**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF IOWA**
**EASTERN DIVISION**

| | |
|---|---|
| John Sexton, | No. 3:23-cv-00031-HCA |
| Plaintiff, | |
| v. | |
| Dakota, Minnesota & Eastern Railroad Corporation d/b/a Canadian Pacific, a Delaware Corporation, | **SEXTON'S BRIEF IN SUPPORT OF MOTION TO COMPEL DISCOVERY** |
| Defendants. | |

## TABLE OF CONTENTS

**INTRODUCTION** ........................................................................... **3**

**FACTUAL BACKGROUND** ............................................................ **3**

**MEET AND CONFER EFFORTS** .............................................. **6**

**LEGAL ARGUMENT** ..................................................................... **8**

*I. Scope of Discovery* .................................................................. 8

*II. CP should be compelled to produce the PMPS for all requested management during the requested time period, as narrowed in the parties' correspondence (Request for Production No.22)* ................................ 10, 11

*III. CP should be required to produce all the requested phone records* .. 14

**Statement Regarding Oral Argument** ..................................... **16**

**Sexton's Requested Relief** ......................................................... **16**

## TABLE OF AUTHORITIES

**Cases**

*Allen v. Admin. Rev. Bd.*, 514 F.3d 468, 476 n.3 (11th Cir. 2008) ................ 9

*Ameristar Airways, Inc. v. Admin. Rev. Bd.*, 650 F.3d 562, 567 (5th Cir. 2011)
............................................................................................................. 9

*Araujo v. New Jersey Transit Rail Operations, Inc.*, 708 F.3d 152, 156 (3rd Cir. 2013) ............................................................................... 9

*DeFrancesco v. Union RR Co.*, ARB No. 10-114, ALJ No. 2009-FRS-0 (ARB Feb. 29, 2012) ........................................................................... 10

*Farnsworth v. Procter & Gamble Co.*, 758 F.2d 1545, 1547(11th Cir. 1985)8

*Jones v. BNSF Ry. Co.*, 2019 WL 6728429, *5-6 (D. Mont. 2019)(CV 14-65-GF-BMM-JTJ) ............................................................................. 13

*Kuduk v. BNSF*, 980 F.Supp.2d 1092, 1101 (D. Minn. 2013)...................... 10

*MapleWood Partners, L.P. v. Indian Harbor Ins. Co.*, 295 F.R.D. 550, 580 (S.D. Fla. 2013)................................................................................ 8

*Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351, 98 S. Ct. 2380 (1978) ............................................................................................ 8

*Voelker v. BNSF Ry. Co.*, 2020 WL 6149553, *7 (D. Mont. 2020)(CV 18-172-M-DLC)...................................................................................... 12, 13

## Rules

Fed. R. Civ. P. 37(a)(1) ............................................................... 6
Fed. R. Civ. P. 26(b)(1) ............................................................... 8
Fed. R. Civ. P. 37(b)(2)(C) ........................................................ 16

## EXHIBIT INDEX

All Exhibits to this motion are attached to the contemporaneously filed Declaration of Cyle A. Cramer.

1. January 18, 2021, Email to Tracy Miller
2. January 20, 2021, Email from Tom Jared
3. Safety Review – US West Cutting Tracks 1
4. Safety Review – US West Cutting Tracks 2
5. February 1, 2021, Email McKelvey to Prince
6. February 1, 2021, Email Jared to McKelvey
7. February 10, 2021, Email Miller to Jared
8. Stipulation regarding Prior Discovery
9. Short Term Incentive Plan
10. Teams Message from McKelvey to Prince

11. 2021 PMP Form for Thomas Jared
12. 2020 PMP Form for Thomas Jared
13. September 26, 2023, Correspondence Letter from Defense
14. November 22, 2023, Correspondence Letter from Defense

## INTRODUCTION

John Sexton (Sexton) moves the Court to compel Defendant Dakota, Minnesota & Eastern Railroad Corporation d/b/a Canadian Pacific (CP) to produce 2022 Performance Management Program forms (PMPs) for several of its management employees named below and phone records for Tracy Miller. Additionally, Sexton moves the Court for the relief articulated below and all further relief the Court deems just and warranted.

## FACTUAL BACKGROUND

In January of 2021, Sexton sent an email to CP management and officers, including, at the time, CP Rail Senior Vice President of Operations, Tracy Miller. [Cramer Decl. at Ex. 1]. The email detailed Sexton's concerns regarding hazardous safety conditions that were relayed to him in his role as the union co-chairman of the Workplace Health and Safety Committee. Mr. Miller then sent these emails to several others, including CP Vice President of Operations for the Southern Region, Jason Ross, and General Manager of Operations for the US West, Tom Jared. *Id*. Ultimately, Mr. Jared later concluded in an email to Mr. Sexton that he talked to several employees involved, took no other action, and that the "matter is closed." [Cramer Decl. at Ex. 2].

A couple weeks later, on February 1, 2021, Mr. Sexton came on duty at 1:30 am. He held a job briefing with his conductor, Justin DePover, where Mr. Sexton noted that the crossings and flangeways would need to be cleared of snow before they ran their train with cars attached over the crossings. Mr. Sexton's concern was that there was a likelihood of a derailment if the crossings

were not cleared. Two derailments had occurred around this time that CP attributed to a failure to "cut" crossings. [Cramer Decl. at Ex. 3] and [Cramer Decl. at Ex. 4]. The process for clearing the snow is called "cutting" where the locomotive is separated from the cars and runs over the crossings, cutting the snow and ice with the wheel flanges. As the engine is much heavier than the cars, the engine can safely clear the snow without the risk of cars derailing. Overhearing the job briefing, assistant trainmaster, Kurtis McKelvey, disagreed with Mr. Sexton that the crossings needed to be cut. However, Mr. Sexton stood his ground and refused to run the train with cars attached unless the tracks were cut. Mr. Sexton and his conductor then took the time to clear the crossings and flangeways of snow.

The time it took to cut the crossings caused a delay that did not go unnoticed by management. Noticing the delay, Gary Prince emailed several management employees, including Mr. McKelvey, Dylan Smith, Marcus Johnson, and Mr. Jared. In this email, Mr. Prince demanded a "full breakdown from the Trainmaster on what happened here." [Cramer Decl. at Ex. 5]. Mr. Prince complained that several crews were called in based on the assumption that Sexton's train would be on time, or within "standard" and now that it is delayed, "[w]e are at risk of 4 re-crews due to 1 train over-standard." *Id*. Mr. Prince concluded his email stating, "[e]nsure the delays in Nexus are filled out correctly with facts, not assumptions." *Id.* Mr. McKelvey then generated an incident report, noting that Sexton "had to cut the Boatels crossing and run down MQS light power before they could shove the cars into it." [Cramer Decl. at Ex. 6]. Mr. Jared's response to Mr. McKelvey's incident report only said, "[c]all me when you have a min [*sic.*]". *Id*.

After causing a delay by cutting the crossings, Mr. Sexton connected the engines to the cars he was tasked with transporting and traveled to Nahant Yard in Davenport, Iowa. Shortly after his arrival in Nahant, General Manager Mr. Jared conducted, unannounced, what CP alleges was an

"efficiency test" on Mr. Sexton. Specifically, Mr. DePover was on the ground observing the train movements being made by Mr. Sexton while communicating instructions on that movement. This is called "protecting the shove." Mr. Jared walked up behind Mr. DePover and told him to stop communicating over the radio with Mr. Sexton, thus interrupting a shoving movement. CP rules and the efficiency test manual do not sanction this type of "set up test" conducted by Mr. Jared. CP rules consider the actions taken by Mr. Jared to be a major/life threatening rule violation (despite CP never investigating nor disciplining Mr. Jared for his violation of CP rules).

Mr. Sexton reported to Mr. Miller the unsafe actions set up by Mr. Jared in conducting this "efficiency test". [Cramer Decl. at Ex. 7]. Mr. Miller then forwarded Mr. Sexton's safety report to Mr. Jared stating, "[y]our territory and the leadership seems to be on a tailspin. I don't fault [Sexton] for this note, but even if not true, we are creating a stage/platform for their feelings. You have got to get your territory settled down but have to be engaged in the right things at the right time to do it." *Id*. Then, CP held a formal investigation against Sexton for failing the "efficiency test" where Mr. Jared acted as a witness and decision maker in deciding whether the test was conducted properly and whether Sexton failed the test. All the while, Sexton requested for witnesses to be present, none of whom CP made available for the investigation hearing. Mr. Jared's position in the investigation was that Mr. Sexton failed the "efficiency test" and recommended the discipline of a 20-day unpaid suspension, which CP imposed against Mr. Sexton. This discipline eliminated any "stage" or "platform" for Sexton's "feelings" about safety within CP, just as Mr. Miller implied Mr. Jared should do.

## MEET AND CONFER EFFORTS

Under the Federal Railway Safety Act, a complaint can only be filed with the Department of Labor, where OSHA then investigates the matter. 49 USC § 20109(d)(1) and 29 CFR § 1982.104. This investigation does not allow for the parties to conduct any discovery. From here, OSHA makes a preliminary decision that either party may appeal. If appealed, the case goes to the Office of Administrative Law Judges (OALJ) for a hearing. This hearing is conducted under 29 CFR § 18 – Rules of Practice and Procedure for Administrative Hearings for Before the Office of Administrative Law Judges, which generally reflects the Federal Rules of Civil Procedure. Only after 210 days of filing a complaint with the Department of Labor, if the Department of Labor has not made a final determination, then the complainant may bring an original action in the appropriate district court of the United States. 49 USC § 20109(d)(3).

When this case was at the OALJ, Sexton sent discovery requests to CP and those requests were answered while the case was still at the OALJ. However, before conducting any communication regarding those discovery answers, Sexton exercised the kick out provision of the FRSA, filing an original action with this Court. For the sake of reducing costs associated with this litigation, Sexton agreed to stipulate with CP that the prior discovery conducted at the OALJ would be merged into the case in front of this Court. [Cramer Decl. at Ex. 8]. That stipulation was executed by Sexton on July 5, 2023 (the same day as the scheduling conference with this Court).

On August 4, 2023, Sexton's counsel requested a conference with CP counsel noting that the intention of the conference was to confer as required by Fed. R. Civ. P. 37(a)(1). This conference occurred on August 11, 2023, however, ended without discussing every discovery dispute as CP counsel requested that Sexton's positions on CP's discovery answers be conveyed in writing. On August 15, 2023, Sexton sent written correspondence to CP in an attempt to narrow

and clear up several discovery requests, detailing all the topics that Sexton's counsel intended to address in the August 11 conference. CP replied to Sexton's first correspondence on September 15, 2023. In an attempt to resolve the discovery disputes in good faith, Sexton followed up with another written correspondence on September 19, 2023. CP responded to that correspondence on September 26, 2023.

On September 21, 2023, Sexton sent a second set of discovery requests to CP based on the correspondence that had occurred thus far. CP answered the second set of discovery requests on October 23, 2023.

Sexton wrote more correspondence regarding discovery on September 27, 2023. On October 10 and 25, 2023, and November 8, 2023, CP sent supplemental disclosures that resolved some of the matters that parties had discussed. On November 14, 2023, Sexton sent CP correspondence regarding remaining discovery matters. CP Responded on November 22, 2023. Sexton again sent correspondence on November 28, 2023. CP responded on December 7, 2023. Then, on December 22, 2023, CP produced some supplemental documents. These numerous back and forth correspondence was an attempt to resolve all of the disputes between the parties in good faith. Although a good number of matters were resolved through these correspondences, a few remained.

Pursuant to LR 7(k), Sexton's counsel inquired about consent to file this motion on January 9, 2024. This conferral resulted in the production of one matter that was in question. On January 10, 2024, counsel for both parties had a final phone conference regarding discovery disputes. That call to an extent resolved another matter for the time being because parties agreed it is best for Sexton to serve new discovery requests on the subject. Sexton's counsel represents here that he

personally conferred in good faith with counsel for CP regarding consent to file this motion and

CP does not consent to this motion.

## LEGAL ARGUMENT

### I.    *Scope of Discovery*

The Federal Rules of Civil Procedure provide for broad discovery. Courts consistently hold

that the "Federal Rules of Civil Procedure strongly favor full discovery whenever possible."

*MapleWood Partners, L.P. v. Indian Harbor Ins. Co.*, 295 F.R.D. 550, 580 (S.D. Fla. 2013) *quoting*

*Farnsworth v. Procter & Gamble Co.*, 758 F.2d 1545, 1547 (11th Cir. 1985). "Parties may obtain

discovery regarding any nonprivileged matter that is relevant to any party's claim or defense," and

"discovery need not be admissible in evidence to be discoverable." Fed. R. Civ. P. 26(b)(1). At the

discovery stage, relevance is expansive, "encompass[ing] any matter that bears on, or that

reasonably could lead to other matter[s] that could bear on, any issue that is or may be in the case."

*Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351, 98 S. Ct. 2380 (1978). "If the information

sought might reasonably assist a party in evaluating the case, preparing for trial, or facilitating

settlement, it is relevant to the subject matter involved in the pending action." *Id.* Further,

"discovery is not limited to issues raised by the pleadings, for discovery itself is designed to help

define and clarify the issues." *Id.*

Proportionality is not strictly determined by the amount in controversy, being only one of

six factors. Proportionality is determined by "considering the importance of the issues at stake in

the action, the amount in controversy, the parties' relative access to relevant information, the

parties' resources, the importance of the discovery in resolving the issues, and whether the burden

or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). The

Committee Note to the 2015 Amendments repeat and emphasize the 1983 Committee Note in

"recogniz[ing], 'the significance of the substantive issues, as measured in philosophic, social, or institutional terms. Thus the rule recognizes that many cases in public policy spheres, such as **employment practices**, free speech, and other matters, may have importance far beyond the monetary amount involved.'" *Id.* (Emphasis added). Further, the 2015 Committee Note provides, "[n]or is the change intended to permit the opposing party to refuse discovery simply by making a boilerplate objection that it is not proportional." *Id.*

The scope of relevance is in part dictated by the law in question. "The purpose of the Federal Rail Safety Act ('FRSA') is 'to promote safety in every area of railroad operations.'" *Araujo v. New Jersey Transit Rail Operations, Inc.*, 708 F.3d 152, 156 (3rd Cir. 2013) *quoting* 49 U.S.C. § 20101. Under the FRSA, a railroad carrier "may not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee if such discrimination is due, in whole or in part" to the employee's protected conduct. 49 U.S.C. § 20109(a). The FRSA incorporates the whistleblower burden-shifting framework pursuant to the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century (AIR-21) codified at 49 U.S.C. § 42121(b)(2)(B). This is a two-part test. The employee must demonstrate that his protected activity "was a contributing factor in the unfavorable personnel action alleged in the complaint." 49 U.S.C. § 42121(b)(2)(B)(iii). Then, "[r]elief may not be ordered . . . if the employer demonstrates by clear and convincing evidence that the employer would have taken the same unfavorable personnel action in the absence of that [protected activity]." 49 U.S.C. § 42121(b)(2)(B)(iv).

The term "contributing factor" provides a low burden for plaintiffs and casts a wide net for relevance. "A contributing factor is any factor, which alone or in combination with other factors tends to affect in any way the outcome of the decision." *Araujo*, at 158, *quoting Ameristar Airways, Inc. v. Admin. Rev. Bd.*, 650 F.3d 562, 567 (5th Cir. 2011); *quoting Allen v. Admin. Rev. Bd.*, 514

F.3d 468, 476 n.3 (11th Cir. 2008). Thus, discoverable (i.e. relevant) evidence in an FRSA case is any evidence that "tends to affect in any way" the plaintiff's claims.

To provide further context, the contributory factor element "can be proven through circumstantial evidence of a temporal proximity, pretext, shifting explanations by the employer, antagonism or hostility toward the plaintiff's protected activity, the falsity of the employer's explanation or a change in the employer's attitude toward plaintiff after he/she engaged in protected activity." *Kuduk v. BNSF,* 980 F.Supp.2d 1092, 1101 (D. Minn. 2013) *citing DeFrancesco v. Union RR Co.,* ARB No. 10-114, ALJ No. 2009-FRS-0 (ARB Feb. 29, 2012). Thus, any evidence that tends to affect in any way these types of evidence is relevant for discovery. Incentive or motive is another factor to consider in FRSA cases, meaning that evidence that tends to affect in any way incentive or motive is discoverable. Generally, demonstrating that there is a motive behind the actions taken provides relevant insight into why those specific actions were taken.

II.   *CP should be compelled to produce the PMPs for all requested management during the requested time period, as narrowed in the parties' correspondence.*

[SPACE INTENTIONALLY LEFT BLANK]

**REQUEST NO. 22.** Please provide a copy of evaluations, goals, metrics, and ratings for each CP management person involved in the disciplinary investigation, discipline assessment, discipline appeal, or any review of Complainant's discipline for the years 2018 to the present.

**RESPONSE NO. 22.** Respondent objects to this Request because it seeks documents that are outside the scope of discovery, in that the documents sought are irrelevant to Complainant's claims against Respondent and Respondent's defenses to such claims. Specifically, manager performance evaluations are not relevant to Complainant's employment or discipline and are thus outside the scope of discovery. Respondent further objects to the phrase "involved in," which is subject to more than one reasonable interpretation and so is ambiguous, vague, overly broad, without limit discernable to Respondent, and not proportional to the needs of the case when the factors of 29 C.F.R. § 18.51(b) are applied. Respondent also objects to this Request to the extent it seeks information dated before January 1, 2021 on the grounds that information prior to this date

19

4877-6995-5930\1

is not relevant to Complainant's claims or Respondent's defenses and is therefore beyond the scope of permissible discovery and unduly burdensome to Respondent. If materials responsive to this Request exist, they will be withheld on the basis of the foregoing objections.

Class I railroads across the country, including CP, incentivize their management employees with large bonuses based on the measurement of several objectives, including the measurement of efficiency through several metrics. Additionally, railroad managers are required to complete self-reviews in which their immediate supervisor also provides comments. At CP, these reviews are called the "Performance Management Program" (PMP). Under CP policy, PMPs are based on the

"achievement of objectives against the standards and measures established for each objective." [Cramer Decl. at Ex. 9]. CP policy is clear that bonuses are based upon individual performance and are "tied directly to the individual's PMP objectives." *Id.*

In this case, Sexton alleges that CP discriminated against him for conducting protected activity under the Federal Railroad Safety Act (FRSA). Such protected activity led to a delay as compared to the "standard," which Sexton alleges contributed to adverse employment actions against him. Communications show that CP management wanted to "hold [Sexton] accountable for delaying the train". [Cramer Decl. at Ex. 10]. As mentioned above, efficiency metrics are directly tied to the bonuses of management employees. Performance objectives not only create an individual incentive for management employees to focus on speed and efficiency, but also create a culture that cares primarily about speed and efficiency. Take for example the PMP objectives in 2021 for Mr. Jared, which states, "Improve overall performance of the southern region, train Performance, origin Performance, terminal Dwell Hours and GTM's." [Cramer Decl. at Ex. 11]. Further, Mr. Jared commented that his "actions and behaviors" in 2021 included "drill down on late trains, terminals with high dwell." *Id.*

Here, Sexton seeks the 2022 PMPs of management involved in the alleged discrimination, including Tom Jared, Mark Johnson, Kurt McKelvey, Jason Ross, and Dylan Smith. After a conference and several letters back and forth with CP regarding the matter of PMPs, CP produced the 2020 and 2021 PMPs for Tom Jared, Mark Johnson, Kurt McKelvey, Jason Ross, and Dylan Smith, however, has objected to the production of 2022 PMPs.

In prior FRSA cases, courts have compelled the production of PMPs, including for the year after the alleged protected activity and adverse employment action. *See Voelker v. BNSF Ry. Co.*, 2020 WL 6149553, *7 (D. Mont. 2020)(CV 18-172-M-DLC) (where the court compelled the

production of PMPs from 2014-2018, describing it as a "sufficiently narrow window" as events that gave rise to the lawsuit occurred in 2015 and the adverse employment action occurred in 2017). In *Voelker*, the court noted the railroad's repeated efforts in not disclosing PMPs and the court's repeated orders to compel PMPs—"[i]n resolving these discovery issues, the Court walks on well-trodden ground." *Citing Jones v. BNSF Ry. Co.*, 2019 WL 6728429, *5-6 (D. Mont. 2019)(CV 14-65-GF-BMM-JTJ).

Here, Sexton seeks the 2022 PMPs for Tom Jared, Mark Johnson, Kurt McKelvey, Jason Ross and Dylan Smith. As described by the *Voelker* court, PMPs including the year after the adverse employment action constitute a "narrow window." Sexton contended in his correspondence to CP counsel that the 2022 PMPs are likely to reflect items from the previous year. Sexton's counsel noted that Mr. Jared's 2020 PMP made a direct comparison to his 2019 metrics and that Mr. Jared noted that CP will continue to "build on our successes" from 2019— this demonstrates that PMPs generally make reflections based on the prior year. [Cramer Decl. at Ex. 12]. Here, Sexton is seeking the 2022 PMPs, only one year after the alleged retaliation in this case. Generally, 2022 PMPs are not in a vacuum—what managers indicate they want to improve on in 2022 can only be compared to the events from the prior year—making the 2022 PMPs relevant in this matter. Any pressure management felt to improve metrics during 2022 was the result of their 2021 PMPs, so the 2022 PMPs are relevant and important for the matters of this case. Since Sexton was disciplined by CP in 2021, Sexton needs to understand the pressures that CP's management were operating under in 2021 and therefore chose to address in 2022 to properly contextualize railroad management's decision-making process.

CP's position is that simply because the events of the case took place in 2021, that there is "no reason how performance objectives and general results for managers in 2022 have anything to

do with the allegations in this case…" with no further explanation. [Cramer Decl. at Ex. 13]. Ultimately, after four months of correspondence, CP has refused to produce 2022 PMPs. Thus, Sexton respectfully asks this Court to compel the production of the 2022 PMPs for the named managers and require CP to pay Sexton's reasonable expenses and attorney's fees for the efforts spent obtaining these documents.

### III.  CP should be required to produce all the requested phone records.

**REQUEST NO. 30.** Produce any and all call logs and phone records from land line phones, work cell phones, and personal cell phones for Tom Jared, Dylan Smith, Kurt McKelvey, Marcus Johnson, Tracy Miller, and Jason Ross for February 1, 2021.

**RESPONSE NO. 30.** CP objects to this Request because it seeks "any and all call logs" regardless of whether any such logs are relevant to Plaintiff's claims against CP and CP's defenses to such claims, which is not proportional to the needs of the case when the factors of Fed. R. Civ. P. 26(b)(1) are applied. CP further objects to this Request because it seeks documents that are outside the scope of discovery, in that the documents sought are irrelevant to Plaintiff's claims against CP and CP's defenses to such claims. Specifically, there may be phone calls that took place on February 1, 2021 that are not relevant to the lawsuit and are thus outside the scope of discovery. Further, phone records for Dylan Smith, Marcus Johnson, Tracy Miller, and Jason Ross for February 1, 2021 are not relevant to the claims and defenses because the allegations of their involvement relate to events that occurred before or after February 1, 2021. CP also objects to the extent this Request seeks documents not in the possession, custody, or control of CP or are equally available to Plaintiff from a third-party. Subject to and without waiving its objections, CP responds that that it is in the process of searching for, collecting, and/ or reviewing phone records for CP landline phones and CP mobile phones assigned to Tom Jared and Kurt McKelvey for February 1, 2021, and will produce responsive documents, if any.

Sexton requested the phone records of Tom Jared, Kurtis McKelvey, Dylan Smith, Marcus Johnson, Tracy Miller, and Jason Ross for February 1, 2021. CP provided the records for Mr. Jared and Mr. McKelvey, objecting to the rest. CP contended that the records of Mr. Smith, Mr. Johnson, Mr. Miller, and Mr. Ross are not relevant. Despite CP's claim, Sexton's counsel was able to determine that Mr. Ross, who CP alleges is the decision maker in Sexton's discipline, had a minimum of three phone calls with Mr. Jared on February 1, 2021. Additionally, Mr. McKelvey and Mr. Jared had a total of five calls into a conference call line on February 1, 2021. Determining whether Mr. Miller was also on the conference call is relevant. Temporal proximity, pretext, and animus are all factors that can be considered in determining the contributing factor element of Sexton's case. Noting that within a couple hours after Sexton's protected activity several management officials began communicating with each other, then Mr. Jared who was involved in that communication, set up a rule-violating test against Sexton, then every step of the way advocated for Sexton's discipline could not be more relevant to the claims in this case.

Only after informing CP that Sexton's counsel had determined that Mr. Ross and Mr. Jared had three phone calls on February 1, 2023, did CP say that it will produce the phone records for Mr. Jared and Mr. Smith. CP still refuses to produce the records of Mr. Miller arguing that "[t]here are no allegations that Tracy Miller was involved in any aspect of the events of February 1, 2021, and so Mr. Miller's phone records are not relevant and will not be produced." [Cramer Decl. at Ex. 14].

Mr. Miller was wrapped up in Sexton's alleged protected activities and was in communication with other management via email from the time of Sexton's protected activity and to the time that Sexton was disciplined—whether these individuals communicated with each other via other means is relevant to the claims of this case. Thus, Sexton requests the Court to compel

the production of the phone records for Mr. Miller pursuant to Request No. 30 and require CP to pay Sexton's reasonable expenses and attorney's fees for the efforts spent obtaining the documents.

## Statement Regarding Oral Argument

Sexton respectfully requests an oral argument on the matters of this Motion to Compel on the basis of whether the Court finds that an oral argument will assist in understanding the issues presented.

## Sexton's Requested Relief

Sexton is entitled to his reasonable attorney's fees and costs incurred in filing this motion. Fed. R. Civ. P. 37(b)(2)(C) ("the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees…"). Sexton will provide an affidavit detailing fees and costs associated with the motion if granted.


Dated: January 12, 2024                          Respectfully submitted,

                                                 /s/ Cyle A. Cramer
                                                 Cyle A. Cramer, *admitted pro hac vice*
                                                 John D. Magnuson, *admitted pro hac vice*
                                                 Yaeger & Jungbauer Barristers, PLC
                                                 4601 Weston Woods Way
                                                 Saint Paul, MN 55127
                                                 T: 651-288-9532
                                                 E: ccramer@yjblaw.com
                                                 E: jmagnuson@yjblaw.com

                                                 *and*

                                                 /s/ Megan R. Merritt
                                                 MEGAN R. MERRITT          AT0010635
                                                             for
                                                 SHUTTLEWORTH & INGERSOLL, P.L.C.
                                                 115 3rd Street SE, Suite 500
                                                 P.O. Box 2107
                                                 Cedar Rapids, IA 52406-2107
                                                 PHONE:   (319) 365-9461
                                                 FAX:     (319) 365-8443

E-MAIL:    mrm@shuttleworthlaw.com

ATTORNEYS FOR JOHN SEXTON