# Fwd: HOME SAFE

| From: | Tracy L Miller ▮▮▮▮ |
|-------|---------------------|
| To: | Jason M Ross ▮▮▮ |
| Date: | Tue, 19 Jan 2021 01:44:26 +0000 |

Begin forwarded message:

**From:** Tracy L Miller ▮▮▮▮▮▮▮
**Date:** January 18, 2021 at 7:30:15 PM CST
**To:** JOHN SEXTON ▮▮▮▮▮
**Cc:** ▮▮▮▮▮▮ Tom Jared ▮▮▮▮ >, Steve Glasgow
<▮▮▮▮ >, chad01johnson ▮▮▮▮▮▮
**Subject: Re: HOME SAFE**

Good evening John,

Trust and hope all is well as it's been a while since we have spoken.

Dylan and Tom have gone through the facts with what's outlined below.  When are you gentlemen free to walk through each item with them?
Trust safety is the number 1 ideal for all of us and we all have to expect accountability from ourselves and those we work with.

I will follow up with you as well

Thanks John

> On Jan 18, 2021, at 3:27 PM, JOHN SEXTON <▮▮▮▮▮▮ > wrote:

> This email did not originate from Canadian Pacific. Please exercise caution with any links or attachments.

The more information I receive from the individuals present during the incident, the more it becomes clear to me that we have two different sets of rules on the CP. One for labor, one for management.

If Trainmaster Chandanais had witnessed T&E crews violating so many rules, they would have received a ride home in his CP company vehicle, which, in spite of CP being a tobacco free environment, isn't, and pulled out of service immediately pending a full investigation.

How much longer will a double standard be allowed to exist on our Home Safe property?

When I spoke with Superintendent Smith on 13 January 2021, he said Mr. Glasgow had spoken to him directly and stated that he did not want his name put out as being the individual coming forward with the information for fear of retribution from Trainmaster Chandanais.    I contacted Mr. Glasgow and he informed me that he had not spoken directly to Superintendent Smith.

Chad Johnson was working as Mr. Glasgow's AE on the day of the incident and tells the exact same scenario played out during the incident at approximately 0950 on 23 December 2020.  Both employees could not believe what they were hearing play out across the mainline channel.

Where is our Home Safe during this incident?  We are told if you see something, say something.  This is being challenged with this correspondence.  We are constantly reminded of Home Safe, about integrity and intestinal fortitude.  Where was this during the incident?

There were several critical rules violations made by Mr. Chandanais during this incident that went against everything we stand for with our Home Safe program.  As safety leaders in the field, this type of behavior from a manager makes us all look bad in the eyes of our fellow employees.

When I hold my footboard job briefings about the topic of the month, I ask my fellow employees to sign the sheet and include their employee number.  I get asked about this incident and all I can say is there is no defense for what happened that day.  The employees on that train were put into harm's way by the one person whose job it is to ensure their safety.  I was given the 3 Whats bulletin at the last Health and Safety meeting: What?  So What?  Now What?

The What is:

1.   No Class III air brake test was performed before the train was moved.

2.   No Engine Air Brake test was performed on the new leader in the consist before the consist was moved.

3.   No 3 points of protection.

4.   The only radio communication Mr. Chandanais had was in his vehicle, away from the train while he was performing service.

5.   Mr. Chandanais did not attach to the crew to perform these tasks, all the while instructing the crew to knowingly violate all the above listed rules.

The So What is:

We all know the effect of Mr. Chandanais careless behavior on that day could have resulted in a catastrophic event, affecting our fellow employees, their families and the public.

The Now What:

That is why this correspondence is being sent and is up to you.


Respectfully,

John Sexton

Union Co-Chair
Quad Cities Health and Safety Committee

# RE: HOME SAFE

**From:** Tom Jared ██████████████████
**To:** JOHN SEXTON ████████████
**Cc:** Steve Glasgow ███████████████████, chad01johnson ██████████████████
   Dylan Smith ████████████████, Joey Reyes ██████████████████
**Date:** Wed, 20 Jan 2021 01:32:46 +0000

Good evening John,

After we talked this afternoon I did more follow up with the employee involved with the allegation. The conductor stated at no time was he instructed to violate any rule, in addition once the power was together they performed the class 3 test.

Also Dylan and I talked in some detail with LC Anderton out of Nahant about the allegations, he was satisfied with the investigation and our follow up, he was also going to follow up with Mr. Glasgow who I see is CC on this correspondence.

Steve if you need additional details let me know we will walk through the information with you and your LC.

Otherwise this matter is closed.

Thanks Tom

██████████



**Tom Jared**
GM Operations – US West Division
C ████████████
C ███████████
1000 Shop Road – Operations Tower
St. Paul MN 55106

**CP Leadership Coach**

---

**From:** Tracy L Miller ████████████████████a>
**Sent:** Monday, January 18, 2021 7:30 PM
**To:** JOHN SEXTON ████████████████.
**Cc:** ████████████; Tom Jared ██████████████; Steve Glasgow

████████████████ ; chad01johnson ██████████████████
**Subject:** Re: HOME SAFE

Good evening John,

Trust and hope all is well as it's been a while since we have spoken.

Dylan and Tom have gone through the facts with what's outlined below.  When are you gentlemen free to walk through each item with them?
Trust safety is the number 1 ideal for all of us and we all have to expect accountability from ourselves and those we work with.

I will follow up with you as well

Thanks John

On Jan 18, 2021, at 3:27 PM, JOHN SEXTON ████████████ > wrote:

This email did not originate from Canadian Pacific. Please exercise caution with any links or attachments.

---

The more information I receive from the individuals present during the incident, the more it becomes clear to me that we have two different sets of rules on the CP. One for labor, one for management.

If Trainmaster Chandanais had witnessed T&E crews violating so many rules, they would have received a ride home in his CP company vehicle, which, in spite of CP being a tobacco free environment, isn't, and pulled out of service immediately pending a full investigation.

How much longer will a double standard be allowed to exist on our Home Safe property?

When I spoke with Superintendent Smith on 13 January 2021, he said Mr. Glasgow had spoken to him directly and stated that he did not want his name put out as being the individual coming forward with the information for fear of retribution from Trainmaster Chandanais.    I contacted Mr. Glasgow and he informed me that he had not spoken directly to Superintendent Smith.

Chad Johnson was working as Mr. Glasgow's AE on the day of the incident and tells the exact same scenario played out during the incident at approximately 0950 on 23 December 2020. Both employees could not believe what they were hearing play out across the mainline channel.

Where is our Home Safe during this incident?  We are told if you see something, say something.  This is being challenged with this correspondence.  We are constantly reminded of Home Safe, about integrity and intestinal fortitude.  Where was this during the incident?

CP_01697

There were several critical rules violations made by Mr. Chandanais during this incident that went against everything we stand for with our Home Safe program. As safety leaders in the field, this type of behavior from a manager makes us all look bad in the eyes of our fellow employees.

When I hold my footboard job briefings about the topic of the month, I ask my fellow employees to sign the sheet and include their employee number. I get asked about this incident and all I can say is there is no defense for what happened that day. The employees on that train were put into harm's way by the one person whose job it is to ensure their safety. I was given the 3 Whats bulletin at the last Health and Safety meeting: What? So What? Now What?

The What is:

1.    No Class III air brake test was performed before the train was moved.

2.    No Engine Air Brake test was performed on the new leader in the consist before the consist was moved.

3.    No 3 points of protection.

4.    The only radio communication Mr. Chandanais had was in his vehicle, away from the train while he was performing service.

5.    Mr. Chandanais did not attach to the crew to perform these tasks, all the while instructing the crew to knowingly violate all the above listed rules.

The So What is:

We all know the effect of Mr. Chandanais careless behavior on that day could have resulted in a catastrophic event, affecting our fellow employees, their families and the public.

The Now What:

That is why this correspondence is being sent and is up to you.


Respectfully,

John Sexton
Union Co-Chair
Quad Cities Health and Safety Committee

 

# Safety Review – US West Cutting Tracks

## Recent Incidents

**Location:**
Sethness Products – MP159 – Davenport Subbdivision

**Description:**
Local assignment shoved one empty tank car into an
industry track that had was covered with ice and snow.
The conductor and brakeman made judgment calls,
thinking they could see the rail when in reality the rail
was buried in the snow.

The car derailed over the rail that was covered by
approximately six inches of ice and snow.



**Preliminary Cause:**
Snow and Ice – Buildup in flange way / Failure to cut
tracks as required

SEXTON     000141



 

## Safety Review – US West Cutting Tracks

### Recent Incidents

**Location:**
West Way Feeds – MP19 – Nitrin Subdivision

**Description:**
Local assignment shoved two cars into an industry track that had a section covered with ice and snow. The conductor made a judgment call holding two loaded tank cars that the equipment would cut the tracks without issue, since the majority of the rail was visible and only a small section was covered.



The lead car derailed over the section of covered rail, which was covered by approximately four inches of ice and snow.

**Preliminary Cause:**
Snow and Ice – Buildup in flange way / Failure to cut tracks as required



SEXTON    000142

## RE: Marquette Sub Delays



**From:** Kurtis McKelvey

**To:** Gary Prince                          Tom Jared                          Dylan Smith
                          Joey Reyes                                Mark J Johnson
                          , "DL_MOC Senior Director
                          , MOC Director East
              "DL_CMC_Management        cmc_management

**Date:** Mon, 01 Feb 2021 15:33:27 +0000

474-31 arrived at MQT 00:56 and held at MP 100 for 475 to pull up and shove in the north wye. 475 gave up TW at 01:37 and 474 IB crew took TW at 01:38 to pull down to the depot for crew change.

I had a job briefing with the crew while waiting for 474 OB to arrive at depot about work to be completed and the siding crossing needing to be cut. OB boarded train at depot and preformed inspection of engine.

The work for 474 was to lift 1 engine and s/o 24 cars behind 49 cars and 1 DP unit. I had an opportunity crew move the engine to the South leg of the wye for 474 to lift allowing 475 to continue with their work in the yard.

474 crew was instructed to lift the engine, tie onto train and then we would drive the AE back and make a standing cut 74 cars deep.

474 was instructed to pull down to the South wye where the engine was to be lifted and roll up MP 100. ATM was at rear of train and visually confirmed rear end passing MP 100 to roll up for 574 crew change. 474 rolled up TW to MP 100 at 02:22, this is the time they arrived at south wye to begin their work.

474 crew cut off light power and went down to the South siding switch. I was crew changing 575 at MP 100 when they said they would need a shovel and broom at the south siding switch to dig it out.

I again instructed them to go lift the engine off the south wye. While they were tying onto the engine I used another crew to sweep out the switch and verify it was safe.

When I got back from making sure the switch was clear 474 was tied onto the engine going through the unit. A watched them for aprox. 10 min before I asked how it was coming and they informed me they "we're trying to figure out why the rear light isn't coming on". I instructed them to go back to the second unit and just turn on the light manually. Then 474 completed consist air brake test on south leg of the wye.

474 then ran light power 2 units down to the south siding switch and ran light power over boatels crossing and down the siding track where their s/o would be made. After this was completed then ran light power back to their train and tied on. I picked up the AE and drove him back where his cut was. Cut was made 74 cars deep and required ATM to relay for AE.

474 AE then rode the shove into MQS where he s/o 24 cars. I picked up the AE on the north end and drove him 24 cars up where he tied 2 hand brakes.

474 then doubled back to rear of their train holding 49 cars and 1 DP engine. The AE stopped and detrained the car, before making the joint on MQT main. AE released 2 hand brakes and checked 2 additional brakes. I drove him up to the head end.

474 then had to wait for air to build up before they could complete the class 3 air brake test. Train was 9349'. PTC was then set up and TW issued and verified.

474 departed MQT 05:39 (3'23") over standard. There is no reason lifting and engine and s/o 24 cars should take this long. I have asked for delay reports to be gathered at Nahant and Road Foreman Finney to get a download of the CP8526 when it arrives at Nahant.



**From:** Gary Prince
**Sent:** Monday, February 1, 2021 4:54 AM
**To:** Tom Jared                    Dylan Smith                    Joey Reyes
                Mark J Johnson                        Kurtis McKelvey
                        DL MOC Senior Director        MOC Senior Director
**MOC Director East**                        D CMC_Management

**Subject:** RE: Marquette Sub Delays

We need a full breakdown from the Trainmaster on what happened here. A set out and locomotive lift should not take 4'30" as projected.

574-138, 475-30 and B39-31 were called based on within standard work event. We are at risk of 4 re-crews due to 1 train over-standard.

Ensure the delays in Nexus are filled out correctly with facts, not assumptions.

GJP



**From:** Ron Pierce
**Sent:** Monday, February 1, 2021 3:51 AM
**To:** Tom Jared                    Dylan Smith                    Joey Reyes
                Mark J Johnson                        Kurtis McKelvey
                        DL MOC Senior Director        MOC Senior Director
**MOC Director East**
**Subject:** Marquette Sub Delays

474-31 arrived Marquette 0056, outbound called 0105 and had to wait for 475-30 to clear onto the Mason City Sub. After 475-31 cleared on the Mason City Sub then 474-31 had to pick up a engine and set out to the yard. Unable to hold 474-31 at Harpers account HOS at 0200 on the inbound.

475-30 arrived Marquette 0108, originally projected to arrive at 0001. But was held up at Ekcards for 6B52-31 to clear as they were having issues with frozen switches on the main line and in the plant at Pattison. Engineering helped clear into the R14 at Pattison. At Marquette the train has set out 4 cars and pick up 1600 feet of traffic. Outbound called 0345. Meeting 474-31 and 574-138 at Marquette.

574-138 arrived Marquette 0208, and is waiting behind 474-31 to depart and pull down and change crews.

Plan for the meet was discussed with Assistant Trainmaster Kurt McKelvey and Superintendent Dylan Smith. Assistant Trainmaster on site working with the crews.

Notifications:
Assistant Superintendnet Joey Reye by the SR Director, who is arranging for the download.
Assistant Trainmaster Kurt McKelvey

RR Pierce

# RE: Incident Report 474-31 [T14 - Planned Lift/Set-Off - Over Standard] - IMOP20210201780627

| | |
|---|---|
| **From:** | Tom Jared |
| **To:** | Kurtis McKelvey |
| **Date:** | Mon, 01 Feb 2021 16:04:33 +0000 |

Call me when you have a min

**From:** Kurtis McKelvey
**Sent:** Monday, February 1, 2021 9:37 AM
**To:** Gary Prince                    Joshua Pennington                    ; Kamron
Muscha                    Jacob Roemer                    Angie Wolter
                    Christopher Grimes                    Tom Jared
                    Dylan Smith                    Gordon Hamby

**Subject:** Incident Report 474-31 [T14 - Planned Lift/Set-Off - Over Standard] -
IMOP20210201780627

# Incident Report 474-31

This email was automatically generated and delivered in accordance to your personal Incident Management subscription. To edit your subscription, access Employee Station.
Note: the sender of this email may not actively monitor this inbox. For assistance contact the required OC Director.

| | |
|---|---|
| **Subdivision** | 385882048 - MARQUETTE |
| **Station** | MARQUETTE |
| **Mile** | 98 |
| **Time** | 09:33 CST |
| **Date** | 2021/02/01 |
| **Delay Amount (HHH:MM)** | +003:23 |
| **Status (HHH:MM)** | 008:29 LT |
| **Reason** | T14 - Planned Lift/Set-Off - Over Standard |
| **Description** | 474 scanned in and held at MP 100 for 475-30 to shove into MQT through the North Wye. 474 issued TW 01:38 to come to depot for crew change. 474 rolled up MP 100 at 02:22 when they arrived at south wye to start their work. 474-31 lifted CP 5047 off the south leg of the wye and s/o 24 cars to MQS. they also had to cut the Boatels crossing and run down MQS light power before they could shove the cars into it. ATM on sight to help with rides and expedite as much as possible. |
| **Notification** | |
| **Action taken** | |
| **Follow Up** | |
| **All Clear Time** | |
| **All Clear Date** | |
| **Engineer** | Initials:  , Name: SEXTON |
| **Conductor** | Initials:  , Name: |
| **Locomotives** | 8526 F,UP 5586 R |

Exhibit 6

| | |
|---|---|
| **Consist Details** | Loads: 117, Empties: 27, Tons: 15471, Length: 9274 |
| **Weather** | |
| **Delay #** | 412184 |
| **Service Manager Incident #** | |

| Equipment ID | Notification # |
|---|---|
| **Mechanical Details** | |

| | |
|---|---|
| **Other Trains Involved** | |
| **Created By** | MCK0224 |
| **Updated By** | MCK0224 |

# FW: RE : HOMESAFE ???

**From:**     Tracy L Miller ███████████████
**To:**        Tom Jared ██████
**Date:**      Wed, 10 Feb 2021 14:53:51 +0000

Your territory and the leadership seems to be on a tailspin. I don't fault John for this note, but even if not true, we are creating a stage/platform for their feelings. You have got to get your territory settled down but have to be engaged in the right things at the right time to do it

Trust I understand the new marriage and the time you want to put in there, but we have to do both EFFECTIVELY....i don't see that happening right now on the railroad



**Tracy L. Miller**

Senior Vice President Operations

██████████

---

**From:** Jason M Ross ██████████████
**Sent:** Wednesday, February 10, 2021 8:51 AM
**To:** ████████████
**Cc:** Tracy L Miller ███████████████
**Subject:** RE: RE : HOMESAFE ???

Good morning John,

Thank you reaching out, Tracy sent this my way as the email address you have is for someone else (there are 3 Jason Ross' in the system)

I will look into this and we will get back to you.



**Jason M. Ross**
VP Southern Region



**CP Leadership Coach**

Confidential

CP_03295

**From:** JOHN SEXTON ███████████
**Sent:** Tuesday, February 9, 2021 8:42 PM
**To:** Tracy L Miller ███████████      Tracy L Miller ███████████
███

**Subject:** Fw: RE : HOMESAFE ???

This email did not originate from Canadian Pacific. Please exercise caution with any links or attachments.

Mr. Miller,

I was in a company vehicle driven from Eckards to Marquette by ATM Kurt McElvey out of Marquette, Iowa during a snow storm while he felt the need to drive at 40 mph on roads that were 100 percent snow covered with blowing and drifting snow. I shared with him on three separate occasions that he was driving too fast and was making me uncomfortable. If this were a carrier contracted cab service I would have had them pull into a gas station which at that time I would have removed my belongings and called a manager for a safe ride. Since this was a fellow CP employee and a manager just what exactly can be done to curtail this? We were already dead on hours of service and on limbo time when he picked us up. Looking for some advice of this.

The next trip out of the hotel to return to Nahant I was called for 474-31. The train was late arriving at Marquette as a 3 train meet was happening in Marquette at the time. When we got on the train we had work to do setting out lines 74 through 51 in Marquette siding. It had been snowing the previous few days and the tracks and crossings were snow covered. I informed ATM McElvey that the crossing and tracks needed cut with the locomotives before our set out. He told me that I would NOT cut the crossings and tracks in which I replied that if he is directing me to not follow the rules and our topic of the month for the Health and Safety Committee and managers {Cutting flangeways and crossings} that he would have to call Superintendent Smith right now to inform him that he is instructing me NOT to follow the rules. He didn't make the call and I cut the tracks and crossings as needed. After reviewing our paperwork our 2 north cars we were shoving into the Marquette siding were a UTLX 971081 and a TILX 500875 both were DANGEROUS ALERT SHIPMENT KEY TRAIN LOADS of AMMONIA. Just exactly what is going on here? My career depends on me to follow the rules 100 percent of the time, all the time to the best of my ability. Why are managers out here instructing crews to break the rules? On Saturday, we had another derailment with crews not cutting flange ways and crossings with an empty car. What would have been the environmental impact as well as the possible loss of life if I didn't insist on cutting the tracks and crossings with 2 loads of AMMONIA. Catastrophic I would imagine.

The same night ATM McElvey instructed a crew to move a locomotive on an open deck bridge for me to pick up in Marquette. This bridge is an open deck design and is not safe for anyone to MU an engine in 6 to 8 inches of snow. I shared all this information with Mr. Jared and Mr. Smith when I arrived at Nahant on 2-01-21.

Respectfully,

John Sexton

Exhibit 8

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF IOWA
### EASTERN DIVISION

| | | |
|---|---|---|
| John Sexton | ) | |
| | ) | Case No. 23-CV-00031 |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | **STIPULATION REGARDING PRIOR** |
| Soo Line Railroad Company, d/b/a Canadian | ) | **DISCOVERY** |
| Pacific Railway, a Minnesota Corporation and | ) | |
| d/b/a CP Rail System, a Minnesota | ) | |
| Corporation, and Dakota, Minnesota, & | ) | |
| Eastern Railroad Corporation, d/b/a Canadian | ) | |
| Pacific, a Delaware Corporation, | ) | |
| | ) | |
| Defendants. | ) | |

WHEREAS, Plaintiff John Sexton ("Plaintiff") first filed his claim for violations of the Federal Rail Safety Act ("FRSA") against Defendant Dakota, Minnesota, & Eastern Railroad Corporation d/b/a Canadian Pacific ("DM&E") with the Department of Labor's Office of Administrative Law Judges ("OALJ") in the case captioned *John Sexton v. Dakota Minnesota & Eastern Railroad Corp., d/b/a Canadian Pacific Railway, 2022-FRS-00056* docketed on August 4, 2022 (the "Administrative Action");

WHEREAS, Plaintiff served his initial disclosures in the Administrative Action on January 24, 2023;

WHEREAS, Plaintiff served written discovery requests to DM&E in the Administrative Action on February 20, 2023, including 5 interrogatories, 26 requests for the production of documents, and 15 requests for admissions;

WHEREAS, DM&E served its initial disclosures and produced 208 pages of documents in the Administrative Action on February 24, 2023;

WHEREAS, DM&E served verified written objections and responses to Plaintiff's discovery requests on March 31, 2023;

WHEREAS, DM&E served written discovery requests to Plaintiff in the Administrative Action on April 7, 2023, including 12 interrogatories, 13 requests for the production of documents, and 6 requests for admissions;

WHEREAS, the Administrative Law Judge entered a Stipulated Protective Order in the Administrative Action on April 13, 2023;

WHEREAS, DM&E produced 1,506 pages of documents responsive to Plaintiff's discovery requests in the Administrative Action on April 14, 2023;

WHEREAS, Plaintiff's responses to DM&E's discovery requests were due on May 8, 2023;

WHEREAS, Plaintiff filed a notice of removal with the OALJ on May 8, 2023;

WHEREAS, Plaintiff filed this action in the U.S. District Court for the Southern District of Iowa on May 11, 2023 (the "Federal Court Action");

WHEREAS, Plaintiff has not yet served his written responses to DM&E's discovery requests or produced documents responsive to DM&E's requests for the production of documents;

WHEREAS, Plaintiff, DM&E, and Defendant Soo Line Railroad Company d/b/a Canadian Pacific ("Soo Line") (together, the "Parties") desire an efficient exchange of discovery in the Federal Court Action and do not wish to duplicate efforts or resources expended on discovery in the Administrative Action;

NOW, THEREFORE, THE PARTIES STIPULATE as follows:

## **STIPULATION**

### **Scope of Stipulation**

This Stipulation will govern written discovery and the production of documents and things, including written discovery requests, interrogatory responses, responses to requests for admission, and responses to requests for documents, as well as documents and things produced in response to written discovery requests in the Federal Court Action.

### **Definitions**

1.     The following definitions shall apply to this Stipulation:

    a.     The term "Prior Discovery" means (1) initial disclosures served in the Administrative Action; (2) written discovery requests, including interrogatories, requests for the production of documents or things, and requests for admissions served in the Administrative Action; (3) written discovery responses, including interrogatory responses, responses to requests for admission, and responses to requests for documents served in the Administrative Action; and (4) documents or things produced in the Administrative Action.

    b.     The term "Party" means any party to this action, any parent company, and all of their respective officers, directors, employees, consultants, retained experts, and counsel (and their respective support staff).

### **Incorporation of Prior Discovery**

2.     The Parties agree that all Prior Discovery is hereby incorporated in the Federal Court Action, meaning the Parties may rely on all Prior Discovery as though it were served or produced in the Federal Court Action.

4874-0746-4555\1

Exhibit 8

3.      The Parties agree that confidentiality designations assigned to Prior Discovery pursuant to the April 13, 2023 Stipulated Protective Order entered in the Administrative Action are hereby incorporated in the Federal Court Action.

4.      The Parties further agree that Plaintiff's deadline to serve written responses and produce documents in response to DM&E's April 7, 2023 discovery requests served in the Administrative Action is thirty (30) days from the first date on which a party executes this Stipulation.

### Limitations on Additional Discovery Requests

5.      The Parties agree that any limitations on the number of discovery requests a Party may serve in the Federal Court Action, whether by agreement of the Parties or pursuant to the Federal Rules of Civil Procedure, shall include Prior Discovery. For example, pursuant to Fed. R. Civ. P. 34, each side is limited to 25 interrogatories, including those served in the Administrative Action.

6.      Nothing in this Stipulation shall prevent any Party from seeking additional relief from the Court, including but not limited to permission to seek additional discovery.

4

Exhibit 8

Dated: June 27, 2023                          DORSEY & WHITNEY LLP


                                              /s/ Joshua Hughes
                                              Joshua Hughes (AT0014950)
                                              hughes.joshua@dorsey.com
                                              Dorsey & Whitney LLP
                                              801 Grand Ave, Suite 4100
                                              Des Moines, IA 50309
                                              Tel: (515) 283-1000
                                              Fax: (515) 598-7704


                                              /s/ John T. Sullivan
                                              John T. Sullivan (admitted pro hac vice)
                                              sullivan.jack@dorsey.com
                                              Briana Al Taqatqa (admitted pro hac vice)
                                              altaqatqa.briana@dorsey.com
                                              Dorsey & Whitney LLP
                                              50 South Sixth Street, Suite 1500
                                              Minneapolis, MN 55402
                                              Tel:  (612) 340-2600
                                              Fax:  (612) 340-2868

                                              ATTORNEYS FOR DEFENDANTS


Dated:  July 5, 2023                          YAEGER & JUNGBAUER
                                              BARRISTERS, PLC


                                              /s/ Cyle A. Cramer
                                              Cyle A. Cramer
                                              ccramer@yjblaw.com
                                              John D. Magnuson
                                              jmagnuson@yjblaw.com
                                              4601 Weston Woods Way
                                              St. Paul MN 55127
                                              Telephone:  (800) 435-7888

                                              ATTORNEYS FOR PLAINTIFF




**Short Term Incentive Plan (STIP)**
Non-Unionized Employees (Canada) and US Salaried Employees
Issuing Department: Human Resources

| | |
|---|---|
| **Policy Statement** | Canadian Pacific offers a Short Term Incentive Plan (the "Plan"), to recognize the contribution that each regular, non-unionized and US salaried employee makes to the Railway's achievement of its business objectives. |
| | |
| **Accountability** | The Management Resources and Compensation Committee of the Board of Directors of Canadian Pacific Railway (the "Committee") has complete authority to interpret and define individual and group eligibility and to establish rules and regulations required to properly administer the Plan. The Board may also suspend, amend or terminate this Plan at any time.<br><br>On an annual basis, managers are responsible for guiding their employees in the objective setting process. Managers must conduct regular progress reviews throughout the year, evaluate performance against objectives at year end and report results to Human Resources.<br><br>Employees are responsible for setting and striving to achieve their annual performance objectives and for soliciting performance feedback from their managers.<br><br>Human Resources is responsible for interpreting this policy, guiding its administration and supporting employees and managers applying the policy. |
| **Process and Application** | |
| Plan Year | The Plan Year runs from January 1 to December 31. |
| | |
| Eligibility | Regular employees who participate in the Company's non-unionized compensation program are eligible to participate in the Plan provided they join the Plan prior to October 1st in their first year of participation.<br><br>Employees must complete three (3) months (65 working days) of cumulative active service in the Plan year in order to be eligible for a STIP payout. |
| | |
| Transfers and Joint Ventures | Employees transferred or seconded to employers participating in a joint venture with CP may be designated as participants in the Plan by the Company. |
| | |
| Temporary Replacements | Unionized employees who temporarily assume a non- |

Employee Policy Manual                                    Effective with the 2021 Plan Year
[APG]



|  | unionized position will be eligible for STIP, provided the temporary assignment commences prior to October 1st of the Plan year and has a minimum continuous duration of three (3) months (65 working days) in the Plan year. |
|---|---|
| Plan Objectives | The objectives of the Plan are: <br><br> • to tie a part of the employee's compensation directly to CP's results; <br> • to reward the achievement of individual and team objectives that support CP's achievement of its annual business plans and long-term strategy; and <br> • to maintain the competitiveness of CP's compensation program. |
| Ending Participation | Participation in the Plan ends when the employee reverts to a unionized position at the Company's request, retires or terminates their employment with CP. <br><br> Employees who revert to a unionized position at their own initiative prior to payout will not be eligible for a STIP award. |
| Target Award Levels | For each Plan Year the Committee establishes the various classes of participants, the weighting of each performance measure assigned to each class and the Target Award Levels. Employee level determines their Target Award Levels. Target Award Levels are expressed as a percentage of annual salary and are the basis for calculating STIP awards. |
| Weighting of Corporate Individual Components | Individual STIP awards are based on two components, individual and corporate. STIP award payouts are based on an employee's group and weighting category at year-end. <br><br> The following table outlines the weighting for corporate and individual performance for the various management levels in the organization: |
| Assessing PMP Objectives | The individual component of STIP awards is tied directly to the individual's PMP objectives established under the Performance Management Program (PMP). A PMP rating (from Unsatisfactory to Outstanding) will be assigned to each of the individual's PMP objectives. |

| LEVEL | CORPORATE | INDIVIDUAL |
|---|---|---|
| Level A to F | 75% | 25% |
| Level 1 | 60% | 40% |
| Level 2 to 6 | 50% | 50% |



**Policy 3411**
Short Term Incentive Plan

The performance ratings are determined on the basis of three dimensions:

1. achievement of objectives against the standards and measures established for each objective;
2. context of performance throughout the year; and
3. peer clustering of employees into a distribution profile established by the Company.

The context of performance dimension considers the "how" of the achievement and adds a necessary judgmental component to the assessment process. The demonstration of company values must be considered.

Taking the three dimensions into account, through the calibration process, an overall PMP rating and an overall STIP attainment level, based on the scales below, are determined for the employee's individual performance component.

| Overall PMP Rating | Overall STIP Attainment Level |
|---|---|
| Outstanding | 170% - 200% |
| Exceeds | 125% - 165% |
| Achieved | 90% - 120% |
| Partially Achieved | 0% - 85% |
| Unsatisfactory | 0% |

**Potential Corporate Payout Levels**

Annually, the Committee establishes the performance criteria, the weighting assigned to each performance criterion and corporate performance target levels for the STIP Program.

Each corporate performance criterion will have three levels of performance and payout.

a) Exceptional Level - 200% of Target Award Level assigned to the corporate component where the actual CP performance meets or exceeds the exceptional level established by the Committee;

b) Target Level - 100% of Target Award Level assigned to the corporate component where the actual CP performance meets the target level established by the Committee;

|  |  |
|---|---|
|  | c) <u>Threshold Level</u> - 50% of Target Award Level assigned to the corporate component when the actual CP performance level for the Plan Year is at the threshold level established by the Committee; and<br><br>Where the actual CP performance falls between the threshold and exceptional levels, the payout level will be prorated.<br><br>Where the actual CP performance falls below the threshold level, no awards will be paid under the corporate component. |
| Corporate Hurdle | For each Plan Year, the Committee establishes a minimum level of corporate performance, below the threshold level, called the corporate hurdle.  If the Company's performance falls below this hurdle, no awards will be paid under the individual or corporate components. |
| Individual Hurdle | If individual performance levels are unsatisfactory, no award will be paid to the individual under the corporate or individual components. |
| CP Net Loss | The Committee has the discretion to adjust the amount of awards so that payment of awards under the Plan does not result in a net loss for CP. No awards will be paid if CP has a net loss for the Plan Year. |
| Calculation of Awards | Awards are calculated by performing the following calculation:<br><br>Target Award Level multiplied by the weighting for the individual component, multiplied by the annual salary in effect at the end of the Plan Year, multiplied by the STIP attainment level<br><br>**added to**<br><br>the Target Award Level, multiplied by the weighting for the corporate component, multiplied by the annual salary in effect at the end of the Plan Year, multiplied by the weighting of the performance measure, multiplied by the payout level.  This calculation is repeated for each of the Company's performance measures.<br><br>For sample STIP calculations, see Appendix 1. |
| Payment of Awards | Awards to be paid out in any Plan Year, will be paid as soon as possible after CP financial results are determined, the Committee has approved a payout, and the participants' performance has been assessed under PMP. |
| Joining Plan Before October 1st | New entrants prior to October 1 of the plan year will have their award for that year prorated based on the length of time they have been a member of the Plan. |

Employee Policy Manual                                          Effective with the 2021 Plan Year

[APG]



Exhibit 9
**Policy 3411**
Short Term Incentive Plan

| | |
|---|---|
| Leaving the Plan Before April 1st | Employees who cease participation in the Plan prior to April 1 of the Plan Year will not be eligible for any STIP Award for the Plan Year. |
| | |
| Leaves of Absence | Leaves of absence (LOA) are those periods when an employee is not actively at work i.e. short or long term disability, personal, maternity, parental, educational leaves. Participants who take a leave of absence greater than 30 consecutive days (22 working days) during the year will have their award prorated based on the length of time in active service during the year. |
| | Potential STIP Awards will be held for participants who take a  personal (non-medical or educational) leave of absence. Eligibility for STIP will be determined at the end of the LOA. If the participant decides not to return it will be considered a voluntary resignation and the participant will not be eligible for a STIP Award. The payment of any STIP Award will only occur when the participant returns from the LOA. |
| | |
| Transfers | Participants transferring on or after April 1st of the Plan Year to a position to which this plan does not apply will have their award prorated based on the length of time in the eligible position. |
| | |
| Termination without Cause | Participants whose employment is terminated by the Company without cause on or after April 1st of the Plan Year will continue to participate in the Plan until their last day actively at work.  If all program conditions are met, (i.e. Company performance and individual performance warrants a payout), they will receive a prorated award based on the length of time they participated in the plan during the year. |
| | |
| Retirements | Employees that retire on or after April 1 of the plan year without a severance payment are eligible for a prorated STIP award provided:<br><br>• he/she provided Retirement Notice in accordance with Retirement Policy 8101; and<br>• retirees are between 55 and less than 60 years of age with a minimum of 5 years of company service from the last date of hire or if retiring at age 60 or greater, must have a minimum of 2 years of company service from their last date of hire. |
| | |
| Termination for Cause | Employees who are terminated for cause during the year will not receive an award for the year in which their employment ended. They will also |

Employee Policy Manual

[APG]

Effective with the 2021 Plan Year


Exhibit 9

**Policy 3411**
Short Term Incentive Plan



| | |
|---|---|
| | not be eligible to receive any award not yet paid at the time of their termination for cause. |
| | |
| Resignation | Employees who resign prior to the STIP payout date will not be eligible for an award for the previous or current plan year. |
| | |
| Death | Employees who are deceased after April 1st of the Plan Year, if all program conditions are met, a prorated award based on the length of their membership in the Plan during the year will be paid to the employee's estate. |
| **Administration** | |
| Setting PMP Objectives | The STIP cycle begins with the establishment of PMP Objectives.  In discussion with their manager and/or team leader, participants are responsible for the development of their PMP objectives and assigning weightings. |
| | |
| Assigning Weights | PMP objectives are weighted according to their relative importance.  The total value of all PMP objectives must equal 100%. |
| | |
| Reporting Results | By the end of January, annually, managers should have STIP attainment levels reported to Human Resources for the previous Plan Year. |
| | |
| **Additional Information** | For additional information, please contact your HR Business Partner or Employee Services by e-mail at Employee_Services@cpr.ca, by phone in Calgary at (403) 319-3900 or toll free at 1 (866) 319-3900. |
| | |
| **Cross Reference** | Policy 5611 - Performance Management Program Policy 8503 - Compensation & Benefits for Unionized Employees who Temporarily Assume Non-Unionized Positions Policy 8101 - Retirement Policy |
| | (U.S. only disclaimer: This policy statement represents the current policy and practice of CP regarding the Short Term Incentive Plan for non-unionized employees and may be changed from time to time by CP without notice.  Nothing in this policy is intended to create any contract, agreement or other obligation by CP with any of its employees.) |

Employee Policy Manual                                    Effective with the 2021 Plan Year

[APG]




Exhibit 9

**Policy 3411**
Short Term Incentive Plan

## APPENDIX 1 - Sample STIP Calculations

| Level 5 with annual salary of $65,000, PMP rating of Achieves at 100% | | | | |
|---|---|---|---|---|
| Target Award Level | Individual Component | Annual Salary | PMP Rating % | Individual Component Award |
| 10% | 50% | $65,000 | 100% | $3250 |
| Added to | | | | |
| Target Award Level | Corporate Component | Annual Salary | Corporate Component % | Corporate Component Award |
| 10% | 50% | $65,000 | 100% (at target) | $3,250 |
| STIP Award total | | | | $6,500 |

| Level 4 with annual salary of $85,000, PMP rating of Exceeds at 125% | | | | |
|---|---|---|---|---|
| Target Award Level | Individual Component | Annual Salary | PMP Rating % | Individual Component Award |
| 15% | 50% | $85,000 | 125% | $7,969 |
| Added to | | | | |
| Target Award Level | Corporate Component | Annual Salary | Corporate Component % | Corporate Component Award |
| 15% | 50% | $85,000 | 50% (Threshold) | $3,188 |
| STIP Award total | | | | $11,157 |

| Level 3 with annual salary of $105,000, PMP rating of Achieves at 110% | | | | |
|---|---|---|---|---|
| Target Award Level | Individual Component | Annual Salary | PMP Rating % | Individual Component Award |
| 17.5% | 50% | $105,000 | 110% | $10,106 |
| Added to | | | | |
| Target Award Level | Corporate Component | Annual Salary | Corporate Component % | Corporate Component Award |
| 17.5% | 50% | $105,000 | 0% (Below Threshold) | $0 |
| STIP Award total | | | | $10,106 |

Employee Policy Manual                          Effective with the 2021 Plan Year

[APG]

**From:**       Kurtis McKelvey
**Sent:**       Mon, 1 Feb 2021 03:47:43 -0600
**To:**         Gary Prince

then im not sure how to hold him accountable for delaying the train

# 2021 Performance Management Form

## Employee Information

| | | | |
|---|---|---|---|
| **Full Name:** | Thomas Jared | **Reports to:** | Jason Ross |
| **Position:** | GM Operations - US West | **Department:** | Operations US West Division |
| **Employee Id:** | ▮▮▮▮▮ | **PMP Status:** | Completed |
| | | **PMP Sub Status:** | |

## Objectives

*This objective was cascaded by the manager:*

| **Foundation:** | Provide Service | **Weight:** | 15 |
|---|---|---|---|

**Objective:** Improve overall performance of the southern region, train Performance, origin Performance, terminal Dwell Hours and GTM's

**My Actions and Behaviors:** Participation in daily region calls, drill down on late trains, terminals with high dwell.

Terminals with high dwell - lead GM's in getting into the what, so what and now what.  Identify the issues and put plans in place to correct same.


Unannounced terminal visits - on a month.
One day in the MOC per quarter.

**Achieves:**
Train Performance % OT +2hrs - Southern Region – Target = 70%
Origin Performance % OT + 2hrs - Southern Region – Target = 98%
Terminal Dwell Hours (All) - Southern Region – Target = 7.5
GTM's – Daily Average - Southern Region – Target = 112
Trip Plans - 97%

**Exceeds:**
Train Performance % OT +2hrs - Southern Region – Target = 73.5%
Origin Performance % OT + 2hrs - Southern Region – Target = 98%
Terminal Dwell Hours (All) - Southern Region – Target = 7.0
GTM's – Daily Average - Southern Region – Target = 115
Trip Plans - 98%

**Actual:**
Trip Plans YTD 95.5%. Challenges first half of the year between February and May in the QC drove the reduced performance.
Q2 we are  at 96.9%
Year end
Train Performance Target = 70% Actual 91%
Origin Performance Target = 98% Actual 93%
Terminal Dwell Hours  Target = 7.5 Actual
GTM's – Target = 112 Actual 107.719
Trip Plans - 97% Actual 95.7

*This objective was cascaded by the manager:*

| **Foundation:** | Optimize Assets | **Weight:** | 15 |
|---|---|---|---|

Exhibit 11

| **Objective:** | Focus on asset utilization, train size, train weights, car velocity and train speed. |
|---|---|
| **My Actions and Behaviors:** | Daily review of performance and driving accountability where it is needed.<br><br>Driving smart operational decisions, train combinations when trains are small and pushing power where it is needed. |
| **Achieves:** | Train Weights – Average Train Weight (All) - Target = 8,979<br>Train Lengths – Average Train Length (All)– Target = 6,721<br>Train Speed – Network Speed (MPH) – Target = 24.4<br>Train Speed – Raw Train Speed (MPH)-  Target = 23<br>Power Utilization – Locomotive Productivity (GTMs/OHP) – Target = 259 |
| **Exceeds:** | Train Weights – Average Train Weight (All) - Target = 9,158 (+2%)<br>Train Lengths – Average Train Length (All)– Target = 6,855 (+2%)<br>Train Speed – Network Speed (MPH) – Target = 24.8 (+2%)<br>Train Speed – Raw Train Speed (MPH)-  Target = 23.46 (+2%)<br>Power Utilization – Locomotive Productivity (GTMs/OHP) – Target = 264 (+2%) |
| **Actual:** | Train Weights up 9.7%<br>Train Lengths up 8.7%<br>Year End<br>Train Weights Target = 8,979 Actual 9241<br>Train Lengths Target = 6,721 Actual 6974<br>Train Speed – Target = 24.4 Actual 22.4<br>Power Utilization  Target = 259 Actual 267 |

*This objective was cascaded by the manager:*

| **Foundation:** | Develop People | **Weight:** | 25 |
|---|---|---|---|

| **Objective:** | Develop people to their fullest potential. |
|---|---|
| **My Actions and Behaviors:** | ATM/LMT/Trainmaster/Assistant Superintendent and Superintendent Development<br>Getting our Leaders to their Potential.<br>Identify and Spend time with 2 officers - 1 day a month - who have potential to become Superintendents.<br>Identify and Spend time with 2 Superintendents - 1 day a month - who have potential to become GM's. |
| **Achieves:** | Identify 1 officers who can become Superintendents. |
| **Exceeds:** | Identify 2 officers who can become Superintendent. |
| **Actual:** | Have been working with David Lackey on his development to progress his to Superintendent. Now that he can focus on one territoty I believe this will help to accelerate his development.<br>Year End<br>David continues to develop in his current roll, 1/2 years to Superintendent |

| **Foundation:** | Operate Safely | **Weight:** | 15 |
|---|---|---|---|

| **Objective:** | Reduce Train accidents and injuries |
|---|---|

CONFIDENTIAL

CP_03403

Exhibit 11

| **My Actions and Behaviors:** | set expectations per superintendent, hold accountable to expectations. Review month |
|---|---|

| **Achieves:** | South-<br>FRA target - 1.61 - 13 injuries<br>Personal injuries - 3.85 - 30 injuries<br>FRA train accidents - 0.39 - 3 total accidents<br>FRA train accidents - 6.85 train accident ratio - 52 incidents<br>Motor vehicle accidents - 13 |
|---|---|

| **Exceeds:** | South-<br>FRA target - 1.61 - 13 injuries<br>Personal injuries - 3.85 - 30 injuries<br>FRA train accidents - 0.39 - 3 total accidents<br>FRA train accidents - 6.85 train accident ratio - 52 incidents<br>Motor vehicle accidents - 13<br><br>Do better than target. |
|---|---|

| **Actual:** | FRA Injury's 1.19<br>All Injury's 3.52<br>FRA Accidents .39<br>All accidents 3.52<br><br>The division has met or exceeded all expectations in the first half on 2021.<br>Year End<br>FRA target - 1.61 - 13 injuries Actual 1.66/7 injuries<br>Personal injuries - 3.85 - 30 injuries Actual 3.79/16<br>FRA train accidents - 0.39 - 3 total accidents Actual 1/.23<br>FRA train accidents - 6.85 train accident ratio - 52 incidents Actual 4.20/18<br>Motor vehicle accidents – 13 Actual 3 |
|---|---|

| **Foundation:** | Control Costs | **Weight:** | 20 |
|---|---|---|---|

| **Objective:** | Achieve VBudget, monitor and manage cc/KGTM, Overtime, Yard and terminal costs. |
|---|---|

| **My Actions and Behaviors:** | Will continue to work with stake holders driving cost down. |
|---|---|

| **Achieves:** | Meet approved budget.<br><br>Maintain cc/KGTM - 1.39 for South<br><br>Crew Transportation - -5% vs 2020 actual spend - achieves target: ▓▓▓▓▓<br><br>Focus on taxi spend. |
|---|---|

| **Exceeds:** | -2% under budget.<br><br>Improve cc/KTGM - 1.38<br><br>Crew Transportation - -10% vs 2020 actual spend - exceeds target: ▓▓▓▓▓<br><br>Focus on taxi spend. |
|---|---|

CONFIDENTIAL

CP_03404

Exhibit 11

**Actual:**

Cost per KGTM $1.34, exceeding the goal of $1.39.
Taxi cost are up 6% from last year.

Challenges with 2021 budget over all so far this year was the QC territory between February and May with higher volumes and a reduced crew base from 2020. Also driving cost were the elimination of ESR between Enderlin and St Paul between February and June.
Year End
Cost per KGTM $1.34 Actual 1.18
Taxi cost 4m vs V-budget of 3.3m

# Consequence Leadership (CL)

|  | Employee Rating | Leader Rating |
|---|---|---|
| Of the 10 Consequence Leadership behaviours, how many can the employee describe how they applied them? | | |

Rate the proficiency of the employee in their application of the Consequence Leadership behaviours/tools below:

|  | Employee Rating | Leader Rating |
|---|---|---|
| Overall CL Rating (Average of Leader ratings): | | |

This section provides an opportunity to elaborate, track progress or provide further context on the assessments above. This "Comments" section is optional.

Employee Comments:

Leader Comments:

# Core Leadership Competencies

Both employee and the employee's leader are to fill out this section to identify where they see the employee at a point in time with respect to CP's four core leadership competencies.

**Note:** This section has no weight on your overall PMP rating. The purpose of these ratings is to identify development areas which you will incorporate into your development action plan. This section has a separate weighting.

|  | Employee Rating | Leader Rating |
|---|---|---|
| Overall Core Leadership Competency Rating (Average of Leader ratings): | | |

This section provides an opportunity to elaborate, track progress or provide further context on the assessments above. This "Comments" section is optional.

Employee Comments:

Leader Comments:

# Functional Competencies

Functional competencies are key technical competencies and behaviours that are core to understanding Operations. Both employee and the employee's leader are to complete this section to identify where they see the employee at a point in time.

| | Employee Rating | Leader Rating |
|---|---|---|
| Overall Functional Competency Rating (Average of Leader ratings): | | |

This section provides an opportunity to elaborate, track progress or provide further context on the assessments above. This "Comments" section is optional.

Employee
Comments:

Leader
Comments:

# Development Action Plan

Exhibit 11

Based on your leader's rating and your self-ratings regarding the CL behaviours/tools and competencies, use this information to help you draft your development action plan.

Your development action plan can include CL, leadership skills, technical skills and anything else that you want to work on to grow professionally at CP.

Note: This development action plan is part of the overall weighting of your PMP.

Weight (%)   | 0 |

| Development Objective | Development Focus | Objective | What actionable, measurable & observable actions will you take to demonstrate this? | Status |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

CONFIDENTIAL

CP_03407

## Mid Year Comments

| Employee Comments: | I believe I have progressed in the first quarter with showing empathy and emotional intelligence. |
|---|---|

| Leader Comments: | You improved in the areas of emotional intelligence and empathy, and I have noticed you coaching some of your officers on same. |
|---|---|

## Leader-Handover Comments

Comments:

## Year-End Comments

Employee Comments:

Leader Comments:

## Year End Final Rating

Final Performance Rating

Final % Achieved                    0

Exhibit 12

# 2020 Performance Management Form

## Employee Information

| | | | |
|---|---|---|---|
| **Full Name:** | Thomas Jared | **Reports to:** | Jason Ross |
| **Position:** | GM Operations - US West | **Department:** | Operations US West Division |
| **Employee Id:** | ██████ | **PMP Status:** | Completed |
| | | **PMP Sub Status:** | |

## Objectives

| | | | |
|---|---|---|---|
| **Foundation:** | Provide Service | **Weight:** | 15 |

**Objective:**
Industry Servicing Measures
Trip Plans
Bad Order to spot
Process Dwell
Terminal Dwell
Train Performance
Terminal Visits

Exhibit 12

**My Actions and Behaviors:**

Industry Servicing Measures
-Complete daily customer service requests
-Attend customer meetings and address operations concerns and improvements, build customer relations
-Customer Inspections

Trip Plans
-Completion of daily Trip Plan objectives - Ensure proper resources are in place (assignment of people, locomotives), mitigate variances (late trains, processing exceptions)

Bad Order to spot
-Average daily bad order count
-Develop a dwell standard

Process Dwell
- Enderlin          - Mason City
- Glenwood          - Nahant
- Kansas City       - Waseca

Terminal Dwell
- Enderlin          - Mason City
- Glenwood          - Nahant
- Kansas City       - Waseca

Train Performance
-Adhere to the Operating Plan
-Origin On Time Performance (475 Kansas City Joint Agency, 472 Nahant, 492 Superior)
-All trains through terminal meet OP standards

Terminal Visits
-Unannounced terminal visits

CONFIDENTIAL

CP_03390

Exhibit 12

**Achieves:**

Industry Servicing Measures
-> 90%
-1/month
-1/month

Trip Plans
-> 97%

Bad Order to spot
-Bad order to move or spot 12 hours

Process Dwell
- < 21 hours    - < 16 hours
- < 16 hours    - < 20 hours
- < 3 hours     - < 18 hours

Terminal Dwell
- < 2.5 hours   - < 12 hours
- < 2 hours     - < 12 hours
- < 3 hours     - < 12 hours

Train Performance
-On Time within 2 hours
-90%

Terminal Visits
-1/ month

**Exceeds:**

Industry Servicing Measures
-> 90%
-1/month
-1/month

Trip Plans
-> 97%

Bad Order to spot
-Bad order to move or spot 12 hours

Process Dwell
- < 21 hours    - < 16 hours
- < 16 hours    - < 20 hours
- < 3 hours     - < 18 hours

Terminal Dwell
- < 2.5 hours   - < 12 hours
- < 2 hours     - < 12 hours
- < 3 hours     - < 12 hours

Train Performance
-On Time within 2 hours
-90%

Terminal Visits
-1/ month

**Actual:**

As attached in the PowerPoint.

**Foundation:** | Control Costs | **Weight:** | 15

Exhibit 12

| | |
|---|---|
| **Objective:** | Fuel Efficiency<br>Terminal Costs<br>Whiteboard Sessions<br>Heldaway<br>Crew Utilization<br>Finance Meetings |
| **My Actions and Behaviors:** | Fuel Efficiency<br>-Improve Fuel Efficiency<br>-Monitor and use fuel trip optimizer (FTO)<br><br>Terminal Costs<br>-Road Overtime<br>-Local Overtime<br>-Yard Overtime<br>-All Overtime (2020 YE target < ████ )<br>-Crew Transportation (2020 YE target < █████<br>-KGTM<br><br>Whiteboard Sessions<br>-Hold monthly terminal whiteboard sessions<br><br>Heldaway<br>-Reduce Heldaway costs (2020 YE target <$████ )<br><br>Crew Utilization<br>-Davenport to Chicago Extended Run<br>-Nahant Consolidation<br>-Yardmaster Consolidation<br>-Guarantee Reduction (2020 YE target < ███ )<br><br>Finance Meetings<br>-Hold finance meetings targeting at risk budget items |
| **Achieves:** | Fuel Efficiency<br>-85% Utilization<br><br>Terminal Costs<br>-9.4%<br>-3.9%<br>-3.0%<br>-25% Reduction<br>-3% Reduction<br>-< $1.70<br><br>Whiteboard Sessions<br>-1/month<br><br>Heldaway<br>-3% reduction<br><br>Crew Utilization<br>-Reduce 1.5 train starts/day<br>-Reduction of 1 – 3 person assignment<br>-Reduce 5 Yardmasters<br>-72% Reduction<br><br>Finance Meetings<br>-Monthly |

CONFIDENTIAL

CP_03392

Exhibit 12

| **Exceeds:** | Fuel Efficiency<br>-85% Utilization<br><br>Terminal Costs<br>-9.4%<br>-3.9%<br>-3.0%<br>-25% Reduction<br>-3% Reduction<br>-< $1.70<br><br>Whiteboard Sessions<br>-1/month<br><br>Heldaway<br>-3% reduction<br><br>Crew Utilization<br>-Reduce 1.5 train starts/day<br>-Reduction of 1 – 3 person assignment<br>-Reduce 5 Yardmasters<br>-72% Reduction<br><br>Finance Meetings<br>-Monthly |
|---|---|
| **Actual:** | As attached in the PowerPoint. |

| **Foundation:** | Optimize Assets | **Weight:** | 15 |
|---|---|---|---|

| **Objective:** | Train Weights<br>Train Lengths<br>Train Speed<br>Power Utilization<br>Bulk Cycles |
|---|---|
| **My Actions and Behaviors:** | Train Weights<br>-For each departing train, maximize the weight up to Operating Plan guidelines (2020 YE target 8,419)<br><br>Train Lengths<br>-For each departing train, maximize the length up to Operating Plan guidelines<br><br>Train Speed<br>-Train speed for US West Division (Raw)<br>-Work events performed within standard<br>-Mainline interruptions – ensure event is managed efficiently through trains work performed within standard<br><br>Power Utilization<br>-Plan daily with Loco Mechanical and Operations to ensure power is utilized<br>-Bad order locomotives online<br><br>Bulk Cycles<br>-Billing to departure |

Exhibit 12

**Achieves:**

Train Weights
-3% increase

Train Lengths
-6,359 feet

Train Speed
-22.4 mph
-100%
-90% meet OP Standards

Power Utilization
-within 24 hours

Bulk Cycles
-Power available upon billing

**Exceeds:**

Train Weights
-3% increase

Train Lengths
-6,359 feet

Train Speed
-22.4 mph
-100%
-90% meet OP Standards

Power Utilization
-within 24 hours

Bulk Cycles
-Power available upon billing

**Actual:**

As attached in the PowerPoint.

| Foundation: | Operate Safely | Weight: | 15 |
|---|---|---|---|

**Objective:**

Reduction in  injuries and  incidents
Safety Competencies
Develop Heat Maps
Home Safe
Health & Safety

CONFIDENTIAL

CP_03394

Exhibit 12

| | |
|---|---|
| **My Actions and Behaviors:** | Reduction in injuries and incidents<br>-Achieve safety targets for injuries and incidents<br>-Ensure compliance to operating rules, processes and procedures<br>-FRA Personal Injuries<br>-All Personal Injuries<br>-FRA Train Accidents<br>-All Train Accidents<br><br>Safety Competencies<br>-Meet minimum safety requirements per the 2019 safety plan<br><br>Develop Heat Maps<br>-Develop heat maps for high risk areas<br><br>Home Safe<br>-Completion and validations<br><br>Health & Safety<br>-Health and Safety Committee Effectiveness<br>-Local Health and Safety Plans<br>-Attend Local Health and Safety Meeting |
| **Achieves:** | Reduction in injuries and incidents<br>-< 1.20<br>-< 2.83<br>-< 1.06<br>-< 16.97<br><br>Safety Competencies<br>-100%<br><br>Develop Heat Maps<br>-Develop quarterly<br><br>Home Safe<br>-100%<br><br>Health & Safety<br>-100%<br>-1/month |
| **Exceeds:** | Reduction in injuries and incidents<br>-< 1.20<br>-< 2.83<br>-< 1.06<br>-< 16.97<br><br>Safety Competencies<br>-100%<br><br>Develop Heat Maps<br>-Develop quarterly<br><br>Home Safe<br>-100%<br><br>Health & Safety<br>-100%<br>-1/month |
| **Actual:** | As attached in the PowerPoint. |

| **Foundation:** | Develop People | **Weight:** | 25 |
|---|---|---|---|

CP_03395

Exhibit 12

| **Objective:** | Rules Testing<br>CL Training<br>PMP Discussions<br>Union Meetings<br>Mentor<br>Manager Certification<br>Managing Information<br>eLearning Courses<br>Town Halls<br>Leadership Development |
|---|---|
| **My Actions and Behaviors:** | Rules Testing<br>-Ensure managers are completing their weekly rules tests<br><br>CL Training<br>-Online CL Training upon onboarding<br>-CL Training – workshop as available<br>-CL2<br><br>PMP Discussions<br>-Ensure PMP discussions occur and are documented in the new PMP tool online<br>-Ensure employees and managers complete the new Leadership Competencies assessment in the PMP tool<br>-Complete Career Development portion of the PMP tool<br><br>Union Meetings<br>-Attend union meetings with General chairmen<br>-Attend union meetings with Local Chairmen<br>-Lead Home Safe calls with the officers and union<br><br>Mentor<br>-Mentor one manager from another department for the next level<br>-Andrew Gunner<br>-David Lackey<br><br>Manager Certification<br>-All managers to be Conductor or Engineer certified<br><br>Managing Information<br>-Managing information for success (0700 report, KPI, inventory management, 48 hr. dwell, trip plan exceptions, etc.)<br><br>eLearning Courses<br>-Complete assigned eLearning courses<br>-Ensure direct reports complete assigned courses<br><br>Town Halls<br>-Hold Town Halls in Davenport, Enderlin, Minot and Thief River Falls<br><br>Leadership Development<br>-People meetings monthly with HR Business Partner to discuss performance, identify areas for improvement, and create a follow-up pla n.<br>-Develop/improve the on-boarding for new leaders (excluding LMT-O)<br>-Create a checklist for tracking<br>-Employee Rewards & Recognition – recognize employees for going above and beyond<br>-Create Development Plans for all employees with strong focus on high potential leaders. Utilize the Leadership Competency framework.<br>-Ensure the talent score card is kept up to date<br>-Apply appropriate consequences and reinforce Q4 leadership behaviors |

CONFIDENTIAL

CP_03396

Exhibit 12

**Achieves:**

Rules Testing
-100% completion > 90% score

CL Training
-100%

PMP Discussions
-100%
-100%
-100%

Union Meetings
-1/quarter
-1/year
-bi-weekly

Mentor
-2 per year (1 every 6 months)

Manager Certification
-Completed by    December 31st

Managing Information
-daily

eLearning Courses
-100% completion
-100% completion

Town Halls
-100% completion

Leadership Development
-100%
-Complete in Q1
-100%
-100%
-100%

CONFIDENTIAL

CP_03397

Exhibit 12

**Exceeds:**

Rules Testing
-100% completion  > 90% score

CL Training
-100%

PMP Discussions
-100%
-100%
-100%

Union Meetings
-1/quarter
-1/year
-bi-weekly

Mentor
-2 per year (1 every 6 months)

Manager Certification
-Completed by    December 31st

Managing Information
-daily

eLearning Courses
-100% completion
-100% completion

Town Halls
-100% completion

Leadership Development
-100%
-Complete in Q1
-100%
-100%
-100%

**Actual:**

As attached in the PowerPoint.

CONFIDENTIAL

CP_03398

# Core Leadership Competencies

Exhibit 12

Both employee and the employee's leader are to fill out this section to identify where they see the employee at a point in time with respect to CP's four core leadership competencies.

**Note:** This section has no weight on your overall PMP rating. The purpose of these ratings is to identify development areas which you will incorporate into your development action plan. This section has a separate weighting.

|  | Employee Rating | Leader Rating |
| --- | --- | --- |
| **Act with Integrity**<br><br>Clearly states goals and beliefs; lets people know their true intentions; does what they said they will do; follows through on commitments but not at all costs; does what is right | Exceeds | Exceeds |
| **Display Emotional Intelligence**<br><br>Demonstrates self-awareness and remains calm under pressure; expresses confidences in ability to succeed; keeps an optimistic attitude even when things are not going well | Exceeds | Meets |
| **Ensure Accountability of Self and Others**<br><br>Doing what we said we would do; fosters a workplace that encourages inclusive collaboration and respect; provides exceptional service to our customers and communities; results oriented but will never sacrifice safety; challenges the status quo, strives for excellence and takes responsibility for actions | Exceeds | Exceeds |
| **Coach and Develop Talent**<br><br>Delegates and leverages others to generate learning and empowerment through asking vs telling and adopting a coach like approach to facilitate growth and development, performance goal and objective setting into actions and measureable results; leverages diverse mix of styles, perspectives, and experiences | Exceeds | Exceeds |

This section provides an opportunity to elaborate, track progress or provide further context on any of the assessments above. This "Comments" section is optional.

Employee Comments:

Leader Comments:    As discussed below.

# Development Action Plan

Exhibit 12

Based on your leader's rating and your own rating regarding the four core leadership competencies, use this information above to help you draft your development action plan.

Your development action plan can include leadership skills, technical skills and anything else that you want to work on to grow professionally at CP.

Note: This section will have an overall weight for your development action plan as part of your PMP.

Weight (%) | 15

| Objective | Plan - My Actions & Behaviours | Status |
|-----------|-------------------------------|--------|
| Utilize the core competency emotional tool kit to develop in leading thought. | Use Harvard management tool kit, leading like a swan. | Pending |

## Mid Year Comments

**Employee Comments:**

The Division continues to provide high-quality service to our customers, you can see this in our Industrial Service measures and our Trip Plans both are in the upper 90 percentile. Processed dell and Terminal Dwell remain a focus, although with the down turn we have seen more cars sitting as we have made reductions. Fuel efficiency is we above 85% at 87.8%. Controlling cost Road overtime we are at under our target of 9.4 at 9.28, KGTMs are t $1.67 from a target of $1.70. We have also made a target of reducing overtime by 25%, we are currently on track to beat that reduction. Train weights and lengths have increased, both above target. Train speed at about 23 miles an hour of a target of 22.4. Safety this is where were we really done well this year for the division, currently at .9 frequency, all injuries are at 2.76. The challenges remains at all Human Factor incidents are all train accident At 10.9 Developing people our biggest challenges remain with our younger employees, Frontline supervisors ensuring they develop in their competencies, in completing their competencies/inputs and holding their employees accountable. We've had three initiatives for 2020, consolidation at Nahant which is completed, ESR Nahant to Chicago has been completed, ESR Mason city into Chicago has been completed, yardmaster consolidation Glenwood to Saint Paul is still ongoing.

**Leader Comments:**

Positive trends so far, meeting most of our objectives.  Things that US west needs to work on - first - People - Superintendents and Asst. Superintendents, must focus on them and getting them to the next level of leadership.  Using the CL language, 10 core behaviors and teach them to be mid level leaders - creating an environment of integrity, demonstrate social awareness, establish accountability and model a coaching mindset.

Focus operationally needs to be on safety.  Teaching our Supt's and Asst. Supt's to be safety leaders. Safety and Human factor incidents in the US west need to stop happening.

Controlling costs and utilizing assets, again - teaching mid level leaders to get ahead of trends.  Furloughs, call backs, cutting a ssignments, holiday reductions - need to be part of their DNA and we need to drive this.

Providing service - trip plan performance is slipping, as well as bulk spots and old date cars.  Need you to lead in this space, especially in the Minnesota and North Dakota space.  Mid level leaders need to get more engaged in old dates and driving for opportunity to move cars.

## Leader-Handover Comments

**Comments:**

## Year-End Comments

Exhibit 12

Employee Comments:

2020 has been a challenging year with the Covid 19 pandemic. Even with this challenge and with our PSR foundations we were able perform at a high level relating to our 5 Foundations. I am particularly proud of what the team/workforce has been able to accomplish relating to Safety, beginning on January 1st when we began our workforce call. These calls built a foundation with the workforce, in late February as the Pandemic began, then also throughout the year, we had a relationship with the workforce relating to prevention of injury's. In 2020 we had 5 injury's compared to 9 in 2019.  2021 we will continue to build on our successes, mainly focusing on Human Factor incident. The team has also continued to outperform most of the company in service customs that is about the 90% compliance  and Trip Plans at 98.3%. Also were able to meet Road overtime targets at 9.4%, this is a reductions of 42% YTD. 2020 was a bu      sy year relating to developing our people, from our weekly calls with the workforce(Running Trades) to month CL engagement with front line manages, then one mentoring with the frontline manages.

Leader Comments:

US West is performing well in several areas.  Notably train speed, dwell and service have all performed well.  In the areas of cost control and asset utilization there has been a solid performance as well.  US west is under budget this year and has contributed greatly to the success of the southern region.  Areas of opportunity are in 2 places.  Safety and People.  In terms of Safety, Tom has taken a leadership role and pushed innovation with respect to safety.  Starting earlier this year with bi-monthly COVID calls with the Union workforce has transitioned into Home Safe calls with the same audience.  In terms of people development - there is opportunity with the Superintendent of Minnesota, and the Quad Cities - for different reasons.  From now and into the future, the development of these two Superintendents will be crucial for the success of the US West.  In the cast of Kamron, development to get him where he needs to be and improve.  In the case of Dylan - development to put him on the right path for success as he is new to the role.

## Year End Final Rating

Final Performance Rating        Exceeds

Final % Achieved                130



**BRIANA AL TAQATQA**
**Associate**
**(612) 492-6617**
**altaqatqa.briana@dorsey.com**

September 26, 2023

**<u>VIA ELECTRONIC MAIL</u>**
Cyle A. Cramer and John D. Magnuson
Yaeger & Jungbauer Barristers
4601 Weston Woods Way
Saint Paul, MN 55127
ccramer@yjblaw.com
jmagnuson@yjblaw.com

Re:    John Sexton v. Dakota, Minnesota & Eastern Railroad Corporation d/b/a Canadian Pacific, No. 23-CV-00031 – Defendant's Discovery Responses

Dear Cyle,

I am writing in response to your September 19, 2023 letter regarding Defendant Dakota, Minnesota & Eastern Railroad Corporation d/b/a Canadian Pacific's ("CP") responses to Plaintiff John Sexton's ("Plaintiff") first set of discovery requests.

We are preparing supplemental written discovery responses and a supplemental document production consistent with our September 15, 2023 letter. We anticipate being in a position to serve these materials on Friday, September 29, 2023. However, these materials include documents designated attorneys' eyes only, which we will not produce without your agreement to the stipulation we circulated last week. If we do not receive agreement on the attorneys' eyes only designation by Thursday, our production will be delayed.

I respond to the additional issues you raised in your September 19 letter below.

**I.    Interrogatory No. 2**

Your request that CP "search system-wide for comparative employees" is unreasonable. Even limiting the search to violations of GCOR 5.3.7 only, your request asks CP to search discipline records for thousands of operational employees nationwide over a three-year period. In considering similar requests for companywide discovery, the Eight Circuit Court of Appeals generally denies such requests absent some showing of a particular need for the requested information. *See, e.g.*, *Semple v. Federal Express Corp.*, 566 F.3d 788, 794 (8th Cir. 2009) (citing *Carman v. McDonnell Douglas Corp.*, 114 F.3d 790, 792 (8th Cir. 1997)) ("[g]enerally, a plaintiff in a wrongful termination case is not entitled to company-wide discovery absent a showing of a particular need for the requested information."); *Sallis v. University of Minn.*, 408 F.3d 470, 478 (8th Cir. 2005) ("Courts have [] limited the discovery of company records to the local facility where plaintiff was employed, where there is no showing of the need for regional or nationwide discovery.").

50 South Sixth Street | Suite 1500 | Minneapolis, MN | 55402-1498 | **T** 612.340.2600 | **F** 612.340.2868 | dorsey.com
4856-8292-8258\1

001



Cyle A. Cramer and John D. Magnuson
September 26, 2023
Page 2

Limiting comparator data to employees disciplined for the same violation, by the same decision maker, in the same region, in the three years leading up to Plaintiff's discipline—as CP has agreed to do—is entirely reasonable and consistent with Eighth Circuit case law.

In *Monohon v. BNSF Ry. Co.*, No. 4:14-cv-00305-JAJ-SBJ, 2015 U.S. Dist. LEXIS 183710, at *2 (S.D. Iowa Oct. 29, 2015), the plaintiff moved to compel discovery relating to any other employees of BNSF who were also involved in seatbelt violations, including if and how they were disciplined. The court concluded such discovery was "overly broad and not reasonably calculated to lead to the discovery of admissible evidence, and [would] subject BNSF to undue burden and expense which outweighs any likely benefit of obtaining information relevant to the claims and defenses at issue in this case." *Id*. at *20. The court limited the scope of comparator information to employees disciplined or terminated for violations of BNSF's seatbelt policy, where the same decision makers involved in plaintiff's termination were involved, within one year of plaintiff's termination. *Id*. at *24.

CP has agreed to provide *broader* comparator information than was required of BNSF. At all relevant times, Plaintiff was an engineer reporting up to Superintendent Operations – Quad Cities Dylan Smith, who reports up to General Manager Operations – U.S. West Tom Jared, who in turn reports up to Vice President Operations – Southern Region Jason Ross. CP has agreed to identify engineers who report up to Jason Ross and who were disciplined for violations of GCOR 5.3.7 in the three years before Mr. Sexton's discipline. The scope of this search encompasses all engineers similarly situated to Mr. Sexton and a broader search would not be reasonably calculated to lead to the discovery of admissible evidence.

Moreover, your assumption that "CP should have the search capabilities to efficiently find these individuals in its discipline database" is wrong. Responding to requests for discipline comparator data requires a manual search through individual electronic personnel files for each employee within the scope of the search. The searches performed to date have been burdensome and the undue burden and expense of broadening those searches to every CP employee nationwide for a three year period outweighs any likely benefit of obtaining information relevant to Mr. Sexton's claims and CP's defenses.

## II.    Document Requests Nos. 8 and 9

CP is still in the process of determining the extent that identification and production of specific Teams messages is feasible and, if so, whether the time and expense of doing so is proportional to the needs of the case, considering the factors of Fed. R. Civ. P. 26(b)(1). We will update you accordingly.

CP will respond to Plaintiff's Second Set of Discovery Requests pursuant to Fed. R. Civ. P. 34.

4856-8292-8258\1



Cyle A. Cramer and John D. Magnuson
September 26, 2023
Page 3

## III.    Document Requests Nos. 12 and 13

As stated above, CP anticipates producing additional documents by September 29, 2023. This production will include documents responsive to Requests Nos. 12 and 13 for the engineers identified in CP's forthcoming supplemental response to Interrogatory No. 2. Due to the manual search process required to locate these documents, CP expects it will produce responsive documents on a rolling basis.

## IV.    Document Requests Nos. 22-25

### A.    Request No. 22

CP will not produce PMP reports and Total Rewards Statements for Tom Jared, Mark Johnson, Kurt McKelvey, Jason Ross, and Dylan Smith for the year 2022. The incidents that give rise to this litigation occurred in 2021, and so we see no reason why 2022 documents have any bearing whatsoever on the issues in this case. If you have a fact-based explanation for why these documents should be produced, please let us know so that we can evaluate it.

As for the earlier PMP reports and Total Rewards Statements, the proposed stipulation that we sent via email on September 21, 2023 and again on September 22, 2023, addressed all concerns that you raised about the "attorneys' eyes only" designation that we will require before producing these documents. Please return the signed stipulation by Thursday, September 28, 2023, so that we can finalize our supplemental document production by September 29, 2023. Due to the costs associated with producing documents, we will hold the production until we receive your response.

### B.    Request No. 23

The Total Rewards Statements include detailed information about the short-term and long-term incentive payments. Accordingly, we think the documents being produced in response to Request No. 22 are likely to answer any questions about CP's incentive plans. If you think otherwise after reviewing the Request No. 22 documents, however, we agree to discuss this issue at that time.

### C.    Requests 24-25

Based on your September 19, 2023 letter, we understand there is no dispute regarding Requests Nos. 24-25 at this time.

*****

We assume this letter and CP's forthcoming supplemental written discovery responses and document production resolve all outstanding issues with regard to CP's discovery responses. If you have further questions or concerns, please do not hesitate to contact me.



Cyle A. Cramer and John D. Magnuson
September 26, 2023
Page 4

Sincerely,

DORSEY & WHITNEY LLP

Briana Al Taqatqa
Associate



**BRIANA AL TAQATQA**
**Associate**
**(612) 492-6617**
**altaqatqa.briana@dorsey.com**

November 22, 2023

<u>**VIA ELECTRONIC MAIL**</u>
Cyle A. Cramer and John D. Magnuson
Yaeger & Jungbauer Barristers
4601 Weston Woods Way
Saint Paul, MN 55127
ccramer@yjblaw.com
jmagnuson@yjblaw.com

Re:    John Sexton v. Dakota, Minnesota & Eastern Railroad Corporation d/b/a
Canadian Pacific, No. 23-CV-00031 – Defendant's Discovery Responses

Dear Cyle,

I am writing in response to your November 14, 2023 letter regarding Defendant Dakota, Minnesota & Eastern Railroad Corporation d/b/a Canadian Pacific's ("CP") responses to Plaintiff John Sexton's ("Plaintiff") discovery requests. I respond to the issues you raised in turn below.

**I.    Requests for Production 8, 9, and 27: Electronic Communications Related to Plaintiff's Alleged Protected Conduct, February 1, 2021 Rule Violation, and Subsequent Discipline**

You asked three questions related to CP's production in response to Requests Nos. 8, 9 and 27:

*1.  What program did these messages originate from—are these Microsoft Teams messages or something else?*

The two ranges of documents to which you refer in your letter, CP_03246-03284 and CP_03333-03345, are Microsoft Teams messages. Because CP also has produced Microsoft Outlook email files in response to Plaintiff's requests, we cannot make a blanket assertion about the program associated with any other document included in our production.

*2.  Why were messages only from what is seemingly January 30th, and February 3rd produced? Were the messages limited by search terms and if so, what were those search terms?*

We did not limit our production by any specific date range and have not withheld any responsive documents. Instead, we collected all Microsoft Teams data from January 1, 2021 through February 28, 2021 for the following custodians: Tom Jared, Mark Johnson, Kurt

**DORSEY**
always ahead

Cyle A. Cramer and John D. Magnuson
November 22, 2023
Page 2

McKelvey, Tracy Miller, Jason Ross, and Dylan Smith. Based on Requests Nos. 8, 9 and 27, we then applied the following search terms to the entire collection:

- Sexton and tracks

- Sexton and delay

- 474-31

- Sexton and e-test

- Sexton and efficiency

- Sexton and half

- DePover and stop

- Sexton and chandanais

We then reviewed all search-term hits and produced messages responsive to Requests Nos. 8, 9 or 27, or were otherwise discoverable given the issues in the case. We also produced messages that were part of the same conversation as a responsive message in order to provide context for the responsive message.

In addition to using search terms, we applied Computer Assisted Learning to the entire database based on the documents identified as responsive. We reviewed additional Teams messages identified by the software as potentially responsive. We did not withhold any responsive messages.

> 3. *Are there messages from February 1st regarding the 474, Sexton's train, that are not produced for some reason? What is that reason?*

We are not withholding any messages identified as responsive to date. During Mr. McKelvey's deposition, however, we learned that the 474 at issue in this case may not necessarily be referred to as the "474-31" in all contexts. Accordingly, we have applied the following additional search terms to all Microsoft Teams messages sent/received on February 1-2, 2021 for all custodians to ensure we are capturing all responsive and relevant communications:

- Sexton

- 474

We are preparing a supplemental document production based on these additional terms, which will include a few additional responsive messages.



Cyle A. Cramer and John D. Magnuson
November 22, 2023
Page 3

Following up on an issue that we discussed off the record during Mr. McKelvey's deposition, I would like to clarify, in writing, the issue related to the time zone shown on the Microsoft Teams messages (and some email communications) within our production. When Outlook and Teams files are collected and processed for review and production in litigation, our document management system applies the Coordinated Universal Time (UTC) time zone to the files. The UTC time zone is six hours ahead of Central Standard Time (CST). Accordingly, for email and Teams messages sent between November 1, 2020 (end of daylight saving time) and March 14, 2021 (start of daylight saving time), a reader may convert UTC time to CST time by subtracting six hours. For example, if a document shows "Sun, 31 Jan 2021 01:56:33 +0000" (CP_03246), then that time is UTC time, and a reader must subtract six hours to determine the time in Central time: in this example, 19:56 CST on January 30, 2021. Please let me know if you still have questions about the time stamps on CP's produced documents.

## II.    Document Requests Nos. 22-25: Employee Performance Evaluations, Incentive Pay, and Train Performance Reports

You raised five issues related to CP's production in response to Requests Nos. 22-25:

### 1.   Is CP going to produce PMPs for 2022?

In response to Plaintiff's baseless allegation that CP's managers are somehow incentivized to discourage or retaliate against safe behavior, CP agreed to produce documents that reflect individual goal-setting and performance objectives and outcomes (called Performance Management Programs, or "PMPs") and documents that reflect how the achievement of individual objectives affect compensation, which occurs through CP's Short-Term Incentive Program ("STIP"). CP is producing these documents for the individuals whom Plaintiff accuses of having an active role in the alleged retaliation against him: Tom Jared, Mark Johnson, Kurt McKelvey, Jason Ross, and Dylan Smith. For these individuals, we have or will produce documents related to individual performance and objectives set for 2020 and 2021, and the resulting compensation based on the achievement of objectives for those two years. Please note that a STIP for a specific year is issued, and therefore dated, in the year after the corresponding PMP. In other words, a 2021 STIP document relates to a 2020 PMP, and a 2022 STIP document relates to a 2021 PMP. To the extent not already produced, these documents will be included in CP's forthcoming supplemental production.

Given that Plaintiff alleges an improper motivation for actions taken in early 2021, we see no reason how performance objectives and results for managers in 2022 have anything to do with the allegations in this case, and so we will not produce PMPs or STIPs applicable to objectives or performance in 2022.  If you have a fact-based explanation for why 2022 performance and results are discoverable here, please let us know so that we can evaluate it.

### 2.   Why are there several blank comment sections in the 2021 PMPs for Dylan Smith, Kurt McKelvey, Mark Johnson, and Thomas Jared?



Cyle A. Cramer and John D. Magnuson
November 22, 2023
Page 4

We produced the PMPs in the form in which they are kept in the ordinary course of business, and so refer you to the face of the documents. We did not alter the documents.

> 3. *Is CP withholding Jason Ross's PMPs?*

We will include Jason Ross's 2020 and 2021 PMPs and corresponding 2021 and 2022 STIPs in CP's forthcoming supplemental production.

> 4. *The Long-Term Incentive Plan and the Performance Management Program (Policy 5611) have not been produced.*

We will include these policy documents for 2021 in CP's forthcoming supplemental document production so that you can see long-term incentive awards have nothing to do with an individual's annual performance objectives.

> 5. *"Plaintiff's August 15, 2023, correspondence specifically identified metrics and for documents defining those metrics. Such documents have not been produced. … These metrics can be found throughout CP's production and therefore documents defining such statistics are necessary."*

We have carefully reviewed Request No. 24 and Plaintiff's August 15, 2023 correspondence. Your November 14, 2023 letter is the first time Plaintiff requested documents "defining" the train performance metrics and statistics included in other documents previously produced. We do not consider providing definitions or explanations of terms or data to be within the scope of our duty to meet and confer. (We also make no representation that any document defining train performance metrics or statistics exists.)

## III.    Document Request No. 28: Video of Plaintiff's February 1, 2021 Rule Violation

CP has completed a diligent search for a copy of the video that was played and described at Plaintiff's February 10, 2021 investigation hearing to show Plaintiff's February 1, 2021 rule violation. CP cannot find a copy of the video file and so believes that no copy currently exists. We are not withholding any materials that would be responsive to Request No. 28.

## IV.    Document Request No. 29: Radio Recordings from February 1, 2021

There are no radio recordings from February 1, 2021. We are not withholding any materials that would be responsive to Request No. 29.

## V.    Document Request No. 30: Phone Records

We will include the phone records that include February 1, 2021 for Dylan Smith and Jason Ross in CP's forthcoming supplemental production. There are no allegations that Mark Johnson or Tracy Miller were involved in any aspect of the events of February 1, 2021, and so Mr. Johnson's and Mr. Miller's phone records are not relevant and will not be produced.

**DORSEY**
always ahead

Cyle A. Cramer and John D. Magnuson
November 22, 2023
Page 5

\*\*\*\*\*

    We assume this letter and CP's forthcoming supplemental production resolve all outstanding issues with regard to CP's discovery responses. If you have further questions or concerns, please do not hesitate to contact me.

        Sincerely,

        DORSEY & WHITNEY LLP

        Briana Al Taqatqa
        Associate