**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| John Sexton, | ) | Case No. 23-cv-00031 |
|  | ) |  |
| Sexton, | ) |  |
| v. | ) | Magistrate Judge Helen C. Adams |
|  | ) |  |
| Dakota, Minnesota & Eastern Railroad | ) |  |
| Corporation d/b/a Canadian Pacific, a | ) |  |
| Delaware Corporation, | ) |  |
|  | ) |  |
| Defendant. | ) |  |

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS
<u>MOTION FOR SUMMARY JUDGMENT</u>**

DORSEY & WHITNEY LLP

Joshua Hughes (AT0014950)
hughes.joshua@dorsey.com
Dorsey & Whitney LLP
801 Grand Ave, Suite 4100
Des Moines, IA 50309
Tel: (515) 283-1000
Fax: (515) 598-7704

John T. Sullivan (pro hac vice)
sullivan.jack@dorsey.com
Briana Al Taqatqa (pro hac vice)
altaqatqa.briana@dorsey.com
Dorsey & Whitney LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
Tel:  (612) 340-2600
Fax:  (612) 340-2868

ATTORNEYS FOR DEFENDANT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................iii

INTRODUCTION..................................................................................................1

SUMMARY OF UNDISPUTED FACTS..................................................................2

      A.    The Parties. .......................................................................................2

      B.    The Requirements of GCOR 5.3.7.....................................................2

      C.    General Manager Tom Jared Observed Sexton Violate
           GCOR 5.3.7. ......................................................................................3

      D.    A Neutral Officer Held an Impartial Hearing and Found Sexton
           Violated GCOR 5.3.7, and an Otherwise Uninvolved Executive
           Decided Discipline. ...........................................................................3

      E.    Sexton's Union Appealed his Discipline and it was Reversed.........4

      F.    Sexton Now Claims His February 2021 Discipline Was
           Retaliation.........................................................................................4

      G.    Sexton Also Claims His February 2021 Discipline Was
           Retaliation for Various Complaints About Various Managers........5

      H.    Procedural History. ...........................................................................6

ARGUMENT......................................................................................................6

I.      SUMMARY JUDGMENT STANDARD.................................................7

II.     SUMMARY JUDGMENT IS WARRANTED BECAUSE SEXTON
       CANNOT ESTABLISH A PRIMA FACIE CASE OF UNLAWFUL
       RETALIATION. ....................................................................................8

      A.    Fatally, Sexton Cannot Establish Any Alleged Adverse Action
           Was Prompted by Intentional Retaliation for Engaging in
           Protected Activity. ............................................................................8

           1.    Allegations at Issue in CP's Motion for Summary
                 Judgment...............................................................................9

           2.    Sexton's January 2021 Emails Are Unrelated to Any
                 Adverse Action. ...................................................................9

3.      There Is No Evidence that CP Intentionally Retaliated
Against Sexton Because of His Alleged Protected
Activities on February 1, 2021. ........................................................ 11

      a)    There is No Connection between Sexton's
Protected Activities on February 1, 2021 and the
Efficiency Test. ...................................................................... 11

      b)    There is No Connection between Sexton's
Protected Activities on February 1, 2021 and
Ross's Discipline Decision. ................................................... 13

      c)    Sexton Has No Evidence of Pretext, Shifting
Explanations, Antagonism, or Hostility Toward
His Protected Activity............................................................ 14

B.      Sexton's Comment at the Investigation Hearing was not Protected
Activity, and CP's E-Test and Investigation were not Adverse
Actions. ........................................................................................................ 16

      1.      Sexton's Comment about Jared Was Not Protected
Activity. ........................................................................................ 16

      2.      CP's E-Test, the Charge Letter and Hearing Notice, and
the "Potential for Blacklisting" Are Not Adverse Actions. ............... 17

III.     **SUMMARY JUDGMENT IS WARRANTED BECAUSE CP
WOULD HAVE ISSUED DISCIPLINE REGARDLESS OF ANY
PROTECTED ACTIVITY. ....................................................................... 18**

**CONCLUSION ....................................................................................................... 20**

# TABLE OF AUTHORITIES

**Cases**

*Allen v. City of Pocahontas*, 340 F.3d 551, 558 n.6 (8th Cir. 2003)...........................14

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) ...........................................7

*Blackorby v. BNSF Ry. Co.*, 849 F.3d 716, 721–22 (8th Cir. 2017)...............................10

*Brisbois v. Soo Line R.R. Co.*, 124 F. Supp. 3d 891, 903 (D. Minn. 2015) ...................17

*Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006) ...................................18

*Conrad v. CSX Transp., Inc.*, 824 F.3d 103, 108 (4th Cir. 2016)...................................12

*Dafoe v. BNSF Ry. Co.*, 164 F. Supp. 3d 1101, 1115 (D. Minn. 2016)..........................15

*Dunn v. BNSF Ry. Dunn v. BNSF Ry. Co.*, No. C17-0333JLR, 2017 U.S. Dist. LEXIS 137109, at
    *27 (W.D. Wash. Aug. 25, 2017) ...........................................................................18

*Foster v. BNSF Ry. Co.*, No. 4:14-cv-313, 2016 U.S. Dist. LEXIS 189038, at *15 (S.D. Iowa Jan.
    28, 2016) ...........................................................................................................14, 18

*Gunderson v. BNSF Ry. Co.*, 850 F.3d 962, 969–70 (8th Cir. 2017) ........................10, 16

*Gunderson v. BNSF Ry. Co.*, No. 14-CV-0223 (PJS/HB), 2015 U.S. Dist. LEXIS 99046 (D.
    Minn. July 28, 2015)............................................................................................16, 20

*Haugh v. Gelita USA, Inc.*, 632 F.3d 464, 470 (8th Cir. 2011) .....................................14

*Heim v. BNSF Ry.*, No. 8:13-cv-369, 2015 U.S. Dist. LEXIS 133913, at *12 (D. Neb. Sept. 30,
    2015). ......................................................................................................................20

*Hess v. Union Pac. R.R. Co.*, No. 4:14-cv-00311-JAJ, 2017 U.S. Dist. LEXIS 221289, at *12
    (S.D. Iowa Jan. 19, 2017) ................................................................................7, 8, 20

*Kuduk v. BNSF Ry. Co.*, 980 F. Supp. 2d 1092, 1101 (D. Minn. 2013) .......................20

*Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 789 (8th Cir. 2014)...................................passim

*Spreger v. Fed. Home Loan Bank of Des Moines*, 253 F.3d 1106, 1110 (8th Cir. 2001)..............8

*Taylor v. White*, 321 F.3d 710, 715 (8th Cir. 2003).......................................................7

*Tompkins v. Metro-North Commuter R.R. Co.*, 983 F.3d 74, 83 (2d Cir. 2020) .........15

**Statutes**

49 C.F.R. § 217.9 ...........................................................................................................18

49 U.S.C. § 20109............................................................................................... 6, 8, 11

49 U.S.C. §§ 20109(a)(1) and (b)(1)(A)-(B) ..................................................................8

**Rules**

Fed. R. Civ. P. 56(a). ......................................................................................................7

## INTRODUCTION

The undisputed and indisputable facts of this case are simple. On February 1, 2021, Plaintiff John Sexton failed an unannounced test that assessed his compliance with an operating rule that he must follow as a locomotive engineer for Defendant Dakota, Minnesota & Eastern Railroad Corporation d/b/a Canadian Pacific ("DM&E" or "CP"). As required by its collective bargaining agreement ("CBA") with Sexton's union, CP responded to his test failure by holding a fair and impartial investigation hearing on February 10, 2021, complete with witnesses, evidence and a union advocate representing Sexton. After the hearing, the officer who presided over the hearing determined that CP had proved that Sexton violated the rule in question; later, an otherwise uninvolved company vice president reviewed the record and Sexton's disciplinary history and decided the discipline: a 20-day suspension, imposed on February 26, 2021.

Sexton now claims he was disciplined not for the rule violation but instead in retaliation for an unrelated conversation with an unrelated manager hours before the performance test. According to Sexton, because he insisted that a short stretch of track should be cleared of snow early on February 1, 2021, CP suspended him on February 26, 2021 – and so violated the Federal Railroad Safety Act's ("FRSA's") prohibition on retaliation. Sexton simply has no evidence that supports the theories he spins around his discipline, including the nearly nonsensical idea that multiple CP managers were motivated to discipline Sexton because his insistence that snow be cleared from a single stretch of tracks on a single day in February – which took just a few minutes – would somehow hinder the managers' bonus potential for the year. Pressed at his deposition to identify facts that support this attenuated theory, Sexton offered only: "That's the way it is."

Sexton's speculation is not enough to defeat summary judgment. Because Sexton has no evidence sufficient to create a genuine issue of material fact worthy of trial, and for the reasons below, CP respectfully requests that this Court grant its motion for summary judgment.

## SUMMARY OF UNDISPUTED FACTS[1]

### A.     The Parties.

CP provides freight rail transportation throughout North America, including through its controlled affiliate DM&E. (SOF ¶ 1.) CP is largely unionized, with operations employees represented by different unions with which CP has negotiated different CBAs. (*Id*. ¶ 2.)

Sexton is a locomotive engineer represented by the Brotherhood of Locomotive Engineers and Trainmen ("BLET"). (*Id*. ¶¶ 3, 4, 11, 12.) Sexton's job is to operate locomotives safely and in compliance with the General Code of Operating Rules ("GCOR") (*Id*. ¶¶ 5, 6, 12.) Sexton receives annual training on rules and procedures to maintain his engineer certification. (*Id*. ¶ 13.)

### B.     The Requirements of GCOR 5.3.7.

When working in a railyard, train crews may perform "shove movements" in which a locomotive is used to push train cars into position on open track, where the cars may then be left until connected to a different train for transport to their next destination. (*Id*. ¶ 14.) When performing a shove, engineers operate the locomotive from the back of the train and so rely on a conductor to communicate about what is in front of the train. (*Id*. ¶ 15.) Typically, conductors communicate with engineers by radio to inform the engineer about the length of track remaining before the train must be stopped. (*Id*. ¶ 16.). The conductor often communicates the distance in decreasing "car counts" – the number of car lengths until the train must be at a stop. (*Id*.)

Applicable to this case, GCOR Rule 5.3.7 mandates that an engineer must have the train at a full stop within half the number of car lengths that were last received over the radio, if no further instructions are received. (*Id*. ¶¶ 7, 17.) For example, if the last car count communicated is 20, the engineer must be prepared to have the train at a full stop within 10 car counts – and then in fact

---

[1] CP incorporates its Local Rule 56(a)(3) Statement of Material Facts in Support of its Motion for Summary Judgement ("SOF") into this brief and summarizes it here for the Court's convenience.

stop the train within that distance if no additional communication is received. (*Id*. ¶¶ 17, 18.)

### C. General Manager Tom Jared Observed Sexton Violate GCOR 5.3.7.

At issue in this litigation is a shove Sexton performed February 1, 2021, when operating Train 474 in the Nahant rail yard in Davenport, Iowa. (*Id*. ¶¶ 21, 22.) As Sexton himself later said at CP's investigation hearing, the conductor told Sexton that he was "good for 40, 15 cars to a stop" while shoving onto open track. (Id. ¶ 23.) GCOR 5.3.7 required Sexton to have the train stopped within seven and one-half car lengths because no further instructions were received. (*Id*. ¶ 24.) Sexton stopped the train after 11 car lengths – and so violated GCOR 5.3.7. (*Id*. ¶¶ 25, 31.)

CP Rail General Manager Operations – US West Division, Tom Jared, observed Sexton violate GCOR 5.3.7. (*Id*. ¶ 26.) Jared made the observation after taking steps to assess whether Sexton would comply, including by directing conductor Justin DePover to give no additional instructions to Sexton after the "fifteen cars to a stop" instruction. (*Id*. ¶¶ 26, 29.) Jared's direction to DePover and intentional modification of operating conditions to assess compliance is what CP calls an "efficiency test" or "e-test." (*Id*.) Jared's duties as general manager include conducting e-tests at his discretion. (*Id*. ¶ 27.) Importantly, Jared did not know that Sexton was the engineer tested; instead, Jared saw that the conditions were ideal to safely conduct an e-test of the 474 crew. (*Id*. ¶¶ 81, 82.) Jared's testimony is uncontradicted: The 474 was going to shove onto a stretch of open track and decided he had an ideal opportunity to safely test compliance with GCOR 5.3.7. (*Id*.) Jared only learned that Sexton was the engineer after the train stopped. (*Id*. ¶ 82.)

### D. A Neutral Officer Held an Impartial Hearing and Found Sexton Violated GCOR 5.3.7, and an Otherwise Uninvolved Executive Decided Discipline.

The CBA between BLET and CP entitled Sexton to a hearing at which CP had to prove he violated the rule before discipline could be imposed. (*Id*. ¶ 32.) On February 4, 2021, and as required by the CBA, CP issued Sexton a notice of an investigation hearing regarding his violation

of GCOR Rule 5.3.7. (*Id*. ¶ 33.) CP held the hearing on February 10, 2021, where both CP and Sexton provided testimony and offered evidence. (*Id*. ¶¶ 34–39.) Presiding officer Mark Johnson determined the charge was proven and recommended a 20-day suspension. (*Id*. ¶¶ 40–43.)

As he does for all cases in his region, CP's Vice President Operations Southern Region, Jason Ross, reviewed the hearing transcript and discipline recommendations and decided the appropriate discipline was a 20-day unpaid suspension, which issued on February 26, 2021. (*Id*. ¶¶ 44–45.) Ross does not look at employees' names when deciding discipline but instead reviews a summary of the offense, the employee's discipline history, and other objective factors. (*Id*. ¶ 47.)

Jared was not involved in the disciplinary decision that followed the hearing, given that he administered the e-test that led to the investigation and discipline. (*Id*. ¶¶ 45, 48.) The letter that notified Sexton of the discipline after Ross decided it was sent out over Jared's electronically stamped signature, however, as administrative staff have permission to add his signature to documents that go out from his office as General Manager. (*Id.*) Ross and Jared both testified that Ross – and not Jared – decided the discipline and directed that the letter be sent. (*Id*.)

**E.**      **Sexton's Union Appealed his Discipline and it was Reversed.**

On May 20, 2021, Sexton's union appealed the discipline decision to a Public Law Board (part of the National Mediation Board that exists to resolve railroad labor grievances) ("PLB") pursuant to the CBA. (*Id*. ¶ 49.) On August 26, 2022, the PLB ruled in the union's favor. As a result, the 20-day suspension was removed from Sexton's record and his 20 days of pay was restored. (*Id*. ¶ 50.) Notably, the board relied in large part on the incorrect belief that Jared decided Sexton's discipline because the discipline was sent out on Jared's letterhead. (*Id*.)

**F.**      **Sexton Now Claims His February 2021 Discipline Was Retaliation.**

Even though his discipline was reversed, removed from his record, and his pay restored, Sexton contests his 20-day suspension as retaliatory. Sexton's current claim is that Jared

4

administered the e-test, and CP disciplined him, because of an incident that occurred earlier on February 1, 2021, in which Sexton asserted that certain rail crossings needed to be "cut" (cleared of ice and snow) before Train 474 left the yard in Marquette, Iowa, for Nahant. (*Id*. ¶¶ 65–67.) Based on the amount of recent snowfall, the trainmaster in Marquette, Kurt McKelvey, initially disagreed but eventually directed Sexton to cut the crossings. (*Id*. ¶ 68–69, 72.) McKelvey testified that his decision was consistent with CP's policy – when in doubt, take the safest course. (*Id*. ¶ 69.)

All evidence indicates that the short time spent cutting the tracks was a small factor among many that delayed the 474 from leaving Marquette on February 1, 2021. In fact, McKelvey attributed no more than a few minutes of the four-hour delay to the cutting operation, as the crew also had to lift an engine, move cars, dig out a switch, tie and release hand brakes, and complete air brake tests before the train could be on its way. (*Id*. ¶¶ 73–76.) According to McKelvey's report at the time, the main reason for the delay was lifting the engine and setting out (moving) 24 cars. (*Id*. ¶ 75.) Nevertheless, Sexton asserts that his insistence that the tracks be cut caused the delay and, in turn, caused Jared to administer the e-test hours later – and then *also* caused the resulting discipline after Sexton failed the test. (*Id*. ¶ 78.) Sexton claims Jared was motivated by self-interest because, according to Sexton, this one four-hour train delay (of which just a few minutes resulted from cutting the crossing) on one winter day in 2021 would impact Jared's 2021 annual performance evaluation, which in turn would hurt his 2021 bonus. (*Id*. ¶¶ 79, 90–94.)

## G.    Sexton Also Claims His February 2021 Discipline Was Retaliation for Various Complaints About Various Managers.

Sexton points to email correspondence as a reason for acts about which he complains. Specifically, on January 3, 2021, and January 18, 2021, Sexton emailed Jared, Ross, and CP Senior Vice President of Operations Tracy Miller with second-hand reports that a manager had instructed a crew to violate CP rules. (*Id*. ¶¶ 101–102.) Jared, Ross, and Miller looked into the matter and

learned that Superintendent Dylan Smith had investigated Sexton's January 3 report, found there had been no rule violation, but had a constructive conversation with the manager about the matter. (*Id*. ¶ 103–104.) Jared assured Sexton that the matter had been investigated and resolved. (*Id*. ¶ 105.) Miller also followed up with Sexton to assure him safety is CP's first priority. (*Id*. ¶ 106.)

On February 9, 2021, Sexton emailed Miller and Ross to complain about McKelvey's driving on snow-covered roads. (*Id*. ¶ 111.)[2] In the same email, Sexton reported the disagreement he had with McKelvey about whether crossings needed to be cut on February 1, 2021. (*Id*.) Ross testified that he agreed with Sexton that the crossings needed to be cut and told both Sexton and McKelvey as much in the days after Sexton's email. (*Id*. ¶¶ 71, 111.)

### H.    Procedural History.

Sexton filed a complaint alleging retaliation in violation of 49 U.S.C. § 20109 with the Occupational Safety and Health Administration ("OSHA") on or around June 30, 2021. (*Id*. ¶ 114.) OSHA dismissed the case on August 3, 2022, finding that CP would have suspended Sexton for 20 days even in the absence of any alleged protected activity, as Sexton violated GCOR 5.3.7 and was disciplined in accordance with CP policy. (*Id*. ¶ 115.) OSHA concluded that there was no evidence of animus toward Sexton because of any alleged protected activity nor evidence that any alleged protected activity contributed to CP's discipline. (*Id*.) Sexton administratively appealed on August 4, 2022, and filed this action on May 5, 2023. (*Id*. ¶ 116; Dkt. 1.)

### ARGUMENT

Sexton's claim does not survive summary judgment for two independently sufficient reasons. First, Sexton has nothing but rank speculation to support his notion that a disagreement

---

[2]    Sexton does not allege that this email is protected activity. *See generally Second Amended Complaint*. CP respectfully reserves the right to address in its reply brief any argument that the email is protected activity that Sexton may make in his response to this motion.

over whether snow needed to be cleared from crossings somehow set in motion a weeks-long conspiracy of retaliation involving some of the highest operational leaders of the region in which he worked. (*See* SOF ¶¶ 84–86.) In fact – and fatally – the best Sexton can do to show a connection between the conversation about cutting crossings and the discipline imposed three weeks later for an unrelated rule violation is his subjective and self-serving belief that "that's the way it is." (*See id.*) Because speculation does not create a genuine issue of material fact regarding the essential causation element of Sexton's retaliation claim, summary judgment is warranted.

Summary judgment also is warranted because CP has presented clear and convincing evidence demonstrating that it would have suspended Sexton for 20 days because he violated GCOR 5.3.7 regardless of any alleged protected activity. (*See* SOF ¶¶ 31–48.) This is fatal to Sexton's claim for reasons separate from the prima facie analysis of Sexton's claim. Eighth Circuit courts grant summary judgment where, as here, a plaintiff has no facts weighing against the finding that the employer would have imposed the same discipline regardless of any protected activity.

## I.      SUMMARY JUDGMENT STANDARD

Summary judgment is warranted when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Opposing summary judgment, Sexton must address each element of his claim – and for each element, "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) (quotations omitted). While Sexton is entitled to reasonable inferences drawn from the evidence he cites, he may not rest on the allegations in his pleadings or rely on mere suspicion. *Hess v. Union Pac. R.R. Co.*, No. 4:14-cv-00311-JAJ, 2017 U.S. Dist. LEXIS 221289, at *12 (S.D. Iowa Jan. 19, 2017). Instead, Sexton must produce substantial evidence that would support a verdict in his favor in order to create a genuine issue of material fact that requires a trial. *Id.* (citing *Taylor v. White*, 321 F.3d 710, 715 (8th Cir. 2003)). The material

facts must demonstrate more than "a scintilla of evidence in support of the plaintiff's position;" instead, "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* (citing *Spreger v. Fed. Home Loan Bank of Des Moines*, 253 F.3d 1106, 1110 (8th Cir. 2001)).

## II.    SUMMARY JUDGMENT IS WARRANTED BECAUSE SEXTON CANNOT ESTABLISH A PRIMA FACIE CASE OF UNLAWFUL RETALIATION.

The FRSA prohibits rail carriers from retaliating against employees who engage in certain protected activities. 49 U.S.C. § 20109(a). Applicable here, the FRSA prohibits a railroad from suspending or otherwise discriminating against an employee because the employee reported, in good faith, a hazardous safety condition or in good faith "refused to work when confronted by a hazardous safety condition" related to his duties. 49 U.S.C. §§ 20109(a)(1) and (b)(1)(A)-(B).

To prevail, Sexton must establish a prima facie case that (1) he engaged in a protected activity; (2) CP knew or suspected, actually or constructively, that he engaged in the protected activity; (3) he suffered an adverse action; and (4) the circumstances raise an inference that the protected activity was a contributing factor in the adverse action. *See Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 789 (8th Cir. 2014). As for the contributing factor, the Eighth Circuit requires Sexton to show intentional retaliation. *Id.* at 791. Even if Sexton makes this prima facie showing, CP is entitled to summary judgment if it demonstrates, by clear and convincing evidence, that it would have taken the same action in the absence of Sexton's protected activity. *Id.* at 789.

### A.    Fatally, Sexton Cannot Establish Any Alleged Adverse Action Was Prompted by Intentional Retaliation for Engaging in Protected Activity.

Demonstrating a throw-it-against-the-wall approach to this case, Sexton alleges a list of supposedly protected activities and a list of supposedly adverse actions about which he complains. Taking each in turn, Sexton cannot establish that any alleged protected activity was a contributing factor – meaning intentional retaliation prompted by Sexton engaging in protected activity – to any alleged adverse action, and so summary judgment is warranted. *See Kuduk,* 768 F.3d at 791.

8

1. **Allegations at Issue in CP's Motion for Summary Judgment.**

Sexton alleges four protected acts: (1) a January 3, 2021 email about a manager's December 2020 conduct; (2) a January 18, 2021 email about the same conduct; (3) his statement to McKelvey at the beginning of the February 1, 2021, shift that crossings needed to be cut, his refusal to operate the train without first cutting the crossings, and his subsequent cutting of the crossings; and (4) Sexton's comment, made during the February 10, 2021 investigation hearing, that he thought that the February 1, 2021, e-test conducted by Jared was itself unsafe. (2d Amend. Compl. ¶¶ 21–25.)[3] CP acknowledges, for purposes of summary judgment only, that the January emails and the interaction with McKelvey could constitute protected activities under the FRSA when viewed in the light most favorable to Sexton. CP disputes that the comment about Jared at the investigation hearing is a protected activity for the reasons set out in Section II.C, below.

Sexton alleges five adverse actions in his Complaint: (1) Jared's administration of the e-test; (2) the February 4, 2021 charge letter and hearing notice; (3) the February 10, 2021 investigation hearing; (4) the 20-day suspension; and (5) the "potential for blacklisting" arising from the investigation and discipline. (2d Amend. Compl. ¶ 26.)[4] Of these, and for purposes of summary judgment only, CP acknowledges that the 20-day suspension constitutes an adverse action. CP disputes the other alleged adverse actions for the reasons set out in Section II.C, below.

2. **Sexton's January 2021 Emails Are Unrelated to Any Adverse Action.**

CP acknowledges, for purposes of summary judgment only, that the January 2021 emails could constitute protected activities under the FRSA when viewed in the light most favorable to

---

[3]    CP respectfully reserves the right to address in its reply brief any new allegations of protected activity that Sexton identifies in his response to CP's motion for summary judgment that were not pleaded in Sexton's Second Amended Complaint.

[4]    CP respectfully reserves the right to address in its reply brief any new allegations of adverse actions that Sexton identifies in his response to CP's motion for summary judgment that were not pleaded in Sexton's Second Amended Complaint.

Sexton. (*See* SOF ¶¶ 101–102.) While CP also acknowledges that Jared and Ross were aware of these emails (*Id*. ¶¶ 101–105), there is no evidence that CP took any adverse action against Sexton because of them, and so any claims based on the emails should be dismissed. (*Id*. ¶¶ 112–113.)

First, there is no evidence that any CP manager, including Jared and Ross, reacted negatively in response to Sexton's January emails. Rather, the undisputed evidence is that Jared and Ross (and Ross's supervisor, Miller) responded immediately when the issues were brought to their attention, investigated, and reported back to Sexton to confirm his concerns had been addressed. (*Id*. ¶¶ 101–105.) This response negates any inference of retaliatory animus. *See Blackorby v. BNSF Ry. Co.*, 849 F.3d 716, 721–22 (8th Cir. 2017) (holding that the nature of a supervisor's reaction when receiving a report is probative to the issue of whether "discriminatory animus" contributed to the employment action) (citing *Kuduk*, 768 F.3d at 791–93).

Moreover, Jared unequivocally denies that the January emails contributed to his decision to administer the e-test on February 1, 2021 – and there is no evidence to suggest otherwise. (*Id*. ¶ 109.) Likewise, Ross denies Sexton's January emails factored into his decision to assess the 20-day suspension – and again there is no evidence to suggest otherwise. (*Id*. ¶ 110.)

Second, the subject matter of the January emails is "wholly unrelated" to the failed e-test and subsequent discipline and so fail as a matter of law. Sexton's January emails address a supervisor's failure to conduct air brake testing and related operational complaints. (*Id*. ¶ 101.) The supervisor about whom Sexton complained in his January emails had nothing to do with the failed e-test on February 1, 2021, and resulting discipline. (*Id*.) Thus, Sexton's January emails are "wholly unrelated" to the discipline, and he has no evidence that even hints otherwise. *Gunderson v. BNSF Ry. Co*., 850 F.3d 962, 969–70 (8th Cir. 2017) ("Moreover, if the discipline was wholly unrelated to protected activity . . . whether it was fairly imposed is not relevant to the FRSA causal

10

analysis."). Sexton simply says it is "all connected." (SOF ¶ 85.) This is speculation, and CP requests that claims based on the January 2021 emails be dismissed.

### 3.    There Is No Evidence that CP Intentionally Retaliated Against Sexton Because of His Alleged Protected Activities on February 1, 2021.

Sexton frames his case chiefly around the events in Marquette, Iowa on February 1, 2021. (*See* 2d Amend. Compl. ¶¶ 23–24.) Again, Sexton alleges that he engaged in protected activity by (1) reporting snow at road crossings and (2) refusing to operate a train without first clearing the snow. (*Id.*) While CP does not dispute, for purposes of summary judgment only, that Sexton's report and refusal could constitute protected activity when taken as true in the light most favorable to Sexton (*see* 49 U.S.C. § 20109(b)(1)(A) and (B)), there is nothing to suggest a causal connection between *either* alleged protected activity and any alleged adverse action that followed.

To create a genuine issue of material fact regarding whether his alleged protected activity on February 1, 2021 was a contributing factor in his suspension, Sexton must submit evidence that (1) Jared knew about the alleged protected activities before he administered the e-test and decided to administer the e-test because of the protected activities and that (2) Ross acted because of the protected activities when he decided to impose a 20-day unpaid suspension. *Kuduk*, 768 F.3d at 789. Sexton cannot meet this burden.

### a)    There is No Connection between Sexton's Protected Activities on February 1, 2021 and the Efficiency Test.

First, there is no evidence that Jared knew of Sexton's alleged report of snow conditions, his refusal to operate the locomotive without first cutting the tracks, or the fact that Sexton cut the tracks in Marquette at the time Jared administered the e-test in Nahant later on February 1, 2021. (SOF ¶¶ 107–108.) Jared denies that this was the case, and in response, Sexton likely will point to phone records that show McKelvey, Jared, Ross, and Miller talked by phone on February 1, 2021, along with the testimony of some witnesses that it was "possible" that the delay of the 474 was

discussed with Jared that day. (SOF ¶ 89.) But it is a speculative leap to assume that simply because a delayed train was "possibly" discussed among managers whose duties encompass the operation of all trains within their territories, those managers actually talked about Sexton and the crossing-cutting disagreement. (*Id*.) To the extent that Sexton asserts Jared is not to believed, he will be asking this Court to take the same improper speculative leap that the Fourth Circuit rejected in *Conrad v. CSX Transp., Inc.*, in which the Fourth Circuit held that "unsupported inferential leaps are no adequate substitute for actual evidence" about what may have been communicated through a "chain" of employees. 824 F.3d 103, 108 (4th Cir. 2016). Given the absolute lack of evidence, Sexton also is likely to attack CP's witnesses' credibility and veracity – and again will fall short, as plaintiffs like Sexton must have more than "mere speculation that a jury might arbitrarily disbelieve a fellow employee's testimony" in order to defeat summary judgment on an FRSA claim. *Id.* at 108.

Even if Sexton's speculation that Jared knew about the earlier disagreement with McKelvey when he administered the e-test was enough to create an inference of retaliatory motive (it is not), Jared testified that he agreed with Sexton's view that the crossings needed to be cut. Jared also testified that he would have disagreed with McKelvey if McKelvey had told Sexton (as Sexton claims): "don't cut those tracks, get on your train and go." (SOF ¶ 70.) Jared was clear that Sexton would not have been disobeying an order if he cut the tracks in those circumstances, as Sexton would be "attempting to follow the rules like he is supposed to." (*Id*.)

In any event, Jared testified that he would have administered the e-test on February 1, 2021 no matter the crew operating the train, and his testimony is not contradicted by facts. (*Id*. ¶¶ 80–83.) Jared testified that he heard over the radio that a train entering the Nahant yard would be performing a shove movement. (*Id*.) Jared assessed the conditions and decided they were safe to

e-test the 474 crew – while not knowing Sexton was the engineer of the 474. (*Id.*) Because there is no evidence that Jared administered the e-test on February 1, 2021 because of Sexton's protected activity earlier that morning – nor evidence that Jared knew about the activity – Sexton cannot show that his protected activity were a contributing factor to Jared's decision to administer the e-test and the resulting discipline. *See Kuduk*, 768 F.3d at 791.

> **b)**  **There is No Connection between Sexton's Protected Activities on February 1, 2021 and Ross's Discipline Decision.**

For purposes of summary judgment, CP does not dispute that Ross knew about Sexton's February 1, 2021 alleged protected activity, given Sexton's February 9, 2021 email to Ross in which he described his disagreement with McKelvey over cutting the crossings. (SOF ¶ 111.) Despite this, Sexton cannot meet his burden to show any protected activities were a contributing factor to Ross's decision to issue a 20-day suspension on February 26, 2021, given that Ross agreed that Sexton did the right thing when he insisted that the crossings be cut and there is no evidence whatsoever that Ross negative reaction whatsoever to Sexton's actions on February 1, 2021.

First, there is no evidence that Ross reacted negatively when he learned of the February 1, 2021 discussion between Sexton and McKelvey related to snow. To the contrary, Ross told Sexton he would look into the matter and get back to him. (*Id.*) Ross did exactly that, and he was clear with Sexton and McKelvey that Sexton was right and McKelvey was wrong. (SOF ¶¶ 71, 111.) Nothing about Sexton's February 9, 2021 email nor Ross's response indicates that Sexton's alleged protected activities on February 1, 2021 influenced Ross's discipline decision. *Kuduk*, 768 F.3d at 791. (SOF ¶¶ 87–88, 111.) In fact, Ross testified that CP expects employees to take the safe course; here, that meant that if there was doubt about whether the crossings needed to be cut, they should be cut. (*Id.* ¶ 71, 77.) Like Jared, Ross said Sexton "did the right thing." (*Id.* ¶¶ 70–71.)

Second, Ross testified that his decision to approve a 20-day suspension for Plaintiff was

entirely unrelated to the events that occurred in Marquette on the morning of February 1, 2021: "I didn't discipline John Sexton for following the rule." (*Id*. ¶ 87.) Likewise, Ross testified that the fact that the 474 was delayed on February 1, 2021 did not motivate him to approve a 20-day suspension for Sexton: "Like I say – you know, that delay on 474, I hate to say it is probably not even something that popped up on my radar. In the middle of January and February that would have been the least of my concerns, that three hour delay on 474 for doing their job." (*Id*. ¶ 88.)

In sum, there is no evidence to suggest Ross suspended Sexton because of Sexton's alleged February 1, 2021 protected activities. CP respectfully requests summary judgment as a result.

### c)   Sexton Has No Evidence of Pretext, Shifting Explanations, Antagonism, or Hostility Toward His Protected Activity.

Finally, Sexton will fail to create a genuine issue of material fact regarding whether CP intentionally retaliated against him because of any alleged protected activity, as there is again simply no evidence – only speculation and supposition – of any improper motivation.

CP expects Sexton will rely on procedural complaints about the discipline process as evidence of pretext. But such complaints are not material facts that could allow a reasonable jury to find in Sexton's favor. *See Foster v. BNSF Ry. Co.*, No. 4:14-cv-313, 2016 U.S. Dist. LEXIS 189038, at *15 (S.D. Iowa Jan. 28, 2016) ("But an employee's 'justifications for his failure to meet [his employer's] expectations are not evidence that creates a genuine issue of fact as to whether [the employer's] reasons are mere pretext'") (quoting *Haugh v. Gelita USA, Inc.*, 632 F.3d 464, 470 (8th Cir. 2011)). In any event, "it is not unlawful for a company to make employment decisions based upon erroneous information and evaluations." *Allen v. City of Pocahontas*, 340 F.3d 551, 558 n.6 (8th Cir. 2003). Courts do not sit as a "super-personnel department that re-examines an employer's disciplinary decisions." *Kuduk*, 768 F.3d at 792 (quotation and citation omitted). Because Sexton cannot offer evidence connecting his protected activity to the discipline, he is not

entitled to relief even if CP's discipline decision was ultimately incorrect. *Id.*

CP also expects that Sexton will claim that the PLB's reversal of CP's decision demonstrates a retaliatory motive because it undercuts the basis for the discipline. Not so. The outcome of Sexton's union's appeal has no bearing on whether CP *intentionally retaliated* against him for engaging in protected activity. *See Tompkins v. Metro-North Commuter R.R. Co.,* 983 F.3d 74, 83 (2d Cir. 2020) ("That this disciplinary finding was ultimately overturned has no connection to whether it was in retaliation for Tompkins's safety complaint, and he has submitted no specific evidence that the discipline was retaliatory."). In fact, the PLB's decision was based on the flawed factual belief that Jared decided Sexton's discipline. (SOF ¶ 50.) This was not the case, as Jared and Ross testified; instead, the administrative office had permission to, and did, add Jared's electronic signature to the letter and send it out without his prior review. (*Id*. ¶¶ 45, 48.)

Nor can Sexton rely on what he calls his history of safety advocacy to show that CP intentionally retaliated against him for the events in Marquette on February 1, 2021. (*Id*. ¶¶ 95–100.) Inferences of retaliation are *weakened*, not strengthened, when an employee's prior complaints never resulted in an adverse action of the kind challenged in later litigation. *See, e.g., Dafoe v. BNSF Ry. Co.*, 164 F. Supp. 3d 1101, 1115 (D. Minn. 2016) (holding that the plaintiff's "numerous safety complaints" over 15 years without an adverse action "belies his claim that the serious rule violations were a façade for retaliation"). That is the exactly the case here. Sexton and Jared have worked together for about 25 years. Over that time, Jared never to sought to e-test or discipline Sexton because he raised safety concerns, and in fact he testified that he has viewed Sexton as reliable "eyes on the ground" who will report safety concerns and violations. (SOF ¶ 96.)

Sexton's position is analogous to the plaintiff in *Gunderson v. BNSF Ry. Co.*, No. 14-CV-0223 (PJS/HB), 2015 U.S. Dist. LEXIS 99046 (D. Minn. July 28, 2015). In *Gunderson*, the

plaintiff alleged retaliation in part because he "was known as a 'bulldog' for safety" who complained internally and to the Federal Railroad Administration ("FRA"). *Id.* In *Gunderson*, the plaintiff offered evidence that managers said he had thrown a "whole [f------] wrench into my yard" and it "would be a lot easier if Gunderson . . . [weren't] around." *Id.* (internal citations and quotations omitted). But even with such evidence of animosity, the district court rejected the "tenuous and speculative" allegation that general safety advocacy motivated intentional retaliation, a finding the Eighth Circuit affirmed. *Id.* at 27; *Gunderson*, 850 F.3d at 970.

Here, unlike the unsuccessful *Gunderson* plaintiff, no facts even hint at any animosity to Sexton's alleged protected conduct. 2015 U.S. Dist. LEXIS 99046, at *3–4. To the contrary, Jared and Ross testified that they agreed with Sexton about cutting the tracks. (SOF ¶¶ 70–71, 77.) Because their testimony is uncontradicted by any evidence, summary judgment is warranted.

### B. Sexton's Comment at the Investigation Hearing was not Protected Activity, and CP's E-Test and Investigation were not Adverse Actions.

As noted above, CP disputes that the comment Sexton made about Jared at his February 10, 2021, investigation hearing was protected activity. CP also disputes that this Court should consider as adverse actions the administration of an e-test and the CBA-required acts it took to investigate the failure of the e-test. CP takes these disputes in turn.

### 1. Sexton's Comment about Jared Was Not Protected Activity.

Sexton claims it was protected activity when he "reported CP Rail Regional Manager Tom Jared's unsafe and rule violating actions of walking up behind a conductor protecting a shove movement and telling the conductor to stop communicating with Sexton who was relying on such communication for the safe operation of the train." (2d Amend. Compl. ¶ 25.) Sexton's "report" was nothing of the sort. All Sexton did was answer a question posed to him at the investigation hearing by his union representative, who asked Sexton if Sexton believed Jared violated GCOR

6.5 when he "interrupted" DePover's car counts. (SOF ¶ 38.) Sexton responded: "Absolutely. He created a unsafe act." (*Id*.) The presiding officer stopped the questioning, noting that the hearing was held to determine if Sexton – not Jared – complied with operating rules. (*Id*.)

Even if the Court determines the comment is protected activity (it is not), there is no evidence that it was a contributing factor to the discipline imposed on February 26, 2021. Ross testified that Sexton's comment about Jared absolutely did not impact his decision to issue a 20-day suspension. (*Id*. ¶ 47.) Sexton cannot present evidence – only speculation – to the contrary.

### 2.      CP's E-Test, the Charge Letter and Hearing Notice, and the "Potential for Blacklisting" Are Not Adverse Actions.

CP asks this Court to dismiss Sexton's claim to the extent it is based on Jared's e-test, the hearing notice and investigation hearing, and "potential for blacklisting" as alleged adverse actions. They simply are not.

The Eighth Circuit has not defined a test for whether a challenged act is an adverse action under the FRSA. There is compelling and persuasive authority, however, that the mere investigation of a rule violation is not an adverse action. In a reported decision, the District of Minnesota rejected the position Sexton takes here, that the accusation of a rule violation is an adverse action, stating that such a holding would "stretch the FRSA so far." *Brisbois v. Soo Line R.R. Co.*, 124 F. Supp. 3d 891, 903 (D. Minn. 2015) ("To hold that a rail worker suffers an adverse employment action any time a rail carrier attempts to determine whether she has violated a rule—typically by following an investigatory process mandated under a CBA—would have major implications for labor relations in the rail industry."). This is consistent with Title VII cases, in which adverse actions are those that a reasonable employee would have found "materially adverse," which means the action "might have dissuaded a reasonable worker from" protected conduct. *See Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006).

17

Jared's e-test was not an adverse action under these principles. It is uncontested that CP conducts e-tests because it is required to do so by federal regulations that require railroads to conduct operational tests to determine compliance with operating rules. 49 C.F.R. § 217.9. (SOF ¶ 5.) Sexton and other engineers routinely undergo e-tests while working for CP. (*Id*. ¶¶ 26–30.) As in *Brisbois*, it cannot be that every e-test carried the risk of litigation over whether the test itself was somehow an adverse action. CP asks this Court not to stretch the FRSA so far.

The investigation process of the CBA also should be rejected as an adverse action for the same reasons. It is important to note that the CBA in which the notice and investigation process is set out was expressly agreed to by the union representing Sexton. (SOF ¶¶ 4, 32–34.) It makes no sense that a union employee could point to the process as an adverse action. In any event, nothing about Jared's e-test or the investigation process dissuaded Sexton from raising what he thought were safety issues, given his February 9, 2021 email to Ross. (*Id*. ¶ 111.)

Finally, "potential for blacklisting" is not an adverse action. First, Sexton did not raise this claim before OSHA, and so it is unexhausted and not before this Court. (SOF ¶ 114); *See Foster*, 2016 U.S. Dist. LEXIS 189038, at *10 (actions are not administratively exhausted if not specifically complained of). Second, even if it were before this Court, "potential for blacklisting" is not an adverse action. In *Dunn v. BNSF Ry. Co.*, the court rejected potential blacklisting as an adverse action because it was based only on the railroad's regular record-keeping processes. No. C17-0333JLR, 2017 U.S. Dist. LEXIS 137109, at *27 (W.D. Wash. Aug. 25, 2017). Sexton's claim is similarly barred because it is based only on CP's regular discipline process. (2d Amend Compl. ¶ 26(e). (citing "actions to reprimand, suspend, or in some other way" affect Sexton).

### III.     SUMMARY JUDGMENT IS WARRANTED BECAUSE CP WOULD HAVE ISSUED DISCIPLINE REGARDLESS OF ANY PROTECTED ACTIVITY.

Even if Sexton could establish that allegedly protected activity prompted intentional

retaliation (which he cannot), summary judgment dismissing his case is warranted because CP presents clear and convincing evidence that it would have suspended Sexton for 20 days regardless of any alleged protected activity. *See Kuduk*, 768 F.3d at 792–93.

First, Jared's decision to e-test the engineer operating the 474 train on February 1, 2021, had nothing to do with Sexton, let alone any protected activity that Sexton may have engaged in. Jared did not know Sexton was operating the 474 at the time he decided to e-test its crew. (SOF ¶¶ 80–82.) Jared's testimony on this point is undisputed: He observed yard conditions were ideal for safely conducting an e-test of a shove movement and so decided to do so. (*Id*.) Jared had no knowledge of any of Sexton's alleged protected activity earlier that day; even if he did, he decided to administer the e-test without any knowledge that *Sexton himself* would be subject to the test. (*Id*.) Contrary to Sexton's allegations, the test was not "set-up" to entrap him, but instead was administered without respect to the identity of any individual employee. (*Id*. ¶¶ 29, 80–82.)

Second, there is no genuine issue of material fact that CP determined that Sexton failed the e-test. (*Id*. ¶¶ 21–25.) While Sexton will try to present different interpretations of what "good for 40" and "fifteen to a stop" meant to him, it is uncontested that Johnson considered and disregarded Sexton's various explanations for why he didn't violate GCOR 5.3.7. (*Id*. ¶¶ 40–43.) And if Sexton complains about how he sought to have additional witnesses testify, it is uncontested that Johnson found that his decision would be no different even if the witnesses had testified. (*Id*. ¶ 42.)

Third, CP issued discipline to Sexton consistent with the Hybrid Discipline & Accountability Guidelines. CP's ultimate determination to impose discipline was consistent with its policies generally and with Ross's practices specifically. (*Id*. ¶¶ 8–9, 45–47.) Sexton's e-test failure was he first "major" safety violation and so Ross imposed a 20-day suspension. (*Id*. ¶ 45–47.) Sexton has not and cannot identify other individuals similarly situated in all material respects

who were subject to an e-test, failed, and did *not* receive discipline in accord with CP's guidelines. *Heim v. BNSF Ry.*, No. 8:13-cv-369, 2015 U.S. Dist. LEXIS 133913, at *12 (D. Neb. Sept. 30, 2015). CP responded to Sexton's failure as it would for any other employee – and Sexton's discipline was squarely within the ranges provided for in CP guidelines and actually reached in similar cases. (SOF ¶¶ 51–64); *see Hess*, 2017 U.S. Dist. LEXIS 221289, at *16. In the district court proceedings for *Kuduk*, the plaintiff speculated that the railroad would not have enforced its "fouling the tracks" rule against him absent his filing of a safety-related report – and his allegation was fatally undermined by evidence demonstrating the railroad had enforced its rules against employees who had not engaged in allegedly protected activity. *Kuduk v. BNSF Ry. Co.*, 980 F. Supp. 2d 1092, 1101 (D. Minn. 2013). Here, Ross testified that "there was no way in Hades" he would not have issued a 20-day suspension for a rule violation like Sexton's, and evidence in the record supports his assertion. (SOF ¶ 46.)

In sum, multiple managers followed a multi-step process that resulted in Sexton's discipline. (*Id*. ¶¶ 31–48.) Jared administered the test and concluded Sexton failed, which initiated the investigation. (*Id*. ¶¶ 26–29.) Johnson presided over the hearing, reviewed evidence and testimony, and found Sexton violated the rule. (*Id*. ¶¶ 40–43.) Ross reviewed the record, agreed that the charge was proven, and assessed discipline within the range in CP's Hybrid Discipline & Accountability Guidelines. (*Id*. ¶¶ 45–48.) There are no facts that call into question the clear and convincing evidence that CP would have taken the same action regardless of alleged protected activity by Sexton. *See Kuduk*, 768 F.3d at 792–93; *Gunderson*, 2015 U.S. Dist. LEXIS 99046, at *37–41. CP respectfully requests summary judgment dismissing this case as a result.

## CONCLUSION

For the above reasons set for the above, CP respectfully requests that the Court grant its motion for summary judgment and dismiss the Complaint with prejudice.

Dated: August 5, 2024

DORSEY & WHITNEY LLP

/s/ Joshua D. Hughes

Joshua Hughes (AT0014950)
hughes.joshua@dorsey.com
Dorsey & Whitney LLP
801 Grand Ave, Suite 4100
Des Moines, IA 50309
Tel: (515) 283-1000
Fax: (515) 598-7704

/s/ John T. Sullivan

John T. Sullivan (pro hac vice)
sullivan.jack@dorsey.com
Briana Al Taqatqa (pro hac vice)
altaqatqa.briana@dorsey.com
Dorsey & Whitney LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
Tel:  (612) 340-2600
Fax:  (612) 340-2868

ATTORNEYS FOR DEFENDANTS

**CERTIFICATE OF SERVICE**

I hereby certify that on August 5, 2024, I caused the foregoing to be electronically served on Sexton via ECF, which provides notice and a copy to Sexton's counsel and all other counsel of record:

Megan R. Merritt
SHUTTLEWORTH & INGERSOLL, P.L.C.
115 3rd Street SE, Suite 500
P.O. Box 2107
Cedar Rapids, IA 52406
Phone: (319) 365-9461
Fax: (319) 365-8443


John D. Magnuson
Cyle A. Cramer
YAEGER & JUNGBAUER BARRISTERS, P.L.C.
4601 Weston Woods Way
St. Paul MN, 55127
Phone: (507) 330-4777
Fax: (651) 288-0227
jmagnuson@yjblaw.com
ccramer@yjblaw.com


/s/ Joshua D. Hughes
_____
Counsel for Defendant