UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | | |
|---|---|---|
| John Sexton, | ) | |
| | ) | Case No. 23–cv–00031 |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | **DEFENDANT'S LOCAL RULE 56(a)(3)** |
| | ) | **STATEMENT OF MATERIAL FACTS** |
| Dakota, Minnesota, & Eastern Railroad | ) | |
| Corporation d/b/a Canadian Pacific, a | ) | |
| Delaware Corporation, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Dated: August 5, 2024

DORSEY & WHITNEY LLP

Joshua Hughes (AT0014950)
hughes.joshua@dorsey.com
Dorsey & Whitney LLP
801 Grand Ave, Suite 4100
Des Moines, IA 50309
Tel: (515) 283–1000
Fax: (515) 598–7704

John T. Sullivan (pro hac vice)
sullivan.jack@dorsey.com
Briana Al Taqatqa (pro hac vice)
altaqatqa.briana@dorsey.com
Dorsey & Whitney LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
Tel:  (612) 340–2600
Fax:  (612) 340–2868

ATTORNEYS FOR DEFENDANT

Defendant Dakota, Minnesota, & Eastern Railroad Corporation d/b/a Canadian Pacific ("CP"), by and through its attorneys and pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56(a)(3), hereby submits its Statement of Material Facts as follows:

## I.    PARTIES

1.    Defendant CP is a Class I railroad that provides freight rail transportation throughout North America, including through its controlled affiliate Dakota, Minnesota & Eastern Railroad ("DM&E").

Support:    **Appendix p. 419**, Jared Decl. ¶ 2.

2.    CP is largely unionized, with many non-management employees represented by various labor unions with which CP has collective bargaining agreements ("CBAs") that govern the terms and conditions of employment for unionized employees.

Support:    **Appendix p. 419**, Jared Decl. ¶ 3.

3.    Plaintiff John Sexton was a CP employee at all times material to this action—and remains a CP employee to this day.

Support:    **Appendix pp. 3–4**, Sexton Dep. 13:2–8, 13:25–14:2.

4.    Sexton is a member of the Brotherhood of Locomotive Engineers and Trainmen (the "Union"). The terms and conditions of Sexton's employment with CP are governed by a CBA that, among other things, provides for an investigation procedure that must be followed before a Union member, such as Sexton, may be disciplined or dismissed.

Support:    **Appendix pp. 5–6**, Sexton Dep. 20:12–24:1,; **Appendix pp. 44– 48**, Sexton Dep. Ex. 1 at CP_00253–57; **Appendix p. 426**, Dittrich-Bigley Decl. ¶ 5.

1

## II.    CP OPERATES IN COMPLIANCE WITH FEDERAL SAFETY REQUIREMENTS AND STATE AND FEDERAL LAWS

5.    The operations of CP's railroads are governed by numerous safety rules, regulations, orders, and directives, including the General Code of Operating Rules ("GCOR"), which is a set of operating rules for numerous Class I, Class II, and Class III railroads in the United States intended to enhance railroad safety.

> Support:    **Appendix p. 7**, Sexton Dep. 26:7–27:4; **Appendix pp. 49–58**, Sexton Dep. Ex. 2 at CP_00283–292; **Appendix p. 422**, McInnis Decl. ¶ 3.

6.    All CP operating employees, including Sexton, must comply with the GCOR.

> Support:    **Appendix p. 7**, Sexton Dep. 26:15–27:10; **Appendix p. 422**, McInnis Decl. ¶ 4.

7.    GCOR Rule 5.3.7—Radio Response provides: "When radio communication is used to make movements, crew members must respond to specific instructions given for each movement. Radio communications for shoving movements must specify the direction and distance and must be acknowledged when distance specified is more than four cars." The Rule further provides: "**Movement must stop within half the distance specified unless additional instructions are received**."

> Support:    **Appendix p. 7**, Sexton Dep. 27:11–28:10; **Appendix p. 59.** Sexton Dep. Ex. 2 at CP_00319 (emphasis in original).

8.    Effective November 1, 2018, CP's Hybrid Discipline & Accountability Guidelines amended CP's prior discipline and accountability process. The Hybrid Discipline & Accountability Guidelines provide a non-exclusive list of examples of "Major – Life Threatening & Conduct Unbecoming Offences" and state that "non–compliance may warrant immediate

removal from service pending a formal investigation and may warrant suspension or in certain cases, dismissal." Such examples include: "Shoving – Failure to provide point protection consistent with the rule." This version of the Hybrid Discipline & Accountability Guidelines applied to all unionized CP employees, including Sexton, and remained in effect at all times material to this action.

> Support:     **Appendix pp. 9–10**, Sexton Dep. 37:2–21, 38:1–15, 39:5–11,
> 39:18–20; **Appendix p. 65,** Sexton Dep. Ex. 3 CP_00443.

9.     The Hybrid Discipline & Accountability Guidelines provides guidelines for assigning discipline based on the circumstances. For Major – Life Threatening & Conduct Unbecoming Offences, the Guidelines provide for: "Depending on the offence the issuance of a minimum of a 20-calendar day suspension up to and including a 45-day calendar suspension and/or dismissal."

> Support:     **Appendix p. 10**, Sexton Dep. 38:16–39:4; **Appendix p. 66,**
> Sexton Dep. Ex. 3 at CP_00444; **Appendix p. 340,** Dittrich-Bigley Dep. 7:17–
> 8:20.

10.     CP prohibits retaliation against an individual who reports a hazardous safety condition, as such reports are protected by the Federal Railroad Safety Act ("FRSA") and CP policy.

> Support:     **Appendix p. 10**, Sexton Dep. 40:12–41:12; **Appendix p. 73,**
> Sexton Dep. Ex. 4 at CP_00451; **Appendix pp. 381, 383,** Ross
> Dep. 97:24–25, 113:5–13; **Appendix pp. 337–338,** Hanson Dep.
> Ex. 64 at CP_06327–28.

## III.    SEXTON IS A CERTIFIED LOCOMOTIVE ENGINEER

11.     Sexton has been an employee of CP since March 1999.

3

Support:        **Appendix p. 3**, Sexton Dep. 13:2–8.

12.     Sexton is a locomotive engineer. His job is to operate locomotives safely pursuant to CP's operational rules and in compliance with the GCOR and other applicable regulations, including when re-locating and re-positioning train cars within railyards.

Support:        **Appendix pp. 3–4, 7**, Sexton Dep. 13:25–14:14; 27:5–10.

13.     Sexton receives annual training and education on CP's operational rules and procedures in order to maintain his locomotive engineer certification.

Support:        **Appendix p. 4**, Sexton Dep. 15:8–21.

14.     When working in a rail yard, train crews may perform "shove movements," in which a locomotive is used to push train cars into position on open track where the cars may then stay until being connected to a train for transport to their next destination.

Support:        **Appendix p. 422**, McInnis Decl. ¶ 5; *see* **Appendix p. 60**, Sexton Dep. Ex. 2 at CP_00340 (GCOR Rule 6.5 Shoving Movements).

15.     When performing a shove, engineers operate the locomotive from the trailing end of the movement, and so rely on one specifically assigned employee protecting the shove to communicate about what is happening at the leading end of the movement.  The engineer performing a shove movement is required to listen and follow the directions of the one employee protecting the movement. The engineer is not to consider any other radio messages from other employees who are not specifically attached to the movement.

Support:        **Appendix pp. 423, 424**, McInnis Decl. ¶¶ 6, 12; **Appendix p. 7**, Sexton Dep. 29:1–19.

16.     When performing a shove movement, the employee protecting the movement communicates with the engineer by radio to inform the engineer about the distance remaining

before the train must come to a complete stop. The employee protecting the movement typically

communicates the distance in "car counts"—the number of car lengths remaining until the train

must be stopped.

> Support:        **Appendix p. 423**, McInnis Decl. ¶ 7; **Appendix p. 7**, Sexton Dep.
>
> 28:11–29:21.

17.     The applicable GCOR Rule 5.3.7, mandates that engineers must be prepared to stop

a shove movement within half the number of car lengths last called over the radio, if they receive

no further instructions. In other words, if the engineer receives no further communication, he must

actually stop the train, and the train must be at a full stop, within one-half of the number of car

lengths that was last transmitted. GCOR 5.3.7's specific language is:

> **5.3.7    Radio Response**
>
> When radio communication is used to make movements, crew members must
> respond to specific instructions given for each movement. Radio communications
> for shoving movements must specify the direction and distance and must be
> acknowledged when distance specified is more than four cars.
> **Movement must stop within half the distance specified unless additional
> instructions are received.**

> Support:        **Appendix p. 423**, McInnis Decl. ¶ 8; **Appendix p. 7**, Sexton Dep.
>
> 27:21–29:7; **Appendix p. 59**, Sexton Dep. Ex. 2 at CP_00319.

18.     For example, if the last car count communicated is forty (40), the engineer must be

prepared to have the train at a full stop within twenty (20) car lengths.

> Support:        **Appendix p. 423**, McInnis Decl. ¶ 9; **Appendix p. 8**, Sexton Dep.
>
> 33:16–25.

19.     If the communications include two car-counts in the same communication, the

engineer should operate based on the most restrictive car-count. For example, if the conductor

says, "Good for forty (40), fifteen (15) to a stop," the engineer should operate based on the fifteen

5

(15) car-count—the more restrictive count.

> Support:    **Appendix p. 423**, McInnis Decl. ¶ 10; **Appendix p. 309**, Jared Dep. 150:3–16; **Appendix pp. 244–245**, Johnson Dep. 39:8–25, 40:14–20, 41:6–10.

20.    If the car-count is ambiguous or the engineer is confused, the engineer should immediately stop the shove movement.

> Support:    **Appendix p. 423**, McInnis Decl. ¶ 11.

## IV.    IN FEBRUARY 2021, SEXTON VIOLATED CP RULES AND WAS DISCIPLINED PURSUANT TO CP POLICY AS A RESULT

### A.    Sexton Violated CP's Operating Rules on February 1, 2021.

21.    On February 1, 2021, Sexton was assigned as the engineer operating the 474-31 train from Marquette, Iowa to the Nahant rail yard in Davenport, Iowa. Justin DePover was assigned as the conductor operating the 474-31 with Sexton that day.

> Support:    **Appendix pp. 11–12**, Sexton Dep. 43:22–44:21, 46:11–15.

22.    On February 1, 2021, Sexton performed a shove movement in the Nahant rail yard.

> Support:    **Appendix p. 20**, Sexton Dep. 94:21–96:21.

23.    The last communication Sexton received from DePover, the conductor, was "good for forty (40), fifteen (15) cars to a stop."

> Support:    **Appendix pp. 24–25**, Sexton Dep. 121:19–122:6.

24.    Because the last instruction was "fifteen (15) to a stop," Sexton was required by GCOR 5.3.7 to be prepared to have the train stopped within seven and one-half car lengths, if he heard no other instructions.

> Support:    **Appendix pp. 7, 26**, Sexton Dep. 28:5–18; 126:19–23; **Appendix pp. 308–309, 312**, Jared Dep. 148:16–149:3, 149:23–150:2, 166:2–167:24; **Appendix pp. 244–245**, Johnson Dep. 37:13–38:13, 39:3–25, 40:22–41:5; **Appendix p. 59**, Sexton Dep.

Ex. 2 at CP_00319.

25.     Sexton shoved eleven cars before stopping and so violated GCOR 5.3.7.

> Support:        **Appendix pp. 25–26**, Sexton Dep. 122:24–123:5; 126:19–23;
> **Appendix pp. 308–309, 312**, Jared Dep. 148:16–149:3, 149:23–150:2, 166:2–167:24;
> **Appendix p. 384**, Ross Dep. 119:4–14.

26.     Sexton's violation was observed by CP Rail General Manager Operations – US West Division, Tom Jared, who was performing what CP refers to as an "efficiency test" or "e-test" in order to determine if Sexton would comply with GCOR 5.3.7 when performing the shove movement.

> Support:        **Appendix p. 21**, Sexton Dep. 104:21–105:17; **Appendix pp. 290–291**, Jared Dep. 21:8–13, 24:21–25:10; **Appendix p. 420**, Jared Decl. ¶ 8;
> **Appendix p. 424**, McInnis Decl. ¶ 13.

27.     Jared oversees CP's operations in six states, including Iowa. Jared's responsibilities include ensuring safe operations, managing budgets, utilizing assets, developing people, and working with customers. As an operational leader, it is not uncommon for Jared to administer efficiency tests in the field. In 2021, Jared administered thirteen efficiency tests. Currently, Jared is required to administer at least twelve efficiency tests per month.

> Support:        **Appendix p. 21**, Sexton Dep. 104:21–105:17; **Appendix pp. 290–290, 302**, Jared Dep. 21:8–13, 24:21–25:10, 109:4–7; **Appendix pp. 419–420**, Jared Decl. ¶¶ 5–7; **Appendix p. 424**, McInnis Decl. ¶ 13.

28.     CP's U.S. Manual on Operating Rules in Compliance provides guidelines regarding the administration of efficiency tests, which test compliance with GCOR rules. The guidelines provided in the U.S. Efficiency Test Manual on Operating Rules in Compliance are not rules and

do not set out mandatory procedures for administering efficiency tests. The guidelines for testing compliance with GCOR 5.3.7 are provided by several tests within CP's U.S. Efficiency Test Manual, including: Test GRA01 Hand Signals or Signal Disappearance (included in the "Stop" test group), Test GRF02 Shoving or Pushing Movements (included in the "Switches – Derails – Protecting Shoves and Equipment Foul of Adjacent Tracks" test group), and Test GR03 Lieu of Hand Signals (included in the "Railroad Radio" test group)..

> Support:       **Appendix pp. 369–370, 372**, Ross Dep. 52:17–53:1, 62:13–23, 63:17–23; **Appendix pp. 293–295**, Jared Dep. 59:6–60:3, 68:6–69:23; **Appendix p. 249**, Johnson Dep. 79:12–22; **Appendix pp. 257–271**, Johnson Dep. Ex. 39 at SEXTON 000368–382; **Appendix p. 424**, McInnis Decl. ¶¶ 14, 15.

29.     [Intentionally left blank.]

30.     Jared administered the efficiency test on February 1, 2021 consistent with the guidelines set out in CP's Efficiency Test Manual and CP practices and rules. Specifically, after DePover gave a 15-car count, Jared instructed DePover not to give further instruction to Sexton. In so doing, Jared altered the conditions of the shove movement to test Sexton's compliance with GCOR Rule 5.3.7, which required him to stop within half the distance specified by DePover's last instruction. This type of "set up" test is consistent with the guidelines set out in CP's Efficiency Test Manual and did not result in any violation of federal law or regulations, or CP practices and rules, including GCOR.

> Support:       **Appendix pp. 292, 297, 306–309, 312**, Jared Dep. 50:20–51:4, 78:22–80:3, 137:4–20, 139:11–24, 143:18–144:18, 147:3–149:3, 167:13–24; **Appendix pp. 369–372**, Ross Dep. 52:17–53:1, 53:23–25, 54:11–55:11, 58:1–20, 59:2–60:18, 62:13–23, 63:17–23; **Appendix pp. 274, 274a-c**, Johnson Dep. Ex.

39 at SEXTON 000472; **Appendix p. 420**, Jared Decl. ¶ 8; **Appendix pp. 424–425**, McInnis Decl. ¶¶ 16–19.

31.     Consistent with CP practices, Sexton was not aware that Jared was administering an efficiency test at the time Sexton chose to violate CP's rules by failing to stop within half the distance specified.

Support:     **Appendix p. 21**, Sexton Dep. 104:21–23; **Appendix pp. 266–267**, Johnson Ex. 39 at SEXTON 000377–78.

**B.     Sexton Received Discipline for His Rule Violation.**

32.     Sexton's failure to stop the train within half of the fifteen car-length instruction that was called over the radio violated GCOR Rule 5.3.7.

Support:     **Appendix p. 311**, Jared Dep. 162:20–25; **Appendix p.  59**, Sexton Dep. Ex. 2 at CP_00319; **Appendix p. 242**, Johnson Dep. 21:6–14; **Appendix p. 252**, Johnson Dep. Ex. 35 at CP_00982.

33.     As a union employee, Sexton was entitled to a hearing before discipline could be assigned.

Support:     **Appendix p. 6**, Sexton Dep. 22:5–18; **Appendix p. 47**, Sexton Dep. Ex. 1 at CP_00256.

34.     Pursuant to Sexton's collective bargaining agreement, on February 4, 2021, CP issued Sexton notice of an investigation hearing regarding his alleged violation of GCOR Rule 5.3.7.

Support:     **Appendix p. 24**, Sexton Dep. 119:8–120:4; **Appendix p. 78**, Sexton Dep. Ex. 9 at SEXTON 000013.

35.     CP held a hearing on February 10, 2021 where both CP and Sexton provided testimony and presented evidence.

9

Support:        **Appendix p. 24**, Sexton Dep. 119:19–24; **Appendix pp. 79–81**, Sexton Dep. Ex. 10 at CP_000018–20.

36.     Jared was the company witness. He presented evidence and explained the circumstances of Sexton's rule violation.

Support:        **Appendix p. 303**, Jared Dep. 123:14–124:11; **Appendix pp. 79–81, 96–115, 121–125**, Sexton Dep. Ex. 10 at CP_000018–20, CP_000035–54, CP_000060–64.

37.     Sexton was represented by Local Chairman Joe Rainwater. Rainwater had the opportunity to cross-examine witnesses and present evidence on Sexton's behalf.

Support:        **Appendix pp. 79–81, 115–125**, Sexton Dep. Ex. 10 at CP_000018–19, CP_000054–64.

38.     Johnson examined, and Rainwater defended, Sexton at the hearing and Sexton was permitted to explain his version of events. Sexton admitted the first car count he received during the shove move on February 1, 2021 was fifty (50) cars. Sexton stated, the next instruction he received was "still good for 40, 15 – 15 cars to a stop."

Support:        **Appendix pp. 24–25**, Sexton Dep. 120:5–7, 121:3–122:20; **Appendix pp. 140–160, 166, 168–178**, Sexton Dep. Ex. 10 at CP_000079–99, CP_000105, CP_000107–117.

39.     Rainwater also asked Sexton questions. Rainwater asked Sexton if Sexton believed Jared violated GCOR 6.5 when he "interrupted" DePover's car counts to Sexton. Sexton responded: "Absolutely. He created a unsafe act." Johnson stopped the questioning, noting that the purpose of the hearing was to determine if Sexton – not Jared – complied with CP's operating rules as alleged in the specific notice of investigation.

Support:        **Appendix pp. 144–146**, Sexton Dep. Ex. 10 at CP_000083–85

(66:15–68:8) ; **Appendix p. 418,** Ross Decl. ¶¶ 14–15.

40.    The conductor, DePover, was a witness. In addition to Jared, DePover was the only

other employee witness with firsthand knowledge of the shove movement and efficiency test.

Support:        **Appendix pp. 126–139, 160–168**, Sexton Dep. Ex. 10 at

CP_000065–78, CP_000099–107; **Appendix p. 252**, Johnson Dep. Ex. 35 at

CP_00982.

41.    The investigation hearing officer was Road Foreman of Engineers and Designated

Supervisor Remote Control Operators Mark Johnson. Prior to working as a CP manager, Johnson

was a locomotive engineer—a unionized CP employee. Johnson's role at the investigation hearing

was to ensure it was conducted in a fair and impartial manner and, afterward, to determine if CP

proved that the charge against Sexton was proven.

Support:        **Appendix pp. 240–241**, Johnson Dep. 7:7–25, 11:18–12:6;

**Appendix pp. 343–344**, Dittrich-Bigley Dep. 24:23–25:17; **Appendix p. 353**, Dittrich-

Bigley Dep. Ex. 66 at CP_06410; **Appendix p. 373**, Ross Dep. 65:12–24.

42.    Johnson determined that CP proved Sexton violated GCOR Rule 5.3.7.

Specifically, Johnson concluded that Sexton was given a 15-car count, received no further

communication, and failed to stop the move within 7-car lengths (half of fifteen). Rather, Sexton

came to a stop at 11-car lengths.

Support:        **Appendix p. 242**, Johnson Dep. 21:4–14; **Appendix p. 252**,

Johnson Dep. Ex. 35 at CP_00982.

43.    Johnson relied on testimony, documentary evidence, including DePover's

contemporaneous signed statement and a train list indicating car lengths, and the video evidence

presented at the hearing. Johnson also heard and considered the Union's arguments on behalf of Sexton and explained his reasons why the Union's arguments did not change his decision. Further, Johnson explained why he declined to call to the hearing two employees whom the Union identified as witnesses. Decisions such as who is and who is not allowed to testify at an investigation hearing are fully within the discretion of the hearing officer.

> Support:    **Appendix pp. 246–248**, Johnson Dep. 48:16–49:2, 52:5–55:21;
>
> **Appendix p. 252**, Johnson Dep. Ex. 35 at CP_00982.

44.    Based on the facts and consistent with CP's Hybrid Discipline & Accountability Guidelines, Johnson recommended a 20–day paid suspension, which was within the range of outcomes for a first Major – Life Threatening offense.

> Support:    **Appendix p. 242**, Johnson Dep. 21:25–22:7; **Appendix p. 252**,
>
> Johnson Dep. Ex. 35 at CP_00982; **Appendix p. 66,** Sexton Dep. Ex. 3 at CP_00444.

45.    Superintendent Dylan Smith reviewed Johnson's recommendation and proposed a twenty-day suspension, with ten (10) days served and ten (10) days deferred. Smith did not witness the rule violation. However, Smith met with Jared and Sexton following the rule violation. Smith testified that immediately following his rule violation on February 1, 2021, Sexton took responsibility for the decision to shove past half the distance communicated, acknowledging that it was a violation of GCOR 5.3.7. Smith also testified that it was not uncommon for him to recommend ten (10) days served and ten (10) days deferred for a first Major rule violation.

> Support:    **Appendix pp. 283–284**, Smith Dep. 22:4–24:9, 25:7–13; **Appendix p. 251**, Johnson Dep. Ex. 35 at CP_00981.

46.    Because Jared had administered the efficiency test and was the company witness at the hearing, he was not involved in the discipline decision-making process in any way and did not

make any recommendation for discipline. Instead, Jared's supervisor, CP's Vice President Operations Southern Region, Jason Ross, reviewed the hearing investigation and the discipline recommendation and determined that the appropriate discipline was a twenty-day suspension without pay, which was imposed on February 26, 2021. Ross was clear and unwavering at his deposition: He alone decided Sexton's discipline and Jared did not make any recommendation about it.

> Support:    **Appendix pp. 296–297**, Jared Dep. 75:13–78:21; **Appendix pp. 368–369, 383–384**, Ross Dep. 48:12–14, 49:15–51:5, 115:5–116:19, 119:4–14; **Appendix p. 26**, Sexton Dep. 127:10–128:1; **Appendix p. 180**, Sexton Dep. Ex. 12, **Appendix pp. 416–417**, Ross Decl. ¶¶ 1–5

47.    Reacting to Smith's recommendation, Ross testified: "There was no way in [Hades] I was going to give somebody a 10 day deferred and 10 day served suspension for a major violation. So he got 20."

> Support:    **Appendix pp. 369, 375**, Ross Dep. 49:8–50:14, 51:3–52:4, 73:17–74:2; **Appendix p. 180**, Sexton Dep. Ex. 12; **Appendix pp. 251–253**, Johnson Dep. Ex. 35.

48.    Ross also testified: "I quite often – when I look at discipline, I don't even look who the names are. I get a list. I get a list of the incident, the date of the incident, the date the hearing took place, review the hearing. If facts are proven, discipline is assessed. That's all that's taken into consideration." There is no evidence that Ross took into account any activity protected by Section 20109 when he decided the discipline to assess to Sexton, including the comment Sexton made about Jared during the February 10, 2021 hearing.

> Support:    **Appendix p. 376**, Ross Dep. 80:13–25; **Appendix p. 416**, Ross

Decl. ¶¶ 4, 13–15.

49.     On February 26, 2021, CP issued a written notice of discipline to Sexton. The discipline notice included Jared's stamped electronic signature. Jared testified that the administrative office has permission to add his stamped electronic signature to documents that need to go out under the General Manager. Jared did not read the discipline notice before it was issued to Sexton. Jared was not involved in any way in the discipline decision or preparing the discipline notice.

> Support:          **Appendix p. 369**, Ross Dep. 50:15–51:5; **Appendix pp. 296–297,** , Jared Dep. 75:13–78:7; **Appendix p. 180**, Sexton Dep. Ex. 12.

50.     On May 20, 2021, Sexton's union appealed the discipline decision to a Public Law Board (part of the National Mediation Board that exists to resolve railroad labor grievances) pursuant to the collective bargaining agreement and applicable federal law.

> Support:          **Appendix p. 26**, Sexton Dep. 127:21–129:2; **Appendix pp. 47–48**, Sexton Dep. Ex. 1 at CP_00256–57; **Appendix p. 181**, Sexton Dep. Ex. 13 at SEXTON 000015; and **Appendix pp. 395–397**, Sullivan Decl. Ex. A, CP_00479–481.

51.     On August 26, 2022, the Public Law Board ruled in the union's favor. The Public Law Board granted Sexton's appeal on procedural grounds based on the incorrect belief that Jared played a role in the imposition of discipline after the investigation hearing. As a result, the February 26, 2021, discipline was removed from Sexton's record and he was compensated for the twenty (20) days of pay that he did not receive during the now-reversed suspension. Sexton made it clear at his deposition that the decision was a "win for John."

> Support:          **Appendix p. 26**, Sexton Dep. 127:21–129:2, 129:11–15; **Appendix pp. 181–184**, Sexton Dep. Ex.13 at SEXTON 000015–18.

14

**C.     CP Consistently Enforces GCOR Rule 5.3.7 Pursuant to the Hybrid Discipline & Accountability Guidelines.**

52.     CP's Hybrid Discipline & Accountability Guidelines provide the process for issuing discipline consistently and fairly.

> Support:     **Appendix p. 427**, Dittrich-Bigley Decl. ¶ 6; **Appendix p. 340**,
>
> Dittrich-Bigley Dep. 7:17–8:2; **Appendix pp. 61–72**, Sexton Dep. Ex. 3.

53.     CP's Hybrid Discipline & Accountability Guidelines provides for a range of outcomes depending on the severity of the rule violation—for example, Non-Major Offences and Attendance versus Major – Life Threatening & Conduct Unbecoming Offences—the employee's discipline record, and whether the employee immediately reports the incident, takes proper protective actions following the incident, and/or acknowledges responsibility.

> Support:     **Appendix p. 427**, Dittrich-Bigley Decl. ¶ 7; **Appendix p. 340–341**,
>
> Dittrich-Bigley Dep. 8:14–9:20; **Appendix pp. 63–72**, Sexton Dep. Ex. 3 at CP_00441–
>
> 450.

54.     For Major – Life Threatening & Conduct Unbecoming Offences, disciplinary consequences may include suspension ranging from twenty (20) to forty-five (45) days, dismissal, demotion, job restrictions, requalification, training, or a Last Chance Agreement. Depending on the circumstances, suspensions may be deferred in part or in full.

> Support:     **Appendix pp. 341–342**, Dittrich-Bigley Dep. 11:3–13, 11:21–12:3,
>
> 12:18–13:1, 16:1–13; **Appendix p. 66**, Sexton Dep. Ex. 3 at CP_00444; **Appendix p. 379**,
>
> Ross Dep. 89:11–17.

55.     For example, if an employee takes accountability for his or her rule violation, CP may recommend a partially deferred suspension. Conversely, if an employee does not accept responsibility for the charged violation, and the charge is proven, CP will assess the full

suspension.

> Support:        **Appendix p. 369**, Ross Dep. 51:9–52:4.

56.     If a suspension is deferred in part or in full, the deferred portion of the suspension will be activated if the employee is culpable for a subsequent offense within the default period, which is typically six (6) months from the date of assessment. If activated, the deferred suspension carries the same gravity as a served suspension.

> Support:        **Appendix p. 341**, Dittrich-Bigley Dep. 10:5–23, 12:4–17; **Appendix p. 63**, Sexton Dep. Ex. 3 at CP_00441.

57.     Depending on the circumstances, the Company may offer the employee the opportunity to sign an Acknowledgment of Responsibility ("AOR"), also known as a "waiver." By signing an AOR, the employee formally acknowledges responsibility for his or her rule violation and waives his or right to a formal investigative hearing and the right to file a grievance or appeal.

> Support:        **Appendix pp. 348–349**, Dittrich-Bigley Dep. 44:15–45:3; **Appendix pp. 378–379**, Ross Dep. 88:24–89:7.

58.     It is CP's policy to document employee discipline.

> Support:        **Appendix p. 427**, Dittrich-Bigley Decl. ¶ 8.

59.     On July 16, 2019, engineer T.V. violated GCOR Rule 5.3.7, which is a Major – Life Threatening & Conduct Unbecoming Offence. T.V. was issued a twenty-day suspension, with five (5) days served and fifteen (15) days deferred. T.V. acknowledged responsibility for the rule violation and agreed to waive the right to a formal investigation hearing. The assessment of discipline for T.V.'s July 16, 2019 rule violation falls within the range of disciplinary consequences that may be assessed for a Major – Life Threatening & Conduct Unbecoming

Offence pursuant to CP's Hybrid Discipline & Accountability Guidelines.

> Support:        **Appendix pp. 427-428**, Dittrich-Bigley Decl. ¶ 11; **Appendix p.**
>
> **347**, Dittrich-Bigley Dep. 37:4–19; **Appendix p. 361**, Dittrich-Bigley Dep. Ex. 69.

60.    On June 7, 2020, engineer M.J. was involved in an incident in which he failed to stop a shove movement within half the distance given. M.J. was issued verbal coaching.

> Support:        **Appendix p. 347**, Dittrich-Bigley Dep. 38:2–25; **Appendix pp.**
>
> **242–243**, Johnson Dep. 24:13–27:5; **Appendix p. 255**, Johnson Dep. Ex. 36 at CP_00616.

61.    On July 29, 2020, engineer T.S. was involved in an incident wherein he failed to stop a shove move in half the distance specified. T.S. was issued verbal coaching.

> Support:        **Appendix p. 347**, Dittrich-Bigley Dep. 39:1–10; **Appendix p. 243**,
>
> Johnson Dep. 27:6–11; **Appendix p. 255**, Johnson Dep. Ex. 36 at CP_00616.

62.    On January 7, 2021, engineer T.P. violated GCOR Rule 5.3.7, which is a Major – Life Threatening & Conduct Unbecoming Offence. T.P. was issued a twenty-day suspension, with ten (10) days served and ten (10) days deferred. T.P. immediately acknowledged and took accountability for his rule violation. The assessment of discipline for T.P.'s January 7, 2021 rule violation falls within the range of disciplinary consequences that may be assessed for a Major – Life Threatening & Conduct Unbecoming Offence pursuant to CP's Hybrid Discipline & Accountability Guidelines.

> Support:        **Appendix p. 428**, Dittrich-Bigley Decl. ¶ 12; **Appendix pp. 345–**
>
> **346**, Dittrich-Bigley Dep. 32:24–36:3 ; **Appendix p. 354**, Dittrich-Bigley Dep. Ex. 67;
>
> **Appendix p. 359–360**, Dittrich-Bigley Dep. Ex. 68 at CP_01785–86 (16:18–17:14).

63.    On February 1, 2021, Sexton violated GCOR Rule 5.3.7, which is a Major – Life Threatening & Conduct Unbecoming Offence. Sexton was issued a twenty-day suspension. The

assessment of discipline for Sexton's February 1, 2021 rule violation falls within the range of disciplinary consequences that may be assessed for a Major – Life Threatening & Conduct Unbecoming Offence pursuant to CP's Hybrid Discipline & Accountability Guidelines.

Support:          **Appendix p. 347**, Dittrich-Bigley Dep. 40:20–25; **Appendix pp. 428-429**, Dittrich-Bigley Decl. ¶ 16; **Appendix p. 379**, Ross Dep. 89:11–17; **Appendix p. 65**, Sexton Dep. Ex. 3 at CP_00443.

64.      At his deposition, Ross testified that "there was no way in Hades" he would impose less than a twenty-day suspension for a first Major – Life Threatening & Conduct Unbecoming Offence. Ross further testified that if he assigned less severe discipline for a first Major rule violation, it would likely be the result of post-hearing negotiations between the Company and the employee's union. In this case, Sexton's Union made no effort to negotiate his discipline after the hearing.

Support:          **Appendix pp. 375–376**, Ross Dep. 76:7–79:16; **Appendix p. 354**, Dittrich-Bigley Dep. Ex. 67.

65.      On February 16, 2021, engineer J.M. violated GCOR Rule 5.3.7, which is a Major – Life Threatening & Conduct Unbecoming Offence. J.M. was dismissed from employment with CP. J.M. had several Major rule violations on his discipline record, including a January 13, 2021 incident for which J.M. was issued a thirty-day "last chance" suspension. The assessment of discipline for J.M.'s February 16, 2021 rule violation falls within the range of disciplinary consequences that may be assessed for a Major – Life Threatening & Conduct Unbecoming Offence pursuant to CP's Hybrid Discipline & Accountability Guidelines.

Support:          **Appendix p. 428**, Dittrich-Bigley Decl. ¶ 14; **Appendix p. 398**, Sullivan Decl. Ex. B, CP_00922; **Appendix p. 285**, Smith Dep. 36:5–10; **Appendix p.**

**288**, Smith Dep. Ex. 47 at CP_00939.

## V.    SEXTON CLAIMS HIS FEBRUARY 2021 DISCIPLINE WAS RETALIATION

### A.    Sexton Claims His February 2021 Discipline Was Retaliation for Delaying a Train.

66.    Sexton claims Jared administered the February 1, 2021 efficiency test to retaliate against Sexton for a conversation that occurred earlier the same day between Sexton and his supervisor, Kurt McKelvey, when Sexton asserted that certain rail crossings needed to be "cut" (cleared of compacted ice and snow) before his train left the yard in Marquette, Iowa, for Nahant, and McKelvey disagreed.

> Support:    **Appendix pp. 26–27**, Sexton Dep. 129:25–130:12, 131:14–18;
> **Appendix pp. 187–188**, Sexton Dep. Ex. 14 at 3–4.

67.    The section of track where the rail crosses a road is called a "crossing." The "flangeway" is the opening parallel to the rail that allows the wheel flange of a train to pass. After a snowfall, vehicles that drive over the crossings may compact snow and ice into the flangeways. The compacted snow or ice in the flangeways has the potential to force a wheel flange up out of the flangeway, which can potentially derail a rail car. To avoid incidents caused by snow and ice buildup, railroaders "cut" the flangeways and crossings by running a locomotive only (without any cars) over that section of the rail to dislodge the snow and ice before operating a full train (with cars).

> Support:    **Appendix pp. 12–13**, Sexton Dep. 47:2–48:14, 50:17–25;
> **Appendix pp. 363–365, 373–374**, Ross Dep. 16:20–17:7, 22:3–15,68:11–69:1.

68.    At approximately 1:30 a.m. on February 1, 2021, Sexton held a job briefing for the 474-31 with the conductor DePover at the Marquette depot. During the job briefing, Sexton noted there was a fresh layer of snow and told DePover, "Before we start anything, we're going to cut

the crossings."

   Support:   **Appendix pp. 12–13**, Sexton Dep. 49:14–50:8.

69. Kurt McKelvey was the Trainmaster on duty in Marquette on February 1, 2021. Based on the small amount of snow that had recently fallen, McKelvey initially did not think the crossings needed to be cut and said so to Sexton. Sexton insisted the crossings needed to be cut and reminded McKelvey about two recent derailments and that cutting the crossings and flangeways was the CP-selected safety topic of the month.

   Support:   **Appendix pp. 222–223**, McKelvey  Dep. 76:1–14; 79:25–80:9; **Appendix pp. 13–14**, Sexton Dep. 51:20–52:18, 53:3–54:4, 55:10–60:7.

70. McKelvey agreed the crossings should be cut.  McKelvey testified that the decision was consistent with CP's policy—when in doubt, take the safest course.

   Support:   **Appendix p. 223**, McKelvey Dep. 79:25–80:9; **Appendix p. 366**, Ross Dep. 26:6–15.

71. At his deposition, Jared testified that Sexton did not have to inform McKelvey that he was cutting the tracks; he could have just done it. Jared further testified that he would have taken exception to McKelvey if McKelvey had told Sexton "don't cut those tracks, get on your train and go." Jared went on that, in that situation, he would "support Mr. Sexton." Jared also testified that Sexton would not have been disobeying an order to cut the tracks even if  McKelvey said "don't cut those tracks, get on your train and go" because Sexton's actions would amount to "attempting to follow the rules like he supposed to."

   Support:   **Appendix pp. 313–314**, Jared Dep. 171:23–173:18.

72. At his deposition, Ross testified that CP teaches employees to take the safe course; when in doubt, cut the crossings. Ross agreed with Jared that Sexton "did the right thing." Ross

also testified that he had a conversation with Sexton and McKelvey a few weeks later about the importance of cutting the crossings. Ross stated unequivocally: "I had that conversation with McKelvey as well because I'm not going to tolerate people cutting the rules and taking shortcuts. I won't tolerate it for one minute."

> Support:      **Appendix pp. 366–367, 385**, Ross Dep. 25:22–26:15, 26:24–29:5, 131:4–13.

73.    Sexton and DePover proceeded to cut the crossings.

> Support:      **Appendix p. 15**, Sexton Dep. 60:8–13.

74.    After they were finished cutting the crossings, Sexton and DePover returned to the Marquette yard to continue the substantial work that needed to be completed before they could depart. The work included lifting an engine, setting out cars, digging out a siding switch, completing an air brake test, cutting cars, tying and releasing hand brakes, and building up air to complete a Class III air brake test. From start to finish, the work took nearly four hours.

> Support:      **Appendix pp. 15–16**, Sexton Dep. 61:4–16, 62:6–20, 63:2–64:25; **Appendix p. 76**, Sexton Dep. Ex. 5; **Appendix p. 224**, McKelvey Dep. 81:7–82:2; **Appendix p. 231**, McKelvey Dep. Ex. 27 at CP_03303.

75.    The 474-31 train departed Marquette at 5:40 a.m. CT on February 1, 2021, which was approximately 3.5 hours late based on the standard time allotted for the work to be performed on the train in Marquette. Jared and Ross testified that a 3.5-hour over-standard delay is not unusual in winter operations.

> Support:      **Appendix p. 16**, Sexton Dep. 63:2–14; **Appendix p. 76**, Sexton Dep. Ex. 5; **Appendix pp. 300, 315**, Jared Dep. 103:18–104:13, 179:24–180:12; **Appendix p. 377**, Ross Dep. 81:10–82:5.

76.    McKelvey attributed about a few minutes of the train delay to the crossing-cutting operation. According to McKelvey's contemporaneous written description of the events of that day, the primary reason for the delay was lifting the engine and setting off (moving) twenty-four cars.

Support:        **Appendix pp. 220–221, 227**, McKelvey Dep. 55:9–56:15, 65:8–13, 114:12–116:24; **Appendix pp. 228–229**, McKelvey Dep. Ex. 26; **Appendix p. 231**, McKelvey Dep. Ex. 27 at CP_03303.

77.    Sexton attributed at least twenty to thirty minutes of the delay to picking up an engine on an open deck bridge and performing an air brake test.

Support:        **Appendix p. 17**, Sexton Dep. 66:10–68:23; **Appendix p. 76**, Sexton Dep. Ex. 5.

78.    Train delays are common in the winter months. Ross testified that he has told thousands of employees, "I'd rather have somebody following the rule and say we took a delay at whatever location than to get a phone call in the middle of the night saying we got a derailment because we violated a rule."

Support:        **Appendix p. 378**, Ross Dep. 85:17–86:7.

79.    Nevertheless, Sexton has created an attenuated and speculative theory that what he calls his insistence that the tracks be cut was the cause of the delay and, in turn, the cause for Jared to administer the efficiency test hours later—and, even later, for Ross to decide and impose the twenty-day suspension.

Support:        **Appendix pp. 28–29**, Sexton Dep. 140:14–141:2; 142:20–143:11.

80.    As far as the supposed motivation for the extensive conspiracy against him, Sexton theorizes that this one four-hour train delay (of which just fifteen minutes resulted from cutting

22

the crossing) on one day in 2021 would negatively impact Jared's 2021 annual performance evaluation, which would in turn result in a lower 2021 incentive payment for Jared—and so motivate Jared to conduct the efficiency test later on February 1, 2021.

> Support:        **Appendix pp. 28, 30, 36**, Sexton Dep. 140:2–13; 148:5–149:12, 178:13–20.

81.    There is no factual support for Sexton's theory. Jared was already in Davenport, Iowa before he knew about the 474-31 train delay that day. And Sexton agrees it is not unusual for Jared to be in Nahant because it is part of his territory.

> Support:        **Appendix p. 298**, Jared Dep. 96:6–18; **Appendix p. 317**, Jared Dep. Ex. 51; **Appendix p. 37**, Sexton Dep. 186:18–187:4.

82.    Jared testified that he heard over the radio that there was a train entering the Nahant yard that would be performing a shove movement. Jared assessed the environment and determined the conditions were safe to administer an efficiency test of the 474-31 crew while they were performing the shove movement.

> Support:        **Appendix pp. 304–305, 316**, Jared Dep. 128:19–129:8, 186:21– 187:3; **Appendix p. 420**, Jared Decl. ¶ 9.

83.    Jared's decision to administer an efficiency test in the Nahant rail yard on February 1, 2021 was entirely unrelated to the events that occurred in Marquette earlier that morning. In fact, Jared decided to administer an efficiency test of the shove movement to be completed by the 474-31 crew *before* he knew Sexton was the engineer operating the locomotive. Jared only learned that Sexton was the engineer after the train stopped and Sexton disembarked. To the best of Jared's current recollection, before he administered the efficiency test on February 1, 2021, Kurt McKelvey had not told Jared about any disagreement that he had with Sexton earlier on February

1, 2021.

      Support:        **Appendix pp. 304–305, 310, 316**, Jared Dep. 128:19–129:8, 157:4–9, 186:21–187:15; **Appendix p. 420**, Jared Decl. ¶¶ 10–12.

84.      The fact that the 474-31 was delayed on February 1, 2021 did not motivate Jared to administer the efficiency test that day.

      Support:        **Appendix pp. 304–305, 310, 316**, Jared Dep. 128:19–129:8, 157:4–9, 186:21–187:15; **Appendix p. 420**, Jared Decl. ¶ 13.

85.      Sexton conceded he has no evidence, beyond the length of the delay itself, that the delay in Marquette caused Jared to perform the efficiency test in Nahant.

      Support:        **Appendix pp. 22–23**, Sexton Dep. 113:8–115:4.

86.      Specifically, Sexton acknowledged that he has no evidence—only his own belief—that Jared knew about the events that occurred in Marquette early on the morning of February 1, 2021.

      Q.  So what is it about [Mr. McKelvey] being angry that you believe caused the shove test?

      A.  Because I had to go out there and — and number one, I didn't listen to him because he wanted me to violate a safety — a safety rule, and I did not — I did not do it. I refused to go out there and just get the hell out of there, get on your train and get the hell out of there like he wanted me to do. I went out there, and I cut the crossings. He didn't want me to. He was physically angry. I could tell by the look on his face. And it's all about the initial terminal delay.

      Q.  So how did the initial terminal delay cause the disciplinary hearing that you say was an adverse employment action?

      A.  Because I — when they had their numerous conference calls that following day, whether he emailed or called whatever, we're trying to get the documentation on that, I'm sure that was brought up, and I'm sure they were — they were not happy that I did not listen to Mr. McElvey and violate that safety — safety regulations. You know, and I did go out there and cut the crossings, and he was not happy. And I'm sure — as soon as — as soon as I left there, he made phone calls, emails, instant messages or texts, whatever he did.

Q.   We covered that before.  You believe those things happened, but you have no personal knowledge that any one of those things happened, correct?

A.   I can almost guarantee it.

Q.   And I understand that you believe you can almost guarantee it, but you have no personal knowledge that Kurt McElvey told anyone else about what happened that morning?

A.   That's the way the railroad works.  The initial terminal day, if you go above standard, they escalate it. That's what it's called, escalate to the next manager.

Q.   And so —

A.   And they — and they — and they want to drill down and get to why this was delayed or what happened. And he was physically angry and upset.  It was all over his face.

Q.   And you believe that that anger at you is the thing that got communicated to other people, correct?

A.   When it got escalated because he had to because it was —

Q.   And my question is —

A.   — over their standard.

Q.   And my question is, you believe it was the anger that was specifically directed at you and your specific actions that got communicated to other people, correct?

A.   Because I did not — yes, because I did not follow his direction when he wanted me to violate safety regulations.

Q.   And you — you believe that happened, but you have no personal knowledge that it actually did, correct?

A.   I'd put my career on it.

Q.   But you might lose that bet because you don't have any personal knowledge as to whether it actually happened, correct?

MR. MAGNUSON:  Objection, form.

Q.   You weren't on any phone call where you heard Kurt McElvey tell anyone else about his interaction with you, correct?

A.   No, but I know how the railroad operates.

25

Support:        **Appendix pp. 28–29**, Sexton Dep. 140:2–142:19.

87.    When pressed at his deposition to explain the factual basis for his causation theory,

Sexton offered nothing more than speculation and hearsay.

    Q.  Do you think that the complaint that you made at some point about the air test had something to do with the decision to — Tom Jared's decision to perform a shove test on February 1st, 2021, in the Nahant yard?

    A.  Part of it, but I think it was directly correlated with me refusing to violate a safety — a hazardous safety violation with Mr. McElvey when I first went on duty.  He was visibly angry, and that's what I think all this is a big part of it.

    Q.  And so this —

    A.  It's all connected.

    Q.  It's all connected.  How — how do you know it's all connected?

    A.  Common sense.

    Q.  Other than common sense, is there anything that you could point to that an outside observer could look at and say, "Well, this looks like it's connected"?

    A.  It's all about bonuses and how they how they get their bonuses.  If they have too big of initial terminal delay and then it affects their – their quarterly bonus or however they do it, semi-yearly bonus whatever it.

    Q.  How do you know that initial terminal delay — delays have an effect on any individual's bonus?

    A.  Common knowledge in the railroad industry, sir.

    Q.  But do you have any personal knowledge of that?

    A.  I hear it all the time from ex managers.

Support:        **Appendix pp. 35–36**, Sexton Dep. 177:23–178:25.

88.    Ross's decision to approve a 20-day suspension for Sexton was entirely unrelated

to the events that occurred in Marquette on the morning of February 1, 2021. Ross testified: "I

didn't discipline John Sexton for following the rule."

Support:        **Appendix p. 385**, Ross Dep. 129:11–17; **Appendix p. 417**, Ross

Decl. ¶ 6.

89.    The fact that the 474-31 was delayed on February 1, 2021 did not motivate Ross to approve a twenty-day suspension for Sexton. Ross testified: "Like I say – you know, that delay on 474, I hate to say it is probably not even something that popped up on my radar. In the middle of January and February that would have been the least of my concerns, that 3 hour delay on 474 for doing their job."

> Support:        **Appendix p. 380**, Ross Dep. 95:16–23; **Appendix p. 417**, Ross Decl. ¶ 7.

90.    Phone records that show McKelvey, Jared, Ross, and Miller had telephone conversations on February 1, 2021. Jason Ross testified that they attend regular calls to discuss the operations of trains within their territories. Ross further testified that individual employees and individual trains were at most rarely discussed on operational calls. Tracy Miller that it was "possible" that the delay of the 474 was discussed that day, but none of the witnesses recalled a specific conversation about the train or about Sexton.

> Support:        **Appendix p. 379**, Ross Dep. 89:20–92:18; **Appendix pp. 386–387**, Ross Dep. Ex. 79; **Appendix p. 389**, Miller Dep. 41:2–43:1; **Appendix pp. 390–391**, Miller Dep. Ex. 75; **Appendix pp. 299–300**, Jared Dep. 98:18–103:21, 104:14–109:22; **Appendix pp. 318–320**, Jared Dep. Ex. 52; **Appendix pp. 225–226**, McKelvey Dep. 102:4–21, 109:10–15; **Appendix pp. 235–238**, McKelvey Dep. Ex. 31.

91.    At all relevant times, CP has evaluated non-union employee performance pursuant to its Performance Management Program ("PMP") and Short-Term Incentive Plan ("STIP") Policy 3411. Senior leaders, in collaboration with human resources, set performance objectives at the

beginning of the year. The performance objectives are then cascaded down to managers within each leader's region, subdivision, and territory. The objectives align with what CP calls its Five Foundations. At the end of the year, leaders evaluate employee performance and, in collaboration with human resources, assign a performance rating.

> Support:    **Appendix p. 382**, Ross Dep. 108:14–25; **Appendix p. 322**, Hanson Dep. 9:8–10:6; **Appendix p. 250**, Johnson Dep. 93:20–94:4; **Appendix pp. 275–281**, Johnson Dep. Ex. 41.

92.    CP uses various metrics to measure achievement of key performance indicators, including origin performance, terminal dwell, and train weight. Actual achievement is aggregated at the end of the year and measured against objectives. Performance of one train on one day would not negatively impact an employee's overall performance rating.

> Support:    **Appendix pp. 324–325**, Hanson Dep. 17:19–18:5, 19:17–21:24; **Appendix pp. 275–281**, Johnson Dep. Ex. 41.

93.    An employee's performance rating is a factor used to determine the individual component of the employee's STIP payment.

> Support:    **Appendix p. 382**, Ross Dep. 106:2–20; **Appendix pp. 322–323, 325–327**, Hanson Dep. 12:23–13:4, 14:16–22, 22:14–23:10, 28:7–29:6.

94.    Jared's potential 2021 short-term incentive payment absolutely did not motivate his decision to administer the efficiency test on February 1, 2021.

> Support:    **Appendix p. 420**, Jared Decl. ¶ 14.

95.    Ross' potential 2021 short-term incentive payment absolutely did not motivate his decision to issue a 20-day suspension for Sexton.

> Support:    **Appendix p. 417**, Ross Decl. ¶ 8.

**B.  Sexton is a Prominent Safety Advocate and Former Co–Chair of the Local Safety Committee**

96.    Sexton understands that his number one responsibility as an engineer is safety. According to Sexton's testimony, "everyone knows [he is] one of the biggest safety advocates on this property."

<u>Support</u>:        **Appendix pp. 4, 27**, Sexton Dep. 14:3–5, 133:21–23.

97.    During the approximately twenty-five years Sexton and Jared have worked together at CP, Sexton has raised dozens of safety–related concerns to Jared and other CP managers. Jared never administered an efficiency test for Sexton because he raised safety concerns. And Jared has never recommended discipline for Sexton because he raised safety concerns. In fact, Jared has viewed Sexton as reliable "eyes on the ground" who will appropriately report safety concerns and rule violations.

<u>Support</u>:        **Appendix p. 421**, Jared Decl. ¶ 17.

98.    Around the time of the February 1, 2021, e-test, Sexton was Co-Chair of the Workplace Health and Safety Committee ("WHSC"), which is a committee of unionized CP employees and CP managers that holds monthly meetings to discuss recent injuries and accidents, safety hazards or concerns, and other safety-related topics.

<u>Support</u>:        **Appendix pp. 4–5**, Sexton Dep. 16:8–23, 20:3–6; **Appendix p. 400**, Sullivan Decl. Ex. C at CP03706.

99.    WHSC committee members are responsible for holding job briefings with other employees regarding the monthly safety-related topic. In January 2021, the WSHC safety topic was "Winter Train Handling," including "Cutting Flangeways & Crossings."

<u>Support</u>:        **Appendix pp. 4, 18–19**, Sexton Dep. 16:8–23, 79:7–17; 81:5–82:3; **Appendix p. 77**, Sexton Dep. Ex. 7;  **Appendix p. 404**, Sullivan Decl. Ex.

C at CP_03710.

100.    Superintendent Smith was Co-Chair of the WHSC with Sexton in January and February 2021.

> Support:        **Appendix p. 5**, Sexton Dep. 19:1–12;  **Appendix p. 400**, Sullivan
>
> Decl. Ex. C at CP_03706.

101.    On or around December 23, 2020, two union employees reported concerns about a manager to Sexton. The union employees reported these concerns to Sexton because, according to Sexton, he was the Union Co-Chair of the WHSC and the employees "knew that [Sexton] would escalate it to find out what's going on here, and that's exactly what [he] did."

> Support:        **Appendix pp. 29–30, 32**, Sexton Dep. 144:10–145:5, 146:3–9,
>
> 154:10–16; **Appendix pp. 212–213**, Sexton Dep. Ex. 16.

### C.    Sexton Also Claims His February 2021 Discipline Was Retaliation for Previous Complaints About a Manager.

102.    On January 3, 2021, Sexton emailed two CP managers with the December 23, 2020 second-hand report of another manager supposedly instructing a crew to violate CP rules. The email described the manager's alleged failure to conduct air brake testing and related operational complaints. The supervisor about whom Sexton complained had nothing to do with the failed e-test on February 1, 2021.

> Support:        **Appendix pp. 29–30**, Sexton Dep. 144:11–146:2; **Appendix pp.**
>
> **212–213**, Sexton Dep. Ex. 16; **Appendix p. 421,** Jared Decl. ¶¶ 15, 16.

103.    Then on January 18, 2021, Sexton emailed CP's senior vice president of operations, Tracy Miller, Ross, and Jared regarding the same allegations that he emailed about on January 3.

> Support:        **Appendix pp. 30–31**, Sexton Dep. 149:24–150:22; **Appendix pp.**
>
> **214–216**, Sexton Dep. Ex. 17.

104.    Miller responded to Jared and another manager: "Guys, what is this about? Was something brought to us that we didn't handle? Who has all the facts?"

    Support:        **Appendix p. 407**, Sullivan Decl. Ex. D at CP_03212.

105.    The other manager, Dylan Smith, responded promptly, explaining that he had investigated Sexton's January 3 report, determined there had been no rule violation, but had a constructive conversation with the manager in any event.

    Support:        **Appendix pp. 405–407**, Sullivan Decl. Ex. D at CP_03210–12.

106.    Jared then communicated with Sexton to assure him the matter had been investigated and resolved. At his deposition, Sexton admitted he has no firsthand knowledge of the actions Jared took to address and resolve the matter.

    Support:        **Appendix pp. 31–32**, Sexton Dep. 152:19–154:4, 155:21–157:17; **Appendix p. 214**, Sexton Dep. Ex. 17 at CP_01696.

107.    Miller also responded to Sexton to assure him safety is CP's first priority and CP expects accountability from everyone. At his deposition, Sexton acknowledged Miller's response did not convey any anger or animus toward Sexton, or dislike of the fact that he was raising these issues.

    Support:        **Appendix p. 215**, Sexton Dep. Ex. 17 at CP_01697; **Appendix p. 31**, Sexton Dep. 151:11–17.

108.    At his deposition, Sexton conceded he has no evidence—only speculation—that these January 2021 emails caused Jared to perform the efficiency test in Nahant on February 1, 2021, and the subsequent discipline.

    Q.  Of course.  What facts are there that connect your 20-day suspension to the January 3rd or January 18th emails?

A.   The fact that I bring this to their attention, continuous safety violations and that – that they see them, and they don't like to – to have things brought to their attention, and that's what it is.

Q.   So I'm looking at Mr. Jared's message back to you on January 19th and Mr. Miller's email to you on January 18th.  Where do they say that they don't like to have things brought to their attention?

A.   It's just obvious.

Q.   Do they say it anywhere in either of their messages –

A.   No.

Q.   – that they don't like to have things brought to their attention?

A.   No.

Q.   But you have the personal belief they don't like to have things brought to their attention; is that right?

A.   Yes.

Support:        **Appendix p. 33**, Sexton Dep. 160:15–161:11.

109.    Pressed for any and all evidence to support his accusation that Jared had a retaliatory motive when deciding to perform the e-test, Sexton said only: "That's the way it is."

Support:        **Appendix pp. 30, 33**, Sexton Dep. 147:24–149:12, 158:6–21, 160:15–161:11.

110.    Jared's decision to administer the efficiency test on February 1, 2021 was entirely unrelated to the emails Sexton sent in January 2021.

Support:        **Appendix p. 421**, Jared Decl. ¶¶ 15-16.

111.    Ross's decision to approve a 20-day suspension for Sexton was entirely unrelated to the emails Sexton sent in January 2021.

Support:        **Appendix p. 417**, Ross Decl. ¶¶ 9–10.

112.    On February 9, 2021, Sexton sent an email to Miller and Ross regarding McKelvey driving too fast for the conditions. Sexton also shared his version of the events of the morning of

February 1, 2021 in Marquette. Ross confirmed receipt on Wednesday, February 10, 2021 and told Sexton he would look into it and get back to him. Ross responded again on Monday, February 15, 2021 that he had gathered information and wanted to meet with Sexton to discuss. Ross recalls speaking to Sexton at some point after his February 15, 2021, response to Sexton.

> Support:    **Appendix pp. 363–364, 366**, Ross Dep. 13:3–19:6, 25:2–26:5;
> **Appendix p. 417**, Ross Decl. ¶ 11; **Appendix p. 34**, Sexton Dep. 162:20–164:22;
> **Appendix pp. 217–218**, Sexton Dep. Ex. 18.

113.    Ross's decision to approve a 20-day suspension for Sexton was entirely unrelated to Sexton's February 9, 2021 email and the resulting conversation between Sexton and Ross. In fact, Ross testified that he does not look at the names of employees when deciding discipline; instead, but instead reviews the portions of a summary chart that list the offense, the employee's discipline history, and other objective factors.

> Support:    **Appendix p. 376**, Ross Dep. 80:13–25; **Appendix p. 417**, Ross Decl. ¶¶ 11, 12.

114.    At his deposition, Sexton conceded that the only evidence he has that his February 9, 2021 email contributed to any negative action against him is his belief that managers "don't like it" when he sends emails and brings "all this safety stuff to their attention."

> Support:    **Appendix p. 34**, Sexton Dep. 164:23–165:12.

## VI.    PROCEDURAL HISTORY

115.    Sexton filed a complaint alleging retaliation in violation of 49 U.S.C. § 20109 with the Occupational Safety and Health Administration ("OSHA") on or around June 30, 2021.

> Support:    **Appendix p. 410**, Sullivan Decl. Ex. E (OSHA Complaint).

116.    OSHA dismissed the case on August 3, 2022, finding that CP would have suspended Sexton for 20 days even in the absence of any alleged protected activity. Specifically,

OSHA determined that Sexton violated GCOR 5.3.7 and was disciplined in accordance with CP's discipline policy. Finally, OSHA concluded that there was no evidence of animus toward Sexton because of any alleged protected activity, nor was there any evidence that his alleged protected activities contributed to CP's discipline.

> Support:        **Appendix p. 411–413**, Sullivan Decl. Ex. F (OSHA Dismissal).

117.    Sexton appealed to the Office of Administrative Law Judges on August 4, 2022.

> Support:        **Appendix p. 414**, Sullivan Decl. Ex. G (Sexton DOL Appeal).

4875-3477-9349\2

Dated: August 5, 2024

DORSEY & WHITNEY LLP

/s/ Joshua D. Hughes

Joshua Hughes (AT0014950)
hughes.joshua@dorsey.com
Dorsey & Whitney LLP
801 Grand Ave, Suite 4100
Des Moines, IA 50309
Tel: (515) 283–1000
Fax: (515) 598–7704

/s/ John T. Sullivan

John T. Sullivan (pro hac vice)
sullivan.jack@dorsey.com
Briana Al Taqatqa (pro hac vice)
altaqatqa.briana@dorsey.com
Dorsey & Whitney LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
Tel:  (612) 340–2600
Fax:  (612) 340–2868

ATTORNEYS FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that on August 5, 2024, I caused the foregoing to be electronically served on Plaintiff via email to his counsel of record:

Megan R. Merritt
SHUTTLEWORTH & INGERSOLL, P.L.C.
115 3rd Street SE, Suite 500
P.O. Box 2107
Cedar Rapids, IA 52406
Phone: (319) 365–9461
Fax: (319) 365–8443
mrm@shuttleworthlaw.com

John D. Magnuson
Cyle A. Cramer
YAEGER & JUNGBAUER BARRISTERS, P.L.C.
4601 Weston Woods Way
St. Paul MN, 55127
Phone: (507) 330–4777
Fax: (651) 288–0227
jmagnuson@yjblaw.com
ccramer@yjblaw.com


/s/ Joshua D. Hughes
Counsel for Defendant

4875-3477-9349\2