UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION

John Sexton,                              )
                                          )        Case No. 23-cv-00031
            Plaintiff,                    )
                                          )
                                          )
v.                                        )
                                          )
Dakota, Minnesota & Eastern Railroad      )
Corporation d/b/a Canadian Pacific, a     )
Delaware Corporation,                     )
                                          )
            Defendant.                    )
                                          )
                                          )
                                          )

**DEFENDANT'S APPENDIX IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

| Exhibit | Document | Appendix Page |
|---|---|---|
| 1 | Excerpts from the deposition of John Sexton taken October 31, 2023 | 1 |
| 2 | Excerpts from the Collective Bargaining Agreement between Canadian Pacific and Its Employees Represented by Brotherhood of Locomotive Engineers and Trainmen dated October 22, 2015 (Sexton Dep. Ex. 1) | 38 |
| 3 | Excerpts from the General Code of Operating Rules (GCOR) effective April 1, 2015 (Sexton Dep. Ex. 2) | 49 |
| 4 | Hybrid Discipline & Accountability Guidelines effective November 1, 2018 (Sexton Dep. Ex. 3) | 61 |
| 5 | Canadian Pacific U.S. Operations Accident, Incident, Injury and Occupational Illness Reporting Policy and Commitment Regarding Intimidation and Harassment, Policy 1819 (Sexton Dep. Ex. 4) | 73 |
| 6 | Train Delay Report for 474-31 on February 1, 2021 (Sexton Dep. Ex. 5) | 76 |
| 7 | WHSC Footboard/Safety Meeting/Dynamic Safety Review Attendance Sheet from January 2021 (Sexton Dep. Ex. 7) | 77 |

| Exhibit | Document | Appendix Page |
|---|---|---|
| 8 | Notice of formal investigation hearing sent to John Sexton and Justin DePover February 4, 2021 (Sexton Dep. Ex. 9) (Unredacted version filed with CP's sealed appendix) | 78 |
| 9 | Transcript of the Investigation Hearing of John Sexton and Justin DePover on February 10, 2021 (Sexton Dep. Ex. 10) (Unredacted version filed with CP's sealed appendix) | 79 |
| 10 | Determination letter from Tom Jared to John Sexton dated February 26, 2021 (Sexton Dep. Ex. 12) (Unredacted version filed with CP's sealed appendix) | 180 |
| 11 | Public Law Board No. 7667 Statement of Claim and Findings dated August 26, 2022 (Sexton Dep. Ex. 13) | 181 |
| 12 | Plaintiff's Answers to Defendant's Discovery Requests dated August 3, 2023 (Sexton Dep. Ex. 14) | 185 |
| 13 | Email from Jeffrey McInnis to Dylan Smith Forwarding message from John Sexton FW: Dan Chandanais dated January 3-4, 2021 (Sexton Dep. Ex. 16) (Unredacted version filed with CP's sealed appendix) | 212 |
| 14 | Email exchange between Tom Jared and John Sexton re: Home Safe dated January 18-20, 2021 (Sexton Dep. Ex. 17) (Unredacted version filed with CP's sealed appendix) | 214 |
| 15 | Email exchange between Jason Ross, John Sexton and Tracy Miller re: Homesafe dated February 9-15, 2021 (Sexton Dep. Ex. 18) (Unredacted version filed with CP's sealed appendix) | 217 |
| 16 | Excerpts from the deposition of Kurtis McKelvey taken November 9, 2023 | 219 |
| 17 | Email exchange between Kurtis McKelvey, Gary Prince, Tom Jared, Dylan Smith, Joey Reyes, Mark Johnson and others re: Marquette Sub Delays dated February 1, 2021 (McKelvey Dep. Ex. 26) | 228 |
| 18 | Email regarding delay details for train 474-31 dated February 2, 2021 (McKelvey Dep. Ex. 27) | 231 |
| 19 | Excerpts of the Verizon phone call detail for Kurtis McKelvey from February 1, 2021 (McKelvey Dep. Ex. 31) (Unredacted version filed with CP's sealed appendix) | 235 |

| Exhibit | Document | Appendix Page |
|---------|----------|---------------|
| 20 | Excerpts from the deposition of Mark Johnson taken May 10, 2024 | 239 |
| 21 | Email exchange regarding John Sexton discipline dated February 15-24, 2021 (Johnson Dep. Ex. 35) (Unredacted version filed with CP's sealed appendix) | 251 |
| 22 | Letter from Michelle Sullivan to Yessenia Valadez (OSHA) responding to request for information re: DOL Case #7-2260-21-066 dated June 17, 2022 (Johnson Dep. Ex. 36) | 254 |
| 23 | Excerpts from the Canadian Pacific US Efficiency Test Manual on Operating Rules in Compliance with FRA 217.9 effective November 1, 2014 (Johnson Dep. Ex. 39) | 257 |
| 24 | Canadian Pacific Short Term Incentive Plan (STIP), Policy 3411, effective with the 2021 plan year (Johnson Dep. Ex. 41) | 275 |
| 25 | Excerpts from the deposition of Dylan Smith taken May 29, 2024 (Unredacted version filed with CP's sealed appendix) | 282 |
| 26 | Southern & Eastern Region Discipline Call Document dated February 18, 2021 (Smith Dep. Ex. 47) (Unredacted version filed with CP's sealed appendix) | 286 |
| 27 | Excerpts from the deposition of Thomas Jared taken June 20, 2024 (Unredacted version filed with CP's sealed appendix) | 289 |
| 28 | Hotel Blackhawk invoice for Tom Jared stay from January 31, 2021 through February 3, 2021 (Jared Dep. Ex. 51) | 317 |
| 29 | Excerpts of the Verizon phone call detail for Tom Jared from February 1, 2021 (Jared Dep. Ex. 52) (Unredacted version filed with CP's sealed appendix) | 318 |
| 30 | Excerpts from the deposition of McKinsey Hanson taken June 24, 2024 | 321 |
| 31 | Canadian Pacific Workplace Harassment-Including Sexual Harassment Policy 1300, revised May 11, 2016 (Hanson Dep. Ex. 64) | 329 |
| 32 | Excerpts from the deposition of Justin Dittrich-Bigley taken June 26, 2024 (Unredacted version filed with CP's sealed appendix) | 339 |

| Exhibit | Document | Appendix Page |
|---|---|---|
| 33 | Excerpts from the U.S. Investigation Training Manual (Dittrich-Bigley Dep. Ex. 66) | 350 |
| 34 | Notice of formal investigation from Tom Jared to employee TP dated January 27, 2021 (Dittrich-Bigley Dep. Ex. 67) (Unredacted version filed with CP's sealed appendix) | 354 |
| 35 | Excerpts from the hearing transcript from the investigation of employee TP dated January 19, 2021 (Dittrich-Bigley Dep. Ex. 68) (Unredacted version filed with CP's sealed appendix) | 355 |
| 36 | Waiver acknowledgement from employee TV dated July 31, 2019 (Dittrich-Bigley Dep. Ex. 69) (Unredacted version filed with CP's sealed appendix) | 361 |
| 37 | Excerpts from the deposition of Jason Ross taken July 18, 2024 (Unredacted version filed with CP's sealed appendix) | 362 |
| 38 | Excerpts from the Verizon phone call detail for Jason Ross from February 1, 2021 (Ross Dep. Ex. 79) (Unredacted version filed with CP's sealed appendix) | 386 |
| 39 | Excerpts from the deposition of Tracy Miller taken July 9, 2024 (Unredacted version filed with CP's sealed appendix) | 388 |
| 40 | Verizon phone call detail for Tracy Miller from February 1, 2021 (Miller Dep. Ex. 75) (Unredacted version filed with CP's sealed appendix) | 390 |
| 41 | Declaration of Jack Sullivan | 392 |
| 42 | Letter from Peter Semenek to Myron Becker appealing Tom Jared's decision regarding John Sexton dated May 20, 2021 (CP_00479-481) (**Exhibit A** to Sullivan Declaration) | 395 |
| 43 | Notice of formal investigation from Arthur Clark to employee J.M. dated May 9, 2021 (CP_00922) (**Exhibit B** to Sullivan Declaration) (Unredacted version filed with CP's sealed appendix) | 398 |
| 44 | Canadian Pacific Workplace Health & Safety Committee Minutes dated January 13, 2021 (CP_03705-3710) (**Exhibit C** to Sullivan Declaration) (Unredacted version filed with CP's sealed appendix) | 399 |

| Exhibit | Document | Appendix Page |
|---|---|---|
| 45 | Email exchange between Tracy Miller, Dylan Smith, Tom Jared and Jason Ross re: Home Safe dated January 18, 2021 (CP_03210-3214) (**Exhibit D** to Sullivan Declaration) (Unredacted version filed with CP's sealed appendix) | 405 |
| 46 | Complaint alleging retaliation in violation of 49 U.S.C. § 20109 filed with the Occupational Safety and Health Administration ("OSHA") on or around June 30, 2021 (CP_02425) (**Exhibit E** to Sullivan Declaration) | 410 |
| 47 | Determination letter from OSHA dated August 3, 2022 (CP_02421–23) (**Exhibit F** to Sullivan Declaration) | 411 |
| 48 | Plaintiff's appeal to the Office of Administrative Law Judges dated August 4, 2022 (CP_02418-19) (**Exhibit G** to Sullivan Declaration) | 414 |
| 49 | Declaration of Jason Ross | 416 |
| 50 | Declaration of Tom Jared | 419 |
| 51 | Declaration of Jeffrey McInnis | 422 |
| 52 | Declaration of Justin Dittrich-Bigley | 426 |

Dated: August 5, 2024

DORSEY & WHITNEY LLP

Joshua Hughes (AT0014950)
hughes.joshua@dorsey.com
Dorsey & Whitney LLP
801 Grand Ave, Suite 4100
Des Moines, IA 50309
Tel: (515) 283-1000
Fax: (515) 598-7704

John T. Sullivan (pro hac vice)
sullivan.jack@dorsey.com
Briana Al Taqatqa (pro hac vice)
altaqatqa.briana@dorsey.com
Dorsey & Whitney LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
Tel:  (612) 340-2600
Fax:  (612) 340-2868

ATTORNEYS FOR DEFENDANT

**CERTIFICATE OF SERVICE**

I hereby certify that on August 5, 2024, I caused the foregoing to be electronically served on Plaintiff via email to his counsel of record:

Megan R. Merritt
SHUTTLEWORTH & INGERSOLL, P.L.C.
115 3rd Street SE, Suite 500
P.O. Box 2107
Cedar Rapids, IA 52406
Phone: (319) 365-9461
Fax: (319) 365-8443
mrm@shuttleworthlaw.com

John D. Magnuson
Cyle A. Cramer
YAEGER & JUNGBAUER BARRISTERS, P.L.C.
4601 Weston Woods Way
St. Paul MN, 55127
Phone: (507) 330-4777
Fax: (651) 288-0227
jmagnuson@yjblaw.com
ccramer@yjblaw.com


/s/ Joshua D. Hughes
Counsel for Defendant

1            IN THE UNITED STATES DISTRICT COURT

2             FOR THE SOUTHERN DISTRICT OF IOWA

3                    EASTERN DIVISION

4    _____

5    John Sexton,

6            Plaintiff,

7      v.          Case No:  3:23-CV-00031-HCA

8

9    Dakota, Minnesota & Eastern Railroad

10   Corporation d/b/a Canadian Pacific, a

11   Delaware Corporation,

12           Defendants.

13   _____

14              DEPOSITION OF JOHN SEXTON

15               OCTOBER 31, 2023

16                  9:00 a.m.

17

18   _____

19

20

21              File # MW 6278989

22

23

24

25   COURT REPORTER:  Christina DeGrande

Page 2

APPEARANCES:

On Behalf of Defendant:

John T. Sullivan, Esq.

Briana Al Taqatqa, Esq.

Dorsey & Whitney LLP

50 South Sixth Street, Suite 1500

Minneapolis, Minnesota 55402

Sullivan.jack@dorsey.com

Altaqatqa.briana@dorsey.com

612-340-2600


On Behalf of John Sexton:

John Magnuson, Esq.

Cyle Cramer, Esq.

Yaeger & Jungbauer Barristers, PLC

4601 Weston Woods Way

Saint Paul, Minnesota 55127

651-288-9532

Jmagnuson.yjblaw.com

Ccramer@yjblaw.com

Page 4

E X H I B I T S (continued)

| NUMBER | DESCRIPTION | |
|---|---|---|
| Exhibit 14 | Interrogatories | 129 |
| Exhibit 15 | Second Amended Complaint | 136 |
| | and Jury Trial Demand | |
| Exhibit 16 | 1/4/2021 Email | 144 |
| Exhibit 17 | 2/20/2021 Email | 149 |
| Exhibit 18 | 2/15/2021 Email | 163 |
| Exhibit 19 | 7/20/2021 OSHA Letter | 169 |

Page 3

I N D E X

| WITNESS | EXAMINATION | PAGES |
|---|---|---|
| JOHN SEXTON | DIRECT | 4 |
| | CROSS | 197 |

E X H I B I T S

| NUMBER | DESCRIPTION | |
|---|---|---|
| Exhibit 1 | Collective Bargaining Agreement | 20 |
| Exhibit 2 | General Code of Operating Rules | 26 |
| Exhibit 3 | Hybrid Discipline and | 36 |
| | Accountability Guidelines | |
| Exhibit 4 | Accident, Incident, Injury, and | 40 |
| | Occupational Illness Reporting | |
| | Policy and Commitment Regarding | |
| | Intimidation and Harassment | |
| Exhibit 5 | Train Delay Report | 62 |
| Exhibit 6 | 2/2/2022 Email | 77 |
| Exhibit 7 | Workplace Health and Safety | 79 |
| | Committee Attendance Sheet | |
| Exhibit 8 | Safety Reviews After Incident | 85 |
| Exhibit 9 | Notice of Disciplinary Hearing | 119 |
| Exhibit 10 | Transcript of Disciplinary | 127 |
| | Hearing | |
| Exhibit 11 | Certified Mail Re: Investigation | 129 |
| Exhibit 12 | Certified Mail Re: Discipline | 127 |
| Exhibit 13 | Public Law Board award | 127 |

Page 5

BE IT REMEMBERED that the deposition upon

oral examination of John Sexton was taken on October

31, 2023, at 9:00 a.m., at 4601 Westin Woods Way

St. Paul, Minnesota 55127, before Christina

DeGrande, Professional Stenographer, Notary Public

in and for the State of Minnesota.

Whereupon, the following proceedings were

had, to wit:

THE COURT REPORTER:  Please raise your

right hand.

Do you swear or affirm that the

testimony you are about to provide for the

cause under consideration will be the truth

and the whole truth, so help you?

THE WITNESS:  Yes.

MR. SULLIVAN:  Thank you, Christina.


JOHN SEXTON,

a witness in the above-entitled action,

after having been first duly sworn,

testifies and says as follows:


DIRECT EXAMINATION

MR. SULLIVAN:

Q.  Good morning, Mr. Sexton.  I'm a lawyer for Canadian

Page 10

1   A.  Twice.
2   Q.  When was the first time that you met with your
3       attorneys about today's deposition?
4   A.  Last evening.
5   Q.  And where was that meeting?
6   A.  At the restaurant.
7   Q.  How long did you meet with your attorneys last
8       night?
9   A.  Hour, 45 minutes, maybe.
10  Q.  And then you said that was the first time you met
11      with them.  When was the second time you met with
12      them?
13  A.  This morning.
14  Q.  How long was that meeting?
15  A.  About an hour, 45.
16  Q.  At any point in advance of today's deposition, did
17      you speak with any coworkers about the fact you were
18      going to be deposed in this lawsuit?
19  A.  Absolutely not.
20  Q.  Did you review any documents while you were
21      preparing for the deposition, specifically during
22      the meetings with your lawyers?
23  A.  No.  I don't need to.
24  Q.  So no, you did not review any documents?
25  A.  No, no.

Page 11

1   Q.  I see you've got a note in front of you.
2   A.  I do.
3   Q.  What is on that note?
4   A.  Respectfully, it's none of your business.
5   Q.  Well, in fact, because this is a deposition, it is
6       my business.  It is something you're looking at
7       during your sworn testimony, so I would like a copy
8       of that note.
9          MR. MAGNUSON:  It's protected by
10         attorney/client privilege.
11         THE WITNESS:  No.  It's something I
12         wrote to myself.  It's --
13  BY MR. SULLIVAN:
14  Q.  So it's a note that you wrote to yourself?
15  A.  Correct.
16         MR. MAGNUSON:  Pursuant to my orders.
17         THE WITNESS:  Correct.
18         MR. MAGNUSON:  So it's attorney/client
19         privileged.
20  MR. SULLIVAN:
21  Q.  Did you review any documents that you have in your
22      possession prior to today's deposition to prepare
23      for this deposition?
24  A.  No.  I don't need to.
25  Q.  Have you searched for documents to -- to give to

Page 12

1       your lawyers in response to requests for documents
2       from the railroad?
3   A.  I don't understand your question.
4   Q.  Over the course of this litigation, we've received
5       some documents that appear to be documents that you
6       gave to your lawyers and then they gave to us.  Do
7       you remember searching for documents in response to
8       requests for documents --
9   A.  Yeah.
10  Q.  -- over the course of the litigation?
11  A.  Yes.
12  Q.  Have you found everything that you've been asked to
13      search for?
14  A.  Unsure.
15  Q.  Can you think of something you've been asked to
16      search for that you have not found?
17  A.  Not at this time.
18  Q.  Have you provided all of the documents that you have
19      found to your lawyers to be provided to the
20      railroad?
21  A.  Yes.
22  Q.  Have you ever been a party to a lawsuit before?
23  A.  No.
24  Q.  Ever have the pleasure of having your deposition
25      taken before?

Page 13

1   A.  No.
2   Q.  When you did you start working for DM&E, Mr. Sexton?
3   A.  It was actually the IMRL.  It's March 22nd, 1999.
4   Q.  What does "IMRL" stand for?
5   A.  The I stood for Iowa, Illinois; the M stood for
6       Missouri, Minnesota; the R for Rail; the L for Link;
7       Iowa, Illinois, Missouri, Minnesota Rail Link owned
8       by Montana Rail Link.
9   Q.  Were you an engineer when you joined the railroad?
10  A.  No.
11  Q.  What position did you hold when you first joined the
12      Railroad in 1999?
13  A.  Brakeman.
14  Q.  How long were you a brakeman?
15  A.  Nine months.  Brakeman, foreman, went right to
16      engine service.
17  Q.  Engine service, is that another way of saying
18      engineer?
19  A.  That's when you go to -- yeah, the engineer class,
20      pass a series of tests and then qualify as a
21      locomotive engineer, correct.
22  Q.  When were you first qualified as a locomotive
23      engineer, approximately?
24  A.  Mid-2000.  Wasn't there very long.
25  Q.  And you've been an engineer ever since the year

4 (Pages 10 - 13)

1    2000?
2    A.  Correct.  Sorry.  Correct.
3    Q.  What are your responsibilities as an engineer?
4    A.  Safety.  Number one, safety.  Cannot express that
5    enough.
6    Q.  What else?
7    A.  Performing my duties as -- as asked --
8    Q.  What are those?
9    A.  -- in a safe manner.
10   Q.  What are those duties?  For someone who doesn't
11   necessarily understand the details of your job, what
12   do you do on a -- during a shift as an engineer,
13   generally?
14   A.  I operate a locomotive.
15   Q.  Do you operate a locomotive on the same -- in the
16   same region all of the time?
17   A.  Yes.
18   Q.  And what region is that?
19   A.  Right now, it's the Davenport area, Iowa.
20   Q.  Who do you report to?
21   A.  That's a broad question, sir.
22   Q.  Who is your next level supervisor, if you know?
23   A.  There's many assistant train -- whoever's the
24   manager on duty.  I mean, that's a broad question.
25   I can't answer that.

1    Q.  So it would depend on the shift?
2    A.  Whoever the manager on duty is, you report to.  I
3    can't answer that.
4    Q.  The answer is, the manager on duty --
5    A.  Correct.
6    Q.  -- is the person who you report to?
7    A.  Yes.
8    Q.  You mentioned the testing that you go through to
9    become an engineer.  So describe that for me.  What
10   is -- how extensive is -- is the testing that's
11   required to -- to earn an engineer certificate?
12   A.  Well, there's extensive testing, written tests.  You
13   have to pass tests to where you are qualified on
14   your territory, and you have to pass what's called a
15   check ride every single year, and every three years,
16   you have to retake all the tests that you take --
17   you took to become an engineer.  It's called the
18   continuing education.
19   Q.  And that's to keep your certification current and
20   effective?
21   A.  Yes.
22   Q.  Is it possible to -- to lose certification?
23   A.  Yes.
24   Q.  How does that happen, generally?
25   A.  By not being -- not following the safety rules,

1    easiest way possible.
2    Q.  Have you served in any leadership or committee roles
3    during your time with the railroad?
4    A.  Specify.
5    Q.  Yeah.
6        MR. MAGNUSON:  Objection, vague.
7    BY MR. SULLIVAN:
8    Q.  The -- so, for example, the Health and Safety
9    Committee, have you ever served on that?
10   A.  Absolutely.
11   Q.  How long have -- well, first, tell me what that is.
12   What is the Health and Safety Committee?
13   A.  Health and Safety Committee is a group of safety
14   leaders that are out of a certain jurisdiction of
15   the railroad, who are willing to go around and hold
16   job briefings with fellow employees, and they sign a
17   monthly safety job briefing form after you conducted
18   a job briefing with them and that they understand
19   everything you said that I will sign it and put
20   their employee number on it as well.  They turn it
21   in at the end of the month.  Then we get our new
22   safety topic at the end of month.  We turn that in
23   and do it all over again.
24   Q.  You said you get the new topic at the end of the
25   month.  So where does the Health and Safety

1    Committee receive the safety topics from?
2    A.  Not sure.  It generally comes from someone in
3    Canada.  Used to be Scott Sutherland, but he since
4    retired.  I don't know who holds his position now.
5    Q.  But effectively, it comes from CP management
6    somewhere?
7    A.  Oh, yes.
8    Q.  And so the -- the Health and Safety Committee isn't
9    selecting its own topics.  It's something that is
10   sort of -- that they're asked to review and deal
11   with from management; is that a fair summary?
12   A.  And so to add in that -- yes, it is, and to add in
13   that, it also is seasonal, in that, like, summertime
14   not having a heat stroke.  In the summertime, when
15   there's storms, lightening storms or what have you,
16   how to seek proper shelter, in wind how to seek
17   shelter.  Seasonal, a lot of it is, and if there has
18   been a lot of incidents in the past, then they will
19   bring that to the table as a safety topic.
20   Q.  So I imagine Iowa's climate isn't that much
21   different than Minnesota, so wintertime, ice and
22   snow, significant safety issue?
23   A.  Yes.
24   Q.  Springtime, I know you have a route that goes near
25   the Mississippi River, so water levels and barge

5 (Pages 14 - 17)

Page 18

1    traffic can be a safety issue; isn't that right?
2    A.   Yes.
3    Q.   I've seen an acronym WHSC?
4    A.   That's the Workplace Health and Safety Committee.
5    Q.   That's what I was wondering, what it stood for.
6    A.   The Workplace Health and Safety Committee.
7    Q.   And that's the safety committee that you observed
8         on?
9    A.   I was the union cochairman for a number of years on
10        that committee.
11   Q.   How long, roughly?
12   A.   I -- I honestly don't know, four or five years
13        maybe.  I don't -- I don't remember, sir.
14   Q.   Is it only union represented employees on the Health
15        and Safety Committee?
16   A.   No.
17   Q.   Who else serves on the Health and Safety Committee
18        in addition to union represented employees?
19   A.   When I was a union cochairman, it was the
20        superintendant was the -- was the company
21        cochairman.  There was two of us.  I was the
22        cochairman.  And there was other fellow employees
23        from every craft who were safety leaders in their
24        craft, and we all met, and we all took care of
25        business.

Page 19

1    Q.   Who was the superintendent cochairman who served
2         with you as the union cochairman?
3    A.   I had several.
4    Q.   Who?
5    A.   John Kay, Dan Mohler, John Stoffer, Dylan Smith.  I
6         think that's it.
7    Q.   So -- and if you remember, in late 2020, would
8         Mr. Smith have been the superintendent cochairman?
9    A.   Yes.
10   Q.   And then into early 2021, would he have been the
11        superintendent cochairman?
12   A.   Yes.
13   Q.   When did you stop serving as the union cochairman,
14        if you remember?
15   A.   I don't recall.
16   Q.   Was it sometime in 2021?
17   A.   I believe so, but I don't recall.
18   Q.   Was it sometime after the February 1st, 2021,
19        incident that we're going to be talking about today?
20   A.   Don't recall.
21   Q.   It could have been before?  It could have been
22        after?
23   A.   Sure.
24   Q.   You don't remember?
25   A.   No.

Page 20

1    Q.   Was Curt McElvey on the WHSC?
2    A.   No, sir.
3    Q.   And I think -- I just want to make sure I understood
4         correctly.  So the committee met on a monthly basis;
5         is that right?
6    A.   Yes.
7    Q.   Is there an expectation for the union co-chair
8         person of the Health and Safety Committee, that that
9         person leads by example and follows safety rules
10        within his or her performance?
11   A.   Yes, 100 percent.
12   Q.   I would assume so.  Seems like that would be part of
13        it.  And Mr. Sexton, so you're a member of the
14        Brother -- Brotherhood of Locomotive Engineers and
15        Trainmen, correct?
16   A.   Yes.
17   Q.   I'd like to shift gears a bit and just go over the
18        CBA and some of the other rules that apply to your
19        position and your workplace.  So I'll start with the
20        CBA.
21             (Exhibit 1 was marked for
22           identification.)
23        BY MR. SULLIVAN:
24   Q.   Show you what's been -- can we go off the record for
25        a moment?

Page 21

1             (Off the record.)
2         BY MR. SULLIVAN:
3    Q.   Mr. Sexton, I'm showing you what's been marked as
4         Exhibit 1.  Do you recognize that as the Collective
5         Bargaining Agreement between your union and Dakota,
6         Minnesota & Eastern Railway?
7    A.   It appears to be.
8             MR. MAGNUSON:  Yeah.  I'll just make an
9           objection.  He can only say what it appears
10          to be.
11        BY MR. SULLIVAN:
12   Q.   Yeah.  You have no reason to disagree when I -- with
13        that assertion that that -- that this is a copy of
14        your Collective Bargaining Agreement?  You have no
15        reason to disagree with that?
16   A.   I'm not sure because I just met you.  I don't know
17        -- I don't know.  Do you want me to go through and
18        read this first?
19   Q.   No.  We won't go through the whole thing.
20   A.   I'm not sure.
21   Q.   But based on the front cover, it appears to be the
22        bargaining agreement?  You can take as much time to
23        review it as you'd like.
24   A.   Don't need to.
25   Q.   I think what I wanted to do was direct your

6 (Pages 18 - 21)

Page 22

1    attention to page 45. There's a stamp in the lower
2    right-hand corner there that says, "CP256," if that
3    makes it easier to find.
4    A. I'm there.
5    Q. So Article 29 relates to investigations and
6    discipline. Do you see that title?
7    A. Yes.
8    Q. And subsection B, I'll just read the first sentence.
9    "No employee shall be disciplined without a fair
10   hearing (investigation by an officer of the
11   company.)" Did I read that correctly?
12   A. Yes.
13   Q. And so according to the CBA, discipline is properly
14   assessed after a hearing; is that correct?
15       MR. MAGNUSON: Objection, foundation.
16       THE WITNESS: Yes.
17       MR. MAGNUSON: Go ahead.
18       THE WITNESS: That's what it says.
19   BY MR. SULLIVAN:
20   Q. And that's how you understand the rules of the CBA?
21   That's what you understand the rules of the CBA to
22   be?
23   A. Supposed to be.
24   Q. Supposed to be. And is it your understanding that
25   you and other employees are not to be disciplined

Page 23

1    without a hearing?
2    A. Without a fair and impartial.
3    Q. Without a fair and impartial hearing?
4    A. Yes.
5    Q. If you could take a look at the next page,
6    subsection G. Just take a look at that paragraph
7    for a moment, and let me know when you've had a
8    chance to review it. So part G of Article 29
9    provides you and other covered employees the right
10   to appeal a discipline decision; is that right?
11   A. Yes.
12   Q. And in the case of the suspension and the decision
13   to suspend you or another covered employee is later
14   found to be unjust, then you or the other employee
15   would be reinstated and made whole for time lost.
16   Is that a fair summary of this section as you
17   understand it?
18   A. Yes.
19   Q. And there's a reference in this paragraph back to
20   Article 28, which I'll ask you to turn to. It's on
21   the page that is CP254 in the lower right-hand
22   corner just a couple pages prior.
23   A. Page 43.
24   Q. That's right. Well, so Article 28 begins on page
25   42, correct?

Page 24

1    A. Yes.
2    Q. And the -- generally speaking, the CBA allows for
3    further appeals of disciplinary decisions through a
4    CP process that the union would engage in; is that
5    your understanding?
6    A. Clarify.
7    Q. I'll strike that. Once an employee has -- I'll
8    strike that again. You and other covered employees
9    are able to pursue cases to arbitration before the
10   Public Law Board; isn't that correct?
11   A. Yes.
12   Q. And is it your understanding that the Public Law
13   Board's decision is binding on both the union and
14   the railroad after it has made a decision?
15   A. That is my understanding, yes.
16   Q. And that arbitration process is the step after the
17   CBA process is completed; is that your
18   understanding?
19   A. I don't understand your question.
20   Q. Well, so the -- the CBA provides for a grievance
21   process, correct?
22   A. Yes.
23   Q. And if at the end of that grievance process the
24   union wants to pursue the matter further, then they
25   can bring an appeal to the Public Law Board; is that

Page 25

1    your understanding?
2    A. Yes.
3    Q. And then after that proceeding, the decision of the
4    Public Law Board is binding on the union and on the
5    railroad; is that what you understand?
6    A. I'm not sure what you mean by that.
7    Q. That their decision is final?
8    A. No.
9    Q. What do you mean it's not final?
10   A. What do you mean it is final?
11   Q. Well, I'm asking the question. So do you believe
12   that a decision of the Public Law Board, when
13   rendered, is something that the railroad must abide
14   by?
15   A. Yes, but not final.
16   Q. What else would happen that could make it be not
17   final, in your view?
18   A. Not sure.
19   Q. Okay.
20   A. You asked me a question that's it's final, so could
21   you --
22       MR. MAGNUSON: And if you don't know,
23   you don't know.
24       Objection, lack of foundation.
25

7 (Pages 22 - 25)

Page 26

1    BY MR. SULLIVAN:
2    Q.  So you don't know if it's final or not?
3    A.  No.
4        (Exhibit 2 was marked for
5        identification.)
6    BY MR. SULLIVAN:
7    Q.  Mr. Sexton, I'm showing you what's been marked as
8        Exhibit 2.  Take as much time as you want to review
9        that.  Do you recognize that document?
10   A.  Yes.
11   Q.  What is it?
12   A.  It's the GCOR, the General Code of Operating Rules.
13   Q.  What is the GCOR?
14   A.  The General Code of Operating Rules.
15   Q.  What is the purpose of the GCOR, in your
16       understanding?
17   A.  These are the rules that we adhere to on a daily
18       basis.
19   Q.  And when you say, "We," you mean engineers?
20   A.  T&E employees, train and engine service employees.
21   Q.  Is it your understanding that this -- that the GCOR
22       applies to only to CP, or does it apply to other
23       railroads as well?
24   A.  Multiple railroads that -- there's a directory in
25       here that all railroads that adopted the GCOR.  On

Page 27

1        pages CP284, 285, 286, there's a list of railroads
2        all the way to 287 that adopt the GCOR.
3    Q.  And DM&E is one of those railroads, correct?
4    A.  It's listed, yes.
5    Q.  And you agree that as a -- as an engineer, you are
6        responsible for knowing the GCOR; is that correct?
7    A.  Yes.
8    Q.  And you're responsible for following the rules set
9        out in the GCOR; is that also true?
10   A.  Yes.
11   Q.  Before we get into the specific issues that were the
12       basis for the lawsuit, I want to talk briefly,
13       generally, about the rule that is at issue here,
14       5.3.7.  That is on the page CP319.
15   A.  You said 5.3.7, correct?
16   Q.  That's right.  Could you please explain to me your
17       understanding of what GCOR 5.3.7 requires?
18       MR. MAGNUSON:  Do you want to just read
19       the rule?
20   BY MR. SULLIVAN:
21   Q.  Well, why don't you start there.  If you could read
22       the rule.
23   A.  "5.3.7, radio response.  When radio communication is
24       used to make movements, crew members must respond to
25       specific instructions given for each movement.

Page 28

1        Radio communications for shoving movements must
2        specify the direction of distance and must be
3        acknowledged when distance specified is more than
4        four cars."
5    Q.  And then there's further text in a box, correct?
6        Could you read that?
7    A.  "Movement must stop within half the range as
8        specified" -- start over.  "Movement must stop
9        within half the distance specified unless additional
10       instructions are received."
11   Q.  What does it mean, in your understanding, to stop
12       within half the distance specified?
13   A.  Do you want a scenario?
14   Q.  Sure.
15   A.  If you give me a 50-car count -- I'm the engineer.
16       I must stop within 25 cars.  If I don't stop within
17       25 cars, then you're in violation of the -- it's
18       basically restricted speed, also.
19   Q.  Let's break that apart for a second.  So the
20       restricted speed, what does that mean?
21   A.  The ability to stop half the range of vision.
22   Q.  What is -- could you explain that?
23   A.  Just like I said.  If you told me to -- I'm good for
24       50 cars, I must be able to stop within 25 cars,
25       nothing else.

Page 29

1    Q.  Fair enough.  And that's the -- so when the rule
2        says, "Unless additional instructions are received,"
3        that would be what you just said, unless you hear
4        something else; is that a fair translation --
5    A.  Yes.
6    Q.  -- of that part of the rule?
7    A.  Yes, sir.
8    Q.  And so if a -- does this rule only apply in
9        situations where the engineer can't see the space
10       into which he or she is shoving a train?
11   A.  The restricted speed or radio response 5.3.7.
12   Q.  Radio response only 5.3.7?
13   A.  Well, it kind of covers both.  Second sentence,
14       "Radio communication for shoving movement."  So kind
15       of covers both there.  So the only time you would be
16       talking on the radio would be when that person is
17       protecting a shove, it's called, because, obviously,
18       I can't see 50 cars behind me, so he would be my
19       eyes.
20   Q.  And then I'm giving you --
21   A.  Car counts.
22   Q.  -- car counts?  So if the person who is giving you
23       car counts said your scenario was 50 cars, then you
24       would be required to be counting and ensuring that
25       the train stops after 25; is that accurate?

8 (Pages 26 - 29)

Page 30

1  A.  No, no.
2  Q.  What's wrong with that?
3  A.  Before.  Before 25, unless you hear -- unless you
4       got further instructions.
5  Q.  Understood.  And so it's -- it's if the call was
6       that there was -- that you were to shove for 40
7       cars, then you would be required to stop within 20
8       cars, correct?
9  A.  Yes.
10  Q.  How about odd numbers?  So if it was you were told
11      that you were to shove for 25 cars and didn't hear
12      anything else, where would you stop?  Where would
13      you -- what length would you be required to stop
14      within?
15  A.  Thirteen.
16  Q.  Within 13?
17  A.  It has to be within half the range of vision.  The
18      person on the ground protecting a shove is your
19      eyes.
20  Q.  Okay.  So it wouldn't be -- so if half of 25 is
21      12 1/2?
22  A.  Thirteen cars.  Not going to split hairs.
23  Q.  But there wouldn't be a requirement that it's 12?
24  A.  No, because that's more than half, so you always
25      want to err on the side of safety instead of --

Page 31

1       because 12 is more than half of 25.  13 is not.
2  Q.  Twelve is less than half of twenty-five.
3  A.  Less than half, sorry.  So 13 is more than --
4  Q.  More than half?
5  A.  -- half, so therefore, you would be within the realm
6       of radio response and restricted speed.
7  Q.  So you would be within the response, the -- just so
8       I'm clear.  So for 25, you would need to stop within
9       12, correct, because that would be within half,
10      where 13 would be outside of half?
11  A.  No.  I -- no.  I would stop 13.  I would not --
12      don't push it.  Don't push it to 12.  You're better
13      off to be -- to err on the side of safety because
14      you don't want to go more than half the range of
15      vision.  Twelve is more than half of twenty-five.
16  Q.  I think we're missing something.
17         MR. MAGNUSON:  I think we're
18         flip-flopped on the --
19      BY MR. SULLIVAN:
20  Q.  Yeah.  So --
21  A.  If, for instance, I -- you gave me a ten-car
22      count --
23  Q.  Right.
24  A.  -- I have to be -- I gotta stop within the five-car
25      count.

Page 32

1  Q.  Right.
2  A.  I will stop at six.  I'll stop before that.  Just
3       the way I've always done it.  I always will.
4  Q.  But --
5  A.  Has to be more than half the range of vision.
6  Q.  Okay.  So we're not talking about the range of
7       vision.  We're talking about 5.3.7 --
8  A.  It's the same.
9  Q.  -- at the distance that's been specified and the
10      requirement to stop within half of the distance
11      unless additional instructions are received.  So
12      thinking specifically and only about 5.3.7, wouldn't
13      4 be within half rather than 6 in the 10-car
14      scenario?
15  A.  No, absolutely not.
16         MR. MAGNUSON:  Can we go off the
17      record?
18         THE WITNESS:  Five would be, but you
19      cannot go beyond half the range of vision.
20      It's very simple.
21         MR. MAGNUSON:  Why don't we go off?
22         THE WITNESS:  You don't go more.  If
23      you're going to go err on the side of
24      judgment, you're going to err on the side of
25      safety.  You go six cars and stop prior to

Page 33

1       the halfway mark.  Because if -- if I stop
2       at five cars, you're still in violation of
3       this rule, sir.  The ability to stop half
4       the range of vision.  You give me ten cars,
5       and I don't -- and I don't stop until five,
6       then I violated the rule, and we've both
7       violated the rule.
8          MR. SULLIVAN:  Let's take a break.  Why
9       don't we -- we've been going about an hour.
10      We can take five minutes, stretch our legs,
11      and we can kind of dive back into this.  So
12      go off the record.  Thank you, Mr. Sexton.
13         (A recess was had from 10:16 a.m. until
14      10:23 a.m.)
15      BY MR. SULLIVAN:
16  Q.  Mr. Sexton, I wanted to pick up where we left off.
17      I think we were maybe holding different ideas in our
18      heads as we were talking about the shoving movements
19      and the car count.  So I want to just revisit that
20      just to clarify and make sure that I'm understanding
21      what you're saying.  So if an engineer was told that
22      he or she was to shove for 40 cars and no additional
23      instructions were received, the engineer would need
24      to stop the shove within 20 cars, correct?
25  A.  Yes.

9 (Pages 30 - 33)

Page 34

1  Q.  And if that was an odd number, if it was 25 cars,
2      for example, and no additional instructions were
3      received, the engineer would need to stop the shove
4      after 12 cars; is that correct?
5  A.  No.
6  Q.  Why is that wrong?
7  A.  Because you got -- you're counting down.  If you're
8      on the ground protecting my shove of 25 cars to a
9      stop, you're counting me down 20 cars -- 15 cars.
10     And if I don't stop before 12, then we,
11     collectively, are in violation of this rule.  It's
12     more than half of the range of your vision.  You're
13     counting down.  We are going down.  So I have to be
14     able to stop at 13.
15 Q.  I see.  So you've seen -- so when the -- when the
16     13th car is approaching, that needs to stop before
17     it enters the space; is that fair?
18 A.  No.  It's -- if you don't -- if you say, "25" --
19 Q.  Okay.
20 A.  -- and I start back, I must stop within 13 cars or
21     there's -- you know, counting down, when there's 13
22     cars, and that way, we are both still within the --
23     the parameters of the GCOR.
24 Q.  Okay.
25 A.  Within half the range of your vision, if you just

Page 35

1      say, "25 cars," and nothing else, I gotta be
2      prepared to stop within 13 cars.
3  Q.  Okay.  So you would count --
4  A.  Counting down.
5  Q.  25, 24, all the way down to 13 is then when you
6      stop?
7  A.  Yes.
8  Q.  Okay.  I appreciate your patience walking through
9      that with me.  It's -- it's more complicated than it
10     seems given that there's only ten words in that part
11     of the rule.  So thank you for that.
12 A.  You're welcome.
13 Q.  Based on what -- you alluded to this, I believe,
14     earlier, and I just want to be clear.  Based on your
15     experience, what is the purpose of this rule?
16 A.  Safety.
17 Q.  And how does it protect safety?
18 A.  That's a broad question.
19 Q.  Well, when you say that the purpose is safety, give
20     me one example of a situation that had this rule --
21     an unsafe situation that this rule prevents
22     occurring?
23 A.  End of track.
24 Q.  What does that mean?
25 A.  End of track, sir.  Track in.  Goes -- it goes to

Page 36

1      the dirt, end of track.  It's what it means.
2  Q.  So the -- the rule prevent the train being --
3  A.  Derailed.
4  Q.  -- shoved off of the end of track?
5  A.  Derailed, run through a slip, sideswiping cars,
6      hitting another train, running over whoever,
7      whatever, derailed, broken rail.
8  Q.  So it's -- that's a litany of unsafe and bad things
9      that could happen if the rule is violated?
10 A.  Yes.
11 Q.  And so you would agree that it's important that this
12     rule is followed?
13 A.  One hundred percent.
14 Q.  And you would agree that employees who violate the
15     rule should be held accountable?
16 A.  Yes.
17 Q.  We're done with the -- with Exhibit 3 for now.
18         MR. MAGNUSON:  That was 2.
19         MR. SULLIVAN:  Exhibit 2, excuse me.
20     For the sake of Christina, could I ask you
21     to just clip that back together in the order
22     that it's in?  Thank you.
23         (Exhibit 3 was marked for
24         identification.)
25

Page 37

1  BY MR. SULLIVAN:
2  Q.  Mr. Sexton, I'm showing you what's been marked as
3      Exhibit 3.  If you could take a look at that and
4      specifically at the second page of document and let
5      me know if you recognize it.
6  A.  I do.
7  Q.  What is Exhibit 3?
8  A.  It's the Hybrid Discipline and Accountability
9      Guidelines.
10 Q.  And what is your understanding of what this
11     guideline document is for?
12 A.  This is their hybrid discipline policy.  This is
13     what they go by, how to determine discipline.
14 Q.  By "they," you mean CP?
15 A.  Carrier, yes, sir.
16 Q.  CP management?
17 A.  Yes.
18 Q.  Okay.  Is it your understanding that the Hybrid
19     Discipline and Accountability Guidelines apply to
20     all unionized employees working for DM&E?
21 A.  Yes.
22         MR. MAGNUSON:  Can we go off the record
23     a second?
24         (Off the record.)
25 BY MR. SULLIVAN:

10 (Pages 34 - 37)

Page 38

1  Q.  Mr. Sexton, I'd ask you to take a look at the page
2      with CP443 in the lower right-hand corner.
3  A.  Okay.
4  Q.  And so the top of that page, is it accurate that
5      this guideline sets out examples of what are defined
6      as major life-threatening violations?
7  A.  Yes.
8  Q.  What is your understanding of what a major
9      life-threatening violation is?
10 A.  I'm not the one that wrote this, sir.  The carrier
11     did, so whatever they have written down is what they
12     consider a major life-threatening situation.
13 Q.  Understood.  And I -- I see that point number 6 in
14     the chart talks about shoving; is that right?
15 A.  Yes.
16 Q.  On the next page, page 444, there is paragraph at
17     the top of the page, "Depending on the offense, the
18     issuance of a minimum of a 20 calendar day
19     suspension up to and including a 45-day calendar
20     suspension and/or dismissal is stated."  Did I read
21     that accurately?
22 A.  Yes.
23 Q.  And so that is the -- this guideline is stating that
24     a 20 calendar day suspension is the minimum penalty,
25     according to the carrier, for a major

Page 39

1      life-threatening offense; is that right?
2  A.  If one was committed, yes.
3  Q.  If one was committed, correct?
4  A.  Yes.
5  Q.  And Mr. Sexton, given that this applies to all
6      unionized employees of the railroad, you don't
7      dispute that this policy applies to you, do you?
8  A.  No.
9  Q.  And you don't dispute that it applied to you in
10     February of 2021?
11 A.  No.
12     MR. MAGNUSON:  And just to be clear,
13     this is a double negative.  "You don't
14     dispute," and you said, "No."  You mean
15     "Correct," so avoid a double negative in the
16     record, correct?
17 BY MR. SULLIVAN:
18 Q.  I'll phrase it less lawyerly.  How about that?  You
19     agree this applied to you in February 2021?
20 A.  Yes.  Sorry.
21 Q.  I -- I apologize.  I try not to talk like a lawyer
22     even though I am one.  But it -- so one more
23     document just to touch on, Mr. Sexton.
24 A.  Are we able to keep these exhibits here?
25     MR. MAGNUSON:  Yes.

Page 40

1  BY MR. SULLIVAN:
2  Q.  Absolutely, yeah.  We'll be referring to them.
3      Well, to be clear, there will be a copy here that
4      will go with you after the day.  This official copy
5      you're reviewing needs to stay with the court
6      reporter when we're finished.
7  A.  Understood.  Thank you.
8  Q.  Thank you.
9          (Exhibit 4 was marked for
10         identification.)
11 BY MR. SULLIVAN:
12 Q.  Mr. Sexton, showing you what I've marked as
13     Exhibit 4.  Do you recognize Exhibit 4?
14 A.  Not sure what it is.  No title on what this is.
15     What exactly are we looking at, sir?
16 Q.  So the title on the first page, "Accident, Incident,
17     Injury, and Occupational Illness Reporting Policy
18     and Commitment Regarding Intimidation and
19     Harassment."  Do you see that?
20 A.  I do.
21 Q.  Have you -- are you familiar with this policy?
22 A.  No.
23 Q.  Do you remember seeing this policy at any point
24     during your employment with CP?
25 A.  Possibly.

Page 41

1  Q.  But you don't have a specific recollection --
2  A.  No.
3  Q.  -- of it?  At the top of the first page, so the top
4      of CP451, I would just read the sentence from the
5      middle of the policy, which is, "CP will not
6      tolerate harassment or intimidation of any person
7      that is intended to discourage or prevent such
8      person from reporting an accident, incident, injury
9      or illness or from receiving immediate medical
10     treatment when necessary."  Is that a policy that
11     you're familiar with?
12 A.  Yes.
13 Q.  On the next page, 452, CP452, there's a heading that
14     says, "Complaint Procedures."  Do you see that?
15 A.  Yes.
16 Q.  Take a -- just glance at it.  I'll summarize it.
17     Step one states that "Violations should be reported
18     to employee relations by email or by phone."  Do you
19     see that language?
20 A.  Yes.
21 Q.  The procedure goes on to say, "CP will provide
22     whistleblower protection to any person making use of
23     this policy to report the violation."  Do you see
24     that statement?
25 A.  Yes.

11 (Pages 38 - 41)

Page 42

1    Q.  Did you understand that this policy or some version
2        of it applied to you in February of 2021?
3    A.  No.
4    Q.  Are you familiar -- were you familiar with -- did
5        you understand that a policy like this existed in
6        February of 2021?
7    A.  I've heard of it.
8    Q.  But you didn't believe it applied to you?
9    A.  That's a broad question.
10   Q.  Did you understand the policy that you had heard of
11       applied to you as an engineer for the railroad?
12   A.  On this incident on February the 1st of 2021?
13   Q.  Yes.
14   A.  Ask that question again, please.
15   Q.  In February of 2021, did you understand that CP had
16       a policy that stated the railroad would provide,
17       quote, "whistleblower protection" to any person
18       making use of a policy to report a violation?
19   A.  I didn't know the CP would provide protection. That
20       would be no.
21   Q.  But you had heard of this policy, you said, correct?
22   A.  I've heard of the term "whistleblower."
23   Q.  Okay.
24   A.  I wasn't aware that the CP would provide protection.
25       That's the first I heard of that.

Page 43

1    Q.  I wanted to make just one quick point on the -- on
2        the record. I understand that the -- the notes that
3        you have are protected, but I'd ask that you ensure
4        that they're preserved after today's deposition.
5    A.  Okay.
6    Q.  Mr. Sexton, I'd like to get to kind of the main
7        event and talk to you about what happened on
8        February 1st, 2021. You may not believe me. I'm
9        not asking you trick questions. I'm not really
10       trying to be your opponent in this situation. I
11       want to hear your side of the story. And with that
12       in mind, I'd like to just walk through February 1,
13       2021, from the beginning of the -- beginning of your
14       shift through the end of your shift.
15           Starting at the beginning, what was your work
16       assignment on February 1st, 2021, if you remember?
17           MR. MAGNUSON: That's a good question.
18       The preamble, I'll object to as a narrative
19       and testimony. For the record, the last
20       part was the question. Preamble...
21       BY MR. SULLIVAN:
22   Q.  You do not need to believe me. I just wanted to say
23       that. So the question is, what was your assignment
24       on February 1st, 2021?
25   A.  474-31.

Page 44

1    Q.  As the engineer of that train?
2    A.  Yes.
3    Q.  What time were you called for duty on February 1st,
4        2021?
5    A.  01:30.
6    Q.  Where were you to report for duty on that day?
7    A.  Marquette, Iowa.
8    Q.  What do you remember was the scheduled route for
9        474-31 on February 1st, 2021?
10   A.  That's broad. What do you mean?
11   Q.  What was -- well, when you reported to work, where
12       was the train?
13   A.  Marquette, Iowa.
14   Q.  Were you to operate the train and bring it to some
15       other place?
16   A.  Yes, sir.
17   Q.  What was that other place?
18   A.  Nahant, Iowa or Davenport.
19   Q.  Was the Nahant yard the next destination that -- for
20       the train on that route on February 1st, 2021?
21   A.  Yes, but not its final destination.
22   Q.  Do you recall what its final destination was?
23   A.  Yes.
24   Q.  What was that? What was the final destination?
25   A.  Kansas City.

Page 45

1    Q.  Do you recall its origin?
2    A.  Yes.
3    Q.  What was its origin?
4    A.  St. Paul.
5    Q.  So if you were called to duty at 01:30, what time
6        was your shift to end on February 1st, 2021?
7    A.  13:30.
8    Q.  Twelve hours later?
9    A.  Yes.
10   Q.  Do you remember who else was on duty on
11       February 1st, 2021, at Marquette?
12   A.  Broad.
13           MR. MAGNUSON: Just going to object to
14       broad.
15       BY MR. SULLIVAN:
16   Q.  For example, do you remember who the dispatcher was?
17   A.  No.
18   Q.  Do you remember who the train master or assistant
19       train master was?
20   A.  Yes.
21   Q.  Who was that?
22   A.  Kurt McElvey.
23   Q.  As assistant train master?
24   A.  No idea what his title was, sir, assistant or train
25       master.

12 (Pages 42 - 45)

Page 46

1  Q.  One of those?
2  A.  Yes, sir.
3  Q.  Was there anyone else there that day filling those
4      roles, as far as you know, or was it simply
5      Mr. McElvey?
6  A.  I just remember Mr. McElvey.
7  Q.  Fair enough.  How about a yard master or a
8      superintendent?  Do you remember anyone in those
9      duties that day?
10  A.  No.  It was 1:30 in the morning.
11  Q.  Who else was serving on 474 with you on
12      February 1st, 2021?
13  A.  Justin DePover.
14  Q.  And Mr. DePover was the conductor; is that right?
15  A.  Yes.
16  Q.  Is his position sometimes referred to as assistant
17      engineer?
18  A.  Yes.
19  Q.  Are those interchangeable -- -
20  A.  Yes.
21  Q.  -- or is there a difference?
22  A.  Yes.  Sorry.
23  Q.  Interchangeable?
24  A.  Yes.
25  Q.  Anyone else or just the two of you?

Page 47

1  A.  Two of us.
2  Q.  So what does it mean to -- to cut tracks or cut
3      crossings?
4  A.  Glad you asked.  Whenever there's snow or ice
5      buildup, whenever -- specifically over crossings
6      where vehicles continually pack the snow and ice
7      into the flangeways of the rail, and if they are not
8      cut with the locomotive prior to you doing your
9      work, there is a great chance to derail and the cars
10      will, obviously, you know, stow on their side.
11      Whatever contents there is will go where it may.
12  Q.  I want to break that down a bit, partially because
13      -- well, for the benefit of the transcript.  So you
14      said, "Crossing."  So that's where the rail crosses
15      a road; is that right?
16  A.  Yes.
17  Q.  And so automobiles and other vehicles that are on
18      the road impact snow into the rail; is that right?
19  A.  Into the flangeways of -- of the -- of the crossing,
20      yes.  It's compacted down to where the empty cars --
21      specifically empty.  Loads do it too.  They ride up
22      that.  They specifically ride up the tracks and
23      derail and create a mess.
24  Q.  The flangeways, what is that, for someone who's not
25      familiar with the term?

Page 48

1  A.  The flangeways are in the crossing, and the
2      flangeways are also frog switch points, and you deal
3      with that when you are encountering switches with
4      frogs in the yard.
5  Q.  Is a -- is a flangeway like the space that is next
6      to a rail?  Am I understanding that correctly?  I
7      just don't know what the term refers to.
8  A.  Yes.
9  Q.  I want to make sure I understand it.
10  A.  Yes.  It's where the -- the -- the tread of the
11      wheels of the locomotive rides along the inside of
12      the -- the rail switch, switch points, frogs,
13      crossings, rail, even the rail that's the -- that's
14      the flange.
15  Q.  Understood.  So the compacted snow or ice in the
16      flangeway forces or has the potential to force a
17      wheel up out of the flangeway and, therefore,
18      derailing the train, potentially, or derailing the
19      car; is that accurate?
20  A.  It is.  And we had two previous derailments in the
21      prior months to this incident that we covered during
22      the health and safety meeting, and that's the reason
23      why this is a health and safety topic of the month.
24  Q.  We'll get to that.  I appreciate you talking about
25      that.  So is it -- it's my understanding that crews

Page 49

1      are to cut tracks any time that they see snow
2      covering the rail; is that true?
3  A.  Not 100 percent, no, because there could be snow on
4      the road, and it still could have melted on the road
5      already because the sun came out.  For instance,
6      there could be snow on the road, and the vehicles
7      could be smashing -- compacting that snow in the
8      flangeways on the crossings.  That's why you got the
9      flangeways and the crossings.
10  Q.  So the stop of the rail might be clear, but there
11      still might be ice and snow in the flangeway; is
12      that accurate?
13  A.  In the automobile crossings in highways, roads, yes.
14  Q.  Okay.  So let's talk about the -- the job briefing
15      at -- at the beginning of your shift on
16      February 1st, 2021.  So what time did that -- did
17      the job briefing occur, if you remember?
18  A.  1:30.
19  Q.  And where was it held?
20  A.  Depot.
21  Q.  Who was all there when the job briefing took place?
22  A.  Myself and Justin DePover, and McElvey was in his
23      office.
24  Q.  And tell me how cutting the tracks came up as a
25      topic at the job briefing?

13 (Pages 46 - 49)

1  A.  Well, I'm the one that always initiates job briefing
2     because that's what I do for the last almost
3     25 years.  And when I brought up the obvious that,
4     you know, we're -- we've got our paperwork, got all
5     of our UPs, the CN paperwork, and, obviously,
6     there's snow outside.  We have a fresh layer of snow
7     out there.  I said, "Before we start anything, we're
8     going to cut the crossings."
9  Q.  And what -- when you said you're going to cut the
10     crossings, where were the crossings?
11  A.  Highway 18 and what's called the cabin crossings.
12  Q.  How -- cabin, c-a-b-i-n?
13  A.  Correct.  And the -- and the boat -- and the boat
14     crossings.  There's two boat crossings, cabin
15     crossing, and Highway 18, plus all the rail we
16     thought we were going to go on that need to be cut.
17  Q.  So how is -- how are crossings cut?
18  A.  You cut away from the train with locomotive only and
19     use the locomotive because they're, obviously,
20     heavier than all cars to cut your -- your path to --
21     whenever you go, and you use the locomotive
22     to dislodge all of the ice and snow from the cross
23     -- from the crossings and all the rail that you're
24     going to travel on, and then you go back to start
25     your work.

1  Q.  So the -- the locomotive ends up covering that
2     distance multiple times?
3  A.  Twice.
4  Q.  Covering the rail -- the line to be traveled that
5     day multiple times, correct?
6  A.  Yes.
7  Q.  That wasn't a clear question.  Excuse me.  So the
8     locomotives go out once alone, correct?
9  A.  Correct.
10  Q.  Then they come back alone, correct?
11  A.  Correct.
12  Q.  Tie up to the trains -- to the cars and then proceed
13     on their way; is that right?
14  A.  Yes.
15  Q.  Do you remember the -- length of track total
16     that needed to be cut on February 1st, 2021?
17  A.  No.
18  Q.  Do you remember how long it took?
19  A.  No.
20  Q.  So tell me about your discussion with Kurt McElvey
21     about whether crossings needed to be cut on
22     February 1st, 2021?
23  A.  Well, after he interrupted my job briefing with
24     Mr. DePover about cutting crossings and came out and
25     literally said, "You are not" -- just like that.

1     "You are not cutting the crossings and flangeways."
2     And I objected, and I said, "I will cut the
3     crossings and flangeways because there have been two
4     derailments in the previous two months.  As a matter
5     of fact, that's our safety topic of the month."  And
6     I, being the union cochairman for the Health -- the
7     Health and Safety Committee, I went out to my cooler
8     and got the -- the sign-in sheet about holding job
9     briefings about cutting crossings and flangeways.  I
10     had Mr. McElvey sign it and put his employee number
11     on it and told him that's -- that's our topic of the
12     month.  We've had two prior derailments, one in
13     Cordova, Illinois, one in Clinton, Iowa, because the
14     CP -- when they investigated, it was because they
15     did not cut the crossings and flangeways.  That's
16     why it was the topic of the month.  And that was why
17     I had Mr. McElvey sign the topic of the month,
18     cutting crossings and flangeways.
19  Q.  So he -- and your testimony is that he did sign the
20     document that you asked him to sign?
21  A.  Yes.
22  Q.  And he wrote his employee number on it?
23  A.  Yes.
24  Q.  Did he say anything after he did that?
25  A.  Yeah.

1  Q.  What did he say?
2  A.  He sure did.
3  Q.  What did he say?
4  A.  He said he was still adamant about me not cutting
5     crossings.  I said flat out, "You need to call the
6     superintendent right now and telling him that you're
7     telling me to violate this rule.  Call him right
8     now."  He didn't do it.  So I went out there and cut
9     the crossings like I was supposed to.
10  Q.  So after you said, "Call the superintendent," did he
11     say anything else?
12  A.  No.  He was angry, to say it nicely.
13  Q.  And he did not repeat a direction to you to not cut
14     the crossings; is that right?
15  A.  From what I recall, sir, he didn't say nothing.  So
16     I took that as the superintendent would be
17     Mr. McElvey's direct supervisor.  I told him to
18     escalate it to his next -- to the next supervisor,
19     which was, at the time, Dylan Smith, who was the
20     carrier's cochairman of the Quad Cities Health and
21     Safety Committee.  I knew exactly what Dylan would
22     have said.  "Cut the damn crossings."
23  Q.  And that's what you would have expected Mr. Smith to
24     say, "Cut the crossings"?
25  A.  One hundred percent, because that's -- it's in the

14 (Pages 50 - 53)

Page 54

1    safety rule book.
2    Q.  And then you -- you proceeded to go ahead and cut
3       the crossings at that point; is that right?
4    A.  Yes.
5    Q.  Did you ever say that you would not operate the
6       train to Nahant if the crossings were not cut?
7    A.  No.
8    Q.  So you never refused to operate the train to Nahant
9       without the crossings being cut?
10   A.  Say that again.
11   Q.  Did you -- did you refuse to operate the train to
12      Nahant if the crossings were not cut?  And I'm
13      noting that Mr. Magnuson is nodding his head towards
14      you before you give your answer.
15   A.  That's kind of a trick -- that's a trick question.
16      Number one, I'm not going to -- I'm not going to
17      violate the rule.  I don't care what the rule is.
18      I'm not going to knowingly violate a rule.  And we
19      have previous knowledge over the last 25 years of
20      trains derailing, having previous incidents in the
21      previous two months, and this being the health and
22      safety topic of the month.  I guess I'm not -- I'm
23      not sure where you're going with this, sir, so I'm
24      going to leave that open.
25   Q.  Well, let me just --

Page 55

1          MR. MAGNUSON:  Let's take another
2       break.
3          MR. SULLIVAN:  All right.  We can take
4       a --
5          MR. MAGNUSON:  First of all, it's
6       getting hot in here.
7          (A recess was had from 10:59 a.m. until
8       11:08 a.m.)
9    BY MR. SULLIVAN:
10   Q.  Mr. Sexton, I might have phrased that -- my last
11      couple questions to you awkwardly, so I'll just try
12      again.  Did you ever tell Mr. McElvey that you would
13      not operate the train to Nahant unless -- or excuse
14      me -- without the crossings being cut?
15   A.  Yes.
16   Q.  You did.  Do you remember how he responded to you
17      saying that?
18   A.  Yeah.  He -- he was angry, and he said, "You need to
19      get on and get the hell out of here."
20   Q.  Was that -- how did you respond to him saying, "You
21      need to get on and get the hell out of here"?
22   A.  That was when I told him to call the superintendent.
23   Q.  And as far as you know, he did not call the
24      superintendent?
25   A.  Sir, I was standing there waiting for him to call

Page 56

1       because I was going to put it on speaker, and we
2       were going to have a chat and find out if he wanted
3       me to violate it.  I wasn't going to violate the
4       rule.  I'm not doing it.  Do you realize what two
5       cars I shoved into Marquette siding?  Do you want to
6       talk about that?
7    Q.  So did he call the superintendent was my question.
8    A.  Not that I know of.  Not at that time.
9    Q.  And not when you were in his presence?
10   A.  Correct.
11   Q.  What was the last thing you remember him saying
12      before he went back into his office?
13   A.  When I left, he was still standing in the -- in the
14      crew room basically out -- like, a table like this
15      where we get paperwork together.  And the last thing
16      he said to me was, "I need you to get on and get the
17      hell out of here."
18          And I said, "I'm not -- I'm not leaving.  I'm
19      cutting the -- I'm not doing nothing -- anything
20      until I cut the crossings.  And if -- you know, if
21      you still think that way," I said, "you need to call
22      the superintendent right now, and we'll get to the
23      bottom of it."  And he stood there and stared at me
24      pissed off, didn't do it.  So, therefore, I went and
25      out cut the crossing.

Page 57

1    Q.  Did you say anything else before you went and --
2       went out and cut the crossings?
3    A.  No, sir.
4    Q.  At what point in the conversation, just so I'm
5       clear, did you ask him to sign the Health and Safety
6       Committee attendance sheet?
7    A.  After he was eavesdropping on my initial job
8       briefing and he heard me tell Mr. DePover that the
9       first thing we're going to do is we're going to cut
10      away from our train and we're going to go cut all
11      the crossings and flangeways, and he came out of his
12      office all pissed off.
13   Q.  I see.  So you said that to Mr. DePover?
14   A.  Correct.
15   Q.  "We're going to cut off and go and cut the
16      crossings"?
17   A.  Yes, sir, because there was a fresh blanket of snow
18      that fell overnight.
19   Q.  And your recollection was Mr. McElvey heard you say
20      that or appeared to hear you say that and came out
21      and said, "You're not doing anything like that,"
22      more or less?
23   A.  Correct.
24   Q.  Okay.  And then in response to that, you went and
25      got the attendance sheet and brought it to him and

15 (Pages 54 - 57)

Page 58

1    had him sign it?
2    A.   Brought it to his attention, shared the two previous
3         stories about derailment in Clinton, Iowa and
4         Comanche -- or Clinton, Iowa and Cordova, Illinois,
5         and we had a job briefing about cutting flangeways
6         and crossings, had him sign it, put his employee
7         number on it.  Yes, sir.
8    Q.   After he did that, signed his name, wrote the
9         employee number, what did he say or what did you
10        say?
11   A.   I can't recall.
12   Q.   At some point, however, it sounds like he -- did he
13        repeat the directions, said just go and don't
14        perform any cutting movements?
15   A.   I can't remember.  Honestly, after I said, "Call the
16        superintendent," and stood there waiting for him to
17        call him and he didn't do it, I went out and cut the
18        crossings.
19   Q.   I'm just trying to line everything up in order, so
20        this will be my last time through this.  So he comes
21        out, says, "You're not doing that," correct?
22   A.   Yes.
23   Q.   And is that what prompted you to go and get the
24        attendance sheet and ask him to sign it?
25   A.   Yes.  But before that, I shared the two previous

Page 59

1         derailments in Clinton, Iowa and Cordova, Illinois,
2         and I said, "Standby."  And then I went outside
3         where my cooler was, and I got the -- the attendance
4         sheet for the Workplace Health and Safety Committee,
5         and we had another job briefing about cutting
6         crossings and flangeways, and I had him sign it and
7         put his employee number on it.
8    Q.   Okay.  And then after he did that, then -- then what
9         happened?
10   A.   And then I don't know if it's before or after I
11        said, you know -- he said, you know, "You need to
12        get the hell out of here," and I said, "You need to
13        call the superintendent."  I don't know the exact
14        order all this went on, but he didn't do it.
15   Q.   He didn't do what?
16   A.   He did not call the superintendent --
17   Q.   All right.
18   A.   -- as requested.
19   Q.   Got it.  So -- and that happened after he signed the
20        sheet?
21   A.   I can't remember, sir.
22   Q.   Okay.  And the -- but the -- at some point in all of
23        that, he said, "You need to get the hell out of
24        here," words to that effect?
25   A.   "You need to get on your train and get the hell out

Page 60

1         of here."
2    Q.   And then you said, "Listen, you need to call
3         superintended.  We're going to call --
4    A.   We're going to -- we're cutting the crossings, and
5         if you don't think we're cutting the crossings, then
6         call the superintendent and we'll have a job
7         briefing on it.
8    Q.   Understood.  Okay.  And do you remember -- then it
9         was you and Mr. DePover operating the locomotive to
10        cut the crossing, right?
11   A.   I'm the engineer.  I'm under the control of the
12        locomotive, and Mr. DePover is the
13        conductor/assistant engineer.  Yes.
14   Q.   Understood.  And you -- and I think you said
15        earlier, you don't remember how long that process
16        took?
17   A.   No.
18   Q.   At any point, did anyone need to give you or
19        Mr. DePover rides in a vehicle to get from one point
20        to another through the crossing movements?
21   A.   At that point, no.  We were light engine.  We
22        were -- just had locomotive.  There were no need for
23        a ride.
24   Q.   Later, were you given rides on February 1st, 2021?
25        Do you remember?

Page 61

1    A.   Probably to speed up the process.  I honestly don't
2         remember, but more than likely.  More than likely,
3         but I don't remember.
4    Q.   So after the crossings had been cut, you would have
5         brought the locomotives back to Marquette, and then
6         what happened?  How long -- what -- what -- do you
7         remember what happened after you brought the
8         locomotives back to Marquette to begin to get ready
9         for the trip to Nahant?
10   A.   Yes.
11   Q.   What happened?
12   A.   Signed on to our cars.  They were right in front of
13        the depot.  We pulled down whenever the cut was, and
14        we had to shove cars into Marquette siding.  And at
15        the cut was two cars of loaded anhydrous sulfur --
16        anhydrous ammonia, two loads.  Marquette siding is
17        ten feet from the Mississippi River, ten feet.  So
18        maybe if I didn't cut the crossings and flangeways
19        and I shoved those cars into the siding, we could
20        have had a huge catastrophe, not only people's lives
21        but wildlife, including the middle America's fresh
22        water drinking supply.
23   Q.   Did you know that there were cars containing
24        anhydrous at the time you had the conversation with
25        Mr. McElvey at the job briefing?

16 (Pages 58 - 61)

Page 62

1   A.  No, because I didn't look at the list because I was
2       too busy entertaining him on what he was trying to
3       do.
4          (Exhibit 5 was marked for
5          identification.)
6   BY MR. SULLIVAN:
7   Q.  Mr. Sexton, I'm marking a document as Exhibit 5 to
8       the deposition.  Have you seen this before?
9   A.  Yes.
10  Q.  What is this?
11  A.  It's a train delay.
12  Q.  What is a Train Delay Report?
13  A.  Exactly what it says.  You document on here what --
14      what you -- your location, what time you started,
15      what time it ended, and what time you left and the
16      duties you performed at that certain location.
17  Q.  Is this your handwriting on this Train Delay Report?
18  A.  No.
19  Q.  Whose handwriting is it, if you know?
20  A.  DePover.
21  Q.  Is it a duty of a conductor to complete the Train
22      Delay Report on a regular basis?
23  A.  Yes.
24  Q.  So there's a central section on the document titled,
25      "Cause of Delay."  Do you see that title?

Page 63

1   A.  I do.
2   Q.  And so within the first entry, it says "Where
3       delayed, Marquette.  Arrive, 01:30."  What -- what
4       does that -- what do -- what do those words and
5       those figures mean on this document?
6   A.  That's were you go on duty, and what time we were on
7       duty was at 1:30.
8   Q.  And then there's another column, Departure, and the
9       first number written there is 05:40.  Do you see
10      that?
11  A.  I do.
12  Q.  That's the time that you would have departed
13      Marquette; is that accurate?
14  A.  Yes.
15  Q.  So fair to say that everything that is written
16      within the Cause of Delay section between the 01:30
17      line and the 05:40 line is Mr. DePover's description
18      of the cause of the delay to 7 -- excuse me -- 474?
19  A.  Yes.
20  Q.  Would you mind reading that?  I don't have a good
21      grasp of his handwriting, and I'm hoping --
22  A.  I don't either, but I'll -- I'll do my best.
23  Q.  Thank you.
24  A.  "Marquette, 01:30 arrival.  TGBOs.  Paperwork."  I
25      don't know what that first -- but it says, "North."

Page 64

1   I don't know what the first word is, but it says,
2   "North Y.  Pick up one engine and set out to
3   Marquette siding.  Needed to cut crossings and
4   siding.  Locomotive brake test."  Because we had to
5   -- I had to pick up an Engine 9 on open deck bridge.
6   "Dig out hoses on engine to access them."  They were
7   impacted by snow, and I had to dig them out by hand.
8   Didn't have a shovel that's small enough to get in
9   the hole to get them out.  "Tie back on and pump
10  air.  Standing cut 84 deep.  Pull up.  Shove 24 --
11  shove 24 cars.  Set out Marquette siding."  That's
12  horrible handwriting.  "Shove back.  Tie onto the
13  rest of train.  Pump air."  "PPC" means set up PPC,
14  positive train control.  We had to get a track
15  warrant at that time because it was not CPC.  It is
16  now, I guess, and then "Depart test.  Engine check,"
17  and we left at 5:40.
18  Q.  Okay.  So I just want to clarify, and I appreciate
19      you adding explanations of what was written here as
20      you were reading it, but that -- you did not just
21      read this word for word, correct?
22  A.  No, sir, number one, because I couldn't read
23      everything that he had written because it's horrible
24      handwriting, and I was trying to clarify everything
25      he was trying expressed.

Page 65

1   Q.  Understood.  So you were using this and then
2       explaining to me --
3   A.  A little ad-libbing, correct.
4   Q.  -- explaining to me the reasons for the tasks that
5       occurred between 1:30 and 5:40?
6   A.  Yes.
7   Q.  So there's no mention in Mr. DePover's Train Delay
8       Report about a direction to not cut the crossings,
9       is there?
10  A.  No need for it.
11  Q.  But there isn't one, is there?
12  A.  I don't see it.
13  Q.  He doesn't say, "Assistant train master directed us
14      to not cut the crossing and we did anyway," or
15      anything like that?
16  A.  It's not written on there.
17  Q.  I just want to be clear.  So what -- what were, if
18      any, the -- the orders that Mr. McElvey gave you on
19      February 1st, 2021?
20  A.  Explain that a little better.
21  Q.  I mean, did he give you a --
22  A.  What are you looking for, sir?
23  Q.  I want to know if he ordered you to do something.
24  A.  Yeah.  "Get on your train and get out hell out of
25      here."  We talked about this.

17 (Pages 62 - 65)

Page 66

1      MR. MAGNUSON: Take it to Nahant.
2      THE WITNESS: Exactly. Get on your
3  train.
4      (The court reporter requested
5  clarification.)
6      MR. MAGNUSON: Take it to Nahant.
7      THE WITNESS: Which is my home
8  terminal.
9  BY MR. SULLIVAN:
10 Q. And that is -- were there any other orders or
11    directives that you remember him giving you during
12    that briefing?
13 A. Yes.
14 Q. What were those?
15 A. I have to pick up an engine on an open deck bridge
16    across Highway 18 before I started -- before I even
17    started my work with setting out cars and Marquette
18    siding and all that.
19 Q. So how do you pick up an engine that's been left on
20    a crossing like that? How does -- how do you
21    perform that operation?
22 A. That's an open deck bridge, sir.
23 Q. And how do you perform that? How do you do that?
24 A. With six or seven inches of fresh snow, very
25    carefully. Not only that, that engine was set out

Page 67

1  and the plow -- there's an abscess window in the
2  plow to get to the hoses that you need to hook up
3  the engines together. It's called MU-ing engines.
4  And you gotta dig all the snow out by hand. Number
5  one, I had to be extremely careful because when I
6  say, "open deck bridge," there's a gap between each
7  railroad tie, eight to ten inches. And there's six,
8  seven inches of snow on there. You've gotta brush
9  all that snow off and be careful because if you have
10 one missed step, you're going to break your leg or
11 you're going to get seriously, seriously injured.
12 Q. So you walked out to the --
13 A. No, sir. The -- the engine was left in the middle
14    of this open deck bridge --
15 Q. Okay.
16 A. -- for whatever reason. Ask Mr. McElvey that. I'd
17    love to hear the explanation myself. They left it
18    on the open deck bridge, and then I was instructed
19    to pick it up and then start our work.
20 Q. Did you -- did you take a locomotive to that?
21 A. Yes.
22 Q. And then connect it to it and then came back with
23    it?
24 A. Correct.
25 Q. Okay. And so that is something that had to be --

Page 68

1  that needed to be performed before you could perform
2  the trip to Nahant?
3  A. Yes.
4  Q. And do you remember how long that took?
5  A. I would say at least a half hour, plus you have to
6     do what's called a 211 engine air brake test after
7     you pick the engine up, so yes.
8  Q. What is a 211 air brake test?
9  A. It's required by the federal railroad administration
10    once you pick up an engine or set out an engine to
11    make sure the brakes apply and release whenever you
12    are under -- whenever you pick up an engine, it has
13    to be tested to make sure it works properly.
14 Q. How long does that take, typically?
15 A. Well, if you're only just doing a 211 engine air
16    brake test, five or six minutes, but when you're
17    doing it on an open deck bridge with fresh snow, you
18    have to clean the rail and deck off. It's going to
19    take a lot longer.
20 Q. How long did it take you perform that test on this
21    engine on the open deck bridge on February 1st,
22    2021?
23 A. I would say 20, 30 minutes, just a guess.
24 Q. And is that, then, in addition to the time to take
25    the 20 or 30 minutes that it took to bring the

Page 69

1  locomotive back to the yard to begin the work, or do
2  you remember?
3  A. Where did that time frame come from?
4  Q. Forgive me. I might have misstated what you said.
5     How long did that total operation take to go and get
6     the train -- get the locomotive, perform the test,
7     and return with it?
8  A. Twenty, thirty minutes.
9  Q. Total?
10 A. Probably.
11 Q. Okay. Including the test?
12 A. Probably.
13 Q. The best that you remember?
14 A. Yes, sir.
15 Q. Looking at Mr. DePover's summary of the causes of
16    delay between 1:30 a.m. and 5:40 a.m. on
17    February 1st, the -- I want to walk through some of
18    those, just so I understand what he's -- he's
19    referring to. So the -- the first thing you said is
20    -- well, let's begin with, "On at 02:10." What does
21    that mean?
22 A. I don't know, sir. I didn't write it. Maybe that's
23    when we got on. I don't know. I didn't write it.
24    I couldn't tell you.
25 Q. And based on your experience working with

18 (Pages 66 - 69)

Page 78

1     when you have a chance to review it.
2   A.  I'm good.
3   Q.  Do you recognize the document that I've marked as
4     Exhibit 6?
5   A.  Yes.
6   Q.  What is Exhibit 6?
7   A.  That's my email to OSHA.
8   Q.  And you sent this on February 2nd, 2022; is that
9     right, when you look at the face of the email?
10  A.  Yes.
11  Q.  I just -- for right now, just want to point out the
12    last sentence of the -- of the second paragraph on
13    the page Sexton147 where it says, "I retrieved my
14    health and safety job briefing form," and then
15    continues on --
16  A.  Hang on a second.
17  Q.  Of course.
18  A.  Where was that again, sir?
19  Q.  Bottom of the first -- of that first big paragraph.
20  A.  Okay.  Got it.  Thank you.
21  Q.  So you -- you tell OSHA, "I retrieved my
22    health and safety job briefing form for the month of
23    February 2021, topic of which is cutting crossings
24    and flangeways," and then it goes on.  So that's the
25    event that you testified to earlier, correct, where

Page 79

1     you went to your cooler, you said, and brought the
2     attendance sheet to Mr. McElvey and asked him to
3     sign it?
4   A.  Yes.
5         (Exhibit 7 was marked for
6         identification.)
7     BY MR. SULLIVAN:
8   Q.  Mr. Sexton, I'm showing you what's marked as
9     Exhibit 7.  Do you recognize this document?
10  A.  Yes.
11  Q.  What is Exhibit 7?
12  A.  That is my copy of the Workplace Health and Safety
13    Committee attendance sheet.
14  Q.  So the -- there are seven signatures at the bottom.
15    It's your testimony that the last signature is
16    Mr. McElvey; is that right?
17  A.  Yes.
18  Q.  Looking at the form, the top of Exhibit 7 has the
19    date of the presentation, January 2021.  Do you see
20    that?
21  A.  I do.
22  Q.  Do you remember the exact date within January 2021
23    when you -- when the Health and Safety Committee
24    heard your presentation on cutting flangeways and
25    crossings?

Page 80

1   A.  It was probably the first or second week.  It --
2     it's not like you don't have the health and safety
3     meetings throughout the time on the first of every
4     month.  It was, like, ten -- you know eight, ten
5     whenever.  It was the first two weeks of every
6     month, generally, so I don't remember the date.
7   Q.  But probably sometime in the first two weeks of
8     January, to the best that you can remember today?
9   A.  Yes.
10  Q.  And it says the location is Nahant, correct?
11  A.  That's my home terminal, correct.
12  Q.  Just where at the terminal do you have the committee
13    meetings?
14  A.  We had them in the -- in the general office.
15  Q.  And there are names listed as attendees.  Is it
16    your testimony that those six individuals were
17    present at the committee meeting in January of 2021
18    when you presented on cutting flangeways and
19    crossings?
20  A.  No.
21  Q.  They're listed as attendees, so could you explain
22    why -- how that's the case they weren't in
23    attendance on this topic?
24  A.  They weren't in attendance at the Health and Safety
25    Committee meeting.  Wasn't that your question, sir?

Page 81

1   Q.  It was -- yeah.
2   A.  None of these individuals were present at the Health
3     and Safety Committee meeting.
4   Q.  Okay.
5   A.  This is our going out into the field with our fellow
6     employees and having safety briefings one on one or
7     in this entire room, and spreading the word on what
8     the health and safety topic for the month is.  Each
9     of those individuals, they weren't all -- they were
10    -- they were -- some -- I got, like, Jess Harris,
11    Max Olson, they had done them at the same time
12    because they were on our same crew and on the same
13    shift.  So I got them at once.  And the other guys
14    could have been individuals.  They could have been
15    together.  I don't recall.
16  Q.  I see.
17  A.  This is going out and spreading, and that way,
18    they'll say, "Well, Sexton talked to be about
19    cutting crossings and flangeways.  He's always
20    talking about something," so then they would
21    continuing just keep talking about it and hopefully
22    it will sink in.
23  Q.  And then -- and you're keeping track here of who you
24    talked to about the topic?
25  A.  Right.  That was part of our requirement to be in

21 (Pages 78 - 81)

Page 82

1  the Health and Safety Committee, to hold job
2  briefings and to have them sign it with their
3  employee number.
4  Q.  Mr. DePover is the name right above Mr. McElvey's.
5  Did he sign that on February 21st, 2021, to the
6  extent that you remember?
7  A.  No.  I -- he probably signed it during the initial
8  job briefing when we left Nahant to go Marquette.
9  We were on duty at Nahant, went to Marquette, stayed
10  over in the hotel, got a call to go 1:30 on the
11  first.  So I'm sure I covered this during our
12  initial job at Davenport before we left.
13  Q.  Okay.  I just wanted to clarify because I know you
14  mentioned there was a job -- you were in the middle
15  of a job briefing with Mr. DePover?
16  A.  At Marquette.
17  Q.  At Marquette when Mr. McElvey came out and had heard
18  you, so I just want to pin this to that event.
19  A.  No.
20  Q.  But it sounds like this wasn't -- he didn't sign
21  this during that briefing, correct?
22  A.  No, no.
23  Q.  You mentioned that you had this form in your cooler
24  on February 1st.  I believe that's were you
25  retrieved it from, to get Mr. McElvey to sign it.

Page 83

1  Does that sound accurate?
2  A.  One hundred percent.
3  Q.  So what do you do with this document over the course
4  of the month?  You're bringing it to people and
5  asking them to sign it; is that right?
6  A.  I -- I -- no.  That's not.
7  Q.  I mean, you --
8  A.  You have to have a job briefing on the topic of the
9  month.
10  Q.  Yeah.
11  A.  And every time, it's the same -- same old thing on
12  the previous derailments in Clinton, Iowa, Cordova,
13  Illinois.  You bring it up, and the cause was not
14  cutting crossings and flangeways.  That's what they
15  wanted to drill into everyone's head, and that's
16  what I did.
17  Q.  As you said before, that's a topic that is directed
18  by CP management for the month?
19  A.  Yes.
20  Q.  What do you do with this form after you've completed
21  all of your briefings with the people to whom you're
22  performing the briefings?
23  A.  Well, the next month, February, we would go in and
24  we would turn the January form in.  We'd get one for
25  February with the new topic of the month and go out

Page 84

1  there and hammer that down.
2  Q.  I see.  Who do you get the -- the new form from?
3  A.  From the -- from the management that has -- has the
4  forms and has the topic of the month.
5  Q.  And then you return the --
6  A.  They -- they -- they distribute them at the health
7  and safety meeting, sir.
8  Q.  I see.  Then you return the complete form at the
9  same time?
10  A.  No.  It will be the following month.  Then you turn
11  that in, get the next month's topic of the month.
12  Q.  Understood.
13  A.  It rolls.  I mean, it just rolls.
14  Q.  So you, effectively, have this with you for about a
15  month?
16  A.  At all times.
17  Q.  And you're performing those briefings, spreading the
18  word?
19  A.  Whenever I see anybody.
20  Q.  Until the next meeting -- the next meeting of the
21  Health and Safety Committee?
22  A.  Until the next topic.
23  Q.  And then you would return this with the new one?
24  A.  Then I get a blank one with the new topic of the
25  month and try to fill it up.

Page 85

1  Q.  I appreciate that.  It's helpful to understand what
2  this came from.
3         (Exhibit 8 was marked for
4         identification.)
5  BY MR. SULLIVAN:
6  Q.  Mr. Sexton, I'm showing you what's marked as
7  Exhibit 8, two pages that have in their lower
8  right-hand corner Sexton141 and Sexton142 as Bates
9  labels.  Do you recognize these documents that are
10  included as Exhibit A?
11  A.  Yes.
12  Q.  What are the documents included in the record as
13  Exhibit A?
14  A.  These are safety reviews after an incident, U.S.
15  West cutting tracks.  Would you like me to read it?
16  Q.  No.  I just want to understand that these are the --
17  are these the documents that were provided by CP
18  management as part of the January 2021 safety topic?
19  A.  Yes.
20  Q.  Were there other documents that were part of -- I
21  mean, there were other -- is this everything that
22  was provided as the safety topic, or were there
23  other documents that -- if you remember?
24  A.  These are the two instances that were investigated
25  and -- and the preliminary cause was snow buildup in

22 (Pages 82 - 85)

Page 94

1    A.  Main line authority in.  That means you hold the
2        main line down to the south end of the yard to
3        Wapello Avenue.  And then we had to wait for B6 to
4        meet with the local.  They were doing work, whatever
5        they were doing to complete their tasks.  And then
6        that was when -- after they cleared the crossovers
7        for us to cross over the industry track, then it was
8        our turn to set out our cars.
9    Q.  And do you remember the tracks that you were
10       directed to set out cars on?
11   A.  If I remember correctly, it was Nahant 4, but don't
12       hold me to it.
13   Q.  Do you remember if it was Nahant 4 and then also
14       Nahant 2.  Would that be a call that could happen?
15   A.  We had to set out on engine, so I -- I -- I don't
16       remember.  I don't remember.
17   Q.  But you think it would -- you have some recollection
18       that Nahant 4 was a place where you set out cars?
19   A.  I believe so.  I mean, I'm not a hundred percent
20       sure.  I don't -- I don't remember.
21   Q.  So it's my understanding that you did start to shove
22       cars on to track 4.  This is when the shove test was
23       set up.  So I'm hoping you could --
24   A.  "Set up" being the correct word.
25   Q.  I'm hoping you can tell me what happened, as you

Page 95

1        remember it.
2    A.  Well, before -- of course, before we even done this
3        waiting for B60 to clear, I have what I call rolling
4        job briefings all the time because work changes
5        constantly, whether it's dispatch or -- it changes
6        all the time on here.  And I have rolling job
7        briefings.  So when the B60 was doing their thing,
8        this was Mr. DePover's first trip back.  He was
9        furloughed for nine, ten months, I don't remember.
10       He was gone for a while.  This was his first trip
11       back.  I was reacquainting him on the way up to
12       Marquette with all that -- all the, you know, the
13       sightings with the cars out, all that stuff, what to
14       look out for, close clearance, all that stuff.
15           When we were at the south end of Nahant, we had
16       to wait for the B60 to clear, and then we were
17       instructed to shove 4 track or 2 track, whichever
18       one it was.  We had set out an engine as well.  I
19       don't remember what track was set out, the engine 2
20       or -- I'd have to look at my notes or my email
21       because that's -- that was what I would recall.  But
22       we -- we were -- we had a job briefing after B60
23       cleared while they were working, and when we -- it
24       was our turn, I contacted Tony Cruciani, who was the
25       conductor on the RC70 job, to have him in position

Page 96

1        to protect my shove.  I believe it was 4 track we
2        shoved the cars on now that we're talking about it,
3        but -- and Mr. Cruciani was in position on the north
4        end of 4 track.  4 track was a clear track, meaning
5        no cars were on the track at the time.
6    Q.  And so did Mr. Cruciani go into position then to
7        protect the shove onto track 4?
8    A.  Yes.
9    Q.  What happened next?
10   A.  Mr. Cruciani told me he was in position on the north
11       end of 4.  You're good for 50 cars, and we were
12       shoving in 27 or so.  And we shoved the south end of
13       the yard.  Mr. DePover got off at the clearance
14       point, and I slowed down for him to get off safely.
15       We detained, and then we put our cars on the 4
16       track.
17   Q.  How many cars?  Do you remember?
18   A.  Twenty-seven I think it says.
19   Q.  And so are you -- you said that you were told, "Good
20       for 50."
21   A.  Cars.
22   Q.  And we'll get to the transcript of the hearing in a
23       bit, but is it possible that it was good for 40?
24       Does that sound accurate?  Do you have any
25       recollection?

Page 97

1    A.  I'd have to -- I'd have revisit that.  I mean,
2        they're -- I -- I don't know.  So we'll have to
3        revisit it.
4    Q.  Okay.  So it's -- but it's possible you were told,
5        "Good for 40"?
6    A.  Could be.
7    Q.  What does "Good for 40" mean?
8    A.  The track is clear, and you're good for 40 cars to
9        his location to the foul point.
10   Q.  Okay.  So he's -- so there's 40 car lengths between
11       the first car that you're shoving to where he is; is
12       that right?
13   A.  Yes.
14   Q.  And so just so I understand kind of bringing back
15       what we talked about before the radio response rule.
16       If that was all you knew, that you're good for 40,
17       then your responsibility would be to stop within 20;
18       is that right?
19   A.  1 -- 21, within half the range of vision.
20   Q.  So --
21   A.  I always go one more car, but yes.
22           MR. MAGNUSON:  On the safe side.
23           THE WITNESS:  Absolutely, on the safe
24       side.
25       BY MR. SULLIVAN:

25 (Pages 94 - 97)

Page 102

1    rule because it says, "Within --
2    A.  I'm not -- yeah.  I'm not going to step on that.
3    Yeah.
4    Q.  But --
5    A.  I'm going to err on side of the safety.  I'm not
6    going to do that.
7    Q.  You're going to go within the requirements of the
8    rule?
9    A.  I'm going to probably one step above.
10   Q.  Okay.
11   A.  Yeah.  I'm not going to put myself in that
12   situation.  That's not the intent, just to be safe.
13   Q.  So on the -- well, so there was other testimony at
14   the hearing that the -- a full command was, "Good
15   for 40 with 15 cars to a stop."  What does that
16   mean?
17   A.  So if I stopped, you know -- or 19 cars, you know,
18   shoving in 19, I still got 21 cars.  It's more than
19   half.
20   Q.  And the rule says, "Within half"?
21   A.  Within half.
22   Q.  And you keep saying, "More than half."  So if it's
23   within half, that would be --
24   A.  A violation.
25   Q.  Well, within half would be in compliance with the

Page 103

1    rule because it says within --
2    A.  I'm not -- yeah.  I'm not going to step on that.
3    Yeah.
4    Q.  But --
5    A.  I'm going to err on side of the safety.  I'm not
6    going to do that.
7    Q.  You're going to go within the requirements of the
8    rule?
9    A.  I'm going to probably one step above.
10   Q.  Okay.
11   A.  Yeah.  I'm not going to put myself in that
12   situation.  That's not the intent, just to be safe.
13   Q.  So on the -- well, so there was other testimony at
14   the hearing that the -- a full command was, "Good
15   for 40 with 15 cars to a stop."  What does that
16   mean?
17   A.  You're talking about two different people.
18   Q.  Okay.  Well, what -- what does -- if we drop the,
19   "Good for 40" and only focus at that --
20   A.  No, no.  "Good for 40" would be Mr. Cruciani at the
21   north end of 4 track.
22   Q.  Okay.
23   A.  "15 cars to the stop" would be Mr. DePover at the
24   clearance point of the south end of the yard, sir.
25   Q.  So tell me about that.  So you mentioned that you

Page 104

1    slowed down so Mr. DePover could dismount the train
2    Safety.  Then what happened?
3    A.  And then he gave me his car count, whatever his car
4    count was.  And I still had Mr. Cruciani at the
5    north end of the yard.  He would update me, Mr.
6    Cruciani would.  You know, he said, "Good for 50" or
7    40 or whatever he said.  He was giving constant
8    updates, Cruciani.
9    Q.  And Mr. DePover was also speaking to you, correct?
10   A.  He did initially.
11   Q.  So let's talk about Mr. DePover's counts to you.
12   What do you remember about Mr. DePover's counts to
13   you?
14   A.  I'd have to revisit that because I don't want to
15   misspeak.
16       MR. MAGNUSON:  We're going to have to
17   go through the transcript.
18       THE WITNESS:  I just -- I don't want to
19   misspeak.  That's --
20   BY MR. SULLIVAN:
21   Q.  So when did you come to learn that Tom Jared had
22   administered a shove test on February 1st, 2021?
23   A.  After I stopped the train.
24   Q.  What happened after you stopped the train?
25   A.  Then DePover got on the radio and said something

Page 105

1    about Mr. Jared was testing us.  I don't remember
2    the exact phrasing.
3    Q.  And then you -- you had already said you were short
4    an hour, so you proceeded to get everything stopped
5    and tied off.  Is that -- did that --
6    A.  No.  And I think that was the -- I think we had
7    seven minutes to work.  It was we were really
8    cutting it close.
9    Q.  Okay.
10   A.  And no idea what --
11   Q.  Did you speak with Mr. Jared on February 1st, 2021?
12   A.  Yes.
13   Q.  Tell me about that conversation.  What happened?
14   A.  Well, we went -- we were in the train master's
15   office at Nahant depot, and he claimed that I
16   violated the shove move, and -- that's what he
17   claimed.
18   Q.  Okay.  Did you say anything in response to that?
19   A.  Yes.
20   Q.  What did you say?
21   A.  I said I didn't violate any shove move.
22   Q.  What did he say in response to that, if you
23   remember?
24   A.  He was very adamant about that I did, and I think he
25   forgot I had Mr. Cruciani on the north end of the

27 (Pages 102 - 105)

Page 110

1  A.  Yes.
2  Q.  And so you believe that the interaction with
3      Mr. McElvey led directly to Mr. Jared's actions at
4      Nahant later that day; is that correct?
5  A.  About me not violating -- or he wanted me to violate
6      a direct safety rule and -- yes.
7  Q.  McElvey?
8  A.  Yes.
9  Q.  So just so it's clear, your position is Mr. McElvey
10     wanted you to violate a safety rule, and you refused
11     that, and that led directly to Mr. Jared performing
12     the E test in Nahant?
13 A.  Because I refused, yes.
14 Q.  Why do you believe that Mr. Jared performed that
15     test as a result of something that occurred between
16     you and Mr. McElvey?
17 A.  Because of the initial term of why it took us so
18     long to get out of Marquette, because I had to cut
19     the crossings and flangeways, and Mr. McElvey wasn't
20     happy about it, as we discussed all morning.
21 Q.  Well, the delay -- we did talk about the delay.  So
22     -- and there were a number of factors that caused
23     the delay, correct?  There was the locomotive that
24     was on the open span bridge, for example?
25 A.  Correct.

Page 111

1  Q.  There were a number of factors that caused the delay
2      leaving Marquette, correct?
3  A.  But the one thing that he was --
4  Q.  I just -- my question was, there were a number of
5      things that caused the delay leaving Marquette,
6      correct?
7  A.  There was more than one.
8  Q.  There were a number of things?
9  A.  It was more than one.
10 Q.  More than one.  One of them was the crossing and --
11     the crossing cutting that you did, correct?
12 A.  My refusal to get on the train and get the hell out
13     of here and my refusal to violate a safety rule.
14 Q.  And then your decision, as you've described it, to
15     go ahead and cut those crossings, correct?
16 A.  Correct.
17 Q.  That caused a delay, yes?
18 A.  Yes.
19 Q.  Other things also caused delays that morning, true?
20 A.  Yes.
21 Q.  So, again, why do you think that the delays that
22     relate to the crossing and your interactions with
23     Mr. McElvey caused Tom Jared to do something at the
24     Nahant yard later that day?
25 A.  Mr. McElvey didn't get angry when I had to sit out

Page 112

1      and pick up cars or cut the -- or get on the engine
2      or any of that on the open deck bridge.  He did get
3      angry when I had to cut the crossings, and I told
4      him I was not going to move the train until I the
5      cut the crossings.  That's when he got angry,
6      physically angry.
7  Q.  What is it about Mr. McElvey getting angry that you
8      think caused Mr. Jared to do something related to
9      the shove test in Nahant six hours later?
10 A.  It's -- it wasn't six hours later.  It was 12 hours
11     later.  And it was because the initial terminal
12     delay.  It's all about time.
13 Q.  So the delay is what caused your -- the fact that
14     there was a delay is what you're saying caused Tom
15     Jared to perform the shove test that he performed at
16     11:45 or so on February 1st?
17 A.  What they consider an excessive delay.
18 Q.  Who is "they"?
19 A.  Managers.
20 Q.  So managers thought there was an excessive delay,
21     and so Tom Jared performed a shove test?
22 A.  Yes.
23 Q.  Well, why -- and let me just ask you, how do you
24     draw that conclusion?  What is it about Kurt McElvey
25     being angry that caused Tom Jared to do something

Page 113

1      later?
2  A.  It's all about delays, so it's -- and that -- and me
3      not listening to Mr. McElvey, and I -- I performed
4      my job in a safe manner added to the delay, in their
5      eyes unnecessarily, even though there was two
6      derailments in the previous months, and I refused to
7      violate a safety -- a safety rule.
8  Q.  So it's clear that it is your personal belief that
9      the delay earlier on February 1st caused Mr. Jared
10     to perform the shove test, correct?
11 A.  It is.
12 Q.  Do you have any evidence that you can think of that
13     supports your belief that the delay caused Tom Jared
14     to perform the shove test?
15 A.  The amount of delay is my belief.
16 Q.  So it's your belief --
17 A.  The initial terminal delay.
18 Q.  So it's the delay and the amount of your delay, in
19     your opinion, is what caused Tom Jared to cause the
20     -- and Mr. Magnuson is nodding his head.
21     MR. MAGNUSON:  No, I'm not.
22     MR. SULLIVAN:  Okay.  I strike that
23 then.
24     MR. MAGNUSON:  I turned my head to look
25 at him.

29 (Pages 110 - 113)

Page 114

1    BY MR. SULLIVAN:
2    Q.  It is the delay and the extent of the delay earlier
3        on February 1st that is the cause, as you see it, of
4        Tom Jared performing the shove test later on
5        February 1st, correct?
6    A.  Yes.
7    Q.  And the evidence you point to to support that belief
8        is the length of the delay that morning?
9    A.  Yes.
10   Q.  Is there any evidence that you can think of as you
11       sit here today that you would point to that support
12       the conclusion that Tom Jared performed the shove
13       test because of the delay?
14   A.  They have standard -- what they call standards. It
15       used to be two hours. Now it's an hour and a half.
16       Now I heard it was 45 minutes. I'm not sure. But
17       whenever it goes over standard, then heads are going
18       to roll.
19   Q.  So it's the length of delay?
20   A.  Length of the delay in the -- yes.
21   Q.  So the -- other than the length of the delay, is
22       there any evidence that you're aware of that
23       supports the conclusion that Tom Jared performed the
24       shove test on February 1st because of the delay that
25       occurred earlier on February 1st?

Page 115

1    A.  That in of itself would be the reason.
2    Q.  So that's the only reason you point to?
3    A.  As of right now, I mean, I don't know what else is
4        out there.
5    Q.  But you have nothing else to point to as you sit
6        here today?
7    A.  I'm not sure. I can't answer that. I'm not sure if
8        there's anything out there. Might be. We'll find
9        out.
10   Q.  But the factors you point to are the delay and the
11       length of delay are the things you believe caused
12       Tom Jared to make the -- take the actions that he
13       took?
14   A.  Correct.
15   Q.  So still in Exhibit 6, your email to OSHA.
16   A.  It did say, "50 cars." I was right.
17   Q.  So on the third page, 149, the middle of the page,
18       you wrote, "I feel this was clearly a setup on GM
19       Jared's part and also strongly feel it was
20       retribution for taking the extra time at our
21       terminal earlier in the night to safely do our work
22       by cutting the crossings and flangeways." Do you
23       see that?
24   A.  I do.
25   Q.  And if it was the length of the delay that caused

Page 116

1        Mr. Jared to, as you put it, perform what was
2        clearly a setup, why is it specifically the delays
3        about the crossing cuttings as opposed to any of the
4        other delays that motivated him to perform the shove
5        test?
6    A.  I can't tell what Mr. Jared's thinking, sir.
7           MR. MAGNUSON:  Objection, foundation,
8        but that's --
9        BY MR. SULLIVAN:
10   Q.  Did Tom Jared ever tell you that he was aware on
11       February 1st of the dispute that you had had earlier
12       with Kurt McElvey on February 1st?
13   A.  No.
14   Q.  Do you have any personal knowledge of any
15       conversation that Mr. McElvey would have had with
16       Mr. Jared on February 1st in which Mr. Jared would
17       have learned about your dispute with Mr. McElvey?
18   A.  I know in my previous almost 25 years experience,
19       they have conference calls. They have two, three a
20       day sometimes. And they have updates on what's
21       going on if trains left. If they picked up cars,
22       set the cars out, yes. He was aware of it whenever
23       their first conference call was.
24   Q.  Were you on that conference call?
25   A.  No.

Page 117

1    Q.  So you don't know if anyone said anything about you
2        on that conference call, do you?
3    A.  I guarantee it. I guarantee it happened.
4    Q.  Okay. But you weren't on the call, were you?
5    A.  No.
6    Q.  So you don't personally have any knowledge that you
7        came up on any conference call on February 1st, do
8        you?
9    A.  No.
10   Q.  What is -- what, from your perspective, is the
11       purpose, if you know, of E testing?
12   A.  Not sure. You'd have to ask the guys who wrote the
13       manual.
14   Q.  Do you think it is when it's done right that it is
15       something done for the sake of safety?
16   A.  If it's done correctly.
17   Q.  If it is done correctly, do you think it is an
18       important part of keeping operations safe?
19   A.  It's part of it.
20   Q.  Whether you were performing the shove and you were
21       hearing Mr. Cruciani's counts and you stopped
22       hearing Mr. DePover, why didn't you stop
23       immediately?
24   A.  I still had a person protecting the shove, sir;
25       Mr. Cruciani.

30 (Pages 114 - 117)

Page 118

1  Q.  So you had -- there was no concern in your mind
2      about what might be going on with Mr. DePover?
3  A.  What my concern was, like I said earlier, is whether
4      his battery died, his antenna loosened, or his
5      microphone malfunctioned.  It happens all the time.
6      So I stopped the train.
7  Q.  I'm sorry.  So you did stop the train?
8  A.  I did.
9  Q.  Why didn't you stop it immediately?
10 A.  I -- I still had to -- well, number one, I -- we
11     were moving.  There's no -- you can't -- you don't
12     just push a brake like you push a brake on your
13     truck.  Doesn't happen.
14 Q.  Yeah.
15 A.  It takes awhile to stop, number one.  And I was
16     calling -- number one, I was having a conversation
17     with Mr. Cruciani as I was reaching out to the ATM
18     as well, and then when I couldn't get anyone to
19     relay, Mr. Cruciani was still protecting my shove.
20     Then I stopped.
21 Q.  Why did you stop when you stopped?
22 A.  Because I could not hear Mr. DePover anymore.
23 Q.  How long were you out of contact with Mr. DePover
24     before you stopped, if you remember?
25 A.  I don't remember.

Page 119

1          MR. SULLIVAN:  Why don't we take about
2      a ten-minute break?  I want to get organized
3      here.
4          (A recess was had from 1:32 p.m. until
5      1:49 p.m.)
6          (Exhibits 9 through 11 were marked for
7      identification.)
8  BY MR. SULLIVAN:
9  Q.  Mr. Sexton, I'm going to give you three related
10     exhibits; Exhibit 9, Exhibit 10 and Exhibit 11,
11     which relate to the disciplinary hearing, in
12     particular.  So start with Exhibit 9.  This is ten,
13     and 11.  So Mr. Sexton, the document that's marked
14     as Exhibit 9, do you recognize that document?
15 A.  Yes.
16 Q.  It's the notice of the disciplinary hearing that was
17     eventually held on February 10th; is that right?
18 A.  Appears to be, yes.
19 Q.  And Exhibit 10 is the thicker document in front of
20     you.  Do you recognize that?
21 A.  Transcript from the investigation.
22 Q.  Okay.  So that's the transcript of that
23     February 10th hearing?
24 A.  Yes.
25 Q.  And it may not be clear on the face of it, but do

Page 120

1      you recognize Exhibit 11 as the exhibits that were
2      presented as -- at the hearing all in a packet
3      together?
4  A.  Yes.
5  Q.  So I want to talk about the hearing.  And you
6      testified at the hearing; is that right?
7  A.  Yes.
8  Q.  It's my understanding that unlike today, you're --
9      the statements at the hearing were not specifically
10     under oath; is that correct?
11 A.  Yes.
12 Q.  But did you tell the truth at the hearing?
13 A.  One hundred percent.
14 Q.  And from your point of view, was it important to the
15     process that everyone at the hearing tells the
16     truth?
17 A.  Yes.
18 Q.  I'd like to talk about the -- take up the issue that
19     we started to talk about, the "Good for 40, stop
20     after 15 conversation."  So in the hearing
21     transcript, I'd like you to turn to the page that's
22     marked in the lower right-hand corner, CP79.
23 A.  Okay.
24 Q.  So just take a look at that for a second just to
25     familiarize yourself.  I know it's kind of deep into

Page 121

1      the transcript.
2  A.  What part are we talking about, sir?
3  Q.  So this is -- you see line 3.  You see your name is
4      kind of dead center on the page?
5  A.  Yes.
6  Q.  So you understand what follows line 3 on this page
7      CP79 is the transcript of the questions and answers
8      that were posed to you at the hearing?
9  A.  Yes.
10 Q.  The beginning of the questions and answers that were
11     posed to and given by you at the hearing, I should
12     say?
13 A.  Yes.
14 Q.  So in -- I'll summarize some of this, but line 16
15     into line 18, Mr. Johnson asks, and you confirm that
16     you were given a 50, 5-0 car count as the initial
17     count.  Do you see that?
18 A.  I do, and I was.
19 Q.  And so when you say you was -- that you were -- that
20     was what you were given as the initial count on
21     February 1st?
22 A.  Yeah.
23 Q.  And then he asks you, "And what was the next
24     instruction you were given over the radio?"  And so
25     your response to that was, "Believe it was good for

31 (Pages 118 - 121)

Page 122

1    -- still good for 40, 15 -- 15 cars to a stop with
2    emphasis on 'good for 40.'"  Did I read that
3    correctly?
4    A.  You did.
5    Q.  Is that testimony accurate still today?
6    A.  Yes.
7    Q.  And so after the 50-car count, you were given
8    updated information; is that accurate?
9    A.  The 40, yes.
10   Q.  So there's two pieces of that.  There's "Still good
11   for 40," and then you also say, "15 cars to a stop."
12   So I think we've covered what "Good for 40" means.
13   What does "15 cars to a stop" mean?
14   A.  That was the amount of cars we were setting out on
15   the track.
16   Q.  So is that -- am I accurate or is it accurate to
17   say, then, that while there was space for 40 cars,
18   your instruction was to place 15 cars into that 40
19   car space?
20   A.  Yes.
21   Q.  Do you recall after you were given the 15-car count
22   how many cars you actually moved into that space?
23   A.  I don't recall.
24   Q.  If there was testimony at the hearing that it was 11
25   cars that moved into the 15-car space, would -- do

Page 123

1    you have any reason to disagree with that?
2    A.  No.
3    Q.  Just as you sit here today, you can't confirm or
4    deny whether it was 11; is that fair?
5    A.  That's correct.
6    Q.  So I want to understand how the rule of 5.3.7, "Stop
7    within half the distance" language that we talked
8    about before applies to the 15-count movement.  So
9    if you were told move -- shove 15 cars into a track,
10   and that is the last thing you hear, how many cars
11   -- or what is the number of cars that you should
12   stop within to remain in compliance with 5.3.7?
13   A.  My last direction was 40 cars, sir.  Let's get
14   this --
15       MR. MAGNUSON:  Just going to object
16       with an incomplete hypothetical.  Let's
17       stick to the facts.
18       THE WITNESS:  There was 40 cars, sir,
19       15 to a cut.  And then if -- even if I went
20       11 cars or whatever, I was still in
21       compliance with 5 after he got 7.
22   BY MR. SULLIVAN:
23   Q.  So you said, "15 to a cut."  This is "15 cars to a
24   stop."  Is there a difference?
25   A.  It's -- it's basically -- it's -- we're splitting

Page 124

1    hairs here.  It's basically the same thing.
2    Q.  Your statement at the hearing was that the last
3    direction you heard was, "Still good for 40, 15 cars
4    to a stop," correct?
5    A.  Yes.
6    Q.  So part of the instructions you were given were, "15
7    cars to a stop," correct?
8    A.  Yes.
9    Q.  Those words meant something?
10   A.  Yes.
11   Q.  And so when you think only of those words, what is
12   the number of cars that may be moved and remain in
13   compliance with 5.3.7?
14   A.  Twenty-one.
15   Q.  Twenty-one is six more than fifteen, so you're
16   saying that --
17   A.  Good for 40 --
18   Q.  -- you can move 21 cars on a 15-car count and it was
19   in compliance with the rules?
20   A.  Good for 40, 15 to a stop or cut.
21   Q.  My question was, is it your testimony that you, as
22   an engineer, can move 21 cars after hearing a 15-car
23   count and remain in compliance with 5.3.7?
24   A.  That's -- you're making --
25   Q.  That's --

Page 125

1    A.  I'm -- it's not -- sir, that's not -- that's not how
2    it happened.
3    Q.  My question --
4    A.  No.
5    Q.  So I want to go back to the question.
6    A.  No.
7    Q.  So 15 -- the direction was, "15 cars to a stop,"
8    right?
9    A.  "Good for 40, stop in 15."
10   Q.  And so focus on the "Stop in 15."  If that's all
11   that you heard, what is the appropriate distance to
12   stop and remain in compliance with 5.3.7?
13   A.  That's not all I heard.
14       MR. MAGNUSON:  Objection, incomplete
15       hypothetical.
16   BY MR. SULLIVAN:
17   Q.  And -- but go on and answer the question.  If that
18   was all that you heard -- we can ask hypotheticals.
19   If that was all that you heard, what is the
20   appropriate distance to stop within and remain
21   within compliance of 5.3.7?
22   A.  Twenty cars.
23   Q.  So if you hear a 15-car count, you can go 20 --
24   A.  No.
25   Q.  And my question is related to 15, not to 40.  I

Veritext Legal Solutions
www.veritext.com                                                      888-391-3376

CP Appendix - 25

1  understand your position on 40.
2  A.  That's not the way railroad communications work,
3    sir.  "Good for 40, stop in 15," period.
4      MR. CRAMER:  He's asking a
5    hypothetical.
6      THE WITNESS:  That's not the way it
7    works.
8      MR. CRAMER:  We -- object to the
9    hypothetical.
10     MR. MAGNUSON:  But you still have to
11   answer the question.
12  BY MR. SULLIVAN:
13  Q.  If he were given the command, "15 to a stop," what
14    does that mean?
15  A.  "Good for 40, stop in 15," I'm -- I'm good for 20
16    cars.
17  Q.  You were given the command --
18  A.  If only -- if all I heard was, "15 cars"?
19  Q.  If all you heard was, "15 to a stop," what does that
20    mean?
21  A.  But that's not all what I heard.  It would be 7 1/2
22    cars.  But that's not all what I heard was, "15 to a
23    stop," but that's not the case.
24  Q.  I understand that's your position, but if -- if all
25    you had heard was, "15," I want to clarify that.  I

1  understand --
2      MR. MAGNUSON:  That's not his position.
3    It's the undisputed testimony of witnesses
4    here.
5      MR. SULLIVAN:  And that is a speaking
6    objection that is worthy of being struck.
7    We can move on.
8      (Exhibits 12 and 13 were marked for
9    identification.)
10  BY MR. SULLIVAN:
11  Q.  Mr. Sexton, I'm showing you exhibits marked 12 and
12    13.  Do you recognize the document that's marked as
13    Exhibit 12?
14  A.  Yes.
15  Q.  And what is the document that's marked as
16    Exhibit 12?
17  A.  Certified Mail for the discipline that was handed
18    out by the general manager, Jared.
19  Q.  In Exhibit 13, do you recognize that?
20  A.  Yes.
21  Q.  What is Exhibit 13?
22  A.  The Public Law Board award.
23  Q.  The Public Law Board award that sustained the
24    union's claim related to -- the -- the discipline
25    that you received in Exhibit 12?

1  A.  Yes.
2  Q.  And as a result of the Public Law Board decision
3    that is marked as Exhibit 13, your 20-day
4    suspension, that was delivered to you in Exhibit 12
5    was undone; isn't that right?
6      MR. MAGNUSON:  Objection, form.
7      THE WITNESS:  I'm not sure what you
8    mean, sir.  Sorry.
9  BY MR. SULLIVAN:
10  Q.  The -- the union's claim was that your discipline
11    was unjustified; is that correct?
12  A.  Yes.
13  Q.  And the claim that the union made to the Public Law
14    Board was sustained, correct?
15  A.  Yes.
16  Q.  And the discipline that you received in Exhibit 12
17    was reversed; is that correct?
18  A.  Yes.
19  Q.  And the -- you originally had received a 20-day
20    suspension; is that true?
21  A.  Yes.
22  Q.  And that was an unpaid suspension, wasn't it?
23  A.  Yes.
24  Q.  And after the Public Law Board's decision that is
25    included as Exhibit 13, you were paid for the

1    20 days that you had missed; isn't that correct?
2  A.  Yes.
3  Q.  Are you aware of any other union proceedings that
4    related to your 20-day suspension that followed the
5    Public Law Board's decision?
6  A.  I'm not sure what you mean, sir.
7  Q.  Did anything else happen?  Did the union do anything
8    else, as far as you're aware, after it received the
9    Public Law Board's decision?
10  A.  Not sure.
11  Q.  Was the -- is it fair to think of the Public Law
12    Board's decision as a win for the union?
13  A.  The win for John is what it is, and yes.
14  Q.  "Win for John," meaning you?
15  A.  Yes.
16  Q.  And a loss for the railroad, correct?
17  A.  No, it's not.  No, that's not correct.
18  Q.  The final set of materials I want to cover with you,
19    Mr. Sexton, are the specific allegations that are
20    being made in the litigation against the railroad.
21    Is the -- the Public Law Board is Exhibit 13?
22      MR. MAGNUSON:  13.
23      (Exhibit 14 was marked for
24    identification.)
25  BY MR. SULLIVAN:

33 (Pages 126 - 129)

Page 130

1    Q.  I'm showing you what's been marked Exhibit 14.  Have
2        you seen that document before?
3    A.  Yes.
4    Q.  Do you understand that to be -- to include -- well,
5        what is the document as you understand it?
6    A.  It's my case to be brought up and heard in front of
7        a jury, hopefully.
8    Q.  Well, and do you understand that this specific
9        document is a set of formal answers that you made to
10       specific formal questions that the railroad asked of
11       you over the course of litigation?
12   A.  Yes.
13   Q.  And on page 1, there's a title, "Plaintiff's
14       Interrogatory Answers," and then Interrogatory
15       Number 1 is set out.  Do you see that?
16   A.  Yes.
17   Q.  And you understand that interrogatory is basically a
18       lawyer way to say "question"?
19   A.  Okay.  I do now.  Thank you.
20   Q.  Okay.  So the question number 1 that was posed here
21       was to identify each and every adverse employment
22       action allegedly taken by respondent that you
23       contend violated 49USC Section 20109.  Do you see
24       that?
25   A.  I do.

Page 131

1    Q.  There's probably a lot of ways to define it, but an
2        adverse employment action, for purposes of my
3        questions, is something that affected you at work in
4        a particularly negative way.  Can you accept that
5        definition for the purposes of these questions?
6    A.  Yeah, yes.
7    Q.  And so the -- the question here was for you to
8        identify the -- the negative actions that occurred
9        to you because you -- that -- that you claim
10       violated federal law, fair?
11   A.  Okay.
12   Q.  And I count five that you identified on here.
13   A.  Okay.
14   Q.  So the first is on page 2 on February 1st,
15       effectively that Mr. Jared performed the shove test
16       related to the movements in the Nahant yard and that
17       that was an adverse employment action?
18   A.  Yes.
19   Q.  So do you agree that is one of the adverse
20       employment actions you assert in this lawsuit?
21   A.  Yes.
22   Q.  On page 3, there's -- well, forgive me.  Beginning
23       on the bottom of page 2, the -- there's a second
24       adverse employment action that's identified, and it
25       is the February 4th letter that notified you of the

Page 132

1        disciplinary hearing.  Is that the second adverse
2        employment action you allege in this hearing?
3    A.  Isn't it at the bottom of page 3, sir?
4            MR. MAGNUSON:  Just --
5            THE WITNESS:  Sorry.
6        BY MR. SULLIVAN:
7    Q.  So at the bottom of page 2 of this document, it
8        says, on February 4th, 2021, "CP Railway noticed
9        Mr. Sexton that it would be conducting a
10       disciplinary hearing against him."  Do you see that?
11   A.  Yes.
12   Q.  And then it continues on to the top of page 3.
13       "This described action by CP Railway," and it goes
14       on effectively to assert that was an adverse
15       employment action?
16   A.  Yes.
17   Q.  So that -- the receipt of the letter, the
18       February 4th letter, is an adverse employment action
19       is that your position?
20   A.  Yes.
21   Q.  The third adverse employment action is described in
22       the paragraph that begins on page -- first paragraph
23       that begins on page 3 of this exhibit.  "On
24       February 10th, CP Railway held an investigation."
25       So it was the investigation on February 10th that

Page 133

1        was a third adverse employment action; is that
2        accurate?
3    A.  Yes.
4    Q.  And then the next paragraph, "On February 26th, the
5        issuance of the 20-day suspension," that's a fourth
6        adverse employment action; is that true?
7    A.  Yes.
8    Q.  The fifth is set out in this paragraph that says,
9        "On or around the time of each of the above-named
10       events, CP Railway notes these things on
11       Mr. Sexton's record creating a potential for
12       blacklisting."  Is the potential for blacklisting an
13       adverse employment action, in your view?
14   A.  Yes.
15   Q.  So that's five that we've gone through.  Are there
16       any adverse employment actions that you claim you
17       sustained or suffered as a result of conduct that
18       violated federal law on the part of CP?
19   A.  The embarrassment of all this going to investigation
20       over something that shouldn't even be investigated.
21       My fellow employees looking at this when everyone
22       knows I'm one of the biggest safety advocates on
23       this property.  It's embarrassing.
24   Q.  So the -- that's a -- sounds like that's an impact
25       of the investigation and the disciplinary

34 (Pages 130 - 133)

1    Q.  I want to ask you about what's described as the
2        potential for blacklisting.  Do you understand that
3        the Public Law Board's decision removed the 20-day
4        suspension from your disciplinary record at CP?
5    A.  I do, but it doesn't remove the fact that going
6        through all this still doesn't -- it tarnishes my
7        reputation.  It tarnishes my safety record.  It
8        tarnishes me as a man doing my job safely as a
9        railroader.
10   Q.  Setting those -- and just putting those two things
11       apart for the moment, specifically your disciplinary
12       record at CP, you understand the 20-day suspension
13       is no longer listed as a discipline on that; is that
14       correct?
15   A.  Yes.
16   Q.  So you think that these five things that we've
17       talked about, the five adverse employment actions
18       were caused by you reporting the snow and ice to
19       Kurt McElvey on February 1st at the job briefing in
20       the -- in Marquette?
21   A.  It was direct -- it was directly because I refused
22       to -- I was ordered to get on the train and get the
23       hell out of here, and I did not comply with his --
24       he wanted me to violate a safety regulation, and I
25       did not do it.

1    Q.  And so what evidence is there that your report of
2        the snow caused the shove test that is the first
3        adverse employment?
4            MR. MAGNUSON:  Objection, incomplete
5        hypothetical, misstates his prior testimony.
6    BY MR. SULLIVAN:
7    Q.  You can answer the question.
8    A.  Ask me again, please.
9    Q.  So you -- it's -- well, let's go back for a second.
10       What evidence is there that your conversation and
11       interaction with Kurt McElvey about cutting
12       crossings on February 1st caused the shove test that
13       you alleged is an adverse employment action in this
14       lawsuit?
15           MR. MAGNUSON:  Exact same objections,
16       misstates his prior testimony back to the
17       very last question.
18           THE WITNESS:  Can I answer?
19   BY MR. SULLIVAN:
20   Q.  Please answer.  The objections don't -- unless
21       Mr. Magnuson directs you not answer a question,
22       please answer my question.
23   A.  I don't know how it works.  Sorry.
24   Q.  We didn't cover that earlier.
25   A.  Other than Mr. McElvey was -- he was physically

1        upset.  He was angry about it.
2    Q.  So what is it about him being angry that you believe
3        caused the shove test?
4    A.  Because I had to go out there and -- and number one,
5        I didn't listen to him because he wanted me to
6        violate a safety -- a safety rule, and I did not --
7        I did not do it.  I refused to go out there and just
8        get the hell out of there, get on your train and get
9        the hell out of there like he wanted me to do.  I
10       went out there, and I cut the crossings.  He didn't
11       want me to.  He was physically angry.  I could tell
12       by the look on his face.  And it's all about the
13       initial terminal delay.
14   Q.  So how did the initial terminal delay cause the
15       disciplinary hearing that you say was an adverse
16       employment action?
17   A.  Because I -- when they had their numerous conference
18       calls that following day, whether he emailed or
19       called whatever, we're trying to get the
20       documentation on that, I'm sure that was brought up,
21       and I'm sure they were -- they were not happy that I
22       did not listen to Mr. McElvey and violate that
23       safety -- safety regulations.  You know, and I did
24       go out there and cut the crossings, and he was not
25       happy.  And I'm sure -- as soon as -- as soon as I

1        left there, he made phone calls, emails, instant
2        messages or texts, whatever he did.
3    Q.  We covered that before.  You believe those things
4        happened, but you have no personal knowledge that
5        any one of those things happened, correct?
6    A.  I can almost guarantee it.
7    Q.  And I understand that you believe you can almost
8        guarantee it, but you have no personal knowledge
9        that Kurt McElvey told anyone else about what
10       happened that morning?
11   A.  That's the way the railroad works.  The initial
12       terminal day, if you go above standard, they
13       escalate it.  That's what it's called, escalate to
14       the next manager.
15   Q.  And so --
16   A.  And they -- and they -- and they want to drill down
17       and get to why this was delayed or what happened.
18       And he was physically angry and upset.  It was all
19       over his face.
20   Q.  And you believe that that anger at you is the thing
21       that got communicated to other people, correct?
22   A.  When it got escalated because he had to because it
23       was --
24   Q.  And my question is --
25   A.  -- over their standard.

36 (Pages 138 - 141)

Page 142

1  Q.  And my question is, you believe it was the anger
2     that was specifically directed at you and your
3     specific actions that got communicated to other
4     people, correct?
5  A.  Because I did not -- yes, because I did not follow
6     his direction when he wanted me to violate safety
7     regulations.
8  Q.  And you -- you believe that happened, but you have
9     no personal knowledge that it actually did, correct?
10 A.  I'd put my career on it.
11 Q.  But you might lose that bet because you don't have
12    any personal knowledge as to whether it actually
13    happened, correct?
14    MR. MAGNUSON:  Objection, form.
15    BY MR. SULLIVAN:
16 Q.  You weren't on any phone call where you heard Kurt
17    McElvey tell anyone else about his interaction with
18    you, correct?
19 A.  No, but I know how the railroad operates.
20 Q.  Right, but you weren't on any phone call where you
21    heard him communicate about your interaction.  When
22    you think about the connection between your
23    interaction with Kurt McElvey and -- do you believe
24    that that also caused the disciplinary hearing that
25    you say is an adverse employment action in this

Page 143

1  case?
2  A.  That's what -- that's the whole reason why we're all
3     sitting here today.
4  Q.  Is the disciplinary hearing?
5  A.  It -- actually, it's me cutting the crossing is why
6     we're here today and me not -- me not listening to
7     him and just get on -- get on the train and get the
8     hell out of there, I did not follow his directions,
9     and I went out there because he wanted me to violate
10    a safety regulation, and I did not do it.  That's
11    the whole reason why we're here today.
12 Q.  So in Exhibit 15, which is the lawsuit, paragraphs
13    21 through 25 each begin with the phrase, "Mr.
14    Sexton engaged in a protected activity."  What do
15    you understand a, quote, "Protected activity" to
16    mean in the context of this lawsuit?
17    MR. MAGNUSON:  Objection, calls for a
18    legal conclusion.
19    BY MR. SULLIVAN:
20 Q.  You can answer.  What do you understand "Protected
21    activity to mean in the context of this lawsuit?
22 A.  The -- not sure.
23 Q.  Well, so let's look at paragraph 21, which goes from
24    page 4 to page 5 of Exhibit 15.  Paragraph 21 talks
25    about an email that you sent on January 3rd, 2021,

Page 144

1     about some events that occurred on December 3rd,
2     2020, do you see that?
3  A.  I do.
4  Q.  So the lawsuit is taking the position that the
5     January 3rd email is protected activity for purposes
6     of this lawsuit.  Do you agree with that?
7  A.  Yes.
8     (Exhibit 16 was marked for
9     identification.)
10    BY MR. SULLIVAN:
11 Q.  Mr. Sexton, showing you what's been marked
12    Exhibit 16.  Do you recognize Exhibit 16, or any
13    part of it, I should say?
14 A.  Yes.
15 Q.  So it looks like from about halfway down, a little
16    more than halfway down on the first page of
17    Exhibit 16, which is numbered CP1688, there are
18    emails from you to Jeff McInnis and then also an
19    email that appears to be sent from you to yourself.
20    Do you see that?
21 A.  I cc'ed Paul Baker who was in -- who was the Manager
22    of Rules at that time, yes.
23 Q.  Is this the January 3rd email that reported what the
24    lawsuit says were several hazardous safety or
25    security issues that occurred on or around

Page 145

1     December 3rd, 2020?
2  A.  Yes.  I received this from another employee.
3  Q.  Who did you receive it from?
4  A.  Steve Lasko and Chad Johnson were the crew that
5     brought this to my attention.
6  Q.  And when you say, "this," I'll point you --
7  A.  This email on page 2, sir, of this Exhibit 16.
8  Q.  Thank you.  That's what I was going to ask.  So the
9     -- that initial January 3rd email forward Dan -- and
10    I don't know how to pronounce his last name.
11 A.  Chandanais.
12 Q.  Chandanais.  So that is a -- is the email that's
13    included in Exhibit 16 on the second page, is that
14    something that was sent to you by someone else and
15    then you forwarded it on?
16 A.  Yes.
17 Q.  And -- understood.  So you forwarded it along to
18    Jeff McInnis and Paul copying Paul Bicha?
19 A.  Bicha.
20 Q.  Bicha.  So on the -- on the message that is on the
21    on the bottom of the second page of Exhibit 16, you
22    didn't write that; is that true?
23 A.  That is 100 percent true.
24 Q.  Okay.  And the events that are described in the
25    message that was sent to you, did you personally

37 (Pages 142 - 145)

Page 146

1    observe any of them?
2    A.  No.
3    Q.  They were reported to you by this other crew, is
4        that correct?
5    A.  Yes, because at the time, I was the cochairman, the
6        union cochairman for the Quad Cities Health and
7        Safety Committee.  And they knew that I would
8        escalate it to find out what's going on here, and
9        that's exactly what I did.
10   Q.  I see.  Do you have any knowledge one way or the
11       other whether Mr. McInnis or Mr. Bicha investigated
12       the allegations that are set out here?
13   A.  Other than -- this is the first time I've seen this
14       cover page.  Other than that, sir...
15   Q.  So other than the message between the two of them,
16       you have no knowledge one way or the other?
17   A.  Yes, sir.
18   Q.  So do you think this January 3rd email that's
19       included as Exhibit 16 had anything to do with Tom
20       Jared's decision to conduct a shove test in the --
21   A.  Yes, sir.
22   Q.  How did this email connect to Tom Jared's decisions
23       on February 1st?
24   A.  What -- what this did was it into play a five call
25       conference call between Tom Jared, Dylan Smith --

Page 147

1    I'll wait until you write them down -- Tom Jared,
2    Dylan Smith, Steve Lasko, Tom Johnson, and myself
3    discussed this matter in depth, and it -- it took
4    awhile for us to get -- you know, get five
5    railroaders on a conference call.  It's a miracle.
6    We got it done sometime early January, and we
7    discussed this, and they tried to basically -- you
8    know, it was -- it was a joke, actually.  The call
9    was a joke.  And they -- they tried to -- they --
10   they tried to make Dan look like he was not
11   violating anything.  And, obviously, it might appear
12   that was there.  He violated a lot of cardinal
13   rules, and if we were to do that as T&E employees,
14   we would be terminated.  It's all about getting the
15   train out of the yard.  It's all about the initial
16   terminal delay.  It's what we're all about.
17   Q.  So you were on a conference call with Tom Jared and
18       some others?
19   A.  Five-way conference call.
20   Q.  And they -- they were in response to this email, it
21       sounds like?
22   A.  That is correct.  You can pull that up on Teams.
23       I'm sure you guys have it.
24   Q.  And how does that have anything to do with the shove
25       test decision you said before was caused by the

Page 148

1    delay earlier on February 1st?
2    A.  The managers don't like when you are -- when, number
3        one, when they have an initial terminal delay like
4        this or the one that I incurred at Marquette.
5    Q.  So how does that connect to Tom Jared's decision to
6        perform a shove test involving you on February 1st
7        at the Nahant yard?
8    A.  It added to all of it.
9    Q.  And what information would you point to that
10       supports that claim?
11   A.  Because I brought this to their attention as the --
12       as the cochairman of the Health and Safety Committee
13       and they -- and they don't -- they don't like it.
14       Nothing was done.  He violated several cardinal
15       rules in here, and we had a five-way conference
16       call, and nothing was done.  They tried to sweep is
17       it under the rug.  They'd done their best to make it
18       look like Mr. Chandanais did not violate any rules,
19       and I pulled out the GCOR, and I'm like, this is --
20       this is what happened.
21   Q.  So what's the connection between all of that and the
22       February 4th discipline and the disciplinary hearing
23       and the discipline that -- excuse me.  The
24       February 4th disciplinary notice, the disciplinary
25       hearing, and the discipline that was issued?

Page 149

1    A.  It's all part of it.
2    Q.  How?
3    A.  It's all a part of the whole thing.  They don't like
4        anything being brought to their attention with the
5        fellow manager when it's coming to an initial
6        terminal delay because it -- it affects their bonus
7        when it's -- when their bonus time comes.  That's
8        what it's all about.
9    Q.  I know you believe that.  But what do you point to
10       that -- what other evidence is there that shows
11       that's the case, other than your personal belief?
12   A.  That's the way it is.
13   Q.  So there's a January 18th email referenced in the
14       complaint.  It's on paragraph 22, page 5 of
15       Exhibit 15.
16   A.  I'm there.
17                (Exhibit 17 was marked for
18            identification.)
19   BY MR. SULLIVAN:
20   Q.  Showing you what's been marked Exhibit 15.
21            MR. MAGNUSON:  17.
22            MR. SULLIVAN:  God, I'm sorry.  I'm
23       sorry.  Thank you for correcting that.
24   BY MR. SULLIVAN:
25   Q.  Exhibit 17, which has been referred to in

38 (Pages 146 - 149)

Page 150

1    Exhibit 15, give you a second to flip through all
2    pages of that. Mr. Sexton, is the January 18th,
3    2021, email that is referred to in the complaint,
4    the message that begins on the second page of
5    Exhibit 17?
6    A. Yes.
7    Q. So this is the message. It says, "On January 18th,
8    2021, at 3:27 p.m., John Sexton wrote," and there's
9    a message that follows that.
10   A. Yes.
11   Q. Is this still relating to the December 20th --
12   excuse me -- December 23rd event involving
13   Mr. Chandanais?
14   A. Chandanais, yes.
15   Q. So -- so you're presenting further information to
16   leaders; is that fair to say?
17   A. Yes.
18   Q. And it looks like from the bottom of the first page
19   on Exhibit 17 on into the top of the second page of
20   Exhibit 17, Tracy Miller responds to your message;
21   is that correct? That's an email back to you --
22   A. Yes.
23   Q. -- from Tracy Miller?
24   A. Yes.
25   Q. Mr. Miller says, "When are you gentlemen free to

Page 151

1    walk through each item with them," at one point of
2    the -- of his message to you. Do you see the --
3    that sentence?
4    A. I do.
5    Q. Is that the beginning of the -- or did that lead to
6    the five-way call that you referred to before?
7    A. I don't recall, sir, if that -- I want to say it was
8    before January 18th, but I -- I can't recall. I
9    thought it was before then, but like I said, I'm not
10   going to -- I don't remember.
11   Q. It's hard to interpret tone and attitude in an email
12   I think it's fair to say, but when you read
13   Mr. Miller's email message back to you, do you pick
14   up on any anger towards you or dislike of the fact
15   that you are raising these issues or anything like
16   that?
17   A. Doesn't appear to, no.
18   Q. And then at the top of Exhibit 17, so the top of
19   page 1 of that exhibit, is a message to you from Tom
20   Jared on -- well, dated here January 20th. Do you
21   see that?
22   A. I do.
23   Q. I'll just take a moment to explain a little oddity
24   of those documents if you give me a second. So the
25   -- you have no reason to disagree with me that the

Page 152

1    time as reflected here is actually six hours in
2    advance of Central Standard time, and I'll --
3    I'll --
4    A. I would have no idea, sir, but I mean, it's all
5    about the same thing. Time is --
6        MR. MAGNUSON: For what it's worth,
7    we've been kind of wondering about it.
8        MR. SULLIVAN: So the emails were
9    produced under Universal Time. So it's --
10   on this -- at this -- on this date, this was
11   actually 7 -- this email was actually sent
12   at 7:32 p.m. January 19th, 2021. You don't
13   have to agree or disagree with me.
14       THE WITNESS: Can you say that again?
15   BY MR. SULLIVAN:
16   Q. January 19th, 2021, 6 hours prior to this time, so I
17   believe that's 7:32 p.m.
18   A. Okay.
19   Q. And so here, Mr. Jared is -- when you see Mr. Jared
20   say to you, "After we talked this afternoon," does
21   that -- do you understand that to be a reference to
22   this five-way --
23   A. Five-way call, more than likely, yes.
24   Q. Okay. And so here, Mr. Jared says, "He did more
25   follow up with the employee involved with the

Page 153

1    allegation." He also states, "The conductor stated
2    at no time was he instructed to violate any rule."
3    Do you see that?
4    A. I did. I did read that.
5    Q. Do you know who the conductor was that was involved
6    in this incident?
7    A. I believe it was Kelton McBride, if I remember
8    correctly.
9    Q. Did you ever speak to Mr. McBride whether he was
10   instructed to violate a rule?
11   A. I did not, sir. He works out of Kansas City. I
12   work out of Davenport. We hardly cross paths.
13   Q. So you have no reason to know one way or the other
14   whether Mr. McBride told Mr. Jared whether he was
15   instructed to violate any rule?
16   A. I have no idea what anyone thinks.
17   Q. Who is LC Anderton out of Nahant?
18   A. Local chairman at the time, Anderton.
19   Q. And Mr. Jared reports that "Local Chairman Anderton
20   was satisfied with the investigation and our
21   follow-up." Do you see that?
22   A. I do, but if he was satisfied with it, why didn't
23   he, Mr. Anderton, in this email, object or add to?
24   Q. Be that as it may, do you have any reason to know
25   whether Mr. Anderton was satisfied with the

39 (Pages 150 - 153)

Page 154

1    investigation of this incident?
2    A.  I have no idea if he was satisfied or not, sir.
3    Q.  So you have no reason to know that he wasn't?
4    A.  Or was.
5    Q.  Or was, correct.  So how does this -- how does the
6       January 18th email that is included in Exhibit 17
7       connect to the discipline that you sustained in the
8       February 2021 disciplinary hearing and the outcome
9       of that hearing?
10   A.  Because my fellow employees brought this to my
11      attention because they knew I would do something
12      about it as the co-chair, and I did.  I explained it
13      to Mr. Jared and Mr. Smith which is Mr. Chandanais'
14      direct supervisors, and we talked about it, and they
15      wanted to sweep it under the rug.  If that was you
16      and I out there doing this, we wouldn't be employed.
17   Q.  So Mr. Jared writes back to you and gives you the
18      results of this investigation, refers to other
19      -- the -- Mr. McBride and Mr. Anderton, and you have
20      no reason to doubt that what he's saying they said
21      is true?
22   A.  I do.
23   Q.  What is -- you said before you didn't have any
24      reason to doubt what they're saying?
25   A.  No.  I said before, I don't know what they're

Page 155

1       thinking.  But I don't believe even after our
2       five-way conference call that -- that all of this is
3       entirely true because if it was, a normal person
4       would cc whoever you're talking about in the body of
5       email.  That's what I do.
6    Q.  So your reason to doubt the veracity of this rests
7       entirely on who was cc'ed on the email; is that
8       right?
9          MR. MAGNUSON:  Objection, misstates his
10         testimony, incomplete hypothetical.
11         THE WITNESS:  Can you ask me again,
12         please?
13         BY MR. SULLIVAN:
14   Q.  So you doubt the truthfulness of Tom Jared's email
15      because he didn't cc Mr. Anderton on it.  Is that --
16   A.  Not only that, and I don't believe he -- he
17      investigated and followed through.
18   Q.  Why don't you believe that he --
19   A.  I just don't believe it, because if he did,
20      something would have happened.
21   Q.  But you didn't -- you have no personal knowledge --
22      you didn't speak with Mr. Anderton about his
23      conversation with Mr. Jared, did you?
24   A.  No.
25   Q.  And you didn't speak to Mr. McBride about his

Page 156

1       conversation with Mr. Jared, did you?
2    A.  No.
3    Q.  So Mr. Jared may very well have actually had the
4       conversations with Mr. Anderton and Mr. McBride that
5       he says he did in this email; isn't that true?
6    A.  I don't know, and neither do you.  We don't know.
7    Q.  And there's no reason to doubt?
8    A.  Yes, there is.
9    Q.  And what is the reason to doubt?
10   A.  Because nothing happened to Mr. Chandanais.
11   Q.  How do you know that?
12   A.  He's still employed.
13   Q.  Is there any sort of discipline that might be issued
14      against someone short of being terminated?
15         MR. MAGNUSON:  Objection, foundation.
16         THE WITNESS:  Well --
17         BY MR. SULLIVAN:
18   Q.  So your assumption is that nothing happened to him
19      because he wasn't terminated, correct?
20   A.  As a manager, a manager's supposed to set --
21   Q.  But your --
22   A.  -- set the stage for everyone to work safely.
23   Q.  And your assumption that nothing happened to
24      Mr. Chand --
25   A.  Chandanais.

Page 157

1    Q.  -- Chandanais -- thank you -- rises solely on the
2       fact that he was never terminated?
3    A.  Or disciplined in any way, shape, or form.
4    Q.  As far as you know?
5    A.  Yes.
6    Q.  And you don't know.  Do you have any personal
7       knowledge of his personnel file?
8    A.  I do not.
9    Q.  So something may very well have happened that you're
10      just not aware of; isn't that true?
11   A.  Well, wouldn't he have put that in the body of the
12      email, sir, or something to the effect?
13   Q.  My question was, you do not have any personal
14      knowledge --
15   A.  No.
16   Q.  -- that that happened, correct?
17   A.  No, sir.
18   Q.  So I'll ask you the questions that I asked before
19      about the other protected conduct about this email.
20      So how does the January 18th email connect to the
21      disciplinary hearing?
22   A.  Didn't we already -- didn't I already answer that?
23   Q.  Not about the January 18th email, abut the January
24      3rd email.  They're --
25   A.  January 18th, isn't that one about Mr. Chandanais

Page 158

1    breaking every rule in the book?
2  Q.  The 18th is the one that follows up and where Mr.
3    Mr. Jared and Mr. Miller both responded to you
4    about.
5  A.  Oh.
6  Q.  So what evidence is there that connects that -- your
7    January 18th email that's included in Exhibit 17 to
8    the -- to CP's decision to issue the disciplinary
9    hearing notice?
10  A.  Did you personally take the time to read my email,
11    sir?
12  Q.  I'm asking the questions, and I -- and with all due
13    respect, my question was, what evidence is there to
14    connect the content and the fact that you sent this
15    email to your later discipline?
16  A.  Because of that email, period.
17  Q.  Because you sent the email, you were disciplined?
18  A.  It's part of it.  It's -- it's part of it.
19  Q.  Why did you believe that?
20  A.  Because it's very -- it's very self-explanatory.
21    All you gotta do is read it.
22  Q.  Are you aware of other people who have where written
23    similar emails?
24  A.  I'm sure they have.  I'm not sure.  I mean,
25    possibly.  I don't know, but they -- my fellow crew

Page 159

1    -- my fellow employees brought it to my attention
2    because they knew I would take care of it and
3    escalate it.  When you do that, they don't like it.
4    They put a target on your back.  All you gotta do is
5    read it.
6  Q.  And so did -- when Tom Jared conducted the shove
7    test, did he say, "I'm doing this because of the
8    emails you were sending in January"?
9  A.  I couldn't tell you what Mr. Jared said, sir.
10  Q.  Did he say that to you?  Do you remember him
11    saying --
12  A.  He didn't say it to me.
13  Q.  Did Mr. Jared tell you, I'm doing that because of
14    what you said this morning, the interaction between
15    and you Kurt McElvey?
16  A.  He didn't say that to me either, but...
17  Q.  At the discipline hearing, did it come out that the
18    reason you were being discipline was because of the
19    January emails?
20  A.  No.
21  Q.  When the decision was made to issue the 20-day
22    suspension, what evidence is there that that
23    decision was influenced or affected by the
24    January 3rd or the January 18th emails?
25    MR. MAGNUSON:  Objection, calls for a

Page 160

1    legal conclusion --
2    MR. SULLIVAN:  The question is what --
3    MR. MAGNUSON:  -- foundation.
4  BY MR. SULLIVAN:
5  Q.  What evidence is there?
6    MR. MAGNUSON:  Same objections.
7  BY MR. SULLIVAN:
8  Q.  So what facts are there?  Not legal, what facts are
9    there?
10    MR. MAGNUSON:  Same objection,
11    foundation, legal conclusion.
12  BY MR. SULLIVAN:
13  Q.  And you can answer the question.
14  A.  Ask me again, please.
15  Q.  Of course.  What facts are there that connect your
16    20-day suspension to the January 3rd or January 18th
17    emails?
18  A.  The fact that I bring this to their attention,
19    continuous safety violations and that -- that they
20    see them, and they don't like to -- to have things
21    brought to their attention, and that's what it is.
22  Q.  So I'm looking at Mr. Jared's message back to you on
23    January 19th and Mr. Miller's email to you on
24    January 18th.  Where do they say that they don't
25    like to have things brought to their attention?

Page 161

1  A.  It's just obvious.
2  Q.  Do they say it anywhere in either of their
3    messages --
4  A.  No.
5  Q.  -- that they don't like to have things brought to
6    their attention?
7  A.  No.
8  Q.  But you have the personal belief they don't like to
9    have things brought to their attention; is that
10    right?
11  A.  Yes.
12  Q.  Did you ever complain to anyone about Tom Jared's
13    shove test that he conducted with you on
14    February 1st?
15  A.  Yes.
16  Q.  When did you complain about it?
17  A.  As soon as it happened.
18  Q.  What do you mean?
19  A.  To him, Dylan Smith.  It was obvious.  If you were
20    there, I would have complained to you about it.
21  Q.  Did you -- did you -- you also challenged it at the
22    investigation hearing itself, right?
23  A.  Yes.
24  Q.  Do you believe that your challenge of his shove test
25    caused the discipline that was issued in later

41 (Pages 158 - 161)

Page 162

1  February 2021?
2  A. Yes.
3  Q. And why do you believe that?
4  A. Because it was -- it's a setup. You can -- it -- it
5     was set up.
6  Q. And when you complained about it, the complaint
7     itself led to the decision to issue the discipline;
8     is that what you believe?
9  A. No. His -- his actions of failure to comply with a
10    test and him doing it wrong in every aspect of
11    meaning, that's why we're here.
12 Q. Do you think anything negative happened to you
13    specifically and only because you complained about
14    Tom's perform -- Tom Jared's performance of that
15    shove test?
16 A. And everything else I put in the emails prior to
17    this, 100 percent.
18 Q. So it all adds in together?
19 A. That's what I said before.
20 Q. Do you remember making a complaint on February 9th
21    about Kurt McElvey's driving?
22 A. Yes.
23 Q. Tell me about that.
24 A. I believe it was he picked us up at Eckert's if I
25    remember correctly. And a bunch of snow, and

Page 163

1     Eckert's, it's up there in northeast Iowa near the
2     bluffs area, on top of bluffs, a shelf and the wind
3     blows like mad. There's snow up there. You get a
4     lot of drifts and blowing snow. He picked us up and
5     was driving too fast for the conditions, and I told
6     him more than twice to slow down.
7  Q. And who did you report that to?
8  A. I believe it was Tom Jared and Tracy Miller, Dylan
9     Smith.
10 Q. Why did you wait until February 9th to make that
11    complaint?
12 A. When was the incident? I mean, so many emails, it's
13    kind of hard to...
14    (Exhibit 18 was marked for
15    identification.)
16    BY MR. SULLIVAN:
17 Q. Showing you Exhibit 18, Mr. Sexton.
18 A. Okay.
19 Q. Why did you wait until February 9th to send this
20    email about driving that occurred on February 1st?
21 A. I'm not sure. I can't answer that. Not sure.
22 Q. Did you report it to anyone on February 1st?
23 A. Not sure. I reported it to Mr. McElvey. He knows.
24 Q. So Mr. Ross responds to you twice, so on
25    February 10th and then a few days later

Page 164

1     February 14th. Do you see those messages back to
2     you on the first page of Exhibit 18?
3  A. I do.
4  Q. And in the most recent of those messages, so the one
5     that is from the 15th of February shortly after
6     midnight Universal Time, Greenwich Time, Mr. Ross
7     says, "I gathered information surrounding what you
8     pointed out below. I would like to connect with you
9     tomorrow to discuss." Did you ever speak with
10    Mr. Ross about this incident?
11 A. I don't recall.
12 Q. Is it possible that you did?
13 A. Possible.
14 Q. Is it possible that when he spoke to you, he told
15    you the result of the review of the incident that
16    management had taken in response to your complaint?
17 A. That's possible.
18 Q. Do you remember anything about management's response
19    to your complaint?
20 A. It took Mr. Ross awhile. No.
21 Q. You don't know one way or the other what they did?
22 A. It -- no, I don't.
23 Q. Do you believe this February 9th email that you sent
24    complaining about Kurt McElvey's driving contributed
25    to any negative event that followed the email?

Page 165

1  A. Part of it.
2  Q. What evidence do you have of that?
3  A. All my emails and bringing all this safety stuff to
4     their attention, they -- they don't like it.
5  Q. Has anyone in CP management ever said to you,
6     "Mr. Sexton, we don't like it when you bring forward
7     these complaints"?
8  A. No.
9  Q. Has anyone in CP management ever said to you,
10    "Mr. Sexton, we're disciplining you because of all
11    the complaints that you make"?
12 A. No.
13 Q. Has anyone ever told you that they heard some member
14    of CP management say, "We're disciplining Mr. Sexton
15    because of all his complaints"?
16 A. Yes.
17 Q. Who is that?
18 A. Someone told Mr. Cruciani, and Tom Jared came down
19    to Nahant to efficiency test me. I guess heads are
20    going to roll or whatever. Whatever he said. I
21    don't know. I just found out about that a short
22    time ago.
23 Q. That heads are going to roll?
24 A. That's just what I heard.
25 Q. You heard someone say -- tell me exactly what you

42 (Pages 162 - 165)

Page 174

1  Q.  And so my question was going to be, did you ever
2      make that complaint to anyone within CP?
3  A.  I just -- yes, sir.
4  Q.  So what is the answer to that because you spoke over
5      me?
6  A.  Sorry.  My apologies.  Yes.  Had a conference on
7      that as well.  Joey Reyes, Jason Ross, Tom Jared
8      were all involved, and there may be other people,
9      but I don't remember.  I'm on a lot of calls, and I
10     do a lot of emails.
11 Q.  When was -- when did you make that -- when was that
12     conference call?
13 A.  I -- I can't recall, sir.  I'm not going to.
14 Q.  Roughly, do you remember what year?
15 A.  Probably 2020, fall, maybe.  That's just a guess.
16 Q.  Okay.  Could have been even earlier than that?
17 A.  Could have.  Could have been.
18 Q.  What else do you remember about that complaint about
19     the air test that you made to those individuals
20     sometime in the past?
21 A.  Could you specify, please?
22 Q.  What did you -- what, exactly, did you say on this
23     call?  Do you remember?
24 A.  Exactly what I just told you, sir.  They were
25     allowing trains to make more than one cut on inbound

Page 175

1      trains, and they -- at the time, it was against
2      federal regulations to make more than one cut on an
3      inbound train, and you could not leave the initial
4      terminal.  More than one cut was made, and they had
5      done it all the time.
6  Q.  How did Jason Ross respond on that conference call
7      after you made that complaint?
8  A.  They -- they tried to -- basically, just like they
9      -- they did with the -- the complaint I brought up
10     on Mr. Chandanais when he violated every rule in the
11     book in there Ottumwa when Mr. Lasko emailed me that
12     email in Exhibit 16, sir.
13 Q.  So I'm specifically asking about Jason Ross.  Do you
14     remember Jason Ross saying anything back to you
15     after you made that complaint on this conference
16     call?
17 A.  If it did, it wasn't much.  And he basically, gave
18     that to Joey Reyes at the time, who was a train
19     master out of -- out of Nahant and Davenport, and
20     Joe Reyes tried to bring up some stuff that -- that
21     it just did not make any sense whatsoever.
22 Q.  What is -- what stuff did he try to bring up?
23 A.  He was just trying -- he was trying to justify, sir,
24     them -- that they could do it because, you know,
25     they could make more one -- you can't -- it's

Page 176

1      simple.  It's black and white.  It's very simple.
2      You make more than one cut, the train has to undergo
3      a Class 1 air test, and they didn't do it for a long
4      time because it would add to their initial terminal
5      delay, and that would -- that would -- they have a
6      standard that they have, and it would affect their
7      bonuses in the long run.
8  Q.  Is there a point in time when the management of the
9      Nahant yard started having those tests performed
10     after the cut?  You said there was a point in time
11     when they didn't do those tests?
12 A.  They didn't.
13 Q.  So sounds like there was a point in time they
14     started to perform the tests.
15 A.  I'm not sure, because unless I work the train, I
16     can't answer that.
17 Q.  Do you have any knowledge of whether those tests are
18     being performed as a matter of policy today?
19 A.  I can't answer that.  I don't work road trains
20     anymore, sir.  I cannot answer that.  I'm not going
21     to answer something I'm not sure of.  I'm sorry.
22 Q.  Do you know if they -- if management started to
23     perform those tests after you raised this issue?
24 A.  I'm not sure of that either because I don't work the
25     train, brother.  I can't tell you.

Page 177

1  Q.  How did you know that it was happening.  You knew it
2      was happening because it was at a time you were
3      working the trains?
4  A.  That, and my employees reported it to me.
5  Q.  Have any fellow employees reported anything about
6      this issue to you within the last six months?
7  A.  No.
8  Q.  How about within the last year?
9  A.  No.
10 Q.  At any point since February of 2021, has any fellow
11     employee reported anything about --
12 A.  Oh --
13 Q.  -- this issue?
14 A.  Yes, yes.
15 Q.  When was that?
16 A.  I can't recall, but prior to that time, I was still
17     the cochairman of the Quad Cities Health and Safety
18     Committee.  They knew I would address it, and I did.
19     And we will find that in Teams.  I keep saying that
20     because I'm telling you, you're going to find that
21     in Teams, and you're going to be shocked.  I can't
22     wait.
23 Q.  Do you think that the complaint that you made at
24     some point about the air test had something to do
25     with the decision to -- Tom Jared's decision to

45 (Pages 174 - 177)

Page 178

1    perform a shove test on February 1st, 2021, in the
2    Nahant yard?
3  A.  Part of it, but I think it was directly correlated
4    with me refusing to violate a safety -- a hazardous
5    safety violation with Mr. McElvey when I first went
6    on duty.  He was visibly angry, and that's what I
7    think all this is a big part of it.
8  Q.  And so this --
9  A.  It's all connected.
10  Q.  It's all connected.  How -- how do you know it's all
11    connected?
12  A.  Common sense.
13  Q.  Other than common sense, is there anything that you
14    could point to that an outside observer could look
15    at and say, "Well, this looks like it's connected"?
16  A.  It's all about bonuses and how they how they get
17    their bonuses.  If they have too big of initial
18    terminal delay and then it affects their -- their
19    quarterly bonus or however they do it, semi-yearly
20    bonus whatever it.
21  Q.  How do you know that initial terminal delay --
22    delays have an effect on any individual's bonus?
23  A.  Common knowledge in the railroad industry, sir.
24  Q.  But do you have any personal knowledge of that?
25  A.  I hear it all the time from ex managers.

Page 179

1  Q.  So which -- name one of the ex managers --
2  A.  No.
3  Q.  -- who has told you that.
4  A.  No.  I'm not going to do that.
5  Q.  Why?  Well, I'm -- unfortunately, you sort of have
6    to.  This is a deposition, and you're under oath.
7    Name one ex manager who told you that?
8  A.  Do I have to answer?
9       MR. MAGNUSON:  Yeah.
10       THE WITNESS:  They -- they -- they say
11       it out of spite when they get -- when they
12       go back into the ranks.  They're pissed.
13       They --
14       BY MR. SULLIVAN:
15  Q.  So name one, one person.  Begin with one, and we'll
16    go through every one you remember.
17  A.  I can barely remember one.
18  Q.  Who would that be?
19  A.  Michael Hunter.
20  Q.  Michael Hunter?
21  A.  Sure.
22  Q.  What did Michael Hunter say about the connection
23    between terminal delays and bonuses?
24  A.  That's their structure.  That's the way it works.
25  Q.  Michael Hunter said, "That's their structure.

Page 180

1    That's the way it works"?
2  A.  Well, not in that specific -- not those exact words,
3    but basically, yes.  It's common knowledge.  It's
4    common knowledge.
5  Q.  Well, okay.  So Michael Hunter said something like,
6    "That's the way it works."  Who else said anything
7    to you that --
8  A.  I can't remember.
9  Q.  -- confirms this idea?
10  A.  I -- I can't recall.
11  Q.  Can you not recall, or are you choosing not to
12    answer the question?
13  A.  No.  I'm not refusing -- choosing not to answer.  I
14    can't recall.
15  Q.  You remember Michael Hunter, but you don't remember
16    anyone else?
17  A.  No, no I don't.
18  Q.  When did Michael Hunter say that to you?
19  A.  Years ago.  Been there quite awhile.
20  Q.  Do you remember roughly when you would have left?
21  A.  2015, '16.  I don't know.
22  Q.  Has any current manager ever said anything to you
23    about the current structure of bonuses and their
24    supposed connection to initial terminal delays?
25  A.  Not that I recall.

Page 181

1  Q.  Did anyone -- did any -- any person ever in January
2    or February of 2021 tell you that there was some
3    sort of a conclusion between initial terminal delays
4    and manager bonuses?
5  A.  It's common knowledge, sir.
6  Q.  And so my question was, did anyone -- do you
7    remember any person ever telling you that
8    information, that that was going on in early 2021?
9  A.  No.
10  Q.  And so it's your idea that the initial terminal
11    delays connect to the bonuses, correct?
12  A.  It does directly.
13  Q.  And then that connection to the bonuses is what
14    makes managers be upset by safety delays?
15  A.  Correct.
16  Q.  If there is no connection between initial terminal
17    delays and bonuses, then what happens to your
18    theory?
19  A.  There is.
20  Q.  But if -- what if there's not?  You believe that
21    there is.  I'm just asking, what if there isn't?
22  A.  It's common knowledge.  It's common knowledge.
23  Q.  That initial terminal delays connect specifically to
24    bonuses?
25  A.  Yes.

46 (Pages 178 - 181)

Page 186

1  Q.  Would there -- were they -- were the other people in
2      the group with Mr. Cruciani all men?
3  A.  Yes.
4  Q.  Do you remember, had you seen any of them before?
5  A.  Some were students.  Mr. Cruciani is a training
6      coordinator.
7  Q.  How many were students?
8  A.  Probably two.  I think there was three of them.
9  Q.  So two students and Mr. Cruciani?
10 A.  That's right.
11 Q.  And how long would you say this interaction took?
12 A.  I was -- it was in passing.
13 Q.  So less than five seconds?
14 A.  Probably, yes.
15 Q.  Less than three seconds?
16 A.  Sure.  I mean, somewhere around three.  I don't
17     know.
18 Q.  When was the last time that you saw Tom Jared in
19     Nahant?
20 A.  Approximately three-and-a-half weekends ago, maybe.
21 Q.  How often, roughly, would you estimate Mr. Jared is
22     in Nahant?
23 A.  No idea.
24 Q.  Is it -- would you consider it to be -- is it a
25     surprise when you see him there?

Page 187

1  A.  It's his territory.  There's nothing surprising
2      about it.
3  Q.  Sometimes he's there, and sometimes he's not?
4  A.  Yeah.  That's right.
5  Q.  So the students, where are they affiliated with?
6      How does that -- maybe just explain to us the --
7  A.  Nahant.  They work out of Nahant.  They get hired
8      on, and they have to pass all the requirements and
9      stuff to become a conductor.
10 Q.  So they're -- are they -- is it --
11 A.  They're new hires.
12 Q.  So maybe in another different -- in a different
13     industry, they might be called "trainees."  Is that
14     roughly fair?
15 A.  That's exactly it.  Students, trainees, it's all the
16     same.
17 Q.  And so you think it was one of the students who said
18     -- oh, wait.  Mr. Cruciani said the statement to the
19     two of them?
20 A.  He was told, "Heads were going to roll."
21 Q.  Had you ever met the two students before?
22 A.  No.
23 Q.  Do you have any reason to think that the -- either
24     of the two students knew anything about the
25     February 21st -- excuse me -- February 1st shove

Page 188

1      test and the discipline that followed?
2  A.  I have no idea.
3  Q.  Do you remember, Mr. Sexton, when you first decided
4      to seek help from a lawyer related to your
5      allegations against CP?
6  A.  Yes.
7  Q.  When was that?
8  A.  Shortly after the ruling was handed down.
9  Q.  The Public Law Report ruling?
10 A.  Yes, I believe so.
11 Q.  And the -- my recollection is the OSHA complaint was
12     already under way at that point; is that right?
13 A.  I believe so, yes.
14 Q.  How did you find the attorneys who are representing
15     you?
16 A.  Today?
17 Q.  Yeah.
18 A.  Through -- I've been a local chairman for a number
19     of years, and I know that they represent railroad
20     employees.
21        MR. CRAMER:  Can I take one more quick
22     break?  I don't know if we need a big pause.
23        MR. SULLIVAN:  This is literally the
24     last page.
25        (Off the record.)

Page 189

1  BY MR. SULLIVAN:
2  Q.  Were you previously represented by a different law
3      firm?
4  A.  I was.
5  Q.  And what law firm was that?
6  A.  Schlichter.
7  Q.  They're -- where are they based out of?
8  A.  St. Louis.
9  Q.  And I know I read something that you had submitted
10     to the -- to the OALJ about some confusion about
11     when and how they were representing you; is that
12     fair to say?
13 A.  Yes.
14 Q.  How did you find that firm?
15 A.  Again, they were attorneys that represent railroad
16     employees, and so I reached out.
17 Q.  So I'd like to discuss what you're alleging as
18     damages, so what you're seeking from the railroad in
19     the lawsuit.  The -- well, why don't you tell me.
20     What are you -- what -- what damages and
21     compensation are you seeking through this lawsuit?
22 A.  Punitive damages, damages to my reputation, the way
23     I feel every time I go to work, the embarrassment
24     that all this is -- that it's caused against me and
25     my family, my safety record and not knowing whether

48 (Pages 186 - 189)

Privileged & Confidential

AN AGREEMENT
BETWEEN

DAKOTA, MINNESOTA & EASTERN RAILWAY (DM&E)

d/b/a

CANADIAN PACIFIC RAILWAY (CP)



AND

ITS EMPLOYEES REPRESENTED BY BROTHERHOOD OF LOCOMOTIVE
ENGINEERS AND TRAINMEN



October 22, 2015

I



EXHIBIT
1

Confidential

CP_00212

## Table of Contents

ARTICLE 1 - PURPOSE ........................................................................................ 5

ARTICLE 2 - GENERAL PRINCIPLES ................................................................. 5

ARTICLE 3 - RECOGNITION ............................................................................... 6

ARTICLE 4 - SCOPE OF AGREEMENT ............................................................... 6

ARTICLE 5 - WAGES ........................................................................................... 7

ARTICLE 6 - SENIORITY .................................................................................... 8

    Section 1    General ............................................................................... 8

    Section 2    Establishment .................................................................... 8

    Section 3    Furloughed Employees ..................................................... 9

    Section 4    Demoted employees ........................................................ 10

    Section 5    Re-Entering Service ......................................................... 10

    Section 6    Seniority Districts and Extra Board Locations ............... 10

    Section 7    Entitlements of affected Employees ............................... 12

    Section 8    Seniority Roster ............................................................... 12

    Section 9    Promotion ........................................................................ 13

    Section 10   Promotion to Engine Service .......................................... 13

    Section 11   Seniority Retention-Company Managers/Officers ......... 14

ARTICLE 7 - FLOW BACK ................................................................................... 15

ARTICLE 8 - JOB VACANCIES AND BIDDING .................................................. 15

    Section 1    Regular Assignments and Extra Boards ......................... 15

    Section 2    Unassigned Pool Service ................................................. 18

    Section 3    Assignment to Positions .................................................. 19

    Section 4    Transfers .......................................................................... 20

ARTICLE 9 - ANNULMENT OF ASSIGNMENTS ................................................ 23

ARTICLE 10 - ABOLISHMENT AND DISPLACEMENT ...................................... 23

ARTICLE 11- GUARANTEED· EXTRA BOARD (GEB) ...................................... 24

ARTICLE 12 - APPROVAL OF APPLICATION FOR EMPLOYMENT ............... 26

ARTICLE 13 - RULES/RECERTIFICATION/INSTRUCTION CLASSES ............ 27

ARTICLE 14 - ON AND OFF DUTY POINT ........................................................ 28

ARTICLE 15 - CALLING FOR DUTY .................................................................. 29

    Section 1    Calling ............................................................................. 29

2

Confidential

Section 2    Used out of Order.................................................................................29

Section 3    Called and Released...............................................................................29

Section 4    Familiarization of Territory ...................................................................30

ARTICLE 16 - MEAL PERIODS....................................................................................30

ARTICLE 17 - EXPENSES.............................................................................................31

Section 1    Held Away From Home Terminal..........................................................31

Section 2    Transportation Expense.........................................................................32

Section 3    Deadheading..........................................................................................32

Section 4    Aggregate Service.................................................................................32

ARTICLE 18 - PERSONAL LEAVE DAYS (PLD's) ....................................................32

ARTICLE 19 - BEREAVEMENT LEAVE ......................................................................33

ARTICLE 20 - HOLIDAYS............................................................................................33

ARTICLE 21 - VACATION.............................................................................................33

Section 1    Entitlements...........................................................................................33

Section 2    Brotherhood of Locomotive Engineers and Trainmen Union
Officials     36

Section 3    General...................................................................................................36

ARTICLE 22 - BENEFITS..............................................................................................37

Section 1    Health & Welfare....................................................................................37

Section 2    Off Track Vehicle Accident Benefits.....................................................37

Section 3    Stock Purchase Plan..............................................................................37

Section 4    Employee Assistance Program..............................................................37

Section 5    401K Plan ..............................................................................................38

ARTICLE 23 - PHYSICAL EXAMINATIONS ...............................................................38

ARTICLE 24 - MEDICAL DISQUALIFICATIONS ........................................................38

ARTICLE 25 - PAYDAY.................................................................................................39

ARTICLE 26 - PAYROLL AND DEDUCTIONS............................................................39

ARTICLE 27 - UNION SHOP AGREEMENT................................................................39

ARTICLE 28 - HANDLING OF CLAIMS AND GRIEVANCES.....................................42

Section 1    Representation.......................................................................................42

Section 2    Handling of Claims and/or Grievance Process .....................................42

Section 3    Handling of Discipline Appeals .............................................................44

Section 4    General...................................................................................................45

3

Confidential

CP_00214

ARTICLE 29 - INVESTIGATIONS AND DISCIPLINE..................................................45

ARTICLE 30 - TIME OFF FOR UNION BUSINESS ...................................................46

ARTICLE 31 - ATTENDING COURT AND INQUESTS.................................................47

ARTICLE 32 - LEAVE OF ABSENCE .......................................................................47

    Section 1    General .....................................................................................47

    Section 2    Less Than 1 Year.......................................................................47

    Section 3    Illness / Injury...........................................................................48

    Section 4    Official / Military ......................................................................48

ARTICLE 33 - JURY DUTY.......................................................................................48

ARTICLE 34 - BULLETIN BOARDS .........................................................................49

ARTICLE 35 - CREW CALLING RECORDS................................................................49

ARTICLE 36 - CREW CONSIST................................................................................49

ARTICLE 37 - TERMINAL EFFICIENCY....................................................................49

ARTICLE 38 - GENERAL PROVISIONS ...................................................................50

ATTACHMENT "A"   Questions and Answers ................................................52

APPENDIX 1  SEVEN DAY MARK............................................................................56

Side Letter 1 - Reversionary Provisions..................................................................58

Side Letter 2 – Regulatory Changes........................................................................60

Side Letter 3 - Notification of Ratification and Employee Share Purchase Plan ..62

Side Letter 4 – Payment for Vacation, Personal Leave ...........................................63

Side Letter 5 – Training and use of Managers ........................................................64

4

Confidential

CP_00215

**PREAMBLE:**

This agreement is intended to provide enhanced quality of life, employment security and compensation enhancements to the BLE&T membership in addition to providing operating flexibility to the Company, resulting in increased productivity. Therefore, **it is hereby agreed:**

**ARTICLE 1 - PURPOSE**

The parties to this Agreement agree that the fundamental objective of the Company is to operate a safe, efficient and effective railroad transport operation and a key component to the success of this venture is the contribution of Locomotive Engineers and Trainmen (hereinafter referred to as employees.)

This Agreement is founded on a principle of paying for employees' time on an all-inclusive basis and contemplates that in order for the operation to be successful, individuals will perform all duties requested of them, subject to the provisions contained herein.

**ARTICLE 2 - GENERAL PRINCIPLES**

A. In this Agreement, words importing the singular shall include the plural and vice versa where the context requires. Words importing the masculine gender shall include the feminine where the context requires.

B. This Agreement is intended to be applied in a non-discriminatory manner without regard to age, race, creed, color, gender, national origin, disability, sexual orientation or marital status.

C. The parties recognize that this is a new Agreement, which replaces any and all existing Agreements, unless otherwise provided, and introduces changes in the workplace. In recognition of this a committee consisting of the BLET General Chairman, a BLET Member appointed by the BLET General Chairman, and the Company's General Manager (s) Operations and Director Labor Relations or their respective designates, will be established. This committee will be known as the Dispute Resolution Committee, and will meet quarterly during the months of January, April, July and October, unless otherwise agreed, to review application of this Agreement. In matters requiring a vote of the Committee, up to two (2) Labor Members and up to two (2) Company Members may vote.

D. It is recognized that Management has the exclusive right to manage its business; to classify and direct the work force; to assign duties and to fix the starting times of jobs; determine procedural methods and equipment to be utilized; schedule the workweek and work; the number of employees to be assigned to a crew, job, terminal/station and the number to be employed or

5

CP_00216

retained in employment, except as otherwise specifically limited by this agreement.

## ARTICLE 3 - RECOGNITION

A. This Agreement covers all employees employed by the Company and represented by the Brotherhood of Locomotive Employees and Trainmen under the Railway Labor Act, as amended.

B. The term "employee" as herein referred to shall include employees represented by the Brotherhood of Locomotive employees and Trainmen, except where otherwise specifically provided for herein. The term "Company" shall mean the Canadian Pacific; Dakota, Minnesota and Eastern Railroad Company. The term "Union" or "General Committee" shall mean the Brotherhood of Locomotive Engineers and Trainmen.

C. The right to make and interpret contracts covering rules, rates of pay and working conditions on behalf of employees covered by this Agreement shall be vested in the regularly constituted General Committee of the Brotherhood of Locomotive Engineers and Trainmen.

D. Where the term "duly accredited representative" appears herein, it shall be understood to mean the regularly constituted General Committee and/or the Officers of the Brotherhood of Locomotive Engineers and Trainmen of which such General Committee or Officers are a part.

## ARTICLE 4 - SCOPE OF AGREEMENT

A. The parties recognize that the scope of this Agreement is unlike traditional agreements in the rail industry and that it must be interpreted accordingly. That being said, the primary role of Employees is to perform transportation duties traditionally associated with the operation of locomotives and trains.

B. The parties recognize that in order to meet a customer's immediate service need, or to meet operational exigencies at a time a regularly assigned crew is not present and available in the terminal for such service, and time will not permit calling a rested extra employee, a qualified employee working under this agreement may be used, without penalty, to perform such service. A qualified employee who is a manager will only be utilized in accordance with the terms and conditions of former Appendix 'F' as set forth in Side Letter No. 5.

C. The parties recognize that to achieve maximum efficiency of operations and to expedite movement of trains, employees may perform incidental work for which they are qualified without additional compensation in the absence or unavailability of another employee who would otherwise perform such work.

6

Confidential

G. The BLET shall indemnify and hold harmless the Company against any and all claims, demands, suits or other forms of liability that arise out of or by reason of any action taken or not taken by the Company pursuant to this Article.

## ARTICLE 28 - HANDLING OF CLAIMS AND GRIEVANCES

### Section 1   Representation

A. The Brotherhood of Locomotive Engineers and Trainmen shall have the exclusive right to represent all employees in company level grievance, claim and disciplinary proceedings.

B. The General Committee of Adjustment, Brotherhood of Locomotive Engineers and Trainmen, will represent all employees referred to herein in the making of contracts, rates, rules, working agreements and interpretations thereof.

C. All disputes involving employees covered by this Agreement will be handled in accordance with the provisions of this Agreement as interpreted by the BLET General Committee and the Company.

D. In matters pertaining to discipline, or other questions not affecting changes in employees' contract, the officials of the Company reserve the right to meet any of their employees either individually or collectively. Reinstatements of discharged employees on a leniency basis with seniority rights unimpaired shall not be permitted except by agreement with the General Chairman of the BLET.

### Section 2   Handling of Claims and/or Grievance Process

A. All claims or grievances must be presented electronically via the electronic system(s) as designated by the Company, by the employee involved, or on behalf of the employee, by his representative, or designee, (claims must be presented under the employee's PIN) to the officer of the Company authorized to receive same within thirty (30) days from the date of the occurrence on which the claim or grievance is based. Should any such claim or grievance be disallowed, the Company shall, within thirty (30) days from the date it is received, notify the employee or his Local Chairman in writing of the reason(s) for such disallowance. Should the Company fail to issue timely declination of the claim or grievance, it will be allowed as entered, however such allowance will not constitute a precedent for other similar claims or grievances.

All resolution of claims resulting from handling during the steps referenced in the paragraph above shall be concluded on a 'without prejudice' basis,

Confidential

and are non-referable unless otherwise noted the General Chairman and the Highest Designated Officer (HDO) of the Company, or their designee(s). Claims not filed within the required thirty (30) days shall be deemed abandoned and barred from further handling.

B. Appeals of all claims and grievances, including those involving discipline, shall be presented and handled via the electronic claim handling system provided by the Company.

In the event the claim or grievance involving matters other than discipline is disallowed, the BLET Local Chairman may appeal the matter to the Superintendent within thirty (30) days from the date of declination. If the claim or grievance is not appealed, the disallowance shall stand, however the disallowance shall not constitute a precedent for other similar claims and grievances.

In the event the appeal is disallowed, the Superintendent shall, within thirty (30) days from the date it is received, notify the Local Chairman in writing of the reason(s) for such disallowance.

Should the Superintendent fail to issue timely notification of the declination of the appeal, the claim or grievance will be allowed as entered; however, such allowance will not constitute a precedent for other similar claims or grievances.

C. Claims declined under Section 2 (B) of this Article may be appealed by the BLET General Chairman to the Company's Highest Designated Officer ("HDO"), or designate, within sixty (60) days of the disallowance. The HDO, or his designate, shall, within sixty (60) days from the receipt of the appeal, notify the General Chairman of the allowance or declination of the claim. Should the HDO or designate fail to timely notify the General Chairman of such declination, the claim will be allowed as entered; however such allowance shall not constitute a precedent for other similar claims.

D. Claims and grievances disallowed by the Company pursuant to Section 2 (C) will be barred from further handling unless, not less than sixty (60) days prior to the next scheduled meeting date of the Labor/Management Resolution Committee, the General Chairman lists the unresolved claim or grievance to the Committee for handling.

E. The Labor/Management Resolution Committee will meet quarterly, or as otherwise mutually agreed, to review and resolve outstanding employee time claims and grievances.

F. The Committee will consider the entire record of each dispute submitted to it. Decisions made pursuant to this process will be written by the Company within forty-five (45) days of the meeting date and will

43

Confidential

represent the final and binding decision on such grievances. The handling of claims and grievances by the Committee will constitute any "conference" prerequisite to submission of disputes to a tribunal established pursuant to law or by agreement.

G. In the event that a majority of the Committee does not agree on the resolution of a particular grievance, either party may initiate proceedings before a tribunal established pursuant to law or by agreement within one-hundred twenty (120) days of the Committee's written decision having been rendered.

H. Nothing in this Section shall preclude an agreement by the parties to conference claims or grievances independent of the procedures set forth in Section 2 (D) and (E) of the Article. Such conference as may be agreed upon will constitute any "conference" prerequisite to the submission of disputes involving claims and/or grievances to a tribunal established pursuant to law or by agreement for the final adjudication of such disputes

## Section 3    Handling of Discipline Appeals

A. Discipline decisions reached by the Company pursuant to Article 29 (E) and (F) of this Agreement may be adjusted between the BLET Local Chairman and the Superintendent, or designate, at any time prior to appeal by the General Chairman as provided in paragraph B hereof.

B. If the discipline is to be appealed, the BLET General Chairman must appeal, in writing, to the HDO, or designate, within ninety (90) days of the date the discipline was assessed, or the appeal will be barred. The HDO, or designate, shall notify the General Chairman of the allowance or declination of the appeal within sixty (60) days of the receipt of the appeal. Should the HDO, or designate, fail to timely notify the General Chairman of the declination of the appeal, the claim will be allowed as entered; however such allowance shall not constitute a precedent for other similar claims.

C. The BLET General Chairman will list unresolved discipline appeals with the HDO, or designate, not less than thirty (30) days prior to the next scheduled meeting of the Labor/Management Committee for handling pursuant to Section 2 (D) and (E) of this Article. Discipline/claims may be handled in conference as agreed upon between scheduled meetings.

D. Nothing in this Section shall preclude an agreement by the parties to conference discipline appeals independent of the procedures set forth in this Article. Such conference as may be agreed upon will constitute any "conference" prerequisite to submission of unresolved disputes involving discipline appeals to a tribunal established by law or by agreement for the final adjudication of such disputes.

Confidential

**Section 4    General**

A. The Labor / Management Resolution Committee will meet quarterly during the months of January, April, July, October, or as otherwise mutually agreed, to review and resolve outstanding time claims and grievances.

B. The Committee will consider the entire record of each dispute submitted to it. Decisions made pursuant to this process will be provided to the Union by the Company within forty-five (45) days of the meeting date and will represent the final and binding decision on such grievances.

C. The handling of claims and grievances by the Committee will constitute any "conference" prerequisite to submission of disputes to a public law board tribunal established pursuant to law or by agreement. In the event that a majority of the Committee does not agree on the resolution of a particular grievance, either party may initiate proceedings before a tribunal established pursuant to law or by agreement within six months of the Committee's written decision having been rendered.

## ARTICLE 29 - INVESTIGATIONS AND DISCIPLINE

A. An employee shall not be withheld from service pending hearing except in cases that are serious, such as but not limited to, theft, altercation, Rule "G", insubordination, major accidents and/or other major offenses whereby the employee's retention in service could be hazardous.

B. No employee shall be disciplined without a fair hearing (investigation) by an officer of the Company. An employee shall be apprised of the charge(s) against him not later than twenty (20) days from the date the carrier has knowledge of the incident to be investigated. If the decision is made to withhold an employee from service pending an investigation, the hearing must be held within ten (10) days of the date the employee was initially withheld from service He shall have reasonable opportunity to secure the presence of necessary witnesses, and he shall have the right to be represented by an accredited representative or member of the Brotherhood of Locomotive Engineers and Trainmen.

C. When not inconvenient to the Company and to other employees, investigations will be held at such times, if possible, as to avoid holding employees out of service to be present at the investigation. Postponements will be granted to either party upon a reasonable showing of a need.

D. Investigations ordinarily will be held within twenty (20) days of the date of the notice of charge referenced in B above. Employees will be advised of the decision in writing within twenty (20) days after the conclusion of the investigation.

E. An employee and/or the employee's representative shall have the option,

45

CP_00256

with the Company's concurrence and prior to the hearing, to discuss the charge with the appropriate Company Officer.

1. If the disposition of the charges is made on the basis of the employee's acknowledgement of responsibility, the disposition shall be reduced to writing and signed by the employee and the official involved and shall incorporate a waiver of hearing and shall specify the maximum discipline, which may be imposed for the employee's acceptance of responsibility.

2. No minutes or other record shall be made of the discussion, and, if the parties are unable to reach an agreed upon disposition on this basis, no reference shall be made to these discussions by either of the parties in any subsequent handling of the charges under the discipline procedure.

F. A true and correct transcript will be taken of all hearings or investigations held at the direction of the Company under this Article and in the event the employee involved is assessed discipline, the employee, his representative and the General Chairman will be furnished a copy of the transcript along with the discipline decision letter. At an investigation, an employee or his representative shall have the right to record, at his expense, the investigation proceedings on a recording device. This provision will not be used to delay or postpone the investigation proceedings. Distribution of notices and transcripts by electronic means shall fulfill the Company's obligation under this rule.

G. Should any employee investigated under this Article consider that the discipline is unjust, he shall have the right to appeal as provided in Article 28 of this agreement. In case of dismissal or suspension which is later found to be unjust, the employee will be reinstated with seniority rights unimpaired and paid for all time lost.

H. Letters of caution or warning are not discipline. Should the employee dispute the validity of the warning, he has the right to request a fair hearing provided the request is made within fifteen (15) days of the date of the warning letter. If the hearing reveals that the letter is unjust, it shall be removed from his record. If the Company decides the letter was warranted, it will apprise the employee of the decision within fifteen (15) days of the hearing. If the employee is dissatisfied with the decision, he shall have the right to appeal as provided in Article 28 herein.

## ARTICLE 30 - TIME OFF FOR UNION BUSINESS

An employee who is elected or appointed to a full time position with the Brotherhood of Locomotive Engineers and Trainmen shall be granted an unpaid leave of absence for the duration of time he holds such position.

45

Confidential

Privileged & Confidential

# GCOR

## General Code of Operating Rules

### Seventh Edition

### Effective April 1, 2015

These rules herein govern the operations of the railroads listed
and must be complied with by all employees regardless of gender
whose duties are in any way affected thereby. They supersede
all previous rules and instructions inconsistent therewith.

© 2015 General Code of Operating Rules Committee,
All Rights Reserved



EXHIBIT
2

Confidential

CP_00283

**i-2     GCOR—Seventh Edition—April 1, 2015**

Front cover photo by Geneva May Short

# Adopted by:

Aberdeen Carolina & Western Railway
Aberdeen & Rockfish Railroad
Acadiana Railway Company
Affton Terminal Railroad
Ag Valley Railroad
Alabama & Gulf Coast Railway
Alabama Southern Railroad
Alabama & Tennessee River Railway, LLC
Alabama Warrior Railroad
Alaska Railroad Corporation
Albany & Eastern Railroad Company
Aliquippa & Ohio River Railroad
Alliance Terminal Railway, LLC
Altamont Commuter Express Rail Authority
Alton & Southern Railway
Amtrak—Chicago Terminal
Amtrak—Michigan Line
Amtrak—NOUPT
AN Railway
Ann Arbor Railroad
Apache Railway Company
A&R Terminal Railroad Company
Arizona & California Railroad
Arizona and California Railway Company
Arizona Central Railroad
Arizona Eastern Railway Company
Arkansas Louisiana & Mississippi Railroad
Arkansas Midland Railroad Company Inc.
Arkansas & Missouri Railroad Company
Arkansas-Oklahoma Railroad
Arkansas Southern Railroad
Ashtabula, Carson & Jefferson Railroad
AT&L Railroad Company
Atlantic & Western Railway
Austin Western Railroad
Autauga Northern Railroad
Baton Rouge Southern Railroad
Bauxite & Northern Railway
Bay Coast Railroad
Bay Line Railroad
Belt Railway Company of Chicago

BHP Nevada Railway Company
B&H Rail Corp
Birmingham Terminal Railroad
Blackwell Northern Gateway Railroad
BNSF Railway
Boise Valley Railroad
Buffalo & Pittsburg Railroad
Burlington Junction Railway
Butte, Anaconda & Pacific Railroad
California Northern Railroad
California Western Railroad
Camas Prairie RailNet, Inc.
Canadian Pacific
Caney Fork & Western Railroad
Canon City and Royal Gorge Railroad
Capital Metropolitan Transportation Authority
Carolina Piedmont Railroad
Carrizo Gorge Railway
Cascade and Columbia River Railroad
Cedar Rapids & Iowa City Railway Company
Central California Traction Company
Central Illinois Railroad
Central Kansas Railway
Central Midland Railway
Central Montana Rail
Central Oregon & Pacific Railroad, Inc.
Central Railroad of Indiana
Central Railroad of Indianapolis
Chattahoochee Bay Railroad
Chattahoochee Industrial Railroad
Chattooga & Chickamauga Railway
Chesapeake & Albemarle Railroad Company, Inc.
Chicago and Chemung Railroad
Chicago, Ft. Wayne & Eastern Railroad
Chicago Rail Link
Chicago SouthShore & South Bend Railroad
City of Prineville Railway
Cleveland Commercial Railroad LLC
C&NC Railroad Corporation
Columbia Basin Railroad Co.
Columbia and Cowlitz Railway
Columbia Terminal
Columbus & Greenville Railway
Columbus & Ohio River Railroad
Commonwealth Railway

Confidential

CP_00284

## GCOR—Seventh Edition—April 1, 2015 i-3

Conecuh Valley Railroad
Connecticut Southern Railroad
Connex Railroad
Corpus Christi Terminal Railroad
Council Bluffs Railway
D&I Railroad
Dakota, Minnesota & Eastern Railroad
Dakota, Missouri Valley & Western Railroad, Inc.
Dakota Southern Railway
Dallas, Garland & Northeastern Railroad, Inc.
Dardanelle & Russellville Railroad
Decatur Junction Railway Company
Denton County Transit Authority
Denver Regional Transportation District Commuter Railroad
Denver Rock Island Railroad
DeQueen & Eastern Railroad Company
Eagle Rail
East Chattanooga Belt Railroad
East Tennessee Railway
Eastern Alabama Railway
Eastern Idaho Railroad
Ellis & Eastern Company
Escanaba & Lake Superior Railroad
Farmrail Corporation
First Coast Railroad
Florida East Coast Railway
Fordyce & Princeton Railroad
Fort Worth & Western Railroad
Fox Valley & Western
Fulton County Railway, LLC
Galveston Railroad
Gateway Western Railway
Georgetown Railroad Company
Georgia Central Railway
Georgia & Florida Railway
Georgia Southwestern Railroad, Inc.
Georgia Woodlands Railroad
Golden Isles Terminal Railroad
Golden Triangle Railroad
Grain Belt Corp
Grand Canyon Railway
Grand Elk Railroad
Grand Rapids Eastern Railroad
Great Northwest Railroad

Great Western Railway
Gulf Colorado & San Saba Railroad
Heart of Georgia Railroad
Herzog Transit Services, Inc.
Hiwassee River Railroad
Huron and Eastern Railway Company, Inc.
Hutchinson and Northern Railway Company
Idaho Northern & Pacific Railroad Company
Illinois & Midland Railroad, Inc.
Illinois Railway, Inc.
Indiana Business Railroad
Indiana & Ohio Railway
Indiana Rail Road Company
Indiana Southern Railroad, Inc.
International Bridge & Terminal Company
Iowa Chicago & Eastern Railroad
Iowa Interstate Railroad Ltd.
Iowa Northern Railway Company
Jaxport Terminal Railway
Kansas City Southern Railway
Kansas City Terminal Railway Company
Kansas & Oklahoma Railroad
Kaw River Railroad
Kentucky West Tennessee Railway
Keokuk Junction Railway Company
Kettle Falls International Railway, LLC
Kiamichi Railroad
Knoxville & Holston River Railroad
Kyle Railroad Company
Lahaina Kaanapali & Pacific Railroad
Lake State Railway
Lake Superior and Ishpeming Railroad
Laurinberg & Southern Railroad
Lavonia, Avon and Lakeville Railroad
Lewis and Clark Railway Company
Little Rock and Western Railway, LP
Longview Switching Company
Los Angeles Junction Railway
Louisiana and Delta Railroad Company
Louisiana & North West Railroad
Louisiana Southern Railroad
Louisville & Indiana Railroad
Luxapalila Valley Railroad
Mahoning Valley Railroad
Manning Rail, Inc.

Confidential

## i-4    GCOR—Seventh Edition—April 1, 2015

Manufacturers Junction Railway
Maryland Midland Railway
Maumee & Western Railroad
McCloud Railway Company
Meridian and Bigbee Railroad
Meridian Southern Railway, LLC
Messena Terminal Railroad Company
Michigan Air-Line Railway Company
Michigan Central Railway
Michigan Shore Railroad
Mid-Michigan Railroad, Inc.
Minnesota Commercial Railway Company
Minnesota, Dakota & Western Railway Company
Minnesota Northern Railroad, Inc.
Minnesota Prairie Line Incorporated
Minnesota Southern Railway
Minnesota Valley Transportation Company
Mission Mountain Railroad
Mississippi Export Railroad Company
Mississippi Southern Railroad
Mississippi & Tennessee RailNet, Inc.
Mississippi Tennessee Railroad
Missouri & Northern Arkansas RR Company, Inc.
Missouri & Valley Park Railroad
Modesto & Empire Traction Company
Modoc Railroad Academy
Montana Rail Link
Mount Vernon Terminal Railway, Inc.
Napa Valley Railroad Company
Nash County Railroad
Nashville and Eastern Railroad
Nashville and Western Railroad
National Coal Rail Line
Nebkota Railway, Inc.
Nebraska Central Railroad Company
Nebraska Kansas Colorado Railway, Inc.
Nebraska Northeastern Railway Company
New England Central Railroad, Inc.
New Mexico Rail Runner Express
New Orleans & Gulf Coast Railway Company
New Orleans Lower Coast Railroad
New Orleans Public Belt Railroad
Newburgh & South Shore Railroad Company
New York & Atlantic Railway
North Carolina & Virginia Railroad Company, Inc.

Northeast Illinois Regional Commuter Railroad Corp.
Northern Indiana Commuter Transportation District
Northern Lines Railway
Northern Ohio & Western Railway
Northern Plains Railroad
Ohio Central Railroad
Ohio & Pennsylvania Railroad
Ohio Southern Railroad
Omaha, Lincoln & Beatrice Railway Company
Osceola and St. Croix Valley Railroad Company
Otter Tail Valley Railroad Company, Inc.
Pacific Harbor Line
Pacific Sun Railroad
Palouse River and Coulee City Railroad
Panhandle Northern Railroad
Pecos Valley Southern Railway Company
Pend Oreille Valley Railroad
Peninsula Corridor Joint Powers Board (Caltrain)
Pennsylvania Southwestern Railroad
Pittsburgh Industrial Railroad
Pittsburgh & Ohio Central Railroad
Point Comfort & Northern Railway Company
Port Bienville Railroad
Port of Tillamook Bay Railroad
Portland Terminal Railroad Company
Portland Vancouver Junction Railroad
Portland & Western Railroad
Progressive Rail Inc.
Puget Sound & Pacific Railroad
Rarus Railway, Inc.
Red River Valley & Western Railroad Co.
Riceboro Southern Railway
Richmond Pacific Railroad
Richmond Terminal Railroad Company
Rio Valley Switching Company
Rochester & Southern Railroad
Rockdale, Sandow & Southern Railroad Company
Rogue Valley Terminal Railroad
Sacramento Valley Railroad
Saginaw Valley Railroad Company
San Antonio Central Railroad
San Diego & Imperial Valley Railroad Company, Inc.
San Diego Northern Railway
San Francisco Bay Railroad
San Joaquin Valley Railroad Co., Inc.

Confidential

CP_00286

San Luis Central Railroad Company

San Pedro and Southwestern Railway Company

Sand Springs Railway Company

Santa Cruz, Big Trees & Pacific Railway Company

Santa Fe Southern Railway, Inc.

Sault Ste. Marie Bridge Company

Savage Bingham & Garfield Railroad Company

Savannah Port Terminal Railroad

SEMO Port Railroad

Sequatchie Valley Railroad

Sierra Railroad Company

Sound Transit

South Buffalo Railway

South Carolina Central Railroad Company, Inc.

South Central Tennessee Railroad

South East Kansas Railroad

South Kansas and Oklahoma Railroad

South Plains Lamesa Railroad Ltd.

Southern California Regional Rail Authority

Southern Switching Company

Southwestern Railroad Company, Inc.

St. Croix Valley Railroad Company

St. Maries River Railroad Company

Stillwater Central Railroad

Swan Ranch Railroad

Tacoma Municipal Belt Line Railway

Talleyrand Terminal Railroad

Tazewell & Peoria Railroad

Temple & Central Texas Railway

Tennessee Southern Railroad

Tennessee Valley Railroad

Tennessee Valley Railroad Museum, Inc

Tennken Railroad Company Inc.

Terminal Railroad Association of St. Louis

Texas, Gonzales & Northern Railway Company

Texas - New Mexico Division

Texas Northeastern Railroad

Texas North Western Railway Company

Texas Rock Crusher Railway Co.

Three Notch Railroad

Timber Rock Railroad

Toledo, Peoria & Western Railway

Tomahawk Railroad

TransitAmerica Services Inc.

Transportación Ferroviaria Mexicana

Trinity Railway Express

Trona Railway Company

Tulare Valley Railroad

Tulsa-Sapulpa Union Railway Company

Twin Cities & Western Railroad Company

Union Pacific Railroad

United States Army Military Railroad System

Utah Central Railway

Utah Railway Company

Utah Transit Authority

V&S Railroad Inc.

Valdosta Railway

Ventura County Railway Company

Verde Canyon Railroad

Vermont Rail System

Vicksburg Southern Railroad

Virginia Southern Division

Wabash Central Railroad

Walking Horse & Eastern Railroad

Warren & Trumbull Railroad

WATCO Transportation Services

West Tennessee Railroad, LLC

West Tennken Railroad Corp.

West Texas and Lubbock Railroad

Western New York and Pennsylvania Railroad, LLC

Wichita Terminal Association

Wichita, Tillman & Jackson Railway

Willamette & Pacific Railroad, Inc.

Willamette Valley Railroad

Willamina and Grand Ronde Railway

Wilmington Terminal Railroad

Wiregrass Central Railroad

Wisconsin & Southern Railroad Company

Wyoming/Colorado Railroad Company

Yadkin Valley Railroad

Yellowstone Valley Railroad

York Railway

Youngstown & Austintown Railroad

Youngstown Belt Railroad

Yreka Western Railroad

Confidential

# Table of Contents

| | | |
|---|---|---|
| 1.0 | **General Responsibilities** | **1-1** |
| 1.1 | Safety | 1-1 |
| | 1.1.1  Maintaining a Safe Course | 1-1 |
| | 1.1.2  Alert and Attentive | 1-1 |
| | 1.1.3  Accidents, Injuries, and Defects | 1-1 |
| | 1.1.4  Condition of Equipment and Tools | 1-1 |
| 1.2 | Personal Injuries and Accidents | 1-1 |
| | 1.2.1  Care for Injured | 1-1 |
| | 1.2.2  Witnesses | 1-1 |
| | 1.2.3  Equipment Inspection | 1-1 |
| | 1.2.4  Mechanical Inspection | 1-2 |
| | 1.2.5  Reporting | 1-2 |
| | 1.2.6  Statements | 1-2 |
| | 1.2.7  Furnishing Information | 1-2 |
| 1.3 | Rules | 1-2 |
| | 1.3.1  Rules, Regulations, and Instructions | 1-2 |
| | 1.3.2  General Orders | 1-3 |
| | 1.3.3  Circulars, Instructions, and Notices | 1-3 |
| 1.4 | Carrying Out Rules and Reporting Violations | 1-3 |
| | 1.4.1  Good Faith Challenge | 1-3 |
| 1.5 | Drugs and Alcohol | 1-4 |
| 1.6 | Conduct | 1-5 |
| | 1.6.1  Motor Vehicle Driving Records | 1-5 |
| | 1.6.2  Notification of Felony Convictions | 1-5 |
| | 1.6.3  Notification of Deteriorating Vision or Hearing | 1-5 |
| 1.7 | Altercations | 1-5 |
| 1.8 | Appearance | 1-5 |
| 1.9 | Respect of Railroad Company | 1-5 |
| 1.10 | Games, Reading, or Other Media | 1-6 |
| 1.11 | Sleeping | 1-6 |
| | 1.11.1  Napping | 1-6 |
| 1.12 | Weapons | 1-7 |
| 1.13 | Reporting and Complying with Instructions | 1-7 |
| 1.14 | Employee Jurisdiction | 1-7 |
| 1.15 | Duty—Reporting or Absence | 1-7 |
| 1.16 | Subject to Call | 1-7 |
| 1.17 | Hours of Service Law | 1-7 |
| 1.18 | Unauthorized Employment | 1-7 |
| 1.19 | Care of Property | 1-8 |
| 1.20 | Alert to Train Movement | 1-8 |
| 1.21 | Occupying Roof | 1-8 |
| 1.22 | Unauthorized Persons on Equipment | 1-8 |
| 1.23 | Altering Equipment | 1-8 |
| 1.24 | Clean Property | 1-8 |
| 1.25 | Credit or Property | 1-8 |
| 1.26 | Gratuities | 1-8 |
| 1.27 | Divulging Information | 1-9 |
| 1.28 | Fire | 1-9 |
| 1.29 | Avoiding Delays | 1-9 |
| 1.30 | Riding Engine | 1-9 |
| 1.31 | Repairs to Foreign Cars | 1-9 |
| 1.32 | Overheated Wheels | 1-9 |
| 1.33 | Inspection of Freight Cars | 1-10 |
| 1.34 | Flat Spots | 1-10 |
| 1.35 | Dump Doors | 1-10 |
| 1.36 | Excessive Dimension Loads | 1-10 |
| 1.37 | Open Top Loads | 1-11 |
| 1.38 | Shipments Susceptible to Damage | 1-11 |
| 1.39 | Accuracy of Speed Indicator | 1-11 |
| 1.40 | Reporting Engine Defects | 1-11 |
| 1.41 | Engines Coupled to Occupied Passenger Cars | 1-11 |
| 1.42 | Trains Detoured | 1-11 |
| 1.43 | Stopped in Tunnels | 1-12 |
| 1.44 | Duties of Train Dispatchers | 1-12 |
| 1.45 | Duties of Control Operators and Operators | 1-12 |
| 1.46 | Duties of Yardmasters | 1-12 |
| 1.47 | Duties of Crew Members | 1-12 |
| 1.48 | Time | 1-14 |
| 2.0 | **Railroad Radio and Communication Rules** | **2-1** |
| 2.1 | Transmitting | 2-1 |
| 2.2 | Required Identification | 2-1 |
| 2.3 | Repetition | 2-1 |
| 2.4 | Ending Transmissions | 2-1 |
| 2.5 | Communication Redundancy | 2-2 |
| 2.6 | Communication Not Understood or Incomplete | 2-2 |
| 2.7 | Monitoring Radio Transmissions | 2-2 |
| 2.8 | Acknowledgment | 2-2 |
| 2.9 | Misuse of Radio Communications | 2-2 |
| 2.10 | Emergency Calls | 2-3 |
| 2.11 | Prohibited Transmissions | 2-3 |
| 2.12 | Fixed Signal Information | 2-3 |
| 2.13 | Not Used | 2-3 |
| 2.14 | Transmission of Mandatory Directives | 2-3 |
| | 2.14.1  Verbally Transmitting and Repeating Mandatory Directives | 2-4 |
| 2.15 | Phonetic Alphabet | 2-4 |
| 2.16 | Assigned Frequencies | 2-4 |
| 2.17 | Radio Testing | 2-4 |
| 2.18 | Malfunctioning Radio | 2-4 |
| 2.19 | Blasting Operations | 2-4 |
| 2.20 | Internal Adjustments | 2-4 |
| 2.21 | Electronic Devices | 2-5 |
| 3.0 | **Section Reserved** | **3-1** |

Confidential

CP_00288

| | | |
|---|---|---|
| 4.0 | Timetables.................................................. 4-1 | |
| 4.1 | New Timetable ................................................. 4-1 | |
| | 4.1.1 | Notice of New Timetable ................... 4-1 |
| 4.2 | Special Instructions ........................................ 4-1 | |
| 4.3 | Timetable Characters ...................................... 4-1 | |
| | | |
| 5.0 | Signals and Their Use .............................. 5-1 | |
| 5.1 | Signal Equipment ............................................ 5-1 | |
| 5.2 | Receiving and Giving Signals ......................... 5-1 | |
| | 5.2.1 | Looking for Signals .......................... 5-1 |
| | 5.2.2 | Signals Used by Employees ............ 5-1 |
| 5.3 | Hand and Radio Signals .................................. 5-2 | |
| | 5.3.1 | Hand Signals ................................... 5-2 |
| | 5.3.2 | Giving Signals ................................. 5-2 |
| | 5.3.3 | Signal Disappearance ..................... 5-2 |
| | 5.3.4 | Signal to Stop ................................. 5-2 |
| | 5.3.5 | Acknowledge Stop Signal ................ 5-2 |
| | 5.3.6 | Radio and Voice Communication ...... 5-2 |
| | 5.3.7 | Radio Response ............................... 5-3 |
| 5.4 | Flags for Temporary Track Conditions ............ 5-3 | |
| | 5.4.1 | Temporary Restrictions .................... 5-3 |
| | 5.4.2 | Display of Yellow Flag ..................... 5-3 |
| | 5.4.3 | Display of Yellow-Red Flag .............. 5-4 |
| | 5.4.4 | Authorized Protection by Yellow or Yellow-Red Flag ............................. 5-5 |
| | 5.4.5 | Display of Green Flag ...................... 5-5 |
| | 5.4.6 | Display of Flags Within Current of Traffic ............................................. 5-6 |
| | 5.4.7 | Display of Red Flag ......................... 5-6 |
| | 5.4.8 | Flag Location ................................... 5-6 |
| 5.5 | Permanent Speed Signs .................................. 5-7 | |
| 5.6 | Unattended Fusee ........................................... 5-7 | |
| 5.7 | Not Used ......................................................... 5-8 | |
| 5.8 | Bell and Whistle Signals .................................. 5-8 | |
| | 5.8.1 | Ringing Engine Bell ......................... 5-8 |
| | 5.8.2 | Sounding Whistle ............................. 5-8 |
| | 5.8.3 | Whistle Failure ................................ 5-9 |
| | 5.8.4 | Whistle Quiet Zone .......................... 5-9 |
| | 5.8.5 | Silenced Whistle ........................... 5-10 |
| 5.9 | Headlight Display .......................................... 5-10 | |
| | 5.9.1 | Dimming Headlight ........................ 5-10 |
| | 5.9.2 | Headlight Off ................................. 5-11 |
| | 5.9.3 | Headlight Failure ........................... 5-11 |
| | 5.9.4 | Displaying Headlights Front and Rear . 5-11 |
| | 5.9.5 | Displaying Ditch Lights .................. 5-11 |
| | 5.9.6 | Displaying Oscillating White Headlight 5-12 |
| | 5.9.7 | Displaying Oscillating or Flashing Red Light ....................................... 5-12 |
| 5.10 | Markers ........................................................ 5-12 | |
| | 5.10.1 | Highly Visible Markers ................... 5-12 |
| | 5.10.2 | Alternative Markers ....................... 5-13 |
| 5.11 | Engine Identifying Number ............................ 5-13 | |

| | | |
|---|---|---|
| 5.12 | Protection of Occupied Outfit Cars ................ 5-13 | |
| 5.13 | Blue Signal Protection of Workmen ............... 5-16 | |
| | 5.13.1 | Utility Employees .......................... 5-19 |
| 5.14 | Signs Protecting Equipment .......................... 5-20 | |
| 5.15 | Improperly Displayed Signals ........................ 5-20 | |
| | | |
| 6.0 | Movement of Trains and Engines ........... 6-1 | |
| 6.1 | Repeat Instructions ......................................... 6-1 | |
| 6.2 | Initiating Movement ......................................... 6-1 | |
| | 6.2.1 | Train Location ................................. 6-1 |
| 6.3 | Main Track Authorization ................................. 6-1 | |
| | 6.3.1 | Train Coordination ........................... 6-2 |
| 6.4 | Reverse Movements ........................................ 6-3 | |
| | 6.4.1 | Permission for Reverse Movements .... 6-3 |
| | 6.4.2 | Movements Within Control Points or Interlockings ................................... 6-3 |
| 6.5 | Shoving Movements ........................................ 6-4 | |
| | 6.5.1 | Remote Control Movements ............. 6-4 |
| 6.6 | Back Up Movements ........................................ 6-5 | |
| 6.7 | Remote Control Zone ....................................... 6-5 | |
| 6.8 | Stopping Clear for Meeting or Passing ............ 6-6 | |
| 6.9 | Meeting or Passing Precautions ...................... 6-6 | |
| 6.10 | Instructions to Clear a Following Train ............. 6-6 | |
| 6.11 | Mandatory Directive ........................................ 6-6 | |
| 6.12 | FRA Excepted Track ........................................ 6-6 | |
| 6.13 | Yard Limits ...................................................... 6-7 | |
| 6.14 | Restricted Limits ............................................. 6-8 | |
| 6.15 | Block Register Territory (BRT) ......................... 6-8 | |
| 6.16 | Approaching Railroad Crossings, Drawbridges, and End of Multiple Main Track ..................... 6-8 | |
| 6.17 | Switches at Junctions ...................................... 6-9 | |
| 6.18 | Stopping Clear of Crossings and Junctions ...... 6-9 | |
| 6.19 | Flag Protection ............................................. 6-10 | |
| 6.20 | Equipment Left on Main Track ....................... 6-11 | |
| 6.21 | Precautions Against Unusual Conditions ........ 6-11 | |
| | 6.21.1 | Protection Against Defects ............ 6-11 |
| | 6.21.2 | Water Above Rail .......................... 6-12 |
| | 6.21.3 | Track Obstruction / Unusual Conditions ..................................... 6-12 |
| 6.22 | Maintaining Control of Train or Engine ........... 6-12 | |
| 6.23 | Emergency Stop or Severe Slack Action ........ 6-12 | |
| 6.24 | Movement on Double Track ............................ 6-12 | |
| 6.25 | Movement Against the Current of Traffic ........ 6-13 | |
| 6.26 | Use of Multiple Main Tracks .......................... 6-13 | |
| 6.27 | Movement at Restricted Speed ...................... 6-13 | |
| 6.28 | Movement on Other than Main Track .............. 6-13 | |
| | 6.28.1 | Sidings of Assigned Direction ........ 6-14 |
| | 6.28.2 | Stopping Clear in Siding ................ 6-14 |
| | 6.28.3 | Cars or Equipment Left on Siding ... 6-14 |
| 6.29 | Inspecting Trains .......................................... 6-14 | |
| | 6.29.1 | Inspecting Passing Trains .............. 6-14 |
| | 6.29.2 | Train Inspections by Crew Members ... 6-15 |

Confidential

CP_00289

**i-8     GCOR—Seventh Edition—April 1, 2015**

6.30    Receiving or Discharging Passengers .............. 6-15
6.31    Maximum Authorized Speed ............................. 6-16
    6.31.1    Permanent Speed Restrictions ........... 6-16
6.32    Road Crossings .............................................. 6-16
    6.32.1    Providing Warning Over Road
           Crossings ........................................... 6-16
    6.32.2    Automatic Warning Devices ............... 6-16
    6.32.3    Providing Warning for Adjacent Tracks 6-17
    6.32.4    Clear of Crossings and Signal Circuits 6-18
    6.32.5    Actuating Automatic Warning Devices
           Unnecessarily ................................... 6-18
    6.32.6    Blocking Public Crossings ................. 6-18

**7.0    Switching ................................................... 7-1**
7.1    Switching Safely and Efficiently ...................... 7-1
7.2    Communication Between Crews Switching ...... 7-1
7.3    Additional Switching Precautions .................... 7-1
7.4    Precautions for Coupling or Moving Cars or
    Engines .......................................................... 7-2
7.5    Testing Hand Brakes ...................................... 7-2
7.6    Securing Cars or Engines ............................... 7-2
7.7    Kicking or Dropping Cars ................................ 7-2
    7.7.1    Gravity Switch Moves ........................ 7-2
7.8    Coupling or Moving Cars on Tracks Where
    Cars are Being Loaded or Unloaded .............. 7-3
7.9    Switching Passenger or Occupied Outfit Cars .. 7-3
7.10    Movement Through Gates or Doorways .......... 7-3
7.11    Charging Necessary Air Brakes ...................... 7-4
7.12    Movements Into Spur Tracks ........................... 7-4
7.13    Protection of Employees in Bowl Tracks ......... 7-4

**8.0    Switches ..................................................... 8-1**
8.1    Hand Operation of Switches ........................... 8-1
8.2    Position of Switches ....................................... 8-1
8.3    Main Track Switches ...................................... 8-1
8.4    Lining Main Track Switch ................................ 8-2
8.5    Not Used ........................................................ 8-2
8.6    Restoring Switch to Normal Position ............... 8-2
8.7    Clear of Main Track Switches ......................... 8-2
8.8    Switches Equipped with Locks, Hooks or
    Latches .......................................................... 8-3
8.9    Movement Over Spring Switches .................... 8-3
    8.9.1    Testing Spring Switch ........................ 8-3
    8.9.2    Trailing Through and Stopping on a
           Spring Switch .................................... 8-4
    8.9.3    Hand Operating a Spring Switch
           Before Making a Trailing Movement .. 8-4
    8.9.4    During Snow or Ice Storms ................ 8-5
    8.9.5    Spiking Spring Switch ........................ 8-5
    8.9.6    Approaching a Spring Switch in Non-
           Signaled Territory .............................. 8-5
8.10    Switch Point Indicator .................................... 8-5
8.11    Switches in Sidings ........................................ 8-5

8.12    Hand-Operated Crossover Switches ............... 8-5
8.13    Scale Track Switches ..................................... 8-6
8.14    Conflicting Movements Approaching Switch ..... 8-6
8.15    Switches Run Through ................................... 8-6
8.16    Damaged or Defective Switches ..................... 8-6
8.17    Avoid Sanding Over Moveable Parts ............... 8-6
8.18    Variable Switches .......................................... 8-6
8.19    Automatic Switches ........................................ 8-7
    8.19.1    Radio Controlled Switches ................. 8-7
8.20    Derail Location and Position ........................... 8-8

**9.0    Block System Rules .................................... 9-1**
9.1    Signal Aspects and Indications ...................... 9-1
9.2    Location of Signals ......................................... 9-1
9.3    What Signals Govern ...................................... 9-1
9.4    Improperly Displayed Signals or Absent Lights .. 9-1
9.5    Where Stop Must be Made .............................. 9-2
    9.5.1    Changing Established Route ............... 9-2
    9.5.2    Protection if Signal Appliance or Track
           is Damaged ...................................... 9-2
    9.5.3    Protection During Repairs .................. 9-2
    9.5.4    Authority to Proceed ......................... 9-2
    9.5.5    Reporting Delays ............................... 9-2
    9.5.6    Track Occupancy Indicator ................. 9-3
9.6    Change of Signal Indication ............................ 9-3
9.7    Failure to Display Most Restrictive Indication ... 9-3
9.8    Next Governing Signal .................................... 9-3
9.9    Train Delayed Within a Block .......................... 9-3
    9.9.1    Approach to Automatic Interlocking ..... 9-4
9.10    Initiating Movement Between Signals .............. 9-4
9.11    Movement from Signal Requiring Restricted
    Speed ............................................................ 9-4
9.12    Stop Indications ............................................ 9-5
    9.12.1    CTC Territory .................................... 9-5
    9.12.2    Manual Interlockings ......................... 9-5
    9.12.3    Automatic Interlockings ..................... 9-6
    9.12.4    ABS Territory .................................... 9-6
9.13    When Instructed to Operate Dual Control
    Switches by Hand ........................................... 9-6
    9.13.1    Hand Operation of Dual Control
           Switches ........................................... 9-7
9.14    Movement with the Current of Traffic ............... 9-7
    9.14.1    Reporting Clear of a Track Having a
           Current of Traffic .............................. 9-7
9.15    Track Permits ................................................ 9-7
    9.15.1    Issuing Track Permits ........................ 9-8
    9.15.2    Clearing Track Permits ...................... 9-8
9.16    Stop and Proceed Indication ........................... 9-9
9.17    Entering Signaled Track at Hand-Operated or
    Spring Switch ................................................. 9-10
    9.17.1    Signal Protection in ABS by Lining
           Switch .............................................. 9-11
9.18    Electrically Locked Switches and Derails .......... 9-12

Confidential

CP_00290

9.19    Leaving Equipment in Signal Systems............ 9-12
9.20    Clear Track Circuits................................. 9-13
9.21    Overlap Circuits..................................... 9-13
9.22    Standing on Sanded Rail........................... 9-13
9.23    Suspension of Block System....................... 9-13
        9.23.1   Guidelines While Block System is
                 Suspended................................ 9-13
9.24    Call Lights........................................... 9-14

10.0    **Rules Applicable Only in Centralized
        Traffic Control (CTC) ........................ 10-1**
10.1    Authority to Enter CTC Limits..................... 10-1
10.2    Clearing Through Hand-Operated Switches ..... 10-1
10.3    Track and Time...................................... 10-3
        10.3.1   Protection of Limits...................... 10-4
        10.3.2   Protection of Machines, Track Cars, or
                 Employees................................ 10-4
        10.3.3   Joint Track and Time.................... 10-4
        10.3.4   Track and Time Acknowledgment...... 10-4

11.0    **Rules Applicable in ACS, ATC and ATS
        Territories .................................... 11-1**
11.1    Establishing Absolute Block ....................... 11-1
11.2    Signal Indications with Absolute Block ........... 11-1
11.3    Broken or Missing Seals ........................... 11-2

12.0    **Rules Applicable Only in Automatic
        Train Stop System (ATS) Territory ......... 12-1**
12.1    Required Equipment ................................ 12-1
        12.1.1   ATS Seals and Keys..................... 12-1
12.2    ATS Device Cut Out, Not Equipped, or Not
        Working.............................................. 12-1
12.3    Unusual Conditions ................................. 12-1
        12.3.1   ATS Penalty Brake Application ......... 12-1
        12.3.2   ATS Inoperative......................... 12-1
        12.3.3   Damaged Inductor ...................... 12-1
12.4    ATS Testing ......................................... 12-2
        12.4.1   Test Inductor Locations................. 12-2
        12.4.2   No Test Inductors....................... 12-2

13.0    **Rules Applicable Only in Automatic Cab
        Signal System (ACS) Territory .............. 13-1**
13.1    General Information ................................. 13-1
        13.1.1   Observance of Signals.................. 13-1
        13.1.2   Conforming with Block Signals ......... 13-1
        13.1.3   Does Not Indicate Conditions Ahead ... 13-1
        13.1.4   Cab Signals Cut In and Out ............ 13-1
13.2    Normal Operation................................... 13-2
        13.2.1   Restrictive to More Favorable.......... 13-2
        13.2.2   Favorable to More Restrictive.......... 13-2
        13.2.3   Elimination of Audible Indicator........ 13-3
13.3    Unusual Conditions ................................. 13-3
        13.3.1   Cab Signal and Block Signal Do Not
                 Agree .................................... 13-3

        13.3.2   Inoperative Cab Signal Device ........... 13-3
        13.3.3   Movement with an Inoperative Cab
                 Signal Device............................ 13-4

14.0    **Rules Applicable Only Within Track
        Warrant Control (TWC) Limits ................ 14-1**
14.1    Authority to Enter TWC Limits..................... 14-1
14.2    Designated Limits................................... 14-2
14.3    Operating with Track Warrants .................... 14-2
        14.3.1   Leaving the Main Track.................. 14-3
14.4    Occupying Same Track Warrant Limits........... 14-3
        14.4.1   Radio Blocking.......................... 14-3
14.5    Protecting Men or Equipment...................... 14-4
14.6    Movement Against the Current of Traffic.......... 14-4
14.7    Reporting Clear of Limits........................... 14-5
14.8    Track Warrant Requests............................ 14-5
14.9    Copying Track Warrants............................ 14-5
        14.9.1   Duplicating Track Warrants.............. 14-5
14.10   Track Warrant in Effect............................. 14-6
14.11   Changing Track Warrants .......................... 14-6
14.12   Not Used............................................. 14-6
14.13   Mechanical Transmission of Track Warrants ..... 14-6

15.0    **Track Bulletin Rules ......................... 15-1**
15.1    Track Bulletins...................................... 15-2
        15.1.1   Changing Address of Track Warrants
                 or Track Bulletins....................... 15-2
15.2    Protection by Track Bulletin Form B............... 15-2
        15.2.1   Protection for On-Track Equipment ..... 15-3
15.3    Authorizing Movement Against the Current of
        Traffic............................................... 15-3
15.4    Protection When Tracks Removed from Service 15-4
15.5    Protection When Tracks Blocked with
        Equipment.......................................... 15-5
15.6    Change of a General Order, Special Instruction,
        or Rule.............................................. 15-5
15.7    Copying Track Bulletins............................ 15-5
15.8    Duplicating Track Bulletins........................ 15-5
15.9    Mechanical Transmission of Track Bulletins ..... 15-5
15.10   Retaining Track Bulletins........................... 15-5
15.11   Not Used............................................. 15-5
15.12   Relief of Engineer or Conductor During Trip ..... 15-6
15.13   Voiding Track Bulletins............................. 15-6
15.14   Delivering Track Bulletins.......................... 15-6

16.0    **Rules Applicable Only in Direct Traffic
        Control (DTC) Limits .......................... 16-1**
16.1    Authority to Enter DTC Limits...................... 16-1
        16.1.1   Switches Between DTC Blocks ........... 16-1
16.2    DTC Authority ...................................... 16-1
16.3    Movement in a Specified Direction................. 16-2
        16.3.1   Leaving the Main Track.................. 16-3
16.4    Work and Time...................................... 16-3

Confidential

## i-10   GCOR—Seventh Edition—April 1, 2015

| 16.5 | Changing DTC Authority | 16-4 |
| 16.6 | Releasing DTC Authority | 16-4 |
| 16.7 | Communication Failure | 16-5 |
| **17.0** | **Rules Applicable Only in Automatic Train Control (ATC) Territory** | **17-1** |
| 17.1 | Automatic Train Control Territory | 17-1 |
| 17.2 | Taking Charge | 17-1 |
| 17.3 | Cut In and Cut Out Requirements | 17-1 |
| 17.4 | Departure Test Requirements | 17-2 |
| | 17.4.1   Departure Test Reporting | 17-2 |
| 17.5 | High Speed Setting | 17-3 |
| | 17.5.1   Over 40 MPH | 17-3 |
| | 17.5.2   Under 40 MPH | 17-3 |
| | 17.5.3   Restricting Cab Signal | 17-3 |
| 17.6 | Conforming with Block Signals | 17-3 |
| | 17.6.1   Approaching Diverging Route | 17-4 |
| 17.7 | ATC Failure/Cut Out Enroute | 17-4 |
| | 17.7.1   Speed Indicator in ATC | 17-5 |
| | 17.7.2   ATC Motion Light | 17-5 |
| | 17.7.3   Audible Indicator | 17-5 |
| 17.8 | Improper Display | 17-5 |
| **18.0** | **Section Reserved** | **17-6** |
| **19.0** | **Section Reserved** | **17-6** |
| **Glossary** | | **GL-1** |
| **Abbreviations** | | **GL-1** |
| **Index** | | **IN-1** |

Confidential

CP_00292

### 5.3.7    Radio Response

When radio communication is used to make movements, crew members must respond to specific instructions given for each movement. Radio communications for shoving movements must specify the direction and distance and must be acknowledged when distance specified is more than four cars.

> Movement must stop within half the distance specified unless additional instructions are received.

## 5.4    Flags for Temporary Track Conditions

### 5.4.1    Temporary Restrictions

Track bulletins, track warrants, or general orders may restrict or stop train movements because of track conditions, structures or men or equipment. Yellow flags are used to indicate temporary speed restrictions. Yellow-red flags are used to indicate when a train may be required to stop. When flags are not displayed, that information will be included in the track bulletin, track warrant, or general order.

When a restriction spans adjoining subdivisions, separate temporary restrictions may be issued on each subdivision. Only one set of flags may be displayed in advance of the entire restriction in each direction.

### 5.4.2    Display of Yellow Flag

#### A.  Restriction Is In Effect

**Two Miles Ahead of Restricted Area.** Yellow flags warn trains to restrict movement because of track conditions or structures. To make sure train movement is restricted at the right location, employees must display a yellow flag 2 miles before the restricted area.



*[Diagram A.]*

**Less than Two Miles Ahead of Restricted Area.** When the restricted area is close to a terminal, junction, or another area, employees will display the yellow flag less than 2 miles before the restricted area. This information will also be included in the track bulletin, track warrant, or general order.



*[Diagram B.]*

**Once the Train Reaches the Restricted Area.** The speed specified by track warrant, track bulletin, general order, or radio speed restriction must not be exceeded until the rear of the train clears the restricted area.

Confidential

## 6.5    Shoving Movements

Equipment must not be shoved until the engineer and the employee protecting the movement have completed a job briefing concerning how protection will be provided. Employee must be in position, provide visual protection of the equipment being shoved and must not engage in unrelated tasks while providing protection.

Equipment must not be shoved until it is visually determined that:

- Portion of track to be used is clear of equipment or conflicting movements.
- The track will remain clear to the location where movement will be stopped.
- Switches and derails are properly lined.

Employees may be relieved from providing visual protection when:

- Local instructions specify tracks involved and how shoving movement will be protected, such as shove light or monitored cameras.
- A track has been pulled and an equivalent amount or less of cars or equipment will be immediately shoved back into that track and that track has remained clear to the location where the movement will be stopped.
- Immediately before shoving, a movement is made on the adjacent track providing the employee the ability to visually determine the track to be shoved is clear and route to be shoved is properly lined.
- Authority on main track or controlled siding allows for movement in direction of shove, provided route is properly lined, road crossings will not be fouled and movement at restricted speed is not required.

  or

- Making back up movements in accordance with Rule 6.6 (Back Up Movements).

Shoving movements over road crossings must be made in accordance with Rule 6.32.1 (Providing Warning Over Road Crossings).

**Speeds when Shoving**

When cars are shoved on a main track or controlled siding in the direction authorized, movement must not exceed:

- 20 MPH for freight trains.
- 30 MPH for passenger trains.
- Maximum timetable speed for snow service unless the employee in charge authorizes a higher speed.

### 6.5.1    Remote Control Movements

Remote control movements are considered shoving movements, except when the remote control operator controlling the movement is riding the leading engine in the direction of movement. Before initiating movement, the remote control operator or a crew member must be in position to visually observe the direction the equipment moves.

When Remote Control Zone is equipped with pull back / stop protection (PSP), the operator must verify that PSP is operational. Pull back and stop protection must again be verified if PSP is overridden.

**Relief of Providing Protection**

The remote control operator is relieved from providing protection and the requirement to stop within half the range of vision for movements with engine on leading end when:

1. The remote control zone has been activated.
2. Switches/derails are known to be properly lined.
3. Track(s) within the zone are known to be clear of other trains, engines, railroad cars, and men or equipment fouling track.

Note: These steps must be repeated each time the remote control zone is activated.

Confidential

Privileged & Confidential

This notice applies to all unionized employees of Canadian Pacific Railway Corporation in Canada and its subsidiaries in the United States, namely, Soo Line Railroad Company, Dakota, Minnesota & Eastern Railroad Corporation and Delaware & Hudson Railway Company, Inc.

In an effort to improve accountability, safety/education, and performance while fostering a more positive working relationship with employees, we believe accountability should focus on Major/Life Threatening Offences, Non-Major offences and Attendance. In this regard, on a trial basis over the next 12 months, in certain circumstances, we will also include the use of demerits in addition to educational letters, suspensions and where warranted dismissal, if necessary, to address employee accountability. The intent of our discipline process is to progressively influence and correct behaviors that do not comply with required standards.

With this in mind, effective November 1, 2018, the attached *Hybrid Discipline & Accountability Guidelines* amend the current Discipline & Accountability process, which has been in effect since March 8, 2017.

Company – Union Review Process

The Company proposes that the appropriate Senior Vice President and respective Union Leader(s) conduct quarterly discipline reviews to determine if the Hybric Discipline & Accountability Guidelines are achieving a meaningful reduction of disciplinary events while improving rule/safety compliance and employee availability. If it is determined the desired expectations are not being achieved, the Company may make adjustments during this trial period to enhance its effectiveness.

  ➤ The Company reserves the right to make amendments to the above three (3) categories and if this occurs we will provide the Union(s) and employees thirty (30) days' advance notice of any changes.

Significant Changes to Note:

1. Demerits will be used for non-major offences and attendance related matters. Upon accumulating sixty (60) demerits, employees will be subject to dismissal.
2. Employees subject to five (5) disciplinary events, within any of the three (3) categories, during a 12-month period may be subject to dismissal.
3. Employees who are discipline free in all three (3) categories for a rolling 12-month period and who have rendered active service during each of the 12-months within that period, and have demerits on their record, will have a maximum of twenty (20) demerits removed from their discipline record.

It is our hope that these changes to which we hold each other accountable will continue to enhance safety through rule compliance and will further benefit each of us in the performance of our jobs.

Sincerely,

Robert Johnson
Executive Vice-President Operations, CP

0 | P a g e



Confidential

CP_00439



# HYBRID DISCIPLINE

# &

# ACCOUNTABILTY GUIDELINES

This notice applies to all unionized employees of Canadian Pacific Railway
Corporation in Canada and its subsidiaries in the United States, namely, Soo Line
Railroad Company, Dakota, Minnesota & Eastern Railroad Corporation and Delaware
& Hudson Railway Company, Inc.

**EFFECTIVE – NOVEMBER 1, 2018**

Canadian Pacific Railway

1 | P a g e

Confidential

CP_00440

### Overview of Hybrid Discipline & Accountability Guidelines

#### General

1. **Employee Recognition**

   a. Employees who are **discipline free in all three (3) categories** for a rolling 12-month period and who have rendered active service during each of the 12-months within that period, and have demerits on their record, will have a maximum of twenty (20) demerits removed from their discipline record. (Example: An employee record stands at 25 demerit points – the record would be adjusted to reflect 5 points)

   b. Employees who are **discipline free** for a 24-month period and who have rendered active service during each of the 24-months within that period, will have the most recent suspension no longer be considered in the assessment of future discipline.

2. **Employee Notification**

   Employees will receive a written warning that their continued employment may be in jeopardy when they accumulate either 30 demerits or 30 suspension days of active discipline.

3. **Exceptional Circumstances:** Employees **subject to five (5) disciplinary events**, within any of the three (3) categories, during a 12-month period, may be subject to dismissal.

4. **Admission of Responsibility:** Where offered by the Company, employees may elect the option of an Admission of Responsibility **as defined by their respective Collective Agreement**.

5. **Demerits:** Demerits only apply to Non-Major Offences and/or Attendance related matters. Employees who accumulate 60 demerits will be subject to dismissal.

6. **Deferred Suspension**: May apply to all three (3) categories, however, in exceptional circumstances; the Company may elect to defer a portion or all of the suspension.

   a. A Deferred Suspension may later be activated if it is determined the employee is culpable for a subsequent offence.

   b. Employees should be aware that a deferred suspension carries the same gravity as a served suspension in the consideration of subsequent disciplinary assessment. The typical default period for a deferred suspension is six (6) months from the date of assessment.

2 | P a g e

Confidential

CP_00441

Other factors to look at when considering discipline:

- Immediately reporting the incident
- Taking proper protective actions following the incident
- Acknowledging responsibility

7. **Areas that require contact with Labour Relations:**

- Probationary Employees
- Personal Injury Handling
- If you require assistance in determining an appropriate assessment of discipline
- Last Chance Terms/Employment offers
- Events Governed by Federal Regulations

## Non-Major Offences and Attendance

**Employee Availability/Attendance** and other operating rule violations **not identified** as Major/ Life Threatening will be treated as a **Non-Major offence** and the disciplinary levels outlined on the table found on page 6, will apply.

1. **Informal Handling Option**

   The Company believes that the majority of employees take great pride in their work and when involved in an incident, understand and accept when they have made a mistake. As a result, we believe it is important to provide employees the option to waive the formal investigation option. We also believe employees want to learn from their experience and move forward as quickly as possible.

2. **Demerits:** Demerits only apply to Non-Major Offences and/or Attendance related matters. Employees who accumulate 60 demerits will be subject to dismissal.

3. **Formal Reprimand**

   A Formal Reprimand is a written disciplinary letter that may be issued following an investigation and will confirm clear expectations of the employee. A Formal Reprimand may be used for those employees that do not have a recent discipline history or, may be used for employees who accept responsibility and demonstrate a willingness to comply with our operating rules before proceeding to the next Discipline Steps. A Formal Reprimand will be provided to employees and placed to their file.

Confidential

## Major - Life Threatening & Conduct Unbecoming Offences

The following _examples_ are for illustrative purposes and non-compliance may warrant immediate removal from service pending a formal investigation and may warrant suspension or in certain cases, dismissal.

### Major - Life Threatening Violations

| 1. | FRA decertifying events | 9. | Occupying track without authority |
|---|---|---|---|
| 2. | Speeding 10 MPH or greater above authorized speed limit for on track equipment | 10. | Failure to inspect passing train |
| 3. | Stop signal violations | 11. | Failure to secure cars or locomotives |
| 4. | Safety violations in and around equipment<br>• Three (3) Point Protection<br>• 50 feet separation between equipment<br>• 15 feet when passing around the end of standing equipment | 12. | Rule violations where a serious collision or derailment, serious injury, fatality or extensive damage to Company or public property occurred or was reasonably foreseeable, including failure to take proper protective measures following an incident |
| 5. | Leaving cars in the foul | 13. | Blue Flag violations |
| 6. | Shoving — Failure to provide point protection consistent with rule | 14. | Reckless endangerment |
| 7. | Riding end of car being shoved not properly equipped, or on the coupler or drawbar | 15. | Tampering with any Safety Device, including Cameras |
| 8. | Any other Critical Life Saving Rules/events - as bulletined to each respective employee group. | | |

### Conduct Unbecoming Offences:

| 1. | Theft, fraud or the unauthorized taking of time or property | 5. | Insubordination |
|---|---|---|---|
| 2. | Sleeping on duty | 6. | Intentional destruction of Company property |
| 3. | Dishonesty, attempting to "cover up" an incident, making material false statements or concealing material facts concerning matters under investigation | 7. | A violation of the following CP Policies:<br><br>Code of Business Ethics, Violence in the Workplace Policy, Use of Personal Electronic Devices, |
| 4. | A violation of Discrimination and Harassment Policies, or other incidents of harassment, discrimination or retaliation | 8. | Alcohol & Drug Policies and Procedures (subject to policy changes)<br><br>i.   Policy 4101 – Alcohol and Drug Assistance through Company Officer & Co-Worker Reporting.<br>ii.   Non-Policy 4104 instances. |

Confidential

CP_00443

## Cont. - Major - Life Threatening & Conduct Unbecoming Offences

Depending on the offence the issuance of a minimum of a **20-calendar day suspension up to and including a 45-day calendar suspension and/or dismissal**. All situations and the disciplinary consequence will be judged based on the circumstances that may be assessed in conjunction with any suspension are:

- Deferred Suspensions (partial or full)
- Demotions
- Job Restrictions

- Requalification
- Training
- Last Chance Agreement Terms – as an alternative to discharge if conditions warrant

The following illustration demonstrates examples of progressive handling

| Major – Life Threatening & Conduct Unbecoming Offences: | 1st Major Rule Infraction | Discipline Minimum 20 day suspension, Up to and including a 45-day calendar suspension and/or dismissal | 2nd Major Rule Infraction 6 months later | Discipline Up to and including a 45-day calendar suspension and/or dismissal | 3rd Major Rule Infraction 8 months later | Discipline Up to and including a 45-day calendar suspension and/or dismissal |
|---|---|---|---|---|---|---|
| Locomotive Engineer / Conductor | Speeding Above 10 mph | 20 day suspension | Failure to inspect passing train | 40 day suspension | Sleeping on Duty | Dismissal |
| Car Department | Blue Flag | 20 day suspension | Failure to secure cars | 30 day suspension *#1* | Fail to provide point protection | Dismissal |
| Locomotive Mechanical | Failure to secure Locomotive | 20 day suspension | Failed to provide 50 feet of separation between equipment | 45 day suspension | Failure to secure locomotive | 60 day suspension and last chance agreement and retraining *#2* |
| Engineering Department | Leaving a main track switch open | 20 day suspension | Occupying track without authority | 40 day suspension | Insubordination | Dismissal |
| Clerical | Improper customer conduct | 20 day suspension | Use of Personal Electronic Devices | 45 day suspension | Breach of Client Confidentiality | Dismissal |
| RTC | Incorrect TOP cancellation & Foreman unprotected | 20 day suspension | Concealing material facts concerning matters under investigation | 30 day suspension | Dishonesty involving incident & rule cover up | Dismissal |

**1* Leniency consideration – Immediately reported incident and acknowledged responsibility
**2* Leniency consideration – Immediately reported the incident and took proper protective actions

5 | Page

Confidential

CP_00444

**Non-Major Offences and Attendance (examples)**

| | | | |
|---|---|---|---|
| 1 | Rule violations that result in FRA reportable train accidents not considered Major Offences | 9. | Violations of radio rules, including: CROR Rule 136(c) – read and repeat violation |
| 2. | Failure to properly coordinate between crews working in same or adjacent tracks | 10. | Speeding less than 10 MPH above authorized speed limit for on track equipment |
| 3. | Failure to properly line switches for intended movement and or operating through an improperly lined switch | 11. | Failure to have or an inadequate job briefing |
| 4. | Attendance Management Violations | 12. | In some situations, late reporting of an injury (contact Labour Relations) |
| 5. | Failure to restore a derail and travelling over derail | 13. | Failure to comply with qualification or certification requirements |
| 6. | Violations causing significant operational impact | 14. | Releasing or tying handbrakes from ground |
| 7. | Handbrakes not released | 15. | Failure to adhere to communicated customer service and performance metrics |
| 8. | Improperly mounting and dismounting moving equipment | | |

NOTE:  **For illustrative purposes,** *an employee currently at Step 2 of the existing Employee Discipline & Accountability Process who is involved in another Non Major event, depending on all of the circumstances involved, would normally be handled at Step 3 above.*

### When progressively handling Non-Major Offences and Attendance issues the following steps will be used:

| First Offence | Second Offence | Third Offence | Fourth Offence | Fifth Offence |
|---|---|---|---|---|
| Employee option: Informal - Accept responsibility and waive a formal investigation Formal Reprimand Or; Formal - Elect a formal investigation and if found culpable may be assessed **10 Demerits** | Employee option: Accept responsibility and waive a formal investigation **10 demerits** Or; Formal - elect a formal investigation and if found culpable may be assessed **15 Demerits** | Employee option: Accept responsibility and waive a formal investigation **15 demerits,** Or; Formal - elect a formal investigation and if found culpable may be assessed **20 Demerits** | 30 Demerits, Or; At Company discretion a 30 day Suspension in lieu of Dismissal for accumulation of demerits | Demerits and/or suspensions, Or: Any combination thereof up to and including Dismissal |

Confidential

> The following Questions and Answers are for illustrative purposes only. In all circumstances where there is a discrepancy, The Hybrid Discipline and Accountability Guidelines document applies.

## Questions and Answers

### General Questions

**Question 1**   How will any previous discipline I have be handled after this Guideline is in effect?

Answer:   Any previous discipline will be treated as if these Guidelines were in effect at that time when any future discipline is given.

**Question 2**   What if an incident is not listed in this document?

Answer:   The offences listed in this document are examples only and not all-inclusive.

**Question 3**   Are suspensions in calendar days or working days?

Answer:   Suspensions are issued in calendar days for employees who do not have a scheduled work week. For employees with a scheduled work week, actual working days will be used.

**Question 4**   General Item #1a refers to employees who are discipline free for a rolling 12-month period will have 20 demerits removed from their record. However, Item #2b refers to suspensions and states the most recent suspension will no longer be considered in the assessment of future discipline. Are demerits completely removed from my record after 12-months?

Answer:   No, similar to suspensions, demerits remain on your record but are no longer considered active for the purposes of assessing future discipline.

**Question 5**   Why is the Company changing the discipline system?

Answer:   The Company routinely reviews all policies and procedures to ensure they reflect the current needs. We believe the Hybrid Discipline Guidelines contained herein will provide a progressive balance when considering discipline for those events that fall under major, non-major and attendance categories.

**Question 6**   If I have four (4) non-major incidents (like absenteeism) and one (1) major incident within twelve (12) months, will I still be subject to dismissal.

Answer:   Yes, five (5) incidents of any kind may result in your dismissal.

Confidential

CP_00446

**Question 7**    What if I have two (2) non-major incidents and three (3) major incidents within twelve (12) months? Am I still subject to dismissal?

Answer:    Yes.

**Question 8**    When the new policy goes into effect, will an employee's current discipline history be expunged?

Answer:    The implementation of this Guideline will not change the existing Discipline Step of an employee. Any previous discipline will be treated as if these Guidelines were in effect at that time when any future discipline is assessed.

**Question 9**    The new Guidelines do not reference letters of caution. If a letter of caution were given to an employee, would this letter be considered discipline?

Answer:    A letter of caution is not considered discipline.

**Question 10**    Who is responsible to initiate the Company-Union Review Process outlined in the Guidelines?

Answer:    It is incumbent upon each Union Leader or Senior Vice President, or their designate, may request a meeting to review the process outlined in the Guidelines.

## Non-Major Questions

**Question 1**    What is the difference between informal handling and formal handling in the first three steps of the Non Major or Attendance category?

Answer:    Informal handling occurs when the employee has accepted responsibility. Formal handling and a formal investigation will occur when the employee elects not to accept responsibility.

**Question 2**    In the application of the First, Second and Third Offences under the Non Major Category offences on Page 6, there is reference to allowing employees to accept responsibility and waive a formal investigation. Why would the Company entertain this?

Answer:    The Company believes that the majority of employees take great pride in their work and when involved in an incident, understand and accept when they have made a mistake. We also believe these employees want to learn from this experience and move forward as quickly as possible.

8 | Page

Confidential

CP_00447

**Question 3**    When progressively handling Non-Major Offences and Attendance issues the terms "Informal" and "Accept responsibility" are referenced as follows:

*"Informal* - Waive formal investigation and accept responsibility and a **Formal Reprimand** "

Is the above referring to either the Informal Handling or Admission of Responsibility provisions that are contained in my collective agreement?

**Answer:**    Yes.

**Question 4**    My Collective Agreement does not provide for an Admission of Responsibility. May I choose to sign one anyways?

We recognize that in some cases, the Collective Agreement may not have an admission of responsibility provision; however, this does not restrict you from involving your union and/or electing a decision that best meets your needs.

**Question 5**    If an employee elects the Informal option and accepts responsibility for a Non-Major Offense, is Union involvement required?

**Answer:**    A Letter of Written Reprimand is recognized as a minor form of discipline and where the Collective Agreement requires union involvement, the answer is yes.

**Question 6**    I received a formal reprimand in September of last year. If I work 12 months discipline free, will the formal reprimand be considered in the future assessment of discipline?

**Answer**    No. Similar to suspensions and demerits, the formal reprimand will remain on your record but will no longer be considered active for the purposes of assessing future discipline.

**Question 7**    I accidently ran through a switch and immediately notified my supervisor. I have accepted full responsibility for the incident, what will I get for discipline? As information, I currently have a Formal Reprimand on file for missing a call.

**Answer:**    This kind of incident would be considered a Non-Major event; however since this is your second event you will be at step 2 of the process. If you waive your rights to a formal investigation, you will receive 10 demerits for this incident.

9 | Page

Confidential

CP_00448

**Question 8**    Can you provide an example where "Failure to adhere to communicated customer service and performance metrics" would apply?

Answer:    When customer service or minimum performance metrics are communicated and reviewed with employees and these metrics are not maintained due to employee performance this would be considered a Non-Major event under Item #15 on Page 6.

**Question 9**    Some of the Collective Agreements have varying ranges of demerits that can be assessed through the Admission of Responsibility (AOR) provisions. For example, under the non-major offences category (see page 6), an employee may elect an Admission of Responsibility for 15 demerits for the second infraction, however, my Collective Agreement AOR provisions limit demerit marks to a maximum of 10 demerits.

Due to my collective agreement provisions, will I be restricted from accepting responsibility and waiving a formal investigation?

Answer:    Accepting responsibility and waiving a formal investigation is a voluntary process. In this example, if the employee elects Informal handling, it will be incumbent upon both the Union and the employee to acknowledge on the Admission of Responsibility form that the assessment of 15 demerits marks will be accepted and not grieved.

**Major Category Questions**

**Question 1**    The Major – Life Threatening and Conduct Unbecoming Offences do not state that an employee could waive their rights to an investigation and accept a disciplinary suspension, why is this?

Answer:    While there may be circumstances where employees may wish to waive their rights and the Company may accept, the majority of events under this category require a formal investigation to understand and determine the circumstances that led up to the incident.

**Question 2**    Do I have to be involved in three (3) major incidents in a 12-month period before I would be dismissed?

Answer:    The specifics of the incident are considered. Depending on the significance of the incident, it may take fewer Major Offences that result in dismissal. The chart on Page 5 provides an illustrated overview to further address your question.

Confidential

**Question 3**    I am an employee with a major offence on my record that resulted in a 20-day suspension. I am now absent from work without authority, what are the possible disciplinary consequences that I may face?

Answer:    If this absenteeism event is your <u>first</u> *offence* under the Non-Major category, discipline is based on your decision to accept responsibility and waive the formal investigation; or elect the formal investigation process outlined on page 6. If you elect informal handling, the maximum discipline you will receive is a formal reprimand versus receipt of 10 demerits under the formal handling process.

**Question 4**    I am a Rail Traffic Controller and I have been charged with insubordination, which is a major offence. Since this is my first Major offence, does this mean I will only receive a twenty (20) day suspension?

Answer:    The circumstances of the incident will be considered. If it is confirmed you were insubordinate, which is a Conduct Unbecoming Offence, you could be dismissed.

**Question 5**    What is an example of Reckless Endangerment?

Answer:    In addition to a violation of the Alcohol and Drug Policies and other Major Rules, driving a company vehicle or operating Company owned equipment under the influence of alcohol or drugs will be considered Reckless Endangerment.

**Question 6**    I am a Clerical employee and I have been assessed a twenty (20) day suspension. I see that for the other crafts, major offences have a component of safety concerns. Do the offences listed in the Major and Conduct Unbecoming Offence category apply to me?

Answer:    Yes.

**Question 7**    I am a Conductor who has received a 20-day suspension. I have been advised that 10 of the days are to be served and that 10 of the days will be deferred. My Union said this is a violation of my agreement and is not permissible. Is this correct?

**Answer:**    A review the 39 Collective Agreements CP has with its Unions confirms there is no specific collective agreement restriction in any agreement that prevents the Company from deferring a suspension.

**Question 8**    I work in the Engineering Department and have received a 20-day suspension. I work a 7 day on, 7 day off work cycle. Will actual calendar days be used when serving suspension purposes?

**Answer:**    Yes.

11 | P a g e

Confidential    CP_00450

Privileged & Confidential

**CANADIAN PACIFIC**
**U.S. OPERATIONS**

**Policy 1819**

Accident, Incident, Injury and Occupational Illness Reporting Policy and
Commitment Regarding Intimidation and Harassment

## POLICY STATEMENT

Canadian Pacific (CP) is committed to the complete, timely and accurate reporting of all accidents, incidents, injuries and occupational illnesses arising from the operation of the railroad. The CP policy means full compliance with the letter and spirit of the Federal Railroad Administration's Accident Reporting Regulations and other regulatory reporting requirements. CP will not tolerate harassment or intimidation of any person that is intended to discourage or prevent such person from reporting an accident, incident, injury or illness or from receiving immediate medical treatment when necessary. Persons who report alleged violations of this policy are also protected from harassment or intimidation. Disciplinary action, as applicable under CP's Code of Business Ethics, CP's Policy HR 1300 Workplace Harassment – Including Sexual Harassment, or collective bargaining agreements will be taken, up to and including dismissal against any officer, manager, supervisor or employee of the railroad committing such harassment or intimidation.

## POLICY DISSEMINATION AND COMPLAINT PROCEDURES

### Policy Dissemination:

The Federal Railroad Administration regulation 225.33 (a)(2) requires the dissemination of the Policy Statement. CP has adopted a policy to ensure the material is posted and available to employees and to apprise them where any complaints or comments about this procedure can be directed.

CP disseminates and communicates the policy, complaint procedures, reporting responsibilities and posting requirements to all employees, managers and craft employees alike at work sites, in the following manner:

- A copy of the **"U.S. Internal Control Plan"** is filed electronically in CP Station and made accessible to all employees. This notice clearly outlines the policy on reporting and harassment/intimidation and complaint procedures.

- The **"Corporate Safety Policy"** is posted at all major facilities and electronically in CP Station and outlines CP's commitment to the health and safety of employees and encourages the reporting of hazards and incidents.

- The **"Corporate Safety Plan"** is posted at all major facilities and electronically in CP Station and outlines the railroad's safety goals, successes and support of the safety plan by all levels of management.

1



EXHIBIT
4

Confidential

CP_00451

CANADIAN PACIFIC
**U.S. OPERATIONS**

**Policy 1819**

Accident, Incident, Injury and Occupational Illness Reporting Policy and
Commitment Regarding Intimidation and Harassment

*Complaint Procedures:*

Complaints arising from violations of the U.S. Internal Control Plan are handled in the following manner:

**Step 1.** Any alleged violation of the Accident, Incident, Injury, Illness Reporting Policy, or related complaints arising from violations of the above procedure should be reported in writing to Employee Relations via <u>employee_relationsus@cpr.ca</u> and/or by phone to (612) 904-6193.

CP will provide "whistle blower" protection to any person making use of this policy to report a violation.

**Step 2.** Employee Relations will carry out an investigation into the alleged violation.

**Step 3.** If the investigation confirms that a violation has occurred, disciplinary action that is deemed appropriate by senior management, up to and including termination of employment, will be taken and a record of this action will be entered into the employee's personal file.

**Step 4.** Results of the investigation must be forwarded to the appropriate department head for disciplinary action and corrective action.

**Step 5.** The complainant will be notified of the results of the investigation within 15 days of the complaint being filed.

2

Confidential

CP_00452

## CANADIAN PACIFIC
## U.S. OPERATIONS

**Policy 1819**

Accident, Incident, Injury and Occupational Illness Reporting Policy and
Commitment Regarding Intimidation and Harassment

| | |
|---|---|
| **Policy Name:** Accident, Incident, Injury, and Occupational Illness Reporting Policy and Commitment Regarding Intimidation and Harassment | **Effective Date:** January, 1997 |
| **Policy Owner:** Safety Management Systems | **Revision Number:** 1819-15 |
| POLICY NUMBER: 1819 | **Revision Dates:** November 2020<br><br>April 2017<br>June 2014<br>June 2013<br>May 2010<br>July 2009<br>June 2008<br>November 2007<br>April 2007<br>September 2006<br>October 2005<br>June 2005<br>March 2004<br>May 2000<br>March 1998 |
| **Issuing Department:** U.S. Operations | |

5

Confidential

CP_00455

**CANADIAN PACIFIC**

# TRAIN DELAY REPORT

Item # 6000

| TRAIN ID | UNITS IN CONSIST | CABOOSE/EOT MARKER | DATE |
|---|---|---|---|
| 474-31 | CP 8526 / CP5047 / UP 5586 | 958023 | 1 Feb |

| FROM STATION | TO STATION | HIGHEST GENERAL ORDERS IN EFFECT | TIME WATCH COMPARED |
|---|---|---|---|
| Marquette | Nahant | A16    FH | 0130 |

| TIME TRAIN MADE UP | TIME ENGINES ON TRAIN | PORTABLE RADIOS IN USE | AIR DEVICE NUMBER |
|---|---|---|---|
| — | | | |

| TERMINAL INITIAL AIR TEST MADE | TIME INITIAL AIR TEST MADE FROM | TO | INITIAL TERMINAL DELAY HOURS / MIN. | FINAL TERMINAL DELAY HOURS / MIN. |
|---|---|---|---|---|
| | | | | |

| NAMES OF CREW MEMBERS OF TRAIN | OCCUPATION | TIME WENT ON DUTY DATE | TIME | TIME WENT OFF DUTY DATE | TIME | TOTAL TIME ON DUTY HOURS | MIN. | OFF DUTY TIME PRIOR HOURS | MIN. |
|---|---|---|---|---|---|---|---|---|---|
| J Sexton | ENGINEER | 2-1 Feb | 0130 | | | | | | |
| J DeBoer | CONDUCTOR | ✓ | ✓ | | 1355 | | | | |
| | OTHER | | | | | | | | |
| | OTHER | | | | | | | | |

| WHERE DELAYED | ARR. | DEP. | CAUSE OF DELAY | LOADS | EMPTIES | TONS | LENGTH |
|---|---|---|---|---|---|---|---|
| Marquette | 0130 | | On @ 0130  TO80's, Paperwork, the North wye, PH 1 engine + S/O to | 117 | 27 | 5590 | 9349 |
| | | | MQ Siding. Needed to cut crossing + Siding, | | | | |
| | | | Locomotive brake test. Dig out hoses on engine to access | | | | |
| | | | them, tie back on + pump off air, standing cut 74 | | | | |
| | | | deep, pull up /shove 24 for setpout in MQ Sdg, | | | | |
| | | | Shove back, tie on to rest of train, pump air, PTC, | | | | |
| | | 0540 | Warrant, Departure test, Engine check, | | | | |
| Dubuque | 0720 | 0730 | Stop, re line switch - NS Detman reported normal | | | | |
| Dubuque Jct | 0755 | 0742 | Wait for CN to avoid 0740 signal indication | | | | |
| Dead cross | 0930 | 0945 | Waiting for Warrant, Talk to UP, All Rct @ 933 Bar Creek | | | | |
| MP 182 | 1045 | | Holding back to not block crossings, Waiting for next | | | | |
| | | 1114 | Warrant | | | | |
| Nahant | 1145 | | Meet train, Wait for 860 to Clear, crossover to Indy | | | | |
| | | | Sexton out S/O 27, S/O Engine, tie back to S/O | | | | |
| | | 1530 | Tie brakes due to time. Ride to depot. | | | | |
| Depot | 1355 | 1355 | Talk to GM about Efficiency failure (GM #23) | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

S94  Axle
144  Cars

TOTAL HANDLED

ENGINEER MUST SIGN THIS REPORT WHEN HOURS OF SERVICE HAVE BEEN EXCEEDED

Conductor Signature: *[signature]*

Engineer Signature: _____

Original filed at terminal. - Fax copy to Minneapolis Operation Center, Fax # 612-904-5840
Fax copy to Timekeeping, Fax # 612-904-5864

**EXHIBIT**
**5**

SEXTON   000163

Footboard/Safety Meeting/Dynamic Safety Review

EXHIBIT

tabbies®

7

## WHSC Attendance Sheet

Date: _JANUARY 2021_

Time: _____

Location: _NAHANT_

**Topics Presented:**  CUTTING FLANGE-WAYS & CROSSINGS

**Presenter(s):**  CLIN SEXTON

**Attendees:**

| Name: (please print) | Employee Number: |
|---|---|
| Jess Harris | 823986 |
| Max Wilson | 823794 |
| Sam Sexton | 969855 |
| JOSH PILLOW | 10C9072 |
| Joe Barrison | 969854 |
| Justin Delover | 1009119 |
| | 1014651 |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

WHSC Footboard/Safety Meeting/Dynamic Safety Review Attendance Sheet 01.27.17

Page 1

SEXTON    000156



Shelley Daberitz
Manager Support Services
Operations-US

11306 Franklin Avenue
Franklin Park, IL
60131

Office: (630) 860-4447
Cell: ████████
Shelley_Daberitz@cpr.ca

**CERTIFIED MAIL 7019 2970 0002 0440 6531**
**CERTIFIED MAIL 7019 2970 0002 0440 6555**

February 4, 2021

John Sexton                          Justin DePover

████████████                    ████████ █ ██

████████                          

Employee # 823777                   Employee # 1009119

Gentlemen:

Attend a formal investigation/hearing session scheduled to be held at the General Yard Office Building conference room, located at 3420 Miller Ave, Davenport, IA, on February 10, 2021 at 12:00 hours.

The purpose of this formal investigation/hearing is to determine the facts and circumstances and to place your responsibility, if any, in connection with your alleged:

- Failure to stop within half the specified distance given while shoving into track NA04.

This incident allegedly occurred at approximately 12:49 hours on February 1, 2021 while working Train 474-31 at Nahant yard.

The following Carrier witnesses known at this time to likely have knowledge of the incidence and/or evidence relative to this investigation/hearing is hereby requested to attend:

- Tom Jared
- Dylan Smith

In accordance with the provisions of your Scheduled Agreement, arrange for representative and/or witnesses, if desired. A copy of this document is enclosed should you desire to coordinate this matter with your representative.

Sincerely,

Shelley R. Daberitz
Manager Support Services
Operations U. S.

CC:     Dylan Smith                          Employee Services
        John Cartlidge                       Timekeeping
        CMC                                  Operating Practices/Rules
        Joey Reyes – Please arrange to conduct
        Tom Jared – Please arrange to attend as Company witness
        Dylan Smith – Please arrange to attend as Company witness



EXHIBIT

9

SEXTON    000013

IN RE THE MATTER OF:                    )

Investigation/Hearing of John           )

Sexton; Justin DePover                  )


February 10, 2021

12:00 PM


PROCEEDINGS HAD at Canadian Pacific 3420 Miller
Avenue, Davenport, Iowa.

EXHIBIT

10

CP_000018

John Sexton; Justin DePover
February 10, 2021

2

PRESENT FOR THE COMPANY:

        MR. MARK JOHNSON, Conducting Officer


PRESENT FOR THE CHARGED EMPLOYEE:

        MR. JOE RAINWATER, Local Chairman, BLET

        Division 117

CP_000019

John Sexton; Justin DePover
February 10, 2021

3

I N D E X

WITNESS:  THOMAS JARED

Examination by Mr. Johnson                    18, 43, 45

Examination by Mr. Rainwater                     38, 44


PRINCIPAL:  JUSTIN DEPOVER

Examination by Mr. Johnson                    48, 57, 83

Examination by Mr. Rainwater            52, 61, 82, 87


PRINCIPAL:  JOHN SEXTON

Examination by Mr. Johnson                        62, 80

Examination by Mr. Rainwater                     64, 88


EXHIBITS:

Exhibit 1                                              9

Exhibit 2                                             12

Exhibit 3                                             21

Exhibit 4                                             27

Exhibit 5                                             30

Exhibit 6                                             34

Exhibit 7                                             71

Exhibit 8                                             77

John Sexton; Justin DePover
February 10, 2021

4

1          MR. JOHNSON:  Good afternoon.  The time is 12:14 on

2    February 10, 2021.  We are located at 3420 Miller Avenue,

3    Davenport, Iowa.

4               My name is Mark Johnson.  My title is Road

5    Trainmaster.  I will be the Conducting Officer in this

6    proceeding.

7               Beginning to my left, please state your name, title,

8    and role in this hearing.

9               So, Mr. Jared, we'll start with you.

10         MR. JARED:  Tom Jared, General Manager for U.S. West for

11    Canadian Pacific.

12         MR. SEXTON:  John Sexton, Locomotive Engineer,

13    Davenport, Iowa.

14         MR. RAINWATER:  Joe Rainwater, Local Chairman.  Also,

15    Locomotive Engineer for Marquette, Iowa.

16         MR. DEPOVER:  And Justin DePover.  I'm a Conductor outta

17    Davenport, Iowa.

18         MR. JOHNSON:  All right.  Thank you, gentlemen.

19               I am charged with conducting a fair and impartial

20    hearing and to develop all the facts and circumstances in

21    connection with this Notice of Charge.

22               The following rules of procedure will be observed and

23    enforced:

24               All present will conduct themselves in a professional

AccuTran Global Enterprises, Inc.
855-552-0505

CP_000021

John Sexton; Justin DePover
February 10, 2021

5

1   manner and show respect for those testifying.  Swearing,

2   abusive conduct, outbursts, and repeated interruptions will not

3   be tolerated.

4          This hearing is being recorded, and the transcript of

5   the recording will be the official record.  Speak slowly and

6   distinctly in order for your testimony or remarks to be

7   properly recorded.

8          Objections raised during this hearing will be

9   addressed and made a matter of record.

10          Reasonable recesses will be granted when requested,

11  but only before or after a witness has testified.  Except in

12  unusual circumstances, recesses will not be granted during a

13  witness' testimony.

14          The charged employee and representative will be

15  afforded the opportunity to present witnesses, cross-examine

16  Company witnesses, and introduce the record information or

17  exhibits pertinent to the matter being investigated.

18          The charged employee and representative will be

19  allowed to make a closing statement prior to the conclusion of

20  this hearing.  Closing statements should be confined to the

21  matter being investigated and based on evidence presented and

22  testimony given during this hearing.

23          This investigation is being held to develop all the

24  facts and circumstances relative to the Notice of Charge dated

John Sexton; Justin DePover
February 10, 2021

6

1    February 4, 2021, and subsequently another letter that was

2    issued changing the Hearing Officer, dated February 10th of

3    2021.

4            The Charge reads as follows:

5            It's on Canadian Pacific letterhead.

6            "CERTIFIED MAIL 7019 2970 0002 0440

7        6531"

8    MR. JOHNSON:  And also:

9            "CERTIFIED MAIL 7019 2970 0002 0440

10       6555"

11   MR. JOHNSON:  Dated:

12           "February 4, 2021"

13   MR. JOHNSON:  Addressed to:

14       "John Sexton

15       ███████████████ ▪

16       ███████ ████████

17       Employee # 823777"

18   MR. JOHNSON:  Also addressed to:

19       "Justin DePover

20       ███████████████

21       ███████ ████████

22       Employee # 1009119"

23   MR. JOHNSON:  Body reads:

24       "Gentlemen:

John Sexton; Justin DePover
February 10, 2021

7

1    Attend a formal investigation or

2    hearing session scheduled to be held at

3    the General Yard Office Building

4    conference room, located at 3420 Miller

5    Avenue, Davenport, Iowa, on February

6    10, 2021 at 12:00 hours.

7    The purpose of this formal

8    investigation or hearing is to

9    determine the facts and circumstances

10    and to place your responsibility, if

11    any, in connection with your alleged:

12    • Failure to stop within half the

13    specified distance given while shoving

14    into Track NA04.

15    This incident allegedly occurred at

16    approximately 12:49 hours on February

17    1, 2021 while working Train 474-31 at

18    Nahant Yard.

19    The following Carrier witnesses

20    known at this time to likely have

21    knowledge of this -- of the incidence

22    and/or rel -- evidence relative to this

23    investigation or hearing is hereby

24    requested to attend:

AccuTran Global Enterprises, Inc.
855-552-0505

CP_000024

John Sexton; Justin DePover
February 10, 2021

8

1          • Tom Jared

2          • Dylan Smith

3          In accordance with the provisions of

4      your Scheduled Agreement, arrange for

5      representative and/or witnesses, if

6      desired.  A copy of this document is

7      enclosed should you desire to

8      coordinate this matter with your

9      representative.

10         Sincerely,

11         Shelley R. Daberitz

12         Manager Support Services

13         Operations U.S."

14     MR. JOHNSON:  CC or carbon copied were:

15         "Dylan Smith

16         John Cartlidge

17         CMC, also known as Crew Management

18     Center

19         Joey Reyes - Please arrange to

20     conduct

21         Tom Jared — Please arrange to attend

22     as Company witness

23         Dylan Smith - Please arrange to

24     attend as Company witness

John Sexton; Justin DePover
February 10, 2021

9

1          Employee Services

2          Timekeeping

3          Operating Practices or Rules"

4      MR. JOHNSON:  I will now label this as Exhibit 1.

5                  (Whereupon, the document was marked as

6                   Exhibit 1 for identification.)

7      MR. RAINWATER:  Do you have copies for everybody?

8      MR. JOHNSON:  When we take a recess, if you don't have

9  copies with you, I can make copies for you.

10      MR. RAINWATER:  I have a copy of Exhibit 1.  I do not,

11  however have a copy of the Postponement, and I'd like to have

12  that sooner rather than later.

13      MR. JOHNSON:  Okay.  So --

14      MR. RAINWATER:  Or, I'm sorry, the -- the -- the change

15  in Hearing Officer, not the Postponement.

16      MR. JOHNSON:  Okay.  I will -- I'll read it in and then

17  I'll make a quick copy for ya.

18          All right.  On Canadian Pacific letterhead again,

19  this is the change of Hearing Officer:

20          "February 10, 2021"

21      MR. JOHNSON:  Addressed to:

22          "John Sexton

23          ███████████████████.

24          ██████    ███████

AccuTran Global Enterprises, Inc.
855-552-0505

CP_000026

John Sexton; Justin DePover
February 10, 2021

10

1          Employee # 823777"

2     MR. JOHNSON:  Also:

3        "Justin DePover

4        2512 E 18th Street

5        Davenport, Iowa 52803

6        Employee # 1009119"

7     MR. JOHNSON:  And reads:

8        "Gentlemen:

9        Please refer to my letter dated

10    February 4, 2021 concerning formal

11    investigation or hearing session

12    scheduled to be held at the General

13    Yard Office Building conference room,

14    located at 3420 Miller Avenue,

15    Davenport, Iowa, on February 10, 2021

16    at 12:00 hours.  The purpose of this

17    investigation or hearing is to

18    determine the facts and circumstances

19    and to place your responsibility, if

20    any, in connection with your alleged

21    failure to stop within half the ranges

22    -- or half the specified distance given

23    while shoving into Track NA04.  This

24    incident allegedly occurred at

CP_000027

John Sexton; Justin DePover
February 10, 2021

11

1          approximately 12:49 hours on February

2          1, 2021 while working Train 474-31 at

3          Nahant Yard.

4              Please be advised that Joey Reyes

5          will no longer be attending as

6          Conducting Officer.  Mark Johnson has

7          been requested to attend the

8          investigation or hearing as Conducting

9          Officer.

10             In accordance with your -- or with

11         the provision of your Scheduled

12         Agreement, arrange for witness, if

13         desired.  A copy of this document is

14         being sent to your representative.

15             Balance of my original notice

16         remains the same.

17             Sincerely,

18             Shelley R. Daberitz

19             Manager Support Services

20             Operations U.S."

21         MR. JOHNSON:  And the only addition to the carbon copy

22    is:

23             "Mark Johnson - Please arrange to

24         conduct"

John Sexton; Justin DePover
February 10, 2021

12

1      MR. JOHNSON:  And Joey Reyes is no longer carbon copied.

2          I'm gonna take a brief minute or two here.  I'll go

3  make a copy for you three, and then we'll resume with this

4  investigation.

5                  (Whereupon, a recess was taken.)

6      MR. JOHNSON:  All right.  We're back on the record.

7  Time is 12:26.

8          I just read in the Notice of -- the change for the

9  Hearing Officer, provided copy to everybody.  Labeling this as

10  Exhibit #2.

11                  (Whereupon, the document was marked as

12                  Exhibit 2 for identification.)

13      MR. RAINWATER:  At this time, just as a matter of

14  record, I notice that Dylan Smith is not in attendance at this

15  d -- is there -- do we have knowledge of whether or not he's

16  going to attend as compelled by the Hearing Letter?

17      MR. JOHNSON:  At this time, there's some personal

18  reasons he's not here.  We're gonna continue with this

19  investigation.  Should it be ter -- determined that he would

20  have something permant -- pertinent to this investigation, then

21  we'll make a decision whether or not we would postpone.

22      MR. RAINWATER:  All right.  And just as a matter of

23  record, I also note that General Manager Jared is in attendance

24  via video conference.  We weren't informed of that ahead of

AccuTran Global Enterprises, Inc.
855-552-0505

CP_000029

John Sexton; Justin DePover
February 10, 2021

13

1   time.  I'd like to object to this hearing just because of

2   that.  This Hearing Letter compels the attendance, same as for

3   -- from -- for the witnesses -- Carrier witnesses, the same as

4   it does for Mr. Sexton and Mr. DePover.  If you read in line

5   one -- oh, I'm sorry, of the opening paragraph of Exhibit 1, it

6   says:

7              "Gentlemen:

8              Attend --"

9              And then it also compels Mr. Jared and Mr. Smith to

10  attend in person.

11             The -- the basis for this objection is also because

12  the Organization was not given the same opportunity to attend

13  via video conference.  We also believe the that the Zoom video

14  conference, while convenient, eliminates the ability of the

15  Hearing Officer to vet testimony by viewing and experiencing

16  the nonverbal cues from any witness who may be attending via

17  video.

18             I'm also concerned about how evidence is going to be

19  submitted as far as it relates to due process.  Other than his

20  own testimony, how is Mr. Jared gonna enter exhibits?

21       MR. JOHNSON:  Okay.  So I'm gonna overrule on your

22  objection.  And you -- did you ever make a request --

23       MR. RAINWATER:  Yeah --

24       MR. JOHNSON:  -- to attend via Zoom?

John Sexton; Justin DePover
February 10, 2021

14

1          MR. RAINWATER:  I -- I guess I didn't know if that was

2    such a possibility.  I mean, like I said, the Hearing Letter

3    compels Mr. Sexton and Mr. DePover to attend.  And in -- in the

4    history of hearings and investigations, I don't know that it's

5    ever been an option to do so in a different manner than by

6    physically being on property in the hearing room.  So --

7          MR. JOHNSON:  So --

8          MR. RAINWATER:  -- I suppose, no, there -- there was no

9    request to be made because I didn't know there was need to make

10   a request --

11         MR. JOHNSON:  Okay.  S --

12         MR. RAINWATER:  -- in that matter.  Nor should I think

13   that it should be allowed, just on the basis like I said, that

14   -- that we get to vet the testimony by both viewing and

15   experiencing the nonverbal cues from the witnesses in

16   attendance.  We don't get that same opportunity by Mr. Jared,

17   who is -- we can only see half of his body and can't see what's

18   in front of him.

19         MR. JOHNSON:  Okay.  Again, I'm overruling on your

20   objection.  And the courts within the United States have gone

21   to doing Zoom and using other video means for testimony, so

22   Mr. Jared will be available through the entire process.  As I

23   said with Mr. Smith, I would make a determination at the end of

24   the testimony that we hear today if -- if I feel that he has

AccuTran Global Enterprises, Inc.
855-552-0505

CP_000031

John Sexton; Justin DePover
February 10, 2021

15

1   something pertinent, then we would take a postponement, a

2   recess at that time --

3        MR. RAINWATER:  Sure.  I understand --

4        MR. JOHNSON:  -- until he's available, so.

5        MR. RAINWATER:  I understand Mr. Smith -- I mean, it --

6   circumstances rise to the level of him not being able to

7   attend.  I would, however, like to note for the record, why is

8   Mr. Jared not in the physical attendance?

9        MR. JOHNSON:  He is available through Zoom due to the

10  current crisis within the United States and the world actually,

11  with COVID, trying to limit exposure.

12       MR. RAINWATER:  Well, I appreciate that he took it upon

13  himself to protect himself, but not give us all the same

14  opportunity, so I'll s -- I'll sustain for now.

15       MR. JOHNSON:  Okay.  So next, I'm going to call

16  Mr. Sexton for preliminary questions.

17          Mr. Sexton, for the record, please state your name

18  and position with the Company.

19       MR. SEXTON:  John Sexton, Locomotive Engineer.

20       MR. JOHNSON:  And what is your address?

21       MR. SEXTON:  ███████████████████   ████████,

22  ████  ████.

23       MR. JOHNSON:  When were you last tested on the Rules?

24       MR. SEXTON:  2020, I believe.

AccuTran Global Enterprises, Inc.
855-552-0505

**CP_000032**

John Sexton; Justin DePover
February 10, 2021

16

1      MR. JOHNSON:  And were you allowed to ask questions?

2      MR. SEXTON:  Absolutely.

3      MR. JOHNSON:  Do you have a representative present?

4      MR. SEXTON:  I do.  Joe Rainwater.

5      MR. JOHNSON:  Okay.  Thank you.  Did you receive the

6  Notice of Charge?

7      MR. SEXTON:  I did not.

8      MR. JOHNSON:  But you are aware to be here today?

9      MR. SEXTON:  I am, only because of Mr. Rainwater, uhm,

10  forwarded the information to -- to me.

11      MR. JOHNSON:  Okay.  Are you ready to proceed with this

12  hearing?

13      MR. SEXTON:  I am.

14      MR. JOHNSON:  Okay.  Mr. DePover -- or you're released

15  from testimony, Mr. Sexton.

16      Mr. DePover, for the record, please state your name

17  and position with the Company.

18      MR. DEPOVER:  Justin DePover, and I'm a Conductor.

19      MR. JOHNSON:  Were -- when -- or what is your address?

20      MR. DEPOVER:  2512 East 18th Street in Davenport, Iowa,

21  52803.

22      MR. JOHNSON:  And when were you last tested on the

23  Rules?

24      MR. DEPOVER:  I had a Refresher's Class on, I believe it

AccuTran Global Enterprises, Inc.
855-552-0505

**CP_000033**

John Sexton; Justin DePover
February 10, 2021

17

1  was the 27th.  I -- I was on furlough for just under eleven

2  months.

3       MR. JOHNSON:  Okay.  Twenty-seventh of?

4       MR. DEPOVER:  Of January.

5       MR. JOHNSON:  Okay.  I was gonna say we're a little

6  ahead of --

7       MR. DEPOVER:  Yeah, I'm sorry about that.

8       MR. JOHNSON:  -- the 27th of February, so.  Do you have

9  a representative present?

10      MR. DEPOVER:  Yes, I do.

11      MR. JOHNSON:  Who is that?

12      MR. DEPOVER:  Mr. Rainwater.

13      MR. JOHNSON:  And did you receive Notice of Charge?

14      MR. DEPOVER:  I did not.

15      MR. JOHNSON:  But you're aware to be here today?

16      MR. DEPOVER:  I was aware also, via email from

17 Mr. Rainwater.

18      MR. JOHNSON:  Are you ready to proceed with this

19 hearing?

20      MR. DEPOVER:  Yes, I am.

21      MR. JOHNSON:  Mr. Rainwater, are you ready to proceed

22 with this hearing?

23      MR. RAINWATER:  Under previous objection, yes.

24      MR. JOHNSON:  Okay.  All right.  Mr. DePover, you're

John Sexton; Justin DePover
February 10, 2021

18

1    released from testimony.

2         I will now call Mr. Jared.

3                    THOMAS JARED

4    called as a witness by the Company herein, was examined and

5    testified as follows:

6                   E X A M I N A T I O N

7                   By:  Mr. Johnson

8         Q.     Mr. Jared, state your name.

9         A.     Thomas Jared.

10        Q.     And what is your job title?

11        A.     General Manager, U.S. West, Canadian Pacific.

12        Q.     And what do you do in that position?

13        A.     My position, I oversee the operations for

14   Canadian Pacific through six states.  That includes safety,

15   that includes budgetary, utilizing assets, developing people,

16   working with customers.

17        Q.     And how long have you held that position?

18        A.     Since 2016, I've been a General Manager.

19        Q.     Okay.  How long have you been with Canadian

20   Pacific?

21        A.     The -- it's a long story, but it -- as of

22   recently, it's been 13 years.

23        Q.     Okay.  And have you been tested on the Rules?

24        A.     I have.

John Sexton; Justin DePover
February 10, 2021

19

1      Q.      Okay.  Are aware of an incident that occurred at

2  approximately 12:49 hours on February 1, 2021?

3      A.      I am.

4      Q.      Could you please describe what you observed or

5  what the incident was?

6      A.      On -- on February 1st, I was at the south end of

7  Nahant Yard.  I was observing Train 474-31 coming down to the

8  south end of the yard.  I observed the Conductor actually

9  dismount the locomotive.  The crew was going to actually shove

10  -- they were instructed to shove 4 Track as part of their

11  setout.  That setout consisted of 76 cars.  Conductor made the

12  cut, pulled up, was gonna shove into the south end of the yard

13  into 4 Track.  Conductor lined all of his switches.  Conductor

14  and Engineer actually briefed with the RC assignment which was

15  actually on the north end of the yard, and they were told that

16  the RC assignment was actually in 16 Track and they would not

17  be in 4.  And the two crew members, Mr. Sexton and Mr. DePover,

18  actually briefed on this over the radio where their actual RC

19  assignment was, and that the 4 Track was actually theirs and it

20  was clear at the time.

21          Mr. DePover actually started a shoving movement

22  into 4 Track.  He gave an initial car count of 50.  I was

23  actually on the south end of the yard at that time in my

24  vehicle, which I actually dismounted at that time, and as I

AccuTran Global Enterprises, Inc.
855-552-0505

CP_000036

John Sexton; Justin DePover
February 10, 2021

20

1    walked over to Mr. DePover, he was in between -- on the south

2    side of 4 Track.  I walked up to him and as I walked up to him,

3    he'd gave a 15-car count to the Engineer, John Sexton.  At that

4    point, I instructed Mr. DePover to not provide any more radio

5    communication to Mr. Sexton, and Mr. Sexton continued to shove

6    back.  And I was -- as I was counting down, we got to seven

7    cars that he actually shoved, which that's when Mr. Sexton

8    should've actually stopped and he did not.  But he did -- I did

9    note that that was the seventh car that was being shoved by,

10   and Mr. DePover, at that time, did confirm that was the seventh

11   car.  And actually, at that time, Mr. Sexton got on the radio

12   and he asked for further instructions from Mr. DePover.

13   Mr. DePover did not -- did not answer.  As you can hear, Mister

14   -- the brakes were actually being applied on the train.  And

15   again, he had 76 cars.  And Mr. Sexton asked one more time, and

16   then brought the train to an actual stop.

17          When he stopped, he'd actually shoved 11 cars

18   into the track further from that initial count of 50.  At that

19   time, I -- Mr. Sexton was asking for his Conductor -- or for

20   the AE, Assistant Engineer DePover, and the -- Mr. DePover told

21   him that I was actually conducting a test.  Mr. Sexton said oh,

22   I must've passed.  But at that time, I told Mr. DePover that --

23   to [indiscernible] his thoughts, make sure to get a proper job

24   briefing, and continue his movement of yarding the train, and

AccuTran Global Enterprises, Inc.
855-552-0505

CP_000037

John Sexton; Justin DePover
February 10, 2021

21

1   we'd brief afterwards, which he did.

2               So through that process, Mr. Sexton did violate

3   General Code of Operating Rules 5.37.  That's called Radio

4   Response, it's actually a shoving movement, where it clearly

5   states:

6           "Movement must stop within half the

7       distance specified unless additional

8       instructions are received."

9       Q.      Okay.  Is that an exhibit that you'd like to

10  enter?

11      A.      Yes, I would.  I -- if you don't have a copy of

12  that, I can get a copy brought to you, but I would like to make

13  it a -- an exhibit.  GCOR—Eighth Edition—April 1, 2020, Rule

14  5.3.7 Radio Response.

15      Q.      Okay.  Yeah, Joey provided me with some things

16  that -- so I did find that.

17      MR. JOHNSON:  I will label this as Exhibit #3.  And that

18  is the GCOR -- Eighth Edition, April 1st of 2020, 5.3.7 Radio

19  Response.

20              (Whereupon, the document was marked as

21              Exhibit 3 for identification.)

22      Q.      So, Mr. Jared, did he comply with this Rule?

23      A.      Absolutely not.

24      Q.      And how not?

AccuTran Global Enterprises, Inc.
855-552-0505

**CP_000038**

John Sexton; Justin DePover
February 10, 2021

22

1          MR. RAINWATER:  Just -- for -- just point of order,

2    you're -- you're sa --

3          A.      He was supposed to have been stopped at seven

4    cars.

5          MR. RAINWATER:  Yeah, we're saying he, can we specify

6    exactly who he is?  There's two charged employees.  Can we

7    specify --

8          MR. JOHNSON:  Okay.

9          MR. RAINWATER:  -- which one we're saying is not in

10   compliant with this Rule?  I missed that because of this video.

11         MR. JOHNSON:  Okay.  If you have an objection or

12   something like that, please let him finish and then --

13         MR. RAINWATER:  Okay.

14         MR. JOHNSON:  -- make your objection.

15         Q.      So, Mister -- Mr. Jared, did Mr. DePover violate

16   this Rule?

17         A.      No, he did not.

18         Q.      Okay.  Did Mr. Sexton violate the Rule?

19         A.      Yes, he did.

20         Q.      And how so?

21         A.      Mr. Sexton, at seven cars, he should have been

22   stopped, which he was not.  As I noted -- I -- I was counting

23   the cars as they were going by.  At the seventh car, as it went

24   by, I noted with Mr. DePover that that was the seventh car

John Sexton; Justin DePover
February 10, 2021

23

1    after his initial radio response of 15.  He did confirm with

2    me.

3          MR. SEXTON:  It's 50.

4          A.      And then, again, Mr. Sexton stopped at 11 car

5    lengths past the initial 15 car instruction he gave to his

6    Engineer, John Sexton.

7          Q.      Okay.  So he gave an initial count of 50.

8    Correct?

9          A.      Correct.  The initial car count was 50 into the

10   track, which was a clear track.

11         Q.      Okay.  And then he gave further instruction for

12   15?  1-5?

13         A.      That's correct.  When I -- when I walked over to

14   him, at that time, he actually made a radio communication to

15   his Engineer, which was John Sexton, of a 15-car count.

16         Q.      Okay.  And then it was how long before he came

17   to a stop?

18         A.      Eleven car lengths.

19         Q.      Is that less or more than half the distance that

20   was specified for the 15-car count?

21         A.      More than half.

22         Q.      Okay.  Any other evidence you'd like to submit?

23         A.      You should have a Tonnage Profile if Mr. Reyes

24   actually printed it for you.  This Tonnage Profile was provided

John Sexton; Justin DePover
February 10, 2021

24

1    by Conductor DePover after they got -- they were done making

2    their shoving movement, and I'd like to reference page 2 of

3    that Tonnage Profile, if you would?

4         Q.       Okay.  Let me kinda go through the stuff that he

5    sent me -- or he gave me.

6         MR. JOHNSON:  Looks like I need to make one more copy,

7    if you guys want a --

8         MR. SEXTON:  [I guess we could].

9         Q.       Okay.  So, Mr. Jared, I have here a 474-31 04617

10   Tonnage Profile, Page 002, it's got some marking on it.

11        A.       So the markings are all from Mr. DePover.  These

12   are all his markings.  You can see where he made a initial mark

13   of line 76.  That was the cut they came off their train with.

14        Q.       Okay.

15        A.       You can also note -- and of course, there is --

16   it looks like there's two different color inks here, but you

17   can also note where he noted the DP unit, which they actually

18   had to set out prior to making their final shove --

19        Q.       Okay.

20        A.       -- from 11.  This is their first shove into the

21   track to get the DP unit set out.

22        Q.       Okay.

23        A.       You can also see where Mr. DePover marked -- it

24   looks like in blue ink -- between lines 54 and 64.  I had asked

John Sexton; Justin DePover
February 10, 2021

25

1   Mr. DePover after the shove movement was made, to note the cars

2   still -- the cars that were actually shoved into the track

3   during that -- that shoving movement between -- after he said

4   15 more cars.

5        Q.     Do you know the total distance that was shoved

6   then, after he was given --

7        A.     It was approximately 110 feet.

8        Q.     They only shoved 110 feet?  Or approximately --

9        A.     Sorry.  No, the -- no, I don't -- we didn't add

10  the footage up to write next to the Tonnage Profile.  I don't

11  have that top of my head.

12       Q.     Okay.  But it was greater than half the

13  distance?

14       A.     Correct.  You'll note in the -- in the Tonnage

15  Profile where some of the car lengths are 42 feet and 1 -- some

16  of the car lengths are 71 feet?

17       Q.     Okay.

18       A.     But the point of the Rule is that half the

19  distance specified, and he shoved 11 car lengths.  When I

20  interviewed Mr. Sexton, he made the statement that he -- all he

21  had was sticks and trees to go off of for his -- for shoving

22  back.

23       Q.     Are there other means for them to know distance?

24       A.     Yeah.  Yes, sir.  He actually has a counter on

26

1    the lead locomotive that he should be able to reference when

2    making a shoving movement.

3         MR. RAINWATER:  Objection.

4         A.        And further, if he's not sure, he could've asked

5    sooner about car distance.  For example, if he only had seven

6    cars -- if he can only shove initial seven cars, he should've w

7    -- asked well in advance of that seven cars for additional car

8    counts, which he did not.  He waited until the seventh car went

9    by before he asked a question.  And then you can hear --

10        MR. RAINWATER:  Objection.  Unless --

11        A.        -- brakes applying.

12        MR. RAINWATER:  Unless Mr. Jared has a Rule that he can

13   point to that says an Engineer is required to use his distance

14   measuring device when making shove moves, that -- that

15   testimony's irrelevant.

16        MR. JOHNSON:  Okay.  The question was whether or not he

17   had means to use.  It wasn't --

18        MR. RAINWATER:  Okay.  Okay.  So I just wanted to

19   clarify that the Rule --

20        MR. JOHNSON:  It wasn't adding -- adding a Rule or

21   anything to it.

22        MR. RAINWATER:  Right.  So I wanna clarify for the --

23   for the record that there's no Rule that says that you have to

24   do that.

CP_000043

John Sexton; Justin DePover
February 10, 2021

27

1        MR. JOHNSON:  So -- yeah.  No, I -- the question was if

2    he had means to be able to, other than sticks and trees.

3           So just to back up here real quick, so the Tonnage

4    Profile, page 002, I'm labeling as Exhibit 4.

5                    (Whereupon, the document was marked as

6                     Exhibit 4 for identification.)

7        MR. JARED:  I'm sorry, did you say Exhibit 4?

8        MR. JOHNSON:  Yes.

9    BY:  MR. JOHNSON

10       Q.      Do you have anything else you'd like to enter as

11   evidence, Mr. Jared?

12       A.      Once the crew actually yarded their train, I

13   didn't actually compare; they were relieved on the south end.

14   And because of their hours, they were brought to the north end

15   to the depot, and individually interviewed.

16              First interview was done with Mr. DePover, where

17   we reviewed, actually, the events had taken place, and then I'd

18   asked Mr. DePover to provide a written statement, which you

19   should have a copy of it as well.  It says 474-31, and has his

20   signature on it, dated 1 February 2021.

21       Q.      Okay.  I don't have that here right now.  Can we

22   take a brief recess, and have you email that --

23       MR. RAINWATER:  I'm gonna --

24       MR. JOHNSON:  -- to me so that --

John Sexton; Justin DePover
February 10, 2021

28

1       MR. RAINWATER:  I'm gonna object here.  This is the

2   precise reason why video conference calls shouldn't be allowed

3   if the witness has to email evidence to you in the middle of

4   his testimony in order to access it.  It's completely

5   ridiculous.  It slows the whole process down.

6       MR. JOHNSON:  Okay.  Your objection is overruled.  It --

7   so he's got evidence that he wants to submit.

8       MR. RAINWATER:  He --

9       MR. JOHNSON:  Part of your initial --

10      MR. RAINWATER:  Then he should've been here to do it.

11      MR. JOHNSON:  Part of your initial objection was that

12  there would be partiality in the way things are being

13  conducted.  If I --

14      MR. RAINWATER:  Yeah, I think that --

15      MR. JOHNSON:  If I understood what your objection was,

16  correct?

17      MR. RAINWATER:  Yeah, I think that's obvious, now, for

18  sure.

19      MR. JOHNSON:  So now you're objecting because not

20  everything is readily available.  As I said with COVID, trying

21  to limit exposure to everybody --

22      MR. RAINWATER:  Mm-hmm.

23      MR. JOHNSON:  -- it's -- i -- it's a challenging time

24  for everybody, Mr. Rainwater.

CP_000045

John Sexton; Justin DePover
February 10, 2021

29

1        So we'll take just a brief -- probably five-minute

2    recess, and I'll see if I've gotten that from you, Mr. Jared.

3        MR. JARED:  Okay.

4        MR. JOHNSON:  Time is 12:46.

5            (Whereupon, a recess was taken.)

6        MR. JOHNSON:  All right.  The time is now 12:49,

7    resuming with the Sexton-DePover Investigation.

8        All right.  Mr. Jared, Mr. Reyes brought in what

9    appears to be a statement.  I'm gonna label --

10   BY:  MR. JOHNSON

11       A.    That's correct.  I actually received the

12   statement from Mr. DePover as we're interview him.  Once we

13   were done with the interview, I asked him pro -- to provide the

14   statement.  This is what he wrote:

15           "When shoving cars into NA04 track a

16       car count of 15 was given and after no

17       communication movement stopped after 11

18       cars."

19       A.    That's Mr. DePover's signature.  And I observed

20   him writing it -- the statement, and then he dated it:

21           "1 Feb 2021"

22       MR. JOHNSON:  Okay.  I'm going to label this as Exhibit

23   #5.

24       MR. RAINWATER:  Five.

John Sexton; Justin DePover
February 10, 2021

30

1                    (Whereupon, the document was marked as

2                    Exhibit 5 for identification.)

3        Q.      So with Exhibit 5, Mr. Jared, that matches

4  exactly what you observed as well?

5        A.      I'm sorry.  One more time?

6        Q.      Mr. DePover's statement here in Exhibit 5, that

7  agrees with what you observed as well?

8        A.      That's correct.

9        Q.      Okay.  Any other evidence you'd like to submit?

10       A.      I have video surveillance of the move that I'd

11  like to present.

12       Q.      Okay.  I'll see if I can --

13       MR. RAINWATER:  So j --

14       MR. SEXTON:  [Is that the body of it]?

15       MR. RAINWATER:  -- just for the record, we're -- we're

16  gonna try to see a video at the same time he's on a video

17  conference on the same device?

18       MR. SEXTON:  Is there audio?

19       MR. RAINWATER:  I -- is that --

20       MR. JARED:  Was that a question for me?

21       MR. RAINWATER:  I -- I'm just asking for a point of

22  record here, is that what's about to happen?

23       MR. JOHNSON:  I'm trying to see if I can share screen --

24  so I'm gonna pull this up, Mr. Jared.  Should be marked.  I

John Sexton; Justin DePover
February 10, 2021

31

1   just don't know how to share a screen.  No.

2        MR. DEPOVER:  I can't read that.

3        MR. SEXTON:  I -- I did, actually.

4        MR. JOHNSON:  Oh.

5        MR. RAINWATER:  Mr. Jared, are you still there?

6        MR. JARED:  You're asking me?

7        MR. RAINWATER:  Oh, yeah, I don't -- a -- a different

8   screen come up.  I didn't know if we lost ya.

9        MR. JOHNSON:  I'm gonna go into the Avigilon cameras

10  here.

11  BY:  MR. JOHNSON

12       Q.    So this occurred February 1st at approximately

13  12:49?

14       A.    Correct.

15       Q.    Okay.

16       MR. SEXTON:  [indiscernible] [whispered]

17       MR. RAINWATER:  I'm sorry.  What's the -- the source of

18  this video?  Is --

19       MR. JOHNSON:  This is the west end yard camera for

20  Nahant Yard, so this would be --

21       MR. DEPOVER:  [indiscernible]

22       MR. JOHNSON:  -- be the west end or the south end of the

23  yard --

24       MR. RAINWATER:  Oh.

CP_000048

John Sexton; Justin DePover
February 10, 2021

32

1        MR. JOHNSON:  -- that you're looking at right now.

2        MR. RAINWATER:  I -- I thought Mr. Jared said he had it

3   from his phone.  Maybe I misheard that.

4        MR. SEXTON:  Is there audio on this tape as well?

5        MR. JOHNSON:  No.

6        MR. JARED:  There's no audio.

7        MR. SEXTON:  I'm sorry, man --

8        MR. RAINWATER:  It's okay.

9        MR. SEXTON:  -- I can't take this [indiscernible].

10       MR. RAINWATER:  Relax.

11       MR. JOHNSON:  Okay.  As a reminder, we're on record

12   here.

13           Okay.  I'm right at 12:49, Mr. Jared.  I'm gonna

14   start playing.

15       MR. JARED:  Can you share your screen?

16       MR. JOHNSON:  I'm not real sure on how to do so.

17       MR. JARED:  Go down where the gr -- little green button

18   says Share Screen.

19       MR. JOHNSON:  Oh, there it is.  Okay.  Can you see it

20   now, Mr. Jared?

21       MR. JARED:  I can, yes.

22       MR. JOHNSON:  Okay.  I'm gonna start playing here for

23   you.

24               (Whereupon a video recording was played)

33

1    BY:  MR. JOHNSON

2           A.        Okay.  You can see where 4 Track is clear.  This

3    is 474 shoving in.  Mr. DePover gave his 50-car count.

4    Mr. DePover's doing a really good job here of looking towards

5    as he's stepping down to.  First he dismounts at that time.

6    They do have 76 cars ahold of at this time.

7                  You're gonna see myself, I'm entering the frame

8    at the bottom of the screen.  As I walk over, Mr. DePover tells

9    the Engineer -- he's looking at his list and tells the Engineer

10   that he's -- a 15-car count.  At this point, he'd already

11   shoved in 12 car lengths.  If you'd like to stop the video, you

12   can count the cars that actually went into track or we can

13   continue on.

14          MR. JOHNSON:  Do you want --

15          A.        I did tell Mr. DePover at this time, that he was

16   not to give a -- additional car counts to the Engineer.

17          MR. JOHNSON:  Do you wanna count the cars or anything?

18   Does anybody need to?

19          MR. RAINWATER:  No, I'm good.

20          Q.        Okay.  We're gonna continue playing.

21          A.        And now we're watching the cars go by.  When we

22   get to the seventh car, I note that that's the seventh car.

23   Mr. DePover does mention they're short cars.  I didn't -- I did

24   agree.  Once we got past the seventh car, Mr. Sexton began to

John Sexton; Justin DePover
February 10, 2021

34

1    ask for -- his Conductor for more car counts, which he did not

2    receive.  The shoving movement continued past those seven

3    cars.  He asked a second time, and then brought the train to an

4    actual stop.

5              And then, you see he continued to shove, where

6    eventually he did bring the train to a stop.  That third flat

7    car, that's the 11th car.

8        Q.    Okay.

9        A.    It's a clear violation of GCOR 5.3.7.

10       Q.    And that's -- is that all you needed for video?

11       A.    That's all I had.

12       Q.    Okay.  All right.  Any other evidence you'd like

13   to submit at this time, Mr. Jared?

14       A.    Not at this time.

15       MR. JOHNSON:  Actually, where we played video -- and

16   I'll make you a copy of this on the next recess, it's just a

17   confidentiality letter where there's been video submitted, I'll

18   label as Exhibit 6.

19                  (Whereupon, the document was marked as

20                  Exhibit 6 for identification.)

21       MR. RAINWATER:  And with confidentiality with regards to

22   what?

23       MR. JOHNSON:  Because video was played with employees in

24   it, so to ensure that the confidentiality, it's not gonna be

John Sexton; Justin DePover
February 10, 2021

35

1   leaked out to YouTube or some other platform --

2        MR. RAINWATER:  S -- but the video's gonna be --

3        MR. JOHNSON:  -- thr -- through social media -- right.

4        MR. RAINWATER:  But the video's gonna be maintained as

5   part of the record and available for review --

6        MR. JOHNSON:  Yes.

7        MR. RAINWATER:  -- throughout the appeals process?

8        MR. SEXTON:  And that --

9        MR. JOHNSON:  That is correct.

10       MR. SEXTON:  And I'm gonna be able to get a copy of this

11  video.  Correct?

12       MR. JOHNSON:  So let me read in this letter, and it will

13  explain everything to you.

14       So with Exhibit 6, what this is gonna read -- or does

15  read is:

16       "The carrier has presented a video

17       hereafter referred to as Company

18       Exhibit 6.  Company Exhibit 6 is

19       confidential.  CP will not distribute

20       copies of Exhibit 6 to the parties at

21       this hearing.  Should any party desire

22       to view the video, it will be made

23       available upon request made by the

24       appropriate union officer or company

AccuTran Global Enterprises, Inc.
855-552-0505

**CP_000052**

John Sexton; Justin DePover
February 10, 2021

36

1          official.  Such request shall be made

2          to Tom Jared -- General Manager, US

3          West.  A grant of such request is

4          limited to viewing of the video and

5          does not give the viewing party the

6          right to copy the video in any form.

7          This designation is made pursuant to

8          Canadian Pacific's confidentiality

9          expectations (as set forth in CP's Code

10         of Business Eth -- Ethics), Information

11         Security Policy, and other policies and

12         practices protecting the

13         confidentiality of CP's confidential

14         company information and confidential

15         employee information."

16         MR. JOHNSON:  So you would just -- if y -- you want to

17    view it, then you would make a request through Mr. Rainwater

18    and he would contact Mr. Jared to arrange for that --

19         MR. RAINWATER:  All right.  So --

20         MR. JOHNSON:  -- or Mr. Semenek.

21         MR. RAINWATER:  -- the confidentiality statement is

22    Exhibit 6, then.  Can I --

23         MR. JOHNSON:  Correct.

24         MR. RAINWATER:  Can we get a copy of that right now?

John Sexton; Justin DePover
February 10, 2021

37

1       MR. JOHNSON:  We'll just take a brief recess here, and

2  I'll go make a copy for everyone.

3           Time is 13:02.

4                   (Whereupon, a brief recess was taken.)

5       MR. JOHNSON:  Time is now 13:03.  Back on the record

6  with the Sexton-DePover Investigation.  They've been provided

7  with a copy of Exhibit #6.

8       MR. RAINWATER:  So just as a point of clarification,

9  this confidentiality statement is not Exhibit 6, the video is

10 Exhibit 6.

11      MR. JOHNSON:  The video itself is Exhibit 6.  This is

12 what's currently entered so that all parties understand that

13 it's not being copied and transferred out anywhere or it would

14 be a violation of the various CP policies.

15      MR. RAINWATER:  Okay.

16      MR. JOHNSON:  And then, instructions on how to view the

17 video.

18 BY:  MR. JOHNSON

19      Q.     All right.  Mr. Jared, do you have any further

20 testimony or evidence that you'd like to submit at this time?

21      A.     No, I do not.

22      MR. JOHNSON:  All right.  Mr. Rainwater, would you like

23 to cross-examine Mr. Jared?

24      MR. RAINWATER:  Yes.

AccuTran Global Enterprises, Inc.
855-552-0505

**CP_000054**

John Sexton; Justin DePover
February 10, 2021

38

1    BY:  MR. RAINWATER

2        Q.      Mr. Jared, with regard to the video that was

3    presented, is there audio evidence available to correspond with

4    the video?  Can you --

5        A.      No.

6        Q.      So -- so there's no way --

7        A.      No, there's not.

8        Q.      -- to correspond with what the crew was

9    communicating on the radio with the movements that were taking

10   place?

11       A.      There's no corresponding audio that goes with

12   the video.

13       Q.      All right.  So did you -- once you exited your

14   vehicle, d -- did you have a radio available that you were

15   listening to the crew on?

16       A.      I did not have a radio with me.

17       Q.      All right.  So is it possible that you didn't

18   hear all the instructions that was -- that were given from the

19   Conductor to the Engineer as they completed this move?

20       A.      The -- I had my truck radio on, I had my windows

21   down.  I have a very loud radio in my truck.  I did not hear

22   any other correspondence with Train 474 --

23       Q.      All right.  Is it possible that --

24       A.      -- through that radio from where I walked from

AccuTran Global Enterprises, Inc.
855-552-0505

CP_000055

John Sexton; Justin DePover
February 10, 2021

39

1    my --

2           Q.     Yeah, the question I asked --

3           A.     Okay.

4           Q.     -- though, is it possible that you -- you didn't

5    hear anything -- additional --

6           A.     No.

7           Q.     -- communication because you weren't -- didn't

8    have a radio on your person?

9           A.     No.

10          Q.     All right.  So you stated earlier with regard to

11   the GCOR Rule that you entered as Exhibit #3, that Mr. DePover

12   was not in violation of this Rule.  Is that correct?

13          A.     That's correct.  Mr. DePover, I did not find him

14   in violation of GCOR 5.3.7.

15          Q.     All right.  Since that's the only Rule that you

16   entered as a Rule, I can only assume then that Mr. DePover is

17   not culpable in this alleged charge whatsoever.  Is that also

18   correct?

19          A.     That is correct.

20          MR. RAINWATER:  All right.  Mr. Johnson, at this time,

21   I'd like to amend the Hearing Letter wherein Mr. DePover is a

22   charged Principal with the charge -- the alleged -- with the

23   allegation on the Ca -- from the Carrier, to have it amended

24   that Mr. DePover be in attendance purely as a witness.

AccuTran Global Enterprises, Inc.
855-552-0505

CP_000056

John Sexton; Justin DePover
February 10, 2021

40

1          MR. JOHNSON:  Okay.  I'm gonna overrule on your

2    objection.  My -- my duty here as the Hearing Officer is to

3    develop the facts and circumstances and if -- place any

4    responsibility, if it is found that they were a responsible

5    party.  So if the record should show that Mr. DePover was

6    erroneously charged with anything, then --

7          MR. RAINWATER:  All right.

8          MR. JOHNSON:  -- in the decision, that would be made a

9    matter of record.

10         MR. RAINWATER:  Well, based upon the testimony, I'm

11   gonna take that is to be the case, and we're going to view

12   Mr. DePover as a -- purely as a witness here.

13   BY:  MR. RAINWATER

14         Q.      Mr. Jared, was -- was this an efficiency testing

15   event that you conducted?  Mr. Jared?  [indiscernible]

16         MR. JOHNSON:  You're on mute.

17         **A.      Yeah, that's correct.**

18         Q.      Okay.  So this wasn't a f -- in -- I assume

19   because Mr. Dylan Smith is also on the Charge Letter, was he --

20   was this a joint testing event?  Or w -- I'm confused as to why

21   he's on here as a witness.

22         **A.      Sure.  Mr. Smith was not with me at the time.**

23   **Mr. Smith was dur -- was at the interview process.**

24         Q.      Okay.  But he wasn't in the vehicle with you?

John Sexton; Justin DePover
February 10, 2021

41

1        A.        No.

2        Q.        Okay.

3    MR. SEXTON:  [indiscernible]

4        Q.        Did you enter this as a -- as an efficiency

5    testing failure into the CP tracking system?

6        MR. JOHNSON:  Okay.  Mr. Rainwater, I'm not here to

7    determine whether there was an efficiency test entered or --

8    for that.  I'm here solely to determine whether or not

9    Mr. Sexton --

10        MR. RAINWATER:  Let me rephrase the question.

11        MR. JOHNSON:  -- or Mister --

12        MR. RAINWATER:  Let me rephrase the question, then.

13        Q.        Mr. Jared, does CP have a efficiency test m --

14    manual that outlines the Rules and compliance and procedures

15    for how to conduct operating tests?

16        A.        Does that have a bearing on whether or not

17    Mr. Sexton violated --

18        Q.        That's not the question --

19        A.        -- the Rule?

20        Q.        -- I asked, Mr. Jared.  I'm here to ask the

21    questions.  Does Mis -- does CP provide a -- a guidance in a

22    manual that instructs and in -- and tells managers how to

23    conduct efficiency tests?

24        A.        There are manuals available.  But again, I don't

John Sexton; Justin DePover
February 10, 2021

42

1    know what bearing that has on whether or not Mr. Sexton

2    violated this Rule.

3        Q.        Understand.  Do they -- can you tell me which

4    testing code you utilized for this efficiency test?

5        A.        I can tell you that Mr. Sexton made a shoving

6    movement and was given a 15-car count, and he failed to stop

7    within half that distance, which was clear in the video, and

8    through my testimony, and then through the written statement of

9    Mr. DePover.

10       Q.        So whenever you previously -- under your

11   previous testimony, you said that Mr. DePover gave Mr. Sexton a

12   50-car count to begin the shove.  Is that correct?  Good for 50

13   cars?

14       A.        That's correct.

15       Q.        All right.  So how far had the movement taken

16   place before you spoke to Mr. DePover and told him not to

17   respond to his Engineer?

18       A.        As I noted in my earlier testimony that he had

19   shoved 12 car lengths into the track.

20       Q.        So 12 cars then, not being anywhere close to

21   half the distance of 50 cars.  Correct?

22       A.        That really doesn't matter because he changed

23   his testimony to 15 cars.

24       Q.        That's not what I asked.  I just a -- asked if

AccuTran Global Enterprises, Inc.
855-552-0505

**CP_000059**

John Sexton; Justin DePover
February 10, 2021

43

1    12 cars was anywhere close to half the range of 50 cars, yes or

2    no?

3         A.      No.  But again --

4         Q.      Okay.  Thank you.

5         A.      -- he changed his car count to 15.

6         Q.      Do you have any further proof as far as related

7    to locomotive downloads with distances that we can correspond

8    to the -- the actual movements?

9         A.      I have my testimony, a written statement from

10   Mr. DePover, the list -- marked list that Mr. DePover provided

11   as evidence.

12        Q.      Okay.

13        MR. RAINWATER:  No further questions for Mr. Jared at

14   this time.  Subject to recall.

15        MR. JOHNSON:  All right.  Just a couple of follow-up for

16   you, Mr. Jared.

17   BY:  MR. JOHNSON

18        Q.      So you heard -- or where were you when

19   Mr. DePover gave the 15-car count?

20        A.      I was standing next to him when he gave the

21   15-car count.

22        Q.      At any time after that before the movement came

23   to a stop, was he observed updating his car count to the

24   Engineer?

AccuTran Global Enterprises, Inc.
855-552-0505

**CP_000060**

John Sexton; Justin DePover
February 10, 2021

44

1          A.        No, he followed my instruction by not providing

2    any other car counts until I -- until the movement came to a

3    stop.

4          MR. JOHNSON:  Okay.  I have no further questions.

5          Any follow-up for you, Mr. Rainwater?

6          MR. RAINWATER:  Just one.

7    BY:  MR. RAINWATER

8          Q.        Mr. Jared, were we able to see your vehicle in

9    the video evidence?  Is it pictured in the video?

10         A.        It must be 'cause of your mask, I can't -- I

11   can't hear you.  What did you say?

12         Q.        I have a feeling that if you were here in

13   attendance, you woulda heard me just fine.

14                   Were we able to see your vehicle that you exited

15   from in the video that you provided?

16         A.        No.

17         Q.        So it's not in the camera view.  Is that

18   correct?

19         A.        That is correct.

20         Q.        I don't know if we can pull that video back up.

21   Can we make an estimation about how far away the maximum screen

22   view goes between Mr. DePover and the -- and the e -- edge of

23   the vee -- of the visual video evidence?

24         A.        Are you gonna have Mr. Johnson pull the video

John Sexton; Justin DePover
February 10, 2021

45

1    back up?

2         MR. JOHNSON:  Yeah, I'm pulling it back up right now.

3         MR. SEXTON:  Yeah.

4         Q.     All right.  So --

5         MR. SEXTON:  Can't see it.

6         MR. RAINWATER:  Yeah, we don't see Mr. Jared's vehicle

7    in view.  And I would estimate, just by --

8         MR. SEXTON:  Fifty yards.

9         MR. RAINWATER:  Yeah, it probably -- probably at least

10   tw -- thirty to forty yards at a minimum.

11        Q.     Okay.  I just wanted to note that for the

12   record, your vehicle is not in view and you didn't have a radio

13   on your person, as you said earlier.

14        MR. RAINWATER:  Thank you.  No further questions at this

15   time.

16        MR. JOHNSON:  Okay.  Just a couple follow-up for ya.

17   BY:  MR. JOHNSON

18        Q.     Mr. Jared, you've already testified that you

19   were standing next to -- which the video shows -- standing next

20   to Mr. DePover when he gave the 15-car count.  Were you --

21        A.     That's correct.

22        Q.     Were you near your radio when the initial

23   communication of 50, 5-0, cars was given?

24        A.     I was.

AccuTran Global Enterprises, Inc.
855-552-0505

CP_000062

John Sexton; Justin DePover
February 10, 2021

46

1          Q.          And was that i -- inside your vehicle?  Or were
2     you outside the vehicle?

3          A.          I was inside my vehicle at the time.

4          Q.          Okay.  So it was clear and then you -- what did
5     you do after you heard the 50-car count?

6          A.          After I heard the 50-car count, I did dismount
7     my vehicle, which is about by that light pole that you see --
8     well, you cannot see the bottom of that light pole, but about
9     that -- about that location, I -- I dismounted my vehicle.  As
10    you've seen from the video, I came up from the bottom of the
11    video.  And then I -- I approached Mr. DePover as he was making
12    his shoving movement.

13         Q.          Okay.  And then you gave him the instruction for
14    the 15-car count without an update?

15         A.          Mr. DePover provided that 15-car count.  And
16    then once he did that, I asked him not to transmit over the
17    radio any more until -- until the test was done.

18         Q.          Okay.

19         MR. JOHNSON:  I have no further questions.

20             Any follow-up from you, Mr. Rainwater?

21         MR. RAINWATER:  No, just like to keep him available for
22    recall should a -- the need arise.

23         MR. JOHNSON:  Okay.  Mr. Jared, you're released from
24    testimony at this time.  I'm gonna put our end on mute.  Should

John Sexton; Justin DePover
February 10, 2021

47

1    a need arise to have you testify, I can contact you via phone

2    and we'll get set back up on Zoom.

3           MR. RAINWATER:  So just --

4           MR. JARED:  That's correct.

5           MR. RAINWATER:  Just for the record, you're gonna mu --

6    mute it and close the video?  He's not gonna have any access to

7    the remainder of this hearing, is he?

8           MR. JOHNSON:  No.  What I can do is end the meeting.

9           MR. RAINWATER:  Yeah.

10          MR. JOHNSON:  That way, then --

11          MR. RAINWATER:  Yeah, we would --

12          MR. JOHNSON:  -- it -- it --

13          MR. RAINWATER:  -- like that to happen, to be

14   sequestered.  Correct.  Yes.

15          MR. JOHNSON:  Okay.  All right.  Yeah, just stay

16   available by phone in case we need to have you recalled so we

17   can get you on video.

18          MR. JARED:  Okay.

19          MR. JOHNSON:  All right.  Thank you, Mr. Jared.

20                    (Whereupon Mr. Jared exits the

21                     investigation/hearing)

22          MR. JOHNSON:  I don't know what that's gonna do to him,

23   but.  I muted, so.

24          MR. RAINWATER:  Or -- okay.  We're not on the record?

John Sexton; Justin DePover
February 10, 2021

48

1        MR. JOHNSON:  Do you need a quick recess?

2        MR. RAINWATER:  Yeah, if we're on break, I'd, you know

3   --

4        MR. JOHNSON:  Okay.

5        MR. RAINWATER:  I drank a lotta tea coming in.

6        MR. JOHNSON:  Yep.  Time is 13:14.  We'll take a short

7   recess.

8                  (Whereupon, a short recess was taken.)

9        MR. JOHNSON:  All right.  The time is 13:20, resuming

10   with the Sexton-DePover Investigation.

11        Finished questioning Mr. Jared.  He's been

12   sequestered and is no longer able to see any video or hear any

13   audio at this time, so.

14        I will call Mr. DePover next.

15                  JUSTIN DEPOVER

16   called as a witness by the Company herein, was examined and

17   testified as follows:

18                  E X A M I N A T I O N

19                  By:  Mr. Johnson

20        Q.    Mr. DePover, I've already asked you all the

21   preliminary questions.  What assignment were you working on

22   February 1st of 2021?

23        A.    That'd be the -- the CP 474-31.

24        Q.    Okay.  And do you remember the incident that --

John Sexton; Justin DePover
February 10, 2021

49

1       A.      Yeah.

2       Q.      -- Mister -- Mr. Jared explained?

3       A.      Yes.

4       Q.      Or described?

5       A.      Yes.

6       Q.      Were these -- in Exhibit 4, were these your

7  markings?

8       A.      Yes, I made all the markings on Exhibit 4, the

9  Tonnage Profile.

10      Q.      Okay.  So this black line under 76, what was

11  that?

12      A.      That was our initial cut location bef -- prior

13  to shoving any tracks.

14      Q.      Okay.  So it --

15      A.      We -- we ended up leaving that on the Main Line.

16      Q.      Which --

17      A.      Fr --

18      Q.      -- car?

19      A.      S -- car number 77 and behind --

20      Q.      Okay.

21      A.      -- is what was left on it.

22      Q.      So you just -- you had ahold of 76 cars then --

23      A.      Yes.

24      Q.      -- as Mr. Jared described?

John Sexton; Justin DePover
February 10, 2021

50

1        A.        Yes.

2        Q.        Okay.  So we go up, there's a blue mark under

3    line 64.  Is that correct?

4        A.        Yes.

5        Q.        What is that?

6        A.        That would've been when I told them that there

7    were 15 cars remaining and that he was clear for 40 still at

8    that time.  And then the -- the next blue line would've been

9    the actual car or the stop, which was in front of us at the

10   time on the -- when he -- when Mr. Sexton did have the train

11   stopped.  And then the -- then I did also indicate the DP unit,

12   which we were to set out to a separate track.

13       Q.        Okay.

14       A.        So that would've been the end of our cut, right

15   -- right at the -- car number 49 would've been the -- the cut

16   location to leave into Nahant 4.

17       Q.        Okay.  So you gave him 15 cars.  Correct?

18       A.        So li --

19       Q.        At line 64?

20       A.        So my initial movement woulda been the clear for

21   50 to start him into the track --

22       Q.        Okay.

23       A.        -- and I asked for 25 at the time.  And then the

24   next call was still clear for 40, had 15 until the stop.

John Sexton; Justin DePover
February 10, 2021

51

1        Q.        Okay.

2        A.        Which was when I was told not to respond to any

3    remarks on the radio yet.

4        Q.        Okay.  And then under line 53 --

5        A.        Tha -- that was when the train actually came to

6    a stop.

7        Q.        Okay.  So you gave him 15, clear for 40?

8        A.        Yes.

9        Q.        Is what you're saying?

10       A.        Yes.

11       Q.        Okay.  Exhibit 5 was your -- is that a statement

12    that was written by you?

13       A.        Yes.

14       Q.        Okay.  And in that letter, do you say -- or in

15    that statement, do you say anything about anything other than a

16    count of 15?

17       A.        On -- on written, I do just have the 15 count

18    and that it stopped after the 11.

19       Q.        Okay.  So if you had given him that instruction,

20    why wouldn't you put that in there?

21       A.        Well, hon -- honestly, it -- with it being my

22    second start back and I was in a closed room with the General

23    Manager, whom I've never met, and Mr. Smith, I was quite under

24    some pressure.

AccuTran Global Enterprises, Inc.
855-552-0505

CP_000068

John Sexton; Justin DePover
February 10, 2021

52

1          MR. JOHNSON:  Okay.  I have no further questions for

2     Mr. DePover at this time.

3               Mr. Rainwater, any follow-up with Mr. DePover --

4          MR. RAINWATER:  Yes.

5          MR. JOHNSON:  -- for you?

6     BY:  MR. RAINWATER

7          Q.      So specifically to Exhibit 5 here, your

8     statement, did you -- was this statement given willingly?  Or y

9     -- were you compelled to give it?

10         A.      I -- I'd say compelled.  I didn't even know I

11    had a choice not to, if that was even a thing.

12         Q.      Okay.  So did you feel intimidated, being in the

13    room with Mr. Jared?

14         A.      Yes, I did.

15         Q.      Did he make any inferences or assum -- or did

16    you assume, based upon what he was asking for, that if you

17    didn't do it, you would be in trouble?

18         A.      I -- I do feel that way still.  I -- I -- I

19    wrote down what I was thinking at the time --

20         Q.      Okay.

21         A.      -- and --

22         Q.      Related back to the video that we watched, I'll

23    ask you the same thing I asked Mr. Jared.  Did -- did Mr. Jared

24    have a radio on his person, a -- a portable?

John Sexton; Justin DePover
February 10, 2021

53

1          A.      He did not.

2          Q.      And his vehicle wasn't within view of the

3    screen.  Is that correct?

4          A.      My back was to it also, so I had --

5          Q.      And your ba --

6          A.      No.  Yeah.

7          Q.      So you didn't see it either?

8          A.      That's correct.

9          Q.      And so you gave instruction, then, after you

10   were prepared to shove into the track.  What did -- what did

11   you tell Mr. Sexton as far as instructions for to initiate your

12   move?

13         A.      The -- the initial movement woulda been that we

14   were clear for 50 cars, and I would've started him in with

15   needing 25 to a stop.  And then I updated him with needing 15

16   more to a stop, still clear for 40 --

17         Q.      Okay.

18         A.      -- and then I was informed not to --

19         Q.      So --

20         A.      -- proceed anymore.

21         Q.      So do you believe because Mr. Jared didn't have

22   a radio on his person, he didn't hear you say clear for 40?

23         A.      I -- that's my assumption.

24         Q.      All right.  So based upon the car counts that

John Sexton; Justin DePover
February 10, 2021

54

1    you were given, the f -- the -- you were shoving 26 cars into

2    this track.  Correct?

3          A.      Yes.

4          Q.      T -- to cut away at your DP?

5          A.      The initial cut, yes.

6          Q.      And you were planning to cut away at your DP on

7    the initial cut.  Correct?

8          A.      Yes.

9          Q.      All right.  And so you told him clear for 50

10   cars.  If he shoved a -- I'm sorry.  One -- once he shoved a

11   little bit more, it looks like he shoved in 13 cars, and then

12   you told him 15, clear for 40.  Is that correct?

13         A.      That's correct.

14         Q.      All right.  So if he stops in 11, does he still

15   have more than -- what -- what's the half the -- half the range

16   of 40?

17         A.      Be 20, so, no.

18         Q.      So he would still technically have nine cars

19   available to him.  Correct?

20         A.      Yes.

21         Q.      All right.  And Mr. Jared as well as yourself ha

22   -- have testified here that these cars -- some of these cars

23   are short, 42 footers.  Is that correct?

24         A.      Yes.

John Sexton; Justin DePover
February 10, 2021

55

1      Q.     T -- to your railroad knowledge, limited though

2  it may be, what's -- what's about the average car length?

3      A.     I'd say about 50 to 60, averaging.

4      Q.     Okay.  And these were 42-foot cars, a -- a bunch

5  of 'em, in your cut?

6      A.     Yes.

7      Q.     So does that mean those smaller cars are gonna

8  come at you a little bit quicker?

9      A.     Yes.

10     Q.     Mm-hmm.

11     A.     Yes, they were.  I believe I even mentioned on

12  the radio call that -- that I had short cars in there --

13     Q.     Okay.

14     A.     -- so he was aware.

15     Q.     And so after Mr. Sexton -- all right.  So I

16  wanna back up, I guess.  After you tell him 15, clear for 40,

17  what happened with Mr. Jared?

18     A.     He came up from behind me and just informed me

19  to stop -- speedf -- or stop replying on the radio.

20     Q.     All right.  Did he kinda catch ya off guard?

21     A.     Yeah, I'd had no idea he was behind me.

22     Q.     All right.  So he -- he kinda distracted you

23  from performing your duty --

24     A.     I --

John Sexton; Justin DePover
February 10, 2021

56

1        Q.       -- for a little bit?

2        A.       Yes, I was engaged with talking with him.

3        Q.       Okay. So di -- and did Mr. Jared interrupt you

4    while the cars were moving next to you?

5        A.       The -- the shoving movement was already

6    occurring. Yes.

7        Q.       Okay. And then after Mr. Jared instructed you

8    not to reply to Mr. Sexton over the radio, what occurred next?

9        A.       I kinda verified it with him at the time because

10   I -- I wanted to give him proper car counts still, but he just

11   kept insisting that I did not reply, and we just waited until I

12   -- then Mr. Sexton eventually did stop the train after

13   inquiring where I was.

14       Q.       All right. So a -- after Mr. Sexton inquired to

15   where you were and you were unable to respond at the direction

16   of Mr. Jared, did Mr. Sexton continue to ask for you on the

17   radio?

18       A.       Yes, he probably asked about three or four

19   times, even after stopped, and then also tried to get ahold of

20   the Yard Office to relay for him if he couldn't hear me.

21       Q.       All right. So i -- that was even after he

22   stopped. And it sounded like he was concerned for your

23   well-being? Or didn't know what was happening?

24       A.       Yeah, he definitely sounded like he had no idea

CP_000073

John Sexton; Justin DePover
February 10, 2021

57

1    what was going on.

2        Q.    All right.  With regard to this written

3    statement that you made, were you -- were you still within your

4    12 hours?  Or was this after your -- the expiration of your

5    hours of service?

6        A.    That woulda been after.

7        Q.    And just to jar your memory here, do you recall

8    Mr. Jared stating that you were not at fault for the

9    allegations in this hearing?

10       A.    During this hearing, yes.

11       MR. RAINWATER:  N -- no further questions at this time.

12       MR. JOHNSON:  Okay.  I just have a couple follow-up

13   questions.

14   BY:  MR. JOHNSON

15       Q.    Where was Mr. Jared when you gave the 15-car

16   count?

17       A.    He was walking up behind me at the time.  I'm --

18   I'm not sure where he woulda been right behind me.  After I

19   gave the 15-car count and the clear for 40, he then came up

20   beside me and I was able to notice that he was in the track

21   with me.

22       Q.    Okay.  So did Mis -- you -- you -- you testified

23   that Mr. Sexton had tried to contact you after approximately

24   seven cars had gone by you?

John Sexton; Justin DePover
February 10, 2021

58

1    A.    I'd -- I'd say it was around there, yes.

2    Q.    Okay.  So if he was clear --

3    A.    I was --

4    Q.    -- for 40, why would he have need to call you?

5    A.    Well, because I -- I gave him a 15-car to a

6    stop.

7    Q.    Okay.  How many cars on here are labeled as

8    42-foot cars from between your blue marks?

9    A.    Well, that is in betwee -- between -- just

10   between the blue marks, though, you're --

11   Q.    Yeah, just between --

12   A.    -- [indiscernible] --

13   Q.    -- line 54 and 64.

14   A.    [indiscernible] 54.

15   Q.    Yeah, sorry, 'cause the --

16   A.    No, that's all right.

17   Q.    -- copy's --

18   A.    One, two, three, four, five -- be seven of 'em.

19   Q.    Okay.  I'll give you a moment.  What's that

20   distance?

21   A.    Oh, shoot.  Forty-two -- it's been a while, so

22   28 -- looks like 294 --

23   Q.    Okay.

24   A.    -- for -- for just those cars.

John Sexton; Justin DePover
February 10, 2021

59

1      Q.      Okay. So I also see line 60. What is that for

2 a length?

3      A.      Fifty-one.

4      Q.      Okay.

5      A.      He --

6      Q.      So add that to it.

7      A.      All right. So it'd be 345 now.

8      Q.      Okay. And then if we -- lines 54, 55, and 56

9 have a same length next to them. What is that?

10      A.      [indiscernible] be 2 -- be 213 for those three

11 in addition to the one -- [indiscernible]. So yeah, I -- a

12 total length, I've -- I figure that'd be 558 feet.

13      Q.      Okay. So that was 558 feet from when you gave

14 the 15-car instruction to the stop. Correct?

15      A.      Yeah, I believe so. Yes.

16      Q.      Okay. And you said the average railcar is 50 to

17 60 feet?

18      A.      I'd -- I'd say on average, yes, about 50 to 60.

19      Q.      Okay. So let's just go with the longer of the

20 two distances. How many car lengths would 15 cars be?

21      A.      Fifteen to sixty. That's 30. [whispered] All

22 right. Yeah, that's -- that's all -- am I -- am I right to say

23 900?

24      MR. SEXTON: That's right.

John Sexton; Justin DePover
February 10, 2021

60

1          MR. RAINWATER:  Fifteen cars at 60 feet?

2          A.       So -- yeah, yeah, fifty and sixteen feet.  Yeah,

3    so -- so that'd -- yeah, it's 900 feet.

4          Q.       Okay.  So if we divide that in half --

5          A.       That'd be 450 then.

6          Q.       So is 5 -- 558 further than what the -- half the

7    distance would be of 15?

8          A.       Fifty's -- I'm just -- I'm not the best at math,

9    I'm sorry.

10         Q.       Okay.

11         A.       [indiscernible] --

12         Q.       Is --

13         A.       It's just what it [is], yeah.

14         Q.       So the 450 feet --

15         A.       Yes.

16         Q.       -- that would be half the distance specified for

17   the 15-car count.  Correct?

18         A.       Okay.  Okay.  Yes.

19         Q.       Okay.  So is 558 feet that he traveled, is that

20   --

21         A.       The -- the --

22         Q.       -- without any further instruction from you, is

23   that greater or less than --

24         A.       Then that would be -- yeah, 558 is greater than

**CP_000077**

John Sexton; Justin DePover
February 10, 2021

61

1   450.

2        Q.      Okay.

3        MR. JOHNSON:  All right.  I have no further questions at

4   this time.

5            Mr. Rainwater, any --

6   BY:  MR. RAINWATER

7        Q.      And related --

8        MR. JOHNSON:  -- follow-up?

9        Q.      -- to our math exercise here, Mr. DePover, so

10  assuming the cars are 60 feet long, if you got a count of 40 --

11  40 cars, is it correct to say that 60 times 40 is 2400 feet?

12       A.      Oh, 60, 40, 12, 24 [whispered] -- yes.

13       Q.      And half of that'd be 1200 feet?

14       A.      Yes.  Half of twent -- 24 feet --

15       Q.      And the length that Mr. Sexton shoved before he

16  stopped was 558 feet, which is less than 1200 feet.  Correct?

17       A.      That's -- that is correct.

18       MR. RAINWATER:  No further questions.

19       MR. JOHNSON:  Okay.  I have no further questions at this

20  time.

21          Mr. DePover, you're released from testimony at this

22  time.  Subject to recall.

23          Do you need a recess or anything before we continue

24  with -- no.  Okay.

John Sexton; Justin DePover
February 10, 2021

62

1      MR. RAINWATER:  I'm good.

2      MR. JOHNSON:  All right.  Next, we'll call Mr. Sexton.

3                      JOHN SEXTON

4  called as a witness by the Company herein, was examined and

5  testified as follows:

6                   E X A M I N A T I O N

7                   By:  Mr. Johnson

8      Q.      Mr. Sexton, what assignment were you working on

9  February 1st of 2021?

10     A.      474-31.

11     Q.      And were you the Engineer or Conductor?

12     A.      Engineer.

13     Q.      Okay.  Do you recall the shove movement that was

14  described by Mr. Jared and Mr. DePover?

15     A.      I do.

16     Q.      Okay.  Were you given a 50, 5-0, car count as

17  your initial count?

18     A.      I was.

19     Q.      Okay.  And what was the next instruction you

20  were given over the radio?

21     A.      Believe it was good for -- still good for 40, 15

22  -- 15 cars to a stop, with emphasis on good for 40.

23     Q.      Okay.  After you were given that instruction,

24  did you try contacting Mr. DePover again?

John Sexton; Justin DePover
February 10, 2021

63

1        A.        I did, about three or four times, that's

2    correct.  And also, the Nahant ATM.

3        Q.        Okay.  And why were you trying to contact

4    Mr. DePover or the ATM?

5        A.        I'd -- I could not contact -- I could not reach

6    him via radio and -- and our radios are not very good

7    sometimes, and sometimes the ATM must relay for us to complete

8    our work in the yard.

9        Q.        Okay.  And why were you trying to contact

10   Mr. DePover at that time?

11       A.        He -- he gave me a -- a car count, and I know

12   Mr. DePover, we've had what I call rolling job briefings for

13   almost 22 years now.  And I told him that -- update me as -- as

14   much as he can, as -- as often as he can, and I'd heard nothing

15   else.  And that's when I was reaching out to Mr. DePover.

16       Q.        Okay.  Do you know the distance that you had

17   traveled, prior to the math exercise we had?

18       A.        I do not.  Other than your -- the -- the math

19   exercise, no, sir.  All I know is I was good for 40 cars, which

20   is 2400 feet.  And during the -- the previous testimony, what,

21   it was 550 feet that I stopped at?  Is that -- is that correct,

22   sir?  I think that's what you said.

23       MR. DEPOVER:  558.

24       Q.        That's 5 -- 558 was --

John Sexton; Justin DePover
February 10, 2021

64

1       A.      Yeah.

2       Q.      -- what Mr. DePover s --

3       MR. SEXTON:  558, you're saying?

4       MR. DEPOVER:  Yeah.  Mm-hmm.

5       MR. SEXTON:  Okay.

6       A.      Yeah.

7       Q.      Based on what the car lengths --

8       A.      Yep, that --

9       Q.      -- were on the Tonnage Profile.

10      A.      That's fair.

11      Q.      So you knew you -- you were gonna have to stop

12  within 15 cars when he gave that instruction?

13      A.      He told me I was good for 40 cars, but then he

14  changed it to 15.  Yes.

15      Q.      Okay.

16      MR. JOHNSON:  I have no further questions at this time

17  for Mr. Sexton.

18          Mr. Rainwater?

19  BY:  MR. RAINWATER

20      Q.      So just to clarify, Mr. DePover told you you

21  were clear for 40 cars, but he only needed 15 more to a stop

22  cut.  Was that your understanding?

23      A.      Initially, sir, it was clear track, good for 50

24  --

AccuTran Global Enterprises, Inc.
855-552-0505

**CP_000081**

John Sexton; Justin DePover
February 10, 2021

65

1       Q.      Right.  That was --

2       A.      -- 5-0, cars.

3       Q.      That was at the be --

4       A.      We all have masks on in here.

5       Q.      Right.

6       A.      Good for 5-0 cars.  And then he -- once

7  Mr. DePover was -- he updated me, he said still good for 40,

8  15, 1-5, to a stop.  That's correct.

9       Q.      Okay.  So based upon your round trip with

10 Mr. DePover, was this -- he just returned from furlough.

11 Correct?

12      A.      Yes, sir, he did.

13      Q.      And -- and how many trips had he made prior to

14 this event?

15      A.      One; that was with me, going north to Marquette,

16 sir.

17      Q.      So you're on the round trip of his first trip

18 back from an 11-month furlough.  Is that correct?

19      A.      That is correct.

20      Q.      And so based upon your previous statement,

21 you're -- you said you were having rolling job briefings with

22 him.  It -- was that just this trip?  Or the way up as well?

23      A.      On the way up --

24      MR. JOHNSON:  Okay.  Mr. Rainwater --

John Sexton; Justin DePover
February 10, 2021

66

1          MR. RAINWATER:  I'm coming to --

2          MR. JOHNSON:  -- let -- let's --

3          MR. RAINWATER:  -- to the point.  I'm coming to the

4     point.

5          A.      On -- on -- on the way -- I -- now, I do this

6     with everyone I work with, sir.  The rolling -- when I say

7     rolling job briefings, I'm talking about whatever is going on

8     at the time, what's coming up, what we need to do, and how

9     we're gonna execute it.

10         Q.      And so is the reason that you were asking

11    Mr. DePover for frequent car counts was just to make sure he

12    both understood what he was doing and you knew where he was

13    gonna be?

14         A.      Yes, sir.

15         Q.      All right.  So whenever you lost communication

16    with Mr. DePover through the manipulation of General Manager

17    Jared with this set up test, did it create a little

18    consternation with yourself?  Or were you concerned?

19         A.      Absolutely I was.  I didn't know what happened,

20    and I was wanting to know where he was and make sure he was

21    safe.

22         Q.      All right.  With regard to this shove move, in

23    and of itself, can you reference GCOR 6.5?  I believe you have

24    a copy of that.  Do you?

AccuTran Global Enterprises, Inc.
855-552-0505

CP_000083

John Sexton; Justin DePover
February 10, 2021

67

1    A.    I do, sir.  Would you like me to read it?

2    Q.    If you could, please read the first paragraph.

3    A.    This is GCOR 6.5 Shoving Movements:

4        "Equipment must not be shoved 'til

5    the engineer and employee protecting

6    the movement have completed a job

7    briefing concerning how protection will

8    be provided.  Employee must be in

9    position, provide visual protection of

10   the equipment being shoved and must not

11   engage in unrelated tasks while

12   providing protection."

13   Q.    Because Mr. Jared interrupted Mr. DePover while

14   he was protecting your shove, do you believe Mr. Jared enticed

15   Mr. DePover an - and, therefore, broke this Rule?

16   A.    Absolutely.

17   Q.    Mr. Jared caused that Rule to be violated?

18   A.    Absolutely.  He created a unsafe act.

19   Q.    All right.

20   MR. RAINWATER:  So, Mr. Johnson, I'm gonna pass you a

21   copy of a few pages from the US Efficiency Test Manual on the

22   Operating Rules Compliance With FRA 217.  This is the Testing

23   --

24   MR. JOHNSON:  I --

AccuTran Global Enterprises, Inc.
855-552-0505

CP_000084

68

1        MR. RAINWATER:  -- and Operating Rules manual that CP

2    gives to its managers, which gives instructions on how to set

3    up tests and perform testing with regard to Operating Rules.

4    And at this time, I'd like to go through --

5        MR. JOHNSON:  I don't understand how this has to do with

6    whether or not Mr. Sexton or Mr. DePover --

7        MR. RAINWATER:  I'll tell you exactly --

8        MR. JOHNSON:  -- complied with the Rules.

9        MR. RAINWATER:  Yeah, I'll tell you exactly how it has

10   to do with it.  It's because Mr. Jared set up an un -- unsafe

11   and unsanctioned test based on CP's own Rules.  If you go to

12   page 107, as noted on the bottom of this, for test GRF02, this

13   test can only be conducted under observation practices.  It

14   cannot be set up, there's no provision that allows CP managers

15   to tell a Conductor to stop communicating with the m -- with

16   the Engineer to determine if they're gonna stop in half the

17   range of vision, and there's reasons for that.  It sets up an

18   unsafe condition, and it's outside of the normal operating

19   parameters that we have to work under.

20           So in addition to that, I'd like to go through some

21   questioning exercises with Mr. Sexton with regard to -- to

22   entering this, also, as an exhibit.

23       MR. JOHNSON:  Okay.  Once again, I'm here to determine

24   whether or not he stopped within half the range.

CP_000085

John Sexton; Justin DePover
February 10, 2021

69

1        MR. RAINWATER:  Mm-hmm.

2        MR. JOHNSON:  I'm not here to determine --

3        MR. RAINWATER:  Right.  We've already proven that

4   Mr. Jare -- Mr. Sexton stopped within half the range of the 40

5   cars specified, actually less than that.  Now we intend to

6   prove that Mr. Jared conducted an unfair test.

7        MR. JOHNSON:  Okay.  Now if you have something against

8   -- with -- an issue with Mr. Jared, there's other means.  I'm

9   here solely to determine what's in the body of the Charge

10  Letter, not --

11       MR. RAINWATER:  Right.  I get it.

12       MR. JOHNSON:  -- outside of that, and you're going

13  outside --

14       MR. RAINWATER:  So Mr. Jared testified --

15       MR. JOHNSON:  -- of that.

16       MR. RAINWATER:  -- that he te -- conducted an efficiency

17  test for shove compliance, shove Rule compliance.  And I

18  believe as part of the facts and circumstances, this evidence

19  that we have here from the Testing Manual will bear out that

20  that test was conducted unfairly, and that's part of th -- the

21  -- the rest of the facts and circumstances with regard to this

22  test.

23       MR. JOHNSON:  So once again, Mr. Rainwater, we're here

24  to determine the facts and -- within the body of this.  If you

John Sexton; Justin DePover
February 10, 2021

70

1    have issue with how the test was conducted, things like that,

2    that has -- y -- that's not relevant to this investigation.

3         MR. RAINWATER:  No, I beg to differ.  I disagree with

4    you.  And -- you know, I've given a lot of leniency on my own s

5    -- behalf here, with Mr. Jared testifying via Zoom, sending e

6    -- exhibits via email, taking a recess in the middle of his

7    testimony to make copies.  All I'm asking for is the opperdin

8    -- tunity to do the same thing as far as entering evidence on

9    behalf of Mr. Sexton that you guys took.  I -- it -- to give me

10   the same opportunity.

11        MR. JOHNSON:  Again, I have no idea what this has to do

12   with whether or not Mr. Sexton --

13        MR. RAINWATER:  Yeah.

14        MR. JOHNSON:  -- or Mr. DePover complied with the Rules.

15        MR. RAINWATER:  We've already shown that he complied

16   with the Rule.  We're telling you that Mr. Jared set up the

17   test unfairly.

18        MR. JOHNSON:  Well, now, I haven't -- I haven't

19   completed this, so there has not been a decision whether they

20   complied or --

21        MR. RAINWATER:  And I understand --

22        MR. JOHNSON:  -- did not comply with the Rule, so --

23        MR. RAINWATER:  I do.

24        MR. JOHNSON:  -- you're making speculation based on your

CP_000087

John Sexton; Justin DePover
February 10, 2021

71

1    --

2          MR. RAINWATER:  Based on the evidence --

3          MR. JOHNSON:  -- right --

4          MR. RAINWATER:  -- pre -- presented so far in this

5    hearing --

6          MR. JOHNSON:  Well --

7          MR. RAINWATER:  -- that's exactly right.  I guess --

8          MR. JOHNSON:  And you know that --

9          MR. RAINWATER:  -- just to --

10         MR. JOHNSON:  -- I have to make a determination, so.

11         MR. RAINWATER:  Just as a point of order, if we can back

12   up to GCOR 6.5, can we please enter that as a Organizational

13   exhibit?  I forgot to get that marked.

14         MR. JOHNSON:  Okay.

15         MR. SEXTON:  What number is that, sir?

16         MR. RAINWATER:  That'll be at the determination of the

17   Hearing Officer.

18         MR. JOHNSON:  Let's do Exhibit 7.

19                   (Whereupon, the document was marked as

20                    Exhibit 7 for identification.)

21         MR. RAINWATER:  Okay.

22         MR. JOHNSON:  Just to --

23         MR. RAINWATER:  Exhibit 7.  All right.

24   BY:  MR. RAINWATER

John Sexton; Justin DePover
February 10, 2021

72

1          Q.          And as part and parcel of that, in the US

2    Efficiency Testing Manual, Mr. Sexton, page 13 lists some dos

3    and don'ts.

4          MR. JOHNSON:  Okay.  So once again, Mr. Jared is not

5    under investigation at this time.

6          MR. RAINWATER:  Yeah, I get that.

7          MR. JOHNSON:  So we're not gonna go off onto this --

8          MR. RAINWATER:  Okay.  We believe that this test was set

9    up in an unfair manner.  Regardless of whether or not

10   Mr. Sexton did or didn't comply with it, tests have to be

11   conducted in a fair manner.  Right?  And by virtue of the

12   actions of Mr. Jared not even following along with what the

13   manual dictates as what is an acceptable test based upon just

14   purely being ab -- able to observe the actions, by -- by

15   manipulating the conditions and telling Mr. DePover not to

16   respond to any questions or give him any further car counts, he

17   violated this -- it -- this whole process for what's considered

18   a fair efficiency test.  So that's why this is relevant to the

19   facts and circumstances of this investigation.

20         MR. JOHNSON:  Okay.  Mr. Rainwater, we're not gonna go

21   off into this realm.  I want to stick to whether or not

22   Mr. Sexton and Mr. DePover complied with the Rules --

23         MR. RAINWATER:  So am I --

24         MR. JOHNSON:  -- and if you have issue with Mr. Jared's

John Sexton; Justin DePover
February 10, 2021

73

1  testing, that needs to be taken up with somebody outside of

2  this room.  I don't --

3        MR. RAINWATER:  Oh, it -- it will be, I promise.  But am

4  I to understand correctly, Mr. Johnson, that you are preventing

5  me from entering evidence that's relative and relevant to this

6  hearing?

7        MR. JOHNSON:  I don't know how it's relevant to this

8  hearing because it does not --

9        MR. RAINWATER:  I've explained it in three different

10 ways --

11       MR. JOHNSON:  This does not --

12       MR. RAINWATER:  -- Mr. Johnson.

13       MR. JOHNSON:  This does not give me any idea of whether

14 or not Mr. Sexton or Mr. DePover -- that's -- that's why I'm

15 not going into this.  Mr. Jared isn't under investigation

16 here.  That's a -- that's all stuff that you can take up with

17 --

18       MR. RAINWATER:  Well, maybe he should be.

19       MR. JOHNSON:  -- other in -- individuals.

20       MR. RAINWATER:  I understand, Mr. Johnson.  And I'll

21 move on, since you're not going to allow me any kinda leeway

22 whatsoever with presenting my own case.  I understand -- were

23 -- when were you informed, sir, of when you were going to be

24 the Hearing Officer?  Was it today, for this hearing?

John Sexton; Justin DePover
February 10, 2021

74

1          MR. JOHNSON:  Last night.

2          MR. RAINWATER:  So last night.  Okay.  On February 8th,

3    I sent an email to Mr. Reyes.  It's got -- who, at the time, up

4    until today, I inter -- was under the impression he was gonna

5    be the Hearing Officer -- and this letter states:

6               "Mr. Reyes,

7               The purpose of this letter is to

8               formally request witness -- witnesses,

9               be made available in the hearing

10              scheduled Wednesday, February 10, 2021

11              at 1200 in the matter of John Sexton

12              and Justin DePover and their alleged,

13              Failure to stop within half the

14              specified distance given while shoving

15              into track NA04

16              On behalf of both Principals, the

17              Organization requests the following:

18               Witnesses

19               Andrew Cruciani, a.  We have reason

20              to believe that Cruc -- Mr. Cruciani

21              was assisting the 474-31 crew at Nahant

22              yard.  It's our contention that he will

23              have first hand, and primary knowledge,

24              of the events and is a material

75

1    witness."

2    MR. RAINWATER:  And:

3        "b.  David Cox -- We have reason to

4    believe that Mr. Cox was able to

5    overhear the radio conversation

6    relative to the charges, therefore

7    making him a material and primary

8    witness as well.

9        Since the Organization is unable to

10   approve or compel the absences of these

11   two witnesses for a hearing, I ask that

12   their time off be approved ahead of the

13   hearing to allow them to pers -- to be

14   present to testify.

15       I thank you for your time and would

16   appreciate a pre-hearing response to my

17   request.  And while I look forward to

18   that, I would appreciate any response

19   be specific to the recrest -- request

20   made rather than the typical form

21   letter response that "this isn't a

22   court of law and the Organization

23   doesn't have the right to discovery

24   ahead of the hearing." I'm not

CP_000092

John Sexton; Justin DePover
February 10, 2021

76

1          requesting discovery ahead of the

2          hearing.  I'm only requesting that

3          specific and pertinent wist --

4          witnesses, be made available at the

5          time of, and during, the hearing

6          process."

7          MR. RAINWATER:  I sent this February 8th to Mr. Reyes.

8   I'm guessing he didn't forward that to you.  Is that correct,

9   Mr. Johnson?

10          MR. JOHNSON:  Do you have any proof that you sent it?  I

11  mean --

12          MR. RAINWATER:  Yeah.

13          MR. JOHNSON:  -- I just see a letter.  I mean, I --

14          MR. RAINWATER:  Here's the email that went along with

15  it.  I thought it had a date stamp on it; it does not.  I can

16  show you that from my email, if you would so permit me.

17          MR. JOHNSON:  Well, if you're entering this as exhibit

18  --

19          MR. RAINWATER:  Yes, I am.

20          MR. JOHNSON:  -- I mean, once again, if the second page

21  you handed me is the email, there's no --

22          MR. RAINWATER:  Yeah, there --

23          MR. JOHNSON:  -- who it was to, who it was from, any of

24  that.

John Sexton; Justin DePover
February 10, 2021

77

1        MR. RAINWATER:  Yup, I get that.  I thought that was on

2  there, but printer must have cut that off and I didn't check

3  it.  Give me just a second.

4        MR. SEXTON:  Want me to go make copies of that?

5        MR. RAINWATER:  Sent two days ago, February 8, 2021 at

6  12:27 p.m.

7        MR. JOHNSON:  Is there any way we can print that?

8        MR. RAINWATER:  Yeah, I'll forward it to you, and then

9  you can print it.  I'd also send it to Joseph Adelfio and --

10  well, there's one other person that his name is slipping my

11  mind at the moment.

12          All right.  Mr. Johnson, this is coming to your email

13  now.  Oh, Benjamin Anderton was the other person that I sent it

14  to.  Do you wanna take a recess and print that?

15        MR. JOHNSON:  We'll take a short recess here.  Time is

16  13:51.

17                    (Whereupon, a short recess was taken.)

18        MR. JOHNSON:  Time is now 14:08, resuming the

19  Sexton-DePover Investigation.

20          All right.  Been handed a two-page document that

21  contained a -- an email for a request for witnesses from

22  Mr. Rainwater to Mr. Ja -- or Mr. Reyes.  Labeling this as

23  Exhibit 8.

24                    (Whereupon, the document was marked as

AccuTran Global Enterprises, Inc.
855-552-0505

**CP_000094**

John Sexton; Justin DePover
February 10, 2021

78

1                    Exhibit 8 for identification.)

2          MR. RAINWATER:  And that's both pages as Exhibit 8?

3          MR. JOHNSON:  That is correct.  The letter is the second

4    page, the email.

5          MR. RAINWATER:  Okay.  So just for the record, then,

6    to-- since we're -- just to refresh everybody since we're just

7    coming back on, I sent this email to Mr. Reyes on February 8th

8    at 12:27 p.m. I received no response, so -- and owing to the

9    fact that neither of the individuals requested were able to be

10   off of work and aren't here, I'll continue my questioning with

11   Mr. Sexton, if that's okay, Mr. Johnson.

12         MR. JOHNSON:  Yes, you may continue.

13         MR. RAINWATER:  All right.

14   BY:  MR. RAINWATER

15         Q.     So, Mr. Sexton, related specifically to Mr. Cox,

16   to your knowledge, where was he during this alleged event?

17         A.     Mr. Cox was sitting on the -- the 574 train on

18   the Main Line.

19         Q.     And while you guys were making your moves off

20   the independent track and shoving into the yard?  Correct?

21         A.     That is correct.

22         Q.     All right.  So was he in a position to hear the

23   radio conversation?

24         A.     His exact words were is -- I -- I heard every

John Sexton; Justin DePover
February 10, 2021

79

1    word.

2        Q.        All right.  And if he was here, would he have

3    been able to testify to the fact that your Conductor,

4    Mr. DePover, gave a car count 40 cars, I need 15?  If he was

5    here?

6        A.        Yes.  But initially, it was 50, and then it was

7    --

8        MR. JOHNSON:  Okay.  That's --

9        A.        -- 40, good for 15.

10       MR. JOHNSON:  That --

11       A.        Correct.

12       MR. JOHNSON:  That's speculation and hearsay.

13       MR. RAINWATER:  No, it's perfectly reasonable,

14   Mr. Johnson, because we requested him to be here, and the fact

15   that the Carrier didn't provide for it as requested allows us

16   the latitude to show exactly what we think he woulda testified

17   to.  M -- it -- you know, if you'd at least given me a response

18   to know they can't be there for whatever reason, then maybe we

19   could have a discussion.  But we have every reason to believe

20   and to assume, rightfully so, what Mr. Cox woulda testified

21   to.  And I'll ask no further questions about it at this time,

22   related to Mr. Cox.

23       Q.        Mr. Sexton, can't remember if I asked you this

24   or not, but related to GCOR 6.5 as we entered as an exhibit,

John Sexton; Justin DePover
February 10, 2021

80

1   did Mr. Jared violate that Rule when he interrupted

2   Mr. DePover?

3         MR. JOHNSON:  Okay.  Mister --

4         A.      Yes.

5         MR. JOHNSON:  -- Rainwater, we're sticking to the -- the

6   Charge Letter.  If you have issues with Mr. Jared, you need to

7   take that up outside of the room --

8         MR. RAINWATER:  All right.  I --

9         MR. JOHNSON:  -- with others.

10        MR. RAINWATER:  I have no further questions for

11  Mr. Sexton at this time.  I would like to recall Mr. DePover.

12        MR. JOHNSON:  I'd like to do a couple follow-up.

13        MR. RAINWATER:  Sure.

14  BY:  MR. JOHNSON

15        Q.      So, Mr. Sexton, you testified that you tried to

16  reach the Nahant ATM because you weren't getting communication

17  back from your Conductor, Mr. DePover.  Correct?

18        A.      That was after I tried to call Mr. DePover two

19  or three times on the radio.  Yes.

20        Q.      Okay.  So why didn't you come to a stop before

21  trying to contact the ATM, knowing that you weren't --

22        A.      Well, I was good f --

23        Q.      -- getting any communication?

24        A.      I was good for 40 cars.

John Sexton; Justin DePover
February 10, 2021

81

1          Q.      Who was giving you shoving instructions?

2          A.      I had a man on the north end protecting the

3    shove, Mr. Cruciani, and I had Mr. DePover on the ground as

4    well, counting me down.

5          Q.      Okay.  So which employee was giving you your

6    shove instructions?

7          A.      Well, at the -- at the time, Cruciani was at the

8    north end of the yard.  He -- he -- he told me it was clear

9    track, good for 50.  Mr. DePover said the same thing, and then

10   he -- he said good for 40 cars, and I --

11         Q.      Who --

12         A.      -- need 15.

13         Q.      Who -- who said that?

14         A.      Mr. DePover.

15         Q.      Okay.  So who was giving your a -- your actual

16   shove instructions?

17         A.      At that point, it was Mr. DePover.

18         Q.      Okay.  Was Mr. Cox in any way tied in to your

19   shove movement?

20         A.      He was sitting on the Main Line observing

21   everything on a different train, listening to the radio

22   procedures.

23         Q.      Okay.  So he was just an observer.  He was not

24   tied in to your shove movement --

John Sexton; Justin DePover
February 10, 2021

82

1       A.      He was not.

2       Q.      -- in any way.

3       A.      And he was on the witness list, and if he'd've

4   been called here, you could ask him that personally.

5       Q.      Okay.

6       MR. JOHNSON:  I have no further questions for Mr. Sexton

7   at this time.

8       MR. RAINWATER:  Like to recall Mr. DePover for a few

9   questions.

10      MR. JOHNSON:  All right.  You may.

11              E X A M I N A T I O N (continued)

12                  By:  Mr. Rainwater

13      Q.      Mr. DePover, when Mr. Jared walked up behind

14  you, d -- did you see him coming?  Or did he catch you off

15  guard?

16      A.      He caught me off guard.  I didn't know he was

17  there until he was right beside me on the track.

18      Q.      All right.  Then -- so he -- he caught you off

19  guard while cars were moving past you?

20      A.      While cars were moving, yes.

21      Q.      All right.  Did he -- did he announce himself or

22  say, hey, I'm coming up behind you?  Or just it was don't give

23  him any more commands?

24      A.      It was just a don't give him any more commands.

AccuTran Global Enterprises, Inc.
855-552-0505

**CP_000099**

John Sexton; Justin DePover
February 10, 2021

83

1     Q.    Have you ever seen Tom Jared before?

2     A.    I have not.

3     Q.    You've never previously met him or been --

4 interacted with him?

5     A.    No, I haven't.

6     Q.    Did he tell you who he was?

7     A.    After the stop and cars were still moving and we

8 started to communicate, then he did, but not initially.

9     Q.    Okay.  So during this time, when he told you who

10 he was, cars were moving past you --

11     A.    Car -- cars were still moving.

12     Q.    Right.  So you're -- it -- did you have to

13 reacquire your position on your list for how many more car

14 counts -- how many more cars you needed?

15     A.    Yes, I had to start trying to read the car and

16 see where I was at that point.

17     Q.    All right.

18    MR. RAINWATER:  No further questions for Mr. DePover.

19    MR. JOHNSON:  Okay.  I have some follow-up questions.

20 BY:  MR. JOHNSON

21     Q.    So, Mr. DePover, did you at any time let

22 Mr. Jared know that you were in the middle of a shove movement?

23     A.    It was already taking place, but I mean --

24     Q.    Did you at any time ask for identification from

John Sexton; Justin DePover
February 10, 2021

84

1  him?

2       A.       After -- after he told me to stop, and then I

3  did ask at that point, but --

4       Q.       Okay.

5       A.       -- he was already s -- somebody I didn't

6  identify at the beginning.  If I'da seen him walking up behind

7  me, I woulda probably stopped us and tried to identify who it

8  was 'cause he was crossing the tracks.

9       Q.       Okay.  But you followed instructions from

10 somebody you didn't know?

11      A.       Then -- I -- initially I was stunned from it,

12 and I guess I just took a minute to process.  And then as -- as

13 I was doing so, it probably -- I would -- I would estimate

14 maybe about five cars had gone by and as he was introducing who

15 he was to me.

16      Q.       Okay.  But that was after the stop was made?

17      A.       The -- the cars were still moving.

18      Q.       When he introduced himself to you?

19      A.       Yes.

20      Q.       Okay.  So the Organization entered Exhibit 7 as

21 contending that Mr. Jared engaged in unrelated activities.

22      A.       No.

23      Q.       So did you allow him -- did you ask him -- so

24 I've asked you, did you tell him to stand by, you were in the

AccuTran Global Enterprises, Inc.
855-552-0505

**CP_0000101**

John Sexton; Justin DePover
February 10, 2021

85

1    middle of a shove move, at any time?

2        A.       I -- I never verbally said to stand by.  I was

3    processing what to do at the time while the movement was still

4    taking place.

5        Q.       Okay.  So you allowed yourself to engage in --

6        MR. RAINWATER:  Objection.

7        Q.       -- unrelated activ --

8        MR. RAINWATER:  Mr. DePover's not being charged with

9    this.  The fact that the General Manager --

10       MR. JOHNSON:  He i -- he was a --

11       MR. RAINWATER:  But -- but --

12       MR. JOHNSON:  -- charged employee --

13       MR. RAINWATER:  He's not being charged with any vi -- J

14   -- Mr. Jared has not alleged any violation of 6 -- 6.5.  We're

15   bringing it to light because Mr. Jared interjected himself into

16   this process, causing the Rule to be violated.  He's the

17   General Manager.  He should -- it -- number one, he should know

18   the Rule.  Number two, there's no estimation whatsoever that

19   anybody on this property should -- should have any kind of

20   ability to be able to tell the General Manager no with regard

21   to a direct -- with regard to a direct instruction.  And the

22   fact that he didn't know who Mr. Jared was until a handful of

23   cars move -- were moving past is irrelevant.  Mr. Jared

24   shouldn't even have been there doing this to begin with.

John Sexton; Justin DePover
February 10, 2021

86

1          We have Mr. DePover, who has less than two years'

2    experience, was just furloughed for a -- almost a year, come

3    back on his first round trip and now the General Manager is --

4    sneaks up behind him, and unannounced.  How is he supposed to

5    react to that?

6          MR. JOHNSON:  Okay.  Mr. Rainwater, I'm gonna overrule

7    on your objection.  You were allowed to enter exhibits.

8    Correct?

9          MR. RAINWATER:  E -- Exhibits 7 and 8, I was.

10         MR. JOHNSON:  Okay.  So you --

11         MR. RAINWATER:  I still have one that it was not

12   allowed.

13         MR. JOHNSON:  Okay.  So you -- you entered Exhibit 7 and

14   it is now a part of the record.  Therefore, I may ask questions

15   related to that.  And whether or not that proves innocence or

16   guilt, I don't know.  I wanna ask the questions, though.

17   BY:  MR. JOHNSON

18         Q.     So, Mr. DePover, with an ion -- unidentified

19   employee, you allowed him to come up and start talking to you

20   in the middle of a shove movement.  Correct?

21         A.     I'd -- he came up to me from behind me on --

22   from 5th Track to 4th Track and was in between the tracks with

23   me before I even knew he was there.  And I was -- I was about

24   to give Mr. Sexton another car count, but was interrupted.

John Sexton; Justin DePover
February 10, 2021

87

1      Q.      Okay.  And you allowed -- y -- you at no time --
2   you acknowledged what he asked you to do.  Correct?
3      A.      As -- so -- and s --
4      Q.      So when Mr. Jared told you not to give him a --
5   any further counts, did you acknowledge him?  Or did you tell
6   him stand by, I'm in the middle of a shove?
7      A.      I -- he continued to speak to me from beside me
8   and explaining who he was while I was watching the shove.
9      Q.      Okay.
10     A.      And then once I was informed that he was the
11  General Manager, I kinda go into the, well, he's my boss, so I
12  followed his instructions.
13     Q.      Okay.
14  MR. JOHNSON:  I have no further questions.
15      Mr. Rainwater, any follow-up for Mr. DePover?
16  MR. RAINWATER:  Just one.
17  BY:  MR. RAINWATER
18     Q.      Mr. DePover, did the video evidence as presented
19  play out the fact that Mr. Jared walked up directly behind you
20  and that you did not observe him until he spoke to you?
21     A.      I believe so.
22     Q.      I agree.
23  MR. RAINWATER:  No further questions.
24  MR. JOHNSON:  Okay.  I have no further questions for any

AccuTran Global Enterprises, Inc.
855-552-0505

**CP_0000104**

John Sexton; Justin DePover
February 10, 2021

88

1    party involved in this, the witnesses or the charged employees.

2            Mr. Rainwater, do you have any additional questions

3    for either party?

4        MR. RAINWATER:  I have one more question for Mr. Sexton.

5        MR. JOHNSON:  All right.  Mr. Sexton --

6        MR. SEXTON:  Excuse me.

7        MR. JOHNSON:  Mr. DePover, you are released from

8    testimony.  Subject to recall.

9            So we're recalling Mr. Sexton.

10       MR. RAINWATER:  Understood.

11       MR. JOHNSON:  Go ahead, Mr. Rainwater.

12               E X A M I N A T I O N (continued)

13                   By:  Mr. Rainwater

14       Q.    Mr. Sexton, did the Carrier present any recorded

15   evidence via radio record that could corroborate Mr. Jared's

16   testimony that he only heard 15 cars?

17       A.    No.

18       Q.    No.  And is it safe to say then, that because

19   they didn't produce that evidence then, that your account, and

20   Mr. DePover's account, and the account that Mr. Cox would've

21   presented should be taken as submitted as fact?

22       A.    Absolutely.

23       MR. RAINWATER:  No further questions.

24       MR. JOHNSON:  All right.  I have no further questions.

AccuTran Global Enterprises, Inc.
855-552-0505

CP_0000105

John Sexton; Justin DePover
February 10, 2021

89

1          Mr. Rainwater, do you have any questions for
2   Mr. Jared or Mr. DePover?
3        MR. RAINWATER:  No, I do not.
4        MR. JOHNSON:  All right.
5        MR. RAINWATER:  If we're gonna go to close -- I mean, if
6   you wanna do preliminary closing questions, that's fine.  I am
7   gonna need time for a closing statement preparation.
8        MR. JOHNSON:  Okay.  Mr. Sexton, you are released from
9   testimony.  Subject to a recall.
10          So, Mr. Rainwater, you are correct.  We will begin to
11  close the hearing.  And you said go ahead, go through the
12  questions, and then you'll take a recess at that time?  Or
13  would you like -- let's just take the recess --
14        MR. RAINWATER:  Yeah, that's --
15        MR. JOHNSON:  -- now.
16        MR. RAINWATER:  That's up to you.  That's fine with me.
17        MR. JOHNSON:  So we'll show the time is 14:21.  We'll
18  take a 15-minute recess.
19        MR. RAINWATER:  Yeah, 15 or 20.
20        MR. JOHNSON:  Okay.
21        MR. RAINWATER:  Appreciate --
22                (Whereupon, a recess was taken.)
23        MR. JOHNSON:  The time is now 14:52, resuming with the
24  Sexton-DePover Investigation.

AccuTran Global Enterprises, Inc.
855-552-0505

**CP_0000106**

John Sexton; Justin DePover
February 10, 2021

90

1          I will call Mr. DePover.

2          Mr. DePover, have you been present during the

3    entirety of this hearing?

4       MR. DEPOVER:  Yes, I have.

5       MR. JOHNSON:  Have you had the opportunity to answer all

6    questions of your own free will?

7       MR. DEPOVER:  Yes, I have.  And I'd also like to let the

8    record speak for itself on that.

9       MR. JOHNSON:  Would you like to make a closing

10   statement?

11      MR. DEPOVER:  No.

12      MR. JOHNSON:  All right.  Mr. Sexton, have you been

13   present during the entirety of this hearing?

14      MR. SEXTON:  I have.

15      MR. JOHNSON:  Have you had the opportunity to answer all

16   questions of your own free will?

17      MR. SEXTON:  Yes.

18      MR. JOHNSON:  Would you like to make a closing

19   statement?

20      MR. SEXTON:  I would.

21      MR. JOHNSON:  Go ahead.

22      MR. SEXTON:  I feel this -- this was based on us not

23   getting outta the yard in -- in Marquette on the -- on this

24   train.  We had a -- quite a delay there with the -- departing

John Sexton; Justin DePover
February 10, 2021

91

1   Marquette.  We had to pick up an engine that was --

2        MR. JOHNSON:  Okay.  Mr. Sexton --

3        MR. SEXTON:  I'm -- I'm doing a --

4        MR. JOHNSON:  The -- the rule --

5        MR. SEXTON:  -- closing statement, here.

6        MR. JOHNSON:  No.

7        MR. SEXTON:  I can --

8        MR. JOHNSON:  In the rules of the investigation, "will

9   be allowed to make a closing statement prior to the conclusion

10  of this hearing.  Closing statements should be confined to the

11  matter being investigated --

12       MR. SEXTON:  This is the matter --

13       MR. JOHNSON:  -- and based on evidence presented and

14  testimony --

15       MR. SEXTON:  Yeah.

16       MR. JOHNSON:  -- given during the hearing."

17           So there was no testimony or evidence based on

18  anything that happened in Marquette, so please confine your

19  closing statement to what's been --

20       MR. SEXTON:  I was trying to build up --

21       MR. JOHNSON:  -- presented today.

22       MR. SEXTON:  -- to where all -- all this is -- th --

23  this is going.  There w -- there was a -- a tremendous delay

24  because of weather conditions.  Parked an engine on -- on an

AccuTran Global Enterprises, Inc.
855-552-0505

**CP_0000108**

John Sexton; Justin DePover
February 10, 2021

92

1    open-deck bridge that we had to --

2        MR. JOHNSON:  Okay.  But there --

3        MR. SEXTON:  -- [indiscernible] --

4        MR. JOHNSON:  -- was no testimony --

5        MR. SEXTON:  There was.

6        MR. JOHNSON:  -- or evidence presented --

7        MR. SEXTON:  You -- you -- you --

8        MR. JOHNSON:  -- on that.  Correct?

9        MR. SEXTON:  -- can pull train -- you can pull train

10    delays, whatever you need to.

11        MR. JOHNSON:  So we need to keep our --

12        MR. SEXTON:  So you're not gonna let me --

13        MR. JOHNSON:  -- closing statement -- you can make a

14    closing statement.  It just has to be confined to the matter

15    that was investigated and based on the evidence presented, so.

16        MR. SEXTON:  Well, the -- the fact of the matter is --

17    is on -- on the -- on the shoving move, I was good for 2400

18    feet.  And according to your Crayola calculations on the -- on

19    the feet that was shoved, it was 558.  Am I correct on that?

20    Five hundred and fifty-eight feet, so I had quite -- quite a

21    bit going on there, quite a bit of extra room.

22        As of the -- the shoving moves as -- GCOR 6.5:

23        "Equipment must not be shoved 'til the Engineer or

24    employee have -- protecting the movement have completed job

CP_0000109

John Sexton; Justin DePover
February 10, 2021

93

1   briefing concerning how protection will be provided.  Employee

2   must be in position --"

3           which Mr. DePover was on the ground protecting our

4   shove.

5           "provide visual protection --"

6           which he was.

7           "of the equipment being shoved and must not engage in

8   any unrelated task while providing in -- protection."

9           With a -- with a -- a fellow employee coming up

10  behind the Conductor, whoever it is, on the ground, and all --

11  he didn't even know he was there, basically, kind of caught him

12  off guard, he basically -- Mr. Jared is the one who violated

13  the -- the shoving movements because he engaged in a

14  conversation with Mr. DePover while the cars were moving into a

15  track.  That is a -- that -- he created an unsafe act on that.

16  And you know, under -- under the -- the test failure of the

17  manager's tests themselves, that under the test conditions,

18  when conducting this test, on the Shoving or Pushing Movements

19  on page 107 of the Manager's Tests:

20          "When conducting this test, actual

21      operating conditions are to be

22      observed."

23      MR. SEXTON:  Watched, not set up.

24          And the test failure on number 4 bulletin on the same

John Sexton; Justin DePover
February 10, 2021

94

1  page:

2          "Employee performing other tasks

3      related to movement."

4      MR. SEXTON:  General Manager Jared actually created an

5  unsafe act by talking to Mr. DePover as the cars were -- were

6  -- were being shoved b -- past him.  He could've -- he coulda

7  startled him.  He coulda jumped forward.  Anything could've

8  happened.  That -- that is -- the -- th -- this was not a good

9  test, everyone knows it, and --

10      MR. JOHNSON:  Is that the end of your statement?

11      MR. SEXTON:  Give me a second, please.  And also, the --

12  the -- the -- the Rule was violated at -- as this test was also

13  set up in -- in their own -- in their own testing manual.

14          Other than that, I'm a little -- I'm a little wound

15  up here, so that's a -- that's all I'm gonna say for right

16  now.  Then I want you to ask me if -- if I think that this has

17  been a fair and impartial hearing, please.

18      MR. JOHNSON:  Okay.  I've asked you the questions I have

19  to ask.  So I can --

20      MR. SEXTON:  So do -- you're not gonna --

21      MR. JOHNSON:  We've moved to closing.  I cannot ask any

22  more questions at --

23      MR. SEXTON:  No, so you --

24      MR. JOHNSON:  -- this time.

John Sexton; Justin DePover
February 10, 2021

95

1        MR. SEXTON:  Okay.  Well, this is not a fair and

2    impartial hearing, so I'll put that on the record, my closing

3    statement.  Now I'm done.

4        MR. JOHNSON:  So, Mr. Rainwater --

5        MR. RAINWATER:  Yes.

6        MR. JOHNSON:  -- have you had an opportunity to

7    cross-examine all witnesses and to present witnesses and

8    evidence on the charged employees' behalf?

9        MR. RAINWATER:  The record speaks for itself.

10       MR. JOHNSON:  Have I ruled on all of your objections?

11       MR. RAINWATER:  Yeah, the record speaks for itself.

12       MR. JOHNSON:  Were you allowed to properly represent the

13   charged employee during this hearing?

14       MR. RAINWATER:  Yeah, the record speaks for itself.

15       MR. JOHNSON:  And would you like to make a closing

16   statement?

17       MR. RAINWATER:  I would.  The facts of this

18   investigation are as follows:  Mr. Jared conducted an unfair

19   test based on incomplete information because he didn't have a

20   radio on his person to hear the full account of instructions

21   from Mr. DePover to Engineer Sexton.  Had he heard that portion

22   of the communication, he would've quickly realized that the way

23   he intended to set up his test was unfair.  Mr. Jared freely

24   testified that he heard Mr. DePover give Mr. Sexton a car count

CP_0000112

96

1    of 50 cars, 5-0 cars, as he started into 4 Track.  Then, after

2    moving 12 cars, Mr. DePover testified that he told Mr. Sexton,

3    I need 15 more and you're good for 40.

4            It's obvious that Mr. Jared did not hear that portion

5    of the instructions.  What's more, he only had to pull the

6    recorded radio conversations that the Railroad keeps on file to

7    -- to have figured this out.  Had he done so, we wouldn't even

8    be in this hearing.  The fact that he didn't present that

9    evidence means he either didn't go to the effort to pull it, or

10   it didn't help his case, so he didn't enter it.  The

11   Organization, however, has the testimony of three witnesses to

12   this event:  Mr. DePover, Mr. Sexton, and had Mr. Cox been

13   allowed to attend as requested, he would've affirmed that as

14   well.

15           Now to the charge at hand.  We've clearly and

16   undeniably outlined that Mr. DePover is not complicit with the

17   charges as alleged.  Mr. Jared even admitted to such.

18           As far as Mr. Sexton is concerned, testimony has

19   clearly outlined and sustained the fact that Mr. Sexton was

20   under the guidance of being clear for 40 -- for a 40-car shove

21   and only needing 15 to a stop and a cut.  Even if Mr. Sexton

22   would've shoved the entire 15 cars before stopping, he still

23   has an additional five cars of space before being required to

24   stop in half the range of the 40-car count as given by

CP_0000113

John Sexton; Justin DePover
February 10, 2021

97

1    Mr. DePover, and thus fulfilling the requirements of GCOR

2    5.3.7.  So clearly the charge is inconsistent with the actual

3    events, and we deny the charge in the strongest terms possible.

4            Additionally, it's very obvious that Mr. Jared

5    conducted this test in an unfair manner.  While Mr. Johnson

6    wouldn't allow me to enter CP's United States version of the

7    Efficiency Test Manual and Operating Rules, the testing

8    procedure in that manual states clearly that tests conducted to

9    evaluate Rules related to shove moves is an observation-only

10   test.  CP's testing code is GRF02.  This test only points out

11   -- this test also points out that an employee should not

12   perform other tasks that are not related to movement, the same

13   as GCOR 6.5, which we entered in Exhibit 7.

14           The fact that M -- Mr. Jared, a General Manager at CP

15   and three levels above the most frequently visible manager in

16   this yard, approached Mr. DePover to give him a direct

17   instruction while engaged in this shove move proves how

18   reckless Mr. Jared is with regard to this event.  The fact that

19   he would even try to manipulate a test that is strictly

20   designed to be observation-only and create var -- variable

21   designed to confuse and reduce situational awareness is an ana

22   -- anathema to everything that Home Safe is about.

23           Further to CP's E-Test Manual, it clearly instructs

24   testing managers to "use common sense when setting up test

John Sexton; Justin DePover
February 10, 2021

98

1   situations." The fact that Mr. Jared interrupted Mr. DePover in

2   the middle of his shove proves Mr. Jared did not follow this

3   manual.

4           Additionally, CP's Testing Manual lists six dos and

5   don'ts for managers to follow when conducting efficiency

6   testing.  Those include:  "Do conduct tests fairly;" "Don't set

7   up a situation that can it -- result in an unsafe act or

8   condition;" "Don't conduct a test to entrap an employee," and

9   "Don't violate a rule in order to setup a test situation."

10          After hearing all of the testimony, it's very obvious

11  that this test was not conducted fairly, that it created an

12  unsafe condition by Mr. Jared interrupting Mr. DePover while he

13  was protecting his shove, and that Mr. Jared did indeed violate

14  a GCOR Rule by setting it up in the manner which he did, and

15  that his intent was clearly to entrap Mr. Sexton.

16          To be fair, with regard to efficiency testing, CP's

17  manager -- CP's manual, excuse me, does allow for some testing

18  situations to be set up in order to see how employees react.

19  For instance, a red flag being placed in a track is one way to

20  set up a stop test.  However, there are no processes outlined

21  in that test that p -- excuse me.  There are processes outlined

22  in that test that provide the manager with a testing situation

23  while a shove move is being conducted.  As is the case here,

24  there are no circumstances that allow that situation to be set

AccuTran Global Enterprises, Inc.
855-552-0505

**CP_0000115**

John Sexton; Justin DePover
February 10, 2021

99

1   up.  This testing situation can only be obs -- observed,

2   according to CP's Testing Manual.  The fact that the Hearing

3   Officer will not let me enter it as an exhibit to prove this is

4   compelling in itself.  They obviously don't want to allow the

5   proof be shown that this test was unfair.

6          Finally, I ask that our objections please be

7   remembered.  We objected from the start that this hearing

8   violated Mr. Sexton and Mr. DePover's due process because the

9   Hearing Letter compels all the witnesses to attend in person

10  the same way it compels the charged employees.  Furthermore,

11  Mr. Jared was not present at the hearing to have the full

12  efficacy of his testimony, including body language, vetted.

13  Additionally, the Organization was not given the same option to

14  attend this hearing via video conference.  The argument that

15  the situation with COVID prevented Mr. Jared from attending is

16  a red herring designed to circumvent the objection and create

17  an unfair advantage for the Carrier.  Mr. Jared could have

18  easily attended this hearing by wearing a mask and socially

19  distancing, the same as everyone else in this room.

20         And so in closing, we ask that the charges in this

21  case be dismissed due to the fact that due process was

22  violated, the fact that the test was set up unfairly, and the

23  fact that the Principals did, in fact, comply with the Rule

24  regarding -- requiring movement to stop in half the range of

CP_0000116

John Sexton; Justin DePover
February 10, 2021

100

1    vision.   Thank you.

2        MR. JOHNSON:   All right.   This hearing has been held to

3    determine all the facts and circumstances in connection with

4    the Notice of Charge.   The official transcript will care -- be

5    re -- carefully reviewed prior to any decision being rendered.

6            The time is now 15:04.   This hearing is closed.

7                     (Which were all the proceedings had and

8                      testimony taken at the hearing of the

9                      above-entitled cause.)

John Sexton; Justin DePover
February 10, 2021

101

C E R T I F I C A T I O N

ACCUTRAN GLOBAL ENTERPRISES, INC. does hereby certify
that the foregoing transcript is a true, accurate, and complete
representation of the audio provided.

CP_0000118



Tom Jared
General Manager Operations
US West

1010 Shop Road
St. Paul, MN
55106

Office: (651) 495-9519
Cell: ▮▮▮▮
Tom_Jared@cpr.ca

February 26, 2021

John Sexton



Employee #823777

Mr. Sexton:

Notice of formal investigation was issued you under date of February 4, 2021 in connection with the occurrence outlined below:

'... to determine the facts and circumstances and to place your responsibility, if any, in connection with your alleged failure to stop within half the specified distance given while shoving into track NA04. This incident allegedly occurred at approximately 12:49 hours on February 1, 2021 while working Train 474-31 at Nahant yard.'

Formal investigation was conducted on February 10, 2021, to develop all the facts and circumstances in connection with the referenced occurrence. At the conclusion of that investigation it was determined the investigation record as a whole contains substantial evidence proving you violated GCOR 5.3.7 – Radio Response.

Based on the facts and evidence in the hearing record and your past discipline history, you are being assessed a twenty (20) day suspension to commence at 00:01 hours on Thursday, February 25, 2021 up to and including 23:59 hours on Tuesday, March 16, 2021. Reinstatement to active duty at 00:01 hours on Wednesday, March 17, 2021.

As a matter of record a copy of this document will be placed in your personnel file.

Respectfully,

Tom Jared
General Manager Operations
U.S. West

CC:     Dylan Smith              CMC
        Joey Reyes              Employee Services (Encl)
        Timekeeping             Operating Practices/Rules (Encl)
        Joe Rainwater – BLET Local Chairman (Encl)
        Pete Semenek – BLET General Chairman (Encl)



EXHIBIT
12

SEXTON    000014

CASE NO. 353

Organization File da-sexton.j.02012021
Carrier File 2021-0022404

## PUBLIC LAW BOARD NO. 7667

| PARTIES | ) BROTHERHOOD OF LOCOMOTIVE ENGINEERS AND TRAINMEN |
|---|---|
| TO | ) |
| DISPUTE | ) DM&E RAILROAD d/b/a CANADIAN PACIFIC |

STATEMENT OF CLAIM:

> Claim on behalf of Canadian Pacific/DM&E Line Employee John Sexton (Claimant) for removal from his record the twenty (20) day suspension assessed and compensation for all time lost, in addition to time and expenses for attending the investigation held on February 10, 2021.

FINDINGS:

The Board, upon consideration of the entire record and all of the evidence, finds that the parties are Carrier and Employee within the meaning of the Railway Labor Act, as amended, that this Board is duly constituted by Agreement dated August 16, 2013, and that this Board has jurisdiction over the dispute involved herein. Awards issued pursuant to the terms and conditions outlined in the Agreement establishing this Expedited Board of Arbitration will not prejudice the rights of either party, will not establish any precedent and will not be referred to in connection with any other case, agreement and/or dispute resolution.

On February 1, 2021, Claimant John Sexton was assigned as the engineer on train 474-31, bringing at train into the Nahant yard. While the crew was in the middle of performing a shove move, General Manager Tom Jared approached the conductor unannounced and instructed him to cease

Public Law Board No. 7667
Case 353



SEXTON   000015

1

radio communications with Claimant. The conductor's initial radio communication was that Claimant was good for 50 cars, and his next communication (according to both Claimant and the conductor) was good for 40, 15 to a stop. After Claimant shoved approximately 7 cars, he radioed the conductor several times, and upon receiving no further radio communication, he initiated braking, eventually stopping after approximately 11 cars, or 558 feet.

By notice dated February 4, 2020, the crew was directed to attend a formal hearing regarding their alleged failure to stop within half the specified distance given while shoving into track NA04. The hearing was held on February 10, 2021, after which Claimant was found to be in violation of GCOR 5.3.7 – Radio Response, and by notice dated February 26, 2021, he was assessed a twenty (20) day suspension.

The Organization challenges the discipline assessment on both procedural and substantive grounds. With respect to the procedures, the Organization maintains the process was flawed due to the General Manager's multiple roles in the proceeding. It points out that he was a witness at the hearing, having initiated the test, and that he then determined the outcome of the hearing and authored the notice of discipline, thus ratifying his own actions. The Organization states it is apparent that the outcome of the hearing was predetermined, and it cites award authority which has overturned discipline in similar circumstances.

With respect the merits, the Organization asserts that the decision to assess discipline was arbitrary and capricious. It states that the record indicates that the instructions given to Claimant were ambiguous at best in that he was first given the 50-car count, then that he was told he was good for 40, while at the same time a stop in 15. It contends that Claimant then complied with the intent of the rule when he stopped when no further communication was received, and that he did so well short of half the 40-car count. The Organization also takes exception to Jared's actions in conducting the test in an unfair manner contrary to the published guidelines for such matters and setting up an unsafe condition when he interrupted, without warning or prior introduction, the conductor who was in the middle of directing the shove. The Organization concludes that to assess discipline based on these facts is unjust.

Public Law Board No. 7667
Case No. 353

2

SEXTON   000016

The Carrier, on the other hand, maintains that discipline was properly assessed, arguing that the record contains substantial evidence to support the conclusion that Claimant violated the cited rule. It points to the General Manager's testimony that Claimant received an instruction to shove 15 car lengths, but that Claimant shoved for 11 car lengths before he stopped. It notes that the cited rule provides that "movement must be stopped within half the distance specified unless additional instructions are received," and it states that it is unrefuted that Claimant continued shoving well past half the 15-car count received from the conductor.

With respect to the Organization's procedural objection, the Carrier claims that Claimant received a fair and impartial hearing, and that the process was not tainted by Jared's involvement. It states that Jared testified to his direct observations, and it apparently contends that Jared didn't actually make the discipline decision, stating "Discipline notices on this property are assessed by the General Manager of the Territory. No decision was made on Claimant's culpability until the transcript of the hearing was reviewed by the hearing officer. The discipline was assessed by the Carrier, not the individual manager."

Regarding the level of discipline assessed, the Carrier states that violations of shove rules are considered major/life threatening offenses under its Hybrid Discipline and Accountability guidelines, and that the guidelines provide that the suspension assessment is an appropriate quantum of discipline for such a violation.

We have carefully reviewed the record, and while we find multiple reasons to question the discipline assessment, we concur with the Organization that the process here was flawed to such an extent that it deprived Claimant of a fair and impartial hearing. General Manager Jared involved himself in too many aspects of the process. The record reflects that it was Jared who initiated the test, in a manner which does raise questions regarding safety in his obviously surprising an employee who was performing the safety-sensitive task of protecting the shove, and it appears that the charges were levied based on his test and observations. The only realistic conclusion that can be reached after an objective review of this record is that Jared levied charges regarding his own somewhat questionable test, provided the testimony to support them, and then signed off on a

Public Law Board No. 7667
Case No. 353

3

SEXTON   000017

predetermined outcome.   We are not convinced by the Carrier's statement that "the Carrier" as some all-inclusive entity rendered the decision.   The Carrier is of course comprised of many people and departments and it has a legal status, but it acts through individuals, and in this case the individual who signed the discipline letter was Jared.   We do not believe the novel explanation offered by the Carrier is sufficient to remove the specter of his excessive involvement in the case. Therefore, we find that the claim must be sustained.

AWARD:   Claim sustained.

Michael D. Phillips
Chairman and Neutral Member

Marcus Ruef
Employee Member

Brian Scudds
Carrier Member

Dated:   August 26, 2022

Public Law Board No. 7667
Case No. 353

4

SEXTON   000018



EXHIBIT

14

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA
## EASTERN DIVISION

| | |
|---|---|
| John Sexton, <br><br>            Plaintiff, <br><br> v. <br><br> Soo Line Railroad Company, d/b/a Canadian Pacific Railway, a Minnesota Corporation and d/b/a CP Rail System, a Minnesota Corporation, and Dakota Minnesota, & Eastern Railroad Corporation d/b/a Canadian Pacific, a Delaware Corporation, <br><br>            Defendants. | No. 3:23-cv-00031-HCA <br><br><br> **PLAINTIFF'S ANSWERS TO DEFENDANT'S DISCOVERY REQUESTS** |

TO: DEFENDANT SOO LINE RAILROAD COMPANY ET AL AND ITS ATTORNEYS OF RECORD

### PLAINTIFF'S INTERROGATORY ANSWERS

**INTERROGATORY NO. 1:** Identify each and every adverse employment action allegedly taken against you by Respondent that you contend violated 49 U.S.C. § 20109 or is otherwise a basis for your Complaint, including the date and a description of each action.

**Objection:** Plaintiff objects to this interrogatory to the extent that it seeks a legal determination. Subject to and without waiving this objection, see the Answer below.

**Answer:** "In considering whether an action is adverse, the [Administrative Review] Board has referenced the United States Supreme Court's decision in *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006), a case decided under Title VII of the Civil Rights Act of 1964. In describing the injury or harm alleged as retaliation, the Court held that: 'a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a

1

charge of discrimination.' *Id.* at 68" (internal quotations omitted). *Thorstenson v. BNSF Ry. Co.*, ARB Case Nos. 2018-0059, 2018-0060 (November 25, 2019).

On February 1, 2021, CP Railway, through its officers, managers, or employees, set up an unsafe and unpermitted situation in which Tom Jared instructed Justin DePover to stop communicating with Mr. Sexton over the radio while Mr. Sexton and Mr. DePover were conducting a shoving movement. CP documents state that "…Mr. Jared, as part of the efficiency test at issue, **instructed the conductor not to provide any more radio communication** to Mr. Sexton…" (See CP_00464). This interruption to a shoving movement is in violation of CP's Testing Manual which states, "Don't set up a situation that can result in an unsafe act or condition. Don't conduct a test to entrap an employee. Don't violate a rule in order to setup a test situation." (See Sexton 000160). Mr. Jared caused Mr. DePover to become distracted and become engaged in unrelated tasks when providing protection to the shoving movement, namely communicating with his superior who walked up behind him and gave him unsanctioned instructions, which is a violation of GCOR 6.5 which states an employee protecting a shove "must not engage in unrelated tasks while providing protection." (See CP_00608). CP documents state that rule violations regarding shoving movements are Major/Life Threatening rule violations. (See CP_00614, CP_00625, CP_01505). Therefore, Mr. Jared conducted an adverse action against Mr. Sexton when he improperly interrupted a shoving movement which unnecessarily threatened Mr. Sexton's life. CP considers a Major Rule violation Reckless Endangerment and Shoving Rule violations are considered Major rule violations; therefore, CP's rules indicate that Mr. Jared recklessly endangered and threatened Mr. Sexton's life in the immediate aftermath of Mr. Sexton refusing orders to not cut the tracks which delayed the train. This described action taken by CP Railway would dissuade a reasonable worker from conducting a protected activity under the FRSA.

On February 4, 2021, CP Railway noticed Mr. Sexton that it would be conducting a disciplinary hearing against him regarding Mr. Jared's entrapment and improper set up test that

2

recklessly threatened Mr. Sexton's life. This described action by CP Railway would dissuade a reasonable worker from conducting a protected activity under the FRSA.

On February 10, 2021, CP Railway held an investigation to "determine the facts and circumstances and to place responsibility, if any" where CP Rail accused Mr. Sexton of violating railroad rules based on Mr. Jared's entrapment and improper set up test that recklessly threatened Mr. Sexton's life. Additionally, this investigation was determined by the Public Law Board 7667 to have been "flawed to such an extent that it deprived [Mr. Sexton] of a fair and impartial hearing." (See Sexton 000017). Further, the Public Law board concluded that "[t]he only realistic conclusion that can be reached after an objective review of this record is that Jared levied charges regarding his own somewhat questionable test, provided testimony to support them, and then signed off on a predetermined outcome." (See Sexton 000017-000018). This described action by CP Railway would dissuade a reasonable worker from conducting a protected activity under the FRSA.

On February 26, 2021, CP Railway issued a 20-day suspension to Mr. Sexton, which subjected Mr. Sexton to the possibility of termination otherwise not permitted absent this discipline. This discipline was in regard to CP Railway's accusation that Mr. Sexton violated railroad rules based on Mr. Jared's entrapment and improper set up test that recklessly threatened Mr. Sexton's life. This described action by CP Railway would dissuade a reasonable worker from conducting a protected activity under the FRSA.

On or around the time of each of the above-named events, CP Railway noted these things on Mr. Sexton's record, creating a potential for blacklisting. This described action taken by CP Railway would dissuade a reasonable worker from conducting a protected activity under the FRSA.

Discovery is ongoing and Plaintiff reserves the right to supplement this answer in the event that additional responsive information is learned and/or identified.


**INTERROGATORY NO. 2:**    Identify each and every action allegedly taken by you

3

that you contend constituted protected activity under 49 U.S.C. § 20109 or is otherwise a basis for your Complaint, including the date and a description of each action.

**Objection:** Plaintiff objects to this interrogatory to the extent that it seeks a legal determination. Subject to and without waiving this objection, see the Answer below.

**Answer:** Mr. Sexton engaged in a protected activity, as statutorily defined by the whistleblower-protection provisions of the Federal Railway Safety Act, codified at 49 U.S.C. § 20109(b)(1)(A), when on February 1, 2021, when he reported, in good faith, to Kurtis McKelvey a hazardous safety or security condition, surrounding snow and ice buildup at crossings, which he believed could cause a derailment. This report of a hazardous safety condition was also discussed and reported during CP Railway's internal investigation against Mr. Sexton and therefore any officer, manager, or employee of CP Railway who reviewed the investigation had knowledge of this safety report.

Mr. Sexton engaged in a protected activity, as statutorily defined by the whistleblower-protection provisions of the Federal Railway Safety Act, codified at 49 U.S.C. § 20109(b)(1)(B), when on February 1, 2021, he refused to operate a train with dozens of cars, including hazardous tank cars containing Hydrogen Fluoride Anhydrous Ammonia, for fear of a derailment, until he had properly cut the tracks with his locomotive(s) uncoupled from the train containing hazardous materials thus removing the snow and ice, per CP Railway rules. This protected activity was discussed during CP Railway's February 10, 2021, internal investigation against Mr. Sexton and therefore any officer, manager, or employee of CP Railway who reviewed the investigation had knowledge of this safety report.

Mr. Sexton engaged in a protected activity, as statutorily defined by the whistleblower-protection provisions of the Federal Railway Safety Act, codified at 49 U.S.C. § 20109(b)(1)(A), when he reported CP Railway Regional Manager Tom Jared's unsafe and rule violating actions of walking up behind a conductor protecting a shove movement and telling the conductor to stop

4

communicating with Mr. Sexton who was relying on such communication for the safe operation of the train. This report was made during CP Railway's February 10, 2021, internal investigation against Mr. Sexton and therefore any officer, manager, or employee of CP Railway who reviewed the investigation had knowledge of this safety report.

Discovery is ongoing and Plaintiff reserves the right to supplement this answer in the event that additional responsive information is learned and/or identified.

**INTERROGATORY NO. 3:** If any of the actions identified in response to Interrogatory No. 2 are reports that you allege that you made, identify the date of each report, the subject(s) of each report, and the name of the person to whom each report was made.

**Objection:** Plaintiff objects to this Interrogatory as duplicative as it seeks the same information as requested in Interrogatory No. 2. The objection to Interrogatory No. 2 is fully adopted here within. Subject to and without waiving this objection, see the Answer below.

**Answer:** See Answer to Interrogatory No. 2.

Discovery is ongoing and Plaintiff reserves the right to supplement this answer in the event that additional responsive information is learned and/or identified.

**INTERROGATORY NO. 4:**  For each action identified in response to Interrogatory No. 2, identify each Person employed by Respondent whom, to your knowledge, had knowledge of the action prior to February 26, 2021.

**Objection:** Plaintiff objects to this interrogatory as overly broad and unduly burdensome to the extent that it seeks the identity of "each" person that has knowledge of information not reasonably accessible to Plaintiff at this time. Complainant may not be aware of "each" person with knowledge or information related to the allegations in this matter, for example "each" person who participated in the decision to investigate and discipline Plaintiff or conducted any

5

review of such action. Plaintiff objects to the extent that this information is primarily in the control of Defendant. Plaintiff specifically reserves the right to supplement this answer to the extent the identity of other persons becomes known. Subject to and without waiving these objections, see the Answer below.

**Answer:** See Answer to Interrogatory No. 2.

Mr. McKelvey had knowledge of Mr. Sexton's safety report regarding cutting the tracks covered under 49 U.S.C. § 20109(b)(1)(A) at the time Mr. Sexton made the safety report to Mr. McKelvey. Additionally, every officer, manager, or employee who reviewed CP's internal investigation against Mr. Sexton had knowledge that Mr. Sexton conducted this protected activity. This could include, but is not limited to Andrew Cruciani (CP_01130), David Cox (CP_01130), Thomas Jared (CP_01131, CP_01133, CP_000014, CP_0000138, CP_01714), Marcus Ruef, Mark Johnson (CP_01123, CP_01135, CP_00002-CP_00005, CP_000021), Jason Ross, Dylan Smith (CP_00004, CP_0000138, CP_000014), Joseph Adelfio (CP_00209, CP_00981, CP_00998, CP_00002, CP_01131, CP_01700-CP_01702), Amanda Cobb (CP_00209), Shelley Daberitz (CP_00456, CP_00981, CP_00001, CP_0000139), John Cartlidge (CP_00456, CP_01122), Joey Reyes (CP_00456, CP_01138, CP_0000139, CP_000014, CP_01703), Richard Ramones (CP_00458), Myron Becker (CP_00479), Brian Scudds (CP_00614, CP_00981, CP_00998, CP_01407-CP_01408, CP_01700-CP_01702, CP_01133), Michelle Sullivan (CP_00615), Mindy George (CP_00981, CP_01131), Al McCombs (CP_00981, CP_01133), everybody named in CP_00984 and CP_00986-00991, Justin DePover (CP_01122), everybody named in CP_01129, everybody named in CP_01131 and CP_01132, (CP_000015-CP_000017, CP_010681-CP_01682), Jeffrey McInnis (CP_01688-CP_01698).

For Mr. Sexton's refusal to operate a train with dozens of cars, including hazardous tank cars containing Hydrogen Fluoride Anhydrous Ammonia, for fear of a derailment, until he had properly cut the tracks with his locomotive(s) uncoupled from the train containing hazardous

6

materials thus removing the snow and ice, per CP Rail rules, protected under 49 U.S.C. § 20109(b)(1)(B), Mr. McKelvey and Mr. Jared had knowledge at the time of the protected activity, and every officer, manager, or employee who reviewed CP's internal investigation against Mr. Sexton had knowledge that Mr. Sexton conducted this protected activity. This likely includes, but is not limited to Thomas Jared, Marcus Ruef, Mark Johnson, Jason Ross, and Dylan Smith, as well as the above-named individuals.

For Mr. Sexton's safety report regarding Mr. Jared's unsafe action covered under 49 U.S.C. § 20109(b)(1)(A), every officer, manager, or employee who reviewed CP's internal investigation against Mr. Sexton had knowledge that Mr. Sexton conducted this protected activity. This likely includes, but is not limited to Thomas Jared, Marcus Ruef, Mark Johnson, Jason Ross, and Dylan Smith as well as the above-named individuals.

Discovery is ongoing and Plaintiff reserves the right to supplement this answer in the event that additional responsive information is learned and/or identified.

**INTERROGATORY NO. 5:** Identify and describe in detail each item of alleged damages claimed by you in this action, whether compensatory, punitive, or otherwise, which you claim you have suffered. Include, without limitation:

    a.    a specific statement of the amount of each element of damages you claim;

    b.    a detailed description of the method by which you calculated each element of damages;

    c.    the identity of any expert you have consulted or retained with respect to your alleged damages; and

    d.    the identities of all Documents which refer, relate, pertain to, or support your damage claims.

In the event you are unable to quantify specific items of alleged damages at this time, state

7

the means, methods, and formulae by which you contend such damages should be computed and any period over which you contend such damages should be computed. If you claim you are entitled to any equitable or injunctive relief, describe in detail the nature of any such relief you claim, and the basis of such claim.

**Objection:** Plaintiff objects to the use of "any," "all," and "any and all" as such a request does not describe with reasonable particularity the documents or information desired as required by the Federal Rules of Civil Procedure. Plaintiff objects to this request as premature, compound, overly broad, unduly burdensome, overly broad, and seeks a legal conclusion. Further Plaintiff objects to the request to identify documents and how such documents will be used in litigation, such as which document/s will be used to support particular claims in this case, because this request calls for the mental impressions of counsel and is counter to the work-product doctrine. Subject to and without waiving these objections, see the Answer below.

**Answer:**

Punitive Damages:

    a.  $250,000.

    b.  This amount was calculated by considering the maximum amount for punitive damages permitted under 49 U.S.C. § 20109(e)(3). This amount is justified because similar to the administrative case *Jason Raye v. Pan Am Railways, Inc.,* Case No.: 2013-FRS-00084 (ARB June 23, 2014), where the railroad investigated an employee, alleged that the employee lied, and where the employee was never actually disciplined nor lost wages, yet was awarded the statutory maximum of $250,000 in punitive damages—CP Railway actually disciplined Mr. Sexton, and in effect alleged that his statements regarding the shoving movement at issue were lies. Additionally, CP Railway's actions

8

demonstrated a complete disregard of Mr. Sexton's life and safety by setting up an unsafe and unsanctioned test when Mr. Jared ordered the employee protecting Mr. Sexton's shoving movements to stop communicating with Mr. Sexton. This entrapment and assessed discipline against Sexton placed his career in jeopardy and greatly affected Mr. Sexton's emotional health. CP Railway's unbridled adherence to Precision Scheduled Railroading and reckless disregard for Mr. Sexton's rights, life, and safety, the maximum punitive damages amount is warranted in this case.

c.  At this time, no expert has been consulted or retained in this case regarding this category of damages.

d.  Plaintiff identifies all documents previously disclosed by either party that have any relevance to the actions CP Railway took against Mr. Sexton in this matter or bears any relevance to the question of punitive damages. Also, see specifically the documents identified in the Answers to Interrogatories 1 and 2. These documents do not constitute every document that may refer, relate, pertain to, or support damages.

Past and future pain, suffering, mental anguish, and loss of enjoyment of life and/or psychological injuries:

a.  Unable to determine at this time.

b.  An amount to be calculated and determined by a jury or trier of fact. "Since compensatory damages for emotional distress are necessarily vague and are generally considered a fact issue for the jury, they may not be amenable to the kind of calculation disclosure contemplated by Rule 26(a)(1)[(A)(iii)]." *Williams v. Trader Pub. Co.*, 218 F.3d 481, 486 n.3 (5th Cir. 2000). Because of

9

CP Railway's reckless disregard for Mr. Sexton's rights, life, and safety, as well as placing a mark on Mr. Sexton's record and putting his career in jeopardy, Mr. Sexton suffered severe pain, suffering, mental anguish, and loss of enjoyment of life warranting reasonable, yet significant damages.

c.  At this time, no expert has been consulted or retained in this case regarding this category of damages.

d.  Plaintiff identifies all documents previously disclosed by either party that have any relevance to the actions CP Railway took against Mr. Sexton in this matter or bears any relevance to the question of past and future pain, suffering, mental anguish, and loss of enjoyment of life and/or psychological injuries. These documents do not constitute every document that may refer, relate, pertain to, or support damages.

Litigation costs, expert-witness fees, and reasonable attorneys' fees pursuant to 49 U.S.C. § 20109(e)(2)(C)

a.  Unable to determine at this time. Fees and costs continue to increase as the case progresses.

b.  This amount is to be determined after litigation in the case that Plaintiff will seek litigation costs, expert-witness fees, and reasonable attorneys' fees pursuant to 49 U.S.C. § 20109(e)(2)(C). Litigation costs and expert-witness fees cannot be calculated at this time as those costs will be incurred throughout litigation and be based upon the costs and rates set by third-party entities. Attorneys' fees will be calculated based upon the time spent by attorneys and staff at Yaeger & Jungbauer Barristers, PLC and at a rate that is considered reasonable for such a firm with nationwide experience and expertise in litigating FRSA cases.

c.  At this time, no expert has been consulted or retained in this case regarding this

10

category of damages, and it is unlikely that there will be any consultation on this matter.

    d.  Plaintiff points to his objection that this interrogatory is premature.

Discovery is ongoing and Plaintiff reserves the right to supplement this answer in the event that additional responsive information is learned and/or identified.

**INTERROGATORY NO. 6:**  Identify any and all Communications of yours with any Person regarding or relating to the action(s) identified in response to Interrogatory No. 1, including the date of the Communication(s), method of Communication(s) (e.g. phone, text, email, in person), the name of the Person(s) with whom you communicated, and the subject of the Communication(s).

**Objections:** Plaintiff objects to the use of "any," "all," and "any and all" as such a request does not describe with reasonable particularity the documents or information desired as required by the Federal Rules of Civil Procedure. Plaintiff objects to this interrogatory as overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. As drafted, this interrogatory seeks the identity of every person with whom Mr. Sexton or his attorneys have had "any communications" including in-person verbal communications regarding this subject, when such communications occurred, how such communications were made, and the subject matter of such conversations (which is redundant as this interrogatory specifically asks for communications "regarding or relating" to the subject set out in Interrogatory No.1). Such a request is not reasonably attainable or accessible pursuant to Fed. R. Civ. P. 26(b)(2)(B). Further, Plaintiff objects under the attorney-client privilege and work-product doctrines.  Subject to and without waiving these objections, see the Answer below.

**Answer:** A vast majority if not all of the communications relevant to this matter are in the control of CP Railway. Plaintiff identifies the previously disclosed documents in this case that

11

include any communication made by or to Plaintiff. Discovery is ongoing and Plaintiff reserves the right to supplement this answer in the event that additional responsive information is learned and/or identified.

**INTERROGATORY NO. 7:**  Identify any and all Communications of yours with any Person regarding or relating to the action(s) identified in response to Interrogatory No. 2, including the date of the Communication(s), method of Communication(s) (e.g. phone, text, email, in person), the name of the Person(s) with whom you communicated, and the subject of the Communication(s).

**Objections:** Plaintiff objects to the use of "any," "all," and "any and all" as such a request does not describe with reasonable particularity the documents or information desired as required by the Federal Rules of Civil Procedure. Plaintiff objects to this interrogatory as overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. As drafted, this interrogatory seeks the identity of every person with whom Mr. Sexton or his attorneys have had "any communications" including in-person verbal communications regarding this subject, when such communications occurred, how such communications were made, and the subject matter of such conversations (which is redundant as this interrogatory specifically asks for communications "regarding or relating" to the subject set out in Interrogatory No.2). Such a request is not reasonably attainable or accessible pursuant to Fed. R. Civ. P. 26(b)(2)(B). Further, Plaintiff objects under the attorney-client privilege and work-product doctrines.  Subject to and without waiving these objections, see the Answer below.

**Answer:** A vast majority if not all of the communications relevant to this matter are in the control of CP Railway. Plaintiff identifies the previously disclosed documents in this case that include any communication made by or to Plaintiff that involved any communications of Mr. Sexton's.

12

Discovery is ongoing and Plaintiff reserves the right to supplement this answer in the event that additional responsive information is learned and/or identified.

**INTERROGATORY NO. 8:** Identify each Person from whom you have acquired, or attempted to acquire, a Statement in this case.

**Objection:** Plaintiff objects to this interrogatory as overly broad, unduly burdensome, and vague as to the term "statement." Plaintiff further objects to this interrogatory to the extent that it seeks information protected from discovery by the work-product doctrine. Subject to and without waiving this objection, see the Answer provided below.

**Answer:** Anthony Cruiciani, Justin DePover, Jason McIntyre, and David Cox.

Discovery is ongoing and Plaintiff reserves the right to supplement this answer in the event that additional responsive information is learned and/or identified.

**INTERROGATORY NO. 9:** Identify all Statements in your possession, custody, or control.

**Objection:** Plaintiff objects to this interrogatory as overly broad, unduly burdensome, and vague as to the term "statement." Plaintiff objects as this request is not reasonably calculated to lead to the discovery of admissible evidence—Defendant does not have a right to "all statements" in either Mr. Sexton's control or in control of his attorneys as such a request is beyond the reasonable scope of discovery. Plaintiff further objects to this interrogatory to the extent that it seeks information protected from discovery by the work-product doctrine. Subject to and without waiving this objection, see the Answer provided below.

**Answer:** For each person identified in the Answer to Interrogatory No. 8, Plaintiff's Counsel, Cyle A. Cramer, made a preliminary phone call informing them that we may request a statement from them in the case and had a brief conversation with each. Any notes taken during

13

these phone calls are covered by the attorney work-product doctrine.

Discovery is ongoing and Plaintiff reserves the right to supplement this answer in the event that additional responsive information is learned and/or identified.

**INTERROGATORY NO. 10:** In addition to anyone identified in your Initial Disclosures, identify all Persons with knowledge or whom you believe may have knowledge of any of the facts or allegations relating to the issues in this case (including without limitation the claims asserted in your Complaint and the damages claimed by you), and, with respect to each such Person, describe what knowledge he or she has or may have.

**Objection:** Plaintiff objects to the use of "any" "all" and "any and all" as such a request does not describe with reasonable particularity the documents or information desired as required by the Federal Rules of Civil Procedure. Plaintiff also objects to this request as unduly burdensome and not reasonably accessible pursuant to Fed. R. Civ. P. 26(b)(2)(B). Plaintiff objects to this Interrogatory as duplicative, overly broad, and unduly burdensome to the extent that it seeks the identity of "all" persons with knowledge or that "may" have knowledge of "any" of the facts or allegations "relating" to this case, and to "what knowledge" such persons "has" or "may" have. Plaintiff cannot reasonably be aware of "all" persons with knowledge or information related to the allegations in this case nor describe what knowledge a person "may" have. Subject to and without waiving this objection see the Answer provided below.

**Answer:** Plaintiff points to all persons identified in Plaintiff's and Defendant's initial disclosures, persons identified in Plaintiff's answer to Interrogatory No. 4, Kimberly Sexton, and any person named or identified in any documents disclosed in this case. In the case of Ms. Sexton, she has knowledge of the emotional toll CP Railway's reckless and life-threatening actions took on the mental health of Mr. Sexton.

14

Discovery is ongoing and Plaintiff reserves the right to supplement this answer in the event that additional responsive information is learned and/or identified.

**INTERROGATORY NO. 11:**  Identify all communications you or your representatives have had with any Person or entity concerning any of the issues, claims, or defenses in this action, including, but not limited to, the fact that you filed the Complaint and the allegations that you have suffered any measure of damages. This Interrogatory includes, but is not limited to, communications with friends, relatives, spouse(s), ex-spouse(s), domestic partner(s), romantic partners, tax advisors, financial planners, medical professionals, current or former employees of Respondent, any local, state, or federal unit of government or any representative of such unit of government, or others.

**Objection:** Plaintiff objects to the use of "any," "all," and "any and all" as such a request does not describe with reasonable particularity the documents or information desired as required by the Federal Rules of Civil Procedure. Plaintiff objects to this interrogatory as duplicative, overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. As drafted, this interrogatory seeks the identity of every person with whom Mr. Sexton or his attorneys have had "any communications" including in-person verbal communications regarding his case, when such communications occurred, how such communications were made, and the subject matter of such conversations. Such a request is not reasonably attainable or accessible pursuant to Fed. R. Civ. P. 26(b)(2)(B). Further, Plaintiff objects under the attorney-client privilege and work-product doctrines.  Subject to and without waiving these objections, see the Answer below.

**Answer:** A vast majority if not all of the communications relevant to this matter are in the control of CP Railway. Plaintiff identifies the previously disclosed documents in this case

15

that include any communication made by or to Plaintiff that involved any communications of Mr. Sexton's.

Discovery is ongoing and Plaintiff reserves the right to supplement this answer in the event that additional responsive information is learned and/or identified.

**INTERROGATORY NO. 12:** Identify each Person you expect to call as a witness at the hearing, including, without limitation, any expert witness, and for each expert witness identified state or identify the following:

    a.    the subject matter of the witness's expertise;

    b.    whether you presently expect the Person to testify at the hearing;

    c.    the identity of all Documents provided to or received from the Person;

    d.    if the Person is expected to testify at the hearing, the substance of the facts and opinions to which the Person is expected to testify; and

    e.    if the Person is expected to testify at the hearing, the grounds for each such opinion that the Person is expected to give.

**Objection:** Plaintiff objects to this interrogatory as premature, as discovery is in its infancy and decisions on who will be called as a witness (both lay and expert) have not yet been made. Plaintiff also objects to the interrogatory to the extent that it imposes a burden beyond that which is contemplated or applied by the governing rules. Plaintiff will provide the necessary information within the time provided for under the procedures, rules, regulations, and orders of this Court. Discovery is ongoing and Plaintiff reserves the right to supplement this answer in the event that additional responsive information is learned and/or identified. Subject to and without waiving this objection, see the Answer provided below.

**Answer:** Plaintiff expects at this time to call all witnesses identified in Plaintiff's and Defendant's Initial Disclosures and on the subject matter identified in the Initial Disclosures and

16

the persons identified in Plaintiff's Answer to Interrogatory No. 4. Such listing and descriptions do not limit who Plaintiff may seek as a witness nor prohibit the subject matter of witness' testimony.

Discovery is ongoing and Plaintiff reserves the right to supplement this answer in the event that additional responsive information is learned and/or identified.

## RESPONDENT'S REQUESTS FOR THE PRODUCTION OF DOCUMENTS

**REQUEST NO. 1.** All documents requested to be identified by Respondent's Interrogatories to Complainant.

**Objection:** Plaintiff objects to the use of "any" "all" and "any and all" as such a request does not describe with reasonable particularity the documents or information desired as required by the Federal Rules of Civil Procedure. Plaintiff also objects to this request as unduly burdensome and not reasonably accessible pursuant to Fed. R. Civ. P. 26(b)(2)(B). Plaintiff fully adopts herein the objections made to each interrogatory.

**Answer:** Each document identified in Plaintiff's answers are already disclosed documents.

Discovery is ongoing and Plaintiff reserves the right to supplement this answer in the event that additional responsive information and/or documents are learned and/or identified.

**REQUEST NO. 2.** All documents consulted or relied upon in answering Respondent's Interrogatories to Complainant.

**Objection:** Plaintiff objects to the use of "any" "all" and "any and all" as such a request does not describe with reasonable particularity the documents or information desired as required by the Federal Rules of Civil Procedure. Plaintiff also objects to this request as unduly burdensome and not reasonably accessible pursuant to Fed. R. Civ. P. 26(b)(2)(B).

Plaintiff fully adopts herein the objections made to each interrogatory.

17

**Answer:** Each document identified in Plaintiff's answers are already disclosed documents.

Discovery is ongoing and Plaintiff reserves the right to supplement this answer in the event that additional responsive information and/or documents are learned and/or identified.

**REQUEST NO. 3.**    All documents pertaining to or constituting any action identified in response to Interrogatory No. 1.

**Objection:** Plaintiff objects to the use of "any" "all" and "any and all" as such a request does not describe with reasonable particularity the documents or information desired as required by the Federal Rules of Civil Procedure and objects to the phrase "pertaining to or constituting" as vague and ambiguous. Plaintiff also objects to this request as duplicative, unduly burdensome, overly broad, and not reasonably accessible pursuant to Fed. R. Civ. P. 26(b)(2)(B). Plaintiff fully adopts herein the objections made to each interrogatory.

**Answer:** Each document identified in Plaintiff's answers are already disclosed documents.

Discovery is ongoing and Plaintiff reserves the right to supplement this answer in the event that additional responsive information and/or documents are learned and/or identified.

**REQUEST NO. 4.**    All documents pertaining to or constituting any action identified in response to Interrogatory No. 2.

**Objection:** Plaintiff objects to the use of "any" "all" and "any and all" as such a request does not describe with reasonable particularity the documents or information desired as required by the Federal Rules of Civil Procedure and objects to the phrase "pertaining to or constituting" as vague and ambiguous. Plaintiff also objects to this request as duplicative, unduly burdensome, overly broad, and not reasonably accessible pursuant to Fed. R. Civ. P. 26(b)(2)(B). Plaintiff fully adopts herein the objections made to each interrogatory.

18

**Answer:** Each document identified in Plaintiff's answers are already disclosed documents.

Discovery is ongoing and Plaintiff reserves the right to supplement this answer in the event that additional responsive information and/or documents are learned and/or identified.

**REQUEST NO. 5.**     All documents that you or your representatives provided to or received from any governmental body or agency relating to the allegations or claims asserted in your Complaint, including but not limited to all documents submitted to the U.S. Department of Labor – Occupational Safety and Health Administration in connection with your Complaint and the investigation of the Complaint.

**Objection:** Plaintiff objects to the use of "any" "all" and "any and all" as such a request does not describe with reasonable particularity the documents or information desired as required by the Federal Rules of Civil Procedure. Plaintiff also objects to this request as unduly burdensome. Further, Plaintiff objects for the reason that such documents are equally available to Defendant from the Department of Labor.

**Answer:** Subject to and without waiving stated objections, see previously disclosed documents Sexton 000147-000149 and CP_0000153.

Discovery is ongoing and Plaintiff reserves the right to supplement this answer in the event that additional responsive information and/or documents are learned and/or identified.

**REQUEST NO. 6.**     All documents read, referred to, or relied upon in drafting the Complaint.

**Objection:** Plaintiff objects to the use of "any" "all" and "any and all" as such a request does not describe with reasonable particularity the documents or information desired as required by the Federal Rules of Civil Procedure. Plaintiff also objects to this request as unduly burdensome

19

and not reasonably accessible pursuant to Fed. R. Civ. P. 26(b)(2)(B). Further, Plaintiff objects to the request to identify documents and how such documents were used in litigation, because this request calls for the mental impressions of counsel and is counter to the work-product doctrine.

**Answer:** Plaintiff has no additional non-objectionable, relevant documents not previously disclosed in response to this request at this time. Discovery is ongoing and Plaintiff reserves the right to supplement this answer in the event that additional responsive information and/or documents are learned and/or identified.

**REQUEST NO. 7.**     Any document that you created, including but not limited to notes that you wrote or recordings that you made, during or regarding any conversation with any employee of Respondent related to the allegations or claims asserted in your Complaint.

**Objection:** Plaintiff objects to the use of "any" "all" and "any and all" as such a request does not describe with reasonable particularity the documents or information desired as required by the Federal Rules of Civil Procedure. Plaintiff also objects to this request as unduly burdensome and not reasonably accessible pursuant to Fed. R. Civ. P. 26(b)(2)(B). As drafted, this interrogatory seeks every document created by Mr. Sexton or his attorneys regarding this case. Such a request is not reasonably attainable or accessible pursuant to Fed. R. Civ. P. 26(b)(2)(B). Further, Plaintiff objects under the attorney-client privilege and work-product doctrines.

Answer: Plaintiff has no additional non-objectionable, relevant documents not previously disclosed in response to this request at this time. Discovery is ongoing and Plaintiff reserves the right to supplement this answer in the event that additional responsive information and/or documents are learned and/or identified.

**REQUEST NO. 8.**     All Communications that you or your representatives have had with any person, including, but not limited to, all former or current employees or agents of

20

Respondent, relating to the facts or allegations at issue in this case (including but not limited to the facts asserted in the Complaint and the damages sought in the Complaint.

**Objection:** Plaintiff objects to the use of "any" "all" and "any and all" as such a request does not describe with reasonable particularity the documents or information desired as required by the Federal Rules of Civil Procedure. Plaintiff also objects to this request as duplicative, unduly burdensome and not reasonably accessible pursuant to Fed. R. Civ. P. 26(b)(2)(B). As drafted, this interrogatory seeks every document containing any communications made by Mr. Sexton or his attorneys regarding this case. Such a request is not reasonably attainable or accessible pursuant to Fed. R. Civ. P. 26(b)(2)(B). Further, Plaintiff objects under the attorney-client privilege and work-product doctrines.

**Answer:** Plaintiff has no additional non-objectionable, relevant documents not previously disclosed in response to this request at this time. Discovery is ongoing and Plaintiff reserves the right to supplement this answer in the event that additional responsive information and/or documents are learned and/or identified.

**REQUEST NO. 9.**    All documents that refer or relate to the facts, events, or legal theories asserted in your Complaint.

**Objection:** Plaintiff objects to the use of "any" "all" and "any and all" as such a request does not describe with reasonable particularity the documents or information desired as required by the Federal Rules of Civil Procedure. Plaintiff also objects to this request as unduly burdensome and not reasonably accessible pursuant to Fed. R. Civ. P. 26(b)(2)(B). As drafted, this interrogatory seeks every document created by Mr. Sexton or his attorneys regarding this case. Such a request is not reasonably attainable or accessible pursuant to Fed. R. Civ. P. 26(b)(2)(B). Further, Plaintiff objects under the attorney-client privilege and work-product doctrines.

**Answer:** Plaintiff has no additional non-objectionable, relevant documents not previously

21

disclosed in response to this request at this time. Discovery is ongoing and Plaintiff reserves the right to supplement this answer in the event that additional responsive information and/or documents are learned and/or identified.

**REQUEST NO. 10.**     All documents that refer or relate to each claimed amount or item of damages, the method by which each claimed amount or item of damages was calculated or determined, and/or which otherwise support or relate to any claims for damages alleged or asserted in this action.

**Objection:** Plaintiff objects to the use of "any" "all" and "any and all" as such a request does not describe with reasonable particularity the documents or information desired as required by the Federal Rules of Civil Procedure. Plaintiff also objects to this request as unduly burdensome and not reasonably accessible pursuant to Fed. R. Civ. P. 26(b)(2)(B). As drafted, this interrogatory seeks every document created Plaintiff's attorneys regarding damages in this case. As such, Plaintiff objects under the attorney-client privilege and work-product doctrines. Further, Plaintiff fully adopts herein the objections made to Interrogatory No. 5.

**Answer:** Plaintiff has no additional non-objectionable, relevant documents not previously disclosed in response to this request at this time. Discovery is ongoing and Plaintiff reserves the right to supplement this answer in the event that additional responsive information and/or documents are learned and/or identified.

**REQUEST NO. 11.**     All documents, including, but not limited to, expert reports, that were prepared by each person whom you expect to call as an expert witness at trial or in support of any motion or concerning any motion and which contain any opinion, conclusion, or inference with respect to any fact or matter about which the expert witness has been retained to testify in this lawsuit and/or the facts or data upon which the expert witness bases such conclusion, opinion, or

22

inference.

**Objection:** Plaintiff objects to this interrogatory as premature, as discovery is in its infancy and decisions on who will be called as a witness (both lay and expert) have not yet been made. Plaintiff also objects to the interrogatory to the extent that it imposes a burden beyond that which is contemplated or applied by the governing rules. Plaintiff will provide the necessary information within the time provided for and under procedures, rules, regulations, and orders of this Court. Discovery is ongoing and Plaintiff reserves the right to supplement this answer in the event that additional responsive information is learned and/or identified. Subject to and without waiving this objection, see the Answer provided below.

**Answer:** Plaintiff has no additional non-objectionable, relevant documents not previously disclosed in response to this request at this time. Discovery is ongoing and Plaintiff reserves the right to supplement this answer in the event that additional responsive information and/or documents are learned and/or identified.

**REQUEST NO. 12.** All files, documents, notes, and correspondence of any type authored by, sent to, or received by each expert with whom you have consulted or whom you have retained in connection with this litigation.

**Objection:** Plaintiff objects to this interrogatory as premature, as discovery is in its infancy and decisions on who will be called as a witness (both lay and expert) have not yet been made. Plaintiff also objects to the interrogatory to the extent that it imposes a burden beyond that which is contemplated or applied by the governing rules. Plaintiff will provide the necessary information within the time provided for and under procedures, rules, regulations, and orders of this Court. Discovery is ongoing and Plaintiff reserves the right to supplement this answer in the event that additional responsive information is learned and/or identified. Subject to and without waiving this objection, see the Answer provided below.

23

**Answer:** Plaintiff has no additional non-objectionable, relevant documents not previously disclosed in response to this request at this time. Discovery is ongoing and Plaintiff reserves the right to supplement this answer in the event that additional responsive information and/or documents are learned and/or identified.

**REQUEST NO. 13.**    All documents that you intend to or may introduce at the hearing or any other proceeding in this matter.

**Objection:** Plaintiff objects to this interrogatory as premature, as discovery is in its infancy and decisions on what documents Plaintiff intends to introduce during trial or any other proceeding in this matter have not yet been made. Plaintiff also objects to the interrogatory to the extent that it imposes a burden beyond that which is contemplated or applied by the governing rules. Plaintiff will provide the necessary information within the time provided for and under procedures, rules, regulations, and orders of this Court. Discovery is ongoing and Plaintiff reserves the right to supplement this answer in the event that additional responsive information is learned and/or identified. Subject to and without waiving this objection, see the Answer provided below.

**Answer:** Plaintiff has no additional non-objectionable, relevant documents not previously disclosed in response to this request at this time. Discovery is ongoing and Plaintiff reserves the right to supplement this answer in the event that additional responsive information and/or documents are learned and/or identified.

## REQUESTS FOR ADMISSIONS

**REQUEST NO. 1.**    Admit that Respondent is a Carrier within the meaning of the Railway Labor Act, as amended.

24

**Objection:** Plaintiff objects to this Request as irrelevant to the issues in this case and not reasonably calculated to lead to the discovery of admissible evidence.

**Answer:** Admitted.

**REQUEST NO. 2.**     Admit that you are an Employee within the meaning of the Railway Labor Act, as amended.

**Objection:** Plaintiff objects to this Request as irrelevant to the issues in this case and not reasonably calculated to lead to the discovery of admissible evidence.

**Answer:** Admitted.

**REQUEST NO. 3.**     Admit that you are a member of the Brotherhood of Locomotive Engineers and Trainmen.

**Answer:** Admitted.

**REQUEST NO. 4.**     Admit that the terms and conditions of your employment with Respondent are governed by a collective bargaining agreement between Respondent and the Brotherhood of Locomotive Engineers and Trainmen.

**Objection:** Plaintiff objects to this Request as irrelevant to the issues in this case and not reasonably calculated to lead to the discovery of admissible evidence.

**Answer:** Admitted. The collective bargaining agreement between Defendant and the Brotherhood of Locomotive Engineers and Trainmen arose out of a private agreement and is not a provision of law within the meaning of U.S.C. § 20109(f). See *Reed v. Norfolk Southern Ry. Co.*, 740 F.3d 420, 425 (7th Cir. 2014). FRSA claims are not subject to mandatory arbitration

25

under the RLA, and the collective bargaining agreement offers no recourse or relief for a railroad employee's right not to be accused of rule violations in retaliation for engaging in conduct protected by the FRSA. U.S.C. § 20109(h) states that "[t]he rights and remedies in this section may not be waived by any agreement, policy, form, or condition of employment." Therefore, Mr. Sexton maintains his right to all remedies and forms of relief permitted under the FRSA.

**REQUEST NO. 5.**     Admit that Public Law Board No. 7667 sustained your claim for "removal from [your] record the twenty (20) day suspension assessed and compensation for all time lost, in addition to time and expenses for attending the investigation held on February 10, 2021" in Case No. 353.

**Objection:** Plaintiff objects to this Request as irrelevant to the issues in this case and not reasonably calculated to lead to the discovery of admissible evidence.

**Answer:** Admitted. The collective bargaining agreement between Defendant and the Brotherhood of Locomotive Engineers and Trainmen arose out of a private agreement and is not a provision of law within the meaning of U.S.C. § 20109(f). See *Reed v. Norfolk Southern Ry. Co.*, 740 F.3d 420, 425 (7th Cir. 2014). FRSA claims are not subject to mandatory arbitration under the RLA, and the collective bargaining agreement offers no recourse or relief for a railroad employee's right not to be accused of rule violations in retaliation for engaging in conduct protected by the FRSA. U.S.C. § 20109(h) states that "[t]he rights and remedies in this section may not be waived by any agreement, policy, form, or condition of employment." Therefore, Mr. Sexton maintains his right to all remedies and forms of relief permitted under the FRSA.

**REQUEST NO. 6.**     Admit that you did not appeal Public Law Board No. 7667's award in Case No. 353.

26

**Objection:** Plaintiff objects to this Request as irrelevant to the issues in this case and not reasonably calculated to lead to the discovery of admissible evidence.

**Answer:** Admitted. The collective bargaining agreement between Defendant and the Brotherhood of Locomotive Engineers and Trainmen arose out of a private agreement and is not a provision of law within the meaning of U.S.C. § 20109(f). See *Reed v. Norfolk Southern Ry. Co.*, 740 F.3d 420, 425 (7th Cir. 2014). FRSA claims are not subject to mandatory arbitration under the RLA, and the collective bargaining agreement offers no recourse or relief for a railroad employee's right not to be accused of rule violations in retaliation for engaging in conduct protected by the FRSA. U.S.C. § 20109(h) states that "[t]he rights and remedies in this section may not be waived by any agreement, policy, form, or condition of employment." Therefore, Mr. Sexton maintains his right to all remedies and forms of relief permitted under the FRSA.

Dated: August 3, 2023

Respectfully Submitted,
YAEGER & JUNGBAUER BARRISTERS, PLC

By: */s/ Cyle Cramer*
John D. Magnuson, *pro hac vice.*
Cyle A. Cramer, *pro hac vice.*
4601 Weston Woods Way
Saint Paul, MN 55127
Telephone: (651) 288-9500
jmagnuson@yjblaw.com
ccramer@yjblaw.com

*/s/ Megan R. Merritt*
MEGAN R. MERRITT AT0010635
          for
SHUTTLEWORTH & INGERSOLL, P.L.C.
115 3rd Street SE, Suite 500
P.O. Box 2107
Cedar Rapids, IA 52406-2107
PHONE: (319) 365-9461
FAX: (319) 365-8443
E-MAIL: mrm@shuttleworthlaw.com

*Attorneys for Plaintiff John Sexton*

27

## FW: Dan Chandanais

| | |
|---|---|
| **From:** | Jeffrey McInnis <jeffrey_mcinnis@cpr.ca> |
| **To:** | Dylan Smith <dylan_smith@cpr.ca> |
| **Date:** | Mon, 04 Jan 2021 15:05:53 +0000 |

**Jeffrey R. McInnis** | Manager Operating Practices - US | C ▮▮▮▮▮ | CP

**From:** Paul Bicha <Paul_Bicha@cpr.ca>
**Sent:** Monday, January 04, 2021 8:50 AM
**To:** Bill Huston <Bill_Huston@cpr.ca>
**Cc:** Jeffrey McInnis <Jeffrey_McInnis@cpr.ca>
**Subject:** FW: Dan Chandanais

Bill,

Here is a message that was emailed to us below that you may want to look into to find out what actually happened.



**Paul Bicha**
Manager of Rules - US
**O** 651-495-9554
C▮▮▮▮▮
1010 Shop Rd.
St. Paul, MN. 55106

**From:** JOHN SEXTON <jtsexton1@msn.com>
**Sent:** Sunday, January 3, 2021 7:10 PM
**To:** Jeff_McGinnis@cpr.ca
**Cc:** Paul Bicha <Paul_Bicha@cpr.ca>
**Subject:** Fw: Dan Chandanais

This email did not originate from Canadian Pacific. Please exercise caution with any links or attachments.

It happened around 0945 on December 23, 2020.

**From:** JOHN SEXTON <jtsexton1@msn.com>
**Sent:** Sunday, January 3, 2021 7:08 PM
**To:** Jeff_McGinnis@cpr.ca <Jeff_McGinnis@cpr.ca>
**Cc:** Paul Bicha <paul_bicha@cpr.ca>
**Subject:** Fw: Dan Chandanais



EXHIBIT
16

Confidential

CP_01688

This is just an example of management putting production before safety. If T&E employees were to work like this we wouldn't have a career much longer. I did not witness this personally but this was emailed to me by a fellow employee who was there when it happened. I don't have the Kansas City employee Kelton McBride's' contact information or I would call and get his side of the story. This all happened on the mainline channel. Is it possible to pull the tapes so you can hear it for yourselves? If this is truly how this event took place should this behavior be tolerated by a person who supposed to set the bar for the rest us? What is more important clearing the BN diamond at Ottumwa or following the rules? Home Safe!!!

**From:** JOHN SEXTON <jtsexton1@msn.com>
**Sent:** Sunday, January 3, 2021 6:41 PM
**To:** JOHN SEXTON <jtsexton1@msn.com>
**Subject:** Fw: Dan Chandanais

All,
    While working 575, waiting to leave Ottumwa on 23 December, the following occurred.

    What I believe was 474-21 arrived with approximately an hour to work and with engine trouble. The outbound crew, of whom Kelton McBride, is the only one I know, was on duty and instructed by Dan Chandanais to not review any train documentation or TGBOs and get immediately on another engine and be in position to assist the inbound crew in swapping power.
    During the work, Dan instructed the outbound crew to not secure the train, as Dan would be in position to attend the train. The crew then broke the consist to remove the disabled locomotive and insert the new one. They were then instructed to not perform an engine air brake test until all the work was completed and the train pulled to the south end of the yard to clear the BNSF diamond. Once the engines were swapped and the crew tied onto the train, they had a new lead locomotive, in no position to verify a proper class 3 air brake test to move the train.
    After the crew, upon instruction, pulled the train into the yard, Dan, without radio or 3 point protection, armed and dumped the EOT for the new lead locomotive.
    On top of the rules violations Dan mandated the crew violate, Dan performed service while we still have employees furloughed.
    I think we can all agree this needs to stop.

Confidential

CP_01689

## RE: HOME SAFE

| | |
|---|---|
| **From:** | Tom Jared <tom_jared@cpr.ca> |
| **To:** | JOHN SEXTON <jtsexton1@msn.com> |
| **Cc:** | Steve Glasgow <s_l_glasgow@yahoo.com>, chad01johnson <chad01johnson@gmail.com>, Dylan Smith <dylan_smith@cpr.ca>, Joey Reyes <joey_reyes@cpr.ca> |
| **Date:** | Wed, 20 Jan 2021 01:32:46 +0000 |

Good evening John,

After we talked this afternoon I did more follow up with the employee involved with the allegation. The conductor stated at no time was he instructed to violate any rule, in addition once the power was together they performed the class 3 test.

Also Dylan and I talked in some detail with LC Anderton out of Nahant about the allegations, he was satisfied with the investigation and our follow up, he was also going to follow up with Mr. Glasgow who I see is CC on this correspondence.

Steve if you need additional details let me know we will walk through the information with you and your LC.

Otherwise this matter is closed.

Thanks Tom

---



**CP Leadership Coach**

**Tom Jared**
GM Operations – US West Division
**O** (612)904-5845
**C**
1000 Shop Road – Operations Tower
St. Paul MN 55106

**From:** Tracy L Miller <Tracy_L_Miller@cpr.ca>
**Sent:** Monday, January 18, 2021 7:30 PM
**To:** JOHN SEXTON <jtsexton1@msn.com>
**Cc:** Jason_Ross@cpr.ca; Tom Jared <Tom_Jared@cpr.ca>; Steve Glasgow



EXHIBIT
17

Confidential

CP_01696

&lt;s_l_glasgow@yahoo.com&gt;; chad01johnson &lt;chad01johnson@gmail.com&gt;
**Subject:** Re: HOME SAFE

Good evening John,

Trust and hope all is well as it's been a while since we have spoken.

Dylan and Tom have gone through the facts with what's outlined below. When are you gentlemen free to walk through each item with them?
Trust safety is the number 1 ideal for all of us and we all have to expect accountability from ourselves and those we work with.

I will follow up with you as well

Thanks John

On Jan 18, 2021, at 3:27 PM, JOHN SEXTON &lt;jtsexton1@msn.com&gt; wrote:

This email did not originate from Canadian Pacific. Please exercise caution with any links or attachments.

The more information I receive from the individuals present during the incident, the more it becomes clear to me that we have two different sets of rules on the CP. One for labor, one for management.

If Trainmaster Chandanais had witnessed T&E crews violating so many rules, they would have received a ride home in his CP company vehicle, which, in spite of CP being a tobacco free environment, isn't, and pulled out of service immediately pending a full investigation.

How much longer will a double standard be allowed to exist on our Home Safe property?

When I spoke with Superintendent Smith on 13 January 2021, he said Mr. Glasgow had spoken to him directly and stated that he did not want his name put out as being the individual coming forward with the information for fear of retribution from Trainmaster Chandanais. I contacted Mr. Glasgow and he informed me that he had not spoken directly to Superintendent Smith.

Chad Johnson was working as Mr. Glasgow's AE on the day of the incident and tells the exact same scenario played out during the incident at approximately 0950 on 23 December 2020. Both employees could not believe what they were hearing play out across the mainline channel.

Where is our Home Safe during this incident? We are told if you see something, say something. This is being challenged with this correspondence. We are constantly reminded of Home Safe, about integrity and intestinal fortitude. Where was this during the incident?

Confidential

CP_01697

There were several critical rules violations made by Mr. Chandanais during this incident that went against everything we stand for with our Home Safe program. As safety leaders in the field, this type of behavior from a manager makes us all look bad in the eyes of our fellow employees.

When I hold my footboard job briefings about the topic of the month, I ask my fellow employees to sign the sheet and include their employee number. I get asked about this incident and all I can say is there is no defense for what happened that day. The employees on that train were put into harm's way by the one person whose job it is to ensure their safety. I was given the 3 Whats bulletin at the last Health and Safety meeting: What? So What? Now What?

The What is:

1.    No Class III air brake test was performed before the train was moved.

2.    No Engine Air Brake test was performed on the new leader in the consist before the consist was moved.

3.    No 3 points of protection.

4.    The only radio communication Mr. Chandanais had was in his vehicle, away from the train while he was performing service.

5.    Mr. Chandanais did not attach to the crew to perform these tasks, all the while instructing the crew to knowingly violate all the above listed rules.

The So What is:

We all know the effect of Mr. Chandanais careless behavior on that day could have resulted in a catastrophic event, affecting our fellow employees, their families and the public.

The Now What:

That is why this correspondence is being sent and is up to you.


Respectfully,

John Sexton
Union Co-Chair
Quad Cities Health and Safety Committee

Confidential

CP_01698

## Re: HOMESAFE ???

| | |
|---|---|
| **From:** | Jason M Ross <jasonm_ross@cpr.ca> |
| **To:** | jtsexton1@msn.com |
| **Cc:** | Tracy L Miller <tracy_l_miller@cpr.ca> |
| **Bcc:** | Jason M Ross <jasonm_ross@cpr.ca> |
| **Date:** | Mon, 15 Feb 2021 00:28:52 +0000 |

Good evening John.

I have gathered information surrounding what you pointed out below. I would like to connect with you tomorrow to discuss.

Let me know if there's a specific time that works for you, otherwise I'll give you a call in the afternoon.

Regards,

Jason M. Ross
VP Southern Region
O- 651-495-9519
C- ▮▮▮▮▮
1010 Shop Road
St Paul MN, 55106

On Feb 10, 2021, at 8:50 AM, Jason M Ross <JasonM_Ross@cpr.ca> wrote:

Good morning John,

Thank you reaching out, Tracy sent this my way as the email address you have is for someone else (there are 3 Jason Ross' in the system)

I will look into this and we will get back to you.



**CP Leadership Coach**

**Jason M. Ross**
VP Southern Region
**O** (651)495-9519
C ▮▮▮▮▮
1010 Shop Road
St. Paul MN 55106

**From:** JOHN SEXTON <jtsexton1@msn.com>
**Sent:** Tuesday, February 9, 2021 8:42 PM



**EXHIBIT**

18

Confidential

CP_00994

**To:** Tracy L Miller <Tracy_L_Miller@cpr.ca>; Tracy L Miller <Tracy_L_Miller@cpr.ca>;
Jason_Ross@cpr.ca
**Subject:** Fw: RE : HOMESAFE ???

This email did not originate from Canadian Pacific. Please exercise caution with any
links or attachments.

Mr. Miller,

I was in a company vehicle driven from Eckards to Marquette by ATM Kurt McElvey out of Marquette,
Iowa during a snow storm while he felt the need to drive at 40 mph on roads that were 100 percent snow
covered with blowing and drifting snow.  I shared with him on three separate occasions that he was
driving too fast and was making me uncomfortable.  If this were a carrier contracted cab service I would
have had them pull into a gas station which at that time I would have removed my belongings and called a
manager for a safe ride.  Since this was a fellow CP employee and a manager just what exactly can be
done to curtail this? We were already dead on hours of service and on limbo time when he picked us
up.  Looking for some advice of this.

The next trip out of the hotel to return to Nahant I was called for 474-31.  The train was late arriving at
Marquette as a 3 train meet was happening in Marquette at the time.  When we got on the train we had
work to do setting out lines 74 through 51 in Marquette siding.  It had been snowing the previous few
days and the tracks and crossings were snow covered. I informed ATM McElvey that the crossing and
tracks needed cut with the locomotives before our set out. He told me that I would NOT cut the crossings
and tracks in which I replied that if he is directing me to not follow the rules and our topic of the month
for the Health and Safety Committee and managers (Cutting flangeways and crossings) that he would
have to call Superintendent Smith right now to inform him that he is instructing me NOT to follow the
rules. He didn't make the call and I cut the tracks and crossings as needed.  After reviewing our paperwork
our 2 north cars we were shoving into the Marquette siding were a UTLX 971081 and a TILX 500875 both
were DANGEROUS ALERT SHIPMENT KEY TRAIN LOADS of AMMONIA.  Just exactly what is going on
here?  My career depends on me to follow the rules 100 percent of the time,  all the time to the best of
my ability.  Why are managers out here instructing crews to break the rules? On Saturday, we had
another derailment with crews not cutting flange ways and crossings with an empty car.  What would
have been the environmental impact as well as the possible loss of life if I didn't insist on cutting the
tracks and crossings with 2 loads of AMMONIA. Catastrophic I would imagine.

The same night ATM McElvey instructed a crew to move a locomotive on an open deck bridge for me to
pick up in Marquette.  This bridge is an open deck design and is not safe for anyone to MU an engine in 6
to 8 inches of snow.  I shared all this information with Mr. Jared and Mr. Smith when I arrived at Nahant
on 2-01-21.

Respectfully,

John Sexton

Confidential

CP_00995

1

```
            IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF IOWA
                     EASTERN DIVISION

    - - - - - - - - - - - - - - - - - - - - -
    No. 3:23-CV-00031-HCA

    John Sexton,

                              Plaintiff,
            vs.

    Dakota, Minnesota & Eastern
    Railroad Corporation d/b/a
    Canadian Pacific, a Delaware
    corporation,

                              Defendants.
    - - - - - - - - - - - - - - - - - - - - -


                    DEPOSITION OF
                   KURTIS MCKELVEY

                  November 9, 2023

                     9:30 a.m.
```

```
            TAKEN BY: BRENDA K. FOSS
               fossbrenda@yahoo.com
                   612-701-4282
```

2

```
            Deposition of KURTIS MCKELVEY,
    taken via Zoom videoconference, by and on
    behalf of Plaintiff, on Thursday, November 9,
    2023, commencing at 9:30 a.m., before Brenda
    K. Foss, Professional Court Reporter, Notary
    Public, State of Minnesota, County of
    Hennepin.

                 *   *   *   *   *
            APPEARANCES


    ON BEHALF OF THE PLAINTIFF:
    JOHN MAGNUSON, ESQUIRE
    CYLE CRAMER, ESQUIRE
    YAEGER & JUNGBAUER BARRISTERS, PLC
    4601 Weston Woods Way
    St. Paul, MN  55127
    jmagnuson@yjblaw.com
    651-288-9500


    ON BEHALF OF THE DEFENDANTS:
    BRIANA AL TAQATQA, ESQUIRE
    NOAH GARCIA
    WHITNEY & DORSEY LLP
    50 South Sixth Street, Suite 1500
    Minneapolis, MN  55402

                 *   *   *   *   *
```

3

```
1                 I N D E X

2
     Examination:               PAGE:
3    By Mr. Magnuson              4

4
     Objections:
5    By Ms. Al Taqatqa        17-18, 20-21,
     23, 34, 38-39, 53, 56, 62-63, 67, 71, 74-75,
6    83, 89, 93, 97, 99-101, 104, 109, 118

7
     Marked Deposition Exhibits:
8    21 - Bates 3241
          Short-Term Incentive   27
9    22 - Bates CP 3361, 2020
          Performance Mgmt Form  30
10   23 - Bates CP 3367, 2021
          Performance Mgmt Form  35
11   24 - Bates Sexton 144, GOI
          Section 1-32           45
12   25 - Bates Sexton 143, GM
          Notice No. 22, 1/12/21 46
13   26 - Bates CP 3286, 2/21
          E-mails                65
14   27 - Bates CP 3303, trains
          impacting train speed  81
15   28 - Skipped
     29 - Bates CP 3244, Incident
16        Report 474-31          87
     30 - Bates CP 3246, e-mail
17        from A. Dalen, Jan '21 89
     31 - Bates CP 3409, Verizon
18        account               102

19   Previous exhibits mentioned:
     7                           59
20   8                           42

21
     Reporter's Certificate     121

22

23
     (Original Deposition Transcript in the
24   possession of John Magnuson, Esquire).

25
```

4

```
1          P R O C E E D I N G S

2

3            KURTIS MCKELVEY,

4    after having been first duly sworn,

5    deposes and says under oath as follows:

6

7          E X A M I N A T I O N

8    BY MR. MAGNUSON:

9  Q  Good morning, Mr. McKelvey.  My name is John

10    Magnuson.  I represent John Sexton in this

11    matter.  I'm assuming you understand that.

12    Will you please state your full name and

13    spell your last name for the record?

14 A  Kurtis Roger McKelvey, M-C-K-E-L-V-E-Y.

15 Q  Thank you, sir.  And what is your current

16    position of employment?

17 A  Terminal trainmaster of Canadian Pacific

18    Kansas City Railroad.

19 Q  Where are you stationed or where is your home

20    terminal currently?

21 A  Bensenville, Illinois.

22 Q  When were you promoted to trainmaster?

23 A  I don't recall the exact time.

24 Q  Approximately?

25 A  Approximately sometime around 2022 maybe.
```

53

1    of February 1st, 2021?
2  A  Not that I'm aware of, no.
3  Q  When did you first become aware that Sexton
4     was disciplined later in that shift?
5         MS. AL TAQATQA:  Object to form.
6  A  I don't recall the time I was made aware of it.
7  Q  (By Mr. Magnuson, continuing) When was the
8     first time anybody came to talk to you about
9     the events of February 1st, 2021?
10  A  What do you mean came to talk to me?
11  Q  Either spoke to you about that.  When was the
12     first time anyone at CP Rail spoke to you
13     about the events surrounding February 1st, 2021?
14         MS. AL TAQATQA:  Objection, form.
15     You can answer if you understand.
16  A  I don't recall the specific dates. Do you remember
17  Q  (By Mr. Magnuson, continuing) Do you remember
18     who first spoke to you regarding those events?
19         MS. AL TAQATQA:  Objection, form.
20  A  I do not.
21  Q  (By Mr. Magnuson, continuing) Were you
22     contacted prior to Mr. Sexton's investigation?
23  A  About what?
24  Q  About the events surrounding February 1st, 2021.
25         MS. AL TAQATQA:  Objection, form.

54

1  A  I'm having a hard time trying to figure out
2     what you're trying to ask.
3  Q  (By Mr. Magnuson, continuing) Well --
4  A  I'm sure I would have talked with several
5     people during the work event.  I'm sure I've
6     talked with several people after the work
7     event.  Who and what time I couldn't tell you
8     the specifics.
9  Q  The work event meaning the 474?
10  A  Yes.
11  Q  Do you recall that there was a significant
12     delay that day with the 474?
13  A  Yes.
14  Q  What do you recall around the event
15     surrounding that delay?
16  A  The only thing I remember about that day is
17     Mr. Sexton was the engineer on that train.  I
18     remember having a conversation with him prior
19     to the work to be completed.  And then the
20     actual work event took a lot longer than
21     expected.  I had several other things I had
22     to do during that time also as part of my
23     daily duties.  And that's pretty much all I
24     remember.
25  Q  What were the other things that you had to

55

1     do?
2  A  I don't recall specifically.  But I'm in
3     charge of managing all of the crews and all
4     of the trains that would come through there.
5     So the 474 is just one train.
6  Q  Do you remember any other trains that were
7     coming through on February 1st?
8  A  I don't specifically, no.
9  Q  What were the reasons that this job took
10     longer than expected?
11  A  It sounds like it was snowing at the time
12     just going back to documents that I have
13     seen.  So I'm sure the weather took some part
14     in the delays.  And then as far as that, I'd
15     have to refer to the drill-down.
16  Q  Mr. Sexton cut some crossings as you recall?
17  A  Yes.
18  Q  And cutting those crossings contributed in
19     some part to the delay.  Is that correct?
20  A  I would say no.
21  Q  How long did it take to cut the crossings?
22  A  I don't recall exactly how long it took.
23  Q  But had he not cut the crossings, the delay
24     would have been shorter.  Correct?
25  A  Theoretically speaking, I can't answer that.

56

1  Q  Had he not cut the crossings, the delay with
2     that train would have been shorter.  Correct?
3         MS. AL TAQATQA:  Objection, form.
4     You can answer.
5  A  I mean it's possible.  You're just speculating.
6     You know, we could have not cut the crossings
7     and he could have ran into another issue that
8     would have delayed it even longer or vice
9     versa.  I can't speculate if we did something
10     what would have occurred.
11  Q  Do you recall how long it took him to cut the
12     crossings?
13  A  I do not recall exactly how long, but
14     typically it's not something that causes a
15     major delay.
16  Q  How many crossings would he have cut, or how
17     many crossings did he cut if you know?
18  A  I think two crossings, possibly three.
19  Q  How many crossings are there between
20     Marquette and Nahant?
21  A  I can't answer that question.
22  Q  More than 10?
23  A  I can't answer that question.
24  Q  More than 20?
25  A  I can't answer that question.  I don't know

**1** them down. I will start.

**2**         MR. MAGNUSON: Briana, I bet

**3** you're writing them down.

**4**         MS. AL TAQATQA: The last one was

**5** 25.

**6**         MR. MAGNUSON: The next one will

**7** be 26.

**8**         (Deposition Exhibit 26 marked for

**9** identification).

**10 Q** (By Mr. Magnuson, continuing) Is this one of

**11** the e-mails that you reviewed to prepare for

**12** your testimony today, Mr. McKelvey?

**13 A** Yes.

**14**         MR. MAGNUSON: Cyle, could you go

**15** to the very bottom of it?

**16**         MR. CRAMER: On the first page?

**17**         MR. MAGNUSON: All the way down

**18** to the Ron Pierce e-mail at 3:51.

**19 Q** (By Mr. Magnuson, continuing) So we're

**20** showing you the first e-mail on this chain

**21** that was sent by Ron Pierce at 3:51. Does

**22** this e-mail refresh your recollection at all

**23** of the events of that day?

**24 A** I mean, I read what it says. As far as what

**25** I actually remember from that day, not really.

**1 Q** Now we'll go up above. The one from Gary

**2** Prince at 4:54, do you recall that e-mail

**3** specifically?

**4 A** No.

**5 Q** Do you recall getting it?

**6 A** No.

**7 Q** It states, 'We need a full breakdown from the

**8** Trainmaster on what happened here.' You were

**9** an assistant trainmaster that day, but is

**10** that who they're referring to? Is that who

**11** Gary Prince was referring to there? Were you

**12** acting as the trainmaster?

**13 A** Yes.

**14 Q** It goes on to say, 'A setout and locomotive

**15** lift should not take 4 hours and 30 minutes

**16** as projected.' Do you read that?

**17 A** Yes.

**18 Q** That's correct? It shouldn't take that long

**19** under standard?

**20 A** That is correct.

**21 Q** He goes on to say, 'We are at risk of 4 re-

**22** crews due to 1 train over-standard.' Do you

**23** recall that being the case that day?

**24 A** I do not recall that.

**25 Q** So when they talk about being at risk of 4 re-

**1** crews, they're not talking about just regularly

**2** scheduled crew changes. They're talking

**3** about re-crews as a result of going over

**4** their hours of service. Correct?

**5**         MS. AL TAQATQA: Objection,

**6** foundation. You can answer if you know.

**7 A** Yeah, I can't say specifically what they're

**8** talking about.

**9 Q** (By Mr. Magnuson, continuing) Well, when he

**10** says risk of re-crews, he's not talking about

**11** regularly scheduled crew changes, is he?

**12**         MS. AL TAQATQA: Same objection.

**13 A** I mean, I can't speak to exactly what

**14** somebody else is talking about.

**15 Q** (By Mr. Magnuson, continuing) Well, we will

**16** talk to Mr. Prince about it. But he did say

**17** that the one train being over-standard is

**18** going to result in four re-crews. That's

**19** what it states. Right?

**20 A** That is what it states, correct.

**21 Q** And your understanding is the one train being

**22** over-standard that he's talking about here is

**23** the 474. Right?

**24 A** Correct.

**25 Q** He goes on to say, 'Ensure the delays in Nexus

**1** are filled out correctly with facts, not

**2** assumptions.' Is that correct?

**3 A** That's what it says, correct.

**4 Q** What is Nexus?

**5 A** Nexus is a computer program.

**6 Q** What does the computer program do?

**7 A** It shows the train line-ups and their

**8** schedule. It shows information about the

**9** trains, how they're operating, whether they

**10** are operating in advance time, link (phonetic)

**11** time, what time they're projected into a

**12** specific terminal or destination. And then

**13** it also shows what other trains are projected

**14** in there. That's how we keep track of the

**15** arrivals, departures, work events, a lot of

**16** the stuff with the times of the trains.

**17 Q** Part of your job at that time was to avoid

**18** the risk of re-crews. Right?

**19 A** I don't know how you're phrasing the

**20** question. Every train gets re-crewed in

**21** Marquette. So it's not the fact that we're

**22** re-crewing the trains. They're going to get

**23** re-crewed there anyways. It's just the fact

**24** of where we're going to re-crew them at and

**25** what impact that's going to have to the overall

73

1  A  It's standard practice when we go through
2     drill-downs, and we wanted to see exactly
3     what happened with the train.  We download
4     the engine so we can see exactly what was
5     going on.
6  Q  And that download would have given us exactly
7     where Sexton's locomotives traveled that day.
8     Correct?
9  A  Like I said, I don't see the downloads.  I
10    don't specifically know what they say.
11 Q  Have you ever seen a download?
12 A  I have seen them.  I'm not trained to interpret
13    them.
14 Q  You understand that downloads show mileposts?
15 A  No, I do not.
16 Q  You understand that downloads show speed.  Right?
17 A  I know they do.  I'm not familiar at all with
18    interpreting them so --
19 Q  You know downloads show various brake
20    applications and throttle positions.  Right?
21 A  No, I do not know that.
22 Q  Have you ever seen one printed out?
23 A  I have seen them.  I'm not familiar and I'm
24    not trained to interpret them.  I'm not an
25    engineer.

74

1  Q  Have you seen the initials MP for milepost on
2     a locomotive download?
3  A  No, I have not.
4  Q  Is it your understanding that this download
5     would have told us exactly where Sexton's
6     locomotives went and when?
7        MS. AL TAQATQA:  Objection, foundation.
8  A  I am not familiar with the information that
9     comes out of the downloads.  I do not know
10    how to interpret them, and it's not in my job
11    capacity to interpret them and state -- and
12    know what they say.
13 Q  (By Mr. Magnuson, continuing) Is Road Foreman
14    Finney still at Nahant?
15 A  That I do not know.
16 Q  Did you ask him to get that download over the
17    phone?
18 A  I don't recall.
19 Q  Did you e-mail him?
20 A  I don't recall.
21 Q  Did you text him or Teams message him?
22 A  I do not recall.
23 Q  Did anyone share the download with you via
24    e-mail?
25 A  I don't believe so, no.

75

1  Q  We'll go to the top of that e-mail, your
2     response.  That gives us your kind of chrono-
3     logical events of that evening, I guess early
4     morning.  Is that correct?
5  A  Yes.
6  Q  Do you remember typing this up?
7  A  I do not.
8  Q  It's about 3:30 in the afternoon is what it
9     looks like on the 1st of February?
10       MS. AL TAQATQA:  Objection to the
11    extent we need to clarify the time zone.
12       MR. MAGNUSON:  Right.  That's
13    where I was going.
14 Q  (By Mr. Magnuson, continuing) What is your
15    understanding of what time you typed this up
16    as you look at the date and time stamp on it?
17 A  I have no recollection of when I would have
18    typed this up.
19 Q  Do you have any idea what time zone, the date
20    and time stamp referenced here, signifies?
21 A  I do not.
22 Q  So if you look at this -- this doesn't shed
23    any light as to when you might have typed it
24    up?
25 A  Correct.

76

1  Q  In the second paragraph you said you had your
2     job briefing with the crew, the 475 crew.
3     OB, does that mean outbound?
4  A  Yes.
5  Q  And that's when you had your discussion about
6     crossings needed to be cut, which you
7     categorized or stated was a disagreement.
8     Correct?
9  A  Correct.  We had a conversation about whether
10    or not the crossings needed to be cut.  I
11    disagreed that they didn't need to be cut
12    due to the snow accumulation and the previous
13    trains that had already ran through and cut
14    the crossings already.
15 Q  Do you remember getting emotional with Mr. Sexton?
16 A  I do not.
17 Q  Towards the bottom there it says, '474 then
18    ran light power 2 units down to the south
19    siding.'  Can you read that?
20 A  '474 crew cut off light power and went down
21    to the south siding switch.  I was crew
22    changing 575 at milepost 100 when they said
23    they would need a shovel and broom at the
24    south siding switch to dig it out.  I again
25    instructed them to go lift the engine off the

77

1    south wye' -- which that's a different
2    location -- 'while they were tying onto the
3    engine I used another crew to sweep out the
4    switch and verify it was safe.'
5            So I think my point there that I
6    was making is that I instructed the crew to
7    go pick up the engine off the south leg of
8    the wye.  They disregarded my instructions
9    and went to the south siding switch and
10   proceeded to do something else that they were
11   not instructed to do.
12 Q What were they doing?  Is this consistent with
13   your memory?  So you remember those events?
14 A No.  I'm just reading the e-mail.
15 Q '474 then ran light power 2 units down to the
16   south siding switch and ran light power over
17   boatels crossing and down the siding track
18   where their setout would be made.'  Do you
19   see that sentence?
20 A Where is that at?
21 Q Cyle, could you just lower it?  It says, '474
22   then ran'.  Towards the bottom there it says,
23   '474 then ran light power'?
24 A Okay.  Yes, I see that.
25 Q How far from Marquette was the south siding

78

1    switch?
2 A From the depot, the crew change location?
3 Q Right.
4 A I don't know.  Maybe roughly a half a mile if
5    that, probably less.
6 Q How far is the Boatels crossing?
7 A It's the same thing.  The crossing is just
8    right before the siding track.
9 Q And that's where they were going to set some
10   cars out, is that right, in that siding?
11 A That is correct.
12 Q So after that, they completed that and ran
13   back to their train and tied on.  Right?
14 A Yes.
15 Q You mentioned they, meaning the 474, was
16   doing something that they weren't instructed
17   to be doing.  What was that?
18 A They were instructed to go pick up an engine.
19   Instead of going and picking up the engine,
20   they went to the south siding switch, the
21   Boatels crossing, and proceeded to try and go
22   into that track.  That was not what they were
23   instructed to do.
24 Q Why did they do that if you know?
25 A I do not know why they disregarded my

79

1    instructions.
2 Q Was the locomotive you instructed them to
3    pick up parked on an open deck bridge?
4 A I don't know if it would be categorized as an
5    open deck bridge.  There was some type of
6    bridge there.  It's commonly referred to as
7    the pink elephant, and it's a common crew
8    change location where we pull trains up to do
9    crew changes at on a regular basis.
10 Q During your job briefing at any point did you
11   tell Mr. Sexton and Mr. DePover to get on
12   their train and go?
13 A I don't specifically recall.
14 Q You could have?  You just don't recall one
15   way or the other?
16 A I don't recall the specific conversation.
17   But speaking in general terms, I'm sure that
18   after the job briefing was completed, every
19   job briefing wraps up with, okay, we all
20   understand the work that needs to be done,
21   let's go get it done safely and efficiently.
22 Q Did that include not cutting the tracks?
23 A I believe the result of the job briefing, we
24   agreed to cut the tracks since it was done.
25 Q But you disagreed with that.  Correct?

80

1 A Originally I did disagree with it.  But, like
2    I stated previously, cutting tracks and
3    cutting crossings isn't something that causes
4    a significant delay.  So we do have a rule in
5    the GCOR that says when it doubt take the
6    safe course.  So when we have a disagreement
7    about any type of safety concern, the result
8    is always going to take the safe course,
9    which is what we did in this instance.
10 Q That was at the initiative of Mr. Sexton.  Correct?
11 A I wouldn't say it was at the initiative of
12   anything.  Ultimately, I'm the manager who
13   makes the final decision.  So ultimately all
14   decisions come down to me.
15 Q You did some -- according to this, you drove
16   Mr. DePover on a number of occasions to keep
17   him from walking.  Correct?
18 A Correct.
19 Q He's referred to as the assistant engineer?
20 A I don't specifically recall who the conductor
21   was on this day.  If you have a document -- I
22   forget what you said his name was.  I will
23   just believe you that that's who the conductor
24   was.
25 Q It was Justin DePover, yep.  At any time when

81

1  Mr. DePover was riding in your vehicle, did
2  you tell him that their decision to cut the
3  tracks quote, unquote woke people up?
4  A  I don't recall saying that, no.
5        (Deposition Exhibit 27 marked for
6  identification).
7  Q  We'll pull up Exhibit 27.  Have you seen this
8  document before?
9  A  I don't recall specifically.  This may have
10  been something that Ms. Briana showed me.
11  Q  Okay.  You're not copied on it.  Have you
12  seen e-mails like this before?
13  A  Yes.
14  Q  Is this a daily e-mail that goes out, the Top
15  15 Trains Impacting Train Speed?
16  A  I believe so, yes.
17  Q  Is that something that you typically receive?
18  A  I believe so, yes.
19  Q  Do you recall specifically getting it that day?
20  A  I do not recall that.
21  Q  Actually, it would be the second, the day
22  after?
23  A  Yes.  From what I understand, this is the
24  train delay generic e-mail that's sent out by
25  the MOC that just has the top delays.  And I

82

1  believe the description referenced in there
2  is what is entered into the Nexus system.
3  Q  This is generated as a result of the Nexus
4  system?
5  A  I don't know specifically how it's generated.
6  Q  Probably goes without saying as a trainmaster
7  you try to avoid your trains being identified
8  as one of the top 15 trains of the day
9  impacting train speed?
10  A  I mean, I just -- I try to get all the trains
11  through the terminal within standard hoversil
12  (phonetic) speed.  More in particular, the
13  document has no bearing on my day-to-day
14  operations.
15  Q  You try to avoid though having any of your
16  trains be identified as the top 15 delays on
17  the system?
18  A  I try to avoid all delays period.
19  Q  Particularly 3 hour and 23 minute delays?
20  A  It doesn't matter if it's a minute or 3
21  hours.  A delay is a delay.
22  Q  The longer the delay, the more likely you
23  are to -- the delay is more likely to result
24  in a drill-down though.  Right?  You've
25  testified to that a little bit ago.

83

1        MS. AL TAQATQA:  Objection,
2  misstates prior testimony.
3  A  I don't believe that's what I said at all.
4  Q  (By Mr. Magnuson, continuing) Is that your
5  experience, that the longer the delay the
6  more likely you are to result in a drill-down?
7  A  No, that is not my experience.
8  Q  You don't drill-down over a minute delay.  Right?
9  A  Absolutely.
10  Q  You do?
11  A  Yes.  Every delay, every train, every delay.
12  Q  Is important and can result in a drill-down?
13  A  Among many other things.  Delays are just
14  one reason for a drill-down.
15  Q  Injuries being another, derailments.  Right?
16  A  Among many other things, yes.
17  Q  What are some of the other things that can
18  cause a drill-down?
19  A  Any type of incident that anybody wants a
20  drill-down for.
21  Q  Were you asked to provide this information in
22  the description or was that, to the extent
23  you know, lifted from your e-mail?
24        MS. AL TAQATQA:  Objection, foundation.
25  A  I don't know.

84

1  Q  (By Mr. Magnuson, continuing) This description
2  references having to cut the Boatels crossing
3  and run down MQS -- I'm assuming that's Marquette
4  siding?
5  A  Correct.
6  Q  -- light power before they could shove the
7  cars into it.  Is that what it says?
8  A  Correct.
9  Q  So the cutting of the tracks to some extent
10  contributed to this delay.  Correct?
11  A  I would disagree, no.
12  Q  To some extent?
13  A  I would disagree, no.
14  Q  Then why do you when you're asked in Exhibit
15  26 to identify the delay, why do you
16  reference the cutting of the crossings?
17  A  Because my job as a trainmaster is to explain
18  the entire work event and everything that
19  occurred during it, which cutting the
20  crossings would have been part of that.  It
21  doesn't necessarily indicate that that's the
22  cause of the delay.  It just was a part of
23  the work event that day.  It was documented.
24  Q  In fact, you reference the cutting of the
25  crossings twice in your explanation.  Is that

101

1  A  That's what it says, correct.
2  Q  And it appears to have been written by you.
3     Correct?
4  A  Correct.
5  Q  Do you remember the day before this incident
6     Mr. Sexton cutting tracks and killing off a
7     train?
8  A  I do not, no.
9        MS. AL TAQATQA:  Objection, form.
10  Q  (By Mr. Magnuson, continuing) Do you even
11     know if Mr. Sexton worked the day before this
12     incident?
13  A  I do not, no.
14  Q  In fact, with Mr. Sexton, his home terminal
15     was Nahant.  Correct?
16  A  Correct.
17  Q  So he worked up to Marquette from Nahant
18     presumably the day before?
19  A  It's possible.  We also deadheaded crews up
20     to be in position.  He could have came from a
21     different location.  There's no way for me to
22     know for sure.
23        MS. AL TAQATQA:  John, could we
24     go off the record for a second?
25        MR. MAGNUSON:  Yes.

102

1        (Discussion off the record).
2        (Deposition Exhibit 31 marked for
3     identification).
4  Q  (By Mr. Magnuson, continuing) Mr. McKelvey,
5     we'll refer you to Exhibit 31.  These are
6     some phone logs, phone records that we got
7     just last night.  And I'm directing your
8     attention starting at February 1st.
9  A  Okay.
10  Q  Did you review this document with Briana?
11  A  No.
12  Q  Have you ever seen this before?
13  A  No.
14  Q  If we start on February 1st, it looks like
15     your phone calls started exactly at midnight.
16     Do you recognize starting at midnight any of
17     these first string of numbers, who they
18     belong to?
19  A  No.
20  Q  They would be in your phone most likely?
21  A  Yes.
22  Q  Would you turn it on and we can pull them up?
23  A  I don't have it with me.
24  Q  Well, you can get it.
25  A  It's at my house.

103

1  Q  I asked you to turn your phone off when we
2     started and you turned it off.
3  A  That's my personal phone.  You're referring
4     to my work cell phone.
5  Q  Are any of these numbers saved on your
6     personal cell phone?
7  A  No.
8  Q  What if somebody at the railroad needs to get
9     ahold of you today?
10  A  Well, I suppose my supervisors have my
11     personal cell phone number if they needed to
12     get ahold of me.
13  Q  So they could call you on your personal cell
14     phone?
15  A  If needed.
16  Q  If they call, you probably have their number
17     saved in there so that you can see who's
18     calling you I imagine.  Right?
19  A  No.
20  Q  You're expected as a trainmaster for CP to be
21     on call 24/7.  Right?
22  A  No.  In my current capacity, no.
23  Q  So you're swearing under oath here today that
24     your work phone is at your home?
25  A  Correct.

104

1  Q  If we had to, we can probably figure out a
2     way to track that when it's turned on again.
3  A  It's --
4        MS. AL TAQATQA:  Objection,
5     argumentative.
6  Q  (By Mr. Magnuson, continuing) The CP can
7     probably find out where that phone is right
8     now.
9  A  Right --
10        MS. AL TAQATQA:  Objection,
11     argumentative.
12  A  Well, right now the phone is dead on my
13     dresser so you'd have a hard time pinging it.
14  Q  (By Mr. Magnuson, continuing) It's now dead.
15     You're lying to us?
16        MS. AL TAQATQA:  Objection,
17     harassing the witness.
18  A  I don't appreciate being accused of lying,
19     sir.
20  Q  I don't appreciate being lied to.
21        MS. AL TAQATQA:  Objection,
22     harassing the witness.
23        MR. MAGNUSON:  Well, we are going
24     to reserve the right to reconvene this
25     deposition to go through this phone log since

109

1  typical workday. Like you just said, I have
2  over 100 phone calls in this specific period
3  of time you were referencing. That's
4  probably accurate for a general day for me.
5  So for me to be able to recall a specific
6  phone call from several years ago when you
7  can see that I get hundreds every day, I
8  don't recall any specific phone call or
9  conversation.
10 Q  Do you recall any phone calls as a result of
11    this over-standard incident?
12 A  I do not recall any specific phone calls, no.
13 Q  Are you saying they didn't occur or you just
14    don't recall one way or the other?
15 A  I do not recall. I don't remember.
16 Q  One way or the other. So these could have
17    related to this over-standard incident?
18 A  They could or they could not have. I don't
19    recall.
20 Q  What time was the daily -- you had daily
21    phone calls, conference calls, when you were
22    at Nahant as an assistant trainmaster. Correct?
23         MS. AL TAQATQA: Objection, form.
24 A  I would say no. At that time I don't believe
25    daily conference calls.

110

1  Q  (By Mr. Magnuson, continuing) So there wasn't
2     a daily conference call at that point in time?
3  A  I don't believe so, no. I don't recall. I
4     do know --
5  Q  I thought there was a morning conference call
6     that occurred.
7  A  There may be. As far as where I worked in
8     Marquette, I was there to keep the trains
9     moving through the terminal. Most of the
10    trains ran through Marquette during the night.
11    So on my typical day I'd report to work
12    around maybe 5:00 p.m., try and work a 12 or
13    13 hour day and get out of there by 6:00 in
14    the morning. Usually I would send out an
15    e-mail of detailing of, you know, the daily
16    occurrences, you know, any incidents that
17    happened overnight and things that related to
18    the upcoming day. But if they could get on
19    conference calls during the morning, it was
20    usually when I was asleep. So it wasn't
21    something that was part of my normal
22    day-to-day duties.
23 Q  So we got Tom Jared's phone records so we
24    know his phone number. And it shows here
25    that you had a call with him at 10:55 a.m.

111

1  Do you recall that phone call?
2  A  I do recall having a conversation with
3     Mr. Jared after that event at some point. I
4     don't remember the specific date and time.
5  Q  Did that call pertain to the over-standard event?
6  A  I don't recall the specifics of the conversation.
7  Q  Did it pertain to Mr. Sexton's alleged failure
8     of a rule?
9  A  I don't recall the specifics of the conversation.
10 Q  Have you ever discussed with Tom Jared the
11    fact that Sexton was accused of violating that
12    rule?
13 A  I don't recall the specific conversation with
14    Mr. Jared about that, no.
15 Q  You just don't recall one way or the other?
16 A  Correct.
17 Q  A number of these calls that morning are to
18    what appears to be if we call it a conference
19    line-up in Calgary. Why would you have called
20    Calgary?
21 A  I don't know.
22 Q  Why would Calgary have called you?
23 A  I don't believe Calgary would have called me.
24 Q  Did you take place in any conference calls
25    that morning?

112

1  A  I don't recall.
2  Q  Did you take part in a conference call with
3     Calgary that morning?
4  A  I don't recall. I could tell you though,
5     however, I typically don't have any
6     conference calls with anybody from Canada.
7  Q  If these conference calls are hosted in
8     Canada though, they could just be local
9     management people going through the CP's
10    phone system to hold a conference call. Right?
11 A  I don't know.
12 Q  Do you have a conference call number that you
13    see pop up or that you call?
14 A  When I do get invitations for the conference
15    calls, it just comes up as an e-mail. It
16    automatically populates to my calendar on my
17    iPhone and I just hit accept and it will
18    reserve it in the calendar. Then if it is
19    time to get on a meeting, you just tap on it
20    and it has the dialing number that it
21    automatically does, enters the password and
22    everything.
23 Q  And these calls are attended typically by how
24    many people, these conference calls?
25 A  I don't know. It depends on the specific call,

113

1     what it was about, who needed to be on it.

2 **Q** Did any of those calls, those conference

3     calls, ever deal with over-standard events

4     and drill-downs?

5 **A** **Which conference calls?**

6 **Q** Well, any of them.

7 **A** **I have been on a lot of conference calls.**

8     **Yes, we talked about train delays on**

9     **conference calls before.**

10 **Q** You just don't specifically recall talking

11     about this train delay with the 474 on the 1st?

12 **A** **That is correct.**

13 **Q** But it could have happened?

14 **A** **Anything is possible.**

15 **Q** Can you scroll down a little bit? I'm going

16     to ask you one last time. You don't have any

17     phone numbers that you recognize here?

18 **A** **Correct.**

19 **Q** Not one?

20 **A** **Correct.**

21          MR. MAGNUSON: We will determine

22     that and talk about it at a future date.

23     We'll go off the record here for about five

24     minutes.

25          (Brief recess).

114

1 **Q** (By Mr. Magnuson, continuing) Mr. McKelvey,

2     you referenced something at the very

3     beginning that this crew, Sexton and DePover,

4     were doing something that they weren't

5     supposed to do at the beginning of that shift.

6     Do you remember that comment?

7 **A** **Yes.**

8 **Q** What is it that they were doing that they

9     weren't supposed to have been doing?

10 **A** **Could we bring up the e-mail that I was**

11     **referring to when I made the comment?**

12 **Q** 26, Bates 3285.

13 **A** **All right. '474 crew cut off light power and**

14     **went down to the south siding switch. I was**

15     **crew changing 575 at milepost 100 when they**

16     **said they would need a shovel and broom at**

17     **the south siding switch to dig it out.' So**

18     **what that tells me -- I don't have specific**

19     **recollection of the events that occurred that**

20     **day. Just going off the comments off of**

21     **the e-mail, I can deduce that the crew was**

22     **instructed to go lift the engine first which**

23     **was on the south right of the wye. The crew**

24     **disregarded the instructions to go to the**

25     **south leg of the wye and proceeded to go to**

115

1     **the south siding switch, of which I knew the**

2     **switch wouldn't have been needed to been dug**

3     **out due to the snow accumulation. I had**

4     **another crew that I was going to utilize to**

5     **help dig that switch out. So the crew that**

6     **had to pick up the engine would not have to**

7     **stop and dig the switch out. So they could**

8     **have went and picked the engine up while the**

9     **other crew dug the switch out for them. It**

10     **appears that they disregarded my instructions**

11     **of what I told them to go do and proceeded to**

12     **go to the switch that I did not instruct them**

13     **to go to, which that would have incurred an**

14     **unnecessary delay.**

15 **Q** So that would have caused the delay, but Sexton

16     cutting the crossings didn't cause a delay

17     is what he's saying?

18 **A** **Ultimately, the cutting of a crossing or**

19     **cutting of a track running light power is**

20     **something that shouldn't take more than a few**

21     **moments. It's not anything that's going to**

22     **cause a significant delay to a train.**

23 **Q** But, again, you don't have any specific

24     recollection of how long that took?

25 **A** **No, I don't have any recollection of exactly**

116

1     **how long that work event took. But based on**

2     **my time at Marquette and the numerous times**

3     **that I have had to cut those crossings, I can**

4     **tell you -- how long do you think it would**

5     **take to run an engine across a road?**

6 **Q** But it takes time to get to the grade

7     crossing. Right?

8 **A** **I mean, it's maybe 100 yards. How far would**

9     **it take you to run two engines 100 yards?**

10 **Q** Are you saying that when they cut these

11     crossings, they only traveled 100 yards?

12 **A** **To the first location. To go from -- it's**

13     **actually milepost 98 is where the crew change**

14     **location is to the south leg of the wye is**

15     **roughly I would say 100 yards.**

16 **Q** But if they went further than that and you

17     can't recall, that would have taken longer.

18     Right?

19 **A** **Yes. Like I said and like we specified**

20     **previously, going to the south leg of the wye**

21     **it was probably under a half a mile. So in**

22     **order to run two engines half a mile, we're**

23     **talking, what, five minutes. It's not a**

24     **significant delay.**

25 **Q** Being accused of violating Canadian Pacific

## RE: Marquette Sub Delays

**From:** Kurtis McKelvey <"/o=cpr/ou=exchange administrative group
(fydibohf23spdlt)/cn=recipients/cn=6a15daf0718843509fc5650c933ec7e0-kurtis mckelvey">
**To:** Gary Prince <gary_prince@cpr.ca>, Tom Jared <tom_jared@cpr.ca>, Dylan Smith
<dylan_smith@cpr.ca>, Joey Reyes <joey_reyes@cpr.ca>, Mark J Johnson
<markj_johnson@cpr.ca>, "DL_MOC_Senior_Director@cpr.ca"
<moc_senior_director@cpr.ca>, MOC Director East <moc_director_east@cpr.ca>,
"DL_CMC_Management@cpr.ca" <cmc_management2@cpr.ca>
**Date:** Mon, 01 Feb 2021 15:33:27 +0000

474-31 arrived at MQT 00:56 and held at MP 100 for 475 to pull up and shove in the north wye.  475
gave up TW at 01:37 and 474 IB crew took TW at 01:38 to pull down to the depot for crew change.

I had a job briefing with the crew while waiting for 474 OB to arrive at depot about work to be
completed and the siding crossing needing to be cut. OB boarded train at depot and preformed
inspection of engine.

The work for 474 was to lift 1 engine and s/o 24 cars behind 49 cars and 1 DP unit. I had an
opportunity crew move the engine to the South leg of the wye for 474 to lift allowing 475 to
continue with their work in the yard.

474 crew was instructed to lift the engine, tie onto train and then we would drive the AE back and
make a standing cut 74 cars deep.

474 was instructed to pull down to the South wye where the engine was to be lifted and roll up MP
100. ATM was at rear of train and visually confirmed rear end passing MP 100 to roll up for 574 crew
change. 474 rolled up TW to MP 100 at 02:22, this is the time they arrived at south wye to begin
their work.

474 crew cut off light power and went down to the South siding switch. I was crew changing 575 at
MP 100 when they said they would need a shovel and broom at the south siding switch to dig it out.

I again instructed them to go lift the engine off the south wye. While they were tying onto the engine
I used another crew to sweep out the switch and verify it was safe.

When I got back from making sure the switch was clear 474 was tied onto the engine going through
the unit. A watched them for aprox. 10 min before I asked how it was coming and they informed me
they "we're trying to figure out why the rear light isn't coming on". I instructed them to go back to
the second unit and just turn on the light manually. Then 474 completed consist air brake test on
south leg of the wye.

474 then ran light power 2 units down to the south siding switch and ran light power over boatels
crossing and down the siding track where their s/o would be made. After this was completed then
ran light power back to their train and tied on. I picked up the AE and drove him back where his cut
was. Cut was made 74 cars deep and required ATM to relay for AE.

474 AE then rode the shove into MQS where he s/o 24 cars. I picked up the AE on the north end and
drove him 24 cars up where he tied 2 hand brakes.

EXHIBIT
26

Confidential

CP_03285

474 then doubled back to rear of their train holding 49 cars and 1 DP engine. The AE stopped and detrained the car, before making the joint on MQT main. AE released 2 hand brakes and checked 2 additional brakes. I drove him up to the head end.

474 then had to wait for air to build up before they could complete the class 3 air brake test. Train was 9349'. PTC was then set up and TW issued and verified.

474 departed MQT 05:39 (3'23") over standard. There is no reason lifting and engine and s/o 24 cars should take this long. I have asked for delay reports to be gathered at Nahant and Road Foreman Finney to get a download of the CP8526 when it arrives at Nahant.

**From:** Gary Prince <Gary_Prince@cpr.ca>
**Sent:** Monday, February 1, 2021 4:54 AM
**To:** Tom Jared <Tom_Jared@cpr.ca>; Dylan Smith <Dylan_Smith@cpr.ca>; Joey Reyes <Joey_Reyes@cpr.ca>; Mark J Johnson <MarkJ_Johnson@cpr.ca>; Kurtis McKelvey <Kurtis_McKelvey@cpr.ca>; DL_MOC_Senior_Director@cpr.ca <MOC_Senior_Director@cpr.ca>; MOC Director East <MOC_Director_East@cpr.ca>; DL_CMC_Management@cpr.ca <CMC_Management2@cpr.ca>
**Subject:** RE: Marquette Sub Delays

We need a full breakdown from the Trainmaster on what happened here. A set out and locomotive lift should not take 4'30" as projected.

574-138, 475-30 and B39-31 were called based on within standard work event. We are at risk of 4 re-crews due to 1 train over-standard.

Ensure the delays in Nexus are filled out correctly with facts, not assumptions.

GJP

**From:** Ron Pierce <Ron_Pierce@cpr.ca>
**Sent:** Monday, February 1, 2021 3:51 AM
**To:** Tom Jared <Tom_Jared@cpr.ca>; Dylan Smith <Dylan_Smith@cpr.ca>; Joey Reyes <Joey_Reyes@cpr.ca>; Mark J Johnson <MarkJ_Johnson@cpr.ca>; Kurtis McKelvey <Kurtis_McKelvey@cpr.ca>; DL_MOC_Senior_Director@cpr.ca <MOC_Senior_Director@cpr.ca>; MOC Director East <MOC_Director_East@cpr.ca>
**Subject:** Marquette Sub Delays

474-31 arrived Marquette 0056, outbound called 0105 and had to wait for 475-30 to clear onto the Mason City Sub. After 475-31 cleared on the Mason City Sub then 474-31 had to pick up a engine and set out to the yard. Unable to hold 474-31 at Harpers account HOS at 0200 on the inbound.

475-30 arrived Marquette 0108, originally projected to arrive at 0001. But was held up at Ekcards for 6B52-31 to clear as they were having issues with frozen switches on the main line and in the plant at Pattison. Engineering helped clear into the R14 at Pattison. At Marquette the train has set out 4 cars and pick up 1600 feet of traffic. Outbound called 0345. Meeting 474-31 and 574-138 at Marquette.

574-138 arrived Marquette 0208, and is waiting behind 474-31 to depart and pull down and change crews.

Plan for the meet was discussed with Assistant Trainmaster Kurt McKelvey and Superintendent Dylan Smith. Assistant Trainmaster on site working with the crews.

Notifications:
Assistant Superintendnet Joey Reye by the SR Director, who is arranging for the download.
Assistant Trainmaster Kurt McKelvey

RR Pierce

Confidential

CP_03287

# Yesterday (01 Feb 2021) - Top 15 Trains Impacting Train Speed - US

**From:** qlikview_administrator@cpr.ca
**To:** duffy_kibsey@cpr.ca, robert_johnson@cpr.ca, craig_ruff@cpr.ca, stu_kennedy@cpr.ca, Lonnie Jamieson <lonnie_jamieson@cpr.ca>, Jeff Edwards <jeff_edwards@cpr.ca>, Courtney Dunford <courtney_dunford@cpr.ca>, Ray Elphick <ray_elphick@cpr.ca>, Shane Scully <shane_scully@cpr.ca>, DL_US_Train_Speed <us_train_speed@cpr.ca>
**Date:** Tue, 02 Feb 2021 10:45:44 +0000

| Delay details for US East and US West - [45:12 total delay] | | | |
|---|---|---|---|
| **Train Name** | **Station** | **Description** | **Delay Hours** |
| 474-31 | Marquette | 474 scanned in and held at MP 100 for 475-30 to shove into MQT through the North Wye. 474 issued TW 01:38 to come to depot for crew change. 474 rolled up MP 100 at 02:22 when they arrived at south wye to start their work. 474-31 lifted CP 5047 off the south leg of the wye and s/o 24 cars to MQS. they also had to cut the Boatels crossing and run down MQS light power before they could shove the cars into it. ATM on sight to help with rides and expedite as much as possible. | 3:23 |
| | Nahant | Train pulled down the main, set off cars to Na04, Dp to Na02, Shoved NA04 & Na11. Then Doubled the Main, Na07 & Na08 | 3:04 |
| | **Total** | | **6:27** |

Redacted

EXHIBIT
27

CP_03303

| Delay details for US East and US West - [45:12 total delay] | | | |
|---|---|---|---|
| Train Name | Station | Description | Delay Hours |
| Redacted | | | |

Confidential

| Delay details for US East and US West - [45:12 total delay] | | | |
|---|---|---|---|
| Train Name | Station | Description | Delay Hours |
| Redacted | | | |

CP_03305



| Delay details for US East and US West - [45:12 total delay] | | | |
|---|---|---|---|
| Train Name | Station | Description | Delay Hours |
| Redacted | | | |

CP_03306



| | Invoice Number | Account Number | Date Due | Page |
|---|---|---|---|---|
| | 9873190538 | ███████ | 03/02/21 | 3759 of 5116 |

## Summary for Kurtis McKelvey: ███████
## 4634

### Your Plan

**Cust Flex UNL Mins&MSG 4GB SHR**
$75.00 monthly charge
Unlimited monthly minutes

**UNL Text Messaging**
Unlimited M2M Text
Unlimited Text Message

**Email Combo Acct SHR MHS 4GB**
4 monthly gigabyte allowance
$10.00 per GB after allowance

**Beginning on 04/27/20:**
**19% Access Discount**

**Beginning on 08/11/20:**
**Out of Contract $20 Off**

**UNL Picture/Video MSG**
Unlimited monthly Picture & Video

Have more questions about your charges?
Get details for usage charges at
b2b.verizonwireless.com.

### Monthly Charges

| | | |
|---|---|---|
| Cust Flex UNL Mins&MSG 4GB SHR | 02/11 – 03/10 | 75.00 |
| 19% Access Discount | 02/11 – 03/10 | −14.25 |
| Out of Contract $20 Off | 02/11 – 03/10 | −20.00 |
| Global Calling | 02/11 – 03/10 | 5.00 |
| Verizon Cloud 600 GB | 02/11 – 03/10 | 5.99 |
| | | **$51.74** |

### Usage and Purchase Charges

| Voice | Allowance | Used | Billable | Cost |
|---|---|---|---|---|
| Calling Plan | *minutes* | unlimited | 3416 | –– | |
| Total Voice | | | | $.00 |

| Messaging | Allowance | Used | Billable | Cost |
|---|---|---|---|---|
| Text | *messages* | unlimited | 4 | –– | –– |
| Unlimited M2M Text | *messages* | unlimited | 18 | –– | –– |
| Picture & Video – Sent | *messages* | unlimited | 2 | –– | –– |
| Picture & Video – Rcv'd | *messages* | unlimited | 2 | –– | –– |
| Total Messaging | | | | $.00 |

| Data | Allowance | Used | Billable | Cost |
|---|---|---|---|---|
| Gigabyte Usage | *gigabytes* | 4.000 (shared) | .837 | –– | –– |
| Total Data | | | | $.00 |
| **Total Usage and Purchase Charges** | | | | **$.00** |

**Surcharges**

| | |
|---|---|
| Fed Universal Service Charge | 2.07 |
| Regulatory Charge | .21 |
| Administrative Charge | 1.95 |
| Iowa Drps Surchg | .03 |
| | **$4.26** |

**Taxes, Governmental Surcharges and Fees**

| | |
|---|---|
| IA State 911 Fee | 1.00 |
| IA State Sls Tax–Telco | .35 |
| IA State Sales Tax | .36 |
| Clayton Cnty Los Tax–Telco | .06 |
| Clayton Cnty Los Tax | .06 |
| | **$1.83** |

**Total Current Charges for** ███████   **$57.83**

EXHIBIT
31

CONFIDENTIAL

CP_03409



| | | Invoice Number | Account Number | | Date Due | Page |
|---|---|---|---|---|---|---|
| | | 9873190538 | | | 03/02/21 | 3770 of 5116 |

## Detail for Kurtis McKelvey:

## Voice, continued

| Date | Time | Number | Rate | Usage Type | Origination | Destination | Min. | Airtime Chrgs | LD/Other Chrgs | Total |
|------|------|--------|------|------------|-------------|-------------|------|---------------|----------------|-------|
| 1/31 | 4:20P | | Off–Peak | PlanAllow | Prairie Du W | Minneapolis MN | 3 | –– | –– | –– |
| 1/31 | 4:26P | | Off–Peak | PlanAllow | Prairie Du W | Incoming CL | 4 | –– | –– | –– |
| 1/31 | 4:41P | | Off–Peak | PlanAllow | Prairie Du W | Davenport IA | 7 | –– | –– | –– |
| 1/31 | 4:47P | | Off–Peak | PlanAllow | Prairie Du W | Minneapolis MN | 1 | –– | –– | –– |
| 1/31 | 4:49P | | Off–Peak | PlanAllow | Prairie Du W | Incoming CL | 7 | –– | –– | –– |
| 1/31 | 4:57P | | Off–Peak | PlanAllow | Prairie Du W | Sioux Fls SD | 12 | –– | –– | –– |
| 1/31 | 5:30P | | Off–Peak | PlanAllow | Marquette IA | Incoming CL | 4 | –– | –– | –– |
| 1/31 | 5:35P | | Off–Peak | PlanAllow | Marquette IA | Incoming CL | 2 | –– | –– | –– |
| 1/31 | 5:55P | | Off–Peak | PlanAllow | Marquette IA | Toll–Free CL | 1 | –– | –– | –– |
| 1/31 | 5:58P | | Off–Peak | PlanAllow | Marquette IA | Sioux Fls SD | 1 | –– | –– | –– |
| 1/31 | 6:43P | | Off–Peak | PlanAllow | Garnavillo IA | Incoming CL | 3 | –– | –– | –– |
| 1/31 | 6:50P | | Off–Peak | PlanAllow | Patch Grov W | Mount Hope WI | 1 | –– | –– | –– |
| 1/31 | 6:51P | | Off–Peak | PlanAllow | Patch Grov W | Sioux Fls SD | 3 | –– | –– | –– |
| 1/31 | 6:54P | | Off–Peak | PlanAllow | Potosi W | Charlescya IA | 3 | –– | –– | –– |
| 1/31 | 7:22P | | Off–Peak | PlanAllow | Dubuque IA | Incoming CL | 1 | –– | –– | –– |
| 1/31 | 7:29P | | Off–Peak | PlanAllow | Dubuque IA | Minneapolis MN | 1 | –– | –– | –– |
| 1/31 | 7:33P | | Off–Peak | PlanAllow | Dubuque IA | Minneapolis MN | 6 | –– | –– | –– |
| 1/31 | 8:18P | | Off–Peak | PlanAllow | Dubuque IA | Incoming CL | 1 | –– | –– | –– |
| 1/31 | 8:19P | | Off–Peak | PlanAllow | Dubuque IA | Incoming CL | 1 | –– | –– | –– |
| 1/31 | 8:20P | | Off–Peak | PlanAllow | Dubuque IA | Minneapolis MN | 7 | –– | –– | –– |
| 1/31 | 8:27P | | Off–Peak | PlanAllow | Dubuque IA | Decorah IA | 1 | –– | –– | –– |
| 1/31 | 8:28P | | Off–Peak | PlanAllow | Dubuque IA | Dubuque IA | 3 | –– | –– | –– |
| 1/31 | 8:45P | | Off–Peak | PlanAllow | Dubuque IA | Incoming CL | 1 | –– | –– | –– |
| 1/31 | 8:52P | | Off–Peak | PlanAllow | Dubuque IA | Incoming CL | 2 | –– | –– | –– |
| 1/31 | 9:29P | | Off–Peak | PlanAllow | Dubuque IA | Incoming CL | 9 | –– | –– | –– |
| 1/31 | 9:37P | | Off–Peak | PlanAllow,CallWait | Dubuque IA | Incoming CL | 6 | –– | –– | –– |
| 1/31 | 9:44P | | Off–Peak | PlanAllow | Dubuque IA | Minneapolis MN | 5 | –– | –– | –– |
| 1/31 | 9:49P | | Off–Peak | PlanAllow | Dubuque IA | Dubuque IA | 5 | –– | –– | –– |
| 1/31 | 9:55P | | Off–Peak | PlanAllow | Dubuque IA | Mount Hope WI | 2 | –– | –– | –– |
| 1/31 | 9:58P | | Off–Peak | PlanAllow | Dubuque IA | Incoming CL | 7 | –– | –– | –– |
| 1/31 | 10:13P | | Off–Peak | PlanAllow | Dubuque IA | Incoming CL | 2 | –– | –– | –– |
| 1/31 | 10:22P | | Off–Peak | PlanAllow | Dubuque IA | Minneapolis MN | 7 | –– | –– | –– |
| 1/31 | 10:36P | | Off–Peak | PlanAllow | Dubuque IA | Dubuque IA | 3 | –– | –– | –– |
| 1/31 | 10:43P | | Off–Peak | PlanAllow | Dubuque IA | Incoming CL | 5 | –– | –– | –– |
| 1/31 | 10:44P | | Off–Peak | PlanAllow | Dubuque IA | Davenport IA | 4 | –– | –– | –– |
| 1/31 | 10:52P | | Off–Peak | PlanAllow | Dubuque IA | Sioux Fls SD | 3 | –– | –– | –– |
| 1/31 | 11:06P | | Off–Peak | PlanAllow | Durango IA | Incoming CL | 4 | –– | –– | –– |
| 1/31 | 11:21P | | Off–Peak | PlanAllow | New Vienna IA | Sioux Fls SD | 3 | –– | –– | –– |
| 2/01 | 12:00A | | Off–Peak | PlanAllow | Garnavillo IA | Incoming CL | 1 | –– | –– | –– |
| 2/01 | 12:04A | | Off–Peak | PlanAllow | Garnavillo IA | Incoming CL | 3 | –– | –– | –– |
| 2/01 | 12:19A | | Off–Peak | PlanAllow | Prairie Du W | Incoming CL | 4 | –– | –– | –– |
| 2/01 | 12:31A | | Off–Peak | PlanAllow | Marquette IA | Minneapolis MN | 2 | –– | –– | –– |
| 2/01 | 12:37A | | Off–Peak | PlanAllow | Marquette IA | Incoming CL | 3 | –– | –– | –– |
| 2/01 | 1:19A | | Off–Peak | PlanAllow | Marquette IA | Incoming CL | 1 | –– | –– | –– |
| 2/01 | 1:47A | | Off–Peak | PlanAllow | Marquette IA | Toll–Free CL | 5 | –– | –– | –– |
| 2/01 | 2:21A | | Off–Peak | PlanAllow | Prairie Du W | Incoming CL | 5 | –– | –– | –– |

CONFIDENTIAL

CP_03420



| | | Invoice Number | Account Number | Date Due | Page |
|---|---|---|---|---|---|
| | | 9873190538 | ██████ | 03/02/21 | 3771 of 5116 |

## Detail for Kurtis McKelvey: ██████

## Voice, continued

| Date | Time | Number | Rate | Usage Type | Origination | Destination | Min. | Airtime Chrgs | LD/Other Chrgs | Total |
|------|------|--------|------|-----------|-------------|-------------|------|---------------|----------------|-------|
| 2/01 | 3:04A | ██ | Off-Peak | PlanAllow | Marquette IA | Incoming CL | 2 | --- | --- | --- |
| 2/01 | 3:23A | ██ | Off-Peak | PlanAllow | Marquette IA | Minneapols MN | 1 | --- | --- | --- |
| 2/01 | 3:23A | ██ | Off-Peak | PlanAllow | Marquette IA | Minneapols MN | 1 | --- | --- | --- |
| 2/01 | 3:24A | ██ | Off-Peak | PlanAllow | Marquette IA | Minneapols MN | 1 | --- | --- | --- |
| 2/01 | 3:36A | ██ | Off-Peak | PlanAllow | Marquette IA | Incoming CL | 2 | --- | --- | --- |
| 2/01 | 4:08A | ██ | Off-Peak | PlanAllow | Prairie Du W | Incoming CL | 2 | --- | --- | --- |
| 2/01 | 4:38A | ██ | Off-Peak | PlanAllow | Prairie Du W | Incoming CL | 2 | --- | --- | --- |
| 2/01 | 4:56A | ██ | Off-Peak | PlanAllow | Marquette IA | Bemidji MN | 3 | --- | --- | --- |
| 2/01 | 5:17A | ██ | Off-Peak | PlanAllow | Marquette IA | Incoming CL | 3 | --- | --- | --- |
| 2/01 | 5:27A | ██ | Off-Peak | PlanAllow | Marquette IA | Minneapols MN | 1 | --- | --- | --- |
| 2/01 | 5:30A | ██ | Off-Peak | PlanAllow | Marquette IA | Minneapols MN | 4 | --- | --- | --- |
| 2/01 | 5:39A | ██ | Off-Peak | PlanAllow | Marquette IA | Incoming CL | 6 | --- | --- | --- |
| 2/01 | 5:54A | ██ | Off-Peak | PlanAllow | Marquette IA | Incoming CL | 5 | --- | --- | --- |
| 2/01 | 6:26A | ██ | Peak | PlanAllow | Monroe /A W | Incoming CL | 2 | --- | --- | --- |
| 2/01 | 6:29A | ██ | Peak | PlanAllow | Garnavillo IA | Davenport IA | 3 | --- | --- | --- |
| 2/01 | 6:37A | ██ | Peak | PlanAllow | Mc Gregor IA | Minneapols MN | 2 | --- | --- | --- |
| 2/01 | 6:45A | ██ | Peak | PlanAllow | Marquette IA | Sioux Fls SD | 13 | --- | --- | --- |
| 2/01 | 6:59A | ██ | Peak | PlanAllow | Marquette IA | Toll-Free CL | 27 | --- | --- | --- |
| 2/01 | 7:37A | ██ | Peak | PlanAllow | Marquette IA | Toll-Free CL | 1 | --- | --- | --- |
| 2/01 | 7:37A | ██ | Peak | PlanAllow | Marquette IA | Calgary AB | 1 | --- | --- | --- |
| 2/01 | 7:41A | ██ | Peak | PlanAllow | Marquette IA | Mason City IA | 5 | --- | --- | --- |
| 2/01 | 7:50A | ██ | Peak | PlanAllow | Marquette IA | Sioux Fls SD | 4 | --- | --- | --- |
| 2/01 | 8:10A | ██ | Peak | PlanAllow | Marquette IA | Minneapols MN | 1 | --- | --- | --- |
| 2/01 | 8:20A | ██ | Peak | PlanAllow | Marquette IA | Davenport IA | 12 | --- | --- | --- |
| 2/01 | 8:31A | ██ | Peak | PlanAllow | Marquette IA | Minneapols MN | 6 | --- | --- | --- |
| 2/01 | 8:38A | ██ | Peak | PlanAllow | Marquette IA | Minneapols MN | 1 | --- | --- | --- |
| 2/01 | 8:53A | ██ | Peak | PlanAllow | Marquette IA | Minneapols MN | 3 | --- | --- | --- |
| 2/01 | 9:45A | ██ | Peak | PlanAllow | Marquette IA | Minneapols MN | 3 | --- | --- | --- |
| 2/01 | 9:48A | ██ | Peak | PlanAllow | Marquette IA | Bemidji MN | 5 | --- | --- | --- |
| 2/01 | 9:54A | ██ | Peak | PlanAllow | Marquette IA | Incoming CL | 7 | --- | --- | --- |
| 2/01 | 10:10A | ██ | Peak | PlanAllow | Prairie Du W | Davenport IA | 2 | --- | --- | --- |
| 2/01 | 10:11A | ██ | Peak | PlanAllow,CallWait | Prairie Du W | Incoming CL | 6 | --- | --- | --- |
| 2/01 | 10:17A | ██ | Peak | PlanAllow | Mc Gregor IA | Sioux Fls SD | 5 | --- | --- | --- |
| 2/01 | 10:23A | ██ | Peak | PlanAllow | Mc Gregor IA | Incoming CL | 1 | --- | --- | --- |
| 2/01 | 10:26A | ██ | Peak | PlanAllow | Garnavillo IA | Minneapols MN | 6 | --- | --- | --- |
| 2/01 | 10:27A | ██ | Peak | PlanAllow,CallWait | Garnavillo IA | Incoming CL | 5 | --- | --- | --- |
| 2/01 | 10:31A | ██ | Peak | PlanAllow | Mc Gregor IA | Minneapols MN | 3 | --- | --- | --- |
| 2/01 | 10:34A | ██ | Peak | PlanAllow | Mc Gregor IA | Minneapols MN | 2 | --- | --- | --- |
| 2/01 | 10:36A | ██ | Peak | PlanAllow | Mc Gregor IA | Dubuque IA | 5 | --- | --- | --- |
| 2/01 | 10:42A | ██ | Peak | PlanAllow | Mc Gregor IA | Sioux Fls SD | 1 | --- | --- | --- |
| 2/01 | 10:50A | ██ | Peak | PlanAllow | Marquette IA | Dubuque IA | 2 | --- | --- | --- |
| 2/01 | 10:52A | ██ | Peak | PlanAllow | Marquette IA | Minneapols MN | 3 | --- | --- | --- |
| 2/01 | 10:55A | ██ | Peak | PlanAllow | Marquette IA | Minneapols MN | 6 | --- | --- | --- |
| 2/01 | 11:01A | ██ | Peak | PlanAllow,CallWait | Marquette IA | Incoming CL | 11 | --- | --- | --- |
| 2/01 | 11:12A | ██ | Peak | PlanAllow | Marquette IA | Dubuque IA | 1 | --- | --- | --- |
| 2/01 | 11:19A | ██ | Peak | PlanAllow | Marquette IA | Sioux Fls SD | 3 | --- | --- | --- |



| | Invoice Number | Account Number | Date Due | Page |
|---|---|---|---|---|
| | 9873190538 | ████████ | 03/02/21 | 3772 of 5116 |

## Detail for Kurtis McKelvey: ████████

## Voice, continued

| Date | Time | Number | Rate | Usage Type | Origination | Destination | Min. | Airtime Chrgs | LD/Other Chrgs | Total |
|------|------|--------|------|------------|-------------|-------------|------|---------------|----------------|-------|
| 2/01 | 11:37A | ████ | Peak | PlanAllow | Marquette IA | Incoming CL | 4 | --- | --- | --- |
| 2/01 | 11:54A | | Peak | PlanAllow | Marquette IA | Toll—Free CL | 2 | --- | --- | --- |
| 2/01 | 11:56A | | Peak | PlanAllow | Marquette IA | Toll—Free CL | 13 | --- | --- | --- |
| 2/01 | 12:09P | | Peak | PlanAllow | Marquette IA | Toll—Free CL | 3 | --- | --- | --- |
| 2/01 | 12:26P | | Peak | PlanAllow | Marquette IA | Dubuque IA | 1 | --- | --- | --- |
| 2/01 | 12:38P | | Peak | PlanAllow | Marquette IA | Incoming CL | 1 | --- | --- | --- |
| 2/01 | 12:39P | | Peak | PlanAllow | Marquette IA | Dubuque IA | 2 | --- | --- | --- |
| 2/01 | 12:42P | | Peak | PlanAllow | Marquette IA | Incoming CL | 11 | --- | --- | --- |
| 2/01 | 1:02P | | Peak | PlanAllow | Marquette IA | Incoming CL | 9 | --- | --- | --- |
| 2/01 | 1:11P | | Peak | PlanAllow | Marquette IA | Dubuque IA | 3 | --- | --- | --- |
| 2/01 | 1:13P | | Peak | PlanAllow | Marquette IA | Minneapols MN | 1 | --- | --- | --- |
| 2/01 | 1:15P | | Peak | PlanAllow | Marquette IA | Incoming CL | 1 | --- | --- | --- |
| 2/01 | 1:20P | | Peak | PlanAllow | Marquette IA | Toll—Free CL | 9 | --- | --- | --- |
| 2/01 | 2:17P | | Peak | PlanAllow | Marquette IA | Sioux Fls SD | 1 | --- | --- | --- |
| 2/01 | 2:25P | | Peak | PlanAllow | Marquette IA | Minneapols MN | 1 | --- | --- | --- |
| 2/01 | 2:28P | | Peak | PlanAllow | Marquette IA | Minneapols MN | 1 | --- | --- | --- |
| 2/01 | 2:34P | | Peak | PlanAllow | Prairie Du W | Sioux Fls SD | 3 | --- | --- | --- |
| 2/01 | 2:39P | | Peak | PlanAllow | Prairie Du W | Bangor WI | 1 | --- | --- | --- |
| 2/01 | 2:40P | | Peak | PlanAllow | Prairie Du W | Davenport IA | 1 | --- | --- | --- |
| 2/01 | 3:54P | | Peak | PlanAllow | Prairie Du W | Incoming CL | 5 | --- | --- | --- |
| 2/01 | 4:06P | | Peak | PlanAllow | Prairie Du W | Incoming CL | 2 | --- | --- | --- |
| 2/01 | 5:29P | | Peak | PlanAllow | Prairie Du W | Prairdchn WI | 1 | --- | --- | --- |
| 2/01 | 6:18P | | Peak | PlanAllow | Marquette IA | Sioux Fls SD | 3 | --- | --- | --- |
| 2/01 | 6:43P | | Peak | PlanAllow | Marquette IA | Incoming CL | 7 | --- | --- | --- |
| 2/01 | 7:51P | | Peak | PlanAllow | Prairie Du W | Incoming CL | 2 | --- | --- | --- |
| 2/01 | 7:52P | | Peak | PlanAllow | Prairie Du W | VM Deposit CL | 1 | --- | --- | --- |
| 2/01 | 7:53P | | Peak | PlanAllow | Prairie Du W | VM Deposit CL | 1 | --- | --- | --- |
| 2/01 | 7:58P | | Peak | PlanAllow | Prairie Du W | Incoming CL | 2 | --- | --- | --- |
| 2/01 | 8:00P | | Peak | PlanAllow | Prairie Du W | Incoming CL | 2 | --- | --- | --- |
| 2/01 | 8:46P | | Peak | PlanAllow | Prairie Du W | Incoming CL | 2 | --- | --- | --- |
| 2/01 | 8:52P | | Peak | PlanAllow | Prairie Du W | Incoming CL | 2 | --- | --- | --- |
| 2/01 | 8:56P | | Peak | PlanAllow,PlanAllow,Span | Prairie Du W | Incoming CL | 7 | --- | --- | --- |
| 2/01 | 9:03P | | Off—Peak | PlanAllow | Prairie Du W | Bangor WI | 2 | --- | --- | --- |
| 2/01 | 10:37P | | Off—Peak | PlanAllow | Prairie Du W | Incoming CL | 4 | --- | --- | --- |
| 2/01 | 10:45P | | Off—Peak | PlanAllow | Prairie Du W | Incoming CL | 2 | --- | --- | --- |
| 2/02 | 1:48A | | Off—Peak | PlanAllow | Prairie Du W | Incoming CL | 1 | --- | --- | --- |
| 2/02 | 1:53A | | Off—Peak | PlanAllow | Prairie Du W | Incoming CL | 3 | --- | --- | --- |
| 2/02 | 2:03A | | Off—Peak | PlanAllow | Marquette IA | Toll—Free CL | 3 | --- | --- | --- |
| 2/02 | 2:06A | | Off—Peak | PlanAllow | Marquette IA | Minneapols MN | 1 | --- | --- | --- |
| 2/02 | 2:08A | | Off—Peak | PlanAllow | Marquette IA | Minneapols MN | 1 | --- | --- | --- |
| 2/02 | 2:13A | | Off—Peak | PlanAllow | Marquette IA | Minneapols MN | 1 | --- | --- | --- |
| 2/02 | 2:17A | | Off—Peak | PlanAllow | Marquette IA | Incoming CL | 1 | --- | --- | --- |
| 2/02 | 2:19A | | Off—Peak | PlanAllow | Marquette IA | Clear Lake IA | 7 | --- | --- | --- |
| 2/02 | 2:54A | | Off—Peak | PlanAllow | Marquette IA | Incoming CL | 4 | --- | --- | --- |
| 2/02 | 3:00A | | Off—Peak | PlanAllow | Marquette IA | Incoming CL | 1 | --- | --- | --- |
| 2/02 | 3:03A | | Off—Peak | PlanAllow | Marquette IA | Incoming CL | 2 | --- | --- | --- |

1

```
 1          IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF IOWA
 2                   EASTERN DIVISION

 3      - - - - - - - - - - - - - - - - - - - -

                     No. 3:23-CV-00031-HCA
 4
        John Sexton,
 5
                            Plaintiff,
 6          vs.

 7      Dakota, Minnesota & Eastern Railroad
        Corporation d/b/a Canadian Pacific,
 8      a Delaware corporation
                            Defendants.
 9
        - - - - - - - - - - - - - - - - - - - -
10

11

12

13              DEPOSITION OF

14               MARK JOHNSON

15               May 10, 2024

16                 1:00 p.m.

17

18

19

20

21

22          TAKEN BY: BRENDA K. FOSS
23            fossbrenda@yahoo.com
                 612-701-4282
24

25
```

3

```
 1               I N D E X

 2
    Examination:                    PAGE:
 3  By Mr. Cramer          4

 4
    Objections:
 5  By Mr. Sullivan      8, 9, 12, 13,
    15, 17-21, 23, 24, 26, 27, 29-34, 36-43, 45,
 6  48-51, 53, 54, 56, 57, 59, 60, 62-67, 70, 71,
    73-77, 80-104

 7
    Marked Deposition Exhibits:
 8  35 - 2/21 e-mails           21
        Bates 00981-983
 9  36 - 6/22 e-mail to Valadez   24
        Bates 00615-617
10  37 - 2/21 e-mail from Reyes    28
        Bates 01703
11  38 - Discipline Call          78
        Bates 00948
12  39 - US Efficiency Test Manual 79
        Bates 000368-608
13  40 - Performance Mgmt Program 93
        Bates 03700-3704
14  41 - STIP                     94
        Bates 03231-3237
15  42 - Short-Term Incentive     97
        Bates 03711
16

17

18

19

20  Reporter's Certificate     106

21

22  (Original Deposition Transcript in the
    possession of Cyle Cramer, Esquire).

23

24              * * * * *
25
```

2

```
 1          Deposition of MARK JOHNSON, taken
 2  via Zoom videoconference, by and on behalf of
 3  Plaintiff, on Friday, May 10, 2024, commencing
 4  at 1:00 p.m., before Brenda K. Foss,
 5  Professional Court Reporter, Notary Public,
 6  State of Minnesota, County of Hennepin.

 7

 8              * * * * *
 9          APPEARANCES

10
    ON BEHALF OF THE PLAINTIFF:
11    CYLE CRAMER, ESQUIRE
      JOHN MAGNUSON, ESQUIRE
12    LAUREN HOSCH, PARALEGAL
      YAEGER & JUNGBAUER BARRISTERS, PLC
13    4601 Weston Woods Way
      St. Paul, MN  55127
14    ccramer@yjblaw.com
      651-288-9500
15

16
    ON BEHALF OF THE DEFENDANTS:
17    JACK SULLIVAN, ESQUIRE
      DORSEY & WHITNEY LLP
18    50 South 6th Street, Suite 1500
      Minneapolis, MN  55402
19    sullivan.jack@dorsey.com
      612-340-2600
20

21
    ALSO PRESENT:
22    Michelle Haynes, CPKC Paralegal
      Noah Garcia, DM&E Counsel
23

24              * * * * *
25
```

4

```
 1          P R O C E E D I N G S

 2

 3          MARK JOHNSON,

 4      after having been first duly sworn,

 5      deposes and says under oath as follows:

 6

 7          E X A M I N A T I O N

 8  BY MR. CRAMER:

 9  Q   Hi.  My name is Cyle Cramer.  I will be

10      taking your deposition today.  I represent

11      the plaintiff in this case, John Sexton.  Can

12      you please state your first and last name

13      spelling your last name?

14  A   Mark Johnson, J-O-H-N-S-O-N.

15  Q   Where are you located today?

16  A   Mason City, Iowa.

17  Q   Is Jack Sullivan in the room with you?

18  A   Jack Sullivan is in the room and is the only

19      person in the room with me.

20  Q   Have you had your deposition taken in the past?

21  A   Yes.

22  Q   How many times?

23  A   Once.

24  Q   What was that for?

25  A   It was over I believe an injury from what I
```

5

1    **recall.**
2   Q   Just a couple quick instructions here.
3       Please answer every question verbally.  So
4       try not to just shake your head.  And also
5       make sure to say yes or no versus nope or
6       uh-huh.  Do you understand?
7   A   **Yes.**
8   Q   Are you prepared to answer questions with
9       nothing preventing you from giving your full
10      attention today?
11  A   **Yes.**
12  Q   Then if you don't understand any question,
13      let me know.  If you don't ask, I will expect
14      that you understand the question.  Do you
15      understand?
16  A   **Yes.**
17  Q   And then please try to wait until I finish my
18      question before answering and I will also try
19      to wait to talk until you're done answering.
20      Sometimes there will be interruptions, but I
21      will try to stop and give you the floor again
22      if we overlap.  Do you understand?
23  A   **Yes.**
24  Q   Then if Mr. Sullivan objects to any of my
25      questions, you must still answer to the best

6

1       of your knowledge unless he specifically
2       instructs you not to.  Do you understand?
3   A   **Yes.**
4   Q   Did you prepare for this deposition today?
5   A   **Yes.**
6   Q   How did you prepare?
7   A   **I had a meeting with Mr. Sullivan yesterday.**
8   Q   How long was that meeting?
9   A   **Three hours.**
10  Q   Was that the only meeting you had?
11  A   **Yes.**
12  Q   Did you review documents in preparation for
13      the deposition today?
14  A   **No.**
15  Q   Have you read the deposition of Kurtis
16      McKelvey that was taken on November 7, 2023?
17  A   **No.**
18  Q   Have you reviewed the deposition of John
19      Sexton that was taken on October 31st, 2023?
20  A   **No.**
21  Q   Have you spoken with anyone about this
22      deposition in the last couple of weeks other
23      than your attorneys?
24  A   **No.**
25  Q   What is your work phone number?

7

1   A   **I don't have a work phone number.**
2   Q   Did you have one in February of 2021?
3   A   **Yes.**
4   Q   Do you recall what that phone number was?
5   A   **From what I can recall, the last four was**
6       **9296.**
7   Q   What is your current job title?
8   A   **Locomotive engineer.**
9   Q   Is that the same job title that you had in
10      February of 2021?
11  A   **No.**
12  Q   What was your job title then?
13  A   **Road Foreman of Engineers and DSRCO, which**
14      **was Designated Supervisor Remote Control**
15      **Operators.**
16  Q   Is that a management position?
17  A   **Yes.**
18  Q   Were you an engineer prior to that?
19  A   **Yes.**
20  Q   Why did you go from the management position
21      to an engineer position since February 2021?
22  A   **My father was terminally ill and just to have**
23      **the time to be able to take off from work to**
24      **take care of matters with him in his final**
25      **couple years.**

8

1   Q   Does being a trainmaster take a lot more time
2       than being an engineer?
3   A   **Yes, it does.**
4   Q   Why is that?
5           MR. SULLIVAN:  Objection, foundation
6       and form.  You can answer the question.
7   A   **Just to cover off days, you have to have more**
8       **availability.  There's more response needed**
9       **from a trainmaster when he's covering for**
10      **somebody else's day off.**
11  Q   (By Mr. Cramer, continuing) To the best of
12      your knowledge, can you please give a
13      description of your management job duties as
14      they were in February 2021?
15  A   **To oversee locomotive engineers and remote**
16      **control operators ensuring compliance with**
17      **company rules, federal rules, and**
18      **regulations.  I would perform ride-alongs**
19      **annually with each engineer or remote control**
20      **operator to observe their performance on the**
21      **locomotive, respond to incidents, and capture**
22      **downloads and review those downloads to see**
23      **if there was any train handling issues.**
24  Q   Was it your expectation as a manager that
25      engineers would listen to your instructions?

9

1  A  Yes.
2  Q  Why do you think that is?
3         MR. SULLIVAN:  Objection, form
4  and foundation.  You can answer.
5  A  So as their supervisor, if they weren't
6  complying with any of the rules or
7  regulations it was my duty to ensure that
8  they understood those rules and regulations.
9  Q  (By Mr. Cramer, continuing) Did you have
10  supervisors that were above you at the time
11  in February 2021?
12  A  Yes.
13  Q  Can you name some of the supervisors above
14  you and their positions?
15  A  My direct report was to Dylan Smith I believe,
16  whoever the superintendent was at the time
17  anyway.  And then above him would have been
18  Tom Jared, who was the general manager, Jason
19  Ross who was a vice president, Tracy Miller
20  who was also a vice president.  Any one of
21  those could call me at any time and I'd have
22  to respond.
23  Q  Would you listen to their instructions when
24  they gave you any?
25  A  Yes.

10

1  Q  And why is that?
2  A  They were my bosses.  So, therefore, it's
3  just like any employee.  If you're given
4  instructions, you comply with them.  If you
5  don't agree with them, you do have a right to
6  challenge.  Usually you work it out from there.
7  Q  Do you remember the date that you reverted
8  back to being an engineer?
9  A  No, I don't recall the exact date.
10  Q  What about the month and year?
11  A  I'm going to guess probably February of '22.
12  Like I say, I don't recall the exact date or
13  the exact time.
14  Q  How much did you interact with Tom Jared when
15  you were in the management position?
16  A  It varied.  Sometimes I wouldn't hear from
17  him for a month.  Other times I might talk to
18  him daily for a week or two and then not hear
19  anything again.  It just depended on what was
20  going on on the territory that I was
21  responsible for.
22  Q  Can you give an example of a situation where
23  you would have been talking to him more
24  consistently within a week?
25  A  If we had say a derailment or an incident

11

1  that occurred.  We would talk more regularly
2  if he had questions over the downloads that I
3  retrieved off the locomotive.
4  Q  In your position as a manager, you were a
5  conducting officer for disciplinary
6  investigations.  Is that correct?
7  A  Yes, several.
8  Q  Do you know how many?
9  A  No, I don't recall every one that I held.
10  Q  Do you have an estimate?
11  A  No.  My best guess would be probably 100 or
12  more.
13  Q  When did you go from being an engineer to the
14  management position?
15  A  January of 2017.
16  Q  Were you trained to be an investigation officer?
17  A  Yes.
18  Q  What was your understanding of the duties of
19  an investigation officer?
20  A  To hold a fair and impartial investigation or
21  hearing and then make a determination and a
22  recommendation for the discipline or whether
23  there was nothing founded.
24  Q  What would you say the purpose of an
25  investigation is from your knowledge?

12

1  A  To determine whether or not a rule was violated
2  or rules were violated and make sure there
3  was evidence presented.  So, I mean, you know,
4  the witness brings in the evidence and if
5  they don't have the evidence, then it doesn't
6  support the charge.
7  Q  As an investigation officer, do you have to
8  make judgment calls on who to believe?
9  A  I wouldn't say you're making -- you're basing
10  everything off of facts.  So if everybody is
11  testifying to the fact, there's no guessing
12  who is I guess more right or more wrong.
13  It's just based on fact.
14  Q  Have you been part of an investigation where
15  two different sets of facts were given?
16  A  I would say in most investigations you have a
17  different recollection of events between
18  charge employee and witnesses on some if not
19  all.
20  Q  How do you choose whose recollection to believe?
21         MR. SULLIVAN:  Objection, form.
22  A  I don't think that I ever tried to pick who
23  was right or who was wrong.  I based my
24  decisions based on facts and the evidence
25  that was presented, along with if they didn't

21

1 an exhibit?

2 MR. CRAMER: I was just about

3 to -- I'll enter it as Exhibit 35.

4 (Deposition Exhibit 35 marked for

5 identification).

6 Q (By Mr. Cramer, continuing) Do you recall

7 writing this e-mail?

8 A I don't recall it. But, yes, I wrote it.

9 Q Is that your e-mail address where it says

10 from?

11 A Yes, that was my e-mail at that time.

12 Q What would you ascribe this e-mail as?

13 A It's my write-up based on the investigation

14 and my recommendation.

15 Q Can you go up a little bit? Then what did

16 you think of Mr. Smith's recommendation?

17 A I had no feeling. That's his recommendation.

18 He's my superior and I have no qualms about

19 it.

20 Q Is his recommendation different than yours?

21 A Yes.

22 Q Were you able to recommend a deferred

23 suspension?

24 MR. SULLIVAN: Objection, foundation.

25 A As I stated before, I don't recall how many I

22

1 would recommend a deferred. I just went

2 based off of the discipline policy that you

3 had entered before and had me look at. So,

4 therefore, based on as being a major

5 violation, I went with the 20 days and

6 Mr. Smith recommended a partial with deferred

7 time.

8 Q (By Mr. Cramer, continuing) As an

9 investigation officer, did you know that you

10 could recommend a deferred suspension?

11 A I also knew that I could recommend no

12 discipline assessed. I mean, I could pretty

13 much recommend what I felt would be sufficient.

14 It was simply that, a recommendation.

15 Q Can you scroll all the way up to the top?

16 According to this, what discipline does it

17 look like Mr. Jared was recommending?

18 A The recommendation -- he said to issue the

19 discipline that I recommended.

20 Q Did Mr. Jared at any time inform you that the

21 discipline could have been a deferred

22 suspension?

23 A No, I don't recall any conversation with

24 Mr. Jared about this outside of the

25 investigation.

23

1 Q As an investigation officer, do you know

2 whether coach and counseling could have been

3 a proper discipline?

4 A Can you clarify that question?

5 Q Yes. Is coach and counseling available in a

6 shoving movement violation such as the one

7 alleged against Mr. Sexton?

8 A A shoving movement was not considered a non-

9 major where verbal coaching would be available

10 to come into play. That's my opinion.

11 Q Is that based on your training as an engineer --

12 sorry -- as an investigation officer?

13 A No. It was based off the discipline policy.

14 Q As an investigation officer, did you have

15 discretion to interpret the discipline policy?

16 MR. SULLIVAN: Objection, lack of

17 personal knowledge and form. You can answer.

18 A So ask the question one more time. I want to

19 make sure I'm understanding it properly.

20 Q (By Mr. Cramer, continuing) As an

21 investigation officer, did you have

22 discretion to interpret the discipline

23 policy?

24 MR. SULLIVAN: Same objections.

25 A Can you clarify that?

24

1 Q (By Mr. Cramer, continuing) I'll try to, and

2 correct me if I misstate any of this. But

3 prior my understanding is you said for a

4 shoving movement violation a coach and

5 counseling wasn't permitted?

6 MR. SULLIVAN: Objection,

7 misstates the witness' testimony.

8 A So the discipline policy is broken into non-

9 major and major. If you go back to the

10 exhibit that you presented under major

11 offenses, there was no option for verbal

12 coaching there.

13 MR. CRAMER: I think I will just

14 leave it at that. Can you bring up the CP

15 00615? I'll enter this as Exhibit 36. I

16 want to go to the second page. Bates should

17 be 616.

18 (Deposition Exhibit 36 marked for

19 identification).

20 MR. SULLIVAN: Take a minute so

21 we can understand the entire document.

22 MR. CRAMER: What was that, Jack?

23 MR. SULLIVAN: Can we give

24 Mr. Johnson a moment to understand the

25 entire document? I don't know that he's seen

**1**  it before.

**2**  THE WITNESS:  I have never seen

**3**  this one.

**4**  MR. SULLIVAN:  Can we look at the

**5**  top and the bottom and who it's from so we

**6**  can have a context what he's being asked

**7**  about and what he's testifying about?

**8**  MR. CRAMER:  Take a second.  Let

**9**  us know when you want us to scroll down.

**10 A**  **(Witness examining document).  You can scroll**

**11**  **down.  Okay.**

**12 Q**  (By Mr. Cramer, continuing) Can you go back

**13**  up to the table, please?  Does this table

**14**  include John Sexton?

**15 A**  **Yes, it does.**

**16 Q**  Under the type of discipline, what does it

**17**  say the type of discipline was?

**18 A**  **Clarify who we're talking about.**

**19 Q**  For John Sexton.

**20 A**  **20 days suspension, did not request waiver.**

**21 Q**  For everybody in this table, what does it say

**22**  the reason for discipline is?

**23 A**  **Failure to stop within half the distance**

**24**  **specified.**

**25 Q**  And that's included for every name?

**1**  MR. SULLIVAN:  Objection, form.

**2 A**  **As I read it, yes.**

**3 Q**  (By Mr. Cramer, continuing) And for the first

**4**  row where it says 'T.V. Engineer', what does

**5**  it say the discipline was in the third column?

**6 A**  **'20 Day Suspension, (Waiver/15 Days Deferred'.**

**7 Q**  Do you understand what that means?

**8 A**  **Yes.**

**9 Q**  Will you please explain it?

**10 A**  **It would mean he served 5 days.  He requested**

**11**  **a waiver.  He was given a waiver.  He served**

**12**  **5 days and then 15 days were deferred.  So**

**13**  **the 15 days would have been out there in the**

**14**  **event that there was another incident that**

**15**  **occurred.**

**16 Q**  And the next row down, 'M.J. Engineer', what

**17**  was the type of discipline assessed there?

**18 A**  **'Verbal Coaching'.**

**19 Q**  And what is that?

**20 A**  **Means he would have had discussion with a**

**21**  **supervisor, whether it be a trainmaster or a**

**22**  **road foreman.  I don't know exactly who, but**

**23**  **they would have had discussion about the**

**24**  **incident.**

**25 Q**  And under the reason for discipline, it's

**1**  listed as the same discipline for that

**2**  individual as Mr. Sexton?

**3**  MR. SULLIVAN:  Objection, asked

**4**  and answered.

**5 A**  **Yes.**

**6 Q**  (By Mr. Cramer, continuing) The next row 'TS

**7**  engineer' what does it say the type of

**8**  discipline is there?

**9 A**  **Verbal coaching.**

**10 Q**  And the reason for discipline for TS?

**11 A**  **Failure to stop within half the distance specified.**

**12 Q**  As an investigation officer, do you know a

**13**  scenario where verbal coaching would be

**14**  appropriate for failing to stop within half

**15**  the distance specified?

**16**  MR. SULLIVAN:  Objection, foundation,

**17**  lack of personal knowledge.

**18 A**  **The difference that I see is Mr. Sexton did**

**19**  **not request a waiver.  None of the others**

**20**  **showed that a waiver was not requested.**

**21 Q**  And what is a waiver?

**22 A**  **It's the employee's acceptance of**

**23**  **responsibility for the incident or rules**

**24**  **violation that occurred.**

**25**  **Can we take a break here?**

**1**  MR. CRAMER:  Yeah, of course.  We

**2**  can come back in 10 minutes.

**3**  (Brief recess).

**4 Q**  (By Mr. Cramer, continuing) Back on the

**5**  record.  Do you recall speaking to Tom Jared

**6**  about Mr. Sexton's February 10th investigation

**7**  outside of the investigation?

**8 A**  **I don't recall having discussion with him**

**9**  **outside of the investigation, no.**

**10 Q**  Do you recall anyone telling you to contact

**11**  Mr. Jared before the investigation?

**12 A**  **I don't recall that.**

**13 Q**  In your experience as an investigation

**14**  officer, would you normally talk to the

**15**  witness prior to an investigation?

**16 A**  **No.**

**17 Q**  Were you scheduled to be the original

**18**  investigation officer in this investigation?

**19 A**  **I don't recall but I believe so.**

**20**  MR. CRAMER:  Let's bring up CP

**21**  1703.  This is Exhibit 37.  We can go through

**22**  one page at a time.

**23**  (Deposition Exhibit 37 marked for

**24**  identification).

**25**  THE WITNESS:  (Witness examining

37

1          MR. SULLIVAN:  Objection, form.
2  A  **(Witness examining document).  It's saying**
3     **that they cut away with 76 cars.**
4  Q  Was it your understanding at the time that
5     their train had 76 cars on it during the
6     shoving movement?
7          MR. SULLIVAN:  Objection, lack of
8     personal knowledge.
9  A  **I wasn't present at the time, so I don't know**
10    **if they had set out more cars previous to**
11    **that.  This document just shows that they**
12    **made a cut behind line number 76.**
13 Q  We can scroll down slowly to make sure we are
14    staying with the same or different set of
15    questions.  Go down to 70.  On lines 13
16    through 15, what does Mr. DePover say there?
17 A  **He's saying that he started clear for 50 cars**
18    **and he was -- started him with that, needing**
19    **25 to a stop.  And then he updated him with**
20    **15 more to a stop, still clear for 40.**
21 Q  Is that different than what Mr. Jared said in
22    the investigation?
23 A  **In the way that I recall it, no, because**
24    **Mr. Jared stated the 50 cars.  And then the**
25    **next update was the 15 that he discussed**

38

1     **earlier.**
2  Q  Did Mr. Jared mention the still clear for 40
3     instruction?
4          MR. SULLIVAN:  Objection, the
5     document speaks for itself.
6  A  **No.**
7  Q  (By Mr. Cramer, continuing)  So is Mr. DePover
8     giving a different statement regarding the
9     events than Mr. Jared was?
10 A  **Not in its entirety.**
11 Q  What do you mean by that?
12 A  **Because they both refer to the same update**
13    **with 15.**
14 Q  Do they both refer to the update of 40?
15         MR. SULLIVAN:  Objection, misstates
16    the testimony in the transcript.
17 A  **No.**
18 Q  (By Mr. Cramer, continuing)  What did you
19    understand 25 to a stop to mean?
20 A  **I wasn't there for that movement.  So 25 to a**
21    **stop could mean to line a switch.  It could**
22    **mean to detrain.  There's different reasons**
23    **that they could need to stop.**
24 Q  Did that sound like an accurate instruction
25    under the circumstances to you?

39

1          MR. SULLIVAN:  Objection, lack of
2     personal knowledge, form, calls for speculation.
3  A  **The way that I look at it, he's giving him**
4     **that they're clear for more than what he**
5     **needs to that stop.**
6  Q  (By Mr. Cramer, continuing)  Can you explain
7     that in a little more detail?
8  A  **So he's telling him he's clear for 50 but he**
9     **needs him to stop in 25.  That means they**
10    **were going to be stopping in 25.  The shove**
11    **instruction is good for 25.  When he updates**
12    **him with 15, still clear for 40, he's still**
13    **wanting a stop made in that 15 cars.  And**
14    **that would be the instruction that Mr. Sexton**
15    **as a locomotive engineer would be operating**
16    **under.**
17 Q  Would it have been safe for Mr. Sexton to
18    stop within half of the distance of 40 cars
19    under that instruction?
20         MR. SULLIVAN:  Objection, lack of
21    personal knowledge, form, calls for speculation.
22 A  **No.  15 is more restrictive than 40.  So I**
23    **would expect that the 15 would be complying**
24    **with rules.  The 40 is just assuring that**
25    **there's plenty of room on the track.**

40

1  Q  (By Mr. Cramer, continuing)  Did you think
2     that Mr. DePover was lying about giving the
3     25 to a stop instruction?
4          MR. SULLIVAN:  Objection, misstates
5     the testimony in the transcript.
6  A  **No.**
7  Q  Then where it says clear for 50 cars, what do
8     you take that to mean?
9  A  **Based on the way he says clear for 50 cars**
10    **starting with needing 25 to a stop, it's**
11    **again assuring him that they have got plenty**
12    **of room.  So the stop doesn't have to be on a**
13    **dime or they're not coming in to a joint.**
14 Q  So should Mr. Sexton take into account the
15    clear for 50 cars when deciding when to stop?
16         MR. SULLIVAN:  Objection, lack of
17    personal knowledge.
18 A  **Once he's given something more restrictive,**
19    **no.  He needs to go with what's most**
20    **restrictive.  25 is more restrictive than 50.**
21 Q  Is that what the rule says, Rule 6.5?
22 A  **I don't have the GCOR in front of me to tell**
23    **you exactly what it reads, but they are**
24    **required to stop within half the distance**
25    **specified.  So in the case of the 25, you**

**41**

1   would have to be stopped within 12-1/2 cars
2   if he wasn't given further instruction.  And
3   the same with the 15, clear for 40, he would
4   need to be stopped within half of the 15,
5   which would be 7-1/2 cars.
6   Q   Did you give any significance to the
7       instruction of still clear for 40?
8           MR. SULLIVAN:  Objection, form.
9   A   No, because he was given something more
10      restrictive.
11  Q   (By Mr. Cramer, continuing) Are you trained
12      on shoving movements?
13  A   Yes.
14  Q   If Mr. DePover gave the instructions clear
15      for 50, 25 to a stop, what would the
16      reasonable instruction be after 10 cars have
17      been shoved?
18          MR. SULLIVAN:  Objection, lack of
19      personal knowledge, calls for speculation.
20  A   In my experience, that would be a 15 car
21      count.
22  Q   (By Mr. Cramer, continuing) What are you
23      basing that experience on?
24          MR. SULLIVAN:  Objection, form.
25  A   My training and my experience.

**42**

1   Q   (By Mr. Cramer, continuing) Is that based on
2       what the rule says?
3   A   Yes.
4   Q   So the rule says you have to follow the more
5       restrictive set of instructions given?
6           MR. SULLIVAN:  Objection.  The
7       rule states for itself.
8   A   I don't recall all of the exhibits that were
9       entered, and I don't have them in front of
10      me.  But there are rules in place that if you
11      are not given -- and it may fall under
12      railroad radio rules -- that if you are not
13      given anything within half -- by the time you
14      reach half the distance, you must be stopped
15      when you have somebody that's on the ground
16      protecting a shove movement.
17  Q   Do you think the instructions Mr. DePover
18      said he gave were confusing?
19  A   No.
20  Q   Why is that?
21  A   He was letting Mr. Sexton know what he needed
22      and that they had extra room.
23  Q   What do you mean by extra room?
24  A   They weren't coming into a joint and that the
25      stop wasn't going to have to be a sudden stop.

**43**

1   Like coming into a joint, there's rules there
2   that apply to how fast you can make a joint.
3   It's just giving more assurance that no
4   equipment is going to be struck or that there
5   is nobody out there.
6   Q   So it's your understanding an instruction of
7       clear for 40 would mean that it was still
8       safe for Sexton to stop within 20 cars?
9           MR. SULLIVAN:  Objection,
10      misstates the witness' testimony.
11  A   No.  He was given a more restrictive count of
12      15.  So, therefore, the 15 is what Mr. Sexton
13      should have been going based off of.
14  Q   (By Mr. Cramer, continuing) Do you recall in
15      the investigation what instructions Mr. Sexton
16      said he was given?
17  A   No, I don't recall.
18  Q   Let's go to 00079.  I think that shows the
19      beginning of the examination of Sexton.  Is
20      it your understanding here that you're
21      starting your questioning of Mr. Sexton?
22  A   Yes.
23  Q   On lines 13 through 22 what does Mr. Sexton
24      say in the investigation the car counts he
25      was given was?

**44**

1   A   He was given 50 as the initial count.  And
2       the next one was still good -- he believes it
3       was still good for 40, 15 cars to a stop with
4       emphasis on good for 40.
5   Q   Is that consistent with what Mr. DePover stated?
6   A   No.
7   Q   How is it not consistent with what Mr. DePover
8       stated?
9   A   Because Mr. DePover didn't say with emphasis
10      on good for 40.  Other than that, it would be
11      consistent but that's the inconsistency in it.
12  Q   The car counts are the same numbers.  Correct?
13  A   Yes.
14  Q   Then can we go just down to page Bates 81?
15      And lines 11 through 14, does that sound to
16      you consistent with what Mr. DePover stated?
17  A   Who is being questioned here?  Is it still
18      Sexton?
19  Q   Yes.  We just went down two pages.  If you
20      want to scroll back up, we can.
21  A   Go back just to the top of this page once.
22  Q   Why don't we go back to 79?
23  A   Okay.  I'm just making sure that I remember
24      who is testifying and who is asking is all.
25  Q   Not a problem.  I appreciate it.  Back to 81.

45

1   A   Okay.  What was your question again?
2   Q   Is that consistent with the instruction
3       DePover said he gave?
4           MR. SULLIVAN:  Objection, form.
5   A   He is actually changing his own testimony
6       because he says, 'He told me I was good for
7       40 cars, but then he changed it to 15.  Yes.'
8       So he's saying that he was initially given 40
9       cars but it changed to 15, which is the more
10      restrictive.  So now he's no longer good for
11      40, just changed to 15.
12  Q   (By Mr. Cramer, continuing) Under the
13      instruction of 40 he had to stop within half
14      that distance.  Correct?
15  A   So in this testimony that Mr. Sexton gave,
16      'He told me I was good for 40 cars, but then
17      he changed it to 15', there's no more, I was
18      good for 40.
19  Q   Do you recall clarifying that answer at all?
20  A   No, I don't recall.
21  Q   What do you say going down on line 20?
22  A   I no longer am speaking at that time.
23  Q   Yes.  Good catch.  What does Mr. Rainwater
24      say there?
25  A   On line 20?  'So just to clarify, Mr. DePover

46

1       told you' --
2   Q   And just --
3   A   -- 'you were clear for 40 cars, but he only
4       needed 15 more to a stop cut'.
5   Q   And then on 23 and onto the next page?
6   A   What's your question here?
7   Q   In lines 6 through 8 is Sexton saying there
8       that he was given an instruction 'still good
9       for 40, 15 to a stop'?
10  A   Yes.
11  Q   We can go through it slowly because it's a
12      few pages down just so we know who's talking.
13      Let's go to page 98.  If you want us to slow
14      down, just let us know.  On lines 7 through
15      10, what is Mr. Sexton saying there?
16  A   He's saying, 'Cruciani was at the north end
17      of the yard.  He told me it was clear track,
18      good for 50.  Mr. DePover said the same thing,
19      and then he said good for 40 cars and I need
20      15'.
21  Q   Was it your understanding that both Mr.
22      Sexton and Mr. DePover were saying the last
23      instruction given was clear for 40, 15 to a
24      stop?
25  A   No.  The 15 to a stop was the last instruction.

47

1   Q   Is that two different instructions to you?
2       So clear for 40, 15 to a stop, are you
3       interpreting that as to two different
4       instructions?
5   A   No.
6   Q   Are you interpreting it as one instruction?
7   A   Yes, with the distance needed and then that
8       they were clear for more than what they
9       needed.
10  Q   Do you recall in the investigation whether
11      Mr. Jared ever said he heard the clear for 40
12      instruction?
13  A   I don't recall.
14  Q   Do you recall that being -- that argument
15      being raised in the investigation, that
16      Mr. Jared did not hear the instruction of
17      clear for 40?
18  A   I don't recall.
19  Q   Let's go to 112 on here.  Go back up slowly.
20      Go back to 98.  So then on 99 it looks like
21      Mr. Rainwater is questioning Mr. DePover.  Do
22      you agree?
23  A   Yes.
24  Q   Then on 112 here, what does Mr. Rainwater say
25      starting at line 17?

48

1           MR. SULLIVAN:  Objection.  The
2       transcript states for itself.
3   A   His recollection of the events at the
4       investigation.
5   Q   (By Mr. Cramer, continuing) Is Mr. Rainwater
6       raising an argument that Mr. Jared didn't
7       hear the full communication?
8           MR. SULLIVAN:  Objection.  The
9       document speaks for itself.
10  A   This is a closing statement, so he's
11      summarizing how he took what happened at the
12      investigation.
13  Q   Would you believe that argument?
14  A   No.
15  Q   Why not?
16  A   Because I came to a decision that discipline
17      was warranted.
18  Q   So you agreed with Mr. Jared that Sexton had
19      violated the shoving movement rule?
20          MR. SULLIVAN:  Objection, misstates
21      the testimony at the hearing.
22  A   Based on the testimony of Mr. Sexton,
23      Mr. Jared and Mr. DePover, he was given a 15
24      car count at the time that Mr. Jared
25      instructed Mr. DePover not to give any more

**1** instructions. And Mr. Sexton didn't stop in
**2** half that distance.
**3** **Q** (By Mr. Cramer, continuing) Let's go back up
**4** to the top. Just jump to 36 and then from
**5** there we can go back and determine who
**6** is talking. Scroll down so we can see we're
**7** on 36. Then let's slowly go back up and
**8** figure out where we are. On CP 35 just
**9** scroll down so we can see the 35. Your
**10** understanding is that in this section you are
**11** asking questions of Mr. Jared?
**12** **A** Yes.
**13** **Q** Let's go down to 36. Starting on line 21 did
**14** you believe that statement given by Mr. Jared?
**15**     MR. SULLIVAN: Objection, form.
**16** **A** Which statement are we referring to?
**17** **Q** Starting at 21. We can just go one sentence
**18** at a time.
**19** **A** (Witness examining document). Yes.
**20** **Q** Moving forward, it's your understanding that
**21** Mr. Jared heard an initial car count of 50
**22** being given?
**23** **A** Yes.
**24** **Q** Looking at the next couple of lines, it was
**25** your understanding as the investigation

**1** officer, that he was in his vehicle when he
**2** heard the 50 car count?
**3** **A** Yes.
**4** **Q** Let's go on to the next page. Then on line 2
**5** there, what was your understanding of what
**6** point in the communication between DePover
**7** and Sexton did Mr. Jared hear the conversation?
**8**     MR. SULLIVAN: Objection, form.
**9** **A** The 15 car count.
**10** **Q** (By Mr. Cramer, continuing) And what was your
**11** understanding of what Mr. Jared was doing
**12** when he heard that car count?
**13** **A** He was performing a shoving movement efficiency
**14** test.
**15** **Q** Do you recall Mr. Jared saying anything about
**16** a 40 car count?
**17**     MR. SULLIVAN: Objection, form.
**18** **A** I don't recall without reviewing the entire
**19** transcript.
**20** **Q** Do you recall how far away Mr. Jared's truck
**21** was from where Mr. DePover was standing?
**22** **A** No, I don't recall.
**23** **Q** Do you recall that being discussed in the
**24** investigation?
**25** **A** I don't recall.

**1** **Q** Do you think it was clearly established that
**2** Mr. Jared heard the whole instruction?
**3**     MR. SULLIVAN: Objection, form.
**4** **A** His testimony is based on his recollection of
**5** the events.
**6** **Q** (By Mr. Cramer, continuing) Let's go back to
**7** CP 981, but we entered it as an exhibit. I
**8** don't remember what exhibit we did it as.
**9** **A** Can we take a break here real quick?
**10**     MR. CRAMER: Yeah, let's do that.
**11**     MR. SULLIVAN: Ten minutes?
**12**     MR. CRAMER: Yes, that's good.
**13**     (Brief recess).
**14** **Q** (By Mr. Cramer, continuing) Let's bring up
**15** Exhibit 35. Can you read to yourself the
**16** first three lines there starting with 'Charge
**17** was proven'?
**18**     MR. SULLIVAN: I think that's the
**19** wrong page.
**20** **Q** Yeah. Scroll down. Sorry.
**21** **A** How far do you want me to read?
**22** **Q** Just those first three lines.
**23** **A** Okay. (Witness examining document).
**24** **Q** What was clear about the instruction given to
**25** Mr. Sexton?

**1**     MR. SULLIVAN: Objection, form.
**2** **A** Can you clarify? Just based on what I'm
**3** reading, I don't know if it's in line with
**4** what your question is.
**5** **Q** (By Mr. Cramer, continuing) On the first
**6** lines 'Charge was proven' and then it says
**7** 'The facts of the case were clear that Mr.
**8** Sexton was given a 15 car count'. What made
**9** you believe that that instruction was clear?
**10** **A** Because all three testified, Mr. Jared and
**11** Mr. Sexton and Mr. DePover, all testified
**12** that the 15 car count was given.
**13** **Q** Did all three testify that a 40 car count was
**14** given?
**15** **A** Based on your previous questioning, no.
**16** **Q** So were there two different versions of
**17** events being given?
**18**     MR. SULLIVAN: Objection, misstates
**19** the transcript.
**20** **A** In my opinion and based on the decision that
**21** I made, even with the testimony to a 40 car
**22** count, the 15 car count was there and is more
**23** restrictive.
**24** **Q** (By Mr. Cramer, continuing) There were two
**25** versions of events being given. Correct?

53

1          MR. SULLIVAN:  Objection, misstates
2   the witness' testimony.
3  A  In my opinion, no.
4  Q  (By Mr. Cramer, continuing) What do you mean
5     by that?
6  A  Reading these three lines that you told me
7     to, it would be based off of testimony at the
8     investigation that Mr. Sexton was given the
9     15 car count.  After 7 cars he started trying
10    to call the conductor.  And then he made
11    attempts to contact the ATM before he came to
12    a stop at 11 cars.  So if he was clearly
13    operating underneath of a 40 car count, he
14    wouldn't have been prepared to stop in 11
15    cars.  He wouldn't have started just prior to
16    reaching half the count of 15 to contact the
17    conductor followed by trying to contact the
18    ATM.
19 Q  On the mitigating factors on item number 1
20    you said, 'The Organization contends that the
21    conductor stated 15 cars, good for 40 cars'.
22    Did you believe that that was the instruction
23    given?
24 A  Yes.
25 Q  Going to the bottom, the big paragraph in the

54

1     middle, you write, 'If he was given the 40
2     car clearance'.  Let me know when you find
3     that.
4  A  Found that.
5  Q  Then you can read the whole sentence to
6     yourself.
7  A  (Witness examining document).  Okay.
8  Q  What did you mean by that?
9  A  So based on the testimony at the investigation,
10    Mr. Jared was next to Mr. DePover when he
11    gave that 15 car count.  So he would have
12    heard the 40 car count.
13 Q  So you believed that Mr. Jared heard the 40
14    car count?
15         MR. SULLIVAN:  Objection, misstates
16    the witness' testimony and misstates the document.
17 A  No.  It's just not clear in the record
18    whether he heard the 40 or not.  He was
19    hearing the same 15 car count that was
20    alluded to by all witnesses.
21 Q  (By Mr. Cramer, continuing) Jump back up to
22    number 1 where you say, 'They argue that Mr.
23    Jared could not hear the conductor's instructions'.
24 A  (Witness examining document).  Okay.
25 Q  And then you say, 'the facts and the video

55

1     show Mr. Jared was next to the conductor when
2     the instructions were given'?
3  A  Yes.
4  Q  Did the video have audio?
5  A  I don't recall if radio transcripts were
6     requested.
7  Q  Do you recall hearing any audio?
8  A  No, I don't recall as stated previously.
9  Q  Item number 2, read that to yourself to
10    refresh yourself.
11 A  (Witness examining document).  Okay.
12 Q  Why was number 2 a mitigating factor for you?
13 A  Just that they had asked for witnesses.  I
14    don't recall if that was previous to the
15    investigation or at the investigation.  But
16    one employee was assigned to another train
17    not connected with their movement and another
18    one was an employee that did not work for CP
19    Railroad at that time.  I don't know of an
20    Andrew Cruciani that ever worked for CP
21    Railroad.
22 Q  Why did it matter whether David Cox or Andrew
23    Cruciani were connected to the shove movement?
24 A  It would matter because then they would have
25    been fully engaged in that movement.

56

1  Q  What does fully engaged in that movement
2     mean?
3  A  They would not have had other distractions.
4  Q  Is not being distracted important during a
5     shoving movement?
6  A  Yes.
7  Q  Why is that?
8  A  Because if you're distracted, your mind has
9     gone away from the task at hand.  You could
10    end up cornering something.  You could hit
11    something.  More cars can go by you than what
12    you needed.  There's numerous reasons.
13 Q  Does it create an unsafe condition when an
14    employee who is protecting the shove is
15    distracted?
16         MR. SULLIVAN:  Objection,
17    misstates the witness' testimony, lack of
18    personal knowledge, calls for speculation.
19 A  Based on my experience, yes.
20 Q  (By Mr. Cramer, continuing) Was there any
21    other witness that could have changed your
22    mind on whether Mr. Sexton violated the
23    shoving rule?
24         MR. SULLIVAN:  Objection, calls
25    for speculation.

77

1 Q As the investigation officer, is it your
2   position that Mr. Sexton was afforded the
3   reasonable opportunity to present the
4   witnesses he requested?
5 A Yes.
6 Q Why is that?
7 A Why is that? They sent a request for them
8   and the -- prior to the night before, the
9   hearing officer did not arrange for them to
10   be off. And why? I don't know other than
11   they didn't have relevant information to the
12   investigation.
13 Q Who makes the determination whether they have
14   relevant information?
15 A I would have at the investigation had the
16   union brought enough information.
17 Q Was there any inconvenience to postponing the
18   investigation to secure the witnesses
19   requested by Mr. Sexton's union?
20       MR. SULLIVAN: Objection, calls
21   for speculation, form, misstates the record
22   whether there was any request to postpone.
23 A No.
24 Q (By Mr. Cramer, continuing) Were you trained
25   on how to conduct a fair investigation?

78

1 A Yes.
2 Q How?
3 A I received training from Canadian Pacific
4   Railroad. I served nine years as a union
5   representative as a local chairman. And I
6   had been involved on both sides of the table
7   as both carrier witness, hearing officer, and
8   a union representative.
9       MR. CRAMER: I'm just going
10   through my notes here for a second. Let's go
11   to CP 00948, and we'll make that Exhibit 38.
12       (Deposition Exhibit 38 marked for
13   identification).
14 Q It's on the bottom left, CP 00948. It's kind
15   of blurry and maybe it's worth zooming in,
16   but do you recognize this document at all?
17 A You would have to zoom in for me to see it in
18   its entirety. (Witness examining document).
19   That's far enough.
20 Q On the right side or towards the right side,
21   in one of the columns there, it's one that
22   looks like to be the most words in it. It
23   starts with 1-Feb-21 on the top. And then it
24   says GRF02 I believe. Do you see where that
25   is?

79

1 A Yeah. It's a little blurry.
2 Q Maybe we'll just try to zoom in a little bit
3   more. I don't know if that'll help.
4 A Okay. (Witness examining document).
5 Q Do you know what the GRF02 means?
6 A I don't recall, but it would probably be a
7   shoving movement test.
8 Q From what you heard at the investigation, is
9   this the shoving test you understood Mr.
10   Jared conducted?
11 A Yes, seeing this document, yes.
12       MR. CRAMER: Can we go to the US
13   - Efficiency Test Manual? We'll mark this as
14   Exhibit 39.
15       (Deposition Exhibit 39 marked for
16   identification).
17 Q Do you recognize this cover page?
18 A Yes.
19 Q Are you familiar with the US - Efficiency
20   Test Manual on Operating Rules in Compliance?
21 A To the best of my recollection, yes. It's
22   been a few years.
23 Q Do you recognize this as the testing manual
24   that was in place in February of 2021?
25 A I would need to scroll down to see the date

80

1   of this. I believe there was probably a
2   newer one in effect.
3 Q Do you know when the newer one went into
4   effect?
5 A I don't recall, but I don't believe we were
6   still using one from 2014 seven years later.
7 Q Can we go to page 103? Actually, down a
8   couple pages, the GRF02 test, does this
9   appear to be the test that Mr. Jared gave to
10   Mr. Sexton?
11       MR. SULLIVAN: Objection, lack of
12   personal knowledge, calls for speculation.
13 A Again, with this being an out-of-date manual
14   based on the information being shown to me,
15   it would appear so.
16 Q (By Mr. Cramer, continuing) Why don't you
17   take a second to review this and let me know
18   if you are aware of any changes between this
19   one and any new one that you think might have
20   occurred since then.
21 A Again, with not knowing 100 percent certain
22   that this was the most current and in effect
23   at the time, I don't know that there are
24   necessarily any changes.
25 Q Under Test Conditions, does it provide that

93

1  A  Without seeing a date on it, I can't testify
2     either way.
3  Q  We can take a second to scroll through it.
4     There might be a date on it. I don't recall.
5  A  Based on the date of July 2009, I still don't
6     know if it would have been updated or not
7     updated. All I can do is testify to the best
8     of my abilities based on what this says.
9  Q  To the best of your ability, do you think
10    that this was the performance management
11    program that was in effect in 2021?
12            MR. SULLIVAN: Objection, lack of
13    personal knowledge.
14 A  Being almost 12 years old, I don't know if
15    this was. I can't testify either way.
16            MR. CRAMER: We'll enter this as
17    Exhibit 40.
18            (Deposition Exhibit 40 marked for
19    identification).
20 Q  (By Mr. Cramer, continuing) Let's bring up CP
21    3231. Are you familiar with this Short Term
22    Incentive Plan?
23 A  Yes.
24 Q  What is it to you?
25 A  It's a bonus that's paid annually based on

94

1     your performance.
2  Q  In February of 2021, was this a bonus that
3     you could have received?
4  A  Yes.
5  Q  We'll enter this as Exhibit 41. I think this
6     one actually has a date on it. We can check
7     on the bottom. It says on there effective
8     with a 2021 plan year. Correct?
9  A  Where does it say that? (Witness examining
10    document). Okay. I'd agree with that.
11            (Deposition Exhibit 41 marked for
12    identification).
13 Q  Were you guided by a supervisor in the
14    objective setting process?
15            MR. SULLIVAN: Objection, form.
16 A  We would receive guidance in building this,
17    yes, our PMP.
18 Q  (By Mr. Cramer, continuing) Under the
19    Accountability section, the second paragraph
20    there it states, 'managers are responsible
21    for guiding their employees in the objective
22    setting process'. Correct?
23 A  Yes.
24 Q  Did you guide other managers or employees in
25    the objective setting process?

95

1  A  No, I did not.
2  Q  Why not?
3  A  Because I didn't have any direct reports to
4     me.
5  Q  Do you recall what your objectives in 2021
6     were?
7  A  No, I don't recall.
8  Q  Did you have progress reviews with anybody?
9            MR. SULLIVAN: Objection, form.
10 A  I don't recall any conversations through the
11    year about my performance other than at the
12    end of the year.
13 Q  (By Mr. Cramer, continuing) Who did you have
14    that conversation with at the end of the year?
15 A  That would have been the superintendent which
16    would have been Dylan Smith.
17 Q  What do you remember discussing during that
18    progress review?
19 A  I don't recall everything other than to keep
20    doing what I was doing on the safety side of
21    things. I was a big piece of their safety.
22 Q  Did you receive an STI payout in 2021?
23 A  As far as I recall, yes.
24 Q  Do you remember how much it was?
25 A  No, I don't recall what it was.

96

1  Q  Do you remember if it was less than $5,000?
2  A  Yes. I'm sure it was in the neighborhood of
3     15 to $20,000.
4  Q  Were you under the impression that your
5     compensation was tied directly to CP's
6     results?
7  A  No.
8            MR. SULLIVAN: Objection, form.
9  A  No.
10 Q  (By Mr. Cramer, continuing) And why didn't
11    you think that?
12 A  That was just a portion of how I was
13    compensated.
14 Q  Was that portion tied directly to CP's
15    results, the bonus portion?
16            MR. SULLIVAN: Objection, form.
17 A  No. Performance of CP was just one of the
18    factors that went into our bonus.
19 Q  (By Mr. Cramer, continuing) Do you know how
20    performance affected your bonus?
21 A  Percentage-wise, no.
22 Q  Let's scroll down, please. Did your PMPs
23    have different weights assigned to them?
24            MR. SULLIVAN: Objection, lack of
25    personal knowledge, form.

# FW: SextonJ_823777-DePoverJ_1009119 Hearing_Stop within half specified distance_2-1-2021 ****SEND DISCIPLINE OUT MONDAY

**From:**  Shelley Daberitz <shelley_daberitz@cpr.ca>
**To:**  Joseph Adelfio <joseph_adelfio@cpr.ca>
**Cc:**  Tom Jared <tom_jared@cpr.ca>, Shelley Daberitz <shelley_daberitz@cpr.ca>, Mindy George <mindy_george@cpr.ca>, Joey Reyes <joey_reyes@cpr.ca>
**Date:**  Wed, 24 Feb 2021 16:05:30 -0600

Joe:  per Mr. Jared, please issue discipline for 20 days actual to service on Monday.

Thank you



**Shelley R. Daberitz**
**Manager Support Services – US**
**11306 Franklin Ave.**
**Franklin Park, IL  60131**
**Cell:** ▮▮▮▮▮▮
**Office:  630-860-4447**

**From:** Dylan Smith <Dylan_Smith@cpr.ca>
**Sent:** Monday, February 15, 2021 3:11 PM
**To:** Mark J Johnson <MarkJ_Johnson@cpr.ca>; Joseph Adelfio <Joseph_Adelfio@cpr.ca>; Tom Jared <Tom_Jared@cpr.ca>; Mindy George <Mindy_George@cpr.ca>; Shelley Daberitz <Shelley_Daberitz@cpr.ca>; Joey Reyes <Joey_Reyes@cpr.ca>; Brian Scudds <Brian_Scudds@cpr.ca>; Al McCombs <Al_McCombs@cpr.ca>; Jason M Ross <JasonM_Ross@cpr.ca>
**Subject:** RE: SextonJ_823777-DePoverJ_1009119 Hearing_Stop within half specified distance_2-1-2021

I've reviewed the evidence and given that this is Mr. Sextons first major I recommend 10 served 10 deferred.



**Dylan Smith**
Superintendent – Quad Cities
O ▮▮▮▮▮▮
3420 Miller Ave.
Davenport, IA 52802

**From:** Mark J Johnson <MarkJ_Johnson@cpr.ca>
**Sent:** Monday, February 15, 2021 2:56 PM
**To:** Joseph Adelfio <Joseph_Adelfio@cpr.ca>; Tom Jared <Tom_Jared@cpr.ca>; Mindy George

Confidential

**Johnson**

**Ex. 35**

CP_00981

<Mindy_George@cpr.ca>; Shelley Daberitz <Shelley_Daberitz@cpr.ca>; Dylan Smith
<Dylan_Smith@cpr.ca>; Joey Reyes <Joey_Reyes@cpr.ca>; Brian Scudds <Brian_Scudds@cpr.ca>;
Al McCombs <Al_McCombs@cpr.ca>; Jason M Ross <JasonM_Ross@cpr.ca>
**Subject:** RE: SextonJ_823777-DePoverJ_1009119 Hearing_Stop within half specified distance_2-1-
2021

Charge was proven.  The facts of the case were clear that Mr. Sexton was given a 15 car count, and
attempted to contact the Conductor after 7 cars; followed by attempting to contact the ATM before
coming to a stop at 11 cars.

Mitigating factors include:

1.    The Organization contends that the conductor stated "15 cars, good for 40 cars." They
     argue that Mr. Jared could not hear the conductor's instructions because he did not have a
     hand held radio; the facts and the video show Mr. Jared was next to the conductor when the
     instructions were given.
2.    The Organization asked for witnesses, and the facts do not show that either of these
     employees were connected with the shove movement. They enter hearsay on behalf of Mr.
     David Cox, who was assigned to another train, and was not connected to the movement. The
     other request was for an "Andrew Cruciani," who is not an employee of CP Rail.
3.    While Mr. Jared was not connected to the movement, the Organization contends that he was
     'engaged in other activities' while involved in a shove movement, thus violating GCOR
     6.5.  No evidence was presented to show that Mr. Jared had attached to the crew.
4.    Organization makes further argument that the testing was unfair because a shove movement
     can only be tested through observation versus set-up.  No evidence showed that Mr. Jared
     attempted to set-up by use of a red board or other means.  He simply asked the conductor to
     give him a car count and then nothing after that, then observed Mr. Sexton's actions in
     relation to complying with rules requiring him to stop in half the distance.
5.    The Organization was disputing that Mr. Jared was not in attendance in person.  They
     provided no evidence to support their basis that it could not be done contractually, nor that
     somehow Mr. Jared had outside influence.
6.    Mr. Sexton contends the only reason he stopped was because he is constantly doing a
     'rolling job briefing.'

Based on the facts of the matter, I recommend Mr. Sexton be assessed a 20-day suspension.  No
discipline should be assessed Mr. DePover, as he was following instructions.  This is a serious matter,
and his testimony hinged on placing onus for his actions on Mr. Jared being unfair, and his conductor
being on his first trip back from furlough.  If he was given the 40 car clearance as they both contend at
the investigation, Mr. Jared would have clearly heard that communication while next to the
Conductor.  This is in contrary to Mr. DePover having provided a written statement shortly after the
incident, that did not include he had told him additionally, 'clear for 40.'  Mr. Jared's testimony reflects
the statement and what was seen on video.  A train list, was provided as evidence that included the
car lengths; Organization made no dispute that the list was inaccurate.  The conductor testified he
made the markings on the list, and that the distance travelled was 558 ft; movement should have been
stopped at 450 ft.



**Mark J. Johnson**
Road Trainmaster—Marquette
C
99 Water St.
Marquette, IA

Confidential                                                                                                    CP_00982

**From:** Joseph Adelfio <Joseph_Adelfio@cpr.ca>
**Sent:** Monday, February 15, 2021 9:24 AM
**To:** Tom Jared <Tom_Jared@cpr.ca>; Mindy George <Mindy_George@cpr.ca>; Shelley Daberitz <Shelley_Daberitz@cpr.ca>; Dylan Smith <Dylan_Smith@cpr.ca>; Joey Reyes <Joey_Reyes@cpr.ca>; Brian Scudds <Brian_Scudds@cpr.ca>; Al McCombs <Al_McCombs@cpr.ca>; Jason M Ross <JasonM_Ross@cpr.ca>; Mark J Johnson <MarkJ_Johnson@cpr.ca>; Joseph Adelfio <Joseph_Adelfio@cpr.ca>
**Subject:** SextonJ_823777-DePoverJ_1009119 Hearing_Stop within half specified distance_2-1-2021
**Importance:** High

**Discipline due March 2, 2021**



**Joseph Adelfio**
Admin Assistant Support Services
**O** 563-441-5900
**C** ███████



Michelle C. Sullivan
Legal Counsel - US

Suite 800
120 South 6th Street
Minneapolis, MN 55402

T 612 904 5871
F 612 904 6184
E Michelle_Sullivan@cpr.ca

June 17, 2022

Yessenia Valadez                    (*via email to:* *Valadez.Yessenia@dol.gov*)
Regional Investigator
Department of Labor – OSHA
2300 Main Street, Ste. 1010
Kansas City, MO 64108

**RE:     Sexton vs. Dakota, Minnesota & Eastern Railroad Corporation d/b/a CP**
**DOL Case #7-2260-21-066**

Investigator Valadez:

Please accept this letter as notice of my representation of Dakota, Minnesota & Eastern Railroad Corporation d/b/a Canadian Pacific ("CP"), in place of Richard Ramones, in the above-referenced matter.

I am in receipt of your recent request for additional information. This response is based on information currently available to CP, and CP reserves the right to amend and/or supplement its Position Statement and/or this response as necessary. **This response is not meant to be exhaustive and CP specifically preserves all rights and defenses available.**

CP denies Mr. Sexton's allegations and further denies that Mr. Sexton suffered any unlawful retaliation during his employment with CP, including any retaliation prohibited under 49 U.S.C. § 20109, as amended by Section 1521 of the Implementing Regulations of the 9/11 Commission Act of 2007, Pub. L. No. 110-53 ("FRSA").

**1. A list of similarly situated employees, from June 2019 – June 2021, who have violated the same or similar rule along with their discipline in response to that violation. Please list the employee's name, department, current status, reason, and date of discipline.**

For purposes of this response letter, CP understands your specification of "similarly situated employees" to be any engineer who reported up to General Manager – US West, Tom Jared during the stated time period. **Furthermore, CP has no record of any personal injury reports, accident reports, or hazardous safety condition reports submitted through CP's internal web-based application submitted by any of these individuals for at least 300 days prior to their**

Confidential

**Johnson**
**Ex. 36**

CP_00615

**respective discipline event.**[1] In order to preserve employee confidentiality, CP objects to providing their full names and instead will provide the respective employee initials, position, and location of the discipline event.

| Name / Position | Date of Discipline / Location | Type of Discipline[2] | Reason for Discipline | Current Status |
|---|---|---|---|---|
| T.V. Engineer | 08/01/19 Nahant, IA | 20 Day Suspension (Waiver / 15 Days Deferred) | Failure to stop within half the distance specified | Employed |
| M. J. Engineer | 06/07/20 Marquette, IA | Verbal Coaching | Failure to stop within half the distance specified | Employed |
| T. S. Engineer | 07/29/20 Glenwood, MN | Verbal Coaching | Failure to stop within half the distance specified | Employed |
| T. P. Engineer | 01/27/21 Enderlin, MN | 20 Day Suspension (Waiver / 10 Days Deferred) | Failure to stop within half the distance specified | Employed |
| John Sexton Engineer | 02/26/21 Nahant, IA | 20 Day Suspension (Did not request waiver) | Failure to stop within half the distance specified | Employed |
| J. M. Engineer | 03/09/21 Glenwood, MN | Dismissal | Failure to stop within half the distance specified | Dismissed |

**2.     A copy of Mr. Sexton's union grievance/appeal, investigative hearing transcriptions, and outcome (or final letter to confirm the outcome of the hearing) to the grievance/appeal regarding the incident of February 1, 2021.**

Mr. Sexton has exercised his right to appeal the discipline assessed on February 26, 2021 (20-day suspension) through his union. Grievances are handled by CP's separate labor relations department. Mr. Sexton's union representative timely appealed the discipline on May 20, 2021, and CP's Assistant Director – Labor Relations, Brian Scudds, timely replied on July 19, 2021. A copy of each is attached as Exhibit 1. A copy of the February 26, 2021 discipline letter was previously submitted as an exhibit to CP's position statement.

---

[1] The Department may recall that Mr. Sexton's alleged protected activity involved a verbal conversation with a Trainmaster in or around January 2021, and it was not submitted through the internal application.

[2] CP's union employees have the option to request a waiver, in which they forego their bargained-for right to a formal investigation and admit to the rule violation.

2

Please know that CP and Mr. Sexton's union, the BLET, engage in quarterly conferences to try to resolve outstanding grievances. Mr. Sexton's appeal was discussed at an October 2021 conference, but not resolved. As such, his appeal is currently scheduled for arbitration later this summer.

Sincerely,

*Michelle C. Sullivan*

Michelle C. Sullivan
Legal Counsel - US

3

CP_00617





# US - Efficiency Test Manual on Operating Rules In Compliance With FRA 217.9

**Including:**

## Safety Rule Book and Tracking Tests



# Train and Engine, Engineering, Train Dispatchers, Operation Supervisors and Control Operators

**Effective November 1, 2014**

Johnson

**Ex. 39**

SEXTON_000368

SEXTON    000369

EFFICIENCY TESTING PROGRAM FOR OPERATING RULES                          7
EFFICIENCY TEST PROGRAM                                                 7
OFFICER QUALIFICATION                                                   7
QUARTERLY REVIEWS                                                       8
ANNUAL SUMMARY                                                          8
EFFICIENCY TEST MANUAL                                                  8
HOW ARE EFFICIENCY TESTS CONDUCTED?                                     8
WHERE ARE EFFICIENCY TESTS CONDUCTED?                                   9
WHEN ARE TESTS CONDUCTED?                                               9
HOW SHOULD YOU PREPARE FOR EFFICIENCY TESTING?                         10
WHAT EQUIPMENT IS NEEDED TO CONDUCT THE TESTS?                         11
PASSENGER TRAINS                                                       13
REQUIREMENTS                                                           13
MEANS AND PROCEDURES FOR EFFICIENCY TESTING                            13

## GROUP "A" TESTS – STOP ....................................................................15
Test GRA01   Hand Signals or Signal Disappearance                     16
Test GRA03   Display of Red Flag                                      17
Test GRA04   Unattended Fusee                                         18
Test GRA05   Signs Protecting Equipment                               19
Test GRA06   Blue Signal Protection of Workmen                        20
Test GRA07   Improperly Displayed Signal                              21
Test GRA10   Movement in Spur Tracks                                  22
Test GRA11   Stop Indication CTC Territory or Manual Interlocking     23
Test GRA13   Stop Indication Automatic Interlocking                   24
Test GRA14   Stop Indication ABS Territory                           26
Test GRA15   Operating With Track Warrant                             27
Test GRA17   Track Side Warning Detector                              28
Test GRA18   Track and Time                                           29

## GROUP "B" TESTS - RESTRICTED SPEED ............................................31
Test GRB01   Unattended Fusee                                         32
Test GRB03   Yard Limits                                              33
Test GRB05   Movement by Signal Requiring Restricted Speed.           34
Test GRB07   Reverse Movements                                        35
Test GRB08   Initiating Movement between Signals                      35
Test GRB10   Joint Track and Time                                     37
Test GRB11   Occupying Same Track Warrant Limits                      38
Test GRB13   Protection When Tracks Removed From Service              39
Test GRB14   Improperly Displayed Signal                              40
Test GRB15   Display of Yellow-Red Flag                               41

## GROUP "C" TEST - ACTION OTHER THAN STOP OR RESTRICTED SPEED .........43
Test GRC01   Yellow Flag                                              44
Test GRC03   Permanent Speed Signs                                    45
Test GRC06   Providing Warning Over Road Crossings                   46
Test GRC07   Movement Other Than Main Track                          47
Test GRC08   Maximum Authorized Speed                                 47
Test GRC10   Distant Signal Approach                                  49
Test GRC11   Approach Diverging                                       49
Test GRC12   Advance Approach                                         49
Test GRC13   Approach Restricting                                     49
Test GRC14   Approach                                                 49
Test GRC15   Diverging Advance Approach                               49
Test GRC16   Diverging Approach                                       49
Test GRC10N  Distant Signal Approach                                  49
Test GRC11N  Approach Slow                                            49
Test GRC12N  Advance Approach                                         49

SEXTON     000370

Test GRC13N  Medium Approach Medium                                                      49
Test GRC14N  Approach                                                                    49
Test GRC15N  Medium Approach                                                             49
Test GRC16N  Approach Medium                                                             49
Test GRC17    Restriction to Crew Member (Track Bulletin)                                51
Test GRC18    Delayed in Block                                                           52

**GROUP "D" TESTS - OBSERVATION TESTS** .............................................**53**
Test GRD01    Engine Bell and Whistle Signal (not including Road crossings,             54
Test GRD01A  Engine Bell and Whistle Signal for Road Crossings 5.8.2 (7)               55
Test GRD01B  Engine Bell and Whistle Signal Quiet Zones                                 56
Test GRD01C  Engine Bell and Whistle Signal Approaching Men or Equipment 5.8.2 (8)     57
Test GRD03    Highly Visible Markers                                                    57
Test GRD04    Duties of Crew Members                                                    58
Test GRD06    Protection in Bowl Tracks                                                 59
Test GRD08    Inspecting Passing Trains                                                 59
Test GRD14    General Rules                                                             60
Test GRD15    Copy and Repeat Mandatory Directives                                      61
Test GRD16    Headlight Display                                                         62
Test GRD17    Radar Inspection or Event Recorder                                        64
Test GRD18    Securing Equipment - Locomotives and Cars Secured                         65
Test GRD20    Automatic Crossing Warning Devices (Malfunction)                          66
Test GRD21    Verbal Communication                                                      68
Test GRD23    Communication between Crews Switching                                     69
Test GRD24    Reporting Clear of Mandatory Directive                                    70
Test GRD25    Flat Switching Module                                                     71
Test GRD28    Games, Reading, or Electronic Devices                                     73
Test GRD29    Tabular General Bulletin Orders                                           74

**GROUP "E" TESTS - MAINTENANCE OF WAY** ........................................**75**
Test GME01    Training-Qualifications-Rules and Instructions                            76
Test GME02    Occupying/Fouling Controlled Tracks                                       77
Test GME03    Requesting And Using a Form B or Track Out of Service track bulletin.     78
Test GME04    Requesting and Using Track Bulletin for Speed Restrictions.              79
Test GME05    Foul Time                                                                 80
Test GME06    Railroad Crossing At Grade - Manual Interlocking                          81
Test GME07    Railroad Crossing At Grade - Automatic Interlocking                       82
Test GME08    Occupying/Fouling Non-Controlled Tracks                                   83
Test GME09    Lone Worker                                                               84
Test GME10    Lookouts                                                                  85
Test GME11    Employee in Charge                                                        86
Test GME12    Job Briefing                                                              86
Test GME13    Right to Challenge on Track Safety                                        87
Test GME14    Joint Authorities and/or Working Limits                                   88
Test GME15    Working On or Around Self Propelled Equipment                             89
Test GME16    Maintenance Machine Operators                                             90
Test GME17    Right to Challenge on Roadway Maintenance Machine Safety                  91
Test GME18    Maximum Authorized speed and Stopping and Safe Braking Distance           92
Test GME19    Movement through Working Limits                                           93
Test GME20    Lights Displayed                                                          93
Test GME21    Flagging Equipment and Emergency Flagging                                 94
Test GME22    Road Crossings                                                            94
Test GME23    Unattended On-Track Equipment                                             95
Test GME24    Air Brake Tests                                                           95
Test GME25    Securing Main Track Switches                                              96
Test GME26    Verbal Communication                                                      97
Test GME27    Automatic Crossing Warning Devices (Signal Employees)                     98

SEXTON    000371

Test GME31    Games, Reading, or Electronic Devices    99

**GROUP "F" TESTS – SWITCHES – DERAILS – PROTECTING SHOVES AND EQUIPMENT FOUL OF ADJACENT TRACKS TESTS ...............................................101**

Test GRF01    Good Faith Challenge    102
Test GRF02    Shoving or Pushing Movements    103
Test GRF03    Picking up a Crew Member    104
Test GRF04    Equipment Left to Foul another Track    104
Test GRF05    Lined, Locked and Checked    105
Test GRF06    Hand Operated Switches    106
Test GRF07    Crossover Switches    107
Test GRF08    Releasing Authority in Non-Signaled Territory    108
Test GRF09    Clear of Main Track Switches    108
Test GRF10    Conflicting Movements Approaching Switch    109
Test GRF11    Derail Location and Position    109

**Group "G" - Test Drug and Alcohol ........................................................................111**

Test GTG01    Drug and Alcohol    112

**GROUP "H" TESTS – HAZARDOUS MATERIAL .......................................................113**

Test GRH01    Haz Mat Required Documentation / Emergency   Response    114
Test GRH02    Haz Mat Train Placement    114
Test GRH03    Haz Mat Switching    115
Test GRH04    Haz Mat Car Inspection / Placards and Markings    115
Test GRH05    Haz Mat Key Train    116
Test GRH06    Haz Mat Chain of Custody    117
Test GRH07    Hazardous Material Train or Equipment Securement    118

**GROUP "S" TEST – Air Brake and Train Handling..................................................119**

Test GMS03    Class I Air Brake Test (Initial Terminal)    120
Test GMS04    Class IA Air Brake Test (1000 Mile)    121
Test GMS05    Class II Air Brake Test (Intermediate)    122
Test GMS06    Class III Air Brake Test (Application, Release, Continuity)    123
Test GMS07    Transfer Air Brake Test    124
Test GMS08    Emergency Application (TIBS/SBU)    125
Test GMS09    Crew to Crew Information    126

**GROUP "R" TESTS - RAILROAD RADIO.................................................................127**

Test GR01    Test Transmissions    128
Test GR02    Identification, Over, Out    128
Test GR03    Lieu of Hand Signals    129

**GROUP "TD" TEST- TRAIN DISPATCHER/CONTROL OPERATOR .......................131**

Test GTD01    Instructions and Authorities    132
Test GTD02    Dispatcher Transfers    132
Test GTD03    Verbally Transmitting Mandatory Directives    133
Test GTD04    Restricting Mandatory Directives    133
Test GTD05    Instructions for Handling CTC & Manual Interlockings    134
Test GTD06    General Rules and Instructions    134
Test GTD07    PTEPP – Possession of in Office PTEPP    135
Test GTD08    PTEPP – Knowledge of PTEPP    135
Test GTD09    Releasing of Authority    135
Test GTD10    Rule Availability and Use    136
Test GTD11    General Orders/Bulletins in Effect    136
Test GTD12    Protect Automatic Warning Device Malfunctions    137
Test GTD13    Records    137
Test GTD14    Blocking or Marking Devices    138
Test GTD15    Sign in Records    138
Test GTD16    Weather Records    138
Test GTD17    Train Crew and Train Records    139

SEXTON    000372

Test GTD18    Train Transfer to Next Days Sheet                                   139
Test GTD19    Recording Train Delays                                             139
Test GTD21    Releasing Authority in Non-signaled Territory                      140
Test GTD22    Games, Reading or Electronic Devices                               140
Test GTD23    Track Bulletins and Tabular General Bulletin Orders                141

**Train and Engine, Train Dispatcher and Operation Supervisor's Safety Tests ..................................................................................... 143**
GRTJOB1       Job Briefing                                                       144
GRT1          Air Hoses and Angle Cocks                                          145
GRT5          Aligning Drawbars/Couplers                                         146
GRT6          Coupling/Uncoupling                                                147
GRT8          Crossing over Rail Equipment*                                      148
GRT9          Derails                                                            149
GRT11         Entraining and Detraining Equipment*                               150
GRT14A        Applying Hand Brakes*                                              151
GRT14R        Releasing Hand Brakes*                                             152
GRT14T        Operating Hand Brakes - Technique*                                 153
GRT16         Multiple Unit (MU) Cable                                           154
GRT20         On or About Tracks*                                                155
GRT21         Personal Protective Equipment and Clothing                         156
GRT23         Restricted/Close Clearances*                                       158
GRT24         Riding Equipment, General*                                         159
GRT24TC       Riding Equipment, Tank Car                                         160
GRT27         Three Point Protection*                                            161

**Train and Engine, Train Dispatcher and Operation Supervisor's Tracking Tests ..................................................................................... 163**
GRT001        Communicate Safety Plan                                            164
GRT004        Workplace Inspections                                              164
GRT006        Footboard Safety Meeting                                           165
GRT011        Orientation Interview (New Hire, Transferee, Return to Work)       165
GRT015        Job Aids (Develop/Update)                                          166
GRT018        Unsafe Condition Reports (Resolved)                                166
GRT022        Risk Assessments                                                   166
GRT027        Incident Investigations                                            167
GRT031        Customer Safety Audits                                             167
GRT039        Quality Safety Review                                              168
GRT040        Employee Review Program                                            168
GRT041        Manager Safety Walkabout                                           169
GRT042        Regional Cross Functional Blitz                                    169
GRT043        Efficiency Test Validation                                         170
GRT044        Divisional Blitz                                                   170
GRT045        Mentoring Employee                                                 171
GRIDEFRT      Movement Ridden, Freight Train                                     171
GRIDEPSGR     Movement Ridden, Passenger Train                                   172
GRIDEYARD     Movement Ridden, Yard Service                                      172

**Engineering Services Safety Tests ........................................................ 173**
GMUCR1A       Job Briefing, Employee in Charge                                   174
GMUCR1B       Job Briefing, Risk Assessment and Controls                         175
GMUC1         Rights and Responsibilities                                        176
GMU1          Air Hoses, Handling                                                177
GMU2          Company Vehicles                                                   178
GMU2B         Company Vehicles, Safe Operations in Yards                         179
GMU3          Confined Space                                                     181
GMU4          Coupling/Uncoupling Equipment                                      182
GMU5          Dangerous Goods, Transportation                                    183

4                                        November 1, 2014

SEXTON    000373

GMU8.1      Getting On/Off (Equipment, Track Units)                                          184
GMU8.2      Getting On/Off (Vehicles)                                                        186
GMU11       Hand Brake Operation - Equipment                                                 187
GMU13        Chemical Safety                                                                 189
GMU15       Jacks                                                                            190
GMU16       Lock-Out/Tag-Out                                                                 191
GMU17.1     Material Handling Equipment, General                                             192
GMU17.3     Material Handling Equipment, Cranes                                              193
GMU21       On or About Equipment                                                            194
GMU22       On or About Tracks                                                               195
GMU22.2     Lookout Protection                                                               196
GMU23.1     Personal Protective Equipment & Clothing, General                                197
GMU23.1A    Personal Protective Equipment & Clothing, Footwear                               198
GMU23.2     Personal Protective Equipment & Clothing, Respirators                            199
GMU23.3     Personal Protective Equipment & Clothing, Knee Pads                              200
GMU24       Personal Protective Equipment & Clothing Charts                                  201
GMU25.1     Protection When Working at Heights                                               202
GMU25.4     Protection When Working at Heights, Pole Climbing                                203
GMU25.5     Protection When Working at Heights, Fall Restraint for Machine Operators         204
GMU26.1     Riding Equipment                                                                 205
GMU26.2     Riding Track Units                                                               206
GMU27       Derails                                                                          207
GMU27.1     Switches, High/Low Stand Table Top                                               209
GMU27.2     Switches, Ergonomic D/Tri Handles                                                211
GMU28       Three-Point Protection                                                           213
GMU29.1     Hand Tools, General                                                              214
GMU29.1A    Hand Tools, Claw Bar                                                             215
GMU29.1B    Hand Tools, Shovel                                                               216
GMU29.1C    Hand Tools, Spike Maul                                                           217
GMU29.1D    Hand Tools, Track Wrench                                                         218
GMU29.2     Power Tools                                                                      219
GMU29.3     Electrical Tools                                                                 219
GMU29.4     Air Powered Tools                                                                220
GMU30       Trenching & Excavations                                                          221
GMU31.0     Welding and Torch Cutting                                                        222
GMU31.1     Welding & Torch Cutting, General                                                 223
GMU31.2     Welding & Torch Cutting, Dry Test, Regulators with Gauges                        224
GMU33       Safety Precautions, Thermite Welding                                             225
GMU37       Electric Arc Welding Safety Precautions                                          226
GMCVDO      Commercial Vehicle Driver Observation                                            227
GMWEDOC     Required Documentation & Inspections for Work Equipment                          228
GMDIWE      Required Daily Inspections of Work Equipment                                     230
GMWET       Required Tools for Work Equipment Operators                                      231
**Engineering Services Tracking Tests** ...................................................**233**
GMV004      Safety Orientation Checklist                                                     235
GMV005      On the Job Tool/Machine Orientation Checklist                                    235
GMV006      Complete New Hire Evaluation Checklist                                           236
GMV007      Existing ES Employees Transferred or New to a Position Checklist                 236
GMV022      Safety Meetings (Includes Dynamic Safety Review)                                 237
GMV023      One to Ones with MSPS (Managers)                                                 237
GMV024      One to Ones with Employees                                                       238
CMV039      Quality Safety Review                                                            238

SEXTON    000374

SEXTON    000375

## EFFICIENCY TESTING PROGRAM FOR OPERATING RULES

The Canadian Pacific – US Efficiency testing program is designed to comply with CFR 49 Part 217.9 and will conduct and maintain an Efficiency test program with particular emphasis on operating rule exceptions that cause or are likely to cause the most accidents and incidents.

Efficiency tests and inspections may only be performed by qualified supervisors who are qualified on the operating rules, inspection program requirements and procedures and have received the appropriate field training.

Safety, tracking documents. LSI and AAR tests are conducted by supervisors and are used strictly for internal use and are not part of the overall Operational Testing Program as it relates to CFR 49 CFR Part 217.9.

## EFFICIENCY TEST PROGRAM

Canadian Pacific will maintain an active documented efficiency testing program.  The program will include objectives, applicable rules and the preparation/procedures to conduct each test.  The efficiency testing program may provide elements deemed as "Failure", but may not include all exceptions that may be associated with the applicable rules identified for a particular test.  The program may contain special instructions regarding testing procedures and entry criteria for recording the test.

Qualified supervisors will perform efficiency tests in accordance with their monthly quotas assigned which is sent to each individual supervisor after the quarterly review is completed for the next following quarter. These monthly quotas will be carried in each quarterly review to which they pertain to.  The monthly baseline quotas are a set of efficiency tests and focus tests if shown are in addition to any monthly baseline test requirements.  The monthly base line quotas and any focus tests for efficiency testing may be adjusted according to future needs based on quarterly review, six month review and/or regulation.

General Managers may assign testing expectations to any specific efficiency or safety tests based on accidents or incidents, as necessary.  These testing expectations are for internal purposes only and are not part of any submission or policy.

Canadian Pacific in line with CFR Part 218 subpart F requirement for the handling of switches; derails; protecting shoves and leaving cars foul of an adjacent track will require that the minimum number of tests and inspections under category Group F will be a yearly average of 10 percent.

Canadian Pacific in line with CFR Part 220.315 requirement for use of electronic devices will require that the minimum number of tests and inspections will be a yearly average of 2 percent.

## OFFICER QUALIFICATION

All supervisors will be qualified on the operating rules in accordance with the efficiency tests they may conduct. Failure to maintain operating rules qualification as outlined under the Rules Examination Policy will prohibit such supervisor from performing efficiency tests, until such time they become operating rules qualified again. Supervisors will receive appropriate field training as necessary to achieve proficiency on the efficiency tests they may conduct. Supervisors conducting efficiency testing will be qualified in one of the following methods:

- Prior to December 31, 2008 supervisors must have signature sheet on file to validate their competence to conduct efficiency testing for the test they conduct.
        or
- After January 1, 2009 any new supervisors will complete the prescribed training, including classroom instruction and training along with the            appropriate field training, as necessary in order to properly conduct efficiency testing.

Classroom training on the efficiency testing program will either be performed by HR training department or by a designated supervisor. Records will be maintained when such supervisor has fully completed training and qualification status to perform efficiency tests.

Only qualified supervisors will conduct efficiency tests and inspections

SEXTON    000376

## QUARTERLY REVIEWS

The Operating Rules Specialist will conduct a Region quarterly review to identify exceptions related to accidents and incidents, which occurred during the previous quarter. This review will include analysis of accident and incident data, results of efficiency testing, and other pertinent safety data. The review will also show whether the supervisor conducted the minimum number of efficiency tests as required in their monthly quota. The Operating Rules Specialist will make any necessary adjustments to the specific focus testing objectives required by supervisors for the subsequent quarter by indicating this adjustment in the new monthly quota after the quarterly report is completed. Operating Rules Specialist will notify each supervisor of their quotas in relation to the efficiency testing program for the preceding quarter.

The Director Operating Standards will be responsible to conduct a six month review of the efficiency testing program. This review will ensure that the program is being utilized as intended, that the quarterly reviews by the respective Operating Rules Specialist have been properly completed, and that appropriate adjustments have been made to the distribution of specific focus testing required. Six month reviews shall be completed no later than 60 days after the review period has ended. A copy of this review will be retained and sent to the appropriate VP of the region.

## ANNUAL SUMMARY

An annual summary shall be done by March 1, for each calendar year for the previous year showing the number, type, and result of each efficiency test and inspection based upon the requirements of the Efficiency test program.

The records of the above periodic reviews will be retained for a period of one year after the end of the calendar year to which they relate and shall be made available to representative of FRA for inspection and copying during normal business hours.

System Administrator to the Efficiency Testing Program
Director Operations Standards – Stan Bell

## EFFICIENCY TEST MANUAL

Compliance with rules governing the operation of trains and maintaining a safe property is important to an efficient operation in the railroad industry. To ensure compliance and to evaluate operating procedures, it is essential to have a comprehensive program to determine if employees are carrying out their duties in accordance with present rules and operating procedures.

This efficiency test booklet is for the use of supervisors directly involved with performing efficiency test. It is not to be distributed or used in a manner that it is available to other than the individuals for whom it is intended.

At the end of each test there is a list of possible failures. Some of the failures that are in the list may point you in the direction of another test. Example: If a train crew releases their movement track warrant in non-signaled territory but doesn't say anything about the switch they used to clear the main track to train dispatcher, they may have passed the releasing mandatory directive test, but not the reporting of the switch to the train dispatcher. That would then be considered two separate tests.

## HOW ARE EFFICIENCY TESTS CONDUCTED?

Generally, tests are conducted without the knowledge of those employees who are being observed. This procedure ensures that the performance being tested is an accurate reflection of the employee's ability to apply the correct rules and procedures for the task they are performing.

The normal testing procedure requires that you and/or a team of managers position yourselves in an area where the performance of the train crew or individual employee can be viewed fairly and accurately. When testing with more than one manager, and a test is being conducted that requires a train to pass a flag or a signal that will provide advance warning, one of the managers should maintain a position at that location to observe the train or engine passing the flag or signal that is providing the advance warning. This should be done without the employee or employees that are being tested knowing of your presence

SEXTON     000377

so that they can carry out their responsibilities. Managers that are out riding trains may also conduct on board evaluations. You should assess the employees performance based on the procedures required by the **General Code of Operating Rules, General Operating Instructions, Timetable and Special Instructions, General Orders**, **Safety Rule Book and Hazardous Materials Instructions.**

**It is important that all tests be conducted fairly, under normal operating conditions and that no attempt ever be made to entrap an employee.**

Once you have made the performance evaluation, crew should be informed either verbally at the time of occurrence of the test or a follow up in written format to inform the crew members tested of the results of the test. This, of course, reinforces the fact that you as a manager are out there and they are being observed, which is one of the major goals of efficiency testing. You are encouraged to **take these opportunities to compliment the crewmembers on satisfactory performances** you have observed, as well as to review any rule violations that you may have witnessed. An additional evaluation involving the questioning of crews about other rules and regulations they are required to know may also be conducted at this time.

## WHERE ARE EFFICIENCY TESTS CONDUCTED?

Job performance can be evaluated at any given time throughout the entire operating territory, but most efforts should be concentrated in those areas:

- Which have experienced a high frequency of train accidents.

- Which have experienced an unusual number of personal injuries.

- Where employees have not been tested recently.

- Areas of High Risk such as High Density or Hazardous Materials routes or switching locations.

- Areas that have been identified by other reports such as ORCA, Crew Mentoring or Crew observation reports that show a lack of rules compliance.

## WHEN ARE TESTS CONDUCTED?

As an administrator of efficiency tests, you must ensure that **your schedule is not predictable**. This is one of the most important aspects of efficiency testing, as again, one of the principal goals of the program is to create an awareness that job performance can and will be evaluated at any given time. Therefore, testing should be conducted at all hours of the day and night, on weekends and holidays.

Scheduling should be spread out over the entire month. Performing a large number of tests in one or two days does not provide proper information regarding rules compliance. For testing to become an easy task and a habit, it should be done on a daily basis. When you are out on the property, you are always in a position to observe employees walking around equipment, lining switches, etc.

SEXTON      000378

CP Appendix - 267

## HOW SHOULD YOU PREPARE FOR EFFICIENCY TESTING?

Before conducting any test, you need to KNOW the rules, which are to be tested.  You cannot expect 100% compliance with the rules if YOU do not fully understand how to apply and comply with them. Prior to conducting the tests on trains you should obtain the following documents where applicable to the territory and employees tested:

- A train location lineup.
- A copy of all track bulletins in effect at that location.
- Information regarding any trains known to be experiencing train handling or air brake problems.
- The train profile/consists for the trains you expect to test, as necessary.
- All necessary manuals for reference to operating rules and procedures.

Train handling and delay to a train being tested or to other trains in the area should not prevent a test from being performed.   Ask the following questions to determine if a test should be made, and if so, the type of test to be made.

- Is this a safe test?
- Will the test cause the hours of service limit to be exceeded for the crew being tested?
- Will the test cause the hours of service limit to be exceeded for the crews of other trains?
- Does the train to be tested have any air or train handling problems that could create an unsafe condition?
- Will the test location provide the proper sight distance desired for the type of test that is being conducted?
- Will the test locations allow the testing manager to safely display an easy stop signal (restricted speed tests) prior to train or engine coming into view?
- Has a job briefing with all members of the test team been completed, reviewing rules related to the test and each team members roll in the test?  Additional job briefings must be performed if changes occur with the test team or the test changes.


# USE COMMON SENSE WHEN SETTING UP TEST SITUATIONS.

SEXTON    000379

## WHAT EQUIPMENT IS NEEDED TO CONDUCT THE TESTS?

These are usually the standard supplies required for most efficiency test situations are but other supplies may be necessary.

### TESTING KIT

- General Code of Operating Rules.
- General Operating Instructions Manual.
- Safety Rule Book.
- US Hazardous Materials Instructions for Rail and the current Emergency Response Guide.
- Instructions Governing Train Dispatchers and Control Operators, if necessary.
- Current Timetable and General Orders in effect.
- Keys for switches.
- Hand-held Red Flag for hand signals
- Reflectorized track flags, Yellow-Red, Yellow, Red and Green. Appropriate Flag holders.
- At least one shunting devices.  Two if simulating train movements in signal territory.
- Lantern or flashlight.
- Fusees
- RADAR device with tuning fork and portable battery pack, if available.
- Railroad radio, charged and necessary radio frequencies.
- Proper ID card.
- Track profile, if needed.
- Telephone numbers (Dispatchers, Local Managers, etc.)
- Proper PPE

SEXTON    000380

Canadian Pacific

## THE "DO'S AND DON'TS" OF EFFICIENCY TESTING

### DO'S

1. **Do** conduct the tests fairly.

2. **Do** conduct the tests safely.

3. **Do** make sure that an employee has every opportunity to demonstrate correct rules knowledge and compliance.

4. **Do** coordinate your testing plans with the train dispatcher/control operator when appropriate.

5. **Do** use every opportunity to improve an employee's knowledge and respect for the rules.

6. **Do** communicate the results of the test by debriefing with the crew.

### DON'TS

1. **Don't** setup a testing situation that is outside the realm of the employee's normal operating experience.

2. **Don't** setup a situation that can result in an unsafe act or condition.

3. **Don't** conduct a test to entrap an employee.

4. **Don't** create situations, which will adversely disrupt the dispatcher's/control operator's train movement plans.

5. **Don't** violate a rule in order to setup a test situation.

6. **Don't** walk away without letting the crew know that a test was performed and how they did.

SEXTON    000381

Canadian Pacific

## PASSENGER TRAINS

1. A division supervisor is required to ride an Amtrak passenger train on each subdivision upon which it operates. Where such train operates on a daily basis, it must be ridden at least twice    a month. If it operates on a frequency less than daily, a division supervisor must ride at least 10 percent of the trips of that train. Supervisors must ride locomotives during such trips.
   **EXCEPTION:** Between Milwaukee and Chicago it will be sufficient to make a total of six trips per month. METRA trains need not be ridden.

2. A division supervisor must monitor the use of radio on each passenger train on each division upon which it operates. Where such train operates on a daily basis, such monitoring must be conducted at least twice a month. If it operates on a frequency less than daily, a division supervisor must monitor the use of radio on at least 10 percent of the trips of that train.

## REQUIREMENTS

Each employee governed by the General Code of Operating Rules and that are under the Hours of Service shall be tested at least once each six-month period by a designated supervisor.

## MEANS AND PROCEDURES FOR EFFICIENCY TESTING

Establish conditions, either actual or simulated, giving consideration to weather, visibility, train operations, grade conditions and other related factors which will require the employee(s) to act on the selected qualifying test(s). Employee(s) should not be aware that an Efficiency Test is being performed nor should test(s) be reported on historical data. Noncompliance with any portion of the selected test(s) shall constitute failure.

Efficiency Tests must be documented for each employee tested including the employee's compliance or failure. Where an Efficiency Test(s) results in a failure, appropriate action must be taken to insure proper understanding of the rules.

Record of Efficiency Tests on prescribed form must be submitted into the electronic filing system.. Copy of Efficiency Tests performed by a supervisor must be retained by that supervisor for one year.

Before conducting efficiency tests all supervisors must be qualified on the operating rules of the railroad. Any new supervisor that will be conducting efficiency test will be required to be qualified on the operating rules of the railroad and must attend training and instruction on the efficiency testing program which will include field training and examination on the aspects of the program.

SEXTON     000382

Canadian Pacific

# GROUP "A" TESTS – STOP

| Test NO. | Name | Rule Number |
|---|---|---|
| GRA01 | Hand Signals or Signal Disappearance | 5.3.1, 5.3.2, 5.3.3, 5.3.4, 5.3.5 or 5.3.7 |
| GRA02 | NOT USED | |
| GRA03 | Display of Red Flag | 5.4.7, 15.2 |
| GRA04 | Unattended Fusee | 5.6 |
| GRA05 | Signs Protecting Equipment | 5.14 |
| GRA06 | Blue Signal Protection of Workmen | 5.13 |
| GRA07 | Improperly Displayed Signal | 5.15, 9.4 or 9.5 |
| GRA08 | NOT USED | |
| GRA09 | NOT USED | |
| GRA10 | Movements into Spur Tracks | 7.12 |
| GRA11 | Stop Indication CTC Territory or Manual Interlocking | 9.12.1 or 9.12.2 |
| GRA12 | NOT USED | |
| GRA13 | Stop Indication Automatic Interlocking | 9.12.3 |
| GRA14 | Stop Indication ABS Territory | 9.12.4 |
| GRA15 | Operating with Track Warrant | 14.3 |
| GRA16 | NOT USED | |
| GRA17 | Track Side Warning Detector | Special Instructions |
| GRA18 | Track and Time | 10.3 |

**REQUIREMENTS: TESTS AS DESCRIBED ABOVE MAY REQUIRE ACTION TO COMPLY WITH A FULL STOP REQUIREMENT IN COMPLIANCE WITH APPLICABLE RULE AS INDICATED.**

SEXTON     000384

## Test GRA01 Hand Signals or Signal Disappearance

Evaluates the employee's ability to stop a movement in response to hand signals or radio communication.
**Note:** Hand signals include the use of flag, lantern or hand.

**Rule Tested:**  GCOR 5.3.1, 5.3.2, 5.3.3, 5.3.4, 5.3.5, 5.3.6 or 5.3.7

**Test Conditions:** When conducting this test you may observe existing operating conditions, or it may be set up.  Individual rule or combination of rules may be used to conduct test.

**Procedures:**
When test conditions are observed:
> Place yourself where you can observe crews at work.
> Observe the use of hand signals or radio communication between crews.
> Observe stop signal given to the movement.
> Observe that movement stops on signal given or within half the range.

When test conditions are set up:
> Instruct a crew member directing movement to give a proceed hand signal to the engineer and then have the individual disappear from view of the engineer.
> > Or
> Instruct a crew member directing movement to give radio communication to make a shove or back up movement to engineer.
> > Or
> Place yourself in a position where movement must stop within half the range of visions such as a yard track or movement moving under restricted speed and give them a stop hand signal or wave any object violently near the track.

**Failure:**
> ☑ When the crew is operating by hand signals, if the movement does not come to a stop immediately after the person giving the hand signals disappears from view of the engineer.
> ☑ When the crewmember giving communication to engineer does not specify direction or distance.
> ☑ When the engineer does not stop within half the distance last specified.
> ☑ When engineer does not acknowledge direction and distance if more than four cars when radio is used.
> ☑ When the engineer does not stop movement within half of the distance that was last communicated.
> ☑ When engineer does not acknowledge hand signal to stop train, except when switching.

SEXTON    000385

Canadian Pacific

# GROUP "F" TESTS – SWITCHES – DERAILS – PROTECTING SHOVES AND EQUIPMENT FOUL OF ADJACENT TRACKS TESTS

| Test NO. | Name | Rule Number |
|---|---|---|
| GRF01 | Good Faith Challenge | 1.4.1 |
| GRF02 | Shoving or Pushing Movements | 6.1.1, 2.13, 5.3.6, 5.3.7 and 6.5 |
| GRF03 | Picking up a Crew Member | 6.6 |
| GRF04 | Equipment Left to Foul another Track | 6.1.1 and 7.1 |
| GRF05 | Lined, Locked and Checked | 6.1.1, 8.2, 8.3 and Special Instructions |
| GRF06 | Hand Operated Switches | 6.1.1, 8.2, 8.3, 8.8 and Special Instructions |
| GRF07 | Crossover Switches | 6.1.1, 8.2, 8.3 & 8.12 |
| GRF08 | Releasing Authority in Non-Signaled Territory - Hand Operated Switch | 6.1.1, 14.7 and Special Instructions |
| GRF09 | Clear of Main Track Switches | 8.7 |
| GRF10 | Conflicting Movements Approaching Switch | 8.14 |
| GRF11 | Derail Location and Position | 8.2 |

November 1, 2014

SEXTON    000470

## Test GRF01  Good Faith Challenge

To evaluate the employee's ability to properly challenge a directive that would be contrary to the operating rules for shoving moves, leaving equipment foul of an adjacent track, the handling of hand-operated switches or fixed derails.

**Rules Tested:**  GCOR 1.4.1

**Test Conditions:**  When conducting this test conditions will need to be set up.

**Procedure:**
When test conditions are set up:
1. Pick a location and situation where you will be able to control the test.
2. Set up a situation where a directive is given to an employee that would violate a railroad operating rule relating to shoving movements, leaving equipment to foul of adjacent track, handling hand-operated switches or fixed derails.
3. Once directive is given to crew, crew needs to challenge the directive given with their supervisor.
4. Make sure that supervisor handles the situation properly, by not requiring employee to comply with directive until challenge is resolved.
5. Determine that the supervisor and employee have resolved the challenge to properly comply with the operating rule.

**Test Failure:**
- ☑ Employee does not challenge the directive given.
- ☑ Supervisor requires the employee to comply with directive without resolving the challenge.
- ☑ Employee not given opportunity to write up for further review.
- ☑ Employee performs task even after it was challenged to a Supervisor without being resolved.
- ☑ Employee is subjected to punishment for making a good faith challenge.


**Note:**  When this type of test performed, the supervisor performing must ensure that before, during and after the test that all rules are complied with.  Employees must not be required to perform any task that would jeopardize their safety.

SEXTON    000471

Canadian Pacific

## Test GRF02  Shoving or Pushing Movements

Evaluates employees rule compliance in participating in the procedure to be used when providing protection when handling cars ahead of the engine.

**Rules Tested:** GCOR Rule 2.13, 5.3.6, 5.3.7, 6.1.1 and 6.5

**Test Conditions:** When conducting this test, actual operating conditions are to be observed.

**Procedure:**
1. Pick a location where crews can be observed and monitored for compliance for a shove move.
2. Observe and listen to a crew to ascertain that job briefing is held between engineer and employee directing move.
3. Determine that employee has checked that track is clear for movement.
4. Determine that employee providing protection does not engage in any task unrelated to the movement.
5. If public crossings are involved that they are protected.
6. Switches and derails for movement are properly lined for intended movement.

**Test Failure:**
- ☑ No job briefing is held between crew members.
- ☑ Switches and derails not lined for intended movement.
- ☑ Movement not protected by employee, as required.
- ☑ Employee performing other task than related to movement.
- ☑ Public crossing not protected as required.
- ☑ Track not visually determined that track is clear for intended movement.
- ☑ No communication or signals are given to control the movement.

**Note:** The shoving or pushing moves do not apply to rolling equipment intentionally shoved or pushed to permit the rolling equipment to roll without power attached, such as, during switching, humping or static drops or under Rule 6.6 Picking up a crew member.

SEXTON    000472

Canadian Pacific

# GROUP "R" TESTS - RAILROAD RADIO

| Test NO. | Name | Rule Number |
|----------|------|-------------|
| GR01 | Test Transmissions | 2.17, 2.18 |
| GR02 | Identification, Over, Out | 2.2, 2.4 |
| GR03 | Lieu of Hand Signals | 2.13, 5.3.6 and 5.3.7 |

**REQUIREMENTS: TESTS AS DESCRIBED ABOVE ARE FOR ALL EMPLOYEES AS OBSERVATIONS TO DETERMINE THAT THE EMPLOYEE IS IN COMPLIANCE WITH RULE INDICATED.**

**NOTE**: If you hear any improper communication over the radio, you should immediately correct the employee involved. If you cannot identify the employee involved, make a request via the radio that proper radio procedures be utilized.

SEXTON     000496

## Test GR01     Test Transmissions

Evaluates employee to determine that they test their radio and that it is working before beginning their work assignment.

**Rules Tested:** GCOR 2.17 and 2.18

**Test Conditions:** When conducting this test, actual operating conditions are to be observed.

**Procedure:** Monitor radio communication or observe employee before beginning a work assignment to determine that a radio test is made which includes an exchange of voice transmissions with another radio.

**Test Failure:**
- ☑ Failure to test radio before beginning work assignment.
- ☑ Failure to notify other crew members of a radio not working.


## Test GR02     Identification, Over, Out

Evaluates employee to determine that proper radio procedure is used in beginning, during and ending of transmissions.

**Rules Tested:** GCOR 2.2 and 2.4

**Test Conditions:** When conducting this test, actual operating conditions are to be observed.

**Procedure:** Monitor radio communication to listen on an employee giving the required identification in transmitting or acknowledging a radio communication.  Also listen for an employee to state OVER when a response is expected or OUT preceded by required identification when done with a transmission.

Exception:  OVER and OUT is not required during yard switching operations.

**Test Failure:**
- ☑ Failure to identify railroad name or initials.
- ☑ Failure to identify name or locations or other unique designation for base stations.
- ☑ Failure to identify engine number or words that identify the precise mobile unit.
- ☑ Failure to use OVER at end of transmission when response is expected.
- ☑ Failure to use required identification and the work OUT when ending a transmission and no response is expected.
- ☑ Failure to repeat identification if communication continues without interruption for 15 minutes or more.

SEXTON     000497

## Test GR03    Lieu of Hand Signals

**Purpose:**  Evaluates ability of employee to properly use the railroad radio in place of hand signals.

**Rules Tested:**  GCOR 2.13, 5.3.6 and 5.3.7

**Test Conditions:** When conducting these tests, actual operating conditions or set up conditions can be observed.

**Procedure:**

**Observation Test**
   Position yourself where movements can be observed during actual operating conditions and listen and watch for employee using railroad radio to direct train or engine movements for backing or shoving to include the direction and distance to be traveled and listen for acknowledgement when distance specified is for more than four cars.

**Set Up Test**
   To perform a set up test, contact with employee on the ground directing movement with railroad radio must be done.  Pick a track that they are switching on to make sure that any car signs given to engineer will hold cars they are handling or make car signs short enough to afford stopping distance of car sign given. Instruct employee directing movements to give a car sign into the track picked out specifying distance and direction and not to state anything further.  Car sign must be more than 4 car lengths.  Determine that movement can stop in half the distance specified.

**Test Failure:**
   ☑  Distant or direction is not given in radio communication.
   ☑  Movement does not stop in half the distance specified.
   ☑  Engineer does not acknowledge radio communication if more than four cars.

SEXTON    000498

CP Appendix - 274c



**Policy 3411**
Short Term Incentive Plan

### Short Term Incentive Plan (STIP)
Non-Unionized Employees (Canada) and US Salaried Employees
Issuing Department: Human Resources

| **Policy Statement** | Canadian Pacific offers a Short Term Incentive Plan (the "Plan"), to recognize the contribution that each regular, non-unionized and US salaried employee makes to the Railway's achievement of its business objectives. |
|---|---|
| | |
| **Accountability** | The Management Resources and Compensation Committee of the Board of Directors of Canadian Pacific Railway (the "Committee") has complete authority to interpret and define individual and group eligibility and to establish rules and regulations required to properly administer the Plan. The Board may also suspend, amend or terminate this Plan at any time.<br><br>On an annual basis, managers are responsible for guiding their employees in the objective setting process. Managers must conduct regular progress reviews throughout the year, evaluate performance against objectives at year end and report results to Human Resources.<br><br>Employees are responsible for setting and striving to achieve their annual performance objectives and for soliciting performance feedback from their managers.<br><br>Human Resources is responsible for interpreting this policy, guiding its administration and supporting employees and managers applying the policy. |
| **Process and Application** | |
| Plan Year | The Plan Year runs from January 1 to December 31. |
| | |
| Eligibility | Regular employees who participate in the Company's non-unionized compensation program are eligible to participate in the Plan provided they join the Plan prior to October 1st in their first year of participation.<br><br>Employees must complete three (3) months (65 working days) of cumulative active service in the Plan year in order to be eligible for a STIP payout. |
| | |
| Transfers and Joint Ventures | Employees transferred or seconded to employers participating in a joint venture with CP may be designated as participants in the Plan by the Company. |
| | |
| Temporary Replacements | Unionized employees who temporarily assume a non- |

Employee Policy Manual                                Effective with the 2021 Plan Year
[APG]

Confidential

**Johnson**
**Ex. 41**

CP_03231



**Policy 3411**
Short Term Incentive Plan

| | |
|---|---|
| | unionized position will be eligible for STIP, provided the temporary assignment commences prior to October 1st of the Plan year and has a minimum continuous duration of three (3) months (65 working days) in the Plan year. |
| Plan Objectives | The objectives of the Plan are: <br><br> • to tie a part of the employee's compensation directly to CP's results; <br> • to reward the achievement of individual and team objectives that support CP's achievement of its annual business plans and long-term strategy; and <br> • to maintain the competitiveness of CP's compensation program. |
| Ending Participation | Participation in the Plan ends when the employee reverts to a unionized position at the Company's request, retires or terminates their employment with CP. <br><br> Employees who revert to a unionized position at their own initiative prior to payout will not be eligible for a STIP award. |
| Target Award Levels | For each Plan Year the Committee establishes the various classes of participants, the weighting of each performance measure assigned to each class and the Target Award Levels.  Employee level determines their Target Award Levels.  Target Award Levels are expressed as a percentage of annual salary and are the basis for calculating STIP awards. |
| Weighting of Corporate Individual Components | Individual STIP awards are based on two components, individual and corporate. STIP award payouts are based on an employee's group and weighting category at year-end. <br><br> The following table outlines the weighting for corporate and individual performance for the various management levels in the organization: <br><br> **LEVEL**     **CORPORATE**     **INDIVIDUAL** <br> Level A to F     75%     25% <br> Level 1     60%     40% <br> Level 2 to 6     50%     50% |
| Assessing PMP Objectives | The individual component of STIP awards is tied directly to the individual's PMP objectives established under the Performance Management Program (PMP).  A PMP rating (from Unsatisfactory to Outstanding) will be assigned to each of the individual's PMP objectives. |

Employee Policy Manual                                    Effective with the 2021 Plan Year

Confidential                                                                                    CP_03232



**Policy 3411**
Short Term Incentive Plan

The performance ratings are determined on the basis of three dimensions:

1. achievement of objectives against the standards and measures established for each objective;
2. context of performance throughout the year; and
3. peer clustering of employees into a distribution profile established by the Company.

The context of performance dimension considers the "how" of the achievement and adds a necessary judgmental component to the assessment process. The demonstration of company values must be considered.

Taking the three dimensions into account, through the calibration process, an overall PMP rating and an overall STIP attainment level, based on the scales below, are determined for the employee's individual performance component.

| Overall PMP Rating | Overall STIP Attainment Level |
|---|---|
| Outstanding | 170% - 200% |
| Exceeds | 125% - 165% |
| Achieved | 90% - 120% |
| Partially Achieved | 0% - 85% |
| Unsatisfactory | 0% |

**Potential Corporate Payout Levels**

Annually, the Committee establishes the performance criteria, the weighting assigned to each performance criterion and corporate performance target levels for the STIP Program.

Each corporate performance criterion will have three levels of performance and payout.

a) Exceptional Level - 200% of Target Award Level assigned to the corporate component where the actual CP performance meets or exceeds the exceptional level established by the Committee;

b) Target Level - 100% of Target Award Level assigned to the corporate component where the actual CP performance meets the target level established by the Committee;

Employee Policy Manual                                    Effective with the 2021 Plan Year

[APG]

Confidential                                                                                CP_03233



**Policy 3411**
Short Term Incentive Plan

|  |  |
|---|---|
|  | c) <u>Threshold Level</u> - 50% of Target Award Level assigned to the corporate component when the actual CP performance level for the Plan Year is at the threshold level established by the Committee; and<br><br>Where the actual CP performance falls between the threshold and exceptional levels, the payout level will be prorated.<br><br>Where the actual CP performance falls below the threshold level, no awards will be paid under the corporate component. |
| Corporate Hurdle | For each Plan Year, the Committee establishes a minimum level of corporate performance, below the threshold level, called the corporate hurdle.  If the Company's performance falls below this hurdle, no awards will be paid under the individual or corporate components. |
| Individual Hurdle | If individual performance levels are unsatisfactory, no award will be paid to the individual under the corporate or individual components. |
| CP Net Loss | The Committee has the discretion to adjust the amount of awards so that payment of awards under the Plan does not result in a net loss for CP.  No awards will be paid if CP has a net loss for the Plan Year. |
| Calculation of Awards | Awards are calculated by performing the following calculation:<br><br>Target Award Level multiplied by the weighting for the individual component, multiplied by the annual salary in effect at the end of the Plan Year, multiplied by the STIP attainment level<br><br>**added to**<br><br>the Target Award Level, multiplied by the weighting for the corporate component, multiplied by the annual salary in effect at the end of the Plan Year, multiplied by the weighting of the performance measure, multiplied by the payout level.  This calculation is repeated for each of the Company's performance measures.<br><br>For sample STIP calculations, see Appendix 1. |
| Payment of Awards | Awards to be paid out in any Plan Year, will be paid as soon as possible after CP financial results are determined, the Committee has approved a payout, and the participants' performance has been assessed under PMP. |
| Joining Plan Before October 1st | New entrants prior to October 1 of the plan year will have their award for that year prorated based on the length of time they have been a member of the Plan. |

Employee Policy Manual                                 Effective with the 2021 Plan Year

[APG]

Confidential                                                                                                    CP_03234



**Policy 3411**
Short Term Incentive Plan

| | |
|---|---|
| Leaving the Plan Before April 1st | Employees who cease participation in the Plan prior to April 1 of the Plan Year will not be eligible for any STIP Award for the Plan Year. |
| Leaves of Absence | Leaves of absence (LOA) are those periods when an employee is not actively at work i.e. short or long term disability, personal, maternity, parental, educational leaves. Participants who take a leave of absence greater than 30 consecutive days (22 working days) during the year will have their award prorated based on the length of time in active service during the year.<br><br>Potential STIP Awards will be held for participants who take a   personal (non-medical or educational) leave of absence. Eligibility for STIP will be determined at the end of the LOA. If the participant decides not to return it will be considered a voluntary resignation and the participant will not be eligible for a STIP Award. The payment of any STIP Award will only occur when the participant returns from the LOA. |
| Transfers | Participants transferring on or after April 1st of the Plan Year to a position to which this plan does not apply will have their award prorated based on the length of time in the eligible position. |
| Termination without Cause | Participants whose employment is terminated by the Company without cause on or after April 1st of the Plan Year will continue to participate in the Plan until their last day actively at work.  If all program conditions are met, (i.e. Company performance and individual performance warrants a payout), they will receive a prorated award based on the length of time they participated in the plan during the year. |
| Retirements | Employees that retire on or after April 1 of the plan year without a severance payment are eligible for a prorated STIP award provided:<br><br>• he/she provided Retirement Notice in accordance with Retirement Policy 8101; and<br>• retirees are between 55 and less than 60 years of age with a minimum of 5 years of company service from the last date of hire or if retiring at age 60 or greater, must have a minimum of 2 years of company service from their last date of hire. |
| Termination for Cause | Employees who are terminated for cause during the year will not receive an award for the year in which their employment ended. They will also |

Employee Policy Manual

[APG]

Effective with the 2021 Plan Year

Confidential

CP_03235



**Policy 3411**
Short Term Incentive Plan

|  |  |
|---|---|
|  | not be eligible to receive any award not yet paid at the time of their termination for cause. |
|  |  |
| Resignation | Employees who resign prior to the STIP payout date will not be eligible for an award for the previous or current plan year. |
|  |  |
| Death | Employees who are deceased after April 1st of the Plan Year, if all program conditions are met, a prorated award based on the length of their membership in the Plan during the year will be paid to the employee's estate. |
| **Administration** |  |
| Setting PMP Objectives | The STIP cycle begins with the establishment of PMP Objectives.  In discussion with their manager and/or team leader, participants are responsible for the development of their PMP objectives and assigning weightings. |
|  |  |
| Assigning Weights | PMP objectives are weighted according to their relative importance.  The total value of all PMP objectives must equal 100%. |
|  |  |
| Reporting Results | By the end of January, annually, managers should have STIP attainment levels reported to Human Resources for the previous Plan Year. |
|  |  |
| **Additional Information** | For additional information, please contact your HR Business Partner or Employee Services by e-mail at Employee_Services@cpr.ca, by phone in Calgary at (403) 319-3900 or toll free at 1 (866) 319-3900. |
|  |  |
| **Cross Reference** | Policy 5611 - Performance Management Program Policy 8503 - Compensation & Benefits for Unionized Employees who Temporarily Assume Non-Unionized Positions Policy 8101 - Retirement Policy |
|  | (U.S. only disclaimer: This policy statement represents the current policy and practice of CP regarding the Short Term Incentive Plan for non-unionized employees and may be changed from time to time by CP without notice.  Nothing in this policy is intended to create any contract, agreement or other obligation by CP with any of its employees.) |

Employee Policy Manual

[APG]

Effective with the 2021 Plan Year

Confidential

CP_03236

CP Appendix - 280



**Policy 3411**
Short Term Incentive Plan

### APPENDIX 1 - Sample STIP Calculations

| Level 5 with annual salary of $65,000, PMP rating of Achieves at 100% | | | | |
|---|---|---|---|---|
| Target Award Level | Individual Component | Annual Salary | PMP Rating % | Individual Component Award |
| 10% | 50% | $65,000 | 100% | $3250 |
| **Added to** | | | | |
| Target Award Level | Corporate Component | Annual Salary | Corporate Component % | Corporate Component Award |
| 10% | 50% | $65,000 | 100% (at target) | $3,250 |
| **STIP Award total** | | | | $6,500 |

| Level 4 with annual salary of $85,000, PMP rating of Exceeds at 125% | | | | |
|---|---|---|---|---|
| Target Award Level | Individual Component | Annual Salary | PMP Rating % | Individual Component Award |
| 15% | 50% | $85,000 | 125% | $7,969 |
| **Added to** | | | | |
| Target Award Level | Corporate Component | Annual Salary | Corporate Component % | Corporate Component Award |
| 15% | 50% | $85,000 | 50% (Threshold) | $3,188 |
| **STIP Award total** | | | | $11,157 |

| Level 3 with annual salary of $105,000, PMP rating of Achieves at 110% | | | | |
|---|---|---|---|---|
| Target Award Level | Individual Component | Annual Salary | PMP Rating % | Individual Component Award |
| 17.5% | 50% | $105,000 | 110% | $10,106 |
| **Added to** | | | | |
| Target Award Level | Corporate Component | Annual Salary | Corporate Component % | Corporate Component Award |
| 17.5% | 50% | $105,000 | 0% (Below Threshold) | $0 |
| **STIP Award total** | | | | $10,106 |

Employee Policy Manual

[APG]

Effective with the 2021 Plan Year

Confidential

CP_03237

CP Appendix - 281

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION

- - - - - - - - - - - - - - - - - - - - - - -

No. 3:23-CV-00031-HCA

John Sexton,

                    Plaintiff,

vs.

Dakota, Minnesota & Eastern Railroad
Corporation d/b/a Canadian Pacific,
a Delaware corporation,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF

DYLAN SMITH

May 29, 2024

10:00 a.m.

TAKEN BY: BRENDA K. FOSS
fossbrenda@yahoo.com
612-701-4282

---

2

Deposition of DYLAN SMITH, taken
via Zoom videoconference, by and on behalf of
Plaintiff, on Wednesday, May 29, 2024,
commencing at 10:00 a.m., before Brenda K. Foss,
Professional Court Reporter, Notary Public,
State of Minnesota, County of Hennepin.

                *    *    *    *    *

APPEARANCES

ON BEHALF OF THE PLAINTIFF:
    CYLE CRAMER, ESQUIRE
    KELEENAH YANG, PARALEGAL
    YAEGER & JUNGBAUER BARRISTERS, PLC
    4601 Weston Woods Way
    St. Paul, MN  55127
    ccramer@yjblaw.com
    651-288-9500

ON BEHALF OF THE DEFENDANTS:
    BRIANA AL TAQATQA, ESQUIRE
    DORSEY & WHITNEY LLP
    50 South 6th Street, Suite 1500
    Minneapolis, MN  55402
    altaqatqa.briana@dorsey.com
    612-340-2600

ON BEHALF OF THE WITNESS DYLAN SMITH:
    RYAN FURNISS, ESQUIRE
    7750 Clayton Road, Suite 102
    St. Louis, MO  63117
    rfurniss@furnisslaw.com
    314-899-9101

ALSO PRESENT:
    Michelle Haynes, CPKC Paralegal

---

3

I N D E X

Examination:                    PAGE:
By Mr. Cramer        4
By Ms. Al Taqatqa       54

Objections:
By Ms. Al Taqatqa        15, 19, 23,
25, 27, 30, 32, 36, 37, 39, 41, 50, 53

Marked Deposition Exhibits:
43 2-1-21 e-mail re Marquette 8
   sub delays, Bates 3285-87
44 Verizon call record     17
   Bates 3922-26
45 2-21 e-mail re discipline 33
   call doc, Bates 932
46 Discipline call document  33
   Bates 009
47 Discipline call documents 36
   Bates 933-940
48 Performance Mgmt Form      46
   Bates 3354-60
49 STIP, Bates 3239       49

Previously Marked Exhibits:
4  CP's Intimidation &      28
   Harassment Policy
9  Notice to attend        26
10 Investigation Transcript  27-30, 40
11 GCOR 5.3.7            39
35 Discipline e-mail        23
   Bates 981

Reporter's Certificate        56

(Original Deposition Transcript in the
possession of Cyle Cramer, Esquire).

                *    *    *    *    *

---

4

P R O C E E D I N G S

DYLAN SMITH,

after having been first duly sworn,

deposes and says under oath as follows:

E X A M I N A T I O N

BY MR. CRAMER:

Q    Just for the record I have Keleenah Yang, my
legal assistant, running my exhibits in the
room with me.  Otherwise I'm ready to go.
Can you please state your first and last name
and spell your last name, please?

A    Dylan Smith, S-M-I-T-H.

Q    Can you please state your address?

A    ███████████████████████

Q    Where are you located right now?

A    In my home.

Q    Have you ever had your deposition taken in
the past?

A    No.

Q    Then just a couple preliminary things here.
Please answer every question verbally.  Don't
shake or nod your head.  Say yes or no versus
nope or huh-uh for example.  Do you understand?

1  Q  What do you mean by that last part of that?
2  A  It's going to take some explanation here so
3     bear with me. I had put quite a bit of work
4     in planning the meets for 474 after the delay
5     on the Marquette subdivision. We were trying
6     to hit some timelines. And that train got
7     delayed in Davenport as a result of a failed
8     efficiency test. So it was offsetting those
9     meets. And as I was drilling down into what
10    was going on, that's when I learned what the
11    efficiency test letter was and started
12    planning how we were going to recover or what
13    the next steps were.
14 Q  So who actually told you about the E test at
15    first?
16 A  Like I said before, I don't remember who the
17    assistant trainmaster was. I recall being in
18    the assistant trainmaster's office, but there
19    could have been additional people there. I
20    just remember that and then drilling into it
21    right away finding out what was going on.
22 Q  Did you hear the shoving movement
23    communications over the radio?
24 A  No. That radio was always set on scan so
25    there's several people talking at once. I

1     wouldn't have heard it.
2  Q  Did you witness the shoving movement?
3  A  No.
4  Q  You recommended that Mr. Sexton should be
5     disciplined. Correct?
6  A  Correct.
7  Q  You relied on Mr. Jared's statement to
8     conclude Mr. Sexton should be disciplined.
9     Correct?
10 A  Not only Mr. Jared's statements.
11 Q  But it included Mr. Jared's statements?
12 A  It did but that was only a small piece of how
13    you assess this.
14 Q  Mr. Jared stated that Mr. Sexton violated the
15    shoving movement rule in the investigation.
16    Correct?
17 A  Correct, yeah.
18 Q  And Mr. Sexton disagreed that he violated the
19    rule. Correct?
20 A  I don't recall in the hearing. But on the
21    day of, he took responsibility for the
22    decision to shove passed that violated the
23    rule.
24 Q  So you choose to believe Mr. Jared's statements?
25 A  No. That's not what I said either. I was

1     there when John and Mr. DePover were brought
2     in to the office, and I had a conversation
3     alongside of Jared with the employees about
4     the rule violation.
5  Q  You recommended Mr. Sexton be disciplined
6     with a 10 day served suspension and 10 days
7     deferred. Correct?
8  A  I don't recall what I recommended.
9  Q  This was a prior exhibit. Can we bring up
10    the discipline e-mail? I think it was 35.
11    Scroll down. Go up a little bit more. On
12    Exhibit 35 labeled CP 981, is this the
13    discipline that you recommended for
14    Mr. Sexton?
15       MS. AL TAQATQA: Objection. The
16    witness hasn't had an opportunity to review
17    the entire document.
18       MR. CRAMER: You can take your
19    time to review it.
20 A  Can you scroll down to the bottom? (Witness
21    examining document). Is that the bottom?
22    Keep going. Start with whatever Mark Johnson
23    typed. Can you scroll down to the bottom?
24    That's good right there. Can you scroll up?
25    I'm done with whatever Mr. Johnson typed.

1     Okay. What was the question?
2  Q  (By Mr. Cramer, continuing) You recommended
3     Mr. Sexton be disciplined with a 10 day
4     served suspension and 10 days served?
5  A  Did you mean 10 day served, 10 day deferred?
6  Q  Yeah. I'll restate it. You recommended
7     Mr. Sexton be disciplined with a 10 day
8     served suspension and 10 days deferred. Correct?
9  A  Correct.
10 Q  Does Mr. Sexton get paid for a 10 day
11    deferred suspension?
12 A  Are you asking for clarification on what 10
13    served and 10 deferred means?
14 Q  Sure. To your understanding, what is a 10
15    day deferred suspension?
16 A  A 10 days deferred would mean if -- I don't
17    have the discipline policy in front of me and
18    I haven't seen it for quite some time. But
19    10 days deferred would mean if he was in
20    trouble and had consequences applied in the
21    form of discipline, then he would serve those
22    10 days that were deferred. I forgot the
23    timeline. So within X amount of time if he
24    was in trouble again violating a rule or
25    whatever it may be. So, yes, he would get

25

**1**     **paid during those 10 days deferred if he was**
**2**     **working.**
**3**  **Q**  But if he had another rule violation, then
**4**     those 10 days deferred would become 10 day
**5**     served. Correct?
**6**  **A**  **Correct, he would have to serve those.**
**7**  **Q**  Why did you recommend 10 days served and 10
**8**     days deferred?
**9**  **A**  **I don't know on this one. I see where I**
**10**     **write it. It wasn't uncommon for me to do**
**11**     **that for first majors. It was at the**
**12**     **discretion of the carrier, the discipline**
**13**     **policy rep.**
**14**           MR. CRAMER: Why don't we take a
**15**     10 minute break? I think just for everybody,
**16**     I think I'm about halfway through. So
**17**     there's probably another hour-and-a-half or
**18**     so after this maybe.
**19**           (Brief recess).
**20**  **Q**  (By Mr. Cramer, continuing) Let's go back on
**21**     the record. Mr. Smith, you received a notice
**22**     to attend a disciplinary investigation as a
**23**     company witness. Correct?
**24**           MS. AL TAQATQA: Objection, form.
**25**  **A**  **I don't know. You're going to have to be a**

26

**1**     **little more specific than that.**
**2**  **Q**  (By Mr. Cramer, continuing) Specifically for
**3**     Mr. Sexton's disciplinary investigation in
**4**     February of 2021, did you receive a notice to
**5**     attend as a company witness?
**6**  **A**  **I don't recall if I did or not.**
**7**  **Q**  Can we bring up Exhibit 9?
**8**  **A**  **I see it's got my name on it, yes.**
**9**           MS. AL TAQATQA: Can you scroll
**10**     down so we can see the whole document?
**11**  **A**  **(Witness examining document).**
**12**  **Q**  (By Mr. Cramer, continuing) You did not
**13**     attend the investigation though. Correct?
**14**  **A**  **No, I didn't.**
**15**  **Q**  But you reviewed the investigation transcript?
**16**  **A**  **Yes.**
**17**  **Q**  And the investigation exhibits?
**18**  **A**  **Yes.**
**19**  **Q**  There's a video of the shoving movement made
**20**     as an exhibit. Correct?
**21**  **A**  **I don't recall.**
**22**  **Q**  Do you recall a video being discussed in the
**23**     investigation transcript?
**24**  **A**  **No.**
**25**  **Q**  You were with Mr. Jared when Mr. DePover made

27

**1**     a written statement regarding the shoving
**2**     movement. Correct?
**3**  **A**  **We were in the trainmaster's office when both**
**4**     **employees were brought into the office.**
**5**  **Q**  When you say both employees, do you mean
**6**     Justin DePover and John Sexton?
**7**  **A**  **Yes.**
**8**  **Q**  Mr. DePover made a written statement. Correct?
**9**  **A**  **Yes.**
**10**  **Q**  Mr. DePover stated in the investigation that
**11**     he was compelled to give a written statement.
**12**     Correct?
**13**           MS. AL TAQATQA: Objection, form,
**14**     lack of foundation.
**15**  **A**  **It's not what you'd call compelled. It's a**
**16**     **role that you have to give statements**
**17**     **regarding incidents that happen.**
**18**  **Q**  (By Mr. Cramer, continuing) But do you recall
**19**     Mr. DePover stating in the investigation that
**20**     he was compelled to give a written statement?
**21**  **A**  **I don't recall the investigation. I wasn't**
**22**     **there. I don't recall it in the transcripts**
**23**     **either.**
**24**  **Q**  Can we bring up Exhibit 10 and go to page 69?
**25**     Let's scroll to the top of this page. We can

28

**1**     scroll all the way up to the top or look at
**2**     it. Is this the investigation transcript you
**3**     recall reviewing?
**4**  **A**  **What was the question again?**
**5**  **Q**  I'm just confirming that this is the
**6**     investigation exhibit you recall reviewing --
**7**     or the investigation transcript. Excuse me.
**8**  **A**  **It was a long time ago. I can only assume**
**9**     **this is it, but I can't be for certain.**
**10**  **Q**  On this page CP 69 on lines 10 through 11
**11**     Mr. DePover is expressing that he said he was
**12**     compelled?
**13**  **A**  **It says that, but it also says that he wrote**
**14**     **the statement which is required.**
**15**  **Q**  CP policy prohibits harassment. Correct?
**16**  **A**  **Absolutely, yes.**
**17**  **Q**  CP policy prohibits intimidation. Correct?
**18**  **A**  **Yep.**
**19**  **Q**  Can we go to Exhibit 4? Do you recognize
**20**     this to be CP's policy regarding intimidation
**21**     and harassment?
**22**  **A**  **It does look like it says Canadian Pacific US**
**23**     **Operations. Intimidation and harassment, I**
**24**     **see those words on there, yes.**
**25**  **Q**  Did you receive training when you worked at

33

**1** identification).

**2 Q** After you take a second to review this, does

**3** it look like a typical e-mail you'd receive

**4** regarding a discipline call?

**5 A Correct, yes.**

**6 Q** Can you repeat your answer?

**7 A Yes.**

**8 Q** Did you receive this e-mail?

**9 A I don't recall receiving it, but it was three**

**10 years ago.**

**11 Q** I believe it's all the way on the right kind

**12** of two-thirds down. It says Dylan Smith and

**13** then there's an e-mail address?

**14 A That's my name and that's my e-mail address.**

**15 Q** It looks like there is an attachment to this

**16** e-mail. Correct?

**17 A Correct, yes.**

**18 Q** Let's open up the 00009 Discipline Call

**19** Document.

**20**       MS. AL TAQATQA: Is this part of

**21** the same exhibit or is this a separate exhibit?

**22**       MR. CRAMER: This is going to be

**23** a separate one, so Exhibit 46.

**24**       (Deposition Exhibit 46 marked for

**25** identification).

34

**1**       MR. CRAMER: I can't recall.

**2** There might have been an earlier version of

**3** this one, but this was a duplicate kind of a

**4** higher quality. So I'm using this one.

**5**       MS. AL TAQATQA: So this was not

**6** the attachment that was produced with the

**7** cover e-mail you just showed?

**8**       MR. CRAMER: This document was

**9** produced multiple times. There was multiple

**10** versions of it. My understanding is that

**11** this is the attachment to the prior e-mail.

**12**       MS. AL TAQATQA: Well, typically

**13** the attachments are -- the attachments follow

**14** the Bates. So if the prior e-mail ended in

**15** Bates 932 or 33 or whatever it was, then the

**16** attachment would be the next number in the

**17** sequence.

**18**       MR. CRAMER: Yes. And that

**19** e-mail and the attachments were produced

**20** several times over. I'm presuming CP 09

**21** might be that e-mail.

**22**       MS. AL TAQATQA: Right. I hear

**23** you. There were some duplicates of the same

**24** e-mail and attachments, but there were also

**25** different versions of this e-mail with

35

**1** different versions of the attachment. So it

**2** doesn't look to me -- it's not obvious to me

**3** from looking at the documents -- and I don't

**4** know how we'd know -- that this version of

**5** the spreadsheet that's on the screen, CP 9,

**6** is the version of the spreadsheet that was

**7** attached to the cover e-mail that was CP 932.

**8**       MR. CRAMER: Let me briefly check

**9** something. If we want, we can take a five

**10** minute break and come back.

**11**       MS. AL TAQATQA: Yes, that would

**12** be good.

**13**       (Brief recess).

**14 Q** (By Mr. Cramer, continuing) We had been

**15** looking at Exhibit 45 if we want to bring

**16** that back up. Mr. Smith, I don't know if

**17** you're back. Thanks for everybody's

**18** patience. We can go back on the record. We

**19** were looking at this e-mail, and it says that

**20** there's an attachment. This e-mail is Bates

**21** number 932. So let's open up CP 933. Did I

**22** mark that other version as an exhibit?

**23**       MS. AL TAQATQA: So Exhibit 47

**24** starts with CP 933?

**25**       MR. CRAMER: Yes.

36

**1**       MS. AL TAQATQA: Which follows in

**2** sequence after what has been marked Exhibit

**3** 45 which starts with Bates number CP 932?

**4**       MR. CRAMER: Correct.

**5**       (Deposition Exhibit 47 marked for

**6** identification).

**7 Q** (By Mr. Cramer, continuing) Mr. Smith, does

**8** this look like the documents you'd receive as

**9** part of a discipline call?

**10 A Yes.**

**11 Q** Can we scroll down to -- this is a column

**12** towards the right where there's a significant

**13** amount of text in that column. Do you see

**14** where it says GRF02?

**15 A Yes.**

**16 Q** Do you know what that means?

**17 A It's an efficiency test code.**

**18 Q** Do you know for what efficiency test?

**19 A It's been awhile since I had one, but I can**

**20 only assume shove movements.**

**21 Q** Under the efficiency test manual in the

**22** operating rules when conducting test GRF02,

**23** actual operating conditions are to be

**24** observed. Correct?

**25**       MS. AL TAQATQA: Objection, foundation.



Redacted

Smith
Ex. 47

SOUTHERN & EASTERN REGION - February 18, 2021

EASTERN REGION

Southern Eastern Region - Discipline Call - Thursday, February 18th, 2021

CONFIDENTIAL - ATTORNEY/SOLICITOR CLIENT COMMUNICATION PREPARED AT THE DIRECTION OF COUNSEL



CP_00937

CP Appendix - 287



Southern Eastern Region - Discipline Call - Thursday, February 18th, 2021

Page 3 of 6

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION

– – – – – – – – – – – – – – – – – – – –
                    No. 3:23-CV-00031-HCA

John Sexton,

                    Plaintiff,

    vs.

Dakota, Minnesota & Eastern Railroad
Corporation d/b/a Canadian Pacific,
a Delaware corporation,

                    Defendants.

– – – – – – – – – – – – – – – – – – – –

DEPOSITION OF

THOMAS JARED

June 20, 2024

10:00 a.m.

TAKEN BY: BRENDA K. FOSS
fossbrenda@yahoo.com
612-701-4282

---

2

Deposition of THOMAS JARED, taken
at Dorsey & Whitney LLP, 50 South 6th Street,
Suite 1500, Minneapolis, Minnesota, by and on
behalf of Plaintiff, on Thursday, June 20,
2024, commencing at 10:00 a.m., before Brenda K.
Foss, Professional Court Reporter, Notary
Public, State of Minnesota, County of
Hennepin.

* * * * *

APPEARANCES

ON BEHALF OF THE PLAINTIFF:
    JOHN MAGNUSON, ESQUIRE
    CYLE CRAMER, ESQUIRE
    YAEGER & JUNGBAUER BARRISTERS, PLC
    4601 Weston Woods Way
    St. Paul, MN  55127
    jmagnuson@yjblaw.com
    ccramer@yjblaw.com
    651-288-9500

ON BEHALF OF THE DEFENDANTS:
    JACK SULLIVAN, ESQUIRE
    DORSEY & WHITNEY LLP
    50 South 6th Street, Suite 1500
    Minneapolis, MN  55402
    sullivan.jack@dorsey.com
    612-340-2600

* * * * *

---

3

I N D E X

Examination:                    PAGE:
By Mr. Magnuson          4

Marked Deposition Exhibits:
50 Sexton's Testing (2013+)    42
51 Jared's hotel receipt       96
52 Verizon records             98
53 Sexton's testing history    187
54 Jan 18, '21 e-mails with Tracy Miller
   et al, Bates CP1692, 1693   188
55 Short-Term Incentive data
   Bates CP 3243               189
56 Feb 9, '21 e-mail from Sexton et al
   Bates CP 3295 and 3296      191
57 Feb 1, '21 Top 15 Train Speeds
   CP 3303-3306                197
58 Feb 9, '21 e-mail from Sexton et al
   Bates 3322-3323             198
59 Jared's 2021 Performance Management Form
   Bates CP 3402-3408          203

Reporter's Certificate         206

(Original Deposition Transcript in the
possession of John Magnuson, Esquire).

                * * * * *

---

4

P R O C E E D I N G S

THOMAS JARED,

after having been first duly sworn,

deposes and says under oath as follows:

E X A M I N A T I O N

BY MR. MAGNUSON:

Q  Good morning, Mr. Jared.  Would you please
   state your full name spelling your last name
   for the record?

A  Thomas Dwight Jared, J-A-R-E-D.

Q  What is your home address?

A  ████████████████████████████████████████
   ██████

Q  Do you have a personal cell phone or a home
   phone number?

A  Yes.

Q  What is that?

A  I don't remember my personal.

Q  You don't remember your personal cell phone
   number?

A  No.

Q  We'll look it up and maybe get it on a break.
   The only reason I ask about the home address

21

1      trained on how to perform E tests?
2   **A   I don't know.**
3   **Q   You were trained obviously as a trainmaster?**
4   **A   I don't recall.**
5   **Q   Trainmasters are expected to know how to**
6      **perform E tests.  Right?**
7   **A   Correct.**
8   **Q   E tests are efficiency tests.  Right?**
9   **A   That is correct.**
10  **Q   That's how trainmasters go about making sure**
11     **that their crews are railroading efficiently**
12     **and safely.  Right?**
13  **A   Correct.**
14  **Q   You don't remember when you were trained on**
15     **it?**
16  **A   Correct.**
17  **Q   Are there rules that relate to how to conduct**
18     **E tests?**
19  **A   There is a manual for guidance.**
20  **Q   What is that called?**
21  **A   I don't know.**
22  **Q   When did you first read that manual?**
23  **A   I couldn't tell you.**
24  **Q   When was the last time you read it?**
25  **A   In its entirety?**

22

1   **Q   Or even referred to it, yes.**
2   **A   I reviewed one yesterday or last week.**
3   **Q   So it's a document that you refer to**
4      **frequently in your work?**
5   **A   I wouldn't say frequently.**
6   **Q   How much do you refer to it?**
7   **A   Maybe once a year.  Maybe once every couple**
8      **years.**
9   **Q   Are you tested on how to perform E tests?**
10  **A   Am I tested?**
11  **Q   Right.**
12  **A   No.**
13  **Q   Are trainmasters?**
14  **A   Tested on how they're --**
15  **Q   How to properly conduct an E test.**
16  **A   There's no specific test if that's what**
17     **you're asking.**
18  **Q   Are employees expected to follow the E test**
19     **procedures that you just referred to?**
20  **A   Employees?**
21  **Q   Yes, trainmasters, anybody conducting E tests,**
22     **are they expected to follow that document?**
23  **A   They're expected to have that document with**
24     **them and refer to it when they need to.**
25  **Q   And that applies to all people conducting E tests?**

23

1   **A   Correct.**
2   **Q   When you say have it with them, nowadays**
3      **you're not talking about a paper document?**
4      **It must be something on a computer or your**
5      **phone?**
6   **A   Well, I don't have a copy of it.**
7   **Q   When was the last time you had a copy of it?**
8   **A   I couldn't tell you.**
9   **Q   You don't know when you were trained**
10     **initially, but did someone train you on how**
11     **to conduct E tests?**
12  **A   I'm sure they did.**
13  **Q   How long ago?**
14  **A   2000.**
15  **Q   So 24 years ago?**
16  **A   Something like that.**
17  **Q   Do you train employees on how to conduct E**
18     **tests?**
19  **A   I have in the past.**
20  **Q   When was the last time you did that?**
21  **A   I don't know.**
22  **Q   Have the rules on how to conduct E tests**
23     **changed over the years?**
24  **A   I believe the manual changed over the years.**
25  **Q   And there are certain quotas that second line**

24

1      supervisors are expected to meet as they
2      relate to E testing.  Correct?
3         MR. SULLIVAN:  Objection, form,
4      lack of personal knowledge.
5   **A   Are you talking about a specific number or**
6      **what are you asking me?**
7   **Q   (By Mr. Magnuson, continuing) Yes.  You know**
8      **what a quota means?**
9   **A   Yes.**
10  **Q   There are rules that set certain quotas for**
11     **trainmasters.  Right?**
12  **A   There is a guideline that they have to**
13     **complete every month or actually every week**
14     **to every month, yep.**
15  **Q   And that would be a quota.  Right?**
16  **A   Okay.**
17  **Q   You agree with that?**
18  **A   Yes.**
19  **Q   That's a quota you have to meet?**
20  **A   Okay.**
21  **Q   Does the US West general manager have a quota**
22     **on E tests?**
23  **A   Now I do.**
24  **Q   You do.  When was that implemented?**
25  **A   This year.**

25

1  Q  In February of 2021 did you have a quota on
2     E testing?
3  A  No.
4  Q  Do you know why the change occurred?
5  A  I don't.
6  Q  How many tests do you currently have to
7     perform a month?
8  A  I perform four RCLS tests. I can't remember
9     the exact number of E tests I have to
10    perform.
11 Q  Do you look or have you looked in your career
12    at employee records? I'll use the example
13    for you of locomotive engineers. Can you
14    look at like their E testing history and
15    their testing history and be able to determine,
16    boy, this guy is not a good engineer?
17                MR. SULLIVAN: Objection, form.
18 A  I have the ability to review employee records.
19 Q  (By Mr. Magnuson, continuing) Yeah. And when
20    you review those, can you, given your
21    experience, look at those and make a
22    determination off the top of your head this
23    guy is a good engineer or this guy is a bad
24    engineer?
25                MR. SULLIVAN: Objection, form.

26

1  A  No.
2  Q  (By Mr. Magnuson, continuing) There's not
3     some level of failures that would cause an
4     alarm to you if you were to look at someone's
5     five, six year history of E tests you would
6     say, boy, this guy has got some problems?
7                MR. SULLIVAN: Objection, form.
8  A  Your original question was to determine
9     whether or not they're a good engineer or
10    not. I don't think that's what you're really
11    asking, is it?
12 Q  (By Mr. Magnuson, continuing) You said you
13    can access E testing records. If you look at
14    an employees's E testing history, if someone
15    has a lot of failures would you be able to
16    look at that record and say this guy is not a
17    good engineer?
18 A  That doesn't determine whether or not they
19    are a good engineer.
20 Q  But can it influence your opinion as to
21    whether or not someone is a good engineer?
22 A  No.
23 Q  Conversely if someone has a really
24    exceptionally good E testing history, can you
25    look at that and say I think that guy, at

27

1     least from what this document says, appears
2     to be a good engineer?
3  A  No.
4  Q  Because you want to take the whole holistic
5     organic approach where you look at how they
6     operate?
7  A  Correct.
8  Q  What is the purpose of keeping a document of
9     an employee's E test history?
10                MR. SULLIVAN: Objection, form,
11    lack of personal knowledge.
12 A  From my perspective?
13 Q  (By Mr. Magnuson, continuing) Right.
14 A  My perspective is that it's a purpose. I can
15    determine how they're doing with rules
16    compliance and other knowledge of the rules.
17 Q  So knowledge of the rules and rules compliance
18    would suggest how someone is performing as an
19    engineer. Right?
20 A  No.
21 Q  Then why keep track of it?
22 A  As I stated earlier, it's about rules
23    compliance and their knowledge of the rules.
24 Q  And that's to make sure they're doing their
25    job properly. Right?

28

1  A  Part of their job.
2  Q  So that would be some evidence as to whether
3     or not an employee is performing good or
4     poorly. Right?
5  A  As it relates to rules compliance.
6  Q  And rules compliance is to make sure that
7     you're doing the job efficiently and safely.
8     Right?
9  A  As it relates to the rules.
10 Q  And the rules are important?
11 A  Correct.
12 Q  And the rules are there to make sure that
13    things run efficiently and safely. Right?
14 A  That's part of it.
15 Q  What is the other part?
16 A  Safely and efficiently. I think you did say
17    that, didn't you?
18 Q  I did.
19 A  You're correct. That's right.
20 Q  Do you remember what rule you looked at in
21    the E testing manual last year?
22 A  Last year? No.
23 Q  Or whenever the last time you looked at it.
24    You said maybe it was last week, last month?
25 A  I think I looked at it yesterday.

49

1  Q  The next page, 26, one-third down the page,
2      9/30/13, Dean Porter conducted a GRF02.
3      Correct?
4  A  I missed that. What page?
5  Q  26.
6  A  Correct.
7  Q  And he passed?
8  A  Correct.
9  Q  Next page 27, three or four lines down,
10     3/6/13, do you see that, Shawn Jefford
11     conducted a GRF02, shoving or pushing.
12     Correct?
13 A  That is correct.
14 Q  And he passed that one as well?
15 A  Yes.
16 Q  So with respect to the GRF02s that we just
17     went through, every one of them was a pass.
18     Correct?
19 A  The ones that you went through, that's
20     correct.
21 Q  So I can represent to you that this is
22     approximately 22 GRF02 tests that we just
23     went through and he passed all those. Right?
24 A  I have not counted them.
25 Q  Sounds accurate or fair? It's close? Have

50

1      you or were you as railroaders encouraged to
2      put more comments in these somewhere around
3      the time of 2/8/17 or somewhere in the early
4      2017 area?
5  A  I don't know.
6  Q  In looking through these, if I can direct
7      your attention to page 13.
8  A  Okay.
9  Q  You'd agree with me that prior to 2/8/17
10     there are very few comments in the comments
11     section?
12 A  Correct.
13 Q  Do you know why that is?
14 A  I do not.
15 Q  And after early '17 there's almost always --
16     I shouldn't even say that. The comments show
17     up far more frequently after early 2017 in
18     this document. Right?
19 A  Correct.
20 Q  Let's look at the first page. About halfway
21     down we have your E test of Mr. Sexton on
22     February 1, 2021. Right?
23 A  That's correct.
24 Q  And you indicated a test code of GRF02,
25     shoving or pushing movements. Right?

51

1  A  That's correct.
2  Q  And in the comments you said "While
3      performing set up test". Right?
4  A  Correct.
5  Q  In going through this document -- you can
6      take time to look at it -- tell me how many
7      times, at least in terms of the comment
8      section, a set up test was given to
9      Mr. Sexton.
10        MR. SULLIVAN: Objection, the
11     document speaks for itself.
12 A  Do you want me to go through each one?
13 Q  Yep.
14 A  Are you asking for every test or just the
15     GRF02 test?
16 Q  Both.
17 A  (Witness examining document). Can I have
18     something I can take notes with? Or just
19     remember what I'm looking for? There's
20     5/10/2018, that's a display yellow flag.
21     That's a set up test.
22 Q  Which page?
23 A  Page 11.
24 Q  What date?
25 A  5/10/2018 at 15:12, John Stoffer, GRB15.

52

1      (Witness examining document).
2  Q  From 1/24/13 up until 7/10/21 Mr. Sexton was
3      given two set up tests. Is that right?
4        MR. SULLIVAN: Objection,
5      misstates the document and evidence that's
6      not in the record.
7  Q  (By Mr. Magnuson, continuing) As far as this
8      document is concerned and you just had a
9      chance to review it, in that time frame
10     7/10/21 to 1/24/13 he's been given according
11     to this document two set up tests. Right?
12 A  What was written and what the test performs,
13     that's what that shows but you have multiple
14     no comments or descriptions. I can tell you
15     which ones were set up or not. We have a
16     yellow flag right here that he passed. That
17     could have been a set up test. That's on
18     page 23, 3/19/2024 (sic).
19 Q  What page?
20 A  Page 23. There's actually two of those on
21     there with Bret Spranger, yellow flag. That
22     could have been set up tests. There's two
23     just on that page.
24 Q  Right.
25 A  Do you want me to review the document and

57

1    lines with the previous document, the testing
2    results. Why don't we go 15 minutes.
3  Q   (By Mr. Magnuson, continuing) Sir, you've got --
4        THE WITNESS: Oh, I thought you
5    meant we were going to take 15 minutes.
6        MR. MAGNUSON: No. I meant we're
7    going to go for 15 minutes and then we'll
8    take a break.
9        MR. SULLIVAN: We're going to
10   take a 15 minute break. The witness has
11   asked for one. We're going to take one.
12   There's no rule that says we can't take a
13   break.
14       MR. MAGNUSON: Counsel is
15   grabbing his computer.
16       MR. SULLIVAN: That's fine. I'm
17   grabbing my computer. I'm taking my legal
18   pad. I have a glass in front of me. There's
19   lots of things happening. We're going to
20   take a 15 minute break. See you in 15 minutes.
21       (Brief recess).
22       MR. SULLIVAN: Can we take a
23   moment to note appearances?
24       MS. REPORTER: Sure.
25       MR. SULLIVAN: Thank you. Jack

58

1    Sullivan on behalf of the defendant and
2    inhouse counsel Noah Garcia for Canadian
3    Pacific Kansas City Railroad is monitoring
4    the deposition through Zoom as he has in
5    other depositions in this case.
6        MR. MAGNUSON: Has Mr. Garcia
7    been present by Zoom the entire time?
8        MR. SULLIVAN: Yes.
9        MR. MAGNUSON: This entire
10   deposition?
11       MR. SULLIVAN: Yes. And if we
12   noted appearances on the record at the
13   beginning of the deposition, that would have
14   been clear to everyone. Mr. Cyle Cramer is
15   here as well in addition to Mr. Magnuson
16   obviously.
17  Q   (By Mr. Magnuson, continuing) Was that about
18   a 10 minute break?
19  A   About 15.
20  Q   So we took a 15 minute break. Counsel for
21   the railroad here, Mr. Sullivan, brought his
22   computer with him on the break and I know you
23   two were in a conference room down the hall.
24   What did you review, if anything, in terms of
25   documents during our break?

59

1  A   Nothing.
2  Q   He didn't show you his computer?
3  A   No.
4  Q   In front of you is Exhibit 39. Can you
5    identify that?
6  A   It says, CPUS Efficiency Testing Manual on
7    Operating Rules in Compliance with FRA 217.9.
8  Q   What is this document? What does it do?
9    What does it govern?
10  A   Do you mind if I take a minute to review it?
11  Q   No.
12  A   (Witness examining document). This
13   efficiency test manual was published on
14   November 1st, 2014. It talks about the
15   tests -- the groups that each test is put
16   into. It talks about what the document is
17   attempting to show as related to FRA 217. It
18   talks about qualifications. It talks about
19   programs. It goes through conduct -- testing
20   conduct and numerous other parts of testing.
21   It goes into detail about each group of
22   tests. Then it goes into specifics about the
23   tests and some things you do for -- whether
24   setting up tests on some of them, how those
25   should be performed. It gives some examples

60

1    of failures. It looks like that's what most
2    of it is. That's for the most part what it
3    is.
4  Q   To the extent you know, is this document
5    produced in conjunction with the FRA or
6    pursuant to some directive in 217.9?
7  A   I don't know.
8  Q   We were talking about some rules a little bit
9    earlier. You may want to fold over some
10   pages. I direct your attention first to page
11   17 of that document.
12  A   Of November 14, 2014?
13  Q   Yes. Let me ask you this. Was this the E
14   test manual that was in effect on February
15   1st, 2021?
16  A   I don't know.
17  Q   You mentioned earlier that employees who give
18   E tests are required to have these rules with
19   them. Right?
20  A   No, I don't think I said that.
21  Q   What was it you said in terms of these
22   rules -- I think you said that employees were
23   required to have them.
24       MR. SULLIVAN: Objection,
25   misstates the witness' testimony.

65

1    towards that rule and it can be done safely.
2  Q  And that was kind of part of my next
3     question. Part of the purpose of these three
4     paragraphs is to make sure that the set up
5     test is done in a safe manner. Correct?
6  A  **Correct.**
7  Q  Because changing conditions of a set up test
8     can in certain circumstances be dangerous.
9     Correct?
10  A  **If it's not done correctly.**
11  Q  So that's correct?
12  A  **Correct, if it's not done correctly you could.**
13  Q  Which is why you want to follow the guideline
14     set up in these three paragraphs. Right?
15  A  **Specific to the Form B and a redboard, that's**
16     **correct.**
17  Q  Give us an example for the jury of how this
18     rule, this under a set up test, would be
19     conducted.
20  A  **First I would understand the location I'm at.**
21     **I would understand what limits I would like**
22     **to perform it under. I'd like to understand**
23     **where I'd be placing my boards and what**
24     **boards I will actually be setting up. I will**
25     **talk to the dispatcher and let them know I'm**

66

1     **out here and I will be performing those tests.**
2     I will make sure that I understand what is
3     happening with the employee's bulletins. I
4     will position myself in a location to where I
5     have clear observation of the rule to be
6     observed.
7  Q  And you understand that Mr. Sexton here was
8     charged with violating 5.3.7, right, in this
9     case?
10  A  **Is that what it is? I have to look at that.**
11  Q  That's what you charged him with. Right?
12  A  **If I -- I have to --**
13  Q  We will go through the investigation
14     transcript. If you don't remember the rule
15     after reviewing the documents and meeting
16     with counsel, we'll go through it.
17  A  **Okay.**
18  Q  So you can't remember the rule you charged
19     him with violating as you sit here right now?
20  A  **It's either 5.3.7 or 5.3.6. There's a lot of**
21     **rules in that rule book.**
22  Q  And you know those rules. Right?
23            MR. SULLIVAN: Objection,
24     argumentative. The witness said he doesn't
25     remember the specific rule.

67

1  Q  (By Mr. Magnuson, continuing) But you know
2     the rules in general?
3  A  **In general I know the rules.**
4  Q  Given your position, yeah.
5            MR. SULLIVAN: Let the record
6     reflect that Mr. Magnuson's voice was
7     sarcastic, yeah, given your position,
8     argumentative.
9            MR. MAGNUSON: Sarcastic?
10  Q  (By Mr. Magnuson, continuing) So GRA03 here,
11     Display of a Red Flag, doesn't reference
12     5.3.7, does it?
13  A  **No.**
14  Q  The three paragraphs under Preparation for a
15     set up test, are those three paragraphs
16     required under this rule?
17  A  **I don't understand what the question is.**
18  Q  When conducting an E test in accordance with
19     GRA03, are the three paragraphs under set up
20     test, are those required to be followed?
21  A  **Those three items are references that you**
22     **need to think through as you're performing a**
23     **test, but I already mentioned I would contact**
24     **the dispatcher as well and let them know I'm**
25     **out there performing a test.**

68

1            **In this particular case -- so I**
2     **didn't actually see that in a procedure set**
3     **up, so there's this and there could be more**
4     **and there could be other things that you're**
5     **not having to do.**
6  Q  If a trainmaster under your supervision
7     conducted an E test pursuant to GRA03 and
8     didn't follow these three paragraphs under
9     set up test, would that be in violation of
10     the rules?
11  A  **This isn't a rule. This book is a guide to**
12     **the efficiency test manual. These are not**
13     **rules.**
14  Q  So people don't -- this is just a guideline?
15  A  **On how to perform a test. This is not a**
16     **rule. The GCOR are rules. This is not a**
17     **rule.**
18  Q  The GCOR doesn't have rules for management in
19     how they conduct their E tests. Right?
20  A  **This is not a rule.**
21  Q  But the GCOR doesn't include instructions for
22     management level employees as to how they
23     conduct E tests. Correct?
24  A  **No. This is a guideline for --**
25  Q  You're missing my question. The GCOR. You

69

1   know the GCOR?
2  A  Yes.
3  Q  You've been looking at the GCOR for 30 years
4     now?
5  A  Correct.
6  Q  Does the GCOR contain rules for management as
7     to how to conduct E tests?
8  A  No.
9  Q  Thank you. So you don't consider Exhibit 39
10    to be a rule book?
11 A  No.
12 Q  But you'd agree that it says Test Manual on
13    Operating Rules. Correct?
14 A  Correct.
15 Q  And the word rule was in there?
16 A  **Yes, but it's operating rules. These were**
17    **not operating rules. GCOR is operating rules.**
18 Q  These -- correct me if I'm wrong -- you're
19    saying are just guidelines and they are not
20    required to be followed?
21 A  **There are some that you should be following**
22    **and there are some you don't need to follow**
23    **depending how you're setting up a test.**
24 Q  We will go back to my question. If you -- do
25    you observe trainmasters or have you ever

70

1     observed trainmasters conducting E tests?
2  A  Yes.
3  Q  If you observed trainmasters not following
4     the rules in this document, what would you
5     do?
6  A  **If I found they're not following the**
7     **guidelines in this document?**
8  Q  Right.
9  A  **We'd have a sit-down and we'd go through**
10    **expectations and the procedures to follow**
11    **whatever tests they're performing.**
12 Q  Would you consider this document a policy?
13 A  **I don't know.**
14 Q  You know what a policy means?
15 A  **Yeah, but I find it to be a manual for**
16    **reviewing E test procedures related to the**
17    **General Code of Operating Rules.**
18 Q  Would you consider a manual to be a policy?
19 A  **No.**
20 Q  I think you've mentioned earlier that part of
21    these three paragraphs under the set up test
22    are so that the set up test can be conducted
23    safely. Correct?
24 A  **Part of it is. And there could be more to**
25    **this or less depending on the test being**

71

1     performed and location.
2  Q  You said earlier that changing conditions on
3     employees if not done right can be dangerous?
4  A  **It could be a concern, yes.**
5  Q  So next we'll go to page 41. Do you see that
6     page?
7  A  Yes.
8  Q  That one says the test is for GRB15 Display
9     of a Yellow Flag. Do you see that?
10 A  Yes.
11 Q  And the rules tested there are GCOR 5.4.3,
12    15.2 and 15.4. Correct?
13 A  Correct.
14 Q  Is 5.3.7 referenced there in the rules
15    tested?
16 A  No.
17 Q  And under Test Conditions this one also
18    states, "When conducting this test you may
19    observe existing operating conditions, or it
20    may be set up." That's what it says. Right?
21 A  **That is correct.**
22 Q  And then under Procedure there are two
23    separate paragraphs. The first is when test
24    conditions are observed and the second is
25    when test conditions are set up. Correct?

72

1  A  **Correct.**
2  Q  And similarly to our last rule, part of the
3     reason for the seven guidelines under the set
4     up paragraph are to ensure that the test is
5     being conducted safely, right, at least part
6     of it?
7  A  **That's correct.**
8  Q  If we can go to page 44, at the top it says
9     Test GRC01 Yellow Flag. Right?
10 A  **GRC03 Permanent Speed Restriction?**
11 Q  I'm sorry. Page 44.
12 A  **Oh, my bad. Okay.**
13 Q  Under this rule tested it says GCOR 5.4.2.
14    Right?
15 A  Yes.
16 Q  5.3.7 is not referenced under rule tested.
17    Correct?
18 A  **That is correct.**
19 Q  This one says under Test Conditions similarly
20    "When conducting this test it may be done by
21    observing existing operating conditions or it
22    may be set up." Correct?
23 A  **That is correct.**
24 Q  Under Procedures there are two paragraphs,
25    one for when the test conditions are observed

73

**1** and the other is for when test conditions are

**2** set up. Correct?

**3** **A** **Correct.**

**4** **Q** And part of the purpose behind the four

**5** guidelines under the paragraph for the set up

**6** test conditions would be to ensure that the

**7** test is being conducted safely. Correct?

**8** **A** **Those four bullet points?**

**9** **Q** Yes.

**10** **A** **I don't see where that has anything to do**

**11** **with safety.**

**12** **Q** Any time you change existing operating

**13** conditions, it could be dangerous is what you

**14** testified to a few minutes ago. Right?

**15** **A** **It could.**

**16** **Q** Could. Okay. When it says set up here, that

**17** means you're changing the operating conditions.

**18** Right?

**19** **A** **Yes, sir.**

**20** **Q** How many other guidelines are there in

**21** Exhibit 39 that have provisions for

**22** conducting a set up test?

**23** **A** **Do you want me to note each rule?**

**24** **Q** Yes.

**25** **A** **(Witness examining document).**

74

**1** **Q** Note for the record he just called these

**2** rules.

**3** **A** **Okay, but they're not. When I say rule, the**

**4** **code or the test code references a rule so --**

**5** **do you just want me to note things?**

**6** **Q** Yes.

**7** **A** **Page 12 talks about don'ts on a set up test.**

**8** **Page 16, page 17, page 18, page 19, page 20,**

**9** **page 21, 23, 24, 25, 26.**

**10** **Q** I will interrupt you. Page 25, I don't see

**11** where that -- oh, it's a continuation of 24.

**12** Sorry I interrupted you.

**13** **A** **If I didn't say 27, 27, 29, 32.**

**14** **Q** I'll stop you there. We get the idea at this

**15** point that there are a lot of these guide-

**16** lines that contain provisions for how to

**17** conduct a set up test. Right?

**18** **A** **Yes, it does -- it provides guidelines to set**

**19** **up a set up test.**

**20** **Q** And I get the hunch, because I'm going

**21** forward here to 34 and 35, those procedures

**22** have procedures for conducting set up tests?

**23** MR. SULLIVAN: Objection, form.

**24** Document speaks for itself.

**25** MR. MAGNUSON: Pull up the

75

**1** investigation letter.

**2** (Discussion off the record).

**3** **Q** (By Mr. Magnuson, continuing) Can we see the

**4** investigation letter? We'll go through this.

**5** Did you read the investigation transcript

**6** after the investigation occurred?

**7** **A** **No.**

**8** **Q** Have you ever read it?

**9** **A** **No.**

**10** MR. SULLIVAN: Can we clip up 39?

**11** I just don't want to get documents messed up.

**12** MR. MAGNUSON: Yes.

**13** **Q** (By Mr. Magnuson, continuing) I'm handing you

**14** what has already been marked Exhibit 12.

**15** Take a second to review it.

**16** **A** **(Witness examining document). Okay.**

**17** **Q** So does that refresh your recollection that

**18** the charges that were brought against

**19** Mr. Sexton and that you issued discipline on

**20** was GCOR 5.3.7?

**21** MR. SULLIVAN: I object to the

**22** form of the question, misstates the record.

**23** **A** **I did not issue the discipline and that is**

**24** **GCOR 5.3.7.**

**25** **Q** This is your signature on Exhibit 12?

76

**1** **A** **That's a stamped signature that came from the**

**2** **administrative office.**

**3** **Q** But that's your signature?

**4** **A** **That is my signature but I did not sign that.**

**5** **Q** Did you read it?

**6** **A** **After it was issued.**

**7** **Q** Not before?

**8** **A** **No.**

**9** **Q** Is that typical? Is that your practice?

**10** **A** **What do you mean?**

**11** **Q** Do you read things before they go out under

**12** your signature typically?

**13** **A** **No.**

**14** **Q** Okay. It seems to indicate that you -- well,

**15** you intended for this letter to go out I'm

**16** assuming?

**17** **A** **I wasn't involved in putting this letter**

**18** **together or anything with this letter.**

**19** **Q** Who did?

**20** **A** **Someone in the administrative office.**

**21** **Q** Do you know who that would have been in

**22** February of '23 (sic)?

**23** **A** **I don't.**

**24** **Q** Did you tell someone to issue this letter on

**25** your behalf?

---

77

1  A  I did not.
2  Q  Does this refresh your recollection at all
3     about the rule that Mr. Sexton was
4     disciplined for violating?
5  A  It does.  It's 5.3.7.
6  Q  Do letters go out with your signature that
7     you don't read on a daily basis?
8  A  I do not review everything that gets put out.
9  Q  With your signature on it?
10  A  Correct.
11  Q  As you sit here today, do you disagree with
12     the contents of this letter?
13  A  I don't disagree with it, no.
14  Q  You don't think anything is incorrect?
15  A  Other than my signature.
16  Q  What do you mean by that?
17  A  I didn't sign it.
18  Q  Do you give people permission to sign certain
19     things on your behalf without reading them or --
20  A  The admin staff has my stamped signature.
21     When things need to go out under the general
22     manager, they do have permission to put that
23     stamp on it, yeah.
24  Q  But you must have told someone to issue this
25     letter?

---

78

1  A  No, I absolutely did not.
2  Q  Who did?
3  A  I don't know.
4  Q  Who made the decision to discipline Mr. Sexton?
5  A  That would have been my boss.
6  Q  Who is that?
7  A  Jason Ross.
8  Q  So if Mr. Ross is asked and he says 'I didn't
9     make that decision', is there anyone else
10     that would have made it?
11  A  I don't know what Mr. Ross is going to say.
12  Q  Did you recommend the 20 day suspension in
13     Mr. Sexton's case?
14  A  No.
15  Q  How do you know that?
16  A  Because I specifically told the admin staff
17     that I'm not to be involved in any way, shape
18     or form in the discipline or the letter to be
19     put out.
20  Q  Because you conducted the test?
21  A  And I was in the hearing.
22  Q  If we can go back to the E test manual to
23     page 103, do you see that?
24  A  Yes.
25  Q  It says Test GRF02 Shoving or Pushing

---

79

1     Movements.  Right?
2  A  Yes.
3  Q  You're familiar with that guideline?
4  A  I am.
5  Q  It says Rules Tested: GCOR 2.13, GCOR 5.3.6,
6     GCOR 5.3.7, GCOR 6.1.1, and GCOR 6.5 are the
7     rules identified there.  Right?
8  A  Correct.
9  Q  And that is the rule that Mr. Sexton
10     was disciplined for violating according to
11     Exhibit 12.  Correct?
12  A  It says 5.3.7, correct.
13  Q  Under Test Conditions it says, "When
14     conducting this test, actual operating
15     conditions are to be observed."  Correct?
16  A  Correct.
17  Q  And the words set up are not in that rule or
18     at least in that line after Test Conditions.
19     Right?
20  A  They're not in this guideline or this manual,
21     no.
22  Q  And under Procedure, there is no paragraph
23     identifying procedures for conducting a set
24     up test.  Correct?
25  A  Correct.

---

80

1  Q  In fact, the words set up don't exist
2     anywhere in Test GRF02.  Correct?
3  A  Correct.
4  Q  I'm going to show you what we have marked
5     Exhibit 35 previously.  Take a minute to
6     review that.  You may want to clip those back
7     together just so we don't have to shuffle
8     cards later.
9  A  (Witness examining document).  Okay.
10  Q  So you've reviewed Exhibit 35 in its
11     entirety.  Correct?
12  A  That is correct.
13  Q  And this is an e-mail string from February
14     15, '21 up to February 24, '21.  Right?
15  A  That is correct.
16  Q  And if you see on the first page it's an
17     e-mail from Dylan Smith on Monday, February
18     15, 2021.  Right?
19  A  Correct.
20  Q  And you're copied on that e-mail?
21  A  I am.
22  Q  It says, "I've reviewed the evidence and
23     given that this is Mr. Sextons first major I
24     recommend 10 served 10 deferred."  Right?
25  A  Correct.

---

93

1  Q  When was the last time you were tested?
2  A  December.
3  Q  Of last year?
4  A  Yes.
5  Q  How did you do?
6  A  Good.  Passed.
7  Q  You don't remember your score?
8  A  No.  In the 90s.
9     MR. SULLIVAN:  Let's take that
10    break.  We'll be back at 1:30.
11       (Luncheon recess).
12 Q  (By Mr. Magnuson, continuing) Mr. Jared, we
13    took a quick lunch break.  We're back here
14    for the afternoon session.  Just a couple of
15    quick follow-ups on what we were talking
16    about before.  Why did the discipline letter
17    not go out under Mr. Ross' signature if you
18    know?
19 A  I don't know.
20 Q  You testified that you agreed with it when
21    you reviewed it at the time?
22 A  I did not say that.
23 Q  Well, when did you first read that letter?
24 A  I don't know.
25 Q  Have you ever seen it before today?

94

1  A  I can't recall.
2  Q  If you had disagreed with it, would you have
3     been able to call Mr. Ross and have a
4     discussion with him about that if you had
5     thought that less discipline was appropriate?
6  A  No.
7  Q  If there was concern over your involvement in
8     the decision to issue discipline, why did
9     this letter go out under your signature?
10 A  I didn't make a decision.
11 Q  You said that you were concerned because you
12    conducted the E test and you conducted the
13    investigation and you wanted to be removed to
14    some extent from the process of the discipline.
15    Right?
16    MR. SULLIVAN:  Objection,
17    misstates the witness' testimony.
18 Q  (By Mr. Magnuson, continuing) If I misstated
19    that, tell me how.
20 A  I have to read what was actually written, but
21    what I said is that -- this probably isn't
22    verbatim, but I was the one that was actually
23    the witness so I could have no part of the
24    discipline process.
25 Q  When you say 'I could have no part of the

95

1     discipline process', what do you mean by
2     that?
3  A  I could not give recommendations.  I could
4     not do anything that's involved in making a
5     decision whether or not he was disciplined
6     through this process.
7  Q  Because you want your investigations to be
8     done in a fair and impartial manner.  Right?
9  A  That is correct.
10 Q  Why in late January 2021 were you down in
11    Iowa?
12 A  I don't remember.
13 Q  Do you recall that you were down there in
14    late January?
15 A  No.
16 Q  You could have been.  You don't have any idea
17    what you were doing down there?
18 A  I don't recall.
19 Q  You weren't down there to conduct E tests,
20    were you, specifically?
21 A  I don't remember.
22 Q  How was your territory doing in early 2021?
23 A  In relationship to what?
24 Q  Your performance.
25 A  I thought I was doing well.

96

1  Q  How about the territory itself, not you in
2     particular but your territory?
3  A  It was doing well.
4        (Deposition Exhibit 51 marked for
5     identification).
6  Q  I will show you what we'll mark as your
7     Exhibit 51.
8  A  (Witness examining document).  Okay.
9  Q  Have you had a chance to review this?
10 A  I have.
11 Q  It appears to be a hotel receipt for you at
12    the Blackhawk Hotel in Davenport, Iowa.
13    Correct?
14 A  Correct.
15 Q  It looks like you checked in on January 31st
16    and checked out on February 2nd.  Does that
17    look to be accurate?
18 A  February 3rd.
19 Q  It looks like the Mastercard was on February
20    3rd.  It looks like you spent three nights.
21    Right?
22    MR. SULLIVAN:  Objection.  The
23    document speaks for itself.
24 A  I don't know what the times for the checkout
25    were.  I would assume that 2/3/21 was three

97

1    **nights.**
2  **Q**  (By Mr. Magnuson, continuing)  There was a
3    $129 charge, $139 charge, and another $139.
4    Do you see that?
5  **A**  **Yes.**
6  **Q**  That appears to be three nights.  Right?
7  **A**  **Yes.**
8  **Q**  Does this refresh your recollection at all as
9    to why you were in Davenport at that time?
10  **A**  **No.**
11  **Q**  What is the 123 Main Street, San Antonio
12    address?
13  **A**  **I have no idea.**
14  **Q**  Did you give them a fictitious address for
15    some reason?
16  **A**  **No.**
17  **Q**  Is that the address that's tied to your
18    credit card?
19  **A**  **No.**
20  **Q**  Did you put this on a company card or your
21    personal card?
22  **A**  **It's a company card.**
23  **Q**  You don't know if you had meetings down there
24    around that time?
25  **A**  **I don't know why I was down there.**

98

1  **Q**  I'm assuming when you say you haven't
2    reviewed any documents to prepare for today,
3    I just want to clear up -- have you read any
4    depositions in this case?
5  **A**  **No.**
6  **Q**  Have you read the investigation transcript?
7  **A**  **No.**
8  **Q**  Have you reviewed anything in your own
9    personal computer as it relates to
10    Mr. Sexton?
11  **A**  **No.**
12  **Q**  Everything you did to prepare for today would
13    be encompassed by the conversations that you
14    had with the railroad's counsel?
15  **A**  **That is correct.**
16         (Deposition Exhibit 52 marked for
17    identification).
18  **Q**  I will show you what's marked as Exhibit 52.
19    I can represent to you that these are phone
20    records that have been produced to us by the
21    railroad.  Okay?
22  **A**  **Okay.**
23  **Q**  To begin with, I'll direct your attention
24    to -- it's difficult to see the page number
25    so I will reference you to CP Bates number

99

1    3457.  It looks to be about 10 or 15 pages
2    in.
3         MR. SULLIVAN:  You said 3437?
4         MR. MAGNUSON:  I will move ahead
5    one page to 3458.
6  **A**  **(Witness examining document).**
7  **Q**  (By Mr. Magnuson, continuing) I'll direct
8    your attention down to the date of February
9    1st.
10  **A**  **Okay.**
11  **Q**  I can represent to you that the 5:42 a.m.
12    call was an outgoing call by you to Dylan
13    Smith.  I'm assuming you're going to say I
14    don't know what Dylan Smith's phone number is
15    but I should ask you.
16  **A**  **I don't.**
17  **Q**  Nobody does know anybody's phone numbers
18    anymore, so that's okay.  But we have Dylan
19    Smith's phone records so we can cross-
20    reference that number.  Okay?
21  **A**  **Okay.**
22  **Q**  So at 5:42 a.m. and 5:54 a.m. there are out-
23    going calls by you to Dylan Smith.  And then
24    at 6:20 a.m. there's an incoming call from
25    Dylan Smith that lasts four minutes.  Do you

100

1    recall those phone calls?
2  **A**  **No.**
3  **Q**  Do you have any idea what those phone calls
4    might have concerned?
5  **A**  **No.**
6  **Q**  At 7:01 a.m. you jump on a conference call
7    with Calgary.  Does that ████ number look
8    familiar to you?
9         MR. SULLIVAN:  Objection,
10    misstates the record.
11  **Q**  (By Mr. Magnuson, continuing)  Do you
12    recognize that number?
13  **A**  **No.**
14  **Q**  When you call in on these conference lines,
15    it's something that you as CP management do
16    every day.  Right?
17  **A**  **Correct.**
18  **Q**  Oftentimes multiple times a day.  Correct?
19  **A**  **Sometimes.**
20  **Q**  What is the purpose of those calls?
21  **A**  **You need to be more specific.**
22  **Q**  Why do you have those conference calls?
23  **A**  **Which ones?**
24  **Q**  What types of conference calls are there?
25  **A**  **There's operations calls.  There's process**

101

1   calls.  There's calls set up periodically
2   throughout the month or the year for
3   different things we're focussed on.  There's
4   safety calls.
5  Q  There are also just the daily calls to
6     discuss what's going on in terms of traffic.
7     Right?
8  A  Correct.
9  Q  Do you know what any of the different numbers
10    are to call in for the various different
11    types of calls you just referenced, or is
12    there one number and these calls are set up
13    at that one number for different purposes?
14 A  I don't know.
15 Q  The daily calls that occur, just to monitor
16    what's going on with traffic on the system,
17    how many people tend to participate in those
18    calls?
19 A  Which call are you talking about?
20 Q  The daily calls to discuss just generally
21    what's going on with traffic on your
22    territory and the system.
23 A  The operations call?
24 Q  Yes.
25 A  The one that's at 7:00 in the morning?

102

1  Q  Yes.
2  A  I wouldn't know.
3  Q  A lot of people on the call typically.  Right?
4  A  Correct.
5  Q  Do you know if those calls are recorded?
6  A  No.
7  Q  If there are over-standard events taking
8     place or occurring or there are significant
9     delays, are those ever discussed on those
10    operations calls?
11 A  At times.
12 Q  Do you remember on February 1st if any over-
13    standard event or delay was discussed while
14    you were on that call?
15 A  I don't.
16 Q  Do you remember if Jason Ross was on that
17    call?
18 A  I don't.
19 Q  Is it possible that an over-standard event
20    was discussed on that call?
21 A  It's possible.
22 Q  If it was the biggest over-standard event on
23    the system at that time, is it more or less
24    likely that that was discussed on that call?
25          MR. SULLIVAN:  Objection, calls

103

1     for speculation.
2  A  I don't know.
3  Q  (By Mr. Magnuson, continuing) Are those calls
4     recorded?
5  A  Not that I'm aware of.
6  Q  They could be.  You just don't know one way
7     or the other?
8  A  No.
9  Q  Drill downs can occur on those calls?
10 A  No.
11 Q  What happens -- people have to answer probably
12    to higher-ups if there's an over-standard
13    event that's having to be answered to?  You
14    have to explain to your supervisor why an
15    over-standard event or delay is occurring?
16          MR. SULLIVAN:  Objection, form.
17 A  Not every delay is talked about.
18 Q  (By Mr. Magnuson, continuing) If it's a 3-1/2
19    hour delay, is that something that you would
20    think would be talked about?
21 A  Not necessarily.
22 Q  3-1/2 hour over-standard events are unusual.
23    Right?
24 A  Not in winter operations, no.
25 Q  McKelvey says that a 3-1/2 hour over-

104

1     standard event, 3-1/2 to 4 hour over-standard
2     event, is the longest he's ever seen in his
3     career.  Do you have any reason to disagree
4     with that?
5          MR. SULLIVAN:  Objection to the
6     extent it misstates Mr. McKelvey's testimony.
7     You can answer.
8  A  Mr. McKelvey had limited time on the railroad
9     and he had a small terminal.  So that might
10    be true for the territory he was on.  But
11    overall we have delays that are especially in
12    winter operations much more extensive than
13    that.
14 Q  So you got off that conference call.  And at
15    7:36 a.m. and 9:40 a.m. -- do you see the
16    7:36 and then on the next page the 9:40?
17 A  I see 7:36 a.m. and you said 9:40?
18 Q  Correct.
19 A  Yes.
20 Q  I can tell you that that number is Jason
21    Ross'.  So you had two incoming calls after
22    the conference call with Jason Ross?
23 A  Okay.
24 Q  Do you have any recollection of those phone
25    calls?

105

1  A  I don't.
2  Q  How many times a day do you typically talk to
3     Jason Ross?
4  A  I have no idea.
5  Q  Multiple times a day?
6  A  Yes.
7  Q  On a regular basis?
8  A  Yes.
9  Q  And that was the case back in February of '21?
10 A  Yes.
11 Q  Under the 9:40 call there's a 10:32 call.  Do
12    you see that?
13 A  Okay.
14 Q  That was Tracy Miller calling you.  Do you
15    have any recollection of that phone call?
16 A  I do not.
17 Q  What is Tracy Miller's position at the time?
18 A  Senior vice president.
19 Q  He was above you?
20 A  Yes.
21 Q  And Ross obviously was above you?
22 A  That is correct.
23 Q  And both of those guys I believe at the time
24    were stationed in Calgary.  Is that correct?
25 A  No.

106

1  Q  Where was Miller at the time?
2  A  St. Paul.
3  Q  But Ross was in Calgary?
4  A  No.
5  Q  He wasn't at the time.  He is now?
6  A  No.
7  Q  Where is Jason Ross now?
8  A  Kansas City.
9  Q  Oh, right.  Is that because of the merger?
10 A  Yes.
11 Q  And before the merger he was in Calgary.
12    Right?
13 A  No.
14 Q  Has he ever been stationed in Calgary?
15 A  Yes.
16 Q  When?
17 A  I don't know the times.
18 Q  In February, early February of '21, where was
19    Ross stationed?
20 A  St. Paul.
21 Q  What was his title at the time?
22 A  VP.
23 Q  So he was above you?
24 A  Yep.
25 Q  If you go down at 10:39 you take another --

107

1     there's another incoming call from Jason
2     Ross.  Okay?
3  A  Okay.
4  Q  And a minute later at 10:40 a.m. there's an
5     outgoing call to Dylan Smith.  Do you recall
6     what that conversation entailed?
7  A  No.
8  Q  At 10:55 a.m. just below that, you placed a
9     call to Kurtis McKelvey.  What was his
10    position on February 1st, '21?
11 A  I don't know.  He was either trainmaster or
12    ATM.
13 Q  That was an incoming call.  Cyle just
14    corrected me.  That doesn't refresh your
15    recollection?
16 A  No.
17 Q  And at 11:14 a.m. you call in to another
18    conference.  That obviously is different than
19    the 7:00 call.  Right?
20 A  Yes.
21 Q  Do you know whether that was an operations
22    conference call or something else?
23 A  Operations call.
24 Q  How do you know that?
25 A  Because we had 0700 and 1100 operations calls.

108

1  Q  Do you recall if Mr. Ross was on that call?
2  A  No.
3  Q  You don't recall talking to him?
4  A  When?
5  Q  On that 11:14 conference call, did you talk
6     to Jason Ross?
7  A  Not that I'm aware of.
8  Q  Do you recall an over-standard event being
9     discussed at that call?
10 A  No.
11 Q  If you go down just a little bit beginning at
12    11:59 a.m. to 1:02 p.m., there are five
13    outgoing calls to Dylan Smith and one
14    incoming call.  Do you see that?
15 A  Yes.
16 Q  Does that refresh your recollection as to
17    what you and Dylan Smith may have been
18    talking about?
19 A  No.
20 Q  Who is McGinnis?
21 A  Manager of Operating Practice.
22 Q  What is McGinnis' first name?
23 A  Jeff.
24 Q  Do you have any idea why you talked to him at
25    1:03?

109

1  A  No.
2  Q  Who is Bailey?
3  A  Superintendent North Dakota, or he was.
4  Q  I should have asked you.  I think you were in
5     charge -- at the time you were in charge of
6     six states?
7  A  Yes.
8  Q  So Bailey was up in North Dakota?
9  A  Correct.
10 Q  I can represent to you -- and we'll go
11    through it because we are going to go through
12    the investigation transcript.  But you
13    conducted the E test on Sexton at 12:49.
14    Okay?
15 A  Okay.
16 Q  So you had an incoming call from Dylan Smith
17    at 12:37 and an outgoing to Dylan Smith at
18    12:56.  In between those two calls, you
19    conducted the E test on Sexton.  Does that
20    refresh your recollection as to the substance
21    of any of those phone calls?
22 A  No.
23 Q  Other than Bailey, in terms of the phone
24    calls we just discussed, Dylan Smith, Tracy
25    Miller, Jason Ross, those are people all in

110

1     the chain of command on the Davenport and
2     Marquette Subs.  They have supervisory
3     managerial responsibility for Davenport and
4     Marquette.  Right?
5  A  Correct.
6  Q  There's one call with Cameron Musha (phonetic).
7     Do you remember talking to him that day?
8  A  No.
9  Q  I believe at the time he was up here in the
10    Twin Cities.  Did he have any responsibility
11    for Marquette or Davenport?
12 A  No.
13 Q  So in that time frame up until early
14    afternoon you take part -- on February 1st
15    you take part in 22 phone calls, two of which
16    were conference calls, two of which went to
17    Musha and Bailey.  So that's 18 phone calls
18    before 1:03 p.m. on February 1st.  And
19    everybody you spoke with had some sort of
20    managerial responsibility over Marquette and
21    Davenport Subs.  Correct?
22 A  Other than Bailey and Musha if that's -- I
23    didn't count them but --
24 Q  Yep.  So you said there's operations calls.
25    There's process calls.  What are process

111

1     calls involving or what do they involve?
2  A  In general, if we're going to look at
3     changing a process we'll get on to a
4     conference call.  We'll get all the stake-
5     holders on the call and talk through the
6     process.
7  Q  And what processes are discussed in these
8     types of calls?  Are you talking about rule
9     changes, modifying over-standard work event
10    times?  What types of things are discussed in
11    the process calls?
12 A  Well, if we're going to talk about changing
13    the operations, we can have a call about
14    that.  That would include talking about
15    terminal times.  Is that what you're asking?
16 Q  Yeah.  Just a general sense of what is
17    discussed at the process calls.  Now, I know
18    there are terms terminal dwell and process
19    dwell.  What is the difference between those
20    two?
21 A  A terminal dwell is a time that a car or a
22    train hits a scanner or a reader at one end
23    of the yard and then it trips a reader on the
24    opposite end of the yard.  And you want to
25    know what process dwell is?

112

1  Q  So terminal dwell deals with how long a car
2     or a train sits in a yard?
3  A  Yes.  No, it doesn't sit.  It goes through.
4  Q  It goes through.  It exists in the yard.  It
5     come in.  It tracks the time.  It comes in
6     and leaves.  Right?
7  A  Correct.
8  Q  What is process dwell?
9  A  Process dwell are measuring cars that come
10    into the yard and are processed, just like it
11    says, until they depart the yard and/or are
12    spotted at a customer.
13 Q  Does process involve or track switching,
14    whether or not the cars are being switched
15    efficiently?
16 A  Yes.
17 Q  So when you say these process conference
18    calls occur, is there a difference between
19    the operations calls like maybe you discuss
20    terminal dwell during the ops calls and
21    process dwell at the process calls?
22            MR. SULLIVAN:  Objection, form.
23 A  No.
24 Q  (By Mr. Magnuson, continuing)  No difference
25    there?

121

1   A   What's his number?
2   Q   ███████████.
3   A   Yes.
4   Q   And you don't know one way or the other
5       whether or not you asked him to call you as
6       it related to the 474 or whether or not you
7       discussed in that conversation the status of
8       the 474?
9   A   That's true.
10  Q   You don't remember one way or the other?
11  A   No.
12  Q   You certainly could have discussed the 474.
13      Right?
14  A   Yes.
15  Q   And you know what an inference is. Right?
16          MR. SULLIVAN: Objection, form.
17  Q   (By Mr. Magnuson, continuing) You know what
18      the word inference means. Right?
19  A   No.
20  Q   Oxford dictionary defines an inference as a
21      conclusion reached on the basis of evidence
22      and reasoning. Does that make sense to you?
23  A   One more time.
24  Q   A conclusion reached on the basis of evidence
25      and reasoning.

122

1   A   Okay.
2   Q   Can we draw an inference that this phone call
3       with Kurtis McKelvey related to the Incident
4       Report where you asked him to call you?
5           MR. SULLIVAN: Objection, lack of
6       personal knowledge, speculation.
7   A   I don't know why I would have. Is it
8       possible are you asking me?
9   Q   (By Mr. Magnuson, continuing) Can you draw an
10      inference that that phone call related to
11      your request to have him call you?
12          MR. SULLIVAN: Objection, calls
13      for speculation.
14  A   No.
15  Q   (By Mr. Magnuson, continuing) And your
16      request to have him call you was in response
17      to an Incident Report concerning the 474.
18      Right?
19  A   I couldn't tell you that.
20  Q   You just think that as it relates to Exhibit
21      29 you might have just asked him to call you
22      for any reason?
23  A   I'm not saying it's not possible if that's
24      what it was. I'm just telling you I don't
25      remember that happening.

123

1   Q   Do you think it's more likely than not that
2       you discussed the 474 with Kurtis McKelvey?
3           MR. SULLIVAN: Objection, calls
4       for speculation, asked and answered.
5           THE WITNESS: One more time, sir.
6   Q   (By Mr. Magnuson, continuing) Is it more
7       likely than not that you discussed the 474
8       with Kurtis McKelvey when you asked him to
9       call you and then he called you?
10          MR. SULLIVAN: Objection, calls
11      for speculation.
12  A   It's possible that's what I was calling him
13      for.
14  Q   (By Mr. Magnuson, continuing) We'll get into
15      the investigation transcript. I'm showing
16      you what has been marked previously as
17      Exhibit 10. That's the investigation
18      transcript relating to why we're here today,
19      John Sexton, that occurred on February 10,
20      2021. I apologize. I had assumed that maybe
21      you would have had read this prior to the
22      deposition today so this is going to be -- I
23      really would prefer not to read it into the
24      record, but we're going to have to do some
25      reading. To begin with, does it look like a

124

1       true and accurate copy to the best of your
2       knowledge of a CP Rail investigation
3       transcript?
4   A   Yes.
5   Q   And you've never read this after the
6       investigation?
7   A   No.
8   Q   Do you recall the investigation itself?
9   A   Vaguely.
10  Q   Do you remember you were a witness?
11  A   Correct.
12  Q   And Justin DePover was originally a principal
13      but ultimately became a witness? Do you
14      remember that?
15  A   I don't recall that, but okay.
16  Q   And John Sexton was the principal. You
17      recall that I'm sure?
18  A   Yes.
19  Q   Do you know or there was testimony here that
20      Mr. Reyes was originally going to be the
21      conducting officer. Do you know why that
22      changed from Mr. Reyes to Mr. Johnson?
23  A   I don't.
24  Q   Do you recall any testimony at the beginning
25      of this investigation between Mr. Rainwater

125

1  and Mr. Johnson about Mr. Cruciani being a
2  witness at this investigation?
3  **A  No, I don't.**
4  **Q**  Do you know who Mr. Cruciani is?
5  **A  Yes.**
6  **Q**  He no longer works for the railroad?
7  **A  Cruciani?**
8  **Q**  Correct.
9  **A  Yes, he does.**
10 **Q**  It's Mr. Cox.  Do you know who Mr. Cox was?
11 **A  Yes.**
12 **Q**  Does he still work for the railroad?
13 **A  I don't know.**
14 **Q**  Along those same lines, was it requested that
15    Mr. Cox by Mr. Rainwater be a witness at this
16    investigation?
17 **A  I'm not aware of who was requested to be**
18    **there or not.**
19 **Q**  CP desires for their company-held formal
20    investigations to be fair and impartial.
21    Right?
22 **A  Yes.**
23 **Q**  Unbiased towards the company versus the
24    employee.  Right?
25 **A  Correct.**

126

1  **Q**  Clean slate.  You want it to be fair for both
2     sides?
3  **A  That's correct.**
4  **Q**  Would you agree with me that when conducting
5     an investigation, people with personal
6     knowledge of the events leading to an
7     investigation should be witnesses?
8        MR. SULLIVAN:  Objection, lack of
9     personal knowledge, calls for speculation.
10 **A  In hearings, you'd like all the pertinent**
11    **parties to show up.**
12 **Q**  (By Mr. Magnuson, continuing) Pertinent
13    parties.  Excellent.  Would you call a
14    pertinent party someone who is a witness to
15    the event?
16 **A  Yes.**
17 **Q**  You've conducted these investigations yourself?
18 **A  I have.**
19 **Q**  You've reviewed transcripts and made
20    discipline recommendations over the years?
21 **A  I have.**
22 **Q**  You know how to see a fair hearing when you
23    see one.  Right?
24 **A  I think so.**
25 **Q**  And you just said you want all people who are

127

1  witnesses to be able to testify?
2        MR. SULLIVAN:  Objection,
3     misstates the witness' testimony.
4        THE WITNESS:  One more time.
5  **Q**  (By Mr. Magnuson, continuing) You said
6     pertinent witnesses should be included?
7  **A  Yes.**
8  **Q**  And you said eye witnesses to events could be
9     considered pertinent.  Right?
10 **A  Yes.**
11 **Q**  And credibility assessments are made at these
12    which is why people prefer live testimony.
13    Right?
14 **A  Not necessarily.**
15 **Q**  You don't tend to rely on handwritten
16    statements as much as you tend to rely on eye
17    witnesses.  Right?  You want witnesses to be
18    able to testify live?
19       MR. SULLIVAN:  Objection, form.
20 **A  I want witnesses to be available for the**
21    **hearing.**
22 **Q**  (By Mr. Magnuson, continuing) And to conduct
23    a fair and impartial hearing, you want
24    pertinent witnesses to testify?
25 **A  I'm sorry?**

128

1  **Q**  In order for a hearing to be fair and
2     impartial, you want pertinent witnesses to
3     testify?
4  **A  Yes.**
5  **Q**  Let's go to page 18.  Let me ask you this
6     before we start.  Before you read anything,
7     what do you remember about the E test you
8     conducted on Mr. Sexton?
9  **A  Where do you want me to start?**
10 **Q**  What do you remember about it?
11 **A  I remember going through the process of**
12    **setting up a test.  I remember the test.  I**
13    **remember it concluding.**
14 **Q**  You've testified a whole bunch of times so
15    far that you don't even know why you were in
16    the Davenport, Marquette area at the time.
17    Right?
18 **A  Yes.**
19 **Q**  How is it that you ended up on the south end
20    of the Marquette yard, Nahant?
21 **A  South of the Nahant yard?**
22 **Q**  Yes.
23 **A  I was performing an E test.**
24 **Q**  Who told you to do that?
25 **A  Nobody.**

129

1  Q  Why did you decide to do that?
2  A  **The situation presented itself to be able to**
3     **perform that type of test.**
4  Q  What was the situation?
5  A  **4 track was a clear track.  I knew there was**
6     **nobody else going to be around that was going**
7     **to affect the movement.  I thought it was**
8     **safe to do so, so I performed the test.**
9  Q  Would you agree with me that you were three
10    levels above the most frequently visible
11    manager in the Nahant yard at that time?
12            MR. SULLIVAN:  Objection, form,
13    calls for speculation.
14            MR. MAGNUSON:  What's wrong with
15    the form?
16            MR. SULLIVAN:  Who is the most
17    visible.  How is he supposed to know who is
18    the most visible?
19            MR. MAGNUSON:  In terms of
20    hierarchy and who physically works at the
21    yard.
22            MR. SULLIVAN:  Who is the most
23    visible, what does that mean?  To who?
24            MR. MAGNUSON:  He can answer.
25  A  **I don't know that.**

130

1  Q  (By Mr. Magnuson, continuing) At Nahant yard
2     that day, who all -- not exactly that day but
3     in terms of hierarchy, who all was responsible
4     below you down to the trainmaster level for
5     that yard?
6  A  **Dylan Smith.  I don't know who the assistant**
7     **superintendent was.  Trainmasters -- I don't**
8     **know which trainmasters were there at the**
9     **time.**
10  Q  What was Dylan's title again?
11  A  **Superintendent I think.**
12  Q  So you have the trainmaster level.  Did road
13    foreman of engines conduct E tests?
14  A  **Yes.**
15  Q  So road foreman of engines would have been at
16    Nahant as well?
17  A  **I'm not sure if we had one there at that time**
18     **or not.**
19  Q  But then superintendents would have been
20    there?
21  A  **Stationed.**
22  Q  Or responsible for it?
23  A  **That is correct.**
24  Q  Stationed there?
25  A  **Thank you.**

131

1  Q  How many trainmasters were there?
2  A  **I don't know.**
3  Q  Over ten?
4  A  **No.**
5  Q  More than four?
6  A  **No.**
7  Q  Approximately within one to four, one to
8     three?
9  A  **One to none.**
10  Q  How many superintendents were there?
11  A  **One.**
12  Q  And that would have been Dylan Smith?
13  A  **Correct.**
14  Q  So you think there was only one trainmaster
15    working at Nahant at that time?
16  A  **Stationed at Nahant at that time.**
17  Q  Stationed at Nahant.  If you're stationed
18    somewhere else, would someone else come in
19    and cover Nahant?
20  A  **No.**
21  Q  So it just would have no trainmaster on duty?
22  A  **Yep.**
23  Q  And you said the situation presented itself.
24    Why were you at Nahant that day at all?
25  A  **I don't recall.**

132

1  Q  You knew that the 474 was coming in to Nahant
2     that day.  Right?
3  A  **Yes.**
4  Q  And you were made aware pursuant to that
5     e-mail that there was a delay with the 474.
6     Right?
7  A  **I can't tell you if I knew about that prior**
8     **to or not.**
9  Q  You monitor your e-mails.  You read them.
10    Right?
11  A  **Not all the time.**
12  Q  It kind of looks like you read the e-mail
13    that you sent to Mr. McKelvey though, doesn't
14    it?
15  A  **It looks like I asked McKelvey to respond to**
16     **me, to call me when he had a minute.**
17  Q  Right in the subject line the 474 is
18    referenced.  Right?
19  A  **That is correct.**
20  Q  You don't know why you were at Nahant that
21    day?
22  A  **No.**
23  Q  How much prior to around noon were you at
24    Nahant?
25  A  **I don't know.**

137

1   A   Yes.
2   Q   And DePover lined his switches?
3   A   Correct.
4   Q   Conductor DePover and Sexton the engineer
5       briefed with the remote control assignment.
6       Right?
7   A   Correct.
8   Q   That was taking place on the north end of the
9       yard?
10  A   That's correct.
11  Q   Did they brief in person or over the radio?
12  A   The radio.
13  Q   So we know the crew at the north end of the
14      yard, the remote control crew, could
15      communicate with Sexton and DePover over the
16      radios.  Right?
17  A   Correct.
18  Q   You heard this on your truck radio because
19      you were still in your truck at that point?
20  A   That's correct.
21  Q   You didn't have a portable radio with you,
22      did you?
23  A   No.
24  Q   And the remote control crew says that they're
25      in 16 track and they would not be in 4.  Right?

138

1   A   I don't remember the exact conversation about
2       that.
3   Q   At some point though you remember that they
4       determined that 4 track was clear?
5   A   I remember that they had a job briefing by
6       the rule and the conductor on the north end
7       of the yard told them that the track was
8       clear and good for 40.
9   Q   And that's what you observed, that 4 track
10      was clear?
11  A   It was.
12  Q   Was it clear for even more than 40?
13  A   Yes.
14  Q   50?
15  A   I believe so.
16  Q   60?
17  A   I think it holds 74 cars.
18  Q   So the whole track 74 cars was clear?
19  A   Yes.
20  Q   At the investigation you testified that
21      DePover actually gave an initial car count of
22      50.  Does that fit with your recollection?
23  A   I don't remember the exact number he gave
24      initially.
25  Q   So we'll go to page 19.

139

1   A   Okay.
2   Q   Towards the bottom there you said, "He gave
3       an initial car count of 50."  Do you see
4       that?
5               MR. SULLIVAN:  You're on the
6       wrong page.
7               THE WITNESS:  Sorry.  19?
8               MR. MAGNUSON:  Yes.
9               THE WITNESS:  What's the question
10      again?
11  Q   (By Mr. Magnuson, continuing) Do you see
12      where you testified that he gave an initial
13      car count of 50?
14  A   Yes.
15  Q   Do you have any reason to disagree with that
16      as you sit here today?
17  A   No.
18  Q   And at that point is when you dismounted your
19      vehicle.  Right?
20  A   That's correct.
21  Q   And this was a CP Rail truck?
22  A   Yes.
23  Q   Was it equipped with GPS?
24  A   Yes.
25  Q   Why didn't you have a portable radio with

140

1       you?
2   A   I don't know.
3   Q   Do you typically carry one?
4   A   At times I do, yes.
5   Q   Why would you carry one versus not carry one?
6   A   I usually use them for derailments.  So if I
7       had it, it would have been in my derailment
8       kit.
9   Q   If you're conducting E tests and you're
10      attempting to monitor employees' radio
11      communications, in those situations do you
12      carry a portable radio, a handheld?
13  A   Not necessarily, no.
14  Q   If you don't carry a portable and you're not
15      near your truck, how do you know what the
16      radio communications are?
17  A   I can't hear it if I'm not in -- if I don't
18      have a portable or some means of listening.
19  Q   So you remember seeing some video at this
20      investigation.  Right?
21  A   Yes, sir.
22  Q   And your truck wasn't visible in the video,
23      was it?
24  A   I thought it was.
25  Q   Well, we'll get to it.  There's a bunch of

141

1 testimony that your truck was not in the
2 field of the video. Okay?
3 **A** **All right.**
4 **Q** Do you know where that video went by the way?
5 **A** **No.**
6 **Q** Who is in control of the exhibits after an
7 investigation takes place?
8 **A** **The conducting officer I suppose.**
9 **Q** So Mr. Johnson would have been in control of
10 making sure that video got saved. Right?
11 **A** **Yes.**
12 **Q** Do you know why it was lost, deleted, whatever?
13 **A** **No.**
14 **Q** Have you seen e-mails from people wondering
15 what happened to that video?
16 **A** **I don't recall.**
17 **Q** So when you get out of your truck, you don't
18 have a portable radio. Do you know from your
19 recollection of the video how much distance
20 the field of the video showed approximately?
21 **A** **What do you mean by field? Like entire --**
22 **Q** 40 yards, 50 yards, 100 yards?
23 **A** **I'd be speculating at this point, but it was**
24 **a fairly large area.**
25 **Q** There was some testimony that your truck was

142

1 parked somewhere estimates-wise between 35
2 and 50 yards from where Mr. DePover was
3 stationed. Do you disagree with that? Is
4 that approximate?
5 **A** **I would disagree with that. I thought -- I**
6 **remember I was closer than that.**
7 **Q** Why wasn't your truck in the video?
8 **A** **I don't know. Well, I don't know where**
9 **you're getting that from.**
10 **Q** Well, you just told us your truck wasn't in
11 the field of the video?
12 **A** **You said that.**
13 **Q** I asked you if that's what you recalled, and
14 you said yes. You don't recall seeing the
15 truck in the video. Correct?
16                 MR. SULLIVAN: Objection.
17 **A** **I don't remember saying that.**
18                 MR. MAGNUSON: Well, we'll go
19 through it again then.
20                 MR. SULLIVAN: Objection.
21 **Q** (By Mr. Magnuson, continuing) Do you remember
22 seeing your truck in the field of the video?
23 **A** **And I think I remember seeing it in the field**
24 **of video when I -- when it was being recorded.**
25 I actually was not right next to the train

143

1 movement when the test started. I pulled up
2 at some point.
3 **Q** But that would have been on the video. Right?
4 **A** **Should have been, yes.**
5 **Q** And we can't look at the video anymore, can we?
6 **A** **I don't have it.**
7 **Q** How long does it take you to walk 50 yards?
8 **A** **I don't know.**
9 **Q** What were the footing conditions like that
10 day?
11 **A** **Good.**
12 **Q** What was the weather like?
13 **A** **Good.**
14 **Q** Snowy?
15 **A** **No.**
16 **Q** Snow on the ground?
17 **A** **Possibly.**
18 **Q** So you depart your truck and you walk up to
19 DePover. Right?
20 **A** **Correct.**
21 **Q** And you didn't announce yourself before you
22 walked up to him. Right?
23 **A** **I announced myself when I got up and I was**
24 **able to talk to him.**
25 **Q** Did you tell him to stop talking to the

144

1 engineer, Sexton, before -- did you introduce
2 yourself before or after you told him to stop
3 talking to Sexton?
4 **A** **I don't recall.**
5 **Q** DePover says you introduced yourself after
6 you told him to stop talking to Sexton. Do
7 you have any reason to disagree with that?
8 **A** **No.**
9 **Q** So you told, while Sexton is shoving --
10 **A** **Correct.**
11 **Q** -- to stop talking to his engineer?
12 **A** **I told DePover to stop giving car counts**
13 **while 474 was shoving back.**
14 **Q** And that's the same thing as stop communicating.
15 Right? Stop communicating with the engineer
16 is the same as stop communicating. Right?
17 **A** **Yeah, I would have told him to stop giving**
18 **car counts to the engineer.**
19 **Q** If you were E testing a conductor and you
20 observed a conductor in the middle of a shove
21 stop giving car counts or stop communicating,
22 would you find that conductor in violation of
23 the rules?
24 **A** **No.**
25 **Q** Yeah?

145

1  A  I said no.
2  Q  If they just stopped communicating?
3  A  After I told them?
4  Q  No, no.  If you are E testing a conductor
5     sitting in your truck for instance -- you're
6     watching the conductor to see what he's doing
7     and see how good he's performing.
8  A  Correct.
9  Q  That's something you do?
10 A  Yes.
11 Q  And you observed that conductor just stare
12    off into space and stop communicating with an
13    engineer, that would be in violation of the
14    rules, wouldn't it?
15 A  That would be, yes.
16 Q  Why?
17 A  Because the rules say he's supposed to
18    provide direction and distance during shoving
19    movements.
20 Q  And you told him not to do that anymore.
21    Correct?
22 A  That's correct.  I was in the process of
23    validating whether or not the engineer was
24    going to comply with half the range of
25    vision.

146

1  Q  And at that point you were operating with the
2     assumption that the last car count was 50?
3  A  No.
4  Q  At that point?
5  A  No.
6  Q  Let's go through your testimony.  Let's go to
7     page 19 through to 20.  Up to that point, you
8     walked up to him.  Right?
9  A  Okay.
10       MR. SULLIVAN:  So it's this
11    section of page 19 and page 20 is on the next
12    page?
13       MR. MAGNUSON:  Yep.
14       THE WITNESS:  So the last
15    paragraph you want me to read?
16 Q  (By Mr. Magnuson, continuing) Top of 20.
17 A  Do you want me to review 20 or 19?
18 Q  Bottom of 19 and the top of 20.  We're going
19    to go through it step by step.
20 A  (Witness examining document).  Do you have a
21    question?
22 Q  As you walked up to him -- well, right before
23    you walked up to him, you were under the
24    assumption that he had given him a 50 car
25    count?

147

1  A  It might be semantics, but are you asking
2     like when I decided to walk up to him?
3  Q  You walked up to him and as you walked up to
4     him, you say he gave a 15 car count to Sexton?
5  A  The testimony says Mr. DePover actually
6     started a shoving movement into 4 track.  He
7     gave initial car count of 50.  I was actually
8     on the south end of the yard at the time in
9     my vehicle.  So I was in my vehicle when he
10    gave the 50 car count, which I actually
11    dismounted at that time and I was -- I walked
12    over to Mr. DePover.  He was in between on
13    the south side of 4 track.  I walked up to
14    him.  As I walked up to him, he gave a 15 car
15    count.
16 Q  So before you got to him, right before you
17    got to him, you were still under the
18    impression that he had a 50 car track?  He
19    had a clear alley for 50 cars?
20 A  I heard him give a 50 car count prior to me
21    dismounting my vehicle.
22 Q  Okay.  That was what I was asking.  So as you
23    got to him, you heard him give a 15 car count
24    to the engineer?
25 A  That's correct.

148

1  Q  What did he say specifically?  What were his
2     exact words?
3  A  I don't remember the exact words, but he gave
4     a 15 car count.  How he says it -- everybody
5     says it a little bit different.
6  Q  As we will find out here shortly, Sexton and
7     DePover testify that he said 15 to a stop,
8     you're good for 40?
9        MR. SULLIVAN:  Objection,
10    misstates the document.
11 Q  (By Mr. Magnuson, continuing) Did you hear
12    him say that?
13 A  No.
14 Q  Did you hear him reference 40 cars at all?
15 A  I don't recall.
16 Q  Did you hear him say 15 cars to a stop at
17    all?
18 A  I heard him say 15 car count.
19 Q  You didn't hear him say 15 to a stop?
20 A  I don't remember him saying that.
21 Q  You didn't hear him reference 40 cars?
22 A  I don't recall him saying that.
23 Q  What would half the distance of 40 cars be?
24 A  20, but he gave a 15 car count.  So it was --
25 Q  If he says 15 to a stop, that's not a 15

149

1    count.  Right?
2  A  No.  The rule is that you go half the range
3     provided.  He provided a 15 car count.
4  Q  And if he had said you are clear for 40, that
5     range would have been 40 cars.  Right?
6  A  That's incorrect.
7  Q  If he had said that.  I understand you don't
8     remember him saying that, but what if he had?
9  A  He would have had to say that you're good for
10    40.
11 Q  And he testified that that's what he said?
12        MR. SULLIVAN:  Objection,
13    misstates the document.
14        MR. MAGNUSON:  We'll get to it.
15        MR. SULLIVAN:  Don't misstate it.
16 Q  (By Mr. Magnuson, continuing) If he said
17    you're clear for 40 or you're good for 40,
18    that means the same thing.  Right?
19 A  He still has to count him down.
20 Q  But if he says you're good for 40 or you're
21    clear for 40, that's a 40 car count.  Right?
22 A  If that's all he said.
23 Q  How does the 15 to a stop, if he said it,
24    play into that?
25 A  He did say it.  And since he gave the 15, he

150

1     would have had to stop in 7-1/2, 8 car
2     lengths.
3  Q  Both Sexton and DePover say that he says 15
4     to a stop, to a stop.  That's less than a 15
5     car count.  That's different than a 15 car
6     count.  Right?
7  A  If he would have said 15 to a stop?
8  Q  And you're clear for 40.
9  A  Then no.  Then he has to go off the most
10    restrictive which is the 15.
11 Q  Clear for 40 means clear for 40.  Right?
12 A  No.  Once he gave -- if that would have been
13    the car count he gave and stuck with that car
14    count, then you're accurate in what you're
15    saying.  But that's not what happened.  He
16    gave a 15 car count.
17 Q  Well, you understand that your recollection
18    is that you heard a 15 car count but Sexton
19    and DePover disagree.  Right?
20 A  I don't know.  I didn't read the testimony.
21 Q  We'll get to it.  Did you talk to Cruciani
22    after this incident about what he heard?
23 A  No.
24 Q  But you knew that he could communicate with
25    Sexton and DePover over the radio, right,

151

1     because they job briefed?
2  A  Correct.
3  Q  Did you know that Cruciani was protecting the
4     shove on the north end?
5  A  He was not protecting the shove.
6  Q  Do you know that Sexton and DePover both
7     claimed he was?
8  A  That's false testimony then.
9  Q  You disagree with them?
10 A  Wholeheartedly, yes.
11 Q  Well, communication could have occurred
12    between your truck and DePover.  Right?
13        MR. SULLIVAN:  Objection, form,
14    calls for speculation.
15 A  Can you repeat it?
16 Q  (By Mr. Magnuson, continuing) I'm assuming
17    because your recollection of these events is
18    so good you're going to tell us that your
19    truck window was down and that your radio was
20    really loud.  Right?
21        MR. SULLIVAN:  Objection,
22    argumentative.
23 A  I'm not saying that.
24 Q  (By Mr. Magnuson, continuing) Do you recall
25    testifying to that?

152

1  A  I don't recall saying that.
2  Q  Could communications between Sexton and
3     DePover have occurred between the time you
4     left your truck and the time you got to
5     DePover?
6  A  It could have, yep.
7  Q  It could have happened and you didn't hear
8     it.  Right?
9  A  It could have.
10 Q  But you knew that Cox and Cruciani were on
11    the north end?
12        MR. SULLIVAN:  Objection,
13    misstates the witness' testimony.
14 A  I don't know where Cox was.
15 Q  (By Mr. Magnuson, continuing) You knew that
16    Cox and Cruciani could communicate by radio
17    with Sexton and DePover.  Right?
18 A  I don't know where Cox was.
19 Q  You heard the north end communicate and
20    conduct a job briefing with the south end.
21    Right?
22 A  I heard Cruciani talking and giving a
23    briefing with the 474 crew.
24 Q  But you didn't talk to Cruciani?
25 A  No.

157

1  Q  Do you just show up in yards randomly and
2      conduct E tests?
3  A  Yes.
4  Q  Why were you in the south part of the yard?
5  A  I was at the south end of the yard because I
6      knew the 474 was coming inbound and I saw the
7      opportunity to perform an E test.
8  Q  So your intent was to E test the 474?
9  A  Correct.
10 Q  So if we can look at pages 19 and 20, this is
11     your testimony.  Initially I thought maybe we
12     were dealing with a typo.  But if you look at
13     19, line 11, it says, "That setout consisted
14     of 76 cars."  On page 20, line 15, it says,
15     "again, he had 76 cars."
16 A  Okay.
17 Q  I think you might have looked at a tonnage
18     profile prior to the investigation.  Does
19     that refresh your recollection that they had
20     ahold of 76 cars?
21 A  No, unless it was on the inbound train.
22 Q  Why does it say 76 cars here on pages 19 and
23     20 with your testimony?
24 A  I don't recall.
25 Q  But you're going to maintain that you were

158

1      mistaken in the investigation, that they had
2      ahold of less?
3  A  Can I read this?  Do you mind?
4  Q  No.
5  A  (Witness examining document).
6  Q  It appears that you testified that they had
7      ahold of 76 cars.  Right?
8  A  Can you let me read my testimony?
9  Q  I have directed you right to the line of page
10     20, line 15.
11 A  I'm aware of that, but I don't know what the
12     rest of my testimony is.  If I cleared that
13     up -- they might have had 76 cars to set out
14     but --
15 Q  You know what --
16 A  That 76 cars didn't have to go on the one
17     track, but I don't know that until I read the
18     transcript.
19 Q  We're not going to use our time here letting
20     him read.  So let's go off the record.  Any
21     time he wants to extend his prep time, we'll
22     go off the record.
23        MR. SULLIVAN:  Do you want to ask
24     him about any other -- like the tonnage
25     profile?  It can help him clarify.

159

1        MR. MAGNUSON:  I was going to get
2      there.  That's already peoples' testimony.
3        MR. SULLIVAN:  His testimony is
4      referring to the tonnage profile on page 23.
5        MR. MAGNUSON:  I see other people
6      on the tonnage profile.
7  Q  (By Mr. Magnuson, continuing) Are you still
8      reading?
9  A  I didn't know you wanted me to keep reading.
10     Sorry.
11 Q  Well, I'm trying to determine whether or not
12     this train had ahold of 76 cars.  At least in
13     the two lines we just referenced of your
14     testimony, you testify that it was 76 cars.
15     Right?
16 A  I did testify twice that said 76 cars.
17 Q  Yes.  That's all I wanted to know.  Did you
18     testify to that?
19 A  Okay.  Yes.
20 Q  Let's go to page 24 -- actually 23, the
21     bottom sentence, line 23, to page 24, line
22     13.  Can you read that?
23 A  (Witness examining document).  To page what,
24     13?
25 Q  24, line 13.

160

1  A  (Witness examining document).  Okay.
2  Q  That discussion about the tonnage profile
3      that Mr. DePover provided in terms of the
4      markings, where he made the mark, would seem
5      to indicate that there were 76 cars as well.
6      Right?
7  A  Right.
8  Q  Page 27, line 12, let me know when you're
9      done with that answer, lines 12 through 20.
10 A  (Witness examining document).
11 Q  After they de-trained, de-boarded, tied up,
12     what have you, you brought them -- them
13     meaning DePover and Sexton -- up to the depot
14     at the north end.  Right?
15 A  Yes, they were brought up to the north end.
16 Q  And you interviewed them.  Right?
17 A  It looks like -- on this part the testimony
18     looks like Mr. DePover was interviewed.
19 Q  It says, "They were relieved on the south
20     end.  And because of their hours, they were
21     brought to the north end".  That would
22     suggest that Sexton was brought to the north
23     end as well or not?
24 A  Correct.
25 Q  So both DePover and Sexton came to the north

161

1     end, and I believe Dylan Smith joined you at
2     that point?
3 **A**  **I believe so.**
4 **Q**  And they were interviewed and you got a
5     written statement from Mr. DePover. Right?
6 **A**  **Yes.**
7 **Q**  And that was after their hours of service had
8     expired. Right?
9 **A**  **I believe so.**
10 **Q**  We don't need to harp on this. Were you able
11     to watch video at the investigation?
12 **A**  **Yes.**
13 **Q**  There's no question that video existed at
14     least the day of this investigation. Right?
15 **A**  **That's correct.**
16 **Q**  Did anyone ever ask you to attempt to find
17     the video or locate it?
18 **A**  **I think at some point somebody did.**
19 **Q**  How is that video, that surveillance video,
20     how is it stored? Who houses it, if you know?
21 **A**  **I don't know how it's stored or who houses it.**
22 **Q**  When it's used in an investigation like this,
23     does someone pull the pertinent part, put it
24     on a thumb drive and hand it to someone, or
25     is it accessed through CP Systems or how does

162

1     that work?
2 **A**  **I don't recall how that was done in this**
3    **particular case.**
4 **Q**  Do you know how it was played? Was it played
5     on a laptop and some projector on a wall?
6 **A**  **I don't.**
7 **Q**  Let's go to page 33.
8 **A**  **Okay.**
9 **Q**  This is your testimony starting at line 2.
10     Do you see on line 6 you state, "They do have
11     76 cars ahold of at this time"?
12 **A**  **Correct.**
13 **Q**  And after that you testified, "You're gonna
14     see myself, I'm entering the frame at the
15     bottom of the screen."
16 **A**  **Okay.**
17 **Q**  That would indicate we couldn't -- the video
18     didn't depict your truck. Right?
19 **A**  **I would assume that's correct.**
20 **Q**  If we go to page 34, line 9, you state, "It's
21     a clear violation of GCOR 5.3.7." Right?
22 **A**  **Do you mind if I read the rest of my transcript**
23    **to see why I said that? (Witness examining**
24    **document). Line 9, that's correct. He**
25    **violated 5.3.7.**

163

1 **Q**  Page 45, line 12, do you recall Mr. Rainwater
2     saying for the record "your vehicle is not in
3     view and you didn't have a radio on your
4     person"?
5 **A**  **I don't recall that.**
6 **Q**  Any reason to dispute that?
7 **A**  **No.**
8 **Q**  We're going to go to page 50.
9 **A**  **Okay.**
10 **Q**  Start at -- I guess they're talking at the
11     top about the tonnage profile. And DePover
12     starts testifying about the move and the
13     tonnage profile. So read from line 6 down to
14     24.
15           MR. SULLIVAN: Just for clarity
16     this it is Justin DePover's examination.
17     Correct?
18           MR. MAGNUSON: His statement,
19     testimony. I don't know what you want to
20     call it.
21           MR. SULLIVAN: He's the person
22     giving the answers.
23           MR. MAGNUSON: Correct.
24 **A**  **(Witness examining document). What line to --**
25 **Q**  (By Mr. Magnuson, continuing) Just 24.

164

1 **A**  **(Witness examining document). Okay.**
2 **Q**  Does that testimony suggest to you that they
3     were going to spot 25 cars in that track,
4     thus the 15 to a stop?
5 **A**  **He's telling him at this point that he had 15**
6    **cars to stop.**
7 **Q**  When he gave the initial -- did you ever hear
8     DePover ask Sexton for 25 at the beginning
9     when the initial count was 50?
10 **A**  **I don't recall that.**
11 **Q**  But then after he moves 10 cars and he says
12     40, 15 until the stop, that would suggest
13     that they were going to spot 25 cars. Right?
14 **A**  **I don't recall the number.**
15 **Q**  But that would make sense from a math
16     perspective, right, if he says, I want 25,
17     you're clear for 50, they move 10, then he
18     says you're clear for 40, 15 to a stop?
19 **A**  **So that -- it's really not that simple. If**
20    **you're shoving into a track, you still have**
21    **to worry about where the clearances are.**
22 **Q**  Oh, of course. I'm talking about what their
23     intent was. This would suggest the intent
24     was to spot 25 cars. Right?
25           MR. SULLIVAN: Objection, lack of

165

1  personal knowledge, calls for speculation.
2        MR. MAGNUSON:  He's got
3  foundation to know this stuff.
4        MR. SULLIVAN:  He doesn't have
5  foundation to know what these peoples' intent
6  was.
7  Q  (By Mr. Magnuson, continuing) We can draw
8  conclusions that this testimony suggests
9  that.  You may not have personal knowledge
10  because I know you say you didn't hear it;
11  but this would suggest to you that was the
12  intent.  Right?
13  A  **No.  That suggests to me that he had to shove**
14  **in 15 car lengths, that he should have**
15  **stopped within 7.**
16  Q  So you're not considering the initial 50?
17  You're not considering clear for a 40?
18  A  **Has no bearing on what was going on at the**
19  **time.**
20  Q  Do you think DePover -- you understand he was
21  on a furlough prior to this shift for quite
22  awhile.  I think it was his second shift back
23  or something like that.  Do you recall any of
24  that?
25  A  **I thought it was his first shift back.  Maybe**

166

1  **it was the second.**
2  Q  First or second.  I understand your testimony
3  is that you got to go with the more conservative
4  15.  Would you agree that clear for 40, 15 to
5  a stop is an unclear radio communication?
6  A  **No.**
7  Q  So these are terms that are within the rules,
8  the radio rules?
9  A  **Correct.**
10  Q  Clear for 40, 15 to a stop?
11  A  **Correct.**
12  Q  Not clear for 15.  Right?  Clear for 40?
13  A  **Correct.  When shoving on other than main**
14  **track and/or a main track in a shoving**
15  **movement, you have to still be prepared to**
16  **stop for equipment, broken rails, other types**
17  **of situations.  So when you're shoving that**
18  **15 car lengths, you're still watching the**
19  **shove.  Otherwise he would have just kept**
20  **shoving and DePover wouldn't have not -- have**
21  **had to say anything.**
22  Q  He stopped after 11.  Right?
23  A  **He stopped 11 cars passed where he should**
24  **have.**
25  Q  Well within 20 though.  Right?

167

1  A  **That has no bearing on the situation.  He**
2  **should have stopped within 7.  6.28 would**
3  **have applied if he would have hit something.**
4  Q  So you're saying he went 11 cars passed where
5  he should have stopped?
6  A  **Isn't that what the testimony says?**
7        MR. SULLIVAN:  Take some time to
8  read it and get clear what you were saying
9  back at that time.
10  A  **Page 20, "When he stopped, he'd actually**
11  **shoved 11 cars into the track further from**
12  **that initial count of 50."**
13  Q  (By Mr. Magnuson, continuing) So he should
14  have stopped at 7 and he actually stopped at
15  11?
16  A  **There you go.  Yes.  Again, you're watching**
17  **the shoving movement.  Like if somebody would**
18  **have walked across that track and fell for**
19  **whatever reason, DePover, the conductor, is**
20  **still responsible to watch that shove and**
21  **make sure there's nothing back there.  That's**
22  **why he did not have -- he was not counting**
23  **him down to the 40.  He was counting him down**
24  **to the 15.**
25  Q  You recall there was a bunch of testimony

168

1  about car lengths.  There was some longer car
2  lengths, some shorter ones, some auto racks,
3  that type of thing.  I don't need to get into
4  it, but you understand that there was some
5  testimony about that.  Right?
6  A  **Correct, but I thought there was also footage**
7  **noted in the transcript somewhere as well on**
8  **my testimony, measurements as well.**
9  Q  You agree that there was no audio to
10  correspond with the video?
11  A  **No.**
12  Q  Oftentimes those radio communications on CP
13  are recorded?
14  A  **Those are not.**
15  Q  Not at Nahant but in other yards and other
16  times, those can be recorded?
17  A  **They can be.**
18  Q  We'll go to 51, the very bottom.  Do you see
19  at the very bottom the sentence there where
20  DePover says he was "quite under some
21  pressure" with respect to you and Mr. Smith
22  being in the office with him?
23  A  **Okay.**
24  Q  Do you see the next page 52 that Mr. DePover
25  testifies that he felt intimidated by you?

169

1    MR. SULLIVAN: Objection,
2 misstates the document.
3 **Q** (By Mr. Magnuson, continuing) On page 52,
4    line 12, Mr. DePover was asked, "Okay. So
5    you did feel intimidated, being in the room
6    with Mr. Jared?" And the answer was, "Yes, I
7    did." Do you see that?
8 **A** **I do.**
9 **Q** That's something that the CP Rail discourages,
10    right, intimidating employees in these
11    circumstances?
12 **A** **We do discourage intimidation, that's true.**
13 **Q** Intimidation is the same thing as hostility.
14    Right?
15 **A** **I don't know that.**
16 **Q** The top of page 53 DePover testifies your
17    vehicle wasn't in the video screen. Correct?
18 **A** **What line?**
19 **Q** 1 through 8.
20 **A** **(Witness examining document). Okay.**
21 **Q** Do you see that? He says your car wasn't in
22    the video either. Right?
23 **A** **Agreed.**
24 **Q** Moving down to line 13.
25 **A** **(Witness examining document).**

170

1 **Q** Have you read that?
2 **A** **Yes.**
3 **Q** 5.3.7 says unless additional instructions are
4    given. Right?
5 **A** **Can I see the rule?**
6 **Q** Yes, we're pulling it. But DePover testifies
7    here on line 16, 15 and 16, he updated -- him
8    being Sexton -- with needing 15 more to a
9    stop, still clear for 40. That's what he
10    says. Right?
11 **A** **Correct.**
12 **Q** I showed you what we marked as your
13    Deposition Exhibit 11.
14 **A** **Okay.**
15 **Q** And you see the box under that, that's the
16    movement must stop within half the distance
17    specified unless additional instructions are
18    received. This is the rule that you
19    testified Mr. Sexton violated. Right?
20 **A** **That's correct.**
21 **Q** And it says, half the distance specified
22    unless additional instructions are received.
23    Do you see that?
24 **A** **I do.**
25 **Q** And you agree with that rule?

171

1 **A** **I do.**
2 **Q** And you've read Mr. DePover's testimony where
3    he says 15 more to a stop, still clear for
4    40. Correct?
5 **A** **15 to a stop. That's correct.**
6 **Q** Still clear for 40 is what he testified to.
7    Right?
8 **A** **That's true but he's also following Rule 6.28.**
9 **Q** That's what he testified to. Right?
10 **A** **I understand that. That's correct.**
11 **Q** And that would be an additional instruction.
12    Right?
13 **A** **That's correct.**
14 **Q** We're going to start speeding this along here.
15 **A** **Am I done with this?**
16 **Q** Yeah, hopefully. Were you aware that
17    Mr. Rainwater requested of Mr. Reyes to have
18    Cruciani and Cox testify and was denied that?
19 **A** **No.**
20 **Q** You don't recall that testimony in the
21    investigation?
22 **A** **No.**
23 **Q** Would you agree with me that if an engineer
24    feels that there was a safety issue with snow
25    and ice buildup on tracks, that the engineer

172

1    should make his supervisor aware of it?
2 **A** **He doesn't have to do that.**
3 **Q** An engineer doesn't have to make his
4    supervisor aware of a safety concern with
5    snow and ice buildup on tracks?
6 **A** **No.**
7 **Q** What should he do in that situation?
8 **A** **Cut the crossing, cut the tracks.**
9 **Q** Shouldn't tell his supervisor where he's
10    going, what he's doing?
11 **A** **Doesn't have to.**
12 **Q** He can just without telling his supervisor
13    cut away light power, cause any delay that's
14    necessary to make sure the tracks are cut?
15 **A** **Yes.**
16 **Q** Okay. Were you made aware that Mr. McKelvey
17    and Mr. Sexton had a disagreement about
18    whether the tracks should be cut?
19 **A** **At some point.**
20 **Q** How were you made aware of that?
21 **A** **I don't recall.**
22 **Q** A conversation with Mr. McKelvey perhaps?
23 **A** **I don't remember.**
24 **Q** Would you take exception with Mr. McKelvey if
25    he told Sexton 'don't cut those tracks, get

173

1   on your train and go'?
2 A **If there was snow covered, I would take**
3   **exception with Mr. McKelvey.**
4 Q Because Sexton says he was told 'don't cut
5   those tracks, get on your train and go'.
6   That's what Sexton testified to.
7 A **Yeah, I support Mr. Sexton.**
8 Q And I can represent to you that Mr. DePover
9   is going to testify consistent with that at
10  trial. So you're okay with Mr. Sexton?
11 A **Yes.**
12 Q If Mr. McKelvey says 'don't cut those tracks,
13  get on your train and go', is that Sexton
14  disobeying an order?
15 A **No.**
16 Q Why?
17 A **Because Mr. Sexton is attempting to follow**
18  **the rules like he's supposed to.**
19 Q You're aware that prior in the months leading
20  up to February 1st, 2021 there were two
21  derailments in the area within a couple
22  hundred miles, 100 miles, due to snow and ice
23  buildup on tracks?
24 A **No.**
25 Q You're not aware of that?

174

1 A **No.**
2 Q You don't recall seeing circulars or fliers
3   that are put up around depots, hey, be
4   careful about -- to cut your tracks because
5   two derailments happened recently?
6 A **I don't remember that being put up.**
7 Q Snow and ice buildup on tracks, particularly
8   crossings, can become problematic because the
9   flange-ways and the wheels can rise up off
10  the rails onto the ice. Right?
11 A **It can happen on crossings and rail yards,**
12  **anywhere there's snow and ice.**
13 Q But it's more frequent at crossings, as I
14  understand it, because automobile traffic
15  tamps down the snow and can cause that ice to
16  build up within the track structure. Right?
17 A **That is correct.**
18 Q Snow and ice buildup on tracks can also cause
19  a locomotive's braking system difficulty or
20  to malfunction. Right?
21 A **A locomotive's braking system can get buildup**
22  **and cause issues stopping because the brakes,**
23  **correct.**
24 Q Ice and snow can build up in the brake system
25  and cause difficulty in stopping. Right?

175

1 A **Yes.**
2 Q Another reason to make sure crossings and
3   flange-ways and tracks are cut is if there's
4   dangerous buildup of snow and ice. Right?
5 A **It's two separate issues.**
6 Q That's what I mean. There's two reasons at
7   least to cut the tracks. One, it can cause
8   derailments because the wheels rise up on it.
9   Right?
10 A **That's correct.**
11 Q And then it also can cause the brakes to
12  malfunction. Snow and ice buildup in brake
13  systems can cause the brakes to malfunction.
14  Right?
15 A **No.**
16 Q On locomotives?
17 A **At a crossing?**
18 Q No. As they're operating. If snow and ice
19  builds up in a locomotive's brake system, it
20  can affect how those brakes operate. Right?
21 A **Correct.**
22 Q And it can cause them to fail?
23 A **That's correct.**
24 Q And when you've got a big, long train, you
25  need -- a 76 car train, for instance, you

176

1   need the brakes to be able to operate safely.
2   Right?
3 A **That's correct. And that's why we have**
4   **procedures when we operate in the winter**
5   **operation that the locomotive engineers are**
6   **responsible to condition their brakes prior**
7   **to stopping.**
8 Q Do you recall whether or not you looked at a
9   train list for Mr. Sexton that day to know
10  whether or not there was hazardous materials
11  on his train?
12 A **I don't recall.**
13 Q Do you know if the 474 routinely transports
14  hazardous materials?
15 A **Yes.**
16 Q It does?
17 A **Yes.**
18 Q Sexton and Mr. DePover both say there was
19  hazardous materials on that train. Okay?
20 A **Okay.**
21 Q Do you have any reason to disagree with that?
22 A **I don't.**
23 Q Marquette to Nahant, you've traveled that
24  route before I'm assuming, that run?
25 A **Yes.**

177

1  Q  And that goes parallel to the Mississippi
2     River.  Right?
3  A  It does, portions of it.
4  Q  Quite close in some places.  Right?
5  A  Correct.
6  Q  And a train carrying hazardous materials de-
7     railing into the Mississippi River would be a
8     catastrophe.  Right?
9  A  Correct.
10 Q  It would be a environmental catastrophe.
11    Right?
12 A  Correct.
13 Q  It would cost the railroad a lot of money to
14    repair the tracks.  Right?
15 A  It could.
16 Q  Cost a lot to repair the freight, the
17    equipment, all that.  Right?
18 A  There is that possibility.
19 Q  A train derailing carrying hazardous
20    materials through areas where people live
21    could be a safety hazard for the folks living
22    in that area.  Right?
23 A  It could.
24 Q  Things like anhydrous ammonia can travel and
25    spread out so that people in the area are

178

1     affected by the fumes.  Right?
2  A  It could be.
3  Q  You're aware that that has happened.  Right?
4     Anhydrous spills occur and they evacuate places?
5  A  I'm aware of that, yes.
6  Q  When you became aware that Sexton and
7     McKelvey had a disagreement about cutting the
8     tracks, do you know how long it took Sexton
9     to cut the tracks?
10 A  No.
11 Q  You're not going to come to trial and
12    testify, well, it just took him two minutes,
13    this was nothing.  You just have no idea one
14    way or the other?
15 A  I thought I saw something during a depo that
16    had a timeline on it.
17 Q  What depo?
18 A  Sorry.  Not depo.  The depo prep when I
19    reviewed the documents.
20 Q  I thought you said you didn't review any
21    documents.
22        MR. SULLIVAN:  That misstates the
23    witness' testimony.
24 A  I reviewed documents during the prep.
25 Q  (By Mr. Magnuson, continuing) What timeline

179

1     did you look at?
2  A  I don't know.  I'd have to look at the
3     document.
4  Q  We can see the timeline.
5        MR. SULLIVAN:  I don't know what
6     the timeline is.
7  Q  (By Mr. Magnuson, continuing) What timeline
8     did you see?
9  A  I don't recall.  There's a write-up.
10    Somebody had it.
11        MR. SULLIVAN:  There is no time-
12    line that's work product that -- are you
13    referring to a document that was like in an
14    e-mail or something that was sent and
15    produced in discovery?
16        THE WITNESS:  McKelvey's
17    drill-down I thought.
18        MR. SULLIVAN:  McKelvey's drill-
19    down is a document that's been produced in
20    discovery.
21 Q  (By Mr. Magnuson, continuing) So you read
22    that?
23 A  Yeah.
24 Q  What did that say with respect to how long it
25    took Sexton to cut the tracks?

180

1  A  I don't know it it's specific in there how
2     long it took to cut the tracks.  It also
3     mentioned in there getting the locomotive off
4     of the bridge and running down across that
5     crossing that they mentioned and then running
6     down the siding and then having to dig out a
7     switch.  So there's lots of things and
8     there's a time in there.
9  Q  Were you made aware that the delay -- the
10    over-standard event was somewhere in the
11    neighborhood of 3 hours, 3-1/2 hours?
12 A  Somewhere in there.
13 Q  I'll show you what we have already marked as
14    Deposition Exhibit 26.  Before you read the
15    whole thing, is this what you reviewed in
16    preparation for your testimony?
17 A  That is correct.  (Witness examining document).
18    Okay.
19 Q  I don't read anywhere in here where it
20    suggests that Sexton and McKelvey had a
21    disagreement about whether or not to cut
22    these tracks.
23 A  I agree.
24 Q  Do you know where else you might have learned
25    that there was a disagreement between those

185

1  **A**  No.
2  **Q**  This was CTC territory. Correct?
3  **A**  No.
4  **Q**  It wasn't at the time?
5  **A**  No.
6  **Q**  Because it was PTC?
7  **A**  **It was TWC.**
8  **Q**  Would TWC -- I was under the impression it
9      was CTC. Would TWC, if it was downloaded or
10     what have you, be able to tell us what times
11     Mr. Sexton's train passed certain signals?
12 **A**  **No. There are no signals in TWC.**
13 **Q**  Because it's track warrant controlled. Okay.
14     So there's no CTC type signals that are
15     communicating between Marquette and Nahant?
16     It's all track warrant controlled?
17 **A**  **No. There's sections of CTC in there.**
18 **Q**  Oh, there is? Okay. Where does it start?
19 **A**  **In 2021?**
20 **Q**  Yes.
21 **A**  **I don't know the milepost, but it's Samoa to**
22     **Deer Creek, Samoa to Deer Creek.**
23 **Q**  Okay. Which would have been passed, at least
24     according to these documents, where Sexton
25     traveled cutting the tracks?

186

1  **A**  **100 miles south, yes.**
2          MR. MAGNUSON: I have to use the
3      restroom super quick. Let's take five minutes.
4          (Brief recess).
5  **Q**  (By Mr. Magnuson, continuing) Mr. Jared,
6      prior to conducting the E test on Sexton, did
7      you notify dispatch that you were going to do
8      it?
9  **A**  **No.**
10 **Q**  Do you know how many trains went through
11     Nahant on February 1st, 2021?
12 **A**  **I do not.**
13 **Q**  Do you know what an approximate amount would
14     be on a daily basis?
15 **A**  **Anywhere from 8 to 12.**
16 **Q**  Fairly busy terminal as I understand it?
17 **A**  **For its size, yes.**
18 **Q**  How many other E tests did you conduct on
19     February 1st, 2021?
20 **A**  **That's the only one I can remember.**
21 **Q**  What was it specifically about the 474 that
22     made you want to E test that train?
23 **A**  **The opportunity to perform that type of a**
24     **test.**
25 **Q**  What do you mean by the opportunity?

187

1  **A**  **It was a controlled environment. The tracks**
2      **were clear. There was no possibility of the**
3      **crew shoving off the end of the track.**
4  **Q**  Did you have any idea that the 474 was
5      delayed when you E tested it?
6  **A**  **Not that I recall.**
7  **Q**  But you did talk to Mr. McKelvey that day
8      prior to E testing?
9  **A**  **I don't recall when I talked to him.**
10 **Q**  But the phone records suggest that you talked
11     to McKelvey before the E test. Right?
12 **A**  **They do suggest that, yes.**
13 **Q**  And you did receive an e-mail from McKelvey
14     or the system identifying the delay. Right?
15 **A**  **That is correct.**
16         (Deposition Exhibit 53 marked for
17     identification.)
18 **Q**  I will show you what we marked Exhibit 53.
19     This is Mr. Sexton's testing data. I'll ask
20     that you look at that, please. All I'm
21     really looking for is if you can kind of skim
22     his results.
23 **A**  **(Witness examining document). What's this?**
24 **Q**  Testing history.
25 **A**  **Oh, for rules?**

188

1  **Q**  Yep.
2  **A**  **I see that. Okay. What about it?**
3  **Q**  If you can look through his scores.
4  **A**  **A lot of 100 percents and upper 90s.**
5  **Q**  That's pretty good. Right?
6  **A**  **Yes.**
7  **Q**  This if you looked at it just sitting in your
8      office wouldn't cause you any alarm or
9      concern about that engineer?
10 **A**  **No. I'm confident in John Sexton's ability**
11     **to understand the rules. Application might**
12     **be a little different but he understands**
13     **them. He had a 2.37 failure rate.**
14         MR. SULLIVAN: There's no
15     question so you don't have to answer.
16         (Deposition Exhibit 54 marked for
17     identification.)
18 **Q**  (By Mr. Magnuson, continuing) This is Exhibit
19     54. Do you recall ever reading this?
20 **A**  **(Witness examining document). Okay.**
21 **Q**  Do you recall reading or receiving the
22     e-mails contained in Exhibit 54?
23 **A**  **I don't recall receiving it, but this is also**
24     **something I reviewed.**
25 **Q**  It is. Do you see that in this document or



# HOTEL
# BLACKHAWK

## AUTOGRAPH COLLECTION®
### HOTELS

**Tom Jared**
**123 main st**
**san antonio TX 78229**
**United States**

Company Name:
Group Name:

| | |
|---|---|
| Room No. | : 0704 |
| Arrival | : 01-31-21 |
| Departure | : 02-03-21 |
| Folio No. | : 136899 |
| Conf. No. | : 5510955 |
| Cashier No. | : 40 |
| Custom Ref. | : |

| Date | Description | Charges | Credits |
|---|---|---|---|
| 01-31-21 | Room Charge | 129.00 | |
| 01-31-21 | Room Sales Tax 7% | 9.03 | |
| 01-31-21 | Occupancy Tax 5% | 6.45 | |
| 02-01-21 | Room Charge | 139.00 | |
| 02-01-21 | Room Sales Tax 7% | 9.73 | |
| 02-01-21 | Occupancy Tax 5% | 6.95 | |
| 02-02-21 | Room Service | 40.29 | |
| | Room# 0704 : CHECK# 0035849 | | |
| 02-02-21 | Room Charge | 139.00 | |
| 02-02-21 | Room Sales Tax 7% | 9.73 | |
| 02-02-21 | Occupancy Tax 5% | 6.95 | |
| 02-03-21 | Master Card | | 496.13 |

| | | |
|---|---|---|
| Total Charges | 496.13 | |
| Total Credits | | 496.13 |
| Balance | | 0.00 |

Guest Signature: _____

| | | | |
|---|---|---|---|
| **Merchant ID** | | **Credit Card #** | XXXXXXXXXXXX0396 |
| **Transaction ID** | 5521953 | **Credit Card Expiry** | XX/XX |
| **Approval Code** | 089485 | **Capture Method** | Manual |
| **Approval Amount** | 496.13 | **Transaction Amount** | 496.13 |

**EXHIBIT**

51

Page No. 1 of 1

CONFIDENTIAL East Third Street Davenport, IA 52801 || Telephone: 563.322.5000 || Fax:  563.322.5010 CP_03477
Operated under license from Marriott International, Inc. or one of its affiliates



**EXHIBIT**
52

| Invoice Number | Account Number | Date Due | Page |
|---|---|---|---|
| 9873190538 | ■■■■■ | 03/02/21 | 4429 of 5116 |

**Summary for Thomas Jared 824262: ■■■■■**
**4634**

## Your Plan

**Cust Flex UNL Min&MSG 10GB Sh**
$105.00 monthly charge
Unlimited monthly minutes

**Email Combo Acct SHR MHS 10GB**
10 monthly gigabyte allowance
$10.00 per GB after allowance

**Beginning on 07/22/15:**
**19% Access Discount**

**Beginning on 04/11/20:**
**Out of Contract $20 Off**

**UNL Picture/Video MSG**
Unlimited monthly Picture & Video

**UNL Text Messaging**
Unlimited monthly M2M Text
Unlimited monthly Text Message

Have more questions about your charges?
Get details for usage charges at
b2b.verizonwireless.com.

## Monthly Charges

| | | |
|---|---|---|
| Cust Flex UNL Min&MSG 10GB Sh | 02/11 – 03/10 | 105.00 |
| 19% Access Discount | 02/11 – 03/10 | –19.95 |
| Out of Contract $20 Off | 02/11 – 03/10 | –20.00 |
| Global Calling | 02/11 – 03/10 | 5.00 |
| | | **$70.05** |

## Usage and Purchase Charges

| Voice | | Allowance | Used | Billable | Cost |
|---|---|---|---|---|---|
| Calling Plan | minutes | unlimited | 8239 | –– | –– |
| Total Voice | | | | | **$.00** |

| Messaging | | Allowance | Used | Billable | Cost |
|---|---|---|---|---|---|
| Text | messages | unlimited | 41 | –– | –– |
| Unlimited M2M Text | messages | unlimited | 20 | –– | –– |
| Picture & Video – Sent | messages | unlimited | 9 | –– | –– |
| Picture & Video – Rcv'd | messages | unlimited | 42 | –– | –– |
| Total Messaging | | | | | **$.00** |

| Data | | Allowance | Used | Billable | Cost |
|---|---|---|---|---|---|
| Gigabyte Usage | gigabytes | 10.000 (shared) | .871 | –– | –– |
| Total Data | | | | | **$.00** |
| **Total Usage and Purchase Charges** | | | | | **$.00** |

**Surcharges**

| | |
|---|---|
| Fed Universal Service Charge | 2.22 |
| Regulatory Charge | .21 |
| Administrative Charge | 1.95 |
| | **$4.38** |

**Taxes, Governmental Surcharges and Fees**

| | |
|---|---|
| MN 911/Telerelay Chrg | 1.02 |
| MN State Telecom Sales Tax | .99 |
| Ramsey Cnty Telecom Sales Tax | .07 |
| Saint Paul City Tele Sales Tax | .07 |
| | **$2.15** |

| | |
|---|---|
| **Total Current Charges for** ■■■■■ | **$76.58** |

CONFIDENTIAL

CP_03429

# verizon✓

| | Invoice Number | Account Number | Date Due | Page |
|---|---|---|---|---|
| | 9873190538 | ▇▇▇▇▇▇ | 03/02/21 | 4458 of 5116 |

## Detail for Thomas Jared 824262: ▇▇▇▇▇▇

## Voice, continued

| Date | Time | Number | Rate | Usage Type | Origination | Destination | Min. | Airtime Chrgs | LD/Other Chrgs | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 1/31 | 9:03A | | Other | Wi-Fi | Minneapoli MN | Incoming CL | 1 | --- | --- | --- |
| 1/31 | 9:14A | | Other | Wi-Fi | Minneapoli MN | Incoming CL | 1 | --- | --- | --- |
| 1/31 | 9:42A | | Other | Wi-Fi | Minneapoli MN | Incoming CL | 2 | --- | --- | --- |
| 1/31 | 9:52A | | Other | Wi-Fi | Minneapoli MN | Incoming CL | 3 | --- | --- | --- |
| 1/31 | 10:09A | | Other | Wi-Fi | Minneapoli MN | Incoming CL | 2 | --- | --- | --- |
| 1/31 | 10:13A | | Other | Wi-Fi | WiFi CL | Davenport IA | 4 | --- | --- | --- |
| 1/31 | 11:00A | | Other | Wi-Fi | Minneapoli MN | Incoming CL | 2 | --- | --- | --- |
| 1/31 | 11:29A | | Other | Wi-Fi | WiFi CL | Davenport IA | 4 | --- | --- | --- |
| 1/31 | 11:42A | | Other | Wi-Fi | Minneapoli MN | Incoming CL | 18 | --- | --- | --- |
| 1/31 | 12:01P | | Other | Wi-Fi | WiFi CL | Cambridge MN | 3 | --- | --- | --- |
| 1/31 | 12:16P | | Other | Wi-Fi | Minneapoli MN | Incoming CL | 11 | --- | --- | --- |
| 1/31 | 12:58P | | Off-Peak | PlanAllow | Eden Prair MN | Incoming CL | 8 | --- | --- | --- |
| 1/31 | 1:05P | | Off-Peak | PlanAllow,CallWait | Eden Prair MN | Incoming CL | 1 | --- | --- | --- |
| 1/31 | 1:07P | | Off-Peak | PlanAllow | Eden Prair MN | Clear Lake IA | 1 | --- | --- | --- |
| 1/31 | 2:31P | | Off-Peak | PlanAllow | Eden Prair MN | Incoming CL | 3 | --- | --- | --- |
| 1/31 | 2:35P | | Off-Peak | PlanAllow | Eden Prair MN | Incoming CL | 3 | --- | --- | --- |
| 1/31 | 3:00P | | Off-Peak | PlanAllow | Eden Prair MN | Incoming CL | 9 | --- | --- | --- |
| 1/31 | 3:23P | | Off-Peak | PlanAllow | Minnetonka MN | Incoming CL | 5 | --- | --- | --- |
| 1/31 | 3:25P | | Off-Peak | PlanAllow | Minnetonka MN | Twincities MN | 3 | --- | --- | --- |
| 1/31 | 3:29P | | Off-Peak | PlanAllow | Minnetonka MN | Clear Lake IA | 3 | --- | --- | --- |
| 1/31 | 3:45P | | Off-Peak | PlanAllow | Minnetonka MN | Twincities MN | 3 | --- | --- | --- |
| 1/31 | 3:56P | | Off-Peak | PlanAllow | Minnetonka MN | Incoming CL | 8 | --- | --- | --- |
| 1/31 | 3:56P | | Off-Peak | PlanAllow | Minnetonka MN | Davenport IA | 7 | --- | --- | --- |
| 1/31 | 5:04P | | Other | Wi-Fi | Minneapoli MN | Incoming CL | 2 | --- | --- | --- |
| 1/31 | 6:59P | | Other | Wi-Fi | WiFi CL | Toll-Free CL | 4 | --- | --- | --- |
| 1/31 | 7:01P | | Other | Wi-Fi,CallWait | Minneapoli MN | Incoming CL | 2 | --- | --- | --- |
| 1/31 | 7:03P | | Other | Wi-Fi | WiFi CL | Toll-Free CL | 16 | --- | --- | --- |
| 1/31 | 7:18P | | Other | Wi-Fi | WiFi CL | Clear Lake IA | 5 | --- | --- | --- |
| 1/31 | 7:23P | | Other | Wi-Fi,CallWait | Minneapoli MN | Incoming CL | 6 | --- | --- | --- |
| 2/01 | 5:38A | | Off-Peak | PlanAllow | Davenport IA | Kansascity MO | 4 | --- | --- | --- |
| 2/01 | 5:42A | | Off-Peak | PlanAllow | Davenport IA | Davenport IA | 12 | --- | --- | --- |
| 2/01 | 5:53A | | Off-Peak | PlanAllow,CallWait | Davenport IA | Incoming CL | 1 | --- | --- | --- |
| 2/01 | 5:54A | | Off-Peak | PlanAllow | Davenport IA | Davenport IA | 5 | --- | --- | --- |
| 2/01 | 5:58A | | Off-Peak | PlanAllow,PlanAllow,Span | Rock Islan IL | Sioux Fls SD | 9 | --- | --- | --- |
| 2/01 | 6:12A | | Peak | PlanAllow | Davenport IA | VM Deposit CL | 1 | --- | --- | --- |
| 2/01 | 6:13A | | Peak | PlanAllow | Davenport IA | Minneapols MN | 2 | --- | --- | --- |
| 2/01 | 6:15A | | Peak | PlanAllow | Davenport IA | Incoming CL | 1 | --- | --- | --- |
| 2/01 | 6:20A | | Peak | PlanAllow | Davenport IA | Incoming CL | 4 | --- | --- | --- |
| 2/01 | 6:42A | | Peak | PlanAllow | Davenport IA | Incoming CL | 2 | --- | --- | --- |
| 2/01 | 7:01A | | Peak | PlanAllow | Davenport IA | Toll-Free CL | 3 | --- | --- | --- |
| 2/01 | 7:08A | | Peak | PlanAllow | Davenport IA | McGregoria IA | 2 | --- | --- | --- |
| 2/01 | 7:18A | | Peak | PlanAllow | Davenport IA | Incoming CL | 4 | --- | --- | --- |
| 2/01 | 7:26A | | Peak | PlanAllow | Davenport IA | Minneapols MN | 2 | --- | --- | --- |
| 2/01 | 7:30A | | Peak | PlanAllow | Davenport IA | Sioux Fls SD | 1 | --- | --- | --- |
| 2/01 | 7:31A | | Peak | PlanAllow | Davenport IA | Bemidji MN | 6 | --- | --- | --- |
| 2/01 | 7:36A | | Peak | PlanAllow | Davenport IA | Incoming CL | 4 | --- | --- | --- |

CONFIDENTIAL

CP_03458



| Invoice Number | Account Number | Date Due | Page |
|---|---|---|---|
| 9873190538 | | 03/02/21 | 4459 of 5116 |

**Detail for Thomas Jared 824262:**

## Voice, continued

| Date | Time | Number | Rate | Usage Type | Origination | Destination | Min. | Airtime Chrgs | LD/Other Chrgs | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 2/01 | 7:39A | | Other | Wi-Fi,CallWait | Minneapoli MN | Incoming CL | 4 | --- | --- | --- |
| 2/01 | 7:43A | | Other | Wi-Fi | WiFi CL | Desplaines IL | 3 | --- | --- | --- |
| 2/01 | 9:23A | | Peak | PlanAllow | Davenport IA | Desplaines IL | 2 | --- | --- | --- |
| 2/01 | 9:31A | | Peak | PlanAllow | Davenport IA | Incoming CL | 10 | --- | --- | --- |
| 2/01 | 9:40A | | Peak | PlanAllow,CallWait | Davenport IA | Incoming CL | 18 | --- | --- | --- |
| 2/01 | 9:57A | | Peak | PlanAllow | Davenport IA | Albany NY | 5 | --- | --- | --- |
| 2/01 | 10:32A | | Peak | PlanAllow | Davenport IA | Incoming CL | 3 | --- | --- | --- |
| 2/01 | 10:39A | | Peak | PlanAllow | Davenport IA | Incoming CL | 1 | --- | --- | --- |
| 2/01 | 10:40A | | Peak | PlanAllow | Davenport IA | Davenport IA | 1 | --- | --- | --- |
| 2/01 | 10:55A | | Other | Wi-Fi | Minneapoli MN | Incoming CL | 6 | --- | --- | --- |
| 2/01 | 11:02A | | Other | Wi-Fi | WiFi CL | Toll-Free CL | 13 | --- | --- | --- |
| 2/01 | 11:12A | | Other | Wi-Fi | WiFi CL | Minneapols MN | 3 | --- | --- | --- |
| 2/01 | 11:14A | | Other | Wi-Fi | WiFi CL | Toll-Free CL | 16 | --- | --- | --- |
| 2/01 | 11:31A | | Other | Wi-Fi | Minneapoli MN | Incoming CL | 5 | --- | --- | --- |
| 2/01 | 11:36A | | Peak | PlanAllow | Davenport IA | Incoming CL | 1 | --- | --- | --- |
| 2/01 | 11:46A | | Other | Wi-Fi | WiFi CL | Minneapols MN | 3 | --- | --- | --- |
| 2/01 | 11:59A | | Peak | PlanAllow | Rock Islan IL | Davenport IA | 6 | --- | --- | --- |
| 2/01 | 12:11P | | Peak | PlanAllow | Davenport IA | Bemidji MN | 1 | --- | --- | --- |
| 2/01 | 12:15P | | Peak | PlanAllow | Davenport IA | Davenport IA | 2 | --- | --- | --- |
| 2/01 | 12:24P | | Peak | PlanAllow | Davenport IA | Davenport IA | 2 | --- | --- | --- |
| 2/01 | 12:37P | | Peak | PlanAllow | Davenport IA | Incoming CL | 1 | --- | --- | --- |
| 2/01 | 12:56P | | Peak | PlanAllow | Davenport IA | Davenport IA | 3 | --- | --- | --- |
| 2/01 | 1:02P | | Peak | PlanAllow | Davenport IA | Davenport IA | 1 | --- | --- | --- |
| 2/01 | 1:03P | | Peak | PlanAllow | Davenport IA | Minneapols MN | 2 | --- | --- | --- |
| 2/01 | 1:43P | | Other | Wi-Fi | WiFi CL | Bemidji MN | 1 | --- | --- | --- |
| 2/01 | 1:45P | | Other | Wi-Fi | WiFi CL | Bemidji MN | 1 | --- | --- | --- |
| 2/01 | 2:45P | | Peak | PlanAllow | Davenport IA | Incoming CL | 4 | --- | --- | --- |
| 2/01 | 3:48P | | Peak | PlanAllow | Davenport IA | Minneapols MN | 8 | --- | --- | --- |
| 2/01 | 4:47P | | Peak | PlanAllow | Rock Islan IL | Incoming CL | 6 | --- | --- | --- |
| 2/01 | 4:53P | | Peak | PlanAllow | Rock Islan IL | Bemidji MN | 1 | --- | --- | --- |
| 2/01 | 4:53P | | Peak | PlanAllow | Rock Islan IL | VM Deposit CL | 1 | --- | --- | --- |
| 2/01 | 5:28P | | Peak | PlanAllow | Davenport IA | Incoming CL | 5 | --- | --- | --- |
| 2/01 | 7:23P | | Peak | PlanAllow | Davenport IA | Toll-Free CL | 8 | --- | --- | --- |
| 2/01 | 7:23P | | Peak | PlanAllow,CallWait | Davenport IA | Incoming CL | 7 | --- | --- | --- |
| 2/01 | 7:39P | | Peak | PlanAllow | Davenport IA | Minneapols MN | 2 | --- | --- | --- |
| 2/01 | 7:56P | | Peak | PlanAllow | Rock Islan IL | Incoming CL | 4 | --- | --- | --- |
| 2/02 | 4:25A | | Off-Peak | PlanAllow | Rock Islan IL | Incoming CL | 2 | --- | --- | --- |
| 2/02 | 5:08A | | Off-Peak | PlanAllow | Davenport IA | Minneapols MN | 1 | --- | --- | --- |
| 2/02 | 5:09A | | Off-Peak | PlanAllow | Davenport IA | Minneapols MN | 7 | --- | --- | --- |
| 2/02 | 5:21A | | Other | Wi-Fi | WiFi CL | Twincities MN | 10 | --- | --- | --- |
| 2/02 | 5:40A | | Off-Peak | PlanAllow | Davenport IA | Davenport IA | 3 | --- | --- | --- |
| 2/02 | 5:42A | | Off-Peak | PlanAllow | Davenport IA | Bemidji MN | 5 | --- | --- | --- |
| 2/02 | 5:50A | | Off-Peak | PlanAllow,PlanAllow,Span | Davenport IA | Kansascity MO | 16 | --- | --- | --- |
| 2/02 | 6:06A | | Peak | PlanAllow | Davenport IA | Bemidji MN | 17 | --- | --- | --- |
| 2/02 | 6:23A | | Peak | PlanAllow | Davenport IA | Minneapols MN | 3 | --- | --- | --- |
| 2/02 | 6:44A | | Peak | PlanAllow | Davenport IA | Twincities MN | 7 | --- | --- | --- |

CONFIDENTIAL

CP_03459

**1**

```
                                                    1

 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF IOWA
 2                EASTERN DIVISION

 3      - - - - - - - - - - - - - - - - - - - -

 4                      No. 3:23-CV-00031-HCA

 5    John Sexton,

 6                         Plaintiff,
          vs.
 7
      Dakota, Minnesota & Eastern Railroad
 8    Corporation d/b/a Canadian Pacific,
      a Delaware corporation,
 9
                         Defendants.
10
      - - - - - - - - - - - - - - - - - - - -
11

12

13

14              DEPOSITION OF

15              MCKINSEY HANSON

16              June 24, 2024

17              10:05 a.m.

18

19

20

21

22

23        TAKEN BY: BRENDA K. FOSS
             fossbrenda@yahoo.com
24             612-701-4282

25
```

**2**

```
                                                    2

 1            Deposition of MCKINSEY HANSON,
 2    taken by Zoom videoconference by and on
 3    behalf of Plaintiff, on Monday, June 24,
 4    2024, commencing at 10:05 a.m., before
 5    Brenda K. Foss, Professional Court Reporter,
 6    Notary Public, State of Minnesota, County of
 7    Hennepin.
 8
 9              *   *   *   *   *
10          APPEARANCES

11

12    ON BEHALF OF THE PLAINTIFF:
      CYLE CRAMER, ESQUIRE
13    YAEGER & JUNGBAUER BARRISTERS, PLC
      4601 Weston Woods Way
14    St. Paul, MN  55127
      ccramer@yjblaw.com
15    651-288-9500

16

17    ON BEHALF OF THE DEFENDANTS:
      BRIANA AL TAQATQA, ESQUIRE
18    DORSEY & WHITNEY LLP
      50 South 6th Street, Suite 1500
19    Minneapolis, MN  55402
      altaqatqa.briana@dorsey.com
20    612-340-2600

21

      Also present: Noah Garcia, BNSF Railway
22
23
24
25
```

**3**

```
                                                    3

 1                I N D E X

 2
      Examination:                     PAGE:
 3    By Mr. Cramer                      4

 4

 5    Marked Deposition Exhibits:
      60 STIP (McKelvey)                22
 6       Bates CP 6292
      61 STIP (Jared)                   27
 7       Bates CP 6291
      62 '21 Performance Mgmt Form      29
 8       (Ross) Bates CP 3816-3822
      63 Business Ethics Rptg Policy    38
 9       Bates CP 6294-6299
      64 Policy 1300                    44
10       Bates CP 6319-6328

11

12

13    Reporter's Certificate          51

14

15    (Original Deposition Transcript in the
      possession of Cyle Cramer, Esquire).

16

17            *   *   *   *   *

18
19
20
21
22
23
24
25
```

**4**

```
                                                    4

 1            P R O C E E D I N G S

 2

 3            MCKINSEY HANSON,

 4    after having been first duly sworn,

 5    deposes and says under oath as follows:

 6

 7            MR. CRAMER:  We can go on the

 8    record.  We can note our appearances.  On

 9    behalf of Plaintiff John Sexton, I'm Attorney

10    Cyle Cramer.

11            MS. AL TAQATQA:  I'm here today

12    on behalf of Defendant Dakota, Minnesota &

13    Eastern Railroad Corporation.  I am counsel

14    for Defendant, Briana Al Taqatqa, Dorsey &

15    Whitney.  Also present is inhouse counsel for

16    Defendant, Noah Garcia, and the witness

17    McKinsey Hanson.

18

19            E X A M I N A T I O N

20    BY MR. CRAMER:

21  Q  Can you please state your first and last name

22    and spell your last name?

23  A  McKinsey Hanson, H-A-N-S-O-N.

24  Q  Where are you located today?

25  A  I'm in St. Paul, Minnesota.
```

9

1   in February of 2021?
2  A That's correct.
3  Q And this replaced the prior policy, 5611?
4  A Correct.
5  Q Do you know about what year that replaced --
6    or the policy 3411 replaced 5611?
7  A I don't, no.
8  Q Under the Short-Term Incentive Plan, is it
9    guiding managers -- let me rephrase that. So
10    according to this policy, on an annual basis
11    managers are responsible for guiding their
12    direct reports and setting objectives. Correct?
13 A That's correct.
14 Q So what guidance do managers receive regarding
15    what objectives to set?
16 A They have this policy to reference; but then
17    throughout the year when we start the
18    performance management process, they get
19    e-mails with additional information to
20    support them starting with beginning of the
21    year objective setting. That comes from the
22    talent management group.
23 Q We'll get into some of the metrics later, but
24    the specific metrics such as origin
25    performance, train performance, do individual

10

1    managers come up with those metrics or do
2    those come down from somewhere else to them?
3  A They're typically set with the senior leader
4    and then it's cascaded down. And then each
5    leader that oversees a subdivision would
6    modify for their specific territory.
7  Q And managers are responsible for achieving
8    their annual performance objectives. Correct?
9  A That's correct.
10 Q And managers conduct reviews with their
11    employees regarding their performance and
12    meeting those objectives. Correct?
13 A Yes.
14 Q And performance measures are weighted. Right?
15 A Yes, they are.
16 Q Who sets these weights?
17 A That would be the individual that's
18    responsible for their own PMP that would set
19    the weights in support with their manager to
20    make sure they're aligned.
21 Q Are there individual weights and corporate
22    weights or do they all -- are they consistent?
23    Does that make sense?
24        MS. AL TAQATQA: Objection, form.
25 A There are individual weights for each

11

1    objective that they set. And then there are
2    corporate percentages as a guideline for
3    meeting a corporate threshold in order to
4    obtain payout.
5  Q (By Mr. Cramer, continuing) And the
6    objectives are weighted according to their
7    relative importance. Right?
8  A Relative importance of the objective to the
9    individual.
10 Q So it's CP's policy that objectives with a
11    higher weight are more important than those
12    with a lower weight?
13        MS. AL TAQATQA: Objection, form.
14        THE WITNESS: Can you repeat the
15    question?
16 Q (By Mr. Cramer, continuing) Is it CP's policy
17    that objectives with a higher weight are more
18    important than those with a lower weight?
19        MS. AL TAQATQA: Same objection.
20 A I would say they're set towards the
21    individual's goals for that year. So if it
22    has a higher weight, then that individual may
23    have a goal that they need to focus on a
24    little bit more than another one.
25 Q And a PMP objective with a higher weight

12

1    affects a person's compensation more than an
2    objective with a lower weight. Correct?
3  A I would say that the goals are looked at on a
4    holistic view. We don't typically get that
5    granular.
6  Q So this policy 3411, Exhibit 41, this policy
7    would have applied to Kurtis McKelvey in
8    February of 2021. Correct?
9  A Correct.
10 Q It would have applied to Marcus Johnson in
11    February of 2021?
12 A Correct.
13 Q And it applied to Dylan Smith in February of
14    2021?
15 A Correct.
16 Q It applied to Jason Ross in February of 2021?
17 A Correct.
18 Q Did it apply to Tracy Miller in February of
19    2021?
20 A Yes, it did.
21 Q Did it apply to Tom Jared in February of 2021?
22 A Yes, it did.
23 Q Is an individual's short-term incentive tied
24    directly to their individual objective?
25        MS. AL TAQATQA: Objection, form.

13

1  A  Yes, it is along with other factors of just
2     reviewing are there any market conditions
3     that would have affected our ability to
4     deliver or weather conditions as well.
5  Q  (By Mr. Cramer, continuing) CP's business
6     objectives are driven by precision scheduled
7     railroading. Correct?
8  A  Partially, yes.
9  Q  Can you repeat that?
10 A  Partially, yes.
11 Q  Let me rephrase. CP's priority is delivery
12    of a customer's shipment from origin to
13    destination as quickly as possible. Correct?
14 A  I would say as quickly and safely as possible.
15 Q  Have you seen any documentation that uses
16    that phrase I used 'delivery of a customer's
17    shipment from origin to destination as
18    quickly as possible'?
19 A  I don't believe I have.
20 Q  Does it include safety in that phrase?
21        MS. AL TAQATQA: Objection,
22    misconstrues the witness' response to the
23    previous question.
24 A  No, I haven't.
25 Q  (By Mr. Cramer, continuing) It's the goal of

14

1     the Short-Term Incentive Plan to incentivize
2     employees. Correct?
3  A  Yes, it is.
4  Q  Is it the goal of the metrics in the
5     Short-Term Incentive Plan to create a culture
6     supporting CP's mission?
7  A  I would say that it's to support the
8     company's overall objectives.
9  Q  The objective of the Short-Term Incentive
10    Plan is to tie a part of the employee's
11    compensation directly to CP's results. Correct?
12 A  That's correct.
13 Q  The manager's overall rating has a direct
14    affect on a manager's base salary. Correct?
15 A  Base salary? No.
16 Q  Does a manager's overall rating have a direct
17    affect on the manager's short-term incentive
18    payment?
19 A  Yes.
20 Q  The policy's objective is to reward the
21    achievement of meeting objectives. Correct?
22 A  Yes.
23 Q  Such as rewarding train speed?
24 A  Train speed is one metric that could be used
25    to understand how we're optimizing our assets.

15

1  Q  So is the policy objective to reward meeting
2     train speed objectives?
3  A  Can you repeat that question?
4  Q  Is the policy's objective to reward meeting
5     train speed objectives?
6  A  It would depend on the person's position, but
7     it could be a component of their performance
8     review.
9  Q  I'm going to bring up a specific individual's
10    PMP. This was previously marked as Exhibit 23.
11    Is this like an accurate depiction, at least
12    in 2021, of an employee's Performance
13    Management Form?
14 A  Yes, it is.
15 Q  Under this first category of objectives, we
16    have some achieves, exceeds. Do you see
17    those sections?
18 A  Yes, I do.
19 Q  To confirm, going back up to the top, we're
20    looking at Kurtis McKelvey's Performance
21    Management Form. So for Mr. McKelvey, he's
22    incentivized to meet train performance
23    objectives. Correct?
24 A  That is correct.
25 Q  And you can tell that by looking at what in

16

1     this PMP?
2  A  The objectives, the actions and behaviors
3     towards meeting the objective. And then he
4     weighed that and the performance would be
5     measured with the achieves and the exceeds
6     measures.
7  Q  So it's CP's policy to reward Mr. McKelvey
8     for meeting or passing his train performance
9     objective. Correct?
10 A  Can you repeat that question?
11 Q  It's CP's policy to reward Mr. McKelvey for
12    meeting or passing his train performance
13    objective?
14 A  That would be one component of it.
15 Q  What is the definition of train performance?
16 A  If you could pull up the document where we
17    responded to the definition of train
18    performance, I'd like to see that.
19 Q  I'm sorry. Can you repeat that? I didn't
20    quite catch it.
21 A  If you can pull up the document where we
22    responded with the definitions of train
23    performance, I would like to review that.
24 Q  Yeah, of course. So I can represent to you
25    that this is a document I received from CP's

CP Appendix - 323

17

1  attorneys with some definitions.  Hopefully
2  this is what you're looking for.
3 A  Yes, that is.  Thank you.  So train
4  performance is also known as the destination
5  performance which measures the percentage of
6  operating plan trains that arrive on time
7  within two hours of scheduled arrival time at
8  the destination or end station for the train.
9 Q  Did you help put these definitions together
10  to your knowledge?
11 A  No, I did not.
12 Q  I'm not going to go through each one, but I
13  will give you a couple minutes to look at
14  them.  I just want to know to your knowledge
15  if they seem accurate.  And if one doesn't
16  seem accurate, just stop and let me know.
17 A  (Witness examining document).  Scroll down.
18  That seems accurate.
19 Q  So going to train performance, is it true
20  that if a train is delayed by more than two
21  hours of the scheduled arrival time,
22  Mr. McKelvey's incentive is negatively
23  affected?
24          MS. AL TAQATQA:  Objection, form.
25 A  I would say one train probably not.  It

18

1  depends on the results at the end of the year
2  as it's aggregated together.
3 Q  (By Mr. Cramer, continuing) But one train
4  contributes to that aggregate?
5 A  Yes, it would.
6 Q  I want to narrow down where these metrics
7  applied for Mr. McKelvey in February of 2021.
8  Is it your understanding that Mr. McKelvey
9  was a trainmaster in Marquette in February of
10  2021?
11 A  Yes, it is.
12          MS. AL TAQATQA:  Cyle, could we
13  put Exhibit 23 back up if that's what you're
14  asking about?
15          MR. CRAMER:  Yes, we can.
16 A  I'd like to note that on the form it says his
17  position is Trainmaster Bensenville.  He did
18  receive a lateral move from Marquette to
19  Bensenville that year.
20 Q  (By Mr. Cramer, continuing) What trains would
21  have fallen under Mr. McKelvey's metrics in
22  February of 2021?
23          MS. AL TAQATQA:  Objection, foundation,
24  goes beyond the scope of the topic.
25 A  I wouldn't be able to narrow down each

19

1  specific train.  But for the performance
2  management plan, whatever time spent in
3  Marquette would be prorated for his PMP.  And
4  then the rest of the time Bensenville would
5  have impacted the rest of it.  So his
6  leadership should have been talking to speak
7  to his time in Marquette versus Bensenville
8  and then coming together to have a consensus
9  on his overall performance.
10 Q  (By Mr. Cramer, continuing) So during
11  Mr. McKelvey's time in Marquette, trains
12  coming in and out of Marquette would have
13  contributed to his metrics?
14          MS. AL TAQATQA:  Objection, form.
15 A  For the time that he spent in that role.  So
16  it would have been prorated.
17 Q  We can bounce back and forth between this
18  exhibit and the other one showing the
19  definitions if you want me to.  Just ask me
20  and I can do that.  But I will move on to
21  origin performance.  So Mr. McKelvey's
22  metrics was also based on having trains
23  depart origin within two hours of the
24  scheduled departure time.  Is that correct?
25 A  Can you flip back to the other document?  I

20

1  would like to confirm.  (Witness examining
2  document).  So origin performance measures
3  the percentage of operating plan trains that
4  depart origin on time and within two hours of
5  scheduled departure time.
6 Q  So for Mr. McKelvey, he's incentivized for
7  having trains depart Marquette within two
8  hours of the scheduled departure time?
9 A  For a portion of his PMP, yes.
10 Q  I'm actually going to go back to the other
11  one.  Mr. McKelvey is incentivized for having
12  cars at his yard for shorter periods of time.
13  Correct?
14          MS. AL TAQATQA:  Objection, form.
15 A  Are you referring to terminal dwell hours?
16 Q  (By Mr. Cramer, continuing) Is that what
17  terminal dwell hours means to CP?
18 A  If you can flip back to the supplement with
19  the definitions.  (Witness examines document).
20  The terminal dwell hours is the average
21  amount of time in hours between car arrival
22  and departure from the yard, excludes cars
23  that move through a terminal on a run-through
24  train, stored bad ordered and maintenance of
25  way's cars.

21

1 Q So Mr. McKelvey is incentivized for having
2   cars in his yard for shorter periods of time
3   under the terminal dwell statistic?
4 A **For part of his PMP, correct.**
5 Q On Exhibit 23, according to this, is
6   Mr. McKelvey incentivized for controlling
7   costs?
8 A **That is part of his PMP, yes.**
9 Q What ways did his PMP include controlling
10   costs?
11 A **The objective is fuel efficiency, terminal**
12   **costs, whiteboard session, heldaway, crew**
13   **utilization.**
14 Q Does controlling costs include lowering the
15   cost of crew transportation?
16 A **Yes, that would be part of it.**
17 Q The controlling cost includes reducing the
18   number of re-crews. Correct?
19 A **It could be part of it.**
20 Q According to his PMP, Mr. McKelvey is
21   incentivized to maximize the weights of
22   trains, the length of trains, and the speed
23   of trains. Correct?
24 A **That's correct.**
25 Q And under the optimize assets where the

22

1   objectives include train weights, train
2   lengths, train speed, power utilization, and
3   bulk cycles, it states the weight as 20.
4   Correct?
5 A **20 percent.**
6 Q That was going to be my next question. So
7   the 20 stands for a percentage?
8 A **Yes, percentage.**
9 Q And the operate safely weight percentage,
10   what is that?
11 A **20.**
12     (Deposition Exhibit 60 marked for
13   identification).
14 Q I'm going to bring up a new exhibit. This is
15   Exhibit 60. Looking at this, is there any
16   way to tell whose PMP this is?
17 A **I don't see a name on it, no.**
18 Q Are these available to each individual manager?
19 A **I believe these are sent out to each manager**
20   **after they receive the payout.**
21 Q I can represent to you that this is
22   Mr. McKelvey's short-term incentive total
23   award statement for 2022. Is it accurate
24   that the total 2021 STIP award reflects his
25   metrics obtained in 2021?

23

1 A **For the individual component, yes.**
2 Q The top chunk of text here in the bold where
3   it includes percentages, operating ratio 35
4   percent, do you see where that is?
5 A **I do.**
6 Q Are those the corporate weights or individual
7   weights?
8 A **It's the STIP corporate performance measures.**
9 Q These are weighted. Correct?
10 A **Correct.**
11 Q So according to this document, CP's corporate
12   performance measures or operating ratio,
13   operating income and trip plan compliance are
14   weighted as eight times more important than
15   train accident frequency. Correct?
16     MS. AL TAQATQA: Objection, form.
17 A **If you're adding them together, then you're**
18   **at 80 percent.**
19 Q (By Mr. Cramer, continuing) And we talked
20   earlier about weights and the significance of
21   weights. So is it CP's policy that
22   objectives with a higher weight are more
23   important than those with a lower weight?
24 A **I would say importance or time spent**
25   **focussing on that component.**

24

1 Q So when adding the operating ratio, operating
2   income, trip plan compliance together, that's
3   eight times more important than train
4   accident frequency?
5     MS. AL TAQATQA: Objection, form
6   and mischaracterizes the witness' testimony.
7     THE WITNESS: Can you repeat the
8   question?
9 Q (By Mr. Cramer, continuing) Combining
10   operating ratio, operating income, and trip
11   plan compliance, CP weighs those corporate
12   performance measures as eight times more
13   important than train accident frequency?
14     MS. AL TAQATQA: Same objections.
15 A **I don't know if I would say eight times more**
16   **important. But in order to run an efficient**
17   **railroad, you have to have measures in place**
18   **in order to understand how we're servicing**
19   **our customers.**
20 Q (By Mr. Cramer, continuing) Give me one
21   second. Going back to Exhibit 41 -- the
22   Bates on the bottom right is 3236. It
23   describes CP's policy as having the PMP
24   objectives are weighted according to the
25   relative importance. Correct?

25

1  A  That is correct.
2  Q  Bringing up what was previously marked as
3     Exhibit 59, this is Tom Jared's 2021
4     Performance Management Form. Correct?
5  A  That is correct.
6  Q  It says he reports to Jason Ross. So are
7     Jason Ross' metrics impacted by Mr. Jared's
8     metrics?
9  A  Yes, they would be.
10 Q  Looking at train performance, CP rewards
11    Mr. Jared for having trains arrive within two
12    hours of the scheduled arrival time. Correct?
13       MS. AL TAQATQA: Objection, form.
14 A  That is one of the metrics on the form.
15 Q  (By Mr. Cramer, continuing) And for Mr. Jared
16    in February of 2021 -- I'm trying to phrase
17    this in a way that is clear. What was
18    included in Mr. Jared's territory in February
19    of 2021?
20 A  Geographically?
21 Q  Yes.
22 A  So US West would have been North Dakota,
23    parts of Minnesota from Thief River Falls
24    down through Glenwood, to Mason City, Iowa
25    going through Iowa to Marquette, Dubuque,

26

1     Davenport, Ottumwa, and then ending at Kansas
2     City, the Joint Agency.
3  Q  And his metrics are impacted by trains in
4     that geographic region. Correct?
5  A  That's correct.
6  Q  So that would have included in February of
7     2021 Marquette?
8  A  Correct.
9  Q  It would have included Nahant?
10 A  Correct.
11 Q  Are controlling costs -- Mr. Jared is incentivized
12    and rewarded to control costs. Correct?
13       MS. AL TAQATQA: Objection, form.
14 A  Controlling costs is one of our foundations.
15    So he does have objectives and metrics
16    assigned to that, yes.
17 Q  (By Mr. Cramer, continuing) Such as lowering
18    the cost of crew transportation?
19 A  That is correct. I wouldn't say lowering
20    cost. I'd say controlling cost.
21 Q  What is the distinction with that to you?
22 A  Controlling cost you could be assigning
23    longer term agreements where it may have a
24    higher cost in one year but over three years
25    it could be lesser, or it could be utilizing

27

1     our managers to transport crews versus a
2     service. So reallocating the cost.
3        MR. CRAMER: I'm probably a
4     little bit more than halfway through already,
5     and we're about an hour in. Do you want to
6     take a 10 minute break?
7        MS. AL TAQATQA: Sounds good.
8        MR. CRAMER: Be back at around
9     11:05?
10       MS. AL TAQATQA: Sounds good.
11       (Brief recess).
12       THE WITNESS: I would like to
13    clarify. I reviewed an e-mail and policy
14    5611 was retired February of 2017.
15       (Deposition Exhibit 61 marked for
16    identification).
17 Q  (By Mr. Cramer, continuing) I'll bring up a
18    new exhibit. It is marked Exhibit 61. I can
19    represent to you that this was Tom Jared's
20    short-term incentive award statement
21    reflecting his bonus for his 2021 metrics.
22    And according to this, Mr. Jared received a
23    $107,284 bonus for meeting or exceeding his
24    objectives in 2021. Is that correct?
25 A  That is correct.

28

1  Q  That's in addition to his salary. Correct?
2  A  That's correct, base salary.
3  Q  Does an overall rating change a manager's
4     bonus?
5        MS. AL TAQATQA: Objection, form.
6  A  What do you mean by overall rating?
7  Q  (By Mr. Cramer, continuing) Well, looking at
8     this we have under the STIP History, Target x
9     Weighting, so this 40 percent, 40 percent, 40
10    percent, and 60 percent, the results 125
11    percent and 120 percent, can you explain to
12    me what each of those means and where they
13    come from?
14 A  So starting with the salary, that's his base
15    salary. The target and weighting is what the
16    target measure is for corporate versus
17    individual. So corporately 60 percent of his
18    Short-Term Incentive Plan is based off of
19    corporate performance. 40 percent is based
20    off of his individual performance. The
21    corporate performance factor ended up being
22    125 percent for 2021. His individual
23    performance factor was 120 percent which
24    means that he received an achieves rating
25    and that he participated in the plan for the

29

1  entire year.

2  Q  Then what are the other ratings in addition

3     to achieves?

4  A  If you could refer to the STIP policy

5     document. There's unsatisfactory, partially

6     achieves, achieves, exceeds, and outstanding.

7  Q  Did Jason Ross have a PMP in 2021?

8  A  Yes, he did.

9  Q  What were Jason Ross' metrics in 2021?

10 A  You'd have to pull up the document.

11 Q  I don't believe I have his 2021 PMPs.

12        MS. AL TAQATQA:  Is that a

13     question for me, Kyle?

14        MR. CRAMER:  No, unless you think

15     I'm mistaken.

16        MS. AL TAQATQA:  I think you

17     might be, but I want to make sure we're

18     talking about the same thing. Should we go

19     off the record?

20        MR. CRAMER:  Yeah, we can do that.

21        (Discussion off the record).

22        (Deposition Exhibit 62 marked for

23     identification).

24        MR. CRAMER:  I'm going to bring

25     up Exhibit 62. We marked this as Exhibit 62,

30

1     Jason Ross' 2021 Performance Management Form.

2        MS. AL TAQATQA:  Is that a

3     question?

4        MR. CRAMER:  No. I'm just

5     bringing it up.

6  Q  (By Mr. Cramer, continuing) The question is

7     looking at Mr. Ross' Performance Management

8     Form, can you tell on the provides service

9     foundation whether he met the objectives

10    under achieves and exceeds?

11 A  Give me just a moment to review.  (Witness

12    examining document).  Looking at the actuals,

13    I don't see where he calls out the specific

14    train performance metric. So it's unclear.

15    For origin performance he has his target at

16    98 percent and origin performance is 93

17    percent plus or minus two hours. So I would

18    say he did not meet that metric.

19        Terminal dwell hours, he

20    achieves measures 9-1/2 hours. In his

21    actuals he lists 10.8 hours. If you go to

22    exceeds, it looks like they would prefer the

23    target to go down not up. So I would say he

24    did not meet terminal dwell hours.

25        GTM's, achieves measure 191 and

31

1     exceeds 193. And the actuals he lists GTM's

2     slightly down, based on a roller cluster

3     year, 173.6 GTM's per year. So he did not

4     meet the achieves measure but does list that

5     it's 9.3 percent better from target but

6     higher than previous years.

7        Trip plans, achieves measures 97

8     percent. Exceeds measures 98 percent.

9     Actuals was 96.1, so did not meet the measure

10    there. But then states exceeding in the area

11    of locomotive productivity, daily average of

12    213 GTM's over OHP on a target of 216.

13 Q  Based on his Performance Management Form, did

14    Mr. Ross receive a short-term incentive

15    payment in 2021?

16        MS. AL TAQATQA:  Objection, foundation.

17 A  Do you have the form available to review?

18 Q  No, I do not.

19 A  I'm not aware.

20 Q  Do you know what Mr. Ross' short-term

21    incentive payment in 2021 was?

22 A  No, I don't.

23 Q  Does CP audit its Short-Term Incentive Plan?

24        MS. AL TAQATQA:  Objection, form.

25 A  What do you mean by audit?

32

1  Q  (By Mr. Cramer, continuing) Does CP conduct

2     any type of review of whether the plan is

3     meeting its objectives?

4        MS. AL TAQATQA:  Objection, form.

5        THE WITNESS:  Can I review the

6     short-term incentive policy quick?

7        MR. CRAMER:  Sure.

8  A  (Witness examining document).  I am not aware

9     of the way that they audited but our total

10    management -- talent management team, total

11    comp team, would review the plan on an annual

12    basis and adjust the policy as needed.

13 Q  Does CP have any policies, programs, or

14    guidelines for any instances where managers

15    might be padding their metrics?

16        MS. AL TAQATQA:  Objection, form.

17        THE WITNESS:  Restate the question.

18 Q  (By Mr. Cramer, continuing) Well, I will try

19    to give an example. So from my understanding

20    of terminal dwell, a manager could impact

21    their terminal dwell statistics by moving

22    cars off of their terminal let's say into a

23    customer's rail. Is that a possibility?

24 A  I'm not aware of how that would impact

25    terminal dwell.

41

1    further.
2  Q  Any alleged intimidation should be reported
3    to employee relations.  Correct?
4  A  **That's correct.**
5  Q  Does this include a manager who receives a
6    report of intimidation from an employee to
7    pass that on to employee relations?
8        MS. AL TAQATQA:  Objection, form.
9  A  **If a manager is made aware of unlawful**
10    **harassment, retaliation, intimidation, they**
11    **should report it to employee relations, correct.**
12  Q  (By Mr. Cramer, continuing) So is it the
13    manager that makes the determination whether
14    it's unlawful?
15  A  **It would depend on the circumstances of**
16    **whether or not they felt it needed to be**
17    **reported.**
18  Q  So it's the manager's discretion whether they
19    should report an employee reporting
20    intimidation to them?
21        MS. AL TAQATQA:  Objection, form.
22  A  **I would say that they should report it either**
23    **way.**
24  Q  (By Mr. Cramer, continuing) Would it be a
25    violation of the policy if an employee

42

1    alleged to a manager that they were
2    intimidated by another manager but that first
3    manager chose not to report that intimidation?
4        MS. AL TAQATQA:  Objection, form.
5  A  **I would need the specifics of the situation**
6    **in order to make a determination.**
7  Q  (By Mr. Cramer, continuing) But in any
8    situation where an employee reports to a
9    manager intimidation by another manager, that
10    first manager should report it to employee
11    relations.  Correct?
12        MS. AL TAQATQA:  Objection, form.
13  A  **Intimidation of what?**
14  Q  (By Mr. Cramer, continuing) Just any type of
15    intimidation.
16  A  **I would say yes, if there's an issue of**
17    **intimidation from one manager to an employee,**
18    **they should be at least having a conversation**
19    **with human resources about the specifics or**
20    **employee relations.**
21  Q  Did employee relations conduct an
22    investigation under this policy in John
23    Sexton's allegations that CP retaliated
24    against him refusing to follow unsafe
25    instructions?

43

1  A  **I'm not aware of one.**
2  Q  Does this policy address employees who refuse
3    to follow unsafe instructions?
4  A  **The title of the policy is Accident,**
5    **Incident, Injury and Occupational Illness**
6    **Reporting Policy.  I am not aware of it**
7    **covering unsafe situations.**
8  Q  Are you aware of any policy that addresses
9    employees who refuse to follow unsafe
10    instructions?
11  A  **That calls that out specifically, no, I am**
12    **not.**
13  Q  This policy does not provide an employee, who
14    received retaliation, damages for emotional
15    distress related to that retaliation.  Correct?
16        MS. AL TAQATQA:  Objection, form.
17        THE WITNESS:  Can you reask that
18    question?
19  Q  (By Mr. Cramer, continuing) This policy does
20    not provide an employee, who received
21    retaliation, damages for emotional distress
22    related to that retaliation.  Correct?
23        MS. AL TAQATQA:  Same objection.
24  A  **What do you mean by damages?**
25  Q  (By Mr. Cramer, continuing) Just, to your

44

1    knowledge, does the policy provide for any
2    type of emotional distress damages?
3  A  **Not that I'm aware of.**
4  Q  The policy does not require CP to pay any
5    type of punitive damages for retaliating
6    against an employee.  Correct?
7  A  **The policy does not go into that, no.**
8        (Deposition Exhibit 64 marked for
9    identification).
10  Q  This is Exhibit 64.  Was this the policy in
11    place in February of 2021?
12  A  **Scroll down.  (Witness examining document).**
13  Q  Do you want me to scroll to the bottom?
14  A  **Yes, please.  (Witness examining document).**
15    **Yes, that was in place in 2021.**
16        MR. CRAMER:  I only have a few
17    more questions.  I'll pull a couple lines up
18    here.  Let's take another five minute break
19    and it shouldn't be more than 15 minutes when
20    we come back.
21        (Brief recess).
22  Q  (By Mr. Cramer, continuing) So on Policy 1300
23    it includes prohibition against retaliation
24    including unwarranted adverse employment
25    action.  Correct?

**Hanson**

**Ex. 64**

**CANADIAN PACIFIC**

Policy 1300
Workplace Harassment –
Including Sexual
Harassment

Workplace Harassment - Including Sexual Harassment

All Employees - US

Issuing Department:  Human Resources (HR)

**Policy
Statement**

As a Canadian Pacific (CP) employee, you are entitled by law and by CP policy to work in an environment free from sexual harassment and other illegal forms of harassment. CP is committed to providing and maintaining a work environment that supports the dignity of all individuals, and will make every effort to ensure that no one at CP is subjected to unlawful harassment.  Such conduct will not be tolerated at any level of CP.

It is CP's policy to investigate complaints of unlawful workplace harassment and to take disciplinary action when warranted against any individual that is found to have engaged in harassment prohibited by this policy. Such disciplinary action may include dismissal.

CP is committed to providing on-going assistance, resources, and training to employees and supervisors, as necessary, in dealing with illegal harassment issues.

**Accountability**

The Chief Executive Officer, CP, has the corporate responsibility for CP's total commitment to a work environment free of illegal harassment. The responsibility for monitoring compliance, communicating obligations, and providing education is delegated to the Vice President HR/IR, together with the U.S. HR staff.

All Employees are responsible for:

1

**CANADIAN PACIFIC**

- not engaging in any form of illegal harassment;
- conducting themselves at all times in a respectful manner towards other employees, non-employees, and applicants for employment;
- prompt, accurate and complete reporting of any instances of unlawful harassment in accordance with the process set forth in Internal Complaint Procedure;
- fully cooperating in any investigation of alleged illegal harassment, including intimidation.

Managers and supervisors are responsible for:

- posting a copy of this Policy prominently in the department;
- making every effort to prevent harassment by ensuring that no pictures, e-mails, text messages, objects or written material that are offensive to any protected group are displayed, viewed, circulated or stored on CP property, or otherwise communicated to CP employees in the workplace;
- engaging in constructive dialogue with employees as to expected behaviors to comply with this policy;
- promptly reporting to the appropriate personnel in HR any unlawful workplace harassment that is witnessed or that is reported, regardless of whether there has been a complaint under this policy by the employee who is the target of the harassment;
- ensuring that complaints of illegal harassment are promptly reported to the appropriate persons in HR as set forth in the Internal Complaint procedure of this policy;

2

**CANADIAN PACIFIC**

- taking effective measures to prevent retaliation against any person for making a complaint of harassment, for participating in an investigation under this policy, or for associating with a person who has made a harassment complaint;
- cooperating fully with any investigation on a report of harassment.

## Process and Application

Scope

This policy applies to the conduct of all CP US employees towards other employees, towards non-employees, and towards applicants for employment. The policy also applies to the conduct of non-employees towards CP employees. Conduct that constitutes illegal harassment in violation of this policy may occur outside the workplace and/or outside of regular working hours as well as in work-related settings such as conferences, business trips, and CP sponsored social events.

Prohibited Harassment

Prohibited harassment under this policy includes inappropriate and unwelcome remarks about or conduct related to an employee's *race, color, religion, national origin, sex, pregnancy, marital status, disability, age, status with regard to public assistance or sexual orientation or identity.* This behavior may include, but is not limited to, the following:

- name calling;
- derogatory comments based upon a person's status as a member of a protected class;
- displaying posters, cartoons, graffiti, insignia, or other symbols which demean or offend a particular protected class;
- tampering with an employee's work station or tools;

3

**CANADIAN PACIFIC**

- explicitly racist remarks;
- creating an offensive or hostile work environment through the use, display, or distribution of hate literature;
- threatening, abusive, or assaultive behavior directed against someone because of his/her protected class.

Sexual Harassment

Sexual harassment consists of unwelcome sexual advances, requests for sexual favors, physical conduct or other conduct when (1) submission to such conduct is stated either explicitly or implicitly as a condition of an individual's employment, continued employment, or career advancement; (2) submission to or rejection of such conduct is used as the basis for employment or promotion decisions affecting an individual; or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive work environment.

Depending on the circumstances, sexual harassment can include, but is not limited to, the following behavior:

- dirty or offensive jokes;
- comments about a person's body;
- suggestive remarks;
- leering;
- derogatory or degrading remarks regarding gender;
- unwanted physical touching;
- display of offensive or sexually explicit pictures, magazines, books, or cartoons;
- sexual advances;
- mental or physical intimidation;
- verbal abuse;
- inappropriate inquiries into or comments about another's personal life;

4

**CANADIAN PACIFIC**

- explicit sexual contact;
- any suggestion that a person's job, job benefits, or advancement depends on that person's giving of sexual favors.

**Romantic Workplace Relationships**

CP strongly discourages romantic relationships between employees of unequal employment status within CP, where a differential in power or authority exists or could be construed as existing. Such relationships may be or may become a violation of CP's illegal workplace harassment policy.

In the event that an employee becomes involved in a consensual romantic relationship with another employee where there is or could be a question of power or authority differential, the employees involved must report the relationship to the Vice President responsible for the area in which the employees work.  This report will permit CP to assess the situation and to make any appropriate workplace adjustments.

5

**CANADIAN PACIFIC**

Policy 1300
Workplace Harassment –
Including Sexual
Harassment

Electronic
Communications

This policy covers communications through any device or communications systems used in the performance of work for or on behalf of CP, such as but not limited to cell phones, e-mail or Internet. Employees may not access or distribute offensive or harassing material or other material that is offensive based on race, color, religion, national origin, sex, pregnancy, marital status, disability, age, status with regard to public assistance or sexual orientation or identity. This prohibition includes the use of CP's electronic communications devices or communications systems to send dirty jokes or other sexual material, regardless of whether the recipient consents to the receipt of such messages.

Internal Complaint
Procedure

An employee who believes they are experiencing or witnessing illegal harassment in the workplace is expected to report it immediately using the internal complaint procedure in this section. CP believes that the use of this internal complaint procedure will foster effective resolution of illegal harassment concerns.

This internal complaint procedure is not, however, intended to deprive employees of their rights to file complaints with governmental agencies or to commence litigation. An employee's use of this internal complaint procedure does not suspend any of the time limitations associated with such laws.

Employees with an illegal harassment complaint should first try to contact any of the following persons in this order:

- HR Business Partner – 612-904-6193

6

**CANADIAN PACIFIC**

Policy 1300
Workplace Harassment –
Including Sexual
Harassment

---

- HR Business Partner – 612-904-6191

If the contact persons listed above are unavailable, the employee making the report should leave a message indicating that they are calling to make a report of harassment under this policy. The contact person(s) will return the call as soon as possible.

If the contact people listed above are not available and emergency assistance is required, the employee should contact the following persons in this order:

Assistant Vice President Human Resources John Derry

Vice President of the department in which the employee works.

You can ask the offender to stop the behavior:  The reporting requirement in this policy is not intended to discourage employees from directly asking the offender to stop the harassing behavior. Any person experiencing prohibited harassment should feel free, without fear of adverse consequences, to tell the person responsible for the behavior to stop.  While this step is not required in order to make a complaint under this policy, CP wants to encourage a culture where its employees feel free to object to harassing behavior. If the employee feels comfortable in taking this step, it can often result in a resolution of the problem.  If such a direct request resolves the problem, the employee need not make a formal report under this policy.

7

**CANADIAN PACIFIC**

| | |
|---|---|
| Employee Cooperation | Employees who make complaints of harassment or who participate in a CP investigation of such report will be expected to fully cooperate with CP by providing complete and accurate information as requested. An employee who makes a complaint of harassment should be prepared to provide the person dealing with the complaint with as much detailed information as possible on the behavior in question, including names of any witnesses. |
| | Employees who have been accused of harassment may wish to discuss the matter with their supervisor, their union representative, or an HR representative. |
| | Employees should understand, however, that any conversations that they have with their supervisor or HR representative cannot remain strictly confidential and will be shared with appropriate CP personnel who are investigating the harassment report. |
| | <u>False complaints</u>: Making a false or fabricated complaint of harassment will be treated very seriously. Any employee who is found to have made such a complaint may subject themselves to discipline, up to and including dismissal. |
| Investigations | All complaints of harassment will be kept in confidence, except as is necessary to investigate the complaint, take appropriate corrective action, or to respond to any legal and/or administrative proceedings arising out of or relating to the harassment complaint. |
| | All complaints of illegal harassment will be reviewed promptly by HR; however, not all complaints warrant a |

8

**CANADIAN PACIFIC**

Policy 1300
Workplace Harassment –
Including Sexual
Harassment

formal investigation. Depending on the facts and circumstances, it may be possible for the supervisor or a resource selected by the complaining party to informally resolve a complaint.

With respect to the investigation process, the preferences of the complaining party may be considered in CP's decision on the most appropriate way to handle and/or resolve the complaint.

The resolution of the complaint and any disciplinary action to be taken will be determined from the facts and circumstances on a case-by-case basis.

If a party to a complaint does not agree with its resolution, he or she may file written comments with the person responsible for handling and resolving the complaint and/or the Assistant Vice President, Human Resources.

Prohibition
Against
Retaliation

Any act of retaliation taken against an individual making a complaint of harassment under this policy, filing a charge of illegal harassment with a government agency, filing a lawsuit alleging illegal harassment, or participating in an investigation of a harassment complaint is strictly prohibited.

Retaliation includes, but is not limited to:

- threats;
- tampering with an employee's work station or other work tools;
- unwarranted negative performance reviews or other unwarranted adverse employment action, including but not limited to reprimands, discipline, demotion, and dismissal.

9

Confidential

CP_06327

**CANADIAN PACIFIC**

If an employee believes he or she is being retaliated against, he or she should immediately report the matter to any of the persons responsible for receiving harassment complaints under this policy.

Additional
Information

For additional information please contact the HR Business Partners at 612-904-6193 or 612-904-6191.

Peter Edwards
Vice President HR/IR

This policy statement represents the current policy and practice of CP regarding workplace harassment and may be changed from time to time by CP without notice. Nothing in this policy is intended to create any contract, agreement or other obligation by CP with any of its employees.

---

Employee Policy Manual                                   Revised May 11, 2016

10

**Page 1**

```
1    IN THE UNITED STATES DISTRICT COURT
2      FOR THE SOUTHERN DISTRICT OF IOWA
            EASTERN DIVISION
3    - - - - - - - - - - - - - - - - - - -
            No. 3:23-CV-00031-HCA
4
5    John Sexton,
6                      Plaintiff,
        vs.
7    Dakota, Minnesota & Eastern Railroad
     Corporation d/b/a Canadian Pacific,
8    a Delaware corporation,
9                      Defendants.
10   - - - - - - - - - - - - - - - - - - -
11
12
13             DEPOSITION OF
14          JUSTIN DITTRICH-BIGLEY
15             June 26, 2024
16               9:00 a.m.
17
18
19
20
21
22
23       TAKEN BY: BRENDA K. FOSS
            fossbrenda@yahoo.com
24            612-701-4282
25
```

**Page 2**

```
1        Deposition of JUSTIN DITTRICH-BIGLEY,
2    taken by Zoom videoconference by and on
3    behalf of Plaintiff, on Wednesday, June 26,
4    2024, commencing at 9:00 a.m., before
5    Brenda K. Foss, Professional Court Reporter,
6    Notary Public, State of Minnesota, County of
7    Hennepin.
8
9        * * * * *
10            APPEARANCES
11
    ON BEHALF OF THE PLAINTIFF:
12      CYLE CRAMER, ESQUIRE
        YAEGER & JUNGBAUER BARRISTERS, PLC
13      4601 Weston Woods Way
        St. Paul, MN  55127
14      ccramer@yjblaw.com
        651-288-9500
15
16
    ON BEHALF OF THE DEFENDANTS:
17      BRIANA AL TAQATQA, ESQUIRE
        DORSEY & WHITNEY LLP
18      50 South 6th Street, Suite 1500
        Minneapolis, MN  55402
19      altaqatqa.briana@dorsey.com
        612-340-2600
20
21
    Also present: Noah Garcia, DM&E,
22               Michelle Haynes, DM&E
23
24
25
```

**Page 3**

```
1            I N D E X
2
3    Examination:                    PAGE:
     By Mr. Cramer             4
4
5    Marked Deposition Exhibits:
     65  Hearing Officer Checklist
6        Bates CP 06375-6380      19
     66  Training Manual
7        Bates CP 06399-6431      25
     67  Discipline letter
8        Bates 01769             33
     68  Transcript of
9        Bates CP 01770-1843     34
     69  Waiver
10       Bates 00674            37
     70  Waiver
11       Bates CP 03478          39
     71  Investigation letter         )
12       Bates CP 34081          40
     72  Letter of reprimand
13       Bates CP 03482          42
     73  Tests, Bates 06381-6398   60
14
15
16   Reporter's Certificate      75
17
18   (Original Deposition Transcript in the
19   possession of Cyle Cramer, Esquire).
20
21       * * * * *
22
23
24
25
```

**Page 4**

```
1          P R O C E E D I N G S
2
3            JUSTIN DITTRICH-BIGLEY,
4        after having been first duly sworn,
5    deposes and says under oath as follows:
6
7        MR. CRAMER:  We can go on the
8    record and note our appearances.  On behalf
9    of Plaintiff John Sexton, I'm Attorney Cyle
10   Cramer.
11       MS. AL TAQATQA:  I'm here on
12   behalf of Defendant Dakota, Minnesota &
13   Eastern Railroad Corporation.  I am counsel
14   for Defendant, Briana Al Taqatqa, Dorsey &
15   Whitney.  Also present with me today are
16   Michelle Haynes for Defendant DM&E, and Noah
17   Garcia is present as inhouse counsel for
18   Defendant DM&E, and the witness Justin
19   Dittrich-Bigley.
20
21           E X A M I N A T I O N
22   BY MR. CRAMER:
23 Q Justin, can you please state your first and
24   last name and spell your last name?
25 A Justin Dittrich-Bigley, D-I-T-T-R-I-C-H-
```

5

1    B-I-G-L-E-Y.
2  Q  Where are you located today?
3  A  Kansas City.
4  Q  Have you been a deposition witness before?
5  A  For personal reasons, yes.
6  Q  I'll just kind go through some preliminary
7     things here to try to make this go smoothly.
8     Please answer every question verbally.  Don't
9     just shake or nod your head and say yes or no
10    versus nope.  If you answer a question, I
11    expect that you understand the question.  So
12    you can ask for clarification or anything
13    that you need.  Do you understand that?
14 A  Yes.
15 Q  Wait until I finish my question before
16    answering and I will try to not start a new
17    question until you're done answering.  Okay?
18 A  Okay.
19 Q  Did you prepare for this deposition?
20 A  Yes.
21 Q  Did you review any documents in preparation
22    for this deposition?
23 A  Yes.
24 Q  What documents were those?
25 A  There were various documents, policies,

6

1     transcripts, investigation notices.
2  Q  When you say transcripts, do you mean
3     investigation transcripts?
4  A  Yes.
5  Q  And not deposition transcripts?  Or did that
6     include deposition transcripts?
7  A  That did not include deposition transcripts.
8  Q  What is your job title?
9  A  Assistant Director, Labor Relations.
10 Q  How long have you been in that role?
11 A  Assistant Director for a few months.
12 Q  What was your role before that?
13 A  Manager, Labor Relations.
14 Q  Then to the best of your ability, can you
15    describe your job duties?
16 A  I work with the labor agreements and the
17    negotiations of those agreements with the
18    union.  I participate in mediation process
19    with the union, arbitration process with the
20    union for discipline and for alleged
21    violations of the labor agreement.
22 Q  The Hybrid Discipline and Accountability
23    Guidelines set up CP's disciplinary procedures.
24    Correct?
25 A  Do you have a specific document you're

7

1     referencing?
2  Q  Yeah, I can pull up what I have.
3  A  Thank you.
4  Q  This was marked previously as Exhibit No. 3.
5     I've got my monitors to my far left here so
6     you're going to get a nice side profile.  I'm
7     going to close this quick so I can bring it
8     up on my other monitor to make sure I'm
9     sharing everything right.  So we have used
10    this as Exhibit No. 3 before.  There's this
11    page and then when I scroll down, we have
12    this.  So at any point you can just let me
13    know if you want me to scroll up or down, et
14    cetera.  If you want to take time to look at
15    it, go ahead.
16 A  Okay.  Can you restate the question?
17 Q  Just that the Hybrid Discipline and
18    Accountability Guidelines set CP's
19    disciplinary procedures.  Correct?
20 A  The guidelines set the process for issuing
21    discipline.
22 Q  And the Hybrid Discipline and Accountability
23    Guidelines is CP's guidelines for assessing
24    consistent discipline.  Correct?
25 A  It's the guidelines to set consistent

8

1     discipline in accordance with various levels
2     of discipline.
3  Q  And it's expected that managers follow these
4     guidelines.  Correct?
5  A  Managers reference these guidelines, and
6     these guidelines are a guide for them when
7     issuing discipline.
8  Q  They're expected to abide by these guidelines.
9     Correct?
10 A  They are expected to reference these prior to
11    issuing any discipline to make sure discipline
12    is issued in the most consistent manner
13    possible.
14 Q  Is management permitted to come up with their
15    own disciplinary outcomes?
16 A  Management uses these guidelines to issue
17    discipline so long as they're within the
18    guidelines.  There's various other factors
19    involved in that.  But with this process they
20    use this to, I guess, remain consistent.
21 Q  So would it be within the guidelines or
22    outside of the guidelines for terminating an
23    employee for their first nonmajor offense
24    when an employee has no other discipline on
25    their record?

9

1          MS. AL TAQATQA:  Objection, form.
2  **A  I would have to know what the nonmajor**
3     **violation is.  The policy -- you know, any**
4     **discipline for that matter has potential of**
5     **dismissal, but I would have to understand**
6     **what specific nonmajor or the situation**
7     **you're asking.**
8  **Q**  (By Mr. Cramer, continuing) Does discipline
9     on an employee's record subject them to more
10    severe disciplinary outcomes if they're
11    determined to have violated a rule with prior
12    discipline still on their record?
13         MS. AL TAQATQA:  Objection, form.
14    Sorry, Justin.  Just give me a minute.  You
15    can answer.
16  **A  It's progressive.  So the policy is viewed.**
17    **Discipline is progressive.  It reverts back**
18    **to over a period of time.  Previous**
19    **discipline is viewed against the policy in a**
20    **progressive manner with the next steps.**
21  **Q**  CP's Hybrid Discipline and Accountability
22    Guidelines is meant to hold employees
23    accountable.  Correct?
24  **A  It's meant to change behavior.**
25  **Q**  And it changes behavior by establishing

10

1     discipline?
2  **A  Discipline is assessed to change behavior for**
3     **various safety issues.  It corrects that**
4     **behavior.**
5  **Q**  Deferred suspension may be applied in major
6     life-threatening rule violations.  Correct?
7  **A  Can you go to the piece of the policy you're**
8     **referencing?  I know it's in there.  I would**
9     **just like to see it.**
10  **Q**  Of course.  Here it talks about deferred
11    suspension on number 6.  Let me know if you
12    want me to move somewhere else.
13         MS. AL TAQATQA:  Can you make it
14    any bigger, Cyle?  It's pretty small.
15         MR. CRAMER:  Yeah, I probably can.
16         MS. AL TAQATQA:  That's better.
17    Thank you.
18  **A  So deferred suspension may apply in all three**
19    **categories.**
20  **Q**  (By Mr. Cramer, continuing) And one of those
21    categories is in major life-threatening rule
22    violations.  Correct?
23  **A  That is one of the categories, correct.**
24  **Q**  Is providing a deferred suspension discretionary?
25  **A  There's various factors that go into that.**

11

1  **When you mean discretionary, I guess what --**
2  **can you be more specific?**
3  **Q**  Well, I guess under what situations may a
4     deferred suspension be applied?
5          MS. AL TAQATQA:  Objection, form.
6  **A  Employees taking accountability, understanding**
7     the severity of an issue, not making excuses
8     for the mistake, and just having that
9     conversation that they understand that
10    something severe could have happened
11    catastrophic and they understand that their
12    actions could have caused something fatal
13    potentially.
14  **Q**  (By Mr. Cramer, continuing) If an employee
15    exercises their right to a disciplinary
16    investigation, are they taking accountability?
17         MS. AL TAQATQA:  Objection, form.
18  **A  The employee has a right to go to an**
19    **investigation under the terms of their labor**
20    **agreement.**
21  **Q**  (By Mr. Cramer, continuing) But how does that
22    apply to them taking accountability or not?
23    Are they taking accountability if they exercise
24    their right to a disciplinary investigation?
25  **A  That would depend on the transcript,**

12

1     **investigation transcript.  There are**
2     **employees that take accountability through**
3     **that process, through their testimony.**
4  **Q**  A deferred suspension, unless later activated,
5     results in no time lost.  Correct?
6  **A  If the full amount is deferred.  There's**
7     **various factors there in terms of a portion**
8     **or all could be deferred.**
9  **Q**  But any portion that is deferred results in
10    no time lost.  Correct?
11  **A  For that portion if they don't have another**
12    **incident within the specified time frame.**
13  **Q**  And similarly, a deferred suspension, the
14    portion that is deferred, results in no pay
15    lost.  Correct?
16  **A  For the part that's deferred if there isn't a**
17    **future violation, correct.**
18  **Q**  I'll scroll up to make sure we're looking at
19    number 6, deferred suspension.  And I'll
20    scroll down onto the next page.  It says,
21    Other factors to look at when considering
22    discipline.  One factor to consider.
23    Considering a deferred suspension is taking
24    protective actions following an incident.
25    Correct?

13

1  A  Correct.
2  Q  And a shoving movement potential rule violation,
3     would that include stopping the train prior
4     to an incident?
5         MS. AL TAQATQA:  Objection, form.
6  A  I would have to have a more specific question
7     surrounding the shove, the various factors
8     involved with that shove.  There's multiple
9     types of shoving scenarios that protective
10    actions following the incident would be
11    viewed differently.  It really depends on the
12    conditions and other factors like that, day-
13    time, night-time, a whole bunch of stuff.
14 Q  Is one of those factors how clear the track
15    is that the shoving movement is occurring on?
16        MS. AL TAQATQA:  Objection, form.
17 A  When you're shoving, the engineer has no way
18    to physically see how clear a track is.  Does
19    that make sense?  It could be 100 cars away.
20 Q  (By Mr. Cramer, continuing) Were you done or
21    was that the --
22 A  That's an example.  I was trying to say
23    you're shoving 100 cars away from a track, so
24    it would be tough to say if that's a factor
25    in terms of taking proper protection action

14

1     following the incident.
2  Q  If an engineer had a job briefing prior to
3     the shoving movement and they knew how clear
4     the track was behind them, does how clear the
5     track is, is that a factor when considering
6     the deferred discipline?
7         MS. AL TAQATQA:  Objection, form.
8  A  I don't believe that has any factor on
9     deferring discipline, how clear the track was.
10 Q  (By Mr. Cramer, continuing) Could one factor
11    be passing on a retest?
12 A  When you say retest, can you be more specific?
13 Q  In a situation where the allegation is an
14    employee failed an efficiency test if another
15    efficiency test is conducted immediately
16    after and they pass the subsequent E test.
17    Would that be a factor when considering a
18    deferred suspension?
19        MS. AL TAQATQA:  Objection, form.
20 A  If they pass an E test, generally there
21    wouldn't be a situation which we're
22    investigating.
23 Q  (By Mr. Cramer, continuing) The situation I'm
24    setting up is there's an E test and the
25    manager believed that the employee failed the

15

1     E test but then conducts the same E test
2     immediately thereafter and the employee
3     passes on the subsequent E test.  So the
4     question is in that situation, would that be
5     a factor when considering a deferred suspension?
6         MS. AL TAQATQA:  Objection, form.
7  A  Only if they held an investigation for the
8     first failed test which wouldn't be connected
9     to the second one.  We'd only be investigating
10    the failure.
11 Q  (By Mr. Cramer, continuing) The investigation
12    they only include the failure; but in the
13    assessment of the discipline, would that
14    situation with the failed E test and then a
15    subsequent passed E test be considered --
16 A  I'm sorry?
17 Q  -- when deciding to use a deferred suspension?
18        MS. AL TAQATQA:  Objection, form.
19 A  If an investigation was held for a failed E
20    test, at the end of the investigation they
21    would look at the hybrid policy, look at the
22    employee's previous discipline, look at the
23    employee's actions during the investigation,
24    and give discipline in accordance with the
25    policy for that incident.

16

1  Q  (By Mr. Cramer, continuing) By the three
2     factors that are listed here, the entirety of
3     the considerations that can be made when
4     considering a deferred suspension, are there
5     other considerations?
6  A  Those are other factors to look at when
7     considering discipline as a whole.  It's not
8     specific just to deferred.
9  Q  Sorry.  Were you asking me a question?  I
10    wasn't --
11 A  No.  Those factors are three example factors
12    when considering to just issue discipline
13    generally.  It could be major, nonmajor.
14 Q  So is a hearing officer supposed to be the
15    ascertainer of truth in an investigation?
16 A  A hearing officer is there to have a fair and
17    impartial investigation in accordance with
18    the labor agreement.  They're there to ask
19    questions, develop facts, question witnesses,
20    and ultimately ensure that the claimant or
21    the employee has a fair and impartial
22    investigation.
23 Q  In situations where a witness and employee
24    are giving two different sets of facts, the
25    hearing officer is going to have to ascertain

21

1  both countries.

2 **Q** If the investigation officer is to assemble

3  and evaluate all the evidence, does that

4  suggest that a hearing officer should

5  communicate with the company witnesses prior

6  to the investigation?

7 **A** **There is communication prior to the**

8  **investigation, yes, between a hearing officer**

9  **and a witness.**

10 **Q** You mentioned a checklist, so I just want to

11  run through it.  So this checklist includes

12  reviewing collective agreement articles.  Correct?

13 **A** **Review collective articles pertaining to the**

14  **investigation and discipline.**

15 **Q** This is all prior to the actual investigation

16  hearing, correct, or at least the collective

17  agreement articles?

18 **A** **It can be throughout that process because**

19  **there's various timelines, beginning, middle,**

20  **end.**

21 **Q** And it describes the hearing officer should

22  review the applicable rules.  Correct?

23 **A** **Can you point to the part you're referencing**

24  **so I can make sure?**

25 **Q** I believe --

22

1 **A** **That's in the US.  That's a role of a witness**

2  **under the note.**

3 **Q** Then it says, However, preparation for a complex

4  case, that should be done by the hearing

5  officer nonetheless.  Correct?

6 **A** **Correct.**

7 **Q** In this section it includes applicable rules,

8  regulations or policies.  Correct?

9      MS. AL TAQATQA:  Objection, form.

10 **A** **Can you tell me what piece you're pointing**

11  **to?  I just want to make sure I'm following.**

12 **Q** (By Mr. Cramer, continuing) It's still the

13  highlighted --

14 **A** **Still the highlighted?  Review applicable**

15  **rules, regulations or policies, correct, is**

16  **what it says.**

17 **Q** In a disciplinary investigation that includes

18  an E test or where an E test was conducted,

19  would this include the efficiency test manual?

20 **A** **It may if the witness feels there's a**

21  **pertinent piece of the manual to enter into**

22  **the investigation.**

23 **Q** Generally speaking, a hearing officer is

24  expected to be prepared for an investigation

25  hearing.  Correct?

23

1 **A** **A hearing officer is expected to be prepared**

2  **and understand the investigation notice and**

3  **hold a fair and impartial investigation.**

4 **Q** What steps should be taken by the hearing

5  officer to be prepared for the investigation

6  hearing?

7 **A** **The hearing officer is going to ensure that**

8  **the witnesses are available, have a location,**

9  **make sure recording devices are working, just**

10  **those parts of the investigation to ensure**

11  **that it goes smoothly in terms of there's no**

12  **issues with technology and that kind of stuff**

13  **too.**

14 **Q** And that preparation includes meeting with

15  the witnesses?

16 **A** **They will meet with witnesses to make sure**

17  **that, one, they can be available on the date**

18  **that it's scheduled, there's no conflict of**

19  **scheduling because that does occur, and make**

20  **sure that the witnesses have seen the**

21  **investigation notice and are, you know,**

22  **generally prepared to come to the**

23  **investigation on the date and time, yes.**

24 **Q** Is it true that investigations are usually

25  not scheduled to occur within 24 hours of the

24

1  alleged rule violation?

2 **A** **I would have to -- I have seen investigations**

3  **scheduled all different variations from an**

4  **alleged violation.**

5 **Q** Does that include within 24 hours of the

6  alleged rule violation?

7 **A** **There's been investigations scheduled the**

8  **next day.**

9 **Q** Is there any reason that you're aware of to

10  have it happen within 24 hours?

11 **A** **Labor relations would prefer to have it as**

12  **soon as possible after an incident because**

13  **everybody involved will have the best**

14  **recollection of the incident and it gives the**

15  **claimant or employee a best shot at a fair**

16  **and impartial investigation because as time**

17  **goes on, people forget things.**

18 **Q** But CP or labor relations wants there to be

19  enough time between the incident and the

20  investigation hearing for the investigation

21  hearing officer to be fully prepared.  Correct?

22 **A** **Correct.**

23 **Q** I'll bring up another document here.  What is

24  this document?

25 **A** **The US Investigation Training Manual.**

25

1  Q  Going down onto page 2, it acknowledges that
2     an investigation that fails to follow the
3     correct process can lead to monetary liability.
4     Correct?
5  A  Can you point to where -- I haven't had a
6     chance to get through it all.  (Witness
7     examining document)  Correct.  It says, "If
8     the company fails to follow the correct
9     process, such failure may lead to a flawed
10    investigation and expose the company to
11    monetary liability".
12              MS. AL TAQATQA:  Cyle, is this an
13    exhibit?
14              MR. CRAMER:  We can mark it as
15    Exhibit 66.  Thank you.
16              (Deposition Exhibit 66 marked for
17    identification.)
18 Q  (By Mr. Cramer, continuing)  I'm referring to
19    this paragraph.  According to this paragraph,
20    CP understands that if a case loses at
21    arbitration, that means either the
22    disciplinary action was not founded on
23    evidence presented or the due process rights
24    of the charged employee were not protected.
25    Correct?

26

1              MS. AL TAQATQA:  Objection,
2     mischaracterizes the exhibit.
3  A  It says, "The company should never lose a
4     case at arbitration if its disciplinary
5     action is founded on evidence presented at
6     the hearing while protecting the due process
7     rights of the charged employee as provided in
8     the CBA".
9  Q  (By Mr. Cramer, continuing)  So that suggests
10    if CP loses at arbitration, that means the
11    disciplinary action was not founded on the
12    evidence or the employee's due process rights
13    weren't protected.  Correct?
14 A  It states that if we do lose a discipline
15    action and the discipline action is founded
16    on evidence presented at the hearing and the
17    due process rights are protected, we
18    shouldn't lose a case at arbitration, correct.
19 Q  I believe we went over this, but we'll just
20    look at where it comes up in this document.
21    It describes here the hearing officer should
22    meet with each company witness prior to the
23    hearing.  Correct?
24 A  This is the preparation guide.  It states,
25    'It is critical to hold a fair and impartial

27

1     hearing.  The goal is to obtain honest/
2     accurate testimony from all parties and to
3     develop the facts and circumstances of the
4     case'.  It further goes on to state, 'The
5     transcript should paint a clear picture of
6     what happened, when, where, who was involved.
7     Technical issues should be explained in lay-
8     person terms'.  It goes on to say, 'Pictures
9     paint a thousand words'.  And it goes on to
10    say the 'ultimate audience is not present at
11    the hearing and may not possess subject
12    matter expertise in order to comprehend the
13    transcript'.  It does go on to say, 'Meet
14    with each company witness.  Discuss the
15    nature of their testimony, the rules or
16    policies involved, and any potential
17    mitigating circumstances.  Ensure each
18    witness has a clear understanding of the
19    incident and has obtained the necessary
20    evidence and is aware of the rules and how
21    the charged employee violated these rules.
22    Ensure they have properly organized their
23    testimony and exhibits'.
24 Q  It includes in there that it's critical to
25    hold a fair and impartial hearing.  So based

28

1     on that, if a hearing gets overturned, is
2     there any sort of investigation on the
3     hearing officer for failing to conduct a fair
4     and impartial hearing?
5  A  It's a general question.  If discipline gets
6     overturned, we review the award and the
7     factors that went into the arbitrator's
8     decision.  There's various factors that may
9     play a role.
10 Q  If the factor in the award is that there
11    wasn't a fair and impartial hearing, is there
12    any investigation that's done regarding that
13    investigation?
14 A  LR would review that award and determine if
15    they agree with the arbitrator's decision and
16    if it's appropriate to educate management on
17    that decision.
18 Q  Does CP assess discipline because an
19    investigation wasn't conducted fairly or
20    impartially?
21              MS. AL TAQATQA:  Objection, form.
22 A  I deal with union investigations.  So it's
23    tough to say what occurs at the management
24    level if the award is determined to be over-
25    ruled because of a procedural objection.  We

29

**1** communicate that to the field, but I'm not
**2** involved in determining management discipline.
**3** **Q** (By Mr. Cramer, continuing) So you don't have
**4** any knowledge of whether management is held
**5** accountable for discipline that's overturned
**6** when it's determined that the investigation
**7** was not fair and impartial?
**8**         MS. AL TAQATQA:  Objection, form.
**9** **A** I'm held accountable in terms of my function
**10** and role and in terms of this process.  So I
**11** know management is held accountable, but it's
**12** a general question on what other departments
**13** or management does when discipline is over-
**14** turned for various issues.
**15** **Q** Is there a policy that discusses
**16** accountability for when discipline is
**17** overturned?
**18** **A** Not that I'm aware of.
**19** **Q** We're on page 14 of this document.  There's a
**20** section here discussing discovery.  You can
**21** take a second to review the paragraph.  It
**22** describes that almost all union agreements do
**23** not provide for discovery.  So does that mean
**24** that discovery by the company employee is
**25** prohibited?

30

**1** **A** When you say company employee, what do you
**2** mean?
**3** **Q** The employee that's being investigated or
**4** their union representative prohibited from
**5** conducting discovery.
**6** **A** There's no labor agreement requirement to
**7** provide any documentation in the form of
**8** discovery prior to a hearing.
**9** **Q** So does CP policy prohibit an employee or
**10** their union representative from conducting
**11** discovery regarding their upcoming
**12** investigation?
**13**         MS. AL TAQATQA:  Objection, form.
**14** **A** A union rep and an employee can do their own
**15** research, but there's no requirement under
**16** the labor agreement for the company to
**17** provide documents that it's going to enter
**18** into the investigation in the form of discovery.
**19** **Q** (By Mr. Cramer, continuing) Does CP policy
**20** require management to provide documents
**21** related to an investigation upon request by
**22** the employee that's being investigated?
**23** **A** Do you know a specific policy you're referencing?
**24** **Q** I'm just asking if that policy exists.
**25** **A** There is no discovery requirement or policy

31

**1** that I'm aware of, and discovery is not a
**2** contractually protected or requirement unless
**3** it's specified in the agreement.  And
**4** arbitrators don't view discovery, unless
**5** specified in the agreement, as anything that
**6** would not be part of a fair and impartial
**7** investigation.  Discovery is not a
**8** contractual requirement.
**9** **Q** So is what's determined to be fair and
**10** impartial only derived from the contractual
**11** obligations?
**12** **A** And arbitration precedent.
**13** **Q** So does that mean that a hearing is fair and
**14** impartial even if the employee and the union
**15** representative is not permitted to conduct
**16** discovery prior to the hearing?
**17**         MS. AL TAQATQA:  Objection, form.
**18** **A** The union and the employee are able to do
**19** their own research and provide their own
**20** evidence.  The company under the contract has
**21** no requirement to provide the documents which
**22** they're going to enter into the hearing in
**23** the form of discovery.
**24** **Q** (By Mr. Cramer, continuing) I'll move down to
**25** a different page here.  Under the complete

32

**1** discipline recommendation section, does it
**2** describe who the appropriate manager is?
**3**         MS. AL TAQATQA:  Cyle, could you
**4** show the witness the whole page so we know
**5** what section of this policy we're looking at?
**6**         MR. CRAMER:  Yeah.  We can move
**7** up, down.  Let me know what you want.  We're
**8** under the Recommending/Issuing Discipline,
**9** and I'm referring to this section.  It
**10** states, 'Complete a discipline recommendation
**11** and send to the appropriate managers'.
**12** **Q** (By Mr. Cramer, continuing) My question is
**13** does this policy describe who the appropriate
**14** managers are?
**15** **A** It doesn't list who those managers would be,
**16** no.
**17** **Q** Who are the appropriate managers to send the
**18** discipline recommendation to?
**19** **A** The recommendation is sent to labor relations
**20** for review.
**21**         MR. CRAMER:  I'm going to close
**22** this one.  We're going to jump through a few
**23** exhibits here.
**24**         (Deposition Exhibit 67 marked for
**25** identification).

33

1  Q  What was the discipline assessed in this
2     letter?
3  A  **20 days suspension.**
4  Q  Was any of that deferred?
5  A  **10 of it was deferred, yes.**
6  Q  Who issued this discipline?
7  A  **The letter came out under Tom Jared's**
8     **signature but the company issues discipline.**
9  Q  Who makes the decision to issue discipline?
10 A  **The company.**
11 Q  A company representative or the company?
12 A  **The company as a whole reviews the transcript**
13    **after LR weighs in and makes a determination**
14    **at that point if charges were proven and if**
15    **the discipline is consistent with the**
16    **process. If the hearing was fair and**
17    **impartial, then discipline is issued from the**
18    **area. But it's a company process. It's not**
19    **one individual.**
20 Q  But individuals make decisions as part of
21    that process?
22 A  **They participate with other departments. LR**
23    **is involved in that process. So it's not one**
24    **singular person. A manager would consult**
25    **with labor relations after investigation and**

34

1     **labor relations would give a recommendation**
2     **or feedback based on their recommendation.**
3     **And then it would be determined if the**
4     **discipline is warranted based on the factors**
5     **already listed: fair and impartial, charges**
6     **were proven. And then discipline would be**
7     **issued by the company.**
8  Q  So multiple people contribute in that process?
9  A  **Yes.**
10 Q  Does this letter specify why this employee
11    was given 10 days deferred suspension?
12 A  **No.**
13 Q  We'll close this one. Actually, I'm going to
14    reopen Exhibit 67 just so we're on the same
15    page. It says Exhibit 67, what we were
16    just looking at. And this discipline looks
17    like it's discipline for a Mr. ███████.
18    Correct?
19 A  **Correct.**
20 Q  The spelling of that is ███████
21 A  **That's correct.**
22         (Deposition Exhibit 68 marked for
23     identification.)
24 Q  Exhibit 68 is an investigation hearing
25    transcript for ███████. I want to scroll

35

1     down. Let's go up so we know who's talking
2     here. It looks like the examination is being
3     done by Mr. Lackey. Correct?
4  A  **Correct.**
5  Q  Then Mr. Adair is the one being questioned?
6  A  **Correct.**
7  Q  We'll go to the top to see who that is. Who
8     is Mr. Adair according to this?
9  A  **Witness.**
10 Q  I guess I shouldn't scroll through so fast.
11    We'll make sure we're still on the same page.
12    So here we were looking at the examination of
13    Mr. Adair by Mr. Lackey. Then I'll scroll
14    down.
15 A  **If you're going to ask me a question about**
16    **this, I want to read it.**
17 Q  Of course. I will be asking on page 1785.
18    It's about five pages. We can definitely
19    take the time to do that. Tell me to scroll
20    when you want me to.
21 A  **Scroll down so I can see line 18 and beyond.**
22    **(Witness examining document). Next page,**
23    **please. Go down. Next page. Keep going.**
24    **Next page. Scroll down. Next page. Scroll**
25    **down. I think we're on the page you wanted**

36

1     to reference.
2  Q  I will be on the bottom half.
3  A  **(Witness examining document). Okay.**
4  Q  Let's go on to the next one a little bit so
5     we can see the rest of what's being said.
6  A  **(Witness examining document).**
7  Q  According to Mr. Adair, he's stating here
8     that the initial command was 30 cars. Correct?
9  A  **30 cars, correct.**
10 Q  Which means Mr. ███ should have stopped at
11    what car count?
12 A  **Within half, so 15.**
13 Q  What car count does Mr. Adair say he stopped
14    at?
15 A  **Traveled 33 cars.**
16 Q  If true, that violates the rule. Correct?
17 A  **Correct.**
18 Q  We can go back to the prior document if we
19    want, but did Mr. ███ waive this disciplinary
20    hearing?
21 A  **When you say waive, can you specify what you**
22    **mean just so I'm clear?**
23 Q  Did he sign a waiver?
24 A  **No.**
25 Q  But he still received a deferred suspension?

**37**

1  **A  That's correct, yes.**
2  (Deposition Exhibit 69 marked for
3  identification).
4  **Q**  This is marked Exhibit 69.  I believe we just
5  referred to a waiver.  Is this what you
6  understand a waiver to be?
7  **A  I'm just reading it.  (Witness examining**
8  **document).  Yes.**
9  **Q**  According to this, ▮▮▮▮ signed a
10  waiver but still received 15 days deferred
11  discipline and a 5-day actual suspension.
12  Correct?
13  **A  Yeah.  The waiver was for 20 days, 15**
14  **deferred, 5 actual.**
15  **Q**  Is there any way from telling on this
16  document whether the discipline was reduced
17  in any way because Ms. ▮▮▮ signed a
18  waiver?
19  **A  No.**
20  MS. AL TAQATQA:  Cyle, we've been
21  going about an hour.  Are you planning to
22  take a break soon?
23  MR. CRAMER:  We can if you want,
24  yeah.  Come back in 10, 15 minutes?
25  MS. AL TAQATQA:  Perfect.

**38**

1  (Brief recess).
2  **Q**  (By Mr. Cramer, continuing) I'm going to
3  bring up what's been previously marked as
4  Exhibit 36.  You can take a second to review
5  it, but have you seen this document before?
6  **A  (Witness examining document).  Yes.**
7  **Q**  I want to scroll down.  This table is
8  described as similarly situated employees.
9  Correct?
10  **A  Yes, similar situated employees.**
11  **Q**  According to this table, it looks like it's
12  initialed MJ Engineer, was assessed verbal
13  coaching for failure to stop within half the
14  distance specified.  Correct?
15  **A  Correct.**
16  **Q**  That's the same reason for discipline as John
17  Sexton in this table.  Correct?
18  **A  Correct.**
19  **Q**  What is verbal coaching?
20  **A  Discussion between employee and manager.**
21  **Q**  Is that considered discipline?
22  **A  No.**
23  **Q**  Does this document show anywhere that MJ
24  Engineer signed a waiver?
25  **A  This document does not.**

**39**

1  **Q**  And TS Engineer was assessed verbal coaching
2  for the same reason for discipline as
3  Mr. Sexton.  Correct?
4  **A  Correct.**
5  **Q**  Verbal coaching results in no lost days of
6  work.  Correct?
7  **A  Correct.**
8  **Q**  And verbal coaching results in no lost pay.
9  Correct?
10  **A  Correct.**
11  (Deposition Exhibit 70 marked for
12  identification).
13  **Q**  This is a signed waiver by ▮▮▮▮▮.
14  Correct?
15  **A  Correct.**
16  **Q**  According to this, he waived the disciplinary
17  process for violating Rule 5.3.7.  Correct?
18  **A  It was a violation of GCOR 5.3.7, correct.**
19  **Q**  And he was disciplined with a 15 day
20  suspension 10 days served 5 days deferred.
21  Correct?
22  **A  No.**
23  **Q**  What was the discipline assessed?
24  **A  10 days in which 5 days will be deferred.**
25  **Q**  I see that.  Thank you.  Is there any way

**40**

1  from telling on this document whether his
2  discipline was reduced in any way because he
3  signed a waiver?
4  **A  No.**
5  (Deposition Exhibit 71 marked for
6  identification).
7  **Q**  We marked this as Exhibit 71, a one page
8  document, Bates CP 03481.  Is the rule
9  described in this letter a shoving rule?
10  **A  The purpose of this investigation hearing is**
11  **to determine the facts and circumstances and**
12  **to place your responsibility, if any, in**
13  **connection with your alleged failure to stop**
14  **within half the range of vision of an**
15  **improperly lined switch resulting in a run**
16  **through switch.  This incident allegedly**
17  **occurred.  The incident is a shove, but**
18  **there's multiple factors there.  There's a**
19  **run through switch also.**
20  **Q**  Is the shoving portion of this governed under
21  the major life threatening rule violation
22  category of the Hybrid Discipline and
23  Accountability Guidelines?
24  **A  Shoving and failure to stop within half the**
25  **range of vision would be a major.**

---

**41**

1  Q  What about the improperly lined switch
2     portion, does that fall under the major life
3     threatening category of the Hybrid Discipline
4     and Accountability Guidelines?
5  A  **Can you bring up that policy?**
6  Q  Yes.
7  A  **(Witness examining document).  Go down.  Next**
8     **page, next page.  Then go back to the**
9     **investigation in your previous exhibit.  What**
10    **was your initial question?**
11 Q  Whether the switching portion of this notice
12    is a major or non-major rule violation.
13 A  **Improperly lined switch resulting in a run**
14    **through switch?  Go back to the policy.  You**
15    **had the page up.  It would be under number 3**
16    **on that page on non-major.**
17 Q  Is the running through the switch
18    encapsulated in number 3?
19 A  **Failure to properly line switches for**
20    **intended movement and/or operating through an**
21    **improperly lined switch.**
22 Q  Going back to the notice then, it includes a
23    major and a non-major rule violation?
24 A  **Potentially at this point it's just the**
25    **notice, but it's referencing failure to stop**

**42**

1     **within half the range of vision of an**
2     **improperly lined switch and then running**
3     **through that switch.**
4  Q  So that includes what could potentially be a
5     major and a non-major rule violation?
6  A  **Potentially, correct.**
7            (Deposition Exhibit 72 marked for
8     identification).
9  Q  We'll stop sharing.  We're marking this as
10    Exhibit 72.  It's a one page document.  It's
11    Bates CP 03482.  Here Tom Jared assessed a
12    letter of reprimand.  Correct?
13           MS. AL TAQATQA:  Objection, form.
14 A  **This is a letter of reprimand, correct.**
15 Q  (By Mr. Cramer, continuing) There was no
16    disciplinary investigation hearing.  Correct?
17 A  **Correct.**
18 Q  From what you can tell, there was no other
19    discipline assessed?
20 A  **What I see in front of me is just a letter of**
21    **reprimand.**
22 Q  To make sure we're on the same page, this is
23    sent to Mr.          .  Correct?
24 A  **Dear Mr.          , correct.**
25 Q  I don't know if I see a first name in there.

**43**

1     Do you see one?
2  A  **(Witness examining document).  Not typed.**
3  Q  Going back to 71, that letter of reprimand is
4     in reference to this notice of investigation.
5     Correct?
6  A  **Can you go back to it now?  (Witness examining**
7     **document).  Yes, it appears to be, correct.**
8  Q  What does a discipline assessed with a last
9     chance mean?
10 A  **An employee would be assessed discipline and**
11    **they're at a level of the discipline process**
12    **which through the progressive process they**
13    **are at a less step based on demerits or other**
14    **issues like majors.  There's various issues.**
15 Q  So that would suggest that there was prior
16    major discipline if discipline assessed was
17    assessed with a last chance?
18 A  **Or minor.**
19 Q  Did you say or a minor?
20 A  **Or minor.  Prior discipline in general is**
21    **what that would indicate.**
22 Q  We can go back to each one if you want to
23    confirm, but I believe I have these listed
24    right.  Looking at the different individuals,
25    Mr.          received a 10 day deferred

**44**

1     suspension and 10 days served.  Ms.
2     received 15 days deferred.  Mr.
3     received a 10 day suspension with 5 days
4     deferred.  MJ and TS both received verbal
5     coaching.  Mr.          received a letter of
6     reprimand.  With all of that, is that
7     consistent discipline?
8  A  **I would have to review each individual**
9     **circumstance, their previous history,**
10    **discipline history, the issue to which was**
11    **potentially being investigated, and the**
12    **alleged rule violations for each one of those**
13    **because each one is going to be different,**
14    **varying degrees of factors.**
15 Q  Does signing a waiver guarantee lesser
16    discipline than engaging in your hearing
17    investigation rights?
18 A  **No.**
19 Q  A waiver doesn't cancel discipline.  Right?
20 A  **Cancel discipline?  What do you mean?**
21 Q  So a waiver let's say for a major rule
22    violation, potential major rule violation, an
23    employee signs a waiver.  Does that result in
24    the disciplinary being waived?
25 A  **The employee is waiving the investigation**

45

1     process.

2 **Q** But not the discipline accountability itself?

3 **A** **Correct. They're accepting accountability.**

4 **Q** What are hearing officers guided to do when

5     an employee states in the investigation that

6     they were being intimidated by a witness?

7          MS. AL TAQATQA: Objection, form.

8 **A** **I would need more context in the transcript**

9     **or the investigation to be able to answer that.**

10 **Q** (By Mr. Cramer, continuing) There's not any

11     policy in place that describes what a hearing

12     officer should do when an employee states in

13     an investigation that they were being

14     intimidated by a witness?

15 **A** **Once again, I would have to read the specifics**

16     of an investigation or an incident to answer

17     that because there are policies, HR policies.

18     But, once again, I would need to specifically

19     read a transcript or a situation to give a

20     more specific answer to that.

21 **Q** There's not a blanket policy that if there is

22     any allegation of intimidation by a witness,

23     that the conducting officer is supposed to

24     report that allegation?

25 **A** **There's varying degrees in a transcript on**

46

1     **how something like that may be said, and I**

2     **would need to specifically read what it says**

3     **to be able to tell you what a hearing officer**

4     **should or shouldn't do.**

5 **Q** Based on the circumstances of the allegation

6     of intimidation, it's possible no action is

7     taken. Correct?

8 **A** **Through the transcript? Possibly, no.**

9 **Q** I am going to bring up what has previously

10     been marked as Exhibit 1. You are familiar

11     with this document. Right?

12 **A** **Yeah, this is the labor agreement between CP**

13     **and DM&E Railroad for the BLET.**

14 **Q** Under this agreement, no employee shall be

15     disciplined without a fair hearing by an

16     officer of the company. Correct?

17 **A** **If there's a spot you're referencing, I would**

18     **like to review it.**

19 **Q** I believe so. Here's an article on

20     investigations and discipline, so I believe

21     it would be in here. You can take a second

22     to look.

23 **A** **(Witness examining document). Next page.**

24     **Keep going down. That's the investigation**

25     **discipline guidelines under the labor agreement.**

47

1 **Q** Under this agreement, no employee shall be

2     disciplined without a fair hearing by an

3     officer of the company. Correct?

4 **A** **This agreement provides the outline for the**

5     **time limits to hold an investigation. It**

6     **also speaks to employees may waive their**

7     **right to discipline through the investigation**

8     **process.**

9 **Q** I think I'm referring to letter B under

10     Article 29. According to that, no employee

11     shall be disciplined without a fair hearing

12     by an officer of the company. Correct?

13 **A** **Yeah. No employee shall be disciplined**

14     **without a fair hearing investigation by an**

15     **officer of the company.**

16 **Q** Who in the disciplinary process makes the

17     decision whether a hearing is fair?

18 **A** **LR would review the transcript and any**

19     **evidence, facts entered in it, and determine**

20     **if the investigation was fair and impartial.**

21 **Q** Is it true under this agreement that

22     employees being investigated are to have a

23     reasonable opportunity to secure the presence

24     of a necessary witness?

25 **A** **I'm reading under B. He shall have a**

48

1     **reasonable opportunity to secure the presence**

2     **of necessary witnesses and he shall have the**

3     **right to be represented by an accredited**

4     **representative or member of the Brotherhood**

5     **of Locomotive Engineer and Trainmen.**

6 **Q** According to that, an investigation would not

7     be fair if an employee was denied the

8     presence of necessary witnesses. Correct?

9 **A** **Not necessarily, no.**

10 **Q** So you disagree that an employee shall have

11     the reasonable opportunity to secure the

12     presence of necessary witnesses?

13          MS. AL TAQATQA: Objection,

14     mischaracterizes the witness' testimony.

15 **A** **They have an opportunity to secure witnesses,**

16     **but those witnesses have to have firsthand**

17     **knowledge. So just bringing in any witness**

18     **doesn't necessarily mean that that witness**

19     **should be at the investigation or has any**

20     **relevant testimony.**

21 **Q** (By Mr. Cramer, continuing) I'm trying to be

22     specific here. I'm talking about what is

23     described here as a necessary witness. My

24     question is is an investigation fair if an

25     employee was denied the presence of a



Dittrich
**Exhibit 66**

## US Investigation Training Manual

| Topic | Page # |
|---|---|
| | |
| Introduction | 2 |
| General Information on Formal Investigations | 3 |
| Incident Investigation and Gathering Evidence | 4-7 |
| The Notice of Investigation | 7-9 |
| Preparing for the Hearing | 10-14 |
|     Hearing Officer Guidelines | |
|     Company Witness Guidelines | |
| The Hearing | 14-23 |
|     Hearing Guidelines | 14 |
|     Hearing Officer Guidelines | 16 |
|     Witness Officer Guidelines | 18 |
|     Other Issues | 20 |
| Recommending / Issuing Discipline | 23-24 |
| | |
| Appendices: | |
|     I.  Sample Hearing Notice | 25 |
|     II. Sample Opening | 26 |
|     III. Sample Closing | 27 |
|     IV. Discipline Recommendation Template | 28 |
|     V. Sample Discipline Notice | 29 |
|     VI. Standard Language re: Pre-Hearing Discovery Request | 30 |
| | |

Confidential

CP_06399

## Introduction

The purpose of this manual is to educate individuals – hearing/conducting officers, incident investigating officers and company witnesses - of the proper procedures in preparing for and conducting formal investigation(s).

If the company fails to follow the correct process, such failure may lead to a flawed investigation and expose the company to monetary liability. This manual is designed as a step-by-step guide to the investigative process. The manual provides insight to issues and methods to address incidents as they may arise during and after the hearing. If you, as hearing officers and/or witnesses, follow the steps reviewed herein, you will have done your part to develop a solid and complete record. The investigative record is the foundation of the company's case should the matter be progressed to arbitration.

The company should never lose a case at arbitration if its disciplinary action is founded on evidence presented at the hearing while protecting the "due process" rights of the charged employee as provided in the CBA

When reviewing this material, it is important to understand that your true audience during a formal disciplinary hearing is the reader of the transcript (not those in attendance at the hearing).

Initially, the person reading the transcript will be other company managers and, ultimately, in many cases, a third party arbitrator. Therefore, the transcript must convey clearly all the facts and circumstances of the case. The transcript must tell the whole story. It should be assumed that those reading the transcript have no knowledge of the incident beyond what is contained in the transcript.

Any technical language or evidence must be explained during the hearing so that a lay person has a clear understanding of the subject matter. This is true even if everyone at the hearing understands the technicalities being discussed; remember, your true audience is not in the room.

The foregoing is most important because an arbitrator **cannot** consider evidence or testimony that is not presented during the hearing (an exception being an employee's formal discipline record).

Last, in arbitration proceedings, the burden of proof is upon the company to show, by substantial evidence, that the employee violated the rule(s) for which he was disciplined. As such, it is vital that a solid and complete development of facts be made in the record – the formal investigation.

~ 2 ~

No manual or course can fully prepare you for the actualities of a formal disciplinary hearing. It is highly recommended that after reading and discussing this material, and after participating in the mock hearings, you attend at least one actual investigation as an observer.

### General Information on Formal Investigation

A formal investigation (formal hearing) is under the direct control of the company.

A formal investigation is more in the nature of an administrative proceeding than a formal action at law. It is not governed by the technical rules pertaining to the admission of evidence that are binding at civil and criminal actions.

The hearing is not an adversarial proceeding. Its purpose is to inquire fairly and impartially into all facts connected with the investigation so as to develop the truth, regardless of the result to either party. A formal hearing is designed to ascertain all the facts that have a direct bearing on the cause(s) of the incident and the alleged wrongful actions of the charged employee(s).

The company has [managerial and contractual] authority to assess discipline after it concludes the formal hearing. The disciplinary action that is issued by the company may be subject to further review by an impartial party if such action is pursued by the employee or a representative of the employee. This "right of review" is guaranteed under the provisions of the CBA and/or the Railway Labor Act, as amended, (RLA). Accordingly, it is necessary and proper that the complete process be handled in a professional manner.

As previously noted, investigations are under the control of the company. Arbitrators recognize that the company's rights will be safeguarded at the hearing. To similar effect, the CBA protects the "due process" rights of the charged employee. The hearing officer must understand the words that "no employee will be disciplined without being given a fair and impartial hearing." When the hearing officer understands the concept and requirements of those words, the charged employee's due process rights will be preserved.

It is important to know that the holding of an investigation is not for the purpose of proving the correctness of the charges, but for the purpose of developing all facts material to the charge(s), both favorable and against the employee.

The presiding officer is a trier of fact and an ascertainer of truth; accordingly, the trial officer is afforded latitude in his efforts to determine the extent and scope of the employee's conduct when mishaps occur on the property.

In the general conduct of the hearing, the hearing officer's job is maintain order, ensure a proper record is formed and to do so in a fair and impartial manner. Such action is the essence of professionalism.

~ 3 ~

## Preparing for the Hearing

1.  Preliminary fact finding has determined that a formal investigation is required.
2.  The Hearing Notice has been issued.


At this point, either the charged employee or their chosen representative may request a waiver (also called an Admission of Responsibility, AOR).   There is really no downside to accepting a waiver from the company's perspective.   If the employee assumes responsibility for the incident and signs a waiver to accept the quantum of discipline as determined by the company, a hearing is no longer required (Note: this also eliminates the lengthy and costly appeal process).   Generally, the only reason not to allow a waiver is if the contemplated outcome is dismissal (based on the employee's current standing in the disciplinary process and/or the severity of the incident).   Any discussions regarding waivers should be off the record.   In the event no agreement is reached, these discussions may not be referenced in the hearing.   A waiver/AOR template is included in discipline policy 5612 (enclosed).

Absent a signed waiver, the hearing officer and company witnesses shall begin preparations for the hearing.   Guidelines follow.


**Hearing Officer, Preparation Guidelines:**

**Key Point:  Your job is to obtain <u>facts</u> and <u>circumstances</u> pertaining to the charge.**
**Preparation is the key to obtain facts and the circumstances related to the incident.**

As the hearing officer, it is critical to hold a fair and impartial hearing.  The goal is to obtain honest/accurate testimony from all parties and to fully develop the facts and circumstances of the case.  The transcript should paint a clear picture of what happened, where it happened, who was involved and why it happened.  Any technical issues should be explained in lay person terms.  Pictures paint a thousand words.  Remember, your ultimate audience is not present at the hearing and may not possess (and should not have to possess) subject matter expertise in order to comprehend the transcript.

- **Meet with each company witness**.   Discuss the nature of their testimony, the rules or policies involved, and any potentially mitigating circumstances.  Ensure each witness has a clear understanding of the incident, has obtained the necessary evidence (see "Incident Investigation and Gathering Evidence"), and is aware of the applicable rules and how [it appears] the charged employee violated these Rules.  Ensure they have properly organized their testimony and exhibits.

~ 12 ~



Tom Jared                    1010 Shop Road    Office: (651) 495-9519
General Manager Operations   St. Paul, MN      Cell:
US West                      55106             Tom_Jared@cpr.ca



**Dittrich**

**Exhibit 67**

January 27, 2021



Employee #

Mr. █████

Notice of formal investigation/hearing was issued you under date of January 11, 2021 in connection with the occurrence outlined below:

"…to determine the facts and circumstances and to place your responsibility, if any, in connection with your alleged failure to stop within half the distance specified while shoving on main line at Enderlin while operating train 2H93-06 at approximately 01:45 hours on January 7, 2021."

Formal investigation/hearing was conducted on January 19, 2021 to develop all facts and circumstances in connection with the referenced occurrence. Following the conclusion of that investigation/hearing it was determined that the transcript of the investigation/hearing record contains substantial proof that you violated the following Company Rules or Notices: GCOR 5.3.7 – Radio Response.

Based on the facts and evidence in the hearing record, the severity of the incident and your past discipline history, you are being assessed a twenty (20) day suspension, serve ten (10) days to be effective 0001 hours on Thursday, January 28, 2021 until 2359 hours on Saturday, February 6, 2021 and ten (10) days deferred.

NOTE: At this time you are not required to serve the deferred portion of the above referenced suspension (the "Deferred Suspension"). If you do not commit another offence for which discipline is warranted within 6 months of the date of this notice, you will no longer be in jeopardy of having to serve the Deferred Suspension. However, if you commit another offence for which discipline is warranted within 6 months of the date of this notice, you will be required to serve the Deferred Suspension as well as being assessed any appropriate consequences for the new offence.

Respectfully,

*John D Jared*

Tom Jared
General Manager Operations
US West

cc    Matt Bailey – Superintendent North Dakota
      Labor Relations
      Crew Management
      Employee Services
      Paul Ripplinger L/C BLET

Confidential                                                                    CP_01769

**Dittrich**
**Exhibit 68**

IN RE THE MATTER OF:                    )

Investigation/Hearing of ████          )

████                                    )

January 19, 2021

11:00 AM

PROCEEDINGS HAD at Canadian Pacific Enderlin

General Yard Office, 101 Harvest Lane, Enderlin, North Dakota.

██████████

January 19, 2021

2

PRESENT FOR THE COMPANY:

     MR. DAVID LACKEY, Conducting Officer


PRESENT FOR THE CHARGED EMPLOYEE:

     MR. PAUL RIPPLINGER, Local Chairman, BLET

       Division 671

AccuTran Global Enterprises, Inc.
855-552-0505

Confidential

CP_01771



January 19, 2021

3

I N D E X

WITNESS:  NICHOLAS ADAIR

Examination by Mr. Lackey                    10, 24, 27

Examination by Mr. Ripplinger                    20, 26

Examination by Mr. Pfaff                              26

PRINCIPAL:

Examination by Mr. Lackey                        29, 38

Examination by Mr. Ripplinger                        36

WITNESS:  CHANDLER NEUFELD

Examination by Mr. Ripplinger                39, 52, 58

Examination by Mr. Lackey                        45, 52

EXHIBITS:

Exhibit 1                                             8

Exhibits 2a - 2c                                     12

Exhibits 3 - 4                                       15

Exhibit 5                                            16

AccuTran Global Enterprises, Inc.
855-552-0505

January 19, 2021

15

1          The picture that I entered as an exhibit is the

2     picture taken from Moorhead Crossing of the car, as I stated,

3     stopped on Moorhead Crossing from Mr. ██████ shove move --

4          Q.     All right.

5          A.     -- when Mr. ████ had received no further

6     communication.

7          MR. LACKEY:  We'll enter the picture of Moorhead

8     Crossing with SOO 117761 into the record as Exhibit 3.

9                    (Whereupon, the document was marked as

10                   Exhibit 3 for identification.)

11         MR. LACKEY:  And the printout of the Train Consist, the

12     2H93-06, from RPM with the highlighted cars starting at Line 74

13     SOO 117761 and ending in the highlighted portion with Line 106

14     CP 608472.  This will be entered in the record as Exhibit 4.

15                    (Whereupon, the document was marked as

16                    Exhibit 4 for identification.)

17         Q.     Go ahead, sir.

18         A.     All right.  As I stated, this move then traveled

19     33 cars from initial movement to stop on an initial command of

20     30 cars with no further command given.  This is in violation of

21     GCOR 5.3.7.  5.3.7 states radio -- the -- the Rule is 5.3.7

22     Radio Response.  I'll read the entire Rule in its entirety.

23          "When radio communication is used to

24          make movements, crew members must

AccuTran Global Enterprises, Inc.
855-552-0505

Confidential

CP_01784

January 19, 2021

16

1    respond to specific instructions given

2    for each movement.  Radio

3    communications for shoving movements

4    must specify the direction and distance

5    and must be acknowledged when distance

6    is specified -- I apologize -- when

7    distance specified is more than four

8    cars."

9    **A.**    **Movement in the box below, it's highlighted.**

10    "Movement must stop within half the

11    distance specified unless additional

12    instructions are received."

13    MR. LACKEY:  Okay.  I will enter this in the record as

14    Exhibit 5, showing 5.3.7 and Radio Response highlighted and the

15    sentence in the box highlighted as well.

16    (Whereupon, the document was marked as

17    Exhibit 5 for identification.)

18    **A.**    **As stated, this movement traveled 33 cars from**

19    **initial movement to a stop on an initial command of 30 cars.**

20    **There were no further instructions given, which, as stated, is**

21    **in violation of GCOR 5.3.7.**

22    **At the point of stopping, I asked Mr.** ▇ **how**

23    **far he believed he traveled.  His reply via radio was 15 cars.**

24    **I replied that is a really long 15 cars.  I need to speak with**

Confidential

CP_01785

████████
January 19, 2021

17

1  you prior to departure.  Approximately 15 to 20 minutes later,

2  Mr. ████ came into my office and sat down.  I asked Mr. ████

3  how many cars he believed he traveled.  And he stated to me

4  more than I should have.  I then asked, how many should you

5  have?  And he -- he stated 15 cars.  I asked, what does the

6  Rule say?  And he said, stoff half -- stop half the distance

7  specified.  I asked him if he did that.  And he stated no sir,

8  I did not.

9              We had a very good talk at that point about

10  things that could happen if the Rule is not followed and the

11  dangers that follow that.  Mr. ████ admitted and accepted

12  responsibility while speaking to me in my office and ensured me

13  of Rule compliance to follow.

14              That's all I have sir.

15      Q.     All right.  Thank you.  Mr. Adair, at the

16  beginning of your statement, you stated that Conductor Neufeld

17  agreed to the test?

18      A.     Yes, sir.  He did.

19      Q.     Did he raise any concerns of the safety of the

20  test?

21      A.     He briefly asked me if this was a -- something

22  he could challenge.  I -- I asked Mr. Neufeld if there was --

23  at any point this test would put him in danger.  Mr. Neufeld

24  stated -- responded to me, no.  I asked him if I was asking him

Confidential



**Dittrich**
**Exhibit 69**

**CP**

**WAIVER**

Date: July 31, 2019

This will acknowledge that I,          employee #      have agreed to the waiver process for my twenty (20) day suspension in which 15 days will be deferred. I acknowledge responsibility for my failure to stop in half the specified distance given. This incident occurred at approximately 17:30 hours on July 16, 2019 while working Train B75-16 at the South End Nahant NA16 Track at Nahant yard. This was a violation of General Code of Operating Rules Rule 5.3.7 – Radio Response and GCOR Rule 1.1 – Safety. In addition, I acknowledge and understand that:

- There will be no formal investigative hearing.
- The suspension will appear on my record as a suspension for cause.
- No grievance/appeal will result from this suspension.
- A copy of this letter will be placed in my file.

**Other conditions: Your five (5) day actual suspension to commence at 00:01 hours on Thursday, August 1, 2019 up to and including 23:59 hours on Monday, August 5, 2019. Reinstatement to active duty at 00:01 hours on Tuesday, August 6, 2019.**

**NOTE: At this time you are not required to serve the deferred portion of the above referenced suspension (the "Deferred Suspension"). If you do not commit another offence for which discipline is warranted within 6 months of the date of this notice, you will no longer be in jeopardy of having to serve the Deferred Suspension. However, if you commit another offence for which discipline is warranted within 6 months of the date of this notice, you will be required to serve the Deferred Suspension as well as being assessed any appropriate consequences for the new offence.**

Employee Signature _____ Date

Manager Signature _____ 8/1/2019 Date

CC: J. Rinnels – D. Smith – J. Cartlidge - CMC – Employee Services – SBP – Operating Practices/Rules – Timekeeping – Pete Semenek – BLET General Chairman

1

```
 1          IN THE UNITED STATES DISTRICT COURT
 2          FOR THE SOUTHERN DISTRICT OF IOWA
                    EASTERN DIVISION
 3    - - - - - - - - - - - - - - - - - - - -
 4                      No. 3:23-CV-00031-HCA
 5    John Sexton,
 6                        Plaintiff,
                vs.
 7    Dakota, Minnesota & Eastern Railroad
      Corporation d/b/a Canadian Pacific,
 8    a Delaware corporation,
 9                        Defendants.
10    - - - - - - - - - - - - - - - - - - - -
11
12
13                  DEPOSITION OF
14                   JASON ROSS
15                 July 18, 2024
16                  10:00 a.m.
17
18
19
20
21
22
23         TAKEN BY: BRENDA K. FOSS
24          fossbrenda@yahoo.com
                612-701-4282
25
```

2

```
 1        Deposition of JASON ROSS, taken by Zoom
 2   videoconference by and on behalf of
 3   Plaintiff, on Thursday, July 18, 2024,
 4   commencing at 10:00 a.m., before Brenda K. Foss,
 5   Professional Court Reporter, Notary Public,
 6   State of Minnesota, County of Hennepin.
 7
 8            *   *   *   *   *
 9        A P P E A R A N C E S
10
11   ON BEHALF OF THE PLAINTIFF:
     JOHN MAGNUSON, ESQUIRE
     CYLE CRAMER, ESQUIRE
12   YAEGER & JUNGBAUER BARRISTERS, PLC
     4601 Weston Woods Way
13   St. Paul, MN  55127
     jmagnuson@yjblaw.com
14   651-288-9500
15
16   ON BEHALF OF THE DEFENDANTS:
     JACK SULLIVAN, ESQUIRE
17   DORSEY & WHITNEY LLP
     50 South 6th Street, Suite 1500
18   Minneapolis, MN  55402
     sullivan.jack@dorsey.com
19   612-340-2600
20
21   Also present: Noah Garcia, DM&E
22
23
24
25
```

3

```
 1              I N D E X
 2
 3   Examination:              PAGE:
     By Mr. Magnuson             4
 4
 5   Marked Deposition Exhibit:
     79  Feb 1st, 2021 call record 89
 6      for Jason Ross
 7
 8   Previously Marked Exhibits:
     13                   114
 9   18                    13
     65                    70
10   66                    65
     69                    76
11   71                    86
     72                    88
12
13
14   Reporter's Certificate     133
15
16   (Original Deposition Transcript in the
17   possession of John Magnuson, Esquire).
18
                  *  *  *  *  *
19
20
21
22
23
24
25
```

4

```
 1            P R O C E E D I N G S
 2
 3            JASON ROSS,
 4     after having been first duly sworn,
 5     deposes and says under oath as follows:
 6
 7         MR. MAGNUSON:  Good morning,
 8   Mr. Ross.  My name is John Magnuson.  I
 9   represent John Sexton in this matter.  With
10   me here today in my office is Cyle Cramer.  I
11   see that Noah Garcia is on the Zoom call.
12   Jack, where is Mr. Garcia located?
13         MR. SULLIVAN:  Jack Sullivan on
14   behalf of the defendant.  Mr. Garcia is
15   observing, not participating in the
16   deposition.  He is in Kansas City, Missouri.
17
18         E X A M I N A T I O N
19   BY MR. MAGNUSON:
20 Q  Good morning, Mr. Ross.  Could you please
21   state your full name spelling your last name
22   for the record?
23 A  My full name is Jason Manfred, M-A-N-F-R-E-D,
24   Andrew Ross, R-O-S-S.
25 Q  Where are you physically located today?
```

13

1  Q  It's fair to say it was not appealed?
2  A  **To my knowledge.**
3  Q  Sir, I have got up on the screen here what
4     has been marked Exhibit 18.  This is an
5     e-mail -- is this one of the e-mails that you
6     reviewed prior to your deposition here today?
7  A  **I think so, yep.**
8  Q  Did it refresh your recollection as to -- let
9     me ask you this.  Do you remember receiving
10    this e-mail that was forwarded to you -- it
11    was intended for you -- and went to the wrong
12    Jason Ross but ultimately was forwarded to
13    you by Tracy Miller?
14 A  **Can you scroll down so I can see it?**
15    **(Witness examining document).  Stop.  Okay.**
16    **Scroll down.  Yep, I remember receiving this,**
17    **yep.**
18 Q  You remember receiving this?
19 A  **Yep.**
20 Q  In that first paragraph Mr. Sexton states
21    that he was in a company vehicle driven from
22    Eckards to Marquette by ATM Kurt McKelvey out
23    of Marquette, Iowa during a snowstorm while
24    he felt the need to drive at 40 miles per
25    hour on roads that were 100 percent snow

14

1     covered with blowing and drifting snow.  I
2     shared with him on three separate occasions
3     that he was driving too fast and was making
4     me uncomfortable.  Do you recall reading that
5     at the time?
6  A  **I recall reading it, yep.**
7  Q  Mr. Sexton in that sentence, two sentences,
8     was complaining of an unsafe condition or
9     unsafe act.  Correct?
10       MR. SULLIVAN:  Objection.  The
11    document speaks for itself.  You can answer.
12 A  **He's sharing his opinion about what he feels**
13    **is an unsafe act or an unsafe condition.**
14 Q  (By Mr. Magnuson, continuing) He felt that
15    Kurtis McKelvey was driving too fast for the
16    conditions is what it says.  Right?
17 A  **That's what he felt according to that record,**
18    **yep.**
19 Q  So at least according to Mr. Sexton here, he
20    was making a safety complaint.  Correct?
21 A  **Where do you see that?**
22 Q  Well, you just agreed with me that he was
23    stating --
24 A  **It's his opinion.**
25 Q  Right.  His opinion is that Kurtis McKelvey

15

1     was driving too fast for the conditions.
2     Right?
3  A  **That's his opinion.**
4  Q  And he's stating facts too, right, his
5     version of facts.  Right?
6  A  **He is stating his version of what happened,**
7     **yep.**
8  Q  He felt that Kurtis McKelvey was driving in
9     an unsafe manner.  Correct?
10 A  **That's what he's saying, yes.**
11 Q  And you read that?
12 A  **Yep.**
13 Q  And he was making, Sexton, a safety complaint
14    to you.  Correct?
15 A  **I don't see this as a safety complaint.**
16 Q  You just agreed with me that --
17 A  **He's stating his opinion.**
18 Q  And his opinion was that Kurtis McKelvey was
19    driving too fast for the conditions.  Right?
20 A  **That's his opinion.**
21 Q  And that's what he's expressing to you.  Right?
22 A  **He's expressing his opinion.**
23 Q  To you.  Right?
24 A  **Yes.**
25 Q  What was your position at the time?

16

1  A  **Vice President of Operations in Southern**
2     **Region.**
3  Q  And that included Mr. Sexton's territory?
4  A  **It did.**
5  Q  And McKelvey's territory?
6  A  **That's right.**
7  Q  And Jared's territory?
8  A  **That's right.**
9  Q  And Miller's territory?
10 A  **That's right, part of it, part of Miller's**
11    **territory.**
12 Q  In the second paragraph where it begins "It
13    had been snowing", do you see that?
14 A  **"It had been snowing the previous few days",**
15    **yep.**
16 Q  He states, "It had been snowing the previous
17    few days and the tracks and crossings were
18    snow covered".  Do you see that?
19 A  **Yep.**
20 Q  You're aware as a railroader that tracks and
21    particularly crossings can get snow and ice
22    built up on them after snowstorms.  Right?
23 A  **That's correct, yep.**
24 Q  Particularly crossings because vehicles drive
25    over the tracks and pack snow in and it can

1  become compacted. Right?

2  **A  Correct.**

3  **Q**  And conditions like that can cause derailments.

4  Right?

5  **A  It can, yep.**

6  **Q**  Derailments are unsafe. Right?

7  **A  Correct.**

8  **Q**  He goes on to say, "I informed ATM McKelvey

9  that the crossing and tracks needed cut with

10  the locomotives before our setout". Let me

11  stop right there. An engineer bringing to

12  the attention of his supervisor, in this case

13  ATM McKelvey, that the tracks need to be cut,

14  that's something you would encourage from an

15  engineer. Right?

16  **A  It's something I expect, yep.**

17  **Q**  Okay. He states, "He told me that I would

18  NOT", not all capitalized, "cut the crossings

19  and tracks in which I replied if he is directing

20  me to not follow the rules and our topic of

21  the month for the health and safety committee

22  and managers (cutting flangeways and crossings)

23  that he would have to call Superintendent

24  Smith right now". I will just stop right

25  there.

1  **A  Okay.**

2  **Q**  Sexton's opinion here that he writes is that

3  he was instructed by Mr. McKelvey not to cut

4  the crossings and tracks. Right?

5  **A  Yes, that's what he states.**

6  **Q**  If there is a buildup of snow and ice on

7  tracks and crossings, that can be an unsafe

8  condition. Right?

9  **A  Correct.**

10  **Q**  And if the tracks are not cut, that could

11  create an unsafe condition. Right?

12  **A  Correct. But in this case he cut the crossings**

13  as you can see. He says he cut them.

14  **Q**  Right. We stopped after "Smith right now".

15  What I'm concentrating on now with you -- and

16  I will direct your attention to this -- is

17  that Sexton claimed to you in this e-mail

18  that he was instructed by McKelvey to not cut

19  the tracks. Correct?

20  **A  That's right. Mr. Sexton and I had a**

21  **conversation after this e-mail was sent.**

22  **Q**  Okay. We'll get to that. He goes on to

23  state that this train had loads of ammonia.

24  Right?

25  **A  Uh-huh.**

1  **Q**  That's a yes?

2  **A  Yes.**

3  **Q**  And that's anhydrous ammonia?

4  **A  I don't know. That's what he's stating. He**

5  **is stating it's ammonia. I don't know what**

6  **the product was.**

7  **Q**  You know what ammonia is?

8  **A  It could be several types of ammonia. I**

9  **don't know what the product he was handling**

10  **was. He says it was ammonia.**

11  **Q**  What is ammonia typically used for?

12  MR. SULLIVAN: Objection, lack of

13  personal knowledge.

14  MR. MAGNUSON: You can answer.

15  THE WITNESS: Can I?

16  MR. SULLIVAN: Yes, go ahead.

17  **A  Cleaning.**

18  **Q**  (By Mr. Magnuson, continuing) Cleaning what?

19  **A  I couldn't tell you.**

20  **Q**  Are you aware that it's used in farm operations?

21  **A  Vaguely, yep.**

22  **Q**  It's used to clean out fertilizer tanks and

23  that type of thing?

24  **A  I'm not a farmer. I couldn't tell.**

25  **Q**  But you've dealt with shipping ammonia over

1  the course of your career I'm assuming?

2  **A  We ship many products.**

3  **Q**  Including ammonia?

4  **A  Including ammonia.**

5  **Q**  Would you consider ammonia to be a hazardous

6  material?

7  **A  Yes.**

8  **Q**  You put HAZMAT placards on loaded ammonia

9  cars. Right?

10  **A  Yes.**

11  **Q**  Because they're volatile chemicals. Right?

12  **A  I can't speak to the volatility of them. I**

13  **can tell you that they're hazardous chemicals**

14  **and that's the way we handle them.**

15  **Q**  If they derail or are involved in collisions,

16  they can leak the ammonia product into the

17  environment. Right?

18  **A  Correct.**

19  **Q**  And that's a dangerous situation for

20  employees and the public. Right?

21  **A  Correct.**

22  **Q**  And for that matter, for the environment if

23  they spill into rivers and that type of thing.

24  Right?

25  **A  Correct.**

21

1   Q   In February of 2021, were you aware that
2       a number -- well, at least two derailments
3       had occurred as a result of snow and ice
4       buildup on tracks causing derailments?
5   A   As a specific number and the timing of them I
6       couldn't tell you.  I don't have that
7       information, not in front of me.  Three years
8       ago -- 3-1/2 years ago is quite a while for
9       me to try and remember back.
10  Q   Sexton states that it was a topic of the
11      month.  Do you recall that being the case?
12  A   Like I said, that was 3-1/2 years ago.  I
13      can't recall exactly what the topic of the
14      month was at that time.
15  Q   What is the topic of the month?
16  A   It's a safety topic we usually talk to
17      employees about.
18  Q   You don't recall two bulletins being put out
19      around that time identifying that two
20      derailments had occurred as a result of snow
21      and ice building up on crossings?
22  A   Again, it was 3-1/2 years ago.  You're asking
23      me to remember something from 3-1/2 years and
24      one, two, three positions ago.  So I don't
25      remember exactly what was put out at that

22

1       time in terms of bulletins.  We put many
2       bulletins out about many reasons.
3   Q   So we can clear things up for a jury that
4       doesn't necessarily understand the physics
5       behind railroading, what can happen when snow
6       and ice builds up particularly in the
7       crossings is that the wheels can ride up on
8       the snow and ice causing them to get above
9       the flange on the wheel and cause a
10      derailment.  Right?
11  A   Yes.
12  Q   Generally speaking?
13  A   That can occur there, yes.  Usually it won't
14      happen with loads but empties are more
15      susceptible to it.
16  Q   Do you know whether this train of
17      Mr. Sexton's was loaded, empty, or a
18      combination of both?
19  A   I don't remember.
20  Q   Are you familiar with the 474 job?
21  A   Again, that was 3-1/2 years ago.  Vaguely I
22      remember what 474 did.
23  Q   So you've said, sir, a number of times that
24      you're having a difficult time remembering
25      specific details from -- what did you say?

23

1       You even did the months, three positions ago
2       and 3-1/2 years ago?
3   A   That's right.  You're asking me to remember
4       specifics about a train schedule where train
5       schedules change.  474 doesn't even run any-
6       more.  We don't even run that train.  So 474
7       at some point we would have retired the
8       schedule.  On a network where we have 239
9       trains, not including locals, it's hard for
10      me to remember what 474 did, exactly what
11      that train did 3-1/2 years ago.
12  Q   I'm not asking you exactly what the train
13      did.  Generally speaking, do you recall if
14      the 474 was made up of loads, empties, or a
15      combination of both?
16  A   474, if my memory serves me correctly,
17      originated in either Nahant or Kansas City.
18      Again, you're going 3-1/2 years back and it
19      would terminate at St. Paul.  Generally
20      speaking, it would have been a mix of loads
21      and empties.
22  Q   And you had a hard time remembering whether
23      or not at the time two derailments had
24      occurred in the area due to snow and ice
25      buildup.  Right?

24

1   A   Yes, correct.  I don't remember.  I honestly
2       don't.  If you have evidence to show that it
3       did, bring it up and I'll comment on it.
4   Q   We may do that later.
5   A   Okay.
6   Q   We're accommodating your time schedule.  You
7       said this is a week you're kind of recovering
8       down there as a result of the work you did
9       during the hurricane?
10  A   That's correct, yeah.
11  Q   So kind of taking a little vacation time?
12  A   Run that by me again.
13  Q   You're considering this kind of vacation time
14      as your rest?
15          MR. SULLIVAN:  To be clear,
16      Mr. Ross isn't recovering.
17  A   I'm working in Mexico.  This is my territory.
18      I worked out of Houston all week last week
19      and then I oversaw the changeover of the
20      Minneapolis operating center and Kansas City
21      operating center into our new operating
22      centers located in Kansas, and then I came
23      here on Tuesday.  I'm not here on vacation.
24  Q   (By Mr. Magnuson, continuing) So you said you
25      had this phone conversation with Sexton?

**25**

1  A  Correct, yeah.

2  Q  It's not going to surprise me here but you're
3     probably going to remember a whole bunch of
4     details about that conversation, aren't you?

5  A  You know what? If you're asking me now about
6     the conversation, I can briefly talk about
7     the conversation. I do remember having a
8     pleasant conversation with John and I encouraged
9     him and thanked him, first of all, for
10    cutting the crossings because I'm not going
11    to tolerate people not cutting crossings.
12    When we talk about the snow and the driving
13    of the vehicle because this e-mail has jogged
14    my memory a little bit, I had a conversation
15    with McKelvey as well. And McKelvey told me
16    that the snow that he was talking about that
17    was covering the roads was not nearly as bad
18    as he was describing it to be. And being
19    that I'm originally from Canada, I'm familiar
20    with driving with ice and snow. So McKelvey
21    and I had a conversation about that. And I
22    had a conversation with John about making
23    sure, you know, we did cut the crossings.
24    And I had that conversation with McKelvey as
25    well because I'm not going to tolerate people

**26**

1     cutting the rules and taking shortcuts. I
2     won't tolerate it for one minute. That's
3     what I remember about that conversation. I
4     actually had a great positive conversation
5     with John.

6  Q  Employees are taught to take the safe course.
7     Right?

8  A  That's right.

9  Q  In the face of doubt or uncertainty, take the
10    safe course. Right?

11 A  That's right.

12 Q  So if there's any doubt or uncertainty in
13    Sexton's mind, he's instructed to cut the
14    crossings. Right?

15 A  He's got to cut the crossings, yeah.

16 Q  And in Kurtis's mind, the snow just wasn't
17    bad enough. Right?

18       MR. SULLIVAN: Objection,
19    misstates the witness' testimony.

20 Q  (By Mr. Magnuson continuing) It wasn't bad
21    enough to have cut the crossings is what --

22 A  I'm talking about when Kurtis was driving in
23    the road.

24 Q  What about cutting the crossings? What did
25    McKelvey tell you about that?

**27**

1  A  He told me it had been snowing and there was
2     snow in the flangeway. He didn't think --
3     because you can have a dusting of snow or you
4     can have snow when it gets hard-packed and
5     that's what he was going on. My conversation
6     with him -- he's no longer with the company,
7     but my conversation with him was we don't
8     make that determination, okay, because trucks
9     can drive over the crossings and they pack
10    down the snow. That's why the rule is there
11    and it's in place. And we're going to follow
12    the rule and cut the crossing. That's all
13    there is to it.

14 Q  Did McKelvey tell you that he instructed
15    Sexton not to cut the tracks?

16 A  Yep, he did.

17 Q  He told you that you instructed him not to cut
18    the tracks?

19 A  That's why he said it because he didn't think
20    the snow was bad enough. I told him you're
21    not here to make that determination.

22 Q  And you determined later that Sexton
23    disobeyed his order and cut the tracks. Right?

24 A  I didn't even approach that to be honest with
25    you. When I was talking with John, my only

**28**

1     concern was what happened, tell me about it,
2     I see this e-mail. He told me he cut the
3     crossings. Okay. He cut the crossing. He
4     did the right thing.

5  Q  So McKelvey told you that he instructed
6     Sexton not to cut the tracks. Right?

7  A  Yep.

8  Q  And according to this e-mail here, Sexton cut
9     the tracks anyway. Right?

10 A  That's right.

11 Q  He disobeyed McKelvey's order. Right?

12 A  He followed the rule.

13 Q  He followed the rule and he disobeyed
14    McKelvey's orders. Right?

15 A  I don't know if it was an order.

16 Q  He told him not the cut the tracks. Right?

17 A  There's a difference between saying don't cut
18    the tracks and an order. If we are going to
19    have a conversation about an order, that's a
20    different conversation.

21 Q  He instructed him not to cut the tracks. Right?

22 A  Yes. He instructed him not to cut the tracks
23    according to what Mr. Sexton said here.

24 Q  And according to what McKelvey told you?

25 A  McKelvey told me that he told him not to cut

29

1   the tracks, yeah.
2 Q And when you say told him not to, that's the
3   same as instructing him not to?
4 A **Saying as the same instruction, yeah. I'm**
5   **not going to argue over semantics.**
6 Q Okay. Management level employees at CP Rail's
7   compensation is comprised to some extent by
8   velocity and dwell. Right?
9 A **Run that by me again.**
10 Q Compensation for management level employees
11   at CP to some extent, to some percentage, is
12   based on dwell and velocity, right, on time
13   metrics?
14        MR. SULLIVAN: Objection, lack of
15   personal knowledge, beyond his own compensation.
16   You can answer.
17 A **Compensation for employees -- for managers at**
18   **CP at the time is based on providing service,**
19   **controlling costs, utilizing assets,**
20   **operating safely, and developing people.**
21 Q (By Mr. Magnuson, continuing) Those are the
22   five principles of precision scheduled
23   railroading. Right?
24 A **Those are the five foundations that our**
25   **company is built on, yes.**

30

1 Q And on-time metrics are part of a number of
2   those foundations. Right? Efficiency,
3   velocity, train speed, those are metrics that
4   go into a number of those foundations. Right?
5 A **Correct, yeah.**
6 Q That includes McKelvey, Jared, Miller, and
7   yourself. Right?
8 A **Correct.**
9        MR. SULLIVAN: Objection, lack of
10   personal knowledge.
11 Q (By Mr. Magnuson, continuing) Well, you know
12   about precision scheduled railroading.
13   Right? You just ticked off -- are you
14   reading something by the way?
15 A **No. I'm drawing on a piece of paper.**
16 Q So you have those five foundations memorized.
17   Right?
18 A **I have had them memorized for a long time,**
19   **yes.**
20 Q I would imagine. Have you ever heard the
21   story of how Hunter, Mr. Harrison, kind of
22   the origin of the precision scheduled
23   railroading when he was in the hump tower
24   down in Memphis? Have you ever heard that
25   story before?

31

1 A **Not that I remember. Maybe it's the way**
2   **you're telling it.**
3 Q There's an old legend when it comes to
4   precision scheduled railroading that Hunter
5   was at the BN and BNSF at the time, and he
6   was in a hump tower and one of his managers
7   came by and said, Hunter, what do you see
8   there? He pointed out to a yard full of
9   railcars. And Mr. Harrison said something
10   along the lines of I see profit. And the
11   bossman says, no, I see a bunch of wasted
12   time and money because those railcars
13   shouldn't be sitting there. Is that a story
14   you've heard?
15 A **Not that I can remember.**
16 Q It's kind of an old legendary story. You
17   said you reviewed a white paper that is
18   available on CP's website that was put out in
19   2015-2016 relative to the CP's merger with
20   the NS. Right?
21 A **Yep, I briefly perused over it. It's 2016.**
22   **Quite frankly, it's old news.**
23 Q But the principles behind precision scheduled
24   railroading haven't changed since 2016, have
25   they?

32

1 A **No.**
2 Q Can you and I just say PSR so we don't have
3   to say the words precision scheduled
4   railroading over and over? Is that fair?
5 A **That's fair.**
6 Q Part of these foundations of PSR is depart
7   from the practice of holding trains until
8   they were completely full. Right?
9 A **Correct.**
10 Q When you say holding trains, I mean holding
11   them in yards. Right?
12 A **Typically that would be holding them at**
13   **origin. You know, old school practice**
14   **previous thoughts are that you would hold a**
15   **train at origin until it was full. When I**
16   **say full, whatever you want the length to be.**
17   **If it was 10,000 feet, 10,000 feet, and then**
18   **let it go.**
19 Q The old model could oftentimes delay customer's
20   shipments. Right?
21 A **The old model did delay customer shipments**
22   **like every time.**
23 Q And that cuts into CP's bottom line. Right?
24 A **I don't know how you're coming up with that**
25   **determination.**

45

1  and you kind of float around in that range.
2  Nobody has ever really broken into the 50's.
3  I think CN might have had a couple quarters
4  where they were at 59 or something like that,
5  and I don't know what accounting they did to
6  get there. I believe I was even there one of
7  those years. So it all depends on timing and
8  certain expenses and time and certain revenue.
9  In general, a good class 1 will be in the low
10  60's.
11 Q  Okay. Do you know, from the time you came on
12  at CP to 2021, how much the work force had
13  declined at CP?
14 A  From when I --
15 Q  What was that? I'm sorry.
16 A  I didn't catch the years.
17 Q  You came on in 2013?
18 A  2013, March of 2013.
19 Q  Between 2013 and 2021, how much had the work
20  force at CP declined?
21 A  I'm not sure exactly what you're looking for
22  in an answer because that answer -- like
23  there's a lot of factors in that. Do I know
24  that the work force declined? Well, I can
25  say from my experience in the Southern Region

46

1  between 2019 when we were hiring people, then
2  we experienced Covid. So there was a certain
3  amount of furloughs that we had made in
4  2018 -- sorry -- 2020, 2021. You're right in
5  the middle of Covid there. So some of the
6  decline that you're talking about in the work
7  force was as a function of Covid. I can't
8  speak too much as to what was happening in
9  Canada because I did not pay a lot of
10  attention to what was happening in Canada and
11  to those intricate details of work force and
12  work force decline. So I can't speak to it
13  with any authority other than I can tell you
14  it happened in my territory. Most of that
15  was Covid driven.
16 Q  So there were work force declines at CP in,
17  say, Iowa in 2021?
18 A  I can't speak to Iowa. I supervise the whole
19  region. I had Chicago, St. Paul, all of
20  Iowa, parts of Missouri, North Dakota,
21  Minnesota. So as to where exactly we made
22  some of those reductions, I can't tell you.
23  I remember making reductions in North Dakota. I
24  remember making reductions in Wisconsin. I
25  remember making reductions in Chicago, in

47

1  St. Paul. I can't off the top of my head
2  remember any reductions in Iowa, but that
3  doesn't mean they didn't happen.
4  Q  In terms of the operating crews, conductors,
5  engineers, does a smaller work force make it
6  more challenging to recrew trains?
7  A  Yeah, of course it would.
8  Q  And recrewing trains is something that under
9  PSR you strive to avoid. Right?
10 A  Under any operating model you strive to avoid
11  recrewing trains. Whenever you recrew a
12  train, you know, it's added complexity for,
13  you know, it could be unknown reasons. But
14  it's added complexity for whatever reason it
15  is. Nobody wants to recrew a train. It doesn't
16  matter if you're old, new, NS, BNSF, CP, CN.
17  It doesn't matter.
18 Q  Are you familiar with the government account-
19  ability office study that was done in 2021?
20 A  No.
21       MR. MAGNUSON: Can we take a five
22  minute break?
23       MR. SULLIVAN: Sounds great.
24  Thank you.
25       (Brief recess).

48

1  Q  (By Mr. Magnuson, continuing) Do you recall
2  that obviously with respect to the E test
3  that Tom Jared performed, Mr. Sexton was
4  disciplined for violating GCOR 5.3.7? Right?
5  A  Yeah, that's for he didn't stop in one-half
6  the distance of the last communication.
7  Q  Were you aware that Mark Johnson originally
8  e-mailed a recommendation that he get a 20
9  day suspension for that?
10 A  I'd have to go back and look. That I don't
11  recall.
12 Q  At the time, were you involved or were you
13  responsible for assessing discipline?
14 A  All discipline went through me.
15 Q  We have also got an e-mail from Dylan Smith
16  that says his recommendation was 10 days
17  served and 10 deferred. Do you recall that?
18 A  Yes. I reviewed that with Jack here in one
19  of the sessions that we had.
20 Q  This is Exhibit 35. Is this one of the
21  e-mails that you reviewed?
22 A  Yep.
23 Q  Dylan Smith recommended 10 served 10 deferred?
24       MR. SULLIVAN: We can't see that,
25  John. I'm sorry.

49

1  Q  (By Mr. Magnuson, continuing)  Go down.  So
2     it's that first paragraph down there, the
3     full paragraph and not the numbered.  It says
4     that Mr. Smith was recommending 20 days.  Right?
5  A  Which paragraph?
6  Q  The non-numbered paragraphs, just the block
7     paragraph.
8  A  "Based on the facts of the matter, I
9     recommend Mr. Sexton" -- yeah, this was Mark
10    Johnson's assessment, 20 days suspension.
11 Q  If we could just go up a little bit, it was
12    Dylan Smith that says, "I recommend 10 served
13    10 deferred".  Right?
14 A  That's what Dylan said, yep.
15 Q  Then on the top it says to Joe Adelfio from
16    Shelley Daberitz.  It says, "Joe: per
17    Mr. Jared, please issue discipline for 20
18    days actual to service on Monday".  Right?
19 A  Yeah, that's what it says.
20 Q  I don't see that you were copied on that e-mail.
21 A  No, I don't appear to be copied on that e-mail
22    at all, no.  But I would have been the one
23    who made the decision on the 20 days because
24    I review all the discipline on Monday.  That
25    e-mail came out on Wednesday.

50

1  Q  When you say discipline, you're looking at
2     discipline that's already been assessed to
3     see if you agree or disagree.  Right?
4  A  No.  There's recommendations.  We would have
5     a call and we'd look at the recommendations.
6     We'd look at the charges.  We'd look at if
7     they're proven or not proven.  I would read
8     the hearings.  In some cases I'd read the
9     hearings.  And Mr. Smith sent that over.  If
10    you look at the e-mail, he sent it over to me.
11    But there was no way in Haitis I was going to
12    give somebody a 10 day deferred and 10 day
13    served suspension for a major violation.  So
14    he got 20.
15 Q  So was it Jared that made the recommendation
16    to you?
17 A  No.
18 Q  Why did the discipline letter go out under
19    Jared's signature electronically signed by Shelley Daberitz?
20
21 A  Because at the time, admin would send out the
22    discipline.  And the only thing I can assume
23    is Shelley or Joe Adelfio sent the discipline
24    out under Tom's signature.
25 Q  Tom Jared testified that Shelley sent it out

51

1     under his electronic signature but that he
2     hadn't read it.
3  A  Yeah.  Tom is not involved in that.  All the
4     final decisions on discipline dismissals,
5     that all came through me.  Specifically to
6     avoid things like what Dylan was saying
7     there, to give 10 days deferred and 10 served
8     and all that, that's not what a major calls
9     for.  It was a major violation.  He went to a
10    hearing and it's 20 days.
11       Now, had Mr. Sexton come in and
12    said -- if I remember right, I might have
13    even had a conversation with Dylan about
14    this.  And Dylan is no longer with the
15    company.  But one of the reasons why he's no
16    longer with company is because of his soft
17    approach at times on safety.  So if somebody
18    came in and they admitted responsibility and
19    said, I throw myself on the sword, I made a
20    mistake, this is what I did, I'll accept
21    accountability and responsibility for it.
22    Then they'd get 10 and 10.
23       But if they want to go to a
24    hearing and they want to dispute all the
25    facts -- that's fine.  That's up to them and

52

1     they can do that.  But if the charges get
2     proven, then they get full measure of
3     discipline.  In this case, the charges were
4     proven so he got a full measure of 20 days.
5  Q  Public Law Board disagrees with whether or
6     not the charges were proven, didn't they?
7  A  Well, the Public Law Board has -- they're
8     entitled to their opinion.  They have never
9     picked up some bodies off the track like I
10    have.
11       MR. SULLIVAN:  Object to the
12    extent the question misstates the PLB's
13    decision.
14 Q  (By Mr. Magnuson, continuing)  You're familiar
15    with the US E testing manual.  Right?
16 A  Yeah.
17 Q  You're familiar with test GRF02.  Right?
18 A  You'd have to pull it up.  I'm familiar with
19    it.  I know it exists.  I have looked through
20    it.  Some of this stuff I've read.  Some of
21    it I have not read.  Efficiency test is a bit
22    -- you have guidelines with efficiency
23    testing.  And sometimes they change or you
24    change the way you apply them.  But at the
25    end of the day, it's the rule that dictates

53

**1** whether or not it was complied with or not.

**2** **Q** If a conductor is directing a shove movement

**3** and gets distracted -- like let's say he

**4** answers his telephone or starts looking at a

**5** plane flying overhead, that can be an unsafe

**6** condition. Right?

**7** **A** **If he answers his telephone, he's in trouble**

**8** **because he's not supposed to have his**

**9** **telephone on. That's the first thing. And**

**10** **if he's looking overhead at an airplane, he's**

**11** **in violation of the rule because when you're**

**12** **doing things like shoving equipment, you're**

**13** **to avoid all distractions.**

**14** **Q** Right. Okay.

**15** **A** **And that's what the rule says. You cannot**

**16** **engage in any other activities.**

**17** **Q** Conductors, when they're directing a shove,

**18** should avoid all distractions. Right?

**19** **A** **Correct.**

**20** **Q** Because that can create an unsafe condition.

**21** Right?

**22** **A** **That's right.**

**23** **Q** And you're aware that in this situation

**24** Mr. Jared conducted a set up test. Right?

**25** **A** **Yep.**

54

**1** **Q** He told Mr. DePover to stop communicating

**2** with Mr. Sexton. Right?

**3** **A** **Correct.**

**4** **Q** And you're aware that Mr. DePover said in the

**5** investigation that he was distracted. Right?

**6** MR. SULLIVAN: Objection to the

**7** extent it misstates evidence in the record.

**8** You can answer.

**9** **A** **You'd have to pull it up. I'd have to see**

**10** **it.**

**11** **Q** (By Mr. Magnuson, continuing) We'll do that.

**12** For now we're going to look at GRF02. This

**13** is the E test that Jared performed on Sexton.

**14** Right?

**15** **A** **I'd have to see it. He might have put it**

**16** **under that code, but it was a test for**

**17** **shoving or pushing equipment, yes.**

**18** **Q** I don't see the words set up in this rule, do

**19** you?

**20** **A** **You don't put your set up tests in here. A**

**21** **set up test is simply the fact we're going to**

**22** **go out and we're going to test something**

**23** **specifically on that rule.**

**24** **Q** You're aware that there are numerous rules in

**25** the E test manual that specifically state the

55

**1** words set up test and have procedures for set

**2** up tests. Right?

**3** **A** **Sure, but I'll also say that any test in that**

**4** **manual could be used as a set up test. You**

**5** **can take any one of those rules and use it as**

**6** **a set up test.**

**7** **Q** To answer my --

**8** **A** **All a set up test is is that I'm going to**

**9** **specifically do certain things to set up a**

**10** **certain condition. That's all I'm saying**

**11** **when we say that.**

**12** **Q** To answer my question, there are numerous

**13** rules that have procedures for conducting a

**14** set up test. Right?

**15** **A** **You'd have to show me, but I'll take your**

**16** **word for it.**

**17** **Q** Is that a yes?

**18** **A** **You'd have to show me.**

**19** **Q** We'll do that. So under test failure, there's

**20** some checked boxes. It says, "No briefing is

**21** held between crew members". Do you know if

**22** Sexton and DePover held a job briefing?

**23** **A** **I'd have to read the hearing again.**

**24** **Q** If I told you that Sexton -- well, if they

**25** don't have a job briefing, they could have

56

**1** been disciplined for that. Right?

**2** **A** **Could have been, yeah.**

**3** **Q** And they weren't disciplined for not holding

**4** a job briefing. Right?

**5** **A** **They could have been disciplined for it. I**

**6** **don't know if they held one or didn't. I**

**7** **don't have those facts in front of me.**

**8** **You're assuming that they performed a job**

**9** **briefing. I'm not going to assume that.**

**10** **Q** Well, Jared and Sexton have both testified

**11** that a job briefing occurred. Okay?

**12** **A** **Okay.**

**13** **Q** Any reason to doubt or dispute that?

**14** **A** **If you're telling me they did, they did. I**

**15** **won't doubt or dispute that.**

**16** **Q** Next one down says, "Switches and derails not

**17** lined for intended movement". Are you aware

**18** of any facts in this case regarding Sexton

**19** and DePover that switches and derails were

**20** not lined for intended movement?

**21** **A** **I'm not aware of that, no.**

**22** **Q** You're aware obviously that DePover was

**23** protecting the shove. Right?

**24** THE WITNESS: Just one second,

**25** please. Can you give me one second? Hold

57

1    on.

2        (Briefly off the record).

3    Q   (By Mr. Magnuson, continuing) The third one
4        down says, "Movement not protected by
5        employee as required". There's no evidence
6        here that this shove movement was not
7        protected. Right?

8    A   I disagree.

9    Q   Well, Sexton has testified that Cox, Cruciani
10       and DePover -- well, not Cox. Cruciani and
11       DePover were protecting his shove. Are you
12       aware of that testimony by Sexton?

13   A   **What I would say is that this rule leads to**
14       **some interpretation. And when you have**
15       **movement not protected by employee as**
16       **required, that also requires the employee to**
17       **be properly communicating with the locomotive**
18       **engineer. So if you're out there and I'm the**
19       **locomotive engineer -- and I am a locomotive**
20       **engineer, by the way, and I have worked as a**
21       **conductor and a brakeman -- and I'm shoving**
22       **the movement and you're not communicating**
23       **with me, the movement is not being protected.**
24       **So the minute he stops communicating, it's no**
25       **longer protected.**

58

1    Q   And Jared told DePover to stop communicating.
2        Right?

3    A   Yes.

4    Q   Next one says, "Employee performing other
5        task than related to movement". Right?

6    A   Yes.

7    Q   Sexton was operating his locomotive. Right?

8    A   Okay.

9    Q   And DePover was protecting the shove until he
10       was told to stop communicating with Sexton.
11       Right?

12   A   **I don't agree. The movement not protected by**
13       **an employee as required could apply to both**
14       **DePover and to Sexton. Sexton's job to**
15       **protect the movement is to make sure he stops**
16       **within one-half range of the last communication.**
17       **That's my job as a locomotive engineer. And**
18       **if I don't stop within one-half range of the**
19       **last communication that I was given, I'm not**
20       **protecting that movement properly.**

21   Q   So the next one down, Public Crossing, that
22       doesn't relate here. It says, "Track not
23       visually determined the track is clear for
24       intended movement". This track was clear for
25       intended movement. Right?

59

1    A   **It has to be because he's pushing on it.**

2    Q   Right. And as far as the bottom one is
3        concerned, DePover was instructed to cease
4        communication with Sexton. Right?

5    A   **That's right.**

6    Q   You're familiar with the do's and don'ts of
7        the efficiency testing manual?

8    A   **You have to pull them up to refresh my memory.**

9    Q   Do you see that?

10   A   **Yes, I do.**

11   Q   Number 2 is don't set up a situation that can
12       result in an unsafe act or condition. Right?

13   A   **Correct.**

14   Q   Number 3 says don't conduct a test to entrap
15       an employee. Right?

16   A   **Correct.**

17   Q   Number 5 says don't violate a rule in order
18       to set up a test situation. Right?

19   A   **Correct.**

20   Q   When it says don't violate a rule, does that
21       include GCOR and FRA rules?

22   A   **Yes, none of which were violated in this case**
23       **by the way. All these three don't apply.**
24       **There was no setup of a situation that could**
25       **result in an unsafe act or condition.**

60

1    Q   That's your opinion. Right?

2    A   **That's my 32 years of experience, my**
3        **qualifications on two class 1 railroads as a**
4        **locomotive engineer and conductor and**
5        **numerous times running an engine and being in**
6        **the field. That's my opinion, yeah.**

7    Q   That's your opinion. Right?

8    A   **That's my professional opinion as a 32 year**
9        **railroader.**

10   Q   That's a yes or no question. Is that a yes?
11       That's your opinion?

12           MR. SULLIVAN: Let the witness
13       answer.

14   A   **You got my answer.**

15   Q   (By Mr. Magnuson, continuing) The answer is
16       yes. Right?

17   A   **That is my professional opinion as a 32 year**
18       **veteran in this industry --**

19           MR. MAGNUSON: That's a yes. You
20       keep interrupting, and you asked that
21       testimony be stricken. I'm going to do the
22       same thing here. I sat and listened to you
23       do it to Kyle the other day. That's a yes.
24       The record will reflect the witness answered
25       yes. That's his opinion.

61

1  Q  (By Mr. Magnuson, continuing) Now, you
2     testified earlier that the Public Law Board's
3     ruling was his opinion.  Right?
4  A  **Correct, their view and opinion, yeah.**
5  Q  And you testified earlier that Sexton's
6     e-mail to you when he made those safety
7     complaints was his opinion.  Right?
8  A  **Yes.**
9  Q  Are you familiar with this rule, sir?
10 A  **Let me look.  It's been a while since I've**
11    **looked at this --**
12 Q  It's GRA01.
13 A  **Yes, so this is -- (witness examining document).**
14 Q  So in the middle you see when test conditions
15    are set up.  Right?
16 A  **Yes.**
17           MR. SULLIVAN:  Can we see the
18    entire page, please?
19 Q  (By Mr. Magnuson, continuing) This is GRA03.
20    Are you familiar with this rule?
21 A  **Yes.**
22 Q  This one says in the middle says, "When test
23    conditions are set up".  Right?
24 A  **Yes, yep.  That's what it says.**
25 Q  Go to the next page, GRA06.

62

1            MR. SULLIVAN:  This is not that
2     page.
3            MR. MAGNUSON:  Page 20.
4  Q  (By Mr. Magnuson, continuing) Are you
5     familiar with this one, test GRA06?
6  A  **I'm looking at it, yes.**
7  Q  And under procedures here, there are two
8     scenarios.  Right?  It says when test
9     conditions are observed.  Right?
10 A  **That's what that it says, yeah.**
11 Q  Is that also known as what's called an
12    observation test?
13 A  **Let me read this a little bit closer.  I want**
14    **to see.  You're taking -- you know, this**
15    **manual, first of all, is guidelines that we**
16    **gave to our employees to help them with their**
17    **testing.  This is not the be all and end all**
18    **of testing.  Any rule that's in the GCOR can**
19    **be tested.  These are simple guidelines for**
20    **the testing manual that we created to help**
21    **people test.  Any one of these tests could be**
22    **a setup test.  Any one of them could be an**
23    **observation.**
24 Q  When it says there "when test conditions are
25    observed", is that also known as an observation

63

1     test?
2  A  **No, I wouldn't agree with that.**
3  Q  And the paragraph below says, "when test
4     conditions are set up".  Right?
5  A  **Yes, that's right.  That's specifically**
6     **referring to blue flag protection of workmen**
7     **though, which is a different class of service**
8     **than locomotive engineers and conductors.**
9  Q  But it uses the words 'and includes
10    guidelines for conducting setup tests'.
11    Right?
12           MR. SULLIVAN:  Objection, form.
13 A  **Right.**
14 Q  (By Mr. Magnuson, continuing) That's a yes?
15 A  **I didn't say yes.**
16 Q  You said right?
17 A  **They're guidelines how to do tests.  It's not**
18    **the be all and the end all.  It's not what**
19    **you must do in all these circumstances and it**
20    **must apply exactly this way.  That's not what**
21    **this manual is intended for.  This manual was**
22    **intended to help supervisors front line**
23    **engage in testing.**
24 Q  The rule --
25 A  **And this manual is from November of 2014.**

64

1  Q  The test that Tom Jared administered, the
2     GRF02, contains no language or procedures
3     relative to a set up test, does it?
4  A  **The test that --**
5            MR. SULLIVAN:  Could we see the
6     document?
7            MR. MAGNUSON:  He's familiar with
8     the GRF02.  If we want to pull it back up
9     again, we can.
10 A  **Here's what I will tell you.**
11 Q  (By Mr. Magnuson, continuing) Hold it.  There
12    is no question for you right now.  We're
13    going to pull the rule up, and I have a
14    specific question.  Do the words set up test
15    exist in this guideline?
16 A  **No.**
17 Q  Are there procedures in this guideline for
18    conducting a set up test?
19 A  **There's nowhere where it says set up test in**
20    **this guideline.**
21           MR. MAGNUSON:  Very good.  You
22    are aware of -- can we take a two second
23    break, one minute even?  I have got to get my
24    voice recognition software to stop taking
25    down my questions and your answers.  I

65

1 somehow hit a button that got my dragon
2 working.
3          (Brief recess).
4 **Q** (By Mr. Magnuson, continuing) I asked you
5 earlier -- I just can't remember what your
6 answer was. You're aware of the Hearing
7 Officer Checklist and Job Aid and the US
8 Investigation Training Manual?
9 **A It's been a while since I've seen it.**
10          MR. MAGNUSON: Let's pull 06399,
11 US Investigation Training.
12 **Q** I'll show you the front page of what's
13 previously been marked as Exhibit 66. You're
14 familiar with this document?
15 **A Like I said, I have seen it before. It's**
16 **been a while.**
17 **Q** Page 12, sir, under Hearing Officer,
18 Preparation Guidelines, the first sentence in
19 that row says, "As the Hearing Officer, it is
20 critical to hold a fair and impartial
21 hearing". Right?
22 **A Yes.**
23 **Q** And you'd agree with that?
24 **A Yes.**
25 **Q** Would you agree with me that in order to have

66

1 a fair and impartial hearing, that all
2 witnesses to an event be allowed to testify?
3 **A They should be, yeah.**
4 **Q** That's a yes?
5 **A Yeah.**
6 **Q** Yes?
7 **A Yes.**
8 **Q** Are you aware that Mr. Rainwater asked to
9 have Cox and Cruciani testify at his
10 investigation?
11 **A No.**
12 **Q** You were not aware of that?
13 **A No. I don't remember that.**
14 **Q** There was an exhibit to the investigation
15 that was an e-mail from Mr. Rainwater to the
16 carrier indicating his desire to have Cox and
17 Cruciani testify at the investigation. You
18 were unaware of that?
19 **A I have not reviewed that, no.**
20 **Q** And that was entered into the record through
21 testimony too. Do you remember that?
22 **A It's 3-1/2 years ago. I don't remember that.**
23 **Q** I will direct your attention to the middle of
24 the page, sir, where it says Locomotive Event
25 Recorder Download. Do you see that?

67

1 **A Yes.**
2 **Q** It states, "Event recorders show time,
3 distance, speed, throttle position, location
4 condition and other information. This
5 evidence, due to its complexity, needs to be
6 read and interpreted by a qualified
7 individual". Did you read that?
8 **A Yes.**
9 **Q** Would you agree with that statement?
10 **A Yes.**
11 **Q** Do you know if the event recorder on
12 Mr. Sexton's locomotive that day was
13 downloaded?
14 **A I can't tell you. I don't know.**
15 **Q** If I told you there was no event recorder
16 referenced in the investigation, would you
17 disagree with me?
18 **A If you have evidence to prove it, then I**
19 **would not disagree with you.**
20 **Q** And you're aware that Mr. Sexton cut the
21 tracks that day?
22 **A Yep.**
23 **Q** You're aware that Sexton, the 474 that day,
24 had a 3-1/2 hour over-standard work event.
25 Right?

68

1 **A If you say so.**
2 **Q** Cutting of tracks takes time. Right?
3 **A Again, if you say so. I don't have the**
4 **details and I don't remember the details of**
5 **the delay that that track took at that**
6 **location.**
7 **Q** Generally speaking, cutting tracks takes
8 additional time. Right?
9 **A Yeah, but you got to remember what a delay**
10 **is.**
11 **Q** Let me ask you this. In order to cut tracks
12 with light locomotives, you have to uncouple
13 from your train. Right?
14 **A Yes.**
15 **Q** Then a conductor has to apply hand brakes and
16 tie down the cars that are left on the tracks.
17 Right?
18 **A Correct.**
19 **Q** And then the locomotive, light locomotive or
20 locomotives, departs and goes X distance to
21 cut the tracks. Right?
22 **A Correct, yeah.**
23 **Q** And then the locomotive or locomotives come
24 back and have to recouple or couple on to the
25 train that they had left. Right?

69

1  A  Correct.
2  Q  And part of the recoupling or coupling
3     process involves re-airing the train.  Right?
4  A  Correct.
5  Q  And that takes time?
6  A  Correct.
7  Q  And that takes additional time in winter?
8  A  Correct.
9  Q  Then the conductor has to release the hand
10    brakes.  Right?
11 A  Correct.
12 Q  And that involves walking whatever distance
13    on the train depending on how many brakes
14    were applied.  Right?
15 A  Correct.
16 Q  Had the locomotive event recorder in this
17    case been downloaded that day, that would
18    show where Mr. Sexton went and how far he
19    traveled when he cut the tracks.  Right?
20 A  **If they had downloaded, yeah.  It would show**
21    **the movement of the locomotive.  That's all**
22    **it would show, forward and backward, speed,**
23    **throttle, air brakes.**
24 Q  Time?
25 A  **Loading.**

70

1  Q  It would have corresponding times.  Right?
2  A  **Times, yep.**
3         MR. MAGNUSON:  Cyle, if you could,
4     pull up 06375, the Hearing Officer Checklist.
5  Q  (By Mr. Magnuson, continuing) I'm showing you
6     what we have previously marked as Exhibit 65.
7     Have you seen this document before?
8  A  **Yeah, it's a checklist and a job aid.**
9  Q  For conducting investigations.  Right?
10 A  **Yep, it's a job aid.**
11 Q  Like the one Sexton had here.  Right?
12 A  **Yes.**
13 Q  And you would expect that this and what we
14    just looked at, Exhibit 67 I believe, you
15    expect these to be followed.  Right?
16 A  **They're guidelines.  You're not going to**
17    **follow everything in them.  You're going to**
18    **use what's applicable to your case.**
19 Q  Okay.  So four checkboxes down there it says,
20    "Assemble and evaluate all evidence".  Right?
21 A  **Correct, yep.**
22 Q  And that's not a depends thing where you may
23    or may not expect them to follow it.  That's
24    something that you would expect of a hearing
25    officer.  Right?

71

1  A  **Within the scope of what they're investigating.**
2     They would only pull evidence and pull the
3     information for what they're investigating.
4     You'd only have memos, witnesses, whatever it
5     is they had, for the incident and the rule
6     that they're investigating.
7  Q  Right.  And there's some dispute in the
8     investigation, if you'll recall, as to how
9     far Sexton traveled and whether or not he
10    could see various things to allow him to
11    determine car counts.  Right?
12 A  Yes.
13         MR. SULLIVAN:  Objection, form.
14 Q  (By Mr. Magnuson, continuing) That's a yes?
15 A  Yeah, yeah.
16 Q  An event recorder would allow us to make a
17    determination as to how far he traveled.  Right?
18 A  **It's one tool that could be used.**
19 Q  And it says, "Assemble and evaluate all
20    evidence".  Right?
21 A  **It's one tool that could be used, yep.  It**
22    **might not be required.  If I'm the**
23    **investigating officer, I might not require**
24    **the download.**
25 Q  The next checkbox down says, "Determine if

72

1     there are any witnesses to the event."  Right?
2  A  **That's what it says.**
3  Q  Then it says, "If so secure their availability
4     for the hearing/statement date."  Right?
5  A  **Correct.**
6  Q  So you would expect, if Mr. Rainwater
7     requests two employees who were in the yard
8     that day to testify and be witnesses, you
9     would expect those witnesses to be able to
10    testify.  Right?
11 A  **It would depend on the hearing officer, if**
12    **they were actually involved in the incident**
13    **or what kind of evidence they were going to**
14    **give.  I don't know what officers or what**
15    **people wanted to give testimony, if they**
16    **were there that day, you know, if they**
17    **even witnessed the event.**
18 Q  Well, if Rainwater sent an e-mail to the
19    hearing officer that said there are two
20    witnesses who were in the yard that day and
21    overheard the communication -- in fact, one
22    of whom, Cruciani, was going to testify that
23    he was protecting the shove on the north end,
24    you would expect those folks to be able to
25    testify.  Right?

73

1  A  I would, yep.

2         (Off the record discussion).

3  Q  (By Mr. Magnuson, continuing) Sir, earlier on
4     in your testimony you talked about there's no
5     way in essentially God's green earth or no
6     way in Haitis that I was going to give 10
7     served 10 deferred for a major like a 5.3.7.
8     Do you remember that?

9         MR. SULLIVAN:  Objection to the
10    extent it misstates the witness' testimony.
11    You can answer.

12 Q  (By Mr. Magnuson, continuing) Right.  I kind
13    of agree with Jack's objection here.  I don't
14    remember what it was you said.  I found the
15    phrase kind of interesting and maybe it's a
16    Canadian phrase.  What was it you said?

17 A  It's an old British phrase.  My grandmother
18    was British.  There was no way that he was
19    going to get -- that I would ever assess 10
20    served and 10 deferred for a major unless the
21    employee came in and admitted the
22    responsibility, in which case I would show
23    them some leeway.  In this case, the charges
24    were proven during the hearing.  It was clear
25    that he violated the rule.  And 10 served and

74

1     10 deferred was not an appropriate consequence
2     for his actions.  So I gave him 20.

3  Q  And employees are entitled to a fair and
4     impartial hearing in these situations if they
5     disagree with the charges.  Right?

6  A  That's right.

7  Q  And your decision when you reviewed the --
8     well, your decision was based on your review
9     of the investigation transcript.  Right?

10 A  Correct, yeah.

11 Q  Do you recall reviewing the video that was
12    discussed in the investigation?

13 A  I review a lot of videos.  I couldn't say if
14    I did or I didn't.  I would assume that if it
15    was included as part of the evidence, I might
16    have reviewed it.  I can't say for certain
17    one way or another.

18 Q  Do you recall in your review of the transcript
19    that there was some discussion about the
20    video and whether or not it showed Mr. Jared's
21    truck and how far away he was parked?

22 A  Vaguely.

23 Q  Do you know what happened to this video?

24 A  No.  Like I said, I vaguely remember anything
25    about the video.

75

1  Q  It's been represented to us that the video no
2     longer exists.  Do you know where the video
3     went?

4  A  No.  If there was a video, I can't speak to
5     where it is.

6  Q  Would it help us now to determine what was in
7     that video to be able to review it?

8         MR. SULLIVAN:  Objection, calls
9     for speculation.  You can answer.

10 A  I'll say that it's a lot of speculation.  I
11    can't say.  I couldn't say one way or
12    another.

13 Q  (By Mr. Magnuson, continuing) You took into
14    account Mr. Jared's testimony in that
15    investigation when you made your decision.
16    Right?

17 A  Yes.

18 Q  And you would consider 5.3.7 a major.  Right?

19 A  Yep, I do.  You're not stopping -- it's about
20    properly protecting your shove.

21 Q  Right.  Do you consider 6.2.8 to be a major?

22 A  You'd have to pull 6.2.8 up so I can look at
23    it and I will tell you if it's a major or not
24    major.

25 Q  We can look at that a little later.  Just so

76

1     I have it, what was the Haitis comment, the
2     British phrase that you used?

3  A  No way in Haitis.

4  Q  No way in Haitis.  Do you know what that
5     means?

6  A  It means no way in hell.

7  Q  Okay.  We're going to pull up an exhibit
8     here.  Showing you what has been marked
9     Exhibit 69, this has been produced to us.
10    Did you review this at all in preparation for
11    your testimony?

12 A  No.

13 Q  Do you want to take a second to review it?
14    Let me ask you this.  Were you responsible
15    for making these discipline decisions on
16    January 27 of 2021 for employees based out of
17    Enderlin, North Dakota?

18 A  Yes.

19 Q  Take a second and review this if you would.

20 A  (Witness examining document).  Okay.

21 Q  You would have reviewed this -- made this
22    discipline decision?

23 A  Yep.

24 Q  And this was an employee that was found to
25    have violated GCOR 5.3.7.  Right?

77

1  A  Yes.

2  Q  And this employee was given 10 served 10

3     deferred.  Right?

4  A  That's right, yeah.

5  Q  Do you recall this?

6  A  I don't recall it, but I do recall at the

7     time in Enderlin there was -- there might

8     have been some facts at that hearing that

9     left it one way or another, and maybe that's

10    why I went to deferred and not given him the

11    full.  There might have been some doubt in

12    that case where I took the safe course and

13    gave him 10 and 10.  The other reason why I

14    would sometimes give 10 and 10 after an

15    employee went to investigation is if the

16    employee or if the union said they won't

17    grieve it or they agreed to come -- or they

18    wanted to get a waiver and we couldn't get

19    them a waiver for whatever reason.  The only

20    thing I can assume in this case is that's why

21    I went with the 10 and 10.

22 Q  But the employee didn't come to you before

23    the investigation and sign a waiver and take

24    responsibility, did he?  He went --

25 A  No, but --

78

1  Q  He went to a formal investigation.  Right?

2  A  That's right.  Like I said though, there were

3     certain cases where the general chairman came

4     to me after and asked to give the guy a break

5     for whatever reason and I would entertain

6     that.

7  Q  But you don't know one way or the other if

8     that happened here?

9  A  I can assume, based on the fact that I gave

10    him 10 and 10 after going to a formal hearing

11    and based on my experience, that that's what

12    happened.

13 Q  Seems to contradict your prior testimony

14    though, doesn't it?

15           MR. SULLIVAN:  Objection,

16    argumentative.  You can answer.

17 A  Well, nobody came to me in the case of

18    Mr. Sexton and said, you know, hey, this is

19    what happened, re-admit it and we'll take the

20    10 and 10 if it's still on the table.  That

21    happened often.  The general chairman that I

22    dealt with --

23 Q  (By Mr. Magnuson, continuing) You said

24    there's no way in Haitis I give anything less

25    than what you gave to Sexton for violation of

79

1     a major 5.3.7.  Right?  That was your

2     testimony?

3  A  That's right based on the fact of that case,

4     yes.  Nobody ever came and vouched for Sexton

5     after the fact.  Nobody ever came and said,

6     look, we did it, and, you know, we're asking

7     for mercy.  Nobody came and said, you know,

8     we should have come to you and asked for a

9     waiver and we didn't.  General chairman

10    didn't call me.  Local chairman didn't call

11    me.  I can tell you Jerry Wallace, who's now

12    passed away and it's unfortunate, and some of

13    the other general chairmen, they would call

14    after the fact and say, listen, this kid

15    doesn't know what he's doing and it got out

16    of hand, can you give us some leeway?

17 Q  When did Jerry Wallace die?

18 A  Last year.

19 Q  I didn't know that.

20 A  He had cancer.  I talked to him a couple

21    times when he had it.  It was very

22    unfortunate.  He was a gentleman.

23 Q  When you made your discipline decision, you

24    had already received Sexton's e-mail to you.

25    Right?

80

1  A  I'd have to look at the dates.  I'm not 100

2     percent sure of that.

3  Q  Okay.  We can do that.

4  A  You'd have to review the dates.

5  Q  Okay.  The e-mail that --

6  A  February 15, yep.

7  Q  And the e-mail that we looked at earlier,

8     Exhibit 35, the e-mail from Daberitz to a

9     number of people, it says, "Per Mr. Jared,

10    please issue discipline for 20 days actual

11    service."  That's dated February 24.  Right?

12 A  Could be, yeah.  It would appear, yes.

13 Q  So you had reviewed Sexton's e-mail prior to

14    your decision.  Right?

15 A  That's what it looks to be on record here,

16    yep.  I would have gotten the e-mail on the

17    15th and I would have made the decision on

18    his discipline on the 22nd.  That being said,

19    I quite often -- when I look at discipline, I

20    don't even look who the names are.  I get a

21    list.  I get a list of the incident, the date

22    of the incident, the date the hearing took

23    place, review the hearing.  If facts are

24    proven, discipline is assessed.  That's all

25    that's taken into consideration.

81

1  Q  We're pulling up another exhibit here.  In
2     February of 2015, did you report to Miller or
3     did Miller report to you?
4  A  I reported to Miller.
5  Q  Showing you what has been marked as
6     Exhibit --
7        (Off the record discussion).
8  Q  (By Mr. Magnuson, continuing) Can you
9     identify what this document is?
10 A  It's a report.  It's hard to see.  Normally I
11    get it as a PDF.  But regardless that's a
12    report with the information that's on that
13    screen.  It's a report that's generated
14    automatically that looks at some delays in
15    the territory, and we can calculate and see
16    roughly where we are with train delays in
17    territory.  In this case, you can see US East
18    and US West was 45 hours in total at the top.
19    And then down here at Nahant and Marquette
20    you're looking at train 474.  It shows 6
21    hours and 27 minutes.
22 Q  Correct me if I'm wrong, but does this
23    indicate that this was a 3 hour and 23 minute
24    over-standard work event?
25 A  I wouldn't use the words over-standard work

82

1     event.  It's a 3 hour and 23 minute delay on
2     top of what's in the schedule at Marquette.
3     Whatever happened there, it took 3 hours and
4     23 minutes longer to do it than the schedule
5     allowed.
6  Q  I can represent to you that everything below
7     this has been redacted.  Does this seem to
8     indicate to you that this is the number one
9     slowest train that day?
10 A  No, that's not necessarily the case.  It just
11    happens to be the order I put it in.
12 Q  So you compile this document?
13 A  I don't, no.
14 Q  Who does?
15 A  It's automatic.  It's automatically compiled
16    by a system that pulls the information
17    together and puts it on a report and sends
18    it.
19 Q  Miller testified that the order is the
20    slowest train at the top to the 15th slowest
21    train at the bottom.  So that's not your
22    understanding?
23 A  Not really, no.  It could be, but the fact of
24    the matter is sometimes it depends on the
25    amount of delay.  So although it's 6 hours

83

1     and 27 minutes on this train, there might be
2     other trains that had more delay but in
3     different locations.  The report is not
4     always 100 percent accurate with the top
5     performers, the top delays.  It's an
6     automatically-generated report.  It depends
7     what people put in for the code.  There's a
8     lot that goes into it.  It's a guideline.
9     It's a guideline you can look at and use.
10 Q  I was going to ask you what's the purpose of
11    this?
12 A  It's a guideline.  You can go in and look at
13    it.  Generally, 90 percent of the time it
14    will get things for you.  And you can drill
15    down on issues and see where your problem
16    children are in terms of trains -- I'm not
17    talking about people -- and look at fixing
18    some of the issues that you have on the
19    territory.  Now, the reason I say that is
20    because schedules are things that sometimes
21    have to be modified.  So you can look at this
22    report sometimes.
23        And, you know, if you're in
24    winter operation and you're seeing that a
25    certain train is taking longer to do the work

84

1     at a location, you use it to question why.
2     And then if it's taking longer just because
3     the type of work it is, because of the weather,
4     because of the issues, you can go back to
5     service design and say, hey, we're having
6     problems with this, let's modify the
7     schedule.  And that will ripple down the line
8     and it'll give us better accurate ETA's and
9     better estimates for the customers of when
10    their cars are going to get there.
11 Q  Is this something you review on a daily basis?
12 A  Yeah, it is, in general, yep.
13 Q  I don't see you specifically copied on it by
14    name.  Are you part of one of these
15    distribution lists?
16 A  Yeah.
17 Q  Which one?
18 A  I don't know.  I can't tell you.
19 Q  So they just show up in your inbox?
20 A  Yes, under the click view administration and
21    I'm in there.  And, you know, it could be in
22    the BCC isle.  I don't know.
23 Q  Do you specifically recall reviewing this
24    particular document?
25 A  No.

85

1  Q  But you would have reviewed it?
2  A  **In general I would review them, yes.**
3  Q  In the paragraph there, middle of the
4     paragraph under Marquette, it says, "They
5     also had to cut the boatels crossing and run
6     down MQS light power before they could shove
7     the cars into it".  Have you read that?
8  A  **Yes.**
9  Q  So you would have read that?
10 A  **Yes.**
11        MR. SULLIVAN:  Calls for
12     speculation.
13 Q  (By Mr. Magnuson, continuing) And you would
14     have read this because it's on February 2nd
15     prior to making your discipline decision.
16     Right?
17 A  **I could have.  I might have read it.  I might**
18     **not have read it.  But to be fair, you know,**
19     **with all due respect, this is railroading.**
20     **This is railroading in the winters.  So when**
21     **I see what they're doing there, it's not**
22     **something that's going to flag some alarm**
23     **bells off in my head.  You know, I'd rather**
24     **have any day of the week -- and I tell this**
25     **to my employees all the time.  You're going**

86

1     **to follow the rule.  And I'd rather have**
2     **somebody following the rule and say we took a**
3     **delay at whatever location than to get a**
4     **phone call in the middle of the night saying**
5     **we got a derailment because we violated a**
6     **rule.  I have said that literally to**
7     **thousands of employees.**
8  Q  Okay.  I've got Exhibit 26 up on the screen.
9     Have you reviewed this in order to prepare
10    for your testimony today?
11 A  **No, I don't believe I have.**
12 Q  You're not named by name in it, but are you
13    part of the distribution lists in this e-mail?
14 A  **No, not that I can tell you because I'm not**
15    **part of the MOC.  That's for the seniors.**
16    **I'm not part of the directors.  I'm not part**
17    **of the CMC.  And none of those other names**
18    **are me.**
19 Q  I'm pulling up another couple exhibits here.
20    This has been marked Exhibit 71.  Have you
21    reviewed this document prior to your
22    testimony today?
23 A  **No.**
24 Q  Take a second to read it.
25 A  **(Witness examining document).**

87

1  Q  Do you recall, were you responsible for
2     assessing discipline over the Excelsior
3     Springs, Missouri area?
4  A  **Yes.**
5  Q  In this situation, an employee was accused of
6     failing to stop within half the range of
7     vision of an improperly lined switch.  Right?
8  A  **Yes.**
9  Q  And it resulted in a run through switch.
10    Right?
11 A  **According to this, yes.**
12 Q  And run through switches can cause derailments.
13    Right?
14 A  **Yes.**
15 Q  This is a major.  Right?
16 A  **It depends.  This is now considered a major.**
17    **We consider run through switches major.  But**
18    **it would depend on what they were doing at**
19    **the time if it was a major or not major.  So**
20    **if they were in the locomotive and they were**
21    **operating the locomotive and both of them**
22    **were in the locomotive and they ran through**
23    **the switch, then they're on the point.**
24    **They're protecting the point.  That's**
25    **considered a run through switch.  At the**

88

1     **time, we treated run through switches as**
2     non-majors.  So you'd have to see more
3     details in this case to determine if it was a
4     major or a non-major.
5  Q  But was this the engineer, Mr. ████?
6  A  **I don't know.**
7  Q  Can we assume that if he failed to stop
8     within half the range of distance?
9  A  **No.  I don't know the details of who the crew**
10    **was.  I can't assume that.  I'd have to see**
11    **more details on this.**
12 Q  You would've assessed this discipline.  Right?
13 A  **Yes.**
14 Q  What discipline was assessed here?
15 A  **I can't tell you.  I'd have to see the**
16    **document or I'd have to review it.  I have**
17    **literally given discipline to hundreds if not**
18    **thousands of circumstances over the 3-1/2**
19    **years.**
20 Q  Okay.  This has been marked as 72.
21 A  **Letter of Reprimand.  Okay.  I see it at the**
22    **top.  (Witness examining document).**
23 Q  So you would have assessed --
24 A  **This is an AOR.  This is an admission of**
25    **responsibility.  There's no formal hearing or**

89

**1**    investigative hearing.  This didn't go to a
**2**    hearing.  This employee came and admitted.
**3**    And the only way they would get a Letter of
**4**    Reprimand is if they -- there could have been
**5**    a lot of reasons why they ran through that
**6**    switch.  But this wasn't a shoving violation,
**7**    not from what I see here.
**8**  **Q**  Do you recall what Mr. Sexton's discipline
**9**    record was like when you assessed this
**10**    discipline?
**11**  **A**  No, I don't.  Here's what I will tell you.  I
**12**    know the fact that he got 20 days meant he
**13**    didn't have any majors on his record because
**14**    the first major is 20 days.  A second major
**15**    is 40.  And a third major is 60 or dismissal.
**16**    So whatever he had on his record, a first
**17**    major right off the bat is 20 days.
**18**          (Deposition Exhibit 79 marked for
**19**    identification).
**20**  **Q**  Sir, I'm showing you what had not been marked
**21**    but we marked it as Exhibit 79.  Did you
**22**    review this at all to prepare for your
**23**    testimony today?
**24**  **A**  No.
**25**  **Q**  I can represent to you this is the call

90

**1**    record for you on February 1st, 2021.  Does
**2**    this look like it's your number?
**3**  **A**  Yeah, that's my number.
**4**  **Q**  At the time?
**5**  **A**  Yep.
**6**  **Q**  Do you see February 1st at 5:29 a.m.?
**7**  **A**  You'd have to zoom that open a little bit.
**8**    Help an old man a bit.  Okay.  5:29 a.m.
**9**    ████████?
**10**  **Q**  Yeah.  Do you see that?  It's a 901 number.
**11**    Is that Tracy Miller's number?
**12**  **A**  I think so.  I couldn't tell you because I've
**13**    got him programmed in my phone as Tracy L.
**14**    Miller.
**15**  **Q**  That's the way we all were.  I can remember
**16**    my high school friends' phone numbers and my
**17**    parents -- that's about it -- or my mom's.
**18**          So at 5:29 a.m., according to
**19**    this at least, you had a 3 minute phone call
**20**    with Tracy Miller.  Right?
**21**  **A**  Yes, or I tried calling him and left him a
**22**    message.  I don't know.
**23**  **Q**  Going down, at 5:53 a.m. you had a 28 minute
**24**    phone call with Mr. Miller.  Right?
**25**  **A**  It could be.

91

**1**  **Q**  Well, that's what the document says?
**2**  **A**  I'm looking for it.  My eyes aren't what they
**3**    used to be even with the glasses.  This is
**4**    kind of foggy.  Okay.  5:53, yes, there's
**5**    Tracy.
**6**  **Q**  Okay.  Do you remember what you talked about
**7**    for those 28 minutes?
**8**  **A**  No.
**9**  **Q**  Is it possible you talked about the 474?
**10**  **A**  I don't remember what I talked about.
**11**  **Q**  Is it possible you discussed the 474?
**12**  **A**  I'm not going to say what is possible because
**13**    I don't remember what I talked about.  I
**14**    talked to Tracy Miller multiple times a day,
**15**    you know, in person, over the phone.  You
**16**    know, I don't remember what I talked to him
**17**    about.
**18**  **Q**  Are delays and over-standard work events
**19**    something you discuss in your phone calls
**20**    pursuant to your job?
**21**  **A**  No.  You know what?  A lot of times what
**22**    Tracy and I would be discussing would be the
**23**    operation in general.  It would probably be
**24**    issues we had in Chicago or St. Paul because
**25**    it was the dead of winter.  You know, I'll

92

**1**    tell you winter is absolute hell when it
**2**    comes to railroading in terms of the cold
**3**    weather.  It being January, I can only assume
**4**    I was talking to him about operational issues
**5**    because that's typically what we talk about
**6**    at 5:00 in the morning.  A 5:00 in the
**7**    morning phone call is this is what I got
**8**    going on, this is what I'm dealing with.
**9**  **Q**  And over-standard work events are part of the
**10**    operational activities.  Right?
**11**  **A**  We would not get into that kind of detail in
**12**    the conversation.  Over-standard work events
**13**    would be something I would expect the general
**14**    managers to deal with.  I might have some
**15**    conversations if something is glaring and off
**16**    the page.  But the conversations I would have
**17**    with Tracy would have been a lot higher level
**18**    than that.
**19**  **Q**  Tom Jared was a general manager.  Right?
**20**  **A**  Yes.
**21**  **Q**  And that's somebody you would expect to deal
**22**    with the over-standard work events you just
**23**    said.  Right?
**24**  **A**  Yes, superintendents, general managers.  They
**25**    are the ones that are going to drill into

93

1  over-standard work events. They're going to
2  figure out what's broken and why and what we
3  need to fix it.
4  **Q**  To prepare for your testimony today, did you
5     review a Teams message that Kurtis McKelvey
6     sent that morning that said "I don't know how
7     to hold him", meaning Sexton, "accountable"?
8              MR. SULLIVAN:  Objection to the
9     extent it misstates the document.
10 **Q**  (By Mr. Magnuson, continuing) Did you review
11    that?
12 **A**  **No, I didn't review any Teams messages.**
13 **Q**  Are you on Teams?
14 **A**  **No. I am now. But like you, I am a stickler**
15    **for -- how should I say this -- rejecting**
16    **some types of technology. I long for the**
17    **days when there's no cell phones. So I only**
18    **recently got onto Teams after Covid when we**
19    **had to get on all these phone calls, but I**
20    **don't do messaging through Teams. I'm old**
21    **school. If you want to talk to me, pick up**
22    **the phone and call me.**
23 **Q**  I hear you. I have had a horrible week with
24    tech. Going down to 7:36 a.m. --
25 **A**  **Yes.**

94

1  **Q**  Do you recognize that phone number?
2  **A**  **No.**
3  **Q**  Any reason to doubt or dispute just based on
4     our cross referencing that that's Tom Jared's
5     phone number?
6  **A**  **I don't know that it is Tom Jared's phone**
7     **number. I'd have to look.**
8  **Q**  I can represent to you we received Tom
9     Jared's phone number and that's his. Okay?
10 **A**  **Okay. That's fine.**
11 **Q**  It says you had a 4 minute phone call with
12    him then. Right?
13 **A**  **Yes.**
14 **Q**  If we go down to 9:29 a.m., you had another 2
15    minute phone call with Tracy Miller. Right?
16 **A**  **I don't know if that's an actual 2 minute**
17    **phone call or if I'm trying to call him and**
18    **it goes to his voicemail or something. But I**
19    **tried calling him and had some type of**
20    **communication with him at that time you'd**
21    **say. I'd be confident in saying that, or he**
22    **is telling me he'll call me back later.**
23 **Q**  If we go down to 9:40 a.m. --
24 **A**  **I'm looking for 9:40. That** ▮▮▮▮▮▮▮**,**
25    **that's Tom, yeah.**

95

1  **Q**  It indicates you had an 18 minute phone call
2     with him. Right?
3  **A**  **Yes.**
4  **Q**  And you testified a few minutes ago that
5     Jared as a general manager would be one of
6     the people responsible for dealing with and
7     drilling down on over-standard work events
8     and delays. Right?
9  **A**  **That amongst the 84 million other things he's**
10    **got to do on his territory. That's not his**
11    **sole purpose in life.**
12 **Q**  I didn't suggest that. Is it possible you
13    discussed the 474 with him that day?
14 **A**  **I highly doubt it.**
15 **Q**  It's possible though. Right?
16 **A**  **I don't know. I don't know what I talked to**
17    **him about that day. Like I say -- you know,**
18    **that delay on 474, I hate to say it is**
19    **probably not even something that popped up on**
20    **my radar. In the middle of January and**
21    **February that would have been the least of my**
22    **concerns, that 3 hour delay on 474 for doing**
23    **their job.**
24 **Q**  But it should be Tom Jared's concern. Right?
25 **A**  **Everything is his concern, yeah.**

96

1  **Q**  Including over-standard work events and
2     delays. Right?
3  **A**  **However, to be fair to Tom, the same applies**
4     **to him. That's something you're going to**
5     **look at as a general manager. That's**
6     **something you might look at as a vice**
7     **president. But you have 84 million other**
8     **things you have to deal with on your**
9     **territory in the middle of winter. That's**
10    **one train out of the 35 he's got on his**
11    **territory.**
12 **Q**  Did Tom Jared tell you that day that he was
13    in the Nahant, Marquette area?
14 **A**  **Not that I remember.**
15 **Q**  Do you know what he was doing down there for
16    three days?
17 **A**  **I don't remember. I don't honestly remember**
18    **what he was doing or what he told me 3-1/2**
19    **years ago.**
20 **Q**  Do you know what he was doing ending up in
21    the Nahant yard that day E testing Sexton?
22 **A**  **That's part of his territory. I expect him**
23    **to be out on his property, on his territory.**
24    **And it's part of his objectives and part of**
25    **his safety accountabilities, is to be out on**

---

97

1  the property testing. He's got territory
2  from Kansas City right up to almost St. Paul
3  and then he's got from -- what's the name of
4  that place -- Humboldt all the way up to the
5  borders. So he could be anywhere on his
6  territory at any given point in time. So it
7  wouldn't surprise me at all if he was there,
8  and at the same time it wouldn't mean
9  anything to jump to my attention that he was
10  there either. That's what he did. He would
11  be in North Dakota. He'd be in Glenwood.
12  He'd be in Noyes. He'd be in Nahant. He'd
13  be in Marquette. He'd be in Kansas City.
14  He'd be at River Junction. That's part of
15  his territory.
16  Q  If Jared, hypothetically speaking, was in
17  that yard as a result of communication with
18  people about this over-standard work event
19  and E tested Sexton because of him delaying
20  that train by cutting the tracks, you would
21  discourage that conduct. Right?
22         MR. SULLIVAN: Objection, calls
23  for speculation. You can answer.
24  A  We don't retaliate. I did not encourage any
25  type of retaliation ever.

98

1  Q  (By Mr. Magnuson, continuing) That
2  hypothetical I just gave you would violate
3  your anti-retaliation rules. Right?
4  A  Yes.
5         MR. SULLIVAN: Same objection.
6  A  Yes.
7  Q  (By Mr. Magnuson, continuing) If we could
8  scroll down to 2:45 p.m., that's a 4 minute
9  phone call with Mr. Jared. Right?
10  A  Yes.
11  Q  If we go down to 3:07, you had a 1 minute
12  call with Mr. Miller?
13  A  Again, that's probably me calling him and him
14  saying he's going to call me back or something;
15  I hate to say it but that's what happened in
16  our business. We get so many calls, a lot of
17  times you get a call and you say, hey, I will
18  call you back and you hang up. You don't
19  want to be rude. You don't want to send them
20  to voicemail. Typically, Tracy and I are
21  pretty busy guys so you'll find a lot of
22  that. He will call me and I will say I have
23  to call him back. It's the same thing even
24  today.
25  Q  So if we scroll down to 7:56 p.m., you have

99

1  one final phone call that day with Tom Jared.
2  Right?
3  A  Where is that? Hold on. I'm looking for it.
4  Q  7:56. I guess we need to scroll down a
5  little bit.
6  A  I see it, yep.
7         MR. MAGNUSON: Okay. We can pull
8  that down.
9         THE WITNESS: Can I have one
10  second, guys?
11         MR. MAGNUSON: Yeah.
12         (Brief off the record recess).
13  Q  (By Mr. Magnuson, continuing) We're pulling
14  up Exhibit 78. Are you familiar with this or
15  did you review it prior to your deposition
16  here today?
17  A  I'm familiar with it.
18  Q  What is it?
19  A  My PMP, Performance Management Form. It's
20  what we use to evaluate our officers and our
21  leaders.
22  Q  This is your Performance Management Form and
23  you submitted this to Tracy Miller and Tracy
24  Miller was allowed to make comments and weigh
25  in on this. Right?

100

1  A  Correct.
2  Q  On the last page if you could, review the
3  Leader Comments there.
4  A  (Witness examining document). Okay.
5  Q  Who was the old Jason?
6  A  The old Jason, he was just -- you know, as
7  you develop in leadership, the old Jason
8  was when I was a general manager, when I was
9  assistant vice president, and I was assistant
10  vice president for maybe three years -- even
11  when I was a superintendent -- I tended to be
12  very, very direct. And some people did not
13  react that way to being so direct. So
14  through some coaching, through working with
15  Tracy, through working with Mr. Redd and some
16  other people, I was able to take a little of
17  that edge off to allow me to be less direct
18  and have some better relationships in terms
19  of developing some emotional intelligence,
20  you know, looking at things a little bit
21  differently and not being all about business.
22  So the old Jason -- that pretty much
23  describes the old Jason. He was all business
24  and no fun.
25  Q  What do you do for fun now?

105

1  A  You could measure it at a corporate level.
2     Like a system level you could always measure
3     it. We recently started measuring it maybe --
4     I think this year we started measuring it, or
5     early last year. And we still -- to be fair,
6     we still haven't broken it down. We're
7     trying to get it down to the regional level,
8     and we can't. We can only get it down to a
9     zone level right now. So it's still not
10    perfect.
11 Q  But to the extent it wasn't tracked in this
12    document at the time, the railroad at the
13    time could still track velocity at a system
14    level?
15 A  Only on a system level. The entire system --
16    the only way you could track velocity was on
17    the entire system. You couldn't break it
18    down to a regional level.
19 Q  If we can, go to the next page. Under controlling
20    costs, would you consider recrews to be a
21    function or an element of controlling costs?
22 A  Yes, I would.
23 Q  Let's go to the next page, optimizing assets.
24    Car velocity and increased train speeds are
25    objectives under optimizing assets. Right?

106

1  A  Yes.
2  Q  This document, Performance Management Forms,
3     are used in determining employees' compensation.
4     Right?
5  A  Correct, yes.
6  Q  And that includes both salary, bonus, and
7     stock options?
8  A  No. Well, no, not entirely. This will
9     determine what you'll get for a raise. I
10    shouldn't say that. It shouldn't determine
11    it. How you perform will determine where you
12    fall into in terms of getting a raise.
13 Q  And how about bonuses?
14 A  This will determine what you're going to get
15    for a short-term bonus but not a long -- like
16    your stock options, that falls into under
17    your long-term. That is not affected by this.
18    That's more contractual.
19 Q  So the short-term bonus is the cash?
20 A  That's right.
21 Q  And those short-term bonuses would be
22    reflected in your tax returns. Right?
23 A  Correct.
24 Q  And the long-term is the stocks, the stock
25    options?

107

1  A  That's right. But they don't vest right
2     away. And the long-term incentives are
3     basically flat rate on your salary type
4     thing. It's a percentage of your salary
5     based on what job you're on. It's not
6     affected by how you perform. So even if you
7     were a superstar and you were the best
8     railroader in the world and you got the best
9     rating of, you know, any vice president -- I
10    will use vice president as an example --
11    you're only going to get what's in your
12    contract for your stock options. And in many
13    cases, you know, you won't get the same as
14    somebody else who works beside you because
15    they might have been around longer and have a
16    higher salary. So it's based on your salary.
17 Q  What was your short-term bonus in 2021?
18 A  I don't remember.
19 Q  You can ballpark it.
20 A  I still don't remember. I'm trying to think.
21    It might have been around $███.
22 Q  What was your salary in 2021?
23 A  I was making I think around ███ US, was my
24    salary.
25 Q  But your short-term bonus would be definitely

108

1     reflected in your tax records. Right?
2  A  Yep.
3  Q  You think it was around $███?
4  A  I think so, yes. I honestly don't remember.
5  Q  That's the answer we get every time we ask.
6     2021 is a long time ago.
7  Q  Most people remember what they earn but --
8        MR. SULLIVAN: Object to form,
9     argumentative, purposeless and irrelevant.
10 Q  (By Mr. Magnuson, continuing) Do you have the
11    ability to get on line when you want and see
12    how you are performing as it relates to these
13    various metrics?
14 A  Well, you see it every day. There's a report
15    that you would look at, and you would see
16    every day how you're performing versus these
17    metrics because the -- these metrics -- I
18    want to be clear. It's not a question of
19    looking at these metrics. These metrics are
20    the basics of railroading, the basics of good
21    railroading. These are things that any decent
22    class 1 railroad or any decent company is
23    going to measure themselves by. You're going
24    to measure yourselves on all these things.
25    These are your KPI's.

113

1  from violating a rule?

2  A  Yeah, I would not allow it.

3  Q  And that includes CPKC rules and FRA rules?

4  A  That's right.

5  Q  In all of these various things that I just

6  asked you about, discouraging unfair

7  investigations, questionable tests, unsafe

8  tests, violating rules to set up a test, you

9  would discourage these even more I would

10  imagine if it were 10 or 11 hours, 9 or 11

11  hours after an employee takes the safe course?

12  A  That would be retaliation, and I don't

13  tolerate retaliation.

14  Q  You encourage the employees that are involved

15  in the investigation process that report to

16  you to conduct their investigations in a

17  manner so that they're not overturned by the

18  Public Law Board.  Right?

19  A  Correct.

20  Q  Getting overturned by the Public Law Board

21  isn't something that you look favorably upon.

22  Right?

23  A  I won't send something to the Public Law

24  Board.  I won't give discipline in an

25  investigation unless charges are proven and

114

1  it's fair and it's been impartial.

2  Q  Looking back on Sexton's investigation, what

3  do you think could have been done differently

4  in that process to prevent that discipline

5  from being overturned by the Public Law Board?

6  MR. SULLIVAN:  Objection, calls

7  for speculation.  You can answer.

8  A  I'd have to review it again in detail to

9  formulate an opinion on that.  I have not

10  reviewed it in that kind of detail where I

11  could give a concise opinion on it.  It was

12  3-1/2 years ago and it wouldn't be fair for

13  me to comment.

14  Q  (By Mr. Magnuson, continuing) Well, the

15  Public Law Board took exception to a number

16  of things in the investigation process as it

17  related to Sexton.  Right?

18  MR. SULLIVAN:  Objection to the

19  extent it misstates the opinion.  You can

20  answer.

21  A  I'd have to see the opinion.  I can't comment

22  without seeing the opinion.

23  Q  (By Mr. Magnuson, continuing) This has been

24  marked Exhibit 13.  Just review the

25  concluding paragraph there.

115

1  A  (Witness examining document).  I read up to

2  and then signed off on pre-determined outcome.

3  (Witness examining document).  So what is

4  your question?

5  Q  What could have been done to have changed the

6  outcome of this Public Law Board decision?

7  MR. SULLIVAN:  Objection, calls

8  for speculation.  You can answer.

9  A  What I will say is even reading their

10  conclusion, it's based on their beliefs and

11  what they're seeing.  I don't think anything

12  should have been changed in the way that the

13  performance of the hearing was done and the

14  way the discipline was assessed.  They're

15  basing it upon their beliefs and what was

16  presented in the case.  I don't agree with

17  their beliefs.  However, out of respect for

18  the Public Law Board and not being part of

19  the collective agreement and what we do, I

20  represent the fact that they made a decision.

21  I don't agree with their decision.  I know as

22  a railroader what happened, and I don't think

23  that there was anything untoward in the way

24  that Mr. Jared performed the test.  The only

25  thing that I could see as being a potential

116

1  problem in it is the fact that the administra-

2  tion of Shelley Daberitz or Joe Adelfio who

3  sent out the discipline, that should have

4  been changed.  It should not have had Mr.

5  Jared's electronic signature on it.  That

6  might have changed the outcome of this Public

7  Law Board decision.

8  Q  Why is that?

9  A  Because when I read this, I believe that they

10  are of the view that Mr. Jared was involved

11  in the decisionmaking process.  And knowing

12  what I know, being that I'm the person that

13  made the decision of what discipline he would

14  get, I know that's not true.  But that's

15  their belief.  That's the way they came to

16  their conclusion.  Just because it goes to

17  the Public Law Board and they make a decision

18  doesn't mean I'm going to agree with it and

19  doesn't mean it was right.

20  Q  And that's your belief, right, just like that

21  was the Public Law Board's belief?

22  A  Correct.

23  Q  Would you agree that Mr. DePover was

24  performing a safety sensitive task?

25  A  And Mr. DePover being the conductor who was

117

1  in charge of protecting the movement of the
2  shove just to refresh my memory on names?
3  Q  Yes.
4  A  He was engaged in -- I would agree with that
5  for sure.
6  Q  That it was a safety sensitive task?
7  A  Correct.
8  Q  And you remember from reading the
9  investigation transcript that Mr. DePover
10 felt that he was surprised and distracted by
11 Mr. Jared. Right?
12 A  That's what he said, yes, a self-serving
13 answer. But, sure, that's what he said.
14 Q  You would defer to an employee's testimony,
15 would you not, in a situation like this that
16 he felt distracted and felt surprised thus
17 creating an unsafe condition?
18 A  I would say it's a self-serving answer with
19 possible influence from the union. I'm going
20 to go by the facts. And the facts in this
21 case were Mr. Jared told him to stop
22 transmitting, which happens on the railroad.
23 Sometimes radios fail. Sometimes somebody
24 walks on you with their radio and the trans-
25 mission doesn't happen. This is not an

118

1  uncommon occurrence. The fact of the matter
2  is Sexton did not stop in half the range of
3  the last communication and, therefore,
4  violated the rule.
5  Q  Do you think that somehow the union put words
6  in DePover's mouth?
7      MR. SULLIVAN: Objection.
8  A  It's possible.
9  Q  (By Mr. Magnuson, continuing) You don't have
10 any evidence to suggest that, do you?
11 A  No, but it's not outside the realm of
12 possibilities.
13 Q  Do you recall reading in the investigation
14 transcript that after this incident when
15 DePover was in a room with two supervisors
16 that he felt intimidated?
17 A  I don't remember reading that.
18 Q  You would discourage your managers from
19 intimidating conductors and engineers. Right?
20 A  Yeah. Nobody is supposed to be intimidating
21 anybody. But how a person feels is how a
22 person feels.
23 Q  Did you take into consideration when you made
24 this discipline decision that DePover
25 testified that he felt intimidated?

119

1  A  No, I did not.
2  Q  Is that something that you could have taken
3  into consideration?
4  A  No. The only things that were taken into
5  consideration were this. There was an
6  efficiency test that was performed. He was
7  told to stop -- well, he was given a
8  distance. He did not stop within one-half of
9  the last communication of the distance.
10 Downloads show that he went too far and eye
11 witness testimony said he went too far.
12 Facts of the matter are he should have
13 stopped. He did not. That's all that was
14 taken into consideration for the statement.
15 Q  So you didn't consider at all the fact that
16 DePover testified that he was surprised and
17 distracted by Jared and that later when he
18 was in a room with two managers that he felt
19 intimidated. You did not give that any
20 weight or consideration. Is that true?
21 A  I did not give it any weight or consideration
22 because it had nothing to do with the facts
23 of the case.
24 Q  But you would certainly discourage your
25 managers from intimidating, distracting, or

120

1  surprising conductors and engineers. Right?
2  A  No -- I discourage my managers -- I do not
3  tolerate people violating our policies period.
4  Q  And that includes your retaliation policies?
5  A  Yeah, it includes all our policies.
6  Q  Have you testified in any FRSA cases in the
7  past?
8  A  What's an FRSA case?
9  Q  The Whistleblower Act, the 2019 statute that
10 gives rise to this claim.
11 A  No, I have not.
12 Q  How many depositions have you given in the
13 past?
14 A  Maybe two, three.
15 Q  Do you recall what those cases involved?
16 Were they injuries or retaliation claims or
17 what?
18 A  They were in Canada, so I don't know if they
19 count here. I testified in court via Zoom
20 for the Lac-Megantic trial. I gave a
21 deposition some years ago about an employee
22 who resigned and decided to sue us later. I
23 don't think I have given any others. I think
24 there was only two or three.
25 Q  What was your involvement in the Lac-Megantic

129

1  Q  How?

2  A  Well, he had conversations with myself and I
3     assume he had conversations with others. And
4     having a conversation with myself over
5     something like that is not an easy
6     conversation to have.

7  Q  Was that the old Jason that handled that
8     conversation with him?

9  A  Don't get caught up in labels of the old
10    Jason and the new Jason or whatever --

11 Q  I want to know how McKelvey was held
12    accountable. He wasn't disciplined, was he?

13 A  Not that I remember, no, but neither was John
14    Sexton for that incident. He wasn't
15    disciplined either. I didn't discipline John
16    Sexton for following the rule. And McKelvey
17    being a young officer --

18 Q  The Public Law Board turned it over. Right?

19 A  No, no. You're confusing two incidents. The
20    incident that happened when he was shoving
21    equipment was a different incident on a
22    different date. Now that I'm looking back
23    through some of my notes -- and if you were
24    to pull them up -- where he had that
25    conversation with McKelvey I believe was

130

1     maybe somewhere in January, was it not, or
2     that incident, the shoving incident was in
3     January. Right? In February.

4  Q  February 1st.

5  A  February 1st. When did he write the
6     letter -- he wrote the letter to me on
7     February 15th after he had gotten in trouble.

8  Q  He told you that very day that Jared E tested
9     him. The very shift is when this
10    conversation with McKelvey occurred. Right?

11 A  No, I don't remember that. I don't remember
12    those details. When I look back at it and I
13    see that on February 1st or 2nd, whatever
14    date it was, and he gets held accountable by
15    Tom Jared for shoving, which he knows is a
16    major violation. Then and only then does all
17    of a sudden a letter show up on February 15th
18    to say that, hey, this happened and I want to
19    bring it to your attention.

20 Q  We have got McKelvey's testimony and we have
21    got Sexton's testimony. We're going to have --
22    Well, they both indicate that when McKelvey
23    told him not to cut the tracks, that was the
24    same shift -- that was the beginning of the
25    shift where Jared conducted the E test.

131

1     Okay? We'll get those facts straight. That
2     was the same shift.

3  A  Okay. Well --

4  Q  And you said McKelvey told you he told Sexton
5     not to cut the tracks. And I asked you how
6     did you hold him accountable. And you said
7     you had a difficult conversation with him?

8  A  I had a very pinpointed conversation with Mr.
9     McKelvey. I warned him that if he continued
10    along that path, if it were to happen again,
11    he wasn't going to work for me. I won't have
12    anybody on property who is going to violate
13    rules or encourage people to violate rules.

14 Q  But you didn't discipline or hold an
15    investigation on him?

16 A  You wouldn't hold an investigation on an
17    employee -- on a manager like that.

18 Q  But you could discipline?

19 A  You handle consequences differently with a
20    manager because they don't fall under a
21    collective agreement. They don't fall under
22    a discipline policy.

23 Q  But you could discipline him pursuant to all
24    these CP policies?

25 A  You don't give demerits to managers.

132

1     Sometimes you give suspensions.

2  Q  How are managers disciplined?

3  A  You can give them -- usually you give them
4     letters or you hold them accountable through
5     suspensions if it's bad enough. Usually it
6     doesn't get that bad. Usually it's a
7     question of having proper conversations,
8     coaching, documenting, making sure HR is
9     involved.

10 Q  Did you do any of that with respect to
11    McKelvey?

12 A  I don't recall.

13        MR. SULLIVAN: We're over time.
14    It's 1:41. We have gone 11 minutes passed
15    our agreed time. I'm assuming we're over the
16    three hours of on the record time. So we're
17    done.

18        MR. MAGNUSON: All right.

19        (WHEREUPON, the testimony was
20    concluded at 1:42 p.m.)

21             *  *  *

22

23

24

25

Ross
**Exhibit 79**

Call Details Jason M Ross – [REDACTED]

Feb 1 – 2 2021

## Detail for Jason M Ross: [REDACTED]

### Voice, continued

| Date | Time | Number | Rate | Usage Type | Origination | Destination | Min. | Airtime Chrgs | LD/Other Chrgs | Total |
|------|------|--------|------|-----------|-------------|-------------|------|---------------|----------------|-------|
| 1/31 | 4:33P | | Off-Peak | PlanAllow | Somerset WI | Desplaines IL | 4 | — | — | — |
| 1/31 | 4:58P | | Off-Peak | PlanAllow | Somerset WI | Incoming CL | 5 | — | — | — |
| 1/31 | 5:02P | | Off-Peak | PlanAllow | Somerset WI | Incoming CL | 3 | — | — | — |
| 1/31 | 6:33P | | Off-Peak | PlanAllow | Somerset WI | Calgary AB | 38 | — | — | — |
| 1/31 | 7:11P | | Off-Peak | PlanAllow | Somerset WI | Desplaines IL | 33 | — | — | — |
| 1/31 | 7:43P | | Off-Peak | PlanAllow | Somerset WI | ST Paul MN | 1 | — | — | — |
| 1/31 | 7:46P | | Off-Peak | PlanAllow | Somerset WI | Calgary AB | 11 | — | — | — |
| 1/31 | 7:51F | | Off-Peak | PlanAllow,CalWait | Somerset WI | Incoming CL | 1 | — | — | — |
| 1/31 | 7:58F | | Off-Peak | PlanAllow | Somerset WI | Minneapolis MN | 7 | — | — | — |
| 1/31 | 8:05F | | Off-Peak | PlanAllow | Somerset WI | Desplaines IL | 11 | — | — | — |
| 1/31 | 8:15F | | Off-Peak | PlanAllow,CalWait | Somerset WI | Incoming CL | 5 | — | — | — |
| 1/31 | 8:30F | | Off-Peak | PlanAllow | Somerset WI | Twincities MN | 10 | — | — | — |
| 1/31 | 5:01A | | Off-Peak | PlanAllow | Somerset WI | Incoming CL | 1 | — | — | — |
| 2/01 | 5:16A | | Off-Peak | PlanAllow | Somerset WI | Twincities MN | 14 | — | — | — |
| 2/01 | 5:29A | | Off-Peak | PlanAllow | Somerset WI | Memphis TN | 3 | — | — | — |
| 2/01 | 5:42A | | Off-Peak | PlanAllow | Somerset WI | Twincities MN | 2 | — | — | — |
| 2/01 | 5:45A | | Off-Peak | PlanAllow | Somerset WI | Twincities MN | 7 | — | — | — |
| 2/01 | 5:51A | | Off-Peak | PlanAllow | Hudson WI | Winnipeg MB | 2 | — | — | — |
| 2/01 | 5:53A | | Off-Peak | PlanAllow,PlanAllow,Span | Woodville WI | Memphis TN | 26 | — | — | — |
| 2/01 | 6:20A | | Peak | PlanAllow | Woodville WI | Desplaines IL | 8 | — | — | — |
| 2/01 | 6:30A | | Peak | PlanAllow | Menomonie WI | Desplaines IL | 5 | — | — | — |
| 2/01 | 6:35A | | Peak | PlanAllow | Osseo WI | Toll-Free CL | 30 | — | — | — |
| 2/01 | 7:12A | | Peak | PlanAllow | Osseo WI | Twincities MN | 22 | — | — | — |
| 2/01 | 7:36A | | Peak | PlanAllow | Black Rive WI | Minneapolis MN | 4 | — | — | — |
| 2/01 | 7:40A | | Peak | PlanAllow | Black Rive WI | Desplaines IL | 17 | — | — | — |
| 2/01 | 8:01A | | Peak | PlanAllow | Waunakee WI | Calgary AB | 5 | — | — | — |
| 2/01 | 8:08A | | Peak | PlanAllow | Waunakee WI | Desplaines IL | 2 | — | — | — |
| 2/01 | 9:07A | | Peak | PlanAllow,CalWait | Waunakee WI | Incoming CL | 3 | — | — | — |
| 2/01 | 9:09A | | Peak | PlanAllow | Stoughton WI | Desplaines IL | 15 | — | — | — |
| 2/01 | 9:25A | | Peak | PlanAllow | Stoughton WI | LA Grange IL | 1 | — | — | — |
| 2/01 | 9:27A | | Peak | PlanAllow | Stoughton WI | Omaha NE | 2 | — | — | — |
| 2/01 | 9:29A | | Peak | PlanAllow | Stoughton WI | Incoming CL | 2 | — | — | — |
| 2/01 | 9:31A | | Peak | PlanAllow | Albion WI | Middleburg FL | 2 | — | — | — |
| 2/01 | 9:33A | | Peak | PlanAllow | Milton WI | Willard OH | 8 | — | — | — |
| 2/01 | 9:40A | | Peak | PlanAllow | Janesville WI | Minneapolis MN | 18 | — | — | — |
| 2/01 | 9:58A | | Peak | PlanAllow | Roscoe IL | Incoming CL | 2 | — | — | — |
| 2/01 | 9:59A | | Peak | PlanAllow | Lowes Park IL | Memphis TN | 1 | — | — | — |
| 2/01 | 10:02A | | Peak | PlanAllow | Rockford IL | Northbrook IL | 7 | — | — | — |
| 2/01 | 10:08A | | Peak | PlanAllow,CalWait | Belvidere IL | Incoming CL | 20 | — | — | — |
| 2/01 | 10:27A | | Peak | PlanAllow | Huntley IL | ST Paul MN | 1 | — | — | — |
| 2/01 | 10:36A | | Peak | PlanAllow | Hoffman Es IL | Minneapolis MN | 1 | — | — | — |
| 2/01 | 10:53A | | Peak | PlanAllow | Bensenvill IL | Desplaines IL | 1 | — | — | — |
| 2/01 | 10:56A | | Peak | PlanAllow | Des Plaine IL | Incoming CL | 2 | — | — | — |
| 2/01 | 10:58A | | Peak | PlanAllow | Mount Pros IL | Toll-Free CL | 17 | — | — | — |
| 2/01 | 11:14A | | Peak | PlanAllow,CalWait | Mount Pros IL | Incoming CL | 1 | — | — | — |
| 2/01 | 11:15A | | Peak | PlanAllow | Mount Pros IL | Chicago IL | 7 | — | — | — |

Confidential

# verizon√

| | Invoice Number | Account Number | Date Due | Page |
|---|---|---|---|---|
| | 9873190538 | Redacted | 03/02/21 | 1890 of 5116 |

## Detail for Jason M Ross:

### Voice, continued



| Date | Time | Number | Rate | Usage Type | Origination | Destination | Min. | Airtime Chrgs | LD/Other Chrgs | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 2/01 | 11:17A | | Peak | PlanAllow | Mount Pros IL | Twincities MN | 2 | — | — | — |
| 2/01 | 11:21A | | Peak | PlanAllow | Mount Pros IL | Chicago IL | 3 | — | — | — |
| 2/01 | 11:23A | | Peak | PlanAllow | Mount Pros IL | Toll-Free CL | 8 | — | — | — |
| 2/01 | 11:02A | | Peak | PlanAllow | Mount Pros IL | Incoming CL | 1 | — | — | — |
| 2/01 | 11:07A | | Peak | PlanAllow | Mount Pros IL | Twincities MN | 3 | — | — | — |
| 2/01 | 12:20P | | Peak | PlanAllow | Mount Pros IL | Incoming CL | 1 | — | — | — |
| 2/01 | 1:02P | | Peak | PlanAllow | Mount Pros IL | Twincities MN | 5 | — | — | — |
| 2/01 | 1:38P | | Peak | PlanAllow | Mount Pros IL | Incoming CL | 3 | — | — | — |
| 2/01 | 2:25P | | Peak | PlanAllow | Mount Pros IL | Twincities MN | 5 | — | — | — |
| 2/01 | 2:45P | | Peak | PlanAllow | Mount Pros IL | Minneapolis MN | 4 | — | — | — |
| 2/01 | 2:48P | | Peak | PlanAllow | Mount Pros IL | Rhineland WI | 13 | — | — | — |
| 2/01 | 3:07P | | Peak | PlanAllow | Mount Pros IL | Memphis TN | 1 | — | — | — |
| 2/01 | 3:35P | | Peak | PlanAllow | Mount Pros IL | Twincities MN | 9 | — | — | — |
| 2/01 | 3:58P | | Peak | PlanAllow | Mount Pros IL | Incoming CL | 1 | — | — | — |
| 2/01 | 5:53P | | Peak | PlanAllow | Mount Pros IL | Incoming CL | 4 | — | — | — |
| 2/01 | 6:43P | | Peak | PlanAllow | Mount Pros IL | Davenport IA | 1 | — | — | — |
| 2/01 | 6:43P | | Peak | PlanAllow | Mount Pros IL | Bemidji MN | 7 | — | — | — |
| 2/01 | 7:22P | | Peak | PlanAllow | Mount Pros IL | Incoming CL | 1 | — | — | — |
| 2/01 | 7:37P | | Peak | PlanAllow | Mount Pros IL | Sioux Fls SD | 8 | — | — | — |
| 2/01 | 7:56P | | Peak | PlanAllow | Mount Pros IL | Minneapolis MN | 4 | — | — | — |
| 2/01 | 8:16P | | Peak | PlanAllow | Mount Pros IL | Incoming CL | 4 | — | — | — |
| 2/01 | 8:18P | | Peak | PlanAllow | Mount Pros IL | Calgary AB | 25 | — | — | — |
| 2/02 | 4:41A | | Off-Peak | PlanAllow | Des Plaine IL | Incoming CL | 2 | — | — | — |
| 2/02 | 4:52A | | Off-Peak | PlanAllow | Des Plaine IL | Northbrook IL | 1 | — | — | — |
| 2/02 | 4:53A | | Off-Peak | PlanAllow | Des Plaine IL | Twincities MN | 4 | — | — | — |
| 2/02 | 4:53A | | Off-Peak | PlanAllow,CallWait | Des Plaine IL | Incoming CL | 3 | — | — | — |
| 2/02 | 5:11A | | Off-Peak | PlanAllow | Des Plaine IL | Twincitez MN | 11 | — | — | — |
| 2/02 | 5:21A | | Off-Peak | PlanAllow | Des Plaine IL | Northbrook IL | 3 | — | — | — |
| 2/02 | 5:24A | | Off-Peak | PlanAllow | Schiller P IL | Twincities MN | 8 | — | — | — |
| 2/02 | 5:34A | | Off-Peak | PlanAllow | Mount Pros IL | Calgary AB | 2 | — | — | — |
| 2/02 | 5:37A | | Off-Peak | PlanAllow | Mount Pros IL | Incoming CL | 8 | — | — | — |
| 2/02 | 5:42A | | Off-Peak | PlanAllow | Mount Pros IL | Buffalo NY | 1 | — | — | — |
| 2/02 | 5:43A | | Off-Peak | PlanAllow | Mount Pros IL | Twincities MN | 7 | — | — | — |
| 2/02 | 5:52A | | Off-Peak | PlanAllow | Mount Pros IL | Winder GA | 2 | — | — | — |
| 2/02 | 5:54A | | Off-Peak | PlanAllow | Mount Pros IL | Minneapolis MN | 2 | — | — | — |
| 2/02 | 6:09A | | Peak | PlanAllow | Mount Pros IL | Calgary AB | 1 | — | — | — |
| 2/02 | 6:10A | | Peak | PlanAllow | Mount Pros IL | Twincities MN | 1 | — | — | — |
| 2/02 | 6:11A | | Peak | PlanAllow,CallWait | Mount Pros IL | Incoming CL | 5 | — | — | — |
| 2/02 | 6:20A | | Peak | PlanAllow | Mount Pros IL | Chicago IL | 1 | — | — | — |
| 2/02 | 6:23A | | Peak | PlanAllow | Mount Pros IL | Northbrook IL | 1 | — | — | — |
| 2/02 | 6:33A | | Peak | PlanAllow | Mount Pros IL | Chicago IL | 2 | — | — | — |
| 2/02 | 6:35A | | Peak | PlanAllow | Mount Pros IL | Twincities MN | 2 | — | — | — |
| 2/02 | 6:35A | | Peak | PlanAllow | Mount Pros IL | Toll-Free CL | 42 | — | — | — |
| 2/02 | 7:10A | | Peak | PlanAllow | Mount Pros IL | Twincities MN | 3 | — | — | — |
| 2/02 | 7:15A | | Peak | PlanAllow | Mount Pros IL | Twincities MN | 1 | — | — | — |
| 2/03 | 7:23A | | Peak | PlanAllow | Mount Pros IL | Toll-Free CL | 13 | — | — | — |

CP_03919

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION

- - - - - - - - - - - - - - - - - - - - -

No. 3:23-CV-00031-HCA

John Sexton,

Plaintiff,

vs.

Dakota, Minnesota & Eastern Railroad
Corporation d/b/a Canadian Pacific,
a Delaware corporation,

Defendants.

- - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF

TRACY MILLER

July 9, 2024

1:05 p.m.

TAKEN BY: BRENDA K. FOSS
fossbrenda@yahoo.com
612-701-4282

---

2

Deposition of TRACY MILLER, taken by
Zoom videoconference by and on behalf of
Plaintiff, on Wednesday, July 9, 2024,
commencing at 1:05 p.m., before Brenda K. Foss,
Professional Court Reporter, Notary Public,
State of Minnesota, County of Hennepin.

*  *  *  *  *

APPEARANCES

ON BEHALF OF THE PLAINTIFF:
JOHN MAGNUSON, ESQUIRE
CYLE CRAMER, ESQUIRE
YAEGER & JUNGBAUER BARRISTERS, PLC
4601 Weston Woods Way
St. Paul, MN  55127
jmagnuson@yjblaw.com
651-288-9500

ON BEHALF OF THE DEFENDANTS:
JACK SULLIVAN, ESQUIRE
DORSEY & WHITNEY LLP
50 South 6th Street, Suite 1500
Minneapolis, MN  55402
sullivan.jack@dorsey.com
612-340-2600

Also present: Noah Garcia, DM&E

---

3

I N D E X

Examination:                      PAGE:
By Mr. Magnuson            5

Marked Deposition Exhibits:
74 E-mail              40
   Bates CP 00996-997
75 Verizon records          41
   Bates 04016-4017
76 Leader Survey Bates      69
   Bates Sexton 1527-1530
77 Feb 1 e-mail from McKelvey 86
   Bates CP 03736
78 Ross' Performance Form     87
   Bates 03807-03815

Reporter's Certificate      111

(Original Deposition Transcript in the
possession of John Magnuson, Esquire).

*  *  *  *  *

---

4

PROCEEDINGS

TRACY MILLER,

after having been first duly sworn,

deposes and says under oath as follows:

MR. MAGNUSON:  John Magnuson on
behalf of the plaintiff John Sexton in this
matter.  Kyle Cramer is also here with me
today.

MR. SULLIVAN:  I'm Jack Sullivan
of Dorsey & Whitney on behalf of the
Defendant Dakota, Minnesota & Eastern
Railroad.  And attending the deposition is
Noah Garcia from Canadian Pacific Kansas
City.

MR. MAGNUSON:  Mr. Garcia,
obviously you won't be objecting.  Right?  It
will be Mr. Sullivan or will you be the one
objecting?

MR. GARCIA:  I am not participating.
I'm attending the deposition, sir.

MR. MAGNUSON:  You're attending
but not defending?

MR. GARCIA:  Correct.

41

1  A  No.
2          (Deposition Exhibit 75 marked for
3  identification).
4          MR. MAGNUSON:  This is 75,
5  CP 04016.
6          MR. SULLIVAN:  Can we see the
7  entire document?
8  Q  (By Mr. Magnuson, continuing) We'll go to the
9  first page of it, 04017.  I'll direct your
10  attention to February 1st.  Do you see that?
11  A  Can you blow it up a little bit?  Thank you.
12  Q  I can represent to you that the four -- if
13  you could go to the next page, 04016.  Sorry.
14  I had my a.m. and p.m.'s mixed up there.  Do
15  you see February 1 there at 5:29 a.m.?
16  A  Yes.
17  Q  I can represent to you that the ▇▇▇▇▇▇▇
18  is Jason Ross' phone number.  Okay?
19  A  Okay.
20  Q  Do you see you had a three minute incoming
21  call with him at 5:29 a.m. and then at 5:53
22  a.m. a 28 minute call?  Right?
23  A  Yes.
24  Q  Do you recall what those conversations were
25  about?

42

1  A  No, sir.
2  Q  Was Mr. Sexton's train referenced in either
3  of these phone calls?
4  A  I have no idea.
5  Q  So it's possible?  You just don't know one
6  way or the other?
7  A  I don't know one way or the other.
8  Q  But it's possible that Sexton's train was
9  referenced in one of those phone calls.  Right?
10  A  I don't know.
11  Q  Which means it's possible.  Right?
12  A  Sir, I don't know.  We talk about a lot in
13  the morning time.  I have no idea what we
14  spoke about.
15  Q  It's possible that John Sexton's train was
16  referenced in one of those phone calls.  Right?
17  A  I don't know.  I don't know if he is or is
18  not.
19  Q  Well, if it's something that was absolutely
20  impossible, you would be able to say so.
21  Right?
22          MR. SULLIVAN:  Objection,
23  argumentative.
24  A  Sir, for clarity, we have phone conversations
25  regularly in the morning time.  I don't know

43

1  what Jason and I spoke about that morning.
2  Q  (By Mr. Magnuson, continuing) See towards the
3  bottom of the page at 9:29 a.m. again you had
4  another two minute phone call with him.
5  Right?
6  A  Yes.
7  Q  If I can direct your attention to 10:32 a.m.
8  You had a call with a ▇▇▇▇▇▇▇ number.
9  Do you see that?
10  A  Yes.
11  Q  I can represent to you that's Tom Jared's
12  phone number.  Okay?
13  A  Okay.
14  Q  You had a three minute call with him at 10:32
15  a.m.  And then at 1:25 p.m. you had another
16  phone call with Tom Jared.  Do you see that,
17  1:25 p.m.?
18  A  Yes.
19  Q  Then at 2:44 p.m. another phone call with
20  Jason Ross?
21  A  Yes.
22  Q  I can represent to you that Tom Jared's E
23  test of Mr. Sexton that day took place at
24  around noon.  Any reason to dispute that?
25  A  No.

44

1  Q  So you knew you would have received the
2  e-mail that this is the slowest train in the
3  United States that day.  Right?
4          MR. SULLIVAN:  Objection, misstates
5  the witness' testimony.
6  A  I don't know that.
7  Q  (By Mr. Magnuson, continuing) Mr. Miller,
8  have you read the public law board's decision
9  in this case?
10  A  Not that I remember, no.
11  Q  Have you at any time reviewed the investi-
12  gation transcript relating to Mr. Sexton's
13  investigation?
14  A  No.
15  Q  Who made the decision to discipline Mr. Sexton?
16  A  I don't know.
17  Q  Did you review the discipline that was assessed?
18  A  I don't recall.
19  Q  It's possible?
20  A  It's possible but I don't remember.
21  Q  In your capacity or at least in February of
22  '21, did you review discipline assessments?
23  A  Yes, I did.
24  Q  As like a matter of course, would you review
25  all of them or would it be a case by case



**verizon✓**

Billing period
Jan 27, 2021 - Feb 26, 2021

Account number

# Tracy Miller

**IPHONE 11**

## Talk activity (cont.)

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | LD/Other Charges | Total |
|---|---|---|---|---|---|---|---|---|
| Jan 30 | 9:00 PM | | Minneapoli, MN | Memphis, TN | 44 | -- | -- | -- |
| Jan 30 | 10:09 PM | | Minneapoli, MN | Incoming, CL | 66 | -- | -- | -- |
| Jan 30 | 11:15 PM | | Minneapoli, MN | Calgary, AB | 1 | -- | -- | -- |
| Jan 30 | 11:26 PM | | Minneapoli, MN | Calgary, AB | 14 | -- | -- | -- |
| Jan 31 | 5:58 AM | | Minneapoli, MN | Davenport, IA | 1 | -- | -- | -- |
| Jan 31 | 6:00 AM | | Plymouth, MN | Toll-Free, CL | 2 | -- | -- | -- |
| Jan 31 | 6:02 AM | | Minneapoli, MN | Bangor, WI | 1 | -- | -- | -- |
| Jan 31 | 6:03 AM | | ST. Paul, MN | Toll-Free, CL | 27 | -- | -- | -- |
| Jan 31 | 6:30 AM | | ST. Paul, MN | Toll-Free, CL | 30 | -- | -- | -- |
| Jan 31 | 10:09 AM | | ST. Paul, MN | Minneapols, MN | 2 | -- | -- | -- |
| Jan 31 | 10:10 AM | | ST. Paul, MN | Incoming, CL | 21 | -- | -- | -- |
| Jan 31 | 10:49 AM | | Mendota He, MN | Memphis, TN | 9 | -- | -- | -- |
| Jan 31 | 10:58 AM | | Bloomingto, MN | Calgary, AB | 7 | -- | -- | -- |
| Jan 31 | 11:42 AM | | Bloomingto, MN | Minneapols, MN | 18 | -- | -- | -- |
| Jan 31 | 12:00 PM | | Richfield, MN | Twincities, MN | 1 | -- | -- | -- |
| Jan 31 | 12:03 PM | | Richfield, MN | Memphis, TN | 2 | -- | -- | -- |
| Jan 31 | 12:12 PM | | Minneapoli, MN | Incoming, CL | 19 | -- | -- | -- |
| Jan 31 | 12:30 PM | | Minneapoli, MN | Incoming, CL | 9 | -- | -- | -- |
| Jan 31 | 12:46 PM | | Maple Grov, MN | Incoming, CL | 5 | -- | -- | -- |
| Jan 31 | 1:24 PM | | Maple Grov, MN | Calgary, AB | 3 | -- | -- | -- |
| Jan 31 | 1:42 PM | | Plymouth, MN | Twincities, MN | 4 | -- | -- | -- |
| Jan 31 | 1:54 PM | | Minneapoli, MN | Memphis, TN | 1 | -- | -- | -- |
| Jan 31 | 2:10 PM | | Minneapoli, MN | Incoming, CL | 7 | -- | -- | -- |
| Jan 31 | 3:47 PM | | Minneapoli, MN | Calgary, AB | 20 | -- | -- | -- |
| Jan 31 | 4:13 PM | | Minneapoli, MN | Montreal, QC | 2 | -- | -- | -- |
| Jan 31 | 7:47 PM | | Minneapoli, MN | Incoming, CL | 5 | -- | -- | -- |
| Jan 31 | 8:04 PM | | Minneapoli, MN | Incoming, CL | 1 | -- | -- | -- |
| Jan 31 | 9:55 PM | | Minneapoli, MN | Memphis, TN | 55 | -- | -- | -- |
| Feb 1 | 5:29 AM | | Minneapoli, MN | Incoming, CL | 3 | -- | -- | -- |
| Feb 1 | 5:47 AM | | Minneapoli, MN | Sioux Fls, SD | 6 | -- | -- | -- |
| Feb 1 | 5:53 AM | | Minneapoli, MN | Incoming, CL | 28 | -- | -- | -- |
| Feb 1 | 6:38 AM | | ST. Paul, MN | Gary, IN | 2 | -- | -- | -- |
| Feb 1 | 6:40 AM | | ST. Paul, MN | VM Deposit, CL | 1 | -- | -- | -- |
| Feb 1 | 6:41 AM | | ST. Paul, MN | Minneapols, MN | 1 | -- | -- | -- |
| Feb 1 | 7:47 AM | | ST. Paul, MN | Calgary, AB | 2 | -- | -- | -- |
| Feb 1 | 9:02 AM | | ST. Paul, MN | Calgary, AB | 1 | -- | -- | -- |
| Feb 1 | 9:09 AM | | ST. Paul, MN | Incoming, CL | 13 | -- | -- | -- |
| Feb 1 | 9:21 AM | | ST. Paul, MN | Omaha, NE | 8 | -- | -- | -- |
| Feb 1 | 9:29 AM | | ST. Paul, MN | Twincities, MN | 2 | -- | -- | -- |
| Feb 1 | 9:58 AM | | ST. Paul, MN | Calgary, AB | 1 | -- | -- | -- |

12



**Billing period**

Jan 27, 2021 - Feb 26, 2021

**Account number**

# Tracy Miller

**IPHONE 11**

## Talk activity (cont.)

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | LD/Other Charges | Total |
|---|---|---|---|---|---|---|---|---|
| Feb 1 | 10:01 AM | | ST. Paul, MN | Incoming, CL | 20 | -- | -- | -- |
| Feb 1 | 10:26 AM | | ST. Paul, MN | Incoming, CL | 5 | -- | -- | -- |
| Feb 1 | 10:30 AM | | ST. Paul, MN | VM Deposit, CL | 1 | -- | -- | -- |
| Feb 1 | 10:32 AM | | W. ST. Pau, MN | Minneapols, MN | 3 | -- | -- | -- |
| Feb 1 | 10:35 AM | | W. ST. Pau, MN | VM Deposit, CL | 1 | -- | -- | -- |
| Feb 1 | 10:41 AM | | ST. Paul, MN | VM Deposit, CL | 1 | -- | -- | -- |
| Feb 1 | 10:42 AM | | ST. Paul, MN | Houston, TX | 2 | -- | -- | -- |
| Feb 1 | 10:49 AM | | W. ST. Pau, MN | Minneapols, MN | 6 | -- | -- | -- |
| Feb 1 | 11:29 AM | | W. ST. Pau, MN | Minneapols, MN | 5 | -- | -- | -- |
| Feb 1 | 11:38 AM | | ST. Paul, MN | Toronto, ON | 5 | -- | -- | -- |
| Feb 1 | 11:44 AM | | Saint Paul, MN | Osseo, MN | 16 | -- | -- | -- |
| Feb 1 | 11:59 AM | | ST. Paul, MN | Calgary, AB | 32 | -- | -- | -- |
| Feb 1 | 12:47 PM | | ST. Paul, MN | Minneapols, MN | 4 | -- | -- | -- |
| Feb 1 | 12:55 PM | | ST. Paul, MN | VM Deposit, CL | 1 | -- | -- | -- |
| Feb 1 | 1:25 PM | | W. ST. Pau, MN | Incoming, CL | 6 | -- | -- | -- |
| Feb 1 | 1:48 PM | | ST. Paul, MN | Twincities, MN | 36 | -- | -- | -- |
| Feb 1 | 2:29 PM | | ST. Paul, MN | Incoming, CL | 4 | -- | -- | -- |
| Feb 1 | 2:44 PM | | W. ST. Pau, MN | Incoming, CL | 1 | -- | -- | -- |
| Feb 1 | 2:51 PM | | ST. Paul, MN | Twincities, MN | 2 | -- | -- | -- |
| Feb 1 | 2:52 PM | | ST. Paul, MN | Winnipeg, MB | 1 | -- | -- | -- |
| Feb 1 | 3:08 PM | | ST. Paul, MN | Minneapols, MN | 1 | -- | -- | -- |
| Feb 1 | 3:09 PM | | ST. Paul, MN | Houston, TX | 19 | -- | -- | -- |
| Feb 1 | 3:28 PM | | Minneapoli, MN | Memphis, TN | 7 | -- | -- | -- |
| Feb 1 | 3:46 PM | | Bloomingto, MN | Sioux Fls, SD | 11 | -- | -- | -- |
| Feb 1 | 3:57 PM | | Wayzata, MN | Atlanta, GA | 6 | -- | -- | -- |
| Feb 1 | 4:02 PM | | Wayzata, MN | Calgary, AB | 1 | -- | -- | -- |
| Feb 1 | 4:03 PM | | Wayzata, MN | Chicgozn03, IL | 22 | -- | -- | -- |
| Feb 1 | 4:33 PM | | Minneapoli, MN | Minneapols, MN | 6 | -- | -- | -- |
| Feb 1 | 4:39 PM | | Minneapoli, MN | Twincities, MN | 16 | -- | -- | -- |
| Feb 1 | 5:04 PM | | Minneapoli, MN | Incoming, CL | 3 | -- | -- | -- |
| Feb 2 | 5:37 AM | | Plymouth, MN | Calgary, AB | 8 | -- | -- | -- |
| Feb 2 | 5:46 AM | | Minneapoli, MN | Northbrook, IL | 4 | -- | -- | -- |
| Feb 2 | 5:52 AM | | Mineapolis, MN | Davenport, IA | 14 | -- | -- | -- |
| Feb 2 | 6:06 AM | | ST. Paul, MN | Toll-Free, CL | 23 | -- | -- | -- |
| Feb 2 | 8:52 AM | | W. ST. Pau, MN | Incoming, CL | 4 | -- | -- | -- |
| Feb 2 | 9:00 AM | | W. ST. Pau, MN | Incoming, CL | 3 | -- | -- | -- |
| Feb 2 | 9:05 AM | | W. ST. Pau, MN | Calgary, AB | 1 | -- | -- | -- |
| Feb 2 | 9:38 AM | | W. ST. Pau, MN | Incoming, CL | 2 | -- | -- | -- |
| Feb 2 | 9:56 AM | | ST. Paul, MN | Osseo, MN | 6 | -- | -- | -- |
| Feb 2 | 10:28 AM | | ST. Paul, MN | Incoming, CL | 30 | -- | -- | -- |

13

Confidential

CP_04017

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION

|  |  |  |
|---|---|---|
| John Sexton, | ) | |
| | ) | Case No. 23-cv-00031 |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | **DECLARATION OF** |
| | ) | **JOHN T. SULLIVAN** |
| Dakota, Minnesota, & Eastern Railroad | ) | |
| Corporation d/b/a Canadian Pacific, a | ) | |
| Delaware Corporation, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

COMES NOW I, John T. Sullivan, and affirm, attest, and declare as follows:

1.      I am lead counsel of record for Defendant Dakota, Minnesota, & Eastern Railroad Corporation, d/b/a Canadian Pacific ("CP") in the above referenced matter, and I have personal knowledge of the facts stated herein.

2.      I provide this Declaration in support of CP's Motion for Summary Judgment. This Declaration is included in CP's Local Rule 56(e) Appendix as Document No. 41.

3.      Attached to this Declaration as its **Exhibit A** is a true and correct copy of a May 20, 2021 letter from Peter Semenek, General Chairman of the Brotherhood of Locomotive Engineers and Trainmen ("BLET") union appealing Plaintiff's twenty-day suspension issue on February 26, 2021. This document was produced in the litigation by CP as CP_00479–481. This document is included in CP's Local Rule 56(e) Appendix as Document No. 42.

4.      Attached to this Declaration as its **Exhibit B** is a true and correct copy of a March 9, 2021 letter from CP's Superintendent Operations Arthur Clark to employee J.M. issuing

discipline. This document was produced in the litigation by CP as CP_00922. This document is included in CP's Local Rule 56(e) Appendix as Document No. 43.

5.     Attached to this Declaration as its **Exhibit C** is a true and correct copy of the January 13, 2021 Workplace Health & Safety Committee Quad Cities meeting minutes. This document was produced in the litigation by CP as CP_03705–10. This document is included in CP's Local Rule 56(e) Appendix as Document No. 44.

6.     Attached to this Declaration as its **Exhibit D** is a true and correct copy of a January 18, 2021 email exchange with the subject "Home Safe." This document was produced in the litigation by CP as CP_03210–14. This document is included in CP's Local Rule 56(e) Appendix as Document No. 45.

7.     Attached to this Declaration as its **Exhibit E** is a true and correct copy of Plaintiff's June 30, 2021 Complaint alleging retaliation in violation of 49 U.S.C. § 20109 filed with the Occupational Safety and Health Administration ("OSHA"). This document was produced in the litigation by CP as CP_02425. This document is included in CP's Local Rule 56(e) Appendix as Document No. 46.

8.     Attached to this Declaration as its **Exhibit F** is a true and correct copy of the August 3, 2022 determination letter from OSHA. This document was produced in the litigation by CP as CP_02421–23. This document is included in CP's Local Rule 56(e) Appendix as Document No. 47.

9.     Attached to this Declaration as its **Exhibit G** is a true and correct copy of the September 26, 2022 Notice of Docketing of Plaintiff's Appeal to the U.S. Department of Labor Office of Administrative Law Judges. This document was produced in the litigation by CP as CP_02418. This document is included in CP's Local Rule 56(e) Appendix as Document No. 48.

**Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.**

Executed on: August 5, 2024                 _/s/ John T. Sullivan_____
                                            John T. Sullivan

# BROTHERHOOD OF LOCOMOTIVE ENGINEERS AND TRAINMEN

GENERAL COMMITTEE OF ADJUSTMENT
CPR-US/METRA NORTH/INDIANA SOUTHERN RR/DM&E
125 E. Lake St., Suite 302 • Bloomingdale, IL 60108

**PETER SEMENEK**
General Chairman

Phone: 630.893.2200
Fax: 630.893.2229
E-mail: chairman@bletgca290.org

**NICK MUGAVERO**
1st Vice Chairman

**JOE RAINWATER**
2nd Vice Chairman

**KYLE DONZE**
3rd Vice Chairman

**PAUL DINAUER**
Secretary Treasurer

May 20, 2021

Mr. Myron Becker
Chief Labor Officer-Labor Relations
Canadian Pacific—US
120 S. 6th Street, Suite 800
Minneapolis, MN  55402

**BLET File:  da-sexton.j.02012021**

Dear Mr. Becker,

This letter represents appeal of General Manager Operations Tom Jared's decision regarding DM&E Employee John Sexton, hereinafter "Claimant," resulting from an Investigation held on February 10, 2021, in connection with the charge quoted below:

> '…alleged failure to stop within half the specified distance given while shoving into track NA04. This incident allegedly occurred at approximately 12:49 hours on February 1, 2021 while working Train 474-31 at Nahant Yard.'

By letter dated February 26, 2021 Superintendent Operations Jared found Claimant to be in violation of GCOR 5.3.7 – Radio Response and assessed Claimant with a twenty (20) day suspension.

## PROCERUAL OBJECTION:

The Organization objects to the to the decision rendered by General Manager Jared, as he wore many different hats throughout the process, making a mockery of the proceedings and denying Claimant his right to a fair and impartial hearing. His decision is prejudiced by the fact that he is the one that initiated the charge against Claimant, he also testified at the hearing as the Carrier witness to support the alleged violation and then subsequently was the judge that determined that Claimant was in violation of the rule he presented at the hearing, thus ratifying his own actions. This in of itself is a fatal flaw warranting the removal of the assessed discipline, as found by Referee Bass in First Division Award 29759.

Without prejudice to the above, it is the position of the Organization that the decision to discipline in the instant case was arbitrary and capricious. The record clearly indicates that after job briefing with his Conductor about the move to be made, Claimant was initially instructed to shove back fifty (50) cars. While in the process of setting out cars into yard Track 4, after shoving approximately twelve (12) car lengths, Claimant was informed that he was good for forty (40) additional cars and that his Conductor needed 15 cars to make a cut. At the time that this transmission was made, General Manager Jared approached Conductor DePover and ordered him not to give Claimant any other instructions.

*A Division of the Rail Conference—International Brotherhood of Teamsters*

**Exhibit 1**

Confidential

CP_00479

Mr. Myron Becker
File: da-sexton.j.02012021
Page 2

Claimant shoved approximately ten (10) additional car lengths (558 feet) when he brought the movement to a stop while simultaneously attempting to contact his Conductor.

General Manager Jared's action was improper and in violation of the Carrier's efficiency testing guidelines. The Carrier must apply the same standard to testing that they expect Claimant to abide by. Therefore, based upon the improperly designed test, the decision to assess discipline in the instant case is unwarranted, as it does not meet the test of just cause (Transcript p. 68, lines 5-19):

| | |
|---|---|
| Mark Johnson (Conducting Officer): | I don't understand how this has to do with whether or not Mr. Sexton or Mr. DePover -- |
| Joe Rainwater (BLET Representative): | *I'll tell you exactly --* |
| Mark Johnson (Conducting Officer): | -- complied with the Rules. |
| Joe Rainwater (BLET Representative): | *Yeah, I'll tell you exactly how it has to do with it. It's because Mr. Jared set up an un -- unsafe and unsanctioned test based on CP's own Rules. If you go to page 107, as noted on the bottom of this, for test GRF02, this test can only be conducted under observation practices. It cannot be set up, there's no provision that allows CP managers to tell a Conductor to stop communicating with the m -- with the Engineer to determine if they're gonna stop in half the range of vision, and there's reasons for that. It sets up an unsafe condition, and it's outside of the normal operating parameters that we have to work under.* |

Without prejudice to the above, if discipline was warranted in the instant case (which it is not), then the assessed discipline must be viewed as harsh and excessive. The record indicates that the instructions that were relayed to Claimant were ambiguous at best in that Claimant was first given a fifty (50) car count. After travelling twelve (12) car lengths, Claimant was told good for forty and then told stop in fifteen (15). These instructions were confusing as none of the counts were even close to half of the last specified distance, nor half the distance Claimant traveled. Claimant clearly applied the intent of the rule which is to stop when there is no further communication (Transcript p. 51, lines 2-13):

| | |
|---|---|
| Justin DePover (Conductor): | *Which was when I was told not to respond to any remarks on the radio yet.* |
| Mark Johnson (Conducting Officer): | Okay. And then under line 53 -- |
| Justin DePover (Conductor): | *Tha -- that was when the train actually came to a stop.* |
| Mark Johnson (Conducting Officer): | Okay. So you gave him 15, clear for 40? |
| Justin DePover (Conductor): | *Yes.* |
| Mark Johnson (Conducting Officer): | Okay. Exhibit 5 was your -- is that a statement that was written by you? |
| Justin DePover (Conductor): | *Yes.* |

Confidential

Mr. Myron Becker
File: da-sexton.j.02012021
Page 3

Transcript p. 56, lines 14-24 and p. 57, line 1:

| Mark Johnson (Conducting Officer): | All right. So a -- after Mr. Sexton inquired to where you were and you were able to respond at the direction of Mr. Jared, did Mr. Sexton continue to ask for you on the radio? |
|---|---|
| Justin DePover (Conductor): | *Yes, he probably asked about three or four times, even after stopped, and then also tried to get ahold of the Yard office to relay for him if he couldn't hear me.* |
| Mark Johnson (Conducting Officer): | All right. So I -- that was even after he stopped. And it sounded like he was concerned for your well-being? Or didn't know what was happening? |
| Justin DePover (Conductor): | *Yeah, he definitely sounded like he had no idea what was going on.* |

Transcript p. 63, lines 16-22:

| Mark Johnson (Conducting Officer): | Okay. Do you know the distance that you had traveled, prior to the math exercise we had? |
|---|---|
| John Sexton (Claimant): | *I do not. Other than your -- the -- the math exercise, no, sir. All I know is I was good for 40 cars, which is 2400 feet. And during the -- the -- previous testimony, what, it was 550 feet that I stopped at? Is that -- is that correct, sir? I think that's what you said.* |

Transcript p. 64, lines 11-14:

| Mark Johnson (Conducting Officer): | So you knew you -- you were gonna have to stop within 15 cars when he gave that instruction? |
|---|---|
| John Sexton (Claimant): | *He told me I was good for 40 cars, but then he changed it to 15. Yes.* |

As moving party to the discipline proceedings, the Carrier in this instance acted unreasonably and unfairly in its decision to assess discipline, to assess discipline based upon a flawed test is illogical. Therefore, we request that all reference of the assessed discipline be removed from Claimant's record and that he be reimbursed for all lost wages including time spent at hearing.

Sincerely,

Peter Semenek
BLET General Chairman

cc:    Joe Rainwater, Local Chairman Division 117
       John Sexton, Claimant

Confidential

CP_00481



Arthur Clark
Superintendent Operations
St. Paul Yard

1010 Shop Rd
St. Paul, MN 55106

**T** (612) 408-8004
E Arthur_Clark@cpr.ca

March 9, 2021



Employee #

Mr.

Notice of formal investigation/hearing was issued you under date of February 18, 2021 in connection with the occurrence outlined below:

"…to determine the facts and circumstances and to place your responsibility, if any, in connection with your alleged failure to stop within half of the last distance specified at Glenwood Yard while working 499-16 at approximately 12:50 on February 16, 2021."

Formal investigation/hearing was conducted on February 24, 2021 to develop all facts and circumstances in connection with the referenced occurrence. Following the conclusion of that investigation/hearing it was determined that the transcript of the investigation/hearing record contains substantial proof that you violated the following Company Rules or Notices: GCOR 5.3.7 – Radio Response.

Based on the facts and evidence in the hearing record and your past discipline history, you are hereby dismissed from the service of the Company.

Please contact the Trainmaster at 651-778-3667 within ten days of receipt of this letter to arrange a time to return all Company property issued to you.

Respectfully,

Arthur Clark
Superintendent Operations
St. Paul Yard

CC:    Labor Relations
       Crew Management
       Employee Services
       Gordon Kepka L/C BLET

Confidential

# Workplace Health & Safety Committee Minutes

## Quad Cities

January 13, 2021



**CP**

## Agenda:

> Call Meeting to Order
> Safety Briefing
> Attendance / Confirm Quorum
> Introduce Guests
> Review Minutes of Previous Meeting / Errors / Omissions
> Motion to Adopt Previous Minutes
> Review Local Stats
> Review Previous Month Incidents
> Safety Hazard / Unsafe Condition Reports
> Safety Plan Activities
> Workplace / Customer Inspections
> SOFA / Planned Peer Observations
> Work Refusals / Right to Challenge
> Taxi Exception Reports
> Old Business
> New Business
> Review Escalated / Tabled Items
> Confirm Date / Time of Next Meeting
> Adjourn

**Meeting Called to Order by:** Dylan Smith

**Quorum:** Yes

**Errors / Omissions Last Month's Minutes:** None

**Motion to Accept Minutes as Submitted / Amended:** J. Sexton, J. Adelfio

## Committee Members:

| Name: | Email: | Phone Number: | Department: | Committee Position: | # of Meetings: | H&S Trained: | Present at Meeting: |
|---|---|---|---|---|---|---|---|
| Adelfio, Joseph | Joseph_Adelfio@cpr.ca | | Mgr | Secretary | 1 | Yes | Yes |
| Billmeyer, Tad | Tad_Billmeyer@cpr.ca | | Mgr, Eng Track / Structure | Member | 0 | No | No |
| Etringer, Patrick | Patrick_Etringer@cpr.ca | | Mgr, Car | Member | 1 | No | Yes |
| Hollar, Nicholas | hollarnicholas@gmail.com | | T&E, Engrs | Member | 0 | Yes | No |
| Hueffmeier, Michael | Michael_Hueffmeier@cpr.ca | | Eng. Track Structure | Member | 0 | No | No |
| Jeffries, Dan | Daniel_Jeffries@cpr.ca | | Eng. Track Structure | Member | 1 | Yes | Yes |
| Knudsen, Mark | Mark_Knudsen@cpr.ca | | Mech, Car | Member | 0 | Yes | No |
| Law, Kevin | Kevin_Law@cpr.ca | | Eng. Track Structure | Member | 1 | Yes | Yes |
| Miller, Mike | millermi52804@yahoo.com | | T&E, Engrs | Member | 1 | Yes | Yes |
| Nolan, Charles | charles_nolan@cpr.ca | | Mgr, Eng Track / Structure | Member | 1 | No | Yes |
| Smith, Dylan | Dylan_Smith@cpr.ca | | Mgr, T&E | Co-Chair | 1 | Yes | Yes |
| Sexton, John | JTSexton1@msn.com | | T&E, Engrs | Co-Chair | 1 | Yes | Yes |
| Wardlow, David | David_Wardlow@cpr.ca | | Eng. S&C | Member | 0 | Yes | No |
| Workman, Weston | Weston_Workman@cpr.ca | | Mgr, Eng Track / Structure | Member | 1 | Yes | Yes |

**Guests:** A. Gibson, T. Houdyshell, J. Vaughn, B. Wold, J. Malek, M. Ortiz, J. Craig

Confidential

## Employees & Geographical Region WHSC Represents:

| Department | Craft Employees Represented WHSC member: | Subdivision Miles Represented: (Include subdivision name and mileage range) | Numbers Represented: Employees | Buildings | Cust |
|---|---|---|---|---|---|
| T&E, Engrs | Hollar, Nicholas | Marquette 96.0-159.0 | 61 | 2 | 5 |
| Eng, Track Structure | Jeffries, Dan | Ottumwa 192.0-297.7; Davenport 192-195 | 17 | 3 | 40 |
| Mech, Car | Knudsen, Mark | Davenport 140.9-195.7 | 15 | 2 | 1 |
| Eng, Track Structure | Law, Kevin | Davenport 140.9-195.7; Ottumwa 195.7-302.8; Eldridge 0.0-9.7; Nitrin 1.8-20.3; Chicago 40.3-141.2; Rockford 12.6-45.3 | 13 | 0 | 0 |
| T&E, Cndrs | Miller, Mike | Davenport 140.9-195.7; Ottumwa 195.7-302.8; Eldridge 0.0-9.7; Nitrin 1.8-20.3; Marquette 0.0-100.0 | 118 | 2 | 40 |
| Eng, Track Structure | Hueffmeier, Michael | Marquette 0.0-159; Owatonna 0.0-85.0; Mason City 0.0-116.7; Sheldon 116.7-253.4; Jackson 43.0-149.4; Tracy 102.5-231.5; Waseca 4.4-102.5; Laredo 302.8-405.1; Kansas City 405.1-498.8 | 34 | 0 | 0 |
| T&E, Engrs | Sexton, John | Davenport 140.9-195.7; Ottumwa 195.7-302.8; Eldridge 0.0-9.7; Nitrin 1.8-20.3; Marquette 0.0-100.0 | 118 | 2 | 40 |
| Eng, S&C | Wardlow, David | Ottumwa/Davenport/Chicago 226.9-41.9 | 6 | 0 | 0 |

**Sub Committee:**

**Local Stats Current Year vs. Previous Year:**

| | T&E | | Engineering | | Mech.-Loco | | Mech.-Car | |
|---|---|---|---|---|---|---|---|---|
| | 2021 | 2020 | 2021 | 2020 | 2021 | 2020 | 2021 | 2020 |
| **FRA Reportable Injuries** | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Non FRA Reportable Injuries** | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 |
| **FRA Train Accidents** | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 |
| **Non FRA Train Accidents** | 2 | 6 | 0 | 0 | 0 | 0 | 0 | 1 |
| **Rule Violations** | 0 | 5 | 0 | 1 | 0 | 0 | 0 | 0 |
| **Motor Vehicle Accidents** | 0 | 3 | 0 | 1 | 0 | 0 | 0 | 0 |

| Date of Last Local Incidents/ | T&E | Engineering | Mech.-Loco |
|---|---|---|---|
| **Number of Days Since:** | Date (Days) | Date (Days) | Date (Days) |
| **Personal Injury** | Oct-19-20  ( 86 ) | Oct-02-19  ( 469 ) | Apr-04-15  ( 2111 ) |
| **Train Accident** | Jan-06-21  ( 7 ) | Jan-03-20  ( 376 ) | Jun-09-11  ( 3506 ) |
| **Rules Violation** | Dec-14-20  ( 30 ) | Apr-18-19  ( 636 ) | (  ) |
| **Motor Vehicle Accident** | May-19-20  ( 239 ) | Mar-09-20  ( 310 ) | (  ) |

| Date of Last Local Incidents/ | Mech.-Car |
|---|---|
| **Number of Days Since:** | Date (Days) |
| Personal Injury | Jun-15-17  ( 1308 ) |
| Train Accident | Feb-29-20  ( 319 ) |
| Rules Violation | (  ) |
| Motor Vehicle Accident | (  ) |

CP_03707

**CP**

## Previous Month's Last Incident / Injury Causes:

### Personal Injuries:

Date:        FRA Reviewed:  Description:

|  | No | No |  |
|---|---|---|---|

### Train Accidents:

Date:        FRA Reviewed:  Description:

| Jan-06-21 | No | Yes | Davenport - Derailed due to bi-passed couplers on 2 empty covered hoppers |
|---|---|---|---|

### Rules Violations:

Date:        Reviewed:    Description:

| Dec-14-20 | Yes | Davenport - Crew was over the speed restriction while having a Tram Rule 2 Train. |
|---|---|---|

### Motor Vehicle Accidents:

Date:        Reviewed:    Description:

|  | No |  |
|---|---|---|

## Safety Hazard / Unsafe Condition Reports:

Description

| Status: | Date: | Department: | Classification: | (include description, action taken by who and when to be completed by): |
|---|---|---|---|---|
| open |  | Other |  |  |

## Safety Framework Activities Completed Last Month:

Description

| Status: | Date: | Department: | (include description, action taken by who and when to be completed by): |
|---|---|---|---|
| open |  | Other | Run Thru Switches - |
| open |  | Other | Slips, Trips, Falls, Sprains & Strains - |
| open |  | Other | Job Briefing/Clear Cab - |

## Workplace Inspections:

Description

| Status: | Date: | Department: | Classification: | (include description, action taken by who and when to be completed by): |
|---|---|---|---|---|
| open |  | Other |  |  |

## Customer / Industry Inspections:

Description

| Status: | Date: | Department: | Classification: | (include description, action taken by who and when to be completed by): |
|---|---|---|---|---|
| open |  | Other |  |  |

Confidential

CP

## SOFA / Planned Peer Observations:

| Status: | Date: | Department: | Employees Observed | Total Observed | At-risk Observed | Description (include description, action taken by who and when to be completed by): |
|---------|-------|-------------|--------------------|----------------|------------------|-----------------------------------------------------|
| open | | Mech.-Car | | | | |
| open | | T&E | | | | |
| open | | Engineering | | | | |

## Risk Assessments Completed:

| Status: | Date: | Department: | Description (include description, action taken by who and when to be completed by): |
|---------|-------|-------------|-----------------------------------------------------|
| open | | Other | N/A |

## Work Refusals / Right to Challenge:

| Status: | Date: | Department: | Description (include description, action taken by who and when to be completed by): |
|---------|-------|-------------|-----------------------------------------------------|
| open | | Other | |

## Taxi Exception Reports:

| Status: | Date: | Department: | Description (include description, action taken by who and when to be completed by): |
|---------|------------|-------------|-----------------------------------------------------|
| open | 2021-01-13 | T&E | PTI - Answering the phone while driving. |
| open | 2021-01-13 | T&E | Luxury Transportation - Had employee in the cab with no mask on. |
| open | 2021-01-13 | T&E | PTI - Conducting interviews on Railroad property West Dav |

## Old Business Review:

| Item Number: | Item Origin: | Old Business Description: | Responsible Person(s): | Status: | Due Date: |
|--------------|--------------------|-----------------------------------------------------|------------------|-----------|------------|
| 2020-11-1 | H&S Com. Member | Le Claire, IA - Can't hear the detectors MP 179.2. | C. Nolan | Completed | 2020-12-31 |
| 2020-11-3 | H&S Com. Member | Mile board going North Deer Creek laying on the ground MP 148 | S. Loyd, N. Lund | Completed | 2020-11-30 |
| 2021-01-1 | H&S Com. Member | Culvert Creek MP 207.3 - Ballast/road bed falling into the creek north of the detector. | S. Loyd/C. Nolan | Open | 2021-02-28 |

## New Business Review:

| Item Number: | Item Origin: | Business Description: | Responsible Person(s): | Status: | Due Date: |
|--------------|--------------------|-----------------------------------------------------|----------|---------|------------|
| 2021-01-3 | H&S Com. Member | Quest Liner Industry - Ces pool buildup outside by gate between the two sets of tracks. (Smells and Bubbles) | C. Nolan | Open | 2021-02-10 |
| 2021-01-4 | H&S Com. | Nahant Yard - Walking conditions due | C. Nolan | Open | 2021-02-10 |

Confidential

CP

| | Member | to snow removal need tending. | | | |
|---|---|---|---|---|---|

## Escalated Item:

| Item Number: | Item Origin: | Escalated Item: | Responsible Person(s): | Status: | Review Date: |
|---|---|---|---|---|---|
| 2020-07-2 | Safety Hazard Rpt. | Classification:Yellow / Class B Dubuque, IA - North Dubuque MP 46 retaining wall south of 3/4 block caving in. (Wes Workman) *UPDATE* Currently waiting for a response on ownership. If it belongs to CP then a plan will need to be made for the fix. | Wes Workman | Open | 2020-11-30 |

## Miscellaneous / Comments:

For January 2021 T&E Footboard is Winter Train Handling; Engineering DSR will be Winter Footwear - Slips, Trips, Falls; Mechanical Safety Meeting will be Hand Tools.

## Next Meeting:

| Place | Date | Time |
|---|---|---|
| Dubuque, IA | February 10, 2021 | 09:00 AM |

| Meeting Adjourned At: | Approved by Management Co-Chair: | Approved by Union Co-Chair: |
|---|---|---|
| 10:23 | Dylan Smith | John Sexton |

End of meeting recap completed?  No

Confidential

## Re: HOME SAFE

**From:**    Tracy L Miller <tracy_l_miller@cpr.ca>
**To:**      Dylan Smith <dylan_smith@cpr.ca>
**Cc:**      Tom Jared <tom_jared@cpr.ca>, Jason M Ross <jasonm_ross@cpr.ca>
**Date:**    Mon, 18 Jan 2021 19:21:25 -0600

What is the plan to communicate factually to sexton and team before their thoughts are spread to everyone?

You and Tom need to get them on the phone together and walk through everything factually vs send emails.

First mistake below is you say the "conductor". You need names and validation for every point made

On Jan 18, 2021, at 5:47 PM, Dylan Smith <Dylan_Smith@cpr.ca> wrote:

Mr. Miller,

As soon as this was escalated, Bill and I interviewed Dan. Also obtained audio from the MOC as well as yard camera footage. We also went through each rule with Dan as well as validated with the MOP.

Rules weren't found to be violated. However there was a constructive conversation regarding Dan performing service.

1.    No Class III air brake test was performed before the train was moved. The intent wasn't to depart. A class 3 wasn't needed at this point during the work.
2.    No Engine Air Brake test was performed on the new leader in the consist before the consist was moved. The CO on the train confirmed a brake test was performed and Dan didn't tell them not to do one.
3.    No 3 points of protection. When Dan was interviewed he stated he didn't break the plane of the rail. 3 point protection wasn't required.
4.    The only radio communication Mr. Chandanais had was in his vehicle, away from the train while he was performing service. This is accurate. Dan stated he didn't have a portable radio and was using the radio in his truck.
5.    Mr. Chandanais did not attach to the crew to perform these tasks, all the while instructing the crew to knowingly violate all the above listed rules.

Initial communication with drill down in red.

All,

While working 575, waiting to leave Ottumwa on 23 December, the following occurred.

What I believe was 474-21 arrived with approximately an hour to work and with engine trouble.

Confidential

CP_03210

The outbound crew, of whom Kelton McBride, is the only one I know, was on duty and instructed by Dan Chandanais to not review any train documentation or TGBOs and get immediately on another engine and be in position to assist the inbound crew in swapping power.

- I reviewed camera footage inside the yard office and observed Kelton McBride and Brent Evenson in the crew room speaking to someone outside the camera footage. No audio is available to confirm the conversation but the crew appears to take instruction then leave the yard office.

- Evenson arrived into crew room at 0908 hours and McBride at 0910 hours. At 0943 hours, crew obtained paperwork then left yard office at 0950 hours.

- Trainmaster Chandanais stated he instructed crew to grab their paperwork and take it out to the engine and review it there as they waited for 474 to arrive.

During the work, Dan instructed the outbound crew to not secure the train, as Dan would be in position to attend the train.

- I reviewed Ottumwa yard camera footage along with audio tapes from 0930-1030 hours and was unable to see or hear any instructions given to any crew regarding attending to a train. (Note: Audio is only recording if the Dispatcher is speaking / listening to that specific tower).

- Trainmaster Chandanais stated he informed the crew he would be in position to attend the train.

The crew then broke the consist to remove the disabled locomotive and insert the new one. They were then instructed to not perform an engine air brake test until all the work was completed and the train pulled to the south end of the yard to clear the BNSF diamond. Once the engines were swapped and the crew tied onto the train, they had a new lead locomotive, in no position to verify a proper class 3 air brake test to move the train.

- No audio tapes nor camera footage was available to substantiate this allegation.

- Trainmaster Chandanais stated he instructed the crew to validate the independent as they were building the outbound power consist. Trainmaster Chandanais instructed them to perform the consist airbrake test once they completed their power moves. Trainmaster Chandanais informed the crew as soon as they could to pull down to the South end of the yard to clear up the BNSF diamond. Trainmaster Chandanais stated he gave no direction or instruction to the crew in regards to the Class III air brake test. Trainmaster Chandanais stated he does not recall specifically all the power moves the crew was to complete as this occurred almost two weeks ago.

Confidential

After the crew, upon instruction, pulled the train into the yard, Dan, without radio or 3 point protection, armed and dumped the EOT for the new lead locomotive.

- No audio tapes nor camera footage was available to substantiate this allegation.

- Trainmaster Chandanais stated he did not have a portable radio at the time but was using his truck radio as he communicated with the crew.  AE McBride asked Trainmaster Chandanais if you wanted to arm the EOT or if you wanted him to come back there.  Trainmaster Chandanais stated he would help them out and pushed the button on the EOT.  The EOT was already affixed to the rear car and Trainmaster Chandanais stated all he did was reach in and push the button.  Trainmaster Chandanais validated with the crew that the EOT was armed, then tested the marker by closing the angle cock ahead of the rear car.  Trainmaster Chandanais stated he did not break the plain nor did  he request three point protection as he had no intentions on breaking the plain.

On top of the rules violations Dan mandated the crew violate, Dan performed service while we still have employees furloughed.

I think we can all agree this needs to stop.

**From:** Tracy L Miller <Tracy_L_Miller@cpr.ca>
**Sent:** Monday, January 18, 2021 3:52 PM
**To:** Dylan Smith <Dylan_Smith@cpr.ca>; Tom Jared <Tom_Jared@cpr.ca>
**Cc:** Jason M Ross <JasonM_Ross@cpr.ca>
**Subject:** FW: HOME SAFE

Guys, what is this about? Was something brought to us that we didn't handle? Who has all the facts?



**Tracy L. Miller**
Senior Vice President Operations
**O** (651)778-3643
**C**
1010 Shop Road
St Paul MN 55106

Confidential

CP_03212

**From:** JOHN SEXTON <jtsexton1@msn.com>
**Sent:** Monday, January 18, 2021 3:27 PM
**To:** Tracy L Miller <Tracy_L_Miller@cpr.ca>; Tracy L Miller <Tracy_L_Miller@cpr.ca>;
Jason_Ross@cpr.ca; Tom Jared <Tom_Jared@cpr.ca>
**Cc:** Steve Glasgow <s_l_glasgow@yahoo.com>; chad01johnson <chad01johnson@gmail.com>
**Subject:** HOME SAFE

This email did not originate from Canadian Pacific. Please exercise caution with any
links or attachments.

The more information I receive from the individuals present during the incident, the more it
becomes clear to me that we have two different sets of rules on the CP. One for labor, one for
management.
If Trainmaster Chandanais had witnessed T&E crews violating so many rules, they would have
received a ride home in his CP company vehicle, which, in spite of CP being a tobacco free
environment, isn't, and pulled out of service immediately pending a full investigation.
How much longer will a double standard be allowed to exist on our Home Safe property?
When I spoke with Superintendent Smith on 13 January 2021, he said Mr. Glasgow had spoken
to him directly and stated that he did not want his name put out as being the individual coming
forward with the information for fear of retribution from Trainmaster Chandanais. I contacted Mr.
Glasgow and he informed me that he had not spoken directly to Superintendent Smith.
Chad Johnson was working as Mr. Glasgow's AE on the day of the incident and tells the exact
same scenario played out during the incident at approximately 0950 on 23 December 2020. Both
employees could not believe what they were hearing play out across the mainline channel.
Where is our Home Safe during this incident? We are told if you see something, say
something. This is being challenged with this correspondence. We are constantly reminded of
Home Safe, about integrity and intestinal fortitude. Where was this during the incident?
There were several critical rules violations made by Mr. Chandanais during this incident that went
against everything we stand for with our Home Safe program. As safety leaders in the field, this
type of behavior from a manager makes us all look bad in the eyes of our fellow employees.
When I hold my footboard job briefings about the topic of the month, I ask my fellow employees
to sign the sheet and include their employee number. I get asked about this incident and all I can
say is there is no defense for what happened that day. The employees on that train were put into
harm's way by the one person whose job it is to ensure their safety. I was given the 3 Whats
bulletin at the last Health and Safety meeting: What? So What? Now What?
The What is:
1. No Class III air brake test was performed before the train was moved.
2. No Engine Air Brake test was performed on the new leader in the consist before the consist
was moved.
3. No 3 points of protection.
4. The only radio communication Mr. Chandanais had was in his vehicle, away from the train
while he was performing service.
5. Mr. Chandanais did not attach to the crew to perform these tasks, all the while instructing
the crew to knowingly violate all the above listed rules.
The So What is:
We all know the effect of Mr. Chandanais careless behavior on that day could have resulted in a
catastrophic event, affecting our fellow employees, their families and the public.
The Now What:
That is why this correspondence is being sent and is up to you.

Confidential

Respectfully,

John Sexton
Union Co-Chair
Quad Cities Health and Safety Committee

Confidential

## **Complaint**

### **Canadian Pacific Railway/Sexton/7-2260-21-066**

This case was initiated on 6/30/2021 by receipt of an allegation from John Sexton (Complainant). Complainant alleges that Canadian Pacific Railway (Respondent) issued a failed efficiency test and pulled Complainant out of service for 20 days on or about February 1, 2021, in retaliation for following safety protocol involving cutting crossings because of snow and ice buildup and reporting three different crew violations to management in late January/early February, 2021. Complainant claims this is in violation of the Federal Railroad Safety Act (FRSA), 49 U.S.C. §20109.

Confidential

**U.S. DEPARTMENT OF LABOR**

Occupational Safety and Health Administration
Kansas City Regional Office
2300 Main Street, Suite 1010
Kansas City, Missouri 64108-2447



August 3, 2022

John Sexton
4624 N Harrison Street
Davenport, IA 52806
jtsexton1@msn.com

Re: Dakota, Minnesota, & Eastern Railroad Corporation dba Canadian Pacific/Sexton/7-2260-21-066

Dear John Sexton:

This is to advise you that we have completed our investigation of the above-referenced complaint filed by you (Complainant) against Dakota, Minnesota, & Eastern Railroad Corporation dba Canadian Pacific (Respondent) on June 30, 2021 under the Federal Railroad Safety Act (FRSA), 49 U.S.C. §20109. In brief, you alleged that Respondent issued a failed efficiency test and pulled you out of service for 20 days on or about February 1, 2021 because you were following safety protocol involving cutting crossings because of snow and ice build-up and reporting three different crew violations to management in late January/early February, 2021.

Following an investigation by a duly-authorized investigator, the Secretary of Labor, acting through his agent, the Regional Administrator for the Occupational Safety and Health Administration (OSHA), Region VII, finds there is no reasonable cause to believe that Respondent violated the FRSA and issues the following findings:

<p align="center"><b>Secretary's Findings</b></p>

On or about February 1, 2021 Complainant contends that he suffered an adverse employment action when issued a failed efficiency test and pulled out of service for 20 days. On June 30, 2021, Complainant filed a complaint with the Secretary of Labor alleging that Respondent retaliated against him in violation of the FRSA. As this complaint was filed within 180 days of the alleged adverse action, it is deemed timely.

Respondent is covered under the FRSA because Respondent is a railroad carrier within the meaning of 49 U.S.C. §20109 and 49 U.S.C. §20102. Respondent provides railroad transportation; in that it transports goods using the general railroad system. Complainant is covered under the FRSA because Complainant is an employee within the meaning of 49 U.S.C. §20109. Respondent is a Class I federally regulated railroad. Complainant was employed a Freight Engineer. Complainant and Respondent are, therefore, covered under FRSA.

As a result of the investigation, the burden of establishing that Complainant was retaliated against in violation of the FRSA cannot be sustained. The available evidence indicates that the employer would have reached the same decision even in the absence of Complainant's protected activity. The evidence

Confidential

demonstrates Complainant was in violation of GCOR 5.3.7: Radio Response and GCOR 6.5 Shoving Movements. The evidence shows that Complainant failed a shoving movement efficiency test and after an investigative hearing, Respondent issued discipline of this violation in accordance with their progressive disciplinary policy. Respondent evidence supports their legitimate, non-retaliatory reason for the adverse employment actions. Furthermore, the investigation did not reveal any animus towards Complainant's alleged protected activities, nor did the evidence reveal that Complainant's alleged protected activities contributed to Respondent's decisions. Therefore, the complaint is dismissed.

Respondent and Complainant have 30 days from the receipt of these Findings to file objections and to request a hearing before an Administrative Law Judge (ALJ). If no objections are filed, these Findings will become final and not subject to court review. Objections must be filed in writing with:

**Primary method - via email to: OALJ-Filings@dol.gov**
**Secondary method (if unable to file via email) - via hard copy submission to:**

Chief Administrative Law Judge
Office of Administrative Law Judges
U.S. Department of Labor
800 K Street NW, Suite 400 North
Washington, D.C. 20001-8002
Phone: (202) 693-7300
Fax: (202) 693-7365

With copies to:

Steven J. Kaplan
Acting Regional Administrator
U.S. Department of Labor, OSHA
2300 Main Street, Suite 1010
Kansas City, MO  64108

And

Dakota, Minnesota &
Eastern Railroad Corporation d/b/a Canadian Pacific
c/o Michelle Sullivan
120 S. Sixth Street, Ste. 800
Minneapolis, MN 55402

In addition, please be advised that the U.S. Department of Labor does not represent any party in the hearing; rather, each party presents his or her own case. The hearing is an adversarial proceeding before an ALJ in which the parties are allowed an opportunity to present their evidence for the record. The ALJ who conducts the hearing will issue a decision based on the evidence and arguments presented by the parties. Review of the ALJ's decision may be sought from the Administrative Review Board, to which the Secretary of Labor has delegated responsibility for issuing final agency decisions under the Act. A copy of this letter has been sent to the Chief Administrative Law Judge along with a copy of your complaint.

Confidential

The rules and procedures for the handling of FRSA cases can be found in Title 29 of the Code of Federal Regulations, Part 1982 (FRSA/NTSSA) and may be obtained at www.whistleblowers.gov.

Sincerely,

KEVIN CRAIN
Assistant Regional Administrator

cc:  Michelle Sullivan, Respondent Representative
     Chief Administrative Law Judge, USDOL
     (FRSA)Federal Railroad Administration

CP_02423

**U.S. Department of Labor**

Office of Administrative Law Judges
800 K Street, NW
Washington, DC  20001-8002

(202) 693-7350
(202) 693-7365 (FAX)



**Issue Date: 26 September 2022**

OALJ Case No.:    2022-FRS-00056
OSHA Case No.     7-2260-21-066

*In the Matter of:*

**JOHN SEXTON,**
        *Complainant,*

v.

**DAKOTA MINNESOTA &**
**EASTERN RAILROAD CORP.,**
**d/b/a CANADIAN PACIFIC RAILWAY,**
        *Respondent.*

## NOTICE OF DOCKETING

This matter arises under the employee protection provisions of the Federal Railroad Safety Act of 2007 ("FRSA"), 49 U.S.C. § 20109, as amended, and the implementing regulations found at 29 C.F.R. Part 1982.  On or about June 30, 2021, Complainant filed a complaint with the Department of Labor's Occupational Safety and Health Administration ("OSHA") alleging Respondent violated the employee protection provisions of the FRSA when he was issued a failed efficiency test and pulled out of service for 20 days in retaliation for following safety protocol involving cutting crossings because of snow and ice build-up and reporting three different crews to management in January/February 2021.

OSHA dismissed the complaint by letter dated August 3, 2022.  Complainant has appealed and OALJ docketed the case on August 4, 2022.  It is not yet assigned to a presiding administrative law judge ("ALJ").  A Notice of Hearing and Prehearing Order will be sent to the parties once the matter is assigned to an ALJ.  You may track the progress of the case using the Case Status Lookup feature on the OALJ website at https://www.dol.gov/agencies/oalj. Until the case is assigned to a presiding ALJ, questions may be addressed to attorney-advisor Madeline Lorang at 202-693-0392 or lorang.madeline.h@dol.gov.

Parties are encouraged to efile with OALJ by using DOL's eFile/eServe System ("EFS") at efile.dol.gov.  Information about creating an EFS account can be located at  https://www.dol.gov/agencies/oalj/EFS.  A Notice of Appearance is required to use EFS.

Confidential

CP_02418

In the meantime, if the case is referred for possible mediation or you wish to request mediation or information on the Alternative Dispute Resolution program, the website contains the appropriate forms as well as contact information at https://www.dol.gov/agencies/oalj/topics/information/SETTLEMENT_JUDGE.

In addition to any of the rules set forth in the statute or implementing regulations governing this case type, the OALJ Rules of Practice and Procedure apply and can be found on the OALJ website at https://www.dol.gov/agencies/oalj/topics/libraries/LIBRULES.   Unless an exemption applies, the parties are required to make initial disclosures within 21 days of the date of this notice without awaiting a discovery request or discovery order. *See* 29 C.F.R. § 18.50(c)(1).   **The initial disclosures should not be filed with this office.**

SO ORDERED:

**STEPHEN R. HENLEY**
Chief Administrative Law Judge

- 2 -

Confidential

CP_02419

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | | |
|---|---|---|
| John Sexton, | ) | |
| | ) | Case No. 23-cv-00031 |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | **DECLARATION OF** |
| | ) | **JASON ROSS** |
| Dakota, Minnesota & Eastern Railroad | ) | |
| Corporation d/b/a Canadian Pacific, a | ) | |
| Delaware Corporation, | ) | |
| | ) | |
| Defendant. | ) | |

COMES NOW I, Jason Ross, and affirm, attest, and declare as follows:

1.      I have been the Senior Vice President of Operations for Soo Line Railroad Company since May 1, 2024.

2.      Prior to that, I was the Vice President of Operations Southern Region for Soo Line Railroad Company from September 1, 2019 until February 15, 2023, and my territory covered Defendant Dakota, Minnesota & Eastern Railroad Corporation d/b/a Canadian Pacific ("CP"). I have personal knowledge of the facts stated herein.

3.      As the Vice President of Operations Southern Region, I was responsible for reviewing and approving employee discipline for employees in my territory.

4.      When I review discipline recommendations, I do not look at the names of employees when deciding discipline; instead, I review the fields of a chart that summarizes the offense, the employee's discipline history, and other objective factors.

5.      In 2021, I reviewed the hearing investigation and the discipline recommendation for Plaintiff John Sexton regarding his failure to comply with Rule 5.3.7 of the General Code of

Operating Rules ("GCOR"). I determined that the appropriate discipline was a twenty-day suspension without pay, which was imposed on February 26, 2021.

6.    My decision to issue a twenty-day suspension to Sexton was entirely unrelated to the events that occurred in Marquette, Iowa, on February 1, 2021, including the discussion between Trainmaster Kurt McKelvey and Sexton related to cutting the tracks, Sexton's refusal to operate the train without first cutting the tracks, and the fact that Sexton and the conductor actually cut the tracks. The fact that Sexton and McKelvey had that disagreement on February 1, 2021 did not in any way motivate my decision to issue a twenty-day suspension to Sexton.

7.    The fact that the 474 train was delayed leaving Marquette on February 1, 2021 did not in any way motivate my decision to issue a twenty-day suspension to Sexton.

8.    My potential 2021 short-term incentive payment absolutely did not in any way motivate my decision to issue a twenty-day suspension to Sexton.

9.    I received emails on January 3, 2021 and January 18, 2021 from Sexton related to a manager's alleged failure to conduct air brake testing and related operational complaints. The supervisor about whom Sexton complained had nothing to do with the failed e-test on February 1, 2021.

10.   The fact that Sexton sent these emails on January 3, 2021 and January 18, 2021 did not in any way motivate my decision to issue a twenty-day suspension to Sexton.

11.   I received an email from Sexton on February 9, 2021 regarding McKelvey driving too fast for the winter road conditions. Sexton also shared his version of the events of the morning of February 1, 2021 in Marquette.

12.   The fact that Sexton sent this email on February 9, 2021 did not in any way motivate my decision to issue a twenty-day suspension to Sexton.

13.    I have reviewed the transcript from the February 10, 2021 investigation hearing into Sexton's violation of GCOR 5.3.7.

14.    Specifically, I read the line of questioning by Local Chairman Joe Rainwater to Sexton related to Tom Jared's administration of the efficiency test on February 1, 2021. Rainwater asked Sexton if Sexton believed Jared violated GCOR 6.5 when he "interrupted" DePover's car counts to Sexton. Sexton responded: "Absolutely. He created a unsafe act."

15.    Sexton's comment at the February 10, 2021 hearing that Jared "created an unsafe act" did not in any way motivate my decision to issue a twenty-day suspension to Sexton.


**Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.**

Executed on: August _1_, 2024

Jason Ross

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | | |
|---|---|---|
| John Sexton, | ) | |
| | ) | Case No. 23-cv-00031 |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | **DECLARATION OF** |
| | ) | **THOMAS JARED** |
| Dakota, Minnesota & Eastern Railroad | ) | |
| Corporation d/b/a Canadian Pacific, a | ) | |
| Delaware Corporation, | ) | |
| | ) | |
| Defendant. | ) | |

COMES NOW I, Thomas Jared, and affirm, attest, and declare as follows:

1.      I am the General Manager – U.S. West for Soo Line Railroad Company and my territory covers Defendant Dakota, Minnesota & Eastern Railroad Corporation d/b/a Canadian Pacific ("CP"). I have personal knowledge of the facts stated herein.

2.      CP is a Class I railroad that provides freight rail transportation services in several Midwest states, including in Iowa through Defendant Dakota, Minnesota & Eastern Railroad, which is an indirect subsidiary of Canadian Pacific Railway Company and controlled by CP.

3.      CP is largely unionized, with many non-management employees represented by various labor unions with which CP has collective bargaining agreements ("CBAs") that govern the terms and conditions of employment for unionized employees.

4.      I have been the General Manager – U.S. West since January 22, 2018.

5.      As the General Manager – U.S. West, I oversee CP's operations in six states, including Iowa. My responsibilities include ensuring safe operations, managing budgets, utilizing assets, developing people, and working with customers.

6.      As an operational leader, it is not uncommon for me to administer efficiency tests in the field to test employees' compliance with operational rules. Currently, I am required to administer at least 12 (twelve) efficiency tests per month.

7.      In 2021, I administered thirteen efficiency tests.

8.      On February 1, 2021, I administered an efficiency test at the Nahant rail yard in Davenport, Iowa.

9.      While visiting the Nahant yard that day, I heard over the radio that the 474-31 train was entering the yard that would be performing a shove movement. I assessed the environment and determined the conditions were safe to administer an efficiency test of the 474-31 crew while they were performing the shove movement.

10.     I did not know Plaintiff John Sexton was the engineer operating the 474-31 at the time I decided to administer the efficiency test. I only learned that Sexton was the engineer after the train stopped and Sexton disembarked.

11.     To the best of my current recollection, before I administered the efficiency test on February 1, 2021, Kurt McKelvey had not told me about any disagreement that he had with Sexton earlier on February 1, 2021.

12.     My decision to administer an efficiency test of the 474-31 crew on February 1, 2021 was entirely unrelated to the events that occurred in Marquette earlier that morning.

13.     The fact that the 474-31 was delayed on February 1, 2021 did not in any way motivate me to administer the efficiency test that day.

14.     My potential 2021 short-term incentive payment absolutely did not in any way motivate my decision to administer the efficiency test on February 1, 2021.

15.    I received emails on January 3, 2021 and January 18, 2021 from Sexton related to a manager's alleged failure to conduct air brake testing and related operational complaints. The supervisor about whom Sexton complained had nothing to do with the failed e-test on February 1, 2021.

16.    The fact that Sexton sent these emails on January 3, 2021 and January 18, 2021 did not in any way motivate my decision to administer the efficiency test on February 1, 2021.

17.    I have worked with Sexton at CP for approximately twenty-five years. Sexton is a self-proclaimed safety advocate and has raised dozens of safety-related concerns to me and other CP managers. I have never administered an efficiency test for Sexton because he raised safety concerns. And I have never recommended discipline for Sexton because he raised safety concerns. In fact, I have viewed Sexton as reliable "eyes on the ground" who will appropriately report safety concerns and rule violations.

**Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.**

Executed on: August 1, 2024

DocuSigned by:

*Tom Jared*

B4E79B06F3DF4F9...

Thomas Jared

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION

John Sexton,

               Plaintiff,

v.

Dakota, Minnesota & Eastern Railroad
Corporation d/b/a Canadian Pacific, a
Delaware Corporation,

               Defendant.

Case No. 23-cv-00031

**DECLARATION OF
JEFFREY MCINNIS**

COMES NOW I, Jeffrey McInnis, and affirm, attest, and declare as follows:

    1.    I am the Assistant Director, Operating Rules & Practices (US) for Soo Line Railroad Company and my territory covers Defendant Dakota, Minnesota & Eastern Railroad Corporation d/b/a Canadian Pacific ("CP"). I have personal knowledge of the facts stated herein.

    2.    I have been the Assistant Director, Operating Rules & Practices (US) since April 25, 2023. Prior to that, I was the Manager Operating Practices – US.

    3.    The operations of CP's railroads are governed by numerous safety rules, regulations, orders, and directives, including the General Code of Operating Rules ("GCOR"), which is a set of operating rules for numerous Class I, Class II, and Class III railroads in the United States intended to enhance railroad safety.

    4.    All CP operating employees, including Plaintiff John Sexton, must comply with the GCOR.

    5.    When working in a rail yard, train crews may perform "shove movements," in which a locomotive is used to push train cars into position on open track where the cars may stay until being connected to a train for transport to their next destination.

6.      When performing a shove, engineers operate the locomotive from the trailing end of the movement, and so rely on one specifically assigned employee protecting the shove to communicate about what is happening at the leading end of the movement.

7.      When performing a shove movement, the employee protecting the movement communicates with the engineer by radio to inform the engineer about the distance remaining before the train must come to a complete stop. The employee protecting the movement typically communicates the distance in "car counts"—the number of car lengths remaining until the train must be stopped.

8.      The GCOR Rule applicable to shove movements is Rule 5.3.7. GCOR Rule 5.3.7 mandates that engineers must be prepared to stop a shove movement within half the number of car lengths last called over the radio, if they receive no further instructions. In other words, if the engineer receives no further communication, he must actually stop the train, and the train must be stopped, within one-half of the number of car lengths that was last transmitted.

9.      For example, if the last car count communicated is forty (40), the engineer must be prepared to have the train at a stop within twenty (20) car lengths.

10.     If the communications include two car-counts in the same communication, the engineer should operate based on the most restrictive car-count. For example, if the conductor says, "Good for forty (40), fifteen (15) to a stop," the engineer should operate based on the fifteen (15) car-count—the more restrictive count.

11.     If the car-count is ambiguous or the engineer is confused, the engineer should immediately stop the shove movement and request clarification.

2

12.     The engineer performing a shove movement is required to listen and follow the directions of the one employee protecting the movement. The engineer is not to consider any other radio messages from other employees who are not specifically attached to the movement.

13.     CP managers are required to test employees on compliance with GCOR. These tests are referred to as "efficiency tests" or "e-tests".

14.     CP's U.S. Efficiency Test Manual for Operating Rules in Compliance with FRA 217.9 provides guidelines regarding the administration of efficiency tests. The guidelines provided in the U.S. Efficiency Test Manual on Operating Rules are not rules and do not set out mandatory procedures for administering efficiency tests.

15.     The guidelines for testing compliance with GCOR 5.3.7 are provided by several tests within CP's U.S. Efficiency Test Manual, including: Test GRA01 Hand Signals or Signal Disappearance (included in the "Stop" test group), Test GRF02 Shoving or Pushing Movements (included in the "Switches – Derails – Protecting Shoves and Equipment Foul of Adjacent Tracks" test group), and Test GR03 Lieu of Hand Signals (included in the "Railroad Radio" test group).

16.     When administering efficiency tests, the testing officer may alter the conditions of the task being performed to force the employee to comply with the rule being tested.

17.     For example, when administering Test GRA01, Test GRF02, or Test GR03 to test compliance with GCOR Rule 5.3.7, the testing officer may instruct the conductor to stop communicating with the engineer over the radio. By altering the conditions of the task being performed—intentionally cutting off radio communication after the last instruction provided—the testing officer is able to determine of the engineer complies with GCOR Rule 5.3.7 and stop the movement within half the number of car lengths last transmitted.

3

18.    This type of "set up" test is consistent with the guidelines set out in CP's Efficiency Test Manual for Test GRA01, Test GRF02, or Test GR03.

19.    When a testing officer enters a failed e-test into the system, the testing officer enters one test code, even if more than one test code could have applied to the test performed. If more than one test code is entered, it would appear as though the employee failed more than one e-test.

**Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.**

Executed on: August _5_, 2024

Jeffrey McInnis

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | | |
|---|---|---|
| John Sexton, | ) | |
| | ) | Case No. 23-cv-00031 |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | **DECLARATION OF** |
| | ) | **JUSTIN DITTRICH-BIGLEY** |
| Dakota, Minnesota, & Eastern Railroad | ) | |
| Corporation d/b/a Canadian Pacific, a | ) | |
| Delaware Corporation, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

COMES NOW I, Justin Dittrich-Bigley, and affirm, attest, and declare as follows:

1.    I am the Assistant Director, Labor Relations for Soo Line Railroad Company d/b/a Canadian Pacific ("CP"). I have personal knowledge of the facts stated herein.

2.    I have been the Assistant Director, Labor Relations since March 28, 2024. Prior to that, I was the Manager Labor Relations.

3.    As the Assistant Director, Labor Relations, I am responsible for labor agreement negotiations with the labor unions, mediation with the unions, and arbitration with the unions related to employee discipline and alleged violations of the labor agreements.

4.    While I was Manager Labor Relations, my responsibilities included labor agreement negotiations, mediation, and arbitration related to employee discipline and alleged violations of the labor agreements for the Dakota, Minnesota & Eastern Railroad Corporation d/b/a Canadian Pacific territory.

5.    The collective bargaining agreements between CP and the labor unions set out the procedural requirements and processes related to employee discipline.

6.      Effective November 1, 2018, CP's Hybrid Discipline & Accountability Guidelines provide the process for issuing discipline consistently and fairly.

7.      CP's Hybrid Discipline & Accountability Guidelines provides for a range of outcomes depending on the severity of the rule violation—for example, Non-Major Offences and Attendance versus Major – Life Threatening & Conduct Unbecoming Offences—the employee's discipline record, and whether the employee immediately reports the incident, takes proper protective actions following the incident, and/or acknowledges responsibility.

8.      If discipline is assessed, it is CP's policy to document discipline in the employee's discipline record.

9.      During my deposition in this case, I was asked about several instances of employee discipline. The attorney taking my deposition showed me a discipline letter for employee T.P. (Exhibit 67); an investigation hearing transcript for employee T.P. (Exhibit 68); an Acknowledgment of Responsibility ("AOR") letter (also known as a "waiver") for employee T.V. (Exhibit 69); an AOR for employee D.C. (Exhibit 70); an investigation letter for employe G.H. (Exhibit 71); and a letter of reprimand for employee G.H. (Exhibit 72).

10.     Since my deposition, I have re-familiarized myself with the circumstances surrounding the discipline of employees T.V. and T.P.

11.     On July 16, 2019, engineer T.V. violated GCOR Rule 5.3.7, which is a Major – Life Threatening & Conduct Unbecoming Offence. T.V. was issued a twenty-day suspension, with five (5) days served and fifteen (15) days deferred. T.V. acknowledged responsibility for the rule violation and agreed to waive the right to a formal investigation hearing. The assessment of discipline for T.V.'s July 16, 2019 rule violation falls within the range of disciplinary

2

consequences that may be assessed for a Major – Life Threatening & Conduct Unbecoming Offence pursuant to CP's Hybrid Discipline & Accountability Guidelines.

12.     On January 7, 2021, engineer T.P. violated GCOR Rule 5.3.7, which is a Major – Life Threatening & Conduct Unbecoming Offence. T.P. was issued a twenty-day suspension, with ten (10) days served and ten (10) days deferred. T.P. immediately acknowledged and took accountability for his rule violation. The assessment of discipline for T.P.'s January 7, 2021 rule violation falls within the range of disciplinary consequences that may be assessed for a Major – Life Threatening & Conduct Unbecoming Offence pursuant to CP's Hybrid Discipline & Accountability Guidelines.

13.     Since my deposition, I re-familiarized myself with the circumstances surrounding the discipline issued to employee J.M. I was not asked about employee J.M. at my deposition.

14.     On February 16, 2021, engineer J.M. violated GCOR Rule 5.3.7, which is a Major – Life Threatening & Conduct Unbecoming Offence. J.M. was dismissed from employment with CP. J.M. had several Major rule violations on his discipline record, including a January 13, 2021 incident for which J.M. was issued a thirty-day "last chance" suspension. The assessment of discipline for J.M.'s February 16, 2021 rule violation falls within the range of disciplinary consequences that may be assessed for a Major – Life Threatening & Conduct Unbecoming Offence pursuant to CP's Hybrid Discipline & Accountability Guidelines.

15.     I have also reviewed documents relevant to the discipline issued to Plaintiff John Sexton on February 26, 2021.

16.     On February 1, 2021, Sexton violated GCOR Rule 5.3.7, which is a Major – Life Threatening & Conduct Unbecoming Offence. Sexton was issued a twenty-day suspension. The assessment of discipline for Sexton's February 1, 2021 rule violation falls within the range of

3

disciplinary consequences that may be assessed for a Major – Life Threatening & Conduct Unbecoming Offence pursuant to CP's Hybrid Discipline & Accountability Guidelines.

**Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.**

Executed on: August _5_, 2024

Justin Dittrich-Bigley

4