# EXHIBIT A

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                FOR THE SOUTHERN DISTRICT OF IOWA

3                        EASTERN DIVISION

4    _____

5    John Sexton,

6             Plaintiff,

7     v.             Case No:  3:23-CV-00031-HCA

8

9    Dakota, Minnesota & Eastern Railroad

10   Corporation d/b/a Canadian Pacific, a

11   Delaware Corporation,

12            Defendants.

13   _____

14              DEPOSITION OF JOHN SEXTON

15                  OCTOBER 31, 2023

16                    9:00 a.m.

17

18   _____

19

20

21             File # MW 6278989

22

23

24

25        COURT REPORTER:  Christina DeGrande

1  A.  Twice.
2  Q.  When was the first time that you met with your
3  attorneys about today's deposition?
4  A.  Last evening.
5  Q.  And where was that meeting?
6  A.  At the restaurant.
7  Q.  How long did you meet with your attorneys last
8  night?
9  A.  Hour, 45 minutes, maybe.
10  Q.  And then you said that was the first time you met
11  with them.  When was the second time you met with
12  them?
13  A.  This morning.
14  Q.  How long was that meeting?
15  A.  About an hour, 45.
16  Q.  At any point in advance of today's deposition, did
17  you speak with any coworkers about the fact you were
18  going to be deposed in this lawsuit?
19  A.  Absolutely not.
20  Q.  Did you review any documents while you were
21  preparing for the deposition, specifically during
22  the meetings with your lawyers?
23  A.  No.  I don't need to.
24  Q.  So no, you did not review any documents?
25  A.  No, no.

1  Q.  I see you've got a note in front of you.
2  A.  I do.
3  Q.  What is on that note?
4  A.  Respectfully, it's none of your business.
5  Q.  Well, in fact, because this is a deposition, it is
6  my business.  It is something you're looking at
7  during your sworn testimony, so I would like a copy
8  of that note.
9       MR. MAGNUSON:  It's protected by
10  attorney/client privilege.
11       THE WITNESS:  No.  It's something I
12  wrote to myself.  It's --
13  BY MR. SULLIVAN:
14  Q.  So it's a note that you wrote to yourself?
15  A.  Correct.
16       MR. MAGNUSON:  Pursuant to my orders.
17       THE WITNESS:  Correct.
18       MR. MAGNUSON:  So it's attorney/client
19  privileged.
20  MR. SULLIVAN:
21  Q.  Did you review any documents that you have in your
22  possession prior to today's deposition to prepare
23  for this deposition?
24  A.  No.  I don't need to.
25  Q.  Have you searched for documents to -- to give to

1  your lawyers in response to requests for documents
2  from the railroad?
3  A.  I don't understand your question.
4  Q.  Over the course of this litigation, we've received
5  some documents that appear to be documents that you
6  gave to your lawyers and then they gave to us.  Do
7  you remember searching for documents in response to
8  requests for documents --
9  A.  Yeah.
10  Q.  -- over the course of the litigation?
11  A.  Yes.
12  Q.  Have you found everything that you've been asked to
13  search for?
14  A.  Unsure.
15  Q.  Can you think of something you've been asked to
16  search for that you have not found?
17  A.  Not at this time.
18  Q.  Have you provided all of the documents that you have
19  found to your lawyers to be provided to the
20  railroad?
21  A.  Yes.
22  Q.  Have you ever been a party to a lawsuit before?
23  A.  No.
24  Q.  Ever have the pleasure of having your deposition
25  taken before?

1  A.  No.
2  Q.  When you did you start working for DM&E, Mr. Sexton?
3  A.  It was actually the IMRL.  It's March 22nd, 1999.
4  Q.  What does "IMRL" stand for?
5  A.  The I stood for Iowa, Illinois; the M stood for
6  Missouri, Minnesota; the R for Rail; the L for Link;
7  Iowa, Illinois, Missouri, Minnesota Rail Link owned
8  by Montana Rail Link.
9  Q.  Were you an engineer when you joined the railroad?
10  A.  No.
11  Q.  What position did you hold when you first joined the
12  Railroad in 1999?
13  A.  Brakeman.
14  Q.  How long were you a brakeman?
15  A.  Nine months.  Brakeman, foreman, went right to
16  engine service.
17  Q.  Engine service, is that another way of saying
18  engineer?
19  A.  That's when you go to -- yeah, the engineer class,
20  pass a series of tests and then qualify as a
21  locomotive engineer, correct.
22  Q.  When were you first qualified as a locomotive
23  engineer, approximately?
24  A.  Mid-2000.  Wasn't there very long.
25  Q.  And you've been an engineer ever since the year

Page 14

1    2000?
2    A.  Correct.  Sorry.  Correct.
3    Q.  What are your responsibilities as an engineer?
4    A.  Safety.  Number one, safety.  Cannot express that
5        enough.
6    Q.  What else?
7    A.  Performing my duties as -- as asked --
8    Q.  What are those?
9    A.  -- in a safe manner.
10   Q.  What are those duties?  For someone who doesn't
11       necessarily understand the details of your job, what
12       do you do on a -- during a shift as an engineer,
13       generally?
14   A.  I operate a locomotive.
15   Q.  Do you operate a locomotive on the same -- in the
16       same region all of the time?
17   A.  Yes.
18   Q.  And what region is that?
19   A.  Right now, it's the Davenport area, Iowa.
20   Q.  Who do you report to?
21   A.  That's a broad question, sir.
22   Q.  Who is your next level supervisor, if you know?
23   A.  There's many assistant train -- whoever's the
24       manager on duty.  I mean, that's a broad question.
25       I can't answer that.

Page 15

1    Q.  So it would depend on the shift?
2    A.  Whoever the manager on duty is, you report to.  I
3        can't answer that.
4    Q.  The answer is, the manager on duty --
5    A.  Correct.
6    Q.  -- is the person who you report to?
7    A.  Yes.
8    Q.  You mentioned the testing that you go through to
9        become an engineer.  So describe that for me.  What
10       is -- how extensive is -- is the testing that's
11       required to -- to earn an engineer certificate?
12   A.  Well, there's extensive testing, written tests.  You
13       have to pass tests to where you are qualified on
14       your territory, and you have to pass what's called a
15       check ride every single year, and every three years,
16       you have to retake all the tests that you take --
17       you took to become an engineer.  It's called the
18       continuing education.
19   Q.  And that's to keep your certification current and
20       effective?
21   A.  Yes.
22   Q.  Is it possible to -- to lose certification?
23   A.  Yes.
24   Q.  How does that happen, generally?
25   A.  By not being -- not following the safety rules,

Page 16

1    easiest way possible.
2    Q.  Have you served in any leadership or committee roles
3        during your time with the railroad?
4    A.  Specify.
5    Q.  Yeah.
6        MR. MAGNUSON:  Objection, vague.
7    BY MR. SULLIVAN:
8    Q.  The -- so, for example, the Health and Safety
9        Committee, have you ever served on that?
10   A.  Absolutely.
11   Q.  How long have -- well, first, tell me what that is.
12       What is the Health and Safety Committee?
13   A.  Health and Safety Committee is a group of safety
14       leaders that are out of a certain jurisdiction of
15       the railroad, who are willing to go around and hold
16       job briefings with fellow employees, and they sign a
17       monthly safety job briefing form after you conducted
18       a job briefing with them and that they understand
19       everything you said that I will sign it and put
20       their employee number on it as well.  They turn it
21       in at the end of the month.  Then we get our new
22       safety topic at the end of month.  We turn that in
23       and do it all over again.
24   Q.  You said you get the new topic at the end of the
25       month.  So where does the Health and Safety

Page 17

1    Committee receive the safety topics from?
2    A.  Not sure.  It generally comes from someone in
3        Canada.  Used to be Scott Sutherland, but he since
4        retired.  I don't know who holds his position now.
5    Q.  But effectively, it comes from CP management
6        somewhere?
7    A.  Oh, yes.
8    Q.  And so the -- the Health and Safety Committee isn't
9        selecting its own topics.  It's something that is
10       sort of -- that they're asked to review and deal
11       with from management; is that a fair summary?
12   A.  And so to add in that -- yes, it is, and to add in
13       that, it also is seasonal, in that, like, summertime
14       not having a heat stroke.  In the summertime, when
15       there's storms, lightening storms or what have you,
16       how to seek proper shelter, in wind how to seek
17       shelter.  Seasonal, a lot of it is, and if there has
18       been a lot of incidents in the past, then they will
19       bring that to the table as a safety topic.
20   Q.  So I imagine Iowa's climate isn't that much
21       different than Minnesota, so wintertime, ice and
22       snow, significant safety issue?
23   A.  Yes.
24   Q.  Springtime, I know you have a route that goes near
25       the Mississippi River, so water levels and barge

5 (Pages 14 - 17)

Page 22

1    attention to page 45. There's a stamp in the lower
2    right-hand corner there that says, "CP256," if that
3    makes it easier to find.
4    A.  I'm there.
5    Q.  So Article 29 relates to investigations and
6    discipline. Do you see that title?
7    A.  Yes.
8    Q.  And subsection B, I'll just read the first sentence.
9    "No employee shall be disciplined without a fair
10   hearing (investigation by an officer of the
11   company.)" Did I read that correctly?
12   A.  Yes.
13   Q.  And so according to the CBA, discipline is properly
14   assessed after a hearing; is that correct?
15         MR. MAGNUSON: Objection, foundation.
16         THE WITNESS: Yes.
17         MR. MAGNUSON: Go ahead.
18         THE WITNESS: That's what it says.
19   BY MR. SULLIVAN:
20   Q.  And that's how you understand the rules of the CBA?
21   That's what you understand the rules of the CBA to
22   be?
23   A.  Supposed to be.
24   Q.  Supposed to be. And is it your understanding that
25   you and other employees are not to be disciplined

Page 23

1    without a hearing?
2    A.  Without a fair and impartial.
3    Q.  Without a fair and impartial hearing?
4    A.  Yes.
5    Q.  If you could take a look at the next page,
6    subsection G. Just take a look at that paragraph
7    for a moment, and let me know when you've had a
8    chance to review it. So part G of Article 29
9    provides you and other covered employees the right
10   to appeal a discipline decision; is that right?
11   A.  Yes.
12   Q.  And in the case of the suspension and the decision
13   to suspend you or another covered employee is later
14   found to be unjust, then you or the other employee
15   would be reinstated and made whole for time lost.
16   Is that a fair summary of this section as you
17   understand it?
18   A.  Yes.
19   Q.  And there's a reference in this paragraph back to
20   Article 28, which I'll ask you to turn to. It's on
21   the page that is CP254 in the lower right-hand
22   corner just a couple pages prior.
23   A.  Page 43.
24   Q.  That's right. Well, so Article 28 begins on page
25   42, correct?

Page 24

1    A.  Yes.
2    Q.  And the -- generally speaking, the CBA allows for
3    further appeals of disciplinary decisions through a
4    CP process that the union would engage in; is that
5    your understanding?
6    A.  Clarify.
7    Q.  I'll strike that. Once an employee has -- I'll
8    strike that again. You and other covered employees
9    are able to pursue cases to arbitration before the
10   Public Law Board; isn't that correct?
11   A.  Yes.
12   Q.  And is it your understanding that the Public Law
13   Board's decision is binding on both the union and
14   the railroad after it has made a decision?
15   A.  That is my understanding, yes.
16   Q.  And that arbitration process is the step after the
17   CBA process is completed; is that your
18   understanding?
19   A.  I don't understand your question.
20   Q.  Well, so the -- the CBA provides for a grievance
21   process, correct?
22   A.  Yes.
23   Q.  And if at the end of that grievance process the
24   union wants to pursue the matter further, then they
25   can bring an appeal to the Public Law Board; is that

Page 25

1    your understanding?
2    A.  Yes.
3    Q.  And then after that proceeding, the decision of the
4    Public Law Board is binding on the union and on the
5    railroad; is that what you understand?
6    A.  I'm not sure what you mean by that.
7    Q.  That their decision is final?
8    A.  No.
9    Q.  What do you mean it's not final?
10   A.  What do you mean it is final?
11   Q.  Well, I'm asking the question. So do you believe
12   that a decision of the Public Law Board, when
13   rendered, is something that the railroad must abide
14   by?
15   A.  Yes, but not final.
16   Q.  What else would happen that could make it be not
17   final, in your view?
18   A.  Not sure.
19   Q.  Okay.
20   A.  You asked me a question that's it's final, so could
21   you --
22         MR. MAGNUSON: And if you don't know,
23   you don't know.
24         Objection, lack of foundation.
25

7 (Pages 22 - 25)

Page 26

1    BY MR. SULLIVAN:
2    Q.  So you don't know if it's final or not?
3    A.  No.
4        (Exhibit 2 was marked for
5        identification.)
6    BY MR. SULLIVAN:
7    Q.  Mr. Sexton, I'm showing you what's been marked as
8        Exhibit 2.  Take as much time as you want to review
9        that.  Do you recognize that document?
10   A.  Yes.
11   Q.  What is it?
12   A.  It's the GCOR, the General Code of Operating Rules.
13   Q.  What is the GCOR?
14   A.  The General Code of Operating Rules.
15   Q.  What is the purpose of the GCOR, in your
16       understanding?
17   A.  These are the rules that we adhere to on a daily
18       basis.
19   Q.  And when you say, "We," you mean engineers?
20   A.  T&E employees, train and engine service employees.
21   Q.  Is it your understanding that this -- that the GCOR
22       applies to only to CP, or does it apply to other
23       railroads as well?
24   A.  Multiple railroads that -- there's a directory in
25       here that all railroads that adopted the GCOR.  On

Page 27

1        pages CP284, 285, 286, there's a list of railroads
2        all the way to 287 that adopt the GCOR.
3    Q.  And DM&E is one of those railroads, correct?
4    A.  It's listed, yes.
5    Q.  And you agree that as a -- as an engineer, you are
6        responsible for knowing the GCOR; is that correct?
7    A.  Yes.
8    Q.  And you're responsible for following the rules set
9        out in the GCOR; is that also true?
10   A.  Yes.
11   Q.  Before we get into the specific issues that were the
12       basis for the lawsuit, I want to talk briefly,
13       generally, about the rule that is at issue here,
14       5.3.7.  That is on the page CP319.
15   A.  You said 5.3.7, correct?
16   Q.  That's right.  Could you please explain to me your
17       understanding of what GCOR 5.3.7 requires?
18       MR. MAGNUSON:  Do you want to just read
19       the rule?
20   BY MR. SULLIVAN:
21   Q.  Well, why don't you start there.  If you could read
22       the rule.
23   A.  "5.3.7, radio response.  When radio communication is
24       used to make movements, crew members must respond to
25       specific instructions given for each movement.

Page 28

1        Radio communications for shoving movements must
2        specify the direction of distance and must be
3        acknowledged when distance specified is more than
4        four cars."
5    Q.  And then there's further text in a box, correct?
6        Could you read that?
7    A.  "Movement must stop within half the range as
8        specified" -- start over.  "Movement must stop
9        within half the distance specified unless additional
10       instructions are received."
11   Q.  What does it mean, in your understanding, to stop
12       within half the distance specified?
13   A.  Do you want a scenario?
14   Q.  Sure.
15   A.  If you give me a 50-car count -- I'm the engineer.
16       I must stop within 25 cars.  If I don't stop within
17       25 cars, then you're in violation of the -- it's
18       basically restricted speed, also.
19   Q.  Let's break that apart for a second.  So the
20       restricted speed, what does that mean?
21   A.  The ability to stop half the range of vision.
22   Q.  What is -- could you explain that?
23   A.  Just like I said.  If you told me to -- I'm good for
24       50 cars, I must be able to stop within 25 cars,
25       nothing else.

Page 29

1    Q.  Fair enough.  And that's the -- so when the rule
2        says, "Unless additional instructions are received,"
3        that would be what you just said, unless you hear
4        something else; is that a fair translation --
5    A.  Yes.
6    Q.  -- of that part of the rule?
7    A.  Yes, sir.
8    Q.  And so if a -- does this rule only apply in
9        situations where the engineer can't see the space
10       into which he or she is shoving a train?
11   A.  The restricted speed or radio response 5.3.7.
12   Q.  Radio response only 5.3.7?
13   A.  Well, it kind of covers both.  Second sentence,
14       "Radio communication for shoving movement."  So kind
15       of covers both there.  So the only time you would be
16       talking on the radio would be when that person is
17       protecting a shove, it's called, because, obviously,
18       I can't see 50 cars behind me, so he would be my
19       eyes.
20   Q.  And then I'm giving you --
21   A.  Car counts.
22   Q.  -- car counts?  So if the person who is giving you
23       car counts said your scenario was 50 cars, then you
24       would be required to be counting and ensuring that
25       the train stops after 25; is that accurate?

8 (Pages 26 - 29)

Page 94

1　A.　Main line authority in.  That means you hold the
2　　　main line down to the south end of the yard to
3　　　Wapello Avenue.  And then we had to wait for B6 to
4　　　meet with the local.  They were doing work, whatever
5　　　they were doing to complete their tasks.  And then
6　　　that was when -- after they cleared the crossovers
7　　　for us to cross over the industry track, then it was
8　　　our turn to set out our cars.
9　Q.　And do you remember the tracks that you were
10　　　directed to set out cars on?
11　A.　If I remember correctly, it was Nahant 4, but don't
12　　　hold me to it.
13　Q.　Do you remember if it was Nahant 4 and then also
14　　　Nahant 2.  Would that be a call that could happen?
15　A.　We had to set out on engine, so I -- I -- I don't
16　　　remember.  I don't remember.
17　Q.　But you think it would -- you have some recollection
18　　　that Nahant 4 was a place where you set out cars?
19　A.　I believe so.  I mean, I'm not a hundred percent
20　　　sure.  I don't -- I don't remember.
21　Q.　So it's my understanding that you did start to shove
22　　　cars on to track 4.  This is when the shove test was
23　　　set up.  So I'm hoping you could --
24　A.　"Set up" being the correct word.
25　Q.　I'm hoping you can tell me what happened, as you

Page 95

1　　　remember it.
2　A.　Well, before -- of course, before we even done this
3　　　waiting for B60 to clear, I have what I call rolling
4　　　job briefings all the time because work changes
5　　　constantly, whether it's dispatch or -- it changes
6　　　all the time on here.  And I have rolling job
7　　　briefings.  So when the B60 was doing their thing,
8　　　this was Mr. DePover's first trip back.  He was
9　　　furloughed for nine, ten months, I don't remember.
10　　　He was gone for a while.  This was his first trip
11　　　back.  I was reacquainting him on the way up to
12　　　Marquette with all that -- all the, you know, the
13　　　sightings with the cars out, all that stuff, what to
14　　　look out for, close clearance, all that stuff.
15　　　　　When we were at the south end of Nahant, we had
16　　　to wait for the B60 to clear, and then we were
17　　　instructed to shove 4 track or 2 track, whichever
18　　　one it was.  We had set out an engine as well.  I
19　　　don't remember what track was set out, the engine 2
20　　　or -- I'd have to look at my notes or my email
21　　　because that's -- that was what I would recall.  But
22　　　we -- we were -- we had a job briefing after B60
23　　　cleared while they were working, and when we -- it
24　　　was our turn, I contacted Tony Cruciani, who was the
25　　　conductor on the RC70 job, to have him in position

Page 96

1　　　to protect my shove.  I believe it was 4 track we
2　　　shoved the cars on now that we're talking about it,
3　　　but -- and Mr. Cruciani was in position on the north
4　　　end of 4 track.  4 track was a clear track, meaning
5　　　no cars were on the track at the time.
6　Q.　And so did Mr. Cruciani go into position then to
7　　　protect the shove onto track 4?
8　A.　Yes.
9　Q.　What happened next?
10　A.　Mr. Cruciani told me he was in position on the north
11　　　end of 4.  You're good for 50 cars, and we were
12　　　shoving in 27 or so.  And we shoved the south end of
13　　　the yard.  Mr. DePover got off at the clearance
14　　　point, and I slowed down for him to get off safely.
15　　　We detained, and then we put our cars on the 4
16　　　track.
17　Q.　How many cars?  Do you remember?
18　A.　Twenty-seven I think it says.
19　Q.　And so are you -- you said that you were told, "Good
20　　　for 50."
21　A.　Cars.
22　Q.　And we'll get to the transcript of the hearing in a
23　　　bit, but is it possible that it was good for 40?
24　　　Does that sound accurate?  Do you have any
25　　　recollection?

Page 97

1　A.　I'd have to -- I'd have revisit that.  I mean,
2　　　they're -- I -- I don't know.  So we'll have to
3　　　revisit it.
4　Q.　Okay.  So it's -- but it's possible you were told,
5　　　"Good for 40"?
6　A.　Could be.
7　Q.　What does "Good for 40" mean?
8　A.　The track is clear, and you're good for 40 cars to
9　　　his location to the foul point.
10　Q.　Okay.  So he's -- so there's 40 car lengths between
11　　　the first car that you're shoving to where he is; is
12　　　that right?
13　A.　Yes.
14　Q.　And so just so I understand kind of bringing back
15　　　what we talked about before the radio response rule.
16　　　If that was all you knew, that you're good for 40,
17　　　then your responsibility would be to stop within 20;
18　　　is that right?
19　A.　1 -- 21, within half the range of vision.
20　Q.　So --
21　A.　I always go one more car, but yes.
22　　　　　MR. MAGNUSON:  On the safe side.
23　　　　　THE WITNESS:  Absolutely, on the safe
24　　　side.
25　　　BY MR. SULLIVAN:

25 (Pages 94 - 97)

Page 102

1    rule because it says, "Within --
2    A.  I'm not -- yeah.  I'm not going to step on that.
3        Yeah.
4    Q.  But --
5    A.  I'm going to err on side of the safety.  I'm not
6        going to do that.
7    Q.  You're going to go within the requirements of the
8        rule?
9    A.  I'm going to probably one step above.
10   Q.  Okay.
11   A.  Yeah.  I'm not going to put myself in that
12       situation.  That's not the intent, just to be safe.
13   Q.  So on the -- well, so there was other testimony at
14       the hearing that the -- a full command was, "Good
15       for 40 with 15 cars to a stop."  What does that
16       mean?
17   A.  So if I stopped, you know -- or 19 cars, you know,
18       shoving in 19, I still got 21 cars.  It's more than
19       half.
20   Q.  And the rule says, "Within half"?
21   A.  Within half.
22   Q.  And you keep saying, "More than half."  So if it's
23       within half, that would be --
24   A.  A violation.
25   Q.  Well, within half would be in compliance with the

Page 103

1    rule because it says within --
2    A.  I'm not -- yeah.  I'm not going to step on that.
3        Yeah.
4    Q.  But --
5    A.  I'm going to err on side of the safety.  I'm not
6        going to do that.
7    Q.  You're going to go within the requirements of the
8        rule?
9    A.  I'm going to probably one step above.
10   Q.  Okay.
11   A.  Yeah.  I'm not going to put myself in that
12       situation.  That's not the intent, just to be safe.
13   Q.  So on the -- well, so there was other testimony at
14       the hearing that the -- a full command was, "Good
15       for 40 with 15 cars to a stop."  What does that
16       mean?
17   A.  You're talking about two different people.
18   Q.  Okay.  Well, what -- what does -- if we drop the,
19       "Good for 40" and only focus at that --
20   A.  No, no.  "Good for 40" would be Mr. Cruciani at the
21       north end of 4 track.
22   Q.  Okay.
23   A.  "15 cars to the stop" would be Mr. DePover at the
24       clearance point of the south end of the yard, sir.
25   Q.  So tell me about that.  So you mentioned that you

Page 104

1    slowed down so Mr. DePover could dismount the train
2    Safety.  Then what happened?
3    A.  And then he gave me his car count, whatever his car
4        count was.  And I still had Mr. Cruciani at the
5        north end of the yard.  He would update me, Mr.
6        Cruciani would.  You know, he said, "Good for 50" or
7        40 or whatever he said.  He was giving constant
8        updates, Cruciani.
9    Q.  And Mr. DePover was also speaking to you, correct?
10   A.  He did initially.
11   Q.  So let's talk about Mr. DePover's counts to you.
12       What do you remember about Mr. DePover's counts to
13       you?
14   A.  I'd have to revisit that because I don't want to
15       misspeak.
16       MR. MAGNUSON:  We're going to have to
17           go through the transcript.
18       THE WITNESS:  I just -- I don't want to
19           misspeak.  That's --
20   BY MR. SULLIVAN:
21   Q.  So when did you come to learn that Tom Jared had
22       administered a shove test on February 1st, 2021?
23   A.  After I stopped the train.
24   Q.  What happened after you stopped the train?
25   A.  Then DePover got on the radio and said something

Page 105

1    about Mr. Jared was testing us.  I don't remember
2    the exact phrasing.
3    Q.  And then you -- you had already said you were short
4        an hour, so you proceeded to get everything stopped
5        and tied off.  Is that -- did that --
6    A.  No.  And I think that was the -- I think we had
7        seven minutes to work.  It was we were really
8        cutting it close.
9    Q.  Okay.
10   A.  And no idea what --
11   Q.  Did you speak with Mr. Jared on February 1st, 2021?
12   A.  Yes.
13   Q.  Tell me about that conversation.  What happened?
14   A.  Well, we went -- we were in the train master's
15       office at Nahant depot, and he claimed that I
16       violated the shove move, and -- that's what he
17       claimed.
18   Q.  Okay.  Did you say anything in response to that?
19   A.  Yes.
20   Q.  What did you say?
21   A.  I said I didn't violate any shove move.
22   Q.  What did he say in response to that, if you
23       remember?
24   A.  He was very adamant about that I did, and I think he
25       forgot I had Mr. Cruciani on the north end of the

27 (Pages 102 - 105)

Page 118

1  Q. So you had -- there was no concern in your mind
2     about what might be going on with Mr. DePover?
3  A. What my concern was, like I said earlier, is whether
4     his battery died, his antenna loosened, or his
5     microphone malfunctioned. It happens all the time.
6     So I stopped the train.
7  Q. I'm sorry. So you did stop the train?
8  A. I did.
9  Q. Why didn't you stop it immediately?
10 A. I -- I still had to -- well, number one, I -- we
11    were moving. There's no -- you can't -- you don't
12    just push a brake like you push a brake on your
13    truck. Doesn't happen.
14 Q. Yeah.
15 A. It takes awhile to stop, number one. And I was
16    calling -- number one, I was having a conversation
17    with Mr. Cruciani as I was reaching out to the ATM
18    as well, and then when I couldn't get anyone to
19    relay, Mr. Cruciani was still protecting my shove.
20    Then I stopped.
21 Q. Why did you stop when you stopped?
22 A. Because I could not hear Mr. DePover anymore.
23 Q. How long were you out of contact with Mr. DePover
24    before you stopped, if you remember?
25 A. I don't remember.

Page 119

1     MR. SULLIVAN: Why don't we take about
2     a ten-minute break? I want to get organized
3     here.
4        (A recess was had from 1:32 p.m. until
5     1:49 p.m.)
6        (Exhibits 9 through 11 were marked for
7     identification.)
8  BY MR. SULLIVAN:
9  Q. Mr. Sexton, I'm going to give you three related
10    exhibits; Exhibit 9, Exhibit 10 and Exhibit 11,
11    which relate to the disciplinary hearing, in
12    particular. So start with Exhibit 9. This is ten,
13    and 11. So Mr. Sexton, the document that's marked
14    as Exhibit 9, do you recognize that document?
15 A. Yes.
16 Q. It's the notice of the disciplinary hearing that was
17    eventually held on February 10th; is that right?
18 A. Appears to be, yes.
19 Q. And Exhibit 10 is the thicker document in front of
20    you. Do you recognize that?
21 A. Transcript from the investigation.
22 Q. Okay. So that's the transcript of that
23    February 10th hearing?
24 A. Yes.
25 Q. And it may not be clear on the face of it, but do

Page 120

1     you recognize Exhibit 11 as the exhibits that were
2     presented as -- at the hearing all in a packet
3     together?
4  A. Yes.
5  Q. So I want to talk about the hearing. And you
6     testified at the hearing; is that right?
7  A. Yes.
8  Q. It's my understanding that unlike today, you're --
9     the statements at the hearing were not specifically
10    under oath; is that correct?
11 A. Yes.
12 Q. But did you tell the truth at the hearing?
13 A. One hundred percent.
14 Q. And from your point of view, was it important to the
15    process that everyone at the hearing tells the
16    truth?
17 A. Yes.
18 Q. I'd like to talk about the -- take up the issue that
19    we started to talk about, the "Good for 40, stop
20    after 15 conversation." So in the hearing
21    transcript, I'd like you to turn to the page that's
22    marked in the lower right-hand corner, CP79.
23 A. Okay.
24 Q. So just take a look at that for a second just to
25    familiarize yourself. I know it's kind of deep into

Page 121

1     the transcript.
2  A. What part are we talking about, sir?
3  Q. So this is -- you see line 3. You see your name is
4     kind of dead center on the page?
5  A. Yes.
6  Q. So you understand what follows line 3 on this page
7     CP79 is the transcript of the questions and answers
8     that were posed to you at the hearing?
9  A. Yes.
10 Q. The beginning of the questions and answers that were
11    posed to and given by you at the hearing, I should
12    say?
13 A. Yes.
14 Q. So in -- I'll summarize some of this, but line 16
15    into line 18, Mr. Johnson asks, and you confirm that
16    you were given a 50, 5-0 car count as the initial
17    count. Do you see that?
18 A. I do, and I was.
19 Q. And so when you say you was -- that you were -- that
20    was what you were given as the initial count on
21    February 1st?
22 A. Yeah.
23 Q. And then he asks you, "And what was the next
24    instruction you were given over the radio?" And so
25    your response to that was, "Believe it was good for

31 (Pages 118 - 121)

Page 122

1   -- still good for 40, 15 -- 15 cars to a stop with
2   emphasis on 'good for 40.'"  Did I read that
3   correctly?
4   A.  You did.
5   Q.  Is that testimony accurate still today?
6   A.  Yes.
7   Q.  And so after the 50-car count, you were given
8   updated information; is that accurate?
9   A.  The 40, yes.
10  Q.  So there's two pieces of that.  There's "Still good
11  for 40," and then you also say, "15 cars to a stop."
12  So I think we've covered what "Good for 40" means.
13  What does "15 cars to a stop" mean?
14  A.  That was the amount of cars we were setting out on
15  the track.
16  Q.  So is that -- am I accurate or is it accurate to
17  say, then, that while there was space for 40 cars,
18  your instruction was to place 15 cars into that 40
19  car space?
20  A.  Yes.
21  Q.  Do you recall after you were given the 15-car count
22  how many cars you actually moved into that space?
23  A.  I don't recall.
24  Q.  If there was testimony at the hearing that it was 11
25  cars that moved into the 15-car space, would -- do

Page 123

1   you have any reason to disagree with that?
2   A.  No.
3   Q.  Just as you sit here today, you can't confirm or
4   deny whether it was 11; is that fair?
5   A.  That's correct.
6   Q.  So I want to understand how the rule of 5.3.7, "Stop
7   within half the distance" language that we talked
8   about before applies to the 15-count movement.  So
9   if you were told move -- shove 15 cars into a track,
10  and that is the last thing you hear, how many cars
11  -- or what is the number of cars that you should
12  stop within to remain in compliance with 5.3.7?
13  A.  My last direction was 40 cars, sir.  Let's get
14  this --
15       MR. MAGNUSON:  Just going to object
16  with an incomplete hypothetical.  Let's
17  stick to the facts.
18       THE WITNESS:  There was 40 cars, sir,
19  15 to a cut.  And then if -- even if I went
20  11 cars or whatever, I was still in
21  compliance with 5 after he got 7.
22  BY MR. SULLIVAN:
23  Q.  So you said, "15 to a cut."  This is "15 cars to a
24  stop."  Is there a difference?
25  A.  It's -- it's basically -- it's -- we're splitting

Page 124

1   hairs here.  It's basically the same thing.
2   Q.  Your statement at the hearing was that the last
3   direction you heard was, "Still good for 40, 15 cars
4   to a stop," correct?
5   A.  Yes.
6   Q.  So part of the instructions you were given were, "15
7   cars to a stop," correct?
8   A.  Yes.
9   Q.  Those words meant something?
10  A.  Yes.
11  Q.  And so when you think only of those words, what is
12  the number of cars that may be moved and remain in
13  compliance with 5.3.7?
14  A.  Twenty-one.
15  Q.  Twenty-one is six more than fifteen, so you're
16  saying that --
17  A.  Good for 40 --
18  Q.  -- you can move 21 cars on a 15-car count and it was
19  in compliance with the rules?
20  A.  Good for 40, 15 to a stop or cut.
21  Q.  My question was, is it your testimony that you, as
22  an engineer, can move 21 cars after hearing a 15-car
23  count and remain in compliance with 5.3.7?
24  A.  That's -- you're making --
25  Q.  That's --

Page 125

1   A.  I'm -- it's not -- sir, that's not -- that's not how
2   it happened.
3   Q.  My question --
4   A.  No.
5   Q.  So I want to go back to the question.
6   A.  No.
7   Q.  So 15 -- the direction was, "15 cars to a stop,"
8   right?
9   A.  "Good for 40, stop in 15."
10  Q.  And so focus on the "Stop in 15."  If that's all
11  that you heard, what is the appropriate distance to
12  stop and remain in compliance with 5.3.7?
13  A.  That's not all I heard.
14       MR. MAGNUSON:  Objection, incomplete
15  hypothetical.
16  BY MR. SULLIVAN:
17  Q.  And -- but go on and answer the question.  If that
18  was all that you heard -- we can ask hypotheticals.
19  If that was all that you heard, what is the
20  appropriate distance to stop within and remain
21  within compliance of 5.3.7?
22  A.  Twenty cars.
23  Q.  So if you hear a 15-car count, you can go 20 --
24  A.  No.
25  Q.  And my question is related to 15, not to 40.  I

32 (Pages 122 - 125)

Page 126

1    understand your position on 40.
2    A.  That's not the way railroad communications work,
3        sir.  "Good for 40, stop in 15," period.
4            MR. CRAMER:  He's asking a
5        hypothetical.
6            THE WITNESS:  That's not the way it
7        works.
8            MR. CRAMER:  We -- object to the
9        hypothetical.
10           MR. MAGNUSON:  But you still have to
11       answer the question.
12   BY MR. SULLIVAN:
13   Q.  If he were given the command, "15 to a stop," what
14       does that mean?
15   A.  "Good for 40, stop in 15," I'm -- I'm good for 20
16       cars.
17   Q.  You were given the command --
18   A.  If only -- if all I heard was, "15 cars"?
19   Q.  If all you heard was, "15 to a stop," what does that
20       mean?
21   A.  But that's not all what I heard.  It would be 7 1/2
22       cars.  But that's not all what I heard was, "15 to a
23       stop," but that's not the case.
24   Q.  I understand that's your position, but if -- if all
25       you had heard was, "15," I want to clarify.  I

Page 127

1    understand --
2            MR. MAGNUSON:  That's not his position.
3        It's the undisputed testimony of witnesses
4        here.
5            MR. SULLIVAN:  And that is a speaking
6        objection that is worthy of being struck.
7        We can move on.
8            (Exhibits 12 and 13 were marked for
9        identification.)
10   BY MR. SULLIVAN:
11   Q.  Mr. Sexton, I'm showing you exhibits marked 12 and
12       13.  Do you recognize the document that's marked as
13       Exhibit 12?
14   A.  Yes.
15   Q.  And what is the document that's marked as
16       Exhibit 12?
17   A.  Certified Mail for the discipline that was handed
18       out by the general manager, Jared.
19   Q.  In Exhibit 13, do you recognize that?
20   A.  Yes.
21   Q.  What is Exhibit 13?
22   A.  The Public Law Board award.
23   Q.  The Public Law Board award that sustained the
24       union's claim related to -- the -- the discipline
25       that you received in Exhibit 12?

Page 128

1    A.  Yes.
2    Q.  And as a result of the Public Law Board decision
3        that is marked as Exhibit 13, your 20-day
4        suspension, that was delivered to you in Exhibit 12
5        was undone; isn't that right?
6            MR. MAGNUSON:  Objection, form.
7            THE WITNESS:  I'm not sure what you
8        mean, sir.  Sorry.
9    BY MR. SULLIVAN:
10   Q.  The -- the union's claim was that your discipline
11       was unjustified; is that correct?
12   A.  Yes.
13   Q.  And the claim that the union made to the Public Law
14       Board was sustained, correct?
15   A.  Yes.
16   Q.  And the discipline that you received in Exhibit 12
17       was reversed; is that correct?
18   A.  Yes.
19   Q.  And the -- you originally had received a 20-day
20       suspension; is that true?
21   A.  Yes.
22   Q.  And that was an unpaid suspension, wasn't it?
23   A.  Yes.
24   Q.  And after the Public Law Board's decision that is
25       included as Exhibit 13, you were paid for the

Page 129

1    20 days that you had missed; isn't that correct?
2    A.  Yes.
3    Q.  Are you aware of any other union proceedings that
4        related to your 20-day suspension that followed the
5        Public Law Board's decision?
6    A.  I'm not sure what you mean, sir.
7    Q.  Did anything else happen?  Did the union do anything
8        else, as far as you're aware, after it received the
9        Public Law Board's decision?
10   A.  Not sure.
11   Q.  Was the -- is it fair to think of the Public Law
12       Board's decision as a win for the union?
13   A.  The win for John is what it is, and yes.
14   Q.  "Win for John," meaning you?
15   A.  Yes.
16   Q.  And a loss for the railroad, correct?
17   A.  No, it's not.  No, that's not correct.
18   Q.  The final set of materials I want to cover with you,
19       Mr. Sexton, are the specific allegations that are
20       being made in the litigation against the railroad.
21       Is the -- the Public Law Board is Exhibit 13?
22           MR. MAGNUSON:  13.
23           (Exhibit 14 was marked for
24       identification.)
25   BY MR. SULLIVAN:

33 (Pages 126 - 129)

Page 130

1  Q.  I'm showing you what's been marked Exhibit 14.  Have
2      you seen that document before?
3  A.  Yes.
4  Q.  Do you understand that to be -- to include -- well,
5      what is the document as you understand it?
6  A.  It's my case to be brought up and heard in front of
7      a jury, hopefully.
8  Q.  Well, and do you understand that this specific
9      document is a set of formal answers that you made to
10     specific formal questions that the railroad asked of
11     you over the course of litigation?
12 A.  Yes.
13 Q.  And on page 1, there's a title, "Plaintiff's
14     Interrogatory Answers," and then Interrogatory
15     Number 1 is set out.  Do you see that?
16 A.  Yes.
17 Q.  And you understand that interrogatory is basically a
18     lawyer way to say "question"?
19 A.  Okay.  I do now.  Thank you.
20 Q.  Okay.  So the question number 1 that was posed here
21     was to identify each and every adverse employment
22     action allegedly taken by respondent that you
23     contend violated 49USC Section 20109.  Do you see
24     that?
25 A.  I do.

Page 131

1  Q.  There's probably a lot of ways to define it, but an
2      adverse employment action, for purposes of my
3      questions, is something that affected you at work in
4      a particularly negative way.  Can you accept that
5      definition for the purposes of these questions?
6  A.  Yeah, yes.
7  Q.  And so the -- the question here was for you to
8      identify the -- the negative actions that occurred
9      to you because you -- that -- that you claim
10     violated federal law, fair?
11 A.  Okay.
12 Q.  And I count five that you identified on here.
13 A.  Okay.
14 Q.  So the first is on page 2 on February 1st,
15     effectively that Mr. Jared performed the shove test
16     related to the movements in the Nahant yard and that
17     that was an adverse employment action?
18 A.  Yes.
19 Q.  So do you agree that is one of the adverse
20     employment actions you assert in this lawsuit?
21 A.  Yes.
22 Q.  On page 3, there's -- well, forgive me.  Beginning
23     on the bottom of page 2, the -- there's a second
24     adverse employment action that's identified, and it
25     is the February 4th letter that notified you of the

Page 132

1      disciplinary hearing.  Is that the second adverse
2      employment action you allege in this hearing?
3  A.  Isn't it at the bottom of page 3, sir?
4           MR. MAGNUSON:  Just --
5           THE WITNESS:  Sorry.
6  BY MR. SULLIVAN:
7  Q.  So at the bottom of page 2 of this document, it
8      says, on February 4th, 2021, "CP Railway noticed
9      Mr. Sexton that it would be conducting a
10     disciplinary hearing against him."  Do you see that?
11 A.  Yes.
12 Q.  And then it continues on to the top of page 3.
13     "This described action by CP Railway," and it goes
14     on effectively to assert that was an adverse
15     employment action?
16 A.  Yes.
17 Q.  So that -- the receipt of the letter, the
18     February 4th letter, is an adverse employment action
19     is that your position?
20 A.  Yes.
21 Q.  The third adverse employment action is described in
22     the paragraph that begins on page -- first paragraph
23     that begins on page 3 of this exhibit.  "On
24     February 10th, CP Railway held an investigation."
25     So it was the investigation on February 10th that

Page 133

1      was a third adverse employment action; is that
2      accurate?
3  A.  Yes.
4  Q.  And then the next paragraph, "On February 26th, the
5      issuance of the 20-day suspension," that's a fourth
6      adverse employment action; is that true?
7  A.  Yes.
8  Q.  The fifth is set out in this paragraph that says,
9      "On or around the time of each of the above-named
10     events, CP Railway notes these things on
11     Mr. Sexton's record creating a potential for
12     blacklisting."  Is the potential for blacklisting an
13     adverse employment action, in your view?
14 A.  Yes.
15 Q.  So that's five that we've gone through.  Are there
16     any adverse employment actions that you claim you
17     sustained or suffered as a result of conduct that
18     violated federal law on the part of CP?
19 A.  The embarrassment of all this going to investigation
20     over something that shouldn't even be investigated.
21     My fellow employees looking at this when everyone
22     knows I'm one of the biggest safety advocates on
23     this property.  It's embarrassing.
24 Q.  So the -- that's a -- sounds like that's an impact
25     of the investigation and the disciplinary

34 (Pages 130 - 133)

Page 138

1  Q.  I want to ask you about what's described as the
2      potential for blacklisting.  Do you understand that
3      the Public Law Board's decision removed the 20-day
4      suspension from your disciplinary record at CP?
5  A.  I do, but it doesn't remove the fact that going
6      through all this still doesn't -- it tarnishes my
7      reputation.  It tarnishes my safety record.  It
8      tarnishes me as a man doing my job safely as a
9      railroader.
10 Q.  Setting those -- and just putting those two things
11     apart for the moment, specifically your disciplinary
12     record at CP, you understand the 20-day suspension
13     is no longer listed as a discipline on that; is that
14     correct?
15 A.  Yes.
16 Q.  So you think that these five things that we've
17     talked about, the five adverse employment actions
18     were caused by you reporting the snow and ice to
19     Kurt McElvey on February 1st at the job briefing in
20     the -- in Marquette?
21 A.  It was direct -- it was directly because I refused
22     to -- I was ordered to get on the train and get the
23     hell out of here, and I did not comply with his --
24     he wanted me to violate a safety regulation, and I
25     did not do it.

Page 139

1  Q.  And so what evidence is there that your report of
2      the snow caused the shove test that is the first
3      adverse employment?
4          MR. MAGNUSON:  Objection, incomplete
5      hypothetical, misstates his prior testimony.
6  BY MR. SULLIVAN:
7  Q.  You can answer the question.
8  A.  Ask me again, please.
9  Q.  So you -- it's -- well, let's go back for a second.
10     What evidence is there that your conversation and
11     interaction with Kurt McElvey about cutting
12     crossings on February 1st caused the shove test that
13     you alleged is an adverse employment action in this
14     lawsuit?
15         MR. MAGNUSON:  Exact same objections,
16     misstates his prior testimony back to the
17     very last question.
18         THE WITNESS:  Can I answer?
19 BY MR. SULLIVAN:
20 Q.  Please answer.  The objections don't -- unless
21     Mr. Magnuson directs you not answer a question,
22     please answer my question.
23 A.  I don't know how it works.  Sorry.
24 Q.  We didn't cover that earlier.
25 A.  Other than Mr. McElvey was -- he was physically

Page 140

1      upset.  He was angry about it.
2  Q.  So what is it about him being angry that you believe
3      caused the shove test?
4  A.  Because I had to go out there and -- and number one,
5      I didn't listen to him because he wanted me to
6      violate a safety -- a safety rule, and I did not --
7      I did not do it.  I refused to go out there and just
8      get the hell out of there, get on your train and get
9      the hell out of there like he wanted me to do.  I
10     went out there, and I cut the crossings.  He didn't
11     want me to.  He was physically angry.  I could tell
12     by the look on his face.  And it's all about the
13     initial terminal delay.
14 Q.  So how did the initial terminal delay cause the
15     disciplinary hearing that you say was an adverse
16     employment action?
17 A.  Because I -- when they had their numerous conference
18     calls that following day, whether he emailed or
19     called whatever, we're trying to get the
20     documentation on that, I'm sure that was brought up,
21     and I'm sure they were -- they were not happy that I
22     did not listen to Mr. McElvey and violate that
23     safety -- safety regulations.  You know, and I did
24     go out there and cut the crossings, and he was not
25     happy.  And I'm sure -- as soon as -- as soon as I

Page 141

1      left there, he made phone calls, emails, instant
2      messages or texts, whatever he did.
3  Q.  We covered that before.  You believe those things
4      happened, but you have no personal knowledge that
5      any one of those things happened, correct?
6  A.  I can almost guarantee it.
7  Q.  And I understand that you believe you can almost
8      guarantee it, but you have no personal knowledge
9      that Kurt McElvey told anyone else about what
10     happened that morning?
11 A.  That's the way the railroad works.  The initial
12     terminal day, if you go above standard, they
13     escalate it.  That's what it's called, escalate to
14     the next manager.
15 Q.  And so --
16 A.  And they -- and they -- they want to drill down
17     and get to why this was delayed or what happened.
18     And he was physically angry and upset.  It was all
19     over his face.
20 Q.  And you believe that that anger at you is the thing
21     that got communicated to other people, correct?
22 A.  When it got escalated because he had to because it
23     was --
24 Q.  And my question is --
25 A.  -- over their standard.

36 (Pages 138 - 141)

Page 142

1  Q.  And my question is, you believe it was the anger
2      that was specifically directed at you and your
3      specific actions that got communicated to other
4      people, correct?
5  A.  Because I did not -- yes, because I did not follow
6      his direction when he wanted me to violate safety
7      regulations.
8  Q.  And you -- you believe that happened, but you have
9      no personal knowledge that it actually did, correct?
10 A.  I'd put my career on it.
11 Q.  But you might lose that bet because you don't have
12     any personal knowledge as to whether it actually
13     happened, correct?
14         MR. MAGNUSON:  Objection, form.
15         BY MR. SULLIVAN:
16 Q.  You weren't on any phone call where you heard Kurt
17     McElvey tell anyone else about his interaction with
18     you, correct?
19 A.  No, but I know how the railroad operates.
20 Q.  Right, but you weren't on any phone call where you
21     heard him communicate about your interaction.  When
22     you think about the connection between your
23     interaction with Kurt McElvey and -- do you believe
24     that that also caused the disciplinary hearing that
25     you say is an adverse employment action in this

Page 143

1      case?
2  A.  That's what -- that's the whole reason why we're all
3      sitting here today.
4  Q.  Is the disciplinary hearing?
5  A.  It -- actually, it's me cutting the crossing is why
6      we're here today and me not -- me not listening to
7      him and just get on -- get on the train and get the
8      hell out of there, I did not follow his directions,
9      and I went out there because he wanted me to violate
10     a safety regulation, and I did not do it.  That's
11     the whole reason why we're here today.
12 Q.  So in Exhibit 15, which is the lawsuit, paragraphs
13     21 through 25 each begin with the phrase, "Mr.
14     Sexton engaged in a protected activity."  What do
15     you understand a, quote, "Protected activity" to
16     mean in the context of this lawsuit?
17         MR. MAGNUSON:  Objection, calls for a
18     legal conclusion.
19         BY MR. SULLIVAN:
20 Q.  You can answer.  What do you understand "Protected
21     activity to mean in the context of this lawsuit?
22 A.  The -- not sure.
23 Q.  Well, so let's look at paragraph 21, which goes from
24     page 4 to page 5 of Exhibit 15.  Paragraph 21 talks
25     about an email that you sent on January 3rd, 2021,

Page 144

1      about some events that occurred on December 3rd,
2      2020, do you see that?
3  A.  I do.
4  Q.  So the lawsuit is taking the position that the
5      January 3rd email is protected activity for purposes
6      of this lawsuit.  Do you agree with that?
7  A.  Yes.
8         (Exhibit 16 was marked for
9         identification.)
10        BY MR. SULLIVAN:
11 Q.  Mr. Sexton, showing you what's been marked
12     Exhibit 16.  Do you recognize Exhibit 16, or any
13     part of it, I should say?
14 A.  Yes.
15 Q.  So it looks like from about halfway down, a little
16     more than halfway down on the first page of
17     Exhibit 16, which is numbered CP1688, there are
18     emails from you to Jeff McInnis and then also an
19     email that appears to be sent from you to yourself.
20     Do you see that?
21 A.  I cc'ed Paul Baker who was in -- who was the Manager
22     of Rules at that time, yes.
23 Q.  Is this the January 3rd email that reported what the
24     lawsuit says were several hazardous safety or
25     security issues that occurred on or around

Page 145

1      December 3rd, 2020?
2  A.  Yes.  I received this from another employee.
3  Q.  Who did you receive it from?
4  A.  Steve Lasko and Chad Johnson were the crew that
5      brought this to my attention.
6  Q.  And when you say, "this," I'll point you --
7  A.  This email on page 2, sir, of this Exhibit 16.
8  Q.  Thank you.  That's what I was going to ask.  So the
9      -- that initial January 3rd email forward Dan -- and
10     I don't know how to pronounce his last name.
11 A.  Chandanais.
12 Q.  Chandanais.  So that is a -- is the email that's
13     included in Exhibit 16 on the second page, is that
14     something that was sent to you by someone else and
15     then you forwarded it on?
16 A.  Yes.
17 Q.  And -- understood.  So you forwarded it along to
18     Jeff McInnis and Paul copying Paul Bicha?
19 A.  Bicha.
20 Q.  Bicha.  So on the -- on the message that is on the
21     on the bottom of the second page of Exhibit 16, you
22     didn't write that; is that true?
23 A.  That is 100 percent true.
24 Q.  Okay.  And the events that are described in the
25     message that was sent to you, did you personally

37 (Pages 142 - 145)

Page 146

1    observe any of them?
2    A.   No.
3    Q.   They were reported to you by this other crew, is
4         that correct?
5    A.   Yes, because at the time, I was the cochairman, the
6         union cochairman for the Quad Cities Health and
7         Safety Committee.  And they knew that I would
8         escalate it to find out what's going on here, and
9         that's exactly what I did.
10   Q.   I see.  Do you have any knowledge one way or the
11        other whether Mr. McInnis or Mr. Bicha investigated
12        the allegations that are set out here?
13   A.   Other than -- this is the first time I've seen this
14        cover page.  Other than that, sir...
15   Q.   So other than the message between the two of them,
16        you have no knowledge one way or the other?
17   A.   Yes, sir.
18   Q.   So do you think this January 3rd email that's
19        included as Exhibit 16 had anything to do with Tom
20        Jared's decision to conduct a shove test in the --
21   A.   Yes, yes.
22   Q.   How did this email connect to Tom Jared's decisions
23        on February 1st?
24   A.   What -- what this did was it into play a five call
25        conference call between Tom Jared, Dylan Smith --

Page 147

1         I'll wait until you write them down -- Tom Jared,
2         Dylan Smith, Steve Lasko, Tom Johnson, and myself
3         discussed this matter in depth, and it -- it took
4         awhile for us to get -- you know, get five
5         railroaders on a conference call.  It's a miracle.
6         We got it done sometime early January, and we
7         discussed this, and they tried to basically -- you
8         know, it was -- it was a joke, actually.  The call
9         was a joke.  And they -- they tried to -- they --
10        they tried to make Dan look like he was not
11        violating anything.  And, obviously, it might appear
12        that was there.  He violated a lot of cardinal
13        rules, and if we were to do that as T&E employees,
14        we would be terminated.  It's all about getting the
15        train out of the yard.  It's all about the initial
16        terminal delay.  It's what we're all about.
17   Q.   So you were on a conference call with Tom Jared and
18        some others?
19   A.   Five-way conference call.
20   Q.   And they -- they were in response to this email, it
21        sounds like?
22   A.   That is correct.  You can pull that up on Teams.
23        I'm sure you guys have it.
24   Q.   And how does that have anything to do with the shove
25        test decision you said before was caused by the

Page 148

1    delay earlier on February 1st?
2    A.   The managers don't like when you are -- when, number
3         one, when they have an initial terminal delay like
4         this or the one that I incurred at Marquette.
5    Q.   So how does that connect to Tom Jared's decision to
6         perform a shove test involving you on February 1st
7         at the Nahant yard?
8    A.   It added to all of it.
9    Q.   And what information would you point to that
10        supports that claim?
11   A.   Because I brought this to their attention as the --
12        as the cochairman of the Health and Safety Committee
13        and they -- and they don't -- they don't like it.
14        Nothing was done.  He violated several cardinal
15        rules in here, and we had a five-way conference
16        call, and nothing was done.  They tried to sweep it
17        it under the rug.  They'd done their best to make it
18        look like Mr. Chandanais did not violate any rules,
19        and I pulled out the GCOR, and I'm like, this is --
20        this is what happened.
21   Q.   So what's the connection between all of that and the
22        February 4th discipline and the disciplinary hearing
23        and the discipline that -- excuse me.  The
24        February 4th disciplinary notice, the disciplinary
25        hearing, and the discipline that was issued?

Page 149

1    A.   It's all part of it.
2    Q.   How?
3    A.   It's all a part of the whole thing.  They don't like
4         anything being brought to their attention with the
5         fellow manager when it's coming to an initial
6         terminal delay because it -- it affects their bonus
7         when it's -- when their bonus time comes.  That's
8         what it's all about.
9    Q.   I know you believe that.  But what do you point to
10        that -- what other evidence is there that shows
11        that's the case, other than your personal belief?
12   A.   That's the way it is.
13   Q.   So there's a January 18th email referenced in the
14        complaint.  It's on paragraph 22, page 5 of
15        Exhibit 15.
16   A.   I'm there.
17        (Exhibit 17 was marked for
18        identification.)
19        BY MR. SULLIVAN:
20   Q.   Showing you what's been marked Exhibit 15.
21        MR. MAGNUSON:  17.
22        MR. SULLIVAN:  God, I'm sorry.  I'm
23        sorry.  Thank you for correcting that.
24        BY MR. SULLIVAN:
25   Q.   Exhibit 17, which has been referred to in

Page 158

1    breaking every rule in the book?
2    Q.  The 18th is the one that follows up and where Mr.
3        Mr. Jared and Mr. Miller both responded to you
4        about.
5    A.  Oh.
6    Q.  So what evidence is there that connects that -- your
7        January 18th email that's included in Exhibit 17 to
8        the -- to CP's decision to issue the disciplinary
9        hearing notice?
10   A.  Did you personally take the time to read my email,
11       sir?
12   Q.  I'm asking the questions, and I -- with all due
13       respect, my question was, what evidence is there to
14       connect the content and the fact that you sent this
15       email to your later discipline?
16   A.  Because of that email, period.
17   Q.  Because you sent the email, you were disciplined?
18   A.  It's part of it.  It's -- it's part of it.
19   Q.  Why did you believe that?
20   A.  Because it's very -- it's very self-explanatory.
21       All you gotta do is read it.
22   Q.  Are you aware of other people who have where written
23       similar emails?
24   A.  I'm sure they have.  I'm not sure.  I mean,
25       possibly.  I don't know, but they -- my fellow crew

Page 159

1        -- my fellow employees brought it to my attention
2        because they knew I would take care of it and
3        escalate it.  When you do that, they don't like it.
4        They put a target on your back.  All you gotta do is
5        read it.
6    Q.  And so did -- when Tom Jared conducted the shove
7        test, did he say, "I'm doing this because of the
8        emails you were sending in January"?
9    A.  I couldn't tell you what Mr. Jared said, sir.
10   Q.  Did he say that to you?  Do you remember him
11       saying --
12   A.  He didn't say it to me.
13   Q.  Did Mr. Jared tell you, I'm doing that because of
14       what you said this morning, the interaction between
15       and you Kurt McElvey?
16   A.  He didn't say that to me either, but...
17   Q.  At the discipline hearing, did it come out that the
18       reason you were being discipline was because of the
19       January emails?
20   A.  No.
21   Q.  When the decision was made to issue the 20-day
22       suspension, what evidence is there that that
23       decision was influenced or affected by the
24       January 3rd or the January 18th emails?
25            MR. MAGNUSON:  Objection, calls for a

Page 160

1        legal conclusion --
2            MR. SULLIVAN:  The question is what --
3            MR. MAGNUSON:  -- foundation.
4    BY MR. SULLIVAN:
5    Q.  What evidence is there?
6            MR. MAGNUSON:  Same objections.
7    BY MR. SULLIVAN:
8    Q.  So what facts are there?  Not legal, what facts are
9        there?
10           MR. MAGNUSON:  Same objection,
11       foundation, legal conclusion.
12   BY MR. SULLIVAN:
13   Q.  And you can answer the question.
14   A.  Ask me again, please.
15   Q.  Of course.  What facts are there that connect your
16       20-day suspension to the January 3rd or January 18th
17       emails?
18   A.  The fact that I bring this to their attention,
19       continuous safety violations and that -- that they
20       see them, and they don't like to -- to have things
21       brought to their attention, and that's what it is.
22   Q.  So I'm looking at Mr. Jared's message back to you on
23       January 19th and Mr. Miller's email to you on
24       January 18th.  Where do they say that they don't
25       like to have things brought to their attention?

Page 161

1    A.  It's just obvious.
2    Q.  Do they say it anywhere in either of their
3        messages --
4    A.  No.
5    Q.  -- that they don't like to have things brought to
6        their attention?
7    A.  No.
8    Q.  But you have the personal belief they don't like to
9        have things brought to their attention; is that
10       right?
11   A.  Yes.
12   Q.  Did you ever complain to anyone about Tom Jared's
13       shove test that he conducted with you on
14       February 1st?
15   A.  Yes.
16   Q.  When did you complain about it?
17   A.  As soon as it happened.
18   Q.  What do you mean?
19   A.  To him, Dylan Smith.  It was obvious.  If you were
20       there, I would have complained to you about it.
21   Q.  Did you -- did you -- you also challenged it at the
22       investigation hearing itself, right?
23   A.  Yes.
24   Q.  Do you believe that your challenge of his shove test
25       caused the discipline that was issued in later

41 (Pages 158 - 161)

Page 178

1 perform a shove test on February 1st, 2021, in the
2 Nahant yard?
3 A. Part of it, but I think it was directly correlated
4 with me refusing to violate a safety -- a hazardous
5 safety violation with Mr. McElvey when I first went
6 on duty.  He was visibly angry, and that's what I
7 think all this is a big part of it.
8 Q. And so this --
9 A. It's all connected.
10 Q. It's all connected.  How -- how do you know it's all
11 connected?
12 A. Common sense.
13 Q. Other than common sense, is there anything that you
14 could point to that an outside observer could look
15 at and say, "Well, this looks like it's connected"?
16 A. It's all about bonuses and how they how they get
17 their bonuses.  If they have too big of initial
18 terminal delay and then it affects their -- their
19 quarterly bonus or however they do it, semi-yearly
20 bonus whatever it.
21 Q. How do you know that initial terminal delay --
22 delays have an effect on any individual's bonus?
23 A. Common knowledge in the railroad industry, sir.
24 Q. But do you have any personal knowledge of that?
25 A. I hear it all the time from ex managers.

Page 179

1 Q. So which -- name one of the ex managers --
2 A. No.
3 Q. -- who has told you that.
4 A. No.  I'm not going to do that.
5 Q. Why?  Well, I'm -- unfortunately, you sort of have
6 to.  This is a deposition, and you're under oath.
7 Name one ex manager who told you that?
8 A. Do I have to answer?
9   MR. MAGNUSON:  Yeah.
10   THE WITNESS:  They -- they -- they say
11   it out of spite when they get -- when they
12   go back into the ranks.  They're pissed.
13   They --
14 BY MR. SULLIVAN:
15 Q. So name one, one person.  Begin with one, and we'll
16 go through every one you remember.
17 A. I can barely remember one.
18 Q. Who would that be?
19 A. Michael Hunter.
20 Q. Michael Hunter?
21 A. Sure.
22 Q. What did Michael Hunter say about the connection
23 between terminal delays and bonuses?
24 A. That's their structure.  That's the way it works.
25 Q. Michael Hunter said, "That's their structure.

Page 180

1 That's the way it works"?
2 A. Well, not in that specific -- not those exact words,
3 but basically, yes.  It's common knowledge.  It's
4 common knowledge.
5 Q. Well, okay.  So Michael Hunter said something like,
6 "That's the way it works."  Who else said anything
7 to you that --
8 A. I can't remember.
9 Q. -- confirms this idea?
10 A. I -- I can't recall.
11 Q. Can you not recall, or are you choosing not to
12 answer the question?
13 A. No.  I'm not refusing -- choosing not to answer.  I
14 can't recall.
15 Q. You remember Michael Hunter, but you don't remember
16 anyone else?
17 A. No, no I don't.
18 Q. When did Michael Hunter say that to you?
19 A. Years ago.  Been there quite awhile.
20 Q. Do you remember roughly when you would have left?
21 A. 2015, '16.  I don't know.
22 Q. Has any current manager ever said anything to you
23 about the current structure of bonuses and their
24 supposed connection to initial terminal delays?
25 A. Not that I recall.

Page 181

1 Q. Did anyone -- did any -- any person ever in January
2 or February of 2021 tell you that there was some
3 sort of a conclusion between initial terminal delays
4 and manager bonuses?
5 A. It's common knowledge, sir.
6 Q. And so my question was, did anyone -- do you
7 remember any person ever telling you that
8 information, that that was going on in early 2021?
9 A. No.
10 Q. And so it's your idea that the initial terminal
11 delays connect to the bonuses, correct?
12 A. It does directly.
13 Q. And then that connection to the bonuses is what
14 makes managers be upset by safety delays?
15 A. Correct.
16 Q. If there is no connection between initial terminal
17 delays and bonuses, then what happens to your
18 theory?
19 A. There is.
20 Q. But if -- what if there's not?  You believe that
21 there is.  I'm just asking, what if there isn't?
22 A. It's common knowledge.  It's common knowledge.
23 Q. That initial terminal delays connect specifically to
24 bonuses?
25 A. Yes.

46 (Pages 178 - 181)

Page 186

1  Q.  Would there -- were they -- were the other people in
2      the group with Mr. Cruciani all men?
3  A.  Yes.
4  Q.  Do you remember, had you seen any of them before?
5  A.  Some were students.  Mr. Cruciani is a training
6      coordinator.
7  Q.  How many were students?
8  A.  Probably two.  I think there was three of them.
9  Q.  So two students and Mr. Cruciani?
10 A.  That's right.
11 Q.  And how long would you say this interaction took?
12 A.  I was -- it was in passing.
13 Q.  So less than five seconds?
14 A.  Probably, yes.
15 Q.  Less than three seconds?
16 A.  Sure.  I mean, somewhere around three.  I don't
17     know.
18 Q.  When was the last time that you saw Tom Jared in
19     Nahant?
20 A.  Approximately three-and-a-half weekends ago, maybe.
21 Q.  How often, roughly, would you estimate Mr. Jared is
22     in Nahant?
23 A.  No idea.
24 Q.  Is it -- would you consider it to be -- is it a
25     surprise when you see him there?

Page 187

1  A.  It's his territory.  There's nothing surprising
2      about it.
3  Q.  Sometimes he's there, and sometimes he's not?
4  A.  Yeah.  That's right.
5  Q.  So the students, where are they affiliated with?
6      How does that -- maybe just explain to us the --
7  A.  Nahant.  They work out of Nahant.  They get hired
8      on, and they have to pass all the requirements and
9      stuff to become a conductor.
10 Q.  So they're -- are they -- is it --
11 A.  They're new hires.
12 Q.  So maybe in another different -- in a different
13     industry, they might be called "trainees."  Is that
14     roughly fair?
15 A.  That's exactly it.  Students, trainees, it's all the
16     same.
17 Q.  And so you think it was one of the students who said
18     -- oh, wait.  Mr. Cruciani said the statement to the
19     two of them?
20 A.  He was told, "Heads were going to roll."
21 Q.  Had you ever met the two students before?
22 A.  No.
23 Q.  Do you have any reason to think that the -- either
24     of the two students knew anything about the
25     February 21st -- excuse me -- February 1st shove

Page 188

1      test and the discipline that followed?
2  A.  I have no idea.
3  Q.  Do you remember, Mr. Sexton, when you first decided
4      to seek help from a lawyer related to your
5      allegations against CP?
6  A.  Yes.
7  Q.  When was that?
8  A.  Shortly after the ruling was handed down.
9  Q.  The Public Law Report ruling?
10 A.  Yes, I believe so.
11 Q.  And the -- my recollection is the OSHA complaint was
12     already under way at that point; is that right?
13 A.  I believe so, yes.
14 Q.  How did you find the attorneys who are representing
15     you?
16 A.  Today?
17 Q.  Yeah.
18 A.  Through -- I've been a local chairman for a number
19     of years, and I know that they represent railroad
20     employees.
21        MR. CRAMER:  Can I take one more quick
22     break?  I don't know if we need a big pause.
23        MR. SULLIVAN:  This is literally the
24     last page.
25        (Off the record.)

Page 189

1  BY MR. SULLIVAN:
2  Q.  Were you previously represented by a different law
3      firm?
4  A.  I was.
5  Q.  And what law firm was that?
6  A.  Schlichter.
7  Q.  They're -- where are they based out of?
8  A.  St. Louis.
9  Q.  And I know I read something that you had submitted
10     to the -- to the OALJ about some confusion about
11     when and how they were representing you; is that
12     fair to say?
13 A.  Yes.
14 Q.  How did you find that firm?
15 A.  Again, they were attorneys that represent railroad
16     employees, and so I reached out.
17 Q.  So I'd like to discuss what you're alleging as
18     damages, so what you're seeking from the railroad in
19     the lawsuit.  The -- well, why don't you tell me.
20     What are you -- what -- what damages and
21     compensation are you seeking through this lawsuit?
22 A.  Punitive damages, damages to my reputation, the way
23     I feel every time I go to work, the embarrassment
24     that all this is -- that it's caused against me and
25     my family, my safety record and not knowing whether

48 (Pages 186 - 189)

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | | |
|---|---|---|
| John Sexton, | ) | |
| | ) | Case No. 23-cv-00031 |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | **DECLARATION OF** |
| | ) | **JEFFREY MCINNIS** |
| Dakota, Minnesota & Eastern Railroad | ) | |
| Corporation d/b/a Canadian Pacific, a | ) | |
| Delaware Corporation, | ) | |
| | ) | |
| Defendant. | ) | |

COMES NOW I, Jeffrey McInnis, and affirm, attest, and declare as follows:

1.    I am the Assistant Director, Operating Rules & Practices (US) for Soo Line Railroad Company and my territory covers Defendant Dakota, Minnesota & Eastern Railroad Corporation d/b/a Canadian Pacific ("CP"). I have personal knowledge of the facts stated herein.

2.    I have been the Assistant Director, Operating Rules & Practices (US) since April 25, 2023. Prior to that, I was the Manager Operating Practices – US.

3.    The operations of CP's railroads are governed by numerous safety rules, regulations, orders, and directives, including the General Code of Operating Rules ("GCOR"), which is a set of operating rules for numerous Class I, Class II, and Class III railroads in the United States intended to enhance railroad safety.

4.    All CP operating employees, including Plaintiff John Sexton, must comply with the GCOR.

5.    When working in a rail yard, train crews may perform "shove movements," in which a locomotive is used to push train cars into position on open track where the cars may stay until being connected to a train for transport to their next destination.

6.    When performing a shove, engineers operate the locomotive from the trailing end of the movement, and so rely on one specifically assigned employee protecting the shove to communicate about what is happening at the leading end of the movement.

7.    When performing a shove movement, the employee protecting the movement communicates with the engineer by radio to inform the engineer about the distance remaining before the train must come to a complete stop. The employee protecting the movement typically communicates the distance in "car counts"—the number of car lengths remaining until the train must be stopped.

8.    The GCOR Rule applicable to shove movements is Rule 5.3.7. GCOR Rule 5.3.7 mandates that engineers must be prepared to stop a shove movement within half the number of car lengths last called over the radio, if they receive no further instructions. In other words, if the engineer receives no further communication, he must actually stop the train, and the train must be stopped, within one-half of the number of car lengths that was last transmitted.

9.    For example, if the last car count communicated is forty (40), the engineer must be prepared to have the train at a stop within twenty (20) car lengths.

10.    If the communications include two car-counts in the same communication, the engineer should operate based on the most restrictive car-count. For example, if the conductor says, "Good for forty (40), fifteen (15) to a stop," the engineer should operate based on the fifteen (15) car-count—the more restrictive count.

11.    If the car-count is ambiguous or the engineer is confused, the engineer should immediately stop the shove movement and request clarification.

2

set

12.     The engineer performing a shove movement is required to listen and follow the directions of the one employee protecting the movement. The engineer is not to consider any other radio messages from other employees who are not specifically attached to the movement.

13.     CP managers are required to test employees on compliance with GCOR. These tests are referred to as "efficiency tests" or "e-tests".

14.     CP's U.S. Efficiency Test Manual for Operating Rules in Compliance with FRA 217.9 provides guidelines regarding the administration of efficiency tests. The guidelines provided in the U.S. Efficiency Test Manual on Operating Rules are not rules and do not set out mandatory procedures for administering efficiency tests.

15.     The guidelines for testing compliance with GCOR 5.3.7 are provided by several tests within CP's U.S. Efficiency Test Manual, including: Test GRA01 Hand Signals or Signal Disappearance (included in the "Stop" test group), Test GRF02 Shoving or Pushing Movements (included in the "Switches – Derails – Protecting Shoves and Equipment Foul of Adjacent Tracks" test group), and Test GR03 Lieu of Hand Signals (included in the "Railroad Radio" test group).

16.     When administering efficiency tests, the testing officer may alter the conditions of the task being performed to force the employee to comply with the rule being tested.

17.     For example, when administering Test GRA01, Test GRF02, or Test GR03 to test compliance with GCOR Rule 5.3.7, the testing officer may instruct the conductor to stop communicating with the engineer over the radio. By altering the conditions of the task being performed—intentionally cutting off radio communication after the last instruction provided—the testing officer is able to determine of the engineer complies with GCOR Rule 5.3.7 and stop the movement within half the number of car lengths last transmitted.

3

18.     This type of "set up" test is consistent with the guidelines set out in CP's Efficiency Test Manual for Test GRA01, Test GRF02, or Test GR03.

19.     When a testing officer enters a failed e-test into the system, the testing officer enters one test code, even if more than one test code could have applied to the test performed. If more than one test code is entered, it would appear as though the employee failed more than one e-test.

**Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.**

Executed on: August _5_, 2024

Jeffrey McInnis

4

# EXHIBIT C

Privileged & Confidential

# GCOR

## General Code of Operating Rules

### Seventh Edition

### Effective April 1, 2015

These rules herein govern the operations of the railroads listed
and must be complied with by all employees regardless of gender
whose duties are in any way affected thereby. They supersede
all previous rules and instructions inconsistent therewith.

© 2015 General Code of Operating Rules Committee,
All Rights Reserved

**EXHIBIT**

2

Front cover photo by Geneva May Short

# Adopted by:

Aberdeen Carolina & Western Railway
Aberdeen & Rockfish Railroad
Acadiana Railway Company
Affton Terminal Railroad
Ag Valley Railroad
Alabama & Gulf Coast Railway
Alabama Southern Railroad
Alabama & Tennessee River Railway, LLC
Alabama Warrior Railroad
Alaska Railroad Corporation
Albany & Eastern Railroad Company
Aliquippa & Ohio River Railroad
Alliance Terminal Railway, LLC
Altamont Commuter Express Rail Authority
Alton & Southern Railway
Amtrak—Chicago Terminal
Amtrak—Michigan Line
Amtrak—NOUPT
AN Railway
Ann Arbor Railroad
Apache Railway Company
A&R Terminal Railroad Company
Arizona & California Railroad
Arizona and California Railway Company
Arizona Central Railroad
Arizona Eastern Railway Company
Arkansas Louisiana & Mississippi Railroad
Arkansas Midland Railroad Company Inc.
Arkansas & Missouri Railroad Company
Arkansas-Oklahoma Railroad
Arkansas Southern Railroad
Ashtabula, Carson & Jefferson Railroad
AT&L Railroad Company
Atlantic & Western Railway
Austin Western Railroad
Autauga Northern Railroad
Baton Rouge Southern Railroad
Bauxite & Northern Railway
Bay Coast Railroad
Bay Line Railroad
Belt Railway Company of Chicago

BHP Nevada Railway Company
B&H Rail Corp
Birmingham Terminal Railroad
Blackwell Northern Gateway Railroad
BNSF Railway
Boise Valley Railroad
Buffalo & Pittsburg Railroad
Burlington Junction Railway
Butte, Anaconda & Pacific Railroad
California Northern Railroad
California Western Railroad
Camas Prairie RailNet, Inc.
Canadian Pacific
Caney Fork & Western Railroad
Canon City and Royal Gorge Railroad
Capital Metropolitan Transportation Authority
Carolina Piedmont Railroad
Carrizo Gorge Railway
Cascade and Columbia River Railroad
Cedar Rapids & Iowa City Railway Company
Central California Traction Company
Central Illinois Railroad
Central Kansas Railway
Central Midland Railway
Central Montana Rail
Central Oregon & Pacific Railroad, Inc.
Central Railroad of Indiana
Central Railroad of Indianapolis
Chattahoochee Bay Railroad
Chattahoochee Industrial Railroad
Chattooga & Chickamauga Railway
Chesapeake & Albemarle Railroad Company, Inc.
Chicago and Chemung Railroad
Chicago, Ft. Wayne & Eastern Railroad
Chicago Rail Link
Chicago SouthShore & South Bend Railroad
City of Prineville Railway
Cleveland Commercial Railroad LLC
C&NC Railroad Corporation
Columbia Basin Railroad Co.
Columbia and Cowlitz Railway
Columbia Terminal
Columbus & Greenville Railway
Columbus & Ohio River Railroad
Commonwealth Railway

Conecuh Valley Railroad
Connecticut Southern Railroad
Connex Railroad
Corpus Christi Terminal Railroad
Council Bluffs Railway
D&I Railroad
Dakota, Minnesota & Eastern Railroad
Dakota, Missouri Valley & Western Railroad, Inc.
Dakota Southern Railway
Dallas, Garland & Northeastern Railroad, Inc.
Dardanelle & Russellville Railroad
Decatur Junction Railway Company
Denton County Transit Authority
Denver Regional Transportation District Commuter Railroad
Denver Rock Island Railroad
DeQueen & Eastern Railroad Company
Eagle Rail
East Chattanooga Belt Railroad
East Tennessee Railway
Eastern Alabama Railway
Eastern Idaho Railroad
Ellis & Eastern Company
Escanaba & Lake Superior Railroad
Farmrail Corporation
First Coast Railroad
Florida East Coast Railway
Fordyce & Princeton Railroad
Fort Worth & Western Railroad
Fox Valley & Western
Fulton County Railway, LLC
Galveston Railroad
Gateway Western Railway
Georgetown Railroad Company
Georgia Central Railway
Georgia & Florida Railway
Georgia Southwestern Railroad, Inc.
Georgia Woodlands Railroad
Golden Isles Terminal Railroad
Golden Triangle Railroad
Grain Belt Corp
Grand Canyon Railway
Grand Elk Railroad
Grand Rapids Eastern Railroad
Great Northwest Railroad

Great Western Railway
Gulf Colorado & San Saba Railroad
Heart of Georgia Railroad
Herzog Transit Services, Inc.
Hiwassee River Railroad
Huron and Eastern Railway Company, Inc.
Hutchinson and Northern Railway Company
Idaho Northern & Pacific Railroad Company
Illinois & Midland Railroad, Inc.
Illinois Railway, Inc.
Indiana Business Railroad
Indiana & Ohio Railway
Indiana Rail Road Company
Indiana Southern Railroad, Inc.
International Bridge & Terminal Company
Iowa Chicago & Eastern Railroad
Iowa Interstate Railroad Ltd.
Iowa Northern Railway Company
Jaxport Terminal Railway
Kansas City Southern Railway
Kansas City Terminal Railway Company
Kansas & Oklahoma Railroad
Kaw River Railroad
Kentucky West Tennessee Railway
Keokuk Junction Railway Company
Kettle Falls International Railway, LLC
Kiamichi Railroad
Knoxville & Holston River Railroad
Kyle Railroad Company
Lahaina Kaanapali & Pacific Railroad
Lake State Railway
Lake Superior and Ishpeming Railroad
Laurinberg & Southern Railroad
Lavonia, Avon and Lakeville Railroad
Lewis and Clark Railway Company
Little Rock and Western Railway, LP
Longview Switching Company
Los Angeles Junction Railway
Louisiana and Delta Railroad Company
Louisiana & North West Railroad
Louisiana Southern Railroad
Louisville & Indiana Railroad
Luxapalila Valley Railroad
Mahoning Valley Railroad
Manning Rail, Inc.

Manufacturers Junction Railway

Maryland Midland Railway

Maumee & Western Railroad

McCloud Railway Company

Meridian and Bigbee Railroad

Meridian Southern Railway, LLC

Messena Terminal Railroad Company

Michigan Air-Line Railway Company

Michigan Central Railway

Michigan Shore Railroad

Mid-Michigan Railroad, Inc.

Minnesota Commercial Railway Company

Minnesota, Dakota & Western Railway Company

Minnesota Northern Railroad, Inc.

Minnesota Prairie Line Incorporated

Minnesota Southern Railway

Minnesota Valley Transportation Company

Mission Mountain Railroad

Mississippi Export Railroad Company

Mississippi Southern Railroad

Mississippi & Tennessee RailNet, Inc.

Mississippi Tennessee Railroad

Missouri & Northern Arkansas RR Company, Inc.

Missouri & Valley Park Railroad

Modesto & Empire Traction Company

Modoc Railroad Academy

Montana Rail Link

Mount Vernon Terminal Railway, Inc.

Napa Valley Railroad Company

Nash County Railroad

Nashville and Eastern Railroad

Nashville and Western Railroad

National Coal Rail Line

Nebkota Railway, Inc.

Nebraska Central Railroad Company

Nebraska Kansas Colorado Railway, Inc.

Nebraska Northeastern Railway Company

New England Central Railroad, Inc.

New Mexico Rail Runner Express

New Orleans & Gulf Coast Railway Company

New Orleans Lower Coast Railroad

New Orleans Public Belt Railroad

Newburgh & South Shore Railroad Company

New York & Atlantic Railway

North Carolina & Virginia Railroad Company, Inc.

Northeast Illinois Regional Commuter Railroad Corp.

Northern Indiana Commuter Transportation District

Northern Lines Railway

Northern Ohio & Western Railway

Northern Plains Railroad

Ohio Central Railroad

Ohio & Pennsylvania Railroad

Ohio Southern Railroad

Omaha, Lincoln & Beatrice Railway Company

Osceola and St. Croix Valley Railroad Company

Otter Tail Valley Railroad Company, Inc.

Pacific Harbor Line

Pacific Sun Railroad

Palouse River and Coulee City Railroad

Panhandle Northern Railroad

Pecos Valley Southern Railway Company

Pend Oreille Valley Railroad

Peninsula Corridor Joint Powers Board (Caltrain)

Pennsylvania Southwestern Railroad

Pittsburgh Industrial Railroad

Pittsburgh & Ohio Central Railroad

Point Comfort & Northern Railway Company

Port Bienville Railroad

Port of Tillamook Bay Railroad

Portland Terminal Railroad Company

Portland Vancouver Junction Railroad

Portland & Western Railroad

Progressive Rail Inc.

Puget Sound & Pacific Railroad

Rarus Railway, Inc.

Red River Valley & Western Railroad Co.

Riceboro Southern Railway

Richmond Pacific Railroad

Richmond Terminal Railroad Company

Rio Valley Switching Company

Rochester & Southern Railroad

Rockdale, Sandow & Southern Railroad Company

Rogue Valley Terminal Railroad

Sacramento Valley Railroad

Saginaw Valley Railroad Company

San Antonio Central Railroad

San Diego & Imperial Valley Railroad Company, Inc.

San Diego Northern Railway

San Francisco Bay Railroad

San Joaquin Valley Railroad Co., Inc.

Confidential

San Luis Central Railroad Company
San Pedro and Southwestern Railway Company
Sand Springs Railway Company
Santa Cruz, Big Trees & Pacific Railway Company
Santa Fe Southern Railway, Inc.
Sault Ste. Marie Bridge Company
Savage Bingham & Garfield Railroad Company
Savannah Port Terminal Railroad
SEMO Port Railroad
Sequatchie Valley Railroad
Sierra Railroad Company
Sound Transit
South Buffalo Railway
South Carolina Central Railroad Company, Inc.
South Central Tennessee Railroad
South East Kansas Railroad
South Kansas and Oklahoma Railroad
South Plains Lamesa Railroad Ltd.
Southern California Regional Rail Authority
Southern Switching Company
Southwestern Railroad Company, Inc.
St. Croix Valley Railroad Company
St. Maries River Railroad Company
Stillwater Central Railroad
Swan Ranch Railroad
Tacoma Municipal Belt Line Railway
Talleyrand Terminal Railroad
Tazewell & Peoria Railroad
Temple & Central Texas Railway
Tennessee Southern Railroad
Tennessee Valley Railroad
Tennessee Valley Railroad Museum, Inc
Tennken Railroad Company Inc.
Terminal Railroad Association of St. Louis
Texas, Gonzales & Northern Railway Company
Texas - New Mexico Division
Texas Northeastern Railroad
Texas North Western Railway Company
Texas Rock Crusher Railway Co.
Three Notch Railroad
Timber Rock Railroad
Toledo, Peoria & Western Railway
Tomahawk Railroad
TransitAmerica Services Inc.
Transportación Ferroviaria Mexicana

Trinity Railway Express
Trona Railway Company
Tulare Valley Railroad
Tulsa-Sapulpa Union Railway Company
Twin Cities & Western Railroad Company
Union Pacific Railroad
United States Army Military Railroad System
Utah Central Railway
Utah Railway Company
Utah Transit Authority
V&S Railroad Inc.
Valdosta Railway
Ventura County Railway Company
Verde Canyon Railroad
Vermont Rail System
Vicksburg Southern Railroad
Virginia Southern Railroad
Wabash Central Railroad
Walking Horse & Eastern Railroad
Warren & Trumbull Railroad
WATCO Transportation Services
West Tennessee Railroad, LLC
West Tennken Railroad Corp.
West Texas and Lubbock Railroad
Western New York and Pennsylvania Railroad, LLC
Wichita Terminal Association
Wichita, Tillman & Jackson Railway
Willamette & Pacific Railroad, Inc.
Willamette Valley Railroad
Willamina and Grand Ronde Railway
Wilmington Terminal Railroad
Wiregrass Central Railroad
Wisconsin & Southern Railroad Company
Wyoming/Colorado Railroad Company
Yadkin Valley Railroad
Yellowstone Valley Railroad
York Railway
Youngstown & Austintown Railroad
Youngstown Belt Railroad
Yreka Western Railroad

Confidential

# Table of Contents

| | | |
|---|---|---|
| **1.0** | **General Responsibilities** | **1-1** |
| 1.1 | Safety | 1-1 |
| | 1.1.1 | Maintaining a Safe Course | 1-1 |
| | 1.1.2 | Alert and Attentive | 1-1 |
| | 1.1.3 | Accidents, Injuries, and Defects | 1-1 |
| | 1.1.4 | Condition of Equipment and Tools | 1-1 |
| 1.2 | Personal Injuries and Accidents | 1-1 |
| | 1.2.1 | Care for Injured | 1-1 |
| | 1.2.2 | Witnesses | 1-1 |
| | 1.2.3 | Equipment Inspection | 1-1 |
| | 1.2.4 | Mechanical Inspection | 1-2 |
| | 1.2.5 | Reporting | 1-2 |
| | 1.2.6 | Statements | 1-2 |
| | 1.2.7 | Furnishing Information | 1-2 |
| 1.3 | Rules | 1-2 |
| | 1.3.1 | Rules, Regulations, and Instructions | 1-2 |
| | 1.3.2 | General Orders | 1-3 |
| | 1.3.3 | Circulars, Instructions, and Notices | 1-3 |
| 1.4 | Carrying Out Rules and Reporting Violations | 1-3 |
| | 1.4.1 | Good Faith Challenge | 1-3 |
| 1.5 | Drugs and Alcohol | 1-4 |
| 1.6 | Conduct | 1-5 |
| | 1.6.1 | Motor Vehicle Driving Records | 1-5 |
| | 1.6.2 | Notification of Felony Convictions | 1-5 |
| | 1.6.3 | Notification of Deteriorating Vision or Hearing | 1-5 |
| 1.7 | Altercations | 1-5 |
| 1.8 | Appearance | 1-5 |
| 1.9 | Respect of Railroad Company | 1-5 |
| 1.10 | Games, Reading, or Other Media | 1-6 |
| 1.11 | Sleeping | 1-6 |
| | 1.11.1 | Napping | 1-6 |
| 1.12 | Weapons | 1-7 |
| 1.13 | Reporting and Complying with Instructions | 1-7 |
| 1.14 | Employee Jurisdiction | 1-7 |
| 1.15 | Duty—Reporting or Absence | 1-7 |
| 1.16 | Subject to Call | 1-7 |
| 1.17 | Hours of Service Law | 1-7 |
| 1.18 | Unauthorized Employment | 1-7 |
| 1.19 | Care of Property | 1-8 |
| 1.20 | Alert to Train Movement | 1-8 |
| 1.21 | Occupying Roof | 1-8 |
| 1.22 | Unauthorized Persons on Equipment | 1-8 |
| 1.23 | Altering Equipment | 1-8 |
| 1.24 | Clean Property | 1-8 |
| 1.25 | Credit or Property | 1-8 |
| 1.26 | Gratuities | 1-8 |
| 1.27 | Divulging Information | 1-9 |
| 1.28 | Fire | 1-9 |
| 1.29 | Avoiding Delays | 1-9 |
| 1.30 | Riding Engine | 1-9 |
| 1.31 | Repairs to Foreign Cars | 1-9 |
| 1.32 | Overheated Wheels | 1-9 |
| 1.33 | Inspection of Freight Cars | 1-10 |
| 1.34 | Flat Spots | 1-10 |
| 1.35 | Dump Doors | 1-10 |
| 1.36 | Excessive Dimension Loads | 1-10 |
| 1.37 | Open Top Loads | 1-11 |
| 1.38 | Shipments Susceptible to Damage | 1-11 |
| 1.39 | Accuracy of Speed Indicator | 1-11 |
| 1.40 | Reporting Engine Defects | 1-11 |
| 1.41 | Engines Coupled to Occupied Passenger Cars | 1-11 |
| 1.42 | Trains Detoured | 1-11 |
| 1.43 | Stopped in Tunnels | 1-12 |
| 1.44 | Duties of Train Dispatchers | 1-12 |
| 1.45 | Duties of Control Operators and Operators | 1-12 |
| 1.46 | Duties of Yardmasters | 1-12 |
| 1.47 | Duties of Crew Members | 1-12 |
| 1.48 | Time | 1-14 |
| **2.0** | **Railroad Radio and Communication Rules** | **2-1** |
| 2.1 | Transmitting | 2-1 |
| 2.2 | Required Identification | 2-1 |
| 2.3 | Repetition | 2-1 |
| 2.4 | Ending Transmissions | 2-2 |
| 2.5 | Communication Redundancy | 2-2 |
| 2.6 | Communication Not Understood or Incomplete | 2-2 |
| 2.7 | Monitoring Radio Transmissions | 2-2 |
| 2.8 | Acknowledgment | 2-2 |
| 2.9 | Misuse of Radio Communications | 2-2 |
| 2.10 | Emergency Calls | 2-3 |
| 2.11 | Prohibited Transmissions | 2-3 |
| 2.12 | Fixed Signal Information | 2-3 |
| 2.13 | Not Used | 2-3 |
| 2.14 | Transmission of Mandatory Directives | 2-3 |
| | 2.14.1 | Verbally Transmitting and Repeating Mandatory Directives | 2-4 |
| 2.15 | Phonetic Alphabet | 2-4 |
| 2.16 | Assigned Frequencies | 2-4 |
| 2.17 | Radio Testing | 2-4 |
| 2.18 | Malfunctioning Radio | 2-4 |
| 2.19 | Blasting Operations | 2-4 |
| 2.20 | Internal Adjustments | 2-4 |
| 2.21 | Electronic Devices | 2-5 |
| **3.0** | **Section Reserved** | **3-1** |

4.0    Timetables.................................................. 4-1
4.1    New Timetable................................................ 4-1
       4.1.1    Notice of New Timetable..................... 4-1
4.2    Special Instructions...................................... 4-1
4.3    Timetable Characters.................................... 4-1

5.0    Signals and Their Use ............................... 5-1
5.1    Signal Equipment.......................................... 5-1
5.2    Receiving and Giving Signals ...................... 5-1
       5.2.1    Looking for Signals............................. 5-1
       5.2.2    Signals Used by Employees................ 5-1
5.3    Hand and Radio Signals................................ 5-2
       5.3.1    Hand Signals...................................... 5-2
       5.3.2    Giving Signals.................................... 5-2
       5.3.3    Signal Disappearance......................... 5-2
       5.3.4    Signal to Stop.................................... 5-2
       5.3.5    Acknowledge Stop Signal.................... 5-2
       5.3.6    Radio and Voice Communication......... 5-2
       5.3.7    Radio Response................................. 5-3
5.4    Flags for Temporary Track Conditions ......... 5-3
       5.4.1    Temporary Restrictions....................... 5-3
       5.4.2    Display of Yellow Flag......................... 5-3
       5.4.3    Display of Yellow-Red Flag.................. 5-4
       5.4.4    Authorized Protection by Yellow or
                Yellow-Red Flag................................. 5-5
       5.4.5    Display of Green Flag.......................... 5-5
       5.4.6    Display of Flags Within Current of
                Traffic.............................................. 5-6
       5.4.7    Display of Red Flag............................ 5-6
       5.4.8    Flag Location .................................... 5-6
5.5    Permanent Speed Signs................................ 5-7
5.6    Unattended Fusee.......................................... 5-7
5.7    Not Used...................................................... 5-8
5.8    Bell and Whistle Signals................................ 5-8
       5.8.1    Ringing Engine Bell........................... 5-8
       5.8.2    Sounding Whistle................................ 5-8
       5.8.3    Whistle Failure................................... 5-9
       5.8.4    Whistle Quiet Zone............................. 5-9
       5.8.5    Silenced Whistle............................... 5-10
5.9    Headlight Display........................................ 5-10
       5.9.1    Dimming Headlight ........................... 5-10
       5.9.2    Headlight Off.................................... 5-11
       5.9.3    Headlight Failure............................... 5-11
       5.9.4    Displaying Headlights Front and Rear. 5-11
       5.9.5    Displaying Ditch Lights ...................... 5-11
       5.9.6    Displaying Oscillating White Headlight 5-12
       5.9.7    Displaying Oscillating or Flashing Red
                Light............................................... 5-12
5.10   Markers...................................................... 5-12
       5.10.1   Highly Visible Markers ...................... 5-12
       5.10.2   Alternative Markers........................... 5-13
5.11   Engine Identifying Number........................... 5-13

5.12   Protection of Occupied Outfit Cars................ 5-13
5.13   Blue Signal Protection of Workmen .............. 5-16
       5.13.1   Utility Employees.............................. 5-19
5.14   Signs Protecting Equipment........................ 5-20
5.15   Improperly Displayed Signals...................... 5-20

6.0    Movement of Trains and Engines ........... 6-1
6.1    Repeat Instructions....................................... 6-1
6.2    Initiating Movement....................................... 6-1
       6.2.1    Train Location.................................... 6-1
6.3    Main Track Authorization............................... 6-1
       6.3.1    Train Coordination ............................ 6-2
6.4    Reverse Movements...................................... 6-3
       6.4.1    Permission for Reverse Movements.... 6-3
       6.4.2    Movements Within Control Points or
                Interlockings..................................... 6-3
6.5    Shoving Movements...................................... 6-4
       6.5.1    Remote Control Movements................ 6-4
6.6    Back Up Movements...................................... 6-5
6.7    Remote Control Zone..................................... 6-5
6.8    Stopping Clear for Meeting or Passing ........... 6-6
6.9    Meeting or Passing Precautions..................... 6-6
6.10   Instructions to Clear a Following Train........... 6-6
6.11   Mandatory Directive ..................................... 6-6
6.12   FRA Excepted Track...................................... 6-6
6.13   Yard Limits.................................................. 6-7
6.14   Restricted Limits.......................................... 6-8
6.15   Block Register Territory (BRT) ....................... 6-8
6.16   Approaching Railroad Crossings, Drawbridges,
       and End of Multiple Main Track...................... 6-8
6.17   Switches at Junctions................................... 6-9
6.18   Stopping Clear of Crossings and Junctions ..... 6-9
6.19   Flag Protection ........................................... 6-10
6.20   Equipment Left on Main Track ...................... 6-11
6.21   Precautions Against Unusual Conditions ....... 6-11
       6.21.1   Protection Against Defects................ 6-11
       6.21.2   Water Above Rail.............................. 6-12
       6.21.3   Track Obstruction / Unusual
                Conditions...................................... 6-12
6.22   Maintaining Control of Train or Engine.......... 6-12
6.23   Emergency Stop or Severe Slack Action ........ 6-12
6.24   Movement on Double Track .......................... 6-12
6.25   Movement Against the Current of Traffic......... 6-13
6.26   Use of Multiple Main Tracks ......................... 6-13
6.27   Movement at Restricted Speed...................... 6-13
6.28   Movement on Other than Main Track.............. 6-13
       6.28.1   Sidings of Assigned Direction ........... 6-14
       6.28.2   Stopping Clear in Siding.................... 6-14
       6.28.3   Cars or Equipment Left on Siding........ 6-14
6.29   Inspecting Trains......................................... 6-14
       6.29.1   Inspecting Passing Trains.................. 6-14
       6.29.2   Train Inspections by Crew Members ... 6-15

| 6.30 | Receiving or Discharging Passengers | 6-15 |
| 6.31 | Maximum Authorized Speed | 6-16 |
| | 6.31.1 Permanent Speed Restrictions | 6-16 |
| 6.32 | Road Crossings | 6-16 |
| | 6.32.1 Providing Warning Over Road Crossings | 6-16 |
| | 6.32.2 Automatic Warning Devices | 6-16 |
| | 6.32.3 Providing Warning for Adjacent Tracks | 6-17 |
| | 6.32.4 Clear of Crossings and Signal Circuits | 6-18 |
| | 6.32.5 Actuating Automatic Warning Devices Unnecessarily | 6-18 |
| | 6.32.6 Blocking Public Crossings | 6-18 |

| **7.0** | **Switching** | **7-1** |
| 7.1 | Switching Safely and Efficiently | 7-1 |
| 7.2 | Communication Between Crews Switching | 7-1 |
| 7.3 | Additional Switching Precautions | 7-1 |
| 7.4 | Precautions for Coupling or Moving Cars or Engines | 7-2 |
| 7.5 | Testing Hand Brakes | 7-2 |
| 7.6 | Securing Cars or Engines | 7-2 |
| 7.7 | Kicking or Dropping Cars | 7-2 |
| | 7.7.1 Gravity Switch Moves | 7-2 |
| 7.8 | Coupling or Moving Cars on Tracks Where Cars are Being Loaded or Unloaded | 7-3 |
| 7.9 | Switching Passenger or Occupied Outfit Cars | 7-3 |
| 7.10 | Movement Through Gates or Doorways | 7-3 |
| 7.11 | Charging Necessary Air Brakes | 7-4 |
| 7.12 | Movements Into Spur Tracks | 7-4 |
| 7.13 | Protection of Employees in Bowl Tracks | 7-4 |

| **8.0** | **Switches** | **8-1** |
| 8.1 | Hand Operation of Switches | 8-1 |
| 8.2 | Position of Switches | 8-1 |
| 8.3 | Main Track Switches | 8-1 |
| 8.4 | Lining Main Track Switch | 8-2 |
| 8.5 | Not Used | 8-2 |
| 8.6 | Restoring Switch to Normal Position | 8-2 |
| 8.7 | Clear of Main Track Switches | 8-2 |
| 8.8 | Switches Equipped with Locks, Hooks or Latches | 8-3 |
| 8.9 | Movement Over Spring Switches | 8-3 |
| | 8.9.1 Testing Spring Switch | 8-3 |
| | 8.9.2 Trailing Through and Stopping on a Spring Switch | 8-4 |
| | 8.9.3 Hand Operating a Spring Switch Before Making a Trailing Movement | 8-4 |
| | 8.9.4 During Snow or Ice Storms | 8-5 |
| | 8.9.5 Spiking Spring Switch | 8-5 |
| | 8.9.6 Approaching a Spring Switch in Non-Signaled Territory | 8-5 |
| 8.10 | Switch Point Indicator | 8-5 |
| 8.11 | Switches in Sidings | 8-5 |

| 8.12 | Hand-Operated Crossover Switches | 8-5 |
| 8.13 | Scale Track Switches | 8-6 |
| 8.14 | Conflicting Movements Approaching Switch | 8-6 |
| 8.15 | Switches Run Through | 8-6 |
| 8.16 | Damaged or Defective Switches | 8-6 |
| 8.17 | Avoid Sanding Over Moveable Parts | 8-6 |
| 8.18 | Variable Switches | 8-6 |
| 8.19 | Automatic Switches | 8-7 |
| | 8.19.1 Radio Controlled Switches | 8-7 |
| 8.20 | Derail Location and Position | 8-8 |

| **9.0** | **Block System Rules** | **9-1** |
| 9.1 | Signal Aspects and Indications | 9-1 |
| 9.2 | Location of Signals | 9-1 |
| 9.3 | What Signals Govern | 9-1 |
| 9.4 | Improperly Displayed Signals or Absent Lights | 9-1 |
| 9.5 | Where Stop Must Be Made | 9-2 |
| | 9.5.1 Changing Established Route | 9-2 |
| | 9.5.2 Protection if Signal Appliance or Track is Damaged | 9-2 |
| | 9.5.3 Protection During Repairs | 9-2 |
| | 9.5.4 Authority to Proceed | 9-2 |
| | 9.5.5 Reporting Delays | 9-2 |
| | 9.5.6 Track Occupancy Indicator | 9-3 |
| 9.6 | Change of Signal Indication | 9-3 |
| 9.7 | Failure to Display Most Restrictive Indication | 9-3 |
| 9.8 | Next Governing Signal | 9-3 |
| 9.9 | Train Delayed Within a Block | 9-3 |
| | 9.9.1 Approach to Automatic Interlocking | 9-4 |
| 9.10 | Initiating Movement Between Signals | 9-4 |
| 9.11 | Movement from Signal Requiring Restricted Speed | 9-4 |
| 9.12 | Stop Indications | 9-5 |
| | 9.12.1 CTC Territory | 9-5 |
| | 9.12.2 Manual Interlockings | 9-5 |
| | 9.12.3 Automatic Interlockings | 9-6 |
| | 9.12.4 ABS Territory | 9-6 |
| 9.13 | When Instructed to Operate Dual Control Switches by Hand | 9-6 |
| | 9.13.1 Hand Operation of Dual Control Switches | 9-7 |
| 9.14 | Movement with the Current of Traffic | 9-7 |
| | 9.14.1 Reporting Clear of a Track Having a Current of Traffic | 9-7 |
| 9.15 | Track Permits | 9-7 |
| | 9.15.1 Issuing Track Permits | 9-8 |
| | 9.15.2 Clearing Track Permits | 9-8 |
| 9.16 | Stop and Proceed Indication | 9-9 |
| 9.17 | Entering Signaled Track at Hand-Operated or Spring Switch | 9-10 |
| | 9.17.1 Signal Protection in ABS by Lining Switch | 9-11 |
| 9.18 | Electrically Locked Switches and Derails | 9-12 |

| | | |
|---|---|---|
| 9.19 | Leaving Equipment in Signal Systems | 9-12 |
| 9.20 | Clear Track Circuits | 9-13 |
| 9.21 | Overlap Circuits | 9-13 |
| 9.22 | Standing on Sanded Rail | 9-13 |
| 9.23 | Suspension of Block System | 9-13 |
| | 9.23.1 Guidelines While Block System is Suspended | 9-13 |
| 9.24 | Call Lights | 9-14 |

**10.0 Rules Applicable Only in Centralized Traffic Control (CTC)** ... **10-1**
| | | |
|---|---|---|
| 10.1 | Authority to Enter CTC Limits | 10-1 |
| 10.2 | Clearing Through Hand-Operated Switches | 10-1 |
| 10.3 | Track and Time | 10-3 |
| | 10.3.1 Protection of Limits | 10-4 |
| | 10.3.2 Protection of Machines, Track Cars, or Employees | 10-4 |
| | 10.3.3 Joint Track and Time | 10-4 |
| | 10.3.4 Track and Time Acknowledgment | 10-4 |

**11.0 Rules Applicable in ACS, ATC and ATS Territories** ... **11-1**
| | | |
|---|---|---|
| 11.1 | Establishing Absolute Block | 11-1 |
| 11.2 | Signal Indications with Absolute Block | 11-1 |
| 11.3 | Broken or Missing Seals | 11-2 |

**12.0 Rules Applicable Only in Automatic Train Stop System (ATS) Territory** ... **12-1**
| | | |
|---|---|---|
| 12.1 | Required Equipment | 12-1 |
| | 12.1.1 ATS Seals and Keys | 12-1 |
| 12.2 | ATS Device Cut Out, Not Equipped, or Not Working | 12-1 |
| 12.3 | Unusual Conditions | 12-1 |
| | 12.3.1 ATS Penalty Brake Application | 12-1 |
| | 12.3.2 ATS Inoperative | 12-1 |
| | 12.3.3 Damaged Inductor | 12-1 |
| 12.4 | ATS Testing | 12-2 |
| | 12.4.1 Test Inductor Locations | 12-2 |
| | 12.4.2 No Test Inductors | 12-2 |

**13.0 Rules Applicable Only in Automatic Cab Signal System (ACS) Territory** ... **13-1**
| | | |
|---|---|---|
| 13.1 | General Information | 13-1 |
| | 13.1.1 Observance of Signals | 13-1 |
| | 13.1.2 Conforming with Block Signals | 13-1 |
| | 13.1.3 Does Not Indicate Conditions Ahead | 13-1 |
| | 13.1.4 Cab Signals Cut In and Out | 13-1 |
| 13.2 | Normal Operation | 13-2 |
| | 13.2.1 Restrictive to More Favorable | 13-2 |
| | 13.2.2 Favorable to More Restrictive | 13-2 |
| | 13.2.3 Elimination of Audible Indicator | 13-3 |
| 13.3 | Unusual Conditions | 13-3 |
| | 13.3.1 Cab Signal and Block Signal Do Not Agree | 13-3 |
| | 13.3.2 Inoperative Cab Signal Device | 13-3 |
| | 13.3.3 Movement with an Inoperative Cab Signal Device | 13-4 |

**14.0 Rules Applicable Only Within Track Warrant Control (TWC) Limits** ... **14-1**
| | | |
|---|---|---|
| 14.1 | Authority to Enter TWC Limits | 14-1 |
| 14.2 | Designated Limits | 14-2 |
| 14.3 | Operating with Track Warrants | 14-2 |
| | 14.3.1 Leaving the Main Track | 14-3 |
| 14.4 | Occupying Same Track Warrant Limits | 14-3 |
| | 14.4.1 Radio Blocking | 14-3 |
| 14.5 | Protecting Men or Equipment | 14-4 |
| 14.6 | Movement Against the Current of Traffic | 14-4 |
| 14.7 | Reporting Clear of Limits | 14-5 |
| 14.8 | Track Warrant Requests | 14-5 |
| 14.9 | Copying Track Warrants | 14-5 |
| | 14.9.1 Duplicating Track Warrants | 14-5 |
| 14.10 | Track Warrant in Effect | 14-6 |
| 14.11 | Changing Track Warrants | 14-6 |
| 14.12 | Not Used | 14-6 |
| 14.13 | Mechanical Transmission of Track Warrants | 14-6 |

**15.0 Track Bulletin Rules** ... **15-1**
| | | |
|---|---|---|
| 15.1 | Track Bulletins | 15-2 |
| | 15.1.1 Changing Address of Track Warrants or Track Bulletins | 15-2 |
| 15.2 | Protection by Track Bulletin Form B | 15-2 |
| | 15.2.1 Protection for On-Track Equipment | 15-3 |
| 15.3 | Authorizing Movement Against the Current of Traffic | 15-3 |
| 15.4 | Protection When Tracks Removed from Service | 15-4 |
| 15.5 | Protection When Tracks Blocked with Equipment | 15-5 |
| 15.6 | Change of a General Order, Special Instruction, or Rule | 15-5 |
| 15.7 | Copying Track Bulletins | 15-5 |
| 15.8 | Duplicating Track Bulletins | 15-5 |
| 15.9 | Mechanical Transmission of Track Bulletins | 15-5 |
| 15.10 | Retaining Track Bulletins | 15-5 |
| 15.11 | Not Used | 15-5 |
| 15.12 | Relief of Engineer or Conductor During Trip | 15-6 |
| 15.13 | Voiding Track Bulletins | 15-6 |
| 15.14 | Delivering Track Bulletins | 15-6 |

**16.0 Rules Applicable Only in Direct Traffic Control (DTC) Limits** ... **16-1**
| | | |
|---|---|---|
| 16.1 | Authority to Enter DTC Limits | 16-1 |
| | 16.1.1 Switches Between DTC Blocks | 16-1 |
| 16.2 | DTC Authority | 16-1 |
| 16.3 | Movement in a Specified Direction | 16-2 |
| | 16.3.1 Leaving the Main Track | 16-3 |
| 16.4 | Work and Time | 16-3 |

| | | |
|---|---|---|
| 16.5 | Changing DTC Authority | 16-4 |
| 16.6 | Releasing DTC Authority | 16-4 |
| 16.7 | Communication Failure | 16-5 |
| **17.0** | **Rules Applicable Only in Automatic Train Control (ATC) Territory** | **17-1** |
| 17.1 | Automatic Train Control Territory | 17-1 |
| 17.2 | Taking Charge | 17-1 |
| 17.3 | Cut In and Cut Out Requirements | 17-1 |
| 17.4 | Departure Test Requirements | 17-2 |
| | 17.4.1  Departure Test Reporting | 17-2 |
| 17.5 | High Speed Setting | 17-3 |
| | 17.5.1  Over 40 MPH | 17-3 |
| | 17.5.2  Under 40 MPH | 17-3 |
| | 17.5.3  Restricting Cab Signal | 17-3 |
| 17.6 | Conforming with Block Signals | 17-3 |
| | 17.6.1  Approaching Diverging Route | 17-4 |
| 17.7 | ATC Failure/Cut Out Enroute | 17-4 |
| | 17.7.1  Speed Indicator in ATC | 17-5 |
| | 17.7.2  ATC Motion Light | 17-5 |
| | 17.7.3  Audible Indicator | 17-5 |
| 17.8 | Improper Display | 17-5 |
| **18.0** | **Section Reserved** | **17-6** |
| **19.0** | **Section Reserved** | **17-6** |
| **Glossary** | | **GL-1** |
| **Abbreviations** | | **GL-1** |
| **Index** | | **IN-1** |

### 5.3.7  Radio Response

When radio communication is used to make movements, crew members must respond to specific instructions given for each movement. Radio communications for shoving movements must specify the direction and distance and must be acknowledged when distance specified is more than four cars.

> Movement must stop within half the distance specified unless additional instructions are received.

## 5.4  Flags for Temporary Track Conditions

### 5.4.1  Temporary Restrictions

Track bulletins, track warrants, or general orders may restrict or stop train movements because of track conditions, structures or men or equipment. Yellow flags are used to indicate temporary speed restrictions. Yellow-red flags are used to indicate when a train may be required to stop. When flags are not displayed, that information will be included in the track bulletin, track warrant, or general order.

When a restriction spans adjoining subdivisions, separate temporary restrictions may be issued on each subdivision. Only one set of flags may be displayed in advance of the entire restriction in each direction.

### 5.4.2  Display of Yellow Flag

#### A.  Restriction Is In Effect

**Two Miles Ahead of Restricted Area.** Yellow flags warn trains to restrict movement because of track conditions or structures. To make sure train movement is restricted at the right location, employees must display a yellow flag 2 miles before the restricted area.



*[Diagram A.]*

**Less than Two Miles Ahead of Restricted Area.** When the restricted area is close to a terminal, junction, or another area, employees will display the yellow flag less than 2 miles before the restricted area. This information will also be included in the track bulletin, track warrant, or general order.



*[Diagram B.]*

**Once the Train Reaches the Restricted Area.** The speed specified by track warrant, track bulletin, general order, or radio speed restriction must not be exceeded until the rear of the train clears the restricted area.

Confidential

## 6.5    Shoving Movements

Equipment must not be shoved until the engineer and the employee protecting the movement have completed a job briefing concerning how protection will be provided. Employee must be in position, provide visual protection of the equipment being shoved and must not engage in unrelated tasks while providing protection.

Equipment must not be shoved until it is visually determined that:

- Portion of track to be used is clear of equipment or conflicting movements.

- The track will remain clear to the location where movement will be stopped.

- Switches and derails are properly lined.

Employees may be relieved from providing visual protection when:

- Local instructions specify tracks involved and how shoving movement will be protected, such as shove light or monitored cameras.

- A track has been pulled and an equivalent amount or less of cars or equipment will be immediately shoved back into that track and that track has remained clear to the location where the movement will be stopped.

- Immediately before shoving, a movement is made on the adjacent track providing the employee the ability to visually determine the track to be shoved is clear and route is properly lined.

- Authority on main track or controlled siding allows for movement in direction of shove, provided route is properly lined, road crossings will not be fouled and movement at restricted speed is not required.

  or

- Making back up movements in accordance with Rule 6.6 (Back Up Movements).

Shoving movements over road crossings must be made in accordance with Rule 6.32.1 (Providing Warning Over Road Crossings).

**Speeds when Shoving**

When cars are shoved on a main track or controlled siding in the direction authorized, movement must not exceed:

- 20 MPH for freight trains.

- 30 MPH for passenger trains.

- Maximum timetable speed for snow service unless the employee in charge authorizes a higher speed.

### 6.5.1    Remote Control Movements

Remote control movements are considered shoving movements, except when the remote control operator controlling the movement is riding the leading engine in the direction of movement. Before initiating movement, the remote control operator or a crew member must be in position to visually observe the direction the equipment moves.

When Remote Control Zone is equipped with pull back / stop protection (PSP), the operator must verify that PSP is operational. Pull back and stop protection must again be verified if PSP is overridden.

**Relief of Providing Protection**

The remote control operator is relieved from providing protection and the requirement to stop within half the range of vision for movements with engine on leading end when:

1. The remote control zone has been activated.

2. Switches/derails are known to be properly lined.

3. Track(s) within the zone are known to be clear of other trains, engines, railroad cars, and men or equipment fouling track.

Note: These steps must be repeated each time the remote control zone is activated.

# EXHIBIT D

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION

- - - - - - - - - - - - - - - - - -
                            No. 3:23-CV-00031-HCA

John Sexton,

                    Plaintiff,

        vs.

Dakota, Minnesota & Eastern Railroad
Corporation d/b/a Canadian Pacific,
a Delaware corporation,

                    Defendants.

- - - - - - - - - - - - - - - - - -

DEPOSITION OF

THOMAS JARED

June 20, 2024

10:00 a.m.

TAKEN BY: BRENDA K. FOSS
fossbrenda@yahoo.com
612-701-4282

---

**Page 3**

I N D E X

Examination:                          PAGE:
By Mr. Magnuson          4

Marked Deposition Exhibits:
50 Sexton's Testing (2013+)   42
51 Jared's hotel receipt     96
52 Verizon records          98
53 Sexton's testing history   187
54 Jan 18, '21 e-mails with Tracy Miller
   et al, Bates CP1692, 1693  188
55 Short-Term Incentive data
   Bates CP 3243        189
56 Feb 9, '21 e-mail from Sexton et al
   Bates CP 3295 and 3296     191
57 Feb 1, '21 Top 15 Train Speeds
   CP 3303-3306       197
58 Feb 9, '21 e-mail from Sexton et al
   Bates 3322-3323       198
59 Jared's 2021 Performance Management Form
   Bates CP 3402-3408     203

Reporter's Certificate        206

(Original Deposition Transcript in the
possession of John Magnuson, Esquire).

                    *   *   *   *   *

---

**Page 2**

Deposition of THOMAS JARED, taken
at Dorsey & Whitney LLP, 50 South 6th Street,
Suite 1500, Minneapolis, Minnesota, by and on
behalf of Plaintiff, on Thursday, June 20,
2024, commencing at 10:00 a.m., before Brenda K.
Foss, Professional Court Reporter, Notary
Public, State of Minnesota, County of
Hennepin.

                    *   *   *   *   *

APPEARANCES

ON BEHALF OF THE PLAINTIFF:
   JOHN MAGNUSON, ESQUIRE
   CYLE CRAMER, ESQUIRE
   YAEGER & JUNGBAUER BARRISTERS, PLC
   4601 Weston Woods Way
   St. Paul, MN  55127
   jmagnuson@yjblaw.com
   ccramer@yjblaw.com
   651-288-9500

ON BEHALF OF THE DEFENDANTS:
   JACK SULLIVAN, ESQUIRE
   DORSEY & WHITNEY LLP
   50 South 6th Street, Suite 1500
   Minneapolis, MN  55402
   sullivan.jack@dorsey.com
   612-340-2600

                    *   *   *   *   *

---

**Page 4**

P R O C E E D I N G S

THOMAS JARED,

after having been first duly sworn,

deposes and says under oath as follows:

E X A M I N A T I O N

BY MR. MAGNUSON:

Q  Good morning, Mr. Jared.  Would you please
   state your full name spelling your last name
   for the record?

A  **Thomas Dwight Jared, J-A-R-E-D.**

Q  What is your home address?

A  ███████████████████████████████████
   ████████████.

Q  Do you have a personal cell phone or a home

   phone number?

A  **Yes.**

Q  What is that?

A  **I don't remember my personal.**

Q  You don't remember your personal cell phone

   number?

A  **No.**

Q  We'll look it up and maybe get it on a break.

   The only reason I ask about the home address

21

1    trained on how to perform E tests?
2  A  **I don't know.**
3  Q  You were trained obviously as a trainmaster?
4  A  **I don't recall.**
5  Q  Trainmasters are expected to know how to
6     perform E tests.  Right?
7  A  **Correct.**
8  Q  E tests are efficiency tests.  Right?
9  A  **That is correct.**
10 Q  That's how trainmasters go about making sure
11    that their crews are railroading efficiently
12    and safely.  Right?
13 A  **Correct.**
14 Q  You don't remember when you were trained on
15    it?
16 A  **Correct.**
17 Q  Are there rules that relate to how to conduct
18    E tests?
19 A  **There is a manual for guidance.**
20 Q  What is that called?
21 A  **I don't know.**
22 Q  When did you first read that manual?
23 A  **I couldn't tell you.**
24 Q  When was the last time you read it?
25 A  **In its entirety?**

22

1  Q  Or even referred to it, yes.
2  A  **I reviewed one yesterday or last week.**
3  Q  So it's a document that you refer to
4     frequently in your work?
5  A  **I wouldn't say frequently.**
6  Q  How much do you refer to it?
7  A  **Maybe once a year.  Maybe once every couple**
8     **years.**
9  Q  Are you tested on how to perform E tests?
10 A  **Am I tested?**
11 Q  Right.
12 A  **No.**
13 Q  Are trainmasters?
14 A  **Tested on how they're --**
15 Q  How to properly conduct an E test.
16 A  **There's no specific test if that's what**
17    **you're asking.**
18 Q  Are employees expected to follow the E test
19    procedures that you just referred to?
20 A  **Employees?**
21 Q  Yes, trainmasters, anybody conducting E tests,
22    are they expected to follow that document?
23 A  **They're expected to have that document with**
24    **them and refer to it when they need to.**
25 Q  And that applies to all people conducting E tests?

23

1  A  **Correct.**
2  Q  When you say have it with them, nowadays
3     you're not talking about a paper document?
4     It must be something on a computer or your
5     phone?
6  A  **Well, I don't have a copy of it.**
7  Q  When was the last time you had a copy of it?
8  A  **I couldn't tell you.**
9  Q  You don't know when you were trained
10    initially, but did someone train you on how
11    to conduct E tests?
12 A  **I'm sure they did.**
13 Q  How long ago?
14 A  **2000.**
15 Q  So 24 years ago?
16 A  **Something like that.**
17 Q  Do you train employees on how to conduct E
18    tests?
19 A  **I have in the past.**
20 Q  When was the last time you did that?
21 A  **I don't know.**
22 Q  Have the rules on how to conduct E tests
23    changed over the years?
24 A  **I believe the manual changed over the years.**
25 Q  And there are certain quotas that second line

24

1     supervisors are expected to meet as they
2     relate to E testing.  Correct?
3           MR. SULLIVAN:  Objection, form,
4     lack of personal knowledge.
5  A  **Are you talking about a specific number or**
6     **what are you asking me?**
7  Q  (By Mr. Magnuson, continuing) Yes.  You know
8     what a quota means?
9  A  **Yes.**
10 Q  There are rules that set certain quotas for
11    trainmasters.  Right?
12 A  **There is a guideline that they have to**
13    **complete every month or actually every week**
14    **to every month, yep.**
15 Q  And that would be a quota.  Right?
16 A  **Okay.**
17 Q  You agree with that?
18 A  **Yes.**
19 Q  That's a quota you have to meet?
20 A  **Okay.**
21 Q  Does the US West general manager have a quota
22    on E tests?
23 A  **Now I do.**
24 Q  You do.  When was that implemented?
25 A  **This year.**

25

1  Q  In February of 2021 did you have a quota on
2     E testing?
3  A  No.
4  Q  Do you know why the change occurred?
5  A  I don't.
6  Q  How many tests do you currently have to
7     perform a month?
8  A  I perform four RCLS tests.  I can't remember
9     the exact number of E tests I have to
10    perform.
11 Q  Do you look or have you looked in your career
12    at employee records?  I'll use the example
13    for you of locomotive engineers.  Can you
14    look at like their E testing history and
15    their testing history and be able to determine,
16    boy, this guy is not a good engineer?
17        MR. SULLIVAN:  Objection, form.
18 A  I have the ability to review employee records.
19 Q  (By Mr. Magnuson, continuing) Yeah.  And when
20    you review those, can you, given your
21    experience, look at those and make a
22    determination off the top of your head this
23    guy is a good engineer or this guy is a bad
24    engineer?
25        MR. SULLIVAN:  Objection, form.

26

1  A  No.
2  Q  (By Mr. Magnuson, continuing) There's not
3     some level of failures that would cause an
4     alarm to you if you were to look at someone's
5     five, six year history of E tests you would
6     say, boy, this guy has got some problems?
7         MR. SULLIVAN:  Objection, form.
8  A  Your original question was to determine
9     whether or not they're a good engineer or
10    not.  I don't think that's what you're really
11    asking, is it?
12 Q  (By Mr. Magnuson, continuing) You said you
13    can access E testing records.  If you look at
14    an employee's's E testing history, if someone
15    has a lot of failures would you be able to
16    look at that record and say this guy is not a
17    good engineer?
18 A  That doesn't determine whether or not they
19    are a good engineer.
20 Q  But can it influence your opinion as to
21    whether or not someone is a good engineer?
22 A  No.
23 Q  Conversely if someone has a really
24    exceptionally good E testing history, can you
25    look at that and say I think that guy, at

27

1     least from what this document says, appears
2     to be a good engineer?
3  A  No.
4  Q  Because you want to take the whole holistic
5     organic approach where you look at how they
6     operate?
7  A  Correct.
8  Q  What is the purpose of keeping a document of
9     an employee's E test history?
10        MR. SULLIVAN:  Objection, form,
11    lack of personal knowledge.
12 A  From my perspective?
13 Q  (By Mr. Magnuson, continuing) Right.
14 A  My perspective is that it's a purpose.  I can
15    determine how they're doing with rules
16    compliance and other knowledge of the rules.
17 Q  So knowledge of the rules and rules compliance
18    would suggest how someone is performing as an
19    engineer.  Right?
20 A  No.
21 Q  Then why keep track of it?
22 A  As I stated earlier, it's about rules
23    compliance and their knowledge of the rules.
24 Q  And that's to make sure they're doing their
25    job properly.  Right?

28

1  A  Part of their job.
2  Q  So that would be some evidence as to whether
3     or not an employee is performing good or
4     poorly.  Right?
5  A  As it relates to rules compliance.
6  Q  And rules compliance is to make sure that
7     you're doing the job efficiently and safely.
8     Right?
9  A  As it relates to the rules.
10 Q  And the rules are important?
11 A  Correct.
12 Q  And the rules are there to make sure that
13    things run efficiently and safely.  Right?
14 A  That's part of it.
15 Q  What is the other part?
16 A  Safely and efficiently.  I think you did say
17    that, didn't you?
18 Q  I did.
19 A  You're correct.  That's right.
20 Q  Do you remember what rule you looked at in
21    the E testing manual last year?
22 A  Last year?  No.
23 Q  Or whenever the last time you looked at it.
24    You said maybe it was last week, last month?
25 A  I think I looked at it yesterday.

73

1  and the other is for when test conditions are
2  set up.  Correct?
3  A  **Correct.**
4  Q  And part of the purpose behind the four
5  guidelines under the paragraph for the set up
6  test conditions would be to ensure that the
7  test is being conducted safely.  Correct?
8  A  **Those four bullet points?**
9  Q  Yes.
10 A  **I don't see where that has anything to do**
11 **with safety.**
12 Q  Any time you change existing operating
13 conditions, it could be dangerous is what you
14 testified to a few minutes ago.  Right?
15 A  **It could.**
16 Q  Could.  Okay.  When it says set up here, that
17 means you're changing the operating conditions.
18 Right?
19 A  **Yes, sir.**
20 Q  How many other guidelines are there in
21 Exhibit 39 that have provisions for
22 conducting a set up test?
23 A  **Do you want me to note each rule?**
24 Q  Yes.
25 A  **(Witness examining document).**

74

1  Q  Note for the record he just called these
2  rules.
3  A  **Okay, but they're not.  When I say rule, the**
4  **code or the test code references a rule so --**
5  **do you just want me to note things?**
6  Q  Yes.
7  A  **Page 12 talks about don'ts on a set up test.**
8  **Page 16, page 17, page 18, page 19, page 20,**
9  **page 21, 23, 24, 25, 26.**
10 Q  I will interrupt you.  Page 25, I don't see
11 where that -- oh, it's a continuation of 24.
12 Sorry I interrupted you.
13 A  **If I didn't say 27, 27, 29, 32.**
14 Q  I'll stop you there.  We get the idea at this
15 point that there are a lot of these guide-
16 lines that contain provisions for how to
17 conduct a set up test.  Right?
18 A  **Yes, it does -- it provides guidelines to set**
19 **up a set up test.**
20 Q  And I get the hunch, because I'm going
21 forward here to 34 and 35, those procedures
22 have procedures for conducting set up tests?
23     MR. SULLIVAN:  Objection, form.
24 Document speaks for itself.
25     MR. MAGNUSON:  Pull up the

75

1  investigation letter.
2     (Discussion off the record).
3  Q  (By Mr. Magnuson, continuing) Can we see the
4  investigation letter?  We'll go through this.
5  Did you read the investigation transcript
6  after the investigation occurred?
7  A  **No.**
8  Q  Have you ever read it?
9  A  **No.**
10     MR. SULLIVAN:  Can we clip up 39?
11 I just don't want to get documents messed up.
12     MR. MAGNUSON:  Yes.
13 Q  (By Mr. Magnuson, continuing) I'm handing you
14 what has already been marked Exhibit 12.
15 Take a second to review it.
16 A  **(Witness examining document).  Okay.**
17 Q  So does that refresh your recollection that
18 the charges that were brought against
19 Mr. Sexton and that you issued discipline on
20 was GCOR 5.3.7?
21     MR. SULLIVAN:  I object to the
22 form of the question, misstates the record.
23 A  **I did not issue the discipline and that is**
24 **GCOR 5.3.7.**
25 Q  This is your signature on Exhibit 12?

76

1  A  **That's a stamped signature that came from the**
2  **administrative office.**
3  Q  But that's your signature?
4  A  **That is my signature but I did not sign that.**
5  Q  Did you read it?
6  A  **After it was issued.**
7  Q  Not before?
8  A  **No.**
9  Q  Is that typical?  Is that your practice?
10 A  **What do you mean?**
11 Q  Do you read things before they go out under
12 your signature typically?
13 A  **No.**
14 Q  Okay.  It seems to indicate that you -- well,
15 you intended for this letter to go out I'm
16 assuming?
17 A  **I wasn't involved in putting this letter**
18 **together or anything with this letter.**
19 Q  Who did?
20 A  **Someone in the administrative office.**
21 Q  Do you know who that would have been in
22 February of '23 (sic)?
23 A  **I don't.**
24 Q  Did you tell someone to issue this letter on
25 your behalf?

77

| 1 | A | I did not. |
| 2 | Q | Does this refresh your recollection at all |
| 3 | | about the rule that Mr. Sexton was |
| 4 | | disciplined for violating? |
| 5 | A | It does. It's 5.3.7. |
| 6 | Q | Do letters go out with your signature that |
| 7 | | you don't read on a daily basis? |
| 8 | A | I do not review everything that gets put out. |
| 9 | Q | With your signature on it? |
| 10 | A | Correct. |
| 11 | Q | As you sit here today, do you disagree with |
| 12 | | the contents of this letter? |
| 13 | A | I don't disagree with it, no. |
| 14 | Q | You don't think anything is incorrect? |
| 15 | A | Other than my signature. |
| 16 | Q | What do you mean by that? |
| 17 | A | I didn't sign it. |
| 18 | Q | Do you give people permission to sign certain |
| 19 | | things on your behalf without reading them or -- |
| 20 | A | The admin staff has my stamped signature. |
| 21 | | When things need to go out under the general |
| 22 | | manager, they do have permission to put that |
| 23 | | stamp on it, yeah. |
| 24 | Q | But you must have told someone to issue this |
| 25 | | letter? |

78

| 1 | A | No, I absolutely did not. |
| 2 | Q | Who did? |
| 3 | A | I don't know. |
| 4 | Q | Who made the decision to discipline Mr. Sexton? |
| 5 | A | That would have been my boss. |
| 6 | Q | Who is that? |
| 7 | A | Jason Ross. |
| 8 | Q | So if Mr. Ross is asked and he says 'I didn't |
| 9 | | make that decision', is there anyone else |
| 10 | | that would have made it? |
| 11 | A | I don't know what Mr. Ross is going to say. |
| 12 | Q | Did you recommend the 20 day suspension in |
| 13 | | Mr. Sexton's case? |
| 14 | A | No. |
| 15 | Q | How do you know that? |
| 16 | A | Because I specifically told the admin staff |
| 17 | | that I'm not to be involved in any way, shape |
| 18 | | or form in the discipline or the letter to be |
| 19 | | put out. |
| 20 | Q | Because you conducted the test? |
| 21 | A | And I was in the hearing. |
| 22 | Q | If we can go back to the E test manual to |
| 23 | | page 103, do you see that? |
| 24 | A | Yes. |
| 25 | Q | It says Test GRF02 Shoving or Pushing |

79

| 1 | | Movements. Right? |
| 2 | A | Yes. |
| 3 | Q | You're familiar with that guideline? |
| 4 | A | I am. |
| 5 | Q | It says Rules Tested: GCOR 2.13, GCOR 5.3.6, |
| 6 | | GCOR 5.3.7, GCOR 6.1.1, and GCOR 6.5 are the |
| 7 | | rules identified there. Right? |
| 8 | A | Correct. |
| 9 | Q | And that is the rule that Mr. Sexton |
| 10 | | was disciplined for violating according to |
| 11 | | Exhibit 12. Right? |
| 12 | A | It says 5.3.7, correct. |
| 13 | Q | Under Test Conditions it says, "When |
| 14 | | conducting this test, actual operating |
| 15 | | conditions are to be observed." Correct? |
| 16 | A | Correct. |
| 17 | Q | And the words set up are not in that rule or |
| 18 | | at least in that line after Test Conditions. |
| 19 | | Right? |
| 20 | A | They're not in this guideline or this manual, |
| 21 | | no. |
| 22 | Q | And under Procedure, there is no paragraph |
| 23 | | identifying procedures for conducting a set |
| 24 | | up test. Correct? |
| 25 | A | Correct. |

80

| 1 | Q | In fact, the words set up don't exist |
| 2 | | anywhere in Test GRF02. Correct? |
| 3 | A | Correct. |
| 4 | Q | I'm going to show you what we have marked |
| 5 | | Exhibit 35 previously. Take a minute to |
| 6 | | review that. You may want to clip those back |
| 7 | | together just so we don't have to shuffle |
| 8 | | cards later. |
| 9 | A | (Witness examining document). Okay. |
| 10 | Q | So you've reviewed Exhibit 35 in its |
| 11 | | entirety. Correct? |
| 12 | A | That is correct. |
| 13 | Q | And this is an e-mail string from February |
| 14 | | 15, '21 up to February 24, '21. Right? |
| 15 | A | That is correct. |
| 16 | Q | And if you see on the first page it's an |
| 17 | | e-mail from Dylan Smith on Monday, February |
| 18 | | 15, 2021. Right? |
| 19 | A | Correct. |
| 20 | Q | And you're copied on that e-mail? |
| 21 | A | I am. |
| 22 | Q | It says, "I've reviewed the evidence and |
| 23 | | given that this is Mr. Sextons first major I |
| 24 | | recommend 10 served 10 deferred." Right? |
| 25 | A | Correct. |

93

1  Q  When was the last time you were tested?
2  A  **December.**
3  Q  Of last year?
4  A  **Yes.**
5  Q  How did you do?
6  A  **Good.  Passed.**
7  Q  You don't remember your score?
8  A  **No.  In the 90s.**
9        MR. SULLIVAN:  Let's take that
10       break.  We'll be back at 1:30.
11             (Luncheon recess).
12  Q  (By Mr. Magnuson, continuing) Mr. Jared, we
13     took a quick lunch break.  We're back here
14     for the afternoon session.  Just a couple of
15     quick follow-ups on what we were talking
16     about before.  Why did the discipline letter
17     not go out under Mr. Ross' signature if you
18     know?
19  A  **I don't know.**
20  Q  You testified that you agreed with it when
21     you reviewed it at the time?
22  A  **I did not say that.**
23  Q  Well, when did you first read that letter?
24  A  **I don't know.**
25  Q  Have you ever seen it before today?

94

1  A  **I can't recall.**
2  Q  If you had disagreed with it, would you have
3     been able to call Mr. Ross and have a
4     discussion with him about that if you had
5     thought that less discipline was appropriate?
6  A  **No.**
7  Q  If there was concern over your involvement in
8     the decision to issue discipline, why did
9     this letter go out under your signature?
10  A  **I didn't make a decision.**
11  Q  You said that you were concerned because you
12     conducted the E test and you conducted the
13     investigation and you wanted to be removed to
14     some extent from the process of the discipline.
15     Right?
16        MR. SULLIVAN:  Objection,
17     misstates the witness' testimony.
18  Q  (By Mr. Magnuson, continuing) If I misstated
19     that, tell me how.
20  A  **I have to read what was actually written, but**
21     **what I said is that -- this probably isn't**
22     **verbatim, but I was the one that was actually**
23     **the witness so I could have no part of the**
24     **discipline process.**
25  Q  When you say 'I could have no part of the

95

1     discipline process', what do you mean by
2     that?
3  A  **I could not give recommendations.  I could**
4     **not do anything that's involved in making a**
5     **decision whether or not he was disciplined**
6     **through this process.**
7  Q  Because you want your investigations to be
8     done in a fair and impartial manner.  Right?
9  A  **That is correct.**
10  Q  Why in late January 2021 were you down in
11     Iowa?
12  A  **I don't remember.**
13  Q  Do you recall that you were down there in
14     late January?
15  A  **No.**
16  Q  You could have been.  You don't have any idea
17     what you were doing down there?
18  A  **I don't recall.**
19  Q  You weren't down there to conduct E tests,
20     were you, specifically?
21  A  **I don't remember.**
22  Q  How was your territory doing in early 2021?
23  A  **In relationship to what?**
24  Q  Your performance.
25  A  **I thought I was doing well.**

96

1  Q  How about the territory itself, not you in
2     particular but your territory?
3  A  **It was doing well.**
4        (Deposition Exhibit 51 marked for
5     identification).
6  Q  I will show you what we'll mark as your
7     Exhibit 51.
8  A  **(Witness examining document).  Okay.**
9  Q  Have you had a chance to review this?
10  A  **I have.**
11  Q  It appears to be a hotel receipt for you at
12     the Blackhawk Hotel in Davenport, Iowa.
13     Correct?
14  A  **Correct.**
15  Q  It looks like you checked in on January 31st
16     and checked out on February 2nd.  Does that
17     look to be accurate?
18  A  **February 3rd.**
19  Q  It looks like the Mastercard was on February
20     3rd.  It looks like you spent three nights.
21     Right?
22        MR. SULLIVAN:  Objection.  The
23     document speaks for itself.
24  A  **I don't know what the times for the checkout**
25     **were.  I would not assume that 2/3/21 was three**

125

1  and Mr. Johnson about Mr. Cruciani being a
2  witness at this investigation?
3  **A  No, I don't.**
4  Q  Do you know who Mr. Cruciani is?
5  **A  Yes.**
6  Q  He no longer works for the railroad?
7  **A  Cruciani?**
8  Q  Correct.
9  **A  Yes, he does.**
10 Q  It's Mr. Cox.  Do you know who Mr. Cox was?
11 **A  Yes.**
12 Q  Does he still work for the railroad?
13 **A  I don't know.**
14 Q  Along those same lines, was it requested that
15    Mr. Cox by Mr. Rainwater be a witness at this
16    investigation?
17 **A  I'm not aware of who was requested to be**
18    **there or not.**
19 Q  CP desires for their company-held formal
20    investigations to be fair and impartial.
21    Right?
22 **A  Yes.**
23 Q  Unbiased towards the company versus the
24    employee.  Right?
25 **A  Correct.**

126

1  Q  Clean slate.  You want it to be fair for both
2     sides?
3  **A  That's correct.**
4  Q  Would you agree with me that when conducting
5     an investigation, people with personal
6     knowledge of the events leading to an
7     investigation should be witnesses?
8         MR. SULLIVAN:  Objection, lack of
9     personal knowledge, calls for speculation.
10 **A  In hearings, you'd like all the pertinent**
11    **parties to show up.**
12 Q  (By Mr. Magnuson, continuing) Pertinent
13    parties.  Excellent.  Would you call a
14    pertinent party someone who is a witness to
15    the event?
16 **A  Yes.**
17 Q  You've conducted these investigations yourself?
18 **A  I have.**
19 Q  You've reviewed transcripts and made
20    discipline recommendations over the years?
21 **A  I have.**
22 Q  You know how to see a fair hearing when you
23    see one.  Right?
24 **A  I think so.**
25 Q  And you just said you want all people who are

127

1  witnesses to be able to testify?
2         MR. SULLIVAN:  Objection,
3  misstates the witness' testimony.
4         THE WITNESS:  One more time.
5  Q  (By Mr. Magnuson, continuing) You said
6     pertinent witnesses should be included?
7  **A  Yes.**
8  Q  And you said eye witnesses to events could be
9     considered pertinent.  Right?
10 **A  Yes.**
11 Q  And credibility assessments are made at these
12    which is why people prefer live testimony.
13    Right?
14 **A  Not necessarily.**
15 Q  You don't tend to rely on handwritten
16    statements as much as you tend to rely on eye
17    witnesses.  Right?  You want witnesses to be
18    able to testify live?
19         MR. SULLIVAN:  Objection, form.
20 **A  I want witnesses to be available for the**
21    **hearing.**
22 Q  (By Mr. Magnuson, continuing) And to conduct
23    a fair and impartial hearing, you want
24    pertinent witnesses to testify?
25 **A  I'm sorry?**

128

1  Q  In order for a hearing to be fair and
2     impartial, you want pertinent witnesses to
3     testify?
4  **A  Yes.**
5  Q  Let's go to page 18.  Let me ask you this
6     before we start.  Before you read anything,
7     what do you remember about the E test you
8     conducted on Mr. Sexton?
9  **A  Where do you want me to start?**
10 Q  What do you remember about it?
11 **A  I remember going through the process of**
12    **setting up a test.  I remember the test.  I**
13    **remember it concluding.**
14 Q  You've testified a whole bunch of times so
15    far that you don't even know why you were in
16    the Davenport, Marquette area at the time.
17    Right?
18 **A  Yes.**
19 Q  How is it that you ended up on the south end
20    of the Marquette yard, Nahant?
21 **A  South of the Nahant yard?**
22 Q  Yes.
23 **A  I was performing an E test.**
24 Q  Who told you to do that?
25 **A  Nobody.**

129

1  Q  Why did you decide to do that?
2  A  **The situation presented itself to be able to**
3     **perform that type of test.**
4  Q  What was the situation?
5  A  **4 track was a clear track. I knew there was**
6     **nobody else going to be around that was going**
7     **to affect the movement. I thought it was**
8     **safe to do so, so I performed the test.**
9  Q  Would you agree with me that you were three
10    levels above the most frequently visible
11    manager in the Nahant yard at that time?
12        MR. SULLIVAN: Objection, form,
13    calls for speculation.
14        MR. MAGNUSON: What's wrong with
15    the form?
16        MR. SULLIVAN: Who is the most
17    visible. How is he supposed to know who is
18    the most visible?
19        MR. MAGNUSON: In terms of
20    hierarchy and who physically works at the
21    yard.
22        MR. SULLIVAN: Who is the most
23    visible, what does that mean? To who?
24        MR. MAGNUSON: He can answer.
25  A  **I don't know that.**

130

1  Q  (By Mr. Magnuson, continuing) At Nahant yard
2     that day, who all -- not exactly that day but
3     in terms of hierarchy, who all was responsible
4     below you down to the trainmaster level for
5     that yard?
6  A  **Dylan Smith. I don't know who the assistant**
7     **superintendent was. Trainmasters -- I don't**
8     **know which trainmasters were there at the**
9     **time.**
10  Q  What was Dylan's title again?
11  A  **Superintendent I think.**
12  Q  So you have the trainmaster level. Did road
13    foreman of engines conduct E tests?
14  A  **Yes.**
15  Q  So road foreman of engines would have been at
16    Nahant as well?
17  A  **I'm not sure if we had one there at that time**
18    **or not.**
19  Q  But then superintendents would have been
20    there?
21  A  **Stationed.**
22  Q  Or responsible for it?
23  A  **That is correct.**
24  Q  Stationed there?
25  A  **Thank you.**

131

1  Q  How many trainmasters were there?
2  A  **I don't know.**
3  Q  Over ten?
4  A  **No.**
5  Q  More than four?
6  A  **No.**
7  Q  Approximately within one to four, one to
8     three?
9  A  **One to none.**
10  Q  How many superintendents were there?
11  A  **One.**
12  Q  And that would have been Dylan Smith?
13  A  **Correct.**
14  Q  So you think there was only one trainmaster
15    working at Nahant at that time?
16  A  **Stationed at Nahant at that time.**
17  Q  Stationed at Nahant. If you're stationed
18    somewhere else, would someone else come in
19    and cover Nahant?
20  A  **No.**
21  Q  So it just would have no trainmaster on duty?
22  A  **Yep.**
23  Q  And you said the situation presented itself.
24    Why were you at Nahant that day at all?
25  A  **I don't recall.**

132

1  Q  You knew that the 474 was coming in to Nahant
2     that day. Right?
3  A  **Yes.**
4  Q  And you were made aware pursuant to that
5     e-mail that there was a delay with the 474.
6     Right?
7  A  **I can't tell you if I knew about that prior**
8     **to or not.**
9  Q  You monitor your e-mails. You read them.
10    Right?
11  A  **Not all the time.**
12  Q  It kind of looks like you read the e-mail
13    that you sent to Mr. McKelvey though, doesn't
14    it?
15  A  **It looks like I asked McKelvey to respond to**
16    **me, to call me when he had a minute.**
17  Q  Right in the subject line the 474 is
18    referenced. Right?
19  A  **That is correct.**
20  Q  You don't know why you were at Nahant that
21    day?
22  A  **No.**
23  Q  How much prior to around noon were you at
24    Nahant?
25  A  **I don't know.**

145

1  A  I said no.

2  Q  If they just stopped communicating?

3  A  After I told them?

4  Q  No, no.  If you are E testing a conductor

5     sitting in your truck for instance -- you're

6     watching the conductor to see what he's doing

7     and see how good he's performing.

8  A  Correct.

9  Q  That's something you do?

10 A  Yes.

11 Q  And you observed that conductor just stare

12    off into space and stop communicating with an

13    engineer, that would be in violation of the

14    rules, wouldn't it?

15 A  That would be, yes.

16 Q  Why?

17 A  Because the rules say he's supposed to

18    provide direction and distance during shoving

19    movements.

20 Q  And you told him not to do that anymore.

21    Correct?

22 A  That's correct.  I was in the process of

23    validating whether or not the engineer was

24    going to comply with half the range of

25    vision.

146

1  Q  And at that point you were operating with the

2     assumption that the last car count was 50?

3  A  No.

4  Q  At that point?

5  A  No.

6  Q  Let's go through your testimony.  Let's go to

7     page 19 through to 20.  Up to that point, you

8     walked up to him.  Right?

9  A  Okay.

10        MR. SULLIVAN:  So it's this

11    section of page 19 and page 20 is on the next

12    page?

13        MR. MAGNUSON:  Yep.

14        THE WITNESS:  So the last

15    paragraph you want me to read?

16 Q  (By Mr. Magnuson, continuing)  Top of 20.

17 A  Do you want me to review 20 or 19?

18 Q  Bottom of 19 and the top of 20.  We're going

19    to go through it step by step.

20 A  (Witness examining document).  Do you have a

21    question?

22 Q  As you walked up to him -- well, right before

23    you walked up to him, you were under the

24    assumption that he had given him a 50 car

25    count?

147

1  A  It might be semantics, but are you asking

2     like when I decided to walk up to him?

3  Q  You walked up to him and as you walked up to

4     him, you say he gave a 15 car count to Sexton?

5  A  The testimony says Mr. DePover actually

6     started a shoving movement into 4 track.  He

7     gave initial car count of 50.  I was actually

8     on the south end of the yard at the time in

9     my vehicle.  So I was in my vehicle when he

10    gave the 50 car count, which I actually

11    dismounted at that time and I was -- I walked

12    over to Mr. DePover.  He was in between on

13    the south side of 4 track.  I walked up to

14    him.  As I walked up to him, he gave a 15 car

15    count.

16 Q  So before you got to him, right before you

17    got to him, you were still under the

18    impression that he had a 50 car track?  He

19    had a clear alley for 50 cars?

20 A  I heard him give a 50 car count prior to me

21    dismounting my vehicle.

22 Q  Okay.  That was what I was asking.  So as you

23    got to him, you heard him give a 15 car count

24    to the engineer?

25 A  That's correct.

148

1  Q  What did he say specifically?  What were his

2     exact words?

3  A  I don't remember the exact words, but he gave

4     a 15 car count.  How he says it -- everybody

5     says it a little bit different.

6  Q  As we will find out here shortly, Sexton and

7     DePover testify that he said 15 to a stop,

8     you're good for 40?

9        MR. SULLIVAN:  Objection,

10    misstates the document.

11 Q  (By Mr. Magnuson, continuing)  Did you hear

12    him say that?

13 A  No.

14 Q  Did you hear him reference 40 cars at all?

15 A  I don't recall.

16 Q  Did you hear him say 15 cars to a stop at

17    all?

18 A  I heard him say 15 car count.

19 Q  You didn't hear him say 15 to a stop?

20 A  I don't remember him saying that.

21 Q  You didn't hear him reference 40 cars?

22 A  I don't recall him saying that.

23 Q  What would half the distance of 40 cars be?

24 A  20, but he gave a 15 car count.  So it was --

25 Q  If he says 15 to a stop, that's not a 15 car

149

1   count.  Right?

2   A   **No.  The rule is that you go half the range**
3       **provided.  He provided a 15 car count.**

4   Q   And if he had said you are clear for 40, that
5       range would have been 40 cars.  Right?

6   A   **That's incorrect.**

7   Q   If he had said that.  I understand you don't
8       remember him saying that, but what if he had?

9   A   **He would have had to say that you're good for**
10      **40.**

11  Q   And he testified that that's what he said?

12          MR. SULLIVAN:  Objection,
13      misstates the document.

14          MR. MAGNUSON:  We'll get to it.

15          MR. SULLIVAN:  Don't misstate it.

16  Q   (By Mr. Magnuson, continuing) If he said
17      you're clear for 40 or you're good for 40,
18      that means the same thing.  Right?

19  A   **He still has to count him down.**

20  Q   But if he says you're good for 40 or you're
21      clear for 40, that's a 40 car count.  Right?

22  A   **If that's all he said.**

23  Q   How does the 15 to a stop, if he said it,
24      play into that?

25  A   **He did say it.  And since he gave the 15, he**

150

1   **would have had to stop in 7-1/2, 8 car**
2   **lengths.**

3   Q   Both Sexton and DePover say that he says 15
4       to a stop, to a stop.  That's less than a 15
5       car count.  That's different than a 15 car
6       count.  Right?

7   A   **If he would have said 15 to a stop?**

8   Q   And you're clear for 40.

9   A   **Then no.  Then he has to go off the most**
10      **restrictive which is the 15.**

11  Q   Clear for 40 means clear for 40.  Right?

12  A   **No.  Once he gave -- if that would have been**
13      **the car count he gave and stuck with that car**
14      **count, then you're accurate in what you're**
15      **saying.  But that's not what happened.  He**
16      **gave a 15 car count.**

17  Q   Well, you understand that your recollection
18      is that you heard a 15 car count but Sexton
19      and DePover disagree.  Right?

20  A   **I don't know.  I didn't read the testimony.**

21  Q   We'll get to it.  Did you talk to Cruciani
22      after this incident about what he heard?

23  A   **No.**

24  Q   But you knew that he could communicate with
25      Sexton and DePover over the radio, right,

151

1   because they job briefed?

2   A   **Correct.**

3   Q   Did you know that Cruciani was protecting the
4       shove on the north end?

5   A   **He was not protecting the shove.**

6   Q   Do you know that Sexton and DePover both
7       claimed he was?

8   A   **That's false testimony then.**

9   Q   You disagree with them?

10  A   **Wholeheartedly, yes.**

11  Q   Well, communication could have occurred
12      between your truck and DePover.  Right?

13          MR. SULLIVAN:  Objection, form,
14      calls for speculation.

15  A   **Can you repeat it?**

16  Q   (By Mr. Magnuson, continuing) I'm assuming
17      because your recollection of these events is
18      so good you're going to tell us that your
19      truck window was down and that your radio was
20      really loud.  Right?

21          MR. SULLIVAN:  Objection,
22      argumentative.

23  A   **I'm not saying that.**

24  Q   (By Mr. Magnuson, continuing) Do you recall
25      testifying to that?

152

1   A   **I don't recall saying that.**

2   Q   Could communications between Sexton and
3       DePover have occurred between the time you
4       left your truck and the time you got to
5       DePover?

6   A   **It could have, yep.**

7   Q   It could have happened and you didn't hear
8       it.  Right?

9   A   **It could have.**

10  Q   But you knew that Cox and Cruciani were on
11      the north end?

12          MR. SULLIVAN:  Objection,
13      misstates the witness' testimony.

14  A   **I don't know where Cox was.**

15  Q   (By Mr. Magnuson, continuing) You knew that
16      Cox and Cruciani could communicate by radio
17      with Sexton and DePover.  Right?

18  A   **I don't know where Cox was.**

19  Q   You heard the north end communicate and
20      conduct a job briefing with the south end.
21      Right?

22  A   **I heard Cruciani talking and giving a**
23      **briefing with the 474 crew.**

24  Q   But you didn't talk to Cruciani?

25  A   **No.**

157

1  Q  Do you just show up in yards randomly and
2     conduct E tests?
3  A  **Yes.**
4  Q  Why were you in the south part of the yard?
5  A  **I was at the south end of the yard because I**
6     **knew the 474 was coming inbound and I saw the**
7     **opportunity to perform an E test.**
8  Q  So your intent was to E test the 474?
9  A  **Correct.**
10 Q  So if we can look at pages 19 and 20, this is
11    your testimony.  Initially I thought maybe we
12    were dealing with a typo.  But if you look at
13    19, line 11, it says, "That setout consisted
14    of 76 cars."  On page 20, line 15, it says,
15    "again, he had 76 cars."
16 A  **Okay.**
17 Q  I think you might have looked at a tonnage
18    profile prior to the investigation.  Does
19    that refresh your recollection that they had
20    ahold of 76 cars?
21 A  **No, unless it was on the inbound train.**
22 Q  Why does it say 76 cars here on pages 19 and
23    20 with your testimony?
24 A  **I don't recall.**
25 Q  But you're going to maintain that you were

158

1     mistaken in the investigation, that they had
2     ahold of less?
3  A  **Can I read this?  Do you mind?**
4  Q  No.
5  A  **(Witness examining document).**
6  Q  It appears that you testified that they had
7     ahold of 76 cars.  Right?
8  A  **Can you let me read my testimony?**
9  Q  I have directed you right to the line of page
10    20, line 15.
11 A  **I'm aware of that, but I don't know what the**
12    **rest of my testimony is.  If I cleared that**
13    **up -- they might have had 76 cars to set out**
14    **but --**
15 Q  You know what --
16 A  **That 76 cars didn't have to go on the one**
17    **track, but I don't know that until I read the**
18    **transcript.**
19 Q  We're not going to use our time here letting
20    him read.  So let's go off the record.  Any
21    time he wants to extend his prep time, we'll
22    go off the record.
23       MR. SULLIVAN:  Do you want to ask
24    him about any other -- like the tonnage
25    profile?  It can help him clarify.

159

1       MR. MAGNUSON:  I was going to get
2     there.  That's already peoples' testimony.
3       MR. SULLIVAN:  His testimony is
4     referring to the tonnage profile on page 23.
5       MR. MAGNUSON:  I see other people
6     on the tonnage profile.
7  Q  (By Mr. Magnuson, continuing) Are you still
8     reading?
9  A  **I didn't know you wanted me to keep reading.**
10    **Sorry.**
11 Q  Well, I'm trying to determine whether or not
12    this train had ahold of 76 cars.  At least in
13    the two lines we just referenced of your
14    testimony, you testify that it was 76 cars.
15    Right?
16 A  **I did testify twice that said 76 cars.**
17 Q  Yes.  That's all I wanted to know.  Did you
18    testify to that?
19 A  **Okay.  Yes.**
20 Q  Let's go to page 24 -- actually 23, the
21    bottom sentence, line 23, to page 24, line
22    13.  Can you read that?
23 A  **(Witness examining document).  To page what,**
24    **13?**
25 Q  24, line 13.

160

1  A  **(Witness examining document).  Okay.**
2  Q  That discussion about the tonnage profile
3     that Mr. DePover provided in terms of the
4     markings, where he made the mark, would seem
5     to indicate that there were 76 cars as well.
6     Right?
7  A  **Right.**
8  Q  Page 27, line 12, let me know when you're
9     done with that answer, lines 12 through 20.
10 A  **(Witness examining document).**
11 Q  After they de-trained, de-boarded, tied up,
12    what have you, you brought them -- them
13    meaning DePover and Sexton -- up to the depot
14    at the north end.  Right?
15 A  **Yes, they were brought up to the north end.**
16 Q  And you interviewed them.  Right?
17 A  **It looks like -- on this part the testimony**
18    **looks like Mr. DePover was interviewed.**
19 Q  It says, "They were relieved on the south
20    end.  And because of their hours, they were
21    brought to the north end".  That would
22    suggest that Sexton was brought to the north
23    end as well or not?
24 A  **Correct.**
25 Q  So both DePover and Sexton came to the north

161

1    end, and I believe Dylan Smith joined you at
2    that point?
3  A  **I believe so.**
4  Q  And they were interviewed and you got a
5    written statement from Mr. DePover. Right?
6  A  **Yes.**
7  Q  And that was after their hours of service had
8    expired. Right?
9  A  **I believe so.**
10  Q  We don't need to harp on this. Were you able
11    to watch video at the investigation?
12  A  **Yes.**
13  Q  There's no question that video existed at
14    least the day of this investigation. Right?
15  A  **That's correct.**
16  Q  Did anyone ever ask you to attempt to find
17    the video or locate it?
18  A  **I think at some point somebody did.**
19  Q  How is that video, that surveillance video,
20    how is it stored? Who houses it, if you know?
21  A  **I don't know how it's stored or who houses it.**
22  Q  When it's used in an investigation like this,
23    does someone pull the pertinent part, put it
24    on a thumb drive and hand it to someone, or
25    is it accessed through CP Systems or how does

162

1    that work?
2  A  **I don't recall how that was done in this**
3    **particular case.**
4  Q  Do you know how it was played? Was it played
5    on a laptop and some projector on a wall?
6  A  **I don't.**
7  Q  Let's go to page 33.
8  A  **Okay.**
9  Q  This is your testimony starting at line 2.
10    Do you see on line 6 you state, "They do have
11    76 cars ahold of at this time"?
12  A  **Correct.**
13  Q  And after that you testified, "You're gonna
14    see myself, I'm entering the frame at the
15    bottom of the screen."
16  A  **Okay.**
17  Q  That would indicate we couldn't -- the video
18    didn't depict your truck. Right?
19  A  **I would assume that's correct.**
20  Q  If we go to page 34, line 9, you state, "It's
21    a clear violation of GCOR 5.3.7." Right?
22  A  **Do you mind if I read the rest of my transcript**
23    to see why I said that? (Witness examining
24    document). Line 9, that's correct. He
25    violated 5.3.7.

163

1  Q  Page 45, line 12, do you recall Mr. Rainwater
2    saying for the record "your vehicle is not in
3    view and you didn't have a radio on your
4    person"?
5  A  **I don't recall that.**
6  Q  Any reason to dispute that?
7  A  **No.**
8  Q  We're going to go to page 50.
9  A  **Okay.**
10  Q  Start at -- I guess they're talking at the
11    top about the tonnage profile. And DePover
12    starts testifying about the move and the
13    tonnage profile. So read from line 6 down to
14    24.
15       MR. SULLIVAN: Just for clarity
16    this it is Justin DePover's examination.
17    Correct?
18       MR. MAGNUSON: His statement,
19    testimony. I don't know what you want to
20    call it.
21       MR. SULLIVAN: He's the person
22    giving the answers.
23       MR. MAGNUSON: Correct.
24  A  **(Witness examining document). What line to --**
25  Q  (By Mr. Magnuson, continuing) Just 24.

164

1  A  **(Witness examining document). Okay.**
2  Q  Does that testimony suggest to you that they
3    were going to spot 25 cars in that track,
4    thus the 15 to a stop?
5  A  **He's telling him at this point that he had 15**
6    **cars to stop.**
7  Q  When he gave the initial -- did you ever hear
8    DePover ask Sexton for 25 at the beginning
9    when the initial count was 50?
10  A  **I don't recall that.**
11  Q  But then after he moves 10 cars and he says
12    40, 15 until the stop, that would suggest
13    that they were going to spot 25 cars. Right?
14  A  **I don't recall the number.**
15  Q  But that would make sense from a math
16    perspective, right, if he says, I want 25,
17    you're clear for 50, they move 10, then he
18    says you're clear for 40, 15 to a stop?
19  A  **So that -- it's really not that simple. If**
20    **you're shoving into a track, you still have**
21    **to worry about where the clearances are.**
22  Q  Oh, of course. I'm talking about what their
23    intent was. This would suggest the intent
24    was to spot 25 cars. Right?
25       MR. SULLIVAN: Objection, lack of

165

1　personal knowledge, calls for speculation.
2　　　　MR. MAGNUSON:  He's got
3　foundation to know this stuff.
4　　　　MR. SULLIVAN:  He doesn't have
5　foundation to know what these peoples' intent
6　is.
7　Q　(By Mr. Magnuson, continuing) We can draw
8　　　conclusions that this testimony suggests
9　　　that.  You may not have personal knowledge
10　　　because I know you say you didn't hear it;
11　　　but this would suggest to you that was the
12　　　intent.  Right?
13　A　**No.  That suggests to me that he had to shove**
14　　　**in 15 car lengths, that he should have**
15　　　**stopped within 7.**
16　Q　So you're not considering the initial 50?
17　　　You're not considering clear for a 40?
18　A　**Has no bearing on what was going on at the**
19　　　**time.**
20　Q　Do you think DePover -- you understand he was
21　　　on a furlough prior to this shift for quite
22　　　awhile.  I think it was his second shift back
23　　　or something like that.  Do you recall any of
24　　　that?
25　A　**I thought it was his first shift back.  Maybe**

166

1　　　**it was the second.**
2　Q　First or second.  I understand your testimony
3　　　is that you got to go with the more conservative
4　　　15.  Would you agree that clear for 40, 15 to
5　　　a stop is an unclear radio communication?
6　A　**No.**
7　Q　So these are terms that are within the rules,
8　　　the radio rules?
9　A　**Correct.**
10　Q　Clear for 40, 15 to a stop?
11　A　**Correct.**
12　Q　Not clear for 15.  Right?  Clear for 40?
13　A　**Correct.  When shoving on other than main**
14　　　**track and/or a main track in a shoving**
15　　　**movement, you have to still be prepared to**
16　　　**stop for equipment, broken rails, other types**
17　　　**of situations.  So when you're shoving that**
18　　　**15 car lengths, you're still watching the**
19　　　**shove.  Otherwise he would have just kept**
20　　　**shoving and DePover wouldn't have not -- have**
21　　　**had to say anything.**
22　Q　He stopped after 11.  Right?
23　A　**He stopped 11 cars passed where he should**
24　　　**have.**
25　Q　Well within 20 though.  Right?

167

1　A　**That has no bearing on the situation.  He**
2　　　**should have stopped within 7.  6.28 would**
3　　　**have applied if he would have hit something.**
4　Q　So you're saying he went 11 cars passed where
5　　　he should have stopped?
6　A　**Isn't that what the testimony says?**
7　　　　　MR. SULLIVAN:  Take some time to
8　　　read it and get clear what you were saying
9　　　back at that time.
10　A　**Page 20, "When he stopped, he'd actually**
11　　　**shoved 11 cars into the track further from**
12　　　**that initial count of 50."**
13　Q　(By Mr. Magnuson, continuing) So he should
14　　　have stopped at 7 and he actually stopped at
15　　　11?
16　A　**There you go.  Yes.  Again, you're watching**
17　　　**the shoving movement.  Like if somebody would**
18　　　**have walked across that track and fell for**
19　　　**whatever reason, DePover, the conductor, is**
20　　　**still responsible to watch that shove and**
21　　　**make sure there's nothing back there.  That's**
22　　　**why he did not have -- he was not counting**
23　　　**him down to the 40.  He was counting him down**
24　　　**to the 15.**
25　Q　You recall there was a bunch of testimony

168

1　　　about car lengths.  There was some longer car
2　　　lengths, some shorter ones, some auto racks,
3　　　that type of thing.  I don't need to get into
4　　　it, but you understand that there was some
5　　　testimony about that.  Right?
6　A　**Correct, but I thought there was also footage**
7　　　**noted in the transcript somewhere as well on**
8　　　**my testimony, measurements as well.**
9　Q　You agree that there was no audio to
10　　　correspond with the video?
11　A　**No.**
12　Q　Oftentimes those radio communications on CP
13　　　are recorded?
14　A　**Those are not.**
15　Q　Not at Nahant but in other yards and other
16　　　times, those can be recorded?
17　A　**They can be.**
18　Q　We'll go to 51, the very bottom.  Do you see
19　　　at the very bottom the sentence there where
20　　　DePover says he was "quite under some
21　　　pressure" with respect to you and Mr. Smith
22　　　being in the office with him?
23　A　**Okay.**
24　Q　Do you see the next page 52 that Mr. DePover
25　　　testifies that he felt intimidated by you?

169

1   MR. SULLIVAN:  Objection,
2   misstates the document.
3   Q  (By Mr. Magnuson, continuing) On page 52,
4   line 12, Mr. DePover was asked, "Okay.  So
5   you did feel intimidated, being in the room
6   with Mr. Jared?"  And the answer was, "Yes, I
7   did."  Do you see that?
8   A  I do.
9   Q  That's something that the CP Rail discourages,
10  right, intimidating employees in these
11  circumstances?
12  A  We do discourage intimidation, that's true.
13  Q  Intimidation is the same thing as hostility.
14  Right?
15  A  I don't know that.
16  Q  The top of page 53 DePover testifies your
17  vehicle wasn't in the video screen.  Correct?
18  A  What line?
19  Q  1 through 8.
20  A  (Witness examining document).  Okay.
21  Q  Do you see that?  He says your car wasn't in
22  the video either.  Right?
23  A  Agreed.
24  Q  Moving down to line 13.
25  A  (Witness examining document).

170

1   Q  Have you read that?
2   A  Yes.
3   Q  5.3.7 says unless additional instructions are
4   given.  Right?
5   A  Can I see the rule?
6   Q  Yes, we're pulling it.  But DePover testifies
7   here on line 16, 15 and 16, he updated -- him
8   being Sexton -- with needing 15 more to a
9   stop, still clear for 40.  That's what he
10  says.  Right?
11  A  Correct.
12  Q  I showed you what we marked as your
13  Deposition Exhibit 11.
14  A  Okay.
15  Q  And you see the box under that, that's the
16  movement must stop within half the distance
17  specified unless additional instructions are
18  received.  This is the rule that you
19  testified Mr. Sexton violated.  Right?
20  A  That's correct.
21  Q  And it says, half the distance specified
22  unless additional instructions are received.
23  Do you see that?
24  A  I do.
25  Q  And you agree with that rule?

171

1   A  I do.
2   Q  And you've read Mr. DePover's testimony where
3   he says 15 more to a stop, still clear for
4   40.  Correct?
5   A  15 to a stop.  That's correct.
6   Q  Still clear for 40 is what he testified to.
7   Right?
8   A  That's true but he's also following Rule 6.28.
9   Q  That's what he testified to.  Right?
10  A  I understand that.  That's correct.
11  Q  And that would be an additional instruction.
12  Right?
13  A  That's correct.
14  Q  We're going to start speeding this along here.
15  A  Am I done with this?
16  Q  Yeah, hopefully.  Were you aware that
17  Mr. Rainwater requested of Mr. Reyes to have
18  Cruciani and Cox testify and was denied that?
19  A  No.
20  Q  You don't recall that testimony in the
21  investigation?
22  A  No.
23  Q  Would you agree with me that if an engineer
24  feels that there was a safety issue with snow
25  and ice buildup on tracks, that the engineer

172

1   should make his supervisor aware of it?
2   A  He doesn't have to do that.
3   Q  An engineer doesn't have to make his
4   supervisor aware of a safety concern with
5   snow and ice buildup on tracks?
6   A  No.
7   Q  What should he do in that situation?
8   A  Cut the crossing, cut the tracks.
9   Q  Shouldn't tell his supervisor where he's
10  going, what he's doing?
11  A  Doesn't have to.
12  Q  He can just without telling his supervisor
13  cut away light power, cause any delay that's
14  necessary to make sure the tracks are cut?
15  A  Yes.
16  Q  Okay.  Were you made aware that Mr. McKelvey
17  and Mr. Sexton had a disagreement about
18  whether the tracks should be cut?
19  A  At some point.
20  Q  How were you made aware of that?
21  A  I don't recall.
22  Q  A conversation with Mr. McKelvey perhaps?
23  A  I don't remember.
24  Q  Would you take exception with Mr. McKelvey if
25  he told Sexton 'don't cut those tracks, get

173

1    on your train and go'?

2  A  **If there was snow covered, I would take**
3     **exception with Mr. McKelvey.**

4  Q  Because Sexton says he was told 'don't cut
5     those tracks, get on your train and go'.
6     That's what Sexton testified to.

7  A  **Yeah, I support Mr. Sexton.**

8  Q  And I can represent to you that Mr. DePover
9     is going to testify consistent with that at
10    trial.  So you're okay with Mr. Sexton?

11 A  **Yes.**

12 Q  If Mr. McKelvey says 'don't cut those tracks,
13    get on your train and go', is that Sexton
14    disobeying an order?

15 A  **No.**

16 Q  Why?

17 A  **Because Mr. Sexton is attempting to follow**
18    **the rules like he's supposed to.**

19 Q  You're aware that prior in the months leading
20    up to February 1st, 2021 there were two
21    derailments in the area within a couple
22    hundred miles, 100 miles, due to snow and ice
23    buildup on tracks?

24 A  **No.**

25 Q  You're not aware of that?

174

1  A  **No.**

2  Q  You don't recall seeing circulars or fliers
3     that are put up around depots, hey, be
4     careful about -- to cut your tracks because
5     two derailments happened recently?

6  A  **I don't remember that being put up.**

7  Q  Snow and ice buildup on tracks, particularly
8     crossings, can become problematic because the
9     flange-ways and the wheels can rise up off
10    the rails onto the ice.  Right?

11 A  **It can happen on crossings and rail yards,**
12    **anywhere there's snow and ice.**

13 Q  But it's more frequent at crossings, as I
14    understand it, because automobile traffic
15    tamps down the snow and can cause that ice to
16    build up within the track structure.  Right?

17 A  **That is correct.**

18 Q  Snow and ice buildup on tracks can also cause
19    a locomotive's braking system difficulty or
20    to malfunction.  Right?

21 A  **A locomotive's braking system can get buildup**
22    **and cause issues stopping because the brakes,**
23    **correct.**

24 Q  Ice and snow can build up in the brake system
25    and cause difficulty in stopping.  Right?

175

1  A  **Yes.**

2  Q  Another reason to make sure crossings and
3     flange-ways and tracks are cut is if there's
4     dangerous buildup of snow and ice.  Right?

5  A  **It's two separate issues.**

6  Q  That's what I mean.  There's two reasons at
7     least to cut the tracks.  One, it can cause
8     derailments because the wheels rise up on it.
9     Right?

10 A  **That's correct.**

11 Q  And then it also can cause the brakes to
12    malfunction.  Snow and ice buildup in brake
13    systems can cause the brakes to malfunction.
14    Right?

15 A  **No.**

16 Q  On locomotives?

17 A  **At a crossing?**

18 Q  No.  As they're operating.  If snow and ice
19    builds up in a locomotive's brake system, it
20    can affect how those brakes operate.  Right?

21 A  **Correct.**

22 Q  And it can cause them to fail?

23 A  **That's correct.**

24 Q  And when you've got a big, long train, you
25    need -- a 76 car train, for instance, you

176

1     need the brakes to be able to operate safely.
2     Right?

3  A  **That's correct.  And that's why we have**
4     **procedures when we operate in the winter**
5     **operation that the locomotive engineers are**
6     **responsible to condition their brakes prior**
7     **to stopping.**

8  Q  Do you recall whether or not you looked at a
9     train list for Mr. Sexton that day to know
10    whether or not there was hazardous materials
11    on his train?

12 A  **I don't recall.**

13 Q  Do you know if the 474 routinely transports
14    hazardous materials?

15 A  **Yes.**

16 Q  It does?

17 A  **Yes.**

18 Q  Sexton and Mr. DePover both say there was
19    hazardous materials on that train.  Okay?

20 A  **Okay.**

21 Q  Do you have any reason to disagree with that?

22 A  **I don't.**

23 Q  Marquette to Nahant, you've traveled that
24    route before I'm assuming, that run?

25 A  **Yes.**

1   A   No.

2   Q   This was CTC territory.  Correct?

3   A   No.

4   Q   It wasn't at the time?

5   A   No.

6   Q   Because it was PTC?

7   A   It was TWC.

8   Q   Would TWC -- I was under the impression it

9       was CTC.  Would TWC, if it was downloaded or

10      what have you, be able to tell us what times

11      Mr. Sexton's train passed certain signals?

12  A   No.  There are no signals in TWC.

13  Q   Because it's track warrant controlled.  Okay.

14      So there's no CTC type signals that are

15      communicating between Marquette and Nahant?

16      It's all track warrant controlled?

17  A   No.  There's sections of CTC in there.

18  Q   Oh, there is?  Okay.  Where does it start?

19  A   In 2021?

20  Q   Yes.

21  A   I don't know the milepost, but it's Samoa to

22      Deer Creek, Samoa to Deer Creek.

23  Q   Okay.  Which would have been passed, at least

24      according to these documents, where Sexton

25      traveled cutting the tracks?

1   A   100 miles south, yes.

2           MR. MAGNUSON:  I have to use the

3       restroom super quick.  Let's take five minutes.

4           (Brief recess).

5   Q   (By Mr. Magnuson, continuing) Mr. Jared,

6       prior to conducting the E test on Sexton, did

7       you notify dispatch that you were going to do

8       it?

9   A   No.

10  Q   Do you know how many trains went through

11      Nahant on February 1st, 2021?

12  A   I do not.

13  Q   Do you know what an approximate amount would

14      be on a daily basis?

15  A   Anywhere from 8 to 12.

16  Q   Fairly busy terminal as I understand it?

17  A   For its size, yes.

18  Q   How many other E tests did you conduct on

19      February 1st, 2021?

20  A   That's the only one I can remember.

21  Q   What was it specifically about the 474 that

22      made you want to E test that train?

23  A   The opportunity to perform that type of a

24      test.

25  Q   What do you mean by the opportunity?

1   A   It was a controlled environment.  The tracks

2       were clear.  There was no possibility of the

3       crew shoving off the end of the track.

4   Q   Did you have any idea that the 474 was

5       delayed when you E tested it?

6   A   Not that I recall.

7   Q   But you did talk to Mr. McKelvey that day

8       prior to E testing?

9   A   I don't recall when I talked to him.

10  Q   But the phone records suggest that you talked

11      to McKelvey before the E test.  Right?

12  A   They do suggest that, yes.

13  Q   And you did receive an e-mail from McKelvey

14      or the system identifying the delay.  Right?

15  A   That is correct.

16          (Deposition Exhibit 53 marked for

17      identification).

18  Q   I will show you what we marked Exhibit 53.

19      This is Mr. Sexton's testing data.  I'll ask

20      that you look at that, please.  All I'm

21      really looking for is if you can kind of skim

22      his results.

23  A   (Witness examining document).  What's this?

24  Q   Testing history.

25  A   Oh, for rules?

1   Q   Yep.

2   A   I see that.  Okay.  What about it?

3   Q   If you can look through his scores.

4   A   A lot of 100 percents and upper 90s.

5   Q   That's pretty good.  Right?

6   A   Yes.

7   Q   This if you looked at it just sitting in your

8       office wouldn't cause you any alarm or

9       concern about that engineer?

10  A   No.  I'm confident in John Sexton's ability

11      to understand the rules.  Application might

12      be a little different but he understands

13      them.  He had a 2.37 failure rate.

14          MR. SULLIVAN:  There's no

15      question so you don't have to answer.

16          (Deposition Exhibit 54 marked for

17      identification).

18  Q   (By Mr. Magnuson, continuing) This is Exhibit

19      54.  Do you recall ever reading this?

20  A   (Witness examining document).  Okay.

21  Q   Do you recall reading or receiving the

22      e-mails contained in Exhibit 54?

23  A   I don't recall receiving it, but this is also

24      something I reviewed.

25  Q   It is.  Do you see that in this document or

# EXHIBIT E

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION

- - - - - - - - - - - - - - - - - - -
                    No. 3:23-CV-00031-HCA

John Sexton,

                        Plaintiff,

        vs.

Dakota, Minnesota & Eastern Railroad
Corporation d/b/a Canadian Pacific,
a Delaware corporation
                        Defendants.

- - - - - - - - - - - - - - - - - - -


DEPOSITION OF

MARK JOHNSON

May 10, 2024

1:00 p.m.


TAKEN BY: BRENDA K. FOSS
fossbrenda@yahoo.com
612-701-4282

---

2

Deposition of MARK JOHNSON, taken
via Zoom videoconference, by and on behalf of
Plaintiff, on Friday, May 10, 2024, commencing
at 1:00 p.m., before Brenda K. Foss,
Professional Court Reporter, Notary Public,
State of Minnesota, County of Hennepin.

        *   *   *   *   *

APPEARANCES


ON BEHALF OF THE PLAINTIFF:
    CYLE CRAMER, ESQUIRE
    JOHN MAGNUSON, ESQUIRE
    LAUREN HOSCH, PARALEGAL
    YAEGER & JUNGBAUER BARRISTERS, PLC
    4601 Weston Woods Way
    St. Paul, MN  55127
    ccramer@yjblaw.com
    651-288-9500


ON BEHALF OF THE DEFENDANTS:
    JACK SULLIVAN, ESQUIRE
    DORSEY & WHITNEY LLP
    50 South 6th Street, Suite 1500
    Minneapolis, MN  55402
    sullivan.jack@dorsey.com
    612-340-2600


ALSO PRESENT:
    Michelle Haynes, CPKC Paralegal
    Noah Garcia, DM&E Counsel

        *   *   *   *   *

---

3

I N D E X

Examination:                    PAGE:
By Mr. Cramer                     4

Objections:
By Mr. Sullivan        8, 9, 12, 13,
15, 17-21, 23, 24, 26, 27, 29-34, 36-43, 45,
48-51, 53, 54, 56, 57, 59, 60, 62-67, 70, 71,
73-77, 80-104

Marked Deposition Exhibits:
35 - 2/21 e-mails              21
     Bates 00981-983
36 - 6/22 e-mail to Valadez   24
     Bates 00615-617
37 - 2/21 e-mail from Reyes   28
     Bates 01703
38 - Discipline Call          78
     Bates 00948
39 - US Efficiency Test Manual 79
     Bates 000368-608
40 - Performance Mgmt Program 93
     Bates 03700-3704
41 - STIP                     94
     Bates 03231-3237
42 - Short-Term Incentive     97
     Bates 03711


Reporter's Certificate       106


(Original Deposition Transcript in the
possession of Cyle Cramer, Esquire).

        *   *   *   *   *

---

4

P R O C E E D I N G S


            MARK JOHNSON,

    after having been first duly sworn,

    deposes and says under oath as follows:


        E X A M I N A T I O N

BY MR. CRAMER:

Q   Hi.  My name is Cyle Cramer.  I will be

    taking your deposition today.  I represent

    the plaintiff in this case, John Sexton.  Can

    you please state your first and last name

    spelling your last name?

A   Mark Johnson, J-O-H-N-S-O-N.

Q   Where are you located today?

A   Mason City, Iowa.

Q   Is Jack Sullivan in the room with you?

A   Jack Sullivan is in the room and is the only

    person in the room with me.

Q   Have you had your deposition taken in the past?

A   Yes.

Q   How many times?

A   Once.

Q   What was that for?

A   It was over I believe an injury from what I

21

1 an exhibit?

2 MR. CRAMER: I was just about

3 to -- I'll enter it as Exhibit 35.

4 (Deposition Exhibit 35 marked for

5 identification).

6 Q (By Mr. Cramer, continuing) Do you recall

7 writing this e-mail?

8 A **I don't recall it. But, yes, I wrote it.**

9 Q Is that your e-mail address where it says

10 from?

11 A **Yes, that was my e-mail at that time.**

12 Q What would you ascribe this e-mail as?

13 A **It's my write-up based on the investigation**

14 **and my recommendation.**

15 Q Can you go up a little bit? Then what did

16 you think of Mr. Smith's recommendation?

17 A **I had no feeling. That's his recommendation.**

18 **He's my superior and I have no qualms about**

19 **it.**

20 Q Is his recommendation different than yours?

21 A **Yes.**

22 Q Were you able to recommend a deferred

23 suspension?

24 MR. SULLIVAN: Objection, foundation.

25 A **As I stated before, I don't recall how many I**

22

1 **would recommend a deferred. I just went**

2 **based off of the discipline policy that you**

3 **had entered before and had me look at. So,**

4 **therefore, based on as being a major**

5 **violation, I went with the 20 days and**

6 **Mr. Smith recommended a partial with deferred**

7 **time.**

8 Q (By Mr. Cramer, continuing) As an

9 investigation officer, did you know that you

10 could recommend a deferred suspension?

11 A **I also knew that I could recommend no**

12 **discipline assessed. I mean, I could pretty**

13 **much recommend what I felt would be sufficient.**

14 It was simply that, a recommendation.

15 Q Can you scroll all the way up to the top?

16 According to this, what discipline does it

17 look like Mr. Jared was recommending?

18 A **The recommendation -- he said to issue the**

19 **discipline that I recommended.**

20 Q Did Mr. Jared at any time inform you that the

21 discipline could have been a deferred

22 suspension?

23 A **No, I don't recall any conversation with**

24 **Mr. Jared about this outside of the**

25 **investigation.**

23

1 Q As an investigation officer, do you know

2 whether coach and counseling could have been

3 a proper discipline?

4 A **Can you clarify that question?**

5 Q Yes. Is coach and counseling available in a

6 shoving movement violation such as the one

7 alleged against Mr. Sexton?

8 A **A shoving movement was not considered a non-**

9 **major where verbal coaching would be available**

10 to come into play. That's my opinion.

11 Q Is that based on your training as an engineer --

12 sorry -- as an investigation officer?

13 A **No. It was based off the discipline policy.**

14 Q As an investigation officer, did you have

15 discretion to interpret the discipline policy?

16 MR. SULLIVAN: Objection, lack of

17 personal knowledge and form. You can answer.

18 A **So ask the question one more time. I want to**

19 **make sure I'm understanding it properly.**

20 Q (By Mr. Cramer, continuing) As an

21 investigation officer, did you have

22 discretion to interpret the discipline

23 policy?

24 MR. SULLIVAN: Same objections.

25 A **Can you clarify that?**

24

1 Q (By Mr. Cramer, continuing) I'll try to, and

2 correct me if I misstate any of this. But

3 prior my understanding is you said for a

4 shoving movement violation a coach and

5 counseling wasn't permitted?

6 MR. SULLIVAN: Objection,

7 misstates the witness' testimony.

8 A **So the discipline policy is broken into non-**

9 **major and major. If you go back to the**

10 **exhibit that you presented under major**

11 **offenses, there was no option for verbal**

12 **coaching there.**

13 MR. CRAMER: I think I will just

14 leave it at that. Can you bring up the CP

15 00615? I'll enter this as Exhibit 36. I

16 want to go to the second page. Bates should

17 be 616.

18 (Deposition Exhibit 36 marked for

19 identification).

20 MR. SULLIVAN: Take a minute so

21 we can understand the entire document.

22 MR. CRAMER: What was that, Jack?

23 MR. SULLIVAN: Can we give

24 Mr. Johnson a moment to understand this

25 entire document? I don't know that he's seen

37

1          MR. SULLIVAN:  Objection, form.
2  A  **(Witness examining document).  It's saying**
3     **that they cut away with 76 cars.**
4  Q  Was it your understanding at the time that
5     their train had 76 cars on it during the
6     shoving movement?
7          MR. SULLIVAN:  Objection, lack of
8     personal knowledge.
9  A  **I wasn't present at the time, so I don't know**
10    **if they had set out more cars previous to**
11    **that.  This document just shows that they**
12    **made a cut behind line number 76.**
13 Q  We can scroll down slowly to make sure we are
14    staying with the same or different set of
15    questions.  Go down to 70.  On lines 13
16    through 15, what does Mr. DePover say there?
17 A  **He's saying that he started clear for 50 cars**
18    **and he was -- started him with that, needing**
19    **25 to a stop.  And then he updated him with**
20    **15 more to a stop, still clear for 40.**
21 Q  Is that different than what Mr. Jared said in
22    the investigation?
23 A  **In the way that I recall it, no, because**
24    **Mr. Jared stated the 50 cars.  And then the**
25    **next update was the 15 that he discussed**

38

1     **earlier.**
2  Q  Did Mr. Jared mention the still clear for 40
3     instruction?
4          MR. SULLIVAN:  Objection, the
5     document speaks for itself.
6  A  **No.**
7  Q  (By Mr. Cramer, continuing) So is Mr. DePover
8     giving a different statement regarding the
9     events than Mr. Jared was?
10 A  **Not in its entirety.**
11 Q  What do you mean by that?
12 A  **Because they both refer to the same update**
13    **with 15.**
14 Q  Do they both refer to the update of 40?
15         MR. SULLIVAN:  Objection, misstates
16    the testimony in the transcript.
17 A  **No.**
18 Q  (By Mr. Cramer, continuing) What did you
19    understand 25 to a stop to mean?
20 A  **I wasn't there for that movement.  So 25 to a**
21    **stop could mean to line a switch.  It could**
22    **mean to detrain.  There's different reasons**
23    **that they could need to stop.**
24 Q  Did that sound like an accurate instruction
25    under the circumstances to you?

39

1          MR. SULLIVAN:  Objection, lack of
2     personal knowledge, form, calls for speculation.
3  A  **The way that I look at it, he's giving him**
4     **that they're clear for more than what he**
5     **needs to that stop.**
6  Q  (By Mr. Cramer, continuing) Can you explain
7     that in a little more detail?
8  A  **So he's telling him he's clear for 50 but he**
9     **needs him to stop in 25.  That means they**
10    **were going to be stopping in 25.  The shove**
11    **instruction is good for 25.  When he updates**
12    **him with 15, still clear for 40, he's still**
13    **wanting a stop made in that 15 cars.  And**
14    **that would be the instruction that Mr. Sexton**
15    **as a locomotive engineer would be operating**
16    **under.**
17 Q  Would it have been safe for Mr. Sexton to
18    stop within half of the distance of 40 cars
19    under that instruction?
20         MR. SULLIVAN:  Objection, lack of
21    personal knowledge, form, calls for speculation.
22 A  **No.  15 is more restrictive than 40.  So I**
23    **would expect that the 15 would be complying**
24    **with rules.  The 40 is just assuring that**
25    **there's plenty of room on the track.**

40

1  Q  (By Mr. Cramer, continuing) Did you think
2     that Mr. DePover was lying about giving the
3     25 to a stop instruction?
4          MR. SULLIVAN:  Objection, misstates
5     the testimony in the transcript.
6  A  **No.**
7  Q  Then where it says clear for 50 cars, what do
8     you take that to mean?
9  A  **Based on the way he says clear for 50 cars**
10    **starting with needing 25 to a stop, it's**
11    **again assuring him that they have got plenty**
12    **of room.  So the stop doesn't have to be on a**
13    **dime or they're not coming in to a joint.**
14 Q  So should Mr. Sexton take into account the
15    clear for 50 cars when deciding when to stop?
16         MR. SULLIVAN:  Objection, lack of
17    personal knowledge.
18 A  **Once he's given something more restrictive,**
19    **no.  He needs to go with what's most**
20    **restrictive.  25 is more restrictive than 50.**
21 Q  Is that what the rule says, Rule 6.5?
22 A  **I don't have the GCOR in front of me to tell**
23    **you exactly what it reads, but they are**
24    **required to stop within half the distance**
25    **specified.  So in the case of the 25, you**

41

1  would have to be stopped within 12-1/2 cars
2  if he wasn't given further instruction.  And
3  the same with the 15, clear for 40, he would
4  need to be stopped within half of the 15,
5  which would be 7-1/2 cars.
6  Q  Did you give any significance to the
7     instruction of still clear for 40?
8          MR. SULLIVAN:  Objection, form.
9  A  No, because he was given something more
10    restrictive.
11 Q  (By Mr. Cramer, continuing) Are you trained
12    on shoving movements?
13 A  Yes.
14 Q  If Mr. DePover gave the instructions clear
15    for 50, 25 to a stop, what would the
16    reasonable instruction be after 10 cars have
17    been shoved?
18         MR. SULLIVAN:  Objection, lack of
19    personal knowledge, calls for speculation.
20 A  In my experience, that would be a 15 car
21    count.
22 Q  (By Mr. Cramer, continuing) What are you
23    basing that experience on?
24         MR. SULLIVAN:  Objection, form.
25 A  My training and my experience.

42

1  Q  (By Mr. Cramer, continuing) Is that based on
2     what the rule says?
3  A  Yes.
4  Q  So the rule says you have to follow the more
5     restrictive set of instructions given?
6          MR. SULLIVAN:  Objection.  The
7     rule states for itself.
8  A  I don't recall all of the exhibits that were
9     entered, and I don't have them in front of
10    me.  But there are rules in place that if you
11    are not given -- and it may fall under
12    railroad radio rules -- that if you are not
13    given anything within half -- by the time you
14    reach half the distance, you must be stopped
15    when you have somebody that's on the ground
16    protecting a shove movement.
17 Q  Do you think the instructions Mr. DePover
18    said he gave were confusing?
19 A  No.
20 Q  Why is that?
21 A  He was letting Mr. Sexton know what he needed
22    and that they had extra room.
23 Q  What do you mean by extra room?
24 A  They weren't coming into a joint and that the
25    stop wasn't going to have to be a sudden stop.

43

1  Like coming into a joint, there's rules there
2  that apply to how fast you can make a joint.
3  It's just giving more assurance that no
4  equipment is going to be struck or that there
5  is nobody out there.
6  Q  So it's your understanding an instruction of
7     clear for 40 would mean that it was still
8     safe for Sexton to stop within 20 cars?
9          MR. SULLIVAN:  Objection,
10    misstates the witness' testimony.
11 A  No.  He was given a more restrictive count of
12    15.  So, therefore, the 15 is what Mr. Sexton
13    should have been going based off of.
14 Q  (By Mr. Cramer, continuing) Do you recall in
15    the investigation what instructions Mr. Sexton
16    said he was given?
17 A  No, I don't recall.
18 Q  Let's go to 00079.  I think that shows the
19    beginning of the examination of Sexton.  Is
20    it your understanding here that you're
21    starting your questioning of Mr. Sexton?
22 A  Yes.
23 Q  On lines 13 through 22 what does Mr. Sexton
24    say in the investigation the car counts he
25    was given was?

44

1  A  He was given 50 as the initial count.  And
2     the next one was still good -- he believes it
3     was still good for 40, 15 cars to a stop with
4     emphasis on good for 40.
5  Q  Is that consistent with what Mr. DePover stated?
6  A  No.
7  Q  How is it not consistent with what Mr. DePover
8     stated?
9  A  Because Mr. DePover didn't say with emphasis
10    on good for 40.  Other than that, it would be
11    consistent but that's the inconsistency in it.
12 Q  The car counts are the same numbers.  Correct?
13 A  Yes.
14 Q  Then can we go just down to page Bates 81?
15    And lines 11 through 14, does that sound to
16    you consistent with what Mr. DePover stated?
17 A  Who is being questioned here?  Is it still
18    Sexton?
19 Q  Yes.  We just went down two pages.  If you
20    want to scroll back up, we can.
21 A  Go back just to the top of this page once.
22 Q  Why don't we go back to 79?
23 A  Okay.  I'm just making sure that I remember
24    who is testifying and who is asking is all.
25 Q  Not a problem.  I appreciate it.  Back to 81.

# EXHIBIT F

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION

- - - - - - - - - - - - - - - - - - - -

No. 3:23-CV-00031-HCA

John Sexton,

                        Plaintiff,

        vs.

Dakota, Minnesota & Eastern Railroad
Corporation d/b/a Canadian Pacific,
a Delaware corporation,

                        Defendants.

- - - - - - - - - - - - - - - - - - - -

DEPOSITION OF

JASON ROSS

July 18, 2024

10:00 a.m.

TAKEN BY: BRENDA K. FOSS
fossbrenda@yahoo.com
612-701-4282

**Page 2**

Deposition of JASON ROSS, taken by Zoom
videoconference by and on behalf of
Plaintiff, on Thursday, July 18, 2024,
commencing at 10:00 a.m., before Brenda K. Foss,
Professional Court Reporter, Notary Public,
State of Minnesota, County of Hennepin.

*  *  *  *  *

APPEARANCES

ON BEHALF OF THE PLAINTIFF:
JOHN MAGNUSON, ESQUIRE
CYLE CRAMER, ESQUIRE
YAEGER & JUNGBAUER BARRISTERS, PLC
4601 Weston Woods Way
St. Paul, MN  55127
jmagnuson@yjblaw.com
651-288-9500

ON BEHALF OF THE DEFENDANTS:
JACK SULLIVAN, ESQUIRE
DORSEY & WHITNEY LLP
50 South 6th Street, Suite 1500
Minneapolis, MN  55402
sullivan.jack@dorsey.com
612-340-2600

Also present: Noah Garcia, DM&E

**Page 3**

I N D E X

Examination:                    PAGE:
By Mr. Magnuson                 4

Marked Deposition Exhibit:
79  Feb 1st, 2021 call record   89
    for Jason Ross

Previously Marked Exhibits:
13                    114
18                     13
65                     70
66                     65
69                     76
71                     86
72                     88

Reporter's Certificate      133

(Original Deposition Transcript in the
possession of John Magnuson, Esquire).

*  *  *  *  *

**Page 4**

P R O C E E D I N G S

JASON ROSS,

after having been first duly sworn,

deposes and says under oath as follows:

MR. MAGNUSON:  Good morning,
Mr. Ross.  My name is John Magnuson.  I
represent John Sexton in this matter.  With
me here today in my office is Cyle Cramer.  I
see that Noah Garcia is on the Zoom call.
Jack, where is Mr. Garcia located?

MR. SULLIVAN:  Jack Sullivan on
behalf of the defendant.  Mr. Garcia is
observing, not participating in the
deposition.  He is in Kansas City, Missouri.

EXAMINATION

BY MR. MAGNUSON:

Q   Good morning, Mr. Ross.  Could you please
state your full name spelling your last name
for the record?

A   My full name is Jason Manfred, M-A-N-F-R-E-D,
Andrew Ross, R-O-S-S.

Q   Where are you physically located today?

25

1  A  Correct, yeah.
2  Q  It's not going to surprise me here but you're
3     probably going to remember a whole bunch of
4     details about that conversation, aren't you?
5  A  **You know what? If you're asking me now about**
6     **the conversation, I can briefly talk about**
7     **the conversation. I do remember having a**
8     **pleasant conversation with John and I encouraged**
9     him and thanked him, first of all, for
10    cutting the crossings because I'm not going
11    to tolerate people not cutting crossings.
12    When we talk about the snow and the driving
13    of the vehicle because this e-mail has jogged
14    my memory a little bit, I had a conversation
15    with McKelvey as well. And McKelvey told me
16    that the snow that he was talking about that
17    was covering the roads was not nearly as bad
18    as he was describing it to be. And being
19    that I'm originally from Canada, I'm familiar
20    with driving with ice and snow. So McKelvey
21    and I had a conversation about that. And I
22    had a conversation with John about making
23    sure, you know, we did cut the crossings.
24    And I had that conversation with McKelvey as
25    well because I'm not going to tolerate people

26

1     cutting the rules and taking shortcuts. I
2     won't tolerate it for one minute. That's
3     what I remember about that conversation. I
4     actually had a great positive conversation
5     with John.
6  Q  Employees are taught to take the safe course.
7     Right?
8  A  **That's right.**
9  Q  In the face of doubt or uncertainty, take the
10    safe course. Right?
11 A  **That's right.**
12 Q  So if there's any doubt or uncertainty in
13    Sexton's mind, he's instructed to cut the
14    crossings. Right?
15 A  **He's got to cut the crossings, yeah.**
16 Q  And in Kurtis's mind, the snow just wasn't
17    bad enough. Right?
18          MR. SULLIVAN: Objection,
19    misstates the witness' testimony.
20 Q  (By Mr. Magnuson, continuing) It wasn't bad
21    enough to have cut the crossings is what --
22 A  **I'm talking about when Kurtis was driving in**
23    **the road.**
24 Q  What about cutting the crossings? What did
25    McKelvey tell you about that?

27

1  A  He told me it had been snowing and there was
2     snow in the flangeway. He didn't think --
3     because you can have a dusting of snow or you
4     can have snow when it gets hard-packed and
5     that's what he was going on. My conversation
6     with him -- he's no longer with the company,
7     but my conversation with him was we don't
8     make that determination, okay, because trucks
9     can drive over the crossings and they pack
10    down the snow. That's why the rule is there
11    and it's in place. And we're going to follow
12    the rule and cut the crossing. That's all
13    there is to it.
14 Q  Did McKelvey tell you that he instructed
15    Sexton not to cut the tracks?
16 A  **Yep, he did.**
17 Q  He told you that he instructed him not to cut
18    the tracks?
19 A  **That's why he said it because he didn't think**
20    **the snow was bad enough. I told him you're**
21    **not here to make that determination.**
22 Q  And you determined later that Sexton
23    disobeyed his order and cut the tracks. Right?
24 A  **I didn't even approach that to be honest with**
25    **you. When I was talking with John, my only**

28

1     **concern was what happened, tell me about it,**
2     **I see this e-mail. He told me he cut the**
3     **crossings. Okay. He cut the crossing. He**
4     **did the right thing.**
5  Q  So McKelvey told you that he instructed
6     Sexton not to cut the tracks. Right?
7  A  **Yep.**
8  Q  And according to this e-mail here, Sexton cut
9     the tracks anyway. Right?
10 A  **That's right.**
11 Q  He disobeyed McKelvey's order. Right?
12 A  **He followed the rule.**
13 Q  He followed the rule and he disobeyed
14    McKelvey's orders. Right?
15 A  **I don't know if it was an order.**
16 Q  He told him not the cut the tracks. Right?
17 A  **There's a difference between saying don't cut**
18    **the tracks and an order. If we are going to**
19    **have a conversation about an order, that's a**
20    **different conversation.**
21 Q  He instructed him not to cut the tracks. Right?
22 A  **Yes. He instructed him not to cut the tracks**
23    **according to what Mr. Sexton said here.**
24 Q  And according to what McKelvey told you?
25 A  **McKelvey told me that he told him not to cut**

29

1    the tracks, yeah.

2  Q  And when you say told him not to, that's the

3    same as instructing him not to?

4  A  **Saying as the same instruction, yeah.  I'm**

5    **not going to argue over semantics.**

6  Q  Okay.  Management level employees at CP Rail's

7    compensation is comprised to some extent by

8    velocity and dwell.  Right?

9  A  **Run that by me again.**

10  Q  Compensation for management level employees

11    at CP to some extent, to some percentage, is

12    based on dwell and velocity, right, on time

13    metrics?

14          MR. SULLIVAN:  Objection, lack of

15    personal knowledge, beyond his own compensation.

16    You can answer.

17  A  **Compensation for employees -- for managers at**

18    **CP at the time is based on providing service,**

19    **controlling costs, utilizing assets,**

20    **operating safely, and developing people.**

21  Q  (By Mr. Magnuson, continuing) Those are the

22    five principles of precision scheduled

23    railroading.  Right?

24  A  **Those are the five foundations that our**

25    **company is built on, yes.**

30

1  Q  And on-time metrics are part of a number of

2    those foundations.  Right?  Efficiency,

3    velocity, train speed, those are metrics that

4    go into a number of those foundations.  Right?

5  A  **Correct, yeah.**

6  Q  That includes McKelvey, Jared, Miller, and

7    yourself.  Right?

8  A  **Correct.**

9          MR. SULLIVAN:  Objection, lack of

10    personal knowledge.

11  Q  (By Mr. Magnuson, continuing) Well, you know

12    about precision scheduled railroading.

13    Right?  You just ticked off -- are you

14    reading something by the way?

15  A  **No.  I'm drawing on a piece of paper.**

16  Q  So you have those five foundations memorized.

17    Right?

18  A  **I have had them memorized for a long time,**

19    **yes.**

20  Q  I would imagine.  Have you ever heard the

21    story of how Hunter, Mr. Harrison, kind of

22    the origin of the precision scheduled

23    railroading when he was in the hump tower

24    down in Memphis?  Have you ever heard that

25    story before?

31

1  A  **Not that I remember.  Maybe it's the way**

2    **you're telling it.**

3  Q  There's an old legend when it comes to

4    precision scheduled railroading that Hunter

5    was at the BN and BNSF at the time, and he

6    was in a hump tower and one of his managers

7    came by and said, Hunter, what do you see

8    there?  He pointed out to a yard full of

9    railcars.  And Mr. Harrison said something

10    along the lines of I see profit.  And the

11    bossman says, no, I see a bunch of wasted

12    time and money because those railcars

13    shouldn't be sitting there.  Is that a story

14    you've heard?

15  A  **Not that I can remember.**

16  Q  It's kind of an old legendary story.  You

17    said you reviewed a white paper that is

18    available on CP's website that was put out in

19    2015-2016 relative to the CP's merger with

20    the NS.  Right?

21  A  **Yep, I briefly perused over it.  It's 2016.**

22    **Quite frankly, it's old news.**

23  Q  But the principles behind precision scheduled

24    railroading haven't changed since 2016, have

25    they?

32

1  A  **No.**

2  Q  Can you and I just say PSR so we don't have

3    to say the words precision scheduled

4    railroading over and over?  Is that fair?

5  A  **That's fair.**

6  Q  Part of these foundations of PSR is depart

7    from the practice of holding trains until

8    they were completely full.  Right?

9  A  **Correct.**

10  Q  When you say holding trains, I mean holding

11    them in yards.  Right?

12  A  **Typically that would be holding them at**

13    **origin.  You know, old school practice**

14    **previous thoughts are that you would hold a**

15    **train at origin until it was full.  When I**

16    **say full, whatever you want the length to be.**

17    **If it was 10,000 feet, 10,000 feet, and then**

18    **let it go.**

19  Q  The old model could oftentimes delay customer's

20    shipments.  Right?

21  A  **The old model did delay customer shipments**

22    **like every time.**

23  Q  And that cuts into CP's bottom line.  Right?

24  A  **I don't know how you're coming up with that**

25    **determination.**

45

1   and you kind of float around in that range.
2   Nobody has ever really broken into the 50's.
3   I think CN might have had a couple quarters
4   where they were at 59 or something like that,
5   and I don't know what accounting they did to
6   get there. I believe I was even there one of
7   those years. So it all depends on timing and
8   certain expenses and time and certain revenue.
9   In general, a good class 1 will be in the low
10  60's.
11 Q   Okay. Do you know, from the time you came on
12     at CP to 2021, how much the work force had
13     declined at CP?
14 A   From when I --
15 Q   What was that? I'm sorry.
16 A   I didn't catch the years.
17 Q   You came on in 2013?
18 A   2013, March of 2013.
19 Q   Between 2013 and 2021, how much had the work
20     force at CP declined?
21 A   I'm not sure exactly what you're looking for
22     in an answer because that answer -- like
23     there's a lot of factors in that. Do I know
24     that the work force declined? Well, I can
25     say from my experience in the Southern Region

46

1   between 2019 when we were hiring people, then
2   we experienced Covid. So there was a certain
3   amount of furloughs that we had made in
4   2018 -- sorry -- 2020, 2021. You're right in
5   the middle of Covid there. So some of the
6   decline that you're talking about in the work
7   force was as a function of Covid. I can't
8   speak too much as to what was happening in
9   Canada because I did not pay a lot of
10  attention to what was happening in Canada and
11  to those intricate details of work force and
12  work force decline. So I can't speak to it
13  with any authority other than I can tell you
14  it happened in my territory. Most of that
15  was Covid driven.
16 Q   So there were work force declines at CP in,
17     say, Iowa in 2021?
18 A   I can't speak to Iowa. I supervise the whole
19     region. I had Chicago, St. Paul, all of
20     Iowa, parts of Missouri, North Dakota,
21     Minnesota. So as to where exactly we made
22     some of those reductions, I can't tell you.
23     I remember making reductions in North Dakota.
24     I remember making reductions in Wisconsin. I
25     remember making reductions in Chicago, in

47

1   St. Paul. I can't off the top of my head
2   remember any reductions in Iowa, but that
3   doesn't mean they didn't happen.
4 Q   In terms of the operating crews, conductors,
5     engineers, does a smaller work force make it
6     more challenging to recrew trains?
7 A   Yeah, of course it would.
8 Q   And recrewing trains is something that under
9     PSR you strive to avoid. Right?
10 A  Under any operating model you strive to avoid
11     recrewing trains. Whenever you recrew a
12     train, you know, it's added complexity for,
13     you know, it could be unknown reasons. But
14     it's added complexity for whatever reason it
15     is. Nobody wants to recrew a train. It doesn't
16     matter if you're old, new, NS, BNSF, CP, CN.
17     It don't matter.
18 Q   Are you familiar with the government account-
19     ability office study that was done in 2021?
20 A   No.
21         MR. MAGNUSON: Can we take a five
22     minute break?
23         MR. SULLIVAN: Sounds great.
24     Thank you.
25         (Brief recess).

48

1 Q   (By Mr. Magnuson, continuing) Do you recall
2     that obviously with respect to the E test
3     that Tom Jared performed, Mr. Sexton was
4     disciplined for violating GCOR 5.3.7? Right?
5 A   Yeah, that's for he didn't stop in one-half
6     the distance of the last communication.
7 Q   Were you aware that Mark Johnson originally
8     e-mailed a recommendation that he get a 20
9     day suspension for that?
10 A  I'd have to go back and look. That I don't
11     recall.
12 Q   At the time, were you involved or were you
13     responsible for assessing discipline?
14 A   All discipline went through me.
15 Q   We have also got an e-mail from Dylan Smith
16     that says his recommendation was 10 days
17     served and 10 deferred. Do you recall that?
18 A   Yes. I reviewed that with Jack here in one
19     of the sessions that we had.
20 Q   This is Exhibit 35. Is this one of the
21     e-mails that you reviewed?
22 A   Yep.
23 Q   Dylan Smith recommended 10 served 10 deferred?
24         MR. SULLIVAN: We can't see that,
25     John. I'm sorry.

49

1  Q  (By Mr. Magnuson, continuing) Go down. So
2     it's that first paragraph down there, the
3     full paragraph and not the numbered. It says
4     that Mr. Smith was recommending 20 days. Right?
5  A  Which paragraph?
6  Q  The non-numbered paragraphs, just the block
7     paragraph.
8  A  "Based on the facts of the matter, I
9     recommend Mr. Sexton" -- yeah, this was Mark
10    Johnson's assessment, 20 days suspension.
11 Q  If we could just go up a little bit, it was
12    Dylan Smith that says, "I recommend 10 served
13    10 deferred". Right?
14 A  That's what Dylan said, yep.
15 Q  Then on the top it says to Joe Adelfio from
16    Shelley Daberitz. It says, "Joe: per
17    Mr. Jared, please issue discipline for 20
18    days actual to service on Monday". Right?
19 A  Yeah, that's what it says.
20 Q  I don't see that you were copied on that e-mail.
21 A  No, I don't appear to be copied on that e-mail
22    at all, no. But I would have been the one
23    who made the decision on the 20 days because
24    I review all the discipline on Monday. That
25    e-mail came out on Wednesday.

50

1  Q  When you say discipline, you're looking at
2     discipline that's already been assessed to
3     see if you agree or disagree. Right?
4  A  No. There's recommendations. We would have
5     a call and we'd look at the recommendations.
6     We'd look at the charges. We'd look at if
7     they're proven or not proven. I would read
8     the hearings. In some cases I'd read the
9     hearings. And Mr. Smith sent that over. If
10    you look at the e-mail, he sent it over to me.
11    But there was no way in Haitis I was going to
12    give somebody a 10 day deferred and 10 day
13    served suspension for a major violation. So
14    he got 20.
15 Q  So was it Jared that made the recommendation
16    to you?
17 A  No.
18 Q  Why did the discipline letter go out under
19    Jared's signature without his knowledge
20    electronically signed by Shelley Daberitz?
21 A  Because at the time, admin would send out the
22    discipline. And the only thing I can assume
23    is Shelley or Joe Adelfio sent the discipline
24    out under Tom's signature.
25 Q  Tom Jared testified that Shelley sent it out

51

1     under his electronic signature but that he
2     hadn't read it.
3  A  Yeah. Tom is not involved in that. All the
4     final decisions on discipline dismissals,
5     that all came through me. Specifically to
6     avoid things like what Dylan was saying
7     there, to give 10 days deferred and 10 served
8     and all that, that's not what a major calls
9     for. It was a major violation. He went to a
10    hearing and it's 20 days.
11       Now, had Mr. Sexton come in and
12    said -- if I remember right, I might have
13    even had a conversation with Dylan about
14    this. And Dylan is no longer with the
15    company. But one of the reasons why he's no
16    longer with company is because of his soft
17    approach at times on safety. So if somebody
18    came in and they admitted responsibility and
19    said, I throw myself on the sword, I made a
20    mistake, this is what I did, I'll accept
21    accountability and responsibility for it.
22    Then they'd get 10 and 10.
23       But if they want to go to a
24    hearing and they want to dispute all the
25    facts -- that's fine. That's up to them and

52

1     they can do that. But if the charges get
2     proven, then they get full measure of
3     discipline. In this case, the charges were
4     proven so he got a full measure of 20 days.
5  Q  Public Law Board disagrees with whether or
6     not the charges were proven, didn't they?
7  A  Well, the Public Law Board has -- they're
8     entitled to their opinion and they have never
9     picked up some bodies off the track like I
10    have.
11       MR. SULLIVAN: Object to the
12    extent the question misstates the PLB's
13    decision.
14 Q  (By Mr. Magnuson, continuing) You're familiar
15    with the US E testing manual. Right?
16 A  Yeah.
17 Q  You're familiar with test GRF02. Right?
18 A  You'd have to pull it up. I'm familiar with
19    it. I know it exists. I have looked through
20    it. Some of this stuff I've read. Some of
21    it I have not read. Efficiency test is a bit
22    -- you have guidelines with efficiency
23    testing. And sometimes they change or you
24    change the way you apply them. But at the
25    end of the day, it's the rule that dictates

85

1  Q  But you would have reviewed it?

2  A  **In general I would review them, yes.**

3  Q  In the paragraph there, middle of the

4     paragraph under Marquette, it says, "They

5     also had to cut the boatels crossing and run

6     down MQS light power before they could shove

7     the cars into it".  Have you read that?

8  A  **Yes.**

9  Q  So you would have read that?

10 A  **Yes.**

11         MR. SULLIVAN:  Calls for

12 speculation.

13 Q  (By Mr. Magnuson, continuing) And you would

14    have read this because it's on February 2nd

15    prior to making your discipline decision.

16    Right?

17 A  **I could have.  I might have read it.  I might**

18    **not have read it.  But to be fair, you know,**

19    **with all due respect, this is railroading.**

20    **This is railroading in the winters.  So when**

21    **I see what they're doing there, it's not**

22    **something that's going to flag some alarm**

23    **bells off in my head.  You know, I'd rather**

24    **have any day of the week -- and I tell this**

25    **to my employees all the time.  You're going**

86

1     **to follow the rule.  And I'd rather have**

2     **somebody following the rule and say we took a**

3     **delay at whatever location than to get a**

4     **phone call in the middle of the night saying**

5     **we got a derailment because we violated a**

6     **rule.  I have said that literally to**

7     **thousands of employees.**

8  Q  Okay.  I've got Exhibit 26 up on the screen.

9     Have you reviewed this in order to prepare

10    for your testimony today?

11 A  **No, I don't believe I have.**

12 Q  You're not named by name in it, but are you

13    part of the distribution lists in this e-mail?

14 A  **No, not that I can tell you because I'm not**

15    **part of the MOC.  That's for the seniors.**

16    **I'm not part of the directors.  I'm not part**

17    **of the CMC.  And none of those other names**

18    **are me.**

19 Q  I'm pulling up another couple exhibits here.

20    This has been marked Exhibit 71.  Have you

21    reviewed this document prior to your

22    testimony today?

23 A  **No.**

24 Q  Take a second to read it.

25 A  **(Witness examining document).**

87

1  Q  Do you recall, were you responsible for

2     assessing discipline over the Excelsior

3     Springs, Missouri area?

4  A  **Yes.**

5  Q  In this situation, an employee was accused of

6     failing to stop within half the range of

7     vision of an improperly lined switch.  Right?

8  A  **Yes.**

9  Q  And it resulted in a run through switch.

10    Right?

11 A  **According to this, yes.**

12 Q  And run through switches can cause derailments.

13    Right?

14 A  **Yes.**

15 Q  This is a major.  Right?

16 A  **It depends.  This is now considered a major.**

17    **We consider run through switches major.  But**

18    **it would depend on what they were doing at**

19    **the time if it was a major or not major.  So**

20    **if they were in the locomotive and they were**

21    **operating the locomotive and both of them**

22    **were in the locomotive and they ran through**

23    **the switch, then they're on the point.**

24    **They're protecting the point.  That's**

25    **considered a run through switch.  At the**

88

1     **time, we treated run through switches as**

2     **non-majors.  So you'd have to see more**

3     **details in this case to determine if it was a**

4     **major or a non-major.**

5  Q  But was this the engineer, Mr. ████?

6  A  **I don't know.**

7  Q  Can we assume that if he failed to stop

8     within half the range of distance?

9  A  **No.  I don't know the details of who the crew**

10    **was.  I can't assume that.  I'd have to see**

11    **more details on this.**

12 Q  You would've assessed this discipline.  Right?

13 A  **Yes.**

14 Q  What discipline was assessed here?

15 A  **I can't tell you.  I'd have to see the**

16    **document or I'd have to review it.  I have**

17    **literally given discipline to hundreds if not**

18    **thousands of circumstances over the 3-1/2**

19    **years.**

20 Q  Okay.  This has been marked as 72.

21 A  **Letter of Reprimand.  Okay.  I see it at the**

22    **top.  (Witness examining document).**

23 Q  So you would have assessed --

24 A  **This is an AOR.  This is an admission of**

25    **responsibility.  There's no formal hearing or**

93

1  over-standard work events. They're going to
2  figure out what's broken and why and what we
3  need to fix it.
4  Q  To prepare for your testimony today, did you
5     review a Teams message that Kurtis McKelvey
6     sent that morning that said "I don't know how
7     to hold him", meaning Sexton, "accountable"?
8         MR. SULLIVAN:  Objection to the
9     extent it misstates the document.
10 Q  (By Mr. Magnuson, continuing) Did you review
11    that?
12 A  No, I didn't review any Teams messages.
13 Q  Are you on Teams?
14 A  No. I am now. But like you, I am a stickler
15    for -- how should I say this -- rejecting
16    some types of technology. I long for the
17    days when there's no cell phones. So I only
18    recently got onto Teams after Covid when we
19    had to get on all these phone calls, but I
20    don't do messaging through Teams. I'm old
21    school. If you want to talk to me, pick up
22    the phone and call me.
23 Q  I hear you. I have had a horrible week with
24    tech. Going down to 7:36 a.m. --
25 A  Yes.

94

1  Q  Do you recognize that phone number?
2  A  No.
3  Q  Any reason to doubt or dispute just based on
4     our cross referencing that that's Tom Jared's
5     phone number?
6  A  I don't know that it is Tom Jared's phone
7     number. I'd have to look.
8  Q  I can represent to you we received Tom
9     Jared's phone number and that's his. Okay?
10 A  Okay. That's fine.
11 Q  It says you had a 4 minute phone call with
12    him then. Right?
13 A  Yes.
14 Q  If we go down to 9:29 a.m., you had another 2
15    minute phone call with Tracy Miller. Right?
16 A  I don't know if that's an actual 2 minute
17    phone call or if I'm trying to call him and
18    it goes to his voicemail or something. But I
19    tried calling him and had some type of
20    communication with him at that time you'd
21    say. I'd be confident in saying that, or he
22    is telling me he'll call me back later.
23 Q  If we go down to 9:40 a.m. --
24 A  I'm looking for 9:40. That ██████████,
25    that's Tom, yeah.

95

1  Q  It indicates you had an 18 minute phone call
2     with him. Right?
3  A  Yes.
4  Q  And you testified a few minutes ago that
5     Jared as a general manager would be one of
6     the people responsible for dealing with and
7     drilling down on over-standard work events
8     and delays. Right?
9  A  That amongst the 84 million other things he's
10    got to do on his territory. That's not his
11    sole purpose in life.
12 Q  I didn't suggest that. Is it possible you
13    discussed the 474 with him that day?
14 A  I highly doubt it.
15 Q  It's possible though. Right?
16 A  I don't know. I don't know what I talked to
17    him about that day. Like I say -- you know,
18    that delay on 474, I hate to say it is
19    probably not even something that popped up on
20    my radar. In the middle of January and
21    February that would have been the least of my
22    concerns, that 3 hour delay on 474 for doing
23    their job.
24 Q  But it should be Tom Jared's concern. Right?
25 A  Everything is his concern, yeah.

96

1  Q  Including over-standard work events and
2     delays. Right?
3  A  However, to be fair to Tom, the same applies
4     to him. That's something you're going to
5     look at as a general manager. That's
6     something you might look at as a vice
7     president. But you have 84 million other
8     things you have to deal with on your
9     territory in the middle of winter. That's
10    one train out of the 35 he's got on his
11    territory.
12 Q  Did Tom Jared tell you that day that he was
13    in the Nahant, Marquette area?
14 A  Not that I remember.
15 Q  Do you know what he was doing down there for
16    three days?
17 A  I don't remember. I don't honestly remember
18    what he was doing or what he told me 3-1/2
19    years ago.
20 Q  Do you know what he was doing ending up in
21    the Nahant yard that day E testing Sexton?
22 A  That's part of his territory. I expect him
23    to be out on his property, on his territory.
24    And it's part of his objectives and part of
25    his safety accountabilities, is to be out on

105

1  A  **You could measure it at a corporate level.**
2     **Like a system level you could always measure**
3     **it.  We recently started measuring it maybe --**
4     I think this year we started measuring it, or
5     early last year.  And we still -- to be fair,
6     we still haven't broken it down.  We're
7     trying to get it down to the regional level,
8     and we can't.  We can only get it down to a
9     zone level right now.  So it's still not
10    perfect.
11  Q  But to the extent it wasn't tracked in this
12     document at the time, the railroad at the
13     time could still track velocity at a system
14     level?
15  A  **Only on a system level.  The entire system --**
16     **the only way you could track velocity was on**
17     **the entire system.  You couldn't break it**
18     **down to a regional level.**
19  Q  If we can, go to the next page.  Under controlling
20     costs, would you consider recrews to be a
21     function or an element of controlling costs?
22  A  **Yes, I would.**
23  Q  Let's go to the next page, optimizing assets.
24     Car velocity and increased train speeds are
25     objectives under optimizing assets.  Right?

106

1  A  **Yes.**
2  Q  This document, Performance Management Forms,
3     are used in determining employees' compensation.
4     Right?
5  A  **Correct, yes.**
6  Q  And that includes both salary, bonus, and
7     stock options?
8  A  **No.  Well, no, not entirely.  This will**
9     **determine what you'll get for a raise.  I**
10     **shouldn't say that.  It shouldn't determine**
11     **it.  How you perform will determine where you**
12     **fall into in terms of getting a raise.**
13  Q  And how about bonuses?
14  A  **This will determine what you're going to get**
15     **for a short-term bonus but not a long -- like**
16     **your stock options, that falls into under**
17     **your long-term.  That is not affected by this.**
18     That's more contractual.
19  Q  So the short-term bonus is the cash?
20  A  **That's right.**
21  Q  And those short-term bonuses would be
22     reflected in your tax returns.  Right?
23  A  **Correct.**
24  Q  And the long-term is the stocks, the stock
25     options?

107

1  A  **That's right.  But they don't vest right**
2     **away.  And the long-term incentives are**
3     **basically flat rate on your salary type**
4     **thing.  It's a percentage of your salary**
5     **based on what job you're on.  It's not**
6     **affected by how you perform.  So even if you**
7     **were a superstar and you were the best**
8     **railroader in the world and you got the best**
9     **rating of, you know, any vice president -- I**
10     **will use vice president as an example --**
11     **you're only going to get what's in your**
12     **contract for your stock options.  And in many**
13     **cases, you know, you won't get the same as**
14     **somebody else who works beside you because**
15     **they might have been around longer and have a**
16     **higher salary.  So it's based on your salary.**
17  Q  What was your short-term bonus in 2021?
18  A  **I don't remember.**
19  Q  You can ballpark it.
20  A  **I still don't remember.  I'm trying to think.**
21     **It might have been around $█████.**
22  Q  What was your salary in 2021?
23  A  **I was making I think around ████ US, was my**
24     **salary.**
25  Q  But your short-term bonus would be definitely

108

1     reflected in your tax records.  Right?
2  A  **Yep.**
3  Q  You think it was around $█████?
4  A  **I think so, yes.  I honestly don't remember.**
5  Q  That's the answer we get every time we ask.
6  A  **2021 is a long time ago.**
7  Q  Most people remember what they earn but --
8        MR. SULLIVAN:  Object to form,
9     argumentative, purposeless and irrelevant.
10  Q  (By Mr. Magnuson, continuing) Do you have the
11     ability to get on line when you want and see
12     how you are performing as it relates to these
13     various metrics?
14  A  **Well, you see it every day.  There's a report**
15     **that you would look at, and you would see**
16     **every day how you're performing versus these**
17     **metrics because the -- these metrics -- I**
18     **want to be clear.  It's not a question of**
19     **looking at these metrics.  These metrics are**
20     **the basics of railroading, the basics of good**
21     **railroading.  These are things that any decent**
22     class 1 railroad or any decent company is
23     going to measure themselves by.  You're going
24     to measure yourselves on all these things.
25     These are your KPI's.

109

1  Q  And these metrics go into the operating
2     ratio.  Right?
3  A  **All these are part of your operating ratio.**
4     **It's all part of your bottom line really.**
5     **It's all part of everything you do.  If**
6     **you're not doing these things as well -- what**
7     **you got to realize is when you look at some**
8     **of these numbers -- you look at dwell, for**
9     **example.  If you're not moving the empty,**
10    **you're not going to get the load on the**
11    **flipside.  If you let cars sit, you're not**
12    **going to generate revenue.  If you don't**
13    **generate revenue, you're going to be going**
14    **out of business.  It's probably the easiest**
15    **way I could explain it.**
16 Q  As we look at the various foundations -- and
17    this is a yes or no question -- operating
18    safely accounts for 20 percent and the
19    remaining accounts for 80 percent.  Correct?
20          MR. SULLIVAN:  Objection, form.
21    You can answer.
22 A  **Correct.**
23          MR. MAGNUSON:  Jack, what's wrong
24    with the form of that question?
25          MR. SULLIVAN:  I don't remember

110

1     the question, but it struck me as there was a
2     form issue with it.
3          MR. MAGNUSON:  For the record, I
4     just asked the question.  So I'll ask it
5     again to make sure there are no objections.
6  Q  (By Mr. Magnuson, continuing) There are these
7     foundations, right, providing service --
8          MR. SULLIVAN:  Oh, I remember.  I
9     remember.
10 Q  (By Mr. Magnuson, continuing) Controlling
11    costs --
12         MR. SULLIVAN:  You're referring
13    to the --
14 Q  -- optimize assets, operating safely, and
15    developing people.  Those are the foundations
16    contained in this document, right, under
17    objectives?  That's correct?
18 A  **That's what's in the document, yeah.**
19         MR. SULLIVAN:  This question
20    didn't refer to the document.  It just talked
21    about the foundations.  That was the form
22    issue that I saw.
23 Q  (By Mr. Magnuson, continuing) There are five
24    of these foundations contained in this
25    document.  Right?

111

1  A  **Yes.**
2  Q  And operating safely accounts for 20 percent
3     of those foundations.  Correct?
4  A  **Yes.**
5  Q  And the remaining foundations accounts for 80
6     percent.  Correct?
7  A  **Yes.**
8          MR. MAGNUSON:  Let's take a five
9     minute break.
10         (Brief recess).
11 Q  (By Mr. Magnuson, continuing) Mr. Ross, you
12    would discourage people reporting to you from
13    holding unfair investigations.  Right?
14 A  **Yes.  I wouldn't allow it.**
15 Q  You would discourage people reporting to you,
16    employees reporting to you, from
17    administering questionable E tests.  Right?
18 A  **Absolutely.**
19 Q  And I'm assuming, based on that answer, that
20    you would also discourage employees that
21    report to you from engaging unsafe E tests.
22    Right?
23 A  **Yes, correct.**
24 Q  You would discourage employees reporting to
25    you from setting up employees.  Right?

112

1          MR. SULLIVAN:  Objection, form.
2     You can answer if you understand the reference.
3  A  **What do you mean by setting up employees?**
4  Q  (By Mr. Magnuson, continuing) We went through
5     the -- you know what?  You're right.  The
6     do's and don'ts called it an entrap.  You
7     would discourage people or employees
8     reporting to you from engaging E tests that
9     are designed to entrap an employee.  Right?
10 A  **Yes.**
11 Q  You would encourage your employees to not
12    violate a rule in order to set up a test
13    situation.  Right?
14 A  **Can you repeat the question?**
15 Q  I flipped the encourage and discourage.  You
16    would discourage employees who report to you
17    from violating a rule in order to set up a
18    test situation.  Right?
19 A  **So when you say I would discourage employees**
20    **to, you mean employees who report to me.  Right?**
21 Q  Yes.
22 A  **Okay.  I would not allow any employee who**
23    **reports to me to set up a rule violation to**
24    **perform a test.**
25 Q  In other words, you would discourage them

113

1  from violating a rule?
2  A  Yeah, I would not allow it.
3  Q  And that includes CPKC rules and FRA rules?
4  A  That's right.
5  Q  In all of these various things that I just
6     asked you about, discouraging unfair
7     investigations, questionable tests, unsafe
8     tests, violating rules to set up a test, you
9     would discourage these even more I would
10    imagine if it were 10 or 11 hours, 9 or 11
11    hours after an employee takes the safe course?
12 A  That would be retaliation, and I don't
13    tolerate retaliation.
14 Q  You encourage the employees that are involved
15    in the investigation process that report to
16    you to conduct their investigations in a
17    manner so that they're not overturned by the
18    Public Law Board.  Right?
19 A  Correct.
20 Q  Getting overturned by the Public Law Board
21    isn't something that you look favorably upon.
22    Right?
23 A  I won't send something to the Public Law
24    Board.  I won't give discipline in an
25    investigation unless charges are proven and

114

1     it's fair and it's been impartial.
2  Q  Looking back on Sexton's investigation, what
3     do you think could have been done differently
4     in that process to prevent that discipline
5     from being overturned by the Public Law Board?
6        MR. SULLIVAN:  Objection, calls
7     for speculation.  You can answer.
8  A  I'd have to review it again in detail to
9     formulate an opinion on that.  I have not
10    reviewed it in that kind of detail where I
11    could give a concise opinion on it.  It was
12    3-1/2 years ago and it wouldn't be fair for
13    me to comment.
14 Q  (By Mr. Magnuson, continuing) Well, the
15    Public Law Board took exception to a number
16    of things in the investigation process as it
17    related to Sexton.  Right?
18       MR. SULLIVAN:  Objection to the
19    extent it misstates the opinion.  You can
20    answer.
21 A  I'd have to see the opinion.  I can't comment
22    without seeing the opinion.
23 Q  (By Mr. Magnuson, continuing) This has been
24    marked Exhibit 13.  Just review the
25    concluding paragraph there.

115

1  A  (Witness examining document).  I read up to
2     and then signed off on pre-determined outcome.
3     (Witness examining document).  So what is
4     your question?
5  Q  What could have been done to have changed the
6     outcome of this Public Law Board decision?
7        MR. SULLIVAN:  Objection, calls
8     for speculation.  You can answer.
9  A  What I will say is even reading their
10    conclusion, it's based on their beliefs and
11    what they're seeing.  I don't think anything
12    should have been changed in the way that the
13    performance of the hearing was done and the
14    way the discipline was assessed.  They're
15    basing it upon their beliefs and what was
16    presented in the case.  I don't agree with
17    their beliefs.  However, out of respect for
18    the Public Law Board and not being part of
19    the collective agreement and what we do, I
20    represent the fact that they made a decision.
21    I don't agree with their decision.  I know as
22    a railroader what happened, and I don't think
23    that there was anything untoward in the way
24    that Mr. Jared performed the test.  The only
25    thing that I could see as being a potential

116

1     problem in it is the fact that the administra-
2     tion of Shelley Daberitz or Joe Adelfio who
3     sent out the discipline, that should have
4     been changed.  It should not have had Mr.
5     Jared's electronic signature on it.  That
6     might have changed the outcome of this Public
7     Law Board decision.
8  Q  Why is that?
9  A  Because when I read this, I believe that they
10    are of the view that Mr. Jared was involved
11    in the decisionmaking process.  And knowing
12    what I know, being that I'm the person that
13    made the decision of what discipline he would
14    get, I know that's not true.  But that's
15    their belief.  That's the way they came to
16    their conclusion.  Just because it goes to
17    the Public Law Board and they make a decision
18    doesn't mean I'm going to agree with it and
19    doesn't mean it was right.
20 Q  And that's your belief, right, just like that
21    was the Public Law Board's belief?
22 A  Correct.
23 Q  Would you agree that Mr. DePover was
24    performing a safety sensitive task?
25 A  And Mr. DePover being the conductor who was

117

1  in charge of protecting the movement of the
2  shove just to refresh my memory on names?
3  Q  Yes.
4  A  He was engaged in -- I would agree with that
5     for sure.
6  Q  That it was a safety sensitive task?
7  A  Correct.
8  Q  And you remember from reading the
9     investigation transcript that Mr. DePover
10    felt that he was surprised and distracted by
11    Mr. Jared. Right?
12 A  That's what he said, yes, a self-serving
13    answer. But, sure, that's what he said.
14 Q  You would defer to an employee's testimony,
15    would you not, in a situation like this that
16    he felt distracted and felt surprised thus
17    creating an unsafe condition?
18 A  I would say it's a self-serving answer with
19    possible influence from the union. I'm going
20    to go by the facts. And the facts in this
21    case were Mr. Jared told him to stop
22    transmitting, which happens on the railroad.
23    Sometimes radios fail. Sometimes somebody
24    walks on you with their radio and the trans-
25    mission doesn't happen. This is not an

118

1  uncommon occurrence. The fact of the matter
2  is Sexton did not stop in half the range of
3  the last communication and, therefore,
4  violated the rule.
5  Q  Do you think that somehow the union put words
6     in DePover's mouth?
7            MR. SULLIVAN: Objection.
8  A  It's possible.
9  Q  (By Mr. Magnuson, continuing) You don't have
10    any evidence to suggest that, do you?
11 A  No, but it's not outside the realm of
12    possibilities.
13 Q  Do you recall reading in the investigation
14    transcript that after this incident when
15    DePover was in a room with two supervisors
16    that he felt intimidated?
17 A  I don't remember reading that.
18 Q  You would discourage your managers from
19    intimidating conductors and engineers. Right?
20 A  Yeah. Nobody is supposed to be intimidating
21    anybody. But how a person feels is how a
22    person feels.
23 Q  Did you take into consideration when you made
24    this discipline decision that DePover
25    testified that he felt intimidated?

119

1  A  No, I did not.
2  Q  Is that something that you could have taken
3     into consideration?
4  A  No. The only things that were taken into
5     consideration were this. There was an
6     efficiency test that was performed. He was
7     told to stop -- well, he was given a
8     distance. He did not stop within one-half of
9     the last communication of the distance.
10    Downloads show that he went too far and eye
11    witness testimony said he went too far.
12    Facts of the matter are he should have
13    stopped. He did not. That's all that was
14    taken into consideration for the statement.
15 Q  So you didn't consider at all the fact that
16    DePover testified that he was surprised and
17    distracted by Jared and that later when he
18    was in a room with two managers that he felt
19    intimidated. You did not give that any
20    weight or consideration. Is that true?
21 A  I did not give it any weight or consideration
22    because it had nothing to do with the facts
23    of the case.
24 Q  But you would certainly discourage your
25    managers from intimidating, distracting, or

120

1  surprising conductors and engineers. Right?
2  A  No -- I discourage my managers -- I do not
3     tolerate people violating our policies period.
4  Q  And that includes your retaliation policies?
5  A  Yeah, it includes all our policies.
6  Q  Have you testified in any FRSA cases in the
7     past?
8  A  What's an FRSA case?
9  Q  The Whistleblower Act, the 2019 statute that
10    gives rise to this claim.
11 A  No, I have not.
12 Q  How many depositions have you given in the
13    past?
14 A  Maybe two, three.
15 Q  Do you recall what those cases involved?
16    Were they injuries or retaliation claims or
17    what?
18 A  They were in Canada, so I don't know if they
19    count here. I testified in court via Zoom
20    for the Lac-Megantic trial. I gave a
21    deposition some years ago about an employee
22    who resigned and decided to sue us later. I
23    don't think I have given any others. I think
24    there was only two or three.
25 Q  What was your involvement in the Lac-Megantic

129

1   Q   How?

2   A   **Well, he had conversations with myself and I**

3       **assume he had conversations with others. And**

4       **having a conversation with myself over**

5       **something like that is not an easy**

6       **conversation to have.**

7   Q   Was that the old Jason that handled that

8       conversation with him?

9   A   **Don't get caught up in labels of the old**

10       **Jason and the new Jason or whatever --**

11   Q   I want to know how McKelvey was held

12       accountable. He wasn't disciplined, was he?

13   A   **Not that I remember, no, but neither was John**

14       **Sexton for that incident. He wasn't**

15       **disciplined either. I didn't discipline John**

16       **Sexton for following the rule. And McKelvey**

17       **being a young officer --**

18   Q   The Public Law Board turned it over. Right?

19   A   **No, no. You're confusing two incidents. The**

20       **incident that happened when he was shoving**

21       **equipment was a different incident on a**

22       **different date. Now that I'm looking back**

23       **through some of my notes -- and if you were**

24       **to pull them up -- where he had that**

25       **conversation with McKelvey I believe was**

130

1       **maybe somewhere in January, was it not, or**

2       **that incident, the shoving incident was in**

3       **January. Right? In February.**

4   Q   February 1st.

5   A   **February 1st. When did he write the**

6       **letter -- he wrote the letter to me on**

7       **February 15th after he had gotten in trouble.**

8   Q   He told you that very day that Jared E tested

9       him. The very shift is when this

10       conversation with McKelvey occurred. Right?

11   A   **No, I don't remember that. I don't remember**

12       **those details. When I look back at it and I**

13       **see that on February 1st or 2nd, whatever**

14       **date it was, and he gets held accountable by**

15       **Tom Jared for shoving, which he knows is a**

16       **major violation. Then and only then does all**

17       **of a sudden a letter show up on February 15th**

18       **to say that, hey, this happened and I want to**

19       **bring it to your attention.**

20   Q   We have got McKelvey's testimony and we have

21       got Sexton's testimony. We're going to have --

22       Well, they both indicate that when McKelvey

23       told him not to cut the tracks, that was the

24       same shift -- that was the beginning of the

25       shift where Jared conducted the E test.

131

1       Okay? We'll get those facts straight. That

2       was the same shift.

3   A   **Okay. Well --**

4   Q   And you said McKelvey told you he told Sexton

5       not to cut the tracks. And I asked you how

6       did you hold him accountable. And you said

7       you had a difficult conversation with him?

8   A   **I had a very pinpointed conversation with Mr.**

9       **McKelvey. I warned him that if he continued**

10       **along that path, if it were to happen again,**

11       **he wasn't going to work for me. I won't have**

12       **anybody on property who is going to violate**

13       **rules or encourage people to violate rules.**

14   Q   But you didn't discipline or hold an

15       investigation on him?

16   A   **You wouldn't hold an investigation on an**

17       **employee -- on a manager like that.**

18   Q   But you could discipline?

19   A   **You handle consequences differently with a**

20       **manager because they don't fall under a**

21       **collective agreement. They don't fall under**

22       **a discipline policy.**

23   Q   But you could discipline him pursuant to all

24       these CP policies?

25   A   **You don't give demerits to managers.**

132

1       **Sometimes you give suspensions.**

2   Q   How are managers disciplined?

3   A   **You can give them -- usually you give them**

4       **letters or you hold them accountable through**

5       **suspensions if it's bad enough. Usually it**

6       **doesn't get that bad. Usually it's a**

7       **question of having proper conversations,**

8       **coaching, documenting, making sure HR is**

9       **involved.**

10   Q   Did you do any of that with respect to

11       McKelvey?

12   A   **I don't recall.**

13       MR. SULLIVAN: We're over time.

14       It's 1:41. We have gone 11 minutes passed

15       our agreed time. I'm assuming we're over the

16       three hours of on the record time. So we're

17       done.

18       MR. MAGNUSON: All right.

19       (WHEREUPON, the testimony was

20       concluded at 1:42 p.m.)

21       *   *   *

# EXHIBIT G

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | | |
|---|---|---|
| John Sexton, | ) | |
| | ) | Case No. 23-cv-00031 |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | **DECLARATION OF** |
| | ) | **THOMAS JARED** |
| Dakota, Minnesota & Eastern Railroad | ) | |
| Corporation d/b/a Canadian Pacific, a | ) | |
| Delaware Corporation, | ) | |
| | ) | |
| Defendant. | ) | |

COMES NOW I, Thomas Jared, and affirm, attest, and declare as follows:

1.      I am the General Manager – U.S. West for Soo Line Railroad Company and my territory covers Defendant Dakota, Minnesota & Eastern Railroad Corporation d/b/a Canadian Pacific ("CP"). I have personal knowledge of the facts stated herein.

2.      CP is a Class I railroad that provides freight rail transportation services in several Midwest states, including in Iowa through Defendant Dakota, Minnesota & Eastern Railroad, which is an indirect subsidiary of Canadian Pacific Railway Company and controlled by CP.

3.      CP is largely unionized, with many non-management employees represented by various labor unions with which CP has collective bargaining agreements ("CBAs") that govern the terms and conditions of employment for unionized employees.

4.      I have been the General Manager – U.S. West since January 22, 2018.

5.      As the General Manager – U.S. West, I oversee CP's operations in six states, including Iowa. My responsibilities include ensuring safe operations, managing budgets, utilizing assets, developing people, and working with customers.

6.      As an operational leader, it is not uncommon for me to administer efficiency tests in the field to test employees' compliance with operational rules. Currently, I am required to administer at least 12 (twelve) efficiency tests per month.

7.      In 2021, I administered thirteen efficiency tests.

8.      On February 1, 2021, I administered an efficiency test at the Nahant rail yard in Davenport, Iowa.

9.      While visiting the Nahant yard that day, I heard over the radio that the 474-31 train was entering the yard that would be performing a shove movement. I assessed the environment and determined the conditions were safe to administer an efficiency test of the 474-31 crew while they were performing the shove movement.

10.     I did not know Plaintiff John Sexton was the engineer operating the 474-31 at the time I decided to administer the efficiency test. I only learned that Sexton was the engineer after the train stopped and Sexton disembarked.

11.     To the best of my current recollection, before I administered the efficiency test on February 1, 2021, Kurt McKelvey had not told me about any disagreement that he had with Sexton earlier on February 1, 2021.

12.     My decision to administer an efficiency test of the 474-31 crew on February 1, 2021 was entirely unrelated to the events that occurred in Marquette earlier that morning.

13.     The fact that the 474-31 was delayed on February 1, 2021 did not in any way motivate me to administer the efficiency test that day.

14.     My potential 2021 short-term incentive payment absolutely did not in any way motivate my decision to administer the efficiency test on February 1, 2021.

15.    I received emails on January 3, 2021 and January 18, 2021 from Sexton related to a manager's alleged failure to conduct air brake testing and related operational complaints. The supervisor about whom Sexton complained had nothing to do with the failed e-test on February 1, 2021.

16.    The fact that Sexton sent these emails on January 3, 2021 and January 18, 2021 did not in any way motivate my decision to administer the efficiency test on February 1, 2021.

17.    I have worked with Sexton at CP for approximately twenty-five years. Sexton is a self-proclaimed safety advocate and has raised dozens of safety-related concerns to me and other CP managers. I have never administered an efficiency test for Sexton because he raised safety concerns. And I have never recommended discipline for Sexton because he raised safety concerns. In fact, I have viewed Sexton as reliable "eyes on the ground" who will appropriately report safety concerns and rule violations.


**Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.**

Executed on: August 1, 2024

Tom Jared
B4E79B06F3DF4F9...

Thomas Jared

3

# EXHIBIT H

# FW: SextonJ_823777-DePoverJ_1009119 Hearing_Stop within half specified distance_2-1-2021 ****SEND DISCIPLINE OUT MONDAY

**From:** Shelley Daberitz <shelley_daberitz@cpr.ca>
**To:** Joseph Adelfio <joseph_adelfio@cpr.ca>
**Cc:** Tom Jared <tom_jared@cpr.ca>, Shelley Daberitz <shelley_daberitz@cpr.ca>, Mindy George <mindy_george@cpr.ca>, Joey Reyes <joey_reyes@cpr.ca>
**Date:** Wed, 24 Feb 2021 16:05:30 -0600

Joe:  per Mr. Jared, please issue discipline for 20 days actual to service on Monday.

Thank you



**Shelley R. Daberitz**
**Manager Support Services – US**
**11306 Franklin Ave.**
**Franklin Park, IL  60131**
**Cell:**
**Office:  630-860-4447**

**From:** Dylan Smith <Dylan_Smith@cpr.ca>
**Sent:** Monday, February 15, 2021 3:11 PM
**To:** Mark J Johnson <MarkJ_Johnson@cpr.ca>; Joseph Adelfio <Joseph_Adelfio@cpr.ca>; Tom Jared <Tom_Jared@cpr.ca>; Mindy George <Mindy_George@cpr.ca>; Shelley Daberitz <Shelley_Daberitz@cpr.ca>; Joey Reyes <Joey_Reyes@cpr.ca>; Brian Scudds <Brian_Scudds@cpr.ca>; Al McCombs <Al_McCombs@cpr.ca>; Jason M Ross <JasonM_Ross@cpr.ca>
**Subject:** RE: SextonJ_823777-DePoverJ_1009119 Hearing_Stop within half specified distance_2-1-2021

I've reviewed the evidence and given that this is Mr. Sextons first major I recommend 10 served 10 deferred.



**Dylan Smith**
Superintendent – Quad Cities
C
3420 Miller Ave.
Davenport, IA 52802

**From:** Mark J Johnson <MarkJ_Johnson@cpr.ca>
**Sent:** Monday, February 15, 2021 2:56 PM
**To:** Joseph Adelfio <Joseph_Adelfio@cpr.ca>; Tom Jared <Tom_Jared@cpr.ca>; Mindy George

Johnson
**Ex. 35**

<Mindy_George@cpr.ca>; Shelley Daberitz <Shelley_Daberitz@cpr.ca>; Dylan Smith
<Dylan_Smith@cpr.ca>; Joey Reyes <Joey_Reyes@cpr.ca>; Brian Scudds <Brian_Scudds@cpr.ca>;
Al McCombs <Al_McCombs@cpr.ca>; Jason M Ross <JasonM_Ross@cpr.ca>
**Subject:** RE: SextonJ_823777-DePoverJ_1009119 Hearing_Stop within half specified distance_2-1-2021

Charge was proven.  The facts of the case were clear that Mr. Sexton was given a 15 car count, and
attempted to contact the Conductor after 7 cars; followed by attempting to contact the ATM before
coming to a stop at 11 cars.

Mitigating factors include:

1.    The Organization contends that the conductor stated "15 cars, good for 40 cars." They
      argue that Mr. Jared could not hear the conductor's instructions because he did not have a
      hand held radio; the facts and the video show Mr. Jared was next to the conductor when the
      instructions were given.
2.    The Organization asked for witnesses, and the facts do not show that either of these
      employees were connected with the shove movement.  They enter hearsay on behalf of Mr.
      David Cox, who was assigned to another train, and was not connected to the movement. The
      other request was for an "Andrew Cruciani," who is not an employee of CP Rail.
3.    While Mr. Jared was not connected to the movement, the Organization contends that he was
      'engaged in other activities' while involved in a shove movement, thus violating GCOR
      6.5.  No evidence was presented to show that Mr. Jared had attached to the crew.
4.    Organization makes further argument that the testing was unfair because a shove movement
      can only be tested through observation versus set-up.  No evidence showed that Mr. Jared
      attempted to set-up by use of a red board or other means.  He simply asked the conductor to
      give him a car count and then nothing after that, then observed Mr. Sexton's actions in
      relation to complying with rules requiring him to stop in half the distance.
5.    The Organization was disputing that Mr. Jared was not in attendance in person. They
      provided no evidence to support their basis that it could not be done contractually, nor that
      somehow Mr. Jared had outside influence.
6.    Mr. Sexton contends the only reason he stopped was because he is constantly doing a
      'rolling job briefing.'

Based on the facts of the matter, I recommend Mr. Sexton be assessed a 20-day suspension.  No
discipline should be assessed Mr. DePover, as he was following instructions. This is a serious matter,
and his testimony hinged on placing onus for his actions on Mr. Jared being unfair, and his conductor
being on his first trip back from furlough.  If he was given the 40 car clearance as they both contend at
the investigation, Mr. Jared would have clearly heard that communication while next to the
Conductor.  This is in contrary to Mr. DePover having provided a written statement shortly after the
incident, that did not include he had told him additionally, 'clear for 40.'  Mr. Jared's testimony reflects
the statement and what was seen on video.  A train list, was provided as evidence that included the
car lengths; Organization made no dispute that the list was inaccurate.  The conductor testified he
made the markings on the list, and that the distance travelled was 558 ft; movement should have been
stopped at 450 ft.



**Mark J. Johnson**
Road Trainmaster—Marquette
C
99 Water St.

Marquette, IA

**From:** Joseph Adelfio <Joseph_Adelfio@cpr.ca>
**Sent:** Monday, February 15, 2021 9:24 AM
**To:** Tom Jared <Tom_Jared@cpr.ca>; Mindy George <Mindy_George@cpr.ca>; Shelley Daberitz
<Shelley_Daberitz@cpr.ca>; Dylan Smith <Dylan_Smith@cpr.ca>; Joey Reyes
<Joey_Reyes@cpr.ca>; Brian Scudds <Brian_Scudds@cpr.ca>; Al McCombs
<Al_McCombs@cpr.ca>; Jason M Ross <JasonM_Ross@cpr.ca>; Mark J Johnson
<MarkJ_Johnson@cpr.ca>; Joseph Adelfio <Joseph_Adelfio@cpr.ca>
**Subject:** SextonJ_823777-DePoverJ_1009119 Hearing_Stop within half specified distance_2-1-2021
**Importance:** High

**Discipline due March 2, 2021**



**Joseph Adelfio**
Admin Assistant Support Services
**O** 563-441-5900
**C** ▮▮▮▮▮▮▮▮

# EXHIBIT I

Privileged & Confidential

AN AGREEMENT
BETWEEN

DAKOTA, MINNESOTA & EASTERN RAILWAY (DM&E)

d/b/a

CANADIAN PACIFIC RAILWAY (CP)



AND

ITS EMPLOYEES REPRESENTED BY BROTHERHOOD OF LOCOMOTIVE
ENGINEERS AND TRAINMEN



October 22, 2015

I

EXHIBIT
1

Confidential

CP_00212

## Table of Contents

ARTICLE 1 - PURPOSE ................................................................................................ 5

ARTICLE 2 - GENERAL PRINCIPLES ....................................................................... 5

ARTICLE 3 - RECOGNITION ...................................................................................... 6

ARTICLE 4 - SCOPE OF AGREEMENT ..................................................................... 6

ARTICLE 5 - WAGES ................................................................................................... 7

ARTICLE 6 - SENIORITY ............................................................................................ 8

Section 1    General ................................................................................................ 8

Section 2    Establishment ..................................................................................... 8

Section 3    Furloughed Employees ....................................................................... 9

Section 4    Demoted employees .......................................................................... 10

Section 5    Re-Entering Service .......................................................................... 10

Section 6    Seniority Districts and Extra Board Locations ............................... 10

Section 7    Entitlements of affected Employees ................................................ 12

Section 8    Seniority Roster ................................................................................ 12

Section 9    Promotion ........................................................................................... 13

Section 10   Promotion to Engine Service .......................................................... 13

Section 11   Seniority Retention-Company Managers/Officers .......................... 14

ARTICLE 7 - FLOW BACK .......................................................................................... 15

ARTICLE 8 - JOB VACANCIES AND BIDDING ....................................................... 15

Section 1    Regular Assignments and Extra Boards .......................................... 15

Section 2    Unassigned Pool Service .................................................................. 18

Section 3    Assignment to Positions .................................................................... 19

Section 4    Transfers ............................................................................................ 20

ARTICLE 9 - ANNULMENT OF ASSIGNMENTS ...................................................... 23

ARTICLE 10 - ABOLISHMENT AND DISPLACEMENT .......................................... 23

ARTICLE 11- GUARANTEED· EXTRA BOARD (GEB) ............................................. 24

ARTICLE 12 - APPROVAL OF APPLICATION FOR EMPLOYMENT ...................... 26

ARTICLE 13 - RULES/RECERTIFICATION/INSTRUCTION CLASSES ................. 27

ARTICLE 14 - ON AND OFF DUTY POINT ............................................................... 28

ARTICLE 15 - CALLING FOR DUTY ......................................................................... 29

Section 1    Calling ................................................................................................ 29

2

Confidential

CP_00213

Section 2    Used out of Order...............................................................................29

Section 3    Called and Released...........................................................................29

Section 4    Familiarization of Territory ...............................................................30

ARTICLE 16 - MEAL PERIODS.............................................................................30

ARTICLE 17 - EXPENSES......................................................................................31

Section 1    Held Away From Home Terminal......................................................31

Section 2    Transportation Expense....................................................................32

Section 3    Deadheading.....................................................................................32

Section 4    Aggregate Service.............................................................................32

ARTICLE 18 - PERSONAL LEAVE DAYS (PLD's) ................................................32

ARTICLE 19 - BEREAVEMENT LEAVE ................................................................33

ARTICLE 20 - HOLIDAYS.....................................................................................33

ARTICLE 21 - VACATION......................................................................................33

Section 1    Entitlements......................................................................................33

Section 2    Brotherhood of Locomotive Engineers and Trainmen Union
Officials      36

Section 3    General...............................................................................................36

ARTICLE 22 - BENEFITS.......................................................................................37

Section 1    Health & Welfare...............................................................................37

Section 2    Off Track Vehicle Accident Benefits.................................................37

Section 3    Stock Purchase Plan.........................................................................37

Section 4    Employee Assistance Program.........................................................37

Section 5    401K Plan ..........................................................................................38

ARTICLE 23 - PHYSICAL EXAMINATIONS .........................................................38

ARTICLE 24 - MEDICAL DISQUALIFICATIONS ..................................................38

ARTICLE 25 - PAYDAY...........................................................................................39

ARTICLE 26 - PAYROLL AND DEDUCTIONS.......................................................39

ARTICLE 27 - UNION SHOP AGREEMENT..........................................................39

ARTICLE 28 - HANDLING OF CLAIMS AND GRIEVANCES.................................42

Section 1    Representation...................................................................................42

Section 2    Handling of Claims and/or Grievance Process .................................42

Section 3    Handling of Discipline Appeals .........................................................44

Section 4    General...............................................................................................45

3

ARTICLE 29 - INVESTIGATIONS AND DISCIPLINE ........................................... 45

ARTICLE 30 - TIME OFF FOR UNION BUSINESS ............................................. 46

ARTICLE 31 - ATTENDING COURT AND INQUESTS ....................................... 47

ARTICLE 32 - LEAVE OF ABSENCE ................................................................. 47

    Section 1    General ........................................................................... 47

    Section 2    Less Than 1 Year ........................................................... 47

    Section 3    Illness / Injury ............................................................... 48

    Section 4    Official / Military ......................................................... 48

ARTICLE 33 - JURY DUTY ............................................................................... 48

ARTICLE 34 - BULLETIN BOARDS ................................................................. 49

ARTICLE 35 - CREW CALLING RECORDS ...................................................... 49

ARTICLE 36 - CREW CONSIST ....................................................................... 49

ARTICLE 37 - TERMINAL EFFICIENCY ......................................................... 49

ARTICLE 38 - GENERAL PROVISIONS ........................................................... 50

ATTACHMENT "A"    Questions and Answers ............................................. 52

APPENDIX 1  SEVEN DAY MARK ................................................................... 56

Side Letter 1 - Reversionary Provisions ............................................................. 58

Side Letter 2 - Regulatory Changes .................................................................... 60

Side Letter 3 - Notification of Ratification and Employee Share Purchase Plan .. 62

Side Letter 4 - Payment for Vacation, Personal Leave ....................................... 63

Side Letter 5 - Training and use of Managers ..................................................... 64

4

Confidential

**PREAMBLE:**

This agreement is intended to provide enhanced quality of life, employment security and compensation enhancements to the BLE&T membership in addition to providing operating flexibility to the Company, resulting in increased productivity. Therefore, **it is hereby agreed:**

**ARTICLE 1 - PURPOSE**

The parties to this Agreement agree that the fundamental objective of the Company is to operate a safe, efficient and effective railroad transport operation and a key component to the success of this venture is the contribution of Locomotive Engineers and Trainmen (hereinafter referred to as employees.)

This Agreement is founded on a principle of paying for employees' time on an all-inclusive basis and contemplates that in order for the operation to be successful, individuals will perform all duties requested of them, subject to the provisions contained herein.

**ARTICLE 2 - GENERAL PRINCIPLES**

A. In this Agreement, words importing the singular shall include the plural and vice versa where the context requires. Words importing the masculine gender shall include the feminine where the context requires.

B. This Agreement is intended to be applied in a non-discriminatory manner without regard to age, race, creed, color, gender, national origin, disability, sexual orientation or marital status.

C. The parties recognize that this is a new Agreement, which replaces any and all existing Agreements, unless otherwise provided, and introduces changes in the workplace. In recognition of this a committee consisting of the BLET General Chairman, a BLET Member appointed by the BLET General Chairman, and the Company's General Manager (s) Operations and Director Labor Relations or their respective designates, will be established. This committee will be known as the Dispute Resolution Committee, and will meet quarterly during the months of January, April, July and October, unless otherwise agreed, to review application of this Agreement. In matters requiring a vote of the Committee, up to two (2) Labor Members and up to two (2) Company Members may vote.

D. It is recognized that Management has the exclusive right to manage its business; to classify and direct the work force; to assign duties and to fix the starting times of jobs; determine procedural methods and equipment to be utilized; schedule the workweek and work; the number of employees to be assigned to a crew, job, terminal/station and the number to be employed or

5

CP_00216

retained in employment, except as otherwise specifically limited by this agreement.

## ARTICLE 3 - RECOGNITION

A. This Agreement covers all employees employed by the Company and represented by the Brotherhood of Locomotive Employees and Trainmen under the Railway Labor Act, as amended.

B. The term "employee" as herein referred to shall include employees represented by the Brotherhood of Locomotive employees and Trainmen, except where otherwise specifically provided for herein. The term "Company" shall mean the Canadian Pacific; Dakota, Minnesota and Eastern Railroad Company. The term "Union" or "General Committee" shall mean the Brotherhood of Locomotive Engineers and Trainmen.

C. The right to make and interpret contracts covering rules, rates of pay and working conditions on behalf of employees covered by this Agreement shall be vested in the regularly constituted General Committee of the Brotherhood of Locomotive Engineers and Trainmen.

D. Where the term "duly accredited representative" appears herein, it shall be understood to mean the regularly constituted General Committee and/or the Officers of the Brotherhood of Locomotive Engineers and Trainmen of which such General Committee or Officers are a part.

## ARTICLE 4 - SCOPE OF AGREEMENT

A. The parties recognize that the scope of this Agreement is unlike traditional agreements in the rail industry and that it must be interpreted accordingly. That being said, the primary role of Employees is to perform transportation duties traditionally associated with the operation of locomotives and trains.

B. The parties recognize that in order to meet a customer's immediate service need, or to meet operational exigencies at a time a regularly assigned crew is not present and available in the terminal for such service, and time will not permit calling a rested extra employee, a qualified employee working under this agreement may be used, without penalty, to perform such service. A qualified employee who is a manager will only be utilized in accordance with the terms and conditions of former Appendix 'F' as set forth in Side Letter No. 5.

C. The parties recognize that to achieve maximum efficiency of operations and to expedite movement of trains, employees may perform incidental work for which they are qualified without additional compensation in the absence or unavailability of another employee who would otherwise perform such work.

6

Confidential

G. The BLET shall indemnify and hold harmless the Company against any and all claims, demands, suits or other forms of liability that arise out of or by reason of any action taken or not taken by the Company pursuant to this Article.

## ARTICLE 28 - HANDLING OF CLAIMS AND GRIEVANCES

### Section 1   Representation

A. The Brotherhood of Locomotive Engineers and Trainmen shall have the exclusive right to represent all employees in company level grievance, claim and disciplinary proceedings.

B. The General Committee of Adjustment, Brotherhood of Locomotive Engineers and Trainmen, will represent all employees referred to herein in the making of contracts, rates, rules, working agreements and interpretations thereof.

C. All disputes involving employees covered by this Agreement will be handled in accordance with the provisions of this Agreement as interpreted by the BLET General Committee and the Company.

D. In matters pertaining to discipline, or other questions not affecting changes in employees' contract, the officials of the Company reserve the right to meet any of their employees either individually or collectively. Reinstatements of discharged employees on a leniency basis with seniority rights unimpaired shall not be permitted except by agreement with the General Chairman of the BLET.

### Section 2   Handling of Claims and/or Grievance Process

A. All claims or grievances must be presented electronically via the electronic system(s) as designated by the Company, by the employee involved, or on behalf of the employee, by his representative, or designee, (claims must be presented under the employee's PIN) to the officer of the Company authorized to receive same within thirty (30) days from the date of the occurrence on which the claim or grievance is based. Should any such claim or grievance be disallowed, the Company shall, within thirty (30) days from the date it is received, notify the employee or his Local Chairman in writing of the reason(s) for such disallowance. Should the Company fail to issue timely declination of the claim or grievance, it will be allowed as entered, however such allowance will not constitute a precedent for other similar claims or grievances.

All resolution of claims resulting from handling during the steps referenced in the paragraph above shall be concluded on a 'without prejudice' basis,

42

CP_00253

and are non-referable unless otherwise noted the General Chairman and the Highest Designated Officer (HDO) of the Company, or their designee(s). Claims not filed within the required thirty (30) days shall be deemed abandoned and barred from further handling.

B. Appeals of all claims and grievances, including those involving discipline, shall be presented and handled via the electronic claim handling system provided by the Company.

In the event the claim or grievance involving matters other than discipline is disallowed, the BLET Local Chairman may appeal the matter to the Superintendent within thirty (30) days from the date of declination. If the claim or grievance is not appealed, the disallowance shall stand, however the disallowance shall not constitute a precedent for other similar claims and grievances.

In the event the appeal is disallowed, the Superintendent shall, within thirty (30) days from the date it is received, notify the Local Chairman in writing of the reason(s) for such disallowance.

Should the Superintendent fail to issue timely notification of the declination of the appeal, the claim or grievance will be allowed as entered; however, such allowance will not constitute a precedent for other similar claims or grievances.

C. Claims declined under Section 2 (B) of this Article may be appealed by the BLET General Chairman to the Company's Highest Designated Officer ("HDO"), or designate, within sixty (60) days of the disallowance. The HDO, or his designate, shall, within sixty (60) days from the receipt of the appeal, notify the General Chairman of the allowance or declination of the claim. Should the HDO or designate fail to timely notify the General Chairman of such declination, the claim will be allowed as entered; however such allowance shall not constitute a precedent for other similar claims.

D. Claims and grievances disallowed by the Company pursuant to Section 2 (C) will be barred from further handling unless, not less than sixty (60) days prior to the next scheduled meeting date of the Labor/Management Resolution Committee, the General Chairman lists the unresolved claim or grievance to the Committee for handling.

E. The Labor/Management Resolution Committee will meet quarterly, or as otherwise mutually agreed, to review and resolve outstanding employee time claims and grievances.

F. The Committee will consider the entire record of each dispute submitted to it. Decisions made pursuant to this process will be written by the Company within forty-five (45) days of the meeting date and will

43

represent the final and binding decision on such grievances. The handling of claims and grievances by the Committee will constitute any "conference" prerequisite to submission of disputes to a tribunal established pursuant to law or by agreement.

G. In the event that a majority of the Committee does not agree on the resolution of a particular grievance, either party may initiate proceedings before a tribunal established pursuant to law or by agreement within one-hundred twenty (120) days of the Committee's written decision having been rendered.

H. Nothing in this Section shall preclude an agreement by the parties to conference claims or grievances independent of the procedures set forth in Section 2 (D) and (E) of the Article. Such conference as may be agreed upon will constitute any "conference" prerequisite to the submission of disputes involving claims and/or grievances to a tribunal established pursuant to law or by agreement for the final adjudication of such disputes

**Section 3    Handling of Discipline Appeals**

A. Discipline decisions reached by the Company pursuant to Article 29 (E) and (F) of this Agreement may be adjusted between the BLET Local Chairman and the Superintendent, or designate, at any time prior to appeal by the General Chairman as provided in paragraph B hereof.

B. If the discipline is to be appealed, the BLET General Chairman must appeal, in writing, to the HDO, or designate, within ninety (90) days of the date the discipline was assessed, or the appeal will be barred. The HDO, or designate, shall notify the General Chairman of the allowance or declination of the appeal within sixty (60) days of the receipt of the appeal. Should the HDO, or designate, fail to timely notify the General Chairman of the declination of the appeal, the claim will be allowed as entered; however such allowance shall not constitute a precedent for other similar claims.

C. The BLET General Chairman will list unresolved discipline appeals with the HDO, or designate, not less than thirty (30) days prior to the next scheduled meeting of the Labor/Management Committee for handling pursuant to Section 2 (D) and (E) of this Article. Discipline/claims may be handled in conference as agreed upon between scheduled meetings.

D. Nothing in this Section shall preclude an agreement by the parties to conference discipline appeals independent of the procedures set forth in this Article. Such conference as may be agreed upon will constitute any "conference" prerequisite to submission of unresolved disputes involving discipline appeals to a tribunal established by law or by agreement for the final adjudication of such disputes.

44

CP_00255

**Section 4   General**

A. The Labor / Management Resolution Committee will meet quarterly during the months of January, April, July, October, or as otherwise mutually agreed, to review and resolve outstanding time claims and grievances.

B. The Committee will consider the entire record of each dispute submitted to it. Decisions made pursuant to this process will be provided to the Union by the Company within forty-five (45) days of the meeting date and will represent the final and binding decision on such grievances.

C. The handling of claims and grievances by the Committee will constitute any "conference" prerequisite to submission of disputes to a public law board tribunal established pursuant to law or by agreement. In the event that a majority of the Committee does not agree on the resolution of a particular grievance, either party may initiate proceedings before a tribunal established pursuant to law or by agreement within six months of the Committee's written decision having been rendered.

## ARTICLE 29 - INVESTIGATIONS AND DISCIPLINE

A. An employee shall not be withheld from service pending hearing except in cases that are serious, such as but not limited to, theft, altercation, Rule "G", insubordination, major accidents and/or other major offenses whereby the employee's retention in service could be hazardous.

B. No employee shall be disciplined without a fair hearing (investigation) by an officer of the Company. An employee shall be apprised of the charge(s) against him not later than twenty (20) days from the date the carrier has knowledge of the incident to be investigated.  If the decision is made to withhold an employee from service pending an investigation, the hearing must be held within ten (10) days of the date the employee was initially withheld from service He shall have reasonable opportunity to secure the presence of necessary witnesses, and he shall have the right to be represented by an accredited representative or member of the Brotherhood of Locomotive Engineers and Trainmen.

C. When not inconvenient to the Company and to other employees, investigations will be held at such times, if possible, as to avoid holding employees out of service to be present at the investigation. Postponements will be granted to either party upon a reasonable showing of a need.

D. Investigations ordinarily will be held within twenty (20) days of the date of the notice of charge referenced in B above. Employees will be advised of the decision in writing within twenty (20) days after the conclusion of the investigation.

E. An employee and/or the employee's representative shall have the option,

Confidential

with the Company's concurrence and prior to the hearing, to discuss the charge with the appropriate Company Officer.

1. If the disposition of the charges is made on the basis of the employee's acknowledgement of responsibility, the disposition shall be reduced to writing and signed by the employee and the official involved and shall incorporate a waiver of hearing and shall specify the maximum discipline, which may be imposed for the employee's acceptance of responsibility.

2. No minutes or other record shall be made of the discussion, and, if the parties are unable to reach an agreed upon disposition on this basis, no reference shall be made to these discussions by either of the parties in any subsequent handling of the charges under the discipline procedure.

F. A true and correct transcript will be taken of all hearings or investigations held at the direction of the Company under this Article and in the event the employee involved is assessed discipline, the employee, his representative and the General Chairman will be furnished a copy of the transcript along with the discipline decision letter. At an investigation, an employee or his representative shall have the right to record, at his expense, the investigation proceedings on a recording device. This provision will not be used to delay or postpone the investigation proceedings. Distribution of notices and transcripts by electronic means shall fulfill the Company's obligation under this rule.

G. Should any employee investigated under this Article consider that the discipline is unjust, he shall have the right to appeal as provided in Article 28 of this agreement. In case of dismissal or suspension which is later found to be unjust, the employee will be reinstated with seniority rights unimpaired and paid for all time lost.

H. Letters of caution or warning are not discipline. Should the employee dispute the validity of the warning, he has the right to request a fair hearing provided the request is made within fifteen (15) days of the date of the warning letter. If the hearing reveals that the letter is unjust, it shall be removed from his record. If the Company decides the letter was warranted, it will apprise the employee of the decision within fifteen (15) days of the hearing. If the employee is dissatisfied with the decision, he shall have the right to appeal as provided in Article 28 herein.

## ARTICLE 30 - TIME OFF FOR UNION BUSINESS

An employee who is elected or appointed to a full time position with the Brotherhood of Locomotive Engineers and Trainmen shall be granted an unpaid leave of absence for the duration of time he holds such position.

46

CP_00257

# EXHIBIT J

IN RE THE MATTER OF:                    )

Investigation/Hearing of John           )

Sexton; Justin DePover                  )


February 10, 2021

12:00 PM


PROCEEDINGS HAD at Canadian Pacific 3420 Miller

Avenue, Davenport, Iowa.

EXHIBIT

10

CP_000018

John Sexton; Justin DePover
February 10, 2021

2

PRESENT FOR THE COMPANY:

    MR. MARK JOHNSON, Conducting Officer

PRESENT FOR THE CHARGED EMPLOYEE:

    MR. JOE RAINWATER, Local Chairman, BLET

        Division 117

CP_000019

John Sexton; Justin DePover
February 10, 2021

3

I N D E X

WITNESS:  THOMAS JARED

     Examination by Mr. Johnson     18, 43, 45

     Examination by Mr. Rainwater     38, 44


PRINCIPAL:  JUSTIN DEPOVER

     Examination by Mr. Johnson     48, 57, 83

     Examination by Mr. Rainwater     52, 61, 82, 87


PRINCIPAL:  JOHN SEXTON

     Examination by Mr. Johnson     62, 80

     Examination by Mr. Rainwater     64, 88


EXHIBITS:

     Exhibit 1     9

     Exhibit 2     12

     Exhibit 3     21

     Exhibit 4     27

     Exhibit 5     30

     Exhibit 6     34

     Exhibit 7     71

     Exhibit 8     77

CP_000020

John Sexton; Justin DePover
February 10, 2021

4

1      MR. JOHNSON:  Good afternoon.  The time is 12:14 on

2  February 10, 2021.  We are located at 3420 Miller Avenue,

3  Davenport, Iowa.

4          My name is Mark Johnson.  My title is Road

5  Trainmaster.  I will be the Conducting Officer in this

6  proceeding.

7          Beginning to my left, please state your name, title,

8  and role in this hearing.

9          So, Mr. Jared, we'll start with you.

10     MR. JARED:  Tom Jared, General Manager for U.S. West for

11  Canadian Pacific.

12     MR. SEXTON:  John Sexton, Locomotive Engineer,

13  Davenport, Iowa.

14     MR. RAINWATER:  Joe Rainwater, Local Chairman.  Also,

15  Locomotive Engineer for Marquette, Iowa.

16     MR. DEPOVER:  And Justin DePover.  I'm a Conductor outta

17  Davenport, Iowa.

18     MR. JOHNSON:  All right.  Thank you, gentlemen.

19          I am charged with conducting a fair and impartial

20  hearing and to develop all the facts and circumstances in

21  connection with this Notice of Charge.

22          The following rules of procedure will be observed and

23  enforced:

24          All present will conduct themselves in a professional

AccuTran Global Enterprises, Inc.
855-552-0505

CP_000021

John Sexton; Justin DePover
February 10, 2021

5

1   manner and show respect for those testifying.  Swearing,

2   abusive conduct, outbursts, and repeated interruptions will not

3   be tolerated.

4          This hearing is being recorded, and the transcript of

5   the recording will be the official record.  Speak slowly and

6   distinctly in order for your testimony or remarks to be

7   properly recorded.

8          Objections raised during this hearing will be

9   addressed and made a matter of record.

10          Reasonable recesses will be granted when requested,

11   but only before or after a witness has testified.  Except in

12   unusual circumstances, recesses will not be granted during a

13   witness' testimony.

14          The charged employee and representative will be

15   afforded the opportunity to present witnesses, cross-examine

16   Company witnesses, and introduce the record information or

17   exhibits pertinent to the matter being investigated.

18          The charged employee and representative will be

19   allowed to make a closing statement prior to the conclusion of

20   this hearing.  Closing statements should be confined to the

21   matter being investigated and based on evidence presented and

22   testimony given during this hearing.

23          This investigation is being held to develop all the

24   facts and circumstances relative to the Notice of Charge dated

CP_000022

6

1    February 4, 2021, and subsequently another letter that was

2    issued changing the Hearing Officer, dated February 10th of

3    2021.

4            The Charge reads as follows:

5            It's on Canadian Pacific letterhead.

6            "CERTIFIED MAIL 7019 2970 0002 0440

7        6531"

8        MR. JOHNSON:  And also:

9            "CERTIFIED MAIL 7019 2970 0002 0440

10       6555"

11       MR. JOHNSON:  Dated:

12           "February 4, 2021"

13       MR. JOHNSON:  Addressed to:

14           "John Sexton

15           ███████████████

16           █████████████

17           Employee # 823777"

18       MR. JOHNSON:  Also addressed to:

19           "Justin DePover

20           ████████████

21           ████████████

22           Employee # 1009119"

23       MR. JOHNSON:  Body reads:

24           "Gentlemen:

CP_000023

John Sexton; Justin DePover
February 10, 2021

7

1       Attend a formal investigation or

2   hearing session scheduled to be held at

3   the General Yard Office Building

4   conference room, located at 3420 Miller

5   Avenue, Davenport, Iowa, on February

6   10, 2021 at 12:00 hours.

7       The purpose of this formal

8   investigation or hearing is to

9   determine the facts and circumstances

10  and to place your responsibility, if

11  any, in connection with your alleged:

12      • Failure to stop within half the

13  specified distance given while shoving

14  into Track NA04.

15      This incident allegedly occurred at

16  approximately 12:49 hours on February

17  1, 2021 while working Train 474-31 at

18  Nahant Yard.

19      The following Carrier witnesses

20  known at this time to likely have

21  knowledge of this -- of the incidence

22  and/or rel -- evidence relative to this

23  investigation or hearing is hereby

24  requested to attend:

John Sexton; Justin DePover
February 10, 2021

8

```
 1          • Tom Jared

 2          • Dylan Smith

 3          In accordance with the provisions of

 4     your Scheduled Agreement, arrange for

 5     representative and/or witnesses, if

 6     desired.  A copy of this document is

 7     enclosed should you desire to

 8     coordinate this matter with your

 9     representative.

10        Sincerely,

11        Shelley R. Daberitz

12        Manager Support Services

13        Operations U.S."

14     MR. JOHNSON:  CC or carbon copied were:

15        "Dylan Smith

16        John Cartlidge

17        CMC, also known as Crew Management

18     Center

19        Joey Reyes - Please arrange to

20     conduct

21        Tom Jared - Please arrange to attend

22     as Company witness

23        Dylan Smith - Please arrange to

24     attend as Company witness
```

CP_000025

John Sexton; Justin DePover
February 10, 2021

9

1          Employee Services

2          Timekeeping

3          Operating Practices or Rules"

4      MR. JOHNSON:  I will now label this as Exhibit 1.

5              (Whereupon, the document was marked as

6              Exhibit 1 for identification.)

7      MR. RAINWATER:  Do you have copies for everybody?

8      MR. JOHNSON:  When we take a recess, if you don't have

9  copies with you, I can make copies for you.

10     MR. RAINWATER:  I have a copy of Exhibit 1.  I do not,

11 however have a copy of the Postponement, and I'd like to have

12 that sooner rather than later.

13     MR. JOHNSON:  Okay.  So --

14     MR. RAINWATER:  Or, I'm sorry, the -- the -- the change

15 in Hearing Officer, not the Postponement.

16     MR. JOHNSON:  Okay.  I will -- I'll read it in and then

17 I'll make a quick copy for ya.

18          All right.  On Canadian Pacific letterhead again,

19 this is the change of Hearing Officer:

20          "February 10, 2021"

21     MR. JOHNSON:  Addressed to:

22          "John Sexton

23          ███████████████

24          ███████████████

John Sexton; Justin DePover
February 10, 2021

10

1          Employee # 823777"

2     MR. JOHNSON:  Also:

3          "Justin DePover

4          2512 E 18th Street

5          Davenport, Iowa 52803

6          Employee # 1009119"

7     MR. JOHNSON:  And reads:

8          "Gentlemen:

9          Please refer to my letter dated

10    February 4, 2021 concerning formal

11    investigation or hearing session

12    scheduled to be held at the General

13    Yard Office Building conference room,

14    located at 3420 Miller Avenue,

15    Davenport, Iowa, on February 10, 2021

16    at 12:00 hours.  The purpose of this

17    investigation or hearing is to

18    determine the facts and circumstances

19    and to place your responsibility, if

20    any, in connection with your alleged

21    failure to stop within half the ranges

22    -- or half the specified distance given

23    while shoving into Track NA04.  This

24    incident allegedly occurred at

John Sexton; Justin DePover
February 10, 2021

11

1      approximately 12:49 hours on February

2      1, 2021 while working Train 474-31 at

3      Nahant Yard.

4          Please be advised that Joey Reyes

5      will no longer be attending as

6      Conducting Officer.  Mark Johnson has

7      been requested to attend the

8      investigation or hearing as Conducting

9      Officer.

10          In accordance with your -- or with

11      the provision of your Scheduled

12      Agreement, arrange for witness, if

13      desired.  A copy of this document is

14      being sent to your representative.

15          Balance of my original notice

16      remains the same.

17          Sincerely,

18          Shelley R. Daberitz

19          Manager Support Services

20          Operations U.S."

21      MR. JOHNSON:  And the only addition to the carbon copy

22  is:

23          "Mark Johnson - Please arrange to

24      conduct"

CP_000028

John Sexton; Justin DePover
February 10, 2021

12

1        MR. JOHNSON:  And Joey Reyes is no longer carbon copied.

2            I'm gonna take a brief minute or two here.  I'll go

3    make a copy for you three, and then we'll resume with this

4    investigation.

5                    (Whereupon, a recess was taken.)

6        MR. JOHNSON:  All right.  We're back on the record.

7    Time is 12:26.

8            I just read in the Notice of -- the change for the

9    Hearing Officer, provided copy to everybody.  Labeling this as

10   Exhibit #2.

11                   (Whereupon, the document was marked as

12                   Exhibit 2 for identification.)

13       MR. RAINWATER:  At this time, just as a matter of

14   record, I notice that Dylan Smith is not in attendance at this

15   d -- is there -- do we have knowledge of whether or not he's

16   going to attend as compelled by the Hearing Letter?

17       MR. JOHNSON:  At this time, there's some personal

18   reasons he's not here.  We're gonna continue with this

19   investigation.  Should it be ter -- determined that he would

20   have something permant -- pertinent to this investigation, then

21   we'll make a decision whether or not we would postpone.

22       MR. RAINWATER:  All right.  And just as a matter of

23   record, I also note that General Manager Jared is in attendance

24   via video conference.  We weren't informed of that ahead of

13

1  time.  I'd like to object to this hearing just because of

2  that.  This Hearing Letter compels the attendance, same as for

3  -- from -- for the witnesses -- Carrier witnesses, the same as

4  it does for Mr. Sexton and Mr. DePover.  If you read in line

5  one -- oh, I'm sorry, of the opening paragraph of Exhibit 1, it

6  says:

7          "Gentlemen:

8          Attend --"

9          And then it also compels Mr. Jared and Mr. Smith to

10  attend in person.

11          The -- the basis for this objection is also because

12  the Organization was not given the same opportunity to attend

13  via video conference.  We also believe the that the Zoom video

14  conference, while convenient, eliminates the ability of the

15  Hearing Officer to vet testimony by viewing and experiencing

16  the nonverbal cues from any witness who may be attending via

17  video.

18          I'm also concerned about how evidence is going to be

19  submitted as far as it relates to due process.  Other than his

20  own testimony, how is Mr. Jared gonna enter exhibits?

21      MR. JOHNSON:  Okay.  So I'm gonna overrule on your

22  objection.  And you -- did you ever make a request --

23      MR. RAINWATER:  Yeah --

24      MR. JOHNSON:  -- to attend via Zoom?

CP_000030

14

1          MR. RAINWATER: I -- I guess I didn't know if that was

2    such a possibility.  I mean, like I said, the Hearing Letter

3    compels Mr. Sexton and Mr. DePover to attend.  And in -- in the

4    history of hearings and investigations, I don't know that it's

5    ever been an option to do so in a different manner than by

6    physically being on property in the hearing room.  So --

7          MR. JOHNSON: So --

8          MR. RAINWATER: -- I suppose, no, there -- there was no

9    request to be made because I didn't know there was need to make

10   a request --

11         MR. JOHNSON: Okay.  S --

12         MR. RAINWATER: -- in that matter.  Nor should I think

13   that it should be allowed, just on the basis like I said, that

14   -- that we get to vet the testimony by both viewing and

15   experiencing the nonverbal cues from the witnesses in

16   attendance.  We don't get that same opportunity by Mr. Jared,

17   who is -- we can only see half of his body and can't see what's

18   in front of him.

19         MR. JOHNSON: Okay.  Again, I'm overruling on your

20   objection.  And the courts within the United States have gone

21   to doing Zoom and using other video means for testimony, so

22   Mr. Jared will be available through the entire process.  As I

23   said with Mr. Smith, I would make a determination at the end of

24   the testimony that we hear today if -- if I feel that he has

John Sexton; Justin DePover
February 10, 2021

15

1  something pertinent, then we would take a postponement, a

2  recess at that time --

3        MR. RAINWATER:  Sure.  I understand --

4        MR. JOHNSON:  -- until he's available, so.

5        MR. RAINWATER:  I understand Mr. Smith -- I mean, it --

6  circumstances rise to the level of him not being able to

7  attend.  I would, however, like to note for the record, why is

8  Mr. Jared not in the physical attendance?

9        MR. JOHNSON:  He is available through Zoom due to the

10  current crisis within the United States and the world actually,

11  with COVID, trying to limit exposure.

12        MR. RAINWATER:  Well, I appreciate that he took it upon

13  himself to protect himself, but not give us all the same

14  opportunity, so I'll s -- I'll sustain for now.

15        MR. JOHNSON:  Okay.  So next, I'm going to call

16  Mr. Sexton for preliminary questions.

17            Mr. Sexton, for the record, please state your name

18  and position with the Company.

19        MR. SEXTON:  John Sexton, Locomotive Engineer.

20        MR. JOHNSON:  And what is your address?

21        MR. SEXTON:  ████████████████████████████

22  ████████████

23        MR. JOHNSON:  When were you last tested on the Rules?

24        MR. SEXTON:  2020, I believe.

CP_000032

John Sexton; Justin DePover
February 10, 2021

16

1       MR. JOHNSON:  And were you allowed to ask questions?

2       MR. SEXTON:  Absolutely.

3       MR. JOHNSON:  Do you have a representative present?

4       MR. SEXTON:  I do.  Joe Rainwater.

5       MR. JOHNSON:  Okay.  Thank you.  Did you receive the

6 Notice of Charge?

7       MR. SEXTON:  I did not.

8       MR. JOHNSON:  But you are aware to be here today?

9       MR. SEXTON:  I am, only because of Mr. Rainwater, uhm,

10 forwarded the information to -- to me.

11       MR. JOHNSON:  Okay.  Are you ready to proceed with this

12 hearing?

13       MR. SEXTON:  I am.

14       MR. JOHNSON:  Okay.  Mr. DePover -- or you're released

15 from testimony, Mr. Sexton.

16         Mr. DePover, for the record, please state your name

17 and position with the Company.

18       MR. DEPOVER:  Justin DePover, and I'm a Conductor.

19       MR. JOHNSON:  Were -- when -- or what is your address?

20       MR. DEPOVER:  2512 East 18th Street in Davenport, Iowa,

21 52803.

22       MR. JOHNSON:  And when were you last tested on the

23 Rules?

24       MR. DEPOVER:  I had a Refresher's Class on, I believe it

**CP_000033**

17

1    was the 27th.  I -- I was on furlough for just under eleven

2    months.

3           MR. JOHNSON:  Okay.  Twenty-seventh of?

4           MR. DEPOVER:  Of January.

5           MR. JOHNSON:  Okay.  I was gonna say we're a little

6    ahead of --

7           MR. DEPOVER:  Yeah, I'm sorry about that.

8           MR. JOHNSON:  -- the 27th of February, so.  Do you have

9    a representative present?

10          MR. DEPOVER:  Yes, I do.

11          MR. JOHNSON:  Who is that?

12          MR. DEPOVER:  Mr. Rainwater.

13          MR. JOHNSON:  And did you receive Notice of Charge?

14          MR. DEPOVER:  I did not.

15          MR. JOHNSON:  But you're aware to be here today?

16          MR. DEPOVER:  I was aware also, via email from

17   Mr. Rainwater.

18          MR. JOHNSON:  Are you ready to proceed with this

19   hearing?

20          MR. DEPOVER:  Yes, I am.

21          MR. JOHNSON:  Mr. Rainwater, are you ready to proceed

22   with this hearing?

23          MR. RAINWATER:  Under previous objection, yes.

24          MR. JOHNSON:  Okay.  All right.  Mr. DePover, you're

CP_000034

John Sexton; Justin DePover
February 10, 2021

18

1    released from testimony.

2            I will now call Mr. Jared.

3                        THOMAS JARED

4    called as a witness by the Company herein, was examined and

5    testified as follows:

6                    E X A M I N A T I O N

7                    By:  Mr. Johnson

8        Q.    Mr. Jared, state your name.

9        A.    Thomas Jared.

10       Q.    And what is your job title?

11       A.    General Manager, U.S. West, Canadian Pacific.

12       Q.    And what do you do in that position?

13       A.    My position, I oversee the operations for

14   Canadian Pacific through six states.  That includes safety,

15   that includes budgetary, utilizing assets, developing people,

16   working with customers.

17       Q.    And how long have you held that position?

18       A.    Since 2016, I've been a General Manager.

19       Q.    Okay.  How long have you been with Canadian

20   Pacific?

21       A.    The -- it's a long story, but it -- as of

22   recently, it's been 13 years.

23       Q.    Okay.  And have you been tested on the Rules?

24       A.    I have.

John Sexton; Justin DePover
February 10, 2021

19

1    Q.    Okay. Are aware of an incident that occurred at

2    approximately 12:49 hours on February 1, 2021?

3    A.    I am.

4    Q.    Could you please describe what you observed or

5    what the incident was?

6    A.    On -- on February 1st, I was at the south end of

7    Nahant Yard. I was observing Train 474-31 coming down to the

8    south end of the yard. I observed the Conductor actually

9    dismount the locomotive. The crew was going to actually shove

10   -- they were instructed to shove 4 Track as part of their

11   setout. That setout consisted of 76 cars. Conductor made the

12   cut, pulled up, was gonna shove into the south end of the yard

13   into 4 Track. Conductor lined all of his switches. Conductor

14   and Engineer actually briefed with the RC assignment which was

15   actually on the north end of the yard, and they were told that

16   the RC assignment was actually in 16 Track and they would not

17   be in 4. And the two crew members, Mr. Sexton and Mr. DePover,

18   actually briefed on this over the radio where their actual RC

19   assignment was, and that the 4 Track was actually theirs and it

20   was clear at the time.

21        Mr. DePover actually started a shoving movement

22   into 4 Track. He gave an initial car count of 50. I was

23   actually on the south end of the yard at that time in my

24   vehicle, which I actually dismounted at that time, and as I

AccuTran Global Enterprises, Inc.
855-552-0505

CP_000036

20

1  walked over to Mr. DePover, he was in between -- on the south

2  side of 4 Track. I walked up to him and as I walked up to him,

3  he'd gave a 15-car count to the Engineer, John Sexton. At that

4  point, I instructed Mr. DePover to not provide any more radio

5  communication to Mr. Sexton, and Mr. Sexton continued to shove

6  back. And I was -- as I was counting down, we got to seven

7  cars that he actually shoved, which that's when Mr. Sexton

8  should've actually stopped and he did not. But he did -- I did

9  note that that was the seventh car that was being shoved by,

10 and Mr. DePover, at that time, did confirm that was the seventh

11 car. And actually, at that time, Mr. Sexton got on the radio

12 and he asked for further instructions from Mr. DePover.

13 Mr. DePover did not -- did not answer. As you can hear, Mister

14 -- the brakes were actually being applied on the train. And

15 again, he had 76 cars. And Mr. Sexton asked one more time, and

16 then brought the train to an actual stop.

17             When he stopped, he'd actually shoved 11 cars

18 into the track further from that initial count of 50. At that

19 time, I -- Mr. Sexton was asking for his Conductor -- or for

20 the AE, Assistant Engineer DePover, and the -- Mr. DePover told

21 him that I was actually conducting a test. Mr. Sexton said oh,

22 I must've passed. But at that time, I told Mr. DePover that --

23 to [indiscernible] his thoughts, make sure to get a proper job

24 briefing, and continue his movement of yarding the train, and

CP_000037

21

1    we'd brief afterwards, which he did.

2               So through that process, Mr. Sexton did violate

3    General Code of Operating Rules 5.37.  That's called Radio

4    Response, it's actually a shoving movement, where it clearly

5    states:

6         "Movement must stop within half the

7         distance specified unless additional

8         instructions are received."

9         Q.    Okay.  Is that an exhibit that you'd like to

10   enter?

11        A.    Yes, I would.  I -- if you don't have a copy of

12   that, I can get a copy brought to you, but I would like to make

13   it a -- an exhibit.  GCOR—Eighth Edition—April 1, 2020, Rule

14   5.3.7 Radio Response.

15        Q.    Okay.  Yeah, Joey provided me with some things

16   that -- so I did find that.

17        MR. JOHNSON:  I will label this as Exhibit #3.  And that

18   is the GCOR -- Eighth Edition, April 1st of 2020, 5.3.7 Radio

19   Response.

20                    (Whereupon, the document was marked as

21                    Exhibit 3 for identification.)

22        Q.    So, Mr. Jared, did he comply with this Rule?

23        A.    Absolutely not.

24        Q.    And how not?

CP_000038

John Sexton; Justin DePover
February 10, 2021

22

1          MR. RAINWATER:  Just -- for -- just point of order,

2     you're -- you're sa --

3          A.      He was supposed to have been stopped at seven

4     cars.

5          MR. RAINWATER:  Yeah, we're saying he, can we specify

6     exactly who he is?  There's two charged employees.  Can we

7     specify --

8          MR. JOHNSON:  Okay.

9          MR. RAINWATER:  -- which one we're saying is not in

10    compliant with this Rule?  I missed that because of this video.

11         MR. JOHNSON:  Okay.  If you have an objection or

12    something like that, please let him finish and then --

13         MR. RAINWATER:  Okay.

14         MR. JOHNSON:  -- make your objection.

15         Q.      So, Mister -- Mr. Jared, did Mr. DePover violate

16    this Rule?

17         A.      No, he did not.

18         Q.      Okay.  Did Mr. Sexton violate the Rule?

19         A.      Yes, he did.

20         Q.      And how so?

21         A.      Mr. Sexton, at seven cars, he should have been

22    stopped, which he was not.  As I noted -- I -- I was counting

23    the cars as they were going by.  At the seventh car, as it went

24    by, I noted with Mr. DePover that that was the seventh car

23

1    after his initial radio response of 15.  He did confirm with

2    me.

3        MR. SEXTON:  It's 50.

4        A.        And then, again, Mr. Sexton stopped at 11 car

5    lengths past the initial 15 car instruction he gave to his

6    Engineer, John Sexton.

7        Q.        Okay.  So he gave an initial count of 50.

8    Correct?

9        A.        Correct.  The initial car count was 50 into the

10   track, which was a clear track.

11       Q.        Okay.  And then he gave further instruction for

12   15?  1-5?

13       A.        That's correct.  When I -- when I walked over to

14   him, at that time, he actually made a radio communication to

15   his Engineer, which was John Sexton, of a 15-car count.

16       Q.        Okay.  And then it was how long before he came

17   to a stop?

18       A.        Eleven car lengths.

19       Q.        Is that less or more than half the distance that

20   was specified for the 15-car count?

21       A.        More than half.

22       Q.        Okay.  Any other evidence you'd like to submit?

23       A.        You should have a Tonnage Profile if Mr. Reyes

24   actually printed it for you.  This Tonnage Profile was provided

24

1   by Conductor DePover after they got -- they were done making

2   their shoving movement, and I'd like to reference page 2 of

3   that Tonnage Profile, if you would?

4        Q.    Okay.  Let me kinda go through the stuff that he

5   sent me -- or he gave me.

6        MR. JOHNSON:  Looks like I need to make one more copy,

7   if you guys want a --

8        MR. SEXTON:  [I guess we could].

9        Q.    Okay.  So, Mr. Jared, I have here a 474-31 04617

10  Tonnage Profile, Page 002, it's got some marking on it.

11       A.    So the markings are all from Mr. DePover.  These

12  are all his markings.  You can see where he made a initial mark

13  of line 76.  That was the cut they came off their train with.

14       Q.    Okay.

15       A.    You can also note -- and of course, there is --

16  it looks like there's two different color inks here, but you

17  can also note where he noted the DP unit, which they actually

18  had to set out prior to making their final shove --

19       Q.    Okay.

20       A.    -- from 11.  This is their first shove into the

21  track to get the DP unit set out.

22       Q.    Okay.

23       A.    You can also see where Mr. DePover marked -- it

24  looks like in blue ink -- between lines 54 and 64.  I had asked

CP_000041

25

1   Mr. DePover after the shove movement was made, to note the cars

2   still -- the cars that were actually shoved into the track

3   during that -- that shoving movement between -- after he said

4   15 more cars.

5           Q.      Do you know the total distance that was shoved

6   then, after he was given --

7           A.      It was approximately 110 feet.

8           Q.      They only shoved 110 feet? Or approximately --

9           A.      Sorry. No, the -- no, I don't -- we didn't add

10  the footage up to write next to the Tonnage Profile. I don't

11  have that top of my head.

12          Q.      Okay. But it was greater than half the

13  distance?

14          A.      Correct. You'll note in the -- in the Tonnage

15  Profile where some of the car lengths are 42 feet and 1 -- some

16  of the car lengths are 71 feet?

17          Q.      Okay.

18          A.      But the point of the Rule is that half the

19  distance specified, and he shoved 11 car lengths. When I

20  interviewed Mr. Sexton, he made the statement that he -- all he

21  had was sticks and trees to go off of for his -- for shoving

22  back.

23          Q.      Are there other means for them to know distance?

24          A.      Yeah. Yes, sir. He actually has a counter on

CP_000042

John Sexton; Justin DePover
February 10, 2021

26

1    the lead locomotive that he should be able to reference when

2    making a shoving movement.

3          MR. RAINWATER:  Objection.

4          A.       And further, if he's not sure, he could've asked

5    sooner about car distance.  For example, if he only had seven

6    cars -- if he can only shove initial seven cars, he should've w

7    -- asked well in advance of that seven cars for additional car

8    counts, which he did not.  He waited until the seventh car went

9    by before he asked a question.  And then you can hear --

10         MR. RAINWATER:  Objection.  Unless --

11         A.       -- brakes applying.

12         MR. RAINWATER:  Unless Mr. Jared has a Rule that he can

13   point to that says an Engineer is required to use his distance

14   measuring device when making shove moves, that -- that

15   testimony's irrelevant.

16         MR. JOHNSON:  Okay.  The question was whether or not he

17   had means to use.  It wasn't --

18         MR. RAINWATER:  Okay.  Okay.  So I just wanted to

19   clarify that the Rule --

20         MR. JOHNSON:  It wasn't adding -- adding a Rule or

21   anything to it.

22         MR. RAINWATER:  Right.  So I wanna clarify for the --

23   for the record that there's no Rule that says that you have to

24   do that.

AccuTran Global Enterprises, Inc.
855-552-0505

**CP_000043**

27

1        MR. JOHNSON: So -- yeah. No, I -- the question was if
2   he had means to be able to, other than sticks and trees.

3            So just to back up here real quick, so the Tonnage
4   Profile, page 002, I'm labeling as Exhibit 4.

5                    (Whereupon, the document was marked as
6                    Exhibit 4 for identification.)

7        MR. JARED: I'm sorry, did you say Exhibit 4?

8        MR. JOHNSON: Yes.

9   BY: MR. JOHNSON

10       Q.    Do you have anything else you'd like to enter as
11  evidence, Mr. Jared?

12       A.    Once the crew actually yarded their train, I
13  didn't actually compare; they were relieved on the south end.
14  And because of their hours, they were brought to the north end
15  to the depot, and individually interviewed.

16            First interview was done with Mr. DePover, where
17  we reviewed, actually, the events had taken place, and then I'd
18  asked Mr. DePover to provide a written statement, which you
19  should have a copy of it as well. It says 474-31, and has his
20  signature on it, dated 1 February 2021.

21       Q.    Okay. I don't have that here right now. Can we
22  take a brief recess, and have you email that --

23       MR. RAINWATER: I'm gonna --

24       MR. JOHNSON: -- to me so that --

CP_000044

John Sexton; Justin DePover
February 10, 2021

28

1          MR. RAINWATER:  I'm gonna object here.  This is the

2     precise reason why video conference calls shouldn't be allowed

3     if the witness has to email evidence to you in the middle of

4     his testimony in order to access it.  It's completely

5     ridiculous.  It slows the whole process down.

6          MR. JOHNSON:  Okay.  Your objection is overruled.  It --

7     so he's got evidence that he wants to submit.

8          MR. RAINWATER:  He --

9          MR. JOHNSON:  Part of your initial --

10          MR. RAINWATER:  Then he should've been here to do it.

11          MR. JOHNSON:  Part of your initial objection was that

12     there would be partiality in the way things are being

13     conducted.  If I --

14          MR. RAINWATER:  Yeah, I think that --

15          MR. JOHNSON:  If I understood what your objection was,

16     correct?

17          MR. RAINWATER:  Yeah, I think that's obvious, now, for

18     sure.

19          MR. JOHNSON:  So now you're objecting because not

20     everything is readily available.  As I said with COVID, trying

21     to limit exposure to everybody --

22          MR. RAINWATER:  Mm-hmm.

23          MR. JOHNSON:  -- it's -- i -- it's a challenging time

24     for everybody, Mr. Rainwater.

CP_000045

29

1          So we'll take just a brief -- probably five-minute

2   recess, and I'll see if I've gotten that from you, Mr. Jared.

3        MR. JARED:  Okay.

4        MR. JOHNSON:  Time is 12:46.

5                (Whereupon, a recess was taken.)

6        MR. JOHNSON:  All right.  The time is now 12:49,

7   resuming with the Sexton-DePover Investigation.

8          All right.  Mr. Jared, Mr. Reyes brought in what

9   appears to be a statement.  I'm gonna label --

10  BY:  MR. JOHNSON

11       A.      That's correct.  I actually received the

12  statement from Mr. DePover as we're interview him.  Once we

13  were done with the interview, I asked him pro -- to provide the

14  statement.  This is what he wrote:

15          "When shoving cars into NA04 track a

16          car count of 15 was given and after no

17          communication movement stopped after 11

18          cars."

19       A.      That's Mr. DePover's signature.  And I observed

20  him writing it -- the statement, and then he dated it:

21          "1 Feb 2021"

22       MR. JOHNSON:  Okay.  I'm going to label this as Exhibit

23  #5.

24       MR. RAINWATER:  Five.

CP_000046

John Sexton; Justin DePover
February 10, 2021

30

1                    (Whereupon, the document was marked as

2                    Exhibit 5 for identification.)

3          Q.      So with Exhibit 5, Mr. Jared, that matches

4    exactly what you observed as well?

5          A.      I'm sorry.  One more time?

6          Q.      Mr. DePover's statement here in Exhibit 5, that

7    agrees with what you observed as well?

8          A.      That's correct.

9          Q.      Okay.  Any other evidence you'd like to submit?

10         A.      I have video surveillance of the move that I'd

11   like to present.

12         Q.      Okay.  I'll see if I can --

13   MR. RAINWATER:  So j --

14   MR. SEXTON:  [Is that the body of it]?

15   MR. RAINWATER:  -- just for the record, we're -- we're

16   gonna try to see a video at the same time he's on a video

17   conference on the same device?

18   MR. SEXTON:  Is there audio?

19   MR. RAINWATER:  I -- is that --

20   MR. JARED:  Was that a question for me?

21   MR. RAINWATER:  I -- I'm just asking for a point of

22   record here, is that what's about to happen?

23   MR. JOHNSON:  I'm trying to see if I can share screen --

24   so I'm gonna pull this up, Mr. Jared.  Should be marked.  I

John Sexton; Justin DePover
February 10, 2021

31

1   just don't know how to share a screen.  No.

2         MR. DEPOVER:  I can't read that.

3         MR. SEXTON:  I -- I did, actually.

4         MR. JOHNSON:  Oh.

5         MR. RAINWATER:  Mr. Jared, are you still there?

6         MR. JARED:  You're asking me?

7         MR. RAINWATER:  Oh, yeah, I don't -- a -- a different

8   screen come up.  I didn't know if we lost ya.

9         MR. JOHNSON:  I'm gonna go into the Avigilon cameras

10  here.

11  BY:  MR. JOHNSON

12        Q.      So this occurred February 1st at approximately

13  12:49?

14        **A.      Correct.**

15        Q.      Okay.

16        MR. SEXTON:  [indiscernible] [whispered]

17        MR. RAINWATER:  I'm sorry.  What's the -- the source of

18  this video?  Is --

19        MR. JOHNSON:  This is the west end yard camera for

20  Nahant Yard, so this would be --

21        MR. DEPOVER:  [indiscernible]

22        MR. JOHNSON:  -- be the west end or the south end of the

23  yard --

24        MR. RAINWATER:  Oh.

John Sexton; Justin DePover
February 10, 2021

32

1          MR. JOHNSON: -- that you're looking at right now.

2          MR. RAINWATER: I -- I thought Mr. Jared said he had it

3   from his phone. Maybe I misheard that.

4          MR. SEXTON: Is there audio on this tape as well?

5          MR. JOHNSON: No.

6          MR. JARED: There's no audio.

7          MR. SEXTON: I'm sorry, man --

8          MR. RAINWATER: It's okay.

9          MR. SEXTON: -- I can't take this [indiscernible].

10         MR. RAINWATER: Relax.

11         MR. JOHNSON: Okay. As a reminder, we're on record

12  here.

13             Okay. I'm right at 12:49, Mr. Jared. I'm gonna

14  start playing.

15         MR. JARED: Can you share your screen?

16         MR. JOHNSON: I'm not real sure on how to do so.

17         MR. JARED: Go down where the gr -- little green button

18  says Share Screen.

19         MR. JOHNSON: Oh, there it is. Okay. Can you see it

20  now, Mr. Jared?

21         MR. JARED: I can, yes.

22         MR. JOHNSON: Okay. I'm gonna start playing here for

23  you.

24                  (Whereupon a video recording was played)

John Sexton; Justin DePover
February 10, 2021

33

1  BY: MR. JOHNSON

2       A.       Okay.  You can see where 4 Track is clear.  This

3  is 474 shoving in.  Mr. DePover gave his 50-car count.

4  Mr. DePover's doing a really good job here of looking towards

5  as he's stepping down to.  First he dismounts at that time.

6  They do have 76 cars ahold of at this time.

7             You're gonna see myself, I'm entering the frame

8  at the bottom of the screen.  As I walk over, Mr. DePover tells

9  the Engineer -- he's looking at his list and tells the Engineer

10 that he's -- a 15-car count.  At this point, he'd already

11 shoved in 12 car lengths.  If you'd like to stop the video, you

12 can count the cars that actually went into track or we can

13 continue on.

14      MR. JOHNSON:  Do you want --

15      A.       I did tell Mr. DePover at this time, that he was

16 not to give a -- additional car counts to the Engineer.

17      MR. JOHNSON:  Do you wanna count the cars or anything?

18 Does anybody need to?

19      MR. RAINWATER:  No, I'm good.

20      Q.       Okay.  We're gonna continue playing.

21      A.       And now we're watching the cars go by.  When we

22 get to the seventh car, I note that that's the seventh car.

23 Mr. DePover does mention they're short cars.  I didn't -- I did

24 agree.  Once we got past the seventh car, Mr. Sexton began to

John Sexton; Justin DePover
February 10, 2021

34

1    ask for -- his Conductor for more car counts, which he did not

2    receive.   The shoving movement continued past those seven

3    cars.  He asked a second time, and then brought the train to an

4    actual stop.

5                And then, you see he continued to shove, where

6    eventually he did bring the train to a stop.   That third flat

7    car, that's the 11th car.

8         Q.       Okay.

9         A.       It's a clear violation of GCOR 5.3.7.

10        Q.       And that's -- is that all you needed for video?

11        A.       That's all I had.

12        Q.       Okay.  All right.  Any other evidence you'd like

13   to submit at this time, Mr. Jared?

14        A.       Not at this time.

15        MR. JOHNSON:  Actually, where we played video -- and

16   I'll make you a copy of this on the next recess, it's just a

17   confidentiality letter where there's been video submitted, I'll

18   label as Exhibit 6.

19                       (Whereupon, the document was marked as

20                       Exhibit 6 for identification.)

21        MR. RAINWATER:  And with confidentiality with regards to

22   what?

23        MR. JOHNSON:  Because video was played with employees in

24   it, so to ensure that the confidentiality, it's not gonna be

John Sexton; Justin DePover
February 10, 2021

35

1   leaked out to YouTube or some other platform --

2          MR. RAINWATER:  S -- but the video's gonna be --

3          MR. JOHNSON:  -- thr -- through social media -- right.

4          MR. RAINWATER:  But the video's gonna be maintained as

5   part of the record and available for review --

6          MR. JOHNSON:  Yes.

7          MR. RAINWATER:  -- throughout the appeals process?

8          MR. SEXTON:  And that --

9          MR. JOHNSON:  That is correct.

10         MR. SEXTON:  And I'm gonna be able to get a copy of this

11  video.  Correct?

12         MR. JOHNSON:  So let me read in this letter, and it will

13  explain everything to you.

14             So with Exhibit 6, what this is gonna read -- or does

15  read is:

16             "The carrier has presented a video

17             hereafter referred to as Company

18             Exhibit 6.  Company Exhibit 6 is

19             confidential.  CP will not distribute

20             copies of Exhibit 6 to the parties at

21             this hearing.  Should any party desire

22             to view the video, it will be made

23             available upon request made by the

24             appropriate union officer or company

AccuTran Global Enterprises, Inc.
855-552-0505

CP_000052

John Sexton; Justin DePover
February 10, 2021

36

1              official.  Such request shall be made

2              to Tom Jared -- General Manager, US

3              West.  A grant of such request is

4              limited to viewing of the video and

5              does not give the viewing party the

6              right to copy the video in any form.

7              This designation is made pursuant to

8              Canadian Pacific's confidentiality

9              expectations (as set forth in CP's Code

10             of Business Eth -- Ethics), Information

11             Security Policy, and other policies and

12             practices protecting the

13             confidentiality of CP's confidential

14             company information and confidential

15             employee information."

16             MR. JOHNSON:  So you would just -- if y -- you want to

17     view it, then you would make a request through Mr. Rainwater

18     and he would contact Mr. Jared to arrange for that --

19             MR. RAINWATER:  All right.  So --

20             MR. JOHNSON:  -- or Mr. Semenek.

21             MR. RAINWATER:  -- the confidentiality statement is

22     Exhibit 6, then.  Can I --

23             MR. JOHNSON:  Correct.

24             MR. RAINWATER:  Can we get a copy of that right now?

CP_000053

John Sexton; Justin DePover
February 10, 2021

37

1          MR. JOHNSON:  We'll just take a brief recess here, and

2     I'll go make a copy for everyone.

3               Time is 13:02.

4                    (Whereupon, a brief recess was taken.)

5          MR. JOHNSON:  Time is now 13:03.  Back on the record

6     with the Sexton-DePover Investigation.  They've been provided

7     with a copy of Exhibit #6.

8          MR. RAINWATER:  So just as a point of clarification,

9     this confidentiality statement is not Exhibit 6, the video is

10    Exhibit 6.

11         MR. JOHNSON:  The video itself is Exhibit 6.  This is

12    what's currently entered so that all parties understand that

13    it's not being copied and transferred out anywhere or it would

14    be a violation of the various CP policies.

15         MR. RAINWATER:  Okay.

16         MR. JOHNSON:  And then, instructions on how to view the

17    video.

18    BY:  MR. JOHNSON

19         Q.     All right.  Mr. Jared, do you have any further

20    testimony or evidence that you'd like to submit at this time?

21         A.     No, I do not.

22         MR. JOHNSON:  All right.  Mr. Rainwater, would you like

23    to cross-examine Mr. Jared?

24         MR. RAINWATER:  Yes.

CP_000054

John Sexton; Justin DePover
February 10, 2021

38

1    BY:  MR. RAINWATER

2         Q.      Mr. Jared, with regard to the video that was

3    presented, is there audio evidence available to correspond with

4    the video?  Can you --

5         A.      No.

6         Q.      So -- so there's no way --

7         A.      No, there's not.

8         Q.      -- to correspond with what the crew was

9    communicating on the radio with the movements that were taking

10   place?

11        A.      **There's no corresponding audio that goes with**

12   **the video.**

13        Q.      All right.  So did you -- once you exited your

14   vehicle, d -- did you have a radio available that you were

15   listening to the crew on?

16        A.      **I did not have a radio with me.**

17        Q.      All right.  So is it possible that you didn't

18   hear all the instructions that was -- that were given from the

19   Conductor to the Engineer as they completed this move?

20        A.      **The -- I had my truck radio on, I had my windows**

21   **down.  I have a very loud radio in my truck.  I did not hear**

22   **any other correspondence with Train 474 --**

23        Q.      All right.  Is it possible that --

24        A.      **-- through that radio from where I walked from**

John Sexton; Justin DePover
February 10, 2021

39

1    my --

2         Q.     Yeah, the question I asked --

3         A.     Okay.

4         Q.     -- though, is it possible that you -- you didn't

5    hear anything -- additional --

6         A.     No.

7         Q.     -- communication because you weren't -- didn't

8    have a radio on your person?

9         A.     No.

10        Q.     All right.  So you stated earlier with regard to

11   the GCOR Rule that you entered as Exhibit #3, that Mr. DePover

12   was not in violation of this Rule.  Is that correct?

13        A.     That's correct.  Mr. DePover, I did not find him

14   in violation of GCOR 5.3.7.

15        Q.     All right.  Since that's the only Rule that you

16   entered as a Rule, I can only assume then that Mr. DePover is

17   not culpable in this alleged charge whatsoever.  Is that also

18   correct?

19        A.     That is correct.

20        MR. RAINWATER:  All right.  Mr. Johnson, at this time,

21   I'd like to amend the Hearing Letter wherein Mr. DePover is a

22   charged Principal with the charge -- the alleged -- with the

23   allegation on the Ca -- from the Carrier, to have it amended

24   that Mr. DePover be in attendance purely as a witness.

CP_000056

John Sexton; Justin DePover
February 10, 2021

40

1       MR. JOHNSON:  Okay.  I'm gonna overrule on your

2  objection.  My -- my duty here as the Hearing Officer is to

3  develop the facts and circumstances and if -- place any

4  responsibility, if it is found that they were a responsible

5  party.  So if the record should show that Mr. DePover was

6  erroneously charged with anything, then --

7       MR. RAINWATER:  All right.

8       MR. JOHNSON:  -- in the decision, that would be made a

9  matter of record.

10      MR. RAINWATER:  Well, based upon the testimony, I'm

11  gonna take that is to be the case, and we're going to view

12  Mr. DePover as a -- purely as a witness here.

13  BY:  MR. RAINWATER

14      Q.      Mr. Jared, was -- was this an efficiency testing

15  event that you conducted?  Mr. Jared?  [indiscernible]

16      MR. JOHNSON:  You're on mute.

17      A.      **Yeah, that's correct.**

18      Q.      Okay.  So this wasn't a f -- in -- I assume

19  because Mr. Dylan Smith is also on the Charge Letter, was he --

20  was this a joint testing event?  Or w -- I'm confused as to why

21  he's on here as a witness.

22      A.      **Sure.  Mr. Smith was not with me at the time.**

23  **Mr. Smith was dur -- was at the interview process.**

24      Q.      Okay.  But he wasn't in the vehicle with you?

**CP_000057**

John Sexton; Justin DePover
February 10, 2021

41

1       A.      No.

2       Q.      Okay.

3       MR. SEXTON:  [indiscernible]

4       Q.      Did you enter this as a -- as an efficiency

5   testing failure into the CP tracking system?

6       MR. JOHNSON:  Okay.  Mr. Rainwater, I'm not here to

7   determine whether there was an efficiency test entered or --

8   for that.  I'm here solely to determine whether or not

9   Mr. Sexton --

10      MR. RAINWATER:  Let me rephrase the question.

11      MR. JOHNSON:  -- or Mister --

12      MR. RAINWATER:  Let me rephrase the question, then.

13      Q.      Mr. Jared, does CP have a efficiency test m --

14  manual that outlines the Rules and compliance and procedures

15  for how to conduct operating tests?

16      A.      Does that have a bearing on whether or not

17  Mr. Sexton violated --

18      Q.      That's not the question --

19      A.      -- the Rule?

20      Q.      -- I asked, Mr. Jared.  I'm here to ask the

21  questions.  Does Mis -- does CP provide a -- a guidance in a

22  manual that instructs and in -- and tells managers how to

23  conduct efficiency tests?

24      A.      There are manuals available.  But again, I don't

CP_000058

John Sexton; Justin DePover
February 10, 2021

42

1   know what bearing that has on whether or not Mr. Sexton

2   violated this Rule.

3       Q.      Understand.  Do they -- can you tell me which

4   testing code you utilized for this efficiency test?

5       A.      I can tell you that Mr. Sexton made a shoving

6   movement and was given a 15-car count, and he failed to stop

7   within half that distance, which was clear in the video, and

8   through my testimony, and then through the written statement of

9   Mr. DePover.

10      Q.      So whenever you previously -- under your

11  previous testimony, you said that Mr. DePover gave Mr. Sexton a

12  50-car count to begin the shove.  Is that correct?  Good for 50

13  cars?

14      A.      That's correct.

15      Q.      All right.  So how far had the movement taken

16  place before you spoke to Mr. DePover and told him not to

17  respond to his Engineer?

18      A.      As I noted in my earlier testimony that he had

19  shoved 12 car lengths into the track.

20      Q.      So 12 cars then, not being anywhere close to

21  half the distance of 50 cars.  Correct?

22      A.      That really doesn't matter because he changed

23  his testimony to 15 cars.

24      Q.      That's not what I asked.  I just a -- asked if

43

1    12 cars was anywhere close to half the range of 50 cars, yes or

2    no?

3            A.        No.  But again --

4            Q.        Okay.  Thank you.

5            A.        -- he changed his car count to 15.

6            Q.        Do you have any further proof as far as related

7    to locomotive downloads with distances that we can correspond

8    to the -- the actual movements?

9            A.        I have my testimony, a written statement from

10   Mr. DePover, the list -- marked list that Mr. DePover provided

11   as evidence.

12           Q.        Okay.

13           MR. RAINWATER:  No further questions for Mr. Jared at

14   this time.  Subject to recall.

15           MR. JOHNSON:  All right.  Just a couple of follow-up for

16   you, Mr. Jared.

17   BY:  MR. JOHNSON

18           Q.        So you heard -- or where were you when

19   Mr. DePover gave the 15-car count?

20           A.        I was standing next to him when he gave the

21   15-car count.

22           Q.        At any time after that before the movement came

23   to a stop, was he observed updating his car count to the

24   Engineer?

John Sexton; Justin DePover
February 10, 2021

44

1         A.        No, he followed my instruction by not providing

2    any other car counts until I -- until the movement came to a

3    stop.

4         MR. JOHNSON:  Okay.  I have no further questions.

5             Any follow-up for you, Mr. Rainwater?

6         MR. RAINWATER:  Just one.

7    BY:  MR. RAINWATER

8         Q.        Mr. Jared, were we able to see your vehicle in

9    the video evidence?  Is it pictured in the video?

10        A.        It must be 'cause of your mask, I can't -- I

11   can't hear you.  What did you say?

12        Q.        I have a feeling that if you were here in

13   attendance, you woulda heard me just fine.

14            Were we able to see your vehicle that you exited

15   from in the video that you provided?

16        A.        No.

17        Q.        So it's not in the camera view.  Is that

18   correct?

19        A.        That is correct.

20        Q.        I don't know if we can pull that video back up.

21   Can we make an estimation about how far away the maximum screen

22   view goes between Mr. DePover and the -- and the e -- edge of

23   the vee -- of the visual video evidence?

24        A.        Are you gonna have Mr. Johnson pull the video

CP_000061

John Sexton; Justin DePover
February 10, 2021

45

1  back up?

2        MR. JOHNSON:  Yeah, I'm pulling it back up right now.

3        MR. SEXTON:  Yeah.

4        Q.     All right.  So --

5        MR. SEXTON:  Can't see it.

6        MR. RAINWATER:  Yeah, we don't see Mr. Jared's vehicle

7   in view.  And I would estimate, just by --

8        MR. SEXTON:  Fifty yards.

9        MR. RAINWATER:  Yeah, it probably -- probably at least

10  tw -- thirty to forty yards at a minimum.

11       Q.     Okay.  I just wanted to note that for the

12  record, your vehicle is not in view and you didn't have a radio

13  on your person, as you said earlier.

14       MR. RAINWATER:  Thank you.  No further questions at this

15  time.

16       MR. JOHNSON:  Okay.  Just a couple follow-up for ya.

17  BY:  MR. JOHNSON

18       Q.     Mr. Jared, you've already testified that you

19  were standing next to -- which the video shows -- standing next

20  to Mr. DePover when he gave the 15-car count.  Were you --

21       A.     That's correct.

22       Q.     Were you near your radio when the initial

23  communication of 50, 5-0, cars was given?

24       A.     I was.

46

1          Q.          And was that i -- inside your vehicle?  Or were

2    you outside the vehicle?

3          A.          I was inside my vehicle at the time.

4          Q.          Okay.  So it was clear and then you -- what did

5    you do after you heard the 50-car count?

6          A.          After I heard the 50-car count, I did dismount

7    my vehicle, which is about by that light pole that you see --

8    well, you cannot see the bottom of that light pole, but about

9    that -- about that location, I -- I dismounted my vehicle.  As

10   you've seen from the video, I came up from the bottom of the

11   video.  And then I -- I approached Mr. DePover as he was making

12   his shoving movement.

13         Q.          Okay.  And then you gave him the instruction for

14   the 15-car count without an update?

15         A.          Mr. DePover provided that 15-car count.  And

16   then once he did that, I asked him not to transmit over the

17   radio any more until -- until the test was done.

18         Q.          Okay.

19         MR. JOHNSON:  I have no further questions.

20              Any follow-up from you, Mr. Rainwater?

21         MR. RAINWATER:  No, just like to keep him available for

22   recall should a -- the need arise.

23         MR. JOHNSON:  Okay.  Mr. Jared, you're released from

24   testimony at this time.  I'm gonna put our end on mute.  Should

CP_000063

John Sexton; Justin DePover
February 10, 2021

47

1    a need arise to have you testify, I can contact you via phone

2    and we'll get set back up on Zoom.

3            MR. RAINWATER:  So just --

4            MR. JARED:  That's correct.

5            MR. RAINWATER:  Just for the record, you're gonna mu --

6    mute it and close the video?  He's not gonna have any access to

7    the remainder of this hearing, is he?

8            MR. JOHNSON:  No.  What I can do is end the meeting.

9            MR. RAINWATER:  Yeah.

10           MR. JOHNSON:  That way, then --

11           MR. RAINWATER:  Yeah, we would --

12           MR. JOHNSON:  -- it -- it --

13           MR. RAINWATER:  -- like that to happen, to be

14   sequestered.  Correct.  Yes.

15           MR. JOHNSON:  Okay.  All right.  Yeah, just stay

16   available by phone in case we need to have you recalled so we

17   can get you on video.

18           MR. JARED:  Okay.

19           MR. JOHNSON:  All right.  Thank you, Mr. Jared.

20                    (Whereupon Mr. Jared exits the

21                     investigation/hearing)

22           MR. JOHNSON:  I don't know what that's gonna do to him,

23   but.  I muted, so.

24           MR. RAINWATER:  Or -- okay.  We're not on the record?

John Sexton; Justin DePover
February 10, 2021

48

1        MR. JOHNSON:  Do you need a quick recess?

2        MR. RAINWATER:  Yeah, if we're on break, I'd, you know

3    --

4        MR. JOHNSON:  Okay.

5        MR. RAINWATER:  I drank a lotta tea coming in.

6        MR. JOHNSON:  Yep.  Time is 13:14.  We'll take a short

7    recess.

8                    (Whereupon, a short recess was taken.)

9        MR. JOHNSON:  All right.  The time is 13:20, resuming

10   with the Sexton-DePover Investigation.

11           Finished questioning Mr. Jared.  He's been

12   sequestered and is no longer able to see any video or hear any

13   audio at this time, so.

14           I will call Mr. DePover next.

15                    JUSTIN DEPOVER

16   called as a witness by the Company herein, was examined and

17   testified as follows:

18                E X A M I N A T I O N

19                   By:  Mr. Johnson

20       Q.    Mr. DePover, I've already asked you all the

21   preliminary questions.  What assignment were you working on

22   February 1st of 2021?

23       A.    That'd be the -- the CP 474-31.

24       Q.    Okay.  And do you remember the incident that --

John Sexton; Justin DePover
February 10, 2021

49

1      A.     Yeah.

2      Q.     -- Mister -- Mr. Jared explained?

3      A.     Yes.

4      Q.     Or described?

5      A.     Yes.

6      Q.     Were these -- in Exhibit 4, were these your

7  markings?

8      A.     Yes, I made all the markings on Exhibit 4, the

9  Tonnage Profile.

10     Q.     Okay.  So this black line under 76, what was

11  that?

12     A.     That was our initial cut location bef -- prior

13  to shoving any tracks.

14     Q.     Okay.  So it --

15     A.     We -- we ended up leaving that on the Main Line.

16     Q.     Which --

17     A.     Fr --

18     Q.     -- car?

19     A.     S -- car number 77 and behind --

20     Q.     Okay.

21     A.     -- is what was left on it.

22     Q.     So you just -- you had ahold of 76 cars then --

23     A.     Yes.

24     Q.     -- as Mr. Jared described?

CP_000066

50

1      A.      Yes.

2      Q.      Okay.  So we go up, there's a blue mark under

3  line 64.  Is that correct?

4      A.      Yes.

5      Q.      What is that?

6      A.      That would've been when I told them that there

7  were 15 cars remaining and that he was clear for 40 still at

8  that time.  And then the -- the next blue line would've been

9  the actual car or the stop, which was in front of us at the

10  time on the -- when he -- when Mr. Sexton did have the train

11  stopped.  And then the -- then I did also indicate the DP unit,

12  which we were to set out to a separate track.

13      Q.      Okay.

14      A.      So that would've been the end of our cut, right

15  -- right at the -- car number 49 would've been the -- the cut

16  location to leave into Nahant 4.

17      Q.      Okay.  So you gave him 15 cars.  Correct?

18      A.      So li --

19      Q.      At line 64?

20      A.      So my initial movement woulda been the clear for

21  50 to start him into the track --

22      Q.      Okay.

23      A.      -- and I asked for 25 at the time.  And then the

24  next call was still clear for 40, had 15 until the stop.

John Sexton; Justin DePover
February 10, 2021

51

1          Q.       Okay.

2          A.       Which was when I was told not to respond to any

3    remarks on the radio yet.

4          Q.       Okay.  And then under line 53 --

5          A.       Tha -- that was when the train actually came to

6    a stop.

7          Q.       Okay.  So you gave him 15, clear for 40?

8          A.       Yes.

9          Q.       Is what you're saying?

10         A.       Yes.

11         Q.       Okay.  Exhibit 5 was your -- is that a statement

12   that was written by you?

13         A.       Yes.

14         Q.       Okay.  And in that letter, do you say -- or in

15   that statement, do you say anything about anything other than a

16   count of 15?

17         A.       On -- on written, I do just have the 15 count

18   and that it stopped after the 11.

19         Q.       Okay.  So if you had given him that instruction,

20   why wouldn't you put that in there?

21         A.       Well, hon -- honestly, it -- with it being my

22   second start back and I was in a closed room with the General

23   Manager, whom I've never met, and Mr. Smith, I was quite under

24   some pressure.

CP_000068

52

1          MR. JOHNSON:  Okay.  I have no further questions for

2    Mr. DePover at this time.

3          Mr. Rainwater, any follow-up with Mr. DePover --

4          MR. RAINWATER:  Yes.

5          MR. JOHNSON:  -- for you?

6    BY:  MR. RAINWATER

7          Q.     So specifically to Exhibit 5 here, your

8    statement, did you -- was this statement given willingly?  Or y

9    -- were you compelled to give it?

10         A.     I -- I'd say compelled.  I didn't even know I

11   had a choice not to, if that was even a thing.

12         Q.     Okay.  So did you feel intimidated, being in the

13   room with Mr. Jared?

14         A.     Yes, I did.

15         Q.     Did he make any inferences or assum -- or did

16   you assume, based upon what he was asking for, that if you

17   didn't do it, you would be in trouble?

18         A.     I -- I do feel that way still.  I -- I -- I

19   wrote down what I was thinking at the time --

20         Q.     Okay.

21         A.     -- and --

22         Q.     Related back to the video that we watched, I'll

23   ask you the same thing I asked Mr. Jared.  Did -- did Mr. Jared

24   have a radio on his person, a -- a portable?

CP_000069

John Sexton; Justin DePover
February 10, 2021

53

1          A.          He did not.

2          Q.          And his vehicle wasn't within view of the

3     screen.  Is that correct?

4          A.          My back was to it also, so I had --

5          Q.          And your ba --

6          A.          No.  Yeah.

7          Q.          So you didn't see it either?

8          A.          That's correct.

9          Q.          And so you gave instruction, then, after you

10    were prepared to shove into the track.  What did -- what did

11    you tell Mr. Sexton as far as instructions for to initiate your

12    move?

13         A.          The -- the initial movement woulda been that we

14    were clear for 50 cars, and I would've started him in with

15    needing 25 to a stop.  And then I updated him with needing 15

16    more to a stop, still clear for 40 --

17         Q.          Okay.

18         A.          -- and then I was informed not to --

19         Q.          So --

20         A.          -- proceed anymore.

21         Q.          So do you believe because Mr. Jared didn't have

22    a radio on his person, he didn't hear you say clear for 40?

23         A.          I -- that's my assumption.

24         Q.          All right.  So based upon the car counts that

AccuTran Global Enterprises, Inc.
855-552-0505

**CP_000070**

John Sexton; Justin DePover
February 10, 2021

54

1    you were given, the f -- the -- you were shoving 26 cars into

2    this track.  Correct?

3         A.    Yes.

4         Q.    T -- to cut away at your DP?

5         A.    The initial cut, yes.

6         Q.    And you were planning to cut away at your DP on

7    the initial cut.  Correct?

8         A.    Yes.

9         Q.    All right.  And so you told him clear for 50

10   cars.  If he shoved a -- I'm sorry.  One -- once he shoved a

11   little bit more, it looks like he shoved in 13 cars, and then

12   you told him 15, clear for 40.  Is that correct?

13        A.    That's correct.

14        Q.    All right.  So if he stops in 11, does he still

15   have more than -- what -- what's the half the -- half the range

16   of 40?

17        A.    Be 20, so, no.

18        Q.    So he would still technically have nine cars

19   available to him.  Correct?

20        A.    Yes.

21        Q.    All right.  And Mr. Jared as well as yourself ha

22   -- have testified here that these cars -- some of these cars

23   are short, 42 footers.  Is that correct?

24        A.    Yes.

55

1          Q.        T -- to your railroad knowledge, limited though
2     it may be, what's -- what's about the average car length?
3          A.        I'd say about 50 to 60, averaging.
4          Q.        Okay.  And these were 42-foot cars, a -- a bunch
5     of 'em, in your cut?
6          A.        Yes.
7          Q.        So does that mean those smaller cars are gonna
8     come at you a little bit quicker?
9          A.        Yes.
10         Q.        Mm-hmm.
11         A.        Yes, they were.  I believe I even mentioned on
12    the radio call that -- that I had short cars in there --
13         Q.        Okay.
14         A.        -- so he was aware.
15         Q.        And so after Mr. Sexton -- all right.  So I
16    wanna back up, I guess.  After you tell him 15, clear for 40,
17    what happened with Mr. Jared?
18         A.        He came up from behind me and just informed me
19    to stop -- speedf -- or stop replying on the radio.
20         Q.        All right.  Did he kinda catch ya off guard?
21         A.        Yeah, I'd had no idea he was behind me.
22         Q.        All right.  So he -- he kinda distracted you
23    from performing your duty --
24         A.        I --

John Sexton; Justin DePover
February 10, 2021

56

1      Q.      -- for a little bit?

2      A.      Yes, I was engaged with talking with him.

3      Q.      Okay. So di -- and did Mr. Jared interrupt you

4   while the cars were moving next to you?

5      A.      The -- the shoving movement was already

6   occurring. Yes.

7      Q.      Okay. And then after Mr. Jared instructed you

8   not to reply to Mr. Sexton over the radio, what occurred next?

9      A.      I kinda verified it with him at the time because

10  I -- I wanted to give him proper car counts still, but he just

11  kept insisting that I did not reply, and we just waited until I

12  -- then Mr. Sexton eventually did stop the train after

13  inquiring where I was.

14     Q.      All right. So a -- after Mr. Sexton inquired to

15  where you were and you were unable to respond at the direction

16  of Mr. Jared, did Mr. Sexton continue to ask for you on the

17  radio?

18     A.      Yes, he probably asked about three or four

19  times, even after stopped, and then also tried to get ahold of

20  the Yard Office to relay for him if he couldn't hear me.

21     Q.      All right. So i -- that was even after he

22  stopped. And it sounded like he was concerned for your

23  well-being? Or didn't know what was happening?

24     A.      Yeah, he definitely sounded like he had no idea

57

1    what was going on.

2          Q.        All right.  With regard to this written

3    statement that you made, were you -- were you still within your

4    12 hours?  Or was this after your -- the expiration of your

5    hours of service?

6          A.        That woulda been after.

7          Q.        And just to jar your memory here, do you recall

8    Mr. Jared stating that you were not at fault for the

9    allegations in this hearing?

10         A.        During this hearing, yes.

11         MR. RAINWATER:  N -- no further questions at this time.

12         MR. JOHNSON:  Okay.  I just have a couple follow-up

13   questions.

14   BY:  MR. JOHNSON

15         Q.        Where was Mr. Jared when you gave the 15-car

16   count?

17         A.        He was walking up behind me at the time.  I'm --

18   I'm not sure where he woulda been right behind me.  After I

19   gave the 15-car count and the clear for 40, he then came up

20   beside me and I was able to notice that he was in the track

21   with me.

22         Q.        Okay.  So did Mis -- you -- you -- you testified

23   that Mr. Sexton had tried to contact you after approximately

24   seven cars had gone by you?

CP_000074

John Sexton; Justin DePover
February 10, 2021

58

1          A.     I'd -- I'd say it was around there, yes.

2          Q.     Okay.  So if he was clear --

3          A.     I was --

4          Q.     -- for 40, why would he have need to call you?

5          A.     Well, because I -- I gave him a 15-car to a

6    stop.

7          Q.     Okay.  How many cars on here are labeled as

8    42-foot cars from between your blue marks?

9          A.     Well, that is in betwee -- between -- just

10   between the blue marks, though, you're --

11         Q.     Yeah, just between --

12         A.     -- [indiscernible] --

13         Q.     -- line 54 and 64.

14         A.     [indiscernible] 54.

15         Q.     Yeah, sorry, 'cause the --

16         A.     No, that's all right.

17         Q.     -- copy's --

18         A.     One, two, three, four, five -- be seven of 'em.

19         Q.     Okay.  I'll give you a moment.  What's that

20   distance?

21         A.     Oh, shoot.  Forty-two -- it's been a while, so

22   28 -- looks like 294 --

23         Q.     Okay.

24         A.     -- for -- for just those cars.

CP_000075

John Sexton; Justin DePover
February 10, 2021

59

1        Q.       Okay. So I also see line 60. What is that for

2   a length?

3        A.       Fifty-one.

4        Q.       Okay.

5        A.       He --

6        Q.       So add that to it.

7        A.       All right. So it'd be 345 now.

8        Q.       Okay. And then if we -- lines 54, 55, and 56

9   have a same length next to them. What is that?

10       A.       [indiscernible] be 2 -- be 213 for those three

11   in addition to the one -- [indiscernible]. So yeah, I -- a

12   total length, I've -- I figure that'd be 558 feet.

13       Q.       Okay. So that was 558 feet from when you gave

14   the 15-car instruction to the stop. Correct?

15       A.       Yeah, I believe so. Yes.

16       Q.       Okay. And you said the average railcar is 50 to

17   60 feet?

18       A.       I'd -- I'd say on average, yes, about 50 to 60.

19       Q.       Okay. So let's just go with the longer of the

20   two distances. How many car lengths would 15 cars be?

21       A.       Fifteen to sixty. That's 30. [whispered] All

22   right. Yeah, that's -- that's all -- am I -- am I right to say

23   900?

24       MR. SEXTON: That's right.

John Sexton; Justin DePover
February 10, 2021

60

1          MR. RAINWATER:  Fifteen cars at 60 feet?

2          A.      So -- yeah, yeah, fifty and sixteen feet.  Yeah,

3    so -- so that'd -- yeah, it's 900 feet.

4          Q.      Okay.  So if we divide that in half --

5          A.      That'd be 450 then.

6          Q.      So is 5 -- 558 further than what the -- half the

7    distance would be of 15?

8          A.      Fifty's -- I'm just -- I'm not the best at math,

9    I'm sorry.

10         Q.      Okay.

11         A.      [indiscernible] --

12         Q.      Is --

13         A.      It's just what it [is], yeah.

14         Q.      So the 450 feet --

15         A.      Yes.

16         Q.      -- that would be half the distance specified for

17   the 15-car count.  Correct?

18         A.      Okay.  Okay.  Yes.

19         Q.      Okay.  So is 558 feet that he traveled, is that

20   --

21         A.      The -- the --

22         Q.      -- without any further instruction from you, is

23   that greater or less than --

24         A.      Then that would be -- yeah, 558 is greater than

CP_000077

61

1  450.

2       Q.     Okay.

3       MR. JOHNSON: All right. I have no further questions at

4  this time.

5            Mr. Rainwater, any --

6  BY: MR. RAINWATER

7       Q.     And related --

8       MR. JOHNSON: -- follow-up?

9       Q.      -- to our math exercise here, Mr. DePover, so

10  assuming the cars are 60 feet long, if you got a count of 40 --

11  40 cars, is it correct to say that 60 times 40 is 2400 feet?

12       A.     Oh, 60, 40, 12, 24 [whispered] -- yes.

13       Q.     And half of that'd be 1200 feet?

14       A.     Yes.  Half of twent -- 24 feet --

15       Q.     And the length that Mr. Sexton shoved before he

16  stopped was 558 feet, which is less than 1200 feet.  Correct?

17       A.     That's -- that is correct.

18       MR. RAINWATER: No further questions.

19       MR. JOHNSON: Okay.  I have no further questions at this

20  time.

21            Mr. DePover, you're released from testimony at this

22  time.  Subject to recall.

23            Do you need a recess or anything before we continue

24  with -- no.  Okay.

John Sexton; Justin DePover
February 10, 2021

62

1        MR. RAINWATER:  I'm good.

2        MR. JOHNSON:  All right.  Next, we'll call Mr. Sexton.

3                         JOHN SEXTON

4    called as a witness by the Company herein, was examined and

5    testified as follows:

6                    E X A M I N A T I O N

7                    By:  Mr. Johnson

8        Q.      Mr. Sexton, what assignment were you working on

9    February 1st of 2021?

10       A.      474-31.

11       Q.      And were you the Engineer or Conductor?

12       A.      Engineer.

13       Q.      Okay.  Do you recall the shove movement that was

14   described by Mr. Jared and Mr. DePover?

15       A.      I do.

16       Q.      Okay.  Were you given a 50, 5-0, car count as

17   your initial count?

18       A.      I was.

19       Q.      Okay.  And what was the next instruction you

20   were given over the radio?

21       A.      Believe it was good for -- still good for 40, 15

22   -- 15 cars to a stop, with emphasis on good for 40.

23       Q.      Okay.  After you were given that instruction,

24   did you try contacting Mr. DePover again?

John Sexton; Justin DePover
February 10, 2021

63

1      A.     I did, about three or four times, that's

2  correct. And also, the Nahant ATM.

3      Q.    Okay. And why were you trying to contact

4  Mr. DePover or the ATM?

5      A.     I'd -- I could not contact -- I could not reach

6  him via radio and -- and our radios are not very good

7  sometimes, and sometimes the ATM must relay for us to complete

8  our work in the yard.

9      Q.    Okay. And why were you trying to contact

10  Mr. DePover at that time?

11      A.    He -- he gave me a -- a car count, and I know

12  Mr. DePover, we've had what I call rolling job briefings for

13  almost 22 years now. And I told him that -- update me as -- as

14  much as he can, as -- as often as he can, and I'd heard nothing

15  else. And that's when I was reaching out to Mr. DePover.

16      Q.    Okay. Do you know the distance that you had

17  traveled, prior to the math exercise we had?

18      A.    I do not. Other than your -- the -- the math

19  exercise, no, sir. All I know is I was good for 40 cars, which

20  is 2400 feet. And during the -- the previous testimony, what,

21  it was 550 feet that I stopped at? Is that -- is that correct,

22  sir? I think that's what you said.

23      MR. DEPOVER: 558.

24      Q.    That's 5 -- 558 was --

John Sexton; Justin DePover
February 10, 2021

64

1      A.      Yeah.

2      Q.      -- what Mr. DePover s --

3      MR. SEXTON:  558, you're saying?

4      MR. DEPOVER:  Yeah.  Mm-hmm.

5      MR. SEXTON:  Okay.

6      A.      Yeah.

7      Q.      Based on what the car lengths --

8      A.      Yep, that --

9      Q.      -- were on the Tonnage Profile.

10     A.      That's fair.

11     Q.      So you knew you -- you were gonna have to stop

12   within 15 cars when he gave that instruction?

13     A.      He told me I was good for 40 cars, but then he

14   changed it to 15.  Yes.

15     Q.      Okay.

16     MR. JOHNSON:  I have no further questions at this time

17   for Mr. Sexton.

18          Mr. Rainwater?

19   BY:  MR. RAINWATER

20     Q.      So just to clarify, Mr. DePover told you you

21   were clear for 40 cars, but he only needed 15 more to a stop

22   cut.  Was that your understanding?

23     A.      Initially, sir, it was clear track, good for 50

24   --

**CP_000081**

John Sexton; Justin DePover
February 10, 2021

65

1          Q.      Right.  That was --

2          A.      -- 5-0, cars.

3          Q.      That was at the be --

4          A.      We all have masks on in here.

5          Q.      Right.

6          A.      Good for 5-0 cars.  And then he -- once

7   Mr. DePover was -- he updated me, he said still good for 40,

8   15, 1-5, to a stop.  That's correct.

9          Q.      Okay.  So based upon your round trip with

10  Mr. DePover, was this -- he just returned from furlough.

11  Correct?

12         A.      Yes, sir, he did.

13         Q.      And -- and how many trips had he made prior to

14  this event?

15         A.      One; that was with me, going north to Marquette,

16  sir.

17         Q.      So you're on the round trip of his first trip

18  back from an 11-month furlough.  Is that correct?

19         A.      That is correct.

20         Q.      And so based upon your previous statement,

21  you're -- you said you were having rolling job briefings with

22  him.  It -- was that just this trip?  Or the way up as well?

23         A.      On the way up --

24         MR. JOHNSON:  Okay.  Mr. Rainwater --

66

1          MR. RAINWATER:  I'm coming to --

2          MR. JOHNSON:  -- let -- let's --

3          MR. RAINWATER:  -- to the point.  I'm coming to the

4    point.

5          A.     On -- on -- on the way -- I -- now, I do this

6    with everyone I work with, sir.  The rolling -- when I say

7    rolling job briefings, I'm talking about whatever is going on

8    at the time, what's coming up, what we need to do, and how

9    we're gonna execute it.

10         Q.     And so is the reason that you were asking

11   Mr. DePover for frequent car counts was just to make sure he

12   both understood what he was doing and you knew where he was

13   gonna be?

14         A.     Yes, sir.

15         Q.     All right.  So whenever you lost communication

16   with Mr. DePover through the manipulation of General Manager

17   Jared with this set up test, did it create a little

18   consternation with yourself?  Or were you concerned?

19         A.     Absolutely I was.  I didn't know what happened,

20   and I was wanting to know where he was and make sure he was

21   safe.

22         Q.     All right.  With regard to this shove move, in

23   and of itself, can you reference GCOR 6.5?  I believe you have

24   a copy of that.  Do you?

John Sexton; Justin DePover
February 10, 2021

67

1        A.      I do, sir.  Would you like me to read it?

2        Q.      If you could, please read the first paragraph.

3        A.      This is GCOR 6.5 Shoving Movements:

4           "Equipment must not be shoved 'til

5        the engineer and employee protecting

6        the movement have completed a job

7        briefing concerning how protection will

8        be provided.  Employee must be in

9        position, provide visual protection of

10       the equipment being shoved and must not

11       engage in unrelated tasks while

12       providing protection."

13       Q.      Because Mr. Jared interrupted Mr. DePover while

14  he was protecting your shove, do you believe Mr. Jared enticed

15  Mr. DePover an - and, therefore, broke this Rule?

16       A.      Absolutely.

17       Q.      Mr. Jared caused that Rule to be violated?

18       A.      Absolutely.  He created a unsafe act.

19       Q.      All right.

20       MR. RAINWATER:  So, Mr. Johnson, I'm gonna pass you a

21  copy of a few pages from the US Efficiency Test Manual on the

22  Operating Rules Compliance With FRA 217.  This is the Testing

23  --

24       MR. JOHNSON:  I --

John Sexton; Justin DePover
February 10, 2021

68

1        MR. RAINWATER:  -- and Operating Rules manual that CP

2   gives to its managers, which gives instructions on how to set

3   up tests and perform testing with regard to Operating Rules.

4   And at this time, I'd like to go through --

5        MR. JOHNSON:  I don't understand how this has to do with

6   whether or not Mr. Sexton or Mr. DePover --

7        MR. RAINWATER:  I'll tell you exactly --

8        MR. JOHNSON:  -- complied with the Rules.

9        MR. RAINWATER:  Yeah, I'll tell you exactly how it has

10  to do with it.  It's because Mr. Jared set up an un -- unsafe

11  and unsanctioned test based on CP's own Rules.  If you go to

12  page 107, as noted on the bottom of this, for test GRF02, this

13  test can only be conducted under observation practices.  It

14  cannot be set up, there's no provision that allows CP managers

15  to tell a Conductor to stop communicating with the m -- with

16  the Engineer to determine if they're gonna stop in half the

17  range of vision, and there's reasons for that.  It sets up an

18  unsafe condition, and it's outside of the normal operating

19  parameters that we have to work under.

20        So in addition to that, I'd like to go through some

21  questioning exercises with Mr. Sexton with regard to -- to

22  entering this, also, as an exhibit.

23        MR. JOHNSON:  Okay.  Once again, I'm here to determine

24  whether or not he stopped within half the range.

**CP_000085**

John Sexton; Justin DePover
February 10, 2021

69

1          MR. RAINWATER:  Mm-hmm.

2          MR. JOHNSON:  I'm not here to determine --

3          MR. RAINWATER:  Right.  We've already proven that

4    Mr. Jare -- Mr. Sexton stopped within half the range of the 40

5    cars specified, actually less than that.  Now we intend to

6    prove that Mr. Jared conducted an unfair test.

7          MR. JOHNSON:  Okay.  Now if you have something against

8    -- with -- an issue with Mr. Jared, there's other means.  I'm

9    here solely to determine what's in the body of the Charge

10   Letter, not --

11         MR. RAINWATER:  Right.  I get it.

12         MR. JOHNSON:  -- outside of that, and you're going

13   outside --

14         MR. RAINWATER:  So Mr. Jared testified --

15         MR. JOHNSON:  -- of that.

16         MR. RAINWATER:  -- that he te -- conducted an efficiency

17   test for shove compliance, shove Rule compliance.  And I

18   believe as part of the facts and circumstances, this evidence

19   that we have here from the Testing Manual will bear out that

20   that test was conducted unfairly, and that's part of th -- the

21   -- the rest of the facts and circumstances with regard to this

22   test.

23         MR. JOHNSON:  So once again, Mr. Rainwater, we're here

24   to determine the facts and -- within the body of this.  If you

AccuTran Global Enterprises, Inc.
855-552-0505

**CP_000086**

John Sexton; Justin DePover
February 10, 2021

70

1  have issue with how the test was conducted, things like that,

2  that has -- y -- that's not relevant to this investigation.

3       MR. RAINWATER:  No, I beg to differ.  I disagree with

4  you.  And -- you know, I've given a lot of leniency on my own s

5  -- behalf here, with Mr. Jared testifying via Zoom, sending e

6  -- exhibits via email, taking a recess in the middle of his

7  testimony to make copies.  All I'm asking for is the opperdin

8  -- tunity to do the same thing as far as entering evidence on

9  behalf of Mr. Sexton that you guys took.  I -- it -- to give me

10  the same opportunity.

11       MR. JOHNSON:  Again, I have no idea what this has to do

12  with whether or not Mr. Sexton --

13       MR. RAINWATER:  Yeah.

14       MR. JOHNSON:  -- or Mr. DePover complied with the Rules.

15       MR. RAINWATER:  We've already shown that he complied

16  with the Rule.  We're telling you that Mr. Jared set up the

17  test unfairly.

18       MR. JOHNSON:  Well, now, I haven't -- I haven't

19  completed this, so there has not been a decision whether they

20  complied or --

21       MR. RAINWATER:  And I understand --

22       MR. JOHNSON:  -- did not comply with the Rule, so --

23       MR. RAINWATER:  I do.

24       MR. JOHNSON:  -- you're making speculation based on your

John Sexton; Justin DePover
February 10, 2021

71

1    --

2           MR. RAINWATER:  Based on the evidence --

3           MR. JOHNSON:  -- right --

4           MR. RAINWATER:  -- pre -- presented so far in this

5    hearing --

6           MR. JOHNSON:  Well --

7           MR. RAINWATER:  -- that's exactly right.  I guess --

8           MR. JOHNSON:  And you know that --

9           MR. RAINWATER:  -- just to --

10          MR. JOHNSON:  -- I have to make a determination, so.

11          MR. RAINWATER:  Just as a point of order, if we can back

12   up to GCOR 6.5, can we please enter that as a Organizational

13   exhibit?  I forgot to get that marked.

14          MR. JOHNSON:  Okay.

15          MR. SEXTON:  What number is that, sir?

16          MR. RAINWATER:  That'll be at the determination of the

17   Hearing Officer.

18          MR. JOHNSON:  Let's do Exhibit 7.

19                    (Whereupon, the document was marked as

20                     Exhibit 7 for identification.)

21          MR. RAINWATER:  Okay.

22          MR. JOHNSON:  Just to --

23          MR. RAINWATER:  Exhibit 7.  All right.

24   BY:  MR. RAINWATER

John Sexton; Justin DePover
February 10, 2021

72

1          Q.          And as part and parcel of that, in the US

2    Efficiency Testing Manual, Mr. Sexton, page 13 lists some dos

3    and don'ts.

4          MR. JOHNSON:  Okay.  So once again, Mr. Jared is not

5    under investigation at this time.

6          MR. RAINWATER:  Yeah, I get that.

7          MR. JOHNSON:  So we're not gonna go off onto this --

8          MR. RAINWATER:  Okay.  We believe that this test was set

9    up in an unfair manner.  Regardless of whether or not

10   Mr. Sexton did or didn't comply with it, tests have to be

11   conducted in a fair manner.  Right?  And by virtue of the

12   actions of Mr. Jared not even following along with what the

13   manual dictates as what is an acceptable test based upon just

14   purely being ab -- able to observe the actions, by -- by

15   manipulating the conditions and telling Mr. DePover not to

16   respond to any questions or give him any further car counts, he

17   violated this -- it -- this whole process for what's considered

18   a fair efficiency test.  So that's why this is relevant to the

19   facts and circumstances of this investigation.

20         MR. JOHNSON:  Okay.  Mr. Rainwater, we're not gonna go

21   off into this realm.  I want to stick to whether or not

22   Mr. Sexton and Mr. DePover complied with the Rules --

23         MR. RAINWATER:  So am I --

24         MR. JOHNSON:  -- and if you have issue with Mr. Jared's

CP_000089

John Sexton; Justin DePover
February 10, 2021

73

1  testing, that needs to be taken up with somebody outside of

2  this room.  I don't --

3        MR. RAINWATER:  Oh, it -- it will be, I promise.  But am

4  I to understand correctly, Mr. Johnson, that you are preventing

5  me from entering evidence that's relative and relevant to this

6  hearing?

7        MR. JOHNSON:  I don't know how it's relevant to this

8  hearing because it does not --

9        MR. RAINWATER:  I've explained it in three different

10  ways --

11        MR. JOHNSON:  This does not --

12        MR. RAINWATER:  -- Mr. Johnson.

13        MR. JOHNSON:  This does not give me any idea of whether

14  or not Mr. Sexton or Mr. DePover -- that's -- that's why I'm

15  not going into this.  Mr. Jared isn't under investigation

16  here.  That's a -- that's all stuff that you can take up with

17  --

18        MR. RAINWATER:  Well, maybe he should be.

19        MR. JOHNSON:  -- other in -- individuals.

20        MR. RAINWATER:  I understand, Mr. Johnson.  And I'll

21  move on, since you're not going to allow me any kinda leeway

22  whatsoever with presenting my own case.  I understand -- were

23  -- when were you informed, sir, of when you were going to be

24  the Hearing Officer?  Was it today, for this hearing?

74

1          MR. JOHNSON:  Last night.

2          MR. RAINWATER:  So last night.  Okay.  On February 8th,

3    I sent an email to Mr. Reyes.  It's got -- who, at the time, up

4    until today, I inter -- was under the impression he was gonna

5    be the Hearing Officer -- and this letter states:

6               "Mr. Reyes,

7               The purpose of this letter is to

8          formally request witness -- witnesses,

9          be made available in the hearing

10          scheduled Wednesday, February 10, 2021

11          at 1200 in the matter of John Sexton

12          and Justin DePover and their alleged,

13               Failure to stop within half the

14          specified distance given while shoving

15          into track NA04

16               On behalf of both Principals, the

17          Organization requests the following:

18               Witnesses

19               Andrew Cruciani, a.  We have reason

20          to believe that Cruc -- Mr. Cruciani

21          was assisting the 474-31 crew at Nahant

22          yard.  It's our contention that he will

23          have first hand, and primary knowledge,

24          of the events and is a material

CP_000091

John Sexton; Justin DePover
February 10, 2021

75

1          witness."

2          MR. RAINWATER:  And:

3            "b.  David Cox -- We have reason to

4          believe that Mr. Cox was able to

5          overhear the radio conversation

6          relative to the charges, therefore

7          making him a material and primary

8          witness as well.

9            Since the Organization is unable to

10         approve or compel the absences of these

11         two witnesses for a hearing, I ask that

12         their time off be approved ahead of the

13         hearing to allow them to pers -- to be

14         present to testify.

15           I thank you for your time and would

16         appreciate a pre-hearing response to my

17         request.  And while I look forward to

18         that, I would appreciate any response

19         be specific to the recrest -- request

20         made rather than the typical form

21         letter response that "this isn't a

22         court of law and the Organization

23         doesn't have the right to discovery

24         ahead of the hearing." I'm not

CP_000092

76

```
 1          requesting discovery ahead of the
 2          hearing.  I'm only requesting that
 3          specific and pertinent wist --
 4          witnesses, be made available at the
 5          time of, and during, the hearing
 6          process."
 7      MR. RAINWATER:  I sent this February 8th to Mr. Reyes.
 8  I'm guessing he didn't forward that to you.  Is that correct,
 9  Mr. Johnson?
10      MR. JOHNSON:  Do you have any proof that you sent it?  I
11  mean --
12      MR. RAINWATER:  Yeah.
13      MR. JOHNSON:  -- I just see a letter.  I mean, I --
14      MR. RAINWATER:  Here's the email that went along with
15  it.  I thought it had a date stamp on it; it does not.  I can
16  show you that from my email, if you would so permit me.
17      MR. JOHNSON:  Well, if you're entering this as exhibit
18  --
19      MR. RAINWATER:  Yes, I am.
20      MR. JOHNSON:  -- I mean, once again, if the second page
21  you handed me is the email, there's no --
22      MR. RAINWATER:  Yeah, there --
23      MR. JOHNSON:  -- who it was to, who it was from, any of
24  that.
```

CP_000093

77

1          MR. RAINWATER: Yup, I get that. I thought that was on

2    there, but printer must have cut that off and I didn't check

3    it. Give me just a second.

4          MR. SEXTON: Want me to go make copies of that?

5          MR. RAINWATER: Sent two days ago, February 8, 2021 at

6    12:27 p.m.

7          MR. JOHNSON: Is there any way we can print that?

8          MR. RAINWATER: Yeah, I'll forward it to you, and then

9    you can print it. I'd also send it to Joseph Adelfio and --

10   well, there's one other person that his name is slipping my

11   mind at the moment.

12          All right. Mr. Johnson, this is coming to your email

13   now. Oh, Benjamin Anderton was the other person that I sent it

14   to. Do you wanna take a recess and print that?

15          MR. JOHNSON: We'll take a short recess here. Time is

16   13:51.

17                    (Whereupon, a short recess was taken.)

18          MR. JOHNSON: Time is now 14:08, resuming the

19   Sexton-DePover Investigation.

20          All right. Been handed a two-page document that

21   contained a -- an email for a request for witnesses from

22   Mr. Rainwater to Mr. Ja -- or Mr. Reyes. Labeling this as

23   Exhibit 8.

24                    (Whereupon, the document was marked as

John Sexton; Justin DePover
February 10, 2021

78

1                     Exhibit 8 for identification.)

2          MR. RAINWATER:  And that's both pages as Exhibit 8?

3          MR. JOHNSON:  That is correct.  The letter is the second

4    page, the email.

5          MR. RAINWATER:  Okay.  So just for the record, then,

6    to-- since we're -- just to refresh everybody since we're just

7    coming back on, I sent this email to Mr. Reyes on February 8th

8    at 12:27 p.m. I received no response, so -- and owing to the

9    fact that neither of the individuals requested were able to be

10   off of work and aren't here, I'll continue my questioning with

11   Mr. Sexton, if that's okay, Mr. Johnson.

12         MR. JOHNSON:  Yes, you may continue.

13         MR. RAINWATER:  All right.

14   BY:  MR. RAINWATER

15         Q.     So, Mr. Sexton, related specifically to Mr. Cox,

16   to your knowledge, where was he during this alleged event?

17         A.     **Mr. Cox was sitting on the -- the 574 train on**

18   **the Main Line.**

19         Q.     And while you guys were making your moves off

20   the independent track and shoving into the yard?  Correct?

21         A.     **That is correct.**

22         Q.     All right.  So was he in a position to hear the

23   radio conversation?

24         A.     **His exact words were is -- I -- I heard every**

AccuTran Global Enterprises, Inc.
855-552-0505

John Sexton; Justin DePover
February 10, 2021

79

1    word.

2         Q.      All right.  And if he was here, would he have

3    been able to testify to the fact that your Conductor,

4    Mr. DePover, gave a car count 40 cars, I need 15?  If he was

5    here?

6         A.        Yes.  But initially, it was 50, and then it was

7    --

8         MR. JOHNSON:  Okay.  That's --

9         A.        -- 40, good for 15.

10        MR. JOHNSON:  That --

11        A.        Correct.

12        MR. JOHNSON:  That's speculation and hearsay.

13        MR. RAINWATER:  No, it's perfectly reasonable,

14   Mr. Johnson, because we requested him to be here, and the fact

15   that the Carrier didn't provide for it as requested allows us

16   the latitude to show exactly what we think he woulda testified

17   to.  M -- it -- you know, if you'd at least given me a response

18   to know they can't be there for whatever reason, then maybe we

19   could have a discussion.  But we have every reason to believe

20   and to assume, rightfully so, what Mr. Cox woulda testified

21   to.  And I'll ask no further questions about it at this time,

22   related to Mr. Cox.

23        Q.      Mr. Sexton, can't remember if I asked you this

24   or not, but related to GCOR 6.5 as we entered as an exhibit,

CP_000096

80

1   did Mr. Jared violate that Rule when he interrupted

2   Mr. DePover?

3          MR. JOHNSON:  Okay.  Mister --

4          A.      Yes.

5          MR. JOHNSON:  -- Rainwater, we're sticking to the -- the

6   Charge Letter.  If you have issues with Mr. Jared, you need to

7   take that up outside of the room --

8          MR. RAINWATER:  All right.  I --

9          MR. JOHNSON:  -- with others.

10         MR. RAINWATER:  I have no further questions for

11  Mr. Sexton at this time.  I would like to recall Mr. DePover.

12         MR. JOHNSON:  I'd like to do a couple follow-up.

13         MR. RAINWATER:  Sure.

14  BY:  MR. JOHNSON

15         Q.      So, Mr. Sexton, you testified that you tried to

16  reach the Nahant ATM because you weren't getting communication

17  back from your Conductor, Mr. DePover.  Correct?

18         A.      That was after I tried to call Mr. DePover two

19  or three times on the radio.  Yes.

20         Q.      Okay.  So why didn't you come to a stop before

21  trying to contact the ATM, knowing that you weren't --

22         A.      Well, I was good f --

23         Q.      -- getting any communication?

24         A.      I was good for 40 cars.

John Sexton; Justin DePover
February 10, 2021

81

1          Q.        Who was giving you shoving instructions?

2          A.        I had a man on the north end protecting the

3    shove, Mr. Cruciani, and I had Mr. DePover on the ground as

4    well, counting me down.

5          Q.        Okay.  So which employee was giving you your

6    shove instructions?

7          A.        Well, at the -- at the time, Cruciani was at the

8    north end of the yard.  He -- he -- he told me it was clear

9    track, good for 50.  Mr. DePover said the same thing, and then

10   he -- he said good for 40 cars, and I --

11         Q.        Who --

12         A.        -- need 15.

13         Q.        Who -- who said that?

14         A.        Mr. DePover.

15         Q.        Okay.  So who was giving your a -- your actual

16   shove instructions?

17         A.        At that point, it was Mr. DePover.

18         Q.        Okay.  Was Mr. Cox in any way tied in to your

19   shove movement?

20         A.        He was sitting on the Main Line observing

21   everything on a different train, listening to the radio

22   procedures.

23         Q.        Okay.  So he was just an observer.  He was not

24   tied in to your shove movement --

CP_000098

82

1          A.          He was not.

2          Q.          -- in any way.

3          A.          And he was on the witness list, and if he'd've

4     been called here, you could ask him that personally.

5          Q.          Okay.

6          MR. JOHNSON:   I have no further questions for Mr. Sexton

7     at this time.

8          MR. RAINWATER:   Like to recall Mr. DePover for a few

9     questions.

10         MR. JOHNSON:   All right.   You may.

11                    E X A M I N A T I O N  (continued)

12                         By:   Mr. Rainwater

13         Q.          Mr. DePover, when Mr. Jared walked up behind

14    you, d -- did you see him coming?   Or did he catch you off

15    guard?

16         A.          He caught me off guard.   I didn't know he was

17    there until he was right beside me on the track.

18         Q.          All right.   Then -- so he -- he caught you off

19    guard while cars were moving past you?

20         A.          While cars were moving, yes.

21         Q.          All right.   Did he -- did he announce himself or

22    say, hey, I'm coming up behind you?   Or just it was don't give

23    him any more commands?

24         A.          It was just a don't give him any more commands.

CP_000099

John Sexton; Justin DePover
February 10, 2021

83

1       Q.      Have you ever seen Tom Jared before?

2       A.      I have not.

3       Q.      You've never previously met him or been --

4    interacted with him?

5       A.      No, I haven't.

6       Q.      Did he tell you who he was?

7       A.      After the stop and cars were still moving and we

8    started to communicate, then he did, but not initially.

9       Q.      Okay.  So during this time, when he told you who

10   he was, cars were moving past you --

11      A.      Car -- cars were still moving.

12      Q.      Right.  So you're -- it -- did you have to

13   reacquire your position on your list for how many more car

14   counts -- how many more cars you needed?

15      A.      Yes, I had to start trying to read the car and

16   see where I was at that point.

17      Q.      All right.

18      MR. RAINWATER:  No further questions for Mr. DePover.

19      MR. JOHNSON:  Okay.  I have some follow-up questions.

20   BY:  MR. JOHNSON

21      Q.      So, Mr. DePover, did you at any time let

22   Mr. Jared know that you were in the middle of a shove movement?

23      A.      It was already taking place, but I mean --

24      Q.      Did you at any time ask for identification from

John Sexton; Justin DePover
February 10, 2021

84

1   him?

2          A.        After -- after he told me to stop, and then I

3   did ask at that point, but --

4          Q.        Okay.

5          A.        -- he was already s -- somebody I didn't

6   identify at the beginning. If I'da seen him walking up behind

7   me, I woulda probably stopped us and tried to identify who it

8   was 'cause he was crossing the tracks.

9          Q.        Okay. But you followed instructions from

10  somebody you didn't know?

11         A.        Then -- I -- initially I was stunned from it,

12  and I guess I just took a minute to process. And then as -- as

13  I was doing so, it probably -- I would -- I would estimate

14  maybe about five cars had gone by and as he was introducing who

15  he was to me.

16         Q.        Okay. But that was after the stop was made?

17         A.        The -- the cars were still moving.

18         Q.        When he introduced himself to you?

19         A.        Yes.

20         Q.        Okay. So the Organization entered Exhibit 7 as

21  contending that Mr. Jared engaged in unrelated activities.

22         A.        No.

23         Q.        So did you allow him -- did you ask him -- so

24  I've asked you, did you tell him to stand by, you were in the

AccuTran Global Enterprises, Inc.
855-552-0505

John Sexton; Justin DePover
February 10, 2021

85

1  middle of a shove move, at any time?

2      A.    I -- I never verbally said to stand by.  I was

3  processing what to do at the time while the movement was still

4  taking place.

5      Q.    Okay.  So you allowed yourself to engage in --

6      MR. RAINWATER:  Objection.

7      Q.    -- unrelated activ --

8      MR. RAINWATER:  Mr. DePover's not being charged with

9  this.  The fact that the General Manager --

10      MR. JOHNSON:  He i -- he was a --

11      MR. RAINWATER:  But -- but --

12      MR. JOHNSON:  -- charged employee --

13      MR. RAINWATER:  He's not being charged with any vi -- J

14  -- Mr. Jared has not alleged any violation of 6 -- 6.5.  We're

15  bringing it to light because Mr. Jared interjected himself into

16  this process, causing the Rule to be violated.  He's the

17  General Manager.  He should -- it -- number one, he should know

18  the Rule.  Number two, there's no estimation whatsoever that

19  anybody on this property should -- should have any kind of

20  ability to be able to tell the General Manager no with regard

21  to a direct -- with regard to a direct instruction.  And the

22  fact that he didn't know who Mr. Jared was until a handful of

23  cars move -- were moving past is irrelevant.  Mr. Jared

24  shouldn't even have been there doing this to begin with.

86

1          We have Mr. DePover, who has less than two years'

2   experience, was just furloughed for a -- almost a year, come

3   back on his first round trip and now the General Manager is --

4   sneaks up behind him, and unannounced.  How is he supposed to

5   react to that?

6          MR. JOHNSON:  Okay.  Mr. Rainwater, I'm gonna overrule

7   on your objection.  You were allowed to enter exhibits.

8   Correct?

9          MR. RAINWATER:  E -- Exhibits 7 and 8, I was.

10         MR. JOHNSON:  Okay.  So you --

11         MR. RAINWATER:  I still have one that it was not

12   allowed.

13         MR. JOHNSON:  Okay.  So you -- you entered Exhibit 7 and

14   it is now a part of the record.  Therefore, I may ask questions

15   related to that.  And whether or not that proves innocence or

16   guilt, I don't know.  I wanna ask the questions, though.

17   BY:  MR. JOHNSON

18         Q.     So, Mr. DePover, with an ion -- unidentified

19   employee, you allowed him to come up and start talking to you

20   in the middle of a shove movement.  Correct?

21         A.     I'd -- he came up to me from behind me on --

22   from 5th Track to 4th Track and was in between the tracks with

23   me before I even knew he was there.  And I was -- I was about

24   to give Mr. Sexton another car count, but was interrupted.

John Sexton; Justin DePover
February 10, 2021

87

1          Q.      Okay.  And you allowed -- y -- you at no time --
2    you acknowledged what he asked you to do.  Correct?

3          A.      As -- so -- and s --

4          Q.      So when Mr. Jared told you not to give him a --
5    any further counts, did you acknowledge him?  Or did you tell
6    him stand by, I'm in the middle of a shove?

7          A.      I -- he continued to speak to me from beside me
8    and explaining who he was while I was watching the shove.

9          Q.      Okay.

10         A.      And then once I was informed that he was the
11   General Manager, I kinda go into the, well, he's my boss, so I
12   followed his instructions.

13         Q.      Okay.

14   MR. JOHNSON:  I have no further questions.

15        Mr. Rainwater, any follow-up for Mr. DePover?

16   MR. RAINWATER:  Just one.

17   BY:  MR. RAINWATER

18         Q.      Mr. DePover, did the video evidence as presented
19   play out the fact that Mr. Jared walked up directly behind you
20   and that you did not observe him until he spoke to you?

21         A.      I believe so.

22         Q.      I agree.

23   MR. RAINWATER:  No further questions.

24   MR. JOHNSON:  Okay.  I have no further questions for any

John Sexton; Justin DePover
February 10, 2021

88

1  party involved in this, the witnesses or the charged employees.

2         Mr. Rainwater, do you have any additional questions

3  for either party?

4       MR. RAINWATER:  I have one more question for Mr. Sexton.

5       MR. JOHNSON:  All right.  Mr. Sexton --

6       MR. SEXTON:  Excuse me.

7       MR. JOHNSON:  Mr. DePover, you are released from

8  testimony.  Subject to recall.

9         So we're recalling Mr. Sexton.

10      MR. RAINWATER:  Understood.

11      MR. JOHNSON:  Go ahead, Mr. Rainwater.

12               E X A M I N A T I O N (continued)

13                    By:  Mr. Rainwater

14      Q.     Mr. Sexton, did the Carrier present any recorded

15  evidence via radio record that could corroborate Mr. Jared's

16  testimony that he only heard 15 cars?

17      **A.     No.**

18      Q.     No.  And is it safe to say then, that because

19  they didn't produce that evidence then, that your account, and

20  Mr. DePover's account, and the account that Mr. Cox would've

21  presented should be taken as submitted as fact?

22      **A.     Absolutely.**

23      MR. RAINWATER:  No further questions.

24      MR. JOHNSON:  All right.  I have no further questions.

AccuTran Global Enterprises, Inc.
855-552-0505

**CP_0000105**

John Sexton; Justin DePover
February 10, 2021

89

```
 1           Mr. Rainwater, do you have any questions for

 2   Mr. Jared or Mr. DePover?

 3         MR. RAINWATER:  No, I do not.

 4         MR. JOHNSON:  All right.

 5         MR. RAINWATER:  If we're gonna go to close -- I mean, if

 6   you wanna do preliminary closing questions, that's fine.  I am

 7   gonna need time for a closing statement preparation.

 8         MR. JOHNSON:  Okay.  Mr. Sexton, you are released from

 9   testimony.  Subject to a recall.

10           So, Mr. Rainwater, you are correct.  We will begin to

11   close the hearing.  And you said go ahead, go through the

12   questions, and then you'll take a recess at that time?  Or

13   would you like -- let's just take the recess --

14         MR. RAINWATER:  Yeah, that's --

15         MR. JOHNSON:  -- now.

16         MR. RAINWATER:  That's up to you.  That's fine with me.

17         MR. JOHNSON:  So we'll show the time is 14:21.  We'll

18   take a 15-minute recess.

19         MR. RAINWATER:  Yeah, 15 or 20.

20         MR. JOHNSON:  Okay.

21         MR. RAINWATER:  Appreciate --

22                   (Whereupon, a recess was taken.)

23         MR. JOHNSON:  The time is now 14:52, resuming with the

24   Sexton-DePover Investigation.
```

John Sexton; Justin DePover
February 10, 2021

90

1          I will call Mr. DePover.

2          Mr. DePover, have you been present during the

3    entirety of this hearing?

4        MR. DEPOVER:  Yes, I have.

5        MR. JOHNSON:  Have you had the opportunity to answer all

6    questions of your own free will?

7        MR. DEPOVER:  Yes, I have.  And I'd also like to let the

8    record speak for itself on that.

9        MR. JOHNSON:  Would you like to make a closing

10   statement?

11       MR. DEPOVER:  No.

12       MR. JOHNSON:  All right.  Mr. Sexton, have you been

13   present during the entirety of this hearing?

14       MR. SEXTON:  I have.

15       MR. JOHNSON:  Have you had the opportunity to answer all

16   questions of your own free will?

17       MR. SEXTON:  Yes.

18       MR. JOHNSON:  Would you like to make a closing

19   statement?

20       MR. SEXTON:  I would.

21       MR. JOHNSON:  Go ahead.

22       MR. SEXTON:  I feel this -- this was based on us not

23   getting outta the yard in -- in Marquette on the -- on this

24   train.  We had a -- quite a delay there with the -- departing

John Sexton; Justin DePover
February 10, 2021

91

1   Marquette.  We had to pick up an engine that was --

2          MR. JOHNSON:  Okay.  Mr. Sexton --

3          MR. SEXTON:  I'm -- I'm doing a --

4          MR. JOHNSON:  The -- the rule --

5          MR. SEXTON:  -- closing statement, here.

6          MR. JOHNSON:  No.

7          MR. SEXTON:  I can --

8          MR. JOHNSON:  In the rules of the investigation, "will

9   be allowed to make a closing statement prior to the conclusion

10  of this hearing.  Closing statements should be confined to the

11  matter being investigated --

12         MR. SEXTON:  This is the matter --

13         MR. JOHNSON:  -- and based on evidence presented and

14  testimony --

15         MR. SEXTON:  Yeah.

16         MR. JOHNSON:  -- given during the hearing."

17             So there was no testimony or evidence based on

18  anything that happened in Marquette, so please confine your

19  closing statement to what's been --

20         MR. SEXTON:  I was trying to build up --

21         MR. JOHNSON:  -- presented today.

22         MR. SEXTON:  -- to where all -- all this is -- th --

23  this is going.  There w -- there was a -- a tremendous delay

24  because of weather conditions.  Parked an engine on -- on an

John Sexton; Justin DePover
February 10, 2021

92

1    open-deck bridge that we had to --

2         MR. JOHNSON:  Okay.  But there --

3         MR. SEXTON:  -- [indiscernible] --

4         MR. JOHNSON:  -- was no testimony --

5         MR. SEXTON:  There was.

6         MR. JOHNSON:  -- or evidence presented --

7         MR. SEXTON:  You -- you -- you --

8         MR. JOHNSON:  -- on that.  Correct?

9         MR. SEXTON:  -- can pull train -- you can pull train

10   delays, whatever you need to.

11        MR. JOHNSON:  So we need to keep our --

12        MR. SEXTON:  So you're not gonna let me --

13        MR. JOHNSON:  -- closing statement -- you can make a

14   closing statement.  It just has to be confined to the matter

15   that was investigated and based on the evidence presented, so.

16        MR. SEXTON:  Well, the -- the fact of the matter is --

17   is on -- on the -- on the shoving move, I was good for 2400

18   feet.  And according to your Crayola calculations on the -- on

19   the feet that was shoved, it was 558.  Am I correct on that?

20   Five hundred and fifty-eight feet, so I had quite -- quite a

21   bit going on there, quite a bit of extra room.

22        As of the -- the shoving moves as -- GCOR 6.5:

23        "Equipment must not be shoved 'til the Engineer or

24   employee have -- protecting the movement have completed job

John Sexton; Justin DePover
February 10, 2021

93

1   briefing concerning how protection will be provided. Employee

2   must be in position --"

3           which Mr. DePover was on the ground protecting our

4   shove.

5           "provide visual protection --"

6           which he was.

7           "of the equipment being shoved and must not engage in

8   any unrelated task while providing in -- protection."

9           With a -- with a -- a fellow employee coming up

10  behind the Conductor, whoever it is, on the ground, and all --

11  he didn't even know he was there, basically, kind of caught him

12  off guard, he basically -- Mr. Jared is the one who violated

13  the -- the shoving movements because he engaged in a

14  conversation with Mr. DePover while the cars were moving into a

15  track. That is a -- that -- he created an unsafe act on that.

16  And you know, under -- under the -- the test failure of the

17  manager's tests themselves, that under the test conditions,

18  when conducting this test, on the Shoving or Pushing Movements

19  on page 107 of the Manager's Tests:

20          "When conducting this test, actual

21      operating conditions are to be

22      observed."

23      MR. SEXTON: Watched, not set up.

24          And the test failure on number 4 bulletin on the same

**CP_0000110**

John Sexton; Justin DePover
February 10, 2021

94

1    page:

2              "Employee performing other tasks

3         related to movement."

4         MR. SEXTON:  General Manager Jared actually created an

5    unsafe act by talking to Mr. DePover as the cars were -- were

6    -- were being shoved b -- past him.  He could've -- he coulda

7    startled him.  He coulda jumped forward.  Anything could've

8    happened.  That -- that is -- the -- th -- this was not a good

9    test, everyone knows it, and --

10        MR. JOHNSON:  Is that the end of your statement?

11        MR. SEXTON:  Give me a second, please.  And also, the --

12   the -- the -- the Rule was violated at -- as this test was also

13   set up in -- in their own -- in their own testing manual.

14            Other than that, I'm a little -- I'm a little wound

15   up here, so that's a -- that's all I'm gonna say for right

16   now.  Then I want you to ask me if -- if I think that this has

17   been a fair and impartial hearing, please.

18        MR. JOHNSON:  Okay.  I've asked you the questions I have

19   to ask.  So I can --

20        MR. SEXTON:  So do -- you're not gonna --

21        MR. JOHNSON:  We've moved to closing.  I cannot ask any

22   more questions at --

23        MR. SEXTON:  No, so you --

24        MR. JOHNSON:  -- this time.

95

1    MR. SEXTON:  Okay.  Well, this is not a fair and

2    impartial hearing, so I'll put that on the record, my closing

3    statement.  Now I'm done.

4        MR. JOHNSON:  So, Mr. Rainwater --

5        MR. RAINWATER:  Yes.

6        MR. JOHNSON:  -- have you had an opportunity to

7    cross-examine all witnesses and to present witnesses and

8    evidence on the charged employees' behalf?

9        MR. RAINWATER:  The record speaks for itself.

10       MR. JOHNSON:  Have I ruled on all of your objections?

11       MR. RAINWATER:  Yeah, the record speaks for itself.

12       MR. JOHNSON:  Were you allowed to properly represent the

13   charged employee during this hearing?

14       MR. RAINWATER:  Yeah, the record speaks for itself.

15       MR. JOHNSON:  And would you like to make a closing

16   statement?

17       MR. RAINWATER:  I would.  The facts of this

18   investigation are as follows:  Mr. Jared conducted an unfair

19   test based on incomplete information because he didn't have a

20   radio on his person to hear the full account of instructions

21   from Mr. DePover to Engineer Sexton.  Had he heard that portion

22   of the communication, he would've quickly realized that the way

23   he intended to set up his test was unfair.  Mr. Jared freely

24   testified that he heard Mr. DePover give Mr. Sexton a car count

John Sexton; Justin DePover
February 10, 2021

96

1  of 50 cars, 5-0 cars, as he started into 4 Track. Then, after

2  moving 12 cars, Mr. DePover testified that he told Mr. Sexton,

3  I need 15 more and you're good for 40.

4         It's obvious that Mr. Jared did not hear that portion

5  of the instructions. What's more, he only had to pull the

6  recorded radio conversations that the Railroad keeps on file to

7  -- to have figured this out. Had he done so, we wouldn't even

8  be in this hearing. The fact that he didn't present that

9  evidence means he either didn't go to the effort to pull it, or

10 it didn't help his case, so he didn't enter it. The

11 Organization, however, has the testimony of three witnesses to

12 this event: Mr. DePover, Mr. Sexton, and had Mr. Cox been

13 allowed to attend as requested, he would've affirmed that as

14 well.

15        Now to the charge at hand. We've clearly and

16 undeniably outlined that Mr. DePover is not complicit with the

17 charges as alleged. Mr. Jared even admitted to such.

18        As far as Mr. Sexton is concerned, testimony has

19 clearly outlined and sustained the fact that Mr. Sexton was

20 under the guidance of being clear for 40 -- for a 40-car shove

21 and only needing 15 to a stop and a cut. Even if Mr. Sexton

22 would've shoved the entire 15 cars before stopping, he still

23 has an additional five cars of space before being required to

24 stop in half the range of the 40-car count as given by

John Sexton; Justin DePover
February 10, 2021

97

1    Mr. DePover, and thus fulfilling the requirements of GCOR

2    5.3.7.  So clearly the charge is inconsistent with the actual

3    events, and we deny the charge in the strongest terms possible.

4          Additionally, it's very obvious that Mr. Jared

5    conducted this test in an unfair manner.  While Mr. Johnson

6    wouldn't allow me to enter CP's United States version of the

7    Efficiency Test Manual and Operating Rules, the testing

8    procedure in that manual states clearly that tests conducted to

9    evaluate Rules related to shove moves is an observation-only

10   test.  CP's testing code is GRF02.  This test only points out

11   -- this test also points out that an employee should not

12   perform other tasks that are not related to movement, the same

13   as GCOR 6.5, which we entered in Exhibit 7.

14         The fact that M -- Mr. Jared, a General Manager at CP

15   and three levels above the most frequently visible manager in

16   this yard, approached Mr. DePover to give him a direct

17   instruction while engaged in this shove move proves how

18   reckless Mr. Jared is with regard to this event.  The fact that

19   he would even try to manipulate a test that is strictly

20   designed to be observation-only and create var -- variable

21   designed to confuse and reduce situational awareness is an ana

22   -- anathema to everything that Home Safe is about.

23         Further to CP's E-Test Manual, it clearly instructs

24   testing managers to "use common sense when setting up test

John Sexton; Justin DePover
February 10, 2021

98

1    situations." The fact that Mr. Jared interrupted Mr. DePover in

2    the middle of his shove proves Mr. Jared did not follow this

3    manual.

4           Additionally, CP's Testing Manual lists six dos and

5    don'ts for managers to follow when conducting efficiency

6    testing.  Those include:  "Do conduct tests fairly;" "Don't set

7    up a situation that can it -- result in an unsafe act or

8    condition;" "Don't conduct a test to entrap an employee," and

9    "Don't violate a rule in order to setup a test situation."

10          After hearing all of the testimony, it's very obvious

11   that this test was not conducted fairly, that it created an

12   unsafe condition by Mr. Jared interrupting Mr. DePover while he

13   was protecting his shove, and that Mr. Jared did indeed violate

14   a GCOR Rule by setting it up in the manner which he did, and

15   that his intent was clearly to entrap Mr. Sexton.

16          To be fair, with regard to efficiency testing, CP's

17   manager -- CP's manual, excuse me, does allow for some testing

18   situations to be set up in order to see how employees react.

19   For instance, a red flag being placed in a track is one way to

20   set up a stop test.  However, there are no processes outlined

21   in that test that p -- excuse me.  There are processes outlined

22   in that test that provide the manager with a testing situation

23   while a shove move is being conducted.  As is the case here,

24   there are no circumstances that allow that situation to be set

John Sexton; Justin DePover
February 10, 2021

99

1    up.  This testing situation can only be obs -- observed,

2    according to CP's Testing Manual.  The fact that the Hearing

3    Officer will not let me enter it as an exhibit to prove this is

4    compelling in itself.  They obviously don't want to allow the

5    proof be shown that this test was unfair.

6            Finally, I ask that our objections please be

7    remembered.  We objected from the start that this hearing

8    violated Mr. Sexton and Mr. DePover's due process because the

9    Hearing Letter compels all the witnesses to attend in person

10   the same way it compels the charged employees.  Furthermore,

11   Mr. Jared was not present at the hearing to have the full

12   efficacy of his testimony, including body language, vetted.

13   Additionally, the Organization was not given the same option to

14   attend this hearing via video conference.  The argument that

15   the situation with COVID prevented Mr. Jared from attending is

16   a red herring designed to circumvent the objection and create

17   an unfair advantage for the Carrier.  Mr. Jared could have

18   easily attended this hearing by wearing a mask and socially

19   distancing, the same as everyone else in this room.

20           And so in closing, we ask that the charges in this

21   case be dismissed due to the fact that due process was

22   violated, the fact that the test was set up unfairly, and the

23   fact that the Principals did, in fact, comply with the Rule

24   regarding -- requiring movement to stop in half the range of

CP_0000116

100

1   vision.  Thank you.

2        MR. JOHNSON:  All right.  This hearing has been held to

3   determine all the facts and circumstances in connection with

4   the Notice of Charge.  The official transcript will care -- be

5   re -- carefully reviewed prior to any decision being rendered.

6            The time is now 15:04.  This hearing is closed.

7                    (Which were all the proceedings had and

8                     testimony taken at the hearing of the

9                     above-entitled cause.)

John Sexton; Justin DePover
February 10, 2021

101

C E R T I F I C A T I O N

ACCUTRAN GLOBAL ENTERPRISES, INC. does hereby certify that the foregoing transcript is a true, accurate, and complete representation of the audio provided.

# EXHIBIT K



**CP**

Tom Jared
General Manager Operations
US West

1010 Shop Road
St. Paul, MN
55106

Office: (651) 495-9519
Cell:
Tom_Jared@cpr.ca

February 26, 2021

John Sexton

███████████████████

Employee #823777

Mr. Sexton:

Notice of formal investigation was issued you under date of February 4, 2021 in connection with the occurrence outlined below:

'... to determine the facts and circumstances and to place your responsibility, if any, in connection with your alleged failure to stop within half the specified distance given while shoving into track NA04. This incident allegedly occurred at approximately 12:49 hours on February 1, 2021 while working Train 474-31 at Nahant yard.'

Formal investigation was conducted on February 10, 2021, to develop all the facts and circumstances in connection with the referenced occurrence. At the conclusion of that investigation it was determined the investigation record as a whole contains substantial evidence proving you violated GCOR 5.3.7 – Radio Response.

Based on the facts and evidence in the hearing record and your past discipline history, you are being assessed a twenty (20) day suspension to commence at 00:01 hours on Thursday, February 25, 2021 up to and including 23:59 hours on Tuesday, March 16, 2021. Reinstatement to active duty at 00:01 hours on Wednesday, March 17, 2021.

As a matter of record a copy of this document will be placed in your personnel file.

Respectfully,

*John D Jared*

Tom Jared
General Manager Operations
U.S. West

CC:     Dylan Smith
        Joey Reyes
        Timekeeping
        Joe Rainwater – BLET Local Chairman (Encl)
        Pete Semenek – BLET General Chairman (Encl)

        CMC
        Employee Services (Encl)
        Operating Practices/Rules (Encl)

**EXHIBIT**

tabbies

12

SEXTON   000014

# EXHIBIT L

CASE NO. 353

Organization File da-sexton.j.02012021
Carrier File 2021-0022404

## PUBLIC LAW BOARD NO. 7667

PARTIES    ) BROTHERHOOD OF LOCOMOTIVE ENGINEERS AND TRAINMEN
           )
TO         )
           )
DISPUTE    ) DM&E RAILROAD d/b/a CANADIAN PACIFIC

STATEMENT OF CLAIM:

Claim on behalf of Canadian Pacific/DM&E Line Employee John Sexton
(Claimant) for removal from his record the twenty (20) day suspension assessed
and compensation for all time lost, in addition to time and expenses for attending
the investigation held on February 10, 2021.

FINDINGS:

The Board, upon consideration of the entire record and all of the evidence, finds that the parties
are Carrier and Employee within the meaning of the Railway Labor Act, as amended, that this
Board is duly constituted by Agreement dated August 16, 2013, and that this Board has jurisdiction
over the dispute involved herein. Awards issued pursuant to the terms and conditions outlined in
the Agreement establishing this Expedited Board of Arbitration will not prejudice the rights of
either party, will not establish any precedent and will not be referred to in connection with any
other case, agreement and/or dispute resolution.

On February 1, 2021, Claimant John Sexton was assigned as the engineer on train 474-31, bringing
at train into the Nahant yard. While the crew was in the middle of performing a shove move,
General Manager Tom Jared approached the conductor unannounced and instructed him to cease

Public Law Board No. 7667
Case No. 353



EXHIBIT
13

1

SEXTON   000015

radio communications with Claimant. The conductor's initial radio communication was that Claimant was good for 50 cars, and his next communication (according to both Claimant and the conductor) was good for 40, 15 to a stop. After Claimant shoved approximately 7 cars, he radioed the conductor several times, and upon receiving no further radio communication, he initiated braking, eventually stopping after approximately 11 cars, or 558 feet.

By notice dated February 4, 2020, the crew was directed to attend a formal hearing regarding their alleged failure to stop within half the specified distance given while shoving into track NA04. The hearing was held on February 10, 2021, after which Claimant was found to be in violation of GCOR 5.3.7 – Radio Response, and by notice dated February 26, 2021, he was assessed a twenty (20) day suspension.

The Organization challenges the discipline assessment on both procedural and substantive grounds. With respect to the procedures, the Organization maintains the process was flawed due to the General Manager's multiple roles in the proceeding. It points out that he was a witness at the hearing, having initiated the test, and that he then determined the outcome of the hearing and authored the notice of discipline, thus ratifying his own actions. The Organization states it is apparent that the outcome of the hearing was predetermined, and it cites award authority which has overturned discipline in similar circumstances.

With respect the merits, the Organization asserts that the decision to assess discipline was arbitrary and capricious. It states that the record indicates that the instructions given to Claimant were ambiguous at best in that he was first given the 50-car count, then that he was told he was good for 40, while at the same time a stop in 15. It contends that Claimant then complied with the intent of the rule when he stopped when no further communication was received, and that he did so well short of half the 40-car count. The Organization also takes exception to Jared's actions in conducting the test in an unfair manner contrary to the published guidelines for such matters and setting up an unsafe condition when he interrupted, without warning or prior introduction, the conductor who was in the middle of directing the shove. The Organization concludes that to assess discipline based on these facts is unjust.

Public Law Board No. 7667
Case No. 353

2

SEXTON   000016

The Carrier, on the other hand, maintains that discipline was properly assessed, arguing that the record contains substantial evidence to support the conclusion that Claimant violated the cited rule. It points to the General Manager's testimony that Claimant received an instruction to shove 15 car lengths, but that Claimant shoved for 11 car lengths before he stopped. It notes that the cited rule provides that "movement must be stopped within half the distance specified unless additional instructions are received," and it states that it is unrefuted that Claimant continued shoving well past half the 15-car count received from the conductor.

With respect to the Organization's procedural objection, the Carrier claims that Claimant received a fair and impartial hearing, and that the process was not tainted by Jared's involvement. It states that Jared testified to his direct observations, and it apparently contends that Jared didn't actually make the discipline decision, stating "Discipline notices on this property are assessed by the General Manager of the Territory. No decision was made on Claimant's culpability until the transcript of the hearing was reviewed by the hearing officer. The discipline was assessed by the Carrier, not the individual manager."

Regarding the level of discipline assessed, the Carrier states that violations of shove rules are considered major/life threatening offenses under its Hybrid Discipline and Accountability guidelines, and that the guidelines provide that the suspension assessment is an appropriate quantum of discipline for such a violation.

We have carefully reviewed the record, and while we find multiple reasons to question the discipline assessment, we concur with the Organization that the process here was flawed to such an extent that it deprived Claimant of a fair and impartial hearing. General Manager Jared involved himself in too many aspects of the process. The record reflects that it was Jared who initiated the test, in a manner which does raise questions regarding safety in his obviously surprising an employee who was performing the safety-sensitive task of protecting the shove, and it appears that the charges were levied based on his test and observations. The only realistic conclusion that can be reached after an objective review of this record is that Jared levied charges regarding his own somewhat questionable test, provided the testimony to support them, and then signed off on a

Public Law Board No. 7667                                                    3
Case No. 353

SEXTON    000017

predetermined outcome.    We are not convinced by the Carrier's statement that "the Carrier" as some all-inclusive entity rendered the decision. The Carrier is of course comprised of many people and departments and it has a legal status, but it acts through individuals, and in this case the individual who signed the discipline letter was Jared. We do not believe the novel explanation offered by the Carrier is sufficient to remove the specter of his excessive involvement in the case. Therefore, we find that the claim must be sustained.

AWARD:  Claim sustained.

Michael D. Phillips
Chairman and Neutral Member

Marcus Ruef
Employee Member

Brian Scudds
Carrier Member

Dated:   August 26, 2022

Public Law Board No. 7667
Case No. 353

4

SEXTON    000018

# EXHIBIT M

## Ogden Expert Witness LLC
Railway Safety & Operations Consultant
Brandon L. Ogden – ███████ – ████████████
Phone: ████████ – Email: ████████████████

March 21, 2024

William G. Jungbauer
4601 Weston Woods Way
Saint Paul, MN 55127

RE:    John Sexton v. Dakota, Minnesota & Eastern Railroad Corporation d/b/a Canadian
Pacific, a Delaware Corporation:

### I.    INTRODUCTION

This report is being submitted by Brandon L. Ogden, Ogden Expert Witness. Ogden Expert
Witness is a consulting firm specializing railroad safety and operations, including my knowledge
and experience as a certified conductor, switchman, and numerous operations management
positions at BNSF Railway.

### II.    BACKGROUND INFORMATION

According to documents and records reviewed, Mr. John Sexton was an employee of Dakota,
Minnesota & Eastern Railroad Corporation d/b/a Canadian Pacific, a Delaware Corporation.
From most recently, and at the relevant times, he worked as a locomotive engineer.

On or about February 1, 2021, Sexton was working as a locomotive engineer with conductor,
Justin DePover. Sexton and DePover believed that there were unsafe conditions of snow and ice
buildup particularly at road crossings and flangeways that could cause a derailment pursuant to
CP Rail operating and safety rules. In fact, CP Rail had two derailments around the same time
that CP attributed to snow and ice buildup in the flangeways because of failing to cut tracks as
required. "Cutting" the tracks refers to separating the locomotive from the cars and running just
the locomotive through snow and ice build up to clear that build up. This is the safe course of
action because the heavier locomotive can safely clear the snow without the increased risk of
cars which are lighter and can ride up onto the snow and ice and therefore are easier to derail.
Sexton reported to the Assistant Trainmaster, Kurtis McKelvey, the potential dangers of
attempting to operate the train in those conditions. Sexton stated that his train, containing
hazardous materials, should be separated from the locomotive, and operated over crossings
and flangeways so that the tracks could be cut, in other words, cleared of snow and ice.
However, McKelvey instructed him to not cut anything, and instead to operate the train as
normal.

1



**Exhibit**
**Ogden 01**
7/10/2024
B. Ogden

Sexton then had McKelvey sign a Health and Safety Job Briefing Form that would have his written acknowledgement that he was recommending them to violate CP Rail Policy and endanger the crew along with the public.

Sexton then had a meeting with DePover, where Sexton decided he would refuse McKelvey's instruction to continue working as normal, rather, they would take the time to cut the tracks, in other words, clear them of snow and ice build up to prevent a catastrophic derailment. Sexton believed it was the safest course of action. Sexton's cutting of the tracks contributed to a significant delay in his train getting to its next destination on time and also affected other train arrivals and departures. This delay impacted much of CP's planned scheduling throughout the rest of the day.

After Sexton spent the time to cut the tracks, Gary Prince emailed McKelvey and the General Manager, Tom Jared, stating that he needs a full breakdown from McKelvey of what happened and that "a set out and locomotive lift should not take 4'30" as projected." Prince further addressed his concerns about the delay in stating, "we are at risk of 4 re-crews due to 1 train over-standard. Ensure the delays in Nexus are filled out correctly with facts, not assumptions."

McKelvey replied to the email and completed an Incident Report. In both, McKelvey attributed cutting crossings as contributing to the delay. In response to McKelvey's Incident Report, Jared responded only stating, "call me when you have a min." Records indicate that McKelvey and Jared did have a phone call shortly after.

Later that day, Sexton's train arrived at the Nahant Yard in Davenport, Iowa. It was Sexton's job to separate cars from the train onto other sets of tracks. Moving cars in a yard such as this is referred to as "shoving." While Sexton's crew was performing shoving movements, Jared walked up to Sexton's conductor DePover and instructed him to stop communicating with Sexton over the radio. This is a dangerous action because DePover was acting as Sexton's eyes on the ground. Further, GCOR rules state that an employee engaged in a shove "must not engage in unrelated tasks while providing protection." Jared claimed that his actions were a part of an "efficiency test" to see if Sexton would stop the train after losing communications with his conductor within a specified distance. However, there is no efficiency test that permits a set up test in this manner. Jared's actions were dangerous and put Sexton's and Depover's lives at risk because it distracted DePover from protecting the shove and made him engage in unrelated tasks by communicating with Jared.

Further, Jared's "efficiency test" subjected Sexton to possible discipline. Jared then concluded that Sexton failed the efficiency test and that Sexton violated GCOR 5.3.7. According to Sexton's employee records, in a nine-year period, this is the first time Jared conducted an efficiency test on Sexton.

CP Rail management bonuses, raises, promotions or demotions are in part based upon performance goals and metrics of CP Rail. When employees, such as Sexton, take safety actions like cutting the tracks, and thus delaying a train, CP Rail officials are placed in a difficult conflict of interest in trying to keep CP trains moving and not delayed versus protecting CP Rail employees and the public safety because of bonuses based on speed metrics. These same

2

officials were allowed by CP Rail to make discretionary decisions as to whether or not an employee, such as Sexton, should be subjected to a disciplinary investigation and actual discipline.

On February 10, 2021, CP Rail conducted its disciplinary investigation and ultimately disciplined Sexton with a violation of GCOR 5.3.7-Radio Response stemming from Jared's suggestion that Sexton failed his efficiency test. CP imposed a twenty-day unpaid suspension.

This suspension was later reviewed by the Public Law Board to determine whether CP was correct in its decision making. The Public Law Board found that the "decision to assess discipline was arbitrary and capricious in that the Carrier failed to meet its burden of proof." Jared, who was both the judge and executioner orchestrating the discipline, chose to subject Sexton to discipline by conducting an e-test, made the suggestion that Sexton failed the e-test, gave statements against Mr. Sexton in his disciplinary investigation, and suggested Sexton be disciplined.

You have asked me to review a number of discovery documents including the CP disciplinary investigation transcript and exhibits regarding Sexton and other documents and records including pertinent GCOR rules, CP Rail policies, CP Rail Short Term Incentive Policy Plans, programs and metrics/goals of various CP Rail management officials who participated in various capacities in the decisions to investigate, discipline, and sustain the suspension of Sexton and to present my opinions as to whether or not such policies, programs, metrics and/or goals presented a potential or actual conflict of interest or other policy/rule violation for CP Rail management officials who exercised discretion in making such decisions in this case.

You have also asked me to give any opinions as to whether Sexton violated any rules, policies, notices, or regulations, and whether CP Rail's decisions to suspend Sexton were supported by the evidence. In addition, you have asked my opinion whether CP Rail would have suspended Sexton for the same rule violations if he had not engaged in numerous protected activities.

### III.    MY BACKGROUND/EXPERIENCE/SPECIALIZED RAILROAD KNOWLEDGE

I have a decade of experience as a certified switchman/conductor or operations manager with BNSF Railway, a Class I Railroad similar to CP and operated under the same GCOR rules. I have extensive knowledge in train operation and operating rules interpretation. From 2006 to 2016 I promoted my way through the railroad management ranks as Trainmaster, Director of Administration, Terminal Manager and Superintendent of Operations. I have distinguished railroad leadership experience and unique industry knowledge and perspective. I led my team of over 300 train, yard and engine employees to multiple extended human factor incident and injury free streaks during my railroad career. I have investigated derailments, crossing accidents, personal injuries and almost any unusual circumstance involving the operating department of the railroad. I have supervised new hire training programs for railroad operating employees.

Over my railroad career, I have taken hundreds of hours of ongoing training in train operations, railroad management, crew training, operating rules, and safety. I have completed thousands of federal required operations tests on railroad operating employees for rules compliance and led railroad site safety teams to solve railroad operating safety issues. I am familiar with how BNSF

applied, used, interpreted, and managed its policies and procedures from 2006-2016 compared with how CP applied, used, interpreted, and managed its policies and procedures for the purposes of this case.

I have interpreted GCOR rules and railroad regulations and I'm familiar with railroad policies and procedures. I assessed alleged rules violations, was involved in disciplinary investigations, and made disciplinary decisions, including whether to terminate employees.

I am aware of how the bonus policies were used by BNSF managers including myself. I have given expert testimony and been retained as a railroad operations expert concerning such matters as train handling, operation of switches, operation of hand brakes, rail equipment movement during switching operations including shove movements, and evaluation of railroad employee rule compliance. My CV (Exhibit "A"), Fee Schedule (Exhibit "B"), and Testimony Case List (Exhibit "C") are attached to this report. As an expert witness I have become familiar with the policies of other railroads including CP Railway, which are similar in nature to the rules, policies, and procedures of BNSF.

**IV.** THIS ENGAGEMENT

1. Federal Complaint dated May 5, 2023
2. Federal Amended Complaint dated August 25, 2023
3. BLET Appeal [CP000015-000017]
4. Hybrid Discipline & Accountability Guidelines [CP00440-00455]
5. CP's Response to BLET Appeal [CP0000147-0000150]
6. Email from Dylan Smith [CP0004-00005]
7. Michelle Sullivan's Notice of Representation [CP00615-00617]
8. Sexton's Safety Testing Results [CP00435-00437]
9. Email from Mark Johnson [CP00002-00003]
10. Email from Tracy Miller [CP01692-01693]
11. Email from Tracy Miller [CP01694-01695]
12. Tom Jared Response [CP01696-01968]
13. Al McCombs Email [CP01133-01134]
14. Sexton's Emails about Cutting Tracks Incident [CP00994-00995]
15. Sexton's Follow up Emails about Cutting Tracks Incident [CP00996-00997]
16. Email from Dylan Smith Recommendation [CP00981-00983]
17. Joe Rainwater's Letter requesting Witnesses [CP00980]
18. CP Rail's Position Statement to OSHA [CP00458-00470]
19. Sexton's Second Amended Complaint dated August 25, 2023
20. Joe Rainwater's Email Requesting Witnesses [CP00979]
21. Train Delay Report [SEXTON000163]
22. Testing Rules [SEXTON000157-000162]
23. Sexton Email to OSHA [SEXTON000147-000149]
24. Safety Review - Cutting Tracks 1 [SEXTON000141]
25. Safety Review - Cutting Tracks 2 [SEXTON000142]
26. Safety Meeting Signature Sheet [SEXTON000156]

27. GOI Section 1 - 32.10 [SEXTON00144]
28. GM Notice No. 22 [SEXTON000143]
29. Depover Handwritten Note [SEXTON000140]
30. GCOR 6.5 [SEXTON000145]
31. David Cox Statement [SEXTON000146]
32. Sexton-Depover Hearing dated February 10, 2021 [SEXTON00019-000138]
33. Notice of Investigation [SEXTON000013]
34. Investigation Exhibits [SEXTON000004-000012]
35. Notice of Discipline [SEXTON00014]
36. Public Law Board No. 7667 Case 353 [SEXTON000015-000018]
37. Brotherhood of Locomotive Engineers and Trainmen GCA Appeal [SEXTON000001-000003]
38. Defendant's Supplemental Responses to Plaintiff's Fifth Set of Discovery Requests dated March 1, 2024
39. CP Rail 2021 Short Term Incentive Plan [CP03231-03237]
40. Kurtis McKelvey 2020 Performance Management Form [CP03361-03366]
41. Kurtis McKelvey 2021 Performance Management Form [CP03367-03374]
42. Thomas Jared 2020 Performance Management Form [CP03389-03401]
43. Thomas Jared 2021 Performance Management Form [CP03402-03408]
44. Incident Report [CP03244-03245]
45. Sexton Deposition Transcript dated October 31, 2023
46. Kurtis McKelvey Deposition Transcript dated November 9, 2023

## V.    SUMMARY OF GROUNDS FOR EACH OPINION

The grounds for my opinions are based on:

1. My specialized training, experience, and knowledge of the custom and practice of the rail industry as it relates to the specific issues in this case.
2. My railroad working experience and training while serving in various positions over 10 years with BNSF Railway.
3. The specialized experience and knowledge gained while serving as a railroad safety and operations consultant in litigated cases.
4. My review of material and/or information received in this matter to date.

## VI.    METHODOLOGY

I use the same methodology that I was trained by BNSF and used during my management years with BNSF in applying, determining, and interpreting BNSF rules, policies, procedures, and applicable regulations in disciplinary investigations and decisions. To the best of my knowledge, my peers were trained in and used these same methods. The primary goal of the methodology used was to understand, interpret, and apply it to the railroad operation, employee training, and disciplinary investigations and decisions. I would review all the pertinent facts and evidence and uniformly apply my methodology in the decisions I made regarding the BNSF discipline policy and how I treated other people. I used and allowed alternative handling/lesser discipline

5

and/or lenience when in doubt of what discipline to apply. The ultimate goal was to operate a safe railroad.

**VII.**   OPINIONS

1. Whether Sexton violated any rules, policies, notices, or regulations supported by the evidence presented by CP in its investigation.

CP Rail held a disciplinary investigation on Sexton on February 10, 2021. Sexton was given a 20-day unpaid suspension for allegedly violating GCOR 5.3.7 - Radio Response. Based upon my review of the investigation transcript and exhibits it is my opinion that CP Rail did not prove Sexton violated any rules. Rather, it is clear CP Rail managers made a predetermined ruling and failed to hold an impartial and unbiased investigation. CP Rail should not have disciplined and suspended Sexton for 20 days based on the facts presented in the CP Rail Formal Investigation.

This opinion is based on my own experience in conducting disciplinary investigations and the Public Law Board's decision to overturn the discipline. I agree with the Public Law Board's position that both on a procedural and substantive basis Sexton's discipline was unwarranted.

I agree that Sexton complied with the intent of the rule. The rule itself states "Movement must stop within half the distance specified unless additional instructions are received." In this instance, when Sexton received his last instruction from DePover, it was his task to shove, or move, 15 more cars in the direction they were shoving. However, DePover gave the additional instruction as part of the entire instruction that Sexton was good for 40 cars. Because he was instructed that he was good for 40 cars, in other words, there was room for 40 cars, safe course of action in compliance with GCOR would be to stop within 20 cars. Sexton stopped after moving 11 cars because he realized he had lost communication with DePover.

Based upon the material provided for my review, it is evident the facts did not support the discipline assigned to Sexton. As such, it is my opinion that the Public Law Board was correct in their decision to overturn the punishment on Sexton.

I also agree with the Public Law Board's decision regarding the procedural aspect of CP's investigation. In my experience conducting disciplinary investigations, this investigation was not handled in a fair and impartial manner, rather, with notable animosity towards Sexton. Jared led the entire process against Sexton, he chose to subject Sexton to discipline by conducting an e-test, made the suggestion that Sexton failed the e-test, gave statements against Mr. Sexton in the disciplinary investigation, and suggested Sexton be disciplined. I agree with the Public Law Board's conclusion that "Jared levied charges regarding his own somewhat questionable test, provided testimony to support them, and then signed off on a predetermined outcome."

2. Whether CP's policies, programs, metrics and/or goals present a potential or actual conflict of interest.

CP Rail policies, programs, metrics, and goals presented a potential or actual conflict of interest for CP Rail management officials who exercised discretion in making decisions in this case, including disciplinary decisions. CP's Short Term Incentive Plan (STIP) requires managers to

conduct regular progress reviews throughout the year and evaluate the performance of the managers under them against objectives set by CP.

The STIP states, "The objectives of the Plan are: to tie a part of the employee's compensation directly to CP's results; to reward the achievement of individual and team objectives that support CP's achievement of its annual business plans and long-term strategy; and to maintain the competitiveness of CP's compensation program." Both Jared's and McKelvey's objectives for 2021 were to "Improve overall performance of the southern region's train Performance, origin Performance, terminal Dwell Hours and GTM's." Each of these objectives is about speed not safety. Both McKelvey's and Jared's Performance Management Form stated that their actions and behaviors include "drill down on late trains, terminals with high dwell." This demonstrates the pressure put on management to emphasize train speed. This pressure creates a culture focused on speed. The faster CP can make trains complete trips, the more money CP will make and also the more money managers like McKelvey and Jared will make.

To further elaborate, McKelvey and Jared were measured on, and thus their bonuses were based on, the metrics of Origin Performance and Terminal Dwell hours, in addition to several others. Upon review of the documents provided, Origin Performance at CP "measures the percentage of Operating Plan trains that depart origin on time and within 2 hours of scheduled departure time." Terminal Dwell hours "is the average amount of time in hours between car arrival to and departure from the yard (excludes cars that move through a terminal on a run-through train, stored, bad ordered, and maintenance-of-way cars). Calculated by dividing the total number of hours cars spent in terminals by the total count of car dwell events." According to the documents provided, Sexton's train was over standard and delayed by 3 hours and 23 minutes.

Ratings are a big deal for managers at CP Rail because the ratings are tied directly to a manager's potential for promotions, demotions, merit raises, and annual bonuses. One of the ways railroad managers may try to improve his or her job performance rating is to make sure that any subordinate managers or employees focus on improving his or her performance, if possible, on that performance metric. For example, Jared's 2021 Total Rewards Statement shows a Total Award of $133,368. In the three years prior to Sexton's discipline, Jared received $391,089 in bonus pay in addition to his base salary.

The policy says it right in its name, the Short-Term Incentive Plan is designed to incentivize management. In my opinion, Jared's bonus and CP's culture surrounding efficiency led him to list "drill down on late trains" as his actions and behaviors in 2021. Jared was incentivized to track down Sexton's late train, perform an e-test on Sexton which in itself subjected Sexton to possible discipline, made the suggestion that Sexton failed the e-test, gave statements against Sexton in his disciplinary investigation, and suggested Sexton be disciplined. This action creates a chilling effect on the workplace preventing other employees from wanting to take the safe course of action.

7

3.  Would CP have conducted an efficiency test and disciplined Sexton if he had not engaged in protected activity?

Operation managers at CP Rail can make many types of important decisions that initially determine whether or not an employee should or should not be formally investigated for possible rule violations and possible discipline. In my experience, metrics that can affect the bonus and performance rating of a manager are always in the back of their minds. The discipline process starts with a decision by a management officer that certain actions or inactions of an employee constitute a potential rule violation. A number of important initial decisions must be made as to (a) whether or not a rule violation may have occurred or (b) whether or not the potential rule violation is serious enough to require a formal disciplinary investigation.

Discipline decisions and rules interpretations are not always "black and white." Managers often make discretionary decisions. And CP Rail managers have a strong motivation to discipline an employee perceived to be delaying trains even if the delay is caused by taking the safe course.

Evidence of the conflict of interest created by the CP's policies, metrics, and goals of CP Rail's managers who exercised disciplinary discretion were substantial factors in CP Rail's decision to discipline Sexton. Sexton was the target of retaliation and CP Rail suspended him for 20 days without proper impartiality. The discipline assigned to Sexton was inappropriate. It is clear that Sexton was targeted, retaliated against, and wrongfully suspended for 20 days by CP Rail managers because he took the safe course of action in refusing McKelvey's order.

Based upon my review of the facts and evidence in this case and my training and experience working as a manager for a Class I railroad, it is my opinion that CP Rail's policies, objectives, metrics, and goals placed on CP Rail management officials who participated in various capacities of the decisions to discipline Sexton were influenced by those policies to emphasize speed. It is my opinion that absent Sexton's protected activities, CP Rail would not have subjected him to discipline and ultimately suspend him without pay.

I understand discovery is a continuing process. Once/if such additional evidence becomes available, I reserve the right to amend, modify in part or in whole or supplement my opinions and/or this report. I may have other or additional opinions depending on what is asked of me at deposition or at trial. I plan to read all additional depositions and review all additional discovery in this case. I will also review opinions of any potential experts identified by defendant and may provide rebuttal opinions. I will also work with counsel in the preparation of demonstrative exhibits at trial.

I hold all of the above opinions with reasonable professional certainty.

Sincerely,

*Brandon Ogden*

Brandon L. Ogden

8

# EXHIBIT N

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | | |
|---|---|---|
| John Sexton, | ) | |
| | ) | Case No. 23-cv-00031 |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | **DEFENDANT'S RESPONSES TO** |
| | ) | **PLAINTIFF'S FIFTH SET OF** |
| Dakota, Minnesota & Eastern Railroad | ) | **DISCOVERY REQUESTS** |
| Corporation d/b/a Canadian Pacific, a | ) | |
| Delaware Corporation, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

Defendant Dakota Minnesota & Eastern Railroad Corporation, d/b/a Canadian Pacific ("Defendant" or "CP"), serves on Plaintiff John Sexton ("Plaintiff or "Mr. Sexton"), the following Responses to Plaintiff's Fifth Set of Discovery Requests as required under Rule 26(e) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENTS AND GENERAL OBJECTIONS

The following Preliminary Statements and General Objections are applicable to all of Plaintiff's discovery requests to Defendant and are incorporated into each of Defendant's responses:

1. The following objections and answers are made on behalf of Defendant. Nothing in this document shall constitute a waiver of any right, claim, or defense by Defendant.

2. Defendant's search for information and documentation in connection with Plaintiff's discovery requests was conducted with the necessary degree of diligence to locate responsive information and/or documents. Discovery is ongoing, and Defendant reserves the right

1

to revise, correct, add to, supplement, or clarify any of its responses to Plaintiff's discovery requests to Defendant.

3.      Defendant objects to the instructions and definitions set forth in discovery requests to the extent they purport to place a greater burden upon Defendant than that imposed by the Federal Rules of Civil Procedure, the Southern District of Iowa Local Rules, and applicable legal authorities.  Defendant will answer only in accordance with its obligations.

4.      Defendant objects to Plaintiff's discovery requests to the extent they purport to place a greater burden upon Defendant than that imposed by the Federal Rules of Civil Procedure, the Southern District of Iowa Local Rules, and applicable legal authorities.  Defendant will answer only in accordance with its obligations.

5.      Defendant objects to Plaintiff's discovery requests to Defendant to the extent they call for information and/or documents protected by the attorney-client privilege, the litigation work-product doctrine, or any other applicable privileges or exemptions.

6.      Defendant objects to each and every request that purports to seek "all" documents, as the burden and expense of identifying, collecting, reviewing, and producing "all" documents outweighs the unlikely benefit of such discovery in resolving the issues in this litigation. Defendant has identified and will produce responsive and discoverable documents identified after searches that were reasonable and appropriate given the circumstances of this case and the factors of proportionality set out in applicable statutes, case law, and regulations.

7.      Defendant's responses to Plaintiff's discovery requests to Defendant are made without intending to waive or waiving, but, to the contrary, intending to preserve and preserving:

> a.      all questions as to competency, relevancy, materiality, privilege, and admissibility as evidence for any purpose, of any responses to Plaintiff's

discovery requests to Defendant or the subject matter thereof, in any subsequent proceeding in this or any other action;

b.      the right to object to the use of any responses to Plaintiff's discovery requests to Defendant or the subject matter thereof in any subsequent proceeding in this or any other action; and

c.      the right to object on any ground at any time to a demand for further responses to Plaintiff's discovery requests to Defendant or to any other interrogatories, requests for documents, requests for statements, or other discovery procedures involving or relating to the subject matter of Plaintiff's discovery requests to Defendant.

8.      Defendant objects to Plaintiff's discovery requests to Defendant to the extent they call for production of information and/or documents unrelated to the issues in this case.

9.      Defendant objects to Plaintiff's discovery requests to Defendant to the extent they call for production of information and/or documents not in Defendant's possession, custody, or control.

10.      Defendant objects to Plaintiff's discovery requests to Defendant to the extent they seek information and/or documents Plaintiff already possesses or to which Plaintiff has equal or greater access.

11.      Defendant objects to Plaintiff's discovery requests to Defendant to the extent that the requested discovery is cumulative of other requests and Defendant's initial disclosures.

12.      Each of Defendant's responses to Plaintiff's discovery requests to Defendant is subject to these Preliminary Statements and General Objections as well as the objections made to each specific request. By responding to certain of Plaintiff's discovery requests to Defendant,

3

Defendant does not waive these Preliminary Statements and General Objections or any specific objections to specific requests.

13.     Defendant objects to Plaintiff's discovery requests to the extent that they request confidential or proprietary information or documents that are private or confidential to Defendant and/or its current or former employees. Subject to other General Objections and any specific objections propounded in response to an individual request, such information or documents shall only be produced pursuant to the Protective Order (Dkt. 22), as amended, governing the use and dissemination of confidential and/or proprietary information in this case.

14.     Defendant encourages further discussion between counsel regarding Plaintiff's discovery requests to Defendant and Defendant's objections and responses to those requests with the expectation and intention that such discussions can lead to further agreement regarding any disputes related to discovery.

## RESPONSE TO INTERROGATORY

**INTERROGATORY NO. 13:** For each of the following terms, list the definitions and/or description CP assigned to each during the year of 2021: "operating ratio", "operating income", "trip plan compliance", "train performance", "origin performance", "terminal dwell hours", "GTMs", "train speed – network speed", "train speed – raw train speed", "power utilization – locomotive productivity", "train speed", "trip plans", "cc/KGTM", "process dwell", "origin on time performance", "industry serving measures", "heldaway costs", "crew utilization",  and "bulk cycles".

**RESPONSE NO. 13:** CP objects to this Interrogatory because the phrase "description CP assigned to" is subject to more than one reasonable interpretation and so is ambiguous, vague, overly broad, without limit discernable to CP, not proportional to the needs of the case when the

4

factors of Fed. R. Civ. P. 26(b)(1) are applied, and may encompass information protected by the attorney-client privilege and litigation work product doctrine. CP further objects to this Interrogatory because it seeks information that is publicly available and so seeks information already known to Plaintiff or available to Plaintiff through public sources. Subject to and without waiving any objections, CP responds as follows:

1. "Operating Ratio" is calculated as operating expenses divided by revenues. See CP Annual Report 2022 at 70 (publicly available at https://s21.q4cdn.com/736796105/files/doc_financials/2022/ar/CP_AnnualReport_2022.pdf).

2. "Operating Income" is an accounting figure that measures the amount of profit realized from CP's operations after deducting operating expenses.

3. "Trip Plan Compliance" is also known as "Merchandise Trip Plan On Time (+12 hrs)" which means the on time performance to the baseline trip plan (the trip plan generated from the original waybill prior to movement), for all merchandise shipments (railcar). Note: as this is an end to end metric it is measured only at the system level.

4. "Train Performance" is also known as "Destination Performance," which measures the percentage of Operating Plan trains that arrive on time and within 2 hours of scheduled arrival time at the destination or end station for the train (if a train is cancelled prior to final destination it will be included based on the schedule to that station).

5. "Origin Performance" measures the percentage of Operating Plan trains that depart origin on time and within 2 hours of scheduled departure time.

6. "Terminal Dwell Hours" is the average amount of time in hours between car arrival to and departure from the yard (excludes cars that move through a terminal on a run-through

train, stored, bad ordered, and maintenance-of-way cars). Calculated by dividing the total

number of hours cars spent in terminals by the total count of car dwell events. *See* KCS

2022 10-K at 28 (publicly available at

https://s21.q4cdn.com/736796105/files/doc_financials/2022/ar/KCS-2022-10-K.pdf).

7.    "GTMs" means gross ton miles. *See* KCS 2022 10-K at 28 (publicly available at

https://s21.q4cdn.com/736796105/files/doc_financials/2022/ar/KCS-2022-10-K.pdf).

GTM is the movement of total train weight over a distance of one mile.

8.    "Train Speed – Network Speed" is average train speed in miles per hour. Does not

include: trains used in or around CP's yards; passenger trains; or trains used in network

maintenance / repairs. In addition, delay hours linked to customers and foreign railroads

are removed from the travel time.

9.    "Train Speed – Raw Train Speed" is average train speed in miles per hour. Does not

include: trains used in or around CP's yards; passenger trains; or trains used in network

maintenance / repairs.

10.    "Power Utilization – Locomotive Productivity" is also known as "GTMs per Operating

HP," which is the daily average GTMs divided by the Operating horsepower. Operating

horsepower excludes units in tied up/storage status, in use on other railways or offline

and includes foreign units that are online. It is a measure of the locomotive productivity.

11.    "Train Speed" measures the line-haul movement from origin to destination. The average

speed is calculated by dividing train-miles by total hours operated, excluding yard and

local trains, passenger trains, maintenance of way trains. (Publicly available at

https://investor.cpr.ca/key-metrics/default.aspx?section=Definitions).

12.    "Trip Plans" can refer to more than one plan. CP's operations team uses this term to

describe the detailed schedule for a car that is generated when the customer provides CP with a bill of lading/waybill.

13. "cc/KGTM" is crew cost per kGTM, which is the total crew related costs incurred per 1000 GTMs – includes taxi and direct non-working costs (does not include vacation and other non-operational costs).

14. "Process Dwell" is a subset of "Terminal Dwell" defined above. "Process Dwell" specifically refers to the dwell that occurs when a car is handled or processed at a terminal or yard. To be "Processed" the car must be switched and transferred from one train to another train at the location in question.

15. "Origin On Time Performance" is also known as "Origin Performance," which measures the percentage of Operating Plan trains that depart origin on time and within 2 hours of scheduled departure time.

16. CP continues to determine the common internal meaning of "Industry Serving Measures" and will supplement this answer when determined.

17. "Heldaway Costs" are the costs incurred for crews held at the away from home terminal. "Heldaway Spend" is a related term, which is the amount paid to employees (RTEs) for each minute they spend over and above the first 10 hours at the away from home terminal.

18. "Crew Utilization"  is a measure of each terminal's crew base in relation to the number of trains/assignments that they are planned to protect.

19. "Bulk Cycles" refers to the overall time required to move a bulk unit train from the point of loading at origin to the point of unloading and back. Measured in hours or days depending on the commodity and length of haul.

7

## RESPONSE TO REQUEST FOR PRODUCTION OF DOCUMENTS

**REQUEST FOR PRODUCTION NO. 36:** Produce documents and/or policies that provide a definition and/or description of each of the following terms: "operating ratio", "operating income", "trip plan compliance", "train performance", "origin performance", "terminal dwell hours", "GTMs", "train speed – network speed", "train speed – raw train speed", "power utilization – locomotive productivity", "train speed", "trip plans", "cc/KGTM", "process dwell", "origin on time performance", "industry serving measures", "heldaway costs", "crew utilization", and "bulk cycles".

**RESPONSE NO. 36:** CP objects to this Request because the phrase "description of" is subject to more than one reasonable interpretation and so is ambiguous, vague, overly broad, without limit discernable to CP, not proportional to the needs of the case when the factors of Fed. R. Civ. P. 26(b)(1) are applied, and may encompass information protected by the attorney-client privilege and litigation work product doctrine. CP further objects to this Request because it seeks documents that are publicly available and so seeks documents available to Plaintiff through public sources and so are as available to Plaintiff as they are to CP. Subject to and without waiving any objections, CP responds that CP will produce the Daily Operations Report and Crew Performance definitions documents.

**REQUEST FOR PRODUCTION NO. 37:** Produce a copy of the following documents listed under the "Cross Reference" section of the Short Term incentive Plan (Policy 3411): Employment Categories (Policy 2210), Compensation Program (Policy 3001), Compensation &

8

Benefits for Unionized Employee who Temporarily Assume Non-Unionized Positions (Policy 8503), Retirement Policy (8101), and Annual Salary Program (Policy 3410).

**RESPONSE NO. 37:** CP objects to this Request because it seeks documents that are outside the scope of discovery, in that the documents sought have no discernable relationship to Plaintiff's claims against CP and CP's defenses to such claims. Specifically, the documents listed in the "Cross Reference" section of the Short Term Incentive Plan (Policy 3411) are not the documents requested in Request No. 37, as Plaintiff's counsel incorrectly asserted. Instead, the documents listed in the "Cross Reference" section of the Short Term Incentive Plan (Policy 3411) are Policy 5611 (Performance Management Program), Policy 8503 (Compensation & Benefits for Unionized Employees who Temporarily Assume Non-Unionized Positions), and Policy 8101 (Retirement Policy). Thus, the requested Employment Categories (Policy 2210), Compensation Program (Policy 3001), and Annual Salary Program (Policy 3410) have no discernable relationship to Plaintiff's employment or discipline and are therefore outside the scope of discovery. CP also objects to this Request because it is not limited by time and so is overly broad and unduly burdensome.

Subject to and without waiving any objections, and with regard to the policies that are actually listed in the "Cross Reference" section of the Short Term Incentive Plan (Policy 3411), CP responds that CP produced Policy 5611 on December 22, 2023. *See* CP_03700. Policy 8503 is only applicable to unionized employees who temporarily assume non-unionized positions. Accordingly, Policy 8503 is not applicable to Plaintiff or the U.S. management employees whose actions are subject to Plaintiff's allegations and so has no discernable relationship to the claims and defenses at issue in this case. CP is withholding Policy 8503 on the basis of the foregoing objections. CP is producing Policy 8101.

9

Dated: February 12, 2024                DORSEY & WHITNEY LLP


/s/ Joshua D. Hughes
Joshua Hughes (AT0014950)
hughes.joshua@dorsey.com
Dorsey & Whitney LLP
801 Grand Ave, Suite 4100
Des Moines, IA 50309
Tel: (515) 283-1000
Fax: (515) 598-7704


/s/ John T. Sullivan
John T. Sullivan (pro hac vice)
sullivan.jack@dorsey.com
Briana Al Taqatqa (pro hac vice)
altaqatqa.briana@dorsey.com
Dorsey & Whitney LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
Tel:  (612) 340-2600
Fax:  (612) 340-2868


ATTORNEYS FOR DEFENDANTS

## <u>CERTIFICATE OF SERVICE</u>

Joshua D. Hughes, an attorney, certifies that on February 12, 2024, he served a copy of the foregoing **Defendant's Responses to Plaintiff's Fifth Set of Discovery Requests** electronically to Plaintiff's attorneys of record.

By: *Joshua D. Hughes*

11

# EXHIBIT O

474-31                    exhibit 5

When shoving cars into NA04 track a car
count of 15 was given and after no communication movement
stopped after 11.

Trate DB

1 Feb 2021

SEXTON   000008

# EXHIBIT P

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION

John Sexton,                                       )
                                                   )
                     Plaintiff,                    )          Case No. 23-cv-00031
                                                   )
                                                   )
v.                                                 )
                                                   )          **DECLARATION OF**
                                                   )          **JASON ROSS**
Dakota, Minnesota & Eastern Railroad               )
Corporation d/b/a Canadian Pacific, a              )
Delaware Corporation,                              )
                                                   )
                     Defendant.                    )


COMES NOW I, Jason Ross, and affirm, attest, and declare as follows:

1.      I have been the Senior Vice President of Operations for Soo Line Railroad Company since May 1, 2024.

2.      Prior to that, I was the Vice President of Operations Southern Region for Soo Line Railroad Company from September 1, 2019 until February 15, 2023, and my territory covered Defendant Dakota, Minnesota & Eastern Railroad Corporation d/b/a Canadian Pacific ("CP"). I have personal knowledge of the facts stated herein.

3.      As the Vice President of Operations Southern Region, I was responsible for reviewing and approving employee discipline for employees in my territory.

4.      When I review discipline recommendations, I do not look at the names of employees when deciding discipline; instead, I review the fields of a chart that summarizes the offense, the employee's discipline history, and other objective factors.

5.      In 2021, I reviewed the hearing investigation and the discipline recommendation for Plaintiff John Sexton regarding his failure to comply with Rule 5.3.7 of the General Code of

Operating Rules ("GCOR"). I determined that the appropriate discipline was a twenty-day suspension without pay, which was imposed on February 26, 2021.

6.      My decision to issue a twenty-day suspension to Sexton was entirely unrelated to the events that occurred in Marquette, Iowa, on February 1, 2021, including the discussion between Trainmaster Kurt McKelvey and Sexton related to cutting the tracks, Sexton's refusal to operate the train without first cutting the tracks, and the fact that Sexton and the conductor actually cut the tracks. The fact that Sexton and McKelvey had that disagreement on February 1, 2021 did not in any way motivate my decision to issue a twenty-day suspension to Sexton.

7.      The fact that the 474 train was delayed leaving Marquette on February 1, 2021 did not in any way motivate my decision to issue a twenty-day suspension to Sexton.

8.      My potential 2021 short-term incentive payment absolutely did not in any way motivate my decision to issue a twenty-day suspension to Sexton.

9.      I received emails on January 3, 2021 and January 18, 2021 from Sexton related to a manager's alleged failure to conduct air brake testing and related operational complaints. The supervisor about whom Sexton complained had nothing to do with the failed e-test on February 1, 2021.

10.     The fact that Sexton sent these emails on January 3, 2021 and January 18, 2021 did not in any way motivate my decision to issue a twenty-day suspension to Sexton.

11.     I received an email from Sexton on February 9, 2021 regarding McKelvey driving too fast for the winter road conditions. Sexton also shared his version of the events of the morning of February 1, 2021 in Marquette.

12.     The fact that Sexton sent this email on February 9, 2021 did not in any way motivate my decision to issue a twenty-day suspension to Sexton.

13.     I have reviewed the transcript from the February 10, 2021 investigation hearing into Sexton's violation of GCOR 5.3.7.

14.     Specifically, I read the line of questioning by Local Chairman Joe Rainwater to Sexton related to Tom Jared's administration of the efficiency test on February 1, 2021. Rainwater asked Sexton if Sexton believed Jared violated GCOR 6.5 when he "interrupted" DePover's car counts to Sexton. Sexton responded: "Absolutely. He created a unsafe act."

15.     Sexton's comment at the February 10, 2021 hearing that Jared "created an unsafe act" did not in any way motivate my decision to issue a twenty-day suspension to Sexton.


**Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.**

Executed on: August __ 2024

Jason Ross

# EXHIBIT Q

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION

- - - - - - - - - - - - - - - - - -

No. 3:23-CV-00031-HCA

John Sexton,

               Plaintiff,

vs.

Dakota, Minnesota & Eastern Railroad
Corporation d/b/a Canadian Pacific,
a Delaware corporation,

               Defendants.

- - - - - - - - - - - - - - - - - -

DEPOSITION OF

MCKINSEY HANSON

June 24, 2024

10:05 a.m.

TAKEN BY: BRENDA K. FOSS
fossbrenda@yahoo.com
612-701-4282

---

2

Deposition of MCKINSEY HANSON,
taken by Zoom videoconference by and on
behalf of Plaintiff, on Monday, June 24,
2024, commencing at 10:05 a.m., before
Brenda K. Foss, Professional Court Reporter,
Notary Public, State of Minnesota, County of
Hennepin.

*   *   *   *   *

APPEARANCES

ON BEHALF OF THE PLAINTIFF:
CYLE CRAMER, ESQUIRE
YAEGER & JUNGBAUER BARRISTERS, PLC
4601 Weston Woods Way
St. Paul, MN 55127
ccramer@yjblaw.com
651-288-9500

ON BEHALF OF THE DEFENDANTS:
BRIANA AL TAQATQA, ESQUIRE
DORSEY & WHITNEY LLP
50 South 6th Street, Suite 1500
Minneapolis, MN 55402
altaqatqa.briana@dorsey.com
612-340-2600

Also present: Noah Garcia, BNSF Railway

---

3

I N D E X

| Examination: | PAGE: |
|---|---|
| By Mr. Cramer | 4 |

Marked Deposition Exhibits:
60 STIP (McKelvey)           22
   Bates CP 6292
61 STIP (Jared)             27
   Bates CP 6291
62 '21 Performance Mgmt Form  29
   (Ross) Bates CP 3816-3822
63 Business Ethics Rptg Policy38
   Bates CP 6294-6299
64 Policy 1300              44
   Bates CP 6319-6328

Reporter's Certificate      51

(Original Deposition Transcript in the
possession of Cyle Cramer, Esquire).

*   *   *   *   *

---

4

P R O C E E D I N G S

MCKINSEY HANSON,

after having been first duly sworn,

deposes and says under oath as follows:

    MR. CRAMER:  We can go on the
record.  We can note our appearances.  On
behalf of Plaintiff John Sexton, I'm Attorney
Cyle Cramer.

    MS. AL TAQATQA:  I'm here today
on behalf of Defendant Dakota, Minnesota &
Eastern Railroad Corporation.  I am counsel
for Defendant, Briana Al Taqatqa, Dorsey &
Whitney.  Also present is inhouse counsel for
Defendant, Noah Garcia, and the witness
McKinsey Hanson.

E X A M I N A T I O N

BY MR. CRAMER:

Q  Can you please state your first and last name
and spell your last name?

A  McKinsey Hanson, H-A-N-S-O-N.

Q  Where are you located today?

A  I'm in St. Paul, Minnesota.

**9**

1   in February of 2021?
2   A   That's correct.
3   Q   And this replaced the prior policy, 5611?
4   A   Correct.
5   Q   Do you know about what year that replaced --
6       or the policy 3411 replaced 5611?
7   A   I don't, no.
8   Q   Under the Short-Term Incentive Plan, is it
9       guiding managers -- let me rephrase that.  So
10      according to this policy, on an annual basis
11      managers are responsible for guiding their
12      direct reports and setting objectives.  Correct?
13  A   That's correct.
14  Q   So what guidance do managers receive regarding
15      what objectives to set?
16  A   They have this policy to reference; but then
17      throughout the year when we start the
18      performance management process, they get
19      e-mails with additional information to
20      support them starting with beginning of the
21      year objective setting.  That comes from the
22      talent management group.
23  Q   We'll get into some of the metrics later, but
24      the specific metrics such as origin
25      performance, train performance, do individual

**10**

1       managers come up with those metrics or do
2       those come down from somewhere else to them?
3   A   They're typically set with the senior leader
4       and then it's cascaded down.  And then each
5       leader that oversees a subdivision would
6       modify for their specific territory.
7   Q   And managers are responsible for achieving
8       their annual performance objectives.  Correct?
9   A   That's correct.
10  Q   And managers conduct reviews with their
11      employees regarding their performance and
12      meeting those objectives.  Correct?
13  A   Yes.
14  Q   And performance measures are weighted.  Right?
15  A   Yes, they are.
16  Q   Who sets these weights?
17  A   That would be the individual that's
18      responsible for their own PMP that would set
19      the weights in support with their manager to
20      make sure they're aligned.
21  Q   Are there individual weights and corporate
22      weights or do they all -- are they consistent?
23      Does that make sense?
24          MS. AL TAQATQA:  Objection, form.
25  A   There are individual weights for each

**11**

1       objective that they set.  And then there are
2       corporate percentages as a guideline for
3       meeting a corporate threshold in order to
4       obtain payout.
5   Q   (By Mr. Cramer, continuing) And the
6       objectives are weighted according to their
7       relative importance.  Right?
8   A   Relative importance of the objective to the
9       individual.
10  Q   So it's CP's policy that objectives with a
11      higher weight are more important than those
12      with a lower weight?
13          MS. AL TAQATQA:  Objection, form.
14          THE WITNESS:  Can you repeat the
15      question?
16  Q   (By Mr. Cramer, continuing) Is it CP's policy
17      that objectives with a higher weight are more
18      important than those with a lower weight?
19          MS. AL TAQATQA:  Same objection.
20  A   I would say they're set towards the
21      individual's goals for that year.  So if it
22      has a higher weight, then that individual may
23      have a goal that they need to focus on a
24      little bit more than another one.
25  Q   And a PMP objective with a higher weight

**12**

1       affects a person's compensation more than an
2       objective with a lower weight.  Correct?
3   A   I would say that the goals are looked at on a
4       holistic view.  We don't typically get that
5       granular.
6   Q   So this policy 3411, Exhibit 41, this policy
7       would have applied to Kurtis McKelvey in
8       February of 2021.  Correct?
9   A   Correct.
10  Q   It would have applied to Marcus Johnson in
11      February of 2021?
12  A   Correct.
13  Q   And it applied to Dylan Smith in February of
14      2021?
15  A   Correct.
16  Q   It applied to Jason Ross in February of 2021?
17  A   Correct.
18  Q   Did it apply to Tracy Miller in February of
19      2021?
20  A   Yes, it did.
21  Q   Did it apply to Tom Jared in February of 2021?
22  A   Yes, it did.
23  Q   Is an individual's short-term incentive tied
24      directly to their individual objective?
25          MS. AL TAQATQA:  Objection, form.

13

1  A  **Yes, it is along with other factors of just**
2     **reviewing are there any market conditions**
3     **that would have affected our ability to**
4     **deliver or weather conditions as well.**
5  Q  (By Mr. Cramer, continuing) CP's business
6     objectives are driven by precision scheduled
7     railroading.  Correct?
8  A  **Partially, yes.**
9  Q  Can you repeat that?
10 A  **Partially, yes.**
11 Q  Let me rephrase.  CP's priority is delivery
12    of a customer's shipment from origin to
13    destination as quickly as possible.  Correct?
14 A  **I would say as quickly and safely as possible.**
15 Q  Have you seen any documentation that uses
16    that phrase I used 'delivery of a customer's
17    shipment from origin to destination as
18    quickly as possible'?
19 A  **I don't believe I have.**
20 Q  Does it include safety in that phrase?
21             MS. AL TAQATQA:  Objection,
22    misconstrues the witness' response to the
23    previous question.
24 A  **No, I haven't.**
25 Q  (By Mr. Cramer, continuing) It's the goal of

14

1     the Short-Term Incentive Plan to incentivize
2     employees.  Correct?
3  A  **Yes, it is.**
4  Q  Is it the goal of the metrics in the
5     Short-Term Incentive Plan to create a culture
6     supporting CP's mission?
7  A  **I would say that it's to support the**
8     **company's overall objectives.**
9  Q  The objective of the Short-Term Incentive
10    Plan is to tie a part of the employee's
11    compensation directly to CP's results.  Correct?
12 A  **That's correct.**
13 Q  The manager's overall rating has a direct
14    affect on a manager's base salary.  Correct?
15 A  **Base salary?  No.**
16 Q  Does a manager's overall rating have a direct
17    affect on the manager's short-term incentive
18    payment?
19 A  **Yes.**
20 Q  The policy's objective is to reward the
21    achievement of meeting objectives.  Correct?
22 A  **Yes.**
23 Q  Such as rewarding train speed?
24 A  **Train speed is one metric that could be used**
25    **to understand how we're optimizing our assets.**

15

1  Q  So is the policy objective to reward meeting
2     train speed objectives?
3  A  **Can you repeat that question?**
4  Q  Is the policy's objective to reward meeting
5     train speed objectives?
6  A  **It would depend on the person's position, but**
7     **it could be a component of their performance**
8     **review.**
9  Q  I'm going to bring up a specific individual's
10    PMP.  This was previously marked as Exhibit 23.
11    Is this like an accurate depiction, at least
12    in 2021, of an employee's Performance
13    Management Form?
14 A  **Yes, it is.**
15 Q  Under this first category of objectives, we
16    have some achieves, exceeds.  Do you see
17    those sections?
18 A  **Yes, I do.**
19 Q  To confirm, going back up to the top, we're
20    looking at Kurtis McKelvey's Performance
21    Management Form.  So for Mr. McKelvey, he's
22    incentivized to meet train performance
23    objectives.  Correct?
24 A  **That is correct.**
25 Q  And you can tell that by looking at what in

16

1     this PMP?
2  A  **The objectives, the actions and behaviors**
3     **towards meeting the objective.  And then he**
4     **weighed that and the performance would be**
5     **measured with the achieves and the exceeds**
6     **measures.**
7  Q  So it's CP's policy to reward Mr. McKelvey
8     for meeting or passing his train performance
9     objective.  Correct?
10 A  **Can you repeat that question?**
11 Q  It's CP's policy to reward Mr. McKelvey for
12    meeting or passing his train performance
13    objective?
14 A  **That would be one component of it.**
15 Q  What is the definition of train performance?
16 A  **If you could pull up the document where we**
17    **responded to the definition of train**
18    **performance, I'd like to see that.**
19 Q  I'm sorry.  Can you repeat that?  I didn't
20    quite catch it.
21 A  **If you can pull up the document where we**
22    **responded with the definitions of train**
23    **performance, I would like to review that.**
24 Q  Yeah, of course.  So I can represent from CP's

21

1  Q  So Mr. McKelvey is incentivized for having
2     cars in his yard for shorter periods of time
3     under the terminal dwell statistic?
4  A  **For part of his PMP, correct.**
5  Q  On Exhibit 23, according to this, is
6     Mr. McKelvey incentivized for controlling
7     costs?
8  A  **That is part of his PMP, yes.**
9  Q  What ways did his PMP include controlling
10    costs?
11 A  **The objective is fuel efficiency, terminal**
12    **costs, whiteboard session, heldaway, crew**
13    **utilization.**
14 Q  Does controlling costs include lowering the
15    cost of crew transportation?
16 A  **Yes, that would be part of it.**
17 Q  The controlling cost includes reducing the
18    number of re-crews.  Correct?
19 A  **It could be part of it.**
20 Q  According to his PMP, Mr. McKelvey is
21    incentivized to maximize the weights of
22    trains, the length of trains, and the speed
23    of trains.  Correct?
24 A  **That's correct.**
25 Q  And under the optimize assets where the

22

1     objectives include train weights, train
2     lengths, train speed, power utilization, and
3     bulk cycles, it states the weight as 20.
4     Correct?
5  A  **20 percent.**
6  Q  That was going to be my next question.  So
7     the 20 stands for a percentage?
8  A  **Yes, percentage.**
9  Q  And the operate safely weight percentage,
10    what is that?
11 A  **20.**
12           (Deposition Exhibit 60 marked for
13    identification).
14 Q  I'm going to bring up a new exhibit.  This is
15    Exhibit 60.  Looking at this, is there any
16    way to tell whose PMP this is?
17 A  **I don't see a name on it, no.**
18 Q  Are these available to each individual manager?
19 A  **I believe these are sent out to each manager**
20    **after they receive the payout.**
21 Q  I can represent to you that this is
22    Mr. McKelvey's short-term incentive total
23    award statement for 2022.  Is it accurate
24    that the total 2021 STIP award reflects his
25    metrics obtained in 2021?

23

1  A  **For the individual component, yes.**
2  Q  The top chunk of text here in the bold where
3     it includes percentages, operating ratio 35
4     percent, do you see where that is?
5  A  **I do.**
6  Q  Are those the corporate weights or individual
7     weights?
8  A  **It's the STIP corporate performance measures.**
9  Q  These are weighted.  Correct?
10 A  **Correct.**
11 Q  So according to this document, CP's corporate
12    performance measures or operating ratio,
13    operating income and trip plan compliance are
14    weighted as eight times more important than
15    train accident frequency.  Correct?
16           MS. AL TAQATQA:  Objection, form.
17 A  **If you're adding them together, then you're**
18    **at 80 percent.**
19 Q  (By Mr. Cramer, continuing) And we talked
20    earlier about weights and the significance of
21    weights.  So is it CP's policy that
22    objectives with a higher weight are more
23    important than those with a lower weight?
24 A  **I would say importance or time spent**
25    **focussing on that component.**

24

1  Q  So when adding the operating ratio, operating
2     income, trip plan compliance together, that's
3     eight times more important than train
4     accident frequency?
5           MS. AL TAQATQA:  Objection, form
6     and mischaracterizes the witness' testimony.
7           THE WITNESS:  Can you repeat the
8     question?
9  Q  (By Mr. Cramer, continuing) Combining
10    operating ratio, operating income, and trip
11    plan compliance, CP weighs those corporate
12    performance measures as eight times more
13    important than train accident frequency?
14           MS. AL TAQATQA:  Same objections.
15 A  **I don't know if I would say eight times more**
16    **important.  But in order to run an efficient**
17    **railroad, you have to have measures in place**
18    **in order to understand how we're servicing**
19    **our customers.**
20 Q  (By Mr. Cramer, continuing) Give me one
21    second.  Going back to Exhibit 41 -- the
22    Bates on the bottom right is 3236.  It
23    describes CP's policy as having the PMP
24    objectives are weighted according to the
25    relative importance.  Correct?

25

1  A  That is correct.
2  Q  Bringing up what was previously marked as
3     Exhibit 59, this is Tom Jared's 2021
4     Performance Management Form. Correct?
5  A  That is correct.
6  Q  It says he reports to Jason Ross. So are
7     Jason Ross' metrics impacted by Mr. Jared's
8     metrics?
9  A  Yes, they would be.
10 Q  Looking at train performance, CP rewards
11    Mr. Jared for having trains arrive within two
12    hours of the scheduled arrival time. Correct?
13       MS. AL TAQATQA: Objection, form.
14 A  That is one of the metrics on the form.
15 Q  (By Mr. Cramer, continuing) And for Mr. Jared
16    in February of 2021 -- I'm trying to phrase
17    this in a way that is clear. What was
18    included in Mr. Jared's territory in February
19    of 2021?
20 A  Geographically?
21 Q  Yes.
22 A  So US West would have been North Dakota,
23    parts of Minnesota from Thief River Falls
24    down through Glenwood, to Mason City, Iowa
25    going through Iowa to Marquette, Dubuque,

26

1     Davenport, Ottumwa, and then ending at Kansas
2     City, the Joint Agency.
3  Q  And his metrics are impacted by trains in
4     that geographic region. Correct?
5  A  That's correct.
6  Q  So that would have included in February of
7     2021 Marquette?
8  A  Correct.
9  Q  It would have included Nahant?
10 A  Correct.
11 Q  Are controlling costs -- Mr. Jared is incentivized
12    and rewarded to control costs. Correct?
13       MS. AL TAQATQA: Objection, form.
14 A  Controlling costs is one of our foundations.
15    So he does have objectives and metrics
16    assigned to that, yes.
17 Q  (By Mr. Cramer, continuing) Such as lowering
18    the cost of crew transportation?
19 A  That is correct. I wouldn't say lowering
20    cost. I'd say controlling cost.
21 Q  What is the distinction with that to you?
22 A  Controlling cost you could be assigning
23    longer term agreements where it may have a
24    higher cost in one year but over three years
25    it could be lesser, or it could be utilizing

27

1     our managers to transport crews versus a
2     service. So reallocating the cost.
3        MR. CRAMER: I'm probably a
4     little bit more than halfway through already,
5     and we're about an hour in. Do you want to
6     take a 10 minute break?
7        MS. AL TAQATQA: Sounds good.
8        MR. CRAMER: Be back at around
9     11:05?
10       MS. AL TAQATQA: Sounds good.
11       (Brief recess).
12       THE WITNESS: I would like to
13    clarify. I reviewed an e-mail and policy
14    5611 was retired February of 2017.
15       (Deposition Exhibit 61 marked for
16    identification).
17 Q  (By Mr. Cramer, continuing) I'll bring up a
18    new exhibit. It is marked Exhibit 61. I can
19    represent to you that this was Tom Jared's
20    short-term incentive award statement
21    reflecting his bonus for his 2021 metrics.
22    And according to this, Mr. Jared received a
23    $107,284 bonus for meeting or exceeding his
24    objectives in 2021. Is that correct?
25 A  That is correct.

28

1  Q  That's in addition to his salary. Correct?
2  A  That's correct, base salary.
3  Q  Does an overall rating change a manager's
4     bonus?
5        MS. AL TAQATQA: Objection, form.
6  A  What do you mean by overall rating?
7  Q  (By Mr. Cramer, continuing) Well, looking at
8     this we have under the STIP History, Target x
9     Weighting, so this 40 percent, 40 percent, 40
10    percent, and 60 percent, the results 125
11    percent and 120 percent, can you explain to
12    me what each of those means and where they
13    come from?
14 A  So starting with the salary, that's his base
15    salary. The target and weighting is what the
16    target measure is for corporate versus
17    individual. So corporately 60 percent of his
18    Short-Term Incentive Plan is based off of
19    corporate performance. 40 percent is based
20    off of his individual performance. The
21    corporate performance factor ended up being
22    125 percent for 2021. His individual
23    performance factor was 120 percent which
24    means that he received an achieves rating
25    and that he participated in the plan for the

29

1    entire year.
2  Q  Then what are the other ratings in addition
3    to achieves?
4  A  **If you could refer to the STIP policy**
5    **document. There's unsatisfactory, partially**
6    **achieves, achieves, exceeds, and outstanding.**
7  Q  Did Jason Ross have a PMP in 2021?
8  A  **Yes, he did.**
9  Q  What were Jason Ross' metrics in 2021?
10 A  **You'd have to pull up the document.**
11 Q  I don't believe I have his 2021 PMPs.
12        MS. AL TAQATQA: Is that a
13    question for me, Kyle?
14        MR. CRAMER: No, unless you think
15    I'm mistaken.
16        MS. AL TAQATQA: I think you
17    might be, but I want to make sure we're
18    talking about the same thing. Should we go
19    off the record?
20        MR. CRAMER: Yeah, we can do that.
21        (Discussion off the record).
22        (Deposition Exhibit 62 marked for
23    identification).
24        MR. CRAMER: I'm going to bring
25    up Exhibit 62. We marked this as Exhibit 62,

30

1    Jason Ross' 2021 Performance Management Form.
2        MS. AL TAQATQA: Is that a
3    question?
4        MR. CRAMER: No. I'm just
5    bringing it up.
6  Q  (By Mr. Cramer, continuing) The question is
7    looking at Mr. Ross' Performance Management
8    Form, can you tell on the provides service
9    foundation whether he met the objectives
10    under achieves and exceeds?
11 A  **Give me just a moment to review. (Witness**
12    **examining document). Looking at the actuals,**
13    **I don't see where he calls out the specific**
14    **train performance metric. So it's unclear.**
15    **For origin performance he has his target at**
16    **98 percent and origin performance is 93**
17    **percent plus or minus two hours. So I would**
18    **say he did not meet that metric.**
19        **Terminal dwell hours, he**
20    **achieves measures 9-1/2 hours. In his**
21    **actuals he lists 10.8 hours. If you go to**
22    **exceeds, it looks like they would prefer the**
23    **target to go down not up. So I would say he**
24    **did not meet terminal dwell hours.**
25        **GTM's, achieves measure 191 and**

31

1    exceeds 193. And the actuals he lists GTM's
2    **slightly down, based on a roller cluster**
3    **year, 173.6 GTM's per year. So he did not**
4    **meet the achieves measure but does list that**
5    **it's 9.3 percent better from target but**
6    **higher than previous years.**
7        **Trip plans, achieves measures 97**
8    **percent. Exceeds measures 98 percent.**
9    **Actuals was 96.1, so did not meet the measure**
10    **there. But then states exceeding in the area**
11    **of locomotive productivity, daily average of**
12    **213 GTM's over OHP on a target of 216.**
13 Q  Based on his Performance Management Form, did
14    Mr. Ross receive a short-term incentive
15    payment in 2021?
16        MS. AL TAQATQA: Objection, foundation.
17 A  **Do you have the form available to review?**
18 Q  No, I do not.
19 A  **I'm not aware.**
20 Q  Do you know what Mr. Ross' short-term
21    incentive payment in 2021 was?
22 A  **No, I don't.**
23 Q  Does CP audit its Short-Term Incentive Plan?
24        MS. AL TAQATQA: Objection, form.
25 A  **What do you mean by audit?**

32

1  Q  (By Mr. Cramer, continuing) Does CP conduct
2    any type of review of whether the plan is
3    meeting its objectives?
4        MS. AL TAQATQA: Objection, form.
5        THE WITNESS: Can I review the
6    short-term incentive policy quick?
7        MR. CRAMER: Sure.
8  A  **(Witness examining document). I am not aware**
9    **of the way that they audited but our total**
10    **management -- talent management team, total**
11    **comp team, would review the plan on an annual**
12    **basis and adjust the policy as needed.**
13 Q  Does CP have any policies, programs, or
14    guidelines for any instances where managers
15    might be padding their metrics?
16        MS. AL TAQATQA: Objection, form.
17        THE WITNESS: Restate the question.
18 Q  (By Mr. Cramer, continuing) Well, I will try
19    to give an example. So from my understanding
20    of terminal dwell, a manager could impact
21    their terminal dwell statistics by moving
22    cars off of their terminal let's say into a
23    customer's rail. Is that a possibility?
24 A  **I'm not aware of how that would impact**
25    **terminal dwell.**

# EXHIBIT R



**Policy 3411**
Short Term Incentive Plan

### Short Term Incentive Plan (STIP)
Non-Unionized Employees (Canada) and US Salaried Employees
Issuing Department: Human Resources

| **Policy Statement** | Canadian Pacific offers a Short Term Incentive Plan (the "Plan"), to recognize the contribution that each regular, non-unionized and US salaried employee makes to the Railway's achievement of its business objectives. |
|---|---|
| **Accountability** | The Management Resources and Compensation Committee of the Board of Directors of Canadian Pacific Railway (the "Committee") has complete authority to interpret and define individual and group eligibility and to establish rules and regulations required to properly administer the Plan. The Board may also suspend, amend or terminate this Plan at any time.<br><br>On an annual basis, managers are responsible for guiding their employees in the objective setting process. Managers must conduct regular progress reviews throughout the year, evaluate performance against objectives at year end and report results to Human Resources.<br><br>Employees are responsible for setting and striving to achieve their annual performance objectives and for soliciting performance feedback from their managers.<br><br>Human Resources is responsible for interpreting this policy, guiding its administration and supporting employees and managers applying the policy. |
| **Process and Application** | |
| Plan Year | The Plan Year runs from January 1 to December 31. |
| Eligibility | Regular employees who participate in the Company's non-unionized compensation program are eligible to participate in the Plan provided they join the Plan prior to October 1st in their first year of participation.<br><br>Employees must complete three (3) months (65 working days) of cumulative active service in the Plan year in order to be eligible for a STIP payout. |
| Transfers and Joint Ventures | Employees transferred or seconded to employers participating in a joint venture with CP may be designated as participants in the Plan by the Company. |
| Temporary Replacements | Unionized employees who temporarily assume a non- |

Employee Policy Manual                                    Effective with the 2021 Plan Year

[APG]

Confidential                                                                                    CP_03231



Johnson
Ex. 41



| | unionized position will be eligible for STIP, provided the temporary assignment commences prior to October 1st of the Plan year and has a minimum continuous duration of three (3) months (65 working days) in the Plan year. |
|---|---|
| Plan Objectives | The objectives of the Plan are:<br><br>• to tie a part of the employee's compensation directly to CP's results;<br>• to reward the achievement of individual and team objectives that support CP's achievement of its annual business plans and long-term strategy; and<br>• to maintain the competitiveness of CP's compensation program. |
| Ending Participation | Participation in the Plan ends when the employee reverts to a unionized position at the Company's request, retires or terminates their employment with CP.<br><br>Employees who revert to a unionized position at their own initiative prior to payout will not be eligible for a STIP award. |
| Target Award Levels | For each Plan Year the Committee establishes the various classes of participants, the weighting of each performance measure assigned to each class and the Target Award Levels. Employee level determines their Target Award Levels. Target Award Levels are expressed as a percentage of annual salary and are the basis for calculating STIP awards. |
| Weighting of Corporate Individual Components | Individual STIP awards are based on two components, individual and corporate. STIP award payouts are based on an employee's group and weighting category at year-end.<br><br>The following table outlines the weighting for corporate and individual performance for the various management levels in the organization:<br><br><table><tr><td>**LEVEL**</td><td>**CORPORATE**</td><td>**INDIVIDUAL**</td></tr><tr><td>Level A to F</td><td>75%</td><td>25%</td></tr><tr><td>Level 1</td><td>60%</td><td>40%</td></tr><tr><td>Level 2 to 6</td><td>50%</td><td>50%</td></tr></table> |
| Assessing PMP Objectives | The individual component of STIP awards is tied directly to the individual's PMP objectives established under the Performance Management Program (PMP). A PMP rating (from Unsatisfactory to Outstanding) will be assigned to each of the individual's PMP objectives. |

Confidential

**Policy 3411**
Short Term Incentive Plan

| | The performance ratings are determined on the basis of three dimensions: <br><br> 1.  achievement of objectives against the standards and measures established for each objective; <br> 2.  context of performance throughout the year; and <br> 3.  peer clustering of employees into a distribution profile established by the Company. <br><br> The context of performance dimension considers the "how" of the achievement and adds a necessary judgmental component to the assessment process.  The demonstration of company values must be considered. <br><br> Taking the three dimensions into account, through the calibration process, an overall PMP rating and an overall STIP attainment level, based on the scales below, are determined for the employee's individual performance component. |
|---|---|

| Overall PMP Rating | Overall STIP Attainment Level |
|---|---|
| Outstanding | 170% - 200% |
| Exceeds | 125% - 165% |
| Achieved | 90% - 120% |
| Partially Achieved | 0% - 85% |
| Unsatisfactory | 0% |

| Potential Corporate Payout Levels | Annually, the Committee establishes the performance criteria, the weighting assigned to each performance criterion and corporate performance target levels for the STIP Program. <br><br> Each corporate performance criterion will have three levels of performance and payout. <br><br> a)  Exceptional Level - 200% of Target Award Level assigned to the corporate component where the actual CP performance meets or exceeds the exceptional level established by the Committee; <br><br> b)  Target Level - 100% of Target Award Level assigned to the corporate component where the actual CP performance meets the target level established by the Committee; |
|---|---|

Confidential                                                                                                        CP_03233



|  |  |
|---|---|
|  | c) <u>Threshold Level</u> - 50% of Target Award Level assigned to the corporate component when the actual CP performance level for the Plan Year is at the threshold level established by the Committee; and<br><br>Where the actual CP performance falls between the threshold and exceptional levels, the payout level will be prorated.<br><br>Where the actual CP performance falls below the threshold level, no awards will be paid under the corporate component. |
| Corporate Hurdle | For each Plan Year, the Committee establishes a minimum level of corporate performance, below the threshold level, called the corporate hurdle. If the Company's performance falls below this hurdle, no awards will be paid under the individual or corporate components. |
| Individual Hurdle | If individual performance levels are unsatisfactory, no award will be paid to the individual under the corporate or individual components. |
| CP Net Loss | The Committee has the discretion to adjust the amount of awards so that payment of awards under the Plan does not result in a net loss for CP. No awards will be paid if CP has a net loss for the Plan Year. |
| Calculation of Awards | Awards are calculated by performing the following calculation:<br><br>Target Award Level multiplied by the weighting for the individual component, multiplied by the annual salary in effect at the end of the Plan Year, multiplied by the STIP attainment level<br><br>**added to**<br><br>the Target Award Level, multiplied by the weighting for the corporate component, multiplied by the annual salary in effect at the end of the Plan Year, multiplied by the weighting of the performance measure, multiplied by the payout level. This calculation is repeated for each of the Company's performance measures.<br><br>For sample STIP calculations, see Appendix 1. |
| Payment of Awards | Awards to be paid out in any Plan Year, will be paid as soon as possible after CP financial results are determined, the Committee has approved a payout, and the participants' performance has been assessed under PMP. |
| Joining Plan Before October 1st | New entrants prior to October 1 of the plan year will have their award for that year prorated based on the length of time they have been a member of the Plan. |

Effective with the 2021 Plan Year

[APG]

Confidential



**Policy 3411**
Short Term Incentive Plan

| | |
|---|---|
| Leaving the Plan Before April 1st | Employees who cease participation in the Plan prior to April 1 of the Plan Year will not be eligible for any STIP Award for the Plan Year. |
| | |
| Leaves of Absence | Leaves of absence (LOA) are those periods when an employee is not actively at work i.e. short or long term disability, personal, maternity, parental, educational leaves. Participants who take a leave of absence greater than 30 consecutive days (22 working days) during the year will have their award prorated based on the length of time in active service during the year.<br><br>Potential STIP Awards will be held for participants who take a   personal (non-medical or educational) leave of absence. Eligibility for STIP will be determined at the end of the LOA. If the participant decides not to return it will be considered a voluntary resignation and the participant will not be eligible for a STIP Award. The payment of any STIP Award will only occur when the participant returns from the LOA. |
| | |
| Transfers | Participants transferring on or after April 1st of the Plan Year to a position to which this plan does not apply will have their award prorated based on the length of time in the eligible position. |
| | |
| Termination without Cause | Participants whose employment is terminated by the Company without cause on or after April 1st of the Plan Year will continue to participate in the Plan until their last day actively at work.  If all program conditions are met, (i.e. Company performance and individual performance warrants a payout), they will receive a prorated award based on the length of time they participated in the plan during the year. |
| | |
| Retirements | Employees that retire on or after April 1 of the plan year without a severance payment are eligible for a prorated STIP award provided:<br><br>• he/she provided Retirement Notice in accordance with Retirement Policy 8101; and<br>• retirees are between 55 and less than 60 years of age with a minimum of 5 years of company service from the last date of hire or if retiring at age 60 or greater, must have a minimum of 2 years of company service from their last date of hire. |
| | |
| Termination for Cause | Employees who are terminated for cause during the year will not receive an award for the year in which their employment ended. They will also |

Employee Policy Manual

[APG]

Effective with the 2021 Plan Year



**Policy 3411**
Short Term Incentive Plan

|  | not be eligible to receive any award not yet paid at the time of their termination for cause. |
|---|---|
|  |  |
| Resignation | Employees who resign prior to the STIP payout date will not be eligible for an award for the previous or current plan year. |
|  |  |
| Death | Employees who are deceased after April 1st of the Plan Year, if all program conditions are met, a prorated award based on the length of their membership in the Plan during the year will be paid to the employee's estate. |
| **Administration** | |
| Setting PMP Objectives | The STIP cycle begins with the establishment of PMP Objectives. In discussion with their manager and/or team leader, participants are responsible for the development of their PMP objectives and assigning weightings. |
|  |  |
| Assigning Weights | PMP objectives are weighted according to their relative importance. The total value of all PMP objectives must equal 100%. |
|  |  |
| Reporting Results | By the end of January, annually, managers should have STIP attainment levels reported to Human Resources for the previous Plan Year. |
|  |  |
| **Additional Information** | For additional information, please contact your HR Business Partner or Employee Services by e-mail at Employee_Services@cpr.ca, by phone in Calgary at (403) 319-3900 or toll free at 1 (866) 319-3900. |
|  |  |
| **Cross Reference** | Policy 5611 - Performance Management Program<br>Policy 8503 - Compensation & Benefits for Unionized Employees who Temporarily Assume Non-Unionized Positions<br>Policy 8101 - Retirement Policy |
|  | (U.S. only disclaimer: This policy statement represents the current policy and practice of CP regarding the Short Term Incentive Plan for non-unionized employees and may be changed from time to time by CP without notice. Nothing in this policy is intended to create any contract, agreement or other obligation by CP with any of its employees.) |

Employee Policy Manual

[APG]

Effective with the 2021 Plan Year

**Policy 3411**
Short Term Incentive Plan

## APPENDIX 1 - Sample STIP Calculations

| Level 5 with annual salary of $65,000, PMP rating of Achieves at 100% | | | | |
|---|---|---|---|---|
| Target Award Level | Individual Component | Annual Salary | PMP Rating % | Individual Component Award |
| 10% | 50% | $65,000 | 100% | $3250 |
| Added to | | | | |
| Target Award Level | Corporate Component | Annual Salary | Corporate Component % | Corporate Component Award |
| 10% | 50% | $65,000 | 100% (at target) | $3,250 |
| STIP Award total | | | | $6,500 |

| Level 4 with annual salary of $85,000, PMP rating of Exceeds at 125% | | | | |
|---|---|---|---|---|
| Target Award Level | Individual Component | Annual Salary | PMP Rating % | Individual Component Award |
| 15% | 50% | $85,000 | 125% | $7,969 |
| Added to | | | | |
| Target Award Level | Corporate Component | Annual Salary | Corporate Component % | Corporate Component Award |
| 15% | 50% | $85,000 | 50% (Threshold) | $3,188 |
| STIP Award total | | | | $11,157 |

| Level 3 with annual salary of $105,000, PMP rating of Achieves at 110% | | | | |
|---|---|---|---|---|
| Target Award Level | Individual Component | Annual Salary | PMP Rating % | Individual Component Award |
| 17.5% | 50% | $105,000 | 110% | $10,106 |
| Added to | | | | |
| Target Award Level | Corporate Component | Annual Salary | Corporate Component % | Corporate Component Award |
| 17.5% | 50% | $105,000 | 0% (Below Threshold) | $0 |
| STIP Award total | | | | $10,106 |

Employee Policy Manual

[APG]

Effective with the 2021 Plan Year

Confidential

# EXHIBIT S



HOTEL
BLACKHAWK

AUTOGRAPH COLLECTION®
HOTELS

**Tom Jared**
**123 main st**
**san antonio TX 78229**
**United States**

| | |
|---|---|
| Room No. | : 0704 |
| Arrival | : 01-31-21 |
| Departure | : 02-03-21 |
| Folio No. | : 136899 |
| Conf. No. | : 5510955 |
| Cashier No. | : 40 |
| Custom Ref. | : |

Company Name:
Group Name:

| Date | Description | Charges | Credits |
|---|---|---|---|
| 01-31-21 | Room Charge | 129.00 | |
| 01-31-21 | Room Sales Tax 7% | 9.03 | |
| 01-31-21 | Occupancy Tax 5% | 6.45 | |
| 02-01-21 | Room Charge | 139.00 | |
| 02-01-21 | Room Sales Tax 7% | 9.73 | |
| 02-01-21 | Occupancy Tax 5% | 6.95 | |
| 02-02-21 | Room Service | 40.29 | |
| | Room# 0704 : CHECK# 0035849 | | |
| 02-02-21 | Room Charge | 139.00 | |
| 02-02-21 | Room Sales Tax 7% | 9.73 | |
| 02-02-21 | Occupancy Tax 5% | 6.95 | |
| 02-03-21 | Master Card | | 496.13 |

| | | |
|---|---|---|
| **Total Charges** | 496.13 | |
| **Total Credits** | | 496.13 |
| **Balance** | | **0.00** |

Guest Signature: _____

| | | | |
|---|---|---|---|
| **Merchant ID** | | **Credit Card #** | XXXXXXXXXXXX0396 |
| | | | |
| **Transaction ID** | 5521953 | **Credit Card Expiry** | XX/XX |
| **Approval Code** | 089485 | **Capture Method** | Manual |
| **Approval Amount** | 496.13 | **Transaction Amount** | 496.13 |



EXHIBIT
51

Page No. 1 of 1