**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF IOWA**
**EASTERN DIVISION**

| | |
|---|---|
| John Sexton,<br><br>     Plaintiff,<br><br>v.<br><br>Dakota, Minnesota & Eastern Railroad Corporation d/b/a Canadian Pacific, a Delaware Corporation,<br><br>     Defendants. | No. 3:23-cv-00031-RGE-HCA<br><br><br><br>**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGEMENT** |

# TABLE OF CONTENTS

INTRODUCTION............................................................................3
EVIDENCE RELIED ON ...............................................................3
ARGUMENT AND AUTHORITY .................................................3
   I.    Legal Standard………………………………………………3
       a.  *Summary Judgment*………………………………………3
       b.  *FRSA Burden-Shifting Framework*…………………………4
  II.    No genuine issue of material fact exists as
        to the question of liability, and Sexton is
        therefore entitled to an entry of judgment
        as a matter of law on liability under the FRSA………………...5
       a.  *Sexton engaged in protected activity*…………………………5
           i.  *Refusal to Operate Train without Cutting*
              *Tracks and Reporting Snow*…………………………...5
          ii.  *Sexton Reports Unsafe Conditions and*
              *McKelvey's Unsafe Instructions*………………….…7
         iii.  *Sexton Reports Jared's Unsafe Test*…………………....8
       b.  *The rail carrier had knowledge of Sexton's*
         *protected activities*……………………………………9
       c.  *CP took adverse personnel action against Sexton*………..…10
           i.  *20-day Unpaid Suspension Constitutes as*
              *a Matter of Law is an Adverse Personnel Action*………11
         ii.  *Jared's Efficiency Test and CP's Disciplinary*

*Hearing are Adverse Personnel Actions*..................**11**
    d.  ***Sexton's protected activity contributed to CP's
    adverse employment actions***.............................**12**
       i.  *Temporal Proximity*..............................**13**
      ii.  *Indications of Pretext and Falsity of
         Employer's Explanation*.....................**13**
     iii.  *Inconsistent Application of Policies*................**19**
     iv.  *Antagonism, Hostility, and Change
         in CP's Attitude Towards Sexton
         After Protected Activity*.......................**20**
III.  **No genuine issue of material fact exists as to
the question of CP's statutory affirmative
defense, and Sexton is therefore entitled to
an entry of judgment as a matter of law in his
favor on CP's statutory affirmative defense**....................**22**

## Table of Authorities

*Acosta v. Union Pacific Railroad Co.*, ARB No. 2018-0020, ALJ No. 2016-FRS-00082 (ARB Jan. 22, 2020)........................................................................................13
*Allen v. Admin. Rev. Bd.*, 514 F.3d 468, 476 n.3 (11th Cir. 2008)...........................4
*Ameristar Airways, Inc. v. Admin. Rev. Bd.*, 650 F.3d 562, 567 (5th Cir. 2011)....................4
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)...........................................3
*Araujo v. New Jersey Transit Rail Ops., Inc.*, 708 F.3d 152, 157-58 (3rd Cir. 2013)..........4, 5, 12
*Black's Law Dictionary*, 9th Edition.............................................................16
*Celotex Corp. v. Cartrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986)........................3
*DeFrancesco v. Union R.R. Co.*, ARB no. 10-114, ALJ No. 2009-FRS-00009, at 5 (ARB Feb. 29, 2012)..........................................................................................4
*Kahn v. U.S. Sec'y of Labor*, 64 F.3d 271, 278 (7th Cir. 1995)....................................13
*Marano v. Dep't of Justice*, 2 F.3d 1137, 1140 (Fed. Cir. 1993)(quoting 135 Cong. Rec. 5033 (1989)(Explanatory Statement on S. 20)...........................................................4, 12
*Murray v. UBS Securities, LLC*, 601 U.S. ___ at 11 slip op. (2023)...............................3
*Petronio v. Nat'l R.R. Pas. Corp.*, 2019 WL 4857579 (SDNY 2019)................................11
*Ray v. Union Pacific RR. Co.*, 971 F. Supp. 2d 869, 884 (S.D. Iowa 2013).........................4
*Rookaird v. BNSF Rly. Co.*, 908 F.3d 451, 456 (9th Cir. 2018).....................................6
*Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 255, n.8...............................3
*Thorstenson v. BNSF Ry. Co.*, ARB Case Nos. 2018-0059, 2018-0060 (November 25, 2019).....11
*U.S. v. Arango*, 670 F.3d 988, 992 (9th Cir. 2010)................................................3
*Watson v. Forth Worth Bank & Trust*, 487 U.S. 977, 986............................................3

## INTRODUCTION

Plaintiff John Sexton moves the Court for an order for partial summary judgment in his favor on the question of liability against Dakota, Minnesota & Eastern Railroad Corporation d/b/a Canadian Pacific (CP) under the whistleblower protections of the Federal Rail Safety Act ("FRSA"), codified at 49 U.S.C. § 20109, and on CP's statutory affirmative defense.

## EVIDENCE RELIED ON

Sexton relies on the contemporaneously filed Affidavit of Cyle A. Cramer in Support of Motion for Summary Judgment ("Cramer Dec."); the exhibits thereto; the pleadings and records in this Court's file; and the arguments and authorities contained herein.

## ARGUMENT & AUTHORITY

### I.    Legal Standard

#### a.  *Summary Judgment*

Summary judgment is appropriate when there is no genuine dispute as to material facts and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotext Corp. v. Cartrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986). A fact is material if it may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In order to survive a motion for summary judgment, the adverse party must present "affirmative evidence," which "is to be believed" and from which "all justifiable inferences are to be drawn in [its] favor." *Id.* at 255-57, 106 S. Ct. at 2513-14. But the existence of a mere scintilla of evidence in support of the non-moving party's position is not sufficient to survive a motion for summary judgment unless a reasonable jury, when viewing the evidence in the light most favorable to the non-moving party, could return a verdict in its favor. *U.S. v. Arango*, 670 F.3d 988, 992 (9th Cir. 2010).

### b. FRSA Burden-Shifting Framework

The Federal Railway Safety Act provides a mandatory burden-shifting framework for determining whether employer disciplinary action violates the statute: "The burden-shifting framework provides a means of getting at intent, and Congress here has decided that the plaintiff's burden on intent is simply to show that the protected activity was a 'contributing factor in the unfavorable personnel action.'" *Murray v. UBS Securities, LLC*, 601 U.S. ___ at 11 slip op. (2023) quoting 49 U.S.C. 42121(b)(2)(B)(i)[1]. Courts describe the burden-shifting framework as answering the "'elusive factual question" surrounding the intent of the employer's disciplinary action. *Murray* at 12, quoting *Watson v. Forth Worth Bank & Trust*, 487 U.S. 977, 986, quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 255, n.8. "The language of the FRSA is 'intended to overrule existing case law, which requires a whistleblower to prove that his protected conduct was a '*significant*,' '*motivating*,' '*substantial*,' or '*predominant*' factor in personnel action in order to overturn that action.'" *Marano v. Dep't of Justice*, 2 F.3d 1137, 1140 (Fed. Cir. 1993)(quoting 135 Cong. Rec. 5033 (1989)(Explanatory Statement on S. 20) emphasis added by Federal Circuit.

A plaintiff under this framework "is not required to make some further showing that his employer acted with 'retaliatory intent.'" *Id.* at 14. A plaintiff need only demonstrate by a preponderance of evidence that: (1) he engaged in protected activity, as defined by the statue; (2) that the railroad knew about the protected activity; (3) that he suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable personnel action. *Araujo v. New Jersey Transit Rail Ops., Inc.*, 708 F.3d 152, 157-58 (3rd Cir. 2013).

"A contributing factor is any factor, which alone or in combination with other factors tends

---

[1] "Any action brought under (d)(1) shall be governed by the legal burdens of proof set forth in section 42121(b)." 49 U.S.C. 20109(d)(3)(A)(i).

to affect in any way the outcome of the decisions." *Araujo v. New Jersey Transit Rail Operations, Inc.*, 708 F.3d 152, 158 (3rd Cir. 2013) quoting *Ameristar Airways, Inc. v. Admin. Rev. Bd.*, 650 F.3d 562, 567 (5th Cir. 2011); quoting *Allen v. Admin. Rev. Bd.*, 514 F.3d 468, 476 n.3 (11th Cir. 2008). "'The contributing factor element of a complaint may be established by direct evidence or indirectly by circumstantial evidence.'" *Ray v. Union Pacific RR. Co.*, 971 F. Supp. 2d 869, 884 (S.D. Iowa 2013) quoting *DeFrancesco v. Union R.R. Co.*, ARB no. 10-114, ALJ No. 2009-FRS-00009, at 5 (ARB Feb. 29, 2012). Circumstantial evidence may include:

> temporal proximity, indications of pretext, inconsistent application of an employer's policies, an employer's shifting explanations for its actions, antagonism or hostility toward a complainant's protected activity, the falsity of an employer's explanation for the adverse action taken, and a change in the employer's attitude toward a complainant after he or she engaged in protected activity.

*Id.*

After an FRSA plaintiff makes this showing, "the burden shifts to the employer to demonstrate by ***clear and convincing evidence*** that the employer would have taken the ***same unfavorable personnel action*** in the absence of that behavior." *Araujo* at 157 (quotations omitted) emphasis added. A railroad must affirmatively prove with clear and convincing evidence that it would have taken that same unfavorable action against the employee absent protected activity—an "honest belief" on the part of the railroad is insufficient to meet this burden.[2]

**II.    No genuine issue of material fact exists as to the question of liability, and Sexton is therefore entitled to an entry of judgment as a matter of law on liability under the FRSA.**

    ***a.  Sexton engaged in protected activity***

        *i.  Rufusal to Operate Train without Cutting Tracks and Reporting of Unsafe Conditions*

---

[2] "Instructing the jurors that they could find for [the railroad] by looking only at whether [the railroad] honestly believed that [the plaintiff] broke a rule risked denying [the plaintiff] a remedy to which he may be entitled under the statute, particularly because the evidence here appears to show relatively clearly that [the plaintiff violated the rule]." *Frost v. BNSF Rly. Co.*, 914 F.3d 1189, 1197 (9th Cir. 2019).

The FRSA includes protections for when an employee "refus[es] to work when confronted by a hazardous safety or security condition related to the performance of the employee's duties…." 49 U.S.C. § 20109(b)(1)(B). Under this provision:

> A refusal is protected under paragraph 1(B) and C if – (A) the refusal is made in good faith and no reasonable alternative to the refusal is available to the employee; (B) a reasonable individual in the circumstances then confronting the employee would conclude that—(i) the hazardous condition presents an imminent danger of death or serious injury; and (ii) the urgency of the situation does not allow sufficient time to eliminate the danger without such refusal; and (iii) the employee, where possible, has notified the railroad carrier of the existence of the hazardous condition and the intention not to perform further work, or not to authorize the use of the hazardous equipment, track, or structures, unless the condition is corrected immediately or the equipment, track, or structures are repaired properly or replaced.

49 U.S.C. § 20109(b)(2).

On February 1, 2021, John Sexton was the engineer and Justin DePover was the conductor for the train assignment 474-31. [SoFs 1 and 3]. At the start of their shift, Sexton conducted a job briefing with Mr. DePover where he stated, "before we start anything, we're going to cut the crossings." *Id.* 4-5. Cutting the track refers to a procedure for dislodging snow and ice buildup from the tracks and crossings. *Id.* 6. This procedure is done by separating the locomotive from the train cars and using only the locomotive to dislodge the snow and ice from the tracks. *Id.*

Trainmaster Kurtis McKelvey approached the crew and disagreed with Sexton regarding whether the tracks needed to be cut. *Id.* 14-15. It is undisputed that it was McKelvey's position that tracks did **<u>not</u>** need to be cut. *Id.* 16. It is undisputed that it was Sexton's position that the tracks **<u>did</u>** need to be cut. *Id.* 17. Sexton refused to operate his entire train out of the Marquette yard without cutting the tracks. *Id.* 23. Sexton then proceeded to cut the crossings. *Id.* 24. After cutting the crossings, Sexton departed Marquette with his full train at approximately 5:40 a.m.— four hours and ten minutes after the start of his shift. *Id.* 34. The cutting of the crossings contributed to one of the longest over-standard work events of McKelvey's career. *Id.* 45. The work event took

three times longer than it was supposed to. *Id.* 44.

The Ninth Circuit has held that "conduct of the employer can amount to an implicit order, and an employee can refuse to follow that implicit order just as much as an explicit one." *Rookaird v. BNSF Rly. Co.*, 908 F.3d 451, 456 (9th Cir. 2018). Even in the light most favorable to the non-moving party, the undisputed evidence of this disagreement amounts to an implicit order from McKelvey because Sexton simply could have changed his position, agreed with McKelvey, and not cut the tracks. Instead, Sexton disagreed about the unsafe condition of the tracks, insisted on, and did, cut the tracks in conflict with McKelvey's disagreement.

As a matter of law, Sexton's refusal to operate his train without cutting the tracks was made in good faith because it is undisputed it had been snowing [SoFs 8], it is undisputed that snow and ice buildup on tracks can cause a derailment (*Id.* 9), it is undisputed that a derailment is a safety hazard (*Id.* 12), it is undisputed that cutting the tracks clears the tracks of snow and ice build-up (*Id.* 9), and testimony from CP management indicates that if an engineer feels there is a safety issue with snow and ice buildup on tracks the engineer should cut the tracks. *Id.*13.

There was no reasonable alternative to the refusal available—Sexton was concerned that if the tracks were not cut, eliminating the danger, there was imminent danger of a derailment. *Id.* 9. and 18. If there is any doubt in Sexton's mind, he must cut the crossings. *Id.* 19. Sexton informed McKelvey about the condition and that he did not intend to perform further work until he had corrected the condition by cutting the tracks. *Id.* 23. When these facts are considered, even when viewed in the light most favorable to the railroad, there is no genuine dispute of material fact that Sexton is entitled to summary judgment as a matter of law that he conducted a protected activity pursuant to 49 U.S.C. 20109(b)(1)(B).

*ii. Sexton Reports Unsafe Conditions and McKelvey's Unsafe Instructions*

The FRSA protects employees who "report, in good faith, a hazardous safety or security condition." 49 U.S.C. 20109(b)(1)(A). Sexton reported to Mr. McKelvey the unsafe condition and that there had been two previous derailments. [SoFs 18]. Also, Sexton reported in an email to Vice President Tracy Miller several safety concerns, including that "the tracks and crossings were snow covered", that he "informed ATM McElvey (sic.) that the crossing and tracks needed cut with the locomotive before our set out", that McKelvey told him that he will "NOT cut the crossing and tracks…", that he "cut the tracks and crossings as needed", and reported the "possible loss of life if I didn't insist on cutting the tracks and crossing with 2 loads of AMMONIA." *Id.* 87. For the same reason's Sexton's report to Mr. McKelvey, Sexton's email to Mr. Miller constitutes a report of a hazardous safety or security condition pursuant to 49 U.S.C. 20109(b)(1)(A).

*iii. Sexton Reports Jared's Unsafe Test*

For context, at the end of the very same shift, General Manager Tom Jared sought out Sexton's train with the intent to conduct a test on Sexton, which would subject Sexton to discipline. [SoFs 62-63]. Jared knew about the delay caused by Sexton. *Id.* 48, 50-51, 53. Upon arrival at CP's Nahant Yard, it was Mr. Sexton's task to move cars onto a siding track. *Id.* 60. Under CP guidelines, a manager may test an employee who is moving a train while receiving radio communications guiding that movement, by observation only ("conditions are to be observed"), to determine rule compliance during that train movement. *Id.* 184. The CP guideline refers to the train movement as "shoving". *Id.* Instead of observing the train movement, Jared approached DePover, who was on the ground providing direction and distance instructions to Sexton over the radio and instructed him to stop communicating with Sexton. *Id.* 83 and 99. Then a disciplinary investigation against Sexton was scheduled where Jared claimed that Sexton did not stop his train quick enough after losing communication with DePover. *Id.* 86, and 100-101.

During CP's disciplinary investigation against Sexton, Sexton stated, "Jared is the one who violated - - the shoving movement because he engaged in a conversation with DePover while the cars were moving into a track. That is a - - that - - he created an unsafe act." *Id.* 135. It is undisputed that Jared walked up to DePover when DePover was supposed to be protecting the shoving movement. *Id.* 76-82, and 99. Federal law and CP rules require giving signals or instructions to control the movement, for the employee to not be engaged in any other task and giving instructions to control the movement. *Id.* 76-82, 121, and 123. It is undisputed Jared instructed DePover to stop providing distance and direction instructions. *Id.* 83. It is undisputed that a conductor directing a shove is a safety sensitive task and the conductor should avoid all distraction because a distraction can cause an unsafe condition. *Id.* 76-82. DePover agreed that he was distracted by Jared. *Id.* 115. The foregoing undisputed facts establish as a matter of law that Sexton reported in good faith, a hazardous safety or security condition pursuant to 49 U.S.C. 20109(b)(1)(A) when he reported that Jared created an unsafe conduct.

### b.   *The rail carrier had knowledge of Sexton's protected activities*

It is undisputed that McKelvey and Sexton had a disagreement about whether the tracks should be cut, with Sexton taking the position that the tracks needed to be cut and he would not operate the full train without the tracks being cut. [SoFs 14-24]. Further, it is undisputed that McKelvey knew that Sexton did in fact cut the tracks. *Id.* 48, 50. Even in the light most favorable to the railroad, McKelvey had direct knowledge of Sexton's refusal and safety report. Jared had direct knowledge of Sexton's delay and cutting of the tracks and Jared was aware that Sexton and McKelvey disagreed about whether the tracks should be cut. *Id.* 48, 50, and 54. Jared and McKelvey had a phone call in the immediate aftermath of Sexton's delay where McKelvey explained to Jared it took Sexton three times longer to do the job than planned.  *Id.* 44.

It is undisputed that Sexton informed Miller that "the tracks and crossings were snow covered". *Id.* 87. The email included Sexton reporting: "I informed ATM McElvey that the crossing and tracks needed cut with the locomotive before our set out. He told me that I would NOT cut the crossing and tracks…." "I cut the tracks and crossings as needed." "What would have been the environmental impact as well as the possible loss of life if I didn't insist on cutting the tracks and crossings with 2 loads of AMMONIA." *Id.* Miller then forwarded the email to Vice President Jason Ross and Jared. *Id.* 89. Miller acknowledged in his email to Jared that "even if not true, we are creating a stage/platform for their feelings." *Id.* Miller's receipt, forwarding, and acknowledgement of Sexton's email demonstrates as a matter of law that Miller had knowledge of the protected activities described in the email. *Id.* Being a recipient of the email, Jared also had knowledge of the protected activities. Lastly, Ross received the email and acknowledged that he would look into it and get back to Sexton. *Id.* 91. There is no evidence in the record that Miller, Ross, and Jared did not read the email. Further, Ross testified that he had a phone call with McKelvey where McKelvey told him that he had instructed Sexton not to cut the tracks. *Id.* 25. Thus, in Ross's mind, McKelvey had instructed Sexton not to cut the tracks and Sexton refused that order. Trainmaster Marcus Johnson who was the investigating officer in CP's disciplinary hearing against Sexton, thus had direct knowledge of Sexton's reporting of Jared's unsafe test. *Id.* 98 Mr. Johnson also had knowledge of Sexton's cutting of the tracks and delay as he was included in McKelvey's emails. *Id.* 48, 50.

### c. CP took adverse personnel action against Sexton

It is undisputed that Jared set up a test against Sexton—the failure of which Jared used to subject Sexton to discipline. *See* Doc. 31, paras. 15 and 19, and SoFs 83, 99, and 143. It is undisputed that CP conducted a disciplinary investigation against Sexton. Doc. 31 at para. 18 and

SoFs 147. It is undisputed that in the disciplinary investigation, Jared stated several times that Sexton was in violation of CP rules. SoFs 101, 104-105. And it is undisputed that CP assessed a 20-day unpaid suspension, signed by Jared in his role as general manager. Doc. 31 at para. 19.

### *i. 20-day Unpaid Suspension Constitutes as a Matter of Law an Adverse Personnel Action*

On its face, a 20-day unpaid suspension is an adverse personnel action. The FRSA states "a railroad carrier may not discharge, demote, **_suspend_**, reprimand, or in any other way discriminate against in employee if such discrimination is due, in whole or in part, to the employee's [protected activity]…." 49 U.S.C. § 20109(a), emphasis added. "Suspend" is explicitly referenced in the FRSA, therefore, the Court should enter summary judgment in Sexton's favor as to the 20-day unpaid suspension being an adverse personnel action.

### *ii. Jared's Test and CP's Disciplinary Hearing are Adverse Personnel Actions*

As a matter of law, Jared's efficiency test, CP's disciplinary investigations, and Jared's statements that Sexton violated a railroad rule constitute adverse personnel action under the phrase "any other way to discriminate against an employee." 49 U.S.C. § 20109(a).

> In considering whether an action is adverse, the [Administrative Review] Board has referenced the United States Supreme Court's decision in *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006), a case decided under Title VII of the Civil Rights Act of 1964. In describing the injury or harm alleged as retaliation, the Court held that: 'a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.' *Id*. at 68 (internal quotations omitted).

*Thorstenson v. BNSF Ry. Co.*, ARB Case Nos. 2018-0059, 2018-0060 (November 25, 2019). Further, "We agree that any alleged adverse action must be considered in context, including internal investigations and hearing which may result in the imposition of discipline." *Id.* citing *Petronio v. Nat'l R.R. Pas. Corp.*, 2019 WL 4857579 (SDNY 2019).

It is undisputed that CP's discipline policy is meant to "change behavior." SoFs 178. It is undisputed that after discipline is assessed, if an employee feels that the discipline is unwarranted,

then they can follow their grievance process through the Collective Bargaining Agreement. *Id.* 163. The Collective Bargaining Agreement provides that as part of the appeal process, discipline disputes may be submitted to a public law board tribunal established by law or agreement. *Id.* 164-165. It is undisputed that the public law board determined that CP's discipline "process here was flawed to such an extent that it deprived Claimant of a fair and impartial hearing." *Id.* 168. CP policy states that "unwarranted adverse employment action" constitutes retaliation and is prohibited. *Id.* 177. Further, Sexton's testimony described "the embarrassment that all this is - - that it's caused against me and my family, my safety records and not knowing whether I'm going to have a job every day at the end of the day I go to work." *Id.* 222. During the investigation hearing itself, Sexton stated, "I'm sorry man" and "I can't take this." *Id.* 223. Sexton's union representative had to tell Sexton "It's okay" and "Relax". *Id.* 224. Later during the investigation, Sexton stated "I'm a little wound up here…" *Id.* 225.

Even in the light most favorable to the railroad, the imposition of such an unfair and flawed disciplinary process would dissuade any reasonable employee from engaging in protected conduct. Sexton's contemporaneous discomfort demonstrated in the investigation transcript in combination with Sexton's testimony establishes that a reasonable worker would be dissuaded from taking protected activity. The entire disciplinary process must be considered an adverse employment action as CP's policy itself described unjust discipline as retaliatory and contrary to CP's policy.

### d. *Sexton's protected activity contributed to CP's adverse employment action*

As addressed above, the contributing factor standard is a relatively low causation analysis. Caselaw makes it unambiguously clear that a plaintiff may meet this burden by demonstrating any factor that tends to affect the adverse personnel action. *See e.g. Araujo v. New Jersey Transit Rail Operations*, *Inc.*, 708 F.3d at 158 ("A contributing factor is any factor, which alone or in

combination with other factors tends to affect in any way the outcome of the decisions"). A plaintiff meets this burden with the existence of circumstantial evidence. *Marano* at 1140. Here, the record evidence provides abundant support to meet this burden.

     *i.   Temporal Proximity*

    Sexton's refusal to operate his entire train before cutting the tracks occurred at the start of his shift on February 1, 2021. SoFs 4-5, 14-24. At the end of that very shift, Jared conducted a questionable and unsafe test on Sexton. *Id.* 62-63, and 83. Three days later Sexton received a letter informing him that CP was going to have a disciplinary hearing against him. *Id.* 86. The disciplinary hearing occurred the next week where Jared insisted Sexton violated the rule. *Id.* 86, 100-101, 104-105. It was also in this disciplinary investigation that Sexton conducted another protected activity in reporting Jared's unsafe set up efficiency test. *Id.* 119, 135. By the end of the month, discipline was assessed against Sexton, with Jared staying on top of that process sending out an email that very morning stating, "He is supposed to start his suspension once he ties up on Monday." *Id.* 146-147. Additionally, Jared signed the discipline letter in his role as general manager. Doc. 31 at para. 19. This swift disciplinary action establishes as a matter of law that there is a temporal proximity between Sexton's protected activities and CP's adverse actions.

     *ii. Indications of Pretext and Falsity of an Employer's Explanation*

    For establishing pretext, "it is not enough for the plaintiff to show that a reason given for a job action is not just, or fair, or sensible . . . rather he must show that the explanation is a 'phony reason.'" *Acosta v. Union Pacific Railroad Co.*, ARB No. 2018-0020, ALJ No. 2016-FRS-00082 (ARB Jan. 22, 2020) citing *Kahn v. U.S. Sec'y of Labor*, 64 F.3d 271, 278 (7th Cir. 1995). Here, the undisputed evidence demonstrates that CP decided against Sexton at every turn and the decisions it made in its discipline are not consistent with management's positions on the rules.

These facts establish as a matter of law that circumstantial evidence of pretext exists.

For context, the dispute in Sexton's discipline was whether he stopped his train quick enough after losing communication with DePover. SoFs 86, 100-101. Trainmaster Johnson conducted an investigation hearing where Mr. Jared was brought as the only additional witness. *Id.* 94, 98. The rule Mr. Jared stated Sexton violated provides: "Movement must stop within half the distance specified ___*unless additional instructions*___ are received." *Id.* 103. In this case, "half the distance" refers to the number of train cars that have moved from a starting position. DePover stated in the investigation the starting instructions were that they only needed to move 25 cars onto the track, but the track was clear for 50 cars. *Id.* 111. Then, both Sexton and DePover stated in the investigation that the last instructions given were stop at 15, clear for 40. *Id.* 111-112. Contrary to Sexton's and DePover's statements, Jared stated that DePover gave a 50-car count, then after 12 cars had gone by, DePover gave only a 15-car count.[3] *Id* 108. Jared's stated conclusion was that Sexton violated the rule because he stopped after 11 cars had gone by, which is more than half of the 15-car count Jared insisted was the only instruction he heard. *Id.* 100. Although obvious, it need be pointed out that 11 cars is ___*less*___ than half of 40 cars, which both Sexton and DePover stated was part of the last instructions given. *Id.* 111-112.

Jared explained during the investigation that he heard the 50-car count when he was in his truck. *Id.* 69. Then he dismounted his truck and walked approximately 30-50 yards up to Mr. DePover, which is when Jared stated he heard the 15-car count. *Id.* 70-72. Again, during this time, Jared said that only 12 cars had gone by. *Id.* 108. Jared did not have a portable radio on him but understood that there was sufficient time for Sexton and DePover to communicate by the time he

---

[3] Notably, if there are 50 cars and only 12 had gone by, Jared's version of the events would mean that DePover was somehow off by 23 cars to only be at 15. With the shortest cars being 42 feet long, Mr. Jared's recounting of events in the investigation would mean that at a minimum, DePover was off by more than three football field-lengths of cars—something that can only be explained with Mr. Jared not hearing the clear for 40 instruction.

got up to DePover. *Id.* 73-74. DePover addressed in the investigation that it is his assumption that Jared did not hear the clear for 40 instruction because Jared did not have a radio on him. *Id.* 114. Johnson's answer to this is unsupported—in Johnson's recommendation that Sexton be disciplined, he argued that Jared could hear the full instruction: "the facts and the video show Jared was next to the conductor when the instructions were given." *Id.* 138-139. Yet, the video used in the investigation had no audio. *Id.* 140. Jared did not state in the investigation he could hear his radio from his truck, but did state his radio was loud. *Id*. 110. Nevertheless, Jared testified he could not hear his radio if he was not near his truck. *Id.* 75. Further, Johnson stated in his discipline recommendation that "No evidence showed that Jared attempted to set-up by use of a read board **<u>or other means</u>**." *Id.* 142 emphasis added. Nevertheless, Johnson testified that Jared set up the test. *Id.* 143. These explanations alone constituted shifting explanation by Johnson.

Despite Jared's statements in the disciplinary investigation that Sexton had violated the rules, he testified that the instruction "15 more to a stop, still clear for 40" means that "still clear for 40" is an additional instruction. *Id.* 189. The rule that Jared stated Sexton violated is clear that "Movement must stop within half the distance specified ***<u>unless additional instructions</u>*** are received." *Id.* 103 emphasis added. Thus, if CP had taken Sexton and DePover for their word— then the facts presented were that Sexton had received an additional instruction under the rule. Johnson's rebuttal is that Sexton was supposed to stop within the "what's most restrictive." *Id.* 192. When pressed on what the rule says, Johnson could not say what the rule says without it in front of him. *Id.* 191. With the rule in front of him, Johnson confirmed that the rule did not actually say anything about stopping within what's "most restrictive." *Id.* 193.

If "additional instructions are received," then the engineer has the right to rely on those instructions. *Id.* 190. Jared knew DePover, Sexton, and Cruciani had a job briefing beforehand. *Id.*

61, 64-67. Sexton communicated how the shoving movement was going to occur and that the track was clear—there is no evidence that Sexton, DePover, nor Cruciani were not in agreement on how the shoving movement was going to occur. *Id* 64-68, and 129. Sexton at the time had been an engineer for nearly 21 years and had passed all 19 shoving movement tests prior to this one in his career at CP. *Id.* 2, 186. Even in the light most favorable to the railroad, there is no denying the rule says, "unless additional instructions are given" and it is undisputed that a "15 more to a stop, still clear for 40" means that "still clear for 40" is an additional instruction. *Id.* 103, 189. Sexton's union representative also understood that Sexton did not violate the rule. 137. CP's explanations are nothing more than pretextual.

CP's policy requires all the witnesses be available—the only witness made available was Jared. *Id.* 170-175. Mr. Sexton's union representative requested witnesses be present, but Johnson testified that he did not think the witnesses were relevant. *Id.* 92, 95. There was a dispute during the investigation where Mr. Sexton stated exactly what Mr. Cox would say—instead of permitting Mr. Cox to provide a statement, Mr. Johnson's response was, "That's speculation and hearsay." *Id.* 128-131]. Mr. Johnson testified, "If the union is requesting them, that is their job to prove that he heard it, not my job to determine whether he did or not." *Id*. 132. Under CP policy it is the hearing officer that "has a responsibility to have witnesses present at the investigation who have firsthand knowledge of the incident." *Id.* 133.

This demonstrates pretext because if the investigation was not phony, then the witnesses should have been present. And it demonstrates inconsistent application of policies because it was Johnson's responsibility to obtain the availability of witnesses. This was nothing more than a kangaroo court to validate Jared's questionable and unsafe test.

As described by the Public Law Board, "The only realistic conclusion that can be reached

after an objective review of this record is that Jared levied charges regarding his own somewhat questionable test, provided the testimony to support them, and then signed off on a predetermined outcome." *Id.* 168. It is undisputed that CP removed Sexton's discipline and compensated Sexton for time lost because of the Public Law Board's decision. *Id.* 167. Even in the light most favorable to the railroad, CP places the determination of whether discipline was warranted in the hands of the Public Law Board, which in so many words found CP's reasoning phony.

Black's Law Dictionary defines "pretext" as "a false or weak reason or motive advanced to hide the actual or strong reason or motive." *Black's Law Dictionary*, 9th Edition. So, the question is, if CP's reasoning is phony, what is the actual reason? The answer: money.

It is undisputed that Kurtis McKelvey, Marcus Johnson, Dylan Smith, Tom Jared, Jason Ross, and Tracy Miller all are incentivized through CP's Short Term Incentive Plan. SoFs 194-199. The Plan states its objective is: "to tie a part of the employee's compensation directly to CP's results." *Id.* 196. This compensation is given in the form of sizable bonuses that are tied directly to objectives. *Id* 196. It is undisputed that there are individual weights assigned for each objective and that those weights establish the importance CP places on each objective. *Id.* 200-201. CP's policy is explicit: "PMP objectives are weighted according to their relative importance." *Id.* 201. It is undisputed that CP monetarily incentivized McKelvey, Johnson, Smith, Jared, Ross, and to weigh overall performance, train performance, origin performance, terminal dwell, GTMs, train weights, train lengths, and train speed as more important than operating safely. *Id.* 202. CP's corporate measures weighed operating ratio, operating income, and trip plan compliance as 8 times more important than train accident frequency. *Id.* 203.

And CP management adheres to the train performance and train speed first mentality: When a train goes over standard, management escalates the over standard event and conducts a drill-

down. *Id.* 208. McKelvey testified that he tries to get all the trains through his terminal within the

standard time. *Id.* 42-43, and 205. McKelvey testified that he tries to avoid all delays period. *Id*

206. McKelvey emphasized that there is no distinction between a three-hour delay and a one

minute delay—"a delay is a delay." *Id.* 207. McKelvey testified that he absolutely drills down on

trains that have even a one-minute delay. *Id.* 208. In fact, McKelvey did drill down on Mr. Sexton's

train. *Id.* 209. McKelvey testified that any type of deviation from the normal operating plan is a

concern to him. *Id.* 210. Jared testified that he tries to avoid delays. *Id.* 212. Ross's operating model

strives to avoid recrewing trains—"Nobody wants to recrew a train. It doesn't matter if you're old,

new NS, BNSF, CP, CN. It doesn't matter." *Id.* 216-220. Ross went in depth, testifying:

> The ***first thing*** you do in a business is you provide a service. If you're
> not providing a service, I don't care what business you're in, you're not going to
> deliver a product that people want. Therefore, you're not making money. ***So you
> have to provide a service. That's the most important thing you do.*** The ***second
> thing*** is you've got to control your costs because if you don't control your costs,
> you're going to go out of business. You can provide a service and be the best
> service in the world and you'll end up out of business. Right? You have to utilize
> your assets because if you're not utilizing your assets properly, you're just going
> to drive costs up. You're going to go out of business. You have to operate safely,
> and that's just a given. The expectation is you operate safely. You should operate
> safely no matter what you're doing. It's a given. Then the last foundation - - and
> it's not the last. It's actually the foundation that the other four are built on, is to
> develop you people."

*Id.* 221 emphasis added.

It is undisputed that CP policy and Ross places as the "first thing" service, and the "second

thing" controlling costs. *Id.* Mr. Ross emphasized these priorities are because of "making money."

*Id.* Ross also testified, "If you let cars sit, you're not going to generate revenue." *Id.* 214, 215. It

is undisputed that Sexton's train was delayed and part of the time his train was delayed included

the time it took for Sexton to cut the tracks, which requires multiple time-consuming steps that

take even longer in winter conditions. *Id.* 29-33, 35-36, 48, and 50. This delay made Sexton's train

the most delayed train for CP in the United States that day. *Id.* 213.

There is no dispute—CP places the determination of unwarranted discipline with the public

law board. The public law board overturned Sexton's discipline and CP followed through with that determination. When it comes to whether CP's decisions were retaliatory—pretext exists as a matter of law because of CP's phony disciplinary explanations and CP undisputed incentives to put speed and performance above safety.

### iii. Inconsistent Application of Policies

CP has provided no evidence that it has ever disciplined another employee for a shoving violation with a 20-day unpaid suspension. *Id.* 150. Every employee with no major discipline already on their record that CP has produced received lesser discipline than Sexton, including no discipline when the company found an employee in violation of the shoving rule. *Id.* 151-159.

 CP's position is that Mr. Ross made the final disciplinary decision. Doc. 31 at para. 19. Ross testified there is "no way in hell" he was "going to give somebody a 10 day deferred and 10 day served suspension for a major violation, so he got 20." *Id.* 160. Again though, there is no evidence produced that any other employee received a 20-day suspension for the same rule violation CP alleges Sexton broke—in fact, the record demonstrates that for all but one employee there was either less discipline or no discipline. *Id.* 151-159. Ross backed away from his "no way in hell" comment by testifying, "there are certain cases where the general chairman came to me after and asked to give the guy a break for whatever reason and I would entertain that." *Id.* 161. This also is circumstantial evidence of a shifting explanation.

There is no disputing that CP imposed a more severe discipline on Sexton than on any of his peers. Ross tried to further justify the inconsistent application in policies by testifying, "if they want to go to a hearing and they want to dispute all the facts - - that's fine. That's up to them and they can do that. But if the charges get proven, then they get full measure of discipline." *Id.* 162. However, Sexton used his investigation to challenge the facts and report Jared's unsafe actions—

thus Ross is admitting that because Sexton disputed Jared's unsafe test, he imposed the most severe discipline he could against Sexton.

Ross testified that he had a conversation with McKelvey where McKelvey told him that he instructed Sexton not to cut the tracks. *Id.* 25. Ross also testified that he told McKelvey, "we are going to follow the rule and cut the crossing." *Id.* 26. Ross testified "I'm not going to tolerate people cutting the rules and taking shortcuts. I won't tolerate it for one minute." *Id.* 27. Nevertheless, Ross did not discipline McKelvey for violating the rules and taking a shortcut. *Id.* 28. The only discipline assessed was against Sexton who had conducted several protected activities and made both McKelvey's and Jared's unsafe conduct known.

*iv. Antagonism, Hostility, and Change in CP's Attitude Towards Sexton*

Within the few hours after Sexton's refusal to operate his train without cutting the tracks, communications began occurring between management that demonstrated antagonism and hostility towards Sexton. *Id.* 37-42, 46-48, 50-53, and 55-59. First, McKelvey received a message from director Gary Prince asking for a write up on the 474 to the DL Senior and East Director. *Id.* 37. McKelvey requested in response the radio recording from when the 474 went on duty. *Id.* 38. After being informed "they are not constantly recorded," McKelvey responds, "then im not sure how to hold him accountable for delaying the train." *Id.* 39-40. Later that day McKelvey also wrote in several messages to another CP employee: "youre missing all the fun up here" "with sexton on a 474 putting on a show here. for like 4 hours in front of everyone." *Id.* 56-57. The antagonism and hostility had risen to the point that this other employee had already heard about the delay. *Id.* 58. Even in the light most favorable to the railroad—the communications here are not about Sexton taking the right course of action, but rather to "hold him accountable for delaying the train." *Id.* 40

Sexton's email to Tracy Miller containing safety concerns and discussing his refusal to

operate his train without cutting the tracks was also not well-received. Miller scolded Jared regarding Sexton's email— Miller's position was not that Sexton's complaints should be taken seriously—rather, "I don't fault John for this note, but even if not true, we are creating a stage/platform for their feelings." *Id.* 90. Miller's reaction to Sexton's safety complaints was not to address the safety concerns, but rather scold Jared for allowing Sexton to draw his own conclusions. The hostility towards Sexton's email rose to the point that Miller brought Jared's marriage into the conversation—that Jared needs to put time into the railroad, but that he doesn't see that happening right now on the railroad with Jared putting time into his new marriage. *Id.* Even in the light most favorable to the railroad—Miller made no reference to fixing or addressing Sexton's safety concerns. Rather, was more concerned about the "platform" that was being created for Sexton's "feelings."

Antagonism and hostility are also present in the undisputed fact that Jared put Sexton's life in jeopardy to conduct a test which the guidelines states "actual operating conditions **are to be observed**." *Id.* 184 emphasis added. Jared knew there was a manual for guidance on testing, that he expects managers to refer to. *Id.* 179-182. The manual provides structured tests for consistency and safety. *Id.* 183. Federal law requires "giving signals or instructions to control the movement." 49 CFR § 218.99(b)(3)(ii). Jared instructed DePover to stop providing distance and direction instructions. SoFs 83. CP management agrees: "…if you're distracted, your mind has gone away from the task at hand. You could end up corning something. You could hit something. More cars can go by than what you needed"; "if he's looking at an airplane, he's in violation of the rule because when you're doing things like shoving equipment, you're to avoid all distractions." *Id.* 79-80. It is not hyperbolic to say Jared put Sexton's life in jeopardy—CP's discipline policy provides that a shoving movement rule violation is a "Major – Life Threatening Violation," as is

"reckless endangerment." *Id.* 125. It is undisputed that DePover agreed in the investigation that Jared distracted him—yet the only action taken was to discipline Sexton who was reporting that Jared's conduct was unsafe. *Id.* 115. In fact, Ross testified, "I would not allow any employee who reports to me to set up a rule violation to perform a test." *Id* 126. Nevertheless, it was Sexton who reported Jared's unsafe conduct who was disciplined.

### III.    No genuine issue of material fact exists as to the question of CP's statutory affirmative defense, and Sexton is therefore entitled to an entry of judgment as a matter of law in his favor on CP's statutory affirmative defense.

It is CP's burden to produce clear and convincing evidence that it would have taken the same action absent Sexton's protected activity. CP has provided no evidence that it has ever disciplined another employee with no major discipline on their record for a shoving violation with a 20-day unpaid suspension. *Id.* 226. Every employee that CP has produced with no major discipline on their record prior to their rule violation received lesser discipline than Sexton, including no discipline when the company found an employee in violation of the shoving rule. *Id.* 151-159. There is simply no way that CP has demonstrated, let alone with clear and convincing evidence, that it would have taken the same action against Mr. Sexton (20-day unpaid suspension) when CP has not produced a single other time it has done so. Additionally, CP has produced no evidence of another time it has conducted a disciplinary investigation that was overturned by the public law board for being flawed to such an extent that it deprived a fair and impartial against a non-protected employee. *Id.* 227. This is an incredibly straightforward analysis. CP may attempt to argue that it "reasonably/honestly believed" Sexton violated railroad rules, however, regardless of any factual question of CP's "reasonable belief"[4], CP has not produced clear and convincing evidence of taking the same actions against non-protected employees.

---

[4] Which Plaintiff denies any factual questions exist to CP's reasonable belief because the undisputed facts as a matter of law demonstrate CP's actions were pretextual and not done because of any reasonable belief.

August 5, 2024

Respectfully Submitted,

YAEGER & JUNGBAUER BARRISTERS, PLC

By: */s/ Cyle Cramer*

John D. Magnuson, *pro hac vice.*
Cyle A. Cramer, *pro hac vice.*
4601 Weston Woods Way
Saint Paul, MN 55127
Telephone: (651) 288-9500
jmagnuson@yjblaw.com
ccramer@yjblaw.com

and

MEGAN R. MERRITT AT0010635
     for
SHUTTLEWORTH & INGERSOLL, P.L.C.
115 3rd Street SE, Suite 500
P.O. Box 2107
Cedar Rapids, IA 52406-2107
PHONE: (319) 365-9461
FAX: (319) 365-8443
E-MAIL: mrm@shuttleworthlaw.com

*Attorneys for Plaintiff John Sexton*