**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF IOWA**
**EASTERN DIVISION**

| | |
|---|---|
| John Sexton, | No. 3:23-cv-00031-RGE-HCA |
| Plaintiff, | |
| v. | |
| Dakota, Minnesota & Eastern Railroad Corporation d/b/a Canadian Pacific, a Delaware Corporation, | **PLAINTIFF'S STATEMENT OF MATERIAL FACTS** |
| Defendants. | |

### A. Events Surrounding CP's Discipline

1. On February 1, 2021, John Sexton was the engineer for the train assignment 474-31. Appx. A at 9.

2. Mr. Sexton first became qualified as a locomotive engineer in 2000. Appx. A at *Id.* at 5.

3. Justin DePover was Mr. Sexton's conductor on February 1, 2021. Appx. A at 10.

4. At the start of his shift, Mr. Sexton conducted a job briefing with Mr. DePover. Appx. A at 12.

5. During the job briefing, Mr. Sexton stated, "Before we start anything, we're going to cut the crossings." Appx. A at 13.

6. Cutting the tracks means an engineer separates the locomotive from the cars and uses only the locomotive (light power) to dislodge snow and ice from crossings and the rail. Appx. A at 13 and 29.

7. Vehicles driving over crossings can compact snow creating conditions that can cause derailments. Appx. A at 43.

8. It was snowing on February 1, 2021. Appx. A at 74.

9. Compacted snow or ice has the potential to force the wheel of a train car up off the rail, causing a derail—locomotives are heavier than all the cars, so it instead dislodges the snow and ice. Appx. A at 11, 13, 29, and 79.

10. Not cutting the tracks can create an unsafe condition. Appx. A at 45.

11. Snow and ice buildup can cause a derailment, which occurs more frequently at crossings. Appx. A at 111.

12. A derailment is a safety hazard. Appx. A at 112.

13. If an engineer feels that there was a safety issue with snow and ice buildup on tracks, they should cut the tracks. Appx. A at 109.

14. Mr. McKelvey had a discussion with Mr. Sexton where Mr. McKelvey took the position that there was not enough snow that required them to have to cut the crossings. Appx. A at 31.

15. Mr. McKelvey and Mr. Sexton had a disagreement about whether the crossings needed to be cut. Appx. A at 30.

16. Mr. McKelvey's position was that the tracks did not need to be cut. Appx. A at 31.

17. Mr. Sexton's position was that the track did need to be cut. Appx. A at 31.

18. Mr. Sexton told Mr. McKelvey, "I will cut the crossing and flangeways because there have been two derailments in the previous two months." Appx. A at 14.

19. If there is any doubt in Sexton's mind, he must cut the crossings. Appx. A at 47.

20. Mr. Sexton went out to his truck and had Mr. McKelvey sign a sheet Mr. Sexton uses for when he conducts safety briefings in the field. Appx. A at 14, 19, and 31.

21. Mr. Sexton told Mr. McKelvey to call the superintendent to tell him that he is telling

Sexton to violate the rule. Appx. A at 15.

22. Mr. McKelvey did not call the superintendent in Mr. Sexton's presence. Appx. A at 17.

23. Mr. Sexton told Mr. McKelvey that he would not operate the train to Nahant without the crossings being cut. Appx. A at 16.

24. Mr. Sexton then proceeded to cut the crossings. Appx. A at 17.

25. Mr. Ross testified that he remembers being told by Mr. McKelvey that he had instructed Mr. Sexton not to cut the tracks. Appx. A at 46, 48, 49, and 50.

26. Mr. Ross told Mr. McKelvey, "we are going to follow the rule and cut the crossing." Appx. A at 48.

27. Ross testified "I'm not going to tolerate people cutting the rules and taking shortcuts. I won't tolerate it for one minute." Appx. A at 46.

28. Mr. Ross did not discipline Mr. McKelvey for violating the rules and taking a shortcut. Appx. A at 66.

29. The process for cutting the tracks involved Mr. Sexton separating his locomotive from the train, using the locomotive to dislodge the snow and ice from the crossings and rail, then he went back to the train to start his work. Appx. A at 13.

30. As part of cutting the tracks, the crew must apply hand brakes and tie down the cars that are left on the tracks. Appx. A at 56.

31. The locomotive must travel the distance to where it is going to cut the tracks and crossings. Appx. A at 56.

32. Then the locomotive must travel back to the train to couple onto the train. Appx. A at 56-57.

33. Coupling the train involved re-airing the train, which involves walking the distance of the

train. Appx. A at 57.

34. Mr. Sexton departed Marquette on the 474-31—the full train—at approximately 5:40 a.m.—four hours and ten minutes after the start of his shift. Appx. A at 57.

35. Mr. DePover completed a handwritten Delay Report that includes Mr. DePover's description of the cause of the delay between 1:30 a.m. and 5:40 a.m. Appx. A at 18 and 114.

36. The delay report includes, "Needed to cut crossing + siding, locomotive brake test…." Appx. A at 115.

37. At 3:38 a.m., director, Gary Prince messaged Mr. McKelvey stating, "can you send a write up of 474 at Marquette to the DL Senior and East Director please". Appx. B at 1.

38. Mr. McKelvey responded stating, "i will when they leave". [CP_03752]. And, "can you send me the radio recording from the time they went on duty please". Appx. B at 2.

39. Mr. Prince responded, "I can only pull tapes if the Dispatcher was on the radio, they are not constantly recorded". Appx. B at 4.

40. Mr. McKelvey then messaged, "then im not sure how to hold him accountable for delaying the train". And, "i cant make him move any faster. im here doing everything i can". Appx. B at 5 and 6.

41. Mr. Prince responded, "I got ya……just need some details with time…….." Appx. B at 7.

42. Mr. McKelvey understood that there is a standard that everything should be able to get within. Appx. A at 72.

43. Mr. McKelvey tries to avoid over-standard work events. Appx. A at 73.

44. Sexton's work event took three times longer than it was supposed to. Appx. A at 70.

45. This is one of the longest work events that Mr. McKelvey has witnessed in his career.

Appx. A. at 71.

46. At 3:51 a.m., director Ron Pierce emailed General Manager Tom Jared, Superintendent

for the Nahant yard Dylan Smith, trainmaster Marcus Johnson, and Mr. McKelvey, with

the caption "Marquette Sub Delays", stating: "474-31 arrived Marquette 0056, outbound

called 0105 and had to wait for 575-30 to clear onto the Mason City Sub." The email

contained additional information, concluding: "574-138 arrived Marquetter 0208, and is

waiting behind 474-31 to depart and pull down and change crews. Plan for the meet was

discussed with Assistant Trainmaster Kurt McKelvey and Superintendent Dylan Smith."

Appx. B at 8-10.

47. At 4:54 a.m., operating manager, Gary Prince, replied to the above email stating: "We

need a full breakdown from the Trainmaster on what happened here. A set out and

locomotive lift should not take 4'30" as projected. 574-138, 475-30 and B39 were called

based on within standard work event. We are at risk of 4 re-crews due to 1 train over-

standard. Ensure the delays in Nexus are filled out correctly with facts, not assumptions."

*Id.*

48. Mr. McKelvey replied at 9:33 a.m., describing 474-31's activities, including: "I had a job

briefing with the crew while waiting for 474 OB to arrive at depot about work to be

completed and the siding crossing needing to be cut." Also, "474 then ran light power 2

units down to the south siding switch and ran light power over boatels crossing and down

the siding track where their s/o would be made. After this was completed then ran light

power back to their train and tied on." *Id.*

49. This email was Mr. McKelvey's drill down of Mr. Sexton's train. Appx. A at 33.

50. Mr. McKelvey completed an Incident Report that was sent to Mr. Jared and Mr. Smith at

9:37 a.m. The Incident Report stated in its entirety: "474 scanned in and held at MP 100 for 475-30 to shove into MQT through the North Wye. 474 issued TW 01:38 to come to depot for crew change. 474 rolled up MP 100 at 02:22 when they arrived at south wye to start their work. 474-31 lifted CP 5047 off the south leg of the wye and s/o 24 cars to MQS. they also had to cut the Boatels crossing and run down MQS light power before they could shove the cars into it ATM on sight to help with rides and expedite as much a possible." The Incident Report listed the engineer as "SEXTON". Appx. B at 11-12.

51. At 10:54 a.m. Mr. Jared responded to only Mr. McKelvey, saying "Call me when you have a min". Appx. A at 95 and Appx. B at 11-12.

52. Mr. McKelvey called Mr. Jared at 10:55 a.m. Appx. A at 36.

53. Mr. McKelvey had a phone call with Mr. Jared where he discussed why it took Mr. Sexton three times longer to do the work event than what it was supposed to take. Appx. A at 70.

54. Mr. Jared was aware that Mr. Sexton and Mr. McKelvey had a disagreement about whether the tracks should be cut. Appx. A at 110.

55. Later that afternoon, Mr. McKelvey sent a series of messages about Mr. Sexton:

56. At 2:28 p.m. Mr. McKelvey sent to Kade Antczak a message stating, "youre missing all the fun up here". Appx. B at 13.

57. At 2:30 p.m. Mr. McKelvey sent to Mr. Antczak a message stating, "with sexton on a 474 putting on a show here. for like 4 hours in front of everyone". Appx. B at 14.

58. Mr. Antczak responded, "oh i heard". Appx. B at 15.

59. Mr. Jared participates in daily conference calls at 7 a.m. and 11 a.m. to discuss what is going on with the traffic in his territory. Appx. A at 92, 93, and 94.

60. Upon arrival in Nahant, it was Mr. Sexton's task to set out cars on a siding track. Appx. A at 20.

61. Mr. Sexton contacted Anthony Cruciani, a conductor on the RC70 job, to have him in position to protect the movement of the cars. Appx. A at 21.

62. Mr. Jared went to the south end of the Nahant yard because he knew the 474-31 was coming inbound and he had the intent perform an efficiency test on the 474-31. Appx. A at 106.

63. Mr. Jared knew that Mr. Sexton was the engineer for the 474-31. Appx. B at 11-12.

64. Mr. Jared heard Mr. Sexton brief the remote-control crew at the north end of the yard prior to the shoving movement. Appx. A at 105.

65. Mr. Jared heard Anthony Cruciani talking and giving a briefing with the 474-31 crew. Appx. A at 105.

66. Mr. Jared heard the brief on his truck radio because he was still in his truck. Appx. A at 99.

67. Mr. Jared heard the conductor on the north end of the yard instruct Mr. Sexton that the track was clear. Appx. A at 100.

68. The track was clear for 74 cars. Appx. A at 100.

69. Mr. Jared heard Mr. DePover give a 50-car count prior to dismounting his truck. Appx. A at 104.

70. Mr. Jared dismounted his truck and walked up to Mr. DePover. Appx. A at 104.

71. Based on a video watched in the investigation, Jared's truck was approximately 30-50 yards away from Mr. DePover. Appx. A at 144.

72. Mr. Jared announced himself when he got up to Mr. DePover. Appx. A at 102.

73. There was sufficient time for Mr. Sexton and Mr. DePover to communicate between the time Mr. Jared left his truck and by the time he got to Mr. DePover. Appx. A at 105.

74. Mr. Jared did not have a portable radio with him. Appx. A at 99.

75. Mr. Jared cannot hear his radio if he is not near his truck. Appx. A at 101.

76. Mr. DePover, the conductor protecting the shoving movement, under CP rules is required to provide direction and distance to Mr. Sexton during the shoving movement. Appx. A at 103.

77. It is important not to be distracted when protecting a shove because that distraction can lead to hitting something. Appx. A at 121.

78. An employee being distracted when protecting a shoving movement creates an unsafe condition. Appx. A at 121 and 55.

79. Johnson testified, "…if you're distracted, your mind has gone away from the task at hand. You could end up cornering something. You could hit something. More cars can go by than what you needed." Appx. A at 121.

80. Ross testified, "if he's looking at an airplane, he's in violation of the rule because when you're doing things like shoving equipment, you're' to avoid all distractions." Appx. A at 55.

81. Mr. DePover was engaged in a safety sensitive task. Appx. A at 65.

82. CP rules say that Mr. DePover is to provide direction and distance during shoving movements. Appx. A at 103.

83. Mr. Jared instructed Mr. DePover to stop providing direction and distance instructions to Mr. Sexton. Appx. A at 103.

84. After the test, Mr. Jared brought Mr. Sexton and Mr. DePover to the north end of the yard

and interviewed Mr. DePover. Appx. A at 107.

85. DePover said in the investigation that he felt compelled to give a statement and indicated that he was being intimidated during that interview. Appx. A at 147.

86. CP then sent Mr. Sexton a letter dated February 4, 2021, informing him and Mr. DePover to attend a formal investigation "to determine the facts and circumstances and to place your responsibility, if any in connection with your alleged: Failure to stop within half the specific distance given while shoving into track NA04. This incident allegedly occurred at approximately 12:49 hours on February 1, 2021 while working Train 474-31 at Nahant yard. The following Carrier witnesses known at this time to likely have knowledge of the incidence and/or evidence relative to this investigation/hearing requested to attend: Tom Jared, Dylan Smith." Appx. A at 129.

87. Mr. Sexton emailed Vice President of Operations, Tracy Miller, discussing the disagreement between him and Mr. McKelvey. The email included Mr. Sexton reporting: "the tracks and crossing were snow covered". And, "I informed ATM McElvey that the crossing and tracks needed cut with the locomotive before our set out. He told me that I would NOT cut the crossing and tracks…." "I cut the tracks and crossings as needed." "What would have been the environmental impact as well as the possible loss of life if I didn't insist on cutting the tracks and crossings with 2 loads of AMMONIA." Appx. B at 16-17.

88. Tracy Miller testified the email has safety complaints. Appx. A at 78.

89. Mr. Miller forwarded Mr. Sexton's email to Mr. Jared and Mr. Ross. Appx. B at 16-17.

90. Mr. Miller's forwarded email stated to Mr. Jared: "Your territory and the leadership seems to be on a tailspin. I don't fault Johns for this note, but even if not true, we are

creating a stage/platform for their feelings. You have got to get your territory settled down but have to be engaged in the right things at the right time to do it. Trust I understand the new marriage and the time you want to put in there, but we have to do both EFFECTIVELY….i don't see that happening right now on the railroad." Appx. B at 16-17.

91. Mr. Ross responded to Mr. Sexton, "I will look into this and we will get back to you." Appx. B at 16-17.

92. Mr. Sexton's union representative requested prior to the investigation for "Andrew Cruciani" and "David Cox" to be made available as witnesses for the investigation hearing. Appx. A at 131-132.

93. Mr. Johnson testified that Mr. Sexton was not able to present the witnesses that he requested. Appx. A at 169.

94. Jared was the only witness made available to the investigation. Appx. A at 134.

95. Mr. Johnson testified that the witnesses requested by Mr. Sexton's union had no relevance. Appx. A at 123.

96. The investigation hearing occurred on February 10, 2021. Appx. A at 133.

97. The investigation hearing was recorded and transcribed. Appx. A at 136.

98. Mr. Johnson was the investigation conducting officer. Appx. A at 135.

99. In the investigation, Mr. Jared stated: "Mr. DePover actually started a shoving movement into 4 Track. He gave an initial car count of 50. I was actually on the south end of the yard at the time in my vehicle, which I actually dismounted at that time, and as I walked over to Mr. DePover, he was in between – on the south side of 4 Track. I walked up to him and as I walked up to him, he'd gave a 15-car count to the Engineer, John Sexton. At

that point, I instructed Mr. DePover to not provide any more radio communication to Mr.

Sexton, and Mr. Sexton continued to shove back." Appx. A at 137-138.

100.    Jared then stated, "When he stopped, he'd actually shoved 11 cars into the track

further from that initial count of 50." Appx. A at 138.

101.    Mr. Jared then stated, "So through that process, Mr. Sexton did violate General

Code of Operating Rules 5.3.7." Appx. A at 139.

102.    CP operates under the General Code of Operating Rules (GCOR) that also applies

to many other railroads in the nation. Appx. A at 7.

103.    GCOR 5.3.7 states: "**Radio Response.** When radio communication is used to

make movements, crew members must respond to specific instructions given for each

movement. Radio communication for shoving movements must specify the direction and

distance and must be acknowledged when distance specified is more than four cars.

**Movement must stop within half the distance specified unless additional instruction**

**are received.**" Appx. A at 130. emphasis in original.

104.    When asked by Mr. Johnson whether Mr. Sexton complied with this rule, Mr.

Jared stated, "Absolutely not." Appx. A at 139.

105.    When asked by Mr. Johnson whether Mr. Sexton violated the rule, Mr. Jared

stated, "Yes, he did." Appx. A at 140.

106.    Mr. Jared stated in the investigation hearing, "Mr. Sexton, at seven cars, he should

have been stopped, which he was not. As I noted – I – I was counting the cars as they

were going by. At the seventh car, as it went by, I noted with Mr. DePover that that was

the seventh car after his initial radio response of 15. He did confirm with me." Appx. A at

140-141.

107.    Mr. Jared stated that the initial car count was 50 then when he walked up to Mr. DePover, he made the radio communication of a 15-car count. Appx. A at 137-138.

108.    Mr. Jared stated that between the 50 car count and 15 to a stop instruction that Sexton had only shoved 12 car lengths. Appx. A at 225.

109.    Mr. Jared stated that eleven car lengths is more than half the distance that was specified for the 15-car count. Appx. A at 141.

110.    In the investigation hearing, when asked whether Mr. Jared could hear his radio, Mr. Jared stated, "The - - I had my truck radio on, I had my windows down. I have a very loud radio in my truck. I did not hear any other correspondence with Train 474 - - through that radio from where I walked from my…." Appx. A at 142-143.

111.    Mr. DePover stated in the investigation the initial instructions he gave was "clear for 50 to start him into the track and I asked for 25 at the time." Mr. DePover stated in the investigation the next instructions he gave Mr. Sexton was "15 cars remaining and that he was clear for 40 still at that time." Appx. A at 145.

112.    Sexton stated in the investigation that the original instruction DePover told him the track was good for 50 and then DePover updated him with good for 40 and 15 to a stop. Appx. A at 151.

113.    Mr. DePover stated it was after that instruction Mr. Jared instructed him to not proceed any further. Appx. A at 148 and 150.

114.    Mr. DePover stated that it is his assumption Mr. Jared did not hear the clear for 40 instruction because Mr. Jared did not have a radio on him. Appx. A at 148.

115.    When asked whether Mr. Jared distracted him, Mr. DePover stated, "Yes, I was engaged with talking with him." Appx. A at 149.

116.     Mr. Johnson didn't believe Mr. DePover was distracted because "there was no testimony on it." Appx. A at 127.

117.     Mr. DePover was asked about a written statement he had made that only addressed a 15-car count. Mr. DePover responded, "Well, hon - - honestly, it - - with it being my second start back and I was in a closed room with the General Manager, whom I've never met, and Mr. Smith, I was quite under some pressure." Appx. A at 146.

118.     Mr. DePover also stated that he was "compelled" to give the statement. Appx. A at 147.

119.     In the investigation, Mr. Sexton stated that he thinks Mr. Jared broke GCOR rule 6.5—that Mr. Jared "created an unsafe act." Appx. A at 152.

120.     GCOR rule 6.5 states, in part: "Employee must be in position, provide visual protection of the equipment being shoved and must not engage in unrelated tasks while providing protection." Appx. A at 152.

121.     Federal Regulations require "During the shoving or pushing movement, the employee directing the movement shall not engage in any task unrelated to the oversight of the shoving or pushing movement." 49 CFR § 218.99(b)(2).

122.     Point protection requires the visual determination that the track is clear—not where a cut is going to be made. 49 CFR § 218.99(b)(3)(i).

123.     Point protection requires "giving signals or instructions to control the movement." 49 CFR § 218.99(b)(3)(ii).

124.     Mr. Jared's instructed Mr. DePover to violate federal law. Appx. A at [Jared Dep. at 145:17-22 and 49 CFR § 218.99(b)(3)(ii)].

125.     CP's discipline policy provides that a shoving movement rule violation is a

"Major – Life Threatening Violation," as is "reckless endangerment." Appx. B at 18.

126.     Mr. Ross testified he "would not allow any employee who reports to me to set up a rule violation to perform a test." Appx. A at 63.

127.     Mr. Sexton's union representative attempted to enter evidence that Mr. Jared conducted an "unfair" and "unsafe" test, however, Mr. Johnson prohibited the representative from discussing that evidence. Appx. A at 153.

128.     Mr. Sexton's union representative then addressed his request for witnesses. Appx. A at 154.

129.     Mr. Sexton agreed that Mr. Cox was in a position to hear the radio conversation. Appx. A at 155.

130.     Mr. Sexton agreed that Mr. Cox could testify to what Mr. DePover's instructions were. Appx. A at 155.

131.     Mr. Johnson's response was, "That's speculation and hearsay." Appx. A at 155.

132.     Mr. Johnson testified, "If the union is requesting them, that is their job to prove that he heard it, not my job to determine whether he did or not." Appx. A at 125.

133.     CP policy is that it is the company's responsibility to have witnesses present at the investigation who have firsthand knowledge of the incident. Appx. A at 182.

134.     Mr. Sexton stated in the investigation, "I had a man protecting the shove, Mr. Cruciani, and I had Mr. DePover on the ground as well, counting me down." Appx. A at 156.

135.     Mr. Sexton reported, "Mr. Jared is the one who violated the - - the shoving movements because he engaged in a conversation with Mr. DePover while the cars were moving into a track. That is a - - that - - he created an unsafe act." Appx. A at 157.

136.    Mr. Sexton's union representative closed stating, "Mr. Jared freely testified that he heard Mr. DePover give Mr. Sexton a car count of 50 cars, 5 – 0 cars, as he started into 4 Track. Then, after moving 12 cars, Mr. DePover testified that he told Mr. Sexton, I need 15 more and you're good for 40. It's obvious that Mr. Jared did not hear that portion of the instructions." Appx. A at 159-160.

137.    Mr. Sexton's union representative stated, "Even if Mr. Sexton would have shoved the entire 15 cars before stopping, he still has an additional five cars of space before being required to stop in half the range of the 40-car count as given by Mr. DePover, and thus fulfilling the requirement of GCOR 5.3.7." Appx. A at 161.

138.    Five days later, Mr. Johnson, wrote an email stating: "Charge was proven. The facts of the case were clear that Mr. Sexton was given a 15 car count, and attempted to contact the Conductor after 7 car; followed by attempting to contact the ATM before coming to stop at 11 cars." Appx. B at 20.

139.    Mr. Johnson added several "mitigating factors" including: "The Organization contends that the conductor stated '15 cars, good for 40 cars.' They argue that Mr. Jared could not hear the conductor's instruction because he did no have a hand held radio; the facts and the video show Mr. Jared was next to the conductor when the instructions were given." Appx. B at 20.

140.    The video had no audio. Appx. A at 226.

141.    Mr. Johnson testified that it was not clear in the record whether Mr. Jared heard the 40-car count or not. Appx. A at 120.

142.    Mr. Johnson also listed: "Organization makes further argument that the testing was unfair because a shove movement can only be tested through observation versus set-

up. No evidence showed that Mr. Jared attempted to set-up by use of a red board or other means." Appx. B at 20.

143.     Mr. Johnson testified that Mr. Jared set up the test. Appx. A at 122.

144.     Mr. Johnson concluded: "Based on the facts of the matter, I recommend Mr. Sexton be assessed a 20-day suspension." Appx. B at 20.

145.     Mr. Sexton received discipline dated February 26, 2021, of a 20-day unpaid suspension. Appx. A at 184.

146.     The same morning Mr. Jared sent an email stating, "He is supposed to start his suspension once he ties up on Monday." Appx. B at 22.

147.     The discipline letter stated: "Formal investigation was conducted on February 10, 2021, to develop all the facts and circumstances in connection with the referenced occurrence. At the conclusion of that investigation it was determined the investigation record as a whole contain substantial evidence proving you violated GCOR 5.3.7 – Radio Response." Appx. A at 184.

148.     The discipline letter was on Mr. Jared's letterhead and had Mr. Jared's signature. Appx. A at 184.

149.     CP admits that the discipline letter was signed by Mr. Jared in his role as general manager. [Doc. 31 at 4, para. 19].

### B.  Comparators and Sexton's Discipline

150.     The record does not include evidence that CP has disciplined any other engineer with a 20-day unpaid suspension for violation of GCOR 5.3.7. [Cramer Dec.].

151.     On February 26, 2018, CP issued against "D.C." a 10-day suspension with 5 days deferred for violating GCOR 5.3.7. Appx. B at 23.

152.     20 days actual served is a more severe discipline than 10 served 10 deferred. Appx.
         A at 91.

153.     A deferred suspension results in no time lost. Appx. A at 179.

154.     On August 1, 2019, CP issued against Engineer "T.V." a 20-day suspension with
         15 days deferred for "failure to stop within half the distance specified." Appx. B at 25.

155.     On June 7, 2020, CP had verbal coaching with Engineer "M.J." for "failure to
         stop within half the distance specified." *Id*.

156.     Verbal coaching is not considered discipline. Appx. A at 181.

157.     On June 8, 2020, Mr. Jared issued "G.H." a letter of reprimand for "failure to stop
         within half the range of vision of improperly lined switch resulting in a run through
         switch." Appx. B at 27.

158.     On July 29, 2020, CP had verbal coaching with Engineer "T.S." for "failure to
         stop within half the distance specified." Appx. B at 25.

159.     On January 27, 2021, Tom Jared issued against Engineer "T.P." a 20-day
         suspension with 10 days deferred for failure to stop within half the distance specified. *Id*.

160.     Mr. Ross testified there is "no way in hell" he was "going to give somebody a 10
         day deferred and 10 day served suspension for a major violation, so he got 20." Appx. A
         at [Ross 76:1-6 and 50:9-14]

161.     Mr. Ross testified, "there are certain cases where the general chairman came to me
         after and asked to give the guy a break for whatever reason and I would entertain that."
         Appx. A at 52 and 60.

162.     Mr. Ross testified, "if they want to go to a hearing and they want to dispute all the
         facts - - that's fine. That's up to them and they can do that. But if the charges get proven,

then they get full measure of discipline." Appx. A at 53.

**C. Public Law Board Award**

163.    After discipline is assessed, if an employee feels that the discipline is
unwarranted, then they can follow their grievance process through the Collective
Bargaining Agreement. Appx. A at 224.

164.    The Collective Bargaining Agreement states "Should an employee investigated
under this Article consider that the discipline is unjust, he shall have the right to appeal as
provided in Article 28 of this agreement." Appx. B at 29.

165.    The Collective Bargaining Agreement provides that as part of the appeal process,
discipline disputes may be submitted to a public law board tribunal established by law or
agreement. Appx. B at 28.

166.    The Collective Bargaining Agreement provided: "In case of dismissal or
suspension which is later found to be unjust, the employee will be reinstated with
seniority rights unimpaired and paid for all lost time." Appx. B at 28.

167.    CP's discipline against Mr. Sexton was overturned by the Public Law Board—
removing the 20 day suspension and awarded back pay. Appx. A at 185.

168.    The Public Law Board award states: "We have carefully reviewed the record, and
while we find multiple reasons to question the discipline assessment, we concur with the
Organization that the process here was flawed to such an extent that it deprived Claimant
of a fair and impartial hearing. The record reflects that it was Jared who initiated the test,
in a manner which does raise questions regarding safety in his obviously surprising an
employee who was performing the safety-sensitive task of protecting the shove, and it
appears that the charges were levied based on his test and observations. The only realistic

conclusion that can be reached after an objective review of this record is that Jared levied charges regarding his own somewhat questionable test, provided the testimony to support them, and then signed off on a predetermined outcome." Appx. A at 187-188.

169.    Mr. Ross testified that it would be retaliation to conduct an unfair investigation, questionable tests, an unsafe test, and violating rules to set up a test 10 or 11 hours after taking the safe course. Appx. A at 64.

### D. CP's Disciplinary Investigation Policies

170.    CP policy instruction managing investigators that "it is critical to hold a fair and impartial hearing." Appx. B at 30.

171.    Employees are entitled to a fair and impartial hearing. Appx. A at 58.

172.    An investigation would not be fair if it was determined that a witness had firsthand knowledge and was not allowed to be there. Appx. A at 182.

173.    Witnesses to the event being investigated should be included in the investigation in order for the hearing to be fair and impartial. Appx. A at 96-98.

174.    CP policy states that "The goal is to obtain honest/accurate testimony from all parties and to develop the facts and circumstances of the case." Appx. B at 31.

175.    The hearing officer is to make sure all the witnesses are available. Appx. A at 180.

176.    CP's US Investigation Manual provides: "The company should never lose at arbitration if its disciplinary action is founded on evidence presented at the hearing while protecting the due process rights of the charged employee as provided in the CBA." Appx. B at 31.

177.    CP policy states that "unwarranted adverse employment action" constitutes retaliation and is prohibited. Appx. B at 32.

178.        The discipline policy is meant to change behavior. Appx. A at 178.

### E.  CP's Efficiency Test Manual and Jared's Efficiency Test

179.        Mr. Jared knew that there was a manual for guidance on how to conduct

efficiency tests. Appx. A at 83.

180.        Mr. Jared expects managers conducting efficiency to have the manual with them

and refer to it. Appx. A at 84.

181.        Mr. Jared does not recall the last time he had a copy of the manual. Appx. A at 85.

182.        The efficiency test manual provides guidelines on how to perform a test. Appx. A

at 89.

183.        The  efficiency  testing  manual  gives  a  structured  test  so  the  tests  are  done

consistently and safety—the manual outlines the process of how a test should be done.

Appx. A at 183.

184.        The efficiency test GRF02 Shoving or Pushing Movements states, "When

conducting this test, actual operating conditions are to be observed. Appx. B at 33.

185.        The efficiency test GRF02 does not provide guidelines for conducting a set up

test. Appx. A at 90.

186.        From 2013 up to the test Mr. Jared stated Mr. Sexton failed, Sexton had been

tested with efficiency test GRF02 on 19 occasions—all of which he passed. Appx. A at

[Dep. ex 50].

187.        From 2013 up to February 1, 2021, Mr. Jared had never conducted an efficiency

test on Mr. Sexton. Appx. A at 189.

188.        An instruction of "clear for 40, 15 to a stop" is a clear instruction and within the

radio rules. Appx. A at 108.

189.     An instruction of "15 more to a stop, still clear for 40" means that "still clear for 40" is an additional instruction. Appx. A at 109.

190.     If "additional instructions are received," then the engineer has the right to rely on those instructions. Appx. A at 213.

191.     Mr. Johnson could not say what the rule was without it in front of him. Appx. A at 119.

192.     Mr. Johnson testified that the shoving rule requires an engineer to stop within "what's most restrictive." Appx. A at 119.

193.     With the rule in front of him, Mr. Johnson confirmed that the rule does not say anything about stopping within what's "most restrictive." Appx. A at 174.

### F. *CP's Incentivization Policies*

194.     In 2021, CP's Short Term Incentive Plan, Policy 3411, was in place. Appx. B at 34-35.

195.     In 2021, the Short Term Incentive Policy applies to Kurtis McKelvey, Marcus Johnson, Dylan Smith, Jason Ross, Tracy Miller, and Tom Jared. Appx. A at 220.

196.     The Short Term Incentive Plan's objectives include: "to tie a part of the employee's compensation directly to CPs results." Appx. B at 34-35, and 54.

197.     The individual component of an employee's award is tied directly to the individual's Performance Management Program objectives. Appx. B at 34-35.

198.     It is the goal of the short-term incentive plan to incentivize employees. Appx. A at 221.

199.     Senior leaders set objectives and then those objectives are cascaded down to lower-level managers. Appx. A at 217.

200.     There are individual weights assigned for each objective. Appx. A at 218.

201.     Objectives are weighted according to the importance CP places on them for each

individual and the amount of time spent focusing on that component. Appx. A at 219,

223, and Appx. B at 34-35.

202.     CP monetarily incentivized McKelvey, Johnson, Smith, Jared, Ross, and to weigh

overall performance, train performance, origin performance, terminal dwell, GTMs, train

weights, train lengths, and train speed as more important than operating safely. Appx. B

36-53.

203.     CP's corporate measures weighed operating ratio, operating income, and trip plan

compliance as 8 times more important than train accident frequency. Appx. B At 54.

204.     Mr. McKelvey is incentivized to lower the cost of crew transportation which can

include reducing the number of recrews. Appx. A at 218.

205.     Mr. McKelvey testified that he tries to get all the trains through his terminal within

the standard time. Appx. A at 34.

206.     Mr. McKelvey tries to avoid all delays period. Appx. A at 34.

207.     There is no distinction between a three-hour delay and a one minute delay—a delay

is a delay. Appx. A at 34.

208.     Mr. McKelvey drills down on trains that have even a one-minute delay. Appx. A at

35.

209.     McKelvey did a drill down on Sexton's train. Appx. A at 33.

210.     Mr. McKelvey testified that any type of deviation from the normal operating plan

is a concern to him. Appx. A at 32.

211.     When a train goes over standard, management escalates the over standard event

and conducts a drill-down. Appx. A at 28.

212.     Mr. Jared tries to avoid delays. Appx. A at 86.

213.     The 474-31 was the most delayed train for CP in the United States on February 1,

2021. Appx. A at 113.

214.     When dwell is reduced, CP is providing a service because CP is moving the cars of

the customer and not letting them sit in its yards. Appx. A at 61.

215.     If cars sit, CP is not generating revenue. Appx. A at 62.

216.     Mr. Jared tried to avoid recrews at places other than a recrew location because it

could cause delays and cost money. Appx. A at 88.

217.     A recrew refers to changing a train's crew at somewhere other than the train's

destination. Appx. A at 87.

218.     A standard work event would not need to be a recrew. Appx. A at 231-232.

219.   Mr. Ross's operating model strives to avoid recrewing trains. Appx. A at 51.

220.   Mr. Ross testified, "Nobody wants to recrew a train. It doesn't matter if you're old, new

NS, BNSF, CP, CN. It doesn't matter." Appx. A at 51.

221.   Mr. Ross testified, "The first thing you do in a business is you provide a service. If you're

not providing a service, I don't care what business you're in, you're not going to deliver a

product that people want. Therefore, you're not making money. So you have to provide a

service. That's the most important thing you do. The second thing is you've got to control your

costs because if you don't control your costs, you're going to go out of business. You can

provide a service and be the best service in the world and you'll end up out of business. Right?

You have to utilize your assets because if you're not utilizing your assets properly, you're just

going to drive costs up. You're going to go out of business. You have to operate safely, and

that's just a given. The expectation is you operate safely. You should operate safely no matter what you're doing. It's a given. Then the last foundation - - and it's not the last. It's actually the foundation that the other four are built on, is to develop you people." Appx. A at 235-236.

### G. Sexton Dissuaded by CP's Disciplinary Actions

222.    Sexton's testimony described "the embarrassment that all this is - - that it's caused against me and my family, my safety records and not knowing whether I'm going to have a job every day at the end of the day I go to work." Appx. A at 23-24.

223.    During the investigation hearing itself, Sexton stated, "I'm sorry man" and "I can't take this." Appx. A at 227.

224.    Sexton's union representative had to tell Sexton "It's okay" and "Relax". Appx. A at *Id.*

225.    Later during the investigation, Sexton stated "I'm a little wound up here…" Appx. A at 158.

### H. Lack of Evidence Supporting CP's Affirmative Defense

226.    There is no evidence demonstrating that CP has disciplined another employee with no major discipline on their record with a 20-day unpaid suspension for the same rule violation CP assessed against Mr. Sexton. [Cramer Affidavit para. 42-43].

227.    There is no evidence demonstrating the CP has conducted a disciplinary investigation that was overturned by the public law board for being flawed to such an extent that it deprived a fair and impartial hearing for any other employee absent protected activity. [Cramer Affidavit para. 44].

August 5, 2024                              Respectfully Submitted,
                                           YAEGER & JUNGBAUER BARRISTERS, PLC

                                           By: */s/ Cyle Cramer*
                                           John D. Magnuson, *pro hac vice.*

Cyle A. Cramer, *pro hac vice.*
4601 Weston Woods Way
Saint Paul, MN 55127
Telephone: (651) 288-9500
jmagnuson@yjblaw.com
ccramer@yjblaw.com

and

MEGAN R. MERRITT AT0010635
      for
SHUTTLEWORTH & INGERSOLL, P.L.C.
115 3rd Street SE, Suite 500
P.O. Box 2107
Cedar Rapids, IA 52406-2107
PHONE: (319) 365-9461
FAX: (319) 365-8443
E-MAIL: mrm@shuttleworthlaw.com

*Attorneys for Plaintiff John Sexton*