**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF IOWA**
**EASTERN DIVISION**

| | |
|---|---|
| John Sexton, | No. 3:23-cv-00031-RGE-HCA |
| Plaintiff, | |
| v. | **PLAINTIFF'S APPENDIX A** |
| Dakota, Minnesota & Eastern Railroad Corporation d/b/a Canadian Pacific, a Delaware Corporation, | |
| Defendants. | |

Excerpts from Sexton's Deposition…………………………………………....1-24
Excerpts from McKelvey's 1st Deposition…………………………………....25-36
Excerpts from Ross' Deposition pages……………………………………..37-66,233-236
Excerpts from McKelvey's 2nd Deposition……………………………………..67-74
Excerpts from Miller's Deposition……………………………………………..75-79
Excerpts from Jared's Deposition………………………………………80-113
Justin Depover Handwritten Note……………………………………………..114
Train Delay Report……………………………………………………………..115
Excerpts from Johnson's Deposition……………………………………116-128
Notice of Investigation…………………………………………………………129
GCOR Radio Response Rules…………………………………………………..130
Formal Request for Andrew Cruciani and David Cox to be witnesses……………131-132
Excerpts from Sexton's Investigation Transcript……………….............133-161, 225-227
Excerpt from Johnson's Deposition……………………………………….......162-174
Excerpts from Dittrich-Bigley's Deposition……………………………………175-183
Notice of Discipline……………………………………………………………184
Public Law Board Decision Overturning Sexton's Discipline………………………185-188
Sexton's previous testing results………………………………………………189-210
Excerpts from Ogden Deposition……………………………………………...211-213
Excerpts from Hanson's Deposition……………………………………………...214-224
Excerpts from Smith's Deposition.............................................................................228-232

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE SOUTHERN DISTRICT OF IOWA

3                      EASTERN DIVISION

4       _____

5       John Sexton,

6              Plaintiff,

7          v.              Case No:  3:23-CV-00031-HCA

8

9       Dakota, Minnesota & Eastern Railroad

10      Corporation d/b/a Canadian Pacific, a

11      Delaware Corporation,

12             Defendants.

13      _____

14              DEPOSITION OF JOHN SEXTON

15                  OCTOBER 31, 2023

16                    9:00 a.m.

17

18      _____

19

20

21              File # MW 6278989

22

23

24

25      COURT REPORTER:  Christina DeGrande

Page 2

1          APPEARANCES:

2          On Behalf of Defendant:

3          John T. Sullivan, Esq.

4          Briana Al Taqatqa, Esq.

5          Dorsey & Whitney LLP

6          50 South Sixth Street, Suite 1500

7          Minneapolis, Minnesota 55402

8          Sullivan.jack@dorsey.com

9          Altaqatqa.briana@dorsey.com

10         ██████████████

11

12         On Behalf of John Sexton:

13         John Magnuson, Esq.

14         Cyle Cramer, Esq.

15         Yaeger & Jungbauer Barristers, PLC

16         4601 Weston Woods Way

17         Saint Paul, Minnesota 55127

18         ██████████████

19         Jmagnuson.yjblaw.com

20         Ccramer@yjblaw.com

21

22

23

24

25

1                           I N D E X

2        WITNESS              EXAMINATION              PAGES

3        JOHN SEXTON         DIRECT                      4

4                            CROSS                     197

5                          E X H I B I T S

6        NUMBER           DESCRIPTION

7        Exhibit 1    Collective Bargaining Agreement    20

8        Exhibit 2    General Code of Operating Rules     26

9        Exhibit 3    Hybrid Discipline and               36

10                    Accountability Guidelines

11       Exhibit 4    Accident, Incident, Injury, and     40

12                    Occupational Illness Reporting

13                    Policy and Commitment Regarding

14                    Intimidation and Harassment

15       Exhibit 5    Train Delay Report                  62

16       Exhibit 6    2/2/2022 Email                      77

17       Exhibit 7    Workplace Health and Safety         79

18                    Committee Attendance Sheet

19       Exhibit 8    Safety Reviews After Incident       85

20       Exhibit 9    Notice of Disciplinary Hearing     119

21       Exhibit 10   Transcript of Disciplinary         127

22                    Hearing

23       Exhibit 11   Certified Mail Re: Investigation   129

24       Exhibit 12   Certified Mail Re: Discipline      127

25       Exhibit 13   Public Law Board award             127

1          E X H I B I T S (continued)

2          NUMBER          DESCRIPTION

3          Exhibit 14   Interrogatories                      129

4          Exhibit 15   Second Amended Complaint             136

5                       and Jury Trial Demand

6          Exhibit 16   1/4/2021 Email                       144

7          Exhibit 17   2/20/2021 Email                      149

8          Exhibit 18   2/15/2021 Email                      163

9          Exhibit 19   7/20/2021 OSHA Letter                169

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 13

1    A.    No.

2    Q.    When you did you start working for DM&E, Mr. Sexton?

3    A.    It was actually the IMRL.  It's March 22nd, 1999.

4    Q.    What does "IMRL" stand for?

5    A.    The I stood for Iowa, Illinois; the M stood for

6          Missouri, Minnesota; the R for Rail; the L for Link;

7          Iowa, Illinois, Missouri, Minnesota Rail Link owned

8          by Montana Rail Link.

9    Q.    Were you an engineer when you joined the railroad?

10   A.    No.

11   Q.    What position did you hold when you first joined the

12         Railroad in 1999?

13   A.    Brakeman.

14   Q.    How long were you a brakeman?

15   A.    Nine months.  Brakeman, foreman, went right to

16         engine service.

17   Q.    Engine service, is that another way of saying

18         engineer?

19   A.    That's when you go to -- yeah, the engineer class,

20         pass a series of tests and then qualify as a

21         locomotive engineer, correct.

22   Q.    When were you first qualified as a locomotive

23         engineer, approximately?

24   A.    Mid-2000.  Wasn't there very long.

25   Q.    And you've been an engineer ever since the year

1          BY MR. SULLIVAN:

2     Q.   So you don't know if it's final or not?

3     A.   No.

4               (Exhibit 2 was marked for

5            identification.)

6          BY MR. SULLIVAN:

7     Q.   Mr. Sexton, I'm showing you what's been marked as

8          Exhibit 2.  Take as much time as you want to review

9          that.  Do you recognize that document?

10    A.   Yes.

11    Q.   What is it?

12    A.   It's the GCOR, the General Code of Operating Rules.

13    Q.   What is the GCOR?

14    A.   The General Code of Operating Rules.

15    Q.   What is the purpose of the GCOR, in your

16         understanding?

17    A.   These are the rules that we adhere to on a daily

18         basis.

19    Q.   And when you say, "We," you mean engineers?

20    A.   T&E employees, train and engine service employees.

21    Q.   Is it your understanding that this -- that the GCOR

22         applies to only to CP, or does it apply to other

23         railroads as well?

24    A.   Multiple railroads that -- there's a directory in

25         here that all railroads that adopted the GCOR.  On

Page 27

1          pages CP284, 285, 286, there's a list of railroads

2          all the way to 287 that adopt the GCOR.

3     Q.   And DM&E is one of those railroads, correct?

4     A.   It's listed, yes.

5     Q.   And you agree that as a -- as an engineer, you are

6          responsible for knowing the GCOR; is that correct?

7     A.   Yes.

8     Q.   And you're responsible for following the rules set

9          out in the GCOR; is that also true?

10    A.   Yes.

11    Q.   Before we get into the specific issues that were the

12         basis for the lawsuit, I want to talk briefly,

13         generally, about the rule that is at issue here,

14         5.3.7.  That is on the page CP319.

15    A.   You said 5.3.7, correct?

16    Q.   That's right.  Could you please explain to me your

17         understanding of what GCOR 5.3.7 requires?

18              MR. MAGNUSON:  Do you want to just read

19           the rule?

20         BY MR. SULLIVAN:

21    Q.   Well, why don't you start there.  If you could read

22         the rule.

23    A.   "5.3.7, radio response.  When radio communication is

24         used to make movements, crew members must respond to

25         specific instructions given for each movement.

```
 1              Radio communications for shoving movements must
 2              specify the direction of distance and must be
 3              acknowledged when distance specified is more than
 4              four cars."
 5      Q.      And then there's further text in a box, correct?
 6              Could you read that?
 7      A.      "Movement must stop within half the range as
 8              specified" -- start over.  "Movement must stop
 9              within half the distance specified unless additional
10              instructions are received."
11      Q.      What does it mean, in your understanding, to stop
12              within half the distance specified?
13      A.      Do you want a scenario?
14      Q.      Sure.
15      A.      If you give me a 50-car count -- I'm the engineer.
16              I must stop within 25 cars.  If I don't stop within
17              25 cars, then you're in violation of the -- it's
18              basically restricted speed, also.
19      Q.      Let's break that apart for a second.  So the
20              restricted speed, what does that mean?
21      A.      The ability to stop half the range of vision.
22      Q.      What is -- could you explain that?
23      A.      Just like I said.  If you told me to -- I'm good for
24              50 cars, I must be able to stop within 25 cars,
25              nothing else.
```

Page 43

```
 1    Q.   I wanted to make just one quick point on the -- on
 2         the record.  I understand that the -- the notes that
 3         you have are protected, but I'd ask that you ensure
 4         that they're preserved after today's deposition.
 5    A.   Okay.
 6    Q.   Mr. Sexton, I'd like to get to kind of the main
 7         event and talk to you about what happened on
 8         February 1st, 2021.  You may not believe me.  I'm
 9         not asking you trick questions.  I'm not really
10         trying to be your opponent in this situation.  I
11         want to hear your side of the story.  And with that
12         in mind, I'd like to just walk through February 1,
13         2021, from the beginning of the -- beginning of your
14         shift through the end of your shift.
15              Starting at the beginning, what was your work
16         assignment on February 1st, 2021, if you remember?
17                   MR. MAGNUSON:  That's a good question.
18              The preamble, I'll object to as a narrative
19              and testimony.  For the record, the last
20              part was the question.  Preamble...
21    BY MR. SULLIVAN:
22    Q.   You do not need to believe me.  I just wanted to say
23         that.  So the question is, what was your assignment
24         on February 1st, 2021?
25    A.   474-31.
```

Page 46

1    Q.   One of those?

2    A.   Yes, sir.

3    Q.   Was there anyone else there that day filling those

4         roles, as far as you know, or was it simply

5         Mr. McElvey?

6    A.   I just remember Mr. McElvey.

7    Q.   Fair enough.  How about a yard master or a

8         superintendent?  Do you remember anyone in those

9         duties that day?

10   A.   No.  It was 1:30 in the morning.

11   Q.   Who else was serving on 474 with you on

12        February 1st, 2021?

13   A.   Justin DePover.

14   Q.   And Mr. DePover was the conductor; is that right?

15   A.   Yes.

16   Q.   Is his position sometimes referred to as assistant

17        engineer?

18   A.   Yes.

19   Q.   Are those interchangeable -- -

20   A.   Yes.

21   Q.   -- or is there a difference?

22   A.   Yes.  Sorry.

23   Q.   Interchangeable?

24   A.   Yes.

25   Q.   Anyone else or just the two of you?

Page 48

1   A.   The flangeways are in the crossing, and the
2        flangeways are also frog switch points, and you deal
3        with that when you are encountering switches with
4        frogs in the yard.
5   Q.   Is a -- is a flangeway like the space that is next
6        to a rail?  Am I understanding that correctly?  I
7        just don't know what the term refers to.
8   A.   Yes.
9   Q.   I want to make sure I understand it.
10  A.   Yes.  It's where the -- the -- the tread of the
11       wheels of the locomotive rides along the inside of
12       the -- the rail switch, switch points, frogs,
13       crossings, rail, even the rail that's the -- that's
14       the flange.
15  Q.   Understood.  So the compacted snow or ice in the
16       flangeway forces or has the potential to force a
17       wheel up out of the flangeway and, therefore,
18       derailing the train, potentially, or derailing the
19       car; is that accurate?
20  A.   It is.  And we had two previous derailments in the
21       prior months to this incident that we covered during
22       the health and safety meeting, and that's the reason
23       why this is a health and safety topic of the month.
24  Q.   We'll get to that.  I appreciate you talking about
25       that.  So is it -- it's my understanding that crews

Page 49

1         are to cut tracks any time that they see snow

2         covering the rail; is that true?

3    A.   Not 100 percent, no, because there could be snow on

4         the road, and it still could have melted on the road

5         already because the sun came out.  For instance,

6         there could be snow on the road, and the vehicles

7         could be smashing -- compacting that snow in the

8         flangeways on the crossings.  That's why you got the

9         flangeways and the crossings.

10   Q.   So the stop of the rail might be clear, but there

11        still might be ice and snow in the flangeway; is

12        that accurate?

13   A.   In the automobile crossings in highways, roads, yes.

14   Q.   Okay.  So let's talk about the -- the job briefing

15        at -- at the beginning of your shift on

16        February 1st, 2021.  So what time did that -- did

17        the job briefing occur, if you remember?

18   A.   1:30.

19   Q.   And where was it held?

20   A.   Depot.

21   Q.   Who was all there when the job briefing took place?

22   A.   Myself and Justin DePover, and McElvey was in his

23        office.

24   Q.   And tell me how cutting the tracks came up as a

25        topic at the job briefing?

1    A.    Well, I'm the one that always initiates job briefing

2          because that's what I do for the last almost

3          25 years.  And when I brought up the obvious that,

4          you know, we're -- we've got our paperwork, got all

5          of our UPs, the CN paperwork, and, obviously,

6          there's snow outside.  We have a fresh layer of snow

7          out there.  I said, "Before we start anything, we're

8          going to cut the crossings."

9    Q.    And what -- when you said you're going to cut the

10         crossings, where were the crossings?

11   A.    Highway 18 and what's called the cabin crossings.

12   Q.    How -- cabin, c-a-b-i-n?

13   A.    Correct.  And the -- and the boat -- and the boat

14         crossings.  There's two boat crossings, cabin

15         crossing, and Highway 18, plus all the rail we

16         thought we were going to go on that need to be cut.

17   Q.    So how is -- how are crossings cut?

18   A.    You cut away from the train with locomotive only and

19         use the locomotive because they're, obviously,

20         heavier than all cars to cut your -- your path to --

21         whenever you are going, and you use the locomotive

22         to dislodge all of the ice and snow from the cross

23         -- from the crossings and all the rail that you're

24         going to travel on, and then you go back to start

25         your work.

1      "You are not cutting the crossings and flangeways."

2      And I objected, and I said, "I will cut the

3      crossings and flangeways because there have been two

4      derailments in the previous two months.  As a matter

5      of fact, that's our safety topic of the month."  And

6      I, being the union cochairman for the Health -- the

7      Health and Safety Committee, I went out to my cooler

8      and got the -- the sign-in sheet about holding job

9      briefings about cutting crossings and flangeways.  I

10     had Mr. McElvey sign it and put his employee number

11     on it and told him that's -- that's our topic of the

12     month.  We've had two prior derailments, one in

13     Cordova, Illinois, one in Clinton, Iowa, because the

14     CP -- when they investigated, it was because they

15     did not cut the crossings and flangeways.  That's

16     why it was the topic of the month.  And that was why

17     I had Mr. McElvey sign the topic of the month,

18     cutting crossings and flangeways.

19   Q.  So he -- and your testimony is that he did sign the

20       document that you asked him to sign?

21   A.  Yes.

22   Q.  And he wrote his employee number on it?

23   A.  Yes.

24   Q.  Did he say anything after he did that?

25   A.  Yeah.

1      Q.   What did he say?

2      A.   He sure did.

3      Q.   What did he say?

4      A.   He said he was still adamant about me not cutting

5            crossings.  I said flat out, "You need to call the

6            superintendent right now and telling him that you're

7            telling me to violate this rule.  Call him right

8            now."  He didn't do it.  So I went out there and cut

9            the crossings like I was supposed to.

10     Q.   So after you said, "Call the superintendent," did he

11           say anything else?

12     A.   No.  He was angry, to say it nicely.

13     Q.   And he did not repeat a direction to you to not cut

14           the crossings; is that right?

15     A.   From what I recall, sir, he didn't say nothing.  So

16           I took that as the superintendent would be

17           Mr. McElvey's direct supervisor.  I told him to

18           escalate it to his next -- to the next supervisor,

19           which was, at the time, Dylan Smith, who was the

20           carrier's cochairman of the Quad Cities Health and

21           Safety Committee.  I knew exactly what Dylan would

22           have said.  "Cut the damn crossings."

23     Q.   And that's what you would have expected Mr. Smith to

24           say, "Cut the crossings"?

25     A.   One hundred percent, because that's -- it's in the

Page 55

1              MR. MAGNUSON:  Let's take another

2         break.

3              MR. SULLIVAN:  All right.  We can take

4         a --

5              MR. MAGNUSON:  First of all, it's

6         getting hot in here.

7              (A recess was had from 10:59 a.m. until

8         11:08 a.m.)

9    BY MR. SULLIVAN:

10   Q.   Mr. Sexton, I might have phrased that -- my last

11        couple questions to you awkwardly, so I'll just try

12        again.  Did you ever tell Mr. McElvey that you would

13        not operate the train to Nahant unless -- or excuse

14        me -- without the crossings being cut?

15   A.   Yes.

16   Q.   You did.  Do you remember how he responded to you

17        saying that?

18   A.   Yeah.  He -- he was angry, and he said, "You need to

19        get on and get the hell out of here."

20   Q.   Was that -- how did you respond to him saying, "You

21        need to get on and get the hell out of here"?

22   A.   That was when I told him to call the superintendent.

23   Q.   And as far as you know, he did not call the

24        superintendent?

25   A.   Sir, I was standing there waiting for him to call

```
 1              because I was going to put it on speaker, and we
 2              were going to have a chat and find out if he wanted
 3              me to violate it.  I wasn't going to violate the
 4              rule.  I'm not doing it.  Do you realize what two
 5              cars I shoved into Marquette siding?  Do you want to
 6              talk about that?
 7      Q.      So did he call the superintendent was my question.
 8      A.      Not that I know of.  Not at that time.
 9      Q.      And not when you were in his presence?
10      A.      Correct.
11      Q.      What was the last thing you remember him saying
12              before he went back into his office?
13      A.      When I left, he was still standing in the -- in the
14              crew room basically out -- like, a table like this
15              where we get paperwork together.  And the last thing
16              he said to me was, "I need you to get on and get the
17              hell out of here."
18                  And I said, "I'm not -- I'm not leaving.  I'm
19              cutting the -- I'm not doing nothing -- anything
20              until I cut the crossings.  And if -- you know, if
21              you still think that way," I said, "you need to call
22              the superintendent right now, and we'll get to the
23              bottom of it."  And he stood there and stared at me
24              pissed off, didn't do it.  So, therefore, I went and
25              out cut the crossing.
```

1    A.   I do.

2    Q.   And so within the first entry, it says "Where

3         delayed, Marquette.  Arrive, 01:30."  What -- what

4         does that -- what do -- what do those words and

5         those figures mean on this document?

6    A.   That's were you go on duty, and what time we were on

7         duty was at 1:30.

8    Q.   And then there's another column, Departure, and the

9         first number written there is 05:40.  Do you see

10        that?

11   A.   I do.

12   Q.   That's the time that you would have departed

13        Marquette; is that accurate?

14   A.   Yes.

15   Q.   So fair to say that everything that is written

16        within the Cause of Delay section between the 01:30

17        line and the 05:40 line is Mr. DePover's description

18        of the cause of the delay to 7 -- excuse me -- 474?

19   A.   Yes.

20   Q.   Would you mind reading that?  I don't have a good

21        grasp of his handwriting, and I'm hoping --

22   A.   I don't either, but I'll -- I'll do my best.

23   Q.   Thank you.

24   A.   "Marquette, 01:30 arrival.  TGBOs.  Paperwork."  I

25        don't know what that first -- but it says, "North."

Page 81

1    Q.   It was -- yeah.

2    A.   None of these individuals were present at the Health

3         and Safety Committee meeting.

4    Q.   Okay.

5    A.   This is our going out into the field with our fellow

6         employees and having safety briefings one on one or

7         in this entire room, and spreading the word on what

8         the health and safety topic for the month is.  Each

9         of those individuals, they weren't all -- they were

10        -- they were -- some -- I got, like, Jess Harris,

11        Max Olson, they had done them at the same time

12        because they were on our same crew and on the same

13        shift.  So I got them at once.  And the other guys

14        could have been individuals.  They could have been

15        together.  I don't recall.

16   Q.   I see.

17   A.   This is going out and spreading, and that way,

18        they'll say, "Well, Sexton talked to be about

19        cutting crossings and flangeways.  He's always

20        talking about something," so then they would

21        continuing just keep talking about it and hopefully

22        it will sink in.

23   Q.   And then -- and you're keeping track here of who you

24        talked to about the topic?

25   A.   Right.  That was part of our requirement to be in

1       A.   Main line authority in.  That means you hold the

2            main line down to the south end of the yard to

3            Wapello Avenue.  And then we had to wait for B6 to

4            meet with the local.  They were doing work, whatever

5            they were doing to complete their tasks.  And then

6            that was when -- after they cleared the crossovers

7            for us to cross over the industry track, then it was

8            our turn to set out our cars.

9       Q.   And do you remember the tracks that you were

10           directed to set out cars on?

11      A.   If I remember correctly, it was Nahant 4, but don't

12           hold me to it.

13      Q.   Do you remember if it was Nahant 4 and then also

14           Nahant 2.  Would that be a call that could happen?

15      A.   We had to set out on engine, so I -- I -- I don't

16           remember.  I don't remember.

17      Q.   But you think it would -- you have some recollection

18           that Nahant 4 was a place where you set out cars?

19      A.   I believe so.  I mean, I'm not a hundred percent

20           sure.  I don't -- I don't remember.

21      Q.   So it's my understanding that you did start to shove

22           cars on to track 4.  This is when the shove test was

23           set up.  So I'm hoping you could --

24      A.   "Set up" being the correct word.

25      Q.   I'm hoping you can tell me what happened, as you

1          remember it.

2     A.   Well, before -- of course, before we even done this

3          waiting for B60 to clear, I have what I call rolling

4          job briefings all the time because work changes

5          constantly, whether it's dispatch or -- it changes

6          all the time on here.  And I have rolling job

7          briefings.  So when the B60 was doing their thing,

8          this was Mr. DePover's first trip back.  He was

9          furloughed for nine, ten months, I don't remember.

10         He was gone for a while.  This was his first trip

11         back.  I was reacquainting him on the way up to

12         Marquette with all that -- all the, you know, the

13         sightings with the cars out, all that stuff, what to

14         look out for, close clearance, all that stuff.

15             When we were at the south end of Nahant, we had

16         to wait for the B60 to clear, and then we were

17         instructed to shove 4 track or 2 track, whichever

18         one it was.  We had set out an engine as well.  I

19         don't remember what track was set out, the engine 2

20         or -- I'd have to look at my notes or my email

21         because that's -- that was what I would recall.  But

22         we -- we were -- we had a job briefing after B60

23         cleared while they were working, and when we -- it

24         was our turn, I contacted Tony Cruciani, who was the

25         conductor on the RC70 job, to have him in position

1              to protect my shove.  I believe it was 4 track we

2              shoved the cars on now that we're talking about it,

3              but -- and Mr. Cruciani was in position on the north

4              end of 4 track.  4 track was a clear track, meaning

5              no cars were on the track at the time.

6        Q.    And so did Mr. Cruciani go into position then to

7              protect the shove onto track 4?

8        A.    Yes.

9        Q.    What happened next?

10       A.    Mr. Cruciani told me he was in position on the north

11             end of 4.  You're good for 50 cars, and we were

12             shoving in 27 or so.  And we shoved the south end of

13             the yard.  Mr. DePover got off at the clearance

14             point, and I slowed down for him to get off safely.

15             We detained, and then we put our cars on the 4

16             track.

17       Q.    How many cars?  Do you remember?

18       A.    Twenty-seven I think it says.

19       Q.    And so are you -- you said that you were told, "Good

20             for 50."

21       A.    Cars.

22       Q.    And we'll get to the transcript of the hearing in a

23             bit, but is it possible that it was good for 40?

24             Does that sound accurate?  Do you have any

25             recollection?

1       BY MR. SULLIVAN:

2    Q.   Were you previously represented by a different law

3         firm?

4    A.   I was.

5    Q.   And what law firm was that?

6    A.   Schlichter.

7    Q.   They're -- where are they based out of?

8    A.   St. Louis.

9    Q.   And I know I read something that you had submitted

10        to the -- to the OALJ about some confusion about

11        when and how they were representing you; is that

12        fair to say?

13   A.   Yes.

14   Q.   How did you find that firm?

15   A.   Again, they were attorneys that represent railroad

16        employees, and so I reached out.

17   Q.   So I'd like to discuss what you're alleging as

18        damages, so what you're seeking from the railroad in

19        the lawsuit.  The -- well, why don't you tell me.

20        What are you -- what -- what damages and

21        compensation are you seeking through this lawsuit?

22   A.   Punitive damages, damages to my reputation, the way

23        I feel every time I go to work, the embarrassment

24        that all this is -- that it's caused against me and

25        my family, my safety record and not knowing whether

1            I'm going to have a job every day at the end of the

2            day I go to work.  It's constantly there.

3     Q.    The -- the direct financial impact, the 20 days

4            without pay that was made back up to you after the

5            Public Law Board issued its decision, correct?

6     A.    It was.

7     Q.    What -- so describe what you said, sort of the

8            embarrassment.  Like -- like, what -- how has that

9            affected your life?

10    A.    It's shameful.  It's embarrassing.  It makes people

11           look at me in a different light.  I don't like that

12           at all.  Makes me constantly worry about my

13           occupation, my family's financial future.

14    Q.    Have you suffered any physical symptoms from this?

15    A.    I don't know what physical symptoms you're looking

16           for, but other than having that constantly in my

17           mind all the time.

18    Q.    So the -- these concerns, the shameful, the

19           embarrassment, those concerns are in your mind.  But

20           have you experienced any physical symptoms as a

21           result of those emotions?

22    A.    I lose sleep.  I don't -- sometimes I don't sleep.

23           Sometimes I don't eat.  Sometimes I each too much.

24           I don't know.  I mean, it's -- it's a roller

25           coaster.  It's a huge knock on my reputation.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION

- - - - - - - - - - - - - - - - - - - - - - -
No. 3:23-CV-00031-HCA

John Sexton,

                              Plaintiff,
     vs.

Dakota, Minnesota & Eastern
Railroad Corporation d/b/a
Canadian Pacific, a Delaware
corporation,

                              Defendants.
- - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF

KURTIS MCKELVEY

November 9, 2023

9:30 a.m.

TAKEN BY: BRENDA K. FOSS
██████████████████████
    ████████████████

1                   Deposition of KURTIS MCKELVEY,

2          taken via Zoom videoconference, by and on

3          behalf of Plaintiff, on Thursday, November 9,

4          2023, commencing at 9:30 a.m., before Brenda

5          K. Foss, Professional Court Reporter, Notary

6          Public, State of Minnesota, County of

7          Hennepin.

8

9                          *    *    *    *    *

10                  APPEARANCES

11

        ON BEHALF OF THE PLAINTIFF:
12          JOHN MAGNUSON, ESQUIRE
            CYLE CRAMER, ESQUIRE
13          YAEGER & JUNGBAUER BARRISTERS, PLC
            4601 Weston Woods Way
14          St. Paul, MN  55127
            jmagnuson@yjblaw.com
15          ████████████████████████

16

        ON BEHALF OF THE DEFENDANTS:
17          BRIANA AL TAQATQA, ESQUIRE
            NOAH GARCIA
18          WHITNEY & DORSEY LLP
            50 South Sixth Street, Suite 1500
19          Minneapolis, MN  55402

20

                     *    *    *    *    *
21

22

23

24

25

1                    I N D E X

2

        Examination:                      PAGE:
3       By Mr. Magnuson                   4

4

        Objections:
5       By Ms. Al Taqatqa                 17-18, 20-21,
        23, 34, 38-39, 53, 56, 62-63, 67, 71, 74-75,
6       83, 89, 93, 97, 99-101, 104, 109, 118

7

        Marked Deposition Exhibits:
8       21 - Bates 3241
             Short-Term Incentive        27
9       22 - Bates CP 3361, 2020
             Performance Mgmt Form       30
10      23 - Bates CP 3367, 2021
             Performance Mgmt Form       35
11      24 - Bates Sexton 144, GOI
             Section 1-32                45
12      25 - Bates Sexton 143, GM
             Notice No. 22, 1/12/21      46
13      26 - Bates CP 3286, 2/21
             E-mails                     65
14      27 - Bates CP 3303, trains
             impacting train speed       81
15      28 - Skipped
        29 - Bates CP 3244, Incident
16           Report 474-31               87
        30 - Bates CP 3246, e-mail
17           from A. Dalen, Jan '21      89
        31 - Bates CP 3409, Verizon
18           account                     102

19      Previous exhibits mentioned:
        7                                 59
20      8                                 42

21

        Reporter's Certificate            121
22

23

        (Original Deposition Transcript in the
24      possession of John Magnuson, Esquire).

25

1  A  I don't recall the exact time off the top of

2     my head.

3  Q  Is it less that an hour or greater than an

4     hour?

5  A  I believe it's greater than an hour.  But,

6     like I said, it's been several years since I

7     was out there supervising that territory.  So

8     the exact time I don't remember.  I want to

9     say it was around an hour-and-a-half,

10    possibly 90 minutes or somewhere around there

11    to the best of my knowledge.

12 Q  Are you familiar with the term drill-down?

13 A  Yes.

14 Q  You understand that when things on the CP are

15    going over standard, that things escalate up

16    the chain of command and drill-downs occur.

17    Right?

18         MS. AL TAQATQA:  Objection, form.

19    You can answer.

20 A  Things are escalated in drill-down all the

21    time for multiple different reasons.

22 Q  (By Mr. Magnuson, continuing) One of those

23    reasons being going over standard.  Correct?

24 A  Correct.

25 Q  And that's to ensure that things are moving

1  Q  Both of them say, as the preliminary cause,

2      failure to cut tracks as required.  Correct?

3  A  Yes.

4  Q  And cutting tracks that have ice and snow

5      built up in them is important.  Correct?

6  A  Yes.

7  Q  And the way tracks are cut in those

8      circumstances is to use light power or light

9      engines to go over and break up the ice and

10     snow with the flange.  Correct?

11 A  Correct.

12 Q  And that's because the ice and snow that

13     builds up on the rail can cause cars, railcars,

14     to ride up and rise up on the ice and snow

15     and then derail.  Correct?

16 A  When you're talking about cutting tracks, yes.

17            (Deposition Exhibit 24 marked for

18     identification).

19 Q  So I'll show you 24 first, which is the GOI

20     Section 1-32.  Are you familiar with this

21     document, sir?

22 A  Specifically this one, no.

23 Q  I will refer you to the bottom of that sort

24     of highlighted.  It's 32.11.  What does GOI

25     stand for actually?

1    A    I always try to participate in the job
2         briefings when I'm available.
3    Q    Do you recall if you participated in the one
4         on this date, February 1st of 2021?
5    A    I believe I did, yes.
6    Q    Did you at any point in that job briefing
7         tell Mr. Sexton that he was not to cut the
8         crossings?
9    A    No.
10   Q    Do you recall that specifically or do you
11        just not recall one way or the other?
12   A    I recall specifically that I never instructed
13        him that he was not to cut the crossings.
14   Q    Did you guys have a disagreement about
15        whether or not he should cut the crossings?
16   A    Yes.
17   Q    You did have a disagreement about that?
18   A    Yes.
19   Q    And Mr. DePover was a witness of that?
20   A    I honestly do not even recall who the
21        conductor was or if he was present at the
22        time.
23   Q    I can represent to you that Mr. DePover and
24        Mr. Sexton both state that you told them that
25        they were not to cut the crossings.  You

1       disagree with that?

2    A  I believe we had a discussion about whether

3       or not the crossings needed to be cut, and I

4       believe my position was that there was not

5       enough snow that required them to have to cut

6       the crossings.

7    Q  How much snow was there, do you recall?

8    A  I do not recall.

9    Q  Mr. Sexton's opinion, to your recollection,

10      was that the tracks needed to be cut.  Correct?

11   A  Correct.

12   Q  And your position was that the tracks didn't

13      need to be cut.  Correct?

14   A  Correct.

15   Q  I'll show you what has already been marked as

16      your Deposition Exhibit 7.  Have you seen

17      this document before?

18   A  I don't recall it, no.

19   Q  You didn't look at this document to prepare

20      for your testimony today?

21   A  No.

22   Q  Is that your signature at the bottom of this

23      document?

24   A  It appears so, yes.

25   Q  Is that your employee number?

1        network.

2    Q   If, hypothetically speaking, the risk of four

3        re-crews he's referring to here is as a

4        result of going over their hours of service,

5        that would concern you, wouldn't it?

6    A   Any time that there's any type of problem, it

7        concerns me, yes.

8    Q   So a risk of a re-crew due to going over

9        their hours of service would concern you?

10   A   Yes.  Any type of deviation from the normal

11       operating plan would be of concern to me.

12   Q   Re-crewing as a result of a crew denying on

13       their hours would be outside of a regularly

14       scheduled event.  Right --

15   A   -- answer a subjective question.  It's

16       something that occurs frequently there.

17   Q   You said that a re-crew as a result of going

18       over their hours of service or dying on their

19       hours would have an impact.  What kind of

20       impact are you talking about?

21   A   There can be a lot of different impacts.

22   Q   Like what?

23   A   Depending where they expire on their hours of

24       service, it may be a place that prevents

25       another train from being able to get to their

1   A   Correct.

2   Q   And you did respond to it.  Correct?

3   A   Correct.

4   Q   And is it your understanding that this was a

5       call for a drill-down by Mr. Prince?

6   A   Yes.

7   Q   If we go up, your response appears to be a

8       drill-down.  Correct?

9   A   Correct.

10  Q   I misspoke as we had the hour and a half --

11      so in your response at the bottom of that,

12      you state that this train was 3 hours and 23

13      minutes over-standard.  Right?

14  A   Yes.

15  Q   You asked for delay reports to be gathered at

16      Nahant, which we have got, and Road Foreman

17      Finney to get a download of the CP8526 when

18      it arrives at Nahant.  Do you know if Road

19      Foreman Finney got that download?

20  A   I do not.

21  Q   Did you ever see a download?

22  A   I don't typically look at the downloads

23      because I'm not an engineer, no.

24  Q   Why did you ask for Road Foreman Finney to

25      get the download?

```
 1        believe the description referenced in there

 2        is what is entered into the Nexus system.

 3    Q   This is generated as a result of the Nexus

 4        system?

 5    A   I don't know specifically how it's generated.

 6    Q   Probably goes without saying as a trainmaster

 7        you try to avoid your trains being identified

 8        as one of the top 15 trains of the day

 9        impacting train speed?

10    A   I mean, I just -- I try to get all the trains

11        through the terminal within standard hoversil

12        (phonetic) speed.  More in particular, the

13        document has no bearing on my day-to-day

14        operations.

15    Q   You try to avoid though having any of your

16        trains be identified as the top 15 delays on

17        the system?

18    A   I try to avoid all delays period.

19    Q   Particularly 3 hour and 23 minute delays?

20    A   It doesn't matter if it's a minute or 3

21        hours.  A delay is a delay.

22    Q   The longer the delay, the more likely you

23        are to -- the delay is more likely to result

24        in a drill-down though.  Right?  You've

25        testified to that a little bit ago.
```

1              MS. AL TAQATQA:  Objection,

2       misstates prior testimony.

3    A  I don't believe that's what I said at all.

4    Q  (By Mr. Magnuson, continuing) Is that your

5       experience, that the longer the delay the

6       more likely you are to result in a drill-down?

7    A  No, that is not my experience.

8    Q  You don't drill-down over a minute delay.  Right?

9    A  Absolutely.

10   Q  You do?

11   A  Yes.  Every delay, every train, every delay.

12   Q  Is important and can result in a drill-down?

13   A  Among many other things.  Delays are just

14      one reason for a drill-down.

15   Q  Injuries being another, derailments.  Right?

16   A  Among many other things, yes.

17   Q  What are some of the other things that can

18      cause a drill-down?

19   A  Any type of incident that anybody wants a

20      drill-down for.

21   Q  Were you asked to provide this information in

22      the description or was that, to the extent

23      you know, lifted from your e-mail?

24              MS. AL TAQATQA:  Objection, foundation.

25   A  I don't know.

```
 1   Q   (By Mr. Magnuson, continuing) So there wasn't
 2       a daily conference call at that point in time?
 3   A   I don't believe so, no.  I don't recall.  I
 4       do know --
 5   Q   I thought there was a morning conference call
 6       that occurred.
 7   A   There may be.  As far as where I worked in
 8       Marquette, I was there to keep the trains
 9       moving through the terminal.  Most of the
10       trains ran through Marquette during the night.
11       So on my typical day I'd report to work
12       around maybe 5:00 p.m., try and work a 12 or
13       13 hour day and get out of there by 6:00 in
14       the morning.  Usually I would send out an
15       e-mail of detailing of, you know, the daily
16       occurrences, you know, any incidents that
17       happened overnight and things that related to
18       the upcoming day.  But if they could get on
19       conference calls during the morning, it was
20       usually when I was asleep.  So it wasn't
21       something that was part of my normal
22       day-to-day duties.
23   Q   So we got Tom Jared's phone records so we
24       know his phone number.  And it shows here
25       that you had a call with him at 10:55 a.m.
```

1           IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF IOWA
2                   EASTERN DIVISION

3      - - - - - - - - - - - - - - - - - - - - - -
                              No. 3:23-CV-00031-HCA
4
      John Sexton,
5
                              Plaintiff,
6          vs.

7      Dakota, Minnesota & Eastern Railroad
      Corporation d/b/a Canadian Pacific,
8      a Delaware corporation,

9                              Defendants.

10     - - - - - - - - - - - - - - - - - - - - - -

11

12

13
                        DEPOSITION OF
14
                         JASON ROSS
15
                       July 18, 2024
16
                        10:00 a.m.
17

18

19

20

21

22

23
                TAKEN BY: BRENDA K. FOSS
24
25

37

```
 1          Deposition of JASON ROSS, taken by Zoom

 2    videoconference by and on behalf of

 3    Plaintiff, on Thursday, July 18, 2024,

 4    commencing at 10:00 a.m., before Brenda K. Foss,

 5    Professional Court Reporter, Notary Public,

 6    State of Minnesota, County of Hennepin.

 7

 8                 *    *    *    *    *

 9          A P P E A R A N C E S

10

      ON BEHALF OF THE PLAINTIFF:
11        JOHN MAGNUSON, ESQUIRE
          CYLE CRAMER, ESQUIRE
12        YAEGER & JUNGBAUER BARRISTERS, PLC
          4601 Weston Woods Way
13        St. Paul, MN  55127
          jmagnuson@yjblaw.com
14        ███████████████

15

16    ON BEHALF OF THE DEFENDANTS:
          JACK SULLIVAN, ESQUIRE
17        DORSEY & WHITNEY LLP
          50 South 6th Street, Suite 1500
18        Minneapolis, MN  55402
          sullivan.jack@dorsey.com
19        ███████████████

20

21    Also present: Noah Garcia, DM&E

22

23

24

25
```

1                      I N D E X

2

         Examination:                      PAGE:
3        By Mr. Magnuson                    4

4

         Marked Deposition Exhibit:
5        79  Feb 1st, 2021 call record  89
             for Jason Ross
6

7

         Previously Marked Exhibits:
8        13                                114
         18                                 13
9        65                                 70
         66                                 65
10       69                                 76
         71                                 86
11       72                                 88

12

13

14       Reporter's Certificate           133

15

16       (Original Deposition Transcript in the
         possession of John Magnuson, Esquire).
17

18                              *   *   *   *   *

19

20

21

22

23

24

25

```
1        governs the carrier's relationship with the

2        unions, the Public Law Board process is the

3        process and the method for determining

4        whether a hearing is fair and impartial.  Right?

5                      MR. SULLIVAN:  Same objections.

6    A   I can't comment to that.  You're asking for

7        something way too specific of my knowledge of

8        that.

9    Q   (By Mr. Magnuson, continuing) Well, you were

10       a local chairman.  Right?

11   A   That's right.

12   Q   And you conducted --

13   A   A local chairman in Canada for the BLE.

14   Q   In the United States you conducted investigations.

15       You were a hearing officer.  Right?

16   A   I have not conducted investigations in the

17       United States.

18   Q   Have you reviewed discipline decisions in the

19       United States?

20   A   Yes.

21   Q   You've made discipline decisions in the

22       United States.  Right?

23   A   Yes.

24   Q   And you understand that the party that comes

25       out on the losing end of a discipline
```

```
 1        decision has the right under the collective

 2        bargaining agreement to appeal that decision

 3        to the Public Law Board.  Right?

 4   A    Yes.

 5   Q    You've reviewed Public Law Board decisions in

 6        the past?

 7   A    Yes.

 8   Q    And the Public Law Board is a three member

 9        panel made up of a carrier member, an

10        employee or organization member, and then a

11        neutral member.  Right?

12   A    That's right.

13   Q    And that is the body to which people appeal

14        these discipline decisions.  Correct?

15   A    Correct.

16   Q    And that body renders decisions about whether

17        hearings are held in a fair and impartial

18        manner.  Right?

19   A    Based on the opinion of the arbitrator, yes.

20   Q    Arbitrators.  There's three of them.  Right?

21   A    My recollection is only one arbitrator.

22   Q    Well, the board -- I think you just agreed

23        with me -- is made up of an employee member,

24        a carrier member, and a neutral.  Right?

25   A    That's right, but there's not three
```

1       arbitrators there.  My recollection is you

2       have somebody who represents the employee.

3       You have somebody who represents the company.

4       And then you have the arbitrator who makes

5       the decision.

6   Q   And that arbitrator is tasked with the

7       responsibility of determining whether or not

8       an investigation was conducted in a fair and

9       impartial manner.  Right?

10  A   Based on their views and opinions, yes.

11  Q   And that's the final say, so to speak, in

12      that process.  Right?

13  A   No.

14  Q   Someone can go to District Court if they

15      disagree?

16  A   They could or they could go to judicial

17      review.  It depends on the location or

18      district you're in, yeah.

19  Q   Do you know whether or not the railroad did

20      that in this case?

21  A   I don't have any knowledge of that, no.

22  Q   So I think it's fair to say we can assume

23      that this decision wasn't appealed.  Right?

24  A   You'd have to check with labor relations, but

25      I think at this point it's fair to say.

1    A    Vice President of Operations in Southern

2         Region.

3    Q    And that included Mr. Sexton's territory?

4    A    It did.

5    Q    And McKelvey's territory?

6    A    That's right.

7    Q    And Jared's territory?

8    A    That's right.

9    Q    And Miller's territory?

10   A    That's right, part of it, part of Miller's

11        territory.

12   Q    In the second paragraph where it begins "It

13        had been snowing", do you see that?

14   A    "It had been snowing the previous few days",

15        yep.

16   Q    He states, "It had been snowing the previous

17        few days and the tracks and crossings were

18        snow covered".  Do you see that?

19   A    Yep.

20   Q    You're aware as a railroader that tracks and

21        particularly crossings can get snow and ice

22        built up on them after snowstorms.  Right?

23   A    That's correct, yep.

24   Q    Particularly crossings because vehicles drive

25        over the tracks and pack snow in and it can

| | | |
|---|---|---|
| 1 | | become compacted.  Right? |
| 2 | A | Correct. |
| 3 | Q | And conditions like that can cause derailments. |
| 4 | | Right? |
| 5 | A | It can, yep. |
| 6 | Q | Derailments are unsafe.  Right? |
| 7 | A | Correct. |
| 8 | Q | He goes on to say, "I informed ATM McKelvey |
| 9 | | that the crossing and tracks needed cut with |
| 10 | | the locomotives before our setout".  Let me |
| 11 | | stop right there.  An engineer bringing to |
| 12 | | the attention of his supervisor, in this case |
| 13 | | ATM McKelvey, that the tracks need to be cut, |
| 14 | | that's something you would encourage from an |
| 15 | | engineer.  Right? |
| 16 | A | It's something I expect, yep. |
| 17 | Q | Okay.  He states, "He told me that I would |
| 18 | | NOT", not all capitalized, "cut the crossings |
| 19 | | and tracks in which I replied if he is directing |
| 20 | | me to not follow the rules and our topic of |
| 21 | | the month for the health and safety committee |
| 22 | | and managers (cutting flangeways and crossings) |
| 23 | | that he would have to call Superintendent |
| 24 | | Smith right now".  I will just stop right |
| 25 | | there. |

1   A   Okay.

2   Q   Sexton's opinion here that he writes is that

3       he was instructed by Mr. McKelvey not to cut

4       the crossings and tracks.  Right?

5   A   Yes, that's what he states.

6   Q   If there is a buildup of snow and ice on

7       tracks and crossings, that can be an unsafe

8       condition.  Right?

9   A   Correct.

10  Q   And if the tracks are not cut, that could

11      create an unsafe condition.  Right?

12  A   Correct.  But in this case he cut the crossings

13      as you can see.  He says he cut them.

14  Q   Right.  We stopped after "Smith right now".

15      What I'm concentrating on now with you -- and

16      I will direct your attention to this -- is

17      that Sexton claimed to you in this e-mail

18      that he was instructed by McKelvey to not cut

19      the tracks.  Correct?

20  A   That's right.  Mr. Sexton and I had a

21      conversation after this e-mail was sent.

22  Q   Okay.  We'll get to that.  He goes on to

23      state that this train had loads of ammonia.

24      Right?

25  A   Uh-huh.

1    A    Correct, yeah.

2    Q    It's not going to surprise me here but you're

3         probably going to remember a whole bunch of

4         details about that conversation, aren't you?

5    A    You know what?  If you're asking me now about

6         the conversation, I can briefly talk about

7         the conversation.  I do remember having a

8         pleasant conversation with John and I encouraged

9         him and thanked him, first of all, for

10        cutting the crossings because I'm not going

11        to tolerate people not cutting crossings.

12        When we talk about the snow and the driving

13        of the vehicle because this e-mail has jogged

14        my memory a little bit, I had a conversation

15        with McKelvey as well.  And McKelvey told me

16        that the snow that he was talking about that

17        was covering the roads was not nearly as bad

18        as he was describing it to be.  And being

19        that I'm originally from Canada, I'm familiar

20        with driving with ice and snow.  So McKelvey

21        and I had a conversation about that.  And I

22        had a conversation with John about making

23        sure, you know, we did cut the crossings.

24        And I had that conversation with McKelvey as

25        well because I'm not going to tolerate people

1    cutting the rules and taking shortcuts.  I

2    won't tolerate it for one minute.  That's

3    what I remember about that conversation.  I

4    actually had a great positive conversation

5    with John.

6  Q  Employees are taught to take the safe course.

7    Right?

8  A  That's right.

9  Q  In the face of doubt or uncertainty, take the

10    safe course.  Right?

11  A  That's right.

12  Q  So if there's any doubt or uncertainty in

13    Sexton's mind, he's instructed to cut the

14    crossings.  Right?

15  A  He's got to cut the crossings, yeah.

16  Q  And in Kurtis's mind, the snow just wasn't

17    bad enough.  Right?

18          MR. SULLIVAN:  Objection,

19    misstates the witness' testimony.

20  Q  (By Mr. Magnuson, continuing) It wasn't bad

21    enough to have cut the crossings is what --

22  A  I'm talking about when Kurtis was driving in

23    the road.

24  Q  What about cutting the crossings?  What did

25    McKelvey tell you about that?

1  A    He told me it had been snowing and there was
2       snow in the flangeway.  He didn't think --
3       because you can have a dusting of snow or you
4       can have snow when it gets hard-packed and
5       that's what he was going on.  My conversation
6       with him -- he's no longer with the company,
7       but my conversation with him was we don't
8       make that determination, okay, because trucks
9       can drive over the crossings and they pack
10      down the snow.  That's why the rule is there
11      and it's in place.  And we're going to follow
12      the rule and cut the crossing.  That's all
13      there is to it.
14 Q    Did McKelvey tell you that he instructed
15      Sexton not to cut the tracks?
16 A    Yep, he did.
17 Q    He told you that he instructed him not to cut
18      the tracks?
19 A    That's why he said it because he didn't think
20      the snow was bad enough.  I told him you're
21      not here to make that determination.
22 Q    And you determined later that Sexton
23      disobeyed his order and cut the tracks.  Right?
24 A    I didn't even approach that to be honest with
25      you.  When I was talking with John, my only

```
1         concern was what happened, tell me about it,
2         I see this e-mail.  He told me he cut the
3         crossings.  Okay.  He cut the crossing.  He
4         did the right thing.
5    Q    So McKelvey told you that he instructed
6         Sexton not to cut the tracks.  Right?
7    A    Yep.
8    Q    And according to this e-mail here, Sexton cut
9         the tracks anyway.  Right?
10   A    That's right.
11   Q    He disobeyed McKelvey's order.  Right?
12   A    He followed the rule.
13   Q    He followed the rule and he disobeyed
14        McKelvey's orders.  Right?
15   A    I don't know if it was an order.
16   Q    He told him not the cut the tracks.  Right?
17   A    There's a difference between saying don't cut
18        the tracks and an order.  If we are going to
19        have a conversation about an order, that's a
20        different conversation.
21   Q    He instructed him not to cut the tracks.  Right?
22   A    Yes.  He instructed him not to cut the tracks
23        according to what Mr. Sexton said here.
24   Q    And according to what McKelvey told you?
25   A    McKelvey told me that he told him not to cut
```

1       the tracks, yeah.

2    Q   And when you say told him not to, that's the

3       same as instructing him not to?

4    A   Saying as the same instruction, yeah.  I'm

5       not going to argue over semantics.

6    Q   Okay.  Management level employees at CP Rail's

7       compensation is comprised to some extent by

8       velocity and dwell.  Right?

9    A   Run that by me again.

10   Q   Compensation for management level employees

11      at CP to some extent, to some percentage, is

12      based on dwell and velocity, right, on time

13      metrics?

14          MR. SULLIVAN:  Objection, lack of

15      personal knowledge, beyond his own compensation.

16      You can answer.

17   A   Compensation for employees -- for managers at

18      CP at the time is based on providing service,

19      controlling costs, utilizing assets,

20      operating safely, and developing people.

21   Q   (By Mr. Magnuson, continuing) Those are the

22      five principles of precision scheduled

23      railroading.  Right?

24   A   Those are the five foundations that our

25      company is built on, yes.

```
 1        St. Paul.  I can't off the top of my head

 2        remember any reductions in Iowa, but that

 3        doesn't mean they didn't happen.

 4   Q    In terms of the operating crews, conductors,

 5        engineers, does a smaller work force make it

 6        more challenging to recrew trains?

 7   A    Yeah, of course it would.

 8   Q    And recrewing trains is something that under

 9        PSR you strive to avoid.  Right?

10   A    Under any operating model you strive to avoid

11        recrewing trains.  Whenever you recrew a

12        train, you know, it's added complexity for,

13        you know, it could be unknown reasons.  But

14        it's added complexity for whatever reason it

15        is.  Nobody wants to recrew a train.  It doesn't

16        matter if you're old, new, NS, BNSF, CP, CN.

17        It don't matter.

18   Q    Are you familiar with the government account-

19        ability office study that was done in 2021?

20   A    No.

21                MR. MAGNUSON:  Can we take a five

22        minute break?

23                MR. SULLIVAN:  Sounds great.

24        Thank you.

25                (Brief recess).
```

1    Q    When you say discipline, you're looking at

2         discipline that's already been assessed to

3         see if you agree or disagree.   Right?

4    A    No.   There's recommendations.   We would have

5         a call and we'd look at the recommendations.

6         We'd look at the charges.   We'd look at if

7         they're proven or not proven.   I would read

8         the hearings.   In some cases I'd read the

9         hearings.   And Mr. Smith sent that over.   If

10        you look at the e-mail, he sent it over to me.

11        But there was no way in Haitis I was going to

12        give somebody a 10 day deferred and 10 day

13        served suspension for a major violation.   So

14        he got 20.

15   Q    So was it Jared that made the recommendation

16        to you?

17   A    No.

18   Q    Why did the discipline letter go out under

19        Jared's signature without his knowledge

20        electronically signed by Shelley Daberitz?

21   A    Because at the time, admin would send out the

22        discipline.   And the only thing I can assume

23        is Shelley or Joe Adelfio sent the discipline

24        out under Tom's signature.

25   Q    Tom Jared testified that Shelley sent it out

1    under his electronic signature but that he

2    hadn't read it.

3  A  Yeah.  Tom is not involved in that.  All the

4    final decisions on discipline dismissals,

5    that all came through me.  Specifically to

6    avoid things like what Dylan was saying

7    there, to give 10 days deferred and 10 served

8    and all that, that's not what a major calls

9    for.  It was a major violation.  He went to a

10   hearing and it's 20 days.

11            Now, had Mr. Sexton come in and

12   said -- if I remember right, I might have

13   even had a conversation with Dylan about

14   this.  And Dylan is no longer with the

15   company.  But one of the reasons why he's no

16   longer with company is because of his soft

17   approach at times on safety.  So if somebody

18   came in and they admitted responsibility and

19   said, I throw myself on the sword, I made a

20   mistake, this is what I did, I'll accept

21   accountability and responsibility for it.

22   Then they'd get 10 and 10.

23            But if they want to go to a

24   hearing and they want to dispute all the

25   facts -- that's fine.  That's up to them and

1       they can do that.  But if the charges get

2       proven, then they get full measure of

3       discipline.  In this case, the charges were

4       proven so he got a full measure of 20 days.

5    Q  Public Law Board disagrees with whether or

6       not the charges were proven, didn't they?

7    A  Well, the Public Law Board has -- they're

8       entitled to their opinion and they have never

9       picked up some bodies off the track like I

10       have.

11              MR. SULLIVAN:  Object to the

12       extent the question misstates the PLB's

13       decision.

14    Q  (By Mr. Magnuson, continuing) You're familiar

15       with the US E testing manual.  Right?

16    A  Yeah.

17    Q  You're familiar with test GRF02.  Right?

18    A  You'd have to pull it up.  I'm familiar with

19       it.  I know it exists.  I have looked through

20       it.  Some of this stuff I've read.  Some of

21       it I have not read.  Efficiency test is a bit

22       -- you have guidelines with efficiency

23       testing.  And sometimes they change or you

24       change the way you apply them.  But at the

25       end of the day, it's the rule that dictates

1      whether or not it was complied with or not.

2   Q  If a conductor is directing a shove movement

3      and gets distracted -- like let's say he

4      answers his telephone or starts looking at a

5      plane flying overhead, that can be an unsafe

6      condition.  Right?

7   A  If he answers his telephone, he's in trouble

8      because he's not supposed to have his

9      telephone on.  That's the first thing.  And

10     if he's looking overhead at an airplane, he's

11     in violation of the rule because when you're

12     doing things like shoving equipment, you're

13     to avoid all distractions.

14  Q  Right.  Okay.

15  A  And that's what the rule says.  You cannot

16     engage in any other activities.

17  Q  Conductors, when they're directing a shove,

18     should avoid all distractions.  Right?

19  A  Correct.

20  Q  Because that can create an unsafe condition.

21     Right?

22  A  That's right.

23  Q  And you're aware that in this situation

24     Mr. Jared conducted a set up test.  Right?

25  A  Yep.

1    A    If you say so.

2    Q    Cutting of tracks takes time.  Right?

3    A    Again, if you say so.  I don't have the

4         details and I don't remember the details of

5         the delay that that track took at that

6         location.

7    Q    Generally speaking, cutting tracks takes

8         additional time.  Right?

9    A    Yeah, but you got to remember what a delay

10        is.

11   Q    Let me ask you this.  In order to cut tracks

12        with light locomotives, you have to uncouple

13        from your train.  Right?

14   A    Yes.

15   Q    Then a conductor has to apply hand brakes and

16        tie down the cars that are left on the tracks.

17        Right?

18   A    Correct.

19   Q    And then the locomotive, light locomotive or

20        locomotives, departs and goes X distance to

21        cut the tracks.  Right?

22   A    Correct, yeah.

23   Q    And then the locomotive or locomotives come

24        back and have to recouple or couple on to the

25        train that they had left.  Right?

```
 1   A   Correct.

 2   Q   And part of the recoupling or coupling

 3       process involves re-airing the train.  Right?

 4   A   Correct.

 5   Q   And that takes time?

 6   A   Correct.

 7   Q   And that takes additional time in winter?

 8   A   Correct.

 9   Q   Then the conductor has to release the hand

10       brakes.  Right?

11   A   Correct.

12   Q   And that involves walking whatever distance

13       on the train depending on how many brakes

14       were applied.  Right?

15   A   Correct.

16   Q   Had the locomotive event recorder in this

17       case been downloaded that day, that would

18       show where Mr. Sexton went and how far he

19       traveled when he cut the tracks.  Right?

20   A   If they had downloaded, yeah.  It would show

21       the movement of the locomotive.  That's all

22       it would show, forward and backward, speed,

23       throttle, air brakes.

24   Q   Time?

25   A   Loading.
```

```
 1        10 deferred was not an appropriate consequence
 2        for his actions.  So I gave him 20.
 3    Q   And employees are entitled to a fair and
 4        impartial hearing in these situations if they
 5        disagree with the charges.  Right?
 6    A   That's right.
 7    Q   And your decision when you reviewed the --
 8        well, your decision was based on your review
 9        of the investigation transcript.  Right?
10    A   Correct, yeah.
11    Q   Do you recall reviewing the video that was
12        discussed in the investigation?
13    A   I review a lot of videos.  I couldn't say if
14        I did or I didn't.  I would assume that if it
15        was included as part of the evidence, I might
16        have reviewed it.  I can't say for certain
17        one way or another.
18    Q   Do you recall in your review of the transcript
19        that there was some discussion about the
20        video and whether or not it showed Mr. Jared's
21        truck and how far away he was parked?
22    A   Vaguely.
23    Q   Do you know what happened to this video?
24    A   No.  Like I said, I vaguely remember anything
25        about the video.
```

1     I have it, what was the Haitis comment, the

2     British phrase that you used?

3  A  No way in Haitis.

4  Q  No way in Haitis.  Do you know what that

5     means?

6  A  It means no way in hell.

7  Q  Okay.  We're going to pull up an exhibit

8     here.  Showing you what has been marked

9     Exhibit 69, this has been produced to us.

10    Did you review this at all in preparation for

11    your testimony?

12  A  No.

13  Q  Do you want to take a second to review it?

14    Let me ask you this.  Were you responsible

15    for making these discipline decisions on

16    January 27 of 2021 for employees based out of

17    Enderlin, North Dakota?

18  A  Yes.

19  Q  Take a second and review this if you would.

20  A  (Witness examining document).  Okay.

21  Q  You would have reviewed this -- made this

22    discipline decision?

23  A  Yep.

24  Q  And this was an employee that was found to

25    have violated GCOR 5.3.7.  Right?

1  Q    He went to a formal investigation.  Right?

2  A    That's right.  Like I said though, there were

3       certain cases where the general chairman came

4       to me after and asked to give the guy a break

5       for whatever reason and I would entertain

6       that.

7  Q    But you don't know one way or the other if

8       that happened here?

9  A    I can assume, based on the fact that I gave

10      him 10 and 10 after going to a formal hearing

11      and based on my experience, that that's what

12      happened.

13 Q    Seems to contradict your prior testimony

14      though, doesn't it?

15            MR. SULLIVAN:  Objection,

16      argumentative.  You can answer.

17 A    Well, nobody came to me in the case of

18      Mr. Sexton and said, you know, hey, this is

19      what happened, re-admit it and we'll take the

20      10 and 10 if it's still on the table.  That

21      happened often.  The general chairman that I

22      dealt with --

23 Q    (By Mr. Magnuson, continuing) You said

24      there's no way in Haitis I give anything less

25      than what you gave to Sexton for violation of

```
 1        that is reduce car dwell.  Right?
 2   A    That might have been misclassified under
 3        here.  It could be -- part of providing
 4        service can be reducing your car dwell but
 5        that could also be optimizing assets and
 6        controlling costs.  It could go into any one
 7        of those three buckets.
 8                  MR. SULLIVAN:  Can we see the
 9        part of the document that you're asking
10        questions about if you're asking questions on
11        part of this document?
12                  MR. MAGNUSON:  Yep.
13   A    When you reduce your dwell, you're providing
14        a service because you're moving the cars of
15        the customer and not letting them sit in your
16        yards.
17   Q    (By Mr. Magnuson, continuing) Is velocity a
18        function or a part of this foundation of
19        providing service?
20   A    You don't have it in here because we didn't
21        measure it at that time.  We can break it
22        down in a regional level.  We just looked at
23        it at the company levels.  It wasn't part of
24        these objectives.  We couldn't measure it.
25   Q    When did that change?
```

1    Q    And these metrics go into the operating

2         ratio.  Right?

3    A    All these are part of your operating ratio.

4         It's all part of your bottom line really.

5         It's all part of everything you do.  If

6         you're not doing these things as well -- what

7         you got to realize is when you look at some

8         of these numbers -- you look at dwell, for

9         example.  If you're not moving the empty,

10        you're not going to get the load on the

11        flipside.  If you let cars sit, you're not

12        going to generate revenue.  If you don't

13        generate revenue, you're going to be going

14        out of business.  It's probably the easiest

15        way I could explain it.

16   Q    As we look at the various foundations -- and

17        this is a yes or no question -- operating

18        safely accounts for 20 percent and the

19        remaining accounts for 80 percent.  Correct?

20             MR. SULLIVAN:  Objection, form.

21        You can answer.

22   A    Correct.

23             MR. MAGNUSON:  Jack, what's wrong

24        with the form of that question?

25             MR. SULLIVAN:  I don't remember

```
 1                    MR. SULLIVAN:  Objection, form.
 2          You can answer if you understand the reference.
 3     A    What do you mean by setting up employees?
 4     Q    (By Mr. Magnuson, continuing) We went through
 5          the -- you know what?  You're right.  The
 6          do's and don'ts called it an entrap.  You
 7          would discourage people or employees
 8          reporting to you from engaging E tests that
 9          are designed to entrap an employee.  Right?
10     A    Yes.
11     Q    You would encourage your employees to not
12          violate a rule in order to set up a test
13          situation.  Right?
14     A    Can you repeat the question?
15     Q    I flipped the encourage and discourage.  You
16          would discourage employees who report to you
17          from violating a rule in order to set up a
18          test situation.  Right?
19     A    So when you say I would discourage employees
20          to, you mean employees who report to me.  Right?
21     Q    Yes.
22     A    Okay.  I would not allow any employee who
23          reports to me to set up a rule violation to
24          perform a test.
25     Q    In other words, you would discourage them
```

1       from violating a rule?

2    A  Yeah, I would not allow it.

3    Q  And that includes CPKC rules and FRA rules?

4    A  That's right.

5    Q  In all of these various things that I just

6       asked you about, discouraging unfair

7       investigations, questionable tests, unsafe

8       tests, violating rules to set up a test, you

9       would discourage these even more I would

10      imagine if it were 10 or 11 hours, 9 or 11

11      hours after an employee takes the safe course?

12   A  That would be retaliation, and I don't

13      tolerate retaliation.

14   Q  You encourage the employees that are involved

15      in the investigation process that report to

16      you to conduct their investigations in a

17      manner so that they're not overturned by the

18      Public Law Board.  Right?

19   A  Correct.

20   Q  Getting overturned by the Public Law Board

21      isn't something that you look favorably upon.

22      Right?

23   A  I won't send something to the Public Law

24      Board.  I won't give discipline in an

25      investigation unless charges are proven and

1       problem in it is the fact that the administra-

2       tion of Shelley Daberitz or Joe Adelfio who

3       sent out the discipline, that should have

4       been changed.  It should not have had Mr.

5       Jared's electronic signature on it.  That

6       might have changed the outcome of this Public

7       Law Board decision.

8   Q   Why is that?

9   A   Because when I read this, I believe that they

10      are of the view that Mr. Jared was involved

11      in the decisionmaking process.  And knowing

12      what I know, being that I'm the person that

13      made the decision of what discipline he would

14      get, I know that's not true.  But that's

15      their belief.  That's the way they came to

16      their conclusion.  Just because it goes to

17      the Public Law Board and they make a decision

18      doesn't mean I'm going to agree with it and

19      doesn't mean it was right.

20  Q   And that's your belief, right, just like that

21      was the Public Law Board's belief?

22  A   Correct.

23  Q   Would you agree that Mr. DePover was

24      performing a safety sensitive task?

25  A   And Mr. DePover being the conductor who was

1    Q    How?

2    A    Well, he had conversations with myself and I

3         assume he had conversations with others.  And

4         having a conversation with myself over

5         something like that is not an easy

6         conversation to have.

7    Q    Was that the old Jason that handled that

8         conversation with him?

9    A    Don't get caught up in labels of the old

10        Jason and the new Jason or whatever --

11   Q    I want to know how McKelvey was held

12        accountable.  He wasn't disciplined, was he?

13   A    Not that I remember, no, but neither was John

14        Sexton for that incident.  He wasn't

15        disciplined either.  I didn't discipline John

16        Sexton for following the rule.  And McKelvey

17        being a young officer --

18   Q    The Public Law Board turned it over.  Right?

19   A    No, no.  You're confusing two incidents.  The

20        incident that happened when he was shoving

21        equipment was a different incident on a

22        different date.  Now that I'm looking back

23        through some of my notes -- and if you were

24        to pull them up -- where he had that

25        conversation with McKelvey I believe was

1               IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF IOWA
2                     EASTERN DIVISION

3       - - - - - - - - - - - - - - - - - - - - - -
                           No. 3:23-CV-00031-HCA
4
        John Sexton,
5
                           Plaintiff,
6          vs.

7       Dakota, Minnesota & Eastern Railroad
        Corporation d/b/a Canadian Pacific,
8       a Delaware corporation
                           Defendants.
9
        - - - - - - - - - - - - - - - - - - - - - -
10

11

12

13                    DEPOSITION OF

14                   KURT McKELVEY

15                    May 10, 2024

16                     11:00 a.m.

17

18

19

20

21

22
                 TAKEN BY:  BRENDA K. FOSS
23                  fossbrenda@yahoo.com

24          ███████████████████

25

1            Deposition of KURT McKELVEY, taken

2      via Zoom videoconference, by and on behalf of

3      Plaintiff, on Friday, May 10, 2024, commencing

4      at 11:00 a.m., before Brenda K. Foss,

5      Professional Court Reporter, Notary Public,

6      State of Minnesota, County of Hennepin.

7

8                    *    *    *    *    *

9            APPEARANCES

10

      ON BEHALF OF THE PLAINTIFF:
11          CYLE CRAMER, ESQUIRE
            JOHN MAGNUSON, ESQUIRE
12          LAUREN HOSCH, PARALEGAL
            YAEGER & JUNGBAUER BARRISTERS, PLC
13          4601 Weston Woods Way
            St. Paul, MN  55127
14          ccramer@yjblaw.com

15          ████████████████

16

      ON BEHALF OF THE DEFENDANTS:
17          BRIANA AL TAQATQA, ESQUIRE
            DORSEY & WHITNEY LLP
18          50 South 6th Street, Suite 1500
            Minneapolis, MN  55402
19          altaqatqa.briana@dorsey.com
            ███████████████0
20

21

      ALSO PRESENT:
22          Michelle Haynes, CPKC Paralegal
            Noah Garcia, DM&E Counsel
23

24                    *    *    *    *    *

25

```
 1                      I  N  D  E  X

 2
        Examination:                    PAGE:
 3      By Mr. Cramer                   5

 4

 5      Objections:
        By Ms. Al Taqatqa              7, 10, 13, 17,
 6                                      19, 31, 33

 7

 8      Marked Deposition Exhibits:
        32 Feb 1, '21 messages          13
 9      33 Feb 1, '21 messages with     25
           Antczak
10      34 Jan 31 and Feb 1, '21        27
           messages
11

12

13

14
        Reporter's Certificate          35
15

16
        (Original Deposition Transcript in the
17      possession of Cyle Cramer, Esquire).

18
                        *    *    *    *    *
19

20

21

22

23

24

25
```

1       You can answer, Kurt.

2    A  Can you be more specific?  There's several

3       conference call lines that Canadian Pacific

4       uses for all types of different things.

5    Q  Do you recall on February 1st calling into a

6       conference line at all?

7    A  I do not.

8    Q  But you have been on conference calls in your

9       position?

10   A  Yes, I have been on conference calls in my

11      position.

12   Q  Do you recall having any telephone conversations

13      with Mr. Tom Jared on February 1st, 2021?

14   A  I don't remember the exact date or time.  But

15      as I talked about in my previous deposition,

16      I do recall having a conversation with

17      Mr. Jared about the incident at some point

18      after the incident.

19   Q  Do you recall what you discussed in that

20      conversation?

21   A  I believe we discussed why it took him so

22      long -- why it took him three times longer to

23      do the work event than what it was supposed

24      to take.

25                 MR. CRAMER:  I have some

1                    MR. CRAMER:  Sure.

2    A    I got that one.  Next page, please.  (Witness

3         examining document).  Next page.  Next page.

4         Next page.

5    Q    (By Mr. Cramer, continuing) Let's stop on

6         this one.  Do you know what you're referring

7         to when you say 'all the fun up here'?

8    A    I don't recall sending this message, no.

9    Q    Go to the next one.  Tell us when you're

10        ready again for the next page.

11   A    (Witness examining document).  Next page.

12        Next page.  Next page, please.  Next page.

13        Next page, please.

14   Q    We'll stick on this one for a second.  So

15        here it looks like Sexton is on the 474

16        train.  Is that correct?

17   A    Yes.

18   Q    What do you mean by 'putting on a show'?

19   A    Like I said, I don't recall sending any of

20        these messages.

21   Q    Is four hours over the length of the work

22        event?

23   A    Four hours for a singular work event is

24        probably one of the longest work events that

25        I have witnessed in my career at Canadian

1      Pacific.

2   Q   Are all work events at Marquette expected to

3      be the same length?

4   A   No, they're not expected to be the same based

5      upon that amount of work.  But there is a

6      standard that you should be able to get

7      everything done within.

8   Q   Do you recall what Mr. Sexton's work event

9      was that day?

10  A   I don't recall.  It's now three years ago.  I

11     don't recall everything.  I believe what I do

12     remember, based on the previous deposition,

13     is he had a fairly large train.  I believe he

14     had an engine or some engines to pick up and

15     cars to set out to the siding.  I don't

16     remember if he had a pickup there also.

17  Q   With a four hour work event being one of the

18     longest in your career, is that something

19     you'd drill down on?

20  A   Yes.

21  Q   Do you recall drilling down on this work event?

22  A   Honestly, no, I don't even recall what it

23     was.

24  Q   And a four hour work event is something you

25     would try to avoid?

1  A   Any over-standard work event is something I

2      try to avoid.

3  Q   Even if it included safety related tasks?

4  A   Can you repeat the question?

5  Q   If a work event was delayed because of safety

6      related tasks, is that something you'd try to

7      avoid?

8  A   I don't understand the question.  Any time

9      that we're handling any movements with the

10     train, it's safety related.

11 Q   After reviewing some of these messages, is

12     your memory refreshed that Sexton had a four

13     hour work event on February 1st?

14 A   Like I said, I don't recall a specific day.

15     I don't know exactly how long it took.  I'm

16     just going off the correspondence you're

17     showing me here.  I don't remember exactly

18     how long it was.

19 Q   If there was a four hour delay, you would

20     have likely done a drill-down on that?

21 A   Yeah, I'm sure there would have been a

22     drill-down.  There should be a drill-down

23     done on every over-standard work event.

24         MS. AL TAQATQA:  Is that Exhibit

25     33?  Are we labeling this as an exhibit?

```
 1        career.  Is that correct?
 2   A    Like I said, I don't recall the specific time.
 3        I do remember John Sexton coming in on a 474
 4        and that was one of the longest work events
 5        if not the longest one I have ever witnessed,
 6        yes.
 7   Q    What do you recall lead to that being such a
 8        long work event?
 9   A    I know that it was snowing out that day so
10        that would typically slow things down.  And
11        then other than that, I couldn't explain what
12        made it take so long.
13   Q    A work event that is three hours over-
14        standard, is that something you don't want to
15        happen again in your career?
16   A    Yeah.  I mean, it would be wonderful if
17        everything for the rest of my career went
18        perfectly.  That would be great.
19   Q    Why is that?
20   A    Why is that?
21   Q    Yes.
22   A    Well, because if everything goes perfectly,
23        that would make my job a lot easier.
24   Q    Do you conduct efficiency tests in your position?
25   A    Yes.
```

1             IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF IOWA
2                     EASTERN DIVISION

3      - - - - - - - - - - - - - - - - - - - - - -
                           No. 3:23-CV-00031-HCA
4
       John Sexton,
5
                            Plaintiff,
6          vs.

7      Dakota, Minnesota & Eastern Railroad
       Corporation d/b/a Canadian Pacific,
8      a Delaware corporation,

9                          Defendants.

10     - - - - - - - - - - - - - - - - - - - - - -

11

12

13
                        DEPOSITION OF
14
                        TRACY MILLER
15
                        July 9, 2024
16
                         1:05 p.m.
17

18

19

20

21

22

23
                  TAKEN BY: BRENDA K. FOSS
24                  fossbrenda@yahoo.com

25

```
 1          Deposition of TRACY MILLER, taken by

 2     Zoom videoconference by and on behalf of

 3     Plaintiff, on Wednesday, July 9, 2024,

 4     commencing at 1:05 p.m., before Brenda K. Foss,

 5     Professional Court Reporter, Notary Public,

 6     State of Minnesota, County of Hennepin.

 7

 8                    *    *    *    *    *

 9          APPEARANCES

10

11     ON BEHALF OF THE PLAINTIFF:
            JOHN MAGNUSON, ESQUIRE
            CYLE CRAMER, ESQUIRE
12          YAEGER & JUNGBAUER BARRISTERS, PLC
            4601 Weston Woods Way
13          St. Paul, MN  55127
            jmagnuson@yjblaw.com
14

15

16     ON BEHALF OF THE DEFENDANTS:
            JACK SULLIVAN, ESQUIRE
17          DORSEY & WHITNEY LLP
            50 South 6th Street, Suite 1500
18          Minneapolis, MN  55402
            sullivan.jack@dorsey.com
19

20

21     Also present: Noah Garcia, DM&E

22

23

24

25
```

1                    I N D E X

2

        Examination:                    PAGE:
3       By Mr. Magnuson                 5

4

5       Marked Deposition Exhibits:
        74 E-mail                       40
6          Bates CP 00996-997
        75 Verizon records              41
7          Bates 04016-4017
        76 Leader Survey Bates          69
8          Bates Sexton 1527-1530
        77 Feb 1 e-mail from McKelvey   86
9          Bates CP 03736
        78 Ross' Performance Form       87
10         Bates 03807-03815

11

12
        Reporter's Certificate         111
13

14
        (Original Deposition Transcript in the
15      possession of John Magnuson, Esquire).

16
                        *    *    *    *    *
17

18

19

20

21

22

23

24

25

1     Sexton.  Right?

2   A   I'd have to see the top and see my name.  So

3     yes.

4   Q   Do you remember receiving this e-mail?

5   A   We went over it and reviewed it, but I don't

6     remember it from 2021.

7   Q   But there is no doubt in your mind that you

8     did receive this e-mail.  Right?

9   A   Considering it's addressed to me, no doubt.

10   Q   And it appears that you responded to it.  Right?

11   A   Yes.

12   Q   So in the e-mail to you that's addressed to

13     Mr. Miller, he makes a number of safety

14     complaints to you.  Correct?

15   A   He highlights some issues that he sees, yes.

16   Q   And those issues were safety complaints.  Right?

17         MR. SULLIVAN:  Objection, the

18     document speaks for itself.

19   A   Yes.

20   Q   (By Mr. Magnuson, continuing) I didn't get

21     that answer.

22   A   Yes.

23   Q   So he makes complaints of drivers driving too

24     fast on snow covered roads.  Right?

25         MR. SULLIVAN:  Objection,

```
 1        on tracks and Sexton claims that he was told

 2        not to cut them, you would take exception to

 3        that, wouldn't you?

 4   A    McKelvey is not in violation by telling him

 5        not to cut it if I understand what you're

 6        asking me.

 7   Q    (By Mr. Magnuson, continuing) If there was

 8        snow and ice built up on tracks -- this is a

 9        hypothetical for you.  If there's snow and

10        ice built up on tracks, that can present a

11        safety hazard and cause a risk of a

12        derailment.  Right?

13   A    Okay.

14   Q    That's true.  Right?

15   A    Yes, snow and ice on a track can cause risk

16        of a derailment, yes.

17   Q    So you agree with that?

18   A    Yes.

19   Q    If what Sexton here is saying is true, A,

20        that there was a snow and ice buildup on the

21        tracks and, B, he was told not to cut them,

22        you would take exception to that.  Right?

23   A    Yes.

24   Q    Were you aware that his cutting of the tracks

25        that day caused an over-standard work event?
```

```
 1            IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF IOWA
 2                   EASTERN DIVISION

 3     - - - - - - - - - - - - - - - - - - - - - -
                         No. 3:23-CV-00031-HCA
 4
       John Sexton,
 5
                         Plaintiff,
 6        vs.

 7     Dakota, Minnesota & Eastern Railroad
       Corporation d/b/a Canadian Pacific,
 8     a Delaware corporation,

 9                       Defendants.

10     - - - - - - - - - - - - - - - - - - - - - -

11

12

13

14                   DEPOSITION OF

15                   THOMAS JARED

16               June 20, 2024

17                  10:00 a.m.

18

19

20

21

22

23            TAKEN BY: BRENDA K. FOSS

24

25
```

1                Deposition of THOMAS JARED, taken

2      at Dorsey & Whitney LLP, 50 South 6th Street,

3      Suite 1500, Minneapolis, Minnesota, by and on

4      behalf of Plaintiff, on Thursday, June 20,

5      2024, commencing at 10:00 a.m., before Brenda K.

6      Foss, Professional Court Reporter, Notary

7      Public, State of Minnesota, County of

8      Hennepin.

9

10                *   *   *   *   *

11           A P P E A R A N C E S

12

ON BEHALF OF THE PLAINTIFF:
13      JOHN MAGNUSON, ESQUIRE
         CYLE CRAMER, ESQUIRE
14      YAEGER & JUNGBAUER BARRISTERS, PLC
         4601 Weston Woods Way
15      St. Paul, MN  55127
         jmagnuson@yjblaw.com
16      ccramer@yjblaw.com

17

18

ON BEHALF OF THE DEFENDANTS:
19      JACK SULLIVAN, ESQUIRE
         DORSEY & WHITNEY LLP
20      50 South 6th Street, Suite 1500
         Minneapolis, MN  55402
21      sullivan.jack@dorsey.com

22

23             *   *   *   *   *

24

25

```
 1                I N D E X

 2
         Examination:                    PAGE:
 3       By Mr. Magnuson                 4

 4

 5       Marked Deposition Exhibits:
         50 Sexton's Testing (2013+)    42
 6       51 Jared's hotel receipt       96
         52 Verizon records             98
 7       53 Sexton's testing history    187
         54 Jan 18, '21 e-mails with Tracy Miller
 8          et al, Bates CP1692, 1693   188
         55 Short-Term Incentive data
 9          Bates CP 3243               189
         56 Feb 9, '21 e-mail from Sexton et al
10          Bates CP 3295 and 3296      191
         57 Feb 1, '21 Top 15 Train Speeds
11          CP 3303-3306                197
         58 Feb 9, '21 e-mail from Sexton et al
12          Bates 3322-3323             198
         59 Jared's 2021 Performance Management Form
13          Bates CP 3402-3408          203

14

15

16       Reporter's Certificate        206

17

18       (Original Deposition Transcript in the
         possession of John Magnuson, Esquire).
19

20                        *   *   *   *   *

21

22

23

24

25
```

1        trained on how to perform E tests?

2    A   I don't know.

3    Q   You were trained obviously as a trainmaster?

4    A   I don't recall.

5    Q   Trainmasters are expected to know how to

6        perform E tests.  Right?

7    A   Correct.

8    Q   E tests are efficiency tests.  Right?

9    A   That is correct.

10   Q   That's how trainmasters go about making sure

11       that their crews are railroading efficiently

12       and safely.  Right?

13   A   Correct.

14   Q   You don't remember when you were trained on

15       it?

16   A   Correct.

17   Q   Are there rules that relate to how to conduct

18       E tests?

19   A   There is a manual for guidance.

20   Q   What is that called?

21   A   I don't know.

22   Q   When did you first read that manual?

23   A   I couldn't tell you.

24   Q   When was the last time you read it?

25   A   In its entirety?

1  Q  Or even referred to it, yes.

2  A  I reviewed one yesterday or last week.

3  Q  So it's a document that you refer to

4     frequently in your work?

5  A  I wouldn't say frequently.

6  Q  How much do you refer to it?

7  A  Maybe once a year.  Maybe once every couple

8     years.

9  Q  Are you tested on how to perform E tests?

10 A  Am I tested?

11 Q  Right.

12 A  No.

13 Q  Are trainmasters?

14 A  Tested on how they're --

15 Q  How to properly conduct an E test.

16 A  There's no specific test if that's what

17    you're asking.

18 Q  Are employees expected to follow the E test

19    procedures that you just referred to?

20 A  Employees?

21 Q  Yes, trainmasters, anybody conducting E tests,

22    are they expected to follow that document?

23 A  They're expected to have that document with

24    them and refer to it when they need to.

25 Q  And that applies to all people conducting E tests?

1    A    Correct.

2    Q    When you say have it with them, nowadays

3         you're not talking about a paper document?

4         It must be something on a computer or your

5         phone?

6    A    Well, I don't have a copy of it.

7    Q    When was the last time you had a copy of it?

8    A    I couldn't tell you.

9    Q    You don't know when you were trained

10        initially, but did someone train you on how

11        to conduct E tests?

12   A    I'm sure they did.

13   Q    How long ago?

14   A    2000.

15   Q    So 24 years ago?

16   A    Something like that.

17   Q    Do you train employees on how to conduct E

18        tests?

19   A    I have in the past.

20   Q    When was the last time you did that?

21   A    I don't know.

22   Q    Have the rules on how to conduct E tests

23        changed over the years?

24   A    I believe the manual changed over the years.

25   Q    And there are certain quotas that second line

1   A   You keep saying PSR, but it's just being on

2       time.

3   Q   Over-standard work events draw attention.

4       Right?

5   A   It's something that we look at.

6   Q   You try to avoid them.  Right?

7   A   Yes.

8   Q   Mr. McKelvey has testified that even a minute

9       over-standard can lead to a drill down.  Do

10      you agree with that?

11  A   It could.

12  Q   Over-standard work events are something you

13      try to avoid?

14  A   Correct.

15  Q   Because they can cause delay.  Right?

16  A   Correct.

17  Q   They can cause customers to become unhappy.

18      Right?

19  A   I suppose.  I can't answer for every customer.

20  Q   Delay is something you try to avoid at the

21      railroad.  Right?

22  A   Correct.

23  Q   Because it can cost money.  Right?

24  A   It can.

25  Q   And delay can cause customers to become unhappy.

```
 1        Right?

 2    A   It could.

 3    Q   And those are things you want to avoid?

 4    A   We try to.

 5    Q   And there are processes in place like coming

 6        up with work standards to put a certain

 7        specific time frame on what you want a work

 8        event to be completed by.  Right?

 9    A   Correct.

10    Q   Going over standard on a work event can cause

11        a drill down.  Right?

12    A   It could.

13    Q   What's a drill down?

14    A   Going over the details of the event minute by

15        minute.

16    Q   I want to talk for a quick second to clean

17        something up that was a little unclear in

18        some prior depositions.  What do you call --

19        would you agree with me that the term recrew

20        refers to changing out a crew on a train

21        before it reaches its destination?

22    A   Yes.

23    Q   Mr. McKelvey tried to tell us that a recrew

24        happens every time you change the crew on a

25        train.  That's not what recrew really means.
```

 1  Q   Where would that train recrew in February of
 2      '21?   Some examples.
 3  A   Are you saying that it got recrewed?
 4  Q   If they had to be recrewed, what's the
 5      procedure?
 6  A   It depends on where they were recrewed at,
 7      but they'd park in a location that was safe
 8      and accessible and we'd call another crew out
 9      and we would swap the crews out.
10  Q   I'm assuming that procedure kind of relates
11      to the K39 and the 576, the 386 and the 387.
12      Is that a safe assumption?
13  A   Yes.
14  Q   Again, that's something you would try to
15      avoid?
16  A   Correct.
17  Q   Because it can cost money and cause delay?
18  A   Correct.
19  Q   And delays and profit margins and making sure
20      the railroad is running on time are goals of
21      PSR?
22  A   You keep saying PSR.  We're just -- it's
23      railroading.  It's a process that you use for
24      railroading is what we do.  We don't call
25      that PSR.  It's just trying to keep your

1    Q    And then it says "or it may be set up."

2         Correct?

3    A    Correct.

4    Q    What does set up mean?

5    A    Basically, the employees are working and you

6         change the condition in some way, shape or

7         form to determine whether or not they're

8         specifically following a specific rule.

9    Q    What is the purpose, to the extent you know,

10        for the procedures to be followed for a set

11        up test?

12   A    For a Form B?

13   Q    There are three paragraphs under Preparation

14        for set up test.  Right?

15   A    Correct.

16   Q    What is the purpose of those three

17        paragraphs?

18   A    It gives you a guideline on how to perform a

19        test.  It talks about what you don't see --

20        and this is the actual rule, but it's talking

21        about the rule that's being tested and things

22        that you need to make sure that you cross-

23        check that it's being followed.  It talks

24        about, you know, making sure that it's

25        performed in a manner that could be specific

1       Movements.  Right?

2    A   Yes.

3    Q   You're familiar with that guideline?

4    A   I am.

5    Q   It says Rules Tested: GCOR 2.13, GCOR 5.3.6,

6        GCOR 5.3.7, GCOR 6.1.1, and GCOR 6.5 are the

7        rules identified there.  Right?

8    A   Correct.

9    Q   And that is the rule that Mr. Sexton

10       was disciplined for violating according to

11       Exhibit 12.  Correct?

12   A   It says 5.3.7, correct.

13   Q   Under Test Conditions it says, "When

14       conducting this test, actual operating

15       conditions are to be observed."  Correct?

16   A   Correct.

17   Q   And the words set up are not in that rule or

18       at least in that line after Test Conditions.

19       Right?

20   A   They're not in this guideline or this manual,

21       no.

22   Q   And under Procedure, there is no paragraph

23       identifying procedures for conducting a set

24       up test.  Correct?

25   A   Correct.

1    Q    I don't see Jason Ross' name on there, do you?

2    A    Not from the one that Shelley put out, no.

3    Q    Right.  But the one that Mr. Ross was copied

4         on was Mr. Smith's recommendation 10 served

5         10 deferred.  Right?

6    A    Yes.

7    Q    20 days actual to service is a more severe

8         discipline than 10 served 10 deferred.  Right?

9    A    Correct.

10   Q    Do you recall, as you sit here today, what

11        happened between February 15th and February

12        24th to lead Ms. Daberitz to send this

13        e-mail?

14   A    I do not.

15   Q    Do you recall discussions with any

16        individuals about the recommended discipline

17        for Mr. Sexton?

18   A    I do not.

19   Q    Do you remember having any conversations with

20        Mr. Ross about Mr. Sexton's discipline?

21   A    I do not.

22   Q    And the document speaks for itself, but it

23        does seem to indicate that Shelley is telling

24        Joe to issue the discipline.  Right?

25   A    She is, correct.

1    calls.  There's calls set up periodically

2    throughout the month or the year for

3    different things we're focussed on.  There's

4    safety calls.

5  Q  There are also just the daily calls to

6    discuss what's going on in terms of traffic.

7    Right?

8  A  Correct.

9  Q  Do you know what any of the different numbers

10    are to call in for the various different

11    types of calls you just referenced, or is

12    there one number and these calls are set up

13    at that one number for different purposes?

14  A  I don't know.

15  Q  The daily calls that occur, just to monitor

16    what's going on with traffic on the system,

17    how many people tend to participate in those

18    calls?

19  A  Which call are you talking about?

20  Q  The daily calls to discuss just generally

21    what's going on with traffic on your

22    territory and the system.

23  A  The operations call?

24  Q  Yes.

25  A  The one that's at 7:00 in the morning?

```
 1        there's another incoming call from Jason

 2        Ross.  Okay?

 3   A    Okay.

 4   Q    And a minute later at 10:40 a.m. there's an

 5        outgoing call to Dylan Smith.  Do you recall

 6        what that conversation entailed?

 7   A    No.

 8   Q    At 10:55 a.m. just below that, you placed a

 9        call to Kurtis McKelvey.  What was his

10        position on February 1st, '21?

11   A    I don't know.  He was either trainmaster or

12        ATM.

13   Q    That was an incoming call.  Cyle just

14        corrected me.  That doesn't refresh your

15        recollection?

16   A    No.

17   Q    And at 11:14 a.m. you call in to another

18        conference.  That obviously is different than

19        the 7:00 call.  Right?

20   A    Yes.

21   Q    Do you know whether that was an operations

22        conference call or something else?

23   A    Operations call.

24   Q    How do you know that?

25   A    Because we had 0700 and 1100 operations calls.
```

1    A    It would be the opposite of what you're saying.

2    Q    How so?

3    A    The process and terminal dwell reports come

4         out 24 hours later.  So if you're going to

5         have a conference call about how a terminal

6         is performing, you'd look the following day.

7    Q    But terminal dwell is something that's

8         updated more frequently?

9    A    No.  They're the same.

10   Q    If you're discussing an over-standard event

11        at your operations call, would that over-

12        standard event be something that people would

13        know about because of Nexus?

14             MR. SULLIVAN:  Objection, calls

15        for speculation.

16   A    It could.

17   Q    (By Mr. Magnuson, continuing) You know what

18        Nexus is.  Right?

19   A    Yes.

20   Q    How the system is performing on any given day

21        is something that's oftentimes discussed in

22        your operations call at 7:00 in the morning.

23        Right?

24   A    Yes.

25   Q    Am I correct in assuming that how people

1    Q    (By Mr. Magnuson, continuing) Would you have
2         any reason to dispute that this e-mail from
3         you was sent to Kurtis at 10 a.m. Central
4         Time?
5    A    I wouldn't.
6    Q    And it says, "Call me when you have a minute".
7         Right?
8    A    Yes.
9    Q    And that's from you to Kurtis at 10 a.m.?
10   A    Okay.  Yes.
11   Q    Approximately 23 minutes after you received
12        the Incident Report on 474.  Right?
13   A    Did I give them back to you?
14   Q    I'm talking about the e-mail below.
15   A    Oh, sorry.  Yep.  I'm following.
16   Q    So that's approximately 25, 30 minutes after
17        you received the Incident Report you e-mailed
18        McKelvey to say "call me".  Correct?
19   A    Correct.
20   Q    If we go back to your phone records --
21   A    What page?
22   Q    3459.
23   A    Okay.
24   Q    You took an incoming call from Kurtis
25        McKelvey then at 10:55 a.m.  Right?

 1   Q   Clean slate.  You want it to be fair for both
 2       sides?
 3   A   That's correct.
 4   Q   Would you agree with me that when conducting
 5       an investigation, people with personal
 6       knowledge of the events leading to an
 7       investigation should be witnesses?
 8                   MR. SULLIVAN:  Objection, lack of
 9       personal knowledge, calls for speculation.
10   A   In hearings, you'd like all the pertinent
11       parties to show up.
12   Q   (By Mr. Magnuson, continuing) Pertinent
13       parties.  Excellent.  Would you call a
14       pertinent party someone who is a witness to
15       the event?
16   A   Yes.
17   Q   You've conducted these investigations yourself?
18   A   I have.
19   Q   You've reviewed transcripts and made
20       discipline recommendations over the years?
21   A   I have.
22   Q   You know how to see a fair hearing when you
23       see one.  Right?
24   A   I think so.
25   Q   And you just said you want all people who are

1    witnesses to be able to testify?

2                MR. SULLIVAN:  Objection,

3    misstates the witness' testimony.

4                THE WITNESS:  One more time.

5    Q  (By Mr. Magnuson, continuing) You said

6    pertinent witnesses should be included?

7    A  Yes.

8    Q  And you said eye witnesses to events could be

9    considered pertinent.  Right?

10   A  Yes.

11   Q  And credibility assessments are made at these

12   which is why people prefer live testimony.

13   Right?

14   A  Not necessarily.

15   Q  You don't tend to rely on handwritten

16   statements as much as you tend to rely on eye

17   witnesses.  Right?  You want witnesses to be

18   able to testify live?

19               MR. SULLIVAN:  Objection, form.

20   A  I want witnesses to be available for the

21   hearing.

22   Q  (By Mr. Magnuson, continuing) And to conduct

23   a fair and impartial hearing, you want

24   pertinent witnesses to testify?

25   A  I'm sorry?

1  Q   In order for a hearing to be fair and
2      impartial, you want pertinent witnesses to
3      testify?
4  A   Yes.
5  Q   Let's go to page 18.  Let me ask you this
6      before we start.  Before you read anything,
7      what do you remember about the E test you
8      conducted on Mr. Sexton?
9  A   Where do you want me to start?
10 Q   What do you remember about it?
11 A   I remember going through the process of
12     setting up a test.  I remember the test.  I
13     remember it concluding.
14 Q   You've testified a whole bunch of times so
15     far that you don't even know why you were in
16     the Davenport, Marquette area at the time.
17     Right?
18 A   Yes.
19 Q   How is it that you ended up on the south end
20     of the Marquette yard, Nahant?
21 A   South of the Nahant yard?
22 Q   Yes.
23 A   I was performing an E test.
24 Q   Who told you to do that?
25 A   Nobody.

1  A   Yes.

2  Q   And DePover lined his switches?

3  A   Correct.

4  Q   Conductor DePover and Sexton the engineer

5      briefed with the remote control assignment.

6      Right?

7  A   Correct.

8  Q   That was taking place on the north end of the

9      yard?

10 A   That's correct.

11 Q   Did they brief in person or over the radio?

12 A   The radio.

13 Q   So we know the crew at the north end of the

14     yard, the remote control crew, could

15     communicate with Sexton and DePover over the

16     radios.  Right?

17 A   Correct.

18 Q   You heard this on your truck radio because

19     you were still in your truck at that point?

20 A   That's correct.

21 Q   You didn't have a portable radio with you,

22     did you?

23 A   No.

24 Q   And the remote control crew says that they're

25     in 16 track and they would not be in 4.  Right?

1   A   I don't remember the exact conversation about

2       that.

3   Q   At some point though you remember that they

4       determined that 4 track was clear?

5   A   I remember that they had a job briefing by

6       the rule and the conductor on the north end

7       of the yard told them that the track was

8       clear and good for 40.

9   Q   And that's what you observed, that 4 track

10      was clear?

11  A   It was.

12  Q   Was it clear for even more than 40?

13  A   Yes.

14  Q   50?

15  A   I believe so.

16  Q   60?

17  A   I think it holds 74 cars.

18  Q   So the whole track 74 cars was clear?

19  A   Yes.

20  Q   At the investigation you testified that

21      DePover actually gave an initial car count of

22      50.  Does that fit with your recollection?

23  A   I don't remember the exact number he gave

24      initially.

25  Q   So we'll go to page 19.

1      you?

2    A    I don't know.

3    Q    Do you typically carry one?

4    A    At times I do, yes.

5    Q    Why would you carry one versus not carry one?

6    A    I usually use them for derailments.  So if I

7         had it, it would have been in my derailment

8         kit.

9    Q    If you're conducting E tests and you're

10        attempting to monitor employees' radio

11        communications, in those situations do you

12        carry a portable radio, a handheld?

13   A    Not necessarily, no.

14   Q    If you don't carry a portable and you're not

15        near your truck, how do you know what the

16        radio communications are?

17   A    I can't hear it if I'm not in -- if I don't

18        have a portable or some means of listening.

19   Q    So you remember seeing some video at this

20        investigation.  Right?

21   A    Yes, sir.

22   Q    And your truck wasn't visible in the video,

23        was it?

24   A    I thought it was.

25   Q    Well, we'll get to it.  There's a bunch of

```
 1        movement when the test started.  I pulled up
 2        at some point.
 3   Q    But that would have been on the video.  Right?
 4   A    Should have been, yes.
 5   Q    And we can't look at the video anymore, can we?
 6   A    I don't have it.
 7   Q    How long does it take you to walk 50 yards?
 8   A    I don't know.
 9   Q    What were the footing conditions like that
10        day?
11   A    Good.
12   Q    What was the weather like?
13   A    Good.
14   Q    Snowy?
15   A    No.
16   Q    Snow on the ground?
17   A    Possibly.
18   Q    So you depart your truck and you walk up to
19        DePover.  Right?
20   A    Correct.
21   Q    And you didn't announce yourself before you
22        walked up to him.  Right?
23   A    I announced myself when I got up and I was
24        able to talk to him.
25   Q    Did you tell him to stop talking to the
```

1    A    I said no.

2    Q    If they just stopped communicating?

3    A    After I told them?

4    Q    No, no.  If you are E testing a conductor

5         sitting in your truck for instance -- you're

6         watching the conductor to see what he's doing

7         and see how good he's performing.

8    A    Correct.

9    Q    That's something you do?

10   A    Yes.

11   Q    And you observed that conductor just stare

12        off into space and stop communicating with an

13        engineer, that would be in violation of the

14        rules, wouldn't it?

15   A    That would be, yes.

16   Q    Why?

17   A    Because the rules say he's supposed to

18        provide direction and distance during shoving

19        movements.

20   Q    And you told him not to do that anymore.

21        Correct?

22   A    That's correct.  I was in the process of

23        validating whether or not the engineer was

24        going to comply with half the range of

25        vision.

```
 1   A   It might be semantics, but are you asking

 2       like when I decided to walk up to him?

 3   Q   You walked up to him and as you walked up to

 4       him, you say he gave a 15 car count to Sexton?

 5   A   The testimony says Mr. DePover actually

 6       started a shoving movement into 4 track.  He

 7       gave initial car count of 50.  I was actually

 8       on the south end of the yard at the time in

 9       my vehicle.  So I was in my vehicle when he

10       gave the 50 car count, which I actually

11       dismounted at that time and I was -- I walked

12       over to Mr. DePover.  He was in between on

13       the south side of 4 track.  I walked up to

14       him.  As I walked up to him, he gave a 15 car

15       count.

16   Q   So before you got to him, right before you

17       got to him, you were still under the

18       impression that he had a 50 car track?  He

19       had a clear alley for 50 cars?

20   A   I heard him give a 50 car count prior to me

21       dismounting my vehicle.

22   Q   Okay.  That was what I was asking.  So as you

23       got to him, you heard him give a 15 car count

24       to the engineer?

25   A   That's correct.
```

1    A    I don't recall saying that.

2    Q    Could communications between Sexton and

3         DePover have occurred between the time you

4         left your truck and the time you got to

5         DePover?

6    A    It could have, yep.

7    Q    It could have happened and you didn't hear

8         it.  Right?

9    A    It could have.

10   Q    But you knew that Cox and Cruciani were on

11        the north end?

12             MR. SULLIVAN:  Objection,

13        misstates the witness' testimony.

14   A    I don't know where Cox was.

15   Q    (By Mr. Magnuson, continuing) You knew that

16        Cox and Cruciani could communicate by radio

17        with Sexton and DePover.  Right?

18   A    I don't know where Cox was.

19   Q    You heard the north end communicate and

20        conduct a job briefing with the south end.

21        Right?

22   A    I heard Cruciani talking and giving a

23        briefing with the 474 crew.

24   Q    But you didn't talk to Cruciani?

25   A    No.

1  Q  Do you just show up in yards randomly and
2     conduct E tests?
3  A  Yes.
4  Q  Why were you in the south part of the yard?
5  A  I was at the south end of the yard because I
6     knew the 474 was coming inbound and I saw the
7     opportunity to perform an E test.
8  Q  So your intent was to E test the 474?
9  A  Correct.
10 Q  So if we can look at pages 19 and 20, this is
11    your testimony.  Initially I thought maybe we
12    were dealing with a typo.  But if you look at
13    19, line 11, it says, "That setout consisted
14    of 76 cars."  On page 20, line 15, it says,
15    "again, he had 76 cars."
16 A  Okay.
17 Q  I think you might have looked at a tonnage
18    profile prior to the investigation.  Does
19    that refresh your recollection that they had
20    ahold of 76 cars?
21 A  No, unless it was on the inbound train.
22 Q  Why does it say 76 cars here on pages 19 and
23    20 with your testimony?
24 A  I don't recall.
25 Q  But you're going to maintain that you were

1    A    (Witness examining document).  Okay.

2    Q    That discussion about the tonnage profile

3         that Mr. DePover provided in terms of the

4         markings, where he made the mark, would seem

5         to indicate that there were 76 cars as well.

6         Right?

7    A    Right.

8    Q    Page 27, line 12, let me know when you're

9         done with that answer, lines 12 through 20.

10   A    (Witness examining document).

11   Q    After they de-trained, de-boarded, tied up,

12        what have you, you brought them -- them

13        meaning DePover and Sexton -- up to the depot

14        at the north end.  Right?

15   A    Yes, they were brought up to the north end.

16   Q    And you interviewed them.  Right?

17   A    It looks like -- on this part the testimony

18        looks like Mr. DePover was interviewed.

19   Q    It says, "They were relieved on the south

20        end.  And because of their hours, they were

21        brought to the north end".  That would

22        suggest that Sexton was brought to the north

23        end as well or not?

24   A    Correct.

25   Q    So both DePover and Sexton came to the north

1    it was the second.

2  Q  First or second.  I understand your testimony

3    is that you got to go with the more conservative

4    15.  Would you agree that clear for 40, 15 to

5    a stop is an unclear radio communication?

6  A  No.

7  Q  So these are terms that are within the rules,

8    the radio rules?

9  A  Correct.

10  Q  Clear for 40, 15 to a stop?

11  A  Correct.

12  Q  Not clear for 15.  Right?  Clear for 40?

13  A  Correct.  When shoving on other than main

14    track and/or a main track in a shoving

15    movement, you have to still be prepared to

16    stop for equipment, broken rails, other types

17    of situations.  So when you're shoving that

18    15 car lengths, you're still watching the

19    shove.  Otherwise he would have just kept

20    shoving and DePover wouldn't have not -- have

21    had to say anything.

22  Q  He stopped after 11.  Right?

23  A  He stopped 11 cars passed where he should

24    have.

25  Q  Well within 20 though.  Right?

1   A   I do.

2   Q   And you've read Mr. DePover's testimony where

3       he says 15 more to a stop, still clear for

4       40.  Correct?

5   A   15 to a stop.  That's correct.

6   Q   Still clear for 40 is what he testified to.

7       Right?

8   A   That's true but he's also following Rule 6.28.

9   Q   That's what he testified to.  Right?

10  A   I understand that.  That's correct.

11  Q   And that would be an additional instruction.

12      Right?

13  A   That's correct.

14  Q   We're going to start speeding this along here.

15  A   Am I done with this?

16  Q   Yeah, hopefully.  Were you aware that

17      Mr. Rainwater requested of Mr. Reyes to have

18      Cruciani and Cox testify and was denied that?

19  A   No.

20  Q   You don't recall that testimony in the

21      investigation?

22  A   No.

23  Q   Would you agree with me that if an engineer

24      feels that there was a safety issue with snow

25      and ice buildup on tracks, that the engineer

1     should make his supervisor aware of it?

2  A  He doesn't have to do that.

3  Q  An engineer doesn't have to make his

4     supervisor aware of a safety concern with

5     snow and ice buildup on tracks?

6  A  No.

7  Q  What should he do in that situation?

8  A  Cut the crossing, cut the tracks.

9  Q  Shouldn't tell his supervisor where he's

10     going, what he's doing?

11  A  Doesn't have to.

12  Q  He can just without telling his supervisor

13     cut away light power, cause any delay that's

14     necessary to make sure the tracks are cut?

15  A  Yes.

16  Q  Okay.  Were you made aware that Mr. McKelvey

17     and Mr. Sexton had a disagreement about

18     whether the tracks should be cut?

19  A  At some point.

20  Q  How were you made aware of that?

21  A  I don't recall.

22  Q  A conversation with Mr. McKelvey perhaps?

23  A  I don't remember.

24  Q  Would you take exception with Mr. McKelvey if

25     he told Sexton 'don't cut those tracks, get

1  A  No.

2  Q  You don't recall seeing circulars or fliers

3     that are put up around depots, hey, be

4     careful about -- to cut your tracks because

5     two derailments happened recently?

6  A  I don't remember that being put up.

7  Q  Snow and ice buildup on tracks, particularly

8     crossings, can become problematic because the

9     flange-ways and the wheels can rise up off

10    the rails onto the ice.  Right?

11 A  It can happen on crossings and rail yards,

12    anywhere there's snow and ice.

13 Q  But it's more frequent at crossings, as I

14    understand it, because automobile traffic

15    tamps down the snow and can cause that ice to

16    build up within the track structure.  Right?

17 A  That is correct.

18 Q  Snow and ice buildup on tracks can also cause

19    a locomotive's braking system difficulty or

20    to malfunction.  Right?

21 A  A locomotive's braking system can get buildup

22    and cause issues stopping because the brakes,

23    correct.

24 Q  Ice and snow can build up in the brake system

25    and cause difficulty in stopping.  Right?

1    Q    And that goes parallel to the Mississippi

2         River.  Right?

3    A    It does, portions of it.

4    Q    Quite close in some places.  Right?

5    A    Correct.

6    Q    And a train carrying hazardous materials de-

7         railing into the Mississippi River would be a

8         catastrophe.  Right?

9    A    Correct.

10   Q    It would be a environmental catastrophe.

11        Right?

12   A    Correct.

13   Q    It would cost the railroad a lot of money to

14        repair the tracks.  Right?

15   A    It could.

16   Q    Cost a lot to repair the freight, the

17        equipment, all that.  Right?

18   A    There is that possibility.

19   Q    A train derailing carrying hazardous

20        materials through areas where people live

21        could be a safety hazard for the folks living

22        in that area.  Right?

23   A    It could.

24   Q    Things like anhydrous ammonia can travel and

25        spread out so that people in the area are

```
 1   A   I don't recall what I felt at the time.
 2                  (Deposition Exhibit 57 marked for
 3       identification).
 4   Q   Have you seen this before?  Did you look at
 5       this yesterday?
 6   A   I believe so.
 7   Q   Or whenever it was when you saw it?
 8   A   Yes.
 9   Q   You've seen this document before.  Is there a
10       name for it?
11   A   Top 15 Trains Impacting Speed US.
12   Q   Is this a daily e-mail that goes out?
13   A   It's a daily document, yes.
14   Q   The rest of this is redacted after the first
15       entry?
16   A   Okay.
17   Q   There's three or four pages here of it.  How
18       are they ordered?  How do you know what the
19       order of first to last being top 15 to bottom
20       15 trains impacting speed is?
21   A   The highest delays are put at the top.
22   Q   So this is the highest delay on the system,
23       at least in the US system, on February -- on
24       February 2nd, this indicated that the 474 on
25       February 1st was the highest delay in the US.
```

474-31          exhibit 5

When shoving cars into NA04 track a car
count of 15 was given and after no communication movement
stopped after 11.

1 Feb 2021

## CANADIAN PACIFIC — TRAIN DELAY REPORT

Item # 6000

| TRAIN ID | UNITS IN CONSIST | | | | | | CABOOSE/EOT MARKER | DATE |
|---|---|---|---|---|---|---|---|---|
| 474-31 | CP 8526 / CP 5047 / UP 5586 | | | | | | 958023 | 1 Feb |

| FROM STATION | TO STATION | HIGHEST GENERAL ORDERS IN EFFECT | | TIME WATCH COMPARED |
|---|---|---|---|---|
| Marquette | Nahant | A-16        F-14 | | 0130 |

| TIME TRAIN MADE UP | TIME ENGINES ON TRAIN | PORTABLE RADIOS IN USE | AIR DEVICE NUMBER |
|---|---|---|---|
| — | — | 1 | |

| TERMINAL INITIAL AIR TEST MADE | TIME INITIAL AIR TEST MADE FROM | TO | INITIAL TERMINAL DELAY HOURS | MIN. | FINAL TERMINAL DELAY HOURS | MIN. |
|---|---|---|---|---|---|---|
| — | | | | | | |

| NAMES OF CREW MEMBERS OF TRAIN | | OCCUPATION | TIME WENT ON DUTY DATE | TIME | TIME WENT OFF DUTY DATE | TIME | TOTAL TIME ON DUTY HOURS | MIN. | OFF DUTY TIME PRIOR HOURS | MIN. |
|---|---|---|---|---|---|---|---|---|---|---|
| J | Sexton | ENGINEER | 2-1 Feb 1 | 0130 | | | | | | |
| J | DeFour | CONDUCTOR | ↓ | ↓ | | 1355 | | | | |
| | | OTHER | | | | | | | | |
| | | OTHER | | | | | | | | |

| WHERE DELAYED | ARR. | DEP. | CAUSE OF DELAY — On @ 0110 | LOADS | EMPTIES | TONS | LENGTH |
|---|---|---|---|---|---|---|---|
| Marquette | 0130 | | TB&O's, Paperwork, line North wye, PM 1 engine + S/O to | 117 | 27 | 5590 | 9349 |
| | | | MQ Siding. Needed to cut crossing + Siding. | | | | |
| | | | Locomotive brake test. Dig out hoses on engine to access | | | | |
| | | | them, tie back on + pump air, shoving cut 74 | | | | |
| | | | deep, pull up /shove 24 for — set/out 2 MQ Sdg. | | | | |
| | | | Shove back, tie on to rest of train, pump air, PTC. | | | | |
| | | 0540 | Warrant, Departure test, Engine check. | | | | |
| Dubuque | 0700 | 0730 | Stop, re line switch. NS1 Dispatcher reported normal | | | | |
| Dubuque Jct | 0735 | 0742 | Wait for CN to answer 0740 signal indication | | | | |
| Bear Creek | 0930 | 0945 | Waiting for Warrant. Talk to UP. All fck @ 533 Bear Creek | | | | |
| MP 182 | 1045 | | Holding back to not block crossings. Waiting for next | | | | |
| | | 1114 | Warrant. | | | | |
| Nahant | 1145 | | Mud line in, Wait for B6° to clear, crossover to Indy | | | | |
| | | | Switch out S/O 27, S/O Engine, S/O tie back to S/O | | | | |
| | | 1330 | Tie, brakes due to blue. Ride to depot. | | | | |
| Depot | 1335 | 1355 | Talk to GM about Efficiency failure (GM #23) | | | | |
| | | | | | | | |
| | | | | | | | |

S94   Axle
144   Cars

TOTAL HANDLED

**ENGINEER MUST SIGN THIS REPORT WHEN HOURS OF SERVICE HAVE BEEN EXCEEDED**

Conductor Signature: _Just DL_

Engineer Signature: _____

Original filed at terminal. - Fax copy to Minneapolis Operation Center, Fax # [redacted]
Fax copy to Timekeeping, Fax # [redacted]

EXHIBIT
5
tabbies®

SEXTON    000163

1              IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF IOWA
2                    EASTERN DIVISION

3     - - - - - - - - - - - - - - - - - - - - - - -
                            No. 3:23-CV-00031-HCA
4
      John Sexton,
5
                            Plaintiff,
6        vs.

7     Dakota, Minnesota & Eastern Railroad
      Corporation d/b/a Canadian Pacific,
8     a Delaware corporation
                            Defendants.
9
      - - - - - - - - - - - - - - - - - - - - - - -
10

11

12

13                    DEPOSITION OF

14                    MARK JOHNSON

15                    May 10, 2024

16                     1:00 p.m.

17

18

19

20

21

22
                  TAKEN BY: BRENDA K. FOSS
23

24

25

```
 1              Deposition of MARK JOHNSON, taken

 2    via Zoom videoconference, by and on behalf of

 3    Plaintiff, on Friday, May 10, 2024, commencing

 4    at 1:00 p.m., before Brenda K. Foss,

 5    Professional Court Reporter, Notary Public,

 6    State of Minnesota, County of Hennepin.

 7

 8                    *    *    *    *    *

 9              APPEARANCES

10
      ON BEHALF OF THE PLAINTIFF:
11        CYLE CRAMER, ESQUIRE
          JOHN MAGNUSON, ESQUIRE
12        LAUREN HOSCH, PARALEGAL
          YAEGER & JUNGBAUER BARRISTERS, PLC
13        4601 Weston Woods Way
          St. Paul, MN  55127
14        ccramer@yjblaw.com

15        ██████████████████

16
      ON BEHALF OF THE DEFENDANTS:
17        JACK SULLIVAN, ESQUIRE
          DORSEY & WHITNEY LLP
18        50 South 6th Street, Suite 1500
          Minneapolis, MN  55402
19        sullivan.jack@dorsey.com

20        ██████████████████

21
      ALSO PRESENT:
22            Michelle Haynes, CPKC Paralegal
              Noah Garcia, DM&E Counsel
23

24                    *    *    *    *    *

25
```

```
1                    I N D E X

2
        Examination:                      PAGE:
3       By Mr. Cramer                      4

4
        Objections:
5       By Mr. Sullivan                    8, 9, 12, 13,
        15, 17-21, 23, 24, 26, 27, 29-34, 36-43, 45,
6       48-51, 53, 54, 56, 57, 59, 60, 62-67, 70, 71,
        73-77, 80-104
7

8       Marked Deposition Exhibits:
        35 - 2/21 e-mails                  21
9            Bates 00981-983
        36 - 6/22 e-mail to Valadez   24
10           Bates 00615-617
        37 - 2/21 e-mail from Reyes   28
11           Bates 01703
        38 - Discipline Call              78
12           Bates 00948
        39 - US Efficiency Test Manual 79
13           Bates 000368-608
        40 - Performance Mgmt Program 93
14           Bates 03700-3704
        41 - STIP                          94
15           Bates 03231-3237
        42 - Short-Term Incentive     97
16           Bates 03711

17

18

19

20      Reporter's Certificate            106

21

22      (Original Deposition Transcript in the
        possession of Cyle Cramer, Esquire).
23

24                        *   *   *   *   *

25
```

1    Q    (By Mr. Cramer, continuing) Did you think

2         that Mr. DePover was lying about giving the

3         25 to a stop instruction?

4                   MR. SULLIVAN:  Objection, misstates

5         the testimony in the transcript.

6    A    No.

7    Q    Then where it says clear for 50 cars, what do

8         you take that to mean?

9    A    Based on the way he says clear for 50 cars

10        starting with needing 25 to a stop, it's

11        again assuring him that they have got plenty

12        of room.  So the stop doesn't have to be on a

13        dime or they're not coming in to a joint.

14   Q    So should Mr. Sexton take into account the

15        clear for 50 cars when deciding when to stop?

16                  MR. SULLIVAN:  Objection, lack of

17        personal knowledge.

18   A    Once he's given something more restrictive,

19        no.  He needs to go with what's most

20        restrictive.  25 is more restrictive than 50.

21   Q    Is that what the rule says, Rule 6.5?

22   A    I don't have the GCOR in front of me to tell

23        you exactly what it reads, but they are

24        required to stop within half the distance

25        specified.  So in the case of the 25, you

```
 1        middle, you write, 'If he was given the 40

 2        car clearance'.  Let me know when you find

 3        that.

 4    A   Found that.

 5    Q   Then you can read the whole sentence to

 6        yourself.

 7    A   (Witness examining document).  Okay.

 8    Q   What did you mean by that?

 9    A   So based on the testimony at the investigation,

10        Mr. Jared was next to Mr. DePover when he

11        gave that 15 car count.  So he would have

12        heard the 40 car count.

13    Q   So you believed that Mr. Jared heard the 40

14        car count?

15            MR. SULLIVAN:  Objection, misstates

16        the witness' testimony and misstates the document.

17    A   No.  It's just not clear in the record

18        whether he heard the 40 or not.  He was

19        hearing the same 15 car count that was

20        alluded to by all witnesses.

21    Q   (By Mr. Cramer, continuing) Jump back up to

22        number 1 where you say, 'They argue that Mr.

23        Jared could not hear the conductor's instructions'.

24    A   (Witness examining document).  Okay.

25    Q   And then you say, 'the facts and the video
```

1    Q    What does fully engaged in that movement

2         mean?

3    A    They would not have had other distractions.

4    Q    Is not being distracted important during a

5         shoving movement?

6    A    Yes.

7    Q    Why is that?

8    A    Because if you're distracted, your mind has

9         gone away from the task at hand.  You could

10        end up cornering something.  You could hit

11        something.  More cars can go by you than what

12        you needed.  There's numerous reasons.

13   Q    Does it create an unsafe condition when an

14        employee who is protecting the shove is

15        distracted?

16             MR. SULLIVAN:  Objection,

17        misstates the witness' testimony, lack of

18        personal knowledge, calls for speculation.

19   A    Based on my experience, yes.

20   Q    (By Mr. Cramer, continuing) Was there any

21        other witness that could have changed your

22        mind on whether Mr. Sexton violated the

23        shoving rule?

24             MR. SULLIVAN:  Objection, calls

25        for speculation.

1      that would happen?

2                 MR. SULLIVAN:  Objection, misstates

3      the witness' testimony, form.

4   A  I wasn't present.  There was no questioning

5      as to what was 40 cars away from them.

6   Q  (By Mr. Cramer, continuing) Back on this

7      exhibit on item number 4, are you describing

8      the union's position there?

9   A  Yes.

10  Q  What is the difference between observation

11     versus setup?

12  A  Setup test is something in the environment

13     has changed versus observation would just be

14     Mr. Jared sat off to the side, either in his

15     truck or outside of his truck, and just

16     observed the entire shove movement.

17  Q  Did Mr. Jared stay in his truck and observe

18     the entire shove movement?

19  A  No.

20  Q  What did he do?

21  A  He set the test up by changing the environment

22     and having Mr. DePover not give a further

23     count.

24  Q  Do you know whether a shoving movement test

25     should be set up for observation only?

1   A   Okay.

2   Q   What are you asking on lines 6 to 8?

3   A   If they have been allowed to or had the

4       opportunity to cross-examine all witnesses

5       and present witnesses.

6   Q   Was it your understanding that Mr. Sexton was

7       able to present the witnesses that he

8       requested?

9   A   Not based on the document that's in front of

10      me, no.

11  Q   So Mr. Sexton requested Mr. Cruciani to

12      attend the investigation?

13  A   Based on the document you showed me

14      previously for the request, that was not

15      entered in as an exhibit.  And based on what

16      I have seen, no.  And I believe the lines you

17      were referring me to, the answer came from

18      Mr. Rainwater that the record speaks for

19      itself.

20  Q   Did Mr. Sexton request David Cox to be a

21      witness?

22  A   Again, based on the exhibits you've presented,

23      the letter from Mr. Rainwater was not marked

24      as an exhibit for the investigation.  So my

25      recollection is no.

```
 1        the witnesses.  Correct?

 2                    MR. SULLIVAN:  Objection, misstates

 3        the witness' testimony, badgering.

 4    A   I never denied the witnesses.  The record

 5        showed that they would have had no relevant

 6        information to this investigation.

 7    Q   (By Mr. Cramer, continuing) Who makes the

 8        determination whether they have relevant

 9        information to give to the investigation?

10    A   In this instance, the records show that they

11        would have had no relevance to this investigation.

12    Q   But who made that decision?

13    A   I did.

14    Q   Why?

15    A   Mr. Cox was assigned to another train and not

16        connected.  The testimony from when you were

17        first on -- I believe it was the 0098 -- read

18        that the union believed that he would have

19        heard the radio conversation.  That's not a

20        fact based he heard the conversation.  Again,

21        he was assigned to a different train.  The

22        other employee that was requested was not an

23        employee of CP Railroad.

24    Q   Do you know whether Mr. Cox was able to

25        overhear the radio?
```

1                    MR. SULLIVAN:  Objection, form.

2   A   Again, the union just believed.  They didn't

3       state that he heard.  So, therefore, it was a

4       fair and impartial investigation in my

5       opinion without the witnesses.

6   Q   (By Mr. Cramer, continuing) Do you know

7       whether Mr. Cox heard the radio conversation

8       or not?

9   A   No.  If the union is requesting them, that is

10      their job to prove that he heard it, not my

11      job to determine whether he did or not.

12  Q   How do they prove that he heard it?

13  A   They didn't prove that he did.  They just

14      stated that they believed he heard it.

15  Q   If he was a witness and said that he heard

16      it, would that be proof?

17                   MR. SULLIVAN:  Objection, calls

18      for speculation, lack of personal knowledge.

19  A   Again, there was no testimony stated that he

20      heard the conversation that would have had me

21      bring him in as a witness.

22  Q   (By Mr. Cramer, continuing) So you don't

23      recall any statements during the

24      investigation that David Cox overheard the

25      radio conversation?

1  A   No.  It's part of the investigation process.

2  Q   He believed that there was an unsafe act.

3      Correct?

4              MR. SULLIVAN:  Objection, lack of

5      personal knowledge.

6  A   I can't speak for Mr. Sexton.

7  Q   (By Mr. Cramer, continuing) He's stating here

8      though General Manager Jared actually created

9      an unsafe act.  Correct?

10  A   That is his belief.

11  Q   Did you believe him?

12  A   No.

13  Q   Why not?

14  A   Mr. Jared was performing a setup test.  At no

15      time did he foul tracks or did he distract

16      Mr. DePover from performing his duties.

17  Q   Do you recall Mr. Jared saying he told

18      Mr. DePover to stop giving instructions?

19  A   I believe we went over some of that where he

20      talked about -- he approached Mr. DePover and

21      Mr. DePover testified to it.

22  Q   But do you think Mr. Jared was distracting

23      Mr. DePover?

24              MR. SULLIVAN:  Objection, lack of

25      personal knowledge, calls for speculation,

1      form.

2   A   No.

3   Q   (By Mr. Cramer, continuing) Why not?

4   A   Because there was no testimony that

5      Mr. DePover felt he was distracted.

6   Q   Is it a safe act to walk up to somebody

7      protecting a shoving movement?

8            MR. SULLIVAN:  Objection, lack of

9      personal knowledge, calls for speculation,

10     form.

11  A   It was done in a safe manner.

12  Q   (By Mr. Cramer, continuing) How can it be

13     done in a safe manner?

14  A   Mr. Jared didn't foul.  He didn't -- there's

15     just no testimony that allowed me to believe

16     that he was distracted or created an unsafe

17     act based on the testimony at the investigation.

18            MR. CRAMER:  Let's take another

19     break.  I don't have much more, but maybe

20     another ten minutes and then we'll wrap up.

21            (Brief recess).

22  Q   (By Mr. Cramer, continuing) I'm going to

23     bring up what was Exhibit 2.  We can go all

24     way to the top so you can get a sense of what

25     this is.  Do you recognize this?

1   A   Yeah, that's the General Code of Operating

2       Rules.

3   Q   Do you know if this was the one in effect in

4       February of 2021?

5   A   Yes.

6   Q   Then go to 319.  Do you see the 5.3.7?

7   A   Yes.

8   Q   Do you understand that to be the rule you

9       believe Mr. Sexton had violated?

10  A   Yes.

11  Q   Take a second to review it.

12  A   (Witness examining document).

13  Q   Does it say more restrictive anywhere in that

14      rule?

15  A   No.

16  Q   Sorry.  What was that?

17  A   I said no.

18              MR. CRAMER:  That's all I have.

19              MR. SULLIVAN:  We have no questions.

20              (WHEREUPON, the testimony was

21              concluded at 5:30 p.m.)

22                      *    *    *

23

24

25

Manager Support Services
Operations-US



Exhibit 1

CERTIFIED MAIL 7019 2970 0002 0440 6531
CERTIFIED MAIL 7019 2970 0002 0440 6555

February 4, 2021



Gentlemen:

Attend a formal investigation/hearing session scheduled to be held at the General Yard Office Building conference room, located at 3420 Miller Ave, Davenport, IA, on February 10, 2021 at 12:00 hours.

The purpose of this formal investigation/hearing is to determine the facts and circumstances and to place your responsibility, if any, in connection with your alleged:

- Failure to stop within half the specified distance given while shoving into track NA04.

This incident allegedly occurred at approximately 12:49 hours on February 1, 2021 while working Train 474-31 at Nahant yard.

The following Carrier witnesses known at this time to likely have knowledge of the incidence and/or evidence relative to this investigation/hearing is hereby requested to attend:

- Tom Jared
- Dylan Smith

In accordance with the provisions of your Scheduled Agreement, arrange for representative and/or witnesses, if desired. A copy of this document is enclosed should you desire to coordinate this matter with your representative.

Sincerely,

Shelley R. Daberitz
Manager Support Services
Operations U. S.

CC:    Dylan Smith                          Employee Services
       John Cartlidge                        Timekeeping
       CMC                                   Operating Practices/Rules
       Joey Reyes – Please arrange to conduct
       Tom Jared – Please arrange to attend as Company witness
       Dylan Smith – Please arrange to attend as Company witness

EXHIBIT

LI

SEXTON   000004

129

### 5.3.7 Radio Response

When radio communication is used to make movements, crew members must respond to specific instructions given for each movement. Radio communications for shoving movements must specify the direction and distance and must be acknowledged when distance specified is more than four cars.

> Movement must stop within half the distance specified unless additional instructions are received.

## 5.4 Flags for Temporary Track Conditions

### 5.4.1 Temporary Restrictions

Track bulletins, track warrants, or general orders may restrict or stop train movements because of track conditions, structures or men or equipment. Yellow flags are used to indicate temporary speed restrictions. Yellow-red flags are used to indicate when a train may be required to stop. When flags are not displayed, that information will be included in the track bulletin, track warrant, or general order.

When a restriction spans adjoining subdivisions, separate temporary restrictions may be issued on each subdivision. Only one set of flags may be displayed in advance of the entire restriction in each direction.

### 5.4.2 Display of Yellow Flag

#### A. Restriction Is In Effect

**Two Miles Ahead of Restricted Area.** Yellow flags warn trains to restrict movement because of track conditions or structures. To make sure train movement is restricted at the right location, employees must display a yellow flag 2 miles before the restricted area.



*[Diagram A.]*

**Less than Two Miles Ahead of Restricted Area.** When the restricted area is close to a terminal, junction, or another area, employees will display the yellow flag less than 2 miles before the restricted area. This information will also be included in the track bulletin, track warrant, or general order.



*[Diagram B.]*

**Once the Train Reaches the Restricted Area.** The speed specified by track warrant, track bulletin, general order, or radio speed restriction must not be exceeded until the rear of the train clears the restricted area.

SEXTON    000006

Exhibit B

**Mark J Johnson**

| | |
|---|---|
| **From:** | ▉▉▉▉▉▉▉▉▉▉▉▉ |
| **Sent:** | Wednesday, February 10, 2021 1:51 PM |
| **To:** | Mark J Johnson |
| **Subject:** | Fwd: Request for witnesses_J.Sexton_J. DePover - alleged failure to stop within half |
| **Attachments:** | Sexton-DePover_Request for Witnesses_Failure to stop within half.pdf |

This email did not originate from Canadian Pacific. Please exercise caution with any links or attachments.

---------- Forwarded message ---------
From: **Joe Rainwater** <jrainwater64@gmail.com>
Date: Mon, Feb 8, 2021, 12:27 PM
Subject: Request for witnesses_J.Sexton_J. DePover - alleged failure to stop within half
To: Joey Reyes ▉▉▉▉▉▉▉▉▉▉

Mr. Reyes,

Please see the attached formal request for witnesses with regard to the upcoming hearing on February 10, 2021.

I look forward to your response.

Thanks,

Joe Rainwater

1

SEXTON    000011



**BROTHERHOOD OF LOCOMOTIVE ENGINEERS&TRAINMEN**
*A Division of the Rail Conference—International Brotherhood of Teamster*
Division 117—Mason City/Marquette-Dubuque, IA

February 8, 2021

Dear Mr. Reyes,

The purpose of this letter is to formally request witnesses, be made available in the hearing scheduled Wednesday, February 10, 2021 at 1200 in the matter of John Sexton and Justin DePover and their alleged,

Failure to stop within half the specified distance given while shoving into track NA04

On behalf of both Principals, the Organization requests the following:

1. Witnesses
   a. **Andrew Cruciani** – We have reason to believe that Mr. Cruciani was assisting the 474-31 crew at Nahant yard. It is our contention that he will have first hand, and primary knowledge, of the events and is a material witness.
   b. **David Cox** – We have reason to believe that Mr. Cox was able to overhear the radio conversation relative to the charges, therefore making him a material and primary witness as well.

Since the Organization is unable to approve or compel the absence of these two witnesses for a hearing, I ask that their time off be approved ahead of the hearing to allow them to be present to testify.

I thank you for your time and would appreciate a pre-hearing response to my requests. While I look forward to that, I would appreciate any response be specific to the request made rather than the typical form letter response that *"this isn't a court of law and the Organization doesn't have the right to discovery ahead of the hearing"*, etc. etc. I'm not requesting discovery ahead of this hearing. I'm only requesting this specific and pertinent witnesses, be made available at the time of, and during, the hearing process.

Thank You,

Joe Rainwater



SEXTON   000012

IN RE THE MATTER OF:                )

Investigation/Hearing of John       )

Sexton; Justin DePover              )


February 10, 2021

12:00 PM



PROCEEDINGS HAD at Canadian Pacific 3420 Miller
Avenue, Davenport, Iowa.

John Sexton; Justin DePover
February 10, 2021

3

I N D E X

WITNESS:  THOMAS JARED

     Examination by Mr. Johnson          18, 43, 45

     Examination by Mr. Rainwater          38, 44


PRINCIPAL:  JUSTIN DEPOVER

     Examination by Mr. Johnson          48, 57, 83

     Examination by Mr. Rainwater    52, 61, 82, 87


PRINCIPAL:  JOHN SEXTON

     Examination by Mr. Johnson          62, 80

     Examination by Mr. Rainwater          64, 88


EXHIBITS:

     Exhibit 1          9

     Exhibit 2          12

     Exhibit 3          21

     Exhibit 4          27

     Exhibit 5          30

     Exhibit 6          34

     Exhibit 7          71

     Exhibit 8          77

John Sexton; Justin DePover
February 10, 2021

4

1        MR. JOHNSON:  Good afternoon.  The time is 12:14 on

2   February 10, 2021.  We are located at 3420 Miller Avenue,

3   Davenport, Iowa.

4            My name is Mark Johnson.  My title is Road

5   Trainmaster.  I will be the Conducting Officer in this

6   proceeding.

7            Beginning to my left, please state your name, title,

8   and role in this hearing.

9            So, Mr. Jared, we'll start with you.

10       MR. JARED:  Tom Jared, General Manager for U.S. West for

11   Canadian Pacific.

12       MR. SEXTON:  John Sexton, Locomotive Engineer,

13   Davenport, Iowa.

14       MR. RAINWATER:  Joe Rainwater, Local Chairman.  Also,

15   Locomotive Engineer for Marquette, Iowa.

16       MR. DEPOVER:  And Justin DePover.  I'm a Conductor outta

17   Davenport, Iowa.

18       MR. JOHNSON:  All right.  Thank you, gentlemen.

19            I am charged with conducting a fair and impartial

20   hearing and to develop all the facts and circumstances in

21   connection with this Notice of Charge.

22            The following rules of procedure will be observed and

23   enforced:

24            All present will conduct themselves in a professional

John Sexton; Justin DePover
February 10, 2021

5

1  manner and show respect for those testifying.  Swearing,

2  abusive conduct, outbursts, and repeated interruptions will not

3  be tolerated.

4          This hearing is being recorded, and the transcript of

5  the recording will be the official record.  Speak slowly and

6  distinctly in order for your testimony or remarks to be

7  properly recorded.

8          Objections raised during this hearing will be

9  addressed and made a matter of record.

10          Reasonable recesses will be granted when requested,

11  but only before or after a witness has testified.  Except in

12  unusual circumstances, recesses will not be granted during a

13  witness' testimony.

14          The charged employee and representative will be

15  afforded the opportunity to present witnesses, cross-examine

16  Company witnesses, and introduce the record information or

17  exhibits pertinent to the matter being investigated.

18          The charged employee and representative will be

19  allowed to make a closing statement prior to the conclusion of

20  this hearing.  Closing statements should be confined to the

21  matter being investigated and based on evidence presented and

22  testimony given during this hearing.

23          This investigation is being held to develop all the

24  facts and circumstances relative to the Notice of Charge dated

John Sexton; Justin DePover
February 10, 2021

19

1      Q.      Okay.  Are aware of an incident that occurred at

2   approximately 12:49 hours on February 1, 2021?

3      **A.      I am.**

4      Q.      Could you please describe what you observed or

5   what the incident was?

6      **A.      On -- on February 1st, I was at the south end of**

7   **Nahant Yard.  I was observing Train 474-31 coming down to the**

8   **south end of the yard.  I observed the Conductor actually**

9   **dismount the locomotive.  The crew was going to actually shove**

10  **-- they were instructed to shove 4 Track as part of their**

11  **setout.  That setout consisted of 76 cars.  Conductor made the**

12  **cut, pulled up, was gonna shove into the south end of the yard**

13  **into 4 Track.  Conductor lined all of his switches.  Conductor**

14  **and Engineer actually briefed with the RC assignment which was**

15  **actually on the north end of the yard, and they were told that**

16  **the RC assignment was actually in 16 Track and they would not**

17  **be in 4.  And the two crew members, Mr. Sexton and Mr. DePover,**

18  **actually briefed on this over the radio where their actual RC**

19  **assignment was, and that the 4 Track was actually theirs and it**

20  **was clear at the time.**

21         **Mr. DePover actually started a shoving movement**

22  **into 4 Track.  He gave an initial car count of 50.  I was**

23  **actually on the south end of the yard at that time in my**

24  **vehicle, which I actually dismounted at that time, and as I**

John Sexton; Justin DePover
February 10, 2021

20

1  walked over to Mr. DePover, he was in between -- on the south

2  side of 4 Track.  I walked up to him and as I walked up to him,

3  he'd gave a 15-car count to the Engineer, John Sexton.  At that

4  point, I instructed Mr. DePover to not provide any more radio

5  communication to Mr. Sexton, and Mr. Sexton continued to shove

6  back.  And I was -- as I was counting down, we got to seven

7  cars that he actually shoved, which that's when Mr. Sexton

8  should've actually stopped and he did not.  But he did -- I did

9  note that that was the seventh car that was being shoved by,

10  and Mr. DePover, at that time, did confirm that was the seventh

11  car.  And actually, at that time, Mr. Sexton got on the radio

12  and he asked for further instructions from Mr. DePover.

13  Mr. DePover did not -- did not answer.  As you can hear, Mister

14  -- the brakes were actually being applied on the train.  And

15  again, he had 76 cars.  And Mr. Sexton asked one more time, and

16  then brought the train to an actual stop.

17          When he stopped, he'd actually shoved 11 cars

18  into the track further from that initial count of 50.  At that

19  time, I -- Mr. Sexton was asking for his Conductor -- or for

20  the AE, Assistant Engineer DePover, and the -- Mr. DePover told

21  him that I was actually conducting a test.  Mr. Sexton said oh,

22  I must've passed.  But at that time, I told Mr. DePover that --

23  to [indiscernible] his thoughts, make sure to get a proper job

24  briefing, and continue his movement of yarding the train, and

John Sexton; Justin DePover
February 10, 2021

21

1    **we'd brief afterwards, which he did.**

2    **          So through that process, Mr. Sexton did violate**

3    **General Code of Operating Rules 5.37.  That's called Radio**

4    **Response, it's actually a shoving movement, where it clearly**

5    **states:**

6              "Movement must stop within half the

7         distance specified unless additional

8         instructions are received."

9         Q.    Okay.  Is that an exhibit that you'd like to

10   enter?

11        **A.    Yes, I would.  I -- if you don't have a copy of**

12   **that, I can get a copy brought to you, but I would like to make**

13   **it a -- an exhibit.  GCOR—Eighth Edition—April 1, 2020, Rule**

14   **5.3.7 Radio Response.**

15        Q.    Okay.  Yeah, Joey provided me with some things

16   that -- so I did find that.

17        MR. JOHNSON:  I will label this as Exhibit #3.  And that

18   is the GCOR -- Eighth Edition, April 1st of 2020, 5.3.7 Radio

19   Response.

20                    (Whereupon, the document was marked as

21                     Exhibit 3 for identification.)

22        Q.    So, Mr. Jared, did he comply with this Rule?

23        **A.    Absolutely not.**

24        Q.    And how not?

John Sexton; Justin DePover
February 10, 2021

22

1       MR. RAINWATER:  Just -- for -- just point of order,

2   you're -- you're sa --

3       **A.      He was supposed to have been stopped at seven**

4   **cars.**

5       MR. RAINWATER:  Yeah, we're saying he, can we specify

6   exactly who he is?  There's two charged employees.  Can we

7   specify --

8       MR. JOHNSON:  Okay.

9       MR. RAINWATER:  -- which one we're saying is not in

10  compliant with this Rule?  I missed that because of this video.

11      MR. JOHNSON:  Okay.  If you have an objection or

12  something like that, please let him finish and then --

13      MR. RAINWATER:  Okay.

14      MR. JOHNSON:  -- make your objection.

15      Q.      So, Mister -- Mr. Jared, did Mr. DePover violate

16  this Rule?

17      **A.      No, he did not.**

18      Q.      Okay.  Did Mr. Sexton violate the Rule?

19      **A.      Yes, he did.**

20      Q.      And how so?

21      **A.      Mr. Sexton, at seven cars, he should have been**

22  **stopped, which he was not.  As I noted -- I -- I was counting**

23  **the cars as they were going by.  At the seventh car, as it went**

24  **by, I noted with Mr. DePover that that was the seventh car**

23

1    after his initial radio response of 15.  He did confirm with

2    me.

3            MR. SEXTON:  It's 50.

4        A.       And then, again, Mr. Sexton stopped at 11 car

5    lengths past the initial 15 car instruction he gave to his

6    Engineer, John Sexton.

7        Q.       Okay.  So he gave an initial count of 50.

8    Correct?

9        A.       Correct.  The initial car count was 50 into the

10   track, which was a clear track.

11       Q.       Okay.  And then he gave further instruction for

12   15?  1-5?

13       A.       That's correct.  When I -- when I walked over to

14   him, at that time, he actually made a radio communication to

15   his Engineer, which was John Sexton, of a 15-car count.

16       Q.       Okay.  And then it was how long before he came

17   to a stop?

18       A.       Eleven car lengths.

19       Q.       Is that less or more than half the distance that

20   was specified for the 15-car count?

21       A.       More than half.

22       Q.       Okay.  Any other evidence you'd like to submit?

23       A.       You should have a Tonnage Profile if Mr. Reyes

24   actually printed it for you.  This Tonnage Profile was provided

John Sexton; Justin DePover
February 10, 2021

38

1    BY:  MR. RAINWATER

2         Q.      Mr. Jared, with regard to the video that was

3    presented, is there audio evidence available to correspond with

4    the video?  Can you --

5         **A.      No.**

6         Q.      So -- so there's no way --

7         **A.      No, there's not.**

8         Q.      -- to correspond with what the crew was

9    communicating on the radio with the movements that were taking

10   place?

11        **A.      There's no corresponding audio that goes with**

12   **the video.**

13        Q.      All right.  So did you -- once you exited your

14   vehicle, d -- did you have a radio available that you were

15   listening to the crew on?

16        **A.      I did not have a radio with me.**

17        Q.      All right.  So is it possible that you didn't

18   hear all the instructions that was -- that were given from the

19   Conductor to the Engineer as they completed this move?

20        **A.      The -- I had my truck radio on, I had my windows**

21   **down.  I have a very loud radio in my truck.  I did not hear**

22   **any other correspondence with Train 474 --**

23        Q.      All right.  Is it possible that --

24        **A.      -- through that radio from where I walked from**

John Sexton; Justin DePover
February 10, 2021

39

1    **my --**

2            Q.      Yeah, the question I asked --

3            **A.      Okay.**

4            Q.      -- though, is it possible that you -- you didn't

5    hear anything -- additional --

6            **A.      No.**

7            Q.      -- communication because you weren't -- didn't

8    have a radio on your person?

9            **A.      No.**

10           Q.      All right.  So you stated earlier with regard to

11   the GCOR Rule that you entered as Exhibit #3, that Mr. DePover

12   was not in violation of this Rule.  Is that correct?

13           **A.      That's correct.  Mr. DePover, I did not find him**

14   **in violation of GCOR 5.3.7.**

15           Q.      All right.  Since that's the only Rule that you

16   entered as a Rule, I can only assume then that Mr. DePover is

17   not culpable in this alleged charge whatsoever.  Is that also

18   correct?

19           **A.      That is correct.**

20           MR. RAINWATER:  All right.  Mr. Johnson, at this time,

21   I'd like to amend the Hearing Letter wherein Mr. DePover is a

22   charged Principal with the charge -- the alleged -- with the

23   allegation on the Ca -- from the Carrier, to have it amended

24   that Mr. DePover be in attendance purely as a witness.

John Sexton; Justin DePover
February 10, 2021

45

1  **back up?**

2        MR. JOHNSON:  Yeah, I'm pulling it back up right now.

3        MR. SEXTON:  Yeah.

4        Q.    All right.  So --

5        MR. SEXTON:  Can't see it.

6        MR. RAINWATER:  Yeah, we don't see Mr. Jared's vehicle

7  in view.  And I would estimate, just by --

8        MR. SEXTON:  Fifty yards.

9        MR. RAINWATER:  Yeah, it probably -- probably at least

10  tw -- thirty to forty yards at a minimum.

11        Q.    Okay.  I just wanted to note that for the

12  record, your vehicle is not in view and you didn't have a radio

13  on your person, as you said earlier.

14        MR. RAINWATER:  Thank you.  No further questions at this

15  time.

16        MR. JOHNSON:  Okay.  Just a couple follow-up for ya.

17  BY:  MR. JOHNSON

18        Q.    Mr. Jared, you've already testified that you

19  were standing next to -- which the video shows -- standing next

20  to Mr. DePover when he gave the 15-car count.  Were you --

21        **A.    That's correct.**

22        Q.    Were you near your radio when the initial

23  communication of 50, 5-0, cars was given?

24        **A.    I was.**

John Sexton; Justin DePover
February 10, 2021

50

1      A.      Yes.

2      Q.      Okay.  So we go up, there's a blue mark under

3   line 64.  Is that correct?

4      A.      Yes.

5      Q.      What is that?

6      A.      That would've been when I told them that there

7   were 15 cars remaining and that he was clear for 40 still at

8   that time.  And then the -- the next blue line would've been

9   the actual car or the stop, which was in front of us at the

10  time on the -- when he -- when Mr. Sexton did have the train

11  stopped.  And then the -- then I did also indicate the DP unit,

12  which we were to set out to a separate track.

13     Q.      Okay.

14     A.      So that would've been the end of our cut, right

15  -- right at the -- car number 49 would've been the -- the cut

16  location to leave into Nahant 4.

17     Q.      Okay.  So you gave him 15 cars.  Correct?

18     A.      So li --

19     Q.      At line 64?

20     A.      So my initial movement woulda been the clear for

21  50 to start him into the track --

22     Q.      Okay.

23     A.      -- and I asked for 25 at the time.  And then the

24  next call was still clear for 40, had 15 until the stop.

John Sexton; Justin DePover
February 10, 2021

51

1      Q.      Okay.

2      **A.      Which was when I was told not to respond to any**

3   **remarks on the radio yet.**

4      Q.      Okay.  And then under line 53 --

5      **A.      Tha -- that was when the train actually came to**

6   **a stop.**

7      Q.      Okay.  So you gave him 15, clear for 40?

8      **A.      Yes.**

9      Q.      Is what you're saying?

10     **A.      Yes.**

11     Q.      Okay.  Exhibit 5 was your -- is that a statement

12  that was written by you?

13     **A.      Yes.**

14     Q.      Okay.  And in that letter, do you say -- or in

15  that statement, do you say anything about anything other than a

16  count of 15?

17     **A.      On -- on written, I do just have the 15 count**

18  **and that it stopped after the 11.**

19     Q.      Okay.  So if you had given him that instruction,

20  why wouldn't you put that in there?

21     **A.      Well, hon -- honestly, it -- with it being my**

22  **second start back and I was in a closed room with the General**

23  **Manager, whom I've never met, and Mr. Smith, I was quite under**

24  **some pressure.**

John Sexton; Justin DePover
February 10, 2021

52

1      MR. JOHNSON:  Okay.  I have no further questions for

2   Mr. DePover at this time.

3          Mr. Rainwater, any follow-up with Mr. DePover --

4      MR. RAINWATER:  Yes.

5      MR. JOHNSON:  -- for you?

6   BY:  MR. RAINWATER

7      Q.      So specifically to Exhibit 5 here, your

8   statement, did you -- was this statement given willingly?  Or y

9   -- were you compelled to give it?

10     **A.      I -- I'd say compelled.  I didn't even know I**

11  **had a choice not to, if that was even a thing.**

12     Q.      Okay.  So did you feel intimidated, being in the

13  room with Mr. Jared?

14     **A.      Yes, I did.**

15     Q.      Did he make any inferences or assum -- or did

16  you assume, based upon what he was asking for, that if you

17  didn't do it, you would be in trouble?

18     **A.      I -- I do feel that way still.  I -- I -- I**

19  **wrote down what I was thinking at the time --**

20     Q.      Okay.

21     **A.      -- and --**

22     Q.      Related back to the video that we watched, I'll

23  ask you the same thing I asked Mr. Jared.  Did -- did Mr. Jared

24  have a radio on his person, a -- a portable?

John Sexton; Justin DePover
February 10, 2021

53

1    A.    He did not.

2    Q.    And his vehicle wasn't within view of the

3    screen.  Is that correct?

4    A.    My back was to it also, so I had --

5    Q.    And your ba --

6    A.    No.  Yeah.

7    Q.    So you didn't see it either?

8    A.    That's correct.

9    Q.    And so you gave instruction, then, after you

10   were prepared to shove into the track.  What did -- what did

11   you tell Mr. Sexton as far as instructions for to initiate your

12   move?

13   A.    The -- the initial movement woulda been that we

14   were clear for 50 cars, and I would've started him in with

15   needing 25 to a stop.  And then I updated him with needing 15

16   more to a stop, still clear for 40 --

17   Q.    Okay.

18   A.    -- and then I was informed not to --

19   Q.    So --

20   A.    -- proceed anymore.

21   Q.    So do you believe because Mr. Jared didn't have

22   a radio on his person, he didn't hear you say clear for 40?

23   A.    I -- that's my assumption.

24   Q.    All right.  So based upon the car counts that

John Sexton; Justin DePover
February 10, 2021

56

1       Q.      -- for a little bit?

2       **A.      Yes, I was engaged with talking with him.**

3       Q.      Okay.  So di -- and did Mr. Jared interrupt you

4   while the cars were moving next to you?

5       **A.      The -- the shoving movement was already**

6   **occurring.  Yes.**

7       Q.      Okay.  And then after Mr. Jared instructed you

8   not to reply to Mr. Sexton over the radio, what occurred next?

9       **A.      I kinda verified it with him at the time because**

10  **I -- I wanted to give him proper car counts still, but he just**

11  **kept insisting that I did not reply, and we just waited until I**

12  **-- then Mr. Sexton eventually did stop the train after**

13  **inquiring where I was.**

14      Q.      All right.  So a -- after Mr. Sexton inquired to

15  where you were and you were unable to respond at the direction

16  of Mr. Jared, did Mr. Sexton continue to ask for you on the

17  radio?

18      **A.      Yes, he probably asked about three or four**

19  **times, even after stopped, and then also tried to get ahold of**

20  **the Yard Office to relay for him if he couldn't hear me.**

21      Q.      All right.  So i -- that was even after he

22  stopped.  And it sounded like he was concerned for your

23  well-being?  Or didn't know what was happening?

24      **A.      Yeah, he definitely sounded like he had no idea**

John Sexton; Justin DePover
February 10, 2021

57

1    **what was going on.**

2         Q.     All right.  With regard to this written

3    statement that you made, were you -- were you still within your

4    12 hours?  Or was this after your -- the expiration of your

5    hours of service?

6         **A.     That woulda been after.**

7         Q.     And just to jar your memory here, do you recall

8    Mr. Jared stating that you were not at fault for the

9    allegations in this hearing?

10        **A.     During this hearing, yes.**

11        MR. RAINWATER:  N -- no further questions at this time.

12        MR. JOHNSON:  Okay.  I just have a couple follow-up

13    questions.

14    BY:  MR. JOHNSON

15        Q.     Where was Mr. Jared when you gave the 15-car

16    count?

17        **A.     He was walking up behind me at the time.  I'm --**

18    **I'm not sure where he woulda been right behind me.  After I**

19    **gave the 15-car count and the clear for 40, he then came up**

20    **beside me and I was able to notice that he was in the track**

21    **with me.**

22        Q.     Okay.  So did Mis -- you -- you -- you testified

23    that Mr. Sexton had tried to contact you after approximately

24    seven cars had gone by you?

John Sexton; Justin DePover
February 10, 2021

65

1    Q.    Right.  That was --

2    **A.    -- 5-0, cars.**

3    Q.    That was at the be --

4    **A.    We all have masks on in here.**

5    Q.    Right.

6    **A.    Good for 5-0 cars.  And then he -- once**

7    **Mr. DePover was -- he updated me, he said still good for 40,**

8    **15, 1-5, to a stop.  That's correct.**

9    Q.    Okay.  So based upon your round trip with

10   Mr. DePover, was this -- he just returned from furlough.

11   Correct?

12   **A.    Yes, sir, he did.**

13   Q.    And -- and how many trips had he made prior to

14   this event?

15   **A.    One; that was with me, going north to Marquette,**

16   **sir.**

17   Q.    So you're on the round trip of his first trip

18   back from an 11-month furlough.  Is that correct?

19   **A.    That is correct.**

20   Q.    And so based upon your previous statement,

21   you're -- you said you were having rolling job briefings with

22   him.  It -- was that just this trip?  Or the way up as well?

23   **A.    On the way up --**

24   MR. JOHNSON:  Okay.  Mr. Rainwater --

John Sexton; Justin DePover
February 10, 2021

67

 1      **A.      I do, sir.  Would you like me to read it?**

 2      Q.      If you could, please read the first paragraph.

 3      **A.       This is GCOR 6.5 Shoving Movements:**

 4         "Equipment must not be shoved 'til

 5      the engineer and employee protecting

 6      the movement have completed a job

 7      briefing concerning how protection will

 8      be provided.  Employee must be in

 9      position, provide visual protection of

10      the equipment being shoved and must not

11      engage in unrelated tasks while

12      providing protection."

13      Q.      Because Mr. Jared interrupted Mr. DePover while

14  he was protecting your shove, do you believe Mr. Jared enticed

15  Mr. DePover an - and, therefore, broke this Rule?

16      **A.       Absolutely.**

17      Q.      Mr. Jared caused that Rule to be violated?

18      **A.       Absolutely.  He created a unsafe act.**

19      Q.      All right.

20      MR. RAINWATER:  So, Mr. Johnson, I'm gonna pass you a

21  copy of a few pages from the US Efficiency Test Manual on the

22  Operating Rules Compliance With FRA 217.  This is the Testing

23  --

24      MR. JOHNSON:  I --

John Sexton; Justin DePover
February 10, 2021

72

1        Q.      And as part and parcel of that, in the US

2   Efficiency Testing Manual, Mr. Sexton, page 13 lists some dos

3   and don'ts.

4        MR. JOHNSON:  Okay.  So once again, Mr. Jared is not

5   under investigation at this time.

6        MR. RAINWATER:  Yeah, I get that.

7        MR. JOHNSON:  So we're not gonna go off onto this --

8        MR. RAINWATER:  Okay.  We believe that this test was set

9   up in an unfair manner.  Regardless of whether or not

10  Mr. Sexton did or didn't comply with it, tests have to be

11  conducted in a fair manner.  Right?  And by virtue of the

12  actions of Mr. Jared not even following along with what the

13  manual dictates as what is an acceptable test based upon just

14  purely being ab -- able to observe the actions, by -- by

15  manipulating the conditions and telling Mr. DePover not to

16  respond to any questions or give him any further car counts, he

17  violated this -- it -- this whole process for what's considered

18  a fair efficiency test.  So that's why this is relevant to the

19  facts and circumstances of this investigation.

20       MR. JOHNSON:  Okay.  Mr. Rainwater, we're not gonna go

21  off into this realm.  I want to stick to whether or not

22  Mr. Sexton and Mr. DePover complied with the Rules --

23       MR. RAINWATER:  So am I --

24       MR. JOHNSON:  -- and if you have issue with Mr. Jared's

John Sexton; Justin DePover
February 10, 2021

74

1    MR. JOHNSON:  Last night.

2    MR. RAINWATER:  So last night.  Okay.  On February 8th,

3  I sent an email to Mr. Reyes.  It's got -- who, at the time, up

4  until today, I inter -- was under the impression he was gonna

5  be the Hearing Officer -- and this letter states:

6         "Mr. Reyes,

7          The purpose of this letter is to

8          formally request witness -- witnesses,

9          be made available in the hearing

10         scheduled Wednesday, February 10, 2021

11         at 1200 in the matter of John Sexton

12         and Justin DePover and their alleged,

13         Failure to stop within half the

14         specified distance given while shoving

15         into track NA04

16         On behalf of both Principals, the

17         Organization requests the following:

18         Witnesses

19         Andrew Cruciani, a.  We have reason

20         to believe that Cruc -- Mr. Cruciani

21         was assisting the 474-31 crew at Nahant

22         yard.  It's our contention that he will

23         have first hand, and primary knowledge,

24         of the events and is a material

79

1    **word.**

2         Q.      All right.  And if he was here, would he have

3    been able to testify to the fact that your Conductor,

4    Mr. DePover, gave a car count 40 cars, I need 15?  If he was

5    here?

6         **A.      Yes.  But initially, it was 50, and then it was**

7    **--**

8         MR. JOHNSON:  Okay.  That's --

9         **A.      -- 40, good for 15.**

10        MR. JOHNSON:  That --

11        **A.      Correct.**

12        MR. JOHNSON:  That's speculation and hearsay.

13        MR. RAINWATER:  No, it's perfectly reasonable,

14   Mr. Johnson, because we requested him to be here, and the fact

15   that the Carrier didn't provide for it as requested allows us

16   the latitude to show exactly what we think he woulda testified

17   to.  M -- it -- you know, if you'd at least given me a response

18   to know they can't be there for whatever reason, then maybe we

19   could have a discussion.  But we have every reason to believe

20   and to assume, rightfully so, what Mr. Cox woulda testified

21   to.  And I'll ask no further questions about it at this time,

22   related to Mr. Cox.

23        Q.      Mr. Sexton, can't remember if I asked you this

24   or not, but related to GCOR 6.5 as we entered as an exhibit,

John Sexton; Justin DePover
February 10, 2021

81

1        Q.      Who was giving you shoving instructions?

2        **A.      I had a man on the north end protecting the**

3    **shove, Mr. Cruciani, and I had Mr. DePover on the ground as**

4    **well, counting me down.**

5        Q.      Okay.  So which employee was giving you your

6    shove instructions?

7        **A.      Well, at the -- at the time, Cruciani was at the**

8    **north end of the yard.  He -- he -- he told me it was clear**

9    **track, good for 50.  Mr. DePover said the same thing, and then**

10   **he -- he said good for 40 cars, and I --**

11       Q.      Who --

12       **A.      -- need 15.**

13       Q.      Who -- who said that?

14       **A.      Mr. DePover.**

15       Q.      Okay.  So who was giving your a -- your actual

16   shove instructions?

17       **A.      At that point, it was Mr. DePover.**

18       Q.      Okay.  Was Mr. Cox in any way tied in to your

19   shove movement?

20       **A.      He was sitting on the Main Line observing**

21   **everything on a different train, listening to the radio**

22   **procedures.**

23       Q.      Okay.  So he was just an observer.  He was not

24   tied in to your shove movement --

John Sexton; Justin DePover
February 10, 2021

93

1    briefing concerning how protection will be provided.  Employee

2    must be in position --"

3            which Mr. DePover was on the ground protecting our

4    shove.

5            "provide visual protection --"

6            which he was.

7            "of the equipment being shoved and must not engage in

8    any unrelated task while providing in -- protection."

9            With a -- with a -- a fellow employee coming up

10   behind the Conductor, whoever it is, on the ground, and all --

11   he didn't even know he was there, basically, kind of caught him

12   off guard, he basically -- Mr. Jared is the one who violated

13   the -- the shoving movements because he engaged in a

14   conversation with Mr. DePover while the cars were moving into a

15   track.  That is a -- that -- he created an unsafe act on that.

16   And you know, under -- under the -- the test failure of the

17   manager's tests themselves, that under the test conditions,

18   when conducting this test, on the Shoving or Pushing Movements

19   on page 107 of the Manager's Tests:

20           "When conducting this test, actual

21       operating conditions are to be

22       observed."

23       MR. SEXTON:  Watched, not set up.

24           And the test failure on number 4 bulletin on the same

John Sexton; Justin DePover
February 10, 2021

94

1  page:

2          "Employee performing other tasks

3          related to movement."

4          MR. SEXTON:  General Manager Jared actually created an

5  unsafe act by talking to Mr. DePover as the cars were -- were

6  -- were being shoved b -- past him.  He could've -- he coulda

7  startled him.  He coulda jumped forward.  Anything could've

8  happened.  That -- that is -- the -- th -- this was not a good

9  test, everyone knows it, and --

10         MR. JOHNSON:  Is that the end of your statement?

11         MR. SEXTON:  Give me a second, please.  And also, the --

12  the -- the -- the Rule was violated at -- as this test was also

13  set up in -- in their own -- in their own testing manual.

14         Other than that, I'm a little -- I'm a little wound

15  up here, so that's a -- that's all I'm gonna say for right

16  now.  Then I want you to ask me if -- if I think that this has

17  been a fair and impartial hearing, please.

18         MR. JOHNSON:  Okay.  I've asked you the questions I have

19  to ask.  So I can --

20         MR. SEXTON:  So do -- you're not gonna --

21         MR. JOHNSON:  We've moved to closing.  I cannot ask any

22  more questions at --

23         MR. SEXTON:  No, so you --

24         MR. JOHNSON:  -- this time.

John Sexton; Justin DePover
February 10, 2021

95

1      MR. SEXTON:  Okay.  Well, this is not a fair and

2  impartial hearing, so I'll put that on the record, my closing

3  statement.  Now I'm done.

4      MR. JOHNSON:  So, Mr. Rainwater --

5      MR. RAINWATER:  Yes.

6      MR. JOHNSON:  -- have you had an opportunity to

7  cross-examine all witnesses and to present witnesses and

8  evidence on the charged employees' behalf?

9      MR. RAINWATER:  The record speaks for itself.

10      MR. JOHNSON:  Have I ruled on all of your objections?

11      MR. RAINWATER:  Yeah, the record speaks for itself.

12      MR. JOHNSON:  Were you allowed to properly represent the

13  charged employee during this hearing?

14      MR. RAINWATER:  Yeah, the record speaks for itself.

15      MR. JOHNSON:  And would you like to make a closing

16  statement?

17      MR. RAINWATER:  I would.  The facts of this

18  investigation are as follows:  Mr. Jared conducted an unfair

19  test based on incomplete information because he didn't have a

20  radio on his person to hear the full account of instructions

21  from Mr. DePover to Engineer Sexton.  Had he heard that portion

22  of the communication, he would've quickly realized that the way

23  he intended to set up his test was unfair.  Mr. Jared freely

24  testified that he heard Mr. DePover give Mr. Sexton a car count

John Sexton; Justin DePover
February 10, 2021

96

1    of 50 cars, 5-0 cars, as he started into 4 Track.  Then, after

2    moving 12 cars, Mr. DePover testified that he told Mr. Sexton,

3    I need 15 more and you're good for 40.

4         It's obvious that Mr. Jared did not hear that portion

5    of the instructions.  What's more, he only had to pull the

6    recorded radio conversations that the Railroad keeps on file to

7    -- to have figured this out.  Had he done so, we wouldn't even

8    be in this hearing.  The fact that he didn't present that

9    evidence means he either didn't go to the effort to pull it, or

10   it didn't help his case, so he didn't enter it.  The

11   Organization, however, has the testimony of three witnesses to

12   this event:  Mr. DePover, Mr. Sexton, and had Mr. Cox been

13   allowed to attend as requested, he would've affirmed that as

14   well.

15        Now to the charge at hand.  We've clearly and

16   undeniably outlined that Mr. DePover is not complicit with the

17   charges as alleged.  Mr. Jared even admitted to such.

18        As far as Mr. Sexton is concerned, testimony has

19   clearly outlined and sustained the fact that Mr. Sexton was

20   under the guidance of being clear for 40 -- for a 40-car shove

21   and only needing 15 to a stop and a cut.  Even if Mr. Sexton

22   would've shoved the entire 15 cars before stopping, he still

23   has an additional five cars of space before being required to

24   stop in half the range of the 40-car count as given by

John Sexton; Justin DePover
February 10, 2021

97

1  Mr. DePover, and thus fulfilling the requirements of GCOR

2  5.3.7.  So clearly the charge is inconsistent with the actual

3  events, and we deny the charge in the strongest terms possible.

4        Additionally, it's very obvious that Mr. Jared

5  conducted this test in an unfair manner.  While Mr. Johnson

6  wouldn't allow me to enter CP's United States version of the

7  Efficiency Test Manual and Operating Rules, the testing

8  procedure in that manual states clearly that tests conducted to

9  evaluate Rules related to shove moves is an observation-only

10  test.  CP's testing code is GRF02.  This test only points out

11  -- this test also points out that an employee should not

12  perform other tasks that are not related to movement, the same

13  as GCOR 6.5, which we entered in Exhibit 7.

14        The fact that M -- Mr. Jared, a General Manager at CP

15  and three levels above the most frequently visible manager in

16  this yard, approached Mr. DePover to give him a direct

17  instruction while engaged in this shove move proves how

18  reckless Mr. Jared is with regard to this event.  The fact that

19  he would even try to manipulate a test that is strictly

20  designed to be observation-only and create var -- variable

21  designed to confuse and reduce situational awareness is an ana

22  -- anathema to everything that Home Safe is about.

23        Further to CP's E-Test Manual, it clearly instructs

24  testing managers to "use common sense when setting up test

1          IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF IOWA
2                    EASTERN DIVISION

3     - - - - - - - - - - - - - - - - - - - - - - -
                          No. 3:23-CV-00031-HCA
4

John Sexton,
5
                          Plaintiff,
6        vs.

7   Dakota, Minnesota & Eastern Railroad
    Corporation d/b/a Canadian Pacific,
8   a Delaware corporation
                          Defendants.
9
      - - - - - - - - - - - - - - - - - - - - - - -
10

11

12

13                    DEPOSITION OF

14                    MARK JOHNSON

15                    May 10, 2024

16                     1:00 p.m.

17

18

19

20

21

22
                TAKEN BY: BRENDA K. FOSS
23               fossbrenda@yahoo.com
                    612-701-4282
24

25

1                    Deposition of MARK JOHNSON, taken

2          via Zoom videoconference, by and on behalf of

3          Plaintiff, on Friday, May 10, 2024, commencing

4          at 1:00 p.m., before Brenda K. Foss,

5          Professional Court Reporter, Notary Public,

6          State of Minnesota, County of Hennepin.

7

8                         *    *    *    *    *

9                    APPEARANCES

10

           ON BEHALF OF THE PLAINTIFF:
11             CYLE CRAMER, ESQUIRE
               JOHN MAGNUSON, ESQUIRE
12             LAUREN HOSCH, PARALEGAL
               YAEGER & JUNGBAUER BARRISTERS, PLC
13             4601 Weston Woods Way
               St. Paul, MN  55127
14             ccramer@yjblaw.com
               651-288-9500
15

16

           ON BEHALF OF THE DEFENDANTS:
17             JACK SULLIVAN, ESQUIRE
               DORSEY & WHITNEY LLP
18             50 South 6th Street, Suite 1500
               Minneapolis, MN  55402
19             sullivan.jack@dorsey.com
               612-340-2600
20

21

           ALSO PRESENT:
22             Michelle Haynes, CPKC Paralegal
               Noah Garcia, DM&E Counsel
23

24                         *    *    *    *    *

25

```
 1                    I N D E X

 2
        Examination:                      PAGE:
 3      By Mr. Cramer                      4

 4
        Objections:
 5      By Mr. Sullivan                    8, 9, 12, 13,
        15, 17-21, 23, 24, 26, 27, 29-34, 36-43, 45,
 6      48-51, 53, 54, 56, 57, 59, 60, 62-67, 70, 71,
        73-77, 80-104
 7

 8      Marked Deposition Exhibits:
        35 - 2/21 e-mails                  21
 9           Bates 00981-983
        36 - 6/22 e-mail to Valadez    24
10           Bates 00615-617
        37 - 2/21 e-mail from Reyes    28
11           Bates 01703
        38 - Discipline Call              78
12           Bates 00948
        39 - US Efficiency Test Manual 79
13           Bates 000368-608
        40 - Performance Mgmt Program  93
14           Bates 03700-3704
        41 - STIP                        94
15           Bates 03231-3237
        42 - Short-Term Incentive       97
16           Bates 03711

17

18

19

20      Reporter's Certificate            106

21

22      (Original Deposition Transcript in the
        possession of Cyle Cramer, Esquire).
23

24                          *   *   *   *   *

25
```

1    Q    (By Mr. Cramer, continuing) Did you think

2         that Mr. DePover was lying about giving the

3         25 to a stop instruction?

4                    MR. SULLIVAN:  Objection, misstates

5         the testimony in the transcript.

6    A    No.

7    Q    Then where it says clear for 50 cars, what do

8         you take that to mean?

9    A    Based on the way he says clear for 50 cars

10        starting with needing 25 to a stop, it's

11        again assuring him that they have got plenty

12        of room.  So the stop doesn't have to be on a

13        dime or they're not coming in to a joint.

14   Q    So should Mr. Sexton take into account the

15        clear for 50 cars when deciding when to stop?

16                    MR. SULLIVAN:  Objection, lack of

17        personal knowledge.

18   A    Once he's given something more restrictive,

19        no.  He needs to go with what's most

20        restrictive.  25 is more restrictive than 50.

21   Q    Is that what the rule says, Rule 6.5?

22   A    I don't have the GCOR in front of me to tell

23        you exactly what it reads, but they are

24        required to stop within half the distance

25        specified.  So in the case of the 25, you

```
 1        middle, you write, 'If he was given the 40

 2        car clearance'.  Let me know when you find

 3        that.

 4   A    Found that.

 5   Q    Then you can read the whole sentence to

 6        yourself.

 7   A    (Witness examining document).  Okay.

 8   Q    What did you mean by that?

 9   A    So based on the testimony at the investigation,

10        Mr. Jared was next to Mr. DePover when he

11        gave that 15 car count.  So he would have

12        heard the 40 car count.

13   Q    So you believed that Mr. Jared heard the 40

14        car count?

15             MR. SULLIVAN:  Objection, misstates

16        the witness' testimony and misstates the document.

17   A    No.  It's just not clear in the record

18        whether he heard the 40 or not.  He was

19        hearing the same 15 car count that was

20        alluded to by all witnesses.

21   Q    (By Mr. Cramer, continuing) Jump back up to

22        number 1 where you say, 'They argue that Mr.

23        Jared could not hear the conductor's instructions'.

24   A    (Witness examining document).  Okay.

25   Q    And then you say, 'the facts and the video
```

1    Q    What does fully engaged in that movement

2         mean?

3    A    They would not have had other distractions.

4    Q    Is not being distracted important during a

5         shoving movement?

6    A    Yes.

7    Q    Why is that?

8    A    Because if you're distracted, your mind has

9         gone away from the task at hand.  You could

10        end up cornering something.  You could hit

11        something.  More cars can go by you than what

12        you needed.  There's numerous reasons.

13   Q    Does it create an unsafe condition when an

14        employee who is protecting the shove is

15        distracted?

16                  MR. SULLIVAN:  Objection,

17        misstates the witness' testimony, lack of

18        personal knowledge, calls for speculation.

19   A    Based on my experience, yes.

20   Q    (By Mr. Cramer, continuing) Was there any

21        other witness that could have changed your

22        mind on whether Mr. Sexton violated the

23        shoving rule?

24                  MR. SULLIVAN:  Objection, calls

25        for speculation.

1        that would happen?

2                MR. SULLIVAN:  Objection, misstates

3        the witness' testimony, form.

4    A   I wasn't present.  There was no questioning

5        as to what was 40 cars away from them.

6    Q   (By Mr. Cramer, continuing) Back on this

7        exhibit on item number 4, are you describing

8        the union's position there?

9    A   Yes.

10   Q   What is the difference between observation

11       versus setup?

12   A   Setup test is something in the environment

13       has changed versus observation would just be

14       Mr. Jared sat off to the side, either in his

15       truck or outside of his truck, and just

16       observed the entire shove movement.

17   Q   Did Mr. Jared stay in his truck and observe

18       the entire shove movement?

19   A   No.

20   Q   What did he do?

21   A   He set the test up by changing the environment

22       and having Mr. DePover not give a further

23       count.

24   Q   Do you know whether a shoving movement test

25       should be set up for observation only?

1    A    Okay.

2    Q    What are you asking on lines 6 to 8?

3    A    If they have been allowed to or had the

4         opportunity to cross-examine all witnesses

5         and present witnesses.

6    Q    Was it your understanding that Mr. Sexton was

7         able to present the witnesses that he

8         requested?

9    A    Not based on the document that's in front of

10        me, no.

11   Q    So Mr. Sexton requested Mr. Cruciani to

12        attend the investigation?

13   A    Based on the document you showed me

14        previously for the request, that was not

15        entered in as an exhibit.  And based on what

16        I have seen, no.  And I believe the lines you

17        were referring me to, the answer came from

18        Mr. Rainwater that the record speaks for

19        itself.

20   Q    Did Mr. Sexton request David Cox to be a

21        witness?

22   A    Again, based on the exhibits you've presented,

23        the letter from Mr. Rainwater was not marked

24        as an exhibit for the investigation.  So my

25        recollection is no.

1          the witnesses.  Correct?

2                    MR. SULLIVAN:  Objection, misstates

3          the witness' testimony, badgering.

4     A    I never denied the witnesses.  The record

5          showed that they would have had no relevant

6          information to this investigation.

7     Q    (By Mr. Cramer, continuing) Who makes the

8          determination whether they have relevant

9          information to give to the investigation?

10    A    In this instance, the records show that they

11         would have had no relevance to this investigation.

12    Q    But who made that decision?

13    A    I did.

14    Q    Why?

15    A    Mr. Cox was assigned to another train and not

16         connected.  The testimony from when you were

17         first on -- I believe it was the 0098 -- read

18         that the union believed that he would have

19         heard the radio conversation.  That's not a

20         fact based he heard the conversation.  Again,

21         he was assigned to a different train.  The

22         other employee that was requested was not an

23         employee of CP Railroad.

24    Q    Do you know whether Mr. Cox was able to

25         overhear the radio?

```
 1                    MR. SULLIVAN:  Objection, form.

 2    A    Again, the union just believed.  They didn't

 3         state that he heard.  So, therefore, it was a

 4         fair and impartial investigation in my

 5         opinion without the witnesses.

 6    Q    (By Mr. Cramer, continuing) Do you know

 7         whether Mr. Cox heard the radio conversation

 8         or not?

 9    A    No.  If the union is requesting them, that is

10         their job to prove that he heard it, not my

11         job to determine whether he did or not.

12    Q    How do they prove that he heard it?

13    A    They didn't prove that he did.  They just

14         stated that they believed he heard it.

15    Q    If he was a witness and said that he heard

16         it, would that be proof?

17                    MR. SULLIVAN:  Objection, calls

18         for speculation, lack of personal knowledge.

19    A    Again, there was no testimony stated that he

20         heard the conversation that would have had me

21         bring him in as a witness.

22    Q    (By Mr. Cramer, continuing) So you don't

23         recall any statements during the

24         investigation that David Cox overheard the

25         radio conversation?
```

1    A    No.   It's part of the investigation process.

2    Q    He believed that there was an unsafe act.

3         Correct?

4                   MR. SULLIVAN:   Objection, lack of

5         personal knowledge.

6    A    I can't speak for Mr. Sexton.

7    Q    (By Mr. Cramer, continuing) He's stating here

8         though General Manager Jared actually created

9         an unsafe act.   Correct?

10   A    That is his belief.

11   Q    Did you believe him?

12   A    No.

13   Q    Why not?

14   A    Mr. Jared was performing a setup test.   At no

15        time did he foul tracks or did he distract

16        Mr. DePover from performing his duties.

17   Q    Do you recall Mr. Jared saying he told

18        Mr. DePover to stop giving instructions?

19   A    I believe we went over some of that where he

20        talked about -- he approached Mr. DePover and

21        Mr. DePover testified to it.

22   Q    But do you think Mr. Jared was distracting

23        Mr. DePover?

24                  MR. SULLIVAN:   Objection, lack of

25        personal knowledge, calls for speculation,

1      form.

2    A   No.

3    Q   (By Mr. Cramer, continuing) Why not?

4    A   Because there was no testimony that

5        Mr. DePover felt he was distracted.

6    Q   Is it a safe act to walk up to somebody

7        protecting a shoving movement?

8                MR. SULLIVAN:  Objection, lack of

9        personal knowledge, calls for speculation,

10       form.

11   A   It was done in a safe manner.

12   Q   (By Mr. Cramer, continuing) How can it be

13       done in a safe manner?

14   A   Mr. Jared didn't foul.  He didn't -- there's

15       just no testimony that allowed me to believe

16       that he was distracted or created an unsafe

17       act based on the testimony at the investigation.

18                MR. CRAMER:  Let's take another

19       break.  I don't have much more, but maybe

20       another ten minutes and then we'll wrap up.

21                    (Brief recess).

22   Q   (By Mr. Cramer, continuing) I'm going to

23       bring up what was Exhibit 2.  We can go all

24       way to the top so you can get a sense of what

25       this is.  Do you recognize this?

1    A    Yeah, that's the General Code of Operating

2         Rules.

3    Q    Do you know if this was the one in effect in

4         February of 2021?

5    A    Yes.

6    Q    Then go to 319.  Do you see the 5.3.7?

7    A    Yes.

8    Q    Do you understand that to be the rule you

9         believe Mr. Sexton had violated?

10   A    Yes.

11   Q    Take a second to review it.

12   A    (Witness examining document).

13   Q    Does it say more restrictive anywhere in that

14        rule?

15   A    No.

16   Q    Sorry.  What was that?

17   A    I said no.

18              MR. CRAMER:  That's all I have.

19              MR. SULLIVAN:  We have no questions.

20              (WHEREUPON, the testimony was

21              concluded at 5:30 p.m.)

22                   *    *    *

23

24

25

1           IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF IOWA
2                   EASTERN DIVISION

3     - - - - - - - - - - - - - - - - - - - - - -
                        No. 3:23-CV-00031-HCA
4
      John Sexton,
5
                        Plaintiff,
6        vs.

7     Dakota, Minnesota & Eastern Railroad
      Corporation d/b/a Canadian Pacific,
8     a Delaware corporation,

9                       Defendants.

10    - - - - - - - - - - - - - - - - - - - - - -

11

12

13
                      DEPOSITION OF
14
                 JUSTIN DITTRICH-BIGLEY
15
                   June 26, 2024
16
                     9:00 a.m.
17

18

19

20

21

22

23           TAKEN BY: BRENDA K. FOSS
                fossbrenda@yahoo.com
24                 612-701-4282

25

1          Deposition of JUSTIN DITTRICH-BIGLEY,

2    taken by Zoom videoconference by and on

3    behalf of Plaintiff, on Wednesday, June 26,

4    2024, commencing at 9:00 a.m., before

5    Brenda K. Foss, Professional Court Reporter,

6    Notary Public, State of Minnesota, County of

7    Hennepin.

8

9                    *    *    *    *    *

10              A P P E A R A N C E S

11

     ON BEHALF OF THE PLAINTIFF:
12        CYLE CRAMER, ESQUIRE
          YAEGER & JUNGBAUER BARRISTERS, PLC
13        4601 Weston Woods Way
          St. Paul, MN  55127
14        ccramer@yjblaw.com

15        ███████████████

16

     ON BEHALF OF THE DEFENDANTS:
17        BRIANA AL TAQATQA, ESQUIRE
          DORSEY & WHITNEY LLP
18        50 South 6th Street, Suite 1500
          Minneapolis, MN  55402
19        altaqatqa.briana@dorsey.com

20        ███████████████

21

     Also present: Noah Garcia, DM&E,
22              Michelle Haynes, DM&E

23

24

25

1                    I N D E X

2

      Examination:                      PAGE:
3     By Mr. Cramer                     4

4

5     Marked Deposition Exhibits:
      65   Hearing Officer Checklist
6          Bates CP 06375-6380         19
      66   Training Manual
7          Bates CP 06399-6431         25
      67   Discipline letter
8          Bates 01769                 33
      68   Transcript of Pfaff
9          Bates CP 01770-1843         34
      69   Waiver (Vanzee)
10         Bates 00674                 37
      70   Waiver (Cutkomp)
11         Bates CP 03478              39
      71   Investigation letter (Haddock)
12         Bates CP 34081              40
      72   Letter of reprimand
13         Bates CP 03482              42
      73   Tests, Bates 06381-6398     60
14

15

16    Reporter's Certificate          75

17

18    (Original Deposition Transcript in the
      possession of Cyle Cramer, Esquire).
19

20                      *    *    *    *    *

21

22

23

24

25

1                    MS. AL TAQATQA:  Objection, form.

2    A    I would have to know what the nonmajor

3         violation is.  The policy -- you know, any

4         discipline for that matter has potential of

5         dismissal, but I would have to understand

6         what specific nonmajor or the situation

7         you're asking.

8    Q    (By Mr. Cramer, continuing) Does discipline

9         on an employee's record subject them to more

10        severe disciplinary outcomes if they're

11        determined to have violated a rule with prior

12        discipline still on their record?

13                   MS. AL TAQATQA:  Objection, form.

14        Sorry, Justin.  Just give me a minute.  You

15        can answer.

16   A    It's progressive.  So the policy is viewed.

17        Discipline is progressive.  It reverts back

18        to over a period of time.  Previous

19        discipline is viewed against the policy in a

20        progressive manner with the next steps.

21   Q    CP's Hybrid Discipline and Accountability

22        Guidelines is meant to hold employees

23        accountable.  Correct?

24   A    It's meant to change behavior.

25   Q    And it changes behavior by establishing

1       investigation transcript.  There are

2       employees that take accountability through

3       that process, through their testimony.

4    Q  A deferred suspension, unless later activated,

5       results in no time lost.  Correct?

6    A  If the full amount is deferred.  There's

7       various factors there in terms of a portion

8       or all could be deferred.

9    Q  But any portion that is deferred results in

10      no time lost.  Correct?

11   A  For that portion if they don't have another

12      incident within the specified time frame.

13   Q  And similarly, a deferred suspension, the

14      portion that is deferred, results in no pay

15      lost.  Correct?

16   A  For the part that's deferred if there isn't a

17      future violation, correct.

18   Q  I'll scroll up to make sure we're looking at

19      number 6, deferred suspension.  And I'll

20      scroll down onto the next page.  It says,

21      Other factors to look at when considering

22      discipline.  One factor to consider.

23      Considering a deferred suspension is taking

24      protective actions following an incident.

25      Correct?

1  A  A hearing officer is expected to be prepared

2     and understand the investigation notice and

3     hold a fair and impartial investigation.

4  Q  What steps should be taken by the hearing

5     officer to be prepared for the investigation

6     hearing?

7  A  The hearing officer is going to ensure that

8     the witnesses are available, have a location,

9     make sure recording devices are working, just

10     those parts of the investigation to ensure

11     that it goes smoothly in terms of there's no

12     issues with technology and that kind of stuff

13     too.

14  Q  And that preparation includes meeting with

15     the witnesses?

16  A  They will meet with witnesses to make sure

17     that, one, they can be available on the date

18     that it's scheduled, there's no conflict of

19     scheduling because that does occur, and make

20     sure that the witnesses have seen the

21     investigation notice and are, you know,

22     generally prepared to come to the

23     investigation on the date and time, yes.

24  Q  Is it true that investigations are usually

25     not scheduled to occur within 24 hours of the

```
 1                      (Brief recess).

 2   Q   (By Mr. Cramer, continuing) I'm going to

 3       bring up what's been previously marked as

 4       Exhibit 36.  You can take a second to review

 5       it, but have you seen this document before?

 6   A   (Witness examining document).  Yes.

 7   Q   I want to scroll down.  This table is

 8       described as similarly situated employees.

 9       Correct?

10   A   Yes, similar situated employees.

11   Q   According to this table, it looks like it's

12       initialed MJ Engineer, was assessed verbal

13       coaching for failure to stop within half the

14       distance specified.  Correct?

15   A   Correct.

16   Q   That's the same reason for discipline as John

17       Sexton in this table.  Correct?

18   A   Correct.

19   Q   What is verbal coaching?

20   A   Discussion between employee and manager.

21   Q   Is that considered discipline?

22   A   No.

23   Q   Does this document show anywhere that MJ

24       Engineer signed a waiver?

25   A   This document does not.
```

```
 1        necessary witness?

 2   A    Yes, if it was determined that the witness

 3        did not have firsthand knowledge.

 4   Q    What makes a witness necessary?

 5   A    They must have firsthand knowledge of the

 6        incident or be a technical expert in some

 7        type of exhibit which is being entered.

 8   Q    So an investigation would not be fair if an

 9        employee was denied the presence of a witness

10        with firsthand knowledge.  Correct?

11   A    An investigation would not be fair if it was

12        determined that a witness had firsthand

13        knowledge and was not allowed to be there.

14   Q    Who makes that determination whether a

15        witness is a necessary witness?

16   A    The company has a responsibility to have

17        witnesses present at the investigation who

18        have knowledge, firsthand knowledge, of the

19        incident.

20   Q    I believe these next questions refer maybe to

21        the above section.  CP agrees that employees

22        represented by the BLET have the right to

23        appeal discipline that employee considers

24        unjust.  Correct?

25   A    The agreement provides an appeal process for
```

1       each test, but it does give some information

2       to the managers on testing.

3   Q   I can bring it up.  Give me one second.  I

4       will ask the same question with this up.  If

5       you want me to go somewhere to help you

6       answer, that's okay.  But the US Efficiency

7       Test Manual on Operating Rules provides the

8       guidelines for conducting efficiency tests.

9       Correct?

10  A   Go down to the next page.  I just want to

11      see.  (Witness examining document).  Yeah, it

12      gives guidelines based on various tests.

13  Q   And what's a guideline?

14  A   It gives them a structure on the test I

15      suppose, breaks out stop, restricted speed,

16      group C test, action other than stop or

17      restricted speed, and means of procedures.

18      I'm just going through there.  But, yeah, it

19      gives a structured test so the tests are done

20      consistent.

21  Q   Does it give a structured test so a test is

22      done safely?

23  A   Yeah.  I would say this outlines kind of the

24      process for how a test should be done.

25  Q   So following the outline for how a test





Tom Jared
General Manager Operations
US West





February 26, 2021

John Sexton

Mr. Sexton:

Notice of formal investigation was issued you under date of February 4, 2021 in connection with the occurrence outlined below:

'... to determine the facts and circumstances and to place your responsibility, if any, in connection with your alleged failure to stop within half the specified distance given while shoving into track NA04. This incident allegedly occurred at approximately 12:49 hours on February 1, 2021 while working Train 474-31 at Nahant yard.'

Formal investigation was conducted on February 10, 2021, to develop all the facts and circumstances in connection with the referenced occurrence. At the conclusion of that investigation it was determined the investigation record as a whole contains substantial evidence proving you violated GCOR 5.3.7 – Radio Response.

Based on the facts and evidence in the hearing record and your past discipline history, you are being assessed a twenty (20) day suspension to commence at 00:01 hours on Thursday, February 25, 2021 up to and including 23:59 hours on Tuesday, March 16, 2021. Reinstatement to active duty at 00:01 hours on Wednesday, March 17, 2021.

As a matter of record a copy of this document will be placed in your personnel file.

Respectfully,

Tom Jared
General Manager Operations
U.S. West

CC:    Dylan Smith                         CMC
       Joey Reyes                          Employee Services (Encl)
       Timekeeping                         Operating Practices/Rules (Encl)
       Joe Rainwater – BLET Local Chairman (Encl)
       Pete Semenek – BLET General Chairman (Encl)

EXHIBIT
12

SEXTON   000014

CASE NO. 353

Organization File da-sexton.j.02012021
Carrier File 2021-0022404

## PUBLIC LAW BOARD NO. 7667

| PARTIES | ) BROTHERHOOD OF LOCOMOTIVE ENGINEERS AND TRAINMEN |
| --- | --- |
| TO | ) |
| DISPUTE | ) DM&E RAILROAD d/b/a CANADIAN PACIFIC |

STATEMENT OF CLAIM:

> Claim on behalf of Canadian Pacific/DM&E Line Employee John Sexton (Claimant) for removal from his record the twenty (20) day suspension assessed and compensation for all time lost, in addition to time and expenses for attending the investigation held on February 10, 2021.

FINDINGS:

The Board, upon consideration of the entire record and all of the evidence, finds that the parties are Carrier and Employee within the meaning of the Railway Labor Act, as amended, that this Board is duly constituted by Agreement dated August 16, 2013, and that this Board has jurisdiction over the dispute involved herein. Awards issued pursuant to the terms and conditions outlined in the Agreement establishing this Expedited Board of Arbitration will not prejudice the rights of either party, will not establish any precedent and will not be referred to in connection with any other case, agreement and/or dispute resolution.

On February 1, 2021, Claimant John Sexton was assigned as the engineer on train 474-31, bringing at train into the Nahant yard. While the crew was in the middle of performing a shove move, General Manager Tom Jared approached the conductor unannounced and instructed him to cease

Public Law Board No. 7667
Case No. 353



EXHIBIT
13

SEXTON  000015

1

radio communications with Claimant. The conductor's initial radio communication was that Claimant was good for 50 cars, and his next communication (according to both Claimant and the conductor) was good for 40, 15 to a stop. After Claimant shoved approximately 7 cars, he radioed the conductor several times, and upon receiving no further radio communication, he initiated braking, eventually stopping after approximately 11 cars, or 558 feet.

By notice dated February 4, 2020, the crew was directed to attend a formal hearing regarding their alleged failure to stop within half the specified distance given while shoving into track NA04. The hearing was held on February 10, 2021, after which Claimant was found to be in violation of GCOR 5.3.7 – Radio Response, and by notice dated February 26, 2021, he was assessed a twenty (20) day suspension.

The Organization challenges the discipline assessment on both procedural and substantive grounds. With respect to the procedures, the Organization maintains the process was flawed due to the General Manager's multiple roles in the proceeding. It points out that he was a witness at the hearing, having initiated the test, and that he then determined the outcome of the hearing and authored the notice of discipline, thus ratifying his own actions. The Organization states it is apparent that the outcome of the hearing was predetermined, and it cites award authority which has overturned discipline in similar circumstances.

With respect the merits, the Organization asserts that the decision to assess discipline was arbitrary and capricious. It states that the record indicates that the instructions given to Claimant were ambiguous at best in that he was first given the 50-car count, then that he was told he was good for 40, while at the same time a stop in 15. It contends that Claimant then complied with the intent of the rule when he stopped when no further communication was received, and that he did so well short of half the 40-car count. The Organization also takes exception to Jared's actions in conducting the test in an unfair manner contrary to the published guidelines for such matters and setting up an unsafe condition when he interrupted, without warning or prior introduction, the conductor who was in the middle of directing the shove. The Organization concludes that to assess discipline based on these facts is unjust.

Public Law Board No. 7667
Case No. 353

2

SEXTON    000016

The Carrier, on the other hand, maintains that discipline was properly assessed, arguing that the record contains substantial evidence to support the conclusion that Claimant violated the cited rule. It points to the General Manager's testimony that Claimant received an instruction to shove 15 car lengths, but that Claimant shoved for 11 car lengths before he stopped. It notes that the cited rule provides that "movement must be stopped within half the distance specified unless additional instructions are received," and it states that it is unrefuted that Claimant continued shoving well past half the 15-car count received from the conductor.

With respect to the Organization's procedural objection, the Carrier claims that Claimant received a fair and impartial hearing, and that the process was not tainted by Jared's involvement. It states that Jared testified to his direct observations, and it apparently contends that Jared didn't actually make the discipline decision, stating "Discipline notices on this property are assessed by the General Manager of the Territory. No decision was made on Claimant's culpability until the transcript of the hearing was reviewed by the hearing officer. The discipline was assessed by the Carrier, not the individual manager."

Regarding the level of discipline assessed, the Carrier states that violations of shove rules are considered major/life threatening offenses under its Hybrid Discipline and Accountability guidelines, and that the guidelines provide that the suspension assessment is an appropriate quantum of discipline for such a violation.

We have carefully reviewed the record, and while we find multiple reasons to question the discipline assessment, we concur with the Organization that the process here was flawed to such an extent that it deprived Claimant of a fair and impartial hearing. General Manager Jared involved himself in too many aspects of the process. The record reflects that it was Jared who initiated the test, in a manner which does raise questions regarding safety in his obviously surprising an employee who was performing the safety-sensitive task of protecting the shove, and it appears that the charges were levied based on his test and observations. The only realistic conclusion that can be reached after an objective review of this record is that Jared levied charges regarding his own somewhat questionable test, provided the testimony to support them, and then signed off on a

Public Law Board No. 7667                                                    3
Case No. 353

SEXTON   000017

predetermined outcome.   We are not convinced by the Carrier's statement that "the Carrier" as some all-inclusive entity rendered the decision. The Carrier is of course comprised of many people and departments and it has a legal status, but it acts through individuals, and in this case the individual who signed the discipline letter was Jared. We do not believe the novel explanation offered by the Carrier is sufficient to remove the specter of his excessive involvement in the case. Therefore, we find that the claim must be sustained.


AWARD:  Claim sustained.


Michael D. Phillips
Chairman and Neutral Member

Marcus Ruef
Employee Member

Brian Scudds
Carrier Member

Dated:  August 26, 2022

Public Law Board No. 7667
Case No. 353

4

SEXTON   000018





Testing (2013+)

EXHIBIT
SO
JALOD

John Sexton ( )
Fall(%): 7 (2.39%)
Date: July 27, 2021

| Date | Session Id | Test Start Time | Testing Officer | Test Code | Test Code Desc | Test Result | Retest Required | Retested In 7 Days | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 07/10/2021 | 1001527125 | 12:21 | JODY BROWN | GMJ8.1 | GETTING ON/OFF [EQUIPMENT] | Pass | No | Not Needed | observed the conductor when getting off equipment properly communicate with the engineer for safe speed less than 4 MPH |
| 07/10/2021 | 1001527125 | 12:21 | JODY BROWN | GRF02 | SHOVING OR PUSHING MOVEMENTS | Pass | No | Not Needed | observed the BD70 crew when shoving into the yard from West Davenport, the conductor was on the point of the movement and good communication was used f... |
| 06/06/2021 | 1001518051 | 07:00 | GARY FINNEY | GRC07 | MOVEMENT OTHER THAN MAIN TRACK | Pass | No | Not Needed | What annual check ride for john Sexton movement on OTM track so what good job working the BD70 being rules compliant now what continue to work safe |
| 05/23/2021 | 1001497630 | 15:00 | RICHARD ANDERSON | GRD25 | FLAT SWITCHING MODULE | Pass | No | Not Needed | Joint test with Dylan Smith observing the BD70 servicing Sterlite |
| 05/07/2021 | 1001485208 | 06:05 | JUSTIN CONKLIN | GRD28 | ELECTRONIC DEVICES | Pass | No | Not Needed | Employee phone was off and stored in his grip when coming on duty. |
| 05/07/2021 | 1001485395 | 09:16 | GARY FINNEY | GRT11S | STATIONARY - ENTRAINING/DETRAINING EQUIPMENT | Pass | No | Not Needed | Observed John detrain while working the BD70-07. He maintained the proper three points of contact and looked both directions before detraining. We discusse... |
| 02/01/2021 | 1001421159 | 12:49 | THOMAS JARED | GRF02 | SHOVING OR PUSHING MOVEMENTS | Fail | No | Yes | While performing set up test at Nahant, Engineer Sexton was instructed to shove into track NA04 with a car count of fifteen car lengths. Without receiving further instru... |
| 02/01/2021 | 1001421159 | 13:05 | THOMAS JARED | GRF02 | SHOVING OR PUSHING MOVEMENTS | Pass | No | Not Needed | Re-test for failure to stop movement in half the specified distance given |
| 01/03/2021 | 1001397887 | 15:40 | GARY FINNEY | GRC07 | MOVEMENT OTHER THAN MAIN TRACK | Pass | No | Not Needed | OBSERVED THE 475-02 enter nahant yard ans depart the main track onto the industry track per gcor 6.28 |
| 01/03/2021 | 1001397887 | 15:40 | GARY FINNEY | GRT14A | APPLYING HAND BRAKES | Pass | No | Not Needed | Shoving into 5 track to set out cars I observed AE Mckee properly apply the handrakes and in conjunction with Engineer John Sexton slack text securement to ensure... |
| 01/03/2021 | 1001397898 | 13:00 | GARY FINNEY | GRT24 | RIDING EQUIPMENT | Pass | No | Not Needed | observed the 474-02 doing their set out at muscatine lower yard with the conductor Mckee properly riding equipment and engineer Sexton communicating prope... |
| 10/27/2020 | 1001351787 | 12:05 | ADAM PARRISH | GRF02 | SHOVING OR PUSHING MOVEMENTS | Pass | No | Not Needed | Observed employee making shove movement in Nahant yard while working 475.26 |
| 10/27/2020 | 1001351787 | 12:05 | ADAM PARRISH | GRF07 | CROSSOVER SWITCHES | Pass | No | Not Needed | Observed employee using crossovers in Nahant yard while working 475.26 |
| 10/08/2020 | 1001340422 | 23:00 | KURTIS MCKELVEY | GRF02 | SHOVING OR PUSHING MOVEMENTS | Pass | No | Not Needed | Mr. Sexton was observed shoving 37 cars into MQ02. He used proper radio procedure and controlled the movement at a safe speed, prepared to stop within hal... |



# Testing (2013+)

John Sexton (
Fail(%):   7  (2.39%)
Date: July 27, 2021

| Date | Session Id | Test Start Time | Testing Officer | Test Code | Test Code Desc | Test Result | Retest Required | Retested In 7 Days | Comments |
|------|-----------|-----------------|-----------------|-----------|----------------|-------------|-----------------|--------------------|----------|
| 10/08/2020 | 1003340422 | 23:00 | KURTIS MCKELVEY | GRT20 | ON OR ABOUT TRACKS (EXCL. LANTERNS) | Pass | No | Not Needed | Mr. Sexton was observed not fouling the tracks while inspecting his locomotives while working in Marquette yard. He looked both ways before crossing the tracks a... |
| 09/14/2020 | 1003321220 | 12:29 | ZACHARY OHLER | GRP07 | CROSSOVER SWITCHES | Pass | No | Not Needed | Made sure both sides of crossover were in corresponding position before initiating movement over it. |
| 09/11/2020 | 1003318817 | 03:35 | JUSTIN CONKLIN | GRD28 | ELECTRONIC DEVICES | Pass | No | Not Needed | Employee phone was off and stored away in grip when coming on duty. |
| 09/04/2020 | 1003315096 | 05:30 | DAN CHANDANAIS | GRP02 | SHOVING OR PUSHING MOVEMENTS | Pass | No | Not Needed | Complied with all rules pertaining to shove moves while making set out to 7 track |
| 09/04/2020 | 1003315096 | 05:30 | DAN CHANDANAIS | GRF04 | EQUIPMENT LEFT TO FOUL ANOTHER TRACK | Pass | No | Not Needed | Set equipment out to 7 track and ensured it was secured and not in the foul |
| 07/07/2020 | 1003275150 | 05:00 | MARK JOHNSON | GMS10 | LOCOMOTIVE AIR BRAKE TEST | Pass | No | Not Needed | Performed a proper locomotive air brake test in Ottumwa when picking up the CP 5966. |
| 07/06/2020 | 1003274455 | 07:05 | LARRY WILLS | GRD28 | ELECTRONIC DEVICES | Pass | No | Not Needed | Employee had all electronic devices off while on duty. |
| 06/27/2020 | 1003268731 | 18:00 | KURTIS MCKELVEY | GRD18 | SECURING EQUIPMENT - LOCOMOTIVES AND CARS | Fail | No | Yes | Mr. Sexton set out an engine (CP8072) to MQENG while working 475-25. After the engine was set out I checked the engine for proper securement and observed that t... |
| 06/27/2020 | 1003268731 | 18:01 | KURTIS MCKELVEY | GRD18 | SECURING EQUIPMENT - LOCOMOTIVES AND CARS | Pass | No | Not Needed | Mr. Sexton was re-tested on securing equipment and reviewed the rule (GOI 4.2-D) about leaving the automatic brake in release when securing a single engi... |
| 05/07/2020 | 1003232353 | 23:10 | DARRELL KITCHEN | GRD28 | ELECTRONIC DEVICES | Pass | No | Not Needed | all electronic devices were turned off and stowed before leaving the eelr |
| 03/30/2020 | 1003206789 | 20:30 | LARRY WILLS | GRD28 | ELECTRONIC DEVICES | Pass | No | Not Needed | Employee had all electronic devices off while on duty |
| 02/27/2020 | 1001186882 | 21:00 | JUSTIN CONKLIN | GRD28 | ELECTRONIC DEVICES | Pass | No | Not Needed | Was dressed and ready for duty and cell phone off and stored away. |
| 01/26/2020 | 1001164139 | 10:45 | MARK JOHNSON | GRA15 | OPERATING WITH TRACK WARRANTS | Pass | No | Not Needed | discusses roll-ups and limits with crewmember before acting. |
| 12/15/2019 | 1001137079 | 19:10 | JUSTIN CONKLIN | GRCO-01 | GRCO-01. POINT PROTECTION | Pass | No | Not Needed | Was observed giving 3 point protection properly |

CP_0000?? 1/1/0000

# Testing (2013+)

John Sexton (_____)
Fall(%): 7 (2.39%)
Date: July 27, 2021

| Date | Session Id | Test Start Time | Testing Officer | Test Code | Test Code Desc | Test Result | Retest Required | Retested In 7 Days | Comments |
|------|-----------|-----------------|-----------------|-----------|----------------|-------------|-----------------|--------------------|----------|
| 12/11/2019 | 1001131791 | 03:15 | DAN CHANDANAIS | GRD30 | TRAINING-QUALIFICATIONS-RULES AND INSTRUCTIONS | Pass | No | Not Needed | |
| 12/11/2019 | 1001131791 | 08:15 | DAN CHANDANAIS | GRD30 | TRAINING-QUALIFICATIONS-RULES AND INSTRUCTIONS | Pass | No | Not Needed | Retest for failure to comply with GM Notice #45 |
| 09/20/2019 | 1001073332 | 10:20 | JACOB RINNELS | GRT27 | THREE POINT PROCTECTION | Pass | No | Not Needed | Observed Mr Sexton repeat 3 point instructions back to Conductor and made sure slack adjusted prior. Positive feedback given |
| 09/20/2019 | 1001073529 | 10:24 | JOEY REYES | GRD25 | FLAT SWITCHING MODULE | Fail | Yes | Yes | failed to stretch slack to ensure cars were coupled together. Conductor coupled cars and said "good joint", engineer never offered to stretch slack |
| 09/20/2019 | 1001073529 | 10:30 | JOEY REYES | GRD25 | FLAT SWITCHING MODULE | Pass | No | Not Needed | retest on failure to stretch slack after coupling equipment |
| 07/02/2019 | 1001022148 | 00:30 | MARK JOHNSON | GRD18 | SECURING EQUIPMENT - LOCOMOTIVES AND CARS | Pass | No | Not Needed | Very good tests on securement; released all air brakes to confirm effectiveness. |
| 07/02/2019 | 1001022148 | 00:30 | MARK JOHNSON | GRD28 | ELECTRONIC DEVICES | Pass | No | Not Needed | Phone was off and stowed; even after tie-up he had not turned his phone back on. |
| 07/02/2019 | 1001022148 | 00:30 | MARK JOHNSON | GRF02 | SHOVING OR PUSHING MOVEMENTS | Pass | No | Not Needed | Was moving prepared to stop while asking for updated distance with his conductor due to some communications issues to ensure he didn't travel over... |
| 07/02/2019 | 1001022148 | 00:30 | MARK JOHNSON | GRT20 | ON OR ABOUT TRACKS (EXCL. LANTERNS) | Pass | No | Not Needed | Looks both ways before crossing tracks; and used the shoulder instead of tie butts to carry his bags to the cab. |
| 07/01/2019 | 1001022148 | 19:30 | MARK JOHNSON | GRC18 | DELAYED IN BLOCK | Pass | No | Not Needed | Operations had difficulty in releasing our track warrant due to a PTC issue. Mr. Sexton was informed to stop and cut out PTC, which put us stopped inside a block. Disc... |
| 06/08/2019 | 1001007242 | 10:00 | MARK JOHNSON | GRA11 | STOP INDICATION CTC TERRITORY OR MANUAL | Pass | No | Not Needed | |
| 06/08/2019 | 1001007242 | 10:00 | MARK JOHNSON | GRC14 | APPROACH | Pass | No | Not Needed | |
| 06/08/2019 | 1001007242 | 13:00 | MARK JOHNSON | GRA11 | STOP INDICATION CTC TERRITORY OR MANUAL | Pass | No | Not Needed | |
| 06/08/2019 | 1001007242 | 13:00 | MARK JOHNSON | GRC14 | APPROACH | Pass | No | Not Needed | |

9 (46)



2710000_CP

# Testing (2013+)

John Sexton ( )
Fail(%):  7 (2.39%)
Date: July 27, 2021

| Date | Session Id | Test Start Time | Testing Officer | Test Code | Test Code Desc | Test Result | Retest Required | Retested In 7 Days | Comments |
|------|-----------|-----------------|-----------------|-----------|----------------|-------------|-----------------|--------------------|----------|
| 05/02/2019 | 1000985872 | 21:00 | JACOB RINNELS | GRD18 | SECURING EQUIPMENT - LOCOMOTIVES AND CARS | Pass | No | Not Needed | |
| 03/28/2019 | 1000963430 | 12:30 | DAN CHANDANAIS | GRD18 | SECURING EQUIPMENT - LOCOMOTIVES AND CARS | Pass | No | Not Needed | |
| 03/28/2019 | 1000963430 | 12:30 | DAN CHANDANAIS | GRF02 | SHOVING OR PUSHING MOVEMENTS | Pass | No | Not Needed | |
| 03/28/2019 | 1000963430 | 12:30 | DAN CHANDANAIS | GRF05 | "LINED, LOCKED AND CHECKED" | Pass | No | Not Needed | |
| 03/28/2019 | 1000963430 | 12:30 | DAN CHANDANAIS | GRT27 | THREE POINT PROCTECTION | Pass | No | Not Needed | |
| 03/22/2019 | 1000959705 | 18:10 | DAN CHANDANAIS | GRD18 | SECURING EQUIPMENT - LOCOMOTIVES AND CARS | Pass | No | Not Needed | |
| 03/22/2019 | 1000959705 | 18:10 | DAN CHANDANAIS | GRF02 | SHOVING OR PUSHING MOVEMENTS | Pass | No | Not Needed | |
| 03/22/2019 | 1000959705 | 18:10 | DAN CHANDANAIS | GRT20 | ON OR ABOUT TRACKS (EXCL. LANTERNS) | Pass | No | Not Needed | |
| 03/22/2019 | 1000959705 | 18:10 | DAN CHANDANAIS | GRT27 | THREE POINT PROCTECTION | Pass | No | Not Needed | |
| 02/14/2019 | 1000937132 | 09:30 | MARK JOHNSON | GRA15 | OPERATING WITH TRACK WARRANTS | Pass | No | Not Needed | |
| 02/08/2019 | 1000933311 | 13:45 | JOEY REYES | GRD28 | ELECTRONIC DEVICES | Pass | No | Not Needed | |
| 02/08/2019 | 1000933311 | 13:45 | JOEY REYES | GRT27 | THREE POINT PROCTECTION | Pass | No | Not Needed | |
| 11/27/2018 | 1000886281 | 05:45 | JOEY REYES | GRD28 | ELECTRONIC DEVICES | Pass | No | Not Needed | |
| 11/27/2018 | 1000886281 | 05:45 | JOEY REYES | GRT20 | ON OR ABOUT TRACKS (EXCL. LANTERNS) | Pass | No | Not Needed | |

10 (46)

CP_0000473

# Testing (2013+)

**John Sexton ( )**
**Fail(%):  7 (2.39%)**
**Date: July 27, 2021**

| Date | Session Id | Test Start Time | Testing Officer | Test Code | Test Code Desc | Test Result | Retest Required | Retested In 7 Days | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 08/27/2018 | 1000825670 | 15:03 | JOHN STOFFER | GMS03 | CLASS 1 AIR BRAKE TEST | Pass | No | Not Needed | |
| 08/23/2018 | 1000823271 | 20:43 | JOHN STOFFER | GRC07 | MOVEMENT OTHER THAN MAIN TRACK | Pass | No | Not Needed | |
| 08/23/2018 | 1000823271 | 20:43 | JOHN STOFFER | GRF04 | EQUIPMENT LEFT TO FOUL ANOTHER TRACK | Pass | No | Not Needed | |
| 08/23/2018 | 1000823276 | 23:47 | JOHN STOFFER | GRT20 | ON OR ABOUT TRACKS (EXCL. LANTERNS) | Pass | No | Not Needed | |
| 08/23/2018 | 1000823507 | 18:00 | JOSHUA CROSSIN | GRC07 | MOVEMENT OTHER THAN MAIN TRACK | Pass | No | Not Needed | |
| 08/23/2018 | 1000823507 | 18:00 | JOSHUA CROSSIN | GRF02 | SHOVING OR PUSHING MOVEMENTS | Pass | No | Not Needed | |
| 08/02/2018 | 1000809775 | 16:34 | JOSHUA CROSSIN | GRD01A | ENGINE BELL AND WHISTLE SIGNAL FOR ROAD | Fail | No | Yes | Engineer failed to whistle off for backup move light power over crossing. |
| 08/02/2018 | 1000809777 | 17:00 | JOSHUA CROSSIN | GRD01A | ENGINE BELL AND WHISTLE SIGNAL FOR ROAD | Pass | No | Not Needed | Engineer sounded off proper cadence showing back to his train. |
| 08/02/2018 | 1000809778 | 17:02 | JOSHUA CROSSIN | GR02 | "IDENTIFICATION, OVER, OUT" | Fail | No | Yes | Engineer failed to say "over" to the conductor during a job briefing |
| 08/02/2018 | 1000809779 | 17:04 | JOSHUA CROSSIN | GR02 | "IDENTIFICATION, OVER, OUT" | Pass | No | Not Needed | |
| 06/13/2018 | 1000772860 | 10:23 | BRETT EASTON | GRD01C | ENGINE BELL AND WHISTLE SIGNAL FOR APPROACHING MEN OR EQUIPM | Pass | No | Not Needed | |
| 05/10/2018 | 1000753214 | 15:12 | JOHN STOFFER | GRB15 | DISPLAY OF YELLOW-RED FLAG | Fail | No | Yes | Yellow/Red flag displayed to the right side of track at MP 187 A2 Davenport sub. Crew had no track bulletin in effect specifying in writing. Crew failed to contact the... |
| 05/10/2018 | 1000753214 | 15:13 | JOHN STOFFER | GRB15 | DISPLAY OF YELLOW-RED FLAG | Pass | No | Not Needed | |
| 03/23/2018 | 1000733169 | 15:43 | JOSHUA CROSSIN | GRD14 | GENERAL RULES (EXCEPT RULE 1.5) | Pass | No | Not Needed | checked employees book made sure they were all current. |

11 (46)



## Testing (2013+)

**John Sexton ( )**
**Fail(%):  7 (2.39%)**
**Date: July 27, 2021**

| Date | Session Id | Test Start Time | Testing Officer | Test Code | Test Code Desc | Test Result | Retest Required | Retested In 7 Days | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 02/23/2018 | 1000709615 | 22:00 | MARK JOHNSON | GRR02 | SHOVING OR PUSHING MOVEMENTS | Pass | No | Not Needed | |
| 02/23/2018 | 1000709615 | 23:30 | MARK JOHNSON | GRC14 | APPROACH | Pass | No | Not Needed | Engineer complied with approach signal. Was riding train, speed was reduced and enginner stopped short of red signal at Fifth Street. |
| 12/25/2017 | 1006676060 | 09:45 | JOHN STOFFER | GRB05 | MOVEMENT BY SIGNAL REQUIRING RESTRICTED | Pass | No | Not Needed | |
| 12/24/2017 | 1006675976 | 19:30 | JOSHUA CROSSIN | GRR02 | "IDENTIFICATION, OVER, OUT" | Pass | No | Not Needed | |
| 10/23/2017 | 1000664591 | 17:32 | MARK JOHNSON | GRC07 | MOVEMENT OTHER THAN MAIN TRACK | Pass | No | Not Needed | |
| 08/30/2017 | 1000613222 | 18:31 | DANIEL MOHLER | GRCO-01 | GRCO-01 POINT PROTECTION | Pass | No | Not Needed | Proper Point Protection |
| 06/24/2017 | 1000579112 | 14:10 | JOHN BURTON | GRD18 | SECURING EQUIPMENT - LOCOMOTIVES AND CARS | Pass | No | Not Needed | |
| 04/25/2017 | 1000546857 | 16:30 | MATTHEW BERRA | GRD21 | VERBAL COMMUNICATION | Pass | No | Not Needed | Asked for permission to enter yard.  Released track authority. |
| 04/25/2017 | 1000546857 | 16:35 | MATTHEW BERRA | GRD31A | ENGINE BELL AND WHISTLE SIGNAL FOR ROAD | Pass | No | Not Needed | |
| 04/25/2017 | 1000546857 | 16:35 | MATTHEW BERRA | GRD16 | HEADLIGHT DISPLAY | Pass | No | Not Needed | |
| 04/27/2017 | 1000545600 | 19:20 | JOHN BURTON | GRD28 | ELECTRONIC DEVICES | Pass | No | Not Needed | |
| 04/06/2017 | 1000538459 | 17:30 | MARK JOHNSON | GRD08 | INSPECTING PASSING TRAINS | Pass | No | Not Needed | Inspected train on both sides. |
| 04/06/2017 | 1000538463 | 16:00 | MATTHEW BERRA | GRD16 | HEADLIGHT DISPLAY | Pass | No | Not Needed | |
| 04/06/2017 | 1000538463 | 16:00 | MATTHEW BERRA | GRD29 | TABULAR GENERAL BULLETIN ORDER | Pass | No | Not Needed | |




CP_000175



# Testing (2013+)

John Sexton ( )
Fail(%): 7 (2.39%)
Date: July 27, 2021

| Date | Session Id | Test Start Time | Testing Officer | Test Code | Test Code Desc | Test Result | Retest Required | Retested In 7 Days | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 04/03/2017 | 1000537087 | 09:30 | MARK JOHNSON | GRD18 | SECURING EQUIPMENT - LOCOMOTIVES AND CARS | Pass | No | Not Needed | Tested securement properly. Observed two cars left unattached to any other equipment on WD05, hand brakes were applied to both cars. |
| 04/03/2017 | 1000537087 | 09:30 | MARK JOHNSON | GRD18 | SHOVING OR PUSHING MOVEMENTS | Pass | No | Not Needed | ensured that he was given direction and distance prior to shoving, and received updates from his crewmembers to continue shove movement. |
| 02/08/2017 | 1000510897 | 14:46 | JOHN STOFFER | GRD14 | GENERAL RULES (EXCEPT RULE 1.5) | Pass | No | Not Needed | |
| 02/08/2017 | 1000510897 | 14:46 | JOHN STOFFER | GRT20 | ON OR ABOUT TRACKS (EXCL. LANTERNS) | Pass | No | Not Needed | Lake |
| 02/08/2017 | 1000510897 | 14:46 | JOHN STOFFER | GRT21 | PERSONAL PROTECTIVE EQUIPMENT AND CLOTHING | Pass | No | Not Needed | vest, plugs gasses, boots & gloves |
| 11/07/2016 | 1000469720 | 18:34 | THOMAS WHALEN | GRD28 | ELECTRONIC DEVICES | Pass | No | Not Needed | |
| 11/07/2016 | 1000469720 | 18:55 | THOMAS WHALEN | GRF04 | EQUIPMENT LEFT TO FOUL ANOTHER TRACK | Pass | No | Not Needed | |
| 11/07/2016 | 1000469720 | 19:00 | THOMAS WHALEN | GRD21 | VERBAL COMMUNICATION | Pass | No | Not Needed | |
| 11/07/2016 | 1000470120 | 14:00 | THOMAS WHALEN | GRA11 | STOP INDICATION CTC TERRITORY OR MANUAL | Pass | No | Not Needed | |
| 10/04/2016 | 1000456496 | 01:15 | ARRON NOBLE | GRD18 | SECURING EQUIPMENT - LOCOMOTIVES AND CARS | Pass | No | Not Needed | |
| 09/24/2016 | 1000451830 | 20:36 | MICHEL HUNTER | GRD25 | FLAT SWITCHING MODULE | Pass | No | Not Needed | |
| 09/15/2016 | 1000449270 | 16:50 | EDDIE DOWNEY | GRB05 | MOVEMENT BY SIGNAL REQUIRING RESTRICTED | Pass | No | Not Needed | |
| 09/15/2016 | 1000449270 | 16:50 | EDDIE DOWNEY | GRC14 | APPROACH | Pass | No | Not Needed | |
| 09/15/2016 | 1000449270 | 16:50 | EDDIE DOWNEY | GRD01A | ENGINE BELL AND WHISTLE SIGNAL FOR ROAD | Pass | No | Not Needed | |

13 (46)

**CP** 9710000_CP

## Testing (2013+)

John Sexton
Fail(%):  7  (2.39%)
Date: July 27, 2021

| Date | Session Id | Test Start Time | Testing Officer | Test Code | Test Code Desc | Test Result | Retest Required | Retested In 7 Days | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 09/15/2016 | 100044927O | 16:50 | EDDIE DOWNEY | GRD16 | HEADLIGHT DISPLAY | Pass | No | Not Needed | |
| 09/15/2016 | 100044927O | 16:50 | EDDIE DOWNEY | GRD17 | RADAR INSPECTION TEST | Pass | No | Not Needed | |
| 09/15/2016 | 100044927O | 16:50 | EDDIE DOWNEY | GRD21 | VERBAL COMMUNICATION | Pass | No | Not Needed | |
| 07/30/2016 | 100043073B | 21:08 | AARON CARTER | GR02 | "IDENTIFICATION, OVER, OUT" | Pass | No | Not Needed | |
| 07/30/2016 | 100043073B | 21:09 | AARON CARTER | GR03 | PICKING UP A CREW MEMBER | Pass | No | Not Needed | |
| 07/30/2016 | 100043073B | 21:10 | AARON CARTER | GRH02 | HAZ MAT TRAIN PLACEMENT | Pass | No | Not Needed | |
| 07/30/2016 | 100043073B | 21:11 | AARON CARTER | GR07 | CROSSOVER SWITCHES | Pass | No | Not Needed | |
| 07/30/2016 | 100043073B | 21:12 | AARON CARTER | GRD01A | ENGINE BELL AND WHISTLE SIGNAL FOR ROAD | Pass | No | Not Needed | |
| 07/30/2016 | 100043073B | 21:13 | AARON CARTER | GRD08 | INSPECTING PASSING TRAINS | Pass | No | Not Needed | |
| 07/30/2016 | 100043073B | 21:14 | AARON CARTER | GRD21 | VERBAL COMMUNICATION | Pass | No | Not Needed | |
| 07/30/2016 | 100043073B | 21:15 | AARON CARTER | GR03 | PICKING UP A CREW MEMBER | Pass | No | Not Needed | |
| 07/09/2016 | 100042109A | 18:01 | ARRON NOBLE | GRD18 | SECURING EQUIPMENT - LOCOMOTIVES AND CARS | Pass | No | Not Needed | |
| 07/09/2016 | 100042109A | 18:01 | ARRON NOBLE | GRD21 | VERBAL COMMUNICATION | Pass | No | Not Needed | |
| 07/09/2016 | 100042109A | 18:01 | ARRON NOBLE | GRD28 | ELECTRONIC DEVICES | Pass | No | Not Needed | |



CP_0000777

# Testing (2013+)

John Sexton ( _____ )
Fail(%):  7  (2.39%)
Date: July 27, 2021

| Date | Session Id | Test Start Time | Testing Officer | Test Code | Test Code Desc | Test Result | Retest Required | Retested In 7 Days | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 07/09/2016 | 1000421094 | 18:01 | ARRON NOBLE | GRF04 | EQUIPMENT LEFT TO FOUL ANOTHER TRACK | Pass | No | Not Needed | |
| 07/09/2016 | 1000421094 | 18:01 | ARRON NOBLE | GRT14R | RELEASING HAND BRAKES | Pass | No | Not Needed | |
| 07/09/2016 | 1000421094 | 18:01 | ARRON NOBLE | GRT20 | ON OR ABOUT TRACKS (EXCL. LANTERNS) | Pass | No | Not Needed | |
| 07/09/2016 | 1000421118 | 21:01 | MICHEL HUNTER | GRF02 | SHOVING OR PUSHING MOVEMENTS | Pass | No | Not Needed | |
| 07/09/2016 | 1000421118 | 21:02 | MICHEL HUNTER | GRD25 | FLAT SWITCHING MODULE | Pass | No | Not Needed | |
| 07/09/2016 | 1000421118 | 21:03 | MICHEL HUNTER | GRD16 | HEADLIGHT DISPLAY | Pass | No | Not Needed | |
| 07/06/2016 | 1000419873 | 23:02 | AARON CARTER | GR02 | "IDENTIFICATION, OVER, OUT" | Pass | No | Not Needed | |
| 06/29/2016 | 1000417067 | 18:00 | ARRON NOBLE | GRD18 | SECURING EQUIPMENT - LOCOMOTIVES AND CARS | Pass | No | Not Needed | |
| 06/29/2016 | 1000417067 | 18:00 | ARRON NOBLE | GRD28 | ELECTRONIC DEVICES | Pass | No | Not Needed | |
| 06/29/2016 | 1000417067 | 18:00 | ARRON NOBLE | GRD29 | TABULAR GENERAL BULLETIN ORDER | Pass | No | Not Needed | |
| 06/29/2016 | 1000417067 | 18:00 | ARRON NOBLE | GRT14R | RELEASING HAND BRAKES | Pass | No | Not Needed | |
| 06/29/2016 | 1000417067 | 18:00 | ARRON NOBLE | GRT20 | ON OR ABOUT TRACKS (EXCL. LANTERNS) | Pass | No | Not Needed | |
| 06/29/2016 | 1000417067 | 19:00 | ARRON NOBLE | GRA15 | OPERATING WITH TRACK WARRANTS | Pass | No | Not Needed | |
| 06/29/2016 | 1000417067 | 19:00 | ARRON NOBLE | GRB08 | INITIATING MOVEMENT BETWEEN SIGNALS | Pass | No | Not Needed | |



8710000_PD

## Testing (2013+)

**John Sexton** ( )
**Fail(%):** 7 (2.39%)
**Date: July 27, 2021**

| Date | Session Id | Test Start Time | Testing Officer | Test Code | Test Code Desc | Test Result | Retest Required | Retested In 7 Days | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 06/29/2016 | 1000417067 | 19:20 | ARRON NOBLE | GRA17 | TRACK SIDE WARNING DETECTOR | Pass | No | Not Needed | |
| 06/29/2016 | 1000417067 | 19:30 | ARRON NOBLE | GRC08 | MAXIMUM AUTHORIZED SPEED | Pass | No | Not Needed | |
| 06/29/2016 | 1000417067 | 20:00 | ARRON NOBLE | GR02 | "IDENTIFICATION, OVER, OUT" | Pass | No | Not Needed | |
| 06/29/2016 | 1000417067 | 20:00 | ARRON NOBLE | GRA14 | STOP INDICATION ABS TERRITORY | Pass | No | Not Needed | |
| 06/18/2016 | 1000411556 | 01:41 | AARON CARTER | GR02 | "IDENTIFICATION, OVER, OUT" | Pass | No | Not Needed | |
| 06/18/2016 | 1000411556 | 01:42 | AARON CARTER | GRF05 | "LINED, LOCKED AND CHECKED" | Pass | No | Not Needed | |
| 06/18/2016 | 1000411556 | 01:43 | AARON CARTER | GRD23 | COMMUNICATION BETWEEN CREWS SWITCHING | Pass | No | Not Needed | |
| 06/18/2016 | 1000411556 | 01:44 | AARON CARTER | GRD16 | HEADLIGHT DISPLAY | Pass | No | Not Needed | |
| 06/18/2016 | 1000411556 | 01:45 | AARON CARTER | GRD08 | INSPECTING PASSING TRAINS | Pass | No | Not Needed | |
| 06/18/2016 | 1000411556 | 01:46 | AARON CARTER | GRF03 | PICKING UP A CREW MEMBER | Pass | No | Not Needed | |
| 05/04/2016 | 1000389597 | 18:34 | PAUL EVANS | GRT11 | ENTRAINING AND DETRAINING EQUIPMENT/MOVING EQUIPMENT | Pass | No | Not Needed | |
| 05/04/2016 | 1000390564 | 18:30 | EDDIE DOWNEY | GRD18 | SECURING EQUIPMENT - LOCOMOTIVES AND CARS | Pass | No | Not Needed | |
| 05/04/2016 | 1000390564 | 18:30 | EDDIE DOWNEY | GRT20 | ON OR ABOUT TRACKS (EXCL. LANTERNS) | Pass | No | Not Needed | |
| 01/27/2016 | 1000339375 | 23:10 | CHAVANNE JESTER JR | GRF02 | SHOVING OR PUSHING MOVEMENTS | Pass | No | Not Needed | |

16 (46)

**CP** 671000_CP

## Testing (2013+)

John Sexton (⬛⬛⬛⬛)
Fall(%):  7 (2.39%)
Date: July 27, 2021

| Date | Session Id | Test Start Time | Testing Officer | Test Code | Test Code Desc | Test Result | Retest Required | Retested In 7 Days | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 01/27/2016 | 1000393375 | 23:15 | CHAVANNE JESTER JR | GRF05 | "LINED, LOCKED AND CHECKED" | Pass | No | Not Needed | |
| 01/27/2016 | 1000393375 | 23:20 | CHAVANNE JESTER JR | GRF07 | CROSSOVER SWITCHES | Pass | No | Not Needed | |
| 01/27/2016 | 1000393375 | 23:25 | CHAVANNE JESTER JR | GRT6 | COUPLING/UNCOUPLING | Pass | No | Not Needed | |
| 01/12/2016 | 1000310880 | 23:15 | BRET SPRANGER | GRD18 | SECURING EQUIPMENT - LOCOMOTIVES AND CARS | Pass | No | Not Needed | |
| 01/12/2016 | 1000310880 | 23:15 | BRET SPRANGER | GRT20 | ON OR ABOUT TRACKS (EXCL. LANTERNS) | Pass | No | Not Needed | |
| 01/06/2016 | 1000328623 | 18:15 | DEAN PORTER | GRD29 | TABULAR GENERAL BULLETIN ORDER | Pass | No | Not Needed | |
| 01/06/2016 | 1000328623 | 18:15 | DEAN PORTER | GRH02 | HAZ MAT TRAIN PLACEMENT | Pass | No | Not Needed | |
| 10/31/2015 | 1000295016 | 12:13 | AARON CARTER | GRT14R | RELEASING HAND BRAKES | Pass | No | Not Needed | |
| 10/31/2015 | 1000295016 | 12:14 | AARON CARTER | GRD01 | ENGINE BELL AND WHISTLE SIGNAL | Pass | No | Not Needed | |
| 10/31/2015 | 1000295016 | 12:16 | AARON CARTER | GRC01 | YELLOW FLAG | Pass | No | Not Needed | |
| 10/31/2015 | 1000295016 | 12:17 | AARON CARTER | GRH02 | HAZ MAT TRAIN PLACEMENT | Pass | No | Not Needed | |
| 10/09/2015 | 1000282200 | 08:58 | AARON CARTER | GRD18 | SECURING EQUIPMENT - LOCOMOTIVES AND CARS | Pass | No | Not Needed | |
| 10/09/2015 | 1000282200 | 09:53 | AARON CARTER | GRA06 | BLUE SIGNAL PROTECTION OF WORKMEN | Pass | No | Not Needed | |
| 10/09/2015 | 1000282200 | 09:54 | AARON CARTER | GRT9 | DERAILS | Pass | No | Not Needed | |

17 (46)

CP    0810000_CP

## Testing (2013+)

John Sexton (          )
Fail(%):    7  (2.39%)
Date: July 27, 2021

| Date | Session Id | Test Start Time | Testing Officer | Test Code | Test Code Desc | Test Result | Retest Required | Retested In 7 Days | Comments |
|------|-----------|-----------------|-----------------|-----------|----------------|-------------|-----------------|--------------------|----------|
| 10/09/2015 | 1000282200 | 09:55 | AARON CARTER | GRR05 | "LINED, LOCKED AND CHECKED" | Pass | No | Not Needed | |
| 10/09/2015 | 1000282200 | 09:56 | AARON CARTER | GRR03 | PICKING UP A CREW MEMBER | Pass | No | Not Needed | |
| 10/09/2015 | 1000282200 | 09:57 | AARON CARTER | GRR02 | SHOVING OR PUSHING MOVEMENTS | Pass | No | Not Needed | |
| 10/09/2015 | 1000282200 | 09:58 | AARON CARTER | GRF11 | DERAIL LOCATION AND POSITION | Pass | No | Not Needed | |
| 10/09/2015 | 1000282200 | 09:59 | AARON CARTER | GRD01A | ENGINE BELL AND WHISTLE SIGNAL FOR ROAD | Pass | No | Not Needed | |
| 10/09/2015 | 1000282200 | 10:00 | AARON CARTER | GRT21 | PERSONAL PROTECTIVE EQUIPMENT AND CLOTHING | Pass | No | Not Needed | |
| 10/09/2015 | 1000282854 | 11:00 | DEAN PORTER | GRD17 | RADAR INSPECTION TEST | Pass | No | Not Needed | |
| 09/16/2015 | 1000270229 | 03:45 | MICHEL HUNTER | GRA14 | STOP INDICATION ABS TERRITORY | Pass | No | Not Needed | |
| 09/16/2015 | 1000270229 | 03:45 | MICHEL HUNTER | GRA15 | OPERATING WITH TRACK WARRANTS | Pass | No | Not Needed | |
| 09/16/2015 | 1000270229 | 03:45 | MICHEL HUNTER | GRB03 | YARD LIMIT | Pass | No | Not Needed | |
| 09/16/2015 | 1000270229 | 03:45 | MICHEL HUNTER | GRD01A | ENGINE BELL AND WHISTLE SIGNAL FOR ROAD | Pass | No | Not Needed | |
| 09/16/2015 | 1000270229 | 03:45 | MICHEL HUNTER | GRD16 | HEADLIGHT DISPLAY | Pass | No | Not Needed | |
| 08/26/2015 | 1000260774 | 11:30 | AARON CARTER | GRH02 | HAZ MAT TRAIN PLACEMENT | Pass | No | Not Needed | |
| 08/04/2015 | 1000251043 | 20:00 | DUSTIN HEICHEL | GRD08 | INSPECTING PASSING TRAINS | Pass | No | Not Needed | |

18 (46)

200



CP_0000187

# Testing (2013+)

John Sexton ( )
Fail(%):  7 (2.39%)
Date: July 27, 2021

| Date | Session Id | Test Start Time | Testing Officer | Test Code | Test Code Desc | Test Result | Retest Required | Retested in 7 Days | Comments |
|------|-----------|-----------------|-----------------|-----------|----------------|-------------|-----------------|--------------------|----------|
| 08/04/2015 | 1000251043 | 20:00 | DUSTIN HEICHEL | GRD18 | SECURING EQUIPMENT - LOCOMOTIVES AND CARS | Pass | No | Not Needed | |
| 08/04/2015 | 1000251043 | 20:00 | DUSTIN HEICHEL | GRD21 | VERBAL COMMUNICATION | Pass | No | Not Needed | |
| 08/04/2015 | 1000251043 | 20:00 | DUSTIN HEICHEL | GRD25 | FLAT SWITCHING MODULE | Pass | No | Not Needed | |
| 08/04/2015 | 1000251043 | 20:00 | DUSTIN HEICHEL | GRT20 | ON OR ABOUT TRACKS (EXCL. LANTERNS) | Pass | No | Not Needed | |
| 07/03/2015 | 1000231623 | 18:30 | BRET SPRANGER | GRT21 | PERSONAL PROTECTIVE EQUIPMENT AND CLOTHING | Pass | No | Not Needed pass | |
| 05/19/2015 | 1000212879 | 11:30 | DEREK MEAD | GM506 | "CLASS 111 AIR BRAKE TEST (APPLICATION, | Pass | No | Not Needed - | |
| 05/19/2015 | 1000212879 | 11:30 | DEREK MEAD | GR02 | "IDENTIFICATION, OVER, OUT" | Pass | No | Not Needed - | |
| 05/19/2015 | 1000212879 | 11:30 | DEREK MEAD | GRB11 | OCCUPYING SAME TRACK WARRANT LIMITS | Pass | No | Not Needed - | |
| 05/19/2015 | 1000212879 | 11:30 | DEREK MEAD | GRD24 | RELEASING MANDATORY DIRECTIVE | Pass | No | Not Needed - | |
| 05/05/2015 | 1000207679 | 09:00 | DEAN PORTER | GRA11 | STOP INDICATION CTC TERRITORY OR MANUAL | Pass | No | Not Needed - | |
| 05/05/2015 | 1000207679 | 09:00 | DEAN PORTER | GRD01C | ENGINE BELL AND WHISTLE SIGNAL FOR APPROACHING MEN OR EQUIPM | Pass | No | Not Needed - | |
| 05/05/2015 | 1000207679 | 09:00 | DEAN PORTER | GRD29 | TABULAR GENERAL BULLETIN ORDER | Pass | No | Not Needed - | |
| 05/05/2015 | 1000207679 | 09:00 | DEAN PORTER | GRH01 | HAZ MAT REQUIRED DOCUMENTATION/EMERGENCY RESPONSE | Pass | No | Not Needed - | |
| 04/23/2015 | 1000204723 | 03:00 | MICHEL HUNTER | GRT21 | PERSONAL PROTECTIVE EQUIPMENT AND CLOTHING | Fail | No | No - Retested Late | mr sexton, did not have is saftey vest zipped up |

19 (46)



Testing (2013+)

John Sexton ( )
Fail(%):  7 (2.39%)
Date: July 27, 2021

| Date | Session Id | Test Start Time | Testing Officer | Test Code | Test Code Desc | Test Result | Retest Required | Retested In 7 Days | Comments |
|------|-----------|-----------------|-----------------|-----------|----------------|-------------|-----------------|--------------------|----------|
| 04/19/2015 | 1000200713 | 01:30 | ADAM JOHNSON | GR02 | "IDENTIFICATION, OVER, OUT" | Pass | No | Not Needed | - |
| 04/19/2015 | 1000200713 | 01:30 | ADAM JOHNSON | GRD16 | HEADLIGHT DISPLAY | Pass | No | Not Needed | - |
| 04/19/2015 | 1000200713 | 01:30 | ADAM JOHNSON | GRD21 | VERBAL COMMUNICATION | Pass | No | Not Needed | - |
| 04/19/2015 | 1000200713 | 01:30 | ADAM JOHNSON | GRT21 | PERSONAL PROTECTIVE EQUIPMENT AND CLOTHING | Pass | No | Not Needed | - |
| 04/19/2015 | 1000200713 | 02:00 | ADAM JOHNSON | GRA15 | OPERATING WITH TRACK WARRANTS | Pass | No | Not Needed | - |
| 04/19/2015 | 1000200713 | 02:00 | ADAM JOHNSON | GRC06 | PROVIDING WARNING OVER ROAD CROSSINGS | Pass | No | Not Needed | - |
| 04/19/2015 | 1000200713 | 02:00 | ADAM JOHNSON | GR02 | "IDENTIFICATION, OVER, OUT" | Pass | No | Not Needed | - |
| 04/10/2015 | 1000197245 | 08:15 | AARON CARTER | GRA06 | BLUE SIGNAL PROTECTION OF WORKMEN | Pass | No | Not Needed | - |
| 04/10/2015 | 1000197245 | 08:15 | AARON CARTER | GRA14 | STOP INDICATION ABS TERRITORY | Pass | No | Not Needed | - |
| 04/10/2015 | 1000197245 | 08:15 | AARON CARTER | GRF02 | SHOVING OR PUSHING MOVEMENTS | Pass | No | Not Needed | - |
| 04/10/2015 | 1000197245 | 08:15 | AARON CARTER | GRF05 | "LINED, LOCKED AND CHECKED" | Pass | No | Not Needed | - |
| 04/10/2015 | 1000197245 | 08:15 | AARON CARTER | GRF06 | HAND OPERATED SWITCHES | Pass | No | Not Needed | - |
| 03/23/2015 | 1000190187 | 21:40 | KEVIN KING | GRD08 | INSPECTING PASSING TRAINS | Pass | No | Not Needed | - |
| 03/22/2015 | 1000189349 | 10:30 | TIMOTHY ROSS | GRD21 | VERBAL COMMUNICATION | Pass | No | Not Needed | - |



CP_0001683_CP

# Testing (2013+)

John Sexton (          )
Fall(%):   7 (2.39%)
Date: July 27, 2021

| Date | Session Id | Test Start Time | Testing Officer | Test Code | Test Code Desc | Test Result | Retest Required | Retested In 7 Days | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 03/22/2015 | 1000189349 | 10:30 | TIMOTHY ROSS | GRD29 | TABULAR GENERAL BULLETIN ORDER | Pass | No | Not Needed | - |
| 03/13/2015 | 1000188851 | 14:00 | DEAN PORTER | GMS06 | "CLASS 111 AIR BRAKE TEST (APPLICATION, | Pass | No | Not Needed | - |
| 03/13/2015 | 1000188851 | 14:00 | DEAN PORTER | GRD29 | TABULAR GENERAL BULLETIN ORDER | Pass | No | Not Needed | - |
| 03/13/2015 | 1000188851 | 14:00 | DEAN PORTER | GRD06 | HAND OPERATED SWITCHES | Pass | No | Not Needed | - |
| 03/13/2015 | 1000188851 | 14:00 | DEAN PORTER | GRR11 | DERAIL LOCATION AND POSITION | Pass | No | Not Needed | - |
| 03/13/2015 | 1000188851 | 14:00 | DEAN PORTER | GRH02 | HAZ MAT TRAIN PLACEMENT | Pass | No | Not Needed | - |
| 03/13/2015 | 1000188851 | 14:00 | DEAN PORTER | GRT20 | ON OR ABOUT TRACKS (EXCL. LANTERNS) | Pass | No | Not Needed | - |
| 03/13/2015 | 1000188851 | 14:30 | DEAN PORTER | GRF02 | SHOVING OR PUSHING MOVEMENTS | Pass | No | Not Needed | - |
| 03/13/2015 | 1000188851 | 16:00 | DEAN PORTER | GRD08 | INSPECTING PASSING TRAINS | Pass | No | Not Needed | - |
| 03/13/2015 | 1000188851 | 16:00 | DEAN PORTER | GRD17 | RADAR INSPECTION TEST | Pass | No | Not Needed | - |
| 03/13/2015 | 1000188851 | 20:00 | DEAN PORTER | GRD08 | INSPECTING PASSING TRAINS | Pass | No | Not Needed | - |
| 03/13/2015 | 1000188851 | 23:00 | DEAN PORTER | GRD18 | SECURING EQUIPMENT - LOCOMOTIVES AND CARS | Pass | No | Not Needed | - |
| 02/13/2015 | 1000178879 | 00:35 | AARON CARTER | GRT21 | PERSONAL PROTECTIVE EQUIPMENT AND CLOTHING | Pass | No | Not Needed | - |
| 02/13/2015 | 1000178879 | 00:35 | AARON CARTER | GRT.DB1 | JOB BRIEFING | Pass | No | Not Needed | - |

21 (46)

CP _0000810

## Testing (2013+)

John Sexton ( )
Fail(%):   7  (2.39%)
Date: July 27, 2021

| Date | Session Id | Test Start Time | Testing Officer | Test Code | Test Code Desc | Test Result | Retest Required 7 Days | Retested In | Comments |
|------|-----------|-----------------|-----------------|-----------|----------------|-------------|------------------------|-------------|----------|
| 02/13/2015 | 1000178879 | 00:45 | AARON CARTER | GRT14R | RELEASING HAND BRAKES | Pass | No | Not Needed | - |
| 02/13/2015 | 1000178879 | 00:55 | AARON CARTER | GRR03 | PICKING UP A CREW MEMBER | Pass | No | Not Needed | - |
| 02/13/2015 | 1000178879 | 00:55 | AARON CARTER | GRR06 | HAND OPERATED SWITCHES | Pass | No | Not Needed | - |
| 02/13/2015 | 1000178879 | 00:55 | AARON CARTER | GRR07 | CROSSOVER SWITCHES | Pass | No | Not Needed | - |
| 02/13/2015 | 1000178879 | 01:10 | AARON CARTER | GRD15 | COPY & REPEAT MANDATORY DIRECTIVE | Pass | No | Not Needed | - |
| 01/11/2015 | 1000160619 | 14:40 | RONALD R PIERCE | GRD08 | INSPECTING PASSING TRAINS | Pass | No | Not Needed | - |
| 01/11/2015 | 1000160619 | 14:38 | RONALD R PIERCE | GRF05 | "LINED, LOCKED AND CHECKED" | Pass | No | Not Needed | Had to hand lined route out NSSW |
| 12/01/2014 | 1000150802 | 00:15 | DOUGLAS CARL | GRD18 | SECURING EQUIPMENT - LOCOMOTIVES AND CARS | Pass | No | Not Needed | - |
| 12/01/2014 | 1000150802 | 00:15 | DOUGLAS CARL | GRF04 | EQUIPMENT LEFT TO FOUL ANOTHER TRACK | Pass | No | Not Needed | - |
| 12/01/2014 | 1000150802 | 00:30 | DOUGLAS CARL | GRB03 | YARD LIMIT | Pass | No | Not Needed | - |
| 12/01/2014 | 1000150802 | 00:45 | DOUGLAS CARL | GMS03 | CLASS 1 AIR BRAKE TEST | Pass | No | Not Needed | - |
| 12/01/2014 | 1000150802 | 23:15 | DOUGLAS CARL | GRF02 | SHOVING OR PUSHING MOVEMENTS | Pass | No | Not Needed | - |
| 11/30/2014 | 1000150802 | 20:00 | DOUGLAS CARL | GRD28 | ELECTRONIC DEVICES | Pass | No | Not Needed | - |
| 11/30/2014 | 1000150802 | 20:15 | DOUGLAS CARL | GRD29 | TABULAR GENERAL BULLETIN ORDER | Pass | No | Not Needed | - |

22 (46)



**Testing (2013+)**

John Sexton ( ▮▮▮ )
Fail(%):   7 (2.39%)
Date: July 27, 2021

| Date | Session Id | Test Start Time | Testing Officer | Test Code | Test Code Desc | Test Result | Retest Required | Retested In 7 Days | Comments |
|------|-----------|-----------------|-----------------|-----------|----------------|-------------|-----------------|--------------------|----------|
| 11/30/2014 | 1000150802 | 23:45 | DOUGLAS CARL | GRD17 | RADAR INSPECTION TEST | Pass | No | Not Needed | - |
| 10/25/2014 | 1000136611 | 21:00 | BRET SPRANGER | GRC18 | DELAYED IN BLOCK | Pass | No | Not Needed | pass |
| 10/25/2014 | 1000136611 | 21:10 | BRET SPRANGER | GRC17 | RESTRICTION TO CREW MEMBER (TRK BULLETIN) | Pass | No | Not Needed | pass |
| 10/25/2014 | 1000136611 | 21:20 | BRET SPRANGER | GRC01 | YELLOW FLAG | Pass | No | Not Needed | pass |
| 10/25/2014 | 1000136611 | 22:00 | BRET SPRANGER | GRC03 | PERMANENT SPEED SIGNS | Pass | No | Not Needed | pass |
| 10/25/2014 | 1000136611 | 22:30 | BRET SPRANGER | GRA01 | HAND SIGNALS OR SIGNAL DISAPPEARANCE | Pass | No | Not Needed | pass |
| 10/25/2014 | 1000136611 | 22:45 | BRET SPRANGER | GRD01 | ENGINE BELL AND WHISTLE SIGNAL | Pass | No | Not Needed | pass |
| 10/25/2014 | 1000136611 | 23:10 | BRET SPRANGER | GRA10 | MOVEMENTS INTO SPUR TRACKS | Pass | No | Not Needed | pass |
| 10/25/2014 | 1000136611 | 23:30 | BRET SPRANGER | GRF11 | DERAIL LOCATION AND POSITION | Pass | No | Not Needed | pass |
| 10/25/2014 | 1000136611 | 23:45 | BRET SPRANGER | GRF10 | CONFLICTING MOVEMENTS APPROACHING SWITCH | Pass | No | Not Needed | pass |
| 03/19/2014 | 1000077339 | 11:00 | DEAN PORTER | GR01 | TEST TRANSMISSIONS | Pass | No | Not Needed | - |
| 03/19/2014 | 1000077339 | 11:00 | DEAN PORTER | GRC01 | YELLOW FLAG | Pass | No | Not Needed | - |
| 03/19/2014 | 1000077339 | 11:00 | DEAN PORTER | GRC08 | MAXIMUM AUTHORIZED SPEED | Pass | No | Not Needed | - |
| 03/19/2014 | 1000077339 | 11:00 | DEAN PORTER | GRD01B | ENGINE BELL AND WHISTLE SIGNAL FOR QUIET ZONES | Pass | No | Not Needed | - |

23 (46)



CP 9810000_CP

# Testing (2013+)

**John Sexton (** ▮ **)**
**Fall(%):  7 (2.39%)**
**Date: July 27, 2021**

| Date | Session Id | Test Start Time | Testing Officer | Test Code | Test Code Desc | Test Result | Retest Required | Retested In 7 Days | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 03/19/2014 | 1000077339 | 11:00 | DEAN PORTER | GRD15 | COPY & REPEAT MANDATORY DIRECTIVE | Pass | No | Not Needed | - |
| 03/19/2014 | 1000077339 | 11:00 | DEAN PORTER | GRD17 | RADAR INSPECTION TEST | Pass | No | Not Needed | - |
| 03/19/2014 | 1000077339 | 11:00 | DEAN PORTER | GRD21 | VERBAL COMMUNICATION | Pass | No | Not Needed | - |
| 03/19/2014 | 1000077714 | 13:00 | MICHAEL STUVER | GRT21 | PERSONAL PROTECTIVE EQUIPMENT AND CLOTHING | Pass | No | Not Needed | - |
| 03/19/2014 | 1000077714 | 14:00 | MICHAEL STUVER | GRA11 | STOP INDICATION CTC TERRITORY OR MANUAL | Pass | No | Not Needed | - |
| 03/19/2014 | 1000077714 | 14:00 | MICHAEL STUVER | GRB11 | OCCUPYING SAME TRACK WARRANT LIMITS | Pass | No | Not Needed | - |
| 03/19/2014 | 1000094579 | 13:00 | MICHAEL STUVER | GRA11 | STOP INDICATION CTC TERRITORY OR MANUAL | Pass | No | Not Needed | - |
| 03/19/2014 | 1000094579 | 13:00 | MICHAEL STUVER | GRT21 | PERSONAL PROTECTIVE EQUIPMENT AND CLOTHING | Pass | No | Not Needed | - |
| 03/19/2014 | 1000094579 | 14:00 | MICHAEL STUVER | GRB11 | OCCUPYING SAME TRACK WARRANT LIMITS | Pass | No | Not Needed | - |
| 01/07/2014 | 1000045928 | 10:00 | PAUL VESELY | GRD01A | ENGINE BELL AND WHISTLE SIGNAL FOR ROAD | Pass | No | Not Needed | - |
| 01/07/2014 | 1000045928 | 10:00 | PAUL VESELY | GRD16 | HEADLIGHT DISPLAY | Pass | No | Not Needed | - |
| 01/07/2014 | 1000045928 | 10:00 | PAUL VESELY | GRT21 | PERSONAL PROTECTIVE EQUIPMENT AND CLOTHING | Pass | No | Not Needed | - |
| 01/07/2014 | 1000045928 | 13:00 | PAUL VESELY | GRB03 | YARD LIMIT | Pass | No | Not Needed | ENGINE SPEEDOMETER |
| 12/27/2013 | 1000040698 | 10:00 | PAUL VESELY | GRA15 | OPERATING WITH TRACK WARRANTS | Pass | No | Not Needed | LETTS--TO--OTTUMWA |

24 (46)





## Testing (2013+)

John Sexton ( )
Fall(%):  7 (2.39%)
Date: July 27, 2021

| Date | Session Id | Test Start Time | Testing Officer | Test Code | Test Code Desc | Test Result | Retest Required | Retested In 7 Days | Comments |
|------|-----------|-----------------|-----------------|-----------|----------------|-------------|-----------------|--------------------|----------|
| 12/27/2013 | 1000040698 | 13:00 | PAUL VESELY | GRB03 | YARD LIMIT | Pass | No | Not Needed | ENGINE SPEEDOMETER |
| 11/17/2013 | 1000032770 | 20:20 | BRET SPRANGER | GRD1B | SECURING EQUIPMENT - LOCOMOTIVES AND CARS | Pass | No | Not Needed | - |
| 11/17/2013 | 1000032770 | 20:20 | BRET SPRANGER | GRF02 | SHOVING OR PUSHING MOVEMENTS | Pass | No | Not Needed | - |
| 11/17/2013 | 1000032770 | 20:20 | BRET SPRANGER | GRF06 | HAND OPERATED SWITCHES | Pass | No | Not Needed | - |
| 10/29/2013 | 1000028108 | 07:30 | SHAWN JEFFORD | GMS10 | LOCOMOTIVE AIR BRAKE TEST | Pass | No | Not Needed | - |
| 10/29/2013 | 1000028108 | 07:30 | SHAWN JEFFORD | GR02 | "IDENTIFICATION, OVER, OUT" | Pass | No | Not Needed | - |
| 10/29/2013 | 1000028108 | 07:30 | SHAWN JEFFORD | GRF04 | EQUIPMENT LEFT TO FOUL ANOTHER TRACK | Pass | No | Not Needed | - |
| 10/29/2013 | 1000028108 | 07:30 | SHAWN JEFFORD | GRF06 | HAND OPERATED SWITCHES | Pass | No | Not Needed | - |
| 10/29/2013 | 1000028108 | 07:30 | SHAWN JEFFORD | GRF09 | CLEAR OF MAIN TRACK SWITCHES | Pass | No | Not Needed | - |
| 10/29/2013 | 1000028108 | 07:30 | SHAWN JEFFORD | GRH01 | HAZ MAT REQUIRED DOCUMENTATION/EMERGENCY RESPONSE | Pass | No | Not Needed | - |
| 10/29/2013 | 1000028108 | 07:30 | SHAWN JEFFORD | GRT27 | THREE POINT PROCTECTION | Pass | No | Not Needed | - |
| 10/15/2013 | 1000035362 | 16:00 | DEAN PORTER | GRA11 | STOP INDICATION CTC TERRITORY OR MANUAL | Pass | No | Not Needed | - |
| 10/15/2013 | 1000035362 | 16:00 | DEAN PORTER | GRF02 | SHOVING OR PUSHING MOVEMENTS | Pass | No | Not Needed | - |
| 10/15/2013 | 1000035362 | 16:00 | DEAN PORTER | GRF04 | EQUIPMENT LEFT TO FOUL ANOTHER TRACK | Pass | No | Not Needed | - |



CP_0010088

# Testing (2013+)

John Sexton (　　　　　)
Fail(%):  7 (2.39%)
Date: July 27, 2021

| Date | Session Id | Test Start Time | Testing Officer | Test Code | Test Code Desc | Test Result | Retest Required | Retested In 7 Days | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 10/15/2013 | 1000035362 | 16:00 | DEAN PORTER | GRH01 | HAZ MAT REQUIRED DOCUMENTATION/EMERGENCY RESPONSE | Pass | No | Not Needed | - |
| 09/30/2013 | 1000023902 | 00:15 | DEAN PORTER | GR02 | "IDENTIFICATION, OVER, OUT" | Pass | No | Not Needed | - |
| 09/30/2013 | 1000023902 | 00:15 | DEAN PORTER | GRD1B | SECURING EQUIPMENT - LOCOMOTIVES AND CARS | Pass | No | Not Needed | - |
| 09/30/2013 | 1000023902 | 00:15 | DEAN PORTER | GRD02 | SHOVING OR PUSHING MOVEMENTS | Pass | No | Not Needed | DIRECTION NO DISTANCE |
| 09/30/2013 | 1000023902 | 00:15 | DEAN PORTER | GRF07 | CROSSOVER SWITCHES | Pass | No | Not Needed | - |
| 09/03/2013 | 1000029116 | 18:35 | JASON HENNEBERG | GRA03 | DISPLAY OF RED FLAG | Pass | No | Not Needed | - |
| 08/16/2013 | 1000019266 | 22:30 | DEAN PORTER | GMS03 | CLASS 1 AIR BRAKE TEST | Pass | No | Not Needed | - |
| 08/16/2013 | 1000019266 | 22:30 | DEAN PORTER | GR01 | TEST TRANSMISSIONS | Pass | No | Not Needed | - |
| 08/16/2013 | 1000019266 | 22:30 | DEAN PORTER | GRD23 | COMMUNICATION BETWEEN CREWS SWITCHING | Pass | No | Not Needed | - |
| 08/16/2013 | 1000019266 | 22:30 | DEAN PORTER | GRD25 | FLAT SWITCHING MODULE | Pass | No | Not Needed | - |
| 06/27/2013 | 1000019031 | 02:30 | DEAN PORTER | GRC06 | PROVIDING WARNING OVER ROAD CROSSINGS | Pass | No | Not Needed | - |
| 06/27/2013 | 1000019031 | 02:30 | DEAN PORTER | GRC17 | RESTRICTION TO CREW MEMBER (TRK BULLETIN) | Pass | No | Not Needed | - |
| 06/27/2013 | 1000019031 | 02:30 | DEAN PORTER | GRD01A | ENGINE BELL AND WHISTLE SIGNAL FOR ROAD | Pass | No | Not Needed | - |
| 05/08/2013 | 1000012136 | 08:00 | PAUL VESELY | GRA15 | OPERATING WITH TRACK WARRANTS | Pass | No | Not Needed | OTTUMWA TO LETTS |



# Testing (2013+)

John Sexton ( )
Fail(%): 7 (2.39%)
Date: July 27, 2021

681-0000_CP

| Date | Session Id | Test Start Time | Testing Officer | Test Code | Test Code Desc | Test Result | Retest Required | Retested In 7 Days | Comments |
|------|-----------|-----------------|-----------------|-----------|----------------|-------------|-----------------|---------------------|----------|
| 05/08/2013 | 1000012136 | 08:00 | PAUL VESELY | GRC08 | MAXIMUM AUTHORIZED SPEED | Pass | No | Not Needed | ENGINE SPEED RECORDER |
| 04/09/2013 | 1000009772 | 15:33 | BRUCE B WOLD | GME26 | VERBAL COMMUNICATION | Pass | No | Not Needed | - |
| 03/06/2013 | 1000007551 | 09:45 | SHAWN JEFFORD | GRD08 | INSPECTING PASSING TRAINS | Pass | No | Not Needed | - |
| 03/06/2013 | 1000007551 | 09:45 | SHAWN JEFFORD | GRE02 | SHOVING OR PUSHING MOVEMENTS | Pass | No | Not Needed | - |
| 03/06/2013 | 1000007551 | 09:45 | SHAWN JEFFORD | GRF04 | EQUIPMENT LEFT TO FOUL ANOTHER TRACK | Pass | No | Not Needed | - |
| 03/06/2013 | 1000007551 | 09:45 | SHAWN JEFFORD | GRF06 | HAND OPERATED SWITCHES | Pass | No | Not Needed | - |
| 03/06/2013 | 1000007551 | 09:45 | SHAWN JEFFORD | GRF07 | CROSSOVER SWITCHES | Pass | No | Not Needed | - |
| 03/06/2013 | 1000007551 | 09:45 | SHAWN JEFFORD | GRF11 | DERAIL LOCATION AND POSITION | Pass | No | Not Needed | - |
| 03/04/2013 | 1000008268 | 10:00 | BRANDON PREGLER | GMS06 | "CLASS 111 AIR BRAKE TEST (APPLICATION, | Pass | No | Not Needed | - |
| 03/04/2013 | 1000008268 | 10:00 | BRANDON PREGLER | GRF05 | "LINED, LOCKED AND CHECKED" | Pass | No | Not Needed | - |
| 01/30/2013 | 1000003435 | 18:15 | BRANDON PREGLER | GRA11 | STOP INDICATION CTC TERRITORY OR MANUAL | Pass | No | Not Needed | - |
| 01/24/2013 | 1000003435 | 16:00 | BRANDON PREGLER | GRC01 | YELLOW FLAG | Pass | No | Not Needed | - |

27 (46)

CP_0000190

CP

## Testing (2013+)

John Sexton ( ▮▮▮▮▮ )
Fall(%):   7 (2.39%)
Date: July 27, 2021

| Date | Session Id | Test Start Time | Testing Officer | Test Code | Test Code Desc | Test Result | Retest Required | Retested In 7 Days | Comments |
|------|-----------|-----------------|-----------------|-----------|----------------|-------------|-----------------|--------------------|----------|
| 01/24/2013 | 100000343S | 16:00 | BRANDON PREGLER | GRHI02 | HAZ MAT TRAIN PLACEMENT | Pass | No | Not Needed | - |

28 (46)

Page 1

1              UNITED STATES DISTRICT COURT

2               SOUTHERN DISTRICT OF IOWA

3                   EASTERN DIVISION

4    _____

5    John Sexton,                            Case No.

                                        23-cv-00031

6            Plaintiff,

7    v.

8    Dakota, Minnesota, & Eastern Railroad

     Corporation d/b/a Canadian Pacific, a

9    Delaware Corporation,

10           Defendant.

     _____

11

12

13           VIDEOCONFERENCE DEPOSITION OF

14                  BRANDON OGDEN

15

16

17   DATE:      07/10/2024

18   TIME:      9:10 a.m.

19   PLACE:     Zoom Videoconference

20

21

22

23

24   REPORTED BY:    Joseph Mailand

25   JOB NO.:        MW 6771421

Page 2

1                A P P E A R A N C E S

2

3    ON BEHALF OF PLAINTIFF:

4    Yaeger & Jungbauer Barristers

5    BY:    Cyle A. Cramer, Esq.

6           4601 Weston Woods Way

7           Saint Paul, Minnesota 55127

8           ████████  ████████  ████████

9           Email:  ccramer@yjblaw.com

10

11   ON BEHALF OF DEFENDANT:

12   Dorsey & Whitney LLP

13   BY:    John T. Sullivan, Esq.

14          Suite 1500

15          50 South Sixth Street

16          Minneapolis, Minnesota 55402

17          ████████  ████████  ████████

18          Email:  altaqatqa.briana@dorsey.com

19

20

21

22   ALSO APPEARED:

23          Noah Garcia

24

25

Page 48

1    A.    I don't see anything in writing under 5.3.7

2    that says anything about intention of a rule.

3    Q.    Let's take about a -- let's take a

4    10-minute break.

5              (Break: 10:13 a.m. to 10:27 a.m.)

6    BY MR. SULLIVAN:

7    Q.    Mr. Ogden, before we move on to your

8    methodology, I just wanted to clarify, again, my

9    understanding of Rule 5.3.7.

10              So -- and, again, as you noted, assuming no

11   other or if no other instructions were received, if

12   there was a 15-car count, the train must be stopped

13   within half of that distance, correct?

14   A.    That's what the rule says, unless there was

15   additional instructions received.

16   Q.    So if the train was stopped after 8, 9, 11

17   cars, that would be a violation of the rule, right?

18   A.    Well, if that is the only car count that

19   was given is 15, then 7 and a half -- I mean, if

20   we're looking at -- again, the letter of the rule,

21   then 7 and a half would be half the distance, so

22   anything beyond that would be a violation if 15-car

23   count is what was given.  Of course, if there were

24   additional instructions received, then the engineer

25   has the right to rely on those restrictions.

1      IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
2           EASTERN DIVISION

3  - - - - - - - - - - - - - - - - - - - - - -
                   No. 3:23-CV-00031-HCA
4

John Sexton,

5                  Plaintiff,
6   vs.

Dakota, Minnesota & Eastern Railroad
Corporation d/b/a Canadian Pacific,
a Delaware corporation,

9              Defendants.

10  - - - - - - - - - - - - - - - - - - - - - -

13          DEPOSITION OF

MCKINSEY HANSON

June 24, 2024

10:05 a.m.

23     TAKEN BY: BRENDA K. FOSS

1                     Deposition of MCKINSEY HANSON,

2          taken by Zoom videoconference by and on

3          behalf of Plaintiff, on Monday, June 24,

4          2024, commencing at 10:05 a.m., before

5          Brenda K. Foss, Professional Court Reporter,

6          Notary Public, State of Minnesota, County of

7          Hennepin.

8

9                          *    *    *    *    *

10                   APPEARANCES

11

     ON BEHALF OF THE PLAINTIFF:
12         CYLE CRAMER, ESQUIRE
           YAEGER & JUNGBAUER BARRISTERS, PLC
13         4601 Weston Woods Way
           St. Paul, MN  55127
14         ccramer@yjblaw.com

15         ████████████████████

16

     ON BEHALF OF THE DEFENDANTS:
17         BRIANA AL TAQATQA, ESQUIRE
           DORSEY & WHITNEY LLP
18         50 South 6th Street, Suite 1500
           Minneapolis, MN  55402
19         altaqatqa.briana@dorsey.com

20         ████████████████████

21

     Also present: Noah Garcia, BNSF Railway
22

23

24

25

1                    I N D E X

2

     Examination:                          PAGE:
3    By Mr. Cramer                         4

4

5    Marked Deposition Exhibits:
     60 STIP (McKelvey)                    22
6       Bates CP 6292
     61 STIP (Jared)                       27
7       Bates CP 6291
     62 '21 Performance Mgmt Form  29
8       (Ross) Bates CP 3816-3822
     63 Business Ethics Rptg Policy 38
9       Bates CP 6294-6299
     64 Policy 1300                        44
10      Bates CP 6319-6328

11

12

     Reporter's Certificate               51
13

14

     (Original Deposition Transcript in the
15   possession of Cyle Cramer, Esquire).

16
                       *    *    *    *    *
17

18

19

20

21

22

23

24

25

1      in February of 2021?

2   A   That's correct.

3   Q   And this replaced the prior policy, 5611?

4   A   Correct.

5   Q   Do you know about what year that replaced --

6      or the policy 3411 replaced 5611?

7   A   I don't, no.

8   Q   Under the Short-Term Incentive Plan, is it

9      guiding managers -- let me rephrase that.  So

10      according to this policy, on an annual basis

11      managers are responsible for guiding their

12      direct reports and setting objectives.  Correct?

13   A   That's correct.

14   Q   So what guidance do managers receive regarding

15      what objectives to set?

16   A   They have this policy to reference; but then

17      throughout the year when we start the

18      performance management process, they get

19      e-mails with additional information to

20      support them starting with beginning of the

21      year objective setting.  That comes from the

22      talent management group.

23   Q   We'll get into some of the metrics later, but

24      the specific metrics such as origin

25      performance, train performance, do individual

```
 1        managers come up with those metrics or do

 2        those come down from somewhere else to them?

 3   A    They're typically set with the senior leader

 4        and then it's cascaded down.  And then each

 5        leader that oversees a subdivision would

 6        modify for their specific territory.

 7   Q    And managers are responsible for achieving

 8        their annual performance objectives.  Correct?

 9   A    That's correct.

10   Q    And managers conduct reviews with their

11        employees regarding their performance and

12        meeting those objectives.  Correct?

13   A    Yes.

14   Q    And performance measures are weighted.  Right?

15   A    Yes, they are.

16   Q    Who sets these weights?

17   A    That would be the individual that's

18        responsible for their own PMP that would set

19        the weights in support with their manager to

20        make sure they're aligned.

21   Q    Are there individual weights and corporate

22        weights or do they all -- are they consistent?

23        Does that make sense?

24             MS. AL TAQATQA:  Objection, form.

25   A    There are individual weights for each
```

1    objective that they set.  And then there are

2    corporate percentages as a guideline for

3    meeting a corporate threshold in order to

4    obtain payout.

5  Q  (By Mr. Cramer, continuing) And the

6    objectives are weighted according to their

7    relative importance.  Right?

8  A  Relative importance of the objective to the

9    individual.

10 Q  So it's CP's policy that objectives with a

11   higher weight are more important than those

12   with a lower weight?

13              MS. AL TAQATQA:  Objection, form.

14              THE WITNESS:  Can you repeat the

15   question?

16 Q  (By Mr. Cramer, continuing) Is it CP's policy

17   that objectives with a higher weight are more

18   important than those with a lower weight?

19              MS. AL TAQATQA:  Same objection.

20 A  I would say they're set towards the

21   individual's goals for that year.  So if it

22   has a higher weight, then that individual may

23   have a goal that they need to focus on a

24   little bit more than another one.

25 Q  And a PMP objective with a higher weight

```
 1        affects a person's compensation more than an
 2        objective with a lower weight.  Correct?
 3    A   I would say that the goals are looked at on a
 4        holistic view.  We don't typically get that
 5        granular.
 6    Q   So this policy 3411, Exhibit 41, this policy
 7        would have applied to Kurtis McKelvey in
 8        February of 2021.  Correct?
 9    A   Correct.
10    Q   It would have applied to Marcus Johnson in
11        February of 2021?
12    A   Correct.
13    Q   And it applied to Dylan Smith in February of
14        2021?
15    A   Correct.
16    Q   It applied to Jason Ross in February of 2021?
17    A   Correct.
18    Q   Did it apply to Tracy Miller in February of
19        2021?
20    A   Yes, it did.
21    Q   Did it apply to Tom Jared in February of 2021?
22    A   Yes, it did.
23    Q   Is an individual's short-term incentive tied
24        directly to their individual objective?
25                  MS. AL TAQATQA:  Objection, form.
```

1    A    Yes, it is along with other factors of just

2         reviewing are there any market conditions

3         that would have affected our ability to

4         deliver or weather conditions as well.

5    Q    (By Mr. Cramer, continuing) CP's business

6         objectives are driven by precision scheduled

7         railroading.  Correct?

8    A    Partially, yes.

9    Q    Can you repeat that?

10   A    Partially, yes.

11   Q    Let me rephrase.  CP's priority is delivery

12        of a customer's shipment from origin to

13        destination as quickly as possible.  Correct?

14   A    I would say as quickly and safely as possible.

15   Q    Have you seen any documentation that uses

16        that phrase I used 'delivery of a customer's

17        shipment from origin to destination as

18        quickly as possible'?

19   A    I don't believe I have.

20   Q    Does it include safety in that phrase?

21             MS. AL TAQATQA:  Objection,

22        misconstrues the witness' response to the

23        previous question.

24   A    No, I haven't.

25   Q    (By Mr. Cramer, continuing) It's the goal of

1  Q  So Mr. McKelvey is incentivized for having

2     cars in his yard for shorter periods of time

3     under the terminal dwell statistic?

4  A  For part of his PMP, correct.

5  Q  On Exhibit 23, according to this, is

6     Mr. McKelvey incentivized for controlling

7     costs?

8  A  That is part of his PMP, yes.

9  Q  What ways did his PMP include controlling

10    costs?

11 A  The objective is fuel efficiency, terminal

12    costs, whiteboard session, heldaway, crew

13    utilization.

14 Q  Does controlling costs include lowering the

15    cost of crew transportation?

16 A  Yes, that would be part of it.

17 Q  The controlling cost includes reducing the

18    number of re-crews.  Correct?

19 A  It could be part of it.

20 Q  According to his PMP, Mr. McKelvey is

21    incentivized to maximize the weights of

22    trains, the length of trains, and the speed

23    of trains.  Correct?

24 A  That's correct.

25 Q  And under the optimize assets where the

1   A   For the individual component, yes.

2   Q   The top chunk of text here in the bold where

3       it includes percentages, operating ratio 35

4       percent, do you see where that is?

5   A   I do.

6   Q   Are those the corporate weights or individual

7       weights?

8   A   It's the STIP corporate performance measures.

9   Q   These are weighted.  Correct?

10  A   Correct.

11  Q   So according to this document, CP's corporate

12      performance measures or operating ratio,

13      operating income and trip plan compliance are

14      weighted as eight times more important than

15      train accident frequency.  Correct?

16              MS. AL TAQATQA:  Objection, form.

17  A   If you're adding them together, then you're

18      at 80 percent.

19  Q   (By Mr. Cramer, continuing) And we talked

20      earlier about weights and the significance of

21      weights.  So is it CP's policy that

22      objectives with a higher weight are more

23      important than those with a lower weight?

24  A   I would say importance or time spent

25      focussing on that component.

1   Q   So for an engineer who received a 20-day

2       unpaid suspension, who or what department

3       would determine whether that discipline was

4       an unwarranted adverse employment action?

5   A   So who determines if it's unwarranted?  So

6       the discipline has been assessed or not

7       assessed?

8   Q   Let's do both.  So if it has not been

9       assessed yet?

10  A   If it has not been assessed, there's a review

11      with senior leaders of the department to

12      ensure that we are being fair in our

13      discipline process.  So that would be the

14      first step.

15  Q   What about after a discipline is assessed?

16  A   After discipline is assessed if the individual

17      feels it's unwarranted, then they would

18      follow their grievance process through the

19      Collective Bargaining Agreement and then it

20      is a review with labor relations.

21  Q   So a neutral arbitration board's overturning

22      of a disciplinary action would suggest that

23      the disciplinary action was unwarranted?

24          MS. AL TAQATQA:  Objection, form.

25  A   It could suggest that, yeah.

John Sexton; Justin DePover
February 10, 2021

33

1   BY:  MR. JOHNSON

2        A.       Okay.  You can see where 4 Track is clear.  This

3   is 474 shoving in.  Mr. DePover gave his 50-car count.

4   Mr. DePover's doing a really good job here of looking towards

5   as he's stepping down to.  First he dismounts at that time.

6   They do have 76 cars ahold of at this time.

7              You're gonna see myself, I'm entering the frame

8   at the bottom of the screen.  As I walk over, Mr. DePover tells

9   the Engineer -- he's looking at his list and tells the Engineer

10  that he's -- a 15-car count.  At this point, he'd already

11  shoved in 12 car lengths.  If you'd like to stop the video, you

12  can count the cars that actually went into track or we can

13  continue on.

14       MR. JOHNSON:  Do you want --

15       A.       I did tell Mr. DePover at this time, that he was

16  not to give a -- additional car counts to the Engineer.

17       MR. JOHNSON:  Do you wanna count the cars or anything?

18  Does anybody need to?

19       MR. RAINWATER:  No, I'm good.

20       Q.       Okay.  We're gonna continue playing.

21       A.       And now we're watching the cars go by.  When we

22  get to the seventh car, I note that that's the seventh car.

23  Mr. DePover does mention they're short cars.  I didn't -- I did

24  agree.  Once we got past the seventh car, Mr. Sexton began to

John Sexton; Justin DePover
February 10, 2021

32

1         MR. JOHNSON:  -- that you're looking at right now.

2         MR. RAINWATER:  I -- I thought Mr. Jared said he had it

3    from his phone.  Maybe I misheard that.

4         MR. SEXTON:  Is there audio on this tape as well?

5         MR. JOHNSON:  No.

6         MR. JARED:  There's no audio.

7         MR. SEXTON:  I'm sorry, man --

8         MR. RAINWATER:  It's okay.

9         MR. SEXTON:  -- I can't take this [indiscernible].

10        MR. RAINWATER:  Relax.

11        MR. JOHNSON:  Okay.  As a reminder, we're on record

12   here.

13            Okay.  I'm right at 12:49, Mr. Jared.  I'm gonna

14   start playing.

15        MR. JARED:  Can you share your screen?

16        MR. JOHNSON:  I'm not real sure on how to do so.

17        MR. JARED:  Go down where the gr -- little green button

18   says Share Screen.

19        MR. JOHNSON:  Oh, there it is.  Okay.  Can you see it

20   now, Mr. Jared?

21        MR. JARED:  I can, yes.

22        MR. JOHNSON:  Okay.  I'm gonna start playing here for

23   you.

24                    (Whereupon a video recording was played)

CP_000049

John Sexton; Justin DePover
February 10, 2021

32

1        MR. JOHNSON:  -- that you're looking at right now.

2        MR. RAINWATER:  I -- I thought Mr. Jared said he had it

3   from his phone.  Maybe I misheard that.

4        MR. SEXTON:  Is there audio on this tape as well?

5        MR. JOHNSON:  No.

6        MR. JARED:  There's no audio.

7        MR. SEXTON:  I'm sorry, man --

8        MR. RAINWATER:  It's okay.

9        MR. SEXTON:  -- I can't take this [indiscernible].

10       MR. RAINWATER:  Relax.

11       MR. JOHNSON:  Okay.  As a reminder, we're on record

12   here.

13          Okay.  I'm right at 12:49, Mr. Jared.  I'm gonna

14   start playing.

15       MR. JARED:  Can you share your screen?

16       MR. JOHNSON:  I'm not real sure on how to do so.

17       MR. JARED:  Go down where the gr -- little green button

18   says Share Screen.

19       MR. JOHNSON:  Oh, there it is.  Okay.  Can you see it

20   now, Mr. Jared?

21       MR. JARED:  I can, yes.

22       MR. JOHNSON:  Okay.  I'm gonna start playing here for

23   you.

24                    (Whereupon a video recording was played)

CP_000049

1               IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF IOWA
2                       EASTERN DIVISION

3       - - - - - - - - - - - - - - - - - - - - - -
                              No. 3:23-CV-00031-HCA
4
        John Sexton,
5
                              Plaintiff,
6          vs.

7       Dakota, Minnesota & Eastern Railroad
        Corporation d/b/a Canadian Pacific,
8       a Delaware corporation,

9                             Defendants.

10      - - - - - - - - - - - - - - - - - - - - - -

11

12

13
                         DEPOSITION OF
14
                         DYLAN SMITH
15
                       May 29, 2024
16
                        10:00 a.m.
17

18

19

20

21

22

23              TAKEN BY: BRENDA K. FOSS
                  fossbrenda@yahoo.com
24                   612-701-4282

25

```
 1                    Deposition of DYLAN SMITH, taken

 2        via Zoom videoconference, by and on behalf of

 3        Plaintiff, on Wednesday, May 29, 2024,

 4        commencing at 10:00 a.m., before Brenda K. Foss,

 5        Professional Court Reporter, Notary Public,

 6        State of Minnesota, County of Hennepin.

 7                      *    *    *    *    *

 8                  APPEARANCES

 9
          ON BEHALF OF THE PLAINTIFF:
10            CYLE CRAMER, ESQUIRE
              KELEENAH YANG, PARALEGAL
11            YAEGER & JUNGBAUER BARRISTERS, PLC
              4601 Weston Woods Way
12            St. Paul, MN  55127
              ccramer@yjblaw.com
13            651-288-9500

14
          ON BEHALF OF THE DEFENDANTS:
15            BRIANA AL TAQATQA, ESQUIRE
              DORSEY & WHITNEY LLP
16            50 South 6th Street, Suite 1500
              Minneapolis, MN  55402
17            altaqatqa.briana@dorsey.com
              612-340-2600
18

19        ON BEHALF OF THE WITNESS DYLAN SMITH:
              RYAN FURNISS, ESQUIRE
20            7750 Clayton Road, Suite 102
              St. Louis, MO  63117
21            rfurniss@furnisslaw.com
              314-899-9101
22

23
          ALSO PRESENT:
24            Michelle Haynes, CPKC Paralegal

25
```

3

```
1                    I N D E X

2
       Examination:                  PAGE:
3      By Mr. Cramer                  4
       By Ms. Al Taqatqa              54

4

5      Objections:
       By Ms. Al Taqatqa             15, 19, 23,
6      25, 27, 30, 32, 36, 37, 39, 41, 50, 53

7
       Marked Deposition Exhibits:
8      43 2-1-21 e-mail re Marquette 8
          sub delays, Bates 3285-87
9      44 Verizon call record        17
          Bates 3922-26
10     45 2-21 e-mail re discipline   33
          call doc, Bates 932
11     46 Discipline call document    33
          Bates 009
12     47 Discipline call documents   36
          Bates 933-940
13     48 Performance Mgmt Form       46
          Bates 3354-60
14     49 STIP, Bates 3239            49

15
       Previously Marked Exhibits:
16     4  CP's Intimidation &         28
          Harassment Policy
17     9  Notice to attend           26
       10 Investigation Transcript   27-30, 40
18     11 GCOR 5.3.7                  39
       35 Discipline e-mail          23
19        Bates 981

20

21     Reporter's Certificate        56

22

23     (Original Deposition Transcript in the
       possession of Cyle Cramer, Esquire).
24

25                          *   *   *   *   *
```

1       requiring a re-crew, does that involve

2       employees being called in that end up not

3       operating a locomotive?

4               MS. AL TAQATQA:  Objection, form.

5       You can answer the question, Dylan.

6  A   I don't understand the question.  So if -- I

7       guess can you repeat the question?

8  Q   (By Mr. Cramer, continuing) If a re-crew is

9       required, does that involve employees being

10      called in that end up not operating a

11      locomotive?

12             MS. AL TAQATQA:  Same objection.

13  A  A re-crew would be an entire crew consisting

14      of a locomotive engineer and on the DM&E an

15      assistant engineer or conductor.  And the

16      conductor or assistant engineer would not

17      operate the locomotive because it's not their

18      duties.

19  Q  (By Mr. Cramer, continuing) So with a re-crew,

20      a crew is called in under the expectation

21      that a train is going to arrive on standard.

22      Correct?

23  A  No.

24  Q  Within a standard work event, there would not

25      need to be a re-crew.  Correct?

1   A   Correct.

2   Q   Going back up to the top -- and I can give

3       you a second to review that whole e-mail if

4       you'd like.  But in review of that e-mail, do

5       you understand that the 474-31 was delayed on

6       February 1st, 2021?

7   A   From what I'm reading just in that first

8       paragraph, they were delayed from midnight 56

9       to 1:37.  And then they received a track

10      warrant at 1:38.  So, yes, they were.  And it

11      was for 44 minutes if my math is right, 42

12      minutes maybe.  Yeah, 42.  So midnight 56 to

13      1:38.

14  Q   Can we scroll down again?  Then that last

15      paragraph on the bottom there, how long do

16      you understand the train was over-standard

17      for?

18  A   It says 3 hours and 23 minutes.

19  Q   Do you recall your work phone number in

20      February of 2021?

21  A   I believe it ended with 0379 maybe.

22  Q   Can we bring up CP 03922?

23              MS. AL TAQATQA:  Has this been

24      marked as an exhibit, Cyle?

25              MR. CRAMER:  It has not.  So that

1            IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF IOWA
2                     EASTERN DIVISION

3      - - - - - - - - - - - - - - - - - - - - - -
                          No. 3:23-CV-00031-HCA
4
     John Sexton,
5
                          Plaintiff,
6         vs.

7     Dakota, Minnesota & Eastern Railroad
     Corporation d/b/a Canadian Pacific,
8     a Delaware corporation,

9                         Defendants.

10     - - - - - - - - - - - - - - - - - - - - - - -

11

12

13
                      DEPOSITION OF
14
                      JASON ROSS
15
                    July 18, 2024
16
                     10:00 a.m.
17

18

19

20

21

22

23
               TAKEN BY:  BRENDA K. FOSS
24              fossbrenda@yahoo.com
                   612-701-4282
25

1          Deposition of JASON ROSS, taken by Zoom

2     videoconference by and on behalf of

3     Plaintiff, on Thursday, July 18, 2024,

4     commencing at 10:00 a.m., before Brenda K. Foss,

5     Professional Court Reporter, Notary Public,

6     State of Minnesota, County of Hennepin.

7

8                     *    *    *    *    *

9          APPEARANCES

10

      ON BEHALF OF THE PLAINTIFF:
11        JOHN MAGNUSON, ESQUIRE
          CYLE CRAMER, ESQUIRE
12        YAEGER & JUNGBAUER BARRISTERS, PLC
          4601 Weston Woods Way
13        St. Paul, MN  55127
          jmagnuson@yjblaw.com
14        651-288-9500

15

16    ON BEHALF OF THE DEFENDANTS:
          JACK SULLIVAN, ESQUIRE
17        DORSEY & WHITNEY LLP
          50 South 6th Street, Suite 1500
18        Minneapolis, MN  55402
          sullivan.jack@dorsey.com
19        612-340-2600

20

21    Also present: Noah Garcia, DM&E

22

23

24

25

```
 1        weights?

 2   A    Yes and no.  There's some guidelines that we

 3        put out about it, and they have to all add up

 4        to 100 obviously.  But usually operations --

 5        you know, we put out the guidelines earlier

 6        in the year.

 7   Q    Do you know why operating safely is assigned

 8        a 20 percent weight?

 9   A    Well, a couple reasons.  You know, I learned

10        this from Hunter Harrison.  The first thing

11        you do in a business is you provide a

12        service.  If you're not providing a service,

13        I don't care what business you're in, you're

14        not going to deliver a product that people

15        want.  Therefore, you're not making money.

16   Q    What is your service that CP provides?

17   A    Transportation, we transport goods.  That's

18        what we do.  So you have to provide a service.

19        That's the most important thing you do.  The

20        second thing is you've got to control your

21        costs because if you don't control your

22        costs, you're going to go out of business.

23        You can provide a service and be the best

24        service in the world and you'll end up out of

25        business.  Right?  You have to utilize your
```

1      assets because if you're not utilizing your

2      assets properly, you're just going to drive

3      your costs up.  You're going to go out of business.

4              You have to operate safely, and

5      that's just a given.  The expectation is you

6      operate safely.  You should operate safely no

7      matter what you're doing.  It's a given.

8              Then the last foundation -- and

9      it's not the last.  It's actually the

10     foundation that the other four are built on,

11     is to develop your people.  So a lot of

12     people think -- go ahead.

13  Q  Part of developing people is to apply the

14     consequence leadership model.  Right?

15  A  Yep, sometimes coaching or -- consequence is

16     also positive as well.  A lot of people look

17     at consequences and they say consequence is

18     negative.  It automatically gives a negative

19     connotation in our mind.  But a consequence

20     of anything we do can be positive or it can

21     be destructive.  There's positive consequences.

22  Q  CP applies and utilizes the consequence

23     leadership model.  Right?

24  A  That's right.

25  Q  So if we go back to provides service, part of