**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF IOWA**
**EASTERN DIVISION**

| | |
|---|---|
| John Sexton,<br><br>                    Plaintiff,<br><br>v.<br><br>Dakota, Minnesota & Eastern Railroad Corporation d/b/a Canadian Pacific, a Delaware Corporation,<br>                    Defendant. | No. 3:23-cv-00031-RGE-HCA<br><br><br>**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION IN LIMINE TO EXCLUDE THE TESTIMONY OF BRANDON L. OGDEN** |

**TABLE OF CONTENTS**

**TABLE OF AUTHORITIES** ......................................................................................2

**INTRODUCTION**...................................................................................................3

**SUMMARY OF FACTS**..........................................................................................4

    1. "Whether Sexton violated any rules, policies, notices or regulations" while performing his job duties on February 1, 2021 (Ogden Report at 6.) ..................................................................7

    2. "Whether CP's policies, programs, metrics, and/or goals present a potential or actual conflict of interest" between speed of operations and employee safety (Ogden Report at 6.) .................................................................................................8

    3. "Would CP have conducted an efficiency and disciplined Sexton if he had not engaged in protected activity" (or, stated another way, in the absence of Sexton's protected conduct, did his actions warrant discipline) (Ogden Report at 8.) ............................9

**Legal Argument** ..................................................................................................**10**

  I.    THE DAUBERT STANDARD IS A FLEXIBLE ONE. .....................................10

  II.    OGDEN POSSESSES SPECIALIZED KNOWELDGE NECESSARY TO ASSIST THE JURY AND HIS METHODOLOGY IS SOUND. .........................12

  III.    OGDEN'S OPINIONS ARE RELEVANT AND HELPFUL ..............................14

    A.  Ogden's opinion that Sexton did not violate GCOR Rule 5.7.3 is relevant and admissible on the issue of causation. ....................................14

    B.  Ogden's testimony regarding CP's conflict of interest is a proper subject of expert testimony and will assist the jury. ....................................17

     C.  Ogden's opinion as to the interplay between Sexton's protected activity and CP's disciplinary decision is not an inadmissible legal conclusion. ...........................................................................................18

IV.    **OGDEN'S OPINIONS ARE RELIABLE.** .......................................................**19**

V.    **CONCLUSION** ..............................................................................................**23**

## <u>TABLE OF AUTHORITIES</u>

Cases

*Blackmore v. Union Pacific R.R.*, No. 8:21CV318, 2023 WL 22213509, at *4 (D. Neb. Feb. 24, 2023)................................................................................... *passim*

*Urquehart v. Union Pac. R.R. Co.*, No. 4:20-CV-00515-BRW, 2021 WL 8014324 (E.D. Ark. Aug. 31, 2021) ....................................................................................6,13

*Nay v. BNSF Ry. Co.*, No. C19-5425-BHS-MLP, 2021 WL 5321979 (W.D. Wash. Nov. 16, 2021) ...........................................................................................6,12,13

*Peterson v. Union Pac. R.R. Co.*, No. 8:20CV293, 2022 WL 328753 (D. Neb. Feb. 3, 2022) ...........................................................................................................6,22

*Jenson v. Eveleth Taconite Co.*, 130 F.3d 1287, 1298 (8th Cir. 1997)..............................10

*Johnson v. Mead Johnson & Co.*, 754 F.3d 557, 562 (8th Cir. 2014) ...............................10

*Feit v. Great-West Life and Annuity Ins. Co.*, 460 F. Supp. 2d 632, 636 (D.N.J. 2006) .........................................................................................................................10

*Paoli R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994)...........................................10

*Hurst v. United States*, 882 F.2d 306, 311 (8th Cir. 1989). ...........................................11

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993) ......................... *passim*

*Walker v. Soo Line R. Co.*, 208 F.3d 581, 586 (7th Cir. 2000)..........................................11

*Lilley v. Home Depot U.S.A.*, Inc., 567 F. Supp. 2d 953, 956 (S.D. Tex. 2008) ..............11

*U.S. v. Sandoval-Mendoza*, 472 F.3d 645, 655 (9th Cir. 2006)........................................11

*Willet v. Johnson & Johnson*, No. 112CV00034JAJRAW, 2019 WL 7500523, at *3 (S.D. Iowa Oct. 1, 2019) ................................................................................12

*Glenn Golden v. Stein*, No. 4:18-cv-00331-JAJ-CFB , 2020 WL 648687, at *3 (S.D. Iowa Oct. 5, 2020) ..................................................................................................12

*Kuduk*, 768 F.3d 786, 792 (8th Cir. 2014) ................................................................. *passim*

*Reeves v. Sanderson* Plumbing Prod., Inc., 530 U.S. 133, 147 (2000)........................14,15

*BNSF Ry. Co. v. United States Department of Labor*, 867 F.3d 942, 947 (8th Cir. 2017) .........................................................................................................................15

*Brown v. Central of Georgia R. Co*, No. 4:22-cv-117(CDL), 2023 WL 7336228, at *3 (M.D. Ga. Nov. 7, 2023)...........................................................................15,16

*U.S. v. Dazey*, 403 F.3d 1147, 1171 (10th Cir. 2005)......................................................19

*K.W.P. v. Kansas City Pub. Sch.*, 296 F. Supp. 3d 1121, 1127 (W.D. Mo. 2017) ...........19

*Peters v. Woodbury Cnty., Iowa*, 979 F. Supp. 2d 901, 922 (N.D. Iowa 2013) ...............19

*Pioneer Hi-Bred Intern., Inc. v. Ottawa Plant Food, Inc.*, 219 F.R.D. 135, 140 (N.D. Iowa 2003) .........................................................................................................22

*Catipovic v. Turley*, 68 F. Supp. 3d 983, 1011 (N.D. Iowa 2014)....................................22

*Margolies v. McCleary, Inc.*, 447 F.3d 1115, 1120-21(8th Cir. 2006)..............................22

Statutes

29 C.F.R. § 1979.104(b)(1)(i)-(iv) .................................................................................14

Rules

Fed. R. of Evid. 702 ................................................................................ *passim*

## <u>INTRODUCTION</u>

In this case arising under the Federal Rail Safety Act, Plaintiff John Sexton will offer the expert testimony of Brandon Ogden, an impressively credentialed railroad safety and operations consultant with over 20-years of training, experience, and knowledge developed first as a supervisory official (Trainmaster, Director of Administration, Terminal Manager, and Superintendent of Operations) for a Class I railroad and then as the owner and operator of his own consulting business. Defendant CP has moved to exclude Ogden's testimony, following in the footsteps of other railroad defendants who have tried and consistently failed to achieve that result. As the discussion that follows will demonstrate, Ogden used the same methodology in this case that has been blessed by courts across the country in denying similar *Daubert* motions, concluding that Ogden's opinions are "based on scientific, technical, or other specialized knowledge and would assist the trier of fact," that he "applies his specialized training and knowledge . . . to reach his conclusions," and that in doing so he "has employed an appropriate methodology."[1] Accordingly, a similar result should obtain here, i.e., the denial of CP's motion.

---

[1] *Blackmore v. Union Pacific R.R.*, No. 8:21CV318, 2023 WL 22213509, at *4 (D. Neb. Feb. 24, 2023).

## SUMMARY OF FACTS RELEVANT TO THIS RESPONSE

The undisputed facts of this case are fully set forth in the Statement of Material Facts (Dkt. 53-2) filed in support of Sexton's motion for summary judgment and are incorporated herein by reference. For instant purposes, it is sufficient to note the following:[2]

On February 1, 2021, Sexton was working as an engineer for Defendant CP and, along with conductor Justin DePover, was assigned to operate a train from CP's rail yard in Marquette to its yard at Nahant. At the start of their shift, Sexton conducted a job briefing, during which he explained that "before we start anything, we're going to cut the crossings," which is a safety procedure whereby the engineer uncouples the locomotive from the train cars and operates it through the crossing to dislodge accumulated snow and ice from the tracks.

While Sexton was so engaged, CP Trainmaster Kurtis McKelvey approached and told Sexton he should not cut the crossing. Believing it would be unsafe to proceed without doing so, Sexton refused to move the train without cutting the tracks. Once the crossing had been cleared the crew departed Marquette for Nahant, albeit only after substantial delay (nearly four hours).

Upon their arrival at Nahant, and with knowledge of the delay Sexton's insistence on safety had caused, CP General Manager Tom Jared sought out the crew and subjected them to an improperly performed "efficiency" test. Specifically, while the crew was engaged in the shoving maneuvers necessary to detach various train cars and place them in their respective tracks, Jared approached conductor DePover, who had deboarded the train and was directing

---

[2] Citations to the facts describing the incidents that led to CP's assessment of discipline against Sexton are set forth in Plaintiff's Statement of Material Facts (Dkt. 52-3) and his Brief in Support of Motion for Partial Summary Judgment (Dkt. 51-3.) The documents supporting those assertions are included in Plaintiff's Appendix A. (Dkt. 53-4.) Documents that are critically relevant to the Court's consideration of CP's instant motion are cited and, to the extent not previously submitted, are attached as exhibits to the Affidavit of Cyle Cramer, filed contemporaneously herewith.

the shove from the ground via radio, and instructed him to stop communicating with Sexton.

Jared's instruction implicates GCOR Rule 5.7.3, which provides that:

> When radio communication is used to make movements, crew members must respond to specific instructions given for each movement. Radio communications for shoving movements must specify the direction and distance and must be acknowledged when distance specified is more than four cars.
>
> **Movement must stop within half the distance specified unless additional instructions are received.**

(Dkt. 52-3, Plaintiff's App. A at 130, GCOR Radio Response Rule) (bold in original).)

Per Jared, Sexton purportedly did not bring his movement to a stop within half the distance DePover had specified in the last radio communication, and thus violated Rule 5.7.3.[3] As a result, CP charged Sexton with a rule violation, conducted an internal investigation, and assessed discipline against him, specifically, a 20-day suspension without pay. Sexton appealed to the Public Law Board (PLB), which ultimately sustained that appeal reasoning, in relevant part, that:

> General Manager Jared involved himself in too many aspects of the process. The record reflects it was Jared who initiated the test, in a manner which does raise questions regarding safety in his obviously surprising an employee who was performing the safety sensitive task of protecting the shove, and it appears that the charges were levied based on his test and observations. The only realistic conclusion that can be reached after an objective review of this record is that Jared levied charges regarding his own questionable test, provided the testimony to support them, and then signed off on a predetermine outcome.

(Dkt. 52-3, Ex. L, PLB No. 7667 Award.) In addition to prosecuting his administrative appeal, Sexton filed suit against CP alleging that he engaged in conduct protected by the FRSA on February 1, 2021, when he: (a) made a good faith report of hazardous safety condition in his workplace (the presence of a significant derailment hazard, i.e., snow and ice on the rails in the Marquette yard); and (b) refused to work when confronted by said hazardous safety condition.

---

[3] As Sexton explains in his summary judgment brief, and as Ogden confirms, Sexton <u>did not</u>, in fact, violate Rule 5.7.3 on February 1, 2021. (*See* Dkt.53-1, Pl. Brief in Supp. of Mot. for Summ. Judg. at 14-16, Dkt. 52-2, Al Taqatqa Decl. Ex. M, Ogden Report at 6-7; Ex. 1 Ogden Dep. 58:5-61:15).

(Dkt. 1, Compl. ¶¶ 20-22.) Sexton further alleged that CP retaliated against him in violation of the FRSA by reprimanding, suspending, or otherwise discriminating against him because he engaged in the foregoing protected conduct. (*Id.* at ¶ 25.)    As noted above, in support of his claims at trial, Sexton will offer the testimony of railroad safety and operations expert Brandon Ogden, who as, reflected in his curriculum vitae (Ex. 2), is impeccably credentialed and ideally qualified to offer testimony that will assist the jury in understanding the issues in this case.

As noted in his CV, Ogden has owned and operated his own consulting firm since 2016, during which time he has: (a) consulted on hundreds of cases railroad cases, including many involving CP; (b) given deposition and/or trial testimony in dozens of such cases;[4] and (c) been accepted by as an expert by courts across the country.[5] In addition to his consulting work, Ogden has a decade of hands-on experience working directly for another Class I Railroad (BNSF),[6] where he was a certified switchman/conductor, yardmaster, and dispatcher, and where he "promot[ed] my way through the railroad management ranks as Trainmaster, Director of Administration, Terminal Manager, and Superintendent of Operations." (Ex. 2 Ogden CV at 1-2; *see also* Ex. 1, Ogden Dep. 7:10-25.) While working for BNSF, Ogden (a) facilitated its "performance management process," which included evaluating TY&E employees "on their safety, service, efficiency, and velocity goals;" (b) "supervised TY&E employees and planned daily operations consistent with safety and efficiency;" (c) "managed [his] division['s] discipline and investigation process, including alleged operating rules and attendance violations;" and (d) interpreted and

---

[4] *See* Ex. 3, Ogden History of Depositions and Court Appearances (2019-present). A review of this document reveals that Ogden has testified as an expert in no less than 13 trials in the last four years. (*Id.*)

[5] *See*, *e.g.*, *Urquehart v. Union Pac. R.R. Co.*, No. 4:20-CV-00515-BRW, 2021 WL 8014324 (E.D. Ark. Aug. 31, 2021); *Nay v. BNSF Ry. Co.*, No. C19-5425-BHS-MLP, 2021 WL 5321979 (W.D. Wash. Nov. 16, 2021); *Peterson v. Union Pac. R.R. Co.*, No. 8:20CV293, 2022 WL 328753 (D. Neb. Feb. 3, 2022); *Blackmore*, 2023 WL 2213509.

[6] Although Ogden worked for BNSF, not CP, it is important to note that "all Class I railroads generally follow the same procedures for investigating potential misconduct and issuing discipline to their union employees." (Ex. 1, Ogden Dep. 25:17-25.)

applied the railroad's "progressive discipline policy, discipline procedures, attendance and GCOR rules." (*Id*.; *see also* Ex. 1, Ogden Dep. 10:16-11:17, 12:17-13:8, 14:11-16:4, 22:2-24:1.)

By virtue of his training and experience, Ogden is intimately familiar not only with the General Code of Operating Rules (GCOR), but also with the efficiency/operating tests that CP and all other Class I railroads use to determine compliance therewith, including the test to which CP General Manager Jared subjected Sexton on February 1, 2021. (Ex. 1, Ogden Dep. 24:18-25:16.) Indeed, Ogden often performed such tests himself. (*Id*. at 34:1-24.) He is also well-versed in the investigation process CP utilizes, having served as the presiding officer in "a lot" of investigative hearings (possibly more than 100) while working for BNSF. (*Id*. at 36:20-37:13.) Importantly, in evaluating CP's conduct and formulating his opinions in this case, Ogden utilized the same methodology he applied when serving as the presiding officer in similar investigatory hearings.  As Ogden explains in his report:

> I use the same methodology that I was trained by the BNSF and used during my management years with BNSF in applying, determining, and interpreting BNSF rules, policies, procedures, and applicable regulations in disciplinary investigations and decisions. To the best of my knowledge, my peers were trained in and used these same methods. The primary goal of the methodology used was to understand, interpret, and apply it to the railroad operation, employee training, and disciplinary investigations and decisions. I would review all pertinent facts and evidence and uniformly apply my methodology in the decisions I made regarding the BNSF discipline policy . . . The ultimate goal was to operate a safe railroad.

(Ogden Report at 5-6; *see also* Ex. 1, Ogden Dep. 52:21-56:4.) As relevant to CP's motion, Ogden has formulated opinions on three general topics:

### 1.    "Whether Sexton violated any rules, policies, notices or regulations" while performing his job duties on February 1, 2021? (Ogden Report at 6.)

Ogden opines that he did not, concluding that "[b]ased upon my review of the investigation transcript and exhibits," as well as "my own experience in conducting disciplinary investigations," it is my opinion that CP Rail did not prove Sexton violated any rules," and thus

that "CP Rail should not have disciplined and suspended Sexton for 20 days based on the facts

presented in the CP Rail Formal Investigation." (*Id.*) In his report, Ogden explains:

> The rule itself [CGOR 5.3.7] states "Movement must stop within half the
> distance specified unless additional instructions are received." In this
> instance, when Sexton received his last instruction from DePover, it was his task to shove,
> or move, 15 more cars in the direction they were shoving. However, DePover gave
> the additional instruction as part of the entire instruction that Sexton was good for
> 40 cars. Because he was instructed that he was good for 40 cars, in other words,
> there was room for 40 cars, safe course of action in compliance with GCOR would
> be to stop within 20 cars. Sexton stopped after moving 11 cars because he realized
> he had lost communication with DePover.
> Based upon the material provided for my review, it is evident the facts did
> not support the discipline assigned to Sexton.

(*Id.*; *see also* Ex. 1, Ogden Dep. 58:5-64:16, 65:8-66:10, 67:15-69:4, 72:12-74:13, 114:16-20,

118:24-119:1.)

### 2.     "Whether CP's policies, programs, metrics, and/or goals present a potential or actual conflict of interest" between speed of operations and employee safety? (Ogden Report at 6.)

Ogden opines that they do, noting that "CP's Short Term Incentive Plan (STIP)"

subjects management officials to performance metrics designed to "'improve overall

performance of the southern region's train Performance, origin Performance, terminal Dwell

Hours, and GTMs.'" (*Id.* at 7.) Per Ogden, "each of these objectives is about speed not safety,"

which "demonstrates the pressure put on management to emphasize train speed," and which

further "creates a culture focused on speed." (*Id.*) In his deposition, Ogden elaborated, noting

that CP has "adopted precision schedule railroading, or PSR," and going on to explain that:

> A.     . . . And with PSR, the -- under their foundations, the number one thing is
> providing service and number 2 is controlling costs, and number 3, I think, is
> asset utilization.  And these are all things that are driving towards train
> performance, train speed, reducing costs, making more money.  Those are the
> first three foundations under PSR for Canadian Pacific.
> Q.     What's the fourth? The first of three. There's five. What are the other two?
> A.     Number 4 is operate safely, I think, and the next one is developing people or
> employees. So when you look at PSR and you look at it through that lens and

knowing that that's the driving mechanism or the driving force behind all of the operating decisions that are being made out there and the disciplinary decisions that are being made, that creates a conflict of interest because, all of a sudden, we have the competing goals, the competing interests.

You're putting PSR and you're putting train speed and these velocity metrics ahead of safety then. That causes a very real issue here.

(Ex. 1, Ogden Dep. 83:9-84:8.)

3.    **"Would CP have conducted an efficiency and disciplined Sexton if he had not engaged in protected activity" (or, stated another way, in the absence of Sexton's protected conduct, did his actions warrant discipline)? (Ogden Report at 8.)**

Ogden opines that the discipline was not justified (and that the efficiency test General Manager Jared performed was unsafe),[7] noting that, for the reasons set forth above, "CP rail managers have a strong motivation to discipline an employee perceived to be delaying trains even if the delay is caused by taking the safe course." (Ogden Report at 8.) He goes on to conclude, "based on my review of the facts and evidence in this case and my training and experience working as a manger for a Class I railroad," that the "discipline assigned to Sexton was inappropriate," and that "CP Rails policies, objectives, metrics, and goals place on CP Rail management officials who participated in various capacities of the decisions to discipline Sexton were influenced by those polices to emphasize speed." (*Id.*)

CP has moved to exclude Ogden's testimony, arguing he does not possess any specialized knowledge that would assist the jury to understand the issues and that his opinions are neither relevant nor reliable. As the discussion that follows will demonstrate, none of CP's arguments are well founded, and Sexton therefore respectfully submits that this Court should join its colleagues in declining CP's invitation to exclude Ogden's testimony.

---

[7] Per Ogden, "Jared's actions were dangerous and put Sexton's and DePover's lives at risk because it distracted DePover from protecting the shove and made him engaged in unrelated tasks by communicating with Jared" instead of concentrating on the train movement. (Ogden Report at 2 (emphasis added); *see also* Ex. 1, Ogden Dep. 99:2-100:2.)

## LEGAL ARGUMENT

**I.     THE DAUBERT STANDARD IS A FLEXIBLE ONE.**

Federal Rule of Evidence 702 governs the admissibility of expert testimony, providing that:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a)     the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b)     the testimony is based on sufficient facts or data;
> (c)     the testimony is the product of reliable principles and methods; and
> (d)     the expert has reliably applied the principles and methods to the facts of the case.

Rule 702 is "broadly phrased,"[8] and was intended to liberalize the introduction of relevant expert testimony. *Jenson v. Eveleth Taconite Co.*, 130 F.3d 1287, 1298 (8th Cir. 1997); *see also Johnson v. Mead Johnson & Co.*, 754 F.3d 557, 562 (8th Cir. 2014) (confirming that *Daubert* and FRE 702 "greatly liberalized what had been the strict Frye standards for admission of expert scientific testimony"). Indeed, "the rule clearly 'is one of admissibility rather than exclusion.'" *Id.* (citation omitted).

Given the foregoing, it is well-settled that an expert's testimony "need not be flawless for it to be reliable and admissible" under Rule 702. *Feit v. Great-West Life and Annuity Ins. Co.*, 460 F. Supp. 2d 632, 636 (D.N.J. 2006); *see also In re Paoli R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994) (confirming that "the grounds for the expert's opinion merely have to be good, they do not have to be perfect"). Additionally, "an expert is permitted wide latitude"[9] in expressing his opinions, and the trial court may exclude them "only if it so fundamentally unsupported that it cannot help the factfinder." *Hurst v. United States*, 882 F.2d 306, 311 (8th Cir. 1989).

---

[8] Advisory Committee Notes to 2000 amendments.
[9] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993).

Expert testimony must also meet the standards of admissibility set forth in *Daubert v. Merrell Dow Pharms., Inc.*, under which the trial court performs a "gatekeeping" function to ensure that scientific evidence and testimony "is not only relevant, but reliable." 509 U.S. 579, 589 (1993). More specifically, the trial court is charged with determining "(1) whether the expert would testify to valid scientific knowledge, and (2) whether that testimony would assist the trier of fact." *Walker v. Soo Line R. Co.*, 208 F.3d 581, 586 (7th Cir. 2000). Importantly, the *Daubert* inquiry is "a flexible one,"[10] that must be performed "with proper deference to the jury's role as the arbiter of disputes between conflicting opinions." *Lilley v. Home Depot U.S.A.*, Inc., 567 F. Supp. 2d 953, 956 (S.D. Tex. 2008). The court's focus "of course, must be solely on the [expert's] principles and methodology, not on the conclusions they generate." *Daubert*, 509 U.S. at 594. Stated another way, "Daubert makes the district court a gatekeeper, not a fact finder." *U.S. v. Sandoval-Mendoza*, 472 F.3d 645, 655 (9th Cir. 2006).

In *Daubert*, the Supreme Court set forth a non-exclusive list of factors to determine whether scientific testimony is sufficiently reliable. Those factors include the following: whether the theory can be, and has been, tested; whether it has been subjected to peer review and publication; whether it has a known or potential error rate; and whether it is generally accepted in the relevant scientific community. *Daubert*, 509 U.S. at 593-94. Importantly, "these factors are neither necessary to nor determinative of reliability in all cases; the inquiry is flexible and puts "principles and methodology" above conclusions and outcomes." *Willet v. Johnson & Johnson*, No. 112CV00034JAJRAW, 2019 WL 7500523, at *3 (S.D. Iowa Oct. 1, 2019); *see also Glenn Golden v. Stein*, No. 4:18-cv-00331-JAJ-CFB , 2020 WL 648687, at *3 (S.D. Iowa Oct. 5, 2020) (confirming that the Daubert factors "are not exclusive or exhaustive and the court may tailor its

---

[10] *Daubert*, 579 U.S. at 594.

inquiry to fit the particular facts of a case"). Accordingly, as the *Daubert* Court emphasized, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

## II. OGDEN POSSESSES SPECIALIZED KNOWLEDGE NECESSARY TO ASSIST THE JURY AND HIS METHODOLOGY IS SOUND.

In a throwaway paragraph at the end of its brief, CP argues that "[i]n formulating his opinions Ogden has not relied on any particularly specialized knowledge or experience," and that he in fact "does not have 'specialized knowledge' necessary to assist the jury" in this case. (*See* Dkt. 52-1 at 20.) CP's contention in this regard is, frankly, absurd, and it serves only to illustrate the infirmity of its motion as a whole.

As the Court is aware, this case involves the interpretation and application of railroad safety and operating rules, and it requires an understanding of railroad operations policies, incentive programs, collective bargaining agreements, and the disciplinary processes, as well as administrative appeals. UP cites no authority in support of its contention that such matters are within the understanding of the typical lay person, and research has revealed none. CP's failure in this regard is not surprising given that courts across the country have recognized not only that testimony on such subjects requires "specialized knowledge," but that Ogden has it. *See*, *e.g.*, *Nay v. BNSF Ry. Co.*, No. C19-5425-BHS-MLP, 2021 WL 5321979, at *5 (W.D. Wash. Nov. 16, 2021) (confirming that "Mr. Ogden is sufficiently qualified to testify as to Railroad Defendants' railroad operations based on his knowledge and prior experience," and going on to note that he "has previously qualified to provide expert testimony on railroad operations and rule interpretations multiple times in federal courts—including this Court—based on his background and relevant experience"); *Blackmore v. Union Pac. R. Co.*, No. 8:21CV318, 2023 WL 2213509, at *4 (D. Neb.

Feb. 24, 2023) (confirming that "Ogden is qualified to testify as an expert on railroad operations and work practices," and that his opinions on those subject matters "are also based on scientific, technical, or other specialized knowledge and would assist the trier of fact"); *Urquehart v. Union Pac. R.R. Co.*, No. 4:20-CV-00515-BRW, 2021 WL 8014324, at *5 (E.D. Ark. Aug. 31, 2021) (denying UP's *Daubert* motion and holding that Ogden's testimony on the subject of railroad operations "will help the jury understand relevant issues in this case").

CP's challenge to Ogden's methodology is likewise cursory[11] and ill-founded, in that it too is devoid of citation to any case in which Ogden's testimony has been excluded for methodological shortcomings. Again, that failure is to be expected because the courts have blessed Ogden's methodology in denying similar *Daubert* motions. *See, e.g.*, Nay, 2021 WL 5321979 (rejecting defendant's argument that "Mr. Ogden's methodology fails to satisfy standards set forth in Rule 702 or *Daubert*); *Blackmore*, 2023 WL 2213509, at *4 (confirming that in formulating his opinions regarding the railroad's "operating decisions and work practices driven  by the adoption of Precision Scheduled Railroading" Ogden "has employed an appropriate methodology and that his testimony would go beyond the knowledge available to the lay jury"). As set forth above, Ogden utilized the same methodology: (a) "that [he] was trained by BNSF and used during my management years with BNSF in applying, determining, and interpreting BNSF rules, policies, procedures, and applicable regulations;" and (b) that he utilized in each of the other cases in which he has been permitted to testify as an expert. Accordingly. CP's challenge should fail.

III.     **OGDEN'S OPINIONS ARE RELEVANT AND HELPFUL.**

A.     **Ogden's opinion that Sexton did not violate GCOR Rule 5.7.3 is relevant and admissible on the issue of causation.**

---

[11] CP argues that "Ogden's conclusions are merely based upon his railroad experience, not on any scientific theory, technique, or methodology." (Dkt. 52-1 at 13.)

Relying primarily, if not exclusively, on *Kuduk v. BNSF Ry. Co.*, CP contends that "whether CP was *correct* in deciding that Sexton violated GCOR 5.3.7 is simply not at issue in this case," because, per *Kuduk*, "'federal courts do not sit as a super personnel department that re-examines' an employer's disciplinary decisions." (Dkt. 52-1 at 7-8 (quoting *Kuduk*, 768 F.3d 786, 792 (8th Cir. 2014).) While the foregoing quote is accurate (albeit taken out of context), CP's insistence that *Kuduk* supports its motion is not.

To prevail on his FRSA claims, Sexton must prove that the circumstances surrounding his discipline "were sufficient to raise the inference that [his] protected activity was a contributing factor in the unfavorable action." 29 C.F.R. § 1979.104(b)(1)(i)-(iv). As CP correctly points out, "the contributing factor that [he] must prove is intentional retaliation prompted by the employee engaging in protected activity." *Kuduk*, 768 F.3d at 791. Conspicuously absent from CP's brief, however, is any acknowledgment of the well-settled precept that employees can prove intentional retaliation by showing that their employer's proffered justification for the imposition of discipline is false. Indeed, per the United States Supreme Court, "[p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination and it may be quite persuasive." *Reeves v. Sanderson* Plumbing Prod., Inc., 530 U.S. 133, 147 (2000). Accordingly:

> In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the fact finder is entitled to consider a party's dishonesty about a material fact as "affirmative evidence of guilt." Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision.

*Id. See also BNSF Ry. Co. v. United States Department of Labor*, 867 F.3d 942, 947 (8th Cir. 2017) (confirming that "intentional discrimination may be inferred 'from the falsity of the employer's explanation'") (*quoting* Reeves, 530 U.S. at 147).

Illustrative of how courts have applied the foregoing principle in FRSA cases is *Brown v. Central of Georgia R. Co.*, a case in which the plaintiff (Brown) alleged that his railroad employer disciplined him in retaliation refusing to perform work he believed to be unsafe, resulting in service delays. *Brown*, No. 4:22-cv-117(CDL), 2023 WL 7336228, at *3 (M.D. Ga. Nov. 7, 2023). Brown sued under the FRSA, and the railroad moved for summary judgment, arguing that it fired  him not for refusing to perform an unsafe job task, but rather for violating the railroad's policies and operating rules. *Id*. As relevant for purposes here, the railroad argued that Brown could not establish his protected conduct was a contributing factor to the discipline. *Id*. at *4.

The court rejected that argument, noting that Brown had "point[ed] to evidence from which a reasonable jury could doubt the truth of [the railroad's] offered explanation for [its] unfavorable personnel action," which, as the court went on to explain, "is probative of discriminatory intent." *Brown*, 2023 WL 7336228, at *4 (emphasis added). In this case too there is evidence that Sexton did not actually violate the rule his employer charged him with and disciplined him for. Ogden's analysis of that evidence, and his corresponding opinion that Sexton did not violate CGOR 5.3.7 is "evidence from which a reasonable jury could doubt [CP's] offered explanation for [its] unfavorable personnel action," which, in turn, is probative of CP's discriminatory intent. *Brown*, 2023 WL 7336228, at *4. Thus, Ogden's opinions in this regard are relevant and admissible.

And nothing in the *Kuduk* decision compels, or even suggests, a different result. In that case, two of Kuduk's supervisors saw him walking between the rails of a live track while performing his duties on June 9, 2010, and instituted an investigation which resulted in his

termination. *Kuduk*, 768 F.3d at 788. Kuduk filed suit, alleging, in relevant part, that the real reason

for his firing was "two complaints he made in the months preceding discharge that constituted

safety reports protected by the FRSA." *Id*. Specifically, Kuduk noted that: (a) on May 17, 2010

(three weeks before his purported June 9 rule violation), he had objected to the manner in which

one of his supervisors performed an operations test; and (b) on May 24, 2010, he had invoked

BNSF's Safety Issue Resolution Process to complain about a safety hazard he believed could lead

to employee injuries. *Id*. at 789.

The district court granted summary judgment to BNSF, concluding that Kuduk "made no

showing that his protected activity was a contributing factor in BNSF's decision to discharge him."

*Kuduk*, 768 F.3d at 790. Kuduk appealed and, as CP notes in its brief, did argue that "serious

questions exist" as to whether he in fact committed the rule violation with which he had been

charged on June 9. *Id*. at 792. CP is also accurate in noting that the Eighth Circuit gave short shrift

to that argument, but it <u>did not</u>, as CP implies, hold that challenges to, or an expert's opinions

about, the accuracy of the railroad's conclusion relative to a rule violation is per se improper or

irrelevant. Quite the contrary, in fact, as the court emphasized it is only when the employee's

protected activity is "completely unrelated" to the incident that led to his discipline that such

evidence can be discounted:

> In this case, it is particularly significant at the summary judgment stage that
> Kuduk's protected activity, though close in time, <u>was completely unrelated to the</u>
> <u>fouling-the-tracks incident that led to his discharge</u>. The facts surrounding Kuduk's
> SIRP report [on May 24] shared no nexus with the later fouling the tracks incident
> [on June 9]. . . In the absence of evidence connecting his protected activity to the
> discharge, Kuduk is not entitled to FRSA anti-retaliation relief even if BNSF
> inaccurately concluded that he committed one of the Eight Deadly decisions by
> fouling the tracks.

*Id*. at 792 (emphasis added).  In this case, Sexton's protected activity is not "completely unrelated"

to the incident that led to CP's assessment of discipline. Indeed, as set forth at length above (and

in Sexton's various summary judgment submissions) they are inextricably intertwined. Thus, even under *Kuduk*, Ogden's opinions are relevant and admissible under FRE 702.

> **B.      Ogden's testimony regarding CP's conflict of interest is a proper subject of expert testimony and will assist the jury.**

As Ogden explains in his report, "CP Rail policies, programs, metrics and/or goals present a potential or actual conflict of interest for CP Rail management officials," including those "officials who exercised discretion in making decisions in this case, including disciplinary decisions." (Ogden Report at 6.) While CP is likely correct in its assertion that a lay juror can understand conflicts of interest generally, the myriad factors that converge to generate the particular conflict of interest at issue here are not. Indeed, as set forth in detail above, evaluation of the competing interests and motivational factors at play here requires an understanding of internal railroad operational rules and policies (including those that govern investigative and disciplinary proceedings, as well Precision Scheduled Railroading), managerial performance metrics, and railroad incentive plans (among other industry-specific considerations).

Given the foregoing, Sexton submits that Ogden's testimony does not, as CP contends, purport to address "a commonsense if-then proposition." (Dkt. 52-1 at 10.) And the courts agree, having recognized that such matters are beyond the ken of the average lay person, and having held that Ogden's experience and specialized knowledge helps the jury understand them. *See, e.g., Blackmore*, 2023 WL 2213509, at *4 (noting that Ogden "applied his specialized training and knowledge" to "reach his conclusions, which included that Union Pacific's operating decisions and work practices driven by the adoption of Precision Scheduled Railroading contributed to unsafe conditions").

> **C.      Ogden's opinion as to the interplay between Sexton's protected activity and CP's disciplinary decision is not an inadmissible legal conclusion.**

CP asserts that "Ogden intends to tell the jury that, absent Sexton's protected activities, which resulted in a delayed train because Sexton took the safe course, CP would not have issued discipline to Sexton for his rule violation." (Dkt 52-1 at 11.) That description is incorrect, or, at the very least, incomplete. As set forth above Ogden has opined: (a) that "in my experience, metrics that can affect the bonus and performance rating of a manger are always in the back of their minds;" (b) that "CP Rail managers have a strong motivation to discipline an employee perceived to be delaying trains" due to the "conflict of interest created by CP's policies, metrics and goals," which emphasize "speed not safety;" (c) that such policies, metrics, and goals "influenced" CP rail management officials "to emphasize speed;" (d) that "CP Rail did not prove Sexton violated any rules;" and (e) that "the facts did not support the discipline assessed to Sexton." (Ogden Report at 6-8.) Considered in the correct context, it is evident that Ogden is not stating a legal conclusion or telling the jury what decision to reach. Indeed, he has at all times recognized and respected the jury's role as the factfinder:

> It's my job to consider and analyze the facts and evidence. <u>Ultimately the jury will be the ones who make the decision on who's right and the outcome of this case</u>. I'm not trying to assess creditability [sic].

(Ex. 1, Ogden Dep. 124:18-22 (emphasis added).) Generally speaking, experts stray into the realm of improper legal conclusions when they "simply tell the jury what result it should reach without providing any explanation of the criteria on which that opinion is based or any means by which the jury can exercise independent judgment." *U.S. v. Dazey*, 403 F.3d 1147, 1171 (10th Cir. 2005). Conversely, experts are permitted to offer opinions that "embrace the ultimate issue of *fact*," including, for example, proffering testimony as to "whether standards or practices are applicable to a given situation and whether those standards or practices were met in the situation." *K.W.P. v. Kansas City Pub. Sch.*, 296 F. Supp. 3d 1121, 1127 (W.D. Mo. 2017) (italics in original); *see also*

*Peters v. Woodbury Cnty., Iowa*, 979 F. Supp. 2d 901, 922 (N.D. Iowa 2013) (explaining that "an expert *may* opine on what institutional practices *are,* although an expert *may not* testify that federal law was contravened") (italics in original). Thus, what an expert can do is this: (a) explain what the "standards or practices applicable to the [subject] incident" are; and (b) opine as to "whether or not [those] certain standards or practices were met by the conduct of the Defendant." *Peters*, 979 F. Supp. 2d at 923. Id. at 923. That is exactly what Ogden has done here.

### IV.    OGDEN'S OPINIONS ARE RELIABLE.

Over the course of a somewhat rambling and largely redundant six pages, CP argues that Ogden's opinions are not reliable because he purportedly "ignores" relevant evidence and testimony that CP describes as "undisputed" (it's not), and because his conclusions are "inconsistent with the facts" or are "based on an incorrect or incomplete review of the record." (*See* Dkt. 52-1 at 14-15, 17.) By way of example CP argues that:

- in formulating his opinion that Sexton did not violate GCOR Rule 5.3.7, Ogden "ignores the contemporaneous written statement from the only eyewitness . . . the conductor [DePover], who wrote "when shoving cars into NA04 track a car count of 15 was given and after no communication movement stopped after 11." (Dkt. 52-1 at 14.)

**This contention is false.** Ogden specifically identified Conductor's DePover's written statement in his report as being included among the materials he reviewed,[12] and he read it again and addressed it <u>at length</u> in his deposition,[13] explaining, in relevant part, that:

> . . . Mr. DePover was very clear in the formal investigation hearing that the one-line statement that he was compelled to handwrite out at the time of the incident or at the time of the operations test that he did that under duress, that he was very concerned about the general manager who oversees likely thousands of employees. They're compelling him to write a statement.
> And he also, during the formal investigation hearing, clearly explained much more detail around the circumstances of the shove movement, well beyond a

---

[12] Ogden Report at 5.
[13] *See, e.g.*, Ex. 1, Ogden Dep. 62:22-68:9.

one-line hand written statement. So if you consider all of the facts and all of the evidence, it became clear that it wasn't just a 15-car count and that Mr. DePover actually did give a 40-car count.

(Ex. 1, Ogden Dep. 63:24-64:15.)  CP also insists that:

- Ogden's opinion that Jared's "speed-related performance objectives" were a factor in his disciplinary decisions relative to Sexton is "divorced from the evidence in the record" because "Jared was not involved in the decision to issue discipline to Sexton," and because "Ogden only relies on parts of the performance evaluations—the parts that mention speed—while ignoring performance objectives tied to operating safely." (Dkt. 52-1 at 16-17.)

**This contention is also false.** First, CP's claim that Jared was not involved in the disciplinary decision is ridiculous, as the record is replete with evidence confirming that he was.

(*See* Ex. 1, Ogden Dep., 78:2-80:13) In his deposition, Ogden testified about that involvement:

Q.    Okay.  And what is your -- how much of your determination that the public law board came to the right result is based on the fact that Mr. Jared was the decision maker, allegedly?

A.    Well, I don't -- I mean, certainly the fact that he -- I mean, really he was the one involved with every piece of this, from the beginning to the end.

Q.    According to the public law board, right?

A    Well, according to the facts and evidence.

Q.    Well, not according to his deposition transcript, which are facts and evidence.

A.    I guess you could point me to what you are specifically referring to in his deposition transcript, but my review of the evidence indicates that Mr. Jared was involved -- well, from the point where he asked Mr. McKelvey asked him to call him shortly after Mr. McKelvey put out the incident report or delay report of the 474 train all the way to the final decision to enforce discipline as I spelled that out in my report.

Q.    If CPKC witnesses testify that Mr. Jared made no recommendation for discipline in this case and made no decision in this case, would that affect your opinion?

A.    I would certainly consider that testimony and I would weigh that -- I would weigh that in and certainly also consider the facts and evidence that I have at this point, which is that -- in part, at least, that there is an email from administrative -- appears to be an administrative person saying to issue the 20-day -- the 20-day suspension to Mr. Sexton per Jared.

Q.    And your assumption is that that language means that Tom Jared made the decision, right?

A.           Yeah.  It looks pretty clear in that email that he is the one instructing the 20-day suspension and enforcing the 20-day suspension on Sexton.  And

> then to follow that up, then we have the discipline letter that's clearly from
> Mr. Jared that has his name and his signature on it.
>
> I just don't know how you would say you weren't the one making
> the decision and enforcing the discipline when that's the evidence.

(Ex. 1, Ogden Dep. 78:15-80:13 (emphasis added).) Second, while Ogden does emphasizes CP's

"speed-related performance objectives," report, he most certainly did not, as CP insists, ignore

performance objectives that were tethered to safety. Again, his consideration of those metrics and

the role they played in the formulation of his opinions is a subject Ogden discussed thoroughly in

his deposition:

> A.    . . . And then we could start talking about velocity or efficiency or cost or
> other things, but the foundations of CP are very different.  They have
> adopted precision schedule railroading or PSR. And with PSR, the -- under
> their foundations, the number one thing is providing service and number 2
> is controlling costs, and number 3, I think, is asset utilization.  And these
> are all things that are driving towards train performance, train speed,
> reducing costs, making more money.  Those are the first three foundations
> under PSR for Canadian Pacific.
>
> Q.    What's the fourth?  The first of three. There's five.  What are the other two?
>
> A.    Number 4 is operate safely, I think, and the next one is developing people
> or employees.  So when you look at PSR and you look at it through that lens
> and knowing that that's the driving mechanism or the driving force behind
> all of the operating decisions that are being made out there and the
> disciplinary decisions that are being made, that creates a conflict of interest
> because, all of a sudden, we have the competing goals, the competing
> interests.
> You're putting PSR and you're putting train speed and these velocity metrics
> ahead of safety then.  That causes a very real issue here.
>
> ***
>
> Q.    So Mr. Jared's PMP for 2020, it includes a safety goal, right?
>
> A.    I would think so.  And I think based upon my review of it there was one.  I
> think it is just a very small percent compared to the overall, because, again,
> CP is focused on velocity and making money.  Yeah.  Operate safely for
> Mr. Jared in 2020.  That's 15 percent of the overall.

(Ex. 1, Ogden Dep. 83:6-84:8, 88:23-89:5) (emphasis added).)

Against this backdrop it simply cannot be credibly argued that Ogden ignored or failed to

consider relevant evidence (much less that he did so to a degree that would weaken the

foundational reliability of his expert opinions). CP's motion is, at its core, nothing more than a

quibble over Ogden's conclusions, which cannot justify exclusion. *See Pioneer Hi-Bred Intern., Inc. v. Ottawa Plant Food, Inc.*, 219 F.R.D. 135, 140 (N.D. Iowa 2003) (holding that "disagreement with an expert's conclusions . . . is not a basis for the court to exclude the opinion"). And even if there were gaps in the facts Ogden considered in formulating opinions, CP's motion would still fail because "questions regarding the factual underpinnings of the expert's opinion affect the weight and credibility of [his] testimony, not its admissibility." *Catipovic v. Turley*, 68 F. Supp. 3d 983, 1011 (N.D. Iowa 2014); *see also Margolies v. McCleary, Inc.,* 447 F.3d 1115, 1120-21 (8th Cir. 2006) ("Time and time again we have noted that the factual basis of an expert's opinion generally relates to the weight a jury ought to accord that opinion.").

In light of the foregoing, Sexton respectfully submits that this Court should follow the lead if its neighboring Nebraska counterpart, which recently denied a similar *Daubert* motion using language that applies with equal force here, explaining that the railroad's arguments:

> . . . relate to considerations that Ogden either failed to acknowledge, or failed to consider, when providing his opinion. However, these arguments do not go to Ogden's experience or methods, they are instead meant to question Ogden's opinions. These opinions should be tested by competing expert testimony and cross-examination, rather than excluded by the Court without the benefit of other testimony. In sum, arguments about the factual inputs of Ogden's opinion go to the weight and credibility not admissibility.

Peterson, 2022 WL 328753, at *4 (emphasis added) (internal citations omitted).

## CONCLUSION

Brandon Ogden is qualified by virtue of his knowledge, experience, and training to render admissible expert opinions, and he has demonstrated that those opinions have ample factual foundation, are well-grounded in the methods and procedures of his field, and are the reliable byproduct of applying a reliable methodology. By its instant motion, CP is just quibbling with Ogden's conclusions, which quibbles go to weight, not admissibility. Ogden's  opinion testimony

satisfies the requirements of Fed. R. Evid. 702 and *Daubert*, and CP's motion to exclude it should be denied in its entirety.

Dated: August 19, 2024                    Respectfully submitted,


**YAEGER JUNGBAUER BARRISTERS, PLC**

/s/ Cyle A. Cramer
John D. Magnuson, *pro hac vice*
Cyle A. Cramer, *pro hac vice*
4601 Weston Woods Way
St. Paul, MN 55127
T: (651) 288-9500
F: (612) 288-0227
jmagnuson@yjblaw.com
ccramer@yjblaw.com

and

Megan r. Merritt, AT0010635
SHUTTLEWORTH & INGERSOLL, P.L.C.
115 3rd Street SE, Suite 500
P.O. Box 2107
Cedar Rapids, IA 52406-2107
T: (319) 365-9461
F: (319) 365-8443
mrm@shuttleworthlaw.com

*ATTORNEYS FOR PLAINTIFF JOHN SEXTON*

**<u>Certificate Of Service</u>**

I hereby certify that on August 19, 2024, I electronically filed the foregoing document

and attachments with the Clerk of the Court using the CM/ECF system that will send notification

of such filing to all parties or counsel of record to be served by electronic means.

DATED this 19th day of August 2024, Saint Paul, Minnesota.

Respectfully submitted,

*/s/ Cyle A. Cramer*
Cyle A. Cramer, *admitted pro hac vice*
John D. Magnuson, *admitted pro hac vice*
Yaeger & Jungbauer Barristers, PLC
4601 Weston Woods Way
Saint Paul, MN 55127
T: 651-288-9532
ccramer@yjblaw.com
jmagnuson@yjblaw.com

*ATTORNEYS FOR PLAINTIFF JOHN SEXTON*