Page 1

1                UNITED STATES DISTRICT COURT

2                 SOUTHERN DISTRICT OF IOWA

3                      EASTERN DIVISION

4  _____

5  John Sexton,                           Case No.

                                        23-cv-00031

6          Plaintiff,

7  v.

8  Dakota, Minnesota, & Eastern Railroad

   Corporation d/b/a Canadian Pacific, a

9  Delaware Corporation,

10         Defendant.

   _____

11

12

13           VIDEOCONFERENCE DEPOSITION OF

14                   BRANDON OGDEN

15

16

17 DATE:        07/10/2024

18 TIME:        9:10 a.m.

19 PLACE:     Zoom Videoconference

20

21

22

23

24 REPORTED BY:    Joseph Mailand

25 JOB NO.:        MW 6771421

Page 2

1                A P P E A R A N C E S

2

3   ON BEHALF OF PLAINTIFF:

4   Yaeger & Jungbauer Barristers

5   BY:    Cyle A. Cramer, Esq.

6          4601 Weston Woods Way

7          Saint Paul, Minnesota 55127

8          Phone:  (800) 435-7888

9          Email:  ccramer@yjblaw.com

10

11  ON BEHALF OF DEFENDANT:

12  Dorsey & Whitney LLP

13  BY:    John T. Sullivan, Esq.

14         Suite 1500

15         50 South Sixth Street

16         Minneapolis, Minnesota 55402

17         Phone:  (612) 340-2600

18         Email:  altaqatqa.briana@dorsey.com

19

20

21

22  ALSO APPEARED:

23         Noah Garcia

24

25

Page 3

1                    I N D E X
2 WITNESS-BRANDON OGDEN                            PAGE
3 Examination by Mr. Sullivan                         4
  Examination by Mr. Cramer                         133
4
5                *    *    *    *
6
7
8
                    E X H I B I T S
9
  EXHIBITS INTRODUCED OR FIRST REFERENCED:          PAGE
10
  EXHIBITS 1      Ogden Expert Witness Report          5
11
  EXHIBITS 2      Ogden Resume                         5
12
  EXHIBITS 3      Ogden Fee Schedule                   5
13
  EXHIBITS 4      Ogden History of Deposition and Court
14               Appearances                           6
15 Previously Marked Exhibits:
16 EXHIBITS 10     Hearing Transcript
               Bates No. CP_000018 to -137      64
17
  EXHIBITS 11     Hearing Exhibits
18               Bates No. SEXTON 000004 -012      45
19 EXHIBITS 13     Public Law Board NO. 7667
               Bates No. SEXTON 000015 to -018   103
20
21 REPORTER'S NOTE:  All quotations from exhibits are
  reflected in the manner in which they were read
22 into the record and do not necessarily indicate an
  exact quote from the document.
23
24
               *    *    *    *
25

Page 7

1    Mr. Ogden is looking at for all of us.

2              MR. SULLIVAN:  Of course.

3    BY MR. SULLIVAN:

4        Q.    Mr. Ogden, what is the highest educational

5    degree you have received?

6        A.    Bachelor's degree, business administration.

7        Q.    And where did you earn that bachelor's

8    degree from?

9        A.    Southwest Baptist University.

10       Q.    And I understand that you had a total of 10

11   years professional experience with the Burlington

12   Northern Santa Fe Railway.  Is that accurate?

13       A.    Correct.

14       Q.    And that was across four different

15   positions?

16       A.    I guess it would depend on how you

17   categorize the positions.  I held four different

18   management positions.

19       Q.    Did you hold any nonmanagement positions?

20       A.    When I first started with the railroad, I

21   started through a management training program and I

22   was certified as a conductor, switchman, remote

23   control operator.  I was also certified as a

24   yardmaster and dispatcher and then eventually

25   promoted to my first management position.

Page 10

1    Q.    So is it accurate to assume that you worked

2    in the positions that you had certifications for to

3    gain experience with those positions so that you

4    would be a more effective manager when you started

5    in a full management position for the BNSF?

6    A.    Yeah.  I mean, the end goal of the

7    management trainee program was to eventually become

8    a manager.  There was an extensive training process

9    where I became certified and worked several

10   positions to earn that opportunity.

11   Q.    How long was the trainee program?

12   A.    Approximately 1 year.

13   Q.    What position did you hold after you

14   completed the trainee program?

15   A.    Trainmaster.

16   Q.    What were your duties as a trainmaster for

17   the BNSF?

18   A.    Well, I was in charge of the safety and

19   efficiency of the operation.  I was directly

20   supervising the conductors and switchmen and

21   engineers who operated under the territory that I

22   was responsible for.  I was completing accident

23   investigations, completing root cause analysis on

24   incidents.

25        I was executing the operating plan.  I was

Page 11

1  ensuring compliance with the rules, completing

2  operations testing.  I was training employees both

3  on the job and in the classroom on safety rules,

4  General Code of Operating Rules, air brake and

5  train handling rules.  All those rules that the

6  employees are governed by.

7     Q.   Anything other than what you've listed?

8     A.   As far as responsibilities for that

9  position?

10    Q.   Yeah.  Correct.

11    A.   Yeah.  I mean, I'm sure there's more.  I

12 worked with the engineering and mechanical

13 department on a daily basis.  I was responsible for

14 overseeing the entire yard in my territory.  I was

15 in charge of controlling costs, executing the

16 operating plan.  I was directly supervising the

17 yardmasters in that position.

18    Q.   Mr. Ogden, do you have your report in front

19 of you?

20    A.   I do have it.

21    Q.   Are you reading anything when you're -- I'm

22 just noticing that your eyes are directed down when

23 you're answering your question.  I'm just curious

24 if you're looking at your report or your resume or

25 anything like that.

Page 12

1     A.    Yes.  I'm referencing my report under

2   terminal manager position.  It's on page 2 on my

3   CV.

4     Q.    And that's the document that's been entered

5   as Ogden 2?

6     A.    That's correct.

7     Q.    So you started as a management trainee in

8   July of 2006; is that accurate?

9     A.    Yes.

10     Q.    And it was about a year that you were in

11   the trainee position?

12     A.    Correct.

13     Q.    And so the terminal trainmaster position

14   would have been approximately 3 years; is that

15   right?

16     A.    Correct.

17     Q.    What was your second position at BNSF?

18     A.    Director of administration.

19     Q.    And the duties that are listed on Exhibit

20   Ogden 2, are those an accurate reflection of your

21   duties as you were director of administration?

22     A.    Yes, I think that those bullet points

23   fairly summarize my responsibilities in that

24   position.

25     Q.    Are there any other duties that you can

Page 13

1   think of that aren't listed on Ogden 2 under

2   director of administration?

3       A.   I mean, obviously several of these

4   categories are very broad.  I don't know how

5   specific you want me to try to get, but I do think

6   that each of those, it looks like six bullet points

7   under director of administration, do generally

8   summarize my responsibilities in that position.

9       Q.   Were you eligible for bonuses when you

10  served in the position of director of

11  administration?

12      A.   Yes.

13      Q.   How were those bonuses calculated if you

14  remember?

15      A.   Yes, I remember.  They were calculated

16  based on upon safety, service, cost.  They were

17  also based upon both individual and company

18  performance.  They were based upon performance

19  management, whether -- basically, how I as an

20  individual was rated on my performance management

21  plan, as well as the overall company performance

22  and each of the performance areas.

23      Q.   And you were eligible for the those bonuses

24  when you were a terminal trainmaster?

25      A.   Yeah.  Each management position I was

Page 14

1    eligible for and received bonuses each year.

2        Q.    Was there ever any difference in the

3    criteria that would determine whether you received

4    a bonus varying on the position that you held?

5        A.    Well, it would change based upon the

6    position because the performance goals in each

7    position changed, so since the PMP ratings were

8    based upon whether I met the performance goals for

9    each position and those ratings were directly tied

10   to my bonus, so they did change with each position.

11       Q.    And your third position at BNSF was

12   terminal manager, correct?

13       A.    Correct.

14       Q.    And, again, the duties summarized on

15   Ogden 2 are an accurate reflection of what your

16   duties were when you were a terminal manager for

17   the BNSF?

18       A.    Yes.

19       Q.    The first bullet listed on Ogden 2 says

20   that you -- a duty was to, quote, "Motivated

21   managers and employees to meet safety, service,

22   efficiency and velocity metrics daily."  Do you see

23   that?

24       A.    Yes.

25       Q.    What does that mean?

Page 15

1    A.    That means to work with each of the

2  managers and employees responsible for running the

3  operation to ensure that we are meeting each of the

4  performance metrics.

5    Q.    How would you motivate managers and

6  employees to meet the safety metrics daily?

7    A.    I would keep the safety information out in

8  front of them, I would look for trends, look for

9  issues that we were having.  Look for risk -- we

10  did a risk analysis to determine where we needed to

11  focus our efforts, ensure that the managers under

12  my responsibility were completing the required

13  testing, were completing the required train rides,

14  basically everything -- the safety meetings, so

15  everything that related to safety I was overseeing

16  that and actually completing that myself.

17    Q.    And then for the service metrics, how did

18  you motivate managers and employees to meet service

19  metrics daily?

20    A.    Well, it's the same thing.  I mean, it's

21  keeping that information out in front of the

22  employees responsible for those areas.  We had

23  corporate dashboards where yardmasters and

24  trainmasters were able to see how we were doing

25  with our service to our customers, whether we were

Page 16

1    meeting the metrics that were put in front of us,

2    having daily conference calls related to that,

3    making sure that we were running trains, not only

4    safely but efficiently as well.

5        Q.    Any difference in your answer for how you

6    motivated managers and employees to meet the

7    efficiency metrics on a daily basis?

8        A.    No, I think it would be very similar.

9        Q.    And then how about the velocity metrics?

10   What did you do to motivate managers and employees

11   to meet velocity metrics on a daily basis?

12       A.    Same thing.

13       Q.    What is a velocity metric from your

14   recollection and experience?

15       A.    Velocity, when it comes to railroading,

16   basically how fast are we moving cars and trains.

17       Q.    How about efficiency?  What is your

18   understanding of an efficiency metric when employed

19   to a railroad?

20       A.    Production.  We're looking at the

21   productivity of the assets, whether that be

22   employees or equipment.  We're also looking at the

23   cost associated with those to get the production.

24       Q.    And how do you explain the safety metric?

25   What would be the sorts of things that would be

Page 22

1   BY MR. SULLIVAN:

2       Q.    Mr. Ogden, your fourth position at the

3   Burlington Northern Santa Fe was superintendent of

4   operations, correct?

5       A.    Correct.

6       Q.    And, again, the duties that are listed on

7   Ogden 2, under superintendent of operations, those

8   are accurate and complete?

9       A.    Those fairly summarize the responsibilities

10  of that position.

11      Q.    Are they accurate?

12      A.    As far as I know they're accurate.  Yes.

13  Do you have a specific question about their

14  accuracy?

15      Q.    Is there any other duties that you

16  have -- that you had when you were superintendent

17  of operations that are not listed under the

18  superintendent of operations item on Ogden 2?

19      A.    Give me a chance to read through every

20  bullet point, please.  (Document[s] reviewed.)

21          I think that these -- I guess with the

22  three -- nine bullet points under superintendent of

23  operations fairly summarize my responsibilities.

24  Of course there are details within these broad

25  areas that I don't list out because I don't want

Page 23

1  the CV to be 20 pages long.

2      Q.    So the item that's on the top of the second

3  page of Ogden 2, "Facilitated the performance

4  management process, including setting PMP goals and

5  rating my subordinates on their safety, service,

6  efficiency and velocity goals at mid year and year

7  end each year."

8          Do you see that?

9      A.    Yes.

10     Q.    What sort of specific things would you do

11 to facilitate the performance management process?

12     A.    I would -- I mean, first of all, the PMP

13 process at BNSF is very similar to CP's, at least

14 according to the material information that I

15 reviewed.  There's a midyear PMP, meaning with each

16 individual that reports to you, there's a year-end

17 meeting.

18          In each of those meetings, the performance

19 goals that were set at the first start of the year

20 are discussed and it's discussed on how the

21 individual and how the company is trending based

22 upon the results of those goals.

23          And then, of course, throughout the year,

24 providing feedback to those employees so that

25 there's no surprises when we get to mid year or

Page 24

1    year end.

2        Q.    Why did you decide to leave the BNSF?

3        A.    I left on really good terms.  Ultimately I

4    decided to leave because I didn't want to sacrifice

5    moving my family around the country from one city

6    to another, moving my kids from one school system

7    to another every year, which is what was going to

8    be required to continue on this succession plan

9    that I was on to be a regional vice president with

10   BNSF some day.

11        I just looked at individuals who were 15,

12   20 years ahead of me and I saw where they were

13   still being told when and where to move and just

14   decided that wasn't the best thing for myself or my

15   family.  I was offered two different promotions in

16   the final months prior to deciding to resign.  I

17   decided not to accept those.

18        Q.    I assume in your first position, the

19   trainee position, was that your first exposure to

20   the General Code of Operating Rules?

21        A.    Yes.

22        Q.    And you're familiar with the term E test or

23   operating test to refer to tests that intend to

24   determine compliance with the GCOR, right?

25        A.    Right.  So efficiency test or E test, also

Page 25

1  referred to as operations testing, it I guess, in

2  part, determines whether employee are complying

3  with the General Code of Operating Rules.  There

4  are other reasons to complete testing as well.

5      Q.   What other reasons are there?

6      A.   You can complete testing for not only

7  safety but also for efficiency.  So when you're out

8  there observing employees completing their work,

9  you're looking to see if they complied with not

10  only GCOR rules for safety, but all the other

11  rules, general notices, general orders, air brake

12  and train handling rules, TY&E safety rules.  Every

13  rule for railroad construction employees.

14          And then you're also observing or should be

15  observing employees to see how they're operating

16  from an efficiency standpoint.

17      Q.   All Class 1 railroads generally follow the

18  same procedures for investigating potential

19  misconduct and issuing discipline to their union

20  employees.  Isn't that right?

21      A.    I think, yeah, generally I agree with that,

22  that Class 1 railroads do have collective

23  bargaining agreements with the unions and they do,

24  as a result of their collective bargaining

25  agreements, hold formal investigation hearings.

Page 34

1    Q.   Would you perform E tests when you were a

2    terminal train manager?

3    A.   Did you say E tests?

4    Q.   Yes.

5    A.   Yes.

6    Q.   Did you perform E tests at your other

7    levels of management?  For example, when you were a

8    terminal manager, would you E test employees?

9    A.   Yes, I completed operations testing in each

10   position that I worked.  I would say less

11   operations as a superintendent than the other

12   positions.  Typically the frontline supervisors are

13   the ones that complete the majority of the

14   operations testing.

15   Q.   But not always?

16   A.   Well, it would be very uncommon for anyone

17   above a superintendent level to complete an

18   operations test from my experience.

19   Q.   And when you were at the superintendent

20   level, you performed E tests, correct?

21   A.   There were times when we had group

22   operations test or cross-departmental operations

23   testing where I would join the group and oversee

24   the testing process.

25   Q.   Is that the only time that you would

Page 36

1    you --

2        Q.    Would you be a company witness?

3        A.    Yeah, I mean if you have facts or evidence

4    to present at the formal investigation hearing, I

5    would expect that you would be at least one of the

6    witnesses.

7        Q.    Generally speaking, if you can quantify it,

8    how many times did you serve as a company witness

9    during an investigative hearing?

10       A.    It was quite a few times.  I don't know if

11   I can pinpoint a number or can give you a range.

12   It was a lot of times.

13       Q.    And would you have performed -- excuse me,

14   would you ever participated in an investigative

15   hearing as a company witness at every one of the

16   levels that you held at the BNSF?

17       A.    I would say less as a superintendent.  I

18   would say more as a terminal manager or director of

19   administration.

20       Q.    How often did you personally serve as a

21   hearing officer presiding over an investigative

22   hearing while presiding over the BNSF?

23       A.    A lot.

24       Q.    More than 10?

25       A.    Yes.

Page 37

1    Q.   More than 20?

2    A.   Yes.

3    Q.   More than 50?

4    A.   Probably.

5    Q.   More than 100?

6    A.   Possibly.

7    Q.   More than 150?

8    A.   I don't know.

9    Q.   So 100 would be 10 per year in your

10   10 years at the BNSF.  Does that sound accurate?

11   A.   It would be.  There were days that I

12   completed multiple formal investigative hearings as

13   a conducting officer.

14   Q.   How did you personally approach fulfilling

15   the responsibilities of being a hearing officer at

16   an investigative hearing?

17   A.   Well, the goal of the formal investigative

18   hearing is to determine the facts and circumstances

19   of whatever the issue is to determine whether the

20   employee caused or contributed to whatever the

21   issue was and whether the employee violated any

22   type of rule policy or regulation.

23        Obviously in order to make a determination

24   on that, you have to gather all the facts and

25   evidence as a conducting officer and question the

Page 52

1  one person who is in control of the shove, correct?

2     A.   Yeah, there is supposed to be one person

3  directing the shove movement.

4     Q.   That person is the eyes and ears of the

5  engineer, right?

6     A.   Yeah, the rules require for one qualified

7  employee to protect the point of the shove movement

8  and provide direction and instruction to the

9  engineer.

10    Q.   And so that's the person the engineer needs

11 to be listening to when the engineer is determining

12 when to stop the train, right?

13    A.   Right.  And in the conventional operation

14 where you have an engineer and an employee on the

15 ground like this scenario, we're talking about like

16 the context of this case, yes, the employee on the

17 ground providing the point protection is who the

18 engineer should be listening to over the radio in

19 this scenario, not by hand signal.  But that is the

20 person who is giving instruction to the engineer.

21    Q.   So please explain the methodology that you

22 used to reach the opinions that you used to reach

23 the opinions in this case.

24    A.   Sure.  They're listed on the bottom of

25 page 5 and on the top of page 6, so I --

Page 53

1    Q.    And that's of your report which is Ogden

2    Exhibit 1?

3    A.    That's correct.  So I used the same

4    methodology that I was trained by BNSF and used

5    during my management years with BNSF and applying,

6    determining, and interpreting BNSF's rules,

7    policies, procedures and applicable regulations and

8    disciplinary investigations and decisions.

9         To the best of my knowledge, my peers were

10   trained and used these same methods.  The primary

11   goal of the methodology used was to understand,

12   interpret, and apply to the railroad operation and

13   employee training and disciplinary investigations

14   and decisions.

15        I would review all pertinent facts and

16   evidence and uniformly apply a methodology in

17   decisions I make regarding the discipline, policy

18   and how I treated other people.  I used and allow

19   alternative handling for lesser discipline and/or

20   lenience when in doubt of what discipline to apply.

21   The ultimate goal was to operate a safe railroad.

22   Q.    So in this case, what documents did

23   you -- you listed a number of documents in your

24   report on page 4 and page 5, right?

25   A.    Correct.

Page 54

1       Q.    Are those the only documents that you've

2    reviewed in this case?

3       A.    No.

4       Q.    What else have you reviewed?

5       A.    I was also provided additional deposition

6    testimony after -- the depositions that were taken

7    after my report were submitted.

8       Q.    Which depositions were those?

9       A.    Those include Curt McElvey's deposition

10   taken May 10th, 2024, Mark Johnson's deposition

11   taken March 10th, 2024, Dylan Smith, May 29th of

12   2024, and Thomas Jared, taken June 20th, 2024.

13      Q.    So you've not reviewed the deposition

14   testimony of any of the railroad's corporate

15   representative witnesses?

16      A.    I understand that those were just recently

17   taken in the last couple of days, at least that was

18   my understanding.  No, I haven't had an opportunity

19   to review those.

20      Q.    So one of those transcripts has been

21   delivered and you haven't reviewed that?

22      A.    If one them has been delivered at this

23   point, no, I have not reviewed that.

24      Q.    Did you speak with Mr. Cramer or John

25   Magnuson over the break?

Page 55

1    A.    No.

2    Q.    So the methodology paragraph that you read

3    that's in your report on page 5 onto page 6, is

4    there anything that you would -- that you would add

5    to that to describe steps you've taken to reach the

6    opinions that you've reached in this case?

7    A.    I think that my methodology section fairly

8    summarizes the methodology that I used at BNSF and

9    in this case.

10   Q.    You state in your report that you hold all

11   of the opinions that you reached with, as you put

12   it, "reasonable professional certainty."  What does

13   that mean to you?

14   A.    Reasonable certainty in my field of

15   expertise, which is railroad safety and operations.

16   Of course, my conclusions were drawn based upon my

17   review of the facts and evidence that were provided

18   to me, specifically to this case, but also based on

19   my specialized training, experience, and knowledge

20   in the railroad industry.

21   Q.    And so I just want to make sure I heard you

22   correctly.  So based on the facts and evidence that

23   were provided to you, you have drawn certain

24   opinions with what you consider to be reasonable

25   certainty, correct?

Page 56

1    A.    Correct.  Certain conclusions based upon

2    reasonable -- or within a reasonable certainty

3    based on the facts and evidence and my specialized

4    training, knowledge, and experience.

5    Q.    And fair to say there may be other facts

6    that, if you knew them, might change your opinion?

7    A.    Well, if there is something else that you

8    don't think I've considered, I'd be glad to hear

9    that and I'd be glad to consider that.  As I always

10    state at the end of my reports, I certainly reserve

11    the right to review additional pertinent

12    information and I certainly reserve the right to

13    change, update, or add to my opinions.

14    Q.    Can you think of any way in which your

15    reasonable certainty could be objectively tested or

16    evaluated by someone else?

17    A.    Are you saying like scientifically tested

18    or analyzed in some way?

19            MR. SULLIVAN:  Could you read back the

20    question?

21            THE WITNESS:  I heard the question.

22    I'm asking for you to explain what you mean by the

23    question.

24    BY MR. SULLIVAN:

25    Q.    Well, it's -- you didn't conduct a science

Page 58

1   "CP."

2      Q.    Thank you for the clarification.  I didn't

3   hear which way -- which one you said, but it's good

4   to be clear.

5           So let's look at page 6 Ogden 1, which is

6   your first opinion.  So I understand your first

7   conclusion here to be that CP did not prove that

8   Mr. Sexton had violated any rules at the

9   investigative hearing, correct?

10     A.    Correct.

11     Q.    What do you base that -- what facts do you

12  base that conclusion on?

13     A.    Well, I base that conclusion on my

14  experience conducting disciplinary investigations

15  based on the fact that the public law board

16  reviewed this case and determined that the

17  discipline should be overturned because the facts

18  were not proven that Mr. Sexton violated any rule

19  and my review of the investigation hearing, and

20  the -- of course, the testimony and statements,

21  emails, and the other evidence was provided to me.

22     Q.    As you sit here now, what specific evidence

23  led you to the conclusion that Mr. Sexton did not

24  violate any rule?

25     A.    I think one thing that stands out to me is

Page 59

1   that the car counts that were given, at least

2   according to the testimony that I've read according

3   to the individuals who actually had a radio on them

4   and actually heard the radio communication

5   throughout the process, which included Sexton,

6   DePover, Cox, that those employees all indicated

7   that the car count wasn't just 15 as Mr. Jared

8   indicates and as he said during the investigation,

9   formal investigation hearing.

10          In fact, the car counts were determined to

11  be 50 and then cleared for 40 more and that

12  Mr. DePover was actually looking at the list, the

13  train list, and determining that he needed 15 more

14  cars to the cut.  In other words, he gave the

15  instruction to Mr. Sexton that he was clear for 40,

16  that he just needed 15 more to make it to the point

17  where he needed to cut the cars.

18          In other words, uncouple the cars, because

19  he was only going to leave -- I think it was 26

20  cars in track 4, so based upon that and based

21  upon -- at least according to the formal

22  investigation hearing and the video, which I

23  haven't had the opportunity to review it.  I

24  understand it's not available anymore.  CP failed

25  to preserve it.

But based upon what was presented at the formal investigation hearing, I understand that Mr. Sexton shoved approximately 558 feet after receiving the 40-car count and that doesn't put him anywhere close to half the distance the last car count received. I mean --

Q. I'd just be curious about that. How do you come to that conclusion that the 558 feet has some correlation to the numerical car count that is -- to which Rule 5.3.7 applies?

A. Well, when we talk about car counts, You know, railroad rules, the custom and practice at least in the industry, is that we're talking about 50-foot car counts. If we take 40 cars times 50 feet, that comes to, what, 2,000 feet. We divide that by half. That gives us a thousand feet. Sexton only shoved 558 feet. He hadn't reached the halfway point protecting from the 40-car count clearance that he had been provided by the person protecting the point of the shove.

Q. So that's assuming that the reference to 40 cars was the direction for the stop, right?

A. Yeah. According to DePover, according to Sexton, and according to the two employees who actually had radios on them that were communicating

Page 61

1   with one another that had a job briefing before the

2   shove movement ever happened, they were on the same

3   page.  They both understood -- it was a clear track

4   in track 4.

5           In other words, there was no equipment

6   standing on the track.  There was no railcars, no

7   locomotives, and that he was initially cleared for

8   50 cars and then he was cleared for another 40 cars

9   and he was given additional information that he

10  only needed 15 cars to the cut.

11          So to me, that would make a lot of sense

12  from a railroad operations standpoint.  I mean, it

13  wouldn't make any sense at all to go from a 50-car

14  count to a 15-car count.  That's just not the way

15  it works in the railroad industry.

16     Q.   And your recollection -- so my

17  understanding from the investigation hearing was

18  there was a reference to 50 cars actually and that

19  the actual statement that was provided was

20  something like clear for 40, 15 to a stop.  Can we

21  agree that clear for 40, 15 to a stop is the

22  language that was heard by John Sexton and that is

23  at issue here?

24          MR. CRAMER:  Objection.  Misstates the

25  record.

Exhibit 1

Page 62

1    A.    I think if you look at the deposition

2    testimony and if you look at the formal

3    investigation hearing and then you look at the

4    statements, it's phrased differently depending on

5    where you go to find the exact verbiage.  I don't

6    know that anyone recalls the exact verbiage.

7         But I think the understanding through the

8    job briefing that had occurred before the shove

9    movement and through the instruction that was being

10   provided, the two crew members were on the same

11   page.  That's what was important is they were on

12   the same page.  It was clear for 50 and then the

13   update was it was clear for 40.  And he's just

14   going to need 15 more cars to get to a point where

15   he's going to make the cut.

16        And he explained that -- DePover explained

17   that in the formal investigation hearing and he

18   referenced the track list or the train list that he

19   had and where he had made marks and that's how he

20   determined where he was going to need approximately

21   15 more cars before he was going to make his cut.

22   Q.    Mr. DePover also provided a written

23   statement where he said there was a 15-car count

24   given, right?

25   A.    Yeah.  So --

Page 63

1    Q.   That was an exhibit at the investigative

2    hearing, wasn't it?

3    A.   It was and --

4    Q.   And so if there -- so if it was a 15-car

5    count, as Mr. DePover said in that statement, then

6    the requirement under 5.3.7 is that the train must

7    have been stopped within half of that distance,

8    assuming that there were no other directions given,

9    correct?

10   A.   Well, no. Because --

11   Q.   "No"?  How is that wrong?

12         MR. CRAMER:  Objection.  Let him finish

13   his answer.

14         MR. SULLIVAN:  I'm asking him to

15   clarify how could that be wrong, if the rule is

16   stop within half the distance given, absent other

17   directions.

18   Q.   And in this case, the distance given, or in

19   this circumstance, the distance given was 15.  Why

20   wouldn't it be required that the train must be

21   stopped within half of the 15-car distance?

22         MR. CRAMER:  Objection.  Form.  And

23   misstates the record.

24   A.   Yeah.  So to answer that, Mr. DePover was

25   very clear in the formal investigation hearing that

Page 64

1    the one-line statement that he was compelled to

2    handwrite out at the time of the incident or at the

3    time of the operations test that he did that under

4    duress, that he was very concerned about the

5    general manager who oversees likely thousands of

6    employees.  They're compelling him to write a

7    statement.

8             And he also, during the formal

9    investigation hearing, clearly explained much more

10   detail around the circumstances of the shove

11   movement, well beyond a one-line hand written

12   statement.  So if you consider all of the facts and

13   all of the evidence, it became clear that it wasn't

14   just a 15-car count and that Mr. DePover actually

15   did give a 40-car count.

16      Q.   Well, I don't know that it's that clear, so

17   let's take a look at the investigative transcript.

18   This is previously entered into the deposition

19   record here as Exhibit 10.  I'm going to share my

20   screen.

21             (Exhibit 10 was introduced.)

22      Q.   Mr. Ogden, do you see Exhibit 10 that I'm

23   sharing on the screen?

24      A.   Yes, I do.

25      Q.   And so you understand that this is the

Page 65

1    transcript of the February 10th, 2021,

2    investigative hearing that is at issue in this

3    case, correct?

4        A.    Correct.

5        Q.    And you see here on Exhibit 48, that this

6    is an examination of Mr. DePover?

7        A.    Correct.

8        Q.    And so on page 50, at line 6 through 12,

9    Mr. DePover says, "That would have been when I told

10   them that there were 15 cars remaining and that he

11   was clear for 40 at that time."

12           Do you see that?

13       A.    Yes.

14       Q.    So what is your interpretation of the 15

15   cars remaining?

16       A.    Exactly what I just described to you

17   earlier.  He was looking in what he talked about I

18   think in his formal investigative hearing that he

19   was looking at his train list.  He indicated, based

20   upon the train list that he had in front of him,

21   that another 15 cars needed to go by him before he

22   was at the location where the train needed to be

23   separated; however, he gave him a clearance for 40

24   cars.

25       Q.    And you talked before about the 25 cars

Page 66

1   being sort of at issue, right?  And I'm curious how

2   you reconcile this with Mr. DePover's clear

3   statement on line 23 and 24 of page 50 in which he

4   says, "And then the next call was still clear for

5   40, had 15 until the stop"?

6       A.   He's still referencing the same thing.

7   He's clear for 40 cars.  That's the car count.  And

8   it's 15 until he's going to be at the location to

9   make the cut, where they tried to shove back the

10  location to make the stop.

11      Q.   But it was 15 until the stop is the word

12  that Mr. DePover used, right?

13      A.   Yeah, I think the important --

14           MR. CRAMER:  You need to let him finish

15  his answer.

16  BY MR. SULLIVAN:

17      Q.   Is the 15 until the stop the direction that

18  the engineer would have been required to follow?

19      A.   No.  He's required to follow the 40-car

20  count and the important thing is --

21      Q.   Why is that?

22      A.   If I could finish --

23           MR. CRAMER:  He needs to finish his

24  answer.

25      Q.   I want to understand why the 40 and not the

Page 67

1  15.

2          MR. CRAMER:  If you let him finish his

3  answer, maybe you would understand.

4      A.   And I don't mean to be rude.  I'm just

5  trying to -- and I don't want to talk over each

6  other because he's trying to take down everything

7  that we're saying, but this is happening over and

8  over and over again where I'm trying to answer and

9  you're cutting me off or you're asking another

10  question and I --

11     Q.   Your answers aren't responsive at times,

12  but let me --

13     A.   I think it's because you don't like my

14  answer.

15     Q.   Well, please explain why the 40 is

16  operative and not the 15.  That was the explanation

17  that you were giving and I'm interested to hear it.

18     A.   Okay.

19          MR. CRAMER:  I'm going to object.  I

20  think this has been asked and answered.

21     A.   So he received a 40-car count.  He was

22  cleared for 40 cars.  And as Mr. DePover explained

23  in the formal investigation transcript, he's

24  looking at the list and he made a determination

25  based upon the list that he needed another 15 cars

Page 68

1   before the train was at a location to make the cut

2   to uncouple the cars at that location.

3           However, the clearance, the car count that

4   was given the engineer was clearly 40 cars.

5   DePover explains that.  That was the understanding

6   of Mr. Sexton, as well, based upon the job briefing

7   that they had, prior to the shove movement and

8   during the shove movement, so the crew was on the

9   same page, and that's the important part.

10      Q.   The crew being Mr. DePover and Mr. Sexton,

11  right?

12      A.   Correct.

13      Q.   Mr. DePover was protecting the shove in

14  this instance?

15      A.   Correct.

16      Q.   And you understand that Mark Johnson was

17  the hearing officer who presided over the

18  investigative hearing in this case, right?

19      A.   Yes.

20      Q.   And Mr. Johnson came to the conclusion that

21  the charge was proven?

22      A.   That's what Mr. Johnson indicated.

23      Q.   And obviously Mr. Johnson was present at

24  the investigative hearing and you weren't, right?

25      A.   Right.  I think I have all of the facts and

Page 69

1    evidence to make a determination and draw

2    conclusions based on the facts and evidence.  I

3    didn't need to be physically sitting at the formal

4    investigation hearing to make a determination.

5        Q.    As you noted, there was a video that was

6    played at the investigative hearing that you have

7    not reviewed, right?

8        A.    Right.  I understand CP failed to preserve

9    the video so it's no longer available for review;

10   however, it was explained in quite a bit of detail

11   what they were looking at in the video and what

12   they were referencing the video for in the

13   transcript.

14       Q.    And Mr. Johnson would have been in a

15   position to evaluate the demeanor of the witnesses

16   at the time that they provided their testimony at

17   the investigative hearing, wouldn't he?

18       A.    What do you mean the demeanor of the

19   witnesses?  Like if they were --

20       Q.    You read the transcript.  He heard the

21   individuals actually say the words that are

22   recorded in the transcript, correct?

23       A.    Well, I would assume that he heard them.

24   He was physically there.

25       Q.    And so he would have been able to make

Page 72

1    these circumstances.

2        Q.    And so let's break that into two things,

3    there's the disciplinary decision, the actual

4    discipline that was issued, and then there was the

5    conclusion that was the charge was proven.

6            And so I just want to be clear that your

7    view is that the only proper result based on the

8    evidence from -- that was presented at the

9    investigative hearing is that the only proper

10   decision would have been that the charge was not

11   proven?

12       A.    Right.  I agree with the public law board.

13   The only reasonable conclusion was that the

14   facts -- based upon the facts and evidence, the

15   charge was not proven.

16       Q.    Do you know how often the public law board

17   overturns disciplinary decisions at any Class 1

18   railroad?

19            MR. CRAMER:  Objection.  Lack of

20   foundation.

21       A.    I haven't reviewed those statistics.  I

22   could only tell you based upon my experience at

23   BNSF.

24       Q.    Based on your experience at BNSF, how often

25   does the public law board overturn a disciplinary

Page 73

1    decision?

2       A.    Very rarely.

3             MR. CRAMER:  Same objection.

4             MR. SULLIVAN:  What was the objection?

5             MR. CRAMER:  Lack of foundation.

6    There's no way he's going to know all BNSF, how

7    often they're overturned.  We're not talking about

8    a specific year period or anything.  Also,

9    objection --

10   BY MR. SULLIVAN:

11      Q.    You said --

12            MR. CRAMER:  Vague.

13            (Indiscernible crosstalk.)

14      A.    I'm sorry.

15      Q.    Your testimony was that based on your

16   personal understanding that the public law board

17   overturning a decision happened rarely when you

18   were at Burlington Northern Santa Fe?

19      A.    Based upon my personal experience the cases

20   that I was involved in that went to a public law

21   board, it was rare that a decision was overturned.

22   I can't think of a specific example of a time that

23   one was overturned.  I'm not going to say that

24   there was never a time, but I don't recall one.

25            And that's just based on my experience.  I

Page 74

1    don't have all of the information needed to

2    determine the actual number of times that they were

3    overturned at BNSF as a company, as a whole.

4        Q.   You came to the conclusion that Mr. Sexton,

5    as you put it, complied with the intent of the

6    rule, right?

7        A.   He did.  He complied with the rule.

8        Q.   And you -- well, so a specific statement in

9    your report is, "I agree that Sexton complied with

10   the intent of the rule."  I just want to

11   understand, your view that he complied with both

12   the intent and the letter of the rule.

13       A.   Correct.  He complied with the rule.

14       Q.   You also have the conclusion that the facts

15   did not support the discipline.  Please explain

16   that.

17       A.   Well, if you don't -- I mean, I think it's

18   pretty simple.  If you don't violate a rule, you

19   shouldn't be disciplined.  The facts and evidence

20   indicate that Mr. Sexton did not violate a rule, so

21   he should not have been disciplined.

22       Q.   But as a general matter, a 20-day

23   suspension for a violation of GCOR 5.3.7 is not in

24   of itself objectionable.  Is that fair to say?

25       A.   I would disagree with that as well.

Page 78

1    ask you a different set of questions.

2          You say -- you've said a number of times

3    that you agree with the public law board's

4    reasoning and I think part of that is premised on

5    the idea that Tom Jared made the disciplinary

6    decision here.  Is that fair to say?

7       A.   He did.

8       Q.   Well, whether he did or not is a question

9    of fact.  You believe that he did?

10      A.   The facts indicate that he did.

11      Q.   And there might be other facts that you're

12   not aware of that indicate that he didn't, right?

13      A.   The facts that I'm aware of indicate that

14   he did.

15      Q.   Okay.  And what is your -- how much of your

16   determination that the public law board came to the

17   right result is based on the fact that Mr. Jared

18   was the decision maker, allegedly?

19      A.   Well, I don't -- I mean, certainly the fact

20   that he -- I mean, really he was the one involved

21   with every piece of this, from the beginning to the

22   end.

23      Q.   According to the public law board, right?

24      A.   Well, according to the facts and evidence.

25      Q.   Well, not according to his deposition

Page 79

1    transcript, which are facts and evidence.

2         A.    I guess you could point me to what you are

3    specifically referring to in his deposition

4    transcript, but my review of the evidence indicates

5    that Mr. Jared was involved -- well, from the point

6    where he asked Mr. McElvey asked him to call him

7    shortly after Mr. McElvey put out the incident

8    report or delay report of the 474 train all the way

9    to the final decision to enforce discipline as I

10   spelled that out in my report.

11        Q.    That's your belief of what happened?

12        A.    That's the conclusion I have drawn based

13   upon the facts and evidence.

14        Q.    If CPKC witnesses testify that Mr. Jared

15   made no recommendation for discipline in this case

16   and made no decision in this case, would that

17   affect your opinion?

18             MR. CRAMER:    Objection.    Misstates the

19   record.

20        A.    I would certainly consider that testimony

21   and I would weigh that -- I would weigh that in and

22   certainly also consider the facts and evidence that

23   I have at this point, which is that -- in part, at

24   least, that there is an email from

25   administrative -- appears to be an administrative

1    person saying to issue the 20-day -- the 20-day

2    suspension to Mr. Sexton per Jared.

3        Q.   And your assumption is that that language

4    means that Tom Jared made the decision, right?

5        A.   Yeah.  It looks pretty clear in that email

6    that he is the one instructing the 20-day

7    suspension and enforcing the 20-day suspension on

8    Sexton.  And then to follow that up, then we have

9    the discipline letter that's clearly from Mr. Jared

10   that has his name and his signature on it.

11            I just don't know how you would say you

12   weren't the one making the decision and enforcing

13   the discipline when that's the evidence.

14       Q.   Well, I mean, if someone -- if that is the

15   sworn testimony of another witness, how would that

16   affect your opinion?

17       A.   As I said, I would consider any new

18   testimony that's pertinent to my opinions.

19       Q.   And would that potentially alter your view

20   that Mr. Jared was involved in every step of the

21   proceeding, as you put it, if his testimony was

22   that he wasn't?

23       A.   Again, I would want to review the testimony

24   that you're referring to and I would want to make a

25   determination after considering that testimony.

Page 83

1    Q.   Did those bonuses and metrics create a

2    conflict of interest for you at BNSF?

3    A.   Well, I think the important -- no, they

4    didn't.  I think the -- at least in my experience

5    at BNSF, it didn't.  The reason is because at BNSF

6    the core foundations were safety first.  And then

7    we could start talking about velocity or efficiency

8    or cost or other things, but the foundations of CP

9    are very different.  They have adopted precision

10   schedule railroading or PSR.

11        And with PSR, the -- under their

12   foundations, the number one thing is providing

13   service and number 2 is controlling costs, and

14   number 3, I think, is asset utilization.  And these

15   are all things that are driving towards train

16   performance, train speed, reducing costs, making

17   more money.  Those are the first three foundations

18   under PSR for Canadian Pacific.

19   Q.   What's the fourth?  The first of three.

20   There's five.  What are the other two?

21   A.   Number 4 is operate safely, I think, and

22   the next one is developing people or employees.  So

23   when you look at PSR and you look at it through

24   that lens and knowing that that's the driving

25   mechanism or the driving force behind all of the

Page 84

1    operating decisions that are being made out there

2    and the disciplinary decisions that are being made,

3    that creates a conflict of interest because, all of

4    a sudden, we have the competing goals, the

5    competing interests.

6            You're putting PSR and you're putting train

7    speed and these velocity metrics ahead of safety

8    then.  That causes a very real issue here.

9        Q.    So to you, the difference between the BNSF

10   and Canadian Pacific is the BNSF says "Safety

11   first" and CPC has its safety goal listed four out

12   of five?

13       A.    Well, it's not just listed four out of five

14   in their foundation.  That's they way they're

15   operating their railroad.

16       Q.    How do you know that?  So you think safety

17   is fourth most important priority out of Canadian

18   Pacific Kansas City?

19       A.    Absolutely.  By the way CP is operating

20   their railroad, that is not their priority.  Safety

21   is not their priority.

22       Q.    So when you say, "By the way CP is

23   operating their railroad," what do you mean by

24   that?

25       A.    I mean, when I look at precision schedule

Page 88

1    numbers, but you don't have any information about

2    injury frequency, do you?

3        A.    Well, frequency at which someone is injured

4    would be the number of injuries or are you talking

5    about the frequency ratio?

6        Q.    Frequency ratio.  Excuse me.  Yes.  That

7    was the words that you used.  You do not have any

8    information about the frequency ratios?

9        A.    I have not reviewed those numbers.

10       Q.    So you talk in your conflict of interest

11   assessment about the goals that are related to

12   improving train performance for Mr. Jared and

13   Mr. McElvey.  Why didn't you discuss the

14   safety-related goals that were set for those two

15   managers in your report?

16       A.    Well, I think that if you look at both the

17   2020 and 2021 performance or the PMP goals for

18   Mr. Jared and Mr. McElvey, you're going to find

19   that the most weight overall is placed upon

20   velocity metrics, not safety.  Safety is only a

21   small percentage of the overall performance goals

22   for either of those.

23       Q.    So Mr. Jared's PMP for 2020, it includes a

24   safety goal, right?

25       A.    I would think so.  And I think based upon

Page 89

1   my review of it there was one.  I think it is just

2   a very small percent compared to the overall,

3   because, again, CP is focused on velocity and

4   making money.  Yeah.  Operate safely for Mr. Jared

5   in 2020.  That's 15 percent of the overall.

6       Q.   Is making money a concern at the Burlington

7   Northern Santa Fe Railroad?

8       A.   Sure.  Not the expense of safety, though.

9       Q.   And it's your view that CPKC puts safety

10  second to making money?

11      A.   Yeah.  It depends on which list you look

12  at, but according to their own foundation, it's

13  number four.  I certainly --

14      Q.   Okay.  But so which list you would look at.

15  What other lists would you look at other than your

16  current and previous reference to the five

17  foundations that it has set out?

18      A.   You can look at precision schedule

19  railroading and the drivers behind precision

20  schedule railroading and you would find that

21  operating faster with less cost and cutting assets,

22  including equipment and people, equals making more

23  money.

24          I mean, that is what precision schedule

25  railroading is all about, so I certainly think that

Page 99

1          MR. CRAMER:  Objection.  Form.

2      A.    It's based upon -- me saying that the

3  so-called operations test that Mr. Jared was

4  performing that day, me saying that it was absurd

5  is based upon the facts and evidence of how he went

6  about it and my experience with completing tens of

7  thousands of operations tests and training other

8  employees how to complete operations tests and

9  reviewing CP's own manual when completing

10  operations testing.

11          And the way he went about it that day is

12  not in compliance with any operations test.  It's

13  completely out of line.  It's unsafe.  It's unfair.

14  And yes, I would go so far as to say it's absurd.

15      Q.    What is unsafe about it?

16      A.    He -- so when we're completing shove

17  movements in the railroad industry, the employee

18  who is charged with protecting the point of the

19  shove and providing the car counts is to solely

20  focus on the shove movement and what they're doing.

21  They're protecting the shove and providing the car

22  counts.  They are to complete no unrelated tasks

23  and not to being distracted or interrupted by

24  anything else during that specific movement.

25          And it's because so many instances happened

Page 100

1    over the years during shove movements that the FRA

2    came out and actually formed regulations around

3    shove movements specifically because of the

4    increased risk associated.

5          When Mr. Jared came up behind the employee,

6    Mr. DePover, unannounced -- he came up announced

7    behind him and he saw that a shove movement was

8    ongoing and he specifically started talking to him

9    and giving him instructions on not providing any

10   more car counts and introducing himself to him and

11   distracting him and interrupting the shove

12   movement, that's certainly unsafe.

13         He caused the shove movement to be unsafe

14   by pulling the employee with the responsibility of

15   protecting the point of the shove movement out of

16   the shove movement.  A test like that should never

17   be set up.  Shove movements should only be

18   observed.  That's been known in the railroad

19   industry for decades.  I mean, that's very clear in

20   BNSF's manual for their operations testing.  It's

21   also very clear in CP's manual for their operations

22   testing.

23   Q.   So I just want to understand the basis for

24   some of the things you're saying.  You just said

25   that you don't set up any tests for a shove moment,

Page 114

1    Q.   And so the specific statement, "kill this

2    train," that was several days before the actual

3    incident here and a communication that had nothing

4    to do with Tom Jared.  How does that apply to your

5    answer and your assessment of Mr. Jared's

6    motivation?

7    A.   I'm just saying generally we have managers,

8    such as McElvey, making statements like that.

9    We're talking about killing a train.  In railroad

10   terminology, we're talking about laying a train

11   down, not getting across the road, delaying a train

12   intentionally.

13   Q.   So McElvey's statement about that is

14   somehow evidence of what Tom Jared is going to do

15   on a different day?

16   A.   I'm just telling you this all works hand in

17   hand.  I don't think we can look at this in silos.

18   We have to look at this as facts and testimony as a

19   whole and we have to consider the precision

20   schedule railroading philosophy that CP is pushing.

21        And when I consider everything as a whole,

22   it became pretty clear to me, especially knowing

23   Jared's position as the high-level manager he was,

24   likely over a thousand employees, to take the time

25   to go perform this type of test on this specific

Page 118

1    again, would be interested in reviewing Mr. Jared's

2    operation testing records over that time period,

3    but it wouldn't surprise me if he only completed or

4    did very few tests.

5          I did notice that it was the first time

6    that he had ever tested Mr. Sexton in reviewing

7    Mr. Sexton's operations testing history at least

8    over -- I think it was a 9-year period, so that

9    was, of course, an indication that he wasn't

10   regularly out there testing Mr. Sexton, other than

11   on this specific day when this incident occurred.

12     Q.    Well, it would seem as Mr. Jared wasn't

13   texting Mr. Sexton often, he wasn't motivated to

14   impose testing on Mr. Sexton in some unfair way

15   because of Mr. Sexton's general view of a person

16   who makes safety complaints, right?

17            MR. CRAMER:  Objection.  Form.

18     A.    I think based upon everything I know in

19   reviewing the facts and evidence, Mr. Sexton was

20   targeted by Mr. Jared.

21     Q.    And I'm curious about that.  So you're

22   making an assertion about what was going inside of

23   Tom Jared's head, right?

24     A.    No, I'm making -- I'm analyzing the facts

25   and the evidence and I'm providing conclusions

Page 119

1  based upon the facts and the evidence.

2     Q.   But your conclusions that a human being did

3  a certain thing on a certain day for a certain

4  reason, right?

5     A.   Well, logic, when you think through things

6  like this, with the background that I have and the

7  expertise that I have, I certainly can use my

8  logic, to a certain extent, common sense, but

9  certainly my railroad safety and operations logic

10 to determine that it would be very out of the

11 ordinary for a manager at his level to go out and

12 do something like this.

13    Q.   In your experience based on Burlington

14 Northern and Canadian Pacific and not Tom Jared

15 specifically, right?

16    A.   Well, I just think through it just from a

17 logical standpoint.  If the general manager for the

18 US region for CP over likely thousands and

19 thousands of employees was out there hunting down a

20 train to complete a shove movement test on a

21 regular basis, how are they doing their job?  Like

22 their job responsibility doesn't require them to go

23 out there and complete this test.

24    Q.   Well, you're assuming they hunted down a

25 train to perform this test.  What if the evidence

Page 124

1    consider -- I mean, at some point if Mr. Ross's

2    deposition testimony becomes available, I would

3    certainly be glad to read it and consider it, but

4    based upon the fact that the discipline came from

5    Mr. Jared through the disciplinary letter, the fact

6    that there was an email indicating that -- per

7    Mr. Jared that sets the 20-day suspension on

8    Mr. Sexton.

9         I mean, that's very difficult to overcome.

10   It's very strong factual evidence in this case that

11   indicates that Mr. Jared was not only involved with

12   the entire process leading up to the discipline but

13   actually assessed the discipline.

14      Q.   Do you think it's your job as an expert

15   witness to weigh evidence and decide whether

16   something happens or is that a jury's job in a

17   trial?

18      A.   It's my job to consider and analyze the

19   facts and evidence.  Ultimately the jury will be

20   the ones who make the decision on who's right and

21   the outcome of the case.  I'm not trying to assess

22   creditability.

23        I'm considering all the facts and the

24   evidence, but for someone to just testify that I

25   raised my hand and say, at this point I am the one