**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF IOWA**
**EASTERN DIVISION**

| | |
|---|---|
| John Sexton, | No. 3:23-cv-00031-RGE-HCA |
| Plaintiff, | |
| v. | **PLAINTIFF'S RESISTANCE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| Dakota, Minnesota & Eastern Railroad Corporation d/b/a Canadian Pacific, a Delaware Corporation, | |
| Defendants. | |

## <u>TABLE OF CONTENTS</u>

**TABLE OF AUTHORITIES**................................................................2

**INTRODUCTION**.............................................................................3

    **A. It is CP's—Not Sexton's—Burden to Demonstrate its Affirmative Defense, Nevertheless Sexton Demonstrates Facts that Preclude CP from Being Able to Provide its Steep Affirmative Defense Burden** ...........................................3

    **B. Sexton Demonstrates Sufficient Evidence to Raise an Inference for His Contributing Factor Prima Facie Case** ................6

**ARGUMENT REGARDING CP'S REMAINING CONTENTIONS** .........7

    **A. Sexton's January 2021 Emails Are Related to Adverse Actions** .........7

    **B. CP'S Fails to Assert the Correct FRSA Legal Standard Making its Summary Judgment Arguments Moot**...........................9

        1. *Jared Had Knowledge of Sexton's Protected Activities the Very Morning He Decided to Conduct One of His Only 13 Tests Conducted that Entire Year* .............................10

        2. *Abundant Evidence Exists Connecting Sexton's Protected Activities to Ross's Excessively Harsh Disciplinary Decision* .....................................................11

3. *Pretext, Shifting Explanations, Antagonism, and Hostility Aplenty* ....................................................................... *11*

**C. Sexton's Report that Jared Interrupted DePover Who Was Performing a Safety Sensitive Task is a Protected Activity**............................**12**

**D. CP'S So-Called "E-Test", Charge Letter, and Investigation Hearing Constitute Protected Activities Under the Circumstances** ................................................................**14**

**CONCLUSION** ................................................................**15**

## <u>TABLE OF AUTHORITIES</u>

Cases

*Allen v. Admin. Rev. Bd.*, 514 F.3d 468, 476 n.3 (11th Cir. 2008)........................9

*Araujo v. New Jersey Transit Rail Operations, Inc.*, 708 F.3d 152, 158 (3rd Cir. 2013) ...............................................................................6,9

*AuBuchon v. Geithner*, 743 F.3d 638, 644 (D. Minn 2015) ...............................15

*Blackorby v. BNSF Ry. Co.*, 849 F.3d 716, 721-22 (8th Cir. 2017).......................7

*Blackorby v. BNSF Ry. Co.* 936 F.3d 733, 734 (8th Cir. 2019) ............................4

*Brisbois v. Soo Line R.R. Co.*, 124 F.Supp 3d 891, 902 (D. Minn. 2015)....................14,15

*DeFrancesco v. Union R.R. Co.*, ARB no. 10-114, ALJ No. 2009-FRS-000009, at 5 (ARB Feb. 29, 2012)........................................................6,9

*DeFrancesco v. Union Rr. Co.*, ARB Case No. 12-057, (2015)...........................5

*Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 789 (8th Cir. 2014) ................................3

*Murray v. UBS Securities LLC*, 601 U.S. ___ slip op. at 14 (2023) ....................9

*Petronio v. Nat'l R.R. Pas. Corp.*, 2019 WL 4857579 (SDNY 2019) ..............14

*Ray v. Union Pacific RR. CO.*, 971 F. Supp. 2d 869, 884 (S.D. Iowa 2013) ..............6,9,12

*Thorstenson v. BNSF Ry. Co.*, ARB Case Nos. 2018-0059, 2018-0060 (November 25, 2019) ...............................................................................14

Statutes

49 U.S.C. 20109(b)(1)(A) ................................................................13

49 USC § 42121(b)(2)(B)(iv) ................................................................4,5

## INTRODUCTION

CP puts forward only two justifications for its Motion for Summary Judgement—both drastically misunderstand the relevant law and are based on confounding assertions completely devoid of the facts in the record—at times to the level of misrepresentation. In its simplest form, CP contends that Sexton fails to even state a prima facie case, and that Sexton has "no facts weighing against the finding that the employer would have imposed the same discipline regardless of any protected activity." Dkt. 50-1 at 10-11. Thus, under CP's approach to its Summary Judgment Motion, all Sexton need demonstrate to rout CP's motion is that "circumstances raise an inference that the protected activity was a contributing factor in the adverse action" and demonstrate "facts weighing against the finding that the employer would have imposed the same discipline regardless of any protected activity." *Id.* at 11-12 citing *Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 789 (8th Cir. 2014). Such demonstrations in this case are so readily present and clear to address, Plaintiff addresses them immediately, then delves into a more substantive response to the rest of CP's briefing. CP notes in its motion that it incorporates its Local 56(a)(3) Statement of Material Facts, providing a summary in CP's motion itself—Plaintiff leaves his response to CP's Statement of Material Facts in the attached Plaintiff's Statement of Disputed Facts filing, addressing each paragraph directly instead of duplicating those responses here.

### A. It is CP's—Not Sexton's—Burden to Demonstrate its Affirmative Defense, Nevertheless Sexton Demonstrates Facts that Preclude CP from Being Able to Provide its Steep Affirmative Defense Burden

CP argues that Sexton cannot demonstrate a single fact weighing against the finding that it would have imposed the ***same*** discipline against him absent his protected activity. Dkt. 50-1 at 11. First, this misapplies the applicable law as it is the ***employer's burden*** to demonstrate clear and convincing evidence that the employer would have taken the same unfavorable personnel action

in absence of the employee's protected activity. *See* 49 USC § 42121(b)(2)(B)(iv).[1] "By express statutory command, the defendant then bears the burden of proving an affirmative defense—that the defendant would have taken the same action in the absence of the protected conduct—by clear and convincing evidence." *Blackorby v. BNSF Ry. Co.* 936 F.3d 733, 734 (8th Cir. 2019). Despite CP's erroneous construction of the law, Sexton can demonstrate that CP has provided no evidence that has ever taken the ***same*** action against any other employee—in fact CP had only taken less severe discipline or in several instances decided not to discipline employees CP had determined violated the exact same alleged rule as Sexton. See Dkt. 53-2 at paras. 150-159.

CP erroneously states, "Sexton has not and cannot identify other individuals similarly situated in all material respects who were subject to an e-test, failed and did *not* receive discipline in accord with CP's guidelines."[2] Dkt. 50-1 at 23-24. First, CP fails to describe what it means by "similarly situated in all material respects…." Second, CP misstates the applicable law—it does not matter whether there are similarly situated employees that "did not receive discipline in accord with CP's guidelines"—instead the statutory language is explicit in that the employer must demonstrate "that the employer would have taken the ***SAME*** unfavorable personnel action…." 49 USC § 42121(b)(2)(B)(iv) emphasis added. The Administrative Review Board explains:

> …it is not enough for [the railroad] to show that [plaintiff] violated its safety rules, that it had legitimate motive for imposing the disciplinary action, or that it imposes 'appropriate discipline' against employee for safety violation and unsafe behavior regardless of whether they [engaged in protected activity]. ***INSTEAD***, [the railroad] was ***REQUIRED*** to demonstrate through factors extrinsic to [plaintiff's] protected activity that the discipline which [plaintiff] was subjected was ***APPLIED CONSISTENTLY***, within clearly established company policy, and in a ***NON-DISPIRATE MANNER CONSISTENT*** with discipline taken against employees who committed the same or similar violations [absent protected activity].

---

[1] "Relief may not be ordered under subparagraph (A) if the ***employer demonstrates*** by clear and convincing evidence that the employer would have taken the same unfavorable personnel action in the absence of that behavior." 49 U.S.C. § 42121(b)(2)(B)(iv).
[2] This claim misrepresents the record, as CP in fact has NOT disciplined employees it had determined violated the same rule it alleges Sexton violated. Dkt. 53-2 at paras. 155-158.

*DeFrancesco v. Union Rr. Co.*, ARB Case No. 12-057, (2015) emphasis added. In other words, a railroad can only meet its affirmative defense if it (1) routinely monitored for compliance with the same work rules alleged against the employee absent protected activity, (2) consistently imposed the same rule violation on an employee for that employee's actions, (3) consistently applied the same severity of discipline for those rule violations. These requirements are explicit in the FRSA which requires a finding of the "same unfavorable action in the absence of that [protected activity]". 49 USC § 42121(b)(2)(B)(iv).

CP's argument is futile—despite CP's claim, Sexton can in fact demonstrate that CP has produced **<u>NO</u>** example where it has ever failed to offer a waiver[3] and disciplined an employee to the excessive point it had Sexton. In fact, CP cannot demonstrate that it even routinely monitored for compliance with the rule—Jared only conducted 13 efficiency tests in all of 2021 and CP has not demonstrated whether those efficiency tests were even for shoving movements as in Sexton's case. See Dkt. 50-2 at para. 27. On June 7, 2020, CP had verbal coaching with Engineer "M.J." for "failure to stop within half the distance specified." Dkt. 53-2 at para. 155. Verbal coaching is not discipline. *Id.* at para. 156. On June 8, 2020, Mr. Jared issued "G.H." a letter of reprimand for "failure to stop within half the range of vision of improperly lined switch resulting in a run through switch. *Id.* at para. 157. On July 29, 2020, CP only had a "verbal coaching" with Engineer "T.S." for "failure to stop within half the distance specified." *Id.* at para. 158. In fact, just a month before CP issued a full 20-day unpaid suspension against Sexton, it assessed only a 10-day unpaid suspension against an employee for the same alleged rule violation. *Id.* at para. 159.

Because it is CP's burden to demonstrate clear and convincing evidence that it would have

---

[3] As admitted by Defendant, only the company may offer a waiver. Dkt. 50-2 at para. 57.

taken the same action and because Sexton can demonstrate evidence that CP treated him with excessive discipline compared to non-protected employees, Sexton defeats this portion of CP's summary judgment.

### B. Sexton Demonstrates Sufficient Evidence to Raise an Inference for His Contributing Factor Prima Facie Case

Regarding CP's general statement that Sexton cannot demonstrate circumstances that raise an inference that the protected activity was a contributing factor in CP's adverse action—caselaw provides that "[a] contributing factor is any factor, which alone or in combination with other factors tends to affect in any way the outcome of the decisions". *Araujo v. New Jersey Transit Rail Operations, Inc.*, 708 F.3d 152, 158 (3rd Cir. 2013). "The contributing factor element of a complaint may be established by direct evidence or indirectly by circumstantial evidence." *Ray v. Union Pacific RR. CO.*, 971 F. Supp. 2d 869, 884 (S.D. Iowa 2013) quoting *DeFrancesco v. Union R.R. Co.*, ARB no. 10-114, ALJ No. 2009-FRS-000009, at 5 (ARB Feb. 29, 2012). Circumstantial evidence may include:

> temporal proximity, indications of pretext, inconsistent application of an employer's policies, an employer's shifting explanations for its actions, antagonism or hostility toward a complainant's protected activity, the falsity of an employer's explanation for the adverse action taken, and a change in the employer's attitude toward a complainant after he or she engaged in protected activity.

*Id.*

As noted above, CP has <u>inconsistently applied</u> its policies in **<u>NOT</u>** offering Sexton a waiver and assessing discipline against him more severely than any other employee part of the record. See Sexton Dec. at para. 1 and Dkt. 53-2 at paras. 150-158. <u>Temporal proximity</u> could not be any more present in that Jared appeared at the very end of Sexton's same shift where he refused to operate his train without cutting the tracks—conducting a test against Sexton which could subject Sexton to discipline. Dkt. 53-2 at paras. 62-63. A few days later CP sent a notice for Sexton to attend a

disciplinary investigation and by the end of the month, CP assessed a 20-day unpaid suspension against Sexton. *Id.* at paras. 86, 100-101, and 104-105. <u>Antagonism and hostility</u> are present in McKelvey's contemporaneous message stating, "im not sure how to hold him accountable for delaying the train." *Id.* at para. 40. Additionally, Miller responded to Sexton's safety report concerned about "creating a stage/platform for their feelings." *Id.* at para. 90. These are just a few examples of contributing factor which are sufficient to defeat CP's summary judgment motion.

## ARGUMENT REGARDING CP'S REMAINING CONTENTIONS

### A. Sexton's January 2021 Emails Are Related to Adverse Actions

CP concedes for the purposes of its motion that Sexton's January 3 and 18, 2021, emails constitute protected activities, and that CP had knowledge of Sexton's protected activities. Dkt. 50-1 at 13-14. CP then argues, "there is no evidence that CP took any adverse action against Sexton because of them, and so any claims based on the emails should be dismissed." *Id.*

CP argues that the "nature of a supervisor's reaction when receiving a report is probative to the issue of whether 'discriminatory animus' contributed to the employer action. Doc. 50-1 at 14 quoting *Blackorby v. BNSF Ry. Co.*, 849 F.3d 716, 721-22 (8th Cir. 2017). Here, CP conveniently left out much of CP's reactions to Sexton's safety reports to come to its conclusion.

The first email in response to Sexton's January 3, 2021, email was to question whether Sexton was even telling the truth: "Here is a message that was emailed to us that you may want to look into to find out what **<u>actually</u>** happened". Dkt. 51 at CP Appendix 212, emphasis added. Then, not that the safety report needed to be resolved, nor concerns regarding the safety report, rather: "We all need to get together and formulate a response for the union." Dkt. 50-3 at CP Appendix 405. Vice President Tracy Miller's response to the January 18, 2021, email was more concerned over Sexton's thoughts being spread to everyone than the actual subject of Sexton's safety

complaints: "What is the plan to communicate factually to sexton and team before their thoughts are spread to everyone?" Dkt. 51 at CP Appendix 405. Miller took issue with the whole ordeal being discussed over email and nitpicked the response: "You and Tom need to get them on the phone together and walk through everything factually vs send emails. First mistake below is you say the 'conductor'. You need names and validation for every point made". *Id.*

From here, the merits of the investigation itself raise an inference that Sexton's reports were not taken seriously. Throughout his email Smith describes he is unsure of exactly what had happened: "I reviewed camera footage inside the yard office…no audio is available to confirm the conversation…." (*Id.* at CP Appendix 406); "I reviewed the Ottumwa yard camera footage along with audio . . . and was unable to see or hear any instructions given to any crew regarding attending to a train" *Id.*; "No audio tapes nor camera footage was available to substantiate this allegation". *Id.* Per CP's argument, the "nature of a supervisor's reaction when receiving a report is probative to the issue of whether 'discriminatory animus' contributed to the employer action." Dkt. 50-1 at 14. Here, in the light most favorable to Plaintiff, there is reason to question whether CP's management was being hostile towards Sexton's reports.

CP goes on to argue that the manager whom Sexton complained about "had nothing to do with the failed e-test…and resulting discipline." *Id.* The specific manager who was the subject of Sexton's complaints may not have been directly involved, however, management involved in the email **were** involved in the test and discipline. Smith responded to the January 3 email who along with Jared was involved in intimidating Mr. DePover into providing an incomplete statement regarding Sexton's shoving movement. Dkt. 53-4 at Appendix A 147. Additionally, Smith suggested Sexton be disciplined. Dkt. 54-1 at Appendix B 19. The January 18 email was sent to Ross who CP contends made the disciplinary decision. Dkt. 51 at CP Appendix 405. Jared was

also included in the email and was instructed by his boss to come up with a plan before Sexton's "thoughts are spread to everyone". *Id.*

**B. CP's Fails to Assert the Correct FRSA Legal Standard Making its Summary Judgment Arguments Moot**

CP incorrectly argues "there is no evidence that CP intentionally retaliated against Sexton because of his alleged protected activities on February 1, 2021." Doc. 50-1 at 15. This is the incorrect legal standard—the Supreme Court is direct on this point: "A whistleblower . . . bears the burden to prove that his protected activity 'was a contributing factor in the unfavorable personnel action alleged in the complaint,' 49 U.S.C. § 42121(b)(2)(B)(i), ***but he is <u>NOT</u> required to make some further showing that his employer acted with '<u>retaliatory intent</u>'.*** *Murray v. UBS Securities LLC*, 601 U.S. ___ slip op. at 14 (2023) emphasis added. Plaintiff is not required to demonstrate retaliatory intent therefore CP's summary judgment motion on this matter is pointless.

The Supreme Court held that the only burden held by a whistleblower is to "prove that his protected activity 'was a contributing factor in the unfavorable personnel action alleged in the complaint…." *Id.* "A contributing factor is any fact, which alone or in combination with other factors tends to affect in any way the outcome of the decisions." *Araujo v. New Jersey Transit Rail Operations, Inc.*, 708 F.3d 152, 158 (3rd Cir. 2013) quoting *Ameristar Airway, Inc. v. Admin. Rev. Bd.*, 650 F.3d 562, 562 (5th Cir. 2011; quoting *Allen v. Admin. Rev. Bd.*, 514 F.3d 468, 476 n.3 (11th Cir. 2008). "The contributing factor element of a complaint may be established by direct evidence or indirectly by circumstantial evidence'" *Ray v. Union Pacific RR. Co.*, 971 F. Supp. 2d 869, 884 (S.D. Iowa 2013) quoting *DeFrancesco v. Union R.R. Co.*, ARB no. 10-114, ALJ No. 2009-FRS-00009, at 5 (ARB Feb. 29, 2012).

Despite CP's failure to even proffer the correct legal standard, Plaintiff must respond to CP's misrepresentations of the record and will demonstrate that Plaintiff can and does in fact

demonstrate the contributing factor element of his claim below.

1. *Jared Had Knowledge of Sexton's Protected Activities the Very Morning He Decided to Conduct One of His Only 13 Tests Conducted that Entire Year.*

CP argues there is no connection between Sexton's Protected activities on February 1, 2021, and Jared's efficiency test that very same day—this is wrong. CP starts by stating there is no evidence that Jared knew of Sexton's alleged report of snow conditions, his refusal to operate the locomotive without first cutting the tracks or the fact that Sexton cut the tracks in Marquette at the time Jared administered the e-test in Nahant later that same day. Dkt. 50-1 at 15. First, the circumstantial evidence that the test occurred literally the exact same shift itself ***is evidence*** probative on the contributing factor element in the form of temporal proximity. Nevertheless, direct evidence exists as to Jared's knowledge: Sexton's delay created a flurry of emails that Jared was included on. McKelvey was asked to "send a write up of the 474 at Marquette to the DL Senior and East Director". Dkt. 54-1 at Appendix B - 2. McKelvey then sent an email to several managers, including Jared that stated, "The work for 474 was to lift 1 engine and s/o 24 cars behind 49 cars and 1 DP unit." *Id.* at 8. But instead, the crew took the time to cut the tracks: "474 cut off light power and went down to the South siding switch." *Id.* McKelvey notes, "I again instructed them to go lift the engine off the south wye." *Id.* Instead, "474 then ran light power 2 units down the south siding switch and ran light power over boatels crossing and down the siding track where their s/o would be made." *Id.* Jared knew that the 474's crew did not receive an instruction to cut the tracks based on this email and Jared knew that the 474's crew did cut the tracks. McKelvey also completed an Incident Report sent to Jared which stated: "they also had to cut the Boatels crossing and run down MQS light power before they could shove the cars into it." *Id.* at 11. The incident report clearly lists the train as 474 all throughout and lists the engineer as "SEXTON". *Id.* Jared's response to McKelvey was, "Call me when you have a min." Dkt 53-2 at para 51. Shortly

after, McKelvey did in fact call Jared. *Id.* at para. 53.

All of this evidence demonstrates Jared's knowledge and at an absolute minimum presents a genuine issue of material fact for a jury—defeating summary judgment.

*2. Abundant Evidence Exists Connecting Sexton's Protected Activities to Ross's Excessively Harsh Disciplinary Decision.*

CP then goes to argue there is no connection between Sexton's protected activities on February 1, 2021, and Ross's discipline decision. CP states, "First, there is no evidence that Ross reacted negatively when he learned of the February 1, 2021, discussion between Sexton and McKelvey related to snow." Doc. 50-1 at 17. Then, "he was clear with Sexton and McKelvey that Sexton was right and McKelvey was wrong." *Id.* Nevertheless, despite Ross's knowledge that McKelvey instructed Sexton to violate a safety rule that could have led to a derailment, Ross assessed no discipline against McKelvey, but took the opportunity to assess against Sexton the most severe discipline the record shows he ever has against any employee for their first major rule violation—let alone finding it a rule violation in the first place. Dkt. 53-2 at 26 and 150-159. The temporal proximity and inconsistent application of policies here provide more than sufficient evidence that Sexton's protected activities on February 1, 2021, contributed to Ross's harsh disciplinary decision. At a minimum, sufficient evidence to defeat CP's summary judgment.

*3. Pretext, Shifting Explanations, Antagonism, and Hostility Aplenty*

Lastly, CP argues that "Sexton has no evidence of pretext, shifting explanations, antagonism, or hostility toward his protected activities." Doc. 50-1 at 18. Again, a simple review of the record demonstrates the complete lack of care put into this argument by CP. First, there is no overcoming McKelvey's desire to "hold him accountable for delaying the train". Doc. 54-1 Appendix B at 5. Further, McKelvey wrote "i cant make him move any faster. im here doing everything i can." *Id.* at 6. Later McKelvey wrote "youre missing all the fun up here with sexton

on a 474 putting on a show here. for like 4 hours in front of everyone". *Id.* at 13-14. After Sexton's note to Senior Vice President of Operations, Tracy Miller, Miller was more concerned about the perception of "creating a stage/platform for their feelings". *Id.* at 16. Miller did not address Sexton's safety reports, but rather attacked Jared for spending too much time on his marriage. *Id.* Then, there is the pretextual nature of the discipline in that Ross could not have more clearly emphasized that making money is the priority: "The ***first thing*** you do in a business is you provide a service. If you're not providing a service, I don't care what business you're in, you're not going to deliver a product that people want. Therefore, you're not making money. ***So you have to provide a service. That's the most important thing you do.***" Doc. 53-2 at para. 221. Safety surely comes at least second, right? No, instead: "The ***second thing*** is you've got to control your costs because if you don't control your costs you're going to go out of business. You can provide a service and be the best service in the world and you'll end up out of business." *Id.*

The law is abundantly clear that circumstantial evidence is sufficient to not only overcome summary judgment but to meet Plaintiff's contributing factor claim. *Ray v. Union Pacific RR. CO.*, at 884. Here, Sexton has demonstrated sufficient circumstantial evidence to defeat CP's summary judgment motion.

### C. Sexton's Report that Jared Interrupted DePover Who was Performing a Safety Sensitive Task is a Protected Activity

CP simply argues that Sexton's report that Jared interrupted DePover is not a report because "[a]ll Sexton did was answer a question posed to him at the investigation hearing by his union representative." Doc. 50-1 at 20. CP does not contest here that Jared's actions were not safe nor that a report that Jared took unsafe actions is not a protected activity—CP's only contention is Sexton's answer that "He created a unsafe act" is not a protected activity because it was in response to a question. CP cites no case law supporting such a contention. Under CP's newly conjured

12

interpretation of the FRSA, anytime an employee answers in the affirmative that there was a safety violation—such affirmation cannot be a protected activity. Such a formulation has no justification under the text of the statute itself, which is incredibly straightforward: "reporting, in good faith, a hazardous safety or security condition." 49 U.S.C. 20109(b)(1)(A).

Regardless of CP's unsupported formulation of the FRSA, it **<u>COMPLETELY</u>**

**<u>MISREPRESENTS THE RECORD.</u>** Sexton stated much more than just "the comment" in response to Mr. Rainwater's question as described by CP. Instead, Mr. Sexton also reported: "Mr. Jared is the one who violated the - - the shoving movement because he engaged in a conversation with Mr. DePover while the cars were moving into a track. That is a – that – he created an unsafe act on that." Doc. 51 at CP Appendix – 172. And "General Manager Jared actually created an unsafe act by talking to Mr. DePover as the cars were – were – were being shoved – past him." *Id.* at CP Appendix 171. Sexton elaborated, "With a – with a – a fellow employee coming up behind the Conductor, whoever it is, on the ground, and all – he didn't even know he was there, basically, kind of caught him off guard." *Id.* "He coulda startled him. He coulda jumped forward. Anything could've happened." *Id.* at 172.

Sexton's report was much more than what CP's says it was. ("All Sexton did was answer a question posed to him at the investigation hearing by his union representative." Doc. 50-1 at 20.). CP fails to indicate how Sexton's **<u>full</u>** report is not a protected activity under the statute and therefore Sexton defeats summary judgment on this matter.

### D. CP's So-Called "E-Test", Charge Letter, and Investigation Hearing Constitute Protected Activities Under the Circumstances

CP concludes by positing that Jared's E-test, the investigation charge letter, and disciplinary hearing are not protected activities. CP notes that the Eighth Circuit has not defined a test for whether a challenged act is an adverse action, however, the Administrative Review Board relies

on the Supreme Court in determining what constitutes an adverse action:

> In considering whether an action is adverse, the [Administrative Review] Board has referenced the United States Supreme Court's decision in *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006), a case decided under Title VII of the Civil Rights Act of 1964. In describing the injury or harm alleged as retaliation, the Court held that: 'a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.' *Id.* at 68 (internal quotations omitted).

*Thorstenson v. BNSF Ry. Co.*, ARB Case Nos. 2018-0059, 2018-0060 (November 25, 2019). The case relied on by CP also relies on this standard. *See Brisbois v. Soo Line R.R. Co.*, 124 F.Supp 3d 891, 902 (D. Minn. 2015).

CP only points to *Brisbois* arguing that "the District of Minnesota rejected the position Sexton takes here, that the accusation of a rule violation is an adverse action stating that such a holding would 'stretch the FRSA so far.'"*Id.* at 903. However, the status of an action as only an "accusation" alone does not preclude it from being an adverse action. As noted by the Administrative Review Board, "We agree that any alleged adverse action must be considered in context, including internal investigations and hearing which may result in the imposition of discipline." *Thorstenson v. BNSF Ry. Co.*, ARB Case Nos. 2018-0059, 2018-0060 (November 25, 2019) citing *Petronio v. Nat'l R.R. Pas. Corp.*, 2019 WL 4857579 (SDNY 2019). Here, Sexton's claims involve more than a simple accusation, here, Jared assessed an unsafe and unsanctioned test, then CP took the formal action of charging Sexton with an alleged rule violation and in the investigation, Jared asserted that Sexton violated the rule. Dkt. 53-2 at paras. 104-105, 124, and 168. Then ultimately, CP disciplined Sexton with a 20-day unpaid suspension. *Id.* at paras. 145. In contrast, the *Brisbois* court noted that "Brisbois was not actually disciplined in connection with these alleged violations." *Brisbois* at 901. The court notes that claiming the accusation of a rule violation alone "is by no means a frivolous argument, but ultimately the Court disagrees." *Id.*at 901-902. The Court provides that to be an adverse action, the action "must be 'material, not trivial'

14

and 'the retaliation must produce some injury or harm'" *Id.* at 902 quoting *AuBuchon v. Geithner*, 743 F.3d 638, 644 (D. Minn 2015).

Here, Sexton has demonstrated that the test itself placed him and DePover in a dangerous situation. Dkt. 53-2 at paras. 120-124. During the investigation hearing itself, Sexton stated, "I'm sorry man" and "I can't take this." *Id.* 223. Sexton's union representative had to tell Sexton "It's okay" and "Relax". *Id.* 224. Later during the investigation, Sexton stated, "I'm a little wound up here…" *Id.* 225. Sexton clearly was expressing discomfort regarding the investigation itself. Ultimately Sexton's testimony described "the embarrassment that all this is - - that it's caused against me and my family, my safety records and not knowing whether I'm going to have a job every day at the end of the day I go to work." *Id.* 222. Sexton has demonstrated an actual material injury due to the unsafe efficiency test and disciplinary process itself.

At a minimum, Sexton has demonstrated a genuine issue of material fact as to whether the imposition of Jared's test and CP's disciplinary process would dissuade any reasonable employee from engaging in protected conduct, thus defeating CP's motion for summary judgment on this issue.

## **CONCLUSION**

CP's incorrect assertion of the FRSA's legal burdens, selective retelling of the record, and unsupported representations that "no evidence" exists speaks for itself. CP imposed excessive discipline against Sexton that it had not imposed against any other similarly situated employee in the record. The record establishes that Sexton's management "tries to avoid all delays period" (Dkt. 53-2 at para. 206) and "the first thing you do in a business is provide a service[]" "That's the most important thing you." *Id.* at para 221. CP's policy objectives are explicit: "to tie a part of the employee's compensation directly to CP's results" (*Id.* at para. 196), and objectives are weighted

according to their importance, which in 2021 corporate objectives placed Operating Ratio, Operating Income, and Trip Plan Compliance at 80% where CP only placed 10% on management focus on Train Accident Frequency. *Id.* at para. 203. For these reasons, Sexton respectfully requests that the Court deny CP's motion for summary judgment.

August 26, 2024                    Respectfully Submitted,
                                   YAEGER & JUNGBAUER BARRISTERS, PLC

                                   By: */s/ Cyle Cramer*
                                   John D. Magnuson, *pro hac vice.*
                                   Cyle A. Cramer, *pro hac vice.*
                                   4601 Weston Woods Way
                                   Saint Paul, MN 55127
                                   Telephone: (651) 288-9500
                                   jmagnuson@yjblaw.com
                                   ccramer@yjblaw.com

                                   and

                                   MEGAN R. MERRITT AT0010635
                                        for
                                   SHUTTLEWORTH & INGERSOLL, P.L.C.
                                   115 3rd Street SE, Suite 500
                                   P.O. Box 2107
                                   Cedar Rapids, IA 52406-2107
                                   PHONE: (319) 365-9461
                                   FAX: (319) 365-8443
                                   E-MAIL: mrm@shuttleworthlaw.com

                                   *Attorneys for Plaintiff John Sexton*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF IOWA**
**EASTERN DIVISION**

| | |
|---|---|
| John Sexton, | No. 3:23-cv-00031-HCA |
| Plaintiff, | |
| v. | |
| Dakota, Minnesota & Eastern Railroad Corporation d/b/a Canadian Pacific, a Delaware Corporation, | **CERTIFICATE OF SERVICE** |
| Defendants. | |

### Certificate Of Service

I hereby certify that on August 26, 2024, I electronically filed the foregoing document and attachments with the Clerk of the Court using the CM/ECF system that will send notification of such filing to all parties or counsel of record to be served by electronic means.


DATED this 26th day of August 2024, Saint Paul, Minnesota


Respectfully Submitted,

YAEGER & JUNGBAUER BARRISTERS, PLC

By: */s/ Cyle Cramer*
John D. Magnuson, *pro hac vice.*
Cyle A. Cramer, *pro hac vice.*
4601 Weston Woods Way
Saint Paul, MN 55127
Telephone: (651) 288-9500
jmagnuson@yjblaw.com
ccramer@yjblaw.com

and

MEGAN R. MERRITT AT0010635
for

17

SHUTTLEWORTH & INGERSOLL, P.L.C.
115 3rd Street SE, Suite 500
P.O. Box 2107
Cedar Rapids, IA 52406-2107
PHONE: (319) 365-9461
FAX: (319) 365-8443
E-MAIL: mrm@shuttleworthlaw.com

*Attorneys for Plaintiff John Sexton*