## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA
## EASTERN DIVISION

| | |
|---|---|
| John Sexton, <br><br>            Plaintiff, <br><br> v. <br><br> Dakota, Minnesota & Eastern Railroad Corporation d/b/a Canadian Pacific, a Delaware Corporation, <br><br>            Defendants. | No. 3:23-cv-00031-RGE-HCA <br><br><br> **PLAINTIFF'S STATEMENT OF DISPUTED FACTS** |

Plaintiff John Sexton by and through his attorneys and pursuant to Federal Rules of Civil Procedure 56 and Local Rule 56(a)(3), submits the following Statement of Disputed Facts in opposition to Defendant Dakota, Minnesota, & Eastern Railroad Corporation d/b/a Canadian Pacific's ("CP") Motion for Summary Judgement in this matter. The following is a verbatim copy of Defendant Dakota, Minnesota, & Eastern Railroad Corporation d/b/a Canadian Pacific's Statement of Material Facts, filed as Dkt. 50-2, adding Plaintiff's notation as to whether the facts are undisputed or disputed and providing citations where necessary to oppose each fact:

**I.    PARTIES**

1.    Defendant CP is a Class I railroad that provides freight rail transportation throughout North America, including through its controlled affiliate Dakota, Minnesota & Eastern Railroad ("DM&E").

Support:    **Appendix p. 419,** Jared Decl. ¶ 2.

**PLAINTIFF RESPONSE:** <u>Admit.</u>

      2.        CP is largely unionized, with many non-management employees represented by various labor unions with which CP has collective bargaining agreements ("CBAs") that govern the terms and conditions of employment for unionized employees.

        <u>Support:</u>        **Appendix p. 419**, Jared Decl. ¶ 2.

**PLAINTIFF RESPONSE:** <u>Admit.</u>

      3.        Plaintiff John Sexton was a CP employee at all times material to this action—and remains a CP employee to this day.

        <u>Support:</u>        **Appendix pp. 3–4,** Sexton Dep. 13:2–8, 13:25–14:2.

**PLAINTIFF RESPONSE:** <u>Admit.</u>

      4.        Sexton is a member of the Brotherhood of Locomotive Engineers and Trainmen (the "Union"). The terms and conditions of Sexton's employment with CP are governed by a CBA that, among other things, provides for an investigation procedure that must be followed before a Union member, such as Sexton, may be disciplined or dismissed.

        <u>Support:</u>        **Appendix pp. 5–6**, Sexton Dep. 20:12–24: 1,; **Appendix pp. 44–48,** Sexton Dep. Ex. 1 at CP_00253–57; **Appendix p. 426**, Dittrich-Bigley Decl. ¶ 5.

**PLAINTIFF RESPONSE:** <u>Admit.</u>

**II.      CP OPERATES IN COMPLIANCE WITH FEDERAL SAFETY REQUIREMENTS AND STATE AND FEDERAL LAWS**

5.      The operations of CP's railroads are governed by numerous safety rules, regulations, orders, and directives, including the General Code of Operating Rules ("GCOR"), which is a set of operating rules for numerous Class I, Class II, and Class III railroads in the United States intended to enhance railroad safety.

> Support:      **Appendix p. 7**, Sexton Dep. 26:7–27:4; **Appendix pp. 49–58**, Sexton Dep. Ex. 2 at CP_00283–292; **Appendix p. 422**, McInnis Decl. ¶ 3.

**Plaintiff Response: Admit.**

6.      All CP operating employees, including Sexton, must comply with the GCOR.

> Support:      **Appendix p. 7**, Sexton Dep. 26:15–27:10; **Appendix p. 422**, McInnis Decl. ¶ 4.

1.  **PLAINTIFF RESPONSE: Admit** to the extent compliance is expected, however, the term "must" does not sufficiently describe CP's application of rules enforcement. Specifically, the only evidence in the record is discipline for unionized employees. CP's discipline policy is only applicable to unionized employees so whether management or other non-unionized employees are disciplined to the same severity, or at all, for violation of GCOR rules is not made evident in the record. Dkt. 50-3, at CP Appendix – 62. Additionally, compliance to the GCOR is expected not only of "operating employees" but "all employees regardless of gender whose duties in in any way affected [by operations of the railroads]." *Id.* at CP Appendix – 49.

7.    GCOR Rule 5.3.7—Radio Response provides: "When radio communication is used to make movements, crew members must respond to specific instructions given for each movement. Radio communications for shoving movements must specify the direction and distance and must be acknowledged when distance specified is more than four cars." The Rule further provides: **"Movement must stop within half the distance specified unless additional instructions are received."**

Support:    **Appendix p. 7**, Sexton Dep. 27:11–28:10; **Appendix p. 59** Sexton Dep. Ex. 2 at CP_00319 (emphasis in original).

**PLAINTIFF RESPONSE: <u>Admit.</u>**

8.    Effective November 1, 2018, CP's Hybrid Discipline & Accountability Guidelines amended CP's prior discipline and accountability process. The Hybrid Discipline & Accountability Guidelines provide a non-exclusive list of examples of "Major – Life Threatening & Conduct Unbecoming Offences" and state that "non–compliance may warrant immediate removal from service pending a formal investigation and may warrant suspension or in certain cases, dismissal." Such examples include: "Shoving – Failure to provide point protection consistent with the rule." This version of the Hybrid Discipline & Accountability Guidelines applied to all unionized CP employees, including Sexton, and remained in effect at all times material to this action.

Support:    **Appendix pp. 9–10**, Sexton Dep. 37:2–21, 38:1–15, 39:5– 11, 39:18–20; **Appendix p. 65**, Sexton Dep. Ex. 3 CP_00443

2. **PLAINTIFF RESPONSE: <u>Admit.</u>**

9.    The Hybrid Discipline & Accountability Guidelines provides guidelines for assigning discipline based on the circumstances. For Major – Life Threatening & Conduct

Unbecoming Offences, the Guidelines provide for: "Depending on the offence the issuance of

a minimum of a 20-calendar day suspension up to and including a 45-day calendar suspension

and/or dismissal."

        Support:        **Appendix p. 10**, Sexton Dep. 38:16–39:4; **Appendix p. 66**,

Sexton Dep. Ex. 3 at CP_00444; **Appendix p. 340**, Dittrich Bigley Dep. 7:17–8:20.

**PLAINTIFF RESPONSE: <u>Admit</u>** to the extent that the Hybrid Discipline & Accountability

Guidelines are "guidelines" which under CP's Statement of Material Facts, "guidelines" "are not

rules and do not set out mandatory procedures…." Dkt. 50-2 at 8, para. 28. Additionally, the

Major – Life Threatening & Conduct Unbecoming Offences provides for discretionary

suspension: "The following <u>examples</u> are for illustrative purposes and non-compliance **<u>may</u>**

warrant immediate removal from service pending formal investigation and **<u>may</u>** warrant

suspension or in certain cases, dismissal." Dkt. 50-3 at CP Appendix 65. Emphasis added.

        10.        CP prohibits retaliation against an individual who reports a hazardous safety

condition, as such reports are protected by the Federal Railroad Safety Act ("FRSA") and CP

policy.

        Support:        **Appendix p. 10**, Sexton Dep. 40:12–41:12; **Appendix p. 73**,

Sexton Dep. Ex. 4 at CP_00451; **Appendix pp. 381, 383**, Ross Dep. 97:24–25,

113:5–13; **Appendix pp. 337–338**, Hanson Dep. Ex. 64 at CP_06327–28.

**PLAINTIFF RESPONSE: <u>Deny.</u>** Both policy 1819 and 1300 cited by CP state nothing about

prohibiting retaliation against reporting a "hazardous safety condition". Policy 1819 only applies

to "reporting an accident, incident, injury or illness…." Dkt. 50-3 at CP Appendix 73. Policy

1300 only applies to "race, color, religion, national origin, sex, pregnancy, marital status,

disability, age, status with regard to public assistance or sexual orientation or identity." *Id.* at CP

Appendix 331. Additionally, there is no evidence to any enforcement mechanism company-wide for discipline that supports CP's claim that such discrimination in these policies is "prohibited." Prohibition inherently requires some type of enforcement mechanism.

### III.    SEXTON IS A CERTIFIED LOCOMOTIVE ENGINEER

11.    Sexton has been an employee of CP since March 1999.

Support:         **Appendix p. 3**, Sexton Dep. 13:2–8

**PLAINTIFF RESPONSE: <u>Admit.</u>**

12.    Sexton is a locomotive engineer. His job is to operate locomotives safely pursuant to CP's operational rules and in compliance with the GCOR and other applicable regulations, including when re-locating and re-positioning train cars within railyards.

Support:         **Appendix pp. 3–4, 7**, Sexton Dep. 13:25–14:14; 27:5–10.

**PLAINTIFF RESPONSE: <u>Admit.</u>**

13.    Sexton receives annual training and education on CP's operational rules and procedures in order to maintain his locomotive engineer certification.

Support:         **Appendix p. 4**, Sexton Dep. 15:8–21

**PLAINTIFF RESPONSE: <u>Admit.</u>**

14.    When working in a rail yard, train crews may perform "shove movements," in which a locomotive is used to push train cars into position on open track where the cars may then stay until being connected to a train for transport to their next destination.

Support:         **Appendix p. 422**, McInnis Decl. ¶ 5; see **Appendix p. 60**, Sexton Dep. Ex. 2 at CP_00340 (GCOR Rule 6.5 Shoving Movements).

**PLAINTIFF RESPONSE: <u>Admit.</u>**

15.     When performing a shove, engineers operate the locomotive from the trailing end of the movement, and so rely on one specifically assigned employee protecting the shove to communicate about what is happening at the leading end of the movement. The engineer performing a shove movement is required to listen and follow the directions of the one employee protecting the movement. The engineer is not to consider any other radio messages from other employees who are not specifically attached to the movement.

Support:    **Appendix pp. 423, 424**, McInnis Decl. ¶¶ 6, 12; **Appendix p. 7**, Sexton Dep. 29:1–19

**PLAINTIFF RESPONSE: Deny.** Before shoving cars, a crew may ask somebody on the far end of the shoving movement to attach to the crew to communicate with the engineer to protect the shove. See Sexton Declaration at para. 2. Before Sexton's February 1, 2021, shoving movement he radioed Anthony Cruciani to assure that the track was clear before his shoving movement began. See Sexton Declaration at para. 3.

16.     When performing a shove movement, the employee protecting the movement communicates with the engineer by radio to inform the engineer about the distance remaining before the train must come to a complete stop. The employee protecting the movement typically communicates the distance in "car counts"—the number of car lengths remaining until the train must be stopped.

Support:    **Appendix p. 423**, McInnis Decl. ¶ 7; **Appendix p. 7**, Sexton Dep. 28:11–29:21.

**PLAINTIFF RESPONSE: Deny**. GCOR 5.3.7 states "Movement must stop within half the distance specified unless additional instructions are received." Dkt. 50-3 at CP Appendix 59. Therefore, the employee protecting the movement provides communications, however, the "car

count" that the employee is providing is _**not**_ "the number of car lengths remaining until the train must be stopped."

        17.      The applicable GCOR Rule 5.3.7, mandates that engineers must be prepared to stop a shove movement within half the number of car lengths last called over the radio, if they receive no further instructions. In other words, if the engineer receives no further communication, he must actually stop the train, and the train must be at a full stop, within one-half of the number of car lengths that was last transmitted. GCOR 5.3.7's specific language is:

      5.3.7    Radio Response

> When radio communication is used to make movements, crew members must respond to specific instructions given for each movement. Radio communications for shoving movements must specify the direction and distance and must be acknowledged when distance specified is more than four cars. Movement must stop within half the distance specified unless additional instructions are received.

      <u>Support:</u>      **Appendix p. 423**, McInnis Decl. ¶ 8; **Appendix p. 7**, Sexton Dep. 27:21–29:7; **Appendix p. 59**, Sexton Dep. Ex. 2 at CP_00319.

**PLAINTIFF RESPONSE: <u>Deny</u>**. The rule does *not* state "half the number of car lengths last called over the radio" or "one-half of the number of car lengths that was last transmitted." Instead, it states "Movement must stop within half the distance specified unless additional instructions are received." Dkt. 50-3 at CP Appendix 59. The phrases "distance specified" and "additional instructions" are not surplusage and have a distinct meaning—under CP's summary of the rule, instructions of "clear for 40, 15 to a stop" and "15 to a stop, clear for 40" would have entirely different meanings because CP's version of the rule places the importance in the

"number of car lengths that was *__last__* transmitted." So, in the preceding examples, under CP's new summary of the rule, an engineer would have to stop within half the distance of 15 under the first instruction, but half the distance of 40 under the latter instruction. Under the rules, crews are required to have a job briefing prior to the shoving movement where the employee has checked that the "track is clear" and the radio communication is to include when the train "must stop". Dkt. 50-3 at CP Appendix 59 and 274. Thus, the only distinctions made by CP's rules are based on track clearance and stopping the train. The rules state nothing about communicating based on where a cut needs to be made or specify any distinction if the communication includes more than one instruction.

18.     For example, if the last car count communicated is forty (40), the engineer must be prepared to have the train at a full stop within twenty (20) car lengths.

Support:          **Appendix p. 423**, McInnis Decl. ¶ 9; **Appendix p. 8**, Sexton Dep. 33:16–25.

**PLAINTIFF RESPONSE: __Admit,__** specifically to this statement as a hypothetical which does not include any indication whether additional instructions were given or whether any other distance was specified.

19.     If the communications include two car-counts in the same communication, the engineer should operate based on the most restrictive car-count. For example, if the conductor says, "Good for forty (40), fifteen (15) to a stop," the engineer should operate based on the fifteen (15) car count—the more restrictive count.

Support:          **Appendix p. 423**, McInnis Decl. ¶ 10; **Appendix p. 309**, Jared Dep. 150:3–16; **Appendix pp. 244–245**, Johnson Dep. 39:8–25, 40:14–20, 41:6–10.

**PLAINTIFF RESPONSE: <u>Deny.</u>** GCOR 5.3.7 says nothing about the "most restrictive" car count. Dkt. 50-3 at CP Appendix 59. No written rule states the terms "most restrictive". GCOR 5.3.7 does not specify a crew must act any differently in a situation in which there is communication that includes more than one instruction. Instead, under the rules, crews are required to have a job briefing prior to the shoving movement where the employee has checked that the "track is clear" and the radio communication is to include when the train "must stop". Dkt. 50-3 at CP Appendix 59 and 274. The only distinctions made by CP's rules are based on track clearance and stopping the train.

20.     If the car-count is ambiguous or the engineer is confused, the engineer should immediately stop the shove movement.

Support:         **Appendix p. 423**, McInnis Decl. ¶ 11.

**PLAINTIFF RESPONSE: <u>Admit</u>.**

IV.     IN FEBUARY 2021, SEXTON VIOLATED CP RULES AND WAS DISCIPLINED PURSUANT TO CP POLICY AS A RESULT

1.     **Sexton Violated CP's Operating Rules on February 1, 2021.**

21.     On February 1, 2021, Sexton was assigned as the engineer operating the 474-31 train from Marquette, Iowa to the Nahant rail yard in Davenport, Iowa. Justin DePover was assigned as the conductor operating the 474-31 with Sexton that day.

Support:         **Appendix pp. 11–12**, Sexton Dep. 43:22–44:21, 46:11–15.

**PLAINTIFF RESPONSE: <u>Admit.</u>**

22.     On February 1, 2021, Sexton performed a shove movement in the Nahant rail yard.

Support:         **Appendix p. 20**, Sexton Dep. 94:21–96:21.

**PLAINTIFF RESPONSE: <u>Admit</u>**.

23.     The last communication Sexton received from DePover, the conductor, was "good for forty (40), fifteen (15) cars to a stop."

> Support:        **Appendix pp. 24–25**, Sexton Dep. 121:19–122:6.

**PLAINTIFF RESPONSE: <u>Deny</u>** as to "good for forty (40), fifteen (15) cars to stop" being an exact quote of what Mr. DePover communicated as the last instruction. Plaintiff agrees that the last instructions included a count of 15 to where the crew needed to make a cut and that the track was clear for 40. However, CP's citation is to Mr. Sexton's deposition where he read from the disciplinary transcript—the disciplinary transcript also shows that Mr. DePover stated that his last instructions were "15 more to a stop, still clear for 40". Dkt. 50-3 at CP Appendix 131.

24.     Because <u>the last instruction was "fifteen (15) to a stop,"</u> Sexton was required by GCOR 5.3.7 to be prepared to have the train stopped within seven and one-half car lengths, if he heard no other instructions.

> Support:        **Appendix pp. 7, 26**, Sexton Dep. 28:5–18; 126:19–23;
> **Appendix pp. 308–309, 312**, Jared Dep. 148:16–149:3, 149:23–150:2, 166:2–167:24; **Appendix pp. 244–245**, Johnson Dep. 37:13–38:13, 39:3–25, 40:22–41:5;
> **Appendix p.59**, Sexton Dep. Ex. 2 at CP_00319.

**PLAINTIFF RESPONSE: <u>Deny.</u>** This suggested statement of fact is contradictory to CP's prior statement (para. 23) in that now CP is saying the last instruction given was "fifteen (15) to a stop" despite above CP states that the last communication was "good for forty (40), fifteen (15) to a stop." Nowhere in the record is there a distinction made between a "communication" and an "instruction"—the GCOR rule itself describes the operative directive as the "distance specified".

Dkt. 50-3 at CP Appendix 59. The "last instruction" was not "fifteen to a stop" instead, the "distance specified" was "you're good for 50 cars" and that they only needed to shove in 27 cars. Dkt. 53-4 at 22:10-16. Then the next distance specified was "15 cars remaining", which was what their job task called for then the crew would separate those cars for storage on that siding track and "clear for 40" as the distance in which the crew could safely operate the locomotive. Dkt. 51 at CP Appendix – 128.

25.     Sexton shoved eleven cars before stopping and so violated GCOR 5.3.7.

Support:        **Appendix pp. 25–26**, Sexton Dep. 122:24–123:5; 126:19–23; **Appendix pp. 308–309, 312**, Jared Dep. 148:16–149:3, 149:23–150:2, 166:2–167:24; **Appendix p. 384**, Ross Dep. 119:4–14.

**PLAINTIFF RESPONSE: Admit** to the extent Sexton shoved eleven cars before coming to a stop and still had four more cars to shove for his assigned job task—in other words, Sexton was expected to have shoved four more cars to complete his job task. Dkt. 50-3 at CP Appendix at 128. **Deny** that Sexton violated GCOR 5.3.7. because the track was clear for 74 cars, Mr. DePover had last specified that the track was "clear for 40" cars—half the distance of 40 is 20 and 11 is within 20. Dkt. 53-4 at 100:18-19 and Dkt. 51 at CP Appendix – 128. An instruction of "15 more to a stop, still clear for 40" means that "still clear for 40" is an additional instruction. Dkt. 53-2 at para. 189. The rule states "Movement must stop within half the distance specified **unless additional instructions are received".** Dkt. 50-3 at CP Appendix – 59. Emphasis added. If "additional instructions are received," then the engineer has the right to rely on those instructions. Dkt. 53-2 at para. 190.

26.     Sexton's violation was observed by CP Rail General Manager Operations – US West Division, Tom Jared, who was performing what CP refers to as an "efficiency test"

or "etest" in order to determine if Sexton would comply with GCOR 5.3.7 when performing the shove movement.

> Support:          **Appendix p. 21**, Sexton Dep. 104:21–105:17; **Appendix pp. 290–291**, Jared Dep. 21:8–13, 24:21–25:10; **Appendix p. 420**, Jared Decl. ¶ 8; Appendix p. 424, McInnis Decl. ¶ 13.

**PLAINTIFF RESPONSE: Deny.** Mr. Jared stated in the disciplinary investigation that he witnessed Sexton shove 12 car lengths after Mr. DePover's 50 car count, then the only instruction he heard next was 15. Dkt. 53-4 at 225. Mr. Jared testified that there was time for Sexton and Mr. DePover to communicate between the time he left his truck and by the time he got up to Mr. DePover. *Id.* at 105. Mr. DePover had stated in the investigation that it is his assumption that Mr. Jared did not hear the clear for 40 instruction because Mr. Jared did not have a radio on him. *Id.* at 148. Mr. Jared testified that he does not recall hearing Mr. DePover reference 40 cars at all. Dkt. 50-3 at CP Appendix 308. Mr. DePover stated in the investigation he specified that the track "was clear for 40". *Id.* at CP Appendix 128. Mr. Sexton stated that Mr. DePover had updated him "still good for 40, 15, 1-5 to a stop." *Id.* at CP Appendix 143. A jury could conclude that Mr. Jared did not witness a rule violation because Jared did not witness the entire event based on the distance that he had parked away from DePover and that Mr. Jared testified that he cannot hear his radio if he is not near his truck. Dkt. 53-2 at 75.

27.     Jared oversees CP's operations in six states, including Iowa. Jared's responsibilities include ensuring safe operations, managing budgets, utilizing assets, developing people, and working with customers. As an operational leader, it is not uncommon for Jared to administer efficiency tests in the field. In 2021, Jared administered thirteen

efficiency tests. Currently, Jared is required to administer at least twelve efficiency tests per month.

> Support:          **Appendix p. 21**, Sexton Dep. 104:21–105:17; **Appendix pp. 290–290, 302**, Jared Dep. 21:8–13, 24:21–25:10, 109:4–7; **Appendix pp. 419–420**, Jared Decl. ¶¶ 5–7; **Appendix p. 424**, McInnis Decl. ¶ 13.

**PLAINTIFF RESPONSE: Admit** as to Jared oversees CP's operations in six states, including Iowa. **Admit** as to Jared's responsibilities include ensuring safe operations, managing budgets, utilizing assets, developing people, and working with customers. **Deny** that it is "not uncommon for Jared to administer efficiency tests in the field" as Plaintiff denies that 13 tests in a 365-day period is a "common" occurrence. **Admit** to Plaintiff's knowledge, Jared administered thirteen efficiency tests in 2021. **Admit** to Plaintiff's knowledge, in 2024 Jared is required to administer at least twelve efficiency tests per month.

28.    CP's U.S. Manual on Operating Rules in Compliance provides guidelines regarding the administration of efficiency tests, which test compliance with GCOR rules. The guidelines provided in the U.S. Efficiency Test Manual on Operating Rules in Compliance are not rules and do not set out mandatory procedures for administering efficiency tests. The guidelines for testing compliance with GCOR 5.3.7 are provided by several tests within CP's U.S. Efficiency Test Manual, including: Test GRA01 Hand Signals or Signal Disappearance (included in the "Stop" test group), Test GRF02 Shoving or Pushing Movements (included in the "Switches – Derails – Protecting Shoves and Equipment Foul of Adjacent Tracks" test group), and Test GR03 Lieu of Hand Signals (included in the "Railroad Radio" test group)..

> Support:          **Appendix pp. 369–370, 372**, Ross Dep. 52:17–53:1, 62:13–23, 63:17–23; **Appendix pp. 293–295**, Jared Dep. 59:6–60:3, 68:6–69:23;

**Appendix p. 249**, Johnson Dep. 79:12–22; **Appendix pp. 257–271**, Johnson Dep. Ex. 39 at SEXTON 000368–382**; Appendix p. 424**, McInnis Decl. ¶¶ 14, 15.

**PLAINTIFF RESPONSE: <u>Deny</u>** that the U.S. Manual on Operating Rules in Compliance does not set out mandatory procedures. Testimony from CP's corporate representative provides that the U.S. Manual on Operating Rules in Compliance with FRA 217.0 "gives a structured test so the tests are done consistently and safely—the manual outlines the process of how a test **<u>should be done</u>**." Dkt. 53-4 at 183. Emphasis added. Additionally, the test in question GRF02 states: "When conducting this test, actual operating conditions **<u>are to be observed</u>**." Dkt. 54-1 at 33. Emphasis added. There is no mincing this "guideline"—it is mandatory that GRF02 tests "are to be observed." *Id.* Moreover, the Manual states: "Don't set up a situation that can result in an unsafe act or condition"; "Don't conduct a test to entrap an employee"; and "Don't violate a rule in order to set up a test situation". Dkt. 50-3 at CP Appendix 270. Nowhere does the Manual say the preceding rules are "not mandatory" or that the entire Manual is "not mandatory".

29.    [Intentionally left blank]

**PLAINTIFF RESPONSE:** CP left No. 29 blank, requiring no admission or denial.

30.    Jared administered the efficiency test on February 1, 2021 consistent with the guidelines set out in CP's Efficiency Test Manual and CP practices and rules. Specifically, after DePover gave a 15-car count, Jared instructed DePover not to give further instruction to Sexton. In so doing, Jared altered the conditions of the shove movement to test Sexton's compliance with GCOR Rule 5.3.7, which required him to stop within half the distance specified by DePover's last instruction. This type of "set up" test is consistent with the guidelines set out in CP's Efficiency Test Manual and did not result in any violation of federal law or regulations, or CP practices and rules, including GCOR.

Support:        **Appendix pp. 292, 297, 306–309, 312**, Jared Dep. 50:20–

51:4,78:22–80:3, 137:4–20, 139:11–24, 143:18–144:18, 147:3–149:3, 167:13–24;

**Appendix pp. 369–372**, Ross Dep. 52:17–53:1, 53:23–25, 54:11–55:11, 58:1–20,

59:2–60:18, 62:13–23, 63:17–23; **Appendix pp. 274, 274a-c**, Johnson Dep. Ex. 39

at SEXTON 000472; **Appendix p. 420**, Jared Decl. ¶ 8; **Appendix pp. 424-425**,

McInnis Decl. ¶¶ 16–19

**PLAINTIFF RESPONSE: <u>Deny.</u>** Jared's instruction to DePover to stop communicating with

Sexton is **NOT** consistent nor in compliance with GRF02. GRF02 provides no steps that involve

instructing the person protecting a shoving movement to stop communicating nor for the person

who is conducting the test to alter the conditions. Dkt. 50-3 at CP Appendix 274. Jared's instruction

to DePover to stop communicating violated federal law and CP rules: Federal law provides that

point protection requires "giving signals or instructions to control the movement." 49 CFR §

218.99(b)(3)(ii). Jared's instruction resulted in there being no instructions to control the movement.

Dkt. 53-4 at 103. CP rules state that the person protecting the shove is to provide direction and

distance during shoving movements—Jared's instructions resulted in there being no direction and

distance communications during the shoving movement. *Id.*

31.     Consistent with CP practices, Sexton was not aware that Jared was

administering an efficiency test at the time Sexton chose to violate CP's rules by failing to

stop within half the distance specified.

Support:        **Appendix p. 21**, Sexton Dep. 104:21–23; **Appendix pp.

266–267**, Johnson Ex. 39 at SEXTON 000377–78.

**PLAINTIFF RESPONSE: <u>Admit</u>** to the extent Sexton did not contemporaneously know that

Jared had instructed DePover to stop providing instructions. **<u>Deny</u>** that Sexton violated CP rules

because the track was clear for 74 cars, Mr. DePover had last specified that the track was "clear

for 40" cars—half the distance of 40 is 20 and Sexton stopped after 11 cars which is within 20.

Dkt. 53-4 at 100:18-19 and Dkt. 51 at CP Appendix – 128. An instruction of "15 more to a stop,

still clear for 40" means that "still clear for 40" is an additional instruction. Dkt. 53-4. The rule

states "Movement must stop within half the distance specified **unless additional instructions**

**are received".** Dkt. 50-3 at CP Appendix – 59. Emphasis added. If "additional instructions are

received," then the engineer has the right to rely on those instructions. Dkt. 53-4 at 213:23-25.

### B. Sexton Received Discipline for His Rule Violation.

32.    Sexton's failure to stop the train within half of the fifteen car-length

instruction that was called over the radio violated GCOR Rule 5.3.7.

Support:    **Appendix p. 311**, Jared Dep. 162:20–25; **Appendix p._59**,

Sexton Dep. Ex. 2 at CP_00319; **Appendix p. 242**, Johnson Dep. 21:6–14; **Appendix**

**p. 252**, Johnson Dep. Ex. 35 at CP_00982.

**PLAINTIFF RESPONSE: Deny** that Sexton violated CP rules because the track was clear for

74 cars, Mr. DePover had last specified that the track was "clear for 40" cars—half the distance

of 40 is 20 and Sexton stopped after 11 cars which is within 20. Dkt. 53-4 at 100:18-19 and Dkt.

51 at CP Appendix – 128. An instruction of "15 more to a stop, still clear for 40" means that

"still clear for 40" is an additional instruction. Dkt. 53-4. The rule states "Movement must stop

within half the distance specified **unless additional instructions are received".** Dkt. 50-3 at CP

Appendix – 59. Emphasis added. If "additional instructions are received," then the engineer has

the right to rely on those instructions. Dkt. 53-4 at 213:23-25.

33.    As a union employee, Sexton was entitled to a hearing before discipline

could be assigned.

Support:          **Appendix p. 6**, Sexton Dep. 22:5–18; **Appendix p. 47**,

Sexton Dep. Ex. 1 at CP_00256.

**PLAINTIFF RESPONSE: <u>Admit.</u>**

34.     Pursuant to Sexton's collective bargaining agreement, on February 4, 2021,

CP issued Sexton notice of an investigation hearing regarding his alleged violation of GCOR

Rule 5.3.7.

Support:          **Appendix p. 24**, Sexton Dep. 119:8–120:4; **Appendix p. 78**,

Sexton Dep. Ex. 9 at SEXTON 000013.

**PLAINTIFF RESPONSE: <u>Admit</u>** that CP issued Sexton a notice of an investigation hearing

regarding Jared's allegation that Sexton violated GCOR 5.3.7.

35.     CP held a hearing on February 10, 2021 where both CP and Sexton provided

testimony and presented evidence.

Support:          **Appendix p. 24**, Sexton Dep. 119:19–24; **Appendix pp. 79–**

**81**, Sexton Dep. Ex. 10 at CP_000018–20.

**PLAINTIFF RESPONSE: <u>Admit</u>** to the extent Sexton provided some testimony and presented

some evidence but was frequently cut off, instructed he could not testify on certain topics, and was

unable to present all the evidence in the form of witness testimony that his union requested. Dkt.

50-3 at CP Appendix 150-160.

36.     Jared was the company witness. He presented evidence and explained the

circumstances of Sexton's rule violation.

> Support:        **Appendix p. 303**, Jared Dep. 123:14–124:11; **Appendix pp.**
> **79–81, 96–115, 121–125**, Sexton Dep. Ex. 10 at CP_000018–20, CP_000035–54,
> CP_000060–64.

**PLAINTIFF RESPONSE: <u>Admit</u>** as to Jared provided statements in the disciplinary investigation. Jared also made the decision that Sexton violated the rule. Dkt. 53-4 at 139-140. **<u>Deny</u>** that Sexton actually violated a rule. See Plaintiff Response above at para. 32.

37.    Sexton was represented by Local Chairman Joe Rainwater. Rainwater had the opportunity to cross-examine witnesses and present evidence on Sexton's behalf.

> Support:        **Appendix pp. 79–81, 115–125**, Sexton Dep. Ex. 10 at
> CP_000018–19, CP_000054–64.

**PLAINTIFF RESPONSE: <u>Admit</u>** that Sexton was represented by Local Chairman Joe Rainwater. **<u>Deny</u>** that Rainwater was able to cross examine witnesses (plural) as there was only one witness allowed to provide statements (Jared) and Rainwater was prohibited from asking some questions and prohibited from submitting requested evidence. Dkt. 50-3 at CP Appendix 81 and 150-160.

38.    Johnson examined, and Rainwater defended, Sexton at the hearing and Sexton was permitted to explain his version of events. Sexton admitted the first car count he received during the shove move on February 1, 2021 was fifty (50) cars. Sexton stated, the next instruction he received was "still good for 40, 15 – 15 cars to a stop."

> Support:        **Appendix pp. 24–25**, Sexton Dep. 120:5–7, 121:3–122:20;
> **Appendix pp. 140–160, 166, 168–178**, Sexton Dep. Ex. 10 at CP_000079–99,
> CP_000105, CP_000107–117.

19

**PLAINTIFF RESPONSE:** **<u>Admit</u>** that Johnson examined Sexton at the hearing. **<u>Admit</u>** that Rainwater defended Sexton at the hearing. **<u>Deny</u>** that Sexton was permitted to explain his version of events as Sexton's union was prohibited from entering evidence regarding Jared's test and testimony from witnesses. Dkt. 50-3 at CP Appendix 150-160. **<u>Admit</u>** as to Sexton stated that the first car count he received during the shove move on February 1, 2021 was fifty (50) cars." **<u>Admit</u>** that Sexton stated during the disciplinary investigation that he received the instruction "still good for 40, 15 – 15 cars to a stop".

39.    Rainwater also asked Sexton questions. Rainwater asked Sexton if Sexton believed Jared violated GCOR 6.5 when he "interrupted" DePover's car counts to Sexton. Sexton responded: "Absolutely. He created a unsafe act." Johnson stopped the questioning, noting that the purpose of the hearing was to determine if Sexton – not Jared – complied with CP's operating rules as alleged in the specific notice of investigation.

Support:    **Appendix pp. 144–146**, Sexton Dep. Ex. 10 at CP_000083–85 (66:15–68:8); **Appendix p. 418,** Ross Decl. ¶¶ 14–15.

**PLAINTIFF RESPONSE:** **<u>Admit</u>** that Rainwater asked Sexton questions. **<u>Admit</u>** that Rainwater asked Sexton if Sexton believed Jared violated GCOR 6.5 when he "interrupted" DePover's car counts to Sexton. **<u>Admit</u>** that Sexton responded: "Absolutely. He created a unsafe act." **<u>Admit</u>** that Johnson stopped the questioning. **<u>Admit</u>** that Johnson noted he believed the purpose of the hearing was to determine if Sexton – not Jared – complied with CP's operating rules but not that Johnson was accurate that Jared's rule violations did not have relevance to CP's claims against Sexton.

40.     The conductor, DePover, was a witness. In addition to Jared, DePover was the only other employee witness with firsthand knowledge of the shove movement and efficiency test.

Support:      **Appendix pp. 126–139, 160–168**, Sexton Dep. Ex. 10 at CP_000065–78, CP_000099–107; **Appendix p. 252**, Johnson Dep. Ex. 35 at CP_00982.

**PLAINTIFF RESPONSE: Deny.** DePover was not brought to the investigation as a witness. Instead, DePover was listed as a principal and CP sent to Mr. DePover a letter to attend the formal investigation: "The purpose of this formal investigation/hearing is to determine the facts and circumstances and to place your responsibility, if any, in connection with your alleged: Failure to stop within half the specified distance given while shoving into track NA04." Dkt. 50-3 at CP Appendix 78 and 81. **Deny** that Jared and DePover were the only other employees with firsthand knowledge of the shove movement that could have provided statements relevant to the test. Sexton's union requested prior to, and during the investigation two witnesses to attend. Dkt. 53-4 at 132.

41.     The investigation hearing officer was Road Foreman of Engineers and Designated Supervisor Remote Control Operators Mark Johnson. Prior to working as a CP manager, Johnson was a locomotive engineer—a unionized CP employee. Johnson's role at the investigation hearing was to ensure it was conducted in a fair and impartial manner and, afterward, to determine if CP proved that the charge against Sexton was proven.

Support:      **Appendix pp. 240–241**, Johnson Dep. 7:7–25, 11:18–12:6; **Appendix pp. 343–344**, Dittrich-Bigley Dep. 24:23–25:17; **Appendix p. 353**, Dittrich- Bigley Dep. Ex. 66 at CP_06410; **Appendix p. 373**, Ross Dep. 65:12–24.

**PLAINTIFF RESPONSE: <u>Admit,</u>** the investigation hearing officer was Road Foreman of Engineers and Designated Supervisor Remote Control Operators Mark Johnson. **<u>Admit</u>** to Plaintiff's knowledge, that prior to working as a CP manager, Johnson was a locomotive engineer which is a unionized position. **<u>Admit</u>** that Johnson's role at the investigation hearing was to ensure that it was conducted in a fair and impartial manner and, afterward, to determine if CP proved that the charge against Sexton was proven.

42.    Johnson determined that CP proved Sexton violated GCOR Rule 5.3.7. Specifically, Johnson concluded that Sexton was given a 15-car count, received no further communication, and failed to stop the move within 7-car lengths (half of fifteen). Rather, Sexton came to a stop at 11-car lengths.

Support:        **Appendix p. 242**, Johnson Dep. 21:4–14; **Appendix p. 252**, Johnson Dep. Ex. 35 at CP_00982.

**PLAINTIFF RESPONSE: <u>Admit</u>** that Johnson did suggest that Sexton be disciplined stating that he believed Sexton violated GCOR Rule 5.3.7. **<u>Admit</u>** that Johnson concluded that Sexton was given a 15-car count and no other communication including that DePover did not give a 40 car clearance stating that "Mr. Jared would have clearly heard that communication while next to the conductor." Dkt. 51 at CP Appendix 251-252. Deny that Sexton violated the rule. See para. 32 above.

43.    Johnson relied on testimony, documentary evidence, including DePover's contemporaneous signed statement and a train list indicating car lengths, and the video evidence presented at the hearing. Johnson also heard and considered the Union's arguments on behalf of Sexton and explained his reasons why the Union's arguments did not change his decision. Further, Johnson explained why he declined to call to the hearing two employees

whom the Union identified as witnesses. Decisions such as who is and who is not allowed to testify at an investigation hearing are fully within the discretion of the hearing officer.

> Support:        **Appendix pp. 246–248**, Johnson Dep. 48:16–49:2, 52:5–55:21; **Appendix p. 252**, Johnson Dep. Ex. 35 at CP_00982.

**PLAINTIFF RESPONSE: <u>Admit</u>** that Johnson referenced statements, documents, and a video with no audio in his email recommending Sexton be disciplined. **<u>Admit</u>** Johnson heard arguments from Mr. Sexton's union representative and provided statements why he disagreed with the union. **<u>Admit</u>** that Johnson provided his reasoning as to why he prohibited witnessing from the disciplinary investigation. **<u>Admit</u>** that the decision of who and who is not allowed to testify at an investigation hearing are fully withing the discretion of the hearing officer.

44.    Based on the facts and consistent with CP's Hybrid Discipline & Accountability Guidelines, Johnson recommended a 20–day paid suspension, which was within the range of outcomes for a first Major – Life Threatening offense.

> Support:        **Appendix p. 242**, Johnson Dep. 21:25–22:7; **Appendix p. 252**, Johnson Dep. Ex. 35 at CP_00982; **Appendix p. 66,** Sexton Dep. Ex. 3 at CP_00444.

**PLAINTIFF RESPONSE: <u>Admit</u>** as to Johnson recommended a 20-day suspension. **<u>Deny</u>** that Johnson's recommendation was consistent with CP's Hybrid Discipline & Accountability and within the ranges of outcomes for a first Major – Life Threatening offense as a 20-day unpaid suspension is not consistent with CP's application of its discipline policy as there is no evidence that CP has ever disciplined any other employee with a 20-day unpaid suspension for violation of GCOR 5.3.7. See 53-2 at 150-158. All employees with no discipline on their record and absent

protected activity received less discipline than Sexton: 10-day suspension with 5 days deferred (Dkt. 54-1 at 23), 20-day suspension with 15 days deferred (*Id.* at 25), 20-day suspension with 10 days deferred (*Id.*), and three instances where CP determined there was a rule violation but issued no discipline (*Id.* at 25 and 27).

45.    Superintendent Dylan Smith reviewed Johnson's recommendation and proposed a twenty-day suspension, with ten (10) days served and ten (10) days deferred. Smith did not witness the rule violation. However, Smith met with Jared and Sexton following the rule violation. Smith testified that immediately following his rule violation on February 1, 2021, Sexton took responsibility for the decision to shove past half the distance communicated, acknowledging that it was a violation of GCOR 5.3.7. Smith also testified that it was not uncommon for him to recommend ten (10) days served and ten (10) days deferred for a first Major rule violation.

Support:        **Appendix pp. 283–284**, Smith Dep. 22:4–24:9, 25:7–13;

**Appendix p. 251**, Johnson Dep. Ex. 35 at CP_00981.

**PLAINTIFF RESPONSE: <u>Admit</u>** that Superintendent Dylan Smith recommended a twenty-day suspension, with ten (10) days served and ten (10) days deferred. **<u>Admit</u>** that Smith did not witness the alleged rule violation. **<u>Admit</u>** that Smith met with Jared and Sexton following Sexton's shoving movement. **<u>Deny</u>** that Smith testified that Sexton took the responsibility for the decision to shove past half the distance communication acknowledging that it was a violation of GCOR 5.3.7.-- Smith's testimony does not state that Sexton acknowledged that his shoving movement was a violation of GCOR 5.3.7.—Mr. Smith's testimony states, "I don't recall in the hearing. But on the day, he took responsibility for the decision to shove passed that violated the rule." Dkt. 50-3 at CP Appendix 283. It is unclear what Smith is stating what Sexton allegedly took responsibility for—

24

Sexton has never denied stopping after 11 cars from the last communication—and it clearly is Smith's position that Sexton violated the rule, however, Smith is not directly stating here that Sexton himself acknowledged he broke a rule. **Admit** Smith testified that it was not uncommon for him to recommend ten (10) days served and ten (10) days deferred for a first Major rule violation.

46.     Because Jared had administered the efficiency test and was the company witness at the hearing, he was not involved in the discipline decision-making process in any way and did not make any recommendation for discipline. Instead, Jared's supervisor, CP's Vice President Operations Southern Region, Jason Ross, reviewed the hearing investigation and the discipline recommendation and determined that the appropriate discipline was a twenty-day suspension without pay, which was imposed on February 26, 2021. Ross was clear and unwavering at his deposition: He alone decided Sexton's discipline and Jared did not make any recommendation about it.

Support:        **Appendix pp. 296–297**, Jared Dep. 75:13–78:21; **Appendix pp. 368–369, 383–384**, Ross Dep. 48:12–14, 49:15–51:5, 115:5–116:19, 119:4–14; **Appendix p. 26**, Sexton Dep. 127:10–128:1; **Appendix p. 180**, Sexton Dep. Ex. 12, **Appendix pp. 416–417**, Ross Decl. ¶¶ 1–5

**PLAINTIFF RESPONSE: Deny** that Jared was not involved in the decision-making process. Jared not only provided statements of what he allegedly observed, when asked whether Sexton complied with the rule during the disciplinary investigation, Jared said, "Absolutely not." Dkt. 53-2 at para. 104. When asked whether Mr. Sexton violated the rule, Jared said, "Yes, he did." *Id.* at para. 105. CP admitted that the discipline letter was signed by Mr. Jared in his role as general manager. Dkt. 31 at 4, para. 19. Additionally, an administrative employee at CP wrote in an email:

"Joe: per Mr. Jared, please issue discipline for 20 days actual to service on Monday." Dkt. 50-3 at

CP Appendix 251. **Admit** to Plaintiff's knowledge, that Jason Ross reviewed the discipline and

that Ross had some involvement in the recommendation and determination to discipline Sexton

with a twenty-day suspension, however no documentation shows Ross ever made any

determination.

47.        Reacting to Smith's recommendation, Ross testified: "There was no way in

[Hades] I was going to give somebody a 10 day deferred and 10 day served suspension for a

major violation. So he got 20."

Support:        **Appendix pp. 369, 375**, Ross Dep. 49:8–50:14, 51:3–52:4,

73:17–74:2; **Appendix p. 180**, Sexton Dep. Ex. 12; **Appendix pp. 251–253**, Johnson

Dep. Ex. 35.

**PLAINTIFF RESPONSE:    Admit,** that this was what Ross testified too, however, the

evidence does not support this testimony. There is no evidence that CP has ever disciplined any

other employee with a 20-day unpaid suspension for violation of GCOR 5.3.7. All employees

with no discipline on their record and absent protected activity received less discipline than

Sexton: 10-day suspension with 5 days deferred (Dkt. 54-1 at 23), 20-day suspension with 15

days deferred (*Id.* at 25), 20-day suspension with 10 days deferred (*Id.*), and three instances

where CP determined there was a rule violation but issued no discipline (*Id.* at 25 and 27).


48.        Ross also testified: "I quite often – when I look at discipline, I don't even

look who the names are. I get a list. I get a list of the incident, the date of the incident, the date

the hearing took place, review the hearing. If facts are proven, discipline is assessed. That's all

that's taken into consideration." There is no evidence that Ross took into account any activity

protected by Section 20109 when he decided the discipline to assess to Sexton, including the comment Sexton made about Jared during the February 10, 2021 hearing.

Support:        **Appendix p. 376**, Ross Dep. 80:13–25; **Appendix p. 416**, Ross Decl. ¶¶ 4, 13–15.

**PLAINTIFF RESPONSE: <u>Admit</u>** that this is what Ross testified, however, the substance of his testimony would be impossible. According to paragraph 46, Ross reviewed the investigation transcript. Every page of the investigation transcript states "John Sexton" on the top. Dkt. 50-3 at CP Appendix 79-179. Additionally, throughout the transcript, when Sexton is talking, the transcript shows who is talking by labeling the statement with "MR. SEXTON". *Id.* If Ross were to read the transcript, he would have to understand who was saying what statements, thus would have to look at the name of the person who is speaking. **<u>Deny</u>** that there is no evidence that Ross took into account any activity protected by Section 20109 when he allegedly decided the discipline. Sexton has demonstrated ample circumstantial evidence in this case. Circumstantial evidence of temporal proximity exists due to the closeness in time of Sexton's protected activities and the discipline taking against him (See Dkt. 53-1 at 13); inconsistent application of policies exists in that the record does not show any other employee to have received the same severity of discipline as Sexton (*Id.* at 19); pretext exists in the form of CP's monetary motivations based on speed and efficiency (*Id.* at 13-14); and more.

49. On February 26, 2021, CP issued a written notice of discipline to Sexton. The discipline notice included Jared's stamped electronic signature. Jared testified that the administrative office has permission to add his stamped electronic signature to documents that need to go out under the General Manager. Jared did not read the discipline notice before it was issued

to Sexton. Jared was not involved in any way in the discipline decision or preparing the discipline notice.

Support:          **Appendix p. 369**, Ross Dep. 50:15–51:5; **Appendix pp. 296–297**, Jared Dep. 75:13 78:7; **Appendix p. 180**, Sexton Dep. Ex. 12.

**PLAINTIFF RESPONSE: Admit** that on February 26, 2021, CP issued a written notice of discipline to Sexton. **Deny** the discipline notice included Jared's stamped electronic signature—CP's own admission is that Jared signed the discipline notice in his role as general manager. Dkt. 31 at 4, para. 19. **Admit** that Jared testified that the administrative office has permission to add his stamped electronic signature to documents that need to go out under the General Manager. **Deny** that Jared did not read the discipline notice before it was issued to Sexton—again, CP admitted that Jared signed the discipline notice in his role as general manager. *Id.* Additionally, the same morning Sexton's discipline went out, Jared knew exactly when Sexton's discipline was supposed to start, emailing: "He is supposed to start his suspension once he ties up on Monday". Dkt. 53-2 at 148. **Deny** that Jared was not involved in the decision-making process. Jared not only provided statements of what he allegedly observed, when asked whether Sexton complied with the rule during the disciplinary investigation, Jared said, "Absolutely not." Dkt. 53-2 at para. 104. When asked whether Mr. Sexton violated the rule, Jared said, "Yes, he did." *Id.* at para. 105. CP admitted that the discipline letter was signed by Mr. Jared in his role as general manager. Dkt. 31 at 4, para. 19. Additionally, an administrative employee at CP wrote in an email: "Joe: per Mr. Jared, please issue discipline for 20 days actual to service on Monday." Dkt. 50-3 at CP Appendix 251.

50.    On May 20, 2021, Sexton's union appealed the discipline decision to a Public Law Board (part of the National Mediation Board that exists to resolve railroad labor grievances) pursuant to the collective bargaining agreement and applicable federal law.

Support:    **Appendix p. 26**, Sexton Dep. 127:21–129:2; **Appendix pp. 47–48**, Sexton Dep. Ex. 1 at CP_00256–57; **Appendix p. 181**, Sexton Dep. Ex. 13 at SEXTON 000015; and **Appendix pp. 395–397**, Sullivan Decl. Ex. A, CP_00479–481.

**PLAINTIFF RESPONSE: Admit.**

51.    On August 26, 2022, the Public Law Board ruled in the union's favor. The Public Law Board granted Sexton's appeal on procedural grounds based on the incorrect belief that Jared played a role in the imposition of discipline after the investigation hearing. As a result, the February 26, 2021, discipline was removed from Sexton's record and he was compensated for the twenty (20) days of pay that he did not receive during the now-reversed suspension. Sexton made it clear at his deposition that the decision was a "win for John."

Support:    **Appendix p. 26**, Sexton Dep. 127:21–129:2, 129:11–15; **Appendix pp. 181–184**, Sexton Dep. Ex.13 at SEXTON 000015–18.

**PLAINTIFF RESPONSE: Admit** as to on August 26, 2022, the Public Law Board ruled in the union's favor. **Deny** as to the Public Law Board made its decision on procedural grounds based on the incorrect belief that Jared played a role in the imposition of discipline after the investigation hearing because the Public Law Board points to additional factors and states "we find multiple reasons to question the discipline assessment…." Dkt. 53 at CP Appendix – 183. The Public Law Board cited Jared's involvement in the test "in a manner which does raise questions regarding safety" and "that the charges were levied based on his test and observations." *Id.* Therefore, the Public Law Board took direct issue with the fact that the charges were based on Jared's unsafe test. Additionally, the Public Law Board overturned the discipline operating under its factual description that the last communication given by DePover was "good for 40, 15

29

to a stop" and that Sexton did not stop until after 11 cars. *Id.* at CP Appendix – 182. Therefore,

the Public Law Board decision was also based on the substantive facts of the test itself. **Admit** as

to the discipline was removed from Sexton's record and he was compensated for 20 days of pay

he had not received as a result of CP's discipline. **Admit** as to Sexton did testify "The win for

John is what is it, and yes"—as it is undisputed that Sexton did not "lose" the Public Law Board

appeal. Dkt. 50-3 at CP Appendix – 26.

> **2.    CP Consistently Enforces GCOR Rule 5.3.7 Pursuant to the Hybrid Discipline & Accountability Guidelines.**

52.    CP's Hybrid Discipline & Accountability Guidelines provide the process

for issuing discipline consistently and fairly.

> Support:    **Appendix p. 427**, Dittrich-Bigley Decl. ¶ 6; **Appendix p. 340**, Dittrich-Bigley Dep. 7:17–8:2; **Appendix pp. 61–72**, Sexton Dep. Ex. 3.

**PLAINTIFF RESPONSE: Deny** as the Hybrid Discipline & Accountability Guidelines does

not provide a "consistent and fair" process because the evidence demonstrates that CP has issued

everything from no discipline to a 20-day unpaid suspension for the same rule violation alleged

against Sexton. In fact, there is no evidence that CP has ever disciplined any other employee with

a 20-day unpaid suspension for violation of GCOR 5.3.7. All employees with no discipline on

their record and absent protected activity received less discipline than Sexton: 10-day suspension

with 5 days deferred (Dkt. 54-1 at 23), 20-day suspension with 15 days deferred (*Id.* at 25), 20-

day suspension with 10 days deferred (*Id.*), and three instances where CP determined there was a

rule violation but issued no discipline (*Id.* at 25 and 27).

53.    CP's Hybrid Discipline & Accountability Guidelines provides for a

range  of outcomes depending on the severity of the rule violation—for example, Non-Major

Offences  and  Attendance  versus  Major – Life Threatening  &  Conduct  Unbecoming

Offences—the employee's discipline record, and whether the employee immediately reports the incident, takes proper protective actions following the incident, and/or acknowledges responsibility.

Support: **Appendix p. 427**, Dittrich-Bigley Decl. ¶ 7; **Appendix p. 340–341**, Dittrich-Bigley Dep. 8:14–9:20; **Appendix pp. 63–72**, Sexton Dep. Ex. 3 at CP_00441- 450.

**PLAINTIFF RESPONSE: <u>Admit.</u>**

54.     For Major – Life Threatening & Conduct Unbecoming Offences, disciplinary consequences may include suspension ranging from twenty (20) to forty-five (45) days, dismissal, demotion, job restrictions, requalification, training, or a Last Chance Agreement. Depending on the circumstances, suspensions may be deferred in part or in full.

Support: **Appendix pp. 341–342**, Dittrich-Bigley Dep. 11:3–13, 11:21–12:3, 12:18–13:1, 16:1–13; **Appendix p. 66, Sexton Dep. Ex. 3** at CP_00444; **Appendix p. 379**, Ross Dep. 89:11–17.

**PLAINTIFF RESPONSE: <u>Admit</u>** as to the fact that Major – Life Threatening Conduct Unbecoming Offences does state it may include suspension ranging from twenty (20) to forty-five (45) days, dismissal, demotion, job restrictions, requalification, training, or a Last Chance Agreement, however the policy does not provide an example in which anything more than a 20-day unpaid suspension for a first and single Major Infraction—for example the only time the policy dictates anything more than a 20-day suspension is for a 2nd Major Rule Infraction and the only time the policy dictates a dismissal is appropriate is for a 3rd Major Rule Infraction. Therefore, the policy's example for a 1st Major Rule Infraction demonstrates a maximum of a 20-day suspension and evidence of other employees demonstrate that a 1st Major Rule Infraction can result in anything

from the maximum of a 20-day unpaid suspension to only a verbal reprimand which CP does not

consider discipline. Dkt. 50-3 at CP Appendix – 66 and Dkt. 54-1 at 23, 25, and 27.

55.    For example, if an employee takes accountability for his or her rule

violation, CP may recommend a partially deferred suspension. Conversely, if an employee

does not accept responsibility for the charged violation, and the charge is proven, CP

will assess the full suspension.

Support:        **Appendix p. 369**, Ross Dep. 51:9–52:4.

**PLAINTIFF RESPONSE: <u>Deny</u>** as the record demonstrates that engineer T.P. challenged the

alleged rule violation by exercising his rights to a disciplinary investigation and was assessed a

20-day suspension with 10 days deferred, thus not the full suspension. Cramer Dec. para. 3.

56.    If a suspension is deferred in part or in full, the deferred portion of the

suspension will be activated if the employee is culpable for a subsequent offense within the

default period, which is typically six (6) months from the date of assessment. If activated, the

deferred suspension carries the same gravity as a served suspension.

Support:        **Appendix p. 341**, Dittrich-Bigley Dep. 10:5–23, 1 2 :4–

17; **Appendix p. 63**, Sexton Dep. Ex. 3 at CP_00441.

**PLAINTIFF RESPONSE: <u>Admit</u>** as to if a suspension is deferred, the deferred portion of the

suspension will be activated if CP decides the employee is culpable for a subsequent offence in the

default period. **<u>Admit</u>** as to the deferred portion of a discipline does not carry the same gravity as

a served suspension.

57.    Depending on the circumstances, the Company may offer the

employee the opportunity to sign an Acknowledgment of Responsibility ("AOR"), also

known as a "waiver." By signing an AOR, the employee formally acknowledges responsibility for his or her rule violation and waives his or right to a formal investigative hearing and the right to file a grievance or appeal.

Support:    **Appendix p p .  348–349**, Dittrich-Bigley Dep.  44:15–45:3; **Appendix pp. 378–379**, Ross Dep. 88:24–89:7.

**PLAINTIFF RESPONSE: <u>Admit</u>** as to CP may offer a waiver and although it is at the discretion of an employee to be ***accept*** a waiver, the employee has no discretion as to whether they are ***offered*** a waiver. Dkt. 50-3 at CP Appendix 63, para. 4. The Major – Life Threatening and Conduct Unbecoming Offences category under CP's policy does not permit CP to an employee to waive their rights to an investigation. Dkt. 50-3 at CP Appendix 71.

58.    It is CP's policy to document employee discipline.

Support:    **Appendix p. 427**, Dittrich-Bigley Decl. ¶ 8.

**PLAINTIFF RESPONSE: <u>Admit</u>** as to Plaintiff's knowledge.

59.    On July 16, 2019, engineer T.V. violated GCOR Rule 5.3.7, which is a Major – Life Threatening & Conduct Unbecoming Offence. T.V. was issued a twenty-day suspension, with five (5) days served and fifteen (15) days deferred. T.V. acknowledged responsibility for the rule violation and agreed to waive the right to a formal investigation hearing. The assessment of discipline for T.V.'s July 16, 2019 rule violation falls within the range of disciplinary consequences that may be assessed for a Major – Life Threatening & Conduct Unbecoming Offence pursuant to CP's Hybrid Discipline & Accountability Guidelines.

Support:          **Appendix pp. 427-428**, Dittrich-Bigley Decl. ¶ 11;

**Appendix p. 347**, Dittrich-Bigley Dep. 37:4–19; **Appendix p. 361**, Dittrich-Bigley

Dep. Ex. 69.

**PLAINTIFF RESPONSE: <u>Admit</u>** as to T.V. received less discipline than Sexton for the same

alleged rule violation.

60.     On June 7, 2020, engineer M.J. was involved in an incident in which he

failed to stop a shove movement within half the distance given. M.J. was issued verbal

coaching.

Support:          **Appendix p. 347**, Dittrich-Bigley Dep. 38:2–25;

**Appendix pp. 242–243**, Johnson Dep. 24:13–27:5; Appendix p. 255, Johnson Dep.

Ex. 36 at CP_00616.

**PLAINTIFF RESPONSE: <u>Admit</u>** as to engineer M.J. received no discipline, instead, was issued

a verbal coaching which falls outside of CP's stated range for discipline under its CP's Hybrid

Discipline & Accountability Guidelines. CP proffers the statement in paras. 59 and 62 described

herein that the discipline falls within its stated guidelines, therefore it is material to point out that

this issuance of no discipline despite the determination of the same rule violation is *inconsistent*

with its discipline policy.

61.     On July 29, 2020, engineer T.S. was involved in an incident wherein he

failed to stop a shove move in half the distance specified. T.S. was issued verbal coaching.

Support:          Appendix p. 347, Dittrich-Bigley Dep. 39:1–10; **Appendix**

**p. 243,** Johnson Dep. 27:6–11; **Appendix p. 255**, Johnson Dep. Ex. 36 at CP_00616.

**PLAINTIFF RESPONSE: <u>Admit</u>** as to engineer T.S. received no discipline, instead, was issued

a verbal coaching which falls outside of CP's stated range for discipline under its CP's Hybrid

Discipline & Accountability Guidelines. CP proffers the statement in paras. 59 and 62 described herein that the discipline falls within its stated guidelines, therefore it is material to point out that this issuance of no discipline despite the determination of the same rule violation is ***inconsistent*** with its discipline policy.

62.     On January 7, 2021, engineer T.P. violated GCOR Rule 5.3.7, which is a Major – Life Threatening & Conduct Unbecoming Offence. T.P. was issued a twenty-day suspension, with ten (10) days served and ten (10) days deferred. T.P. immediately acknowledged and took accountability for his rule violation. The assessment of discipline for T.P.'s January 7, 2021 rule violation falls within the range of disciplinary consequences that may be assessed for a Major – Life Threatening & Conduct Unbecoming Offence pursuant to CP's Hybrid Discipline & Accountability Guidelines.

Support:         **Appendix p. 428**, Dittrich-Bigley Decl. ¶ 12; **Appendix pp. 345–346**, Dittrich-Bigley Dep. 32:24–36:3 ; **Appendix p. 354**, Dittrich-Bigley Dep. Ex. 67; **Appendix p. 359–360**, Dittrich-Bigley Dep. Ex. 68 at CP_01785–86 (16:18–17:14).

**PLAINTIFF RESPONSE: Admit** as to on January 7, 2021, engineer T.P. violated GCOR Rule 5.3.7, which is a Major – Life Threatening & Conduct Unbecoming Offence. **Admit** as to T.P. was issued a twenty-day suspension, with ten (10) days served and ten (10) days deferred. **Deny** as to T.P. immediately acknowledged and took accountability for his rule violation—this. As the record demonstrates, engineer T.P. challenged the alleged rule violation by exercising his rights to a disciplinary investigation and was assessed a 20-day suspension with 10 days deferred. See Cramer Dec. at para. 3. CP noticed the discipline in a letter dated January 27, 2021, in which it states, "Based on the facts and evidence in the hearing record, the severity of the incent and your past

discipline history, you are being assessed a twenty (20) day suspension, serve ten (10) days to be effective . . . and ten (10) days deferred." *Id.* **Admit** as the assessment of discipline falls within the range of disciplinary consequences that may be assessed pursuant to CP's Hybrid Discipline & Accountability Guidelines and is less discipline than CP issued against Sexton for the same alleged rule violation.

63.     On February 1, 2021, Sexton violated GCOR Rule 5.3.7, which is a Major – Life Threatening & Conduct Unbecoming Offence. Sexton was issued a twenty-day suspension. The assessment of discipline for Sexton's February 1, 2021 rule violation falls within the range of disciplinary consequences that may be assessed for a Major – Life Threatening & Conduct Unbecoming Offence pursuant to CP's Hybrid Discipline & Accountability Guidelines.

Support:     **Appendix p. 347**, Dittrich-Bigley Dep. 40:20–25; **Appendix pp. 428-429**, Dittrich-Bigley Decl. ¶ 16; **Appendix p. 379**, Ross Dep. 89:11–17; **Appendix p.65**, Sexton Dep. Ex. 3 at CP_00443.

**PLAINTIFF RESPONSE: Deny** that Sexton violated GCOR 5.3.7. because the track was clear for 74 cars, Mr. DePover had last specified that the track was "clear for 40" cars—half the distance of 40 is 20 and 11 is within 20. Dkt. 53-4 at 100:18-19 and Dkt. 51 at CP Appendix – 128. An instruction of "15 more to a stop, still clear for 40" means that "still clear for 40" is an additional instruction. Dkt. 53-4. The rule states "Movement must stop within half the distance specified **unless additional instructions are received".** Dkt. 50-3 at CP Appendix – 59. Emphasis added. If "additional instructions are received," then the engineer has the right to rely on those instructions. Dkt. 53-4 at 213:23-25. **Admit** as to CP issued Sexton a twenty-day suspension. **Admit** as to the 20-day unpaid suspension falls within the range of disciplinary

consequences as the maximum example that may be assessed for a first Major – Life Threatening & Conduct Unbecoming Offence pursuant to CP's Hybrid Discipline & Accountability Guidelines. Dkt. 50-3 at CP Appendix – 66.

> 64.    At his deposition, Ross testified that "there was no way in Hades" he would impose less than a twenty-day suspension for a first Major – Life Threatening & Conduct Unbecoming Offence. Ross further testified that if he assigned less severe discipline for a first Major rule violation, it would likely be the result of post-hearing negotiations between the Company and the employee's union. In this case, Sexton's Union made no effort to negotiate his discipline after the hearing.

> Support:    **Appendix pp. 375–376**, Ross Dep. 76:7–79:16; **Appendix p. 354**, Dittrich-Bigley Dep. Ex. 67.

**PLAINTIFF RESPONSE: Admit** as to Ross's testimony is what he testified, but not to the truth of the testimony—there is no evidence supporting this testimony as there is not a single example except for Sexton in which a twenty-day suspension was assessed as other employees received less or no discipline for the same alleged rule violation. Dkt. 54-1 at 23, 25, and 27. **Admit** as to Sexton's Union did not contact Ross in an attempt to negotiate—the Discipline Notice available to Sexton and his Union was signed by Mr. Jared in his role as general manager and provided no indication that Ross had any involvement in the discipline. Dkt. 31 at 4, para. 19 and Dkt. 50-3 at 79.  Additionally, CP may offer a waiver and although it is at the discretion of an employee to *accept* a waiver, the employee has no discretion as to whether they are *offered* a waiver. Dkt. 50-3 at CP Appendix 63, para. 4. The Major – Life Threatening and Conduct Unbecoming Offences category under CP's policy does not permit CP to offer an employee to waive an investigation. Dkt. 50-3 at CP Appendix 71. CP did not offer Sexton a waiver. See Sexton Dec. at para. 1.

65.     On February 16, 2021, engineer J.M. violated GCOR Rule 5.3.7, which is a Major – Life Threatening & Conduct Unbecoming Offence. J.M. was dismissed from employment with CP. J.M. had several Major rule violations on his discipline record, including a January 13, 2021 incident for which J.M. was issued a thirty-day "last chance" suspension. The assessment of discipline for J.M.'s February 16, 2021 rule violation falls within the range of disciplinary consequences that may be assessed for a Major – Life Threatening & Conduct Unbecoming Offence pursuant to CP's Hybrid Discipline & Accountability Guidelines.

> Support:          **Appendix p. 428**, Dittrich-Bigley Decl. ¶ 14; **Appendix p. 398**, Sullivan Decl. Ex. B, CP_00922; Appendix p. 285, Smith Dep. 36:5–10; **Appendix p. 288,** Smith Dep. Ex. 47 at CP_00939.

**PLAINTIFF RESPONSE: Admit** that J.M. was terminated, however, J.M.'s discipline was overturned by the Public Law Board, stating "it does not appear that the instant discipline event would have called for dismissal." See Cramer Dec. at para. 4. This was based on the fact that the Public Law Board had also overturned a 30-day suspension assessed by CP which was considered in CP's dismissal decision. *Id.* **Deny** that the assessment of discipline was within the range of consequences that may be assessed pursuant to CP's Hybrid and Discipline & Accountability Guidelines because the Public Law Board concluded: "We therefore conclude that, while the instant violation should result in at most a 30-day suspension, Claimant is entitled to compensation and benefits lost during the period of his dismissal in excess of 30 days, subject to deduction for outside earning during the period of dismissal." *Id.*

V.     SEXTON CLAIMS HIS FEBUARY 2021 DISCIPLINE WAS RETALIATION

    1.     **Sexton Claims His February 2021 Discipline Was Retaliation for Delaying a Train.**

66.     Sexton claims Jared administered the February 1, 2021 efficiency test to retaliate against Sexton for a conversation that occurred earlier the same day between Sexton and his supervisor, Kurt McKelvey, when Sexton asserted that certain rail crossings needed to be "cut" (cleared of compacted ice and snow) before his train left the yard in Marquette, Iowa, for Nahant, and McKelvey disagreed.

Support:         **Appendix pp. 26–27**, Sexton Dep. 129:25–130:12, 131:14–18; **Appendix pp. 187–188**, Sexton Dep. Ex. 14 at 3–4.

**PLAINTIFF RESPONSE: <u>Admit as to the following:</u>** Plaintiff's claim includes that he reported, in good faith, a hazardous safety or security condition, surrounding snow and ice buildup at crossings, which he believed could cause a derailment. Dkt. 26 at 6, para. 23. Plaintiff's claim includes his refusal to operate a train until he cut the tracks. *Id.* at para. 24. Plaintiff's claim includes Mr. Jared reprimanded, suspended, or in some other way discriminated against Mr. Sexton by setting up an unsafe and unpermitted efficiency test. *Id.* at 6, para. 26. And Sexton claims that the decisions to reprimand or discriminate against Mr. Sexton were due, in whole or in part, to his engagement in protected activity. *Id.* at 7, para. 28.

67.     The section of track where the rail crosses a road is called a "crossing." The "flangeway" is the opening parallel to the rail that allows the wheel flange of a train to pass. After a snowfall, vehicles that drive over the crossings may compact snow and ice into the flangeways. The compacted snow or ice in the flangeways has the potential to force a wheel flange up out of the flangeway, which can potentially derail a rail car. To avoid incidents caused by snow and ice buildup, railroaders "cut" the flangeways and crossings by running a locomotive only (without any cars) over that section of the rail to dislodge the snow and ice before operating a full train (with cars).

Support:        **Appendix pp. 12–13**, Sexton Dep. 47:2–48:14, 50:17–25;

**Appendix pp. 363–365, 373–374**, Ross Dep. 16:20–17:7, 22:3–15,68:11–69:1.

**PLAINTIFF RESPONSE: <u>Admit</u>** to all five statements.

68.    At approximately 1:30 a.m. on February 1, 2021, Sexton held a job briefing for the 474-31 with the conductor DePover at the Marquette depot. During the job briefing, Sexton noted there was a fresh layer of snow and told DePover, "Before we start anything, we're going to cut the crossings."

Support:        **Appendix pp. 12–13**, Sexton Dep. 49:14–50:8.

**PLAINTIFF RESPONSE: <u>Admit.</u>**

69.    Kurt McKelvey was the Trainmaster on duty in Marquette on February 1, 2021. Based on the small amount of snow that had recently fallen, McKelvey initially did not think the crossings needed to be cut and said so to Sexton. Sexton insisted the crossings needed to be cut and reminded McKelvey about two recent derailments and that cutting the crossings and flangeways was the CP-selected safety topic of the month.

Support:        **Appendix pp. 222–223**, McKelvey Dep. 76:1–14; 79:25–80:9; **Appendix pp. 13–14**, Sexton Dep. 51:20–52:18, 53:3–54:4, 55:10–60:7.

**PLAINTIFF RESPONSE: <u>Admit</u>** as to everything except quantity of snow—Mr. McKelvey did not testify that there was a "small amount of snow."

70.    McKelvey agreed the crossings should be cut. McKelvey testified that the decision was consistent with CP's policy—when in doubt, take the safest course.

Support:        **Appendix p. 223**, McKelvey Dep. 79:25–80:9; **Appendix p. 366**, Ross Dep. 26:6–15.

**PLAINTIFF RESPONSE: <u>Deny</u>**. Mr. McKelvey and Mr. Sexton had a disagreement about whether the crossing needed to be cut. Dkt. 53-4 at Appx. A, pg. 30. Mr. McKelvey concludes that he "believed the result of the job briefing" was that "we agreed to cut the tracks" and that his belief was only based on the fact that Sexton did in fact cut the tracks. Dkt. 50-3 at CP Appendix 223. No evidence suggests that McKelvey actually explicitly agreed with Sexton that he was to cut the tracks. Mr. Ross was under the impression that Mr. McKelvey had instructed Mr. Sexton not to cut the tracks. *Id.* at Appx. A, at pgs. 46, 48, 49, and 50.

71.     At his deposition, Jared testified that Sexton did not have to inform McKelvey that he was cutting the tracks; he could have just done it. Jared further testified that he would have taken exception to McKelvey if McKelvey had told Sexton "don't cut those tracks, get on your train and go." Jared went on that, in that situation, he would "support Mr. Sexton." Jared also testified that Sexton would not have been disobeying an order to cut the tracks even if McKelvey said "don't cut those tracks, get on your train and go" because Sexton's actions would amount to "attempting to follow the rules like he supposed to."

Support:          **Appendix pp. 313–314**, Jared Dep. 171:23–173:18.

**PLAINTIFF RESPONSE: <u>Admit</u>** as Jared did testify that Sexton did not have to inform McKelvey that he was cutting the tracks; he just could have done it. **<u>Admit</u>** as to Jared testified he would have taken exception to McKelvey if he had told Sexton "don't cut those tracks, get on your train and go." However, what "exception" means is unclear, and Mr. McKelvey received no discipline after telling Mr. Ross that he had instructed Sexton not to cut the tracks. **<u>Admit</u>** that Mr. Jared testified that he would "support Mr. Sexton". **<u>Admit</u>** that Jared testified that Sexton would not have been disobeying an order to cut the track even if McKelvey said "don't cut those tracks,

get on your train and go". However, **<u>Deny</u>** that "don't cut those tracks, get on your train and go" is not an order.

72.    At his deposition, Ross testified that CP teaches employees to take the safe course; when in doubt, cut the crossings. Ross agreed with Jared that Sexton "did the right thing." Ross also testified that he had a conversation with Sexton and McKelvey a few weeks later about the importance of cutting the crossings. Ross stated unequivocally: "I had that conversation with McKelvey as well because I'm not going to tolerate people cutting the rules and taking shortcuts. I won't tolerate it for one minute."

Support:        **<u>Appendix pp. 366–367, 385</u>**, Ross Dep. 25:22–26:15, 26:24–29:5,131:4–13.

**PLAINTIFF RESPONSE: <u>Admit</u>** as Ross testified that CP teaches employees to take the safe course; when in doubt, cut the crossings. However, as to McKelvey's position as management for CP he had a disagreement with Sexton's regarding Sexton's doubt. Dkt. 53-4 at Appx. A, pg. 30. **<u>Admit</u>** to the extent that Ross testified he agreed with Jared that Sexton "did the right thing." However, this is irrelevant as to the elements of an FRSA case. **<u>Admit</u>** as to Ross testifying about having the described conversation, however, he **did tolerate** Mr. McKelvey cutting the rules as Mr. Ross testified that Mr. McKelvey stated that he had instructed Mr. Sexton not to cut the tracks and Mr. Ross took no disciplinary action. Dkt. 53-2 at paras. 25-28.

73.    Sexton and DePover proceeded to cut the crossings.

Support:        **<u>Appendix p. 15</u>**, Sexton Dep. 60:8–13.

**PLAINTIFF RESPONSE: <u>Admit.</u>**

74.    After they were finished cutting the crossings, Sexton and DePover returned to the Marquette yard to continue the substantial work that needed to be completed before they

could depart. The work included lifting an engine, setting out cars, digging out a siding switch, completing an air brake test, cutting cars, tying and releasing hand brakes, and building up air to complete a Class III air brake test. From start to finish, the work took nearly four hours.

Support:        **Appendix pp. 15–16**, Sexton Dep. 61:4–16, 62:6–20, 63:2–64:25; **Appendix p. 76**, Sexton Dep. Ex. 5; **Appendix p. 224**, McKelvey Dep. 81:7–82:2; **Appendix p. 231**, McKelvey Dep. Ex. 27 at CP_03303.

**PLAINTIFF RESPONSE: Admit** after Sexton and DePover were finished cutting the crossings, they returned to the Marquette yard to continue the work that needed to be completed before they could depart. **Admit** the work included lifting an engine, setting out cars, digging out a siding switch, completing an air brake test, cutting cars, tying and releasing hand brakes, and building up air to complete a Class III air brake test. **Deny** that the work took nearly 4 hours. The Top 15 Trains Impacting Train Speed documents describes that "474 rolled up MP 100 at 02:22 when they arrived at south wye to start their work." Dkt. 50-3 at CP Appendix 231. It then goes on to describe "they also had to cut the Boatels crossing and run down MQS light power before they could shove the cars into it." *Id.* The described delay which included the cutting of the crossings is 3 hours 23 minutes. *Id.* McKelvey described in an email that the 474 began their work at 02:22. Dkt. 50-3 at 228-229. Then, that "474 cut off light power and went down to the South Siding switch." *Id.* McKelvey described several tasks, then "474 then ran light power 2 units down to the south siding switch and ran light power over boatels crossing and down the siding track where their s/o would be made. *Id.* After this was completed then ran light power back to their train and tied on." *Id.* McKelvey concluded that "There is no reason lifting and (sic.) engine and s/o 24 cars should take this long." *Id.* McKelvey attributes the planned tasks should not have taken an additional 3 hours

43

and 23 minutes, which would mean the time Sexton took to conduct the task not originally planned (cutting the tracks) accounts in that additional 3 hours and 23 minutes. *Id.*

75.     The 474-31 train departed Marquette at 5:40 a.m. CT on February 1, 2021, which was approximately 3.5 hours late based on the standard time allotted for the work to be performed on the train in Marquette. Jared and Ross testified that a 3.5-hour over-standard delay is not unusual in winter operations.

Support:         **Appendix p. 16**, Sexton Dep. 63:2–14; **Appendix p. 76**, Sexton Dep. Ex. 5; **Appendix pp. 300, 315**, Jared Dep. 103:18–104:13, 179:24– 180:12; **Appendix p. 377**, Ross Dep. 81:10–82:5.

**PLAINTIFF RESPONSE: Admit** as to the 474-31 train departed Marquette at 5:40 a.m. CT on February 1, 2021, which was approximately 3.5 hours late based on the standard time allotted for the work to be performed on the train in Marquette. **Deny** that a 3.5-hour over-standard delay is not unusual in winter operations as McKelvey had worked in winter operations and this 3.5 hour delay was one of the longest work events that he had witnessed in his career. Dkt. 53-2 at para. 45. Additionally, Sexton's train was in the top 15 most delayed trains list in the United States on the day he took the time to cut the tracks. Dkt. 50-3 at CP Appendix 231.

76.     McKelvey attributed about a few minutes of the train delay to the crossing-cutting operation. According to McKelvey's contemporaneous written description of the events of that day, the primary reason for the delay was lifting the engine and setting off (moving) twenty-four cars.

Support:         **Appendix pp. 220–221, 227**, McKelvey Dep. 55:9–56:15, 65:8– 13, 114:12–116:24; **Appendix pp. 228–229**, McKelvey Dep. Ex. 26; **Appendix p. 231**, McKelvey Dep. Ex. 27 at CP_03303.

**PLAINTIFF RESPONSE: <u>Admit</u>** that McKelvey attributed about a few minutes of the train delay to the crossing-cutting operation, however, his written statements do not indicate it was only a few minutes. The Top 15 Trains Impacting Train Speed documents describes that "474 rolled up MP 100 at 02:22 when they arrived at south wye to start their work." Dkt. 50-3 at CP Appendix 231. It then goes on to describe "they also had to cut the Boatels crossing and run down MQS light power before they could shove the cars into it." *Id.* The described delay which included the cutting of the crossings is 3 hours 23 minutes. *Id.* McKelvey described in an email that the 474 began their work at 02:22. *Id.* at CP Appendix 228-229. Then, that "474 cut off light power and went down to the South Siding switch." *Id.* McKelvey described several tasks, then "474 then ran light power 2 units down to the south siding switch and ran light power over boatels crossing and down the siding track where their s/o would be made. *Id.* After this was completed then ran light power back to their train and tied on." *Id.* McKelvey concluded that "There is no reason lifting and (sic.) engine and s/o 24 cars should take this long." *Id.* McKelvey attributes the planned tasks should not have taken an additional 3 hours and 23 minutes, which would mean the time Sexton took to conduct the task not originally planned (cutting the tracks) accounts in that additional 3 hours and 23 minutes. *Id.* **<u>Deny</u>** Mr. McKelvey's written statement was that the "primary" reason for the delay was lifting the engine and setting off (moving) twenty-four cars as Mr. McKelvey did not use the term "primary" or a term similar to it.

77.     Sexton attributed at least twenty to thirty minutes of the delay to picking up an engine on an open deck bridge and performing an air brake test.

Support:          **Appendix p. 17**, Sexton Dep. 66:10–68:23; **Appendix p. 76**, Sexton Dep. Ex. 5.

**PLAINTIFF RESPONSE: <u>Admit.</u>**

78.    Train delays are common in the winter months. Ross testified that he has told thousands of employees, "I'd rather have somebody following the rule and say we took a delay at whatever location than to get a phone call in the middle of the night saying we got a derailment because we violated a rule."

Support:        **Appendix p. 378**, Ross Dep. 85:17–86:7.

**PLAINTIFF RESPONSE: Deny** train delays are common in the winter months. CP cites no testimony that supports this conclusion. **Admit** as to Ross did testify "I'd rather have somebody following the rule and say we took a delay at whatever location than to get a phone call in the middle of the night saying we got a derailment because we violated a rule."

79.    Nevertheless, Sexton has created an attenuated and speculative theory that what he calls his insistence that the tracks be cut was the cause of the delay and, in turn, the cause for Jared to administer the efficiency test hours later—and, even later, for Ross to decide and impose the twenty-day suspension.

Support:        **Appendix pp. 28–29**, Sexton Dep. 140:14–141:2; 142:20–143:11.

**PLAINTIFF RESPONSE: Deny**. This is an improper statement and not a statement of fact. CP only cites Sexton's deposition. CP cites no testimony where Mr. Sexton uses the phrase "attenuated and speculative theory." Instead, CP's citations to Sexton's testimony highlight the exact circumstantial evidence that supports a Plaintiff's contributing factor case: "He was physically upset. He was angry about it." Dkt. 50-3 at CP Appendix 28. (Antagonism or hostility towards complainant's protected activity). And that Jared was there to conduct the test during the very same shift of Sexton's protected activity. (Temporal proximity).

80.     As far as the supposed motivation for the extensive conspiracy against him, Sexton theorizes that this one four-hour train delay (of which just fifteen minutes resulted from cutting the crossing) on one day in 2021 would negatively impact Jared's 2021 annual performance evaluation, which would in turn result in a lower 2021 incentive payment for Jared—and so motivate Jared to conduct the efficiency test later on February 1, 2021.

Support:          **Appendix pp. 28, 30, 36**, Sexton Dep. 140:2–13; 148:5–149:12, 178:13–20.

**PLAINTIFF RESPONSE: <u>Admit</u>** that in part, Sexton claims that management, including Jared, were incentivized, per CP's policy, to weigh train speed and efficiency as more important than safety. CP's Short Term Incentive Plan is direct: "The objectives of the Plan are: to tie a part of the employee's compensation directly to CP's results; to reward the achievement of individual and team objection that support CP's achievement of its annual business plans and long-term strategy." Dkt. 54-1 at 35. **<u>Deny</u>** that Sexton "theorizes" that just fifteen minutes result from cutting the crossing. McKelvey attributes the planned tasks should not have taken an additional 3 hours and 23 minutes, which would mean the time Sexton took to conduct the task not originally planned (cutting the tracks) accounts in that additional 3 hours and 23 minutes. Dkt. 50-3, CP Appendix – 228-231.

81.     There is no factual support for Sexton's theory. Jared was already in Davenport, Iowa before he knew about the 474-31 train delay that day. And Sexton agrees it is not unusual for Jared to be in Nahant because it is part of his territory.

Support:          **Appendix p. 298**, Jared Dep. 96:6–18; **Appendix p. 317**, Jared Dep. Ex. 51; **Appendix p. 37**, Sexton Dep. 186:18–187:4.

**PLAINTIFF RESPONSE: <u>Deny</u>** as to "there is no factual support for Sexton's theory". First, CP's corporate representative testified that one train contributes to the aggregated performance metric. Dkt. 50-3 at CP Appendix 324 – Dep. 18:3-5. Regardless of whether a single train impacts Jared's performance, Sexton has demonstrated ample circumstantial evidence in this case. Circumstantial evidence of temporal proximity exists due to the closeness in time of Sexton's protected activities and the discipline taking against him (See Dkt. 53-1 at 13); inconsistent application of policies exists in that the record does not show any other employee to have received the same severity of discipline as Sexton (*Id.* at 19); pretext exists in the form of CP's monetary motivations based on speed and efficiency (*Id.* at 13-14); and more. Lastly, even if a single train does not contribute to Jared's incentive bonus, Mr. Jared testified that he tries to avoid delays. Dkt. 53-2 at para. 212. In fact, management testified "It doesn't matter if it's a minute delay or 3 hours. A delay is a delay. *Id.* at para. 207. **<u>Admit</u>** as to Jared was already in Davenport on February 1, 2021. **<u>Admit</u>** that to Plaintiff's knowledge it is not unusual for Jared to be at the Nahant yard, only under the notion that the Nahant yard is within his territory—not that Jared was frequently in Nahant.

82.     Jared testified that he heard over the radio that there was a train entering the Nahant yard that would be performing a shove movement. Jared assessed the environment and determined the conditions were safe to administer an efficiency test of the 474-31 crew while they were performing the shove movement.

Support:     **Appendix pp. 304–305, 316**, Jared Dep. 128:19–129:8, 186:21– 187:3; **Appendix p. 420**, Jared Decl. ¶ 9.

**PLAINTIFF RESPONSE: <u>Admit</u>** that Jared testified that he heard over the radio that there was a train entering the Nahant yard that would be performing a shove movement. **<u>Admit</u>** that Jared

assessed the environment and determined the conditions were safe to administer an efficiency test of the 474-31 crew while they were performing the shove movement but not that his administration of the test was safe under the conditions.

83.    Jared's decision to administer an efficiency test in the Nahant rail yard on February 1, 2021 was entirely unrelated to the events that occurred in Marquette earlier that morning. In fact, Jared decided to administer an efficiency test of the shove movement to be completed by the 474-31 crew *before* he knew Sexton was the engineer operating the locomotive. Jared only learned that Sexton was the engineer after the train stopped and Sexton disembarked. To the best of Jared's current recollection, before he administered the efficiency test on February 1, 2021, Kurt McKelvey had not told Jared about any disagreement that he had with Sexton earlier on February 1, 2021.

Support:         **Appendix pp. 304–305, 310, 316**, Jared Dep. 128:19–129:8, 157:4– 9, 186:21–187:15; **Appendix p. 420**, Jared Decl. ¶¶ 10–12.

**PLAINTIFF RESPONSE: Deny** to the extent that it is a legal conclusion whether Sexton's protected activities contributed to Jared subjecting Sexton to discipline by conducting a test. Ample circumstantial evidence exists to demonstrate that Sexton's protected activities contributed to Jared's adverse employment actions. Temporal proximity in the immediacy of the test at the end of the very same shift as Sexton's protected activities and indications of pretext and inconsistent application of policies exists in Jared's unsanctioned and unsafe set up test. **Deny** that Jared decided to administer an efficiency test of the shove movement before he knew Sexton was the engineer operating the locomotive. Direct evidence exists as to Jared's knowledge: Sexton's delay created a flurry of emails and communications. McKelvey was asked to "send a write up of the 474 at Marquette to the DL Senior and East Director". Dkt. 54-1 at Appendix B - 2. McKelvey

then sent an email to several managers, including Jared that stated, "The work for 474 was to lift 1 engine and s/o 24 cars behind 49 cars and 1 DP unit." *Id.* at 8. But instead, the crew took the time to cut the tracks: "474 cut off light power and went down to the South siding switch." *Id.* McKelvey notes, "I again instructed them to go lift the engine off the south wye." *Id.* Instead, "474 then ran light power 2 units down the south siding switch and ran light power over boatels crossing and down the siding track where their s/o would be made." *Id.* Jared knew that the 474's crew did not receive an instruction to cut the tracks based on this email and Jared knew that the 474's crew did cut the tracks. McKelvey also completed an Incident Report sent to Jared which stated: "they also had to cut the Boatels crossing and run down MQS light power before they could shove the cars into it." *Id.* at 11. The incident report clearly lists the train as 474 all throughout and lists the engineer as "SEXTON". *Id.* Jared's response to McKelvey was, "Call me when you have a min." Dkt 53-2 at para 51. Shortly after, McKelvey did in fact call Jared. *Id.* at para. 53.

84.    The fact that the 474-31 was delayed on February 1, 2021 did not motivate Jared to administer the efficiency test that day.

Support:    **Appendix pp. 304–305, 310, 316**, Jared Dep. 128:19–129:8, 157:4 – 9, 186:21–187:15; **Appendix p. 420**, Jared Decl. ¶ 13.

**PLAINTIFF RESPONSE: <u>Deny</u>** to the extent that it is a legal conclusion whether Sexton's protected activities contributed to Jared subjecting Sexton to discipline by conducting a test. Ample circumstantial evidence exists to demonstrate that Sexton's protected activities contributed to Jared's adverse employment actions. Temporal proximity in the immediacy of the test at the end of the very same shift as Sexton's protected activities and indications of pretext and inconsistent application of policies exists in Jared's unsanctioned and unsafe set up test.

85.     Sexton conceded he has no evidence, beyond the length of the delay itself, that the delay in Marquette caused Jared to perform the efficiency test in Nahant.

Support:          **Appendix pp. 22–23**, Sexton Dep. 113:8–115:4.

**PLAINTIFF RESPONSE: <u>Deny.</u>** Sexton stated several reasons in his deposition why he believed the length of the delay cause Jared to perform a test in Nahant. Sexton testified that McKelvey did not get angry with him regarding any other part of the delay, until he had to cut the crossings— "that's when he got angry, physically angry." Dkt. 50-3 at CP Appendix 22. Sexton further pointed out that its not simply the delay itself but that managers have standards they don't want to go over. *Id.* at CP Appendix 23. Then, when asked "But you have nothing else to point to as you sit here today?" *Id.* Sexton answered, "I'm not sure, I can't answer that. I'm not sure if there's anything out there. Might be. We'll find out." *Id.* And has been addressed repeatedly, there is ample evidence that Sexton's protected activities contributed to CP's adverse employment actions. Circumstantial evidence of temporal proximity exists due to the closeness in time of Sexton's protected activities and the discipline taking against him (See Dkt. 53-1 at 13); inconsistent application of policies exists in that the record does not show any other employee to have received the same severity of discipline as Sexton (*Id.* at 19); pretext exists in the form of CP's monetary motivations based on speed and efficiency (*Id.* at 13-14); and more.

86.     Specifically, Sexton acknowledged that he has no evidence—only his own belief—that Jared knew about the events that occurred in Marquette early on the morning of February 1, 2021.

Q.     So what is it about [Mr. McKelvey] being angry that you believe caused the shove test?

A.     Because I had to go out there and — and number one, I didn't listen to him because he wanted me to violate a safety — a safety rule, and I did not — I did not do it. I refused to go out there and just get the hell out of there, get on your

51

train and get the hell out of there like he wanted me to do. I went out there, and I cut the crossings. He didn't want me to. He was physically angry. I could tell by the look on his face. And it's all about the initial terminal delay.

Q.    So how did the initial terminal delay cause the disciplinary hearing that you say was an adverse employment action?

A.    Because I — when they had their numerous conference calls that following day, whether he emailed or called whatever, we're trying to get the documentation on that, I'm sure that was brought up, and I'm sure they were — they were not happy that I did not listen to Mr. McElvey and violate that safety — safety regulations. You know, and I did go out there and cut the crossings, and he was not happy. And I'm sure — as soon as — as soon as I left there, he made phone calls, emails, instant messages or texts, whatever he did.

Q.    We covered that before. You believe those things happened, but you have no personal knowledge that any one of those things happened, correct?

A.    I can almost guarantee it.

Q.    And I understand that you believe you can almost guarantee it, but you have no personal knowledge that Kurt McElvey told anyone else about what happened that morning?

A.    That's the way the railroad works. The initial terminal day, if you go above standard, they escalate it. That's what it's called, escalate to the next manager.

Q.    And so —

A.    And they — and they — and they want to drill down and get to why this was delayed or what happened. And he was physically angry and upset. It was all over his face.

Q.    And you believe that that anger at you is the thing that got communicated to other people, correct?

A.    When it got escalated because he had to because it was —

Q.    And my question is —

A.    — over their standard.

Q.    And my question is, you believe it was the anger that was specifically directed at you and your specific actions that got communicated to other people, correct?

A.    Because I did not — yes, because I did not follow his direction when he wanted me to violate safety regulations.

Q.    And you — you believe that happened, but you have no personal knowledge that it actually did, correct?

A.    I'd put my career on it.

Q.    But you might lose that bet because you don't have any personal knowledge as to whether it actually happened, correct?

MR. MAGNUSON: Objection, form.

Q.    You weren't on any phone call where you heard Kurt McElvey tell anyone else about his interaction with you, correct?

A.    No, but I know how the railroad operates.

Support:        **Appendix pp. 28–29**, Sexton Dep. 140:2–142:19.

**PLAINTIFF RESPONSE: Admit** as to what Sexton knew at the time, however, direct evidence exists as to Jared's knowledge: Sexton's delay created a flurry of emails and communications. McKelvey was asked to "send a write up of the 474 at Marquette to the DL Senior and East Director". Dkt. 54-1 at Appendix B - 2. McKelvey then sent an email to several managers, including Jared that stated, "The work for 474 was to lift 1 engine and s/o 24 cars behind 49 cars and 1 DP unit." *Id.* at 8. But instead, the crew took the time to cut the tracks: "474 cut off light power and went down to the South siding switch." *Id.* McKelvey notes, "I again instructed them to go lift the engine off the south wye." *Id.* Instead, "474 then ran light power 2 units down the south siding switch and ran light power over boatels crossing and down the siding track where their s/o would be made." *Id.* Jared knew that the 474's crew did not receive an instruction to cut the tracks based on this email and Jared knew that the 474's crew did cut the tracks. McKelvey also completed an Incident Report sent to Jared which stated: "they also had to cut the Boatels crossing and run down MQS light power before they could shove the cars into it." *Id.* at 11. The

incident report clearly lists the train as 474 all throughout and lists the engineer as "SEXTON". *Id.*

Jared's response to McKelvey was, "Call me when you have a min." Dkt 53-2 at para 51. Shortly

after, McKelvey did in fact call Jared. *Id.* at para. 53.

87.    When pressed at his deposition to explain the factual basis for his causation

theory, Sexton offered nothing more than speculation and hearsay.

Q.    Do you think that the complaint that you made at some point about
the air test had something to do with the decision to — Tom Jared's decision to
perform a shove test on February 1st, 2021, in the Nahant yard?

A.    Part of it, but I think it was directly correlated with me refusing to
violate a safety — a hazardous safety violation with Mr. McElvey when I first went
on duty. He was visibly angry, and that's what I think all this is a big part of it.

Q.    And so this —

A.    It's all connected.

Q.    It's all connected. How — how do you know it's all connected?

A.    Common sense.

Q.    Other than common sense, is there anything that you could point to
that an outside observer could look at and say, "Well, this looks like it's connected"?

A.    It's all about bonuses and how they how they get their bonuses. If
they have too big of initial terminal delay and then it affects their – their quarterly
bonus or however they do it, semi-yearly bonus whatever it.

Q.    How do you know that initial terminal delay — delays have an effect
on any individual's bonus?

A.    Common knowledge in the railroad industry, sir.

Q.    But do you have any personal knowledge of that?

A.     I hear it all the time from ex managers.

Support:        **Appendix pp. 35–36**, Sexton Dep. 177:23–178:25.

**PLAINTIFF RESPONSE: <u>Deny.</u>** Plaintiff is able to demonstrate sufficient evidence to meet his contributing factor case. Circumstantial evidence of temporal proximity exists due to the closeness in time of Sexton's protected activities and the discipline taking against him (See Dkt. 53-1 at 13); inconsistent application of policies exists in that the record does not show any other employee to have received the same severity of discipline as Sexton (*Id.* at 19); pretext exists in the form of CP's monetary motivations based on speed and efficiency (*Id.* at 13-14); and more.

88.    Ross's decision to approve a 20-day suspension for Sexton was entirely unrelated to the events that occurred in Marquette on the morning of February 1, 2021. Ross testified: "I didn't discipline John Sexton for following the rule."

<u>Support:</u>    **Appendix p. 385**, Ross Dep. 129:11–17; **Appendix p. 417**, Ross Decl. ¶ 6.

**PLAINTIFF RESPONSE: <u>Deny</u>** to the extent that it is a legal conclusion whether Sexton's protected activities contributed to CP's adverse employment actions. Ample circumstantial evidence exists to demonstrate that Sexton's protected activities contributed to CP's adverse employment actions. Circumstantial evidence of temporal proximity exists due to the closeness in time of Sexton's protected activities and the discipline taking against him (See Dkt. 53-1 at 13); inconsistent application of policies exists in that the record does not show any other employee to have received the same severity of discipline as Sexton (*Id.* at 19); pretext exists in the form of CP's monetary motivations based on speed and efficiency (*Id.* at 13-14); and more.

89.    The fact that the 474-31 was delayed on February 1, 2021 did not motivate Ross to approve a twenty-day suspension for Sexton. Ross testified: "Like I say – you know, that delay on 474, I hate to say it is probably not even something that popped up on my radar.

In the middle of January and February that would have been the least of my concerns, that 3-hour delay on 474 for doing their job."

Support:        **Appendix p. 380**, Ross Dep. 95:16–23; **Appendix p. 417**, Ross Decl. ¶ 7.

**PLAINTIFF RESPONSE: <u>Deny</u>** to the extent that it is a legal conclusion whether Sexton's protected activities contributed to CP's adverse employment actions. Ample circumstantial evidence exists to demonstrate that Sexton's protected activities contributed to CP's adverse employment actions. Circumstantial evidence of temporal proximity exists due to the closeness in time of Sexton's protected activities and the discipline taking against him (See Dkt. 53-1 at 13); inconsistent application of policies exists in that the record does not show any other employee to have received the same severity of discipline as Sexton (*Id.* at 19); pretext exists in the form of CP's monetary motivations based on speed and efficiency (*Id.* at 13-14); and more.

90.    Phone records that show McKelvey, Jared, Ross, and Miller had telephone conversations on February 1, 2021. Jason Ross testified that they attend regular calls to discuss the operations of trains within their territories. Ross further testified that individual employees and individual trains were at most rarely discussed on operational calls. Tracy Miller that it was "possible" that the delay of the 474 was discussed that day, but none of the witnesses recalled a specific conversation about the train or about Sexton.

Support:        **Appendix p. 379**, Ross Dep. 89:20–92:18; **Appendix pp. 386–387**, Ross Dep. Ex. 79; Appendix p. 389, Miller Dep. 41:2–43:1; **Appendix pp. 390–391**, Miller Dep. Ex. 75; **Appendix pp. 299–300**, Jared Dep. 98:18–103:21, 104:14–109:22; **Appendix pp. 318–320**, Jared Dep. Ex. 52; **Appendix pp. 225–226**,

McKelvey Dep. 102:4–21, 109:10–15; **Appendix pp. 235–238**, McKelvey Dep. Ex. 31.

**PLAINTIFF RESPONSE: <u>Admit.</u>**

91.    At all relevant times, CP has evaluated non-union employee performance pursuant to its Performance Management Program ("PMP") and Short-Term Incentive Plan ("STIP") Policy 3411. Senior leaders, in collaboration with human resources, set performance objectives at the beginning of the year. The performance objectives are then cascaded down to managers within each leader's region, subdivision, and territory. The objectives align with what CP calls its Five Foundations. At the end of the year, leaders evaluate employee performance and, in collaboration with human resources, assign a performance rating.

<u>Support:</u>    **Appendix p. 382**, Ross Dep. 108:14–25; **Appendix p. 322**, Hanson Dep. 9:8–10:6; **Appendix p. 250**, Johnson Dep. 93:20–94:4; **Appendix pp. 275–281**, Johnson Dep. Ex. 41.

**PLAINTIFF RESPONSE: <u>Admit.</u>**

92.    CP uses various metrics to measure achievement of key performance indicators, including origin performance, terminal dwell, and train weight. Actual achievement is aggregated at the end of the year and measured against objectives. Performance of one train on one day would not negatively impact an employee's overall performance rating.

<u>Support:</u>    **Appendix pp. 324–325**, Hanson Dep. 17:19–18:5, 19:17–21:24; **Appendix pp. 275–281**, Johnson Dep. Ex. 41.

**PLAINTIFF RESPONSE: <u>Admit</u>** as to CP uses various metrics to measure achievement of key performance indicators, including origin performance, terminal dwell, and train weight. **<u>Admit</u>** as to actual achievement is aggregated at the end of the year and measured against objectives. **<u>Deny</u>**

performance of one train on one day would not negatively impact an employee's overall performance—CP's corporate representative testified that one train contributes to the aggregated performance metric. Dkt. 50-3 at CP Appendix 324 – Dep. 18:3-5.

93.    An employee's performance rating is a factor used to determine the individual component of the employee's STIP payment.

> Support:    **Appendix p. 382**, Ross Dep. 106:2–20; **Appendix pp. 322–323, 325–327**, Hanson Dep. 12:23–13:4, 14:16–22, 22:14–23:10, 28:7–29:6.

**PLAINTIFF RESPONSE: <u>Admit.</u>**

94.    Jared's potential 2021 short-term incentive payment absolutely did not motivate his decision to administer the efficiency test on February 1, 2021.

> Support:    **Appendix p. 420**, Jared Decl. ¶ 14.

**PLAINTIFF RESPONSE: <u>Deny.</u>** Jared testified that he tries to avoid all delays. To the extent this statement is an attempt to conflate Jared's motivation with Plaintiff's contributing factor case, Plaintiff can demonstrate sufficient evidence to meet his contributing factor case. Circumstantial evidence of temporal proximity exists due to the closeness in time of Sexton's protected activities and the discipline taking against him (See Dkt. 53-1 at 13); inconsistent application of policies exists in that the record does not show any other employee to have received the same severity of discipline as Sexton (*Id.* at 19); pretext exists in the form of CP's monetary motivations based on speed and efficiency (*Id.* at 13-14); and more.

95.    Ross' potential 2021 short-term incentive payment absolutely did not motivate his decision to issue a 20-day suspension for Sexton.

> Support:    **Appendix p. 417**, Ross Decl. ¶ 8.

**PLAINTIFF RESPONSE: <u>Deny.</u>** To the extent this statement is an attempt to conflate Ross's motivation with Plaintiff's contributing factor case, Plaintiff can demonstrate sufficient evidence to meet his contributing factor case. Circumstantial evidence of temporal proximity exists due to the closeness in time of Sexton's protected activities and the discipline taking against him (See Dkt. 53-1 at 13); inconsistent application of policies exists in that the record does not show any other employee to have received the same severity of discipline as Sexton (*Id.* at 19); pretext exists in the form of CP's monetary motivations based on speed and efficiency (*Id.* at 13-14); and more.

> **2.      Sexton is a Prominent Safety Advocate and Former Co-Chair of the Local Safety Committee**

96.     Sexton understands that his number one responsibility as an engineer is safety. According to Sexton's testimony, "everyone knows [he is] one of the biggest safety advocates on this property."

> Support:        **Appendix pp. 4, 27**, Sexton Dep. 14:3–5, 133:21–23.

**PLAINTIFF RESPONSE: <u>Admit.</u>**

97.     During the approximately twenty-five years Sexton and Jared have worked together at CP, Sexton has raised dozens of safety–related concerns to Jared and other CP managers. Jared never administered an efficiency test for Sexton because he raised safety concerns. And Jared has never recommended discipline for Sexton because he raised safety concerns. In fact, Jared has viewed Sexton as reliable "eyes on the ground" who will appropriately report safety concerns and rule violations.

> Support:        **Appendix p. 421**, Jared Decl. ¶ 17.

**PLAINTIFF RESPONSE: <u>Admit</u>** as to during the approximately twenty-five years Sexton and Jared have worked together at CP, Sexton has raised dozens of safety-related concerns to CP

managers including Jared. **Deny** that Jared has never administered an efficiency test for Sexton because he raised safety concerns—as this being an attempt to conflate Jared's declaration to the contributing factor element, the law is clear on what a plaintiff need demonstrate to establish their contributing factor case: Courts describe the burden-shifting framework as answering the "'elusive factual question" surrounding the intent of the employer's disciplinary action. *Murray v. UBS Securities, LLC,* 601 U.S. ___ at 12 slip op. (2023), quoting *Watson v. Forth Worth Bank & Trust,* 487 U.S. 977, 986, quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 255, n.8. "'The contributing factor element of a complaint may be established by direct evidence or indirectly by circumstantial evidence.'" *Ray v. Union Pacific RR. Co.*, 971 F. Supp. 2d 869, 884 (S.D. Iowa 2013) quoting *DeFrancesco v. Union R.R. Co.*, ARB no. 10-114, ALJ No. 2009-FRS-00009, at 5 (ARB Feb. 29, 2012). Circumstantial evidence may include:

> temporal proximity, indications of pretext, inconsistent application of an employer's policies, an employer's shifting explanations for its actions, antagonism or hostility toward a complainant's protected activity, the falsity of an employer's explanation for the adverse action taken, and a change in the employer's attitude toward a complainant after he or she engaged in protected activity.
>
> *Id.*

As addressed in Plaintiff's Brief in Support of Plaintiff's Motion for Summary Judgment, Plaintiff has demonstrated circumstantial evidence sufficient to meet Plaintiff's contributing factor case. Sexton has demonstrated ample circumstantial evidence in this case. Circumstantial evidence of temporal proximity exists due to the closeness in time of Sexton's protected activities and the discipline taking against him (See Dkt. 53-1 at 13); inconsistent application of policies exists in that the record does not show any other employee to have received the same severity of discipline as Sexton (*Id.* at 19); pretext exists in the form of CP's monetary motivations based on speed and efficiency (*Id.* at 13-14); and more.

98.     Around the time of the February 1, 2021, e-test, Sexton was Co-Chair of the Workplace Health and Safety Committee ("WHSC"), which is a committee of unionized CP employees and CP managers that holds monthly meetings to discuss recent injuries and accidents, safety hazards or concerns, and other safety-related topics.

> Support:     **Appendix pp. 4–5**, Sexton Dep. 16:8–23, 20:3–6; **Appendix p. 400**, Sullivan Decl. Ex. C at CP03706.

**PLAINTIFF RESPONSE: <u>Admit</u>**.

99.     WHSC committee members are responsible for holding job briefings with other employees regarding the monthly safety-related topic. In January 2021, the WSHC safety topic was "Winter Train Handling," including "Cutting Flangeways & Crossings."

> Support:     **Appendix pp. 4, 18–19**, Sexton Dep. 16:8–23, 79:7–17; 81:5– 82:3; **Appendix p. 77**, Sexton Dep. Ex. 7; **Appendix p. 404**, Sullivan Decl. Ex. C at CP_03710.

**PLAINTIFF RESPONSE: <u>Admit.</u>**

100.    Superintendent Smith was Co-Chair of the WHSC with Sexton in January and February 2021.

> Support:     **Appendix p. 5**, Sexton Dep. 19:1–12; **Appendix p. 400**, Sullivan Decl. Ex. C at CP_03706.

**PLAINTIFF RESPONSE: <u>Admit.</u>**

101.    On or around December 23, 2020, two union employees reported concerns about a manager to Sexton. The union employees reported these concerns to Sexton because, according to Sexton, he was the Union Co-Chair of the WHSC and the employees "knew that [Sexton] would escalate it to find out what's going on here, and that's exactly what [he] did."

Support:        **Appendix pp. 29–30, 32**, Sexton Dep. 144:10–145:5, 146:3–9, 154:10–16; **Appendix pp. 212–213**, Sexton Dep. Ex. 16.

**PLAINTIFF RESPONSE: <u>Admit.</u>**

**3.        Sexton Also Claims His February 2021 Discipline Was Retaliation for Previous Complaints About a Manager.**

102.    On January 3, 2021, Sexton emailed two CP managers with the December 23, 2020 second-hand report of another manager supposedly instructing a crew to violate CP rules. The email described the manager's alleged failure to conduct air brake testing and related operational complaints. The supervisor about whom Sexton complained had nothing to do with the failed e-test on February 1, 2021.

Support:        Appendix pp. 29–30, Sexton Dep. 144:11–146:2; **Appendix pp. 212–213**, Sexton Dep. Ex. 16; **Appendix p. 421**, Jared Decl. ¶¶ 15, 16.

**PLAINTIFF RESPONSE: <u>Admit</u>** as to On January 3, 2021, Sexton emailed two CP managers with the December 23, 2020 second-hand report of another manager supposedly instructing a crew to violate CP rules. **<u>Admit</u>** the email described the manager's alleged failure to conduct air brake testing and related operational complaints. **<u>Deny</u>** the supervisor about whom Sexton complained had nothing to do with the failed e-test on February 1, 2021, as every manager involved in looking into this manager did have involvement with the February 1, 2021, test and subsequent discipline. Smith responded to the January 3 email who along with Jared was involved in intimidating Mr. DePover into providing an incomplete statement regarding Sexton's shoving movement. Dkt. 53-4 at Appendix A 147. Additionally, Smith suggested Sexton be disciplined. Dkt. 54-1 at Appendix B 19. The January 18 email was sent to Ross who CP contends made the disciplinary decision. Dkt. 51 at CP Appendix 405. Jared was also included in the email and was

instructed by his boss to come up with a plan before Sexton's "thoughts are spread to everyone". *Id.*

103.    Then on January 18, 2021, Sexton emailed CP's senior vice president of operations, Tracy Miller, Ross, and Jared regarding the same allegations that he emailed about on January 3.

Support:        **Appendix pp. 30–31**, Sexton Dep. 149:24–150:22; **Appendix pp. 214–216**, Sexton Dep. Ex. 17.

**PLAINTIFF RESPONSE: Admit.**

104.    Miller responded to Jared and another manager: "Guys, what is this about? Was something brought to us that we didn't handle? Who has all the facts?"

Support:        **Appendix p. 407**, Sullivan Decl. Ex. D at CP_03212.

**PLAINTIFF RESPONSE: Admit.**

105.    The other manager, Dylan Smith, responded promptly, explaining that he had investigated Sexton's January 3 report, determined there had been no rule violation, but had a constructive conversation with the manager in any event.

Support:        **Appendix pp. 405–407**, Sullivan Decl. Ex. D at CP_03210–12.

**PLAINTIFF RESPONSE: Admit** that Dylan Smith Responded and that he took actions looking into Sexton's report. **Deny** that Smith determined that no rule violation occurred—throughout his email Smith describes he is unsure of exactly what had happened: "I reviewed camera footage inside the yard office…no audio is available to confirm the conversation…."; (Dkt. 51 at CP Appendix 406) "I reviewed the Ottumwa yard camera footage along with audio . . . and was unable

to see or hear any instructions given to any crew regarding attending to a train"; (*Id.*) "No audio tape nor camera footage was available to substantiate this allegation". *Id.*

106.    Jared then communicated with Sexton to assure him the matter had been investigated and resolved. At his deposition, Sexton admitted he has no firsthand knowledge of the actions Jared took to address and resolve the matter.

Support:    **Appendix pp. 31–32**, Sexton Dep. 152:19–154:4, 155:21–157:17; **Appendix p. 214**, Sexton Dep. Ex. 17 at CP_01696.

**PLAINTIFF RESPONSE: <u>Admit</u>** as to Jared communicated with Sexton to assure him the matter had been investigated and resolved. **<u>Admit</u>** that Sexton indicated that he had no first hand knowledge of the action Jared took to address and resolve the matter outside of the email communications.

107.    Miller also responded to Sexton to assure him safety is CP's first priority and CP expects accountability from everyone. At his deposition, Sexton acknowledged Miller's response did not convey any anger or animus toward Sexton, or dislike of the fact that he was raising these issues.

Support:    **Appendix p. 215**, Sexton Dep. Ex. 17 at CP_01697; **Appendix p. 31**, Sexton Dep. 151:11–17.

**PLAINTIFF RESPONSE: <u>Admit.</u>**

108.    At his deposition, Sexton conceded he has no evidence—only speculation—that these January 2021 emails caused Jared to perform the efficiency test in Nahant on February 1, 2021, and the subsequent discipline.

Q.    Of course. What facts are there that connect your 20-day suspension to the January 3rd or January 18th emails?

A. The fact that I bring this to their attention, continuous safety violations and that – that they see them, and they don't like to – to have things brought to their attention, and that's what it is.

Q. So I'm looking at Mr. Jared's message back to you on January 19th and Mr. Miller's email to you on January 18th. Where do they say that they don't like to have things brought to their attention?

A. It's just obvious.

Q. Do they say it anywhere in either of their messages –

A. No.

Q. – that they don't like to have things brought to their attention?

A. No.

Q. But you have the personal belief they don't like to have things brought to their attention; is that right?

A. Yes.

Support:        **Appendix p. 33**, Sexton Dep. 160:15–161:11.

**PLAINTIFF RESPONSE: <u>Deny.</u>** Plaintiff has demonstrated circumstantial evidence of temporal proximity exists due to the closeness in time of Sexton's protected activities and the test conducted by Jared; inconsistent application of policies exists in that Jared imposed a set up test when the test is to be observed and the record does not show any other employee to have received the same severity of discipline as Sexton (*Id.* at 19); pretext exists in the form of CP's monetary motivations based on speed and efficiency (*Id.* at 13-14); and more.

109.    Pressed for any and all evidence to support his accusation that Jared had a retaliatory motive when deciding to perform the e-test, Sexton said only: "That's the way it is."

Support:        **Appendix pp. 30, 33,** Sexton Dep. 147:24–149:12, 158:6–21, 160:15–161:11.

**PLAINTIFF RESPONSE: <u>Deny.</u>** Sexton was not asked for "any and all evidence" to support his claim that Jared had a retaliatory motive. In fact, the quote "That's the way it is" was in response to the question "What **<u>OTHER</u>** evidence is there that shows that's the case…?" Dkt. 50-3 at CP Appendix 30. Emphasis added. This is because Sexton has just mention several things that supported his claim—in the six pages of transcript cited to by CP Mr. Sexton noted the hostility and antagonism that arises from safety complaints ("The managers don't like when you are - - when, number one they have an initial terminal delay of the one that I incurred at Marquette") *Id.* (which alone is two different explanations to support his Claim); Sexton also noted that despite raising safety concerns—nothing was done regarding those concerns; *Id.* Sexton then noted that monetary component that a delay affect's management's bonuses. *Id.*

110.    Jared's decision to administer the efficiency test on February 1, 2021 was entirely unrelated to the emails Sexton sent in January 2021.

<u>Support:</u>        **Appendix p. 421**, Jared Decl. ¶¶ 15-16.

**PLAINTIFF RESPONSE: <u>Deny</u>**. To the extent this statement is an attempt to conflate the terms "related" and "contributing factor" the law is clear on what a plaintiff need demonstrate to establish their contributing factor case: Courts describe the burden-shifting framework as answering the "'elusive factual question" surrounding the intent of the employer's disciplinary action. *Murray v. UBS Securities, LLC,* 601 U.S. ___ at 12 slip op. (2023), quoting *Watson v. Forth Worth Bank & Trust*, 487 U.S. 977, 986, quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 255, n.8. "'The contributing factor element of a complaint may be established by direct evidence or indirectly by circumstantial evidence.'" *Ray v. Union Pacific RR. Co.*, 971 F. Supp. 2d 869, 884 (S.D. Iowa 2013) quoting *DeFrancesco v. Union R.R. Co.*, ARB no. 10-114, ALJ No. 2009-FRS-00009, at 5 (ARB Feb. 29, 2012). Circumstantial evidence may include:

> temporal proximity, indications of pretext, inconsistent application of an employer's policies, an employer's shifting explanations for its actions, antagonism or hostility toward a complainant's protected activity, the falsity of an employer's explanation for the adverse action taken, and a change in the employer's attitude toward a complainant after he or she engaged in protected activity.
>
> *Id.*

At this point, it is undisputed that Sexton was suspended within the a couple weeks after his February 9, 2021 email (Dkt. 50-3 at CP Appendix 180); CP assessed more severe discipline against Sexton for the same alleged rule violation than any other employee demonstration inconsistent application of policies and hostility (Dkt. 53-2 at paras. 150-159); and CP's agreed upon method for reviewing its disciplinary actions (Public Law Board review) cited Jared's involvement in the test "in a manner which does raise questions regarding safety" and "that the charges were levied based on his test and observations." (Dkt. 50-3 at CP Appendix 183). And CP agreed to remove the discipline demonstrating falsity of CP's explanations. See para. 51 herein.

111.    Ross's decision to approve a 20-day suspension for Sexton was entirely unrelated to the emails Sexton sent in January 2021.

Support:    **Appendix p. 417**, Ross Decl. ¶¶ 9–10.

**PLAINTIFF RESPONSE: Deny.** To the extent this statement is an attempt to conflate the terms "related" and "contributing factor" the law is clear on what a plaintiff need demonstrate to establish their contributing factor case: Courts describe the burden-shifting framework as answering the "'elusive factual question" surrounding the intent of the employer's disciplinary action. *Murray v. UBS Securities, LLC,* 601 U.S. ___ at 12 slip op. (2023), quoting *Watson v. Forth Worth Bank & Trust*, 487 U.S. 977, 986, quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 255, n.8. "'The contributing factor element of a complaint may be established by direct evidence or indirectly by circumstantial evidence.'" *Ray v. Union Pacific RR. Co.*, 971 F. Supp. 2d 869, 884

(S.D. Iowa 2013) quoting *DeFrancesco v. Union R.R. Co.*, ARB no. 10-114, ALJ No. 2009-FRS-00009, at 5 (ARB Feb. 29, 2012). Circumstantial evidence may include:

> temporal proximity, indications of pretext, inconsistent application of an employer's policies, an employer's shifting explanations for its actions, antagonism or hostility toward a complainant's protected activity, the falsity of an employer's explanation for the adverse action taken, and a change in the employer's attitude toward a complainant after he or she engaged in protected activity.
>
> *Id.*

At this point, it is undisputed that Sexton was suspended within the a couple weeks after his February 9, 2021 email (Dkt. 50-3 at CP Appendix 180); CP assessed more severe discipline against Sexton for the same alleged rule violation than any other employee demonstration inconsistent application of policies and hostility (Dkt. 53-2 at paras. 150-159); and CP's agreed upon method for reviewing its disciplinary actions (Public Law Board review) cited Jared's involvement in the test "in a manner which does raise questions regarding safety" and "that the charges were levied based on his test and observations." (Dkt. 50-3 at CP Appendix 183). And CP agreed to remove the discipline demonstrating falsity of CP's explanations. See para. 51 herein.

112.   On February 9, 2021, Sexton sent an email to Miller and Ross regarding McKelvey driving too fast for the conditions. Sexton also shared his version of the events of the morning of February 1, 2021 in Marquette. Ross confirmed receipt on Wednesday, February 10, 2021 and told Sexton he would look into it and get back to him. Ross responded again on Monday, February 15, 2021 that he had gathered information and wanted to meet with Sexton to discuss. Ross recalls speaking to Sexton at some point after his February 15, 2021, response to Sexton.

Support:        **Appendix pp. 363–364, 366**, Ross Dep. 13:3–19:6, 25:2–26:5; **Appendix p. 417**, Ross Decl. ¶ 11; **Appendix p. 34**, Sexton Dep. 162:20–164:22; **Appendix pp. 217–218**, Sexton Dep. Ex. 18.

**PLAINTIFF RESPONSE: <u>Admit</u>** as to on February 9, 2021, Sexton sent an email to Miller and Ross regarding McKelvey driving too fast for the conditions. **<u>Admit</u>** that Sexton also described events of the morning of February 1, 2021, in Marquette. **<u>Admit</u>** that Ross confirmed receipt on Wednesday February 10, 2021, and told Sexton he would look into it and get back to him. **<u>Admit</u>** responded again on Monday, February 15, 2021 that he had gathered information and wanted to meet with Sexton to discuss. **<u>Admit</u>** that Ross recalls speaking to Sexton at some point after his February 15, 2021, response to Sexton.

113.    Ross's decision to approve a 20-day suspension for Sexton was entirely unrelated to Sexton's February 9, 2021 email and the resulting conversation between Sexton and Ross. In fact, Ross testified that he does not look at the names of employees when deciding discipline; instead, but instead reviews the portions of a summary chart that list the offense, the employee's discipline history, and other objective factors.

Support:        **Appendix p. 376**, Ross Dep. 80:13–25; **Appendix p. 417**, Ross Decl. ¶¶ 11, 12.

**PLAINTIFF RESPONSE: <u>Deny</u>** that CP's discipline against Sexton was "unrelated" to Sexton's February 9, 2021. To the extent this statement is an attempt to conflate the terms "related" and "contributing factor" the law is clear on what a plaintiff need demonstrate to establish their contributing factor case: Courts describe the burden-shifting framework as answering the "'elusive factual question" surrounding the intent of the employer's disciplinary action. *Murray v. UBS Securities, LLC,* 601 U.S. ___ at 12 slip op. (2023), quoting *Watson v. Forth Worth Bank & Trust*, 487 U.S. 977, 986, quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 255, n.8. "'The contributing factor element of a complaint may be established by direct evidence or indirectly by circumstantial evidence.'" *Ray v. Union Pacific RR. Co.*, 971 F. Supp. 2d 869, 884

(S.D. Iowa 2013) quoting *DeFrancesco v. Union R.R. Co.*, ARB no. 10-114, ALJ No. 2009-FRS-00009, at 5 (ARB Feb. 29, 2012). Circumstantial evidence may include:

> temporal proximity, indications of pretext, inconsistent application of an employer's policies, an employer's shifting explanations for its actions, antagonism or hostility toward a complainant's protected activity, the falsity of an employer's explanation for the adverse action taken, and a change in the employer's attitude toward a complainant after he or she engaged in protected activity.
>
> *Id.*

At this point, it is undisputed that Sexton was suspended within the a couple weeks after his February 9, 2021 email (Dkt. 50-3 at CP Appendix 180); CP assessed more severe discipline against Sexton for the same alleged rule violation than any other employee demonstration inconsistent application of policies and hostility (Dkt. 53-2 at paras. 150-159); and CP's agreed upon method for reviewing its disciplinary actions (Public Law Board review) cited Jared's involvement in the test "in a manner which does raise questions regarding safety" and "that the charges were levied based on his test and observations." (Dkt. 50-3 at CP Appendix 183). And CP agreed to remove the discipline demonstrating falsity of CP's explanations. See para. 51 herein.

**Deny** as to Ross does not look at the names of employees when deciding discipline; but instead reviews the portions of a summary chart that list the offense, the employee's discipline history, and other objective factors. The summary chart itself lists the employee's name. Dkt. 50-3 at CP Appendix 287. Additionally, every single page of the disciplinary transcript lists Sexton's name on the top and of course, his name is throughout the transcript. Dkt. 50-3 at CP Appendix 79-179. There is no possible way that Ross does not "look" at the names of employees when deciding discipline.

114.     At his deposition, Sexton conceded that the only evidence he has that his February 9, 2021 email contributed to any negative action against him is his belief that managers "don't like it" when he sends emails and brings "all this safety stuff to their attention."

Support:      **Appendix p. 34**, Sexton Dep. 164:23–165:12.

**PLAINTIFF RESPONSE: <u>Deny.</u>** Sexton did not testify that this was the "only" evidence. He was asked, "Do you believe this February 9th email what you sent complaining about Kurt McKevley's driving contributed to any negative event that followed the email?" Dkt. 50-3 at CP Appendix 34 – Sexton Dep. 164:23-165:12. Mr. Sexton responded, "Part of it." *Id.* When asked what evidence he has of that, Sexton did respond, "they don't like it." *Id.* However, he was not asked whether that was the "only" evidence, or if there was any other evidence.

VI.     PROCEDURAL HISTORY

115.     Sexton filed a complaint alleging retaliation in violation of 49 U.S.C. § 20109 with the Occupational Safety and Health Administration ("OSHA") on or around June 30, 2021.

Support:      **Appendix p. 410**, Sullivan Decl. Ex. E (OSHA Complaint).

**PLAINTIFF RESPONSE: <u>Admit.</u>**

116.     OSHA dismissed the case on August 3, 2022, finding that CP would have suspended Sexton for 20 days even in the absence of any alleged protected activity. Specifically, OSHA determined that Sexton violated GCOR 5.3.7 and was disciplined in accordance with CP's discipline policy. Finally, OSHA concluded that there was no evidence of animus toward Sexton because of any alleged protected activity, nor was there any evidence that his alleged protected activities contributed to CP's discipline.

Support:      **Appendix p. 411–413**, Sullivan Decl. Ex. F (OSHA Dismissal).

**PLAINTIFF RESPONSE: <u>Admit</u>** as to the contents of OSHA's findings which was based on OSHA's findings with no discovery, additionally, this is a de novo review and therefore OSHA's findings have no bearing on this case.

      117.    Sexton appealed to the Office of Administrative Law Judges on August 4, 2022.

      <u>Support</u>:      **Appendix p. 414**, Sullivan Decl. Ex. G (Sexton DOL Appeal).

**PLAINTIFF RESPONSE: <u>Admit.</u>**


August 26, 2024              Respectfully Submitted,
                                  Y<small>AEGER</small> & J<small>UNGBAUER</small> B<small>ARRISTERS</small>, PLC

                                    By: <u>*/s/ Cyle Cramer*</u>
                                    John D. Magnuson, *pro hac vice.*
                                    Cyle A. Cramer, *pro hac vice.*
                                    4601 Weston Woods Way
                                    Saint Paul, MN 55127
                                    Telephone: (651) 288-9500
                                    jmagnuson@yjblaw.com
                                    ccramer@yjblaw.com

                                    and

                                    MEGAN R. MERRITT AT0010635
                                        for
                                    SHUTTLEWORTH & INGERSOLL, P.L.C.
                                    115 3<small>rd</small> Street SE, Suite 500
                                    P.O. Box 2107
                                    Cedar Rapids, IA 52406-2107
                                    PHONE: (319) 365-9461
                                    FAX: (319) 365-8443
                                    E-MAIL: mrm@shuttleworthlaw.com

                                    *Attorneys for Plaintiff John Sexton*