**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION**

| | | |
|---|---|---|
| John Sexton, | ) | Case No. 23-cv-00031 |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Magistrate Judge Helen C. Adams |
| | ) | |
| Dakota, Minnesota & Eastern Railroad | ) | |
| Corporation d/b/a Canadian Pacific, a | ) | |
| Delaware Corporation, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

DORSEY & WHITNEY LLP

Joshua Hughes (AT0014950)
hughes.joshua@dorsey.com
Dorsey & Whitney LLP
801 Grand Ave, Suite 4100
Des Moines, IA 50309
Tel: (515) 283-1000
Fax: (515) 598-7704

John T. Sullivan (pro hac vice)
sullivan.jack@dorsey.com
Briana Al Taqatqa (pro hac vice)
altaqatqa.briana@dorsey.com
Dorsey & Whitney LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
Tel: (612) 340-2600
Fax: (612) 340-2868

ATTORNEYS FOR DEFENDANT

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ....................................................................................... iii

INTRODUCTION ................................................................................................... 1

ARGUMENT ......................................................................................................... 2

I.     LEGAL STANDARD FOR SEXTON'S MOTION. ..................................... 2

II.    SEXTON IGNORES CONTROLLING AUTHORITY APPLICABLE
TO AN ESSENTIAL ELEMENT OF HIS CLAIM AND SO CANNOT
BE ENTITLED TO JUDGMENT AS A MATTER OF LAW. .................... 3

III.   SEXTON'S MOTION FAILS WHEN CONTROLLING AUTHORITY
IS APPLIED TO FACTS VIEWED IN THE LIGHT MOST
FAVORABLE TO CP. ............................................................................. 6

        A.    The Facts Properly Viewed in the Light Most Favorable to CP ..................... 7

               1.    Requirements of GCOR 5.3.7. ................................................ 7

               2.    Sexton Violated GCOR 5.3.7. ................................................. 8

               3.    CP Proved Sexton Violated GCOR 5.3.7, and Disciplined
Him. ......................................................................................... 8

               4.    Sexton's Disagreement with Assistant Trainmaster Kurt
McKelvey was not Related to Sexton's Violation of
GCOR 5.3.7. ........................................................................... 9

        B.    Sexton Impermissibly Resolves Issues and Draws Inferences in
His Own Favor When Identifying Alleged Protected Activity ..................... 10

        C.    Sexton Impermissibly Resolves Issues and Draws Inferences in
His Own Favor When Asserting that CP Knew of His Protected
Activities. ................................................................................................. 11

        D.    Sexton Fails to Show as a Matter of Law that the February 1,
2021 Efficiency Test and CP's CBA-Required Disciplinary
Investigation are Adverse Actions. ............................................................ 13

        E.    Sexton Cannot Demonstrate that the Adverse Actions he Alleges
were Prompted by Intentional Retaliation for Engaging in
Protected Activity. .................................................................................... 14

1.    Temporal proximity. .......................................................................... 15

2.    Indications of pretext and falsity of an employer's
      explanation. ...................................................................................... 16

3.    Inconsistent application of policies.................................................... 17

4.    Antagonism, hostility, and change in CP's attitude toward
      Sexton. .............................................................................................. 18

IV.    SEXTON IS NOT ENTITLED TO JUDGMENT AGAINST CP's
       STATUTORY AFFIRMATIVE DEFENSE. ........................................................ 19

CONCLUSION ................................................................................................................ 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.E.S. v. Skiles,*
 708 F. Supp. 2d 867 (S.D. Iowa 2010) ............................................................ *passim*

*Allen v. Admin. Rev. Bd.*,
 514 F.3d 468 (11th Cir. 2008) ..........................................................................4

*Ameristar Airways, Inc. v. Admin. Rev. Bd.*,
 650 F.3d 562 (5th Cir. 2011) ............................................................................4

*Anderson v. Liberty Lobby, Inc.*,
 477 U.S. 242 (1986)......................................................................................2, 15

*Araujo v. N.J. Transit Rail Ops., Inc.*,
 708 F.3d 152 (3rd Cir. 2013) .........................................................................1, 4

*Blackorby v. BNSF Railway,*
 849 F.3d 716 (8th Cir. 2017) ............................................................................5

*Brisbois v. Soo Line R.R. Co.*,
 124 F. Supp. 3d 891 (D. Minn. 2015)..............................................................14

*Burlington N. & Santa Fe Ry. v. White*,
 548 U.S. 53 (2006)...........................................................................................13

*Dakota, Minn. & E. R.R. Corp. v. United States DOL Admin. Review Bd.*,
 948 F.3d 940 (8th Cir. 2020) ............................................................................5

*DeFrancesco v. Union R.R. Co.*,
 ARB No. 10-114, ALJ No. 2009-FRS-009, 2012 DOL Ad. Rev. Bd. LEXIS
 23 (Dept. Labor Administrative Review Board Feb. 9, 2012)..................................4

*Gunderson v. BNSF Ry.*,
 850 F.3d 962 (8th Cir. 2017) ............................................................................5

*Heim v. BNSF Ry.*,
 849 F.3d 723 (8th Cir. 2017) ............................................................................5

*Hess v. Union Pac. R.R.*,
 898 F.3d 852 (8th Cir. 2018) ............................................................................5

*Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*,
 778 F.3d 593 (7th Cir. 2015) ..................................................................3, 6, 17

*Hunt v. Cromartie*,
   526 U.S. 541 (1999) ..........................................................................................1

*Husinga v. Fed.-Mogul Ignition Co.*,
   519 F. Supp. 2d 929 (S.D. Iowa 2007) ..........................................................7

*Kuduk v. BNSF Railway*,
   768 F.3d 786 (8th Cir. 2014) ................................................... *passim*

*Kuduk v. BNSF Ry. Co.*,
   980 F. Supp. 2d 1092 (D. Minn. 2013) ..........................................................19

*Loos v. BNSF Railway*,
   865 F.3d 1106 (8th Cir. 2017), *rev'd on other grounds*, 139 S. Ct. 893, 203 L.
   Ed. 2d 160 (2019) ..........................................................................................5

*Metro. Life Ins. Co. v. Johnson*,
   297 F.3d 558 (7th Cir. 2002) ..........................................................................7

*Neylon v. BNSF Ry. Co.*,
   968 F.3d 724 (8th Cir. 2020) ..........................................................................5

*Ray v. Union Pacific R.R. Co.*,
   971 F. Supp. 2d 869 (S.D. Iowa 2013) ..........................................................4

*Turner v. Ferguson*,
   141 F.3d 821 (8th Cir. 1998) ...............................................................1, 3, 6

*W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
   299 F. Supp. 3d 1055 (D. Minn. 2018) ..........................................................3

## Statutes

42 U.S.C. § 20109(b)(1)(A) ..................................................................................11

49 C.F.R. § 217.9 ..................................................................................................14

## Rules

Fed. R. Civ. P. 11(b) ..............................................................................................5

Fed. R. Civ. P. 56(a) ..............................................................................................2

Local Rule 7(g) ......................................................................................................5

## INTRODUCTION

Plaintiff John Sexton ("Sexton") asks this Court to declare him the winner of this lawsuit—while relying on incorrect legal standards and improperly casting facts and inferences in the light most favorable to *himself*, not Defendant Dakota, Minnesota & Eastern Railroad Corporation d/b/a Canadian Pacific ("DM&E" or "CP"). His motion for partial summary judgment fails as a result.

Sexton's legal errors are both procedural and substantive—and fatal to his motion. Procedurally, Sexton does not apply controlling law applicable to motions in which a party seeks summary judgment on a claim for which the moving party carries the burden of proof. In the Eighth Circuit, summary judgment in this posture is barred "when the evidence is susceptible of different interpretations or inferences by the trier of fact." *A.E.S. v. Skiles*, 708 F. Supp. 2d 867, 872 (S.D. Iowa 2010); *see also Turner v. Ferguson*, 141 F.3d 821, 824 (8th Cir. 1998) ("Summary judgments in favor of parties who have the burden of proof are rare, and rightly so."). Sexton ignores this burden and, throughout his brief, improperly draws inferences of facts only in his own favor. His motion for the "rare" relief he seeks should be denied for this reason alone.

Sexton's motion also fails on the substantive law. Not once does he cite *Kuduk v. BNSF Railway*, the Eighth Circuit decision that controls retaliation claims under the Federal Railroad Safety Act ("FRSA"). 768 F.3d 786 (8th Cir. 2014). *Kuduk* mandates that Sexton must prove that CP engaged in "intentional retaliation prompted by [Sexton] engaging in protected activity" when attempting to establish that his alleged protected activity was a "contributing factor" to some adverse action. *Id*. at 791. Sexton ignores *Kuduk* and instead brazenly builds his contributing-factor argument on a lower standard that was expressly rejected by *Kuduk*. *See* Pl. Brief at 4–5 (citing inappositely *Araujo v. N.J. Transit Rail Ops., Inc.*, 708 F.3d 152, 157–58 (3rd Cir. 2013)). Sexton's motion thus fails for this independently sufficient reason: He seeks judgment as a matter of law based on what is unquestionably the wrong law.

# ARGUMENT[1]

Sexton's brief is riddled with contested facts labeled "uncontested," baseless and unsupported accusations about individuals' motivations, and factual inferences drawn in nearly every instance in favor of *Sexton*—not CP. Sexton's motion therefore fails under the standards that apply to plaintiffs seeking partial summary judgment on liability (which standards Sexton ignores).

Sexton's motion fails for the independently sufficient reason that his argument about whether any alleged protected activity was a "contributing factor" to any alleged adverse personnel action is based exclusively on legal principles rejected by the Eighth Circuit a decade ago. He is not entitled to summary judgment as a matter of law.

## I.    LEGAL STANDARD FOR SEXTON'S MOTION.

Summary judgment is warranted when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists "if it has a real basis in the record." *See A.E.S.*, 708 F. Supp. 2d at 869. A "genuine issue of fact is material if it 'might affect the outcome of the suit under the governing law.'" *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Courts must draw "all justifiable inferences" from the facts in favor of the non-moving party. *Id.* at 255–57.

The summary judgment standard applies differently when a party moves for 2umary judgment on a claim for which the party bears the burden of proof. When that is the case, as here, the motion must be denied when "the evidence is susceptible of different interpretations or inferences by the trier of fact." *A.E.S.*, 708 F. Supp. 2d at 872; *Turner*, 141 F.3d at 824 ("Summary

---

[1]    CP does not set out a fact narrative in this brief to avoid repeating its other filings now before the Court. Instead, CP refers the Court to the summary of undisputed facts included in CP's Memorandum of Law in Support of its Motion for Summary Judgment (Dkt. 50-1) for the background of the parties and the underlying events. When necessary, CP addresses Sexton's fact assertions in the sections of this brief that correspond to the sections of Sexton's brief where he made the assertions in the first instance.

judgments in favor of parties who have the burden of proof are rare, and rightly so.").

As described by the Seventh Circuit and applied in this circuit, when a party moves for summary judgment on a claim for which it bears the burden of proof, the party "must lay out the elements of the claim, cite the facts which it believes satisfies these elements, *and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim*." *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015) (emphasis added) (applied by *W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 299 F. Supp. 3d 1055, 1062 (D. Minn. 2018)).

## II.   SEXTON IGNORES CONTROLLING AUTHORITY APPLICABLE TO AN ESSENTIAL ELEMENT OF HIS CLAIM AND SO CANNOT BE ENTITLED TO JUDGMENT AS A MATTER OF LAW.

CP requests that this Court deny Sexton's motion for the simple reason that he cannot be entitled to judgment as a matter of law when he bases his argument on the wrong law.

Controlling Eighth Circuit authority mandates that for CP to be liable for violating the FRSA's prohibition on retaliation, Sexton must prove that (1) he engaged in a protected activity; (2) CP knew or suspected, actually or constructively, that he engaged in the protected activity; (3) he suffered an adverse action; and (4) the "circumstances raise an inference that the protected activity was a contributing factor in the adverse action." *Kuduk*, 768 F.3d at 789. The "contributing factor" element is critical, and the test for it in the Eighth Circuit is clear: The "contributing factor that an employee must prove is **intentional retaliation** prompted by the employee engaging in protected activity." *Id.* at 791 (emphasis added).

Sexton wholly misstates the law applicable to the "contributing factor" element of his claim. Specifically, when asking for CP to be declared liable without a trial, Sexton baldly represents—contrary to *Kuduk*—that he "is not required to make some further showing that his employer acted with 'retaliatory intent.'" Pl. Brief at 4. Instead, Sexton would have this Court

consider the "contributing factor" element to be met if he merely shows that protected activity was "any factor, which alone or in combination with other factors tends to affect in any way the outcome of the [adverse action] decisions." *Id.* at 4–5. Sexton relies on *Araujo v. New Jersey Transit Rail Operations, Inc.*, 708 F.3d 152, 158 (3d Cir. 2013), when asking the Court to apply this standard, which Sexton labels a "relatively low causation analysis." Pl. Brief at 12–13.

Sexton's argument is plainly wrong and barred by *Kuduk*, which expressly considered and rejected the very *Araujo* standard relied on by Sexton. 768 F.3d at 790–91. As stated in *Kuduk*:

> Relying on the Third Circuit's decision in *Araujo v. N.J. Transit Rail Ops., Inc.*, Kuduk argues that he need not demonstrate the existence of a retaliatory motive on the part of the employee taking the alleged prohibited personnel action in order to establish that his protected activity was a contributing factor to the personnel action. . . . **We disagree. . . . the contributing factor that an employee must prove is intentional retaliation prompted by the employee engaging in protected activity.**

*Id.* (quotation marks, citations, alterations omitted) (emphasis added).

Notably, Sexton does not cite a single Eighth Circuit appellate decision when discussing the contributing factor standard. In fact, the one district court decision that he cites from this circuit predates *Kuduk* by one year and also relies on the now-rejected *Araujo* standard: *Ray v. Union Pacific R.R. Co.*, 971 F. Supp. 2d 869, 884 (S.D. Iowa 2013) (cited in Pl. Brief at 5.) Every other case Sexton cites as support for the incorrect standard comes from some other circuit and predates *Kuduk*, and so is inapposite because of the controlling law in this Circuit: *Kuduk. See* Pl. Brief at 4–5 (citing *Araujo*, 703 F.3d 152; *Ameristar Airways, Inc. v. Admin. Rev. Bd.*, 650 F.3d 562, 567 (5th Cir. 2011); *Allen v. Admin. Rev. Bd.*, 514 F.3d 468, 476 n.3 (11th Cir. 2008); *Ray*, 971 F. Supp. 2d 869; *DeFrancesco v. Union R.R. Co.*, ARB No. 10-114, ALJ No. 2009-FRS-009, 2012 DOL Ad. Rev. Bd. LEXIS 23 (Dept. Labor Administrative Review Board Feb. 9, 2012)).

There is no question that *Kuduk* is the law, as the Eighth Circuit has repeatedly reaffirmed

its holding and applied its reasoning when assessing the FRSA contributing-factor standard. As

the Eighth Circuit itself summarized in a 2020 decision:

> In *Heim v. BNSF Ry.*, 849 F.3d 723, 727 (8th Cir. 2017), we
> confirmed that a FRSA plaintiff must prove "intentional retaliation
> prompted by the employee engaging in protected activity." . . . In
> *Blackorby v. BNSF Railway*, 849 F.3d 716, 721–22 (8th Cir. 2017),
> we again followed *Kuduk's* holding that "the 'essence' of the
> FRSA's employee-protections provision is 'discriminatory
> animus,'" rejecting arguments by plaintiff and the Secretary of
> Labor that we follow the Third Circuit's decision in *Araujo*, a
> contention considered and rejected in *Kuduk*. In *Loos v. BNSF
> Railway*, we again held that an FRSA plaintiff "must show that
> intentional retaliation prompted by a protected activity was a
> contributing factor." 865 F.3d 1106, 1112 (8th Cir. 2017), *rev'd on
> other grounds*, 139 S. Ct. 893, 203 L. Ed. 2d 160 (2019); *accord
> Hess v. Union Pac. R.R.*, 898 F.3d 852, 858 (8th Cir. 2018);
> *Gunderson v. BNSF Ry.*, 850 F.3d 962, 969 (8th Cir. 2017).

*Dakota, Minn. & E. R.R. Corp. v. United States DOL Admin. Review Bd.*, 948 F.3d 940, 945–46

(8th Cir. 2020). Accordingly then, for his motion to succeed, Sexton must show that he is entitled

to summary judgment as a matter of law under the standard set by *Kuduk*, *Heim*, *Blackorby*, *Loos*,

*Hess*, *Gunderson*, and *Dakota, Minn. & E. R.R. Corp.*

Yet Sexton does not even attempt to argue that he is entitled to summary judgment as a

matter of law under the applicable law. Instead, he asks this Court to apply the *Araujo* standard

that has been rejected repeatedly by the Eighth Circuit and enter summary judgment based on its

"relatively low" standard. This is wrong as a matter of law, and CP respectfully requests that this

Court deny Sexton's motion for partial summary judgment on this legal basis.[2] *Neylon v. BNSF*

---

[2]    Sexton makes no argument that *Kuduk* should be modified or reversed or that new law
should be established. Fed. R. Civ. P. 11(b). He simply applies the wrong law without explanation.
It may be that Sexton planned to address *Kuduk* in his reply brief. If that is so, this Court should
disregard his argument as contrary to its rules, given that *Kuduk* is long-settled law and CP's
reliance on it must have been anticipated by Sexton. *See* Local Rule 7(g) (allowing reply briefs "to
assert newly-decided authority or to respond to new and unanticipated arguments").

*Ry. Co.*, 968 F.3d 724 (8th Cir. 2020) ("Regardless of other circuits' decisions, this court requires [plaintiff] to show intentional retaliation.").

### III.  SEXTON'S MOTION FAILS WHEN CONTROLLING AUTHORITY IS APPLIED TO FACTS VIEWED IN THE LIGHT MOST FAVORABLE TO CP.

Sexton's reliance on the wrong legal standard for the contributing-factor element of his FRSA claim is fatal to his motion for summary judgment. His motion also fails because Sexton does not carry his burden to demonstrate that he is entitled to judgment when the facts are assessed accurately and with inferences drawn, as they must be, in favor of CP.

For his motion to succeed, Sexton must demonstrate that there are no genuine issues of material fact regarding whether: (1) he engaged in a protected activity; (2) CP knew or suspected, actually or constructively, that he engaged in the protected activity; (3) he suffered an adverse action; and (4) the circumstances raise an inference that the protected activity was a contributing factor in the adverse action – meaning, that CP decisionmakers intentionally retaliated against him and were prompted by his alleged protected activity when doing so. *Kuduk*, 768 F.3d at 789, 791. Because he carries the burden of proof, Sexton cannot rely on the absence of evidence but must instead "demonstrate that the record is so one-sided as to rule out the prospect of a finding in favor of" CP on Sexton's retaliation claim. *Hotel 71 Mezz Lender LLC*, 778 F.3d at 601. Sexton's motion must be denied if "the evidence is susceptible of different interpretations or inferences by the trier of fact." *A.E.S.*, 708 F. Supp. 2d at 872; *Turner*, 141 F.3d at 824.

As detailed below, Sexton does not demonstrate that the record here is so one-sided as to rule out a finding in CP's favor. Further, nearly every interpretation or inference that Sexton impermissibly draws in his favor is equally susceptible, or more susceptible, of an interpretation in CP's favor. When the record is properly assessed in CP's favor, it is clear that Sexton's motion

falls far short of the necessary standards for summary judgment in his favor as a matter of law.[3]

### A.    The Facts Properly Viewed in the Light Most Favorable to CP.

Sexton's FRSA claim arises from a 20-day suspension imposed by CP's Vice President Operations Southern Region, Jason Ross, in February 2021. (RSOF ¶ 148, SAMF ¶ 39.)[4] Ross imposed the 20-day suspension because Sexton violated Rule 5.3.7 of the General Code of Operating Rules ("GCOR") while performing what is called a "shove movement" on February 1, 2021. (SAMF ¶¶ 13-17, 40.)

### 1.    Requirements of GCOR 5.3.7.

By way of background: When performing a shove movement, locomotive engineers such as Sexton operate the locomotive from the back of the train and so rely on a conductor to communicate about what is in front of the train. (SAMF ¶ 1.) Typically, conductors communicate with engineers by radio to inform the engineer about the length of track remaining before the train must be stopped. (*Id.*) The conductor often communicates the distance in decreasing "car counts" – the number of car lengths until the train must be at a stop. (*Id.*) Applicable to this case, GCOR

---

[3]    CP's pending motion for summary judgment (Dkt. 50) has no bearing on the positions it takes in this motion. "Rather, for the purposes of summary judgment, a party concedes there are no factual issues and accepts the other party's allegations only for the purposes of their own motion." *Husinga v. Fed.-Mogul Ignition Co.*, 519 F. Supp. 2d 929, 942 (S.D. Iowa 2007) (citations omitted). Thus, CP does not waive arguments for its own motion to be granted by arguing that Sexton's motion should be denied, and for purposes of Sexton's motion, CP is entitled to the benefit of conflicts in the evidence and justifiable inferences that may be drawn from the evidence. *Id.* (citing *Metro. Life Ins. Co. v. Johnson*, 297 F.3d 558, 561–62 (7th Cir. 2002) ("With cross-motions [for summary judgment], our review of the record requires that we construe all inferences in favor of the party against whom the motion under consideration is made.")).

[4]    Citations to "RSOF ¶ __" are to Defendant's Local Rule 56(b)(2) Response to Plaintiff's Statement of Material Facts. Citations to "SOF ¶ __" are to Plaintiff's Statement of Material Facts. Dkt. 53-2, and citations to "SAMF ¶ __" are to CP's Local Rule 56 (b)(3) Statement of Additional Material Facts. CP's statements of responsive and additional facts are submitted with this memorandum, along with an Appendix to which evidence is attached.

5.3.7 mandates that an engineer must have a train at a full stop within half the number of car lengths that were last received over the radio, if no further instructions are received. (*Id*. ¶ 2.) For example, if the last car count communicated is 20, the engineer must be prepared to have the train at a full stop within 10 car counts—and then in fact stop the train within that distance if no additional communication is received. (SAMF ¶¶ 2–3.)

### 2. Sexton Violated GCOR 5.3.7.

Sexton violated GCOR 5.3.7 on February 1, 2021, when he was performing a shove movement in the Nahant rail yard in Davenport, Iowa. (RSOF ¶¶ 100–101.) As Sexton himself later said at CP's hearing investigating the incident, the conductor assigned to protect the shove movement, Justin DePover, told Sexton that he was "good for 40, 15 cars to a stop" while shoving onto open track. (SAMF ¶¶ 12–14.) GCOR 5.3.7 required Sexton to have the train stopped within seven and one-half car lengths after no further instructions were received. (SAMF ¶ 14.) Sexton stopped the train after 11 car lengths – and so violated GCOR 5.3.7. (*Id*.)

CP General Manager Operations – US West Division, Tom Jared, observed Sexton's violation after taking steps to assess whether Sexton would comply with the rule through what CP calls an "efficiency test" or "e-test." (SAMF ¶ 17.) Jared followed applicable policies and rules when administering the e-test. (*Id*. ¶¶ 16-17.) Specifically, after hearing DePover give the "15 cars to a stop" instruction, Jared instructed DePover to give no further instructions in order to determine if Sexton would follow GCOR 5.3.7. (*Id*. ¶ 17.) Sexton did not. (*Id*. ¶ 14.) At the time he administered the e-test, Jared did not know Sexton was the engineer operating Train 474-31; he only learned it was Sexton after the train stopped and Sexton disembarked. (*Id*. ¶ 18.)

### 3. CP Proved Sexton Violated GCOR 5.3.7, and Disciplined Him.

The collective bargaining agreement between CP and the union that represents Sexton entitled Sexton to a hearing at which CP had to prove Sexton violated GCOR 5.3.7 before

discipline could be imposed. (RSOF ¶¶ 86; SAMF ¶ 29.) CP held the hearing on February 10, 2021, and both Sexton and CP provided testimony and evidence. (SAMF ¶¶ 29–38.) A neutral CP officer, Mark Johnson, presided over the hearing, determined that the charge was proven, and recommended a 20-day suspension. (RSOF ¶¶ 138–139, 144, 147.) Consistent with the CBA and CP's US Investigation Training Manual, Johnson had discretion to make his determination without hearing from every witness that Sexton and his union wanted to appear and addressed in his findings his reasoning for why the additional witnesses were not necessary. (RSOF¶¶ 171–175; SAMF ¶¶ 29, 34.)

Johnson's recommendation for a 20-day suspension went to Ross, who imposed the penalty. (SAMF ¶ 39–40.) Jared did not make any recommendation and did not decide or impose the discipline. (RSOF ¶ 148, SAMF ¶ 39.) The CP administrative office has permission to add Jared's stamped, electronic signature to correspondence that needs to go out from the General Manager. (SAMF ¶ 39.) The February 26, 2021 discipline notice went out to Sexton on Jared's letterhead and over his electronic signature; Jared did not read the notice before it was sent. (*Id.*)

###    4.    Sexton's Disagreement with Assistant Trainmaster Kurt McKelvey was not Related to Sexton's Violation of GCOR 5.3.7.

Sexton contends that his February 26, 2021 discipline was the result of a chain of events that began early in his February 1, 2021 work shift. Specifically, Sexton suggests that his discipline was related to the disagreement that he had with Assistant Trainmaster Kurt McKelvey at the DM&E railyard in Marquette, Iowa, about whether there was enough recent snowfall to require nearby crossings (areas where railroad track crossed roadways) to be cleared of snow before Sexton could operate Train 474-31 from Marquette to Davenport. (RSOF ¶¶ 15–17.) McKelvey initially thought there was not enough snowfall to warrant cutting the tracks. (RSOF ¶ 16; ¶ SAMF ¶ 7) Sexton insisted on cutting the tracks before operating the 474-31. (RSOF ¶¶ 15–17.)

McKelvey ultimately agreed, which is consistent with CP's policy: when in doubt, take the safe course. (SAMF ¶ 7.) After the disagreement, Sexton proceeded to clear the snow by "cutting" the crossings, which involved running only a locomotive over the rail crossings. (RSOF ¶¶ 29–31.)

On February 9, 2021—after he had received notice of his disciplinary hearing and the day before the hearing was held—Sexton emailed CP Senior Vice President of Operations Tracy Miller and Vice President Operations Southern Region, Jason Ross to complain about McKelvey's driving on snow-covered roads. (RSOF ¶¶ 87, 89.) In the same email, Sexton reported the disagreement that he had with McKelvey about whether crossings needed to be cut on February 1, 2021. (RSOF ¶ 87.) It is uncontested that Miller and Ross agreed with Sexton that the crossings needed to be cut; Ross was clear that he believed Sexton was in the right and that Sexton's disagreement with McKelvey had nothing to do with the discipline imposed for Sexton's unrelated violation of GCOR 5.3.7. (SAMF ¶¶ 25–27.)

**B.    Sexton Impermissibly Resolves Issues and Draws Inferences in His Own Favor When Identifying Alleged Protected Activity.**

Sexton identifies three actions as alleged protected activity in his motion. Only two—the disagreement with McKelvey and the February 9, 2021 email to Miller and Ross—should be considered by this Court in its analysis of whether Sexton is entitled to summary judgment as a matter of law. CP acknowledges, for purposes of summary judgment only, that Sexton's statements to McKelvey and his email to Miller and Ross could constitute protected activity under the FRSA when viewed in the light most favorable to CP.

The third alleged protected activity[5] encompasses answers Sexton gave in response to questions by his union representative during CP's formal disciplinary investigation into his

---

[5]    Sexton's Complaint also alleges that two emails he sent in January 2021 were protected actions, Dkt. 26 at ¶¶ 21–22, but Sexton has now apparently abandoned that theory.

violation of GCOR 5.3.7. According to Sexton, his answers about Jared's conduct of the e-test were a "report" that should be considered protected activity. This is not so when facts are viewed in the light most favorable to CP and inferences are drawn in its favor.

Viewed in the light most favorable to CP, Sexton's statements at the February 10, 2021 hearing were nothing but answers to questions posed to him by his union representative, who asked if Sexton believed Jared violated GCOR 6.5 when he "interrupted" DePover's car counts. (SAMF ¶ 37.) Sexton responded: "Absolutely. He created a [sic] unsafe act." (*Id.*) Johnson then stopped the questioning, noting that the hearing was held to determine if Sexton—not Jared—complied with operating rules. (*Id.*)

Sexton's answers at the hearing are not protected conduct as a matter of law. The FRSA protects employees who "report[], in good faith, a hazardous safety or security condition." 42 U.S.C. § 20109(b)(1)(A). Drawing inferences in CP's favor, Sexton's statements were no such report. Instead, the justifiable inference is that Sexton was trying to minimize his conduct and avoid responsibility for his rule violation by undermining the validity of the test that established the violation. (RSOF ¶ 37.) His statements were certainly not a "report" to Johnson, who made it clear that the hearing was not the forum for Sexton to address concerns about Jared. (*Id.*) CP therefore asks this Court not to consider Sexton's statements about Jared at his discipline hearing to be protected activity.

### C.    Sexton Impermissibly Resolves Issues and Draws Inferences in His Own Favor When Asserting that CP Knew of His Protected Activities.

Sexton's factual narrative about how and when CP leaders supposedly learned about his protected activities is a disorienting account that jumps from one week to another and conflates the roles and actions of various CP managers, while impermissibly drawing inferences in Sexton's favor, not CP's. (Pl. Brief at 9–10.) Sexton's recitation of facts thus cannot be the basis for

summary judgment in Sexton's favor as a matter of law on the element of whether CP decisionmakers knew about Sexton's alleged protected activity when deciding the adverse actions he challenges.

CP does not dispute that Sexton and McKelvey's disagreement occurred early in Sexton's work shift on February 1, 2021, in Marquette, Iowa. (RSOF ¶¶ 15–17.) Despite Sexton's unsupported representations to the contrary, however, there is no evidence establishing that McKelvey told Jared about the disagreement prior to Jared's administration of the e-test at the end of Sexton's shift on February 1, 2021, in Davenport, Iowa. (RSOF ¶¶ 48, 49, 50, 54.) In fact, Jared testified that he may not have learned about McKelvey's and Sexton's disagreement until he received the February 9, 2021 email—an uncontested fact that Sexton does not address in his brief. (RSOF ¶ 54.)

Sexton makes much about reports that McKelvey sent as a matter of course on February 1, 2021, detailing the many factors that caused Train 474-31 to be delayed leaving Marquette on that day. Pl. Brief at 9. Only one of these factors was Sexton's work to cut the crossings, however. (RSOF ¶ 48.) Importantly, McKelvey says nothing in any report about any *disagreement* over cutting, nor does he indicate in any way that the crossing cuts were out of the ordinary or somehow attributable to Sexton or suggest that Sexton should be disciplined for cutting the crossing. (*Id.*)

The only actual evidence that Sexton cites to link McKelvey's interaction with Sexton on February 1 with Jared's e-test later the same day is the fact that phone records show McKelvey and Jared spoke on the phone between the two events, while simultaneously ignoring evidence that makes it clear the two spoke daily in the ordinary course of operations. From the innocuous fact of the phone call alone, Sexton asks the Court to infer that Sexton's protected activity was discussed—which is exactly the sort of inference that the Court cannot draw, as it favors Sexton.

To the contrary, CP is entitled to the different and equally reasonable interpretation that the men did not discuss Sexton's protected activity—an interpretation that is supported by Jared's testimony that he may not have learned about the disagreement between Sexton and McKelvey until after Miller forwarded to him Sexton's February 9, 2021 email to Miller. (RSOF ¶¶ 87, 89; SAMF ¶ 23.)

Ross agreed with Sexton's position about whether the crossings needed to be cut and told both Sexton and McKelvey that was his position. (SAMF ¶¶ 26–27.) Ross was clear that the disagreement between Sexton and McKelvey had nothing to do with his decision to impose a 20-day suspension on Sexton as discipline for his unrelated violation of GCOR 5.3.7. (SAMF ¶ 27.)

### D.    Sexton Fails to Show as a Matter of Law that the February 1, 2021 Efficiency Test and CP's CBA-Required Disciplinary Investigation are Adverse Actions.

CP does not dispute that the 20-day suspension imposed for Sexton's violation of GCOR 5.3.7 is an adverse action for purposes of the FRSA. As for the other adverse actions he alleges, Sexton fails to demonstrate that either Jared's administration of the February 1 test or CP's later CBA-required disciplinary investigation should be considered adverse actions sufficient to support summary judgment against CP as a matter of law.

The Eighth Circuit has not found an e-test to be an adverse action under the FRSA, nor has it set out an analysis for how courts are to determine whether a challenged act is an adverse action in FRSA cases. In Title VII cases, however, courts determine adverse actions to be those that a reasonable employee would find "materially adverse," which means the action "might have dissuaded a reasonable worker from" protected conduct. *See Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006).

Jared's e-test of Sexton was not an adverse action under this principle. It is uncontested that CP conducts e-tests in order to improve safety by ensuring safe behavior by employees

through compliance with operating rules. *See* 49 C.F.R. § 217.9. (SAMF ¶¶ 16–17). It is self-evident that an employee who complies with the rules being tested will pass the e-test—and so would experience no negative consequences, let alone consequences that are "materially adverse." Further, when viewed in CP's favor, the fact is that Sexton did not know he was being e-tested until after he failed the test. It was Sexton's failure to comply with GCOR 5.3.7, not the administration of the test itself, that led to negative consequences. Thus, it cannot be that every e-test—pass or fail—might dissuade a reasonable worker from protected conduct and so be an adverse action. In any event, nothing about Jared's e-test in fact dissuaded Sexton from subsequent acts of alleged protected activity, as it was just eight days later that he emailed his complaints about McKelvey to Miller and Ross. (SAMF ¶ 26.)

As for CP's CBA-required investigation process: There is compelling and persuasive authority that the mere investigation of a rule violation is not an adverse action as a matter of law. In a reported FRSA decision, the District of Minnesota rejected the premise that the accusation and investigation of a railroad rule violation is an adverse action, stating that such a holding would "stretch the FRSA so far." *Brisbois v. Soo Line R.R. Co.*, 124 F. Supp. 3d 891, 903 (D. Minn. 2015) ("To hold that a rail worker suffers an adverse employment action any time a rail carrier attempts to determine whether she has violated a rule—typically by following an investigatory process mandated under a CBA—would have major implications for labor relations in the rail industry."). CP asks this Court to apply *Brisbois* and determine that Sexton has failed to demonstrate that the CBA-required investigation is an adverse action as a matter of law.

### E.    Sexton Cannot Demonstrate that the Adverse Actions he Alleges were Prompted by Intentional Retaliation for Engaging in Protected Activity.

As established in Section II, above, Sexton's motion for summary judgment fails in full because he applies the wrong legal authority to the contributing-factor element of his claim.

Accordingly, his eight-page argument for why he is entitled to summary judgment as a matter of law on the question of whether protected activity was a contributing factor in later alleged adverse actions should be disregarded out of hand, as it is self-evident that summary judgment as a matter of law is only proper when the correct legal standard is applied. *See Liberty Lobby,* 477 U.S. at 248 (describing a genuine issue of fact as material if it "might affect the outcome of the suit under the **governing law**") (emphasis added).

Given Sexton's fatally flawed legal analysis of the contributing-factor standard, this Court need not wade into his factual arguments and contentions about this element. If the Court does, however, it will find that once again Sexton's argument for summary judgment is undermined by his constant effort to skew facts and inferences in the light least favorable to CP and most favorable to Sexton. His arguments are summarized and taken in turn below.

### 1.    Temporal proximity.

In short, Sexton asks this Court to infer that Sexton's disagreement with McKelvey should be viewed as a contributing factor to his eventual discipline simply because both occurred in the same month. Pl. Brief at 13. Throughout his argument on this point, he shades the facts in his favor, calling Jared's e-test "questionable and unsafe" and contending that Jared "stayed on top of" the disciplinary process even though Jared and Ross testified consistently that Jared had no role in the disciplinary process, other than to describe his observations of Sexton's failed test. (SAMF ¶ 39.) On this flimsy support, Sexton asks this Court to agree that he has "establish[ed] as a matter of law that there is a temporal proximity between Sexton's protected activities and CP's adverse actions." Pl. Brief at 13.

This Court should reject Sexton's temporal proximity argument. First, temporal proximity is not a factor to be "established." Under the authority cited by Sexton, it is a type of circumstantial evidence that may be considered when assessing whether the contributing factor element is

satisfied. As evidence, temporal proximity must be viewed in the light most favorable to CP, and summary judgment in Sexton's favor is barred if different interpretations are justifiable from the same evidence. *A.E.S.*, 708 F. Supp. 2d at 872. And that is the case here: Where Sexton asks this Court to infer retaliation from the timing of the events listed by Sexton, it is equally likely (in fact, more likely) that the CBA-mandated deadlines for when CP must initiate, conduct, and decide disciplinary proceedings explain why the events occurred when they did. Sexton is not entitled to summary judgment given the multiple opposing justifiable interpretations and inferences. *Id.*; *see generally Kuduk*, 768 F.3d at 892 (holding that "temporal proximity, without more, is insufficient to establish a prima facie case").

### 2.    Indications of pretext and falsity of an employer's explanation.

Sexton concedes that to establish pretext, he must do more than disagree with CP's explanations for its decision to discipline him or show that the decision was "not just, fair, or sensible"; instead, he "must show that the explanation is a 'phony reason.'" Pl. Brief at 13. And yet across five pages of his brief, Sexton sets out what is merely a catalog of reasons why he disagrees with his discipline and considers it unjust, unfair, and not sensible. Pl. Brief at 13–18.

For example, Sexton takes issue with whether he in fact violated GCOR 5.3.7 while arguing that the Court should find CP liable as a matter of law on the question of pretext. *See* Pl. Brief at 14–15. Sexton's argument is based wholly on one phrase: "good for 40, 15 to a stop." (SAMF ¶ 14.) Sexton asserts that "good for 40" controlled his shove movement, and so he did not violate GCOR 5.3.7 when he stopped the train after 11 cars had been shoved. Pl. Brief at 15. In support, Sexton asserts—incorrectly—that it is "undisputed" that "still clear for 40" was the instruction that he applied to his shove movement, despite CP's clear and consistent determination since February 2021 that the controlling instruction was "15 to a stop." (RSOF ¶ 138; SAMF ¶ 14.)

Sexton appears to concede that to reach his desired result, CP would have needed to have

"taken Sexton and DePover for their word" (Pl. Brief at 15)—which is exactly what CP was not

required to do, given the role of the neutral hearing officer. (RSOF¶¶ 171–175; SAMF ¶¶ 29, 34.)

More importantly here: taking Sexton and DePover "for their word" does not help Sexton meet his

high burden for summary judgment, as facts must be viewed in the light most favorable to CP and

inferences drawn in favor of CP. At most, Sexton's complaints address only whether the

determination that he violated GCOR 5.3.7 was "just, fair, or sensible" and are no basis for the

finding that he requests from this Court: that CP's determination was "phony." Pl. Brief at 13–18.

At bottom, however, Sexton's pretext argument comes down to this: Because Sexton's

discipline was eventually reversed by the Public Law Board after a union challenge, then the

reasoning and rationale for the discipline decision should be labeled "phony," and because CP tries

to avoid train delays and control costs, managers are improperly incentivized to put speed over

safety. *See* Pl. Brief at 16–18. While these may be marginally acceptable arguments to make to a

jury, they are certainly not uncontested facts that "demonstrate why the record is so one-sided as

to rule out the prospect of a finding in favor of [CP] on the claim." *Hotel 71 Mezz Lender LLC*,

778 F.3d at 601. Sexton is not entitled to summary judgment as a matter of law.

### 3. Inconsistent application of policies.

Sexton labels as undisputed his assertion that CP "imposed a more severe discipline on

[Sexton] than on any of his peers." Pl. Brief at 19. Yet he does not mention that shortly after he

was suspended for 20 days, another engineer was fired from CP for also violating GCOR 5.3.7.

(SAMF ¶ 51.) Similarly, Sexton implies that Ross changed his testimony about the standards he

applied when he decided Sexton's discipline when compared to other employees. Pl. Brief at 19.

This is not true; Ross was consistent in his explanation about when and how employees would be

disciplined if he was evaluating a rule violation considered a first major offense. (RSOF ¶¶ 160–

162.) In any event, Sexton's claim that Ross "backed away" from his explanation is argument, not fact—and certainly not an inference drawn in favor of CP as required for Sexton's motion. It fails.

### 4.    Antagonism, hostility, and change in CP's attitude toward Sexton.

Finally, Sexton's assertions that he was met with "antagonism and hostility" are based on nothing but his self-serving interpretation of facts and evidence—which is not sufficient to support summary judgment as a matter of law.

As one example, Sexton draws a negative inference from McKelvey's statement that he did not know how to "hold [Sexton] accountable for delaying the train" on February 1, 2021. Pl. Brief at 20. Sexton's interpretation is not the only interpretation, however, as it is likely that Sexton's conduct during the many other work tasks performed while preparing Train 474-31 to leave Marquette on February 1, 2021 resulted in delays that required accountability, as McKelvey wrote in his summary of the events that there was "no reason" that lifting an engine and setting out 24 train cars "should take this long." (RSOF ¶ 48.) Similarly, McKelvey noted that at one point, he watched Sexton and DePover for ten minutes before asking them "how [the work in the yard] was coming." (*Id.*) In response, the crew said they "were trying to figure out why the rear light isn't coming on." (*Id.*) McKelvey continued: "I instructed them to go back to the second unit and just turn the light on manually." (*Id.*) Drawing inferences in favor of CP, it is as likely that a factfinder could determine McKelvey had nonretaliatory reasons to seek accountability for Sexton's work performance on February 1, 2021. *A.E.S.*, 708 F. Supp. 2d at 872.[6]

* * * *

---

[6]    Elsewhere, Sexton inexplicably points to what he calls Miller's hostility and antagonism *toward Jared* as somehow relevant to the Court's assessment of hostility and antagonism toward Sexton. Pl. Brief at 21. Sexton cites no authority to support the notion that free-flowing hostility should be so thoroughly imputed throughout an employer that summary judgment as a matter of law is justified.

Again, this Court does not need to wade through Sexton's lengthy and unsupported fact assertions related to the contributing-factor element of his claim. His motion for summary judgment fails entirely as a matter of law because he relies on the wrong law applicable to his claim. (*See* Section II, above.) If the Court does take on the fact analysis, however, it is clear that Sexton falls far short of demonstrating that the record is so one-sided as to rule out the prospect of a finding in favor of CP on the matter. Sexton's motion should be denied.

## IV.    SEXTON IS NOT ENTITLED TO JUDGMENT AGAINST CP'S STATUTORY AFFIRMATIVE DEFENSE.

Finally, Sexton seeks summary judgment against CP's statutory affirmative defense, which requires the Court to dismiss Sexton's complaint if CP presents clear and convincing evidence that it would have suspended Sexton for 20 days regardless of any alleged protected activity. *See Kuduk*, 768 F.3d at 792–93. Sexton's argument against CP's affirmative defense is a one-paragraph afterthought that does not support summary judgment in his favor.

As an initial matter, CP demonstrated its entitlement to the statutory affirmative defense in its brief supporting its motion for summary judgment dismissing Sexton's complaint. Def.'s Mem. Supp. Mot. Summ. J. (Dkt. 50-1) at 18–20. There, CP demonstrated how its multi-step disciplinary process and application of its Hybrid Discipline & Accountability Guidelines resulted in discipline against Sexton that is well within the range provided in the guidelines and applied in similar cases. *Id.* at 19–20. CP's entitlement to the affirmative defense is squarely in line with the district court proceedings for *Kuduk*, in which the plaintiff speculated that the railroad would not have enforced a rule against him absent his filing of a safety-related report—only to have the court conclude that his claim was fatally undermined by evidence demonstrating the railroad had enforced its rules against employees who had not engaged in allegedly protected activity. *Kuduk v. BNSF Ry. Co.*, 980 F. Supp. 2d 1092, 1101–02 (D. Minn. 2013).

Arguing for summary judgment against CP's affirmative defense, Sexton asserts that CP has not produced evidence that "it has ever disciplined another employee with no major discipline on their record for a shoving violation with a 20-day suspension." Pl. Brief at 22.[7] This is a misleadingly narrow framing of the questions before the Court. Contrary to Sexton's assertion, CP Vice President Operations Southern Region, Jason Ross—who decided Sexton's discipline and decides all discipline in his territory—testified at his deposition that he routinely imposes 20-day suspensions on employees when they commit their first "major" safety violation as defined by CP. (RSOF ¶ 160.) As inconvenient as Ross's testimony is for Sexton, it is unquestionably evidence, and so he cannot claim there is no evidence supporting CP's affirmative defense.

Ross's testimony does not stand alone. CP also produced substantial evidence regarding multiple employees who, like Sexton, were disciplined consistent with CP's Hybrid Discipline & Accountability Guidelines. (RSOF ¶¶ 150–162.) Sexton's argument against CP's affirmative defense thus fails because the facts, when viewed in the light most favorable to CP, show that the defense has evidentiary support and should not be dismissed as a matter of law. CP thus requests that this Court deny Sexton's motion for summary judgment against the affirmative defense.[8]

## CONCLUSION

For the reasons set for the above, CP respectfully requests that the Court deny Sexton's motion for partial summary judgment in full.

---

[7]     Sexton's only support for this assertion is the statement of counsel at SOF ¶ 226. *See* RSOF ¶ 226.

[8]     Sexton also asserts that CP has not produced "evidence of another time it has conducted a disciplinary investigation that was overturned by the [P]ublic [L]aw [B]oard for being flawed to such an extent that it deprived a fair and impartial [sic] against a non-protected employee." Pl. Brief at 22. Whatever the inference Sexton wants the Court to draw from this confusing assertion, it is not an inference in favor of CP and so cannot weigh against CP as the party resisting summary judgment on CP's affirmative defense.

Dated: August 26, 2024

DORSEY & WHITNEY LLP

/s/ Joshua D. Hughes

Joshua Hughes (AT0014950)
hughes.joshua@dorsey.com
Dorsey & Whitney LLP
801 Grand Ave, Suite 4100
Des Moines, IA 50309
Tel: (515) 283-1000
Fax: (515) 598-7704

/s/ John T. Sullivan

John T. Sullivan (pro hac vice)
sullivan.jack@dorsey.com
Briana Al Taqatqa (pro hac vice)
altaqatqa.briana@dorsey.com
Dorsey & Whitney LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
Tel:  (612) 340-2600
Fax:  (612) 340-2868

ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I hereby certify that on August 26, 2024, I caused the foregoing to be electronically served on Plaintiff via ECF, which provides notice and a copy to Plaintiff's counsel and all other counsel of record:

Megan R. Merritt
SHUTTLEWORTH & INGERSOLL, P.L.C.
115 3rd Street SE, Suite 500
P.O. Box 2107
Cedar Rapids, IA 52406
Phone: (319) 365-9461
Fax: (319) 365-8443


John D. Magnuson
Cyle A. Cramer
YAEGER & JUNGBAUER BARRISTERS, P.L.C.
4601 Weston Woods Way
St. Paul MN, 55127
Phone: (507) 330-4777
Fax: (651) 288-0227
jmagnuson@yjblaw.com
ccramer@yjblaw.com


/s/ Joshua D. Hughes

Counsel for Defendant