UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | | |
|---|---|---|
| John Sexton, | ) | |
| | ) | Case No. 23–cv–00031 |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | **DEFENDANT'S LOCAL RULE 56(b)(2)** |
| | ) | **RESPONSE TO PLAINTIFF'S** |
| Dakota, Minnesota, & Eastern Railroad | ) | **STATEMENT OF MATERIAL FACTS** |
| Corporation d/b/a Canadian Pacific, a | ) | |
| Delaware Corporation, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Dated: August 26, 2024

DORSEY & WHITNEY LLP

Joshua Hughes (AT0014950)
hughes.joshua@dorsey.com
Dorsey & Whitney LLP
801 Grand Ave, Suite 4100
Des Moines, IA 50309
Tel: (515) 283–1000
Fax: (515) 598–7704

John T. Sullivan (pro hac vice)
sullivan.jack@dorsey.com
Briana Al Taqatqa (pro hac vice)
altaqatqa.briana@dorsey.com
Dorsey & Whitney LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
Tel:  (612) 340–2600
Fax:  (612) 340–2868

ATTORNEYS FOR DEFENDANT

Defendant Dakota, Minnesota & Eastern Railroad Corporation d/b/a Canadian Pacific ("CP"), by and through its attorneys and pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56(b)(2), hereby submits its Response to Plaintiff's Statement of Material Facts (Dkt. 53-2) as follows:

## A.   EVENTS SURROUNDING CP'S DISCIPLINE

1.      On February 1, 2021, John Sexton was the engineer for the train assignment 474-31.

> **Support:       Appx. A at 9.**

**RESPONSE:** CP admits.

2.      Mr. Sexton first became qualified as a locomotive engineer in 2000.

> **Support:       Appx. A at *Id*. at 5.**

**RESPONSE:** CP admits.

3.      Justin DePover was Mr. Sexton's conductor on February 1, 2021.

> **Support:       Appx. A at 10.**

**RESPONSE:** CP admits.

4.      At the start of his shift, Mr. Sexton conducted a job briefing with Mr. DePover.

> **Support:       Appx. A at 12.**

**RESPONSE:** CP admits.

5.      During the job briefing, Mr. Sexton stated, "Before we start anything, we're going to cut the crossings."

> **Support:       Appx. A at 13.**

**RESPONSE:** CP admits.

6.      Cutting the tracks means an engineer separates the locomotive from the cars and uses only the locomotive (light power) to dislodge snow and ice from crossings and the rail.

> **Support:       Appx. A at 13 and 29.**

**RESPONSE:** CP admits.

7.    Vehicles driving over crossings can compact snow creating conditions that can cause derailments.

**Support:    Appx. A at 43.**

**RESPONSE:** CP admits. *See also* **Appx. A at 44.**

8.    It was snowing on February 1, 2021.

**Support:    Appx. A at 74.**

**RESPONSE:** CP admits.

9.    Compacted snow or ice has the potential to force the wheel of a train car up off the rail, causing a derail—locomotives are heavier than all the cars, so it instead dislodges the snow and ice.

**Support:    Appx. A at 11, 13, 29, and 79.**

**RESPONSE:** CP admits.

10.    Not cutting the tracks can create an unsafe condition.

**Support:    Appx. A at 45.**

**RESPONSE:** CP admits that Ross testified if there is a buildup of snow and ice on tracks and crossings, that could create an unsafe condition. *See* **Appx. A at 45.** CP further states, Ross testified that CP teaches employees to take the safe course; when in doubt, cut the crossings.

Support:    SAMF ¶ 25.

11.    Snow and ice buildup can cause a derailment, which occurs more frequently at crossings.

**Support:    Appx. A at 111.**

**RESPONSE:** CP admits that Jared testified snow and ice buildup is more common at crossings:

Q.    Snow and ice buildup on tracks, particularly crossings, can become problematic because the flange-ways and the wheels can rise up off the rails onto the ice. Right?

2

A.     It can happen on crossings and rail yards, anywhere there's snow and ice.

Q.     But it's more frequent at crossings, as I understand it, because automobile traffic tamps down the snow and can cause that ice to build up within the track structure. Right?

A.     That is correct.

*See* **Appx. A at 111.**

12.     A derailment is a safety hazard.

**Support:     Appx. A at 112.**

**RESPONSE:** CP admits. CP further states that the testimony Plaintiff cites for the proposition refers specifically to derailments of trains carrying hazardous materials. *See* **Appx. A at 112** (Question: "A train derailing carrying hazardous materials through areas where people live could be a safety hazard for the folks living in that area. Right?" Answer: "It could.").

13.     If an engineer feels that there was a safety issue with snow and ice buildup on tracks, they should cut the tracks.

**Support:     Appx. A at 109.**

**RESPONSE:** CP admits. *See also* **Appx. A at 110.**

14.     Mr. McKelvey had a discussion with Mr. Sexton where Mr. McKelvey took the position that there was not enough snow that required them to have to cut the crossings.

**Support:     Appx. A at 31.**

**RESPONSE:** CP admits.

15.     Mr. McKelvey and Mr. Sexton had a disagreement about whether the crossings needed to be cut.

**Support:     Appx. A at 30.**

**RESPONSE:** CP admits.

16.     Mr. McKelvey's position was that the tracks did not need to be cut.

**Support:     Appx. A at 31.**

**RESPONSE:** CP admits. CP further states McKelvey ultimately agreed the crossings should be cut.  McKelvey testified that the decision was consistent with CP's policy—when in doubt, take the safest course.

> Support:        SAMF ¶ 7.

17.     Mr. Sexton's position was that the track did need to be cut.

> **Support:        Appx. A at 31.**

**RESPONSE:** CP admits.

18.     Mr. Sexton told Mr. McKelvey, "I will cut the crossing and flangeways because there have been two derailments in the previous two months."

> **Support:        Appx. A at 14.**

**RESPONSE:** CP admits that Sexton testified to this effect.

19.     If there is any doubt in Sexton's mind, he must cut the crossings.

> **Support:        Appx. A at 47.**

**RESPONSE:** CP admits.

20.     Mr. Sexton went out to his truck and had Mr. McKelvey sign a sheet Mr. Sexton uses for when he conducts safety briefings in the field.

> **Support:        Appx. A at 14, 19, and 31.**

**RESPONSE:** CP admits that Sexton testified to this effect.

21.     Mr. Sexton told Mr. McKelvey to call the superintendent to tell him that he is telling Sexton to violate the rule.

> **Support:        Appx. A at 15.**

**RESPONSE:** CP admits that Sexton testified to this effect.

22.     Mr. McKelvey did not call the superintendent in Mr. Sexton's presence.

> **Support:        Appx. A at 17.**

**RESPONSE:** CP admits.

23.    Mr. Sexton told Mr. McKelvey that he would not operate the train to Nahant without the crossings being cut.

**Support:    Appx. A at 16.**

**RESPONSE:** CP admits that Sexton testified to this effect.

24.    Mr. Sexton then proceeded to cut the crossings.

**Support:    Appx. A at 17.**

**RESPONSE:** CP admits.

25.    Mr. Ross testified that he remembers being told by Mr. McKelvey that he had instructed Mr. Sexton not to cut the tracks.

**Support:    Appx. A at 46, 48, 49, and 50.**

**RESPONSE:** CP admits that Ross testified he had conversations with Sexton and with McKelvey after Ross received an email from Sexton on February 9, 2021 regarding McKelvey driving too fast for the conditions. In the February 9, 2021 email, Sexton also shared his version of the events of the morning of February 1, 2021 in Marquette. Ross confirmed receipt of the email on Wednesday, February 10, 2021 and told Sexton he would look into it and get back to him. Ross responded again on Monday, February 15, 2021 that he had gathered information and wanted to meet with Sexton to discuss. Ross testified that he recalls speaking to Sexton at some point after his February 15, 2021, response to Sexton. Ross also testified that he had a conversation with Sexton and McKelvey a few weeks later about the importance of cutting the crossings. Ross stated unequivocally: "I had that conversation with McKelvey as well because I'm not going to tolerate people cutting the rules and taking shortcuts. I won't tolerate it for one minute."

Support:    SAMF ¶ 26.

26.    Mr. Ross told Mr. McKelvey, "we are going to follow the rule and cut the crossing."

**Support:    Appx. A at 48.**

**RESPONSE:** CP admits.

27.    Ross testified "I'm not going to tolerate people cutting the rules and taking shortcuts. I won't tolerate it for one minute."

**Support:        Appx. A at 46.**

**RESPONSE:** CP admits. *See also* **Appx. A at 47.**

28.    Mr. Ross did not discipline Mr. McKelvey for violating the rules and taking a shortcut.

**Support:        Appx. A at 66.**

**RESPONSE:** CP admits that McKelvey did not receive formal discipline for his conduct on February 1, 2021. CP further states that Ross provided verbal coaching to McKelvey after Ross received an email from Sexton on February 9, 2021 regarding McKelvey driving too fast for the conditions and the events of the morning of February 1, 2021 in Marquette. Ross testified that he had a conversation with McKelvey about the importance of cutting the crossings. Ross stated unequivocally: "I had that conversation with McKelvey as well because I'm not going to tolerate people cutting the rules and taking shortcuts. I won't tolerate it for one minute." Ross also testified that Sexton was not disciplined for his conduct on the morning of February 1, 2021 in Marquette. Ross testified: "I didn't discipline John Sexton for following the rule."

Support:        SAMF ¶ 27.

29.    The process for cutting the tracks involved Mr. Sexton separating his locomotive from the train, using the locomotive to dislodge the snow and ice from the crossings and rail, then he went back to the train to start his work.

**Support:        Appx. A at 13.**

**RESPONSE:** CP admits.

30.    As part of cutting the tracks, the crew must apply hand brakes and tie down the cars that are left on the tracks.

**Support:        Appx. A at 56.**

**RESPONSE:** CP admits.

31.    The locomotive must travel the distance to where it is going to cut the tracks and crossings.

    **Support:**    **Appx. A at 56.**

**RESPONSE:** CP admits. *See also* **Appx. A at 57.**

32.    Then the locomotive must travel back to the train to couple onto the train.

    **Support:**    **Appx. A at 56–57.**

**RESPONSE:** CP admits.

33.    Coupling the train involved re-airing the train, which involves walking the distance of the train.

    **Support:**    **Appx. A at 57.**

**RESPONSE:** CP admits.

34.    Mr. Sexton departed Marquette on the 474-31—the full train—at approximately 5:40 a.m.—four hours and ten minutes after the start of his shift.

    **Support:**    **Appx. A at 57.**

**RESPONSE:** CP admits. *See* **Appx. A at 18.**

35.    Mr. DePover completed a handwritten Delay Report that includes Mr. DePover's description of the cause of the delay between 1:30 a.m. and 5:40 a.m.

    **Support:**    **Appx. A at 18 and 114.**

**RESPONSE:** CP admits. *See* **Appx. A at 115.**

36.    The delay report includes, "Needed to cut crossing + siding, locomotive brake test…."

    **Support:**    **Appx. A at 115.**

**RESPONSE:** CP admits that the quoted text is one part of the "cause of delay" described in the February 1, 2021 Train Delay Report. CP further states the "cause of delay" for the 474-31 in Marquette on February 1, 2021 was described in full as follows:

> TGBO's, paperwork, [indecipherable] north wye, P/I 1 engine + S/O to MQ siding. Needed to cut crossing + siding, locomotive brake test, dig out hoses on engine to

access them, tie back on + pump air, standing cut 74 deep, pull up /show 24 [indecipherable] set/out + MQ siding. Shove back, tie on to rest of train, pump air, PTC, warrant, departure test, engine check.

*See* **Appx. A at 115.**

37.     At 3:38 a.m., director, Gary Prince messaged Mr. McKelvey stating, "can you send a write up of 474 at Marquette to the DL Senior and East Director please".

**Support:      Appx. B at 1.**

**RESPONSE:** CP admits that Senior Director Dispatching Gary Prince sent the quoted

message via Teams.

38.     Mr. McKelvey responded stating, "i will when they leave". [CP_03752]. And, "can you send me the radio recording from the time they went on duty please".

**Support**:      **Appx. B at 2.**

**RESPONSE:** CP admits. *See* **Appx. B at 3.**

39.     Mr. Prince responded, "I can only pull tapes if the Dispatcher was on the radio, they are not constantly recorded".

**Support:      Appx. B at 4.**

**RESPONSE:** CP admits.

40.     Mr. McKelvey then messaged, "then im not sure how to hold him accountable for delaying the train". And, "i cant make him move any faster. im here doing everything i can".

**Support:      Appx. B at 5 and 6.**

**RESPONSE:** CP admits.

41.     Mr. Prince responded, "I got ya……just need some details with time…….."

**Support:      Appx. B at 7.**

**RESPONSE:** CP admits.

42.     Mr. McKelvey understood that there is a standard that everything should be able to get within.

**Support:      Appx. A at 72.**

**RESPONSE:** CP admits that McKelvey testified there is a standard amount of time expected to complete a particular work event in Marquette. *See* **Appx. A at 72.**

43.    Mr. McKelvey tries to avoid over-standard work events.

**Support:**    **Appx. A at 73.**

**RESPONSE:** CP admits.

44.    Sexton's work event took three times longer than it was supposed to.

**Support:**    **Appx. A at 70.**

**RESPONSE:** CP admits that the 474-31 departed Marquette at 5:40 a.m. CT on February 1, 2021, which was approximately 3.5 hours late based on the standard time allotted for the work to be performed on the train in Marquette. CP further states that cutting the crossings was just one task to be completed that morning. After they were finished cutting the crossings, Sexton and DePover returned to the Marquette yard to continue the substantial work that needed to be completed before they could depart. The work included lifting an engine, setting out cars, digging out a siding switch, completing an air brake test, cutting cars, tying and releasing hand brakes, and building up air to complete a Class III air brake test. From start to finish, the work took nearly four hours. Jared and Ross testified that a 3.5-hour over-standard delay is not unusual in winter operations.

Support:    SAMF ¶ 8.

45.    This is one of the longest work events that Mr. McKelvey has witnessed in his career.

**Support:**    **Appx. A. at 71.**

**RESPONSE:** CP admits that McKelvey testified: "Four hours for a singular work event is probably one of the longest work events that I have witnessed in my career at Canadian Pacific." *See* **Appx. A. at 71–72.** CP further states that the "singular work event" to which McKelvey was

referring included cutting crossings, lifting an engine, setting out cars, digging out a siding switch, completing an air brake test, cutting cars, tying and releasing hand brakes, and building up air to complete a Class III air brake test. CP also states that CP hired McKelvey in January 2020 to join the Leadership Management Trainee Operations program. McKelvey completed the training program in April or May 2020 and was assigned as Assistant Trainmaster in Marquette, Iowa. Thus, in February 2021, McKelvey had been in a management position at CP for approximately ten months and it was his first winter season in a management position.

> Support:        SAMF ¶ 9.

46.    At 3:51 a.m., director Ron Pierce emailed General Manager Tom Jared, Superintendent for the Nahant yard Dylan Smith, trainmaster Marcus Johnson, and Mr. McKelvey, with the caption "Marquette Sub Delays", stating: "474-31 arrived Marquette 0056, outbound called 0105 and had to wait for 575-30 to clear onto the Mason City Sub." The email contained additional information, concluding: "574-138 arrived Marquette 0208, and is waiting behind 474-31 to depart and pull down and change crews. Plan for the meet was discussed with Assistant Trainmaster Kurt McKelvey and Superintendent Dylan Smith."

> **Support:        Appx. B at 8-10.**

**RESPONSE:** CP admits.

47.    At 4:54 a.m., operating manager, Gary Prince, replied to the above email stating: "We need a full breakdown from the Trainmaster on what happened here. A set out and locomotive lift should not take 4'30" as projected. 574-138, 475-30 and B39 were called based on within standard work event. We are at risk of 4 re-crews due to 1 train over-standard. Ensure the delays in Nexus are filled out correctly with facts, not assumptions."

> **Support:        *Id.***

**RESPONSE:** CP admits that Prince sent the quoted message via Teams, but denies that Prince is an "operating manager." (*See* RSOF ¶ 37.)

48.    Mr. McKelvey replied at 9:33 a.m., describing 474-31's activities, including: "I had a job briefing with the crew while waiting for 474 OB to arrive at depot about work to be completed and the siding crossing needing to be cut." Also, "474 then ran light power 2 units down to the south siding switch and ran light power over boatels crossing and down the siding track where their s/o would be made. After this was completed then ran light power back to their train and tied on."

**Support:**  *Id.*

**RESPONSE:** CP admits. *See* **Appx. B at 8–9.** CP further states that Plaintiff quotes portions of two paragraphs of a 13-paragraph email, which describes the entire work event in detail as follows:

> 474-31 arrived at MQT 00:56 and held at MP 100 for 475 to pull up and shove in the north wye. 475 gave up TW at 01:37 and 474 IB crew took TW at 01:38 to pull down to the depot for crew change.
>
> I had a job briefing with the crew while waiting for 474 OB to arrive at depot about work to be completed and the siding crossing needed to be cut. OB boarded train at depot and preformed inspection of engine.
>
> The work for 474 was to lift 1 engine and s/o 24 cars behind 49 cars and 1 DP unit. I had an opportunity crew move the engine to the South leg of the wye for 474 to lift allowing 475 to continue with their work in the yard.
>
> 474 crew was instructed to lift the engine, tie onto train and then we would drive the AE back and make a standing cut 74 cars deep.
>
> 474 was instructed to pull down to the South wye where the engine was to be lifted and roll up MP 100. ATM was at rear of train and visually confirmed rear end passing MP 100 to roll up for 574 crew change. 474 rolled up TW to MP 100 at 02:22, this is the time they arrived at south wye to begin their work.
>
> 474 crew cut off light power and went down to the South siding switch. I was crew changing 575 at MP 100 when they said they would need a shovel and broom at the south siding switch to dig it out.
>
> I again instructed them to go lift the engine off the south wye. While they were tying onto the engine I used another crew to sweep out the switch and verify it was safe.
>
> When I got back from making sure the switch was clear 474 was tied onto the engine going through the unit. [I] watched them for aprox. 10 min before I asked how it was coming and they informed me they "were trying to figure out why the rear light isn't coming on." I instructed them to go back to the second unit and just turn on the light manually. Then 474 completed consist air brake test on south leg of the wye.
>
> 474 then ran light power 2 units down to the south siding switch and ran light power over boatels crossing and down the siding track where their s/o would be made. After this was completed then ran light power back to their train and tied on. I picked up the AE and drove him back where his cut was. Cut was made 74 cars deep and required ATM to relay for AE.

474 AE then rode the shove into MQS where he s/o 24 cars. I picked up the AE on the north end and drove him 24 cars up where he tied 2 hand brakes.

474 then doubled back to rear of their train holding 49 cars and 1 DP engine. The AE stopped and detrained the car, before making the joint on MQT main. AE released 2 hand brakes and checked 2 additional brakes. I drove him up to the head end.

474 then had to wait for air to build up before they could complete the class 3 air brake test. Train was 9349'. PTC was then set up and TW issued and verified.

474 departed MQT 05:39 (3'23") over standard. There is no reason lifting [an] engine and s/o 24 cars should take this long. I have asked for delay reports to be gathered at Nahant and Road Foreman Finney to get a download of the CP8526 when it arrives at Nahant.

*See* **Appx. B at 8–9.**

McKelvey attributed about a few minutes of the train delay to the crossing-cutting operation. According to McKelvey's contemporaneous written description of the events of that day, the primary reason for the delay was lifting the engine and setting off (moving) twenty-four cars.

Support:        SAMF ¶ 10.

Sexton attributed at least twenty to thirty minutes of the delay to picking up an engine on an open deck bridge and performing an air brake test.

Support:        SAMF ¶ 11.

49.    This email was Mr. McKelvey's drill down of Mr. Sexton's train.

**Support:        Appx. A at 33.**

**RESPONSE:** CP admits.

50.    Mr. McKelvey completed an Incident Report that was sent to Mr. Jared and Mr. Smith at 9:37 a.m. The Incident Report stated in its entirety: "474 scanned in and held at MP 100 for 475-30 to shove into MQT through the North Wye. 474 issued TW 01:38 to come to depot for crew change. 474 rolled up MP 100 at 02:22 when they arrived at south wye to start their work. 474-31 lifted CP 5047 off the south leg of the wye and s/o 24 cars to MQS. they also had to cut the Boatels crossing and run down MQS light power before they could shove the cars into it. ATM on sight to help with rides and expedite as much as possible." The Incident Report listed the

engineer as "SEXTON".

**Support:** **Appx. B at 11-12.**

**RESPONSE:** CP admits.

51.    At 10:54 a.m. Mr. Jared responded to only Mr. McKelvey, saying "Call me when you have a min".

**Support:** **Appx. A at 95 and Appx. B at 11-12.**

**RESPONSE:** CP admits that Jared sent the email at 10:04 a.m. CT. *See* **Appx. B at 11.**

52.    Mr. McKelvey called Mr. Jared at 10:55 a.m.

**Support:** **Appx. A at 36.**

**RESPONSE:** CP admits that phone records indicate McKelvey called Jared at 10:55 a.m.

CT on February 1, 2021. CP further states that Plaintiff's citation is not evidence. *See* **Appx. A at**

**36** (Question: "So we got Tom Jared's phone records so we know his phone number. And it shows

here that you had a call with him at 10:55 a.m.").

Support:    SAMF ¶ 20.

53.    Mr. McKelvey had a phone call with Mr. Jared where he discussed why it took Mr. Sexton three times longer to do the work event than what it was supposed to take.

**Support:** **Appx. A at 70.**

**RESPONSE:** CP admits that McKelvey testified, in full:

Q:    Do you recall having any telephone conversations with Mr. Tom Jared on February 1st, 2021?

A:    I don't remember the exact date or time. But as I talked about in my previous deposition, I do recall having a conversation with Mr. Jared about the incident at some point after the incident.

Q:    Do you recall what you discussed in that conversation?

A:    I believe we discussed why it took him so long – why it took him three times longer to do the work event than what it was supposed to take.

*See* **Appx. A at 70.** CP further states that the "work event" to which McKelvey was referring

13

included cutting crossings, lifting an engine, setting out cars, digging out a siding switch, completing an air brake test, cutting cars, tying and releasing hand brakes, and building up air to complete a Class III air brake test. *Id*. at 71–72.

54.    Mr. Jared was aware that Mr. Sexton and Mr. McKelvey had a disagreement about whether the tracks should be cut.

**Support:**    **Appx. A at 110.**

**RESPONSE:** CP denies that Jared was aware on February 1, 2021, of the discussion between Sexton and McKelvey that occurred on that date. Rather, Jared testified he was made aware "at some point" that Sexton and McKelvey had a disagreement about whether the tracks should be cut. Mr. Jared testified that he did not recall how or when he was made aware of the disagreement. *See* **Appx. A at 110.** Mr. Jared testified that he could have learned about the conflict from Sexton's February 9, 2021, email.

Support:    SAMF ¶ 23.

55.    Later that afternoon, Mr. McKelvey sent a series of messages about Mr. Sexton[.]

**Support:**    **None.**

**RESPONSE:** CP responds that it can neither admit nor deny because the statement is vague as to the date and mode of messaging, and Plaintiff has not provided any evidence in support.

56.    At 2:28 p.m. Mr. McKelvey sent to Kade Antczak a message stating, "youre missing all the fun up here".

**Support:**    **Appx. B at 13.**

**RESPONSE:** CP admits that McKelvey sent the quoted message via Teams to CP Operations Supervisor Kade Antczak.

Support:    SAMF ¶ 21.

57.    At 2:30 p.m. Mr. McKelvey sent to Mr. Antczak a message stating, "with sexton on a 474 putting on a show here. for like 4 hours in front of everyone".

**Support:**      **Appx. B at 14.**

**RESPONSE:** CP admits that McKelvey sent the quoted message via Teams to CP Operations Supervisor Kade Antczak.

Support:      SAMF ¶ 21.

58.     Mr. Antczak responded, "oh i heard". Appx. B at 15.

**Support:**      **Appx. B at 15.**

**RESPONSE:** CP admits that CP Operations Supervisor Kade Antczak sent the quoted message via Teams to McKelvey.

Support:      SAMF ¶ 21.

59.     Mr. Jared participates in daily conference calls at 7 a.m. and 11 a.m. to discuss what is going on with the traffic in his territory.

**Support:**       **Appx. A at 92, 93, and 94.**

**RESPONSE:** CP admits that Jared testified there were standing daily operations calls at 7:00 a.m. and 11:00 a.m. CP further states that Jared also testified that he does not recall discussing any over-standard delays during the 7:00 a.m. and 11:00 a.m. operations calls on February 1, 2021.

Support:      SAMF ¶ 24.

60.     Upon arrival in Nahant, it was Mr. Sexton's task to set out cars on a siding track.

**Support:**       **Appx. A at 20.**

**RESPONSE:** CP admits.

61.     Mr. Sexton contacted Anthony Cruciani, a conductor on the RC70 job, to have him in position to protect the movement of the cars.

**Support:**      **Appx. A at 21.**

**RESPONSE:** CP admits that Sexton testified, "I contacted Tony Cruciani, who was the conductor on the RC70 job, to have him in position to protect my shove." *See* **Appx. A at 21–22.** CP further states that DePover was the conductor operating the 474-31 with Sexton on February

1, 2021. Consistent with CP rules and the GCOR, DePover was the only person assigned to protect

the movement and so Cruciani's statements and descriptions were not instructions to Sexton.

Support:        SAMF ¶¶ 12–13.

62.    Mr. Jared went to the south end of the Nahant yard because he knew the 474-31 was coming inbound and he had the intent perform an efficiency test on the 474-31.

**Support:        Appx. A at 106.**

**RESPONSE:** CP admits.

63.    Mr. Jared knew that Mr. Sexton was the engineer for the 474-31.

**Support:        Appx. B at 11-12.**

**RESPONSE:** CP admits that Jared testified he knew Sexton was the engineer operating

474-31 only *after* he had administered the efficiency test, the train stopped, and Sexton

disembarked.

Support:        SAMF ¶ 18.

64.    Mr. Jared heard Mr. Sexton brief the remote-control crew at the north end of the yard prior to the shoving movement.

**Support:        Appx. A at 105.**

**RESPONSE:** CP admits that Jared testified he heard "Cruciani talking and giving a

briefing with the 474 crew." *See* **Appx. A at 105.** There is no evidence to support the proposition

that Jared heard *Sexton*, specifically. Further, Jared testified that he only learned that Sexton was

the engineer after the train stopped and Sexton disembarked.

Support:        SAMF ¶ 18.

65.    Mr. Jared heard Anthony Cruciani talking and giving a briefing with the 474-31 crew.

**Support:        Appx. A at 105.**

**RESPONSE:** CP admits.

66.     Mr. Jared heard the brief on his truck radio because he was still in his truck.

**Support:       Appx. A at 99.**

**RESPONSE:** CP admits.

67.     Mr. Jared heard the conductor on the north end of the yard instruct Mr. Sexton that the track was clear.

**Support:       Appx. A at 100.**

**RESPONSE:** CP admits that Jared heard the conductor on the north end of the yard tell the 474-31 crew that Track 4 was "clear and good for 40" car lengths. *See* **Appx. A at 100.** Jared did not testify that he heard the conductor on the north end of the yard tell "Sexton" the track was clear. *Id.*

68.     The track was clear for 74 cars.

**Support:       Appx. A at 100.**

**RESPONSE:** CP admits.

69.     Mr. Jared heard Mr. DePover give a 50-car count prior to dismounting his truck.

**Support:       Appx. A at 104.**

**RESPONSE:** CP admits.

70.     Mr. Jared dismounted his truck and walked up to Mr. DePover.

**Support:       Appx. A at 104.**

**RESPONSE:** CP admits.

71.     Based on a video watched in the investigation, Jared's truck was approximately 30-50 yards away from Mr. DePover.

**Support:       Appx. A at 144.**

**RESPONSE:** CP denies this statement as unsupported.  Plaintiff cites a comment made by Sexton's union representative during the investigation hearing, which is not evidence. *See* Appx. A at 144 (Mr. Rainwater: "Yeah, we don't see Mr. Jared's vehicle in view. And I would estimate,

just by –" Mr. Sexton: "Fifty yards." Mr. Rainwater: "Yeah, it probably – probably at least tw –

thirty to forty yards at a minimum."). When asked about this estimate at his deposition, Jared

testified: "I would disagree with that. I thought – I remember I was closer than that."

Support:        SAMF ¶ 38.

72.    Mr. Jared announced himself when he got up to Mr. DePover.

**Support:      Appx. A at 102.**

**RESPONSE:** CP admits.

73.    There was sufficient time for Mr. Sexton and Mr. DePover to communicate
between the time Mr. Jared left his truck and by the time he got to Mr. DePover.

**Support:      Appx. A at 105.**

**RESPONSE:** CP admits that Jared testified that communications between Sexton and

DePover could have occurred between the time Jared left his truck and the time Jared got to

DePover. *See* **Appx. A at 105.**

74.    Mr. Jared did not have a portable radio with him.

**Support:      Appx. A at 99.**

**RESPONSE:** CP admits.

75.    Mr. Jared cannot hear his radio if he is not near his truck.

**Support:      Appx. A at 101.**

**RESPONSE:** CP admits.

76.    Mr. DePover, the conductor protecting the shoving movement, under CP rules is
required to provide direction and distance to Mr. Sexton during the shoving movement.

**Support:      Appx. A at 103.**

**RESPONSE:** CP admits.

77.    It is important not to be distracted when protecting a shove because that distraction
can lead to hitting something.

**Support:**        **Appx. A at 121.**

**RESPONSE:** CP admits.

78.    An employee being distracted when protecting a shoving movement creates an unsafe condition.

**Support:**        **Appx. A at 121 and 55.**

**RESPONSE:** CP admits.

79.    Johnson testified, "…if you're distracted, your mind has gone away from the task at hand. You could end up cornering something. You could hit something. More cars can go by than what you needed."

**Support:**        **Appx. A at 121.**

**RESPONSE:** CP admits.

80.    Ross testified, "if he's looking at an airplane, he's in violation of the rule because when you're doing things like shoving equipment, you're to avoid all distractions."

**Support:**        **Appx. A at 55.**

**RESPONSE:** CP admits.

81.    Mr. DePover was engaged in a safety sensitive task.

**Support:**        **Appx. A at 65.**

**RESPONSE:** CP admits that Ross testified that he agrees DePover was engaged in a safety

sensitive task when he was performing a shove movement on February 1, 2021.

Support:        SAMF ¶ 15.

82.    CP rules say that Mr. DePover is to provide direction and distance during shoving movements.

**Support:**        **Appx. A at 103.**

**RESPONSE:** CP admits.

83.    Mr. Jared instructed Mr. DePover to stop providing direction and distance instructions to Mr. Sexton.

**Support:**        **Appx. A at 103.**

**RESPONSE:** CP admits that Jared told DePover not to provide further instructions because Jared "was in the process of validating whether or not the engineer was going to comply with half the range of vision," consistent with the guidelines set out in CP's Efficiency Test Manual and CP practices and rules. *See* **Appx. A at 103.**

> Support:        SAMF ¶¶ 16–17.

84.    After the test, Mr. Jared brought Mr. Sexton and Mr. DePover to the north end of the yard and interviewed Mr. DePover.

**Support:        Appx. A at 107.**

**RESPONSE:** CP admits that DePover was interviewed. *See* **Appx. A at 107.** CP further states that DePover provided a contemporaneous written statement and Sexton was also interviewed.

> Support:        SAMF ¶ 19.

85.    DePover said in the investigation that he felt compelled to give a statement and indicated that he was being intimidated during that interview.

**Support:        Appx. A at 147.**

**RESPONSE:** CP admits that DePover said he felt compelled to give a statement, but CP denies that DePover said he "was being intimidated during the interview." Rather, when asked if he felt intimidated, DePover responded that he did. The relevant line of questioning by Mr. Rainwater, Sexton's and DePover's union representative who represented them at the investigation hearing, is as follows:

> Q.      So specifically to Exhibit 5 here, your statement, did you – was this statement given willingly? Or y – were you compelled to give it?

> A.      I – I'd say compelled. I didn't even know I had a choice not to, if that was even a thing.

> Q.      Okay. So did you feel intimidated, being in the room with Mr. Jared?

> A.      Yes, I did.

*See* **Appx. A at 147.**

86.    CP then sent Mr. Sexton a letter dated February 4, 2021, informing him and Mr. DePover to attend a formal investigation "to determine the facts and circumstances and to place your responsibility, if any, in connection with your alleged: Failure to stop within half the specified distance given while shoving into track NA04. This incident allegedly occurred at approximately 12:49 hours on February 1, 2021 while working Train 474-31 at Nahant yard. The following Carrier witnesses known at this time to likely have knowledge of the incidence and/or evidence relative to this investigation/hearing requested to attend: Tom Jared, Dylan Smith."

**Support:**    **Appx. A at 129.**

**RESPONSE:** CP admits.

87.    Mr. Sexton emailed Vice President of Operations, Tracy Miller, discussing the disagreement between him and Mr. McKelvey. The email included Mr. Sexton reporting: "the tracks and crossing were snow covered". And, "I informed ATM McElvey that the crossing and tracks needed cut with the locomotive before our set out. He told me that I would NOT cut the crossing and tracks…." "I cut the tracks and crossings as needed." "What would have been the environmental impact as well as the possible loss of life if I didn't insist on cutting the tracks and crossings with 2 loads of AMMONIA."

**Support:**    **Appx. B at 16-17.**

**RESPONSE:** CP admits that Sexton sent the above-described email to Miller on Tuesday, February 9, 2021—the day before the investigation hearing related to his February 1, 2021 rule violation, for which he received notice on February 4, 2021. *See* **Appx. A at 129; Appx. B at 16-17**.

88.    Tracy Miller testified the email has safety complaints.

**Support:**    **Appx. A at 78.**

**RESPONSE:** CP admits.

89.    Mr. Miller forwarded Mr. Sexton's email to Mr. Jared and Mr. Ross.

**Support:**    **Appx. B at 16-17.**

**RESPONSE:** CP admits.

90.    Mr. Miller's forwarded email stated to Mr. Jared: "Your territory and the leadership seems to be on a tailspin. I don't fault John for this note, but even if not true, we are creating a stage/platform for their feelings. You have got to get your territory settled down but have to be

engaged in the right things at the right time to do it. Trust I understand the new marriage and the time you want to put in there, but we have to do both EFFECTIVELY....i don't see that happening right now on the railroad."

**Support:    Appx. B at 16-17.**

**RESPONSE:** CP admits.

91.    Mr. Ross responded to Mr. Sexton, "I will look into this and we will get back to you."

**Support:    Appx. B at 16-17.**

**RESPONSE:** CP admits.

92.    Mr. Sexton's union representative requested prior to the investigation for "Andrew Cruciani" and "David Cox" to be made available as witnesses for the investigation hearing.

**Support:    Appx. A at 131-132.**

**RESPONSE:** CP admits that Sexton's union representative sent a letter to Joey Reyes requesting that Cruciani and Cox be made available in the hearing. *See* **Appx. A at 131-132.** CP further states that Reyes was not the hearing officer who conducted the investigation hearing.

Support:    SAMF ¶ 31.

93.    Mr. Johnson testified that Mr. Sexton was not able to present the witnesses that he requested.

**Support:    Appx. A at 169.**

**RESPONSE:** CP denies as unsupported. Johnson testified at his deposition, more than three years after the February 10, 2021 investigation hearing, that he did not recall if Sexton's union representative requested for Cruciani and Cox prior to the hearing, at the time of the hearing, or during the hearing. *See* **Appx. A at 169.** CP further states that Sexton's CBA provides: the employee "shall have reasonable opportunity to secure the presence of *necessary* witnesses." (Emphasis added.) CP's US Investigation Training Manual provides, the hearing officer may "reasonably deny a request for additional witnesses if the union representative/charged employee

fails to adequately explain their pertinence to the matter under investigation." Johnson testified at

his deposition that neither Cruciani nor Cox had information relevant to the investigation.

Specifically, Johnson testified:

> Mr. Cox was assigned to another train and not connected. The testimony from when
> you were first on –I believe it was the 0098 – read that the union believed that he
> would have heard the radio conversation. That's not a fact based he heard the
> conversation. Again, he was assigned to a different train. The other employee that
> was requested was not an employee of CP Railroad.
>
> Support:        SAMF ¶¶ 29, 32, 34.

94.    Jared was the only witness made available to the investigation.

**Support:    Appx. A at 134.**

**RESPONSE:** CP denies. The conductor, DePover, was a witness, as was Sexton himself.

In addition to Jared, DePover was the only other employee witness who observed Sexton's conduct

and failure to comply with GCOR 5.3.7 during the test administered by Jared.

> Support:        SAMF ¶ 35.

95.    Mr. Johnson testified that the witnesses requested by Mr. Sexton's union had no

relevance.

**Support:    Appx. A at 123.**

**RESPONSE:** CP denies as unsupported. Johnson testified at his deposition that that neither

Cruciani nor Cox had information relevant to the investigation. Specifically, Johnson testified:

> Mr. Cox was assigned to another train and not connected. The testimony from when
> you were first on –I believe it was the 0098 – read that the union believed that he
> would have heard the radio conversation. That's not a fact based he heard the
> conversation. Again, he was assigned to a different train. The other employee that
> was requested was not an employee of CP Railroad.
>
> Support:        SAMF ¶ 34.

96.    The investigation hearing occurred on February 10, 2021.

**Support:    Appx. A at 133.**

**RESPONSE:** CP admits.

97.    The investigation hearing was recorded and transcribed.

   **Support:**  **Appx. A at 136.**

**RESPONSE:** CP admits.

98.    Mr. Johnson was the investigation conducting officer.

   **Support:**  **Appx. A at 135.**

**RESPONSE:** CP admits.

99.    In the investigation, Mr. Jared stated: "Mr. DePover actually started a shoving movement into 4 Track. He gave an initial car count of 50. I was actually on the south end of the yard at that time in my vehicle, which I actually dismounted at that time, and as I walked over to Mr. DePover, he was in between – on the south side of 4 Track. I walked up to him and as I walked up to him, he'd gave a 15-car count to the Engineer, John Sexton. At that point, I instructed Mr. DePover to not provide any more radio communication to Mr. Sexton, and Mr. Sexton continued to shove back."

   **Support:**  **Appx. A at 137-138.**

**RESPONSE:** CP admits.

100.    Jared then stated, "When he stopped, he'd actually shoved 11 cars into the track further from that initial count of 50."

   **Support:**  **Appx. A at 138.**

**RESPONSE:** CP admits.

101.    Mr. Jared then stated, "So through that process, Mr. Sexton did violate General Code of Operating Rules 5.3.7."

   **Support:**  **Appx. A at 139.**

**RESPONSE:** CP admits.

102.    CP operates under the General Code of Operating Rules (GCOR) that also applies to many other railroads in the nation.

   **Support:**  **Appx. A at 7.**

**RESPONSE:** CP admits. *See* **Appx. A at 6.**

103.    GCOR 5.3.7 states: "**Radio Response.** When radio communication is used to make movements, crew members must respond to specific instructions given for each movement. Radio communication for shoving movements must specify the direction and distance and must be acknowledged when distance specified is more than four cars. **Movement must stop within half the distance specified unless additional instructions are received.**"

> **Support:**    **Appx. A at 130. emphasis in original.**

**RESPONSE:** CP admits.

104.    When asked by Mr. Johnson whether Mr. Sexton complied with this rule, Mr. Jared stated, "Absolutely not."

> **Support:**    **Appx. A at 139.**

**RESPONSE:** CP admits.

105.    When asked by Mr. Johnson whether Mr. Sexton violated the rule, Mr. Jared stated, "Yes, he did."

> **Support:**    **Appx. A at 140.**

**RESPONSE:** CP admits.

106.    Mr. Jared stated in the investigation hearing, "Mr. Sexton, at seven cars, he should have been stopped, which he was not. As I noted – I – I was counting the cars as they were going by. At the seventh car, as it went by, I noted with Mr. DePover that that was the seventh car after his initial radio response of 15. He did confirm with me."

> **Support:**    **Appx. A at 140-141.**

**RESPONSE:** CP admits.

107.    Mr. Jared stated that the initial car count was 50 then when he walked up to Mr. DePover, he made the radio communication of a 15-car count.

> **Support:**    **Appx. A at 137-138.**

**RESPONSE:** CP admits.

108.    Mr. Jared stated that between the 50 car count and 15 to a stop instruction that Sexton had only shoved 12 car lengths.

> **Support:**    **Appx. A at 225.**

**RESPONSE:** CP admits that at the investigation hearing, Jared narrated the video, which

showed Sexton's rule violation. Jared narrated:

> You're gonna see myself, I'm entering the frame at the bottom of the screen. As I walk over, Mr. DePover tells the Engineer – he's looking at his list and tells the Engineer that he's -- a 15-car count. At this point, he'd already shoved in 12 car lengths. If you'd like to stop the video, you can count the cars that actually went into track or we can continue on.

*See* **Appx. A at 225.**

109.    Mr. Jared stated that eleven car lengths is more than half the distance that was specified for the 15-car count.

**Support:    Appx. A at 141.**

**RESPONSE:** CP admits.

110.    In the investigation hearing, when asked whether Mr. Jared could hear his radio, Mr. Jared stated, "The - - I had my truck radio on, I had my windows down. I have a very loud radio in my truck. I did not hear any other correspondence with Train 474 - - through that radio from where I walked from my…."

**Support:    Appx. A at 142-143.**

**RESPONSE:** CP admits. CP further states, in response to the question, "is it possible that

you didn't hear anything – additional – communication because you weren't – didn't have a radio

on your person?" Jared responded, "No." *See* **Appx. A at 142-143.**

111.    Mr. DePover stated in the investigation the initial instructions he gave was "clear for 50 to start him into the track and I asked for 25 at the time." Mr. DePover stated in the investigation the next instructions he gave Mr. Sexton was "15 cars remaining and that he was clear for 40 still at that time."

**Support:    Appx. A at 145.**

**RESPONSE:** CP admits. CP further states that Plaintiff cites the hearing transcript lines

out of order. The cited transcript page reads:

Q.    Okay. So we go up, there's a blue mark under line 64. Is that correct?

A.    Yes.

Q.    What is that?

A.     That would've been when I told them that there were 15 cars remaining and that he was clear for 40 still at that time. And then the -- the next blue line would've been the actual car or the stop, which was in front of us at the time on the -- when he -- when Mr. Sexton did have the train stopped. And then the -- then I did also indicate the DP unit, which we were to set out to a separate track.

Q.     Okay.

A.     So that would've been the end of our cut, right -- right at the -- car number 49 would've been the -- the cut location to leave into Nahant 4.

Q.     Okay. So you gave him 15 cars. Correct?

A.     So li --

Q.     At line 64?

A.     So my initial movement woulda been the clear for 50 to start him into the track --

Q.     Okay.

A.     -- and I asked for 25 at the time. And then the next call was still clear for 40, had 15 until the stop.

*See* **Appx. A at 145.**

112.    Sexton stated in the investigation that the original instruction DePover told him the track was good for 50 and then DePover updated him with good for 40 and 15 to a stop.

**Support:       Appx. A at 151.**

**RESPONSE:** CP admits.

113.    Mr. DePover stated it was after that instruction Mr. Jared instructed him to not proceed any further.

**Support:       Appx. A at 148 and 150.**

**RESPONSE:** CP admits that DePover stated at the investigation hearing that Jared was

right behind DePover when DePover gave Sexton the 15-car count, and then Jared instructed

DePover not to provide further instructions. *See* **Appx. A at 148**

114.    Mr. DePover stated that it is his assumption Mr. Jared did not hear the clear for 40 instruction because Mr. Jared did not have a radio on him.

**Support:**     **Appx. A at 148.**

**RESPONSE:** CP denies that "clear for 40," is an instruction. Pursuant to CP's rules, Sexton was required to comply with the more restrictive car-count: "15 more to a stop." CP further states that DePover responded affirmatively to Sexton's union representative's leading question. The cited transcript page reads:

> A.     The – the initial movement woulda been that we were clear for 50 cars, and I would've started him in with needing 25 to a stop. And then I updated him with needing 15 more to a stop, still clear for 40 –

> Q.     Okay.

> A.     -- and then I was informed not to –

> Q.     So –

> A.     -- proceed anymore.

> Q.     So do you believe because Mr. Jared didn't have a radio on his person, he didn't hear you say clear for 40?

> A.     I – that's my assumption.

*See* **Appx. A at 148.**

115.     When asked whether Mr. Jared distracted him, Mr. DePover stated, "Yes, I was engaged with talking with him."

**Support:**     **Appx. A at 149.**

**RESPONSE:** CP admits that Sexton's union representative asked, "All right. So he – he kinda distracted you from performing your duty – for a little bit?" And DePover responded, "Yes, I was engaged with talking with him."

Support:     SAMF ¶ 36.

116.     Mr. Johnson didn't believe Mr. DePover was distracted because "there was no testimony on it."

**Support:**     **Appx. A at 127.**

**RESPONSE:** CP denies as unsupported. Johnson testified that he didn't think Jared was

distracting DePover or creating an "unsafe act" in administering the efficiency test. The relevant

testimony from Johnson's deposition is as follows:

> Q.      Do you recall Mr. Jared saying he told Mr. DePover to stop giving instructions?
>
> A.      I believe we went over some of that where he talked about – he approached Mr. DePover and Mr. DePover testified to it.
>
> Q.      But do you think Mr. Jared was distracting Mr. DePover?
>
> [objection omitted]
>
> A.      No.
>
> Q.      Why not?
>
> A.      Because there was no testimony that Mr. DePover felt he was distracted.
>
> …
>
> A.      Mr. Jared didn't foul. He didn't – there's just no testimony that allowed me to believe that he was distracted or created an unsafe act based on the testimony at the investigation.

*See* **Appx. A at 126–127.**

117.    Mr. DePover was asked about a written statement he had made that only addressed a 15-car count. Mr. DePover responded, "Well, hon - - honestly, it - - with it being my second start back and I was in a closed room with the General Manager, whom I've never met, and Mr. Smith, I was quite under some pressure."

**Support:**      **Appx. A at 146.**

**RESPONSE:** CP admits.

118.    Mr. DePover also stated that he was "compelled" to give the statement.

**Support:**      **Appx. A at 147.**

**RESPONSE:** CP admits that DePover said he felt compelled to give a statement. The

relevant line of questioning by Mr. Rainwater, Sexton's union representative who represented him

at the investigation hearing, is as follows:

Q. So specifically to Exhibit 5 here, your statement, did you – was this statement given willingly? Or y – were you compelled to give it?

A. I – I'd say compelled. I didn't even know I had a choice not to, if that was even a thing.

*See* **Appx. A at 147.**

119. In the investigation, Mr. Sexton stated that he thinks Mr. Jared broke GCOR rule 6.5—that Mr. Jared "created an unsafe act."

**Support:        Appx. A at 152.**

**RESPONSE:** CP admits.

120. GCOR rule 6.5 states, in part: "Employee must be in position, provide visual protection of the equipment being shoved and must not engage in unrelated tasks while providing protection."

**Support:        Appx. A at 152.**

**RESPONSE:** CP admits.

121. Federal Regulations require "During the shoving or pushing movement, the employee directing the movement shall not engage in any task unrelated to the oversight of the shoving or pushing movement."

**Support:        49 CFR § 218.99(b)(2).**

**RESPONSE:** CP states that Paragraph 121 is a legal conclusion, not a statement of fact requiring an admission or denial. To the extent a response is required, CP admits that Paragraph 121 accurately quotes 49 CFR § 218.99(b)(2).

122. Point protection requires the visual determination that the track is clear—not where a cut is going to be made.

**Support:        49 CFR § 218.99(b)(3)(i).**

**RESPONSE:** CP states that Paragraph 122 is a legal conclusion, not a statement of fact requiring an admission or denial. To the extent a response is required, CP admits that 49 CFR § 218.99(b)(3)(i) provides that point protection may be provided by a crewmember visually determining that the track is clear.

123.    Point protection requires "giving signals or instructions to control the movement."

**Support:        49 CFR § 218.99(b)(3)(ii).**

**RESPONSE:** CP states that Paragraph 123 is a legal conclusion, not a statement of fact requiring an admission or denial. To the extent a response is required, CP admits that 49 CFR § 218.99(b)(3)(i) provides that point protection may be provided by a crewmember giving signals or instructions necessary to control the movement.

124.    Mr. Jared's [sic] instructed Mr. DePover to violate federal law.

**Support:        Appx. A at [Jared Dep. at 145:17-22 and 49 CFR § 218.99(b)(3)(ii)].**

**RESPONSE:** CP states that Paragraph 124 is a legal conclusion, not a statement of fact requiring an admission or denial. To the extent a response is required, CP denies. Performing efficiency tests of employees is also required by FRA regulations. Jared administered the efficiency test on February 1, 2021 consistent with the guidelines set out in CP's Efficiency Test Manual and CP practices and rules. Specifically, after DePover gave a 15-car count, Jared instructed DePover not to give further instruction to Sexton. In so doing, Jared altered the conditions of the shove movement to test Sexton's compliance with GCOR Rule 5.3.7, which required him to stop within half the distance specified by DePover's last instruction. This type of "set up" test is consistent with the guidelines set out in CP's Efficiency Test Manual and did not result in any violation of federal law or regulations, nor any of CP practices and rules, including GCOR.

Support:        SAMF ¶¶ 16–17.

125.    CP's discipline policy provides that a shoving movement rule violation is a "Major – Life Threatening Violation," as is "reckless endangerment."

**Support:        Appx. B at 18.**

**RESPONSE:** CP admits.

126.    Mr. Ross testified he "would not allow any employee who reports to me to set up a rule violation to perform a test."

**Support:    Appx. A at 63.**

**RESPONSE:** CP admits.

127.    Mr. Sexton's union representative attempted to enter evidence that Mr. Jared conducted an "unfair" and "unsafe" test, however, Mr. Johnson prohibited the representative from discussing that evidence.

**Support:    Appx. A at 153.**

**RESPONSE:** CP admits that, at the investigation hearing, Sexton's union representative, Joe Rainwater, asked Sexton if Sexton believed Jared violated GCOR 6.5 when he "interrupted" DePover's car counts to Sexton. Sexton responded: "Absolutely. He created a unsafe act." The hearing officer, Mark Johnson, stopped the questioning, noting that the purpose of the hearing was to determine if Sexton – not Jared – complied with CP's operating rules as alleged in the specific notice of investigation. Johnson explained that evidence related to whether Jared's administration of the efficiency test violated CP's rules is not relevant to the determination of whether Sexton failed the test. Johnson also explained to Rainwater that if he had an issue with the way Jared administered the efficiency test, it should be addressed with the appropriate party. Rainwater responded: "Oh, it – it will be, I promise."

Support:    SAMF ¶ 37.

128.    Mr. Sexton's union representative then addressed his request for witnesses.

**Support:    Appx. A at 154.**

**RESPONSE:** CP admits.

129.    Mr. Sexton agreed that Mr. Cox was in a position to hear the radio conversation.

**Support:    Appx. A at 155.**

**RESPONSE:** CP denies that the transcript page cited supports the statement in Paragraph

129. However, CP admits that, at the investigation hearing, Sexton said Cox was in a position to hear the radio conversation.

> Support:        SAMF ¶ 33.

130.    Mr. Sexton agreed that Mr. Cox could testify to what Mr. DePover's instructions were.

> **Support:        Appx. A at 155.**

**RESPONSE:** CP admits.

131.    Mr. Johnson's response was, "That's speculation and hearsay."

> **Support:        Appx. A at 155.**

**RESPONSE:** CP admits.

132.    Mr. Johnson testified, "If the union is requesting them, that is their job to prove that he heard it, not my job to determine whether he did or not."

> **Support:        Appx. A at 125.**

**RESPONSE:** CP admits.

133.    CP policy is that it is the company's responsibility to have witnesses present at the investigation who have firsthand knowledge of the incident.

> **Support:        Appx. A at 182.**

**RESPONSE:** CP admits that CP's 30(b)(6) designee testified at his deposition, "The company has a responsibility to have witnesses present at the investigation who have knowledge, firsthand knowledge, of the incident." CP further states that Sexton's CBA provides: the employee "shall have reasonable opportunity to secure the presence of *necessary* witnesses." (Emphasis added.) CP also states that CP's US Investigation Training Manual provides, the hearing officer may "reasonably deny a request for additional witnesses if the union representative/charged employee fails to adequately explain their pertinence to the matter under investigation."

> Support:        SAMF ¶ 29.

134.    Mr. Sexton stated in the investigation, "I had a man protecting the shove, Mr. Cruciani, and I had Mr. DePover on the ground as well, counting me down."

**Support:**    **Appx. A at 156.**

**RESPONSE:** CP admits that, at the investigation hearing, Sexton said, "I had a man on the north end protecting the shove, Mr. Cruciani, and I had Mr. DePover on the ground as well, counting me down." *See* **Appx. A at 156.** Sexton clarified it was Mr. DePover who was giving the shove instructions. As a result, Sexton was required to follow only DePover's instructions, as neither Cruciani nor any other person had any actual role in the protecting the shove movement. *Id*.

Support:    SAMF ¶ 12.

135.    Mr. Sexton reported, "Mr. Jared is the one who violated the - - the shoving movements because he engaged in a conversation with Mr. DePover while the cars were moving into a track. That is a - - that - - he created an unsafe act."

**Support:**    **Appx. A at 157.**

**RESPONSE:** CP admits that, at the investigation hearing, Sexton said: "Mr. Jared is the one who violated the - - the shoving movements because he engaged in a conversation with Mr. DePover while the cars were moving into a track. That is a - - that - - he created an unsafe act on that." *See* **Appx. A at 157.**

136.    Mr. Sexton's union representative closed stating, "Mr. Jared freely testified that he heard Mr. DePover give Mr. Sexton a car count of 50 cars, 5 – 0 cars, as he started into 4 Track. Then, after moving 12 cars, Mr. DePover testified that he told Mr. Sexton, I need 15 more and you're good for 40. It's obvious that Mr. Jared did not hear that portion of the instructions."

**Support:**    **Appx. A at 159-160.**

**RESPONSE:** CP admits that, at the investigation hearing, Rainwater made an argument but denies that the union representative's argument was supported by fact at the hearing or that it is now supported by facts. *See* **Appx. A at 159-160.**

137.    Mr. Sexton's union representative stated, "Even if Mr. Sexton would have shoved

the entire 15 cars before stopping, he still has an additional five cars of space before being required to stop in half the range of the 40-car count as given by Mr. DePover, and thus fulfilling the requirement of GCOR 5.3.7."

**Support:        Appx. A at 161.**

**RESPONSE:** CP admits that, at the investigation hearing, Rainwater made an argument but denies that the union representative's argument was supported by fact at the hearing or that it is now supported by facts. *See* **Appx. A at 161.**

138.    Five days later, Mr. Johnson, wrote an email stating: "Charge was proven. The facts of the case were clear that Mr. Sexton was given a 15 car count, and attempted to contact the Conductor after 7 cars; followed by attempting to contact the ATM before coming to stop at 11 cars."

**Support:        Appx. B at 20.**

**RESPONSE:** CP admits that Johnson wrote an email on February 15, 2021 that included the quoted language.

139.    Mr. Johnson added several "mitigating factors" including: "The Organization contends that the conductor stated '15 cars, good for 40 cars.' They argue that Mr. Jared could not hear the conductor's instruction because he did not have a hand held radio; the facts and the video show Mr. Jared was next to the conductor when the instructions were given."

**Support:        Appx. B at 20.**

**RESPONSE:** CP admits that, on February 15, 2021, Johnson included "mitigating factors" with his explanation and recommendation for the discipline assessed to Sexton.

140.    The video had no audio.

**Support:        Appx. A at 226.**

**RESPONSE:** CP admits.

141.    Mr. Johnson testified that it was not clear in the record whether Mr. Jared heard the 40-car count or not.

**Support:        Appx. A at 120.**

**RESPONSE:** CP admits that Johnson testified at his deposition: "It's just not clear in the

record whether he heard the 40 or not. He was hearing the same 15 car count that was alluded to

by all witnesses." *See* **Appx. A at 120.**

142.    Mr. Johnson also listed: "Organization makes further argument that the testing was unfair because a shove movement can only be tested through observation versus set-up. No evidence showed that Mr. Jared attempted to set-up by use of a red board or other means."

> **Support:**    **Appx. B at 20.**

**RESPONSE:** CP admits that, in finding the charge against Sexton was proven on February

15, 2021, Johnson reasoned, in part:

> Organization makes further argument that the testing was unfair because a shove movement can only be tested through observation versus set-up. No evidence showed that Mr. Jared attempted to set-up by use of a red board or other means. He simply asked the conductor to give him a car count and then nothing after that, then observed Mr. Sexton's actions in relation to complying with rules requiring him to stop in half the distance.

*See* **Appx. B at 20.**

143.    Mr. Johnson testified that Mr. Jared set up the test.

> **Support:**    **Appx. A at 122.**

**RESPONSE:** CP admits that Johnson testified at his deposition: Jared "set the test up by

changing the environment and having Mr. DePover not give a further count." *See* **Appx. A at 122.**

144.    Mr. Johnson concluded: "Based on the facts of the matter, I recommend Mr. Sexton be assessed a 20-day suspension."

> **Support:**    **Appx. B at 20.**

**RESPONSE:** CP admits that, on February 15, 2021, Johnson recommended a 20-day

suspension for Sexton.

145.    Mr. Sexton received discipline dated February 26, 2021, of a 20-day unpaid suspension.

> **Support:**    **Appx. A at 184.**

**RESPONSE:** CP admits.

146.    The same morning Mr. Jared sent an email stating, "He is supposed to start his suspension once he ties up on Monday."

**Support:        Appx. B at 22.**

**RESPONSE:** CP admits.

147.    The discipline letter stated: "Formal investigation was conducted on February 10, 2021, to develop all the facts and circumstances in connection with the referenced occurrence. At the conclusion of that investigation it was determined the investigation record as a whole contains substantial evidence proving you violated GCOR 5.3.7 – Radio Response."

**Support:        Appx. A at 184.**

**RESPONSE:** CP admits.

148.    The discipline letter was on Mr. Jared's letterhead and had Mr. Jared's signature.

**Support:        Appx. A at 184.**

**RESPONSE:** CP admits that discipline notice was on Jared's letterhead and included Jared's stamped electronic signature. CP further states that Jared testified that the administrative office has permission to add his stamped electronic signature to documents that need to go out under the General Manager. Jared did not read the discipline notice before it was issued to Sexton. Jared was not involved in any way in the discipline decision or preparing the discipline notice. Instead, CP Vice President Operations Southern Region Jason Ross decided the discipline to be imposed on Mr. Sexton.

Support:        SAMF ¶ 39.

149.    CP admits that the discipline letter was signed by Mr. Jared in his role as general manager.

**Support:        [Doc. 31 at 4, para. 19].**

**RESPONSE:** CP admits. CP further states that the discipline notice was on Jared's letterhead and included Jared's stamped electronic signature. Jared testified that the administrative office has permission to add his stamped electronic signature to documents that need to go out

under the General Manager. Jared did not read the discipline notice before it was issued to Sexton.

Jared was not involved in any way in the discipline decision or preparing the discipline notice.

> Support:   SAMF ¶ 39.

### B.   COMPARATORS AND SEXTON'S DISCIPLINE

150.   The record does not include evidence that CP has disciplined any other engineer with a 20-day unpaid suspension for violation of GCOR 5.3.7.

> **Support:   [Cramer Dec.].**

**RESPONSE:** CP denies.

On July 16, 2019, engineer T.V. violated GCOR Rule 5.3.7, which is a Major – Life Threatening & Conduct Unbecoming Offence. T.V. was issued a twenty-day suspension, with five (5) days served and fifteen (15) days deferred. T.V. acknowledged responsibility for the rule violation and agreed to waive the right to a formal investigation hearing. The assessment of discipline for T.V.'s July 16, 2019 rule violation falls within the range of disciplinary consequences that may be assessed for a Major – Life Threatening & Conduct Unbecoming Offence pursuant to CP's Hybrid Discipline & Accountability Guidelines.

> Support:   SAMF ¶ 47.

On January 7, 2021, engineer T.P. violated GCOR Rule 5.3.7, which is a Major – Life Threatening & Conduct Unbecoming Offence. T.P. was issued a twenty-day suspension, with ten (10) days served and ten (10) days deferred. T.P. immediately acknowledged and took accountability for his rule violation. The assessment of discipline for T.P.'s January 7, 2021 rule violation falls within the range of disciplinary consequences that may be assessed for a Major – Life Threatening & Conduct Unbecoming Offence pursuant to CP's Hybrid Discipline & Accountability Guidelines.

> Support:   SAMF ¶ 50.

On February 16, 2021, engineer J.M. violated GCOR Rule 5.3.7, which is a Major – Life Threatening & Conduct Unbecoming Offence. J.M. was dismissed from employment with CP. J.M. had several Major rule violations on his discipline record, including a January 13, 2021 incident for which J.M. was issued a thirty-day "last chance" suspension. The assessment of discipline for J.M.'s February 16, 2021 rule violation falls within the range of disciplinary consequences that may be assessed for a Major – Life Threatening & Conduct Unbecoming Offence pursuant to CP's Hybrid Discipline & Accountability Guidelines.

> Support:        SAMF ¶ 51.

151.    On February 26, 2018, CP issued against "D.C." a 10-day suspension with 5 days deferred for violating GCOR 5.3.7.

> **Support:        Appx. B at 23.**

**RESPONSE:** CP admits. CP further states that engineer D.C. acknowledged responsibility for the rule violation and agreed to waive the right to a formal investigation hearing. The assessment of for D.C.'s February 12, 2018 rule violation falls within the range of disciplinary consequences that may be assessed for a Major – Life Threatening & Conduct Unbecoming Offence pursuant to CP's Hybrid Discipline & Accountability Guidelines.

> Support:        SAMF ¶ 46.

152.    20 days actual served is a more severe discipline than 10 served 10 deferred.

> **Support:        Appx. A at 91.**

**RESPONSE:** CP denies. If a suspension is deferred in part or in full, the deferred portion of the suspension will be activated if the employee is culpable for a subsequent offense within the default period, which is typically six (6) months from the date of assessment. If activated, the deferred suspension carries the same gravity as a served suspension.

> Support:        SAMF ¶ 44.

153.    A deferred suspension results in no time lost.

**Support:        Appx. A at 179.**

**RESPONSE:** CP admits that, if a suspension is deferred in part or in full, the deferred portion of the suspension will be activated if the employee is culpable for a subsequent offense within the default period, which is typically six (6) months from the date of assessment. If activated, the deferred suspension carries the same gravity as a served suspension.

Support:        SAMF ¶ 44.

154.    On August 1, 2019, CP issued against Engineer "T.V." a 20-day suspension with 15 days deferred for "failure to stop within half the distance specified."

**Support:        Appx. B at 25.**

**RESPONSE:** CP admits that, on July 16, 2019, engineer T.V. violated GCOR Rule 5.3.7, which is a Major – Life Threatening & Conduct Unbecoming Offence. T.V. was issued a twenty-day suspension, with five (5) days served and fifteen (15) days deferred. T.V. acknowledged responsibility for the rule violation and agreed to waive the right to a formal investigation hearing. The assessment of discipline for T.V.'s July 16, 2019 rule violation falls within the range of disciplinary consequences that may be assessed for a Major – Life Threatening & Conduct Unbecoming Offence pursuant to CP's Hybrid Discipline & Accountability Guidelines.

Support:        SAMF ¶ 47.

155.    On June 7, 2020, CP had verbal coaching with Engineer "M.J." for "failure to stop within half the distance specified."

**Support:        Appx. B at 25.**

**RESPONSE:** CP admits that, on June 7, 2020, engineer M.J. was involved in an incident in which he failed to stop a shove movement within half the distance given. M.J. was issued verbal coaching.

Support:        SAMF ¶ 48.

156.    Verbal coaching is not considered discipline.

**Support:        Appx. A at 181.**

**RESPONSE:** CP admits.

157.    On June 8, 2020, Mr. Jared issued "G.H." a letter of reprimand for "failure to stop within half the range of vision of improperly lined switch resulting in a run through switch."

**Support:        Appx. B at 27.**

**RESPONSE:** CP admits that CP issued G.H. a letter of reprimand, which was on Jared's letterhead. CP further states that, pursuant to CP's Hybrid Discipline & Accountability Guidelines, "failure to properly line switches for intended movement and or operating through an improperly lined switch" is a "Non-Major Offence" (not a "Major – Life Threatening & Conduct Unbecoming Offence").

<u>Support</u>:        SAMF ¶ 45.

158.    On July 29, 2020, CP had verbal coaching with Engineer "T.S." for "failure to stop within half the distance specified."

**Support:        Appx. B at 25.**

**RESPONSE:** CP admits that, on July 29, 2020, engineer T.S. was involved in an incident wherein he failed to stop a shove move in half the distance specified. T.S. was issued verbal coaching.

<u>Support</u>:        SAMF ¶ 49.

159.    On January 27, 2021, Tom Jared issued against Engineer "T.P." a 20-day suspension with 10 days deferred for failure to stop within half the distance specified.

**Support:        Appx. B at 25.**

**RESPONSE:** CP admits that, on January 7, 2021, engineer T.P. violated GCOR Rule 5.3.7, which is a Major – Life Threatening & Conduct Unbecoming Offence. T.P. was issued a twenty-day suspension, with ten (10) days served and ten (10) days deferred which was on Jared's

letterhead. T.P. immediately acknowledged and took accountability for his rule violation. The assessment of discipline for T.P.'s January 7, 2021 rule violation falls within the range of disciplinary consequences that may be assessed for a Major – Life Threatening & Conduct Unbecoming Offence pursuant to CP's Hybrid Discipline & Accountability Guidelines.

      Support:      SAMF ¶ 50.

160.    Mr. Ross testified there is "no way in hell" he was "going to give somebody a 10 day deferred and 10 day served suspension for a major violation, so he got 20."

      **Support:**      **Appx. A at [Ross 76:1-6 and 50:9-14].**

**RESPONSE:** CP admits that, at his deposition, Ross testified that "there was no way in Hades" he would impose less than a twenty-day suspension for a first Major – Life Threatening & Conduct Unbecoming Offence. Ross further testified that if he assigned less severe discipline for a first Major rule violation, it would likely be the result of post-hearing negotiations between the Company and the employee's union. In this case, Sexton's union made no effort to negotiate his discipline after the hearing.

      Support:      SAMF ¶ 40.

161.    Mr. Ross testified, "there are certain cases where the general chairman came to me after and asked to give the guy a break for whatever reason and I would entertain that."

      **Support:**      **Appx. A at 52 and 60.**

**RESPONSE:** CP admits.

162.    Mr. Ross testified, "if they want to go to a hearing and they want to dispute all the facts - - that's fine. That's up to them and they can do that. But if the charges get proven, then they get full measure of discipline."

      **Support:**      **Appx. A at 53.**

**RESPONSE:** CP admits.

**C.    PUBLIC LAW BOARD AWARD**

163.    After discipline is assessed, if an employee feels that the discipline is unwarranted,

then they can follow their grievance process through the Collective Bargaining Agreement.

**Support:        Appx. A at 224.**

**RESPONSE:** CP admits.

164.    The Collective Bargaining Agreement states "Should an employee investigated under this Article consider that the discipline is unjust, he shall have the right to appeal as provided in Article 28 of this agreement."

**Support:        Appx. B at 29.**

**RESPONSE:** CP admits.

165.    The Collective Bargaining Agreement provides that as part of the appeal process, discipline disputes may be submitted to a public law board tribunal established by law or agreement.

**Support:        Appx. B at 28.**

**RESPONSE:** CP admits, but the page cited does not support the statement in Paragraph 165. Instead, Article 28, Section 2 of Sexton's CBA provides the requirements for appealing a discipline decision.

Support:        SAMF ¶ 41.

166.    The Collective Bargaining Agreement provided: "In case of dismissal or suspension which is later found to be unjust, the employee will be reinstated with seniority rights unimpaired and paid for all lost time."

**Support:        Appx. B at 28.**

**RESPONSE:** CP admits. *See* **Appx. B at 29.**

167.    CP's discipline against Mr. Sexton was overturned by the Public Law Board—removing the 20 day suspension and awarded back pay.

**Support:        Appx. A at 185.**

**RESPONSE:** CP admits that on August 26, 2022, the Public Law Board ruled in the union's favor on its appeal of Sexton's February 26, 2021 discipline. The Public Law Board granted Sexton's appeal on procedural grounds based on the incorrect belief that Jared played a

role in the imposition of discipline after the investigation hearing. As a result, the February 26, 2021, discipline was removed from Sexton's record and he was compensated for the twenty (20) days of pay that he did not receive during the now-reversed suspension. Sexton made it clear at his deposition that the decision was a "win for John."

> Support:    SAMF ¶ 42.

168.    The Public Law Board award states: "We have carefully reviewed the record, and while we find multiple reasons to question the discipline assessment, we concur with the Organization that the process here was flawed to such an extent that it deprived Claimant of a fair and impartial hearing. The record reflects that it was Jared who initiated the test, in a manner which does raise questions regarding safety in his obviously surprising an employee who was performing the safety-sensitive task of protecting the shove, and it appears that the charges were levied based on his test and observations. The only realistic conclusion that can be reached after an objective review of this record is that Jared levied charges regarding his own somewhat questionable test, provided the testimony to support them, and then signed off on a predetermined outcome."

**Support:    Appx. A at 187-188.**

**RESPONSE:** CP admits that the August 26, 2022 Public Law Board Award includes the above statements, but denies that the statements are accurate, as Jared's actions were not unsafe nor was his test "questionable" in any way. CP expressly denies that there is any evidence to support the Public Law Board's conclusion that Jared "signed off on a predetermined outcome." CP further states, Jared administered the efficiency test on February 1, 2021 consistent with the guidelines set out in CP's Efficiency Test Manual and CP practices and rules. Specifically, after DePover gave a 15-car count, Jared instructed DePover not to give further instruction to Sexton. In so doing, Jared altered the conditions of the shove movement to test Sexton's compliance with GCOR Rule 5.3.7, which required him to stop within half the distance specified by DePover's last instruction. This type of "set up" test is consistent with the guidelines set out in CP's Efficiency Test Manual and did not result in any violation of federal law or regulations, or CP practices and rules, including GCOR.

> Support:    SAMF ¶¶ 16–17.

169.    Mr. Ross testified that it would be retaliation to conduct an unfair investigation, questionable tests, an unsafe test, and violating rules to set up a test 10 or 11 hours after taking the safe course.

**Support:        Appx. A at 64.**

**RESPONSE:** CP admits that Ross testified as follows:

Q.    In all of these various things that I just asked you about, discouraging unfair investigations, questionable tests, unsafe tests, violating rules to set up a test, you would discourage these even more I would imagine if it were 10 or 11 hours, 9 or 11 hours after an employee takes the safe course?

A.    That would be retaliation, and I don't tolerate retaliation.

*See* **Appx. A at 64.**

### D.    CP'S DISCIPLINARY INVESTIGATION POLICIES

170.    CP policy instruction [sic] managing investigators that "it is critical to hold a fair and impartial hearing."

**Support:        Appx. B at 30.**

**RESPONSE:** CP admits.

171.    Employees are entitled to a fair and impartial hearing.

**Support:        Appx. A at 58.**

**RESPONSE:** CP admits.

172.    An investigation would not be fair if it was determined that a witness had firsthand knowledge and was not allowed to be there.

**Support:        Appx. A at 182.**

**RESPONSE:** CP admits that CP's 30(b)(6) designee testified at his deposition, "An investigation would not be fair if it was determined that a witness had firsthand knowledge and was not allowed to be there." *See* **Appx. A at 182.** CP further states that Sexton's CBA provides: the employee "shall have reasonable opportunity to secure the presence of *necessary* witnesses." (Emphasis added.) CP also states that CP's US Investigation Training Manual provides, the

hearing officer may "reasonably deny a request for additional witnesses if the union representative/charged employee fails to adequately explain their pertinence to the matter under investigation."

Support:        SAMF ¶ 29.

173.    Witnesses to the event being investigated should be included in the investigation in order for the hearing to be fair and impartial.

**Support:        Appx. A at 96-98.**

**RESPONSE:** CP admits that, when asked at his deposition, "In order for a hearing to be fair and impartial, you want pertinent witnesses to testify?" Jared answered, "Yes." *See* **Appx. A at 98.** CP further states that Sexton's CBA provides: the employee "shall have reasonable opportunity to secure the presence of *necessary* witnesses." (Emphasis added.) CP also states that CP's US Investigation Training Manual provides, the hearing officer may "reasonably deny a request for additional witnesses if the union representative/charged employee fails to adequately explain their pertinence to the matter under investigation."

Support:        SAMF ¶ 29.

174.    CP policy states that "The goal is to obtain honest/accurate testimony from all parties and to develop the facts and circumstances of the case."

**Support:        Appx. B at 31.**

**RESPONSE:** CP admits that the goal is to obtain honest and accurate testimony from all necessary and pertinent witnesses. *See* **Appx. B at 30.**

Support:        SAMF ¶ 30.

175.    The hearing officer is to make sure all the witnesses are available.

**Support:        Appx. A at 180.**

**RESPONSE:** CP admits the hearing officer is to make sure all the necessary and pertinent witnesses with firsthand knowledge are available. *See* **Appx. A at 182.** CP further states that

Sexton's CBA provides: the employee "shall have reasonable opportunity to secure the presence of *necessary* witnesses." (Emphasis added.) CP also states that CP's US Investigation Training Manual provides, the hearing officer may "reasonably deny a request for additional witnesses if the union representative/charged employee fails to adequately explain their pertinence to the matter under investigation."

      Support:      SAMF ¶ 29.

176.    CP's US Investigation Manual provides: "The company should never lose a case at arbitration if its disciplinary action is founded on evidence presented at the hearing while protecting the 'due process' rights of the charged employee as provided in the CBA."

      **Support:      Appx. B at 31.**

**RESPONSE:** CP admits.

177.    CP policy states that "unwarranted adverse employment action" constitutes retaliation and is prohibited.

      **Support:      Appx. B at 32.**

**RESPONSE:** CP admits.

178.    The discipline policy is meant to change behavior.

      **Support:      Appx. A at 178.**

**RESPONSE:** CP admits that CP's Hybrid Discipline & Accountability Guidelines is intended to "progressively influence and correct behaviors that do not comply with required standards."

      Support:      SAMF ¶ 43.

**E.    CP'S EFFICIENCY TEST MANUAL AND JARED'S EFFICIENCY TEST**

179.    Mr. Jared knew that there was a manual for guidance on how to conduct efficiency tests.

      **Support:      Appx. A at 83.**

**RESPONSE:** CP admits.

180.    Mr. Jared expects managers conducting efficiency to have the manual with them and refer to it.

**Support:       Appx. A at 84.**

**RESPONSE:** CP admits that Jared testified that managers conducting efficiency tests are "expected to have that document with them and refer to it when they need to." *See* **Appx. A at 84.**

181.    Mr. Jared does not recall the last time he had a copy of the manual.

**Support:       Appx. A at 85.**

**RESPONSE:** CP admits.

182.    The efficiency test manual provides guidelines on how to perform a test.

**Support:       Appx. A at 89.**

**RESPONSE:** CP denies as unsupported. CP states that CP's U.S. Manual on Operating Rules in Compliance provides guidelines regarding the administration of efficiency tests, which test compliance with GCOR rules. The guidelines provided in the U.S. Efficiency Test Manual on Operating Rules in Compliance are not rules and do not set out mandatory procedures for administering efficiency tests, nor are the procedures described in the manual the exclusive ways for efficiency tests to be performed. The guidelines for testing compliance with GCOR 5.3.7 are provided by several tests within CP's U.S. Efficiency Test Manual, including: Test GRA01 Hand Signals or Signal Disappearance (included in the "Stop" test group), Test GRF02 Shoving or Pushing Movements (included in the "Switches – Derails – Protecting Shoves and Equipment Foul of Adjacent Tracks" test group), and Test GR03 Lieu of Hand Signals (included in the "Railroad Radio" test group).

Support:       SAMF ¶ 16.

183.    The efficiency testing manual gives a structured test so the tests are done consistently and safety—the manual outlines the process of how a test should be done.

**Support:       Appx. A at 183.**

**RESPONSE:** CP admits that CP's U.S. Manual on Operating Rules in Compliance provides guidelines regarding the administration of efficiency tests, which test compliance with GCOR rules. The guidelines provided in the U.S. Efficiency Test Manual on Operating Rules in Compliance are not rules and do not set out mandatory procedures for administering efficiency tests, nor are the procedures described in the manual the exclusive ways for efficiency tests to be performed. The guidelines for testing compliance with GCOR 5.3.7 are provided by several tests within CP's U.S. Efficiency Test Manual, including: Test GRA01 Hand Signals or Signal Disappearance (included in the "Stop" test group), Test GRF02 Shoving or Pushing Movements (included in the "Switches – Derails – Protecting Shoves and Equipment Foul of Adjacent Tracks" test group), and Test GR03 Lieu of Hand Signals (included in the "Railroad Radio" test group).

> Support:        SAMF ¶ 16.

184.    The efficiency test GRF02 Shoving or Pushing Movements states, "When conducting this test, actual operating conditions are to be observed."

> **Support:        Appx. B at 33.**

**RESPONSE:** CP admits.

185.    The efficiency test GRF02 does not provide guidelines for conducting a set up test.

> **Support:        Appx. A at 90.**

**RESPONSE:** CP admits.

186.    From 2013 up to the test Mr. Jared stated Mr. Sexton failed, Sexton had been tested with efficiency test GRF02 on 19 occasions—all of which he passed.

> **Support:        Appx. A at [Dep. ex 50].**

**RESPONSE:** CP admits.

187.    From 2013 up to February 1, 2021, Mr. Jared had never conducted an efficiency test on Mr. Sexton.

> **Support:        Appx. A at 189.**

**RESPONSE:** CP admits that Sexton's efficiency test records do not indicate that Jared administered an efficiency test for Sexton between 2013 and February 1, 2021. *See* **Appx. A at 189–210.**

188.    An instruction of "clear for 40, 15 to a stop" is a clear instruction and within the radio rules.

> **Support:**    **Appx. A at 108.**

**RESPONSE:** CP admits that the instruction "15 to a stop" is a clear instruction and denies that "clear for 40" was an "instruction" within the context of GCOR 5.3.7. If the instruction includes two car-counts in the same communication, the engineer should operate based on the most restrictive car-count. For example, if the conductor says, "Good for forty (40), fifteen (15) to a stop," the engineer should operate based on the fifteen (15) car-count—the more restrictive count. If the car-count is ambiguous or the engineer is confused, the engineer should immediately stop the shove movement.

> Support:    SAMF ¶¶ 4–5.

189.    An instruction of "15 more to a stop, still clear for 40" means that "still clear for 40" is an additional instruction.

> **Support:**    **Appx. A at 109.**

**RESPONSE:** CP denies as unsupported. CP further denies that "still clear for 40" was an "additional instruction" as the term is used in GCOR Rule 5.3.7. The undisputed evidence shows that the last communication Sexton received from DePover, the conductor, was "good for forty (40), fifteen (15) cars to a stop." Even if "good for forty (40)" were considered to be an "instruction," "fifteen (15) to a stop" would be an additional instruction. As a result, GCOR 5.3.7 required Sexton to be prepared to have the train stopped within seven and one-half car lengths and to actually have the train stopped within that distance if he heard no other instructions. Sexton shoved eleven cars after being instructed "15 to a stop" before stopping and so violated

GCOR 5.3.7.

Support:        SAMF ¶ 14.

190.    If "additional instructions are received," then the engineer has the right to rely on those instructions.

**Support:        Appx. A at 213.**

**RESPONSE:** CP denies as unsupported. Plaintiff cites to his expert's deposition testimony, which is not evidence—it is an opinion. CP further states:

When performing a shove movement, the employee protecting the movement communicates with the engineer by radio to inform the engineer about the distance remaining before the train must come to a complete stop. The employee protecting the movement typically communicates the distance in "car counts"—the number of car lengths remaining until the train must be stopped.

The applicable GCOR Rule 5.3.7, mandates that engineers must be prepared to stop a shove movement within half the number of car lengths last called over the radio, if they receive no further instructions. In other words, if the engineer receives no further communication, he must actually stop the train, and the train must be at a full stop, within one-half of the number of car lengths that was last transmitted. GCOR 5.3.7's specific language is:

### 5.3.7   Radio Response

When radio communication is used to make movements, crew members must respond to specific instructions given for each movement. Radio communications for shoving movements must specify the direction and distance and must be acknowledged when distance specified is more than four cars. **Movement must stop within half the distance specified unless additional instructions are received.**

Support:        **Appendix p. 423**, McInnis Decl. ¶ 8; **Appendix p. 7**, Sexton Dep.

27:21–29:7; **Appendix p. 59**, Sexton Dep. Ex. 2 at CP_00319.

For example, if the last car count communicated is forty (40), the engineer must be prepared

to have the train at a full stop within twenty (20) car lengths.

If the communication includes two car-counts in the same communication, the engineer should operate based on the most restrictive car-count. For example, if the conductor says, "Good for forty (40), fifteen (15) to a stop," the engineer should operate based on the fifteen (15) car-count—the more restrictive count.

If the car-count is ambiguous or the engineer is confused, the engineer should immediately stop the shove movement.

> Support:       SAMF ¶¶ 1–5.

191.    Mr. Johnson could not say what the rule was without it in front of him.

> **Support:       Appx. A at 119.**

**RESPONSE:** CP denies, as Johnson testified clearly and accurately about the requirements of GCOR 5.3.7, as follows:

> A.      Once he's given something more restrictive, no. He needs to go with what's most restrictive. 25 is more restrictive than 50.
>
> Q.      Is that what the rules says, Rule 6.5?
>
> A.      I don't have the GCOR in front of me to tell you exactly what it reads, but they are required to stop within half the distance specified. So in the case of the 25, you would have to be stopped within 12-1/2 cars if he wasn't given further instruction. And the same with the 15, clear for 40, he would need to be stopped within half of the 15, which would be 7-1/2 cars.
>
> Q.      Did you give any significance to the instruction of still clear for 40?
>
> [objection omitted]
>
> A.      No, because he was given something more restrictive.
>
> Support:       SAMF ¶ 6.

192.    Mr. Johnson testified that the shoving rule requires an engineer to stop within "what's most restrictive."

> **Support:       Appx. A at 119.**

**RESPONSE:** CP admits.

193.    With the rule in front of him, Mr. Johnson confirmed that the rule does not say anything about stopping within what's "most restrictive."

> **Support:**    **Appx. A at 174.**

**RESPONSE:** CP admits that Johnson testified as follows:

> Q.    Take a second to review [GCOR Rule 5.3.7].
>
> A.    (Witness examining document).
>
> Q.    Does it say more restrictive anywhere in that rule?
>
> A.    No.

*See* **Appx. A at 174.** CP further states:

If the communication from the conductor to the engineer includes two car-counts in the same communication, the engineer should operate based on the most restrictive car-count. For example, if the conductor says, "Good for forty (40), fifteen (15) to a stop," the engineer should operate based on the fifteen (15) car-count—the more restrictive count. If the car-count is ambiguous or the engineer is confused, the engineer should immediately stop the shove movement.

> <u>Support</u>:    SAMF ¶¶ 4–5.

**F.    CP'S INCENTIVIZATION POLICIES**

194.    In 2021, CP's Short Term Incentive Plan, Policy 3411, was in place.

> **Support:**    **Appx. B at 34–35.**

**RESPONSE:** CP admits.

195.    In 2021, the Short Term Incentive Policy applied to Kurtis McKelvey, Marcus Johnson, Dylan Smith, Jason Ross, Tracy Miller, and Tom Jared.

> **Support:**    **Appx. A at 220.**

**RESPONSE:** CP admits.

196.    The Short Term Incentive Plan's objectives include: "to tie a part of the employee's

compensation directly to CPs [sic] results."

**Support:**      **Appx. B at 34-35, and 54.**

**RESPONSE:** CP admits. CP further states that the Policy Statement of Policy 3411 provides: "Canadian Pacific offers a Short Term Incentive Plan (the "Plan"), to recognize the contribution that each regular, non-unionized and US salaried employee makes to the Railway's achievement of its business objectives." *See* **Appx. B at 34**. Further, the "results" referred to in the Plan are company-wide results across a range of performance areas. *See* **Appx. B at 34** (corporate performance measures include the company's Operating Ratio, Operating Income, Train Accident Frequency, Personal Injury Frequency, and Trip Plan Compliance.)

197.    The individual component of an employee's award is tied directly to the individual's Performance Management Program objectives.

**Support:**      **Appx. B at 34-35.**

**RESPONSE:** CP admits.

198.    It is the goal of the short-term incentive plan to incentivize employees.

**Support:**      **Appx. A at 221.**

**RESPONSE:** CP denies as unsupported. CP further states that the Policy Statement of Policy 3411 provides: "Canadian Pacific offers a Short Term Incentive Plan (the "Plan"), to recognize the contribution that each regular, non-unionized and US salaried employee makes to the Railway's achievement of its business objectives." *See* **Appx. B at 34**.

199.    Senior leaders set objectives and then those objectives are cascaded down to lower-level managers.

**Support:**      **Appx. A at 217.**

**RESPONSE:** CP admits. *See* **Appx. A at 217–18.**

200.    There are individual weights assigned for each objective.

**Support:**      **Appx. A at 218.**

**RESPONSE:** CP admits. *See* **Appx. A at 218–19.**

201.    Objectives are weighted according to the importance CP places on them for each individual and the amount of time spent focusing on that component.

> **Support:**      **Appx. A at 219, 223, and Appx. B at 34-35.**

**RESPONSE:** CP admits that the objectives in an employee's annual Performance

Management Program ("PMP") form are weighted and that the weights are individualized relative

to the importance of the particular objective to the individual's performance and goals for the year.

For example, if an employee has a specific goal that he/she needs to focus on more than another

goal, the weight assigned to the objective tied to the former goal may be higher than the weight

assigned to the objective tied to the latter goal. *See* **Appx. A at 219**.

202.    CP monetarily incentivized McKelvey, Johnson, Smith, Jared, Ross, and to weigh overall performance, train performance, origin performance, terminal dwell, GTMs, train weights, train lengths, and train speed as more important than operating safely.

> **Support:**      **Appx. B 36-53.**

**RESPONSE:** CP denies as unsupported. Plaintiff is adding the weights assigned to several

objectives and then comparing that sum to the individual weight assigned to the "operating safely"

objective for these managers. *See* **Appx. A at 223**. That is not how CP assesses or evaluates the

objectives, as "operating safely" is not less important than any other objective.

> Support:      SAMF ¶ 52.

203.    CP's corporate measures weighed operating ratio, operating income, and trip plan compliance as 8 times more important than train accident frequency.

> **Support:**      **Appx. B At 54.**

**RESPONSE:** CP denies as unsupported. Plaintiff is adding the weights assigned to several

corporate objectives and then comparing that sum to the individual weight assigned to the "train

accident frequency" corporate objective. *See* **Appx. B At 54**; **Appx. A at 223**. That is not how CP

assesses or evaluates the objectives.

<u>Support</u>:        SAMF ¶ 52.

204.    Mr. McKelvey is incentivized to lower the cost of crew transportation which can include reducing the number of recrews.

**Support:        Appx. A at 218.**

**RESPONSE:** CP admits that "controlling costs" is one of CP's Five Foundations and that CP evaluates the performance of all management employees, including McKelvey in 2021, based on achievement of metrics tied to the Five Foundations. CP further states:

Senior leaders, in collaboration with human resources, set performance objectives at the beginning of the year. The performance objectives are then cascaded down to managers within each leader's region, subdivision, and territory. The objectives align with what CP calls its Five Foundations. At the end of the year, leaders evaluate employee performance and, in collaboration with human resources, assign a performance rating. Central to the "Five Foundations" is "operating safely," which is no less important than any other of the foundations (which are Provide Service, Optimize Assets, Develop People, and Control Costs).

<u>Support</u>:        SAMF ¶ 53.

CP uses various metrics to measure achievement of key performance indicators, including origin performance, terminal dwell, and train weight. Actual achievement is aggregated at the end of the year and measured against objectives. Performance of one train on one day would not negatively impact an employee's overall performance rating.

<u>Support</u>:        SAMF ¶ 54.

An employee's performance rating is a factor used to determine the individual component of the employee's STIP payment.

<u>Support</u>:        SAMF ¶ 55.

205.    Mr. McKelvey testified that he tries to get all the trains through his terminal within the standard time.

**Support:**      **Appx. A at 34.**

**RESPONSE:** CP admits.

206.    Mr. McKelvey tries to avoid all delays period.

**Support:**      **Appx. A at 34.**

**RESPONSE:** CP admits.

207.    There is no distinction between a three-hour delay and a one minute delay—a delay is a delay.

**Support:**      **Appx. A at 34.**

**RESPONSE:** CP admits that McKelvey testified at his deposition: "It doesn't matter if it's a minute or 3 hours. A delay is a delay." *See* **Appx. A at 34.**

208.    Mr. McKelvey drills down on trains that have even a one-minute delay.

**Support:**      **Appx. A at 35.**

**RESPONSE:** CP admits.

209.    McKelvey did a drill down on Sexton's train.

**Support:**      **Appx. A at 33.**

**RESPONSE:** CP admits.

210.    Mr. McKelvey testified that any type of deviation from the normal operating plan is a concern to him.

**Support:**      **Appx. A at 32.**

**RESPONSE:** CP admits.

211.    When a train goes over standard, management escalates the over standard event and conducts a drill-down.

**Support:**      **Appx. A at 28.**

**RESPONSE:** CP admits.

212.    Mr. Jared tries to avoid delays.

**Support:**      **Appx. A at 86.**

**RESPONSE:** CP admits.

213.    The 474-31 was the most delayed train for CP in the United States on February 1, 2021.

**Support:**      **Appx. A at 113.**

**RESPONSE:** CP admits that CP distributes a daily report titled "Top 15 Trains Impacting Speed US," which displays 15 delayed trains for the day prior in descending order starting with the most delayed train. On February 2, 2021, the 474-31 was at the top of the "Top 15 Trains Impacting Speed US" list.

Support:      SAMF ¶ 22.

214.    When dwell is reduced, CP is providing a service because CP is moving the cars of the customer and not letting them sit in its yards.

**Support:**      **Appx. A at 61.**

**RESPONSE:** CP admits.

215.    If cars sit, CP is not generating revenue.

**Support:**      **Appx. A at 62.**

**RESPONSE:** CP admits that Ross testified: "If you let cars sit, you're not going to generate revenue. If you don't generate revenue, you're going to be going out of business." *See* **Appx. A at 62.**

216.    Mr. Jared tried to avoid recrews at places other than a recrew location because it could cause delays and cost money.

**Support:**      **Appx. A at 88.**

**RESPONSE:** CP admits.

217.    A recrew refers to changing a train's crew at somewhere other than the train's destination.

**Support:**      **Appx. A at 87.**

**RESPONSE:** CP admits.

218.    A standard work event would not need to be a recrew.

      **Support:**      **Appx. A at 231-232.**

**RESPONSE:** CP admits.

219.    Mr. Ross's operating model strives to avoid recrewing trains.

      **Support:**      **Appx. A at 51.**

**RESPONSE:** CP admits that Ross testified, "Under any operating model you strive to avoid recrewing trains." *See* **Appx. A at 51.**

220.    Mr. Ross testified, "Nobody wants to recrew a train. It doesn't matter if you're old, new NS, BNSF, CP, CN. It doesn't matter."

      **Support:**      **Appx. A at 51.**

**RESPONSE:** CP admits.

221.    Mr. Ross testified, "The first thing you do in a business is you provide a service. If you're not providing a service, I don't care what business you're in, you're not going to deliver a product that people want. Therefore, you're not making money. So you have to provide a service. That's the most important thing you do. The second thing is you've got to control your costs because if you don't control your costs, you're going to go out of business. You can provide a service and be the best service in the world and you'll end up out of business. Right? You have to utilize your assets because if you're not utilizing your assets properly, you're just going to drive costs up. You're going to go out of business. You have to operate safely, and that's just a given. The expectation is you operate safely. You should operate safely no matter what you're doing. It's a given. Then the last foundation - - and it's not the last. It's actually the foundation that the other four are built on, is to develop you people."

      **Support:**      **Appx. A at 235–236.**

**RESPONSE:** CP admits that the cited text accurately quotes Ross's deposition testimony regarding CP's Five Foundations.

### G.    SEXTON DISSUADED BY CP'S DISCIPLINARY ACTIONS

222.    Sexton's testimony described "the embarrassment that all this is - - that it's caused against me and my family, my safety records and not knowing whether I'm going to have a job every day at the end of the day I go to work."

> Support:        Appx. A at 23–24.

**RESPONSE:** CP denies that the cited testimony supports the inference that Sexton was "dissuaded by CP's disciplinary actions." Rather, Sexton gave the cited testimony in response to being asked "what damages and compensation are you seeking through this lawsuit?" *See* **Appx. A at 23–24.**

> Support:        *See also* SAMF ¶ 28.

223.    During the investigation hearing itself, Sexton stated, "I'm sorry man" and "I can't take this."

> Support:        Appx. A at 227.

**RESPONSE:** CP denies that the cited testimony supports the inference that Sexton was "dissuaded by CP's disciplinary actions." Rather, Sexton, apparently frustrated, made the following statements during the investigation hearing:

> Mr. Sexton:    Is there audio on this tape as well?
>
> Mr. Johnson:   No.
>
> Mr. Jared:     There's no audio.
>
> Mr. Sexton:    I'm sorry, man –
>
> Mr. Rainwater: It's okay.
>
> Mr. Sexton:    -- I can't take this [indiscernible].
>
> Mr. Rainwater: Relax.
>
> Mr. Johnson:   Okay. As a reminder, we're on record here.

Appx. A at 227.

224.    Sexton's union representative had to tell Sexton "It's okay" and "Relax".

> Support:        Appx. A at 227.

**RESPONSE:** CP denies that the cited testimony supports the inference that Sexton was "dissuaded by CP's disciplinary actions." Rather, Sexton's union representative warned Sexton to

relax in response to Sexton's comments, apparently made out of frustration:

> Mr. Sexton:     Is there audio on this tape as well?
>
> Mr. Johnson:   No.
>
> Mr. Jared:       There's no audio.
>
> Mr. Sexton:     I'm sorry, man –
>
> Mr. Rainwater: It's okay.
>
> Mr. Sexton:     -- I can't take this [indiscernible].
>
> Mr. Rainwater: Relax.
>
> Mr. Johnson:   Okay. As a reminder, we're on record here.

**Appx. A at 227.**

225.    Later during the investigation, Sexton stated "I'm a little wound up here…"

**Support:**       **Appx. A at 158.**

**RESPONSE:** CP denies that the cited testimony supports the inference that Sexton was

"dissuaded by CP's disciplinary actions." Rather, Sexton stated during his closing statement:

> Give me a second, please. And also, the – the – the – the Rule was violated at – as
> this test was also set up in – in their own – in their own testing manual. Other than
> that, I'm a little – I'm a little wound up here, so that's a – that's all I'm gonna say
> for right now. Then I want you to ask me if – if I think that this has been a fair and
> impartial hearing, please.

*See* **Appx. A at 158.**

### H.    LACK OF EVIDENCE SUPPORTING CP'S AFFIRMATIVE DEFENSE

226.    There is no evidence demonstrating that CP has disciplined another employee with
no major discipline on their record with a 20-day unpaid suspension for the same rule violation CP
assessed against Mr. Sexton.

**Support:**       **Cramer Affidavit para 42–43.**

**RESPONSE:** CP denies, this statement as unsupported, as the information cited in support

is a statement of counsel regarding what counsel describes as an absence of evidence. CP further

incorporates into this Response the information set out in CP's responses to Paragraphs 150-162, which describe a range of situations in which CP disciplined employees within the range of disciplinary consequences that may be assessed for a Major – Life Threatening & Conduct Unbecoming Offence pursuant to CP's Hybrid Discipline & Accountability Guidelines.

227.    There is no evidence demonstrating the CP [sic] has conducted a disciplinary investigation that was overturned by the public law board for being flawed to such an extent that it deprived a fair and impartial hearing for any other employee absent protected activity.

**Support:        Cramer Affidavit para 44.**

**RESPONSE:** CP denies this statement as unsupported, as the information cited in support is a statement of counsel regarding what counsel describes as an absence of evidence.


Dated: August 26, 2024                    DORSEY & WHITNEY LLP


                                         /s/ Joshua D. Hughes
                                         Joshua Hughes (AT0014950)
                                         hughes.joshua@dorsey.com
                                         Dorsey & Whitney LLP
                                         801 Grand Ave, Suite 4100
                                         Des Moines, IA 50309
                                         Tel: (515) 283–1000
                                         Fax: (515) 598–7704


                                         /s/ John T. Sullivan
                                         John T. Sullivan (pro hac vice)
                                         sullivan.jack@dorsey.com
                                         Briana Al Taqatqa (pro hac vice)
                                         altaqatqa.briana@dorsey.com
                                         Dorsey & Whitney LLP
                                         50 South Sixth Street, Suite 1500
                                         Minneapolis, MN 55402
                                         Tel:  (612) 340–2600
                                         Fax:  (612) 340–2868


                                         ATTORNEYS FOR DEFENDANT

## CERTIFICATE OF SERVICE

        I hereby certify that on August 26, 2024, I caused the foregoing to be electronically served on Plaintiff via ECF, which provides notice and a copy to Plaintiff's counsel and all other counsel of record:

Megan R. Merritt
SHUTTLEWORTH & INGERSOLL, P.L.C.
115 3rd Street SE, Suite 500
P.O. Box 2107
Cedar Rapids, IA 52406
Phone: (319) 365–9461
Fax: (319) 365–8443
mrm@shuttleworthlaw.com

John D. Magnuson
Cyle A. Cramer
YAEGER & JUNGBAUER BARRISTERS, P.L.C.
4601 Weston Woods Way
St. Paul MN, 55127
Phone: (507) 330–4777
Fax: (651) 288–0227
jmagnuson@yjblaw.com
ccramer@yjblaw.com


        /s/ Joshua D. Hughes
        Counsel for Defendant