UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | |
|---|---|
| John Sexton,<br><br>        Plaintiff,<br><br>v.<br><br>Dakota, Minnesota, & Eastern Railroad Corporation d/b/a Canadian Pacific, a Delaware Corporation,<br><br>        Defendant. | Case No. 23–cv–00031<br><br>**DEFENDANT'S LOCAL RULE 56(b)(3) STATEMENT OF ADDITIONAL MATERIAL FACTS** |

Dated: August 26, 2024

DORSEY & WHITNEY LLP

Joshua Hughes (AT0014950)
hughes.joshua@dorsey.com
Dorsey & Whitney LLP
801 Grand Ave, Suite 4100
Des Moines, IA 50309
Tel: (515) 283–1000
Fax: (515) 598–7704

John T. Sullivan (pro hac vice)
sullivan.jack@dorsey.com
Briana Al Taqatqa (pro hac vice)
altaqatqa.briana@dorsey.com
Dorsey & Whitney LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
Tel:  (612) 340–2600
Fax:  (612) 340–2868

ATTORNEYS FOR DEFENDANT

Defendant Dakota, Minnesota & Eastern Railroad Corporation d/b/a Canadian Pacific ("CP"), by and through its attorneys and pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56(b)(3), hereby submits its Statement of Additional Material Facts as follows:

A.   **ADDITIONAL FACTS RELATED TO GCOR 5.3.7**

1.   When performing a shove movement, the employee protecting the movement communicates with the engineer by radio to inform the engineer about the distance remaining before the train must come to a complete stop. The employee protecting the movement typically communicates the distance in "car counts"—the number of car lengths remaining until the train must be stopped.

> Support:   **Resp. App. p. 303**,[1] McInnis Decl. ¶ 7; **Resp. App. p. 3**, Sexton Dep. 28:11–29:21.

2.   The applicable GCOR Rule 5.3.7, mandates that engineers must be prepared to stop a shove movement within half the number of car lengths last called over the radio, if they receive no further instructions. In other words, if the engineer receives no further communication, he must actually stop the train, and the train must be at a full stop, within one-half of the number of car lengths that was last transmitted. GCOR 5.3.7's specific language is:

**5.3.7   Radio Response**

> When radio communication is used to make movements, crew members must respond to specific instructions given for each movement. Radio communications for shoving movements must specify the direction and distance and must be acknowledged when distance specified is more than four cars.
> **Movement must stop within half the distance specified unless additional instructions are received.**

---

[1] Citations to "Resp. App." refer to CP's Responsive Appendix filed in support of its Statement of Additional Material Facts.

      Support:      **Resp. App. p. 303**, McInnis Decl. ¶ 8; **Resp. App. p. 3**, Sexton Dep. 27:21–29:7; **Resp. App. p. 36**, Sexton Dep. Ex. 2 at CP_00319.

3. For example, if the last car count communicated is twenty (20), the engineer must be prepared to have the train at a full stop within ten (10) car lengths.

      Support:      **Resp. App. p. 303**, McInnis Decl. ¶ 9; **Resp. App. p. 4**, Sexton Dep. 33:16–25.

4. If the communication includes two car-counts in the same communication, the engineer should operate based on the most restrictive car-count. For example, if the conductor says, "Good for forty (40), fifteen (15) to a stop," the engineer should operate based on the fifteen (15) car-count—the more restrictive count.

      Support:      **Resp. App. p. 303**, McInnis Decl. ¶ 10; **Resp. App. p. 237**, Jared Dep. 150:3–16; **Resp. App. pp. 183–84**, Johnson Dep. 39:8–25, 40:14–20, 41:6–10.

5. If the car-count is ambiguous or the engineer is confused, the engineer should immediately stop the shove movement.

      Support:      **Resp. App. p. 303**, McInnis Decl. ¶ 11.

6. Johnson testified clearly and accurately about the requirements of GCOR 5.3.7, as follows:

    A. Once he's given something more restrictive, no. He needs to go with what's most restrictive. 25 is more restrictive than 50.

    Q. Is that what the rules says, Rule 6.5?

    A. I don't have the GCOR in front of me to tell you exactly what it reads, but they are required to stop within half the distance specified. So in the case of the 25, you would have to be stopped within 12-1/2 cars if he wasn't given further instruction. And the same with the 15, clear for 40, he would need to be stopped within half of the 15, which would be 7-1/2 cars.

2

Q. Did you give any significance to the instruction of still clear for 40?

[objection omitted]

A. No, because he was given something more restrictive.

Support: **Resp. App. pp. 183–84**, Johnson Dep. 40:18–41:10.

### B. ADDITIONAL FACTS RELATED TO THE EVENTS OF FEBRUARY 1, 2021

7. McKelvey initially disagreed, but ultimately agreed that the crossings should be cut. McKelvey testified that the decision was consistent with CP's policy—when in doubt, take the safest course.

Support: **Resp. App. p. 167**, McKelvey Dep. 79:25–80:9; **Resp. App. p. 282**, Ross Dep. 26:6–15.

8. The 474-31 departed Marquette at 5:40 a.m. CT on February 1, 2021, which was approximately 3.5 hours late based on the standard time allotted for the work to be performed on the train in Marquette. CP further states that cutting the crossings was just one task to be completed that morning. After they were finished cutting the crossings, Sexton and DePover returned to the Marquette yard to continue the substantial work that needed to be completed before they could depart. The work included lifting an engine, setting out cars, digging out a siding switch, completing an air brake test, cutting cars, tying and releasing hand brakes, and building up air to complete a Class III air brake test. From start to finish, the work took nearly four hours. Jared and Ross testified that a 3.5-hour over-standard delay is not unusual in winter operations.

Support: **Resp. App. pp. 7–8**, Sexton Dep. 61:4–16, 62:6–20, 63:2–64:25; **Resp. App. p. 50**, Sexton Dep. Ex. 5; **Resp. App. p. 168**, McKelvey Dep. 81:7–82:2; **Resp. App. p. 173**, McKelvey Dep. Ex. 27 at CP_03303; **Resp. App. pp. 230, 242**, Jared Dep. 103:18–104:13, 179:24–180:12; **Resp. App. p. 290**, Ross

3

Dep. 81:10–82:5.

9. McKelvey testified: "Four hours for a singular work event is probably one of the longest work events that I have witnessed in my career at Canadian Pacific." CP further states that the "singular work event" to which McKelvey was referring included cutting crossings, lifting an engine, setting out cars, digging out a siding switch, completing an air brake test, cutting cars, tying and releasing hand brakes, and building up air to complete a Class III air brake test. CP also states that CP hired McKelvey in January 2020 to join the Leadership Management Trainee Operations program. McKelvey completed the training program in April or May 2020 and was assigned as Assistant Trainmaster in Marquette, Iowa. Thus, in February 2021, McKelvey had been in a management position at CP for approximately ten months and it was his first winter season in a management position.

  Support:  **Resp. App. p. 173**, McKelvey Dep. Ex. 27 at CP_03303; **Resp. App. pp. 163–64**, McKelvey Dep. 11:22–12:5, 13:5–20.

10. McKelvey attributed about a few minutes of the train delay to the crossing-cutting operation. According to McKelvey's contemporaneous written description of the events of that day, the primary reason for the delay was lifting the engine and setting off (moving) twenty-four cars.

  Support:  **Resp. App. pp. 165–66, 169**, McKelvey Dep. 55:9–56:15, 65:8–13, 114:12–116:24; **Resp. App. pp. 170–72**, McKelvey Dep. Ex. 26; **Resp. App. p. 173**, McKelvey Dep. Ex. 27 at CP_03303.

11. Sexton attributed at least twenty to thirty minutes of the delay to picking up an engine on an open deck bridge and performing an air brake test.

  Support:  **Resp. App. p. 9**, Sexton Dep. 66:10–68:23; **Resp. App. p. 50**,

Sexton Dep. Ex. 5.

12. At the February 10, 2021 investigation hearing, Sexton said, "I had a man on the north end protecting the shove, Mr. Cruciani, and I had Mr. DePover on the ground as well, counting me down." Sexton then admitted it was Mr. DePover who was giving the shove instructions. As a result, Sexton was required to follow only DePover's instructions, as neither Cruciani nor any other person had any actual role in the protecting the shove movement.

> Support:   **Resp. App. pp. 303–04**, McInnis Decl. ¶¶ 6, 12; **Resp. App. p. 3**, Sexton Dep. 29:1–19; **Resp. App. p. 131**, Sexton Dep. Ex. 10 at CP_000098 (Tr. 81:1-17).

13. DePover was the conductor operating the 474-31 with Sexton on February 1, 2021. Consistent with CP rules and the GCOR, DePover was the only person assigned to protect the movement and so Cruciani's statements and descriptions were not instructions to Sexton.

> Support:   **Resp. App. pp. 3, 5–6**, Sexton Dep. 29:1–19, 43:22–44:21, 46:11–15; **Resp. App. pp. 303–04**, McInnis Decl. ¶¶ 6, 12.

14. The last communication Sexton received from DePover, the conductor, was "good for forty (40), fifteen (15) cars to a stop." Even if "good for forty (40)" were considered to be an "instruction," "fifteen (15) to a stop" would be an additional instruction. As a result, GCOR 5.3.7 required Sexton to be prepared to have the train stopped within seven and one-half car lengths and to actually have the train stopped within that distance if he heard no other instructions. Sexton shoved eleven cars after being instructed "15 to a stop" before stopping and so violated GCOR 5.3.7.

> Support:   **Resp. App. pp. 3, 10–12**, Sexton Dep. 28:5–18; 121:19–122:6; 122:24–123:5; 126:19–23; **Resp. App. pp. 236–37, 240**, Jared Dep. 148:16–149:3,

5

149:23–150:2, 166:2–167:24; **Resp. App. pp. 183–84**, Johnson Dep. 37:13–38:13, 39:3–25, 40:22–41:5; **Resp. App. p. 36**, Sexton Dep. Ex. 2 at CP_00319; **Resp. App. p. 294**, Ross Dep. 119:4–14.

15. Ross testified at his deposition that he agrees DePover was engaged in a safety sensitive task when he was performing a shove movement on February 1, 2021.

<u>Support</u>: **Resp. App. pp. 293–94**, Ross Dep. 116:23–117:7.

16. CP's U.S. Manual on Operating Rules in Compliance provides guidelines regarding the administration of efficiency tests, which test compliance with GCOR rules. The guidelines provided in the U.S. Efficiency Test Manual on Operating Rules in Compliance are not rules and do not set out mandatory procedures for administering efficiency tests, nor are the procedures described in the manual the exclusive ways for efficiency tests to be performed. The guidelines for testing compliance with GCOR 5.3.7 are provided by several tests within CP's U.S. Efficiency Test Manual, including: Test GRA01 Hand Signals or Signal Disappearance (included in the "Stop" test group), Test GRF02 Shoving or Pushing Movements (included in the "Switches – Derails – Protecting Shoves and Equipment Foul of Adjacent Tracks" test group), and Test GR03 Lieu of Hand Signals (included in the "Railroad Radio" test group).

<u>Support</u>: **Resp. App. pp. 284–85, 287**, Ross Dep. 52:17–53:1, 62:13–23, 63:17–23; **Resp. App. pp. 225–27**, Jared Dep. 59:6–60:3, 68:6–69:23; **Resp. App. p. 187**, Johnson Dep. 79:12–22; **Resp. App. pp. 195–210c**, Johnson Dep. Ex. 39 at SEXTON 000368–382, 384–385, 470–472, 496–498; **Resp. App. p. 304**, McInnis Decl. ¶¶ 14, 15.

17. Jared administered the efficiency test on February 1, 2021 consistent with the guidelines set out in CP's Efficiency Test Manual and CP practices and rules. Specifically, after

DePover gave a 15-car count, Jared instructed DePover not to give further instruction to Sexton. In so doing, Jared altered the conditions of the shove movement to test Sexton's compliance with GCOR Rule 5.3.7, which required him to stop within half the distance specified by DePover's last instruction. This type of "set up" test is consistent with the guidelines set out in CP's Efficiency Test Manual and did not result in any violation of federal law or regulations, nor any of CP practices and rules, including GCOR.

> Support:    **Resp. App. pp. 224, 229, 234–37, 240**, Jared Dep. 50:20–51:4, 78:22–80:3, 137:4–20, 139:11–24, 143:18–144:18, 147:3–149:3, 167:13–24; **Resp. App. pp. 284–87**, Ross Dep. 52:17–53:1, 53:23–25, 54:11–55:11, 58:1–20, 59:2–60:18, 62:13–23, 63:17–23; **Resp. App. pp. 210, 210a-c**, Johnson Dep. Ex. 39 at SEXTON 000472, 496–498; **Resp. App. p. 300**, Jared Decl. ¶ 8; **Resp. App. pp. 304–05**, McInnis Decl. ¶¶ 16–19.

18.    Jared testified he knew Sexton was the engineer operating 474-31 only *after* he had administered the efficiency test, the train stopped, and Sexton disembarked. He did not who the engineer was at the time he decided to administer the test.

> Support:    **Resp. App. pp. 232–33, 238, 243**, Jared Dep. 128:19–129:8, 157:4–9, 186:21–187:15; **Resp. App. p. 300**, Jared Decl. ¶¶ 10–12.

19.    DePover and Sexton were both interviewed following Sexton's failed efficiency test on February 1, 2021. DePover provided a contemporaneous written statement describing Sexton's rule violation.

> Support:    **Resp. App. pp. 238–39**, Jared Dep. 160:8–161:6.

20.    Phone records indicate McKelvey called Jared at 10:55 a.m. CT on February 1, 2021.

|  |  |  |
|---|---|---|
| | Support: | **Resp. App. p. 248**, Jared Dep. Ex. 52 at CP_03459. |

21. In February 2021, Kade Antczak was a CP Operations Supervisor.

    Support: **Resp. App. p. 179**, McKelvey Dep. Vol. II 21:3–20.

22. CP distributes a daily report titled "Top 15 Trains Impacting Speed US," which displays 15 delayed trains for the day prior in descending order starting with the most delayed train. On February 2, 2021, the 474-31 was at the top of the "Top 15 Trains Impacting Speed US" list.

    Support: **Resp. App. p. 245**, Jared Dep. 197:1-198:4; **Resp. App. p. 249**, Jared Dep. Ex. 57 at CP_03303.

### C. ADDITIONAL FACTS RELATED TO SEXTON'S ALLEGED PROTECTED CONDUCT

23. Jared testified he was made aware "at some point" that Sexton and McKelvey had a disagreement about whether the tracks should be cut. Mr. Jared testified that he did not recall how or when he was made aware of the disagreement. Mr. Jared testified that he could have learned about the conflict from Sexton's February 9, 2021 email.

    Support: **Resp. App. pp. 241, 244**, Jared Dep. 172:16-19, 191:20–192:23.

24. Jared testified there were standing daily operations calls at 7:00 a.m. and 11:00 a.m. Jared also testified that he does not recall discussing any over-standard delays during the 7:00 a.m. and 11:00 a.m. operations calls on February 1, 2021.

    Support: **Resp. App. pp. 230–31**, Jared Dep. 101:5-25, 102:7–21, 107:17–108:10.

25. Ross testified that CP teaches employees to take the safe course; when in doubt, cut the crossings.

    Support: **Resp. App. p. 282**, Ross Dep. 25:5–26:15.

26. Ross testified he had conversations with Sexton and with McKelvey after Ross received an email from Sexton on February 9, 2021 regarding McKelvey driving too fast for the conditions. In the February 9, 2021 email, Sexton also shared his version of the events of the morning of February 1, 2021 in Marquette. Ross confirmed receipt of the email on Wednesday, February 10, 2021 and told Sexton he would look into it and get back to him. Ross responded again on Monday, February 15, 2021 that he had gathered information and wanted to meet with Sexton to discuss. Ross testified that he recalls speaking to Sexton at some point after his February 15, 2021, response to Sexton. Ross also testified that he had a conversation with Sexton and McKelvey a few weeks later about the importance of cutting the crossings. Ross stated unequivocally: "I had that conversation with McKelvey as well because I'm not going to tolerate people cutting the rules and taking shortcuts. I won't tolerate it for one minute."

> Support: **Resp. App. pp. 280–83, 295**, Ross Dep. 13:3–19:6, 25:2–26:5, 26:24–29:5, 131:4–13; **Resp. App. p. 297**, Ross Decl. ¶ 11; **Resp. App. p. 13**, Sexton Dep. 162:20–164:22; **Resp. App. pp. 160–61**, Sexton Dep. Ex. 18.

27. Ross provided verbal coaching to McKelvey after Ross received an email from Sexton on February 9, 2021 regarding McKelvey driving too fast for the conditions and the events of the morning of February 1, 2021 in Marquette. Ross testified that he had a conversation with McKelvey about the importance of cutting the crossings. Ross stated unequivocally: "I had that conversation with McKelvey as well because I'm not going to tolerate people cutting the rules and taking shortcuts. I won't tolerate it for one minute." Ross also testified that Sexton was not disciplined for his conduct on the morning of February 1, 2021 in Marquette. Ross testified: "I didn't discipline John Sexton for following the rule."

> Support: **Resp. App. pp. 280–83, 295**, Ross Dep. 13:3–19:6, 25:2–26:5,

9

26:24–29:5, 129:11–17, 131:4–13; **Resp. App. p. 294**, Ross Decl. ¶¶ 6, 11; **Resp. App. p. 13**, Sexton Dep. 162:20–164:22; **Resp. App. pp. 160–61**, Sexton Dep. Ex. 18.

28. When asked at his deposition whether he has ever been unable to work because of the emotional feelings he's having, Sexton responded: "No. I'm not a sissy."

    Support:    **Resp. App. p. 14**, Sexton Dep. 192:1–4.

### D. ADDITIONAL FACTS RELATED TO THE FEBRUARY 10, 2021 INVESTIGATION HEARING

29. Sexton's CBA provides: the employee "shall have reasonable opportunity to secure the presence of *necessary* witnesses." (Emphasis added.) CP's US Investigation Training Manual provides, the hearing officer may "reasonably deny a request for additional witnesses if the union representative/charged employee fails to adequately explain their pertinence to the matter under investigation."

    Support:    **Resp. App. p. 24,** Sexton Dep. Ex. 1 at CP_00256; **Resp. App. p. 268,** Dittrich-Bigley Dep. Ex. 66 at CP_06408.

30. The goal of the investigation hearing is to obtain honest and accurate testimony from all necessary and pertinent witnesses.

    Support:    **Resp. App. p. 24,** Sexton Dep. Ex. 1 at CP_00256; **Resp. App. p. 269,** Dittrich-Bigley Dep. Ex. 66 at CP_06410.

31. Sexton's union representative sent a letter to Joey Reyes requesting that Cruciani and Cox be made available in the hearing. Reyes was not the hearing officer who conducted the investigation hearing.

    Support:    **Resp. App. pp. 153-154**, Schmit Dep. Ex. 11 at Sexton 000011-12; **Resp. App. p. 54**, Sexton Dep. Ex. 10 at CP_000021 (Tr. 4:1–6).

32. Johnson testified that he did not recall if Sexton's union representative requested for Cruciani and Cox prior to the hearing, at the time of the hearing, or during the hearing.

> Support: **Resp. App. p. 185**, Johnson Dep. 69:3–70:10.

33. At the February 10, 2021 investigation hearing, Sexton said Cox was in a position to hear the radio conversation.

> Support: **Resp. App. pp. 128–29**, Sexton Dep. Ex. 10 at CP_000095–96 (Tr. 78:22–73:1).

34. Johnson testified at his deposition that that neither Cruciani nor Cox had information relevant to the investigation. Specifically, Johnson testified:

> Mr. Cox was assigned to another train and not connected. The testimony from when you were first on –I believe it was the 0098 – read that the union believed that he would have heard the radio conversation. That's not a fact based he heard the conversation. Again, he was assigned to a different train. The other employee that was requested was not an employee of CP Railroad.

> Support: **Resp. App. p. 186**, Johnson Dep. 74:4–23.

35. The conductor, DePover, was a witness at the February 10, 2021 investigation hearing, as was Sexton himself. In addition to Jared, DePover was the only other employee witness who observed Sexton's conduct and failure to comply with GCOR 5.3.7 during the test administered by Jared.

> Support: **Resp. App. pp. 98–111, 132–140**, Sexton Dep. Ex. 10 at CP_000065–78 (Tr. 48:15–61:22), CP_000099–107 (Tr. 82:8–90:11); **Resp. App. p. 190**, Johnson Dep. Ex. 35 at CP_00982.

36. At the February 10, 2021 investigation hearing, Sexton's union representative asked, "All right. So he – he kinda distracted you from performing your duty – for a little bit?" And DePover responded, "Yes, I was engaged with talking with him."

11

>Support:     **Resp. App. pp. 105–06**, Sexton Dep. Ex. 10 at CP_000072–73 (Tr. 55:20–56:2).

37. At the February 10, 2021 investigation hearing, Sexton's union representative, Joe Rainwater, asked Sexton if Sexton believed Jared violated GCOR 6.5 when he "interrupted" DePover's car counts to Sexton. Sexton responded: "Absolutely. He created a unsafe act." The hearing officer, Mark Johnson, stopped the questioning, noting that the purpose of the hearing was to determine if Sexton – not Jared – complied with CP's operating rules as alleged in the specific notice of investigation. Johnson explained that evidence related to whether Jared's administration of the efficiency test violated CP's rules is not relevant to the determination of whether Sexton failed the test. Johnson also explained to Rainwater that if he had an issue with the way Jared administered the efficiency test, it should be addressed with the appropriate party. Rainwater responded: "Oh, it – it will be, I promise."

>Support:     **Resp. App. pp. 116–18**, Sexton Dep. Ex. 10 at CP_000083–85 (Tr. 66:15–68:8); **Resp. App. p. 298,** Ross Decl. ¶¶ 14–15.

38. Sexton's union representative and Sexton commented during the investigation hearing: Mr. Rainwater: "Yeah, we don't see Mr. Jared's vehicle in view. And I would estimate, just by –" Mr. Sexton: "Fifty yards." Mr. Rainwater: "Yeah, it probably – probably at least tw – thirty to forty yards at a minimum." When asked about this estimate at his deposition, Jared testified: "I would disagree with that. I thought – I remember I was closer than that."

>Support:     **Resp. App. p. 235**, Jared Dep. 141:17–142:6; **Resp. App. p. 95**, Sexton Dep. Ex. 10 at CP_000062 (Tr. 45:6–10).

E. **ADDITIONAL FACTS RELATED TO SEXTON'S DISCIPLINE**

39. The February 26, 2021 discipline notice was on Jared's letterhead and included Jared's stamped electronic signature. Jared testified that the administrative office has permission

to add his stamped electronic signature to documents that need to go out under the General Manager. Jared did not read the discipline notice before it was issued to Sexton. Jared was not involved in any way in the discipline decision or preparing the discipline notice. Instead, CP Vice President Operations Southern Region Jason Ross decided the discipline to be imposed on Sexton.

  Support:  **Resp. App. p. 284**, Ross Dep. 50:15–51:10; **Resp. App. pp. 228–29,** Jared Dep. 75:13–78:7; **Resp. App. p. 155**, Sexton Dep. Ex. 12.

40. Ross testified that "there was no way in Hades" he would impose less than a twenty-day suspension for a first Major – Life Threatening & Conduct Unbecoming Offence. Ross further testified that if he assigned less severe discipline for a first Major rule violation, it would likely be the result of post-hearing negotiations between the Company and the employee's union. In this case, Sexton's union made no effort to negotiate his discipline after the hearing.

  Support:  **Resp. App. pp. 288–89**, Ross Dep. 76:7–79:16; **Resp. App. p. 270**, Dittrich-Bigley Dep. Ex. 67.

41. Article 28, Section 2 of Sexton's CBA provides the requirements for appealing a discipline decision.

  Support:  **Resp. App. pp. 21–23**, Sexton Dep. Ex. 1 at CP_00253–55.

42. On August 26, 2022, the Public Law Board ruled in the union's favor on its appeal of Sexton's February 26, 2021 discipline. The Public Law Board granted Sexton's appeal on procedural grounds based on the incorrect belief that Jared played a role in the imposition of discipline after the investigation hearing. As a result, the February 26, 2021, discipline was removed from Sexton's record and he was compensated for the twenty (20) days of pay that he did not receive during the now-reversed suspension. Sexton made it clear at his deposition that the decision was a "win for John."

  Support:  **Resp. App. p. 12**, Sexton Dep. 127:21–129:2, 129:11–15; **Resp. App. pp. 156–59**, Sexton Dep. Ex. 13 at SEXTON 000015–18.

### F. ADDITIONAL FACTS RELATED TO OTHER EMPLOYEE DISCIPLINE

43. CP's Hybrid Discipline & Accountability Guidelines is intended to "progressively influence and correct behaviors that do not comply with required standards."

  Support:  **Resp. App. p. 38,** Sexton Dep. Ex. 3 at CP_00439.

44. If a suspension is deferred in part or in full, the deferred portion of the suspension will be activated if the employee is culpable for a subsequent offense within the default period, which is typically six (6) months from the date of assessment. If activated, the deferred suspension carries the same gravity as a served suspension.

  Support:  **Resp. App. p. 261**, Dittrich-Bigley Dep. 10:5–23, 12:4–17; **Resp. App. p. 40**, Sexton Dep. Ex. 3 at CP_00441.

45. Pursuant to CP's Hybrid Discipline & Accountability Guidelines, "failure to properly line switches for intended movement and or operating through an improperly lined switch" is a "Non-Major Offence" (not a "Major – Life Threatening & Conduct Unbecoming Offence").

  Support:  **Resp. App. p. 44**, Sexton Dep. Ex. 3 at CP_00445.

46. On February 26, 2018, engineer D.C. violated GCOR Rule 5.3.7, which is a Major – Life Threatening & Conduct Unbecoming Offence. D.C. was issued a ten-day suspension, with five (5) days served and five (5) days deferred. D.C. acknowledged responsibility for the rule violation and agreed to waive the right to a formal investigation hearing. The assessment of for D.C.'s February 12, 2018 rule violation falls within the range of disciplinary consequences that may be assessed for a Major – Life Threatening & Conduct Unbecoming Offence pursuant to CP's Hybrid Discipline & Accountability Guidelines.

Support: **Resp. App. p. 264**, Dittrich-Bigley Dep. 39:11-24; **Resp. App. p. 278,** Dittrich-Bigley Dep. Ex. 70.

47. On July 16, 2019, engineer T.V. violated GCOR Rule 5.3.7, which is a Major – Life Threatening & Conduct Unbecoming Offence. T.V. was issued a twenty-day suspension, with five (5) days served and fifteen (15) days deferred. T.V. acknowledged responsibility for the rule violation and agreed to waive the right to a formal investigation hearing. The assessment of discipline for T.V.'s July 16, 2019 rule violation falls within the range of disciplinary consequences that may be assessed for a Major – Life Threatening & Conduct Unbecoming Offence pursuant to CP's Hybrid Discipline & Accountability Guidelines.

Support: **Resp. App. p. 307**, Dittrich-Bigley Decl. ¶ 11; **Resp. App. p. 264**, Dittrich-Bigley Dep. 37:4–19; **Resp. App. p. 277**, Dittrich-Bigley Dep. Ex. 69.

48. On June 7, 2020, engineer M.J. was involved in an incident in which he failed to stop a shove movement within half the distance given. M.J. was issued verbal coaching.

Support: **Resp. App. p. 264**, Dittrich-Bigley Dep. 38:2–25; **Resp. App. pp. 181–82**, Johnson Dep. 24:13–27:5; **Resp. App. p. 193**, Johnson Dep. Ex. 36 at CP_00616.

49. On July 29, 2020, engineer T.S. was involved in an incident wherein he failed to stop a shove move in half the distance specified. T.S. was issued verbal coaching.

Support: **Resp. App. p. 264**, Dittrich-Bigley Dep. 39:1–10; **Resp. App. p. 182**, Johnson Dep. 27:6–11; **Resp. App. p. 193**, Johnson Dep. Ex. 36 at CP_00616.

50. On January 7, 2021, engineer T.P. violated GCOR Rule 5.3.7, which is a Major – Life Threatening & Conduct Unbecoming Offence. T.P. was issued a twenty-day suspension, with ten (10) days served and ten (10) days deferred. T.P. immediately acknowledged and took

15

accountability for his rule violation. The assessment of discipline for T.P.'s January 7, 2021 rule violation falls within the range of disciplinary consequences that may be assessed for a Major – Life Threatening & Conduct Unbecoming Offence pursuant to CP's Hybrid Discipline & Accountability Guidelines.

> Support:   **Resp. App. p. 308**, Dittrich-Bigley Decl. ¶ 12; **Resp. App. pp. 262–63**, Dittrich-Bigley Dep. 32:24–36:3; **Resp. App. p. 270**, Dittrich-Bigley Dep. Ex. 67; **Resp. App. p. 275–76**, Dittrich-Bigley Dep. Ex. 68 at CP_01785–86 (16:18–17:14).

51. On February 16, 2021, engineer J.M. violated GCOR Rule 5.3.7, which is a Major – Life Threatening & Conduct Unbecoming Offence. J.M. was dismissed from employment with CP. J.M. had several Major rule violations on his discipline record, including a January 13, 2021 incident for which J.M. was issued a thirty-day "last chance" suspension. The assessment of discipline for J.M.'s February 16, 2021 rule violation falls within the range of disciplinary consequences that may be assessed for a Major – Life Threatening & Conduct Unbecoming Offence pursuant to CP's Hybrid Discipline & Accountability Guidelines.

> Support:   **Resp. App. p. 308**, Dittrich-Bigley Decl. ¶ 14; **Resp. App. p. 312**, Sullivan Decl. Ex. A, CP_00922; **Resp. App. p. 219**, Smith Dep. 36:5–10; **Resp. App. p. 222**, Smith Dep. Ex. 47 at CP_00939.

**G.   ADDITIONAL FACTS RELATED TO CP'S INDIVIDUAL AND CORPORATE PERFORAMNCE OBJECTIVES**

52. CP's individual performance objectives, which are tied to CP's Five Foundations, are weighted. Performance objectives tied to "operating safely" are not less important than any other objective.

> Support:   **Resp. App. pp. 254, 257–58**, Hanson Dep. 10:14–11:24, 23:2–

16

24:19, 26:11–20; **Resp. App. p. 216**, Johnson Dep. Ex. 41 at CP_03236; **Resp. App. pp. 283, 291**, Ross Dep. 29:10–25, 101:15–103:12.

53.  Senior leaders, in collaboration with human resources, set performance objectives at the beginning of the year. The performance objectives are then cascaded down to managers within each leader's region, subdivision, and territory. The objectives align with what CP calls its Five Foundations. At the end of the year, leaders evaluate employee performance and, in collaboration with human resources, assign a performance rating. Central to the "Five Foundations" is "operating safely," which is no less important than any other of the foundations (which are Provide Service, Optimize Assets, Develop People, and Control Costs).

<u>Support</u>: **Resp. App. p. 292**, Ross Dep. 108:14–25; **Resp. App. p. 254**, Hanson Dep. 9:8–10:6; **Resp. App. p. 188**, Johnson Dep. 93:20–94:4; **Resp. App. pp. 211–213**, Johnson Dep. Ex. 41 at CP_03231–33.

54.  CP uses various metrics to measure achievement of key performance indicators, including origin performance, terminal dwell, and train weight. Actual achievement is aggregated at the end of the year and measured against objectives. Performance of one train on one day would not negatively impact an employee's overall performance rating.

<u>Support</u>: **Resp. App. pp. 256–57**, Hanson Dep. 17:19–18:5, 19:17–21:24; **Resp. App. pp. 211–213**, Johnson Dep. Ex. 41 at CP_03231–33.

55.  An employee's performance rating is a factor used to determine the individual component of the employee's STIP payment.

<u>Support</u>: **Resp. App. p. 292**, Ross Dep. 106:2–20; **Resp. App. pp. 254–55, 257–59**, Hanson Dep. 12:23–13:4, 14:16–22, 22:14–23:10, 28:7–29:6.

| | |
|---|---|
| Dated: August 26, 2024 | DORSEY & WHITNEY LLP |
| | |
| | /s/ Joshua D. Hughes |
| | Joshua Hughes (AT0014950) |
| | hughes.joshua@dorsey.com |
| | Dorsey & Whitney LLP |
| | 801 Grand Ave, Suite 4100 |
| | Des Moines, IA 50309 |
| | Tel: (515) 283–1000 |
| | Fax: (515) 598–7704 |
| | |
| | /s/ John T. Sullivan |
| | John T. Sullivan (pro hac vice) |
| | sullivan.jack@dorsey.com |
| | Briana Al Taqatqa (pro hac vice) |
| | altaqatqa.briana@dorsey.com |
| | Dorsey & Whitney LLP |
| | 50 South Sixth Street, Suite 1500 |
| | Minneapolis, MN 55402 |
| | Tel:  (612) 340–2600 |
| | Fax:  (612) 340–2868 |
| | |
| | ATTORNEYS FOR DEFENDANT |

## CERTIFICATE OF SERVICE

    I hereby certify that on August 26, 2024, I caused the foregoing to be electronically served on Plaintiff via ECF, which provides notice and a copy to Plaintiff's counsel and all other counsel of record:

Megan R. Merritt
SHUTTLEWORTH & INGERSOLL, P.L.C.
115 3rd Street SE, Suite 500
P.O. Box 2107
Cedar Rapids, IA 52406
Phone: (319) 365–9461
Fax: (319) 365–8443
mrm@shuttleworthlaw.com

John D. Magnuson
Cyle A. Cramer
YAEGER & JUNGBAUER BARRISTERS, P.L.C.
4601 Weston Woods Way
St. Paul MN, 55127
Phone: (507) 330–4777
Fax: (651) 288–0227
jmagnuson@yjblaw.com
ccramer@yjblaw.com

                                              /s/ Joshua D. Hughes
                                              Counsel for Defendant