UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | | |
|---|---|---|
| John Sexton, | ) | |
| | ) | Case No. 23-cv-00031 |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Dakota, Minnesota & Eastern Railroad | ) | |
| Corporation d/b/a Canadian Pacific, a | ) | |
| Delaware Corporation, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

## APPENDIX TO DEFENDANT'S STATEMENT OF ADDITIONAL MATERIAL FACTS IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

| Exhibit | Document | Appendix Page(s) |
|---|---|---|
| 1 | Excerpts from the deposition of John Sexton taken October 31, 2023 | 1-14 |
| 2 | Excerpts from the Collective Bargaining Agreement between Canadian Pacific and Its Employees Represented by Brotherhood of Locomotive Engineers and Trainmen dated October 22, 2015 (Sexton Dep. Ex. 1) | 15-25 |
| 3 | Excerpts from the General Code of Operating Rules (GCOR) effective April 1, 2015 (Sexton Dep. Ex. 2) | 26-37 |
| 4 | Hybrid Discipline & Accountability Guidelines effective November 1, 2018 (Sexton Dep. Ex. 3) | 38-49 |
| 5 | Train Delay Report for 474-31 on February 1, 2021 (Sexton Dep. Ex. 5) | 50 |
| 6 | Transcript of the Investigation Hearing of John Sexton and Justin DePover on February 10, 2021 (Sexton Dep. Ex. 10) (Unredacted version filed with CP's sealed appendix) | 51-151 |
| 7 | Email and attached letter from Joe Rainwater to Joey Reyes re: Request for witnesses dated February 8, 2021 (Excerpts from | 152-154 |

| Exhibit | Document | Appendix Page(s) |
|---|---|---|
|  | Sexton Dep. Ex. 11) (Unredacted version filed with CP's sealed appendix) |  |
| 8 | Determination letter from Tom Jared to John Sexton dated February 26, 2021 (Sexton Dep. Ex. 12) (Unredacted version filed with CP's sealed appendix) | 155 |
| 9 | Public Law Board No. 7667 Statement of Claim and Findings dated August 26, 2022 (Sexton Dep. Ex. 13) | 156-159 |
| 10 | Email exchange between Jason Ross, John Sexton and Tracy Miller re: Homesafe dated February 9-15, 2021 (Sexton Dep. Ex. 18) (Unredacted version filed with CP's sealed appendix) | 160-161 |
| 11 | Excerpts from the deposition of Kurtis McKelvey taken November 9, 2023 | 162-169 |
| 12 | Email exchange between Kurtis McKelvey, Gary Prince, Tom Jared, Dylan Smith, Joey Reyes, Mark Johnson and others re: Marquette Sub Delays dated February 1, 2021 (McKelvey Dep. Ex. 26) | 170-172 |
| 13 | Email regarding delay details for train 474-31 dated February 2, 2021 (McKelvey Dep. Ex. 27) (Redactions in original) | 173-176 |
| 14 | Excerpts from the deposition of Kurtis McKelvey taken May 10, 2024 | 177-179 |
| 15 | Excerpts from the deposition of Mark Johnson taken May 10, 2024 | 180-188 |
| 16 | Email exchange regarding John Sexton discipline dated February 15-24, 2021 (Johnson Dep. Ex. 35) (Unredacted version filed with CP's sealed appendix) | 189-191 |
| 17 | Letter from Michelle Sullivan to Yessenia Valadez (OSHA) responding to request for information re: DOL, Case #7-2260-21-066 dated June 17, 2022 (Johnson Dep. Ex. 36) | 192-194 |
| 18 | Excerpts from the Canadian Pacific US Efficiency Test Manual on Operating Rules in Compliance with FRA 217.9 effective November 1, 2014 (Johnson Dep. Ex. 39) | 195-210 |

| Exhibit | Document | Appendix Page(s) |
|---|---|---|
| 19 | Canadian Pacific Short Term Incentive Plan (STIP), Policy 3411, effective with the 2021 plan year (Johnson Dep. Ex. 41) | 211-217 |
| 20 | Excerpts from the deposition of Dylan Smith taken May 29, 2024 (Unredacted version filed with CP's sealed appendix) | 218-219 |
| 21 | Southern & Eastern Region Discipline Call Document dated February 18, 2021 (Smith Dep. Ex. 47) (Unredacted version filed with CP's sealed appendix) | 220-222 |
| 22 | Excerpts from the deposition of Thomas Jared taken June 20, 2024 (Unredacted version filed with CP's sealed appendix) | 223-245 |
| 23 | Excerpts of the Verizon phone call detail for Tom Jared from February 1, 2021 (Jared Dep. Ex. 52) (Unredacted version filed with CP's sealed appendix) | 246-248 |
| 24 | Email regarding "Top 15 Trains Impacting Train Speed – US" dated February 2, 2021 (Jared Dep. Ex. 57) (Redaction in original) | 249-252 |
| 25 | Excerpts from the deposition of McKinsey Hanson taken June 24, 2024 | 253-259 |
| 26 | Excerpts from the deposition of Justin Dittrich-Bigley taken June 26, 2024 (Unredacted version filed with CP's sealed appendix) | 260-264 |
| 27 | Excerpts from the U.S. Investigation Training Manual (Dittrich-Bigley Dep. Ex. 66) | 265-269 |
| 28 | Notice of formal investigation from Tom Jared to employee TP dated January 27, 2021 (Dittrich-Bigley Dep. Ex. 67) (Unredacted version filed with CP's sealed appendix) | 270 |
| 29 | Excerpts from the hearing transcript from the investigation of employee TP dated January 19, 2021 (Dittrich-Bigley Dep. Ex. 68) (Unredacted version filed with CP's sealed appendix) | 271-276 |
| 30 | Waiver acknowledgement from employee TV dated July 31, 2019 (Dittrich-Bigley Dep. Ex. 69) (Unredacted version filed with CP's sealed appendix) | 277 |

| Exhibit | Document | Appendix Page(s) |
|---|---|---|
| 31 | Waiver acknowledgement from employee DC dated February 26, 2018 (Dittrich-Bigley Dep. Ex. 70) (Unredacted version filed with CP's sealed appendix) | 278 |
| 32 | Excerpts from the deposition of Jason Ross taken July 18, 2024 (Unredacted version filed with CP's sealed appendix) | 279-295 |
| 33 | Declaration of Jason Ross dated August 1, 2024 | 296-298 |
| 34 | Declaration of Tom Jared dated August 1, 2024 | 299-301 |
| 35 | Declaration of Jeffrey McInnis dated August 5, 2024 | 302-305 |
| 36 | Declaration of Justin Dittrich-Bigley dated August 5, 2024 | 306-309 |
| 37 | Declaration of Jack Sullivan dated August 26, 2024 | 310-311 |
| 38 | Notice of formal investigation from Arthur Clark to employee J.M. dated May 9, 2021 (CP_00922) (**Exhibit A** to Sullivan Declaration) (Unredacted version filed with CP's sealed appendix) | 312 |

Dated: August 26, 2024

DORSEY & WHITNEY LLP


/s/ Joshua D. Hughes

Joshua Hughes (AT0014950)
hughes.joshua@dorsey.com
Dorsey & Whitney LLP
801 Grand Ave, Suite 4100
Des Moines, IA 50309
Tel: (515) 283-1000
Fax: (515) 598-7704


/s/ John T. Sullivan

John T. Sullivan (pro hac vice)
sullivan.jack@dorsey.com
Briana Al Taqatqa (pro hac vice)
altaqatqa.briana@dorsey.com
Dorsey & Whitney LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
Tel:  (612) 340-2600
Fax:  (612) 340-2868


ATTORNEYS FOR DEFENDANTS

**CERTIFICATE OF SERVICE**

I hereby certify that on August 26, 2024, I caused the foregoing to be electronically served on Plaintiff via email to his counsel of record:

Megan R. Merritt
SHUTTLEWORTH & INGERSOLL, P.L.C.
115 3rd Street SE, Suite 500
P.O. Box 2107
Cedar Rapids, IA 52406
Phone: (319) 365-9461
Fax: (319) 365-8443
mrm@shuttleworthlaw.com

John D. Magnuson
Cyle A. Cramer
YAEGER & JUNGBAUER BARRISTERS, P.L.C.
4601 Weston Woods Way
St. Paul MN, 55127
Phone: (507) 330-4777
Fax: (651) 288-0227
jmagnuson@yjblaw.com
ccramer@yjblaw.com


/s/ Joshua D. Hughes
Counsel for Defendant

Page 1

1             IN THE UNITED STATES DISTRICT COURT

2              FOR THE SOUTHERN DISTRICT OF IOWA

3                      EASTERN DIVISION

4    _____

5    John Sexton,

6            Plaintiff,

7        v.            Case No:  3:23-CV-00031-HCA

8

9    Dakota, Minnesota & Eastern Railroad

10   Corporation d/b/a Canadian Pacific, a

11   Delaware Corporation,

12           Defendants.

13   _____

14            DEPOSITION OF JOHN SEXTON

15               OCTOBER 31, 2023

16                  9:00 a.m.

17

18   _____

19

20

21            File # MW 6278989

22

23

24

25   COURT REPORTER:  Christina DeGrande

Page 2

1   APPEARANCES:
2   On Behalf of Defendant:
3   John T. Sullivan, Esq.
4   Briana Al Taqatqa, Esq.
5   Dorsey & Whitney LLP
6   50 South Sixth Street, Suite 1500
7   Minneapolis, Minnesota 55402
8   Sullivan.jack@dorsey.com
9   Altaqatqa.briana@dorsey.com
10  612-340-2600
11
12  On Behalf of John Sexton:
13  John Magnuson, Esq.
14  Cyle Cramer, Esq.
15  Yaeger & Jungbauer Barristers, PLC
16  4601 Weston Woods Way
17  Saint Paul, Minnesota 55127
18  651-288-9532
19  Jmagnuson.yjblaw.com
20  Ccramer@yjblaw.com
21
22
23
24
25

Page 3

1           I N D E X
2   WITNESS      EXAMINATION      PAGES
3   JOHN SEXTON      DIRECT      4
4           CROSS      197
5       E X H I B I T S
6   NUMBER      DESCRIPTION
7   Exhibit 1   Collective Bargaining Agreement   20
8   Exhibit 2   General Code of Operating Rules   26
9   Exhibit 3   Hybrid Discipline and      36
10      Accountability Guidelines
11  Exhibit 4   Accident, Incident, Injury, and   40
12      Occupational Illness Reporting
13      Policy and Commitment Regarding
14      Intimidation and Harassment
15  Exhibit 5   Train Delay Report      62
16  Exhibit 6   2/2/2022 Email      77
17  Exhibit 7   Workplace Health and Safety   79
18      Committee Attendance Sheet
19  Exhibit 8   Safety Reviews After Incident   85
20  Exhibit 9   Notice of Disciplinary Hearing   119
21  Exhibit 10  Transcript of Disciplinary   127
22      Hearing
23  Exhibit 11  Certified Mail Re: Investigation   129
24  Exhibit 12  Certified Mail Re: Discipline   127
25  Exhibit 13  Public Law Board award   127

Page 4

1   E X H I B I T S (continued)
2   NUMBER      DESCRIPTION
3   Exhibit 14  Interrogatories      129
4   Exhibit 15  Second Amended Complaint      136
5       and Jury Trial Demand
6   Exhibit 16  1/4/2021 Email      144
7   Exhibit 17  2/20/2021 Email      149
8   Exhibit 18  2/15/2021 Email      163
9   Exhibit 19  7/20/2021 OSHA Letter      169
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1       BE IT REMEMBERED that the deposition upon
2   oral examination of John Sexton was taken on October
3   31, 2023, at 9:00 a.m., at 4601 Westin Woods Way
4   St. Paul, Minnesota 55127, before Christina
5   DeGrande, Professional Stenographer, Notary Public
6   in and for the State of Minnesota.
7       Whereupon, the following proceedings were
8   had, to wit:
9       THE COURT REPORTER:  Please raise your
10  right hand.
11      Do you swear or affirm that the
12  testimony you are about to provide for the
13  cause under consideration will be the truth
14  and the whole truth, so help you?
15      THE WITNESS:  Yes.
16      MR. SULLIVAN:  Thank you, Christina.
17
18      JOHN SEXTON,
19  a witness in the above-entitled action,
20  after having been first duly sworn,
21  testifies and says as follows:
22
23      DIRECT EXAMINATION
24  MR. SULLIVAN:
25  Q.  Good morning, Mr. Sexton.  I'm a lawyer for Canadian

2 (Pages 2 - 5)

CP Resp. App. - 2

Page 26

1    BY MR. SULLIVAN:
2    Q.  So you don't know if it's final or not?
3    A.  No.
4        (Exhibit 2 was marked for
5        identification.)
6    BY MR. SULLIVAN:
7    Q.  Mr. Sexton, I'm showing you what's been marked as
8        Exhibit 2.  Take as much time as you want to review
9        that.  Do you recognize that document?
10   A.  Yes.
11   Q.  What is it?
12   A.  It's the GCOR, the General Code of Operating Rules.
13   Q.  What is the GCOR?
14   A.  The General Code of Operating Rules.
15   Q.  What is the purpose of the GCOR, in your
16       understanding?
17   A.  These are the rules that we adhere to on a daily
18       basis.
19   Q.  And when you say, "We," you mean engineers?
20   A.  T&E employees, train and engine service employees.
21   Q.  Is it your understanding that this -- that the GCOR
22       applies to only to CP, or does it apply to other
23       railroads as well?
24   A.  Multiple railroads that -- there's a directory in
25       here that all railroads that adopted the GCOR.  On

Page 27

1        pages CP284, 285, 286, there's a list of railroads
2        all the way to 287 that adopt the GCOR.
3    Q.  And DM&E is one of those railroads, correct?
4    A.  It's listed, yes.
5    Q.  And you agree that as a -- as an engineer, you are
6        responsible for knowing the GCOR; is that correct?
7    A.  Yes.
8    Q.  And you're responsible for following the rules set
9        out in the GCOR; is that also true?
10   A.  Yes.
11   Q.  Before we get into the specific issues that were the
12       basis for the lawsuit, I want to talk briefly,
13       generally, about the rule that is at issue here,
14       5.3.7.  That is on the page CP319.
15   A.  You said 5.3.7, correct?
16   Q.  That's right.  Could you please explain to me your
17       understanding of what GCOR 5.3.7 requires?
18       MR. MAGNUSON:  Do you want to just read
19       the rule?
20       BY MR. SULLIVAN:
21   Q.  Well, why don't you start there.  If you could read
22       the rule.
23   A.  "5.3.7, radio response.  When radio communication is
24       used to make movements, crew members must respond to
25       specific instructions given for each movement.

Page 28

1        Radio communications for shoving movements must
2        specify the direction of distance and must be
3        acknowledged when distance specified is more than
4        four cars."
5    Q.  And then there's further text in a box, correct?
6        Could you read that?
7    A.  "Movement must stop within half the range as
8        specified" -- start over.  "Movement must stop
9        within half the distance specified unless additional
10       instructions are received."
11   Q.  What does it mean, in your understanding, to stop
12       within half the distance specified?
13   A.  Do you want a scenario?
14   Q.  Sure.
15   A.  If you give me a 50-car count -- I'm the engineer.
16       I must stop within 25 cars.  If I don't stop within
17       25 cars, then you're in violation of the -- it's
18       basically restricted speed, also.
19   Q.  Let's break that apart for a second.  So the
20       restricted speed, what does that mean?
21   A.  The ability to stop half the range of vision.
22   Q.  What is -- could you explain that?
23   A.  Just like I said.  If you told me to -- I'm good for
24       50 cars, I must be able to stop within 25 cars,
25       nothing else.

Page 29

1    Q.  Fair enough.  And that's the -- so when the rule
2        says, "Unless additional instructions are received,"
3        that would be what you just said, unless you hear
4        something else; is that a fair translation --
5    A.  Yes.
6    Q.  -- of that part of the rule?
7    A.  Yes, sir.
8    Q.  And so if a -- does this rule only apply in
9        situations where the engineer can't see the space
10       into which he or she is shoving a train?
11   A.  The restricted speed or radio response 5.3.7.
12   Q.  Radio response only 5.3.7?
13   A.  Well, it kind of covers both.  Second sentence,
14       "Radio communication for shoving movement."  So kind
15       of covers both there.  So the only time you would be
16       talking on the radio would be when that person is
17       protecting a shove, it's called, because, obviously,
18       I can't see 50 cars behind me, so he would be my
19       eyes.
20   Q.  And then I'm giving you --
21   A.  Car counts.
22   Q.  -- car counts?  So if the person who is giving you
23       car counts said your scenario was 50 cars, then you
24       would be required to be counting and ensuring that
25       the train stops after 25; is that accurate?

8 (Pages 26 - 29)

Page 30

1    A.   No, no.
2    Q.   What's wrong with that?
3    A.   Before.  Before 25, unless you hear -- unless you
4         got further instructions.
5    Q.   Understood.  And so it's -- it's if the call was
6         that there was -- that you were to shove for 40
7         cars, then you would be required to stop within 20
8         cars, correct?
9    A.   Yes.
10   Q.   How about odd numbers?  So if it was you were told
11        that you were to shove for 25 cars and didn't hear
12        anything else, where would you stop?  Where would
13        you -- what length would you be required to stop
14        within?
15   A.   Thirteen.
16   Q.   Within 13?
17   A.   It has to be within half the range of vision.  The
18        person on the ground protecting a shove is your
19        eyes.
20   Q.   Okay.  So it wouldn't be -- so if half of 25 is
21        12 1/2?
22   A.   Thirteen cars.  Not going to split hairs.
23   Q.   But there wouldn't be a requirement that it's 12?
24   A.   No, because that's more than half, so you always
25        want to err on the side of safety instead of --

Page 31

1         because 12 is more than half of 25.  13 is not.
2    Q.   Twelve is less than half of twenty-five.
3    A.   Less than half, sorry.  So 13 is more than --
4    Q.   More than half?
5    A.   -- half, so therefore, you would be within the realm
6         of radio response and restricted speed.
7    Q.   So you would be within the response, the -- just so
8         I'm clear.  So for 25, you would need to stop within
9         12, correct, because that would be within half,
10        where 13 would be outside of half?
11   A.   No.  I -- no.  I would stop 13.  I would not --
12        don't push it.  Don't push it to 12.  You're better
13        off to be -- to err on the side of safety because
14        you don't want to go more than half the range of
15        vision.  Twelve is more than half of twenty-five.
16   Q.   I think we're missing something.
17            MR. MAGNUSON:  I think we're
18        flip-flopped on the --
19   BY MR. SULLIVAN:
20   Q.   Yeah.  So --
21   A.   If, for instance, I -- you gave me a ten-car
22        count --
23   Q.   Right.
24   A.   -- I have to be -- I gotta stop within the five-car
25        count.

Page 32

1    Q.   Right.
2    A.   I will stop at six.  I'll stop before that.  Just
3         the way I've always done it.  I always will.
4    Q.   But --
5    A.   Has to be more than half the range of vision.
6    Q.   Okay.  So we're not talking about the range of
7         vision.  We're talking about 5.3.7 --
8    A.   It's the same.
9    Q.   -- at the distance that's been specified and the
10        requirement to stop within half of the distance
11        unless additional instructions are received.  So
12        thinking specifically and only about 5.3.7, wouldn't
13        4 be within half rather than 6 in the 10-car
14        scenario?
15   A.   No, absolutely not.
16            MR. MAGNUSON:  Can we go off the
17        record?
18            THE WITNESS:  Five would be, but you
19        cannot go beyond half the range of vision.
20        It's very simple.
21            MR. MAGNUSON:  Why don't we go off?
22            THE WITNESS:  You don't go more.  If
23        you're going to go err on the side of
24        judgment, you're going to err on the side of
25        safety.  You go six cars and stop prior to

Page 33

1         the halfway mark.  Because if -- if I stop
2         at five cars, you're still in violation of
3         this rule, sir.  The ability to stop half
4         the range of vision.  You give me ten cars,
5         and I don't -- and I don't stop until five,
6         then I violated the rule, and we've both
7         violated the rule.
8            MR. SULLIVAN:  Let's take a break.  Why
9         don't we -- we've been going about an hour.
10        We can take five minutes, stretch our legs,
11        and we can kind of dive back into this.  So
12        go off the record.  Thank you, Mr. Sexton.
13            (A recess was had from 10:16 a.m. until
14        10:23 a.m.)
15   BY MR. SULLIVAN:
16   Q.   Mr. Sexton, I wanted to pick up where we left off.
17        I think we were maybe holding different ideas in our
18        heads as we were talking about the shoving movements
19        and the car count.  So I want to just revisit that
20        just to clarify and make sure that I'm understanding
21        what you're saying.  So if an engineer was told that
22        he or she was to shove for 40 cars and no additional
23        instructions were received, the engineer would need
24        to stop the shove within 20 cars, correct?
25   A.   Yes.

9 (Pages 30 - 33)

1 Q. Did you understand that this policy or some version
2    of it applied to you in February of 2021?
3 A. No.
4 Q. Are you familiar -- were you familiar with -- did
5    you understand that a policy like this existed in
6    February of 2021?
7 A. I've heard of it.
8 Q. But you didn't believe it applied to you?
9 A. That's a broad question.
10 Q. Did you understand the policy that you had heard of
11    applied to you as an engineer for the railroad?
12 A. On this incident on February the 1st of 2021?
13 Q. Yes.
14 A. Ask that question again, please.
15 Q. In February of 2021, did you understand that CP had
16    a policy that stated the railroad would provide,
17    quote, "whistleblower protection" to any person
18    making use of a policy to report a violation?
19 A. I didn't know the CP would provide protection. That
20    would be no.
21 Q. But you had heard of this policy, you said, correct?
22 A. I've heard of the term "whistleblower."
23 Q. Okay.
24 A. I wasn't aware that the CP would provide protection.
25    That's the first I heard of that.

1 Q. I wanted to make just one quick point on the -- on
2    the record. I understand that the -- the notes that
3    you have are protected, but I'd ask that you ensure
4    that they're preserved after today's deposition.
5 A. Okay.
6 Q. Mr. Sexton, I'd like to get to kind of the main
7    event and talk to you about what happened on
8    February 1st, 2021. You may not believe me. I'm
9    not asking you trick questions. I'm not really
10    trying to be your opponent in this situation. I
11    want to hear your side of the story. And with that
12    in mind, I'd like to just walk through February 1,
13    2021, from the beginning of the -- beginning of your
14    shift through the end of your shift.
15       Starting at the beginning, what was your work
16    assignment on February 1st, 2021, if you remember?
17       MR. MAGNUSON: That's a good question.
18    The preamble, I'll object to as a narrative
19    and testimony. For the record, the last
20    part was the question. Preamble...
21    BY MR. SULLIVAN:
22 Q. You do not need to believe me. I just wanted to say
23    that. So the question is, what was your assignment
24    on February 1st, 2021?
25 A. 474-31.

1 Q. As the engineer of that train?
2 A. Yes.
3 Q. What time were you called for duty on February 1st,
4    2021?
5 A. 01:30.
6 Q. Where were you to report for duty on that day?
7 A. Marquette, Iowa.
8 Q. What do you remember was the scheduled route for
9    474-31 on February 1st, 2021?
10 A. That's broad. What do you mean?
11 Q. What was -- well, when you reported to work, where
12    was the train?
13 A. Marquette, Iowa.
14 Q. Were you to operate the train and bring it to some
15    other place?
16 A. Yes, sir.
17 Q. What was that other place?
18 A. Nahant, Iowa or Davenport.
19 Q. Was the Nahant yard the next destination that -- for
20    the train on that route on February 1st, 2021?
21 A. Yes, but not its final destination.
22 Q. Do you recall what its final destination was?
23 A. Yes.
24 Q. What was that? What was the final destination?
25 A. Kansas City.

1 Q. Do you recall its origin?
2 A. Yes.
3 Q. What was its origin?
4 A. St. Paul.
5 Q. So if you were called to duty at 01:30, what time
6    was your shift to end on February 1st, 2021?
7 A. 13:30.
8 Q. Twelve hours later?
9 A. Yes.
10 Q. Do you remember who else was on duty on
11    February 1st, 2021, at Marquette?
12 A. Broad.
13       MR. MAGNUSON: Just going to object to
14    broad.
15    BY MR. SULLIVAN:
16 Q. For example, do you remember who the dispatcher was?
17 A. No.
18 Q. Do you remember who the train master or assistant
19    train master was?
20 A. Yes.
21 Q. Who was that?
22 A. Kurt McElvey.
23 Q. As assistant train master?
24 A. No idea what his title was, sir, assistant or train
25    master.

12 (Pages 42 - 45)

CP Resp. App. - 5

Page 46

1   Q.  One of those?
2   A.  Yes, sir.
3   Q.  Was there anyone else there that day filling those
4       roles, as far as you know, or was it simply
5       Mr. McElvey?
6   A.  I just remember Mr. McElvey.
7   Q.  Fair enough.  How about a yard master or a
8       superintendent?  Do you remember anyone in those
9       duties that day?
10  A.  No.  It was 1:30 in the morning.
11  Q.  Who else was serving on 474 with you on
12      February 1st, 2021?
13  A.  Justin DePover.
14  Q.  And Mr. DePover was the conductor; is that right?
15  A.  Yes.
16  Q.  Is his position sometimes referred to as assistant
17      engineer?
18  A.  Yes.
19  Q.  Are those interchangeable -- -
20  A.  Yes.
21  Q.  -- or is there a difference?
22  A.  Yes.  Sorry.
23  Q.  Interchangeable?
24  A.  Yes.
25  Q.  Anyone else or just the two of you?

Page 47

1   A.  Two of us.
2   Q.  So what does it mean to -- to cut tracks or cut
3       crossings?
4   A.  Glad you asked.  Whenever there's snow or ice
5       buildup, whenever -- specifically over crossings
6       where vehicles continually pack the snow and ice
7       into the flangeways of the rail, and if they are not
8       cut with the locomotive prior to you doing your
9       work, there is a great chance to derail and the cars
10      will, obviously, you know, stow on their side.
11      Whatever contents there is will go where it may.
12  Q.  I want to break that down a bit, partially because
13      -- well, for the benefit of the transcript.  So you
14      said, "Crossing."  So that's where the rail crosses
15      a road; is that right?
16  A.  Yes.
17  Q.  And so automobiles and other vehicles that are on
18      the road impact snow into the rail; is that right?
19  A.  Into the flangeways of -- of the -- of the crossing,
20      yes.  It's compacted down to where the empty cars --
21      specifically empty.  Loads do it too.  They ride up
22      that.  They specifically ride up the tracks and
23      derail and create a mess.
24  Q.  The flangeways, what is that, for someone who's not
25      familiar with the term?

Page 48

1   A.  The flangeways are in the crossing, and the
2       flangeways are also frog switch points, and you deal
3       with that when you are encountering switches with
4       frogs in the yard.
5   Q.  Is a -- is a flangeway like the space that is next
6       to a rail?  Am I understanding that correctly?  I
7       just don't know what the term refers to.
8   A.  Yes.
9   Q.  I want to make sure I understand it.
10  A.  Yes.  It's where the -- the -- the tread of the
11      wheels of the locomotive rides along the inside of
12      the -- the rail switch, switch points, frogs,
13      crossings, rail, even the rail that's the -- that's
14      the flange.
15  Q.  Understood.  So the compacted snow or ice in the
16      flangeway forces or has the potential to force a
17      wheel up out of the flangeway and, therefore,
18      derailing the train, potentially, or derailing the
19      car; is that accurate?
20  A.  It is.  And we had two previous derailments in the
21      prior months to this incident that we covered during
22      the health and safety meeting, and that's the reason
23      why this is a health and safety topic of the month.
24  Q.  We'll get to that.  I appreciate you talking about
25      that.  So is it -- it's my understanding that crews

Page 49

1       are to cut tracks any time that they see snow
2       covering the rail; is that true?
3   A.  Not 100 percent, no, because there could be snow on
4       the road, and it still could have melted on the road
5       already because the sun came out.  For instance,
6       there could be snow on the road, and the vehicles
7       could be smashing -- compacting that snow in the
8       flangeways on the crossings.  That's why you got the
9       flangeways and the crossings.
10  Q.  So the stop of the rail might be clear, but there
11      still might be ice and snow in the flangeway; is
12      that accurate?
13  A.  In the automobile crossings in highways, roads, yes.
14  Q.  Okay.  So let's talk about the -- the job briefing
15      at -- at the beginning of your shift on
16      February 1st, 2021.  So what time did that -- did
17      the job briefing occur, if you remember?
18  A.  1:30.
19  Q.  And where was it held?
20  A.  Depot.
21  Q.  Who was all there when the job briefing took place?
22  A.  Myself and Justin DePover, and McElvey was in his
23      office.
24  Q.  And tell me how cutting the tracks came up as a
25      topic at the job briefing?

13 (Pages 46 - 49)

CP Resp. App. - 6

Page 58

1  had him sign it?
2  A.  Brought it to his attention, shared the two previous
3     stories about derailment in Clinton, Iowa and
4     Comanche -- or Clinton, Iowa and Cordova, Illinois,
5     and we had a job briefing about cutting flangeways
6     and crossings, had him sign it, put his employee
7     number on it.  Yes, sir.
8  Q.  After he did that, signed his name, wrote the
9     employee number, what did he say or what did you
10    say?
11  A.  I can't recall.
12  Q.  At some point, however, it sounds like he -- did he
13    repeat the directions, said just go and don't
14    perform any cutting movements?
15  A.  I can't remember.  Honestly, after I said, "Call the
16    superintendent," and stood there waiting for him to
17    call him and he didn't do it, I went out and cut the
18    crossings.
19  Q.  I'm just trying to line everything up in order, so
20    this will be my last time through this.  So he comes
21    out, says, "You're not doing that," correct?
22  A.  Yes.
23  Q.  And is that what prompted you to go and get the
24    attendance sheet and ask him to sign it?
25  A.  Yes.  But before that, I shared the two previous

Page 59

1     derailments in Clinton, Iowa and Cordova, Illinois,
2     and I said, "Standby."  And then I went outside
3     where my cooler was, and I got the -- the attendance
4     sheet for the Workplace Health and Safety Committee,
5     and we had another job briefing about cutting
6     crossings and flangeways, and I had him sign it and
7     put his employee number on it.
8  Q.  Okay.  And then after he did that, then -- then what
9     happened?
10  A.  And then I don't know if it's before or after I
11    said, you know -- he said, you know, "You need to
12    get the hell out of here," and I said, "You need to
13    call the superintendent."  I don't know the exact
14    order all this went on, but he didn't do it.
15  Q.  He didn't do what?
16  A.  He did not call the superintendent --
17  Q.  All right.
18  A.  -- as requested.
19  Q.  Got it.  So -- and that happened after he signed the
20    sheet?
21  A.  I can't remember, sir.
22  Q.  Okay.  And the -- but the -- at some point in all of
23    that, he said, "You need to get the hell out of
24    here," words to that effect?
25  A.  "You need to get on your train and get the hell out

Page 60

1     of here."
2  Q.  And then you said, "Listen, you need to call
3     superintended.  We're going to call --
4  A.  We're going to -- we're cutting the crossings, and
5     if you don't think we're cutting the crossings, then
6     call the superintendent and we'll have a job
7     briefing on it.
8  Q.  Understood.  Okay.  And do you remember -- then it
9     was you and Mr. DePover operating the locomotive to
10    cut the crossing, right?
11  A.  I'm the engineer.  I'm under the control of the
12    locomotive, and Mr. DePover is the
13    conductor/assistant engineer.  Yes.
14  Q.  Understood.  And you -- and I think you said
15    earlier, you don't remember how long that process
16    took?
17  A.  No.
18  Q.  At any point, did anyone need to give you or
19    Mr. DePover rides in a vehicle to get from one point
20    to another through the crossing movements?
21  A.  At that point, no.  We were light engine.  We
22    were -- just had locomotive.  There were no need for
23    a ride.
24  Q.  Later, were you given rides on February 1st, 2021?
25    Do you remember?

Page 61

1  A.  Probably to speed up the process.  I honestly don't
2     remember, but more than likely.  More than likely,
3     but I don't remember.
4  Q.  So after the crossings had been cut, you would have
5     brought the locomotives back to Marquette, and then
6     what happened?  How long -- what -- what -- do you
7     remember what happened after you brought the
8     locomotives back to Marquette to begin to get ready
9     for the trip to Nahant?
10  A.  Yes.
11  Q.  What happened?
12  A.  Signed on to our cars.  They were right in front of
13    the depot.  We pulled down whenever the cut was, and
14    we had to shove cars into Marquette siding.  And at
15    the cut was two cars of loaded anhydrous sulfur --
16    anhydrous ammonia, two loads.  Marquette siding is
17    ten feet from the Mississippi River, ten feet.  So
18    maybe if I didn't cut the crossings and flangeways
19    and I shoved those cars into the siding, we could
20    have had a huge catastrophe, not only people's lives
21    but wildlife, including the middle America's fresh
22    water drinking supply.
23  Q.  Did you know that there were cars containing
24    anhydrous at the time you had the conversation with
25    Mr. McElvey at the job briefing?

16 (Pages 58 - 61)

Page 62

1    A.  No, because I didn't look at the list because I was
2       too busy entertaining him on what he was trying to
3       do.
4         (Exhibit 5 was marked for
5       identification.)
6    BY MR. SULLIVAN:
7    Q.  Mr. Sexton, I'm marking a document as Exhibit 5 to
8       the deposition.  Have you seen this before?
9    A.  Yes.
10   Q.  What is this?
11   A.  It's a train delay.
12   Q.  What is a Train Delay Report?
13   A.  Exactly what it says.  You document on here what --
14      what you -- your location, what time you started,
15      what time it ended, and what time you left and the
16      duties you performed at that certain location.
17   Q.  Is this your handwriting on this Train Delay Report?
18   A.  No.
19   Q.  Whose handwriting is it, if you know?
20   A.  DePover.
21   Q.  Is it a duty of a conductor to complete the Train
22      Delay Report on a regular basis?
23   A.  Yes.
24   Q.  So there's a central section on the document titled,
25      "Cause of Delay."  Do you see that title?

Page 63

1    A.  I do.
2    Q.  And so within the first entry, it says "Where
3      delayed, Marquette.  Arrive, 01:30."  What -- what
4      does that -- what do -- what do those words and
5      those figures mean on this document?
6    A.  That's were you go on duty, and what time we were on
7      duty was at 1:30.
8    Q.  And then there's another column, Departure, and the
9      first number written there is 05:40.  Do you see
10      that?
11   A.  I do.
12   Q.  That's the time that you would have departed
13      Marquette; is that accurate?
14   A.  Yes.
15   Q.  So fair to say that everything that is written
16      within the Cause of Delay section between the 01:30
17      line and the 05:40 line is Mr. DePover's description
18      of the cause of the delay to 7 -- excuse me -- 474?
19   A.  Yes.
20   Q.  Would you mind reading that?  I don't have a good
21      grasp of his handwriting, and I'm hoping --
22   A.  I don't either, but I'll -- I'll do my best.
23   Q.  Thank you.
24   A.  "Marquette, 01:30 arrival.  TGBOs.  Paperwork."  I
25      don't know what that first -- but it says, "North."

Page 64

1    I don't know what the first word is, but it says,
2    "North Y.  Pick up one engine and set out to
3    Marquette siding.  Needed to cut crossings and
4    siding.  Locomotive brake test."  Because we had to
5    -- I had to pick up an Engine 9 on open deck bridge.
6    "Dig out hoses on engine to access them."  They were
7    impacted by snow, and I had to dig them out by hand.
8    Didn't have a shovel that's small enough to get in
9    the hole to get them out.  "Tie back on and pump
10   air.  Standing cut 84 deep.  Pull up.  Shove 24 --
11   shove 24 cars.  Set out Marquette siding."  That's
12   horrible handwriting.  "Shove back.  Tie onto the
13   rest of train.  Pump air."  "PPC" means set up PPC,
14   positive train control.  We had to get a track
15   warrant at that time because it was not CPC.  It is
16   now, I guess, and then "Depart test.  Engine check,"
17   and we left at 5:40.
18   Q.  Okay.  So I just want to clarify, and I appreciate
19      you adding explanations of what was written here as
20      you were reading it, but that -- you did not just
21      read this word for word, correct?
22   A.  No, sir, number one, because I couldn't read
23      everything that he had written because it's horrible
24      handwriting, and I was trying to clarify everything
25      he was trying expressed.

Page 65

1    Q.  Understood.  So you were using this and then
2      explaining to me --
3    A.  A little ad-libbing, correct.
4    Q.  -- explaining to me the reasons for the tasks that
5      occurred between 1:30 and 5:40?
6    A.  Yes.
7    Q.  So there's no mention in Mr. DePover's Train Delay
8      Report about a direction to not cut the crossings,
9      is there?
10   A.  No need for it.
11   Q.  But there isn't one, is there?
12   A.  I don't see it.
13   Q.  He doesn't say, "Assistant train master directed us
14      to not cut the crossing and we did anyway," or
15      anything like that?
16   A.  It's not written on there.
17   Q.  I just want to be clear.  So what -- what were, if
18      any, the -- the orders that Mr. McElvey gave you on
19      February 1st, 2021?
20   A.  Explain that a little better.
21   Q.  I mean, did he give you a --
22   A.  What are you looking for, sir?
23   Q.  I want to know if he ordered you to do something.
24   A.  Yeah.  "Get on your train and get out hell out of
25      here."  We talked about this.

17 (Pages 62 - 65)

Page 66

1  MR. MAGNUSON: Take it to Nahant.
2  THE WITNESS: Exactly. Get on your
3  train.
4  (The court reporter requested
5  clarification.)
6  MR. MAGNUSON: Take it to Nahant.
7  THE WITNESS: Which is my home
8  terminal.
9  BY MR. SULLIVAN:
10  Q. And that is -- were there any other orders or
11  directives that you remember him giving you during
12  that briefing?
13  A. Yes.
14  Q. What were those?
15  A. I have to pick up an engine on an open deck bridge
16  across Highway 18 before I started -- before I even
17  started my work with setting out cars and Marquette
18  siding and all that.
19  Q. So how do you pick up an engine that's been left on
20  a crossing like that? How does -- how do you
21  perform that operation?
22  A. That's an open deck bridge, sir.
23  Q. And how do you perform that? How do you do that?
24  A. With six or seven inches of fresh snow, very
25  carefully. Not only that, that engine was set out

Page 67

1  and the plow -- there's an abscess window in the
2  plow to get to the hoses that you need to hook up
3  the engines together. It's called MU-ing engines.
4  And you gotta dig all the snow out by hand. Number
5  one, I had to be extremely careful because when I
6  say, "open deck bridge," there's a gap between each
7  railroad tie, eight to ten inches. And there's six,
8  seven inches of snow on there. You've gotta brush
9  all that snow off and be careful because if you have
10  one missed step, you're going to break your leg or
11  you're going to get seriously, seriously injured.
12  Q. So you walked out to the --
13  A. No, sir. The -- the engine was left in the middle
14  of this open deck bridge --
15  Q. Okay.
16  A. -- for whatever reason. Ask Mr. McElvey that. I'd
17  love to hear the explanation myself. They left it
18  on the open deck bridge, and then I was instructed
19  to pick it up and then start our work.
20  Q. Did you -- did you take a locomotive to that?
21  A. Yes.
22  Q. And then connect it to it and then came back with
23  it?
24  A. Correct.
25  Q. Okay. And so that is something that had to be --

Page 68

1  that needed to be performed before you could perform
2  the trip to Nahant?
3  A. Yes.
4  Q. And do you remember how long that took?
5  A. I would say at least a half hour, plus you have to
6  do what's called a 211 engine air brake test after
7  you pick the engine up, so yes.
8  Q. What is a 211 air brake test?
9  A. It's required by the federal railroad administration
10  once you pick up an engine or set out an engine to
11  make sure the brakes apply and release whenever you
12  are under -- whenever you pick up an engine, it has
13  to be tested to make sure it works properly.
14  Q. How long does that test take, typically?
15  A. Well, if you're only just doing a 211 engine air
16  brake test, five or six minutes, but when you're
17  doing it on an open deck bridge with fresh snow, you
18  have to clean the rail and deck off. It's going to
19  take a lot longer.
20  Q. How long did it take you perform that test on this
21  engine on the open deck bridge on February 1st,
22  2021?
23  A. I would say 20, 30 minutes, just a guess.
24  Q. And is that, then, in addition to the time to take
25  the 20 or 30 minutes that it took to bring the

Page 69

1  locomotive back to the yard to begin the work, or do
2  you remember?
3  A. Where did that time frame come from?
4  Q. Forgive me. I might have misstated what you said.
5  How long did that total operation take to go and get
6  the train -- get the locomotive, perform the test,
7  and return with it?
8  A. Twenty, thirty minutes.
9  Q. Total?
10  A. Probably.
11  Q. Okay. Including the test?
12  A. Probably.
13  Q. The best that you remember?
14  A. Yes, sir.
15  Q. Looking at Mr. DePover's summary of the causes of
16  delay between 1:30 a.m. and 5:40 a.m. on
17  February 1st, the -- I want to walk through some of
18  those, just so I understand what he's -- he's
19  referring to. So the -- the first thing you said is
20  -- well, let's begin with, "On at 02:10." What does
21  that mean?
22  A. I don't know, sir. I didn't write it. Maybe that's
23  when we got on. I don't know. I didn't write it.
24  I couldn't tell you.
25  Q. And based on your experience working with

18 (Pages 66 - 69)

Page 118

1  Q.  So you had -- there was no concern in your mind
2      about what might be going on with Mr. DePover?
3  A.  What my concern was, like I said earlier, is whether
4      his battery died, his antenna loosened, or his
5      microphone malfunctioned.  It happens all the time.
6      So I stopped the train.
7  Q.  I'm sorry.  So you did stop the train?
8  A.  I did.
9  Q.  Why didn't you stop it immediately?
10  A.  I -- I still had to -- well, number one, I -- we
11      were moving.  There's no -- you can't -- you don't
12      just push a brake like you push a brake on your
13      truck.  Doesn't happen.
14  Q.  Yeah.
15  A.  It takes awhile to stop, number one.  And I was
16      calling -- number one, I was having a conversation
17      with Mr. Cruciani as I was reaching out to the ATM
18      as well, and then when I couldn't get anyone to
19      relay, Mr. Cruciani was still protecting my shove.
20      Then I stopped.
21  Q.  Why did you stop when you stopped?
22  A.  Because I could not hear Mr. DePover anymore.
23  Q.  How long were you out of contact with Mr. DePover
24      before you stopped, if you remember?
25  A.  I don't remember.

Page 119

1          MR. SULLIVAN:  Why don't we take about
2      a ten-minute break?  I want to get organized
3      here.
4          (A recess was had from 1:32 p.m. until
5      1:49 p.m.)
6          (Exhibits 9 through 11 were marked for
7      identification.)
8  BY MR. SULLIVAN:
9  Q.  Mr. Sexton, I'm going to give you three related
10      exhibits; Exhibit 9, Exhibit 10 and Exhibit 11,
11      which relate to the disciplinary hearing, in
12      particular.  So start with Exhibit 9.  This is ten,
13      and 11.  So Mr. Sexton, the document that's marked
14      as Exhibit 9, do you recognize that document?
15  A.  Yes.
16  Q.  It's the notice of the disciplinary hearing that was
17      eventually held on February 10th; is that right?
18  A.  Appears to be, yes.
19  Q.  And Exhibit 10 is the thicker document in front of
20      you.  Do you recognize that?
21  A.  Transcript from the investigation.
22  Q.  Okay.  So that's the transcript of that
23      February 10th hearing?
24  A.  Yes.
25  Q.  And it may not be clear on the face of it, but do

Page 120

1      you recognize Exhibit 11 as the exhibits that were
2      presented as -- at the hearing all in a packet
3      together?
4  A.  Yes.
5  Q.  So I want to talk about the hearing.  And you
6      testified at the hearing; is that right?
7  A.  Yes.
8  Q.  It's my understanding that unlike today, you're --
9      the statements at the hearing were not specifically
10      under oath; is that correct?
11  A.  Yes.
12  Q.  But did you tell the truth at the hearing?
13  A.  One hundred percent.
14  Q.  And from your point of view, was it important to the
15      process that everyone at the hearing tells the
16      truth?
17  A.  Yes.
18  Q.  I'd like to talk about the -- take up the issue that
19      we started to talk about, the "Good for 40, stop
20      after 15 conversation."  So in the hearing
21      transcript, I'd like you to turn to the page that's
22      marked in the lower right-hand corner, CP79.
23  A.  Okay.
24  Q.  So just take a look at that for a second just to
25      familiarize yourself.  I know it's kind of deep into

Page 121

1      the transcript.
2  A.  What part are we talking about, sir?
3  Q.  So this is -- you see line 3.  You see your name is
4      kind of dead center on the page?
5  A.  Yes.
6  Q.  So you understand what follows line 3 on this page
7      CP79 is the transcript of the questions and answers
8      that were posed to you at the hearing?
9  A.  Yes.
10  Q.  The beginning of the questions and answers that were
11      posed to and given by you at the hearing, I should
12      say?
13  A.  Yes.
14  Q.  So in -- I'll summarize some of this, but line 16
15      into line 18, Mr. Johnson asks, and you confirm that
16      you were given a 50, 5-0 car count as the initial
17      count.  Do you see that?
18  A.  I do, and I was.
19  Q.  And so when you say you was -- that you were -- that
20      was what you were given as the initial count on
21      February 1st?
22  A.  Yeah.
23  Q.  And then he asks you, "And what was the next
24      instruction you were given over the radio?"  And so
25      your response to that was, "Believe it was good for

31 (Pages 118 - 121)

Page 122

1  -- still good for 40, 15 -- 15 cars to a stop with
2  emphasis on 'good for 40.'"  Did I read that
3  correctly?
4  A.  You did.
5  Q.  Is that testimony accurate still today?
6  A.  Yes.
7  Q.  And so after the 50-car count, you were given
8  updated information; is that accurate?
9  A.  The 40, yes.
10  Q.  So there's two pieces of that.  There's "Still good
11  for 40," and then you also say, "15 cars to a stop."
12  So I think we've covered what "Good for 40" means.
13  What does "15 cars to a stop" mean?
14  A.  That was the amount of cars we were setting out on
15  the track.
16  Q.  So is that -- am I accurate or is it accurate to
17  say, then, that while there was space for 40 cars,
18  your instruction was to place 15 cars into that 40
19  car space?
20  A.  Yes.
21  Q.  Do you recall after you were given the 15-car count
22  how many cars you actually moved into that space?
23  A.  I don't recall.
24  Q.  If there was testimony at the hearing that it was 11
25  cars that moved into the 15-car space, would -- do

Page 123

1  you have any reason to disagree with that?
2  A.  No.
3  Q.  Just as you sit here today, you can't confirm or
4  deny whether it was 11; is that fair?
5  A.  That's correct.
6  Q.  So I want to understand how the rule of 5.3.7, "Stop
7  within half the distance" language that we talked
8  about before applies to the 15-count movement.  So
9  if you were told move -- shove 15 cars into a track,
10  and that is the last thing you hear, how many cars
11  -- or what is the number of cars that you should
12  stop within to remain in compliance with 5.3.7?
13  A.  My last direction was 40 cars, sir.  Let's get
14  this --
15      MR. MAGNUSON:  Just going to object
16  with an incomplete hypothetical.  Let's
17  stick to the facts.
18      THE WITNESS:  There was 40 cars, sir,
19  15 to a cut.  And then if -- even if I went
20  11 cars or whatever, I was still in
21  compliance with 5 after he got 7.
22  BY MR. SULLIVAN:
23  Q.  So you said, "15 to a cut."  This is "15 cars to a
24  stop."  Is there a difference?
25  A.  It's -- it's basically -- it's -- we're splitting

Page 124

1  hairs here.  It's basically the same thing.
2  Q.  Your statement at the hearing was that the last
3  direction you heard was, "Still good for 40, 15 cars
4  to a stop," correct?
5  A.  Yes.
6  Q.  So part of the instructions you were given were, "15
7  cars to a stop," correct?
8  A.  Yes.
9  Q.  Those words meant something?
10  A.  Yes.
11  Q.  And so when you think only of those words, what is
12  the number of cars that may be moved and remain in
13  compliance with 5.3.7?
14  A.  Twenty-one.
15  Q.  Twenty-one is six more than fifteen, so you're
16  saying that --
17  A.  Good for 40 --
18  Q.  -- you can move 21 cars on a 15-car count and it was
19  in compliance with the rules?
20  A.  Good for 40, 15 to a stop or cut.
21  Q.  My question was, is it your testimony that you, as
22  an engineer, can move 21 cars after hearing a 15-car
23  count and remain in compliance with 5.3.7?
24  A.  That's -- you're making --
25  Q.  That's --

Page 125

1  A.  I'm -- it's not -- sir, that's not -- that's not how
2  it happened.
3  Q.  My question --
4  A.  No.
5  Q.  So I want to go back to the question.
6  A.  No.
7  Q.  So 15 -- the direction was, "15 cars to a stop,"
8  right?
9  A.  "Good for 40, stop in 15."
10  Q.  And so focus on the "Stop in 15."  If that's all
11  that you heard, what is the appropriate distance to
12  stop and remain in compliance with 5.3.7?
13  A.  That's not all I heard.
14      MR. MAGNUSON:  Objection, incomplete
15  hypothetical.
16  BY MR. SULLIVAN:
17  Q.  And -- but go on and answer the question.  If that
18  was all that you heard -- we can ask hypotheticals.
19  If that was all that you heard, what is the
20  appropriate distance to stop within and remain
21  within compliance of 5.3.7?
22  A.  Twenty cars.
23  Q.  So if you hear a 15-car count, you can go 20 --
24  A.  No.
25  Q.  And my question is related to 15, not to 40.  I

32 (Pages 122 - 125)

Page 126

1    understand your position on 40.
2    A.   That's not the way railroad communications work,
3         sir. "Good for 40, stop in 15," period.
4              MR. CRAMER:  He's asking a
5         hypothetical.
6              THE WITNESS:  That's not the way it
7         works.
8              MR. CRAMER:  We -- object to the
9         hypothetical.
10             MR. MAGNUSON:  But you still have to
11        answer the question.
12   BY MR. SULLIVAN:
13   Q.   If he were given the command, "15 to a stop," what
14        does that mean?
15   A.   "Good for 40, stop in 15," I'm -- I'm good for 20
16        cars.
17   Q.   You were given the command --
18   A.   If only -- if all I heard was, "15 cars"?
19   Q.   If all you heard was, "15 to a stop," what does that
20        mean?
21   A.   But that's not all what I heard.  It would be 7 1/2
22        cars.  But that's not all what I heard was, "15 to a
23        stop," but that's not the case.
24   Q.   I understand that's your position, but if -- if all
25        you had heard was, "15," I want to clarify that.  I

Page 127

1    understand --
2              MR. MAGNUSON:  That's not his position.
3         It's the undisputed testimony of witnesses
4         here.
5              MR. SULLIVAN:  And that is a speaking
6         objection that is worthy of being struck.
7         We can move on.
8         (Exhibits 12 and 13 were marked for
9         identification.)
10   BY MR. SULLIVAN:
11   Q.   Mr. Sexton, I'm showing you exhibits marked 12 and
12        13.  Do you recognize the document that's marked as
13        Exhibit 12?
14   A.   Yes.
15   Q.   And what is the document that's marked as
16        Exhibit 12?
17   A.   Certified Mail for the discipline that was handed
18        out by the general manager, Jared.
19   Q.   In Exhibit 13, do you recognize that?
20   A.   Yes.
21   Q.   What is Exhibit 13?
22   A.   The Public Law Board award.
23   Q.   The Public Law Board award that sustained the
24        union's claim related to -- the -- the discipline
25        that you received in Exhibit 12?

Page 128

1    A.   Yes.
2    Q.   And as a result of the Public Law Board decision
3         that is marked as Exhibit 13, your 20-day
4         suspension, that was delivered to you in Exhibit 12
5         was undone; isn't that right?
6              MR. MAGNUSON:  Objection, form.
7              THE WITNESS:  I'm not sure what you
8         mean, sir.  Sorry.
9    BY MR. SULLIVAN:
10   Q.   The -- the union's claim was that your discipline
11        was unjustified; is that correct?
12   A.   Yes.
13   Q.   And the claim that the union made to the Public Law
14        Board was sustained, correct?
15   A.   Yes.
16   Q.   And the discipline that you received in Exhibit 12
17        was reversed; is that correct?
18   A.   Yes.
19   Q.   And the -- you originally had received a 20-day
20        suspension; is that true?
21   A.   Yes.
22   Q.   And that was an unpaid suspension, wasn't it?
23   A.   Yes.
24   Q.   And after the Public Law Board's decision that is
25        included as Exhibit 13, you were paid for the

Page 129

1    20 days that you had missed; isn't that correct?
2    A.   Yes.
3    Q.   Are you aware of any other union proceedings that
4         related to your 20-day suspension that followed the
5         Public Law Board's decision?
6    A.   I'm not sure what you mean, sir.
7    Q.   Did anything else happen?  Did the union do anything
8         else, as far as you're aware, after it received the
9         Public Law Board's decision?
10   A.   Not sure.
11   Q.   Was the -- is it fair to think of the Public Law
12        Board's decision as a win for the union?
13   A.   The win for John is what it is, and yes.
14   Q.   "Win for John," meaning you?
15   A.   Yes.
16   Q.   And a loss for the railroad, correct?
17   A.   No, it's not.  No, that's not correct.
18   Q.   The final set of materials I want to cover with you,
19        Mr. Sexton, are the specific allegations that are
20        being made in the litigation against the railroad.
21        Is the -- the Public Law Board is Exhibit 13?
22             MR. MAGNUSON:  13.
23        (Exhibit 14 was marked for
24        identification.)
25   BY MR. SULLIVAN:

33 (Pages 126 - 129)

Page 162

1    February 2021?
2    A.  Yes.
3    Q.  And why do you believe that?
4    A.  Because it was -- it's a setup.  You can -- it -- it
5        was set up.
6    Q.  And when you complained about it, the complaint
7        itself led to the decision to issue the discipline;
8        is that what you believe?
9    A.  No.  His -- his actions of failure to comply with a
10       test and him doing it wrong in every aspect of
11       meaning, that's why we're here.
12   Q.  Do you think anything negative happened to you
13       specifically and only because you complained about
14       Tom's perform -- Tom Jared's performance of that
15       shove test?
16   A.  And everything else I put in the emails prior to
17       this, 100 percent.
18   Q.  So it all adds in together?
19   A.  That's what I said before.
20   Q.  Do you remember making a complaint on February 9th
21       about Kurt McElvey's driving?
22   A.  Yes.
23   Q.  Tell me about that.
24   A.  I believe it was he picked us up at Eckert's if I
25       remember correctly.  And a bunch of snow, and

Page 163

1        Eckert's, it's up there in northeast Iowa near the
2        bluffs area, on top of bluffs, a shelf and the wind
3        blows like mad.  There's snow up there.  You get a
4        lot of drifts and blowing snow.  He picked us up and
5        was driving too fast for the conditions, and I told
6        him more than twice to slow down.
7    Q.  And who did you report that to?
8    A.  I believe it was Tom Jared and Tracy Miller, Dylan
9        Smith.
10   Q.  Why did you wait until February 9th to make that
11       complaint?
12   A.  When was the incident?  I mean, so many emails, it's
13       kind of kind of hard to...
14           (Exhibit 18 was marked for
15           identification.)
16   BY MR. SULLIVAN:
17   Q.  Showing you Exhibit 18, Mr. Sexton.
18   A.  Okay.
19   Q.  Why did you wait until February 9th to send this
20       email about driving that occurred on February 1st?
21   A.  I'm not sure.  I can't answer that.  Not sure.
22   Q.  Did you report it to anyone on February 1st?
23   A.  Not sure.  I reported to Mr. McElvey.  He knows.
24   Q.  So Mr. Ross responds to you twice, so on
25       February 10th and then a few days later

Page 164

1        February 14th.  Do you see those messages back to
2        you on the first page of Exhibit 18?
3    A.  I do.
4    Q.  And in the most recent of those messages, so the one
5        that is from the 15th of February shortly after
6        midnight Universal Time, Greenwich Time, Mr. Ross
7        says, "I gathered information surrounding what you
8        pointed out below.  I would like to connect with you
9        tomorrow to discuss."  Did you ever speak with
10       Mr. Ross about this incident?
11   A.  I don't recall.
12   Q.  Is it possible that you did?
13   A.  Possible.
14   Q.  Is it possible that when he spoke to you, he told
15       you the result of the review of the incident that
16       management had taken in response to your complaint?
17   A.  That's possible.
18   Q.  Do you remember anything about management's response
19       to your complaint?
20   A.  It took Mr. Ross awhile.  No.
21   Q.  You don't know one way or the other what they did?
22   A.  It -- no, I don't.
23   Q.  Do you believe this February 9th email that you sent
24       complaining about Kurt McElvey's driving contributed
25       to any negative event that followed the email?

Page 165

1    A.  Part of it.
2    Q.  What evidence do you have of that?
3    A.  All my emails and bringing all this safety stuff to
4        their attention, they -- they don't like it.
5    Q.  Has anyone in CP management ever said to you,
6        "Mr. Sexton, we don't like it when you bring forward
7        these complaints?"
8    A.  No.
9    Q.  Has anyone in CP management ever said to you,
10       "Mr. Sexton, we're disciplining you because of all
11       the complaints that you make"?
12   A.  No.
13   Q.  Has anyone ever told you that they heard some member
14       of CP management say, "We're disciplining Mr. Sexton
15       because of all his complaints"?
16   A.  Yes.
17   Q.  Who is that?
18   A.  Someone told Mr. Cruciani, and Tom Jared came down
19       to Nahant to efficiency test me.  I guess heads are
20       going to roll or whatever.  Whatever he said.  I
21       don't know.  I just found out about that a short
22       time ago.
23   Q.  That heads are going to roll?
24   A.  That's just what I heard.
25   Q.  You heard someone say -- tell me exactly what you

42 (Pages 162 - 165)

Page 190

1    I'm going to have a job every day at the end of the
2    day I go to work. It's constantly there.
3    Q. The -- the direct financial impact, the 20 days
4    without pay that was made back up to you after the
5    Public Law Board issued its decision, correct?
6    A. It was.
7    Q. What -- so describe what you said, sort of the
8    embarrassment. Like -- like, what -- how has that
9    affected your life?
10   A. It's shameful. It's embarrassing. It makes people
11   look at me in a different light. I don't like that
12   at all. Makes me constantly worry about my
13   occupation, my family's financial future.
14   Q. Have you suffered any physical symptoms from this?
15   A. I don't know what physical symptoms you're looking
16   for, but other than having that constantly in my
17   mind all the time.
18   Q. So the -- these concerns, the shameful, the
19   embarrassment, those concerns are in your mind. But
20   have you experienced any physical symptoms as a
21   result of those emotions?
22   A. I lose sleep. I don't -- sometimes I don't sleep.
23   Sometimes I don't eat. Sometimes I each too much.
24   I don't know. I mean, it's -- it's a roller
25   coaster. It's a huge knock on my reputation.

Page 191

1    Q. Do you currently see a therapist or a mental health
2    provider of any kind?
3    A. No.
4    Q. Have you ever?
5    A. No.
6    Q. Have you spoken about the emotional effects that
7    you've described with any physician or medical
8    provider?
9    A. No.
10   Q. Have you ever asked a medical provider to treat
11   anything related to the emotional -- emotional state
12   that you described?
13   A. No.
14   Q. Have you talked to friends or family about what
15   you're experiencing?
16   A. Yes.
17   Q. Who?
18   A. My wife, Joe Rainwater, these gentlemen.
19   Q. What have you told Mr. Rainwater about emotional
20   feelings you had about this?
21   A. Everything I just shared with you, sir.
22   Q. Anything else?
23   A. Everything I just shared with you, sir. No.
24   Q. But nothing in addition to those things?
25   A. No.

Page 192

1    Q. Have you ever not -- have you ever been unable to
2    work because of the emotional feelings you're
3    having?
4    A. No. I'm not a sissy.
5    Q. Have you ever communicated with Mr. Rainwater about
6    any of these symptoms in writing, email, or text?
7    A. No. Plenty of -- plenty of phone conversations, but
8    no. He knows. Someone knows.
9    Q. How about your wife, any text messages?
10   A. No, but she's heard it all for the last 20 -- almost
11   25 years.
12   Q. How about for related specifically to this case?
13   A. Mr. Rainwater, my wife, and these gentlemen.
14   Q. You said your wife's heard it all for last for 20,
15   25 years. What's different today than what she
16   would have heard 15 years ago? I don't understand
17   what she heard previously. You said, "She's heard
18   it all"?
19   A. Yeah.
20   Q. Did your job previous -- has it always caused you
21   some amount of stress?
22   A. I was the local chairman for some amount of years,
23   sir.
24   Q. Did that ever cause you stress or any concerns that
25   you discussed with your wife?

Page 193

1    A. It didn't -- that was defending other fellow
2    employees, so no.
3    Q. So you didn't previously feel stress related to your
4    job?
5    A. That's always. That's an open question. There's
6    always stress on your job.
7    Q. Have you ever felt any of the issues that you said
8    were shameful or embarrassing related to your
9    professional position before this event?
10   A. Only when I was unjustly -- had discipline on me.
11   Other than that, no.
12   Q. How have -- do you feel you've experienced unjust
13   discipline?
14   A. It's a proven fact, two other times besides this
15   one.
16   Q. What are those times?
17   A. 2014 and early 2000 -- I forget the year.
18   Q. What happened in the early 2000s?
19   A. Failure to do an air test is what it was.
20   Q. What happened as a result of the failure to do an
21   air test?
22   A. I was -- Mr. Jared was a train master then, and
23   terminated for 30 days, I believe it was, and I
24   appealed that.
25   Q. That was -- you lost your certification for 30 days,

49 (Pages 190 - 193)

Privileged & Confidential

AN AGREEMENT
BETWEEN

DAKOTA, MINNESOTA & EASTERN RAILWAY (DM&E)

d/b/a

CANADIAN PACIFIC RAILWAY (CP)



AND

ITS EMPLOYEES REPRESENTED BY BROTHERHOOD OF LOCOMOTIVE
ENGINEERS AND TRAINMEN



October 22, 2015

1



EXHIBIT

1

tabbies®

Confidential

CP_00212

## Table of Contents

ARTICLE 1 - PURPOSE ........................................................................................ 5

ARTICLE 2 - GENERAL PRINCIPLES ............................................................... 5

ARTICLE 3 - RECOGNITION ............................................................................. 6

ARTICLE 4 - SCOPE OF AGREEMENT ............................................................. 6

ARTICLE 5 - WAGES .......................................................................................... 7

ARTICLE 6 - SENIORITY ................................................................................... 8

    Section 1    General ............................................................................ 8

    Section 2    Establishment ................................................................. 8

    Section 3    Furloughed Employees ................................................... 9

    Section 4    Demoted employees ...................................................... 10

    Section 5    Re-Entering Service ....................................................... 10

    Section 6    Seniority Districts and Extra Board Locations ............ 10

    Section 7    Entitlements of affected Employees ............................. 12

    Section 8    Seniority Roster ............................................................. 12

    Section 9    Promotion ...................................................................... 13

    Section 10   Promotion to Engine Service ........................................ 13

    Section 11   Seniority Retention-Company Managers/Officers ....... 14

ARTICLE 7 - FLOW BACK ................................................................................. 15

ARTICLE 8 - JOB VACANCIES AND BIDDING .............................................. 15

    Section 1    Regular Assignments and Extra Boards ..................... 15

    Section 2    Unassigned Pool Service ............................................... 18

    Section 3    Assignment to Positions ................................................ 19

    Section 4    Transfers ........................................................................ 20

ARTICLE 9 - ANNULMENT OF ASSIGNMENTS ........................................... 23

ARTICLE 10 - ABOLISHMENT AND DISPLACEMENT ................................ 23

ARTICLE 11- GUARANTEED· EXTRA BOARD (GEB) ................................. 24

ARTICLE 12 - APPROVAL OF APPLICATION FOR EMPLOYMENT ............ 26

ARTICLE 13 - RULES/RECERTIFICATION/INSTRUCTION CLASSES ........ 27

ARTICLE 14 - ON AND OFF DUTY POINT ..................................................... 28

ARTICLE 15 - CALLING FOR DUTY ............................................................... 29

    Section 1    Calling ........................................................................... 29

Confidential

CP_00213

Section 2    Used out of Order...............................................................................29

Section 3    Called and Released............................................................................29

Section 4    Familiarization of Territory ..............................................................30

ARTICLE 16 - MEAL PERIODS........................................................................30

ARTICLE 17 - EXPENSES..................................................................................31

Section 1    Held Away From Home Terminal.....................................................31

Section 2    Transportation Expense.....................................................................32

Section 3    Deadheading.......................................................................................32

Section 4    Aggregate Service..............................................................................32

ARTICLE 18 - PERSONAL LEAVE DAYS (PLD's) ......................................32

ARTICLE 19 - BEREAVEMENT LEAVE .........................................................33

ARTICLE 20 - HOLIDAYS..................................................................................33

ARTICLE 21 - VACATION ..................................................................................33

Section 1    Entitlements.......................................................................................33

Section 2    Brotherhood of Locomotive Engineers and Trainmen Union
Officials     36

Section 3    General...............................................................................................36

ARTICLE 22 - BENEFITS....................................................................................37

Section 1    Health & Welfare...............................................................................37

Section 2    Off Track Vehicle Accident Benefits................................................37

Section 3    Stock Purchase Plan..........................................................................37

Section 4    Employee Assistance Program..........................................................37

Section 5    401K Plan ..........................................................................................38

ARTICLE 23 - PHYSICAL EXAMINATIONS..................................................38

ARTICLE 24 - MEDICAL DISQUALIFICATIONS..........................................38

ARTICLE 25 - PAYDAY.......................................................................................39

ARTICLE 26 - PAYROLL AND DEDUCTIONS...............................................39

ARTICLE 27 - UNION SHOP AGREEMENT....................................................39

ARTICLE 28 - HANDLING OF CLAIMS AND GRIEVANCES.......................42

Section 1    Representation....................................................................................42

Section 2    Handling of Claims and/or Grievance Process .................................42

Section 3    Handling of Discipline Appeals ........................................................44

Section 4    General...............................................................................................45

3

Confidential

CP_00214

ARTICLE 29 - INVESTIGATIONS AND DISCIPLINE...............................................45

ARTICLE 30 - TIME OFF FOR UNION BUSINESS.................................................46

ARTICLE 31 - ATTENDING COURT AND INQUESTS...........................................47

ARTICLE 32 - LEAVE OF ABSENCE......................................................................47

    Section 1    General ...........................................................................................47

    Section 2    Less Than 1 Year...........................................................................47

    Section 3    Illness / Injury...............................................................................48

    Section 4    Official / Military .........................................................................48

ARTICLE 33 - JURY DUTY.....................................................................................48

ARTICLE 34 - BULLETIN BOARDS.......................................................................49

ARTICLE 35 - CREW CALLING RECORDS...........................................................49

ARTICLE 36 - CREW CONSIST..............................................................................49

ARTICLE 37 - TERMINAL EFFICIENCY...............................................................49

ARTICLE 38 - GENERAL PROVISIONS .................................................................50

ATTACHMENT "A"    Questions and Answers .........................................................52

APPENDIX 1  SEVEN DAY MARK...........................................................................56

Side Letter 1 - Reversionary Provisions....................................................................58

Side Letter 2 – Regulatory Changes...........................................................................60

Side Letter 3 - Notification of Ratification and Employee Share Purchase Plan ..62

Side Letter 4 – Payment for Vacation, Personal Leave .............................................63

Side Letter 5 – Training and use of Managers ...........................................................64

Confidential

CP_00215

**PREAMBLE:**

This agreement is intended to provide enhanced quality of life, employment security and compensation enhancements to the BLE&T membership in addition to providing operating flexibility to the Company, resulting in increased productivity. Therefore, **it is hereby agreed:**

**ARTICLE 1 - PURPOSE**

The parties to this Agreement agree that the fundamental objective of the Company is to operate a safe, efficient and effective railroad transport operation and a key component to the success of this venture is the contribution of Locomotive Engineers and Trainmen (hereinafter referred to as employees.)

This Agreement is founded on a principle of paying for employees' time on an all-inclusive basis and contemplates that in order for the operation to be successful, individuals will perform all duties requested of them, subject to the provisions contained herein.

**ARTICLE 2 - GENERAL PRINCIPLES**

A. In this Agreement, words importing the singular shall include the plural and vice versa where the context requires. Words importing the masculine gender shall include the feminine where the context requires.

B. This Agreement is intended to be applied in a non-discriminatory manner without regard to age, race, creed, color, gender, national origin, disability, sexual orientation or marital status.

C. The parties recognize that this is a new Agreement, which replaces any and all existing Agreements, unless otherwise provided, and introduces changes in the workplace. In recognition of this a committee consisting of the BLET General Chairman, a BLET Member appointed by the BLET General Chairman, and the Company's General Manager (s) Operations and Director Labor Relations or their respective designates, will be established. This committee will be known as the Dispute Resolution Committee, and will meet quarterly during the months of January, April, July and October, unless otherwise agreed, to review application of this Agreement. In matters requiring a vote of the Committee, up to two (2) Labor Members and up to two (2) Company Members may vote.

D. It is recognized that Management has the exclusive right to manage its business; to classify and direct the work force; to assign duties and to fix the starting times of jobs; determine procedural methods and equipment to be utilized; schedule the workweek and work; the number of employees to be assigned to a crew, job, terminal/station and the number to be employed or

5

CP_00216

retained in employment, except as otherwise specifically limited by this agreement.

## ARTICLE 3 - RECOGNITION

A. This Agreement covers all employees employed by the Company and represented by the Brotherhood of Locomotive Employees and Trainmen under the Railway Labor Act, as amended.

B. The term "employee" as herein referred to shall include employees represented by the Brotherhood of Locomotive employees and Trainmen, except where otherwise specifically provided for herein. The term "Company" shall mean the Canadian Pacific; Dakota, Minnesota and Eastern Railroad Company. The term "Union" or "General Committee" shall mean the Brotherhood of Locomotive Engineers and Trainmen.

C. The right to make and interpret contracts covering rules, rates of pay and working conditions on behalf of employees covered by this Agreement shall be vested in the regularly constituted General Committee of the Brotherhood of Locomotive Engineers and Trainmen.

D. Where the term "duly accredited representative" appears herein, it shall be understood to mean the regularly constituted General Committee and/or the Officers of the Brotherhood of Locomotive Engineers and Trainmen of which such General Committee or Officers are a part.

## ARTICLE 4 - SCOPE OF AGREEMENT

A. The parties recognize that the scope of this Agreement is unlike traditional agreements in the rail industry and that it must be interpreted accordingly. That being said, the primary role of Employees is to perform transportation duties traditionally associated with the operation of locomotives and trains.

B. The parties recognize that in order to meet a customer's immediate service need, or to meet operational exigencies at a time a regularly assigned crew is not present and available in the terminal for such service, and time will not permit calling a rested extra employee, a qualified employee working under this agreement may be used, without penalty, to perform such service. A qualified employee who is a manager will only be utilized in accordance with the terms and conditions of former Appendix 'F' as set forth in Side Letter No. 5.

C. The parties recognize that to achieve maximum efficiency of operations and to expedite movement of trains, employees may perform incidental work for which they are qualified without additional compensation in the absence or unavailability of another employee who would otherwise perform such work.

Confidential

CP_00217

G. The BLET shall indemnify and hold harmless the Company against any and all claims, demands, suits or other forms of liability that arise out of or by reason of any action taken or not taken by the Company pursuant to this Article.

## ARTICLE 28 - HANDLING OF CLAIMS AND GRIEVANCES

### Section 1   Representation

A. The Brotherhood of Locomotive Engineers and Trainmen shall have the exclusive right to represent all employees in company level grievance, claim and disciplinary proceedings.

B. The General Committee of Adjustment, Brotherhood of Locomotive Engineers and Trainmen, will represent all employees referred to herein in the making of contracts, rates, rules, working agreements and interpretations thereof.

C. All disputes involving employees covered by this Agreement will be handled in accordance with the provisions of this Agreement as interpreted by the BLET General Committee and the Company.

D. In matters pertaining to discipline, or other questions not affecting changes in employees' contract, the officials of the Company reserve the right to meet any of their employees either individually or collectively. Reinstatements of discharged employees on a leniency basis with seniority rights unimpaired shall not be permitted except by agreement with the General Chairman of the BLET.

### Section 2   Handling of Claims and/or Grievance Process

A. All claims or grievances must be presented electronically via the electronic system(s) as designated by the Company, by the employee involved, or on behalf of the employee, by his representative, or designee, (claims must be presented under the employee's PIN) to the officer of the Company authorized to receive same within thirty (30) days from the date of the occurrence on which the claim or grievance is based. Should any such claim or grievance be disallowed, the Company shall, within thirty (30) days from the date it is received, notify the employee or his Local Chairman in writing of the reason(s) for such disallowance. Should the Company fail to issue timely declination of the claim or grievance, it will be allowed as entered, however such allowance will not constitute a precedent for other similar claims or grievances.

All resolution of claims resulting from handling during the steps referenced in the paragraph above shall be concluded on a 'without prejudice' basis,

42

and are non-referable unless otherwise noted the General Chairman and the Highest Designated Officer (HDO) of the Company, or their designee(s). Claims not filed within the required thirty (30) days shall be deemed abandoned and barred from further handling.

B. Appeals of all claims and grievances, including those involving discipline, shall be presented and handled via the electronic claim handling system provided by the Company.

In the event the claim or grievance involving matters other than discipline is disallowed, the BLET Local Chairman may appeal the matter to the Superintendent within thirty (30) days from the date of declination. If the claim or grievance is not appealed, the disallowance shall stand, however the disallowance shall not constitute a precedent for other similar claims and grievances.

In the event the appeal is disallowed, the Superintendent shall, within thirty (30) days from the date it is received, notify the Local Chairman in writing of the reason(s) for such disallowance.

Should the Superintendent fail to issue timely notification of the declination of the appeal, the claim or grievance will be allowed as entered; however, such allowance will not constitute a precedent for other similar claims or grievances.

C. Claims declined under Section 2 (B) of this Article may be appealed by the BLET General Chairman to the Company's Highest Designated Officer ("HDO"), or designate, within sixty (60) days of the disallowance. The HDO, or his designate, shall, within sixty (60) days from the receipt of the appeal, notify the General Chairman of the allowance or declination of the claim. Should the HDO or designate fail to timely notify the General Chairman of such declination, the claim will be allowed as entered; however such allowance shall not constitute a precedent for other similar claims.

D. Claims and grievances disallowed by the Company pursuant to Section 2 (C) will be barred from further handling unless, not less than sixty (60) days prior to the next scheduled meeting date of the Labor/Management Resolution Committee, the General Chairman lists the unresolved claim or grievance to the Committee for handling.

E. The Labor/Management Resolution Committee will meet quarterly, or as otherwise mutually agreed, to review and resolve outstanding employee time claims and grievances.

F. The Committee will consider the entire record of each dispute submitted to it. Decisions made pursuant to this process will be written by the Company within forty-five (45) days of the meeting date and will

43

CP_00254

represent the final and binding decision on such grievances. The handling of claims and grievances by the Committee will constitute any "conference" prerequisite to submission of disputes to a tribunal established pursuant to law or by agreement.

G. In the event that a majority of the Committee does not agree on the resolution of a particular grievance, either party may initiate proceedings before a tribunal established pursuant to law or by agreement within one-hundred twenty (120) days of the Committee's written decision having been rendered.

H. Nothing in this Section shall preclude an agreement by the parties to conference claims or grievances independent of the procedures set forth in Section 2 (D) and (E) of the Article. Such conference as may be agreed upon will constitute any "conference" prerequisite to the submission of disputes involving claims and/or grievances to a tribunal established pursuant to law or by agreement for the final adjudication of such disputes

## Section 3    Handling of Discipline Appeals

A. Discipline decisions reached by the Company pursuant to Article 29 (E) and (F) of this Agreement may be adjusted between the BLET Local Chairman and the Superintendent, or designate, at any time prior to appeal by the General Chairman as provided in paragraph B hereof.

B. If the discipline is to be appealed, the BLET General Chairman must appeal, in writing, to the HDO, or designate, within ninety (90) days of the date the discipline was assessed, or the appeal will be barred. The HDO, or designate, shall notify the General Chairman of the allowance or declination of the appeal within sixty (60) days of the receipt of the appeal. Should the HDO, or designate, fail to timely notify the General Chairman of the declination of the appeal, the claim will be allowed as entered; however such allowance shall not constitute a precedent for other similar claims.

C. The BLET General Chairman will list unresolved discipline appeals with the HDO, or designate, not less than thirty (30) days prior to the next scheduled meeting of the Labor/Management Committee for handling pursuant to Section 2 (D) and (E) of this Article. Discipline/claims may be handled in conference as agreed upon between scheduled meetings.

D. Nothing in this Section shall preclude an agreement by the parties to conference discipline appeals independent of the procedures set forth in this Article. Such conference as may be agreed upon will constitute any "conference" prerequisite to submission of unresolved disputes involving discipline appeals to a tribunal established by law or by agreement for the final adjudication of such disputes.

Confidential

CP_00255

**Section 4   General**

A. The Labor / Management Resolution Committee will meet quarterly during the months of January, April, July, October, or as otherwise mutually agreed, to review and resolve outstanding time claims and grievances.

B. The Committee will consider the entire record of each dispute submitted to it. Decisions made pursuant to this process will be provided to the Union by the Company within forty-five (45) days of the meeting date and will represent the final and binding decision on such grievances.

C. The handling of claims and grievances by the Committee will constitute any "conference" prerequisite to submission of disputes to a public law board tribunal established pursuant to law or by agreement. In the event that a majority of the Committee does not agree on the resolution of a particular grievance, either party may initiate proceedings before a tribunal established pursuant to law or by agreement within six months of the Committee's written decision having been rendered.

## ARTICLE 29 - INVESTIGATIONS AND DISCIPLINE

A. An employee shall not be withheld from service pending hearing except in cases that are serious, such as but not limited to, theft, altercation, Rule "G", insubordination, major accidents and/or other major offenses whereby the employee's retention in service could be hazardous.

B. No employee shall be disciplined without a fair hearing (investigation) by an officer of the Company. An employee shall be apprised of the charge(s) against him not later than twenty (20) days from the date the carrier has knowledge of the incident to be investigated.  If the decision is made to withhold an employee from service pending an investigation, the hearing must be held within ten (10) days of the date the employee was initially withheld from service He shall have reasonable opportunity to secure the presence of necessary witnesses, and he shall have the right to be represented by an accredited representative or member of the Brotherhood of Locomotive Engineers and Trainmen.

C. When not inconvenient to the Company and to other employees, investigations will be held at such times, if possible, as to avoid holding employees out of service to be present at the investigation. Postponements will be granted to either party upon a reasonable showing of a need.

D. Investigations ordinarily will be held within twenty (20) days of the date of the notice of charge referenced in B above. Employees will be advised of the decision in writing within twenty (20) days after the conclusion of the investigation.

E. An employee and/or the employee's representative shall have the option,

45

CP_00256

with the Company's concurrence and prior to the hearing, to discuss the charge with the appropriate Company Officer.

1. If the disposition of the charges is made on the basis of the employee's acknowledgement of responsibility, the disposition shall be reduced to writing and signed by the employee and the official involved and shall incorporate a waiver of hearing and shall specify the maximum discipline, which may be imposed for the employee's acceptance of responsibility.

2. No minutes or other record shall be made of the discussion, and, if the parties are unable to reach an agreed upon disposition on this basis, no reference shall be made to these discussions by either of the parties in any subsequent handling of the charges under the discipline procedure.

F. A true and correct transcript will be taken of all hearings or investigations held at the direction of the Company under this Article and in the event the employee involved is assessed discipline, the employee, his representative and the General Chairman will be furnished a copy of the transcript along with the discipline decision letter. At an investigation, an employee or his representative shall have the right to record, at his expense, the investigation proceedings on a recording device. This provision will not be used to delay or postpone the investigation proceedings. Distribution of notices and transcripts by electronic means shall fulfill the Company's obligation under this rule.

G. Should any employee investigated under this Article consider that the discipline is unjust, he shall have the right to appeal as provided in Article 28 of this agreement. In case of dismissal or suspension which is later found to be unjust, the employee will be reinstated with seniority rights unimpaired and paid for all time lost.

H. Letters of caution or warning are not discipline. Should the employee dispute the validity of the warning, he has the right to request a fair hearing provided the request is made within fifteen (15) days of the date of the warning letter. If the hearing reveals that the letter is unjust, it shall be removed from his record. If the Company decides the letter was warranted, it will apprise the employee of the decision within fifteen (15) days of the hearing. If the employee is dissatisfied with the decision, he shall have the right to appeal as provided in Article 28 herein.

## ARTICLE 30 - TIME OFF FOR UNION BUSINESS

An employee who is elected or appointed to a full time position with the Brotherhood of Locomotive Engineers and Trainmen shall be granted an unpaid leave of absence for the duration of time he holds such position.

46

Confidential

Privileged & Confidential

# GCOR

## General Code of Operating Rules

### Seventh Edition

### Effective April 1, 2015

These rules herein govern the operations of the railroads listed and must be complied with by all employees regardless of gender whose duties are in any way affected thereby. They supersede all previous rules and instructions inconsistent therewith.

© 2015 General Code of Operating Rules Committee, All Rights Reserved



EXHIBIT

2

Confidential

CP_00283

**i-2     GCOR—Seventh Edition—April 1, 2015**

Front cover photo by Geneva May Short

# Adopted by:

Aberdeen Carolina & Western Railway
Aberdeen & Rockfish Railroad
Acadiana Railway Company
Affton Terminal Railroad
Ag Valley Railroad
Alabama & Gulf Coast Railway
Alabama Southern Railroad
Alabama & Tennessee River Railway, LLC
Alabama Warrior Railroad
Alaska Railroad Corporation
Albany & Eastern Railroad Company
Aliquippa & Ohio River Railroad
Alliance Terminal Railway, LLC
Altamont Commuter Express Rail Authority
Alton & Southern Railway
Amtrak—Chicago Terminal
Amtrak—Michigan Line
Amtrak—NOUPT
AN Railway
Ann Arbor Railroad
Apache Railway Company
A&R Terminal Railroad Company
Arizona & California Railroad
Arizona and California Railway Company
Arizona Central Railroad
Arizona Eastern Railway Company
Arkansas Louisiana & Mississippi Railroad
Arkansas Midland Railroad Company Inc.
Arkansas & Missouri Railroad Company
Arkansas-Oklahoma Railroad
Arkansas Southern Railroad
Ashtabula, Carson & Jefferson Railroad
AT&L Railroad Company
Atlantic & Western Railway
Austin Western Railroad
Autauga Northern Railroad
Baton Rouge Southern Railroad
Bauxite & Northern Railway
Bay Coast Railroad
Bay Line Railroad
Belt Railway Company of Chicago

BHP Nevada Railway Company
B&H Rail Corp
Birmingham Terminal Railroad
Blackwell Northern Gateway Railroad
BNSF Railway
Boise Valley Railroad
Buffalo & Pittsburg Railroad
Burlington Junction Railway
Butte, Anaconda & Pacific Railroad
California Northern Railroad
California Western Railroad
Camas Prairie RailNet, Inc.
Canadian Pacific
Caney Fork & Western Railroad
Canon City and Royal Gorge Railroad
Capital Metropolitan Transportation Authority
Carolina Piedmont Railroad
Carrizo Gorge Railway
Cascade and Columbia River Railroad
Cedar Rapids & Iowa City Railway Company
Central California Traction Company
Central Illinois Railroad
Central Kansas Railway
Central Midland Railway
Central Montana Rail
Central Oregon & Pacific Railroad, Inc.
Central Railroad of Indiana
Central Railroad of Indianapolis
Chattahoochee Bay Railroad
Chattahoochee Industrial Railroad
Chattooga & Chickamauga Railway
Chesapeake & Albemarle Railroad Company, Inc.
Chicago and Chemung Railroad
Chicago, Ft. Wayne & Eastern Railroad
Chicago Rail Link
Chicago SouthShore & South Bend Railroad
City of Prineville Railway
Cleveland Commercial Railroad LLC
C&NC Railroad Corporation
Columbia Basin Railroad Co.
Columbia and Cowlitz Railway
Columbia Terminal
Columbus & Greenville Railway
Columbus & Ohio River Railroad
Commonwealth Railway

Confidential

CP_00284

**GCOR—Seventh Edition—April 1, 2015**    i-3

Conecuh Valley Railroad
Connecticut Southern Railroad
Connex Railroad
Corpus Christi Terminal Railroad
Council Bluffs Railway
D&I Railroad
Dakota, Minnesota & Eastern Railroad
Dakota, Missouri Valley & Western Railroad, Inc.
Dakota Southern Railway
Dallas, Garland & Northeastern Railroad, Inc.
Dardanelle & Russellville Railroad
Decatur Junction Railway Company
Denton County Transit Authority
Denver Regional Transportation District Commuter Railroad
Denver Rock Island Railroad
DeQueen & Eastern Railroad Company
Eagle Rail
East Chattanooga Belt Railroad
East Tennessee Railway
Eastern Alabama Railway
Eastern Idaho Railroad
Ellis & Eastern Company
Escanaba & Lake Superior Railroad
Farmrail Corporation
First Coast Railroad
Florida East Coast Railway
Fordyce & Princeton Railroad
Fort Worth & Western Railroad
Fox Valley & Western
Fulton County Railway, LLC
Galveston Railroad
Gateway Western Railway
Georgetown Railroad Company
Georgia Central Railway
Georgia & Florida Railway
Georgia Southwestern Railroad, Inc.
Georgia Woodlands Railroad
Golden Isles Terminal Railroad
Golden Triangle Railroad
Grain Belt Corp
Grand Canyon Railway
Grand Elk Railroad
Grand Rapids Eastern Railroad
Great Northwest Railroad

Great Western Railway
Gulf Colorado & San Saba Railroad
Heart of Georgia Railroad
Herzog Transit Services, Inc.
Hiwassee River Railroad
Huron and Eastern Railway Company, Inc.
Hutchinson and Northern Railway Company
Idaho Northern & Pacific Railroad Company
Illinois & Midland Railroad, Inc.
Illinois Railway, Inc.
Indiana Business Railroad
Indiana & Ohio Railway
Indiana Rail Road Company
Indiana Southern Railroad, Inc.
International Bridge & Terminal Company
Iowa Chicago & Eastern Railroad
Iowa Interstate Railroad Ltd.
Iowa Northern Railway Company
Jaxport Terminal Railway
Kansas City Southern Railway
Kansas City Terminal Railway Company
Kansas & Oklahoma Railroad
Kaw River Railroad
Kentucky West Tennessee Railway
Keokuk Junction Railway Company
Kettle Falls International Railway, LLC
Kiamichi Railroad
Knoxville & Holston River Railroad
Kyle Railroad Company
Lahaina Kaanapali & Pacific Railroad
Lake State Railway
Lake Superior and Ishpeming Railroad
Laurinberg & Southern Railroad
Lavonia, Avon and Lakeville Railroad
Lewis and Clark Railway Company
Little Rock and Western Railway, LP
Longview Switching Company
Los Angeles Junction Railway
Louisiana and Delta Railroad Company
Louisiana & North West Railroad
Louisiana Southern Railroad
Louisville & Indiana Railroad
Luxapalila Valley Railroad
Mahoning Valley Railroad
Manning Rail, Inc.

Confidential

CP_00285

## i-4    GCOR—Seventh Edition—April 1, 2015

Manufacturers Junction Railway
Maryland Midland Railway
Maumee & Western Railroad
McCloud Railway Company
Meridian and Bigbee Railroad
Meridian Southern Railway, LLC
Messena Terminal Railroad Company
Michigan Air-Line Railway Company
Michigan Central Railway
Michigan Shore Railroad
Mid-Michigan Railroad, Inc.
Minnesota Commercial Railway Company
Minnesota, Dakota & Western Railway Company
Minnesota Northern Railroad, Inc.
Minnesota Prairie Line Incorporated
Minnesota Southern Railway
Minnesota Valley Transportation Company
Mission Mountain Railroad
Mississippi Export Railroad Company
Mississippi Southern Railroad
Mississippi & Tennessee RailNet, Inc.
Mississippi Tennessee Railroad
Missouri & Northern Arkansas RR Company, Inc.
Missouri & Valley Park Railroad
Modesto & Empire Traction Company
Modoc Railroad Academy
Montana Rail Link
Mount Vernon Terminal Railway, Inc.
Napa Valley Railroad Company
Nash County Railroad
Nashville and Eastern Railroad
Nashville and Western Railroad
National Coal Rail Line
Nebkota Railway, Inc.
Nebraska Central Railroad Company
Nebraska Kansas Colorado Railway, Inc.
Nebraska Northeastern Railway Company
New England Central Railroad, Inc.
New Mexico Rail Runner Express
New Orleans & Gulf Coast Railway Company
New Orleans Lower Coast Railroad
New Orleans Public Belt Railroad
Newburgh & South Shore Railroad Company
New York & Atlantic Railway
North Carolina & Virginia Railroad Company, Inc.

Northeast Illinois Regional Commuter Railroad Corp.
Northern Indiana Commuter Transportation District
Northern Lines Railway
Northern Ohio & Western Railway
Northern Plains Railroad
Ohio Central Railroad
Ohio & Pennsylvania Railroad
Ohio Southern Railroad
Omaha, Lincoln & Beatrice Railway Company
Osceola and St. Croix Valley Railroad Company
Otter Tail Valley Railroad Company, Inc.
Pacific Harbor Line
Pacific Sun Railroad
Palouse River and Coulee City Railroad
Panhandle Northern Railroad
Pecos Valley Southern Railway Company
Pend Oreille Valley Railroad
Peninsula Corridor Joint Powers Board (Caltrain)
Pennsylvania Southwestern Railroad
Pittsburgh Industrial Railroad
Pittsburgh & Ohio Central Railroad
Point Comfort & Northern Railway Company
Port Bienville Railroad
Port of Tillamook Bay Railroad
Portland Terminal Railroad Company
Portland Vancouver Junction Railroad
Portland & Western Railroad
Progressive Rail Inc.
Puget Sound & Pacific Railroad
Rarus Railway, Inc.
Red River Valley & Western Railroad Co.
Riceboro Southern Railway
Richmond Pacific Railroad
Richmond Terminal Railroad Company
Rio Valley Switching Company
Rochester & Southern Railroad
Rockdale, Sandow & Southern Railroad Company
Rogue Valley Terminal Railroad
Sacramento Valley Railroad
Saginaw Valley Railroad Company
San Antonio Central Railroad
San Diego & Imperial Valley Railroad Company, Inc.
San Diego Northern Railway
San Francisco Bay Railroad
San Joaquin Valley Railroad Co., Inc.

Confidential

San Luis Central Railroad Company
San Pedro and Southwestern Railway Company
Sand Springs Railway Company
Santa Cruz, Big Trees & Pacific Railway Company
Santa Fe Southern Railway, Inc.
Sault Ste. Marie Bridge Company
Savage Bingham & Garfield Railroad Company
Savannah Port Terminal Railroad
SEMO Port Railroad
Sequatchie Valley Railroad
Sierra Railroad Company
Sound Transit
South Buffalo Railway
South Carolina Central Railroad Company, Inc.
South Central Tennessee Railroad
South East Kansas Railroad
South Kansas and Oklahoma Railroad
South Plains Lamesa Railroad Ltd.
Southern California Regional Rail Authority
Southern Switching Company
Southwestern Railroad Company, Inc.
St. Croix Valley Railroad Company
St. Maries River Railroad Company
Stillwater Central Railroad
Swan Ranch Railroad
Tacoma Municipal Belt Line Railway
Talleyrand Terminal Railroad
Tazewell & Peoria Railroad
Temple & Central Texas Railway
Tennessee Southern Railroad
Tennessee Valley Railroad
Tennessee Valley Railroad Museum, Inc
Tennken Railroad Company Inc.
Terminal Railroad Association of St. Louis
Texas, Gonzales & Northern Railway Company
Texas - New Mexico Division
Texas Northeastern Railroad
Texas North Western Railway Company
Texas Rock Crusher Railway Co.
Three Notch Railroad
Timber Rock Railroad
Toledo, Peoria & Western Railway
Tomahawk Railroad
TransitAmerica Services Inc.
Transportación Ferroviaria Mexicana

Trinity Railway Express
Trona Railway Company
Tulare Valley Railroad
Tulsa-Sapulpa Union Railway Company
Twin Cities & Western Railroad Company
Union Pacific Railroad
United States Army Military Railroad System
Utah Central Railway
Utah Railway Company
Utah Transit Authority
V&S Railroad Inc.
Valdosta Railway
Ventura County Railway Company
Verde Canyon Railroad
Vermont Rail System
Vicksburg Southern Railroad
Virginia Southern Division
Wabash Central Railroad
Walking Horse & Eastern Railroad
Warren & Trumbull Railroad
WATCO Transportation Services
West Tennessee Railroad, LLC
West Tennken Railroad Corp.
West Texas and Lubbock Railroad
Western New York and Pennsylvania Railroad, LLC
Wichita Terminal Association
Wichita, Tillman & Jackson Railway
Willamette & Pacific Railroad, Inc.
Willamette Valley Railroad
Willamina and Grand Ronde Railway
Wilmington Terminal Railroad
Wiregrass Central Railroad
Wisconsin & Southern Railroad Company
Wyoming/Colorado Railroad Company
Yadkin Valley Railroad
Yellowstone Valley Railroad
York Railway
Youngstown & Austintown Railroad
Youngstown Belt Railroad
Yreka Western Railroad

Confidential

CP_00287

# Table of Contents

**1.0    General Responsibilities........................... 1-1**

1.1    Safety........................................................... 1-1
    1.1.1    Maintaining a Safe Course .............. 1-1
    1.1.2    Alert and Attentive .......................... 1-1
    1.1.3    Accidents, Injuries, and Defects ...... 1-1
    1.1.4    Condition of Equipment and Tools .... 1-1

1.2    Personal Injuries and Accidents .................. 1-1
    1.2.1    Care for Injured ............................... 1-1
    1.2.2    Witnesses ........................................ 1-1
    1.2.3    Equipment Inspection ...................... 1-1
    1.2.4    Mechanical Inspection ..................... 1-2
    1.2.5    Reporting ......................................... 1-2
    1.2.6    Statements ....................................... 1-2
    1.2.7    Furnishing Information ..................... 1-2

1.3    Rules ........................................................... 1-2
    1.3.1    Rules, Regulations, and Instructions ... 1-2
    1.3.2    General Orders ................................ 1-3
    1.3.3    Circulars, Instructions, and Notices ..... 1-3

1.4    Carrying Out Rules and Reporting Violations ... 1-3
    1.4.1    Good Faith Challenge ...................... 1-3

1.5    Drugs and Alcohol ...................................... 1-4

1.6    Conduct ...................................................... 1-5
    1.6.1    Motor Vehicle Driving Records ......... 1-5
    1.6.2    Notification of Felony Convictions ..... 1-5
    1.6.3    Notification of Deteriorating Vision or
             Hearing .......................................... 1-5

1.7    Altercations ................................................ 1-5
1.8    Appearance ................................................ 1-5
1.9    Respect of Railroad Company .................... 1-5
1.10    Games, Reading, or Other Media .............. 1-6
1.11    Sleeping ..................................................... 1-6
    1.11.1    Napping ........................................ 1-6
1.12    Weapons ..................................................... 1-7
1.13    Reporting and Complying with Instructions ... 1-7
1.14    Employee Jurisdiction ................................ 1-7
1.15    Duty—Reporting or Absence ...................... 1-7
1.16    Subject to Call ............................................ 1-7
1.17    Hours of Service Law ................................. 1-7
1.18    Unauthorized Employment .......................... 1-7
1.19    Care of Property ......................................... 1-8
1.20    Alert to Train Movement ............................. 1-8
1.21    Occupying Roof ........................................... 1-8
1.22    Unauthorized Persons on Equipment ......... 1-8
1.23    Altering Equipment ..................................... 1-8
1.24    Clean Property ............................................ 1-8
1.25    Credit or Property ....................................... 1-8
1.26    Gratuities .................................................... 1-8
1.27    Divulging Information .................................. 1-9

1.28    Fire ............................................................. 1-9
1.29    Avoiding Delays .......................................... 1-9
1.30    Riding Engine ............................................. 1-9
1.31    Repairs to Foreign Cars ............................. 1-9
1.32    Overheated Wheels .................................... 1-9
1.33    Inspection of Freight Cars ........................ 1-10
1.34    Flat Spots ................................................. 1-10
1.35    Dump Doors ............................................. 1-10
1.36    Excessive Dimension Loads ..................... 1-10
1.37    Open Top Loads ....................................... 1-11
1.38    Shipments Susceptible to Damage ........... 1-11
1.39    Accuracy of Speed Indicator .................... 1-11
1.40    Reporting Engine Defects ......................... 1-11
1.41    Engines Coupled to Occupied Passenger Cars . 1-11
1.42    Trains Detoured ........................................ 1-11
1.43    Stopped in Tunnels ................................... 1-12
1.44    Duties of Train Dispatchers ...................... 1-12
1.45    Duties of Control Operators and Operators ... 1-12
1.46    Duties of Yardmasters ............................... 1-12
1.47    Duties of Crew Members ........................... 1-12
1.48    Time .......................................................... 1-14

**2.0    Railroad Radio and Communication
        Rules.................................................. 2-1**

2.1    Transmitting ............................................... 2-1
2.2    Required Identification ................................ 2-1
2.3    Repetition ................................................... 2-1
2.4    Ending Transmissions ................................. 2-2
2.5    Communication Redundancy ....................... 2-2
2.6    Communication Not Understood or Incomplete . 2-2
2.7    Monitoring Radio Transmissions ................. 2-2
2.8    Acknowledgment ......................................... 2-2
2.9    Misuse of Radio Communications ............... 2-2
2.10    Emergency Calls ......................................... 2-3
2.11    Prohibited Transmissions ........................... 2-3
2.12    Fixed Signal Information ............................. 2-3
2.13    Not Used .................................................... 2-3
2.14    Transmission of Mandatory Directives ......... 2-3
    2.14.1    Verbally Transmitting and Repeating
              Mandatory Directives ................... 2-4
2.15    Phonetic Alphabet ...................................... 2-4
2.16    Assigned Frequencies ................................. 2-4
2.17    Radio Testing ............................................. 2-4
2.18    Malfunctioning Radio .................................. 2-4
2.19    Blasting Operations .................................... 2-4
2.20    Internal Adjustments ................................... 2-4
2.21    Electronic Devices ...................................... 2-5

**3.0    Section Reserved ...................................... 3-1**

Confidential

CP_00288

| 4.0 | Timetables | 4-1 |
| 4.1 | New Timetable | 4-1 |
| | 4.1.1 Notice of New Timetable | 4-1 |
| 4.2 | Special Instructions | 4-1 |
| 4.3 | Timetable Characters | 4-1 |
| 5.0 | Signals and Their Use | 5-1 |
| 5.1 | Signal Equipment | 5-1 |
| 5.2 | Receiving and Giving Signals | 5-1 |
| | 5.2.1 Looking for Signals | 5-1 |
| | 5.2.2 Signals Used by Employees | 5-1 |
| 5.3 | Hand and Radio Signals | 5-2 |
| | 5.3.1 Hand Signals | 5-2 |
| | 5.3.2 Giving Signals | 5-2 |
| | 5.3.3 Signal Disappearance | 5-2 |
| | 5.3.4 Signal to Stop | 5-2 |
| | 5.3.5 Acknowledge Stop Signal | 5-2 |
| | 5.3.6 Radio and Voice Communication | 5-2 |
| | 5.3.7 Radio Response | 5-3 |
| 5.4 | Flags for Temporary Track Conditions | 5-3 |
| | 5.4.1 Temporary Restrictions | 5-3 |
| | 5.4.2 Display of Yellow Flag | 5-3 |
| | 5.4.3 Display of Yellow-Red Flag | 5-4 |
| | 5.4.4 Authorized Protection by Yellow or Yellow-Red Flag | 5-5 |
| | 5.4.5 Display of Green Flag | 5-5 |
| | 5.4.6 Display of Flags Within Current of Traffic | 5-6 |
| | 5.4.7 Display of Red Flag | 5-6 |
| | 5.4.8 Flag Location | 5-6 |
| 5.5 | Permanent Speed Signs | 5-7 |
| 5.6 | Unattended Fusee | 5-7 |
| 5.7 | Not Used | 5-8 |
| 5.8 | Bell and Whistle Signals | 5-8 |
| | 5.8.1 Ringing Engine Bell | 5-8 |
| | 5.8.2 Sounding Whistle | 5-8 |
| | 5.8.3 Whistle Failure | 5-9 |
| | 5.8.4 Whistle Quiet Zone | 5-9 |
| | 5.8.5 Silenced Whistle | 5-10 |
| 5.9 | Headlight Display | 5-10 |
| | 5.9.1 Dimming Headlight | 5-10 |
| | 5.9.2 Headlight Off | 5-11 |
| | 5.9.3 Headlight Failure | 5-11 |
| | 5.9.4 Displaying Headlights Front and Rear | 5-11 |
| | 5.9.5 Displaying Ditch Lights | 5-11 |
| | 5.9.6 Displaying Oscillating White Headlight | 5-12 |
| | 5.9.7 Displaying Oscillating or Flashing Red Light | 5-12 |
| 5.10 | Markers | 5-12 |
| | 5.10.1 Highly Visible Markers | 5-12 |
| | 5.10.2 Alternative Markers | 5-13 |
| 5.11 | Engine Identifying Number | 5-13 |
| 5.12 | Protection of Occupied Outfit Cars | 5-13 |
| 5.13 | Blue Signal Protection of Workmen | 5-16 |
| | 5.13.1 Utility Employees | 5-19 |
| 5.14 | Signs Protecting Equipment | 5-20 |
| 5.15 | Improperly Displayed Signals | 5-20 |
| 6.0 | Movement of Trains and Engines | 6-1 |
| 6.1 | Repeat Instructions | 6-1 |
| 6.2 | Initiating Movement | 6-1 |
| | 6.2.1 Train Location | 6-1 |
| 6.3 | Main Track Authorization | 6-1 |
| | 6.3.1 Train Coordination | 6-2 |
| 6.4 | Reverse Movements | 6-3 |
| | 6.4.1 Permission for Reverse Movements | 6-3 |
| | 6.4.2 Movements Within Control Points or Interlockings | 6-3 |
| 6.5 | Shoving Movements | 6-4 |
| | 6.5.1 Remote Control Movements | 6-4 |
| 6.6 | Back Up Movements | 6-5 |
| 6.7 | Remote Control Zone | 6-5 |
| 6.8 | Stopping Clear for Meeting or Passing | 6-6 |
| 6.9 | Meeting or Passing Precautions | 6-6 |
| 6.10 | Instructions to Clear a Following Train | 6-6 |
| 6.11 | Mandatory Directive | 6-6 |
| 6.12 | FRA Excepted Track | 6-6 |
| 6.13 | Yard Limits | 6-7 |
| 6.14 | Restricted Limits | 6-8 |
| 6.15 | Block Register Territory (BRT) | 6-8 |
| 6.16 | Approaching Railroad Crossings, Drawbridges, and End of Multiple Main Track | 6-8 |
| 6.17 | Switches at Junctions | 6-9 |
| 6.18 | Stopping Clear of Crossings and Junctions | 6-9 |
| 6.19 | Flag Protection | 6-10 |
| 6.20 | Equipment Left on Main Track | 6-11 |
| 6.21 | Precautions Against Unusual Conditions | 6-11 |
| | 6.21.1 Protection Against Defects | 6-11 |
| | 6.21.2 Water Above Rail | 6-12 |
| | 6.21.3 Track Obstruction / Unusual Conditions | 6-12 |
| 6.22 | Maintaining Control of Train or Engine | 6-12 |
| 6.23 | Emergency Stop or Severe Slack Action | 6-12 |
| 6.24 | Movement on Double Track | 6-12 |
| 6.25 | Movement Against the Current of Traffic | 6-13 |
| 6.26 | Use of Multiple Main Tracks | 6-13 |
| 6.27 | Movement at Restricted Speed | 6-13 |
| 6.28 | Movement on Other than Main Track | 6-13 |
| | 6.28.1 Sidings of Assigned Direction | 6-14 |
| | 6.28.2 Stopping Clear in Siding | 6-14 |
| | 6.28.3 Cars or Equipment Left on Siding | 6-14 |
| 6.29 | Inspecting Trains | 6-14 |
| | 6.29.1 Inspecting Passing Trains | 6-14 |
| | 6.29.2 Train Inspections by Crew Members | 6-15 |

Confidential

6.30 Receiving or Discharging Passengers ............ 6-15
6.31 Maximum Authorized Speed ...................... 6-16
  6.31.1 Permanent Speed Restrictions ........... 6-16
6.32 Road Crossings .................................... 6-16
  6.32.1 Providing Warning Over Road Crossings ................ 6-16
  6.32.2 Automatic Warning Devices .............. 6-16
  6.32.3 Providing Warning for Adjacent Tracks 6-17
  6.32.4 Clear of Crossings and Signal Circuits 6-18
  6.32.5 Actuating Automatic Warning Devices Unnecessarily ....... 6-18
  6.32.6 Blocking Public Crossings .............. 6-18

7.0 Switching................................................ 7-1
7.1 Switching Safely and Efficiently ................ 7-1
7.2 Communication Between Crews Switching .... 7-1
7.3 Additional Switching Precautions .............. 7-1
7.4 Precautions for Coupling or Moving Cars or Engines ....... 7-2
7.5 Testing Hand Brakes ............................. 7-2
7.6 Securing Cars or Engines ....................... 7-2
7.7 Kicking or Dropping Cars ........................ 7-2
  7.7.1 Gravity Switch Moves ................... 7-2
7.8 Coupling or Moving Cars on Tracks Where Cars are Being Loaded or Unloaded ....... 7-3
7.9 Switching Passenger or Occupied Outfit Cars ... 7-3
7.10 Movement Through Gates or Doorways ........ 7-3
7.11 Charging Necessary Air Brakes ............... 7-4
7.12 Movements Into Spur Tracks ................... 7-4
7.13 Protection of Employees in Bowl Tracks ....... 7-4

8.0 Switches .................................................. 8-1
8.1 Hand Operation of Switches ..................... 8-1
8.2 Position of Switches .............................. 8-1
8.3 Main Track Switches ............................. 8-1
8.4 Lining Main Track Switch ....................... 8-2
8.5 Not Used ........................................... 8-2
8.6 Restoring Switch to Normal Position ........... 8-2
8.7 Clear of Main Track Switches ................... 8-2
8.8 Switches Equipped with Locks, Hooks or Latches ....... 8-3
8.9 Movement Over Spring Switches ............... 8-3
  8.9.1 Testing Spring Switch .................. 8-3
  8.9.2 Trailing Through and Stopping on a Spring Switch ....... 8-4
  8.9.3 Hand Operating a Spring Switch Before Making a Trailing Movement .... 8-4
  8.9.4 During Snow or Ice Storms ............ 8-5
  8.9.5 Spiking Spring Switch .................. 8-5
  8.9.6 Approaching a Spring Switch in Non-Signaled Territory ....... 8-5
8.10 Switch Point Indicator ........................... 8-5
8.11 Switches in Sidings .............................. 8-5

8.12 Hand-Operated Crossover Switches ............ 8-5
8.13 Scale Track Switches ............................ 8-6
8.14 Conflicting Movements Approaching Switch .... 8-6
8.15 Switches Run Through ........................... 8-6
8.16 Damaged or Defective Switches ................ 8-6
8.17 Avoid Sanding Over Moveable Parts ........... 8-6
8.18 Variable Switches ................................ 8-6
8.19 Automatic Switches .............................. 8-7
  8.19.1 Radio Controlled Switches............ 8-7
8.20 Derail Location and Position ................... 8-8

9.0 Block System Rules ............................... 9-1
9.1 Signal Aspects and Indications ................. 9-1
9.2 Location of Signals .............................. 9-1
9.3 What Signals Govern ............................. 9-1
9.4 Improperly Displayed Signals or Absent Lights .. 9-1
9.5 Where Stop Must Be Made ...................... 9-2
  9.5.1 Changing Established Route ........... 9-2
  9.5.2 Protection if Signal Appliance or Track is Damaged ....... 9-2
  9.5.3 Protection During Repairs.............. 9-2
  9.5.4 Authority to Proceed ................... 9-2
  9.5.5 Reporting Delays ....................... 9-2
  9.5.6 Track Occupancy Indicator ........... 9-3
9.6 Change of Signal Indication .................... 9-3
9.7 Failure to Display Most Restrictive Indication ... 9-3
9.8 Next Governing Signal ........................... 9-3
9.9 Train Delayed Within a Block ................... 9-3
  9.9.1 Approach to Automatic Interlocking .... 9-4
9.10 Initiating Movement Between Signals ........... 9-4
9.11 Movement from Signal Requiring Restricted Speed ....... 9-4
9.12 Stop Indications .................................. 9-5
  9.12.1 CTC Territory .......................... 9-5
  9.12.2 Manual Interlockings .................. 9-5
  9.12.3 Automatic Interlockings............... 9-6
  9.12.4 ABS Territory.......................... 9-6
9.13 When Instructed to Operate Dual Control Switches by Hand ....... 9-6
  9.13.1 Hand Operation of Dual Control Switches ....... 9-7
9.14 Movement with the Current of Traffic ........... 9-7
  9.14.1 Reporting Clear of a Track Having a Current of Traffic ....... 9-7
9.15 Track Permits ..................................... 9-7
  9.15.1 Issuing Track Permits ................. 9-8
  9.15.2 Clearing Track Permits ............... 9-8
9.16 Stop and Proceed Indication.................... 9-9
9.17 Entering Signaled Track at Hand-Operated or Spring Switch ....... 9-10
  9.17.1 Signal Protection in ABS by Lining Switch ....... 9-11
9.18 Electrically Locked Switches and Derails........ 9-12

**GCOR—Seventh Edition—April 1, 2015**  i-9

| | | |
|---|---|---|
| 9.19 | Leaving Equipment in Signal Systems | 9-12 |
| 9.20 | Clear Track Circuits | 9-13 |
| 9.21 | Overlap Circuits | 9-13 |
| 9.22 | Standing on Sanded Rail | 9-13 |
| 9.23 | Suspension of Block System | 9-13 |
| | 9.23.1 Guidelines While Block System is Suspended | 9-13 |
| 9.24 | Call Lights | 9-14 |

**10.0 Rules Applicable Only in Centralized Traffic Control (CTC) ... 10-1**

| | | |
|---|---|---|
| 10.1 | Authority to Enter CTC Limits | 10-1 |
| 10.2 | Clearing Through Hand-Operated Switches | 10-1 |
| 10.3 | Track and Time | 10-3 |
| | 10.3.1 Protection of Limits | 10-4 |
| | 10.3.2 Protection of Machines, Track Cars, or Employees | 10-4 |
| | 10.3.3 Joint Track and Time | 10-4 |
| | 10.3.4 Track and Time Acknowledgment | 10-4 |

**11.0 Rules Applicable in ACS, ATC and ATS Territories ... 11-1**

| | | |
|---|---|---|
| 11.1 | Establishing Absolute Block | 11-1 |
| 11.2 | Signal Indications with Absolute Block | 11-1 |
| 11.3 | Broken or Missing Seals | 11-2 |

**12.0 Rules Applicable Only in Automatic Train Stop System (ATS) Territory ... 12-1**

| | | |
|---|---|---|
| 12.1 | Required Equipment | 12-1 |
| | 12.1.1 ATS Seals and Keys | 12-1 |
| 12.2 | ATS Device Cut Out, Not Equipped, or Not Working | 12-1 |
| 12.3 | Unusual Conditions | 12-1 |
| | 12.3.1 ATS Penalty Brake Application | 12-1 |
| | 12.3.2 ATS Inoperative | 12-1 |
| | 12.3.3 Damaged Inductor | 12-1 |
| 12.4 | ATS Testing | 12-2 |
| | 12.4.1 Test Inductor Locations | 12-2 |
| | 12.4.2 No Test Inductors | 12-2 |

**13.0 Rules Applicable Only in Automatic Cab Signal System (ACS) Territory ... 13-1**

| | | |
|---|---|---|
| 13.1 | General Information | 13-1 |
| | 13.1.1 Observance of Signals | 13-1 |
| | 13.1.2 Conforming with Block Signals | 13-1 |
| | 13.1.3 Does Not Indicate Conditions Ahead | 13-1 |
| | 13.1.4 Cab Signals Cut In and Out | 13-1 |
| 13.2 | Normal Operation | 13-2 |
| | 13.2.1 Restrictive to More Favorable | 13-2 |
| | 13.2.2 Favorable to More Restrictive | 13-2 |
| | 13.2.3 Elimination of Audible Indicator | 13-3 |
| 13.3 | Unusual Conditions | 13-3 |
| | 13.3.1 Cab Signal and Block Signal Do Not Agree | 13-3 |
| | 13.3.2 Inoperative Cab Signal Device | 13-3 |
| | 13.3.3 Movement with an Inoperative Cab Signal Device | 13-4 |

**14.0 Rules Applicable Only Within Track Warrant Control (TWC) Limits ... 14-1**

| | | |
|---|---|---|
| 14.1 | Authority to Enter TWC Limits | 14-1 |
| 14.2 | Designated Limits | 14-2 |
| 14.3 | Operating with Track Warrants | 14-2 |
| | 14.3.1 Leaving the Main Track | 14-3 |
| 14.4 | Occupying Same Track Warrant Limits | 14-3 |
| | 14.4.1 Radio Blocking | 14-3 |
| 14.5 | Protecting Men or Equipment | 14-4 |
| 14.6 | Movement Against the Current of Traffic | 14-4 |
| 14.7 | Reporting Clear of Limits | 14-5 |
| 14.8 | Track Warrant Requests | 14-5 |
| 14.9 | Copying Track Warrants | 14-5 |
| | 14.9.1 Duplicating Track Warrants | 14-5 |
| 14.10 | Track Warrant in Effect | 14-6 |
| 14.11 | Changing Track Warrants | 14-8 |
| 14.12 | Not Used | 14-8 |
| 14.13 | Mechanical Transmission of Track Warrants | 14-8 |

**15.0 Track Bulletin Rules ... 15-1**

| | | |
|---|---|---|
| 15.1 | Track Bulletins | 15-2 |
| | 15.1.1 Changing Address of Track Warrants or Track Bulletins | 15-2 |
| 15.2 | Protection by Track Bulletin Form B | 15-2 |
| | 15.2.1 Protection for On-Track Equipment | 15-3 |
| 15.3 | Authorizing Movement Against the Current of Traffic | 15-3 |
| 15.4 | Protection When Tracks Removed from Service | 15-4 |
| 15.5 | Protection When Tracks Blocked with Equipment | 15-5 |
| 15.6 | Change of a General Order, Special Instruction, or Rule | 15-5 |
| 15.7 | Copying Track Bulletins | 15-5 |
| 15.8 | Duplicating Track Bulletins | 15-5 |
| 15.9 | Mechanical Transmission of Track Bulletins | 15-5 |
| 15.10 | Retaining Track Bulletins | 15-5 |
| 15.11 | Not Used | 15-5 |
| 15.12 | Relief of Engineer or Conductor During Trip | 15-6 |
| 15.13 | Voiding Track Bulletins | 15-6 |
| 15.14 | Delivering Track Bulletins | 15-6 |

**16.0 Rules Applicable Only in Direct Traffic Control (DTC) Limits ... 16-1**

| | | |
|---|---|---|
| 16.1 | Authority to Enter DTC Limits | 16-1 |
| | 16.1.1 Switches Between DTC Blocks | 16-1 |
| 16.2 | DTC Authority | 16-1 |
| 16.3 | Movement in a Specified Direction | 16-2 |
| | 16.3.1 Leaving the Main Track | 16-3 |
| 16.4 | Work and Time | 16-3 |

Confidential

CP_00291

**i-10    GCOR—Seventh Edition—April 1, 2015**

| 16.5 | Changing DTC Authority | 16-4 |
| 16.6 | Releasing DTC Authority | 16-4 |
| 16.7 | Communication Failure | 16-5 |
| **17.0** | **Rules Applicable Only in Automatic Train Control (ATC) Territory** | **17-1** |
| 17.1 | Automatic Train Control Territory | 17-1 |
| 17.2 | Taking Charge | 17-1 |
| 17.3 | Cut In and Cut Out Requirements | 17-1 |
| 17.4 | Departure Test Requirements | 17-2 |
| | 17.4.1 Departure Test Reporting | 17-2 |
| 17.5 | High Speed Setting | 17-3 |
| | 17.5.1 Over 40 MPH | 17-3 |
| | 17.5.2 Under 40 MPH | 17-3 |
| | 17.5.3 Restricting Cab Signal | 17-3 |
| 17.6 | Conforming with Block Signals | 17-3 |
| | 17.6.1 Approaching Diverging Route | 17-4 |
| 17.7 | ATC Failure/Cut Out Enroute | 17-4 |
| | 17.7.1 Speed Indicator in ATC | 17-5 |
| | 17.7.2 ATC Motion Light | 17-5 |
| | 17.7.3 Audible Indicator | 17-5 |
| 17.8 | Improper Display | 17-5 |
| **18.0** | **Section Reserved** | **17-6** |
| **19.0** | **Section Reserved** | **17-6** |
| **Glossary** | | **GL-1** |
| **Abbreviations** | | **GL-1** |
| **Index** | | **IN-1** |

Confidential

### 5.3.7   Radio Response

When radio communication is used to make movements, crew members must respond to specific instructions given for each movement. Radio communications for shoving movements must specify the direction and distance and must be acknowledged when distance specified is more than four cars.

> Movement must stop within half the distance specified unless additional instructions are received.

## 5.4   Flags for Temporary Track Conditions

### 5.4.1   Temporary Restrictions

Track bulletins, track warrants, or general orders may restrict or stop train movements because of track conditions, structures or men or equipment. Yellow flags are used to indicate temporary speed restrictions. Yellow-red flags are used to indicate when a train may be required to stop. When flags are not displayed, that information will be included in the track bulletin, track warrant, or general order.

When a restriction spans adjoining subdivisions, separate temporary restrictions may be issued on each subdivision. Only one set of flags may be displayed in advance of the entire restriction in each direction.

### 5.4.2   Display of Yellow Flag

#### A.   Restriction Is In Effect

**Two Miles Ahead of Restricted Area.** Yellow flags warn trains to restrict movement because of track conditions or structures. To make sure train movement is restricted at the right location, employees must display a yellow flag 2 miles before the restricted area.



[Diagram A.]

**Less than Two Miles Ahead of Restricted Area.** When the restricted area is close to a terminal, junction, or another area, employees will display the yellow flag less than 2 miles before the restricted area. This information will also be included in the track bulletin, track warrant, or general order.



[Diagram B.]

**Once the Train Reaches the Restricted Area.** The speed specified by track warrant, track bulletin, general order, or radio speed restriction must not be exceeded until the rear of the train clears the restricted area.

Confidential

## 6.5    Shoving Movements

Equipment must not be shoved until the engineer and the employee protecting the movement have completed a job briefing concerning how protection will be provided. Employee must be in position, provide visual protection of the equipment being shoved and must not engage in unrelated tasks while providing protection.

Equipment must not be shoved until it is visually determined that:

- Portion of track to be used is clear of equipment or conflicting movements.

- The track will remain clear to the location where movement will be stopped.

- Switches and derails are properly lined.

Employees may be relieved from providing visual protection when:

- Local instructions specify tracks involved and how shoving movement will be protected, such as shove light or monitored cameras.

- A track has been pulled and an equivalent amount or less of cars or equipment will be immediately shoved back into that track and that track has remained clear to the location where the movement will be stopped.

- Immediately before shoving, a movement is made on the adjacent track providing the employee the ability to visually determine the track to be shoved is clear and route is properly lined.

- Authority on main track or controlled siding allows for movement in direction of shove, provided route is properly lined, road crossings will not be fouled and movement at restricted speed is not required.

    or

- Making back up movements in accordance with Rule 6.6 (Back Up Movements).

Shoving movements over road crossings must be made in accordance with Rule 6.32.1 (Providing Warning Over Road Crossings).

### Speeds when Shoving

When cars are shoved on a main track or controlled siding in the direction authorized, movement must not exceed:

- 20 MPH for freight trains.

- 30 MPH for passenger trains.

- Maximum timetable speed for snow service unless the employee in charge authorizes a higher speed.

### 6.5.1    Remote Control Movements

Remote control movements are considered shoving movements, except when the remote control operator controlling the movement is riding the leading engine in the direction of movement. Before initiating movement, the remote control operator or a crew member must be in position to visually observe the direction the equipment moves.

When Remote Control Zone is equipped with pull back / stop protection (PSP), the operator must verify that PSP is operational. Pull back and stop protection must again be verified if PSP is overridden.

### Relief of Providing Protection

The remote control operator is relieved from providing protection and the requirement to stop within half the range of vision for movements with engine on leading end when:

1. The remote control zone has been activated.

2. Switches/derails are known to be properly lined.

3. Track(s) within the zone are known to be clear of other trains, engines, railroad cars, and men or equipment fouling track.

Note: These steps must be repeated each time the remote control zone is activated.

Confidential

Privileged & Confidential

This notice applies to all unionized employees of Canadian Pacific Railway Corporation in Canada and its subsidiaries in the United States, namely, Soo Line Railroad Company, Dakota, Minnesota & Eastern Railroad Corporation and Delaware & Hudson Railway Company, Inc.

In an effort to improve accountability, safety/education, and performance while fostering a more positive working relationship with employees, we believe accountability should focus on **Major/Life Threatening Offences, Non-Major offences and Attendance**. In this regard, **on a trial basis over the next 12 months, in certain circumstances, we will also include the use of demerits in addition to** educational letters, suspensions and where warranted dismissal, if necessary, to address employee accountability. The intent of our discipline process is to progressively influence and correct behaviors that do not comply with required standards.

With this in mind, **effective November 1, 2018,** the attached *Hybrid Discipline & Accountability Guidelines* amend the current Discipline & Accountability process, which has been in effect since March 8, 2017.

### Company – Union Review Process

The Company proposes that the appropriate Senior Vice President and respective Union Leader(s) conduct quarterly discipline reviews to determine if the Hybric Discipline & Accountability Guidelines are achieving a meaningful reduction of disciplinary events while improving rule/safety compliance and employee availability. If it is determined the desired expectations are not being achieved, the Company may make adjustments during this trial period to enhance its effectiveness.

 > The Company reserves the right to make amendments to the above three (3) categories and if this occurs we will provide the Union(s) and employees thirty (30) days' advance notice of any changes.

### Significant Changes to Note:

1. **Demerits** will be used for non-major offences and attendance related matters. Upon accumulating sixty (60) demerits, employees will be subject to dismissal.
2. Employees **subject to five (5) disciplinary events**, within any of the three (3) categories, during a 12-month period may be subject to dismissal.
3. Employees who are **discipline free in all three (3) categories** for a rolling 12-month period and who have rendered active service during each of the 12-months within that period, and have demerits on their record, will have a maximum of twenty (20) demerits removed from their discipline record.

It is our hope that these changes to which we hold each other accountable will continue to enhance safety through rule compliance and will further benefit each of us in the performance of our jobs.

Sincerely,

Robert Johnson
Executive Vice-President Operations, CP

0 | Page



EXHIBIT
3

CP_00439

Confidential



# HYBRID DISCIPLINE

# &

# ACCOUNTABILTY GUIDELINES

This notice applies to all unionized employees of Canadian Pacific Railway Corporation in Canada and its subsidiaries in the United States, namely, Soo Line Railroad Company, Dakota, Minnesota & Eastern Railroad Corporation and Delaware & Hudson Railway Company, Inc.

**EFFECTIVE – NOVEMBER 1, 2018**

Canadian Pacific Railway

1 | P a g e

Confidential

CP_00440

### Overview of Hybrid Discipline & Accountability Guidelines

#### General

1. **Employee Recognition**

   a. Employees who are **discipline free in all three (3) categories** for a rolling 12-month period and who have rendered active service during each of the 12-months within that period, and have demerits on their record, will have a maximum of twenty (20) demerits removed from their discipline record. (Example: An employee record stands at 25 demerit points – the record would be adjusted to reflect 5 points)

   b. Employees who are **discipline free** for a 24-month period and who have rendered active service during each of the 24-months within that period, will have the most recent suspension no longer be considered in the assessment of future discipline.

2. **Employee Notification**

   Employees will receive a written warning that their continued employment may be in jeopardy when they accumulate either 30 demerits or 30 suspension days of active discipline.

3. **Exceptional Circumstances:** Employees **subject to five (5) disciplinary events**, within any of the three (3) categories, during a 12-month period, may be subject to dismissal.

4. **Admission of Responsibility:** Where offered by the Company, employees may elect the option of an Admission of Responsibility **as defined by their respective Collective Agreement**.

5. **Demerits:** Demerits only apply to Non-Major Offences and/or Attendance related matters. Employees who accumulate 60 demerits will be subject to dismissal.

6. **Deferred Suspension:** May apply to all three (3) categories, however, in exceptional circumstances; the Company may elect to defer a portion or all of the suspension.

   a. A Deferred Suspension may later be activated if it is determined the employee is culpable for a subsequent offence.

   b. Employees should be aware that a deferred suspension carries the same gravity as a served suspension in the consideration of subsequent disciplinary assessment. The typical default period for a deferred suspension is six (6) months from the date of assessment.

2 | Page

Confidential

CP_00441

**Other factors to look at when considering discipline:**

- Immediately reporting the incident
- Taking proper protective actions following the incident
- Acknowledging responsibility

7. **Areas that require contact with Labour Relations:**

- Probationary Employees
- Personal Injury Handling
- If you require assistance in determining an appropriate assessment of discipline
- Last Chance Terms/Employment offers
- Events Governed by Federal Regulations

## Non-Major Offences and Attendance

**Employee Availability/Attendance** and other operating rule violations **not identified** as Major/ Life Threatening will be treated as a **Non-Major offence** and the disciplinary levels outlined on the table found on page 6, will apply.

1. **Informal Handling Option**

   The Company believes that the majority of employees take great pride in their work and when involved in an incident, understand and accept when they have made a mistake. As a result, we believe it is important to provide employees the option to waive the formal investigation option. We also believe employees want to learn from their experience and move forward as quickly as possible.

2. **Demerits:** Demerits only apply to Non-Major Offences and/or Attendance related matters. Employees who accumulate 60 demerits will be subject to dismissal.

3. **Formal Reprimand**

   A Formal Reprimand is a written disciplinary letter that may be issued following an investigation and will confirm clear expectations of the employee. A Formal Reprimand may be used for those employees that do not have a recent discipline history or, may be used for employees who accept responsibility and demonstrate a willingness to comply with our operating rules before proceeding to the next Discipline Steps. A Formal Reprimand will be provided to employees and placed to their file.

3 | Page

Confidential

CP_00442

## Major - Life Threatening & Conduct Unbecoming Offences

The following examples are for illustrative purposes and non-compliance may warrant immediate removal from service pending a formal investigation and may warrant suspension or in certain cases, dismissal.

### Major - Life Threatening Violations

| 1. | FRA decertifying events | 9. | Occupying track without authority |
|---|---|---|---|
| 2. | Speeding 10 MPH or greater above authorized speed limit for on track equipment | 10. | Failure to inspect passing train |
| 3. | Stop signal violations | 11. | Failure to secure cars or locomotives |
| 4. | Safety violations in and around equipment<br>• Three (3) Point Protection<br>• 50 feet separation between equipment<br>• 15 feet when passing around the end of standing equipment | 12. | Rule violations where a serious collision or derailment, serious injury, fatality or extensive damage to Company or public property occurred or was reasonably foreseeable, including failure to take proper protective measures following an incident |
| 5. | Leaving cars in the foul | 13. | Blue Flag violations |
| 6. | Shoving – Failure to provide point protection consistent with rule | 14. | Reckless endangerment |
| 7. | Riding end of car being shoved not properly equipped, or on the coupler or drawbar | 15. | Tampering with any Safety Device, including Cameras |
| 8. | Any other Critical Life Saving Rules/events - as bulletined to each respective employee group. | | |

### Conduct Unbecoming Offences:

| 1. | Theft, fraud or the unauthorized taking of time or property | 5. | Insubordination |
|---|---|---|---|
| 2. | Sleeping on duty | 6. | Intentional destruction of Company property |
| 3. | Dishonesty, attempting to "cover up" an incident, making material false statements or concealing material facts concerning matters under investigation | 7 | A violation of the following CP Policies:<br><br>Code of Business Ethics, Violence in the Workplace Policy, Use of Personal Electronic Devices, |
| 4. | A violation of Discrimination and Harassment Policies, or other incidents of harassment, discrimination or retaliation | 8 | Alcohol & Drug Policies and Procedures (subject to policy changes)<br><br>I.  Policy 4101 – Alcohol and Drug Assistance through Company Officer & Co-Worker Reporting.<br>II.  Non-Policy 4104 instances. |

4 | P a g e

Confidential

CP_00443

## Cont. - Major - Life Threatening & Conduct Unbecoming Offences

Depending on the offence the issuance of a minimum of a **20-calendar day suspension up to and including a 45-day calendar suspension and/or dismissal**. All situations and the disciplinary consequence will be judged based on the circumstances that may be assessed in conjunction with any suspension are:

- Deferred Suspensions (partial or full)
- Demotions
- Job Restrictions

- Requalification
- Training
- Last Chance Agreement Terms – as an alternative to discharge if conditions warrant

The following illustration demonstrates examples of progressive handling

| Major - Life Threatening & Conduct Unbecoming Offences: | 1st Major Rule Infraction | Discipline | 2nd Major Rule Infraction | Discipline | 3rd Major Rule Infraction | Discipline |
|---|---|---|---|---|---|---|
| | | Minimum 20 day suspension, Up to and including a 45-day calendar suspension and/or dismissal | 6 months later | Up to and including a 45-day calendar suspension and/or dismissal | 8 months later | Up to and including a 45-day calendar suspension and/or dismissal |
| Locomotive Engineer / Conductor | Speeding Above 10 mph | 20 day suspension | Failure to inspect passing train | 40 day suspension | Sleeping on Duty | Dismissal |
| Car Department | Blue Flag | 20 day suspension | Failure to secure cars | 30 day suspension *#1* | Fail to provide point protection | Dismissal |
| Locomotive Mechanical | Failure to secure Locomotive | 20 day suspension | Failed to provide 50 feet of separation between equipment | 45 day suspension | Failure to secure locomotive | 60 day suspension and last chance agreement and retraining *#2* |
| Engineering Department | Leaving a main track switch open | 20 day suspension | Occupying track without authority | 40 day suspension | Insubordination | Dismissal |
| Clerical | Improper customer conduct | 20 day suspension | Use of Personal Electronic Devices | 45 day suspension | Breach of Client Confidentiality | Dismissal |
| RTC | Incorrect TOP cancellation & Foreman unprotected | 20 day suspension | Concealing material facts concerning matters under investigation | 30 day suspension | Dishonesty involving incident & rule cover up | Dismissal |

**\*\*1\*** Leniency consideration – Immediately reported incident and acknowledged responsibility
**\*\*2\*** Leniency consideration – Immediately reported the incident and took proper protective actions

Confidential

CP_00444

<u>Non-Major Offences and Attendance (examples)</u>

| | | | |
|---|---|---|---|
| 1 | Rule violations that result in FRA reportable train accidents not consicered Major Offences | 9. | Violations of radio rules, including: CROR Rule 136(c) – read and repeat violation |
| 2. | Failure to properly coordinate between crews working in same or adjacent tracks | 10. | Speeding less than 10 MPH above authorized speed limit for on track equipment |
| 3. | Failure to properly line switches for intended movement and or operating through an improperly lined switch | 11. | Failure to have or an inadequate job briefing |
| 4. | Attendance Management Violations | 12. | In some situations, late reporting of an injury (contact Labour Relations) |
| 5. | Failure to restore a derail and travelling over derail | 13. | Failure to comply with qualification or certification requirements |
| 6. | Violations causing significant operational impact | 14. | Releasing or tying handbrakes from ground |
| 7. | Handbrakes not released | 15. | Failure to adhere to communicated customer service and performance metrics |
| 8. | Improperly mounting and dismounting moving equipment | | |

NOTE: **For illustrative purposes,** *an employee currently at Step 2 of the existing Employee Discipline & Accountability Process who is involved in another Non Major event, depending on all of the circumstances involved, would normally be handled at Step 3 above.*

### When progressively handling Non-Major Offences and Attendance issues the following steps will be used:

| First Offence | Second Offence | Third Offence | Fourth Offence | Fifth Offence |
|---|---|---|---|---|
| **Employee option:** | **Employee option:** | **Employee option:** | 30 Demerits. | **Demerits and/or suspensions,** |
| **Informal** - Accept responsibility and waive a formal investigation **Formal Reprimand** | Accept responsibility and waive a formal investigation **10 demerits** | Accept responsibility and waive a formal investigation **15 demerits,** | Or; | **Or:** |
| Or; | Or; | Or; | At Company discretion a 30 day Suspension in lieu of Dismissal for accumulation of demerits | **Any combination thereof up to and including Dismissal** |
| **Formal** - Elect a formal investigation and if found culpable may be assessed | **Formal** - elect a formal investigation and if found culpable may be assessed | **Formal** - elect a formal investigation and if found culpable may be assessed | | |
| **10 Demerits** | **15 Demerits** | **20 Demerits** | | |

Confidential

CP_00445

> The following Questions and Answers are for illustrative purposes only. In all circumstances where there is a discrepancy, The Hybrid Discipline and Accountability Guidelines document applies.

## Questions and Answers

### General Questions

**Question 1**     How will any previous discipline I have be handled after this Guideline is in effect?

Answer:     Any previous discipline will be treated as if these Guidelines were in effect at that time when any future discipline is given.

**Question 2**     What if an incident is not listed in this document?

Answer:     The offences listed in this document are examples only and not all-inclusive.

**Question 3**     Are suspensions in calendar days or working days?

Answer:     Suspensions are issued in calendar days for employees who do not have a scheduled work week. For employees with a scheduled work week, actual working days will be used.

**Question 4**     General Item #1a refers to employees who are discipline free for a rolling 12-month period will have 20 demerits removed from their record. However, Item #2b refers to suspensions and states the most recent suspension will no longer be considered in the assessment of future discipline. Are demerits completely removed from my record after 12-months?

Answer:     No, similar to suspensions, demerits remain on your record but are no longer considered active for the purposes of assessing future discipline.

**Question 5**     Why is the Company changing the discipline system?

Answer:     The Company routinely reviews all policies and procedures to ensure they reflect the current needs. We believe the Hybrid Discipline Guidelines contained herein will provide a progressive balance when considering discipline for those events that fall under major, non-major and attendance categories.

**Question 6**     If I have four (4) non-major incidents (like absenteeism) and one (1) major incident within twelve (12) months, will I still be subject to dismissal.

Answer:     Yes, five (5) incidents of any kind may result in your dismissal.

7 | Page

Confidential

CP_00446

**Question 7**    What if I have two (2) non-major incidents and three (3) major incidents within twelve (12) months? Am I still subject to dismissal?

Answer:    Yes.

**Question 8**    When the new policy goes into effect, will an employee's current discipline history be expunged?

Answer:    The implementation of this Guideline will not change the existing Discipline Step of an employee. Any previous discipline will be treated as if these Guidelines were in effect at that time when any future discipline is assessed.

**Question 9**    The new Guidelines do not reference letters of caution. If a letter of caution were given to an employee, would this letter be considered discipline?

Answer:    A letter of caution is not considered discipline.

**Question 10**    Who is responsible to initiate the Company-Union Review Process outlined in the Guidelines?

Answer:    It is incumbent upon each Union Leader or Senior Vice President, or their designate, may request a meeting to review the process outlined in the Guidelines.

**Non-Major Questions**

**Question 1**    What is the difference between informal handling and formal handling in the first three steps of the Non Major or Attendance category?

Answer:    Informal handling occurs when the employee has accepted responsibility. Formal handling and a formal investigation will occur when the employee elects not to accept responsibility.

**Question 2**    In the application of the First, Second and Third Offences under the Non Major Category offences on Page 6, there is reference to allowing employees to accept responsibility and waive a formal investigation. Why would the Company entertain this?

Answer:    The Company believes that the majority of employees take great pride in their work and when involved in an incident, understand and accept when they have made a mistake. We also believe these employees want to learn from this experience and move forward as quickly as possible.

8 | Page

Confidential

CP_00447

**Question 3**  When progressively handling Non-Major Offences and Attendance issues the terms "Informal" and "Accept responsibility" are referenced as follows:

*"Informal - Waive formal investigation and accept responsibility and a **Formal Reprimand**"*

Is the above referring to either the Informal Handling or Admission of Responsibility provisions that are contained in my collective agreement?

**Answer:**  Yes.

**Question 4**  My Collective Agreement does not provide for an Admission of Responsibility. May I choose to sign one anyways?

We recognize that in some cases, the Collective Agreement may not have an admission of responsibility provision; however, this does not restrict you from involving your union and/or electing a decision that best meets your needs.

**Question 5**  If an employee elects the Informal option and accepts responsibility for a Non-Major Offense, is Union involvement required?

**Answer:**  A Letter of Written Reprimand is recognized as a minor form of discipline and where the Collective Agreement requires union involvement, the answer is yes.

**Question 6**  I received a formal reprimand in September of last year. If I work 12 months discipline free, will the formal reprimand be considered in the future assessment of discipline?

**Answer**  No. Similar to suspensions and demerits, the formal reprimand will remain on your record but will no longer be considered active for the purposes of assessing future discipline.

**Question 7**  I accidently ran through a switch and immediately notified my supervisor. I have accepted full responsibility for the incident, what will I get for discipline? As information, I currently have a Formal Reprimand on file for missing a call.

**Answer:**  This kind of incident would be considered a Non-Major event; however since this is your second event you will be at step 2 of the process. If you waive your rights to a formal investigation, you will receive 10 demerits for this incident.

9 | Page

Confidential

CP_00448

**Question 8**   Can you provide an example where "Failure to adhere to communicated customer service and performance metrics" would apply?

Answer:   When customer service or minimum performance metrics are communicated and reviewed with employees and these metrics are not maintained due to employee performance this would be considered a Non-Major event under Item #15 on Page 6.

**Question 9**   Some of the Collective Agreements have varying ranges of demerits that can be assessed through the Admission of Responsibility (AOR) provisions. For example, under the non-major offences category (see page 6), an employee may elect an Admission of Responsibility for 15 demerits for the second infraction, however, my Collective Agreement AOR provisions limit demerit marks to a maximum of 10 demerits.

Due to my collective agreement provisions, will I be restricted from accepting responsibility and waiving a formal investigation?

Answer:   Accepting responsibility and waiving a formal investigation is a voluntary process. In this example, if the employee elects Informal handling, it will be incumbent upon both the Union and the employee to acknowledge on the Admission of Responsibility form that the assessment of 15 demerits marks will be accepted and not grieved.

**Major Category Questions**

**Question 1**   The Major – Life Threatening and Conduct Unbecoming Offences do not state that an employee could waive their rights to an investigation and accept a disciplinary suspension, why is this?

Answer:   While there may be circumstances where employees may wish to waive their rights and the Company may accept, the majority of events under this category require a formal investigation to understand and determine the circumstances that led up to the incident.

**Question 2**   Do I have to be involved in three (3) major incidents in a 12-month period before I would be dismissed?

Answer:   The specifics of the incident are considered. Depending on the significance of the incident, it may take fewer Major Offences that result in dismissal. The chart on Page 5 provides an illustrated overview to further address your question.

10 | Page

Confidential

CP_00449

**Question 3**    I am an employee with a major offence on my record that resulted in a 20-day suspension. I am now absent from work without authority, what are the possible disciplinary consequences that I may face?

Answer:    If this absenteeism event is your first *offence* under the Non-Major category, discipline is based on your decision to accept responsibility and waive the formal investigation; or elect the formal investigation process outlined on page 6. If you elect informal handling, the maximum discipline you will receive is a formal reprimand versus receipt of 10 demerits under the formal handling process.

**Question 4**    I am a Rail Traffic Controller and I have been charged with insubordination, which is a major offence. Since this is my first Major offence, does this mean I will only receive a twenty (20) day suspension?

Answer:    The circumstances of the incident will be considered. If it is confirmed you were insubordinate, which is a Conduct Unbecoming Offence, you could be dismissed.

**Question 5**    What is an example of Reckless Endangerment?

Answer:    In addition to a violation of the Alcohol and Drug Policies and other Major Rules, driving a company vehicle or operating Company owned equipment under the influence of alcohol or drugs will be considered Reckless Endangerment.

**Question 6**    I am a Clerical employee and I have been assessed a twenty (20) day suspension. I see that for the other crafts, major offences have a component of safety concerns. Do the offences listed in the Major and Conduct Unbecoming Offence category apply to me?

Answer:    Yes.

**Question 7**    I am a Conductor who has received a 20-day suspension.  I have been advised that 10 of the days are to be served and that 10 of the days will be deferred. My Union said this is a violation of my agreement and is not permissible. Is this correct?

**Answer:**    A review the 39 Collective Agreements CP has with its Unions confirms there is no specific collective agreement restriction in any agreement that prevents the Company from deferring a suspension.

**Question 8**    I work in the Engineering Department and have received a 20-day suspension. I work a 7 day on, 7 day off work cycle. Will actual calendar days be used when serving suspension purposes?

**Answer:**    Yes.

11 | P a g e

Confidential

CP_00450

**CANADIAN PACIFIC** — **TRAIN DELAY REPORT**

Item # 6000

| TRAIN ID | UNITS IN CONSIST | | | CABOOSE/EOT MARKER | DATE |
|---|---|---|---|---|---|
| 474-31 | CP 8526 / CP 5047 / UP 5586 | | | 958023 | 1 Feb |

| FROM STATION | TO STATION | HIGH/LAST GENERAL ORDERS IN EFFECT | TIME WATCH COMPARED |
|---|---|---|---|
| Marquette | Nahant | A16    F14 | 0134 |

| TIME TRAIN MADE UP | TIME ENGINES ON TRAIN | PORTABLE RADIOS IN USE | AIR DEVICE NUMBER |
|---|---|---|---|

| TERMINAL INITIAL AIR TEST MADE | TIME INITIAL AIR TEST MADE FROM / TO | INITIAL TERMINAL DELAY HOURS / MIN. | FINAL TERMINAL DELAY HOURS / MIN. |
|---|---|---|---|

| NAMES OF CREW MEMBERS OF TRAIN | OCCUPATION | TIME WENT ON DUTY DATE | TIME | TIME WENT OFF DUTY DATE | TIME | TOTAL TIME ON DUTY HOURS | MIN. | OFF DUTY TIME PRIOR HOURS | MIN. |
|---|---|---|---|---|---|---|---|---|---|
| J Sexton | ENGINEER | 2-1 Feb | 0130 | | | | | | |
| J Debour | CONDUCTOR | ✓ | ✓ | | 1335 | | | | |
| | OTHER | | | | | | | | |
| | OTHER | | | | | | | | |

| WHERE DELAYED | ARR. | DEP. | On @ 0110 | CAUSE OF DELAY | LOADS | EMPTIES | TONS | LENGTH |
|---|---|---|---|---|---|---|---|---|
| Marquette | 0130 | | TOFO's, Paperwork, Idle Nork wyc, P14 1 engine + S/O to | 117 | 27 | 5590 | 7349 |
| | | | MQ Siding. Needed to cut crossing + Siding. | | | | |
| | | | Locomotive brake test. Dig out hoses on engine to access | | | | |
| | | | them, tie back on + pump air air, Standing cut 74 | | | | |
| | | | deep, pull up /shove 24 for setout in MQ Sdg, | | | | |
| | | | Shove back, tie on to rest of train, pump air, PTC | | | | |
| | | 0540 | Warrant, Departure test, Engine check, | | | | |
| Dubuque | 0700 | 0730 | Stop re hinswitch. NSI Dutman reported normal | | | | |
| Dubuque Jct | 0735 | 0742 | Wait for CN to ansie 0740 signal indication | | | | |
| Deer Crove | 0950 | 0945 | Waiting for Warrant. Talk to UP. All red @ S35 Bar Creek | | | | |
| MP 182 | 1045 | | Holding back to not block crossings. Waiting for new | | | | |
| | | 1114 | Warrant | | | | |
| Nahant | 1145 | | Mail line d, Wait for B60 to Clear, crossover to Indy | | | | |
| | | | Switch out S/O 27, S/O Engine, tie back to S/O | | | | |
| | | 1330 | Tie broker due to hlw. Ride to depot. | | | | |
| Depot | 1335 | 1355 | Talk to GM about Efficiency failure (GM #28) | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

S94 Axle
144 Cars

TOTAL HANDLED

**ENGINEER MUST SIGN THIS REPORT WHEN HOURS OF SERVICE HAVE BEEN EXCEEDED**

Conductor Signature: _____

Engineer Signature: _____

Original filed at terminal. - Fax copy to Minneapolis Operation Center, Fax # 612-904-5840
Fax copy to Timekeeping, Fax # 612-904-5844

EXHIBIT
5

SEXTON    000163

IN RE THE MATTER OF:                    )

Investigation/Hearing of John           )

Sexton; Justin DePover                  )


               February 10, 2021

                  12:00 PM


               PROCEEDINGS HAD at Canadian Pacific 3420 Miller

Avenue, Davenport, Iowa.



EXHIBIT

10

CP_000018

John Sexton; Justin DePover
February 10, 2021

2

PRESENT FOR THE COMPANY:

        MR. MARK JOHNSON, Conducting Officer

PRESENT FOR THE CHARGED EMPLOYEE:

        MR. JOE RAINWATER, Local Chairman, BLET

        Division 117

AccuTran Global Enterprises, Inc.
855-552-0505

**CP_000019**

John Sexton; Justin DePover
February 10, 2021

3

I N D E X

WITNESS:   THOMAS JARED

      Examination by Mr. Johnson          18, 43, 45

      Examination by Mr. Rainwater          38, 44


PRINCIPAL:   JUSTIN DEPOVER

      Examination by Mr. Johnson          48, 57, 83

      Examination by Mr. Rainwater    52, 61, 82, 87


PRINCIPAL:   JOHN SEXTON

      Examination by Mr. Johnson          62, 80

      Examination by Mr. Rainwater          64, 88


EXHIBITS:

      Exhibit 1          9

      Exhibit 2          12

      Exhibit 3          21

      Exhibit 4          27

      Exhibit 5          30

      Exhibit 6          34

      Exhibit 7          71

      Exhibit 8          77

AccuTran Global Enterprises, Inc.
855-552-0505

**CP_000020**

John Sexton; Justin DePover
February 10, 2021

4

1          MR. JOHNSON:  Good afternoon.  The time is 12:14 on

2    February 10, 2021.  We are located at 3420 Miller Avenue,

3    Davenport, Iowa.

4              My name is Mark Johnson.  My title is Road

5    Trainmaster.  I will be the Conducting Officer in this

6    proceeding.

7              Beginning to my left, please state your name, title,

8    and role in this hearing.

9              So, Mr. Jared, we'll start with you.

10         MR. JARED:  Tom Jared, General Manager for U.S. West for

11   Canadian Pacific.

12         MR. SEXTON:  John Sexton, Locomotive Engineer,

13   Davenport, Iowa.

14         MR. RAINWATER:  Joe Rainwater, Local Chairman.  Also,

15   Locomotive Engineer for Marquette, Iowa.

16         MR. DEPOVER:  And Justin DePover.  I'm a Conductor outta

17   Davenport, Iowa.

18         MR. JOHNSON:  All right.  Thank you, gentlemen.

19             I am charged with conducting a fair and impartial

20   hearing and to develop all the facts and circumstances in

21   connection with this Notice of Charge.

22             The following rules of procedure will be observed and

23   enforced:

24             All present will conduct themselves in a professional

John Sexton; Justin DePover
February 10, 2021

5

1   manner and show respect for those testifying.  Swearing,

2   abusive conduct, outbursts, and repeated interruptions will not

3   be tolerated.

4        This hearing is being recorded, and the transcript of

5   the recording will be the official record.  Speak slowly and

6   distinctly in order for your testimony or remarks to be

7   properly recorded.

8        Objections raised during this hearing will be

9   addressed and made a matter of record.

10       Reasonable recesses will be granted when requested,

11  but only before or after a witness has testified.  Except in

12  unusual circumstances, recesses will not be granted during a

13  witness' testimony.

14       The charged employee and representative will be

15  afforded the opportunity to present witnesses, cross-examine

16  Company witnesses, and introduce the record information or

17  exhibits pertinent to the matter being investigated.

18       The charged employee and representative will be

19  allowed to make a closing statement prior to the conclusion of

20  this hearing.  Closing statements should be confined to the

21  matter being investigated and based on evidence presented and

22  testimony given during this hearing.

23       This investigation is being held to develop all the

24  facts and circumstances relative to the Notice of Charge dated

CP_000022

John Sexton; Justin DePover
February 10, 2021

6

1   February 4, 2021, and subsequently another letter that was

2   issued changing the Hearing Officer, dated February 10th of

3   2021.

4           The Charge reads as follows:

5           It's on Canadian Pacific letterhead.

6           "CERTIFIED MAIL 7019 2970 0002 0440

7       6531"

8   MR. JOHNSON:  And also:

9           "CERTIFIED MAIL 7019 2970 0002 0440

10      6555"

11  MR. JOHNSON:  Dated:

12          "February 4, 2021"

13  MR. JOHNSON:  Addressed to:

14          "John Sexton

15  ████████████████████████

16  ████████████████████████

17          Employee # 823777"

18  MR. JOHNSON:  Also addressed to:

19          "Justin DePover

20  ████████████████████████

21  ████████████████████████

22          Employee # 1009119"

23  MR. JOHNSON:  Body reads:

24          "Gentlemen:

AccuTran Global Enterprises, Inc.
855-552-0505

CP_000023

John Sexton; Justin DePover
February 10, 2021

7

1      Attend a formal investigation or

2    hearing session scheduled to be held at

3    the General Yard Office Building

4    conference room, located at 3420 Miller

5    Avenue, Davenport, Iowa, on February

6    10, 2021 at 12:00 hours.

7      The purpose of this formal

8    investigation or hearing is to

9    determine the facts and circumstances

10    and to place your responsibility, if

11    any, in connection with your alleged:

12      • Failure to stop within half the

13    specified distance given while shoving

14    into Track NA04.

15      This incident allegedly occurred at

16    approximately 12:49 hours on February

17    1, 2021 while working Train 474-31 at

18    Nahant Yard.

19      The following Carrier witnesses

20    known at this time to likely have

21    knowledge of this -- of the incidence

22    and/or rel -- evidence relative to this

23    investigation or hearing is hereby

24    requested to attend:

CP_000024

John Sexton; Justin DePover
February 10, 2021

8

1         • Tom Jared

2         • Dylan Smith

3         In accordance with the provisions of

4    your Scheduled Agreement, arrange for

5    representative and/or witnesses, if

6    desired.  A copy of this document is

7    enclosed should you desire to

8    coordinate this matter with your

9    representative.

10       Sincerely,

11       Shelley R. Daberitz

12       Manager Support Services

13       Operations U.S."

14   MR. JOHNSON:  CC or carbon copied were:

15       "Dylan Smith

16       John Cartlidge

17       CMC, also known as Crew Management

18   Center

19       Joey Reyes - Please arrange to

20   conduct

21       Tom Jared - Please arrange to attend

22   as Company witness

23       Dylan Smith - Please arrange to

24   attend as Company witness

AccuTran Global Enterprises, Inc.
855-552-0505

**CP_000025**

John Sexton; Justin DePover
February 10, 2021

9

1           Employee Services

2           Timekeeping

3           Operating Practices or Rules"

4      MR. JOHNSON:  I will now label this as Exhibit 1.

5                (Whereupon, the document was marked as

6                Exhibit 1 for identification.)

7      MR. RAINWATER:  Do you have copies for everybody?

8      MR. JOHNSON:  When we take a recess, if you don't have

9  copies with you, I can make copies for you.

10     MR. RAINWATER:  I have a copy of Exhibit 1.  I do not,

11  however have a copy of the Postponement, and I'd like to have

12  that sooner rather than later.

13     MR. JOHNSON:  Okay.  So --

14     MR. RAINWATER:  Or, I'm sorry, the -- the -- the change

15  in Hearing Officer, not the Postponement.

16     MR. JOHNSON:  Okay.  I will -- I'll read it in and then

17  I'll make a quick copy for ya.

18           All right.  On Canadian Pacific letterhead again,

19  this is the change of Hearing Officer:

20           "February 10, 2021"

21     MR. JOHNSON:  Addressed to:

22           "John Sexton

23  ████████████████████████████

24  ████████████████████████████

AccuTran Global Enterprises, Inc.
855-552-0505

CP_000026

John Sexton; Justin DePover
February 10, 2021

10

1           Employee # 823777"

2      MR. JOHNSON:  Also:

3        "Justin DePover

4

5

6        Employee # 1009119"

7      MR. JOHNSON:  And reads:

8        "Gentlemen:

9        Please refer to my letter dated

10     February 4, 2021 concerning formal

11     investigation or hearing session

12     scheduled to be held at the General

13     Yard Office Building conference room,

14     located at 3420 Miller Avenue,

15     Davenport, Iowa, on February 10, 2021

16     at 12:00 hours.  The purpose of this

17     investigation or hearing is to

18     determine the facts and circumstances

19     and to place your responsibility, if

20     any, in connection with your alleged

21     failure to stop within half the ranges

22     -- or half the specified distance given

23     while shoving into Track NA04.  This

24     incident allegedly occurred at

John Sexton; Justin DePover
February 10, 2021

11

1    approximately 12:49 hours on February

2    1, 2021 while working Train 474-31 at

3    Nahant Yard.

4        Please be advised that Joey Reyes

5    will no longer be attending as

6    Conducting Officer.  Mark Johnson has

7    been requested to attend the

8    investigation or hearing as Conducting

9    Officer.

10       In accordance with your -- or with

11   the provision of your Scheduled

12   Agreement, arrange for witness, if

13   desired.  A copy of this document is

14   being sent to your representative.

15       Balance of my original notice

16   remains the same.

17       Sincerely,

18       Shelley R. Daberitz

19       Manager Support Services

20       Operations U.S."

21   MR. JOHNSON:  And the only addition to the carbon copy

22   is:

23       "Mark Johnson - Please arrange to

24   conduct"

John Sexton; Justin DePover
February 10, 2021

12

1     MR. JOHNSON:  And Joey Reyes is no longer carbon copied.

2         I'm gonna take a brief minute or two here.  I'll go

3     make a copy for you three, and then we'll resume with this

4     investigation.

5             (Whereupon, a recess was taken.)

6     MR. JOHNSON:  All right.  We're back on the record.

7     Time is 12:26.

8         I just read in the Notice of -- the change for the

9     Hearing Officer, provided copy to everybody.  Labeling this as

10    Exhibit #2.

11            (Whereupon, the document was marked as

12            Exhibit 2 for identification.)

13    MR. RAINWATER:  At this time, just as a matter of

14    record, I notice that Dylan Smith is not in attendance at this

15    d -- is there -- do we have knowledge of whether or not he's

16    going to attend as compelled by the Hearing Letter?

17    MR. JOHNSON:  At this time, there's some personal

18    reasons he's not here.  We're gonna continue with this

19    investigation.  Should it be ter -- determined that he would

20    have something permant -- pertinent to this investigation, then

21    we'll make a decision whether or not we would postpone.

22    MR. RAINWATER:  All right.  And just as a matter of

23    record, I also note that General Manager Jared is in attendance

24    via video conference.  We weren't informed of that ahead of

AccuTran Global Enterprises, Inc.
855-552-0505

**CP_000029**

John Sexton; Justin DePover
February 10, 2021

13

1  time.  I'd like to object to this hearing just because of

2  that.  This Hearing Letter compels the attendance, same as for

3  -- from -- for the witnesses -- Carrier witnesses, the same as

4  it does for Mr. Sexton and Mr. DePover.  If you read in line

5  one -- oh, I'm sorry, of the opening paragraph of Exhibit 1, it

6  says:

7          "Gentlemen:

8          Attend --"

9          And then it also compels Mr. Jared and Mr. Smith to

10 attend in person.

11         The -- the basis for this objection is also because

12 the Organization was not given the same opportunity to attend

13 via video conference.  We also believe the that the Zoom video

14 conference, while convenient, eliminates the ability of the

15 Hearing Officer to vet testimony by viewing and experiencing

16 the nonverbal cues from any witness who may be attending via

17 video.

18         I'm also concerned about how evidence is going to be

19 submitted as far as it relates to due process.  Other than his

20 own testimony, how is Mr. Jared gonna enter exhibits?

21     MR. JOHNSON:  Okay.  So I'm gonna overrule on your

22 objection.  And you -- did you ever make a request --

23     MR. RAINWATER:  Yeah --

24     MR. JOHNSON:  -- to attend via Zoom?

John Sexton; Justin DePover
February 10, 2021

14

1         MR. RAINWATER:  I -- I guess I didn't know if that was

2    such a possibility.  I mean, like I said, the Hearing Letter

3    compels Mr. Sexton and Mr. DePover to attend.  And in -- in the

4    history of hearings and investigations, I don't know that it's

5    ever been an option to do so in a different manner than by

6    physically being on property in the hearing room.  So --

7         MR. JOHNSON:  So --

8         MR. RAINWATER:  -- I suppose, no, there -- there was no

9    request to be made because I didn't know there was need to make

10   a request --

11        MR. JOHNSON:  Okay.  S --

12        MR. RAINWATER:  -- in that matter.  Nor should I think

13   that it should be allowed, just on the basis like I said, that

14   -- that we get to vet the testimony by both viewing and

15   experiencing the nonverbal cues from the witnesses in

16   attendance.  We don't get that same opportunity by Mr. Jared,

17   who is -- we can only see half of his body and can't see what's

18   in front of him.

19        MR. JOHNSON:  Okay.  Again, I'm overruling on your

20   objection.  And the courts within the United States have gone

21   to doing Zoom and using other video means for testimony, so

22   Mr. Jared will be available through the entire process.  As I

23   said with Mr. Smith, I would make a determination at the end of

24   the testimony that we hear today if -- if I feel that he has

John Sexton; Justin DePover
February 10, 2021

15

1   something pertinent, then we would take a postponement, a

2   recess at that time --

3       MR. RAINWATER:  Sure.  I understand --

4       MR. JOHNSON:  -- until he's available, so.

5       MR. RAINWATER:  I understand Mr. Smith -- I mean, it --

6   circumstances rise to the level of him not being able to

7   attend.  I would, however, like to note for the record, why is

8   Mr. Jared not in the physical attendance?

9       MR. JOHNSON:  He is available through Zoom due to the

10  current crisis within the United States and the world actually,

11  with COVID, trying to limit exposure.

12      MR. RAINWATER:  Well, I appreciate that he took it upon

13  himself to protect himself, but not give us all the same

14  opportunity, so I'll s -- I'll sustain for now.

15      MR. JOHNSON:  Okay.  So next, I'm going to call

16  Mr. Sexton for preliminary questions.

17          Mr. Sexton, for the record, please state your name

18  and position with the Company.

19      MR. SEXTON:  John Sexton, Locomotive Engineer.

20      MR. JOHNSON:  And what is your address?

21      MR. SEXTON:  ████████████████████████████

22  ████████████

23      MR. JOHNSON:  When were you last tested on the Rules?

24      MR. SEXTON:  2020, I believe.

AccuTran Global Enterprises, Inc.
855-552-0505

**CP_000032**

John Sexton; Justin DePover
February 10, 2021

16

1     MR. JOHNSON:  And were you allowed to ask questions?

2     MR. SEXTON:  Absolutely.

3     MR. JOHNSON:  Do you have a representative present?

4     MR. SEXTON:  I do.  Joe Rainwater.

5     MR. JOHNSON:  Okay.  Thank you.  Did you receive the

6  Notice of Charge?

7     MR. SEXTON:  I did not.

8     MR. JOHNSON:  But you are aware to be here today?

9     MR. SEXTON:  I am, only because of Mr. Rainwater, uhm,

10  forwarded the information to -- to me.

11     MR. JOHNSON:  Okay.  Are you ready to proceed with this

12  hearing?

13     MR. SEXTON:  I am.

14     MR. JOHNSON:  Okay.  Mr. DePover -- or you're released

15  from testimony, Mr. Sexton.

16        Mr. DePover, for the record, please state your name

17  and position with the Company.

18     MR. DEPOVER:  Justin DePover, and I'm a Conductor.

19     MR. JOHNSON:  Were -- when -- or what is your address?

20     MR. DEPOVER:  2512 East 18th Street in Davenport, Iowa,

21  52803.

22     MR. JOHNSON:  And when were you last tested on the

23  Rules?

24        MR. DEPOVER:  I had a Refresher's Class on, I believe it

AccuTran Global Enterprises, Inc.
855-552-0505

CP_000033

John Sexton; Justin DePover
February 10, 2021

17

1    was the 27th.  I -- I was on furlough for just under eleven

2    months.

3            MR. JOHNSON:  Okay.  Twenty-seventh of?

4            MR. DEPOVER:  Of January.

5            MR. JOHNSON:  Okay.  I was gonna say we're a little

6    ahead of --

7            MR. DEPOVER:  Yeah, I'm sorry about that.

8            MR. JOHNSON:  -- the 27th of February, so.  Do you have

9    a representative present?

10           MR. DEPOVER:  Yes, I do.

11           MR. JOHNSON:  Who is that?

12           MR. DEPOVER:  Mr. Rainwater.

13           MR. JOHNSON:  And did you receive Notice of Charge?

14           MR. DEPOVER:  I did not.

15           MR. JOHNSON:  But you're aware to be here today?

16           MR. DEPOVER:  I was aware also, via email from

17   Mr. Rainwater.

18           MR. JOHNSON:  Are you ready to proceed with this

19   hearing?

20           MR. DEPOVER:  Yes, I am.

21           MR. JOHNSON:  Mr. Rainwater, are you ready to proceed

22   with this hearing?

23           MR. RAINWATER:  Under previous objection, yes.

24           MR. JOHNSON:  Okay.  All right.  Mr. DePover, you're

CP_000034

John Sexton; Justin DePover
February 10, 2021

18

1    released from testimony.

2            I will now call Mr. Jared.

3                    THOMAS JARED

4    called as a witness by the Company herein, was examined and

5    testified as follows:

6                    E X A M I N A T I O N

7                    By:  Mr. Johnson

8        Q.      Mr. Jared, state your name.

9        A.      Thomas Jared.

10       Q.      And what is your job title?

11       A.      General Manager, U.S. West, Canadian Pacific.

12       Q.      And what do you do in that position?

13       A.      My position, I oversee the operations for

14   Canadian Pacific through six states.  That includes safety,

15   that includes budgetary, utilizing assets, developing people,

16   working with customers.

17       Q.      And how long have you held that position?

18       A.      Since 2016, I've been a General Manager.

19       Q.      Okay.  How long have you been with Canadian

20   Pacific?

21       A.      The -- it's a long story, but it -- as of

22   recently, it's been 13 years.

23       Q.      Okay.  And have you been tested on the Rules?

24       A.      I have.

John Sexton; Justin DePover
February 10, 2021

19

1       Q.      Okay. Are aware of an incident that occurred at

2    approximately 12:49 hours on February 1, 2021?

3       A.      I am.

4       Q.      Could you please describe what you observed or

5    what the incident was?

6       A.      On -- on February 1st, I was at the south end of

7    Nahant Yard. I was observing Train 474-31 coming down to the

8    south end of the yard. I observed the Conductor actually

9    dismount the locomotive. The crew was going to actually shove

10   -- they were instructed to shove 4 Track as part of their

11   setout. That setout consisted of 76 cars. Conductor made the

12   cut, pulled up, was gonna shove into the south end of the yard

13   into 4 Track. Conductor lined all of his switches. Conductor

14   and Engineer actually briefed with the RC assignment which was

15   actually on the north end of the yard, and they were told that

16   the RC assignment was actually in 16 Track and they would not

17   be in 4. And the two crew members, Mr. Sexton and Mr. DePover,

18   actually briefed on this over the radio where their actual RC

19   assignment was, and that the 4 Track was actually theirs and it

20   was clear at the time.

21           Mr. DePover actually started a shoving movement

22   into 4 Track. He gave an initial car count of 50. I was

23   actually on the south end of the yard at that time in my

24   vehicle, which I actually dismounted at that time, and as I

CP_000036

John Sexton; Justin DePover
February 10, 2021

20

1  walked over to Mr. DePover, he was in between -- on the south
2  side of 4 Track.  I walked up to him and as I walked up to him,
3  he'd gave a 15-car count to the Engineer, John Sexton.  At that
4  point, I instructed Mr. DePover to not provide any more radio
5  communication to Mr. Sexton, and Mr. Sexton continued to shove
6  back.  And I was -- as I was counting down, we got to seven
7  cars that he actually shoved, which that's when Mr. Sexton
8  should've actually stopped and he did not.  But he did -- I did
9  note that that was the seventh car that was being shoved by,
10 and Mr. DePover, at that time, did confirm that was the seventh
11 car.  And actually, at that time, Mr. Sexton got on the radio
12 and he asked for further instructions from Mr. DePover.
13 Mr. DePover did not -- did not answer.  As you can hear, Mister
14 -- the brakes were actually being applied on the train.  And
15 again, he had 76 cars.  And Mr. Sexton asked one more time, and
16 then brought the train to an actual stop.
17          When he stopped, he'd actually shoved 11 cars
18 into the track further from that initial count of 50.  At that
19 time, I -- Mr. Sexton was asking for his Conductor -- or for
20 the AE, Assistant Engineer DePover, and the -- Mr. DePover told
21 him that I was actually conducting a test.  Mr. Sexton said oh,
22 I must've passed.  But at that time, I told Mr. DePover that --
23 to [indiscernible] his thoughts, make sure to get a proper job
24 briefing, and continue his movement of yarding the train, and

CP_000037

John Sexton; Justin DePover
February 10, 2021

21

1    we'd brief afterwards, which he did.

2              So through that process, Mr. Sexton did violate

3    General Code of Operating Rules 5.37.  That's called Radio

4    Response, it's actually a shoving movement, where it clearly

5    states:

6              "Movement must stop within half the

7         distance specified unless additional

8         instructions are received."

9         Q.    Okay.  Is that an exhibit that you'd like to

10   enter?

11        A.    Yes, I would.  I -- if you don't have a copy of

12   that, I can get a copy brought to you, but I would like to make

13   it a -- an exhibit.  GCOR—Eighth Edition—April 1, 2020, Rule

14   5.3.7 Radio Response.

15        Q.    Okay.  Yeah, Joey provided me with some things

16   that -- so I did find that.

17        MR. JOHNSON:  I will label this as Exhibit #3.  And that

18   is the GCOR -- Eighth Edition, April 1st of 2020, 5.3.7 Radio

19   Response.

20              (Whereupon, the document was marked as

21              Exhibit 3 for identification.)

22        Q.    So, Mr. Jared, did he comply with this Rule?

23        A.    Absolutely not.

24        Q.    And how not?

AccuTran Global Enterprises, Inc.
855-552-0505

CP_000038

John Sexton; Justin DePover
February 10, 2021

22

1          MR. RAINWATER:  Just -- for -- just point of order,

2    you're -- you're sa --

3          A.     He was supposed to have been stopped at seven

4    cars.

5          MR. RAINWATER:  Yeah, we're saying he, can we specify

6    exactly who he is?  There's two charged employees.  Can we

7    specify --

8          MR. JOHNSON:  Okay.

9          MR. RAINWATER:  -- which one we're saying is not in

10   compliant with this Rule?  I missed that because of this video.

11         MR. JOHNSON:  Okay.  If you have an objection or

12   something like that, please let him finish and then --

13         MR. RAINWATER:  Okay.

14         MR. JOHNSON:  -- make your objection.

15         Q.     So, Mister -- Mr. Jared, did Mr. DePover violate

16   this Rule?

17         A.     No, he did not.

18         Q.     Okay.  Did Mr. Sexton violate the Rule?

19         A.     Yes, he did.

20         Q.     And how so?

21         A.     Mr. Sexton, at seven cars, he should have been

22   stopped, which he was not.  As I noted -- I -- I was counting

23   the cars as they were going by.  At the seventh car, as it went

24   by, I noted with Mr. DePover that that was the seventh car

CP_000039

23

1    after his initial radio response of 15.  He did confirm with

2    me.

3        MR. SEXTON:  It's 50.

4        A.    And then, again, Mr. Sexton stopped at 11 car

5    lengths past the initial 15 car instruction he gave to his

6    Engineer, John Sexton.

7        Q.    Okay.  So he gave an initial count of 50.

8    Correct?

9        A.    Correct.  The initial car count was 50 into the

10   track, which was a clear track.

11       Q.    Okay.  And then he gave further instruction for

12   15?  1-5?

13       A.    That's correct.  When I -- when I walked over to

14   him, at that time, he actually made a radio communication to

15   his Engineer, which was John Sexton, of a 15-car count.

16       Q.    Okay.  And then it was how long before he came

17   to a stop?

18       A.    Eleven car lengths.

19       Q.    Is that less or more than half the distance that

20   was specified for the 15-car count?

21       A.    More than half.

22       Q.    Okay.  Any other evidence you'd like to submit?

23       A.    You should have a Tonnage Profile if Mr. Reyes

24   actually printed it for you.  This Tonnage Profile was provided

John Sexton; Justin DePover
February 10, 2021

24

1   by Conductor DePover after they got -- they were done making

2   their shoving movement, and I'd like to reference page 2 of

3   that Tonnage Profile, if you would?

4        Q.      Okay.   Let me kinda go through the stuff that he

5   sent me -- or he gave me.

6        MR. JOHNSON:  Looks like I need to make one more copy,

7   if you guys want a --

8        MR. SEXTON:  [I guess we could].

9        Q.      Okay.   So, Mr. Jared, I have here a 474-31 04617

10  Tonnage Profile, Page 002, it's got some marking on it.

11       A.      So the markings are all from Mr. DePover.  These

12  are all his markings.  You can see where he made a initial mark

13  of line 76.  That was the cut they came off their train with.

14       Q.      Okay.

15       A.      You can also note -- and of course, there is --

16  it looks like there's two different color inks here, but you

17  can also note where he noted the DP unit, which they actually

18  had to set out prior to making their final shove --

19       Q.      Okay.

20       A.      -- from 11.  This is their first shove into the

21  track to get the DP unit set out.

22       Q.      Okay.

23       A.      You can also see where Mr. DePover marked -- it

24  looks like in blue ink -- between lines 54 and 64.  I had asked

CP_000041

John Sexton; Justin DePover
February 10, 2021

25

1    Mr. DePover after the shove movement was made, to note the cars

2    still -- the cars that were actually shoved into the track

3    during that -- that shoving movement between -- after he said

4    15 more cars.

5        Q.    Do you know the total distance that was shoved

6    then, after he was given --

7        A.    It was approximately 110 feet.

8        Q.    They only shoved 110 feet? Or approximately --

9        A.    Sorry. No, the -- no, I don't -- we didn't add

10   the footage up to write next to the Tonnage Profile. I don't

11   have that top of my head.

12       Q.    Okay. But it was greater than half the

13   distance?

14       A.    Correct. You'll note in the -- in the Tonnage

15   Profile where some of the car lengths are 42 feet and 1 -- some

16   of the car lengths are 71 feet?

17       Q.    Okay.

18       A.    But the point of the Rule is that half the

19   distance specified, and he shoved 11 car lengths. When I

20   interviewed Mr. Sexton, he made the statement that he -- all he

21   had was sticks and trees to go off of for his -- for shoving

22   back.

23       Q.    Are there other means for them to know distance?

24       A.    Yeah. Yes, sir. He actually has a counter on

John Sexton; Justin DePover
February 10, 2021

26

1   the lead locomotive that he should be able to reference when

2   making a shoving movement.

3       MR. RAINWATER:  Objection.

4       A.       And further, if he's not sure, he could've asked

5   sooner about car distance.  For example, if he only had seven

6   cars -- if he can only shove initial seven cars, he should've w

7   -- asked well in advance of that seven cars for additional car

8   counts, which he did not.  He waited until the seventh car went

9   by before he asked a question.  And then you can hear --

10      MR. RAINWATER:  Objection.  Unless --

11      A.       -- brakes applying.

12      MR. RAINWATER:  Unless Mr. Jared has a Rule that he can

13  point to that says an Engineer is required to use his distance

14  measuring device when making shove moves, that -- that

15  testimony's irrelevant.

16      MR. JOHNSON:  Okay.  The question was whether or not he

17  had means to use.  It wasn't --

18      MR. RAINWATER:  Okay.  Okay.  So I just wanted to

19  clarify that the Rule --

20      MR. JOHNSON:  It wasn't adding -- adding a Rule or

21  anything to it.

22      MR. RAINWATER:  Right.  So I wanna clarify for the --

23  for the record that there's no Rule that says that you have to

24  do that.

John Sexton; Justin DePover
February 10, 2021

27

1        MR. JOHNSON:  So -- yeah.  No, I -- the question was if

2    he had means to be able to, other than sticks and trees.

3            So just to back up here real quick, so the Tonnage

4    Profile, page 002, I'm labeling as Exhibit 4.

5                        (Whereupon, the document was marked as

6                        Exhibit 4 for identification.)

7        MR. JARED:  I'm sorry, did you say Exhibit 4?

8        MR. JOHNSON:  Yes.

9    BY:  MR. JOHNSON

10       Q.     Do you have anything else you'd like to enter as

11   evidence, Mr. Jared?

12       A.     Once the crew actually yarded their train, I

13   didn't actually compare; they were relieved on the south end.

14   And because of their hours, they were brought to the north end

15   to the depot, and individually interviewed.

16            First interview was done with Mr. DePover, where

17   we reviewed, actually, the events had taken place, and then I'd

18   asked Mr. DePover to provide a written statement, which you

19   should have a copy of it as well.  It says 474-31, and has his

20   signature on it, dated 1 February 2021.

21       Q.     Okay.  I don't have that here right now.  Can we

22   take a brief recess, and have you email that --

23       MR. RAINWATER:  I'm gonna --

24       MR. JOHNSON:  -- to me so that --

John Sexton; Justin DePover
February 10, 2021

28

1    MR. RAINWATER:  I'm gonna object here.  This is the
2  precise reason why video conference calls shouldn't be allowed
3  if the witness has to email evidence to you in the middle of
4  his testimony in order to access it.  It's completely
5  ridiculous.  It slows the whole process down.
6    MR. JOHNSON:  Okay.  Your objection is overruled.  It --
7  so he's got evidence that he wants to submit.
8    MR. RAINWATER:  He --
9    MR. JOHNSON:  Part of your initial --
10    MR. RAINWATER:  Then he should've been here to do it.
11    MR. JOHNSON:  Part of your initial objection was that
12  there would be partiality in the way things are being
13  conducted.  If I --
14    MR. RAINWATER:  Yeah, I think that --
15    MR. JOHNSON:  If I understood what your objection was,
16  correct?
17    MR. RAINWATER:  Yeah, I think that's obvious, now, for
18  sure.
19    MR. JOHNSON:  So now you're objecting because not
20  everything is readily available.  As I said with COVID, trying
21  to limit exposure to everybody --
22    MR. RAINWATER:  Mm-hmm.
23    MR. JOHNSON:  -- it's -- i -- it's a challenging time
24  for everybody, Mr. Rainwater.

AccuTran Global Enterprises, Inc.
855-552-0505

**CP_000045**

John Sexton; Justin DePover
February 10, 2021

29

1          So we'll take just a brief -- probably five-minute

2     recess, and I'll see if I've gotten that from you, Mr. Jared.

3          MR. JARED:  Okay.

4          MR. JOHNSON:  Time is 12:46.

5                    (Whereupon, a recess was taken.)

6          MR. JOHNSON:  All right.  The time is now 12:49,

7     resuming with the Sexton-DePover Investigation.

8          All right.  Mr. Jared, Mr. Reyes brought in what

9     appears to be a statement.  I'm gonna label --

10    BY:  MR. JOHNSON

11         A.      That's correct.  I actually received the

12    statement from Mr. DePover as we're interview him.  Once we

13    were done with the interview, I asked him pro -- to provide the

14    statement.  This is what he wrote:

15              "When shoving cars into NA04 track a

16         car count of 15 was given and after no

17         communication movement stopped after 11

18         cars."

19         A.      That's Mr. DePover's signature.  And I observed

20    him writing it -- the statement, and then he dated it:

21              "1 Feb 2021"

22         MR. JOHNSON:  Okay.  I'm going to label this as Exhibit

23    #5.

24         MR. RAINWATER:  Five.

AccuTran Global Enterprises, Inc.
855-552-0505

**CP_000046**

John Sexton; Justin DePover
February 10, 2021

30

1                    (Whereupon, the document was marked as

2                    Exhibit 5 for identification.)

3        Q.      So with Exhibit 5, Mr. Jared, that matches

4   exactly what you observed as well?

5        A.      I'm sorry.  One more time?

6        Q.      Mr. DePover's statement here in Exhibit 5, that

7   agrees with what you observed as well?

8        A.      That's correct.

9        Q.      Okay.  Any other evidence you'd like to submit?

10       A.      I have video surveillance of the move that I'd

11  like to present.

12       Q.      Okay.  I'll see if I can --

13       MR. RAINWATER:  So j --

14       MR. SEXTON:  [Is that the body of it]?

15       MR. RAINWATER:  -- just for the record, we're -- we're

16  gonna try to see a video at the same time he's on a video

17  conference on the same device?

18       MR. SEXTON:  Is there audio?

19       MR. RAINWATER:  I -- is that --

20       MR. JARED:  Was that a question for me?

21       MR. RAINWATER:  I -- I'm just asking for a point of

22  record here, is that what's about to happen?

23       MR. JOHNSON:  I'm trying to see if I can share screen --

24  so I'm gonna pull this up, Mr. Jared.  Should be marked.  I

John Sexton; Justin DePover
February 10, 2021

31

1   just don't know how to share a screen.  No.

2         MR. DEPOVER:  I can't read that.

3         MR. SEXTON:  I -- I did, actually.

4         MR. JOHNSON:  Oh.

5         MR. RAINWATER:  Mr. Jared, are you still there?

6         MR. JARED:  You're asking me?

7         MR. RAINWATER:  Oh, yeah, I don't -- a -- a different

8   screen come up.  I didn't know if we lost ya.

9         MR. JOHNSON:  I'm gonna go into the Avigilon cameras

10  here.

11  BY:  MR. JOHNSON

12        Q.     So this occurred February 1st at approximately

13  12:49?

14        **A.     Correct.**

15        Q.     Okay.

16        MR. SEXTON:  [indiscernible] [whispered]

17        MR. RAINWATER:  I'm sorry.  What's the -- the source of

18  this video?  Is --

19        MR. JOHNSON:  This is the west end yard camera for

20  Nahant Yard, so this would be --

21        MR. DEPOVER:  [indiscernible]

22        MR. JOHNSON:  -- be the west end or the south end of the

23  yard --

24        MR. RAINWATER:  Oh.

John Sexton; Justin DePover
February 10, 2021

32

1       MR. JOHNSON:  -- that you're looking at right now.

2       MR. RAINWATER:  I -- I thought Mr. Jared said he had it

3  from his phone.  Maybe I misheard that.

4       MR. SEXTON:  Is there audio on this tape as well?

5       MR. JOHNSON:  No.

6       MR. JARED:  There's no audio.

7       MR. SEXTON:  I'm sorry, man --

8       MR. RAINWATER:  It's okay.

9       MR. SEXTON:  -- I can't take this [indiscernible].

10      MR. RAINWATER:  Relax.

11      MR. JOHNSON:  Okay.  As a reminder, we're on record

12  here.

13          Okay.  I'm right at 12:49, Mr. Jared.  I'm gonna

14  start playing.

15      MR. JARED:  Can you share your screen?

16      MR. JOHNSON:  I'm not real sure on how to do so.

17      MR. JARED:  Go down where the gr -- little green button

18  says Share Screen.

19      MR. JOHNSON:  Oh, there it is.  Okay.  Can you see it

20  now, Mr. Jared?

21      MR. JARED:  I can, yes.

22      MR. JOHNSON:  Okay.  I'm gonna start playing here for

23  you.

24              (Whereupon a video recording was played)

CP_000049

John Sexton; Justin DePover
February 10, 2021

33

1   BY:  MR. JOHNSON

2        A.        Okay.  You can see where 4 Track is clear.  This

3   is 474 shoving in.  Mr. DePover gave his 50-car count.

4   Mr. DePover's doing a really good job here of looking towards

5   as he's stepping down to.  First he dismounts at that time.

6   They do have 76 cars ahold of at this time.

7             You're gonna see myself, I'm entering the frame

8   at the bottom of the screen.  As I walk over, Mr. DePover tells

9   the Engineer -- he's looking at his list and tells the Engineer

10  that he's -- a 15-car count.  At this point, he'd already

11  shoved in 12 car lengths.  If you'd like to stop the video, you

12  can count the cars that actually went into track or we can

13  continue on.

14       MR. JOHNSON:  Do you want --

15       A.        I did tell Mr. DePover at this time, that he was

16  not to give a -- additional car counts to the Engineer.

17       MR. JOHNSON:  Do you wanna count the cars or anything?

18  Does anybody need to?

19       MR. RAINWATER:  No, I'm good.

20       Q.        Okay.  We're gonna continue playing.

21       A.        And now we're watching the cars go by.  When we

22  get to the seventh car, I note that that's the seventh car.

23  Mr. DePover does mention they're short cars.  I didn't -- I did

24  agree.  Once we got past the seventh car, Mr. Sexton began to

John Sexton; Justin DePover
February 10, 2021

34

1  ask for -- his Conductor for more car counts, which he did not

2  receive.  The shoving movement continued past those seven

3  cars.  He asked a second time, and then brought the train to an

4  actual stop.

5          And then, you see he continued to shove, where

6  eventually he did bring the train to a stop.  That third flat

7  car, that's the 11th car.

8      Q.    Okay.

9      A.    It's a clear violation of GCOR 5.3.7.

10     Q.    And that's -- is that all you needed for video?

11     A.    That's all I had.

12     Q.    Okay.  All right.  Any other evidence you'd like

13  to submit at this time, Mr. Jared?

14     A.    Not at this time.

15     MR. JOHNSON:  Actually, where we played video -- and

16  I'll make you a copy of this on the next recess, it's just a

17  confidentiality letter where there's been video submitted, I'll

18  label as Exhibit 6.

19                  (Whereupon, the document was marked as

20                  Exhibit 6 for identification.)

21     MR. RAINWATER:  And with confidentiality with regards to

22  what?

23     MR. JOHNSON:  Because video was played with employees in

24  it, so to ensure that the confidentiality, it's not gonna be

AccuTran Global Enterprises, Inc.
855-552-0505

CP_000051

John Sexton; Justin DePover
February 10, 2021

35

1    leaked out to YouTube or some other platform --

2        MR. RAINWATER:  S -- but the video's gonna be --

3        MR. JOHNSON:  -- thr -- through social media -- right.

4        MR. RAINWATER:  But the video's gonna be maintained as

5    part of the record and available for review --

6        MR. JOHNSON:  Yes.

7        MR. RAINWATER:  -- throughout the appeals process?

8        MR. SEXTON:  And that --

9        MR. JOHNSON:  That is correct.

10        MR. SEXTON:  And I'm gonna be able to get a copy of this

11    video.  Correct?

12        MR. JOHNSON:  So let me read in this letter, and it will

13    explain everything to you.

14            So with Exhibit 6, what this is gonna read -- or does

15    read is:

16            "The carrier has presented a video

17            hereafter referred to as Company

18            Exhibit 6.  Company Exhibit 6 is

19            confidential.  CP will not distribute

20            copies of Exhibit 6 to the parties at

21            this hearing.  Should any party desire

22            to view the video, it will be made

23            available upon request made by the

24            appropriate union officer or company

AccuTran Global Enterprises, Inc.
855-552-0505

**CP_000052**

John Sexton; Justin DePover
February 10, 2021

36

1      official.  Such request shall be made

2      to Tom Jared -- General Manager, US

3      West.  A grant of such request is

4      limited to viewing of the video and

5      does not give the viewing party the

6      right to copy the video in any form.

7      This designation is made pursuant to

8      Canadian Pacific's confidentiality

9      expectations (as set forth in CP's Code

10     of Business Eth -- Ethics), Information

11     Security Policy, and other policies and

12     practices protecting the

13     confidentiality of CP's confidential

14     company information and confidential

15     employee information."

16         MR. JOHNSON:  So you would just -- if y -- you want to

17   view it, then you would make a request through Mr. Rainwater

18   and he would contact Mr. Jared to arrange for that --

19         MR. RAINWATER:  All right.  So --

20         MR. JOHNSON:  -- or Mr. Semenek.

21         MR. RAINWATER:  -- the confidentiality statement is

22   Exhibit 6, then.  Can I --

23         MR. JOHNSON:  Correct.

24         MR. RAINWATER:  Can we get a copy of that right now?

John Sexton; Justin DePover
February 10, 2021

37

1       MR. JOHNSON:  We'll just take a brief recess here, and

2   I'll go make a copy for everyone.

3           Time is 13:02.

4                   (Whereupon, a brief recess was taken.)

5       MR. JOHNSON:  Time is now 13:03.  Back on the record

6   with the Sexton-DePover Investigation.  They've been provided

7   with a copy of Exhibit #6.

8       MR. RAINWATER:  So just as a point of clarification,

9   this confidentiality statement is not Exhibit 6, the video is

10  Exhibit 6.

11      MR. JOHNSON:  The video itself is Exhibit 6.  This is

12  what's currently entered so that all parties understand that

13  it's not being copied and transferred out anywhere or it would

14  be a violation of the various CP policies.

15      MR. RAINWATER:  Okay.

16      MR. JOHNSON:  And then, instructions on how to view the

17  video.

18  BY: MR. JOHNSON

19      Q.    All right.  Mr. Jared, do you have any further

20  testimony or evidence that you'd like to submit at this time?

21      A.    No, I do not.

22      MR. JOHNSON:  All right.  Mr. Rainwater, would you like

23  to cross-examine Mr. Jared?

24      MR. RAINWATER:  Yes.

AccuTran Global Enterprises, Inc.
855-552-0505

CP_000054

John Sexton; Justin DePover
February 10, 2021

38

1   BY:  MR. RAINWATER

2       Q.      Mr. Jared, with regard to the video that was

3   presented, is there audio evidence available to correspond with

4   the video?  Can you --

5       A.      No.

6       Q.      So -- so there's no way --

7       A.      No, there's not.

8       Q.      -- to correspond with what the crew was

9   communicating on the radio with the movements that were taking

10  place?

11      A.      There's no corresponding audio that goes with

12  the video.

13      Q.      All right.  So did you -- once you exited your

14  vehicle, d -- did you have a radio available that you were

15  listening to the crew on?

16      A.      I did not have a radio with me.

17      Q.      All right.  So is it possible that you didn't

18  hear all the instructions that was -- that were given from the

19  Conductor to the Engineer as they completed this move?

20      A.      The -- I had my truck radio on, I had my windows

21  down.  I have a very loud radio in my truck.  I did not hear

22  any other correspondence with Train 474 --

23      Q.      All right.  Is it possible that --

24      A.      -- through that radio from where I walked from

John Sexton; Justin DePover
February 10, 2021

39

1   my --

2          Q.      Yeah, the question I asked --

3          A.      Okay.

4          Q.      -- though, is it possible that you -- you didn't

5   hear anything -- additional --

6          A.      No.

7          Q.      -- communication because you weren't -- didn't

8   have a radio on your person?

9          A.      No.

10         Q.      All right.  So you stated earlier with regard to

11  the GCOR Rule that you entered as Exhibit #3, that Mr. DePover

12  was not in violation of this Rule.  Is that correct?

13         A.      That's correct.  Mr. DePover, I did not find him

14  in violation of GCOR 5.3.7.

15         Q.      All right.  Since that's the only Rule that you

16  entered as a Rule, I can only assume then that Mr. DePover is

17  not culpable in this alleged charge whatsoever.  Is that also

18  correct?

19         A.      That is correct.

20         MR. RAINWATER:  All right.  Mr. Johnson, at this time,

21  I'd like to amend the Hearing Letter wherein Mr. DePover is a

22  charged Principal with the charge -- the alleged -- with the

23  allegation on the Ca -- from the Carrier, to have it amended

24  that Mr. DePover be in attendance purely as a witness.

CP_000056

John Sexton; Justin DePover
February 10, 2021

40

1        MR. JOHNSON:  Okay.  I'm gonna overrule on your

2   objection.  My -- my duty here as the Hearing Officer is to

3   develop the facts and circumstances and if -- place any

4   responsibility, if it is found that they were a responsible

5   party.  So if the record should show that Mr. DePover was

6   erroneously charged with anything, then --

7        MR. RAINWATER:  All right.

8        MR. JOHNSON:  -- in the decision, that would be made a

9   matter of record.

10       MR. RAINWATER:  Well, based upon the testimony, I'm

11  gonna take that is to be the case, and we're going to view

12  Mr. DePover as a -- purely as a witness here.

13  BY:  MR. RAINWATER

14       Q.     Mr. Jared, was -- was this an efficiency testing

15  event that you conducted?  Mr. Jared?  [indiscernible]

16       MR. JOHNSON:  You're on mute.

17       A.     Yeah, that's correct.

18       Q.     Okay.  So this wasn't a f -- in -- I assume

19  because Mr. Dylan Smith is also on the Charge Letter, was he --

20  was this a joint testing event?  Or w -- I'm confused as to why

21  he's on here as a witness.

22       A.     Sure.  Mr. Smith was not with me at the time.

23  Mr. Smith was dur -- was at the interview process.

24       Q.     Okay.  But he wasn't in the vehicle with you?

John Sexton; Justin DePover
February 10, 2021

41

1          A.      No.

2          Q.      Okay.

3     MR. SEXTON:  [indiscernible]

4          Q.      Did you enter this as a -- as an efficiency

5     testing failure into the CP tracking system?

6          MR. JOHNSON:  Okay.  Mr. Rainwater, I'm not here to

7     determine whether there was an efficiency test entered or --

8     for that.  I'm here solely to determine whether or not

9     Mr. Sexton --

10         MR. RAINWATER:  Let me rephrase the question.

11         MR. JOHNSON:  -- or Mister --

12         MR. RAINWATER:  Let me rephrase the question, then.

13         Q.      Mr. Jared, does CP have a efficiency test m --

14     manual that outlines the Rules and compliance and procedures

15     for how to conduct operating tests?

16         A.      Does that have a bearing on whether or not

17     Mr. Sexton violated --

18         Q.      That's not the question --

19         A.      -- the Rule?

20         Q.      -- I asked, Mr. Jared.  I'm here to ask the

21     questions.  Does Mis -- does CP provide a -- a guidance in a

22     manual that instructs and in -- and tells managers how to

23     conduct efficiency tests?

24         A.      There are manuals available.  But again, I don't

John Sexton; Justin DePover
February 10, 2021

42

1   know what bearing that has on whether or not Mr. Sexton

2   violated this Rule.

3          Q.      Understand.  Do they -- can you tell me which

4   testing code you utilized for this efficiency test?

5          A.      I can tell you that Mr. Sexton made a shoving

6   movement and was given a 15-car count, and he failed to stop

7   within half that distance, which was clear in the video, and

8   through my testimony, and then through the written statement of

9   Mr. DePover.

10         Q.      So whenever you previously -- under your

11  previous testimony, you said that Mr. DePover gave Mr. Sexton a

12  50-car count to begin the shove.  Is that correct?  Good for 50

13  cars?

14         A.      That's correct.

15         Q.      All right.  So how far had the movement taken

16  place before you spoke to Mr. DePover and told him not to

17  respond to his Engineer?

18         A.      As I noted in my earlier testimony that he had

19  shoved 12 car lengths into the track.

20         Q.      So 12 cars then, not being anywhere close to

21  half the distance of 50 cars.  Correct?

22         A.      That really doesn't matter because he changed

23  his testimony to 15 cars.

24         Q.      That's not what I asked.  I just a -- asked if

John Sexton; Justin DePover
February 10, 2021

43

1  12 cars was anywhere close to half the range of 50 cars, yes or

2  no?

3      A.      No.  But again --

4      Q.      Okay.  Thank you.

5      A.      -- he changed his car count to 15.

6      Q.      Do you have any further proof as far as related

7  to locomotive downloads with distances that we can correspond

8  to the -- the actual movements?

9      A.      I have my testimony, a written statement from

10  Mr. DePover, the list -- marked list that Mr. DePover provided

11  as evidence.

12      Q.      Okay.

13      MR. RAINWATER:  No further questions for Mr. Jared at

14  this time.  Subject to recall.

15      MR. JOHNSON:  All right.  Just a couple of follow-up for

16  you, Mr. Jared.

17  BY:  MR. JOHNSON

18      Q.      So you heard -- or where were you when

19  Mr. DePover gave the 15-car count?

20      A.      I was standing next to him when he gave the

21  15-car count.

22      Q.      At any time after that before the movement came

23  to a stop, was he observed updating his car count to the

24  Engineer?

AccuTran Global Enterprises, Inc.
855-552-0505

CP_000060

John Sexton; Justin DePover
February 10, 2021

44

1      A.      No, he followed my instruction by not providing

2    any other car counts until I -- until the movement came to a

3    stop.

4         MR. JOHNSON:  Okay.  I have no further questions.

5            Any follow-up for you, Mr. Rainwater?

6         MR. RAINWATER:  Just one.

7    BY:  MR. RAINWATER

8         Q.      Mr. Jared, were we able to see your vehicle in

9    the video evidence?  Is it pictured in the video?

10        A.      It must be 'cause of your mask, I can't -- I

11   can't hear you.  What did you say?

12        Q.      I have a feeling that if you were here in

13   attendance, you woulda heard me just fine.

14            Were we able to see your vehicle that you exited

15   from in the video that you provided?

16        A.      No.

17        Q.      So it's not in the camera view.  Is that

18   correct?

19        A.      That is correct.

20        Q.      I don't know if we can pull that video back up.

21   Can we make an estimation about how far away the maximum screen

22   view goes between Mr. DePover and the -- and the e -- edge of

23   the vee -- of the visual video evidence?

24        A.      Are you gonna have Mr. Johnson pull the video

AccuTran Global Enterprises, Inc.
855-552-0505

CP_000061

John Sexton; Justin DePover
February 10, 2021

45

1    back up?

2        MR. JOHNSON:  Yeah, I'm pulling it back up right now.

3        MR. SEXTON:  Yeah.

4        Q.     All right.  So --

5        MR. SEXTON:  Can't see it.

6        MR. RAINWATER:  Yeah, we don't see Mr. Jared's vehicle

7    in view.  And I would estimate, just by --

8        MR. SEXTON:  Fifty yards.

9        MR. RAINWATER:  Yeah, it probably -- probably at least

10   tw -- thirty to forty yards at a minimum.

11       Q.     Okay.  I just wanted to note that for the

12   record, your vehicle is not in view and you didn't have a radio

13   on your person, as you said earlier.

14       MR. RAINWATER:  Thank you.  No further questions at this

15   time.

16       MR. JOHNSON:  Okay.  Just a couple follow-up for ya.

17   BY:  MR. JOHNSON

18       Q.     Mr. Jared, you've already testified that you

19   were standing next to -- which the video shows -- standing next

20   to Mr. DePover when he gave the 15-car count.  Were you --

21       A.     That's correct.

22       Q.     Were you near your radio when the initial

23   communication of 50, 5-0, cars was given?

24       A.     I was.

CP_000062

John Sexton; Justin DePover
February 10, 2021

46

1       Q.      And was that i -- inside your vehicle?  Or were

2  you outside the vehicle?

3       A.      I was inside my vehicle at the time.

4       Q.      Okay.  So it was clear and then you -- what did

5  you do after you heard the 50-car count?

6       A.      After I heard the 50-car count, I did dismount

7  my vehicle, which is about by that light pole that you see --

8  well, you cannot see the bottom of that light pole, but about

9  that -- about that location, I -- I dismounted my vehicle.  As

10 you've seen from the video, I came up from the bottom of the

11 video.  And then I -- I approached Mr. DePover as he was making

12 his shoving movement.

13      Q.      Okay.  And then you gave him the instruction for

14 the 15-car count without an update?

15      A.      Mr. DePover provided that 15-car count.  And

16 then once he did that, I asked him not to transmit over the

17 radio any more until -- until the test was done.

18      Q.      Okay.

19      MR. JOHNSON:  I have no further questions.

20          Any follow-up from you, Mr. Rainwater?

21      MR. RAINWATER:  No, just like to keep him available for

22 recall should a -- the need arise.

23      MR. JOHNSON:  Okay.  Mr. Jared, you're released from

24 testimony at this time.  I'm gonna put our end on mute.  Should

John Sexton; Justin DePover
February 10, 2021

47

1    a need arise to have you testify, I can contact you via phone

2    and we'll get set back up on Zoom.

3         MR. RAINWATER:  So just --

4         MR. JARED:  That's correct.

5         MR. RAINWATER:  Just for the record, you're gonna mu --

6    mute it and close the video?  He's not gonna have any access to

7    the remainder of this hearing, is he?

8         MR. JOHNSON:  No.  What I can do is end the meeting.

9         MR. RAINWATER:  Yeah.

10        MR. JOHNSON:  That way, then --

11        MR. RAINWATER:  Yeah, we would --

12        MR. JOHNSON:  -- it -- it --

13        MR. RAINWATER:  -- like that to happen, to be

14   sequestered.  Correct.  Yes.

15        MR. JOHNSON:  Okay.  All right.  Yeah, just stay

16   available by phone in case we need to have you recalled so we

17   can get you on video.

18        MR. JARED:  Okay.

19        MR. JOHNSON:  All right.  Thank you, Mr. Jared.

20                  (Whereupon Mr. Jared exits the

21                   investigation/hearing)

22        MR. JOHNSON:  I don't know what that's gonna do to him,

23   but.  I muted, so.

24        MR. RAINWATER:  Or -- okay.  We're not on the record?

AccuTran Global Enterprises, Inc.
855-552-0505

**CP_000064**

John Sexton; Justin DePover
February 10, 2021

48

1        MR. JOHNSON:  Do you need a quick recess?

2        MR. RAINWATER:  Yeah, if we're on break, I'd, you know

3   --

4        MR. JOHNSON:  Okay.

5        MR. RAINWATER:  I drank a lotta tea coming in.

6        MR. JOHNSON:  Yep.  Time is 13:14.  We'll take a short

7   recess.

8                    (Whereupon, a short recess was taken.)

9        MR. JOHNSON:  All right.  The time is 13:20, resuming

10  with the Sexton-DePover Investigation.

11       Finished questioning Mr. Jared.  He's been

12  sequestered and is no longer able to see any video or hear any

13  audio at this time, so.

14       I will call Mr. DePover next.

15                    JUSTIN DEPOVER

16  called as a witness by the Company herein, was examined and

17  testified as follows:

18                  E X A M I N A T I O N

19                  By:  Mr. Johnson

20       Q.    Mr. DePover, I've already asked you all the

21  preliminary questions.  What assignment were you working on

22  February 1st of 2021?

23       A.      That'd be the -- the CP 474-31.

24       Q.      Okay.  And do you remember the incident that --

John Sexton; Justin DePover
February 10, 2021

49

1      A.      Yeah.

2      Q.      -- Mister -- Mr. Jared explained?

3      A.      Yes.

4      Q.      Or described?

5      A.      Yes.

6      Q.      Were these -- in Exhibit 4, were these your

7  markings?

8      A.      Yes, I made all the markings on Exhibit 4, the

9  Tonnage Profile.

10     Q.      Okay.  So this black line under 76, what was

11 that?

12     A.      That was our initial cut location bef -- prior

13 to shoving any tracks.

14     Q.      Okay.  So it --

15     A.      We -- we ended up leaving that on the Main Line.

16     Q.      Which --

17     A.      Fr --

18     Q.      -- car?

19     A.      S -- car number 77 and behind --

20     Q.      Okay.

21     A.      -- is what was left on it.

22     Q.      So you just -- you had ahold of 76 cars then --

23     A.      Yes.

24     Q.      -- as Mr. Jared described?

CP_000066

John Sexton; Justin DePover
February 10, 2021

50

1      A.      Yes.

2      Q.      Okay. So we go up, there's a blue mark under

3   line 64. Is that correct?

4      A.      Yes.

5      Q.      What is that?

6      A.      That would've been when I told them that there

7   were 15 cars remaining and that he was clear for 40 still at

8   that time. And then the -- the next blue line would've been

9   the actual car or the stop, which was in front of us at the

10  time on the -- when he -- when Mr. Sexton did have the train

11  stopped. And then the -- then I did also indicate the DP unit,

12  which we were to set out to a separate track.

13     Q.      Okay.

14     A.      So that would've been the end of our cut, right

15  -- right at the -- car number 49 would've been the -- the cut

16  location to leave into Nahant 4.

17     Q.      Okay. So you gave him 15 cars. Correct?

18     A.      So li --

19     Q.      At line 64?

20     A.      So my initial movement woulda been the clear for

21  50 to start him into the track --

22     Q.      Okay.

23     A.      -- and I asked for 25 at the time. And then the

24  next call was still clear for 40, had 15 until the stop.

AccuTran Global Enterprises, Inc.
855-552-0505

**CP_000067**

John Sexton; Justin DePover
February 10, 2021

51

1      Q.      Okay.

2      A.      Which was when I was told not to respond to any

3   remarks on the radio yet.

4      Q.      Okay.  And then under line 53 --

5      A.      Tha -- that was when the train actually came to

6   a stop.

7      Q.      Okay.  So you gave him 15, clear for 40?

8      A.      Yes.

9      Q.      Is what you're saying?

10      A.      Yes.

11      Q.      Okay.  Exhibit 5 was your -- is that a statement

12   that was written by you?

13      A.      Yes.

14      Q.      Okay.  And in that letter, do you say -- or in

15   that statement, do you say anything about anything other than a

16   count of 15?

17      A.      On -- on written, I do just have the 15 count

18   and that it stopped after the 11.

19      Q.      Okay.  So if you had given him that instruction,

20   why wouldn't you put that in there?

21      A.      Well, hon -- honestly, it -- with it being my

22   second start back and I was in a closed room with the General

23   Manager, whom I've never met, and Mr. Smith, I was quite under

24   some pressure.

AccuTran Global Enterprises, Inc.
855-552-0505

**CP_000068**

John Sexton; Justin DePover
February 10, 2021

52

1          MR. JOHNSON:  Okay.  I have no further questions for

2     Mr. DePover at this time.

3              Mr. Rainwater, any follow-up with Mr. DePover --

4          MR. RAINWATER:  Yes.

5          MR. JOHNSON:  -- for you?

6     BY:  MR. RAINWATER

7          Q.     So specifically to Exhibit 5 here, your

8     statement, did you -- was this statement given willingly?  Or y

9     -- were you compelled to give it?

10         A.     I -- I'd say compelled.  I didn't even know I

11    had a choice not to, if that was even a thing.

12         Q.     Okay.  So did you feel intimidated, being in the

13    room with Mr. Jared?

14         A.     Yes, I did.

15         Q.     Did he make any inferences or assum -- or did

16    you assume, based upon what he was asking for, that if you

17    didn't do it, you would be in trouble?

18         A.     I -- I do feel that way still.  I -- I -- I

19    wrote down what I was thinking at the time --

20         Q.     Okay.

21         A.     -- and --

22         Q.     Related back to the video that we watched, I'll

23    ask you the same thing I asked Mr. Jared.  Did -- did Mr. Jared

24    have a radio on his person, a -- a portable?

John Sexton; Justin DePover
February 10, 2021

53

1          A.      He did not.

2          Q.      And his vehicle wasn't within view of the

3    screen.  Is that correct?

4          A.      My back was to it also, so I had --

5          Q.      And your ba --

6          A.      No.  Yeah.

7          Q.      So you didn't see it either?

8          A.      That's correct.

9          Q.      And so you gave instruction, then, after you

10   were prepared to shove into the track.  What did -- what did

11   you tell Mr. Sexton as far as instructions for to initiate your

12   move?

13         A.      The -- the initial movement woulda been that we

14   were clear for 50 cars, and I would've started him in with

15   needing 25 to a stop.  And then I updated him with needing 15

16   more to a stop, still clear for 40 --

17         Q.      Okay.

18         A.      -- and then I was informed not to --

19         Q.      So --

20         A.      -- proceed anymore.

21         Q.      So do you believe because Mr. Jared didn't have

22   a radio on his person, he didn't hear you say clear for 40?

23         A.      I -- that's my assumption.

24         Q.      All right.  So based upon the car counts that

John Sexton; Justin DePover
February 10, 2021

54

1   you were given, the f -- the -- you were shoving 26 cars into

2   this track.  Correct?

3        A.      Yes.

4        Q.      T -- to cut away at your DP?

5        A.      **The initial cut, yes.**

6        Q.      And you were planning to cut away at your DP on

7   the initial cut.  Correct?

8        A.      Yes.

9        Q.      All right.  And so you told him clear for 50

10  cars.  If he shoved a -- I'm sorry.  One -- once he shoved a

11  little bit more, it looks like he shoved in 13 cars, and then

12  you told him 15, clear for 40.  Is that correct?

13       A.      **That's correct.**

14       Q.      All right.  So if he stops in 11, does he still

15  have more than -- what -- what's the half the -- half the range

16  of 40?

17       A.      **Be 20, so, no.**

18       Q.      So he would still technically have nine cars

19  available to him.  Correct?

20       A.      Yes.

21       Q.      All right.  And Mr. Jared as well as yourself ha

22  -- have testified here that these cars -- some of these cars

23  are short, 42 footers.  Is that correct?

24       A.      Yes.

John Sexton; Justin DePover
February 10, 2021

55

1      Q.      T -- to your railroad knowledge, limited though

2    it may be, what's -- what's about the average car length?

3      A.      I'd say about 50 to 60, averaging.

4      Q.      Okay.  And these were 42-foot cars, a -- a bunch

5    of 'em, in your cut?

6      A.      Yes.

7      Q.      So does that mean those smaller cars are gonna

8    come at you a little bit quicker?

9      A.      Yes.

10     Q.      Mm-hmm.

11     A.      Yes, they were.  I believe I even mentioned on

12   the radio call that -- that I had short cars in there --

13     Q.      Okay.

14     A.      -- so he was aware.

15     Q.      And so after Mr. Sexton -- all right.  So I

16   wanna back up, I guess.  After you tell him 15, clear for 40,

17   what happened with Mr. Jared?

18     A.      He came up from behind me and just informed me

19   to stop -- speedf -- or stop replying on the radio.

20     Q.      All right.  Did he kinda catch ya off guard?

21     A.      Yeah, I'd had no idea he was behind me.

22     Q.      All right.  So he -- he kinda distracted you

23   from performing your duty --

24     A.      I --

John Sexton; Justin DePover
February 10, 2021

56

1        Q.      -- for a little bit?

2        A.      Yes, I was engaged with talking with him.

3        Q.      Okay.  So di -- and did Mr. Jared interrupt you

4    while the cars were moving next to you?

5        A.      The -- the shoving movement was already

6    occurring.  Yes.

7        Q.      Okay.  And then after Mr. Jared instructed you

8    not to reply to Mr. Sexton over the radio, what occurred next?

9        A.      I kinda verified it with him at the time because

10   I -- I wanted to give him proper car counts still, but he just

11   kept insisting that I did not reply, and we just waited until I

12   -- then Mr. Sexton eventually did stop the train after

13   inquiring where I was.

14       Q.      All right.  So a -- after Mr. Sexton inquired to

15   where you were and you were unable to respond at the direction

16   of Mr. Jared, did Mr. Sexton continue to ask for you on the

17   radio?

18       A.      Yes, he probably asked about three or four

19   times, even after stopped, and then also tried to get ahold of

20   the Yard Office to relay for him if he couldn't hear me.

21       Q.      All right.  So i -- that was even after he

22   stopped.  And it sounded like he was concerned for your

23   well-being?  Or didn't know what was happening?

24       A.      Yeah, he definitely sounded like he had no idea

AccuTran Global Enterprises, Inc.
855-552-0505

CP_000073

CP Resp. App. - 106

John Sexton; Justin DePover
February 10, 2021

57

1   what was going on.

2        Q.    All right.  With regard to this written

3   statement that you made, were you -- were you still within your

4   12 hours?  Or was this after your -- the expiration of your

5   hours of service?

6        A.    That woulda been after.

7        Q.    And just to jar your memory here, do you recall

8   Mr. Jared stating that you were not at fault for the

9   allegations in this hearing?

10       A.    During this hearing, yes.

11       MR. RAINWATER:  N -- no further questions at this time.

12       MR. JOHNSON:  Okay.  I just have a couple follow-up

13  questions.

14  BY:  MR. JOHNSON

15       Q.    Where was Mr. Jared when you gave the 15-car

16  count?

17       A.    He was walking up behind me at the time.  I'm --

18  I'm not sure where he woulda been right behind me.  After I

19  gave the 15-car count and the clear for 40, he then came up

20  beside me and I was able to notice that he was in the track

21  with me.

22       Q.    Okay.  So did Mis -- you -- you -- you testified

23  that Mr. Sexton had tried to contact you after approximately

24  seven cars had gone by you?

John Sexton; Justin DePover
February 10, 2021

58

| | | |
|---|---|---|
| 1 | A. | I'd -- I'd say it was around there, yes. |
| 2 | Q. | Okay. So if he was clear -- |
| 3 | A. | I was -- |
| 4 | Q. | -- for 40, why would he have need to call you? |
| 5 | A. | Well, because I -- I gave him a 15-car to a |

6  stop.

7       Q.      Okay. How many cars on here are labeled as

8  42-foot cars from between your blue marks?

9       A.      Well, that is in betwee -- between -- just

10  between the blue marks, though, you're --

11      Q.      Yeah, just between --

12      A.      -- [indiscernible] --

13      Q.      -- line 54 and 64.

14      A.      [indiscernible] 54.

15      Q.      Yeah, sorry, 'cause the --

16      A.      No, that's all right.

17      Q.      -- copy's --

18      A.      One, two, three, four, five -- be seven of 'em.

19      Q.      Okay. I'll give you a moment. What's that

20  distance?

21      A.      Oh, shoot. Forty-two -- it's been a while, so

22  28 -- looks like 294 --

23      Q.      Okay.

24      A.      -- for -- for just those cars.

John Sexton; Justin DePover
February 10, 2021

59

1       Q.       Okay.  So I also see line 60.  What is that for

2   a length?

3       A.       Fifty-one.

4       Q.       Okay.

5       A.       He --

6       Q.       So add that to it.

7       A.       All right.  So it'd be 345 now.

8       Q.       Okay.  And then if we -- lines 54, 55, and 56

9   have a same length next to them.  What is that?

10      A.       [indiscernible] be 2 -- be 213 for those three

11  in addition to the one -- [indiscernible].  So yeah, I -- a

12  total length, I've -- I figure that'd be 558 feet.

13      Q.       Okay.  So that was 558 feet from when you gave

14  the 15-car instruction to the stop.  Correct?

15      A.       Yeah, I believe so.  Yes.

16      Q.       Okay.  And you said the average railcar is 50 to

17  60 feet?

18      A.       I'd -- I'd say on average, yes, about 50 to 60.

19      Q.       Okay.  So let's just go with the longer of the

20  two distances.  How many car lengths would 15 cars be?

21      A.       Fifteen to sixty.  That's 30.  [whispered] All

22  right.  Yeah, that's -- that's all -- am I -- am I right to say

23  900?

24          MR. SEXTON:  That's right.

John Sexton; Justin DePover
February 10, 2021

60

1        MR. RAINWATER:  Fifteen cars at 60 feet?

2        A.      So -- yeah, yeah, fifty and sixteen feet.  Yeah,

3  so -- so that'd -- yeah, it's 900 feet.

4        Q.      Okay.  So if we divide that in half --

5        A.      That'd be 450 then.

6        Q.      So is 5 -- 558 further than what the -- half the

7  distance would be of 15?

8        A.      Fifty's -- I'm just -- I'm not the best at math,

9  I'm sorry.

10       Q.      Okay.

11       A.      [indiscernible] --

12       Q.      Is --

13       A.      It's just what it [is], yeah.

14       Q.      So the 450 feet --

15       A.      Yes.

16       Q.      -- that would be half the distance specified for

17  the 15-car count.  Correct?

18       A.      Okay.  Okay.  Yes.

19       Q.      Okay.  So is 558 feet that he traveled, is that

20  --

21       A.      The -- the --

22       Q.      -- without any further instruction from you, is

23  that greater or less than --

24       A.      Then that would be -- yeah, 558 is greater than

John Sexton; Justin DePover
February 10, 2021

61

1  450.

2      Q.     Okay.

3      MR. JOHNSON:  All right.  I have no further questions at

4  this time.

5          Mr. Rainwater, any --

6  BY:  MR. RAINWATER

7      Q.     And related --

8      MR. JOHNSON:  -- follow-up?

9      Q.     -- to our math exercise here, Mr. DePover, so

10  assuming the cars are 60 feet long, if you got a count of 40 --

11  40 cars, is it correct to say that 60 times 40 is 2400 feet?

12      A.     Oh, 60, 40, 12, 24 [whispered] -- yes.

13      Q.     And half of that'd be 1200 feet?

14      A.     Yes.  Half of twent -- 24 feet --

15      Q.     And the length that Mr. Sexton shoved before he

16  stopped was 558 feet, which is less than 1200 feet.  Correct?

17      A.     That's -- that is correct.

18      MR. RAINWATER:  No further questions.

19      MR. JOHNSON:  Okay.  I have no further questions at this

20  time.

21          Mr. DePover, you're released from testimony at this

22  time.  Subject to recall.

23          Do you need a recess or anything before we continue

24  with -- no.  Okay.

CP_000078

John Sexton; Justin DePover
February 10, 2021

62

1       MR. RAINWATER:  I'm good.

2       MR. JOHNSON:  All right.  Next, we'll call Mr. Sexton.

3                    JOHN SEXTON

4   called as a witness by the Company herein, was examined and

5   testified as follows:

6                E X A M I N A T I O N

7                By:  Mr. Johnson

8       Q.     Mr. Sexton, what assignment were you working on

9   February 1st of 2021?

10      A.     474-31.

11      Q.     And were you the Engineer or Conductor?

12      A.     Engineer.

13      Q.     Okay.  Do you recall the shove movement that was

14  described by Mr. Jared and Mr. DePover?

15      A.     I do.

16      Q.     Okay.  Were you given a 50, 5-0, car count as

17  your initial count?

18      A.     I was.

19      Q.     Okay.  And what was the next instruction you

20  were given over the radio?

21      A.     Believe it was good for -- still good for 40, 15

22  -- 15 cars to a stop, with emphasis on good for 40.

23      Q.     Okay.  After you were given that instruction,

24  did you try contacting Mr. DePover again?

AccuTran Global Enterprises, Inc.
855-552-0505

**CP_000079**

John Sexton; Justin DePover
February 10, 2021

63

1        A.        I did, about three or four times, that's

2    correct.  And also, the Nahant ATM.

3        Q.        Okay.  And why were you trying to contact

4    Mr. DePover or the ATM?

5        A.        I'd -- I could not contact -- I could not reach

6    him via radio and -- and our radios are not very good

7    sometimes, and sometimes the ATM must relay for us to complete

8    our work in the yard.

9        Q.        Okay.  And why were you trying to contact

10   Mr. DePover at that time?

11       A.        He -- he gave me a -- a car count, and I know

12   Mr. DePover, we've had what I call rolling job briefings for

13   almost 22 years now.  And I told him that -- update me as -- as

14   much as he can, as -- as often as he can, and I'd heard nothing

15   else.  And that's when I was reaching out to Mr. DePover.

16       Q.        Okay.  Do you know the distance that you had

17   traveled, prior to the math exercise we had?

18       A.        I do not.  Other than your -- the -- the math

19   exercise, no, sir.  All I know is I was good for 40 cars, which

20   is 2400 feet.  And during the -- the previous testimony, what,

21   it was 550 feet that I stopped at?  Is that -- is that correct,

22   sir?  I think that's what you said.

23       MR. DEPOVER:  558.

24       Q.        That's 5 -- 558 was --

John Sexton; Justin DePover
February 10, 2021

64

1     A.     Yeah.

2     Q.    -- what Mr. DePover s --

3    MR. SEXTON:  558, you're saying?

4    MR. DEPOVER:  Yeah.  Mm-hmm.

5    MR. SEXTON:  Okay.

6     A.     Yeah.

7     Q.    Based on what the car lengths --

8     A.     Yep, that --

9     Q.    -- were on the Tonnage Profile.

10    A.    That's fair.

11    Q.    So you knew you -- you were gonna have to stop

12 within 15 cars when he gave that instruction?

13    A.    He told me I was good for 40 cars, but then he

14 changed it to 15.  Yes.

15    Q.    Okay.

16    MR. JOHNSON:  I have no further questions at this time

17 for Mr. Sexton.

18      Mr. Rainwater?

19 BY:  MR. RAINWATER

20    Q.    So just to clarify, Mr. DePover told you you

21 were clear for 40 cars, but he only needed 15 more to a stop

22 cut.  Was that your understanding?

23    A.    Initially, sir, it was clear track, good for 50

24 --

John Sexton; Justin DePover
February 10, 2021

65

1        Q.        Right.  That was --

2        A.        -- 5-0, cars.

3        Q.        That was at the be --

4        A.        We all have masks on in here.

5        Q.        Right.

6        A.        Good for 5-0 cars.  And then he -- once

7    Mr. DePover was -- he updated me, he said still good for 40,

8    15, 1-5, to a stop.  That's correct.

9        Q.        Okay.  So based upon your round trip with

10   Mr. DePover, was this -- he just returned from furlough.

11   Correct?

12       A.        Yes, sir, he did.

13       Q.        And -- and how many trips had he made prior to

14   this event?

15       A.        One; that was with me, going north to Marquette,

16   sir.

17       Q.        So you're on the round trip of his first trip

18   back from an 11-month furlough.  Is that correct?

19       A.        That is correct.

20       Q.        And so based upon your previous statement,

21   you're -- you said you were having rolling job briefings with

22   him.  It -- was that just this trip?  Or the way up as well?

23       A.        On the way up --

24       MR. JOHNSON:  Okay.  Mr. Rainwater --

John Sexton; Justin DePover
February 10, 2021

66

1       MR. RAINWATER:  I'm coming to --

2       MR. JOHNSON:  -- let -- let's --

3       MR. RAINWATER:  -- to the point.  I'm coming to the

4   point.

5       A.      On -- on -- on the way -- I -- now, I do this

6   with everyone I work with, sir.  The rolling -- when I say

7   rolling job briefings, I'm talking about whatever is going on

8   at the time, what's coming up, what we need to do, and how

9   we're gonna execute it.

10      Q.      And so is the reason that you were asking

11  Mr. DePover for frequent car counts was just to make sure he

12  both understood what he was doing and you knew where he was

13  gonna be?

14      A.      Yes, sir.

15      Q.      All right.  So whenever you lost communication

16  with Mr. DePover through the manipulation of General Manager

17  Jared with this set up test, did it create a little

18  consternation with yourself?  Or were you concerned?

19      A.      Absolutely I was.  I didn't know what happened,

20  and I was wanting to know where he was and make sure he was

21  safe.

22      Q.      All right.  With regard to this shove move, in

23  and of itself, can you reference GCOR 6.5?  I believe you have

24  a copy of that.  Do you?

John Sexton; Justin DePover
February 10, 2021

67

1        A.        I do, sir.  Would you like me to read it?

2        Q.        If you could, please read the first paragraph.

3        A.        This is GCOR 6.5 Shoving Movements:

4           "Equipment must not be shoved 'til

5        the engineer and employee protecting

6        the movement have completed a job

7        briefing concerning how protection will

8        be provided.  Employee must be in

9        position, provide visual protection of

10       the equipment being shoved and must not

11       engage in unrelated tasks while

12       providing protection."

13       Q.        Because Mr. Jared interrupted Mr. DePover while

14   he was protecting your shove, do you believe Mr. Jared enticed

15   Mr. DePover an — and, therefore, broke this Rule?

16       A.        Absolutely.

17       Q.        Mr. Jared caused that Rule to be violated?

18       A.        Absolutely.  He created a unsafe act.

19       Q.        All right.

20       MR. RAINWATER:  So, Mr. Johnson, I'm gonna pass you a

21   copy of a few pages from the US Efficiency Test Manual on the

22   Operating Rules Compliance With FRA 217.  This is the Testing

23   --

24       MR. JOHNSON:  I --

AccuTran Global Enterprises, Inc.
855-552-0505

**CP_000084**

John Sexton; Justin DePover
February 10, 2021

68

1        MR. RAINWATER:  -- and Operating Rules manual that CP

2   gives to its managers, which gives instructions on how to set

3   up tests and perform testing with regard to Operating Rules.

4   And at this time, I'd like to go through --

5        MR. JOHNSON:  I don't understand how this has to do with

6   whether or not Mr. Sexton or Mr. DePover --

7        MR. RAINWATER:  I'll tell you exactly --

8        MR. JOHNSON:  -- complied with the Rules.

9        MR. RAINWATER:  Yeah, I'll tell you exactly how it has

10  to do with it.  It's because Mr. Jared set up an un -- unsafe

11  and unsanctioned test based on CP's own Rules.  If you go to

12  page 107, as noted on the bottom of this, for test GRF02, this

13  test can only be conducted under observation practices.  It

14  cannot be set up, there's no provision that allows CP managers

15  to tell a Conductor to stop communicating with the m -- with

16  the Engineer to determine if they're gonna stop in half the

17  range of vision, and there's reasons for that.  It sets up an

18  unsafe condition, and it's outside of the normal operating

19  parameters that we have to work under.

20           So in addition to that, I'd like to go through some

21  questioning exercises with Mr. Sexton with regard to -- to

22  entering this, also, as an exhibit.

23       MR. JOHNSON:  Okay.  Once again, I'm here to determine

24  whether or not he stopped within half the range.

John Sexton; Justin DePover
February 10, 2021

69

1          MR. RAINWATER:  Mm-hmm.

2          MR. JOHNSON:  I'm not here to determine --

3          MR. RAINWATER:  Right.  We've already proven that

4    Mr. Jare -- Mr. Sexton stopped within half the range of the 40

5    cars specified, actually less than that.  Now we intend to

6    prove that Mr. Jared conducted an unfair test.

7          MR. JOHNSON:  Okay.  Now if you have something against

8    -- with -- an issue with Mr. Jared, there's other means.  I'm

9    here solely to determine what's in the body of the Charge

10   Letter, not --

11         MR. RAINWATER:  Right.  I get it.

12         MR. JOHNSON:  -- outside of that, and you're going

13   outside --

14         MR. RAINWATER:  So Mr. Jared testified --

15         MR. JOHNSON:  -- of that.

16         MR. RAINWATER:  -- that he te -- conducted an efficiency

17   test for shove compliance, shove Rule compliance.  And I

18   believe as part of the facts and circumstances, this evidence

19   that we have here from the Testing Manual will bear out that

20   that test was conducted unfairly, and that's part of th -- the

21   -- the rest of the facts and circumstances with regard to this

22   test.

23         MR. JOHNSON:  So once again, Mr. Rainwater, we're here

24   to determine the facts and -- within the body of this.  If you

AccuTran Global Enterprises, Inc.
855-552-0505

**CP_000086**

CP Resp. App. - 119

John Sexton; Justin DePover
February 10, 2021

70

1   have issue with how the test was conducted, things like that,

2   that has -- y -- that's not relevant to this investigation.

3       MR. RAINWATER:  No, I beg to differ.  I disagree with

4   you.  And -- you know, I've given a lot of leniency on my own s

5   -- behalf here, with Mr. Jared testifying via Zoom, sending e

6   -- exhibits via email, taking a recess in the middle of his

7   testimony to make copies.  All I'm asking for is the opperdin

8   -- tunity to do the same thing as far as entering evidence on

9   behalf of Mr. Sexton that you guys took.  I -- it -- to give me

10  the same opportunity.

11      MR. JOHNSON:  Again, I have no idea what this has to do

12  with whether or not Mr. Sexton --

13      MR. RAINWATER:  Yeah.

14      MR. JOHNSON:  -- or Mr. DePover complied with the Rules.

15      MR. RAINWATER:  We've already shown that he complied

16  with the Rule.  We're telling you that Mr. Jared set up the

17  test unfairly.

18      MR. JOHNSON:  Well, now, I haven't -- I haven't

19  completed this, so there has not been a decision whether they

20  complied or --

21      MR. RAINWATER:  And I understand --

22      MR. JOHNSON:  -- did not comply with the Rule, so --

23      MR. RAINWATER:  I do.

24      MR. JOHNSON:  -- you're making speculation based on your

John Sexton; Justin DePover
February 10, 2021

71

1    --

2         MR. RAINWATER:  Based on the evidence --

3         MR. JOHNSON:  -- right --

4         MR. RAINWATER:  -- pre -- presented so far in this

5    hearing --

6         MR. JOHNSON:  Well --

7         MR. RAINWATER:  -- that's exactly right.  I guess --

8         MR. JOHNSON:  And you know that --

9         MR. RAINWATER:  -- just to --

10        MR. JOHNSON:  -- I have to make a determination, so.

11        MR. RAINWATER:  Just as a point of order, if we can back

12   up to GCOR 6.5, can we please enter that as a Organizational

13   exhibit?  I forgot to get that marked.

14        MR. JOHNSON:  Okay.

15        MR. SEXTON:  What number is that, sir?

16        MR. RAINWATER:  That'll be at the determination of the

17   Hearing Officer.

18        MR. JOHNSON:  Let's do Exhibit 7.

19                   (Whereupon, the document was marked as

20                    Exhibit 7 for identification.)

21        MR. RAINWATER:  Okay.

22        MR. JOHNSON:  Just to --

23        MR. RAINWATER:  Exhibit 7.  All right.

24   BY:  MR. RAINWATER

John Sexton; Justin DePover
February 10, 2021

72

1          Q.     And as part and parcel of that, in the US

2     Efficiency Testing Manual, Mr. Sexton, page 13 lists some dos

3     and don'ts.

4          MR. JOHNSON:  Okay.  So once again, Mr. Jared is not

5     under investigation at this time.

6          MR. RAINWATER:  Yeah, I get that.

7          MR. JOHNSON:  So we're not gonna go off onto this --

8          MR. RAINWATER:  Okay.  We believe that this test was set

9     up in an unfair manner.  Regardless of whether or not

10    Mr. Sexton did or didn't comply with it, tests have to be

11    conducted in a fair manner.  Right?  And by virtue of the

12    actions of Mr. Jared not even following along with what the

13    manual dictates as what is an acceptable test based upon just

14    purely being ab -- able to observe the actions, by -- by

15    manipulating the conditions and telling Mr. DePover not to

16    respond to any questions or give him any further car counts, he

17    violated this -- it -- this whole process for what's considered

18    a fair efficiency test.  So that's why this is relevant to the

19    facts and circumstances of this investigation.

20         MR. JOHNSON:  Okay.  Mr. Rainwater, we're not gonna go

21    off into this realm.  I want to stick to whether or not

22    Mr. Sexton and Mr. DePover complied with the Rules --

23         MR. RAINWATER:  So am I --

24         MR. JOHNSON:  -- and if you have issue with Mr. Jared's

John Sexton; Justin DePover
February 10, 2021

73

1  testing, that needs to be taken up with somebody outside of

2  this room.  I don't --

3      MR. RAINWATER:  Oh, it -- it will be, I promise.  But am

4  I to understand correctly, Mr. Johnson, that you are preventing

5  me from entering evidence that's relative and relevant to this

6  hearing?

7      MR. JOHNSON:  I don't know how it's relevant to this

8  hearing because it does not --

9      MR. RAINWATER:  I've explained it in three different

10  ways --

11      MR. JOHNSON:  This does not --

12      MR. RAINWATER:  -- Mr. Johnson.

13      MR. JOHNSON:  This does not give me any idea of whether

14  or not Mr. Sexton or Mr. DePover -- that's -- that's why I'm

15  not going into this.  Mr. Jared isn't under investigation

16  here.  That's a -- that's all stuff that you can take up with

17  --

18      MR. RAINWATER:  Well, maybe he should be.

19      MR. JOHNSON:  -- other in -- individuals.

20      MR. RAINWATER:  I understand, Mr. Johnson.  And I'll

21  move on, since you're not going to allow me any kinda leeway

22  whatsoever with presenting my own case.  I understand -- were

23  -- when were you informed, sir, of when you were going to be

24  the Hearing Officer?  Was it today, for this hearing?

CP_000090

John Sexton; Justin DePover
February 10, 2021

74

1         MR. JOHNSON:  Last night.

2         MR. RAINWATER:  So last night.  Okay.  On February 8th,

3   I sent an email to Mr. Reyes.  It's got -- who, at the time, up

4   until today, I inter -- was under the impression he was gonna

5   be the Hearing Officer -- and this letter states:

6              "Mr. Reyes,

7              The purpose of this letter is to

8         formally request witness -- witnesses,

9         be made available in the hearing

10        scheduled Wednesday, February 10, 2021

11        at 1200 in the matter of John Sexton

12        and Justin DePover and their alleged,

13          Failure to stop within half the

14        specified distance given while shoving

15        into track NA04

16          On behalf of both Principals, the

17        Organization requests the following:

18          Witnesses

19          Andrew Cruciani, a.  We have reason

20        to believe that Cruc -- Mr. Cruciani

21        was assisting the 474-31 crew at Nahant

22        yard.  It's our contention that he will

23        have first hand, and primary knowledge,

24        of the events and is a material

75

1    witness."

2    MR. RAINWATER:  And:

3    "b.  David Cox -- We have reason to

4    believe that Mr. Cox was able to

5    overhear the radio conversation

6    relative to the charges, therefore

7    making him a material and primary

8    witness as well.

9    Since the Organization is unable to

10   approve or compel the absences of these

11   two witnesses for a hearing, I ask that

12   their time off be approved ahead of the

13   hearing to allow them to pers -- to be

14   present to testify.

15   I thank you for your time and would

16   appreciate a pre-hearing response to my

17   request.  And while I look forward to

18   that, I would appreciate any response

19   be specific to the recrest -- request

20   made rather than the typical form

21   letter response that "this isn't a

22   court of law and the Organization

23   doesn't have the right to discovery

24   ahead of the hearing." I'm not

John Sexton; Justin DePover
February 10, 2021

76

1        requesting discovery ahead of the

2        hearing.  I'm only requesting that

3        specific and pertinent wist --

4        witnesses, be made available at the

5        time of, and during, the hearing

6        process."

7        MR. RAINWATER:  I sent this February 8th to Mr. Reyes.

8    I'm guessing he didn't forward that to you.  Is that correct,

9    Mr. Johnson?

10        MR. JOHNSON:  Do you have any proof that you sent it?  I

11    mean --

12        MR. RAINWATER:  Yeah.

13        MR. JOHNSON:  -- I just see a letter.  I mean, I --

14        MR. RAINWATER:  Here's the email that went along with

15    it.  I thought it had a date stamp on it; it does not.  I can

16    show you that from my email, if you would so permit me.

17        MR. JOHNSON:  Well, if you're entering this as exhibit

18    --

19        MR. RAINWATER:  Yes, I am.

20        MR. JOHNSON:  -- I mean, once again, if the second page

21    you handed me is the email, there's no --

22        MR. RAINWATER:  Yeah, there --

23        MR. JOHNSON:  -- who it was to, who it was from, any of

24    that.

John Sexton; Justin DePover
February 10, 2021

77

1          MR. RAINWATER:  Yup, I get that.  I thought that was on

2    there, but printer must have cut that off and I didn't check

3    it.  Give me just a second.

4          MR. SEXTON:  Want me to go make copies of that?

5          MR. RAINWATER:  Sent two days ago, February 8, 2021 at

6    12:27 p.m.

7          MR. JOHNSON:  Is there any way we can print that?

8          MR. RAINWATER:  Yeah, I'll forward it to you, and then

9    you can print it.  I'd also send it to Joseph Adelfio and --

10   well, there's one other person that his name is slipping my

11   mind at the moment.

12          All right.  Mr. Johnson, this is coming to your email

13   now.  Oh, Benjamin Anderton was the other person that I sent it

14   to.  Do you wanna take a recess and print that?

15          MR. JOHNSON:  We'll take a short recess here.  Time is

16   13:51.

17                    (Whereupon, a short recess was taken.)

18          MR. JOHNSON:  Time is now 14:08, resuming the

19   Sexton-DePover Investigation.

20          All right.  Been handed a two-page document that

21   contained a -- an email for a request for witnesses from

22   Mr. Rainwater to Mr. Ja -- or Mr. Reyes.  Labeling this as

23   Exhibit 8.

24                    (Whereupon, the document was marked as

AccuTran Global Enterprises, Inc.
855-552-0505

**CP_000094**

John Sexton; Justin DePover
February 10, 2021

78

1              Exhibit 8 for identification.)

2        MR. RAINWATER: And that's both pages as Exhibit 8?

3        MR. JOHNSON: That is correct. The letter is the second

4   page, the email.

5        MR. RAINWATER: Okay. So just for the record, then,

6   to-- since we're -- just to refresh everybody since we're just

7   coming back on, I sent this email to Mr. Reyes on February 8th

8   at 12:27 p.m. I received no response, so -- and owing to the

9   fact that neither of the individuals requested were able to be

10  off of work and aren't here, I'll continue my questioning with

11  Mr. Sexton, if that's okay, Mr. Johnson.

12        MR. JOHNSON: Yes, you may continue.

13        MR. RAINWATER: All right.

14  BY: MR. RAINWATER

15        Q.    So, Mr. Sexton, related specifically to Mr. Cox,

16  to your knowledge, where was he during this alleged event?

17        A.    **Mr. Cox was sitting on the -- the 574 train on**

18  **the Main Line.**

19        Q.    And while you guys were making your moves off

20  the independent track and shoving into the yard? Correct?

21        A.    **That is correct.**

22        Q.    All right. So was he in a position to hear the

23  radio conversation?

24        A.    **His exact words were is -- I -- I heard every**

John Sexton; Justin DePover
February 10, 2021

79

1    word.

2        Q.      All right.  And if he was here, would he have

3    been able to testify to the fact that your Conductor,

4    Mr. DePover, gave a car count 40 cars, I need 15?  If he was

5    here?

6        A.      Yes.  But initially, it was 50, and then it was

7    --

8        MR. JOHNSON:  Okay.  That's --

9        A.      -- 40, good for 15.

10       MR. JOHNSON:  That --

11       A.      Correct.

12       MR. JOHNSON:  That's speculation and hearsay.

13       MR. RAINWATER:  No, it's perfectly reasonable,

14   Mr. Johnson, because we requested him to be here, and the fact

15   that the Carrier didn't provide for it as requested allows us

16   the latitude to show exactly what we think he woulda testified

17   to.  M -- it -- you know, if you'd at least given me a response

18   to know they can't be there for whatever reason, then maybe we

19   could have a discussion.  But we have every reason to believe

20   and to assume, rightfully so, what Mr. Cox woulda testified

21   to.  And I'll ask no further questions about it at this time,

22   related to Mr. Cox.

23       Q.      Mr. Sexton, can't remember if I asked you this

24   or not, but related to GCOR 6.5 as we entered as an exhibit,

John Sexton; Justin DePover
February 10, 2021

80

1    did Mr. Jared violate that Rule when he interrupted

2    Mr. DePover?

3         MR. JOHNSON:  Okay.  Mister --

4         A.    Yes.

5         MR. JOHNSON:  -- Rainwater, we're sticking to the -- the

6    Charge Letter.  If you have issues with Mr. Jared, you need to

7    take that up outside of the room --

8         MR. RAINWATER:  All right.  I --

9         MR. JOHNSON:  -- with others.

10        MR. RAINWATER:  I have no further questions for

11   Mr. Sexton at this time.  I would like to recall Mr. DePover.

12        MR. JOHNSON:  I'd like to do a couple follow-up.

13        MR. RAINWATER:  Sure.

14   BY:  MR. JOHNSON

15        Q.    So, Mr. Sexton, you testified that you tried to

16   reach the Nahant ATM because you weren't getting communication

17   back from your Conductor, Mr. DePover.  Correct?

18        A.    That was after I tried to call Mr. DePover two

19   or three times on the radio.  Yes.

20        Q.    Okay.  So why didn't you come to a stop before

21   trying to contact the ATM, knowing that you weren't --

22        A.    Well, I was good f --

23        Q.    -- getting any communication?

24        A.    I was good for 40 cars.

John Sexton; Justin DePover
February 10, 2021

81

1    Q.    Who was giving you shoving instructions?

2    A.    I had a man on the north end protecting the

3    shove, Mr. Cruciani, and I had Mr. DePover on the ground as

4    well, counting me down.

5    Q.    Okay.  So which employee was giving you your

6    shove instructions?

7    A.    Well, at the -- at the time, Cruciani was at the

8    north end of the yard.  He -- he -- he told me it was clear

9    track, good for 50.  Mr. DePover said the same thing, and then

10   he -- he said good for 40 cars, and I --

11   Q.    Who --

12   A.    -- need 15.

13   Q.    Who -- who said that?

14   A.    Mr. DePover.

15   Q.    Okay.  So who was giving your a -- your actual

16   shove instructions?

17   A.    At that point, it was Mr. DePover.

18   Q.    Okay.  Was Mr. Cox in any way tied in to your

19   shove movement?

20   A.    He was sitting on the Main Line observing

21   everything on a different train, listening to the radio

22   procedures.

23   Q.    Okay.  So he was just an observer.  He was not

24   tied in to your shove movement --

AccuTran Global Enterprises, Inc.
855-552-0505

CP_000098

John Sexton; Justin DePover
February 10, 2021

82

1       A.      He was not.

2       Q.      -- in any way.

3       A.      And he was on the witness list, and if he'd've

4  been called here, you could ask him that personally.

5       Q.      Okay.

6       MR. JOHNSON:  I have no further questions for Mr. Sexton

7  at this time.

8       MR. RAINWATER:  Like to recall Mr. DePover for a few

9  questions.

10      MR. JOHNSON:  All right.  You may.

11              E X A M I N A T I O N (continued)

12                   By:  Mr. Rainwater

13      Q.      Mr. DePover, when Mr. Jared walked up behind

14  you, d -- did you see him coming?  Or did he catch you off

15  guard?

16      A.      He caught me off guard.  I didn't know he was

17  there until he was right beside me on the track.

18      Q.      All right.  Then -- so he -- he caught you off

19  guard while cars were moving past you?

20      A.      While cars were moving, yes.

21      Q.      All right.  Did he -- did he announce himself or

22  say, hey, I'm coming up behind you?  Or just it was don't give

23  him any more commands?

24      A.      It was just a don't give him any more commands.

AccuTran Global Enterprises, Inc.
855-552-0505

**CP_000099**

John Sexton; Justin DePover
February 10, 2021

83

1          Q.       Have you ever seen Tom Jared before?

2          A.       I have not.

3          Q.       You've never previously met him or been --

4    interacted with him?

5          A.       No, I haven't.

6          Q.       Did he tell you who he was?

7          A.       After the stop and cars were still moving and we

8    started to communicate, then he did, but not initially.

9          Q.       Okay.  So during this time, when he told you who

10   he was, cars were moving past you --

11         A.       Car -- cars were still moving.

12         Q.       Right.  So you're -- it -- did you have to

13   reacquire your position on your list for how many more car

14   counts -- how many more cars you needed?

15         A.       Yes, I had to start trying to read the car and

16   see where I was at that point.

17         Q.       All right.

18         MR. RAINWATER:  No further questions for Mr. DePover.

19         MR. JOHNSON:  Okay.  I have some follow-up questions.

20   BY:  MR. JOHNSON

21         Q.       So, Mr. DePover, did you at any time let

22   Mr. Jared know that you were in the middle of a shove movement?

23         A.       It was already taking place, but I mean --

24         Q.       Did you at any time ask for identification from

John Sexton; Justin DePover
February 10, 2021

84

1   him?

2        A.       After -- after he told me to stop, and then I

3   did ask at that point, but --

4        Q.       Okay.

5        A.       -- he was already s -- somebody I didn't

6   identify at the beginning.  If I'da seen him walking up behind

7   me, I woulda probably stopped us and tried to identify who it

8   was 'cause he was crossing the tracks.

9        Q.       Okay.  But you followed instructions from

10  somebody you didn't know?

11       A.       Then -- I -- initially I was stunned from it,

12  and I guess I just took a minute to process.  And then as -- as

13  I was doing so, it probably -- I would -- I would estimate

14  maybe about five cars had gone by and as he was introducing who

15  he was to me.

16       Q.       Okay.  But that was after the stop was made?

17       A.       The -- the cars were still moving.

18       Q.       When he introduced himself to you?

19       A.       Yes.

20       Q.       Okay.  So the Organization entered Exhibit 7 as

21  contending that Mr. Jared engaged in unrelated activities.

22       A.       No.

23       Q.       So did you allow him -- did you ask him -- so

24  I've asked you, did you tell him to stand by, you were in the

John Sexton; Justin DePover
February 10, 2021

85

1   middle of a shove move, at any time?

2       A.      I -- I never verbally said to stand by.  I was

3   processing what to do at the time while the movement was still

4   taking place.

5       Q.      Okay.  So you allowed yourself to engage in --

6       MR. RAINWATER:  Objection.

7       Q.      -- unrelated activ --

8       MR. RAINWATER:  Mr. DePover's not being charged with

9   this.  The fact that the General Manager --

10      MR. JOHNSON:  He i -- he was a --

11      MR. RAINWATER:  But -- but --

12      MR. JOHNSON:  -- charged employee --

13      MR. RAINWATER:  He's not being charged with any vi -- J

14  -- Mr. Jared has not alleged any violation of 6 -- 6.5.  We're

15  bringing it to light because Mr. Jared interjected himself into

16  this process, causing the Rule to be violated.  He's the

17  General Manager.  He should -- it -- number one, he should know

18  the Rule.  Number two, there's no estimation whatsoever that

19  anybody on this property should -- should have any kind of

20  ability to be able to tell the General Manager no with regard

21  to a direct -- with regard to a direct instruction.  And the

22  fact that he didn't know who Mr. Jared was until a handful of

23  cars move -- were moving past is irrelevant.  Mr. Jared

24  shouldn't even have been there doing this to begin with.

AccuTran Global Enterprises, Inc.
855-552-0505

**CP_0000102**

John Sexton; Justin DePover
February 10, 2021

86

1          We have Mr. DePover, who has less than two years'

2    experience, was just furloughed for a -- almost a year, come

3    back on his first round trip and now the General Manager is --

4    sneaks up behind him, and unannounced.  How is he supposed to

5    react to that?

6          MR. JOHNSON:  Okay.  Mr. Rainwater, I'm gonna overrule

7    on your objection.  You were allowed to enter exhibits.

8    Correct?

9          MR. RAINWATER:  E -- Exhibits 7 and 8, I was.

10         MR. JOHNSON:  Okay.  So you --

11         MR. RAINWATER:  I still have one that it was not

12   allowed.

13         MR. JOHNSON:  Okay.  So you -- you entered Exhibit 7 and

14   it is now a part of the record.  Therefore, I may ask questions

15   related to that.  And whether or not that proves innocence or

16   guilt, I don't know.  I wanna ask the questions, though.

17   BY:  MR. JOHNSON

18         Q.     So, Mr. DePover, with an ion -- unidentified

19   employee, you allowed him to come up and start talking to you

20   in the middle of a shove movement.  Correct?

21         A.     I'd -- he came up to me from behind me on --

22   from 5th Track to 4th Track and was in between the tracks with

23   me before I even knew he was there.  And I was -- I was about

24   to give Mr. Sexton another car count, but was interrupted.

John Sexton; Justin DePover
February 10, 2021

87

1        Q.       Okay.  And you allowed -- y -- you at no time --
2   you acknowledged what he asked you to do.  Correct?
3        A.       As -- so -- and s --
4        Q.       So when Mr. Jared told you not to give him a --
5   any further counts, did you acknowledge him?  Or did you tell
6   him stand by, I'm in the middle of a shove?
7        A.       I -- he continued to speak to me from beside me
8   and explaining who he was while I was watching the shove.
9        Q.       Okay.
10       A.       And then once I was informed that he was the
11  General Manager, I kinda go into the, well, he's my boss, so I
12  followed his instructions.
13       Q.       Okay.
14       MR. JOHNSON:  I have no further questions.
15           Mr. Rainwater, any follow-up for Mr. DePover?
16       MR. RAINWATER:  Just one.
17  BY:  MR. RAINWATER
18       Q.       Mr. DePover, did the video evidence as presented
19  play out the fact that Mr. Jared walked up directly behind you
20  and that you did not observe him until he spoke to you?
21       A.       I believe so.
22       Q.       I agree.
23       MR. RAINWATER:  No further questions.
24       MR. JOHNSON:  Okay.  I have no further questions for any

AccuTran Global Enterprises, Inc.
855-552-0505

**CP_0000104**

John Sexton; Justin DePover
February 10, 2021

88

1    party involved in this, the witnesses or the charged employees.

2            Mr. Rainwater, do you have any additional questions

3    for either party?

4        MR. RAINWATER:  I have one more question for Mr. Sexton.

5        MR. JOHNSON:  All right.  Mr. Sexton --

6        MR. SEXTON:  Excuse me.

7        MR. JOHNSON:  Mr. DePover, you are released from

8    testimony.  Subject to recall.

9            So we're recalling Mr. Sexton.

10       MR. RAINWATER:  Understood.

11       MR. JOHNSON:  Go ahead, Mr. Rainwater.

12               E X A M I N A T I O N (continued)

13                   By:  Mr. Rainwater

14       Q.     Mr. Sexton, did the Carrier present any recorded

15   evidence via radio record that could corroborate Mr. Jared's

16   testimony that he only heard 15 cars?

17       A.     No.

18       Q.     No.  And is it safe to say then, that because

19   they didn't produce that evidence then, that your account, and

20   Mr. DePover's account, and the account that Mr. Cox would've

21   presented should be taken as submitted as fact?

22       A.     Absolutely.

23       MR. RAINWATER:  No further questions.

24       MR. JOHNSON:  All right.  I have no further questions.

CP_0000105

John Sexton; Justin DePover
February 10, 2021

89

1              Mr. Rainwater, do you have any questions for

2    Mr. Jared or Mr. DePover?

3         MR. RAINWATER:  No, I do not.

4         MR. JOHNSON:  All right.

5         MR. RAINWATER:  If we're gonna go to close -- I mean, if

6    you wanna do preliminary closing questions, that's fine.  I am

7    gonna need time for a closing statement preparation.

8         MR. JOHNSON:  Okay.  Mr. Sexton, you are released from

9    testimony.  Subject to a recall.

10             So, Mr. Rainwater, you are correct.  We will begin to

11   close the hearing.  And you said go ahead, go through the

12   questions, and then you'll take a recess at that time?  Or

13   would you like -- let's just take the recess --

14        MR. RAINWATER:  Yeah, that's --

15        MR. JOHNSON:  -- now.

16        MR. RAINWATER:  That's up to you.  That's fine with me.

17        MR. JOHNSON:  So we'll show the time is 14:21.  We'll

18   take a 15-minute recess.

19        MR. RAINWATER:  Yeah, 15 or 20.

20        MR. JOHNSON:  Okay.

21        MR. RAINWATER:  Appreciate --

22             (Whereupon, a recess was taken.)

23        MR. JOHNSON:  The time is now 14:52, resuming with the

24   Sexton-DePover Investigation.

AccuTran Global Enterprises, Inc.
855-552-0505

CP_0000106

John Sexton; Justin DePover
February 10, 2021

90

1            I will call Mr. DePover.

2            Mr. DePover, have you been present during the

3       entirety of this hearing?

4            MR. DEPOVER:  Yes, I have.

5            MR. JOHNSON:  Have you had the opportunity to answer all

6       questions of your own free will?

7            MR. DEPOVER:  Yes, I have.  And I'd also like to let the

8       record speak for itself on that.

9            MR. JOHNSON:  Would you like to make a closing

10      statement?

11           MR. DEPOVER:  No.

12           MR. JOHNSON:  All right.  Mr. Sexton, have you been

13      present during the entirety of this hearing?

14           MR. SEXTON:  I have.

15           MR. JOHNSON:  Have you had the opportunity to answer all

16      questions of your own free will?

17           MR. SEXTON:  Yes.

18           MR. JOHNSON:  Would you like to make a closing

19      statement?

20           MR. SEXTON:  I would.

21           MR. JOHNSON:  Go ahead.

22           MR. SEXTON:  I feel this -- this was based on us not

23      getting outta the yard in -- in Marquette on the -- on this

24      train.  We had a -- quite a delay there with the -- departing

AccuTran Global Enterprises, Inc.
855-552-0505

**CP_0000107**

John Sexton; Justin DePover
February 10, 2021

91

1   Marquette.  We had to pick up an engine that was --

2         MR. JOHNSON:  Okay.  Mr. Sexton --

3         MR. SEXTON:  I'm -- I'm doing a --

4         MR. JOHNSON:  The -- the rule --

5         MR. SEXTON:  -- closing statement, here.

6         MR. JOHNSON:  No.

7         MR. SEXTON:  I can --

8         MR. JOHNSON:  In the rules of the investigation, "will

9   be allowed to make a closing statement prior to the conclusion

10  of this hearing.  Closing statements should be confined to the

11  matter being investigated --

12        MR. SEXTON:  This is the matter --

13        MR. JOHNSON:  -- and based on evidence presented and

14  testimony --

15        MR. SEXTON:  Yeah.

16        MR. JOHNSON:  -- given during the hearing."

17         So there was no testimony or evidence based on

18  anything that happened in Marquette, so please confine your

19  closing statement to what's been --

20        MR. SEXTON:  I was trying to build up --

21        MR. JOHNSON:  -- presented today.

22        MR. SEXTON:  -- to where all -- all this is -- th --

23  this is going.  There w -- there was a -- a tremendous delay

24  because of weather conditions.  Parked an engine on -- on an

John Sexton; Justin DePover
February 10, 2021

92

1    open-deck bridge that we had to --

2        MR. JOHNSON:  Okay.  But there --

3        MR. SEXTON:  -- [indiscernible] --

4        MR. JOHNSON:  -- was no testimony --

5        MR. SEXTON:  There was.

6        MR. JOHNSON:  -- or evidence presented --

7        MR. SEXTON:  You -- you -- you --

8        MR. JOHNSON:  -- on that.  Correct?

9        MR. SEXTON:  -- can pull train -- you can pull train

10   delays, whatever you need to.

11       MR. JOHNSON:  So we need to keep our --

12       MR. SEXTON:  So you're not gonna let me --

13       MR. JOHNSON:  -- closing statement -- you can make a

14   closing statement.  It just has to be confined to the matter

15   that was investigated and based on the evidence presented, so.

16       MR. SEXTON:  Well, the -- the fact of the matter is --

17   is on -- on the -- on the shoving move, I was good for 2400

18   feet.  And according to your Crayola calculations on the -- on

19   the feet that was shoved, it was 558.  Am I correct on that?

20   Five hundred and fifty-eight feet, so I had quite -- quite a

21   bit going on there, quite a bit of extra room.

22           As of the -- the shoving moves as -- GCOR 6.5:

23           "Equipment must not be shoved 'til the Engineer or

24   employee have -- protecting the movement have completed job

AccuTran Global Enterprises, Inc.
855-552-0505

**CP_0000109**

John Sexton; Justin DePover
February 10, 2021

93

1    briefing concerning how protection will be provided.  Employee

2    must be in position --"

3         which Mr. DePover was on the ground protecting our

4    shove.

5         "provide visual protection --"

6         which he was.

7         "of the equipment being shoved and must not engage in

8    any unrelated task while providing in -- protection."

9         With a -- with a -- a fellow employee coming up

10   behind the Conductor, whoever it is, on the ground, and all --

11   he didn't even know he was there, basically, kind of caught him

12   off guard, he basically -- Mr. Jared is the one who violated

13   the -- the shoving movements because he engaged in a

14   conversation with Mr. DePover while the cars were moving into a

15   track.  That is a -- that -- he created an unsafe act on that.

16   And you know, under -- under the -- the test failure of the

17   manager's tests themselves, that under the test conditions,

18   when conducting this test, on the Shoving or Pushing Movements

19   on page 107 of the Manager's Tests:

20        "When conducting this test, actual

21        operating conditions are to be

22        observed."

23   MR. SEXTON:  Watched, not set up.

24        And the test failure on number 4 bulletin on the same

John Sexton; Justin DePover
February 10, 2021

94

1    page:

2            "Employee performing other tasks

3        related to movement."

4        MR. SEXTON:  General Manager Jared actually created an

5    unsafe act by talking to Mr. DePover as the cars were -- were

6    -- were being shoved b -- past him.  He could've -- he coulda

7    startled him.  He coulda jumped forward.  Anything could've

8    happened.  That -- that is -- the -- th -- this was not a good

9    test, everyone knows it, and --

10        MR. JOHNSON:  Is that the end of your statement?

11        MR. SEXTON:  Give me a second, please.  And also, the --

12    the -- the -- the Rule was violated at -- as this test was also

13    set up in -- in their own -- in their own testing manual.

14            Other than that, I'm a little -- I'm a little wound

15    up here, so that's a -- that's all I'm gonna say for right

16    now.  Then I want you to ask me if -- if I think that this has

17    been a fair and impartial hearing, please.

18        MR. JOHNSON:  Okay.  I've asked you the questions I have

19    to ask.  So I can --

20        MR. SEXTON:  So do -- you're not gonna --

21        MR. JOHNSON:  We've moved to closing.  I cannot ask any

22    more questions at --

23        MR. SEXTON:  No, so you --

24        MR. JOHNSON:  -- this time.

AccuTran Global Enterprises, Inc.
855-552-0505

**CP_0000111**

John Sexton; Justin DePover
February 10, 2021

95

1      MR. SEXTON:  Okay.  Well, this is not a fair and
2  impartial hearing, so I'll put that on the record, my closing
3  statement.  Now I'm done.
4      MR. JOHNSON:  So, Mr. Rainwater --
5      MR. RAINWATER:  Yes.
6      MR. JOHNSON:  -- have you had an opportunity to
7  cross-examine all witnesses and to present witnesses and
8  evidence on the charged employees' behalf?
9      MR. RAINWATER:  The record speaks for itself.
10     MR. JOHNSON:  Have I ruled on all of your objections?
11     MR. RAINWATER:  Yeah, the record speaks for itself.
12     MR. JOHNSON:  Were you allowed to properly represent the
13  charged employee during this hearing?
14     MR. RAINWATER:  Yeah, the record speaks for itself.
15     MR. JOHNSON:  And would you like to make a closing
16  statement?
17     MR. RAINWATER:  I would.  The facts of this
18  investigation are as follows: Mr. Jared conducted an unfair
19  test based on incomplete information because he didn't have a
20  radio on his person to hear the full account of instructions
21  from Mr. DePover to Engineer Sexton.  Had he heard that portion
22  of the communication, he would've quickly realized that the way
23  he intended to set up his test was unfair.  Mr. Jared freely
24  testified that he heard Mr. DePover give Mr. Sexton a car count

John Sexton; Justin DePover
February 10, 2021

96

1  of 50 cars, 5-0 cars, as he started into 4 Track.  Then, after

2  moving 12 cars, Mr. DePover testified that he told Mr. Sexton,

3  I need 15 more and you're good for 40.

4      It's obvious that Mr. Jared did not hear that portion

5  of the instructions.  What's more, he only had to pull the

6  recorded radio conversations that the Railroad keeps on file to

7  -- to have figured this out.  Had he done so, we wouldn't even

8  be in this hearing.  The fact that he didn't present that

9  evidence means he either didn't go to the effort to pull it, or

10  it didn't help his case, so he didn't enter it.  The

11  Organization, however, has the testimony of three witnesses to

12  this event:  Mr. DePover, Mr. Sexton, and had Mr. Cox been

13  allowed to attend as requested, he would've affirmed that as

14  well.

15      Now to the charge at hand.  We've clearly and

16  undeniably outlined that Mr. DePover is not complicit with the

17  charges as alleged.  Mr. Jared even admitted to such.

18      As far as Mr. Sexton is concerned, testimony has

19  clearly outlined and sustained the fact that Mr. Sexton was

20  under the guidance of being clear for 40 -- for a 40-car shove

21  and only needing 15 to a stop and a cut.  Even if Mr. Sexton

22  would've shoved the entire 15 cars before stopping, he still

23  has an additional five cars of space before being required to

24  stop in half the range of the 40-car count as given by

John Sexton; Justin DePover
February 10, 2021

97

1    Mr. DePover, and thus fulfilling the requirements of GCOR

2    5.3.7.  So clearly the charge is inconsistent with the actual

3    events, and we deny the charge in the strongest terms possible.

4            Additionally, it's very obvious that Mr. Jared

5    conducted this test in an unfair manner.  While Mr. Johnson

6    wouldn't allow me to enter CP's United States version of the

7    Efficiency Test Manual and Operating Rules, the testing

8    procedure in that manual states clearly that tests conducted to

9    evaluate Rules related to shove moves is an observation-only

10   test.  CP's testing code is GRF02.  This test only points out

11   -- this test also points out that an employee should not

12   perform other tasks that are not related to movement, the same

13   as GCOR 6.5, which we entered in Exhibit 7.

14           The fact that M -- Mr. Jared, a General Manager at CP

15   and three levels above the most frequently visible manager in

16   this yard, approached Mr. DePover to give him a direct

17   instruction while engaged in this shove move proves how

18   reckless Mr. Jared is with regard to this event.  The fact that

19   he would even try to manipulate a test that is strictly

20   designed to be observation-only and create var -- variable

21   designed to confuse and reduce situational awareness is an ana

22   -- anathema to everything that Home Safe is about.

23           Further to CP's E-Test Manual, it clearly instructs

24   testing managers to "use common sense when setting up test

John Sexton; Justin DePover
February 10, 2021

98

1    situations." The fact that Mr. Jared interrupted Mr. DePover in

2    the middle of his shove proves Mr. Jared did not follow this

3    manual.

4         Additionally, CP's Testing Manual lists six dos and

5    don'ts for managers to follow when conducting efficiency

6    testing.  Those include:  "Do conduct tests fairly;" "Don't set

7    up a situation that can it -- result in an unsafe act or

8    condition;" "Don't conduct a test to entrap an employee," and

9    "Don't violate a rule in order to setup a test situation."

10        After hearing all of the testimony, it's very obvious

11   that this test was not conducted fairly, that it created an

12   unsafe condition by Mr. Jared interrupting Mr. DePover while he

13   was protecting his shove, and that Mr. Jared did indeed violate

14   a GCOR Rule by setting it up in the manner which he did, and

15   that his intent was clearly to entrap Mr. Sexton.

16        To be fair, with regard to efficiency testing, CP's

17   manager -- CP's manual, excuse me, does allow for some testing

18   situations to be set up in order to see how employees react.

19   For instance, a red flag being placed in a track is one way to

20   set up a stop test.  However, there are no processes outlined

21   in that test that p -- excuse me.  There are processes outlined

22   in that test that provide the manager with a testing situation

23   while a shove move is being conducted.  As is the case here,

24   there are no circumstances that allow that situation to be set

AccuTran Global Enterprises, Inc.
855-552-0505

**CP_0000115**

John Sexton; Justin DePover
February 10, 2021

99

1    up.  This testing situation can only be obs -- observed,

2    according to CP's Testing Manual.  The fact that the Hearing

3    Officer will not let me enter it as an exhibit to prove this is

4    compelling in itself.  They obviously don't want to allow the

5    proof be shown that this test was unfair.

6            Finally, I ask that our objections please be

7    remembered.  We objected from the start that this hearing

8    violated Mr. Sexton and Mr. DePover's due process because the

9    Hearing Letter compels all the witnesses to attend in person

10   the same way it compels the charged employees.  Furthermore,

11   Mr. Jared was not present at the hearing to have the full

12   efficacy of his testimony, including body language, vetted.

13   Additionally, the Organization was not given the same option to

14   attend this hearing via video conference.  The argument that

15   the situation with COVID prevented Mr. Jared from attending is

16   a red herring designed to circumvent the objection and create

17   an unfair advantage for the Carrier.  Mr. Jared could have

18   easily attended this hearing by wearing a mask and socially

19   distancing, the same as everyone else in this room.

20           And so in closing, we ask that the charges in this

21   case be dismissed due to the fact that due process was

22   violated, the fact that the test was set up unfairly, and the

23   fact that the Principals did, in fact, comply with the Rule

24   regarding -- requiring movement to stop in half the range of

John Sexton; Justin DePover
February 10, 2021

100

1    vision.  Thank you.

2         MR. JOHNSON:  All right.  This hearing has been held to

3    determine all the facts and circumstances in connection with

4    the Notice of Charge.  The official transcript will care -- be

5    re -- carefully reviewed prior to any decision being rendered.

6         The time is now 15:04.  This hearing is closed.

7                   (Which were all the proceedings had and

8                    testimony taken at the hearing of the

9                    above-entitled cause.)

John Sexton; Justin DePover
February 10, 2021

101

C E R T I F I C A T I O N

ACCUTRAN GLOBAL ENTERPRISES, INC. does hereby certify that the foregoing transcript is a true, accurate, and complete representation of the audio provided.

AccuTran Global Enterprises, Inc.
855-552-0505

**CP_0000118**



Shelley Daberitz          11306 Franklin Avenue     Office: (630) 860-4447
Manager Support Services  Franklin Park, IL          Cell:
Operations-US             60131                       Shelley_Daberitz@cpr.ca

*Exhibit 1*

**CERTIFIED MAIL 7019 2970 0002 0440 6531**
**CERTIFIED MAIL 7019 2970 0002 0440 6555**

February 4, 2021

John Sexton                              Justin DePover

Employee # 823777                        Employee # 1009119

Gentlemen:

Attend a formal investigation/hearing session scheduled to be held at the General Yard Office Building conference room, located at 3420 Miller Ave, Davenport, IA, on February 10, 2021 at 12:00 hours.

The purpose of this formal investigation/hearing is to determine the facts and circumstances and to place your responsibility, if any, in connection with your alleged:

- Failure to stop within half the specified distance given while shoving into track NA04.

This incident allegedly occurred at approximately 12:49 hours on February 1, 2021 while working Train 474-31 at Nahant yard.

The following Carrier witnesses known at this time to likely have knowledge of the incidence and/or evidence relative to this investigation/hearing is hereby requested to attend:

- Tom Jared
- Dylan Smith

In accordance with the provisions of your Scheduled Agreement, arrange for representative and/or witnesses, if desired. A copy of this document is enclosed should you desire to coordinate this matter with your representative.

Sincerely,

Shelley R. Daberitz
Manager Support Services
Operations U. S.

CC:  Dylan Smith                          Employee Services
     John Cartlidge                       Timekeeping
     CMC                                  Operating Practices/Rules
     Joey Reyes – Please arrange to conduct
     Tom Jared – Please arrange to attend as Company witness
     Dylan Smith – Please arrange to attend as Company witness



**EXHIBIT**

**11**

SEXTON   000004

*Exhibit 8*

**Mark J Johnson**

| | |
|---|---|
| **From:** | Joe Rainwater <jrainwater64@gmail.com> |
| **Sent:** | Wednesday, February 10, 2021 1:51 PM |
| **To:** | Mark J Johnson |
| **Subject:** | Fwd: Request for witnesses_J.Sexton_J. DePover - alleged failure to stop within half |
| **Attachments:** | Sexton-DePover_Request for Witnesses_Failure to stop within half.pdf |

This email did not originate from Canadian Pacific. Please exercise caution with any links or attachments.

---------- Forwarded message ---------
From: **Joe Rainwater** <jrainwater64@gmail.com>
Date: Mon, Feb 8, 2021, 12:27 PM
Subject: Request for witnesses_J.Sexton_J. DePover - alleged failure to stop within half
To: Joey Reyes <joey_reyes@cpr.ca>
Cc: Joseph Adelfio <joseph_adelfio@cpr.ca>, hello <bna24601@gmail.com>, <33ioj386aphy@hpeprint.com>

Mr. Reyes,

Please see the attached formal request for witnesses with regard to the upcoming hearing on February 10, 2021.

I look forward to your response.

Thanks,

Joe Rainwater

1

SEXTON   000011



**BROTHERHOOD OF LOCOMOTIVE ENGINEERS&TRAINMEN**
*A Division of the Rail Conference—International Brotherhood of Teamster*
Division 117—Mason City/Marquette-Dubuque, IA

February 8, 2021

Dear Mr. Reyes,

The purpose of this letter is to formally request witnesses, be made available in the hearing scheduled Wednesday, February 10, 2021 at 1200 in the matter of John Sexton and Justin DePover and their alleged,

    Failure to stop within half the specified distance given while shoving into track NA04

On behalf of both Principals, the Organization requests the following:

1. Witnesses
   a. **Andrew Cruciani** – We have reason to believe that Mr. Cruciani was assisting the 474-31 crew at Nahant yard. It is our contention that he will have first hand, and primary knowledge, of the events and is a material witness.

   b. **David Cox** – We have reason to believe that Mr. Cox was able to overhear the radio conversation relative to the charges, therefore making him a material and primary witness as well.

Since the Organization is unable to approve or compel the absence of these two witnesses for a hearing, I ask that their time off be approved ahead of the hearing to allow them to be present to testify.

I thank you for your time and would appreciate a pre-hearing response to my requests. While I look forward to that, I would appreciate any response be specific to the request made rather than the typical form letter response that *"this isn't a court of law and the Organization doesn't have the right to discovery ahead of the hearing"*. etc. etc. I'm not requesting discovery ahead of this hearing. I'm only requesting this specific and pertinent witnesses, be made available at the time of, and during, the hearing process.

Thank You,

Joe Rainwater

Joe Rainwater – BLET 117
8923 89th St. Ct. S
Cottage Grove, MN 55016
(816)223-9682
jrainwater64@gmail.com

SEXTON   000012



Tom Jared
General Manager Operations
US West

1010 Shop Road
St. Paul, MN
55106

Office: (651) 495-9519
Cell: ███████
Tom_Jared@cpr.ca

**CP**

February 26, 2021

John Sexton

████████████████

Employee #823777

Mr. Sexton:

Notice of formal investigation was issued you under date of February 4, 2021 in connection with the occurrence outlined below:

'… to determine the facts and circumstances and to place your responsibility, if any, in connection with your alleged failure to stop within half the specified distance given while shoving into track NA04. This incident allegedly occurred at approximately 12:49 hours on February 1, 2021 while working Train 474-31 at Nahant yard.'

Formal investigation was conducted on February 10, 2021, to develop all the facts and circumstances in connection with the referenced occurrence. At the conclusion of that investigation it was determined the investigation record as a whole contains substantial evidence proving you violated GCOR 5.3.7 – Radio Response.

Based on the facts and evidence in the hearing record and your past discipline history, you are being assessed a twenty (20) day suspension to commence at 00:01 hours on Thursday, February 25, 2021 up to and including 23:59 hours on Tuesday, March 16, 2021. Reinstatement to active duty at 00:01 hours on Wednesday, March 17, 2021.

As a matter of record a copy of this document will be placed in your personnel file.

Respectfully,

*[signature]*

Tom Jared
General Manager Operations
U.S. West

CC:    Dylan Smith                        CMC
       Joey Reyes                         Employee Services (Encl)
       Timekeeping                        Operating Practices/Rules (Encl)
       Joe Rainwater – BLET Local Chairman (Encl)
       Pete Semenek – BLET General Chairman (Encl)



**EXHIBIT**

tabbies®

12

SEXTON   000014

CASE NO. 353

Organization File da-sexton.j.02012021
Carrier File 2021-0022404

## PUBLIC LAW BOARD NO. 7667

PARTIES      ) BROTHERHOOD OF LOCOMOTIVE ENGINEERS AND TRAINMEN
             )
TO           )
             )
DISPUTE      ) DM&E RAILROAD d/b/a CANADIAN PACIFIC

STATEMENT OF CLAIM:

Claim on behalf of Canadian Pacific/DM&E Line Employee John Sexton
(Claimant) for removal from his record the twenty (20) day suspension assessed
and compensation for all time lost, in addition to time and expenses for attending
the investigation held on February 10, 2021.

FINDINGS:

The Board, upon consideration of the entire record and all of the evidence, finds that the parties
are Carrier and Employee within the meaning of the Railway Labor Act, as amended, that this
Board is duly constituted by Agreement dated August 16, 2013, and that this Board has jurisdiction
over the dispute involved herein. Awards issued pursuant to the terms and conditions outlined in
the Agreement establishing this Expedited Board of Arbitration will not prejudice the rights of
either party, will not establish any precedent and will not be referred to in connection with any
other case, agreement and/or dispute resolution.

On February 1, 2021, Claimant John Sexton was assigned as the engineer on train 474-31, bringing
at train into the Nahant yard. While the crew was in the middle of performing a shove move,
General Manager Tom Jared approached the conductor unannounced and instructed him to cease

Public Law Board No. 7667
Case No. 353



EXHIBIT
13

SEXTON   000015

1

radio communications with Claimant. The conductor's initial radio communication was that Claimant was good for 50 cars, and his next communication (according to both Claimant and the conductor) was good for 40, 15 to a stop. After Claimant shoved approximately 7 cars, he radioed the conductor several times, and upon receiving no further radio communication, he initiated braking, eventually stopping after approximately 11 cars, or 558 feet.

By notice dated February 4, 2020, the crew was directed to attend a formal hearing regarding their alleged failure to stop within half the specified distance given while shoving into track NA04. The hearing was held on February 10, 2021, after which Claimant was found to be in violation of GCOR 5.3.7 – Radio Response, and by notice dated February 26, 2021, he was assessed a twenty (20) day suspension.

The Organization challenges the discipline assessment on both procedural and substantive grounds. With respect to the procedures, the Organization maintains the process was flawed due to the General Manager's multiple roles in the proceeding. It points out that he was a witness at the hearing, having initiated the test, and that he then determined the outcome of the hearing and authored the notice of discipline, thus ratifying his own actions. The Organization states it is apparent that the outcome of the hearing was predetermined, and it cites award authority which has overturned discipline in similar circumstances.

With respect the merits, the Organization asserts that the decision to assess discipline was arbitrary and capricious. It states that the record indicates that the instructions given to Claimant were ambiguous at best in that he was first given the 50-car count, then that he was told he was good for 40, while at the same time a stop in 15. It contends that Claimant then complied with the intent of the rule when he stopped when no further communication was received, and that he did so well short of half the 40-car count. The Organization also takes exception to Jared's actions in conducting the test in an unfair manner contrary to the published guidelines for such matters and setting up an unsafe condition when he interrupted, without warning or prior introduction, the conductor who was in the middle of directing the shove. The Organization concludes that to assess discipline based on these facts is unjust.

Public Law Board No. 7667
Case No. 353

2

SEXTON   000016

The Carrier, on the other hand, maintains that discipline was properly assessed, arguing that the record contains substantial evidence to support the conclusion that Claimant violated the cited rule. It points to the General Manager's testimony that Claimant received an instruction to shove 15 car lengths, but that Claimant shoved for 11 car lengths before he stopped. It notes that the cited rule provides that "movement must be stopped within half the distance specified unless additional instructions are received," and it states that it is unrefuted that Claimant continued shoving well past half the 15-car count received from the conductor.

With respect to the Organization's procedural objection, the Carrier claims that Claimant received a fair and impartial hearing, and that the process was not tainted by Jared's involvement. It states that Jared testified to his direct observations, and it apparently contends that Jared didn't actually make the discipline decision, stating "Discipline notices on this property are assessed by the General Manager of the Territory. No decision was made on Claimant's culpability until the transcript of the hearing was reviewed by the hearing officer. The discipline was assessed by the Carrier, not the individual manager."

Regarding the level of discipline assessed, the Carrier states that violations of shove rules are considered major/life threatening offenses under its Hybrid Discipline and Accountability guidelines, and that the guidelines provide that suspension assessment is an appropriate quantum of discipline for such a violation.

We have carefully reviewed the record, and while we find multiple reasons to question the discipline assessment, we concur with the Organization that the process here was flawed to such an extent that it deprived Claimant of a fair and impartial hearing. General Manager Jared involved himself in too many aspects of the process. The record reflects that it was Jared who initiated the test, in a manner which does raise questions regarding safety in his obviously surprising an employee who was performing the safety-sensitive task of protecting the shove, and it appears that the charges were levied based on his test and observations. The only realistic conclusion that can be reached after an objective review of this record is that Jared levied charges regarding his own somewhat questionable test, provided the testimony to support them, and then signed off on a

Public Law Board No. 7667
Case No. 353

3

SEXTON    000017

predetermined outcome. We are not convinced by the Carrier's statement that "the Carrier" as some all-inclusive entity rendered the decision. The Carrier is of course comprised of many people and departments and it has a legal status, but it acts through individuals, and in this case the individual who signed the discipline letter was Jared. We do not believe the novel explanation offered by the Carrier is sufficient to remove the specter of his excessive involvement in the case. Therefore, we find that the claim must be sustained.

AWARD: Claim sustained.


_____
Michael D. Phillips
Chairman and Neutral Member

_____
Marcus Ruef
Employee Member

_____
Brian Scudds
Carrier Member

Dated:   August 26, 2022


Public Law Board No. 7667
Case No. 353

4

SEXTON   000018

## Re: HOMESAFE ???

| | |
|---|---|
| **From:** | Jason M Ross <jasonm_ross@cpr.ca> |
| **To:** | jtsexton1@msn.com |
| **Cc:** | Tracy L Miller <tracy_l_miller@cpr.ca> |
| **Bcc:** | Jason M Ross <jasonm_ross@cpr.ca> |
| **Date:** | Mon, 15 Feb 2021 00:28:52 +0000 |

Good evening John,

I have gathered information surrounding what you pointed out below. I would like to connect with you tomorrow to discuss.

Let me know if there's a specific time that works for you, otherwise I'll give you a call in the afternoon.

Regards,

Jason M. Ross
VP Southern Region
O- 651-495-9519
C- ███████
1010 Shop Road
St Paul MN, 55106

> On Feb 10, 2021, at 8:50 AM, Jason M Ross <JasonM_Ross@cpr.ca> wrote:

Good morning John,

Thank you reaching out, Tracy sent this my way as the email address you have is for someone else (there are 3 Jason Ross' in the system)

I will look into this and we will get back to you.



**Jason M. Ross**
VP Southern Region
O (651)495-9519
C ███████
1010 Shop Road
St. Paul MN 55106

**CP Leadership Coach**

**From:** JOHN SEXTON <jtsexton1@msn.com>
**Sent:** Tuesday, February 9, 2021 8:42 PM



EXHIBIT
18

Confidential

CP_00994

CP Resp. App. - 160

**To:** Tracy L Miller <Tracy_L_Miller@cpr.ca>; Tracy L Miller <Tracy_L_Miller@cpr.ca>; Jason_Ross@cpr.ca
**Subject:** Fw: RE : HOMESAFE ???

This email did not originate from Canadian Pacific. Please exercise caution with any links or attachments.

Mr. Miller,

I was in a company vehicle driven from Eckards to Marquette by ATM Kurt McElvey out of Marquette, Iowa during a snow storm while he felt the need to drive at 40 mph on roads that were 100 percent snow covered with blowing and drifting snow. I shared with him on three separate occasions that he was driving too fast and was making me uncomfortable. If this were a carrier contracted cab service I would have had them pull into a gas station which at that time I would have removed my belongings and called a manager for a safe ride. Since this was a fellow CP employee and a manager just what exactly can be done to curtail this? We were already dead on hours of service and on limbo time when he picked us up. Looking for some advice of this.

The next trip out of the hotel to return to Nahant I was called for 474-31. The train was late arriving at Marquette as a 3 train meet was happening in Marquette at the time. When we got on the train we had work to do setting out lines 74 through 51 in Marquette siding. It had been snowing the previous few days and the tracks and crossings were snow covered. I informed ATM McElvey that the crossing and tracks needed cut with the locomotives before our set out. He told me that I would NOT cut the crossings and tracks in which I replied that if he is directing me to not follow the rules and our topic of the month for the Health and Safety Committee and managers (Cutting flangeways and crossings) that he would have to call Superintendent Smith right now to inform him that he is instructing me NOT to follow the rules. He didn't make the call and I cut the tracks and crossings as needed. After reviewing our paperwork our 2 north cars we were shoving into the Marquette siding were a UTLX 971081 and a TILX 500875 both were DANGEROUS ALERT SHIPMENT KEY TRAIN LOADS of AMMONIA. Just exactly what is going on here? My career depends on me to follow the rules 100 percent of the time, all the time to the best of my ability. Why are managers out here instructing crews to break the rules? On Saturday, we had another derailment with crews not cutting flange ways and crossings with an empty car. What would have been the environmental impact as well as the possible loss of life if I didn't insist on cutting the tracks and crossings with 2 loads of AMMONIA. Catastrophic I would imagine.

The same night ATM McElvey instructed a crew to move a locomotive on an open deck bridge for me to pick up in Marquette. This bridge is an open deck design and is not safe for anyone to MU an engine in 6 to 8 inches of snow. I shared all this information with Mr. Jared and Mr. Smith when I arrived at Nahant on 2-01-21.

Respectfully,

John Sexton

Confidential

CP_00995

**Page 1**

```
                                    1


        IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF IOWA
                 EASTERN DIVISION

- - - - - - - - - - - - - - - - - - - -
No. 3:23-CV-00031-HCA

John Sexton,

                        Plaintiff,
        vs.

Dakota, Minnesota & Eastern
Railroad Corporation d/b/a
Canadian Pacific, a Delaware
corporation,

                        Defendants.
- - - - - - - - - - - - - - - - - - - -


               DEPOSITION OF

              KURTIS MCKELVEY

             November 9, 2023

                 9:30 a.m.







           TAKEN BY: BRENDA K. FOSS
             fossbrenda@yahoo.com
                612-701-4282
```

**Page 2**

```
                                    2
        Deposition of KURTIS MCKELVEY,
taken via Zoom videoconference, by and on
behalf of Plaintiff, on Thursday, November 9,
2023, commencing at 9:30 a.m., before Brenda
K. Foss, Professional Court Reporter, Notary
Public, State of Minnesota, County of
Hennepin.

            *   *   *   *   *

          A P P E A R A N C E S


ON BEHALF OF THE PLAINTIFF:
    JOHN MAGNUSON, ESQUIRE
    CYLE CRAMER, ESQUIRE
    YAEGER & JUNGBAUER BARRISTERS, PLC
    4601 Weston Woods Way
    St. Paul, MN  55127
    jmagnuson@yjblaw.com
    651-288-9500


ON BEHALF OF THE DEFENDANTS:
    BRIANA AL TAQATQA, ESQUIRE
    NOAH GARCIA
    WHITNEY & DORSEY LLP
    50 South Sixth Street, Suite 1500
    Minneapolis, MN  55402


            *   *   *   *   *
```

**Page 3**

```
                                    3

I N D E X

Examination:                    PAGE:
By Mr. Magnuson                  4

Objections:
By Ms. Al Taqatqa          17-18, 20-21,
23, 34, 38-39, 53, 56, 62-63, 67, 71, 74-75,
83, 89, 93, 97, 99-101, 104, 109, 118

Marked Deposition Exhibits:
21 - Bates 3241
     Short-Term Incentive   27
22 - Bates CP 3361, 2020
     Performance Mgmt Form   30
23 - Bates CP 3367, 2021
     Performance Mgmt Form   35
24 - Bates Sexton 144, GOI
     Section 1-32            45
25 - Bates Sexton 143, GM
     Notice No. 22, 1/12/21  46
26 - Bates CP 3286, 2/21
     E-mails                 65
27 - Bates CP 3303, trains
     impacting train speed   81
28 - Skipped
29 - Bates CP 3244, Incident
     Report 474-31           87
30 - Bates CP 3246, e-mail
     from A. Dalen, Jan '21  89
31 - Bates CP 3409, Verizon
     account                102

Previous exhibits mentioned:
7                            59
8                            42


Reporter's Certificate      121


(Original Deposition Transcript in the
possession of John Magnuson, Esquire).
```

**Page 4**

```
                                    4
         P R O C E E D I N G S


             KURTIS MCKELVEY,

   after having been first duly sworn,

   deposes and says under oath as follows:


             E X A M I N A T I O N

BY MR. MAGNUSON:

 Q  Good morning, Mr. McKelvey.  My name is John
    Magnuson.  I represent John Sexton in this
    matter.  I'm assuming you understand that.
    Will you please state your full name and
    spell your last name for the record?
 A  Kurtis Roger McKelvey, M-C-K-E-L-V-E-Y.
 Q  Thank you, sir.  And what is your current
    position of employment?
 A  Terminal trainmaster of Canadian Pacific
    Kansas City Railroad.
 Q  Where are you stationed or where is your home
    terminal currently?
 A  Bensenville, Illinois.
 Q  When were you promoted to trainmaster?
 A  I don't recall the exact time.
 Q  Approximately?
 A  Approximately sometime around 2022 maybe.
```

9

1  Q  What did you do after high school?
2  A  Work and college.
3  Q  Where did you go to college?
4  A  Lake County Community College.
5  Q  What did you study?
6  A  At which time?
7  Q  Well, when you went --
8  A  I studied several different things at
9     multiple colleges.
10  Q  You keep looking over to your left there.
11     What are you looking at?
12  A  You're on the screen to my left. The camera
13     is in front of me.
14  Q  That makes sense. So you went to -- was it
15     White Community College?
16  A  Lake County Community College.
17  Q  Oh. How long did you attend that?
18  A  Probably a total of around three years.
19  Q  And you studied just general things?
20  A  I started going for a degree in business, and
21     then I switched my major to Applied Science
22     of Fire Science Technology. I got a degree
23     in Fire Science Technology. And then I went
24     to Malcolm X Community College through the
25     Chicago -- City of Chicago colleges paramedic

10

1     program.
2  Q  Did you become a certified paramedic?
3  A  Yes, sir.
4  Q  What types of things do people do with the
5     Applied Fire Science Technology degree? Is
6     that like you investigate fire incidents or --
7  A  Yeah, emergency response.
8  Q  Any other college other than Lake County and
9     Malcolm X?
10  A  I believe I took a course to get a CNA
11     license at one point also through I believe
12     Solex College.
13  Q  That's a certified nursing assistant?
14  A  Yes.
15  Q  Did you get the CNA degree --
16  A  Yes.
17  Q  -- or certification? Okay. You said you
18     also worked around the time you were going to
19     community college. Where did you work?
20  A  I worked in different places during that time.
21  Q  Where?
22  A  I worked delivering pizzas at one point. I
23     worked at Abercrombie and Fitch at one point.
24     I worked at a warehouse called E Parks and
25     Rockford Products at one point.

11

1  Q  What year did you start with the railroad?
2  A  Which railroad?
3  Q  Well, it brings me to where we're at next.
4     When did you start working for any railroad?
5  A  I believe it was 2018.
6  Q  Which railroad was that?
7  A  Union Pacific.
8  Q  What position did you hire out with the UP?
9  A  Conductor.
10  Q  Out of where?
11  A  Proviso.
12  Q  Did you become an engineer?
13  A  No.
14  Q  How long did you work as a conductor out of
15     Proviso?
16  A  Until I was furloughed towards the end of 2019.
17  Q  How long were you furloughed?
18  A  Furloughed until I -- technically, I'm still
19     furloughed. From there I never went back.
20  Q  Do you still hold seniority?
21  A  I don't know.
22  Q  When did you start with the CP?
23  A  January of 2020.
24  Q  Did you hire out as an assistant trainmaster
25     or a conductor?

12

1  A  I was hired out for the LMT-O program.
2  Q  What is the LMT-O program?
3  A  Leadership Management Trainee Operations.
4  Q  You began that program in January of 2020?
5  A  Correct.
6  Q  So the idea there was you would complete the
7     program and become management?
8  A  Correct.
9  Q  Where was that training? Where did that
10     training take place?
11  A  Several different locations.
12  Q  What locations?
13  A  I had to travel up to Canada twice. I spent
14     time in St. Paul, Nahant, and ultimately was
15     placed in Marquette.
16  Q  So you were, I'm assuming, trained extensively
17     in Precision Scheduled Railroading. Is that
18     correct?
19  A  I was trained, yes, sir.
20  Q  In Precision Scheduled Railroading and the
21     concepts surrounding that?
22  A  I wouldn't say that's what the focus of it
23     was. It was a lot of aspects. That was part
24     of it, yes.
25  Q  You became familiar with the Consequence

13

1      Leadership model?
2  A   Yes.
3  Q   As part of that training?
4  A   Yes.
5  Q   We'll get into that later. How long did that
6      training last?
7  A   I believe the training was slotted to be six
8      months. Me and another gentleman were kind
9      of fast-tracked through it due to our
10     previous experience. So I think ultimately
11     it was around four months or so.
12 Q   So around April of 2020 you were done, April
13     or May?
14 A   Yeah, I believe somewhere around there.
15 Q   And then you were promoted to an actual
16     management position once you completed that
17     training?
18 A   Yes, I was placed as assistant trainmaster.
19 Q   At Marquette?
20 A   Yes.
21 Q   At that point you became familiar with both
22     the 474 and the 475 jobs?
23 A   Yes, those were part of the trains that ran
24     through the terminal on a daily basis, yes.
25 Q   I was going to ask you that. That's a daily

14

1      train. Correct?
2  A   Supposed to be, yes.
3  Q   If everything is working correctly, it's a
4      daily train?
5  A   Well, everything can always change. But,
6      yes, it's planned to run every day.
7  Q   And that's a St. Paul to Kansas City train.
8      Correct?
9  A   I believe at that time, yes.
10 Q   Is that no longer the case?
11 A   To be honest, I couldn't speak about that.
12     That train doesn't run through my territory
13     anymore. So the adjustments that were made
14     to what it does I'm not familiar with.
15 Q   And the 474 runs from St. Paul to Kansas City.
16     Right?
17 A   I believe at the time in question that we're
18     talking about, yes.
19 Q   And then the 475 goes the other way from
20     Kansas City back up to St. Paul. Correct?
21 A   Correct.
22 Q   As part of the LMT-O, were you trained and
23     tested on the GCOR?
24 A   Yes.
25 Q   Were you trained and tested on the US

15

1      Efficiency Testing Manual?
2  A   It's more of a reference guide. I wouldn't
3      say no I was trained on it.
4  Q   Let's clear that up. So you were trained on
5      it?
6  A   No, that's not what I said. I was trained on
7      E testing. And E test manual that you're
8      referring to is more of a reference book. It
9      was not given out to me at any point during
10     my training. It was something that it was in
11     my office that I can use to refer to if needed.
12 Q   Do you refer to it on a regular basis?
13 A   As needed. I wouldn't call it on a regular
14     basis but when needed.
15 Q   Back in February of 2021, would you refer to it?
16 A   Several years ago I'm sure there were times
17     when I referred to it, yes.
18 Q   So the incident that we're talking about here
19     today, as you know by now, was February 1st,
20     2021. Right?
21 A   Okay.
22 Q   So you would have been an assistant trainmaster
23     for eight months at that point approximately?
24 A   Okay.
25 Q   Is that correct?

16

1  A   Like I said, I don't know the specific dates.
2      But, generally speaking, if those are the
3      dates that we're talking about, then yes.
4  Q   You're familiar with the term PMP?
5  A   Yes.
6  Q   What does that stand for?
7  A   Personal measured performance or something.
8      I'm not exactly sure what the acronym stands
9      for off the top of my head.
10 Q   You understand that the objective of that
11     plan is to tie a part of the employee's
12     compensation directly to CP's results. Correct?
13 A   I don't understand the question.
14 Q   The plan -- you're familiar with it, right,
15     the PMP?
16 A   Yes, I'm familiar with the PMP.
17 Q   And part of the objective of that plan, as
18     you understand it, is to tie an employee's
19     compensation to CP's results. Correct?
20 A   Apply employee's compensation?
21 Q   Right.
22 A   No.
23 Q   You understand that part of your compensation
24     is tied to CP's results. Correct?
25 A   Yes, my compensation, yes.

53

1  of February 1st, 2021?
2  A  Not that I'm aware of, no.
3  Q  When did you first become aware that Sexton
4     was disciplined later in that shift?
5          MS. AL TAQATQA:  Object to form.
6  A  I don't recall the time I was made aware of it.
7  Q  (By Mr. Magnuson, continuing) When was the
8     first time anybody came to talk to you about
9     the events of February 1st, 2021?
10 A  What do you mean came to talk to me?
11 Q  Either spoke to you about that.  When was the
12    first time anyone at CP Rail spoke to you
13    about the events surrounding February 1st, 2021?
14         MS. AL TAQATQA:  Objection, form.
15    You can answer if you understand.
16 A  I don't recall the specific dates. Do you remember
17 Q  (By Mr. Magnuson, continuing) Do you remember
18    who first spoke to you regarding those events?
19         MS. AL TAQATQA:  Objection, form.
20 A  I do not.
21 Q  (By Mr. Magnuson, continuing) Were you
22    contacted prior to Mr. Sexton's investigation?
23 A  About what?
24 Q  About the events surrounding February 1st, 2021.
25         MS. AL TAQATQA:  Objection, form.

54

1  A  I'm having a hard time trying to figure out
2     what you're trying to ask.
3  Q  (By Mr. Magnuson, continuing) Well --
4  A  I'm sure I would have talked with several
5     people during the work event.  I'm sure I've
6     talked with several people after the work
7     event.  Who and what time I couldn't tell you
8     the specifics.
9  Q  The work event meaning the 474?
10 A  Yes.
11 Q  Do you recall that there was a significant
12    delay that day with the 474?
13 A  Yes.
14 Q  What do you recall around the event
15    surrounding that delay?
16 A  The only thing I remember about that day is
17    Mr. Sexton was the engineer on that train.  I
18    remember having a conversation with him prior
19    to the work to be completed.  And then the
20    actual work event took a lot longer than
21    expected.  I had several other things I had
22    to do during that time also as part of my
23    daily duties.  And that's pretty much all I
24    remember.
25 Q  What were the other things that you had to

55

1  do?
2  A  I don't recall specifically.  But I'm in
3     charge of managing all of the crews and all
4     of the trains that would come through there.
5     So the 474 is just one train.
6  Q  Do you remember any other trains that were
7     coming through on February 1st?
8  A  I don't specifically, no.
9  Q  What were the reasons that this job took
10    longer than expected?
11 A  It sounds like it was snowing at the time
12    just going back to documents that I have
13    seen.  So I'm sure the weather took some part
14    in the delays.  And then as far as that, I'd
15    have to refer to the drill-down.
16 Q  Mr. Sexton cut some crossings as you recall?
17 A  Yes.
18 Q  And cutting those crossings contributed in
19    some part to the delay.  Is that correct?
20 A  I would say no.
21 Q  How long did it take to cut the crossings?
22 A  I don't recall exactly how long it took.
23 Q  But had he not cut the crossings, the delay
24    would have been shorter.  Correct?
25 A  Theoretically speaking, I can't answer that.

56

1  Q  Had he not cut the crossings, the delay with
2     that train would have been shorter.  Correct?
3          MS. AL TAQATQA:  Objection, form.
4     You can answer.
5  A  I mean it's possible.  You're just speculating.
6     You know, we could have not cut the crossings
7     and he could have ran into another issue that
8     would have delayed it even longer or vice
9     versa.  I can't speculate if we did something
10    what would have occurred.
11 Q  Do you recall how long it took him to cut the
12    crossings?
13 A  I do not recall exactly how long, but
14    typically it's not something that causes a
15    major delay.
16 Q  How many crossings would he have cut, or how
17    many crossings did he cut if you know?
18 A  I think two crossings, possibly three.
19 Q  How many crossings are there between
20    Marquette and Nahant?
21 A  I can't answer that question.
22 Q  More than 10?
23 A  I can't answer that question.
24 Q  More than 20?
25 A  I can't answer that question.  I don't know

CP Resp. App. - 165

---

**65**

1  them down.  I will start.

2          MR. MAGNUSON:  Briana, I bet

3  you're writing them down.

4          MS. AL TAQATQA:  The last one was

5  25.

6          MR. MAGNUSON:  The next one will

7  be 26.

8          (Deposition Exhibit 26 marked for

9  identification).

10 **Q**  (By Mr. Magnuson, continuing) Is this one of

11 the e-mails that you reviewed to prepare for

12 your testimony today, Mr. McKelvey?

13 **A**  Yes.

14         MR. MAGNUSON:  Cyle, could you go

15 to the very bottom of it?

16         MR. CRAMER:  On the first page?

17         MR. MAGNUSON:  All the way down

18 to the Ron Pierce e-mail at 3:51.

19 **Q**  (By Mr. Magnuson, continuing) So we're

20 showing you the first e-mail on this chain

21 that was sent by Ron Pierce at 3:51.  Does

22 this e-mail refresh your recollection at all

23 of the events of that day?

24 **A**  I mean, I read what it says.  As far as what

25 I actually remember from that day, not really.

---

**66**

1  **Q**  Now we'll go up above.  The one from Gary

2  Prince at 4:54, do you recall that e-mail

3  specifically?

4  **A**  No.

5  **Q**  Do you recall getting it?

6  **A**  No.

7  **Q**  It states, 'We need a full breakdown from the

8  Trainmaster on what happened here.'  You were

9  an assistant trainmaster that day, but is

10 that who they're referring to?  Is that who

11 Gary Prince was referring to there?  Were you

12 acting as the trainmaster?

13 **A**  Yes.

14 **Q**  It goes on to say, 'A setout and locomotive

15 lift should not take 4 hours and 30 minutes

16 as projected.'  Do you read that?

17 **A**  Yes.

18 **Q**  That's correct?  It shouldn't take that long

19 under standard?

20 **A**  That is correct.

21 **Q**  He goes on to say, 'We are at risk of 4 re-

22 crews due to 1 train over-standard.'  Do you

23 recall that being the case that day?

24 **A**  I do not recall that.

25 **Q**  So when they talk about being at risk of 4 re-

---

**67**

1  crews, they're not talking about just regularly

2  scheduled crew changes.  They're talking

3  about re-crews as a result of going over

4  their hours of service.  Correct?

5          MS. AL TAQATQA:  Objection,

6  foundation.  You can answer if you know.

7  **A**  Yeah, I can't say specifically what they're

8  **talking about.**

9  **Q**  (By Mr. Magnuson, continuing) Well, when he

10 says risk of re-crews, he's not talking about

11 regularly scheduled crew changes, is he?

12         MS. AL TAQATQA:  Same objection.

13 **A**  I mean, I can't speak to exactly what

14 **somebody else is talking about.**

15 **Q**  (By Mr. Magnuson, continuing) Well, we will

16 talk to Mr. Prince about it.  But he did say

17 that the one train being over-standard is

18 going to result in four re-crews.  That's

19 what it states.  Right?

20 **A**  That is what it states, correct.

21 **Q**  And your understanding is the one train being

22 over-standard that he's talking about here is

23 the 474.  Right?

24 **A**  Correct.

25 **Q**  He goes to say, 'Ensure the delays in Nexus

---

**68**

1  are filled out correctly with facts, not

2  assumptions.'  Is that correct?

3  **A**  That's what it says, correct.

4  **Q**  What is Nexus?

5  **A**  Nexus is a computer program.

6  **Q**  What does the computer program do?

7  **A**  It shows the train line-ups and their

8  **schedule.  It shows information about the**

9  **trains, how they're operating, whether they**

10 **are operating in advance time, link (phonetic)**

11 **time, what time they're projected into a**

12 **specific terminal or destination.  And then**

13 **it also shows what other trains are projected**

14 **in there.  That's how we keep track of the**

15 **arrivals, departures, work events, a lot of**

16 **the stuff with the times of the trains.**

17 **Q**  Part of your job at that time was to avoid

18 the risk of re-crews.  Right?

19 **A**  I don't know how you're phrasing the

20 **question.  Every train gets re-crewed in**

21 **Marquette.  So it's not the fact that we're**

22 **re-crewing the trains.  They're going to get**

23 **re-crewed there anyways.  It's just the fact**

24 **of where we're going to re-crew them at and**

25 **what impact that's going to have to the overall**

---

77

1 south wye' -- which that's a different
2 location -- 'while they were tying onto the
3 engine I used another crew to sweep out the
4 switch and verify it was safe.'
5        So I think my point there that I
6 was making is that I instructed the crew to
7 go pick up the engine off the south leg of
8 the wye. They disregarded my instructions
9 and went to the south siding switch and
10 proceeded to do something else that they were
11 not instructed to do.
12 Q What were they doing? Is this consistent with
13   your memory? So you remember those events?
14 A No. I'm just reading the e-mail.
15 Q '474 then ran light power 2 units down to the
16   south siding switch and ran light power over
17   boatels crossing and down the siding track
18   where their setout would be made.' Do you
19   see that sentence?
20 A Where is that at?
21 Q Cyle, could you just lower it? It says, '474
22   then ran'. Towards the bottom there it says,
23   '474 then ran light power'?
24 A Okay. Yes, I see that.
25 Q How far from Marquette was the south siding

78

1   switch?
2 A From the depot, the crew change location?
3 Q Right.
4 A I don't know. Maybe roughly a half a mile if
5   that, probably less.
6 Q How far is the Boatels crossing?
7 A It's the same thing. The crossing is just
8   right before the siding track.
9 Q And that's where they were going to set some
10   cars out, is that right, in that siding?
11 A That is correct.
12 Q So after that, they completed that and ran
13   back to their train and tied on. Right?
14 A Yes.
15 Q You mentioned they, meaning the 474, was
16   doing something that they weren't instructed
17   to be doing. What was that?
18 A They were instructed to go pick up an engine.
19   Instead of going and picking up the engine,
20   they went to the south siding switch, the
21   Boatels crossing, and proceeded to try and go
22   into that track. That was not what they were
23   instructed to do.
24 Q Why did they do that if you know?
25 A I do not know why they disregarded my

79

1   instructions.
2 Q Was the locomotive you instructed them to
3   pick up parked on an open deck bridge?
4 A I don't know if it would be categorized as an
5   open deck bridge. There was some type of
6   bridge there. It's commonly referred to as
7   the pink elephant, and it's a common crew
8   change location where we pull trains up to do
9   crew changes at on a regular basis.
10 Q During your job briefing at any point did you
11   tell Mr. Sexton and Mr. DePover to get on
12   their train and go?
13 A I don't specifically recall.
14 Q You could have? You just don't recall one
15   way or the other?
16 A I don't recall the specific conversation.
17   But speaking in general terms, I'm sure that
18   after the job briefing was completed, every
19   job briefing wraps up with, okay, we all
20   understand the work that needs to be done,
21   let's go get it done safely and efficiently.
22 Q Did that include not cutting the tracks?
23 A I believe the result of the job briefing, we
24   agreed to cut the tracks since it was done.
25 Q But you disagreed with that. Correct?

80

1 A Originally I did disagree with it. But, like
2   I stated previously, cutting tracks and
3   cutting crossings isn't something that causes
4   a significant delay. So we do have a rule in
5   the GCOR that says when it doubt take the
6   safe course. So when we have a disagreement
7   about any type of safety concern, the result
8   is always going to take the safe course,
9   which is what we did in this instance.
10 Q That was at the initiative of Mr. Sexton. Correct?
11 A I wouldn't say it was at the initiative of
12   anything. Ultimately, I'm the manager who
13   makes the final decision. So ultimately all
14   decisions come down to me.
15 Q You did some -- according to this, you drove
16   Mr. DePover on a number of occasions to keep
17   him from walking. Correct?
18 A Correct.
19 Q He's referred to as the assistant engineer?
20 A I don't specifically recall who the conductor
21   was on this day. If you have a document -- I
22   forget what you said his name was. I will
23   just believe you that that's who the conductor
24   was.
25 Q It was Justin DePover, yep. At any time when

81

1    Mr. DePover was riding in your vehicle, did
2    you tell him that their decision to cut the
3    tracks quote, unquote woke people up?
4  A **I don't recall saying that, no.**
5    (Deposition Exhibit 27 marked for
6    identification).
7  Q  We'll pull up Exhibit 27. Have you seen this
8    document before?
9  A **I don't recall specifically. This may have**
10   **been something that Ms. Briana showed me.**
11 Q  Okay. You're not copied on it. Have you
12   seen e-mails like this before?
13 A **Yes.**
14 Q  Is this a daily e-mail that goes out, the Top
15   15 Trains Impacting Train Speed?
16 A **I believe so, yes.**
17 Q  Is that something that you typically receive?
18 A **I believe so, yes.**
19 Q  Do you recall specifically getting it that day?
20 A **I do not recall that.**
21 Q  Actually, it would be the second, the day
22   after?
23 A **Yes. From what I understand, this is the**
24   **train delay generic e-mail that's sent out by**
25   **the MOC that just has the top delays. And I**

82

1    **believe the description referenced in there**
2    **is what is entered into the Nexus system.**
3  Q  This is generated as a result of the Nexus
4    system?
5  A **I don't know specifically how it's generated.**
6  Q  Probably goes without saying as a trainmaster
7    you try to avoid your trains being identified
8    as one of the top 15 trains of the day
9    impacting train speed?
10 A **I mean, I just -- I try to get all the trains**
11   **through the terminal within standard hoversil**
12   **(phonetic) speed. More in particular, the**
13   **document has no bearing on my day-to-day**
14   **operations.**
15 Q  You try to avoid though having any of your
16   trains be identified as the top 15 delays on
17   the system?
18 A **I try to avoid all delays period.**
19 Q  Particularly 3 hour and 23 minute delays?
20 A **It doesn't matter if it's a minute or 3**
21   **hours. A delay is a delay.**
22 Q  The longer the delay, the more likely you
23   are to -- the delay is more likely to result
24   in a drill-down though. Right? You've
25   testified to that a little bit ago.

83

1    MS. AL TAQATQA: Objection,
2    misstates prior testimony.
3  A **I don't believe that's what I said at all.**
4  Q  (By Mr. Magnuson, continuing) Is that your
5    experience, that the longer the delay the
6    more likely you are to result in a drill-down?
7  A **No, that is not my experience.**
8  Q  You don't drill-down over a minute delay. Right?
9  A **Absolutely.**
10 Q  You do?
11 A **Yes. Every delay, every train, every delay.**
12 Q  Is important and can result in a drill-down?
13 A **Among many other things. Delays are just**
14   **one reason for a drill-down.**
15 Q  Injuries being another, derailments. Right?
16 A **Among many other things, yes.**
17 Q  What are some of the other things that can
18   cause a drill-down?
19 A **Any type of incident that anybody wants a**
20   **drill-down for.**
21 Q  Were you asked to provide this information in
22   the description or was that, to the extent
23   you know, lifted from your e-mail?
24   MS. AL TAQATQA: Objection, foundation.
25 A **I don't know.**

84

1  Q  (By Mr. Magnuson, continuing) This description
2    references having to cut the Boatels crossing
3    and run down MQS -- I'm assuming that's Marquette
4    siding?
5  A **Correct.**
6  Q  -- light power before they could shove the
7    cars into it. Is that what it says?
8  A **Correct.**
9  Q  So the cutting of the tracks to some extent
10   contributed to this delay. Correct?
11 A **I would disagree, no.**
12 Q  To some extent?
13 A **I would disagree, no.**
14 Q  Then why do you when you're asked in Exhibit
15   26 to identify the delay, why do you
16   reference the cutting of the crossings?
17 A **Because my job as a trainmaster is to explain**
18   **the entire work event and everything that**
19   **occurred during it, which cutting the**
20   **crossings would have been part of that. It**
21   **doesn't necessarily indicate that that's the**
22   **cause of the delay. It just was a part of**
23   **the work event that day. It was documented.**
24 Q  In fact, you reference the cutting of the
25   crossings twice in your explanation. Is that

113

**1** what it was about, who needed to be on it.

**2 Q** Did any of those calls, those conference

**3** calls, ever deal with over-standard events

**4** and drill-downs?

**5 A** Which conference calls?

**6 Q** Well, any of them.

**7 A** I have been on a lot of conference calls.

**8** Yes, we talked about train delays on

**9** conference calls before.

**10 Q** You just don't specifically recall talking

**11** about this train delay with the 474 on the 1st?

**12 A** That is correct.

**13 Q** But it could have happened?

**14 A** Anything is possible.

**15 Q** Can you scroll down a little bit? I'm going

**16** to ask you one last time. You don't have any

**17** phone numbers that you recognize here?

**18 A** Correct.

**19 Q** Not one?

**20 A** Correct.

**21**         MR. MAGNUSON: We will determine

**22** that and talk about it at a future date.

**23** We'll go off the record here for about five

**24** minutes.

**25**         (Brief recess).

114

**1 Q** (By Mr. Magnuson, continuing) Mr. McKelvey,

**2** you referenced something at the very

**3** beginning that this crew, Sexton and DePover,

**4** were doing something that they weren't

**5** supposed to do at the beginning of that shift.

**6** Do you remember that comment?

**7 A** Yes.

**8 Q** What is it that they were doing that they

**9** weren't supposed to have been doing?

**10 A** Could we bring up the e-mail that I was

**11** referring to when I made the comment?

**12 Q** 26, Bates 3285.

**13 A** All right. '474 crew cut off light power and

**14** went down to the south siding switch. I was

**15** crew changing 575 at milepost 100 when they

**16** said they would need a shovel and broom at

**17** the south siding switch to dig it out.' So

**18** what that tells me -- I don't have specific

**19** recollection of the events that occurred that

**20** day. Just going off of the comments off of

**21** the e-mail, I can deduce that the crew was

**22** instructed to go lift the engine first which

**23** was on the south right of the wye. The crew

**24** disregarded the instructions to go to the

**25** south leg of the wye and proceeded to go to

115

**1** the south siding switch, of which I knew the

**2** switch wouldn't have been needed to been dug

**3** out due to the snow accumulation. I had

**4** another crew that I was going to utilize to

**5** help dig that switch out. So the crew that

**6** had to pick up the engine would not have to

**7** stop and dig the switch out. So they could

**8** have went and picked the engine up while the

**9** other crew dug the switch out for them. It

**10** appears that they disregarded my instructions

**11** of what I told them to go do and proceeded to

**12** go to the switch that I did not instruct them

**13** to go to, which that would have incurred an

**14** unnecessary delay.

**15 Q** So that would have caused the delay, but Sexton

**16** cutting the crossings didn't cause a delay

**17** is what you're saying?

**18 A** Ultimately, the cutting of a crossing or

**19** cutting of a track running light power is

**20** something that shouldn't take more than a few

**21** moments. It's not anything that's going to

**22** cause a significant delay to a train.

**23 Q** But, again, you don't have any specific

**24** recollection of how long that took?

**25 A** No, I don't have any recollection of exactly

116

**1** how long that work event took. But based on

**2** my time at Marquette and the numerous times

**3** that I have had to cut those crossings, I can

**4** tell you -- how long do you think it would

**5** take to run an engine across a road?

**6 Q** But it takes time to get to the grade

**7** crossing. Right?

**8 A** I mean, it's maybe 100 yards. How far would

**9** it take you to run two engines 100 yards?

**10 Q** Are you saying that when they cut these

**11** crossings, they only traveled 100 yards?

**12 A** To the first location. To go from -- it's

**13** actually milepost 98 is where the crew change

**14** location is to the south leg of the wye is

**15** roughly I would say 100 yards.

**16 Q** But if they went further than that and you

**17** can't recall, that would have taken longer.

**18** Right?

**19 A** Yes. Like I said and like we specified

**20** previously, going to the south leg of the wye

**21** it was probably under a half a mile. So in

**22** order to run two engines half a mile, we're

**23** talking, what, five minutes. It's not a

**24** significant delay.

**25 Q** Being accused of violating Canadian Pacific

## RE: Marquette Sub Delays

| | |
|---|---|
| **From:** | Kurtis McKelvey <"/o=cpr/ou=exchange administrative group (fydibohf23spdlt)/cn=recipients/cn=6a15daf0718843509fc5650c933ec7e0-kurtis mckelvey"> |
| **To:** | Gary Prince <gary_prince@cpr.ca>, Tom Jared <tom_jared@cpr.ca>, Dylan Smith <dylan_smith@cpr.ca>, Joey Reyes <joey_reyes@cpr.ca>, Mark J Johnson <markj_johnson@cpr.ca>, "DL_MOC_Senior_Director@cpr.ca" <moc_senior_director@cpr.ca>, MOC Director East <moc_director_east@cpr.ca>, "DL_CMC_Management@cpr.ca" <cmc_management2@cpr.ca> |
| **Date:** | Mon, 01 Feb 2021 15:33:27 +0000 |

474-31 arrived at MQT 00:56 and held at MP 100 for 475 to pull up and shove in the north wye.  475 gave up TW at 01:37 and 474 IB crew took TW at 01:38 to pull down to the depot for crew change.

I had a job briefing with the crew while waiting for 474 OB to arrive at depot about work to be completed and the siding crossing needing to be cut. OB boarded train at depot and preformed inspection of engine.

The work for 474 was to lift 1 engine and s/o 24 cars behind 49 cars and 1 DP unit. I had an opportunity crew move the engine to the South leg of the wye for 474 to lift allowing 475 to continue with their work in the yard.

474 crew was instructed to lift the engine, tie onto train and then we would drive the AE back and make a standing cut 74 cars deep.

474 was instructed to pull down to the South wye where the engine was to be lifted and roll up MP 100. ATM was at rear of train and visually confirmed rear end passing MP 100 to roll up for 574 crew change. 474 rolled up TW to MP 100 at 02:22, this is the time they arrived at south wye to begin their work.

474 crew cut off light power and went down to the South siding switch. I was crew changing 575 at MP 100 when they said they would need a shovel and broom at the south siding switch to dig it out.

I again instructed them to go lift the engine off the south wye. While they were tying onto the engine I used another crew to sweep out the switch and verify it was safe.

When I got back from making sure the switch was clear 474 was tied onto the engine going through the unit. A watched them for aprox. 10 min before I asked how it was coming and they informed me they "we're trying to figure out why the rear light isn't coming on". I instructed them to go back to the second unit and just turn on the light manually. Then 474 completed consist air brake test on south leg of the wye.

474 then ran light power 2 units down to the south siding switch and ran light power over boatels crossing and down the siding track where their s/o would be made. After this was completed then ran light power back to their train and tied on. I picked up the AE and drove him back where his cut was. Cut was made 74 cars deep and required ATM to relay for AE.

474 AE then rode the shove into MQS where he s/o 24 cars. I picked up the AE on the north end and drove him 24 cars up where he tied 2 hand brakes.

EXHIBIT
26

CP_03285

474 then doubled back to rear of their train holding 49 cars and 1 DP engine. The AE stopped and detrained the car, before making the joint on MQT main. AE released 2 hand brakes and checked 2 additional brakes. I drove him up to the head end.

474 then had to wait for air to build up before they could complete the class 3 air brake test. Train was 9349'. PTC was then set up and TW issued and verified.

474 departed MQT 05:39 (3'23") over standard. There is no reason lifting and engine and s/o 24 cars should take this long. I have asked for delay reports to be gathered at Nahant and Road Foreman Finney to get a download of the CP8526 when it arrives at Nahant.

**From:** Gary Prince <Gary_Prince@cpr.ca>
**Sent:** Monday, February 1, 2021 4:54 AM
**To:** Tom Jared <Tom_Jared@cpr.ca>; Dylan Smith <Dylan_Smith@cpr.ca>; Joey Reyes <Joey_Reyes@cpr.ca>; Mark J Johnson <MarkJ_Johnson@cpr.ca>; Kurtis McKelvey <Kurtis_McKelvey@cpr.ca>; DL_MOC_Senior_Director@cpr.ca <MOC_Senior_Director@cpr.ca>; MOC Director East <MOC_Director_East@cpr.ca>; DL_CMC_Management@cpr.ca <CMC_Management2@cpr.ca>
**Subject:** RE: Marquette Sub Delays

We need a full breakdown from the Trainmaster on what happened here. A set out and locomotive lift should not take 4'30" as projected.

574-138, 475-30 and B39-31 were called based on within standard work event. We are at risk of 4 re-crews due to 1 train over-standard.

Ensure the delays in Nexus are filled out correctly with facts, not assumptions.

GJP

**From:** Ron Pierce <Ron_Pierce@cpr.ca>
**Sent:** Monday, February 1, 2021 3:51 AM
**To:** Tom Jared <Tom_Jared@cpr.ca>; Dylan Smith <Dylan_Smith@cpr.ca>; Joey Reyes <Joey_Reyes@cpr.ca>; Mark J Johnson <MarkJ_Johnson@cpr.ca>; Kurtis McKelvey <Kurtis_McKelvey@cpr.ca>; DL_MOC_Senior_Director@cpr.ca <MOC_Senior_Director@cpr.ca>; MOC Director East <MOC_Director_East@cpr.ca>
**Subject:** Marquette Sub Delays

474-31 arrived Marquette 0056, outbound called 0105 and had to wait for 475-30 to clear onto the Mason City Sub. After 475-31 cleared on the Mason City Sub then 474-31 had to pick up a engine and set out to the yard. Unable to hold 474-31 at Harpers account HOS at 0200 on the inbound.

475-30 arrived Marquette 0108, originally projected to arrive at 0001. But was held up at Ekcards for 6B52-31 to clear as they were having issues with frozen switches on the main line and in the plant at Pattison. Engineering helped clear into the R14 at Pattison. At Marquette the train has set out 4 cars and pick up 1600 feet of traffic. Outbound called 0345. Meeting 474-31 and 574-138 at Marquette.

574-138 arrived Marquette 0208, and is waiting behind 474-31 to depart and pull down and change crews.

Plan for the meet was discussed with Assistant Trainmaster Kurt McKelvey and Superintendent Dylan Smith. Assistant Trainmaster on site working with the crews.

Notifications:
Assistant Superintendnet Joey Reye by the SR Director, who is arranging for the download.
Assistant Trainmaster Kurt McKelvey

RR Pierce

Confidential

# Yesterday (01 Feb 2021) - Top 15 Trains Impacting Train Speed - US

**From:** qlikview_administrator@cpr.ca
**To:** duffy_kibsey@cpr.ca, robert_johnson@cpr.ca, craig_ruff@cpr.ca, stu_kennedy@cpr.ca, Lonnie Jamieson <lonnie_jamieson@cpr.ca>, Jeff Edwards <jeff_edwards@cpr.ca>, Courtney Dunford <courtney_dunford@cpr.ca>, Ray Elphick <ray_elphick@cpr.ca>, Shane Scully <shane_scully@cpr.ca>, DL_US_Train_Speed <us_train_speed@cpr.ca>
**Date:** Tue, 02 Feb 2021 10:45:44 +0000

| Delay details for US East and US West - [45:12 total delay] | | | |
|---|---|---|---|
| **Train Name** | **Station** | **Description** | **Delay Hours** |
| **474-31** | Marquette | 474 scanned in and held at MP 100 for 475-30 to shove into MQT through the North Wye. 474 issued TW 01:38 to come to depot for crew change. 474 rolled up MP 100 at 02:22 when they arrived at south wye to start their work. 474-31 lifted CP 5047 off the south leg of the wye and s/o 24 cars to MQS. they also had to cut the Boatels crossing and run down MQS light power before they could shove the cars into it. ATM on sight to help with rides and expedite as much as possible. | 3:23 |
| | Nahant | Train pulled down the main, set off cars to Na04, Dp to Na02, Shoved NA04 & Na11. Then Doubled the Main, Na07 & Na08 | 3:04 |
| | **Total** | | **6:27** |

Redacted

EXHIBIT
27

Confidential
CP_03303

| Delay details for US East and US West - [45:12 total delay] | | | |
|---|---|---|---|
| Train Name | Station | Description | Delay Hours |
| Redacted | | | |

Confidential

| Delay details for US East and US West - [45:12 total delay] | | | |
|---|---|---|---|
| Train Name | Station | Description | Delay Hours |
| Redacted | | | |

Confidential

| Delay details for US East and US West - [45:12 total delay] | | | |
|---|---|---|---|
| Train Name | Station | Description | Delay Hours |
| Redacted | | | |

Confidential

**Page 1**

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION

- - - - - - - - - - - - - - - - - - -

No. 3:23-CV-00031-HCA

John Sexton,

                              Plaintiff,

        vs.

Dakota, Minnesota & Eastern Railroad
Corporation d/b/a Canadian Pacific,
a Delaware corporation

                              Defendants.

- - - - - - - - - - - - - - - - - - -

DEPOSITION OF

KURT McKELVEY

May 10, 2024

11:00 a.m.

TAKEN BY: BRENDA K. FOSS
fossbrenda@yahoo.com
612-701-4282

**Page 2**

Deposition of KURT McKELVEY, taken
via Zoom videoconference, by and on behalf of
Plaintiff, on Friday, May 10, 2024, commencing
at 11:00 a.m., before Brenda K. Foss,
Professional Court Reporter, Notary Public,
State of Minnesota, County of Hennepin.

* * * * *

APPEARANCES

ON BEHALF OF THE PLAINTIFF:
CYLE CRAMER, ESQUIRE
JOHN MAGNUSON, ESQUIRE
LAUREN HOSCH, PARALEGAL
YAEGER & JUNGBAUER BARRISTERS, PLC
4601 Weston Woods Way
St. Paul, MN 55127
ccramer@yjblaw.com
651-288-9500

ON BEHALF OF THE DEFENDANTS:
BRIANA AL TAQATQA, ESQUIRE
DORSEY & WHITNEY LLP
50 South 6th Street, Suite 1500
Minneapolis, MN 55402
altaqatqa.briana@dorsey.com
612-340-2600

ALSO PRESENT:
Michelle Haynes, CPKC Paralegal
Noah Garcia, DM&E Counsel

* * * * *

**Page 3**

I N D E X

Examination:                    PAGE:
By Mr. Cramer              5

Objections:
By Ms. Al Taqatqa          7, 10, 13, 17,
                           19, 31, 33

Marked Deposition Exhibits:
32 Feb 1, '21 messages          13
33 Feb 1, '21 messages with     25
   Antczak
34 Jan 31 and Feb 1, '21        27
   messages

Reporter's Certificate          35

(Original Deposition Transcript in the
possession of Cyle Cramer, Esquire).

* * * * *

**Page 4**

P R O C E E D I N G S

KURT McKELVEY,

after having been first duly sworn,

deposes and says under oath as follows:

MS. AL TAQATQA:  Do you mind if I
say something quickly on the record?

MR. CRAMER:  Go ahead.

MS. AL TAQATQA:  I just wanted to
state for the record that DM&E agreed to
produce Mr. McKelvey for a second deposition
pursuant to a stipulation that's been entered
into between the parties.  And the stipulation
provides that the deposition will not last
longer than one hour and that plaintiff's
counsel may only question Mr. McKelvey about
any document that was produced after his
first deposition that is within the range of
CP 3686 through CP 6290 and on its face
includes or refers to Mr. McKelvey or his
work phone number 612-393-2358.

MR. CRAMER:  Yes, that is the
case.  I'm going to do a couple preliminary
questions and maybe just establish some of

5

1  the timeframe again, which I guess typically
2  would be outside of that. Is that okay just
3  making sure we're working on the same day and
4  that sort of thing?
5        MS. AL TAQATQA: I will let you
6  know if I have any concerns with your
7  questions.
8        MR. CRAMER: Sounds good.
9
10       EXAMINATION
11 BY MR. CRAMER:
12 Q  Good morning, Mr. McKelvey. My name is Cyle
13    Cramer. Can you state for the record your
14    first and last name and then spell your last
15    name?
16 A  My name is Kurtis McKelvey, M-C-K-E-L-V-E-Y.
17 Q  Our office conducted your deposition in the
18    past so you are aware we're talking mostly
19    about the incident on February 1st, 2021
20    involving Mr. Sexton and his train?
21 A  Okay.
22 Q  The audio cut out. I know you nodded, but
23    did you also say yes?
24 A  Yeah.
25 Q  Just a couple preliminary things, just please

6

1  answer every question verbally. Don't just
2  shake or nod your head. And say yes or no
3  versus nope or uh-huh, for example. Do you
4  understand that?
5  A  Yes.
6  Q  Are you prepared to answer questions and
7     nothing will prevent you from giving your
8     full attention today?
9  A  Yes.
10 Q  I'm still not hearing you say yes. Could you
11    maybe just say your name again longer or
12    something longer to make sure I'm picking up
13    the audio?
14 A  Kurtis McKelvey.
15 Q  Thank you. I can hear that. If you don't
16    understand a question and if you don't ask, I
17    will expect that you understand the question.
18    Do you understand that?
19 A  Yes.
20 Q  Did you prepare for the deposition today?
21 A  I had a brief meeting with my lawyer
22    yesterday or with Briana and I think Noah.
23 Q  How long was that meeting?
24 A  Approximately an hour.
25 Q  Did you review any documents for that meeting?

7

1  A  I did not.
2  Q  Sorry. What was that?
3  A  No, I did not.
4  Q  Have you read your deposition taken with our
5     office that occurred on November 7, 2023?
6  A  No, I have not.
7  Q  Did you read Mr. Sexton's deposition that was
8     taken on October 31st, 2023?
9  A  No, I have not.
10 Q  Have you spoken with anyone else about this
11    matter in the last couple of weeks other than
12    your attorneys?
13 A  No.
14 Q  I think I'm going to just start with going
15    through some of the phone records that have
16    been produced since. On February 1st, do you
17    recall having a phone conversation with a
18    Dylan Smith?
19 A  I do not.
20 Q  Do you recall being part of any conference
21    call on February 1st?
22 A  I do not.
23 Q  Is there a conference call line that you are
24    aware of?
25        MS. AL TAQATQA: Objection, form.

8

1  You can answer, Kurt.
2  A  Can you be more specific? There's several
3     conference call lines that Canadian Pacific
4     uses for all types of different things.
5  Q  Do you recall on February 1st calling into a
6     conference line at all?
7  A  I do not.
8  Q  But you have been on conference calls in your
9     position?
10 A  Yes, I have been on conference calls in my
11    position.
12 Q  Do you recall having any telephone conversations
13    with Mr. Tom Jared on February 1st, 2021?
14 A  I don't remember the exact date or time. But
15    as I talked about in my previous deposition,
16    I do recall having a conversation with
17    Mr. Jared about the incident at some point
18    after the incident.
19 Q  Do you recall what you discussed in that
20    conversation?
21 A  I believe we discussed why it took him so
22    long -- why it took him three times longer to
23    do the work event than what it was supposed
24    to take.
25        MR. CRAMER: I have some

21

1    if you said something.  Sorry.
2  A  Yes, that's correct.
3  Q  Do you understand this string of messages to
4    be talking about the 474?
5  A  Like I said, I would assume so but I don't
6    remember that day.  I don't remember three
7    years ago and I don't remember sending any of
8    these messages.
9  Q  Who is Kade Antczak?
10  A  I believe Kade was a dispatcher with CP.
11  Q  Is he still a dispatcher?
12  A  He no longer works with CP, no.
13  Q  Did you communicate with him on February 1st,
14    2021?
15  A  I don't specifically recall.
16  Q  Does this look like a typical message you
17    would have sent to Kade at that time?
18  A  Yes.
19  Q  Do you remember sending this specific one?
20  A  I do not.
21  Q  Go to 3741.
22       MS. AL TAQATQA:  Cyle, can you
23    give the witness the opportunity to review,
24    if it's a conversation, to review the
25    conversation?

22

1       MR. CRAMER:  Sure.
2  A  I got that one.  Next page, please.  (Witness
3    examining document).  Next page.  Next page.
4    Next page.
5  Q  (By Mr. Cramer, continuing) Let's stop on
6    this one.  Do you know what you're referring
7    to when you say 'all the fun up here'?
8  A  I don't recall sending this message, no.
9  Q  Go to the next one.  Tell us when you're
10    ready again for the next page.
11  A  (Witness examining document).  Next page.
12    Next page.  Next page, please.  Next page.
13    Next page, please.
14  Q  We'll stick on this one for a second.  So
15    here it looks like Sexton is on the 474
16    train.  Is that correct?
17  A  Yes.
18  Q  What do you mean by 'putting on a show'?
19  A  Like I said, I don't recall sending any of
20    these messages.
21  Q  Is four hours over the length of the work
22    event?
23  A  Four hours for a singular work event is
24    probably one of the longest work events that
25    I have witnessed in my career at Canadian

23

1    Pacific.
2  Q  Are all work events at Marquette expected to
3    be the same length?
4  A  No, they're not expected to be the same based
5    upon that amount of work.  But there is a
6    standard that you should be able to get
7    everything done within.
8  Q  Do you recall what Mr. Sexton's work event
9    was that day?
10  A  I don't recall.  It's now three years ago.  I
11    don't recall everything.  I believe what I do
12    remember, based on the previous deposition,
13    is he had a fairly large train.  I believe he
14    had an engine or some engines to pick up and
15    cars to set out to the siding.  I don't
16    remember if he had a pickup there also.
17  Q  With a four hour work event being one of the
18    longest in your career, is that something
19    you'd drill down on?
20  A  Yes.
21  Q  Do you recall drilling down on this work event?
22  A  Honestly, no, I don't even recall what it
23    was.
24  Q  And a four hour work event is something you
25    would try to avoid?

24

1  A  Any over-standard work event is something I
2    try to avoid.
3  Q  Even if it included safety related tasks?
4  A  Can you repeat the question?
5  Q  If a work event was delayed because of safety
6    related tasks, is that something you'd try to
7    avoid?
8  A  I don't understand the question.  Any time
9    that we're handling any movements with the
10    train, it's safety related.
11  Q  After reviewing some of these messages, is
12    your memory refreshed that Sexton had a four
13    hour work event on February 1st?
14  A  Like I said, I don't recall a specific day.
15    I don't know exactly how long it took.  I'm
16    just going off the correspondence you're
17    showing me here.  I don't remember exactly
18    how long it was.
19  Q  If there was a four hour delay, you would
20    have likely done a drill-down on that?
21  A  Yeah, I'm sure there would have been a
22    drill-down.  There should be a drill-down
23    done on every over-standard work event.
24       MS. AL TAQATQA:  Is that Exhibit
25    33?  Are we labeling this as an exhibit?

1

```
            IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF IOWA
                      EASTERN DIVISION

- - - - - - - - - - - - - - - - - - - -
                        No. 3:23-CV-00031-HCA
John Sexton,

                        Plaintiff,

        vs.

Dakota, Minnesota & Eastern Railroad
Corporation d/b/a Canadian Pacific,
a Delaware corporation
                        Defendants.
- - - - - - - - - - - - - - - - - - - -
```

                    DEPOSITION OF

                    MARK JOHNSON

                    May 10, 2024

                    1:00 p.m.

                TAKEN BY: BRENDA K. FOSS
                 fossbrenda@yahoo.com
                    612-701-4282

---

2

Deposition of MARK JOHNSON, taken via Zoom videoconference, by and on behalf of Plaintiff, on Friday, May 10, 2024, commencing at 1:00 p.m., before Brenda K. Foss, Professional Court Reporter, Notary Public, State of Minnesota, County of Hennepin.

              *    *    *    *    *

                APPEARANCES


ON BEHALF OF THE PLAINTIFF:
    CYLE CRAMER, ESQUIRE
    JOHN MAGNUSON, ESQUIRE
    LAUREN HOSCH, PARALEGAL
    YAEGER & JUNGBAUER BARRISTERS, PLC
    4601 Weston Woods Way
    St. Paul, MN  55127
    ccramer@yjblaw.com
    651-288-9500


ON BEHALF OF THE DEFENDANTS:
    JACK SULLIVAN, ESQUIRE
    DORSEY & WHITNEY LLP
    50 South 6th Street, Suite 1500
    Minneapolis, MN  55402
    sullivan.jack@dorsey.com
    612-340-2600


ALSO PRESENT:
    Michelle Haynes, CPKC Paralegal
    Noah Garcia, DM&E Counsel

              *    *    *    *    *

---

3

                 I N D E X

Examination:                        PAGE:
By Mr. Cramer          4

Objections:
By Mr. Sullivan          8, 9, 12, 13,
15, 17-21, 23, 24, 26, 27, 29-34, 36-43, 45,
48-51, 53, 54, 56, 57, 59, 60, 62-67, 70, 71,
73-77, 80-104

Marked Deposition Exhibits:
35 - 2/21 e-mails          21
     Bates 00981-983
36 - 6/22 e-mail to Valadez   24
     Bates 00615-617
37 - 2/21 e-mail from Reyes   28
     Bates 01703
38 - Discipline Call          78
     Bates 00948
39 - US Efficiency Test Manual 79
     Bates 000368-608
40 - Performance Mgmt Program 93
     Bates 03700-3704
41 - STIP                     94
     Bates 03231-3237
42 - Short-Term Incentive     97
     Bates 03711

Reporter's Certificate     106

(Original Deposition Transcript in the possession of Cyle Cramer, Esquire).

              *    *    *    *    *

---

4

              P R O C E E D I N G S


                   M A R K   J O H N S O N,

      after having been first duly sworn,

   deposes and says under oath as follows:


              E X A M I N A T I O N

BY MR. CRAMER:

Q   Hi.  My name is Cyle Cramer.  I will be taking your deposition today.  I represent the plaintiff in this case, John Sexton.  Can you please state your first and last name spelling your last name?

A   Mark Johnson, J-O-H-N-S-O-N.

Q   Where are you located today?

A   Mason City, Iowa.

Q   Is Jack Sullivan in the room with you?

A   Jack Sullivan is in the room and is the only person in the room with me.

Q   Have you had your deposition taken in the past?

A   Yes.

Q   How many times?

A   Once.

Q   What was that for?

A   It was over I believe an injury from what I

21

1  an exhibit?
2        MR. CRAMER:  I was just about
3  to -- I'll enter it as Exhibit 35.
4        (Deposition Exhibit 35 marked for
5  identification)
6  Q  (By Mr. Cramer, continuing) Do you recall
7  writing this e-mail?
8  A  **I don't recall it.  But, yes, I wrote it.**
9  Q  Is that your e-mail address where it says
10  from?
11  A  **Yes, that was my e-mail at that time.**
12  Q  What would you ascribe this e-mail as?
13  A  **It's my write-up based on the investigation**
14  **and my recommendation.**
15  Q  Can you go up a little bit?  Then what did
16  you think of Mr. Smith's recommendation?
17  A  **I had no feeling.  That's his recommendation.**
18  **He's my superior and I have no qualms about**
19  **it.**
20  Q  Is his recommendation different than yours?
21  A  **Yes.**
22  Q  Were you able to recommend a deferred
23  suspension?
24        MR. SULLIVAN:  Objection, foundation.
25  A  **As I stated before, I don't recall how many I**

22

1  **would recommend a deferred.  I just went**
2  **based off of the discipline policy that you**
3  **had entered before and had me look at.  So,**
4  **therefore, based on as being a major**
5  **violation, I went with the 20 days and**
6  **Mr. Smith recommended a partial with deferred**
7  **time.**
8  Q  (By Mr. Cramer, continuing) As an
9  investigation officer, did you know that you
10  could recommend a deferred suspension?
11  A  **I also knew that I could recommend no**
12  **discipline assessed.  I mean, I could pretty**
13  **much recommend what I felt would be sufficient.**
14  It was simply that, a recommendation.
15  Q  Can you scroll all the way up to the top?
16  According to this, what discipline does it
17  look like Mr. Jared was recommending?
18  A  **The recommendation -- he said to issue the**
19  **discipline that I recommended.**
20  Q  Did Mr. Jared at any time inform you that the
21  discipline could have been a deferred
22  suspension?
23  A  **No, I don't recall any conversation with**
24  **Mr. Jared about this outside of the**
25  **investigation.**

23

1  Q  As an investigation officer, do you know
2  whether coach and counseling could have been
3  a proper discipline?
4  A  **Can you clarify that question?**
5  Q  Yes.  Is coach and counseling available in a
6  shoving movement violation such as the one
7  alleged against Mr. Sexton?
8  A  **A shoving movement was not considered a non-**
9  **major where verbal coaching would be available**
10  **to come into play.  That's my opinion.**
11  Q  Is that based on your training as an engineer --
12  sorry -- as an investigation officer?
13  A  **No.  It was based off the discipline policy.**
14  Q  As an investigation officer, did you have
15  discretion to interpret the discipline policy?
16        MR. SULLIVAN:  Objection, lack of
17  personal knowledge and form.  You can answer.
18  A  **So ask the question one more time.  I want to**
19  **make sure I'm understanding it properly.**
20  Q  (By Mr. Cramer, continuing) As an
21  investigation officer, did you have
22  discretion to interpret the discipline
23  policy?
24        MR. SULLIVAN:  Same objections.
25  A  **Can you clarify that?**

24

1  Q  (By Mr. Cramer, continuing) I'll try to, and
2  correct me if I misstate any of this.  But
3  prior my understanding is you said for a
4  shoving movement violation a coach and
5  counseling wasn't permitted?
6        MR. SULLIVAN:  Objection,
7  misstates the witness' testimony.
8  A  **So the discipline policy is broken into non-**
9  **major and major.  If you go back to the**
10  **exhibit that you presented under major**
11  **offenses, there was no option for verbal**
12  **coaching there.**
13        MR. CRAMER:  I think I will just
14  leave it at that.  Can you bring up the CP
15  00615?  I'll enter this as Exhibit 36.  I
16  want to go to the second page.  Bates should
17  be 616.
18        (Deposition Exhibit 36 marked for
19  identification).
20        MR. SULLIVAN:  Take a minute so
21  we can understand the entire document.
22        MR. CRAMER:  What was that, Jack?
23        MR. SULLIVAN:  Can we give
24  Mr. Johnson a moment to understand this
25  entire document?  I don't know that he's seen

CP Resp. App. - 181

25

**1** it before.

**2**         THE WITNESS: I have never seen

**3** this one.

**4**         MR. SULLIVAN: Can we look at the

**5** top and the bottom and who it's from so we

**6** can have a context what he's being asked

**7** about and what he's testifying about?

**8**         MR. CRAMER: Take a second. Let

**9** us know when you want us to scroll down.

**10 A** (Witness examining document). You can scroll

**11**     down. Okay.

**12 Q** (By Mr. Cramer, continuing) Can you go back

**13**     up to the table, please? Does this table

**14**     include John Sexton?

**15 A** Yes, it does.

**16 Q** Under the type of discipline, what does it

**17**     say the type of discipline was?

**18 A** Clarify who we're talking about.

**19 Q** For John Sexton.

**20 A** 20 days suspension, did not request waiver.

**21 Q** For everybody in this table, what does it say

**22**     the reason for discipline is?

**23 A** Failure to stop within half the distance

**24**     specified.

**25 Q** And that's included for every name?

26

**1**         MR. SULLIVAN: Objection, form.

**2 A** As I read it, yes.

**3 Q** (By Mr. Cramer, continuing) And for the first

**4**     row where it says 'T.V. Engineer', what does

**5**     it say the discipline was in the third column?

**6 A** '20 Day Suspension, (Waiver/15 Days Deferred'.

**7 Q** Do you understand what that means?

**8 A** Yes.

**9 Q** Will you please explain it?

**10 A** It would mean he served 5 days. He requested

**11**     a waiver. He was given a waiver. He served

**12**     5 days and then 15 days were deferred. So

**13**     the 15 days would have been out there in the

**14**     event that there was another incident that

**15**     occurred.

**16 Q** And the next row down, 'M.J. Engineer', what

**17**     was the type of discipline assessed there?

**18 A** 'Verbal Coaching'.

**19 Q** And what is that?

**20 A** Means he would have had discussion with a

**21**     supervisor, whether it be a trainmaster or a

**22**     road foreman. I don't know exactly who, but

**23**     they would have had discussion about the

**24**     incident.

**25 Q** And under the reason for discipline, it's

27

**1** listed as the same discipline for that

**2** individual as Mr. Sexton?

**3**         MR. SULLIVAN: Objection, asked

**4** and answered.

**5 A** Yes.

**6 Q** (By Mr. Cramer, continuing) The next row 'TS

**7**     engineer' what does it say the type of

**8**     discipline is there?

**9 A** Verbal coaching.

**10 Q** And the reason for discipline for TS?

**11 A** Failure to stop within half the distance specified.

**12 Q** As an investigation officer, do you know a

**13**     scenario where verbal coaching would be

**14**     appropriate for failing to stop within half

**15**     the distance specified?

**16**         MR. SULLIVAN: Objection, foundation,

**17**     lack of personal knowledge.

**18 A** The difference that I see is Mr. Sexton did

**19**     not request a waiver. None of the others

**20**     showed that a waiver was not requested.

**21 Q** And what is a waiver?

**22 A** It's the employee's acceptance of

**23**     responsibility for the incident or rules

**24**     violation that occurred.

**25**         Can we take a break here?

28

**1**         MR. CRAMER: Yeah, of course. We

**2** can come back in 10 minutes.

**3**         (Brief recess).

**4 Q** (By Mr. Cramer, continuing) Back on the

**5**     record. Do you recall speaking to Tom Jared

**6**     about Mr. Sexton's February 10th investigation

**7**     outside of the investigation?

**8 A** I don't recall having discussion with him

**9**     outside of the investigation, no.

**10 Q** Do you recall anyone telling you to contact

**11**     Mr. Jared before the investigation?

**12 A** I don't recall that.

**13 Q** In your experience as an investigation

**14**     officer, would you normally talk to the

**15**     witness prior to an investigation?

**16 A** No.

**17 Q** Were you scheduled to be the original

**18**     investigation officer in this investigation?

**19 A** I don't recall but I believe so.

**20**         MR. CRAMER: Let's bring up CP

**21**     1703. This is Exhibit 37. We can go through

**22**     one page at a time.

**23**         (Deposition Exhibit 37 marked for

**24**     identification).

**25**         THE WITNESS: (Witness examining

37

1  MR. SULLIVAN: Objection, form.
2  A  (Witness examining document). It's saying
3     that they cut away with 76 cars.
4  Q  Was it your understanding at the time that
5     their train had 76 cars on it during the
6     shoving movement?
7  MR. SULLIVAN: Objection, lack of
8     personal knowledge.
9  A  I wasn't present at the time, so I don't know
10    if they had set out more cars previous to
11    that. This document just shows that they
12    made a cut behind line number 76.
13 Q  We can scroll down slowly to make sure we are
14    staying with the same or different set of
15    questions. Go down to 70. On lines 13
16    through 15, what does Mr. DePover say there?
17 A  He's saying that he started clear for 50 cars
18    and he was -- started him with that, needing
19    25 to a stop. And then he updated him with
20    15 more to a stop, still clear for 40.
21 Q  Is that different than what Mr. Jared said in
22    the investigation?
23 A  In the way that I recall it, no, because
24    Mr. Jared stated the 50 cars. And then the
25    next update was the 15 that he discussed

38

1     earlier.
2  Q  Did Mr. Jared mention the still clear for 40
3     instruction?
4  MR. SULLIVAN: Objection, the
5     document speaks for itself.
6  A  No.
7  Q  (By Mr. Cramer, continuing) So is Mr. DePover
8     giving a different statement regarding the
9     events than Mr. Jared was?
10 A  Not in its entirety.
11 Q  What do you mean by that?
12 A  Because they both refer to the same update
13    with 15.
14 Q  Do they both refer to the update of 40?
15 MR. SULLIVAN: Objection, misstates
16    the testimony in the transcript.
17 A  No.
18 Q  (By Mr. Cramer, continuing) What did you
19    understand 25 to a stop to mean?
20 A  I wasn't there for that movement. So 25 to a
21    stop could mean to line a switch. It could
22    mean to detrain. There's different reasons
23    that they could need to stop.
24 Q  Did that sound like an accurate instruction
25    under the circumstances to you?

39

1  MR. SULLIVAN: Objection, lack of
2     personal knowledge, form, calls for speculation.
3  A  The way that I look at it, he's giving him
4     that they're clear for more than what he
5     needs to that stop.
6  Q  (By Mr. Cramer, continuing) Can you explain
7     that in a little more detail?
8  A  So he's telling him he's clear for 50 but he
9     needs him to stop in 25. That means they
10    were going to be stopping in 25. The shove
11    instruction is good for 25. When he updates
12    him with 15, still clear for 40, he's still
13    wanting a stop made in that 15 cars. And
14    that would be the instruction that Mr. Sexton
15    as a locomotive engineer would be operating
16    under.
17 Q  Would it have been safe for Mr. Sexton to
18    stop within half of the distance of 40 cars
19    under that instruction?
20 MR. SULLIVAN: Objection, lack of
21    personal knowledge, form, calls for speculation.
22 A  No. 15 is more restrictive than 40. So I
23    would expect that the 15 would be complying
24    with rules. The 40 is just assuring that
25    there's plenty of room on the track.

40

1  Q  (By Mr. Cramer, continuing) Did you think
2     that Mr. DePover was lying about giving the
3     25 to a stop instruction?
4  MR. SULLIVAN: Objection, misstates
5     the testimony in the transcript.
6  A  No.
7  Q  Then where it says clear for 50 cars, what do
8     you take that to mean?
9  A  Based on the way he says clear for 50 cars
10    starting with needing 25 to a stop, it's
11    again assuring him that they have got plenty
12    of room. So the stop doesn't have to be on a
13    dime or they're not coming in to a joint.
14 Q  So should Mr. Sexton take into account the
15    clear for 50 cars when deciding when to stop?
16 MR. SULLIVAN: Objection, lack of
17    personal knowledge.
18 A  Once he's given something more restrictive,
19    no. He needs to go with what's most
20    restrictive. 25 is more restrictive than 50.
21 Q  Is that what the rule says, Rule 6.5?
22 A  I don't have the GCOR in front of me to tell
23    you exactly what it reads, but they are
24    required to stop within half the distance
25    specified. So in the case of the 25, you

**41**

1  would have to be stopped within 12-1/2 cars
2  if he wasn't given further instruction.  And
3  the same with the 15, clear for 40, he would
4  need to be stopped within half of the 15,
5  which would be 7-1/2 cars.
6  Q  Did you give any significance to the
7     instruction of still clear for 40?
8        MR. SULLIVAN:  Objection, form.
9  A  No, because he was given something more
10    restrictive.
11 Q  (By Mr. Cramer, continuing) Are you trained
12    on shoving movements?
13 A  Yes.
14 Q  If Mr. DePover gave the instructions clear
15    for 50, 25 to a stop, what would the
16    reasonable instruction be after 10 cars have
17    been shoved?
18        MR. SULLIVAN:  Objection, lack of
19    personal knowledge, calls for speculation.
20 A  In my experience, that would be a 15 car
21    count.
22 Q  (By Mr. Cramer, continuing) What are you
23    basing that experience on?
24        MR. SULLIVAN:  Objection, form.
25 A  My training and my experience.

**42**

1  Q  (By Mr. Cramer, continuing) Is that based on
2     what the rule says?
3  A  Yes.
4  Q  So the rule says you have to follow the more
5     restrictive set of instructions given?
6        MR. SULLIVAN:  Objection.  The
7     rule states for itself.
8  A  I don't recall all of the exhibits that were
9     entered, and I don't have them in front of
10    me.  But there are rules in place that if you
11    are not given -- and it may fall under
12    railroad radio rules -- that if you are not
13    given anything within half -- by the time you
14    reach half the distance, you must be stopped
15    when you have somebody that's on the ground
16    protecting a shove movement.
17 Q  Do you think the instructions Mr. DePover
18    said he gave were confusing?
19 A  No.
20 Q  Why is that?
21 A  He was letting Mr. Sexton know what he needed
22    and that they had extra room.
23 Q  What do you mean by extra room?
24 A  They weren't coming into a joint and that the
25    stop wasn't going to have to be a sudden stop.

**43**

1  Like coming into a joint, there's rules there
2  that apply to how fast you can make a joint.
3  It's just giving more assurance that no
4  equipment is going to be struck or that there
5  is nobody out there.
6  Q  So it's your understanding an instruction of
7     clear for 40 would mean that it was still
8     safe for Sexton to stop within 20 cars?
9        MR. SULLIVAN:  Objection,
10    misstates the witness' testimony.
11 A  No.  He was given a more restrictive count of
12    15.  So, therefore, the 15 is what Mr. Sexton
13    should have been going based off of.
14 Q  (By Mr. Cramer, continuing) Do you recall in
15    the investigation what instructions Mr. Sexton
16    said he was given?
17 A  No, I don't recall.
18 Q  Let's go to 00079.  I think that shows the
19    beginning of the examination of Sexton.  Is
20    it your understanding here that you're
21    starting your questioning of Mr. Sexton?
22 A  Yes.
23 Q  On lines 13 through 22 what does Mr. Sexton
24    say in the investigation the car counts he
25    was given was?

**44**

1  A  He was given 50 as the initial count.  And
2     the next one was still good -- he believes it
3     was still good for 40, 15 cars to a stop with
4     emphasis on good for 40.
5  Q  Is that consistent with what Mr. DePover stated?
6  A  No.
7  Q  How is it not consistent with what Mr. DePover
8     stated?
9  A  Because Mr. DePover didn't say with emphasis
10    on good for 40.  Other than that, it would be
11    consistent but that's the inconsistency in it.
12 Q  The car counts are the same numbers.  Correct?
13 A  Yes.
14 Q  Then can we go just down to page Bates 81?
15    And lines 11 through 14, does that sound to
16    you consistent with what Mr. DePover stated?
17 A  Who is being questioned here?  Is it still
18    Sexton?
19 Q  Yes.  We just went down two pages.  If you
20    want to scroll back up, we can.
21 A  Go back just to the top of this page once.
22 Q  Why don't we go back to 79?
23 A  Okay.  I'm just making sure that I remember
24    who is testifying and who is asking is all.
25 Q  Not a problem.  I appreciate it.  Back to 81.

| | | 69 |
|---|---|---|
| 1 | A | Okay. |
| 2 | Q | What are you asking on lines 6 to 8? |
| 3 | A | If they have been allowed to or had the |
| 4 | | opportunity to cross-examine all witnesses |
| 5 | | and present witnesses. |
| 6 | Q | Was it your understanding that Mr. Sexton was |
| 7 | | able to present the witnesses that he |
| 8 | | requested? |
| 9 | A | Not based on the document that's in front of |
| 10 | | me, no. |
| 11 | Q | So Mr. Sexton requested Mr. Cruciani to |
| 12 | | attend the investigation? |
| 13 | A | Based on the document you showed me |
| 14 | | previously for the request, that was not |
| 15 | | entered in as an exhibit.  And based on what |
| 16 | | I have seen, no.  And I believe the lines you |
| 17 | | were referring me to, the answer came from |
| 18 | | Mr. Rainwater that the record speaks for |
| 19 | | itself. |
| 20 | Q | Did Mr. Sexton request David Cox to be a |
| 21 | | witness? |
| 22 | A | Again, based on the exhibits you've presented, |
| 23 | | the letter from Mr. Rainwater was not marked |
| 24 | | as an exhibit for the investigation.  So my |
| 25 | | recollection is no. |

| | | 70 |
|---|---|---|
| 1 | Q | Is it a fair and impartial investigation if |
| 2 | | the employees' witnesses aren't there to |
| 3 | | speak? |
| 4 | | MR. SULLIVAN:  Objection, form, |
| 5 | | lack of personal knowledge, calls for |
| 6 | | speculation. |
| 7 | A | Again, I don't recall if they were requested |
| 8 | | prior to the investigation, at the time of |
| 9 | | the investigation, nor whether it was brought |
| 10 | | up in the investigation. |
| 11 | | MR. CRAMER:  Let's take a little |
| 12 | | break.  I will double-check on that.  We can |
| 13 | | come back in 10 minutes. |
| 14 | | MR. SULLIVAN:  Sounds good. |
| 15 | | (Brief recess). |
| 16 | Q | (By Mr. Cramer, continuing) Back on the |
| 17 | | record.  Is it against CP policy to |
| 18 | | intimidate employees? |
| 19 | | MR. SULLIVAN:  Objection, foundation, |
| 20 | | form. |
| 21 | A | There's a policy that talks about that, yes. |
| 22 | Q | Is it against the policy to intimidate |
| 23 | | employees? |
| 24 | | MR. SULLIVAN:  Objection, lack of |
| 25 | | personal knowledge. |

| | | 71 |
|---|---|---|
| 1 | A | Again, I was not present on February 1st.  So |
| 2 | | in the policy, no, you cannot intimidate. |
| 3 | | Was the employee actually intimidated?  I |
| 4 | | don't know.  I was not there. |
| 5 | Q | (By Mr. Cramer, continuing) Mr. DePover |
| 6 | | stated he felt intimidated by Mr. Jared? |
| 7 | | MR. SULLIVAN:  Objection, misstates |
| 8 | | Mr. DePover's statement. |
| 9 | A | He testifies to that on the record. |
| 10 | Q | Is it against CP policy to deny the union the |
| 11 | | ability to call witnesses? |
| 12 | | MR. SULLIVAN:  Objection, lack of |
| 13 | | personal knowledge. |
| 14 | A | No.  It depends on their involvement, whether |
| 15 | | they had involvement in the incident or not. |
| 16 | Q | What do you mean by involvement? |
| 17 | A | Involvement would be directly involved in the |
| 18 | | incident as it happened or information that |
| 19 | | lead to the incident. |
| 20 | Q | Did the union suggest that Mr. Cox had |
| 21 | | information regarding the incident? |
| 22 | A | Again, the letter that you presented for the |
| 23 | | request for witnesses, I don't know who that |
| 24 | | was sent to.  I don't recall whether that was |
| 25 | | presented at the investigation. |

| | | 72 |
|---|---|---|
| 1 | Q | Can we go back to, I believe, Exhibit 35? |
| 2 | | It's the CP 00981.  This is Exhibit 35.  On |
| 3 | | item number 2 in your e-mail, it looks like |
| 4 | | you're acknowledging that the union asked for |
| 5 | | witnesses? |
| 6 | A | Okay. |
| 7 | Q | Is that accurate? |
| 8 | A | Yes, to include one that was not an employee |
| 9 | | of CP Railroad. |
| 10 | Q | According to your e-mail, does it look like |
| 11 | | David Cox had information regarding the |
| 12 | | shoving movement? |
| 13 | A | No. |
| 14 | Q | Can we go to Exhibit 10 on 92?  Let's scroll |
| 15 | | up to the top of this page all the way.  This |
| 16 | | is still Exhibit 10, and you can see it's the |
| 17 | | John Sexton, Justin DePover investigation on |
| 18 | | February 10, 2021. |
| 19 | A | Okay. |
| 20 | Q | Does Mr. Rainwater describe here what the |
| 21 | | union believed Mr. Cox could offer? |
| 22 | | MR. SULLIVAN:  Can we go back so |
| 23 | | we can see the beginning of Mr. Rainwater's |
| 24 | | statement?  This appears to be in the middle |
| 25 | | of him talking about something. |

73

1  A  We need to go back further so I know what's
2     going on here.  Can you scroll down a little
3     bit here for just a moment?  We can scroll up
4     some more.  Scroll up some more.  (Witness
5     examining document).  We can go back to the
6     exhibit I believe.
7  Q  (By Mr. Cramer, continuing) At the top of 91
8     here, Mr. Rainwater told you that he sent a
9     letter to Mr. Reyes.  Correct?
10 A  That's what his testimony is, yes.
11 Q  Did Mr. Rainwater read that letter out during
12    the investigation?
13 A  Yes, he did.
14 Q  Right after Mr. Reyes, what does
15    Mr. Rainwater say the letter said?
16 A  'The purpose of this letter is to formally
17    request witness -- witnesses'.
18 Q  You didn't allow those witnesses to be
19    present in the investigation?
20        MR. SULLIVAN:  Objection, form,
21    misstates the witness' testimony in the record.
22 A  I also believed this was the first it was
23    brought to my attention, that there was a
24    request for witnesses.
25 Q  (By Mr. Cramer, continuing) But you denied

74

1     the witnesses.  Correct?
2         MR. SULLIVAN:  Objection, misstates
3     the witness' testimony, badgering.
4  A  I never denied the witnesses.  The record
5     showed that they would have had no relevant
6     information to this investigation.
7  Q  (By Mr. Cramer, continuing) Who makes the
8     determination whether they have relevant
9     information to give to the investigation?
10 A  In this instance, the records show that they
11    would have had no relevance to this investigation.
12 Q  But who made that decision?
13 A  I did.
14 Q  Why?
15 A  Mr. Cox was assigned to another train and not
16    connected.  The testimony from when you were
17    first on -- I believe it was the 0098 -- read
18    that the union believed that he would have
19    heard the radio conversation.  That's not a
20    fact based he heard the conversation.  Again,
21    he was assigned to a different train.  The
22    other employee that was requested was not an
23    employee of CP Railroad.
24 Q  Do you know whether Mr. Cox was able to
25    overhear the radio?

75

1         MR. SULLIVAN:  Objection, form.
2  A  Again, the union just believed.  They didn't
3     state that he heard.  So, therefore, it was a
4     fair and impartial investigation in my
5     opinion without the witnesses.
6  Q  (By Mr. Cramer, continuing) Do you know
7     whether Mr. Cox heard the radio conversation
8     or not?
9  A  No.  If the union is requesting them, that is
10    their job to prove that he heard it, not my
11    job to determine whether he did or not.
12 Q  How do they prove that he heard it?
13 A  They didn't prove that he did.  They just
14    stated that they believed he heard it.
15 Q  If he was a witness and said that he heard
16    it, would that be proof?
17        MR. SULLIVAN:  Objection, calls
18    for speculation, lack of personal knowledge.
19 A  Again, there was no testimony stated that he
20    heard the conversation that would have had me
21    bring him in as a witness.
22 Q  (By Mr. Cramer, continuing) So you don't
23    recall any statements during the
24    investigation that David Cox overheard the
25    radio conversation?

76

1  A  Again, my only recollection was based off
2     when you had I believe it was 0098 brought
3     up.  At the top it talked about Mr. Rainwater
4     was stating I believe Mr. Cox.  It didn't say
5     Mr. Cox heard.  It just said that he believed.
6  Q  You don't think that Mr. Cox's presence could
7     help clarify whether he heard the radio
8     conversation or not?
9  A  I wasn't there at the time of the incident
10    nor was I Mr. Cox.  I don't know if he would
11    have been on the proper radio channel to hear
12    the conversation.  I don't know any of that.
13 Q  That's all information he could answer if he
14    were in the investigation.  Correct?
15        MR. SULLIVAN:  Objection, calls
16    for speculation, form.
17 A  No.
18 Q  (By Mr. Cramer, continuing) That's not
19    information he could provide?
20        MR. SULLIVAN:  Objection, calls
21    for speculation.
22 A  Again, the union only stated that they
23    believed that he heard it.  They didn't state
24    he heard it.  He said, I believe.  That's not
25    affirmative.

77

1  Q  As the investigation officer, is it your
2     position that Mr. Sexton was afforded the
3     reasonable opportunity to present the
4     witnesses he requested?
5  A  Yes.
6  Q  Why is that?
7  A  **Why is that?  They sent a request for them**
8     **and the -- prior to the night before, the**
9     **hearing officer did not arrange for them to**
10    **be off.  And why?  I don't know other than**
11    **they didn't have relevant information to the**
12    **investigation.**
13 Q  Who makes the determination whether they have
14    relevant information?
15 A  **I would have at the investigation had the**
16    **union brought enough information.**
17 Q  Was there any inconvenience to postponing the
18    investigation to secure the witnesses
19    requested by Mr. Sexton's union?
20       MR. SULLIVAN:  Objection, calls
21    for speculation, form, misstates the record
22    whether there was any request to postpone.
23 A  **No.**
24 Q  (By Mr. Cramer, continuing) Were you trained
25    on how to conduct a fair investigation?

78

1  A  **Yes.**
2  Q  How?
3  A  **I received training from Canadian Pacific**
4     **Railroad.  I served nine years as a union**
5     **representative as a local chairman.  And I**
6     **had been involved on both sides of the table**
7     **as both carrier witness, hearing officer, and**
8     **a union representative.**
9        MR. CRAMER:  I'm just going
10    through my notes here for a second.  Let's go
11    to CP 00948, and we'll make that Exhibit 38.
12       (Deposition Exhibit 38 marked for
13    identification.)
14 Q  It's on the bottom left, CP 00948.  It's kind
15    of blurry and maybe it's worth zooming in,
16    but do you recognize this document at all?
17 A  **You would have to zoom in for me to see it in**
18    **its entirety.  (Witness examining document).**
19    **That's far enough.**
20 Q  On the right side or towards the right side,
21    in one of the columns there, it's one that
22    looks like to be the most words in it.  It
23    starts with 1-Feb-21 on the top.  And then it
24    says GRF02 I believe.  Do you see where that
25    is?

79

1  A  **Yeah.  It's a little blurry.**
2  Q  Maybe we'll just try to zoom in a little bit
3     more.  I don't know if that'll help.
4  A  **Okay.  (Witness examining document).**
5  Q  Do you know what the GRF02 means?
6  A  **I don't recall, but it would probably be a**
7     **shoving movement test.**
8  Q  From what you heard at the investigation, is
9     this the shoving test you understood Mr.
10    Jared conducted?
11 A  **Yes, seeing this document, yes.**
12       MR. CRAMER:  Can we go to the US
13    - Efficiency Test Manual?  We'll mark this as
14    Exhibit 39.
15       (Deposition Exhibit 39 marked for
16    identification.)
17 Q  Do you recognize this cover page?
18 A  **Yes.**
19 Q  Are you familiar with the US - Efficiency
20    Test Manual on Operating Rules in Compliance?
21 A  **To the best of my recollection, yes.  It's**
22    **been a few years.**
23 Q  Do you recognize this as the testing manual
24    that was in place in February of 2021?
25 A  **I would need to scroll down to see the date**

80

1     **of this.  I believe there was probably a**
2     **newer one in effect.**
3  Q  Do you know when the newer one went into
4     effect?
5  A  **I don't recall, but I don't believe we were**
6     **still using one from 2014 seven years later.**
7  Q  Can we go to page 103?  Actually, down a
8     couple pages, the GRF02 test, does this
9     appear to be the test that Mr. Jared gave to
10    Mr. Sexton?
11       MR. SULLIVAN:  Objection, lack of
12    personal knowledge, calls for speculation.
13 A  **Again, with this being an out-of-date manual**
14    **based on the information being shown to me,**
15    **it would appear so.**
16 Q  (By Mr. Cramer, continuing) Why don't you
17    take a second to review this and let me know
18    if you are aware of any changes between this
19    one and any new one that you think might have
20    occurred since then.
21 A  **Again, with not knowing 100 percent certain**
22    **that this was the most current and in effect**
23    **at the time, I don't know that there are**
24    **necessarily any changes.**
25 Q  Under Test Conditions, does it provide that

CP Resp. App. - 187

93

1  A  Without seeing a date on it, I can't testify
2     either way.
3  Q  We can take a second to scroll through it.
4     There might be a date on it. I don't recall.
5  A  Based on the date of July 2009, I still don't
6     know if it would have been updated or not
7     updated. All I can do is testify to the best
8     of my abilities based on what this says.
9  Q  To the best of your ability, do you think
10    that this was the performance management
11    program that was in effect in 2021?
12         MR. SULLIVAN: Objection, lack of
13    personal knowledge.
14 A  Being almost 12 years old, I don't know if
15    this was. I can't testify either way.
16         MR. CRAMER: We'll enter this as
17    Exhibit 40.
18         (Deposition Exhibit 40 marked for
19    identification).
20 Q  (By Mr. Cramer, continuing) Let's bring up CP
21    3231. Are you familiar with this Short Term
22    Incentive Plan?
23 A  Yes.
24 Q  What is it to you?
25 A  It's a bonus that's paid annually based on

94

1     your performance.
2  Q  In February of 2021, was this a bonus that
3     you could have received?
4  A  Yes.
5  Q  We'll enter this as Exhibit 41. I think this
6     one actually has a date on it. We can check
7     on the bottom. It says on there effective
8     with a 2021 plan year. Correct?
9  A  Where does it say that? (Witness examining
10    document). Okay. I'd agree with that.
11         (Deposition Exhibit 41 marked for
12    identification).
13 Q  Were you guided by a supervisor in the
14    objective setting process?
15         MR. SULLIVAN: Objection, form.
16 A  We would receive guidance in building this,
17    yes, our PMP.
18 Q  (By Mr. Cramer, continuing) Under the
19    Accountability section, the second paragraph
20    there it states, 'managers are responsible
21    for guiding their employees in the objective
22    setting process'. Correct?
23 A  Yes.
24 Q  Did you guide other managers or employees in
25    the objective setting process?

95

1  A  No, I did not.
2  Q  Why not?
3  A  Because I didn't have any direct reports to
4     me.
5  Q  Do you recall what your objectives in 2021
6     were?
7  A  No, I don't recall.
8  Q  Did you have progress reviews with anybody?
9         MR. SULLIVAN: Objection, form.
10 A  I don't recall any conversations through the
11    year about my performance other than at the
12    end of the year.
13 Q  (By Mr. Cramer, continuing) Who did you have
14    that conversation with at the end of the year?
15 A  That would have been the superintendent which
16    would have been Dylan Smith.
17 Q  What do you remember discussing during that
18    progress review?
19 A  I don't recall everything other than to keep
20    doing what I was doing on the safety side of
21    things. I was a big piece of their safety.
22 Q  Did you receive an STI payout in 2021?
23 A  As far as I recall, yes.
24 Q  Do you remember how much it was?
25 A  No, I don't recall what it was.

96

1  Q  Do you remember if it was less than $5,000?
2  A  Yes. I'm sure it was in the neighborhood of
3     15 to $20,000.
4  Q  Were you under the impression that your
5     compensation was tied directly to CP's
6     results?
7  A  No.
8         MR. SULLIVAN: Objection, form.
9  A  No.
10 Q  (By Mr. Cramer, continuing) And why didn't
11    you think that?
12 A  That was just a portion of how I was
13    compensated.
14 Q  Was that portion tied directly to CP's
15    results, the bonus portion?
16         MR. SULLIVAN: Objection, form.
17 A  No. Performance of CP was just one of the
18    factors that went into our bonus.
19 Q  (By Mr. Cramer, continuing) Do you know how
20    performance affected your bonus?
21 A  Percentage-wise, no.
22 Q  Let's scroll down, please. Did your PMPs
23    have different weights assigned to them?
24         MR. SULLIVAN: Objection, lack of
25    personal knowledge, form.

## FW: SextonJ_823777-DePoverJ_1009119 Hearing_Stop within half specified distance_2-1-2021 ****SEND DISCIPLINE OUT MONDAY

**From:** Shelley Daberitz <shelley_daberitz@cpr.ca>
**To:** Joseph Adelfio <joseph_adelfio@cpr.ca>
**Cc:** Tom Jared <tom_jared@cpr.ca>, Shelley Daberitz <shelley_daberitz@cpr.ca>, Mindy George <mindy_george@cpr.ca>, Joey Reyes <joey_reyes@cpr.ca>
**Date:** Wed, 24 Feb 2021 16:05:30 -0600

Joe:  per Mr. Jared, please issue discipline for 20 days actual to service on Monday.

Thank you



**Shelley R. Daberitz**
**Manager Support Services – US**
**11306 Franklin Ave.**
**Franklin Park, IL  60131**
**Cell:** ▮▮▮▮▮▮▮
**Office:  630-860-4447**

**From:** Dylan Smith <Dylan_Smith@cpr.ca>
**Sent:** Monday, February 15, 2021 3:11 PM
**To:** Mark J Johnson <MarkJ_Johnson@cpr.ca>; Joseph Adelfio <Joseph_Adelfio@cpr.ca>; Tom Jared <Tom_Jared@cpr.ca>; Mindy George <Mindy_George@cpr.ca>; Shelley Daberitz <Shelley_Daberitz@cpr.ca>; Joey Reyes <Joey_Reyes@cpr.ca>; Brian Scudds <Brian_Scudds@cpr.ca>; Al McCombs <Al_McCombs@cpr.ca>; Jason M Ross <JasonM_Ross@cpr.ca>
**Subject:** RE: SextonJ_823777-DePoverJ_1009119 Hearing_Stop within half specified distance_2-1-2021

I've reviewed the evidence and given that this is Mr. Sextons first major I recommend 10 served 10 deferred.



**Dylan Smith**
Superintendent – Quad Cities
C ▮▮▮▮▮▮
3420 Miller Ave.
Davenport, IA 52802

**From:** Mark J Johnson <MarkJ_Johnson@cpr.ca>
**Sent:** Monday, February 15, 2021 2:56 PM
**To:** Joseph Adelfio <Joseph_Adelfio@cpr.ca>; Tom Jared <Tom_Jared@cpr.ca>; Mindy George

**Johnson**
**Ex. 35**

Confidential

CP_00981

&lt;Mindy_George@cpr.ca&gt;; Shelley Daberitz &lt;Shelley_Daberitz@cpr.ca&gt;; Dylan Smith &lt;Dylan_Smith@cpr.ca&gt;; Joey Reyes &lt;Joey_Reyes@cpr.ca&gt;; Brian Scudds &lt;Brian_Scudds@cpr.ca&gt;; Al McCombs &lt;Al_McCombs@cpr.ca&gt;; Jason M Ross &lt;JasonM_Ross@cpr.ca&gt;
**Subject:** RE: SextonJ_823777-DePoverJ_1009119 Hearing_Stop within half specified distance_2-1-2021

Charge was proven. The facts of the case were clear that Mr. Sexton was given a 15 car count, and attempted to contact the Conductor after 7 cars; followed by attempting to contact the ATM before coming to a stop at 11 cars.

Mitigating factors include:

1.   The Organization contends that the conductor stated "15 cars, good for 40 cars." They argue that Mr. Jared could not hear the conductor's instructions because he did not have a hand held radio; the facts and the video show Mr. Jared was next to the conductor when the instructions were given.
2.   The Organization asked for witnesses, and the facts do not show that either of these employees were connected with the shove movement. They enter hearsay on behalf of Mr. David Cox, who was assigned to another train, and was not connected to the movement. The other request was for an "Andrew Cruciani," who is not an employee of CP Rail.
3.   While Mr. Jared was not connected to the movement, the Organization contends that he was 'engaged in other activities' while involved in a shove movement, thus violating GCOR 6.5. No evidence was presented to show that Mr. Jared had attached to the crew.
4.   Organization makes further argument that the testing was unfair because a shove movement can only be tested through observation versus set-up. No evidence showed that Mr. Jared attempted to set-up by use of a red board or other means. He simply asked the conductor to give him a car count and then nothing after that, then observed Mr. Sexton's actions in relation to complying with rules requiring him to stop in half the distance.
5.   The Organization was disputing that Mr. Jared was not in attendance in person. They provided no evidence to support their basis that it could not be done contractually, nor that somehow Mr. Jared had outside influence.
6.   Mr. Sexton contends the only reason he stopped was because he is constantly doing a 'rolling job briefing.'

Based on the facts of the matter, I recommend Mr. Sexton be assessed a 20-day suspension. No discipline should be assessed Mr. DePover, as he was following instructions. This is a serious matter, and his testimony hinged on placing onus for his actions on Mr. Jared being unfair, and his conductor being on his first trip back from furlough. If he was given the 40 car clearance as they both contend at the investigation, Mr. Jared would have clearly heard that communication while next to the Conductor. This is in contrary to Mr. DePover having provided a written statement shortly after the incident, that did not include he had told him additionally, 'clear for 40.' Mr. Jared's testimony reflects the statement and what was seen on video. A train list, was provided as evidence that included the car lengths; Organization made no dispute that the list was inaccurate. The conductor testified he made the markings on the list, and that the distance travelled was 558 ft; movement should have been stopped at 450 ft.



**Mark J. Johnson**
Road Trainmaster—Marquette
**C**
99 Water St.
Marquette, IA

Confidential

**From:** Joseph Adelfio <Joseph_Adelfio@cpr.ca>
**Sent:** Monday, February 15, 2021 9:24 AM
**To:** Tom Jared <Tom_Jared@cpr.ca>; Mindy George <Mindy_George@cpr.ca>; Shelley Daberitz
<Shelley_Daberitz@cpr.ca>; Dylan Smith <Dylan_Smith@cpr.ca>; Joey Reyes
<Joey_Reyes@cpr.ca>; Brian Scudds <Brian_Scudds@cpr.ca>; Al McCombs
<Al_McCombs@cpr.ca>; Jason M Ross <JasonM_Ross@cpr.ca>; Mark J Johnson
<MarkJ_Johnson@cpr.ca>; Joseph Adelfio <Joseph_Adelfio@cpr.ca>
**Subject:** SextonJ_823777-DePoverJ_1009119 Hearing_Stop within half specified distance_2-1-2021
**Importance:** High

**Discipline due March 2, 2021**



**Joseph Adelfio**
Admin Assistant Support Services
**O** 563-441-5900
**C**



Michelle C. Sullivan
Legal Counsel - US

Suite 800
120 South 6th Street
Minneapolis, MN 55402

T 612 904 5871
F 612 904 6184
E Michelle_Sullivan@cpr.ca

June 17, 2022

Yessenia Valadez                    (*via email to: Valadez.Yessenia@dol.gov*)
Regional Investigator
Department of Labor – OSHA
2300 Main Street, Ste. 1010
Kansas City, MO 64108

**RE:   Sexton vs. Dakota, Minnesota & Eastern Railroad Corporation d/b/a CP
DOL Case #7-2260-21-066**

Investigator Valadez:

Please accept this letter as notice of my representation of Dakota, Minnesota & Eastern Railroad Corporation d/b/a Canadian Pacific ("CP"), in place of Richard Ramones, in the above-referenced matter.

I am in receipt of your recent request for additional information. This response is based on information currently available to CP, and CP reserves the right to amend and/or supplement its Position Statement and/or this response as necessary. **This response is not meant to be exhaustive and CP specifically preserves all rights and defenses available.**

CP denies Mr. Sexton's allegations and further denies that Mr. Sexton suffered any unlawful retaliation during his employment with CP, including any retaliation prohibited under 49 U.S.C. § 20109, as amended by Section 1521 of the Implementing Regulations of the 9/11 Commission Act of 2007, Pub. L. No. 110-53 ("FRSA").

**1. A list of similarly situated employees, from June 2019 – June 2021, who have violated the same or similar rule along with their discipline in response to that violation. Please list the employee's name, department, current status, reason, and date of discipline.**

For purposes of this response letter, CP understands your specification of "similarly situated employees" to be any engineer who reported up to General Manager – US West, Tom Jared during the stated time period. **Furthermore, CP has no record of any personal injury reports, accident reports, or hazardous safety condition reports submitted through CP's internal web-based application submitted by any of these individuals for at least 300 days prior to their**

Johnson
Ex. 36

Confidential

CP_00615

CP Resp. App. - 192

**respective discipline event.**[1] In order to preserve employee confidentiality, CP objects to providing their full names and instead will provide the respective employee initials, position, and location of the discipline event.

| Name / Position | Date of Discipline / Location | Type of Discipline[2] | Reason for Discipline | Current Status |
|---|---|---|---|---|
| T.V. Engineer | 08/01/19 Nahant, IA | 20 Day Suspension (Waiver / 15 Days Deferred) | Failure to stop within half the distance specified | Employed |
| M. J. Engineer | 06/07/20 Marquette, IA | Verbal Coaching | Failure to stop within half the distance specified | Employed |
| T. S. Engineer | 07/29/20 Glenwood, MN | Verbal Coaching | Failure to stop within half the distance specified | Employed |
| T. P. Engineer | 01/27/21 Enderlin, MN | 20 Day Suspension (Waiver / 10 Days Deferred) | Failure to stop within half the distance specified | Employed |
| John Sexton Engineer | 02/26/21 Nahant, IA | 20 Day Suspension (Did not request waiver) | Failure to stop within half the distance specified | Employed |
| J. M. Engineer | 03/09/21 Glenwood, MN | Dismissal | Failure to stop within half the distance specified | Dismissed |

**2.     A copy of Mr. Sexton's union grievance/appeal, investigative hearing transcriptions, and outcome (or final letter to confirm the outcome of the hearing) to the grievance/appeal regarding the incident of February 1, 2021.**

Mr. Sexton has exercised his right to appeal the discipline assessed on February 26, 2021 (20-day suspension) through his union. Grievances are handled by CP's separate labor relations department. Mr. Sexton's union representative timely appealed the discipline on May 20, 2021, and CP's Assistant Director – Labor Relations, Brian Scudds, timely replied on July 19, 2021. A copy of each is attached as Exhibit 1. A copy of the February 26, 2021 discipline letter was previously submitted as an exhibit to CP's position statement.

---

[1] The Department may recall that Mr. Sexton's alleged protected activity involved a verbal conversation with a Trainmaster in or around January 2021, and it was not submitted through the internal application.

[2] CP's union employees have the option to request a waiver, in which they forego their bargained-for right to a formal investigation and admit to the rule violation.

2

Please know that CP and Mr. Sexton's union, the BLET, engage in quarterly conferences to try to resolve outstanding grievances. Mr. Sexton's appeal was discussed at an October 2021 conference, but not resolved. As such, his appeal is currently scheduled for arbitration later this summer.

Sincerely,

*Michelle C. Sullivan*

Michelle C. Sullivan
Legal Counsel - US

3

Confidential

CP_00617





# US - Efficiency Test Manual on Operating Rules In Compliance With FRA 217.9

**Including:**

## Safety Rule Book and Tracking Tests



## Train and Engine, Engineering, Train Dispatchers, Operation Supervisors and Control Operators

**Effective November 1, 2014**

Johnson

**Ex. 39**

SEXTON   000368

SEXTON    000369

Canadian Pacific

EFFICIENCY TESTING PROGRAM FOR OPERATING RULES    7
EFFICIENCY TEST PROGRAM    7
OFFICER QUALIFICATION    7
QUARTERLY REVIEWS    8
ANNUAL SUMMARY    8
EFFICIENCY TEST MANUAL    8
HOW ARE EFFICIENCY TESTS CONDUCTED?    8
WHERE ARE EFFICIENCY TESTS CONDUCTED?    9
WHEN ARE TESTS CONDUCTED?    9
HOW SHOULD YOU PREPARE FOR EFFICIENCY TESTING?    10
WHAT EQUIPMENT IS NEEDED TO CONDUCT THE TESTS?    11
PASSENGER TRAINS    13
REQUIREMENTS    13
MEANS AND PROCEDURES FOR EFFICIENCY TESTING    13

**GROUP "A" TESTS – STOP** ................................................................**15**
Test GRA01   Hand Signals or Signal Disappearance    16
Test GRA03   Display of Red Flag    17
Test GRA04   Unattended Fusee    18
Test GRA05   Signs Protecting Equipment    19
Test GRA06   Blue Signal Protection of Workmen    20
Test GRA07   Improperly Displayed Signal    21
Test GRA10   Movement in Spur Tracks    22
Test GRA11   Stop Indication CTC Territory or Manual Interlocking    23
Test GRA13   Stop Indication Automatic Interlocking    24
Test GRA14   Stop Indication ABS Territory    26
Test GRA15   Operating With Track Warrant    27
Test GRA17   Track Side Warning Detector    28
Test GRA18   Track and Time    29

**GROUP "B" TESTS - RESTRICTED SPEED** ...........................................**31**
Test GRB01   Unattended Fusee    32
Test GRB03   Yard Limits    33
Test GRB05   Movement by Signal Requiring Restricted Speed.    34
Test GRB07   Reverse Movements    35
Test GRB08   Initiating Movement between Signals    35
Test GRB10   Joint Track and Time    37
Test GRB11   Occupying Same Track Warrant Limits    38
Test GRB13   Protection When Tracks Removed From Service    39
Test GRB14   Improperly Displayed Signal    40
Test GRB15   Display of Yellow-Red Flag    41

**GROUP "C" TEST - ACTION OTHER THAN STOP OR RESTRICTED SPEED** .........**43**
Test GRC01   Yellow Flag    44
Test GRC03   Permanent Speed Signs    45
Test GRC06   Providing Warning Over Road Crossings    46
Test GRC07   Movement Other Than Main Track    47
Test GRC08   Maximum Authorized Speed    47
Test GRC10   Distant Signal Approach    49
Test GRC11   Approach Diverging    49
Test GRC12   Advance Approach    49
Test GRC13   Approach Restricting    49
Test GRC14   Approach    49
Test GRC15   Diverging Advance Approach    49
Test GRC16   Diverging Approach    49
Test GRC10N   Distant Signal Approach    49
Test GRC11N   Approach Slow    49
Test GRC12N   Advance Approach    49

SEXTON    000370

Test GRC13N  Medium Approach Medium                                                          49
Test GRC14N  Approach                                                                        49
Test GRC15N  Medium Approach                                                                 49
Test GRC16N  Approach Medium                                                                 49
Test GRC17    Restriction to Crew Member (Track Bulletin)                                    51
Test GRC18    Delayed in Block                                                               52
**GROUP "D" TESTS - OBSERVATION TESTS** .................................................... **53**
Test GRD01    Engine Bell and Whistle Signal (not including Road crossings,                  54
Test GRD01A   Engine Bell and Whistle Signal for Road Crossings 5.8.2 (7)                    55
Test GRD01B   Engine Bell and Whistle Signal Quiet Zones                                     56
Test GRD01C   Engine Bell and Whistle Signal Approaching Men or Equipment 5.8.2 (8)          57
Test GRD03    Highly Visible Markers                                                         57
Test GRD04    Duties of Crew Members                                                         58
Test GRD06    Protection in Bowl Tracks                                                      59
Test GRD08    Inspecting Passing Trains                                                      59
Test GRD14    General Rules                                                                  60
Test GRD15    Copy and Repeat Mandatory Directives                                           61
Test GRD16    Headlight Display                                                              62
Test GRD17    Radar Inspection or Event Recorder                                            64
Test GRD18    Securing Equipment - Locomotives and Cars Secured                             65
Test GRD20    Automatic Crossing Warning Devices (Malfunction)                              66
Test GRD21    Verbal Communication                                                          68
Test GRD23    Communication between Crews Switching                                         69
Test GRD24    Reporting Clear of Mandatory Directive                                        70
Test GRD25    Flat Switching Module                                                         71
Test GRD28    Games, Reading, or Electronic Devices                                         73
Test GRD29    Tabular General Bulletin Orders                                               74
**GROUP "E" TESTS - MAINTENANCE OF WAY** ...................................................... **75**
Test GME01    Training-Qualifications-Rules and Instructions                                76
Test GME02    Occupying/Fouling Controlled Tracks                                           77
Test GME03    Requesting And Using a Form B or Track Out of Service track bulletin.         78
Test GME04    Requesting and Using Track Bulletin for Speed Restrictions.                   79
Test GME05    Foul Time                                                                     80
Test GME06    Railroad Crossing At Grade - Manual Interlocking                              81
Test GME07    Railroad Crossing At Grade - Automatic Interlocking                           82
Test GME08    Occupying/Fouling Non-Controlled Tracks                                       83
Test GME09    Lone Worker                                                                   84
Test GME10    Lookouts                                                                       85
Test GME11    Employee in Charge                                                             86
Test GME12    Job Briefing                                                                   86
Test GME13    Right to Challenge on Track Safety                                             87
Test GME14    Joint Authorities and/or Working Limits                                        88
Test GME15    Working On or Around Self Propelled Equipment                                  89
Test GME16    Maintenance Machine Operators                                                  90
Test GME17    Right to Challenge on Roadway Maintenance Machine Safety                       91
Test GME18    Maximum Authorized speed and Stopping and Safe Braking Distance                92
Test GME19    Movement through Working Limits                                                93
Test GME20    Lights Displayed                                                               93
Test GME21    Flagging Equipment and Emergency Flagging                                      94
Test GME22    Road Crossings                                                                 94
Test GME23    Unattended On-Track Equipment                                                  95
Test GME24    Air Brake Tests                                                                95
Test GME25    Securing Main Track Switches                                                   96
Test GME26    Verbal Communication                                                           97
Test GME27    Automatic Crossing Warning Devices (Signal Employees)                          98

SEXTON     000371

Test GME31   Games, Reading, or Electronic Devices                                99

## GROUP "F" TESTS – SWITCHES – DERAILS – PROTECTING SHOVES AND EQUIPMENT FOUL OF ADJACENT TRACKS TESTS ...............................................101

Test GRF01   Good Faith Challenge                                                 102
Test GRF02   Shoving or Pushing Movements                                         103
Test GRF03   Picking up a Crew Member                                             104
Test GRF04   Equipment Left to Foul another Track                                 104
Test GRF05   Lined, Locked and Checked                                            105
Test GRF06   Hand Operated Switches                                               106
Test GRF07   Crossover Switches                                                   107
Test GRF08   Releasing Authority in Non-Signaled Territory                        108
Test GRF09   Clear of Main Track Switches                                         108
Test GRF10   Conflicting Movements Approaching Switch                             109
Test GRF11   Derail Location and Position                                         109

## Group "G" - Test Drug and Alcohol ........................................................111

Test GTG01   Drug and Alcohol                                                     112

## GROUP "H" TESTS – HAZARDOUS MATERIAL ....................................................113

Test GRH01   Haz Mat Required Documentation / Emergency   Response               114
Test GRH02   Haz Mat Train Placement                                             114
Test GRH03   Haz Mat Switching                                                   115
Test GRH04   Haz Mat Car Inspection / Placards and Markings                      115
Test GRH05   Haz Mat Key Train                                                   116
Test GRH06   Haz Mat Chain of Custody                                            117
Test GRH07   Hazardous Material Train or Equipment Securement                    118

## GROUP "S" TEST – Air Brake and Train Handling...............................................119

Test GMS03   Class I Air Brake Test (Initial Terminal)                           120
Test GMS04   Class IA Air Brake Test (1000 Mile)                                 121
Test GMS05   Class II Air Brake Test (Intermediate)                              122
Test GMS06   Class III Air Brake Test (Application, Release, Continuity)          123
Test GMS07   Transfer Air Brake Test                                             124
Test GMS08   Emergency Application (TIBS/SBU)                                     125
Test GMS09   Crew to Crew Information                                            126

## GROUP "R" TESTS - RAILROAD RADIO...............................................................127

Test GR01    Test Transmissions                                                  128
Test GR02    Identification, Over, Out                                           128
Test GR03    Lieu of Hand Signals                                                129

## GROUP "TD" TEST- TRAIN DISPATCHER/CONTROL OPERATOR .......................131

Test GTD01   Instructions and Authorities                                        132
Test GTD02   Dispatcher Transfers                                                132
Test GTD03   Verbally Transmitting Mandatory Directives                          133
Test GTD04   Restricting Mandatory Directives                                    133
Test GTD05   Instructions for Handling CTC & Manual Interlockings                134
Test GTD06   General Rules and Instructions                                      134
Test GTD07   PTEPP – Possession of in Office PTEPP                               135
Test GTD08   PTEPP – Knowledge of PTEPP                                          135
Test GTD09   Releasing of Authority                                              135
Test GTD10   Rule Availability and Use                                           136
Test GTD11   General Orders/Bulletins in Effect                                  136
Test GTD12   Protect Automatic Warning Device Malfunctions                       137
Test GTD13   Records                                                             137
Test GTD14   Blocking or Marking Devices                                         138
Test GTD15   Sign in Records                                                     138
Test GTD16   Weather Records                                                     138
Test GTD17   Train Crew and Train Records                                        139

SEXTON     000372

Test GTD18     Train Transfer to Next Days Sheet                                    139
Test GTD19     Recording Train Delays                                              139
Test GTD21     Releasing Authority in Non-signaled Territory                       140
Test GTD22     Games, Reading or Electronic Devices                                140
Test GTD23     Track Bulletins and Tabular General Bulletin Orders                 141

**Train and Engine, Train Dispatcher and Operation Supervisor's Safety
Tests ..................................................................................143**

GRTJOB1       Job Briefing                                                         144
GRT1          Air Hoses and Angle Cocks                                            145
GRT5          Aligning Drawbars/Couplers                                           146
GRT6          Coupling/Uncoupling                                                  147
GRT8          Crossing over Rail Equipment*                                        148
GRT9          Derails                                                              149
GRT11         Entraining and Detraining Equipment*                                 150
GRT14A        Applying Hand Brakes*                                                151
GRT14R        Releasing Hand Brakes*                                               152
GRT14T        Operating Hand Brakes - Technique*                                   153
GRT16         Multiple Unit (MU) Cable                                             154
GRT20         On or About Tracks*                                                  155
GRT21         Personal Protective Equipment and Clothing                           156
GRT23         Restricted/Close Clearances*                                         158
GRT24         Riding Equipment, General*                                           159
GRT24TC       Riding Equipment, Tank Car                                           160
GRT27         Three Point Protection*                                              161

**Train and Engine, Train Dispatcher and Operation Supervisor's Tracking
Tests ..................................................................................163**

GRT001        Communicate Safety Plan                                              164
GRT004        Workplace Inspections                                                164
GRT006        Footboard Safety Meeting                                             165
GRT011        Orientation Interview (New Hire, Transferee, Return to Work)         165
GRT015        Job Aids (Develop/Update)                                            166
GRT018        Unsafe Condition Reports (Resolved)                                  166
GRT022        Risk Assessments                                                     166
GRT027        Incident Investigations                                              167
GRT031        Customer Safety Audits                                               167
GRT039        Quality Safety Review                                                168
GRT040        Employee Review Program                                              168
GRT041        Manager Safety Walkabout                                             169
GRT042        Regional Cross Functional Blitz                                      169
GRT043        Efficiency Test Validation                                           170
GRT044        Divisional Blitz                                                     170
GRT045        Mentoring Employee                                                   171
GRIDEFRT      Movement Ridden, Freight Train                                       171
GRIDEPSGR     Movement Ridden, Passenger Train                                     172
GRIDEYARD     Movement Ridden, Yard Service                                        172

**Engineering Services Safety Tests ...............................................173**

GMUCR1A       Job Briefing, Employee in Charge                                     174
GMUCR1B       Job Briefing, Risk Assessment and Controls                           175
GMUC1         Rights and Responsibilities                                          176
GMU1          Air Hoses, Handling                                                  177
GMU2          Company Vehicles                                                     178
GMU2B         Company Vehicles, Safe Operations in Yards                           179
GMU3          Confined Space                                                       181
GMU4          Coupling/Uncoupling Equipment                                        182
GMU5          Dangerous Goods, Transportation                                      183

SEXTON     000373

| | | |
|---|---|---|
| GMU8.1 | Getting On/Off (Equipment, Track Units) | 184 |
| GMU8.2 | Getting On/Off (Vehicles) | 186 |
| GMU11 | Hand Brake Operation - Equipment | 187 |
| GMU13 | Chemical Safety | 189 |
| GMU15 | Jacks | 190 |
| GMU16 | Lock-Out/Tag-Out | 191 |
| GMU17.1 | Material Handling Equipment, General | 192 |
| GMU17.3 | Material Handling Equipment, Cranes | 193 |
| GMU21 | On or About Equipment | 194 |
| GMU22 | On or About Tracks | 195 |
| GMU22.2 | Lookout Protection | 196 |
| GMU23.1 | Personal Protective Equipment & Clothing, General | 197 |
| GMU23.1A | Personal Protective Equipment & Clothing, Footwear | 198 |
| GMU23.2 | Personal Protective Equipment & Clothing, Respirators | 199 |
| GMU23.3 | Personal Protective Equipment & Clothing, Knee Pads | 200 |
| GMU24 | Personal Protective Equipment & Clothing Charts | 201 |
| GMU25.1 | Protection When Working at Heights | 202 |
| GMU25.4 | Protection When Working at Heights, Pole Climbing | 203 |
| GMU25.5 | Protection When Working at Heights, Fall Restraint for Machine Operators | 204 |
| GMU26.1 | Riding Equipment | 205 |
| GMU26.2 | Riding Track Units | 206 |
| GMU27 | Derails | 207 |
| GMU27.1 | Switches, High/Low Stand Table Top | 209 |
| GMU27.2 | Switches, Ergonomic D/Tri Handles | 211 |
| GMU28 | Three-Point Protection | 213 |
| GMU29.1 | Hand Tools, General | 214 |
| GMU29.1A | Hand Tools, Claw Bar | 215 |
| GMU29.1B | Hand Tools, Shovel | 216 |
| GMU29.1C | Hand Tools, Spike Maul | 217 |
| GMU29.1D | Hand Tools, Track Wrench | 218 |
| GMU29.2 | Power Tools | 219 |
| GMU29.3 | Electrical Tools | 219 |
| GMU29.4 | Air Powered Tools | 220 |
| GMU30 | Trenching & Excavations | 221 |
| GMU31.0 | Welding and Torch Cutting | 222 |
| GMU31.1 | Welding & Torch Cutting, General | 223 |
| GMU31.2 | Welding & Torch Cutting, Dry Test, Regulators with Gauges | 224 |
| GMU33 | Safety Precautions, Thermite Welding | 225 |
| GMU37 | Electric Arc Welding Safety Precautions | 226 |
| GMCVDO | Commercial Vehicle Driver Observation | 227 |
| GMWEDOC | Required Documentation & Inspections for Work Equipment | 228 |
| GMDIWE | Required Daily Inspections of Work Equipment | 230 |
| GMWET | Required Tools for Work Equipment Operators | 231 |
| **Engineering Services Tracking Tests** ................................................ | | **233** |
| GMV004 | Safety Orientation Checklist | 235 |
| GMV005 | On the Job Tool/Machine Orientation Checklist | 235 |
| GMV006 | Complete New Hire Evaluation Checklist | 236 |
| GMV007 | Existing ES Employees Transferred or New to a Position Checklist | 236 |
| GMV022 | Safety Meetings (Includes Dynamic Safety Review) | 237 |
| GMV023 | One to Ones with MSPS (Managers) | 237 |
| GMV024 | One to Ones with Employees | 238 |
| CMV039 | Quality Safety Review | 238 |

SEXTON     000374

SEXTON     000375

## EFFICIENCY TESTING PROGRAM FOR OPERATING RULES

The Canadian Pacific – US Efficiency testing program is designed to comply with CFR 49 Part 217.9 and will conduct and maintain an Efficiency test program with particular emphasis on operating rule exceptions that cause or are likely to cause the most accidents and incidents.

Efficiency tests and inspections may only be performed by qualified supervisors who are qualified on the operating rules, inspection program requirements and procedures and have received the appropriate field training.

Safety, tracking documents. LSI and AAR tests are conducted by supervisors and are used strictly for internal use and are not part of the overall Operational Testing Program as it relates to CFR 49 CFR Part 217.9.

## EFFICIENCY TEST PROGRAM

Canadian Pacific will maintain an active documented efficiency testing program.  The program will include objectives, applicable rules and the preparation/procedures to conduct each test.  The efficiency testing program may provide elements deemed as "Failure", but may not include all exceptions that may be associated with the applicable rules identified for a particular test.  The program may contain special instructions regarding testing procedures and entry criteria for recording the test.

Qualified supervisors will perform efficiency tests in accordance with their monthly quotas assigned which is sent to each individual supervisor after the quarterly review is completed for the next following quarter. These monthly quotas will be carried in each quarterly review to which they pertain to.  The monthly baseline quotas are a set of efficiency tests and focus tests if shown are in addition to any monthly baseline test requirements.  The monthly base line quotas and any focus tests for efficiency testing may be adjusted according to future needs based on quarterly review, six month review and/or regulation.

General Managers may assign testing expectations to any specific efficiency or safety tests based on accidents or incidents, as necessary.  These testing expectations are for internal purposes only and are not part of any submission or policy.

Canadian Pacific in line with CFR Part 218 subpart F requirement for the handling of switches; derails; protecting shoves and leaving cars foul of an adjacent track will require that the minimum number of tests and inspections under category Group F will be a yearly average of 10 percent.

Canadian Pacific in line with CFR Part 220.315 requirement for use of electronic devices will require that the minimum number of tests and inspections will be a yearly average of 2 percent.

## OFFICER QUALIFICATION

All supervisors will be qualified on the operating rules in accordance with the efficiency tests they may conduct. Failure to maintain operating rules qualification as outlined under the Rules Examination Policy will prohibit such supervisor from performing efficiency tests, until such time they become operating rules qualified again. Supervisors will receive appropriate field training as necessary to achieve proficiency on the efficiency tests they may conduct. Supervisors conducting efficiency testing will be qualified in one of the following methods:

- Prior to December 31, 2008 supervisors must have signature sheet on file to validate their competence to conduct efficiency testing for the test they conduct.
     or
- After January 1, 2009 any new supervisors will complete the prescribed training, including classroom instruction and training along with the          appropriate field training, as necessary in order to properly conduct efficiency testing.

Classroom training on the efficiency testing program will either be performed by HR training department or by a designated supervisor. Records will be maintained when such supervisor has fully completed training and qualification status to perform efficiency tests.

Only qualified supervisors will conduct efficiency tests and inspections

SEXTON    000376

## QUARTERLY REVIEWS

The Operating Rules Specialist will conduct a Region quarterly review to identify exceptions related to accidents and incidents, which occurred during the previous quarter.  This review will include analysis of accident and incident data, results of efficiency testing, and other pertinent safety data.  The review will also show whether the supervisor conducted the minimum number of efficiency tests as required in their monthly quota.  The Operating Rules Specialist will make any necessary adjustments to the specific focus testing objectives required by supervisors for the subsequent quarter by indicating this adjustment in the new monthly quota after the quarterly report is completed.  Operating Rules Specialist will notify each supervisor of their quotas in relation to the efficiency testing program for the preceding quarter.

The Director Operating Standards will be responsible to conduct a six month review of the efficiency testing program.  This review will ensure that the program is being utilized as intended, that the quarterly reviews by the respective Operating Rules Specialist have been properly completed, and that appropriate adjustments have been made to the distribution of specific focus testing required.  Six month reviews shall be completed no later than 60 days after the review period has ended. A copy of this review will be retained and sent to the appropriate VP of the region.

## ANNUAL SUMMARY

An annual summary shall be done by March 1, for each calendar year for the previous year showing the number, type, and result of each efficiency test and inspection based upon the requirements of the Efficiency test program.

The records of the above periodic reviews will be retained for a period of one year after the end of the calendar year to which they relate and shall be made available to representative of FRA for inspection and copying during normal business hours.

System Administrator to the Efficiency Testing Program
Director Operations Standards – Stan Bell

## EFFICIENCY TEST MANUAL

Compliance with rules governing the operation of trains and maintaining a safe property is important to an efficient operation in the railroad industry.  To ensure compliance and to evaluate operating procedures, it is essential to have a comprehensive program to determine if employees are carrying out their duties in accordance with present rules and operating procedures.

This efficiency test booklet is for the use of supervisors directly involved with performing efficiency test.  It is not to be distributed or used in a manner that it is available to other than the individuals for whom it is intended.

At the end of each test there is a list of possible failures. Some of the failures that are in the list may point you in the direction of another test. Example: If a train crew releases their movement track warrant in non-signaled territory but doesn't say anything about the switch they used to clear the main track to train dispatcher, they may have passed the releasing mandatory directive test, but not the reporting of the switch to the train dispatcher. That would then be considered two separate tests.

## HOW ARE EFFICIENCY TESTS CONDUCTED?

Generally, tests are conducted without the knowledge of those employees who are being observed.  This procedure ensures that the performance being tested is an accurate reflection of the employee's ability to apply the correct rules and procedures for the task they are performing.

The normal testing procedure requires that you and/or a team of managers position yourselves in an area where the performance of the train crew or individual employee can be viewed fairly and accurately.  When testing with more than one manager, and a test is being conducted that requires a train to pass a flag or a signal that will provide advance warning, one of the managers should maintain a position at that location to observe the train or engine passing the flag or signal that is providing the advance warning.  This should be done without the employee or employees that are being tested knowing of your presence

SEXTON     000377

Canadian Pacific

so that they can carry out their responsibilities. Managers that are out riding trains may also conduct on board evaluations. You should assess the employees performance based on the procedures required by the **General Code of Operating Rules, General Operating Instructions, Timetable and Special Instructions, General Orders**, **Safety Rule Book and Hazardous Materials Instructions.**

**It is important that all tests be conducted fairly, under normal operating conditions and that no attempt ever be made to entrap an employee.**

Once you have made the performance evaluation, crew should be informed either verbally at the time of occurrence of the test or a follow up in written format to inform the crew members tested of the results of the test. This, of course, reinforces the fact that you as a manager are out there and they are being observed, which is one of the major goals of efficiency testing. You are encouraged to **take these opportunities to compliment the crewmembers on satisfactory performances** you have observed, as well as to review any rule violations that you may have witnessed. An additional evaluation involving the questioning of crews about other rules and regulations they are required to know may also be conducted at this time.

## WHERE ARE EFFICIENCY TESTS CONDUCTED?

Job performance can be evaluated at any given time throughout the entire operating territory, but most efforts should be concentrated in those areas:

- Which have experienced a high frequency of train accidents.

- Which have experienced an unusual number of personal injuries.

- Where employees have not been tested recently.

- Areas of High Risk such as High Density or Hazardous Materials routes or switching locations.

- Areas that have been identified by other reports such as ORCA, Crew Mentoring or Crew observation reports that show a lack of rules compliance.

## WHEN ARE TESTS CONDUCTED?

As an administrator of efficiency tests, you must ensure that **your schedule is not predictable**. This is one of the most important aspects of efficiency testing, as again, one of the principal goals of the program is to create an awareness that job performance can and will be evaluated at any given time. Therefore, testing should be conducted at all hours of the day and night, on weekends and holidays**.**

Scheduling should be spread out over the entire month. Performing a large number of tests in one or two days does not provide proper information regarding rules compliance. For testing to become an easy task and a habit, it should be done on a daily basis. When you are out on the property, you are always in a position to observe employees walking around equipment, lining switches, etc.

SEXTON     000378

Canadian Pacific

## HOW SHOULD YOU PREPARE FOR EFFICIENCY TESTING?

Before conducting any test, you need to KNOW the rules, which are to be tested.  You cannot expect 100% compliance with the rules if YOU do not fully understand how to apply and comply with them. Prior to conducting the tests on trains you should obtain the following documents where applicable to the territory and employees tested:

- A train location lineup.
- A copy of all track bulletins in effect at that location.
- Information regarding any trains known to be experiencing train handling or air brake problems.
- The train profile/consists for the trains you expect to test, as necessary.
- All necessary manuals for reference to operating rules and procedures.

Train handling and delay to a train being tested or to other trains in the area should not prevent a test from being performed.   Ask the following questions to determine if a test should be made, and if so, the type of test to be made.

- Is this a safe test?
- Will the test cause the hours of service limit to be exceeded for the crew being tested?
- Will the test cause the hours of service limit to be exceeded for the crews of other trains?
- Does the train to be tested have any air or train handling problems that could create an unsafe condition?
- Will the test location provide the proper sight distance desired for the type of test that is being conducted?
- Will the test locations allow the testing manager to safely display an easy stop signal (restricted speed tests) prior to train or engine coming into view?
- Has a job briefing with all members of the test team been completed, reviewing rules related to the test and each team members roll in the test?  Additional job briefings must be performed if changes occur with the test team or the test changes.

## <u>USE COMMON SENSE WHEN SETTING UP TEST SITUATIONS.</u>

SEXTON    000379

## WHAT EQUIPMENT IS NEEDED TO CONDUCT THE TESTS?

These are usually the standard supplies required for most efficiency test situations are but other supplies may be necessary.

### **TESTING KIT**

- General Code of Operating Rules.
- General Operating Instructions Manual.
- Safety Rule Book.
- US Hazardous Materials Instructions for Rail and the current Emergency Response Guide.
- Instructions Governing Train Dispatchers and Control Operators, if necessary.
- Current Timetable and General Orders in effect.
- Keys for switches.
- Hand-held Red Flag for hand signals
- Reflectorized track flags, Yellow-Red, Yellow, Red and Green. Appropriate Flag holders.
- At least one shunting devices.  Two if simulating train movements in signal territory.
- Lantern or flashlight.
- Fusees
- RADAR device with tuning fork and portable battery pack, if available.
- Railroad radio, charged and necessary radio frequencies.
- Proper ID card.
- Track profile, if needed.
- Telephone numbers (Dispatchers, Local Managers, etc.)
- Proper PPE

SEXTON    000380

Canadian Pacific

# THE "DO'S AND DON'TS" OF EFFICIENCY TESTING

| **DO'S** | **DON'TS** |
|---|---|
| 1. **Do** conduct the tests fairly. | 1. **Don't** setup a testing situation that is outside the realm of the employee's normal operating experience. |
| 2. **Do** conduct the tests safely. | 2. **Don't** setup a situation that can result in an unsafe act or condition. |
| 3. **Do** make sure that an employee has every opportunity to demonstrate correct rules knowledge and compliance. | 3. **Don't** conduct a test to entrap an employee. |
| 4. **Do** coordinate your testing plans with the train dispatcher/control operator when appropriate. | 4. **Don't** create situations, which will adversely disrupt the dispatcher's/control operator's train movement plans. |
| 5. **Do** use every opportunity to improve an employee's knowledge and respect for the rules. | 5. **Don't** violate a rule in order to setup a test situation. |
| 6. **Do** communicate the results of the test by debriefing with the crew. | 6. **Don't** walk away without letting the crew know that a test was performed and how they did. |

SEXTON    000381

CP Resp. App. - 208

## PASSENGER TRAINS

1.  A division supervisor is required to ride an Amtrak passenger train on each subdivision upon which it operates.  Where such train operates on a daily basis, it must be ridden at least twice    a month.  If it operates on a frequency less than daily, a division supervisor must ride at least 10 percent of the trips of that train.  Supervisors must ride locomotives during such trips.
    **EXCEPTION:** Between Milwaukee and Chicago it will be sufficient to make a total of six trips per month.  METRA trains need not be ridden.

2.  A division supervisor must monitor the use of radio on each passenger train on each division upon which it operates.  Where such train operates on a daily basis, such monitoring must be conducted at least twice a month.  If it operates on a frequency less than daily, a division supervisor must monitor the use of radio on at least 10 percent of the trips of that train.

## REQUIREMENTS

Each employee governed by the General Code of Operating Rules and that are under the Hours of Service shall be tested at least once each six-month period by a designated supervisor.

## MEANS AND PROCEDURES FOR EFFICIENCY TESTING

Establish conditions, either actual or simulated, giving consideration to weather, visibility, train operations, grade conditions and other related factors which will require the employee(s) to act on the selected qualifying test(s). Employee(s) should not be aware that an Efficiency Test is being performed nor should test(s) be reported on historical data. Noncompliance with any portion of the selected test(s) shall constitute failure.

Efficiency Tests must be documented for each employee tested including the employee's compliance or failure. Where an Efficiency Test(s) results in a failure, appropriate action must be taken to insure proper understanding of the rules.

Record of Efficiency Tests on prescribed form must be submitted into the electronic filing system.. Copy of Efficiency Tests performed by a supervisor must be retained by that supervisor for one year.

Before conducting efficiency tests all supervisors must be qualified on the operating rules of the railroad. Any new supervisor that will be conducting efficiency test will be required to be qualified on the operating rules of the railroad and must attend training and instruction on the efficiency testing program which will include field training and examination on the aspects of the program.

SEXTON     000382

CP Resp. App. - 209

Canadian Pacific

# GROUP "A" TESTS – STOP

| Test NO. | Name | Rule Number |
|---|---|---|
| GRA01 | Hand Signals or Signal Disappearance | 5.3.1, 5.3.2, 5.3.3, 5.3.4, 5.3.5 or 5.3.7 |
| GRA02 | NOT USED | |
| GRA03 | Display of Red Flag | 5.4.7, 15.2 |
| GRA04 | Unattended Fusee | 5.6 |
| GRA05 | Signs Protecting Equipment | 5.14 |
| GRA06 | Blue Signal Protection of Workmen | 5.13 |
| GRA07 | Improperly Displayed Signal | 5.15, 9.4 or 9.5 |
| GRA08 | NOT USED | |
| GRA09 | NOT USED | |
| GRA10 | Movements into Spur Tracks | 7.12 |
| GRA11 | Stop Indication CTC Territory or Manual Interlocking | 9.12.1 or 9.12.2 |
| GRA12 | NOT USED | |
| GRA13 | Stop Indication Automatic Interlocking | 9.12.3 |
| GRA14 | Stop Indication ABS Territory | 9.12.4 |
| GRA15 | Operating with Track Warrant | 14.3 |
| GRA16 | NOT USED | |
| GRA17 | Track Side Warning Detector | Special Instructions |
| GRA18 | Track and Time | 10.3 |

**REQUIREMENTS: TESTS AS DESCRIBED ABOVE MAY REQUIRE ACTION TO COMPLY WITH A FULL STOP REQUIREMENT IN COMPLIANCE WITH APPLICABLE RULE AS INDICATED.**

SEXTON     000384

Canadian Pacific

## Test GRA01 Hand Signals or Signal Disappearance

Evaluates the employee's ability to stop a movement in response to hand signals or radio communication.
**Note:** Hand signals include the use of flag, lantern or hand.

**Rule Tested:**  GCOR 5.3.1, 5.3.2, 5.3.3, 5.3.4, 5.3.5, 5.3.6 or 5.3.7

**Test Conditions:** When conducting this test you may observe existing operating conditions, or it may be set up.  Individual rule or combination of rules may be used to conduct test.

**Procedures:**
When test conditions are observed:
    Place yourself where you can observe crews at work.
    Observe the use of hand signals or radio communication between crews.
    Observe stop signal given to the movement.
    Observe that movement stops on signal given or within half the range.

When test conditions are set up:
    Instruct a crew member directing movement to give a proceed hand signal to the engineer and then
    have the individual disappear from view of the engineer.
        Or
    Instruct a crew member directing movement to give radio communication to make a shove or back up
    movement to engineer.
        Or
    Place yourself in a position where movement must stop within half the range of visions such as a yard
    track or movement moving under restricted speed and give them a stop hand signal or wave any
    object violently near the track.

**Failure:**
- ☑ When the crew is operating by hand signals, if the movement does not come to a stop immediately after the person giving the hand signals disappears from view of the engineer.
- ☑ When the crewmember giving communication to engineer does not specify direction or distance.
- ☑ When the engineer does not stop within half the distance last specified.
- ☑ When engineer does not acknowledge direction and distance if more than four cars when radio is used.
- ☑ When the engineer does not stop movement within half of the distance that was last communicated.
- ☑ When engineer does not acknowledge hand signal to stop train, except when switching.

November 1, 2014

SEXTON    000385

Canadian Pacific

# GROUP "F" TESTS – SWITCHES – DERAILS – PROTECTING SHOVES AND EQUIPMENT FOUL OF ADJACENT TRACKS TESTS

| Test NO. | Name | Rule Number |
|----------|------|-------------|
| GRF01 | Good Faith Challenge | 1.4.1 |
| GRF02 | Shoving or Pushing Movements | 6.1.1, 2.13, 5.3.6, 5.3.7 and 6.5 |
| GRF03 | Picking up a Crew Member | 6.6 |
| GRF04 | Equipment Left to Foul another Track | 6.1.1 and 7.1 |
| GRF05 | Lined, Locked and Checked | 6.1.1, 8.2, 8.3 and Special Instructions |
| GRF06 | Hand Operated Switches | 6.1.1, 8.2, 8.3, 8.8 and Special Instructions |
| GRF07 | Crossover Switches | 6.1.1, 8.2, 8.3 & 8.12 |
| GRF08 | Releasing Authority in Non-Signaled Territory - Hand Operated Switch | 6.1.1, 14.7 and Special Instructions |
| GRF09 | Clear of Main Track Switches | 8.7 |
| GRF10 | Conflicting Movements Approaching Switch | 8.14 |
| GRF11 | Derail Location and Position | 8.2 |

November 1, 2014

SEXTON     000470

Canadian Pacific

## Test GRF01  Good Faith Challenge

To evaluate the employee's ability to properly challenge a directive that would be contrary to the operating rules for shoving moves, leaving equipment foul of an adjacent track, the handling of hand-operated switches or fixed derails.

**Rules Tested:**  GCOR 1.4.1

**Test Conditions:**  When conducting this test conditions will need to be set up.

**Procedure:**
When test conditions are set up:
1. Pick a location and situation where you will be able to control the test.
2. Set up a situation where a directive is given to an employee that would violate a railroad operating rule relating to shoving movements, leaving equipment to foul of adjacent track, handling hand-operated switches or fixed derails.
3. Once directive is given to crew, crew needs to challenge the directive given with their supervisor.
4. Make sure that supervisor handles the situation properly, by not requiring employee to comply with directive until challenge is resolved.
5. Determine that the supervisor and employee have resolved the challenge to properly comply with the operating rule.

**Test Failure:**
- ☑ Employee does not challenge the directive given.
- ☑ Supervisor requires the employee to comply with directive without resolving the challenge.
- ☑ Employee not given opportunity to write up for further review.
- ☑ Employee performs task even after it was challenged to a Supervisor without being resolved.
- ☑ Employee is subjected to punishment for making a good faith challenge.


**Note:**  When this type of test performed, the supervisor performing must ensure that before, during and after the test that all rules are complied with.  Employees must not be required to perform any task that would jeopardize their safety.

SEXTON    000471

Canadian Pacific

## Test GRF02  Shoving or Pushing Movements

Evaluates employees rule compliance in participating in the procedure to be used when providing protection when handling cars ahead of the engine.

**Rules Tested:** GCOR Rule 2.13, 5.3.6, 5.3.7, 6.1.1 and 6.5

**Test Conditions:** When conducting this test, actual operating conditions are to be observed.

**Procedure:**
1. Pick a location where crews can be observed and monitored for compliance for a shove move.
2. Observe and listen to a crew to ascertain that job briefing is held between engineer and employee directing move.
3. Determine that employee has checked that track is clear for movement.
4. Determine that employee providing protection does not engage in any task unrelated to the movement.
5. If public crossings are involved that they are protected.
6. Switches and derails for movement are properly lined for intended movement.

**Test Failure:**
☑ No job briefing is held between crew members.
☑ Switches and derails not lined for intended movement.
☑ Movement not protected by employee, as required.
☑ Employee performing other task than related to movement.
☑ Public crossing not protected as required.
☑ Track not visually determined that track is clear for intended movement.
☑ No communication or signals are given to control the movement.

**Note:** The shoving or pushing moves do not apply to rolling equipment intentionally shoved or pushed to permit the rolling equipment to roll without power attached, such as, during switching, humping or static drops or under Rule 6.6 Picking up a crew member.

SEXTON    000472

Canadian Pacific

# GROUP "R" TESTS - RAILROAD RADIO

| Test NO. | Name | Rule Number |
|---|---|---|
| GR01 | Test Transmissions | 2.17, 2.18 |
| GR02 | Identification, Over, Out | 2.2, 2.4 |
| GR03 | Lieu of Hand Signals | 2.13, 5.3.6 and 5.3.7 |

**REQUIREMENTS: TESTS AS DESCRIBED ABOVE ARE FOR ALL EMPLOYEES AS OBSERVATIONS TO DETERMINE THAT THE EMPLOYEE IS IN COMPLIANCE WITH RULE INDICATED.**

**NOTE**: If you hear any improper communication over the radio, you should immediately correct the employee involved. If you cannot identify the employee involved, make a request via the radio that proper radio procedures be utilized.

SEXTON    000496

## Test GR01    Test Transmissions

Evaluates employee to determine that they test their radio and that it is working before beginning their work assignment.

**Rules Tested:** GCOR 2.17 and 2.18

**Test Conditions:** When conducting this test, actual operating conditions are to be observed.

**Procedure:** Monitor radio communication or observe employee before beginning a work assignment to determine that a radio test is made which includes an exchange of voice transmissions with another radio.

**Test Failure:**
- ☑ Failure to test radio before beginning work assignment.
- ☑ Failure to notify other crew members of a radio not working.

## Test GR02    Identification, Over, Out

Evaluates employee to determine that proper radio procedure is used in beginning, during and ending of transmissions.

**Rules Tested:** GCOR 2.2 and 2.4

**Test Conditions:** When conducting this test, actual operating conditions are to be observed.

**Procedure:** Monitor radio communication to listen on an employee giving the required identification in transmitting or acknowledging a radio communication.  Also listen for an employee to state OVER when a response is expected or OUT preceded by required identification when done with a transmission.

Exception:  OVER and OUT is not required during yard switching operations.

**Test Failure:**
- ☑ Failure to identify railroad name or initials.
- ☑ Failure to identify name or locations or other unique designation for base stations.
- ☑ Failure to identify engine number or words that identify the precise mobile unit.
- ☑ Failure to use OVER at end of transmission when response is expected.
- ☑ Failure to use required identification and the work OUT when ending a transmission and no response is expected.
- ☑ Failure to repeat identification if communication continues without interruption for 15 minutes or more.

SEXTON     000497

CP Resp. App. - 210b

Canadian Pacific

## Test GR03    Lieu of Hand Signals

**Purpose:**  Evaluates ability of employee to properly use the railroad radio in place of hand signals.

**Rules Tested:**  GCOR 2.13, 5.3.6 and 5.3.7

**Test Conditions:** When conducting these tests, actual operating conditions or set up conditions can be observed.

**Procedure:**

**Observation Test**
   Position yourself where movements can be observed during actual operating conditions and listen and watch for employee using railroad radio to direct train or engine movements for backing or shoving to include the direction and distance to be traveled and listen for acknowledgement when distance specified is for more than four cars.

**Set Up Test**
   To perform a set up test, contact with employee on the ground directing movement with railroad radio must be done.  Pick a track that they are switching on to make sure that any car signs given to engineer will hold cars they are handling or make car signs short enough to afford stopping distance of car sign given. Instruct employee directing movements to give a car sign into the track picked out specifying distance and direction and not to state anything further.  Car sign must be more than 4 car lengths.  Determine that movement can stop in half the distance specified.

**Test Failure:**
   ☑ Distant or direction is not given in radio communication.
   ☑ Movement does not stop in half the distance specified.
   ☑ Engineer does not acknowledge radio communication if more than four cars.

SEXTON    000498



<div align="right">

**Policy 3411**
Short Term Incentive Plan

</div>

**Short Term Incentive Plan (STIP)**
Non-Unionized Employees (Canada) and US Salaried Employees
Issuing Department: Human Resources

| | |
|---|---|
| **Policy Statement** | Canadian Pacific offers a Short Term Incentive Plan (the "Plan"), to recognize the contribution that each regular, non-unionized and US salaried employee makes to the Railway's achievement of its business objectives. |
| | |
| **Accountability** | The Management Resources and Compensation Committee of the Board of Directors of Canadian Pacific Railway (the "Committee") has complete authority to interpret and define individual and group eligibility and to establish rules and regulations required to properly administer the Plan. The Board may also suspend, amend or terminate this Plan at any time.<br><br>On an annual basis, managers are responsible for guiding their employees in the objective setting process. Managers must conduct regular progress reviews throughout the year, evaluate performance against objectives at year end and report results to Human Resources.<br><br>Employees are responsible for setting and striving to achieve their annual performance objectives and for soliciting performance feedback from their managers.<br><br>Human Resources is responsible for interpreting this policy, guiding its administration and supporting employees and managers applying the policy. |
| **Process and Application** | |
| Plan Year | The Plan Year runs from January 1 to December 31. |
| | |
| Eligibility | Regular employees who participate in the Company's non-unionized compensation program are eligible to participate in the Plan provided they join the Plan prior to October 1st in their first year of participation.<br><br>Employees must complete three (3) months (65 working days) of cumulative active service in the Plan year in order to be eligible for a STIP payout. |
| | |
| Transfers and Joint Ventures | Employees transferred or seconded to employers participating in a joint venture with CP may be designated as participants in the Plan by the Company. |
| | |
| Temporary Replacements | Unionized employees who temporarily assume a non- |

Employee Policy Manual
[APG]

<div align="right">Effective with the 2021 Plan Year</div>

Confidential



<div align="right">CP_03231</div>



**Policy 3411**
Short Term Incentive Plan

| | |
|---|---|
| | unionized position will be eligible for STIP, provided the temporary assignment commences prior to October 1st of the Plan year and has a minimum continuous duration of three (3) months (65 working days) in the Plan year. |
| Plan Objectives | The objectives of the Plan are:<br><br>• to tie a part of the employee's compensation directly to CP's results;<br>• to reward the achievement of individual and team objectives that support CP's achievement of its annual business plans and long-term strategy; and<br>• to maintain the competitiveness of CP's compensation program. |
| Ending Participation | Participation in the Plan ends when the employee reverts to a unionized position at the Company's request, retires or terminates their employment with CP.<br><br>Employees who revert to a unionized position at their own initiative prior to payout will not be eligible for a STIP award. |
| Target Award Levels | For each Plan Year the Committee establishes the various classes of participants, the weighting of each performance measure assigned to each class and the Target Award Levels.  Employee level determines their Target Award Levels.  Target Award Levels are expressed as a percentage of annual salary and are the basis for calculating STIP awards. |
| Weighting of Corporate Individual Components | Individual STIP awards are based on two components, individual and corporate. STIP award payouts are based on an employee's group and weighting category at year-end.<br><br>The following table outlines the weighting for corporate and individual performance for the various management levels in the organization:<br><br>| **LEVEL** | **CORPORATE** | **INDIVIDUAL** |<br>|---|---|---|<br>| Level A to F | 75% | 25% |<br>| Level 1 | 60% | 40% |<br>| Level 2 to 6 | 50% | 50% | |
| Assessing PMP Objectives | The individual component of STIP awards is tied directly to the individual's PMP objectives established under the Performance Management Program (PMP).  A PMP rating (from Unsatisfactory to Outstanding) will be assigned to each of the individual's PMP objectives. |

Employee Policy Manual                                     Effective with the 2021 Plan Year
[APG]

Confidential                                                                                CP_03232



**Policy 3411**
Short Term Incentive Plan

The performance ratings are determined on the basis of three dimensions:

1. achievement of objectives against the standards and measures established for each objective;
2. context of performance throughout the year; and
3. peer clustering of employees into a distribution profile established by the Company.

The context of performance dimension considers the "how" of the achievement and adds a necessary judgmental component to the assessment process. The demonstration of company values must be considered.

Taking the three dimensions into account, through the calibration process, an overall PMP rating and an overall STIP attainment level, based on the scales below, are determined for the employee's individual performance component.

| Overall PMP Rating | Overall STIP Attainment Level |
|---|---|
| Outstanding | 170% - 200% |
| Exceeds | 125% - 165% |
| Achieved | 90% - 120% |
| Partially Achieved | 0% - 85% |
| Unsatisfactory | 0% |

**Potential Corporate Payout Levels**

Annually, the Committee establishes the performance criteria, the weighting assigned to each performance criterion and corporate performance target levels for the STIP Program.

Each corporate performance criterion will have three levels of performance and payout.

a) Exceptional Level - 200% of Target Award Level assigned to the corporate component where the actual CP performance meets or exceeds the exceptional level established by the Committee;

b) Target Level - 100% of Target Award Level assigned to the corporate component where the actual CP performance meets the target level established by the Committee;

Confidential                                                    CP_03233



**Policy 3411**
Short Term Incentive Plan

|  | |
|---|---|
| | c)  <u>Threshold Level</u> - 50% of Target Award Level assigned to the corporate component when the actual CP performance level for the Plan Year is at the threshold level established by the Committee; and<br><br>Where the actual CP performance falls between the threshold and exceptional levels, the payout level will be prorated.<br><br>Where the actual CP performance falls below the threshold level, no awards will be paid under the corporate component. |
| Corporate Hurdle | For each Plan Year, the Committee establishes a minimum level of corporate performance, below the threshold level, called the corporate hurdle.  If the Company's performance falls below this hurdle, no awards will be paid under the individual or corporate components. |
| Individual Hurdle | If individual performance levels are unsatisfactory, no award will be paid to the individual under the corporate or individual components. |
| CP Net Loss | The Committee has the discretion to adjust the amount of awards so that payment of awards under the Plan does not result in a net loss for CP. No awards will be paid if CP has a net loss for the Plan Year. |
| Calculation of Awards | Awards are calculated by performing the following calculation:<br><br>Target Award Level multiplied by the weighting for the individual component, multiplied by the annual salary in effect at the end of the Plan Year, multiplied by the STIP attainment level<br><br>**added to**<br><br>the Target Award Level, multiplied by the weighting for the corporate component, multiplied by the annual salary in effect at the end of the Plan Year, multiplied by the weighting of the performance measure, multiplied by the payout level.  This calculation is repeated for each of the Company's performance measures.<br><br>For sample STIP calculations, see Appendix 1. |
| Payment of Awards | Awards to be paid out in any Plan Year, will be paid as soon as possible after CP financial results are determined, the Committee has approved a payout, and the participants' performance has been assessed under PMP. |
| Joining Plan Before October 1st | New entrants prior to October 1 of the plan year will have their award for that year prorated based on the length of time they have been a member of the Plan. |

[APG]

Confidential                                                                                 CP_03234



**Policy 3411**
Short Term Incentive Plan

| Leaving the Plan Before April 1st | Employees who cease participation in the Plan prior to April 1 of the Plan Year will not be eligible for any STIP Award for the Plan Year. |
| --- | --- |
| Leaves of Absence | Leaves of absence (LOA) are those periods when an employee is not actively at work i.e. short or long term disability, personal, maternity, parental, educational leaves. Participants who take a leave of absence greater than 30 consecutive days (22 working days) during the year will have their award prorated based on the length of time in active service during the year.<br><br>Potential STIP Awards will be held for participants who take a  personal (non-medical or educational) leave of absence. Eligibility for STIP will be determined at the end of the LOA. If the participant decides not to return it will be considered a voluntary resignation and the participant will not be eligible for a STIP Award. The payment of any STIP Award will only occur when the participant returns from the LOA. |
| Transfers | Participants transferring on or after April 1st of the Plan Year to a position to which this plan does not apply will have their award prorated based on the length of time in the eligible position. |
| Termination without Cause | Participants whose employment is terminated by the Company without cause on or after April 1st of the Plan Year will continue to participate in the Plan until their last day actively at work.  If all program conditions are met, (i.e. Company performance and individual performance warrants a payout), they will receive a prorated award based on the length of time they participated in the plan during the year. |
| Retirements | Employees that retire on or after April 1 of the plan year without a severance payment are eligible for a prorated STIP award provided:<br><br>• he/she provided Retirement Notice in accordance with Retirement Policy 8101; and<br>• retirees are between 55 and less than 60 years of age with a minimum of 5 years of company service from the last date of hire or if retiring at age 60 or greater, must have a minimum of 2 years of company service from their last date of hire. |
| Termination for Cause | Employees who are terminated for cause during the year will not receive an award for the year in which their employment ended. They will also |

Employee Policy Manual

[APG]

Effective with the 2021 Plan Year

Confidential



**Policy 3411**
Short Term Incentive Plan

| | |
|---|---|
| | not be eligible to receive any award not yet paid at the time of their termination for cause. |
| | |
| Resignation | Employees who resign prior to the STIP payout date will not be eligible for an award for the previous or current plan year. |
| | |
| Death | Employees who are deceased after April 1st of the Plan Year, if all program conditions are met, a prorated award based on the length of their membership in the Plan during the year will be paid to the employee's estate. |
| **Administration** | |
| Setting PMP Objectives | The STIP cycle begins with the establishment of PMP Objectives.  In discussion with their manager and/or team leader, participants are responsible for the development of their PMP objectives and assigning weightings. |
| | |
| Assigning Weights | PMP objectives are weighted according to their relative importance.  The total value of all PMP objectives must equal 100%. |
| | |
| Reporting Results | By the end of January, annually, managers should have STIP attainment levels reported to Human Resources for the previous Plan Year. |
| | |
| **Additional Information** | For additional information, please contact your HR Business Partner or Employee Services by e-mail at Employee_Services@cpr.ca, by phone in Calgary at (403) 319-3900 or toll free at 1 (866) 319-3900. |
| | |
| **Cross Reference** | Policy 5611 - Performance Management Program Policy 8503 - Compensation & Benefits for Unionized Employees who Temporarily Assume Non-Unionized Positions Policy 8101 - Retirement Policy |
| | (U.S. only disclaimer: This policy statement represents the current policy and practice of CP regarding the Short Term Incentive Plan for non-unionized employees and may be changed from time to time by CP without notice.  Nothing in this policy is intended to create any contract, agreement or other obligation by CP with any of its employees.) |

Confidential



**Policy 3411**
Short Term Incentive Plan

### APPENDIX 1 - Sample STIP Calculations

| Level 5 with annual salary of $65,000, PMP rating of Achieves at 100% | | | | |
|---|---|---|---|---|
| **Target Award Level** | **Individual Component** | **Annual Salary** | **PMP Rating %** | **Individual Component Award** |
| 10% | 50% | $65,000 | 100% | $3250 |
| **Added to** | | | | |
| **Target Award Level** | **Corporate Component** | **Annual Salary** | **Corporate Component %** | **Corporate Component Award** |
| 10% | 50% | $65,000 | 100% (at target) | $3,250 |
| **STIP Award total** | | | | **$6,500** |

| Level 4 with annual salary of $85,000, PMP rating of Exceeds at 125% | | | | |
|---|---|---|---|---|
| **Target Award Level** | **Individual Component** | **Annual Salary** | **PMP Rating %** | **Individual Component Award** |
| 15% | 50% | $85,000 | 125% | $7,969 |
| **Added to** | | | | |
| **Target Award Level** | **Corporate Component** | **Annual Salary** | **Corporate Component %** | **Corporate Component Award** |
| 15% | 50% | $85,000 | 50% (Threshold) | $3,188 |
| **STIP Award total** | | | | **$11,157** |

| Level 3 with annual salary of $105,000, PMP rating of Achieves at 110% | | | | |
|---|---|---|---|---|
| **Target Award Level** | **Individual Component** | **Annual Salary** | **PMP Rating %** | **Individual Component Award** |
| 17.5% | 50% | $105,000 | 110% | $10,106 |
| **Added to** | | | | |
| **Target Award Level** | **Corporate Component** | **Annual Salary** | **Corporate Component %** | **Corporate Component Award** |
| 17.5% | 50% | $105,000 | 0% (Below Threshold) | $0 |
| **STIP Award total** | | | | **$10,106** |

Employee Policy Manual                                        Effective with the 2021 Plan Year

[APG]

Confidential                                                                CP_03237

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION

- - - - - - - - - - - - - - - - - - - -

No. 3:23-CV-00031-HCA

John Sexton,

                              Plaintiff,

        vs.

Dakota, Minnesota & Eastern Railroad
Corporation d/b/a Canadian Pacific,
a Delaware corporation,

                              Defendants.

- - - - - - - - - - - - - - - - - - - -

DEPOSITION OF

DYLAN SMITH

May 29, 2024

10:00 a.m.

TAKEN BY: BRENDA K. FOSS
fossbrenda@yahoo.com
612-701-4282

---

2

Deposition of DYLAN SMITH, taken
via Zoom videoconference, by and on behalf of
Plaintiff, on Wednesday, May 29, 2024,
commencing at 10:00 a.m., before Brenda K. Foss,
Professional Court Reporter, Notary Public,
State of Minnesota, County of Hennepin.

          * * * * * *

APPEARANCES

ON BEHALF OF THE PLAINTIFF:
    CYLE CRAMER, ESQUIRE
    KELEENAH YANG, PARALEGAL
    YAEGER & JUNGBAUER BARRISTERS, PLC
    4601 Weston Woods Way
    St. Paul, MN  55127
    ccramer@yjblaw.com
    651-288-9500

ON BEHALF OF THE DEFENDANTS:
    BRIANA AL TAQATQA, ESQUIRE
    DORSEY & WHITNEY LLP
    50 South 6th Street, Suite 1500
    Minneapolis, MN  55402
    altaqatqa.briana@dorsey.com
    612-340-2600

ON BEHALF OF THE WITNESS DYLAN SMITH:
    RYAN FURNISS, ESQUIRE
    7750 Clayton Road, Suite 102
    St. Louis, MO  63117
    rfurniss@furnisslaw.com
    314-899-9101

ALSO PRESENT:
    Michelle Haynes, CPKC Paralegal

---

3

                I N D E X

Examination:                      PAGE:
By Mr. Cramer         4
By Ms. Al Taqatqa        54

Objections:
By Ms. Al Taqatqa         15, 19, 23,
25, 27, 30, 32, 36, 37, 39, 41, 50, 53

Marked Deposition Exhibits:
43  2-1-21 e-mail re Marquette 8
    sub delays, Bates 3285-87
44 Verizon call record      17
    Bates 3922-26
45 2-21 e-mail re discipline  33
    call doc, Bates 932
46 Discipline call document   33
    Bates 009
47 Discipline call documents  36
    Bates 933-940
48 Performance Mgmt Form       46
    Bates 3354-60
49 STIP, Bates 3239           49

Previously Marked Exhibits:
4  CP's Intimidation &        28
    Harassment Policy
9  Notice to attend          26
10 Investigation Transcript  27-30, 40
11 GCOR 5.3.7                39
35 Discipline e-mail         23
    Bates 981

Reporter's Certificate        56

(Original Deposition Transcript in the
possession of Cyle Cramer, Esquire).

                        * * * * *

---

4

          P R O C E E D I N G S

          DYLAN SMITH,
     after having been first duly sworn,
     deposes and says under oath as follows:

          E X A M I N A T I O N

BY MR. CRAMER:

Q   Just for the record I have Keleenah Yang, my
    legal assistant, running my exhibits in the
    room with me.  Otherwise I'm ready to go.
    Can you please state your first and last name
    and spell your last name, please?

A   Dylan Smith, S-M-I-T-H.

Q   Can you please state your address?

A   ███████████████████████████████████ .

Q   Where are you located right now?

A   In my home.

Q   Have you ever had your deposition taken in
    the past?

A   No.

Q   Then just a couple preliminary things here.
    Please answer every question verbally.  Don't
    shake or nod your head.  Say yes or no versus
    nope or huh-uh for example.  Do you understand?

33

1 identification).

2 **Q** After you take a second to review this, does

3 it look like a typical e-mail you'd receive

4 regarding a discipline call?

5 **A Correct, yes.**

6 **Q** Can you repeat your answer?

7 **A Yes.**

8 **Q** Did you receive this e-mail?

9 **A I don't recall receiving it, but it was three**

10 **years ago.**

11 **Q** I believe it's all the way on the right kind

12 of two-thirds down. It says Dylan Smith and

13 then there's an e-mail address?

14 **A That's my name and that's my e-mail address.**

15 **Q** It looks like there is an attachment to this

16 e-mail. Correct?

17 **A Correct, yes.**

18 **Q** Let's open up the 00009 Discipline Call

19 Document.

20         MS. AL TAQATQA: Is this part of

21 the same exhibit or is this a separate exhibit?

22         MR. CRAMER: This is going to be

23 a separate one, so Exhibit 46.

24         (Deposition Exhibit 46 marked for

25 identification).

34

1         MR. CRAMER: I can't recall.

2 There might have been an earlier version of

3 this one, but this was a duplicate kind of a

4 higher quality. So I'm using this one.

5         MS. AL TAQATQA: So this was not

6 the attachment that was produced with the

7 cover e-mail you just showed?

8         MR. CRAMER: This document was

9 produced multiple times. There was multiple

10 versions of it. My understanding is that

11 this is the attachment to the prior e-mail.

12         MS. AL TAQATQA: Well, typically

13 the attachments are -- the attachments follow

14 the Bates. So if the prior e-mail ended in

15 Bates 932 or 33 or whatever it was, then the

16 attachment would be the next number in the

17 sequence.

18         MR. CRAMER: Yes. And that

19 e-mail and the attachments were produced

20 several times over. I'm presuming CP 09

21 might be that e-mail.

22         MS. AL TAQATQA: Right. I hear

23 you. There were some duplicates of the same

24 e-mail and attachments, but there were also

25 different versions of this e-mail with

35

1 different versions of the attachment. So it

2 doesn't look to me -- it's not obvious to me

3 from looking at the documents -- and I don't

4 know how we'd know -- that this version of

5 the spreadsheet that's on the screen, CP 9,

6 is the version of the spreadsheet that was

7 attached to the cover e-mail that was CP 932.

8         MR. CRAMER: Let me briefly check

9 something. If we want, we can take a five

10 minute break and come back.

11         MS. AL TAQATQA: Yes, that would

12 be good.

13         (Brief recess).

14 **Q** (By Mr. Cramer, continuing) We had been

15 looking at Exhibit 45 if we want to bring

16 that back up. Mr. Smith, I don't know if

17 you're back. Thanks for everybody's

18 patience. We can go back on the record. We

19 were looking at this e-mail, and it says that

20 there's an attachment. This e-mail is Bates

21 number 932. So let's open up CP 933. Did I

22 mark that other version as an exhibit?

23         MS. AL TAQATQA: So Exhibit 47

24 starts with CP 933?

25         MR. CRAMER: Yes.

36

1         MS. AL TAQATQA: Which follows in

2 sequence after what has been marked Exhibit

3 45 which starts with Bates number CP 932?

4         MR. CRAMER: Correct.

5         (Deposition Exhibit 47 marked for

6 identification).

7 **Q** (By Mr. Cramer, continuing) Mr. Smith, does

8 this look like the documents you'd receive as

9 part of a discipline call?

10 **A Yes.**

11 **Q** Can we scroll down to -- this is a column

12 towards the right where there's a significant

13 amount of text in that column. Do you see

14 where it says GRF02?

15 **A Yes.**

16 **Q** Do you know what that means?

17 **A It's an efficiency test code.**

18 **Q** Do you know for what efficiency test?

19 **A It's been awhile since I had one, but I can**

20 **only assume shove movements.**

21 **Q** Under the efficiency test manual in the

22 operating rules when conducting test GRF02,

23 actual operating conditions are to be

24 observed. Correct?

25         MS. AL TAQATQA: Objection, foundation.



Redacted

Smith
Ex. 47

Southern Eastern Region - Discipline Call - Thursday, February 18th, 2021

CONFIDENTIAL - ATTORNEY/SOLICITOR CLIENT COMMUNICATION PREPARED AT THE DIRECTION OF COUNSEL

SOUTHERN & EASTERN REGION - February 18, 2021

EASTERN REGION

Page 1 of 6

Confidential



Confidential

CP_00937



Redacted

Redacted

Southern Eastern Region - Discipline Call - Thursday, February 18th, 2021

1

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF IOWA
 2                  EASTERN DIVISION

 3      - - - - - - - - - - - - - - - - - - - -
                   No. 3:23-CV-00031-HCA
 4
        John Sexton,
 5
                           Plaintiff,
 6        vs.

 7      Dakota, Minnesota & Eastern Railroad
        Corporation d/b/a Canadian Pacific,
 8      a Delaware corporation,

 9                         Defendants.

10      - - - - - - - - - - - - - - - - - - - -

11

12

13

14              DEPOSITION OF

15              THOMAS JARED

16             June 20, 2024

17              10:00 a.m.

18

19

20

21

22

23          TAKEN BY: BRENDA K. FOSS
              fossbrenda@yahoo.com
24              612-701-4282

25
```

2

```
 1        Deposition of THOMAS JARED, taken
 2  at Dorsey & Whitney LLP, 50 South 6th Street,
 3  Suite 1500, Minneapolis, Minnesota, by and on
 4  behalf of Plaintiff, on Thursday, June 20,
 5  2024, commencing at 10:00 a.m., before Brenda K.
 6  Foss, Professional Court Reporter, Notary
 7  Public, State of Minnesota, County of
 8  Hennepin.

 9

10              *   *   *   *   *

11              APPEARANCES

12

13  ON BEHALF OF THE PLAINTIFF:
      JOHN MAGNUSON, ESQUIRE
14    CYLE CRAMER, ESQUIRE
      YAEGER & JUNGBAUER BARRISTERS, PLC
15    4601 Weston Woods Way
      St. Paul, MN  55127
16    jmagnuson@yjblaw.com
      ccramer@yjblaw.com
17    651-288-9500

18

19  ON BEHALF OF THE DEFENDANTS:
      JACK SULLIVAN, ESQUIRE
20    DORSEY & WHITNEY LLP
      50 South 6th Street, Suite 1500
21    Minneapolis, MN  55402
      sullivan.jack@dorsey.com
22    612-340-2600

23

24              *   *   *   *   *

25
```

3

```
 1              I N D E X

 2
    Examination:                PAGE:
 3  By Mr. Magnuson               4

 4

 5  Marked Deposition Exhibits:
    50 Sexton's Testing (2013+)   42
 6  51 Jared's hotel receipt      96
    52 Verizon records            98
 7  53 Sexton's testing history  187
    54 Jan 18, '21 e-mails with Tracy Miller
 8     et al, Bates CP1692, 1693  188
    55 Short-Term Incentive data
 9     Bates CP 3243              189
    56 Feb 9, '21 e-mail from Sexton et al
10     Bates CP 3295 and 3296     191
    57 Feb 1, '21 Top 15 Train Speeds
11     CP 3303-3306               197
    58 Feb 9, '21 e-mail from Sexton et al
12     Bates 3322-3323            198
    59 Jared's 2021 Performance Management Form
13     Bates CP 3402-3408         203

14

15

16  Reporter's Certificate       206

17

18  (Original Deposition Transcript in the
    possession of John Magnuson, Esquire).

19

20          *   *   *   *   *
21
22
23
24
25
```

4

```
 1          P R O C E E D I N G S

 2

 3            THOMAS JARED,

 4      after having been first duly sworn,

 5      deposes and says under oath as follows:

 6

 7            E X A M I N A T I O N

 8  BY MR. MAGNUSON:

 9  Q  Good morning, Mr. Jared.  Would you please

10     state your full name spelling your last name

11     for the record?

12  A  Thomas Dwight Jared, J-A-R-E-D.

13  Q  What is your home address?

14  A

15

16  Q  Do you have a personal cell phone or a home

17     phone number?

18  A  Yes.

19  Q  What is that?

20  A  I don't remember my personal.

21  Q  You don't remember your personal cell phone

22     number?

23  A  No.

24  Q  We'll look it up and maybe get it on a break.

25     The only reason I ask about the home address
```

49

1  Q  The next page, 26, one-third down the page,
2      9/30/13, Dean Porter conducted a GRF02.
3      Correct?
4  A  **I missed that.  What page?**
5  Q  26.
6  A  **Correct.**
7  Q  And he passed?
8  A  **Correct.**
9  Q  Next page 27, three or four lines down,
10     3/6/13, do you see that, Shawn Jefford
11     conducted a GRF02, shoving or pushing.
12     Correct?
13 A  **That is correct.**
14 Q  And he passed that one as well?
15 A  **Yes.**
16 Q  So with respect to the GRF02s that we just
17     went through, every one of them was a pass.
18     Correct?
19 A  **The ones that you went through, that's**
20     **correct.**
21 Q  So I can represent to you that this is
22     approximately 22 GRF02 tests that we just
23     went through and he passed all those.  Right?
24 A  **I have not counted them.**
25 Q  Sounds accurate or fair?  It's close?  Have

50

1      you or were you as railroaders encouraged to
2      put more comments in these somewhere around
3      the time of 2/8/17 or somewhere in the early
4      2017 area?
5  A  **I don't know.**
6  Q  In looking through these, if I can direct
7      your attention to page 13.
8  A  **Okay.**
9  Q  You'd agree with me that prior to 2/8/17
10     there are very few comments in the comments
11     section?
12 A  **Correct.**
13 Q  Do you know why that is?
14 A  **I do not.**
15 Q  And after early '17 there's almost always --
16     I shouldn't even say that.  The comments show
17     up far more frequently after early 2017 in
18     this document.  Right?
19 A  **Correct.**
20 Q  Let's look at the first page.  About halfway
21     down we have your E test of Mr. Sexton on
22     February 1, 2021.  Right?
23 A  **That's correct.**
24 Q  And you indicated a test code of GRF02,
25     shoving or pushing movements.  Right?

51

1  A  **That's correct.**
2  Q  And in the comments you said "While
3      performing set up test".  Right?
4  A  **Correct.**
5  Q  In going through this document -- you can
6      take time to look at it -- tell me how many
7      times, at least in terms of the comment
8      section, a set up test was given to
9      Mr. Sexton.
10        MR. SULLIVAN:  Objection, the
11     document speaks for itself.
12 A  **Do you want me to go through each one?**
13 Q  Yep.
14 A  **Are you asking for every test or just the**
15     **GRF02 test?**
16 Q  Both.
17 A  **(Witness examining document).  Can I have**
18     **something I can take notes with?  Or just**
19     **remember what I'm looking for?  There's**
20     **5/10/2018, that's a display yellow flag.**
21     **That's a set up test.**
22 Q  Which page?
23 A  **Page 11.**
24 Q  What date?
25 A  **5/10/2018 at 15:12, John Stoffer, GRB15.**

52

1      (Witness examining document).
2  Q  From 1/24/13 up until 7/10/21 Mr. Sexton was
3      given two set up tests.  Is that right?
4         MR. SULLIVAN:  Objection,
5      misstates the document and evidence that's
6      not in the record.
7  Q  (By Mr. Magnuson, continuing) As far as this
8      document is concerned and you just had a
9      chance to review it, in that time frame
10     7/10/21 to 1/24/13 he's been given according
11     to this document two set up tests.  Right?
12 A  **What was written and what the test performs,**
13     **that's what that shows but you have multiple**
14     **no comments or descriptions.  I can tell you**
15     **which ones were set up or not.  We have a**
16     **yellow flag right here that he passed.  That**
17     **could have been a set up test.  That's on**
18     **page 23, 3/19/2024 (sic).**
19 Q  What page?
20 A  **Page 23.  There's actually two of those on**
21     **there with Bret Spranger, yellow flag.  That**
22     **could have been set up tests.  There's two**
23     **just on that page.**
24 Q  Right.
25 A  **Do you want me to review the document and**

57

1    lines with the previous document, the testing
2    results. Why don't we go 15 minutes.
3  Q  (By Mr. Magnuson, continuing) Sir, you've got --
4        THE WITNESS: Oh, I thought you
5    meant we were going to take 15 minutes.
6        MR. MAGNUSON: No. I meant we're
7    going to go for 15 minutes and then we'll
8    take a break.
9        MR. SULLIVAN: We're going to
10   take a 15 minute break. The witness has
11   asked for one. We're going to take one.
12   There's no rule that says we can't take a
13   break.
14       MR. MAGNUSON: Counsel is
15   grabbing his computer.
16       MR. SULLIVAN: That's fine. I'm
17   grabbing my computer. I'm taking my legal
18   pad. I have a glass in front of me. There's
19   lots of things happening. We're going to
20   take a 15 minute break. See you in 15 minutes.
21       (Brief recess).
22       MR. SULLIVAN: Can we take a
23   moment to note appearances?
24       MS. REPORTER: Sure.
25       MR. SULLIVAN: Thank you. Jack

58

1    Sullivan on behalf of the defendant and
2    inhouse counsel Noah Garcia for Canadian
3    Pacific Kansas City Railroad is monitoring
4    the deposition through Zoom as he has in
5    other depositions in this case.
6        MR. MAGNUSON: Has Mr. Garcia
7    been present by Zoom the entire time?
8        MR. SULLIVAN: Yes.
9        MR. MAGNUSON: This entire
10   deposition?
11       MR. SULLIVAN: Yes. And if we
12   noted appearances on the record at the
13   beginning of the deposition, that would have
14   been clear to everyone. Mr. Cyle Cramer is
15   here as well in addition to Mr. Magnuson
16   obviously.
17  Q  (By Mr. Magnuson, continuing) Was that about
18   a 10 minute break?
19  A  About 15.
20  Q  So we took a 15 minute break. Counsel for
21   the railroad here, Mr. Sullivan, brought his
22   computer with him on the break and I know you
23   two were in a conference room down the hall.
24   What did you review, if anything, in terms of
25   documents during our break?

59

1  A  Nothing.
2  Q  He didn't show you his computer?
3  A  No.
4  Q  In front of you is Exhibit 39. Can you
5    identify that?
6  A  It says, CPUS Efficiency Testing Manual on
7    Operating Rules in Compliance with FRA 217.9.
8  Q  What is this document? What does it do?
9    What does it govern?
10 A  Do you mind if I take a minute to review it?
11 Q  No.
12 A  (Witness examining document). This
13   efficiency test manual was published on
14   November 1st, 2014. It talks about the
15   tests -- the groups that each test is put
16   into. It talks about what the document is
17   attempting to show as related to FRA 217. It
18   talks about qualifications. It talks about
19   programs. It goes through conduct -- testing
20   conduct and numerous other parts of testing.
21   It goes into detail about each group of
22   tests. Then it goes into specifics about the
23   tests and some things you do for -- whether
24   setting up tests on some of them, how those
25   should be performed. It gives some examples

60

1    of failures. It looks like that's what most
2    of it is. That's for the most part what it
3    is.
4  Q  To the extent you know, is this document
5    produced in conjunction with the FRA or
6    pursuant to some directive in 217.9?
7  A  I don't know.
8  Q  We were talking about some rules a little bit
9    earlier. You may want to fold over some
10   pages. I direct your attention first to page
11   17 of that document.
12 A  Of November 14, 2014?
13 Q  Yes. Let me ask you this. Was this the E
14   test manual that was in effect on February
15   1st, 2021?
16 A  I don't know.
17 Q  You mentioned earlier that employees who give
18   E tests are required to have these rules with
19   them. Right?
20 A  No, I don't think I said that.
21 Q  What was it you said in terms of these
22   rules -- I think you said that employees were
23   required to have them.
24       MR. SULLIVAN: Objection,
25   misstates the witness' testimony.

65

1 towards that rule and it can be done safely.
2 Q And that was kind of part of my next
3 question. Part of the purpose of these three
4 paragraphs is to make sure that the set up
5 test is done in a safe manner. Correct?
6 A Correct.
7 Q Because changing conditions of a set up test
8 can in certain circumstances be dangerous.
9 Correct?
10 A If it's not done correctly.
11 Q So that's correct?
12 A Correct, if it's not done correctly you could.
13 Q Which is why you want to follow the guideline
14 set up in these three paragraphs. Right?
15 A Specific to the Form B and a redboard, that's
16 correct.
17 Q Give us an example for the jury of how this
18 rule, this under a set up test, would be
19 conducted.
20 A First I would understand the location I'm at.
21 I would understand what limits I would like
22 to perform it under. I'd like to understand
23 where I'd be placing my boards and what
24 boards I will actually be setting up. I will
25 talk to the dispatcher and let them know I'm

66

1 out here and I will be performing those tests.
2 I will make sure that I understand what is
3 happening with the employee's bulletins. I
4 will position myself in a location to where I
5 have clear observation of the rule to be
6 observed.
7 Q And you understand that Mr. Sexton here was
8 charged with violating 5.3.7, right, in this
9 case?
10 A Is that what it is? I have to look at that.
11 Q That's what you charged him with. Right?
12 A If I -- I have to --
13 Q We will go through the investigation
14 transcript. If you don't remember the rule
15 after reviewing the documents and meeting
16 with counsel, we'll go through it.
17 A Okay.
18 Q So you can't remember the rule you charged
19 him with violating as you sit here right now?
20 A It's either 5.3.7 or 5.3.6. There's a lot of
21 rules in that rule book.
22 Q And you know those rules. Right?
23 MR. SULLIVAN: Objection,
24 argumentative. The witness said he doesn't
25 remember the specific rule.

67

1 Q (By Mr. Magnuson, continuing) But you know
2 the rules in general?
3 A In general I know the rules.
4 Q Given your position, yeah.
5 MR. SULLIVAN: Let the record
6 reflect that Mr. Magnuson's voice was
7 sarcastic, yeah, given your position,
8 argumentative.
9 MR. MAGNUSON: Sarcastic?
10 Q (By Mr. Magnuson, continuing) So GRA03 here,
11 Display of a Red Flag, doesn't reference
12 5.3.7, does it?
13 A No.
14 Q The three paragraphs under Preparation for a
15 set up test, are those three paragraphs
16 required under this rule?
17 A I don't understand what the question is.
18 Q When conducting an E test in accordance with
19 GRA03, are the three paragraphs under set up
20 test, are those required to be followed?
21 A Those three items are references that you
22 need to think through as you're performing a
23 test, but I already mentioned I would contact
24 the dispatcher as well and let them know I'm
25 out there performing a test.

68

1 In this particular case -- so I
2 didn't actually see that in a procedure set
3 up, so there's this and there could be more
4 and there could be other things that you're
5 not having to do.
6 Q If a trainmaster under your supervision
7 conducted an E test pursuant to GRA03 and
8 didn't follow these three paragraphs under
9 set up test, would that be in violation of
10 the rules?
11 A This isn't a rule. This book is a guide to
12 the efficiency test manual. These are not
13 rules.
14 Q So people don't -- this is just a guideline?
15 A On how to perform a test. This is not a
16 rule. The GCOR are rules. This is not a
17 rule.
18 Q The GCOR doesn't have rules for management in
19 how they conduct their E tests. Right?
20 A This is not a rule.
21 Q But the GCOR doesn't include instructions for
22 management level employees as to how they
23 conduct E tests. Correct?
24 A No. This is a guideline for --
25 Q You're missing my question. The GCOR. You

69

1  know the GCOR?
2  A  Yes.
3  Q  You've been looking at the GCOR for 30 years
4  now?
5  A  Correct.
6  Q  Does the GCOR contain rules for management as
7  to how to conduct E tests?
8  A  No.
9  Q  Thank you.  So you don't consider Exhibit 39
10  to be a rule book?
11  A  No.
12  Q  But you'd agree that it says Test Manual on
13  Operating Rules.  Correct?
14  A  Correct.
15  Q  And the word rule was in there?
16  A  Yes, but it's operating rules.  These were
17  not operating rules.  GCOR is operating rules.
18  Q  These -- correct me if I'm wrong -- you're
19  saying are just guidelines and they are not
20  required to be followed?
21  A  There are some that you should be following
22  and there are some you don't need to follow
23  depending how you're setting up a test.
24  Q  We will go back to my question.  If you -- do
25  you observe trainmasters or have you ever

70

1  observed trainmasters conducting E tests?
2  A  Yes.
3  Q  If you observed trainmasters not following
4  the rules in this document, what would you
5  do?
6  A  If I found they're not following the
7  guidelines in this document?
8  Q  Right.
9  A  We'd have a sit-down and we'd go through
10  expectations and the procedures to follow
11  whatever tests they're performing.
12  Q  Would you consider this document a policy?
13  A  I don't know.
14  Q  You know what a policy means?
15  A  Yeah, but I find it to be a manual for
16  reviewing E test procedures related to the
17  General Code of Operating Rules.
18  Q  Would you consider a manual to be a policy?
19  A  No.
20  Q  I think you've mentioned earlier that part of
21  these three paragraphs under the set up test
22  are so that the set up test can be conducted
23  safely.  Correct?
24  A  Part of it is.  And there could be more to
25  this or less depending on the test being

71

1  performed and location.
2  Q  You said earlier that changing conditions on
3  employees if not done right can be dangerous?
4  A  It could be a concern, yes.
5  Q  So next we'll go to page 41.  Do you see that
6  page?
7  A  Yes.
8  Q  That one says the test is for GRB15 Display
9  of a Yellow Flag.  Do you see that?
10  A  Yes.
11  Q  And the rules tested there are GCOR 5.4.3,
12  15.2 and 15.4.  Correct?
13  A  Correct.
14  Q  Is 5.3.7 referenced there in the rules
15  tested?
16  A  No.
17  Q  And under Test Conditions this one also
18  states, "When conducting this test you may
19  observe existing operating conditions, or it
20  may be set up."  That's what it says.  Right?
21  A  That is correct.
22  Q  And then under Procedure there are two
23  separate paragraphs.  The first is when test
24  conditions are observed and the second is
25  when test conditions are set up.  Correct?

72

1  A  Correct.
2  Q  And similarly to our last rule, part of the
3  reason for the seven guidelines under the set
4  up paragraph are to ensure that the test is
5  being conducted safely, right, at least part
6  of it?
7  A  That's correct.
8  Q  If we can go to page 44, at the top it says
9  Test GRC01 Yellow Flag.  Right?
10  A  GRC03 Permanent Speed Restriction?
11  Q  I'm sorry.  Page 44.
12  A  Oh, my bad.  Okay.
13  Q  Under this rule tested it says GCOR 5.4.2.
14  Right?
15  A  Yes.
16  Q  5.3.7 is not referenced under rule tested.
17  Correct?
18  A  That is correct.
19  Q  This one says under Test Conditions similarly
20  "When conducting this test it may be done by
21  observing existing operating conditions or it
22  may be set up."  Correct?
23  A  That is correct.
24  Q  Under Procedures there are two paragraphs,
25  one for when the test conditions are observed

73

**1** and the other is for when test conditions are
**2** set up.  Correct?
**3 A** **Correct.**
**4 Q** And part of the purpose behind the four
**5** guidelines under the paragraph for the set up
**6** test conditions would be to ensure that the
**7** test is being conducted safely.  Correct?
**8 A** **Those four bullet points?**
**9 Q** Yes.
**10 A** **I don't see where that has anything to do**
**11** **with safety.**
**12 Q** Any time you change existing operating
**13** conditions, it could be dangerous is what you
**14** testified to a few minutes ago.  Right?
**15 A** **It could.**
**16 Q** Could.  Okay.  When it says set up here, that
**17** means you're changing the operating conditions.
**18** Right?
**19 A** **Yes, sir.**
**20 Q** How many other guidelines are there in
**21** Exhibit 39 that have provisions for
**22** conducting a set up test?
**23 A** **Do you want me to note each rule?**
**24 Q** Yes.
**25 A** **(Witness examining document).**

74

**1 Q** Note for the record he just called these
**2** rules.
**3 A** **Okay, but they're not.  When I say rule, the**
**4** **code or the test code references a rule so --**
**5** **do you just want me to note things?**
**6 Q** Yes.
**7 A** **Page 12 talks about don'ts on a set up test.**
**8** **Page 16, page 17, page 18, page 19, page 20,**
**9** **page 21, 23, 24, 25, 26.**
**10 Q** I will interrupt you.  Page 25, I don't see
**11** where that -- oh, it's a continuation of 24.
**12** Sorry I interrupted you.
**13 A** **If I didn't say 27, 27, 29, 32.**
**14 Q** I'll stop you there.  We get the idea at this
**15** point that there are a lot of these guide-
**16** lines that contain provisions for how to
**17** conduct a set up test?  Right?
**18 A** **Yes, it does -- it provides guidelines to set**
**19** **up a set up test.**
**20 Q** And I get the hunch, because I'm going
**21** forward here to 34 and 35, those procedures
**22** have procedures for conducting set up tests?
**23** MR. SULLIVAN:  Objection, form.
**24** Document speaks for itself.
**25** MR. MAGNUSON:  Pull up the

75

**1** investigation letter.
**2** (Discussion off the record).
**3 Q** (By Mr. Magnuson, continuing) Can we see the
**4** investigation letter?  We'll go through this.
**5** Did you read the investigation transcript
**6** after the investigation occurred?
**7 A** **No.**
**8 Q** Have you ever read it?
**9 A** **No.**
**10** MR. SULLIVAN:  Can we clip up 39?
**11** I just don't want to get documents messed up.
**12** MR. MAGNUSON:  Yes.
**13 Q** (By Mr. Magnuson, continuing) I'm handing you
**14** what has already been marked Exhibit 12.
**15** Take a second to review it.
**16 A** **(Witness examining document).  Okay.**
**17 Q** So does that refresh your recollection that
**18** the charges that were brought against
**19** Mr. Sexton and that you issued discipline on
**20** was GCOR 5.3.7?
**21** MR. SULLIVAN:  I object to the
**22** form of the question, misstates the record.
**23 A** **I did not issue the discipline and that is**
**24** **GCOR 5.3.7.**
**25 Q** This is your signature on Exhibit 12?

76

**1 A** **That's a stamped signature that came from the**
**2** **administrative office.**
**3 Q** But that's your signature?
**4 A** **That is my signature but I did not sign that.**
**5 Q** Did you read it?
**6 A** **After it was issued.**
**7 Q** Not before?
**8 A** **No.**
**9 Q** Is that typical?  Is that your practice?
**10 A** **What do you mean?**
**11 Q** Do you read things before they go out under
**12** your signature typically?
**13 A** **No.**
**14 Q** Okay.  It seems to indicate that you -- well,
**15** you intended for this letter to go out I'm
**16** assuming?
**17 A** **I wasn't involved in putting this letter**
**18** **together or anything with this letter.**
**19 Q** Who did?
**20 A** **Someone in the administrative office.**
**21 Q** Do you know who that would have been in
**22** February of '23 (sic)?
**23 A** **I don't.**
**24 Q** Did you tell someone to issue this letter on
**25** your behalf?

77

1  A  I did not.
2  Q  Does this refresh your recollection at all
3     about the rule that Mr. Sexton was
4     disciplined for violating?
5  A  It does. It's 5.3.7.
6  Q  Do letters go out with your signature that
7     you don't read on a daily basis?
8  A  I do not review everything that gets put out.
9  Q  With your signature on it?
10 A  Correct.
11 Q  As you sit here today, do you disagree with
12    the contents of this letter?
13 A  I don't disagree with it, no.
14 Q  You don't think anything is incorrect?
15 A  Other than my signature.
16 Q  What do you mean by that?
17 A  I didn't sign it.
18 Q  Do you give people permission to sign certain
19    things on your behalf without reading them or --
20 A  The admin staff has my stamped signature.
21    When things need to go out under the general
22    manager, they do have permission to put that
23    stamp on it, yeah.
24 Q  But you must have told someone to issue this
25    letter?

78

1  A  No, I absolutely did not.
2  Q  Who did?
3  A  I don't know.
4  Q  Who made the decision to discipline Mr. Sexton?
5  A  That would have been my boss.
6  Q  Who is that?
7  A  Jason Ross.
8  Q  So if Mr. Ross is asked and he says 'I didn't
9     make that decision', is there anyone else
10    that would have made it?
11 A  I don't know what Mr. Ross is going to say.
12 Q  Did you recommend the 20 day suspension in
13    Mr. Sexton's case?
14 A  No.
15 Q  How do you know that?
16 A  Because I specifically told the admin staff
17    that I'm not to be involved in any way, shape
18    or form in the discipline or the letter to be
19    put out.
20 Q  Because you conducted the test?
21 A  And I was in the hearing.
22 Q  If we can go back to the E test manual to
23    page 103, do you see that?
24 A  Yes.
25 Q  It says Test GRF02 Shoving or Pushing

79

1     Movements. Right?
2  A  Yes.
3  Q  You're familiar with that guideline?
4  A  I am.
5  Q  It says Rules Tested: GCOR 2.13, GCOR 5.3.6,
6     GCOR 5.3.7, GCOR 6.1.1, and GCOR 6.5 are the
7     rules identified there. Right?
8  A  Correct.
9  Q  And that is the rule that Mr. Sexton
10    was disciplined for violating according to
11    Exhibit 12. Correct?
12 A  It says 5.3.7, correct.
13 Q  Under Test Conditions it says, "When
14    conducting this test, actual operating
15    conditions are to be observed." Correct?
16 A  Correct.
17 Q  And the words set up are not in that rule or
18    at least in that line after Test Conditions.
19    Right?
20 A  They're not in this guideline or this manual,
21    no.
22 Q  And under Procedure, there is no paragraph
23    identifying procedures for conducting a set
24    up test. Correct?
25 A  Correct.

80

1  Q  In fact, the words set up don't exist
2     anywhere in Test GRF02. Correct?
3  A  Correct.
4  Q  I'm going to show you what we have marked
5     Exhibit 35 previously. Take a minute to
6     review that. You may want to clip those back
7     together just so we don't have to shuffle
8     cards later.
9  A  (Witness examining document). Okay.
10 Q  So you've reviewed Exhibit 35 in its
11    entirety. Correct?
12 A  That is correct.
13 Q  And this is an e-mail string from February
14    15, '21 up to February 24, '21. Right?
15 A  That is correct.
16 Q  And if you see on the first page it's an
17    e-mail from Dylan Smith on Monday, February
18    15, 2021. Right?
19 A  Correct.
20 Q  And you're copied on that e-mail?
21 A  I am.
22 Q  It says, "I've reviewed the evidence and
23    given that this is Mr. Sextons first major I
24    recommend 10 served 10 deferred." Right?
25 A  Correct.

101

1  calls. There's calls set up periodically
2  throughout the month or the year for
3  different things we're focussed on. There's
4  safety calls.
5  Q There are also just the daily calls to
6  discuss what's going on in terms of traffic.
7  Right?
8  A Correct.
9  Q Do you know what any of the different numbers
10  are to call in for the various different
11  types of calls you just referenced, or is
12  there one number and these calls are set up
13  at that one number for different purposes?
14  A I don't know.
15  Q The daily calls that occur, just to monitor
16  what's going on with traffic on the system,
17  how many people tend to participate in those
18  calls?
19  A Which call are you talking about?
20  Q The daily calls to discuss just generally
21  what's going on with traffic on your
22  territory and the system.
23  A The operations call?
24  Q Yes.
25  A The one that's at 7:00 in the morning?

102

1  Q Yes.
2  A I wouldn't know.
3  Q A lot of people on the call typically. Right?
4  A Correct.
5  Q Do you know if those calls are recorded?
6  A No.
7  Q If there are over-standard events taking
8  place or occurring or there are significant
9  delays, are those ever discussed on those
10  operations calls?
11  A At times.
12  Q Do you remember on February 1st if any over-
13  standard event or delay was discussed while
14  you were on that call?
15  A I don't.
16  Q Do you remember if Jason Ross was on that
17  call?
18  A I don't.
19  Q Is it possible that an over-standard event
20  was discussed on that call?
21  A It's possible.
22  Q If it was the biggest over-standard event on
23  the system at that time, is it more or less
24  likely that that was discussed on that call?
25           MR. SULLIVAN: Objection, calls

103

1  for speculation.
2  A I don't know.
3  Q (By Mr. Magnuson, continuing) Are those calls
4  recorded?
5  A Not that I'm aware of.
6  Q They could be. You just don't know one way
7  or the other?
8  A No.
9  Q Drill downs can occur on those calls?
10  A No.
11  Q What happens -- people have to answer probably
12  to higher-ups if there's an over-standard
13  event that's having to be answered to? You
14  have to explain to your supervisor why an
15  over-standard event or delay is occurring?
16           MR. SULLIVAN: Objection, form.
17  A Not every delay is talked about.
18  Q (By Mr. Magnuson, continuing) If it's a 3-1/2
19  hour delay, is that something that you would
20  think would be talked about?
21  A Not necessarily.
22  Q 3-1/2 hour over-standard events are unusual.
23  Right?
24  A Not in winter operations, no.
25  Q McKelvey says that a 3-1/2 hour over-

104

1  standard event, 3-1/2 to 4 hour over-standard
2  event, is the longest he's ever seen in his
3  career. Do you have any reason to disagree
4  with that?
5           MR. SULLIVAN: Objection to the
6  extent it misstates Mr. McKelvey's testimony.
7  You can answer.
8  A Mr. McKelvey had limited time on the railroad
9  and he had a small terminal. So that might
10  be true for the territory he was on. But
11  overall we have delays that are especially in
12  winter operations much more extensive than
13  that.
14  Q So you got off that conference call. And at
15  7:36 a.m. and 9:40 a.m. -- do you see the
16  7:36 and then on the next page the 9:40?
17  A I see 7:36 a.m. and you said 9:40?
18  Q Correct.
19  A Yes.
20  Q I can tell you that that number is Jason
21  Ross'. So you had two incoming calls after
22  the conference call with Jason Ross?
23  A Okay.
24  Q Do you have any recollection of those phone
25  calls?

CP Resp. App. - 230

105

1  A  I don't.
2  Q  How many times a day do you typically talk to
3     Jason Ross?
4  A  I have no idea.
5  Q  Multiple times a day?
6  A  Yes.
7  Q  On a regular basis?
8  A  Yes.
9  Q  And that was the case back in February of '21?
10 A  Yes.
11 Q  Under the 9:40 call there's a 10:32 call. Do
12    you see that?
13 A  Okay.
14 Q  That was Tracy Miller calling you. Do you
15    have any recollection of that phone call?
16 A  I do not.
17 Q  What is Tracy Miller's position at the time?
18 A  Senior vice president.
19 Q  He was above you?
20 A  Yes.
21 Q  And Ross obviously was above you?
22 A  That is correct.
23 Q  And both of those guys I believe at the time
24    were stationed in Calgary. Is that correct?
25 A  No.

106

1  Q  Where was Miller at the time?
2  A  St. Paul.
3  Q  But Ross was in Calgary?
4  A  No.
5  Q  He wasn't at the time. He is now?
6  A  No.
7  Q  Where is Jason Ross now?
8  A  Kansas City.
9  Q  Oh, right. Is that because of the merger?
10 A  Yes.
11 Q  And before the merger he was in Calgary.
12    Right?
13 A  No.
14 Q  Has he ever been stationed in Calgary?
15 A  Yes.
16 Q  When?
17 A  I don't know the times.
18 Q  In February, early February of '21, where was
19    Ross stationed?
20 A  St. Paul.
21 Q  What was his title at the time?
22 A  VP.
23 Q  So he was above you?
24 A  Yep.
25 Q  If you go down at 10:39 you take another --

107

1     there's another incoming call from Jason
2     Ross. Okay?
3  A  Okay.
4  Q  And a minute later at 10:40 a.m. there's an
5     outgoing call to Dylan Smith. Do you recall
6     what that conversation entailed?
7  A  No.
8  Q  At 10:55 a.m. just below that, you placed a
9     call to Kurtis McKelvey. What was his
10    position on February 1st, '21?
11 A  I don't know. He was either trainmaster or
12    ATM.
13 Q  That was an incoming call. Cyle just
14    corrected me. That doesn't refresh your
15    recollection?
16 A  No.
17 Q  And at 11:14 a.m. you call in to another
18    conference. That obviously is different than
19    the 7:00 call. Right?
20 A  Yes.
21 Q  Do you know whether that was an operations
22    conference call or something else?
23 A  Operations call.
24 Q  How do you know that?
25 A  Because we had 0700 and 1100 operations calls.

108

1  Q  Do you recall if Mr. Ross was on that call?
2  A  No.
3  Q  You don't recall talking to him?
4  A  When?
5  Q  On that 11:14 conference call, did you talk
6     to Jason Ross?
7  A  Not that I'm aware of.
8  Q  Do you recall an over-standard event being
9     discussed at that call?
10 A  No.
11 Q  If you go down just a little bit beginning at
12    11:59 a.m. to 1:02 p.m., there are five
13    outgoing calls to Dylan Smith and one
14    incoming call. Do you see that?
15 A  Yes.
16 Q  Does that refresh your recollection as to
17    what you and Dylan Smith may have been
18    talking about?
19 A  No.
20 Q  Who is McGinnis?
21 A  Manager of Operating Practice.
22 Q  What is McGinnis' first name?
23 A  Jeff.
24 Q  Do you have any idea why you talked to him at
25    1:03?

CP Resp. App. - 231

125

1 and Mr. Johnson about Mr. Cruciani being a
2 witness at this investigation?
3 A No, I don't.
4 Q Do you know who Mr. Cruciani is?
5 A Yes.
6 Q He no longer works for the railroad?
7 A Cruciani?
8 Q Correct.
9 A Yes, he does.
10 Q It's Mr. Cox. Do you know who Mr. Cox was?
11 A Yes.
12 Q Does he still work for the railroad?
13 A I don't know.
14 Q Along those same lines, was it requested that
15 Mr. Cox by Mr. Rainwater be a witness at this
16 investigation?
17 A I'm not aware of who was requested to be
18 there or not.
19 Q CP desires for their company-held formal
20 investigations to be fair and impartial.
21 Right?
22 A Yes.
23 Q Unbiased towards the company versus the
24 employee. Right?
25 A Correct.

126

1 Q Clean slate. You want it to be fair for both
2 sides?
3 A That's correct.
4 Q Would you agree with me that when conducting
5 an investigation, people with personal
6 knowledge of the events leading to an
7 investigation should be witnesses?
8 MR. SULLIVAN: Objection, lack of
9 personal knowledge, calls for speculation.
10 A In hearings, you'd like all the pertinent
11 parties to show up.
12 Q (By Mr. Magnuson, continuing) Pertinent
13 parties. Excellent. Would you call a
14 pertinent party someone who is a witness to
15 the event?
16 A Yes.
17 Q You've conducted these investigations yourself?
18 A I have.
19 Q You've reviewed transcripts and made
20 discipline recommendations over the years?
21 A I have.
22 Q You know how to see a fair hearing when you
23 see one. Right?
24 A I think so.
25 Q And you just said you want all people who are

127

1 witnesses to be able to testify?
2 MR. SULLIVAN: Objection,
3 misstates the witness' testimony.
4 THE WITNESS: One more time.
5 Q (By Mr. Magnuson, continuing) You said
6 pertinent witnesses should be included?
7 A Yes.
8 Q And you said eye witnesses to events could be
9 considered pertinent. Right?
10 A Yes.
11 Q And credibility assessments are made at these
12 which is why people prefer live testimony.
13 Right?
14 A Not necessarily.
15 Q You don't tend to rely on handwritten
16 statements as much as you tend to rely on eye
17 witnesses. Right? You want witnesses to be
18 able to testify live?
19 MR. SULLIVAN: Objection, form.
20 A I want witnesses to be available for the
21 hearing.
22 Q (By Mr. Magnuson, continuing) And to conduct
23 a fair and impartial hearing, you want
24 pertinent witnesses to testify?
25 A I'm sorry?

128

1 Q In order for a hearing to be fair and
2 impartial, you want pertinent witnesses to
3 testify?
4 A Yes.
5 Q Let's go to page 18. Let me ask you this
6 before we start. Before you read anything,
7 what do you remember about the E test you
8 conducted on Mr. Sexton?
9 A Where do you want me to start?
10 Q What do you remember about it?
11 A I remember going through the process of
12 setting up a test. I remember the test. I
13 remember it concluding.
14 Q You've testified a whole bunch of times so
15 far that you don't even know why you were in
16 the Davenport, Marquette area at the time.
17 Right?
18 A Yes.
19 Q How is it that you ended up on the south end
20 of the Marquette yard, Nahant?
21 A South of the Nahant yard?
22 Q Yes.
23 A I was performing an E test.
24 Q Who told you to do that?
25 A Nobody.

129

1  Q  Why did you decide to do that?
2  A  **The situation presented itself to be able to**
3     **perform that type of test.**
4  Q  What was the situation?
5  A  **4 track was a clear track.  I knew there was**
6     **nobody else going to be around that was going**
7     **to affect the movement.  I thought it was**
8     **safe to do so, so I performed the test.**
9  Q  Would you agree with me that you were three
10    levels above the most frequently visible
11    manager in the Nahant yard at that time?
12              MR. SULLIVAN:  Objection, form,
13    calls for speculation.
14              MR. MAGNUSON:  What's wrong with
15    the form?
16              MR. SULLIVAN:  Who is the most
17    visible.  How is he supposed to know who is
18    the most visible?
19              MR. MAGNUSON:  In terms of
20    hierarchy and who physically works at the
21    yard.
22              MR. SULLIVAN:  Who is the most
23    visible, what does that mean?  To who?
24              MR. MAGNUSON:  He can answer.
25  A  **I don't know that.**

130

1  Q  (By Mr. Magnuson, continuing) At Nahant yard
2     that day, who all -- not exactly that day but
3     in terms of hierarchy, who all was responsible
4     below you down to the trainmaster level for
5     that yard?
6  A  **Dylan Smith.  I don't know who the assistant**
7     **superintendent was.  Trainmasters -- I don't**
8     **know which trainmasters were there at the**
9     **time.**
10  Q  What was Dylan's title again?
11  A  **Superintendent I think.**
12  Q  So you have the trainmaster level.  Did road
13    foreman of engines conduct E tests?
14  A  **Yes.**
15  Q  So road foreman of engines would have been at
16    Nahant as well?
17  A  **I'm not sure if we had one there at that time**
18    **or not.**
19  Q  But then superintendents would have been
20    there?
21  A  **Stationed.**
22  Q  Or responsible for it?
23  A  **That is correct.**
24  Q  Stationed there?
25  A  **Thank you.**

131

1  Q  How many trainmasters were there?
2  A  **I don't know.**
3  Q  Over ten?
4  A  **No.**
5  Q  More than four?
6  A  **No.**
7  Q  Approximately within one to four, one to
8     three?
9  A  **One to none.**
10  Q  How many superintendents were there?
11  A  **One.**
12  Q  And that would have been Dylan Smith?
13  A  **Correct.**
14  Q  So you think there was only one trainmaster
15    working at Nahant at that time?
16  A  **Stationed at Nahant at that time.**
17  Q  Stationed at Nahant.  If you're stationed
18    somewhere else, would someone else come in
19    and cover Nahant?
20  A  **No.**
21  Q  So it just would have no trainmaster on duty?
22  A  **Yep.**
23  Q  And you said the situation presented itself.
24    Why were you at Nahant that day at all?
25  A  **I don't recall.**

132

1  Q  You knew that the 474 was coming in to Nahant
2     that day.  Right?
3  A  **Yes.**
4  Q  And you were made aware pursuant to that
5     e-mail that there was a delay with the 474.
6     Right?
7  A  **I can't tell you if I knew about that prior**
8     **to or not.**
9  Q  You monitor your e-mails.  You read them.
10    Right?
11  A  **Not all the time.**
12  Q  It kind of looks like you read the e-mail
13    that you sent to Mr. McKelvey though, doesn't
14    it?
15  A  **It looks like I asked McKelvey to respond to**
16    **me, to call me when he had a minute.**
17  Q  Right in the subject line the 474 is
18    referenced.  Right?
19  A  **That is correct.**
20  Q  You don't know why you were at Nahant that
21    day?
22  A  **No.**
23  Q  How much prior to around noon were you at
24    Nahant?
25  A  **I don't know.**

137

1  A  Yes.
2  Q  And DePover lined his switches?
3  A  Correct.
4  Q  Conductor DePover and Sexton the engineer
5     briefed with the remote control assignment.
6     Right?
7  A  Correct.
8  Q  That was taking place on the north end of the
9     yard?
10 A  That's correct.
11 Q  Did they brief in person or over the radio?
12 A  The radio.
13 Q  So we know the crew at the north end of the
14    yard, the remote control crew, could
15    communicate with Sexton and DePover over the
16    radios.  Right?
17 A  Correct.
18 Q  You heard this on your truck radio because
19    you were still in your truck at that point?
20 A  That's correct.
21 Q  You didn't have a portable radio with you,
22    did you?
23 A  No.
24 Q  And the remote control crew says that they're
25    in 16 track and they would not be in 4.  Right?

138

1  A  I don't remember the exact conversation about
2     that.
3  Q  At some point though you remember that they
4     determined that 4 track was clear?
5  A  I remember that they had a job briefing by
6     the rule and the conductor on the north end
7     of the yard told them that the track was
8     clear and good for 40.
9  Q  And that's what you observed, that 4 track
10    was clear?
11 A  It was.
12 Q  Was it clear for even more than 40?
13 A  Yes.
14 Q  50?
15 A  I believe so.
16 Q  60?
17 A  I think it holds 74 cars.
18 Q  So the whole track 74 cars was clear?
19 A  Yes.
20 Q  At the investigation you testified that
21    DePover actually gave an initial car count of
22    50.  Does that fit with your recollection?
23 A  I don't remember the exact number he gave
24    initially.
25 Q  So we'll go to page 19.

139

1  A  Okay.
2  Q  Towards the bottom there you said, "He gave
3     an initial car count of 50."  Do you see
4     that?
5        MR. SULLIVAN:  You're on the
6  wrong page.
7        THE WITNESS:  Sorry.  19?
8        MR. MAGNUSON:  Yes.
9        THE WITNESS:  What's the question
10    again?
11 Q  (By Mr. Magnuson, continuing)  Do you see
12    where you testified that he gave an initial
13    car count of 50?
14 A  Yes.
15 Q  Do you have any reason to disagree with that
16    as you sit here today?
17 A  No.
18 Q  And at that point is when you dismounted your
19    vehicle.  Right?
20 A  That's correct.
21 Q  And this was a CP Rail truck?
22 A  Yes.
23 Q  Was it equipped with GPS?
24 A  Yes.
25 Q  Why didn't you have a portable radio with

140

1     you?
2  A  I don't know.
3  Q  Do you typically carry one?
4  A  At times I do, yes.
5  Q  Why would you carry one versus not carry one?
6  A  I usually use them for derailments.  So if I
7     had it, it would have been in my derailment
8     kit.
9  Q  If you're conducting E tests and you're
10    attempting to monitor employees' radio
11    communications, in those situations do you
12    carry a portable radio, a handheld?
13 A  Not necessarily, no.
14 Q  If you don't carry a portable and you're not
15    near your truck, how do you know what the
16    radio communications are?
17 A  I can't hear it if I'm not in -- if I don't
18    have a portable or some means of listening.
19 Q  So you remember seeing some video at this
20    investigation.  Right?
21 A  Yes, sir.
22 Q  And your truck wasn't visible in the video,
23    was it?
24 A  I thought it was.
25 Q  Well, we'll get to it.  There's a bunch of

CP Resp. App. - 234

141

1  testimony that your truck was not in the
2  field of the video. Okay?
3  A  **All right.**
4  Q  Do you know where that video went by the way?
5  A  **No.**
6  Q  Who is in control of the exhibits after an
7  investigation takes place?
8  A  **The conducting officer I suppose.**
9  Q  So Mr. Johnson would have been in control of
10  making sure that video got saved. Right?
11  A  **Yes.**
12  Q  Do you know why it was lost, deleted, whatever?
13  A  **No.**
14  Q  Have you seen e-mails from people wondering
15  what happened to that video?
16  A  **I don't recall.**
17  Q  So when you get out of your truck, you don't
18  have a portable radio. Do you know from your
19  recollection of the video how much distance
20  the field of the video showed approximately?
21  A  **What do you mean by field? Like entire --**
22  Q  40 yards, 50 yards, 100 yards?
23  A  **I'd be speculating at this point, but it was**
24  **a fairly large area.**
25  Q  There was some testimony that your truck was

142

1  parked somewhere estimates-wise between 35
2  and 50 yards from where Mr. DePover was
3  stationed. Do you disagree with that? Is
4  that approximate?
5  A  **I would disagree with that. I thought -- I**
6  **remember I was closer than that.**
7  Q  Why wasn't your truck in the video?
8  A  **I don't know. Well, I don't know where**
9  **you're getting that from.**
10  Q  Well, you just told us your truck wasn't in
11  the field of the video?
12  A  **You said that.**
13  Q  I asked you if that's what you recalled, and
14  you said yes. You don't recall seeing the
15  truck in the video. Correct?
16      MR. SULLIVAN: Objection.
17  A  **I don't remember saying that.**
18      MR. MAGNUSON: Well, we'll go
19  through it again then.
20      MR. SULLIVAN: Objection.
21  Q  (By Mr. Magnuson, continuing) Do you remember
22  seeing your truck in the field of the video?
23  A  **And I think I remember seeing it in the field**
24  **of video when I -- when it was being recorded.**
25  I actually was not right next to the train

143

1  movement when the test started. I pulled up
2  at some point.
3  Q  But that would have been on the video. Right?
4  A  **Should have been, yes.**
5  Q  And we can't look at the video anymore, can we?
6  A  **I don't have it.**
7  Q  How long does it take you to walk 50 yards?
8  A  **I don't know.**
9  Q  What were the footing conditions like that
10  day?
11  A  **Good.**
12  Q  What was the weather like?
13  A  **Good.**
14  Q  Snowy?
15  A  **No.**
16  Q  Snow on the ground?
17  A  **Possibly.**
18  Q  So you depart your truck and you walk up to
19  DePover. Right?
20  A  **Correct.**
21  Q  And you didn't announce yourself before you
22  walked up to him. Right?
23  A  **I announced myself when I got up and I was**
24  **able to talk to him.**
25  Q  Did you tell him to stop talking to the

144

1  engineer, Sexton, before -- did you introduce
2  yourself before or after you told him to stop
3  talking to Sexton?
4  A  **I don't recall.**
5  Q  DePover says you introduced yourself after
6  you told him to stop talking to Sexton. Do
7  you have any reason to disagree with that?
8  A  **No.**
9  Q  So you told, while Sexton is shoving --
10  A  **Correct.**
11  Q  -- to stop talking to his engineer?
12  A  **I told DePover to stop giving car counts**
13  **while 474 was shoving back.**
14  Q  And that's the same thing as stop communicating.
15  Right? Stop communicating with the engineer
16  is the same as stop communicating. Right?
17  A  **Yeah, I would have told him to stop giving**
18  **car counts to the engineer.**
19  Q  If you were E testing a conductor and you
20  observed a conductor in the middle of a shove
21  stop giving car counts or stop communicating,
22  would you find that conductor in violation of
23  the rules?
24  A  **No.**
25  Q  Yeah?

1  A  I said no.
2  Q  If they just stopped communicating?
3  A  After I told them?
4  Q  No, no.  If you are E testing a conductor
5     sitting in your truck for instance -- you're
6     watching the conductor to see what he's doing
7     and see how good he's performing.
8  A  Correct.
9  Q  That's something you do?
10 A  Yes.
11 Q  And you observed that conductor just stare
12    off into space and stop communicating with an
13    engineer, that would be in violation of the
14    rules, wouldn't it?
15 A  That would be, yes.
16 Q  Why?
17 A  Because the rules say he's supposed to
18    provide direction and distance during shoving
19    movements.
20 Q  And you told him not to do that anymore.
21    Correct?
22 A  That's correct.  I was in the process of
23    validating whether or not the engineer was
24    going to comply with half the range of
25    vision.

1  Q  And at that point you were operating with the
2     assumption that the last car count was 50?
3  A  No.
4  Q  At that point?
5  A  No.
6  Q  Let's go through your testimony.  Let's go to
7     page 19 through to 20.  Up to that point, you
8     walked up to him.  Right?
9  A  Okay.
10           MR. SULLIVAN:  So it's this
11    section of page 19 and page 20 is on the next
12    page?
13           MR. MAGNUSON:  Yep.
14           THE WITNESS:  So the last
15    paragraph you want me to read?
16 Q  (By Mr. Magnuson) Top of 20.
17 A  Do you want me to review 20 or 19?
18 Q  Bottom of 19 and the top of 20.  We're going
19    to go through it step by step.
20 A  (Witness examining document).  Do you have a
21    question?
22 Q  As you walked up to him -- well, right before
23    you walked up to him, you were under the
24    assumption that he had given him a 50 car
25    count?

1  A  It might be semantics, but are you asking
2     like when I decided to walk up to him?
3  Q  You walked up to him and as you walked up to
4     him, you say he gave a 15 car count to Sexton?
5  A  The testimony says Mr. DePover actually
6     started a shoving movement into 4 track.  He
7     gave initial car count of 50.  I was actually
8     on the south end of the yard at the time in
9     my vehicle.  So I was in my vehicle when he
10    gave the 50 car count, which I actually
11    dismounted at that time and I was -- I walked
12    over to Mr. DePover.  He was in between on
13    the south side of 4 track.  I walked up to
14    him.  As I walked up to him, he gave a 15 car
15    count.
16 Q  So before you got to him, right before you
17    got to him, you were still under the
18    impression that he had a 50 car track?  He
19    had a clear alley for 50 cars?
20 A  I heard him give a 50 car count prior to me
21    dismounting my vehicle.
22 Q  Okay.  That was what I was asking.  So as you
23    got to him, you heard him give a 15 car count
24    to the engineer?
25 A  That's correct.

1  Q  What did he say specifically?  What were his
2     exact words?
3  A  I don't remember the exact words, but he gave
4     a 15 car count.  How he says it -- everybody
5     says it a little bit different.
6  Q  As we will find out here shortly, Sexton and
7     DePover testify that he said 15 to a stop,
8     you're good for 40?
9            MR. SULLIVAN:  Objection,
10    misstates the document.
11 Q  (By Mr. Magnuson, continuing) Did you hear
12    him say that?
13 A  No.
14 Q  Did you hear him reference 40 cars at all?
15 A  I don't recall.
16 Q  Did you hear him say 15 cars to a stop at
17    all?
18 A  I heard him say 15 car count.
19 Q  You didn't hear him say 15 to a stop?
20 A  I don't remember him saying that.
21 Q  You didn't hear him reference 40 cars?
22 A  I don't recall him saying that.
23 Q  What would half the distance of 40 cars be?
24 A  20, but he gave a 15 car count.  So it was --
25 Q  If he says 15 to a stop, that's not a 15 car

149

**1** count. Right?
**2 A No. The rule is that you go half the range**
**3 provided. He provided a 15 car count.**
**4 Q** And if he had said you are clear for 40, that
**5** range would have been 40 cars. Right?
**6 A That's incorrect.**
**7 Q** If he had said that. I understand you don't
**8** remember him saying that, but what if he had?
**9 A He would have had to say that you're good for**
**10 40.**
**11 Q** And he testified that that's what he said?
**12**       MR. SULLIVAN: Objection,
**13** misstates the document.
**14**       MR. MAGNUSON: We'll get to it.
**15**       MR. SULLIVAN: Don't misstate it.
**16 Q** (By Mr. Magnuson, continuing) If he said
**17** you're clear for 40 or you're good for 40,
**18** that means the same thing. Right?
**19 A He still has to count him down.**
**20 Q** But if he says you're good for 40 or you're
**21** clear for 40, that's a 40 car count. Right?
**22 A If that's all he said.**
**23 Q** How does the 15 to a stop, if he said it,
**24** play into that?
**25 A He did say it. And since he gave the 15, he**

150

**1 would have had to stop in 7-1/2, 8 car**
**2 lengths.**
**3 Q** Both Sexton and DePover say that he says 15
**4** to a stop, to a stop. That's less than a 15
**5** car count. That's different than a 15 car
**6** count. Right?
**7 A If he would have said 15 to a stop?**
**8 Q** And you're clear for 40.
**9 A Then no. Then he has to go off the most**
**10 restrictive which is the 15.**
**11 Q** Clear for 40 means clear for 40. Right?
**12 A No. Once he gave -- if that would have been**
**13 the car count he gave and stuck with that car**
**14 count, then you're accurate in what you're**
**15 saying. But that's not what happened. He**
**16 gave a 15 car count.**
**17 Q** Well, you understand that your recollection
**18** is that you heard a 15 car count but Sexton
**19** and DePover disagree. Right?
**20 A I don't know. I didn't read the testimony.**
**21 Q** We'll get to it. Did you talk to Cruciani
**22** after this incident about what he heard?
**23 A No.**
**24 Q** But you knew that he could communicate with
**25** Sexton and DePover over the radio, right,

151

**1** because they job briefed?
**2 A Correct.**
**3 Q** Did you know that Cruciani was protecting the
**4** shove on the north end?
**5 A He was not protecting the shove.**
**6 Q** Do you know that Sexton and DePover both
**7** claimed he was?
**8 A That's false testimony then.**
**9 Q** You disagree with them?
**10 A Wholeheartedly, yes.**
**11 Q** Well, communication could have occurred
**12** between your truck and DePover. Right?
**13**       MR. SULLIVAN: Objection, form,
**14** calls for speculation.
**15 A Can you repeat it?**
**16 Q** (By Mr. Magnuson, continuing) I'm assuming
**17** because your recollection of these events is
**18** so good you're going to tell us that your
**19** truck window was down and that your radio was
**20** really loud. Right?
**21**       MR. SULLIVAN: Objection,
**22** argumentative.
**23 A I'm not saying that.**
**24 Q** (By Mr. Magnuson, continuing) Do you recall
**25** testifying to that?

152

**1 A I don't recall saying that.**
**2 Q** Could communications between Sexton and
**3** DePover have occurred between the time you
**4** left your truck and the time you got to
**5** DePover?
**6 A It could have, yep.**
**7 Q** It could have happened and you didn't hear
**8** it. Right?
**9 A It could have.**
**10 Q** But you knew that Cox and Cruciani were on
**11** the north end?
**12**       MR. SULLIVAN: Objection,
**13** misstates the witness' testimony.
**14 A I don't know where Cox was.**
**15 Q** (By Mr. Magnuson, continuing) You knew that
**16** Cox and Cruciani could communicate by radio
**17** with Sexton and DePover. Right?
**18 A I don't know where Cox was.**
**19 Q** You heard the north end communicate and
**20** conduct a job briefing with the south end.
**21** Right?
**22 A I heard Cruciani talking and giving a**
**23 briefing with the 474 crew.**
**24 Q** But you didn't talk to Cruciani?
**25 A No.**

157

1  Q  Do you just show up in yards randomly and
2     conduct E tests?
3  A  Yes.
4  Q  Why were you in the south part of the yard?
5  A  **I was at the south end of the yard because I**
6     **knew the 474 was coming inbound and I saw the**
7     **opportunity to perform an E test.**
8  Q  So your intent was to E test the 474?
9  A  **Correct.**
10 Q  So if we can look at pages 19 and 20, this is
11    your testimony.  Initially I thought maybe we
12    were dealing with a typo.  But if you look at
13    19, line 11, it says, "That setout consisted
14    of 76 cars."  On page 20, line 15, it says,
15    "again, he had 76 cars."
16 A  **Okay.**
17 Q  I think you might have looked at a tonnage
18    profile prior to the investigation.  Does
19    that refresh your recollection that they had
20    ahold of 76 cars?
21 A  **No, unless it was on the inbound train.**
22 Q  Why does it say 76 cars here on pages 19 and
23    20 with your testimony?
24 A  **I don't recall.**
25 Q  But you're going to maintain that you were

158

1     mistaken in the investigation, that they had
2     ahold of less?
3  A  **Can I read this?  Do you mind?**
4  Q  No.
5  A  **(Witness examining document).**
6  Q  It appears that you testified that they had
7     ahold of 76 cars.  Right?
8  A  **Can you let me read my testimony?**
9  Q  I have directed you right to the line of page
10    20, line 15.
11 A  **I'm aware of that, but I don't know what the**
12    **rest of my testimony is.  If I cleared that**
13    **up -- they might have had 76 cars to set out**
14    **but --**
15 Q  You know what --
16 A  **That 76 cars didn't have to go on the one**
17    **track, but I don't know that until I read the**
18    **transcript.**
19 Q  We're not going to use our time here letting
20    him read.  So let's go off the record.  Any
21    time he wants to extend his prep time, we'll
22    go off the record.
23       MR. SULLIVAN:  Do you want to ask
24    him about any other -- like the tonnage
25    profile?  It can help him clarify.

159

1        MR. MAGNUSON:  I was going to get
2     there.  That's already peoples' testimony.
3        MR. SULLIVAN:  His testimony is
4     referring to the tonnage profile on page 23.
5        MR. MAGNUSON:  I see other people
6     on the tonnage profile.
7  Q  (By Mr. Magnuson, continuing) Are you still
8     reading?
9  A  **I didn't know you wanted me to keep reading.**
10    **Sorry.**
11 Q  Well, I'm trying to determine whether or not
12    this train had ahold of 76 cars.  At least in
13    the two lines we just referenced of your
14    testimony, you testify that it was 76 cars.
15    Right?
16 A  **I did testify twice that said 76 cars.**
17 Q  Yes.  That's all I wanted to know.  Did you
18    testify to that?
19 A  **Okay.  Yes.**
20 Q  Let's go to page 24 -- actually 23, the
21    bottom sentence, line 23, to page 24, line
22    13.  Can you read that?
23 A  **(Witness examining document).  To page what,**
24    **13?**
25 Q  24, line 13.

160

1  A  **(Witness examining document).  Okay.**
2  Q  That discussion about the tonnage profile
3     that Mr. DePover provided in terms of the
4     markings, where he made the mark, would seem
5     to indicate that there were 76 cars as well.
6     Right?
7  A  **Right.**
8  Q  Page 27, line 12, let me know when you're
9     done with that answer, lines 12 through 20.
10 A  **(Witness examining document).**
11 Q  After they de-trained, de-boarded, tied up,
12    what have you, you brought them -- them
13    meaning DePover and Sexton -- up to the depot
14    at the north end.  Right?
15 A  **Yes, they were brought up to the north end.**
16 Q  And you interviewed them.  Right?
17 A  **It looks like -- on this part the testimony**
18    **looks like Mr. DePover was interviewed.**
19 Q  It says, "They were relieved on the south
20    end.  And because of their hours, they were
21    brought to the north end".  That would
22    suggest that Sexton was brought to the north
23    end as well or not?
24 A  **Correct.**
25 Q  So both DePover and Sexton came to the north

161

1  end, and I believe Dylan Smith joined you at
2  that point?
3  **A  I believe so.**
4  **Q**  And they were interviewed and you got a
5  written statement from Mr. DePover.  Right?
6  **A  Yes.**
7  **Q**  And that was after their hours of service had
8  expired.  Right?
9  **A  I believe so.**
10 **Q**  We don't need to harp on this.  Were you able
11 to watch video at the investigation?
12 **A  Yes.**
13 **Q**  There's no question that video existed at
14 least the day of this investigation.  Right?
15 **A  That's correct.**
16 **Q**  Did anyone ever ask you to attempt to find
17 the video or locate it?
18 **A  I think at some point somebody did.**
19 **Q**  How is that video, that surveillance video,
20 how is it stored?  Who houses it, if you know?
21 **A  I don't know how it's stored or who houses it.**
22 **Q**  When it's used in an investigation like this,
23 does someone pull the pertinent part, put it
24 on a thumb drive and hand it to someone, or
25 is it accessed through CP Systems or how does

162

1  that work?
2  **A  I don't recall how that was done in this**
3  **particular case.**
4  **Q**  Do you know how it was played?  Was it played
5  on a laptop and some projector on a wall?
6  **A  I don't.**
7  **Q**  Let's go to page 33.
8  **A  Okay.**
9  **Q**  This is your testimony starting at line 2.
10 Do you see on line 6 you state, "They do have
11 76 cars ahold of at this time"?
12 **A  Correct.**
13 **Q**  And after that you testified, "You're gonna
14 see myself, I'm entering the frame at the
15 bottom of the screen."
16 **A  Okay.**
17 **Q**  That would indicate we couldn't -- the video
18 didn't depict your truck.  Right?
19 **A  I would assume that's correct.**
20 **Q**  If we go to page 34, line 9, you state, "It's
21 a clear violation of GCOR 5.3.7."  Right?
22 **A  Do you mind if I read the rest of my transcript**
23 to see why I said that? (Witness examining
24 document).  Line 9, that's correct.  He
25 violated 5.3.7.

163

1  **Q**  Page 45, line 12, do you recall Mr. Rainwater
2  saying for the record "your vehicle is not in
3  view and you didn't have a radio on your
4  person"?
5  **A  I don't recall that.**
6  **Q**  Any reason to dispute that?
7  **A  No.**
8  **Q**  We're going to go to page 50.
9  **A  Okay.**
10 **Q**  Start at -- I guess they're talking at the
11 top about the tonnage profile.  And DePover
12 starts testifying about the move and the
13 tonnage profile.  So read from line 6 down to
14 24.
15       MR. SULLIVAN:  Just for clarity
16 this it is Justin DePover's examination.
17 Correct?
18       MR. MAGNUSON:  His statement,
19 testimony.  I don't know what you want to
20 call it.
21       MR. SULLIVAN:  He's the person
22 giving the answers.
23       MR. MAGNUSON:  Correct.
24 **A  (Witness examining document).  What line to --**
25 **Q**  (By Mr. Magnuson, continuing) Just 24.

164

1  **A  (Witness examining document).  Okay.**
2  **Q**  Does that testimony suggest to you that they
3  were going to spot 25 cars in that track,
4  thus the 15 to a stop?
5  **A  He's telling him at this point that he had 15**
6  **cars to stop.**
7  **Q**  When he gave the initial -- did you ever hear
8  DePover ask Sexton for 25 at the beginning
9  when the initial count was 50?
10 **A  I don't recall that.**
11 **Q**  But then after he moves 10 cars and he says
12 40, 15 until the stop, that would suggest
13 that they were going to spot 25 cars.  Right?
14 **A  I don't recall the number.**
15 **Q**  But that would make sense from a math
16 perspective, right, if he says, I want 25,
17 you're clear for 50, they move 10, then he
18 says you're clear for 40, 15 to a stop?
19 **A  So that -- it's really not that simple.  If**
20 **you're shoving into a track, you still have**
21 **to worry about where the clearances are.**
22 **Q**  Oh, of course.  I'm talking about what their
23 intent was.  This would suggest the intent
24 was to spot 25 cars.  Right?
25       MR. SULLIVAN:  Objection, lack of

165

1  personal knowledge, calls for speculation.
2  　　　　MR. MAGNUSON:  He's got
3  foundation to know this stuff.
4  　　　　MR. SULLIVAN:  He doesn't have
5  foundation to know what these peoples' intent
6  was.
7  Q  (By Mr. Magnuson, continuing) We can draw
8  conclusions that this testimony suggests
9  that.  You may not have personal knowledge
10  because I know you say you didn't hear it;
11  but this would suggest to you that was the
12  intent.  Right?
13  A  **No.  That suggests to me that he had to shove**
14  **in 15 car lengths, that he should have**
15  **stopped within 7.**
16  Q  So you're not considering the initial 50?
17  You're not considering clear for a 40?
18  A  **Has no bearing on what was going on at the**
19  **time.**
20  Q  Do you think DePover -- you understand he was
21  on a furlough prior to this shift for quite
22  awhile.  I think it was his second shift back
23  or something like that.  Do you recall any of
24  that?
25  A  **I thought it was his first shift back.  Maybe**

166

1  **it was the second.**
2  Q  First or second.  I understand your testimony
3  is that you got to go with the more conservative
4  15.  Would you agree that clear for 40, 15 to
5  a stop is an unclear radio communication?
6  A  **No.**
7  Q  So these are terms that are within the rules,
8  the radio rules?
9  A  **Correct.**
10  Q  Clear for 40, 15 to a stop?
11  A  **Correct.**
12  Q  Not clear for 15.  Right?  Clear for 40?
13  A  **Correct.  When shoving on other than main**
14  **track and/or a main track in a shoving**
15  **movement, you have to still be prepared to**
16  **stop for equipment, broken rails, other types**
17  **of situations.  So when you're shoving that**
18  **15 car lengths, you're still watching the**
19  **shove.  Otherwise he would have just kept**
20  **shoving and DePover wouldn't have not -- have**
21  **had to say anything.**
22  Q  He stopped after 11.  Right?
23  A  **He stopped 11 cars passed where he should**
24  **have.**
25  Q  Well within 20 though.  Right?

167

1  A  **That has no bearing on the situation.  He**
2  **should have stopped within 7.  6.28 would**
3  **have applied if he would have hit something.**
4  Q  So you're saying he went 11 cars passed where
5  he should have stopped?
6  A  **Isn't that what the testimony says?**
7  　　　　MR. SULLIVAN:  Take some time to
8  read it and get clear what you were saying
9  back at that time.
10  A  **Page 20, "When he stopped, he'd actually**
11  **shoved 11 cars into the track further from**
12  **that initial count of 50."**
13  Q  (By Mr. Magnuson, continuing) So he should
14  have stopped at 7 and he actually stopped at
15  11?
16  A  **There you go.  Yes.  Again, you're watching**
17  **the shoving movement.  Like if somebody would**
18  **have walked across that track and fell for**
19  **whatever reason, DePover, the conductor, is**
20  **still responsible to watch that shove and**
21  **make sure there's nothing back there.  That's**
22  **why he did not have -- he was not counting**
23  **him down to the 40.  He was counting him down**
24  **to the 15.**
25  Q  You recall there was a bunch of testimony

168

1  about car lengths.  There was some longer car
2  lengths, some shorter ones, some auto racks,
3  that type of thing.  I don't need to get into
4  it, but you understand that there was some
5  testimony about that.  Right?
6  A  **Correct, but I thought there was also footage**
7  **noted in the transcript somewhere as well on**
8  **my testimony, measurements as well.**
9  Q  You agree that there was no audio to
10  correspond with the video?
11  A  **No.**
12  Q  Oftentimes those radio communications on CP
13  are recorded?
14  A  **Those are not.**
15  Q  Not at Nahant but in other yards and other
16  times, those can be recorded?
17  A  **They can be.**
18  Q  We'll go to 51, the very bottom.  Do you see
19  at the very bottom the sentence there where
20  DePover says he was "quite under some
21  pressure" with respect to you and Mr. Smith
22  being in the office with him?
23  A  **Okay.**
24  Q  Do you see the next page 52 that Mr. DePover
25  testifies that he felt intimidated by you?

169

1      MR. SULLIVAN:  Objection,
2   misstates the document.
3   Q   (By Mr. Magnuson, continuing) On page 52,
4       line 12, Mr. DePover was asked, "Okay.  So
5       you did feel intimidated, being in the room
6       with Mr. Jared?"  And the answer was, "Yes, I
7       did."  Do you see that?
8   A   I do.
9   Q   That's something that the CP Rail discourages,
10      right, intimidating employees in these
11      circumstances?
12  A   We do discourage intimidation, that's true.
13  Q   Intimidation is the same thing as hostility.
14      Right?
15  A   I don't know that.
16  Q   The top of page 53 DePover testifies your
17      vehicle wasn't in the video screen.  Correct?
18  A   What line?
19  Q   1 through 8.
20  A   (Witness examining document).  Okay.
21  Q   Do you see that?  He says your car wasn't in
22      the video either.  Right?
23  A   Agreed.
24  Q   Moving down to line 13.
25  A   (Witness examining document).

170

1   Q   Have you read that?
2   A   Yes.
3   Q   5.3.7 says unless additional instructions are
4       given.  Right?
5   A   Can I see the rule?
6   Q   Yes, we're pulling it.  But DePover testifies
7       here on line 16, 15 and 16, he updated -- him
8       being Sexton -- with needing 15 more to a
9       stop, still clear for 40.  That's what he
10      says.  Right?
11  A   Correct.
12  Q   I showed you what we marked as your
13      Deposition Exhibit 11.
14  A   Okay.
15  Q   And you see the box under that, that's the
16      movement must stop within half the distance
17      specified unless additional instructions are
18      received.  This is the rule that you
19      testified Mr. Sexton violated.  Right?
20  A   That's correct.
21  Q   And it says, half the distance specified
22      unless additional instructions are received.
23      Do you see that?
24  A   I do.
25  Q   And you agree with that rule?

171

1   A   I do.
2   Q   And you've read Mr. DePover's testimony where
3       he says 15 more to a stop, still clear for
4       40.  Correct?
5   A   15 to a stop.  That's correct.
6   Q   Still clear for 40 is what he testified to.
7       Right?
8   A   That's true but he's also following Rule 6.28.
9   Q   That's what he testified to.  Right?
10  A   I understand that.  That's correct.
11  Q   And that would be an additional instruction.
12      Right?
13  A   That's correct.
14  Q   We're going to start speeding this along here.
15  A   Am I done with this?
16  Q   Yeah, hopefully.  Were you aware that
17      Mr. Rainwater requested of Mr. Reyes to have
18      Cruciani and Cox testify and was denied that?
19  A   No.
20  Q   You don't recall that testimony in the
21      investigation?
22  A   No.
23  Q   Would you agree with me that if an engineer
24      feels that there was a safety issue with snow
25      and ice buildup on tracks, that the engineer

172

1       should make his supervisor aware of it?
2   A   He doesn't have to do that.
3   Q   An engineer doesn't have to make his
4       supervisor aware of a safety concern with
5       snow and ice buildup on tracks?
6   A   No.
7   Q   What should he do in that situation?
8   A   Cut the crossing, cut the tracks.
9   Q   Shouldn't tell his supervisor where he's
10      going, what he's doing?
11  A   Doesn't have to.
12  Q   He can just without telling his supervisor
13      cut away light power, cause any delay that's
14      necessary to make sure the tracks are cut?
15  A   Yes.
16  Q   Okay.  Were you made aware that Mr. McKelvey
17      and Mr. Sexton had a disagreement about
18      whether the tracks should be cut?
19  A   At some point.
20  Q   How were you made aware of that?
21  A   I don't recall.
22  Q   A conversation with Mr. McKelvey perhaps?
23  A   I don't remember.
24  Q   Would you take exception with Mr. McKelvey if
25      he told Sexton 'don't cut those tracks, get

177

1  Q  And that goes parallel to the Mississippi
2     River.  Right?
3  A  It does, portions of it.
4  Q  Quite close in some places.  Right?
5  A  Correct.
6  Q  And a train carrying hazardous materials de-
7     railing into the Mississippi River would be a
8     catastrophe.  Right?
9  A  Correct.
10 Q  It would be a environmental catastrophe.
11    Right?
12 A  Correct.
13 Q  It would cost the railroad a lot of money to
14    repair the tracks.  Right?
15 A  It could be.
16 Q  Cost a lot to repair the freight, the
17    equipment, all that.  Right?
18 A  There is that possibility.
19 Q  A train derailing carrying hazardous
20    materials through areas where people live
21    could be a safety hazard for the folks living
22    in that area.  Right?
23 A  It could.
24 Q  Things like anhydrous ammonia can travel and
25    spread out so that people in the area are

178

1     affected by the fumes.  Right?
2  A  It could be.
3  Q  You're aware that that has happened.  Right?
4     Anhydrous spills occur and they evacuate places?
5  A  I'm aware of that, yes.
6  Q  When you became aware that Sexton and
7     McKelvey had a disagreement about cutting the
8     tracks, do you know how long it took Sexton
9     to cut the tracks?
10 A  No.
11 Q  You're not going to come to trial and
12    testify, well, it just took him two minutes,
13    this was nothing.  You just have no idea one
14    way or the other?
15 A  I thought I saw something during a depo that
16    had a timeline on it.
17 Q  What depo?
18 A  Sorry.  Not depo.  The depo prep when I
19    reviewed the documents.
20 Q  I thought you said you didn't review any
21    documents.
22        MR. SULLIVAN:  That misstates the
23    witness' testimony.
24 A  I reviewed documents during the prep.
25 Q  (By Mr. Magnuson, continuing) What timeline

179

1     did you look at?
2  A  I don't know.  I'd have to look at the
3     document.
4  Q  We can see the timeline.
5        MR. SULLIVAN:  I don't know what
6     the timeline is.
7  Q  (By Mr. Magnuson, continuing) What timeline
8     did you see?
9  A  I don't recall.  There's a write-up.
10    Somebody had it.
11       MR. SULLIVAN:  There is no time-
12    line that's work product that -- are you
13    referring to a document that was like in an
14    e-mail or something that was sent and
15    produced in discovery?
16       THE WITNESS:  McKelvey's
17    drill-down I thought.
18       MR. SULLIVAN:  McKelvey's drill-
19    down is a document that's been produced in
20    discovery.
21 Q  (By Mr. Magnuson, continuing) So you read
22    that?
23 A  Yeah.
24 Q  What did that say with respect to how long it
25    took Sexton to cut the tracks?

180

1  A  I don't know it it's specific in there how
2     long it took to cut the tracks.  It also
3     mentioned in there getting the locomotive off
4     of the bridge and running down across that
5     crossing that they mentioned and then running
6     down the siding and then having to dig out a
7     switch.  So there's lots of things and
8     there's a time in there.
9  Q  Were you made aware that the delay -- the
10    over-standard event was somewhere in the
11    neighborhood of 3 hours, 3-1/2 hours?
12 A  Somewhere in there.
13 Q  I'll show you what we have already marked as
14    Deposition Exhibit 26.  Before you read the
15    whole thing, is this what you reviewed in
16    preparation for your testimony?
17 A  That is correct.  (Witness examining document).
18    Okay.
19 Q  I don't read anywhere in here where it
20    suggests that Sexton and McKelvey had a
21    disagreement about whether or not to cut
22    these tracks.
23 A  I agree.
24 Q  Do you know where else you might have learned
25    that there was a disagreement between those

1  A  No.
2  Q  This was CTC territory.  Correct?
3  A  No.
4  Q  It wasn't at the time?
5  A  No.
6  Q  Because it was PTC?
7  A  It was TWC.
8  Q  Would TWC -- I was under the impression it
9     was CTC.  Would TWC, if it was downloaded or
10    what have you, be able to tell us what times
11    Mr. Sexton's train passed certain signals?
12 A  No.  There are no signals in TWC.
13 Q  Because it's track warrant controlled.  Okay.
14    So there's no CTC type signals that are
15    communicating between Marquette and Nahant?
16    It's all track warrant controlled?
17 A  No.  There's sections of CTC in there.
18 Q  Oh, there is?  Okay.  Where does it start?
19 A  In 2021?
20 Q  Yes.
21 A  I don't know the milepost, but it's Samoa to
22    Deer Creek, Samoa to Deer Creek.
23 Q  Okay.  Which would have been passed, at least
24    according to these documents, where Sexton
25    traveled cutting the tracks?

1  A  100 miles south, yes.
2           MR. MAGNUSON:  I have to use the
3     restroom super quick.  Let's take five minutes.
4              (Brief recess).
5  Q  (By Mr. Magnuson, continuing) Mr. Jared,
6     prior to conducting the E test on Sexton, did
7     you notify dispatch that you were going to do
8     it?
9  A  No.
10 Q  Do you know how many trains went through
11    Nahant on February 1st, 2021?
12 A  I do not.
13 Q  Do you know what an approximate amount would
14    be on a daily basis?
15 A  Anywhere from 8 to 12.
16 Q  Fairly busy terminal as I understand it?
17 A  For its size, yes.
18 Q  How many other E tests did you conduct on
19    February 1st, 2021?
20 A  That's the only one I can remember.
21 Q  What was it specifically about the 474 that
22    made you want to E test that train?
23 A  The opportunity to perform that type of a
24    test.
25 Q  What do you mean by the opportunity?

1  A  It was a controlled environment.  The tracks
2     were clear.  There was no possibility of the
3     crew shoving off the end of the track.
4  Q  Did you have any idea that the 474 was
5     delayed when you E tested it?
6  A  Not that I recall.
7  Q  But you did talk to Mr. McKelvey that day
8     prior to E testing?
9  A  I don't recall when I talked to him.
10 Q  But the phone records suggest that you talked
11    to McKelvey before the E test.  Right?
12 A  They do suggest that, yes.
13 Q  And you did receive an e-mail from McKelvey
14    or the system identifying the delay.  Right?
15 A  That is correct.
16           (Deposition Exhibit 53 marked for
17    identification).
18 Q  I will show you what we marked Exhibit 53.
19    This is Mr. Sexton's testing data.  I'll ask
20    that you look at that, please.  All I'm
21    really looking for is if you can kind of skim
22    his results.
23 A  (Witness examining document).  What's this?
24 Q  Testing history.
25 A  Oh, for rules?

1  Q  Yep.
2  A  I see that.  Okay.  What about it?
3  Q  If you can look through his scores.
4  A  A lot of 100 percents and upper 90s.
5  Q  That's pretty good.  Right?
6  A  Yes.
7  Q  This if you looked at it just sitting in your
8     office wouldn't cause you any alarm or
9     concern about that engineer?
10 A  No.  I'm confident in John Sexton's ability
11    to understand the rules.  Application might
12    be a little different but he understands
13    them.  He had a 2.37 failure rate.
14           MR. SULLIVAN:  There's no
15    question so you don't have to answer.
16           (Deposition Exhibit 54 marked for
17    identification).
18 Q  (By Mr. Magnuson, continuing) This is Exhibit
19    54.  Do you recall ever reading this?
20 A  (Witness examining document).  Okay.
21 Q  Do you recall reading or receiving the
22    e-mails contained in Exhibit 54?
23 A  I don't recall receiving it, but this is also
24    something I reviewed.
25 Q  It is.  Do you see that in this document or

189

1   at the end of it at least John Sexton
2   identifies himself as a union co-chair of the
3   Quad Cities Health and Safety Committee?  Right?
4 A That is correct.
5 Q You're aware that he held that position at
6   one point?
7 A Yes.
8 Q In this document, this e-mail that he sent to
9   the railroad on which you were copied, he
10  makes various safety complaints.  Right?
11 A That's correct.
12 Q You said you don't recall reading it then,
13  but you read it to prepare for your testimony
14  today?
15 A That is correct.
16        (Deposition Exhibit 55 marked for
17  identification).
18 Q Showing you what's been marked Exhibit 55,
19  are you familiar with this document?
20 A It's something I reviewed yesterday.
21 Q So in 2020 your salary was $214,834?
22 A If that's what the math adds up to.
23 Q It's right in the middle of the page there.
24  It says Salary.
25 A Oh, that's right.

190

1 Q And your total STIP, your Short-Term
2   Incentive Plan, was $133,368.  Right?
3 A Correct.
4 Q And you understand that part of your STIP
5   award is based on on-time performance and
6   dwell metrics and that type of thing?
7 A It's one of the metrics that we measure for
8   that.
9 Q In fact, if you go to the fourth paragraph
10  down it says STIP is comprised of 35 percent
11  operating ratio.  Right?
12 A That's correct.
13 Q 35 percent operating income?
14 A Correct.
15 Q Trip plan compliance at 10?
16 A Okay.
17 Q And that adds up to 80 percent.  Right?
18 A Yes.
19 Q So train accident frequency is 10 percent and
20  personal injury frequency is 10 percent.  True?
21 A True.
22 Q And you knew that back in 2021?
23 A I would say yes if I read the document.
24 Q You've read this document in the past.  Right?
25 A I believe this is something that gets sent to

191

1   me.
2 Q Prior to 2021?
3 A What do you mean?
4 Q Did you receive this document prior to 2021,
5   2020, for the last however years you've been
6   in management?
7 A No.
8 Q Since the Short-Term Incentive Plan and the
9   cash compensation plan came into being, have
10  you received this?
11 A I don't know when we started receiving them.
12 Q Did you receive it prior to 2021?
13 A I don't recall.
14 Q Prior to 2021, were you aware of the
15  performance measures and the performance
16  metrics that go into this bonus?
17 A Yes.
18        (Deposition Exhibit 56 marked for
19  identification).
20 Q Showing you what we have marked as Exhibit
21  56, have you seen this before?
22 A Yes.
23 Q You read it to prepare for your deposition
24  today?
25 A I did.

192

1 Q This is an e-mail from Tracy Miller to you
2   the very day of Sexton's investigation.  Right?
3 A That's part of it.  On the back it's John
4   Sexton's e-mail to Mr. Miller.
5 Q In that e-mail to Mr. Miller by Mr. Sexton,
6   Mr. Sexton makes safety complaints.  Correct?
7 A It looks like he's noting some concerns about
8   Mr. McKelvey's driving.
9 Q Do you see in the middle of the larger
10  paragraph from Sexton referencing that
11  McKelvey told him not to cut the crossings,
12  which he replied that if he's directing him
13  not to follow rules -- the topic of the month
14  for the Health and Safety Committee and
15  managers, he is referencing the prior
16  derailment fliers -- that he would have to
17  call Superintendent Smith right now and
18  inform him that he is instructing me not to
19  follow the rules.  Do you see that?
20 A I see that part of the paragraph.
21 Q Is that maybe the conflict between McKelvey
22  and Sexton that you were referencing earlier?
23 A It could be.
24 Q If what Sexton is saying here is true, that's
25  not conduct by Mr. McKelvey that you would

197

1  A  I don't recall what I felt at the time.
2          (Deposition Exhibit 57 marked for
3      identification).
4  Q  Have you seen this before?  Did you look at
5      this yesterday?
6  A  I believe so.
7  Q  Or whenever it was when you saw it?
8  A  Yes.
9  Q  You've seen this document before.  Is there a
10     name for it?
11 A  Top 15 Trains Impacting Speed US.
12 Q  Is this a daily e-mail that goes out?
13 A  It's a daily document, yes.
14 Q  The rest of this is redacted after the first
15     entry?
16 A  Okay.
17 Q  There's three or four pages here of it.  How
18     are they ordered?  How do you know what the
19     order of first to last being top 15 to bottom
20     15 trains impacting speed is?
21 A  The highest delays are put at the top.
22 Q  So this is the highest delay on the system,
23     at least in the US system, on February -- on
24     February 2nd, this indicated that the 474 on
25     February 1st was the highest delay in the US.

198

1      Right?
2  A  Due to its accumulation of time between
3      Marquette and Nahant, correct.  And this
4      report would have came out the day after.
5  Q  Yep, came out February 2nd and it was
6      referring to February 1st.  Right?
7  A  Yes.
8  Q  So can we say that this is the biggest over-
9      standard work event on the system?
10 A  In the US.
11 Q  In the US.  Okay.
12 A  Combined between Nahant and Marquette.
13 Q  And it's specifically referencing in the
14     description the 474.  Right?
15 A  Correct.
16         (Deposition Exhibit 58 marked for
17     identification).
18 Q  I'm showing you what we marked as 58.  Did
19     you review this one when you prepared?
20 A  I don't remember.
21 Q  You know what?  I think this was one we were
22     going to use to reference phone numbers.  I
23     don't see you're copied on this one.  So set
24     that one aside.
25         Oh, we can -- at the very top of

199

1      this, it's February 11, 2021, Jason Ross to
2      Tracy Miller.  Jason says, "Yes, going to
3      follow up with Tom, he owes me a call."  Do
4      you remember having that call referring to
5      any of the events relating to the 474 and
6      Mr. Sexton's train?
7  A  I don't.
8  Q  There is a white paper on the CP website
9      about PSR, precision scheduled railroading.
10     Have you ever read that?
11 A  I don't know what you're referring to.
12 Q  That hasn't been circulated to you guys?
13     You haven't had meetings on a white paper
14     relating to PSR?
15 A  Not that I recall, no.
16 Q  You haven't seen any documents that define
17     more specifically what it is?
18 A  No.
19 Q  In your extent of your knowledge, have you
20     given us that at the beginning of the
21     deposition, the basics: be professional, run
22     on time, be safe?
23 A  My previous statement of the PSR?  Correct.
24 Q  How do things run differently now after 2012
25     than they did prior after PSR was implemented?

200

1  A  Operations is -- operations is preferenced in
2      the departments.  When operating the
3      railroad, we're focussed on on-time trains.
4      We are focussed on safety.  We are focussed
5      on the five foundations.  Those were all put
6      into place in 2012.
7  Q  PSR is included in a lot of promotional
8      marketing materials that the railroad sends
9      to its various customers.  Right?
10 A  I don't know.
11 Q  You've testified in the past that that's the
12     case?
13 A  I'm not sure what my previous testimony is.
14 Q  Do you remember the Lemieux case?
15 A  No, I don't.
16 Q  You testified that your knowledge is that the
17     railroad uses those statistics in its PSR in
18     marketing?
19 A  I don't know when that was.
20 Q  And these statistics and PSR are also used by
21     the railroad in publications promoting its
22     stock and stock value?
23 A  Okay.
24 Q  Do you understand that or are you aware of
25     that?



**EXHIBIT 52**

| | Invoice Number | Account Number | Date Due | Page |
|---|---|---|---|---|
| | 9873190538 | ████████ | 03/02/21 | 4429 of 5116 |

**Summary for Thomas Jared 824262: ████████ 4634**

## Your Plan

**Cust Flex UNL Min&MSG 10GB Sh**
$105.00 monthly charge
Unlimited monthly minutes

**Email Combo Acct SHR MHS 10GB**
10 monthly gigabyte allowance
$10.00 per GB after allowance

**Beginning on 07/22/15:**
**19% Access Discount**

**Beginning on 04/11/20:**
**Out of Contract $20 Off**

**UNL Picture/Video MSG**
Unlimited monthly Picture & Video

**UNL Text Messaging**
Unlimited monthly M2M Text
Unlimited monthly Text Message

Have more questions about your charges?
Get details for usage charges at
b2b.verizonwireless.com.

## Monthly Charges

| | | |
|---|---|---|
| Cust Flex UNL Min&MSG 10GB Sh | 02/11 – 03/10 | 105.00 |
| 19% Access Discount | 02/11 – 03/10 | –19.95 |
| Out of Contract $20 Off | 02/11 – 03/10 | –20.00 |
| Global Calling | 02/11 – 03/10 | 5.00 |
| | | **$70.05** |

## Usage and Purchase Charges

| Voice | Allowance | Used | Billable | Cost |
|---|---|---|---|---|
| Calling Plan            minutes | unlimited | 8239 | –– | |
| Total Voice | | | | $.00 |

| Messaging | Allowance | Used | Billable | Cost |
|---|---|---|---|---|
| Text                     messages | unlimited | 41 | –– | –– |
| Unlimited M2M Text       messages | unlimited | 20 | –– | –– |
| Picture & Video – Sent   messages | unlimited | 9 | –– | –– |
| Picture & Video – Rcv'd  messages | unlimited | 42 | –– | –– |
| Total Messaging | | | | $.00 |

| Data | Allowance | Used | Billable | Cost |
|---|---|---|---|---|
| Gigabyte Usage          gigabytes | 10.000 (shared) | .871 | –– | –– |
| Total Data | | | | $.00 |

| **Total Usage and Purchase Charges** | | | | **$.00** |

**Surcharges**

| | |
|---|---|
| Fed Universal Service Charge | 2.22 |
| Regulatory Charge | .21 |
| Administrative Charge | 1.95 |
| | **$4.38** |

**Taxes, Governmental Surcharges and Fees**

| | |
|---|---|
| MN 911/Telerelay Chrg | 1.02 |
| MN State Telecom Sales Tax | .99 |
| Ramsey Cnty Telecom Sales Tax | .07 |
| Saint Paul City Tele Sales Tax | .07 |
| | **$2.15** |

| **Total Current Charges for** ████████ | **$76.58** |

CONFIDENTIAL

CP_03429



| | Invoice Number | Account Number | | Date Due | Page |
|---|---|---|---|---|---|
| | 9873190538 | ████████ | | 03/02/21 | 4458 of 5116 |

## Detail for Thomas Jared 824262: ████████

## Voice, continued

| Date | Time | Number | Rate | Usage Type | Origination | Destination | Min. | Airtime Chrgs | LD/Other Chrgs | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 1/31 | 9:03A | | Other | Wi-Fi | Minneapoli MN | Incoming CL | 1 | --- | --- | --- |
| 1/31 | 9:14A | | Other | Wi-Fi | Minneapoli MN | Incoming CL | 1 | --- | --- | --- |
| 1/31 | 9:42A | | Other | Wi-Fi | Minneapoli MN | Incoming CL | 2 | --- | --- | --- |
| 1/31 | 9:52A | | Other | Wi-Fi | Minneapoli MN | Incoming CL | 3 | --- | --- | --- |
| 1/31 | 10:09A | | Other | Wi-Fi | Minneapoli MN | Incoming CL | 2 | --- | --- | --- |
| 1/31 | 10:13A | | Other | Wi-Fi | WiFi CL | Davenport IA | 4 | --- | --- | --- |
| 1/31 | 11:00A | | Other | Wi-Fi | Minneapoli MN | Incoming CL | 2 | --- | --- | --- |
| 1/31 | 11:29A | | Other | Wi-Fi | WiFi CL | Davenport IA | 4 | --- | --- | --- |
| 1/31 | 11:42A | | Other | Wi-Fi | Minneapoli MN | Incoming CL | 18 | --- | --- | --- |
| 1/31 | 12:01P | | Other | Wi-Fi | WiFi CL | Cambridge MN | 3 | --- | --- | --- |
| 1/31 | 12:16P | | Other | Wi-Fi | Minneapoli MN | Incoming CL | 11 | --- | --- | --- |
| 1/31 | 12:58P | | Off-Peak | PlanAllow | Eden Prair MN | Incoming CL | 8 | --- | --- | --- |
| 1/31 | 1:05P | | Off-Peak | PlanAllow,CallWait | Eden Prair MN | Incoming CL | 1 | --- | --- | --- |
| 1/31 | 1:07P | | Off-Peak | PlanAllow | Eden Prair MN | Clear Lake IA | 1 | --- | --- | --- |
| 1/31 | 2:31P | | Off-Peak | PlanAllow | Eden Prair MN | Incoming CL | 3 | --- | --- | --- |
| 1/31 | 2:35P | | Off-Peak | PlanAllow | Eden Prair MN | Incoming CL | 3 | --- | --- | --- |
| 1/31 | 3:00P | | Off-Peak | PlanAllow | Eden Prair MN | Incoming CL | 9 | --- | --- | --- |
| 1/31 | 3:23P | | Off-Peak | PlanAllow | Minnetonka MN | Incoming CL | 5 | --- | --- | --- |
| 1/31 | 3:25P | | Off-Peak | PlanAllow | Minnetonka MN | Twincities MN | 3 | --- | --- | --- |
| 1/31 | 3:29P | | Off-Peak | PlanAllow | Minnetonka MN | Clear Lake IA | 3 | --- | --- | --- |
| 1/31 | 3:45P | | Off-Peak | PlanAllow | Minnetonka MN | Twincities MN | 3 | --- | --- | --- |
| 1/31 | 3:56P | | Off-Peak | PlanAllow | Minnetonka MN | Incoming CL | 8 | --- | --- | --- |
| 1/31 | 3:56P | | Off-Peak | PlanAllow | Minnetonka MN | Davenport IA | 7 | --- | --- | --- |
| 1/31 | 5:04P | | Other | Wi-Fi | Minneapoli MN | Incoming CL | 2 | --- | --- | --- |
| 1/31 | 6:59P | | Other | Wi-Fi | WiFi CL | Toll-Free CL | 4 | --- | --- | --- |
| 1/31 | 7:01P | | Other | Wi-Fi,CallWait | Minneapoli MN | Incoming CL | 2 | --- | --- | --- |
| 1/31 | 7:03P | | Other | Wi-Fi | WiFi CL | Toll-Free CL | 16 | --- | --- | --- |
| 1/31 | 7:18P | | Other | Wi-Fi | WiFi CL | Clear Lake IA | 5 | --- | --- | --- |
| 1/31 | 7:23P | | Other | Wi-Fi,CallWait | Minneapoli MN | Incoming CL | 6 | --- | --- | --- |
| 2/01 | 5:38A | | Off-Peak | PlanAllow | Davenport IA | Kansascity MO | 4 | --- | --- | --- |
| 2/01 | 5:42A | | Off-Peak | PlanAllow | Davenport IA | Davenport IA | 12 | --- | --- | --- |
| 2/01 | 5:53A | | Off-Peak | PlanAllow,CallWait | Davenport IA | Incoming CL | 1 | --- | --- | --- |
| 2/01 | 5:54A | | Off-Peak | PlanAllow | Davenport IA | Davenport IA | 5 | --- | --- | --- |
| 2/01 | 5:58A | | Off-Peak | PlanAllow,PlanAllow,Span | Rock Islan IL | Sioux Fls SD | 9 | --- | --- | --- |
| 2/01 | 6:12A | | Peak | PlanAllow | Davenport IA | VM Deposit CL | 1 | --- | --- | --- |
| 2/01 | 6:13A | | Peak | PlanAllow | Davenport IA | Minneapols MN | 2 | --- | --- | --- |
| 2/01 | 6:15A | | Peak | PlanAllow | Davenport IA | Incoming CL | 1 | --- | --- | --- |
| 2/01 | 6:20A | | Peak | PlanAllow | Davenport IA | Incoming CL | 4 | --- | --- | --- |
| 2/01 | 6:42A | | Peak | PlanAllow | Davenport IA | Incoming CL | 2 | --- | --- | --- |
| 2/01 | 7:01A | | Peak | PlanAllow | Davenport IA | Toll-Free CL | 3 | --- | --- | --- |
| 2/01 | 7:08A | | Peak | PlanAllow | Davenport IA | McGregoria IA | 2 | --- | --- | --- |
| 2/01 | 7:18A | | Peak | PlanAllow | Davenport IA | Incoming CL | 4 | --- | --- | --- |
| 2/01 | 7:26A | | Peak | PlanAllow | Davenport IA | Minneapols MN | 2 | --- | --- | --- |
| 2/01 | 7:30A | | Peak | PlanAllow | Davenport IA | Sioux Fls SD | 1 | --- | --- | --- |
| 2/01 | 7:31A | | Peak | PlanAllow | Davenport IA | Bemidji MN | 6 | --- | --- | --- |
| 2/01 | 7:36A | | Peak | PlanAllow | Davenport IA | Incoming CL | 4 | --- | --- | --- |

CONFIDENTIAL

CP_03458



| | Invoice Number | Account Number | Date Due | Page |
|---|---|---|---|---|
| | 9873190538 | ███████████ | 03/02/21 | 4459 of 5116 |

## Detail for Thomas Jared 824262: ███████████

## Voice, continued

| Date | Time | Number | Rate | Usage Type | Origination | Destination | Min. | Airtime Chrgs | LD/Other Chrgs | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 2/01 | 7:39A | | Other | Wi-Fi,CallWait | Minneapoli MN | Incoming CL | 4 | --- | --- | --- |
| 2/01 | 7:43A | | Other | Wi-Fi | WiFi CL | Desplaines IL | 3 | --- | --- | --- |
| 2/01 | 9:23A | | Peak | PlanAllow | Davenport IA | Desplaines IL | 2 | --- | --- | --- |
| 2/01 | 9:31A | | Peak | PlanAllow | Davenport IA | Incoming CL | 10 | --- | --- | --- |
| 2/01 | 9:40A | | Peak | PlanAllow,CallWait | Davenport IA | Incoming CL | 18 | --- | --- | --- |
| 2/01 | 9:57A | | Peak | PlanAllow | Davenport IA | Albany NY | 5 | --- | --- | --- |
| 2/01 | 10:32A | | Peak | PlanAllow | Davenport IA | Incoming CL | 3 | --- | --- | --- |
| 2/01 | 10:39A | | Peak | PlanAllow | Davenport IA | Incoming CL | 1 | --- | --- | --- |
| 2/01 | 10:40A | | Peak | PlanAllow | Davenport IA | Davenport IA | 1 | --- | --- | --- |
| 2/01 | 10:55A | | Other | Wi-Fi | Minneapolis MN | Incoming CL | 6 | --- | --- | --- |
| 2/01 | 11:02A | | Other | Wi-Fi | WiFi CL | Toll-Free CL | 13 | --- | --- | --- |
| 2/01 | 11:12A | | Other | Wi-Fi | WiFi CL | Minneapolis MN | 3 | --- | --- | --- |
| 2/01 | 11:14A | | Other | Wi-Fi | WiFi CL | Toll-Free CL | 16 | --- | --- | --- |
| 2/01 | 11:31A | | Other | Wi-Fi | Minneapoli MN | Incoming CL | 5 | --- | --- | --- |
| 2/01 | 11:36A | | Peak | PlanAllow | Davenport IA | Incoming CL | 1 | --- | --- | --- |
| 2/01 | 11:46A | | Other | Wi-Fi | WiFi CL | Minneapolis MN | 3 | --- | --- | --- |
| 2/01 | 11:59A | | Peak | PlanAllow | Rock Islan IL | Davenport IA | 6 | --- | --- | --- |
| 2/01 | 12:11P | | Peak | PlanAllow | Davenport IA | Bemidji MN | 1 | --- | --- | --- |
| 2/01 | 12:15P | | Peak | PlanAllow | Davenport IA | Davenport IA | 2 | --- | --- | --- |
| 2/01 | 12:24P | | Peak | PlanAllow | Davenport IA | Davenport IA | 2 | --- | --- | --- |
| 2/01 | 12:37P | | Peak | PlanAllow | Davenport IA | Incoming CL | 1 | --- | --- | --- |
| 2/01 | 12:56P | | Peak | PlanAllow | Davenport IA | Davenport IA | 3 | --- | --- | --- |
| 2/01 | 1:02P | | Peak | PlanAllow | Davenport IA | Davenport IA | 1 | --- | --- | --- |
| 2/01 | 1:03P | | Peak | PlanAllow | Davenport IA | Minneapolis MN | 2 | --- | --- | --- |
| 2/01 | 1:43P | | Other | Wi-Fi | WiFi CL | Bemidji MN | 1 | --- | --- | --- |
| 2/01 | 1:45P | | Other | Wi-Fi | WiFi CL | Bemidji MN | 1 | --- | --- | --- |
| 2/01 | 2:45P | | Peak | PlanAllow | Davenport IA | Incoming CL | 4 | --- | --- | --- |
| 2/01 | 3:48P | | Peak | PlanAllow | Davenport IA | Minneapolis MN | 8 | --- | --- | --- |
| 2/01 | 4:47P | | Peak | PlanAllow | Rock Islan IL | Incoming CL | 6 | --- | --- | --- |
| 2/01 | 4:53P | | Peak | PlanAllow | Rock Islan IL | Bemidji MN | 1 | --- | --- | --- |
| 2/01 | 4:53P | | Peak | PlanAllow | Rock Islan IL | VM Deposit CL | 1 | --- | --- | --- |
| 2/01 | 5:28P | | Peak | PlanAllow | Davenport IA | Incoming CL | 5 | --- | --- | --- |
| 2/01 | 7:23P | | Peak | PlanAllow | Davenport IA | Toll-Free CL | 8 | --- | --- | --- |
| 2/01 | 7:23P | | Peak | PlanAllow,CallWait | Davenport IA | Incoming CL | 7 | --- | --- | --- |
| 2/01 | 7:39P | | Peak | PlanAllow | Davenport IA | Minneapolis MN | 2 | --- | --- | --- |
| 2/01 | 7:56P | | Peak | PlanAllow | Rock Islan IL | Incoming CL | 4 | --- | --- | --- |
| 2/02 | 4:25A | | Off-Peak | PlanAllow | Rock Islan IL | Incoming CL | 2 | --- | --- | --- |
| 2/02 | 5:08A | | Off-Peak | PlanAllow | Davenport IA | Minneapolis MN | 1 | --- | --- | --- |
| 2/02 | 5:09A | | Off-Peak | PlanAllow | Davenport IA | Minneapolis MN | 7 | --- | --- | --- |
| 2/02 | 5:21A | | Other | Wi-Fi | WiFi CL | Twincities MN | 10 | --- | --- | --- |
| 2/02 | 5:40A | | Off-Peak | PlanAllow | Davenport IA | Davenport IA | 3 | --- | --- | --- |
| 2/02 | 5:42A | | Off-Peak | PlanAllow | Davenport IA | Bemidji MN | 5 | --- | --- | --- |
| 2/02 | 5:50A | | Off-Peak | PlanAllow,PlanAllow,Span | Davenport IA | Kansascity MO | 16 | --- | --- | --- |
| 2/02 | 6:06A | | Peak | PlanAllow | Davenport IA | Bemidji MN | 17 | --- | --- | --- |
| 2/02 | 6:23A | | Peak | PlanAllow | Davenport IA | Minneapolis MN | 3 | --- | --- | --- |
| 2/02 | 6:44A | | Peak | PlanAllow | Davenport IA | Twincities MN | 7 | --- | --- | --- |

CONFIDENTIAL

CP_03459

## Yesterday (01 Feb 2021) - Top 15 Trains Impacting Train Speed - US

**From:** qlikview_administrator@cpr.ca
**To:** duffy_kibsey@cpr.ca, robert_johnson@cpr.ca, craig_ruff@cpr.ca, stu_kennedy@cpr.ca, Lonnie Jamieson <lonnie_jamieson@cpr.ca>, Jeff Edwards <jeff_edwards@cpr.ca>, Courtney Dunford <courtney_dunford@cpr.ca>, Ray Elphick <ray_elphick@cpr.ca>, Shane Scully <shane_scully@cpr.ca>, DL_US_Train_Speed <us_train_speed@cpr.ca>
**Date:** Tue, 02 Feb 2021 10:45:44 +0000

| Train Name | Station | Delay details for US East and US West - [45:12 total delay] | Delay Hours |
|---|---|---|---|
| | | Description | |
| 474-31 | Marquette | 474 scanned in and held at MP 100 for 475-30 to shove into MQT through the North Wye. 474 issued TW 01:38 to come to depot for crew change. 474 rolled up MP 100 at 02:22 when they arrived at south wye to start their work. 474-31 lifted CP 5047 off the south leg of the wye and s/o 24 cars to MQS. they also had to cut the Boatels crossing and run down MQS light power before they could shove the cars into it. ATM on sight to help with rides and expedite as much as possible. | 3:23 |
| | Nahant | Train pulled down the main, set off cars to Na04, Dp to Na02, Shoved NA04 & Na11. Then Doubled the Main, Na07 & Na08 | 3:04 |
| | **Total** | | **6:27** |

Redacted

EXHIBIT
57

Confidential

CP_03303

CP Resp. App. - 249

| Delay details for US East and US West - [45:12 total delay] | | | |
|---|---|---|---|
| Train Name | Station | Description | Delay Hours |
| Redacted | | | |

Confidential

| Delay details for US East and US West - [45:12 total delay] | | | |
|---|---|---|---|
| Train Name | Station | Description | Delay Hours |
| Redacted | | | |

Confidential

CP_03305

| Delay details for US East and US West - [45:12 total delay] | | | |
|---|---|---|---|
| Train Name | Station | Description | Delay Hours |
| Redacted | | | |

Confidential

CP_03306

1

```
                                              1
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF IOWA
 2                  EASTERN DIVISION

 3    - - - - - - - - - - - - - - - - - - - -
                    No. 3:23-CV-00031-HCA
 4
      John Sexton,
 5
                          Plaintiff,
 6          vs.

 7    Dakota, Minnesota & Eastern Railroad
      Corporation d/b/a Canadian Pacific,
 8    a Delaware corporation,

 9                         Defendants.

10    - - - - - - - - - - - - - - - - - - - -

11

12

13

14              DEPOSITION OF

15             MCKINSEY HANSON

16              June 24, 2024

17               10:05 a.m.

18

19

20

21

22

23         TAKEN BY: BRENDA K. FOSS
              fossbrenda@yahoo.com
24               612-701-4282

25
```

2

```
 1          Deposition of MCKINSEY HANSON,
 2    taken by Zoom videoconference by and on
 3    behalf of Plaintiff, on Monday, June 24,
 4    2024, commencing at 10:05 a.m., before
 5    Brenda K. Foss, Professional Court Reporter,
 6    Notary Public, State of Minnesota, County of
 7    Hennepin.
 8
 9                *   *   *   *   *
10           APPEARANCES

11
      ON BEHALF OF THE PLAINTIFF:
12    CYLE CRAMER, ESQUIRE
      YAEGER & JUNGBAUER BARRISTERS, PLC
13    4601 Weston Woods Way
      St. Paul, MN  55127
14    ccramer@yjblaw.com
      651-288-9500
15

16
      ON BEHALF OF THE DEFENDANTS:
17    BRIANA AL TAQATQA, ESQUIRE
      DORSEY & WHITNEY LLP
18    50 South 6th Street, Suite 1500
      Minneapolis, MN  55402
19    altaqatqa.briana@dorsey.com
      612-340-2600
20

21
      Also present: Noah Garcia, BNSF Railway
22

23

24

25
```

3

```
 1                I N D E X

 2
      Examination:                    PAGE:
 3    By Mr. Cramer                      4

 4

 5    Marked Deposition Exhibits:
      60 STIP (McKelvey)                22
 6       Bates CP 6292
      61 STIP (Jared)                   27
 7       Bates CP 6291
      62 '21 Performance Mgmt Form      29
 8       (Ross) Bates CP 3816-3822
      63 Business Ethics Rptg Policy    38
 9       Bates CP 6294-6299
      64 Policy 1300                    44
10       Bates CP 6319-6328

11

12
      Reporter's Certificate           51
13

14

15    (Original Deposition Transcript in the
      possession of Cyle Cramer, Esquire).
16

17                *   *   *   *   *

18

19

20

21

22

23

24

25
```

4

```
 1              P R O C E E D I N G S

 2

 3            MCKINSEY HANSON,

 4      after having been first duly sworn,

 5      deposes and says under oath as follows:

 6

 7          MR. CRAMER:  We can go on the

 8    record.  We can note our appearances.  On

 9    behalf of Plaintiff John Sexton, I'm Attorney

10    Cyle Cramer.

11          MS. AL TAQATQA:  I'm here today

12    on behalf of Defendant Dakota, Minnesota &

13    Eastern Railroad Corporation.  I am counsel

14    for Defendant, Briana Al Taqatqa, Dorsey &

15    Whitney.  Also present is inhouse counsel for

16    Defendant, Noah Garcia, and the witness

17    McKinsey Hanson.

18

19           E X A M I N A T I O N

20    BY MR. CRAMER:

21  Q  Can you please state your first and last name

22     and spell your last name?

23  A  McKinsey Hanson, H-A-N-S-O-N.

24  Q  Where are you located today?

25  A  I'm in St. Paul, Minnesota.
```

9

1  in February of 2021?
2  **A  That's correct.**
3  Q  And this replaced the prior policy, 5611?
4  **A  Correct.**
5  Q  Do you know about what year that replaced --
6  or the policy 3411 replaced 5611?
7  **A  I don't, no.**
8  Q  Under the Short-Term Incentive Plan, is it
9  guiding managers -- let me rephrase that.  So
10  according to this policy, on an annual basis
11  managers are responsible for guiding their
12  direct reports and setting objectives.  Correct?
13  **A  That's correct.**
14  Q  So what guidance do managers receive regarding
15  what objectives to set?
16  **A  They have this policy to reference; but then**
17  **throughout the year when we start the**
18  **performance management process, they get**
19  **e-mails with additional information to**
20  **support them starting with beginning of the**
21  **year objective setting.  That comes from the**
22  **talent management group.**
23  Q  We'll get into some of the metrics later, but
24  the specific metrics such as origin
25  performance, train performance, do individual

10

1  managers come up with those metrics or do
2  those come down from somewhere else to them?
3  **A  They're typically set with the senior leader**
4  **and then it's cascaded down.  And then each**
5  **leader that oversees a subdivision would**
6  **modify for their specific territory.**
7  Q  And managers are responsible for achieving
8  their annual performance objectives.  Correct?
9  **A  That's correct.**
10  Q  And managers conduct reviews with their
11  employees regarding their performance and
12  meeting those objectives.  Correct?
13  **A  Yes.**
14  Q  And performance measures are weighted.  Right?
15  **A  Yes, they are.**
16  Q  Who sets these weights?
17  **A  That would be the individual that's**
18  **responsible for their own PMP that would set**
19  **the weights in support with their manager to**
20  **make sure they're aligned.**
21  Q  Are there individual weights and corporate
22  weights or do they all -- are they consistent?
23  Does that make sense?
24        MS. AL TAQATQA:  Objection, form.
25  **A  There are individual weights for each**

11

1  **objective that they set.  And then there are**
2  **corporate percentages as a guideline for**
3  **meeting a corporate threshold in order to**
4  **obtain payout.**
5  Q  (By Mr. Cramer, continuing) And the
6  objectives are weighted according to their
7  relative importance.  Right?
8  **A  Relative importance of the objective to the**
9  **individual.**
10  Q  So it's CP's policy that objectives with a
11  higher weight are more important than those
12  with a lower weight?
13        MS. AL TAQATQA:  Objection, form.
14        THE WITNESS:  Can you repeat the
15  question?
16  Q  (By Mr. Cramer, continuing) Is it CP's policy
17  that objectives with a higher weight are more
18  important than those with a lower weight?
19        MS. AL TAQATQA:  Same objection.
20  **A  I would say they're set towards the**
21  **individual's goals for that year.  So if it**
22  **has a higher weight, then that individual may**
23  **have a goal that they need to focus on a**
24  **little bit more than another one.**
25  Q  And a PMP objective with a higher weight

12

1  affects a person's compensation more than an
2  objective with a lower weight.  Correct?
3  **A  I would say that the goals are looked at on a**
4  **holistic view.  We don't typically get that**
5  **granular.**
6  Q  So this policy 3411, Exhibit 41, this policy
7  would have applied to Kurtis McKelvey in
8  February of 2021.  Correct?
9  **A  Correct.**
10  Q  It would have applied to Marcus Johnson in
11  February of 2021?
12  **A  Correct.**
13  Q  And it applied to Dylan Smith in February of
14  2021?
15  **A  Correct.**
16  Q  It applied to Jason Ross in February of 2021?
17  **A  Correct.**
18  Q  Did it apply to Tracy Miller in February of
19  2021?
20  **A  Yes, it did.**
21  Q  Did it apply to Tom Jared in February of 2021?
22  **A  Yes, it did.**
23  Q  Is an individual's short-term incentive tied
24  directly to their individual objective?
25        MS. AL TAQATQA:  Objection, form.

13

1  A  Yes, it is along with other factors of just
2     reviewing are there any market conditions
3     that would have affected our ability to
4     deliver or weather conditions as well.
5  Q  (By Mr. Cramer, continuing) CP's business
6     objectives are driven by precision scheduled
7     railroading.  Correct?
8  A  Partially, yes.
9  Q  Can you repeat that?
10 A  Partially, yes.
11 Q  Let me rephrase.  CP's priority is delivery
12    of a customer's shipment from origin to
13    destination as quickly as possible.  Correct?
14 A  I would say as quickly and safely as possible.
15 Q  Have you seen any documentation that uses
16    that phrase I used 'delivery of a customer's
17    shipment from origin to destination as
18    quickly as possible'?
19 A  I don't believe I have.
20 Q  Does it include safety in that phrase?
21           MS. AL TAQATQA:  Objection,
22    misconstrues the witness' response to the
23    previous question.
24 A  No, I haven't.
25 Q  (By Mr. Cramer, continuing) It's the goal of

14

1     the Short-Term Incentive Plan to incentivize
2     employees.  Correct?
3  A  Yes, it is.
4  Q  Is it the goal of the metrics in the
5     Short-Term Incentive Plan to create a culture
6     supporting CP's mission?
7  A  I would say that it's to support the
8     company's overall objectives.
9  Q  The objective of the Short-Term Incentive
10    Plan is to tie a part of the employee's
11    compensation directly to CP's results.  Correct?
12 A  That's correct.
13 Q  The manager's overall rating has a direct
14    affect on a manager's base salary.  Correct?
15 A  Base salary?  No.
16 Q  Does a manager's overall rating have a direct
17    affect on the manager's short-term incentive
18    payment?
19 A  Yes.
20 Q  The policy's objective is to reward the
21    achievement of meeting objectives.  Correct?
22 A  Yes.
23 Q  Such as rewarding train speed?
24 A  Train speed is one metric that could be used
25    to understand how we're optimizing our assets.

15

1  Q  So is the policy objective to reward meeting
2     train speed objectives?
3  A  Can you repeat that question?
4  Q  Is the policy's objective to reward meeting
5     train speed objectives?
6  A  It would depend on the person's position, but
7     it could be a component of their performance
8     review.
9  Q  I'm going to bring up a specific individual's
10    PMP.  This was previously marked as Exhibit 23.
11    Is this like an accurate depiction, at least
12    in 2021, of an employee's Performance
13    Management Form?
14 A  Yes, it is.
15 Q  Under this first category of objectives, we
16    have some achieves, exceeds.  Do you see
17    those sections?
18 A  Yes, I do.
19 Q  To confirm, going back up to the top, we're
20    looking at Kurtis McKelvey's Performance
21    Management Form.  So for Mr. McKelvey, he's
22    incentivized to meet train performance
23    objectives.  Correct?
24 A  That is correct.
25 Q  And you can tell that by looking at what in

16

1     this PMP?
2  A  The objectives, the actions and behaviors
3     towards meeting the objective.  And then he
4     weighed that and the performance would be
5     measured with the achieves and the exceeds
6     measures.
7  Q  So it's CP's policy to reward Mr. McKelvey
8     for meeting or passing his train performance
9     objective.  Correct?
10 A  Can you repeat that question?
11 Q  It's CP's policy to reward Mr. McKelvey for
12    meeting or passing his train performance
13    objective?
14 A  That would be one component of it.
15 Q  What is the definition of train performance?
16 A  If you could pull up the document where we
17    responded to the definition of train
18    performance, I'd like to see that.
19 Q  I'm sorry.  Can you repeat that?  I didn't
20    quite catch it.
21 A  If you can pull up the document where we
22    responded with the definitions of train
23    performance, I would like to review that.
24 Q  Yeah, of course.  So I can represent to you
25    that this is a document I received from CP's

17

1  attorneys with some definitions. Hopefully
2  this is what you're looking for.
3  A  **Yes, that is. Thank you. So train**
4  **performance is also known as the destination**
5  **performance which measures the percentage of**
6  **operating plan trains that arrive on time**
7  **within two hours of scheduled arrival time at**
8  **the destination or end station for the train.**
9  Q  Did you help put these definitions together
10  to your knowledge?
11  A  **No, I did not.**
12  Q  I'm not going to go through each one, but I
13  will give you a couple minutes to look at
14  them. I just want to know to your knowledge
15  if they seem accurate. And if one doesn't
16  seem accurate, just stop and let me know.
17  A  **(Witness examining document). Scroll down.**
18  **That seems accurate.**
19  Q  So going to train performance, is it true
20  that if a train is delayed by more than two
21  hours of the scheduled arrival time,
22  Mr. McKelvey's incentive is negatively
23  affected?
24          MS. AL TAQATQA: Objection, form.
25  A  **I would say one train probably not. It**

18

1  **depends on the results at the end of the year**
2  **as it's aggregated together.**
3  Q  (By Mr. Cramer, continuing) But one train
4  contributes to that aggregate?
5  A  **Yes, it would.**
6  Q  I want to narrow down where these metrics
7  applied for Mr. McKelvey in February of 2021.
8  Is it your understanding that Mr. McKelvey
9  was a trainmaster in Marquette in February of
10  2021?
11  A  **Yes, it is.**
12          MS. AL TAQATQA: Cyle, could we
13  put Exhibit 23 back up if that's what you're
14  asking about?
15          MR. CRAMER: Yes, we can.
16  A  **I'd like to note that on the form it says his**
17  **position is Trainmaster Bensenville. He did**
18  **receive a lateral move from Marquette to**
19  **Bensenville that year.**
20  Q  (By Mr. Cramer, continuing) What trains would
21  have fallen under Mr. McKelvey's metrics in
22  February of 2021?
23          MS. AL TAQATQA: Objection, foundation,
24  goes beyond the scope of the topic.
25  A  **I wouldn't be able to narrow down each**

19

1  **specific train. But for the performance**
2  **management plan, whatever time spent in**
3  **Marquette would be prorated for his PMP. And**
4  **then the rest of the time Bensenville would**
5  **have impacted the rest of it. So his**
6  **leadership should have been talking to speak**
7  **to his time in Marquette versus Bensenville**
8  **and then coming together to have a consensus**
9  **on his overall performance.**
10  Q  (By Mr. Cramer, continuing) So during
11  Mr. McKelvey's time in Marquette, trains
12  coming in and out of Marquette would have
13  contributed to his metrics?
14          MS. AL TAQATQA: Objection, form.
15  A  **For the time that he spent in that role. So**
16  **it would have been prorated.**
17  Q  We can bounce back and forth between this
18  exhibit and the other one showing the
19  definitions if you want me to. Just ask me
20  and I can do that. But I will move on to
21  origin performance. So Mr. McKelvey's
22  metrics was also based on having trains
23  depart origin within two hours of the
24  scheduled departure time. Is that correct?
25  A  **Can you flip back to the other document? I**

20

1  **would like to confirm. (Witness examining**
2  **document). So origin performance measures**
3  **the percentage of operating plan trains that**
4  **depart origin on time and within two hours of**
5  **scheduled departure time.**
6  Q  So for Mr. McKelvey, he's incentivized for
7  having trains depart Marquette within two
8  hours of the scheduled departure time?
9  A  **For a portion of his PMP, yes.**
10  Q  I'm actually going to go back to the other
11  one. Mr. McKelvey is incentivized for having
12  cars at his yard for shorter periods of time.
13  Correct?
14          MS. AL TAQATQA: Objection, form.
15  A  **Are you referring to terminal dwell hours?**
16  Q  (By Mr. Cramer, continuing) Is that what
17  terminal dwell hours means to CP?
18  A  **If you can flip back to the supplement with**
19  **the definitions. (Witness examines document).**
20  **The terminal dwell hours is the average**
21  **amount of time in hours between car arrival**
22  **and departure from the yard, excludes cars**
23  **that move through a terminal on a run-through**
24  **train, stored bad ordered and maintenance of**
25  **way's cars.**

21

1  Q  So Mr. McKelvey is incentivized for having
2     cars in his yard for shorter periods of time
3     under the terminal dwell statistic?
4  A  **For part of his PMP, correct.**
5  Q  On Exhibit 23, according to this, is
6     Mr. McKelvey incentivized for controlling
7     costs?
8  A  **That is part of his PMP, yes.**
9  Q  What ways did his PMP include controlling
10    costs?
11 A  **The objective is fuel efficiency, terminal**
12    **costs, whiteboard session, heldaway, crew**
13    **utilization.**
14 Q  Does controlling costs include lowering the
15    cost of crew transportation?
16 A  **Yes, that would be part of it.**
17 Q  The controlling cost includes reducing the
18    number of re-crews.  Correct?
19 A  **It could be part of it.**
20 Q  According to his PMP, Mr. McKelvey is
21    incentivized to maximize the weights of
22    trains, the length of trains, and the speed
23    of trains.  Correct?
24 A  **That's correct.**
25 Q  And under the optimize assets where the

22

1     objectives include train weights, train
2     lengths, train speed, power utilization, and
3     bulk cycles, it states the weight as 20.
4     Correct?
5  A  **20 percent.**
6  Q  That was going to be my next question.  So
7     the 20 stands for a percentage?
8  A  **Yes, percentage.**
9  Q  And the operate safely weight percentage,
10    what is that?
11 A  **20.**
12         (Deposition Exhibit 60 marked for
13    identification.)
14 Q  I'm going to bring up a new exhibit.  This is
15    Exhibit 60.  Looking at this, is there any
16    way to tell whose PMP this is?
17 A  **I don't see a name on it, no.**
18 Q  Are these available to each individual manager?
19 A  **I believe these are sent out to each manager**
20    **after they receive the payout.**
21 Q  I can represent to you that this is
22    Mr. McKelvey's short-term incentive total
23    award statement for 2022.  Is it accurate
24    that the total 2021 STIP award reflects his
25    metrics obtained in 2021?

23

1  A  **For the individual component, yes.**
2  Q  The top chunk of text here in the bold where
3     it includes percentages, operating ratio 35
4     percent, do you see where that is?
5  A  **I do.**
6  Q  Are those the corporate weights or individual
7     weights?
8  A  **It's the STIP corporate performance measures.**
9  Q  These are weighted.  Correct?
10 A  **Correct.**
11 Q  So according to this document, CP's corporate
12    performance measures or operating ratio,
13    operating income and trip plan compliance are
14    weighted as eight times more important than
15    train accident frequency.  Correct?
16        MS. AL TAQATQA:  Objection, form.
17 A  **If you're adding them together, then you're**
18    **at 80 percent.**
19 Q  (By Mr. Cramer, continuing) And we talked
20    earlier about weights and the significance of
21    weights.  So is it CP's policy that
22    objectives with a higher weight are more
23    important than those with a lower weight?
24 A  **I would say importance or time spent**
25    **focussing on that component.**

24

1  Q  So when adding the operating ratio, operating
2     income, trip plan compliance together, that's
3     eight times more important together than
4     train accident frequency?
5         MS. AL TAQATQA:  Objection, form
6     and mischaracterizes the witness' testimony.
7         THE WITNESS:  Can you repeat the
8     question?
9  Q  (By Mr. Cramer, continuing) Combining
10    operating ratio, operating income, and trip
11    plan compliance, CP weighs those corporate
12    performance measures as eight times more
13    important than train accident frequency?
14        MS. AL TAQATQA:  Same objections.
15 A  **I don't know if I would say eight times more**
16    **important.  But in order to run an efficient**
17    **railroad, you have to have measures in place**
18    **in order to understand how we're servicing**
19    **our customers.**
20 Q  (By Mr. Cramer, continuing) Give me one
21    second.  Going back to Exhibit 41 -- the
22    Bates on the bottom right is 3236.  It
23    describes CP's policy as having the PMP
24    objectives are weighted according to the
25    relative importance.  Correct?

25

1  A  That is correct.

2  Q  Bringing up what was previously marked as
3     Exhibit 59, this is Tom Jared's 2021
4     Performance Management Form.  Correct?

5  A  That is correct.

6  Q  It says he reports to Jason Ross.  So are
7     Jason Ross' metrics impacted by Mr. Jared's
8     metrics?

9  A  Yes, they would be.

10 Q  Looking at train performance, CP rewards
11    Mr. Jared for having trains arrive within two
12    hours of the scheduled arrival time.  Correct?

13        MS. AL TAQATQA:  Objection, form.

14 A  That is one of the metrics on the form.

15 Q  (By Mr. Cramer, continuing) And for Mr. Jared
16    in February of 2021 -- I'm trying to phrase
17    this in a way that is clear.  What was
18    included in Mr. Jared's territory in February
19    of 2021?

20 A  Geographically?

21 Q  Yes.

22 A  So US West would have been North Dakota,
23    parts of Minnesota from Thief River Falls
24    down through Glenwood, to Mason City, Iowa
25    going through Iowa to Marquette, Dubuque,

26

1     Davenport, Ottumwa, and then ending at Kansas
2     City, the Joint Agency.

3  Q  And his metrics are impacted by trains in
4     that geographic region.  Correct?

5  A  That's correct.

6  Q  So that would have included in February of
7     2021 Marquette?

8  A  Correct.

9  Q  It would have included Nahant?

10 A  Correct.

11 Q  Are controlling costs -- Mr. Jared is incentivized
12    and rewarded to control costs.  Correct?

13        MS. AL TAQATQA:  Objection, form.

14 A  Controlling costs is one of our foundations.
15    So he does have objectives and metrics
16    assigned to that, yes.

17 Q  (By Mr. Cramer, continuing) Such as lowering
18    the cost of crew transportation?

19 A  That is correct.  I wouldn't say lowering
20    cost.  I'd say controlling cost.

21 Q  What is the distinction with that to you?

22 A  Controlling cost you could be assigning
23    longer term agreements where it may have a
24    higher cost in one year but over three years
25    it could be lesser, or it could be utilizing

27

1     our managers to transport crews versus a
2     service.  So reallocating the cost.

3        MR. CRAMER:  I'm probably a
4     little bit more than halfway through already,
5     and we're about an hour in.  Do you want to
6     take a 10 minute break?

7        MS. AL TAQATQA:  Sounds good.

8        MR. CRAMER:  Be back at around
9     11:05?

10       MS. AL TAQATQA:  Sounds good.

11       (Brief recess).

12       THE WITNESS:  I would like to
13    clarify.  I reviewed an e-mail and policy
14    5611 was retired February of 2017.

15       (Deposition Exhibit 61 marked for
16    identification).

17 Q  (By Mr. Cramer, continuing) I'll bring up a
18    new exhibit.  It is marked Exhibit 61.  I can
19    represent to you that this was Tom Jared's
20    short-term incentive award statement
21    reflecting his bonus for his 2021 metrics.
22    And according to this, Mr. Jared received a
23    $107,284 bonus for meeting or exceeding his
24    objectives in 2021.  Is that correct?

25 A  That is correct.

28

1  Q  That's in addition to his salary.  Correct?

2  A  That's correct, base salary.

3  Q  Does an overall rating change a manager's
4     bonus?

5        MS. AL TAQATQA:  Objection, form.

6  A  What do you mean by overall rating?

7  Q  (By Mr. Cramer, continuing) Well, looking at
8     this we have under the STIP History, Target x
9     Weighting, so this 40 percent, 40 percent, 40
10    percent, and 60 percent, the results 125
11    percent and 120 percent, can you explain to
12    me what each of those means and where they
13    come from?

14 A  So starting with the salary, that's his base
15    salary.  The target and weighting is what the
16    target measure is for corporate versus
17    individual.  So corporately 60 percent of his
18    Short-Term Incentive Plan is based off of
19    corporate performance.  40 percent is based
20    off of his individual performance.  The
21    corporate performance factor ended up being
22    125 percent for 2021.  His individual
23    performance factor was 120 percent which
24    means that he received an achieves rating
25    and that he participated in the plan for the

CP Resp. App. - 258

29

1    entire year.
2  Q  Then what are the other ratings in addition
3    to achieves?
4  A  **If you could refer to the STIP policy**
5    **document. There's unsatisfactory, partially**
6    **achieves, achieves, exceeds, and outstanding.**
7  Q  Did Jason Ross have a PMP in 2021?
8  A  **Yes, he did.**
9  Q  What were Jason Ross' metrics in 2021?
10  A  **You'd have to pull up the document.**
11  Q  I don't believe I have his 2021 PMPs.
12       MS. AL TAQATQA:  Is that a
13    question for me, Kyle?
14       MR. CRAMER:  No, unless you think
15    I'm mistaken.
16       MS. AL TAQATQA:  I think you
17    might be, but I want to make sure we're
18    talking about the same thing.  Should we go
19    off the record?
20       MR. CRAMER:  Yeah, we can do that.
21       (Discussion off the record).
22       (Deposition Exhibit 62 marked for
23    identification).
24       MR. CRAMER:  I'm going to bring
25    up Exhibit 62.  We marked this as Exhibit 62,

30

1    Jason Ross' 2021 Performance Management Form.
2       MS. AL TAQATQA:  Is that a
3    question?
4       MR. CRAMER:  No.  I'm just
5    bringing it up.
6  Q  (By Mr. Cramer, continuing) The question is
7    looking at Mr. Ross' Performance Management
8    Form, can you tell on the provides service
9    foundation whether he met the objectives
10    under achieves and exceeds?
11  A  **Give me just a moment to review.  (Witness**
12    **examining document).  Looking at the actuals,**
13    **I don't see where he calls out the specific**
14    **train performance metric.  So it's unclear.**
15    **For origin performance he has his target at**
16    **98 percent and origin performance is 93**
17    **percent plus or minus two hours.  So I would**
18    **say he did not meet that metric.**
19       **Terminal dwell hours, he**
20    **achieves measures 9-1/2 hours.  In his**
21    **actuals he lists 10.8 hours.  If you go to**
22    **exceeds, it looks like they would prefer the**
23    **target to go down not up.  So I would say he**
24    **did not meet terminal dwell hours.**
25       **GTM's, achieves measure 191 and**

31

1    exceeds 193.  And the actuals he lists GTM's
2    slightly down, based on a roller cluster
3    year, 173.6 GTM's per year.  So he did not
4    meet the achieves measure but does list that
5    it's 9.3 percent better from target but
6    higher than previous years.
7       Trip plans, achieves measures 97
8    percent.  Exceeds measures 98 percent.
9    Actuals was 96.1, so did not meet the measure
10    there.  But then states exceeding in the area
11    of locomotive productivity, daily average of
12    213 GTM's over OHP on a target of 216.
13  Q  Based on his Performance Management, did
14    Mr. Ross receive a short-term incentive
15    payment in 2021?
16       MS. AL TAQATQA:  Objection, foundation.
17  A  **Do you have the form available to review?**
18  Q  No, I do not.
19  A  **I'm not aware.**
20  Q  Do you know what Mr. Ross' short-term
21    incentive payment in 2021 was?
22  A  **No, I don't.**
23  Q  Does CP audit its Short-Term Incentive Plan?
24       MS. AL TAQATQA:  Objection, form.
25  A  **What do you mean by audit?**

32

1  Q  (By Mr. Cramer, continuing) Does CP conduct
2    any type of review of whether the plan is
3    meeting its objectives?
4       MS. AL TAQATQA:  Objection, form.
5       THE WITNESS:  Can I review the
6    short-term incentive policy quick?
7       MR. CRAMER:  Sure.
8  A  **(Witness examining document).  I am not aware**
9    **of the way that they audited but our total**
10    **management -- talent management team, total**
11    **comp team, would review the plan on an annual**
12    **basis and adjust the policy as needed.**
13  Q  Does CP have any policies, programs, or
14    guidelines for any instances where managers
15    might be padding their metrics?
16       MS. AL TAQATQA:  Objection, form.
17       THE WITNESS:  Restate the question.
18  Q  (By Mr. Cramer, continuing) Well, I will try
19    to give an example.  So from my understanding
20    of terminal dwell, a manager could impact
21    their terminal dwell statistics by moving
22    cars off of their terminal let's say into a
23    customer's rail.  Is that a possibility?
24  A  **I'm not aware of how that would impact**
25    **terminal dwell.**

1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2         FOR THE SOUTHERN DISTRICT OF IOWA
                   EASTERN DIVISION
 3    - - - - - - - - - - - - - - - - - - - - -
 4                     No. 3:23-CV-00031-HCA
 5    John Sexton,
 6                     Plaintiff,
            vs.
 7    Dakota, Minnesota & Eastern Railroad
      Corporation d/b/a Canadian Pacific,
 8    a Delaware corporation,
 9                     Defendants.
10    - - - - - - - - - - - - - - - - - - - - -
11
12
13                  DEPOSITION OF
14              JUSTIN DITTRICH-BIGLEY
15                  June 26, 2024
16                    9:00 a.m.
17
18
19
20
21
22
23           TAKEN BY: BRENDA K. FOSS
                  fossbrenda@yahoo.com
24                  612-701-4282
25
```

2

```
 1        Deposition of JUSTIN DITTRICH-BIGLEY,
 2    taken by Zoom videoconference by and on
 3    behalf of Plaintiff, on Wednesday, June 26,
 4    2024, commencing at 9:00 a.m., before
 5    Brenda K. Foss, Professional Court Reporter,
 6    Notary Public, State of Minnesota, County of
 7    Hennepin.
 8
 9              *   *   *   *   *
10             APPEARANCES
11
12    ON BEHALF OF THE PLAINTIFF:
         CYLE CRAMER, ESQUIRE
13       YAEGER & JUNGBAUER BARRISTERS, PLC
         4601 Weston Woods Way
14       St. Paul, MN  55127
         ccramer@yjblaw.com
15       651-288-9500
16
17    ON BEHALF OF THE DEFENDANTS:
         BRIANA AL TAQATQA, ESQUIRE
18       DORSEY & WHITNEY LLP
         50 South 6th Street, Suite 1500
19       Minneapolis, MN  55402
         altaqatqa.briana@dorsey.com
20       612-340-2600
21
      Also present: Noah Garcia, DM&E,
22              Michelle Haynes, DM&E
23
24
25
```

3

```
 1                  I N D E X
 2
 3    Examination:                    PAGE:
      By Mr. Cramer                     4
 4
 5    Marked Deposition Exhibits:
 6    65  Hearing Officer Checklist
          Bates CP 06375-6380         19
 7    66  Training Manual
          Bates CP 06399-6431         25
 8    67  Discipline letter
          Bates 01769                 33
 9    68  Transcript of ███
          Bates CP 01770-1843         34
10    69  Waiver (███████)
          Bates 00674                 37
11    70  Waiver (███████)
          Bates CP 03478              39
12    71  Investigation letter (████████)
          Bates CP 34081              40
13    72  Letter of reprimand
          Bates CP 03482              42
14    73  Tests, Bates 06381-6398     60
15
16    Reporter's Certificate          75
17
18    (Original Deposition Transcript in the
      possession of Cyle Cramer, Esquire).
19
20             *   *   *   *   *
21
22
23
24
25
```

4

```
 1              P R O C E E D I N G S
 2
 3           JUSTIN DITTRICH-BIGLEY,
 4      after having been first duly sworn,
 5      deposes and says under oath as follows:
 6
 7           MR. CRAMER:  We can go on the
 8    record and note our appearances.  On behalf
 9    of Plaintiff John Sexton, I'm Attorney Cyle
10    Cramer.
11           MS. AL TAQATQA:  I'm here on
12    behalf of Defendant Dakota, Minnesota &
13    Eastern Railroad Corporation.  I am counsel
14    for Defendant, Briana Al Taqatqa, Dorsey &
15    Whitney.  Also present with me today are
16    Michelle Haynes for Defendant DM&E, and Noah
17    Garcia is present as inhouse counsel for
18    Defendant DM&E, and the witness Justin
19    Dittrich-Bigley.
20
21              E X A M I N A T I O N
22    BY MR. CRAMER:
23  Q  Justin, can you please state your first and
24     last name and spell your last name?
25  A  Justin Dittrich-Bigley, D-I-T-T-R-I-C-H-
```

9

1    MS. AL TAQATQA:  Objection, form.
2  A  I would have to know what the nonmajor
3    violation is.  The policy -- you know, any
4    discipline for that matter has potential of
5    dismissal, but I would have to understand
6    what specific nonmajor or the situation
7    you're asking.
8  Q  (By Mr. Cramer, continuing) Does discipline
9    on an employee's record subject them to more
10   severe disciplinary outcomes if they're
11   determined to have violated a rule with prior
12   discipline still on their record?
13   MS. AL TAQATQA:  Objection, form.
14   Sorry, Justin.  Just give me a minute.  You
15   can answer.
16 A  It's progressive.  So the policy is viewed.
17   Discipline is progressive.  It reverts back
18   to over a period of time.  Previous
19   discipline is viewed against the policy in a
20   progressive manner with the next steps.
21 Q  CP's Hybrid Discipline and Accountability
22   Guidelines is meant to hold employees
23   accountable.  Correct?
24 A  It's meant to change behavior.
25 Q  And it changes behavior by establishing

10

1    discipline?
2  A  Discipline is assessed to change behavior for
3    various safety issues.  It corrects that
4    behavior.
5  Q  Deferred suspension may be applied in major
6    life-threatening rule violations.  Correct?
7  A  Can you go to the piece of the policy you're
8    referencing? I know it's in there.  I would
9    just like to see it.
10 Q  Of course.  Here it talks about deferred
11   suspension on number 6.  Let me know if you
12   want me to move somewhere else.
13   MS. AL TAQATQA:  Can you make it
14   any bigger, Cyle?  It's pretty small.
15   MR. CRAMER:  Yeah, I probably can.
16   MS. AL TAQATQA:  That's better.
17   Thank you.
18 A  So deferred suspension may apply in all three
19   categories.
20 Q  (By Mr. Cramer, continuing) And one of those
21   categories is in major life-threatening rule
22   violations.  Correct?
23 A  That is one of the categories, correct.
24 Q  Is providing a deferred suspension discretionary?
25 A  There's various factors that go into that.

11

1    When you mean discretionary, I guess what --
2    can you be more specific?
3  Q  Well, I guess under what situations may a
4    deferred suspension be applied?
5    MS. AL TAQATQA:  Objection, form.
6  A  Employees taking accountability, understanding
7    the severity of an issue, not making excuses
8    for the mistake, and just having that
9    conversation that they understand that
10   something severe could have happened
11   catastrophic and they understand that their
12   actions could have caused something fatal
13   potentially.
14 Q  (By Mr. Cramer, continuing) If an employee
15   exercises their right to a disciplinary
16   investigation, are they taking accountability?
17   MS. AL TAQATQA:  Objection, form.
18 A  The employee has a right to go to an
19   investigation under the terms of their labor
20   agreement.
21 Q  (By Mr. Cramer, continuing) But how does that
22   apply to them taking accountability or not?
23   Are they taking accountability if they exercise
24   their right to a disciplinary investigation?
25 A  That would depend on the transcript,

12

1    investigation transcript.  There are
2    employees that take accountability through
3    that process, through their testimony.
4  Q  A deferred suspension, unless later activated,
5    results in no time lost.  Correct?
6  A  If the full amount is deferred.  There's
7    various factors there in terms of a portion
8    or all could be deferred.
9  Q  But any portion that is deferred results in
10   no time lost.  Correct?
11 A  For that portion if they don't have another
12   incident within the specified time frame.
13 Q  And similarly, a deferred suspension, the
14   portion that is deferred, results in no pay
15   lost.  Correct?
16 A  For the part that's deferred if there isn't a
17   future violation, correct.
18 Q  I'll scroll up to make sure we're looking at
19   number 6, deferred suspension.  And I'll
20   scroll down onto the next page.  It says,
21   Other factors to look at when considering
22   discipline.  One factor to consider.
23   Considering a deferred suspension is taking
24   protective actions following an incident.
25   Correct?

CP Resp. App. - 261

**29**

1  communicate that to the field, but I'm not
2  involved in determining management discipline.
3  Q  (By Mr. Cramer, continuing) So you don't have
4  any knowledge of whether management is held
5  accountable for discipline that's overturned
6  when it's determined that the investigation
7  was not fair and impartial?
8      MS. AL TAQATQA:  Objection, form.
9  A  I'm held accountable in terms of my function
10  and role and in terms of this process.  So I
11  know management is held accountable, but it's
12  a general question on what other departments
13  or management does when discipline is over-
14  turned for various issues.
15  Q  Is there a policy that discusses
16  accountability for when discipline is
17  overturned?
18  A  Not that I'm aware of.
19  Q  We're on page 14 of this document.  There's a
20  section here discussing discovery.  You can
21  take a second to review the paragraph.  It
22  describes that almost all union agreements do
23  not provide for discovery.  So does that mean
24  that discovery by the company employee is
25  prohibited?

**30**

1  A  When you say company employee, what do you
2  mean?
3  Q  The employee that's being investigated or
4  their union representative prohibited from
5  conducting discovery.
6  A  There's no labor agreement requirement to
7  provide any documentation in the form of
8  discovery prior to a hearing.
9  Q  So does CP policy prohibit an employee or
10  their union representative from conducting
11  discovery regarding their upcoming
12  investigation?
13      MS. AL TAQATQA:  Objection, form.
14  A  A union rep and an employee can do their own
15  research, but there's no requirement under
16  the labor agreement for the company to
17  provide documents that it's going to enter
18  into the investigation in the form of discovery.
19  Q  (By Mr. Cramer, continuing) Does CP policy
20  require management to provide documents
21  related to an investigation upon request by
22  the employee that's being investigated?
23  A  Do you know a specific policy you're referencing?
24  Q  I'm just asking if that policy exists.
25  A  There is no discovery requirement or policy

**31**

1  that I'm aware of, and discovery is not a
2  contractually protected or requirement unless
3  it's specified in the agreement.  And
4  arbitrators don't view discovery, unless
5  specified in the agreement, as anything that
6  would not be part of a fair and impartial
7  investigation.  Discovery is not a
8  contractual requirement.
9  Q  So is what's determined to be fair and
10  impartial only derived from the contractual
11  obligations?
12  A  And arbitration precedent.
13  Q  So does that mean that a hearing is fair and
14  impartial even if the employee and the union
15  representative is not permitted to conduct
16  discovery prior to the hearing?
17      MS. AL TAQATQA:  Objection, form.
18  A  The union and the employee are able to do
19  their own research and provide their own
20  evidence.  The company under the contract has
21  no requirement to provide the documents which
22  they're going to enter into the hearing in
23  the form of discovery.
24  Q  (By Mr. Cramer, continuing) I'll move down to
25  a different page here.  Under the complete

**32**

1  discipline recommendation section, does it
2  describe who the appropriate manager is?
3      MS. AL TAQATQA:  Cyle, could you
4  show the witness the whole page so we know
5  what section of this policy we're looking at?
6      MR. CRAMER:  Yeah.  We can move
7  up, down.  Let me know what you want.  We're
8  under the Recommending/Issuing Discipline,
9  and I'm referring to this section.  It
10  states, 'Complete a discipline recommendation
11  and send to the appropriate managers'.
12  Q  (By Mr. Cramer, continuing) My question is
13  does this policy describe who the appropriate
14  managers are?
15  A  It doesn't list who those managers would be,
16  no.
17  Q  Who are the appropriate managers to send the
18  discipline recommendation to?
19  A  The recommendation is sent to labor relations
20  for review.
21      MR. CRAMER:  I'm going to close
22  this one.  We're going to jump through a few
23  exhibits here.
24      (Deposition Exhibit 67 marked for
25  identification).

33

1 Q What was the discipline assessed in this
2   letter?
3 A **20 days suspension.**
4 Q Was any of that deferred?
5 A **10 of it was deferred, yes.**
6 Q Who issued this discipline?
7 A **The letter came out under Tom Jared's**
8   **signature but the company issues discipline.**
9 Q Who makes the decision to issue discipline?
10 A **The company.**
11 Q A company representative or the company?
12 A **The company as a whole reviews the transcript**
13   **after LR weighs in and makes a determination**
14   **at that point if charges were proven and if**
15   **the discipline is consistent with the**
16   **process. If the hearing was fair and**
17   **impartial, then discipline is issued from the**
18   **area. But it's a company process. It's not**
19   **one individual.**
20 Q But individuals make decisions as part of
21   that process?
22 A **They participate with other departments. LR**
23   **is involved in that process. So it's not one**
24   **singular person. A manager would consult**
25   **with labor relations after investigation and**

34

1   **labor relations would give a recommendation**
2   **or feedback based on their recommendation.**
3   **And then it would be determined if the**
4   **discipline is warranted based on the factors**
5   **already listed: fair and impartial, charges**
6   **were proven. And then discipline would be**
7   **issued by the company.**
8 Q So multiple people contribute in that process?
9 A **Yes.**
10 Q Does this letter specify why this employee
11   was given 10 days deferred suspension?
12 A **No.**
13 Q We'll close this one. Actually, I'm going to
14   reopen Exhibit 67 just so we're on the same
15   page here. It says Exhibit 67, what we were
16   just looking at. And this discipline looks
17   like it's discipline for a Mr. ▮▮▮▮▮▮▮.
18   Correct?
19 A **Correct.**
20 Q The spelling of that is ▮▮▮▮▮?
21 A **That's correct.**
22    (Deposition Exhibit 68 marked for
23   identification).
24 Q Exhibit 68 is an investigation hearing
25   transcript for ▮▮▮▮▮▮. I want to scroll

35

1   down. Let's go up so we know who's talking
2   here. It looks like the examination is being
3   done by Mr. Lackey. Correct?
4 A **Correct.**
5 Q Then Mr. Adair is the one being questioned?
6 A **Correct.**
7 Q We'll go to the top to see who that is. Who
8   is Mr. Adair according to this?
9 A **Witness.**
10 Q I guess I shouldn't scroll through so fast.
11   We'll make sure we're still on the same page.
12   So here we were looking at the examination of
13   Mr. Adair by Mr. Lackey. Then I'll scroll
14   down.
15 A **If you're going to ask me a question about**
16   **this, I want to read it.**
17 Q Of course. I will be asking on page 1785.
18   It's about five pages. We can definitely
19   take the time to do that. Tell me to scroll
20   when you want me to.
21 A **Scroll down so I can see line 18 and beyond.**
22   **(Witness examining document). Next page,**
23   **please. Go down. Next page. Keep going.**
24   **Next page. Scroll down. Next page. Scroll**
25   **down. I think we're on the page you wanted**

36

1   to reference.
2 Q I will be on the bottom half.
3 A **(Witness examining document). Okay.**
4 Q Let's go on to the next one a little bit so
5   we can see the rest of what's being said.
6 A **(Witness examining document).**
7 Q According to Mr. Adair, he's stating here
8   that the initial command was 30 cars. Correct?
9 A **30 cars, correct.**
10 Q Which means Mr. ▮▮▮ should have stopped at
11   what car count?
12 A **Within half, so 15.**
13 Q What car count does Mr. Adair say he stopped
14   at?
15 A **Traveled 33 cars.**
16 Q If true, that violates the rule. Correct?
17 A **Correct.**
18 Q We can go back to the prior document if we
19   want, but did Mr. ▮▮▮ waive this disciplinary
20   hearing?
21 A **When you say waive, can you specify what you**
22   **mean just so I'm clear?**
23 Q Did he sign a waiver?
24 A **No.**
25 Q But he still received a deferred suspension?

CP Resp. App. - 263

37

1  A  That's correct, yes.
2          (Deposition Exhibit 69 marked for
3  identification).
4  Q  This is marked Exhibit 69.  I believe we just
5  referred to a waiver.  Is this what you
6  understand a waiver to be?
7  A  I'm just reading it.  (Witness examining
8  document).  Yes.
9  Q  According to this, ███████ signed a
10  waiver but still received 15 days deferred
11  discipline and a 5-day actual suspension.
12  Correct?
13  A  Yeah.  The waiver was for 20 days, 15
14  deferred, 5 actual.
15  Q  Is there any way from telling on this
16  document whether the discipline was reduced
17  in any way because Ms. ███ signed a
18  waiver?
19  A  No.
20          MS. AL TAQATQA:  Cyle, we've been
21  going about an hour.  Are you planning to
22  take a break soon?
23          MR. CRAMER:  We can if you want,
24  yeah.  Come back in 10, 15 minutes?
25          MS. AL TAQATQA:  Perfect.

38

1          (Brief recess).
2  Q  (By Mr. Cramer, continuing) I'm going to
3  bring up what's been previously marked as
4  Exhibit 36.  You can take a second to review
5  it, but have you seen this document before?
6  A  (Witness examining document).  Yes.
7  Q  I want to scroll down.  This table is
8  described as similarly situated employees.
9  Correct?
10  A  Yes, similar situated employees.
11  Q  According to this table, it looks like it's
12  initialed MJ Engineer, was assessed verbal
13  coaching for failure to stop within half the
14  distance specified.  Correct?
15  A  Correct.
16  Q  That's the same reason for discipline as John
17  Sexton in this table.  Correct?
18  A  Correct.
19  Q  What is verbal coaching?
20  A  Discussion between employee and manager.
21  Q  Is that considered discipline?
22  A  No.
23  Q  Does this document show anywhere that MJ
24  Engineer signed a waiver?
25  A  This document does not.

39

1  Q  And TS Engineer was assessed verbal coaching
2  for the same reason for discipline as
3  Mr. Sexton.  Correct?
4  A  Correct.
5  Q  Verbal coaching results in no lost days of
6  work.  Correct?
7  A  Correct.
8  Q  And verbal coaching results in no lost pay.
9  Correct?
10  A  Correct.
11          (Deposition Exhibit 70 marked for
12  identification).
13  Q  This is a signed waiver by ███████.
14  Correct?
15  A  Correct.
16  Q  According to this, he waived the disciplinary
17  process for violating Rule 5.3.7.  Correct?
18  A  It was a violation of GCOR 5.3.7, correct.
19  Q  And he was disciplined with a 15 day
20  suspension 10 days served 5 days deferred.
21  Correct?
22  A  No.
23  Q  What was the discipline assessed?
24  A  10 days in which 5 days will be deferred.
25  Q  I see that.  Thank you.  Is there any way

40

1  from telling on this document whether his
2  discipline was reduced in any way because he
3  signed a waiver?
4  A  No.
5          (Deposition Exhibit 71 marked for
6  identification).
7  Q  We marked this as Exhibit 71, a one page
8  document, Bates CP 03481.  Is the rule
9  described in this letter a shoving rule?
10  A  The purpose of this investigation hearing is
11  to determine the facts and circumstances and
12  to place your responsibility, if any, in
13  connection with your alleged failure to stop
14  within half the range of vision of an
15  improperly lined switch resulting in a run
16  through switch.  This incident allegedly
17  occurred.  The incident is a shove, but
18  there's multiple factors there.  There's a
19  run through switch also.
20  Q  Is the shoving portion of this governed under
21  the major life threatening rule violation
22  category of the Hybrid Discipline and
23  Accountability Guidelines?
24  A  Shoving and failure to stop within half the
25  range of vision would be a major.

CP Resp. App. - 264



Dittrich

**Exhibit 66**

## US Investigation Training Manual

| Topic | Page # |
|---|---|
|  |  |
| Introduction | 2 |
| General Information on Formal Investigations | 3 |
| Incident Investigation and Gathering Evidence | 4-7 |
| The Notice of Investigation | 7-9 |
| Preparing for the Hearing | 10-14 |
|      Hearing Officer Guidelines |  |
|      Company Witness Guidelines |  |
| The Hearing | 14-23 |
|      Hearing Guidelines | 14 |
|      Hearing Officer Guidelines | 16 |
|      Witness Officer Guidelines | 18 |
|      Other Issues | 20 |
| Recommending / Issuing Discipline | 23-24 |
|  |  |
| Appendices: |  |
|      I.  Sample Hearing Notice | 25 |
|      II. Sample Opening | 26 |
|      III. Sample Closing | 27 |
|      IV. Discipline Recommendation Template | 28 |
|      V. Sample Discipline Notice | 29 |
|      VI. Standard Language re: Pre-Hearing Discovery Request | 30 |
|  |  |

Confidential

## Introduction

The purpose of this manual is to educate individuals – hearing/conducting officers, incident investigating officers and company witnesses - of the proper procedures in preparing for and conducting formal investigation(s).

If the company fails to follow the correct process, such failure may lead to a flawed investigation and expose the company to monetary liability.  This manual is designed as a step-by-step guide to the investigative process.  The manual provides insight to issues and methods to address incidents as they may arise during and after the hearing.   If you, as hearing officers and/or witnesses, follow the steps reviewed herein, you will have done your part to develop a solid and complete record.  The investigative record is the foundation of the company's case should the matter be progressed to arbitration.

The company should never lose a case at arbitration if its disciplinary action is founded on evidence presented at the hearing while protecting the "due process" rights of the charged employee as provided in the CBA

When reviewing this material, it is important to understand that your true audience during a formal disciplinary hearing is the reader of the transcript (not those in attendance at the hearing).

Initially, the person reading the transcript will be other company managers and, ultimately, in many cases, a third party arbitrator. Therefore, the transcript must convey clearly all the facts and circumstances of the case.  The transcript must tell the whole story.  It should be assumed that those reading the transcript have no knowledge of the incident beyond what is contained in the transcript.

Any technical language or evidence must be explained during the hearing so that a lay person has a clear understanding of the subject matter.  This is true even if everyone at the hearing understands the technicalities being discussed; remember, your true audience is not in the room.

The foregoing is most important because an arbitrator **cannot** consider evidence or testimony that is not presented during the hearing (an exception being an employee's formal discipline record).

Last, in arbitration proceedings, the burden of proof is upon the company to show, by substantial evidence, that the employee violated the rule(s) for which he was disciplined.  As such, it is vital that a solid and complete development of facts be made in the record – the formal investigation.

~ 2 ~

No manual or course can fully prepare you for the actualities of a formal disciplinary hearing. It is highly recommended that after reading and discussing this material, and after participating in the mock hearings, you attend at least one actual investigation as an observer.

### General Information on Formal Investigation

A formal investigation (formal hearing) is under the direct control of the company.

A formal investigation is more in the nature of an administrative proceeding than a formal action at law. It is not governed by the technical rules pertaining to the admission of evidence that are binding at civil and criminal actions.

The hearing is not an adversarial proceeding. Its purpose is to inquire fairly and impartially into all facts connected with the investigation so as to develop the truth, regardless of the result to either party. A formal hearing is designed to ascertain all the facts that have a direct bearing on the cause(s) of the incident and the alleged wrongful actions of the charged employee(s).

The company has [managerial and contractual] authority to assess discipline after it concludes the formal hearing. The disciplinary action that is issued by the company may be subject to further review by an impartial party if such action is pursued by the employee or a representative of the employee. This "right of review" is guaranteed under the provisions of the CBA and/or the Railway Labor Act, as amended, (RLA). Accordingly, it is necessary and proper that the complete process be handled in a professional manner.

As previously noted, investigations are under the control of the company. Arbitrators recognize that the company's rights will be safeguarded at the hearing. To similar effect, the CBA protects the "due process" rights of the charged employee. The hearing officer must understand the words that "no employee will be disciplined without being given a fair and impartial hearing." When the hearing officer understands the concept and requirements of those words, the charged employee's due process rights will be preserved.

It is important to know that the holding of an investigation is not for the purpose of proving the correctness of the charges, but for the purpose of developing all facts material to the charge(s), both favorable and against the employee.

The presiding officer is a trier of fact and an ascertainer of truth; accordingly, the trial officer is afforded latitude in his efforts to determine the extent and scope of the employee's conduct when mishaps occur on the property.

In the general conduct of the hearing, the hearing officer's job is maintain order, ensure a proper record is formed and to do so in a fair and impartial manner. Such action is the essence of professionalism.

~ 3 ~

Confidential                                                              CP_06401

Other stipulations may include: listing witnesses the Company intends to have present at the hearing; whether the rules allegedly violated need to be cited in the notice; and who is required, other than the charged employee, to receive copies of the notice. Failure to comply with any of these requirements, particularly the time limits, may be fatal errors and cause any discipline assessed to be overturned.

- **The charge must be clear and specific**.  The failure to provide proper notice is *per se* a fatal defect, which nullifies the proceedings.  The application from arbitrators is that the "charge" should be specific enough so that the accused can understand the nature of the event for which charged and provide an adequate defense.  Vague and ambiguous charges may render the notice invalid and cause the discipline assessed to be reversed. The charge must specify the date, approximate time, and location of the event under investigation.  Specifically, a precise charge must respond to the questions of "who, what, where and when."

- **The investigation can only cover the charge in the notice, and the accused can only be disciplined for the charge listed in the notice**.  If there are possible multiple violations, they should all be listed.  Unless specifically required by the labor agreement, it is recommended that rules not be cited in the notice.  Always use the term "alleged" in the charge language; no violation is proven until after the employee has been afforded a fair and impartial hearing (or a Waiver/Admission of Responsibility (AOR) is signed; see "Preparing for the Hearing" for further discussion).

- **The notice shall be issued in the form of a requirement, not an invitation**.  When the notice is phrased as a requirement ("arrange to attend"), employees who choose not to attend do so at their own peril.

- **The notice must specify the date, time and location of the hearing**.  The location should include a street address and a specific room.

- **The notice shall advise the accused of the right to representation and to request additional witnesses**, each in accordance with the labor agreement.  **Note**: you may reasonably deny a request for additional witnesses if the union representative/charged employee fails to adequately explain their pertinence to the matter under investigation.

# Preparing for the Hearing

1. Preliminary fact finding has determined that a formal investigation is required.
2. The Hearing Notice has been issued.


At this point, either the charged employee or their chosen representative may request a waiver (also called an Admission of Responsibility, AOR).  There is really no downside to accepting a waiver from the company's perspective.  If the employee assumes responsibility for the incident and signs a waiver to accept the quantum of discipline as determined by the company, a hearing is no longer required (Note: this also eliminates the lengthy and costly appeal process).  Generally, the only reason not to allow a waiver is if the contemplated outcome is dismissal (based on the employee's current standing in the disciplinary process and/or the severity of the incident).  Any discussions regarding waivers should be off the record.  In the event no agreement is reached, these discussions may not be referenced in the hearing.  A waiver/AOR template is included in discipline policy 5612 (enclosed).

Absent a signed waiver, the hearing officer and company witnesses shall begin preparations for the hearing.  Guidelines follow.


## Hearing Officer, Preparation Guidelines:

**Key Point:  Your job is to obtain <u>facts</u> and <u>circumstances</u> pertaining to the charge.**
**Preparation is the key to obtain facts and the circumstances related to the incident.**

As the hearing officer, it is critical to hold a fair and impartial hearing.  The goal is to obtain honest/accurate testimony from all parties and to fully develop the facts and circumstances of the case.  The transcript should paint a clear picture of what happened, where it happened, who was involved and why it happened.  Any technical issues should be explained in lay person terms.  Pictures paint a thousand words.  Remember, your ultimate audience is not present at the hearing and may not possess (and should not have to possess) subject matter expertise in order to comprehend the transcript.

- **Meet with each company witness**.  Discuss the nature of their testimony, the rules or policies involved, and any potentially mitigating circumstances.  Ensure each witness has a clear understanding of the incident, has obtained the necessary evidence (see "Incident Investigation and Gathering Evidence"), and is aware of the applicable rules and how [it appears] the charged employee violated these Rules.  Ensure they have properly organized their testimony and exhibits.


~ 12 ~



Tom Jared                 1010 Shop Road    Office: (651) 495-9519
General Manager Operations  St. Paul, MN      Cell:
US West                   55106             Tom_Jared@cpr.ca

**Dittrich**

**Exhibit 67**

January 27, 2021



Employee #923821

Mr. 

Notice of formal investigation/hearing was issued you under date of January 11, 2021 in connection with the occurrence outlined below:

"…to determine the facts and circumstances and to place your responsibility, if any, in connection with your alleged failure to stop within half the distance specified while shoving on main line at Enderlin while operating train 2H93-06 at approximately 01:45 hours on January 7, 2021."

Formal investigation/hearing was conducted on January 19, 2021 to develop all facts and circumstances in connection with the referenced occurrence. Following the conclusion of that investigation/hearing it was determined that the transcript of the investigation/hearing record contains substantial proof that you violated the following Company Rules or Notices: GCOR 5.3.7 – Radio Response.

Based on the facts and evidence in the hearing record, the severity of the incident and your past discipline history, you are being assessed a twenty (20) day suspension, serve ten (10) days to be effective 0001 hours on Thursday, January 28, 2021 until 2359 hours on Saturday, February 6, 2021 and ten (10) days deferred.

NOTE: At this time you are not required to serve the deferred portion of the above referenced suspension (the "Deferred Suspension"). If you do not commit another offence for which discipline is warranted within 6 months of the date of this notice, you will no longer be in jeopardy of having to serve the Deferred Suspension. However, if you commit another offence for which discipline is warranted within 6 months of the date of this notice, you will be required to serve the Deferred Suspension as well as being assessed any appropriate consequences for the new offence.

Respectfully,

*[signature]*

Tom Jared
General Manager Operations
US West

cc    Matt Bailey – Superintendent North Dakota
      Labor Relations
      Crew Management
      Employee Services
      Paul Ripplinger L/C BLET

Confidential



IN RE THE MATTER OF:                    )

Investigation/Hearing of ███████        )

███████                                 )


January 19, 2021

11:00 AM


PROCEEDINGS HAD at Canadian Pacific Enderlin

General Yard Office, 101 Harvest Lane, Enderlin, North Dakota.

**Dittrich Exhibit 68**

Confidential

CP_01770

██████████████

January 19, 2021

2

PRESENT FOR THE COMPANY:

        MR. DAVID LACKEY, Conducting Officer

PRESENT FOR THE CHARGED EMPLOYEE:

        MR. PAUL RIPPLINGER, Local Chairman, BLET

          Division 671

AccuTran Global Enterprises, Inc.
855-552-0505

Confidential

CP_01771

███████

January 19, 2021

3

# I N D E X

WITNESS:  NICHOLAS ADAIR

      Examination by Mr. Lackey          10, 24, 27

      Examination by Mr. Ripplinger       20, 26

      Examination by Mr. Pfaff            26


PRINCIPAL:  ███████

      Examination by Mr. Lackey            29, 38

      Examination by Mr. Ripplinger          36


WITNESS:  CHANDLER NEUFELD

      Examination by Mr. Ripplinger     39, 52, 58

      Examination by Mr. Lackey           45, 52


EXHIBITS:

      Exhibit 1                      8

      Exhibits 2a – 2c             12

      Exhibits 3 - 4               15

      Exhibit 5                   16

█████████
January 19, 2021

15

1        The picture that I entered as an exhibit is the

2  picture taken from Moorhead Crossing of the car, as I stated,

3  stopped on Moorhead Crossing from Mr. █████ shove move --

4        Q.      All right.

5        A.      -- when Mr. █████ had received no further

6  communication.

7        MR. LACKEY:  We'll enter the picture of Moorhead

8  Crossing with SOO 117761 into the record as Exhibit 3.

9                    (Whereupon, the document was marked as

10                   Exhibit 3 for identification.)

11       MR. LACKEY:  And the printout of the Train Consist, the

12  2H93-06, from RPM with the highlighted cars starting at Line 74

13  SOO 117761 and ending in the highlighted portion with Line 106

14  CP 608472.  This will be entered in the record as Exhibit 4.

15                   (Whereupon, the document was marked as

16                   Exhibit 4 for identification.)

17       Q.      Go ahead, sir.

18       A.      All right.  As I stated, this move then traveled

19  33 cars from initial movement to stop on an initial command of

20  30 cars with no further command given.  This is in violation of

21  GCOR 5.3.7.  5.3.7 states radio -- the -- the Rule is 5.3.7

22  Radio Response.  I'll read the entire Rule in its entirety.

23           "When radio communication is used to

24       make movements, crew members must

AccuTran Global Enterprises, Inc.
855-552-0505

████

January 19, 2021

16

1    respond to specific instructions given

2    for each movement.  Radio

3    communications for shoving movements

4    must specify the direction and distance

5    and must be acknowledged when distance

6    is specified -- I apologize -- when

7    distance specified is more than four

8    cars."

9    A.    **Movement in the box below, it's highlighted.**

10    "Movement must stop within half the

11    distance specified unless additional

12    instructions are received."

13    MR. LACKEY:  Okay.  I will enter this in the record as

14    Exhibit 5, showing 5.3.7 and Radio Response highlighted and the

15    sentence in the box highlighted as well.

16    (Whereupon, the document was marked as

17    Exhibit 5 for identification.)

18    A.    **As stated, this movement traveled 33 cars from**

19    **initial movement to a stop on an initial command of 30 cars.**

20    **There were no further instructions given, which, as stated, is**

21    **in violation of GCOR 5.3.7.**

22    At the point of stopping, I asked Mr. ████ how

23    far he believed he traveled.  His reply via radio was 15 cars.

24    I replied that is a really long 15 cars.  I need to speak with

Confidential

CP_01785

17

1    you prior to departure.  Approximately 15 to 20 minutes later,

2    Mr. ███████ came into my office and sat down.  I asked Mr. ███████

3    how many cars he believed he traveled.  And he stated to me

4    more than I should have.  I then asked, how many should you

5    have?  And he -- he stated 15 cars.  I asked, what does the

6    Rule say?  And he said, stoff half -- stop half the distance

7    specified.  I asked him if he did that.  And he stated no sir,

8    I did not.

9            We had a very good talk at that point about

10   things that could happen if the Rule is not followed and the

11   dangers that follow that.  Mr. ███████ admitted and accepted

12   responsibility while speaking to me in my office and ensured me

13   of Rule compliance to follow.

14           That's all I have sir.

15       Q.    All right.  Thank you.  Mr. Adair, at the

16   beginning of your statement, you stated that Conductor Neufeld

17   agreed to the test?

18       A.    Yes, sir.  He did.

19       Q.    Did he raise any concerns of the safety of the

20   test?

21       A.    He briefly asked me if this was a -- something

22   he could challenge.  I -- I asked Mr. Neufeld if there was --

23   at any point this test would put him in danger.  Mr. Neufeld

24   stated -- responded to me, no.  I asked him if I was asking him

Confidential

CP_01786



**Dittrich**
**Exhibit 69**

**CP**

**WAIVER**

Date: July 31, 2019

This will acknowledge that I, ████████ employee # ████ have agreed to the waiver process for my twenty (20) day suspension in which 15 days will be deferred. I acknowledge responsibility for my failure to stop in half the specified distance given. This incident occurred at approximately 17:30 hours on July 16, 2019 while working Train B75-16 at the South End Nahant NA16 Track at Nahant yard. This was a violation of General Code of Operating Rules Rule 5.3.7 – Radio Response and GCOR Rule 1.1 – Safety. In addition, I acknowledge and understand that:

- There will be no formal investigative hearing.
- The suspension will appear on my record as a suspension for cause.
- No grievance/appeal will result from this suspension.
- A copy of this letter will be placed in my file.

**Other conditions: Your five (5) day actual suspension to commence at 00:01 hours on Thursday, August 1, 2019 up to and including 23:59 hours on Monday, August 5, 2019. Reinstatement to active duty at 00:01 hours on Tuesday, August 6, 2019.**

**NOTE: At this time you are not required to serve the deferred portion of the above referenced suspension (the "Deferred Suspension"). If you do not commit another offence for which discipline is warranted within 6 months of the date of this notice, you will no longer be in jeopardy of having to serve the Deferred Suspension. However, if you commit another offence for which discipline is warranted within 6 months of the date of this notice, you will be required to serve the Deferred Suspension as well as being assessed any appropriate consequences for the new offence.**

_____          _____
                                                   Date

_____          8/1/2019
                Manager Signature                      Date

CC: J. Rinnels – D. Smith – J. Cartlidge - CMC – Employee Services – SBP – Operating Practices/Rules – Timekeeping – Pete Semenek – BLET General Chairman

Confidential





Dittrich
**Exhibit 70**

**WAIVER**

Date:  February 26, 2018

This will acknowledge that I, ████████ employee # █████ have agreed to the waiver process for my ten (10) day suspension in which five (5) days will be deferred.  I acknowledge responsibility for my failure to protect your movement by stopping within half the distance of the initiated car count while making a shoving movement. This incident allegedly occurred at approximately 16:00 hours on February 12, 2018 while working as the engineer on Assignment BD70-12 at the Concord Road Crossing at Davenport Yard. This was a violation of General Code of Operating Rule 5.3.7.  In addition, I acknowledge and understand that:

- There will be no formal investigative hearing.
- The suspension will appear on my record as a suspension for cause.
- No grievance/appeal will result from this suspension.
- A copy of this letter will be placed in my file.

**Other conditions: Your five (5) day actual suspension to commence at 00:01 hours on February 27, 2018 up to and including 23:59 hours on March 3, 2018. Reinstatement to active duty at 00:01 hours on March 4, 2018.**

**NOTE: At this time you are not required to serve the deferred portion of the above referenced suspension (the "Deferred Suspension").  If you do not commit another offence for which discipline is warranted within 6 months of the date of this notice, you will no longer be in jeopardy of having to serve the Deferred Suspension.  However, if you commit another offence for which discipline is warranted within 6 months of the date of this notice, you will be required to serve the Deferred Suspension as well as being assessed any appropriate consequences for the new offence.**

| | |
|---|---|
| ████████████ | 2-26-18 |
| | Date |
| _Manager Signature_ | 2/26/18 |
| | Date |

CC:  J. Stoffer – D. Mohler - J. Cartlidge - CMC – Employee Services – SBP – Operating Practices/Rules – Timekeeping – Pete Semenek – BLET General Chairman

CP_03478

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION

- - - - - - - - - - - - - - - - - - - -

No. 3:23-CV-00031-HCA

John Sexton,

                   Plaintiff,

vs.

Dakota, Minnesota & Eastern Railroad
Corporation d/b/a Canadian Pacific,
a Delaware corporation,

                   Defendants.

- - - - - - - - - - - - - - - - - - - -

DEPOSITION OF

JASON ROSS

July 18, 2024

10:00 a.m.

TAKEN BY: BRENDA K. FOSS
fossbrenda@yahoo.com
612-701-4282

**Page 2**

Deposition of JASON ROSS, taken by Zoom
videoconference by and on behalf of
Plaintiff, on Thursday, July 18, 2024,
commencing at 10:00 a.m., before Brenda K. Foss,
Professional Court Reporter, Notary Public,
State of Minnesota, County of Hennepin.

* * * * *
APPEARANCES

ON BEHALF OF THE PLAINTIFF:
JOHN MAGNUSON, ESQUIRE
CYLE CRAMER, ESQUIRE
YAEGER & JUNGBAUER BARRISTERS, PLC
4601 Weston Woods Way
St. Paul, MN 55127
jmagnuson@yjblaw.com
651-288-9500

ON BEHALF OF THE DEFENDANTS:
JACK SULLIVAN, ESQUIRE
DORSEY & WHITNEY LLP
50 South 6th Street, Suite 1500
Minneapolis, MN 55402
sullivan.jack@dorsey.com
612-340-2600

Also present: Noah Garcia, DM&E

**Page 3**

I N D E X

Examination:          PAGE:
By Mr. Magnuson       4

Marked Deposition Exhibit:
79  Feb 1st, 2021 call record 89
    for Jason Ross

Previously Marked Exhibits:
13           114
18           13
65           70
66           65
69           76
71           86
72           88

Reporter's Certificate    133

(Original Deposition Transcript in the
possession of John Magnuson, Esquire).

* * * * *

**Page 4**

P R O C E E D I N G S

JASON ROSS,

after having been first duly sworn,

deposes and says under oath as follows:

MR. MAGNUSON:  Good morning,
Mr. Ross.  My name is John Magnuson.  I
represent John Sexton in this matter.  With
me here today in my office is Cyle Cramer.  I
see that Noah Garcia is on the Zoom call.
Jack, where is Mr. Garcia located?

MR. SULLIVAN:  Jack Sullivan on
behalf of the defendant.  Mr. Garcia is
observing, not participating in the
deposition.  He is in Kansas City, Missouri.

E X A M I N A T I O N

BY MR. MAGNUSON:

Q  Good morning, Mr. Ross.  Could you please
state your full name spelling your last name
for the record?

A  **My full name is Jason Manfred, M-A-N-F-R-E-D,**
**Andrew Ross, R-O-S-S.**

Q  Where are you physically located today?

13

1  Q  It's fair to say it was not appealed?
2  A  **To my knowledge.**
3  Q  Sir, I have got up on the screen here what
4     has been marked Exhibit 18.  This is an
5     e-mail -- is this one of the e-mails that you
6     reviewed prior to your deposition here today?
7  A  **I think so, yep.**
8  Q  Did it refresh your recollection as to -- let
9     me ask you this.  Do you remember receiving
10    this e-mail that was forwarded to you -- it
11    was intended for you -- and went to the wrong
12    Jason Ross but ultimately was forwarded to
13    you by Tracy Miller?
14 A  **Can you scroll down so I can see it?**
15    **(Witness examining document).  Stop.  Okay.**
16    **Scroll down.  Yep, I remember receiving this,**
17    yep.
18 Q  You remember receiving this?
19 A  **Yep.**
20 Q  In that first paragraph Mr. Sexton states
21    that he was in a company vehicle driven from
22    Eckards to Marquette by ATM Kurt McKelvey out
23    of Marquette, Iowa during a snowstorm while
24    he felt the need to drive at 40 miles per
25    hour on roads that were 100 percent snow

14

1     covered with blowing and drifting snow.  I
2     shared with him on three separate occasions
3     that he was driving too fast and was making
4     me uncomfortable.  Do you recall reading that
5     at the time?
6  A  **I recall reading it, yep.**
7  Q  Mr. Sexton in that sentence, two sentences,
8     was complaining of an unsafe condition or
9     unsafe act.  Correct?
10       MR. SULLIVAN:  Objection.  The
11    document speaks for itself.  You can answer.
12 A  **He's sharing his opinion about what he feels**
13    **is an unsafe act or an unsafe condition.**
14 Q  (By Mr. Magnuson, continuing)  He felt that
15    Kurtis McKelvey was driving too fast for the
16    conditions is what it says.  Right?
17 A  **That's what he felt according to that record,**
18    **yep.**
19 Q  So at least according to Mr. Sexton here, he
20    was making a safety complaint.  Correct?
21 A  **Where do you see that?**
22 Q  Well, you just agreed with me that he was
23    stating --
24 A  **It's his opinion.**
25 Q  Right.  His opinion is that Kurtis McKelvey

15

1     was driving too fast for the conditions.
2     Right?
3  A  **That's his opinion.**
4  Q  And he's stating facts too, right, his
5     version of facts.  Right?
6  A  **He is stating his version of what happened,**
7     **yep.**
8  Q  He felt that Kurtis McKelvey was driving in
9     an unsafe manner.  Correct?
10 A  **That's what he's saying, yes.**
11 Q  And you read that?
12 A  **Yep.**
13 Q  And he was making, Sexton, a safety complaint
14    to you.  Correct?
15 A  **I don't see this as a safety complaint.**
16 Q  You just agreed with me that --
17 A  **He's stating his opinion.**
18 Q  And his opinion was that Kurtis McKelvey was
19    driving too fast for the conditions.  Right?
20 A  **That's his opinion.**
21 Q  And that's what he's expressing to you.  Right?
22 A  **He's expressing his opinion.**
23 Q  To you.  Right?
24 A  **Yes.**
25 Q  What was your position at the time?

16

1  A  **Vice President of Operations in Southern**
2     **Region.**
3  Q  And that included Mr. Sexton's territory?
4  A  **It did.**
5  Q  And McKelvey's territory?
6  A  **That's right.**
7  Q  And Jared's territory?
8  A  **That's right.**
9  Q  And Miller's territory?
10 A  **That's right, part of it, part of Miller's**
11    **territory.**
12 Q  In the second paragraph where it begins "It
13    had been snowing", do you see that?
14 A  **"It had been snowing the previous few days",**
15    yep.
16 Q  He states, "It had been snowing the previous
17    few days and the tracks and crossings were
18    snow covered".  Do you see that?
19 A  **Yep.**
20 Q  You're aware as a railroader that tracks and
21    particularly crossings can get snow and ice
22    built up on them after snowstorms.  Right?
23 A  **That's correct, yep.**
24 Q  Particularly crossings because vehicles drive
25    over the tracks and pack snow in and it can

17

**1** become compacted. Right?

**2 A Correct.**

**3 Q** And conditions like that can cause derailments.

**4** Right?

**5 A It can, yep.**

**6 Q** Derailments are unsafe. Right?

**7 A Correct.**

**8 Q** He goes on to say, "I informed ATM McKelvey

**9** that the crossing and tracks needed cut with

**10** the locomotives before our setout". Let me

**11** stop right there. An engineer bringing to

**12** the attention of his supervisor, in this case

**13** ATM McKelvey, that the tracks need to be cut,

**14** that's something you would encourage from an

**15** engineer. Right?

**16 A It's something I expect, yep.**

**17 Q** Okay. He states, "He told me that I would

**18** NOT", not all capitalized, "cut the crossings

**19** and tracks in which I replied if he is directing

**20** me to not follow the rules and our topic of

**21** the month for the health and safety committee

**22** and managers (cutting flangeways and crossings)

**23** that he would have to call Superintendent

**24** Smith right now". I will just stop right

**25** there.

18

**1 A Okay.**

**2 Q** Sexton's opinion here that he writes is that

**3** he was instructed by Mr. McKelvey not to cut

**4** the crossings and tracks. Right?

**5 A Yes, that's what he states.**

**6 Q** If there is a buildup of snow and ice on

**7** tracks and crossings, that can be an unsafe

**8** condition. Right?

**9 A Correct.**

**10 Q** And if the tracks are not cut, that could

**11** create an unsafe condition. Right?

**12 A Correct. But in this case he cut the crossings**

**13** as you can see. He says he cut them.

**14 Q** Right. We stopped after "Smith right now".

**15** What I'm concentrating on now with you -- and

**16** I will direct your attention to this -- is

**17** that Sexton claimed to you in this e-mail

**18** that he was instructed by McKelvey to not cut

**19** the tracks. Correct?

**20 A That's right. Mr. Sexton and I had a**

**21** conversation after this e-mail was sent.

**22 Q** Okay. We'll get to that. He goes on to

**23** state that this train had loads of ammonia.

**24** Right?

**25 A Uh-huh.**

19

**1 Q** That's a yes?

**2 A Yes.**

**3 Q** And that's anhydrous ammonia?

**4 A I don't know. That's what he's stating. He**

**5** is stating it's ammonia. I don't know what

**6** the product was.

**7 Q** You know what ammonia is?

**8 A It could be several types of ammonia. I**

**9** don't know what the product he was handling

**10** was. He says it was ammonia.

**11 Q** What is ammonia typically used for?

**12**         MR. SULLIVAN: Objection, lack of

**13** personal knowledge.

**14**         MR. MAGNUSON: You can answer.

**15**         THE WITNESS: Can I?

**16**         MR. SULLIVAN: Yes, go ahead.

**17 A Cleaning.**

**18 Q** (By Mr. Magnuson, continuing) Cleaning what?

**19 A I couldn't tell you.**

**20 Q** Are you aware that it's used in farm operations?

**21 A Vaguely, yep.**

**22 Q** It's used to clean out fertilizer tanks and

**23** that type of thing?

**24 A I'm not a farmer. I couldn't tell.**

**25 Q** But you've dealt with shipping ammonia over

20

**1** the course of your career I'm assuming?

**2 A We ship many products.**

**3 Q** Including ammonia?

**4 A Including ammonia.**

**5 Q** Would you consider ammonia to be a hazardous

**6** material?

**7 A Yes.**

**8 Q** You put HAZMAT placards on loaded ammonia

**9** cars. Right?

**10 A Yes.**

**11 Q** Because they're volatile chemicals. Right?

**12 A I can't speak to the volatility of them. I**

**13** can tell you that they're hazardous chemicals

**14** and that's the way we handle them.

**15 Q** If they derail or are involved in collisions,

**16** they can leak the ammonia product into the

**17** environment. Right?

**18 A Correct.**

**19 Q** And that's a dangerous situation for

**20** employees and the public. Right?

**21 A Correct.**

**22 Q** And for that matter, for the environment if

**23** they spill into rivers and that type of thing.

**24** Right?

**25 A Correct.**

25

1  A  Correct, yeah.
2  Q  It's not going to surprise me here but you're
3     probably going to remember a whole bunch of
4     details about that conversation, aren't you?
5  A  **You know what?  If you're asking me now about**
6     **the conversation, I can briefly talk about**
7     **the conversation.  I do remember having a**
8     **pleasant conversation with John and I encouraged**
9     him and thanked him, first of all, for
10    cutting the crossings because I'm not going
11    to tolerate people not cutting crossings.
12    When we talk about the snow and the driving
13    of the vehicle because this e-mail has jogged
14    my memory a little bit, I had a conversation
15    with McKelvey as well.  And McKelvey told me
16    that the snow that he was talking about that
17    was covering the roads was not nearly as bad
18    as he was describing it to be.  And being
19    that I'm originally from Canada, I'm familiar
20    with driving with ice and snow.  So McKelvey
21    and I had a conversation about that.  And I
22    had a conversation with John about making
23    sure, you know, we did cut the crossings.
24    And I had that conversation with McKelvey as
25    well because I'm not going to tolerate people

26

1     cutting the rules and taking shortcuts.  I
2     won't tolerate it for one minute.  That's
3     what I remember about that conversation.  I
4     actually had a great positive conversation
5     with John.
6  Q  Employees are taught to take the safe course.
7     Right?
8  A  **That's right.**
9  Q  In the face of doubt or uncertainty, take the
10    safe course.  Right?
11 A  **That's right.**
12 Q  So if there's any doubt or uncertainty in
13    Sexton's mind, he's instructed to cut the
14    crossings.  Right?
15 A  **He's got to cut the crossings, yeah.**
16 Q  And in Kurtis's mind, the snow just wasn't
17    bad enough.  Right?
18          MR. SULLIVAN:  Objection,
19    misstates the witness' testimony.
20 Q  (By Mr. Magnuson, continuing) It wasn't bad
21    enough to have cut the crossings is what --
22 A  **I'm talking about when Kurtis was driving in**
23    **the road.**
24 Q  What about cutting the crossings?  What did
25    McKelvey tell you about that?

27

1  A  He told me it had been snowing and there was
2     snow in the flangeway.  He didn't think --
3     because you can have a dusting of snow or you
4     can have snow when it gets hard-packed and
5     that's what he was going on.  My conversation
6     with him -- he's no longer with the company,
7     but my conversation with him was we don't
8     make that determination, okay, because trucks
9     can drive over the crossings and they pack
10    down the snow.  That's why the rule is there
11    and it's in place.  And we're going to follow
12    the rule and cut the crossing.  That's all
13    there is to it.
14 Q  Did McKelvey tell you that he instructed
15    Sexton not to cut the tracks?
16 A  **Yep, he did.**
17 Q  He told you that he instructed him not to cut
18    the tracks?
19 A  **That's why he said it because he didn't think**
20    **the snow was bad enough.  I told him you're**
21    **not here to make that determination.**
22 Q  And you determined later that Sexton
23    disobeyed his order and cut the tracks.  Right?
24 A  **I didn't even approach that to be honest with**
25    **you.  When I was talking with John, my only**

28

1     concern was what happened, tell me about it,
2     I see this e-mail.  He told me he cut the
3     crossings.  Okay.  He cut the crossing.  He
4     did the right thing.
5  Q  So McKelvey told you that he instructed
6     Sexton not to cut the tracks.  Right?
7  A  **Yep.**
8  Q  And according to this e-mail here, Sexton cut
9     the tracks anyway.  Right?
10 A  **That's right.**
11 Q  He disobeyed McKelvey's order.  Right?
12 A  **He followed the rule.**
13 Q  He followed the rule and he disobeyed
14    McKelvey's orders.  Right?
15 A  **I don't know if it was an order.**
16 Q  He told him not the cut the tracks.  Right?
17 A  **There's a difference between saying don't cut**
18    **the tracks and an order.  If we are going to**
19    **have a conversation about an order, that's a**
20    **different conversation.**
21 Q  He instructed him not to cut the tracks.  Right?
22 A  **Yes.  He instructed him not to cut the tracks**
23    **according to what Mr. Sexton said here.**
24 Q  And according to what McKelvey told you?
25 A  **McKelvey told me that he told him not to cut**

29

1    the tracks, yeah.

2 **Q** And when you say told him not to, that's the

3    same as instructing him not to?

4 **A** **Saying as the same instruction, yeah. I'm**

5    **not going to argue over semantics.**

6 **Q** Okay. Management level employees at CP Rail's

7    compensation is comprised to some extent by

8    velocity and dwell. Right?

9 **A** **Run that by me again.**

10 **Q** Compensation for management level employees

11    at CP to some extent, to some percentage, is

12    based on dwell and velocity, right, on time

13    metrics?

14          MR. SULLIVAN: Objection, lack of

15    personal knowledge, beyond his own compensation.

16    You can answer.

17 **A** **Compensation for employees -- for managers at**

18    **CP at the time is based on providing service,**

19    **controlling costs, utilizing assets,**

20    **operating safely, and developing people.**

21 **Q** (By Mr. Magnuson, continuing) Those are the

22    five principles of precision scheduled

23    railroading. Right?

24 **A** **Those are the five foundations that our**

25    **company is built on, yes.**

30

1 **Q** And on-time metrics are part of a number of

2    those foundations. Right? Efficiency,

3    velocity, train speed, those are metrics that

4    go into a number of those foundations. Right?

5 **A** **Correct, yeah.**

6 **Q** That includes McKelvey, Jared, Miller, and

7    yourself. Right?

8 **A** **Correct.**

9          MR. SULLIVAN: Objection, lack of

10    personal knowledge.

11 **Q** (By Mr. Magnuson, continuing) Well, you know

12    about precision scheduled railroading.

13    Right? You just ticked off -- are you

14    reading something by the way?

15 **A** **No. I'm drawing on a piece of paper.**

16 **Q** So you have those five foundations memorized.

17    Right?

18 **A** **I have had them memorized for a long time,**

19    **yes.**

20 **Q** I would imagine. Have you ever heard the

21    story of how Hunter, Mr. Harrison, kind of

22    the origin of the precision scheduled

23    railroading when he was in the hump tower

24    down in Memphis? Have you ever heard that

25    story before?

31

1 **A** **Not that I remember. Maybe it's the way**

2    **you're telling it.**

3 **Q** There's an old legend when it comes to

4    precision scheduled railroading that Hunter

5    was at the BN and BNSF at the time, and he

6    was in a hump tower and one of his managers

7    came by and said, Hunter, what do you see

8    there? He pointed out to a yard full of

9    railcars. And Mr. Harrison said something

10    along the lines of I see profit. And the

11    bossman says, no, I see a bunch of wasted

12    time and money because those railcars

13    shouldn't be sitting there. Is that a story

14    you've heard?

15 **A** **Not that I can remember.**

16 **Q** It's kind of an old legendary story. You

17    said you reviewed a white paper that is

18    available on CP's website that was put out in

19    2015-2016 relative to the CP's merger with

20    the NS. Right?

21 **A** **Yep, I briefly perused over it. It's 2016.**

22    **Quite frankly, it's old news.**

23 **Q** But the principles behind precision scheduled

24    railroading haven't changed since 2016, have

25    they?

32

1 **A** **No.**

2 **Q** Can you and I just say PSR so we don't have

3    to say the words precision scheduled

4    railroading over and over? Is that fair?

5 **A** **That's fair.**

6 **Q** Part of these foundations of PSR is depart

7    from the practice of holding trains until

8    they were completely full. Right?

9 **A** **Correct.**

10 **Q** When you say holding trains, I mean holding

11    them in yards. Right?

12 **A** **Typically that would be holding them at**

13    **origin. You know, old school practice**

14    **previous thoughts are that you would hold a**

15    **train at origin until it was full. When I**

16    **say full, whatever you want the length to be.**

17    **If it was 10,000 feet, 10,000 feet, and then**

18    **let it go.**

19 **Q** The old model could oftentimes delay customer's

20    shipments. Right?

21 **A** **The old model did delay customer shipments**

22    **like every time.**

23 **Q** And that cuts into CP's bottom line. Right?

24 **A** **I don't know how you're coming up with that**

25    **determination.**

49

1  Q  (By Mr. Magnuson, continuing)  Go down.  So
2     it's that first paragraph down there, the
3     full paragraph and not the numbered.  It says
4     that Mr. Smith was recommending 20 days.  Right?
5  A  Which paragraph?
6  Q  The non-numbered paragraphs, just the block
7     paragraph.
8  A  "Based on the facts of the matter, I
9     recommend Mr. Sexton" -- yeah, this was Mark
10    Johnson's assessment, 20 days suspension.
11 Q  If we could just go up a little bit, it was
12    Dylan Smith that says, "I recommend 10 served
13    10 deferred".  Right?
14 A  That's what Dylan said, yep.
15 Q  Then on the top it says to Joe Adelfio from
16    Shelley Daberitz.  It says, "Joe: per
17    Mr. Jared, please issue discipline for 20
18    days actual to service on Monday".  Right?
19 A  Yeah, that's what it says.
20 Q  I don't see that you were copied on that e-mail.
21 A  No, I don't appear to be copied on that e-mail
22    at all, no.  But I would have been the one
23    who made the decision on the 20 days because
24    I review all the discipline on Monday.  That
25    e-mail came out on Wednesday.

50

1  Q  When you say discipline, you're looking at
2     discipline that's already been assessed to
3     see if you agree or disagree.  Right?
4  A  No.  There's recommendations.  We would have
5     a call and we'd look at the recommendations.
6     We'd look at the charges.  We'd look at if
7     they're proven or not proven.  I would read
8     the hearings.  In some cases I'd read the
9     hearings.  And Mr. Smith sent that over.  If
10    you look at the e-mail, he sent it over to me.
11    But there was no way in Haitis I was going to
12    give somebody a 10 day deferred and 10 day
13    served suspension for a major violation.  So
14    he got 20.
15 Q  So was it Jared that made the recommendation
16    to you?
17 A  No.
18 Q  Why did the discipline letter go out under
19    Jared's signature without his knowledge
20    electronically signed by Shelley Daberitz?
21 A  Because at the time, admin would send out the
22    discipline.  And the only thing I can assume
23    is Shelley or Joe Adelfio sent the discipline
24    out under Tom's signature.
25 Q  Tom Jared testified that Shelley sent it out

51

1     under his electronic signature but that he
2     hadn't read it.
3  A  Yeah.  Tom is not involved in that.  All the
4     final decisions on discipline dismissals,
5     that all came through me.  Specifically to
6     avoid things like what Dylan was saying
7     there, to give 10 days deferred and 10 served
8     and all that, that's not what a major calls
9     for.  It was a major violation.  He went to a
10    hearing and it's 20 days.
11          Now, had Mr. Sexton come in and
12    said -- if I remember right, I might have
13    even had a conversation with Dylan about
14    this.  And Dylan is no longer with the
15    company.  But one of the reasons why he's no
16    longer with company is because of his soft
17    approach at times on safety.  So if somebody
18    came in and they admitted responsibility and
19    said, I throw myself on the sword, I made a
20    mistake, this is what I did, I'll accept
21    accountability and responsibility for it.
22    Then they'd get 10 and 10.
23          But if they want to go to a
24    hearing and they want to dispute all the
25    facts -- that's fine.  That's up to them and

52

1     they can do that.  But if the charges get
2     proven, then they get full measure of
3     discipline.  In this case, the charges were
4     proven so he got a full measure of 20 days.
5  Q  Public Law Board disagrees with whether or
6     not the charges were proven, didn't they?
7  A  Well, the Public Law Board has -- they're
8     entitled to their opinion and they have never
9     picked up some bodies off the track like I
10    have.
11          MR. SULLIVAN:  Object to the
12    extent the question misstates the PLB's
13    decision.
14 Q  (By Mr. Magnuson, continuing)  You're familiar
15    with the US E testing manual.  Right?
16 A  Yeah.
17 Q  You're familiar with test GRF02.  Right?
18 A  You'd have to pull it up.  I'm familiar with
19    it.  I know it exists.  I have looked through
20    it.  Some of this stuff I've read.  Some of
21    it I have not read.  Efficiency test is a bit
22    -- you have guidelines with efficiency
23    testing.  And sometimes they change or you
24    change the way you apply them.  But at the
25    end of the day, it's the rule that dictates

**53**

1  whether or not it was complied with or not.
2  **Q**  If a conductor is directing a shove movement
3  and gets distracted -- like let's say he
4  answers his telephone or starts looking at a
5  plane flying overhead, that can be an unsafe
6  condition.  Right?
7  **A  If he answers his telephone, he's in trouble**
8  **because he's not supposed to have his**
9  **telephone on.  That's the first thing.  And**
10  **if he's looking overhead at an airplane, he's**
11  **in violation of the rule because when you're**
12  **doing things like shoving equipment, you're**
13  **to avoid all distractions.**
14  **Q**  Right.  Okay.
15  **A  And that's what the rule says.  You cannot**
16  **engage in any other activities.**
17  **Q**  Conductors, when they're directing a shove,
18  should avoid all distractions.  Right?
19  **A  Correct.**
20  **Q**  Because that can create an unsafe condition.
21  Right?
22  **A  That's right.**
23  **Q**  And you're aware that in this situation
24  Mr. Jared conducted a set up test.  Right?
25  **A  Yep.**

**54**

1  **Q**  He told Mr. DePover to stop communicating
2  with Mr. Sexton.  Right?
3  **A  Correct.**
4  **Q**  And you're aware that Mr. DePover said in the
5  investigation that he was distracted.  Right?
6       MR. SULLIVAN:  Objection to the
7  extent it misstates evidence in the record.
8  You can answer.
9  **A  You'd have to pull it up.  I'd have to see**
10  **it.**
11  **Q**  (By Mr. Magnuson, continuing) We'll do that.
12  For now we're going to look at GRF02.  This
13  is the E test that Jared performed on Sexton.
14  Right?
15  **A  I'd have to see it.  He might have put it**
16  **under that code, but it was a test for**
17  **shoving or pushing equipment, yes.**
18  **Q**  I don't see the words set up in this rule, do
19  you?
20  **A  You don't put your set up tests in here.  A**
21  **set up test is simply the fact we're going to**
22  **go out and we're going to test something**
23  **specifically on that rule.**
24  **Q**  You're aware that there are numerous rules in
25  the E test manual that specifically state the

**55**

1  words set up test and have procedures for set
2  up tests.  Right?
3  **A  Sure, but I'll also say that any test in that**
4  **manual could be used as a set up test.  You**
5  **can take any one of those rules and use it as**
6  **a set up test.**
7  **Q**  To answer my --
8  **A  All a set up test is is that I'm going to**
9  **specifically do certain things to set up a**
10  **certain condition.  That's all we're saying**
11  **when we say that.**
12  **Q**  To answer my question, there are numerous
13  rules that have procedures for conducting a
14  set up test.  Right?
15  **A  You'd have to show me, but I'll take your**
16  **word for it.**
17  **Q**  Is that a yes?
18  **A  You'd have to show me.**
19  **Q**  We'll do that.  So under test failure, there's
20  some checked boxes.  It says, "No briefing is
21  held between crew members".  Do you know if
22  Sexton and DePover held a job briefing?
23  **A  I'd have to read the hearing again.**
24  **Q**  If I told you that Sexton -- well, if they
25  don't have a job briefing, they could have

**56**

1  been disciplined for that.  Right?
2  **A  Could have been, yeah.**
3  **Q**  And they weren't disciplined for not holding
4  a job briefing.  Right?
5  **A  They could have been disciplined for it.  I**
6  **don't know if they held one or didn't.  I**
7  **don't have those facts in front of me.**
8  **You're assuming that they performed a job**
9  **briefing.  I'm not going to assume that.**
10  **Q**  Well, Jared and Sexton have both testified
11  that a job briefing occurred.  Okay?
12  **A  Okay.**
13  **Q**  Any reason to doubt or dispute that?
14  **A  If you're telling me they did, they did.  I**
15  **won't doubt or dispute that.**
16  **Q**  Next one down says, "Switches and derails not
17  lined for intended movement".  Are you aware
18  of any facts in this case regarding Sexton
19  and DePover that switches and derails were
20  not lined for intended movement?
21  **A  I'm not aware of that, no.**
22  **Q**  You're aware obviously that DePover was
23  protecting the shove.  Right?
24       THE WITNESS:  Just one second,
25  please.  Can you give me one second?  Hold

57

1  on.

2      (Briefly off the record).

3  Q  (By Mr. Magnuson, continuing) The third one

4  down says, "Movement not protected by

5  employee as required".  There's no evidence

6  here that this shove movement was not

7  protected.  Right?

8  A  I disagree.

9  Q  Well, Sexton has testified that Cox, Cruciani

10  and DePover -- well, not Cox.  Cruciani and

11  DePover were protecting his shove.  Are you

12  aware of that testimony by Sexton?

13  A  **What I would say is that this rule leads to**

14  **some interpretation.  And when you have**

15  **movement not protected by employee as**

16  **required, that also requires the employee to**

17  **be properly communicating with the locomotive**

18  **engineer.  So if you're out there and I'm the**

19  **locomotive engineer -- and I am a locomotive**

20  **engineer, by the way, and I have worked as a**

21  **conductor and a brakeman -- and I'm shoving**

22  **the movement and you're not communicating**

23  **with me, the movement is not being protected.**

24  **So the minute he stops communicating, it's no**

25  **longer protected.**

58

1  Q  And Jared told DePover to stop communicating.

2  Right?

3  A  **Yes.**

4  Q  Next one says, "Employee performing other

5  task than related to movement".  Right?

6  A  **Yes.**

7  Q  Sexton was operating his locomotive.  Right?

8  A  **Okay.**

9  Q  And DePover was protecting the shove until he

10  was told to stop communicating with Sexton.

11  Right?

12  A  **I don't agree.  The movement not protected by**

13  **an employee as required could apply to both**

14  **DePover and to Sexton.  Sexton's job to**

15  **protect the movement is to make sure he stops**

16  **within one-half range of the last communication.**

17  **That's my job as a locomotive engineer.  And**

18  **if I don't stop within one-half range of the**

19  **last communication that I was given, I'm not**

20  **protecting that movement properly.**

21  Q  So the next one down, Public Crossing, that

22  doesn't relate here.  It says, "Track not

23  visually determined the track is clear for

24  intended movement".  This track was clear for

25  intended movement.  Right?

59

1  A  **It has to be because he's pushing on it.**

2  Q  Right.  And as far as the bottom one is

3  concerned, DePover was instructed to cease

4  communication with Sexton.  Right?

5  A  **That's right.**

6  Q  You're familiar with the do's and don'ts of

7  the efficiency testing manual?

8  A  **You have to pull them up to refresh my memory.**

9  Q  Do you see that?

10  A  **Yes, I do.**

11  Q  Number 2 is don't set up a situation that can

12  result in an unsafe act or condition.  Right?

13  A  **Correct.**

14  Q  Number 3 says don't conduct a test to entrap

15  an employee.  Right?

16  A  **Correct.**

17  Q  Number 5 says don't violate a rule in order

18  to set up a test situation.  Right?

19  A  **Correct.**

20  Q  When it says don't violate a rule, does that

21  include GCOR and FRA rules?

22  A  **Yes, none of which were violated in this case**

23  **by the way.  All these three don't apply.**

24  **There was no setup of a situation that could**

25  **result in an unsafe act or condition.**

60

1  Q  That's your opinion.  Right?

2  A  **That's my 32 years of experience, my**

3  **qualifications on two class 1 railroads as a**

4  **locomotive engineer and conductor and**

5  **numerous times running an engine and being in**

6  **the field.  That's my opinion, yeah.**

7  Q  That's your opinion.  Right?

8  A  **That's my professional opinion as a 32 year**

9  **railroader.**

10  Q  That's a yes or no question.  Is that a yes?

11  That's your opinion?

12      MR. SULLIVAN:  Let the witness

13  answer.

14  A  **You got my answer.**

15  Q  (By Mr. Magnuson, continuing) The answer is

16  yes.  Right?

17  A  **That is my professional opinion as a 32 year**

18  **veteran in this industry --**

19      MR. MAGNUSON:  That's a yes.  You

20  keep interrupting, and you asked that

21  testimony be stricken.  I'm going to do the

22  same thing here.  I sat and listened to you

23  do it to Kyle the other day.  That's a yes.

24  The record will reflect the witness answered

25  yes.  That's his opinion.

61

1  Q  (By Mr. Magnuson, continuing) Now, you
2     testified earlier that the Public Law Board's
3     ruling was his opinion. Right?
4  A  **Correct, their view and opinion, yeah.**
5  Q  And you testified earlier that Sexton's
6     e-mail to you when he made those safety
7     complaints was his opinion. Right?
8  A  **Yes.**
9  Q  Are you familiar with this rule, sir?
10 A  **Let me look. It's been a while since I've**
11    **looked at this --**
12 Q  It's GRA01.
13 A  **Yes, so this is -- (witness examining document).**
14 Q  So in the middle you see when test conditions
15    are set up. Right?
16 A  **Yes.**
17            MR. SULLIVAN: Can we see the
18    entire page, please?
19 Q  (By Mr. Magnuson, continuing) This is GRA03.
20    Are you familiar with this rule?
21 A  **Yes.**
22 Q  This one says in the middle says, "When test
23    conditions are set up". Right?
24 A  **Yes, yep. That's what it says.**
25 Q  Go to the next page, GRA06.

62

1            MR. SULLIVAN: This is not that
2     page.
3            MR. MAGNUSON: Page 20.
4  Q  (By Mr. Magnuson, continuing) Are you
5     familiar with this one, test GRA06?
6  A  **I'm looking at it, yes.**
7  Q  And under procedures here, there are two
8     scenarios. Right? It says when test
9     conditions are observed. Right?
10 A  **That's what that it says, yeah.**
11 Q  Is that also known as what's called an
12    observation test?
13 A  **Let me read this a little bit closer. I want**
14    **to see. You're taking -- you know, this**
15    **manual, first of all, is guidelines that we**
16    **gave to our employees to help them with their**
17    **testing. This is not the be all and end all**
18    **of testing. Any rule that's in the GCOR can**
19    **be tested. These are simple guidelines for**
20    **the testing manual that we created to help**
21    **people test. Any one of these tests could be**
22    **a setup test. Any one of them could be an**
23    **observation.**
24 Q  When it says there "when test conditions are
25    observed", is that also known as an observation

63

1     test?
2  A  **No, I wouldn't agree with that.**
3  Q  And the paragraph below says, "when test
4     conditions are set up". Right?
5  A  **Yes, that's right. That's specifically**
6     **referring to blue flag protection of workmen**
7     **though, which is a different class of service**
8     **to locomotive engineers and conductors.**
9  Q  But it uses the words 'and includes
10    guidelines for conducting setup tests'.
11    Right?
12            MR. SULLIVAN: Objection, form.
13 A  **Right.**
14 Q  (By Mr. Magnuson, continuing) That's a yes?
15 A  **I didn't say yes.**
16 Q  You said right?
17 A  **They're guidelines how to do tests. It's not**
18    **the be all and the end all. It's not what**
19    **you must do in all these circumstances and it**
20    **must apply exactly this way. That's not what**
21    **this manual is intended for. This manual was**
22    **intended to help supervisors front line**
23    **engage in testing.**
24 Q  The rule --
25 A  **And this manual is from November of 2014.**

64

1  Q  The test that Tom Jared administered, the
2     GRF02, contains no language or procedures
3     relative to a set up test, does it?
4  A  **The test that --**
5            MR. SULLIVAN: Could we see the
6     document?
7            MR. MAGNUSON: He's familiar with
8     the GRF02. If we want to pull it back up
9     again, we can.
10 A  **Here's what I will tell you.**
11 Q  (By Mr. Magnuson, continuing) Hold it. There
12    is no question for you right now. We're
13    going to pull the rule up, and I have a
14    specific question. Do the words set up test
15    exist in this guideline?
16 A  **No.**
17 Q  Are there procedures in this guideline for
18    conducting a set up test?
19 A  **There's nowhere where it says set up test in**
20    **this guideline.**
21            MR. MAGNUSON: Very good. You
22    are aware of -- can we take a two second
23    break, one minute even? I have got to get my
24    voice recognition software to stop taking
25    down my questions and your answers. I

73

1  A  I would, yep.

2          (Off the record discussion).

3  Q  (By Mr. Magnuson, continuing) Sir, earlier on

4     in your testimony you talked about there's no

5     way in essentially God's green earth or no

6     way in Haitis that I was going to give 10

7     served 10 deferred for a major like a 5.3.7.

8     Do you remember that?

9          MR. SULLIVAN:  Objection to the

10     extent it misstates the witness' testimony.

11     You can answer.

12  Q  (By Mr. Magnuson, continuing) Right.  I kind

13     of agree with Jack's objection here.  I don't

14     remember what it was you said.  I found the

15     phrase kind of interesting and maybe it's a

16     Canadian phrase.  What was it you said?

17  A  **It's an old British phrase.  My grandmother**

18     **was British.  There was no way that he was**

19     **going to get -- that I would ever assess 10**

20     **served and 10 deferred for a major unless the**

21     **employee came in and admitted the**

22     **responsibility, in which case I would show**

23     **them some leeway.  In this case, the charges**

24     **were proven during the hearing.  It was clear**

25     **that he violated the rule.  And 10 served and**

74

1     **10 deferred was not an appropriate consequence**

2     **for his actions.  So I gave him 20.**

3  Q  And employees are entitled to a fair and

4     impartial hearing in these situations if they

5     disagree with the charges.  Right?

6  A  **That's right.**

7  Q  And your decision when you reviewed the --

8     well, your decision was based on your review

9     of the investigation transcript.  Right?

10  A  **Correct, yeah.**

11  Q  Do you recall reviewing the video that was

12     discussed in the investigation?

13  A  **I review a lot of videos.  I couldn't say if**

14     **I did or I didn't.  I would assume that if it**

15     **was included as part of the evidence, I might**

16     **have reviewed it.  I can't say for certain**

17     **one way or another.**

18  Q  Do you recall in your review of the transcript

19     that there was some discussion about the

20     video and whether or not it showed Mr. Jared's

21     truck and how far away he was parked?

22  A  **Vaguely.**

23  Q  Do you know what happened to this video?

24  A  **No.  Like I said, I vaguely remember anything**

25     **about the video.**

75

1  Q  It's been represented to us that the video no

2     longer exists.  Do you know where the video

3     went?

4  A  **No.  If there was a video, I can't speak to**

5     **where it is.**

6  Q  Would it help us now to determine what was in

7     that video to be able to review it?

8          MR. SULLIVAN:  Objection, calls

9     for speculation.  You can answer.

10  A  **I'll say that it's a lot of speculation.  I**

11     **can't say.  I couldn't say one way or**

12     **another.**

13  Q  (By Mr. Magnuson, continuing) You took into

14     account Mr. Jared's testimony in that

15     investigation when you made your decision.

16     Right?

17  A  **Yes.**

18  Q  And you would consider 5.3.7 a major.  Right?

19  A  **Yep, I do.  You're not stopping -- it's about**

20     **properly protecting your shove.**

21  Q  Right.  Do you consider 6.2.8 to be a major?

22  A  **You'd have to pull 6.2.8 up so I can look at**

23     **it and I will tell you if it's a major or not**

24     **major.**

25  Q  We can look at that a little later.  Just so

76

1     I have it, what was the Haitis comment, the

2     British phrase that you used?

3  A  **No way in Haitis.**

4  Q  No way in Haitis.  Do you know what that

5     means?

6  A  **It means no way in hell.**

7  Q  Okay.  We're going to pull up an exhibit

8     here.  Showing you what has been marked

9     Exhibit 69, this has been produced to us.

10     Did you review this at all in preparation for

11     your testimony?

12  A  **No.**

13  Q  Do you want to take a second to review it?

14     Let me ask you this.  Were you responsible

15     for making these discipline decisions on

16     January 27 of 2021 for employees based out of

17     Enderlin, North Dakota?

18  A  **Yes.**

19  Q  Take a second and review this if you would.

20  A  **(Witness examining document).  Okay.**

21  Q  You would have reviewed this -- made this

22     discipline decision?

23  A  **Yep.**

24  Q  And this was an employee that was found to

25     have violated GCOR 5.3.7.  Right?

77

1  A  Yes.
2  Q  And this employee was given 10 served 10
3     deferred.  Right?
4  A  That's right, yeah.
5  Q  Do you recall this?
6  A  I don't recall it, but I do recall at the
7     time in Enderlin there was -- there might
8     have been some facts at that hearing that
9     left it one way or another, and maybe that's
10    why I went to deferred and not given him the
11    full.  There might have been some doubt in
12    that case where I took the safe course and
13    gave him 10 and 10.  The other reason why I
14    would sometimes give 10 and 10 after an
15    employee went to investigation is if the
16    employee or if the union said they won't
17    grieve it or they agreed to come -- or they
18    wanted to get a waiver and we couldn't get
19    them a waiver for whatever reason.  The only
20    thing I can assume in this case is that's why
21    I went with the 10 and 10.
22 Q  But the employee didn't come to you before
23    the investigation and sign a waiver and take
24    responsibility, did he?  He went --
25 A  No, but --

78

1  Q  He went to a formal investigation.  Right?
2  A  That's right.  Like I said though, there were
3     certain cases where the general chairman came
4     to me after and asked to give the guy a break
5     for whatever reason and I would entertain
6     that.
7  Q  But you don't know one way or the other if
8     that happened here?
9  A  I can assume, based on the fact that I gave
10    him 10 and 10 after going to a formal hearing
11    and based on my experience, that that's what
12    happened.
13 Q  Seems to contradict your prior testimony
14    though, doesn't it?
15              MR. SULLIVAN:  Objection,
16    argumentative.  You can answer.
17 A  Well, nobody came to me in the case of
18    Mr. Sexton and said, you know, hey, this is
19    what happened, re-admit it and we'll take the
20    10 and 10 if it's still on the table.  That
21    happened often.  The general chairman that I
22    dealt with --
23 Q  (By Mr. Magnuson, continuing)  You said
24    there's no way in Haitis I give anything less
25    than what you gave to Sexton for violation of

79

1     a major 5.3.7.  Right?  That was your
2     testimony?
3  A  That's right based on the fact of that case,
4     yes.  Nobody ever came and vouched for Sexton
5     after the fact.  Nobody ever came and said,
6     look, we did it, and, you know, we're asking
7     for mercy.  Nobody came and said, you know,
8     we should have come to you and asked for a
9     waiver and we didn't.  General chairman
10    didn't call me.  Local chairman didn't call
11    me.  I can tell you Jerry Wallace, who's now
12    passed away and it's unfortunate, and some of
13    the other general chairmen, they would call
14    after the fact and say, listen, this kid
15    doesn't know what he's doing and it got out
16    of hand, can you give us some leeway?
17 Q  When did Jerry Wallace die?
18 A  Last year.
19 Q  I didn't know that.
20 A  He had cancer.  I talked to him a couple
21    times when he had it.  It was very
22    unfortunate.  He was a gentleman.
23 Q  When you made your discipline decision, you
24    had already received Sexton's e-mail to you.
25    Right?

80

1  A  I'd have to look at the dates.  I'm not 100
2     percent sure of that.
3  Q  Okay.  We can do that.
4  A  You'd have to review the dates.
5  Q  Okay.  The e-mail that --
6  A  February 15, yep.
7  Q  And the e-mail that we looked at earlier,
8     Exhibit 35, the e-mail from Daberitz to a
9     number of people, it says, "Per Mr. Jared,
10    please issue discipline for 20 days actual
11    service".  That's dated February 24.  Right?
12 A  Could be, yeah.  It would appear, yes.
13 Q  So you had reviewed Sexton's e-mail prior to
14    your decision.  Right?
15 A  That's what it looks to be on record here,
16    yep.  I would have gotten the e-mail on the
17    15th and I would have made the decision on
18    his discipline on the 22nd.  That being said,
19    I quite often -- when I look at discipline, I
20    don't even look who the names are.  I get a
21    list.  I get a list of the incident, the date
22    of the incident, the date the hearing took
23    place, review the hearing.  If facts are
24    proven, discipline is assessed.  That's all
25    that's taken into consideration.

81

1  Q  We're pulling up another exhibit here.  In
2     February of 2015, did you report to Miller or
3     did Miller report to you?
4  A  I reported to Miller.
5  Q  Showing you what has been marked as
6     Exhibit --
7           (Off the record discussion).
8  Q  (By Mr. Magnuson, continuing) Can you
9     identify what this document is?
10 A  It's a report.  It's hard to see.  Normally I
11    get it as a PDF.  But regardless that's a
12    report with the information that's on that
13    screen.  It's a report that's generated
14    automatically that looks at some delays in
15    the territory, and we can calculate and see
16    roughly where we are with train delays in
17    territory.  In this case, you can see US East
18    and US West was 45 hours in total at the top.
19    And then down here at Nahant and Marquette
20    you're looking at train 474.  It shows 6
21    hours and 27 minutes.
22 Q  Correct me if I'm wrong, but does this
23    indicate that this was a 3 hour and 23 minute
24    over-standard work event?
25 A  I wouldn't use the words over-standard work

82

1     event.  It's a 3 hour and 23 minute delay on
2     top of what's in the schedule at Marquette.
3     Whatever happened there, it took 3 hours and
4     23 minutes longer to do it than the schedule
5     allowed.
6  Q  I can represent to you that everything below
7     this has been redacted.  Does this seem to
8     indicate to you that this is the number one
9     slowest train that day?
10 A  No, that's not necessarily the case.  It just
11    happens to be the order I put it in.
12 Q  So you compile this document?
13 A  I don't, no.
14 Q  Who does?
15 A  It's automatic.  It's automatically compiled
16    by a system that pulls the information
17    together and puts it on a report and sends
18    it.
19 Q  Miller testified that the order is the
20    slowest train at the top to the 15th slowest
21    train at the bottom.  So that's not your
22    understanding?
23 A  Not really, no.  It could be, but the fact of
24    the matter is sometimes it depends on the
25    amount of delay.  So although it's 6 hours

83

1     and 27 minutes on this train, there might be
2     other trains that had more delay but in
3     different locations.  The report is not
4     always 100 percent accurate with the top
5     performers, the top delays.  It's an
6     automatically-generated report.  It depends
7     what people put in for the code.  There's a
8     lot that goes into it.  It's a guideline.
9     It's a guideline you can look at and use.
10 Q  I was going to ask you what's the purpose of
11    this?
12 A  It's a guideline.  You can go in and look at
13    it.  Generally, 90 percent of the time it
14    will get things for you.  And you can drill
15    down on issues and see where your problem
16    children are in terms of trains -- I'm not
17    talking about people -- and look at fixing
18    some of the issues that you have on the
19    territory.  Now, the reason I say that is
20    because schedules are things that sometimes
21    have to be modified.  So you can look at this
22    report sometimes.
23           And, you know, if you're in
24    winter operation and you're seeing that a
25    certain train is taking longer to do the work

84

1     at a location, you use it to question why.
2     And then if it's taking longer just because
3     the type of work it is, because of the weather,
4     because of the issues, you can go back to
5     service design and say, hey, we're having
6     problems with this, let's modify the
7     schedule.  And that will ripple down the line
8     and it'll give us better accurate ETA's and
9     better estimates for the customers of when
10    their cars are going to get there.
11 Q  Is this something you review on a daily basis?
12 A  Yeah, it is, in general, yep.
13 Q  I don't see you specifically copied on it by
14    name.  Are you part of one of these
15    distribution lists?
16 A  Yeah.
17 Q  Which one?
18 A  I don't know.  I can't tell you.
19 Q  So they just show up in your inbox?
20 A  Yes, under the click view administration and
21    I'm in there.  And, you know, it could be in
22    the BCC isle.  I don't know.
23 Q  Do you specifically recall reviewing this
24    particular document?
25 A  No.

101

1  A   I race cars.
2  Q   You drive them?
3  A   Yeah.
4  Q   What kind?
5  A   LMP3's.
6  Q   I don't even know what that is.
7  A   It's a prototype race car for ex professional
8      race cars.
9  Q   So do you drive them around an empty track or
10     you race on a track with other people?
11 A   I do both. Usually I race with other people.
12     I've got an event at the Ozarks I'm planning
13     on making this weekend. You meet a lot of
14     nice people there.
15 Q   This document, without going into too much
16     detail, you know, you've got your foundation
17     objectives. It's provide service, control
18     costs, optimize assets, operate safely,
19     develop people. You're familiar with those
20     objectives. Right?
21 A   Correct, yep.
22 Q   And they are given percentages as weights.
23     Right?
24 A   That's right.
25 Q   Are you responsible at all in assigning those

102

1      weights?
2  A   Yes and no. There's some guidelines that we
3      put out about it, and they have to all add up
4      to 100 obviously. But usually operations --
5      you know, we put out the guidelines earlier
6      in the year.
7  Q   Do you know why operating safely is assigned
8      a 20 percent weight?
9  A   Well, a couple reasons. You know, I learned
10     this from Hunter Harrison. The first thing
11     you do in a business is you provide a
12     service. If you're not providing a service,
13     I don't care what business you're in, you're
14     not going to deliver a product that people
15     want. Therefore, you're not making money.
16 Q   What is your service that CP provides?
17 A   Transportation, we transport goods. That's
18     what we do. So you have to provide a service.
19     That's the most important thing you do. The
20     second thing is you've got to control your
21     costs because if you don't control your
22     costs, you're going to go out of business.
23     You can provide a service and be the best
24     service in the world and you'll end up out of
25     business. Right? You have to utilize your

103

1      assets because if you're not utilizing your
2      assets properly, you're just going to drive
3      your costs up. You're going to go out of business.
4          You have to operate safely, and
5      that's just a given. The expectation is you
6      operate safely. You should operate safely no
7      matter what you're doing. It's a given.
8          Then the last foundation -- and
9      it's not the last. It's actually the
10     foundation that the other four are built on,
11     is to develop your people. So a lot of
12     people think -- go ahead.
13 Q   Part of developing people is to apply the
14     consequence leadership model. Right?
15 A   Yep, sometimes coaching or -- consequence is
16     also positive as well. A lot of people look
17     at consequences and they say consequence is
18     negative. It automatically gives a negative
19     connotation in our mind. But a consequence
20     of anything we do can be positive or it can
21     be destructive. There's positive consequences.
22 Q   CP applies and utilizes the consequence
23     leadership model. Right?
24 A   That's right.
25 Q   So if we go back to provides service, part of

104

1      that is reduce car dwell. Right?
2  A   That might have been misclassified under
3      here. It could be -- part of providing
4      service can be reducing your car dwell but
5      that could also be optimizing assets and
6      controlling costs. It could go into any one
7      of those three buckets.
8          MR. SULLIVAN: Can we see the
9      part of the document that you're asking
10     questions about if you're asking questions on
11     part of this document?
12         MR. MAGNUSON: Yep.
13 A   When you reduce your dwell, you're providing
14     a service because you're moving the cars of
15     the customer and not letting them sit in your
16     yards.
17 Q   (By Mr. Magnuson, continuing) Is velocity a
18     function or a part of this foundation of
19     providing service?
20 A   You don't have it in here because we didn't
21     measure it at that time. We can break it
22     down in a regional level. We just looked at
23     it at the company levels. It wasn't part of
24     these objectives. We couldn't measure it.
25 Q   When did that change?

---

**105**

1  A  You could measure it at a corporate level.
2     Like a system level you could always measure
3     it. We recently started measuring it maybe --
4     I think this year we started measuring it, or
5     early last year. And we still -- to be fair,
6     we still haven't broken it down. We're
7     trying to get it down to the regional level,
8     and we can't. We can only get it down to a
9     zone level right now. So it's still not
10    perfect.
11  Q  But to the extent it wasn't tracked in this
12    document at the time, the railroad at the
13    time could still track velocity at a system
14    level?
15  A  Only on a system level. The entire system --
16    the only way you could track velocity was on
17    the entire system. You couldn't break it
18    down to a regional level.
19  Q  If we can, go to the next page. Under controlling
20    costs, would you consider recrews to be a
21    function or an element of controlling costs?
22  A  Yes, I would.
23  Q  Let's go to the next page, optimizing assets.
24    Car velocity and increased train speeds are
25    objectives under optimizing assets. Right?

---

**106**

1  A  Yes.
2  Q  This document, Performance Management Forms,
3     are used in determining employees' compensation.
4     Right?
5  A  Correct, yes.
6  Q  And that includes both salary, bonus, and
7     stock options?
8  A  No. Well, no, not entirely. This will
9     determine what you'll get for a raise. I
10    shouldn't say that. It shouldn't determine
11    it. How you perform will determine where you
12    fall into in terms of getting a raise.
13  Q  And how about bonuses?
14  A  This will determine what you're going to get
15    for a short-term bonus but not a long -- like
16    your stock options, that falls into under
17    your long-term. That is not affected by this.
18    That's more contractual.
19  Q  So the short-term bonus is the cash?
20  A  That's right.
21  Q  And those short-term bonuses would be
22    reflected in your tax returns. Right?
23  A  Correct.
24  Q  And the long-term is the stocks, the stock
25    options?

---

**107**

1  A  That's right. But they don't vest right
2     away. And the long-term incentives are
3     basically flat rate on your salary type
4     thing. It's a percentage of your salary
5     based on what job you're on. It's not
6     affected by how you perform. So even if you
7     were a superstar and you were the best
8     railroader in the world and you got the best
9     rating of, you know, any vice president -- I
10    will use vice president as an example --
11    you're only going to get what's in your
12    contract for your stock options. And in many
13    cases, you know, you won't get the same as
14    somebody else who works beside you because
15    they might have been around longer and have a
16    higher salary. So it's based on your salary.
17  Q  What was your short-term bonus in 2021?
18  A  I don't remember.
19  Q  You can ballpark it.
20  A  I still don't remember. I'm trying to think.
21    It might have been around $▮▮▮▮▮▮
22  Q  What was your salary in 2021?
23  A  I was making I think around▮ ▮▮▮ US, was my
24    salary.
25  Q  But your short-term bonus would be definitely

---

**108**

1     reflected in your tax records. Right?
2  A  Yep.
3  Q  You think it was around ▮▮▮▮▮▮?
4  A  I think so, yes. I honestly don't remember.
5  Q  That's the answer we get every time we ask.
6  A  2021 is a long time ago.
7  Q  Most people remember what they earn but --
8        MR. SULLIVAN: Object to form,
9     argumentative, purposeless and irrelevant.
10  Q  (By Mr. Magnuson, continuing) Do you have the
11    ability to get on line when you want and see
12    how you are performing as it relates to these
13    various metrics?
14  A  Well, you see it every day. There's a report
15    that you would look at, and you would see
16    every day how you're performing versus these
17    metrics because the -- these metrics -- I
18    want to be clear. It's not a question of
19    looking at these metrics. These metrics are
20    the basics of railroading, the basics of good
21    railroading. These are things that any decent
22    class 1 railroad or any decent company is
23    going to measure themselves by. You're going
24    to measure yourselves on all these things.
25    These are your KPI's.

---

113

1   from violating a rule?
2 A Yeah, I would not allow it.
3 Q And that includes CPKC rules and FRA rules?
4 A That's right.
5 Q In all of these various things that I just
6   asked you about, discouraging unfair
7   investigations, questionable tests, unsafe
8   tests, violating rules to set up a test, you
9   would discourage these even more I would
10   imagine if it were 10 or 11 hours, 9 or 11
11   hours after an employee takes the safe course?
12 A That would be retaliation, and I don't
13   tolerate retaliation.
14 Q You encourage the employees that are involved
15   in the investigation process that report to
16   you to conduct their investigations in a
17   manner so that they're not overturned by the
18   Public Law Board.  Right?
19 A Correct.
20 Q Getting overturned by the Public Law Board
21   isn't something that you look favorably upon.
22   Right?
23 A I won't send something to the Public Law
24   Board.  I won't give discipline in an
25   investigation unless charges are proven and

114

1   it's fair and it's been impartial.
2 Q Looking back on Sexton's investigation, what
3   do you think could have been done differently
4   in that process to prevent that discipline
5   from being overturned by the Public Law Board?
6       MR. SULLIVAN:  Objection, calls
7   for speculation.  You can answer.
8 A I'd have to review it again in detail to
9   formulate an opinion on that.  I have not
10   reviewed it in that kind of detail where I
11   could give a concise opinion on it.  It was
12   3-1/2 years ago and it wouldn't be fair for
13   me to comment.
14 Q (By Mr. Magnuson, continuing) Well, the
15   Public Law Board took exception to a number
16   of things in the investigation process as it
17   related to Sexton.  Right?
18       MR. SULLIVAN:  Objection to the
19   extent it misstates the opinion.  You can
20   answer.
21 A I'd have to see the opinion.  I can't comment
22   without seeing the opinion.
23 Q (By Mr. Magnuson, continuing) This has been
24   marked Exhibit 13.  Just review the
25   concluding paragraph there.

115

1 A (Witness examining document).  I read up to
2   and then signed off on pre-determined outcome.
3   (Witness examining document).  So what is
4   your question?
5 Q What could have been done to have changed the
6   outcome of this Public Law Board decision?
7       MR. SULLIVAN:  Objection, calls
8   for speculation.  You can answer.
9 A What I will say is even reading their
10   conclusion, it's based on their beliefs and
11   what they're seeing.  I don't think anything
12   should have been changed in the way that the
13   performance of the hearing was done and the
14   way the discipline was assessed.  They're
15   basing it upon their beliefs and what was
16   presented in the case.  I don't agree with
17   their beliefs.  However, out of respect for
18   the Public Law Board and not being part of
19   the collective agreement and what we do, I
20   represent the fact that they made a decision.
21   I don't agree with their decision.  I know as
22   a railroader what happened, and I don't think
23   that there was anything untoward in the way
24   that Mr. Jared performed the test.  The only
25   thing that I could see as being a potential

116

1   problem in it is the fact that the administra-
2   tion of Shelley Daberitz or Joe Adelfio who
3   sent out the discipline, that should have
4   been changed.  It should not have had Mr.
5   Jared's electronic signature on it.  That
6   might have changed the outcome of this Public
7   Law Board decision.
8 Q Why is that?
9 A Because when I read this, I believe that they
10   are of the view that Mr. Jared was involved
11   in the decisionmaking process.  And knowing
12   what I know, being that I'm the person that
13   made the decision of what discipline he would
14   get, I know that's not true.  But that's
15   their belief.  That's the way they came to
16   their conclusion.  Just because it goes to
17   the Public Law Board and they make a decision
18   doesn't mean I'm going to agree with it and
19   doesn't mean it was right.
20 Q And that's your belief, right, just like that
21   was the Public Law Board's belief?
22 A Correct.
23 Q Would you agree that Mr. DePover was
24   performing a safety sensitive task?
25 A And Mr. DePover being the conductor who was

117

1  in charge of protecting the movement of the
2  shove just to refresh my memory on names?
3  Q  Yes.
4  A  He was engaged in -- I would agree with that
5  for sure.
6  Q  That it was a safety sensitive task?
7  A  Correct.
8  Q  And you remember from reading the
9  investigation transcript that Mr. DePover
10 felt that he was surprised and distracted by
11 Mr. Jared. Right?
12 A  That's what he said, yes, a self-serving
13 answer. But, sure, that's what he said.
14 Q  You would defer to an employee's testimony,
15 would you not, in a situation like this that
16 he felt distracted and felt surprised thus
17 creating an unsafe condition?
18 A  I would say it's a self-serving answer with
19 possible influence from the union. I'm going
20 to go by the facts. And the facts in this
21 case were Mr. Jared told him to stop
22 transmitting, which happens on the railroad.
23 Sometimes radios fail. Sometimes somebody
24 walks on you with their radio and the trans-
25 mission doesn't happen. This is not an

118

1  uncommon occurrence. The fact of the matter
2  is Sexton did not stop in half the range of
3  the last communication and, therefore,
4  violated the rule.
5  Q  Do you think that somehow the union put words
6  in DePover's mouth?
7         MR. SULLIVAN: Objection.
8  A  It's possible.
9  Q  (By Mr. Magnuson, continuing) You don't have
10 any evidence to suggest that, do you?
11 A  No, but it's not outside the realm of
12 possibilities.
13 Q  Do you recall reading in the investigation
14 transcript that after this incident when
15 DePover was in a room with two supervisors
16 that he felt intimidated?
17 A  I don't remember reading that.
18 Q  You would discourage your managers from
19 intimidating conductors and engineers. Right?
20 A  Yeah. Nobody is supposed to be intimidating
21 anybody. But how a person feels is how a
22 person feels.
23 Q  Did you take into consideration when you made
24 this discipline decision that DePover
25 testified that he felt intimidated?

119

1  A  No, I did not.
2  Q  Is that something that you could have taken
3  into consideration?
4  A  No. The only things that were taken into
5  consideration were this. There was an
6  efficiency test that was performed. He was
7  told to stop -- well, he was given a
8  distance. He did not stop within one-half of
9  the last communication of the distance.
10 Downloads show that he went too far and eye
11 witness testimony said he went too far.
12 Facts of the matter are he should have
13 stopped. He did not. That's all that was
14 taken into consideration for the statement.
15 Q  So you didn't consider at all the fact that
16 DePover testified that he was surprised and
17 distracted by Jared and that later when he
18 was in a room with two managers that he felt
19 intimidated. You did not give that any
20 weight or consideration. Is that true?
21 A  I did not give it any weight or consideration
22 because it had nothing to do with the facts
23 of the case.
24 Q  But you would certainly discourage your
25 managers from intimidating, distracting, or

120

1  surprising conductors and engineers. Right?
2  A  No -- I discourage my managers -- I do not
3  tolerate people violating our policies period.
4  Q  And that includes your retaliation policies?
5  A  Yeah, it includes all our policies.
6  Q  Have you testified in any FRSA cases in the
7  past?
8  A  What's an FRSA case?
9  Q  The Whistleblower Act, the 2019 statute that
10 gives rise to this claim.
11 A  No, I have not.
12 Q  How many depositions have you given in the
13 past?
14 A  Maybe two, three.
15 Q  Do you recall what those cases involved?
16 Were they injuries or retaliation claims or
17 what?
18 A  They were in Canada, so I don't know if they
19 count here. I testified in court via Zoom
20 for the Lac-Megantic trial. I gave a
21 deposition some years ago about an employee
22 who resigned and decided to sue us later. I
23 don't think I have given any others. I think
24 there was only two or three.
25 Q  What was your involvement in the Lac-Megantic

129

1  Q  How?

2  A  Well, he had conversations with myself and I
3     assume he had conversations with others. And
4     having a conversation with myself over
5     something like that is not an easy
6     conversation to have.

7  Q  Was that the old Jason that handled that
8     conversation with him?

9  A  Don't get caught up in labels of the old
10    Jason and the new Jason or whatever --

11 Q  I want to know how McKelvey was held
12    accountable. He wasn't disciplined, was he?

13 A  Not that I remember, no, but neither was John
14    Sexton for that incident. He wasn't
15    disciplined either. I didn't discipline John
16    Sexton for following the rule. And McKelvey
17    being a young officer --

18 Q  The Public Law Board turned it over. Right?

19 A  No, no. You're confusing two incidents. The
20    incident that happened when he was shoving
21    equipment was a different incident on a
22    different date. Now that I'm looking back
23    through some of my notes -- and if you were
24    to pull them up -- where he had that
25    conversation with McKelvey I believe was

130

1     maybe somewhere in January, was it not, or
2     that incident, the shoving incident was in
3     January. Right? In February.

4  Q  February 1st.

5  A  February 1st. When did he write the
6     letter -- he wrote the letter to me on
7     February 15th after he had gotten in trouble.

8  Q  He told you that very day that Jared E tested
9     him. The very shift is when this
10    conversation with McKelvey occurred. Right?

11 A  No, I don't remember that. I don't remember
12    those details. When I look back at it and I
13    see that on February 1st or 2nd, whatever
14    date it was, and he gets held accountable by
15    Tom Jared for shoving, which he knows is a
16    major violation. Then and only then does all
17    of a sudden a letter show up on February 15th
18    to say that, hey, this happened and I want to
19    bring it to your attention.

20 Q  We have got McKelvey's testimony and we have
21    got Sexton's testimony. We're going to have --
22    Well, they both indicate that when McKelvey
23    told him not to cut the tracks, that was the
24    same shift -- that was the beginning of the
25    shift where Jared conducted the E test.

131

1     Okay? We'll get those facts straight. That
2     was the same shift.

3  A  Okay. Well --

4  Q  And you said McKelvey told you he told Sexton
5     not to cut the tracks. And I asked you how
6     did you hold him accountable. And you said
7     you had a difficult conversation with him?

8  A  I had a very pinpointed conversation with Mr.
9     McKelvey. I warned him that if he continued
10    along that path, if it were to happen again,
11    he wasn't going to work for me. I won't have
12    anybody on property who is going to violate
13    rules or encourage people to violate rules.

14 Q  But you didn't discipline or hold an
15    investigation on him?

16 A  You wouldn't hold an investigation on an
17    employee -- on a manager like that.

18 Q  But you could discipline?

19 A  You handle consequences differently with a
20    manager because they don't fall under a
21    collective agreement. They don't fall under
22    a discipline policy.

23 Q  But you could discipline him pursuant to all
24    these CP policies?

25 A  You don't give demerits to managers.

132

1     Sometimes you give suspensions.

2  Q  How are managers disciplined?

3  A  You can give them -- usually you give them
4     letters or you hold them accountable through
5     suspensions if it's bad enough. Usually it
6     doesn't get that bad. Usually it's a
7     question of having proper conversations,
8     coaching, documenting, making sure HR is
9     involved.

10 Q  Did you do any of that with respect to
11    McKelvey?

12 A  I don't recall.

13        MR. SULLIVAN: We're over time.
14    It's 1:41. We have gone 11 minutes passed
15    our agreed time. I'm assuming we're over the
16    three hours of on the record time. So we're
17    done.

18        MR. MAGNUSON: All right.
19        (WHEREUPON, the testimony was
20    concluded at 1:42 p.m.)
21            *   *   *
22
23
24
25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | | |
|---|---|---|
| John Sexton, | ) | |
| Plaintiff, | ) | Case No. 23-cv-00031 |
| | ) | |
| v. | ) | **DECLARATION OF** |
| | ) | **JASON ROSS** |
| Dakota, Minnesota & Eastern Railroad | ) | |
| Corporation d/b/a Canadian Pacific, a | ) | |
| Delaware Corporation, | ) | |
| | ) | |
| Defendant. | ) | |

COMES NOW I, Jason Ross, and affirm, attest, and declare as follows:

1. I have been the Senior Vice President of Operations for Soo Line Railroad Company since May 1, 2024.

2. Prior to that, I was the Vice President of Operations Southern Region for Soo Line Railroad Company from September 1, 2019 until February 15, 2023, and my territory covered Defendant Dakota, Minnesota & Eastern Railroad Corporation d/b/a Canadian Pacific ("CP"). I have personal knowledge of the facts stated herein.

3. As the Vice President of Operations Southern Region, I was responsible for reviewing and approving employee discipline for employees in my territory.

4. When I review discipline recommendations, I do not look at the names of employees when deciding discipline; instead, I review the fields of a chart that summarizes the offense, the employee's discipline history, and other objective factors.

5. In 2021, I reviewed the hearing investigation and the discipline recommendation for Plaintiff John Sexton regarding his failure to comply with Rule 5.3.7 of the General Code of

Operating Rules ("GCOR"). I determined that the appropriate discipline was a twenty-day suspension without pay, which was imposed on February 26, 2021.

6.    My decision to issue a twenty-day suspension to Sexton was entirely unrelated to the events that occurred in Marquette, Iowa, on February 1, 2021, including the discussion between Trainmaster Kurt McKelvey and Sexton related to cutting the tracks, Sexton's refusal to operate the train without first cutting the tracks, and the fact that Sexton and the conductor actually cut the tracks. The fact that Sexton and McKelvey had that disagreement on February 1, 2021 did not in any way motivate my decision to issue a twenty-day suspension to Sexton.

7.    The fact that the 474 train was delayed leaving Marquette on February 1, 2021 did not in any way motivate my decision to issue a twenty-day suspension to Sexton.

8.    My potential 2021 short-term incentive payment absolutely did not in any way motivate my decision to issue a twenty-day suspension to Sexton.

9.    I received emails on January 3, 2021 and January 18, 2021 from Sexton related to a manager's alleged failure to conduct air brake testing and related operational complaints. The supervisor about whom Sexton complained had nothing to do with the failed e-test on February 1, 2021.

10.    The fact that Sexton sent these emails on January 3, 2021 and January 18, 2021 did not in any way motivate my decision to issue a twenty-day suspension to Sexton.

11.    I received an email from Sexton on February 9, 2021 regarding McKelvey driving too fast for the winter road conditions. Sexton also shared his version of the events of the morning of February 1, 2021 in Marquette.

12.    The fact that Sexton sent this email on February 9, 2021 did not in any way motivate my decision to issue a twenty-day suspension to Sexton.

2

13.    I have reviewed the transcript from the February 10, 2021 investigation hearing into Sexton's violation of GCOR 5.3.7.

14.    Specifically, I read the line of questioning by Local Chairman Joe Rainwater to Sexton related to Tom Jared's administration of the efficiency test on February 1, 2021. Rainwater asked Sexton if Sexton believed Jared violated GCOR 6.5 when he "interrupted" DePover's car counts to Sexton. Sexton responded: "Absolutely. He created a unsafe act."

15.    Sexton's comment at the February 10, 2021 hearing that Jared "created an unsafe act" did not in any way motivate my decision to issue a twenty-day suspension to Sexton.

**Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.**

Executed on: August 1, 2024

Jason Ross

3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | | |
|---|---|---|
| John Sexton, | ) | |
| | ) | Case No. 23-cv-00031 |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | **DECLARATION OF** |
| | ) | **THOMAS JARED** |
| Dakota, Minnesota & Eastern Railroad | ) | |
| Corporation d/b/a Canadian Pacific, a | ) | |
| Delaware Corporation, | ) | |
| | ) | |
| Defendant. | ) | |

COMES NOW I, Thomas Jared, and affirm, attest, and declare as follows:

1.      I am the General Manager – U.S. West for Soo Line Railroad Company and my territory covers Defendant Dakota, Minnesota & Eastern Railroad Corporation d/b/a Canadian Pacific ("CP"). I have personal knowledge of the facts stated herein.

2.      CP is a Class I railroad that provides freight rail transportation services in several Midwest states, including in Iowa through Defendant Dakota, Minnesota & Eastern Railroad, which is an indirect subsidiary of Canadian Pacific Railway Company and controlled by CP.

3.      CP is largely unionized, with many non-management employees represented by various labor unions with which CP has collective bargaining agreements ("CBAs") that govern the terms and conditions of employment for unionized employees.

4.      I have been the General Manager – U.S. West since January 22, 2018.

5.      As the General Manager – U.S. West, I oversee CP's operations in six states, including Iowa. My responsibilities include ensuring safe operations, managing budgets, utilizing assets, developing people, and working with customers.

6.      As an operational leader, it is not uncommon for me to administer efficiency tests in the field to test employees' compliance with operational rules. Currently, I am required to administer at least 12 (twelve) efficiency tests per month.

7.      In 2021, I administered thirteen efficiency tests.

8.      On February 1, 2021, I administered an efficiency test at the Nahant rail yard in Davenport, Iowa.

9.      While visiting the Nahant yard that day, I heard over the radio that the 474-31 train was entering the yard that would be performing a shove movement. I assessed the environment and determined the conditions were safe to administer an efficiency test of the 474-31 crew while they were performing the shove movement.

10.      I did not know Plaintiff John Sexton was the engineer operating the 474-31 at the time I decided to administer the efficiency test. I only learned that Sexton was the engineer after the train stopped and Sexton disembarked.

11.      To the best of my current recollection, before I administered the efficiency test on February 1, 2021, Kurt McKelvey had not told me about any disagreement that he had with Sexton earlier on February 1, 2021.

12.      My decision to administer an efficiency test of the 474-31 crew on February 1, 2021 was entirely unrelated to the events that occurred in Marquette earlier that morning.

13.      The fact that the 474-31 was delayed on February 1, 2021 did not in any way motivate me to administer the efficiency test that day.

14.      My potential 2021 short-term incentive payment absolutely did not in any way motivate my decision to administer the efficiency test on February 1, 2021.

2

15.     I received emails on January 3, 2021 and January 18, 2021 from Sexton related to a manager's alleged failure to conduct air brake testing and related operational complaints. The supervisor about whom Sexton complained had nothing to do with the failed e-test on February 1, 2021.

16.     The fact that Sexton sent these emails on January 3, 2021 and January 18, 2021 did not in any way motivate my decision to administer the efficiency test on February 1, 2021.

17.     I have worked with Sexton at CP for approximately twenty-five years. Sexton is a self-proclaimed safety advocate and has raised dozens of safety-related concerns to me and other CP managers. I have never administered an efficiency test for Sexton because he raised safety concerns. And I have never recommended discipline for Sexton because he raised safety concerns. In fact, I have viewed Sexton as reliable "eyes on the ground" who will appropriately report safety concerns and rule violations.


**Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.**

Executed on: August 1, 2024

Tom Jared

Thomas Jared

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | | |
|---|---|---|
| John Sexton, | ) | |
| Plaintiff, | ) ) ) | Case No. 23-cv-00031 |
| v. | ) ) ) | **DECLARATION OF JEFFREY MCINNIS** |
| Dakota, Minnesota & Eastern Railroad Corporation d/b/a Canadian Pacific, a Delaware Corporation, | ) ) ) ) | |
| Defendant. | ) | |

COMES NOW I, Jeffrey McInnis, and affirm, attest, and declare as follows:

1.      I am the Assistant Director, Operating Rules & Practices (US) for Soo Line Railroad Company and my territory covers Defendant Dakota, Minnesota & Eastern Railroad Corporation d/b/a Canadian Pacific ("CP"). I have personal knowledge of the facts stated herein.

2.      I have been the Assistant Director, Operating Rules & Practices (US) since April 25, 2023. Prior to that, I was the Manager Operating Practices – US.

3.      The operations of CP's railroads are governed by numerous safety rules, regulations, orders, and directives, including the General Code of Operating Rules ("GCOR"), which is a set of operating rules for numerous Class I, Class II, and Class III railroads in the United States intended to enhance railroad safety.

4.      All CP operating employees, including Plaintiff John Sexton, must comply with the GCOR.

5.      When working in a rail yard, train crews may perform "shove movements," in which a locomotive is used to push train cars into position on open track where the cars may then stay until being connected to a train for transport to their next destination.

6.      When performing a shove, engineers operate the locomotive from the trailing end of the movement, and so rely on one specifically assigned employee protecting the shove to communicate about what is happening at the leading end of the movement.

7.      When performing a shove movement, the employee protecting the movement communicates with the engineer by radio to inform the engineer about the distance remaining before the train must come to a complete stop. The employee protecting the movement typically communicates the distance in "car counts"—the number of car lengths remaining until the train must be stopped.

8.      The GCOR Rule applicable to shove movements is Rule 5.3.7. GCOR Rule 5.3.7 mandates that engineers must be prepared to stop a shove movement within half the number of car lengths last called over the radio, if they receive no further instructions. In other words, if the engineer receives no further communication, he must actually stop the train, and the train must be stopped, within one-half of the number of car lengths that was last transmitted.

9.      For example, if the last car count communicated is forty (40), the engineer must be prepared to have the train at a stop within twenty (20) car lengths.

10.      If the communications include two car-counts in the same communication, the engineer should operate based on the most restrictive car-count. For example, if the conductor says, "Good for forty (40), fifteen (15) to a stop," the engineer should operate based on the fifteen (15) car-count—the more restrictive count.

11.      If the car-count is ambiguous or the engineer is confused, the engineer should immediately stop the shove movement and request clarification.

2

12.    The engineer performing a shove movement is required to listen and follow the directions of the one employee protecting the movement. The engineer is not to consider any other radio messages from other employees who are not specifically attached to the movement.

13.    CP managers are required to test employees on compliance with GCOR. These tests are referred to as "efficiency tests" or "e-tests".

14.    CP's U.S. Efficiency Test Manual for Operating Rules in Compliance with FRA 217.9 provides guidelines regarding the administration of efficiency tests. The guidelines provided in the U.S. Efficiency Test Manual on Operating Rules are not rules and do not set out mandatory procedures for administering efficiency tests.

15.    The guidelines for testing compliance with GCOR 5.3.7 are provided by several tests within CP's U.S. Efficiency Test Manual, including: Test GRA01 Hand Signals or Signal Disappearance (included in the "Stop" test group), Test GRF02 Shoving or Pushing Movements (included in the "Switches – Derails – Protecting Shoves and Equipment Foul of Adjacent Tracks" test group), and Test GR03 Lieu of Hand Signals (included in the "Railroad Radio" test group).

16.    When administering efficiency tests, the testing officer may alter the conditions of the task being performed to force the employee to comply with the rule being tested.

17.    For example, when administering Test GRA01, Test GRF02, or Test GR03 to test compliance with GCOR Rule 5.3.7, the testing officer may instruct the conductor to stop communicating with the engineer over the radio. By altering the conditions of the task being performed—intentionally cutting off radio communication after the last instruction provided—the testing officer is able to determine of the engineer complies with GCOR Rule 5.3.7 and stop the movement within half the number of car lengths last transmitted.

3

18.     This type of "set up" test is consistent with the guidelines set out in CP's Efficiency Test Manual for Test GRA01, Test GRF02, or Test GR03.

19.     When a testing officer enters a failed e-test into the system, the testing officer enters one test code, even if more than one test code could have applied to the test performed. If more than one test code is entered, it would appear as though the employee failed more than one e-test.

**Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.**

Executed on: August <u>5</u> 2024

Jeffrey McInnis

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | | |
|---|---|---|
| John Sexton, | ) | |
| | ) | Case No. 23-cv-00031 |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | **DECLARATION OF** |
| | ) | **JUSTIN DITTRICH-BIGLEY** |
| Dakota, Minnesota, & Eastern Railroad | ) | |
| Corporation d/b/a Canadian Pacific, a | ) | |
| Delaware Corporation, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

COMES NOW I, Justin Dittrich-Bigley, and affirm, attest, and declare as follows:

1.      I am the Assistant Director, Labor Relations for Soo Line Railroad Company d/b/a Canadian Pacific ("CP"). I have personal knowledge of the facts stated herein.

2.      I have been the Assistant Director, Labor Relations since March 28, 2024. Prior to that, I was the Manager Labor Relations.

3.      As the Assistant Director, Labor Relations, I am responsible for labor agreement negotiations with the labor unions, mediation with the unions, and arbitration with the unions related to employee discipline and alleged violations of the labor agreements.

4.      While I was Manager Labor Relations, my responsibilities included labor agreement negotiations, mediation, and arbitration related to employee discipline and alleged violations of the labor agreements for the Dakota, Minnesota & Eastern Railroad Corporation d/b/a Canadian Pacific territory.

5.      The collective bargaining agreements between CP and the labor unions set out the procedural requirements and processes related to employee discipline.

6.    Effective November 1, 2018, CP's Hybrid Discipline & Accountability Guidelines provide the process for issuing discipline consistently and fairly.

7.    CP's Hybrid Discipline & Accountability Guidelines provides for a range of outcomes depending on the severity of the rule violation—for example, Non-Major Offences and Attendance versus Major – Life Threatening & Conduct Unbecoming Offences—the employee's discipline record, and whether the employee immediately reports the incident, takes proper protective actions following the incident, and/or acknowledges responsibility.

8.    If discipline is assessed, it is CP's policy to document discipline in the employee's discipline record.

9.    During my deposition in this case, I was asked about several instances of employee discipline. The attorney taking my deposition showed me a discipline letter for employee T.P. (Exhibit 67); an investigation hearing transcript for employee T.P. (Exhibit 68); an Acknowledgment of Responsibility ("AOR") letter (also known as a "waiver") for employee T.V. (Exhibit 69); an AOR for employee D.C. (Exhibit 70); an investigation letter for employe G.H. (Exhibit 71); and a letter of reprimand for employee G.H. (Exhibit 72).

10.    Since my deposition, I have re-familiarized myself with the circumstances surrounding the discipline of employees T.V. and T.P.

11.    On July 16, 2019, engineer T.V. violated GCOR Rule 5.3.7, which is a Major – Life Threatening & Conduct Unbecoming Offence. T.V. was issued a twenty-day suspension, with five (5) days served and fifteen (15) days deferred. T.V. acknowledged responsibility for the rule violation and agreed to waive the right to a formal investigation hearing. The assessment of discipline for T.V.'s July 16, 2019 rule violation falls within the range of disciplinary

2

consequences that may be assessed for a Major – Life Threatening & Conduct Unbecoming Offence pursuant to CP's Hybrid Discipline & Accountability Guidelines.

12.     On January 7, 2021, engineer T.P. violated GCOR Rule 5.3.7, which is a Major – Life Threatening & Conduct Unbecoming Offence. T.P. was issued a twenty-day suspension, with ten (10) days served and ten (10) days deferred. T.P. immediately acknowledged and took accountability for his rule violation. The assessment of discipline for T.P.'s January 7, 2021 rule violation falls within the range of disciplinary consequences that may be assessed for a Major – Life Threatening & Conduct Unbecoming Offence pursuant to CP's Hybrid Discipline & Accountability Guidelines.

13.     Since my deposition, I re-familiarized myself with the circumstances surrounding the discipline issued to employee J.M. I was not asked about employee J.M. at my deposition.

14.     On February 16, 2021, engineer J.M. violated GCOR Rule 5.3.7, which is a Major – Life Threatening & Conduct Unbecoming Offence. J.M. was dismissed from employment with CP. J.M. had several Major rule violations on his discipline record, including a January 13, 2021 incident for which J.M. was issued a thirty-day "last chance" suspension. The assessment of discipline for J.M.'s February 16, 2021 rule violation falls within the range of disciplinary consequences that may be assessed for a Major – Life Threatening & Conduct Unbecoming Offence pursuant to CP's Hybrid Discipline & Accountability Guidelines.

15.     I have also reviewed documents relevant to the discipline issued to Plaintiff John Sexton on February 26, 2021.

16.     On February 1, 2021, Sexton violated GCOR Rule 5.3.7, which is a Major – Life Threatening & Conduct Unbecoming Offence. Sexton was issued a twenty-day suspension. The assessment of discipline for Sexton's February 1, 2021 rule violation falls within the range of

3

disciplinary consequences that may be assessed for a Major – Life Threatening & Conduct Unbecoming Offence pursuant to CP's Hybrid Discipline & Accountability Guidelines.

**Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.**

Executed on: August _5,_ 2024

Justin Dittrich-Bigley

4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | | |
|---|---|---|
| John Sexton, | ) | |
| | ) | Case No. 23-cv-00031 |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | **DECLARATION OF** |
| | ) | **JOHN T. SULLIVAN** |
| Dakota, Minnesota, & Eastern Railroad | ) | |
| Corporation d/b/a Canadian Pacific, a | ) | |
| Delaware Corporation, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

COMES NOW I, John T. Sullivan, and affirm, attest, and declare as follows:

1.     I am lead counsel of record for Defendant Dakota, Minnesota & Eastern Railroad Corporation, d/b/a Canadian Pacific ("CP") in the above referenced matter, and I have personal knowledge of the facts stated herein.

2.     I provide this Declaration in support of CP's Memorandum of Law in Opposition to Plaintiff's Motion for Partial Summary Judgment. This Declaration is included in CP's Local Rule 56(e) Response Appendix as Document No. 37.

3.     Attached to this Declaration as its **Exhibit A** is a true and correct copy of a March 9, 2021 letter from CP's Superintendent Operations Arthur Clark to employee J.M. issuing discipline. This document was produced in the litigation by CP as CP_00922. This document is included in CP's Local Rule 56(e) Response Appendix as Document No. 38.

**Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.**

Executed on: August 26, 2024          */s/ John T. Sullivan*
                                      John T. Sullivan



Arthur Clark
Superintendent Operations
St. Paul Yard

1010 Shop Rd
St. Paul, MN 55106

T (612) 408-8004
E Arthur_Clark@cpr.ca

March 9, 2021



Employee #939624

Mr. ▇▇▇▇

Notice of formal investigation/hearing was issued you under date of February 18, 2021 in connection with the occurrence outlined below:

"…to determine the facts and circumstances and to place your responsibility, if any, in connection with your alleged failure to stop within half of the last distance specified at Glenwood Yard while working 499-16 at approximately 12:50 on February 16, 2021."

Formal investigation/hearing was conducted on February 24, 2021 to develop all facts and circumstances in connection with the referenced occurrence. Following the conclusion of that investigation/hearing it was determined that the transcript of the investigation/hearing record contains substantial proof that you violated the following Company Rules or Notices: GCOR 5.3.7 – Radio Response.

Based on the facts and evidence in the hearing record and your past discipline history, you are hereby dismissed from the service of the Company.

Please contact the Trainmaster at 651-778-3667 within ten days of receipt of this letter to arrange a time to return all Company property issued to you.

Respectfully,

Arthur Clark
Superintendent Operations
St. Paul Yard

CC:   Labor Relations
      Crew Management
      Employee Services
      Gordon Kepka L/C BLET

Confidential