**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION**

| | |
|---|---|
| John Sexton, | No. 3:23-cv-00031-RGE-HCA |
| Plaintiff, | |
| v. | |
| Dakota, Minnesota & Eastern Railroad Corporation d/b/a Canadian Pacific, a Delaware Corporation, | **PLAINTIFF'S RESPONSE TO CP'S STATEMENT OF ADDITIONAL FACTS** |
| Defendants. | |

Plaintiff John Sexton by and through his attorneys submits the following responses to Defendant Dakota, Minnesota, & Eastern Railroad Corporation d/b/a Canadian Pacific's ("CP") Statement of Additional Facts at Dkt. 59-2. The following is a verbatim copy of Defendant Dakota, Minnesota, & Eastern Railroad Corporation d/b/a Canadian Pacific's Statement of Additional Facts, filed as Dkt. 59-2, adding Plaintiff's notation as to whether the facts are undisputed or disputed and providing citations where necessary to oppose each fact:

### A.    ADDITIONAL FACTS RELATED TO GCOR 5.3.7

1.    When performing a shove movement, the employee protecting the movement communicates with the engineer by radio to inform the engineer about the distance remaining before the train must come to a complete stop. The employee protecting the movement typically communicates the distance in "car counts"—the number of car lengths remaining until the train must be stopped.

> Support:    **Resp. App. p. 303**,[1] McInnis Decl. ¶ 7; **Resp. App. p. 3**, Sexton Dep. 28:11–29:21.

**PLAINTIFF RESPONSE: Deny**. GCOR 5.3.7 states "Movement must stop within half the distance specified unless additional instructions are received." Dkt. 50-3 at CP Appendix 59. Therefore, the employee protecting

the movement provides communications, however, the "car count" that the employee is providing is ***not*** "the number of car lengths remaining until the train must be stopped."

      2.      The applicable GCOR Rule 5.3.7, mandates that engineers must be prepared to stop a shove movement within half the number of car lengths last called over the radio, if they receive no further instructions. In other words, if the engineer receives no further communication, he must actually stop the train, and the train must be at a full stop, within one-half of the number of car lengths that was last transmitted. GCOR 5.3.7's specific language is:

> **5.3.7**   **Radio Response**
>
> When radio communication is used to make movements, crew members must respond to specific instructions given for each movement. Radio communications for shoving movements must specify the direction and distance and must be acknowledged when distance specified is more than four cars.
>
> **Movement must stop within half the distance specified unless additional instructions are received.**
>
> <u>Support</u>:      **Resp. App. p. 303**, McInnis Decl. ¶ 8; **Resp. App. p. 3**, Sexton Dep. 27:21–29:7; **Resp. App. p. 36**, Sexton Dep. Ex. 2 at CP_00319.

**PLAINTIFF RESPONSE: <u>Deny</u>**. The rule does ***not*** state "half the number of car lengths last called over the radio" or "one-half of the number of car lengths that was last transmitted." Instead, it states "Movement must stop within half the distance specified unless additional instructions are received." Dkt. 50-3 at CP Appendix 59. The phrases "distance specified" and "additional instructions" are not surplusage and have a distinct meaning—under CP's summary of the rule, instructions of "clear for 40, 15 to a stop" and "15 to a stop, clear for 40" would have entirely different meanings because CP's version of the rule places the importance in the "number of car lengths that was ***last*** transmitted." So, in the preceding examples, under CP's new summary of the rule, an engineer would have to stop within half the distance of 15 under the first instruction, but half the distance of 40 under the latter instruction. Under the rules, crews are required to have a job briefing prior to the shoving movement where the employee has checked that the "track is clear" and the radio communication is to include when the train "must stop". Dkt. 50-3 at CP Appendix 59 and 274. Thus, the only distinctions made by CP's rules are based on track clearance and stopping the train. The rules state nothing

about communicating based on where a cut needs to be made or specify any distinction if the communication includes more than one instruction.

3.      For example, if the last car count communicated is twenty (20), the engineer must be prepared to have the train at a full stop within ten (10) car lengths.

>   Support:      **Resp. App. p. 303**, McInnis Decl. ¶ 9; **Resp. App. p. 4**, Sexton Dep. 33:16–25.

**PLAINTIFF RESPONSE: <u>Admit,</u>** specifically to this statement as a hypothetical which does not include any indication whether additional instructions were given or whether any other distance was specified.

4.      If the communication includes two car-counts in the same communication, the engineer should operate based on the most restrictive car-count. For example, if the conductor says, "Good for forty (40), fifteen (15) to a stop," the engineer should operate based on the fifteen (15) car-count—the more restrictive count.

>   Support:      **Resp. App. p. 303**, McInnis Decl. ¶ 10; **Resp. App. p. 237**, Jared Dep. 150:3–16; **Resp. App. pp. 183–84**, Johnson Dep. 39:8–25, 40:14–20, 41:6–10.

**PLAINTIFF RESPONSE: <u>Deny.</u>** GCOR 5.3.7 says nothing about the "most restrictive" car count. Dkt. 50-3 at CP Appendix 59. No written rule states the terms "most restrictive". GCOR 5.3.7 does not specify a crew must act any differently in a situation in which there is communication that includes more than one instruction. Instead, under the rules, crews are required to have a job briefing prior to the shoving movement where the employee has checked that the "track is clear" and the radio communication is to include when the train "must stop". Dkt. 50-3 at CP Appendix 59 and 274. The only distinctions made by CP's rules are based on track clearance and stopping the train.

5.      If the car-count is ambiguous or the engineer is confused, the engineer should immediately stop the shove movement.

>   Support:      **Resp. App. p. 303**, McInnis Decl. ¶ 11.

**PLAINTIFF RESPONSE: <u>Admit</u>**.

6.    Johnson testified clearly and accurately about the requirements of GCOR 5.3.7, as follows:

A.    Once he's given something more restrictive, no. He needs to go with what's most restrictive. 25 is more restrictive than 50.

Q.    Is that what the rules says, Rule 6.5?

A.    I don't have the GCOR in front of me to tell you exactly what it reads, but they are required to stop within half the distance specified. So in the case of the 25, you would have to be stopped within 12-1/2 cars if he wasn't given further instruction. And the same with the 15, clear for 40, he would need to be stopped within half of the 15, which would be 7-1/2 cars.

Q.    Did you give any significance to the instruction of still clear for 40?

[objection omitted]

A.    No, because he was given something more restrictive.

Support:        **Resp. App. pp. 183–84**, Johnson Dep. 40:18 41:10.

**PLAINTIFF RESPONSE: Deny** as to Johnson's testimony was "clear and accurate" about the requirements of GCOR 5.3.7. When asked what the GCOR rule says, he testified, "I don't have the GCOR in front of me to tell you exactly what it reads…." Dkt. 53-4 at 119. Then after reading GCOR 5.3.7, Johnson was asked, "Does it say more restrictive anywhere in that rule?" *Id.* at 128. Johnson answered no. *Id.*

## B.    ADDITIONAL FACTS RELATED TO THE EVENTS OF FEBRUARY 1, 2021

7.    McKelvey initially disagreed, but ultimately agreed that the crossings should be cut.  McKelvey testified that the decision was consistent with CP's policy—when in doubt, take the safest course.

Support:        **Resp. App. p. 167**, McKelvey Dep. 79:25–80:9; **Resp. App. p. 282**, Ross Dep. 26:6–15.

**PLAINTIFF RESPONSE: Deny**. Mr. McKelvey and Mr. Sexton had a disagreement about whether the crossing needed to be cut. Dkt. 53-4 at Appx. A, pg. 30. Mr. McKelvey concludes that he "believed the

result of the job briefing" was that "we agreed to cut the tracks" and that his belief was only based on the fact that Sexton did in fact cut the tracks. Dkt. 50-3 at CP Appendix 223. No evidence suggests that McKelvey actually explicitly agreed with Sexton that he was to cut the tracks. Mr. Ross was under the impression that Mr. McKelvey had instructed Mr. Sexton not to cut the tracks. *Id.* at Appx. A, at pgs. 46, 48, 49, and 50.

8.     The 474-31 departed Marquette at 5:40 a.m. CT on February 1, 2021, which was approximately 3.5 hours late based on the standard time allotted for the work to be performed on the train in Marquette. CP further states that cutting the crossings was just one task to be completed that morning. After they were finished cutting the crossings, Sexton and DePover returned to the Marquette yard to continue the substantial work that needed to be completed before they could depart. The work included lifting an engine, setting out cars, digging out a siding switch, completing an air brake test, cutting cars, tying and releasing hand brakes, and building up air to complete a Class III air brake test. From start to finish, the work took nearly four hours. Jared and Ross testified that a 3.5-hour over-standard delay is not unusual in winter operations.

> Support:        **Resp. App. pp. 7–8**, Sexton Dep. 61:4–16, 62:6–20, 63:2–64:25;
> **Resp. App. p. 50**, Sexton Dep. Ex. 5; **Resp. App. p. 168**, McKelvey Dep. 81:7–
> 82:2; **Resp. App. p. 173**, McKelvey Dep. Ex. 27 at CP_03303; **Resp. App. pp.**
> **230, 242**, Jared Dep. 103:18–104:13, 179:24–180:12; **Resp. App. p. 290**, Ross
> Dep. 81:10–82:5.

**PLAINTIFF RESPONSE: Admit** as to the 474-31 train departed Marquette at 5:40 a.m. CT on February 1, 2021, which was approximately 3.5 hours late based on the standard time allotted for the work to be performed on the train in Marquette. **Admit** that cutting the tracks was just one task to be completed that morning. **Admit** after Sexton and DePover were finished cutting the crossings, they returned to the Marquette yard to continue the work that needed to be completed before they could depart. **Admit** the work included lifting an engine, setting out cars, digging out a siding switch, completing an air brake test, cutting cars, tying and releasing hand brakes, and building up air to complete a Class III air brake test. **Deny** that the work took nearly 4 hours. The Top 15 Trains Impacting Train Speed documents describes that "474 rolled up MP 100 at 02:22 when they arrived at south wye to start their work." Dkt. 50-3 at CP Appendix 231. It then goes on to describe "they

also had to cut the Boatels crossing and run down MQS light power before they could shove the cars into it." *Id.* The described delay which included the cutting of the crossings is 3 hours 23 minutes. *Id.* McKelvey described in an email that the 474 began their work at 02:22. Dkt. 50-3 at 228-229. Then, that "474 cut off light power and went down to the South Siding switch." *Id.* McKelvey described several tasks, then "474 then ran light power 2 units down to the south siding switch and ran light power over boatels crossing and down the siding track where their s/o would be made. *Id.* After this was completed then ran light power back to their train and tied on." *Id.* McKelvey concluded that "There is no reason lifting and (sic.) engine and s/o 24 cars should take this long." *Id.* McKelvey attributes the planned tasks should not have taken an additional 3 hours and 23 minutes, which would mean the time Sexton took to conduct the task not originally planned (cutting the tracks) accounts in that additional 3 hours and 23 minutes. *Id.* **Deny** that a 3.5-hour over-standard delay is not unusual in winter operations as McKelvey had worked in winter operations and this 3.5 hour delay was one of the longest work events that he had witnessed in his career. Dkt. 53-2 at para. 45. Additionally, Sexton's train was in the top 15 most delayed trains list in the United States on the day he took the time to cut the tracks. Dkt. 50-3 at CP Appendix 231.

9.       McKelvey testified: "Four hours for a singular work event is probably one of the longest work events that I have witnessed in my career at Canadian Pacific." CP further states that the "singular work event" to which McKelvey was referring included cutting crossings, lifting an engine, setting out cars, digging out a siding switch, completing an air brake test, cutting cars, tying and releasing hand brakes, and building up air to complete a Class III air brake test. CP also states that CP hired McKelvey in January 2020 to join the Leadership Management Trainee Operations program. McKelvey completed the training program in April or May 2020 and was assigned as Assistant Trainmaster in Marquette, Iowa. Thus, in February 2021, McKelvey had been in a management position at CP for approximately ten months and it was his first winter season in a management position.

Support:        **Resp. App. p. 173**, McKelvey Dep. Ex. 27 at CP_03303; **Resp. App. pp. 163–64**, McKelvey Dep. 11:22–12:5, 13:5–20.

**PLAINTIFF RESPONSE: Admit** that McKelvey testified: "Four hours for a singular work event is probably one of the longest work events that I have witnesses in my career at Canadian Pacific." **Admit** as to Sexton's work included cutting crossings, lifting an engine, setting out cars, diffing out a siding

switch, completing an air brake test, cutting cars, trying and releasing hand brakes, and building up air to complete a Class III air brake test. However, **Deny** as to what McKelvey was referring to as the "singular work event" as CP cites to the Top 15 Trains Impacting Train Speed – US which does not include all the tasks described. **Admit** to Plaintiff's knowledge CP hired McKelvey in 2020 to join the Leadership Management Trainee Operations program. **Admit** to Plaintiff's knowledge that McKelvey complete the training program in April or May 2020 and was assigned as Assistant Trainmaster in Marquette, Iowa. **Admit** to Plaintiff's knowledge that McKelvey had only been in a management position at CP for approximately ten months, and as a manager for CP, 2021 was his first full winter season.

10.     McKelvey attributed about a few minutes of the train delay to the crossing-cutting operation. According to McKelvey's contemporaneous written description of the events of that day, the primary reason for the delay was lifting the engine and setting off (moving) twenty-four cars.

> Support:          **Resp. App. pp. 165–66, 169**, McKelvey Dep. 55:9–56:15, 65:8–13,114:12–116:24; **Resp. App. pp. 170–72**, McKelvey Dep. Ex. 26; **Resp. App. p.173**, McKelvey Dep. Ex. 27 at CP_03303.

**PLAINTIFF RESPONSE: Admit** that McKelvey attributed about a few minutes of the train delay to the crossing-cutting operation, however, his written statements do not indicate it was only a few minutes. The Top 15 Trains Impacting Train Speed documents describes that "474 rolled up MP 100 at 02:22 when they arrived at south wye to start their work." Dkt. 50-3 at CP Appendix 231. It then goes on to describe "they also had to cut the Boatels crossing and run down MQS light power before they could shove the cars into it." *Id.* The described delay which included the cutting of the crossings is 3 hours 23 minutes. *Id.* McKelvey described in an email that the 474 began their work at 02:22. *Id.* at CP Appendix 228-229. Then, that "474 cut off light power and went down to the South Siding switch." *Id.* McKelvey described several tasks, then "474 then ran light power 2 units down to the south siding switch and ran light power over boatels crossing and down the siding track where their s/o would be made. *Id.* After this was completed then ran light power

back to their train and tied on." *Id.* McKelvey concluded that "There is no reason lifting and (sic.) engine and s/o 24 cars should take this long." *Id.* McKelvey attributes the planned tasks should not have taken an additional 3 hours and 23 minutes, which would mean the time Sexton took to conduct the task not originally planned (cutting the tracks) accounts in that additional 3 hours and 23 minutes. *Id*. **Deny** Mr. McKelvey's written statement was that the "primary" reason for the delay was lifting the engine and setting off (moving) twenty-four cars as Mr. McKelvey did not use the term "primary" or a term similar to it.

11.    Sexton attributed at least twenty to thirty minutes of the delay to picking up an engine on an open deck bridge and performing an air brake test.

> Support:        **Resp. App. p. 9**, Sexton Dep. 66:10–68:23; **Resp. App. p. 50**, Sexton Dep. Ex. 5.

**PLAINTIFF RESPONSE: Admit.**

12.    At the February 10, 2021 investigation hearing, Sexton said, "I had a man on the north end protecting the shove, Mr. Cruciani, and I had Mr. DePover on the ground as well, counting me down." Sexton then admitted it was Mr. DePover who was giving the shove instructions. As a result, Sexton was required to follow only DePover's instructions, as neither Cruciani nor any other person had any actual role in the protecting the shove movement.

> Support:        **Resp. App. pp. 303–04**, McInnis Decl. ¶¶ 6, 12; **Resp. App. p. 3**, Sexton Dep. 29:1–19; **Resp. App. p. 131**, Sexton Dep. Ex. 10 at CP_000098 (Tr.81:1-17).

**PLAINTIFF RESPONSE: Admit** as to at the February 10, 2021 investigation hearing, Sexton said, "I had a man on the north end protecting the shove, Mr. Cruciani, and I had Mr. DePover on the ground as well, counting me down." **Admit** that Sexton indicated that Mr. DePover was giving him car counts. **Deny** that "Sexton was required to follow only DePover's instructions, as neither Cruciani nor any other person had any actual role in the protected the shove movement." Before shoving cars, a crew may ask somebody on the far end of the shoving movement

to attach to the crew to communicate with the engineer to protect the shove. See Sexton Declaration at Dkt. 57-3 para. 2. Before Sexton's February 1, 2021, shoving movement he radioed Anthony Cruciani to assure that the track was clear before his shoving movement began. *Id.* at para. 3. Surely, if somebody other than DePover radioed that the tracks were no longer clear, Sexton should stop.

13.    DePover was the conductor operating the 474-31 with Sexton on February 1, 2021. Consistent with CP rules and the GCOR, DePover was the only person assigned to protect the movement and so Cruciani's statements and descriptions were not instructions to Sexton.

> Support:        **Resp. App. pp. 3, 5–6**, Sexton Dep. 29:1–19, 43:22–44:21, 46:11–15; **Resp. App. pp. 303–04**, McInnis Decl. ¶¶ 6, 12.

**PLAINTIFF'S RESPONSE:  Admit** that DePover was the conductor working with Sexton on February 1, 2021. **Deny** that DePover was the only person assigned to protect the movement and so Cruciani's statements and descriptions were not instructions to Sexton. Before shoving cars, a crew may ask somebody on the far end of the shoving movement to attach to the crew to communicate with the engineer to protect the shove. See Sexton Declaration at Dkt. 57-3 para. 2. Before Sexton's February 1, 2021, shoving movement he radioed Anthony Cruciani to assure that the track was clear before his shoving movement began. *Id.* at para. 3. Surely, if somebody other than DePover radioed that the tracks were no longer clear, Sexton should stop.

14.    The last communication Sexton received from DePover, the conductor, was "good for forty (40), fifteen (15) cars to a stop." Even if "good for forty (40)" were considered to be an "instruction," "fifteen (15) to a stop" would be an additional instruction. As a result, GCOR 5.3.7 required Sexton to be prepared to have the train stopped within seven and one-half car lengths and to actually have the train stopped within that distance if he heard no other instructions. Sexton shoved eleven cars after being instructed "15 to a stop" before stopping and so violated GCOR 5.3.7.

**PLAINTIFF RESPONSE: Deny** as to "good for forty (40), fifteen (15) cars to stop" being an exact quote of

what Mr. DePover communicated as the last instruction. Plaintiff agrees that the last instructions included a count of 15 to where the crew needed to make a cut and that the track was clear for 40. However, CP's citation is to Mr. Sexton's deposition where he read from the disciplinary transcript—the disciplinary transcript also shows that Mr. DePover stated that his last instructions were "15 more to a stop, still clear for 40". Dkt. 50-3 at CP Appendix 131. **Admit** that even if "good for forty (40)" were considered to be an "instruction," "fifteen (15) to a stop" would be an additional instruction to the same extent that that "good for forty (40)" is an additional instruction to "fifteen (15) to a stop". **Deny** that Sexton violated GCOR 5.3.7. because the track was clear for 74 cars, Mr. DePover had last specified that the track was "clear for 40" cars— half the distance of 40 is 20 and 11 is within 20. Dkt. 53-4 at 100:18-19 and Dkt. 51 at CP Appendix – 128. An instruction of "15 more to a stop, still clear for 40" means that "still clear for 40" is an additional instruction. Dkt. 53-2 at para. 189. The rule states "Movement must stop within half the distance specified **unless additional instructions are received".** Dkt. 50-3 at CP Appendix – 59. Emphasis added. If "additional instructions are received," then the engineer has the right to rely on those instructions. Dkt. 53-2 at para. 190.

> Support:    **Resp. App. pp. 3, 10–12**, Sexton Dep. 28:5–18; 121:19–122:6;122:24–123:5; 126:19–23; **Resp. App. pp. 236–37, 240**, Jared Dep. 148:16–149:3,149:23–150:2, 166:2–167:24; **Resp. App. pp. 183–84**, Johnson Dep. 37:13–38:13,39:3–25, 40:22–41:5; **Resp. App. p. 36**, Sexton Dep. Ex. 2 at CP_00319; **Resp.App. p. 294**, Ross Dep. 119:4–14.

15.    Ross testified at his deposition that he agrees DePover was engaged in a safety sensitive task when he was performing a shove movement on February 1, 2021.

> Support:    **Resp. App. pp. 293–94**, Ross Dep. 116:23–117:7.

**PLAINTIFF RESPONSE: Admit.**

16.    CP's U.S. Manual on Operating Rules in Compliance provides guidelines regarding the administration of efficiency tests, which test compliance with GCOR rules. The guidelines provided in the U.S. Efficiency Test Manual on Operating Rules in Compliance are not rules and do not set out mandatory procedures for administering efficiency tests, nor are the procedures

described in the manual the exclusive ways for efficiency tests to be performed. The guidelines for testing compliance with GCOR 5.3.7 are provided by several tests within CP's U.S. Efficiency Test Manual, including: Test GRA01 Hand Signals or Signal Disappearance (included in the "Stop" test group), Test GRF02 Shoving or Pushing Movements (included in the "Switches – Derails – Protecting Shoves and Equipment Foul of Adjacent Tracks" test group), and Test GR03 Lieu of Hand Signals (included in the "Railroad Radio" test group).

> Support:        **Resp. App. pp. 284–85, 287**, Ross Dep. 52:17–53:1, 62:13–23,63:17–23; **Resp. App. pp. 225–27**, Jared Dep. 59:6–60:3, 68:6–69:23; **Resp. App.p. 187**, Johnson Dep. 79:12–22; **Resp. App. pp. 195–210c**, Johnson Dep. Ex. 39 at SEXTON 000368–382, 384–385, 470–472, 496–498; **Resp. App. p. 304**, McInnis Decl. ¶¶ 14, 15.

**PLAINTIFF RESPONSE: <u>Deny</u>** that the U.S. Manual on Operating Rules in Compliance does not set out mandatory procedures. Testimony from CP's corporate representative provides that the U.S. Manual on Operating Rules in Compliance with FRA 217.0 "gives a structured test so the tests are done consistently and safely—the manual outlines the process of how a test **should be done**." Dkt. 53-4 at 183. Emphasis added. Additionally, the test in question GRF02 states: "When conducting this test, actual operating conditions **are to be observed**." Dkt. 54-1 at 33. Emphasis added. There is no mincing this "guideline"—it is mandatory that GRF02 tests "are to be observed." *Id.* Moreover, the Manual states: "Don't set up a situation that can result in an unsafe act or condition"; "Don't conduct a test to entrap an employee"; and "Don't violate a rule in order to set up a test situation". Dkt. 50-3 at CP Appendix 270. Nowhere does the Manual say the preceding rules are "not mandatory" or that the entire Manual is "not mandatory".

17.    Jared administered the efficiency test on February 1, 2021 consistent with the guidelines set out in CP's Efficiency Test Manual and CP practices and rules. Specifically, after DePover gave a 15-car count, Jared instructed DePover not to give further instruction to Sexton. In so doing, Jared altered the conditions of the shove movement to test Sexton's compliance with GCOR Rule 5.3.7, which required him to stop within half the distance specified by DePover's last instruction. This type of "set

up" test is consistent with the guidelines set out in CP's Efficiency Test Manual and did not result in any violation of federal law or regulations, nor any of CP practices and rules, including GCOR.

> Support:    **Resp. App. pp. 224, 229, 234–37, 240**, Jared Dep. 50:20–51:4,78:22–80:3,    137:4–20,    139:11–24,    143:18–144:18,    147:3–149:3,    167:13–24; **Resp. App. pp. 284–87**, Ross Dep. 52:17–53:1, 53:23–25, 54:11–55:11, 58:1–20, 59:2–60:18, 62:13–23, 63:17–23; **Resp. App. pp. 210, 210a-c**, Johnson Dep. Ex. 39 at SEXTON 000472, 496–498; **Resp. App. p. 300**, Jared Decl. ¶ 8; **Resp. App. pp. 304– 05**, McInnis Decl. ¶¶ 16–19.

**PLAINTIFF RESPONSE: <u>Deny.</u>** Jared's instruction to DePover to stop communicating with Sexton is **NOT** consistent nor in compliance with GRF02. GRF02 provides no steps that involve instructing the person protecting a shoving movement to stop communicating nor for the person who is conducting the test to alter the conditions. Dkt. 50-3 at CP Appendix 274. Jared's instruction to DePover to stop communicating violated federal law and CP rules: Federal law provides that point protection requires "giving signals or instructions to control the movement." 49 CFR § 218.99(b)(3)(ii). Jared's instruction resulted in there being no instructions to control the movement. Dkt. 53-4 at 103. CP rules state that the person protecting the shove is to provide direction and distance during shoving movements—Jared's instructions resulted in there being no direction and distance communications during the shoving movement. *Id.*

18.    Jared testified he knew Sexton was the engineer operating 474-31 only *after* he had administered the efficiency test, the train stopped, and Sexton disembarked. He did not who the engineer was at the time he decided to administer the test.

> Support:    **Resp. App. pp. 232–33, 238, 243**, Jared Dep. 128:19–129:8, 157:4–9, 186:21–187:15; **Resp. App. p. 300**, Jared Decl. ¶¶ 10–12.

**PLAINTIFF'S RESPONSE: <u>Deny</u>** that Jared decided to administer an efficiency test of the shove movement before he knew Sexton was the engineer operating the locomotive. Direct evidence exists as to Jared's knowledge: Sexton's delay created a flurry of emails and communications. McKelvey was asked to "send a write up of the 474 at Marquette to the DL Senior and East Director". Dkt. 54-1 at Appendix B - 2. McKelvey then sent an email to several managers, including Jared that stated, "The work for 474 was to lift 1

engine and s/o 24 cars behind 49 cars and 1 DP unit." *Id.* at 8. But instead, the crew took the time to cut the tracks: "474 cut off light power and went down to the South siding switch." *Id.* McKelvey notes, "I again instructed them to go lift the engine off the south wye." *Id.* Instead, "474 then ran light power 2 units down the south siding switch and ran light power over boatels crossing and down the siding track where their s/o would be made." *Id.* Jared knew that the 474's crew did not receive an instruction to cut the tracks based on this email and Jared knew that the 474's crew did cut the tracks. McKelvey also completed an Incident Report sent to Jared which stated: "they also had to cut the Boatels crossing and run down MQS light power before they could shove the cars into it." *Id.* at 11. The incident report clearly lists the train as 474 all throughout and lists the engineer as "SEXTON". *Id.* Jared's response to McKelvey was, "Call me when you have a min." Dkt 53-2 at para 51. Shortly after, McKelvey did in fact call Jared. *Id.* at para. 53.

19.    DePover and Sexton were both interviewed following Sexton's failed efficiency test on February 1, 2021. DePover provided a contemporaneous written statement describing Sexton's rule violation.

Support:        **Resp. App. pp. 238–39**, Jared Dep. 160:8–161:6.

**PLAINTIFF'S RESPONSE: Admit** as to DePover and Sexton were both interviewed following Jared's instructions to DePover to stop engaging in a safety sensitive task when he was performing a shove movement on February 1, 2021. **Deny** that it was a failed efficiency test. See Plaintiff's Response to para. 14. **Admit** that DePover provided a statement, however, it was after the shoving movement, it did not state that Sexton violated a rule, and DePover believed that he was compelled to write the statement. Dkt. 53-3 at Plaintiff Appendix A 147.

20.    Phone records indicate McKelvey called Jared at 10:55 a.m. CT on February 1, 2021.
Support:        **Resp. App. p. 248**, Jared Dep. Ex. 52 at CP_03459.

**PLAINTIFF'S RESPONSE: Admit.**

21.    In February 2021, Kade Antczak was a CP Operations Supervisor.

Support:    **Resp. App. p. 179**, McKelvey Dep. Vol. II 21:3–20.

**PLAINTIFF'S RESPONSE: <u>Admit.</u>**

22.    CP distributes a daily report titled "Top 15 Trains Impacting Speed US," which displays 15 delayed trains for the day prior in descending order starting with the most delayed train. On February 2, 2021, the 474-31 was at the top of the "Top 15 Trains Impacting Speed US" list.

Support:    **Resp. App. p. 245**, Jared Dep. 197:1-198:4; **Resp. App. p. 249**, Jared Dep. Ex. 57 at CP_03303.

**PLAINTIFF'S RESPONSE: <u>Admit.</u>**

### C.    ADDITIONAL FACTS RELATED TO SEXTON'S ALLEGED PROTECTED CONDUCT

23.    Jared testified he was made aware "at some point" that Sexton and McKelvey had a disagreement about whether the tracks should be cut. Mr. Jared testified that he did not recall how or when he was made aware of the disagreement. Mr. Jared testified that he could have learned about the conflict from Sexton's February 9, 2021 email.

Support:    **Resp. App. pp. 241, 244**, Jared Dep. 172:16-19, 191:20–192:23.

**PLAINTIFF'S RESPONSE: <u>Admit</u> as to this is what Jared testified.**

24.    Jared testified there were standing daily operations calls at 7:00 a.m. and 11:00 a.m. Jared also testified that he does not recall discussing any over-standard delays during the 7:00 a.m. and 11:00 a.m. operations calls on February 1, 2021.

Support:    **Resp. App. pp. 230–31**, Jared Dep. 101:5-25, 102:7–21, 107:17–108:10.

**PLAINTIFF'S RESPONSE: <u>Admit</u> as to this is what Jared testified.**

25.    Ross testified that CP teaches employees to take the safe course; when in doubt, cut the crossings.

Support:        **Resp. App. p. 282**, Ross Dep. 25:5–26:15.

**PLAINTIFF RESPONSE: <u>Admit</u>** as Ross testified that CP teaches employees to take the safe course; when in doubt, cut the crossings. However, McKelvey as a manager of CP disagreed with Sexton regarding Sexton's doubt. Dkt. 53-4 at Appx. A, pg. 30.

26.    Ross testified he had conversations with Sexton and with McKelvey after Ross received an email from Sexton on February 9, 2021 regarding McKelvey driving too fast for the conditions. In the February 9, 2021 email, Sexton also shared his version of the events of the morning of February 1, 2021 in Marquette. Ross confirmed receipt of the email on Wednesday, February 10, 2021 and told Sexton he would look into it and get back to him. Ross responded again on Monday, February 15, 2021 that he had gathered information and wanted to meet with Sexton to discuss. Ross testified that he recalls speaking to Sexton at some point after his February 15, 2021, response to Sexton. Ross also testified that he had a conversation with Sexton and McKelvey a few weeks later about the importance of cutting the crossings. Ross stated unequivocally: "I had that conversation with McKelvey as well because I'm not going to tolerate people cutting the rules and taking shortcuts. I won't tolerate it for one minute."

Support:        **Resp. App. pp. 280–83, 295**, Ross Dep. 13:3–19:6, 25:2–26:5,26:24–29:5, 131:4–13; **Resp. App. p. 297**, Ross Decl. ¶ 11; **Resp. App. p. 13**,Sexton Dep. 162:20–164:22; **Resp. App. pp. 160–61**, Sexton Dep. Ex. 18.

**PLAINTIFF'S RESPONSE: <u>Admit</u>** as to Ross testified he had conversations with Sexton and with McKelvey after Ross received an email from Sexton on February 9, 2021 regarding McKelvey driving too fast for the conditions. **<u>Admit</u>** as to in the February 9, 2021, email, Sexton also shared his version of the events of the morning of February 1, 2021, in Marquette. **<u>Admit</u>** as to Ross confirmed receipt of the email on Wednesday, February 10, 2021, and told Sexton he would look into it and get back to him. **<u>Admit</u>** as to Ross responded again on Monday, February 15, 2021 that he had gathered information and wanted to meet with Sexton to discuss. **<u>Admit</u>** as to Ross also testified that

he had a conversation with Sexton and McKelvey a few weeks later about the importance of cutting the crossings. **Admit** as to Ross stated "I had that conversation with McKelvey as well because I'm not going to tolerate people cutting the rules and taking shortcuts. I won't tolerate it for one minute." **Deny** that Ross is not going to tolerate people cutting the rules and taking shortcuts as he did tolerate McKelvey cutting the rules as Mr. Ross testified that Mr. McKelvey stated that he had instructed Mr. Sexton not to cut the tracks and Mr. Ross took no disciplinary action. Dkt. 53-2 at paras. 25-28.

27.    Ross provided verbal coaching to McKelvey after Ross received an email from Sexton on February 9, 2021, regarding McKelvey driving too fast for the conditions and the events of the morning of February 1, 2021 in Marquette. Ross testified that he had a conversation with McKelvey about the importance of cutting the crossings. Ross stated unequivocally: "I had that conversation with McKelvey as well because I'm not going to tolerate people cutting the rules and taking shortcuts. I won't tolerate it for one minute." Ross also testified that Sexton was not disciplined for his conduct on the morning of February 1, 2021 in Marquette. Ross testified: "I didn't discipline John Sexton for following the rule."

> Support:    **Resp. App. pp. 280–83, 295**, Ross Dep. 13:3–19:6, 25:2–26:5,26:24–29:5, 129:11–17, 131:4–13; **Resp. App. p. 294**, Ross Decl. ¶¶ 6, 11; **Resp.App. p. 13**, Sexton Dep. 162:20–164:22; **Resp. App. pp. 160–61**, Sexton Dep. Ex.18.

**PLAINTIFF'S RESPONSE: Admit** that Ross testified that he had a conversation with McKelvey, however Ross did not describe it a "verbal coaching". **Admit** as to Ross testified that he had a conversation with McKelvey about the importance of cutting the crossings. **Admit** as to Ross stated "I had that conversation with McKelvey as well because I'm not going to tolerate people cutting the rules and taking shortcuts. I won't tolerate it for one minute." **Deny** as to that Ross didn't discipline Sexton for following the rule to the extent that it is a legal conclusion whether Sexton's protected activities contributed to CP's adverse employment actions. Ample circumstantial evidence exists to demonstrate that

Sexton's protected activities contributed to CP's adverse employment actions. Circumstantial evidence of temporal proximity exists due to the closeness in time of Sexton's protected activities and the discipline taking against him (See Dkt. 53-1 at 13); inconsistent application of policies exists in that the record does not show any other employee to have received the same severity of discipline as Sexton (*Id.* at 19); pretext exists in the form of CP's monetary motivations based on speed and efficiency (*Id.* at 13-14); and more.

28.    When asked at his deposition whether he has ever been unable to work because of the emotional feelings he's having, Sexton responded: "No. I'm not a sissy."

Support:    **Resp. App. p. 14**, Sexton Dep. 192:1–4.

**PLAINTIFF'S RESPONSE: Admit** as to this is what Sexton testified only regarding whether he has been unable to work because of emotional feelings and this speaks nothingas to whether he has had or continues to have emotional feelings regarding his claim.

### D.    ADDITIONAL FACTS RELATED TO THE FEBRUARY 10, 2021 INVESTIGATION HEARING

29.    Sexton's CBA provides: the employee "shall have reasonable opportunity to secure the presence of *necessary* witnesses." (Emphasis added.) CP's US Investigation Training Manual provides, the hearing officer may "reasonably deny a request for additional witnesses if the union representative/charged employee fails to adequately explain their pertinence to the matter under investigation."

Support:    **Resp. App. p. 24,** Sexton Dep. Ex. 1 at CP_00256; **Resp. App. p.268,** Dittrich-Bigley Dep. Ex. 66 at CP_06408.

**PLAINTIFF'S RESPONSE: Admit**.

30.    The goal of the investigation hearing is to obtain honest and accurate testimony from all necessary and pertinent witnesses.

Support:    **Resp. App. p. 24,** Sexton Dep. Ex. 1 at CP_00256; **Resp. App. p.269,** Dittrich-Bigley Dep. Ex. 66 at CP_06410.

**PLAINTIFF'S RESPONSE: <u>Admit</u>** as Sexton's Collective Bargaining Agreement provides that the goal of a disciplinary investigation hearing is to obtain honest and accurate testimony from all necessary and pertinent witnesses.

31.    Sexton's union representative sent a letter to Joey Reyes requesting that Cruciani and Cox be made available in the hearing. Reyes was not the hearing officer who conducted the investigation hearing.

> Support:        **Resp. App. pp. 153-154**, Schmit Dep. Ex. 11 at Sexton 000011-12;**Resp. App. p. 54**, Sexton Dep. Ex. 10 at CP_000021 (Tr. 4:1–6).

**PLAINTIFF'S RESPONSE: <u>Admit</u>** as to Sexton's representative sent a letter to Joey Reyes requesting that Cruciani and Cox be made available in the hearing. **<u>Admit</u>** that Reyes was not the hearing officer who conducting the investigation hearing, however, at the time Sexton's Representative sent the request, Reyes was assigned to be the hearing officer. Dkt. 59-3 at CP Resp. Apps. – 152 ("Joey Reyes – Please arrange to conduct").

32.    Johnson testified that he did not recall if Sexton's union representative requested for Cruciani and Cox prior to the hearing, at the time of the hearing, or during the hearing.

> Support:        **Resp. App. p. 185**, Johnson Dep. 69:3–70:10.

**PLAINTIFF'S RESPONSE: <u>Admit</u>** that Johnson testified he could not recall if Sexton's union representative requested for Cruciani and Cox prior to the hearing, at the time of the hearing, or during the hearing. However, it is undisputed that Sexton's union representative did ask Joey Reyes for Cruciani and Cox be made available in the hearing. See CP SoF above at para. 31. Additionally, Sexton's union representative read the request to Johnson during the investigation hearing and Johnson submitted the request as an exhibit to the investigation. Dkt. 50-3 at CP Appendix 152-153, 155. Then after the investigation Johnson sent an email stating, "The Organization asked for witnesses, and the facts do not show that either of these employees were connected with the shove

movement." Dkt. 54-1 at 20.

33.     At the February 10, 2021 investigation hearing, Sexton said Cox was in a position

to hear the radio conversation.

> Support:        **Resp. App. pp. 128–29**, Sexton Dep. Ex. 10 at CP_000095–96
> (Tr.78:22–73:1).

**PLAINTIFF'S RESPONSE: <u>Admit.</u>**

34.     Johnson testified at his deposition that that neither Cruciani nor Cox had

information relevant to the investigation. Specifically, Johnson testified:

> Mr. Cox was assigned to another train and not connected. The testimony from when
> you were first on –I believe it was the 0098 – read that the union believed that he
> would have heard the radio conversation. That's not a fact based he heard the
> conversation. Again, he was assigned to a different train. The other employee that
> was requested was not an employee of CP Railroad.

> Support:        **Resp. App. p. 186**, Johnson Dep. 74:4–23.

**PLAINTIFF'S RESPONSE: <u>Admit</u>** as to this was Johnson's testimony, however, as stated by CP

in para. 33 above, Sexton said that Cox was in a position to hear the radio conversation.

35.     The conductor, DePover, was a witness at the February 10, 2021 investigation

hearing, as was Sexton himself. In addition to Jared, DePover was the only other employee witness

who observed Sexton's conduct and failure to comply with GCOR 5.3.7 during the test

administered by Jared.

> Support:        **Resp. App. pp. 98–111, 132–140**, Sexton Dep. Ex. 10 at
> CP_000065–78 (Tr. 48:15–61:22), CP_000099–107 (Tr. 82:8–90:11); **Resp. App. pp.190**,
> Johnson Dep. Ex. 35 at CP_00982.

**<u>Deny.</u>** DePover was not brought to the investigation as a witness. Instead, DePover was listed as a principal

and CP sent to Mr. DePover a letter to attend the formal investigation: "The purpose of this formal

investigation/hearing is to determine the facts and circumstances and to place your responsibility, if any, in

connection with your alleged: Failure to stop within half the specified distance given while shoving into track NA04." Dkt. 50-3 at CP Appendix 78 and 81. **Deny** that Jared and DePover were the only other employees with firsthand knowledge of the shove movement that could have provided statements relevant to the test. Sexton's union requested prior to, and during the investigation two witnesses to attend. Dkt. 53-4 at 132. **Deny** that Sexton violated the rule. See Plaintiff's Response to para. 14 above.

36.    At the February 10, 2021 investigation hearing, Sexton's union representative asked, "All right. So he – he kinda distracted you from performing your duty – for a little bit?" And DePover responded, "Yes, I was engaged with talking with him."

Support:    **Resp. App. pp. 105–06**, Sexton Dep. Ex. 10 at CP_000072–73 (Tr.55:20–56:2).

**PLAINTIFF'S RESPONSE**: **Admit.**

37.    At the February 10, 2021 investigation hearing, Sexton's union representative, Joe Rainwater, asked Sexton if Sexton believed Jared violated GCOR 6.5 when he "interrupted" DePover's car counts to Sexton. Sexton responded: "Absolutely. He created a unsafe act." The hearing officer, Mark Johnson, stopped the questioning, noting that the purpose of the hearing was to determine if Sexton – not Jared – complied with CP's operating rules as alleged in the specific notice of investigation. Johnson explained that evidence related to whether Jared's administration of the efficiency test violated CP's rules is not relevant to the determination of whether Sexton failed the test. Johnson also explained to Rainwater that if he had an issue with the way Jared administered the efficiency test, it should be addressed with the appropriate party. Rainwater responded: "Oh, it – it will be, I promise."

Support:    **Resp. App. pp. 116–18**, Sexton Dep. Ex. 10 at CP_000083–85 (Tr. 66:15–68:8); **Resp. App. p. 298**, Ross Decl. ¶¶ 14–15.

**PLAINTIFF'S RESPONSE:** **Admit** that this summarizes the investigation hearing transcript.

38.     Sexton's union representative and Sexton commented during the investigation hearing: Mr. Rainwater: "Yeah, we don't see Mr. Jared's vehicle in view. And I would estimate, just by –" Mr. Sexton: "Fifty yards." Mr. Rainwater: "Yeah, it probably – probably at least tw – thirty to forty yards at a minimum." When asked about this estimate at his deposition, Jared testified: "I would disagree with that. I thought – I remember I was closer than that."

> Support:     **Resp. App. p. 235**, Jared Dep. 141:17–142:6; **Resp. App. p. 95**, Sexton Dep. Ex. 10 at CP_000062 (Tr. 45:6–10).

**PLAINTIFF'S RESPONSE**: **Admit** that this summarizes the investigation transcript and Jared's deposition testimony.

### E.     ADDITIONAL FACTS RELATED TO SEXTON'S DISCIPLINE

39.     The February 26, 2021 discipline notice was on Jared's letterhead and included Jared's stamped electronic signature. Jared testified that the administrative office has permission to add his stamped electronic signature to documents that need to go out under the General Manager. Jared did not read the discipline notice before it was issued to Sexton. Jared was not   involved in any way in the discipline decision or preparing the discipline notice. Instead, CP Vice President Operations Southern Region Jason Ross decided the discipline to be imposed on Sexton.

> Support:     **Resp. App. p. 284**, Ross Dep. 50:15–51:10; **Resp. App. pp. 228–29,** Jared Dep.75:13–78:7; **Resp. App. p. 155**, Sexton Dep. Ex. 12.

**PLAINTIFF RESPONSE:** **Admit** that on February 26, 2021, CP issued a written notice of discipline to Sexton. **Deny** the discipline notice included Jared's stamped electronic signature—CP's own admission is that Jared signed the discipline notice in his role as general manager. Dkt. 31 at 4, para. 19. **Admit** that Jared testified that the administrative office has permission to add his stamped electronic signature to documents that need to go out under the General Manager. **Deny** that Jared did not read the discipline notice before it was issued to Sexton—again, CP admitted that Jared signed the discipline notice in his role as general manager. *Id.* Additionally, the same morning Sexton's discipline went out, Jared knew exactly when Sexton's discipline

was supposed to start, emailing: "He is supposed to start his suspension once he ties up on Monday". Dkt. 53-2 at 148. **Deny** that Jared was not involved in the decision-making process. Jared not only provided statements of what he allegedly observed, when asked whether Sexton complied with the rule during the disciplinary investigation, Jared said, "Absolutely not." Dkt. 53-2 at para. 104. When asked whether Mr. Sexton violated the rule, Jared said, "Yes, he did." *Id.* at para. 105. CP admitted that the discipline letter was signed by Mr. Jared in his role as general manager. Dkt. 31 at 4, para. 19. Additionally, an administrative employee at CP wrote in an email: "Joe: per Mr. Jared, please issue discipline for 20 days actual to service on Monday." Dkt. 50-3 at CP Appendix 251.

40.     Ross testified that "there was no way in Hades" he would impose less than a twenty-day suspension for a first Major – Life Threatening & Conduct Unbecoming Offence. Ross further testified that if he assigned less severe discipline for a first Major rule violation, it would likely be the result of post-hearing negotiations between the Company and the employee's union. In this case, Sexton's union made no effort to negotiate his discipline after the hearing.

Support:        **Resp. App. pp. 288–89**, Ross Dep. 76:7–79:16; **Resp. App. p. 270**,Dittrich-Bigley Dep. Ex. 67.

**PLAINTIFF RESPONSE: Admit** as to Ross's testimony is what he testified, but not to the truth of the testimony—there is no evidence supporting this testimony as there is not a single example except for Sexton in which a twenty-day suspension was assessed as other employees received less or no discipline for the same alleged rule violation. Dkt. 54-1 at 23, 25, and 27. **Admit** as to Sexton's Union did not contact Ross in an attempt to negotiate—the Discipline Notice available to Sexton and his Union was signed by Mr. Jared in his role as general manager and provided no indication that Ross had any involvement in the discipline. Dkt. 31 at 4, para. 19 and Dkt. 50-3 at 79.  Additionally, CP may offer a waiver and although it is at the discretion of an employee to *accept* a waiver, the employee has no discretion as to whether they are *offered* a waiver. Dkt. 50-3 at CP Appendix 63, para. 4. The Major – Life Threatening and Conduct Unbecoming Offences category under CP's policy does not permit CP to offer an employee to waive an investigation. Dkt. 50-3 at CP

19

Appendix 71. CP did not offer Sexton a waiver. See Sexton Dec. at para. 1.

41.    Article 28, Section 2 of Sexton's CBA provides the requirements for appealing a discipline decision.

Support:        **Resp. App. pp. 21–23**, Sexton Dep. Ex. 1 at CP_00253–55.

**PLAINTIFF'S RESPONSE:** **Admit** however the CBA does not preclude Sexton from filing a claim of retaliation under the Federal Railroad Safety Act regarding CP's disciplinary actions.

42.    On August 26, 2022, the Public Law Board ruled in the union's favor on its appeal of Sexton's February 26, 2021 discipline. The Public Law Board granted Sexton's appeal on procedural grounds based on the incorrect belief that Jared played a role in the imposition of discipline after the investigation hearing. As a result, the February 26, 2021, discipline was removed from Sexton's record and he was compensated for the twenty (20) days of pay that he did not receive during the now-reversed suspension. Sexton made it clear at his deposition that the decision was a "win for John."

Support:        **Resp. App. p. 12**, Sexton Dep. 127:21–129:2, 129:11–15; **Resp. App. pp. 156–59**, Sexton Dep. Ex. 13 at SEXTON 000015–18.

**PLAINTIFF RESPONSE:** **Admit** as to on August 26, 2022, the Public Law Board ruled in the union's favor. **Deny** as to the Public Law Board made its decision on procedural grounds based on the incorrect belief that Jared played a role in the imposition of discipline after the investigation hearing because the Public Law Board points to additional factors and states "we find multiple reasons to question the discipline assessment…." Dkt. 53 at CP Appendix – 183. The Public Law Board cited Jared's involvement in the test "in a manner which does raise questions regarding safety" and "that the charges were levied based on his test and observations." *Id.* Therefore, the Public Law Board took direct issue with the fact that the charges were based on Jared's unsafe test. Additionally, the Public Law Board overturned the discipline operating under its factual description that the last communication given by DePover was "good for 40, 15 to a stop" and that Sexton did

not stop until after 11 cars. *Id.* at CP Appendix – 182. Therefore, the Public Law Board decision was also based on the substantive facts of the test itself. **Admit** as to the discipline was removed from Sexton's record and he was compensated for 20 days of pay he had not received as a result of CP's discipline. **Admit** as to Sexton did testify "The win for John is what it is"—as it is undisputed that Sexton did not "lose" the Public Law Board appeal. Dkt. 50-3 at CP Appendix – 26.

### F.    ADDITIONAL FACTS RELATED TO OTHER EMPLOYEE DISCIPLINE

43.    CP's Hybrid Discipline & Accountability Guidelines is intended to "progressively influence and correct behaviors that do not comply with required standards."

Support:        **Resp. App. p. 38,** Sexton Dep. Ex. 3 at CP_00439.

**PLAINTIFF'S RESPONSE: Admit** as to this is what CP's Hybrid Discipline & Accountability Guidelines state.

44.    If a suspension is deferred in part or in full, the deferred portion of the suspension will be activated if the employee is culpable for a subsequent offense within the default period, which is typically six (6) months from the date of assessment. If activated, the deferred suspension carries the same gravity as a served suspension.

Support:        **Resp. App. p. 261**, Dittrich-Bigley Dep. 10:5–23, 12:4–17; **Resp. App. p. 40**, Sexton Dep. Ex. 3 at CP_00441.

**PLAINTIFF RESPONSE: Admit** as to if a suspension is deferred, the deferred portion of the suspension will be activated if CP decides the employee is culpable for a subsequent offence in the default period. **Admit** as to the deferred portion of a discipline does not carry the same gravity as a served suspension.

45.    Pursuant to CP's Hybrid Discipline & Accountability Guidelines, "failure to properly line switches for intended movement and or operating through an improperly lined switch" is a "Non-Major Offence" (not a "Major – Life Threatening & Conduct Unbecoming Offence").

Support:        **Resp. App. p. 44**, Sexton Dep. Ex. 3 at CP_00445.

**PLAINTIFF'S RESPONSE: <u>Admit.</u>**

46.      On February 26, 2018, engineer D.C. violated GCOR Rule 5.3.7, which is a Major – Life Threatening & Conduct Unbecoming Offence. D.C. was issued a ten-day suspension, with five (5) days served and five (5) days deferred. D.C. acknowledged responsibility for the rule violation and agreed to waive the right to a formal investigation hearing. The assessment of for D.C.'s February 12, 2018 rule violation falls within the range of disciplinary consequences that may be assessed for a Major – Life Threatening & Conduct Unbecoming Offence pursuant to CP's Hybrid Discipline & Accountability Guidelines.

Support:        **Resp. App. p. 264**, Dittrich-Bigley Dep. 39:11-24; **Resp. App. p. 278**, Dittrich-Bigley Dep. Ex. 70.

**PLAINTIFF'S RESPONSE: <u>Admit</u>** as to on February 26, 2018, engineer D.C. violated GCOR Rule 5.3.7, which is a Major – Life Threatening & Conduct Unbecoming Offence. **<u>Admit</u>** as to D.C. was issued a ten-day suspension, with (5) days served and five (5) days deferred. **<u>Admit</u>** as to D.C. acknowledged responsibility for the rule violation and agreed to waive the right to a formal investigation hearing. **<u>Deny</u>** that the assessment of for D.C.'s February 12, 2018 rule violation falls within the range of disciplinary consequences that may be assessed for a Major – Life Threatening & Conduct Unbecoming Offence pursuant to CP's Hybrid Discipline & Accountability Guidelines. CP's own Statement of Fact in Dkt. 50-2 at para. 9 states "The Hybrid Discipline & Accountability Guidelines provides guidelines for assigning discipline based on the circumstances. For Major – Life Threatening & Conduct Unbecoming Offences, the Guidelines provide for: "Depending on the offence the issuance of a minimum of a 20-calendar day suspension up to and including a 45-day calendar suspension and/or dismissal." Thus, if D.C. was issued a ten-day suspension, that does not fall within the "minimum of a 20-calendar day suspension".

47.     On July 16, 2019, engineer T.V. violated GCOR Rule 5.3.7, which is a Major –
Life Threatening & Conduct Unbecoming Offence. T.V. was issued a twenty-day suspension, with
five (5) days served and fifteen (15) days deferred. T.V. acknowledged responsibility for the rule
violation and agreed to waive the right to a formal investigation hearing. The assessment of
discipline for T.V.'s July 16, 2019 rule violation falls within the range of disciplinary
consequences that may be assessed for a Major – Life Threatening & Conduct Unbecoming
Offence pursuant to CP's Hybrid Discipline & Accountability Guidelines.

> Support:        **Resp. App. p. 307**, Dittrich-Bigley Decl. ¶ 11; **Resp. App. p. 264**,
> Dittrich-Bigley Dep. 37:4–19; **Resp. App. p. 277**, Dittrich-Bigley Dep. Ex. 69.

**PLAINTIFF RESPONSE: Admit** as to T.V. received less discipline than Sexton for the same alleged rule
violation.

48.     On June 7, 2020, engineer M.J. was involved in an incident in which he failed to
stop a shove movement within half the distance given. M.J. was issued verbal coaching.

> Support:        **Resp. App. p. 264**, Dittrich-Bigley Dep. 38:2–25; **Resp. App. pp.
> 181–82**, Johnson Dep. 24:13–27:5; **Resp. App. p. 193**, Johnson Dep. Ex. 36 at
> CP_00616.

**PLAINTIFF'S RESPONSE: Admit.**

49.     On July 29, 2020, engineer T.S. was involved in an incident wherein he failed to
stop a shove move in half the distance specified. T.S. was issued verbal coaching.

> Support:        **Resp. App. p. 264**, Dittrich-Bigley Dep. 39:1–10; **Resp. App. p.
> 182**, Johnson Dep. 27:6–11; **Resp. App. p. 193**, Johnson Dep. Ex. 36 at CP_00616.

**PLAINTIFF'S RESPONSE: Admit.**

50.     On January 7, 2021, engineer T.P. violated GCOR Rule 5.3.7, which is a Major –
Life Threatening & Conduct Unbecoming Offence. T.P. was issued a twenty-day suspension, with
ten (10) days served and ten (10) days deferred. T.P. immediately acknowledged and took

accountability for his rule violation. The assessment of discipline for T.P.'s January 7, 2021 rule violation falls within the range of disciplinary consequences that may be assessed for a Major – Life Threatening & Conduct Unbecoming Offence pursuant to CP's Hybrid Discipline & Accountability Guidelines.

Support:    **Resp. App. p. 308**, Dittrich-Bigley Decl. ¶ 12; **Resp. App. pp. 262–63**, Dittrich-Bigley Dep. 32:24–36:3; **Resp. App. p. 270**, Dittrich-Bigley Dep. Ex.67; **Resp. App. p. 275–76**, Dittrich-Bigley Dep. Ex. 68 at CP_01785–86 (16:18–17:14).

**PLAINTIFF RESPONSE:** **Admit** as to on January 7, 2021, engineer T.P. violated GCOR Rule 5.3.7, which is a Major – Life Threatening & Conduct Unbecoming Offence. **Admit** as to T.P. was issued a twenty-day suspension, with ten (10) days served and ten (10) days deferred. **Deny** as to T.P. immediately acknowledged and took accountability for his rule violation as the record demonstrates, engineer T.P. challenged the alleged rule violation by exercising his rights to a disciplinary investigation and was assessed a 20-day suspension with 10 days deferred. See Dkt. 57-2 Cramer Dec. at para. 3. CP noticed the discipline in a letter dated January 27, 2021, in which it states, "Based on the facts and evidence in the hearing record, the severity of the incent and your past discipline history, you are being assessed a twenty (20) day suspension, serve ten (10) days to be effective . . . and ten (10) days deferred." *Id.* **Admit** as the assessment of discipline falls within the range of disciplinary consequences that may be assessed pursuant to CP's Hybrid Discipline & Accountability Guidelines and is less discipline than CP issued against Sexton for the same alleged rule violation.

51.    On February 16, 2021, engineer J.M. violated GCOR Rule 5.3.7, which is a Major – Life Threatening & Conduct Unbecoming Offence. J.M. was dismissed from employment with CP. J.M. had several Major rule violations on his discipline record, including a January 13, 2021 incident for which J.M. was issued a thirty-day "last chance" suspension. The assessment of discipline for J.M.'s February 16, 2021 rule violation falls within the range of disciplinary consequences that may be assessed for a Major – Life Threatening & Conduct Unbecoming Offence pursuant to CP's Hybrid Discipline & Accountability Guidelines.

Support:    **Resp. App. p. 308**, Dittrich-Bigley Decl. ¶ 14; **Resp. App. p.**

19

**312**,Sullivan Decl. Ex. A, CP_00922; **Resp. App. p. 219**, Smith Dep. 36:5–10; **Resp.App. p. 222**, Smith Dep. Ex. 47 at CP_00939.

**PLAINTIFF RESPONSE: <u>Admit</u>** that J.M. was terminated, however, J.M.'s discipline was overturned by the Public Law Board, stating "it does not appear that the instant discipline event would have called for dismissal." See Dkt. 57-2 Cramer Dec. at para. 4. This was based on the fact that the Public Law Board had also overturned a 30-day suspension assessed by CP which was considered in CP's dismissal decision. *Id.* <u>**Deny**</u> that the assessment of discipline was within the range of consequences that may be assessed pursuant to CP's Hybrid and Discipline & Accountability Guidelines because the Public Law Board concluded: "We therefore conclude that, while the instant violation should result in at most a 30-day suspension, Claimant is entitled to compensation and benefits lost during the period of his dismissal in excess of 30 days, subject to deduction for outside earning during the period of dismissal." *Id.*

### G.    ADDITIONAL FACTS RELATED TO CP'S INDIVIDUAL AND CORPORATE PERFORAMNCE OBJECTIVES

52.    CP's individual performance objectives, which are tied to CP's Five Foundations, are weighted. Performance objectives tied to "operating safely" are not less important than any other objective.

> <u>Support:</u>    **Resp. App. pp. 254, 257–58**, Hanson Dep. 10:14–11:24, 23:2–24:19, 26:11–20; **Resp. App. p. 216**, Johnson Dep. Ex. 41 at CP_03236; **Resp. App. pp. 283, 291**, Ross Dep. 29:10–25, 101:15–103:12.

**PLAINTIFF'S RESPONSE: <u>Admit</u>** as to CP's individual performance objectives, which are tied to CP's Five Foundations, are weighted. **<u>Deny</u>** that the performance objectives tied to "operating safely" are not less important than any other objective. CP's policy states, "PMP objectives are weighted according to their relative importance." Dkt. 50-3. As noted by CP, there are five foundations—only one of those foundations is "Operate Safely". For McKelvey, Johnson, Smith, Jared, and Ross, their "Operate Safely Metric" fell at either 15% or 20%, whereas the rest of their performance metrics totaled 80% or 85% including metrics such as "Provide Service", "Optimize

19

Assets", "Control Costs", "Develop People", and "Achieve V-Budget." Dkt. 54-1 at 35-53.

53.     Senior leaders, in collaboration with human resources, set performance objectives at the beginning of the year. The performance objectives are then cascaded down to managers within each leader's region, subdivision, and territory. The objectives align with what CP calls its Five Foundations. At the end of the year, leaders evaluate employee performance and, in collaboration with human resources, assign a performance rating. Central to the "Five Foundations" is "operating safely," which is no less important than any other of the foundations (which are Provide Service, Optimize Assets, Develop People, and Control Costs).

> Support:        **Resp. App. p. 292**, Ross Dep. 108:14–25; **Resp. App. p. 254**, Hanson Dep. 9:8–10:6; **Resp. App. p. 188**, Johnson Dep. 93:20–94:4; **Resp. App. pp. 211–213**, Johnson Dep. Ex. 41 at CP_03231–33.

**PLAINTIFF'S RESPONSE:** **Admit** as to Senior leaders, in collaboration with human resources, set performance objectives at the beginning of the year. **Admit** the performance objectives are then cascaded down to managers within each leader's region, subdivision, and territory. **Admit** the objectives align with what CP calls its Five Foundations. **Admit** at the end of the year, leaders evaluate employee performance and, in collaboration with human resources, assign a performance rating. **Deny** that central to the "Five Foundations" is "operating safely," which is no less important than any other of the foundations (which are Provide Service, Optimize Assets, Develop People, and Control Costs). See Plaintiff's Response to para. 52 above. In fact, in some cases "Operating Safety" is weighted as less important than individual components. Johnson, Jared, and Smith all weigh "Develop People" higher than "Operating Safely". Dkt. 54-1 at 35-53.

54.     CP uses various metrics to measure achievement of key performance indicators, including origin performance, terminal dwell, and train weight. Actual achievement is aggregated at the end of the year and measured against objectives. Performance of one train on one day would not negatively impact an employee's overall performance rating.

Support:    **Resp. App. pp. 256–57**, Hanson Dep. 17:19–18:5, 19:17–21:24; **Resp. App. pp. 211–213**, Johnson Dep. Ex. 41 at CP_03231–33.

**PLAINTIFF RESPONSE: <u>Admit</u>** as to CP uses various metrics to measure achievement of key performance indicators, including origin performance, terminal dwell, and train weight. **<u>Admit</u>** as to actual achievement is aggregated at the end of the year and measured against objectives. **<u>Deny</u>** performance of one train on one day would not negatively impact an employee's overall performance—CP's corporate representative testified that one train contributes to the aggregated performance metric. Dkt. 50-3 at CP Appendix 324 – Dep. 18:3-5.

55.    An employee's performance rating is a factor used to determine the individual component of the employee's STIP payment.

Support:    **Resp. App. p. 292**, Ross Dep. 106:2–20; **Resp. App. pp. 254–55, 257–59**, Hanson Dep. 12:23–13:4, 14:16–22, 22:14–23:10, 28:7–29:6.

**PLAINTIFF'S RESPONSE: <u>Admit.</u>**

September 3, 2024        Respectfully Submitted,

YAEGER & JUNGBAUER BARRISTERS, PLC

By: */s/ Cyle Cramer*
John D. Magnuson, *pro hac vice.*
Cyle A. Cramer, *pro hac vice.*
4601 Weston Woods Way
Saint Paul, MN 55127
Telephone: (651) 288-9500
jmagnuson@yjblaw.com
ccramer@yjblaw.com

and

MEGAN R. MERRITT AT0010635
        for
SHUTTLEWORTH & INGERSOLL, P.L.C.
115 3rd Street SE, Suite 500
P.O. Box 2107
Cedar Rapids, IA 52406-2107
PHONE: (319) 365-9461
FAX: (319) 365-8443
E-MAIL: mrm@shuttleworthlaw.com

*Attorneys for Plaintiff John Sexton*
                    19