IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
DAVENPORT DIVISION

JOHN SEXTON,

           Plaintiff,

vs.

DAKOTA MINNESOTA & EASTERN
RAILROAD CORP.,

           Defendant.

3:23-cv-00031-HCA

ORDER DENYING PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT
AND DENYING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT

## I.    INTRODUCTION

On August 5, 2024, Defendant Dakota Minnesota & Eastern Railroad, Corp. d/b/a Canadian Pacific ("CP") filed a motion for summary judgment, ECF No. 50, and Plaintiff John Sexton ("Sexton") filed a motion for partial summary judgment, ECF No. 53. Both parties filed additional, sealed appendices to support the motions. Def.'s Sealed App., ECF No. 51; Pl.'s App. B, ECF No. 54-1. Plaintiff Sexton filed a resistance to Defendant CP's motion, ECF No. 57, and Defendant CP filed a resistance to Plaintiff Sexton's motion, ECF No. 59. Defendant CP filed a reply, ECF No. 62, and Plaintiff Sexton filed a reply, ECF No. 63. The Court heard oral argument on both motions on November 13, 2024. ECF No. 65.

The Court deems the matter fully submitted and ready for ruling. For the following reasons the Court **denies** Plaintiff's Motion for Partial Summary Judgment and **denies** Defendant's Motion for Summary Judgment.

## II.    BACKGROUND

### A.    Summary of Relevant Facts

The following facts are either undisputed, or if disputed, both parties' positions are stated, so the Court may view the facts in the light most favorable to the respective non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

#### 1.    Plaintiff Sexton's employment

Plaintiff Sexton has been an employee of Defendant CP, a Class I railroad, since March 1999, and is a certified locomotive engineer. Pl.'s Statement Disputed Facts ("SDF") ECF No. 57-1 at ¶¶ 11–12.[1] Plaintiff Sexton belongs to the Brotherhood of Locomotive Engineers and Trainmen ("union"). *Id*. at ¶¶ 1–4. A Collective Bargaining Agreement ("CBA") governs Plaintiff Sexton's employment with Defendant CP. *Id*.

#### 2.    Plaintiff Sexton cuts the crossings

On February 1, 2021,[2] Plaintiff Sexton was the engineer, and Justin DePover ("DePover") the conductor, assigned to operate train 474-31 ("474") from Marquette to Davenport, supervised by Trainmaster Kurt McKelvey ("McKelvey"). *Id*. at ¶¶ 21, 69. Plaintiff Sexton held a job briefing with DePover at 1:30 a.m. and Plaintiff Sexton indicated the crew would need to "cut the crossings"[3] before proceeding with their scheduled tasks for the day. *Id*. at ¶ 68. McKelvey

---

[1] Plaintiff admits the following paragraphs of Defendant's statement of undisputed facts: 1–5, 7–8, 11–15, 20–22, 33–34, 50, 53, 57–58, 67–68, 73, 77, 90–91, 93, 96, 98–101, 103–104, 107, 115, 177. Plaintiff admits with qualification paragraphs: 6, 9, 18, 25, 27, 31, 35–39, 41–45, 47–49, 51, 54, 56, 59–66, 69, 71–72, 74–76, 78, 80–82, 86, 92, 97, 102, 105–106, 112, 116.
Plaintiff denies paragraphs: 10, 15–17, 19, 23–24, 26, 28, 30, 32, 40, 46, 52, 55, 70, 79, 83–85, 87–89, 94–95, 108–111, 113–114. Paragraphs intentionally left blank: 29. ECF No. 57-1.

[2] Most of the pertinent events to the cross-motions for summary judgment relate to events starting in February 2021, but Plaintiff Sexton also emailed managers safety concerns about Trainmaster Dan Chandanais on January 18, 2021. Def.'s App., ECF No. 50-3 at 405–408.

[3] To prevent derailment, when snow gets packed down by automobiles crossing over railroad tracks, the crew must drive a locomotive without cars along the track to clear the snow. Pl.'s SDF, ECF No. 57-1 at ¶ 67. This is referred to as "cutting the tracks" or "cutting the crossings." *Id*.

disagreed with Plaintiff Sexton and told him not to cut the tracks. *Id*. at ¶ 69. Plaintiff Sexton "insisted the crossings needed to be cut and reminded McKelvey about two recent derailments and that cutting the crossings and flangeways was the CP-selected safety topic of the month." *Id*. The parties agree this disagreement occurred but contest the outcome and spirit of the conversation. *Id*. at ¶ 70. Defendant CP characterizes the disagreement as a conversation resulting in McKelvey agreeing with Plaintiff Sexton, while Plaintiff Sexton contends McKelvey never agreed and ordered him not to cut the tracks. *Id*. Regardless of the conversation's outcome or character, it is undisputed Plaintiff Sexton cut the tracks before performing the other necessary tasks. *Id*. at ¶ 74.

### 3.    Defendant CP's response to the 474 delay

At 3:38 a.m. director Gary Prince ("Prince"), messaged McKelvey requesting a write up of the 474 for the "DL Senior and East Director." Def.'s Resp. Pl.'s Statement Material Facts ("SMF"),  ECF No. 59-1 at ¶ 37.[4] McKelvey informed Prince he would send one when the train left and requested "radio recording from the time they went on duty." *Id*. at ¶ 38. Prince told McKelvey the crew was not constantly recorded, and McKelvey replied, "then im not sure how to hold him accountable for delaying the train . . . i cant make him move any faster. im doing everything i can." *Id*. at ¶¶ 39–40.

At 3:51 a.m. director Ron Pierce ("Pierce") emailed McKelvey, General Manager Tom Jared ("Jared"), Superintendent Dylan Smith ("Smith"), and Trainmaster Marcus Johnson

---

[4] Defendant admits the following paragraphs of Plaintiff's statement of material facts: 1–9, 13–17, 19, 22, 24, 26–27, 29–35, 37–41, 46, 49–50, 60, 62, 65–66, 68–70, 72, 74–80, 82, 86, 88–91, 96–107, 109, 112, 117, 119–122, 125–126, 128, 130–132, 140, 145–147, 151, 156, 191–164, 166, 170–171, 176–177, 179, 181, 184–186, 192, 194–195, 197, 199–200, 205–206, 208–212, 214, 216–218, 220–221. Defendant admits with qualification the following paragraphs: 10–12, 18, 20–21, 23, 25, 28, 36, 42–45, 47–48, 52–54, 56–59, 61, 63–64, 67, 73, 81, 83–85, 87, 92, 108, 110–111, 113, 115, 118, 123, 127, 129, 133–139, 141–144, 148–149, 152–155, 157–160, 165, 167–169, 172–175, 178, 180, 183,188, 193, 196, 201, 204, 207, 213, 215, 219. Defendant denies the following paragraphs: 71, 93–95, 114, 116, 124, 150, 182, 189–191, 198, 202–203, 222–227. Defendant neither admits nor denies paragraph 55 for vagueness.

("Johnson") inquiring about the 474 delay.[5] *Id*. at ¶ 46. At 4:54 a.m., Prince replied to Pierce's email and requested a full breakdown of the 474 delay, noting it should not have taken four and a half hours, and outlining the negative impact the "over-standard" work event had on other trains and other crews within the company. *Id*. at ¶ 47.

The 474 left Marquette around 5:30 a.m.—a delay of three and a half hours. Pl.'s SDF, ECF No. 57-1 at ¶ 75. McKelvey testified the delay was "one of the longest work events" he witnessed since starting with Defendant CP in January 2020. Def.'s Resp. Pl.'s SMF, ECF No. 59-1 at ¶ 45. The parties contest how much of the delay was due to cutting the track versus other unrelated issues.[6] Pl.'s SDF, ECF No. 57-1 at ¶¶ 76–77. DePover completed a detailed Delay Report that included a reference to cutting the crossings as one of the handful of reasons for the delay with Plaintiff Sexton listed in the heading as the engineer. Ex. 5, Pl.'s App. A, ECF No. 53-4 at 115.

At 9:33 a.m., McKelvey responded to Pierce's email chain recounting the entire delay, including reference to cutting the tracks. Def.'s Resp. Pl.'s SMF, ECF No. 59-1 at ¶ 48. At 9:37 a.m., McKelvey sent an incident report to Jared and Smith, including a reference to cutting the tracks. *Id*. at ¶ 50. At 10:04 a.m., Jared replied only to McKelvey on this email thread, saying, "call me when you have a min." *Id*. at ¶ 51. McKelvey called Jared at 10:55 a.m. *Id*. at ¶ 52. McKelvey testified they discussed "why it took him so long – why it took him three times longer to do the work event than what it was supposed to take." *Id*. at ¶ 53. The parties dispute whether McKelvey discussed his disagreement with Plaintiff Sexton during the phone call—Jared testified only that he learned about the discussion "at some point." *Id*. at ¶ 54. Plaintiff Sexton also suggested the

---

[5]  Pierce's email was also sent to Joey Reyes, DL_MOC_Senior_Director@cpr.ca, MOC_Senior_Director@cpr.ca, and MOC Director East. App. B, ECF No. 54-1 at 9.
[6] The Delay Report lists a handful of activities contributing to the delay, but times are not allocated to each task. Ex. 5, Pl.'s App. A, ECF No. 53-4 at 115.

delay was discussed at one of Jared's two daily operations calls but Jared testified he does not recall if it was discussed at the meetings. *Id*. at ¶ 50.

At 2:28 p.m., McKelvey messaged a supervisor, "youre [*sic*] missing all the fun up here," followed by a message at 2:30 p.m. saying, "with sexton on a 474 putting on a show here. for like 4 hours in front of everyone." *Id*. at ¶ 57. The supervisor replied, "oh i heard." *Id*. at ¶ 58. McKelvey, Jared, Miller, and Vice President Jason Ross ("Ross") exchanged various phone calls throughout the day, but all testified they do not remember whether the delay or Plaintiff Sexton were discussed during the calls. Pl.'s SDF, ECF No. 57-1 at ¶ 90.

### 4.    Plaintiff Sexton performs a shove movement

After the 474 arrived in Davenport, at 11:45 a.m., Plaintiff Sexton was to perform a "shove movement" with DePover monitoring the tracks. *Id*. at ¶ 22; Ex. 5, Pl.'s App. A, ECF No. 53-4 at 115. Locomotive engineers are required to perform shove movements where a locomotive "shoves" other train cars onto open track, requiring the engineer to rely on radio communication from a crew member and then stopping the locomotive. Def.'s Resp. Pl.'s SMF, ECF No. 59-1 at ¶¶ 14–17. The crew member monitoring the tracks will often communicate the remaining distance in terms of "car counts." *Id*. at ¶¶ 15–18.

The radio communications during a shove movement are subject to the General Code of Operating Rules[7] ("GCOR")—Rule 5.3.7—Radio Responses. *Id*. at ¶¶ 7, 20. Rule 5.3.7 requires an engineer to stop the train "within half the distance specified unless additional instructions are received." *Id*. Violation of this rule is considered a Major Offense under CP's Hybrid Discipline and Accountability Guidelines ("discipline guidelines"). *Id*. at ¶ 8. Violations of Major Offenses "may warrant immediate removal from service pending a formal investigation and may warrant

---

[7] GCOR is a ruleset applicable to railroads nationwide. ECF No. 57-1 at ¶¶ 5–6.

suspension or in certain cases, dismissal." *Id.* at ¶¶ 8–9. Specifically, the discipline guidelines for Major Offenses recommend a 20-to-45-day suspension and/or dismissal. *Id.*

**5.    Jared conducts an e-test on Plaintiff Sexton's shove movement**

Jared knew the 474 was going to perform a shove movement and decided to ensure compliance with GCOR 5.3.7 by issuing an efficiency test ("e-test"). Pl.'s SDF, ECF No. 57-1 at ¶¶ 26–28. Jared performed thirteen e-tests in 2021. *Id.* at ¶ 27. Jared testified he learned Plaintiff Sexton was the 474 engineer only after he decided to issue the e-test. *Id.* at ¶ 83. Plaintiff Sexton argues Jared knew Plaintiff Sexton was the engineer when he decided to perform the e-test, as Plaintiff Sexton's name was listed as engineer for the 474 on the reports McKelvey sent out that morning. *Id.*

During the shove movement, Plaintiff Sexton was communicating over the radio with DePover and another conductor, with Jared listening to the conversation on his truck radio. Def.'s Resp. Pl.'s SMF, ECF No. 59-1 at ¶¶ 64–66. Jared testified he never heard Plaintiff Sexton over the radio, just the other conductors, nor did he hear either of them say Plaintiff Sexton's name. *Id.* at ¶ 67. Jared heard DePover give a 50-car count before Jared left his truck and walked up to DePover. *Id.* at ¶¶ 69–70. Jared did not have a portable radio and could not hear his truck radio while walking, potentially leaving time for radio communications he did not hear. *Id.* at ¶¶ 73–75. When he got to DePover, Jared instructed DePover to stop providing directions. *Id.* at ¶ 83. The parties dispute whether telling DePover to stop providing directions was consistent with the guidelines for conducting e-tests. Pl.'s SDF, ECF No. 57-1 at ¶¶ 30–31. The parties agree the guideline provides, "When conducting this test, actual operating conditions are to be observed," and do not provide any guidelines for a "set-up" test. Def.'s Resp. Pl.'s SMF, ECF No. 59-1 at ¶¶ 184–185.

The parties also dispute what DePover said to Plaintiff Sexton during the shove movement, with Defendant CP alleging DePover said, "good for 40, 15 cars to stop," and Plaintiff Sexton asserting DePover said, "15 more to a stop, still clear for 40." Pl.'s SDF, ECF No. 57-1 at ¶ 23. Under Defendant CP's version, "15 cars to stop" was the last instruction given, thereby requiring Plaintiff Sexton to bring the train to a stop within 7.5 car lengths under GCOR 5.3.7. *Id.* at ¶ 24. Plaintiff Sexton argues "still clear for 40" was the last distance given and that the "15 more to a stop" was an "additional instruction," requiring him to stop within the 15 car lengths not half under GCOR 5.3.7. *Id.* at ¶ 25. The parties also dispute what Jared heard, if anything, of this instruction. *Id*. at ¶ 26. Plaintiff Sexton shoved 11 cars before stopping the train. *Id*. at ¶ 25.

Immediately after the shove movement, Jared took DePover and Plaintiff Sexton to the end of the yard to interview them. Def.'s Resp. Pl.'s SMF, ECF No. 59-1 at ¶ 84. Jared, DePover, and Sexton then went to the trainmaster's office where Smith was to give statements. Pl.'s SDF, ECF No. 57-1 at ¶ 45; Smith Dep. 26:25–27:9, Def.'s App., ECF No. 50-3 at 284. DePover testified he felt compelled to give a statement and felt he was being intimidated by Jared. Def.'s Resp. Pl.'s SMF, ECF No. 59-1 at ¶¶ 84–85.

### 6.    Defendant CP conducts an investigation hearing into Plaintiff Sexton's shove movement

On February 4, 2021, Defendant CP issued a notice of an investigation hearing to Plaintiff Sexton, in accordance with the CBA, regarding the alleged violation of GCOR 5.3.7. Pl.'s SDF, ECF No. 57-1 at ¶ 34.

On February 9, 2021, Plaintiff Sexton emailed Miller and Ross about the events of February 1. *Id*. at ¶ 112; Def.'s Resp. Pl.'s SMF, ECF No. 59-1 at ¶ 87. The email included Plaintiff Sexton's version of events, including McKelvey telling him not to cut the tracks and Plaintiff Sexton responding with his concern about the possible environmental impact and loss of life if he did not

cut the tracks. Pl.'s SDF, ECF No. 57-1 at ¶ 112; Def.'s Resp. Pl.'s SMF, ECF No. 59-1 at ¶ 87.

Ross agreed to investigate the situation and "get back to him." Pl.'s SDF, ECF No. 57-1 at ¶ 112.

Miller forwarded the email to Jared including a note about his leadership being "on a tailspin" and

saying, "I don't fault [Plaintiff Sexton] for this note, but even if not true, we are creating a

stage/platform for their feelings." Def.'s Resp. Pl.'s SMF, ECF No. 59-1 at ¶ 90.

Johnson conducted the hearing on February 10, 2021. Pl.'s SDF, ECF No. 57-1 at 35. Jared,

Sexton, and DePover were the only individuals that testified. *Id.* at ¶¶ 36, 38. DePover also was

being investigated as to his participation in the shove movement. Def.'s Resp. Pl.'s SMF, ECF No.

59-1 at ¶ 86. Plaintiff Sexton requested additional witnesses, including an employee in a position

to hear the radio communications, but the request was denied. *Id.* at ¶¶ 130–133.

At the hearing, Sexton stated the first car count he received was for 50 cars and the next

instruction was "still good for 40, 15, 15 cars to a stop." Pl.'s SDF, ECF No. 57-1 at ¶ 38. At one

point during the hearing, Plaintiff Sexton's union representative asked if he thought Jared had

violated a different GCOR rule when he interrupted DePover's communications. *Id.* at ¶ 39.

Plaintiff Sexton responded, "Absolutely. He created a unsafe act." *Id.* Johnson informed Plaintiff

Sexton the hearing was not about whether Jared violated a rule but whether Plaintiff Sexton had.

*Id.* It does not appear the incident with McKelvey or cutting the tracks was discussed during the

hearing.

### 7.    Hearing results and comparators

Johnson determined Plaintiff Sexton violated GCOR 5.3.7 and recommended a 20-day

suspension. [8] *Id.* at ¶¶ 42, 44. Johnson emailed his findings, including the union's "argument that

_____

[8] The Court notes in its Statement of Material Facts Defendant CP states, "Johnson recommended
a 20-day paid suspension." Pl.'s SDF, ECF No. 57-1 at ¶ 44. However, all citations in the appendix
reference only a 20-day suspension with no reference to whether he recommended it be paid.
Plaintiff admits, "Johnson recommended a 20-day suspension" and denies the remainder of the

the testing was unfair because a shove movement can only be tested through observation versus set-up. No evidence showed that Mr. Jared attempted to set-up by use of a red board or other means." Def.'s Resp. Pl.'s SMF, ECF No. 59-1 at ¶ 142. At his deposition Johnson testified Jared "set the test up by changing the environment and having Mr. DePover not give a further count." *Id*. at ¶ 144.

Smith reviewed Johnson's recommendation and proposed a 20-day suspension with 10 days deferred—a common recommendation for a first Major Offense violation. Pl.'s SDF, ECF No. 57-1 at ¶ 45. The deferred part of a suspension is only served if the employee commits a subsequent offense within the specified default period. *Id*. at ¶ 56. The parties dispute whether a deferred suspension carries the same gravity as a non-deferred suspension. Def.'s Resp. Pl.'s SMF, ECF No. 59-1 at ¶ 152. The parties provide several comparators for other employees' disciplinary records for similar infractions:

| Employee | Date | Violation | Discipline | Served vs. Deferred |
|---|---|---|---|---|
| TV | 7/16/2019 | GCOR 5.3.7 | 20-day suspension | 5 served; 15 deferred |
| MJ | 6/7/2020 | Failure to stop within half distance required for shove movement | Verbal coaching | |
| TS | 7/29/2020 | Failure to stop within half distance required for shove movement | Verbal coaching | |
| TP | 1/7/2021 | GCOR 5.3.7 | 20-day suspension | 10 served; 10 deferred |
| JM[9] | 2/16/2021 | GCOR 5.3.7 with several prior major rule violations | Termination | |

contention, referencing a "20-day unpaid suspension." *Id*. Consistent with the remainder of the record it appears disputed as to whether Johnson's recommendation was for a 20-day paid or unpaid suspension.

[9] Employee "JM" violated GCOR 5.3.7 and was terminated—however, JM had several major infractions on his record prior to the violation his employment was terminated. JM does not appear to be an appropriate comparator as Plaintiff Sexton had no prior major offenses on his record and a comparator must be a "similarly situated" employee. Pl.'s SDF, ECF No. 57-1 at ¶ 65.

| DC | 2/26/2018 | GCOR 5.3.7 | 10-day suspension | 5 served; 5 deferred |
| GH | 6/8/2020 | "failure to stop within half the range of vision" | Letter of reprimand | |

*Id.* at ¶¶ 154–160.

On February 15, 2021, Ross informed Plaintiff Sexton he had "gathered information" regarding Plaintiff Sexton's February 9 email and wanted to discuss in person. Pl.'s SDF, ECF No. 57-1 at ¶ 112. This discussion took place sometime after the email exchange. *Id.* Ross also asserts he had a conversation with McKelvey and Plaintiff Sexton about the importance of cutting the crossings but did not discipline McKelvey. Def.'s Resp. Pl.'s SMF, ECF No. 59-1 at ¶¶ 25–28.

### 8.    No admission of responsibility

One factor Defendant CP's discipline guidelines recommend taking into consideration when levying discipline is whether the employee "acknowledges responsibility." Pl.'s SDF, ECF No. 57-1 at ¶ 53. Defendant CP may offer an employee an Acknowledgment of Responsibility, referred to as a waiver, where "the employee formally acknowledges responsibility for his or her rule violation and waives his or [her] right to a formal investigative hearing and the right to file a grievance or appeal." *Id.* at ¶ 57. Under the "Major Category Questions" section the policy provides further explanation:

> Question 1 The Major - Life Threatening and Conduct Unbecoming Offenses do not state that an employee could waive their rights to an investigation and accept a disciplinary suspension, why is this?
>
> Answer: While there may be circumstances where employees may wish to waive their rights and the Company may accept, the majority of events under this category require a formal investigation to understand and determine the circumstances that led up to the incident.

Def.'s App., ECF No. 50-3 at 71. Defendant CP did not offer Plaintiff Sexton a waiver, but the CBA provides:

> An employee and/ or the employee's representative shall have the option, with the Company's concurrence and prior to the hearing, to discuss the charge with the appropriate Company Officer.
> 1. If the disposition of the charges is made on the basis of the employee's acknowledgement of responsibility, the disposition shall be reduced to writing and signed by the employee and the official involved and shall incorporate a waiver of hearing and shall specify the maximum discipline, which may be imposed for the employee's acceptance of responsibility.

*Id*. at 47. Ross testified if employees want a hearing as required by the CBA, rather than waiving their rights to one, "if the charges get proven, then they get full measure of discipline." Def.'s Resp. Pl.'s SMF, ECF No. 59-1 at ¶ 162. Ross also testified sometimes he would lessen the discipline if the general chairman asked him to after the hearing. *Id*.

Of the comparators offered by the parties, Defendant CP offered TV and DC waivers. *Id*. at ¶ 151; Pl.'s SDF, ECF No. 57-1 at ¶ 59. The parties do not allege TP—the third comparator issued a suspension—was offered a waiver. Pl.'s SDF, ECF No. 57-1 at ¶ 62.

### 9.    Plaintiff Sexton is suspended

On February 26, 2021, Plaintiff Sexton received a written notice of a 20-day suspension on Jared's letterhead with Jared's electronic signature. *Id*. at ¶ 49. CP alleges Ross reviewed the hearing and Smith's recommendation and was the sole decision-maker in issuing Plaintiff Sexton a 20-day suspension with no days deferred. *Id*. at ¶ 56. Ross testified, "There was no way in [Hades] I was going to give somebody a 10-day deferred and 10 day served suspension for a major violation. So, he got 20." *Id*. at ¶ 47. Ross further testified he does not look at the names of the employees when levying discipline. *Id*. at ¶ 48. Plaintiff Sexton concedes Ross played a role in issuing the discipline, but argues Jared was involved in the decision. *Id*. at ¶¶ 47, 49. Plaintiff Sexton supports this contention by pointing to a line in Defendant CP's answer stating Jared signed the notice, an email from Jared stating Plaintiff Sexton "is supposed to start his suspension . . . on Monday," and an email from an administrative employee stating, "per Mr. Jared, please issue

discipline." *Id*. at ¶¶ 47, 49. Jared testified he did not read the notice before it was given to Plaintiff Sexton, as the administrative office has permission to use his signature. *Id*. at ¶ 49. Both Ross and Jared testified they agreed with Plaintiff Sexton's decision to cut the tracks. *Id*. at ¶¶ 71–72.

### 10.    External reviews of Plaintiff Sexton's suspension

The union appealed the disciplinary decision to the Public Law Board ("PLB"), who found for Plaintiff Sexton, overturning the suspension, and awarded Plaintiff Sexton back pay. *Id*. at ¶¶ 50–51. The PLB found "multiple reasons to question the discipline assessment," including not only Jared's involvement at the hearing, but the way he conducted the e-test "in a manner which does raise questions regarding safety." *Id*. The PLB concluded, "The only realistic conclusion that can be reached after an objective review of this record is that Jared levied charges regarding his own somewhat questionable test, provided the testimony to support them, and then signed off on a predetermined outcome." Def.'s Resp. Pl.'s SMF, ECF No. 59-1 at ¶ 168. Defendant CP asserts the PLB's decision was on "procedural grounds based on the incorrect belief that Jared played a role in the imposition of discipline after the investigation hearing." *Id*. at ¶ 51.

Plaintiff Sexton also filed a complaint with OSHA alleging retaliation. Pl.'s SDF, ECF No. 57-1 at ¶¶ 5–6. OSHA dismissed Plaintiff Sexton's case citing to a lack of animus and no evidence the protected activity contributed to the suspension. Pl.'s SDF, ECF No. 57-1 at ¶¶ 5–6.

### B.    Procedural History

Plaintiff Sexton filed his first complaint with this Court on May 5, 2023, alleging one count of retaliation in violation of the Federal Railroad Safety Act ("FRSA") against Soo Railroad Co. ("Soo") and Defendant CP. ECF No. 1 at ¶¶ 19–28. On August 24, 2023, Plaintiff Sexton filed a motion to amend the complaint, ECF No. 23, and a corrected motion to amend the complaint, ECF No. 24. The Court granted Plaintiff Sexton's motion, ECF No. 25, and Plaintiff Sexton filed the second amended complaint, removing Soo and adding protected activities, ECF No. 26. Defendant

12

CP moves for summary judgment on all claims. ECF No. 50. Plaintiff Sexton moves for summary judgment as to the issue of liability and Defendant CP's affirmative defense. ECF No. 53.

## III.     LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, the Court must grant a party's motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." *Amini v. City of Minneapolis*, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 252 (1986)). "[T]he substantive law will identify which facts are material. . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

A party asserting a fact cannot be or is genuinely disputed must support the assertion and "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). The Court "may consider only the portion of the submitted materials that is admissible or useable at trial." *Walker v. Wayne Cnty.*, 850 F.2d 433, 434 (8th Cir. 1988) (citations omitted). "[W]ithout a showing of admissibility, a party may not rely on hearsay evidence to support or oppose [a motion for summary judgment]," however, the Court does not commit error in considering hearsay evidence if a party fails to challenge it. *Id.* (citations omitted).

The nonmoving party "receives the benefit of all reasonable inferences supported by the evidence but has 'the obligation to come forward with specific facts showing that there is a genuine issue for trial.'" *Atkinson v. City of Mt. View*, 709 F.3d 1201, 1207 (8th Cir. 2013) (quoting *Dahl*

*v. Rice Cnty.*, 621 F.3d 740, 743 (8th Cir. 2010)); *see* Fed. R. Civ. P. 56(c)(1). "[A] party must provide more than conjecture and speculation." *Rusness v. Becker Cnty.*, 31 F.4th 606, 614 (8th Cir. 2022).

Further, without accompanying details or other evidence, "conclusory, self-serving affidavit[s] will not defeat an otherwise meritorious summary judgment motion." *Keiran v. Home Cap., Inc.*, 858 F.3d 1127, 1132 (8th Cir. 2017). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial," and the moving party is entitled to judgment as a matter of law. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042–43 (8th Cir. 2011) (en banc) (quoting *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009)); *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

## IV.    ANALYSIS

In Plaintiff Sexton's motion for partial summary judgment, Plaintiff Sexton argues Defendant CP issued discipline against him in retaliation for engaging in protected activity, in violation of the FRSA. ECF No. 53-1. Plaintiff Sexton characterizes the entire chain of events as setting him up to fail because of his initial safety report and insistence the tracks be cut. In his version Plaintiff Sexton went against McKelvey's direct orders, delaying the train, resulting in outcry from all corners of the organization, particularly from Jared, who, whether at McKelvey's behest or his own initiative, set up a flawed test for Plaintiff Sexton, purposefully mischaracterized his performance as a failure, insisted as much in a hearing where he was the sole witness, and then issued, or at least influenced, discipline harsher than both what was recommended and any other employee has received for similar infractions.

In Defendant CP's motion for summary judgment, Defendant CP characterizes the occurrences of February 1 as unrelated, discrete events rather than a chain—Jared had no idea

Sexton was the engineer when he performed a standard test, and Defendant CP let a completely independent and detached disciplinary process result ins discipline consistent with the guidelines. ECF No. 50-1.

Most of the facts of the case are undisputed, however, the implications or inferences to be drawn from those facts are contested. Furthermore, there are significant credibility determinations to be made affecting the weight to be given to various witnesses' testimony. Viewing the facts in the light most favorable to the non-moving party, and drawing all inferences in the non-moving party's favor, neither party is entitled to judgment as a matter of law because the facts alleged in both motions for summary judgment are sufficient to prove Plaintiff's claim, when viewing the facts in the light most favorable to Plaintiff Sexton, or find in favor of Defendant CP, when viewing the facts in the light most favorable to Defendant CP.

The FRSA provides in pertinent part:

> A railroad carrier engaged in interstate or foreign commerce, or an officer or employee of such a railroad carrier, shall not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee for--(A) reporting, in good faith, a hazardous safety or security condition; [or] (B) refusing to work when confronted by a hazardous safety or security condition related to the performance of the employee's duties.

49 U.S.C. § 20109(b)(1). Enforcement of the FRSA is "governed under the rules and procedures set forth in section 42121(b), including . . . the legal burdens of proof set forth in section 42121(b)." *Id.* § 20109(d)(2)(A)(i). The Court analyzes whistleblower claims under the FRSA in two steps: " 'First, the plaintiff must make a *prima facie* case.' If the plaintiff establishes a *prima facie* case, 'the railroad has the opportunity to demonstrate by clear and convincing evidence that it would have discharged the employee even if he had not engaged in protected activity.'" *Hess v. Union Pac. R.R. Co.*, 898 F.3d 852, 857 (8th Cir. 2018) (quoting *Loos v. BNSF Ry. Co.*, 865 F.3d 1106,

1112 (8th Cir. 2017), *rev'd and remanded*, 586 U.S. 310 (2019), *opinion reinstated in part*, 920 F.3d 1218 (8th Cir. 2019)).

### A.    Whether Plaintiff Sexton can Establish a Prima Facie Claim of Retaliation

49 U.S.C. § 42121(b) requires the Court apply a burden shifting approach to whistleblower claims. In order to establish a prima facie case of retaliation in violation of the FRSA, Plaintiff Sexton must show "(i) he engaged in a protected activity; (ii) [Defendant CP] knew or suspected, actually or constructively, that he engaged in the protected activity; (iii) he suffered an adverse action; and (iv) the circumstances raise an inference that the protected activity was a contributing factor in the adverse action." *Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 789 (8th Cir. 2014) (citing 49 U.S.C. § 42121(b)(2)(B)(i); 29 C.F.R. § 1982.104(e)(2)).

#### 1.    Plaintiff Sexton engaged in protected activity

Plaintiff Sexton maintains he engaged in several protected activities. The Court will analyze each in turn.

##### a.    *Reporting snow on tracks and refusing to operate until cleared*

Plaintiff Sexton argues, and Defendant CP does not dispute for the sake of summary judgment, that Plaintiff Sexton engaged in protected activity, covered by the FRSA when he reported the snow-covered tracks and insisted the tracks needed to be cut. ECF No. 50-1 at 9. *See* 49 U.S.C 20109(b)(1) ("reporting, in good faith, a hazardous safety or security condition; [or] refusing to work when confronted by a hazardous safety or security condition related to the performance of the employee's duties.").

##### b.    *February 9, 2021, email to Miller about McKelvey*

Plaintiff Sexton next argues he engaged in protected activity by emailing Miller about the disagreement with McKelvey, including information about Plaintiff Sexton's safety concern. ECF No. 53-1 at 7–8. For the purposes of summary judgment, Defendant CP does not contest the email

to Miller "could constitute protected activity under the FRSA." ECF No. 59 at 10; *see* FRSA, 49 U.S.C. § 20109(b)(1).

### c.    January 2021 emails

Similarly, Plaintiff Sexton contends he engaged in protected activity in January 2021, when he emailed several managers with safety concerns. ECF No. 57 at 7–8. For the sake of summary judgment, Defendant CP does not contest the emails could be considered protected activity under the FRSA. ECF No. 50-1 at 9; *see* FRSA, 49 U.S.C. § 20109(b)(1).

### d.    Report of shoving test during disciplinary investigation

The last protected activity Plaintiff Sexton contends he engaged in was telling Johnson he believed Jared broke GCOR Rule 5.3.7 and created an unsafe act, during the investigation hearing. ECF No. 53-1 at 8–9. Defendant CP disputes this was protected activity, instead characterizing Plaintiff Sexton's actions as, "answer[ing] a question posed to him at the investigation hearing by his union representative." ECF No. 50-1 at 16.

The FRSA protects "reporting, in good faith, a hazardous safety or security condition." 49 U.S.C. § 20109(b)(1). A genuine dispute of material fact exists as to if this statement could be considered a report and as such is not appropriate for summary judgment.

### e.    Protected activity element

Accordingly, the Court finds and concludes as a matter of law Plaintiff Sexton engaged in protected activity when he reported safety concerns in the January 2021 emails, the February 2021 email to Miller, in person to McKelvey, and insisted on clearing the tracks prior to continuing work. The Court further finds and concludes there is a material question as to whether Plaintiff Sexton's mention of Jared's unsafe acts regarding the e-test during his investigative hearing constitutes protected activity and therefore is inappropriate for summary judgment.

### 2.    Plaintiff Sexton suffered an adverse action

Under the FRSA, adverse actions are considered: "discharge, demot[ion], suspen[sion], reprimand, or . . . discriminat[ion] against an employee." 49 U.S.C. § 20109(b)(1). Both parties reference the Title VII of the Civil Rights Act ("Title VII") case, *Burlington Northern & Santa Fe Railroad v. White*, as setting the legal standard for defining an adverse action. ECF Nos. 53-1 at 11; 59 at 13; *see* 548 U.S. 53, 68 (2006). The Supreme Court in *Burlington* held, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have "dissuaded a reasonable worker from making or supporting a charge of discrimination." ' " 548 U.S. at 68 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)); *see also Washington v. Ill. Dep't of Rev.,* 420 F.3d 658, 662 (7th Cir. 2005). Considering the United States Supreme Court's recent holding in *Muldrow v. City of St. Louis*, the Eighth Circuit Court of Appeals has defined an adverse employment action as:

> [A] disadvantageous change to the compensation, terms, conditions, or privileges of employment. The Supreme Court recently obviated the requirement—replete in our case law — that the claimed injury be 'significant,' 'material,' or 'serious.' After *Muldrow*, [Plaintiff] is only required to plead 'some harm respecting an identifiable term or condition of employment.'

*Cole v. Grp. Health Plan, Inc.*, 105 F.4th 1110, 1114 (8th Cir. 2024) (quoting *Muldrow v. City of St. Louis*, 601 U.S. 346, 356 n.2 (2024)) (citing 42 U.S.C. § 2000e-2(a)). The Court will evaluate each alleged adverse action under the *Burlington* and *Muldrow* standards. *See Muldrow*, 601 U.S. at 356 n.2; *Burlington*, 548 U.S. at 68.

#### a.    20-day unpaid suspension

Plaintiff Sexton contends, and Defendant does not dispute, the 20-day unpaid suspension is an adverse action as a matter of law. ECF No. 59 at 13. Suspension is one of the explicitly enumerated adverse actions described under the FRSA. *See* 49 U.S.C. § 20109(b)(1).

    *b.*  *E-Test*

Plaintiff Sexton argues the "unsafe and unpermitted efficiency test" was an adverse employment action. ECF No. 53-1 at 11. Defendant CP contends the administration of the e-test was routine, conducted in accordance with policy, and in no way adverse. ECF Nos. 59 at 13–14; 50-1 at 17. Plaintiff Sexton, on the other hand, asserts Jared's administration of the e-test was "unsafe and unsanctioned." ECF No. 57 at 14.

On its face, being subjected to an efficiency test proscribed in Defendant CP's policies cannot be considered an adverse action. No reasonable person would be dissuaded from making a complaint for fear of being subjected to a test they know they could be subjected to as part of their ordinary job. *See Muldrow*, 601 U.S. at 356 n.2; *Burlington*, 548 U.S. at 68. Plaintiff Sexton insists because the test was designed to be faulty, it constitutes an adverse action. ECF No. 57 at 14. This argument can be pertinent to the knowledge and contributing factor elements of a prima facie case of retaliation but does not transform an otherwise routine test into an adverse employment action. *See Kuduk*, 768 F.3d at 790 (quoting *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011)).

    *c.*  *Disciplinary hearing, including notice*

Similarly, Plaintiff Sexton contends both the notice and the disciplinary hearing itself were adverse employment actions. ECF No. 53-1 at 11–12. Viewing the facts of the investigative process in a light most favorable to Plaintiff Sexton, he still must be able to show some disadvantageous harm that was the result of a standard disciplinary hearing mandated by the CBA. *See Muldrow*, 601 U.S. at 356 n.2; *Burlington*, 548 U.S. at 68. "The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington*, 548 U.S. at 67. The investigation itself produces no harm—the discipline resulting from the investigation does.

###### d.    *Potential for blacklisting*

Finally, Plaintiff Sexton maintains a note in his personnel file about the alleged rule infraction, and its resulting potential for blacklisting, is in and of itself an adverse action. 2d Amend. Compl., ECF No. 26 at ¶ 26. This argument is splitting hairs—any harm Plaintiff Sexton alleges resulting from the note is inherently attached to the suspension and not a separate, discreet adverse employment action.

###### e.    *Adverse action element*

The Court finds and concludes Plaintiff Sexton's 20-day unpaid suspension constitutes an adverse employment action as a matter of law. However, the Court further finds and concludes the suspension is the only legitimate adverse action, even when the potential blacklisting, hearing, and e-test are evaluated in the light most favorable to Plaintiff Sexton.

### 3.    Whether Defendant CP knew about Plaintiff Sexton's protected activity

###### a.    *Ross's knowledge*

Both parties agree Ross played a role in issuing the 20-day suspension. ECF Nos. 50-1 at 13; 57 at 11. For the purposes of summary judgment, Defendant CP does not dispute Ross knew about the disagreement between Plaintiff Sexton and McKelvey. ECF No. 50-1 at 13. Similarly, Ross was copied on the internal messages surrounding Plaintiff Sexton's January 2021 safety emails, creating no genuine issue of material fact as to his knowledge of the safety reports. Def.'s App., 50-3 at 405–409.

###### b.    *Jared's knowledge*

Besides Ross's involvement, Plaintiff Sexton alleges Jared played a role in issuing the discipline, either directly—because the suspension was delivered on Jared's letterhead—or indirectly—by setting Plaintiff Sexton up to fail the e-test and sabotaging his hearing. ECF No. 57 at 9–10. Even if Ross was the ultimate decisionmaker, the Court can consider Jared's alleged

indirect involvement because the "FRSA knowledge requirement may be satisfied by circumstantial evidence the employer had actual or constructive knowledge of protected activity." *See Kuduk*, 768 F.3d at 790 (citing 29 C.F.R. § 1982.104(e)(2)(ii)). Such a contention is consistent with a "cat's paw" theory of liability, explained by the Eighth Circuit in *Kuduk v. BNSF Railway*: "if a supervisor performs an act motivated by [discriminatory] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable." *Id*. (quoting *Staub*, 562 U.S. at 422) (emphasis and alterations in original).

Defendant CP counters this theory with Jared's testimony that he did not know Plaintiff Sexton was the engineer on the 474 when he decided to issue the e-test. Pl.'s SDF, ECF No. 57-1 at ¶ 49. In response, Plaintiff Sexton offers emails and reports Jared received mentioning both that Plaintiff Sexton was the engineer, and the tracks were cut, plus the phone call between McKelvey and Jared. *Id*. at ¶¶ 47, 49. As such, a disputed question of material fact exists as to whether Jared knew of Plaintiff Sexton's protected activity.

### 4.    Contributing factor analysis

The final element Plaintiff Sexton must prove to show a prima facie case of retaliation under the FRSA is whether any protected activity—reporting the safety hazard to McKelvey, refusing to operate the train until the tracks were clear, reporting the incident to Miller, or testifying about Jared's unsafe act during his disciplinary hearing—was a contributing factor in the adverse action taken by Defendant CP—suspending Plaintiff Sexton. *See Kuduk,* 768 F.3d at 789 (citing 49 U.S.C. § 42121(b)(2)(B)(i); 29 C.F.R. § 1982.104(e)(2)). As with many claims of retaliation under the FRSA, this element is the most vigorously contested.

a.    *The appropriate standard for the contributing factor element*

The parties disagree over the appropriate standard for the contributing factor evaluation. Defendant CP maintains *Kuduk* is controlling, Eighth Circuit authority, while Plaintiff Sexton relies upon the Supreme Court's recent ruling in *Murray v. UBS Securities*. ECF Nos. 59 at 3–6; 63 at 1–4. The Court of Appeals for the Eighth Circuit held, and repeatedly affirmed, "retaliatory intent" was required for protected activity to be a contributing factor in FRSA cases. *See Kuduk*, 768 F.3d at 791. The *Kuduk* court held, "[T]he contributing factor that an employee must prove is intentional retaliation prompted by the employee engaging in protected activity." *Id.* (citing *Consol. Rail Corp. v. U.S. Dep't of Labor*, 567 Fed. Appx. 334, 338–39 (6th Cir. 2014); *Ameristar Airways, Inc. v. U.S. Dep't of Labor*, 650 F.3d 562, 569–70 (5th Cir. 2011)). However, Plaintiff Sexton argues *Kuduk* is inconsistent with *Murray*, and therefore *Murray* is controlling. ECF No. 63 at 1–4; *see Murray v. UBS Sec., LLC,* 601 U.S. 23 (2024).

*Murray* involved a claim of retaliation under Sarbanes-Oxley, and the Supreme Court held a whistleblower "is not required to make some further showing that his employer acted with 'retaliatory intent,' " overturning Second Circuit precedent to the contrary. 601 U.S. at 39. Defendant CP distinguishes *Kuduk* by interpreting the *Murray* decision narrowly—arguing *Murray* only applies to Sarbanes-Oxley cases:

> While *Murray* construed the burdens of production set out in 49 U.S.C. § 42121(b)(2)(B), which sets standards for both Sarbanes-Oxley and the FRSA (and certain other federal claims), the *Murray* decision does not expressly mandate that the standard under *Kuduk* nor any other statute is abrogated or must be disregarded. Accordingly, *Kuduk* remains good law in the Eighth Circuit and therefore must apply to this action.

ECF No. 62 at 3.

The Court seriously considered whether it was necessary to decide this issue at the summary judgment stage. The Court finds that the answer is no because the record in this case

establishes that there are genuine issues of disputed fact for the jury to determine regardless of which standard is applied, and thus summary judgement is not appropriate for either party. *See* Fed. R. Civ. P. 56(a); *Celotex Corp.,* 477 U.S. at 322–23.

Plaintiff Sexton may prove this element with direct or circumstantial evidence. In lieu of direct evidence of retaliation, the Court considers:

> [C]ircumstantial evidence such as the temporal proximity between the protected activity and the adverse action, indications of pretext such as inconsistent application of policies and shifting explanations, antagonism or hostility toward protected activity, the relation between the discipline and the protected activity, and the presence of intervening events that independently justify discharge.

*Hess*, 898 F.3d at 858 (quoting *Loos*, 865 F.3d at 1112-13).

### b.    As applied to Plaintiff Sexton

Defendant CP argues Plaintiff Sexton cannot show a causal connection between his safety-related actions and Ross's decision to issue a suspension because Ross testified he "agreed that Sexton did the right thing" and "there is no evidence whatsoever" that Ross reacted negatively to Plaintiff Sexton's actions. ECF No. 50-1 at 13; ECF No. 50-2 at ¶ 72. Defendant CP then contends Plaintiff Sexton "has no evidence of pretext, shifting explanations, antagonism, or hostility toward his protected activity." ECF No. 50-1 at 14. Plaintiff Sexton points to temporal proximity, inconsistently applied disciplinary policies, and antagonism as ample circumstantial evidence to not only survive Defendant CP's summary judgment motion, but to entitle him to summary judgment in his favor. ECF Nos. 57 at 6–7; 53 at 12–22.

### i.    Linking Jared's e-test to protected activity

Plaintiff Sexton has provided evidence sufficient to support a finding McKelvey had animosity towards Plaintiff Sexton's protected activity, but McKelvey's alleged animosity towards Plaintiff Sexton could only be part of the circumstantial chain of events if Jared knew of the purported disagreement. Pl.'s SDF, ECF No. 57-1 at ¶ 70; Def.'s Resp. Pl.'s SMF, ECF No. 59-1

at ¶¶ 39–40; *see Murray,* 601 U.S. at 36–37. Plaintiff Sexton has offered evidence sufficient to support a finding Jared knew Plaintiff Sexton was the engineer of the 474 and that the 474 crew cut the tracks in Marquette. Pl.'s SDF, ECF No. 57-1 at ¶ 83. Plaintiff Sexton indicates that Jared knew Plaintiff Sexton insisted on cutting the tracks over McKelvey's objections based on the reports of the incident and the phone call where Jared and McKelvey testified to discussing the incident. Def.'s Resp. Pl. SMF, ECF No. 59-1 at ¶ 54.

For a reasonable jury to infer from this evidence Plaintiff Sexton's report and insistence on track cutting were contributing factors in Jared's decision to administer the e-test, the jury would have to make several inferences including; 1) Jared and McKelvey discussed the 474 delay, 2) McKelvey told Jared about his disagreement with Plaintiff Sexton or that Plaintiff Sexton was the one who insisted the tracks be cut, 3) Jared decided to issue the e-test because of the delay, and 4) this decision was in part motivated by the track cutting or Plaintiff Sexton's report. *See Cont'l Cement Co.,* 94 F.4th at 732. Of particular importance, it is not sufficient if Plaintiff Sexton could show the 474 delay generally was a contributing factor in Jared's decision to e-test Plaintiff Sexton, as there were several activities contributing to its delay and only the track cutting is considered protected activity under the FRSA. *Id.* at ¶ 50; *see Cont'l Cement Co.,* 94 F.4th at 732; FRSA, 49 U.S.C. § 20109. Plaintiff Sexton must show the protected activity specifically was at least a contributing factor. *Murray*, 601 U.S. at 36–37.

Plaintiff Sexton has provided evidence sufficient for a reasonable jury to find Jared knew the tracks were cut, Plaintiff Sexton was the 474 engineer, and the 474 delay was due to a handful of activities including track cutting, and that Jared knew that Plaintiff Sexton played a role in cutting the tracks.

Plaintiff Sexton's January emails with safety concerns are not connected to the e-test. Plaintiff Sexton offers no record evidence to suggest Jared considered the emails when deciding to issue the e-test.

### ii.    Linking the 20-day suspension to protected activity

Three individuals at CP reviewed the disciplinary hearing and made recommendations for Plaintiff Sexton's ultimate suspension: first, Johnson, the investigator, recommended a 20-day suspension; next, Smith recommended a 10-day served and 10-day deferred suspension; and finally, Ross decided on a 20-day suspension. To prove a prima facie case of retaliation, Plaintiff Sexton must be able to show a causal connection linking his protected activity—cutting the tracks and associated reports, the January safety emails, or mentioning Jared's "unsafe act" at his hearing—to the 20-day suspension. *Murray*, 601 U.S. at 36–37.

First, Plaintiff Sexton argues Johnson's initial recommendation was based on a flawed investigation, because he was not allowed to have witnesses he requested. ECF No. 53-1 at 16. Plaintiff Sexton relies on the PLB finding as evidence of this. *Id*. However, even if the Court finds a genuine dispute exists as to the efficacy of the hearing, to be appropriate to survive summary judgment, the dispute must be over a material fact, and the efficacy of the hearing is only material if Plaintiff Sexton can show the hearing was flawed, at least in part, because of his protected activity. *See Anderson*, 477 U.S. at 248. This he cannot do.

As an initial matter, the January safety emails were never mentioned during the hearing and nothing in the record shows Johnson was aware of the emails. *See, e.g.*, Johnson Dep., Pl.'s App. A, ECF No. 53-4 at 116–128, 162–174; Sexton Hr'g, Pl.'s App A, ECF No. 53-4 at 133–161, 225–227; Sexton Hr'g, Def.'s App., ECF No. 50-3 at 79–179; Johnson Dep., Def.'s App., ECF No. 50-3 at 239–250; Jan. Emails, Exs. 13–15, 45, Def.'s Sealed App., ECF No. 51 at 212–218, 405–

409. Further, the investigation transcript shows McKelvey was never mentioned, nor was Sexton's report or insistence on cutting the tracks. It does not appear any of the 474's activity in Marquette was discussed during the hearing. Sexton Hr'g, Def.'s App., ECF No. 50-3 at 79–179. Johnson was copied on McKelvey's original delay report, so was aware the 474 was delayed prior to the e-test, but Sexton has provided no evidence to suggest Johnson knew Plaintiff Sexton was the one who insisted the tracks be cut, much less that Johnson took this into account during the hearing. *See* Def.'s Resp. Pl.'s SMF, ECF No. 59-1 at ¶¶ 46–47.

Similarly, Smith reviewed the hearing and recommended a 10-day served, 10-day deferred suspension. Pl.'s SDF, ECF No. 57-1 at ¶ 45. While Smith originally responded to Plaintiff Sexton's January safety emails, Plaintiff Sexton has provided no evidence to suggest Smith took this protected activity, or the 474 delay, into account. Additionally, the recommendation falls squarely in line with the comparator evidence Plaintiff Sexton has provided.

Finally, for Plaintiff Sexton's claims to survive summary judgment, he must be able to show a link between his protected activity and Ross's decision to suspend Sexton for 20 days. *See Murray*, 601 U.S. at 36–37. Unlike Johnson and Smith, there is record evidence from which a jury could conclude Ross knew of Plaintiff Sexton's disagreement with McKelvey at the time he was deciding discipline. *See* Safety Rep. Email, Ex. 56, App. B, ECF No. 54-1. For circumstantial evidence, Plaintiff Sexton relies on the fact Ross ignored Smith's recommendation for 10-days served and 10 deferred and issued Sexton the more severe 20-day suspension. Pl.'s SDF, ECF No. 57-1 at ¶ 47. Further, Sexton presents evidence Ross had not issued such severe punishment to any other similarly situated employee for similar infractions. Def.'s Resp. Pl.'s SMF, ECF No. 59-1 at ¶¶ 154–60.

As explanation, Defendant CP relies on its discipline guidelines, CBA, and Ross's deposition, arguing the suspension is in line with the guidelines. Ross testified "There was no way in [Hades] I was going to give somebody a 10 day deferred and 10 day served suspension for a major violation. So he got 20." Ross Dep. 50:11–14, App. A, ECF No. 53-4 at 52. This statement appears consistent with the discipline guidelines, however, when asked about the other employees who received lesser discipline, Ross testified it was likely because the employees accepted responsibility and waived their right to an investigation. Ross testified, "if the charges get proven, then they get full measure of discipline," in direct contradiction with the disciplinary policy stating most major offenses would require a formal investigation and employees do not have a right to waive their hearings in exchange for a lesser punishment. Def.'s Resp. Pl.'s SMF, ECF No. 59-1 at ¶ 162; Def.'s App., ECF No. 50-3 at 71.

There also appears to be contradictory policy regarding how an employee obtains an admission of responsibility form—the CBA places responsibility on the "employee and/or the employee's representative," the discipline guidelines specify the waiver would be "offered by the Company," and Ross testified he would entertain lowering the discipline if the general chairman requested. Ross Dep. 1–12, App A. ECF No. 53-4 at 60; Def.'s App., ECF No. 50-3 at 47.

### iii.    Contributing factor element

Taken in the light most favorable to Plaintiff Sexton and making all inferences in Plaintiff Sexton's favor, a reasonable jury could find Plaintiff Sexton has provided sufficient circumstantial evidence to prove a causal connection between Plaintiff Sexton's protected activity and the ultimate adverse employment action because of 1) the short temporal proximity—a mere three days between the protected activity and issuance of an investigation notice; 2) hostility—from the flurry of emails demanding answers for the delay and McKelvey's exasperated texts, seeking to

hold Plaintiff Sexton accountable; 3) the inconsistent application of policies; and 4) shifting explanations for how and when waivers are awarded—as the punishment Ross imposed was more severe than both what was recommended by Smith and any other employee received for the same rule violation. ECF No. 53-1 at 13–22.

On the other hand, Defendant CP has provided admissible evidence to counter each of these contentions including: the CBA's investigation timeline requirement, Ross's testimony that he always agreed with Plaintiff Sexton on the issue of cutting the tracks, and that the efficiency test was an independent, intervening act. Pl.'s SDF, ECF No. 57-1 at ¶¶ 46, 72.

Accordingly, a genuine question of material fact exists as to whether Plaintiff Sexton has shown a prima facie case of retaliation under the FRSA making summary judgment for either party inappropriate. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge" when ruling on a motion for summary judgment. *Anderson*, 477 U.S. at 455; *see also Tolan v. Cotton,* 572 U.S. 650, 656 (2014) ("a 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.' ")

**B.    Whether Defendant CP would have Disciplined Plaintiff Sexton Regardless**

Even though a genuine issue of material fact exists as to Plaintiff Sexton's prima facie case of retaliation under the FRSA, if Defendant CP can show it would have disciplined Plaintiff Sexton in the absence of protected activity, Plaintiff Sexton's claim of retaliation will not survive summary judgment. *See Blackorby v. BNSF Ry. Co.*, 936 F.3d 733, 734 (8th Cir. 2019). Both parties ask the Court to issue summary judgment in their favor on the affirmative defense.

### 1.  Whose burden to demonstrate

Under the FRSA and burden-shifting framework of 49 USC § 42121:

[T]he plaintiff bears the burden of proving that intentional retaliation in response to protected conduct served as a contributing factor in an adverse employment action. By express statutory command, the defendant then bears the burden of proving an affirmative defense—that the defendant would have taken the same action in the absence of protected conduct—by clear and convincing evidence.

*Id*. (citing 49 U.S.C. § 42121(b)(2)(B)(iv)).

Plaintiff Sexton argues Defendant CP attempts to shift the burden to Plaintiff Sexton to demonstrate the affirmative defense. ECF No. 57 at 3–5. It is Defendant CP's burden, not Plaintiff Sexton's. *Blackorby,* 936 F.3d at 737. Because of the heightened, clear and convincing evidence standard demanded by the defense, the "affirmative defense is often not suitable for summary judgment." *Kuduk*, 768 F.3d at 793. However, if Defendant CP proffers enough evidence to support its affirmative defense, Plaintiff Sexton must offer rebuttal evidence to create a genuine issue of material fact. *See id*.

### 2.  Whether burden is met

In *Kuduk*, the Eighth Circuit affirmed the district court's finding defendant proved the affirmative defense because defendant conducted an independent investigation, held a formal hearing, had a disinterested manager make the disciplinary decision, allowed plaintiff to appeal, and continued discussions with the union. 768 F.3d at 793. Further, defendant provided "uncontroverted evidence" it consistently enforced the policy it disciplined plaintiff for. *Id*. The plaintiff argued the defendant could not meet its burden because it was disputed whether plaintiff truly violated the rule but provided no supporting evidence for the contention. *Id*.

As in *Kuduk*, Defendant CP held an independent investigation and has offered uncontroverted evidence Plaintiff Sexton's suspension falls into the disciplinary guidelines specified range. *See id*. Unlike *Kuduk*, Plaintiff Sexton was not allowed to present his requested

witnesses, the PLB found the hearing was flawed, and the decisionmaker ultimately levied a harsher punishment on Plaintiff Sexton than recommended by one of the reviewers.

Further unlike *Kuduk*, Defendant CP has not provided "uncontroverted" evidence of similarly disciplined individuals. In contrast, Plaintiff Sexton has provided a list of similarly situated individuals who were issued discipline for violating GCOR 5.3.7 and all received less harsh disciplinary actions. Def.'s Resp. Pl.'s SMF, ECF No. 59-1 at ¶¶ 154–160. Defendant CP argues the reason Plaintiff Sexton's discipline was more severe is because he did not "take responsibility" for the rule violation, but Plaintiff Sexton provided an affidavit stating he was never given the opportunity to take accountability. *Id*. at ¶ 162. Defendant CP argued at the hearing the union contract requires the employee to request an opportunity to take accountability, but its own disciplinary policy states the Company is responsible for providing the opportunity for employees to take responsibility. Pl.'s SDF, ECF No. 57-1 at ¶ 112.

Viewing the record in its entirety, a material question of disputed fact exists as to whether Defendant CP has met the "heightened burden under the clear-and-convincing-evidence standard" required to prove its affirmative defense, making summary judgment for either party on the affirmative defense inappropriate. *Blackorby,* 936 F.3d at 734.

## V.     CONCLUSION

For the foregoing reasons, there are genuine issues of disputed material fact and neither party is entitled to judgment as a matter of law. The Court **denies** Plaintiff Sexton's Motion for Partial Summary Judgment, ECF No. 53, and **denies** Defendant's Motion for Summary Judgment, ECF No. 50.

IT IS SO ORDERED.

Dated March 31, 2025.

Helen C. Adams
U.S. Magistrate Judge