**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION**

| | | |
|---|---|---|
| John Sexton, | ) | Case No. 23-cv-00031 |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| Dakota, Minnesota & Eastern Railroad | ) | |
| Corporation d/b/a Canadian Pacific, a | ) | |
| Delaware Corporation, | ) | |
| | ) | |
| Defendant. | ) | |

**APPENDIX TO DEFENDANT'S MOTIONS IN LIMINE**

| Exhibit | Document | Appendix Page(s) |
|---|---|---|
| A | Declaration of Joshua Hughes in support of Defendant's Motions in Limine | 4–6 |
| B | August 26, 2022 Decision of the Public Law Board<br><br>(Exhibit 13 to Deposition of John Sexton) | 7–11 |
| C | March 21, 2024 Expert Report of Brandon L. Ogden<br><br>(Exhibit 1 to Deposition of Brandon Ogden) | 12–20 |
| D | October 31, 2023 Deposition of John Sexton Transcript (Excerpts) | 21–31 |
| E | June 20, 2024 Deposition of Tom Jared Transcript (Excerpts) | 32–41 |
| F | November 9, 2023 Deposition of Kurtis McKelvey Transcript (Excerpts) | 42–48 |
| G | July 18, 2024 Deposition of Jason Ross Transcript (Excerpts) | 49–58 |

Dated: January 22, 2026

DORSEY & WHITNEY LLP


/s/ Joshua D. Hughes
Joshua Hughes (AT0014950)
hughes.joshua@dorsey.com
Dorsey & Whitney LLP
801 Grand Ave, Suite 4100
Des Moines, IA 50309
Tel: (515) 283-1000
Fax: (515) 598-7704


/s/ John T. Sullivan
John T. Sullivan (pro hac vice)
sullivan.jack@dorsey.com
Briana Al Taqatqa (pro hac vice)
altaqatqa.briana@dorsey.com
Dorsey & Whitney LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
Tel:  (612) 340-2600
Fax:  (612) 340-2868


ATTORNEYS FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that on January 22, 2026, I caused the foregoing to be electronically served on Plaintiff via ECF, which provides notice and a copy to Plaintiff's counsel and all other counsel of record:

Megan R. Merritt
SHUTTLEWORTH & INGERSOLL, P.L.C.
115 3rd Street SE, Suite 500
P.O. Box 2107
Cedar Rapids, IA 52406
Phone: (319) 365-9461
Fax: (319) 365-8443
mrm@shuttleworthlaw.com

John D. Magnuson
YAEGER & JUNGBAUER BARRISTERS, P.L.C.
4601 Weston Woods Way
St. Paul, MN 55127
Phone: (507) 330-4777
Fax: (651) 288-0227
jmagnuson@yjblaw.com

Cyle A. Cramer
NICHOLS KASTER, PLLP
80 South Eighth Street
4700 IDS Center
Minneapolis, MN 55402
Phone: (512) 256-3200
Fax: (612) 338-4878
ccramer@nka.com


/s/ Joshua D. Hughes
Counsel for Defendant

**DM&E Appendix 003**

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | | |
|---|---|---|
| John Sexton, | ) | |
| | ) | Case No. 23-cv-00031 |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | **DECLARATION OF** |
| | ) | **JOSHUA D. HUGHES** |
| Dakota, Minnesota, & Eastern Railroad | ) | |
| Corporation d/b/a Canadian Pacific, a | ) | |
| Delaware Corporation, | ) | |
| | ) | |
| Defendant. | ) | |

COMES NOW I, Joshua D. Hughes, and affirm, attest, and declare as follows:

1.    I am counsel of record for Defendant Dakota, Minnesota, & Eastern Railroad Corporation, d/b/a Canadian Pacific ("DM&E") in the above referenced matter, and I have personal knowledge of the facts stated herein.

2.    I provide this Declaration in support of DM&E's Motions in Limine.

3.    Attached to this Declaration as **Exhibit B** is a true and correct copy of the August 26, 2022, decision of the Public Law Board. This document was Exhibit 13 at Sexton's deposition.

4.    Attached to this Declaration as its **Exhibit C** is a true and correct copy of the March 21, 2024, report of Brandon L. Ogden. This document was Exhibit 1 at Ogden's Deposition.

5.    Attached to this Declaration as **Exhibit D** is a true and correct copy of excerpts of the transcript of the October 31, 2023 Deposition of John Sexton.

6.    Attached to this Declaration as **Exhibit E** is a true and correct copy of excerpts of the transcript of the June 20, 2024, Deposition of Tom Jared.

7.    Attached to this Declaration as **Exhibit F** is a true and correct copy of excerpts of the transcript of the November 9, 2023 Deposition of Kurtis McKelvey.

8.      Attached to this Declaration as **Exhibit G** is a true and correct copy of excerpts of the transcript of the July 18, 2024 Deposition of Jason Ross.


**Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.**


Executed on: January 22, 2026            _/s/ Joshua D. Hughes_____
                                         Joshua D. Hughes

# EXHIBIT B

CASE NO. 353

Organization File da-sexton.j.02012021
Carrier File 2021-0022404

## PUBLIC LAW BOARD NO. 7667

PARTIES     ) BROTHERHOOD OF LOCOMOTIVE ENGINEERS AND TRAINMEN
                      )
TO                )
                      )
DISPUTE     ) DM&E RAILROAD d/b/a CANADIAN PACIFIC

STATEMENT OF CLAIM:

Claim on behalf of Canadian Pacific/DM&E Line Employee John Sexton (Claimant) for removal from his record the twenty (20) day suspension assessed and compensation for all time lost, in addition to time and expenses for attending the investigation held on February 10, 2021.

FINDINGS:

The Board, upon consideration of the entire record and all of the evidence, finds that the parties are Carrier and Employee within the meaning of the Railway Labor Act, as amended, that this Board is duly constituted by Agreement dated August 16, 2013, and that this Board has jurisdiction over the dispute involved herein. Awards issued pursuant to the terms and conditions outlined in the Agreement establishing this Expedited Board of Arbitration will not prejudice the rights of either party, will not establish any precedent and will not be referred to in connection with any other case, agreement and/or dispute resolution.

On February 1, 2021, Claimant John Sexton was assigned as the engineer on train 474-31, bringing at train into the Nahant yard. While the crew was in the middle of performing a shove move, General Manager Tom Jared approached the conductor unannounced and instructed him to cease

Public Law Board No. 7667
Case No. 353



1

SEXTON    000015

radio communications with Claimant. The conductor's initial radio communication was that Claimant was good for 50 cars, and his next communication (according to both Claimant and the conductor) was good for 40, 15 to a stop. After Claimant shoved approximately 7 cars, he radioed the conductor several times, and upon receiving no further radio communication, he initiated braking, eventually stopping after approximately 11 cars, or 558 feet.

By notice dated February 4, 2020, the crew was directed to attend a formal hearing regarding their alleged failure to stop within half the specified distance given while shoving into track NA04. The hearing was held on February 10, 2021, after which Claimant was found to be in violation of GCOR 5.3.7 – Radio Response, and by notice dated February 26, 2021, he was assessed a twenty (20) day suspension.

The Organization challenges the discipline assessment on both procedural and substantive grounds. With respect to the procedures, the Organization maintains the process was flawed due to the General Manager's multiple roles in the proceeding. It points out that he was a witness at the hearing, having initiated the test, and that he then determined the outcome of the hearing and authored the notice of discipline, thus ratifying his own actions. The Organization states it is apparent that the outcome of the hearing was predetermined, and it cites award authority which has overturned discipline in similar circumstances.

With respect the merits, the Organization asserts that the decision to assess discipline was arbitrary and capricious. It states that the record indicates that the instructions given to Claimant were ambiguous at best in that he was first given the 50-car count, then that he was told he was good for 40, while at the same time a stop in 15. It contends that Claimant then complied with the intent of the rule when he stopped when no further communication was received, and that he did so well short of half the 40-car count. The Organization also takes exception to Jared's actions in conducting the test in an unfair manner contrary to the published guidelines for such matters and setting up an unsafe condition when he interrupted, without warning or prior introduction, the conductor who was in the middle of directing the shove. The Organization concludes that to assess discipline based on these facts is unjust.

Public Law Board No. 7667
Case No. 353

2

SEXTON   000016

The Carrier, on the other hand, maintains that discipline was properly assessed, arguing that the record contains substantial evidence to support the conclusion that Claimant violated the cited rule. It points to the General Manager's testimony that Claimant received an instruction to shove 15 car lengths, but that Claimant shoved for 11 car lengths before he stopped. It notes that the cited rule provides that "movement must be stopped within half the distance specified unless additional instructions are received," and it states that it is unrefuted that Claimant continued shoving well past half the 15-car count received from the conductor.

With respect to the Organization's procedural objection, the Carrier claims that Claimant received a fair and impartial hearing, and that the process was not tainted by Jared's involvement. It states that Jared testified to his direct observations, and it apparently contends that Jared didn't actually make the discipline decision, stating "Discipline notices on this property are assessed by the General Manager of the Territory. No decision was made on Claimant's culpability until the transcript of the hearing was reviewed by the hearing officer. The discipline was assessed by the Carrier, not the individual manager."

Regarding the level of discipline assessed, the Carrier states that violations of shove rules are considered major/life threatening offenses under its Hybrid Discipline and Accountability guidelines, and that the guidelines provide that the suspension assessment is an appropriate quantum of discipline for such a violation.

We have carefully reviewed the record, and while we find multiple reasons to question the discipline assessment, we concur with the Organization that the process here was flawed to such an extent that it deprived Claimant of a fair and impartial hearing. General Manager Jared involved himself in too many aspects of the process. The record reflects that it was Jared who initiated the test, in a manner which does raise questions regarding safety in his obviously surprising an employee who was performing the safety-sensitive task of protecting the shove, and it appears that the charges were levied based on his test and observations. The only realistic conclusion that can be reached after an objective review of this record is that Jared levied charges regarding his own somewhat questionable test, provided the testimony to support them, and then signed off on a

Public Law Board No. 7667                                                                 3
Case No. 353

SEXTON   000017

predetermined outcome.   We are not convinced by the Carrier's statement that "the Carrier" as some all-inclusive entity rendered the decision. The Carrier is of course comprised of many people and departments and it has a legal status, but it acts through individuals, and in this case the individual who signed the discipline letter was Jared. We do not believe the novel explanation offered by the Carrier is sufficient to remove the specter of his excessive involvement in the case. Therefore, we find that the claim must be sustained.


AWARD:  Claim sustained.


Michael D. Phillips
Chairman and Neutral Member


Marcus Ruef
Employee Member

Brian Scudds
Carrier Member

Dated:   August 26, 2022

Public Law Board No. 7667
Case No. 353

4

SEXTON   000018

# EXHIBIT C

## Ogden Expert Witness LLC
Railway Safety & Operations Consultant
Brandon L. Ogden – 629 Route D – Lockwood, MO 65682
Phone: 417-813-0958 – Email: brandon@ogdenexpertwitness.com

March 21, 2024

William G. Jungbauer
4601 Weston Woods Way
Saint Paul, MN 55127

RE:    John Sexton v. Dakota, Minnesota & Eastern Railroad Corporation d/b/a Canadian
    Pacific, a Delaware Corporation:

### I.    INTRODUCTION

This report is being submitted by Brandon L. Ogden, Ogden Expert Witness. Ogden Expert
Witness is a consulting firm specializing railroad safety and operations, including my knowledge
and experience as a certified conductor, switchman, and numerous operations management
positions at BNSF Railway.

### II.    BACKGROUND INFORMATION

According to documents and records reviewed, Mr. John Sexton was an employee of Dakota,
Minnesota & Eastern Railroad Corporation d/b/a Canadian Pacific, a Delaware Corporation.
From most recently, and at the relevant times, he worked as a locomotive engineer.

On or about February 1, 2021, Sexton was working as a locomotive engineer with conductor,
Justin DePover. Sexton and DePover believed that there were unsafe conditions of snow and ice
buildup particularly at road crossings and flangeways that could cause a derailment pursuant to
CP Rail operating and safety rules. In fact, CP Rail had two derailments around the same time
that CP attributed to snow and ice buildup in the flangeways because of failing to cut tracks as
required. "Cutting" the tracks refers to separating the locomotive from the cars and running just
the locomotive through snow and ice build up to clear that build up. This is the safe course of
action because the heavier locomotive can safely clear the snow without the increased risk of
cars which are lighter and can ride up onto the snow and ice and therefore are easier to derail.
Sexton reported to the Assistant Trainmaster, Kurtis McKelvey, the potential dangers of
attempting to operate the train in those conditions. Sexton stated that his train, containing
hazardous materials, should be separated from the locomotive, and operated over crossings
and flangeways so that the tracks could be cut, in other words, cleared of snow and ice.
However, McKelvey instructed him to not cut anything, and instead to operate the train as
normal.

1

Exhibit
Ogden 01
7/10/2024
B. Ogden

Sexton then had McKelvey sign a Health and Safety Job Briefing Form that would have his written acknowledgement that he was recommending them to violate CP Rail Policy and endanger the crew along with the public.

Sexton then had a meeting with DePover, where Sexton decided he would refuse McKelvey's instruction to continue working as normal, rather, they would take the time to cut the tracks, in other words, clear them of snow and ice build up to prevent a catastrophic derailment. Sexton believed it was the safest course of action. Sexton's cutting of the tracks contributed to a significant delay in his train getting to its next destination on time and also affected other train arrivals and departures. This delay impacted much of CP's planned scheduling throughout the rest of the day.

After Sexton spent the time to cut the tracks, Gary Prince emailed McKelvey and the General Manager, Tom Jared, stating that he needs a full breakdown from McKelvey of what happened and that "a set out and locomotive lift should not take 4'30" as projected." Prince further addressed his concerns about the delay in stating, "we are at risk of 4 re-crews due to 1 train over-standard. Ensure the delays in Nexus are filled out correctly with facts, not assumptions."

McKelvey replied to the email and completed an Incident Report. In both, McKelvey attributed cutting crossings as contributing to the delay. In response to McKelvey's Incident Report, Jared responded only stating, "call me when you have a min." Records indicate that McKelvey and Jared did have a phone call shortly after.

Later that day, Sexton's train arrived at the Nahant Yard in Davenport, Iowa. It was Sexton's job to separate cars from the train onto other sets of tracks. Moving cars in a yard such as this is referred to as "shoving." While Sexton's crew were performing shoving movements, Jared walked up to Sexton's conductor DePover and instructed him to stop communicating with Sexton over the radio. This is a dangerous action because DePover was acting as Sexton's eyes on the ground. Further, GCOR rules state that an employee engaged in a shove "must not engage in unrelated tasks while providing protection." Jared claimed that his actions were a part of an "efficiency test" to see if Sexton would stop the train after losing communications with his conductor within a specified distance. However, there is no efficiency test that permits a set up test in this manner. Jared's actions were dangerous and put Sexton's and Depover's lives at risk because it distracted DePover from protecting the shove and made him engage in unrelated tasks by communicating with Jared.

Further, Jared's "efficiency test" subjected Sexton to possible discipline. Jared then concluded that Sexton failed the efficiency test and that Sexton violated GCOR 5.3.7. According to Sexton's employee records, in a nine-year period, this is the first time Jared conducted an efficiency test on Sexton.

CP Rail management bonuses, raises, promotions or demotions are in part based upon performance goals and metrics of CP Rail. When employees, such as Sexton, take safety actions like cutting the tracks, and thus delaying a train, CP Rail officials are placed in a difficult conflict of interest in trying to keep CP trains moving and not delayed versus protecting CP Rail employees and the public safety because of bonuses based on speed metrics. These same

2

officials were allowed by CP Rail to make discretionary decisions as to whether or not an employee, such as Sexton, should be subjected to a disciplinary investigation and actual discipline.

On February 10, 2021, CP Rail conducted its disciplinary investigation and ultimately disciplined Sexton with a violation of GCOR 5.3.7-Radio Response stemming from Jared's suggestion that Sexton failed his efficiency test. CP imposed a twenty-day unpaid suspension.

This suspension was later reviewed by the Public Law Board to determine whether CP was correct in its decision making. The Public Law Board found that the "decision to assess discipline was arbitrary and capricious in that the Carrier failed to meet its burden of proof." Jared, who was both the judge and executioner orchestrating the discipline, chose to subject Sexton to discipline by conducting an e-test, made the suggestion that Sexton failed the e-test, gave statements against Mr. Sexton in his disciplinary investigation, and suggested Sexton be disciplined.

You have asked me to review a number of discovery documents including the CP disciplinary investigation transcript and exhibits regarding Sexton and other documents and records including pertinent GCOR rules, CP Rail policies, CP Rail Short Term Incentive Policy Plans, programs and metrics/goals of various CP Rail management officials who participated in various capacities in the decisions to investigate, discipline, and sustain the suspension of Sexton and to present my opinions as to whether or not such policies, programs, metrics and/or goals presented a potential or actual conflict of interest or other policy/rule violation for CP Rail management officials who exercised discretion in making such decisions in this case.

You have also asked me to give any opinions as to whether Sexton violated any rules, policies, notices, or regulations, and whether CP Rail's decisions to suspend Sexton were supported by the evidence. In addition, you have asked my opinion whether CP Rail would have suspended Sexton for the same rule violations if he had not engaged in numerous protected activities.

III.    MY BACKGROUND/EXPERIENCE/SPECIALIZED RAILROAD KNOWLEDGE

I have a decade of experience as a certified switchman/conductor or operations manager with BNSF Railway, a Class I Railroad similar to CP and operated under the same GCOR rules. I have extensive knowledge in train operation and operating rules interpretation. From 2006 to 2016 I promoted my way through the railroad management ranks as Trainmaster, Director of Administration, Terminal Manager and Superintendent of Operations. I have distinguished railroad leadership experience and unique industry knowledge and perspective. I led my team of over 300 train, yard and engine employees to multiple extended human factor incident and injury free streaks during my railroad career. I have investigated derailments, crossing accidents, personal injuries and almost any unusual circumstance involving the operating department of the railroad. I have supervised new hire training programs for railroad operating employees.

Over my railroad career, I have taken hundreds of hours of ongoing training in train operations, railroad management, crew training, operating rules, and safety. I have completed thousands of federal required operations tests on railroad operating employees for rules compliance and led railroad site safety teams to solve railroad operating safety issues. I am familiar with how BNSF

applied, used, interpreted, and managed its policies and procedures from 2006-2016 compared with how CP applied, used, interpreted, and managed its policies and procedures for the purposes of this case.

I have interpreted GCOR rules and railroad regulations and I'm familiar with railroad policies and procedures. I assessed alleged rules violations, was involved in disciplinary investigations, and made disciplinary decisions, including whether to terminate employees.

I am aware of how the bonus policies were used by BNSF managers including myself. I have given expert testimony and been retained as a railroad operations expert concerning such matters as train handling, operation of switches, operation of hand brakes, rail equipment movement during switching operations including shove movements, and evaluation of railroad employee rule compliance. My CV (Exhibit "A"), Fee Schedule (Exhibit "B"), and Testimony Case List (Exhibit "C") are attached to this report. As an expert witness I have become familiar with the policies of other railroads including CP Railway, which are similar in nature to the rules, policies, and procedures of BNSF.

### IV.    THIS ENGAGEMENT

1. Federal Complaint dated May 5, 2023
2. Federal Amended Complaint dated August 25, 2023
3. BLET Appeal [CP000015-000017]
4. Hybrid Discipline & Accountability Guidelines [CP00440-00455]
5. CP's Response to BLET Appeal [CP0000147-0000150]
6. Email from Dylan Smith [CP0004-00005]
7. Michelle Sullivan's Notice of Representation [CP00615-00617]
8. Sexton's Safety Testing Results [CP00435-00437]
9. Email from Mark Johnson [CP00002-00003]
10. Email from Tracy Miller [CP01692-01693]
11. Email from Tracy Miller [CP01694-01695]
12. Tom Jared Response [CP01696-01968]
13. Al McCombs Email [CP01133-01134]
14. Sexton's Emails about Cutting Tracks Incident [CP00994-00995]
15. Sexton's Follow up Emails about Cutting Tracks Incident [CP00996-00997]
16. Email from Dylan Smith Recommendation [CP00981-00983]
17. Joe Rainwater's Letter requesting Witnesses [CP00980]
18. CP Rail's Position Statement to OSHA [CP00458-00470]
19. Sexton's Second Amended Complaint dated August 25, 2023
20. Joe Rainwater's Email Requesting Witnesses [CP00979]
21. Train Delay Report [SEXTON000163]
22. Testing Rules [SEXTON000157-000162]
23. Sexton Email to OSHA [SEXTON000147-000149]
24. Safety Review - Cutting Tracks 1 [SEXTON000141]
25. Safety Review - Cutting Tracks 2 [SEXTON000142]
26. Safety Meeting Signature Sheet [SEXTON000156]

4

27. GOI Section 1 - 32.10 [SEXTON00144]
28. GM Notice No. 22 [SEXTON000143]
29. Depover Handwritten Note [SEXTON000140]
30. GCOR 6.5 [SEXTON000145]
31. David Cox Statement [SEXTON000146]
32. Sexton-Depover Hearing dated February 10, 2021 [SEXTON00019-000138]
33. Notice of Investigation [SEXTON000013]
34. Investigation Exhibits [SEXTON000004-000012]
35. Notice of Discipline [SEXTON00014]
36. Public Law Board No. 7667 Case 353 [SEXTON000015-000018]
37. Brotherhood of Locomotive Engineers and Trainmen GCA Appeal [SEXTON000001-000003]
38. Defendant's Supplemental Responses to Plaintiff's Fifth Set of Discovery Requests dated March 1, 2024
39. CP Rail 2021 Short Term Incentive Plan [CP03231-03237]
40. Kurtis McKelvey 2020 Performance Management Form [CP03361-03366]
41. Kurtis McKelvey 2021 Performance Management Form [CP03367-03374]
42. Thomas Jared 2020 Performance Management Form [CP03389-03401]
43. Thomas Jared 2021 Performance Management Form [CP03402-03408]
44. Incident Report [CP03244-03245]
45. Sexton Deposition Transcript dated October 31, 2023
46. Kurtis McKelvey Deposition Transcript dated November 9, 2023

**V.**     SUMMARY OF GROUNDS FOR EACH OPINION

The grounds for my opinions are based on:

1. My specialized training, experience, and knowledge of the custom and practice of the rail industry as it relates to the specific issues in this case.
2. My railroad working experience and training while serving in various positions over 10 years with BNSF Railway.
3. The specialized experience and knowledge gained while serving as a railroad safety and operations consultant in litigated cases.
4. My review of material and/or information received in this matter to date.

**VI.**     METHODOLOGY

I use the same methodology that I was trained by BNSF and used during my management years with BNSF in applying, determining, and interpreting BNSF rules, policies, procedures, and applicable regulations in disciplinary investigations and decisions. To the best of my knowledge, my peers were trained in and used these same methods. The primary goal of the methodology used was to understand, interpret, and apply it to the railroad operation, employee training, and disciplinary investigations and decisions. I would review all the pertinent facts and evidence and uniformly apply my methodology in the decisions I made regarding the BNSF discipline policy and how I treated other people. I used and allowed alternative handling/lesser discipline

5

**DM&E Appendix 017**

and/or lenience when in doubt of what discipline to apply. The ultimate goal was to operate a safe railroad.

### VII.    OPINIONS

1.  Whether Sexton violated any rules, policies, notices, or regulations supported by the evidence presented by CP in its investigation.

CP Rail held a disciplinary investigation on Sexton on February 10, 2021. Sexton was given a 20-day unpaid suspension for allegedly violating GCOR 5.3.7 - Radio Response. Based upon my review of the investigation transcript and exhibits it is my opinion that CP Rail did not prove Sexton violated any rules. Rather, it is clear CP Rail managers made a predetermined ruling and failed to hold an impartial and unbiased investigation. CP Rail should not have disciplined and suspended Sexton for 20 days based on the facts presented in the CP Rail Formal Investigation.

This opinion is based on my own experience in conducting disciplinary investigations and the Public Law Board's decision to overturn the discipline. I agree with the Public Law Board's position that both on a procedural and substantive basis Sexton's discipline was unwarranted.

I agree that Sexton complied with the intent of the rule. The rule itself states "Movement must stop within half the distance specified unless additional instructions are received." In this instance, when Sexton received his last instruction from DePover, it was his task to shove, or move, 15 more cars in the direction they were shoving. However, DePover gave the additional instruction as part of the entire instruction that Sexton was good for 40 cars. Because he was instructed that he was good for 40 cars, in other words, there was room for 40 cars, safe course of action in compliance with GCOR would be to stop within 20 cars. Sexton stopped after moving 11 cars because he realized he had lost communication with DePover.

Based upon the material provided for my review, it is evident the facts did not support the discipline assigned to Sexton. As such, it is my opinion that the Public Law Board was correct in their decision to overturn the punishment on Sexton.

I also agree with the Public Law Board's decision regarding the procedural aspect of CP's investigation. In my experience conducting disciplinary investigations, this investigation was not handled in a fair and impartial manner, rather, with notable animosity towards Sexton. Jared led the entire process against Sexton, he chose to subject Sexton to discipline by conducting an e-test, made the suggestion that Sexton failed the e-test, gave statements against Mr. Sexton in the disciplinary investigation, and suggested Sexton be disciplined. I agree with the Public Law Board's conclusion that "Jared levied charges regarding his own somewhat questionable test, provided testimony to support them, and then signed off on a predetermined outcome."

2.  Whether CP's policies, programs, metrics and/or goals present a potential or actual conflict of interest.

CP Rail policies, programs, metrics, and goals presented a potential or actual conflict of interest for CP Rail management officials who exercised discretion in making decisions in this case, including disciplinary decisions. CP's Short Term Incentive Plan (STIP) requires managers to

conduct regular progress reviews throughout the year and evaluate the performance of the managers under them against objectives set by CP.

The STIP states, "The objectives of the Plan are: to tie a part of the employee's compensation directly to CP's results; to reward the achievement of individual and team objectives that support CP's achievement of its annual business plans and long-term strategy; and to maintain the competitiveness of CP's compensation program." Both Jared's and McKelvey's objectives for 2021 were to "Improve overall performance of the southern region's train Performance, origin Performance, terminal Dwell Hours and GTM's." Each of these objectives is about speed not safety. Both McKelvey's and Jared's Performance Management Form stated that their actions and behaviors include "drill down on late trains, terminals with high dwell." This demonstrates the pressure put on management to emphasize train speed. This pressure creates a culture focused on speed. The faster CP can make trains complete trips, the more money CP will make and also the more money managers like McKelvey and Jared will make.

To further elaborate, McKelvey and Jared were measured on, and thus their bonuses were based on, the metrics of Origin Performance and Terminal Dwell hours, in addition to several others. Upon review of the documents provided, Origin Performance at CP "measures the percentage of Operating Plan trains that depart origin on time and within 2 hours of scheduled departure time." Terminal Dwell hours "is the average amount of time in hours between car arrival to and departure from the yard (excludes cars that move through a terminal on a run-through train, stored, bad ordered, and maintenance-of-way cars). Calculated by dividing the total number of hours cars spent in terminals by the total count of car dwell events." According to the documents provided, Sexton's train was over standard and delayed by 3 hours and 23 minutes.

Ratings are a big deal for managers at CP Rail because the ratings are tied directly to a manager's potential for promotions, demotions, merit raises, and annual bonuses. One of the ways railroad managers may try to improve his or her job performance rating is to make sure that any subordinate managers or employees focus on improving his or her performance, if possible, on that performance metric. For example, Jared's 2021 Total Rewards Statement shows a Total Award of $133,368. In the three years prior to Sexton's discipline, Jared received $391,089 in bonus pay in addition to his base salary.

The policy says it right in its name, the Short-Term Incentive Plan is designed to incentivize management. In my opinion, Jared's bonus and CP's culture surrounding efficiency led him to list "drill down on late trains" as his actions and behaviors in 2021. Jared was incentivized to track down Sexton's late train, perform an e-test on Sexton which in itself subjected Sexton to possible discipline, made the suggestion that Sexton failed the e-test, gave statements against Sexton in his disciplinary investigation, and suggested Sexton be disciplined. This action creates a chilling effect on the workplace preventing other employees from wanting to take the safe course of action.

3.  Would CP have conducted an efficiency test and disciplined Sexton if he had not engaged in protected activity?

Operation managers at CP Rail can make many types of important decisions that initially determine whether or not an employee should or should not be formally investigated for possible rule violations and possible discipline. In my experience, metrics that can affect the bonus and performance rating of a manager are always in the back of their minds. The discipline process starts with a decision by a management officer that certain actions or inactions of an employee constitute a potential rule violation. A number of important initial decisions must be made as to (a) whether or not a rule violation may have occurred or (b) whether or not the potential rule violation is serious enough to require a formal disciplinary investigation.

Discipline decisions and rules interpretations are not always "black and white." Managers often make discretionary decisions. And CP Rail managers have a strong motivation to discipline an employee perceived to be delaying trains even if the delay is caused by taking the safe course.

Evidence of the conflict of interest created by the CP's policies, metrics, and goals of CP Rail's managers who exercised disciplinary discretion were substantial factors in CP Rail's decision to discipline Sexton. Sexton was the target of retaliation and CP Rail suspended him for 20 days without proper impartiality. The discipline assigned to Sexton was inappropriate. It is clear that Sexton was targeted, retaliated against, and wrongfully suspended for 20 days by CP Rail managers because he took the safe course of action in refusing McKelvey's order.

Based upon my review of the facts and evidence in this case and my training and experience working as a manager for a Class I railroad, it is my opinion that CP Rail's policies, objectives, metrics, and goals placed on CP Rail management officials who participated in various capacities of the decisions to discipline Sexton were influenced by those policies to emphasize speed. It is my opinion that absent Sexton's protected activities, CP Rail would not have subjected him to discipline and ultimately suspend him without pay.

I understand discovery is a continuing process. Once/if such additional evidence becomes available, I reserve the right to amend, modify in part or in whole or supplement my opinions and/or this report. I may have other or additional opinions depending on what is asked of me at deposition or at trial. I plan to read all additional depositions and review all additional discovery in this case. I will also review opinions of any potential experts identified by defendant and may provide rebuttal opinions. I will also work with counsel in the preparation of demonstrative exhibits at trial.

I hold all of the above opinions with reasonable professional certainty.

Sincerely,

Brandon Ogden

Brandon L. Ogden

8

# EXHIBIT D

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2           FOR THE SOUTHERN DISTRICT OF IOWA

3                    EASTERN DIVISION

4    _____

5    John Sexton,

6           Plaintiff,

7       v.           Case No:  3:23-CV-00031-HCA

8

9    Dakota, Minnesota & Eastern Railroad

10   Corporation d/b/a Canadian Pacific, a

11   Delaware Corporation,

12          Defendants.

13   _____

14            DEPOSITION OF JOHN SEXTON

15               OCTOBER 31, 2023

16               9:00 a.m.

17

18   _____

19

20

21            File # MW 6278989

22

23

24

25   COURT REPORTER:  Christina DeGrande

Page 2

1           APPEARANCES:

2           On Behalf of Defendant:

3           John T. Sullivan, Esq.

4           Briana Al Taqatqa, Esq.

5           Dorsey & Whitney LLP

6           50 South Sixth Street, Suite 1500

7           Minneapolis, Minnesota 55402

8           Sullivan.jack@dorsey.com

9           Altaqatqa.briana@dorsey.com

10          612-340-2600

11

12          On Behalf of John Sexton:

13          John Magnuson, Esq.

14          Cyle Cramer, Esq.

15          Yaeger & Jungbauer Barristers, PLC

16          4601 Weston Woods Way

17          Saint Paul, Minnesota 55127

18          651-288-9532

19          Jmagnuson.yjblaw.com

20          Ccramer@yjblaw.com

21

22

23

24

25

1                    I N D E X

2        WITNESS          EXAMINATION            PAGES

3        JOHN SEXTON      DIRECT                   4

4                         CROSS                  197

5                    E X H I B I T S

6        NUMBER       DESCRIPTION

7        Exhibit 1    Collective Bargaining Agreement    20

8        Exhibit 2    General Code of Operating Rules    26

9        Exhibit 3    Hybrid Discipline and              36

10                    Accountability Guidelines

11       Exhibit 4    Accident, Incident, Injury, and    40

12                    Occupational Illness Reporting

13                    Policy and Commitment Regarding

14                    Intimidation and Harassment

15       Exhibit 5    Train Delay Report                 62

16       Exhibit 6    2/2/2022 Email                     77

17       Exhibit 7    Workplace Health and Safety        79

18                    Committee Attendance Sheet

19       Exhibit 8    Safety Reviews After Incident      85

20       Exhibit 9    Notice of Disciplinary Hearing    119

21       Exhibit 10   Transcript of Disciplinary        127

22                    Hearing

23       Exhibit 11   Certified Mail Re: Investigation  129

24       Exhibit 12   Certified Mail Re: Discipline     127

25       Exhibit 13   Public Law Board award            127

Page 4

1          E X H I B I T S (continued)

2          NUMBER        DESCRIPTION

3          Exhibit 14  Interrogatories                    129

4          Exhibit 15  Second Amended Complaint           136

5                      and Jury Trial Demand

6          Exhibit 16  1/4/2021 Email                     144

7          Exhibit 17  2/20/2021 Email                    149

8          Exhibit 18  2/15/2021 Email                    163

9          Exhibit 19  7/20/2021 OSHA Letter              169

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 128

1    A.   Yes.

2    Q.   And as a result of the Public Law Board decision

3         that is marked as Exhibit 13, your 20-day

4         suspension, that was delivered to you in Exhibit 12

5         was undone; isn't that right?

6                    MR. MAGNUSON:  Objection, form.

7                    THE WITNESS:  I'm not sure what you

8              mean, sir.  Sorry.

9         BY MR. SULLIVAN:

10   Q.   The -- the union's claim was that your discipline

11        was unjustified; is that correct?

12   A.   Yes.

13   Q.   And the claim that the union made to the Public Law

14        Board was sustained, correct?

15   A.   Yes.

16   Q.   And the discipline that you received in Exhibit 12

17        was reversed; is that correct?

18   A.   Yes.

19   Q.   And the -- you originally had received a 20-day

20        suspension; is that true?

21   A.   Yes.

22   Q.   And that was an unpaid suspension, wasn't it?

23   A.   Yes.

24   Q.   And after the Public Law Board's decision that is

25        included as Exhibit 13, you were paid for the

1           20 days that you had missed; isn't that correct?

2      A.   Yes.

3      Q.   Are you aware of any other union proceedings that

4           related to your 20-day suspension that followed the

5           Public Law Board's decision?

6      A.   I'm not sure what you mean, sir.

7      Q.   Did anything else happen?  Did the union do anything

8           else, as far as you're aware, after it received the

9           Public Law Board's decision?

10     A.   Not sure.

11     Q.   Was the -- is it fair to think of the Public Law

12          Board's decision as a win for the union?

13     A.   The win for John is what it is, and yes.

14     Q.   "Win for John," meaning you?

15     A.   Yes.

16     Q.   And a loss for the railroad, correct?

17     A.   No, it's not.  No, that's not correct.

18     Q.   The final set of materials I want to cover with you,

19          Mr. Sexton, are the specific allegations that are

20          being made in the litigation against the railroad.

21          Is the -- the Public Law Board is Exhibit 13?

22                    MR. MAGNUSON:  13.

23                    (Exhibit 14 was marked for

24               identification.)

25          BY MR. SULLIVAN:

Page 192

1    Q.   Have you ever not -- have you ever been unable to

2         work because of the emotional feelings you're

3         having?

4    A.   No.  I'm not a sissy.

5    Q.   Have you ever communicated with Mr. Rainwater about

6         any of these symptoms in writing, email, or text?

7    A.   No.  Plenty of -- plenty of phone conversations, but

8         no.  He knows.  Someone knows.

9    Q.   How about your wife, any text messages?

10   A.   No, but she's heard it all for the last 20 -- almost

11        25 years.

12   Q.   How about for related specifically to this case?

13   A.   Mr. Rainwater, my wife, and these gentlemen.

14   Q.   You said your wife's heard it all for last for 20,

15        25 years.  What's different today than what she

16        would have heard 15 years ago?  I don't understand

17        what she heard previously.  You said, "She's heard

18        it all"?

19   A.   Yeah.

20   Q.   Did your job previous -- has it always caused you

21        some amount of stress?

22   A.   I was the local chairman for some amount of years,

23        sir.

24   Q.   Did that ever cause you stress or any concerns that

25        you discussed with your wife?

```
 1    A.    I believe we already covered this.  The being

 2          ridiculed, shamed, embarrassed by my fellow

 3          employees, having a target on my back by the carrier

 4          officers.

 5    Q.    What's an example of you having a target on your

 6          back by the carrier officers?

 7    A.    We've been talking about it all day.

 8    Q.    Has anything happened in the last six months that

 9          indicates to you you have a target on your back?

10    A.    No.

11    Q.    Has anything happened to you in the last year that

12          indicates to you have a target on your back?

13    A.    Not until they know I have this suit going on, no.

14    Q.    Do you think they are unaware of the lawsuit?

15    A.    Absolutely not.  I'm 100 percent aware that they

16          know what's going on.

17    Q.    And yet you don't feel right now that you have a

18          target on your back?

19    A.    Yes, I do have a target on my back.

20    Q.    So, again, why -- what has actually happened that

21          makes you feel like you have a target on your back?

22    A.    My -- my previous dealing with the carrier, all of

23          my emails I have forwarded to the third man in

24          charge of this railroad, and all of the unsafe acts

25          I bring to their attention that nothing -- nothing's
```

Page 199

```
 1            done about it.

 2     Q.     Do you remember when you were represented by the

 3            previous law firm, were they ever authorized to make

 4            a settlement proposal on your behalf?

 5     A.     No.

 6                  MR. MAGNUSON:  And --

 7                  THE WITNESS:  Sorry.

 8                  MR. MAGNUSON:  I'm going to object as

 9            to his communication with his prior lawyers

10            as also being privileged.

11                  MR. SULLIVAN:  Understood.  Why don't

12            we just take a minute?  I'm going to go

13            through my notes, and we should -- I'm going

14            to be able to wrap up.

15                  (A recess was had from 4:01 p.m. until

16            4:13 p.m.)

17                  MR. SULLIVAN:  Back on the record.

18            Thank you for your time today, Mr. Sexton.

19            I don't have any other questions at this

20            time.

21

22                        CROSS-EXAMINATION

23            BY MR. MAGNUSON:

24     Q.     Mr. Sexton, I just have a few brief questions for

25            you.  Make this, hopefully, quick.  At the beginning
```

Page 213

1       STATE OF MINNESOTA    )
                              )  ss
2       COUNTY OF ANOKA       )

3            BE IT KNOWN THAT I, Christina M. De Grande,

4       the undersigned professional stenographic court

5       reporter took the proceedings on October 31, 2023.

6            I do hereby certify that I was then and there a

7       notary public in and for the County of Anoka, State

8       of Minnesota, and by virtue thereof, I am duly

9       authorized to administer an oath;

10           That before testifying, the witnesses were

11      first duly sworn under oath by me to testify to the

12      whole truth relative to the cause under

13      consideration.

14           The foregoing 211 pages are a true and accurate

15      copy of my original stenotype notes as transcribed

16      by computer-aided transcription taken relative to

17      the aforementioned matter.

18           I am not related to any of the parties hereto

19      nor am I interested in the outcome of the action.

20

21      WITNESS MY HAND AND SEAL this 13th day of

        October, 2023

22

23      _Christina De Grande_

        CHRISTINA M. DE GRANDE

24      Professional Stenographic Court Reporter

        And Notary Public

25      Commission expires January 31, 2027

# EXHIBIT E

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF IOWA
 2                    EASTERN DIVISION

 3      - - - - - - - - - - - - - - - - - - - - - -
                          No. 3:23-CV-00031-HCA
 4
        John Sexton,
 5
                          Plaintiff,
 6          vs.

 7      Dakota, Minnesota & Eastern Railroad
        Corporation d/b/a Canadian Pacific,
 8      a Delaware corporation,

 9                        Defendants.

10      - - - - - - - - - - - - - - - - - - - - - -

11

12

13
                        DEPOSITION OF
14
                        THOMAS JARED
15
                      June 20, 2024
16
                        10:00 a.m.
17

18

19

20

21

22

23          TAKEN BY: BRENDA K. FOSS
                 fossbrenda@yahoo.com
24                   612-701-4282

25
```

1                    Deposition of THOMAS JARED, taken

2          at Dorsey & Whitney LLP, 50 South 6th Street,

3          Suite 1500, Minneapolis, Minnesota, by and on

4          behalf of Plaintiff, on Thursday, June 20,

5          2024, commencing at 10:00 a.m., before Brenda K.

6          Foss, Professional Court Reporter, Notary

7          Public, State of Minnesota, County of

8          Hennepin.

9

10                       *    *    *    *    *

11              A P P E A R A N C E S

12

    ON BEHALF OF THE PLAINTIFF:
13       JOHN MAGNUSON, ESQUIRE
         CYLE CRAMER, ESQUIRE
14       YAEGER & JUNGBAUER BARRISTERS, PLC
         4601 Weston Woods Way
15       St. Paul, MN  55127
         jmagnuson@yjblaw.com
16       ccramer@yjblaw.com
         651-288-9500
17

18

    ON BEHALF OF THE DEFENDANTS:
19       JACK SULLIVAN, ESQUIRE
         DORSEY & WHITNEY LLP
20       50 South 6th Street, Suite 1500
         Minneapolis, MN  55402
21       sullivan.jack@dorsey.com
         612-340-2600
22

23                       *    *    *    *    *
24

25

1                    I N D E X

2

       Examination:                          PAGE:
3      By Mr. Magnuson                        4

4

5      Marked Deposition Exhibits:
       50 Sexton's Testing (2013+)    42
6      51 Jared's hotel receipt       96
       52 Verizon records             98
7      53 Sexton's testing history    187
       54 Jan 18, '21 e-mails with Tracy Miller
8          et al, Bates CP1692, 1693  188
       55 Short-Term Incentive data
9          Bates CP 3243              189
       56 Feb 9, '21 e-mail from Sexton et al
10         Bates CP 3295 and 3296     191
       57 Feb 1, '21 Top 15 Train Speeds
11         CP 3303-3306               197
       58 Feb 9, '21 e-mail from Sexton et al
12         Bates 3322-3323            198
       59 Jared's 2021 Performance Management Form
13         Bates CP 3402-3408         203

14

15

16     Reporter's Certificate        206

17

18     (Original Deposition Transcript in the
       possession of John Magnuson, Esquire).
19

20                          *   *   *   *   *

21

22

23

24

25

1    investigation letter.

2              (Discussion off the record).

3  Q   (By Mr. Magnuson, continuing) Can we see the

4      investigation letter?  We'll go through this.

5      Did you read the investigation transcript

6      after the investigation occurred?

7  A   No.

8  Q   Have you ever read it?

9  A   No.

10             MR. SULLIVAN:  Can we clip up 39?

11     I just don't want to get documents messed up.

12             MR. MAGNUSON:  Yes.

13 Q   (By Mr. Magnuson, continuing) I'm handing you

14     what has already been marked Exhibit 12.

15     Take a second to review it.

16 A   (Witness examining document).  Okay.

17 Q   So does that refresh your recollection that

18     the charges that were brought against

19     Mr. Sexton and that you issued discipline on

20     was GCOR 5.3.7?

21             MR. SULLIVAN:  I object to the

22     form of the question, misstates the record.

23 A   I did not issue the discipline and that is

24     GCOR 5.3.7.

25 Q   This is your signature on Exhibit 12?

1    A    That's a stamped signature that came from the
2         administrative office.
3    Q    But that's your signature?
4    A    That is my signature but I did not sign that.
5    Q    Did you read it?
6    A    After it was issued.
7    Q    Not before?
8    A    No.
9    Q    Is that typical?  Is that your practice?
10   A    What do you mean?
11   Q    Do you read things before they go out under
12        your signature typically?
13   A    No.
14   Q    Okay.  It seems to indicate that you -- well,
15        you intended for this letter to go out I'm
16        assuming?
17   A    I wasn't involved in putting this letter
18        together or anything with this letter.
19   Q    Who did?
20   A    Someone in the administrative office.
21   Q    Do you know who that would have been in
22        February of '23 (sic)?
23   A    I don't.
24   Q    Did you tell someone to issue this letter on
25        your behalf?

1   A   I did not.

2   Q   Does this refresh your recollection at all

3       about the rule that Mr. Sexton was

4       disciplined for violating?

5   A   It does.  It's 5.3.7.

6   Q   Do letters go out with your signature that

7       you don't read on a daily basis?

8   A   I do not review everything that gets put out.

9   Q   With your signature on it?

10  A   Correct.

11  Q   As you sit here today, do you disagree with

12      the contents of this letter?

13  A   I don't disagree with it, no.

14  Q   You don't think anything is incorrect?

15  A   Other than my signature.

16  Q   What do you mean by that?

17  A   I didn't sign it.

18  Q   Do you give people permission to sign certain

19      things on your behalf without reading them or --

20  A   The admin staff has my stamped signature.

21      When things need to go out under the general

22      manager, they do have permission to put that

23      stamp on it, yeah.

24  Q   But you must have told someone to issue this

25      letter?

1  A  No, I absolutely did not.

2  Q  Who did?

3  A  I don't know.

4  Q  Who made the decision to discipline Mr. Sexton?

5  A  That would have been my boss.

6  Q  Who is that?

7  A  Jason Ross.

8  Q  So if Mr. Ross is asked and he says 'I didn't

9     make that decision', is there anyone else

10    that would have made it?

11  A  I don't know what Mr. Ross is going to say.

12  Q  Did you recommend the 20 day suspension in

13    Mr. Sexton's case?

14  A  No.

15  Q  How do you know that?

16  A  Because I specifically told the admin staff

17    that I'm not to be involved in any way, shape

18    or form in the discipline or the letter to be

19    put out.

20  Q  Because you conducted the test?

21  A  And I was in the hearing.

22  Q  If we can go back to the E test manual to

23    page 103, do you see that?

24  A  Yes.

25  Q  It says Test GRF02 Shoving or Pushing

```
 1         put any strain on your marriage?
 2    A    No.
 3    Q    Have you ever bragged to CP Rail employees
 4         about using cocaine as a stimulant to help
 5         you stay up to speed with your job?
 6    A    No.
 7    Q    Have you ever bragged to CP Rail employees
 8         about using cocaine period?
 9    A    Never.
10    Q    He also states that "we are creating a stage/
11         platform for their feelings."  He's referring
12         to Sexton's safety complaints.  Right?
13    A    Where do you see that?
14    Q    First paragraph.
15    A    Yes, I see that.  Correct.
16    Q    He says, 'I don't fault John for the note,
17         but if not true we're creating a stage/
18         platform for their feelings.'  This seems to
19         suggest that Tracy Miller is telling you he
20         doesn't want to receive any more e-mails like
21         this.  Right?
22    A    I don't know what it means.
23    Q    Did you call Mr. Miller and talk to him about
24         this e-mail?
25    A    Not that I recall.
```

```
1     STATE OF MINNESOTA)
                        ) Ss.
2     COUNTY OF HENNEPIN)

3              I, Brenda K. Foss, Certified
      Shorthand Reporter and Notary Public duly and
4     qualified in and for the State of Minnesota
      do hereby certify there came before me the
5     deponent herein, who was by me duly sworn to
      testify to the truth and nothing but the
6     truth concerning the matters in this
      cause.
7
               I further certify that the foregoing
8     transcript is a true and correct transcript
      of my original stenographic notes.
9
               I further certify that I am neither
10    attorney or counsel for, nor related to or
      employed by any of the parties to the action
11    in which this deposition is taken; and
      furthermore, that I am not a relative or
12    employee of any attorney or counsel employed
      by the parties hereto or financially
13    interested in the action.

14             IN WITNESS WHEREOF, I have hereunto
      set my hand and affixed my Notarial Seal this
15    28th day of June, 2024.

16
                         Brenda K. Foss
17                       Court Reporter

18

19

20

21

22

23

24

25
```

# EXHIBIT F

1            IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF IOWA
2                   EASTERN DIVISION

3     - - - - - - - - - - - - - - - - - - - - - - - -
      No. 3:23-CV-00031-HCA
4

5     John Sexton,

6                          Plaintiff,
          vs.
7
      Dakota, Minnesota & Eastern
8     Railroad Corporation d/b/a
      Canadian Pacific, a Delaware
9     corporation,

10                         Defendants.
      - - - - - - - - - - - - - - - - - - - - - - - -
11

12
                      DEPOSITION OF
13
                   KURTIS MCKELVEY
14
                   November 9, 2023
15
                     9:30 a.m.
16

17

18

19

20

21
               TAKEN BY: BRENDA K. FOSS
22              fossbrenda@yahoo.com
                   612-701-4282
23

24

25

```
1                    Deposition of KURTIS MCKELVEY,

2       taken via Zoom videoconference, by and on

3       behalf of Plaintiff, on Thursday, November 9,

4       2023, commencing at 9:30 a.m., before Brenda

5       K. Foss, Professional Court Reporter, Notary

6       Public, State of Minnesota, County of

7       Hennepin.

8

9                         *    *    *    *    *

10                 A P P E A R A N C E S

11
        ON BEHALF OF THE PLAINTIFF:
12           JOHN MAGNUSON, ESQUIRE
             CYLE CRAMER, ESQUIRE
13           YAEGER & JUNGBAUER BARRISTERS, PLC
             4601 Weston Woods Way
14           St. Paul, MN  55127
             jmagnuson@yjblaw.com
15           651-288-9500

16
        ON BEHALF OF THE DEFENDANTS:
17           BRIANA AL TAQATQA, ESQUIRE
             NOAH GARCIA
18           WHITNEY & DORSEY LLP
             50 South Sixth Street, Suite 1500
19           Minneapolis, MN  55402

20                    *    *    *    *    *
21

22

23

24

25
```

```
 1                  I N D E X

 2
        Examination:                     PAGE:
 3      By Mr. Magnuson                   4

 4
        Objections:
 5      By Ms. Al Taqatqa               17-18, 20-21,
        23, 34, 38-39, 53, 56, 62-63, 67, 71, 74-75,
 6      83, 89, 93, 97, 99-101, 104, 109, 118

 7
        Marked Deposition Exhibits:
 8      21 - Bates 3241
             Short-Term Incentive        27
 9      22 - Bates CP 3361, 2020
             Performance Mgmt Form        30
10      23 - Bates CP 3367, 2021
             Performance Mgmt Form        35
11      24 - Bates Sexton 144, GOI
             Section 1-32                 45
12      25 - Bates Sexton 143, GM
             Notice No. 22, 1/12/21       46
13      26 - Bates CP 3286, 2/21
             E-mails                      65
14      27 - Bates CP 3303, trains
             impacting train speed        81
15      28 - Skipped
        29 - Bates CP 3244, Incident
16           Report 474-31                87
        30 - Bates CP 3246, e-mail
17           from A. Dalen, Jan '21       89
        31 - Bates CP 3409, Verizon
18           account                     102

19      Previous exhibits mentioned:
        7                                 59
20      8                                 42

21
        Reporter's Certificate          121
22

23
        (Original Deposition Transcript in the
24      possession of John Magnuson, Esquire).

25
```

1       rules is serious.  Right?

2    A  Yes.

3    Q  Have you ever been accused of violating any

4       CP rules?

5    A  No.

6    Q  Were you involved in a motor vehicle accident

7       recently in your personal vehicle that

8       resulted in a fatality?

9    A  Yes.

10   Q  You were working at the time?

11   A  Yes.

12   Q  Who did you have in your car with you?

13   A  An engineer named Ely Reyes (phonetic).

14   Q  Why were you driving an engineer in your

15      personal vehicle?

16   A  Because it was the only mode of

17      transportation I had at the time.

18   Q  You were aware that there are rules that

19      prevent CP employees from using their

20      personal vehicles for work purposes?

21   A  Yes.

22   Q  You weren't charged with that -- violating

23      any rules in that respect?

24   A  Correct.

25   Q  Do you know why?

1  A    I believe because of all the investigations

2       that took place, including the police

3       department, found that I did nothing wrong.

4  Q    But there are rules, CP rules, that prevent

5       you from using your personal vehicle for work

6       purposes.  Right?

7  A    Yes.

8  Q    And you violated that rule it sounds like.  Right?

9  A    Yes.

10 Q    But you weren't disciplined for that?

11 A    No.

12 Q    Lucky you.

13            MS. AL TAQATQA:  Objection, harassing.

14 A    Lucky me for being involved in a fatal

15      incident?  Thank you, sir.  I appreciate that.

16 Q    (By Mr. Magnuson, continuing) No, not being

17      accused of violating rules.

18 A    Yeah, that's enough.

19 Q    So in addition to the event recorder which

20      you said you have no familiarity with, would

21      either the CTC system -- would we be able to

22      look back and see what signals Sexton's

23      locomotives traveled passed?

24 A    I don't know, sir.  I'd have to refer you to

25      the signal department.

1       STATE OF MINNESOTA)
                         ) Ss.
2       COUNTY OF HENNEPIN)

3               I, Brenda K. Foss, Certified
        Shorthand Reporter and Notary Public duly and
4       qualified in and for the State of Minnesota
        do hereby certify there came remotely before
5       me the deponent herein, who was by me duly
        sworn to testify to the truth and nothing but
6       the truth concerning the matters in this
        cause.
7
                I further certify that the foregoing
8       transcript is a true and correct transcript
        of my original stenographic notes.
9
                I further certify that I am neither
10      attorney or counsel for, nor related to or
        employed by any of the parties to the action
11      in which this deposition is taken; and
        furthermore, that I am not a relative or
12      employee of any attorney or counsel employed
        by the parties hereto or financially
13      interested in the action.

14              IN WITNESS WHEREOF, I have hereunto
        set my hand and affixed my Notarial Seal this
15      24th day of November, 2023.

16
                                Brenda K. Foss
17                              Court Reporter

18

19

20

21

22

23

24

25

# EXHIBIT G

```
1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF IOWA
2                      EASTERN DIVISION

3       - - - - - - - - - - - - - - - - - - - - -
                            No. 3:23-CV-00031-HCA
4
       John Sexton,
5
                            Plaintiff,
6          vs.

7       Dakota, Minnesota & Eastern Railroad
       Corporation d/b/a Canadian Pacific,
8       a Delaware corporation,

9                           Defendants.

10      - - - - - - - - - - - - - - - - - - - - -

11

12

13
                       DEPOSITION OF
14
                        JASON ROSS
15
                      July 18, 2024
16
                       10:00 a.m.
17

18

19

20

21

22

23
                TAKEN BY: BRENDA K. FOSS
24                fossbrenda@yahoo.com
                     612-701-4282
25
```

1            Deposition of JASON ROSS, taken by Zoom

2      videoconference by and on behalf of

3      Plaintiff, on Thursday, July 18, 2024,

4      commencing at 10:00 a.m., before Brenda K. Foss,

5      Professional Court Reporter, Notary Public,

6      State of Minnesota, County of Hennepin.

7

8                     *   *   *   *   *

9            A P P E A R A N C E S

10

       ON BEHALF OF THE PLAINTIFF:
11         JOHN MAGNUSON, ESQUIRE
           CYLE CRAMER, ESQUIRE
12         YAEGER & JUNGBAUER BARRISTERS, PLC
           4601 Weston Woods Way
13         St. Paul, MN   55127
           jmagnuson@yjblaw.com
14         651-288-9500

15

16     ON BEHALF OF THE DEFENDANTS:
           JACK SULLIVAN, ESQUIRE
17         DORSEY & WHITNEY LLP
           50 South 6th Street, Suite 1500
18         Minneapolis, MN   55402
           sullivan.jack@dorsey.com
19         612-340-2600

20

21     Also present: Noah Garcia, DM&E

22

23

24

25

```
 1                    I N D E X

 2
        Examination:                      PAGE:
 3      By Mr. Magnuson                    4

 4
        Marked Deposition Exhibit:
 5      79  Feb 1st, 2021 call record 89
            for Jason Ross
 6

 7
        Previously Marked Exhibits:
 8      13                                114
        18                                 13
 9      65                                 70
        66                                 65
10      69                                 76
        71                                 86
11      72                                 88

12

13

14      Reporter's Certificate           133

15

16      (Original Deposition Transcript in the
        possession of John Magnuson, Esquire).
17

18                           *   *   *   *   *

19

20

21

22

23

24

25
```

```
 1        surprising conductors and engineers.  Right?
 2   A    No -- I discourage my managers -- I do not
 3        tolerate people violating our policies period.
 4   Q    And that includes your retaliation policies?
 5   A    Yeah, it includes all our policies.
 6   Q    Have you testified in any FRSA cases in the
 7        past?
 8   A    What's an FRSA case?
 9   Q    The Whistleblower Act, the 2019 statute that
10        gives rise to this claim.
11   A    No, I have not.
12   Q    How many depositions have you given in the
13        past?
14   A    Maybe two, three.
15   Q    Do you recall what those cases involved?
16        Were they injuries or retaliation claims or
17        what?
18   A    They were in Canada, so I don't know if they
19        count here.  I testified in court via Zoom
20        for the Lac-Megantic trial.  I gave a
21        deposition some years ago about an employee
22        who resigned and decided to sue us later.  I
23        don't think I have given any others.  I think
24        there was only two or three.
25   Q    What was your involvement in the Lac-Megantic
```

1      derailment?

2   A  Is that something subject to this conversation?

3   Q  Well, what was the crux of your testimony?

4      Who did you testify for?

5   A  I testified for the company.  It was based on

6      the lawsuit that the -- there was a coalition

7      of people that were trying to sue the company

8      because we were not involved in the payments

9      but it had to do with the fact I was the

10     superintendent in St. Luke in 2013 and

11     re-interchanged with the MMA.  And the MMA,

12     of course, had the accident off our property

13     days later.  However, some people were suing

14     us saying that we were somehow involved,

15     which was proven not to be the case and was

16     not upheld in court, in the Quebec court.

17  Q  Do you know what the name of that case was,

18     the title?

19  A  No, I do not.

20  Q  Do you know what the organization was or

21     organizations that were suing you?

22  A  I don't remember.

23  Q  How was it they were claiming you were at

24     fault, meaning the CP?

25              MR. SULLIVAN:  Objection, lack of

1      answer if you understand the question.

2   A  They did not accuse me of doing anything

3      wrong.  They asked me questions about the

4      operation of St. Luke and the interchange

5      with MMA.  I wasn't accused of anything.

6   Q  (By Mr. Magnuson, continuing) I don't mean

7      you personally.  I mean the railroad.  What

8      were they claiming that the railroad did

9      wrong?

10                MR. SULLIVAN:  You answered this

11     multiple times.  You can answer one more time.

12  A  I stay in my lane.  I don't get involved with

13     some things that other legal experts are

14     handling on our behalf.  What I knew was

15     there was a court case.  They wanted me to

16     testify.  I was called as a witness, and so I

17     gave my testimony.

18  Q  (By Mr. Magnuson, continuing) What part of

19     your testimony involved the claim that CP did

20     something wrong that might have lead to this

21     derailment?

22  A  I'd have to let you refer to the Lac-Megantic

23     case.

24  Q  Who was your lawyer in that case?

25  A  I had legal counsel from the company.

1    A    I don't remember.

2    Q    What year?

3    A    I don't remember.  It might have been 2021.

4    Q    How far along in Covid were we?

5    A    Well, that's the thing.  I think it was 2021

6         because -- it wasn't 2022.  Canada had

7         different travel restrictions than we did.

8         Canada was still in lockdown for some time.

9         That's one of the reasons I didn't travel to

10        Canada at the time for the court case.

11   Q    You testified for four or five hours?

12   A    About four hours I think, yeah.

13   Q    And you don't know what year it was?

14             MR. SULLIVAN:  Objection,

15        argumentative, asked and answered.

16   Q    (By Mr. Magnuson, continuing) Were you ever

17        given a copy of your transcript of your

18        testimony?

19   A    No.

20   Q    So you didn't read it?

21   A    No.  With all due respect, I went there.  I

22        answered the questions they asked me.  I told

23        everything to the best of my recollection.

24        That's all I can say.  It was not a great

25        time in Quebec history, not a good time for

1       the people of Lac-Megantic.  We were in no

2       way involved or responsible but there's

3       always people that form different opinions.

4    Q  Not a great time in the railroad industry

5       period.  Right?

6    A  I'm more concerned about the people at Lac-

7       Megantic.  I have been to that town.  I have

8       met some of those people.  A very sad thing

9       to happen there because people were violating

10      rules and people weren't holding people

11      accountable, meaning the people who were in

12      charge of the MMA including Transport Canada.

13   Q  So violating rules with respect to hazardous

14      material trains can cause derailments and

15      catastrophic events like Lac-Megantic.  Right?

16   A  Any rule violation can cause it.

17   Q  Any rule violation can cause something like

18      Lac-Megantic to occur.  Right?

19   A  That's right.  That's why it's important.

20              MR. SULLIVAN:  Objection, calls

21      for speculation.  Jason, you can answer.  And

22      I'm going to note for the record we are over

23      our 1:30 agreed stop time.  And we're talking

24      about a case that has no connection to the

25      United States or John Sexton.  So I would ask

1      STATE OF MINNESOTA)
                   ) Ss.
2      COUNTY OF HENNEPIN)

3           I, Brenda K. Foss, Certified
      Shorthand Reporter and Notary Public duly and
4      qualified in and for the State of Minnesota
      do hereby certify there came remotely before
5      me the deponent herein, who was by me duly
      sworn to testify to the truth and nothing but
6      the truth concerning the matters in this
      cause.
7
           I further certify that the foregoing
8      transcript is a true and correct transcript
      of my original stenographic notes.
9
           I further certify that I am neither
10     attorney or counsel for, nor related to or
      employed by any of the parties to the action
11     in which this deposition is taken; and
      furthermore, that I am not a relative or
12     employee of any attorney or counsel employed
      by the parties hereto or financially
13     interested in the action.

14          IN WITNESS WHEREOF, I have hereunto
      set my hand and affixed my Notarial Seal this
15     22nd day of July, 2024.

16
                           Brenda K. Foss
17                        Court Reporter

18

19

20

21

22

23

24

25