1    IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF IOWA
2    EASTERN DIVISION

3    - - - - - - - - - - - - - - - - - - - - - -
         No. 3:23-CV-00031-HCA
4

5    John Sexton,

6         Plaintiff,
              vs.
7      Dakota, Minnesota & Eastern

8    Railroad Corporation d/b/a
         Canadian Pacific, a Delaware
9    corporation,

10        Defendants.
         - - - - - - - - - - - - - - - - - - - - - -
11

12        DEPOSITION OF

13        KURTIS MCKELVEY

14        November 9, 2023

15         9:30 a.m.

16

17

18

19

20

21        TAKEN BY: BRENDA K. FOSS

22      fossbrenda@yahoo.com
              612-701-4282
23

24

25

1

1       Deposition of KURTIS MCKELVEY,

2    taken via Zoom videoconference, by and on

3    behalf of Plaintiff, on Thursday, November 9,

4    2023, commencing at 9:30 a.m., before Brenda

5    K. Foss, Professional Court Reporter, Notary

6    Public, State of Minnesota, County of

7    Hennepin.

8

9       *  *  *  *  *

10    APPEARANCES

11    ON BEHALF OF THE PLAINTIFF:

12    JOHN MAGNUSON, ESQUIRE
          CYLE CRAMER, ESQUIRE
13    YAEGER & JUNGBAUER BARRISTERS, PLC
          4601 Weston Woods Way
14    St. Paul, MN  55127
          jmagnuson@yjblaw.com
15    651-288-9500

16    ON BEHALF OF THE DEFENDANTS:

17    BRIANA AL TAQATQA, ESQUIRE
          NOAH GARCIA
18    WHITNEY & DORSEY LLP
          50 South Sixth Street, Suite 1500
19    Minneapolis, MN  55402

20       *  *  *  *  *

21

22

23

24

25

2

1      I N D E X

2      Examination:          PAGE:

3    By Mr. Magnuson          4

4      Objections:

5    By Ms. Al Taqatqa        17-18, 20-21,
         23, 34, 38-39, 53, 56, 62-63, 67, 71, 74-75,
6    83, 89, 93, 97, 99-101, 104, 109, 118

7      Marked Deposition Exhibits:

8    21 - Bates 3241
            Short-Term Incentive    27
9    22 - Bates CP 3361, 2020
            Performance Mgmt Form    30
10   23 - Bates CP 3367, 2021
            Performance Mgmt Form    35
11   24 - Bates Sexton 144, GOI
            Section 1-32        45
12   25 - Bates Sexton 143, GM
            Notice No. 22, 1/12/21   46
13   26 - Bates CP 3286, 2/21
            E-mails          65
14   27 - Bates CP 3303, trains
            impacting train speed   81
15   28 - Skipped
            29 - Bates CP 3244, Incident
16   Report 474-31        87
            30 - Bates CP 3246, e-mail
17   from A. Dalen, Jan '21   89
            31 - Bates CP 3409, Verizon
18   account          102

19   Previous exhibits mentioned:
            7              59
20   8              42

21     Reporter's Certificate    121

22

23     (Original Deposition Transcript in the

24   possession of John Magnuson, Esquire).

25

1   P R O C E E D I N G S

2

3      KURTIS MCKELVEY,

4    after having been first duly sworn,

5    deposes and says under oath as follows:

6

7      EXAMINATION

8   BY MR. MAGNUSON:

9   Q  Good morning, Mr. McKelvey.  My name is John

10   Magnuson.  I represent John Sexton in this

11   matter.  I'm assuming you understand that.

12   Will you please state your full name and

13   spell your last name for the record?

14   A  Kurtis Roger McKelvey, M-C-K-E-L-V-E-Y.

15   Q  Thank you, sir.  And what is your current

16   position of employment?

17   A  Terminal trainmaster of Canadian Pacific

18   Kansas City Railroad.

19   Q  Where are you stationed or where is your home

20   terminal currently?

21   A  Bensenville, Illinois.

22   Q  When were you promoted to trainmaster?

23   A  I don't recall the exact time.

24   Q  Approximately?

25   A  Approximately sometime around 2022 maybe.

1   Q  When did you move to Bensenville?

2   A  August of 2022.

3   Q  Who is currently in the room with you?

4   A  Briana.

5   Q  Where are you?  Are you down in Bensenville

6    right now?

7   A  No.  I'm in downtown Chicago, the law firm.

8   Q  Where at?  What law firm?

9   A  I don't recall the name.

10  Q  Is it the law firm that Briana is with?

11  A  I don't believe so.

12  Q  So Briana is the only other person in the

13   room with you?

14  A  Correct.

15  Q  Do you have your cell phone with you?

16  A  Yes.

17  Q  Could I ask you to turn it off?

18  A  Sure.

19  Q  Mr. McKelvey, what's your home address?

20  A  12955 South Exchange Avenue, Chicago,

21   Illinois 60633.

22  Q  Did you have the opportunity to meet with

23   Briana before your deposition here today?

24  A  Yes.

25  Q  When was that?

1   A  Yesterday and I believe over the phone a few

2    days prior.

3   Q  A few days prior over the phone, how long did

4    you talk with her?

5   A  A few hours.

6   Q  Then where did you meet yesterday?

7   A  The location that we're currently at today.

8   Q  How long did you meet yesterday?

9   A  A couple hours again.

10  Q  Did you review any documents at either of

11   those meetings, or in general even outside of

12   those meetings, to prepare for your testimony?

13  A  Yes.

14  Q  What all did you review?

15  A  I believe some e-mails and a Teams message.

16  Q  When you say Teams message, are you talking

17   about one Teams message or a series of a

18   group of Teams messages?

19  A  I think just one.

20  Q  Which one was that?

21  A  Something about cutting tracks.

22      MR. MAGNUSON:  This part is going

23   to be a little tricky because I don't want to

24   necessarily ask you about communications that

25   you've had with Briana that are covered by

1    the attorney/client privilege.  Briana, maybe

2    you can help me with some guidance.  I was

3    planning on getting to this later, but were

4    you able to determine or figure out the time

5    and date on those Teams messages as to when

6    they were sent and received?

7        MS. AL TAQATQA:  Are you asking

8    me or the witness?

9        MR. MAGNUSON:  No.  It's kind of

10   a hybrid question.  I don't want to impinge

11   on the attorney/client privilege here.  But

12   to the extent you two figured out the timing,

13   I just want to know.

14       MS. AL TAQATQA:  Well, I will

15   object to the extent the question asks for

16   any information protected by the attorney/

17   client privilege.  And I instruct the witness

18   to answer what he knows, you know, based on

19   his own knowledge rather than anything he

20   learned pursuant to our conversations.  So,

21   Kurt, if he asks you a question and you know

22   the answer because it's something that you

23   know, you can answer.  If it's something that

24   you know because we talked about it, then I

25   will instruct you not to answer.

1      MR. MAGNUSON:  That's fair.

2    Q  (By Mr. Magnuson, continuing) So do you know

3    when you reviewed that Teams message when

4    that message was sent?

5    A  No.

6    Q  You'd agree with me that it doesn't really

7    seem to jibe with the timing of the events.

8    Is that right?

9    A  I don't understand the question.  I would not

10    agree with you, no.

11    Q  We'll get to that later.  Okay.  What other

12    documents did you review to prepare for your

13    testimony today?

14    A  I believe that was it.

15    Q  Let me get a little background here in terms

16    of your employment background.  Where did you

17    go to high school and when did you graduate?

18    A  Harlem High School.  I graduated in -- I went

19    to Harlem High School.  I actually graduated

20    from Richmond-Burton Community High School in

21    2003.

22    Q  Harlem like in New York?

23    A  Harlem as in Machesney Park, Illinois.

24    Q  What year did you graduate?

25    A  2003.

1    Q  What did you do after high school?

2    A  Work and college.

3    Q  Where did you go to college?

4    A  Lake County Community College.

5    Q  What did you study?

6    A  At which time?

7    Q  Well, when you went --

8    A  I studied several different things at

9     multiple colleges.

10   Q  You keep looking over to your left there.

11    What are you looking at?

12   A  You're on the screen to my left.  The camera

13    is in front of me.

14   Q  That makes sense.  So you went to -- was it

15    White Community College?

16   A  Lake County Community College.

17   Q  Oh.  How long did you attend that?

18   A  Probably a total of around three years.

19   Q  And you studied just general things?

20   A  I started going for a degree in business, and

21    then I switched my major to Applied Science

22    of Fire Science Technology.  I got a degree

23    in Fire Science Technology.  And then I went

24    to Malcolm X Community College through the

25    Chicago -- City of Chicago colleges paramedic

1    program.

2    Q   Did you become a certified paramedic?

3    A   Yes, sir.

4    Q   What types of things do people do with the

5    Applied Fire Science Technology degree?  Is

6    that like you investigate fire incidents or --

7    A   Yeah, emergency response.

8    Q   Any other college other than Lake County and

9    Malcolm X?

10   A   I believe I took a course to get a CNA

11   license at one point also through I believe

12   Solex College.

13   Q   That's a certified nursing assistant?

14   A   Yes.

15   Q   Did you get the CNA degree --

16   A   Yes.

17   Q   -- or certification?  Okay.  You said you

18   also worked around the time you were going to

19   community college.  Where did you work?

20   A   I worked in different places during that time.

21   Q   Where?

22   A   I worked delivering pizzas at one point.  I

23   worked at Abercrombie and Fitch at one point.

24   I worked at a warehouse called E Parks and

25   Rockford Products at one point.

1   Q  What year did you start with the railroad?

2   A  Which railroad?

3   Q  Well, it brings me to where we're at next.

4      When did you start working for any railroad?

5   A  I believe it was 2018.

6   Q  Which railroad was that?

7   A  Union Pacific.

8   Q  What position did you hire out with the UP?

9   A  Conductor.

10  Q  Out of where?

11  A  Proviso.

12  Q  Did you become an engineer?

13  A  No.

14  Q  How long did you work as a conductor out of

15     Proviso?

16  A  Until I was furloughed towards the end of 2019.

17  Q  How long were you furloughed?

18  A  Furloughed until I -- technically, I'm still

19     furloughed.  From there I never went back.

20  Q  Do you still hold seniority?

21  A  I don't know.

22  Q  When did you start with the CP?

23  A  January of 2020.

24  Q  Did you hire out as an assistant trainmaster

25     or a conductor?



11.1 ● Defendant Affirmative

11.2 ● Plaintiff Affirmative

1   A   I was hired out for the LMT-O program.

2   Q   What is the LMT-O program?

3   A   Leadership Management Trainee Operations.

4   Q   You began that program in January of 2020?

5   A   Correct.

6   Q   So the idea there was you would complete the

7       program and become management?

8   A   Correct.

9   Q   Where was that training?  Where did that

10      training take place?

11  A   Several different locations.

12  Q   What locations?

13  A   I had to travel up to Canada twice.  I spent

14      time in St. Paul, Nahant, and ultimately was

15      placed in Marquette.

16  Q   So you were, I'm assuming, trained extensively

17      in Precision Scheduled Railroading.  Is that

18      correct?

19  A   I was trained, yes, sir.

20  Q   In Precision Scheduled Railroading and the

21      concepts surrounding that?

22  A   I wouldn't say that's what the focus of it

23      was.  It was a lot of aspects.  That was part

24      of it, yes.

25  Q   You became familiar with the Consequence



Defendant Affirmative

1   Leadership model?

2   A   Yes.

3   Q   As part of that training?

4   A   Yes.

5   Q   We'll get into that later.  How long did that

6   training last?

7   A   I believe the training was slotted to be six

8   months.  Me and another gentleman were kind

9   of fast-tracked through it due to our

10  previous experience.  So I think ultimately

11  it was around four months or so.

12  Q   So around April of 2020 you were done, April

13  or May?

14  A   Yeah, I believe somewhere around there.

15  Q   And then you were promoted to an actual

16  management position once you completed that

17  training?

18  A   Yes, I was placed as assistant trainmaster.

19  Q   At Marquette?

20  A   Yes.

21  Q   At that point you became familiar with both

22  the 474 and the 475 jobs?

23  A   Yes, those were part of the trains that ran

24  through the terminal on a daily basis, yes.

25  Q   I was going to ask you that.  That's a daily

1    train.  Correct?

2    A  Supposed to be, yes.

3    Q  If everything is working correctly, it's a

4    daily train?

5    A  Well, everything can always change.  But,

6    yes, it's planned to run every day.

7    Q  And that's a St. Paul to Kansas City train.

8    Correct?

9    A  I believe at that time, yes.

10   Q  Is that no longer the case?

11   A  To be honest, I couldn't speak about that.

12   That train doesn't run through my territory

13   anymore.  So the adjustments that were made

14   to what it does I'm not familiar with.

15   Q  And the 474 runs from St. Paul to Kansas City.

16   Right?

17   A  I believe at the time in question that we're

18   talking about, yes.

19   Q  And then the 475 goes the other way from

20   Kansas City back up to St. Paul.  Correct?

21   A  Correct.

22   Q  As part of the LMT-O, were you trained and

23   tested on the GCOR?

24   A  Yes.

25   Q  Were you trained and tested on the US

1    Efficiency Testing Manual?

2    A  It's more of a reference guide.  I wouldn't

3    say no I was trained on it.

4    Q  Let's clear that up.  So you were trained on

5    it?

6    A  No, that's not what I said.  I was trained on

7    E testing.  And E test manual that you're

8    referring to is more of a reference book.  It

9    was not given out to me at any point during

10    my training.  It was something that it was in

11    my office that I can use to refer to if needed.

12    Q  Do you refer to it on a regular basis?

13    A  As needed.  I wouldn't call it on a regular

14    basis but when needed.

15    Q  Back in February of 2021, would you refer to it?

16    A  Several years ago I'm sure there were times

17    when I referred to it, yes.

18    Q  So the incident that we're talking about here

19    today, as you know by now, was February 1st,

20    2021.  Right?

21    A  Okay.

22    Q  So you would have been an assistant trainmaster

23    for eight months at that point approximately?

24    A  Okay.

25    Q  Is that correct?

1    A  Like I said, I don't know the specific dates.

2      But, generally speaking, if those are the

3      dates that we're talking about, then yes.

4    Q  You're familiar with the term PMP?

5    A  Yes.

6    Q  What does that stand for?

7    A  Personal measured performance or something.

8      I'm not exactly sure what the acronym stands

9      for off the top of my head.

10   Q  You understand that the objective of that

11     plan is to tie a part of the employee's

12     compensation directly to CP's results.  Correct?

13   A  I don't understand the question.

14   Q  The plan -- you're familiar with it, right,

15     the PMP?

16   A  Yes, I'm familiar with the PMP.

17   Q  And part of the objective of that plan, as

18     you understand it, is to tie an employee's

19     compensation to CP's results.  Correct?

20   A  Apply employee's compensation?

21   Q  Right.

22   A  No.

23   Q  You understand that part of your compensation

24     is tied to CP's results.  Correct?

25   A  Yes, my compensation, yes.

1  Q  And your own individual results.  Correct?

2  A  Correct.

3  Q  And the way part of those individual results

4    and CP's results is you'll go through them

5    and there are a number of metrics that are

6    tracked.  Correct?

7      MS. AL TAQATQA:  Objection to form.

8    You can answer.

9  A  I believe so, yes.

10  Q  (By Mr. Magnuson, continuing) You're familiar

11    with the term dwell time?

12  A  Yes.

13  Q  And that tracks how long cars are idle, not

14    moving.  Correct?

15  A  Correct.

16  Q  There's terminal dwell.  Correct?

17  A  Correct.

18  Q  And that's how long a car sits at a terminal?

19  A  Basically, yes.

20  Q  What other dwell metrics are tracked?

21  A  I'm sure there's all types of dwell metrics

22    that are measured by several different crafts

23    and people at the company.

24  Q  Let's limit it to T and E, T, Y and E.  What

25    other dwell metrics, to your knowledge, are



17.1 Defendant Objection
17.2 Plaintiff Affirmative
17.3 Defendant Objection



Plaintiff Affirmative

1    tracked in the T and E department?

2       MS. AL TAQATQA:  Objection,

3    foundation.  You can answer if you know.

4    A  I would say with the technology that we have

5    nowadays, every aspect of every car and dwell

6    is measured.  We know how long every car sits

7    in the yard.  We measure the dwell on the

8    engines.  You can measure anything.

9    Q  (By Mr. Magnuson, continuing) And those dwell

10   statistics are important components of

11   Precision Scheduled Railroading.  Correct?

12   A  Yes.

13   Q  We'll just abbreviate that so I don't have to

14   say it over and over.  Can we just agree that

15   we call it PSR?

16   A  Agreed.

17   Q  So your testimony is that with this

18   technology today, that dwell on every car and

19   every locomotive can be tracked.  Correct?

20   A  Correct.

21   Q  On-time performance is another important

22   metric under PSR.  Is that correct?

23   A  Correct.

24   Q  And that's in terms of customer service,

25   making sure that they're getting their goods



1   on a regularly scheduled basis.  Correct?

2   A   There's a lot of different reasons that we

3   try to keep the trains running on time.  That

4   is just one of the reasons.

5   Q   Time is money when it comes to tracking these

6   metrics.  Correct?

7   A   I suppose.

8   Q   Because the railroad is not making money when

9   things are sitting idle.  Correct?

10  A   I don't know I could really speak to when the

11  railroad is making money or not.  That's not

12  an aspect of my job.

13  Q   Part of your own compensation is tied to when

14  trains are moving.  Right?

15  A   No.

16  Q   Part of your own compensation, part of your

17  bonus, isn't dependent on your on-time and

18  dwell metrics?

19  A   No.

20  Q   I thought you just testified that there was a

21  relationship there.

22  A   There is a relationship.  I'm sure if you

23  have the document that breaks down how the

24  PMP is broke down, there's a certain

25  percentage weighted to several different

1    categories. I don't know them off the top of

2    my head. I can tell you from my personal

3    experience I have never noticed any type of

4    compensation change based upon a singular

5    train's performance.

6    Q  In February of 2021, what was -- let me ask 

7    you this. When it comes to the CP and PSR,

8    what does the standard mean?

9        MS. AL TAQATQA:  Objection, form.

10    You can answer if you understand.

11    A  I don't understand the question that he's

12    trying to ask.

13    Q  (By Mr. Magnuson, continuing) You understand

14    what the term standard means?

15    A  In what context?

16    Q  In terms of how long a job should take.

17    A  You're talking about like a singular work event?

18    Q  Yep.

19    A  So you're talking about a work event standard?

20    Q  That's correct.

21    A  Okay. Yes.

22    Q  You understand what that means?

23    A  Yes.

24    Q  In February of 2021, what was the standard for

25    the 474?

1   A  I don't recall the exact time off the top of

2     my head.

3   Q  Is it less that an hour or greater than an

4     hour?

5   A  I believe it's greater than an hour.  But,

6     like I said, it's been several years since I

7     was out there supervising that territory.  So

8     the exact time I don't remember.  I want to

9     say it was around an hour-and-a-half,

10    possibly 90 minutes or somewhere around there

11    to the best of my knowledge.

12  Q  Are you familiar with the term drill-down?

13  A  Yes.

14  Q  You understand that when things on the CP are

15    going over standard, that things escalate up

16    the chain of command and drill-downs occur.

17    Right?

18      MS. AL TAQATQA:  Objection, form.

19    You can answer.

20  A  Things are escalated in drill-down all the

21    time for multiple different reasons.

22  Q  (By Mr. Magnuson, continuing) One of those

23    reasons being going over standard.  Correct?

24  A  Correct.

25  Q  And that's to ensure that things are moving



21.1  Defendant Objection
21.2  Plaintiff Affirmative



1   on time.  Correct?

2   A  No.

3   Q  Part of the reason for a drill-down is to

4   ensure that when things go over standard, you

5   figure out why they're running late and what

6   can be done to expedite.  Correct?

7   A  I would have to say no.

8   Q  Why is that?

9   A  The point of a drill-down is not to expedite

10   anything.  A drill-down occurs after something

11   has already happened.  So at that point the

12   point of the drill-down is not to expedite.

13   The point of a drill-down is to determine the

14   root cause of the event that you're drilling

15   down to to learn the contributing factors,

16   take-aways from it, and to learn how we can

17   do better.

18   Q  To prevent it from happening again?

19   A  In some cases, yes.

20   Q  And part of the consequence leadership model

21   is that consequences occur as a result of

22   these drill-downs.  Correct?

23   A  No.

24   Q  What's your understanding of the Consequence

25   Leadership model?



Defendant Objection

1   A   Consequence Leadership model is -- it's a

2   broad question.  Consequence Leadership model

3   is core management principles for CP, you

4   know, our core foundations, values, and how

5   we deal with I would say both problems and,

6   you know, when things go well, providing both

7   positive feedback and constructive feedback.

8   Q   I'm going to show you on the screen what we

9   will mark as your Deposition -- or Exhibit 20

10  not tied to your deposition.  Have you seen

11  this before?

12  A   I most likely have.  I don't recall this document.

13  I'm sure I was issued it at some point.

14  Q   If we can go to the second page where it says

15  Plan Objectives, do you see in the middle of

16  that page, sir, where it says Plan Objectives?

17  A   Yes.

18  Q   Under that it says, 'to tie a part of the

19  employee's compensation directly to CP's

20  results'.  Correct?

21      MS. AL TAQATQA:  Objection,

22  foundation.  I don't know that we have

23  established that the witness knows what this

24  document is.

25      MR. MAGNUSON:  Well, he said he's

1    familiar with it.


Plaintiff Affirmative

2    Q  (By Mr. Magnuson, continuing) You're familiar

3    with the document, sir?

4    A  I said I don't recognize it.  If this is

5    something to the STIP, I'm sure I was issued

6    it by human resources at some point.  But,

7    no, I'm not familiar with it.  This is not

8    something that I regularly refer to.

9    Q  But it's kind of your assumption that you

10   were given this?

11   A  I mean, it covers the STIP payment which does

12   pertain to me.  So I'm sure I had to be

13   issued some kind of document pertaining to

14   this.  But it's not something that I refer to

15   since I was probably hired on at CP.

16   Q  Do you agree or disagree with the statement

17   'to tie a part of the employee's compensation

18   directly to CP's results'?  You're familiar

19   with that concept?

20   A  Yes, I see it right there.

21   Q  Do you agree with that?

22   A  Sure, I guess.

23   Q  Under that it says, 'to reward the

24   achievement of individual and team objectives

25   that support CP's achievement of its annual

1  business plans and long-term strategy and to

2  maintain the competitiveness of CP's

3  compensation program.' You're aware of those

4  principles?

5  A  I would say no, I'm not aware of those

6  principles but I can read them on the

7  document.  Like I said, it's not something

8  that I've probably seen since I hired on at

9  CP since 2020.

10  Q  Do you understand that those concepts apply

11  to your employment?

12  A  I don't believe that those concepts apply to

13  my employment.  It says that they apply to

14  the STIP plan.

15  Q  And the STIP plan is part of your employment.

16  Right?

17  A  The STIP plan is a short-term incentive program.

18  Q  That applies to your employment.  Right?

19  A  No.  I'd have to disagree.  I don't believe

20  it applies to my employment.  It's due to my

21  bonus.  The company could choose to say that

22  we didn't have a good year or my personal

23  performance wasn't good or whatever the case

24  may be and say that there's no short-term

25  incentive plan payment coming out.  That does



1    not doesn't necessarily mean that it affects

2    my employment.

3    Q  It affects your compensation.  Right?

4    A  It would affect my bonus, yes.

5    Q  And your bonus is part of your compensation.

6    Right?

7    A  Yes.

8    Q  If we can go to Individual Hurdle two pages

9    down, do you see Individual Hurdle there?

10   A  Yes.

11   Q  It says, 'If individual performance levels

12   are unsatisfactory, no award will be paid to

13   the individual under the corporate or

14   individual components.' It's kind of what

15   you just said there where if you don't meet

16   certain expectations you could receive no

17   short-term incentive.  Correct?

18   A  According to what that document says, yes.

19   Q  And you understand that applies to you?

20   A  Yes.  However, I've never seen that applied

21   to anybody in my career at CP.

22   Q  That wasn't really my question.  This applies

23   to you.  This concept applies to you.  Right?

24   A  I couldn't speak to that.

25   Q  Well, you did just speak to it.  You said if



Defendant Objection

1    you don't meet expectations you could receive

2    no short-term incentive.  Correct?

3    A  I believe I said possibly.  I'm not -- I

4    don't know how these bonuses are calculated.

5    That would be my superiors and possibly the HR.

6    So all I know is exactly what it says on the

7    document there.  How everything is calculated

8    and how it pertains to me particularly is not

9    something that I'm privy to.

10        (Deposition Exhibit 21 marked for

11    identification).

12   Q  Mr. McKelvey, we've marked Deposition Exhibit

13   21.  3241 is the Bates.  Have you seen this

14   document before, Mr. McKelvey?

15   A  I don't believe so, no.

16   Q  It appears to be your Short-Term Incentive

17   for the year 2020.  Is that correct?

18   A  I don't know.  I can't tell.  I don't really

19   see my name on it anywhere.

20   Q  No, they didn't give us that.  But you

21   started your employment with the CP in 2020

22   and the other people we got had previous

23   years.  I can represent to you, sir, that in

24   the discovery responses that counsel provided

25   us they indicated that this was specifically



Defendant Objection

1   your Short-Term Incentive.  Okay?

2   A  Okay.

3   Q  Do you recall receiving a $16,000 bonus in

4   2020?

5   A  I don't recall the exact amount but I will

6   take your word for it, sure.

7   Q  That's at least what the document states.  Right?

8   A  It's three years ago so my memory is a little

9   hazy.  I don't remember the exact amount.

10  It's similar to that, yes.

11  Q  What was your bonus in 2021?

12  A  I don't recall.

13  Q  Was it more than $16,000?

14  A  No.  I believe that first year that I was

15  with CP was the biggest bonus I got due to

16  the corporate percentage at 172 percent.

17  Q  If you see the fourth paragraph down, you can

18  take a second to review it.  It's starting

19  with 'The 2021 STIP corporate performance

20  measures'.  Have you had a chance to review

21  that?

22  A  Yes.

23  Q  You're familiar with those terms?  Operating

24  Ratio, do you know what that means?

25  A  Not really, no.

1    Q  Operating Income, do you know what that means?

2    A  No.

3    Q  Train Accident Frequency, Personal Injury

4       Frequency, and Trip Plan Compliance, that

5       adds up to 100 percent.  Right?

6    A  I'll take your word that they add up to 100

7       percent, yes.

8    Q  So you're not familiar with the concepts or

9       the terms Operating Ratio or Operating Income?

10   A  I have heard the terms before.  I'm not

11      familiar with exactly what they -- what

12      metrics they use to make up those percentages.

13      That's not something that I deal with in my

14      day-to-day duties.

15   Q  Your job is to keep freight moving and

16      achieve CP goals.  Right?

17   A  Are you talking about my current job, my

18      current position?

19   Q  Yeah, trainmaster and assistant trainmaster,

20      both now and at the time of this incident

21      which was February of 2021.

22   A  Yeah, my job would be just to supervise the

23      movements of trains through the terminal that

24      I'm in and, you know, the employees and

25      anything that has to do with the movement of



30.1

Defendant Objection

1    trains.

2    Q   As you said with the technological advances

3    you're able to track dwell metrics on a car/

4    locomotive basis constantly.  Right?

5    A   I wouldn't say constantly.  But, yes, we're

6    able to track cars through the network.

7        (Deposition Exhibit 22 marked for

8    identification).

9    Q   We marked as Exhibit 22 your individual 2020

10   Performance Management Form.  Have you seen

11   this document before, sir?

12   A   I don't recall it, no.

13   Q   Well, I can represent to you that this is

14   what was provided to us by the railroad.

15   It's your 2020 Performance Management Form.

16   You weren't shown a copy of this?

17   A   I'm sure I was.  But this document from three

18   years ago I don't recall it, no.

19   Q   Do you have a meeting with your supervisor to

20   go over your performance management form when

21   it's completed?

22   A   Yes, some type of meeting.  It may be some-

23   times over the phone, just a phone call.

24   Q   It says on this that you report to Joey

25   Reyes.  Was that true in 2020?



1   A  Most likely, yes, at this time.

2   Q  Do you recall having a meeting with Mr. Reyes

3      about this form?

4   A  I do recall having a phone call from

5      Mr. Reyes telling me what my bonus was going

6      to be, yes.

7   Q  At the beginning there it says "Objective"

8      and "Service customers according to DOW service

9      with no misses."  What does DOW stand for?

10  A  Day of week.

11  Q  And what does that mean?

12  A  It means that particular customers have a

13     certain schedule, certain days of the week in

14     which they are to be serviced.

15  Q  Does that apply to the 474?

16  A  No.

17  Q  Why not?

18  A  Because the 474 is a road train.  Day of week

19     service refers to local jobs that work

20     specific customers.

21  Q  The road train though still has customers.

22     It just has multiple customers typically.  Right?

23  A  I would say typically no.  There would be no

24     typical answer for that.  It varies day-to-day.

25  Q  So you're saying that on a road train the day

1    of week service, it doesn't apply?

2    A   Correct.  And --

3    Q   Go ahead.

4    A   I would say overall it doesn't apply because

5        not all road trains -- there are road trains

6        that do work customers.

7    Q   Typically the road trains pull into a yard -- 

8        the train is broken down, so to speak, and

9        then its freight is delivered to certain

10       individual customers.  Correct?

11   A   In very broad general speaking terms.

12   Q   I agree.  That is broad.  But just generally

13       speaking?

14   A   Yes.  But, I mean, it changes based upon the

15       train, the location, the terminal that they

16       are working.  There's a lot of different

17       variables.  I couldn't say there's one set

18       standard that applies to everything.  Every

19       train is different.  Every circumstance is

20       different.  Work events change.

21   Q   Road trains have customers though, correct,

22       ultimately?

23   A   Ultimately I would say no.  Customers by

24       design are generally serviced by local jobs.

25       However, there are some customers that do get

32.1  Defendant Objection
32.2  Plaintiff Affirmative

1   worked by road trains. 

2   Q   At the end of the day though, the freight

3   that is being hauled on a road train ends up

4   at a customer.  Correct?

5   A   Yes.  Every car that the railroad moves

6   eventually is for a customer, correct.

7   Q   Okay.  And it's important under PSR to make

8   sure that the freight is delivered on time.

9   Correct?

10   A   It's important for the railroad.  It's

11   important that the freight is delivered on

12   time, period.  It doesn't have anything to do

13   with PSR.

14   Q   Under "Achieves" it says 'Connect all trip

15   plan cars and service all customers with no

16   misses.'  What does connect all trip plan

17   cars mean?

18   A   Like I said, one of the ways of tracking cars

19   and how we track them is based on the trip

20   plans.  So every car that has a trip plan has

21   a scheduled connection of when it's supposed

22   to make a certain train and depart at a

23   certain time in order to make the destination

24   by the desired time to get to the customer on

25   time.

Defendant Objection



Defendant Objection

1    Q  And that applies to road trains.  Correct?

2    A  Yes.

3    Q  It says, 'service all customers with no

4    misses.'  Correct?

5    A  Correct.

6    Q  When it says all customers, that applies to

7    customers that ultimately receive freight

8    from freight trains, correct, over-the-road

9    freight trains?

10   A  I believe in this context it would be

11   speaking to local jobs.

12   Q  But you're not certain about that?

13   A  I am certain because I would have been the

14   one that filled out this form.  Like I said,

15   it was three years ago.  But I can tell you,

16   by the way that I wrote it and worded it,

17   that would be to apply to local trains.

18   Q  You said you filled this out yourself?

19   A  Yes.  The top part is filled out by the

20   employees.  So that would have been me, yes.

21   Q  If we go down to the Core Leadership

22   Competencies part, 4 of 6, that's not filled

23   out by you, is it?

24       MS. AL TAQATQA:  Object to form.

25   You can answer if you understand.

1   A  I believe the employee rating part is filled

2   out by myself and leader rating was filled

3   out by my supervisor.

4   Q  (By Mr. Magnuson, continuing) That would have

5   been Mr. Reyes?

6   A  I believe so.  There's a lot of turnovers

7   that happen at the railroad.  So I have had

8   several different supervisors.  But if Joey

9   Reyes is on it, then at the time he most

10  likely would have been the supervisor.  But,

11  like I said, going back that long ago I don't

12  recall the specific dates and times.

13  Q  And you see he gave you a need to improve and

14  ensure accountability of self and others as

15  well as coach and develop talent?

16  A  Yes.

17     (Deposition Exhibit 23 marked for

18  identification).

19  Q  We'll show you next what we've marked as your

20  Exhibit 23.  Have you seen this document

21  before?  I'm assuming you have since you

22  probably filled it out.

23  A  I don't recall this specific document.

24  Q  When you were at Marquette, what percentage

25  of your responsibilities dealt with local



Plaintiff Affirmative

Defendant Objection

1    trains versus road trains approximately?

2    A  Maybe 50/50'ish.

3    Q  So the 474 and 475 were each -- would you

4    call that one train just going two different

5    directions or two trains?

6    A  Two trains.

7    Q  So those were two of your road trains.  How

8    many road trains approximately did you have

9    or were you responsible for?

10   A  I couldn't tell you.  Every one that came

11   through the terminal.

12   Q  More than ten?

13   A  I mean, are you talking about on a singular

14   day or my total time in Marquette?

15   Q  Like on a weekly basis.

16   A  Yeah, there were more than ten trains that

17   ran through on a weekly basis.

18   Q  So when you talk about your objectives here,

19   you're only talking about approximately 50

20   percent of the freight that you were

21   overseeing if we go back to Exhibit 22?

22   A  I'm not sure what objectives you're

23   specifically talking to.

24   Q  Well, we'll just talk about the objectives

25   there at the beginning that you reference.  I

1    think you said you filled this out.  And
2    correct me if I'm wrong, you stated that the
3    way you worded it makes you think that this
4    only applied to local jobs?
5    A  I speak of day of week service.  Day of week
6    service applies to local jobs servicing
7    customers.
8    Q  So why didn't you put anything in your
9    objectives about the other 50 percent of the
10   freight that you were managing?
11   A  This is the first time I had ever filled out
12   a PMP, and I wasn't exactly sure what I
13   needed to put in there.
14   Q  On-time performance and dwell metrics still
15   applied at that time to the freight trains,
16   correct, the road trains?
17   A  Yes.
18   Q  Would you call the 474 and 475 mixed freight
19   trains?
20   A  They're manifest trains.
21   Q  What is the difference between a mixed and a
22   manifest train, mixed freight and a manifest
23   train, or are they the same thing?
24   A  I believe they were the -- I think you're
25   getting into semantics, but they're basically

1   the same thing.



Plaintiff Affirmative

2   Q  Okay.  That's what I thought.  At the time

3   you were overseeing the 474 and 475, there

4   were sand plants that were important

5   customers.  Correct?

6   A  Correct.

7   Q  And those sand plants were a profitable part

8   of CP's business at the time.  Correct?

9       MS. AL TAQATQA:  Objection,

10  foundation.  You can answer if you know.

11  A  Yeah, I don't know.  The profitability of any

12  specific train or any specific car is not

13  something that I know about.

14  Q  (By Mr. Magnuson, continuing) You were under

15  the impression, however, that those were

16  important customers.  Right?

17  A  Every customer is an important customer.

18  Q  The sand plants in particular were important?

19  A  Every customer.  I wouldn't place one

20  customer's priority over another.

21  Q  What other customers did you have -- what

22  other customers were serviced by the 474 and

23  475 in February of 2020?

24  A  I don't recall any specific customers that

25  were serviced by the 474 and 475.



1   Q  What freight would typically make up those

2    trains in addition to sand?

3   A  I wouldn't say sand would make up those trains.

4   Q  They were part of those trains.  Correct?

5   A  Typically no.

6   Q  The 474 and 475 did not haul or service sand

7    plants?

8   A  Correct.  The 474 and 475 by design are not

9    servicing sand plants.

10  Q  They haul sand for sand customers.  Correct?

11  A  They could haul any number of things.  So I'm

12   sure that there was sand that was moved on

13   those trains, yes.

14  Q  There were -- lumber was moved on those trains?

15  A  There were all types of different commodities

16   that were moved on those trains.

17  Q  HAZMAT was moved on those trains?

18  A  Yes.

19  Q  Anhydrous ammonia was moved on those trains?

20  A  Like without getting into any specifics, I

21   couldn't recall.  But generally, yes, there

22   were all types of commodities.

23  Q  What other types of HAZMAT would be hauled by

24   the 474 and 475 in February of 2020?

25      MS. AL TAQATQA:  Objection to form.

1    You can answer.

2    A   I can't speak to the specific types of

3    commodities that were hauled.  It's just a

4    mixed manifest.  So whatever track they had

5    to go from St. Paul down to Kansas City or

6    get set off at any terminal in between to

7    make any other connections would have been

8    hauled by that train.  Like I said, it could

9    have been any type of commodities.

10   Q   Give me some examples of other types of

11   HAZMAT that would have been hauled on those

12   trains.

13   A   Ethanol, asphalt, yes, you can get anhydrous

14   ammonia, sulfur.  I'm not familiar with all

15   the different types, you know, every single

16   one of HAZMAT.  But we haul all different

17   kinds of commodities, hazardous and non-

18   hazardous materials.

19       MS. AL TAQATQA:  Kurt, do you

20   want to take a break?  It's been a little

21   more than an hour.

22       THE WITNESS:  In 10, 15 minutes.

23       MS. AL TAQATQA:  You can just say

24   the word.

25   (40.2)(40.3) Mr. Magnuson, continuing) So you were



40.1   Plaintiff Affirmative

40.2   Defendant Affirmative

40.3   Plaintiff Affirmative

1     based -- in February 2021 you were based at

2     Marquette.  Right?

3     A  Correct.

4     Q  If someone comes to work at Marquette to work

5     the 474 and you're working, do they come to

6     you in Marquette to get the paperwork for

7     their job or how do they get their instructions

8     as to what to do?

9     A  It depends on the day.  Each day is different.

10    But typically what I would try to do or my

11    daily routine would be to have the paperwork

12    ready for when the crew comes on duty, have

13    the job briefing with them about the work to

14    be completed, any other situational things

15    that they need to be made aware of, and then

16    be there to assist them with whatever help

17    they needed to complete the work.

18    Q  Do you coordinate with the dispatcher in terms

19    of completing your paperwork or did you at

20    the time?

21    A  No.

22    Q  Who do you work with in terms to get the

23    paperwork ready -- we'll narrow this down and

24    we'll talk about February of 2021.  At that

25    time, who did you work with in terms of

1    getting your paperwork ready?

2    A  Tiffany was responsible for doing it.

3    Q  Who would you share that with prior to

4    holding your job briefing, if anyone?

5    A  Who would I share what with?

6    Q  Your paperwork.

7    A  Nobody.

8    Q  I'll show you what's previously been marked

9    as Exhibit 8.  It's a two-page document.

10    It's the first page and that's the second

11    page.  Would you like to take a moment to --

12    well, have you seen these before?

13    A  I don't recall these, no.

14    Q  You didn't review them in preparation for

15    your testimony today?

16    A  No.

17    Q  Would you just take a quick second to review

18    them?

19    A  Yeah.  Is this the first page?

20    Q  Here's the first page.  We'll do that one

21    first.

22    A  (Witness examining document).

23    Q  Just tell me when you're ready.

24    A  Go to the second page, please.  (Witness

25    examining document).


42.1  ● Defendant Objection

1    Q  The first one, this references a derailment

2    that happened at Sethness Products, approximately

3    milepost 159.  Are you familiar with that

4    incident?

5    A  No.

6    Q  You weren't made aware of that derailment?

7    A  I may have been made aware of the derailment

8    at the time.  I don't have any specific

9    recollection of it, no.

10   Q  And we'll go to the second one.  Do you

11   recall that incident?

12   A  No.

13   Q  You don't recall seeing this document previously?

14   A  Correct.

15   Q  You don't recall either of these derailments

16   occurring prior to February of 2024 -- 2021?

17   I'm sorry.

18   A  Correct, I have no specific recollection of

19   either of these incidents, no.

20   Q  Do you recall Mr. Sexton referencing these

21   incidents to you?

22   A  No.

23   Q  These are both CP Home Safe documents.  Correct?

24   A  Yes.

25   Q  And both of these -- well, one occurred on



43.1  Defendant Objection

43.2  Plaintiff Affirmative

1    the Nitrin subdivision and Davenport

2    subdivision.  Were these in your territory?

3    A  No.

4    Q  Where were they in relationship to your territory?

5    A  The Davenport subdivision is south by Nahant.

6    And the Nitrin Subdivision, I'm not even sure

7    where that is.

8    Q  Are these CP Home Safe documents circulated

9    by e-mail?

10   A  I don't recall.

11   Q  Do you get them now by e-mail?

12   A  Most likely I may.

13   Q  You may.  Do you answer your CP e-mail on a --

14   A  I do.  I have about 5,000 deleted e-mails

15   right now in my in-box waiting to be removed.

16   So I get a very high volume of e-mails, a lot

17   of safety documents, drill-down on incidents

18   that occurred.  So I get a lot of safety

19   related documents, yes.  Do I get these

20   particular Home Safe ones?  I couldn't say

21   specifically that I do.

22   Q  Exhibit 8 references two derailments that

23   occurred as a result of snow and ice building

24   up on rail.  Correct?

25   A  Yes.

1    Q  Both of them say, as the preliminary cause,

2    failure to cut tracks as required.  Correct?

3    A  Yes.

4    Q  And cutting tracks that have ice and snow

5    built up in them is important.  Correct?

6    A  Yes.

7    Q  And the way tracks are cut in those

8    circumstances is to use light power or light

9    engines to go over and break up the ice and

10   snow with the flange.  Correct?

11   A  Correct.

12   Q  And that's because the ice and snow that

13   builds up on the rail can cause cars, railcars,

14   to ride up and rise up on the ice and snow

15   and then derail.  Correct?

16   A  When you're talking about cutting tracks, yes.

17       (Deposition Exhibit 24 marked for

18   identification).

19   Q  So I'll show you 24 first, which is the GOI

20   Section 1-32.  Are you familiar with this

21   document, sir?

22   A  Specifically this one, no.

23   Q  I will refer you to the bottom of that sort

24   of highlighted.  It's 32.11.  What does GOI

25   stand for actually?

1   A  General Operating Instructions.

2   Q  You were under and governed by General

3     Operating Instructions in February of 2021?

4   A  One of the many road books that we're

5     governed by, yes.

6   Q  And do you see 32.11?  It says, 'When snow

7     and ice conditions are building up on yard

8     tracks, elevator tracks, industrial tracks

9     and particularly on crossings', which is

10    bolded, 'within such tracks, the locomotive

11    must be run through prior to cars being set

12    out, lifted or moved.'  You're familiar with

13    that rule?

14  A  Yes.

15  Q  It's important to be followed?

16  A  Is that a question?

17  Q  Yeah.  It's important to follow that rule?

18  A  It's important to follow all the rules.

19  Q  Right.  Including this one?

20  A  Yes.

21  Q  Part of the purpose behind that rule is

22    derailments can be dangerous.  Correct?

23  A  Yes.  Derailments are always dangerous.

24      (Deposition Exhibit 25 marked for

25    identification).

1   Q  Yes.  Next I'll show you 25.  Are you

2    familiar with this document?

3   A  No.

4   Q  Do you see that this is a General Manager

5    Notice issued on January 12, 2021?  Right?

6   A  Yes.

7   Q  If we could scroll down, it appears to have

8    been generated by Tom Jared.  Correct?

9   A  Yes.

10   Q  He was your general manager at the time?

11   A  Yes.

12   Q  And this notice went out to all employees.

13    Correct?

14   A  Yes.

15   Q  You were an employee of the CP at that point.

16    Correct?

17   A  Yes.

18   Q  So you would have received this notice.  Correct?

19   A  Yes.

20   Q  You just don't recall it?

21   A  Correct.  I have been issued probably thousands

22    of those.

23   Q  It says, 'Over the last month, CP Properties

24    have experienced several snow and/or ice

25    covered rail incidents.  As such, safety

1    reviews of these incidents have revealed that

2    all were preventable.'  You don't recall

3    receiving this notice or the incidents that

4    are referenced in it?

5    A   Right.  I have no specific recollection of

6    this specific document.

7    Q   In the middle of it, it references 32.11,

8    which is the rule we just went through a

9    minute ago.  Right?

10   A   Correct.

11   Q   And, again, in this one -- and this is the

12   one provided by the company -- particularly

13   on crossings is bolded, correct, when it

14   references snow and ice buildup?

15   A   Correct.

16   Q   Presumably that's to highlight the importance

17   of eliminating ice and snow buildup on crossings?

18   A   Correct.

19       MR. MAGNUSON:  Give me one

20   second.  I have to get some exhibits in order

21   here.

22       THE WITNESS:  Can we take a ten

23   minute break?

24       MR. MAGNUSON:  Yeah, this would

25   be a good time.


Plaintiff Affirmative

1     (Brief recess).

2   Q  (By Mr. Magnuson, continuing) I'm just going

3   to back up a little bit and ask you some

4   general questions here, Mr. McKelvey.  How

5   long did you actually work on the ground as a

6   conductor?

7   A  I'd say short of two years.

8   Q  And you didn't become an engineer?  I don't

9   recall if I asked you that question or not.

10  A  That is correct.  I was never an engineer.

11  Q  Part of your job as a trainmaster and assistant

12  trainmaster is to avoid delays.  Correct?

13  A  Yes.

14  Q  And part of your job as a trainmaster/

15  assistant trainmaster is to meet your dwell

16  and on-time expectations.  Correct?

17  A  Correct.

18  Q  You also, as part of these metrics like dwell

19  and on-time expectations that we have talked

20  about, part of those equations in terms of

21  efficiency at the railroad is keeping an eye

22  on re-crewing trains too.  Correct?

23  A  Can you ask that question again?

24  Q  Yeah.  It's an awkward question.  Part of

25  your job as a trainmaster and assistant

1  trainmaster is to manage your crews. Correct?

2  A  Correct.

3  Q  Because they're subject to the hours of

4  service law. Correct?

5  A  Correct.

6  Q  And you want to make sure that your crews tie

7  up efficiently so that you don't have to re-

8  crew in an inefficient manner. Correct?

9  A  If you're asking if we try to avoid re-

10  crewing trains, then yes, that's correct.

11  Q  Because re-crewing trains can cause delays.

12  Correct?

13  A  I mean, there's a lot of things that can

14  cause a delay to a train. I wouldn't say --

15  Q  Depending on the circumstances, re-crewing

16  trains can be inefficient. Correct? If

17  crews are dying on their hours and you have

18  to re-crew a train in an inefficient manner,

19  that can cause delays. Correct?

20  A  I'm just thrown off when you say re-crewing

21  trains in an inefficient manner. I'm not

22  sure exactly sure what that means.

23  Generally, each train has a schedule, like

24  where it's supposed to be, the work is to be

25  completed, and where the crew change would

1    take place.  So my job as a trainmaster is to

2    make sure that that happens.

3    Q  And changing over a crew in those circumstances

4    is different than re-crewing a train.  Correct?

5    A  Not really, no.

6    Q  Well, let's go back to your answer a minute

7    ago.  How do you refer to it when crews are

8    changed according to schedule?

9    A  It's called a crew change whether it's on

10   schedule or not on schedule.

11   Q  Is a crew change different than a re-crew?

12   A  It's semantics.  No.  It's the same thing.

13   You're talking about putting a different crew

14   on a train.

15   Q  Do you have a certain term for when you have

16   to re-crew due to an Hours of Service Act?

17   A  No.

18   Q  Delays can cause drill-downs, can't they?

19   A  Can they cause drill-downs?

20   Q  Can drill-downs occur as a result of delays?

21   A  Yes.

22   Q  More often, the length of the delay the more

23   likely a drill-down is to occur?

24   A  No.

25   Obviously, sir, you know why we're here today.


Defendant Affirmative



1    Your involvement in terms of Mr. Sexton's case

2    revolves around the 474 train, which Mr. Sexton

3    and DePover were called for on February 1st,

4    2021. Do you understand all that?

5    A  Yes, I understand it. As far as the specific

6    dates, times and people, I don't have

7    specific recollection of that particular event.

8    Q  Do you recall Mr. Sexton working that day?

9    A  The incident in question, I have

10   recollections about a few things about the

11   event. Most of the details and stuff I don't

12   recall specifically, no.

13   Q  Do you recall that Mr. DePover was his

14   conductor or assistant engineer that day?

15   A  No, I do not.

16   Q  Do you remember it snowing in the days

17   previous to February 1st, 2021?

18   A  I do not remember the weather from 2021, no.

19   Q  On our break, I don't want to know the

20   context or what you talked about, but who all

21   did you talk to on the break?

22   A  My lawyer, or Briana.

23   Q  You didn't talk to Noah Garcia?

24   A  I did not.

25   Q  Did you make any notes surrounding the events

1   of February 1st, 2021?

2   A  Not that I'm aware of, no.

3   Q  When did you first become aware that Sexton 

4   was disciplined later in that shift?

5       MS. AL TAQATQA:  Object to form.

6   A  I don't recall the time I was made aware of it.

7   Q  (By Mr. Magnuson, continuing) When was the

8   first time anybody came to talk to you about

9   the events of February 1st, 2021?

10  A  What do you mean came to talk to me?

11  Q  Either spoke to you about that.  When was the

12  first time anyone at CP Rail spoke to you

13  about the events surrounding February 1st, 2021?

14      MS. AL TAQATQA:  Objection, form.

15  You can answer if you understand.

16  A  I don't recall the specific dates.

17  Q  (By Mr. Magnuson, continuing) Do you remember

18  who first spoke to you regarding those events?

19      MS. AL TAQATQA:  Objection, form.

20  A  I do not.

21  Q  (By Mr. Magnuson, continuing) Were you

22  contacted prior to Mr. Sexton's investigation?

23  A  About what?

24  Q  About the events surrounding February 1st, 2021.

25      MS. AL TAQATQA:  Objection, form.



53.1  Plaintiff Affirmative

53.2  Plaintiff Affirmative

1   A  I'm having a hard time trying to figure out

2      what you're trying to ask.

3   Q  (By Mr. Magnuson, continuing) Well --

4   A  I'm sure I would have talked with several

5      people during the work event.  I'm sure I've

6      talked with several people after the work

7      event.  Who and what time I couldn't tell you

8      the specifics.

9   Q  The work event meaning the 474?

10  A  Yes.

11  Q  Do you recall that there was a significant 

12     delay that day with the 474?

13  A  Yes.

14  Q  What do you recall around the event

15     surrounding that delay?

16  A  The only thing I remember about that day is

17     Mr. Sexton was the engineer on that train.  I

18     remember having a conversation with him prior

19     to the work to be completed.  And then the

20     actual work event took a lot longer than

21     expected.  I had several other things I had

22     to do during that time also as part of my

23     daily duties.  And that's pretty much all I

24     remember.

25  Q  What were the other things that you had to

1    do?

2    A  I don't recall specifically.  But I'm in

3    charge of managing all of the crews and all

4    of the trains that would come through there.

5    So the 474 is just one train.

6    Q  Do you remember any other trains that were

7    coming through on February 1st?

8    A  I don't specifically, no.

9    Q  What were the reasons that this job took

10   longer than expected?

11   A  It sounds like it was snowing at the time

12   just going back to documents that I have

13   seen.  So I'm sure the weather took some part

14   in the delays.  And then as far as that, I'd

15   have to refer to the drill-down.

16   Q  Mr. Sexton cut some crossings as you recall?

17   A  Yes.

18   Q  And cutting those crossings contributed in

19   some part to the delay.  Is that correct?

20   A  I would say no.

21   Q  How long did it take to cut the crossings?

22   A  I don't recall exactly how long it took.

23   Q  But had he not cut the crossings, the delay

24   would have been shorter.  Correct?

25   A  Theoretically speaking, I can't answer that.


Defendant Affirmative

1   Q  Had he not cut the crossings, the delay with

2   that train would have been shorter.  Correct?

3      MS. AL TAQATQA:  Objection, form.

4   You can answer.

5   A  I mean it's possible.  You're just speculating.

6   You know, we could have not cut the crossings

7   and he could have ran into another issue that

8   would have delayed it even longer or vice

9   versa.  I can't speculate if we did something

10  what would have occurred.

11  Q  Do you recall how long it took him to cut the

12  crossings?

13  A  I do not recall exactly how long, but

14  typically it's not something that causes a

15  major delay.

16  Q  How many crossings would he have cut, or how

17  many crossings did he cut if you know?

18  A  I think two crossings, possibly three.

19  Q  How many crossings are there between

20  Marquette and Nahant?

21  A  I can't answer that question.

22  Q  More than 10?

23  A  I can't answer that question.

24  Q  More than 20?

25  A  I can't answer that question.  I don't know



1    how many road crossings are between Marquette

2    and Davenport, Iowa.

3    Q  We can look at a map and make that

4    determination though, couldn't we?

5    A  Yes.

6    Q  To your recollection, did Mr. Sexton cut all

7    of the crossings between Marquette and Nahant?

8    A  No.

9    Q  How many do you think he cut?

10   A  I don't know how many he cut.

11   Q  You just don't recall?

12   A  I'm not responsible for his whole trip from

13   there to Davenport or what he does once he

14   departs Marquette.  It's not really something

15   that I am aware of.

16   Q  Do you remember where Mr. Sexton and

17   Mr. DePover held their job briefing?

18   A  Job briefings are typically held in the crew

19   trailer.

20   Q  Is your office in the crew trailer?

21   A  Yes.

22   Q  Do you oftentimes overhear job briefings?

23   A  Sometimes.

24   Q  Do you sometimes participate in the job

25   briefings?

1    A  I always try to participate in the job
2    briefings when I'm available.
3    Q  Do you recall if you participated in the one
4    on this date, February 1st of 2021?
5    A  I believe I did, yes.
6    Q  Did you at any point in that job briefing
7    tell Mr. Sexton that he was not to cut the
8    crossings?
9    A  No.
10   Q  Do you recall that specifically or do you
11   just not recall one way or the other?
12   A  I recall specifically that I never instructed
13   him that he was not to cut the crossings.
14   Q  Did you guys have a disagreement about
15   whether or not he should cut the crossings?
16   A  Yes.
17   Q  You did have a disagreement about that?
18   A  Yes.
19   Q  And Mr. DePover was a witness of that?
20   A  I honestly do not even recall who the
21   conductor was or if he was present at the
22   time.
23   Q  I can represent to you that Mr. DePover and
24   Mr. Sexton both state that you told them that
25   they were not to cut the crossings.  You

1    disagree with that?

2    A  I believe we had a discussion about whether

3    or not the crossings needed to be cut, and I

4    believe my position was that there was not

5    enough snow that required them to have to cut

6    the crossings.

7    Q  How much snow was there, do you recall?

8    A  I do not recall.

9    Q  Mr. Sexton's opinion, to your recollection,

10   was that the tracks needed to be cut.  Correct?

11   A  Correct.

12   Q  And your position was that the tracks didn't

13   need to be cut.  Correct?

14   A  Correct.

15   Q  I'll show you what has already been marked as

16   your Deposition Exhibit 7.  Have you seen

17   this document before?

18   A  I don't recall it, no.

19   Q  You didn't look at this document to prepare

20   for your testimony today?

21   A  No.

22   Q  Is that your signature at the bottom of this

23   document?

24   A  It appears so, yes.

25   Q  Is that your employee number?

1    A  Yes.

2    Q  Do you know why your signature and employee

3      number are on this document?

4    A  Because I was most likely present at that

5      Footboard/Safety Meeting.

6    Q  Do you recall that you signed it after the

7      job briefing with Mr. Sexton and Mr. DePover

8      the morning of the 1st of February, 2021?

9    A  I don't recall when this document was signed,

10     no.

11   Q  Do you recall signing any sort of document

12     that morning?

13   A  No.

14   Q  Do you remember Mr. Sexton going to his truck

15     and getting this document to have you sign it?

16   A  No, I do not.

17   Q  You just don't recall one way or the other?

18   A  That is correct.

19   Q  So you could have signed it that morning?

20   A  Yes, I very well could have.

21   Q  Mr. Sexton claims that he had you sign this

22     document as a result of your disagreement

23     about whether or not the crossings needed to

24     be cut.  Does that refresh your recollection

25     at all?


Defendant Affirmative

1   A  No.

2   Q  At the time, did you communicate for any of

3   your work at CP Rail on a personal cell phone?

4   A  No.

5   Q  You were issued a CP Rail company-issued cell

6   phone?

7   A  Correct.

8   Q  And you did all of your work-related

9   communications on that cell phone?

10  A  Yes.

11  Q  Where is that cell phone that you had on

12  February 1st, 2021?

13  A  I do not know.

14  Q  You've changed phones since then?

15  A  Yes.

16  Q  Do you know if that phone was imaged onto

17  your new phone?

18  A  I do not know.

19  Q  Like text messages were -- did you use your

20  company-related cell phone to text message in

21  February of 2021?

22  A  Yes.

23  Q  Were you ever asked to search your phone for

24  text messages related to February 1st, 2021?

25  A  I don't recall specifically.  I know that I



1    was told approximately a year ago about this

2    deposition.  And I think I was asked at the

3    time if I had any documents or e-mails or

4    anything pertaining to this incident, which I

5    did not.

6    Q  Did they ask you to search your phone for

7    text messages?

8        MS. AL TAQATQA:  Objection to the

9    extent it calls for attorney/client privilege

10   communications.  If you have information that

11   was not part of a conversation with an

12   attorney either at Dorsey & Whitney or an

13   attorney at CP, you can answer.  Otherwise I

14   will instruct you not to answer.

15       THE WITNESS:  What was the question?

16   Q  (By Mr. Magnuson, continuing) Had anyone

17   asked you to search for text messages relating

18   to February 1st, 2021?

19   A  I don't believe I was asked to search for

20   text messages, no.

21   Q  Have you searched for text messages related

22   to February 1st, 2021?

23   A  No.

24   Q  Do you know if they're still on your phone?

25   A  They 100 percent are not on my phone.

1   Q  Why?  Were they deleted when you changed phones?

2   A  I don't know if they were deleted.  But I

3    have been issued a new phone, and I don't

4    have correspondence going back like three years.

5   Q  Do you know that for sure?  Like is your

6    phone backed up in the cloud?

7   A  No, it's not.

8   Q  Do you know that for certain?

9   A  Yes, I do.

10  Q  CP kind of controls that phone though, right,

11   in terms of the -- like if you need it fixed,

12   replaced or anything like that, you go through

13   CP's IT department?

14  A  Correct.

15     MS. AL TAQATQA:  Objection, form.

16  Q  (By Mr. Magnuson, continuing) So the text

17   message function on your cell phone -- you

18   also I understand use Teams?

19  A  Correct.

20  Q  Is that an instant messaging platform?

21  A  Yes, I guess, communication.

22  Q  You use that to communicate with other people

23   in writing.  Correct?

24  A  Correct.

25  Q  You also use e-mail?


Plaintiff Affirmative

1  A  Yes.



Plaintiff Affirmative

Defendant Objection

2  Q  Any other third party messaging apps that

3     you're aware of that were related to your

4     phone or connected to your phone on February

5     1st of 2021?

6  A  No.

7  Q  So the universe of your ability to

8     communicate with that work phone would be

9     text messages, Teams, e-mails, and phone

10    calls.  Correct?

11  A  Correct.

12  Q  I would ask that you not go back and delete

13    anything at this point.  And I can represent

14    to you if you do, you could get caught at it

15    if someone looks at your phone.  So I would

16    ask that you preserve anything on your phone

17    currently as it relates to February 1st, 2021.

18    Okay?

19  A  Yes, sir.

20  Q  And you don't think your phone is backed up

21    on the cloud.  Is it backed up on CP servers?

22  A  That I don't know.

23     MR. MAGNUSON:  What are we on?

24    Bates 3285.  Brenda, what number are we on?

25     MS. REPORTER:  I wasn't writing

1    them down.  I will start.

2        MR. MAGNUSON:  Briana, I bet

3    you're writing them down.

4        MS. AL TAQATQA:  The last one was

5    25.

6        MR. MAGNUSON:  The next one will

7    be 26.

8        (Deposition Exhibit 26 marked for

9    identification).

10   Q  (By Mr. Magnuson, continuing) Is this one of

11   the e-mails that you reviewed to prepare for

12   your testimony today, Mr. McKelvey?

13   A  Yes.

14       MR. MAGNUSON:  Cyle, could you go

15   to the very bottom of it?

16       MR. CRAMER:  On the first page?

17       MR. MAGNUSON:  All the way down

18   to the Ron Pierce e-mail at 3:51.

19   Q  (By Mr. Magnuson, continuing) So we're

20   showing you the first e-mail on this chain

21   that was sent by Ron Pierce at 3:51.  Does

22   this e-mail refresh your recollection at all

23   of the events of that day?

24   A  I mean, I read what it says.  As far as what

25   I actually remember from that day, not really.



65.1  Plaintiff Affirmative

65.2  Plaintiff Affirmative



1   Q  Now we'll go up above.  The one from Gary

2     Prince at 4:54, do you recall that e-mail

3     specifically?

4   A  No.

5   Q  Do you recall getting it?

6   A  No.

7   Q  It states, 'We need a full breakdown from the

8     Trainmaster on what happened here.'  You were

9     an assistant trainmaster that day, but is

10    that who they're referring to?  Is that who

11    Gary Prince was referring to there?  Were you

12    acting as the trainmaster?

13  A  Yes.

14  Q  It goes on to say, 'A setout and locomotive

15    lift should not take 4 hours and 30 minutes

16    as projected.'  Do you read that?

17  A  Yes.

18  Q  That's correct?  It shouldn't take that long

19    under standard?

20  A  That is correct.

21  Q  He goes on to say, 'We are at risk of 4 re-

22    crews due to 1 train over-standard.'  Do you

23    recall that being the case that day?

24  A  I do not recall that.

25     So when they talk about being at risk of 4 re-

1   crews, they're not talking about just regularly

2   scheduled crew changes.  They're talking

3   about re-crews as a result of going over

4   their hours of service.  Correct?

5      MS. AL TAQATQA:  Objection,

6   foundation.  You can answer if you know.

7   A  Yeah, I can't say specifically what they're

8   talking about.

9   Q  (By Mr. Magnuson, continuing) Well, when he

10  says risk of re-crews, he's not talking about

11  regularly scheduled crew changes, is he?

12     MS. AL TAQATQA:  Same objection.

13  A  I mean, I can't speak to exactly what

14  somebody else is talking about.

15  Q  (By Mr. Magnuson, continuing) Well, we will

16  talk to Mr. Prince about it.  But he did say

17  that the one train being over-standard is

18  going to result in four re-crews.  That's

19  what it states.  Right?

20  A  That is what it states, correct.

21  Q  And your understanding is the one train being

22  over-standard that he's talking about here is

23  the 474.  Right?

24  A  Correct.

25  Q  He goes to say, 'Ensure the delays in Nexus



67.1  Plaintiff Affirmative
67.2  Defendant Objection
67.3  Defendant Objection
67.4  Plaintiff Affirmative

1    are filled out correctly with facts, not

2    assumptions.'  Is that correct?

3    A  That's what it says, correct.

4    Q  What is Nexus?

5    A  Nexus is a computer program.

6    Q  What does the computer program do?

7    A  It shows the train line-ups and their

8    schedule.  It shows information about the

9    trains, how they're operating, whether they

10   are operating in advance time, link (phonetic)

11   time, what time they're projected into a

12   specific terminal or destination.  And then

13   it also shows what other trains are projected

14   in there.  That's how we keep track of the

15   arrivals, departures, work events, a lot of

16   the stuff with the times of the trains.

17   Q  Part of your job at that time was to avoid

18   the risk of re-crews.  Right?

19   A  I don't know how you're phrasing the

20   question.  Every train gets re-crewed in

21   Marquette.  So it's not the fact that we're

22   re-crewing the trains.  They're going to get

23   re-crewed there anyways.  It's just the fact

24   of where we're going to re-crew them at and

25   what impact that's going to have to the overall

1    network.

2    Q  If, hypothetically speaking, the risk of four

3    re-crews he's referring to here is as a

4    result of going over their hours of service,

5    that would concern you, wouldn't it?

6    A  Any time that there's any type of problem, it

7    concerns me, yes.

8    Q  So a risk of a re-crew due to going over

9    their hours of service would concern you?

10   A  Yes.  Any type of deviation from the normal

11   operating plan would be of concern to me.

12   Q  Re-crewing as a result of a crew denying on

13   their hours would be outside of a regularly

14   scheduled event.  Right --

15   A  -- answer a subjective question.  It's

16   something that occurs frequently there.

17   Q  You said that a re-crew as a result of going

18   over their hours of service or dying on their

19   hours would have an impact.  What kind of

20   impact are you talking about?

21   A  There can be a lot of different impacts.

22   Q  Like what?

23   A  Depending where they expire on their hours of

24   service, it may be a place that prevents

25   another train from being able to get to their


Defendant Affirmative

1    destination.  It may be someplace that blocks

2    another train's work event.  It may be some

3    place that causes a delay to another train.

4    It may be something that causes a delay to

5    this particular train.  There's a lot of

6    different things that could occur.

7    Q  So it looks like the 474 and the 475 and the

8    B39-31 were all at risk of re-crewing due to

9    this one over-standard train.  Is that what

10   you're understanding there?

11   A  Yeah, according to this particular e-mail.

12   But as to my daily duties there, this is

13   something that I dealt with on a daily basis.

14   This wasn't a singular occurrence.  This was

15   a fairly usual common occurrence.

16   Q  You're saying a 4-1/2 hour over-standard is a

17   common occurrence?

18   A  Not a 4-1/2 over-standard but not necessarily

19   at the time.  But the fact that you have one

20   train in there being able to prevent other

21   trains from getting through the terminal and

22   complete their work is a fairly common

23   occurrence there.

24   Q  Just to be clear, a 4 hour and 30 minute over-

25   standard is not common.  Correct?



1    MS. AL TAQATQA:  Objection.  I

2    don't know that that's what the document says.

3    MR. MAGNUSON:  I'm asking him.

4    MS. AL TAQATQA:  Well, I think

5    it's a foundation objection or misstates what

6    is represented on the exhibit in front of the

7    witness.  You can answer if you understand.

8    THE WITNESS:  Can you repeat the

9    question?

10   Q  (By Mr. Magnuson, continuing) Was a 4 hour

11   and 30 minute over-standard common at that time?

12   A  No.

13   Q  This e-mail was directed to you, correct,

14   stating 'We need a full breakdown from the

15   Trainmaster' which was you.  Right?

16   A  I would say no.  I don't believe that that

17   was directed exactly to me.

18   Q  You responded to it.  Right?

19   A  I did.  But it appears that that e-mail is

20   directed to a lot of different people,

21   probably one of the various e-mail groups

22   that we have.  I was probably one of the

23   recipients in the group.

24   Q  But you were the only trainmaster that could

25   respond to this.  Right?

1  A  Correct.

2  Q  And you did respond to it.  Correct?

3  A  Correct.

4  Q  And is it your understanding that this was a

5     call for a drill-down by Mr. Prince?

6  A  Yes.

7  Q  If we go up, your response appears to be a

8     drill-down.  Correct?

9  A  Correct.

10 Q  I misspoke as we had the hour and a half --

11    so in your response at the bottom of that,

12    you state that this train was 3 hours and 23

13    minutes over-standard.  Right?

14 A  Yes.

15 Q  You asked for delay reports to be gathered at

16    Nahant, which we have got, and Road Foreman

17    Finney to get a download of the CP8526 when

18    it arrives at Nahant.  Do you know if Road

19    Foreman Finney got that download?

20 A  I do not.

21 Q  Did you ever see a download?

22 A  I don't typically look at the downloads

23    because I'm not an engineer, no.

24 Q  Why did you ask for Road Foreman Finney to

25    get the download?

1   A  It's standard practice when we go through

2   drill-downs, and we wanted to see exactly

3   what happened with the train.  We download

4   the engine so we can see exactly what was

5   going on.

6   Q  And that download would have given us exactly

7   where Sexton's locomotives traveled that day.

8   Correct?

9   A  Like I said, I don't see the downloads.  I

10  don't specifically know what they say.

11  Q  Have you ever seen a download?

12  A  I have seen them.  I'm not trained to interpret

13  them.

14  Q  You understand that downloads show mileposts?

15  A  No, I do not.

16  Q  You understand that downloads show speed.  Right?

17  A  I know they do.  I'm not familiar at all with

18  interpreting them so --

19  Q  You know downloads show various brake

20  applications and throttle positions.  Right?

21  A  No, I do not know that.

22  Q  Have you ever seen one printed out?

23  A  I have seen them.  I'm not familiar and I'm

24  not trained to interpret them.  I'm not an

25  engineer.

1    Q   Have you seen the initials MP for milepost on

2    a locomotive download?

3    A   No, I have not.

4    Q   Is it your understanding that this download 

5    would have told us exactly where Sexton's

6    locomotives went and when?

7         MS. AL TAQATQA:  Objection, foundation.

8    A   I am not familiar with the information that

9    comes out of the downloads.  I do not know

10   how to interpret them, and it's not in my job

11   capacity to interpret them and state -- and

12   know what they say.

13   Q   (By Mr. Magnuson, continuing) Is Road Foreman

14   Finney still at Nahant?

15   A   That I do not know.

16   Q   Did you ask him to get that download over the

17   phone?

18   A   I don't recall.

19   Q   Did you e-mail him?

20   A   I don't recall.

21   Q   Did you text him or Teams message him?

22   A   I do not recall.

23   Q   Did anyone share the download with you via

24   e-mail?

25   A   I don't believe so, no.

Defendant Objection

Defendant Objection

1  Q  We'll go to the top of that e-mail, your

2  response.  That gives us your kind of chrono-

3  logical events of that evening, I guess early

4  morning.  Is that correct?

5  A  Yes.

6  Q  Do you remember typing this up?

7  A  I do not.

8  Q  It's about 3:30 in the afternoon is what it

9  looks like on the 1st of February?

10     MS. AL TAQATQA:  Objection to the

11  extent we need to clarify the time zone.

12     MR. MAGNUSON:  Right.  That's

13  where I was going.

14  Q  (By Mr. Magnuson, continuing) What is your

15  understanding of what time you typed this up

16  as you look at the date and time stamp on it?

17  A  I have no recollection of when I would have

18  typed this up.

19  Q  Do you have any idea what time zone, the date

20  and time stamp referenced here, signifies?

21  A  I do not.

22  Q  So if you look at this -- this doesn't shed

23  any light as to when you might have typed it

24  up?

25  A  Correct.



75.1 ● Defendant Affirmative

75.2 ● Defendant Objection


Defendant Affirmative

1   Q   In the second paragraph you said you had your
2   job briefing with the crew, the 475 crew.
3   OB, does that mean outbound?
4   A   Yes.
5   Q   And that's when you had your discussion about
6   crossings needed to be cut, which you
7   categorized or stated was a disagreement.
8   Correct?
9   A   Correct.  We had a conversation about whether
10  or not the crossings needed to be cut.  I
11  disagreed that they didn't need to be cut
12  due to the snow accumulation and the previous
13  trains that had already ran through and cut
14  the crossings already.
15  Q   Do you remember getting emotional with Mr. Sexton?
16  A   I do not.
17  Q   Towards the bottom there it says, '474 then
18  ran light power 2 units down to the south
19  siding.'  Can you read that?
20  A   '474 crew cut off light power and went down
21  to the south siding switch.  I was crew
22  changing 575 at milepost 100 when they said
23  they would need a shovel and broom at the
24  south siding switch to dig it out.  I again
25  instructed them to go lift the engine off the

1    south wye' -- which that's a different

2    location -- 'while they were tying onto the

3    engine I used another crew to sweep out the

4    switch and verify it was safe.'

5        So I think my point there that I

6    was making is that I instructed the crew to

7    go pick up the engine off the south leg of

8    the wye.  They disregarded my instructions

9    and went to the south siding switch and

10   proceeded to do something else that they were

11   not instructed to do.

12   Q  What were they doing?  Is this consistent with

13   your memory?  So you remember those events?

14   A  No.  I'm just reading the e-mail.

15   Q  '474 then ran light power 2 units down to the

16   south siding switch and ran light power over

17   boatels crossing and down the siding track

18   where their setout would be made.'  Do you

19   see that sentence?

20   A  Where is that at?

21   Q  Cyle, could you just lower it?  It says, '474

22   then ran'.  Towards the bottom there it says,

23   '474 then ran light power'?

24   A  Okay.  Yes, I see that.

25   Q  How far from Marquette was the south siding

1     switch?

2     A   From the depot, the crew change location?

3     Q   Right.

4     A   I don't know.  Maybe roughly a half a mile if

5     that, probably less.

6     Q   How far is the Boatels crossing?

7     A   It's the same thing.  The crossing is just

8     right before the siding track.

9     Q   And that's where they were going to set some

10    cars out, is that right, in that siding?

11    A   That is correct.

12    Q   So after that, they completed that and ran

13    back to their train and tied on.  Right?

14    A   Yes.

15    Q   You mentioned they, meaning the 474, was

16    doing something that they weren't instructed

17    to be doing.  What was that?

18    A   They were instructed to go pick up an engine.

19    Instead of going and picking up the engine,

20    they went to the south siding switch, the

21    Boatels crossing, and proceeded to try and go

22    into that track.  That was not what they were

23    instructed to do.

24    Q   Why did they do that if you know?

25    A   I do not know why they disregarded my

1    instructions.

2    Q  Was the locomotive you instructed them to

3    pick up parked on an open deck bridge?

4    A  I don't know if it would be categorized as an

5    open deck bridge.  There was some type of

6    bridge there.  It's commonly referred to as

7    the pink elephant, and it's a common crew

8    change location where we pull trains up to do

9    crew changes at on a regular basis.

10   Q  During your job briefing at any point did you

11   tell Mr. Sexton and Mr. DePover to get on

12   their train and go?

13   A  I don't specifically recall.

14   Q  You could have?  You just don't recall one

15   way or the other?

16   A  I don't recall the specific conversation.

17   But speaking in general terms, I'm sure that

18   after the job briefing was completed, every

19   job briefing wraps up with, okay, we all

20   understand the work that needs to be done,

21   let's go get it done safely and efficiently.

22   Q  Did that include not cutting the tracks?

23   A  I believe the result of the job briefing, we

24   agreed to cut the tracks since it was done.

25   Q  But you disagreed with that.  Correct?

1    A  Originally I did disagree with it.  But, like

2    I stated previously, cutting tracks and

3    cutting crossings isn't something that causes

4    a significant delay.  So we do have a rule in

5    the GCOR that says when it doubt take the

6    safe course.  So when we have a disagreement

7    about any type of safety concern, the result

8    is always going to take the safe course,

9    which is what we did in this instance.

10   Q  That was at the initiative of Mr. Sexton.  Correct?

11   A  I wouldn't say it was at the initiative of

12   anything.  Ultimately, I'm the manager who

13   makes the final decision.  So ultimately all

14   decisions come down to me.

15   Q  You did some -- according to this, you drove

16   Mr. DePover on a number of occasions to keep

17   him from walking.  Correct?

18   A  Correct.

19   Q  He's referred to as the assistant engineer?

20   A  I don't specifically recall who the conductor

21   was on this day.  If you have a document -- I

22   forget what you said his name was.  I will

23   just believe you that that's who the conductor

24   was.

25   Q  It was Justin DePover, yep.  At any time when



1   Mr. DePover was riding in your vehicle, did

2   you tell him that their decision to cut the

3   tracks quote, unquote woke people up?

4   A  I don't recall saying that, no.

5       (Deposition Exhibit 27 marked for

6   identification).

7   Q  We'll pull up Exhibit 27.  Have you seen this

8   document before?

9   A  I don't recall specifically.  This may have

10   been something that Ms. Briana showed me.

11   Q  Okay.  You're not copied on it.  Have you

12   seen e-mails like this before?

13   A  Yes.

14   Q  Is this a daily e-mail that goes out, the Top

15   15 Trains Impacting Train Speed?

16   A  I believe so, yes.

17   Q  Is that something that you typically receive?

18   A  I believe so, yes.

19   Q  Do you recall specifically getting it that day?

20   A  I do not recall that.

21   Q  Actually, it would be the second, the day

22   after?

23   A  Yes.  From what I understand, this is the

24   train delay generic e-mail that's sent out by

25   the MOC that just has the top delays.  And I


Defendant Counter

1    believe the description referenced in there

2    is what is entered into the Nexus system.

3    Q   This is generated as a result of the Nexus

4    system?

5    A   I don't know specifically how it's generated.

6    Q   Probably goes without saying as a trainmaster

7    you try to avoid your trains being identified

8    as one of the top 15 trains of the day

9    impacting train speed?

10   A   I mean, I just -- I try to get all the trains

11   through the terminal within standard hoversil

12   (phonetic) speed.  More in particular, the

13   document has no bearing on my day-to-day

14   operations.

15   Q   You try to avoid though having any of your

16   trains be identified as the top 15 delays on

17   the system?

18   A   I try to avoid all delays period.

19   Q   Particularly 3 hour and 23 minute delays?

20   A   It doesn't matter if it's a minute or 3

21   hours.  A delay is a delay.

22   Q   The longer the delay, the more likely you

23   are to -- the delay is more likely to result

24   in a drill-down though.  Right?  You've

25   testified to that a little bit ago.

1      MS. AL TAQATQA:  Objection,

2    misstates prior testimony.

3    A  I don't believe that's what I said at all.

4    Q  (By Mr. Magnuson, continuing) Is that your

5    experience, that the longer the delay the

6    more likely you are to result in a drill-down?

7    A  No, that is not my experience.

8    Q  You don't drill-down over a minute delay.  Right?

9    A  Absolutely.

10   Q  You do?

11   A  Yes.  Every delay, every train, every delay.

12   Q  Is important and can result in a drill-down?

13   A  Among many other things.  Delays are just

14   one reason for a drill-down.

15   Q  Injuries being another, derailments.  Right?

16   A  Among many other things, yes.

17   Q  What are some of the other things that can

18   cause a drill-down?

19   A  Any type of incident that anybody wants a

20   drill-down for.

21   Q  Were you asked to provide this information in

22   the description or was that, to the extent

23   you know, lifted from your e-mail?

24      MS. AL TAQATQA:  Objection, foundation.

25   I don't know.



83.1  ● Defendant Counter

83.2  ● Defendant Affirmative

83.3  ● Plaintiff Affirmative

83.4  ● Defendant Counter

1    Q  (By Mr. Magnuson, continuing) This description

2    references having to cut the Boatels crossing

3    and run down MQS -- I'm assuming that's Marquette

4    siding?

5    A  Correct.

6    Q  -- light power before they could shove the

7    cars into it.  Is that what it says?

8    A  Correct.

9    Q  So the cutting of the tracks to some extent

10   contributed to this delay.  Correct?

11   A  I would disagree, no.

12   Q  To some extent?

13   A  I would disagree, no.

14   Q  Then why do you when you're asked in Exhibit

15   26 to identify the delay, why do you

16   reference the cutting of the crossings?

17   A  Because my job as a trainmaster is to explain

18   the entire work event and everything that

19   occurred during it, which cutting the

20   crossings would have been part of that.  It

21   doesn't necessarily indicate that that's the

22   cause of the delay.  It just was a part of

23   the work event that day.  It was documented.

24   Q  In fact, you reference the cutting of the

25   crossings twice in your explanation.  Is that



84.1  ● Plaintiff Affirmative

84.2  ● Defendant Affirmative

1   correct?

2       MS. AL TAQATQA:  Can we show the

3   witness the exhibit if you're going to ask

4   him questions about it?

5       MR. MAGNUSON:  Yeah.  That's 26.

6       MS. AL TAQATQA:  We don't have it

7   on the screen.

8       THE WITNESS:  What was the question? 

9   Q   (By Mr. Magnuson, continuing) You reference

10  cutting of the crossings twice in your e-mail

11  as a result of this drill-down.  Correct?

12  A   I reference cutting the crossings in the

13  drill-down, correct.

14  Q   Yep.  And in Exhibit 27 in the description,

15  that also references cutting of the crossings.

16  Right?

17  A   Correct.

18  Q   And the delay report also references cutting

19  of the crossings.  Correct?

20  A   I don't know.  I haven't seen the delay report.

21      MR. MAGNUSON:  Cyle, can you pull

22  the delay report up, please?

23      MR. CRAMER:  Was that Exhibit 5?

24      MR. MAGNUSON:  I think so, yeah.

25  Q   (By Mr. Magnuson, continuing) I'm assuming



Defendant Affirmative

1    you saw this prior to your deposition?

2    A  No.  This is the first time I have seen this.

3    Q  Did you review it after you asked for it?

4    A  I don't recall.

5    Q  It identifies a Train Delay Report.  It

6    references the engineer being John Sexton.

7    It says the conductor is J. DePover.  Is that

8    correct?

9    A  It appears so, yes.

10   Q  This also -- if you haven't seen it, please

11   take a minute to review it.  Okay?

12   A  Okay.  (Witness examining document).

13   Q  This document also references the need to cut

14   the crossing and the siding.  Right?

15   A  Uh-huh.

16   Q  That's a yes?

17   A  Yes.

18   Q  And Train Delay Reports are documents that

19   are filled out which identify the reasons for

20   a delay.  Correct?

21   A  No.

22   Q  What is the purpose of a Train Delay Report?

23   A  A Train Delay Report is to record all the

24   events that happened during that particular

25   trip.



Plaintiff Affirmative

Defendant Affirmative

1    Q  I.e. delays.  Correct?

2    A  No, not necessarily.  I mean, they're

3    required to fill them out for every trip

4    regardless if there's a delay or not.

5    Q  Who all was -- well, to the extent you know,

6    who all received this Delay Report?

7    A  I don't know.

8        (Deposition Exhibit 28 is skipped).

9    Q  This is what we marked as Deposition Exhibit

10   28.  Did you review this document prior to

11   testifying today?

12       MS. AL TAQATQA:  Sorry, John.  I

13   think this is 29.

14       MR. MAGNUSON:  My bad.

15       (Deposition Exhibit 29 marked for

16   identification).

17   Q  (By Mr. Magnuson, continuing) 29, have you

18   reviewed this document?

19   A  Yes, I believe I was shown this document.

20   Q  At the top -- well, it appears to be an

21   e-mail as a result of your Incident Report

22   that you sent out.  Correct?

23   A  It appears to be, yes.

24   Q  And it was from Tom Jared to you.  Correct?

25   A  It looks like it, yes.



1    Q  It says, 'Call me when you have a minute.'

2    Correct?

3    A  Yes.

4    Q  Did you call him?

5    A  I don't specifically recall when but I'm sure

6    I did.  If my boss told me to call him, I'm

7    sure I called him.

8    Q  As a result of this incident.  Correct?

9    A  I don't know if it was a result of this

10    incident or not.  I don't specifically recall.

11    Q  Well, he references -- he replies to you.

12    Right?

13    A  Yeah.  I understand.  I can read the e-mail.

14    As to my specific recollection, I don't

15    recollect the events from that long ago.  So

16    all I have to reference is what you can show

17    on the document.

18    Q  And it appears that now in -- this is -- probably

19    someone else is going to have to speak to

20    this in terms of the time on these.  Is he

21    forwarding your e-mail which is dated

22    February 1st, 2021 at 9:37?  And there's a

23    different date and time stamp and a different

24    appearance -- well, I'm trying to get to the

25    bottom of when these e-mails were sent and

1    received.  Do you have any idea what actual

2    time Tom Jared e-mailed you to call him?

3        MS. AL TAQATQA:  Objection,

4    foundation.  Can you show the witness the

5    entire exhibit?

6    A  I would say I don't have a specific 

7    recollection of the date or times of any of

8    the correspondence relating to this incident.

9        (Deposition Exhibit 30 marked for

10    identification).

11    Q  (By Mr. Magnuson, continuing) We'll pull up

12    Exhibit 30 here.  By way of background, these

13    were not provided to us in order.  So for

14    this exhibit, we have put them in what

15    appears to be chronological order.  Have you

16    seen this exhibit before?

17    A  No.

18    Q  You didn't look at this to prepare for your

19    testimony today with Briana?

20    A  No.

21    Q  Do these appear to be Teams messages?

22    A  I couldn't say.

23    Q  You know what Teams messages look like

24    though.  Right?

25    A  Yes.  When I'm on Teams, it looks nothing

1    like this.  This looks more like e-mail.



2    Q  Have you seen this e-mail or message before?

3    A  Yes.

4    Q  When?

5    A  Yesterday.

6    Q  And you state to a number of individuals,

7    'Sexton is going to kill this train off

8    cutting tracks.'  Is that correct?

9    A  That's what it says, yes.

10   Q  Do you know when you sent this e-mail?

11   A  I do not.

12   Q  Do you recall sending it February 1st, 2021?

13   A  I do not.

14   Q  Do you have any insight as to why the sent

15   time says Sunday, January 31st?

16   A  I have no recollection.  That doesn't tell me

17   a day, a time, a train.  It doesn't tell me a

18   track.  It tells me absolutely nothing.

19   Q  You don't recall sending it?

20   A  Correct.

21   Q  So if we go to the next page -- that will

22   just be the next one down -- this says, 'need

23   CN's and UP's for 474.'  That's sent by you.

24   Does that mean you need CN locomotives and UP

25   locomotives for the 474 job?



Defendant Objection

1   A  No.

2   Q  What does that mean?

3   A  I mean, without speculating I couldn't tell

4   you exactly what it meant.  I mean, I could

5   speculate and tell you what I think it means.

6   Q  We're all kind of living in that area when it

7   comes to that.  I couldn't even begin to

8   speculate so you'd be closer than me.  To

9   you, if you had to speculate what would that

10  mean?

11  A  It would be bulletins to get across the CN

12  and the UP interchanges.

13  Q  Okay.  From Marquette to Nahant, does the 474

14  cross CN and UP interchanges?

15  A  Yes.

16  Q  So you need authority from both of those

17  railroads to do that?

18  A  Correct.

19  Q  Who is Heidi Peterson?

20  A  Heidi Peterson is one of the directors of the

21  MOC.

22  Q  So she's in downtown Minneapolis at the

23  dispatch center?

24  A  I don't know specifically where she's at.

25  Q  So as a director, she's like a Ron Pierce,



1   Gary Prince type?

2   A  I'm speaking in her current capacity.  I'm

3   not sure exactly what her position was at the

4   date in question.

5   Q  And the directors oversee the dispatchers.

6   Correct?

7   A  Correct.

8   Q  Who is Andrew Dalen?

9   A  I believe he's also a director for the MOC.

10  I'm not sure what his capacity was at this

11  time.

12  Q  Heidi Peterson sent out one of these messages

13  saying 'send them to Kittridge.'  Where is

14  Kittridge?

15  A  It's another location in between Nahant and

16  Marquette.

17  Q  So the 474 would pass Kittridge?

18  A  Yes.

19  Q  Let's go down to 3247.  The 474 from

20  Marquette to Nahant, is that PTC or CTC or is

21  it a combination?

22  A  I believe it's a combination.  I can't speak

23  -- the territory that I oversee does not go

24  all the way to Nahant.

25  Q  How far did your territory oversee?  How far

1  towards Nahant did it go?

2  A  Officially to Dubuque.  I was also

3  responsible for helping out in Savanna.

4  Q  Marquette to Nahant, that run is almost

5  entirely right along the Mississippi River,

6  isn't it?

7  A  Yes.

8  Q  That one there says, '474 saying CN's don't

9  match up on PTC.'  Is that a typical kind of

10  e-mail that you would send out referencing

11  the fact that the CN's -- I'm assuming those

12  are track warrants that don't match up with

13  the PTC system?

14  A  Well, they would be bulletins from the CN,

15  yes.

16  Q  So that appears to be someone on the 474

17  communicating to you that those bulletins

18  don't match with the PTC.  Is that right?

19  A  It appears to be, yes.

20  Q  And then, Cyle, if we'd just go to the next

21  page it says, 'disregard. went through.'

22  That was from you 15 seconds later.  Were

23  these e-mails that were sent on your phone if

24  you know?

25      MS. AL TAQATQA:  Objection, foundation.



93.1 Defendant Objection

93.2 Defendant Objection

1    A  I don't recall.



Defendant Objection

Plaintiff Affirmative

2    Q  (By Mr. Magnuson, continuing) Is that typical

3    though that if you're working, you're in your

4    truck or you're responding to e-mails like

5    this on your phone?

6    A  There is nothing typical about my day-to-day.

7    It's always different.

8    Q  And the people that are copied on these are

9    the same people over and over.  They appear

10   to be management level employees at CP?

11   A  Yes.

12   Q  They're all management level employees?

13   A  I couldn't speak to everybody on there; but

14   from the names I recognize, yes.

15   Q  Is there a name for this work group or do you

16   have a name for this work group or a file

17   saved?

18   A  Once again just speculating, but if these are

19   Teams messages, it was probably communicated

20   through a group chat that had several people

21   in it.

22   Q  Are these management level employees all --

23   well, what's the name of your subdivision at

24   the time?  What was the name of your subdivision?

25   A  Marquette subdivision.



1   Q   Are these people all on the Marquette sub?

2   A   No.

3   Q   Where else were these folks from?  They're

4       above the Marquette sub.  Right?

5   A   What do you mean above the Marquette sub?

6   Q   Well, they oversee not only the Marquette sub

7       but additional subdivisions.  Correct?

8   A   There's lots of different people on there.

9       I'd say not all of them are -- even oversee

10      any territory.

11  Q   Like Gary Prince, for instance, you know who

12      he is?

13  A   Yes.  I know Donna Soch, the last person on

14      that e-mail, is one of the locomotive desk

15      people.  So she doesn't oversee any territory.

16  Q   But Joey Reyes would have been above you.

17      You report up to Gary Prince.  He's above

18      you.  Right?

19  A   I mean, he's in a different department, but

20      yes.

21  Q   Let's go to 3274.  Have you seen this message

22      or e-mail?

23  A   No.

24  Q   It appears to be Heidi Peterson asking out

25      time on 9474.  Is that the same as the 474?



1   A  I don't know.

2   Q  Is there sometimes a 9 before the 474 when

3      referring to this job?

4   A  Typically no.

5   Q  Is there a 9474 job that you're aware of?

6   A  No.

7   Q  Let's go to 3260.  Have you seen this e-mail

8      or message?

9   A  No.

10  Q  It states, '9474 saying another 20 or 30

11     minutes before they are departing.  475 only

12     good until 2145, won't have time to make it

13     in then.'  What is your understanding of what

14     this means?

15  A  My understanding is the 9474 saying that they

16     are going to depart in 20 or 30 minutes.

17     There's a 475 train that is only good until

18     2145 and won't have time to make it.  And I

19     would assume that means to the depot for a

20     crew change.

21  Q  And when you say good until 2145, that means

22     that's when their hours of service would expire?

23  A  Correct.

24  Q  So that train was at risk of a re-crew prior

25     to making it to the depot?

1  A  Yes.

2  Q  Go to 3254.  This one is sent from you to the 

3  same distribution group saying, 'they are

4  saying it's that long to build up the air.'

5  What are you saying there?

6     MS. AL TAQATQA:  Objection, foundation.

7  A  Yeah.  I don't recall specifically what I was

8  trying to say.  All I can do is speculate.

9  Q  (By Mr. Magnuson, continuing) If you're

10  speculating, are you referring to the 474

11  there?

12     MS. AL TAQATQA:  Objection, foundation.

13  Is there a message before this that can help

14  the witness put context to this message?

15     MR. MAGNUSON:  Not necessarily.

16  This appears to be a minute by minute blow by

17  blow.

18  A  It appears when they say have the outbound

19  ride the 9474 out there, then yes, it would

20  appear that, yes, that message about the air

21  was referring to the 9474.

22  Q  And the amount of time it would take to build

23  up the air in the train before they could depart?

24  A  Yes.

25  Q  And the next page 15 seconds later, you got a

1    message from Heidi Peterson that says,

2    'Nevermind Kurtis do you still have the 374

3    crew there?'  To the extent you know, what

4    does that mean?

5    A  It sounds like they're asking about a

6    different crew.

7    Q  Was there a 374 job?

8    A  I don't recall.  The job -- when you speak to

9    specific jobs, we consider jobs as remarkable

10   jobs on a day-to-day basis.  A regular train

11   is not a job, a remarkable job.

12   Q  Is there a 374 crew or do you remember --

13   A  I don't recall.

14   Q  Let's go to 3337.  It's pretty close to the

15   end.  Have you seen this message before?

16   A  No.

17   Q  Who is Joseph Adelfio?

18   A  He is one of the head clerks.

19   Q  And this appears to be a message from him to

20   Dylan Smith who -- what was his position at

21   the time?

22   A  I don't recall the specific dates and times

23   going back that far.  At some point during

24   the period we're talking about, Dylan Smith

25   became the acting superintendent.  I'm not

1   sure if that was before or after this time.

2   Q  So when we talked in that message about

3   Sexton cutting tracks killing off the train,

4   what does that mean when you kill off a train?

5   A  Just -- excuse me -- killing off a train

6   delays somewhere that results in it not

7   making destination.

8   Q  In other words, the crew would die on their

9   hours before they reached their destination?

10  A  Possibly, yes.

11  Q  Does that message appear to be you attributing

12  Sexton cutting tracks to killing off the 474

13  train?

14     MS. AL TAQATQA:  Objection, form.

15  You can answer.

16  A  Like I said, I can't speak to specifically

17  what I'm talking about in here.  There's no

18  train, no track specified.

19  Q  (By Mr. Magnuson, continuing) But if we just

20  go by what it appears to say, it appears to

21  you -- it appears that you were saying,

22  Sexton was cutting tracks and that him

23  cutting tracks was going to kill off a train,

24  i.e., the crew would die on its hours prior

25  to reaching its destination.  Is that what it



99.1  Defendant Objection

99.2  Defendant Objection

99.3  Plaintiff Affirmative

99.4  Defendant Objection

1     appears to say?

2          MS. AL TAQATQA:  Objection,

3     misstates the exhibit.

4     A  No, that's not what I said.

5     Q  (By Mr. Magnuson, continuing) Well, you just

6     talked a few minutes ago -- killing off a

7     train, in your way of speaking and you

8     reading this, is the crew would die on its

9     hours prior to reaching its destination.

10    Correct?

11         MS. AL TAQATQA:  Objection,

12    misstates prior testimony.

13    A  It's not exactly what I said, no.

14    Q  (By Mr. Magnuson, continuing) Well, what do

15    you mean again by killing off a train?

16    A  In the context that this message says, it

17    does not tell me specifically what train or

18    what tracks are being cut or what the exact

19    delay is that I'm referencing.

20    Q  What do you mean by killing off a train?

21    A  Killing off a train means something happening

22    that would result in it not making destination.

23    Q  Okay.  And that, in this very brief message,

24    says that Sexton is going to kill this train

25    off cutting tracks.  Right?



100.1  Defendant Objection

100.2  Defendant Objection

100.3  Plaintiff Affirmative

100.4  Defendant Objection



1   A  That's what it says, correct.

2   Q  And it appears to have been written by you.

3      Correct?

4   A  Correct.

5   Q  Do you remember the day before this incident

6      Mr. Sexton cutting tracks and killing off a

7      train?

8   A  I do not, no.

9      MS. AL TAQATQA:  Objection, form.

10  Q  (By Mr. Magnuson, continuing) Do you even

11     know if Mr. Sexton worked the day before this

12     incident?

13  A  I do not, no.

14  Q  In fact, with Mr. Sexton, his home terminal

15     was Nahant.  Correct?

16  A  Correct.

17  Q  So he worked up to Marquette from Nahant

18     presumably the day before?

19  A  It's possible.  We also deadheaded crews up

20     to be in position.  He could have came from a

21     different location.  There's no way for me to

22     know for sure.

23     MS. AL TAQATQA:  John, could we

24  go off the record for a second?

25     MR. MAGNUSON:  Yes.



1    (Discussion off the record).

2     (Deposition Exhibit 31 marked for

3    identification).

4    Q  (By Mr. Magnuson, continuing) Mr. McKelvey,

5    we'll refer you to Exhibit 31.  These are

6    some phone logs, phone records that we got

7    just last night.  And I'm directing your

8    attention starting at February 1st.

9    A  Okay.

10   Q  Did you review this document with Briana?

11   A  No.

12   Q  Have you ever seen this before?

13   A  No.

14   Q  If we start on February 1st, it looks like

15   your phone calls started exactly at midnight.

16   Do you recognize starting at midnight any of

17   these first string of numbers, who they

18   belong to?

19   A  No.

20   Q  They would be in your phone most likely?

21   A  Yes.

22   Q  Would you turn it on and we can pull them up?

23   A  I don't have it with me.

24   Q  Well, you can get it.

25   A  It's at my house.

1   Q  I asked you to turn your phone off when we

2      started and you turned it off.

3   A  That's my personal phone.  You're referring

4      to my work cell phone.

5   Q  Are any of these numbers saved on your

6      personal cell phone?

7   A  No.

8   Q  What if somebody at the railroad needs to get

9      ahold of you today?

10  A  Well, I suppose my supervisors have my

11     personal cell phone number if they needed to

12     get ahold of me.

13  Q  So they could call you on your personal cell

14     phone?

15  A  If needed.

16  Q  If they call, you probably have their number

17     saved in there so that you can see who's

18     calling you I imagine.  Right?

19  A  No.

20  Q  You're expected as a trainmaster for CP to be

21     on call 24/7.  Right?

22  A  No.  In my current capacity, no.

23  Q  So you're swearing under oath here today that

24     your work phone is at your home?

25  A  Correct.

1   Q  If we had to, we can probably figure out a

2      way to track that when it's turned on again.

3   A  It's --

4         MS. AL TAQATQA:  Objection,

5      argumentative.

6   Q  (By Mr. Magnuson, continuing) The CP can

7      probably find out where that phone is right

8      now.

9   A  Right --

10        MS. AL TAQATQA:  Objection,

11     argumentative.

12  A  Well, right now the phone is dead on my

13     dresser so you'd have a hard time pinging it.

14  Q  (By Mr. Magnuson, continuing) It's now dead.

15     You're lying to us?

16        MS. AL TAQATQA:  Objection,

17     harassing the witness.

18  A  I don't appreciate being accused of lying,

19     sir.

20  Q  I don't appreciate being lied to.

21        MS. AL TAQATQA:  Objection,

22     harassing the witness.

23        MR. MAGNUSON:  Well, we are going

24     to reserve the right to reconvene this

25     deposition to go through this phone log since

1    we got it last night and I haven't had the

2    opportunity to figure out who these calls

3    were made to and received from by

4    Mr. McKelvey on the date of this incident.

5    They are a minute by minute series of phone

6    calls from all sorts of numbers.  We have a

7    right to know who belongs to those numbers.

8    So I am going to specifically reserve the

9    right, or you can go fetch your phone out of

10   your truck and we can go through it now.

11        THE WITNESS:  I will ask you one

12   more time, sir, to stop accusing me of lying.

13   I told you where my phone is.

14   Q  (By Mr. Magnuson, continuing) Your work phone

15   will have all these numbers saved in it.

16   Correct?

17   A  I don't know whose numbers those are.  I

18   don't know.  They may have been deleted since

19   that time.  This is when I worked in a

20   different location in a different capacity.

21   I have a different phone than I did at that

22   time.  So I cannot speak to that.

23   Q  I would certainly ask you not to delete

24   anything off that work phone and preserve it.

25   Okay?



Plaintiff Affirmative

Defendant Objection

1   A  Okay.

2   Q  And we're going to ask to have that phone

3   imaged.  And if you delete something from it,

4   we'll find out.  Okay?

5   A  Okay.

6   Q  That will be resolved with a forensic

7   examination of your phone.  We've done this

8   before with CP management.

9      MS. AL TAQATQA:  There's no need

10  to try to intimidate the witness.  He

11  understands.  He's not going to --

12     MR. MAGNUSON:  We are trying to

13  get to the truth here.  And I want to know

14  who these numbers belong to.  If he had his

15  work phone, we could probably make some

16  progress there but we are going to reconvene

17  this deposition to go through this phone log.

18     MS. AL TAQATQA:  We are not going

19  to agree to reconvene the deposition to go

20  through the phone log.  If you want to talk

21  about it, we can go off the record.

22     MR. MAGNUSON:  We got these

23  records last night.

24     MS. AL TAQATQA:  That is not

25  true.  You got the records yesterday afternoon,

1    and it's a short document.  It's not

2    unreasonable.

3         MR. MAGNUSON:  There are

4    approximately just under 100 phone calls on

5    February 1st.  Ascertaining who belongs to

6    each of those phone numbers is not short, and

7    I have a right to ask him about all the phone

8    conversations he had and with whom on

9    February 1st.  So we're going to reconvene

10   this deposition to discuss the phone logs.

11        MS. AL TAQATQA:  Brenda, can we

12   go off the record?

13        MR. MAGNUSON:  No.  I want this

14   on the record.

15        MS. AL TAQATQA:  I'm not going to

16   get into a discussion with you on the record

17   about discovery.  But Mr. McKelvey is here

18   and he's ready to answer questions based on

19   his personal knowledge and his recollection

20   as he sits here today.

21        MR. MAGNUSON:  Cyle --

22        MS. AL TAQATQA:  Do you want to

23   hear what I have to say?

24        MR. MAGNUSON:  No, I don't.

25   (Mr. Magnuson, continuing) Do you, sir,



107.1  Defendant Objection

107.2  Plaintiff Affirmative

1   recognize any of these phone numbers?


108.1 Defendant Affirmative

2   A  No.

3   Q  Not one?

4   A  Correct.

5   Q  Does it appear to be true and correct?

6   A  I couldn't say.  I mean, it looks like a

7   document that would be generated from the

8   phone company like an old phone bill like I

9   get on my personal phone.  I have never once

10  seen a phone bill related to my company phone

11  in the history of my career at CP.  So I

12  couldn't testify to that.

13  Q  Starting at 5:27 a.m. on the 1st you receive

14  a phone call from someone appearing to be --

15  that's incoming from Marquette.  Right?

16  A  I don't know.  I have no specific recollection

17  of any phone calls from that long ago.

18  Q  Well, you're on the phone either making or

19  receiving a call at 5:17, 5:27, 5:30, 5:39,

20  5:54, 6:26, 6:29, 6:37, 6:45, 7:00, 7:30,

21  7:37.  We go on like that.  You don't recall

22  that string of phone calls taking place that

23  day?

24  A  No, I do not.  As you can see from this

25  document, this is a snapshot of one day, a



Plaintiff Affirmative

1    typical workday.  Like you just said, I have
2    over 100 phone calls in this specific period
3    of time you were referencing.  That's
4    probably accurate for a general day for me.
5    So for me to be able to recall a specific
6    phone call from several years ago when you
7    can see that I get hundreds every day, I
8    don't recall any specific phone call or
9    conversation.
10    Q  Do you recall any phone calls as a result of
11    this over-standard incident?
12    A  I do not recall any specific phone calls, no.
13    Q  Are you saying they didn't occur or you just
14    don't recall one way or the other?
15    A  I do not recall.  I don't remember.
16    Q  One way or the other.  So these could have
17    related to this over-standard incident?
18    A  They could or they could not have.  I don't
19    recall.
20    Q  What time was the daily -- you had daily
21    phone calls, conference calls, when you were
22    at Nahant as an assistant trainmaster.  Correct?
23        MS. AL TAQATQA:  Objection, form.
24    A  I would say no.  At that time I don't believe
25    daily conference calls.

1    Q  (By Mr. Magnuson, continuing) So there wasn't

2    a daily conference call at that point in time?

3    A  I don't believe so, no.  I don't recall.  I

4    do know --

5    Q  I thought there was a morning conference call

6    that occurred.

7    A  There may be.  As far as where I worked in

8    Marquette, I was there to keep the trains

9    moving through the terminal.  Most of the

10   trains ran through Marquette during the night.

11   So on my typical day I'd report to work

12   around maybe 5:00 p.m., try and work a 12 or

13   13 hour day and get out of there by 6:00 in

14   the morning.  Usually I would send out an

15   e-mail of detailing of, you know, the daily

16   occurrences, you know, any incidents that

17   happened overnight and things that related to

18   the upcoming day.  But if they could get on

19   conference calls during the morning, it was

20   usually when I was asleep.  So it wasn't

21   something that was part of my normal

22   day-to-day duties.

23   Q  So we got Tom Jared's phone records so we

24   know his phone number.  And it shows here

25   that you had a call with him at 10:55 a.m.



Defendant Affirmative

1   Do you recall that phone call?


111.1 Defendant Objection

111.2 Defendant Objection

2   A  I do recall having a conversation with

3   Mr. Jared after that event at some point.  I

4   don't remember the specific date and time.

5   Q  Did that call pertain to the over-standard event?

6   A  I don't recall the specifics of the conversation.

7   Q  Did it pertain to Mr. Sexton's alleged failure

8   of a rule?

9   A  I don't recall the specifics of the conversation.

10  Q  Have you ever discussed with Tom Jared the

11  fact that Sexton was accused of violating that

12  rule?

13  A  I don't recall the specific conversation with

14  Mr. Jared about that, no.

15  Q  You just don't recall one way or the other?

16  A  Correct.

17  Q  A number of these calls that morning are to

18  what appears to be if we call it a conference

19  line-up in Calgary.  Why would you have called

20  Calgary?

21  A  I don't know.

22  Q  Why would Calgary have called you?

23  A  I don't believe Calgary would have called me.

24  Q  Did you take place in any conference calls

25  that morning?



1    A  I don't recall.

2    Q  Did you take part in a conference call with

3    Calgary that morning?

4    A  I don't recall.  I could tell you though,

5    however, I typically don't have any

6    conference calls with anybody from Canada.

7    Q  If these conference calls are hosted in

8    Canada though, they could just be local

9    management people going through the CP's

10   phone system to hold a conference call.  Right?

11   A  I don't know.

12   Q  Do you have a conference call number that you

13   see pop up or that you call?

14   A  When I do get invitations for the conference

15   calls, it just comes up as an e-mail.  It

16   automatically populates to my calendar on my

17   iPhone and I just hit accept and it will

18   reserve it in the calendar.  Then if it is

19   time to get on a meeting, you just tap on it

20   and it has the dialing number that it

21   automatically does, enters the password and

22   everything.

23   Q  And these calls are attended typically by how

24   many people, these conference calls?

25   A  I don't know.  It depends on the specific call,

1    what it was about, who needed to be on it.



2    Q   Did any of those calls, those conference

3    calls, ever deal with over-standard events

4    and drill-downs?

5    A   Which conference calls?

6    Q   Well, any of them.

7    A   I have been on a lot of conference calls.

8    Yes, we talked about train delays on

9    conference calls before.

10   Q   You just don't specifically recall talking

11   about this train delay with the 474 on the 1st?

12   A   That is correct.

13   Q   But it could have happened?

14   A   Anything is possible.

15   Q   Can you scroll down a little bit?  I'm going

16   to ask you one last time.  You don't have any

17   phone numbers that you recognize here?

18   A   Correct.

19   Q   Not one?

20   A   Correct.

21       MR. MAGNUSON:  We will determine

22   that and talk about it at a future date.

23   We'll go off the record here for about five

24   minutes.

25       (Brief recess).

1   Q  (By Mr. Magnuson, continuing) Mr. McKelvey,

2   you referenced something at the very

3   beginning that this crew, Sexton and DePover,

4   were doing something that they weren't

5   supposed to do at the beginning of that shift.

6   Do you remember that comment?

7   A  Yes.

8   Q  What is it that they were doing that they

9   weren't supposed to have been doing?

10  A  Could we bring up the e-mail that I was

11  referring to when I made the comment?

12  Q  26, Bates 3285.

13  A  All right.  '474 crew cut off light power and

14  went down to the south siding switch.  I was

15  crew changing 575 at milepost 100 when they

16  said they would need a shovel and broom at

17  the south siding switch to dig it out.'  So

18  what that tells me -- I don't have specific

19  recollection of the events that occurred that

20  day.  Just going off of the comments off of

21  the e-mail, I can deduce that the crew was

22  instructed to go lift the engine first which

23  was on the south right of the wye.  The crew

24  disregarded the instructions to go to the

25  south leg of the wye and proceeded to go to



114.1  ● Defendant Affirmative

114.2  ● Plaintiff Affirmative

1    the south siding switch, of which I knew the

2    switch wouldn't have been needed to been dug

3    out due to the snow accumulation.  I had

4    another crew that I was going to utilize to

5    help dig that switch out.  So the crew that

6    had to pick up the engine would not have to

7    stop and dig the switch out.  So they could

8    have went and picked the engine up while the

9    other crew dug the switch out for them.  It

10   appears that they disregarded my instructions

11   of what I told them to go do and proceeded to

12   go to the switch that I did not instruct them

13   to go to, which that would have incurred an

14   unnecessary delay.

15   Q  So that would have caused the delay, but Sexton

16   cutting the crossings didn't cause a delay

17   is what you're saying?

18   A  Ultimately, the cutting of a crossing or

19   cutting of a track running light power is

20   something that shouldn't take more than a few

21   moments.  It's not anything that's going to

22   cause a significant delay to a train.

23   Q  But, again, you don't have any specific

24   recollection of how long that took?

25   A  No, I don't have any recollection of exactly



Defendant Objection

1  how long that work event took.  But based on

2  my time at Marquette and the numerous times

3  that I have had to cut those crossings, I can

4  tell you -- how long do you think it would

5  take to run an engine across a road?

6  Q  But it takes time to get to the grade

7  crossing.  Right?

8  A  I mean, it's maybe 100 yards.  How far would

9  it take you to run two engines 100 yards?

10  Q  Are you saying that when they cut these

11  crossings, they only traveled 100 yards?

12  A  To the first location.  To go from -- it's

13  actually milepost 98 is where the crew change

14  location is to the south leg of the wye is

15  roughly I would say 100 yards.

16  Q  But if they went further than that and you

17  can't recall, that would have taken longer.

18  Right?

19  A  Yes.  Like I said and like we specified

20  previously, going to the south leg of the wye

21  it was probably under a half a mile.  So in

22  order to run two engines half a mile, we're

23  talking, what, five minutes.  It's not a

24  significant delay.

25  Being accused of violating Canadian Pacific

1    rules is serious. Right?

2    A  Yes.

3    Q  Have you ever been accused of violating any

4    CP rules?

5    A  No.

6    Q  Were you involved in a motor vehicle accident

7    recently in your personal vehicle that

8    resulted in a fatality?

9    A  Yes.

10   Q  You were working at the time?

11   A  Yes.

12   Q  Who did you have in your car with you?

13   A  An engineer named Ely Reyes (phonetic).

14   Q  Why were you driving an engineer in your

15   personal vehicle?

16   A  Because it was the only mode of

17   transportation I had at the time.

18   Q  You were aware that there are rules that

19   prevent CP employees from using their

20   personal vehicles for work purposes?

21   A  Yes.

22   Q  You weren't charged with that -- violating

23   any rules in that respect?

24   A  Correct.

25   Q  Do you know why?


117.1 Plaintiff Affirmative

1    A  I believe because of all the investigations

2    that took place, including the police

3    department, found that I did nothing wrong.

4    Q  But there are rules, CP rules, that prevent

5    you from using your personal vehicle for work

6    purposes.  Right?

7    A  Yes.

8    Q  And you violated that rule it sounds like.  Right?

9    A  Yes.

10   Q  But you weren't disciplined for that?

11   A  No.

12   Q  Lucky you.

13       MS. AL TAQATQA:  Objection, harassing.

14   A  Lucky me for being involved in a fatal

15   incident?  Thank you, sir.  I appreciate that.

16   Q  (By Mr. Magnuson, continuing) No, not being

17   accused of violating rules.

18   A  Yeah, that's enough.

19   Q  So in addition to the event recorder which

20   you said you have no familiarity with, would

21   either the CTC system -- would we be able to

22   look back and see what signals Sexton's

23   locomotives traveled passed?

24   A  I don't know, sir.  I'd have to refer you to

25   the signal department.



118.1  Defendant Objection

118.2  Plaintiff Affirmative

118.3  Defendant Objection

1    Q  So they would be able to tell us exactly how

2     far Sexton's train traveled?

3    A  I don't know what they would be able to tell

4     you.

5    Q  Do you know that when trains pass signals,

6     that the CTC registers that?

7    A  Yes.

8    Q  So someone in the signal department would be

9     able to tell us which signals Sexton's train

10    traveled passed when he was cutting the

11    crossings.  Right?

12   A  No.

13   Q  It wouldn't?

14   A  Correct.

15   Q  How many signals are there between Marquette

16    and Nahant?

17   A  I don't know exactly how many signals there

18    are.  The territory that I operated on there

19    is zero signals.  It's dark territory.

20   Q  So the dark territory, is that now PTC?

21   A  No.  It's Track Warrant Control.

22   Q  In other words, you've got to have a warrant

23    in order to travel over the tracks.  Right?

24   A  Yes.

25       MR. MAGNUSON:  That's all I have,

1    other than reserving the right to discuss the

2    phone logs.

3    Q  (By Mr. Magnuson, continuing) One last

4    question.  Did you commend Sexton for cutting

5    the tracks?

6    A  I don't recall.

7    Q  Do you recall sending an e-mail or a text or

8    a phone call or something commending him for

9    taking the safe course and cutting the tracks?

10   A  I don't recall.

11   Q  Do you know if anybody else did?

12   A  No, I can't speak to the actions of anyone else.

13      MR. MAGNUSON:  Okay.  That's all

14   I have.  Thanks.

15      MS. AL TAQATQA:  I do not have a

16   redirect, but we do disagree that there's any

17   basis that would hold open the deposition.

18   And we will read and sign.

19      (WHEREUPON, the testimony was

20      concluded at 11:15 a.m.)

21       *  *  *

22

23

24

25

120.1 Plaintiff Affirmative

1  STATE OF MINNESOTA)
                      ) Ss.
2  COUNTY OF HENNEPIN)

3     I, Brenda K. Foss, Certified
          Shorthand Reporter and Notary Public duly and
4  qualified in and for the State of Minnesota
          do hereby certify there came remotely before
5  me the deponent herein, who was by me duly
          sworn to testify to the truth and nothing but
6  the truth concerning the matters in this
          cause.
7          I further certify that the foregoing

8  transcript is a true and correct transcript
          of my original stenographic notes.
9          I further certify that I am neither

10 attorney or counsel for, nor related to or
          employed by any of the parties to the action
11 in which this deposition is taken; and
          furthermore, that I am not a relative or
12 employee of any attorney or counsel employed
          by the parties hereto or financially
13 interested in the action.

14    IN WITNESS WHEREOF, I have hereunto
          set my hand and affixed my Notarial Seal this
15 24th day of November, 2023.

16          Brenda K. Foss

17       Court Reporter

18

19

20

21

22

23

24

25