1    IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF IOWA
2    EASTERN DIVISION

3    - - - - - - - - - - - - - - - - - - - - - -
                    No. 3:23-CV-00031-HCA
4    John Sexton,

5        Plaintiff,

6    vs.

7    Dakota, Minnesota & Eastern Railroad
        Corporation d/b/a Canadian Pacific,
8    a Delaware corporation
                        Defendants.
9    - - - - - - - - - - - - - - - - - - - - - -

10

11

12

13    DEPOSITION OF

14    KURT McKELVEY

15    May 10, 2024

16    11:00 a.m.

17

18

19

20

21

22    TAKEN BY: BRENDA K. FOSS

23    fossbrenda@yahoo.com
                612-701-4282
24

25

1

1      Deposition of KURT McKELVEY, taken

2   via Zoom videoconference, by and on behalf of

3   Plaintiff, on Friday, May 10, 2024, commencing

4   at 11:00 a.m., before Brenda K. Foss,

5   Professional Court Reporter, Notary Public,

6   State of Minnesota, County of Hennepin.

7

8      * * * * *

9      APPEARANCES

10     ON BEHALF OF THE PLAINTIFF:

11   CYLE CRAMER, ESQUIRE
          JOHN MAGNUSON, ESQUIRE
12   LAUREN HOSCH, PARALEGAL
          YAEGER & JUNGBAUER BARRISTERS, PLC
13   4601 Weston Woods Way
          St. Paul, MN  55127
14   ccramer@yjblaw.com
          651-288-9500
15

16     ON BEHALF OF THE DEFENDANTS:

17   BRIANA AL TAQATQA, ESQUIRE
          DORSEY & WHITNEY LLP
18   50 South 6th Street, Suite 1500
          Minneapolis, MN  55402
19   altaqatqa.briana@dorsey.com
          612-340-2600
20

21     ALSO PRESENT:

22   Michelle Haynes, CPKC Paralegal
          Noah Garcia, DM&E Counsel
23

24      * * * * *

25

1      I N D E X

2      Examination:              PAGE:

3    By Mr. Cramer          5

4

5    Objections:
          By Ms. Al Taqatqa          7, 10, 13, 17,
6            19, 31, 33

7

8    Marked Deposition Exhibits:
          32 Feb 1, '21 messages       13
9    33 Feb 1, '21 messages with   25
          Antczak
10   34 Jan 31 and Feb 1, '21    27
          messages
11

12

13

14      Reporter's Certificate     35

15

16      (Original Deposition Transcript in the

17   possession of Cyle Cramer, Esquire).

18        * * * * *

19

20

21

22

23

24

25

1      P R O C E E D I N G S

2

3        KURT McKELVEY,

4      after having been first duly sworn,

5      deposes and says under oath as follows:

6

7        MS. AL TAQATQA:  Do you mind if I

8    say something quickly on the record?

9        MR. CRAMER:  Go ahead.

10       MS. AL TAQATQA:  I just wanted to

11   state for the record that DM&E agreed to

12   produce Mr. McKelvey for a second deposition

13   pursuant to a stipulation that's been entered

14   into between the parties.  And the stipulation

15   provides that the deposition will not last

16   longer than one hour and that plaintiff's

17   counsel may only question Mr. McKelvey about

18   any document that was produced after his

19   first deposition that is within the range of

20   CP 3686 through CP 6290 and on its face

21   includes or refers to Mr. McKelvey or his

22   work phone number 612-393-2358.

23       MR. CRAMER:  Yes, that is the

24   case.  I'm going to do a couple preliminary

25   questions and maybe just establish some of



Plaintiff Affirmative

Defendant Affirmative

1    the timeframe again, which I guess typically

2    would be outside of that.  Is that okay just

3    making sure we're working on the same day and

4    that sort of thing?

5        MS. AL TAQATQA:  I will let you

6    know if I have any concerns with your

7    questions.

8        MR. CRAMER:  Sounds good.

9

10        EXAMINATION

11    BY MR. CRAMER:

12    Q  Good morning, Mr. McKelvey.  My name is Cyle

13    Cramer.  Can you state for the record your

14    first and last name and then spell your last

15    name?

16    A  My name is Kurtis McKelvey, M-C-K-E-L-V-E-Y.

17    Q  Our office conducted your deposition in the

18    past so you are aware we're talking mostly

19    about the incident on February 1st, 2021

20    involving Mr. Sexton and his train?

21    A  Okay.

22    Q  The audio cut out.  I know you nodded, but

23    did you also say yes?

24    A  Yeah.

25    Q  Just a couple preliminary things, just please

1    answer every question verbally.  Don't just

2    shake or nod your head.  And say yes or no

3    versus nope or uh-huh, for example.  Do you

4    understand that?

5    A  Yes.

6    Q  Are you prepared to answer questions and

7    nothing will prevent you from giving your

8    full attention today?

9    A  Yes.

10    Q  I'm still not hearing you say yes.  Could you

11    maybe just say your name again longer or

12    something longer to make sure I'm picking up

13    the audio?

14    A  Kurtis McKelvey.

15    Q  Thank you.  I can hear that.  If you don't

16    understand a question and if you don't ask, I

17    will expect that you understand the question.

18    Do you understand that?

19    A  Yes.

20    Q  Did you prepare for the deposition today?

21    A  I had a brief meeting with my lawyer

22    yesterday or with Briana and I think Noah.

23    Q  How long was that meeting?

24    A  Approximately an hour.

25    Q  Did you review any documents for that meeting?

1    A  I did not.

2    Q  Sorry.  What was that?

3    A  No, I did not.

4    Q  Have you read your deposition taken with our

5       office that occurred on November 7, 2023?

6    A  No, I have not.

7    Q  Did you read Mr. Sexton's deposition that was

8       taken on October 31st, 2023?

9    A  No, I have not.

10   Q  Have you spoken with anyone else about this

11      matter in the last couple of weeks other than

12      your attorneys?

13   A  No.

14   Q  I think I'm going to just start with going

15      through some of the phone records that have

16      been produced since.  On February 1st, do you

17      recall having a phone conversation with a

18      Dylan Smith?

19   A  I do not.

20   Q  Do you recall being part of any conference

21      call on February 1st?

22   A  I do not.

23   Q  Is there a conference call line that you are

24      aware of?

25         MS. AL TAQATQA:  Objection, form.

1    You can answer, Kurt.



2    A  Can you be more specific?  There's several

3    conference call lines that Canadian Pacific

4    uses for all types of different things.

5    Q  Do you recall on February 1st calling into a

6    conference line at all?

7    A  I do not.

8    Q  But you have been on conference calls in your

9    position?

10   A  Yes, I have been on conference calls in my

11   position.

12   Q  Do you recall having any telephone conversations

13   with Mr. Tom Jared on February 1st, 2021?

14   A  I don't remember the exact date or time.  But

15   as I talked about in my previous deposition,

16   I do recall having a conversation with

17   Mr. Jared about the incident at some point

18   after the incident.

19   Q  Do you recall what you discussed in that

20   conversation?

21   A  I believe we discussed why it took him so

22   long -- why it took him three times longer to

23   do the work event than what it was supposed

24   to take.

25       MR. CRAMER:  I have some


Plaintiff Affirmative

1    additional Teams messages here.  I am just

2    going to look at them quick so I know what

3    order I want to pull them up.  Lauren, can

4    you pull up this one?  It sounds like it's

5    just loading on our end.  One second.

6    Q   (By Mr. Cramer, continuing) Do you recall

7    looking at some documents that look similar

8    to this in the last deposition?

9    A   No, I do not.  Can you scroll down and show

10   me the whole document?

11   Q   Let us know when you want to go to the next

12   page.

13   A   (Witness examining document).  Next page.

14   Next page.  Next page.  Next page.  Next

15   page.  Next page.  Next page.  And next page.

16   Q   That's the last one.

17   A   Okay.

18   Q   We'll go back to the top.  Do you recall

19   sending any of these messages?

20   A   I do not.

21   Q   Do you doubt that you sent them for any

22   reason?

23   A   No, I do not.

24   Q   Who is Gary Prince?

25   A   I believe at the time Gary Prince -- I'm not



Plaintiff Affirmative

1    sure if he was the east director or the

2    senior director but he's one of the directors

3    for the dispatching center.

4    Q   Do you understand these to be typed messages

5    that you sent?

6    A   That's what you're showing me, so I'll take

7    you at your word.

8    Q   I understand -- and I don't want to put words

9    in your mouth so correct me if I'm wrong --

10   that you don't recall sending these specific

11   messages.  Correct?

12   A   That is correct.

13   Q   Are you familiar with sending typed messages

14   of this nature, not necessarily the content

15   but sending typed messages to other people in

16   the company?

17      MS. AL TAQATQA:  Objection, form.

18   You can answer, Kurt, if you understand.

19   A   Yes.  I deal with written correspondence in

20   aspects of my job, yes.

21   Q   (By Mr. Cramer, continuing) What computer

22   program or cell phone app do you use that on?

23   A   We use e-mail, text message, Teams.  I'm

24   not -- I'm not sure when we switched from

25   Teams to whatever we used previously.  I'm



Defendant Objection

1  not even sure what that was, but, yeah, Teams

2  or Zoom maybe.  To be honest, I don't remember.

3  Q  Did you communicate with Gary Prince

4  frequently?

5  A  No.

6  Q  Why were you communicating with him on this

7  day?

8  A  I don't really remember exactly.  It was so

9  long ago.  I don't remember.  I mean, I would

10  be speculating if I told you why.

11  Q  Do you remember what train number Mr. Sexton

12  was on February 1st, 2021?

13  A  I guess I don't remember the exact dates and

14  times.  But the incident that's in question

15  here involving Mr. Sexton, the train was a

16  474.  I'm not sure what the date was of it.

17  Q  Looking at this first message, you're unsure

18  if that's referring to Mr. Sexton's train?

19  A  Yeah, it just says the write up of 474.  It's

20  not very specific.

21  Q  What do you understand this message to be

22  asking?

23  A  'Can you send a write up of the 474 at Marquette

24  to the DL Senior and East Director please'.

25  So that would be asking for a write-up of the

1    474 when it was at Marquette, send to the

2    e-mail for the Senior Director and the East

3    Director.

4    Q   You would have been the trainmaster on duty

5    on this day?

6    A   Most likely, yes.

7    Q   So this is asking you to write a write-up?

8    A   Yes.

9    Q   What do you understand a write-up to be?

10   A   A drill-down of the work event from the time

11   that the crew went on duty until they departed

12   the terminal.

13   Q   What is the purpose of a drill-down?

14   A   The purpose of a drill-down is to identify

15   areas where we can improve and learn from

16   those, you know, mistakes or events or what-

17   ever that may be going forward.

18   Q   What actions do you take to improve on a so-

19   called mistake?

20   A   It depends what the mistake would be.

21   Q   Who is the DL Senior being referred to in

22   this message?

23   A   I don't know who the DL Senior is.  I don't

24   remember who the senior director was at that

25   time, but a DL senior is usually a generic


Defendant Objection

1   e-mail that goes to all of the senior

2   directors.  Like the east directors have

3   their own.  So it's just an e-mail that goes

4   out to, you know, several different people at

5   once.

6       MR. CRAMER:  Before I forget, I

7   would like to enter this group of messages as

8   an exhibit.  I believe we left off on 31.  So

9   this would be 32.

10      (Deposition Exhibit 32 marked for

11  identification).

12  Q  Do you try to avoid having to send a write-up

13  to the DL senior?

14      MS. AL TAQATQA:  Objection, form.

15  You can answer.

16  A  No.

17  Q  (By Mr. Cramer, continuing) Was that a no?

18  A  Correct, no.

19  Q  You understand when you send something to the

20  DL senior it would be going to managers above

21  you in position?

22  A  Yes.

23  Q  Who is the east director?

24  A  There are a lot of them.

25  Q  In your perspective, is it a positive or a



13.1    Plaintiff Affirmative

13.2    Plaintiff Affirmative

13

1    negative thing when you have to send a write-

2    up to your superiors?

3    A  Like I said, it depends on the situation.  It

4    could be positive.  It could be negative.

5    Q  What if you had to write about a mistake?

6    A  I wouldn't consider it really a negative

7    thing.  I mean, it happens frequently.

8    It's -- I mean, it's standard practice for

9    trains that go over-standard or, you know,

10   something that we do drill-downs into stuff

11   probably almost on a daily basis.

12   Q  You do drill-downs to improve on the

13   situation that happened?

14   A  Like I said previously, we try to drill down

15   to find out areas that we can improve on in

16   our procedures, processes, et cetera to, you

17   know, do better going forward.

18   Q  Let's go to the next page.  Actually, let's

19   go up back to the other page, the first one.

20   I just want to look at the time here.  What

21   do you see the date and the time of this

22   message as?

23   A  Monday, February 1st, 2021, 03:38 and 36

24   seconds.

25   Q  Then go on to the next page.  So how much

1    later do you understand this message to be

2    sent?

3    A  This one is 3:45.  What's that, 7 minutes?

4    Q  Is this you responding to Mr. Prince?

5    A  I believe so.  It says -- the e-mail says

6    it's from me to him so I would have to --

7    Q  Sorry.  Go ahead.

8    A  No.  Go ahead.

9    Q  Okay.  Do you remember what you're referring

10   to in this message?

11   A  I do not remember anything about any of these

12   conversations.

13   Q  Go to the next page.  What radio recordings

14   were you requesting here?

15   A  I don't specifically remember.  I don't

16   remember sending this message so I would

17   be -- I can speculate what I meant, but I

18   don't even remember sending the message.

19   Q  Do you request radio recordings often?

20   A  I wouldn't say often.  Only when needed.

21   Q  It says 'they', 'from the time they went on

22   duty'.  Do you recall who 'they' are?

23   A  I don't even recall sending this message.

24   Q  How many trains would you have been the

25   trainmaster for on February 1st, 2021?



1   A  I don't recall.  All of them that came

2   through the terminal.

3   Q  And how many came through your terminal

4   around that time on average?

5   A  It varies.

6   Q  Did you say a number or what you did you say?

7   A  It varies.

8   Q  Can you give a range?

9   A  Probably no less than four or five, maybe as

10   many as ten in a shift.  It depends on a lot

11   of factors.

12   Q  How long is a shift?

13   A  Typically a shift is -- I didn't have a shift

14   when I was at Marquette so there was no

15   actual shift.  I was just there when I needed

16   to be to make sure the trains were moving.

17   Q  You can go to the next page.  I don't have

18   any questions on this page.  Let's go to the

19   next one.  How did you hold this crew

20   accountable for delaying the train?

21   A  I don't believe I did hold anybody accountable.

22   Q  Did you want to hold somebody accountable?

23   A  Hold them accountable for what?

24   Q  This message says, 'I'm not sure how to hold

25   him accountable for delaying the train.'  So

1   did you want to hold somebody accountable for

2   delaying the train?

3   A   Like I said, I don't even recall sending this

4   message.  It doesn't even say who I'm talking

5   about in that message.

6   Q   Is that something you would usually do is try

7   to hold somebody accountable for delaying a

8   train?

9   A   My job as a trainmaster is to promote safety,

10   promote the safe movements of trains, and

11   hold people accountable for their actions

12   whether it be positive or negative.  The

13   majority of my job involves me giving

14   positive feedback, holding people accountable,

15   letting them know that they did a good job,

16   reinforcing the things that they did well, to

17   try and promote that behavior going forward

18   in the future.

19   Q   What do you do when a safety related thing

20   causes a delay of a train?

21       MS. AL TAQATQA:  Objection, form.

22   You can answer if you understand the question.

23   A   I don't understand that question.

24   Q   (By Mr. Cramer, continuing) Is there ever a

25   time where you have to take the safe course



17.1   ● Defendant Affirmative

1    of action that can cause a delay?

2    A  It's the first rule that we follow by the

3    railroad, is always take the safe course.  By

4    taking the safe course and doing things the

5    safe way, we wouldn't consider that a delay

6    to a train.  It's quite the opposite.  By

7    doing something unsafe or something that adds

8    risk most likely would be the cause of adding

9    time or, you know, delaying a train or making,

10   you know, something take longer.

11   Q  Do you recall Mr. Sexton cutting the tracks

12   the morning of February 1st, 2021?

13   A  Can you repeat that?

14   Q  Do you recall Mr. Sexton cutting the tracks,

15   or the crossings and flangeways, on February

16   1st, 2021?

17   A  No.  I remember a few things about the work

18   event, but I don't specifically remember

19   everything about it, no.

20   Q  You don't remember how long it took him to

21   cut the crossings?

22   A  I do not, no.

23   Q  Go to the next page.  How many trains can go

24   through your terminal at one time?

25   A  That's a trick question.  I have had as many


18.1    Plaintiff Affirmative

1   as three or four in there at the same time

2   before.

3   Q  Do you recall how many you had on the morning

4   of February 1st, 2021?

5   A  I do not.

6   Q  On this message you say, 'I can't make him

7   move any faster.'  Is that correct?

8   A  That's what I'm reading on the page, yes.

9   Q  Do you recall who you are referring to when

10   you say 'him'?

11   A  I do not recall sending that message, no.

12   Q  Do you recall that person attempting to cut

13   the tracks?

14      MS. AL TAQATQA:  Objection.  The

15   witness said he doesn't remember sending the

16   message or who he was talking about.  You can

17   answer, Kurt, if you understand the question.

18   A  Can you repeat the question?

19   Q  (By Mr. Cramer, continuing) This might not be

20   verbatim, but I believe it was do you recall

21   the person you were trying to get to move

22   faster cutting tracks that morning?

23   A  I do not recall.  I don't recall sending this

24   message or who I was referring to.

25   Q  If you had to make a train move faster at



19.1 Defendant Objection
19.2 Defendant Objection
19.3 Defendant Objection
19.4 Plaintiff Affirmative

1    that time, what sort of things would you do

2    to make that train try to speed up?

3    A  I want to answer your question, but I think

4    you're wording it wrong.  I can't make the

5    trains move faster, you know.  And at this

6    point, the train was stopped in the terminal

7    doing a work event.  So I would assume that

8    you mean what would I do to kind of make the

9    work event go faster.  Is that correct?

10   Q  Correct.

11   A  So normally the part of my job to help

12   expedite the train movements throughout the

13   terminal would involve me being with the

14   conductor, giving him rides to different

15   locations depending on what he needed, and

16   being there to supervise and answer any

17   questions related to the work event.

18   Q  What work event was happening at your

19   terminal around 3:48 on February 1st, 2021?

20   A  I don't recall that specific date, so I would

21   be speculating.

22   Q  Back on the top page, the 474 was Mr. Sexton's

23   train that day?

24   A  Correct.

25   Q  I wasn't looking at the screen.  I'm not sure

1    if you said something.  Sorry.

2    A  Yes, that's correct.

3    Q  Do you understand this string of messages to

4    be talking about the 474?

5    A  Like I said, I would assume so but I don't

6    remember that day.  I don't remember three

7    years ago and I don't remember sending any of

8    these messages.

9    Q  Who is Kade Antczak?

10    A  I believe Kade was a dispatcher with CP.

11    Q  Is he still a dispatcher?

12    A  He no longer works with CP, no.

13    Q  Did you communicate with him on February 1st,

14    2021?

15    A  I don't specifically recall.

16    Q  Does this look like a typical message you

17    would have sent to Kade at that time?

18    A  Yes.

19    Q  Do you remember sending this specific one?

20    A  I do not.

21    Q  Go to 3741.

22        MS. AL TAQATQA:  Cyle, can you

23    give the witness the opportunity to review,

24    if it's a conversation, to review the

25    conversation?

1    MR. CRAMER:  Sure.

2    A  I got that one.  Next page, please.  (Witness

3    examining document).  Next page.  Next page.

4    Next page.

5    Q  (By Mr. Cramer, continuing) Let's stop on

6    this one.  Do you know what you're referring

7    to when you say 'all the fun up here'?

8    A  I don't recall sending this message, no.

9    Q  Go to the next one.  Tell us when you're

10    ready again for the next page.

11    A  (Witness examining document).  Next page.

12    Next page.  Next page, please.  Next page.

13    Next page, please.

14    Q  We'll stick on this one for a second.  So

15    here it looks like Sexton is on the 474

16    train.  Is that correct?

17    A  Yes.

18    Q  What do you mean by 'putting on a show'?

19    A  Like I said, I don't recall sending any of

20    these messages.

21    Q  Is four hours over the length of the work

22    event?

23    A  Four hours for a singular work event is

24    probably one of the longest work events that

25    I have witnessed in my career at Canadian



22.1  Plaintiff Affirmative

22.2  Defendant Objection

22.3  Defendant Objection

1    Pacific.

2    Q   Are all work events at Marquette expected to

3    be the same length?

4    A   No, they're not expected to be the same based

5    upon that amount of work.  But there is a

6    standard that you should be able to get

7    everything done within.

8    Q   Do you recall what Mr. Sexton's work event

9    was that day?

10   A   I don't recall.  It's now three years ago.  I

11   don't recall everything.  I believe what I do

12   remember, based on the previous deposition,

13   is he had a fairly large train.  I believe he

14   had an engine or some engines to pick up and

15   cars to set out to the siding.  I don't

16   remember if he had a pickup there also.

17   Q   With a four hour work event being one of the

18   longest in your career, is that something

19   you'd drill down on?

20   A   Yes.

21   Q   Do you recall drilling down on this work event?

22   A   Honestly, no, I don't even recall what it

23   was.

24   Q   And a four hour work event is something you

25   would try to avoid?

1   A  Any over-standard work event is something I

2      try to avoid.

3   Q  Even if it included safety related tasks? (24.1)

4   A  Can you repeat the question?

5   Q  If a work event was delayed because of safety

6      related tasks, is that something you'd try to

7      avoid?

8   A  I don't understand the question.  Any time

9      that we're handling any movements with the

10     train, it's safety related.

11  Q  After reviewing some of these messages, is (24.2)

12     your memory refreshed that Sexton had a four

13     hour work event on February 1st?

14  A  Like I said, I don't recall a specific day.

15     I don't know exactly how long it took.  I'm

16     just going off the correspondence you're

17     showing me here.  I don't remember exactly

18     how long it was.

19  Q  If there was a four hour delay, you would

20     have likely done a drill-down on that?

21  A  Yeah, I'm sure there would have been a

22     drill-down.  There should be a drill-down

23     done on every over-standard work event.

24        MS. AL TAQATQA:  Is that Exhibit

25     33?  Are we labeling this as an exhibit?



24.1  ● Defendant Counter

24.2  ● Plaintiff Affirmative

24

1      MR. CRAMER:  Yes, we can do that.

2    We'll label that as Exhibit 33.  Sorry.

3      (Deposition Exhibit 33 marked for

4    identification).

5    Q  Go down to each page again.  Let's stop on 

6    3740.  Actually, let's stop here.  It looks

7    like Kade is saying 'oh I heard'.  Correct?

8    A  That's what it looks like, yes.

9    Q  Do you have any knowledge on how he would

10   have heard?

11   A  I do not.

12   Q  Are you aware of e-mails that go out when

13   there's a delay?

14   A  No, I'm not aware of any, no, at least --

15   except for the ones that I would have sent,

16   no, I'm not privy to anything else.

17   Q  Do you know who TA1 -- I believe it's

18   supposed to be a 1 or an L.  Does that

19   reference mean anything to you?

20   A  I don't specifically remember.  Speculating,

21   three initials is usually what dispatchers

22   use.

23   Q  Do you recognize this dispatcher?

24   A  It sounds familiar.  But, no, I can't

25   remember specifically who that is, no.

1    Q  I can't remember if I asked at the top.  Who

2    was Kade Antczak again?  What was his position

3    at the time?

4    A  I believe he was a dispatcher.

5    Q  Just go down each page a little bit again.

6    Next one, and the next one.  Do you recall

7    not being home and not sleeping on February

8    1st?

9    A  No, I don't recall that date, but there's a

10    lot of times where I haven't been home and

11    slept because it's part of my job.

12    Q  You can go back to that one, yeah.  Do you

13    recall sending this message?

14    A  I do not.

15    Q  Is there any reason you wouldn't want anybody

16    to know that you weren't at a specific

17    location on that day?

18    A  No.

19        MR. CRAMER:  We'll go through a

20    couple things I have here.  Let's bring up

21    this one.  We have a few more of these

22    messages.

23        MS. AL TAQATQA:  Can I see the

24    Bates stamp on this, Cyle?

25        MR. CRAMER:  Yes.

1    THE WITNESS:  Can you go back up?

2  Can I read that and see who it's from and who

3  all it went to?

4    MS. AL TAQATQA:  Will this be

5  Exhibit 34?

6    MR. CRAMER:  Yes.

7    (Deposition Exhibit 34 marked for

8  identification).

9    THE WITNESS:  (Witness examining

10  document).  Okay.

11  Q  (By Mr. Cramer, continuing) Who is Ron 

12  Pierce?

13  A  I believe he's one of the east directors.

14  Q  On it looks like the third line of names, is

15  that your name listed there first?

16  A  Yes.

17  Q  Do you recall receiving this message?

18  A  I do not.

19  Q  The second to the last name, do you know who

20  Mark Johnson is?

21  A  Yes.

22  Q  Who is he?

23  A  Currently I believe he is an engineer on the

24  DM&E.

25  Q  Was he in a different position at that time



Plaintiff Affirmative

```
 1    on February 1st, 2021?
 2    A   Most likely, yes.
 3    Q   Why do you say most likely?
 4    A   Because he changed positions, and I don't
 5    recall when he did.  So I don't remember what
 6    position he was in at that time.
 7    Q   Do you remember what position he was in prior
 8    to being an engineer?
 9    A   Yes.  He was a trainmaster.
10        MR. CRAMER:  Go to the next one.
11    So we're all in agreement, I'm entering this
12    as Exhibit 33.
13        MS. AL TAQATQA:  34.
14        MR. CRAMER:  34.
15    Q   (By Mr. Cramer, continuing) Who is Barry
16    Major?
17    A   Barry Major is currently a trainmaster.
18    Q   Was he in a different position on January
19    31st that you're aware of?
20    A   I don't remember the specific dates and times
21    when everybody moved.  But when I met him, he
22    was an ATM out of Mason City.
23    Q   If he was a trainmaster at this time, why
24    would he be sending these messages?
25    A   I don't know.  I can't tell you why Barry
```

1    Major was sending messages.

2    Q   Is he discussing the 474 on this message?

3    A   It appears like he's asking when the 475 and

4    474 will be to Marquette.

5    Q   Is this message referring to the 474 before

6    it got to Marquette on February 1st?

7    A   I don't know.  I can't tell you what Barry

8    Major was referring to.

9         MR. CRAMER:  I don't think I have

10   any more questions on those ones.  I want to

11   take a second to look at one more thing here.

12        MR. MAGNUSON:  Cyle, let's take a

13   quick break so we don't burn up any more of

14   our time.

15        MR. CRAMER:  Yeah, let's do that.

16        MR. MAGNUSON:  Just ten minutes.

17        (Brief recess).

18        MS. AL TAQATQA:  I will say

19   before you get started, Cyle, that we have

20   just under 15 minutes left in the deposition.

21   Go ahead.

22        MR. CRAMER:  I only have a few

23   more.

24   Q   (By Mr. Cramer, continuing) A four hour work

25   event is one of the longest events of your



29.1  Defendant Objection

29.2  Plaintiff Affirmative

1    career. Is that correct?

2    A  Like I said, I don't recall the specific time.

3    I do remember John Sexton coming in on a 474

4    and that was one of the longest work events

5    if not the longest one I have ever witnessed,

6    yes.

7    Q  What do you recall lead to that being such a

8    long work event?

9    A  I know that it was snowing out that day so

10   that would typically slow things down. And

11   then other than that, I couldn't explain what

12   made it take so long.

13   Q  A work event that is three hours over-

14   standard, is that something you don't want to

15   happen again in your career?

16   A  Yeah. I mean, it would be wonderful if

17   everything for the rest of my career went

18   perfectly. That would be great.

19   Q  Why is that?

20   A  Why is that?

21   Q  Yes.

22   A  Well, because if everything goes perfectly,

23   that would make my job a lot easier.

24   Q  Do you conduct efficiency tests in your position?

25   A  Yes.



Defendant Objection

1   Q   How do you choose when to do an efficiency

2   test?

3   A   There's no set -- I don't know how to phrase

4   it.  There's no set -- there's nothing that

5   tells me that I have to do it at a specific

6   date or a specific time.  It's up to my

7   discretion.

8   Q   Does conducting an efficiency test subject an

9   employee to possible discipline?

10      MS. AL TAQATQA:  I'm going to

11  object to this line of questioning.  It's

12  outside the scope of the stipulation.

13      MR. CRAMER:  One second.  Are you

14  instructing him not to answer?

15      MS. AL TAQATQA:  Unless you can

16  show me a document that's been produced since

17  his first deposition that includes or refers

18  to him on his face that gives rise to this

19  questioning.

20      MR. CRAMER:  Well, let me --

21  where did my notes go?  Let me backtrack.

22  Can we bring back up this one?

23      MS. AL TAQATQA:  Is this the

24  document?

25      MR. CRAMER:  Yes.

1          MS. AL TAQATQA:  What does this

2      have to do with efficiency testing?

3    Q   (By Mr. Cramer, continuing) So the question

4      is if you have discretion to conduct

5      efficiency tests, would an employee putting

6      on a show make you want to conduct an

7      efficiency test on them?

8    A   Most likely, no.

9    Q   Why is that?

10   A   Because doing efficiency tests takes added

11     time, having to observe whatever action is

12     taking place that I'm conducting an

13     efficiency test on.  Then afterwards I have

14     to go and debrief with the employee or

15     employees that were being efficiency tested,

16     let them know they were being tested, and

17     then also let them know the results of the

18     efficiency test.  And depending on what the

19     results of that efficiency test was, then it

20     would be giving them either a positive or

21     constructive feedback based on the behaviors

22     and actions that I would have witnessed.

23   Q   So with this 474 being delayed, would you

24     want to avoid doing an efficiency test?

25   A   Like I said, I would be speculating if you're

1    asking me about something from three years

2    ago.  So if you're asking about something

3    that I was thinking from three years ago, I

4    don't recall.

5    Q  With the train being approximately three

6    hours over-standard, you would want to avoid

7    doing an efficiency test?

8    A  When a train is already late, I would not

9    want to do anything that would add additional

10   delays to it.

11   Q  Have you ever disciplined an employee for

12   delaying a train?

13      MS. AL TAQATQA:  Objection.  This

14   is outside the scope.  I'm going to instruct

15   Mr. McKelvey not to answer.

16      MR. CRAMER:  These documents

17   clearly demonstrate that there was a delay in

18   the train, and I think discipline for a delay

19   is very within the scope of this deposition.

20      MS. AL TAQATQA:  Can you repeat

21   your question?

22   Q  (By Mr. Cramer, continuing) Have you ever

23   disciplined a crew for delaying a train?

24      MS. AL TAQATQA:  I object to the

25   form of the question.  Mr. McKelvey, you can

1    answer to the extent you understand the

2    question.

3    A   No, I have never -- one, I'm not the one that

4    disciplines anyone.  That's not my -- that's

5    not in my scope in my current position.

6    Q   (By Mr. Cramer, continuing) Would you

7    recommend discipline in your position?

8    A   No, I do not recommend discipline in my

9    position.

10   Q   Do you recommend an employee to be

11   investigated for discipline?

12   A   Yes, I do send out investigation requests in

13   my position.

14        MR. CRAMER:  I think that's all I

15   have.

16        MS. AL TAQATQA:  Okay.  I don't

17   have any questions.

18        (WHEREUPON, the testimony was

19        concluded at 12:15 p.m.)

20        *  *  *

21

22

23

24

25

1    STATE OF MINNESOTA)
              ) Ss.
2    COUNTY OF HENNEPIN)

3        I, Brenda K. Foss, Certified
              Shorthand Reporter and Notary Public duly and
4    qualified in and for the State of Minnesota
              do hereby certify there came remotely before
5    me the deponent herein, who was by me duly
              sworn to testify to the truth and nothing but
6    the truth concerning the matters in this
              cause.
7        I further certify that the foregoing

8    transcript is a true and correct transcript
              of my original stenographic notes.
9        I further certify that I am neither

10   attorney or counsel for, nor related to or
              employed by any of the parties to the action
11   in which this deposition is taken; and
              furthermore, that I am not a relative or
12   employee of any attorney or counsel employed
              by the parties hereto or financially
13   interested in the action.

14       IN WITNESS WHEREOF, I have hereunto
              set my hand and affixed my Notarial Seal this
15   20th day of May, 2024.

16              Brenda K. Foss

17           Court Reporter

18

19

20

21

22

23

24

25