1    IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF IOWA
2     EASTERN DIVISION

3    - - - - - - - - - - - - - - - - - - - - -
                    No. 3:23-CV-00031-HCA
4     John Sexton,

5         Plaintiff,

6    vs.

7    Dakota, Minnesota & Eastern Railroad
        Corporation d/b/a Canadian Pacific,
8    a Delaware corporation,

9         Defendants.

10    - - - - - - - - - - - - - - - - - - - - -

11

12

13       DEPOSITION OF

14       TRACY MILLER

15       July 9, 2024

16       1:05 p.m.

17

18

19

20

21

22

23       TAKEN BY: BRENDA K. FOSS

24       fossbrenda@yahoo.com
                612-701-4282
25

1

1        Deposition of TRACY MILLER, taken by

2    Zoom videoconference by and on behalf of

3    Plaintiff, on Wednesday, July 9, 2024,

4    commencing at 1:05 p.m., before Brenda K. Foss,

5    Professional Court Reporter, Notary Public,

6    State of Minnesota, County of Hennepin.

7

8        * * * * *

9        APPEARANCES

10      ON BEHALF OF THE PLAINTIFF:

11      JOHN MAGNUSON, ESQUIRE
             CYLE CRAMER, ESQUIRE
12      YAEGER & JUNGBAUER BARRISTERS, PLC
             4601 Weston Woods Way
13      St. Paul, MN  55127
             jmagnuson@yjblaw.com
14      651-288-9500

15

16      ON BEHALF OF THE DEFENDANTS:
             JACK SULLIVAN, ESQUIRE
17      DORSEY & WHITNEY LLP
             50 South 6th Street, Suite 1500
18      Minneapolis, MN  55402
             sullivan.jack@dorsey.com
19      612-340-2600

20

21    Also present: Noah Garcia, DM&E

22

23

24

25

1    I N D E X

2    Examination:          PAGE:

3    By Mr. Magnuson          5

4

5    Marked Deposition Exhibits:
         74 E-mail          40
6    Bates CP 00996-997
         75 Verizon records       41
7    Bates 04016-4017
         76 Leader Survey Bates     69
8    Bates Sexton 1527-1530
         77 Feb 1 e-mail from McKelvey 86
9    Bates CP 03736
         78 Ross' Performance Form    87
10   Bates 03807-03815

11

12    Reporter's Certificate     111

13

14    (Original Deposition Transcript in the

15   possession of John Magnuson, Esquire).

16        * * * * *

17

18

19

20

21

22

23

24

25

1    P R O C E E D I N G S

2

3     TRACY MILLER,

4     after having been first duly sworn,

5     deposes and says under oath as follows:

6

7     MR. MAGNUSON:  John Magnuson on

8    behalf of the plaintiff John Sexton in this

9    matter.  Kyle Cramer is also here with me

10   today.

11    MR. SULLIVAN:  I'm Jack Sullivan

12   of Dorsey & Whitney on behalf of the

13   Defendant Dakota, Minnesota & Eastern

14   Railroad.  And attending the deposition is

15   Noah Garcia from Canadian Pacific Kansas

16   City.

17    MR. MAGNUSON:  Mr. Garcia,

18   obviously you won't be objecting.  Right?  It

19   will be Mr. Sullivan or will you be the one

20   objecting?

21    MR. GARCIA:  I am not participating.

22   I'm attending the deposition, sir.

23    MR. MAGNUSON:  You're attending

24   but not defending?

25    MR. GARCIA:  Correct.

1      EXAMINATION

2    BY MR. MAGNUSON:

3    Q  Mr. Miller, would you please state your full

4      name spelling your last name for the record?

5    A  Tracy Miller, M-I-L-L-E-R.

6    Q  And where are you today?

7    A  I'm sitting in Kansas City, Missouri in

8      CPKC's US headquarters.

9    Q  I understand you moved down there.  Maybe not

10     recently.  Let me ask you this.  When did you

11     move down to Kansas City?

12   A  I came to Kansas City April 2024 -- April

13     2023.

14   Q  That would have been pursuant to the merger?

15   A  I came at merger time, yes.

16   Q  You came from Calgary?

17   A  No.  I came from Minneapolis, St. Paul area.

18   Q  How long were you stationed in Minneapolis

19     and St. Paul?

20   A  March 2019 until April last year.

21   Q  So you were in the Twin Cities area after

22     leaving CN?

23   A  Correct.

24   Q  I was under the impression I guess that you

25     were headquartered or stationed in Calgary at



5.1
  ● Defendant Affirmative

5.2
  ● Defendant Affirmative

1    some point, but that's not true.  Is that

2    right?

3    A  That's correct.

4    Q  What is your current position?

5    A  Senior Vice President of Operations.

6    Q  What was your position here in the Twin Cities?

7    A  Initially March '19 it was Vice President

8    Corporate Risk.  And then I became Vice

9    President of Operations and then Senior Vice

10   President of Operations.

11   Q  Did you become VP of Operations in the Twin

12   Cities?

13   A  I think it was around summertime July'ish of

14   2019.

15   Q  '23?

16   A  No.  2019.

17       MR. SULLIVAN:  John, you froze

18   for a minute so I don't know that we heard

19   your entire last question.

20   Q  Okay.  When you were in the Twin Cities, when

21   did you move from that risk management

22   position to VP of Operations?

23   A  Around July 2019.

24   Q  I'm assuming you were in that risk management

25   position to avoid being in a competitive role



6.1  ● Plaintiff Affirmative

6.2  ● Defendant Affirmative

6.3  ● Plaintiff Affirmative

6.4  ● Defendant Objection

1    with your agreement and your dispute with the

2    Canadian National.  Is that correct?

3    A  It was during my transition from senior at CP

4    to the operations role.

5    Q  But you don't have a background in risk

6    management, do you?

7    A  I have a background in safety.

8    Q  But you had an agreement with the CN that 

9    said you couldn't be in a competitive

10   position with the CP.  Right?

11   A  Correct.

12   Q  And that's why you were not initially in the

13   operations department?

14   A  Yes.

15   Q  How many depositions have you given in the

16   past?

17   A  That I remember, two prior to this one.

18   Q  Two prior to this one?

19   A  Correct.

20   Q  Were you deposed as part of your lawsuit

21   against the CN and the CN's lawsuit against

22   you?

23   A  You partially cut in and out on me.  Can you

24   ask it again?

25   Did you give your deposition in the case that

Plaintiff Affirmative
Defendant Objection
Plaintiff Affirmative
Defendant Objection

7

1    you brought against the Canadian National and

2    the Canadian National brought against you?

3    A   Yes, I did.

4    Q   So that would leave one other time other than

5    the one here today.  Do you remember what

6    that involved or what that case was about?

7    A   I think you asked me if I remember what it

8    was about?

9    Q   Yes.

10   A   It referenced an employee injury when I was

11   with Illinois Central in I think New Orleans,

12   Louisiana.

13   Q   That would have been a long time ago then?

14   A   It sure was.

15       MR. MAGNUSON:  Hang on a second.

16   My Wi-Fi seems to be weak.  Let's go off the

17   record.

18       (Brief recess).

19   Q   (By Mr. Magnuson, continuing) We're hard-

20   wired now so this should be quicker.

21   Mr. Miller, just briefly can you walk us

22   through your railroad career starting with

23   where you hired out, what your positions were

24   and that type of thing?  You don't need to

25   belabor the point.  I just kind of want an

1    over- view.

2    A  So I was with the Illinois Central Railroad

3    in 1994, a management trainee job.  I worked

4    as trainmaster for the IC and then of course

5    CN from '94 I think until -- the years run

6    together but about '97, '98'ish.  I went to

7    Chicago for a handful of months.  I went to

8    Michigan, which is the Grand Trunk Railroad,

9    Grand Trunk Western Railroad, for CN about

10   1999 before CN and Illinois Central merged --

11   before CN purchased IC.  And I moved around

12   several times from superintendent job to

13   general superintendent job.  In 2006 I became

14   General Manager.  In late 2018 I became

15   Assistant Vice President of Safety for CN.

16   And I separated from CN in March -- January

17   of 2019.  And then in March 2019 came to CP

18   and basically was in the St. Paul area from

19   March '19 until April of 2023.  And now I'm

20   in Kansas City the past year.

21   Q  When did Hunter Harrison first start at the

22   CN?

23   A  I don't know.

24   Q  When did you first become introduced to

25   Mr. Harrison's precision scheduled railroading?



Plaintiff Affirmative

Defendant Objection

1    A  I started in 1994, so somewhere in the first

2    couple years I'm sure.

3    Q  Is that when Harrison brought it with him

4    from the BNSF is what is I understand?

5        MR. SULLIVAN:  Objection, lack of

6    personal knowledge.  You can answer.

7    A  Yeah, Mr. Harrison came from CN to the

8    Illinois Central.

9    Q  (By Mr. Magnuson, continuing) Okay.  So where

10    did he go after the BNSF, the CN or the IC?

11    A  Illinois Central.

12    Q  And then to the Canadian National?

13    A  Canadian National purchased the Illinois Central.

14    Q  Do you know when that was?

15    A  If I recall, 1999.

16    Q  Do you know Hunter personally?

17    A  What do you mean by personally?

18    Q  Well, you met him in person.  You worked with

19    him in person.  It wasn't just somebody who

20    would be on calls?

21    A  Yes.

22    Q  Do you know John Sexton?

23    A  Yes.

24    Q  You met him in person?

25    A  Yes.


Plaintiff Affirmative

10

1  Q  Was that in his capacity as a union officer?

2  A  I don't remember if he was a union officer or

3    not.

4  Q  I can represent to you that he was on the

5    safety committee.  Were you aware of that?

6  A  I don't remember if he was or was not.

7  Q  Why is it you came to meet Mr. Sexton?

8  A  When I first got to Canadian Pacific, I was

9    riding what we called the inspection car.

10   And we did a town hall in Davenport, Iowa and

11   we met there.

12  Q  Do you remember what your conversations were

13   like, what you talked about?  Did you go out

14   to eat or anything like that?

15  A  No, we never went to eat.  It was hello, how

16   you doing conversations.

17  Q  How is it you remember Sexton?

18  A  Pardon me?

19  Q  How is it you specifically meeting John?

20  A  Just some people I remember.  Some people I

21   don't.

22  Q  Gotcha.  Let me ask you this.  At the

23   Canadian Pacific, you've got a workplace

24   harassment policy and a business ethics

25   reporting policy.  You were familiar with

1    those?

2    A  Vaguely.  I understand them both enough.

3    Q  Kind of gives somebody that feels like maybe

4    they've been discriminated against some

5    guidelines as to how to bring those types of

6    complaints to the attention of the railroad.

7    Right?

8        MR. SULLIVAN:  Objection to the

9    extent it misstates the documents.

10   Q  (By Mr. Magnuson, continuing) Just generally

11   an overview?

12   A  Yes.

13   Q  Do you know if policies similar to that were

14   in effect at the Canadian National?

15   A  I can assume but I don't remember.

16   Q  Do you remember when you were passed up for

17   these promotions, those three promotions that

18   you in your lawsuit claimed that you should

19   have been given but were denied because of

20   your race?  Did you follow these types of

21   policies in terms of reporting your claim of

22   harassment or discrimination to the Canadian

23   National?

24       MR. SULLIVAN:  Objection, lack of

25   relevance to this proceeding.

1    A  I try not to remember much about that.  I

2      moved on with my life from CN.

3    Q  (By Mr. Magnuson, continuing) Well, I can

4      represent to you that Mr. Sullivan in

5      Mr. Sexton's deposition asked a lot of

6      questions about why he didn't follow these

7      two policies.  And I guess what I am asking

8      you is did you follow policies like this when

9      you were passed up allegedly for these three

10     promotions due to your race?

11        MR. SULLIVAN:  Objection, lack of

12     relevance to this proceeding.

13   A  I don't remember.

14   Q  (By Mr. Magnuson, continuing) Did you bring

15     complaints to the Canadian National's

16     attention that you felt you were discriminated

17     against prior to filing your lawsuit against

18     them?

19        MR. SULLIVAN:  Objection, lack of

20     relevance to this proceeding.

21   A  Yes, I did speak to one supervisor.

22   Q  (By Mr. Magnuson, continuing) But you don't

23     specifically recall one way or the other

24     whether or not you followed any guidelines

25     laid out in policies?

1   A   I do not.

2   Q   You were accused of fraud and unjust

3   enrichment when the CN countersued you. Is

4   that correct?

5   A   Yes.

6   Q   And you were accused of dishonesty

7   essentially in terms of the fraud claim.

8   Right?

9   A   I was accused of not letting them know that I

10   was leaving.

11   Q   By dishonesty. Right?

12   A   I'd have to go back and read it to understand

13   what they claimed.

14   Q   So you had a noncompetition agreement in

15   place with the Canadian National. Right?

16   A   Yes.

17   Q   And you cashed out just under a million

18   dollars in stock options in January of 2019.

19   Right?

20       MR. SULLIVAN: Objection, lack of

21   relevance to this proceeding.

22   Q   (By Mr. Magnuson, continuing) Is that

23   correct?

24   A   Yes.

25   Q   And the very day that you cashed out that



14.1 Plaintiff Affirmative

14.2 Defendant Objection

14.3 Defendant Objection

14.4 Plaintiff Affirmative

1    stock, someone at CN called you and asked you

2    why you were cashing it out.  Right?

3        MR. SULLIVAN:  Objection, lack of

4    relevance to this proceeding.

5    A  When I cashed it out, yes, I was called.

6    Q  (By Mr. Magnuson, continuing) And you

7    ultimately were able to cash that out?

8    A  Yes.

9    Q  And you told them that you had no intention

10   of leaving the company but that you wanted to

11   buy a gift for your wife.  Right?

12       MR. SULLIVAN:  Objection, lack of

13   relevance to this proceeding.  I'll make a

14   standing objection to all these questions

15   about Mr. Miller's departure from CN.

16       MR. MAGNUSON:  I appreciate the

17   standing objection.  I'm not going to get too

18   far into this, but it does go to honesty and

19   veracity, Jack.  You know that.  He was

20   accused of fraud and dishonesty in that case.

21       MR. SULLIVAN:  And there was no

22   finding and no judgment related to that case.

23   Q  (By Mr. Magnuson, continuing) You told them

24   you were going to buy your wife a gift with

25   the million dollars in stock.  Right?



15.1  Plaintiff Affirmative
15.2  Defendant Objection
15.3  Defendant Objection
15.4  Plaintiff Affirmative

1    A  Yes.

2    Q  And the very day after that phone call 

3    happened, January 23rd of 2019, you accepted

4    CP's offer and signed an offer letter.  Right?

5    A  I don't remember dates but it was close.

6    Q  This is all in the pleadings that were in

7    that case.  And you didn't tell CN that you

8    resigned until January 28th.  Right?

9    A  Correct.

10   Q  And you didn't tell anybody at CN that you

11   had accepted a position with CP until January

12   31st.  Right?

13   A  I don't remember the dates but probably close.

14   Q  And you were sued for breaching restrictive

15   covenants.  Correct?

16   A  Yes.

17   Q  You were sued for fraudulent misrepresentation.

18   Correct?

19   A  If I remember, yes.

20   Q  You were sued for unjust enrichment.  Correct?

21   A  I'd have to go back and look.  I don't recall

22   that.

23   Q  And that case has now resolved.  Right?

24   A  Yes, it is.

25   Q  Part of your agreement with the Canadian

1   Pacific was that they would cover your legal

2   costs and cover any judgment against you

3   pursuant to those counterclaims.  Right?

4   A  I was identified.

5   Q  Did you receive compensation as part of your

6   settlement or did CP have to pay CN money as

7   part of that settlement?

8       MR. SULLIVAN:  Objection to the

9   extent it requires the witness to violate

10  confidentiality provisions.  I direct the

11  witness not to answer.  I also make a further

12  objection that these questions have nothing

13  to do with the John Sexton case and are

14  intended only to embarrass and harass this

15  witness.

16      MR. MAGNUSON:  I have no

17  intention of embarrassing or harassing, sir,

18  but you were accused in that case of

19  dishonesty and the jury has a right to know

20  about that.

21  Q  (By Mr. Magnuson, continuing) In February of

22  2021, what was the territory you oversaw?

23  A  I had the US portion of CP which included

24  Kansas City, Iowa, Minnesota, Illinois, North

25  Dakota, Upper New York and I'm thinking

1    Maine.  I think we had that territory at the

2    time.  Plus I had Northern Ontario East

3    including Quebec.

4    Q  That's a big territory.  So you oversaw

5    everything in north -- everything in the

6    United States.  Is that correct?

7    A  Correct.

8    Q  And what territory was Tom Jared responsible

9    for in February of 2021?

10   A  Tom Jared was responsible for Kansas City

11   territory, Iowa, a North Dakota area, a

12   portion of Minnesota, Northern Minnesota and

13   I think a portion of the south end if I

14   recall.

15   Q  In February of 2021, how was Tom Jared's

16   territory performing?

17   A  I can't remember back that far.

18   Q  We can pull up Exhibit 56, Kyle.

19       I should ask you, Mr. Miller,

20   did you review any documents to prepare for

21   your testimony today?

22   A  Yes, I did.

23   Q  How many times did you meet with any lawyers?

24   A  Twice.

25   Q  When and for how long?



Plaintiff Affirmative

1   A   One day last week.  I think it was last

2       Monday or Tuesday, two hours I think, and

3       then yesterday for a couple hours.

4   Q   Were these meetings in person or virtually?

5   A   Mr. Garcia was here with me personally and

6       Mr. Sullivan was virtually.

7   Q   Did you review any documents with Mr. Garcia

8       and Mr. Sullivan?

9   A   Yes.

10  Q   What did you review?

11  A   Couple e-mails.

12  Q   A couple like two or more than two?

13  A   It was probably more than two.

14  Q   More than ten?

15  A   No.

16  Q   Did you review this Exhibit 56 which is up on

17      the screen right now?

18  A   Can you blow it up a little bit?

19  Q   Yes.  So this is actually an e-mail that was

20      sent from you to Tom Jared on February 10,

21      2021.  Right?

22  A   Yes.

23  Q   And you knew that -- did you know that this

24      is the same day that Mr. Sexton's

25      investigation occurred?



1  A  No, I did not.

2  Q  Were you aware of that when you sent this

3     e-mail?

4  A  No.

5  Q  Does this refresh your recollection at all

6     about how Mr. Jared's territory was

7     performing in February of 2021?

8  A  No.

9  Q  You stated to Mr. Jared, 'Your territory and

10    the leadership seems to be on a tailspin'.

11    Right?

12 A  Yes.

13 Q  What does tailspin mean?

14 A  I don't recall what I meant three years ago.

15    There would have been some issues but I don't

16    recall what the issues were.

17 Q  You go on to state, 'I don't fault John for

18    this note, but even if not true, we are

19    creating a stage/platform for their

20    feelings'.  What does that mean?

21 A  That means you're allowing them to have a

22    perception that things are not the way

23    they're supposed to be or not the way that

24    they are factually.

25 Q  What do you mean by they?



1  A  Meaning the work force, the unionized work

2  force.

3  Q  So what is it that the unionized work force

4  is thinking?  What did you just say?

5  A  You look at the way it's written.  I don't

6  remember any of the facts to it.  But if you

7  look at the way it's written, that would mean

8  I don't fault John for this note but even if

9  not true, we are creating a stage/platform

10  for their feelings.  That means you're

11  allowing people to draw their own conclusions

12  whether they're factual or not factual, even

13  if they're not factual.

14  Q  So you're encouraging Mr. Jared to not have

15  employees bring their safety concerns like

16  this to management's attention?

17      MR. SULLIVAN:  Objection,

18  misstates the witness' testimony.  You can

19  answer, Mr. Miller.

20  A  No.

21      MR. MAGNUSON:  I didn't get the

22  answer there.

23  A  I said no.

24  Q  (By Mr. Magnuson, continuing) You go on to

25  state, 'You have to get your territory

1   settled down but have to be engaged in the

2   right things at the right time to do it'.

3   What do you mean by that?

4   A  That means make sure that you have your

5   priorities right.

6   Q  What was your concern with respect to

7   Mr. Jared's priorities?

8   A  I don't recall three years ago what that was.

9   Q  Just below it, it says, 'trust I understand 

10  the new marriage'.  What do you mean by trust

11  I understand the new marriage?

12  A  You have to read the rest of it.  'Trust I

13  understand the new marriage and time you want

14  to put in there but we have to do both

15  effectively.  I don't see that happening

16  right now'.

17  Q  On the railroad?

18  A  Yes.

19  Q  What do you mean by that?

20  A  Just reading it and not remembering the

21  situation, it means you have to have the

22  right balance between the time on the

23  railroad and the time at home.

24  Q  So you felt he was spending too much time at

25  home?



Plaintiff Affirmative

1  A  I can make that assumption but I don't

2  remember the whole thing.

3  Q  Well, you're talking about a guy's marriage

4  here.  You don't remember any of the details

5  or the specifics about what it was that

6  caused you to have this concern?

7  A  Sir, this is 3-1/2 years ago.  No, I don't.

8  Q  How many rule G's has Tom Jared failed?

9  A  I don't know if Tom Jared failed any rule G's.

10  Q  You're responsible for making sure your

11  managers are complying with the rule G rules

12  and all that good stuff.  Right?

13  A  I'll ask for clarity on your question.  When

14  you say how many rule G's Tom failed, you

15  mean personally?

16  Q  If you have any knowledge of any rule G's

17  that Tom Jared has failed, please give them

18  to us.

19  A  Are you saying personally Tom Jared had drug

20  and alcohol in his --

21  Q  I'm asking --

22  A  The answer is zero, none that I know of.

23  Q  So if we go to the next page on this e-mail

24  which started this string, this is an e-mail

25  directly to you and Jason Ross from John

1    Sexton.  Right?

2    A  I'd have to see the top and see my name.  So

3    yes.

4    Q  Do you remember receiving this e-mail?

5    A  We went over it and reviewed it, but I don't

6    remember it from 2021.

7    Q  But there is no doubt in your mind that you

8    did receive this e-mail.  Right?

9    A  Considering it's addressed to me, no doubt.

10   Q  And it appears that you responded to it.  Right?

11   A  Yes.

12   Q  So in the e-mail to you that's addressed to

13   Mr. Miller, he makes a number of safety

14   complaints to you.  Correct?

15   A  He highlights some issues that he sees, yes.

16   Q  And those issues were safety complaints.  Right?

17       MR. SULLIVAN:  Objection, the

18   document speaks for itself.

19   A  Yes.

20   Q  (By Mr. Magnuson, continuing) I didn't get

21   that answer.

22   A  Yes.

23   Q  So he makes complaints of drivers driving too

24   fast on snow covered roads.  Right?

25       MR. SULLIVAN:  Objection,



24.1  Plaintiff Affirmative
24.2  Defendant Objection
24.3  Plaintiff Affirmative
24.4  Defendant Objection



1     misstates the document.

2     A  Yes, he says the driver is driving 40 miles

3     an hour.

4     Q  On roads that were 100 percent snow covered.

5     Actually, he says while he needed to drive at

6     40 -- he's complaining about the driver going

7     too fast on snow covered roads.  Right?

8     A  Correct.

9     Q  In the paragraph below he lays out his

10    version of what happened with Mr. McKelvey

11    relative to cutting the tracks.  Right?

12    A  I'd have to read it here.

13    Q  Go ahead.

14    A  (Witness examining document).  Okay.  I'm

15    done.

16    Q  According to Mr. Sexton, he was told by

17    McKelvey not to cut the crossings and the

18    tracks.  Right?

19    A  Correct.

20    Q  And Mr. Sexton, according to him in this

21    e-mail, disobeyed that order and he cut the

22    tracks and crossings as needed.  Right?

23    A  I'd have to go back and look.  I think

24    McKelvey agreed in the end to cut the

25    crossings.

1    Q  I'm asking you in this e-mail -- it sounds

2      like you must have reviewed McKelvey's

3      deposition?

4    A  No, I have not.

5    Q  So in the middle of this paragraph here it

6      says, 'he didn't make the call and I cut the

7      tracks and crossings as needed'.  Do you see

8      that?

9    A  I'm reading it again.  (Witness examining

10     document).  Okay.  Yes, I see that.

11   Q  How is it you remember the detail about

12     McKelvey and him claiming that ultimately he

13     gave Sexton the green light to cut the

14     crossings?

15   A  I didn't remember the detail.  I didn't know

16     about it.  I missed that.  I thought it said

17     he did make the call.

18   Q  And Sexton's train that day had two cars of

19     anhydrous ammonia.  Right?

20       MR. SULLIVAN:  Objection, lack of

21     personal knowledge.

22   Q  (By Mr. Magnuson, continuing) According to

23     this document?

24   A  I see a load of ammonia.

25   Q  At the bottom it says two loads of ammonia.



26.1  Plaintiff Affirmative

26.2  Defendant Objection

26.3  Plaintiff Affirmative

26.4  Defendant Objection

26.5  Plaintiff Affirmative

26.6  Defendant Objection

1    Right?

2    A  Okay.  Yes.

3    Q  And that means two railcars with ammonia.  Right?

4    A  Correct.

5    Q  And that's a hazardous chemical.  Right?

6    A  Correct.

7    Q  If cars like that are involved in derailments,

8    there's a risk that they can explode or

9    release ammonia into the environment.  Right?

10   A  It depends on the derailment.

11   Q  Are you familiar with derailments that have

12   happened at the CP where ammonia escapes into

13   the environment?

14   A  Yes, I am.

15   Q  Were you familiar with the one that happened

16   up in Minot?

17   A  I was not at CP at that time, no.

18   Q  Are you familiar with that derailment?

19   A  No.

20   Q  What other derailments where ammonia cars

21   have derailed are you familiar with?

22   A  I can't remember off the top of my head.  I

23   have been to a few.

24   Q  When anhydrous ammonia escapes from railcars,

25   unintentionally people can get injured and



27.1  ● Defendant Objection

27.2  ● Plaintiff Affirmative

27.3  ● Plaintiff Affirmative

1    the environment can be damaged.  Right?

2    A  Yes.

3    Q  In fact, there are all sorts of precautions

4    that CP takes to prevent derailments of

5    hazardous material cars.  Right?

6    A  Yes.

7    Q  Two derailments had occurred in Iowa in the

8    months leading up to February 2021.  Right?

9    Do you remember those?

10   A  I do not remember.

11   Q  Let's pull up Exhibit 8.  Have you seen this

12   Safety Incident, Safety Review before?

13   A  Not that I remember, no.

14   Q  Can you go to the next page, Kyle?  Have you

15   seen this document relating to the Nitrin

16   Subdivision?

17   A  I don't remember it.

18   Q  These seem to indicate that two derailments

19   happened on the Marquette Subdivision and the

20   Nitrin Subdivision because employees failed

21   to cut tracks.  Right?

22   A  I'm reading it.  (Witness examining

23   document).  That one does, yes.

24       MR. MAGNUSON:  Kyle, can you go

25   to the other one?  We'll read that too.

1      THE WITNESS:  (Witness examining

2     document).  Yes.

3   Q  (By Mr. Magnuson, continuing) This one, Bates

4     number 141, seems to indicate similarly that

5     a derailment had occurred because of snow and

6     ice buildup in flangeways, right, failure to

7     cut tracks?

8   A  Yeah.  That one was shoving one empty car in,

9     correct.

10  Q  And it appears, at least according to these

11    documents, that both of those derailments

12    occurred because employees did not cut tracks

13    in flangeways.  Right?

14  A  Based on those, yes.

15  Q  Any reason to doubt or dispute the authenticity

16    of these or whether or not they existed prior

17    to February of 2021?

18  A  Ask that again.

19  Q  Any reason to doubt that these were put

20    out -- these bulletins were put out to the

21    employees prior to February of 2021?

22  A  On the surface, no.

23  Q  Going back to this e-mail -- if we can bring

24    up 56 again.  If what Mr. Sexton is saying in

25    this e-mail is correct -- I'm not asking you

1    to agree with whether or not it happened, but

2    if you did a drill down on your own and you

3    determined that what Mr. Sexton is saying

4    here is correct, McKelvey would be in

5    violation of CP rules, wouldn't he?

6        MR. SULLIVAN:  Objection, calls

7    for speculation.

8    A  Ask it one more time.

9    Q  (By Mr. Magnuson, continuing) If what Mr.

10   Sexton is saying here is correct, that

11   McKelvey told him he would not cut the

12   crossings, that would be in violation of CP

13   rules.  Right?

14   A  He's not in violation if there's no action.

15   Q  Okay.  What I'm asking you is about McKelvey

16   and his instruction to not cut the tracks.

17   If there's snow and ice on tracks and Sexton

18   claims that he was told not to cut them, you

19   would take exception to that, wouldn't you?

20   A  One more time.

21       MR. MAGNUSON:  Brenda, can you

22   read it back?

23       MS. REPORTER:  What I'm asking

24   you is about McKelvey and his instruction to

25   not cut the tracks.  If there's snow and ice



Plaintiff Affirmative

1    on tracks and Sexton claims that he was told

2    not to cut them, you would take exception to

3    that, wouldn't you?

4    A   McKelvey is not in violation by telling him

5    not to cut it if I understand what you're

6    asking me.

7    Q   (By Mr. Magnuson, continuing) If there was

8    snow and ice built up on tracks -- this is a

9    hypothetical for you.  If there's snow and

10   ice built up on tracks, that can present a

11   safety hazard and cause a risk of a

12   derailment.  Right?

13   A   Okay.

14   Q   That's true.  Right?

15   A   Yes, snow and ice on a track can cause risk

16   of a derailment, yes.

17   Q   So you agree with that?

18   A   Yes.

19   Q   If what Sexton here is saying is true, A,

20   that there was a snow and ice buildup on the

21   tracks and, B, he was told not to cut them,

22   you would take exception to that.  Right?

23   A   Yes.

24   Q   Were you aware that his cutting of the tracks

25   that day caused an over-standard work event?

1    MR. SULLIVAN:  Objection,

2    misstates the record.

3    A  I don't remember.

4    Q  (By Mr. Magnuson, continuing) Did you know

5    that this was the number one top 15 trains

6    impacting train speed that day?

7    A  I may have at that time.

8    Q  So does it kind of refresh your recollection

9    a little bit?

10   A  No, sir, it doesn't.

11   Q  Let's pull up 57.  Mr. Miller, if Mr. Sexton

12   cut tracks and flangeways and crossings that

13   day, that would have contributed to a delay.

14   Right?

15   MR. SULLIVAN:  Objection, lack of

16   personal knowledge.

17   A  I don't know.

18   Q  If he did it, if he cut tracks and flange-

19   ways, that takes additional time.  Right?

20   A  Yes, it would take additional time.

21   Q  And you're aware that in order to do that,

22   you do it with light power?

23   A  Am I aware -- say it again.

24   Q  When you cut tracks like that, you do it with

25   light power.  Right?



32.1  Plaintiff Affirmative

32.2  Plaintiff Affirmative

32.3  Plaintiff Affirmative

32


33.1 ● Defendant Objection

1   A  Yes.

2   Q  So that means you have to cut away from the

3      rest of the train.  Right?

4   A  Yes.

5   Q  And then you have to go where you're cutting

6      tracks, crossings, flangeways, what have you,

7      and then you have to double back and return

8      to your train.  Right?

9   A  Correct.

10  Q  And then you have to put air back in the

11     train.  Right?

12  A  You have to couple back up, correct.

13  Q  You have to couple up and put air back in the

14     train.  Right?

15  A  Yes, that's part of coupling up, yes.

16  Q  That takes additional work by both the

17     conductor and the engineer.  Right?

18  A  Correct.

19  Q  And it takes longer in the wintertime to put

20     air in a train than it does in the summer.

21     Right?

22  A  Theoretically, yes, it does.

23  Q  So if we have an over-standard work event

24     that day and Mr. Sexton cut the tracks, that

25     would have contributed to the delay.  Right?

1      MR. SULLIVAN:  Objection, lack of

2    personal knowledge.

3    A  That could add extra time. 

4    Q  (By Mr. Magnuson, continuing) That could add

5    extra time.  Right?

6    A  Yes.

7    Q  And CP discourages over-standard work events.

8    Right?

9    A  Depends on the situation.

10   Q  Well, precision scheduled railroading revolves

11   around plans.  Right?

12   A  Yes, it does.

13   Q  And with plans, various management level

14   people evaluate how long a certain work event

15   should take.  Right?

16   A  Yes.

17   Q  And if things go longer in terms of the work

18   event than they're planned for, drill downs

19   occur.  Right?

20   A  Ask it one more time.

21   Q  Over-standard work events can result in drill

22   downs.  Right?

23   A  They could depending upon the situation.

24   Q  A 3 hour and 23 minute over-standard work

25   event is pretty long over-standard, isn't it?

1    A  Yes.

2    Q  In fact, it's an unusually long over-standard

3     work event.  Right?

4    A  We have had them before but that's a long one.

5    Q  I'm sorry.  I didn't get your answer there.

6    A  Yes, that's longer than normal.

7    Q  So up on the screen, Mr. Miller, is Exhibit

8     57.  Have you seen this before?

9    A  No.  Well, I haven't seen it recently.  I may

10    have seen it back in 2021.

11   Q  So in the address line there at the very

12    bottom it says DL_US_train_speed.  Are you

13    part of that distribution group that would

14    have received this e-mail?

15   A  I don't know.

16   Q  Do you know who was included on that

17    distribution list?

18   A  No.

19   Q  How would we find out?

20   A  I could not tell you.

21   Q  Are you a member of additional e-mail distribution

22    lists in addition to your Miller e-mail?

23   A  Yes, I am.

24   Q  Which ones are you a member of?

25   A  Sir, there's a lot of distribution lists.  I

1    don't know which one I'm a part of.

2    Q  Do you get this daily top 15 trains impacting

3    train speed in the US e-mail?

4    A  I do not get that one.

5    Q  You didn't get this one?

6    A  You said do I or did I?

7    Q  Well, are you a member of the group that gets

8    this e-mail that looks to be on a daily basis?

9    A  I mean, this particular e-mail that you put

10    up right now, I do not get this e-mail today.

11    Q  Did you in February of 2021?

12    A  I can assume that I did, yes.

13    Q  So you can assume that you received this

14    e-mail about Mr. Sexton's train that day?

15    A  The e-mail is not about his train, but I used

16    to get the top 15 trains in the US.

17    Q  Why do you say this isn't Mr. Sexton's train

18    that day?  How do you know that?

19    A  I'm speaking of the report.  You're talking

20    about a specific train?  Ask your question

21    again so we can be aligned.

22    Q  This reference here, the 474, is referencing

23    the same train that Mr. Sexton e-mailed you

24    about.  Right?

25    A  Yes.


Plaintiff Affirmative

1   Q  Okay.  And you see in this over-standard

2   e-mail here, this top 15 trains, it says,

3   'They also had to cut the boatels crossing

4   and run down MQS light power before they

5   could just shove the cars into it'.  Right?

6   A  Yes.

7   Q  And MQS light power means just the engines

8   running down to the Marquette siding.  Right?

9   A  I don't know what MQS means, but light power

10  means, yes, just the power.

11  Q  So in this top 15 trains memo, the cutting of

12  the tracks that Sexton referenced in his

13  e-mail to you is the same work event.  Right?

14  A  I can assume that, yes.

15  Q  You can assume that?

16  A  Yes.

17  Q  And on-time metrics and various efficiency

18  velocity metrics can affect or impact

19  trainmasters' pay.  Right?

20     MR. SULLIVAN:  Objection, lack of

21  personal knowledge.

22  A  What do you mean affect their pay?

23  Q  (By Mr. Magnuson, continuing) Is there a

24  bonus tied in any way to velocity metrics and

25  what you track in terms of on-time performance?



37.1  ● Defendant Objection

37.2  ● Defendant Objection

37.3  ● Plaintiff Affirmative

1   A  For certain managers, yes.

2   Q  Including trainmasters?

3   A  I'd have to go back and look.  I don't recall

4      if trainmasters have on-time performance in

5      their goals.

6   Q  Those metrics would certainly affect or

7      impact Mr. Jared's compensation and bonus at

8      the time.  Right?

9         MR. SULLIVAN:  Objection, lack of

10     personal knowledge.

11  A  I'd have to see his as well to understand.

12  Q  (By Mr. Magnuson, continuing) Well, you can

13     assume -- I mean, this is part of CP's

14     operating.  You tie efficiency to compensation.

15     Right?

16        MR. SULLIVAN:  Objection, lack of

17     personal knowledge.

18  A  There's goals that feed into other metrics.

19     You get a bonus annually.

20  Q  (By Mr. Magnuson, continuing) And those goals

21     in large part relate to efficiency and on-

22     time metrics, right, velocity?

23  A  Some do.  Some don't.

24  Q  Did you ever talk to Kurtis McKelvey about

25     this e-mail that Mr. Sexton sent you?



38.1  Plaintiff Affirmative
38.2  Defendant Objection
38.3  Plaintiff Affirmative



1    A  Not that I remember.

2    Q  There's some e-mails going back and forth

3      with you directing Jason Ross to talk to Tom

4      Jared about it.  Right?

5    A  From what I was shown during prep, yes.

6    Q  Let's look at Exhibit 58.

7        MR. SULLIVAN:  Can we see the

8      whole document?

9    Q  This is another copy, different exhibit, of

10     the same e-mail that Sexton sent but it

11     appears that you forwarded this to Jason Ross

12     on February 11.  Right?

13   A  Can I see the rest?  (Witness examining

14     document).  You can go back up.  Okay.

15   Q  You forwarded Sexton's e-mail to you on to

16     Jason Ross and said 'Did you talk to Kurt?'

17     Right?

18   A  Yes.

19   Q  And that's Kurt McKelvey?

20   A  Correct.

21   Q  And then Ross responds to you, 'Yes, going to

22     follow up with Tom.  He owes me a call.'  I'm

23     assuming Tom is Tom Jared?

24   A  I can assume so, yes.

25   Q  Do you know if anyone, you or Mr. Ross,

1    followed up with McKelvey in terms of what

2    happened?

3    A  I did not follow up with McKelvey.

4    Q  Did Jason Ross?

5    A  I don't remember.

6        (Deposition Exhibit 74 marked for

7    identification).

8    Q  This is Exhibit 74, CP 00996.  Did you review

9    this e-mail, Mr. Miller, in your preparation

10    for the deposition today?

11    A  Yes, sir.

12    Q  It appears that this is again the same e-mail

13    from Sexton to you that was then forwarded by

14    you on February 14 to Jason Ross saying 'when

15    will you get back to John'.  Right?

16    A  Yes.

17    Q  And Ross replies to you 'shoot, meant to do

18    that this weekend.  I will call him

19    tomorrow.'  Do you see that?

20    A  Yes.

21    Q  Do you know if Mr. Ross ever followed up with

22    Mr. Sexton?

23    A  I do not.

24    Q  Did you go through any phone logs or phone

25    records prior to today?

1   A  No.

2      (Deposition Exhibit 75 marked for 

3   identification).

4      MR. MAGNUSON:  This is 75,

5   CP 04016.

6      MR. SULLIVAN:  Can we see the

7   entire document?

8   Q  (By Mr. Magnuson, continuing) We'll go to the

9   first page of it, 04017.  I'll direct your

10  attention to February 1st.  Do you see that?

11  A  Can you blow it up a little bit?  Thank you.

12  Q  I can represent to you that the four -- if

13  you could go to the next page, 04016.  Sorry.

14  I had my a.m. and p.m.'s mixed up there.  Do

15  you see February 1 there at 5:29 a.m.?

16  A  Yes.

17  Q  I can represent to you that the 612-300-0325

18  is Jason Ross' phone number.  Okay?

19  A  Okay.

20  Q  Do you see you had a three minute incoming

21  call with him at 5:29 a.m. and then at 5:53

22  a.m. a 28 minute call?  Right?

23  A  Yes.

24  Q  Do you recall what those conversations were

25  about?



Plaintiff Affirmative

41

1  A  No, sir.

2  Q  Was Mr. Sexton's train referenced in either

3   of these phone calls?

4  A  I have no idea.

5  Q  So it's possible?  You just don't know one

6   way or the other?

7  A  I don't know one way or the other.

8  Q  But it's possible that Sexton's train was

9   referenced in one of those phone calls.  Right?

10  A  I don't know.

11  Q  Which means it's possible.  Right?

12  A  Sir, I don't know.  We talk about a lot in

13   the morning time.  I have no idea what we

14   spoke about.

15  Q  It's possible that John Sexton's train was

16   referenced in one of those phone calls.  Right?

17  A  I don't know.  I don't know if he is or is

18   not.

19  Q  Well, if it's something that was absolutely

20   impossible, you would be able to say so.

21   Right?

22      MR. SULLIVAN:  Objection,

23   argumentative.

24  A  Sir, for clarity, we have phone conversations

25   regularly in the morning time.  I don't know

1     what Jason and I spoke about that morning.

2     Q  (By Mr. Magnuson, continuing) See towards the

3     bottom of the page at 9:29 a.m. again you had

4     another two minute phone call with him.

5     Right?

6     A  Yes.

7     Q  If I can direct your attention to 10:32 a.m.

8     You had a call with a 612-816-5443 number.

9     Do you see that?

10    A  Yes.

11    Q  I can represent to you that's Tom Jared's

12    phone number.  Okay?

13    A  Okay.

14    Q  You had a three minute call with him at 10:32

15    a.m.  And then at 1:25 p.m. you had another

16    phone call with Tom Jared.  Do you see that,

17    1:25 p.m.?

18    A  Yes.

19    Q  Then at 2:44 p.m. another phone call with

20    Jason Ross?

21    A  Yes.

22    Q  I can represent to you that Tom Jared's E

23    test of Mr. Sexton that day took place at

24    around noon.  Any reason to dispute that?

25    A  No.



Plaintiff Affirmative

1   Q  So you knew you would have received the

2    e-mail that this is the slowest train in the

3    United States that day.  Right?

4        MR. SULLIVAN:  Objection, misstates

5    the witness' testimony.

6   A  I don't know that.

7   Q  (By Mr. Magnuson, continuing) Mr. Miller,

8    have you read the public law board's decision

9    in this case?

10  A  Not that I remember, no.

11  Q  Have you at any time reviewed the investi-

12   gation transcript relating to Mr. Sexton's

13   investigation?

14  A  No.

15  Q  Who made the decision to discipline Mr. Sexton?

16  A  I don't know.

17  Q  Did you review the discipline that was assessed?

18  A  I don't recall.

19  Q  It's possible?

20  A  It's possible but I don't remember.

21  Q  In your capacity or at least in February of

22   '21, did you review discipline assessments?

23  A  Yes, I did.

24  Q  As like a matter of course, would you review

25   all of them or would it be a case by case

1    basis?

2    A   Case by case.

3    Q   You don't recall one way or the other if you

4    reviewed Mr. Sexton's?

5    A   No, I do not.

6    Q   Sir, I'm showing you what we already marked 

7    as Exhibit 12.  Okay?

8    A   Was that for me, sir?

9    Q   Have you seen this?

10   A   During the prep.

11   Q   So it appears to be a letter signed by Tom

12   Jared.  Right?

13   A   Yes.

14   Q   Assessing discipline to Mr. Sexton.  Right?

15   A   Yes.

16   Q   Tom Jared testified that even though this has

17   his signature on it, he didn't read it and

18   didn't know it was going out.

19       MR. SULLIVAN:  Objection to the

20   extent it misstates Mr. Jared's testimony.

21   Q   (By Mr. Magnuson, continuing) Prior to it

22   going out, at least according to Mr. Jared,

23   he didn't read this.  He testified that an

24   admin person sent this out with his

25   signature.  He also said that he didn't make

1    the decision to discipline Mr. Sexton. On
2    its face, it appears that Mr. Jared issued
3    the discipline to Mr. Sexton, doesn't it?
4    A  Yes.
5    Q  Mr. Jared further testified that correspondence
6    with his E signature on it like this
7    routinely goes out without him ever seeing
8    it. Are you okay with that?
9    A  I guess what are you asking?
10   Q  You're his boss. Right?
11   A  I was.
12   Q  At the time you were Tom Jared's boss?
13   A  Hmm-mm.
14   Q  That's a yes?
15   A  Yes.
16   Q  If administrative people are routinely
17   sending out correspondence with his signature
18   on it that he hasn't read, do you take
19   exception to that?
20   A  No.
21   Q  Is that typical with higher up management at
22   CP Rail?
23   A  It's like a trick question. Can you clarify
24   your question?
25   Q  Well, general managers, AVP's and that type

1    of thing typically have admin people sending

2    out correspondence under people's signatures

3    without ever having read it?

4        MR. SULLIVAN:  Objection, lack of

5    personal knowledge.

6    A  Referencing discipline, the admins will send

7    out discipline to employees using the name of

8    the manager that's administering the discipline.

9    Q  (By Mr. Magnuson, continuing) So it appears

10   in this document that Mr. Jared administered

11   the discipline.  Right?

12   A  That's what this document appears to be.  But

13   it could very easily be an admin using the

14   wrong manager's name.

15       MR. MAGNUSON:  Let's take a quick

16   10-minute break.  We'll go off the record.

17       (Brief recess).

18   Q  (By Mr. Magnuson, continuing) Mr. Miller, in

19   February of 2021, were you on the Teams

20   messaging app?

21   A  I don't know.

22   Q  You know what Teams is.  Right?

23   A  Yes.

24   Q  Do you know if you were using that in

25   February of 2021?



Plaintiff Affirmative

1   A  I do not believe I was.

2   Q  Were you able to access Nexus in February of

3      2021?

4   A  Yes, but I did not use it.

5   Q  Did you use it in February of 2021?

6   A  No.

7   Q  Why not?

8   A  I don't need to use it.

9   Q  Are you able or were you able in February of

10     2021 to otherwise track train speed where

11     various trains are on your territory?

12  A  Yes.

13  Q  How would you go about doing that?

14  A  I use RPM.

15  Q  What does that stand for?

16  A  Don't quote me.  I think it's railroad

17     performance monitor.

18  Q  What is that?  Can you describe it a little

19     bit?

20  A  It's a system that tracks trains, colors,

21     showing whether they're on time, early, late.

22     You can look at consists.  You can look at

23     locomotives, yards.  You can look at a lot of

24     information in the system.

25  Q  Is that on a mobile device, on a desktop

1    computer, on a laptop?  How do you access it?

2    A  I use a desktop and laptop.

3    Q  Was that the case in February of 2021?

4    A  Yes.

5    Q  So part of your job is to monitor RPM and see

6    how your traffic is performing.  Right?

7    A  I monitor RPM and watch train performance.

8    Q  Over-standard work events are something that

9    get talked about in these phone calls that

10   you have with your various managers.  Right?

11   A  Some do.  Some don't.

12   Q  In February of 2021, how often would you

13   check RPM assuming you're in the office and

14   working that day?

15   A  I don't know.

16   Q  Is it something that's kind of up on your

17   screen all the time and you're kind of

18   constantly watching it?

19   A  No.

20   Q  Do you have to log in specifically and check

21   it and then back out?

22   A  I can open it up and leave it as a secondary

23   screen.

24   Q  And you could do that in February of '21?

25   A  Yes.

1   Q  And over-standard work events can result in

2   drill downs.  Right?

3   A  Yes.

4   Q  That's all part of the consequence leadership

5   model which is people have to be held

6   accountable for things like over-standard

7   work events.  Right?

8   A  Yes.

9   Q  Do you ever discuss over-standard work events

10  with people like Jason Ross or Tom Jared kind

11  of in realtime when they're occurring if

12  you're looking at RPM?  Can you call someone

13  and say, why is this train over-standard?

14  A  Ask the question again.

15      MR. SULLIVAN:  Objection, form.

16  Q  (By Mr. Magnuson, continuing) Did you in

17  February 2021 have the ability to call these

18  managers, like you talked on the February 1st

19  to Jared and Ross a number of times?  You

20  have the ability to look at RPM and see that

21  an over-standard work event is taking place

22  and call your manager.  Right?

23  A  Yes, I have the ability to observe RPM and

24  engage in trains and have discussions.

25  Q  In realtime, call a manager and ask them or



50.1 ● Plaintiff Affirmative

50.2 ● Plaintiff Affirmative

1    inquire what's taking so long or why is this

2    over-standard?

3    A  Yes, I do.

4    Q  Do you know what Tom Jared was doing in

5    Davenport, Iowa and at Nahant on February

6    1st, 2021?

7    A  No.

8    Q  We have a hotel receipt that said he was

9    there for three nights.  Do you know why he

10   was there for three nights?

11   A  Not other than it was part of his territory.

12   Q  Who signs off on Tom Jared's expense reports?

13   A  Jason Ross.

14   Q  I'm assuming those expense reports would

15   reflect the purpose for him being in

16   Davenport?

17        MR. SULLIVAN:  Objection, doesn't

18   have personal knowledge.

19   A  Not necessarily.

20   Q  (By Mr. Magnuson, continuing) When someone

21   travels for CP, for instance in Mr. Jared's

22   case, and puts the hotel on a company card,

23   who handles the itineraries for those trips?

24   Does he have to seek permission to take a

25   trip?  Are there e-mails that go out

1    directing him to take a trip?

2        MR. SULLIVAN:  Objection, form,

3    lack of personal knowledge.

4    A  Can you ask one question at a time so I can

5    answer for you?

6    Q  (By Mr. Magnuson, continuing) How are

7    itineraries developed when you travel for CP

8    Rail?

9    A  That's the responsibility of that leader

10   that's traveling.

11   Q  So Tom Jared would have done his own travel?

12       MR. SULLIVAN:  Objection, lack of

13   personal knowledge.

14   A  I don't know.

15   Q  (By Mr. Magnuson, continuing) Do people have

16   to seek permission to travel?

17   A  Normally not on your own territory.

18   Q  Employees such as Tom Jared in February of

19   '21, are they responsible for telling someone

20   why they're traveling or where they're traveling?

21   A  Not on his own territory.  He may tell his

22   leader, hey, I plan to go to location X but

23   he's not looking for permission.

24   Q  So in February of '21, Tom Jared had the

25   authority to travel within his territory when

1    he wanted, where he wanted without any

2    oversight?

3    A  Correct.

4    Q  I think we asked this already.  I don't know

5    if we got an answer.  Would his expense

6    report reflect the purpose of his travel to

7    Davenport?

8         MR. SULLIVAN:  Objection, lack of

9    personal knowledge.

10   A  I don't know.

11   Q  (By Mr. Magnuson, continuing)  On February 1st

12   of 2021 in the morning, if you had been at

13   your desk and been looking at RPM, RPM would

14   have told you that the 474 was the longest

15   over-standard work event on the US system

16   that day.  Right?

17   A  No.

18   Q  What would RPM have told you about a 3-1/2

19   hour over-standard work event and

20   Mr. Sexton's train?

21   A  RPM only gives me what I ask for.  I would

22   have to seek out specific trains to see what

23   the statuses are.  There's no pop-up in RPM

24   that says here's one to look at.

25   Q  But someone could have brought it to your

1    attention on one of those phone calls, right,

2    and then you could have looked at the 474?

3    A  Someone could have.

4    Q  You just don't know one way or the other

5    whether they did.  Right?

6    A  Right.

7    Q  Did Jason Ross have RPM at the time? 

8        MR. SULLIVAN:  Objection, lack of

9    personal knowledge.

10   A  Yes.

11   Q  (By Mr. Magnuson, continuing) How about Tom

12   Jared?

13   A  Yes.

14   Q  Why is it that you don't use Nexus?

15   A  I don't need to.

16   Q  Why is that?

17   A  I don't need to.

18   Q  What is Nexus?

19   A  I don't use Nexus.  I use RPM and I can get

20   what I want out of RPM what I'm looking for.

21   Q  I'm just asking what is Nexus?

22   A  Nexus is a system that's used to look at

23   cars, look at yards, evaluate traffic that's

24   inbound and outbound.

25       MR. MAGNUSON:  Kyle, if we could

1    pull up Exhibit 29.

2    Q  We pulled up Exhibit 29 here, Mr. Miller.

3    Take a second and review it.  Have you looked

4    at this document prior to today?

5    A  No.

6    Q  Have you had a chance to look at this?

7    A  I'm reading it again.  I'm reading it now.

8    Q  Okay.

9    A  (Witness examining document).

10   Q  Let me know if you want us to scroll down.

11   A  Go down.  Go to the top.  (Witness examining

12   document).

13   Q  Is this document part of what you might

14   consider the drill down process?

15   A  No, not me.

16   Q  Not you?  What do you mean by not you?

17   A  I wouldn't consider it part of the drill down

18   process.  It just gives a description of 474,

19   what happened.  I wouldn't consider it as a

20   drill down document.

21   Q  What does it mean by incident report?  Does

22   that reference the over-standard work event?

23   A  I don't know.

24   Q  You assume and expect Mr. Jared to answer

25   his -- monitor his e-mails and read them.

1    Right?

2    A  Say again.

3    Q  You expect as Mr. Jared's boss at least in

4     February 2021 to read his e-mails.  Right?

5    A  Yes.

6    Q  So we can assume that on February 1st, 2021

7     at 9:37 a.m. Mr. Jared read this e-mail.  Right?

8        MR. SULLIVAN:  Objection, lack of

9     personal knowledge.

10   A  I can't assume when he would have read it.

11   Q  (By Mr. Magnuson, continuing) And this

12    references a 3 hour and 23 minute over-

13    standard delay.  Right?

14   A  Yes.

15   Q  If we scroll up, there's an e-mail from Tom

16    Jared to Kurtis McKelvey.  Right?

17   A  Yes.

18   Q  Kurtis McKelvey was John Sexton's trainmaster

19    that day.  Right?

20       MR. SULLIVAN:  Objection, lack of

21    personal knowledge.

22   A  Well, Kurtis was working that particular day,

23    yes.

24   Q  (By Mr. Magnuson, continuing) Well, you read

25    the e-mail that John Sexton sent to you and

1    that referenced McKelvey being his train-

2    master.  Right?

3    A  I just answered it and said Kurtis was

4    working that day, yes.

5    Q  And John Sexton in that e-mail told you

6    Kurtis told Sexton not to cut the tracks.

7    Right?

8    A  Yes.

9    Q  And Sexton cut them anyway?

10   A  Based on the e-mail, yes.

11   Q  And that cutting of the tracks contributed in

12   some way to delaying that train.  Right?

13      MR. SULLIVAN:  Objection, lack of

14   personal knowledge.

15   A  That would have added extra time.

16   Q  (By Mr. Magnuson, continuing) And Tom Jared

17   had told Kurtis McKelvey to call him when he

18   had a minute.  Right?

19   A  Yes.

20   Q  And I can reference for you that phone call

21   occurred.  Okay?

22   A  Okay.

23   Q  Do you think we can assume that that phone

24   call referenced this over-standard work event

25   based on this correspondence?



57.1  Defendant Objection
57.2  Plaintiff Affirmative
57.3  Defendant Objection
57.4  Plaintiff Affirmative
57.5  Defendant Objection

1        MR. SULLIVAN:  Objection, calls

2    for speculation, lack of personal knowledge.

3    A  I don't know for sure.  But based on the

4    e-mail, yes.

5    Q  (By Mr. Magnuson, continuing) It looks that

6    way to us, yep.  So you'd agree with that?

7    A  Based on the e-mail, we can assume that

8    that's what it was about.

9    Q  So you never worked as an engineer or

10   conductor.  Is that correct?

11   A  No.

12   Q  When you were a trainmaster or a general

13   manager, did you conduct E tests?

14   A  Yes.

15   Q  You're familiar with the E test manual?

16   A  Yes.

17   Q  Do you know the specifics of Mr. Jared's

18   E test of Sexton?

19   A  No, I do not.

20   Q  Is it unusual at all to you that Tom Jared,

21   being a general manager, would be E testing

22   John Sexton?

23   A  No.

24   Q  So your general managers typically conduct

25   E tests?

1   A  Yes.

2   Q  Do you have any idea why Tom Jared was at

3   Nahant that morning, February 1st of 2021?

4   A  No, I do not.

5   Q  If this over-standard work event caused Mr.

6   Jared in any way to E test Mr. Sexton, would

7   you take exception to that?

8       MR. SULLIVAN:  Objection, calls

9   for speculation, assumes facts not in

10  evidence.

11  A  I don't know enough to answer that.

12  Q  (By Mr. Magnuson, continuing) Well, if -- and

13  I'm just talking hypothetically here.  If

14  McKelvey tells Jared when he calls him, right

15  here when it says 'call me when you have a

16  minute', and Jared says 'Kurtis, what's up

17  with the delay' and Kurtis says 'Tom, Sexton

18  took a bunch of time cutting the tracks'

19  causing Jared to E test Sexton, would you

20  take exception to that?

21      MR. SULLIVAN:  Objection, calls

22  for speculation, assumes facts not in

23  evidence, lack of personal knowledge.

24  A  I would not take exception to Tom Jared

25  testing Mr. Sexton.

1    Q  (By Mr. Magnuson, continuing) Well, would you

2      take exception if it was because Kurtis tells

3      Jared that Sexton cut the tracks and caused a

4      delay?

5        MR. SULLIVAN:  Objection, calls

6      for speculation, assumes facts not in

7      evidence, lack of personal knowledge.

8    A  I don't know if I can say that would be Tom's

9      reason for testing him.

10   Q  (By Mr. Magnuson, continuing) And that wasn't

11     my question.  You know CP's rules.  Right?

12   A  Do I know what?

13   Q  You know the CP rules relating to anti-

14     discrimination, antiharassment, anti-

15     retaliation.  Right?

16   A  Yes.

17   Q  And you're responsible in your position for

18     making sure those rules are followed.  Right?

19   A  Yes.

20   Q  And if Jared -- this is a hypothetical.  I'm

21     not asking you what happened.  This is a

22     hypothetical.  If Jared E tests Sexton

23     because McKelvey tells Jared that Sexton cut

24     the tracks and caused a delay, that would be

25     in violation of CP's anti-harassment,

1    retaliation, discrimination policies.  Right?

2        MR. SULLIVAN:  Objection, calls

3    for speculation.

4    A  I don't know how that would deem as

5    harassment.  Tom as general manager has

6    freedom to E test any train crew.

7    Q  (By Mr. Magnuson, continuing) At the time you

8    were Tom's boss.  Right?

9    A  Yes.

10   Q  And responsible for making sure he's

11   following the rules.  Right?

12   A  Yes.

13   Q  And responsible for not violating any anti-

14   retaliation policies.  Right?

15   A  Yes.

16   Q  And you've already indicated that if there's

17   snow and ice built up on the tracks, you

18   would expect those tracks to be cut.  Right?

19   A  Yes, I'd expect us to do the right thing to

20   not derail.

21   Q  And if McKelvey told Jared -- I'm not saying

22   it's true.  This is a hypothetical.  If

23   McKelvey told Jared in this phone call right

24   beforehand this delay was caused by Sexton

25   cutting the tracks resulting in Jared

1    E testing Sexton, that would be in violation

2    of those anti-retaliation policies, wouldn't

3    it?

4        MR. SULLIVAN:  Objection, calls

5    for speculation, lack of personal knowledge.

6    A  I don't see how.

7    Q  (By Mr. Magnuson, continuing) So you'd agree

8    with me that Sexton cutting the tracks after

9    being told not to engaged in a protected

10   activity.  Right?

11       MR. SULLIVAN:  Objection,

12   misstates the record, calls for a legal

13   conclusion.

14   A  I wasn't there for the conversation.  I don't

15   know what the conversation was between Sexton

16   and McKelvey.

17   Q  (By Mr. Magnuson, continuing) But you read

18   Sexton's e-mail?

19   A  Correct.

20   Q  And I'm asking you to assume that what Sexton

21   wrote is true.  Okay?

22   A  Okay.

23   Q  Sexton, if what he wrote is true, did the

24   right thing by cutting those tracks.  Right?

25   A  Yes.

1   Q  And you've testified that cutting tracks can

2   cause delay?

3   A  It takes time to cut tracks.

4   Q  And additional time means a delay?

5   A  Not necessarily.

6   Q  But if McKelvey tells Jared this delay is

7   because Sexton cut the tracks and Jared goes

8   and tests Sexton because of that, that would

9   be in violation of CP's anti-retaliation

10  policy. Right?

11      MR. SULLIVAN: Objections, asked

12  and answered, lack of personal knowledge,

13  calls for speculation.

14  A  Not necessarily.

15  Q  (By Mr. Magnuson, continuing) How so?

16  A  He could be testing just to make sure that

17  Sexton is doing everything properly. It

18  doesn't have to be retaliatory.

19  Q  So that would just be a coincidence then in

20  your mind, that scenario?

21  A  No, just hypothetical.

22  Q  Right. With that hypothetical, in your mind,

23  you wouldn't, being an individual responsible

24  for enforcing these policies, would you look

25  into that further? Would you call Tom Jared


Plaintiff Affirmative

1    and say, did you E test him because he cut

2    the tracks?

3    A  No.

4    Q  You wouldn't?

5    A  No.

6    Q  And you're responsible for enforcing those

7    rules?

8    A  Yeah.  I don't see where he's being

9    retaliatory.

10   Q  You see the phone calls and you see the

11   e-mails.  Right?  We've gone through them

12   here today.

13   A  Yes.

14   Q  So this in your mind was a coincidence?

15   A  I'm not saying that.  I didn't say that.

16   Q  Sir, did you read any depositions to prepare

17   for your deposition today?

18   A  No.

19   Q  I'm going to real quickly ask you some

20   questions here.  Have you seen this e-mail?

21   It's been marked as Exhibit 26.

22   A  I don't think so, no.

23   Q  I just have -- it's largely the same content

24   that we have been going over here today, but

25   there are a number of additional distribution

1    lists here.  There's DL MOC senior director,

2    MOC senior director, MOC director east, DL

3    CMC management.  Are you part of any of those

4    distribution lists?

5    A  No.

6    Q  If you know, who would have been part of

7    those distribution lists?

8    A  I don't know how to explain them.  The senior

9    directors, director east, those are the

10   managers in the operations center.  The CMC

11   management, those are also crew management

12   center managers.  That's what CMC stands for,

13   crew management center.  That group, they're

14   all in the operations center.

15   Q  And that wasn't something you were connected

16   with, the operations center?

17   A  What do you mean connected?

18   Q  At least in terms of these e-mail strings?

19   A  I was not on these e-mail strings.

20   Q  So have any of the e-mails or phone logs that

21   you've looked at here today or breakdown of

22   this over-standard work event refreshed your

23   recollection at all about these events on

24   February 1st, 2021?

25   A  No, sir.



Plaintiff Affirmative

1   Q  You don't remember Sexton's train?

2   A  No, sir.

3   Q  You don't remember what you and Jason Ross or

4     Tom Jared talked about in these various phone

5     calls on the 1st?  Is that right?

6   A  That's correct.

7   Q  And none of the e-mails that you forwarded to

8     Ross refreshes your recollection about

9     whether or not you spoke with either McKelvey

10    or Jared about any of these events?

11  A  No.

12  Q  You receive a PMP with CP Rail?

13  A  Yes, I do.

14  Q  Do you remember what your bonus was in 2021?

15  A  No, I don't.

16  Q  Was it over $400,000?

17  A  Sir, I have no recollection what my bonus was.

18  Q  Do you know what it was last year?

19  A  No.

20  Q  You don't know what your bonuses are?

21  A  No, I do not remember what my bonus was.

22  Q  What is your salary?

23  A  I think about $200,000, something like that.

24  Q  How much stock do you own in CP?

25     MR. SULLIVAN:  Objection, irrelevant.

1   A  I don't know. 

2   Q  (By Mr. Magnuson, continuing) Over a million

3     dollars worth?

4       MR. SULLIVAN:  Same objection.

5   A  I would think so.

6   Q  Can you tell this jury in 2021 if you

7     received a bonus of more than $400,000?

8   A  I do not recall what I received in 2021.

9   Q  It could have been more?

10  A  I don't know.  It could have been more.  It

11    could have been less.  I don't remember.

12  Q  Not even a ballpark?

13      MR. SULLIVAN:  Objection, asked

14   and answered.

15  A  No.

16  Q  It could have been a million?  It could have

17    been $25?

18      MR. SULLIVAN:  Objection,

19   argumentative, asked and answered.

20  Q  Is that a fair swing?  We could be somewhere

21    between $25 and a million?

22  A  Yes, it is.

23  Q  Closer to a million or closer to $25?

24  A  I don't know.

25  Q  Would you agree with me if someone that is

Plaintiff Affirmative

Defendant Objection

Plaintiff Affirmative

Defendant Objection

Plaintiff Affirmative

Defendant Objection

Plaintiff Affirmative

Defendant Objection

1    under oath says they don't know and they

2    really know, that that's a lie?

3    A  I would.  I would agree with you.

4    Q  So if you really know what your bonus was and

5    you're not telling us, you're lying?

6        MR. SULLIVAN:  Objection,

7    argumentative.  There's no basis to believe

8    Mr. Miller is not telling the truth.  These

9    questions are just to harass this witness.

10   Let's move on.

11       MR. MAGNUSON:  It's absolutely

12   unbelievable is what it is, Jack.  You know

13   it.

14       MR. SULLIVAN:  I do not know

15   that.  Don't put words in my mouth or the

16   witness'.

17   Q  (By Mr. Magnuson, continuing) I bet Jack

18   knows what he's getting paid.  I know.  At

19   any time around these events in February 2021,

20   Mr. Miller, did you become aware that Mr.

21   McKelvey was claiming in various e-mails that

22   he was overtired and hadn't been home to sleep?

23   A  No.

24   Q  Did you review e-mails to that effect while

25   you were preparing for your deposition?

1   A  No.

2   Q  You remember the Shawn Duce resignation

3    e-mail I'm assuming?

4   A  No.

5       MR. MAGNUSON:  We'll give you a

6    chance to read it.

7       MR. SULLIVAN:  Are you going to

8    mark this as an exhibit?

9       MR. MAGNUSON:  We are.

10      (Deposition Exhibit 76 marked for

11   identification).

12      MR. SULLIVAN:  Can you please go

13   up to the top?

14      MR. MAGNUSON:  Just tell us to

15   scroll or stop.

16      MR. SULLIVAN:  I'm sorry.  Can

17   we go back up to the addressees to see if

18   Mr. Miller is included in this list?

19      MR. MAGNUSON:  He was the first

20   person.

21      MR. SULLIVAN:  Got it.  I didn't

22   see that.  Thank you.

23      THE WITNESS:  (Witness examining

24   document).  Will you blow it up a little bit

25   for me?  Thank you.

1    Q  (By Mr. Magnuson, continuing) You know the

2    front line supervisor survey follows this

3    e-mail, as it's an e-mail of you sending the

4    results around.  Can we go off the record

5    while you --

6        MR. SULLIVAN:  No, we don't agree

7    to go off the record.  He can take the time

8    that he needs to read the exhibit.

9        MR. MAGNUSON:  Well, we'll be

10   objecting to that and we'll be going over our

11   time for however long it takes him to read it.

12       MR. SULLIVAN:  We will be done at

13   three hours.  If you want to present a multi-

14   page exhibit and not provide copies in advance

15   so the witness --

16       MR. MAGNUSON:  I provided you a

17   copy in advance.

18       MR. SULLIVAN:  Not to the

19   witness, not as an exhibit.  You're putting

20   things up on the screen and having Kyle be

21   the AV guy to scroll us through these things.

22       MR. MAGNUSON:  If you chose not

23   to review this document with your client,

24   that's on you, Jack.  He sent the e-mail

25   distributing the survey.  We're going off the

1    record.

2        MR. SULLIVAN:  I don't agree.

3        MR. MAGNUSON:  Let's call the

4    judge.  Let's call chambers.  We're now off

5    the record.

6        (Brief recess).

7    Q  (By Mr. Magnuson, continuing) Tell us,

8    Mr. Miller, where you left off.

9    A  I think he had shown -- is that where he

10   signs it at the bottom there?

11   Q  Below this is your e-mail circulating the

12   front line supervisor results of that survey.

13   A  I think I have read this piece.  You can keep

14   going.  (Witness examining document).  Is

15   that the first part of the survey?  I think

16   you may have skipped some.

17   Q  Did you read the supervisor survey prior to

18   today?

19   A  No.  Is this the first part?

20   Q  That's all of it.

21   A  Am I supposed to be reading it?

22   Q  I would like that, yes.  I'm going to ask you

23   some questions about it.

24   A  Is that the beginning of it there?

25   Q  Yes.

1   A  (Witness examining document).

2   Q  We'll go down.  Tell us when to go down.

3   A  Is this the first page here?

4   Q  Yes.

5   A  Thank you.  Go to the second page, the next

6     page.  (Witness examining document).  Next

7     page, next page, okay.

8         MR. MAGNUSON:  Off the record

9     briefly.  It sounds like the Court is calling

10    back.

11        (Brief recess).

12  Q  (By Mr. Magnuson, continuing) Let me ask you,

13    Mr. Miller, what was your involvement in this

14    Front Line Leader Survey?

15  A  You mean after this survey?

16  Q  How about even before?  Were you involved in

17    the process of putting it together,

18    distributing it, looking at the data or any

19    of that?

20  A  No, sir.

21  Q  You received it and then forwarded it on?

22  A  Correct.

23  Q  That makes that quicker.  We may not need the

24    extra ten minutes.  Were you involved in any

25    follow-up as a result of this survey in terms

1   of making any changes at CP Rail?

2   A  I don't remember all the details, but yes.

3   Q  What was done by CP as a result of this survey?

4   A  I can say myself -- as I mentioned, I had the

5   US and Eastern Canada and Greg Squires had

6   Western Canada.  We elected to have

7   multiple -- three or four conference calls

8   with all the managers under us so that we

9   could -- we'd want to talk through the survey

10  and listen to them.  That was the first thing

11  that we did.

12  Q  Were you surprised at all by the results of

13  this?

14  A  Some yes.  Some no.

15  Q  Were you disappointed in the results of some

16  of these survey results?

17  A  Some yes.  Some no.

18  Q  Well, we're looking at the first one here.

19  The question was, "Despite working a 24/7

20  operational role, CP provides me with the

21  opportunity to balance my work and home

22  life." That was the question.  Right?

23  A  Yes.

24  Q  It appears that the results were a full 71

25  percent either disagreed or strongly

1    disagreed.  Right?

2        MR. SULLIVAN:  Objection,

3    document speaks for itself.

4    A  Yes.

5    Q  (By Mr. Magnuson, continuing) You would agree

6    with me then that apparently, according to

7    this document, 71 percent of your front line

8    supervisors felt like there was a work/life

9    balance that was out of balance.  Right?

10       MR. SULLIVAN:  Objection,

11   misstates the document.

12   A  Reading the numbers, yes.

13   Q  If you take 34.7 plus 36.9, that's 71.6

14   percent?

15   A  Yes.

16   Q  Were you surprised by those results?

17   A  I don't remember.

18   Q  Were you disappointed with them?

19   A  I don't remember the specifics on this piece.

20   Q  Then under the graph there's a question,

21   "What would it take for you to provide a more

22   positive response to this question?"  Number

23   1 -- let me ask you this.  Were these pre-

24   filled comments that people would check on or

25   were these comments directly submitted by

1    employees?

2    A  I don't remember.  I don't remember.

3    Q  The first one says, "Ability to disconnect -

4    answering phone 24/7, getting on conference

5    calls on days off, no homework on days off".

6    And there were 44 comments.  Do you see that?

7    A  Yes.

8    Q  In February of 2021, were trainmasters

9    required to answer their phones 24/7 unless

10   they're on vacation or some sort of medical

11   leave?

12   A  You got buckets of trainmasters.  You have

13   the terminal folk who work a shift and go

14   home.  Then you have road trainmasters who

15   are responsible for their territories.  On

16   they're non-off days, yes.  On their off

17   days, no.

18   Q  Do you think employees working 24/7 presents

19   a safety hazard?

20       MR. SULLIVAN:  Objection, calls

21   for speculation, misstates the document.

22   A  Yes.

23   Q  (By Mr. Magnuson, continuing) Who all was

24   interviewed for this survey, do you know?  I

25   don't mean individuals.  I mean what positions.

1  A  I think it was a corporate survey.  You know,

2    I can't speak to that.  But it would have

3    been the trainmaster level and up.

4  Q  I was under the assumption, but I don't know

5    that it was just front line folks like

6    trainmasters, road foremen of engine.  So it

7    could be those folks on up.  Right?

8  A  I don't remember, sir.

9  Q  Did you take the survey?

10  A  I can't recall in 2021.

11  Q  Let's go to number 5.  Do you see that number

12    5 there, Mr. Miller?

13  A  Yes.

14  Q  "I have recently had thoughts of leaving CP".

15    And that one, strongly agree or agree,

16    comes to 61.3 percent.  Do you see that?

17      MR. SULLIVAN:  Objection, form.

18  A  Say that again.

19  Q  (By Mr. Magnuson, continuing) Well, you see

20    that the results there are 33.5 percent

21    strongly agree and 27.8 percent agree.

22    Right?

23  A  Yes.

24  Q  And you'd agree that that comes to 61.3

25    percent?

1  A  Yes.

2  Q  So 61.3 percent, at least when this survey

3  was issued, were thinking of leaving CP.

4  That's what this document states?

5  A  Yes.

6  Q  Number 1 below that says, "Changing

7  schedules, no time off".  Do you see that?

8  A  Yes.

9  Q  Number 2 is, "The way I'm treated, yelling,

10  belittling, job threatened".  Number 3 below

11  that is, "Workload, staffing positions, not

12  enough people".  Number 4, "Burnout and

13  stress due to workload and hours".  Do you

14  see that?

15  A  Yes.

16  Q  Were these results as a vice president

17  concerning to you at all when you circulated

18  this in June of '21?

19      MR. SULLIVAN:  Objection,

20  misstates the record.

21  A  Yes, it would have been.

22  Q  (By Mr. Magnuson, continuing) Why were you

23  concerned?

24  A  Because people thought about leaving and we

25  needed good workers and good leaders here.

1   Q  And you read the Shawn Duce resignation

2    e-mail here.  Right?

3   A  Yes.

4   Q  Did that refresh your recollection at all

5    about the Shawn Duce resignation e-mail?

6   A  I barely remember Shawn Duce.

7   Q  Do you recall receiving this e-mail?

8   A  I do now that I have read it.

9   Q  Did you have discussions with any of your

10   fellow managers about the contents of this

11   e-mail?

12  A  I don't remember exactly, but I'm sure I did.

13  Q  He certainly expresses concern about the

14   work/life balance being put on managers,

15   particularly trainmasters, at CP Rail.

16   Right?

17  A  Yes.

18  Q  He's complaining about the 24/7 nature of the

19   work and the pressure?

20      MR. SULLIVAN:  Objection, the

21   document speaks for itself.

22  A  Yes.

23  Q  (By Mr. Magnuson, continuing) I just asked

24   you a minute ago.  I didn't hear your answer

25   because I'm busy reading.  Did you have

1    conversations with other managers about the

2    contents of the Shawn Duce resignation

3    e-mail?

4    A  I don't remember specifically, but I'm sure I

5    did.

6    Q  Do you remember who that might have been?

7    A  No.

8    Q  Do you remember what the crux of your

9    communications with other managers was, like

10   should we look into this?

11   A  I'm sure we would have discussed the contents

12   of his e-mail.

13   Q  Why?

14   A  Because he sent it to me and he copied many

15   other managers on there, and that's what I

16   would have discussed with them.

17   Q  In the very beginning of it it says, "Several

18   months ago Mr. Miller asked a question on why

19   leaders keep leaving CP for other

20   opportunities".  Do you see that?

21      MR. SULLIVAN:  Could we please

22   see that on the screen rather than what we

23   are looking at before we ask questions about

24   it?

25   Q  (By Mr. Magnuson, continuing) Do you see at

1    the beginning it says, "Several months ago

2    Mr. Miller asked a question on why leaders

3    keep leaving CP for other opportunities"?  Do

4    you see that?

5    A  Yes, sir, I do.

6    Q  What is he referring to there?  Was this a

7    meeting on a phone call?  When did you ask

8    this question?

9    A  I don't remember.

10   Q  So several months ago this e-mail was sent by

11   Mr. Duce in September of '21.  Right?

12   A  I have to see the date again.

13   Q  Okay.

14   A  Yes.

15   Q  Do you recall in the middle part of 2021

16   leaders leaving CP?

17   A  At some point, yes, I'm sure we did have some

18   leave.

19   Q  What positions are you referring to when you

20   say leaders, or when he says leaders?

21   A  I don't know.

22   Q  Did that involve trainmasters?

23   A  He may be talking about trainmasters.

24   Q  Mr. Duce was a trainmaster.  Right?

25   A  Yes.

1    Q  It says, "There were several leaders that

2      responded to this question in an effort to

3      provide answers".  Do you know what he's

4      referring to there?

5    A  I don't remember.  No, I don't.

6    Q  Do you think it's referring to the survey?

7        MR. SULLIVAN:  Objection, calls

8      for speculation, lack of personal knowledge.

9    A  I don't know if he's referencing the survey

10      or referencing my ask several months prior.

11    Q  (By Mr. Magnuson, continuing) Below that he

12      refers to three sessions that were held to

13      review the results and then states none of

14      that was brought up.  Do you know what he's

15      referring to with these three sessions?

16    A  Tell me where you're reading.

17    Q  Just continuing on with the same paragraph.

18    A  No, I don't know what he's referring to.

19    Q  Next paragraph down in the middle of it, he

20      states, "There have been more days than I can

21      remember where I have worked anywhere from 24

22      to 48 hours and weeks on end without a

23      reprieve".  I asked you earlier if that's

24      true, that would cause you concern in terms

25      of safety?

1    A  If that was true, but I wouldn't know of any

2      manager that would have done that.

3    Q  At the bottom of that same paragraph -- go

4      down to the top of the next page.  The last

5      sentence in the top paragraph there says, "I

6      suspect that one reason so many officers

7      leave CP is the unrealistic demands and

8      sacrifices that are required of employees and

9      their families".  Do you see that?

10   A  No.  Show it to me.

11   Q  It's on the second page there at the bottom

12     of the top paragraph.  It's the last sentence

13     in the top paragraph, "I suspect".

14   A  Last sentence.  I certainly understand.  He's

15     down there.  (Witness examining document).  Okay.

16   Q  It seems to line up with the first survey

17     result, doesn't it?

18        MR. SULLIVAN:  Objection, lack of

19     personal knowledge, calls for speculation.

20   A  I'd have to speculate on what he's talking

21     about.

22   Q  (By Mr. Magnuson, continuing) Is this a

23     sentiment that has been expressed to you by

24     others?

25        MR. SULLIVAN:  Objection, form.

1    A  What sentiment, sir?

2    Q  (By Mr. Magnuson, continuing) The sentiment

3      that is expressed in that sentence, "I

4      suspect that one reason so many officers

5      leave CP is the unrealistic demands and

6      sacrifices that are required of employees and

7      their families".

8    A  Yes, I've heard that before.

9    Q  By whom?

10   A  Different managers.

11   Q  Trainmasters?

12   A  Yes.

13   Q  CP strives to be the best.  Right?

14   A  Yes.

15   Q  By striving to be the best and part of the

16     process of striving to be the best is

17     adhering to precision scheduled railroading.

18     Right?

19   A  That's a piece of it, yes.

20   Q  Would you agree with me that an unintended

21     consequence of striving to be the best and

22     adhering to precision scheduled railroading

23     can have unintended consequences on peoples'

24     work/life balance and demands?

25         MR. SULLIVAN:  Objection, form.

1    A  Yes, it could.

2    Q  (By Mr. Magnuson, continuing) Did you work

3     with Tony Marquis?

4    A  Briefly I did.

5    Q  Did you respect him?

6    A  Yes.

7    Q  And you worked with Nick Walker?

8    A  Yes.

9    Q  Do you remember Brad McDaniel?

10   A  Yes.

11   Q  Did Brad McDaniel ever tell you why he quit?

12       MR. SULLIVAN:  Objection, relevance.

13   A  Brad McDaniel didn't quit.

14   Q  (By Mr. Magnuson, continuing) Was he

15    terminated?

16   A  Yes.

17   Q  For what?

18   A  Multiple violations of things he shouldn't

19    have done.

20   Q  Let's go to number 2 on the survey results,

21    "Does my leadership team make me valued and

22    respected?"  Strongly disagree was 11.4

23    percent and disagree was 29 percent.  Right?

24   A  Yes.

25   Q  Does that result concern you?

1    A  It raises your eyebrows, yes.

2    Q  If we go to number 3, "I am motivated to

3    progress my career at CP", 26.7 percent

4    strongly disagreed -- sorry.  13.6 strongly

5    disagreed and 26.7 disagreed.  Do those

6    results concern you?

7    A  Not as much.  That one is more about detail.

8    Q  Number 4, "CP focuses on retaining good

9    people in Operations".  Retaining good people

10   in operations is crucial to running a safe

11   railroad.  Right?

12   A  Yes.

13   Q  33 percent disagreed and 24.4 percent

14   strongly disagreed on that one.  Right?

15       MR. SULLIVAN:  Objection,

16   document speaks for itself.

17   A  Yes.

18   Q  (By Mr. Magnuson, continuing) Number 1 under

19   that says, "Recognize that CP is losing many

20   people due to work/life balance issues

21   related to excessive work scheduling hours,

22   stress associated with the hours being

23   worked".  Do you see that?

24   A  Yes, I do.

25   Q  Does any of that concern you?

1    A  Yes.

2    Q  Let's go to page 5 of 5.  "What keeps you at

3      CP?"  Do you see the number 1 there?  It

4      says, "Pay, benefits, pension".  Right?

5    A  Yes.

6    Q  Does that surprise you at all?

7    A  No.

8        MR. MAGNUSON:  I'm going to mute

9      it for just one quick second here.  I'm

10     having something printed out.  We'll be right

11     back.

12        (Brief recess).

13        (Deposition Exhibit 77 marked for

14     identification).

15    Q  (By Mr. Magnuson, continuing) Did you review

16     this document prior to today, Mr. Miller?

17    A  No.

18    Q  It appears to be a Teams message from Kurtis

19     McKelvey on February 1st, 2021 at

20     approximately 2:31 p.m.  Do you see that?

21    A  Yes.

22        MR. SULLIVAN:  Objection,

23     misstates the document.

24    Q  (By Mr. Magnuson, continuing) This Teams

25     message appears to be to Kade Antczak.  Do



1    you see that?

2    A  Yes.

3    Q  Who is Kade Antczak?

4    A  Don't know.

5    Q  This is the date that you had this 3-1/2 hour

6    over-standard work event.  Right?  We have

7    gone through that.  Right?

8    A  Yes.

9    Q  And the date that Mr. Sexton cut the tracks, 

10    which contributed to a delay.  Right?

11    A  Yes.

12    Q  And Mr. Sexton was E tested by Mr. Jared

13    approximately at noon that day.  Right?

14    A  Based on what you told me, yes.

15    Q  And Mr. McKelvey in this Teams message

16    appears to say, "I haven't been home. Or

17    slept".  Right?

18    A  Yes.

19        (Deposition Exhibit 78 marked for

20    identification).

21    Q  Did you review this document prior to your

22    deposition?

23    A  I don't remember.

24    Q  It appears to be Jason Ross' 2020 Performance

25    Management Form.  Right?

1    A   Yes.

2    Q   On that first page there where it says

3    Achieves, it says train destination

4    performance, origin performance, terminal

5    dwell hours, and GTM's.  Can you describe for

6    us what those terms mean and the

7    corresponding numbers?

8    A   Train destination performance -- what was the

9    second part of what you said?

10   Q   Well, under each of these achieves, the train

11   destination performance, origin

12   performance -- if we can just take them one

13   at a time and, if you could, explain what

14   those phrases, those terms, and the

15   corresponding numbers and percentages mean.

16   A   Destination train performance would be -- the

17   plus amount is two hours.  The goal would be

18   to achieve 60 percent.  And that's train from

19   origin to destination.  Meaning in simplest

20   terms is if it terminates at St. Paul, 60

21   percent of the trains that terminate had to

22   be on time or within a two hour range.  So

23   for the south, which was Jason's territory

24   Q1, he did 55 percent, Q2 61 percent, and Q3

25   67, and Q4 I think that's 58 percent.

1          Origin train performance, plus

2      two hours for the south is 90 percent, which

3      means for every originating train out of the

4      south or out of a terminal of the south, 90

5      percent of those trains had to be on time

6      departing.

7          Terminal dwell hours, 9 hours.

8      That's -- I better explain it.  From a car

9      arriving to departing the yard, the goal was

10     the average of all cars to be 9 hours in the

11     terminal.

12         And then the last one, GTM's/

13     operating horse power, that is gross time

14     hours.  Operating horse power is locomotives.

15     That just means that we have to run trains at

16     a specific size basically per our plan maxing

17     out trains.

18   Q  And just so we understand, when it refers to

19     south, does that include Iowa?

20   A  Yes.

21   Q  And obviously would have dealt with the two

22     subdivisions we're talking about here today,

23     right, in Marquette and Nahant?

24   A  Yes.

25   Q  Did he meet the goals?



1    A  I don't recall.  I can't tell from what's on

2    the screen.

3    Q  Let's go two pages down.  Under the Objective

4    there it says a foundation.  What does the

5    foundation mean?

6    A  We have five foundations.  That's one of the

7    five.

8    Q  When you say we have, that's precision

9    scheduled railroading.  There are five main

10   principles.  Right?

11   A  Yes.

12   Q  Provides service.  What does provides service

13   mean in layman terms if we're talking about

14   precision scheduled railroading?

15   A  Do what you say you're going to do for the

16   commitments to the customers.

17   Q  Get the trains to their destination on time.

18   Right?

19   A  It's more of fulfilling your commitments to

20   the customers.  But, yes, that's part of it.

21   Q  And that foundation is given a 15 percent

22   weight.  Is that right?

23   A  Yes.

24   Q  We can go to the next foundation.  The next

25   foundation that we're looking at is control

1    costs.  Right?

2    A  Yes.

3    Q  And that is given a 15 percent weight?

4    A  Yes.

5    Q  And part of controlling costs is controlling

6    crew costs.  Right?

7    A  Yes.

8    Q  When crews die on their hours, that can

9    result in additional crew costs.  Right?

10   A  Correct.

11   Q  We can go to the next foundation.  The next

12   one we're looking at is optimizing assets.

13   Right?

14   A  Yes, sir, but we have done that one.

15   Q  We have done what?

16   A  You asked me about that one already.

17   Q  No.  We asked about provides service and

18   control costs.  So this is optimizing assets.

19   What does optimizing assets mean?

20   A  In layman's terms, you use what you have and

21   be productive with it.

22   Q  Part of precision scheduled railroading, at

23   least when it arrived in 2012, involved re-

24   ducing locomotive leads substantially.  Is

25   that right?



Plaintiff Affirmative

1   A  I wasn't here in 2012.

2   Q  Have you been made aware of that though?

3   A  I'm sure that was part of it.

4   Q  Part of optimizing assets is to minimize the

5      number of locomotives you have to have at

6      your disposal.  Right?

7   A  Yes.

8   Q  And part of that is because older locomotives

9      take longer to repair, they break down more

10     frequently?

11  A  Yes.

12  Q  So when things get stretched thin, there are

13     times when there aren't enough locomotives.

14     Right?

15  A  That's relative.  It's not that there aren't

16     enough.  Maybe they are not in the right

17     location at the right time.

18  Q  That comes to planning, right, making sure

19     that your trains are getting where they're

20     supposed to be on time so that the

21     locomotives can be kept working and in use?

22  A  That's a part of it.

23  Q  And this weight was also given 15 percent.

24     Right?

25  A  Yes.


Plaintiff Affirmative

1   Q  Under the objective there it says, Car

2       velocity and increased train speed.  What

3       does car velocity mean?

4   A  That's basically how far, how many miles a

5       car, an individual car in the totality of all

6       cars on the railroad, how far they travel in

7       one day.

8   Q  Okay.

9   A  Miles that they run in a 24 hour period.

10  Q  So if a car sits in a yard too long, that

11      negatively affects that metric.  Right?

12  A  Right.  Can I had add something to that?

13      There's variables where it does not affect

14      that metric if it's sitting.

15  Q  What variables might those be?

16  A  One might be a customer.  If it's a customer

17      car and the customer cannot take it, that car

18      does not negatively affect car velocity.

19  Q  Okay.  From what you've read about this case,

20      Mr. Sexton's case, that wasn't the case here,

21      was it, at least as far as what we have

22      reviewed here today?

23          MR. SULLIVAN:  Objection, form,

24      lack of personal knowledge.

25  A  No.

1   Q  (By Mr. Magnuson, continuing) Is that

2   correct?

3   A  Correct.

4   Q  The next foundation, if we can go to that, is 

5   operate safely.  And as we're adding up the

6   previous foundation weights, what we have

7   come to so far is 80 percent.  Right?

8   A  I'd have to go back and count them.

9   Q  We can do that.  Optimize assets is 15 percent.

10  Control costs is 15 percent.  Provides

11  service is 15 percent.  So the foundation

12  operates safely here is given a 20 percent

13  weight?

14  A  Yes.

15  Q  Then if we can go to the developing people,

16  developing people is given a 25 percent

17  weight.  Right?

18  A  Yes.

19  Q  Do you have any idea why these ratios come to

20  only 20 percent on safety?

21      MR. SULLIVAN:  Objection, misstates

22  the document.

23      THE WITNESS:  Ask it again.

24  Q  (By Mr. Magnuson, continuing) Do you have any

25  idea why -- if we look at these foundations,

1    developing people, operating safely,

2    optimizing assets, controlling costs, and

3    providing service, the operating safely

4    accounts for 20 percent and all the rest

5    account for 80.  Right?

6        MR. SULLIVAN:  Objection.  The

7    document speaks for itself.

8    Q  (By Mr. Magnuson, continuing) And that's the

9    way the math works out here.  Right?

10   A  Did you include developing people?

11   Q  Yes.

12   A  Okay.

13   Q  So that's an 80/20 ratio.  Do you know why

14   operating safely is only given a 20 percent

15   weight?

16   A  What do you mean only given a 20 percent?

17   Q  Okay.  I will take out the word only.  Why is

18   operating safely given a 20 percent ratio

19   when the other four come to 80 percent?

20   A  In totality it has to equal 100 percent.

21   Q  Right.  Why is operating safely given a 20

22   percent weight?

23   A  I don't know.  We got five foundations there

24   and the total number has to be 20.  I don't

25   remember in 2021 -- or 2020 I think this

1    document is -- why the weights were

2    appropriated the way that they were.

3    Q  These were appropriated pursuant to precision

4    scheduled railroading.  Right?

5        MR. SULLIVAN:  Objection, lack of

6    personal knowledge.

7    A  I don't remember why they were appropriated

8    the way they were.

9    Q  (By Mr. Magnuson, continuing) Go to page 7 of

10   9. Do you see the leader comments at the

11   bottom there?

12   A  Yes.

13   Q  Those leader comments were written by you?

14   A  Yes.

15   Q  Regarding Mr. Ross?

16   A  Yes.

17   Q  At the bottom it says, "Also improve reading

18   the "room" so you know when to pull up versus

19   continue the drill down!"  What does that mean?

20   A  I don't remember from then, but it would be a

21   statement toward knowing your audience.

22   Q  How does that relate to pulling up versus

23   continuing a drill down?

24   A  Well, when you apply the CL tools, you know

25   your audience and you know how the room is



Plaintiff Affirmative

1    taking your questions, what individuals

2    you're dealing with.  That tells you to go

3    left or to go right in a conversation, how to

4    engage differently or more effectively.

5    Q  Drill downs can occur over the telephone in

6    addition to in a room.  Right?

7    A  Yes.  You say drill down.  It's basically

8    asking questions to understand the root cause

9    of an issue or even sometimes to understand

10    what went well.  A drill down can be both.

11    Q  Would you expect a drill down to occur on a

12    3-1/2 hour over-standard work event?

13    A  Yes, I would expect people to be engaged

14    there.

15    Q  And a drill down on a 3-1/2 over-standard

16    work event could be handled over the phone.

17    Right?

18       MR. SULLIVAN:  Objection,

19    speculation.

20    A  Yeah.

21    Q  (By Mr. Magnuson, continuing) Let's go to the

22    last page.  Take a quick second to review

23    these leader comments if that's okay.

24    A  (Witness examining document).

25    Q  Did you review that?

1   A  I'm reading.  (Witness examining document).

2     Okay.

3   Q  In the middle of that paragraph it says, "The 

4     OLD Jason has died out as none of the Leaders

5     talk about it from what I hear which means

6     you are/have grasped the personal."  What do

7     you mean by the old Jason?

8   A   That was -- Jason and I worked together at

9     the other railroad, and that was from my

10    experiences of what I heard about him at the

11    other railroad.

12  Q  Which other railroad?

13  A  Canadian National.

14  Q  And what was the old Jason like?

15      MR. SULLIVAN:  Objection, lack of

16    personal knowledge.

17  A  It was things that I heard.

18  Q  (By Mr. Magnuson, continuing) Like what?

19  A  Didn't know how to engage with people, didn't

20    know how to engage, didn't get to the root

21    cause of things, made assumptions, stuff like

22    that.

23  Q  Did the old Jason have a tendency to be

24    overly aggressive?

25      MR. SULLIVAN:  Objection, lack of

98.1 Plaintiff Affirmative

98.2 Defendant Objection

1    personal knowledge.

2    A   That I don't know.

3    Q   (By Mr. Magnuson, continuing) Have a 

4    reputation for being abrasive?

5        MR. SULLIVAN:  Objection, lack of

6    personal knowledge.

7    A   I have heard that.

8    Q   And you said "has died out as none of the

9    Leaders" with a capital L, "talk about it".

10   You're talking in that sentence about leaders

11   at CP Rail.  Right?

12   A   Yes.

13   Q   So that would leave us to believe that the

14   old Jason might have existed at CP Rail too.

15   Right?

16       MR. SULLIVAN:  Objection, calls

17   for speculation, lack of personal knowledge.

18   Q   (By Mr. Magnuson, continuing) Did the old

19   Jason have a tendency to be hard on his

20   trainmasters?

21       MR. SULLIVAN:  Objection, lack of

22   personal knowledge.

23   A   I didn't work with Jason at CN.

24   Q   (By Mr. Magnuson, continuing) You worked with

25   him at CP?

1    A  Yes.

2    Q  And the Leaders with a capital L you're

3    talking about there, you're referring to CP

4    leaders.  Right?

5    A  The capital L has no relevance, but I'm

6    referring to CP leaders.

7    Q  Have you ever seen the old Jason come down on

8    trainmasters for having over-standard work

9    events?

10   A  No.

11       MR. MAGNUSON:  We'll go off the

12   record for five minutes.  I'm just about done.

13       (Brief recess).

14   Q  (By Mr. Magnuson, continuing) Sir, when were

15   you a trainmaster and for how long?

16   A  I started at Illinois Central in '94.  I

17   don't remember.  Maybe '99 I think.

18   Q  So five years approximately?

19   A  Sounds right.

20   Q  Where were you working out of?

21   A  Fulton, Kentucky, Jackson, Mississippi, Baton

22   Rouge.

23   Q  You weren't a trainmaster up in the Midwest

24   where we have to deal with snow and ice.  Is

25   that correct?

1    A  No, I was not a trainmaster in the midwest.

2    Q  What do you personally do to make sure that

3       CP anti-retaliation policies are followed?

4    A  I didn't expect the question.  You know, I

5       engage with my managers on a regular basis

6       about integrity, about just living our values

7       and our principles, being respectful.  I just

8       like every other manager annually read the

9       code of ethics and sign off.  And, you know,

10      if -- as a human being just like everybody

11      else and just like you in your role, I can't

12      stop people from doing what they're doing but

13      I can create accountability when people do

14      things we're not supposed to do.

15   Q  When employees bring retaliation complaints

16      to you, do you ever perform drill downs on

17      those?

18   A  No, I don't personally.

19   Q  What do you do when employees bring

20      retaliation complaints to you?

21   A  It depends on what it is.  It depends on the

22      magnitude of it.  Our -- I fail to remember

23      the name of the department, but we have a

24      team that handles those complaints.  And then

25      they provide feedback.  And based on that


101.1 Plaintiff Affirmative

1    feedback and based on the facts and based on

2    the findings, we apply proper consequences or

3    sometimes no consequences.

4    Q   What team is this?

5    A   I can't remember the name of the team, but we

6    have an internal group that reports

7    through -- I think through the HR department.

8    Q   Did you forward Mr. Sexton's e-mail to that

9    team?

10   A   I don't remember.  I'm sorry.  I'm thinking

11   current times.  I thought you asked me since

12   you asked me what do I do.

13   Q   Did this team exist in February of 2021?

14   A   I'm sure it did.  But back then, I don't know

15   if I forwarded that e-mail -- I don't know if

16   that was the process in 2021.  Here as CPKC

17   that is the process.

18   Q   Is that process pursuant to a rule or a

19   policy of some sort?

20   A   If you don't mind, let me talk you through.

21   Prior to CPKC, we have I think it's called

22   the A line.  Any employee, manager or

23   unionized employee can call the A line with a

24   complaint.  Be it rule violation.  Be it any

25   issue.

1        Going back based on what I have

2    read, this letter from John Sexton he sent

3    directly to me highlighting issues that he

4    saw.  From what you've shown me, I passed

5    that on to Jason, concerning (phonetic)

6    sending it to the wrong Jason Ross.  I do not

7    recall how it was handled with Jason, Tom

8    Jared, back to John Sexton.

9    Q  But to the best of your knowledge, this team

10   wasn't involved in that process?

11   A  No.

12   Q  If you were to receive an e-mail like that

13   today, would you forward that to your team?

14       MR. SULLIVAN:  Objection, calls

15   for speculation.

16   Q  (By Mr. Magnuson, continuing) Or this team

17   that you're referring to?

18   A  I would engage them.

19   Q  The team?

20   A  Yes.

21   Q  Why?

22   A  Evolution.

23   Q  What is it about Mr. Sexton's e-mail and

24   evolution that would cause you to send it

25   along to the team now?

Plaintiff Affirmative

1    A  That was 2021.  And in 2021, I passed it on

2       to the vice president of transportation and

3       the vice president of operations to handle

4       it.  If it happened today, it would still be

5       dealt with the appropriate officers.  As a

6       matter of just engaging or cutting in, I'll

7       call it the HR team, I would let them know

8       about it.  I'm not saying that they would be

9       the ones to deal with it.

10   Q  What is it about the contents of that e-mail

11      that would cause you to send it to this team?

12   A  Nothing different from the last one.  I would

13      just share it with them.

14   Q  What is it that Sexton said that would cause

15      you to forward this message on to this team

16      now?

17   A  My time as a leader, my growth as a leader

18      would have me include them in it as well.

19   Q  Is it because Sexton claims in there that he

20      was retaliated against?

21   A  No.

22   Q  You'd agree with me that Sexton claims he was

23      retaliated against for cutting the tracks in

24      that e-mail.  Right?

25          MR. SULLIVAN:  Objection,

1    document speaks for itself.

2    A  I would have to go back and look at it.

3        MR. MAGNUSON:  We'll pull it up.

4        MR. SULLIVAN:  We have four

5    minutes left.

6    Q  (By Mr. Magnuson, continuing) I can kind of

7    direct your attention to the middle.

8    A  Can you blow it up?

9    Q  Do you see that middle paragraph there?  He

10   says that the tracks were covered in snow.

11    Right?

12   A  Can you highlight what you're reading?  It

13   saves me time from searching.

14   Q  In the fourth line down he says the tracks

15   and crossings were covered, snow covered.

16    Right?

17   A  Yeah.

18   Q  And then he tells McKelvey in the next

19   sentence that the crossings and tracks needed

20   to be cut with the locomotives.  Right?

21   A  Yes.

22   Q  The next sentence says, He told me that I

23   would NOT, all caps not, cut the crossings

24   and tracks.  Do you see that?

25   A  Yes.



1    Q   Would that cause you if you received that

2        today to involve this team?

3    A   No.

4    Q   I think we have already talked about it.  He

5        took the safe course here by cutting the

6        tracks.  Right?

7    A   Yes.

8    Q   And I can represent to you that McKelvey says

9        they had a pretty serious disagreement about

10       it.

11          MR. SULLIVAN:  Objection to the

12       extent it misstates the record.

13   Q   (By Mr. Magnuson, continuing) That would

14       cause you no concern?

15   A   Ask your question again.

16   Q   If Sexton is taking the safe course by

17       cutting the tracks, you have agreed to that.

18       And McKelvey, according to this, tells him he

19       is not cutting the tracks.  That would be one

20       of your trainmasters telling your engineer

21       not to take the safe course.  Right?

22   A   Based on this e-mail, yes.

23   Q   And you don't want your trainmasters telling

24       your engineers not to take the safe course,

25       do you?



1   A  I want people to do what's right.

2   Q  And, yes, that involves and includes taking

3   the safe course.  Right?

4   A  Correct.

5   Q  If a manager is telling an engineer not to

6   take the safe course, what would you do?

7   A  I would engage with him.

8   Q  What do you mean by engage?  If it came to

9   your attention that one of your trainmasters

10  was telling one of your engineers not to take

11  the safe course, what would you do?  You

12  said, I would engage them.  And I said, how?

13  A  Ask questions, understand what's going on,

14  see what the situation is.

15  Q  Would you talk to the engineer as well?

16  A  Both engineer and trainmaster.

17  Q  You would talk to the engineer and the

18  trainmaster and would you also forward those

19  concerns to this team?

20      MR. SULLIVAN:  Objection, calls

21  for speculation.

22  A  Probably based on what I'm reading -- based

23  on what we talked about, no.

24  Q  (By Mr. Magnuson, continuing) But if it came

25  to your attention that one of your train-

1    masters was telling an engineer not to take

2    the safe course, notwithstanding this e-mail,

3    would you involve this team?

4        MR. SULLIVAN:  Objection, calls

5    for speculation.

6    A  No.  I would talk to both engineer and the

7    trainmaster and understand what situation

8    we're dealing with.

9    Q  (By Mr. Magnuson, continuing) What if part of

10   your talking to them confirmed that a

11   trainmaster was telling an engineer not to

12   take the safe course?  You talked to the

13   engineer, you talked to the trainmaster, and

14   you concluded your trainmaster was telling

15   your engineer not to take the safe course.

16   Then what would you do?

17   A  I would handle it accordingly.

18   Q  And how would you handle it?

19   A  I don't know how I would handle it, but I

20   would handle it with the trainmaster in

21   whatever way deemed necessary.

22   Q  What if the employee in that case, the guy

23   who claims he was told not to take the safe

24   course, was disciplined that very same day?

25       MR. SULLIVAN:  Objection,

1     misstates the record, calls for speculation.

2     A   You can't be disciplined the same day.

3     Q   (By Mr. Magnuson, continuing) He was E tested

4     and then disciplined as a result of the E

5     test the very same day?

6         MR. SULLIVAN:  Objection, form,

7     misstates the record.

8         THE WITNESS:  So what's your

9     question?

10    Q   (By Mr. Magnuson, continuing) If after

11    talking to an engineer and a trainmaster and

12    you independently determined that your

13    trainmaster was telling your engineer not to

14    take the safe course, would you involve this

15    team?

16    A   No.

17    Q   Would you potentially discipline the trainmaster?

18        MR. SULLIVAN:  Objection, calls

19    for speculation.

20    Q   (By Mr. Magnuson, continuing) If you found

21    out that your trainmaster was telling an

22    engineer not to take the safe course, could

23    that result in discipline to the trainmaster?

24    A   I would talk to them and see what if any

25    consequences would apply.

1    Q  So you're saying yes it could result in

2      discipline to the trainmaster?

3    A  It could and it could not.

4    Q  Again, you don't want your trainmasters

5      telling engineers not to take the safe

6      course.  Right?

7    A  Correct.

8    Q  Even if that involves causing a delay in an

9      over-standard work event.  Correct?

10   A  Correct.

11       MR. SULLIVAN:  That's four minutes.

12     We're at time.

13       MR. MAGNUSON:  That's all I have.

14       MR. SULLIVAN:  We'll read and sign.

15       (WHEREUPON, the testimony was

16       concluded at 5:15 p.m.)

17          *   *   *

18

19

20

21

22

23

24

25

1    STATE OF MINNESOTA)
                ) Ss.
2    COUNTY OF HENNEPIN)

3        I, Brenda K. Foss, Certified
            Shorthand Reporter and Notary Public duly and
4    qualified in and for the State of Minnesota
            do hereby certify there came remotely before
5    me the deponent herein, who was by me duly
            sworn to testify to the truth and nothing but
6    the truth concerning the matters in this
            cause.
7        I further certify that the foregoing

8    transcript is a true and correct transcript
            of my original stenographic notes.
9        I further certify that I am neither

10   attorney or counsel for, nor related to or
            employed by any of the parties to the action
11   in which this deposition is taken; and
            furthermore, that I am not a relative or
12   employee of any attorney or counsel employed
            by the parties hereto or financially
13   interested in the action.

14       IN WITNESS WHEREOF, I have hereunto
            set my hand and affixed my Notarial Seal this
15   17th day of July, 2024.

16            Brenda K. Foss

17            Court Reporter