**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION**

| | |
|---|---|
| John Sexton, | Case No. 3:23-cv-00031-HCA |
| Plaintiff, | |
| v. | |
| Dakota, Minnesota & Eastern Railroad Corporation d/b/a Canadian Pacific, a Delaware Corporation, | |
| Defendant. | |

**DEFENDANT'S MEMORANDUM OF LAW
IN SUPPORT OF ITS RENEWED MOTION FOR JUDGMENT
AS A MATTER OF LAW; IN THE ALTERNATIVE, FOR A NEW TRIAL;
<u>OR IN THE FURTHER ALTERNATIVE, FOR JUDGMENT TO BE AMENDED</u>**

DORSEY & WHITNEY LLP

Joshua Hughes (AT0014950)
hughes.joshua@dorsey.com
Dorsey & Whitney LLP
801 Grand Ave, Suite 4100
Des Moines, IA 50309
Tel: (515) 283-1000
Fax: (515) 598-7704

John T. Sullivan (pro hac vice)
sullivan.jack@dorsey.com
Briana Al Taqatqa (pro hac vice)
altaqatqa.briana@dorsey.com
Dorsey & Whitney LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
Tel:  (612) 340-2600
Fax:  (612) 340-2868

ATTORNEYS FOR DEFENDANT

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................. iii

INTRODUCTION ........................................................................................................... 1

ARGUMENT .................................................................................................................. 2

I.    DM&E'S Renewed Motion for JMOL Should Be Granted. ................................. 2

    A.    There Was No Evidence of a Protected Refusal. ....................................... 2

        1.    There was no evidence of a refusal at all. ...................................... 2

        2.    No reasonable jury could find an "imminent danger of death or serious injury" at the time of Sexton's alleged "refused to work" on this record. ..................................................................................... 5

        3.    Sexton had a reasonable alternative – and he took it. .................... 8

        4.    No evidence shows an urgency preventing mitigation. .................. 8

    B.    No Reasonable Jury Could Find that Ross Knew of the Alleged Refusal. ............. 9

    C.    No Reasonable Jury Could Find that Ross Intentionally Retaliated Against Sexton on this Record. ..................................................................... 12

        1.    There was no direct evidence of intentional retaliation. .............. 13

        2.    Circumstantial evidence does not support intentional retaliation. ............. 14

        3.    Sexton's rule violation broke the causal chain. ........................... 15

II.   JMOL IS WARRANTED FOR DM&E ON ITS AFFIRMATIVE DEFENSE ................ 16

    A.    Sexton Was Disciplined for an Independent Rule Violation. ................... 16

    B.    Ross's Testimony Compels a Finding for DM&E. .................................. 17

    C.    Comparator Evidence Reinforces DM&E's Defense. ............................. 18

III.  PUNITIVE DAMAGES FAIL AS A MATTER OF LAW. ........................................ 19

IV.   THE COURT SHOULD ORDER A NEW TRIAL IF IT DOES NOT GRANT JMOL. ................................................................................................................. 20

    A.    The Court Should Grant a New Trial Because the Verdict Was Against the Weight of the Evidence. ...................................................................... 21

B.      The Court Should Grant a New Trial Because the Jury Awarded Sexton an Excessive Damages Award that Was Not Supported by the Evidence at Trial. ...................................................................................................23

C.      The Court Should Grant a New Trial Due to Sexton's Counsel's Improper Arguments and Prejudicial Insinuations. ...........................................25

D.      A New Trial Is Warranted Because It Was Error to Allow Ogden to Testify. ...................................................................................................27

V.      IF THE JUDGMENT AGAINST DM&E STANDS, IT MUST BE AMENDED. ..........29

CONCLUSION ....................................................................................................30

## TABLE OF AUTHORITIES

**Cases**

*Baker v. John Morrell & Co.*, 249 F. Supp. 2d 1138 (N.D. Iowa 2003). ....................................30

*Berberich v. Kan. City S. Ry. Co.*, 162 F.4th 1045 (10th Cir. 2025) .................................4, 5, 6, 9

*Blair v. Wills*, 420 F.3d 823 (8th Cir. 2005) ....................................................................25

*BNSF Ry. Co. v. U.S. DOL Admin. Rev. Bd.*, 867 F.3d 942 (8th Cir. 2017) ................................19

*Butler v. French*, 83 F.3d 942 (8th Cir. 1996) ..................................................................20

*Dafoe v. BNSF Ry. Co.*, 164 F.Supp.3d 1101 (D. Minn. 2016) .............................................9, 12

*Delph v. Dr. Pepper Bottling Co.*, 130 F.3d 349 (8th Cir. 1997) .............................................24

*Forshee v. Waterloo Indus.*, 178 F.3d 527 (8th Cir. 1999) ..............................................24, 30

*Freeman v. Ace Tel. Ass'n.*, 467 F.3d 695 (8th Cir. 2006) ..................................................22

*Gary v. Bicknell*, 86 F.3d 1472 (8th Cir. 1996) ........................................................20, 21, 27

*Gill v. Maciejewski*, 546 F.3d 557 (8th Cir. 2008) ...............................................................2

*Gilster v. Primebank*, 747 F.3d 1007 (8th Cir. 2014) ..........................................................27

*Gunderson v. BNSF Ry. Co.*, 850 F.3d 962 (8th Cir. 2017) ..................................................15

*Hinz v. Neuroscience, Inc.*, 538 F.3d 979 (8th Cir. 2008) ......................................................2

*Klossner v. Iadu Table Mount MHP, LLC*, No. 20-cv-1037, 2021 U.S. Dist. LEXIS 148483 (N.D. Iowa Apr. 16, 2021) ...............................................................................................28

*Kolstad v. Am. Dental Ass'n*, 527 U.S. 526 (1999) .............................................................19

*Koziara v. BNSF Ry. Co.*, 840 F.3d 873 (7th Cir. 2016) ..................................................21, 23

*Kuduk v. BNSF Ry. Co.*, 768 F.3d 786 (8th Cir. 2014) ....................................................passim

*Liner v. J.B. Talley and Co., Inc.*, 618 F.2d 327 (5th Cir. 1980) .............................................25

*Monohon v. BNSF Ry.*, 17 F.4th 773 (8th Cir. 2021) ........................................................4, 6, 7

*Phillips v. Collings*, 256 F.3d 843 (8th Cir. 2001) ..............................................................23

*Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133 (2000) ............................................10, 22

*Rennenger v. Manley Toy Direct L.L.C.*, No. 10-cv-00400, 2016 U.S. Dist. LEXIS 203518 (S.D. Iowa July 7, 2016) ...............................................................................................29

*Ruffin-Thompkins v. Experian Info. Sols., Inc.*, 422 F.3d 603 (7th Cir. 2005) .......................24, 30

*Sanders v. BNSF Ry. Co.*, No. 17-cv-5106, 2022 U.S. Dist. LEXIS 218148 (D. Minn. Dec. 5, 2022) ...............................................................................................................20

*Shepard v. Wapello Cnty.*, 303 F.Supp.2d 1004 (S.D. Iowa 2003) ...........................................25

*Staub v. Proctor Hosp.*, 562 U.S. 411 (2011)..............................................................15

*Storage Tech. Corp. v. Cisco Sys.*, 395 F.3d 921 (8th Cir. 2005) ................................12

*Taylor v. Tenant Tracker, Inc.*, 710 F.3d 824 (8th Cir. 2013)...............................23, 30

*Tompkins v. Metro-North Commuter R.R. Co.*, 983 F.3d. 74 (2d Cir. 2020) .................6

*Wallace v. Pharma Medica Rsch., Inc.*, 78 F.4th 402 (8th Cir. 2023) ....................27, 29

*Webner v. Titan Distrib.*, 267 F.3d 828 (8th Cir. 2001) ...............................................20

*White v. Pence*, 961 F.2d 776 (8th Cir. 1992) ..............................................................21

*Yowell v. Admin. Rev. Bd.*, 993 F.3d 418 (5th Cir. 2021).............................................17

*Ziparo v. CSX Transp., Inc.*, 160 F.4th 315 (2d Cir. 2025)............................................6

**Statutes**

42 U.S.C. § 1981 ............................................................................................................29

49 U.S.C. § 20109(b).................................................................................................passim

**Rules**

Fed. R. Civ. P. 50 .......................................................................................................2, 20

Fed. R. Civ. P. 58 ............................................................................................................29

Fed. R. Civ. P. 59 .......................................................................................................20, 21

Fed. R. Evid. 702............................................................................................................27

**INTRODUCTION**

This Court should grant judgment as a matter of law ("JMOL") for Defendant Dakota, Minnesota & Eastern Railroad, d/b/a Canadian Pacific's ("DM&E" or "CP") because of the fatal flaw the Court identified at the hearing on the motion: There is no evidence from which a reasonable jury could find that Jason Ross intentionally retaliated against Plaintiff John Sexton. As a result, no reasonable jury could decide the contributing-factor element of Sexton's Federal Railroad Safety Act ("FRSA") claim in Sexton's favor—even if Sexton engaged in a protected refusal, as he argued. DM&E's motion for JMOL should be granted on this basis alone.

The lack of intentional-retaliation evidence is not the only basis for JMOL. The FRSA only protects refusals to work when the opposite act—working—poses imminent danger of death or serious injury, no reasonable alternative exists, and there is no time to eliminate the danger. The record includes no evidence from which a reasonable jury could find these elements, nor does it include evidence that Ross knew of any sort of refusal as defined by the FRSA. Because the existence of a protected refusal and knowledge of the protected refusal are required elements of Sexton's claim, JMOL should be granted for these additional and independently sufficient reasons—or, as an alternative, on DM&E's affirmative defense. Finally, JMOL should be granted voiding punitive damages, as there was no evidence sufficient for a reasonable jury to award those damages, given the high standard required to do so.

If JMOL is not granted, then DM&E asks the Court to grant its alternative motion for a new trial because a miscarriage of justice resulted from the verdict being against the weight of the evidence, from the excessive damages award, and from the legal errors at trial.

If the Court grants neither JMOL nor a new trial, then DM&E asks it to alter or amend the judgment under Fed. R. Civ. P. 59(e) to reduce the compensatory and punitive damages awards, including, at a minimum, for punitive damages to be limited to the FRSA's cap of $250,000.

1

## ARGUMENT

### I.    DM&E'S Renewed Motion for JMOL Should Be Granted.

DM&E moved for JMOL at the close of Sexton's case and hereby renews its motion. Fed. R. Civ. P. 50. In deciding this motion, the Court must view the evidence in the light most favorable to Sexton but should nevertheless grant JMOL if Sexton "fails to present enough evidence to permit a reasonable jury to decide in his favor." *Gill v. Maciejewski*, 546 F.3d 557, 562 (8th Cir. 2008) (citation and internal quotation omitted). As is the case here, when there is "no proof beyond speculation to support the verdict," JMOL is appropriate. *Hinz v. Neuroscience, Inc.*, 538 F.3d 979, 984 (8th Cir. 2008) (citation and internal quotation omitted).

Sexton's FRSA claim was premised on these allegations: (1) he engaged in a protected refusal to work on February 1, 2021, when confronted by a hazardous safety condition; (2) DM&E knew of the protected refusal; (3) DM&E took an adverse action when decisionmaker Jason Ross suspended Sexton for 20 days without pay on February 26, 2021 (which is not disputed); and (4) Ross "intentionally retaliated" against Sexton by suspending him "due, in whole or in part," to Sexton's protected refusal. Final Jury Ins. No. 5 (Dkt. 139). Sexton had to prove that DM&E, through Ross, "acted with intent to retaliate" for his protected refusal when it suspended him. *Id.*

### A.    There Was No Evidence of a Protected Refusal.

Sexton's entire claim is this: by doing other work before following Kurt McKelvey's supposed order to "get on your train and get the hell out of here," he refused to work in a manner protected by the FRSA. But no reasonable jury could find that Sexton satisfied the elements of the statute for a protected refusal on this record, and JMOL is warranted.

### 1.    There was no evidence of a refusal at all.

The FRSA does not protect any refusal to work, at any time, by any employee—rather, the criteria are precisely drawn. *See* 49 U.S.C. § 20109(b). A refusal to work may be protected only if

the employee, when possible, first notifies the railroad that a hazardous condition exists and that the employee intends to stop working if the condition is not corrected. *Id.* at (2)(C). That is not the end of the analysis; after the required notice, assuming the hazardous condition is not corrected, the refusal to work is only protected if the opposite act—working—poses imminent danger of death or serious injury, no reasonable alternative exists, and there is no time to eliminate the danger. *Id.* at (2)(A–B). If those elements, and the ones discussed in more detail below, are met, then employers are precluded from disciplining or retaliating against employees for not working.

According to Sexton's allegations, he gave the notice required by Section 20109(b)(2)(C) to DM&E of the alleged hazardous condition when he complained to McKelvey. Certified Trial Transcript ("Tr.") 150:6–13. But, even viewing the evidence in the light most favorable to Sexton, he failed to satisfy any of the other criteria. Nor could he, because, instead, he immediately corrected the alleged hazard. And because the hazard was immediately corrected, Sexton never actually refused to work, nor did he ever stop working. He never sat down in protest, went to his car until a supervisor said the danger had been addressed, or went home. Sexton's actions on February 1, 2021, thus were not a refusal protected by the FRSA, and JMOL should be granted.

The trial record demonstrates that Sexton did not *refuse* to work. Instead, Sexton reported for duty on February 1, 2021, conducted his job briefing and *performed his assigned work*. Tr. 149:15–17; 150:6–13; 158:9–25; 250:3–6. His testimony was that he insisted on running a locomotive over a crossing that he believed to be snow- and ice-packed before he shoved cars onto the Marquette siding, as assigned. Tr. 151:11–12. Sexton described what he called an argument lasting only "ten or twelve minutes" with McKelvey about whether the siding crossing needed to be cut (Tr. 217:13–15), but Sexton never claimed he said he would stop working, not operate the train, or otherwise cease to perform his duties. Moreover, there is no dispute that McKelvey

assented to Sexton performing the additional work of cutting the crossing before shoving the cars onto the siding. Tr. 279:11 (Dkt. 123 (79:22–80:9)).

Under the FRSA, *insisting* on working is not "refusing to work." *See Berberich v. Kan. City S. Ry. Co.*, 162 F.4th 1045, 1054 (10th Cir. 2025). In *Berberich*, the Tenth Circuit rejected a plaintiff's attempt to stretch the application of a FRSA refusal to work to apply to "its exact opposite—***working***." *Id.* (emphasis added). The Tenth Circuit's reasoning is persuasive and consistent with decisions of the Eighth Circuit recognizing congressional intent for the FRSA's protection of a refusal to work to apply only in "limited, serious, and time-sensitive circumstances." *Monohon v. BNSF Ry.*, 17 F.4th 773, 782 (8th Cir. 2021).[1]

In *Berberich*, a conductor was working on foot in a railyard towards the rear of his train. *Berberich*, 162 F.4th at 1047. When the train was ready to move forward, someone needed to line the switch at the locomotive so the train would move to the correct track. *Id.* at n.2. Instead of simply getting on his train to move and allowing the engineer to line the switch, the conductor first insisted on taking the additional step of lining the switch himself, which required him to walk the long distance from the rear of the train to the front and back again. *Id.* at 1047. The conductor asserted that, by insisting on lining the switch before getting on his train, he was refusing an order requiring the engineer do so instead. *Id.* at 1048. When the conductor was later dismissed for violating a different rule, he claimed his firing was in retaliation for his refusal to follow the alleged standing instruction for engineers to line switches. *Id.* at 1050–51.

---

[1]    The Congressional requirement to hold refusal cases to a higher standard than reporting cases is evident from the strict factors in 49 U.S.C. § 20109(b)(2). After years of litigating this case as both a reporting case under § 20109(b)(1)(A) and a refusal case under §§ 20109(b)(1)(B) and 20109(b)(2), *see* Order on Summ. J. (Dkt. 68) at 16, Sexton finally chose to go to trial on a protected refusal theory—and so cannot now dodge the heightened standards required by the law.

The Tenth Circuit refused to accept the conductor's "distorted construction" of the FRSA. *Id.* at 1053. Like Sexton's, the conductor's theory in *Berberich* was a double-negative: his refusal was that he would not *not* line the switch and would instead perform a specific task in a specific way. *See id.* The Tenth Circuit recognized that insisting on a specific action does not amount to "not working," and this was so "regardless of whether he was violating a standing order" on which crewmember should line a switch. *Id.* The Tenth Circuit refused to equate a "'refusal to work' with 'refusal to work in an unsafe manner required by the employer.'" *Id.* at 1054.

Here, Sexton's alleged refusal to work likewise is an *insistence* on performing a specific task in a specific way. Berberbich and Sexton both claim that the instruction allegedly given—for the engineer to line the switch in *Berberich*, for Sexton not to cut the crossing—was unsafe. But neither Berberich nor Sexton stopped working upon receiving that order. Instead, they both simply went on to work in the way they believed they should: Berberich, by lining the switch and then carrying on; Sexton, by cutting the crossing and then carrying on. For the reasons articulated by the Tenth Circuit, the choice to work in a preferred manner, and insisting on performing additional work, is not a refusal to work and is therefore not protected by the FRSA. *Id.* at 1054. DM&E's motion for JMOL should be granted on this basis alone.

**2.      No reasonable jury could find an "imminent danger of death or serious injury" at the time of Sexton's alleged "refused to work" on this record.**

To establish a FRSA-protected refusal to work, Sexton must have proven that a "reasonable individual in the circumstances ***then confronting*** [Sexton] would conclude that the hazardous condition presents an imminent danger of death or serious injury." Final Jury Ins. No. 6(B) (Dkt. 139) (emphasis added); *accord* 49 U.S.C. § 20109(b)(2)(B)(i). The phrase "then confronting [Sexton]," focuses the inquiry on whether an "imminent danger of death or serious injury" existed at the time Sexton engaged in a refusal to work. Here, the hazard alleged by Sexton was the snow-

and ice-packed crossing on the Marquette siding. Tr. 156:22–157:9. Even assuming for the sake of argument that Sexton reasonably could be found to have refused to work, no reasonable juror could find that his refusal was related to a hazardous condition posing an imminent danger of death or serious injury *at that time*. *See* 49 U.S.C. § 20109(b)(2)(B)(i).

First, Sexton testified such a crossing would present a danger only "if we did not cut the crossings with the locomotives and just let a car go over it," because that "would *possibly* cause a derailment." Tr. 148:9–20. Such a speculative and conditional future harm cannot be "imminent" within the meaning of the FRSA. *Monohon*, 17 F.4th at 782 (refusals are to be protected only in limited circumstances with imminent danger); *see also Berberich*, 162 F.4th at 1055 (finding nothing imminently hazardous about a stationary misaligned switch under the circumstances).

In *Berberich*, just as here, the supposed "hazard" identified was a stationary one—a misaligned switch, analogous to a stationary snow-and ice-packed crossing—with no evidence that anyone would be harmed by Berberich's *inaction*. *See Id.* There, the court concluded that "no reasonable jury could find that Plaintiff" was facing a potentially hazardous condition posing an "imminent danger of serious injury or death" when he insisted on lining the switch. *Id*. (citation and internal quotation omitted). Similarly, in *Tompkins v. Metro-North Commuter R.R. Co.*, the plaintiff refused to walk outdoors to a building because he claimed the route was slippery and unsafe. 983 F.3d. 74, 77 (2d Cir. 2020), *overruled in part on other grounds by Ziparo v. CSX Transp., Inc.*, 160 F.4th 315 (2d Cir. 2025). The Second Circuit upheld summary judgment for the railroad because the plaintiff did not offer evidence that other employees' subjective view that the walkways were safe was objectively unreasonable. *Id.* at 81. These cases make clear: even if Sexton was refusing to work, he did not face imminent danger and so the refusal was not protected.

Second, Sexton testified he was concerned a derailment would create an "environmental

6

catastrophe there in Marquette" that would kill Sexton, his conductor, and Trainmaster McKelvey (Tr. 156:22–157:9); and that, had he not insisted on performing additional work by cutting the crossing, "it would have killed all of us" (Tr. 157:8–9). Further, Sexton testified that if a pressurized tanker car derailed with even one wheel on the ground, "nine times out of ten" a critical valve would rupture and the car would explode "like a hair spray can." Tr. 157:21–158:1. Sexton's hyperbolic, inflammatory, and speculative catastrophizing of potential future harm—suggesting that a car *might* derail, *might* explode, *might* roll into the Mississippi River, and *might* create widespread contamination—cannot satisfy the objective reasonableness standard. *See Monohon*, 17 F.4th at 782 (holding the "refusal-to-work provision requires objective reasonableness—that a reasonable individual would conclude that the hazardous condition presents an imminent danger of death or serious injury that is so urgent there is no time to eliminate the danger").

This is especially true given that Sexton's testimony demonstrated that he has no specific knowledge about tank car safety standards or construction. Tr. 245:15–247:5. Sexton told the jury he was "not sure how to ascertain one car from the other" when it comes to tank car standards. Tr. 246:16–21. Moreover, Sexton conceded that he did not know the contents of any train cars at the time of this disagreement with McKelvey, including whether any of the cars carried hazardous materials. Tr. 244:18–21. In fact, Sexton did not know his train carried hazardous materials until after any risk from the supposed hazard had passed. Trial Exhibit ("Ex.") 7 (Dkt. 156-3 at 2).

Here, the record lacks evidence supporting any objective concerns about hazardous conditions at the time of Sexton's alleged refusal to work, and his hyperbolic, inflammatory, self-serving and speculative catastrophizing of potential future harm, which was not based on any facts in evidence, does not fill this void. Accordingly, even if Sexton was refusing to work, he was not facing imminent danger and so his refusal was not protected by the FRSA.

**3.      Sexton had a reasonable alternative – and he took it.**

Sexton's FRSA claim required him to show that "no reasonable alternative to the refusal [was] available" at the time he allegedly refused to work. Final Jury Ins. No. 6(A) (Dkt. 139). Here, because there was no refusal to work as Sexton did not leave the premises and instead continued to work throughout his entire shift and perform all of his required tasks for the day, simply continuing on was a reasonable alternative, and Sexton's testimony confirms that *he took it*. That is, Sexton testified that he told McKelvey to contact the local superintendent if he disagreed with Sexton, and, when McKelvey did not do so, Sexton stayed and worked: he cut the crossing and completed his assigned tasks. Tr. 156:17–21. Because Sexton actually availed himself of a reasonable alternative to a refusal to work, by working, no reasonable jury could conclude that he proved that there was no reasonable alternative.

**4.      No evidence shows an urgency preventing mitigation.**

The FRSA protects a refusal to work only when there is no time to eliminate the danger. 49 U.S.C. § 20109(b)(2)(B)(ii), *accord* Final Jury Ins. No. 6(B) (Dkt. 139). The FRSA therefore does not protect Sexton's alleged refusal here, as—even under his telling—Sexton not only anticipated the allegedly hazardous condition but also had sufficient time to eliminate it.

The hazard alleged by Sexton was the potential that the uncut siding crossing would derail his train. Tr. 148:9–20; 156:22–157:9; 531:3–10. According to Sexton, the alleged hazard was foreseeable and remote enough for Sexton to have time to correct it, and in fact actually correct it. Tr. 147:11–20. No reasonable jury could determine that other factors created such urgency that Sexton had no time to correct the condition: Sexton had just begun his shift on when he insisted on cutting the crossing (Tr. 147:11–20), and he testified that he still made it to Davenport without hitting the mandatory daily limit on hours. Tr. 173:18–23.

For the foregoing reasons, Sexton cannot establish a protected refusal as a matter of law, and DM&E's motion for JMOL should be granted.

**B.    No Reasonable Jury Could Find that Ross Knew of the Alleged Refusal.**

To prove his FRSA claim, Sexton also must have proven that Ross "knew [Sexton] refused to operate a train on February 1, 2021, when confronted by a hazardous safety condition[.]" Final Jury Ins. No. 5 (Dkt. 139); *accord Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 789 (8th Cir. 2014). Sexton did not prove this.

Ross testified unequivocally that he knew nothing about a supposed refusal:

> Q.    You were aware when you made your decision that Mr. Sexton informed you and Mr. Miller that he refused to get on his train and go, and he insisted on cutting those grade crossings; right?
>
> A.    I don't think he refused. He insisted on cutting them, if my memory –
>
> Q.    He insisted on cutting them; right?
>
> A.    Yeah.

(Tr. 638:18–22). As set forth above, an insistence on working is not the same (and is in fact the exact opposite) as refusing to work under the FRSA. *See Berberich*, 162 F.4th at 1054. This distinction matters here as well. *See Dafoe v. BNSF Ry. Co.*, 164 F.Supp.3d 1101, 1114 (D. Minn. 2016) (finding knowledge element of FRSA claim not met without evidence that decisionmaker "had anything more than limited knowledge" of protected activity). Ross's testimony at most established "limited knowledge" of the circumstances in Marquette on February 1, 2021, but it did not establish that Ross knew that Sexton refused to work in a manner protected by the FRSA.

Sexton argued that circumstantial evidence supports a jury inference that Ross knew that Sexton supposedly refused to work on February 1, 2021. It does not. Sexton pointed to "the phone records, the emails, the Teams messages." Tr. 881:10–11. But no reasonable jury could agree.

9

Taking each alleged basis in turn, the jury had Ross's phone records from January 31, 2021 through February 2, 2021. Ex. 57A (Dkt. 157-11). Ross testified that he spoke with Tracy Miller and Jared during that period. Tr. 633:5–7, 20–23. But Ross's phone records are only evidence that he talked to both Miller and Jared—not evidence of the content of any such discussion. Further, the phone records can only be used as circumstantial evidence of Ross's knowledge of any supposedly protected refusal to work if there was other evidence in the record that either Jared or Miller knew about a protected refusal and communicated it to Ross. No such evidence exists.

First, Ross testified that he did not speak with Jared about Sexton's disciplinary case. Tr. 653:1–5. Ross also testified he would not have spoken with Jared or Miller about one single over-standard work event because it would not be important enough to concern him, given his role. Tr. 634:11–19. Nothing Jared or Miller said contradicted Ross's account. *See* Dkt. 134. Without evidence of inconsistency or contradiction, no reasonable juror could have found that Ross and Jared shared any knowledge about Sexton's alleged statutorily protected refusal to work on February 1, 2021. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 151 (2000) (explaining courts should credit "evidence supporting the moving party that is uncontradicted and unimpeached" on JMOL) (citation and internal quotation omitted).

Second, there was no evidence that would support a reasonable jury's finding that Miller knew about Sexton's alleged protected refusal. Sexton points to "the emails," but evidence at trial showed that the first that Miller or Ross learned of any allegedly statutorily protected refusal to work in Marquette on February 1, 2021 was when they received an email from Sexton the night before his February 10, 2021 disciplinary hearing, well after the phone calls in Exhibit 57A. Ex. 9 (Dkt. 156-5 (the "Homesafe Email"); Dkt. 134 (19:19–20:4). The Homesafe Email, even when viewed in a light most favorable to Sexton, cannot establish Ross or Miller's knowledge of a

statutorily protected refusal to work:

> I informed ATM McElvey that the crossing and tracks needed cut with the locomotives before our set out. He told me that I would NOT cut the crossings and tracks in which I replied that if he is directing me to not follow the rules and our topic of the month for the Health and Safety Committee and managers {Cutting flangeways and crossings} that he would have to call Superintendent Smith right now to inform him that he is instructing me NOT to follow the rules. **He didn't make the call and I cut the tracks and crossings as needed.**

(Ex. 9 (Dkt. 156-5) (emphasis added)). At best, the Homesafe Email demonstrates that Sexton challenged McKelvey's order. But for the reasons explained above, the FRSA cannot be distorted to create a "work refusal" in order to protect an employee whenever they disagree with an order of a supervisor,[2] nor does it protect an employee's *insistence* on working. That is exactly what Sexton said he did in the Homesafe Email: "What would have been the environmental impact as well as the possible loss of life if I didn't **insist** on cutting the tracks and crossings with 2 loads of AMMONIA." (Ex. 9 (Dkt. 156-5) (emphasis added)). Nor could Ross himself have been expected to understand otherwise from the email, as Ross, and every witness including Sexton, testified that cutting a crossing when it is packed with snow and ice is the safe and accepted course of action. Tr. 308:10–17; 506:12–16; 528:3–8; 623:3–6; 625:19–24; 631:11–14; 655:5–20. There is no basis from which a reasonable jury could even infer that Ross had knowledge of an ostensibly protected refusal to work based on "the emails."

Finally, the "Teams Messages" could not have allowed a reasonable jury to infer Ross's

---

[2]    If that had been Sexton's allegation, employees have legal protections under 49 U.S.C. § 20109 (a)(2), which protects employees who refuse to follow an order that "violate[s] or assist[s] in the violation of any Federal law, rule, or regulation relating to railroad safety or security." Sexton could have chosen to prosecute his case under this subsection but chose instead to allege that he "refused to work" under 49 U.S.C. § 20109 (b)(1)(B).

knowledge. First, the messages presented to the jury (Exs. 105, 106, 107, 111, and 122 (Dkts. 158-12, 158-13, 158-14, 158-15, and 158-16) (the "Teams Message Exhibits")) did not include Ross. The only way a reasonable jury could rely on the Teams Message Exhibits to infer Ross had knowledge of some protected refusal to work by Sexton would be to infer that McKelvey told Ross about it. But no evidence could support that finding. Ross spoke to McKelvey in response to the Homesafe Email. Tr. Ex. 38 (Dkt. 157-6). But Ross's testimony established that the subject of their conversation was *McKelvey's* failure to observe safety standards. Tr. 630:21–631:14.

Because none of the purported bases of circumstantial evidence supporting Ross's knowledge of any supposed refusal to work holds up under scrutiny, there is no basis from which a reasonable jury could have inferred that Ross had knowledge of Sexton's alleged statutorily protected refusal to work on February 1, 2021. Actual knowledge of the alleged statutorily protected refusal is required. *See* Order on Summary Judgment, Dkt. 68 at 24 ("Of particular importance, it is not sufficient if Plaintiff Sexton could show the 474 delay generally was a contributing factor in Jared's decision to e-test Plaintiff Sexton."); *Dafoe*, 164 F.Supp.3d at 1114. Jury speculation that Ross *must have had* knowledge is insufficient to meet the legal standard. *Storage Tech. Corp. v. Cisco Sys.*, 395 F.3d 921, 928–29 (8th Cir. 2005) ("When the record contains no proof beyond speculation to support the verdict, the defendant is entitled to judgment as a matter of law.") (citation and internal quotation omitted). Because Sexton produced no evidence of Ross having knowledge of a refusal to work, judgment as a matter of law in favor of DM&E is required.

**C.    No Reasonable Jury Could Find that Ross Intentionally Retaliated Against Sexton on this Record.**

JMOL is further warranted because there is no evidence that Ross intentionally retaliated against Sexton because Sexton engaged in a protected refusal to work. The only support Sexton

12

gave for this element was speculation at closing argument: speculation that Ross's consistent and unimpeached testimony that he was unaware of any protected refusal was false, speculation that Ross's consistent and unimpeached testimony that he agreed with Sexton on cutting the crossing was false, and speculation that Ross (and others) were motivated to retaliate to protect their bonuses. Speculation without evidence cannot support a verdict, and JMOL should be granted.

### 1. There was no direct evidence of intentional retaliation.

Sexton's counsel conceded at trial that he had no direct evidence of intentional retaliation. Tr. 828:3–6. Conversely, DM&E submitted direct evidence of Ross's lack of retaliatory animus.

Ross decided Sexton's discipline. Tr. 618:5–9. He testified unequivocally that he did not intentionally retaliate against Sexton because of any supposed refusal to work. Tr. 656:16–19. Ross also testified that nothing Sexton did in Marquette on February 1, 2021, played any role in his decision to discipline Sexton for the shove-movement violation that occurred at the end of Sexton's shift in Davenport. Tr. 656:2–5. To that end, Ross testified that he independently reviewed the transcript of Sexton's disciplinary investigation hearing, the evidence presented, and CP's Hybrid Discipline and Accountability Guidelines before deciding to suspend Sexton for 20 days without pay because of the shove-movement violation. Tr. 652:1–16. Importantly, Ross testified that he agreed Sexton did the right thing by asking to cut the crossing, and that McKelvey was wrong to initially disagree with Sexton. Tr. 652:1–16; 655:14–20; 656:2–5.

At the hearing on DM&E's Motion for JMOL following the cessation of Plaintiff's case, when asked to identify evidence that could support a finding that Ross intentionally retaliated against Sexton, Sexton's counsel generally listed factors that applied to other witnesses—for example, the temporal proximity between the start and end of Sexton's shift. But as to Ross, counsel was only able to cite to CP's general operating metrics and argued that those metrics "show motive." Tr. 822:1–8. However, alleged motive is only a proposed explanation of why something

13

may have been done—not evidence of what was done.

### 2.    Circumstantial evidence does not support intentional retaliation.

Sexton argued that circumstantial evidence demonstrated that Ross intentionally retaliated against Sexton. This is wrong.

### (a)    There was no evidence of retaliatory animus or intent.

Even if Sexton's request to cut the crossing amounted to a statutorily protected refusal to work—and to be clear, it does not as a matter of law—there is no evidence that Ross reacted negatively to that information as required to meet Sexton's burden. *Kuduk*, 768 F.3d at 791 ("There is no evidence that Jaeb reacted negatively to Kuduk's [protected activity] and no evidence that Jaeb communicated his knowledge of Kuduk's [protected activity] to the decision-makers in a manner that might have influenced their discharge decision.").

To be sure, Sexton testified that he believed McKelvey "wasn't happy" about Sexton wanting to cut the crossings. Tr. 150:14–20. However, it was undisputed that McKelvey was not involved in Sexton's efficiency test, in Sexton's disciplinary hearing, in reviewing the transcript or evidence from the hearing, in recommending any level of discipline, or in issuing the 20-day suspension. Rather, undisputed testimony established that Ross was responsible for deciding to issue a 20-day suspension to Sexton, and there was no testimony by Sexton or any other witness that Ross was unhappy with Sexton's request to cut the crossing. In fact, the opposite is true.

In sum, there is no evidence from which a reasonable jury could infer that McKelvey's purported "animus" toward Sexton was shared by any other manager—and most importantly, by Ross—even when viewed in the light most favorable to Sexton. JMOL should be granted.

### (b)    Sexton's motive theory has no support in fact.

Lacking any evidence of retaliation, Sexton turns to a supposed motive for retaliation in an effort to show that retaliation must have occurred: the existence of an incentive program for certain

managers. But the trial record is entirely absent of any evidence that the performance of the 474 train on February 1, 2021 actually contributed in any way to negative performance metrics or bonus calculations for Ross or any other DM&E manager. Trial testimony confirmed train performance metrics, along with safety objectives and related goals, are reviewed holistically and in the aggregate when determining whether a bonus is merited. Tr. 400:4–10. There was no evidence that the delay of the 474 train *actually* made a difference to the short-term incentive payment of Ross, Jared, Mark Johnson, or anyone else at issue. *See* Exs. 86 (Dkt. 158-5), 87 (Dkt. 158-6), and 93 (Dkt. 158-8); Tr. 526:23–527:3. In fact, Ross testified that railroad scheduling is specifically designed to account for occasional delays, particularly in winter months. Tr. 650:7–13. Ross's testimony that a "three-hour delay in the middle of winter [is] not even a factor to anything" was unimpeached at trial. Tr. 650:7–13; *see also* Tr. 411:4–11. As such, there is no basis from which a reasonable jury could conclude this information supported Sexton's theory.

### 3.    Sexton's rule violation broke the causal chain.

Under the FRSA, a protected refusal must still be the proximate cause of the ultimate adverse action in order for the employer to be liable. *See Kuduk*, 768 F.3d at 790 (citing *Staub v. Proctor Hosp.*, 562 U.S. 411, 423 (2011)). Even if a lower-level supervisor's animus towards a protected refusal is passed along to others at higher supervisory levels, the employer is not liable if "the employer's investigation results in an adverse action for reasons unrelated to the supervisor's original biased action." *Staub*, 562 U.S. at 421. Put differently, "[a]n employee who engages in protected activity is not insulated from adverse action for violating workplace rules." *Gunderson v. BNSF Ry. Co.*, 850 F.3d 962, 969–70 (8th Cir. 2017).

As did the plaintiff in *Gunderson*, Sexton seems to claim he was subject to retaliation through a "cat's paws" theory of causation. *Id.* at 970. Under this theory, if a supervisor performs an act motivated by retaliatory animus and intended by the supervisor to cause an adverse

15

employment action, "and if that act is a proximate cause of the ultimate employment action, then the employer is liable." Order on Summ. J. (Dkt. 68) at 21 (citing *Kuduk*, 768 F.3d at 790). Sexton's argument seems to be that Jared's e-test was motivated by retaliatory animus and was intended to cause an adverse action. But even if, for the sake of argument, that were accurate, Sexton's independent failure of the e-test severs the causal chain. And any claim the process resulting from his failure was because of intentional retaliation crumbles further at the discipline investigation hearing presided over by Mark Johnson—who testified that all he knew about the events of February 1 was in the "drill down" email, and there was nothing in the email about any disagreement with or refusal by Sexton. Tr. 529:25–530:13; 532:17–22. Because Johnson acted independently when he presided over the hearing and made his recommendation, there is no evidence from which a reasonable jury could conclude that he was in some way swayed by Jared or influenced by Sexton's alleged protected refusal. *See* Tr. 526:23–527:3.

For the foregoing reasons, no reasonable jury could have found Sexton met his burden on this element, and JMOL for DM&E is warranted.

## II.    JMOL IS WARRANTED FOR DM&E ON ITS AFFIRMATIVE DEFENSE.

Even if Sexton produced sufficient evidence on the elements (which he did not), judgment as a matter of law is independently required because trial evidence compelled a finding in DM&E's favor on its affirmative defense, that it would have taken the same disciplinary action absent any protected refusal to work. Final Jury Ins. No. 7 (Dkt. 139); *Kuduk*, 768 F.3d at 792–93.

### A.    Sexton Was Disciplined for an Independent Rule Violation.

The weight of the trial evidence demonstrated that Sexton was disciplined for a major operating rules violation observed during an efficiency test conducted after the events in Marquette. Sexton failed to stop within the distance required by the GCOR following a final communication, resulting in an overrun of the permissible car count. Tr. 453:11–25; 456:15–21;

481:18–25; 652:1–16; Ex. 15 (Dkt. 156-7) at 20:2–16, 62:19–22. Multiple witnesses testified consistently that this violation occurred and that it triggered discipline. Tr. 453:11–25; 482:4–15; 494:6–17 (Johnson); 652:1–16 (Ross). Sexton did not dispute that the rule violation happened. Ex. 15 (Dkt. 156-7) at 62:19–22.

The evidence further showed that the discipline imposed was the *minimum* discipline required under DM&E's Hybrid Discipline & Accountability Guidelines for a first major safety violation where the employee did not accept responsibility. Tr. 494:6–19; Ex. 60 (Dkt. 157-14) at 6. Ross testified that there was "no way in Hades" he would have imposed a lesser penalty for such a violation if the employee did not admit responsibility. Tr. 638:2–8. That testimony was corroborated by DM&E's written disciplinary policies and was not contradicted by any evidence at trial. Ex. 60 (Dkt. 157-14) at 6.

### B.    Ross's Testimony Compels a Finding for DM&E.

Ross alone decided Sexton's discipline. Tr. 618:5–9. Ross testified that the alleged refusal in Marquette played no role in his decision, that he agreed Sexton did the right thing by cutting the crossing, and that the discipline was based exclusively on the later e-test violation. Tr. 652:1–16; 655:14–20; 656:2–5. Ross further testified that he independently reviewed the hearing transcript, the evidence, and the disciplinary guidelines before imposing discipline. Tr. 652:1–16.

No witness contradicted Ross's testimony. Sexton offered no evidence that Ross harbored retaliatory intent, that Ross deviated from standard disciplinary practice, or that Ross would have imposed a different penalty absent the alleged protected refusal. The affirmative defense does not require the employer to prove that the protected conduct was unknown—only that the same action would have been taken regardless. *Yowell v. Admin. Rev. Bd.*, 993 F.3d 418, 422 & 427–28 (5th Cir. 2021) (upholding employer's termination where plaintiff engaged in protected conduct and employer knew of that protected conduct, because the employer would have terminated the

17

plaintiff in the absence of a protected report and explaining that "an employee may not solely rely on the fact that a protected activity is what informed the employer of wrongdoing. Instead, the focus must be on the employer's actions after learning of the wrongdoing."); *Kuduk*, 768 F.3d at 793. Here, Ross's unimpeached testimony squarely established that fact.

### C.     Comparator Evidence Reinforces DM&E's Defense.

There was no evidence of disparate treatment, inconsistent enforcement, shifting explanations, or procedural irregularities in Sexton's discipline. To the contrary, the evidence showed that Sexton received the minimum discipline permitted and that the investigatory and disciplinary process complied with the collective bargaining agreement and CP policy.

In fact, DM&E introduced comparator and policy evidence showing that employees who committed similar major operating-rules violations were disciplined consistently under the Hybrid Discipline Guidelines. Ex. 60 (Dkt. 157-14); Ex. 61 (Dkt. 157-15); Ex. 64 (Dkt. 157-17); Ex. 200 (Dkt. 161-1); Ex. 215 (Dkt. 161-2). Specifically, engineer Jason McIntyre was charged with the *same violation* as Sexton—"failure to stop within half of the last distance specified"—on February 16, 2021, and was disciplined consistent with CP's Hybrid Discipline Guidelines, just as Sexton was. *See* Ex. 61 (Dkt. 157-15); Ex. 215 (Dkt. 161-2); Ex. 217A (Dkt. 161-2); Ex. 60 (Dkt. 157-14) at 6. McIntyre's discipline history resulted in his termination, unlike Sexton, who at the time had no violations and so received the minimum under the Guidelines. Ex. 64 (Dkt. 157-17); Ex. 60 (Dkt. 157-14) at 6. There is no evidence McIntyre engaged in an allegedly protected refusal prior to his rule violation and subsequent dismissal on March 9, 2021.

The jury heard other evidence that DM&E treated Sexton's case consistently with other similarly situated individuals. Engineer Theresa Vanzee was charged with a failure to stop in half the specified distance given in July 2019. Ex. 68 (Dkt. 158). Vanzee acknowledged responsibility for the violation. *Id.* DM&E issued Vanzee a 20-day suspension, of which fifteen days were

deferred due to her acknowledgement of responsibility. *Id.*; Tr. 562:8–15; 594:21–595:4. Similarly, engineer Tyler Pfaff was charged with a violation of GCOR Rule 5.3.7. for failure to stop within half the distance specified on January 11, 2021. Ex. 65 (Dkt. 157-18). Pfaff accepted responsibility in a conversation with the trainmaster on duty at the time the violation occurred. Ex. 66 (Dkt. 159) at 16:18–17:8. Pfaff, like Sexton, was issued a 20-day suspension. Ex. 65 (Dkt. 157-18). Although Pfaff did not sign a formal waiver, Pfaff nevertheless accepted responsibility for his actions and so ten of the days were deferred. *Id.*; Tr. 598:8–23; 600:8–21; 601:20–24; 602:4–10; 602:17–21. Unlike Pfaff or Vanzee, the jury heard that Sexton never accepted responsibility for his rule violation. Tr. 197:2–8; 199:22–25. Nor did Sexton request or accept a formal disciplinary waiver; in fact, he testified that he would not have accepted a waiver even if offered. Tr. 257:2–4.

## III.    PUNITIVE DAMAGES FAIL AS A MATTER OF LAW.

Sexton faced a "formidable burden" to obtain punitive damages, and there is no evidence sufficient for a reasonable jury to determine he carried it. *See BNSF Ry. Co. v. U.S. DOL Admin. Rev. Bd.*, 867 F.3d 942, 949 (8th Cir. 2017) (citation and internal quotation omitted). Specifically, Sexton had to prove that when DM&E suspended him for 20 days without pay, it knew that the suspension "was in violation of the law prohibiting retaliation, or [DM&E] acted with reckless disregard of that law." Final Punitive Damages Jury Instruction No. 14 ("Final Punitive Ins.") (Dkt. 146) at 3; *accord Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 538 (1999). Even if there were evidence from which a reasonable jury could determine Sexton met that burden, punitive damages would be barred because no reasonable jury could reject the evidence that DM&E "made a good-faith effort to comply with the law prohibiting retaliation." Final Punitive Ins. No. 14 (Dkt. 146) at 3; *accord BNSF Ry. Co.*, 867 F.3d at 949.

There is no evidence from which a reasonable jury could find that DM&E acted with "conscious wrongdoing" or without regard to Sexton's rights, and no reasonable jury could dispute

19

DM&E's substantial and good-faith efforts to comply with the FRSA. First, DM&E maintains and enforces robust anti-retaliation policies. Tr. 384:24–385:1; 402:18–24; 405:3–8; 406:5–14; Ex. 200 (Dkt. 161-1) at 8, 14, and 17–18; Ex. 103 (Dkt. 158-11) at 9–10. Second, DM&E disciplines union and non-union employees who fail to follow proper procedures and rules. Tr. 413:10–414:8. Third, there was no evidence showing intentional lawbreaking, hostility toward Sexton, hostility toward safety complaints, or reckless indifference. *Cf. Sanders v. BNSF Ry. Co.*, No. 17-cv-5106, 2022 U.S. Dist. LEXIS 218148, at *17 (D. Minn. Dec. 5, 2022) (holding sufficient evidence to award punitive damages existed where the manager pressured plaintiff "to refrain from entering legitimate slow orders" and advocated for his firing "when he would not do so"). Fourth, there is no evidence that DM&E recklessly disregarded Sexton's right to be free from retaliation. *See Webner v. Titan Distrib.*, 267 F.3d 828, 837–38 (8th Cir. 2001) (vacating punitive damages in employment discrimination case because even though the defendant's actions were unlawful, they did not "rise to the level of maliciousness required to sustain . . . punitive damages").

For these reasons, no reasonable jury could have found Sexton met his burden to obtain punitive damages, and JMOL for DM&E as to the punitive damages award is warranted.

## IV.   THE COURT SHOULD ORDER A NEW TRIAL IF IT DOES NOT GRANT JMOL.

If the Court does not enter JMOL in favor of DM&E, DM&E asks for a new trial pursuant to Rule 50(b)(2) and Rule 59(a). A motion for a new trial should be granted if the verdict is against the great weight of the evidence and where a new trial is necessary to prevent a miscarriage of justice. *Butler v. French*, 83 F.3d 942, 944 (8th Cir. 1996). "A new trial is appropriate when the first trial, through a verdict against the weight of the evidence, an excessive damage award, or legal errors at trial, resulted in a miscarriage of justice." *Gary v. Bicknell*, 86 F.3d 1472, 1480 (8th Cir. 1996). In determining whether a verdict is against the weight of the evidence, the Court "can rely on its own reading of the evidence – it can weigh the evidence, disbelieve witnesses, and grant

a new trial even where there is substantial evidence to sustain the verdict." *White v. Pence*, 961 F.2d 776, 780 (8th Cir. 1992); *Bicknell*, 83 F.3d at 1480 (holding a district court may "grant a new trial based on its appraisal of the fairness of the trial and the reliability of the jury's verdict").

A new trial is necessitated here because the verdict was against the weight of the evidence, the jury awarded an excessive and unsupported damage award, and there were legal errors that resulted in a miscarriage of justice and prejudiced DM&E.

**A.     The Court Should Grant a New Trial Because the Verdict Was Against the Weight of the Evidence.**

The verdict in favor of Sexton was against the clear weight of the evidence. While a jury is entitled to weigh credibility and draw reasonable inferences, Rule 59 allows a new trial if the verdict rests on evidence so weak that allowing it to stand would be unjust. Fed. R. Civ. P. 59; *see also Koziara v. BNSF Ry. Co.*, 840 F.3d 873, 879 (7th Cir. 2016) (reversing jury award in favor of plaintiff and ordering that the lawsuit be dismissed because the plaintiff failed to show intentional retaliation). That is the case here. DM&E witnesses consistently told the jury that DM&E disciplined Sexton for a documented and admitted rule-compliance failure observed during a routine efficiency test, not because of any protected refusal to work. The jury's contrary conclusion is unsupported by the evidence and ignores undisputed facts presented at trial.

First, the evidence overwhelmingly established a legitimate, non-retaliatory basis for Sexton's discipline. The uncontroverted testimony showed that Sexton failed to stop his train within the distance required by GCOR 5.3.7 after receiving a final "15 to a stop" communication. Tr. 453:11–25; 456:15–21; 481:18–25; 652:1–16; Ex. 15 (Dkt. 156-7) at 20:2–16, 62:19–22. DM&E introduced contemporaneous records, hearing testimony, and multiple witnesses—none of whom were impeached—confirming that the rule violation occurred and that the discipline imposed was consistent with the Hybrid Discipline & Accountability Guidelines. Tr. 453:11–25;

21

456:15–21; 481:18–25; 482:4–15; 494:6–17; 652:1–16; Ex. 15 (Dkt. 156-7) at 20:2–16, 62:19–22. No witness credibly testified that the discipline deviated from policy, was pretextual, or was imposed in a manner different than what was given to similarly situated employees.

Second, Sexton failed to establish a causal link between any alleged protected refusal to work and the adverse action. The only purported protected refusal to work—a disagreement with a supervisor regarding whether to cut a crossing—was resolved when the crossing was in fact cut and the train subsequently departed. Tr. 279:11 (Dkt. 123 (79:22–80:9)). There was no evidence that the decisionmaker responsible for imposing discipline acted with retaliatory motive, knowledge, or influence related to that disagreement. To the contrary, testimony showed that the efficiency test was conducted because the train movement presented a suitable opportunity for compliance testing, and that the discipline decision was made after review of the investigative record—not in response to any protected refusal. Tr. 366:12–19. The jury's finding of causation rests on temporal proximity alone, which is not enough to defeat substantial contrary evidence. *Freeman v. Ace Tel. Ass'n.*, 467 F.3d 695, 698 (8th Cir. 2006) (intervening misconduct undermines causation a reasonable person might otherwise have drawn from temporal proximity).

Third, the jury rejected credible, consistent defense testimony without a reasonable basis to do so. Key witnesses, including Johnson as hearing officer and Ross as decisionmaker, testified that Sexton's insistence on cutting the crossing played no role in the discipline process or decision. Tr. 451:24–452:1; 650:7–13; 656:2–5. Their testimony was corroborated by the hearing transcript (Ex. 15 (Dkt. 156-7)) and other documentary evidence (e.g., Ex. 27 (Dkt. 157-1)), and Sexton offered no competent evidence establishing animus, shifting explanations, or retaliatory pressure. A verdict is against the weight of the evidence when, to reach it, the jury must discredit unimpeached testimony that is consistent with other evidence. *Reeves*, 530 U.S. at 151; *Phillips v.*

22

*Collings*, 256 F.3d 843, 847 (8th Cir. 2001). That is exactly the case here.

Finally, permitting the verdict to stand would result in a miscarriage of justice. Sexton received the minimum discipline permitted for a proven major rule violation. Yet the jury nonetheless found liability for retaliation despite the absence of evidence showing a protected refusal to work caused or even influenced the discipline decision. When the evidence as a whole so strongly favors DM&E that reasonable jurors could not have reached the verdict rendered, Rule 59 requires a new trial. The Court should therefore vacate the verdict and grant DM&E a new trial to prevent manifest injustice. *See Koziara*, 840 F.3d at 879.

**B.      The Court Should Grant a New Trial Because the Jury Awarded Sexton an Excessive Damages Award that Was Not Supported by the Evidence at Trial.**

The jury's $750,000 emotional distress damages award is unsupported by evidence and rests on speculation, not proof. To establish damages for emotional distress, Sexton was required to present "competent evidence of 'genuine injury,' which 'may be evidenced by one's conduct and observed by others.'" *Taylor v. Tenant Tracker, Inc.*, 710 F.3d 824, 828–29 (8th Cir. 2013) (finding that plaintiff's description that she "was very upset" and "extremely upset and embarrassed" was insufficient to satisfy the requirement of genuine injury and actual damages). In *Taylor*, the Eight Circuit held the "genuine injury" requirement exists for claims based on emotional harm and arising under federal statutes, including Title VII and Section 1983. *Id.* at 828.

Sexton did not offer any evidence supporting *any* emotional distress award, let alone the excessive sum of $750,000. The record contains no evidence of economic loss resulting from manifestations of distress, no medical or psychological treatment, and no testimony from any healthcare provider or expert establishing the nature, extent, or duration of any alleged emotional distress. Sexton said only that he was "demoralized" and "angry," and his counsel ridiculed the idea that medical records or treatment was somehow relevant. Tr. 194:1–3; 915:17–19. For his

part, Sexton was clear: He is not a "sissy." Tr. 248:19–23. Sexton's subjective and uncorroborated descriptions of demoralization, embarrassment, frustration, or anxiety are legally insufficient to sustain an award of this size. *See Forshee v. Waterloo Indus.*, 178 F.3d 527, 530–31 (8th Cir. 1999) (reversing emotional distress award because plaintiff's evidence was based entirely upon her own testimony, plaintiff suffered no physical injury, and no other witness corroborated any outward manifestation of emotional distress); *Ruffin-Thompkins v. Experian Info. Sols., Inc.*, 422 F.3d 603, 610 (7th Cir. 2005) (plaintiff failed to demonstrate actual damages where she offered conclusory statements of her emotional distress and failed to describe her injury in any reasonable detail). Nor did Sexton even bother to say anything in support of *future* emotional distress.

Sexton also did not introduce evidence or testimony that would allow the jury to determine emotional distress damages in a rational, non-speculative manner. Sexton offered no evidence of ongoing impairment and no proof that the challenged discipline altered his employment status, seniority, job duties, or career trajectory. Tr. 249:8–15. To the contrary, the undisputed evidence showed that Sexton remains employed as a locomotive engineer, retained his seniority, returned to work with full back pay, and continues to hold preferred assignments. Tr. 135:11–12; 29:13–21; 202:6–10; 203:9–17. In the absence of objective, corroborated evidence of harm, the jury lacked any basis from which to conclude that $750,000 represented fair or reasonable compensation. *See Delph v. Dr. Pepper Bottling Co.*, 130 F.3d 349, 357 (8th Cir. 1997) (reducing emotional distress award of $150,000 because testimony of plaintiff and his wife only established the plaintiff said he was "very hurt" and experienced headaches and stomachaches).

Because damages must be proven with reasonable certainty, a verdict that has no evidentiary support cannot stand. Here, the size of the award bears no relationship to the scant testimony presented and thus reflects passion or conjecture rather than a reasoned assessment. The

24

Court accordingly should vacate damages and grant a new trial, or alternatively order remittitur to an amount supported by the evidence, which at most would be nominal. *Shepard v. Wapello Cnty.*, 303 F.Supp.2d 1004, 1024 (S.D. Iowa 2003) (ordering a new trial on damages because the evidence did not support the $250,000 award where the alleged distress stemmed from a single incident).

**C.      The Court Should Grant a New Trial Due to Sexton's Counsel's Improper Arguments and Prejudicial Insinuations.**

A new trial is further warranted because of Sexton's counsel's insinuations and arguments that went beyond advocacy and unfairly prejudiced DM&E.

"Improper questioning by counsel generally entitles the aggrieved party to a new trial if it conveys improper information to the jury and prejudices the opposing litigant." *Blair v. Wills*, 420 F.3d 823, 829 (8th Cir. 2005) (citation and internal quotation omitted). Improper questioning and comments are particularly prejudicial where they inject facts not in evidence, imply wrongdoing without a factual basis, impugn witness credibility through insinuation, or invite the jury to draw inferences based on speculation rather than testimony. When the conduct bears directly on credibility determinations or central issues of intent, the risk of prejudice is heightened because attorneys' questions and statements are not evidence—and yet jurors inevitably are influenced by insinuations. *Liner v. J.B. Talley and Co., Inc.*, 618 F.2d 327, 330 (5th Cir. 1980). Sexton's counsel crossed each of the lines above, and his conduct warrants a new trial.

Examining Ross, counsel represented prejudicial and irrelevant information about a tragic derailment. Counsel first claimed that if "a derailment happens and the cars go on their sides, things can break, things can get punctured on the car, valves can get sheared, and you're going to have an explosion; right?" Tr. 623:21–23. Ross responded: "I think you're taking a lot of leeway there." Tr. 623:24. Counsel then raised a fatal derailment from more than 20 years ago, in Minot, N.D., that involved CP and in which (according only to counsel) "somebody died, and there were 300

25

injuries? You've never heard of that?" Tr. 624:5–8. Counsel pressed this point even though Ross had said he neither worked for CP or in the U.S. at the time. Tr. 614:23–615:3.

During closing argument, counsel insinuated that Jared, Ross, and Jeff McInnis did not tell the truth because they advanced at CP based on merit and did not have degrees beyond high school or GEDs: "And, yes, some of these guys worked their way up, God bless them. Grueling hours, wicked pressures. **What else do we expect them to come in here and say?** They've got a job to do." Tr. 916:18–22 (emphasis added). He made the same insinuation when questioning Jared, implying that Jared's testimony was shaded by a fear he might lose his job. Tr. 382:6–12 ("We talked about how you've attained this position with a 12th grade education." "That's correct." "You don't want to lose this job, do you?" . . . "No."); 382:25–383:1 ("Don't know many people that make that kind of money with a 12th grade education, do we?").

Counsel also implied that every time a witness did not remember something, he or she was lying. "If someone remembers something and they walk into court and repeatedly say 'I don't remember' and 'I don't know' to questions that hurt the railroad's case and then remember, in exquisite detail, the details that hurt Sexton's case, what are we to infer from that? Are they telling the truth? That's for you to decide." Tr. 884:19–25. That goes far beyond the Court's instructions to the jury. *See* Final Jury Ins. No. 3 (Dkt. 139).

Finally, counsel asked the jury to make inferences from evidence that was not in the record, statements Sexton's expert Brandon Ogden did not say, and even McKelvey's absence, which was due to the fact he was outside the Court's subpoena power. "There's video played at the investigation . . . that we don't have anymore. There was no event recorder data pulled from that locomotive." Tr. 875:1–3. After repeated objections and a conference outside the presence of the jury to keep counsel and Ogden within the bounds of the stipulation to which Sexton agreed,

counsel all but told the jury to consider what Ogden did not say: "There was a lot of things Mr. Ogden unfortunately couldn't tell you he probably would have liked to." Tr. 884:3–5.

As for McKelvey, counsel read a Teams message in his closing in which McKelvey said "Can you send me the radio recordings from the time [Sexton] went on duty please," and then asked the jury: "We didn't hear any radio recordings, did we?" Tr. 870:11. He went on: "And where is Kurtis McKelvey now? . . . Ross didn't say it. Again, we can draw the inference. He wasn't fired. **Did he have enough of this? We don't know because he wasn't here to tell us.**" Tr. 912:20–913:4 (emphasis added).

The prejudice resulting from counsel's statements was substantial. First, the jury's verdict depended heavily on whether it credited the testimony of DM&E's decisionmaker, investigators, and managers, and improper insinuations attacking credibility without evidentiary support are especially damaging in cases turning on intent and motivation. *See Gilster v. Primebank*, 747 F.3d 1007, 1011 (8th Cir. 2014). Second, counsel's insinuations put unsworn testimony to the jury – repeatedly. This harm was not undone by the instruction that counsel's statements are not evidence.

Where improper questioning likely influenced the jury's verdict in a close case, or where the verdict appears inconsistent with the weight of the evidence, a new trial is required. *Bicknell*, 86 F.3d at 1480. That is the case here.

### D.       A New Trial Is Warranted Because It Was Error to Allow Ogden to Testify.

A new trial is appropriate when legal errors result in a "miscarriage of justice." *Id.* Courts grant a new trial when expert testimony is allowed in error and had a substantial influence on the verdict. *Wallace v. Pharma Medica Rsch., Inc.*, 78 F.4th 402, 408 (8th Cir. 2023). Here, the decision not to bar Ogden from testifying was error sufficient for a new trial, given his lack of qualification and the unreliability of his opinions, in violation of Fed. R. Evid. 702. (Order Granting Motion in Limine in Part and Denying in Part, March 31, 2025, Dkt. 69.)

Ogden is not and never was a locomotive engineer. Tr. 723:17–724:2. Despite this, he baselessly instructed the jury that Sexton had *not* violated Rule 5.3.7, and his opinions centered on how an engineer should interpret radio communications, apply stopping-distance rules, and operate a train during a shove. Tr. 705:18–23. By allowing Ogden to opine on matters squarely within the professional judgment of certified engineers, the Court permitted testimony beyond his expertise, leaving the jury with the false impression that Ogden possessed operational authority he did not.

Ogden also invaded the jury's role. He did not merely provide technical background; he offered conclusions on ultimate issues the jury was required to decide—namely, whether Sexton complied with operating rules and whether DM&E acted improperly in disciplining him. Tr. 708:5–17; 705:18–706:16. Experts may not present legal conclusions or tell the jury how to decide disputed facts. *See Klossner v. Iadu Table Mount MHP, LLC*, No. 20-cv-1037, 2021 U.S. Dist. LEXIS 148483, at *12 (N.D. Iowa Apr. 16, 2021). Allowing Ogden to do so improperly substituted expert opinion for the jury's evaluation of testimony and evidence, thereby prejudicing DM&E.

The prejudice was compounded by the fact Ogden has never worked for DM&E and had no familiarity with its operational environments, discipline framework, or efficiency-testing practices. Tr. 724:5–19. Rather than applying DM&E-specific rules, training materials, and real-world operational constraints, Ogden relied on generalized industry concepts and his own subjective interpretations. *See, e.g.*, Tr. 715:18–20 (unsupported opinion on how "railroad managers are graded"). Ogden's lack of institutional knowledge rendered his opinions speculative and unreliable, yet the jury was invited to treat them as authoritative critiques of DM&E's actions. That prejudice was amplified when Sexton relied heavily on Ogden's testimony in closing argument as effectively dispositive. *See* Tr. 884:3–5.

Finally, Ogden did not witness any of the events at issue and had no personal knowledge

28

of what occurred during the shove movement, the communications between crew members, or the contemporaneous observations of DM&E management. Tr. 724:5–19. Permitting such testimony substituted Ogden's after-the-fact theorizing for the testimony of witnesses who were present and accountable. Given how central Ogden's opinions were to Sexton's case and the likelihood that his unsupported conclusions influenced the jury's decision, the erroneous admission of his testimony substantially affected the verdict and requires a new trial. *Wallace*, 78 F.4th at 408.

## V.    IF THE JUDGMENT AGAINST DM&E STANDS, IT MUST BE AMENDED.

If the Court declines to grant the relief requested above, DM&E respectfully requests that the Count instead alter or amend the judgment (Dkt. 155) in two ways. First, at a minimum, to reduce the punitive damages award to no more than the FRSA's $250,000 limit. 49 U.S.C. § 20109(e)(3). Second, to reduce the unsupported awards of $375,000 for past emotional distress and $375,000 for future emotional distress. None of these awards should stand.

Rule 59(e) of the Federal Rules of Civil Procedure empowers the Court to alter or amend the judgment to "correct manifest errors of law." Here, the jury returned a general verdict for Sexton that included its punitive damages award. Rule 58(b)(1)(A) required the clerk of court to enter judgment without awaiting direction from the Court, and the clerk did so on March 17, 2026—with the jury's full award of punitive damages included in the $2.25 million judgment. Because the punitive damages exceed the statutory cap, they must be reduced to that cap and the judgment amended accordingly. In *Rennenger v. Manley Toy Direct L.L.C.*, for example, a jury awarded $10 million in punitive damages in a Title VII action, and judgment was entered. No. 10-cv-00400, 2016 U.S. Dist. LEXIS 203518, at *4–5 (S.D. Iowa July 7, 2016). The defendant filed a Rule 59(e) motion asking the Southern District of Iowa to apply Title VII's cap on punitive damages and amend the judgment accordingly. *Id.* at *10; *see also* 42 U.S.C. § 1981a(b). The district court granted the motion and amended the judgment to include punitive damages of only

29

$100,000, the statutory limit for an employer the size of the defendant. *Id.* at \*34. Similarly, in *Baker v. John Morrell & Co.*, the Northern District of Iowa reduced compensatory and punitive damages in a Title VII case to the combined statutory cap of $300,000 from a total that had exceeded $700,000. 249 F. Supp. 2d 1138, 1191–92, 1195 (N.D. Iowa 2003). As in *Rennenger*, the *Baker* defendant sought and the court granted relief under Rule 59(e). *Id.* at 1150.

Rule 59(e) also empowers the Court to alter or amend the judgment to correct a manifest error of fact. As explained in Section IV(B), the emotional distress awards are unsupported by evidence and rest only on speculation. Sexton needed to present "competent evidence of genuine injury," *Taylor*, 710 F.3d at 828. Sexton offered nothing to support the damages assessed by the jury: no economic loss, no professional treatment, no testimony from anyone but himself. Sexton's subjective and uncorroborated descriptions cannot sustain the verdict. *Id.; see also Forshee*, 178 F.3d at 530–531; *Ruffin-Thompkins*, 422 F.3d at 610.

As it is, the $2.25 million judgment against DM&E includes punitive damages of $1.5 million—six times the statutory limit. It also includes emotional distress damages that are based on nothing but fiction. This is manifestly wrong and the judgment should be altered or amended.

**CONCLUSION**

For the reasons set out above, DM&E respectfully requests that this Court grant its motion for JMOL because there is no evidence from which a reasonable jury could find that Sexton proved his claim. JMOL also should be granted on the independent basis that DM&E met its burden and proved its affirmative defense. If JMOL is not granted, DM&E asks the Court to grant its alternative motion for a new trial. Finally, if the Court grants neither JMOL nor a new trial, then DM&E asks the Court to alter or amend the judgment to void or reduce punitive damages to no more than the FRSA's cap of $250,000 and void or reduce the emotional distress award.

Respectfully Submitted:

Dated: April 14, 2026                                    DORSEY & WHITNEY LLP


                                                         /s/ Joshua D. Hughes
                                                         Joshua Hughes (AT0014950)
                                                         hughes.joshua@dorsey.com
                                                         Dorsey & Whitney LLP
                                                         801 Grand Ave, Suite 4100
                                                         Des Moines, IA 50309
                                                         Tel: (515) 283-1000
                                                         Fax: (515) 598-7704


                                                         /s/ John T. Sullivan
                                                         John T. Sullivan (pro hac vice)
                                                         sullivan.jack@dorsey.com
                                                         Briana Al Taqatqa (pro hac vice)
                                                         altaqatqa.briana@dorsey.com
                                                         Dorsey & Whitney LLP
                                                         50 South Sixth Street, Suite 1500
                                                         Minneapolis, MN 55402
                                                         Tel:  (612) 340-2600
                                                         Fax:  (612) 340-2868


                                                         ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I hereby certify that on April 14, 2026, I caused the foregoing to be electronically served on Plaintiff via ECF, which provides notice and a copy to Plaintiff's counsel and all other counsel of record:

Megan R. Merritt
SHUTTLEWORTH & INGERSOLL, P.L.C.
115 3rd Street SE, Suite 500
P.O. Box 2107
Cedar Rapids, IA 52406
Phone: (319) 365-9461
Fax: (319) 365-8443
mrm@shuttleworthlaw.com

John D. Magnuson
YAEGER & JUNGBAUER BARRISTERS, P.L.C.
4601 Weston Woods Way
St. Paul, MN 55127
Phone: (507) 330-4777
Fax: (651) 288-0227
jmagnuson@yjblaw.com

Cyle A. Cramer
NICHOLS KASTER, PLLP
80 South Eighth Street
4700 IDS Center
Minneapolis, MN 55402
Phone: (512) 256-3200
Fax: (612) 338-4878
ccramer@nka.com


                                        /s/ *Joshua D. Hughes*
                                        Counsel for Defendant