# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## FORM 10-K

(Mark one)

☒     ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES AND EXCHANGE ACT OF 1934

For fiscal year ended December 31, 2025

OR

☐     TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from     to

Commission File Number 001-01342

# Canadian Pacific Kansas City Limited

(Exact name of registrant as specified in its charter)

| Canada | 98-0355078 |
|---|---|
| (State or Other Jurisdiction of Incorporation or Organization) | (IRS Employer Identification No.) |
| 7550 Ogden Dale Road S.E., Calgary, Alberta, Canada | T2C 4X9 |
| (Address of principal executive offices) | (Zip Code) |

(403) 319-7000

Registrant's Telephone Number, Including Area Code:

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which Registered |
|---|---|---|
| Common Shares, without par value, of Canadian Pacific Kansas City Limited | CP | New York Stock Exchange |
| Common Shares, without par value, of Canadian Pacific Kansas City Limited | CP | Toronto Stock Exchange |
| Perpetual 4% Consolidated Debenture Stock of Canadian Pacific Railway Company | CP/40 | New York Stock Exchange |
| Perpetual 4% Consolidated Debenture Stock of Canadian Pacific Railway Company | BC87 | London Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the *Securities Act.*
Yes ☑   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the *Exchange Act*.
Yes ☐ No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the *Securities Exchange Act of 1934* during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑    No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☑    No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the *Exchange Act*.

| Large accelerated filer ☑ | Accelerated filer ☐ | Non-accelerated filer ☐ | Smaller reporting company ☐ | Emerging growth company ☐ |
|---|---|---|---|---|

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the *Exchange Act*. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the *Sarbanes-Oxley Act* (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☑

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to § 240.10D-1(b). ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the *Exchange Act*). Yes ☐ No ☑

As of June 30, 2025, the last business day of the registrant's most recently completed second fiscal quarter, the aggregate market value of the voting stock held by non-affiliates of the registrant, in U.S. dollars, was $72,746,204,564, based on the closing sales price per share as reported by the New York Stock Exchange on such date.

As of the close of business on February 25, 2026, there were 897,958,953 of the registrant's Common Shares outstanding.

## DOCUMENTS INCORPORATED BY REFERENCE

Not applicable.

## EXPLANATORY NOTE

Canadian Pacific Kansas City Limited ("CPKC"), a corporation incorporated under the *Canada Business Corporations Act*, qualifies as a foreign private issuer in the U.S. for purposes of *the Securities Exchange Act of 1934*, as amended (the *"Exchange Act"*). Although as a foreign private issuer CPKC is no longer required to do so, CPKC currently continues to file annual reports on Form 10-K, quarterly reports on Form 10-Q, and current reports on Form 8-K with the Securities and Exchange Commission ("SEC") instead of filing reports on forms available to foreign private issuers.

CPKC prepares and files a management information circular and related material under Canadian requirements. As CPKC's management information circular is not filed pursuant to Regulation 14A, CPKC may not incorporate by reference information required by Part III of this Form 10-K from its management information circular. Accordingly, in reliance upon and as permitted by Instruction G(3) to Form 10-K, CPKC will be filing an amendment to this Form 10-K containing the Part III information no later than 120 days after the end of the fiscal year covered by this Form 10-K. All references to websites (including our website) contained herein do not constitute incorporation by reference of information contained on such websites and such information should not be considered part of this document.

# ITEM 1. BUSINESS

## Company Overview

Canadian Pacific Kansas City Limited ("CPKC" or the "Company") owns and operates the only freight railway spanning Canada, the United States ("U.S."), and Mexico. CPKC provides rail and intermodal transportation services over a network of approximately 20,000 miles, serving principal business centres across Canada, the U.S., and Mexico. CPKC transports bulk commodities, merchandise freight, and intermodal traffic. For additional information regarding CPKC's network and geographical locations, refer to Item 2. Properties.

The Company was originally incorporated on June 22, 2001, under the *Canada Business Corporations Act* and controls and owns all of the Common Shares of Canadian Pacific Railway Company ("CPRC"), which was incorporated in 1881 by Letters Patent pursuant to an Act of the Parliament of Canada. CPKC's registered, executive and corporate head office is located at 7550 Ogden Dale Road S.E., Calgary, Alberta, T2C 4X9, Canada. CPKC's U.S. head office is located at 427 West 12 Street, Kansas City, Missouri, 64105. CPKC's Common Shares (the "Common Shares") are listed on the Toronto Stock Exchange ("TSX") and the New York Stock Exchange ("NYSE") under the symbol "CP".

On April 14, 2023, CPKC assumed control of Kansas City Southern ("KCS") through an indirect wholly-owned subsidiary. For the purposes of this Annual Report on Form 10-K, unless the context indicates otherwise, all references herein to "CPKC", "the Company", "we", "our" and "us" refer to Canadian Pacific Kansas City Limited and its subsidiaries, which includes KCS as a consolidated subsidiary from April 14, 2023 ("Control Date"). Prior to April 14, 2023, the Company's 100% interest in KCS was accounted for and reported as an equity-method investment (see Part II Item 8. Financial Statements and Supplementary Data, Note 11 Business acquisition and Note 12 Investment in Kansas City Southern). All references to currency amounts included in this Annual Report on Form 10-K are in Canadian dollars unless specifically noted otherwise.

## Strategy

The Company's strategy remains focused on precision scheduled railroading as embedded within our five foundations:

- **Provide Service:** Providing efficient and consistent transportation solutions for the Company's customers. "Doing what we say we are going to do" is what drives the Company in providing a reliable product with a lower cost operating model. Centralized planning aligned with local execution is bringing the Company closer to the customer and accelerating decision-making.
- **Control Costs:** Controlling and removing unnecessary costs from the organization, eliminating bureaucracy, and continuing to identify productivity enhancements are the keys to success.
- **Optimize Assets:** Through longer and heavier trains, and improved asset utilization, the Company is moving increased volumes with fewer locomotives and cars while unlocking capacity for future growth potential.
- **Operate Safely:** Each year, the Company safely moves millions of carloads of freight across North America while ensuring the safety of our people and the communities through which we operate. Safety is never to be compromised. The Company strives for continuous implementation of state-of-the-art safety technology, safety management systems, and safety culture with our employees to ensure safe, efficient operations across our network.
- **Develop People:** The Company recognizes that none of the other foundations can be achieved without its people. Every employee is a railroader and the Company has established a culture focused on our values of accountability, diversity and pride, in everything we do. Coaching and mentoring all employees into becoming leaders will continue to drive the Company forward.

As a Company, we remain focused on our next level of service, productivity, and innovation to continue to generate sustainable value for our customers, employees, and shareholders.

## Business Developments

On January 28, 2026, the Company announced that the TSX has accepted its notice of intention to implement an early renewal of its normal course issuer bid ("NCIB"), commencing on February 2, 2026, to purchase up to approximately 82.2 million Common Shares, less the 37.3 million Common Shares purchased under the 2025 NCIB, for net new purchases of up to 44.9 million Common Shares for cancellation on or before February 1, 2027. CPKC has terminated its existing 2025 NCIB which commenced on March 3, 2025 and had an expiry date of March 2, 2026. The Company had purchased and cancelled all 37.3 million Common Shares authorized to be purchased under the 2025 NCIB by October 29, 2025. See Part II, Item 5. Market for Registrant's Common Equity, Related Shareholder Matters and Issuer Purchases of Equity Securities for further details of share repurchases.

On May 30, 2025, the Company entered into new four-year collective agreements with the Teamsters Canada Rail Conference ("TCRC") - Train and Engine ("T&E") division and TCRC - Rail Traffic Controller ("RCTC") division, following binding arbitration. The new collective agreements include annual wage increases of 3%, effective from January 1, 2024 to December 31, 2027.

On April 1, 2025, CPKC sold its 50% equity method investment in the Panama Canal Railway Company to APM Terminals Panama Rail LP, a subsidiary of A.P. Moller-Maersk A/S, for gross proceeds of U.S. $350 million. The Company received cash consideration of U.S. $344 million ($493 million) and recognized a pre-tax gain of U.S. $232 million ($333 million) (U.S. $177 million after tax ($256 million)).

## Operations

The Company only has one operating segment: rail transportation. Although the Company provides a breakdown of revenue by business line, the overall financial and operational performance of the Company is analyzed as one segment due to the integrated nature of the rail network. Additional information regarding the Company's business and operations, including revenue and financial information, and information by geographic location is presented in Part II, Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations, and Item 8. Financial Statements and Supplementary Data, Note 28 Segmented and geographic information.

## Lines of Business

The Company transports freight consisting of bulk commodities, merchandise, and intermodal traffic. Bulk commodities, which typically move in large volumes across long distances, include Grain, Coal, Potash, and Fertilizers and sulphur. Merchandise freight consists of industrial and consumer products, such as Forest products, Energy, chemicals and plastics, Metals, minerals and consumer products, and Automotive. Intermodal traffic consists largely of retail goods in overseas containers that are transported by train, ship, and truck, and in domestic containers that are moved by train and truck.

In 2025, the Company generated Freight revenues totalling $14,776 million ($14,223 million in 2024).

The following chart shows the percentage of the Company's total Freight revenues derived from each of the three major lines of business in 2025:



**2025 Freight Revenues**

An **employee** is defined as an individual currently engaged in full-time, part-time, or seasonal employment with the Company. The Company monitors employment and workforce levels in order to efficiently meet service and strategic requirements. The number of employees is a key driver to total compensation and benefits costs. The decrease in the average number of total employees was primarily due to the completion of systems integration in 2025 and efficient resource planning.

# Results of Operations
## Operating Revenues

| For the year ended December 31 | 2025 | 2024 | Total Change | % Change |
|---|---|---|---|---|
| Freight revenues (in millions) | $ 14,776 | $ 14,223 | $ 553 | 4 |
| Non-freight revenues (in millions) | 302 | 323 | (21) | (7) |
| Total revenues (in millions) | $ 15,078 | $ 14,546 | $ 532 | 4 |
| Carloads (in thousands) | 4,514.0 | 4,370.0 | 144.0 | 3 |
| Revenue ton-miles (in millions) | 219,420 | 211,458 | 7,962 | 4 |
| Freight revenue per carload (in dollars) | $ 3,273 | $ 3,255 | $ 18 | 1 |
| Freight revenue per revenue ton-mile (in cents) | 6.73 | 6.73 | — | — |

The Company's revenues are primarily derived from transporting freight. Changes in freight volumes generally contribute to corresponding changes in Freight revenues and certain variable expenses such as fuel, equipment rents, and crew costs. Non-freight revenues are generated from leasing certain assets, interline switching, and other arrangements including contracts with passenger service operators, subsurface and mineral rights agreements, and logistical services.

Total Revenues
The increase in Freight revenues was primarily due to higher volumes as measured by RTMs. The decrease in Non-freight revenues was primarily due to lower leasing revenues.

RTMs
RTMs are defined as the movement of one revenue-producing ton of freight over a distance of one mile. RTMs measure the relative weight and distance of rail freight moved by the Company. The increase in RTMs was primarily due to higher volumes of Intermodal, Grain, Potash, Coal, and Automotive, partially offset by lower volumes of crude.

Freight Revenue per RTM
Freight revenue per RTM is defined as freight revenue per revenue-producing ton of freight over a distance of one mile. This is an indicator of yield. Freight revenue per RTM was flat primarily due to higher freight rates and the favourable impact of the change in foreign exchange ("FX") rates of $154 million, offset by the unfavourable impact of lower fuel prices on fuel surcharge revenues of $205 million.

# Lines of Business
Grain

| For the year ended December 31 | 2025 | 2024 | Total Change | % Change |
|---|---|---|---|---|
| Freight revenues (in millions) | $ 3,217 | $ 3,012 | $ 205 | 7 |
| Carloads (in thousands) | 570.8 | 549.6 | 21.2 | 4 |
| Revenue ton-miles (in millions) | 61,346 | 58,101 | 3,245 | 6 |
| Freight revenue per carload (in dollars) | $ 5,636 | $ 5,480 | $ 156 | 3 |
| Freight revenue per revenue ton-mile (in cents) | 5.24 | 5.18 | 0.06 | 1 |

The increase in Grain revenue was primarily due to higher volumes of Canadian grain to Vancouver, British Columbia ("B.C.") and Thunder Bay, Ontario, higher volumes of U.S. grain to Mexico and the U.S. Pacific Northwest, and an increase in freight revenue per RTM, partially offset by lower fuel surcharge revenue. Freight revenue per RTM increased due to higher freight rates and the favourable impact of the change in FX rates.

# CONSOLIDATED STATEMENTS OF INCOME

| Year ended December 31 (in millions of Canadian dollars, except share and per share data) | | 2025 | 2024 | 2023 |
|---|---|---|---|---|
| **Revenues (Note 4)** | | | | |
| Freight | $ | 14,776 $ | 14,223 $ | 12,281 |
| Non-freight | | 302 | 323 | 274 |
| **Total revenues** | | 15,078 | 14,546 | 12,555 |
| **Operating expenses** | | | | |
| Compensation and benefits (Note 11, 23, 24) | | 2,581 | 2,565 | 2,332 |
| Fuel | | 1,731 | 1,802 | 1,681 |
| Materials | | 474 | 406 | 346 |
| Equipment rents | | 408 | 347 | 277 |
| Depreciation and amortization (Note 13, 15) | | 2,019 | 1,900 | 1,543 |
| Purchased services and other (Note 26) | | 2,256 | 2,347 | 1,988 |
| **Total operating expenses** | | 9,469 | 9,367 | 8,167 |
| **Operating income** | | 5,609 | 5,179 | 4,388 |
| Equity earnings of Kansas City Southern (Note 11, 12) | | — | — | (230) |
| Other (income) expense (Note 5, 17, 18) | | (1) | (42) | 52 |
| Other components of net periodic benefit recovery (Note 23) | | (415) | (352) | (327) |
| Net interest expense | | 876 | 801 | 771 |
| Remeasurement loss of Kansas City Southern (Note 11) | | — | — | 7,175 |
| Gain on sale of equity investment (Note 6) | | (333) | — | — |
| **Income (loss) before income tax expense (recovery)** | | 5,482 | 4,772 | (3,053) |
| Current income tax expense | | 1,174 | 1,031 | 909 |
| Deferred income tax expense (recovery) (Note 11) | | 171 | 28 | (7,885) |
| **Income tax expense (recovery) (Note 7)** | | 1,345 | 1,059 | (6,976) |
| **Net income** | $ | 4,137 $ | 3,713 $ | 3,923 |
| Net loss attributable to non-controlling interest | | (4) | (5) | (4) |
| **Net income attributable to controlling shareholders** | $ | 4,141 $ | 3,718 $ | 3,927 |
| **Earnings per share (Note 8)** | | | | |
| Basic earnings per share | $ | 4.52 $ | 3.98 $ | 4.22 |
| Diluted earnings per share | $ | 4.51 $ | 3.98 $ | 4.21 |
| **Weighted-average number of shares (millions) (Note 8)** | | | | |
| Basic | | 916.2 | 933.0 | 931.3 |
| Diluted | | 917.1 | 934.6 | 933.7 |

See Notes to Consolidated Financial Statements.

# CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME

| Year ended December 31 (in millions of Canadian dollars) | | 2025 | 2024 | 2023 |
|---|---|---|---|---|
| Net income | $ | 4,137 $ | 3,713 $ | 3,923 |
| Net (loss) gain in foreign currency translation adjustments, net of hedging activities | | (1,601) | 2,622 | (655) |
| Change in derivatives designated as cash flow hedges | | (1) | 6 | 7 |
| Change in pension and post-retirement defined benefit plans | | 185 | 979 | (73) |
| Other comprehensive income (loss) from equity investees | | 7 | (8) | 7 |
| Other comprehensive (loss) income before income taxes | | (1,410) | 3,599 | (714) |
| Income tax expense on above items | | (80) | (219) | (4) |
| Other comprehensive (loss) income | | (1,490) | 3,380 | (718) |
| **Comprehensive income** | $ | **2,647** $ | **7,093** $ | **3,205** |
| Comprehensive (loss) income attributable to non-controlling interest | | (52) | 77 | (13) |
| **Comprehensive income attributable to controlling shareholders** | $ | **2,699** $ | **7,016** $ | **3,218** |

See Notes to Consolidated Financial Statements.

# CONSOLIDATED BALANCE SHEETS

| As at December 31 (in millions of Canadian dollars, except Common Shares) | | 2025 | 2024 |
|---|---|---|---|
| **Assets** | | | |
| **Current assets** | | | |
| Cash and cash equivalents | $ | 184 $ | 739 |
| Accounts receivable, net (Note 10) | | 2,029 | 1,968 |
| Materials and supplies | | 502 | 457 |
| Other current assets | | 224 | 220 |
| | | 2,939 | 3,384 |
| Investments | | 473 | 586 |
| Properties (Note 13, 20) | | 55,323 | 56,024 |
| Goodwill (Note 11, 14) | | 18,436 | 19,350 |
| Intangible assets (Note 15) | | 2,911 | 3,146 |
| Pension asset (Note 23) | | 5,129 | 4,586 |
| Other assets (Note 20) | | 734 | 668 |
| **Total assets** | $ | 85,945 $ | 87,744 |
| **Liabilities and equity** | | | |
| **Current liabilities** | | | |
| Accounts payable and accrued liabilities (Note 16, 20) | $ | 2,751 $ | 2,842 |
| Long-term debt maturing within one year (Note 17, 18, 20) | | 3,240 | 2,819 |
| | | 5,991 | 5,661 |
| Pension and other benefit liabilities (Note 23) | | 537 | 548 |
| Other long-term liabilities (Note 19, 20) | | 815 | 867 |
| Long-term debt (Note 17, 18, 20) | | 19,948 | 19,804 |
| Deferred income taxes (Note 7) | | 11,829 | 11,974 |
| **Total liabilities** | | 39,120 | 38,854 |
| **Shareholders' equity** | | | |
| Share capital (Note 21) | | | |
| Authorized unlimited Common Shares without par value. | | | |
| Issued and outstanding are 897.6 million and 933.5 million as at December 31, 2025 and 2024, respectively. | | 24,751 | 25,689 |
| Authorized unlimited number of first and second Preferred Shares; none outstanding. | | | |
| Additional paid-in capital | | 105 | 94 |
| Accumulated other comprehensive income (Note 9) | | 1,238 | 2,680 |
| Retained earnings | | 19,783 | 19,429 |
| | | 45,877 | 47,892 |
| **Non-controlling interest** | | 948 | 998 |
| **Total equity** | | 46,825 | 48,890 |
| **Total liabilities and equity** | $ | 85,945 $ | 87,744 |

See Commitments and contingencies (Note 26).

See Notes to Consolidated Financial Statements.

**Approved on behalf of the Board:**

| /s/ ISABELLE COURVILLE | /s/ JANET H. KENNEDY |
|---|---|
| Isabelle Courville, Director, | Janet H. Kennedy, Director, |
| Chair of the Board | Chair of the Audit and Finance Committee |

## Summary of share unit liabilities settled

The following table summarizes the total share unit liabilities settled for each of the years ended December 31:

| (in millions of Canadian dollars) | | 2025 | | 2024 | | 2023 |
|---|---|---|---|---|---|---|
| Plan | | | | | | |
| PSUs | $ | 48 | $ | 54 | $ | 86 |
| DSUs | | 4 | | 9 | | 2 |
| Other | | 12 | | 1 | | 1 |
| Total | $ | 64 | $ | 64 | $ | 89 |

### C. Employee share purchase plan

The Company has an employee share purchase plan whereby both employee and the Company contributions are used to purchase Common Shares on the open market for employees. The Company's contributions are expensed over the one year vesting period. Under the plan, the Company matches $1 for every $3 contributed by employees up to a maximum employee contribution of 6% of annual salary.

The total number of Common Shares purchased in 2025 on behalf of participants, including the Company's contributions, was 737,804 (2024 - 746,544; 2023 - 600,730). In 2025, the Company's contributions were $17 million (2024 - $17 million; 2023 - $15 million) and the related compensation and benefits expense was $13 million (2024 - $12 million; 2023 - $11 million).

## 25.   Variable interest entities

The Company leases equipment from certain trusts, which are financed by a combination of debt and equity and are unrelated third parties. The lease agreements, which are classified as operating leases, have fixed price purchase options that create the Company's variable interests and result in the trusts being considered variable interest entities ("VIE").

Maintaining and operating the leased assets according to specific contractual obligations outlined in the terms of the lease agreements and industry standards is the Company's responsibility. The rigour of the contractual terms of the lease agreements and industry standards are such that the Company has limited discretion over the maintenance activities associated with these assets. Accordingly, the Company does not have the power to direct the activities that most significantly impact these entities economic performance.

The Company's financial exposure resulting from its involvement with these entities, is limited to its fixed lease payments. In 2025, lease payments related to the VIE were $12 million. Total future minimum lease payments to the end of the lease term in 2030 are $41 million. The fixed price purchase options for all leased assets expire in 2026. Although the leased assets must be returned in good operating condition, subject to normal wear and tear, the Company does not guarantee the residual value of the assets at the end of the lease.

Since the Company has neither the power to direct the activities of the VIE, or the obligation to absorb expected losses or residual returns, it does not consolidate the VIE.

## 26.   Commitments and contingencies

### Commitments

At December 31, 2025, the Company had commitments amounting to $4,397 million, for investments in the Celaya-NBA Line Railway Bypass and the Concession, other capital expenditures, bulk fuel, locomotive maintenance and overhaul, and other goods and services. These commitments are for the years 2026-2033.

Annual maturities and principal repayments of debt for the next five years and thereafter are provided in Note 17. Commitments related to leases, including minimum annual payments for the next five years and thereafter, are included in Note 20.

## Litigation

In the normal course of its operations, the Company becomes involved in various legal actions, including claims relating to injuries and damage to property. The Company maintains provisions it considers to be adequate for such actions. While the final outcome with respect to actions outstanding or pending as at December 31, 2025 cannot be predicted with certainty, it is the opinion of management that their resolution will not have a material adverse effect on the Company's business, financial position, results of operations, or liquidity. However, an unexpected adverse resolution of one or more of these legal actions could have a material adverse effect on the Company's business, financial position, results of operations, or liquidity in a particular quarter or fiscal year.

### Legal proceedings related to Lac-Mégantic rail accident

On July 6, 2013, a train carrying petroleum crude oil operated by Montréal Maine and Atlantic Railway ("MMAR") or a subsidiary, Montréal Maine & Atlantic Canada Co. ("MMAC" and collectively the "MMA Group"), derailed in Lac-Mégantic, Québec. The derailment occurred on a section of railway owned and operated by the MMA Group and while the MMA Group exclusively controlled the train.

Following the derailment, MMAC sought court protection in Canada under the *Companies' Creditors Arrangement Act* and MMAR filed for bankruptcy in the U.S. Plans of arrangement were approved in both Canada and the U.S. (the "Plans"), providing for the distribution of approximately $440 million amongst those claiming derailment damages.

A number of legal proceedings, set out below, were commenced in Canada and the U.S. against the Company and others:

(1)  Québec's Minister of Sustainable Development, Environment, Wildlife and Parks ordered various parties, including the Company, to remediate the derailment site (the "Cleanup Order") and served the Company with a Notice of Claim for $95 million for those costs. The Company appealed the Cleanup Order and contested the Notice of Claim with the Administrative Tribunal of Québec. These proceedings are stayed pending determination of the Attorney General of Québec ("AGQ") action (paragraph 2 below).

(2)  The AGQ sued the Company in the Québec Superior Court claiming $409 million in damages, which was further amended and reduced to $231 million (the "AGQ Action"). The AGQ Action alleges that: (i) the Company was responsible for the petroleum crude oil from its point of origin until its delivery to Irving Oil Ltd.; and (ii) the Company is vicariously liable for the acts and omissions of the MMA Group.

(3)  A class action in the Québec Superior Court on behalf of persons and entities residing in, owning or leasing property in, operating a business in, or physically present in Lac-Mégantic at the time of the derailment was certified against the Company on May 8, 2015 (the "Class Action"). Other defendants including MMAC and Mr. Thomas Harding ("Harding") were added to the Class Action on January 25, 2017. On November 28, 2019, the plaintiffs' motion to discontinue their action against Harding was granted. The Class Action seeks unquantified damages, including for wrongful death, personal injury, property damage, and economic loss.

(4)  Eight subrogated insurers sued the Company in the Québec Superior Court claiming approximately $16 million in damages, which was amended and reduced to approximately $14 million (the "Promutuel Action"), and two additional subrogated insurers sued the Company claiming approximately $3 million in damages (the "Royal Action"). Both actions contain similar allegations as the AGQ Action. The actions do not identify the subrogated parties. As such, the extent of any overlap between the damages claimed in these actions and under the Plans is unclear. The Royal Action is stayed pending determination of the consolidated proceedings described below.

On December 11, 2017, the AGQ Action, the Class Action and the Promutuel Action were consolidated. The joint liability trial of these consolidated claims commenced on September 21, 2021 with oral arguments ending on June 15, 2022. The Québec Superior Court issued a decision on December 14, 2022 dismissing all claims against the Company, finding that the Company's actions were not the direct and immediate cause of the accident and the damages suffered by the plaintiffs. All three plaintiffs filed a declaration of appeal on January 13, 2023. The appeal was heard October 7 to 10, 2024 by the Québec Court of Appeal. On February 26, 2025, the Québec Court of Appeal issued its unanimous decision upholding the trial decision and dismissing the appeals in their entirety. On April 28, 2025, all three plaintiffs filed applications for leave to appeal to the Supreme Court of Canada. On May 30, 2025, the Company filed its response to the plaintiffs' leave applications. A damages trial will follow after the disposition of all appeals, if necessary.

(5)  Forty-eight plaintiffs (all individual claims joined in one action) sued the Company, MMAC, and Harding in the Québec Superior Court claiming approximately $5 million in damages for economic loss and pain and suffering, and asserting similar allegations as in the Class Action and the AGQ Action. The majority of the plaintiffs opted-out of the Class Action and all but two are also plaintiffs in litigation against the Company, described in paragraph 7 below. This action is stayed pending determination of the consolidated claims described above.

(6)   The MMAR U.S. bankruptcy estate representative commenced an action against the Company in November 2014 in the Maine Bankruptcy Court claiming that the Company failed to abide by certain regulations and seeking approximately U.S. $30 million in damages for MMAR's loss in business value according to an expert report filed by the bankruptcy estate. This action asserts that the Company knew or ought to have known that the shipper misclassified the petroleum crude oil and therefore should have refused to transport it. Summary judgement motion was argued and taken under advisement on June 9, 2022. On May 23, 2023, the case management judge stayed the proceedings pending the outcome of the appeal in the Canadian consolidated claims. On April 18, 2025, the Court lifted the stay and ordered briefing concerning the Company's request for summary judgement based on the preclusive effect of matters decided in other Lac-Mégantic cases. The Court will address that basis for summary judgement first, then will address other arguments for summary judgement, if necessary, afterwards. On October 8, 2025, the Court heard the Company's summary judgement motion. The Court's decision is pending.

(7)   The class and mass tort action commenced against the Company in June 2015 in Texas (on behalf of Lac-Mégantic residents and wrongful death representatives) and the wrongful death and personal injury actions commenced against the Company in June 2015 in Illinois and Maine, were all transferred and consolidated in Federal District Court in Maine (the "Maine Actions"). The Maine Actions allege that the Company negligently misclassified and improperly packaged the petroleum crude oil. On the Company's motion, the Maine Actions were dismissed. The plaintiffs appealed the dismissal decision to the U.S. First Circuit Court of Appeals, which dismissed the plaintiffs' appeal on June 2, 2021. The plaintiffs further petitioned the U.S. First Circuit Court of Appeals for a rehearing, which was denied on September 8, 2021. On January 24, 2022, the plaintiffs further appealed to the U.S. Supreme Court on two bankruptcy procedural grounds. On May 31, 2022, the U.S. Supreme Court denied the petition, thereby rejecting the plaintiffs' appeal.

(8)   The trustee for the wrongful death trust commenced Carmack Amendment claims against the Company in North Dakota Federal Court, seeking to recover approximately U.S. $6 million for damaged rail cars and lost crude oil and reimbursement for the settlement paid by the consignor and the consignee under the Plans (alleged to be U.S. $110 million and U.S. $60 million, respectively). The Court issued an Order on August 6, 2020 granting and denying in parts the parties' summary judgement motions which has been reviewed and confirmed following motions by the parties for clarification and reconsideration. Final briefs of dispositive motions for summary judgement and for reconsideration on tariff applicability were submitted on September 30, 2022. On January 20, 2023, the Court granted in part the Company's summary judgement motion by dismissing all claims for recovery of settlement payments but leaving for trial the determination of the value of the lost crude oil. It also dismissed the Company's motion for reconsideration on tariff applicability. The remaining issues of the value of the lost crude oil and applicability of judgement reduction provisions did not require trial, and were fully briefed in 2024. On January 5, 2024, the Court issued its decision finding that the Company was liable for approximately U.S. $3.9 million plus pre-judgement interest, but declined to determine whether judgement reduction provisions were applicable, referring the parties to a court in Maine on that issue. On January 18, 2024, the Company filed a motion for reconsideration for the Court to apply the judgement reduction provisions. On January 19, 2024, the trustee for the wrongful death trust filed a Notice of Appeal for the January 5, 2024 decision, as well as prior decisions. On February 23, 2024, the Court denied the Company's motion for reconsideration, again referring the parties to a court in Maine to apply the judgement reduction provision. On March 6, 2024, the Company filed its notice of appeal of this latest ruling, as well as prior decisions. The appeal was heard on March 18, 2025. On July 3, 2025, the U.S. Eighth Circuit Court of Appeals unanimously allowed the Company's appeal, reversing the district court decision and remanding the matter back to the district court for a complete reduction of the judgement against the Company. On July 17, 2025, the trustee for the wrongful death trust petitioned the U.S. Eighth Circuit Court of Appeals for a rehearing. On August 7, 2025, the U.S. Eighth Circuit Court of Appeals denied the petition for a rehearing. The deadline for any petition to the U.S. Supreme Court for certiorari passed in November 2025 and no petition was filed.

At this stage of the proceedings, any potential responsibility and the quantum of potential losses cannot be determined. Nevertheless, the Company denies liability and is vigorously defending these proceedings.

## Court decision related to Remington Development Corporation legal claim
On October 20, 2022, the Court of King's Bench of Alberta issued a decision in a claim brought by Remington Development Corporation ("Remington") against the Company and the Province of Alberta ("Alberta") with respect to an alleged breach of contract by the Company in relation to the sale of certain properties in Calgary. In its decision, the Court found the Company had breached its contract with Remington and Alberta had induced the contract breach. The Court found the Company and Alberta liable for damages of approximately $164 million plus interest and costs, and subject to an adjustment to the acquisition value of the property. In a further decision on August 30, 2023, the Court determined that adjustment and set the total damages at $165 million plus interest and costs. On October 20, 2023, the Court determined the costs payable to Remington, however, the Court had not provided any indication of how the damages, which were estimated to total approximately $232 million as at June 30, 2025, should be apportioned between the Company and Alberta. On November 17, 2022, the Company filed an appeal of the Court's decision. On April 11, 2024, the Court of Appeal of Alberta ("ABCA") stayed the judgement pending the outcome of the appeal. On September 10, 2024, the ABCA heard the Company's appeal and reserved its decision. On July 2, 2025, the ABCA unanimously allowed the Company's appeal and set aside the trial judgement and costs order. A majority of the ABCA ordered a new trial in the Court of King's Bench. On September 26, 2025, Remington sought leave to appeal the ABCA's decision to the Supreme Court of Canada.

**2014 tax assessment**

On April 13, 2022, the SAT delivered an audit assessment of CPKCM's 2014 tax returns (the "2014 Assessment"). As at December 31, 2025, the 2014 Assessment, including inflation, interest, and penalties was Ps.6,552 million ($499 million).

On July 7, 2022, CPKCM filed an administrative appeal (the "Administrative Appeal") before the SAT, seeking to revoke the 2014 Assessment on the basis that the SAT's notification of the 2014 Assessment through the tax mailbox was not legal, because it was in violation of a tax mailbox injunction previously granted to CPKCM on March 19, 2015. On September 26, 2022, the SAT dismissed the Administrative Appeal, on the basis that it was not a timely submission (the "Administrative Appeal Resolution").

On October 10, 2022, CPKCM submitted an annulment lawsuit (the "Annulment Lawsuit") before the Federal Administrative Court (the "Administrative Court"), challenging the 2014 Assessment, its notification, and the Administrative Appeal Resolution. On April 24, 2024, the Administrative Court resolved the Annulment Lawsuit, confirming the Administrative Appeal Resolution and the 2014 Assessment (the "Administrative Court Resolution").

On June 21, 2024, CPKCM challenged the Administrative Court Resolution by submitting an Amparo appeal (Demanda de Amparo) before the Collegiate Circuit Court (Tribunal Colegiado de Circuito). On June 4, 2025, the Twenty Third Collegiate Court of the First Circuit (the "Circuit Court") unanimously granted CPKCM's Amparo petition, vacating the prior decision and sending the matter back to the Administrative Court with an order to issue a new resolution addressing CPKCM's arguments that were presented in the Annulment Lawsuit. On June 25, 2025, the Administrative Court resolved the Annulment Lawsuit unfavourably to CPKCM (the "2025 Administrative Court Resolution"). On August 19, 2025, CPKCM submitted a new Amparo appeal challenging the 2025 Administrative Court Resolution. On September 8, 2025, the Circuit Court admitted the Amparo appeal submitted by CPKCM. CPKCM expects to prevail based on the technical merits of its case.

On August 20, 2025, derived from the submission of the Amparo appeal, the Administrative Court issued a resolution granting an injunction against the enforcement and collection of the 2014 Assessment, as long as the 2014 Assessment is duly guaranteed.

## 2023 business interruption insurance settlement

During the third quarter of 2023, the Company realized gain contingencies of $51 million recognized to "Purchased services and other", as a result of settlements reached with insurers for business interruption losses incurred by the Company related to a wildfire and flooding in British Columbia in 2021.

## 27.   Guarantees

In the normal course of operations, the Company enters into contractual arrangements that involve providing certain guarantees, which extend over the term of the contracts. These guarantees include, but are not limited to:
- guarantees to pay other parties in the event of the occurrence of specified events, including damage to equipment, in relation to assets used in the operation of the railway through operating leases, rental agreements, easements, trackage, and interline agreements;
- guarantees to pay other parties in the event of a specified change in control of the Company or particular subsidiaries of the Company;
- guarantees to repay amounts outstanding for certain debt obligations;
- a guarantee to repay a portion of amounts outstanding for certain debt obligations held by an equity investee; and
- indemnifications of certain tax-related payments incurred by lessors and lenders.

The maximum amount that could be payable under these guarantees, excluding residual value guarantees, cannot be reasonably estimated due to the nature of certain guarantees. All or a portion of amounts paid under guarantees to other parties in the event of the occurrence of specified events could be recoverable from other parties or through insurance. The Company has accrued for all guarantees that it expects to pay. As at December 31, 2025, accruals of $16 million (2024 - $8 million), were recognized in "Accounts payable and accrued liabilities".

## Indemnification

Pursuant to a trust and custodial services agreement with the trustee of the Canadian Pacific Railway Company Pension Plan, the Company has undertaken to indemnify and save harmless the trustee, to the extent not paid by the fund, from any and all taxes, claims, liabilities, damages, costs, and expenses arising out of the performance of the trustee's obligations under the agreement, except as a result of misconduct by the trustee. The indemnity includes liabilities, costs, or expenses relating to any legal reporting or notification obligations of the trustee with respect to the defined benefit and defined contribution options of the pension plans, or otherwise with respect to the assets of the pension plans that are not part of the fund. The indemnity survives the termination or expiry of the agreement with respect to claims and liabilities arising prior to the termination or expiry. As at December 31, 2025, the Company had not recognized a liability associated with this indemnification as it does not expect to make any payments pertaining to it.

## 28.   Segmented and geographic information

### Operating segment
The Company only has one operating segment: rail transportation.

The Company's chief operating decision-maker ("CODM") is the Company's Chief Executive Officer. The CODM uses "Net income attributable to controlling shareholders" to assess the Company's performance and decide on the allocation of resources. "Net income attributable to controlling shareholders" is used in conjunction with certain Non-GAAP measures, operational performance indicators, and figures prepared on a forecast basis to evaluate the return on the Company's assets and make operational and investment decisions. The Company's significant segment expenses are consistent with the expenses presented on the Company's Consolidated Statements of Income.

For the years ended December 31, 2025, 2024, and 2023, no single customer accounted for more than 10% of "Total revenues".

### Geographic information
The Company's "Total revenues" were all earned, and long-lived assets were all held, within Canada, the U.S., and Mexico, as reported in the table below:

| For the years ended and as at December 31 (in millions of Canadian dollars) | | Canada | U.S. | Mexico | Total |
|---|---|---|---|---|---|
| **2025** | | | | | |
| Revenues | $ | 7,243 $ | 5,124 $ | 2,711 $ | 15,078 |
| Long-lived assets: Properties and Operating lease ROU assets | | 17,559 | 26,860 | 11,326 | 55,745 |
| **2024** | | | | | |
| Revenues | | 6,936 | 4,988 | 2,622 | 14,546 |
| Long-lived assets: Properties and Operating lease ROU assets | | 16,536 | 27,897 | 11,955 | 56,388 |
| **2023** | | | | | |
| Revenues | | 6,651 | 4,257 | 1,647 | 12,555 |

## 29. Subsequent events
In February 2026, the Company repaid, at maturity, U.S. $250 million ($339 million) 3.70% 10.5-year Notes.

# SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the *Securities Exchange Act of 1934*, the Company has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**CANADIAN PACIFIC KANSAS CITY LIMITED**
(Registrant)

By:   /s/ KEITH CREEL
        Keith Creel
        President, Chief Executive Officer and Director

Dated: February 26, 2026

# POWER OF ATTORNEY

Each of the undersigned do hereby appoint each of Nadeem Velani and Cassandra P. Quach, his or her true and lawful attorney-in-fact and agent, to sign on his or her behalf the Company's Annual Report on Form 10-K, for the year ended December 31, 2025, and any and all amendments thereto, and to file the same, with all exhibits thereto, with the Securities and Exchange Commission.

Pursuant to the requirements of the *Securities Exchange Act of 1934*, this report has been signed below by the following persons on behalf of the Company and in the capacities indicated on February 26, 2026.

| Signature | Title |
|---|---|
| /s/ KEITH CREEL<br>Keith Creel | President, Chief Executive Officer and Director<br>(Principal Executive Officer) |
| /s/ NADEEM VELANI<br>Nadeem Velani | Executive Vice-President and Chief Financial Officer<br>(Principal Financial Officer and Principal Accounting Officer) |
| /s/ ISABELLE COURVILLE<br>Isabelle Courville | Chair of the Board of Directors |
| /s/ GORDON T. TRAFTON<br>Gordon T. Trafton | Vice-Chair of the Board of Directors |
| /s/ JOHN R. BAIRD<br>John R. Baird | Director |
| /s/ ANTONIO GARZA<br>Antonio Garza | Director |
| /s/ ARTURO GUTIÉRREZ HERNÁNDEZ<br>Arturo Gutiérrez Hernández | Director |
| /s/ EDWARD R. HAMBERGER<br>Edward R. Hamberger | Director |
| /s/ JANET H. KENNEDY<br>Janet H. Kennedy | Director |
| /s/ HENRY MAIER<br>Henry Maier | Director |
| /s/ MARC PARENT<br>Marc Parent | Director |
| /s/ MATTHEW H. PAULL<br>Matthew H. Paull | Director |
| /s/ JANE L. PEVERETT<br>Jane L. Peverett | Director |
| /s/ ANDREA ROBERTSON<br>Andrea Robertson | Director |

**Exhibit 23.1**

### CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We consent to the incorporation by reference in the Registration Statements (Form S-8 No.333-13962, 333-127943, 333-140955, 333-183891, 333-183892, 333-183893, 333-188826, 333-188827, 333-208647, 333-271449 and 333-285353) of Canadian Pacific Kansas City Limited of our reports dated February 26, 2026, with respect to the consolidated financial statements of Canadian Pacific Kansas City Limited and the effectiveness of internal control over financial reporting of Canadian Pacific Kansas City Limited included in this Annual Report (Form 10-K) of Canadian Pacific Kansas City Limited for the year ended December 31, 2025.

/s/ Ernst & Young LLP

Chartered Professional Accountants
Calgary, Canada
February 26, 2026

Exhibit 31.1

**Certification by the Chief Executive Officer of the Registrants filed pursuant to Rule 13a-14(a) of the Exchange Act.**
**Canadian Pacific Kansas City Limited**

I, Keith Creel, certify that:

1. I have reviewed this Annual Report on Form 10-K of Canadian Pacific Kansas City Limited;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 26, 2026

/s/ KEITH CREEL
Keith Creel
President and Chief Executive Officer

Exhibit 31.2

**Certification by the Chief Financial Officer of the Registrants filed pursuant to Rule 13a-14(a) of the Exchange Act.**
**Canadian Pacific Kansas City Limited**

I, Nadeem Velani, certify that:

1. I have reviewed this Annual Report on Form 10-K of Canadian Pacific Kansas City Limited;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: **February 26, 2026**

/s/ NADEEM VELANI
Nadeem Velani
Executive Vice-President and Chief Financial Officer

Exhibit 32.1

**Certifications Furnished Pursuant to 18 U.S.C. Section 1350,**
**As Adopted Pursuant to**
**Section 906 of the Sarbanes-Oxley Act of 2002**

**Canadian Pacific Kansas City Limited**

In connection with the Annual Report of Canadian Pacific Kansas City Limited (the "Company") on Form 10-K for the period ended December 31, 2025 (the "Report") to which this certificate is an exhibit, I, Keith Creel, hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

1. The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: **February 26, 2026**

/s/ KEITH CREEL
Keith Creel
President and Chief Executive Officer

Exhibit 32.2

**Certifications Furnished Pursuant to 18 U.S.C. Section 1350,
As Adopted Pursuant to
Section 906 of the Sarbanes-Oxley Act of 2002**

**Canadian Pacific Kansas City Limited**

In connection with the Annual Report of Canadian Pacific Kansas City Limited (the "Company") on Form 10-K for the period ended December 31, 2025 (the "Report") to which this certificate is an exhibit, I, Nadeem Velani, hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

1. The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: **February 26, 2026**

/s/ NADEEM VELANI
Nadeem Velani
Executive Vice-President and Chief Financial Officer